Bruce Salzburg
Wyoming Attorney General

John Renneisen
Deputy Attorney General

Misha Westby – WY Bar No. 6-2826
Cathleen D. Parker –WY Bar No. 6-3236
Senior Assistant Attorney General
2424 Pioneer Ave., 2nd Floor
Cheyenne, WY 82002
T: (307) 777-5457
F: (307) 777-8920
E: mwestb@state.wy.us

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Tricia Wachsmuth, | ) | |
| | ) | |
| Plaintiff, | ) | 10-CV-041-J |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Powell, Tim Feathers, Chad Miner, | ) | |
| Mike Chretien, Roy Eckerdt, Dave Brown, | ) | |
| Mike Hall, Brett Lara, Matt McCaslin, | ) | |
| Alan Kent, Matthew Danzer, Officer Brilakis, | ) | |
| Lee Blackmore, Cody Bradley, Kirk Chapman, | ) | |
| | ) | |
| Defendants. | ) | |

## INDIVIDUAL DEFENDANTS' MEMORANDUM IN SUPPORT
## OF MOTION FOR SUMMARY JUDGMENT

The Individual Defendants, by and through the Office of the Attorney General of the

State of Wyoming, hereby file their Memorandum in Support of Motion for Summary Judgment.

### *UNDISPUTED FACTS*

On February 24, 2009, Officer Miner of the Powell Police Department was contacted by

an individual claiming to have information about a marijuana grow operation.  (Exhibit. A –

Deposition of Officer Miner, at 42).  This individual, who will be identified as CI,[1] informed Officer Miner that he had outstanding arrest warrants and that he wanted to voluntarily appear in court rather than be arrested in exchange for providing information.  (Miner Dep. 43-44).  To verify his story, Officer Miner pulled the CI's police reports to confirm his description of the outstanding warrants.  (Miner Dep. 50).  Officer Miner also ran a report on Bret Wachsmuth, the person identified as having the grow operation.  (Miner Dep. 101).  The address originally identified for the Waschsmuths in these records was located in the county.

Officer Miner contacted Deputy Patterson with the Park County Sheriff's Department for assistance since the Deputy had experience in this area and because Officer Miner believed the Wachsmuth residence was in the county.[2]  (Miner Dep. 57-58; Exhibit B – Deposition of Deputy Patterson, at 25-26).  Deputy Patterson, Deputy County Attorney Jonathan Davis and Officer Miner interviewed the CI and obtained the necessary information.  (Miner Dep. 41-42, 57; Patterson Dep. 32-33).  Deputy Patterson and Officer Miner, with the assistance of Deputy County Attorney Davis, then prepared the affidavit for the search warrant.  (Exhibit C – Deposition Ex. 13; Miner Dep. 63-64, 91; Patterson Dep. 75-77).  The search warrant was signed by Judge Waters.  (Exhibit D - Deposition Ex. 17).[3]

---

[1] The Magistrate Judge has issued a ruling in this case regarding the identification of the confidential information so he will be identified by this term throughout the motion.

[2] Up until this point, the CI had not provided an address for the Wachsmuths and Officer Miner assumed the address in the records was current.  The CI corrected this information and provided the correct address which was in the city limits.

[3] The Plaintiff asserts multiple causes of action stemming from the execution of the search warrant.  There are no specific claims associated with the affidavit and search warrant; however, all aspects of this incident are necessary to a determination about the reasonableness of the officer's actions under the totality of the circumstances.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 2 of 40

Officer Miner contacted his superiors and a team was gathered to execute the search warrant.  (Exhibit E – Deposition of Chief Feathers, at 125, 130-31; Exhibit F – Deposition of Sergeant Kent, at 53).  Sgt. Chretien was assigned to organize the team based on the high risk nature of the warrant and his experience with tactical operations.  (Feathers Dep. 131, 169).  The information provided by the CI and relied on in analyzing the manner of executing the search warrant was as follows:

- the Wachsmuths had a marijuana grow operation with 10-20 plants (Exhibit G – Deposition of Sergeant Chretien, at 145);

- the Wachsmuths exhibited paranoid behavior (Miner Dep. 89, 116);

- the Wachsmuths were always "peeping" out the windows looking for law enforcement (Chretien Dep. 142);

- there were several loaded weapons left lying around the house and Bret Wachsmuth sometimes carried a loaded .22 caliber pistol on his person.  (Miner Dep. 116).

- there was armor piercing ammunition in the home (Chretien Dep. 224);

- Tricia's mother sent prescription medications mostly oxycodone and valium and the Wachsmuths crushed up the pills and injected or smoked the powder,  (Chretien Dep. 143; Miner Dep. 74; Dep. Ex. 13);

- The CI had warned them that they had been turned into the police.  (Feathers Dep. 130; Kent Dep. 85, 118).

Some of the officers also provided additional corroboration during the planning meeting:

- Officer Lara described a conversation with Tom Wachsmuth where Tom discussed his son, Bret Wachsmuth's, psychiatric and emotional issues.  (Exhibit H – Deposition of Officer Lara, at 9-10).

- Sgt. Eckerdt informed the officers that he had seen a photograph on a social networking site of Bret Wachsmuth brother and another individual thought to be Bret in riot gear posing with assault weapons (Exhibit I – Deposition of Sergeant Eckerdt, at 37).

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 3 of 40

Several options were considered by Chief Feathers and Sgt. Kent for executing the warrant including not preparing for a contingency and getting Tom Wachsmuth involved in serving the warrant. (Feathers Dep. 140-41). A contemporaneous recording of a conversation between Sgt. Kent and Chief Feathers illustrates these conversations. (Feathers Dep. 140-41, Exhibit J – Audio Recording). Based on the high risk nature of the search warrant, the first option was not considered viable. There were also concerns about getting Tom Wachsmuth involved including the appearance that they were giving law enforcement special treatment, the possibility that Tom could be accused of warning his son and daughter-in-law if nothing was discovered in the search and the possibility of introducing an uncertain variable that can cause an already potentially violent situation to spin out of control. (Feathers Dep. 140-41). Even with these concerns, Chief Feathers made the decision that he would contact Tom Wachsmuth's supervisor Steve Hermann to ask his opinion about involving Tom in the execution of the search warrant. (Feathers Dep. 143). Chief Feathers asked whether or not Tom Wachsmuth could be counted on to handle the situation appropriately, Hermann responded that he would like to think so but he just wasn't sure. (Feathers Dep. 143). Based on Hermann's hesitation, Chief Feathers determined that involving Tom Wachsmuth in the execution of the search warrant was not a viable option. (Feathers Dep. 143).

In light of the numerous risks identified, i.e. loaded guns, grow operation, paranoid behavior, etc., a knock and talk was also ruled out. Officer Chretien was assigned to plan the execution of the search warrant based on his experience with special operations. (Feathers Dep. 131, 169). The plan was to knock and announce, wait a reasonable amount of time for them to answer the door, and prepare for a dynamic entry if no one answered the door. (Chretien Dep. 168). Officers were called and Sgt. Chretien organized a team to be stationed at the front door, a

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 4 of 40

team to be stationed by the back door and a team to potentially deploy a flashbang device by the master bedroom window.  (Chretien Dep. 159).

After the briefing, the officers went to the Wachsmuth residence and began getting into position.  (Exhibit K – Deposition of Officer Hall. at 73).  As the front yard team assembled in front of the house, the dog in the Wachsmuth house began barking.  This caused a heightened level of awareness for the officers since the element of surprise was lost.  (Exhibit L – Deposition of Officer Chapman, at 40-41; Chretien Dep. 171).  As the front door team approached the porch, officers saw a woman sitting on the couch turn around, pull the curtain aside and peek out the window.  (Chapman Dep. 40-41; Hall Dep. 81-84).  The officers were in clear view on the porch when the woman looked in their direction.  (Hall Dep. 81-84).  Officer Chapman knocked on the door, announced "Police, search warrant."  (Chapman Dep. 40; Chretien Dep. 173; Deposition of Officer Danzer, at 120, Hall Dep. 84; Kent Dep. 141, 47; Miner Dep. 112-13).  Officer Hall observed the woman on the couch turn around and sit back down on the couch after the knock and announce.  (Hall Dep. 83).  The Plaintiff testified that she was watching television and did not hear the knock but that she did look out the window and see someone on the porch.  (Exhibit N – Deposition of Tricia Wachsmuth, at 105-06).

