# EXHIBIT B
## Patterson Depo

*Wachsmuth v. City of Powell, et. al.,* Case No. 10-CV-41-J
Memorandum in Support of Motion for Summary Judgment

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF WYOMING

 3   ----------------------------------------------------------

 4   TRICIA WACHSMUTH,                 )
                                       )
 5              Plaintiff,             )
                                       )
 6        vs.                          )  NO. 10-CV-041J
                                       )
 7                                     )
     CITY OF POWELL, AND IN THEIR      )
 8   INDIVIDUAL CAPACITY, TIM          )
     FEATHERS, CHAD MINER, MIKE        )
 9   CHRETIEN, ROY ECKERDT, DAVE       )
     BROWN, MIKE HALL, BRETT LARA,     )
10   MATT MCCASLIN, ALAN KENT, MATT    )
     DANZER, OFFICER BRILAKIS, LEE     )
11   BLACKMORE, CODY BRADLEY, KIRK     )
     CHAPMAN, JOHN DOES #1-#4,         )
12                                     )
                Defendants.            )
13   _____

14              DEPOSITION OF DAVE PATTERSON
                9:02 a.m., Friday, October 8, 2010
15   _____

16

17

18        Pursuant to notice, the deposition of DAVE

19   PATTERSON was taken in behalf of Plaintiff in

20   accordance with the applicable Federal Rules of Civil

21   Procedure at 270 North Clark, Powell, Wyoming, before

22   Vonni R. Bray, Registered Professional Reporter and

23   Notary Public of the State of Montana.

24

25
```

1  informants?

2      A.   Yes.

3      Q.   And what kind of training have you had in
4  that area?

5          MR. THOMPSON:  Objection as to form.

6          MS. WESTBY:  Join.

7  BY MR. GOSMAN:

8      Q.   Go ahead.

9      A.   Basic narcotic school, 40-hour school.  Part
10 of the school is informant development and management,
11 as well as the advanced school.  They, again, hit on
12 informant development and management.  And the advanced
13 ATF school, it's briefly touched on in relation to
14 informant introduction of undercovers.

15     Q.   When did you first learn about the Wachsmuth
16 case, and that would be Bret and Tricia Wachsmuth?

17     A.   Would have been February 25th of 2009.

18     Q.   What was your first contact in regard to that
19 case?

20     A.   Officer Chad Miner from Powell Police
21 Department came into my office at the Powell annex and
22 advised me that -- initially, I didn't know who the
23 investigation was revolving around.  But he advised me
24 that they were -- that he had information from an
25 informant that potentially they were going to be doing

1  a search warrant tonight.
2           And he said that he might be contacting me --
3  he asked me what time I was getting off duty.
4       Q.   Do you remember about what time of day that
5  was?
6       A.   It was just before 4:00, like 3:30-ish, just
7  before 4:00, because I was off duty at 4:00.
8       Q.   Did Officer Miner, in the course of that
9  conversation at 4:00 in the afternoon, mention to you
10 anything about the deployment of the Park County SRG
11 team?
12      A.   He made a statement that we may need your SRG
13 team -- I don't know if he called it "your SRG."  But
14 we may need your tactical team.  He made a comment that
15 that may be something that had taken place.  And I
16 advised him if he got to the point where he needed
17 help, to give me a call.  And then I could come back
18 in.
19      Q.   All right.  Did he tell you at that time
20 where the operation was suspected of being located?
21      A.   My understanding was it was out in the
22 county, and that's why he was making contact with us as
23 well.
24      Q.   Okay.  And so was that the substance of that
25 conversation?

1   A.  Yeah, I asked Officer Miner for permission --
2   I said, "Do you mind if I talk to the guy?"
3   Q.  And what did he say?
4   A.  Officer Miner said, "Yeah, sure."
5   Q.  So you visited with the confidential
6   informant, and what did you learn?
7   A.  I was trying to get a reference point of
8   knowledge from him on what my -- what he could tell me
9   about what he saw, what may be there, just to basically
10  get a reference point from him on what kind of a
11  situation we were talking about.  A better idea.
12  Q.  What information did he give you?
13  A.  I asked him to just describe kind of the nuts
14  and bolts of what might be there equipment-wise.  We
15  talked about was there a halide light, was there a
16  ballast, how was it hooked up?  Sounded like there was
17  one light.  Asked him how many plants there might be.
18  He described that there might be -- and this is purely
19  recollection.  I think it was somewhere from 18 to 20,
20  roughly, plants and that there were also some starter
21  plants.
22          We talked briefly about -- I was shown a
23  phone that had a photo on it of a mature plant.  And I
24  observed that photo, and there was no reference point,
25  so I couldn't determine where the photo was taken.  The

1  photo was of a mature plant that wasn't budding yet.
2  But it was a mature plant, probably just getting ready
3  to bud.
4          And I had commented that that photo really --
5  I think I made the comment to Officer Miner that there
6  was no reference, so it could have came from anywhere.
7          And then I asked about the -- that was pretty
8  much it related to the informant, as far as -- oh, I
9  did ask about seed or cloning, whether the grow had
10 been cloned from another grow or whether it came from
11 seed.  And he indicated that he thought that the seeds
12 had been ordered through the Internet.
13         And that was pretty much the gist of the
14 conversation.  There was a little reference to -- there
15 was some reference to Bret Wachsmuth's mental
16 condition.  Because I asked about -- I was trying to
17 determine what would push this to the point where they
18 may need our special response team.
19     Q.  Yes.  And what did he say?
20     A.  As it was explained to me, and I had -- to
21 qualify this, I don't know Bret Wachsmuth.  I've never
22 talked to the guy.  That there were potential EDP,
23 emotionally disturbed person issues with him
24 potentially.  And the informant did say that he knew he
25 had guns at the house.

1  Q. How old is your son?
2  A. He is 16.
3  Q. Would that cause you concern if you saw that
4  kind of photograph of an individual that you were
5  anticipating going into that residence to serve a
6  search warrant based on a marijuana grow operation?
7  A. Yeah.
8     MR. GOSMAN: Asked and answered.
9  BY MS. WESTBY:
10 Q. And go ahead and answer.
11 A. I would be concerned. I would check it out.
12 Q. Okay. And I think you talked about -- well,
13 let me just ask you this question: You helped prepare
14 the affidavit for the search warrant in this case,
15 correct?
16 A. A small portion of it, yeah.
17 Q. You worked with Officer Miner, correct?
18 A. Uh-huh.
19 Q. "Yes"?
20 A. Yes.
21 Q. And you -- I think you maybe were dictating?
22 A. Yeah, I was talking as it was being typed.
23 Q. Okay. So somebody was typing and the two of
24 you were talking?
25 A. Uh-huh. Yes.

