FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

JAN 1 8 2011
4:50 PM
Stephan Harris, Clerk
Casper

**SUBMITTED BY:**
JEFFREY C. GOSMAN
**GOSMAN LAW OFFICE**
PO Box 51267
Casper, WY 82601-2481
(307) 265-6715 **(fax.)**
(307) 265-3082 **(ph.)**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TRICIA WACHSMUTH,<br><br>Plaintiff,<br><br>vs.<br><br>City of Powell, and in their individual capacity,<br>Tim Feathers, Chad Miner,<br>Mike Chretien, Roy Eckerdt, Dave Brown,<br>Mike Hall, Brett Lara, Matt McCaslin,<br>Alan Kent, Matt Danzer, Officer Brilakis,<br>Lee Blackmore, Cody Bradley, Kirk Chapman<br>John Does #1 - #4<br><br>Defendants | CASE NO. **10 CV 041J** |

### *PLAINTIFF'S RESPONSE TO THE SUMMARY JUDGMENT*
### *MOTION OF THE DEFENDANTS*

*Comes Now*, Plaintiff, by and through counsel Jeff Gosman of *GOSMAN LAW OFFICE* and

responds to the summary judgment motions of the Defendants as set out hereafter.

### PLAINTIFF'S FORECAST OF THE EVIDENCE

On the 24th of February, 2009, thirteen members of the seventeen member Powell Police force gathered at the police station and were informed that they would participate in a SWAT style entry into the home of Bret and Tricia Wachsmuth in the service of a misdemeanor search warrant, complete with the detonation of a noise flash distraction device or flashbang. Most of the officers had never performed a dynamic entry before.[1] The Powell Police Department has no SWAT team, or any specialized tactical unit. *Feathers, p. 80, l. 6-9 and p. 85, l. 5-14.* The Powell Police Department had requested help from the only tactical team in the County, the Park County Sheriff's Office Special Response Group ("*SRG*") that night, *Chretien, p. 61, l. 20-25, Appendix Two,* but the team leader declined their request because they hadn't done their homework and didn't establish that a tactical unit was needed. *Patterson Declaration. Appendix Three.* The thirteen members of the Powell Police Department who assembled that night had never performed as a team before, *Chretien, p. 105, l. 23 through p. 106, l. 9; Feathers, p.87, l. 2-9,* and had never deployed a flashbang device in an operational setting. *Feathers, p. 88, l. 3-8.* No one in the Powell Police Department was certified in the use flashbangs until after this incident. *Feathers, p. 13, l. 23 through p. 14, l. 12.* The Powell Police Department had provided a basic course in police tactics, *Feathers,*

---

[1]     *See Response to Plaintiff's Third Discovery Request, Exhibit 59 to Chief Feather's Deposition and see Feathers, p. 88, l. 14 through p. 125, l. 1. 1. Appendix One.*

*p. 19., l. 11 through p. 23., l. 4*, in September and October of 2005, and the Department, itself, did not provide training appropriate for a SWAT team. *Feathers, p. 84, l. 18 through p.85, l. 4.* One of the officers, Brilakis, had no prior documented tactical training, and the tactical training of Hall, who was on the entry team, was limited to a basic course in drug investigation. *Feathers, p. 41, l. 24 through p. 42, l. 18.* Officer McCaslin, tasked with deploying the flashbang was not certified in the device, and had detonated just two of them in his career, in a police tactics course three years earlier. *McCaslin, p. 36, l. 18 through p. 37, l. 10, Appendix Four.* Sergeant Kent, one of three sergeants on the Powell police force who accompanied McCaslin and raked the window into which the flashbang was deposited, didn't remember ever seeing any training materials on a diversionary device. *Kent, p. 137, l. 18 through p. 138, l. 4, Appendix Five.*

The Chief of Police, the fourteenth member of the Powell Police Department involved in the raid was receiving information, overseeing formation of the plan, and imparting his approval. *Feathers, p. 125, l. 2 through p. 144, l. 2.* Sergeant Chretien, who had served on a SWAT team in Georgia, and tasked with formulating the entry plan on the Wachsmuth residence admitted that the only difference between a typical SWAT team high-risk warrant service and the warrant service that was performed by the Powell police officers on the 24th of February 2009 was the name. *Chretien, p. 59, l. 8-19.* Sergeant Chretien acknowledged that he selected the team members based on their training in one basic police tactics course conducted by a Doug Pechtel in 2005. *Chretien, p. 98, l. 3-25, cross reference to Exhibit 31 attached to Feather's Deposition..*

Officer Blackmore was providing intelligence at the Wachsmuth residence on the evening before the raid. It was reported that a young child had entered the premises and did not leave.

*Cretien, p. 121, l. 3-19; and see reference to 10 yr old child in Ex. 10 to the Torczon deposition, Appendix Six.* Bret Wachsmuth was not home that night, nor was his vehicle parked out front. *Bret Wachsmuth, p. 88, l. 16 through p. 91, l. 5, Appendix Seven.* Miner identified the Wachsmuth vehicles in his affidavit for search warrant down to the VINs. *Miner p. 52, l. 15 through 52, l. 5, See exhibit 13 to the Miner deposition, Appendix Eight.*

No one ran a criminal records check on either Bret or Tricia Wachsmuth, and there was no evidence they had ever committed an act of violence. *Chretien, p. 217, l. 6-14; Miner, p. 24, l. 15-24.* In fact, Brett Wachsmuth had no prior criminal history, or any record of violence. *Bret Wachsmuth, p. 36, l. 13-22*, and neither did Tricia. All of the prescription pain medications found on the premises were lawfully prescribed. *Miner, p. 84, l. 6-16.* There was *no* suspicion that the Wachsmuths were dealing drugs. *Miner, p. 75, l. 3-5.*

Officer Miner had never used the confidential informant before and had no knowledge that anyone else had either, *Miner, p. 46, l. 6-20.* Miner checked his criminal history. *Miner, p. 50, l. 10-13.* The confidential informant admitted to Miner that he was trying to get even with the Wachsmuths because they were going to testify against him in a custody case. *Miner, p. 55, line 8 through p. 56, line 22.*

The Defendants have attempted to bolster their evidence that Bret Wachsmuth posed a threat that night to officer safety by adding that Officer Lara, one of the last officers to arrive at the station to receive his instructions for the raid, commented that Bret Wachsmuth's father had once told him that Bret had depression problems, was Bi-polar and was taking medication for that condition.

*Chretien, p. 141, l. 20 through p  142, l. 13.* Chronologically, this information simply came too late to impact the decision to employ the entry team, since they had all assembled at the police station when the information was disclosed, and the decision to use the team had been made. *Lara, p. 7, l. 21 through p. 10, l. 15, Appendix Nine; Kent, p. 91, l. 5 through p. 92, l. 10, Miner, p. 104, l. 19 through p. 105, l. 6; Eckerdt, p. 34, l. 16 through 35, l. 20, Appendix Ten, Hall p. 43, l. 17 through p. 44, l. 3, Appendix Sixteen.*

Next, Sergeant Eckerdt, allegedly added to the store of information, when he arrived at the station for his instructions by saying that he had seen Sean Wachsmuth, whom Eckerdt knew from Scouting, on his MySpace page, wearing tactical gear including an armored vest, and displaying a tactical rifle with another young man whom he later learned was Bret Wachsmuth. *Feathers, p. 129, l. 6 through p. 130, l. 4, Sean Wachsmuth declaration, Appendix Eleven; Eckerdt, p. 21, l. 18-21; p. 36, l. 17-25.* Sergeant Eckerdt proceeded to explain that when he had seen the pictures, he confronted Tom Wachsmuth, Bret and Sean's father about them. It was from Tom Wachsmuth, he reported, that he learned that the other individual in the photographs with Sean was Sean's brother, Bret Wachsmuth. *Eckerdt, p. 36, l. 17 through p. 39, l. 16.* This information, allegedly loomed large in the minds of the officers as they headed out for the raid that night, since it suggested that Bret Wachsmuth possessed tactical gear.