After waiting a reasonable time, specifically long enough to allow the woman on the couch to open the door if she chose, Officer Miner used the ram to open the door and Officer Chapman entered the residence with the other officers behind him.  (Chretien Dep. 173; Danzer Dep. 120; Hall Dep. 85; Miner Dep. 113).  Officer Chapman entered with his weapon at the ready position, held to his shoulder with the barrel pointing forward and toward the ground.  (Hall Dep. 89).  Consistent with his training and standard police procedure, the gun was brought up and pointed when a potential threat was identified.  Immediately upon entering the living

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 5 of 40

room, Officer Chapman identified the Plaintiff heading away from the front door and towards the

kitchen. (Chapman Dep. 42). He pointed his weapon at her briefly until he analyzed the threat,

put his weapon down and told her to sit back on the couch. (Chapman Dep. 42).

The other officers on the entry team entered the house and fanned out to secure the

residence. Officer Eckerdt stayed with Tricia during this process. (Chretien Dep. 96, 206).

While there is significant disagreement about the facts from this point, this motion will present

the facts in the light most favorable to the Plaintiff, consistent with the summary judgment

standard. Tricia Wachsmuth testified that the officers pointed their guns at her when they came

in the house:

> A. When I looked out the window I could only see one. And that's why I
> squinted closer. And as soon as I squinted closer, made eye contact with the one,
> it was just boom throughout my whole house.
>         And then they came running in. Police search warrant, police search
> warrant. And then a guy came running in and had a gun held at me.
>
> Q. Okay. And when you say held at you --
>
> A. It was -- I was sitting on the couch, hands up, of course, you know -- because
> at first I grabbed my cell phone to call 911 because I wasn't sure what was going
> on. I was thinking I was getting robbed. I grabbed my phone and then the
> officer was told to take my phone. He took my phone. And I looked up, and
> that's when I realized it was the cops. And the officer had the gun pointed
> directly at my head the entire time. I'm sitting there with my hands up. Blanket
> still on me.

(Tricia Wachsmuth Dep. 106-07). It is interesting to note that the Plaintiff's testimony is

internally inconsistent in that the "guy came running in and had a gun held at me" but in the next

answer she was trying to make a call and when the officer took her phone she looked up and

realized they were the police and the "officer had the gun pointed directly at my head the entire

time." (*Id.*).

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 6 of 40

The Plaintiff testified that the officers were running around the house yelling clear, clear and when they got to the basement door, she heard "oh, it's unlocked.  Get her.  She's going first."  (Tricia Wachsmuth Dep. 108).  Although Tricia again testifies that the officer behind her had his gun pointed at her head, she admits that she could not see him when he was behind her and that she did not turn around to look:

> Q. And I'm wondering how you know that if you were walking in front him and he was behind you.
>
> A. Because when I first stood up, I saw him behind me with the gun pointed to my head as I was walking and you could hear his foot -- footsteps behind me walking.
>
> Q. Could you see the gun?
>
> A. After that?  No.  But I know it was pointed at my head.  Because when I was going down the stairs and I stopped halfway down, I looked up, he still had that gun pointed at me.
>
> Q. In fact, I think what you testified to is that when you stopped halfway on the stairs, he brought the gun back up?
>
> A. Yes.  They were -- they were in a relaxed position. And then as soon as I stopped, they went like this.
>
> Q. So at some point in time, they put their guns down?
> A. From my head.
>
> Q. From your head. Do you know when that happened?
>
> A. Honestly, I can't for surely say they put them down from my head because they were behind me.

(Tricia Wachsmuth Dep. 112-13).

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 7 of 40

The Defendants who were present and heard the exchange testified that Sgt. Chretien asked her if anyone was downstairs and when she hesitated asked her again.  (Hall Dep. 100; Chretien Dep. 196-97).  In an effort to determine whether or not she was telling the truth, Sgt. Chretien called her bluff and said something to the effect of "good, you're going first." (Chretien Dep. 197).  Any disagreement in the exact words does not constitute a material issue of fact since the resulting action is the same, the Plaintiff did go downstairs at least part of the way in front of the officers.  (Chapman Dep. 57-58).

In the light most favorable to the Plaintiff, she went down to the landing at the bottom of the stairs and the officers then went around her to secure the basement.  (Tricia Wachsmuth Dep. 110).   The Plaintiff was then "arrested" and "cuffed" and taken back upstairs.   (Tricia Wachsmuth Dep. 118).  She was allowed to get her shoes and coat, taken out to one of the squad cars and eventually to the Powell Police Department.

During the search of the Wachsmuth home, officers found, in part, loaded weapons placed strategically around the house, including the master bedroom, marijuana and drug paraphernalia on the living room table as well as in the bedroom and two mature two feet tall marijuana plants.  (Kent Dep. 165; Exhibit O – Deposition of Sergeant McCaslin, at 108; Exhibit P – Deposition Exhibit 32).  Police also found a grow log, which Bret Wachsmuth admits fairly represents the history of the grow operation, that supported the CI's statement that there were between ten and twenty plants shortly before the search warrant was executed.[4]  (Exhibit Q – Deposition of Bret Wachsmuth, at 47-48, 51, 56-57).  Officers found a bullet proof vest in the

---

[4] One mature plant was discarded because it was a male and approximately 8 to 10 starter plants died.

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 8 of 40

closet, prescription bottles and a box with a stuffed animal with the seam ripped open and a letter to Tricia Wachsmuth's mother.  (Miner Dep. 80-81).  In short, all of the information provided as the basis for the search warrant was confirmed during the search of the residence.

## THE PLAINTIFF'S CLAIMS

The Plaintiff asserts several causes of action as to the officers in their individual capacity:

1. Fourth Amendment, unreasonable search and seizure, overall executing of the search warrant.

2. Fourth Amendment, use of the flashbang device constituted excessive force.

3. Excessive force, "using Plaintiff as a human shield."

4. Excessive force, holding Plaintiff at gunpoint during the search of the premises.

5. Allegation of use of excessive force, failing to knock and announce.

6. Failure to properly supervise and train his officers against Chief Feathers

7. Count seven and eight are only asserted against the entity

8. Counts nine and ten assert liability for intentional infliction of emotional distress.

9. Finally, the Plaintiff attempts to state a cause of action under Article 1 § 4 of the Wyoming Constitution.

## LAW AND ANALYSIS

**STANDARD OF REVIEW**

A summary judgment motion should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 9 of 40

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*

A factual dispute is only "genuine" if the evidence and the inferences drawn there from, when viewed in the light most favorable to the nonmoving party, are "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial'" *Scott v. Harris*, 550 U.S. 372, 380 (2007)(*quoting, Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

> The nonmoving party may not rest upon the mere allegations or denials of [his] pleading. The nonmoving party must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Salehpoor v. Shahinpoor,* 358 F.3d 782, 786 (10th Cir. 2004)(quotation omitted).

## QUALIFIED IMMUNITY

In suits against government officials, summary judgment is appropriate on the basis of qualified immunity as a means of screening out insubstantial claims and shielding government officials from the costs and burdens of trial. *Crawford-El v. Britton,* 523 U.S. 574, 586 (1998). Motions for summary judgment involving qualified immunity are reviewed differently from other summary judgment decisions. *Smith v. Cochran*, 339 F.3d 1205, 1211 (10th Cir. 2003). In cases arising under 42 U.S.C. § 1983, once a defendant asserts qualified immunity as a defense,

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 10 of 40

the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right. *Id.*

The two-prong qualified immunity analysis has evolved since its rationalization in *Harlow v. Fitgerald*, 457 U.S. 800 (1982). In *Harlow*, the Supreme Court explained that government officials performing discretionary functions are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Id.* at 817-18. "Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. *Id.* at 818.