```
 1      Q.   Okay.  And you were a part of that process?
 2      A.   Yes.
 3      Q.   And you went through the process of providing
 4 information that went into the affidavit to obtain this
 5 search warrant?
 6      A.   Yes.
 7      Q.   Were you also present with officer Miner and
 8 Deputy County Attorney Davis when this issue was
 9 addressed -- was talked to with the judge informally?
10      A.   No.
11      Q.   You weren't part of that conversation?
12      A.   No.
13      Q.   Did you know that the -- this matter was
14 discussed with the judge prior to his signing the
15 search warrant?
16      A.   No.
17      Q.   Okay.  Deputy County Attorney Davis was also
18 present with you and Officer Miner at least for some
19 portions of the conversation with the CI, correct?
20      A.   Yes.
21      Q.   And was he also present while you were
22 providing information with Officer Miner for the
23 affidavit?
24      A.   He was coming back and forth out of an office
25 that he was in and out.
```

1    Q.    He was there for part of that time?
2    A.    Uh-huh.  Yes.
3    Q.    And would it be fair to say that you felt
4  comfortable enough with the information that was
5  provided, the information that you had, to be part of
6  the -- or to help prepare and provide part of the
7  information in the affidavit that went to securing the
8  search warrant?
9    A.    I was -- I was comfortable enough to prepare
10 information related to the specific section I was asked
11 for input on, yes, the marijuana growing portion.
12   Q.    And you're quoted -- your name appears in the
13 affidavit, correct?
14   A.    I assume so.  I don't have the affidavit.
15   Q.    Okay.  Have you seen it?
16   A.    No.
17              (Exhibit 13 identified)
18 BY MS. WESTBY:
19   Q.    Okay.  It is Exhibit 13.  If you'll just take
20 a look there and --
21   A.    Well, I've seen it on the screen --
22   Q.    Okay.
23   A.    -- of the computer.
24   Q.    Is your name -- are you quoted in there?
25   A.    Yeah, I see it on Paragraph 3, Line 4.