The problem with this scenario was that the photographs to which Eckerdt referred did not include Bret Wachsmuth, but were pictures of Sean and his girlfriend, clearly of the feminine gender, clowning around in Tom's yard. When shown the photographs in his deposition, Sergeant

Eckerdt recognized that the individual with Sean was a female and not Bret, and denied having ever seen those pictures. *Eckerdt, p. 39, l. 19 through p. 40, l. 23 and see Exhibit 47 to the Eckerdt deposition.* Tom Wachsmuth testified that, indeed, Eckerdt had approached him about the pictures in Exhibit 47, which had been taken from Sean's MySpace page, and asked him if the gear the two were wearing was DCI issued. *Tom Wachsmuth, p. 50, l. 3 through p. 52, l. 13, Appendix Twelve.* Tom assured him it was not, and as they discussed the pictures, he pointed out to Eckerdt that the girl was Sean's girlfriend, whose mother Eckerdt knew. *Id.*

Recognizing that Eckerdt could cover up his actions by insisting that he had seen other photographs of Sean Wachsmuth and Bret Wachsmuth in tactical gear on Sean's MySpace page, Sean Wachsmuth has attached his affidavit, which includes the complete body of photographs which have ever been posted on his MySpace page. *Sean Wachsmuth Declaration.* The affidavit attaches a copy of a subpoena which Pla ntiff served on MySpace together with his consent for the release of the information and a letter from MySpace confirming that they had produced all the pictures posted on the account. There are no photographs of Bret Wachsmuth among them. Exhibit 47 to the Eckerdt deposition consists of the photographs that Eckerdt showed Tom Wachsmuth on the day the two discussed the matter and it clearly shows Sean Wachsmuth with an individual who is unmistakably a young woman. Eckerdt not only dissembled, but he fashioned a plan either to aid in the justification of the SWAT style entry into the Wachsmuth home, or to influence the outcome of litigation against him.

There is no reference to photographs of Bret Wachsmuth in tactical gear in Chretien's report,

*Exhibit 16 to the Chretien deposition*, in the notes for the raid planning, *Exhibit 10 to the Torczon deposition*, or the affidavit for search warrant, *Exhibit 13 to the Chretien Deposition*. There is no reference to the photographs in the pleadings. Sergeant Chretien, the raid planner, did not obtain any information from Eckerdt that night relative to Bret Wachsmuth. *Chretien, p. 148, l. 17-21*.

Plaintiff posits that not or ly did Eckerdt dissemble about what he had seen, but that he never mentioned these photographs at all that night at the station, and only came up with the idea after the officers went looking for further evidence to show they feared for their safety. In any event, this information was circulated while the officers were at the police station receiving their assignments after the entry plan had already been formed. *See reference to Lara disclosing information after the team was being assembled, and citations to the record.*

Miner learned from the C.I. that night that Bret Wachsmuth was described as paranoid and he peeked out windows. *Miner, p. 88, l. 20 through p. 89, l. 20.* Sergeant Chretien mentioned that Miner told him about armor piercing ammunition, *Chretien, p. 224, l. 2-7*, Miner stated that did not happen. *Miner, p. 89, l. 22 through p. 90, l. 2.* What is clear, even with guns present in the house, and a small marijuana grow operation in the basement, *Miner, p. 61, l. 24 through p. 62, l. 3*, there was no objective evidence that Bret Wachsmuth was violent, a drug dealer, or so unstable that he represented a threat to the officers. The officers did not apply for a no-knock warrant and haven't even argued that exigent circumstances justified their actions that night. The marijuana plants in the home were estimated at 2 feet tall in the Affidavit for Search Warrant, *Exhibit 13 to the Miner Deposition*, and were not likely to be easily disposed.

Miner met with Lieutenant Patterson of the Park County Sheriff's Office shortly after coming in contact with the confidential informant. *See Patterson declaration and Patterson deposition, p. 26, l. 15 through p. 27, l. 18, Appendix Thirteen.* He requested the assistance of the Park County Special Response Group to assist in the warrant service. *Id.* He also requested Patterson's assistance with an affidavit for search warrant because he had never done a marijuana grow operation before. *Patterson, p. 26, l. 2 through p. 27, l. 6; Miner, p. 41, l. 7-12.* Lieutenant Patterson interviewed the confidential informant, determined that the grow operation was small, and that there was no need for a dynamic entry. *Patterson declaration.* He informed Sergeant Miner that his team would not participate in the warrant service. *Patterson declaration.*

Patterson suggested that a less intrusive means of effecting the warrant be used including a "knock and talk," just waiting or calling Tom Wachsmuth, a DCI agent who lived in Powell, and who was Bret Wachsmuth's father and seeking his help in effecting the warrant service. *Patterson, p. 39, l. 2 through p. 40, l. 25; Patterson Declaration.* Sergeant Miner responded that "administration was on his ass, and that he really needed to boot a door." *Patterson declaration.* Lieutenant Patterson asked him why he didn't tighten his information up more, and he said "he was going on days off." *Patterson declaration.* It was clear to Patterson after his discussions with Miner that they "were going to knock a door down." *id.* This was before any of the other officers were assembled in the police station to receive their assignments. Patterson later spoke with Chretien who told him that he was pressured to do a dynamic entry. *Patterson, p. 54, l. 2-9.*

While it was never discussed in any of the reports, one of the reasons offered by the officers, and the Police Chief, for moving forward so quickly on the warrant was the report by the Confidential informant that he had called the Wachmsuths and told them he was turning them in that day. *Miner, p. 90, l. 25 through p. 91. l. 19.* However, Bret Wachsmuth reported in his deposition, that he was the one who reported that the Confidential Informant had called him that day to warn him that he was being turned in, and this happened after the raid was over and he was being interviewed by the police. Tom Wachsmuth, p. 95, l. 23 through p. 96., l. 6.  This interview occurred in the evening of the 24th of February, 2009 and mentions the phone call to Bret Wachsmuth from the CI. *See Exhibit 39 to the Brown Deposition, Appendix Fourteen.* The next day, Officer Miner prepared the affidavits for arrest warrants for Bret and Tricia Wachsmuth. *See Exhibits 14 & 15 of the Miner Deposition.*

Paragraph 4 of the affidavits, prepared on the 25th of February, 2009, the day after the search was executed, contains an exact statement of the information that had been included in the affidavit for search warrant the day before, with one significant exception. That exception is the addition of the language: "CI-2009-02 was in phone contact with Bret on 02/24/09. During these conversations that CI-2009-02 stated (sic) to Bret that he was going to turn him into the Police." This important information was omitted from the document where it would have been most significant, the affidavit for search warrant prepared the right of the 24th of Feburary. *See Exhibit 13 to the Miner deposition.* Lieutenant Patterson of the Park County Sheriff's Office, who was with Miner when he interviewed

the Confidential informant, *Miner, p. 90, l. 25 through p. 91, l. 19*, and who helped Miner prepare

the search warrant affidavit stated that he never heard the confidential informant mention that he had

contacted the Wachsmuths to warn them. *Patterson declaration*. Furthermore, Officer Miner never

mentioned this event to Lieutenant Patterson, even though it would have been particularly relevant

since Patterson quizzed him about why the raid had to be conducted that day. *Patterson declaration*.

Chretien's report of the raid and the information that supported it, makes no reference to the CI

warning the Wachsmuths. *Exhibit 16 to the Cretien deposition*. None of the other police reports

make any reference to this information.

According to Tom Wachsmuth, Sergeant Chretien, tasked with putting together an entry

plan for the warrant service, told him later that evening when the officers came to his house to

pick up Bret Wachsmuth:

> I tried to convince them, and it was my idea that we should have called you and had
> you bring us into the house, but I was told no. And I was ordered with the task of putting
> together an entry plan. He said, and you can put two and two together who has the authority
> over me to tell me that we couldn't call you, and we'd have to do an entry plan --an entry into
> the house. He apologized for things that had happened. He didn't specifically say what they
> were. He just apologized. He said, I'm sorry that things went this way. And I had no idea
> what he meant by that.

*Tom Wachsmuth, p. 15, l. 6-18*

Sergeant Chretien went on to tel Tom Wachsmuth that evening while he was in Tom's house that:

> He said that -- again, he went on to say that when I was told no, that we couldn't call you and
> have you come in and get us into the house, he said, then I made the decision then that if I
> was going to be charged with doing and assembling an entry team, that I was going to do it
> right.

*Tom Wachsmuth, p. 16, l. 3-8.*

Sergeant Chretien put together the entry plan. Quoting from his own report, which was

approved by Chief Feathers, the "plan" for that evening set out:

> Based on the information received, and my knowledge, training, and experience on numerous narcotics search warrants, I decided to take extra precautions to minimize the chance of someone getting hurt. Those extra precautions included planning multiple breaches simultaneously, using as many officers as I had available, and introducing a Noise Flash Distraction Device (NFDD), or "flashbang."
>
> The plan was for three officers to approach the back door via a wooden privacy fence in the back yard. Their purpose was to secure the back door and create a distraction by breaking a window in either the south east bedroom, or the back door itself. Another officer, along with Officer Blackmore, would secure the detached garage from outside the fence. The fence connected the house to the garage, and we did not know where a gate was located. Six officers would form the primary entry team. One officer would carry the ram, the rest were equipped with long guns. Two other officers would form a distraction team and follow the entry team in to secure prisoners, and would be armed with pistols. One of these two would carry the window rake, the other the NFDD.
>
> The plan was to knock on the front door and announce "police, search warrant." If the door did not open immediately, we would use the ram to force entry. The primary entry teams responsibility was to secure the residence and ensure the safety of everyone involved. The follow on officers would secure prisoners. Once everyone was secure and the residence checked for threats, the evidence team would take over. We planned to immediately remove any occupants to the police station for interviews.