The United States Supreme Court revisited qualified immunity in the context of Fourth Amendment excessive force claims. In *Scott v. Harris*, the Court restated the analysis as follows:

> In resolving questions of qualified immunity, courts are required to resolve a "threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? This must be the initial inquiry." If, and only if, the court finds a violation of a constitutional right, "the next, sequential step is to ask whether the right was clearly established...in light of the specific context of the case."

*Scott v. Harris*, 550 U.S. 372, 377 (2007)(*quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

In 2009, the Supreme Court again addressed qualified immunity in the context of the Fourth Amendment. *Pearson v. Callahan*, 129 S.Ct. 808 (2009). The Supreme Court held that the mandated two-step procedure was no longer mandatory: "while the sequence set forth therein is often appropriate, it should no longer be regarded as mandatory in all cases." *Id.* at 811. The

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 11 of 40

Tenth Circuit recognized the discretion to apply the objective test in the most appropriate order in *Rhoads v. Miller*, 352 Fed. Apps. 289, 2009 WL 3646078 (10th Cir. 2009).

Regardless of the order of application, the court must grant summary judgment based on qualified immunity when "the plaintiff fails to satisfy either part of this two-part inquiry." *Smith*, 339 F.2d at 1211. As discussed below, the Plaintiff cannot establish excessive force in violation of the Fourth Amendment and summary judgment is appropriate because a reasonable officer would not have known that the conduct was clearly unlawful.

## STATE LAW CLAIMS

Plaintiff alleges a state law claim for intentional infliction of emotional distress and state law constitutional claims. The Wyoming Governmental Claims Act, is a close-ended statute, and unless a specific exception applies claims are barred against the state. *Abelseth v. City of Gillette*, 752 P.2d 430 (Wyo. 1988). Since there is no exception for intentional infliction of emotional distress, "[u]nder Wyoming law, the claim for ... infliction of emotional distress against the state would fail." *Routh v. State, ex rel. Wyoming Workers' Compensation Div.,* 952 P.2d 1108 (Wyo. 1998). Similarly, there is no exception for general constitutional claims pursuant to state law. *Diamond Surface, Inc. v. Cleveland*, 963 P.2d 996 (Wyo. 1998). The Plaintiff's claims do not fall under any of the exceptions set forth in the Wyoming Governmental Claims Act, therefore, Plaintiff's state law claims are barred and the Defendants are entitled to Summary Judgment.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 12 of 40

**FEDERAL CLAIMS**

**I.      THE EXECUTION OF THE SEARCH WARRANT WAS REASONABLE**

The decision to prepare for a possible dynamic entry was reasonable under the circumstances and consistent with Tenth Circuit and Supreme Court law.  The Plaintiff's claim regarding the manner in which the warrant was executed is analyzed under the Fourth Amendment.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. "The Fourth Amendment requires an examination of not only whether a particular search or seizure was justified, but also whether it was conducted in a reasonable manner." *Whitewater v. Goss*, 192 Fed.Appx. 794 (10th Cir. 2006); *See Tennessee v. Garner,* 471 U.S. 1, 7-8 (1985).  "Fourth Amendment scrutiny extends ... to the decision to employ a SWAT team to make an arrest ... and to conduct a search of a residence," *Holland v. Harrington,* 268 F.3d 1179, 1189 (10th Cir. 2001).

**A.      Fourth Amendment Analysis**

Tennessee v. Garner, 471 U.S. 1, 7 (1985), establishes the requirement of the Fourth Amendment to examine the reasonableness of the manner in which a search or seizure is conducted:

> To determine the constitutionality of a seizure "[w]e must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983); ... We have described "the balancing of competing interests" as "the key principle of the Fourth Amendment." *Michigan v. Summers,* 452 U.S. 692, 700 n. 12, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).... Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also *how it is carried out. ...*

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 13 of 40

*Id.* at 8. (emphasis added & citations omitted).  The court must scrutinize whether "the totality of the circumstances justified a particular sort of search or seizure." *Id.* at 9.  Excessive force claims arising in the context of an arrest are governed by the Fourth Amendment's reasonableness standard.  *Graham v. Connor*, 490 U.S. 386, 394-95 (1989).  Thus, the issue is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting (the officer), without regard to (the officer's) underlying intent or motivation."  *Graham*, 490 U.S. at 397.

The reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight."  *Id.*  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving."  *Id.* at 396-97.

Excessive force claims must be adjudicated from the perspective of a reasonable officer on the scene devoting "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" in light of all the circumstances."  *Graham*, 490 U.S. at 396.

Plaintiff claims Defendants used excessive force in violation of the Fourth Amendment when officers: 1) formed a SWAT team for entry into the residence, 2) used a flashbang device, 3) allegedly used Plaintiff to lead officers into the basement, 4) allegedly kept Plaintiff at gunpoint during search of the premises, and 5) allegedly failed to knock and announce their entrance into the house.  These claims, when analyzed under the *Graham* factors clearly meet the

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 14 of 40

criteria justifying the use of tactical entry, a flashbang device and any alleged use of force within the house.  Even taking the facts in a light most favorable to the Plaintiff, summary judgment is warranted here as there is no evidence of excessive force given the totality of the circumstances.

The officers were presented with a high risk situation involving loaded weapons, drugs, paranoid behavior and a suspect with known psychological problems.  In short a potentially violent and dangerous situation.

### 1.      The Decision to Prepare for a dynamic entry

The Tenth Circuit in *Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001), found that a Fourth Amendment analysis extended to the decision to employ a SWAT team to make a "dynamic entry" on a misdemeanor warrant and to conduct a search of a residence.

> The decision to use a SWAT team to make a "dynamic entry" into a residence constitutes conduct "immediately connected with the seizure" because it determines the degree of force initially to be applied in effecting the seizure itself. If, as *Garner* instructs, "it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out," 471 U.S. at 8, 105 S.Ct. 1694, then the decision to deploy a SWAT team to execute a warrant must be "reasonable" because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests. Both *Williams* and *Andrade* examined the reasonableness of the decision to deploy a SWAT team in each case, rather than placing that decision beyond Fourth Amendment scrutiny altogether.

> Where a plaintiff claims that the use of a SWAT team to effect a seizure itself amounted to excessive force, we review the decision to use that degree of force by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Garner,* 471 U.S. at 8, 105 S.Ct. 1694 (internal quotation omitted).

*Id.* at 1190.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 15 of 40

The Court in Holland evaluated this issue citing two cases where SWAT teams were utilized in effecting misdemeanor warrants.

> *Andrade v. Chojnacki,* 65 F.Supp.2d 431 (W.D.Tex.1999), was a Federal Tort Claims Act case arising out of two organized assaults by federal law enforcement officers on the Branch Davidian compound in Waco, Texas in February and April of 1993.  The *Andrade* court concluded that plaintiffs' claims as to the planning of these "dynamic entry" operations failed to state a claim under the Fourth Amendment, observing that "[t]he decision to use 'dynamic' entry is not, in and of itself, a violation of the Fourth Amendment."  *Id.* at 457 (no citation to authority).  Further, **"[t]here are absolutely no specific facts contained in Plaintiffs' complaints that would suggest that any of the named Defendants planned any activity for the specific purpose of causing harm to the Davidians."** *Id.*  Thus, *Andrade* suggests that to be actionable under the Fourth Amendment, the facts surrounding the planning of a "dynamic entry" operation must show that the planning included the specific intent to cause harm through the use of excessive force.
>
> In *Williams v. Richmond County, Georgia,* 804 F.Supp. 1561 (S.D.Ga.1992), the court observed that "[m]erely deploying the SWAT team was not an unreasonable seizure which raises constitutional problems.  Even if law enforcement officials here arguably erred in judgment when they decided on a plan that employed potentially deadly force," the court continued, "such evidence falls short of a showing that there was no plausible basis in this instance for the officials' belief that this degree of force might be necessary." *Id.* at 1569.