*Exhibit 16 to the Chretien deposition.*

Sergeant Chretien went over the plan with every officer involved and named in the Plaintiff's

complaint, except Blackmore, before it was executed. *See Exhibit 16 to the Chretien deposition,*

*Chapman, p. 30, l. 19 through p 31, l. 16, Appendix Fifteen, Exhibit 10 to the Torczon deposition,*

*Brilakis, p. 25, l. 14 through p. 26, l. 14; Appendix Seventeen; Bradley, p. 15, l. 6-25, Appendix*

*Eighteen; Miner, p. 97, l. 10 through 98, l. 16; Lara, p. 5, l. 23 through p. 8, l. 11; Danzer, p. 52,*

*l. 8 through p. 54, l. 10, Appendix Nineteen; Brown, p. 30, l. 3 through p. 31, l. 15; Eckerdt, p. 19, l. 2 through p. 22, l. 7.* All of the officers should have been aware it was a knock and announce warrant. *Eckerdt, p. 23, l. 7-11; Exhibit 10 to the Torczon deposition.* No one voiced any reservations or concerns. Marissa Torczon, a police dispatcher, was charged with documenting the discussion of the entry plan. Exhibit Ten of the depositions describes the steps that were to be taken in effecting the warrant service. They are listed in Exhibit ten in the following order: 1) Knock door, 2) Police, search warrant, 3) break window (reference to bedroom window where flashbang was to be deployed), 4) flashbang, 5) wait for noise, 6) break window (back), 7) door. There is no reference to counting seconds or giving the homeowner the chance to respond to the declaration— "police, search warrant." *See Exhibit 10 to Torczon deposition.* This is consistent with Chretien's own declaration of his plan to announce, "police, search warrant" and then immediately ram the door.

Chief Feathers was directly involved in each step of the plan, and gave it his final imprimatur before the officers acted. *Kent, p. 91, l. 15 through p. 94, l3.* Chief Feathers acknowledged that he was aware that Chretien planned an immediate entry, *Feathers, p.153, l. 23 through p. 154, l. 9; p. 156, l. 9-13*, even though he knew that the warrant was knock and announce, *Feathers, p. 154, l. 10-15,* and such a plan violated the Fourth Amendment to the U.S. Constitution. *Feathers, p. 74, l. 20 through p. 75, l. 13.* Chief Feathers offered as an explanation for his approving such a plan that Chretien told him that "immediately" in connection with the officer's entry into the home after

announcing "police, search warrant," meant "waiting a reasonable period of time." *Feathers, p. 154, l. 1-20; p 158, l. 21 through p. 159, l. 25.* The finder of fact is entitled to dismiss this ridiculous contention as pretextual. Feathers, reviewed and approved Chretien's report, without comment and the language that the officers would immediately ram the door remained unchanged. *Feathers, p. 158, l. 4 through p. 159, l. 25.* The lawyers who entered answers to Plaintiff's complaint on behalf of Chief Feathers admitted in the pleadings that the plan was to immediately ram the door after announcing, "police, search warrant," *Feathers, p. 161, l. 3 through p. 162, l. 20; p. 163, l. 25 through p. 166, l. 21*, and Chief Feathers, reviewed the answers to the Plaintiff's complaint before they were filed.

Furthermore, Sergeant Chretien, with whom Chief Feathers allegedly had this discussion, never mentioned discussing the word "immediately" to mean "wait a reasonable time." He responded to counsel's question in his deposition – Did you tell him that you planned to use a knock-and-announce and then deploy the battering ram immediately?– by saying "No, I didn't because that's not what we discussed." *Chretien, p. 219, l. 15 through p. 220, l. 3.* Sergeant Chretien had previously clarified, in his deposition, that the language in his report, Exhibit 16 to the depositions, was accurate to the best of his knowledge at the time. *Chretien, p. 174, l. 18 through p. 175, l. 3.* He went on thereafter to state that the only thing he saw that was not accurate in his report was the statement that McCaslin had looked in the window before he deployed the flashbang.[2]

---

[2]    Chretien had learned later from Officer McCaslin that the window was too high to afford McCaslin a view of the room into which the device was thrown.

*Chretien, p. 174, l. 18 through p. 176, l. 8.* Sergeant Chretien further stated that immediately

ramming the door after knock ng and announcing, police, search warrant was part of the plan.

*Chretien Depo p. 168, line 13, through p. 169, line 4.* And, he admitted that there were no other

documents, other than his own report and Exhibit 10 (the Torczon notes) of which he was aware that

gave a different description of the entry plan. *Chretien Depo p. 171, line 4-12.*

     Tricia Wachsmuth has testified that once one of the officers made eye contact with her on

the porch, the door was rammed, the flashbang device detonated and the officers were in the house

before anyone even knocked, let alone announced "police, search warrant." Tricia was sitting on

the couch approximately four feet from the door, and didn't have time to move before she was

confronted by an officer with a gun.

     Tricia Wachsmuth gave the following account of the events surrounding the warrant service

that night from her deposition:

**TRICIA WACHSMUTH**- Page 104
12 Q. Okay. Tell me about the 24th, the date of
13 this incident, what you were doing before the police
14 came.
15 A. I was sitting on the couch watching Grease.
16 Q. Okay. Where was Bret?
17 A. At his parents's house.
18 Q. How long had he been there?
19 A. I'm not sure. Not too long Maybe half an
20 hour, an hour. Maybe about an hour.
21 Q. Okay. Was there anybody else in the house?

22 A. No. Thank God.
23 Q. Is there a -- is there some kind of, you
24 know, metal thing that could be used as a padlock on
25 the basement door?
**TRICIA WACHSMUTH** - Page 105
1 A. It was just the handle.
2 Q. There was nothing that --
3 A. A dead bolt or anything like that?
4 Q. Or a piece of metal that went over?
5 A. One of these hooky slides?
6 Q. Uh-huh.
7 A. No, just the door handle.
8 Q. Okay. Or one of those things that you

could

9 hang a padlock on, a metal piece that goes over that

10 you hang a padlock on?

11 A. No.

12 Q. Okay. So you're sitting on the couch

13 watching Grease, Tom -- or Bret is at Tom and Donna's

14 house. What happened?

15 A. I curled up on the couch with a blanket, and

16 I have the dog on me, Chihuahua. And all of a sudden,

17 he's just staring at the door. Which he has never

18 done. Just stared at it. You know, no growl, no bark

19 no nothing, just staring. So I was thinking, okay,

20 maybe Bret is pulling up.

21 And so I leaned back -- and -- can I lean

22 back? I leaned back and looked out my window, and I

23 saw something, but I wasn't sure what it was. I saw

24 some person. My heart starts racing. It's like, okay,

25 you know, is this CI (Confidential Informant)[3] trying to break into my home

**TRICIA WACHSMUTH** - Page 106

1 knowing that the Blazer is gone, knowing Bret is gone?

2 So I lean forward just to make sure, you

3 know, get a double-take and I squinted, because I

4 didn't have my glasses on. And as soon as I

leaned

5 forward and squinted it was just bam. Throughout my

6 whole house.

7 Q. Okay. Let's talk first about -- was there a

8 knock at the door?

9 A. No.

10 Q. You never heard a knock at the door?

11 A. Never heard a knock at the door.

12 Q. How high was the TV up?

13 A. Not high. It was just me sitting on the

14 couch, not far from the TV. You know, it wasn't at a

15 high volume at all.

16 Q. Did you see one or more people come up the

17 stairs?

18 A. What do you mean? After they busted in or

19 when I looked out the window.

20 Q. No. When you looked out the window?

21 A. When I looked out the window I could only see

22 one. And that's why I squinted closer. And as soon as

23 I squinted closer, made eye contact with the one, it

24 was just boom throughout my whole house.

25 And then they came running in. Police search

**TRICIA WACHSMUTH** - Page 107

1 warrant, police search warrant. And then a guy came

2 running in and had a gun held at me.