*Id.* at 1189-90 (emphasis added).

In *Holland,* the officers were concerned for the safety of the officers and the occupants of the home based on similar considerations to the ones raised in this case.  The officers were informed that there would be children present, that there might be weapons present, an unknown number of adults and that the Plaintiff had violent tendencies.  The plaintiff in Holland adamantly disputed these risk factors arguing in part that the officers knew the plaintiff had no prior criminal history.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 16 of 40

The Tenth Circuit found for the defendants holding that, even viewed in the light most favorable to the plaintiffs, they had failed to show that "the display of force inherent in the deployment of the SWAT team-the force invoked by the *decision* to deploy-was excessive under Fourth Amendment standards." *Id* at 1191.   The Court also found that these facts supported a plausible basis for believing that "dynamic entry" was warranted in this situation and that the fact that no altercation occurred simply supported the conclusion that legitimate concerns did not materialize due to the swift actions of the SWAT team.   *Id.*

The case at issue involved similar risks as identified in *Holland,* including a concern about the potential destruction of evidence, "even though that evidence could not easily be destroyed."   *Id.*   Although the Plaintiff's contention that this was a misdemeanor search warrant is contradicted by the statutory provision cited in the warrant,[5] the Tenth Circuit law directly on point entitles the Defendants to summary judgment on the issue of the decision to prepare for a dynamic entry.   "[T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence.   The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation."   *Michigan v. Summers*, 452 U.S. 692, 702-03 (1981).

## 2.      Whether the Officers were Required to Knock and Announce

Although the officers testify without exception that they knocked, waited a reasonable amount of time and only entered after the Plaintiff had time to get to the door and it was clear she was not going to answer, the Plaintiff asserts that she "never heard a knock at the door." (Tricia

---

[5]/WYO. STAT. §35-7-1031 provides that possession of less than three ounces is a misdemeanor but possession of more than three ounces is a felony.   The weight of the two plants found in the search was more than three ounces.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 17 of 40

Wachsmuth Dep. 106).  The Plaintiff admits that she was watching television and that she looked out the window after the dog barked and saw someone on the porch before the officers entered. (Tricia Wachsmuth Dep. 106).  Even taking the facts in the light most favorable to the Plaintiff, the officers actions were reasonable in light of the circumstances.

The method of an officer's entry into a residence is a factor to be considered in assessing the reasonableness of a search and seizure under the Fourth Amendment.  *Wilson v. Arkansas*, 514 U.S. 927, 934.  The common law principle of announcement prior to entry is "embedded in Anglo-American law."  *Id.*  The type of announcement necessary is based on a principal that the party has sufficient notice that an officer is present and not a trespasser.  *Id.* at 932.  However, courts have also recognized that an officer's unannounced entry into a home might be reasonable in some circumstances.  *Id.* at 934.  Although the United States Supreme Court refused a blanket exception to the knock and announce rule for drug warrants, the Court did acknowledge:

> We recognized in *Wilson* that the knock-and-announce requirement could give way "under circumstances presenting a threat of physical violence," or "where police officers have reason to believe that evidence would likely be destroyed if advance notice were given." 514 U.S., at 936, 115 S.Ct., at 1919. It is indisputable that felony drug investigations may frequently involve both of these circumstances.

*Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).  "This Court has encountered before the links between drugs and violence, see, *e.g., Michigan v. Summers,* 452 U.S. 692, 702, 101 S.Ct. 2587, 2594, 69 L.Ed.2d 340 (1981), and the likelihood that drug dealers will attempt to dispose of drugs before police seize them, see, *e.g., Ker v. California,* 374 U.S. 23, 28, n. 3, 83 S.Ct. 1623, 1627, n. 3, 10 L.Ed.2d 726 (1963)." *Id.*  The Tenth Circuit has addressed certain circumstances allowing unannounced entry:

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 18 of 40

The term "exigent circumstances," in conjunction with the entry of a residence during the execution of a search warrant, refers to those situations where "the officers believe there is an emergency situation and ... their belief is objectively reasonable." *United States v. Spinelli,* 848 F.2d 26, 29 (2d Cir.). *See also United States v. Flickinger,* 573 F.2d 1349, 1355 (9th Cir.)  (exigent circumstances are those which suggest an "urgent need for immediate action"). The reasonableness of the officers' conduct hinges on the facts within their knowledge indicating exigency. *McConney,* 728 F.2d at 1206. The conclusion of exigency under these facts must be especially clear in this case where there was no knock or warning whatsoever, where there was no information as to who was in the house, where the destruction of physical property took place, and where the occupants of the residence could be injured as a result of the entry.  We must determine whether the officers, after considering the *particular* facts regarding the premises to be searched and the circumstances surrounding the execution of the warrant, could reasonably have decided that an urgent need existed for such an entry into the premises.  *Jones v. United States,* 362 U.S. 257, 272, 80 S.Ct. 725, 737, 4 L.Ed.2d 697 ("a claim under 18 U.S.C. § 3109 depends upon the particular circumstances surrounding the execution of the warrant") (citing *Miller v. United States,* 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332).

*U.S. v. Stewart*, 867 F.2d 581 (10th Cir. 1989).  In this case, in addition to the risks known before the warrant was obtained, i.e. loaded weapons placed strategically around the house, paranoid behavior, marijuana grow operation, etc., events occurred on the scene to increase the risk to the officers and others present.  As the officers were approaching the house, the dog barked alerting the occupants to the police presence before they were in position.  (Chapman Dep. 40-41; Chretien Dep. 171).  In addition, an occupant looked out the window and saw the officers as they were approaching the residence.  (Chapman Dep. 40-41; Hall Dep. 81-84).  "Exigent circumstances exist when there is a 'likelihood that notice would result in the destruction of evidence.'"  *U.S. v. Berrocal*, 232 F.3d 902 (10th Cir. 2000); citing *United States v. Dahlman,* 13 F.3d 1391, 1398 (10th Cir.1993).

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 19 of 40

The occupant who looked out the window did not make any attempt to open the door. (Hall Dep. 83, Tricia Wachsmuth Dep. 106).  The fact that the Plaintiff appeared to sit back down on the couch after making eye contact with at least one officer also signifies refusal or constructive denial of admittance.  "If the occupants do not admit the officers within a reasonable period of time, the officers may be deemed to be constructively refused admittance, and they may then enter by force." *United States v. Gay,* 240 F.3d 1222, 1228 (10th Cir. 2001).  Even taking the testimony of the Plaintiff as true, the officers' actions were reasonable and appropriate in light of the circumstances.  There is nothing in case law that would alert the officers that their actions in entering the home were unconstitutional, to the contrary, the law supports the actions even as set forth by the Plaintiff.

### 3.        Use of the Flashbang Device

"The use of a flashbang device is neither per se objectively reasonable nor unreasonable. The reasonableness of its use depends on the facts and circumstances of each case." *Kirk v. Watkins*, 182 F.3d 932 (10th Cir. 1999).  The Tenth Circuit has consistently analyzed the use of a flashbang device based on the totality of the circumstances.  *Whitewater v. Goss*, 192 Fed.Appx. 794 (10th Cir. 2006).