3 Q. Okay. And when you say held at you --

4 A. It was -- I was sitting on the couch, hands

5 up, of course, you know -- because at first I grabbed

6 my cell phone to call 911 because I wasn't

---

[3] Parenthetical material added.

sure what

7 was going on. I was thinking I was getting robbed.

8 I grabbed my phone and then the officer was

9 told to take my phone. He took my phone. And I looked

10 up, and that's when I realized it was the cops. And

11 the officer had the gun pointed directly at my head the

12 entire time. I'm sitting there with my hands up.

13 Blanket still on me.

14 Q. What kind of weapon was it?

15 A. A big long one. I just call it a big -- big 16 one.

17 Q. Okay. And your testimony is that he had it

18 pointed at your head?

19 A. Yep.

20 Q. How far away from you was he?

21 A. About from me to you.

22 Q. Do you know which officer that was?

23 A. (Witness shakes head.)

24 Q. Okay. And then what happened?

25 A. Okay. And then I was sitting there on my

**TRICIA WACHSMUTH** - Page 108

1 couch with my hands up. And they are going around,

2 clear, clear, clear, clear. And then they get to the

3 basement door. And I hear, "Oh, it's unlocked. Get

4 her. She's going first."

5 I said, "Me?" And he said, "Yes, you. Get

6 her. She's going first." And then that's when I stood

7 up, hands up the entire time. And the officer got

8 behind me with his gun. And there's officers -- a few

9 officers lined up here along the -- there's the door to

10 the garage -- basement. And then there's a few

11 officers here. I'm walking by, guns pointed at me the

12 entire time.

13 Q. When you say guns pointed at you, where on

14 your body were they pointed?

15 A. As I was walking by them, the guy behind me

16 had it at my head the entire time. As I was walking by

17 them, I don't know. They were just pointed at me.

18 Q. So show me how the guy has his gun pointed at

19 your head, the one who is walking behind you.

20 A. (Witness complies.)

21 Like that.

22 Q. Okay. Where were the other officers' weapons

23 pointed?

24 THE COURT REPORTER: I'm sorry. I didn't

25 hear you.

**TRICIA WACHSMUTH** - Page 109

1 BY MS. WESTBY.

2 Q. Where were the other officers' weapons 3 pointed?

4 A. Okay. As I was walking by them, they were

5 just kind of following me with them. And then I get to

6 the top of the stairs, kind of went to the side

and was

7 told, "Yeah, you're going." And so I started to go

8 down the stairs. Officers are following. And I got

9 really scared. All these thoughts kept going through

10 my head. You know, what if I trip? What if my furnace

11 goes off? What if I knock something down the stairs?

12 Am I going to get shot? You know, they are all behind

13 me, you know.

14 And I had my hands up -- because I stopped

15 halfway and put my hands up against the wall. When I

16 stopped and put my hands up against the wall, they kind

17 of took a step back. Everybody lifted up their guns.

18 And then the guy -- and then the guy who was on my side

19 right about here, he had his gun, and he had to let go

20 and shift it into one hand and reached for me. When I

21 had my hands up against the side of the w     a     l     l     ,

I was --

22 I was froze. I was scared. He grabbed me, pulled

23 me -- pushed me away from the wall. As he pushed me

24 away from the wall, he said to keep going. And I

25 looked back and saw the officers and guns. And I just

**TRICIA WACHSMUTH** - Page 110

1 kept going.

2 And then when I got down to the bottom of the

3 stairs, as soon as I had got down to the bottom and

4 stopped, that's when they all came rushing down. And

5 an officer came and cuffed me. As he put my cuffs on

6 he told me, he was like, you know, "I'm not going to

7 put these on tight Please don't get out of them.

8 You've been cooperative."

Ms. Wachsmuth had been compliant from the moment the officers entered the house.

*Miner, p. 147, l.5-16, Tricia Wachsmuth declaration, Appendix Twenty Two.* Instead of putting her

in handcuffs and removing her from the home immediately, as planned, *See Exhibit 10 to Torczon*

*deposition*, the officers who took custody of her failed to secure her person until she had been forced

to lead the officers downstairs at gunpoint to finish clearing the house. *Miner, p. 136, l. 15-23;*

*Tricia Wachsmuth Declaration.* Plaintiff was held at gunpoint from the time the officers entered the

home, until just before the home was declared cleared. *See Tricia's deposition testimony above and her declaration for the weapon positions.* She estimated the time at approximately ten minutes. *See Tricia Wachsmuth declaration.* Based on the CAD report, that time frame was approximately 9 minutes. *See page 3 of Exhibit 19 to Miner deposition.*

The officers charged with deploying the flashbang, raked the window, and dropped the device on the bed, *Chretien, p. 247, l. 15-25*, which started a fire on the bedding. *Bret Wachsmuth, p. 29, l2 through p. 30 l. 2.* The window height prevented Officer McCaslin and Sergeant Kent him from seeing the area where the flashbang device was being deployed. *McCaslin, p. 80, l. 13 through p. 81, l. 8.* Sergeant Kent who raked the window admitted that not being able to see in the window was a good reason for not deploying the device. *Kent, p. 134, l. 8-17; Kent, p. 134, l. 20 through p. 136, l. 9.* Neither officer had any idea where the child was located in the home. *Kent, p. 142, l. 4 through p. 143, l. 15; McCaslin, p. 74, l. 8-20.* Kent and McCaslin joined the other officers in the Wachsmuth residence before Tricia was taken downstairs. *Kent, p. 148, l. 19-23; McCaslin, p. 82, l. 2-18.*

Sergeant Chretien stated that one of the reasons for conducting the raid was to protect the young child: ". . . obviously I want to take whatever precautions I can to minimize the trauma on a young child." *Chretien depo p. 163, lines 15-25.* The result doesn't entirely make sense. Bret Wachsmuth who was bi-polar and may have been called by the CI as paranoid and a peeper, had never committed an act of violence against another human being, and had no criminal record. He was not dealing drugs, and had nothing more than a few marijuana plants to protect. The warrant

was for a misdemeanor marijuana grow operation, and if prescription pain pills had been sent from Tricia's mother it would still have been a misdemeanor warrant. Even if Bret Wachsmuth had guns around the house, there was no objective evidence that Bret Wachsmuth posed a serious threat to the officers or to anyone else. In fact, if the intelligence that had been gathered had been competently assessed, it was clear that Bret Wachsmuth's vehicle wasn't even there that night. On the other hand conducting a no-knock raid on the Wachsmuth residence when there was reason to believe a young child was in the premises, by a group of officers who had never performed a SWAT type entry before as a team, whose formal training was a basic course in police tactics that occurred three years earlier, was adding an element of danger that simply would not have been there otherwise.

The lack of officer training in this case led to the failure to respect the constitutional requirements of the knock and announce rules for serving the warrant, failure to look before deploying a flashbang device nto a bedroom where a young child could have been present, unnecessarily pointing weapons at the Plaintiff after it was clear she did not present a threat to officer safety, while leaving her unrestrained after she should have been handcuffed, and forcing her to lead the officers as a human shield into an uncleared area of the home being searched. The lack of training highlighted by these basic errors in conducting the search warrant, is part of the totality of the circumstances that support the inference that the officer's actions were objectively unreasonable.

Following the raid, Sergeant Chretien apologized to his fellow officers for sending Tricia

downstairs first into an uncleared area. *Hall, p. 101, l. 23 through p. 103, l. 4.* Officer Hall, who had no training, but more common sense than most of the rest of the officers, admitted that he wanted to stop Tricia from going downstairs because he knew she shouldn't be going first into an uncleared area. *Hall, p. 103, l. 12 through p. 104, l. 11.* While remorse for their actions may not frame the constitutional argument, it certainly does help frame the underlying recognition that the officers violated common sense, common decency and police practices. Sergeant Chretien admitted in his deposition that nowhere in his police training was there any allowance for using suspects as human shields. *Chretien, p. 199, l. 5 through p. 200, l. 16.*

Sergeants Eckerdt, and Chretien and Officer Danzer went to the residence of Tom Wachsmuth. Even though the suspect Bret Wachsmuth had been considered sufficiently dangerous to conduct a no-knock warrant by a 13 member SWAT style team, the officers voluntarily went into Tom Wachsmuth's residence and spent five to ten minutes talking with Tom Wachsmuth while Bret, who was sitting unsecured on a couch in the living room, sat and listened. *Bret Wachsmuth, p. 91, l. 10 through p. 93, l. 25.*

Plaintiff's expert pointed out that the actions of the Powell Police Department fell below all industry standards of reasonableness in nearly every aspect of the operation.