The Court in *United States v. Myers,* 106 F.3d 936 (10th Cir. 1997), analyzed the use of a flashbang device in a residence where children may reside under the *Graham* factors and found that it was not *per se* excessive force.  *Id.* at 940.  In this case, although there was a possibility that an older child was seen entering the house, the information available was that no child resided in the home.  The officers' use of a flashbang device in the master bedroom was reasonable under the circumstances.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 20 of 40

The flashbang device was used in this case because there was information about several loaded weapons in the house, primarily in the master bedroom. (McCaslin Dep. 58). There was information that the Plaintiff was paranoid and had psychiatric problems. (Miner Dep. 89, 116). These pieces of information in addition to the purpose of the warrant, a marijuana grow operation, created a significant risk to the safety of the officers and others present.

In this case the officers raked the window of what they knew was the master bedroom. (McCaslin Dep. 76, 78). The lights were off in the bedroom but the officers could see the area immediately inside the window. (McCaslin Dep. 80). Sgt. Kent broke the window and Officer McCaslin scanned the bedroom, determined that there was no one in the immediate area and dropped the flashbang device. (McCaslin Dep. 80). The officers specifically picked the master bedroom for placement of the flashbang device because of the location of the weapons and the fact that a child was unlikely to be in that room. (Chretien Dep. 159-60; Kent Dep. 130). There is no caselaw on point that would indicate this was an inappropriate use of a flashbang device and the Court in *Myers* refused to find the use of a flashbang where a child might be present per se unreasonable. *Id.* at 940. *See also Commonwealth v. Garner,* 672 N.E.2d 510 (Mass.Sup.Ct. 1996)(holding that officers did not unreasonably execute warrant when officer broke window and dropped flashbang device into bedroom in which four-year-old child was present, even though he failed to look inside bedroom first as required by departmental policy). Therefore, the officers are entitled to qualified immunity on this issue.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 21 of 40

(4)     **The Plaintiff's Claim that She was Held at Gun Point During the Search and Forced to go Downstairs Before the Officers**

a.      **Reasonableness of the actions**

The reasonableness of an officer's conduct must be assessed "from the perspective of a reasonable officer on the scene," recognizing the fact that the officer may be "forced to make split-second judgments" under stressful and dangerous conditions.... The Fourth Amendment standard requires inquiry into the factual circumstances of every case; relevant factors include the crime's severity, the potential threat posed by the suspect to the officer's and others' safety, and the suspect's attempts to resist or evade arrest...." *Gross,* 245 F.3d at 1158 (citing *Graham v. Connor,* 490 U.S. 386, 396-97 (1989)) (citations omitted).  The reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer on scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396-97.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving." *Id.* at 396-97.  Thus, the issue is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting (the officer), without regard to (the officer's) underlying intent or motivation." *Graham*, 490 U.S. at 397.

b.      **Pointing the Weapons at the Plaintiff during the Search**

At best, in the light most favorable to the Plaintiff, officers pointed weapons at her from the time they entered the home through the clearing of the upstairs and until she reached the basement landing and the officers went around her to clear the basement.  (Tricia Wachsmuth Dep. 109-10).  At that point, another officer came downstairs handcuffed the Plaintiff, allowed

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 22 of 40

her to put on shoes and a coat and took her out to a squad car. (Tricia Wachsmuth Dep. 110). During the time the officers allegedly had their weapons pointed at the Plaintiff, she attempted to use her cell phone and the phone was taken away by the officers. (Tricia Wachsmuth Dep. 107).

"The right to arrest an individual carries with it the right to use some physical coercion to effect the arrest, and it is not unreasonable for officers to carry weapons or to take control of a situation by displaying their weapons." *Holland ex rel. Overdorff v. Harrington,* 268 F.3d 1179 (10th Cir. 2001); citing *Thompson v. City of Lawrence, Kansas,* 58 F.3d 1511, 1516 (10th Cir. 1995). In *Michigan v. Summers,* 452 U.S. 692 (1981), the United States Supreme Court found that officers executing a search warrant for contraband may "detain the occupants of the premises while a proper search is conducted." *Id.* at 705. In weighing whether the search in *Summers* was reasonable, the Court first found that "detention represents only an incremental intrusion on personal liberty when the search of a home has been authorized by a valid warrant." *Id.* at 703. Against that interest, it balanced "preventing flight in the event that incriminating evidence is found"; "minimizing the risk of harm to the officers"; and facilitating "the orderly completion of the search." *Id.* at 702-703; see *Muehler v. Mena,* 544 U.S. 93 (2005). In *Los Angeles County, California v. Rettele*, 550 U.S. 609 (2007), the Supreme Court found the deputies' actions in ordering residents out of bed and holding them naked at gunpoint while they secured the premises were reasonable even though they were a different race than the suspect identified in the warrant:

> In executing a search warrant officers may take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search. *Id.,* at 98-100, 125 S.Ct. 1465; see also *id.,* at 103, 125 S.Ct. 1465 (KENNEDY, J., concurring); *Summers, supra,* at 704-705, 101 S.Ct. 2587. The test of reasonableness under the Fourth Amendment is an objective one. *Graham v.*

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 23 of 40

*Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (addressing the reasonableness of a seizure of the person).  Unreasonable actions include the use of excessive force or restraints that cause unnecessary pain or are imposed for a prolonged and unnecessary period of time.  *Mena, supra,* at 100, 125 S.Ct. 1465; *Graham, supra,* at 396-399, 109 S.Ct. 1865.

> …

> This is not to say, of course, that the deputies were free to force Rettele and Sadler to remain motionless and standing for any longer than necessary.  We have recognized that "special circumstances, or possibly a prolonged detention" might render a search unreasonable.  *See Id.,* at 705, n. 21, 101 S.Ct. 2587.  There is no accusation that the detention here was prolonged.  The deputies left the home less than 15 minutes after arriving.  The detention was shorter and less restrictive than the 2- to 3-hour handcuff detention upheld in *Mena.*  See 544 U.S., at 100, 125 S.Ct. 1465.

*Id.* at 614-15*; compare Lucas v. City of Boston,* No. 07-CV-10979, 2009 WL 1844288, at *20

(D.Mass. June 19, 2009) (distinguishing *Rettele* as a case of "officers pointing guns at adults who

the officers had some reason to suspect were cooperating with dangerous suspect," and denying

summary judgment to officers who pointed guns at two children).

At most, the officers here held the Plaintiff at gunpoint during the initial clearing of the

house.  She was one of two individuals identified in the search warrant.  (Deposition Ex. 17).

The initial clearing of the house including the basement took less than five minutes.  (Miner Dep.

152).  There is no clearly established law that would have put the officers on notice that they

were violating the Plaintiff's rights, in fact, the United State Supreme Court precedent clearly

indicates that such conduct would be reasonable.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 24 of 40

c.       **Plaintiff's Claim that she was used as a "Human Shield"**

After an exhaustive search for cases involving a similar claim, the only instructive case appears to be from the Third Circuit.  In *Mellott v. Heemer*, 161 F.3d 117 (3rd Cir. 1998), deputy marshals were accused of excessive force in allegedly using the plaintiff as a "human shield" in executing a court ordered eviction.  The deputy marshals executed one eviction order and were discussing a second eviction.   One of the residents from the first eviction overheard the conversation and volunteered to accompany the deputy marshals to the other home.  Although he drove himself there, he then claimed that the deputy marshals forced him, at gunpoint, to go first stating that, "if anything goes wrong…you're going to be the first one to go down." *Id.* at 121. The Third Circuit, analyzing the claims under the Fourth Amendment, found that the defendants were entitled to summary judgment on the basis that the plaintiff was not seized and also that they were entitled to qualified immunity.  *Id.* at 125.   In this case, although the Plaintiff was directed to sit on the couch and not to make a telephone call, she was not handcuffed until after she went down the stairs to the basement, as the Tenth Circuit recently found this may be more akin to an investigative detention.  *Armijo ex rel. Armijo Sanchez v. Peterson*, 601 F.3d 1065 (10th Cir. 2010).