1.    There was absolutely no basis for establishing the CI's reliability.
      a.    His information was not reasonably current.
      b.    He had not been engaged in a controlled buy
      c.    There is no evidence or even an allegation in the affidavit for search warrant that he had previously proven to be reliable.

2.    The flashbang device was deployed with reckless indifference.

    a.     It was thrown through a window onto a bed; and,

    b.     a child was believed to be in the home; and

    c.     Officer McCaslin could not see where the device was being deployed although he knew it to be in a bedroom

3.    Plaintiff was the victim of objectively unreasonable excessive force.

    a.     All of the information previously described herein;

    b.     According to plaintiff, who was home alone and wearing only pajamas, while watching television:

        i.     She immediately raised her "hands in the air", submitted to the officers' questions informed them that no one else was home and was compliant/submissive but, nevertheless, she was continually held thereafter at gunpoint,

        ii.    She was forced ahead of the officers searching her home, while still held at gunpoint, as a literal human shield which was so contrary to police practice as to be unconscionable;

            (1)    Police do not use hostages to protect themselves and have a fundamental duty to protect people who they have taken into custody;

            (2)    if. as the officers were apparently contemplating, some armed threat had appeared before them, plaintiff would have undoubtedly been caught in the resulting crossfire and killed or serioiusly injured.

        iii.    When plaintiff briefly stopped on the stairs down to the basement, the officers raised their weapons to the ready position and pointed them at her head;

        iv.    Nearly the entire complement of PPD officers was deployed in this SWAT configured operation, however:

            (1)    There was no evidence of prior drug trafficking from the home,

            (2)    There was no history of violence for the known occupants of the home or on those premises,

            (3)    There was no objective threat to the officers or general public;

            (4)    Plaintiff was not given even the slightest but requisite opportunity to answer the knock and announce before her door was forcibly breached.

*See D.P. Van Blaricom Declaration, Appendix Twenty One.*

### *ARGUMENT*

Summary Judgment in a Civil Rights case involves several special considerations. First, summary judgment may be granted or denied based on the existence of genuine issues of material fact on any element of the Plaintiff's claims. In a 1983 action, public officials sued in their individual capacity have qualified immunity which protects them from liability unless they violated clearly established constitutional rights of which reasonable person would have known. *Harlow v. Fitzgerald*, 102 S.Ct 2727, *2738* (U.S. [CA D.C.] 1982). Second, the qualified immunity defense is immediately appealable to the extent it turns on a pure issue of law, but pretrial rejection of the qualified immunity defense is not immediately appealable to extent that it turns on an issue of fact. *Johnson v. Jones*, 115 S.Ct 2151, *2158* (U.S. [CA7] 1995), *Mick v. Brewer*, 76 F.3d 1127, *1133-4* (CA 10 [D.Ct. KA] 1996); *Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253, *1258* (CA 10 [NM] 1998). There is no qualified immunity for governmental entities, hence no interlocutory appeal. *Owen v. City of Independence, MO*, 100 S.Ct. 1398, *1415* (U.S. [CA 8] 1980)

## I.   *OFFICIAL CAPACITY LIABILITY FOR APPROVING A CONSTITUTIONALLY INFIRM ENTRY PLAN.*

The contours of entity liability under § 1983 are apparently undisturbed by *Ashcroft v. Iqbal*, 129 S.Ct 1937 (US [CA 2] 2009). The Supreme Court in *Pembaur v. City of Cincinnati*, 106 S.Ct. 1292. *1298-99* (U.S. [CA 6] 1986) allowed § 1983 official capacity liability where official policy was established by one decision rather than an ongoing policy carried out and applied over time. "The touchstone for determining "official policy" is 'distinguish[ing] acts

of the municipality from acts of employees of the municipality, and thereby mak[ing] clear that municipal liability is limited to action for which the municipality is actually responsible.'" *Melton v. City of Oklahoma City*, 879 F.2d 706, *723* (CA 10 [W.D. OK] 1989), quoting *Pembaur*, 106 S.Ct. at 1298-99. The determination of who is a final policy maker is by resort to state law. *City of St. Louis v. Praprotnik*, 108 S.Ct. 915, *925* (U.S. [CA 8] 1988). It is a question of the delegation of legal power. *Brammer-Hoelter v. Twin Peaks Charter Co.*, 602 F.3d 1175, *1189* (CA 10 [CO] 2010). There are three factors that determine who is a final decision maker. They are:

> (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final-i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."

*Id.*

In this case, the City of Powell has a city manager form of government. The Powell City Manager has the authority to prescribe the powers and duties of all employees, including department heads, pursuant to City Ordinance § 2.08.050. *Exhibit 52 to the Feathers Deposition.* The Chief of Police promulgated and adopted the Police Department Policies and Procedures Manual, which grants him ultimate authority to determine policy for the police department. Defendant, City of Powell acknowledges that Chief Feathers is the final decisionmaker for the Powell Police Department. *See City of Powell Brief- pp 4-5.*

The Chief of Police, Defendant Tim Feathers, authorized the execution of a constitutionally

infirm raid on the Wachsmuth residence that permitted the officers of the Powell Police Department to enter the home in a SWAT style raid immediately after announcing their presence without allowing the homeowner the opportunity to respond to the officer's request for entry. Plaintiff has testified that the officers didn't bother to knock and announce, but upon making eye contact with one of them on her porch, they simply rammed the door and entered. Feathers admits that he was aware that the warrant was a knock and announce warrant. Feathers admits that he was aware that Chretien's plan was to knock and announce and then immediately ram the door. Feathers admits he was aware this conduct was unconstitutional. Feathers tries to excuse his ratification of such a plan by stating he spoke with Chretien about the nature of the word "immediately" and was satisfied that, by it, Chretien meant "wait a reasonable time" before entering. The word "immediately" is of common usage. It is defined as "without lapse of time; without delay; instantly; at once: i.e.– Please telephone him immediately. 2. with no object or space intervening. 3. closely: immediately in the vicinity. 4. without intervening medium or agent; concerning or affecting directly. –conjunction 5. Chiefly British . the moment that; as soon as." *Dictionary.com*. The concepts understood by the word "immediately" and the phrase "wait a reasonable time" are polar opposites. It is implausible that grown men accustomed to gauging their actions against established constitutional standards, could confuse the term "immediately" with the phrase "wait a reasonable time," particularly when the term shows up in the report of Chretien which Feathers approved over a month later, and in the answers filed by the parties' attorneys which admitted that the plan was to knock and announce and immediately ram the door. The factfinder will be entitled to reject Feather's proposal.

Thus, the Plaintiff is entitled to the inference that Chief Feathers knew that Chretien intended to violate the 4th amendment. In further support of this scenario, there is the testimony of Lieutenant Patterson of the Park County Sheriff's office that Miner informed him that administration was on his ass to kick a door down earlier in the day, and the admission of Chretien to Tom Wachsmuth that night that he wanted to do it differently, but those in authority over him required a dynamic entry and so he decided to do it right. Of course, the testimony of the Plaintiff that the officers didn't even knock, let alone announce their presence and wait a reasonable time for her to answer the door must be taken as true.

The "knock and announce" requirement has long been a part of the Fourth Amendment reasonableness inquiry. ***Wilson v. Arkansas***, 115 S.Ct. 1914 (U.S. 1995); ***Miller v. United States***, 78 S.Ct. 190, (U.S. 1958). ". . .[T]he common law recognized that individuals should be provided the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." ***Richards v. Wisconsin***, 117 S. Ct. 1416, ***1421, n. 5*** (US [WI] 1997). In ***U.S. v. Gallegos***, 314 F.3d 456, ***495*** (CA 10 [UT] 2002) the Court quoted further from ***Richards, supra.***,

> . . . [T]he privacy interests advanced by the rule include: (1) permitting individuals to comply with the law by peaceably permitting officers to enter their homes; (2) avoiding the unnecessary destruction of property that attends a forcible entry; and (3) providing an opportunity for occupants to "prepare themselves" for entry by law enforcement officers by, for example, "pull[ing] on clothes or get[ting] out of bed."