The only other case to analyze a claim of "human shield" under the Fourth Amendment involved a high speed chase where officers attempted to stop the fleeing vehicle by setting up roadblocks that also stopped passing motorists.  *Boyle v. City of Liberty, Mo.,* 833 F. Supp. 1436 (W.D.Mo. 1993).   The court, balancing the law enforcement interests against the interests of innocent bystanders, denied the defendants motion to dismiss.  This case is easily distinguished based on the fact that this case does not involve an innocent bystander.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 25 of 40

There are no "human shield" cases on point in the Tenth Circuit, the only United States Supreme Court cases are inapplicable to these circumstances and as stated above, the closest case from another jurisdiction found for the defendants.   Therefore, the Defendants are entitled to qualified immunity on the basis that there is no clearly established law that would put the Defendants on notice that such actions were unconstitutional.

Although differing in almost every other way about the facts of this case, both parties agree that the Plaintiff went downstairs after being asked whether or not anyone was downstairs. The Plaintiff admitted that, before the police got there, she knew there was no one downstairs.[6] (Tricia Wachsmuth Dep. 127).  The Plaintiff also admits that she told the officers that there was no one downstairs several times.   Based on the Plaintiff's admissions in this case, even if the Plaintiff was forced to go downstairs, she was not being used as a human shield since there was no basis to believe that there was any danger present in the basement.   The Plaintiff further admits that she did not argue with the officers or tell them that she did not want to go downstairs. (Tricia Wachsmuth Dep. 197).

The intention of the officer, as testified to under oath, was an attempt to "call her bluff" to determine if she was lying.  (Chretien Dep. 197).  The Plaintiff's testimony is consistent with this position since she admits she was told to go downstairs after being asked several times who was downstairs.  (Tricia Wachsmuth Dep. 126-28).  By definition, the Plaintiff's willingness to go downstairs confirmed her statement that there was no one downstairs.   In addition, the Plaintiff's knowledge that there was no one downstairs forecloses any argument that she believed

---

[6] Although during her deposition she did express a concern that after she was asked several times about who was downstairs, she started to wonder if "someone snuck in my basement" while she was watching television or in the bathroom.  (Tricia Wachsmuth Dep. 116).

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 26 of 40

she was being used as a human shield between the officers and any danger in the basement. Although physical injury is not required for a finding of a Fourth Amendment violation, the conclusion that an officer did not violate clearly established right may be "confirmed" by the fact that "the force was not so excessive that [plaintiff] suffered hurt or injury," *Saucier v. Katz,* 533 U.S. 194, 209 (2001)(Overruled on other grounds).

In essence, the Plaintiff going first into the basement is akin to the common situation where suspects are asked to show officers the location of drugs or other contraband during the execution of a search warrant.   In such cases, the suspects are asked to go into unsecured locations in a residence in front of officers.  There is no precedent that would alert officers to any problem with such a method of executing a search warrant and this case should be similarly analyzed.  At best, this claim is an additional claim of officers pointing their guns at the Plaintiff. As set forth in the law above, if the officers did in fact continue to point their guns at the Plaintiff during the clearing of the house, there is no clearly established law to put them on notice that such actions are unconstitutional.  The actions of the officers in allowing the Plaintiff to go first into the basement did not violate clearly established law and they are entitled to summary judgment.

As set forth above, the facts of this case, even in the light most favorable to the Plaintiff, do not establish liability as to any officer or any action taken in this case.  This was a high risk search warrant involving drugs, guns and paranoid behavior.   The Supreme Court has unequivocally recognized, even in cases involving far less known risks, the necessity of quick and decisive action by law enforcement in these situations:

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 27 of 40

> Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Michigan v. Summers*, 452 U.S. 692, 702-703 (1981). The officers in this case acted pursuant to the authority of a search warrant and reasonably in light of the totality of the circumstances. All Defendants are entitled to summary judgment.

## II.    Actions of the Individual Officers

If the Court is unable to rule in the Defendants' favor on the basis of the actions taken as a whole, then the individual actions and liability of each named Defendant must be analyzed independently since each played a different role in the events that night. To the extent that the Plaintiff relies on damage to property to state a claim, such claim must fail. Officers executing a search warrant occasionally "must damage property in order to perform their duty." *Dalia v. United States,* 441 U.S. 238, 258 (1979). The only claim of damage in this case is that damage which resulted from the legitimate purpose of executing the search warrant, i.e. broken window for the flashbang, resulting scorch mark on the wall and pillow and bedding, broken door due to breaching the door, etc. Although not necessary for a determination, the search did reveal substantial evidence of illegal activity. There is no basis for liability based on any claim of property damage.

### A.    Liability of Chief Feathers

Under § 1983, government officials are not vicariously liable for the misconduct of their subordinates. "[T]here is no concept of strict supervisor liability under § 1983." *Jenkins v. Wood,* 81 F.3d 988, 994 (10th Cir. 1996). Liability must be based on more than the fact that an

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 28 of 40

employer has the right to control employees. "Supervisors are only liable under § 1983 for their own culpable involvement in the violation of a person's constitutional rights." *Serna v. Colorado Dept. of Corrections,* 455 F.3d 1146, 1151 (10th Cir. 2006). To establish supervisor liability, "it is not enough for a plaintiff merely to show a defendant was in charge of other state actors who actually committed the violation. Instead, ... the plaintiff must establish 'a deliberate, intentional act by the supervisor to violate constitutional rights.'" *Jenkins,* 81 F.3d at 994-95 (quoting *Woodward v. City of Worland,* 977 F.2d 1392, 1399 (10th Cir. 1992)).

### 1.    Independent Actions of Chief Feathers and Affirmative Link

The only independent action taken by Chief Feathers was in the initial evaluation and planning of the search warrant. Chief Feathers considered several methods of executing the search warrant, including contacting Tom Wachsmuth. The decision to prepare for a dynamic entry after determining that the other options were not viable is reasonable and supported by the Tenth Circuit law directly on point. *Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001)(Finding the decision to utilize dynamic entry to make an arrest on a misdemeanor warrant reasonable under a Fourth Amendment analysis). The officers in this case, although not specifically called a SWAT team, all testified to extensive training in the areas of tactical deployment and strategic weaponry as well as use of flash bang devices and dynamic entry. (Danzer Dep. 21, 24-29, 42-43; Miner Dep. 12-21; Lara Dep. 22-27; Hall Dep. 9-13, 17-18; Exhibit R – Deposition of Investigator Brown, at 17-28; Eckerdt Dep. 6-16; Kent Dep. 14-16, 40-45; Bradley Dep. 7-9, 12-14). In fact, the officers testified to an intensive training course before this event occurred and ongoing monthly training as a unit often specifically geared to dynamic entry. (*Id.*).

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 29 of 40

The Plaintiff has not established any evidence to support an allegation that Chief Feathers knew what actions the officers would take in executing the search warrant.  Chief Feathers was not present during the planning of the search warrant at the station or the execution of the search warrant at the residence.  A supervisor may be held liable for the alleged unconstitutional acts of his subordinates only if the Plaintiff can demonstrate an "affirmative link" through facts showing that he actively participated or acquiesced in the constitutional violation.  *Holland,* 268 F.3d 1179 (10th Cir. 2001); *see also Winters v. Board of County Comm'rs,* 4 F.3d 848, 855 (10th Cir. 1993) (citing *Rizzo v. Goode,* 423 U.S. 362 (1976)); *Snell v. Tunnell,* 920 F.2d 673, 700 (10th Cir. 1990) ("For supervisory liability [in a § 1983 action], plaintiffs must demonstrate an affirmative link between the supervisor's conduct and the constitutional deprivation."). "A plaintiff may show that 'an affirmative link exists between the [constitutional] deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise.'" *Id. citing Worrell v. Henry,* 219 F.3d 1197, 1214 (10th Cir. 2000) (quoting *Meade v. Grubbs,* 841 F.2d 1512, 1527 (10th Cir. 1988) (quotation omitted)); *see Snell,* 920 F.2d at 700 ("Plaintiffs must show that a supervisory defendant, expressly or otherwise, authorized, supervised, or participated in conduct which caused the constitutional deprivation."). As set forth above, no constitutional violation occurred and the Plaintiff has failed to establish any affirmative link between any action taken by Chief Feathers and alleged constitutional violations.