The "Fourth Amendment, reflecting the long common law tradition protecting the sanctity of the home, includes a general presumption that police officers executing a search warrant for a

residence must announce their presence and authority before entering. If the occupants do not admit the officers within a reasonable period of time, the officers may be deemed to be constructively refused admittance, and they may then enter by force." **U.S. v. Moore**, 91 F.3d 96, **98** (CA 10 [KA] 1996). Where forced entry is virtually instantaneous with the knock and announce it precludes any claim that the officers were constructively refused admittance. **Id.** At least since 1996 in the Tenth Circuit, it has been clearly established constitutional law that an immediate entry into a home without knocking and announcing or waiting a reasonable period of time in the absence of exigent circumstances violates the Fourth Amendment. In **U.S. v. Gallegos**, 314 F.3d 456 (CA 10 [UT] 2002), the Court held that a wait of five to ten seconds was unreasonable under the facts of that case and that a five to ten second time frame pushed the limits of reasonableness. In **Holland Ex. Rel. Overdorff v. Harrington**, 268 F.3d 1179, **1194** (CA 10 [CO] 2001), the Tenth Circuit applied this rule in the civil context announcing that, the failure to knock and announce and wait a reasonable time was clearly unconstitutional. It is a fact based inquiry. **Id.** Here, Tricia Wachsmuth was seen by at least one officer just a few feet away from the door sitting on her couch, just before the police entered. *Chapman, p. 40, l. 12 through p. 41, l. 13; Eckerdt, p.57, l. 4 through p. 58, l. 6.* From the time she saw someone standing on her porch until a police officer pointed his weapon at her on the couch, she didn't have time to move. *Tricia Wachsmuth declaration.*

Furthermore, since the plan was to deny the Plaintiff the opportunity to come to the door, and comply with the officer's requests, it followed that the home was broken into, the flashbang device

was deployed, the Plaintiff was held at gunpoint for ten minutes and used as a human shield.  The decision to deploy a dynamic entry team that knowingly would use excessive force is a separate basis for liability under the principles announced in *Holland Ex. Rel. Overdorff v. Harrington*, 268 F.3d 1179, *1190* (CA 10 [CO] 2001).  The Plaintiff will develop this argument more fully in the section on supervisory liability set out below.

The actions of Chief Feathers in giving actual final approval to the entry plan were 1) the actions of a final policy maker, 2) constituted a deliberate choice among various alternatives, including going to Tom Wachsmuth and asking him to assist in the warrant, or simply waiting a reasonable time for the occupant to get off the couch and answer the door, and 3) were admittedly unconstitutional. *Brammer-Hoelter v. Twin Peaks Charter Co.*, 602 F.3d at 1188.

## II.    LIABLITY OF SERGEANT CHRETIEN AS AUTHOR OF THE ENTRY PLAN.

Failure to wait a reasonable period of time on a knock and announce warrant after announcing police presence violates the Fourth Amendment.  An entry plan that called for immediate forcible entry by ramming the door, on a known knock and announce warrant where no exigent circumstances existed violated the Fourth Amendment and the law was clearly established at the time.  The officers involved in carrying out Chretien's entry plan failed to follow clearly established constitutional guidelines when they rammed the door to the Plaintiff's residence without either announcement of their presence or waiting for constructive denial of admittance.  Sergeant Chretien is liable to the Plaintiff under § 1983 as a person who, under color of law subjected the Plaintiff to the deprivation of her rights under the Constitution in forming such a plan, and

instructing officers under his command to carry it out.

## III. *LIABILITY OF THE POWELL POLICE OFFICERS WHO WERE PRESENT WHEN THE PLAN WAS PRESENTED AND WHO MADE NO EFFORT TO PREVENT ITS BEING CARRIED OUT*

Each of the following named Defendants, Chad Miner, Roy Eckerdt, Dave Brown, Mike Hall, Brett Lara, Matt McCaslin. Alan Kent, Matt Danzer, Matt Brilakis, Cody Bradley, and Kirk Chapman were present at the police station when the entry plan was presented. The only two documents generated contemporaneously with the events of that evening, Marissa Torczon's hand written notes of the planning session, and Sergeant Chretien's report of the planning session both support the inference that Chretien planned to violate the Fourth Amendment by conducting the warrant service as a no-knock service with an overwhelming show of force, including the use of a distraction device.

As previously discussed, failure to knock and announce in the absence of exigent circumstances, violated clearly established constitutional law. Each of the officers is individually liable for his failure to stop the use of excessive force in violating the Plaintiff's Fourth Amendment rights under the knock and announce rules. It was clearly established as early as 1996 in the Tenth circuit that individual officers have the affirmative duty to intervene to prevent another office's use of excessive force. *Mick v. Brewer*, 76 F.3d 1127, *1136* (CA 10 [KA] 1996). As early as 1984, the Tenth Circuit held that "[A]n officer who fails to perform a duty may be liable under § 1983 if that failure causes deprivation of protected rights." *Lusby v. T.G. & Y Stores, Inc.*, 749 F.2d 1423, *1433* (CA 10 [W.D. OK] 1984). In 2008, the Tenth Circuit reiterated that it

was clearly established constitutional law that an officer could be held liable for failure to intervene

to prevent an excessive use of force. *Fogerty v. Gallegos*, 523 F.3d 1147, *1162* (CA 10

[NM] 2008).

## IV. THE DECISION TO DEPLOY THE SWAT STYLE TEAM VIOLATED THE KNOCK AND ANNOUNCE RULES AND CONSTITUTED EXCESSIVE FORCE

The decision to deploy a SWAT type team is subject to Fourth Amendment scrutiny.

*Holland Ex. Rel. Overdorff v. Harrington*, 268 F.3d at 1190. The Tenth Circuit has

found the decision to deploy a SWAT team will be an unconstitutional application of force, where

the decision is made knowing that a constitutional violation will occur. *Holland*, at 1191. In this

case, violation of the knock and announce rules had been built into the plan, and it follows closely

that excessive force would be applied since the entire plan involved violent entry into the home, use

of a distraction device, and deploying an entry team to perform room clearing tactics where the

homeowner was not given the chance to answer the door. "[W]e review the decision to use that

degree of force by 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth

Amendment interests against the importance of the governmental interests alleged to justify the

intrusion. 'Garner, 471 U.S. at 8, 105 S.Ct. 1694." *Id.*

In *Holland* at 1190-1191, the Court examined the totality of the circumstances, to

support use of a SWAT team including:

1. The suspect had a history of violence.

2. Several other persons who resided at the 60 acre compound had histories of violence

3. The SWAT team was unsure of the number of individuals who were at the compound but believed there could be as many as seven or eight.

4. The SWAT team suspected there were firearms in the residence.

5. There was concern about destruction of evidence.

6. There were children present at the compound.

In *Hernandez v. Conde,* 442 F.Supp.2d 1141, *1154* (D.Ct. KA) 2006), the District Court for the District of Kansas found the following factors satisfied the reasonableness test in the deployment of a SWAT team:

1. A cocaine sale had been conducted at the residence.

2. The residents of the house were allegedly mid-level to high-level drug dealers.

3. The search was in a high crime area.

4. The location was connected to a double homicide.

5. There was traffic to the house.

6. The officers were unaware of the presence of guns.

Both of these cases recognized that the policy makers had *no knowledge* the SWAT team would use excessive force when they made the decision to deploy it.

In the instant case, the decision to deploy the SWAT style team involved the following information taken in the light most favorable to the Plaintiff:

1. Neither Bret nor Tricia Wachsmuth had ever been convicted or even charged with a crime previously.

2.  Neither Bret nor Tricia Wachsmuth had any record of violence.

3.  There was no evidence or insinuation that Bret or Tricia Wachsmuth were selling drugs.

4.  The search warrant was a knock and announce warrant for misdemeanor drug possession, and he officer applying for it made no effort to secure a no-knock warrant.

5.  The location of the Wachsmuth residence was not a high crime area, and there was no traffic reported in or out of the house.

6.  The allegation that Bret Wachsmuth was paranoid and a peeper was made by a confidential informant whose credibility had not been established. Miner had spent a total of two hours with him. *Miner, p. 54, l. 22 through p. 55, l. 7.*

7.  The confidential informant had disclosed reasons for wanting to get even with the Wachsmuths.

8.  The allegations that Bret was paranoid and a peeper did not establish that he was a threat to officers

9.  The allegations that Bret Wachsmuth had loaded guns in the house did not establish an objective threat to the officers sufficient to support the actions taken.

10. Lieutenant Patterson of the Park County Sheriff's office who was the head of the only specially trained tactical unit in the county, declined to employ his SRG team in aid of the warrant service because the investigation had not been properly vetted

and the evidence of an objective threat to the officers was not established.

11. Officer Miner, who obtained the search warrant, had told Lt. Patterson that he was getting pressure from administration to kick a door down, that he was going on days off and had to do it then, when asked why it couldn't be handled as a normal warrant service.

12. Sergeant Chretien, the raid planner, told Tom Wachsmuth that he didn't want to use the dynamic entry but people higher up in the chain of command gave him no choice.