### 2.      Failure to Train or Supervise against Chief Feathers

This claim is more properly alleged against the entity or Chief Feathers in his official capacity.  Therefore, Chief Feathers will rely on the arguments set forth in the brief filed by the entity and the officers in their official capacity.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 30 of 40

**B.      Backyard and Perimeter Team Officers**

**1.      Officers Blackmore and Brilakis**

The Plaintiff has agreed to a dismissal of these officers based on their lack of involvement in this matter.

**2.      Officer Lara**

Officer Lara was assigned to go around the back of the house, break a window in the back door and enter at the same time as the front door team.  Because the dog alerted and the officers were forced to move into place at the front door more quickly than planned, the officers assigned to the backyard did not make it over the fence in time to enter through the back door. (Lara Dep. 40-41).   Officer Lara's involvement in this case is limited to the fact that he confirmed, during the planning meeting, the information about Bret Wachsmuth having psychological problems.  (Lara Dep. 9-10).   Officer Lara had worked with Tom Wachsmuth when assigned to DCI and he relayed a conversation he had had with Tom regarding Bret's psychological problems.  Bret Wachsmuth confirmed during his deposition that he does indeed suffer from psychological problems and has suffered from these problems since high school. (Bret Wachsmuth Dep. 12-14).  There is no basis for liability based on the information provided by Officer Lara.  He entered the house after Tricia Wachsmuth was arrested and assisted in taking photographs.  (Lara Dep. 43).  Any continued claim against Officer Lara is frivolous and the Defendants request he be dismissed and they be allowed costs for the filing of this motion.

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 31 of 40

### 3.    Officer Bradley

Officer Bradley was also assigned to the backyard team.  (Exhibit S – Deposition of Officer Bradley, at 23).  Because of the height of the fence, the officers were unable to reach the residence in time to create a diversion when the front door was rammed.  (Bradley Dep. 26-28). Officer Bradley entered the home after an officer in the home opened the back door.  (Bradley Dep. 25).  Tricia Wachsmuth was no longer in the home when he entered the home.  (Bradley Dep. 26).  He walked through the house and out the front door and transported Tricia Wachsmuth to the police department.  (Bradley Dep. 26).  Any continued claim against Officer Bradley is frivolous and the Defendants request he be dismissed and they be allowed costs for the filing of this motion.

### 4.    Investigator Brown

Investigator Brown also did not make it over the fence in time and only entered the home after the back door was opened by officers inside the house.  After the back door was open, Officer Brown returned to his vehicle, drove it to the front of the Wachsmuth residence, and began taking pre-search pictures.  (Brown Dep. 46).  This included documenting each room. (Brown Dep. 47).  Later that night, Officer Brown interviewed both Bret and Tricia Wachsmuth at the police station.  (Brown Dep. 57-58; Eckerdt Dep. 97).  The only time the Plaintiff mentioned Investigator Brown was to complain that he slammed his hands on the table and demanded to know where her husband was when he questioned her at the station.  (Tricia Wachsmuth Dep. 146-47).  This does not state a cause of action and any continued claim against Investigator Brown is frivolous, the Defendants request he be dismissed and they be allowed costs for the filing of this motion.

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 32 of 40

**B.      The Front Entry Team**

The front entry team consisted of 6 officers – Officer Chapman, Sgt. Chretien, Officer Danzer, Sgt. Eckerdt, Officer Hall, and Officer Miner.  (Chapman Dep. 39; Hall Dep. 74).

### 1.      Officer Chapman

Officer Chapman was assigned to knock and announce the warrant.  (Chapman Dep. 40). Officer Chapman was the first officer in the house.  (Chapman Dep. 41).  He found Tricia Wachsmuth approximately three feet from the sofa heading in the direction of the kitchen. (Chapman Dep. 41).  Officer Chapman, slung his rifle on his shoulder, took Tricia's left arm and directed her to couch.  (Chapman Dep. 42).  Afterwards, he continued clearing the house including the kitchen.  Once the upstairs rooms were cleared, Officers Chapman and Danzer cleared the kitchen.  (Chapman Dep. 44, 48-49, 53).

After the main floor of the house was primarily cleared, officers approached the basement door.  (Chapman Dep. 53).  Officer Danzer informed Sgt. Cretien that the basement door was unlocked.[7]  Officer Chapman did not hear the conversation between Sgt. Cretien and Tricia because his attention was focused on the basement door.  (Chapman Dep. 55-56).  The next thing he noticed was Tricia walking by them, opening the door, turning on the light and starting down the stairs while saying ""See, there's no one else down here."  (Chapman Dep. 55-56).  Officer Danzer followed Tricia down the stairs and was immediately behind her.  (Chapman Dep. 62; Danzer Dep. 128-29).  Officer Chapman was directly behind Officer Danzer, and Sgt. Chretien was next in line on the stairs.  Tricia Wachsmuth stopped walking down the stairs and both Officers Danzer and Chapman proceeded around her to clear the basement.  (Chapman Dep. 62-63, 68).

---

[7] The CI had told Officer Miner that the only time the basement door was unlocked was when someone was downstairs.

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 33 of 40

As set forth above, there is no clearly established law that would create liability as to the entry method utilized by the officers.   The exigent circumstances occurring after the officers reached the house foreclose liability even if the Court, taking the facts in the light most favorable to the Plaintiff, assumes that the knock and announce did not occur.   There is no claim specifically directed at Officer Chapman once they enter the residence.   He did not hear the conversation between Sgt. Cretien and the Plaintiff about going downstairs.   At most, he is alleged to be one of the officers who pointed a weapon at the Plaintiff as she went down the stairs before the basement was cleared.[8]   This is simply not enough to establish liability based on the clear precedent set in *Los Angeles County, California v. Rettele*, 550 U.S. 609 (2007).

### 2.        Officer Miner

Officer Miner was contacted by the CI.   He prepared the affidavit for the search warrant with the assistance of Deputy Paterson and Deputy County Attorney Davis.   The Plaintiff has not raised any claims based on the initial information gathering or the validity of the search warrant. Officer Miner was obtaining the search warrant during the initial planning stage of the operation and arrived at the station later in the evening.   Officer Miner was assigned the task of breaching the front door with the ram if no one answered.   (Miner Dep. 113).   He was the last officer through the front door.  (Chretien Dep. 187).

Officer Miner assisted Officer Hall in clearing the master bedroom.   (Hall Dep. 94). Officer Miner heard Sgt. Chretien ask the Plaintiff if anyone was downstairs, heard part of the Plaintiff's response and then Sgt. Chretien ask the question again.  (Miner Dep. 132-33).  He did

---

[8] It is interesting to note that he was the second officer in line in a narrow stairway and by virtue of necessity he would have to point his weapon at the back of the officer in front of him to be able to point it at the Plaintiff.

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 34 of 40

not hear Sgt. Chretien issue an order to the Plaintiff to go downstairs.  (Miner Dep. 132-33).  He

did not immediately follow the Plaintiff and the other officers into the basement but eventually

went downstairs, handcuffed the Plaintiff and brought her back upstairs.  (Miner Dep. 135-37).

The Plaintiff has failed to establish any facts relevant to Officer Miner that would make him

liable in this case and he is entitled to a dismissal.