13. The Powell Police Department did not have a SWAT team or any trained unit of tactical officers.

14. None of the officers had ever performed together in an operational setting as a team.

15. The Powell Police Department had never detonated a flashbang device in an operational setting.

16. The officer chosen to deploy the flashbang was not certified and last trained in deploying the device in 2005.

17. Sergeant Chretien planned for a no-knock warrant service, even though he had a knock and announce warrant.

18. During the raid, the following constitutional violations occurred:

    a. The officers neither knocked nor announced before battering the door in violation of the warrant and without exigent circumstances.

    b. The flashbang device was deployed through a bedroom window without

looking because the window was too high. A small child was suspected of being in the residence, but no one had any idea where. The flashbang device landed on a bed and started a fire in the bedding.

c.     The officers on the entry team held Plaintiff by gunpoint after it was clear that she posed no threat to the officers.

d.     The Plaintiff was used as a human shield to clear an uncleared area of the home.

19.     After the warrant was executed, the following was noted— there were guns in the house, and two marijuana plants in the basement. The only prescription drugs belonged to Bret Wachsmuth. Bret Wachsmuth was at his father's house when the raid was conducted, his vehicle was not at the residence. The Wachsmuth's were charged with misdemeanors.

Employing the balancing test articulated in **Holland**, the Court would balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion. The government's interest in violating the knock and announce warrant and deploying an untrained unit that acted in every sense as a SWAT team, was officer safety and destruction of evidence. Destruction of marijuana plants two feet high in the time it would take a person to answer the door is not realistic.

The Plaintiffs have made a showing that Chretien, Kent and Feathers "decided to use the SWAT team knowing that the SWAT team would use excessive force, . . . or that they instructed

the SWAT team to use excessive force while conducting the . . . raid." **Holland** at 1191.

It was clearly established constitutional law after **Holland**, that deployment of a SWAT style team knowing that the it would violate the knock and announce rules and engage in excessive force was itself an unreasonable use of force under the Fourth Amendment.

After **Ashcroft v. Iqbal**, 129 S.Ct 1937 (US [CA 2] 2009) the full contours of supervisor liability in the context of traditional § 1983 supervisor liability are uncertain. Nevertheless, as the Tenth Circuit noted in **Dodds v. Richardson**, 614 F.3d 1185, **1199** (CA 10 [W.D. OK] 2010) where an official with policy making authority actively endorses or implements a decision which is constitutionally infirm, the official may face personal liability for the violation which results from the decision. This is not vicarious liability, but liability for the officer's own actions. As established in **Pembaur**, the single decision of a policy maker, or supervisor, may create liability where it is itself unconstitutional. In that context, where the decision itself violates federal law, proof that the decisionmaker has intentionally deprived Plaintiff of a federally protected right necessarily establishes that he acted culpably. **Dodds v. Richardson**, 614 F.3d at 1199, n. 8. The Plaintiff has stated a claim of supervisory liability against Chief Feathers and Sergeant Kent on the basis that they acted intentionally to ratify and make possible the actions of the SWAT style team to violate Plaintiff's Fourth Amendment rights to a reasonable opportunity to answer the door, and for deploying a SWAT style team that they knew would use excessive force because it took away the homeowner's right to avoid forced entry.

## VI.    THE ACTIONS OF THE ENTRY TEAM IN FAILING TO ANNOUNCE AND RAMMING THE DOOR WERE UNCONSTITUTIONAL

The actions of the entry team consisting of Sergeant Chretien, Officer Miner, Officer Chapman, Officer Danzer, Officer Hall, and Sergeant Eckerdt violated the 4th amendment to the constitution and constituted excessive force when the officers rammed the door without either a knock or an announcement. Th s is clearly established constitutional law. As the Supreme Court noted in **Hudson v. Michigan**, 126 S.Ct. 2159, **2167-8** (U.S. [MI] 2006), the circuits have had little trouble dispensing with the qualified immunity defense when knock and announce rules are disregarded.

## VII.    DEPLOYMENT OF THE FLASHBANG WAS EXCESSIVE FORCE.

For some time now, it has been apparent that the deployment of flashbang devices would be subjected to Fourth Amendment reasonableness scrutiny. **U.S. v. Meyers**, 106 F.3d 936, **940** (CA 10 [KA] 1997). While **Meyers** did not determine the use of a flashbang to be unconstitutional per se, it set two important precedents. First, **Meyers** did establish that the use of the device was subject to Fourth Amendment reasonableness scrutiny, which meant that officers using the device going forward must establish the **Graham** factors or risk that they do violate clearly established law. Second, **Meyers** cautioned that "[t]he use of a "flashbang" device in a house where innocent and unsuspecting children sleep gives us great pause. Certainly, we could not countenance the use of such a device as a routine matter." **U.S. v. Meyers**, 106 F.3d at 940.

The Ninth Circuit has held that deployment of a flashbang device without looking in a room

with innocent bystanders is constitutionally excessive, **U.S v. Stewart**, 867 F.2d 581 (CA 10 [CO] 1989), in the absence of a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury.   The Seventh Circuit has cautioned that the use of such devices in close proximity to suspects may not be reasonable. **U.S. v. Morris**, 349 F.3d 1009, **1112** (CA 7 [C.D. IL] 2003). In another Seventh Circuit case, **U.S. v. Jones**, 214 F.3d 836, **837-838** (CA 7 [C.D. IL] 2000), the Court noted that use of the device where young children may be present was a concern.  In **Taylor v. City of Middletown**, 436 F.Supp.2d 377, **387** (D.Ct. CT 2006) the Connecticut District Court (Second Circuit) held it was unreasonable and well established that deploying a flashbang at someone was excessive force. The Third Circuit in **Estate of Robert Cecil Smith v. Marasco**, 430 F.3d 140 (CA 3 [E.D. PA] 2005) found that deploying a flashbang device six hours after securing the premises with an emotionally disturbed suspect was both unreasonable and the principle was well established by applying the **Graham** factors.

While it is true that clearly established law involves a resort to Supreme Court Precedent, the law of the circuit and the law of sister circuits, it is equally clear that all that is required is that a reasonable official would understand that what he is doing violates the constitution. **Hope v. Pelzer**, 122 S.Ct. 2508, **2515** (U.S. [CA 11] 2002). In **Fogerty v. Gallegos**, 523 F.3d 1147, **1161** (CA 10 [N.M.] 2008)

> "[w]e cannot find qualified immunity wherever we have a new fact pattern." Thus, our circuit uses a sliding scale to determine when law is clearly established. Under this approach, "[t]he more obviously egregious the conduct in light of prevailing constitutional principles,

the less specificity is required from prior case law to clearly establish the violation." (quoting Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir.2004)). Relevant here, " Graham establishes that force is east justified against nonviolent misdemeanants who do not flee or actively resist arrest."

The use of the device in this case followed upon the heels of an unconstitutional entry that did not afford the homeowner the opportunity to come to the door and admit the officers which would have obviated the necessity for the distraction. The officers, McCaslin and Kent, charged with deploying the device were not certified in its use. No one at the Powell Police Department had ever used a flashbang before except in training exercises. McCaslin hadn't deployed a flashbang even in training, in over three years. Both men saw that the window height prevented them from observing where the device would land. Both men believed that a young child was somewhere in the residence. Both men knew they were deploying the device in the bedroom. Neither man knew where the bed was. It was a reasonable inference that the young child would be in the bedroom or even sleeping in the bedroom at 9:15 p.m. when the raid was conducted, and that the bed could be located directly under the window where the device was deployed, which, it was.

In **Meyers** the Court roted that while it gave them great pause to permit the use of a flashbang in a home where young children sleep, there were significant counter-veiling factors that under the **Graham** analysis supported the police, Meyers had a history of illegal drug trafficking, had spent time in federal prison for a fire bombing incident, had a lengthy pattern of criminal activity and his home was the likely source of a commercial marijuana grow operation.

Applying the **Graham** factors to this case: 1) the severity of the crime at issue, 2) whether

the suspect posed an immediate threat to the safety of the officers or others, and 3) whether he was actively resisting arrest or attempting to evade arrest by flight, **Graham v. Conner**, 109 S.Ct. 1865, **1872** (U.S. [CA 4] 1989), it should be clear that the degree of force to be used here was tempered by the lack of an objective threat, and the relatively minor nature of the crime.  The crime was a misdemeanor, neither suspect had any prior criminal history or history of violence, there was reason to believe that the "paranoid" suspect, Bret Wachsmuth, wasn't even in the residence since no vehicles were out front. A ten year old child was thought to be inside, and there was no reason to suspect that anyone would flee.  The officer in charge of the only trained tactical unit in the County refused to get involved because the operation was proceeding too quickly, and because there was no evidence of an objective threat to the officers.