### 3.     Officer Hall

After entering the house, Officers Danzer and Hall and Sgt. Chretien cleared the

bathroom and both bedrooms.  (Chapman Dep. 49; Chretien Dep. 189).  Officer Miner assisted

Officer Hall in clearing the master bedroom.  (Hall Dep. 94).  He heard the conversation between

Sgt. Chretien and the Plaintiff.  (Hall Dep. 100-01).  Officer Hall observed Tricia Wachsmuth go

down the stairs, but did not follow the other officers.  (Hall Dep. 99).  Officer Hall assisted in

searching for evidence.    (Hall Dep. 111).    There are no allegations against Officer Hall

individually.  He is not alleged to have pointed his gun at the Plaintiff during the search and there

is no evidence that he was with the officers who went into the basement.  Officer Hall is entitled

to summary judgment.

### 4.     Officer Danzer

After entering the residence, Officer Danzer assisted in clearing the bathroom and both

bedrooms.  (Chapman Dep. 49).  Officer Danzer approached the basement door, noticed it was

unlocked and informed Sgt. Chretien.  (Chretien Dep. 196).  He heard Sgt. Chretien say that she

was going downstairs and he followed her downstairs.  (Danzer depo. 128-30).  Eventually the

Plaintiff stopped walking down the stairs and both Officers Danzer and Chapman proceeded by

her to clear the basement.  (Chapman Dep. 62-63, 68).  As stated above, the only possible claim,

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 35 of 40

as alleged by the Plaintiff, against Officer Danzer is that he pointed his weapon at the Plaintiff going downstairs.   Clearly established law allows officers to point weapons at suspects throughout the clearing process, there is no basis for liability as to Officer Danzer's actions.

### 5.      Sgt. Eckerdt

Sgt. Eckerdt informed the other officers during the briefing that he had seen a picture of Bret Wachsmuth's brother Shawn and another male on a social networking site wearing tactical gear and holding tactical rifles.  (Eckerdt dep. 37).  Sgt. Eckerdt entered the home after several officers and stayed with the Plaintiff while she was on the couch and during the time the upstairs was cleared.  (Eckerdt Dep. 58-60).  He did not hear anyone order Tricia to go into the basement and did not follow her into the basement.  Sgt. Eckerdt entered the stairway about the same time that the other officers entered the basement.  (Eckerdt Dep. 68).  In the light most favorable to the Plaintiff the only claim against Sgt. Eckerdt would be pointing a weapon at her for a short period of time while she sat on the couch.  This occurred, even according to the Plaintiff during the time the upstairs was being cleared.  Under *Los Angeles County, California v. Rettele*, 550 U.S. 609 (2007), such a use of force is reasonable and Sgt. Eckerdt is entitled to summary judgment.

### 6.      Sgt. Chretien

After eliminating other options, Chief Feathers assigned Sgt. Chretien to organize the tactical execution of the search warrant.  (Feathers Dep. 131, 169; Chretien Dep. 20-22, 24).  Sgt. Chretien prepared the entry plan on dry erase boards in the station's basement and the plan was communicated to the relevant officers.  (Chretien Dep. 86).  After the main floor of the house was primarily cleared, officers approached the basement door.  (Chapman Dep. 53).  Officer

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 36 of 40

Danzer informed Sgt. Chretien that the basement door was unsecured. (Chretien Dep. 196). Sgt. Chretien asked Tricia Wachsmuth if there was anyone else present in the home and she said no. (Chretien Dep. 196). Because of the hesitation in her response, Sgt. Chretien again asked her if there was anyone downstairs. (Chretien Dep. 196-97). In an attempt to call her bluff, he told her that she could go first. (Chretien Dep. 197-98). Tricia Wachsmuth walked to the basement door, opened it, flipped on the light and said, "See, there's no one else down here." (Chapman Dep. 62). Tricia Wachsmuth began walking down the stairs with Officer Danzer immediately behind her. (Chapman Dep. 62; Danzer Dep. 128-29). Officer Chapman was directly behind Officer Danzer, and Sgt. Chretien was next in line on the stairs. (Chretien Dep. 202). Tricia Wachsmuth stopped walking down the stairs and the officers proceeded around her to clear the basement. (Chapman Dep. 62-63, 68).

The allegations against Sgt. Chretien, as set forth by the Plaintiff, are that he used excessive force in planning this as a dynamic entry and in having the Plaintiff go first into the basement. As set forth above, *Holland v. Harrington,* 268 F.3d 1179, 1189 (10th Cir. 2001), establishes that the planning of a dynamic entry was reasonable even if it was to execute a misdemeanor search warrant. In addition, there is no clearly established law to alert Sgt. Cretien that his actions in "calling her bluff" to determine the truthfulness of the Plaintiff's answer would violate her constitutional rights. He is therefore entitled to qualified immunity.

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 37 of 40

### C.      Officers Assigned to Deploy the Flashbang Device

#### 1.      Sgt. Kent

Chief Feathers and Sgt. Kent discussed multiple options for executing the search warrant. (Kent Dep. 85, 97-99).   Sgt. Kent contacted Officer Blackmore to provide surveillance of the Wachsmuth residence.  (Exhibit T – Deposition of Officer Blackmore, at 15).   Officer Chretien assigned Officer McCaslin and Sgt. Kent the task of deploying the flashbang, if forced entry was required.   (Kent Dep. 131).   They were also both also assigned to assist with evidence. (McCaslin Dep. 61).   Upon hearing the door being rammed, Sgt. Kent raked the glass, ripped the shades down and observed the bedroom.  (Kent Dep. 135, 148).   Both officers then entered the home and assisted in clearing the bedrooms.   (Kent Dep. 152).   Sgt. Kent did not hear the conversation between Sgt. Chretien and the Plaintiff.  (Kent Dep. 166).   Sgt. Kent assisted in searching for evidence.  (Kent Dep. 164).

The action of Sgt. Kent in planning the execution of the search warrant and the use of the flashbang device were reasonable under the totality of the circumstances and Sgt. Kent is entitled to summary judgment pursuant to *Whitewater v. Goss*, 192 Fed.Appx. 794 (10th Cir. 2006).

#### 2.      Officer McCaslin

After the window was raked and the blinds and curtains pulled back, both officer McCaslin and Sgt. Kent observed the room.  (McCaslin Dep. 76, 80).   Officer McCaslin then dropped the flashbang into the window of the bedroom.  (McCaslin Dep. 81).   Officer McCaslin has been trained on the use of flashbang devices.  (McCaslin Dep. 28-32).   Both officers then entered the home and assisted in clearing the bedrooms.  (McCaslin Dep. 83).   Officer McCaslin was not present during the conversation or when the Plaintiff went downstairs.  (McCaslin Dep.

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 38 of 40

88).   Officer McCaslin was one of the officers responsible for gathering any evidence.
(McCaslin Dep. 91).   The use and deployment of the flashbang device was reasonable and
Officer McCaslin is entitled to summary judgment.

## CONCLUSION

The Defendants in this case were executing a search warrant involving the elements that
courts have recognized as creating a potentially violent and dangerous situation.   The planning of
the execution of the search warrant was to gain control of the situation in a decisive manner for
the safety of the officers as well as the suspects.   The results of the search confirmed the reports
of illegal activity in almost every detail.   The officers' actions were reasonable under the totality
of the circumstances and the officers' actions must be analyzed from the prospective of the
officers at the scene in a rapidly unfolding and potentially dangerous situation.   The Officers are
entitled to summary judgment and a dismissal of all claims against them.

DATED this 23rd day of December, 2010.

/s/ Misha Westby
Misha Westby – WSB No. 6826
Senior Assistant Attorney General

*Wachsmuth v. City of Powell, et. al.*, Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 39 of 40

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of December, 2010, the foregoing was served electronically via email and U.S. Mail to the following individuals:

Jeffrey C. Gosman                    Tom Thompson
Gosman Law Office                    MacPherson, Kelly & Thompson
PO Box 51267                         PO Box 999
Casper, WY 82601-2481                Rawlins, WY  82301-0999
E:  Jeffg@gosmanlawoffices.com       E:  tthompson@wyomingattorneys.net


/s/ Lee Ann Schutt
Office of the Wyoming Attorney General

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment
Page 40 of 40