Basic standards for using these devices include knowing where they are to be thrown, and avoiding throwing them in areas where flammable materials are present, such as on a bed with pillows and bedding.  It is also basic practice not to deploy the devices where young children are present because of the danger of death or serious injury.  *McCaslin, p. 38, l. 7 through p. 49, l. 12.* Applying the sliding scale discussed in **Fogerty v. Gallegos**, 523 F.3d at 1161, Sergeant Kent and Officer McCaslin should have known that their actions in the context of the plan to raid the Wachsmuth home were unreasonable.

## VIII.   LIABILITY OF THE OFFICERS FOR HOLDING THE PLAINTIFF AT GUNPOINT AFTER IT WAS CLEAR SHE DID NOT POSE A THREAT TO OFFICER SAFETY OR A RISK OF FLIGHT.

Pointing weapons at a suspect is subject to the reasonableness standards of the Fourth

Amendment. It is clearly established law that pointing a weapon at the head of a person who no longer poses a threat to officer safety or represents a flight risk is excessive force. *Holland v. Harrington*, 268 F.3d at 1193. "We can find no substantial grounds for a reasonable officer to conclude that there was legitimate justification for continuing to hold the young people outside the residence directly at gunpoint after they had completely submitted to the SWAT deputies' initial show of force. . ." *Holland* at 1197.

Sergeant Eckerdt was the officer who initially took custody of the Plaintiff.[4] He not only held her at gunpoint, but pointed his rifle at her head for most of ten minutes until she was secured at the bottom of the stairs by Officer Miner. Tricia Wachsmuth presented no risk of flight. She had her hands up most of the time, had delivered her cell phone to one of the officers, had responded to all of their questions, and complied with every demand. The officers admitted she did not pose a threat and was compliant.

After Chapman, Miner, Chretien, Hall and Danzer cleared the upstairs with the assistance of Kent and McCaslin, while Eckerdt stood over the Plaintiff, they all assembled in the living room and Kitchen and held their weapons in the ready position pointed at the Plaintiff. By this time, Plaintiff should have been handcuffed. However, it was clear she posed no threat to the officers

---

[4]     Counsel for the Defendants have suggested that Tricia Wachsmuth may not have been seized from the time she was held at gunpoint on her couch, and then ordered down the stairs under the guns of the entire entry team, while five members of the Powell Police Department secured the perimeter of her home. *Holland v. Harrington*, 268 F.3d at 1187 recites clear law that if the suspect is not free to go there is a seizure.

sitting on the couch while Eckerdt pointing his weapon at her head. She was frightened and emotionally traumatized. She was compliant. Pointing weapons in this situation was clearly excessive. It was clearly established in this circuit that pointing weapons at a suspect who ceases to present a threat to officers and poses no risk of flight is excessive force. Any officers who were not pointing their weapons at the Plaintiff are liable for standing by while the others did, under the principles announced in *Mick v. Brewer*, 76 F.3d at 1136; *Lusby v. T.G. & Y Stores, Inc.*, 749 F.2d at 1433.

## IX. LIABLITY OF CHRETIEN FOR USING THE PLAINTIFF AS A HUMAN SHIELD.

Sergeant Chretien, who had SWAT experience, and should have known better, let his exuberance for the occasion get the better of him and ordered the Plaintiff to lead the officers as a human shield into the last uncleared area of the house, the basement. Tricia, having every gun in the room pointed at her, did not feel free to decline the order. Plaintiff arose from the couch and with the guns following her as she went to the basement door, hesitated, and was told, "yes, your going" after which she started down the stairs. At some point as she descended, Plaintiff stopped and rested against the wall with her hands up, contemplating what might happen if the furnace made a noise, or if she knocked something off the stairs. At that, the officer directly behind her, Danzer, grabbed her and pushed her away from the wall and said "keep going." All the officers behind her raised their weapons from the ready position to the weapon position and pointed them at her at that time.

Chretien apologized to a group of his own officers within a few days of the search for

sending Tricia into an uncleared area of the home in front of them. Chretien apologized to Tom Wachsmuth for the way things were handled the night of the search. Hall stated to Tom Wachsmuth that he wished he had just grabbed Tricia and had gotten her out of there before she went down the stairs. Chretien stated in his deposition that none of his training or experience supported using a suspect as a human shield.

There is a dearth of cases on the constitutionality of police using suspects as human shields, probably because it is so outrageous, that it just doesn't happen very often. This is a case where the unreasonableness of the conduct is so clear that an exact precedent is not necessary. In such a case, the sliding scale announced in **Pierce v. Gilchrist**, 359 F.3d at 1298 and restated in **Fogerty v. Gallegos**, 523 F 3d at 1161 applies, "'[t]he more obviously egregious the conduct in light of prevailing constitutior al principles, the less specificity is required from prior case law to clearly establish the violation.' Graham establishes that force is least justified against nonviolent misdemeanants who do not flee or actively resist arrest." As Plaintiff's police practices expert put it:

Using plaintiff as a human shield was so outrageous and contrary to police practice as to be unconscionable:

i)      Police do not use hostages to protect themselves and have a fundamental duty to protect people who they have taken into custody,

ii)     If, as the officers were apparently contemplating, some armed threat had appeared before them, plaintiff would have undoubtedly been caught in the resulting crossfire and killed or seriously injured.

*Van Blaricom Supplemental Report.*

## X. *LIABILITY OF THE ENTR* ⸝ *TEAM, MCCASLIN AND KENT FOR ALLOWING CHRETIEN TO USE THE PLAINTIFF AS A HUMAN SHIELD*

Every officer in the home that night would have heard Officer Chretien direct the Plaintiff to take them downstairs. Most of the officers admitted hearing something along those lines, although there was much dissembling on that point. Tricia Wachsmuth makes it clear Sergeant Chretien's voice carried through out the house, and everyone should have heard him. *Tricia Wachsmuth declaration*. Chretien himself admitted telling Plaintiff she would lead them downstairs but declared it was a bluff. *Chretien, p. 196, l. 18 through p. 198, line 9*. All the officers had the opportunity to do as Officer Hall thought to do – step in and stop this action, but none of them did so. The officers in the home are liable for violating a clearly established constitutional point, that they take action to prevent excessive force by a fellow officer from taking place. The officers present in the home at that time included every member of the entry team, Chretien, Eckerdt, Hall, Danzer, Chapman, Miner and McCaslin and Kent, the flashbang team.

An officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983. This duty was clearly established law by the evening of the 24th of February, 2009. **Fogerty** at 1162.

*Wherefore*, Plaintiff prays that

1. The motion to grant qualified immunity to the officers be denied; and,

2. the motion for summary judgment be denied.

   Monday, January 10, 20 1.

Respectfully submitted,

JEFFREY C. GOSMAN
Plaintiff's Counsel
**GOSMAN LAW OFFICE**
PO Box 51267
Casper, Wyoming 82601
(307) 265-3082 (ph.)
(307) 265-6715 (fax.)

### *Certificate of Service*

I hereby certify that true and correct copies of the foregoing document was served this Monday, January 10, 2011 by *e-submission* to the following parties in interest:

| | |
|---|---|
| Misha Westby<br>Senior Assistant Attorney General<br>2424 Pioneer Avenue, 2nd Floor<br>Cheyenne, WY 82002<br>　　　(307) 777-5477<br>　　　(307) 777 8920 (f)<br>mwest@state.wy.us | Tom Thompson<br>MacPerson, Kelly & Thompson<br>P.O. 999<br>Rawlins, WY 82301-0999<br>　　　(307) 324-2713<br>　　　(307) 324-7348<br>tthompson@wyomingattorneys.net |

Jeff Gosman

*TABLE OF APPENDICES*

1.      Tim Feathers Deposition.
2.      Mike Chretien Deposition.
3.      Dave Patterson Declaration
4.      Matt McCaslin Deposition.
5.      Alan Kent Deposition.
6.      Marissa Torczon Deposition.
7.      Bret Wachsmuth Deposition.
8.      Chad Miner Deposition
9.      Brett Lara Deposition.
10.     Roy Eckerdt Deposition.
11.     Sean Wachsmuth Declaration.
12.     Tom Wachsmuth Deposition.
13.     Dave Patterson Deposition
14.     Dave Brown Deposition.
15.     Kirk Chapman Deposition.
16.     Mike Hall Deposition
17.     Matt Brilakis Deposition.
18.     Cody Bradley Deposition.
19.     Matt Danzer Deposition.
20.     Tricia Wachsmuth Deposition.
21.     D.P. VanBlaricom Declaration.
22.     Tricia Wachsmuth Declaration.