# Appendix One

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Tim Feathers*
*November 23, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 11-23-10 Tim Feathers_SCOPED.txt
Min-U-Script® with Word Index

TIM FEATHERS - November 23, 2010                                Page 1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF WYOMING

3   ------------------------------------------------

4   TRICIA WACHSMUTH,                    )
                                         )
5              Plaintiff,                )
                                         )
6       vs.                              )  NO. 10-CV-041J
                                         )
7                                        )
    CITY OF POWELL, AND IN THEIR         )
8   INDIVIDUAL CAPACITY, TIM             )
    FEATHERS, CHAD MINER, MIKE           )
9   CHRETIEN, ROY ECKERDT, DAVE          )
    BROWN, MIKE HALL, BRETT LARA,        )
10  MATT MCCASLIN, ALAN KENT, MATT       )
    DANZER, OFFICER BRILAKIS, LEE        )
11  BLACKMORE, CODY BRADLEY, KIRK        )
    CHAPMAN, JOHN DOES #1-#4,            )
12                                       )
               Defendants.               )
13  _____

14          DEPOSITION OF TIM FEATHERS
15      3:05 p.m., Tuesday, November 23, 2010

16

17

18          Pursuant to notice, the deposition of TIM

19  FEATHERS was taken in behalf of Plaintiff in accordance

20  with the applicable Federal Rules of Civil Procedure at

21  270 North Clark, Powell, Wyoming  before Vonni R. Bray,

22  Registered Professional Reporter and Notary Public of

23  the State of Montana.

24

25

---

TIM FEATHERS - November 23, 2010                                Page 2

1                     APPEARANCES

2   FOR PLAINTIFF:

3           Mr. Jeffrey C. Gosman
            Gosman Law Office
4           125 W 2nd Street
            P.O. Box 51267
5           Casper, WY 82601-2481
            Telephone: (307)265-3082 ~ Fax: (307)265-6715
6           E-mail: jeff@gosmanlawoffices.com

7

8   FOR INDIVIDUAL DEFENDANTS:

9           Ms. Misha Westby
            Senior Assistant Attorney General
10          2424 Pioneer Avenue, 2nd Floor
            Cheyenne, WY 82002
11          Telephone: (307)777-5477 Fax: (307)777-8920
            E-mail: mwestb@state.wy.us
12

13  FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
    CAPACITY:
14

15          Mr. Tom Thompson
            MacPerson, Kelly & Thompson
16          616 West Buffalo
            P.O. Box 999
17          Rawlins, WY 82301-0999
            Telephone: (307)324-2713 ~ Fax: (307)324-7348
18          E-mail: tthompson@wyomingattorneys.net

19

20

21

22

23

24

25

---

TIM FEATHERS - November 23, 2010                                Page 3

1                     INDEX TO WITNESSES

2                                              PAGE

3   TIM FEATHERS

4       Direct Examination by Mr. Gosman ..............4
        Signature Page .............................174
5       Reporter's Certificate .....................175

6

7

8                        EXHIBITS

9   EXHIBIT          DESCRIPTION              PAGE

10     10     Notes of Wachsmuth Warrant ............134

11     16     PPD Supplement 7 by Mike Chretien ......158

12     18     Park County SO Incident Report .........137

13     27     Countermeasures Tactical Institute ......63
              Patrol Officer Specialized Tactics
14            Course

15     29     Crisis Response Tactics ................43

16     31     WY P.O.S.T. Training Records ............41

17     33     Answer Filed by Mr. Thompson ...........161

18     35     PPD Patrol Friday Training ..............10

19     38     SWAT Standards for Law Enforcement ......32
              Agents
20
       52     PPD Policies and Procedures Manual .......6
21
       55     Defendants' Answer and Affirmative .....164
22            Defenses

23     59     Defendants' Responses to ...............88
              Plaintiff's First Discovery
24            Request

25

---

TIM FEATHERS - November 23, 2010                                Page 4
Direct Examination by Mr. Gosman

1               TIM FEATHERS,

2   having been first duly sworn, testified as follows:

3           DIRECT EXAMINATION

4   BY MR. GOSMAN:

5       Q.  Chief, you have heard me ask the same

6   questions over and over again for a couple of weeks

7   now, so we're going to forego a lot of this.  And one

8   of the things we're going to forego is all this

9   business about have you given a deposition before.  I

10  assume that you have.  And if you haven't, you know now

11  how it's done, certainly.

12          And I'm not particularly interested in your

13  work history, so we're going to go ahead and start

14  directly with your employment by the Powell Police

15  Department.

16          When were you hired as the Chief of Police at

17  the Powell Police Department?

18      A.  When was I hired by the Powell Police

19  Department or when did I become the chief of police?

20      Q.  You were hired before you became the Chief of

21  Police; is that correct?

22      A.  Yes.

23      Q.  And you became the Chief of Police when?

24      A.  1998.

25      Q.  How long had you worked in the Powell Police

---

Case 1:10-cv-00041-ABJ Document 65-1 Filed 01/10/11 Page 4 of 117
Tricia Wachsmuth v.
City of Powell, et al.

Tim Feathers
November 23, 2010

TIM FEATHERS - November 23, 2010                    Page 5
Direct Examination by Mr. Gosman

1  Department before then?
2      A.  I was originally hired in 1981.
3      Q.  Did you pretty well start out your law
4  enforcement career with Powell?
5      A.  No.
6      Q.  Where had you served before that?
7      A.  I worked for several months on the McGuffey,
8  Ohio Police Department and then for about a year on the
9  Ada, Ohio Police Department.
10     Q.  And then you came to Powell?
11     A.  Yes.  I had a period of ime where I was not
12  working full time, attending school, finishing my
13  bachelor's degree.  I did a little bit of part-time
14  work for the Paulding, Ohio Police Department during
15  that time.
16     Q.  And when you became the Chief of Police, did
17  they have a written job description for your position?
18     A.  Yes.
19     Q.  And is it the same job description that they
20  have today?
21     A.  No.
22     Q.  Let me hand you what we have marked as an
23  exhibit here somewhere.  Well we're off to a roaring
24  start here.  Okay.  I don't seem to have that exhibit.
25         All right.  Let me ask you this question:

---

TIM FEATHERS - November 23, 2010                    Page 7
Direct Examination by Mr. Gosman

1      Q.  And then your job description would as well;
2  would it not?
3      A.  My job description would as well.
4      Q.  All right.  And when it comes to making
5  decisions that affect the Powell Police Department
6  regarding everyday decisions concerning how the Powell
7  Police Department officers conduct themselves, that
8  would be you, would it not?
9         MR. THOMPSON: Object as to form.
10        MS. WESTBY: Join.
11        THE WITNESS: That's a pretty broad
12  statement, so I'm not sure what all that would
13  comprehend.
14  BY MR. GOSMAN:
15     Q.  Yeah.  Is there anyone in the Powell Police
16  Department or the City of Powell that has authority
17  higher than yours to approve individual police actions?
18        MS. WESTBY: Object to the form of the
19  question.
20        MR. THOMPSON: Join.
21        THE WITNESS: I guess, depending upon the
22  nature and circumstances, it's possible that my direct
23  supervisor, the city administrator, could, yes.
24  BY MR. GOSMAN:
25     Q.  Well, what does the policy say, itself, with

---

TIM FEATHERS - November 23, 2010                    Page 6
Direct Examination by Mr. Gosman

1  Are you the final policymaker for the City of Powell
2  Police Department?
3         MR. THOMPSON: Objection as to form.
4         MS. WESTBY: Join.
5         THE WITNESS: What do you mean by final
6  policymaker?
7  BY MR. GOSMAN:
8      Q.  You are the one that is charged with and the
9  top person in the chain of command in developing policy
10  and procedures for the Powell Police Department?
11     A.  Within the department, yes.
12            (Exhibit 52 identif ed)
13  BY MR. GOSMAN:
14     Q.  All right.  And let's go ahead -- and I don't
15  know that we've actually -- we're only going to mark
16  certain sections of what we've identified as
17  Exhibit 52.  This is the Powell Police Department's
18  policies and procedures.  Could I have you turn to --
19  oh, it's policy 1.2.01.
20     A.  Okay.
21     Q.  And does this set out your authority as the
22  Powell Police Chief with respect to the development of
23  policies and procedures as they pertain to the Powell
24  Police Department?
25     A.  This is one document that would.

---

TIM FEATHERS - November 23, 2010                    Page 8
Direct Examination by Mr. Gosman

1  regard to your authority relative to your police
2  officers?
3      A.  This policy?
4      Q.  Yes.  Could you go ahead and read that
5  portion?
6         Let's see.  Let me just point it out to you.
7  This first paragraph under "policy statement."
8      A.  The first paragraph?
9      Q.  Yeah.  Go ahead.
10     A.  "The Chief of Police of the City of Powell
11  shall have the authority to adopt policies, procedures,
12  rules and regulations for the effective and efficient
13  administration and management of the agency.
14        "All policies, procedures, rules and
15  regulations contained in this manual shall be
16  subordinate to the Powell City Employees Handbook,
17  which is adopted in its entirety, except where noted
18  and approved by the governing body.
19        "These policies, procedures, rules and
20  regulations supercede all previous policies,
21  procedures, rules, and regulations and shall have the
22  same authority as those in existence.
23        "Policies, procedures, rules, and regulations
24  shall not be canceled, amended, or issued without the
25  approval of and verified by the signature of the Chief

Case 1:10-cv-00041-ABJ    Document 65-1    Filed 01/10/11    Page 5 of 117
Tricia Wachsmuth v.                                                                    Tim Feathers
City of Powell, et al.                                                              November 23, 2010

TIM FEATHERS - November 23, 2010                    Page 9
Direct Examination by Mr. Gosman

1  of Police or, in his absence, the officer designated to
2  act in his behalf."
3     Q. Wyoming has annual recertification
4  requirements for each peace officer, does it not?
5     A. Yes.
6     Q. And what are those recertification
7  requirements?
8     A. It requires a certain amount of POST
9  certified hours of training dependent upon the
10 officer's certification level.
11    Q. And do you keep a log of each officer's
12 certification with the Wyoming POST?
13    A. POST sends us a training summary for every
14 officer on an annual basis.
15    Q. And do you retain that documentation?
16    A. Yes, it is put in the officer's personnel
17 file.
18    Q. Okay. I don't think I've gotten any of the
19 POST certifications for officer training.
20    A. Exhibit 31 is those records.
21    Q. All right. Well -- all right. What's the
22 minimum number of hours that are required every year
23 for POST recertification?
24    A. An officer certified at the level for
25 Professional Peace Officer is required 40 hours of POST

TIM FEATHERS - November 23, 2010                   Page 10
Direct Examination by Mr. Gosman

1  certified training every two years.
2     Q. All right. And so the records that you have
3  provided me in Exhibit 31 reflect those POST
4  training -- the POST training coursework for each of
5  the officers involved in this lawsuit; is that true?
6     A. Yes.
7     Q. Does the Powell Police Department have other
8  training programs?
9     A. You mean other than those that would be
10 reflected on that POST training record?
11    Q. Yes.
12    A. Yes.
13    Q. What are they?
14    A. There are a number. We have our field
15 training program, which is the new officer orientation
16 training. Do you want a description of that program?
17    Q. No, we'll talk about that again in a moment,
18 so let's leave out the new officer -- what is it
19 called, the FTO?
20    A. FTO, yes. We have our in-service training,
21 which is going to cover general police officer skills,
22 which is a broad range of things.
23         (Exhibit 35 identified)
24 BY MR. THOMPSON:
25    Q. Let me stop you for just a moment there, if I

TIM FEATHERS - November 23, 2010                   Page 11
Direct Examination by Mr. Gosman

1  may, and ask you if the documents we've identified in
2  Exhibit 35 are the records that reflect in-service
3  training that you've just described?
4         MR. THOMPSON: And, Counsel, you've put
5  together these exhibits, and I just want to make clear
6  for the record that I don't think Chief Feathers knows
7  whether or not they are inclusive of all the documents
8  provided to you in discovery.
9         MR. GOSMAN: I'm not sure -- I hate to admit
10 this, but --
11        MR. THOMPSON: You put together the exhibit
12 book, correct?
13        MR. GOSMAN: Yes, I did.
14        MR. THOMPSON: And so I don't think he knows
15 whether or not it's inclusive of everything that was
16 provided to you through our office in discovery.
17        MR. GOSMAN: Well, and that's always a
18 question. I appreciate that. That's fine.
19        MR. THOMPSON: And that would hold true with
20 Exhibit 31. Because I think, as demonstrated today,
21 there was some documents that were missing, and we
22 believe we provided them in discovery.
23        MR. GOSMAN: And I don't have any quarrel
24 with that, so I'll accept that.
25        MR. THOMPSON: Okay.

TIM FEATHERS - November 23, 2010                   Page 12
Direct Examination by Mr. Gosman

1         THE WITNESS: Okay. What's your question
2  about Exhibit --
3  BY MR. GOSMAN:
4     Q. Yes, my question is: Does this group of
5  documents reflect the in-service training that you had
6  mentioned just a moment ago that was provided by the
7  Powell Police Department?
8     A. This will reflect some of it.
9     Q. All right. Is there -- and why do you say
10 "some of it"?
11    A. Because there's not records here that would
12 document all that has been provided.
13    Q. Okay. What kinds of things are missing from
14 this written record?
15    A. It doesn't appear that any of the ongoing
16 firearms training records are in here. That's part of
17 our in-service training.
18    Q. Do you know whether those records have been
19 kept?
20    A. Yes, they have.
21    Q. Okay. Have you provided them to your
22 attorneys?
23    A. No, I have not.
24    Q. Okay. But they are available?
25    A. Yes.

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 6 of 117
Tricia Wachsmuth v.
City of Powell, et al.                                                Tim Feathers
                                                                 November 23, 2010

TIM FEATHERS - November 23, 2010              Page 13
Direct Examination by Mr. Gosman

1  Q. All right. So we have he firearms training
2  records that are not part of the document, Exhibit
3  No. 35?
4  A. Right.
5  Q. Go ahead.
6  A. There may be individu il records kept by
7  individual instructors. I don't know if there are, but
8  some of them may have their own recordkeeping system
9  outside the departments. So n that realm we have,
10  obviously, our firearms instructors. We have custody
11  control instructors, EVO instructors.
12  Q. What is EVO?
13  A. Emergency vehicle operations, driving,
14  vehicle-related items.
15  We have our senior Intc ximeter operator, who
16  trains on our breath test devices. We have, oh, our
17  field training officers, who are involved in your
18  ongoing general skills training. But I believe most,
19  if not all, of that documentation is going to be in
20  Exhibit 35. It looks like that's what those records
21  mainly are.
22  Q. Okay.
23  A. We have our less lethal instructor and his
24  training.
25  Q. That is who?

TIM FEATHERS - November 23, 2010              Page 14
Direct Examination by Mr. Gosman

1  A. Officer Miner. That would include less
2  lethal impact munitions, NFDDs and taser.
3  Q. So it does include noise distraction devices,
4  then?
5  A. Yes.
6  Q. Less lethal munitions?
7  A. Yes.
8  Q. And, of course, I think it's clear that
9  Officer Miner was certified in that area after this
10  event, which is the 24th of February, 2009?
11  A. Yes, he was certified as an instructor after
12  this event.
13  Q. All right. By the way, somebody was going to
14  get me Officer Miner's notebook, and I would like to
15  have that before I leave this week, if I could. And
16  that's the course materials for 1is DEF-TEC
17  certification.
18  MS. WESTBY: It's a big notebook. I mean, I
19  don't know that we're going to le able to get it copied
20  by the time we leave.
21  BY MR. GOSMAN:
22  Q. Okay. You'll get that cc pied to me as soon
23  as you can.
24  A. I'll see if we can get it done before you
25  leave.

TIM FEATHERS - November 23, 2010              Page 15
Direct Examination by Mr. Gosman

1  Q. Thank you.
2  Okay. So that I understand, and this is an
3  area that I do not understand, you do have certified
4  instructors that provide training at the Powell Police
5  Department, correct?
6  A. Yes.
7  Q. And you just described, for instance,
8  Officer Miner, who is certified in less lethal
9  munitions, noise flash distraction devices. And what
10  was the other?
11  A. Taser.
12  Q. Taser. And when he teaches a course on this
13  subject, does he keep a log or record of the attendees?
14  A. Yes.
15  Q. And are these courses POST qualified?
16  A. Not all of them.
17  Q. All right. What's the difference between
18  those that are and those that aren't?
19  A. For POST to certify and provide training,
20  they have certain requirements that some of our
21  in-service training doesn't meet, just things like
22  duration. It has to be a minimum number of hours.
23  Well, if we schedule a one or
24  two-hour-duration in-service training session, that may
25  not meet their standards for that. It used to be four

TIM FEATHERS - November 23, 2010              Page 16
Direct Examination by Mr. Gosman

1  hours. They have changed it. I don't know what it is
2  now. It's less than that, but I don't know. I don't
3  remember.
4  It could also be, for instance, our annual
5  firearms qualification, just an ongoing type of
6  qualification. They won't accept that for credit. So
7  it kind of -- some of the in-service training we do
8  because of its brevity or repetitive nature may not be
9  certified or eligible for certification.
10  We have some that probably is, but we just
11  haven't submitted the paperwork on it and had it
12  certified.
13  Q. Okay. Do you have a record of these
14  certified training -- or these training exercises that
15  are conducted by your certified trainers?
16  A. Some of them.
17  Q. Okay. And by way of saying that, are you
18  saying that you simply didn't keep the records for some
19  of the other training sessions?
20  A. Some of it is going to depend on what type of
21  training it was and when it was, whether or not we had
22  a recordkeeping system in place for it.
23  Q. Has the recordkeeping system in place changed
24  within the last couple of years?
25  A. It has been evolving since about 2005.

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 7 of 117
Tricia Wachsmuth v.                                                    Tim Feathers
City of Powell, et al.                                          November 23, 2010

1   Q. And at the time of the Wachsmuth warrant
2   service, February of 2009, were your certified trainers
3   keeping a log of their courses and the attendees?
4   A. The condition of those records at that time
5   is reflected in Exhibit 35.
6   Q. All right. So Exhibit 35 is the complete
7   collection of your in-service training, including the
8   certified training provided by -- or, I'm sorry, the
9   training provided by your certified officers?
10  A. Again, not all of it. For instance, I
11  noticed our firearms training records aren't in here.
12  Q. Yes, I see.
13  A. Okay. So -- and, again, there could have
14  been records, apart from department records, that the
15  instructors kept that is not a part of this exhibit as
16  well. That was up to the individual instructor if they
17  chose to keep records beyond what the department was
18  doing.
19  Q. So did some of these instructors, then, hold
20  classes that weren't part of something that was
21  officially a department training exercise?
22  A. No.
23  Q. I didn't quite understand what you said just
24  a moment ago about the records not -- some of the
25  records being not handed over to the police department?

1   A. What I'm saying is that at different times
2   there were different forms of recordkeeping
3   requirements that we had in place, an instructor would
4   meet that. But an instructor may choose to keep
5   records of his own in addition to that.
6   Q. I see. Thank you. All right.
7   A. He, personally. That he was not being
8   required to keep by the department. Whether or not
9   they have any of those, I don't know. I know off and
10  on over the years that's been the practice of some
11  instructors but not of others.
12  Q. And prior to February of 2009, did the
13  department have a policy or a custom for retaining at
14  least a list of attendees in the training that was
15  provided by certified instructors?
16  A. When that training started -- when our
17  records keeping system kind of began and began this
18  evolution of development in '05, it began with a
19  training calendar, which showed training topics and
20  dates. It progressed to then documenting that
21  information plus who the instructor was and maybe
22  supporting documentation or materials they used in the
23  training.
24      Then, you know, looks like about '06,
25  expanded to include a bit more particulars regarding

1   the subject matter of the training beyond the general
2   topic or title. And looks like it stayed pretty much
3   that way through about '08.
4       And then in -- I don't remember if it was
5   January of '09 or January of '10, that included
6   training rosters of who was in attendance.
7   Q. All right. So the records that we have in
8   Exhibit 35 are complete, based on the recordkeeping
9   requirements of the time period involved?
10  A. Yes.
11  Q. Now, we've heard some considerable discussion
12  over the last few days about training that was
13  undocumented that occurred specifically relative to
14  dynamic entry. And you've heard that testimony,
15  correct?
16      MS. WESTBY: Object to the form of the
17  question. That misstates the testimony.
18      MR. THOMPSON: Join.
19      THE WITNESS: I have heard officers'
20  testimony regarding their training, yes.
21  BY MR. GOSMAN:
22  Q. All right. And I don't really care a whole
23  lot about their training other than what pertains to
24  dynamic entry and the various features of a dynamic
25  entry.

1       What I would like to know from you, Chief,
2   is: What is the training program for providing this
3   specific form of training to the Powell police
4   officers?
5   A. For clarification, let me restate your
6   question.
7   Q. Yeah.
8   A. You want to know what ongoing training in the
9   area of dynamic entry the Powell Police Department
10  provides for its officers?
11  Q. Right, yes.
12  A. Okay. We've had Countermeasures Tactical
13  Institute come in 2005 and deliver a block of training
14  for us. After that training, we were incorporating
15  into our in-service training periodic -- I don't know
16  if you want to call it practice, drills, exercises,
17  reviews of that subject matter.
18  Q. Let's go back to the Patrol Tactic Response
19  Program that was put on. Apparently, Countermeasures
20  Tactical Institute came to the Cody area?
21  A. They came to Powell.
22  Q. Powell. Did you ask all of the Powell police
23  officers to attend this program?
24  A. All of our officers attended the program that
25  were with us at that time.

TIM FEATHERS - November 23, 2010                                    Page 21
Direct Examination by Mr. Gosman

1   Q.   All right.  Was that a mandatory program?
2   A.   Yes.
3   Q.   And did you have this training with the idea
4   in mind that you would assemble a team, some kind of
5   tactical response team, not necessarily a SWAT team,
6   but at least a special operations team with the Powell
7   Police Department?
8   A.   No.
9   Q.   Did you -- you attended this course as well,
10  did you not?
11  A.   Yes.
12  Q.   And did you understand that this course was
13  to provide a level of tactical training that was not
14  equal to that that would be afforded to a true SWAT
15  team?
16  A.   Yes.
17  Q.   And did you understand that there were
18  activities that could be conducted below at the level
19  of a SWAT team with additional training?
20       MS. WESTBY: Object to the form of the
21  question.
22       THE WITNESS: What do you mean by activities?
23  BY MR. GOSMAN:
24  Q.   I mean by activities, critical events such as
25  high-risk warrant service.  And I'll stop there since

TIM FEATHERS - November 23, 2010                                    Page 22
Direct Examination by Mr. Gosman

1   that's the only one we're interested in.
2   A.   Yes.
3   Q.   So if you didn't have a SWAT team but you
4   were a small rural police department, you could develop
5   a substitute for a SWAT team that would, with
6   additional training, be able to perform that
7   function --
8        MS. WESTBY: Object to the form.
9   BY MR. GOSMAN:
10  Q.   -- dynamic entry and warrant service?
11       MS. WESTBY: Object to the form of the
12  question.
13       MR. THOMPSON: Join.
14       THE WITNESS: I want to kind of restate my
15  answer on that.
16  BY MR. GOSMAN:
17  Q.   Yes.
18  A.   I was seeking to provide to the officers of
19  the Powell Police Department a level of training that
20  would equip them to conduct those functions when we
21  needed to.
22  Q.   All right.  Was this the first step or was
23  this the beginning and the end of that training effort?
24  A.   The purpose of the Countermeasures course in
25  2005 was to establish the basic skill level.

TIM FEATHERS - November 23, 2010                                    Page 23
Direct Examination by Mr. Gosman

1   Q.   And beyond that, the training that has
2   occurred relative to that basic skill level has been
3   in-house by the Powell Police Department up until, at
4   least, November -- February of 2009?
5        MR. THOMPSON: Objection as to form.
6        MS. WESTBY: Join.
7        THE WITNESS: Most of it would have been
8   conducted in-house.
9   BY MR. GOSMAN:
10  Q.   Had there been any other POST training made
11  available to the Powell police officers to upgrade
12  their basic skill level in this area since 2005 and
13  before February of 2009?
14  A.   Individual officers may have had opportunity
15  to attend training that would accomplish that, but
16  without reviewing each of their POST records, I
17  couldn't tell you.
18  Q.   I think we've already gone over everybody's
19  POST record, except for the last deponent.  I didn't
20  have his.  So we -- I'm not going to go through that
21  exercise.
22       The record speaks for itself, correct, the
23  POST records for those officers?
24  A.   Well, they have been questioned regarding
25  their POST record, and that would be reflected in the

TIM FEATHERS - November 23, 2010                                    Page 24
Direct Examination by Mr. Gosman

1   record of their deposition, yes.
2   Q.   Have Powell Police Department officers been
3   involved in joint training exercises with other
4   agencies here in the area?
5   A.   Yes.
6   Q.   And are those training exercises documented?
7   A.   Well, I know some of them are.  I don't know
8   if all of them are.
9   Q.   And which agencies have Powell Police
10  Department officers participated in with other
11  agencies?
12  A.   Park County Sheriff's Office, Cody Police
13  Department, Wyoming Highway Patrol.  I'm not sure about
14  Wyoming Game and Fish officers.  And I'm not sure about
15  DCI agents.
16  Q.   All right.  Let's limit that question to
17  dynamic entry tactics.  Which agencies have Powell
18  police officers been involved in joint training?
19  A.   Well, Park County SO and Cody PD both sent
20  officers to the Countermeasures training both times we
21  hosted it here.
22  Q.   Countermeasures training, and that would have
23  been -- yes, I understand that's the 2005 session.  And
24  then the one that occurred in 2009, correct?
25  A.   Yes.

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 9 of 117

Tricia Wachsmuth v.                                                          Tim Feathers
City of Powell, et al.                                                November 23, 2010

1   Q.  All right.
2   A.  I know we have sent several officers over to
3   Cody when they hosted joint training.  Our TFOs --
4   well, not just our TFOs, any officer we've sent to the
5   DCI drug investigation school has some training on
6   warrant service with the DCI in that school.  Officers
7   we've sent to the DEA, Drug Investigation School,
8   likewise, get training in that school.
9   Q.  Let's stop there.  Which -- do you know of
10  any officers that have gone to that school prior to
11  2009, so February of 2009?
12  A.  Anyone who would have been assigned to the
13  team as a TFO went through that.
14  Q.  Who all has been assigned to the team?  Let's
15  go back to starting in 2005.
16  A.  Well, let me work my way back.  That might be
17  the easiest way for me to remember.
18  Currently, Mike Hall is assigned to the team,
19  he has been since July of 2009.  Prior to that was
20  Officer Chad Glick.  And I don t remember if his was a
21  two or three-year term.
22  Prior to that was Officer Bret Lara.  I think
23  his was a two-year term.  Prior to that was Officer
24  Juliet Wardwell.  And I think prior to that was
25  Sergeant Alan Kent.  That's going to take you back well

1   before 2005.
2   Q.  Yes.  And did each one of those TFOs train
3   with the DEA?
4   A.  I believe they did.  Again, without looking
5   at their POST record to verify it, I couldn't be
6   certain.  But I know that DCI drug school and the DEA
7   school was kind of considered to be a basic level of
8   training they would receive when they took that
9   assignment.
10  Q.  And those schools are reflected in the POST
11  records?
12  A.  Those would be in their POST records.
13  Q.  All right.  Does the field training program
14  apply to officers once they have made it past the
15  probationary period?
16  A.  The FTO program, by that terminology, what we
17  understand as the FTO program, is the initial officer
18  orientation training, which is a 14 week program, which
19  is their first 14 weeks of employment here.
20  So, no, once they complete that program, it
21  is not something they redo.  However, our field
22  training officers, who train in that program as part of
23  their ongoing training responsibilities, do provide
24  in-service training on general police skills.
25  Q.  Okay.  And is that in-service training that

1   they provide on general police skills documented in the
2   in-service training records of Exhibit 35?
3   A.  Yes, that is primarily what is documented
4   there.
5   Q.  Now, Officer -- was it Chapman that we just
6   heard from, or Bradley?  The last officer that we
7   deposed?
8   A.  Officer Chapman was the last one before me.
9   Q.  All right.  Okay.  Thank you.
10  He testified that he had been involved in
11  training exercises involving room clearing and other
12  dynamic entry techniques at the -- at some schools here
13  in Powell and perhaps in Cody.  You heard him testify
14  to that?
15  A.  Yes.
16  Q.  What was that about?
17  A.  Part of the in-service training that was
18  provided during this timeframe included training on
19  entry and room clearing.  And when we could get
20  buildings available to us to do that, we would make use
21  of them.
22  Schools.  The school district will commonly
23  make their buildings available to us for training
24  purposes because it's obviously mutually beneficial for
25  them to have us regularly training in their facility if

1   they have a crisis there.
2   So the new high school they moved into in --
3   it was either August of '08 or August of '09.  I
4   believe it was August of -- I don't remember, it was
5   one or the other.  When they made that transition and
6   moved out of the old high school, right before they
7   did, they allowed us to use that for a training
8   exercise.
9   And, in fact, we did that jointly with their
10  staff on a staff day over there where there were no
11  students in the facility.
12  And then before they moved into the new high
13  school, we held a full-scale exercise with fire, EMS,
14  and law enforcement at the new high school.
15  Also, they built a new Southside school.
16  This is the third year they have been in it, so they
17  would have moved into that in '08.
18  And when they vacated the old Southside
19  school, they made it available to us to do training
20  in -- limited training because they're now using the
21  facility again.
22  We weren't allowed to breach doors or
23  discharge flashbangs or anything like that in the
24  building, but we were able to go in and practice room
25  clearing and entry.  And that was done both at the

TIM FEATHERS - November 23, 2010                              Page 29
Direct Examination by Mr. Gosman

1   level of what is documented in the in-service training
2   as well as at the squad level, which is not documented
3   in this in-service training; whereas, sergeants had
4   opportunities with their squads, they could just take
5   their squad and go train.
6          That training might be -- might be 30
7   minutes, it might go a couple hours, depending on what
8   they wanted to focus on in the training in their squad.
9   That is the training that is probably not documented
10  anywhere.
11     Q.  How big are the squads?
12     A.  When they are on the full staff, a squad will
13  encompass a sergeant and three officers.
14     Q.  Can you refer me to any place in Exhibit 35
15  where any of these school training exercises were
16  conducted?
17     A.  No, the documentation isn't sufficient for me
18  to identify that.
19     Q.  Let's take a minute and talk about the
20  officers with the Powell Police Department that were
21  certified in areas relative to dynamic entry prior to
22  February of 2009.
23     A.  And define what you mean by certified.
24     Q.  Well, we know, for instance, that
25  Officer Miner obtained a certificate when he went to

TIM FEATHERS - November 23, 2010                              Page 30
Direct Examination by Mr. Gosman

1   the NFDT class in Casper. And we know, for instance,
2   that SWAT teams have internal procedures for certifying
3   their instructors. And so I'm referring to any
4   certification process that would convey some
5   certificate of authority or a level of training that
6   would qualify a person to teach the course that he's
7   teaching.
8          MR. THOMPSON: Objection as to form.
9   BY MR. GOSMAN:
10     Q.  In other words, something either from the
11  place where the course was conducted, from an agency,
12  or perhaps if you had internal policies that
13  established certification procedures, that would work.
14         MR. THOMPSON: Objection as to form.
15         MS. WESTBY: Join.
16         THE WITNESS: There is no standardized
17  instructor's certification for dynamic entries.
18  BY MR. GOSMAN:
19     Q.  Per se?
20     A.  Per se, given out by any issuing authority
21  that I am aware of.
22     Q.  All right. I'll go along with that.
23     A.  What we have done -- and, again, it's been an
24  evolving process -- is bringing in Countermeasures to
25  provide the base level of instruction and then using

TIM FEATHERS - November 23, 2010                              Page 31
Direct Examination by Mr. Gosman

1   our instructional staff -- firearms instructors have
2   been heavily involved in it, but not just firearms
3   instructors -- to then continue to drill and train our
4   folks on those tasks that were taught by
5   Countermeasures.
6          In the '09 training, we took that a step
7   further, asked the training provider to identify those
8   that showed strength in those skill areas and then work
9   with them on how to develop and oversee training
10  exercises, and those people have been the ones
11  responsible for that since then.
12     Q.  And those people are not -- they haven't
13  received certificates from any agency that confirms
14  that they have completed a certain level of skill and
15  training in order to teach these -- this material; is
16  that correct?
17     A.  That's right.
18     Q.  All right. Does the Powell Police Department
19  have a memorandum of understanding -- memorandum of
20  agreement with the Park County Sheriff's Office and
21  other agencies in this area?
22     A.  We have no written, standing mutual aid
23  agreements as defined by state statute. There was a
24  memorandum of understanding regarding just general
25  cooperation that was developed a number of years ago.

TIM FEATHERS - November 23, 2010                              Page 32
Direct Examination by Mr. Gosman

1   It's general and nonspecific. It just essentially says
2   we're going to cooperate and help one another out when
3   we need it.
4      Q.  So let me go ahead and hand you what we've
5   marked as Exhibit 49. You're familiar with the NTOA,
6   are you not?
7      A.  I am familiar with NTOA.
8      Q.  That's Exhibit 39. But it's marked as
9   Exhibit 49. And we're going to have to switch that
10  page out before we go anywhere with this.
11     A.  I see we already have an Exhibit 39 in the
12  book, if that matters.
13     Q.  What is it? The Brown supplement, I'll bet.
14     A.  It is the Brown supplement.
15         MR. GOSMAN: Let's go off the record.
16             (Discussion held off the
17             record.)
18             (Exhibit 38 identified)
19         MS. WESTBY: Where did this document come
20  from?
21         MR. GOSMAN: This document came from the
22  National Tactical Officers Association.
23         MS. WESTBY: Is this another document that
24  we're just getting at the last minute?
25         MR. GOSMAN: Yes, it is.

Case 1:10-cv-00041-ABJ Document 65-1 Filed 01/10/11 Page 11 of 117
Tricia Wachsmuth v.
City of Powell, et al.

Tim Feathers
November 23, 2010

TIM FEATHERS - November 23, 2010     Page 33
Direct Examination by Mr. Gosman

1   MR. THOMPSON: And, for the record, I'd note
2  I went back and looked at my discovery request --
3       MR. GOSMAN: Wait a minute. I think I
4  supplied this to you the very first time we came up
5  here in October as one of the deposition exhibits.
6       MS. WESTBY: No.
7       MR. GOSMAN: Did I not? Maybe I didn't. I
8  can't say for sure. We don't have to have this on the
9  record.
10      MR. THOMPSON: I did want to note for the
11  record that the discovery request that was sent to you,
12  that you responded to, did ask for photos and you
13  didn't provide any and didn't supplement the record.
14     MR. GOSMAN: Well, we didn't have any either.
15     MR. THOMPSON: Okay.
16     MR. GOSMAN: All right.
17     MR. THOMPSON: Until yesterday.
18     MR. GOSMAN: Yes.
19     MS. WESTBY: And so I'm assuming that you had
20  this document since the last time we were up here in
21  depositions and --
22     MR. GOSMAN: Yes, that's true.
23     MS. WESTBY: -- and it wasn't provided.
24     MR. GOSMAN: That's true. All right.
25

---

TIM FEATHERS - November 23, 2010     Page 34
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2  Q. Let's see. Officer, did you find page 2?
3  A. I did.
4  Q. First of all, do you recognize the National
5  Tactical Officers Association as an association that
6  has expertise in the area of SWAT standards?
7     MR. THOMPSON: Objection as to form.
8     MS. WESTBY: Join.
9     THE WITNESS: I've heard of them. I'm not
10  that familiar with them. That is what I understand
11  them to be, though.
12  BY MR. GOSMAN:
13  Q. Okay. Right now we're focused on memorandums
14  of agreements as they pertain to SWAT teams. And I'd
15  like you, if you could, to read into the record the
16  paragraph that begins "The primary characteristic of
17  SWAT."
18     MS. WESTBY: And, I mean, I don't understand
19  the purpose of this. But I'm not going to -- you know,
20  we haven't had the opportunity -- this witness hasn't
21  had the opportunity to read this document. It appears
22  to be approximately -- oh, about 60, 70 pages in
23  length.
24     So, you know, I don't know what you're
25  planning on asking about this, but I'm not going to

---

TIM FEATHERS - November 23, 2010     Page 35
Direct Examination by Mr. Gosman

1  allow him to answer questions about it without having
2  had the opportunity to review it.
3     MR. GOSMAN: Well, we're only going to make
4  reference to one or two pages in the entire document.
5  BY MR. GOSMAN:
6  Q. Take the opportunity to read the page that
7  you're on and the page next to it and then we'll go
8  ahead and spend a minute talking about it.
9     MR. THOMPSON: And I'd join in that
10  objection. And I'd also state the document speaks for
11  itself so reading it into the record is just a waste of
12  time.
13     MS. WESTBY: You can go ahead and read the
14  pages and then we'll see whether we proceed.
15     So you're telling him to read pages 2 and 3?
16     MR. GOSMAN: Yes.
17     I'm going to withdraw the document as an
18  exhibit. Any references we make we'll just read into
19  the record. There are only a couple. So 38 is no
20  longer 38.
21     THE WITNESS: Do we have a question pending?
22     MR. GOSMAN: No.
23     THE WITNESS: Then I would like to take a
24  break and discuss this with the two of you.
25     MR. THOMPSON: Okay.

---

TIM FEATHERS - November 23, 2010     Page 36
Direct Examination by Mr. Gosman

1     MR. GOSMAN: Fine.
2         (Recess taken 3:58 p.m. to
3         4:09 p.m., November 23, 2010)
4  BY MR. GOSMAN:
5  Q. Okay. Officer, would you read in that
6  paragraph that I think I previously mentioned, on
7  page 2, starting with "The primary characteristics of
8  SWAT" to the end of that page.
9     MS. WESTBY: And I guess I'm going to object
10  to him reading in something from this document. We
11  were not provided this document until a couple of
12  minutes ago. You know, he's not offering any testimony
13  about it. So I don't understand the purpose of reading
14  in a portion of it.
15     MR. GOSMAN: Okay. Well, unless you're
16  instructing him not to answer, I want him to read in
17  that paragraph, and then I have a couple questions to
18  ask him about it.
19     MS. WESTBY: Then I want it to be noted that
20  he has no position on what you're having him read, that
21  he's simply reading out of a document that was not
22  produced, as it should have been, in discovery but was
23  produced a couple minutes ago.
24     MR. GOSMAN: Okay. All right.
25

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 12 of 117
Tricia Wachsmuth v.
City of Powell, et al.

Tim Feathers
November 23, 2010

1   BY MR. GOSMAN:
2       Q.   With that in mind, Officer, could you go
3   ahead and read that paragraph starting with "The
4   primary characteristic"?
5           MS. WESTBY: Go ahead.
6           THE WITNESS: "The primary characteristic of
7   SWAT that distinguishes it from other units is the
8   focus of efforts. SWAT teams are focused on tactical
9   solutions as opposed to other functions, such as
10  investigation. The purpose of SWAT is to increase the
11  likelihood of safely resolving critical incidents.
12          "Nothing in these standards is intended to
13  preclude agencies from utilizing specially-trained
14  units in areas such as narcotics investigations, felony
15  apprehension, and other tasks. However, agencies which
16  don't have their own SWAT teams and, instead, utilize
17  specially-trained units shall have a memorandum of
18  agreement with a SWAT team that meets these standards.
19          "The agreement shall specify that the SWAT
20  team is the designated agency to handle SWAT-specific
21  incidents and that the specially-trained units shall
22  only engage in the following operations until the
23  arrival of the SWAT team: One tactical command; two,
24  containment; three, emergency action.
25

1   BY MR. GOSMAN:
2       Q.   All right. And my question is: Do you have
3   any kind of -- in your memorandum of understanding,
4   which I believe you've indicated does exist between
5   your agency and the Park County Sheriff's Office, that
6   they will supply services with their specially-trained
7   unit for the Powell Police Department?
8       A.   I don't know. I'd have to look at it.
9       Q.   If it's there, it's there; is that what
10  you're saying?
11      A.   I'm saying I don't know. I'd have to look at
12  it.
13      Q.   Okay. All right. I'll make a request to
14  produce that document.
15      A.   And I would like to add, to point back to my
16  earlier testimony, I really don't know if that document
17  even is still in force and effect. It's been that long
18  ago.
19      Q.   All right. So in the absence of whatever is
20  contained in the memorandum of understanding, you don't
21  have an agreement with the Park County Sheriff's Office
22  to use their special tactics unit in situations that
23  call for that?
24          MS. WESTBY: Object to the form of the
25  question. Misstates the testimony.

1           MR. THOMPSON: Join.
2           THE WITNESS: What do you mean by their
3   special tactics unit?
4   BY MR. GOSMAN:
5       Q.   Well, I think they call it an SCG. And I'm
6   not sure now what SRG meant. But they've got an SRG
7   team, which is a tactical team at the Park County
8   Sheriff's Office. You're aware of that, are you not?
9       A.   I'm aware they have a group that they refer
10  to as the SRG.
11      Q.   All right. And my question is simply: Do
12  you have any kind of understanding or agreement with
13  them to use that team if you need to call upon those
14  resources?
15          MR. THOMPSON: Objection as to the form.
16          MS. WESTBY: Join.
17          THE WITNESS: There is no written agreement
18  that specifies that.
19  BY MR. GOSMAN:
20      Q.   All right. Is there an understanding between
21  your agency and theirs concerning the use of that team?
22      A.   What do you mean by understanding?
23      Q.   Well, something short of an agreement, but
24  nevertheless, an arrangement that if you need the SRG
25  team from the Park County Sheriff's Office, they will

1   respond if possible?
2       A.   Are you talking in writing?
3       Q.   No, I'm not really. I'm talking just an
4   understanding between your agency and theirs that if
5   you need to access their SRG unit that they will make
6   it available.
7       A.   I don't know.
8       Q.   Has the memorandum of understanding been --
9   it's something that apparently may not even be in force
10  at this time; is that true?
11      A.   Yes.
12      Q.   Was it an annual agreement, do you know?
13      A.   No. It's just been long enough ago since we
14  signed it and it hasn't been revisited by the agency
15  administrators in a number of years. I have no idea
16  what the Park County sheriff or the Cody police chief
17  think of it, how they view it, or whether or not they
18  still consider it to be in force and effect.
19      Q.   Okay. Let's go back to Exhibit 52 for just a
20  moment, and that is the policy and procedures manual.
21          And, let's see. I notice that there is a
22  place at the top of each one of these policies for the
23  signature of the authorized person.
24          And it's not signed, which is fine with me,
25  but are you the authorized person that would sign that

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 13 of 117

Tricia Wachsmuth v.                                          Tim Feathers
City of Powell, et al.                                  November 23, 2010

TIM FEATHERS - November 23, 2010                              Page 41
Direct Examination by Mr. Gosman

1  policy, the official policy?
2    A.  Yes.
3    Q.  With regard to the POST training records of
4  the officers -- I made note, and I believe it's
5  documented in Exhibit 31, that neither -- and I think
6  the testimony will witness this -- confirms this, that
7  neither Officer Brilakis or Officer Hall were involved
8  in the 2005 patrol tactics course and that neither of
9  them have any tactical training in POST-certified
10  tactical training in dynamic entry tactics. And I want
11  you to confirm that. But I'm going to ask you if
12  that's true.
13          MS. WESTBY: And, again, I object to the form
14  of the question. Misstates the testimony.
15          MR. THOMPSON: Join.
16          THE WITNESS: No, it's not true.
17  BY MR. GOSMAN:
18    Q.  It's not true, okay. And it may not be true.
19  Let's go ahead and take a look at Hall's records in
20  Exhibit 31. Okay. It's Document 1 now. I assume
21  you're there.
22              (Exhibit 31 identified)
23  BY MR. GOSMAN:
24    Q.  Go ahead and take a look at those records.
25  And, again, I will say this, that it is clear that

TIM FEATHERS - November 23, 2010                              Page 42
Direct Examination by Mr. Gosman

1  Officer Hall has had a course since February of 2009,
2  and that was your immediate action patrol course.
3          But prior to that, I don't see anything in
4  his record that indicates that he had any tactical
5  training, POST certified tactical training.
6    A.  8/8/2008, 40 hours' drug investigations,
7  Riverton, Wyoming. That's the DCI drug school in which
8  they trained on warrant service, including entry and
9  clearing. And that is POST certified training and it
10  is on his record. And the subjects were covered as a
11  part of that training.
12    Q.  Okay. Well, let's go to Officer Brilakis,
13  then. We have his POST records as the first document.
14  By the way, I believe that's 31A, so it's at
15  the end of the group of documents.
16          Do you see anything in his POST records? He
17  didn't --
18    A.  I do not see anything --
19          MS. WESTBY: No, that's absolutely not true.
20          MR. GOSMAN: That's true -- well, it's not --
21  I don't know whether it's true or not. I shouldn't
22  say.
23          MS. WESTBY: It's completely untrue,
24  completely misstates his testimony.
25          THE WITNESS: I do not see anything in his

TIM FEATHERS - November 23, 2010                              Page 43
Direct Examination by Mr. Gosman

1  Wyoming POST training record.
2  BY MR. GOSMAN:
3    Q.  Okay. All right. Let's go ahead and take a
4  peek at his Florida training record.
5    A.  I don't know if I would be able to tell by
6  title from a Florida training record what the content
7  of that was. So as long as you're aware of that.
8    Q.  Okay. So Officer Hall did take a drug -- was
9  it a drug investigations course in Riverton, Wyoming?
10    A.  Yes.
11    Q.  And who put that on?
12    A.  Wyoming Division of Criminal Investigation.
13    Q.  DCI. And it's your understanding that that
14  program does include warrant service with room
15  clearing?
16    A.  Yes.
17    Q.  Do you know what percentage of the course
18  that room clearing constitutes?
19    A.  No.
20    Q.  All right. Let's go to Exhibit 29 if we
21  could for a moment. And can you tell me what this
22  course is?
23              (Exhibit 29 identified)
24          THE WITNESS: This is the lesson plan for the
25  tactical training provided to Powell police officers

TIM FEATHERS - November 23, 2010                              Page 44
Direct Examination by Mr. Gosman

1  from December of 1991 through about 2001.
2  BY MR. GOSMAN:
3    Q.  Have you updated this course and continued to
4  provide it to the Powell Police Department officers?
5    A.  This training was superseded by the
6  Countermeasures training.
7    Q.  Well, let's go ahead and go through this
8  document.
9          Have you -- did you participate in the
10  creation of this document?
11    A.  I was its original author.
12    Q.  All right.
13    A.  I should say I was one of its original
14  authors.
15    Q.  Let's go ahead and start on -- it's page 5 of
16  this document. We have the definition of a critical
17  incident at the top of the page.
18          Could you just generally describe for me what
19  a critical incident is?
20          MS. WESTBY: Object to the form of the
21  question. He told you that this was superseded by
22  another training. So I'm wondering if you're asking
23  him based on this document or based on his
24  understanding.
25          MR. GOSMAN: What difference does that make?

1   I want to know how he describes a critical incident.

2       MS. WESTBY: From this document or just from

3   his general understanding?

4   BY MR. GOSMAN:

5       Q. From your general understanding, what is a

6   critical incident?

7       A. For me, a critical incident would be any kind

8   of an incident where there would be a high degree of

9   risk to life safety or potentially even widespread

10  property damage.

11      Q. All right. And under paragraph -- let me ask

12  this question: Do you include the Wachsmuth warrant

13  service in that definition that you've just given me?

14      A. I would include high-risk warrant service in

15  that definition.

16      Q. All right. And let's go to paragraph B. And

17  I'd like you to go ahead and read into the record

18  paragraph B1 from this training manual.

19      A. "It would take a fully trained SWAT or

20  hostage rescue team to deal with many of these. As an

21  agency, we cannot justify a SWAT team by these types of

22  activities being commonly present here or by budgetary

23  means as SWAT teams require a great amount of training

24  time."

25      Q. And then paragraph No. 3.

1       A. "You will also notice that in those areas

2   that will require SWAT or hostage rescue capability to

3   resolve the problem, we will need to initially respond,

4   contain, and initiate the law enforcement response

5   before turning it over to those fully trained to

6   resolve the situation."

7       Q. Let me ask you this question: I believe this

8   training program discusses room clearing tactics. And

9   how would you characterize the weapon position that

10  should be employed by officers who are carrying out

11  room clearing tactics in high-risk warrant service

12  situations?

13      A. My understanding of the currently accepted

14  procedure?

15      Q. Yes, that's fine. Well, I mean, the

16  currently accepted procedure as of the 24th of

17  February, 2009.

18      A. It has not changed since then.

19      Q. All right, fine.

20      A. There's going to be three potential weapon

21  positions. One is called the universal cover mode,

22  which would involve pointing the weapon at an

23  identified threat. The safety will be off, the finger

24  will be outside the trigger guard, the muzzle of the

25  weapon will be low enough for you to see over the top

1   of the weapon and observe the hands of the suspect.

2   This would be the position you would be in while you

3   were commanding or taking into custody.

4       The other is a ready position which involves

5   the rifle shouldered, the muzzle depressed to

6   approximately a 45-degree angle, so it's out of your

7   line of view but where it can be rapidly employed and

8   placed on target.

9       The third is called an inside ready with the

10  butt of the rifle in the shoulder. The weapon is --

11  muzzle of the weapon is depressed straight down at the

12  ground, which will usually require you to rotate the

13  rifle at the inside so that the muzzle is pointing

14  straight down.

15      Depending on the circumstances, any one of

16  those three positions would be appropriate.

17      Q. Okay. And then on page 13 of this document,

18  we are talking about covert entry and search tactics.

19  And at paragraph B1 on page 13 there's a small

20  statement there about search tactics, and I'd like you

21  to read that into the record, please. It's B1.

22      A. "Covert entry is low key. It is not rush in,

23  shoot 'em up. A situation arrives where you need a

24  dynamic entry, back up, secure outer perimeter and call

25  qualified SWAT team."

1       Q. What does it mean if the situation is hot?

2       A. I don't see what you're talking about.

3       Q. That's on paragraph 3 just down below, "If

4   situation is hot." Is that an active shooter

5   situation, do you suppose?

6       A. I don't know.

7       Q. All right. Paragraph 2 deals with evaluating

8   the situation. Why don't you take just a minute and

9   read that into the record, please.

10      A. "Evaluate situation, Sub A, do you need to

11  have the outer perimeter secure? In parenthesis "set

12  up."

13      Sub B, is it hot?

14      Sub C, is it routine open door?

15      Sub D, is it feasible to call out several

16  more officers?

17      Q. All right. These paragraphs attempt to

18  document the kind of evaluative process that you would

19  want to go through in any situation where you're

20  considering dynamic entry, correct?

21      MS. WESTBY: Object to the form of the

22  question.

23      MR. THOMPSON: Join.

24      MS. WESTBY: You're asking him questions

25  about a document that he has already told you --

1    MR. GOSMAN: We've decided that --
2    MS. WESTBY: -- has been superseded.
3    MR. GOSMAN: -- superseded? I don't know
4  about superseded. You've misstated the evidence. In
5  any event, I just want an answer.
6    THE WITNESS: I said this is a lesson plan of
7  a training curriculum that has been superseded by the
8  Countermeasures training that was provided in the
9  beginning of --
10    THE REPORTER: I'm sorry. I'm sorry. I lost
11  you.
12    THE WITNESS: This is a lesson plan that was
13  superseded by training provided by Countermeasures
14  Tactical Institute beginning in 2005.
15  BY MR. GOSMAN:
16    Q. Well, we'll get to that in a minute. But are
17  you saying these materials are completely outdated?
18    A. Much of this material is outdated.
19    Q. All right. Well, is that particular
20  paragraph outdated?
21    A. As regards to what?
22    Q. Evaluating the situation.
23    MR. THOMPSON: Objection as to form.
24    MS. WESTBY: Join.
25    THE WITNESS: Do you mean evaluating the

1  situation according to the four subs listed underneath
2  it?
3  BY MR. GOSMAN:
4    Q. Yes.
5    A. It does not apply to dynamic entries. The
6  section of the lesson plan is on covert entry and
7  search.
8    Q. Okay. All right. I'll give you that.
9    MR. THOMPSON: That's good, 'cause that's
10  what the document says.
11    MR. GOSMAN: All right.
12  BY MR. GOSMAN:
13    Q. So let's go ahead and go back up to page 5
14  for just a second and where we talked about SWAT teams.
15  I want you to tell me if that paragraph that you
16  previously read into the record is completely outdated.
17  I mean, I need to know that before we go on.
18    MS. WESTBY: He's told you that.
19    MR. GOSMAN: No, he hasn't.
20    MS. WESTBY: Yes, he did. Read it in the
21  transcript.
22    MR. GOSMAN: Read it and weep. I'll do that.
23    Okay. But in the meant me, I don't recollect
24  any statements being made about whether the material he
25  read into the record from page 5 was completely

1  outdated.
2    MS. WESTBY: He told you this entire
3  lesson --
4    MR. GOSMAN: I don't care to argue with you
5  about it.
6    MS. WESTBY: He told you this entire lesson
7  plan was superseded by the other document.
8    MR. GOSMAN: Well, you know, the Bible has
9  been translated more than once, too. That doesn't mean
10  it's been superseded. I just want to know from the
11  officer. Thank you.
12    Page 5.
13    MS. WESTBY: You're ridiculous.
14    THE WITNESS: So what's your question?
15  BY MR. GOSMAN:
16    Q. Yes. Did the statement that you read from
17  page 5, that it would take a fully trained SWAT or
18  hostage rescue team to deal with many of these
19  situations -- rather, has that statement been
20  completely superseded by subsequent thinking?
21    A. I would no longer consider that to be a valid
22  and accurate statement.
23    Q. All right. So we'll find out later whether
24  that's correct or not.
25    Now, let's go down to subparagraph 3.

1    "And in those situations that will require
2  SWAT or hostage rescue, we will need to initially
3  respond, contain or initiate the law enforcement
4  response before turning over to fully trained officers
5  to resolve the situation."
6    Has that been completely supplemented by new
7  thinking?
8    MS. WESTBY: Object to the form of the
9  question.
10    MR. THOMPSON: Join.
11    THE WITNESS: I would no longer consider that
12  to be an accurate statement.
13  BY MR. GOSMAN:
14    Q. Very good.
15    Okay. We're on page 13. And we're on
16  paragraph C. And we're dealing with the selection of
17  the entry team. And I'd like you to read paragraphs 1
18  and 2 into the record.
19    A. Paragraph C, entry.
20    Sub 1, select qualified entry team.
21    Sub A, each person should be individually
22  suited and qualified for the position he is in.
23    Q. Excuse me, officer, and I think it will work
24  better if I stop you there, and at each one of these
25  paragraphs, and ask you if this paragraph has been

TIM FEATHERS - November 23, 2010 Page 53
Direct Examination by Mr. Gosman

1  completely superseded by subsequent thinking in this
2  area.
3      A.  Yes.
4      Q.  So it's not that important that the
5  individuals are suited and qualified for the positions
6  they are in?
7          MR. THOMPSON: Objection as to form.
8          MS. WESTBY: Join.
9          THE WITNESS: That is not what I said.  I
10  just said that this has been superseded.
11  BY MR. GOSMAN:
12     Q.  Well, all right.  Then, so that we're not
13  confused here, I'm not interested in whether it's been
14  superseded or not.  I'm interested in whether or not
15  the principles still apply.
16         Does this principle still apply --
17         MR. THOMPSON: Objection --
18  BY MR. GOSMAN:
19     Q.  -- based on the new training --
20         MR. THOMPSON: Objection --
21  BY MR. GOSMAN:
22     Q.  -- that's available in this field?
23         MR. THOMPSON: -- as to form.
24         MS. WESTBY: Join.
25         THE WITNESS: Not in the way that it was

TIM FEATHERS - November 23, 2010 Page 54
Direct Examination by Mr. Gosman

1  originally intended when it was written in this
2  document.
3  BY MR. GOSMAN:
4      Q.  Okay.  How so?
5      A.  At the time this was written and the amount
6  of training that had been provided to officers in the
7  department and the fact that there were a number of
8  officers who did not have the training, nor possess the
9  aptitude to perform those roles, what we were doing was
10  trying to be selective on where we placed people so
11  that they were being placed someplace that they were
12  suited and qualified for.
13     Q.  Okay.  And I think I understand that.  But
14  that doesn't mean that it's still not true that each
15  person should be individually suited and qualified for
16  the position, correct --
17         MR. THOMPSON: Objection as to form.
18         MS. WESTBY: Join.
19  BY MR. GOSMAN:
20     Q.  -- on an entry team?
21     A.  I'm just telling you that that's what the
22  intent of the statement was at the time it was written.
23     Q.  All right.  And, today, would you want each
24  person individually suited and qualified for the
25  position he's in on an entry team?

TIM FEATHERS - November 23, 2010 Page 55
Direct Examination by Mr. Gosman

1      A.  Yes.
2      Q.  Paragraph No. 2.
3      A.  "Deciding to go in."
4      Q.  No, I'm sorry.  I said two, I meant B.  Let's
5  -- we're going to go down through this list.
6      A.  "B, teams should have proper training."
7      Q.  And really, that's true today, too, isn't it?
8      A.  Yes.
9      Q.  And C?
10     A.  "Teams should have proper weapons for
11  situations."
12     Q.  And that's true today?
13     A.  Yes.
14     Q.  All right.  Let's go to paragraph 2.
15     A.  "Deciding to go in."
16     Q.  Paragraph A?
17     A.  "Sub A, do you know suspect is there?"
18     Q.  And that would still be true today, would it
19  not?
20     A.  That would be a consideration.
21     Q.  And go ahead.  Paragraph B.
22     A.  "Is suspect barricaded or just hiding?"
23     Q.  And that would be true today?
24     A.  That would be a consideration.
25     Q.  Paragraph C?

TIM FEATHERS - November 23, 2010 Page 56
Direct Examination by Mr. Gosman

1      A.  "What weapons or potential weapons does
2  suspect have?"
3      Q.  And, of course, that would be true today,
4  would it not?
5      A.  That would be a consideration.
6      Q.  And subparagraph D?
7      A.  What -- I think there's a typo there.  I
8  think it should say, "What are our other options?
9  Don't get in a hurry to go in; he may come out."
10     Q.  And that would be true today, would it not?
11     A.  That would be a consideration.
12     Q.  And subparagraph E?
13     A.  "Entry is our last choice."
14     Q.  And would that be true today?
15     A.  It could be.
16     Q.  Okay.  Paragraph -- subparagraph F?
17     A.  "Gather as much intelligence as possible
18  before going in "
19     Q.  All right.  Thank you.
20         And we're going to turn now to page 18, and
21  this is where the training turns to dynamic entry.
22         Paragraph 5A, which is the introduction, is a
23  paragraph that I'd like you to read into the record,
24  and then I'll visit with you for a moment about it.
25     A.  "The law enforcement response to critical

1  incidents should be viewed as a continuum. On the left
2  or lower end of the continuum is the traditional law
3  enforcement clear or slow methodical search.
4        "On the right or upper end is the dynamic
5  hostage rescue. Which is to be used depends on the
6  circumstances of the situation and the goal of your
7  mission.
8        "The skills we have covered so far will
9  enable you to deal with the first half of this
10 continuum. The dynamic training we will now cover will
11 prepare you for the second half of the continuum,
12 excluding hostage rescue. As a result, this training
13 will prepare you to carry out approximately
14 three-fourths of a range of responses on the
15 continuum."
16     Q.  Is this continuum also known as the force
17 continuum?
18     A.  No.
19     Q.  All right. Let's go ahead and move to
20 paragraph B. Why dynamic? Would you read the
21 subparagraphs under that subheading?
22     A.  "One, if life is threatened.
23          Sub A, suicide.
24          Sub B, harm others.
25          Two, if evidence may be destroyed.

1          Sub A, drug arrests."
2      Q.  All right. Now, do the principles that are
3  outlined in that paragraph apply today?
4      A.  As stated here?
5      Q.  Yes.
6      A.  I don't know if they apply as stated here.
7      Q.  All right. What's your argument with the
8  statement as it is there?
9          MR. THOMPSON: Objection as to form.
10         MS. WESTBY: Join.
11         THE WITNESS: I believe that this is, one,
12 outdated; two, limited and incomplete. This kind of a
13 decision now is going to be a totality of the
14 circumstances assessment.
15 BY MR. GOSMAN:
16     Q.  Okay. Do we still consider whether life is
17 threatened in making a dynamic entry?
18     A.  Life safety is an issue considered.
19     Q.  All right. And let's take the second one.
20 If evidence may be destroyed, certainly, that is a
21 consideration, is it not?
22     A.  Evidence destruction is considered.
23     Q.  In the decision to make a dynamic entry,
24 correct?
25     A.  It will be one of the factors considered.

1      Q.  Okay. Now, if we eliminate the threat to
2  life or the possibility that evidence may be destroyed,
3  why would you engage in a dynamic entry in a warrant
4  service?
5      A.  In a warrant service?
6      Q.  Yes.
7      A.  So you're now limiting your question
8  specifically to warrant service, not dynamic entries in
9  general?
10     Q.  Yes, I am.
11     A.  Okay. Search warrant service or arrest
12 warrant service?
13     Q.  That's a good question. Search warrant
14 service.
15     A.  So your question is if we have a search
16 warrant and there is no threat to life and no danger of
17 evidence to be destroyed, would we use a dynamic entry?
18     Q.  Yes.
19         MS. WESTBY: I mean, I have to object. It's
20 asking him to come up with scenarios. It's a reverse
21 hypothetical. Object to the form.
22         MR. THOMPSON: Join.
23         MS. WESTBY: Go ahead.
24         THE WITNESS: Based on that hypothetical as I
25 just stated it back to you with that very narrow set of

1  parameters, I would say there would be no need for a
2  dynamic entry.
3  BY MR. GOSMAN:
4      Q.  Okay. Let's go on to paragraph D on the next
5  page, principles of dynamic entry. I want you to go
6  ahead and read those into the record.
7      A.  Page 19, sub D?
8      Q.  Yes.
9      A.  "Principles of Dynamic Entry.
10         Sub 1, surprise.
11         Sub 2, speed.
12         Sub 3, violence of action.
13         Sub 4, still need a definite plan, the goal
14 of which is to stop the threat.
15         "You must not deviate from the plan under any
16 circumstances. You may have to adapt to overcome the
17 unexpected, but do not deviate from the plan. The
18 difference between these two is if you still carry out
19 your assignment at the designated time with the desired
20 results. Never deviate from the plan."
21     Q.  Do those principles still hold true today?
22         MR. THOMPSON: Objection as to form.
23         MS. WESTBY: Join.
24         THE WITNESS: Principle 1 and 2 do.
25 Principle 3 does, although in training materials you

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 18 of 117
Tricia Wachsmuth v.
City of Powell, et al.
Tim Feathers
November 23, 2010

1  will find it stated a different way.  I don't -- and I
2  can't think of the terminology, but it was testified to
3  earlier by another officer who defined violence of
4  action of just --
5  BY MR. GOSMAN:
6    Q.  Yes.
7    A.  Rapid movement, lots of noise, those kinds of
8  things.  They call it something different.
9        Principle 4, I do not believe would apply
10 today.
11   Q.  Okay.
12   A.  As it's stated.
13   Q.  All right.  And then under subparagraph E,
14 dynamic tactics, we have as the first item listed
15 there, diversion devices.  Would you read subparagraph
16 1A, B, C, D, and E into the record, please.
17   A.  "One, diversion devices.
18        Sub A, a diversion device should be used when
19 you are sure or reasonably sure there is a subject in a
20 building that you feel is about to take his/her own
21 life or another person's life."
22   Q.  Let me stop you.  Does that principle apply
23 today?
24   A.  What do you mean by apply?
25   Q.  I mean is it true today that a diversion

1  device should be used when you are sure or reasonably
2  sure there is a subject in the building that you feel
3  is about to take his or her life or another person's
4  life?
5    A.  Are you asking is that an appropriate
6  circumstance under which to use a diversion device or
7  are you asking is that the only circumstance under
8  which you would use a diversion device?
9    Q.  I guess I'm asking for the latter.
10   A.  Only?
11   Q.  Yes.
12   A.  No.
13   Q.  What other circumstances are appropriate for
14 a diversionary device?
15        MS. WESTBY: Object to the form of the
16 question.
17 BY MR. GOSMAN:
18   Q.  Based on the training -
19   A.  Based on the training?
20   Q.  -- that you've had?
21        MS. WESTBY: Object to the form of the
22 question.
23        MR. THOMPSON: Join.
24        THE WITNESS: Again, are we talking in
25 service of a search warrant?

1  BY MR. GOSMAN:
2    Q.  Yes.
3    A.  Okay.  In the service of a search warrant, it
4  could be if you have probable cause to believe, based
5  on your totality of the circumstances assessment, that
6  there is risk to the officers or others as they enter.
7  And you could use it to distract and divert attention
8  either away from your entry -- you could use it to deny
9  suspect access to particular areas of the facility.
10   Q.  Weapons in particular?
11   A.  Weapons, potentially escape, potentially
12 places where there may be other persons they're trying
13 to protect, places where there may be evidence they may
14 be trying to access to destroy.
15   Q.  Why was the diversionary device used in the
16 Wachsmuth case?
17   A.  Because of the threat to the officers
18 presented by the occupants of the residence.
19   Q.  Okay.  Now let's go ahead and take a look at
20 Exhibit 27.  I'm going to ask you if you can identify
21 that document.
22        (Exhibit 27 identified)
23        THE WITNESS: Well, from the cover page, it
24 appears to be the course manual from Countermeasures
25 Tactical Institute for the training course they

1  provided us in 2005.
2  BY MR. GOSMAN:
3    Q.  All right.  Does this contain the updated
4  training on these tactical issues that we've been
5  talking about?
6    A.  Most of it, yes.
7    Q.  Okay.  Let's see.  Let's go to page 27 --
8  well, let's see.  No, I'm getting ahead of myself.
9  Give me a moment.  Sorry about that.
10       Okay.  On page 10, we have the force
11 continuum.  Would you take a moment and take a look at
12 that?
13   A.  Are you talking page 10 of the manual or
14 Bates stamp 10?
15   Q.  It's page number 10.
16   A.  All right.
17   Q.  You are familiar with the concept of the
18 force continuum?
19   A.  Yes.
20   Q.  And is that force continuum represented here
21 on page 10 of this document?
22   A.  Well, there is a force continuum represented
23 there.
24   Q.  Is that the -- I want you to take a minute
25 and describe for me what you understand the concept of

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 19 of 117
Tricia Wachsmuth v.                                          Tim Feathers
City of Powell, et al.                              November 23, 2010

1  the force continuum to be.
2     A. We do not use force continuums anymore in our
3  training. So do you still want me to answer that?
4     Q. Yeah.
5     A. Okay. I mean, it's kind of a moot point.
6  But what a force continuum was -- in the past you've
7  seen them embodied in policies. They have since been
8  removed from policies and replaced with the standard of
9  objective reasonableness to a reasonable peace officer
10  based on the totality of the circumstances assessment.
11        For the while they remained in training
12  materials, and they have since been even pretty much
13  removed from that.
14     Q. Okay. You can stop there.
15     A. Okay.
16     Q. So let's go ahead and use the -- I think you
17  said "objectively reasonable" to an officer in the --
18  under the totality of the circumstances he's presented.
19        Is that what has been substituted for the
20  force continuum?
21     A. That is the current standard under the Fourth
22  Amendment.
23     Q. Very good. All right.
24        And would you agree with me, Chief, that
25  leading Tricia Wachsmuth -- or having her lead the

1  officers down the stairs while they were pointing their
2  weapons at her would be objectively unreasonable use of
3  force in the totality of the circumstances in this
4  case?
5        I'm not asking you to tell me -- or to agree
6  with me that that happened. I'm just saying, if that
7  happened, would that be objectively unreasonable in
8  your mind?
9        MS. WESTBY: Object to the form of the
10  question. Incomplete hypothetical, misstates the
11  evidence and the testimony.
12        MR. THOMPSON: And calls for legal
13  conclusion, and I join.
14        MS. WESTBY: Yeah.
15        THE WITNESS: So am I to answer that?
16  MR. GOSMAN:
17     Q. Yeah.
18        MR. THOMPSON: If you can.
19        MS. WESTBY: If you can.
20        THE WITNESS: That's just it. I don't know
21  that I can. It didn't happen that way.
22  MR. GOSMAN:
23     Q. Well, Tricia Wachsmuth said it did. And I
24  know you don't want to believe her, and that's fine.
25  But if what she said was true -- and I'm not asking you

1  to make any judgments about that, whether what she said
2  was true or not -- then the police officers in this
3  scenario led or forced her to go down the stairs ahead
4  of them while they had their rifles, their long guns
5  trained on her, is that objectively unreasonable in
6  your mind in the totality of the circumstances?
7        MS. WESTBY: And, again, object to the form
8  of the question. Misstates the testimony and the
9  evidence. But the more important thing is it's an
10  incomplete hypothetical. The standard is totality of
11  the circumstances. You haven't given him enough of
12  those for him to be able to --
13        MR. GOSMAN: All right. Object as to form,
14  please.
15        MS. WESTBY: -- to be able to come to a
16  conclusion. And calls for a legal conclusion.
17        MR. THOMPSON: Join.
18        THE WITNESS: Based on the limited
19  information you've given me, I would have to say I
20  don't know.
21  MR. GOSMAN:
22     Q. What other information would you need?
23        MR. THOMPSON: Objection as to form.
24        MS. WESTBY: Join.
25        THE WITNESS: I would need to have the

1  totality of the circumstances in a complete context.
2  MR. GOSMAN:
3     Q. Let's see here. And based on objective
4  reasonableness and the totality of the circumstances,
5  as you understand that term, would it have been
6  objectively unreasonable to drop a flashbang device
7  into the master bedroom of a home where a small child
8  is known to be present, where you can't see where the
9  device is being deployed?
10        MS. WESTBY: And, again, same objection.
11  Same objection.
12        MR. THOMPSON: Join.
13  MR. GOSMAN:
14     Q. Go ahead, Officer.
15     A. Could you restate the question?
16        MR. GOSMAN: I'll ask the reporter to read
17  it.
18             (The record was read as
19             requested.)
20        MS. WESTBY: And I would add that, again,
21  you're trying to turn him into an expert; this time a
22  legal expert. And you're not paying him. He's not
23  your expert and you're not entitled to do that with a
24  defendant.
25        MR. THOMPSON: Join.

1   MR. GOSMAN:
2     Q.   Go ahead.
3          MR. THOMPSON: You can answer.
4          THE WITNESS: Again, like the last time, I
5   don't know that I can really answer that question.
6   MR. GOSMAN:
7     Q.   Would you do it?
8          MS. WESTBY: Objec to the form of the
9   question. You know --
10         MR. GOSMAN: You know, that's fine. You've
11  objected to the form of the question.
12         MS. WESTBY: Again, incomplete --
13  MR. GOSMAN:
14    Q.   It's a simple question. Would you do it?
15         MS. WESTBY: Again incomplete hypothetical,
16  not enough information.
17  MR. GOSMAN:
18    Q.   All right. I'll back up.
19         Would you drop a flashbang device in a window
20  that you couldn't see into, in a home where a young
21  child had been thought to be present and where the
22  location of that child was not known?
23         MR. THOMPSON: Objection as to form.
24         MS. WESTBY: I join. Incomplete
25  hypothetical.

1          THE WITNESS: Possibly.
2   MR. GOSMAN:
3     Q.   You would do that?
4     A.   Possibly.
5     Q.   What kind of circumstances would it take for
6   you to drop a flashbang device into a home where you
7   can't see where the device is being deployed and you
8   know a young child is present but you don't know where?
9          MS. WESTBY: Object to the form of the
10  question.
11         MR. THOMPSON: Join.
12         THE WITNESS: So, in essence, you're wanting
13  me to just engage in utter speculation and concoct
14  special circumstances under which that could happen?
15         MR. GOSMAN: Well, you know, not really,
16  because I think you told me that you might possibly do
17  that. And I'm sure there's something in your mind
18  there that would lead you to say that you might, under
19  some circumstances, do such a thing. And I'd just like
20  to know what they would be.
21         MR. THOMPSON: Object.
22         MS. WESTBY: Objec to the form of the
23  question.
24         MR. THOMPSON: Join.
25         THE WITNESS: Yeah, I just...

1   MR. GOSMAN:
2     Q.   What circumstances would make that
3   appropriate?
4          MS. WESTBY: Same objection. Go ahead.
5          THE WITNESS: I think the circumstances in
6   the Wachsmuth case were appropriate.
7   MR. GOSMAN:
8     Q.   Okay. Under what circumstances -- or let me
9   strike that.
10         Would you consider it to be objectively
11  reasonable under the totality of the circumstances rule
12  for officers on a knock-and-announce warrant to knock
13  and announce and fail to wait before the door was
14  rammed open and the officers entered the residence?
15         MS. WESTBY: Again, same objection,
16  incomplete hypothetical. It's -- the standard is --
17         MR. GOSMAN: You know, I don't really need
18  this discussion. I mean, you've objected on the basis
19  it's an incomplete hypothetical. That's perfectly
20  satisfactory --
21         MS. WESTBY: And you keep doing it. The
22  standard is totality of the circumstances. You keep
23  giving him incomplete hypotheticals. You're giving him
24  two or three facts and then asking him the question
25  again. He's not an expert. He's not your expert and

1   you're not allowed to make him be your expert. Calls
2   for a legal conclusion.
3          MR. THOMPSON: Join.
4          THE WITNESS: Define fail to wait.
5   MR. GOSMAN:
6     Q.   The door is immediately rammed after the
7   knock-and-announce is made.
8          MR. THOMPSON: Objection --
9          MS. WESTBY: Same objection.
10         MR. THOMPSON: Yeah, join.
11         THE WITNESS: With no hesitation in between?
12  MR. GOSMAN:
13    Q.   That's correct.
14    A.   None whatsoever?
15    Q.   None whatsoever.
16    A.   Okay. What was the original question, then?
17    Q.   Would that be objectively reasonable under
18  the totality of circumstances rule as you understand
19  it?
20    A.   On a knock-and-announce warrant?
21    Q.   Yes.
22         MS. WESTBY: Same objection, incomplete
23  hypothetical.
24         MR. THOMPSON: Join.
25         THE WITNESS: Again, I think there could be

TIM FEATHERS - November 23, 2010                                Page 73
Direct Examination by Mr. Gosman

1   circumstances present where it could be.
2   MR. GOSMAN:
3       Q.  Well, what circumstances existed at the
4   Wachsmuth residence that night that would have
5   justified that approach?
6           MR. THOMPSON: What approach, Counsel?
7   MR. GOSMAN:
8       Q.  Ramming the door immediately after the
9   knock-and-announce with no hesitation.
10          MR. THOMPSON: Objection as to form.
11  Misstates the evidence.
12          MR. GOSMAN: Well, it misstates the evidence
13  as you want it to be.
14          MS. WESTBY: Join.
15  MR. GOSMAN:
16      Q.  Go ahead.
17          MR. THOMPSON: Is that a question?
18          MR. GOSMAN: That's an objection to your
19  objection, I guess, Tom.  Sorry about that.
20  MR. GOSMAN:
21      Q.  Go ahead.
22      A.  Well, that isn't the way it happened that
23  night, so I don't really know how I can answer your
24  question since it didn't happen that way.
25      Q.  Were you there?

TIM FEATHERS - November 23, 2010                                Page 74
Direct Examination by Mr. Gosman

1       A.  I was not.
2       Q.  So you can't tell me what circumstances would
3   justify on a knock-and-announce warrant at the
4   Wachsmuth residence for the officers to have entered
5   the home immediately with the ram after announcing,
6   "Police, search warrant"?
7           MS. WESTBY: Object to the form of the
8   question.  Again, same objection.
9           MR. GOSMAN: Just state your objection,
10  please, so we don't have to listen to this --
11          MS. WESTBY: Please don't do that.
12          MR. GOSMAN: -- over and over again.
13          MS. WESTBY: I view that as threatening.
14          MR. THOMPSON: Join.
15          THE WITNESS: Again, if you're saying
16  immediately means, you know, no time lapse, immediately
17  happened, that isn't the way it went down. And I can't
18  answer that question.
19  MR. GOSMAN:
20      Q.  Well, let's just back up for a second and ask
21  you to say this: As you understand the Fourth
22  Amendment, is it appropriate on a knock-and-announce
23  warrant to announce, "Police, search warrant," and then
24  immediately ram the door in without any hesitation?
25          MS. WESTBY: Object to the form of the

TIM FEATHERS - November 23, 2010                                Page 75
Direct Examination by Mr. Gosman

1   question.  Same objection.
2           MR. THOMPSON: Join.
3           MS. WESTBY: Clear -- I mean, absolutely
4   asking for a legal expert opinion.  And this has gone
5   on long enough.
6           Go ahead if you can answer.
7   MR. GOSMAN:
8       Q.  Officer?
9           MS. WESTBY: And this is the last time.
10          THE WITNESS: My understanding of
11  knock-and-announce under the Fourth Amendment is you're
12  required to knock, announce your identity and your
13  purpose and wait a reasonable amount of time.
14  MR. GOSMAN:
15      Q.  Okay.  Does the Powell Police Department have
16  a SWAT team?
17      A.  No.
18      Q.  Let's see  All right.  I am getting a little
19  bit ahead of myself.  We're still on Exhibit No. 27.
20          THE WITNESS: Can we take a short break?
21          MR. GOSMAN: Yes, we can.
22          (Recess taken 5:03 p.m. to
23          5:10 p.m., November 23, 2010)
24  MR. GOSMAN:
25      Q.  Okay.  I think we're on Exhibit 27.  And I

TIM FEATHERS - November 23, 2010                                Page 76
Direct Examination by Mr. Gosman

1   wanted to turn your attention to the P.I.E.R.
2   philosophy, which is on page 27 of this patrol tactics
3   course.
4           And can you tell me what -- it says right
5   there what P.I.E.R. stands for, Patrol Interdiction to
6   Emergency Response.  What is a P.I.E.R. team?
7       A.  Well, there's no such thing as a P.I.E.R.
8   team.
9       Q.  Okay.  What is P.I.E.R.?  What is it designed
10  for?
11      A.  P.I.E.R. is designed for a patrol response to
12  an active threat.
13      Q.  Okay.  And you'll notice on this document
14  that we're looking at, it's page 27 where we're
15  discussing the P.I.E.R. portion of the -- of this
16  course, that P.I.E.R. is not intended to be used as a
17  SWAT team?
18      A.  That's right.
19      Q.  And so that's still current thinking, at
20  least as SWAT teams relate to P.I.E.R. events?
21          MS. WESTBY: Object to the form of the
22  question.
23          MR. THOMPSON: Join.
24          THE WITNESS: Yes.
25

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 22 of 117
Tricia Wachsmuth v.                                                    **Tim Feathers**
City of Powell, et al.                                          **November 23, 2010**

TIM FEATHERS - November 23, 2010                    Page 77
Direct Examination by Mr. Gosman

1    MR. GOSMAN:
2    Q. And, in fact, that's current thinking as it
3    pertains to all other critical incident events, is it
4    not?
5            MS. WESTBY: Object to the form of the
6    question.
7            MR. THOMPSON: Join.
8            THE WITNESS: If I understand your question
9    correctly, I would say no.
10   MR. GOSMAN:
11   Q. Okay. Go ahead and explain what you're
12   thinking there.
13   A. Restate your question.
14   Q. Yeah. The question is that in none of these
15   critical incidents is the -- are the resources of the
16   local agency intended to be used as a SWAT team if they
17   are not, in fact, trained as a SWAT team?
18           MS. WESTBY: Object to the form of the
19   question.
20           MR. THOMPSON: Join.
21           THE WITNESS: If you are intending that to be
22   a statement of the P.I.E.R. philosophy, you're
23   misstating it.
24   MR. GOSMAN:
25   Q. Okay. All right. Well, it says P.I.E.R. is

TIM FEATHERS - November 23, 2010                    Page 78
Direct Examination by Mr. Gosman

1    not intended to be used as a SWAT team, period. Does
2    it not?
3    A. Correct.
4    Q. So we'll leave that.
5            Would you agree with me that local law
6    enforcement agencies which do not have qualified
7    tactical teams should not use their resources as a
8    substitute for a SWAT team?
9            MS. WESTBY: Object to the form of the
10   question.
11           MR. THOMPSON: Join.
12           THE WITNESS: I don't know what you mean by
13   that.
14   MR. GOSMAN:
15   Q. What is it -- what is the difference between
16   a SWAT team and just the 11 officers that assembled
17   that night to perform the dynamic entry on the
18   Wachsmuth residence?
19   A. There would be a number of differences.
20   Probably the primary difference is that a SWAT team
21   would be used to provide a tactical solution to an
22   incident as a primary solution where there would be --
23   in certain types of incidents where there -- where we
24   would not use patrol officers or police officers
25   trained as our officers are to do that.

TIM FEATHERS - November 23, 2010                    Page 79
Direct Examination by Mr. Gosman

1    Q. And so is it fair to say that you would not
2    want to put your patrol officers in a situation where a
3    SWAT team was the appropriate response?
4            MR. THOMPSON: Object as to form.
5            THE WITNESS: Recognizing that appropriate
6    can be interpreted many ways, based on how I would
7    define appropriate, yes, I would agree with that.
8    MR. GOSMAN:
9    Q. That was one of the softest lobs you're going
10   to get tonight.
11           Okay. Let's go ahead and move on to
12   Exhibit 37. Can you identify that document for me,
13   please?
14   A. I think it's the power point that goes with
15   the outdated lesson plan we looked at earlier.
16   Q. Okay. Let's see. When was the last time
17   this document was used, do you know?
18   A. Can you tell me which exhibit the lesson plan
19   outline was that we looked at earlier?
20   Q. I think it was 29.
21   A. If you notice on the cover page of the lesson
22   plan in Exhibit 29, the last updated date of
23   September '02 was in bold. That means those were
24   proposed changes. Those changes were never adopted and
25   implemented.

TIM FEATHERS - November 23, 2010                    Page 80
Direct Examination by Mr. Gosman

1            The last adopted and implemented update was
2    February 6 of 1999, so the last time this lesson plan
3    would have been trained with would have been prior to
4    September of 2002.
5    Q. Okay. Thank you. All right.
6            Now, I believe I've asked you this question.
7    Does the Powell Police Department have a SWAT-qualified
8    team?
9    A. We do not have a SWAT team.
10   Q. And why not?
11   A. Based on the size and staffing of our agency,
12   I do not have the manpower or fiscal resources to
13   staff, train, and keep current such a unit.
14   Q. All right. It is a fairly significant
15   training regimen that is associated with qualification
16   for SWAT, is it not?
17           MS. WESTBY: Object to the form of the
18   question.
19           THE WITNESS: I cannot speak in detail to
20   what that would require simply because I've never
21   followed through in fully investigating it.
22   MR. GOSMAN:
23   Q. All right. Well, let's go ahead and take a
24   look again at Exhibit -- I think it was 38. And that
25   was the NTOA SWAT standards document.

1    MR. THOMPSON: I thought you withdrew this.

2    MS. WESTBY: Yeah.

3    MR. GOSMAN: Well, yeah, I did.  I did

4  withdraw it.  I'm not going to try to attach the entire

5  manual.

6        MS. WESTBY: And we're not going to allow him

7  to answer questions about it either.  He hasn't had an

8  opportunity to review it.

9  MR. GOSMAN:

10    Q.  Well, we're going to go to -- we've already

11  talked about page 2, and I'm now going to turn your

12  attention, Officer, to page -- yes, it's on page 6, and

13  starts with paragraph numbered 5.4.

14        And it talks about SWAT training, and I want

15  you to just take a look at that for a minute and then

16  read the minimum training standards for a SWAT team

17  into the record for me if you could.

18        MS. WESTBY: Say that again.  These are

19  not standards.  These are not nationally recognized

20  standards, right?

21        MR. GOSMAN: These are NTOA standards, so

22  they are nationally recognized.  I mean, the same

23  extent --

24        MS. WESTBY: The problem is that we have not

25  had an opportunity to review this document.  We've not

1  had an opportunity to talk to our client about it or

2  to, you know, have any idea what else is in this

3  document.  That's the whole point of doing discovery --

4  written discovery prior to depositions.  So that's the

5  problem that we're having.

6  MR. GOSMAN:

7    Q.  Have you taken the opportunity to review that

8  paragraph that I've mentioned to you?

9    A.  I've scanned it.

10    Q.  Okay.  Now, do you have any reason to doubt

11  that the minimum training standards that are listed in

12  this document, which is the National Tactical Officers

13  Association SWAT standards manual, are not the training

14  standards established by that agency?

15        MR. THOMPSON: Counsel, you're having him

16  read portions of the document?

17        MR. GOSMAN: Yes, I am.

18        MR. THOMPSON: If you're going to go ahead

19  and have him read from the document, let's introduce

20  the whole document so it's not taken out of context.

21        MR. GOSMAN: Okay.  That's fine.  We can do

22  that.

23        THE WITNESS: I have no idea what the

24  question was you just asked

25

1  MR. GOSMAN:

2    Q.  Okay.  The question was: Do you have any

3  reason to doubt that these are, in fact, the training

4  standards established by the -- by NTOA for SWAT?

5    A.  I don't know.

6        MS. WESTBY: And how would he have any idea?

7  He's not had an opportunity to review this document,

8  nor has --

9        MR. THOMPSON: Counsel.

10        MS. WESTBY: -- half his attorneys.

11        MR. GOSMAN: All right.  Well, let's see

12  here.

13  MR. GOSMAN:

14    Q.  Is it your testimony that you're unable to

15  discern from reading the paragraph that I've just asked

16  you to read what the minimum training standards are

17  under NTOA for a SWAT team?

18        MR. THOMPSON: Objection as to form.

19        THE WITNESS: I can read and understand the

20  paragraph.  What I don't know is, is this actually

21  NTOA's recommended standards.  I mean, I've been handed

22  a document I've never seen before.  It appears to have

23  NTOA's emblem on it.  It appears to be copyrighted with

24  their copyright, but I just don't know what this is.  I

25  don't have a context for the document.

1        It's not like I was able to pull it out of

2  their website or it was given to me by an NTOA officer

3  where I could verify that it, in fact, was an NTOA

4  document.  That's my issue.

5  MR. GOSMAN:

6    Q.  Okay.  And with those reservations in mind,

7  would you go ahead and read the minimum training

8  standards that are contained on page 7?

9        MR. THOMPSON: Let me see this for a second.

10        MS. WESTBY: Again, I would object to -- I

11  don't understand the purpose of it.  But I would object

12  to him being asked to read portions of the document

13  that he has not been previously provided, has not had

14  an opportunity to adequately review into the record.

15        MR. GOSMAN: While you're reading that, Tom,

16  we'll go ahead and move on.

17  MR. GOSMAN:

18    Q.  Would it be fair to say that the Powell

19  Police Department does not have any training

20  requirements that are appropriate for a SWAT-qualified

21  team?

22        MR. THOMPSON: Objection as to form.

23        MS. WESTBY: Join.

24        THE WITNESS: Are you asking, does the

25  training we provide meet some standard to qualify our

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 24 of 117
Tricia Wachsmuth v.                                                    Tim Feathers
City of Powell, et al.                                          November 23, 2010

1   officers as a SWAT team?
2   MR. GOSMAN:
3   Q.   Yes.
4   A.   No.
5   Q.   Does the Powell Police Department have any
6   special operations units that are trained and operating
7   as such?
8        MR. THOMPSON: Objection, asked and answered.
9        MS. WESTBY: Yeah. I agree. Join.
10       THE WITNESS: You mean particular officers
11  specifically chosen to operate in a standalone unit?
12  MR. GOSMAN:
13  Q.   Yes.
14  A.   No.
15  Q.   Do you have any other special tactical teams
16  that are specially assigned, trained together and
17  function operationally together?
18       MR. THOMPSON: Objection as to form.
19       THE WITNESS: Ask that question again.
20       MR. GOSMAN: I'll have the reporter read it
21  back.
22            (The record was read as
23            requested.).
24       THE WITNESS: By your definition as stated,
25  no.

1        Can we stop there for a moment?
2        MR. GOSMAN: Yes.
3        THE WITNESS: I want to just step out and
4   visit with my counsel for a moment and I'll be right
5   back.
6        MR. GOSMAN: Okay. Very good.
7            (Recess taken 5:26 p.m. to
8            5:30 p.m., November 23, 2010)
9   MR. GOSMAN:
10  Q.   Go ahead and expand on your answer.
11       THE WITNESS: Would the reporter read back
12  the last question and my answer?
13            (The record was read as
14            requested.)
15  MR. GOSMAN:
16  Q.   And if you'd like to expand on that answer,
17  you may.
18  A.   I would like to expand on that answer. The
19  first part of your question that dealt with
20  specially-assigned individual units just simply doesn't
21  apply to our agency. Our officers are generalists.
22  They are not specialists. They are not, in this
23  regard, part of special units.
24       So when it comes to the training and the
25  functioning and the operating together in these areas,

1   yes, we do.
2   Q.   All right. Have the officers involved in the
3   Wachsmuth warrant service, as a group, ever performed a
4   dynamic entry in an operational setting?
5   A.   Again, when you say, again, as a group, do
6   you mean those -- all of those specific officers
7   operating together on another case or incident?
8   Q.   Yes.
9   A.   I don't know.
10  Q.   Okay.
11  A.   Short of going back and reviewing incidents
12  and seeing who the officers were.
13       MR. THOMPSON: And he's got Exhibit 39 back
14  now.
15       MR. GOSMAN: Okay. Well, I assumed that.
16  MR. GOSMAN:
17  Q.   All right. How about in groups less than all
18  the officers that, nevertheless, included officers that
19  were involved in the Wachsmuth warrant service?
20  A.   Been involved in actual incidents together?
21  Q.   I'm not talking about incidents though. I'm
22  talking about dynamic entry into a home with an entry
23  team, a ram, and a -- and the officers entered the
24  home, and this is prior, of course, to February of
25  2009, yes.

1   A.   Are you requiring all those elements, dynamic
2   entry, ram, flashbang, or just any of those elements?
3   Q.   Correct me if I'm wrong, but I think the City
4   has admitted that a flashbang device had never been
5   used before, operationally, at the time the Wachsmuth
6   warrant service was made.
7   A.   Yes, I believe that's correct.
8   Q.   Okay. So, no, I'm not going to ask you to
9   include the flashbang.
10  A.   All right. Again, short of looking at
11  specific incidents, it's going to be hard for me to say
12  yes, absolutely, these officers on this date at this
13  place.
14  Q.   Right. And that's why I sent out discovery
15  and asked you to take your time and collect that
16  information for me. It's in Exhibit 59.
17       And I want you to go ahead and take some time
18  and go through Exhibit 59, and then we'll get back to
19  these NTOA standards.
20            (Exhibit 59 identified)
21       THE WITNESS: Okay.
22       MR. THOMPSON: You want him to go through all
23  the --
24       MR. GOSMAN: Well, you should be familiar
25  with most of these incidents. And they do contain a

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 25 of 117
Tricia Wachsmuth v.                                                          Tim Feathers
City of Powell, et al.                                                  November 23, 2010

TIM FEATHERS - November 23, 2010                    Page 89
Direct Examination by Mr. Gosman

1  number of documents per incident. And they're almost
2  always -- they almost always start with some kind of
3  initial report. So, yeah. I don't want you to go
4  through them all, no. We don't have time for that.
5       THE WITNESS: I will do it, then, based on my
6  best recollection of these incidents.
7  MR. GOSMAN:
8  Q.  Okay.
9  A.  Incident Powell Police Case Report 07540.
10 Q.  You know, I'm not sure that I want to go
11 through each one of them specifically because what I'm
12 looking for, again, are those incidents that meet the
13 qualifications we've talked about: Dynamic entry,
14 battering ram, multiple officers, long guns, I think,
15 is appropriate.
16 A.  Well, let me give you the answer for this one
17 and you tell me if that meets your --
18 Q.  Okay.
19 A.  And this incident here, after the suspect was
20 taken in custody, I believe a dynamic entry was done on
21 the residence by multiple officers armed with long guns
22 to clear and secure the residence.
23 Q.  Is that stated anywhere in the record?
24 A.  All the report indicates is that certain
25 officers assembled and cleared the residence.

TIM FEATHERS - November 23, 2010                    Page 90
Direct Examination by Mr. Gosman

1  Q.  Which officers?
2  A.  I'd have to look in the report.
3  Q.  Of course. And while you're doing that, is
4  it -- the suspect had already been hauled off at that
5  time, correct?
6  A.  Yes.
7  Q.  Was there a search warrant associated with
8  this arrest?
9  A.  I don't remember.
10 Q.  Go ahead.
11 A.  Well, okay. I'm on the wrong case here, I
12 think. It's hard for me to tell with everybody
13 redacted.
14 Q.  Don't you wish you had the original?
15 A.  That's about the right date, if that's the
16 incident I'm thinking of.
17     Okay. Yeah, I'm sorry, the incident that I
18 just referred to, the correct case number for that is
19 07606.
20     Okay. It says in here I sent Officers
21 Wardwell, Kelly, Bradley, and McCaslin to secure and
22 clear trailer number -- and the number is redacted --
23 to make sure the trailer was safe.
24 Q.  Okay. All right. Was the door opened?
25 A.  It says in the report here that it was locked

TIM FEATHERS - November 23, 2010                    Page 91
Direct Examination by Mr. Gosman

1  but that the keys were in the car. And at that point
2  it's unclear if our folks cleared it or if, because of
3  the officer-involved shooting connected to it and the
4  investigation that was turned over to DCI, whether they
5  did it.
6       My recollection is, I thought our officers
7  did it, but that's not stated in the report.
8  Q.  And we've only got one copy of that, so is
9  there specific language in there that indicates that
10 DCI did come onto the scene and secure the scene?
11 A.  Well, our officers secured it. And that's
12 why I'm saying it's unclear whether or not they also
13 cleared it, based on the language in here.
14 Q.  All right. And those -- so which of those
15 officers were involved in the Wachsmuth event?
16 A.  McCaslin and Bradley.
17 Q.  Yeah. And let's see. Did they have long
18 guns that night?
19 A.  Yes.
20 Q.  Did they have their extra body armor on?
21 A.  Yes, in that -- my recollection of all the
22 officers I saw respond, they put that armor on. I
23 can't...
24 Q.  This suspect had been involved in an officer
25 shooting?

TIM FEATHERS - November 23, 2010                    Page 92
Direct Examination by Mr. Gosman

1  A.  The suspect was shot by one of our officers.
2  Q.  Oh, I see. Yes, I remember that situation.
3  All right. And so -- well, actually, what was there to
4  clear at that point? I mean, the suspect was shot,
5  correct?
6       MS. WESTBY: Object to the form of the
7  question.
8  MR. GOSMAN:
9  Q.  I really am trying to figure out -- I do
10 remember that incident. I'm trying to figure out how
11 we had a true dynamic room-clearing situation there,
12 whether you did it or DCI.
13     MS. WESTBY: Object to the form of the
14 question.
15     MR. THOMPSON: Join.
16 MR. GOSMAN:
17 Q.  The threat had been removed; isn't that true?
18     MR. THOMPSON: Objection as to form.
19     THE WITNESS: The known threat had been
20 removed.
21 MR. GOSMAN:
22 Q.  And there was no other indication that there
23 were any other threats than that individual who had
24 been shot by one of the officers?
25     MR. THOMPSON: Objection as to form.

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 26 of 117
Tricia Wachsmuth v.                                                                    Tim Feathers
City of Powell, et al.                                                              November 23, 2010

1  MS. WESTBY: Join.
2  THE WITNESS: No.
3  MR. GOSMAN:
4  Q. And you're not sure whether DCI went into
5  that trailer or your officers did, correct?
6  A. No, I'm not. Based on the report, it is
7  unclear.
8  Q. Okay. So let's go on.
9  A. Okay. Let me see if I can recognize these
10  incidents.
11  Q. I tried to hold it up to the light to see if
12  I could read the names, but your redaction was pretty
13  good.
14  A. Well, you should have copied versions of
15  those here.
16  Okay. Case Number 05908. We were serving an
17  arrest warrant on a subject connected to a DCI drug
18  case. There were information regarding the suspect
19  being armed. And, again, it's not articulated in the
20  report here. Oh, yeah, it is. And that he had with
21  him a rifle and a handgun.
22  While we were getting set up outside the
23  house, he came out. We arrested him on the front lawn.
24  There were other occupants at the house. I believe a
25  number of our officers essentially conducted a dynamic

1  entry on the house, cleared it, secured the rest of the
2  people, and then we continued with our follow-up
3  investigation.
4  Q. Is there anything in that documentation that
5  says that?
6  A. No. And it's going to be the case in every
7  last one of these reports. That wasn't the focus of
8  the investigation and the operation. It's just going
9  to say we entered and cleared. But what I'm telling
10  you is, the methodology they use to enter and clear was
11  dynamic entry and clearing
12  Q. Why? Why would you dynamically enter a home
13  when the suspect had come out and surrendered?
14  A. Because that was the known threat. The
15  weapons hadn't been secured yet and there were other
16  people still in the residence
17  Q. Weren't they the ones that called the cops?
18  A. No.
19  Q. Didn't they come out and speak to the
20  officers during the course of this investigation?
21  A. I don't remember without going back.
22  Q. So there's no evidence in the report that a
23  dynamic entry was conducted by officers of the Powell
24  Police Department?
25  MS. WESTBY: Object to the form of the

1  question.
2  MR. THOMPSON: Join.
3  THE WITNESS: Other than the statements that
4  are -- that the place was entered and cleared.
5  MR. GOSMAN:
6  Q. Could you go back to that, Chief, and let me
7  just take a peek at it.
8  A. In the investigation section of the report,
9  the -- one, two -- third paragraph, last sentence.
10  Q. Okay. Thank you.
11  Says nothing else of interest was found in
12  the -- I'm sorry, part of the wrong paragraph. Go
13  ahead. I just picked up he cleared. Okay. Entered
14  the house.
15  Yeah, it doesn't say cleared though, does it?
16  A. Just says they entered the house, took
17  another person into custody.
18  Q. All right. Okay. And let's see. And that
19  was officer -- oh, Miner was involved in entering the
20  house. All right. Very good.
21  So is there anything else in here?
22  A. Well, I guess that's what you're going to
23  find in the --
24  Q. No, I want you to go through it and I want
25  you to tell me every other instance where there is,

1  even arguably, a dynamic entry by a team in the
2  circumstances that we've discussed. I think you've
3  gotten most of the way through it.
4  A. Well, no, there's a bunch more cases here.
5  Q. Okay.
6  A. And that's what I'm saying. That's what
7  you're going to find in each of them.
8  Okay. Here's Case 06388, assisting DCI in
9  the service of search warrant. When the warrant was
10  served, Sergeant Eckerdt, Officer McCaslin, along with
11  Deputy Walton and TFO Lara entered the front of the
12  house. That's the only description.
13  Q. We don't know whether it was a dynamic entry
14  or whether it was a warrant with a knock-and-announce?
15  A. Based on our collective recollection as an
16  agency -- because when you sent this discovery request
17  out, I asked the officers to forward to me any cases
18  they were involved in in which a dynamic entry was
19  used. This case was put forward by the officers
20  involved. But that's all the report says.
21  Q. All right. Let me see that, then, too.
22  Okay. I'm going to take this document from
23  you for just a moment.
24  Okay. Was the suspect home in that warrant?
25  A. I don't know.

Tricia Wachsmuth v.
City of Powell, et al.

Tim Feathers
November 23, 2010

TIM FEATHERS - November 23, 2010                    Page 97
Direct Examination by Mr. Gosman

1  Q. I can't remember whether it says there or
2  not.
3     All right. So it didn't say -- it says that
4  the officers entered the hon e. It doesn't say that it
5  was a -- that there was any particular danger -- there
6  were no objective threats that were identified in
7  connection with execution of the warrant; isn't that
8  true?
9  A. The report does not indicate that.
10 Q. Yeah.
11 A. Again, Mr. Gosman, your discovery request was
12 copies of reports of incidents where a dynamic entry
13 was used. And it's been a little difficult to find
14 that. But if we define a dynamic entry as speed,
15 surprise, and violence of action as the components that
16 make up a dynamic entry, the officers that were
17 involved in these cases said they qualify, even though
18 the reports themselves do not specifically articulate
19 that.
20 Q. Well, they don't say anything about it, do
21 they?
22 A. Other than entry was made, the place was
23 cleared, the place was secured. But when you send me a
24 discovery request saying send me cases on this, I want
25 to honor that request. So I went to them and said,

TIM FEATHERS - November 23, 2010                    Page 98
Direct Examination by Mr. Gosman

1  give me any cases any of you can remember, within the
2  parameters of your discovery request.
3     These are the ones that they put forth to me.
4  I reviewed them. When it wasn't specifically in there,
5  I went to them and asked. And they said, yes, it did.
6  So this is what we have.
7  Q. All right.
8  A. And this does not include -- this does not
9  include other involvement when we were assisting DCI or
10 another agency, where our agency didn't cut a report on
11 it.
12 Q. Didn't prepare a report?
13 A. Yeah. I just want you to understand I was
14 doing all I could to honor your discovery request.
15 Q. And I'm just trying to figure out how the
16 evidence that you've given me, based on the
17 documentation, squares with the statements that you're
18 making.
19    MS. WESTBY: Object to the form of that
20 statement.
21    MR. GOSMAN: All right.
22 MR. GOSMAN:
23 Q. So let's go ahead and continue.
24 A. Okay.
25 Q. I think we've decided that some of these

TIM FEATHERS - November 23, 2010                    Page 99
Direct Examination by Mr. Gosman

1  instances just did not involve dynamic entry. Isn't
2  that true?
3     MS. WESTBY: Object to the form of the
4  question.
5     MR. THOMPSON: Objection.
6     THE WITNESS: My testimony would be that,
7  based on the officers involved in these incidents --
8  recollection of the incidents, they did involve a
9  dynamic entry as defined by speed, surprise and
10 violence of action, even though the reports do not
11 indicate that.
12    And I can tell you right now I remember from
13 reviewing them before they were sent in on discovery,
14 none of the reports are going to say a dynamic entry
15 was done.
16 MR. GOSMAN:
17 Q. I don't know that we used dynamic entry in
18 this case, but --
19 A. And none of these reports are going to
20 describe the particulars of how it was done. Every
21 last one of them, all it says is entered, secured,
22 entered, cleared.
23 Q. All right. Okay. In that case -- hand it
24 back to me -- I think what you're telling me is that
25 every one of those documents involved a dynamic entry

TIM FEATHERS - November 23, 2010                   Page 100
Direct Examination by Mr. Gosman

1  by some officers of the Powell Police Department.
2  A. To the best of our ability to recall that and
3  meet that definition of the dynamic entry, our
4  understanding of it and honor your discovery request,
5  yes.
6  Q. Okay. Well, the very first report here has,
7  "Sergeant Kent going into an apartment. He drew his
8  firearm before entering the unlocked apartment and they
9  found the suspect sleeping in one of the bedrooms. We
10 turned the room light on and identified ourselves as
11 police officers."
12    And you're telling me that this case involved
13 room clearing by armed officers in a dynamic entry?
14    MS. WESTBY: Object to the form of the
15 question, asked and answered several times.
16    MR. THOMPSON: And misstates his prior
17 testimony.
18    MR. GOSMAN: I don't think we actually
19 referred to this thing at all before. This is the
20 first one, very first incident.
21    MS. WESTBY: And he told you about all of
22 them.
23    MR. GOSMAN: No, he darn sure didn't tell me
24 about all of them.
25

1   MR. GOSMAN:
2   Q.  Anyway, it's Case 07-540.
3       MR. THOMPSON: Counsel, if it's going to
4   speed things up, you might want to look at your
5   original discovery request. You defined what you
6   wanted the response to be for, so I think you
7   included --
8       MR. GOSMAN: That's true.
9       MR. THOMPSON: -- a definition of dynamic
10  entry. And those were responsive to that request.
11      MR. GOSMAN: Well, that's your statement.
12      MR. THOMPSON: No that's discovery signed
13  under oath.
14      MR. GOSMAN: Yeah, I did include a
15  definition. You did include it in your answer. I'll
16  take a look at that later.
17  MR. GOSMAN:
18  Q.  But anyway -- let's see. Okay. The first
19  case has Sergeant Kent walking through the unlocked
20  door and going directly to the bedroom where the man's
21  wife said that suspect was located. All right.
22      The second case, I think was the one where
23  the man was shot. And we know in that case that the
24  suspect came out of the house, tried to drive away and
25  was shot by a Powell police officer, and then we're not

1   sure who went into the house afterwards. Correct?
2       MS. WESTBY: Object to the form of the
3   question.
4       MR. GOSMAN: All right. It's in the record.
5   We'll go on.
6       MR. THOMPSON: If you're going to ask him
7   questions, can he see the document?
8       MR. GOSMAN: Yes.
9       MS. WESTBY: It's okay. 'Cause he's not
10  really having him answer. He's just making statements.
11  MR. GOSMAN:
12  Q.  Well, this is the second case, and this is
13  the one where the officer was shot.
14  A.  Can I say something --
15  Q.  Go ahead.
16  A.  -- to help clarify some of this --
17  Q.  Yeah.
18  A.  -- and speed it up?
19  Q.  Yes, you can.
20  A.  In many of these incidents, in fact, probably
21  in almost all of them, I was not present. I was not
22  there. So when you ask me particulars about them, I
23  most likely don't have firsthand knowledge.
24      But in trying to answer your discovery
25  request of incidents that the department has been

1   involved in, I had to reach out to the collective
2   memory of my officers and ask them to forward these
3   cases to me with the definition that was in the
4   discovery request. And these are the cases they sent.
5       So how they fit that definition, they would
6   have to answer your particular questions. I wasn't
7   there. I don't have the firsthand knowledge on that.
8       If I know anything about any of them, it's
9   just what I can glean from the report or what I may
10  remember about what an officer told me.
11  Q.  Would it be safe to say that the best
12  information that we have, then, about these incidents
13  is that information that is contained in the reports?
14      MS. WESTBY: Object to the form of the
15  question.
16      MR. GOSMAN: I am trying to cut a few corners
17  here myself.
18      MS. WESTBY: Well, object to the form of the
19  question.
20  MR. GOSMAN:
21  Q.  Because you weren't personally involved in
22  any of these cases?
23      MR. THOMPSON: Objection as to form.
24      Go ahead, Chief.
25      THE WITNESS: Right, I was not personally

1   involved in the cases. Your best evidence is going to
2   be the testimony of the officers that were. They are
3   not here.
4       What you mean by your question is the best
5   evidence we have available in front of us right now, at
6   this moment, is going to be those statements in those
7   reports that are very general in scope and nonspecific
8   but that the officers involved forwarded those cases to
9   me as meeting the definition of dynamic entry.
10  MR. GOSMAN:
11  Q.  Well, and see, here's one where you were
12  involved. Chief Feathers deployed two other
13  enforcement teams to areas near -- I know that in some
14  of these cases you were actually involved -- were
15  advised that the suspect was on the back porch outside
16  in the backyard. And this is Case No. 091443.
17      So came out of the house, Officer Sapp
18  approached the porch, put handcuffs on the suspect and
19  searched him. He was later removed from the scene.
20  Okay. The immediate action team and Team 2 entered the
21  house and cleared the area.
22      Do you remember that particular incident?
23  A.  I do.
24  Q.  Okay. Tell me about that incident.
25  A.  It was a domestic violence incident where a

1  man had threatened his wife with several weapons, had
2  bound her, held her overnight. She -- I think he let
3  her go to work in the morning. She reported the
4  incident. We were -- we responded to it, set up an
5  emergency action team outside the residence.
6        While we were in the process of attempting to
7  have our negotiator contact him, he stepped outside on
8  the porch, was confronted by an officer at gunpoint and
9  taken into custody.
10       Once he was in custody, not knowing whether
11  or not there was anyone else still in the residence,
12  unsecured weapons in the residence, the emergency
13  action team entered the residence using dynamic
14  clearing principles and cleared and secured the
15  residence for us to continue then, our investigation.
16   Q.  The man lived with his wife, correct?
17   A.  Yes.
18   Q.  And you knew she wasn't a suspect?
19   A.  Yes.
20   Q.  Who else would have been in the house?
21        Did she say that there was anybody else in
22  the house or there might --
23   A.  No.
24   Q.  -- even be someone else in the house?
25   A.  No.

1   Q.  In fact, didn't she tell you that he was the
2  only one in the house?
3   A.  She may have. I don't remember.
4   Q.  All right. Well, I don't see anything in
5  091443 that indicates that there was even anybody else
6  in the trailer or suspected to be in the trailer, and
7  the suspect had come out of the trailer and was secured
8  outside the trailer. So I don't know how you could say
9  that there was an objective circumstance there that
10  would require a dynamic entry.
11       MR. THOMPSON: Objection as to form.
12  MR. GOSMAN:
13   Q.  And we don't see anything in the report that
14  suggests that the officers entered as a team and went
15  room to room in a clearing operation.
16       MS. WESTBY: Object to the form of the
17  question. I don't know even what the question is.
18  MR. GOSMAN:
19   Q.  Isn't that true?
20       MR. THOMPSON: Object as to form.
21       MS. WESTBY: Join.
22       THE WITNESS: All I can tell you is those are
23  the cases that seem to meet your request for discovery,
24  and we presented them. That's --
25

1  MR. GOSMAN:
2   Q.  You were there for that one, though, correct?
3   A.  Which one is this?
4   Q.  This is the one with the fellow that was
5  thinking about committing suicide and it was a domestic
6  dispute. And the wife got out and they set up a team
7  and they went to the house and he came out on the
8  porch.
9   A.  What's the case number?
10   Q.  091443. You should know. Yeah, it says "the
11  department was advised by Chief Feathers that based on
12  the information" --
13   A.  I was in the command post. I wasn't at the
14  residence.
15   Q.  Where was the command post?
16   A.  About a block and a half away in a church
17  parking lot.
18   Q.  Okay. Are there any policies for room
19  clearing or dynamic entry in a warrant service?
20        I mean, do you use dynamic entry every time
21  there's -- you're at a house and you take a suspect
22  into custody and you go into the house?
23       MS. WESTBY: Object to the form of the
24  question.
25       MR. THOMPSON: Join.

1        THE WITNESS: If the question was do we use
2  dynamic entry every time, no.
3  MR. GOSMAN:
4   Q.  All right. Well, what we have here are a
5  group of documents where, almost to a case, if not, in
6  fact, to each of the cases that are -- that were
7  submitted here, there is no -- the suspect has either
8  come out of the house and been arrested or the
9  situation simply did not involve clearing the house at
10  all.
11        And I'm trying to figure out how it is that
12  those situations are the same as the dynamic entry that
13  was planned in the Wachsmuth residence.
14       MS. WESTBY: Object to the form of the
15  question. Asked and answered over and over again.
16  MR. GOSMAN:
17   Q.  We know for a fact that the objective dangers
18  are removed in nearly every one of these cases, and it
19  appears, at least in the one case that I did read, that
20  Sergeant Kent just walked to the back of the -- or
21  perhaps it was Brown. But anyway, one of the officers
22  just walked to the back of the trailer and got the guy
23  out of bed.
24       MR. THOMPSON: Misstates the evidence.
25       MS. WESTBY: Same objection.

1  MR. GOSMAN:
2      Q. If the objective danger is removed, what is
3  the purpose of dynamic entry?
4      MS. WESTBY: Object to the form of the
5  question. Incomplete hypothetical.
6  MR. GOSMAN:
7      Q. That was a question, Chief.
8      A. Well, again, in the context of these cases
9  you're talking about, all I can say is in attempting to
10 answer your discovery request, we tried to find cases
11 that met the definitions in there.
12     I don't know. Maybe they don't meet your
13 definition and we just give you a bunch of cases that
14 weren't what you were interested in. But I wanted to
15 make sure we made a good faith effort to honor your
16 discovery request and not exclude anything that could
17 potentially meet your definition.
18     Maybe what we did was provided you cases that
19 just didn't meet that definition. I don't know.
20     Q. Here's another one, 03098. This one,
21 investigation by Sergeant Kent. Somebody had arrived
22 at the house that morning who had a rifle and a
23 handgun. Miner took cover south of the house, Chief
24 Feathers arrived. Miner and Blackmore held positions
25 near an open window on the south side of the house.

1  Through the window they could see the suspect lying on
2  the couch. After several minutes the front door opened
3  and the suspect came out.
4      Officer Miner pointed his handgun at the
5  suspect and ordered him to the ground. He was
6  transported to the LEC by Officer Bradley. DCI -- I
7  think one of the owners or companions in the house
8  signed a DCI consent to search.
9      Miner and Wardwell searched the house. It
10 doesn't say anything at all about a dynamic entry or
11 even the need for one since he suspect come out,
12 again, and had been arrested.
13     Now, I haven't gone through all of these, but
14 most of them, every one that I've seen so far, the
15 suspect has -- well, there is one exception, but the
16 suspect has come out of the house. And in the case
17 where the suspect was in the house, he was asleep in
18 the bedroom, and the officer, in his report stated that
19 he opened the unlocked door and just walked to the back
20 of the bedroom.
21     A. Okay.
22     Q. Okay. So I think it's going to be worth
23 while to go through each one of these cases so that I
24 can get a feel from you -- I want -- you're the only
25 witness I have here. And these are examples of what

1  you've called dynamic entry, and I see no reason for a
2  dynamic entry or even reference to a dynamic entry in
3  them, the ones that I've seen so far.
4      And so the first one of these cases is case
5  Number 07540. And this is the case where "Sergeant
6  Kent and I went over to the apartment. I drew my
7  firearm before entering the unlocked apartment. We
8  found the individual sleeping in one of the bedrooms.
9      "We turned the room light on and identified
10 ourselves as police officers. I told him to keep his
11 hands visible and informed him he was under arrest. He
12 got out of bed and got dressed. I placed handcuffs on
13 him, double-checking him for tightness."
14     And there's no reference here to going back
15 to searching -- and searching the house.
16     Can you show me anything in this case, this
17 first case that we're looking at here that would
18 indicate that there was a dynamic entry to the
19 residence with room clearing and -- well, with room
20 clearing?
21     A. No, I can't, not based on the report.
22     Q. All right. And let's -- okay. The second
23 case is 091443. We talked about that. That was the --
24 okay, yes, this was the case where the man in a
25 domestic dispute came out to the back porch and outside

1  the backyard. This was in the home. There was a woman
2  and her son. She was the one that called the police.
3      There's no evidence of guns -- we can't say
4  for sure that there's no evidence of guns in the
5  residence.
6      It does say the immediate action team entered
7  the house and cleared the area. It doesn't say that
8  they -- that it was a dynamic entry with the officers
9  using room clearing techniques, et cetera, correct?
10     A. Correct. And none of these reports will say
11 that. I've already reviewed them when we submitted
12 them. None of them say that.
13     Q. Okay. All right. Well, in this case, we --
14 again, we had the suspect secured and taken to jail
15 before anyone even entered the house?
16     MR. THOMPSON: Counsel, it might help to read
17 your definition of dynamic entry which was responsive
18 to these interrogatories.
19     MR. GOSMAN: Yes.
20     MR. THOMPSON: "Means entering into a
21 residence or structure by means of rapid entry into and
22 rapid movement through the residence or structure. It
23 usually but may not always involve a diversionary
24 device, such as a flashbang.
25     "Dynamic entry as used here means an entry

Case 1:10-cv-00041-ABJ    Document 65-1    Filed 01/10/11    Page 31 of 117
Tricia Wachsmuth v.                                                                    Tim Feathers
City of Powell, et al.                                                          November 23, 2010

| TIM FEATHERS - November 23, 2010                     Page 113<br>Direct Examination by Mr. Gosman | TIM FEATHERS - November 23, 2010                     Page 115<br>Direct Examination by Mr. Gosman |
|---|---|
| 1 where force is contemplated and a team of officers<br>2 consisting of more than three officers are assigned to<br>3 effect the entry.<br>4     MR. GOSMAN: Okay.<br>5     MR. THOMPSON: I' the City of Powell Police<br>6 Department has a working definition of a term dynamic<br>7 entry, it may respond to the discovery below by<br>8 reference to its own definition."<br>9     MR. GOSMAN: Okay. Did you do that? Were<br>10 you using the definition that I supplied?<br>11     THE WITNESS: I was focusing on rapid entry<br>12 and rapid movement through.<br>13 MR. GOSMAN:<br>14  Q. In the first case it looks like there were<br>15 just two officers in the residence, Kent and Danzer.<br>16     In the second case, again, the suspect had<br>17 been taken away to jail. And it was only after that<br>18 happened that the team entered the house. And that's<br>19 the only information we have about that case.<br>20     Okay. 07606 is the next case. And this was<br>21 the case where the man came out of the trailer and was<br>22 trying to leave the area and apparently he had guns<br>23 with him. And he was shot by a police officer.<br>24     Let's see what it says about the -- yeah,<br>25 yeah. I see. Is Kevin Schmidt still with the Powell | 1 what Officer Schmidt had told me regarding the<br>2 discharge of his weapon."<br>3     Okay. You don't have any recollection of<br>4 that incident, whether your officers ended up clearing<br>5 the residence?<br>6  A. No.<br>7  Q. Okay. It does on the last -- let's see. On<br>8 page 24 of the reports, this is McCaslin.<br>9     "Sergeant Kent requested that officers<br>10 Bradley, Wardwell, Kelly and I, Kent, Bradley and<br>11 McCaslin, along with Wardwell and Kelly, clear the<br>12 trailer at Queens.<br>13     "The door was locked when we first<br>14 approached. We waited until DCI agent Steve Hermann<br>15 brought the keys to us and gave them to me. I unlocked<br>16 the door and we cleared the trailer."<br>17     Okay. The trailer was cleared by the Powell<br>18 Police Department that evening. It was empty. I think<br>19 it was clear that it was empty before they went into<br>20 it. And certainly, they wouldn't have been engaged in<br>21 a dynamic entry room-clearing situation similar to what<br>22 took place in the Wachsmuth's -- in those<br>23 circumstances, wouldn't you agree?<br>24     MR. THOMPSON: Objection as to form.<br>25     MS. WESTBY: Join. |
| TIM FEATHERS - November 23, 2010                     Page 114<br>Direct Examination by Mr. Gosman | TIM FEATHERS - November 23, 2010                     Page 116<br>Direct Examination by Mr. Gosman |
| 1 Police Department?<br>2  A. Yes.<br>3     MR. THOMPSON: Can you redact his ramblings?<br>4 I don't want to pay for that.<br>5     MR. GOSMAN: That's a good idea.<br>6     MR. THOMPSON: There's a condensed version<br>7 and the defense counsel version.<br>8 MR. GOSMAN:<br>9  Q. Okay. And in this case where the individual<br>10 was shot outside the home, we previously discussed that<br>11 it's hard to tell from the report whether DCI went into<br>12 the home or whether the patrol officers from Powell<br>13 Police Department went into the home.<br>14     Do you have any recollection at this time<br>15 whether DCI, in fact, went into that trailer?<br>16  A. No.<br>17  Q. Was there anybody in the trailer at that<br>18 time?<br>19  A. Not that I remember.<br>20  Q. "I talked with Agent Wachsmuth about<br>21 retrieving the keys so the trailer could be cleared.<br>22 He told me that he was told to leave the keys in the<br>23 ignition until they could be photographed.<br>24     "Officers stayed at the trailer until it<br>25 could be cleared. I showed and told Agent Wachsmuth | 1     THE WITNESS: You're making a lot of<br>2 presumptions in there that I don't know, so I don't<br>3 know that I can agree to that statement. Again, all I<br>4 can say is, is based on the definition in your request<br>5 or discovery, these are the cases that we felt would<br>6 meet that definition of a rapid entry and rapid<br>7 movement.<br>8     We were just trying to comply. If they don't<br>9 meet what you were looking for, then I'm sorry, we gave<br>10 you something you didn't want.<br>11 MR. GOSMAN:<br>12  Q. Well, if the trailer is empty and you know<br>13 that the trailer is empty and the suspect has been<br>14 taken away, why would there be rapid response and --<br>15 with room clearing tactics?<br>16     MS. WESTBY: Object to the form of the<br>17 question.<br>18     MR. THOMPSON: Join.<br>19     Go ahead.<br>20 MR. GOSMAN:<br>21  Q. Go ahead.<br>22  A. Because that would be the safest and most<br>23 appropriate way to clear it.<br>24  Q. An empty trailer?<br>25     MR. THOMPSON: Objection as to form. |

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 32 of 117
Tricia Wachsmuth v.                                                          Tim Feathers
City of Powell, et al.                                                  November 23, 2010

1    MS. WESTBY: Join.
2    THE WITNESS: A presumed empty trailer by
3  you.
4    MR. GOSMAN:
5    Q. The officers who are going into the trailer
6  are apprized of the facts of the situation, are they
7  not?
8    A. What facts are those?
9    Q. Well, those facts are that the suspect had
10 been shot and taken to the hospital and there was no
11 one in the trailer.
12   A. They were never apprized that there was no
13 one in the trailer that I'm aware of. The known
14 suspect had been taken into custody. It doesn't
15 preclude the possibility of there being someone else in
16 there with access to the weapons that were inside.
17   Q. Officer -- and I'm reading from the same
18 report, this is page 20. Officer Bradley and I were
19 informed of the situation by Sergeant Kent. Kent
20 advised that a male was in trailer number such and such
21 have on Queens Boulevard.
22   The male was possibly suicidal, was armed
23 with a 9mm handgun. The male had already fired off a
24 round in the trailer. The other occupants of the
25 trailer had since left the trailer.

1    MS. WESTBY: Object to the form of the
2  question.
3    MR. GOSMAN:
4    Q. I assume that was evidence that would have
5  been communicated to the entry team, was it not?
6    MR. THOMPSON: Objection as to form.
7    MS. WESTBY: Join.
8    THE WITNESS: Again, Mr. Gosman, based on the
9  fact that the known persons are removed from the
10 trailer, you're asking my officers to presume there
11 will not be any threat in there and walk into a
12 situation where they know loaded firearms remain.
13   I don't expect them to take those kind of
14 foolish risks with their lives. They use a safe and
15 appropriate method to clear the trailer.
16   Q. And you really have no idea what method that
17 was, correct?
18   MR. THOMPSON: Objection to form.
19   MR. GOSMAN:
20   Q. Because you weren't there and the report
21 doesn't say anything about how they entered the trailer
22 or what they did.
23   MS. WESTBY: Okay.
24   THE WITNESS: And I believe I explained that,
25 which this really causes me to wonder now why I'm even

1  being asked these questions, since I've said I wasn't
2  there and I've said these reports were produced based
3  on your definition in your discovery requests and were
4  forwarded to me by the officers who were there. They
5  are the ones that can answer these questions, not me.
6    MR. GOSMAN:
7    Q. We don't have them and we have this
8  information.
9    MR. THOMPSON: Well, Counsel, that's your
10 fault, you didn't ask them the questions. And would
11 you please sit down. You're standing about an inch
12 away from the deponent.
13   MR. GOSMAN: Yeah. Okay. I will.
14   MS. WESTBY: And you're being offensive.
15   MR. GOSMAN:
16   Q. All right. Well, let's see.
17   MR. THOMPSON: Those are all questions you
18 could have asked each one of those officers because we
19 timely produced that discovery.
20   THE WITNESS: While you're looking at that,
21 can I step out to the restroom?
22   MR. GOSMAN: Yes, you can.
23         (Recess taken 6:33 p.m. to
24         6:46, November 23, 2010)
25

1    MR. GOSMAN:
2    Q. Show you this again. I noticed in Case
3  Number 07-606, which was the case where the man was
4  shot, that as the officers were securing the scene
5  before the man came out of his trailer, it indicates --
6  and this is Matt McCaslin, "Danzer and I cleared
7  trailers 27 through 30 and advised the command post who
8  we evacuated."
9    And I assume that the term cleared here is
10 used not in the sense that there was a dynamic entry
11 and that each room of the house was cleared but that
12 they went in to warn folks that there was a problem in
13 the neighborhood and they needed to evacuate.
14   A. Since we were doing a neighborhood
15 evacuation, I would presume that, but it is a
16 presumption on my part.
17   Q. And then the next report is case
18 Number 07-98. And in this case, it does appear that
19 there was a breaching of the door. This is the case
20 where the individual was observed in the room and
21 refused to come to the door. And there was also a
22 woman in the house.
23   And Chad Miner with Sergeant Kent breached
24 the interior door that was also shut announcing myself
25 as I went with Sergeant Kent -- and I'm reading from

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 33 of 117
Tricia Wachsmuth v.                                                      Tim Feathers
City of Powell, et al.                                           November 23, 2010

| TIM FEATHERS - November 23, 2010                Page 121 | TIM FEATHERS - November 23, 2010                Page 123 |
|---|---|
| Direct Examination by Mr. Gosman | Direct Examination by Mr. Gosman |

TIM FEATHERS - November 23, 2010                Page 121
Direct Examination by Mr. Gosman

1  page 3 of that report.
2      And they found the suspect in the kitchen
3  area of the house and took him into custody and
4  observed the other suspect, a woman, in the house who
5  apparently had a warrant for her arrest. Do you
6  remember that?
7  A. (Witness shakes head.)
8  Q. Okay. In the house as well. She was also
9  removed from the house and taken down and charged. She
10 was placed under arrest. And it doesn't say anything
11 at all about clearing the house or searching it, either
12 one.
13     And I'd like you to take just a minute and
14 confirm that that's true, that there's no reference in
15 this report to clearing the house or searching it.
16     MR. THOMPSON: Objection.
17     MS. WESTBY: I object to the form of the
18 question. He already said he didn't know about this
19 case. He's already told you that the reports are not
20 always going to reference the specific things you're
21 asking for. It's terminology that you use, not that
22 the police department uses. I object to the form of
23 the question.
24     MR. THOMPSON: Join.
25     THE WITNESS: Okay. What was I looking for

TIM FEATHERS - November 23, 2010                Page 122
Direct Examination by Mr. Gosman

1  in here?
2  MR. GOSMAN:
3  Q. Yes, any statement that the rooms were
4  cleared or the house was searched.
5  A. Nope, didn't see any.
6  Q. Okay. And the next case is 06-388. This was
7  a -- a situation where Officer Kent was requested by
8  DCI to assist in a warrant service. And Sergeant
9  Eckerdt, McCaslin and -- Deputy Walton, that would be
10 Park County Sheriff's Office, I assume -- and TFO Lara.
11     At that time Lara was working for DCI; is
12 that true?
13 A. Well, he was a Powel police officer assigned
14 to the team as a task force officer.
15 Q. Okay.
16 A. He was still a City of Powell employee.
17 Q. Okay. All right. And the warrant was
18 served, Sergeant Eckerdt, Officer McCaslin, along with
19 Deputy Walton and TFO Lara entered the front of the
20 house. The house was searched.
21     And, again, I don't see any evidence here
22 that the house was cleared in the room clearing fashion
23 that we're talking about in connection with a -- with a
24 dynamic entry similar to the one that was effected on
25 the Wachsmuth residence.

TIM FEATHERS - November 23, 2010                Page 123
Direct Examination by Mr. Gosman

1  Do you see any evidence in that report that
2  would support that?
3  A. Not in the report.
4  Q. And the next case is 05908. It's the last
5  one. And you were apparently present at this incident.
6  And this was where the -- after several minutes the
7  front door opened and the individual came outside. He
8  was secured.
9      Okay. And then in this case, someone else
10 signed a consent to search the house, Miner and
11 Wardwell searched the house and took pictures. There's
12 no evidence or indication in this report that there was
13 any room clearing or dynamic entry involved in this
14 house, would you agree with me?
15 A. In the -- one, two -- third paragraph it says
16 Officer Miner, Wardwell entered the house and had -- a
17 redacted name of a person -- prone out on the floor.
18 Redacted name, was handcuffed and taken outside.
19 Q. Yeah, he was actually outside the house and
20 apparently he went back into the house?
21 A. No, this was a second subject that was in the
22 house.
23 Q. Oh, second subject okay.
24     All right. Well, and, of course, that can
25 happen in any circumstance. It doesn't have anything

TIM FEATHERS - November 23, 2010                Page 124
Direct Examination by Mr. Gosman

1  to do with dynamic entry, the fact that a second
2  suspect is in the house and the officers have entered
3  it.
4  A. Unless we used a dynamic entry as defined in
5  your discovery request and entered the house through
6  rapid movement, rapid entry and movement to locate and
7  arrest that suspect.
8  Q. Yes. All right. But we don't see any
9  evidence that actually occurred. There's nothing
10 in the language of the report that would indicate that
11 occurred in this case, correct?
12     MS. WESTBY: Object to the form of the
13 question. He's already stated over and over and over
14 again that these were produced because they were
15 responsive to your requests. The production is done
16 according to the rules. That's evidence of that.
17     MR. GOSMAN: Okay.
18 MR. GOSMAN:
19 Q. So in the report itself, is there anything
20 that indicates that a dynamic entry was used into the
21 house and that it was -- there was room clearing that
22 took place?
23 A. Not in the report.
24 Q. Okay. Well, that takes care of that.
25 A. Whew.

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 34 of 117
Tricia Wachsmuth v.                                                    **Tim Feathers**
City of Powell, et al.                                          **November 23, 2010**

TIM FEATHERS - November 23, 2010                    Page 125
Direct Examination by Mr. Gosman

1   Q. Yes, thank you very much.

2      On the 24th of February, 2009, as we know, a
3   warrant was served on the home of Bret and Tricia
4   Wachsmuth.
5      When did you become aware of this pending
6   warrant service?

7   A. I first became aware that we were
8   investigating an allegation of a marijuana grow
9   operation involving Bret Wachsmuth midafternoon.

10  Q. And was that in communications you had with
11  Officer Miner?

12  A. Sergeant Kent and Officer Miner.

13  Q. All right. Do you remember who contacted you
14  first?

15  A. I'm not sure.

16  Q. Did you have any information that you
17  requested of them at the time you communicated first
18  with either officer about this case?

19  A. Did I ask them for information?

20  Q. Yes.

21  A. They were briefing me on the initial report
22  and the investigation they were initiating.

23  Q. All right. What was their report to you, as
24  best you remember?

25  A. Substance, I don't remember. In general,

TIM FEATHERS - November 23, 2010                    Page 126
Direct Examination by Mr. Gosman

1   they were just telling me that there was an informant
2   that had given them this information and they were
3   going to begin the investigation.

4   Q. Okay. Did you review the affidavit for the
5   search warrant?

6   A. No.

7   Q. Did you visit with either Officer Miner or
8   Sergeant Kent about developing information from the
9   confidential informant?

10  A. What do you mean "developing information from
11  the confidential informant"?

12  Q. Well, the City of Powell has policies and
13  procedures for utilizing a confidential informant, does
14  it not?

15  A. Yes.

16  Q. And are those to be used in every case where
17  a confidential informant is employed?

18  A. Yes.

19  Q. Did you ask them whether or not they had
20  acquired any of the information that's set out in those
21  policies?

22  A. No.

23  Q. Did you assume that that was being done?

24  A. Yes.

25  Q. Was it — was it done?

TIM FEATHERS - November 23, 2010                    Page 127
Direct Examination by Mr. Gosman

1   A. Without going back and reviewing the policy
2   and looking at the case file, I don't know.

3   Q. Do you know how much experience Officer
4   Miner -- did you know at the time, how much experience
5   Officer Miner had in marijuana grow operations?

6   A. I'm not sure what I knew at the time.

7   Q. Did you communicate with Officer Miner or
8   Sergeant Kent about the involvement of Lt. Patterson in
9   the execution of the search warrant?

10  A. What do you mean by communicate about
11  Lt. Patterson's involvement in the execution of a
12  search warrant?

13  Q. Lt. Patterson testified that he was asked to
14  provide assistance in the form of his SRG unit. Did
15  you know about that?

16      MS. WESTBY: Object to the form of the
17  question. Misstates the testimony.

18      MR. THOMPSON: Join.

19      MS. WESTBY: Go ahead.

20      THE WITNESS: I never asked for nor
21  authorized anyone to ask for the assistance of the Park
22  County Sheriff's Office SRG team.

23  MR. GOSMAN:

24  Q. You remember Lt. Patterson testifying to that
25  effect, do you not?

TIM FEATHERS - November 23, 2010                    Page 128
Direct Examination by Mr. Gosman

1   A. No.

2   Q. Did you understand that Lt. Patterson was
3   being consulted in connection with the case?

4   A. Yes.

5   Q. And what was your understanding of his role
6   then?

7   A. That he was being consulted for his
8   background and experience regarding marijuana grow
9   operations and the interview with the informant and in
10  assisting with the drafting of the affidavit for search
11  warrant.

12  Q. All right. Were you aware of the fact that
13  he was in charge of the Park County SRG unit?

14      MS. WESTBY: Object to the form of the
15  question.

16      THE WITNESS: Well, I am now. But I don't
17  know if I was then. I probably was.

18  MR. GOSMAN:

19  Q. And do you remember thinking about whether,
20  since it appeared clear at some point in the course of
21  the afternoon or early evening that you were
22  considering a dynamic entry, that you might want to
23  consult with Lt. Patterson about his SRG team and see
24  if you could get his expertise and the expertise of his
25  team to assist in this warrant service?

1  MR. THOMPSON: Objection as to form.
2  MS. WESTBY: Join.
3  THE WITNESS: I was not considering a dynamic
4  entry at any point during the afternoon.
5  MR. GOSMAN:
6  Q. When did you begin to consider that?
7  A. Later in the evening after there had been a
8  full debrief of the informant and Sergeant Kent called
9  me at home to give me the information that they
10  possessed and we discussed various options.
11  Q. What was the information that was conveyed to
12  you by Sergeant Kent at that time?
13  A. That there was a report of a marijuana grow
14  operation, that it involved a number of plants. I
15  don't remember the estimated number right now, but I
16  believe it was somewhere around a dozen plants.
17  That the informant also reported that they
18  were receiving prescription medication through the
19  mail, hidden in stuffed animals from Tricia Wachsmuth's
20  mother, and that there may be prescription meds there
21  as well.
22  That Bret Wachsmuth had strategically placed
23  loaded firearms around the home, that he sometimes
24  carried a loaded firearm, that he was paranoid, that
25  they would peek out the windows a lot, that he had some

1  form of a prior mental health history.
2  That Sergeant Eckerdt had seen this picture
3  on MySpace with Bret and Shawn wearing body armor and
4  holding rifles.
5  That the informant had called Bret and told
6  him that he was going to turn him into us, so Bret had
7  been forewarned that we were aware of his grow
8  operation.
9  That -- I believe at the time of the first
10  call, Officer Miner was in the process of getting the
11  warrant. I don't know that he had obtained it yet.
12  And we talked about some various options.
13  Q. Okay. Now, it's true, is it not, that
14  Officer Lara and Officer Eckerd did not produce their
15  contributions to this case until after they had been
16  called down to the police station to assemble for the
17  warrant service?
18  MR. THOMPSON: Objection as to form.
19  MS. WESTBY: Join.
20  THE WITNESS: My understanding is that they
21  shared that information during the briefing process.
22  MR. GOSMAN:
23  Q. How do you describe the briefing process?
24  A. The process where the officers gathered and
25  the plan was developed on how the warrant was going to

1  be served.
2  Q. The decision had already been made to call
3  the team -- nearly every officer in the Powell Police
4  Department together to serve this warrant. Certainly,
5  that wouldn't have been necessary unless the decision
6  had already been made to serve the warrant with at
7  least an option of dynamic entry, correct?
8  A. I think you're making some wrong assumptions
9  there.
10  Q. Go ahead. Clear them up.
11  A. As the planning was being developed there was
12  contingency planning taking place of how to go about
13  serving a search warrant, serving this search warrant
14  under these circumstances. No final decisions had been
15  made at this point.
16  However, I did instruct Sergeant Kent that he
17  was to oversee the investigation and that he was to
18  task Sergeant Chretien with developing a plan for the
19  safe execution of the search warrant given the totality
20  of the circumstances of the information presented to us
21  and that I wanted to review that plan before it was
22  finalized.
23  Q. And when did you review that plan before it
24  was finalized?
25  A. Later that evening in a phone call from

1  Sergeant Chretien.
2  Q. What time was that?
3  A. I don't know.
4  Q. Had the officers already assembled at the
5  station?
6  A. I believe so.
7  Q. What other contingencies were being
8  considered at that time?
9  A. What time?
10  Q. The time that you made the plan to use the
11  dynamic entry. Or made the decision to approve the
12  dynamic entry, I'm sorry.
13  MS. WESTBY: Object to the form of the
14  questions. Misstates the testimony.
15  MR. THOMPSON: Join.
16  THE WITNESS: If your question is what
17  options did I consider prior to landing on the decision
18  to use the dynamic entry -- the potential for a dynamic
19  entry?
20  MR. GOSMAN:
21  Q. Actually, you said the final decision was
22  made when you spoke with Sergeant Chretien and that
23  this was during the period that he was briefing the
24  officers, correct?
25  MR. THOMPSON: Objection as to form.

1    MS. WESTBY: Join.
2    MR. GOSMAN:
3    Q.   Okay. Go ahead. Tell me where I'm wrong
4    there. Let's clear it up.
5    A.   I got a phone call from Sergeant Chretien
6    later in the evening after the plan had been developed,
7    okay. I don't know at what point in that briefing
8    process this was. I believe there were already
9    officers assembled at the office. I don't know how far
10   along they were. I don't know what involvement they
11   had had. That's when he called me and we went over the
12   plan that he had come up with.
13   Q.   Would it be fair to say that
14   Sergeant Chretien would probably not be assigning
15   officers to an entry team and to deploy a flashbang
16   device and so on and so forth without the final
17   approval from you that such a plan would go forward?
18   MS. WESTBY: Object to the form of the
19   question.
20   MR. THOMPSON: Join.
21   THE WITNESS: Yes, he would be doing that
22   before final approval because it is a contingency plan.
23   MR. GOSMAN:
24   Q.   All right. He could have been doing it. Do
25   you know whether he was doing it?

1    A.   Yes.
2    (Exhibit 10 identified)
3    BY MR. GOSMAN:
4    Q.   All right. Have you looked at Exhibit 10?
5    A.   Not recently.
6    Q.   Okay. You know what Exhibit 10 is; we've
7    talked about it numerous depositions, correct?
8    A.   Yes.
9    Q.   And do you see anything on Exhibit 10 that
10   indicates any other options that were being considered
11   there with the officers at the time that Marissa
12   Torczon prepared this report?
13   MS. WESTBY: Any other option other than --
14   MR. GOSMAN:
15   Q.   Other than dynamic entry with the entry team
16   defined and the roles of all of the officers and the
17   information supplied regarding the Wachsmuths.
18   MR. THOMPSON: Objection.
19   MS. WESTBY: And other than the
20   knock-and-announce or --
21   MR. GOSMAN: Well, yes, knock-and-announce.
22   It was a knock-and-announce warrant, yes.
23   THE WITNESS: I see knock-and-announce.
24   Other than that, no, not on this document.
25

1    MR. GOSMAN:
2    Q.   All right. In fact, this document says Tom
3    Wachsmuth stays in the lobby, doesn't it?
4    A.   It does.
5    Q.   So you've already decided that Tom is not
6    going to have anything to do with this. You've
7    eliminated that option, correct?
8    A.   I don't know. I don't know when this
9    document was written in relationship to my phone calls
10   with my sergeants.
11   Q.   That's fair enough. But we do know that it
12   was written at the time that the officers assembled at
13   the police station and that Marissa was called in to
14   prepare this document --
15   A.   At some point during that process.
16   Q.   Let's see. Was there a point in the evening
17   where Sergeant Chretien or someone suggested to you a
18   dynamic entry, a possible dynamic entry?
19   A.   That was one of the options we discussed.
20   Q.   And at that time, did you -- at that time,
21   were you aware that Lt. Patterson had been called in on
22   the case and had assisted Officer Miner?
23   A.   In gathering the search warrant?
24   Q.   Yes.
25   A.   Yes, I knew he'd been involved in assisting

1    with the search warrant.
2    Q.   And you knew that his department had a -- an
3    SRG unit, specially trained unit, to perform a team
4    dynamic entry?
5    A.   I knew they had a group called a special
6    response group.
7    Q.   And your testimony is that you did not know
8    that Officer Miner asked Officer Patterson to assist
9    with his SRG group?
10   MS. WESTBY: Object to the form of the
11   question. Misstates the evidence and testimony.
12   MR. THOMPSON: Join.
13   THE WITNESS: No, I was not aware of any
14   request made for the SRG.
15   MR. GOSMAN:
16   Q.   Did you ever see Officer Patterson's report
17   in this case?
18   A.   Yes.
19   Q.   Do you remember observing when you saw that
20   report that, in fact, Officer Miner had spoken with him
21   about this -- about being -- about inviting his team to
22   assist in the Wachsmuth search?
23   MS. WESTBY: Well, if you're going to refer
24   to the document, you need to show him the document and
25   where that is

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 37 of 117
Tricia Wachsmuth v.                                                    Tim Feathers
City of Powell, et al.                                          November 23, 2010

1   MR. GOSMAN: Yeah, you're right. And I'm
2   looking for it.
3   MR. GOSMAN:
4   Q. Okay. Let's have you turn to Exhibit 18 in
5   the notebook.
6       Now, have you seen this document before?
7       (Exhibit 18 identified)
8       THE WITNESS: Appears to be Lt. Patterson's
9   report.
10  BY MR. GOSMAN:
11  Q. Okay. Have you seen this document before?
12  A. Yes.
13  Q. Okay. And you notice there in the fourth
14  paragraph, Sergeant Patterson -- Lt. Patterson advises
15  Officer Miner that he needed to contact the sheriff to
16  advise him of the fact that Powell was requesting our
17  assistance and that this case was in the county?
18  A. Which paragraph?
19  Q. Paragraph 5, sorry.
20      MS. WESTBY: Object to the form of the
21  question. It doesn't say anything about SRG.
22      Kind of in the middle.
23      THE WITNESS: Okay. What that's referring to
24  is, is that we had an informant at that time it was
25  believed the location was in the county. It's in the

1   sheriff's jurisdiction and the sheriff was going to
2   serve the warrant, not us, they are only assisting
3   us by making use of our informant to develop
4   information for a search warrant and go execute it in
5   their jurisdiction.
6       This was not a request for their SRG. At
7   this point in the process, it was still believed that
8   Bret and Tricia Wachsmuth lived out in Park County
9   outside our jurisdiction.
10  MR. GOSMAN:
11  Q. Well, and did you just tell me that if that
12  were the case that the Powell Police Department was
13  requesting their assistance to execute the warrant in
14  the county?
15  A. No, we were requesting their assistance to
16  turn the case over to them because it's in their
17  jurisdiction.
18  Q. Okay.
19  A. And we would be assisting them by providing
20  them our informant.
21  Q. Okay. And then it does say in the second
22  page, the third paragraph from the bottom, that he
23  advised Officer Miner that since the case was in the
24  city that he would be contacting his supervisor and
25  advising...

1   A. That they would not be calling in their
2   personnel on overtime for a warrant within their
3   jurisdiction.
4   Q. Right. Okay.
5   A. It was within our jurisdiction, which is
6   standard sheriff's office practice. They are not going
7   to expend overtime to assist another agency.
8   Q. Well, it would appear, then, that he was
9   requested at some point to assist the agency in the
10  service of the warrant in the city of Powell when it
11  was learned that the residence was actually in Powell
12  and not out at Tom Wachsmuth's place, correct?
13      MR. THOMPSON: Objection as to form.
14      MS. WESTBY: Yeah, completely misstates the
15  testimony.
16      THE WITNESS: That's not what that means to
17  me.
18  MR. GOSMAN:
19  Q. Okay. All right. You never understood that
20  officer -- Lt. Patterson had been requested by
21  Officer Miner to provide his SRG to assist in this
22  warrant service?
23      MR. THOMPSON: Objection as to form.
24  MR. GOSMAN:
25  Q. Go ahead.

1   A. No.
2   Q. Do you know whether it was Lt. Patterson that
3   initially suggested that the Powell Police Department
4   contact Tom Wachsmuth and ask him to either call his
5   son out or to obtain information about effecting this
6   search warrant in the safest way possible?
7   A. The first discussion I had on that was with
8   Sergeant Kent when we were discussing various options.
9   Q. This was in the early afternoon?
10  A. No. This is in the evening.
11  Q. All right.
12  A. And as far as I knew, that was Sergeant
13  Kent's suggestion.
14  Q. Okay. And was it, in fact, Sergeant Kent's
15  suggesting that to you?
16  A. No, it was just an option that he brought up
17  in a range of options that we discussed and considered.
18  Q. All right. And what did you say to that?
19  A. Well, we discussed several options, one of
20  which was getting Tom involved. Generally, that is not
21  something I would do. Getting family members involved,
22  you can introduce very uncertain variables that can
23  cause a situation that could be potentially violent
24  like this to spin out of control very quickly.
25  Q. Particularly if you don't know the parents?

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 38 of 117
Tricia Wachsmuth v.                                                          Tim Feathers
City of Powell, et al.                                              November 23, 2010

1    A. Particularly if you don't know the parents.
2    That's exactly right.
3    Q. In this case, you knew Tom Wachsmuth,
4    correct?
5           MS. WESTBY: Please let him finish his
6    answer.
7           THE WITNESS: Normally, I would not consider
8    that at all. Now, if you add in the variable that the
9    parent involved is a law enforcement officer, you
10   inject another element into this, okay.
11   MR. GOSMAN:
12   Q. Okay.
13   A. And that element is what happens if you serve
14   the warrant and you find nothing. You've just now left
15   yourself open to the appearance and the potential
16   accusation that you're showing favorites and you tip
17   them off.
18          So, even though that is another weight
19   against not considering using the parent, because we
20   had already considered and decided not to use several
21   other options, and we were coming down to either this,
22   or go knock-and-announce and hope they open up and let
23   us in and cooperate. And if not, we have to use the
24   dynamic entry.
25          I was willing to consider it figuring that if

1    this would be successful, it would be worth any
2    potential risk we might run of an appearance of
3    favoritism if we didn't find anything.
4           However, I was only willing to consider this
5    as an option if I had a high degree of assurance that
6    Tom would completely cooperate.
7    Q. Yes.
8    A. I do not know Tom that well on a personal
9    level. I have dealt with parents. There are some
10   parents out there that will take a position of my child
11   is an adult, they know right from wrong, you know, I'm
12   going to let the chips fall where they may and they are
13   going to be responsible for their actions.
14          I've dealt with parents that say that, but
15   when the time comes, they do the exact opposite and
16   things spin out of control.
17          And I've dealt with parents that will do
18   anything and everything they can to protect their
19   children from the consequences of their actions. And I
20   was only willing to get Tom involved in this if I felt
21   he was in that first category.
22          But I didn't know Tom. I don't know Tom that
23   well on a personal level. My association with him is
24   purely business and professional. So I called someone
25   who I felt would know him well enough and whose opinion

1    I could trust on whether or not he would be helpful.
2           So I called his supervisor, Steve Hermann,
3    the northwest enforcement team leader. I explained to
4    him what we had, asked him if he felt Tom would help or
5    hinder this investigation.
6           And when I asked him if he thought Tom would
7    help, his response was -- and this is a quote, I'd like
8    to think so, but I'm not sure.
9           And that wasn't good enough for me to get Tom
10   involved. This did not give me a great enough
11   assurance that I would not be injecting an unknown
12   variable into this that could make it become even more
13   tense, uncertain and rapidly evolving if he failed to
14   cooperate, so I chose not to get Tom involved.
15   Q. What time did you call Steve Hermann?
16   A. I don't remember. It was on -- it was not
17   too long after the phone call from Alan Kent in which
18   we discussed what options we might have in front of us.
19          We discussed -- we had several options. I
20   called Steve to see what he thought about this one.
21   And then later, Alan and I discussed our options some
22   more. And I think it was after that that Mike Chretien
23   called and ran over the plan for the service of the
24   warrant he had come up with.
25          And then it was after that phone call that I

1    talked to Alan Kent and made a final decision on what
2    we're going to do.
3    Q. Okay. What other options did you consider
4    other than what we've just talked about?
5           MR. THOMPSON: And other than what he's
6    already testified to?
7           MR. GOSMAN: Well, I just said, "other than
8    what we just talked about." So, yes.
9           THE WITNESS: I considered just simply
10   waiting.
11   MR. GOSMAN:
12   Q. And what was the problem there?
13   A. That the informant had called him and told
14   him he was turning him into us, and that by waiting we
15   would give him an opportunity to destroy the evidence.
16   Q. And do you know what time -- or who told you
17   about this phone call from -- I'm sorry, yeah, about
18   the phone call to the confidential -- or from the
19   confidential informant?
20   A. I got all of my information about the case
21   either through Sergeant Kent or Sergeant Chretien.
22   Most of it came through Sergeant Kent.
23   Q. Did you know the confidential informant?
24   A. No.
25   Q. And did you know how long Miner had known the

1 confidential informant?

2 A. No.

3 Q. He'd known him for about an hour; isn't that

4 true?

5 A. I don't know.

6 Q. And you were basing the entire operation on

7 the information that came from the confidential

8 informant?

9 MR. THOMPSON: Objection as to form.

10 MS. WESTBY: Join.

11 THE WITNESS: Not true.

12 MR. GOSMAN:

13 Q. Not true? Well, other than what Eckerdt and

14 Lara had to add about Tom - about Bret Wachsmuth,

15 correct?

16 A. And what Lt. Patterson contributed concerning

17 the reliability of the informant's information on the

18 accuracy of what a grow operation would be like, upon

19 other information provided by the officers. Yeah, it

20 was more there than just the informant.

21 Q. Well, but Officer Patterson didn't offer

22 anything in terms of this case except what he knew

23 about marijuana grow operations.

24 MS. WESTBY: Object to the form of the

25 question. Completely misstates the testimony.

1 MR. THOMPSON: Join.

2 THE WITNESS: And even that went towards

3 verifying the reliability of the informant.

4 MR. GOSMAN:

5 Q. Well, did you understand that

6 Officer Patterson was vouching for the confidential

7 informant?

8 MS. WESTBY: Object to the form of the

9 question.

10 THE WITNESS: I don't know what you mean by

11 vouching.

12 MR. GOSMAN:

13 Q. That he made any kind of statement that

14 indicated that he felt the confidential informant was

15 reliable.

16 MS. WESTBY: Other than preparing the

17 affidavit, object to the form of the question.

18 MR. THOMPSON: Join.

19 THE WITNESS: My understanding was -- is that

20 Lt. Patterson confirmed that the information that the

21 informant gave was consistent with how a marijuana grow

22 operation would be run and that that contributed to

23 establishing the reliability of the informant

24 sufficiently enough that the county attorney was

25 willing to draw up the affidavit.

1 Q. Okay.

2 A. And Judge Waters was willing to sign it.

3 Q. All right. And as a matter of fact, there

4 was marijuana in the basement of the home, correct?

5 A. Yes.

6 Q. And so really the only question in this case

7 concerns the confidential informant's reliability in

8 terms of describing Bret Wachsmuth in such a way that

9 you felt you needed to use the team of Powell police

10 officers to effect the warrant?

11 MR. THOMPSON: Objection as to form.

12 MS. WESTBY: Join.

13 THE WITNESS: I'm not really sure what you

14 just asked me there.

15 MR. GOSMAN:

16 Q. Yeah, well, was there any -- was there any

17 independent verification of what the confidential

18 informant had said about guns being in the house and

19 Bret Wachsmuth being paranoid?

20 A. The statements by Sergeant Eckerdt and

21 Officer Lara

22 Q. And it s your testimony that you knew about

23 those statements when the decision was made to deploy

24 this team?

25 A. I knew about that information prior to making

1 my final decision.

2 Q. All right. And so what we had, then, from

3 Lara at least was that Bret Wachsmuth was depressed and

4 taking medication?

5 MS. WESTBY: Object to the form of the

6 question. Misstates his testimony.

7 MR. THOMPSON: Join.

8 THE WITNESS: That is not the information I

9 had. The information I had was that he had a prior

10 mental health history. And I'm not certain, but I

11 think it may have been identified as bipolar.

12 MR. GOSMAN:

13 Q. Okay. All right. And does bipolar, as a

14 mental condition, indicate to you that a person is

15 violent and represents a threat to officers?

16 MR. THOMPSON: Objection as to form.

17 MS. WESTBY: Join.

18 THE WITNESS: In my experience as a peace

19 officer, I have dealt with people who are bipolar, who

20 were violent and were a threat to my safety at the time

21 I dealt with them.

22 MR. GOSMAN:

23 Q. And have you met with people who are bipolar

24 who are not?

25 A. Yes, I have.

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 40 of 117
Tricia Wachsmuth v.                                                      **Tim Feathers**
City of Powell, et al.                                              **November 23, 2010**

TIM FEATHERS - November 23, 2010                              Page 149
Direct Examination by Mr. Gosman

1  Q. And so I guess it would depend on whether or
2  not there was any history of violence connected with
3  this disorder --
4          MR. THOMPSON: Objection as to form.
5          MS. WESTBY: Objection.
6  MR. GOSMAN:
7  Q. -- in order for you to know whether or not
8  there was a threat to the police officers, correct?
9          MS. WESTBY: Object to the form.
10         MR. THOMPSON: Join.
11         THE WITNESS: No, it would depend on whether
12 or not that bipolar condition is connected to other
13 circumstances and the totality of the circumstances
14 such as paranoia, illegal drug use, possession of
15 firearms, carrying firearms, and those types of things.
16 MR. GOSMAN:
17 Q. All right. And does the fact that a person
18 is paranoid indicate to you that they present an
19 objective danger to police officers?
20         MS. WESTBY: Object to the form of the
21 question.
22         MR. THOMPSON: Join.
23         THE WITNESS: It could, given the totality of
24 the circumstances in which paranoia is one
25 circumstance.

TIM FEATHERS - November 23, 2010                              Page 151
Direct Examination by Mr. Gosman

1          MS. WESTBY: Join.
2          THE WITNESS: Can I just say same answer?
3  MR. GOSMAN:
4  Q. Yes.
5  A. Same answer.
6  Q. Now, was there any evidence that Bret
7  Wachsmuth had been violent in the past?
8  A. I was not aware at that time of any prior
9  history of violence on his part.
10 Q. Had he been arrested for anything? Did he
11 have a criminal history?
12 A. I was not aware of any criminal history.
13 Q. Did you inquire about those things?
14 A. I don't remember if I inquired specifically
15 about criminal history. I don't know. I'd be
16 guessing.
17 Q. Well, did you inquire about whether or not
18 Bret Wachsmuth had ever had any history of violence
19 against anyone?
20 A. I inquired about who Bret Wachsmuth was and
21 what we knew about him. But I don't remember if there
22 were -- I don't remember any -- anything specific to
23 criminal history, anything specific to violent acts.
24         I remember asking some questions about his
25 mental health history, any incidents surrounding that.

TIM FEATHERS - November 23, 2010                              Page 150
Direct Examination by Mr. Gosman

1  Q. And does the fact that a person has guns in
2  their home indicate that they will -- that they present
3  an objective danger to police officers?
4          MS. WESTBY: Objection.
5          MR. THOMPSON: Objection as to form.
6          Go ahead, Chief.
7          THE WITNESS: It could, given the totality of
8  the circumstances in which that is one circumstance.
9  MR. GOSMAN:
10 Q. And does the fact that a person has a loaded
11 handgun or handguns in the home indicate that there is
12 an objective danger to police officers?
13         MR. THOMPSON: Objection as to form.
14         MS. WESTBY: Join.
15         THE WITNESS: It could, given the totality of
16 the circumstances in which that is one circumstance.
17 MR. GOSMAN:
18 Q. And does the fact that a person is growing
19 marijuana present an objective danger to police
20 officers in serving a warrant --
21         MR. THOMPSON: Objection as to form.
22 MR. GOSMAN:
23 Q. -- that would call for the deployment of a
24 dynamic entry team?
25         MR. THOMPSON: Same objection.

TIM FEATHERS - November 23, 2010                              Page 152
Direct Examination by Mr. Gosman

1  But whether or not I specifically said, you know, has
2  he ever been violent, I just don't remember.
3  Q. Wasn't that a very important factor in
4  determining whether or not you were going to deploy a
5  dynamic entry team to serve a search warrant, whether
6  or not the suspect had any history of violence?
7          MS. WESTBY: Object to the form of the
8  question.
9          MR. THOMPSON: Join.
10         THE WITNESS: It could be one factor in the
11 totality of the circumstances.
12 MR. GOSMAN:
13 Q. Well, you've got some factors there that
14 we've already identified, paranoia and perhaps bipolar,
15 and he has guns in the house.
16         Are you telling me you didn't want to know
17 whether this person had ever committed an act of
18 violence against a police officer or any other
19 individual in his life?
20         MS. WESTBY: Object to the form of the
21 question. Misstates his answer.
22         MR. THOMPSON: Join.
23         THE WITNESS: No, I'm not telling you that.
24 MR. GOSMAN:
25 Q. Okay. What are you telling me?

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 41 of 117
Tricia Wachsmuth v.
City of Powell, et al.
Tim Feathers
November 23, 2010

TIM FEATHERS - November 23, 2010                Page 153
Direct Examination by Mr. Gosman

1  A. I'm just telling you those are the inquiries
2  that I made.
3  Q. And so you didn't inquire about either
4  violence or prior criminal history?
5  MR. THOMPSON: Objection, asked and answered.
6  MS. WESTBY: Yeah.
7  THE WITNESS: I told you I do not remember
8  whether or not I specifically asked for those specific
9  elements in my discussions.
10 MR. GOSMAN:
11 Q. Did you ask this Hermann fellow whether or
12 not -- or did you ask him any questions at all about
13 his knowledge of Bret Wachsmuth?
14 A. I don't remember.
15 Q. Going back to Exhibit 10 for a moment, did
16 you understand that the plan as drawn up on Exhibit 10
17 was the plan that you approved?
18 MR. THOMPSON: Objection as to form.
19 MS. WESTBY: Join.
20 MR. GOSMAN:
21 Q. Do you understand that?
22 A. I'm not sure I understand your question.
23 Q. Yeah. How much detail was given to you about
24 the plan that was going to be executed that night at
25 the Wachsmuth's?

TIM FEATHERS - November 23, 2010                Page 154
Direct Examination by Mr. Gosman

1  A. Sergeant Chretien gave me a run-down of the
2  general plan. I don't believe he went over the
3  specific assignment of every person. but that -- you
4  know, but that they would, you know, have an entry team
5  assembled, that they would knock-and-announce.
6  And when he described it to me, he said that
7  they would knock-and-announce and that if the door
8  wasn't immediately opened, they would breach the door
9  and insert the flashbang in the one bedroom window.
10 And when he said that, I said, now, wait a
11 minute. I said, do you have a no-knock warrant? And
12 he said no.
13 And I said, so this is a knock-and-announce
14 warrant, right?
15 He said, yes.
16 I said, then you are aware that you must
17 knock-and-announce and leave a reasonable amount of
18 time before you breach that door?
19 And he said yes, that's what I mean when I
20 say immediate.
21 And I said, okay, now -- 1I said, I'm not
22 aware that the courts have set any kind of a specific
23 time limit. So I said, I'm not exactly sure how the
24 courts are defining a reasonable amount of time. But I
25 said, my guess is it's going to be a totality of the

TIM FEATHERS - November 23, 2010                Page 155
Direct Examination by Mr. Gosman

1  circumstances assessment.
2  I said, so is that part of your plan?
3  And he said yes, that's what I meant.
4  I said okay.
5  And he -- and just gave me that kind of a
6  general overview of the plan.
7  I did -- I believe I did ask him specifically
8  to -- if whether or not the person he had chosen to
9  deploy the flashbang was someone that had been through
10 the training on it. And he said yes, it was.
11 He may have even identified Officer McCaslin
12 at the time. I just don't remember.
13 Q. Did you know that Officer McCaslin had had
14 training in the flashbang device?
15 A. Yes.
16 Q. And would that have been at the Patrol
17 Tactics training in 2005?
18 A. Yes.
19 Q. Do you know whether he deployed a device any
20 time since then?
21 MR. THOMPSON: Between when? Between the
22 date of deploying the device and when he had this
23 conversation?
24 MR. GOSMAN:
25 Q. The date that he had the training and the

TIM FEATHERS - November 23, 2010                Page 156
Direct Examination by Mr. Gosman

1  date --
2  A. Yeah, I was aware that he had employed live
3  devices at the training in Cody. Yes, I was aware of
4  that.
5  So there was that overview of the plan. It
6  was a contingency plan. The plan was we're going to
7  knock on the door and see if they open it. And if they
8  don't, here's what we're going to do.
9  Q. Okay. And so, officer -- it's your testimony
10 that Officer Chretien told you specifically that his
11 plan was to immediately breach the door after
12 announcing, "Police, search warrant"?
13 A. Yes.
14 Q. All right. And you told him that he couldn't
15 do that, correct?
16 A. I had him clarify for me what he meant by
17 immediately. And I explained to him my understanding
18 of the Fourth Amendment requirements on
19 knock-and-announce warrants to ensure that his plan was
20 in compliance with those requirements.
21 Q. All right. Let's go ahead and look at
22 Exhibit 10. There's a list of elements there on the
23 right-hand side of the page that contains the order of
24 the execution of the principle elements of the plan.
25 And I want you to go ahead and read that.

1   A. Talking ones Number 1 through 7 on the
2 right-hand side?
3   Q. Yes. Yes.
4   A. Number 1, knock door.
5       Number 2, police, search warrant.
6       Number 3, break window. With an arrow
7 pointing down to Number 4 that it looks like it says
8 bedroom, in parentheses afterwards.
9       Number 4 says flashbang, with the word
10 bedroom, in parentheses afterwards.
11       Number 5 is wait for noise.
12       Number 6 is break window, in parenthesis,
13 it's cut off, but I think is it says back or back door.
14       And Number 7 is door.
15   Q. All right. And would you agree with me that
16 that is consistent with what Chretien told you on the
17 phone that night, that he planned to knock-and-announce
18 and immediately breach the door?
19   A. This is consistent with our discussion of
20 knocking and announcing and if the door is not opening
21 in a reasonable amount of time, it is breached.
22   Q. Does it say anything at all about waiting for
23 the door to be answered before the window is broke and
24 the flashbang is deployed?
25       MS. WESTBY: Object to the form of the

1 question.
2       THE WITNESS: It is not written in here, no.
3 MR. GOSMAN:
4   Q. Let's go ahead and turn to Exhibit 16 for a
5 moment. You approved this report, did you not?
6       (Exhibit 16 identified)
7       THE WITNESS: I did.
8 BY MR. GOSMAN:
9   Q. And it was prepared by Michael Chretien, or
10 at least it is 3/2 of 2009, correct?
11   A. Yes.
12   Q. And this was after the warrant service had
13 been accomplished?
14   A. That's right.
15   Q. And you'll notice on the -- it's the third
16 paragraph from the bottom, it says "the plan was to
17 knock on the front door and announce 'Police, search
18 warrant.' If the door did not open immediately, we
19 would use the ram to force entry. Is that not correct?
20   A. That is correct.
21   Q. And this was after you allege that you made
22 it clear to Officer Chretien that he was not to ram the
23 door immediately but to wait a reasonable time for the
24 occupants to answer the door?
25       MR. THOMPSON: Objection.

1       MS. WESTBY: Object to the form of the
2 question. He specifically told you what was meant by
3 immediately. He told you it several times.
4       THE WITNESS: That misstates my testimony on
5 my conversation with Sergeant Chretien. My testimony
6 was -- and I will repeat it -- was -- is that when he
7 told me that the plan was to knock-and-announce and hit
8 the door with a ram immediately if it wasn't opened, I
9 asked him what he meant by that.
10       And what he meant by that was that there
11 would be a reasonable period of time that they would
12 wait before that happened. And that's what he meant in
13 the term immediately.
14       So when I read this report, I read it in the
15 context of that discussion.
16 MR. GOSMAN:
17   Q. All right.
18   A. And I understood it in those terms. And in
19 those terms, I understand this to mean immediately is
20 after an objectively reasonable amount of time given
21 the totality of the circumstances as they occurred at
22 the moment they knock on the door.
23   Q. All right. You approved this report,
24 correct?
25   A. I did.

1   Q. All right. And you knew at the time that you
2 approved this report that the term immediately, as it's
3 commonly defined, would have been inconsistent with
4 waiting a reasonable time in order to effect entry into
5 the home.
6       MS. WESTBY: Objection to the form of the
7 question.
8 MR. GOSMAN:
9   Q. Correct?
10       MS. WESTBY: That's completely, completely
11 inaccurate.
12       MR. THOMPSON: It's argumentative.
13       THE WITNESS: I don't know what you're saying
14 there. But I'll just respond in this fashion: That
15 had I not had that conversation with Sergeant Chretien
16 where he provided me the context for what he meant by
17 immediately, I wouldn't have approved this report with
18 that term in there.
19 MR. GOSMAN:
20   Q. Well, you certainly had the opportunity to
21 visit with him and have this report changed before you
22 approved it, did you not?
23   A. I could have.
24
25

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 43 of 117
Tricia Wachsmuth v.
City of Powell, et al.
Tim Feathers
November 23, 2010

1            (Exhibit 33 identified)
2    BY MR. GOSMAN:
3       Q. All right. Let's go ahead and take a look at
4    Exhibit 33. And this is the answer, and also there's a
5    copy at the back of the answer of the complaint. This
6    was the answer filed by Mr. Thompson on your behalf.
7    Do you acknowledge that?
8       A. It says "Answer of defendant, City of Powell
9    and all other named defendants in their official
10   capacity and assertion of affirmative defenses."
11      Q. And your name appears as the second in line
12   after City of Powell, does it not, in "Comes now the
13   defendant, City of Powell, Tim Feathers"?
14      A. Yes.
15      Q. Did you have the opportunity to visit with
16   your attorney before he filed this answer to the
17   plaintiff's complaint?
18           MR. THOMPSON: Objection to form. He's not
19   going to answer questions about conversations.
20           MR. GOSMAN: I don't want him to answer
21   questions. I'm saying, did you have the opportunity to
22   visit with your attorney?
23           MR. THOMPSON: Go ahead and answer that.
24           THE WITNESS: Yes.
25

1    MR. GOSMAN:
2       Q. And did you look at the answer?
3       A. Yes.
4       Q. And let's go ahead and go to paragraph 36 on
5    page 8 of this answer. I want you to go ahead and read
6    paragraph 36 into the record for me.
7       A. "In response to paragraph 36 of the
8    plaintiff's complaint, defendants admit their primary
9    team consisting of six officers, and five with long
10   guns, were to announce, 'Police, search warrant,' and
11   if the door did not open immediately, the ram was to be
12   used for entry. Defendants deny the remainder of the
13   paragraph."
14      Q. Did you see this paragraph when you reviewed
15   the complaint -- or answer, I'm sorry?
16      A. Yes, I did.
17      Q. And did you -- did you make any effort to
18   contact your attorney and inform him that this language
19   was incorrect?
20      A. I discussed --
21           MS. WESTBY: No.
22           MR. GOSMAN: Yeah.
23           MS. WESTBY: No, we're not going to get into
24   discussions.
25           MR. GOSMAN: I'm not -- I'm just saying did

1    you make any effort to contact your attorney and
2    discuss this.
3            MR. THOMPSON: Counsel, you're crossing the
4    line. You're getting into conversations with me and
5    I'm not going to allow him to answer questions in
6    regards to what our discussions were.
7            MR. GOSMAN: All right.
8            MR. THOMPSON: You've got the answer.
9            MS. WESTBY: And substantively he's already
10   defined for you what immediately means. And just
11   'cause you don't like it doesn't mean it's not true,
12   again.
13           MR. GOSMAN: Okay. All right. Well, you
14   know, immediately can mean, I guess, a lot of things to
15   a lot of people.
16           MS. WESTBY: Absolutely. Immediately --
17   absolutely.
18           MR. GOSMAN: That's it. That's what this
19   case boils down to. Immediately means within a
20   reasonable period of time.
21           MS. WESTBY: That's exactly right.
22           MR. THOMPSON: I'll blow that up on a
23   eight-by-ten board and put it in front of the jury.
24   MR. GOSMAN:
25      Q. All right. So let's go ahead and take a look

1    at another document. And this is a new document. I
2    think we've -- let's see. This will be Exhibit 55.
3    There's the first page to it.
4            (Exhibit 55 identified)
5            MS. WESTBY: Are we honestly going to go
6    through this answer as well?
7            MR. GOSMAN: Yes, we are.
8    MR. GOSMAN:
9       Q. I'm going to hand you Exhibit 55. And this
10   is the answer to the complaint that was filed on behalf
11   of your other attorney, Misha Westby.
12      Do you see your name there in the -- at the
13   top of the answer as being one of the parties on whose
14   behalf Misha Westby was responding to the complaint?
15      A. I do.
16      Q. All right. And let's see. I think it's
17   paragraph 36 in that -- no, it's not paragraph 36.
18   Excuse me for just a moment.
19      Yes, it's paragraph 17. Go ahead and read
20   that paragraph into the record, please.
21      A. It's verbatim the same as the other one. You
22   still want me to read it?
23      Q. No.
24      All right. Did you see that response to the
25   answer?

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 44 of 117

Tricia Wachsmuth v.                                                    Tim Feathers
City of Powell, et al.                                          November 23, 2010

1    A. Yes.
2    Q. Did you see it before it was filed?
3        MS. WESTBY: And, you know, no, we're not
4    going to get into this. This is --
5    MR. GOSMAN:
6    Q. Did you see it before it was filed.
7        MS. WESTBY: Jeff, we're not going to get
8    into this.
9        MR. GOSMAN: I'm continuing the deposition
10   and we're going to call the magistrate tomorrow.
11       MS. WESTBY: We're not going to get into
12   this. You're asking him about --
13       MR. GOSMAN: This is the fifth time today you
14   have instructed a witness not to answer.
15       MS. WESTBY: Well, if you let will me finish
16   my objection, I will tell you why you're invading the
17   attorney-client privilege. You were asking him about
18   communications that I had --
19       MR. GOSMAN: No I am not.
20       MS. WESTBY: -- because it was a
21   communication with his attorney that is the basis of
22   his knowledge of this answer.
23       MR. GOSMAN: He's already admitted that he
24   reviewed the answers. And there's certainly nothing
25   invading attorney-client privilege about reviewing a

1    pleading.
2        MS. WESTBY: And we've discussed this over
3    and over again and he's told you his definition of
4    immediately.
5        MR. GOSMAN: Well, I just want him to say
6    that he -- or tell me one way or the other whether he
7    reviewed this answer before it was filed.
8        MS. WESTBY: And that's it and then you're
9    done?
10       MR. GOSMAN: Yes ma'am. Not done with the
11   deposition necessarily.
12       MS. WESTBY: That one question on this --
13       MR. GOSMAN: Yes, on this topic.
14       MS. WESTBY: -- document that his attorney
15   prepared?
16       Go ahead. That one answer.
17       THE WITNESS: Your question is did I review
18   this document before it was filed?
19   MR. GOSMAN:
20   Q. Yes.
21   A. Absolutely.
22   Q. All right. Have you visited with
23   Sergeant Chretien about this issue of what the term
24   immediately really means since that night?
25   A. No.

1    Q. Were you present when Officer Chretien
2    apologized for having Tricia Wachsmuth go down the
3    stairs first into an uncleared room?
4        MR. THOMPSON: Objection as to form.
5        MS. WESTBY: Join.
6        THE WITNESS: I was not present at any time
7    Sergeant Chretien apologized for anything.
8    MR. GOSMAN:
9    Q. Did you hear about it?
10   A. Not really. I guess. I heard it come up in
11   these depositions, but I'm not really sure what it is
12   about.
13   Q. Were you involved in any of the debriefing
14   that took place after this warrant service?
15   A. I was not involved in any debrief on this
16   warrant service.
17   Q. Okay. How many officers did you understand
18   were involved in the entry team that was assembled that
19   night?
20   A. That made the initial entry?
21   Q. Not that made the initial entry, but that
22   were assembled and part of the team.
23   A. Total officers on scene?
24   Q. Yes.
25       MS. WESTBY: Object to the form of the

1    question.
2        THE WITNESS: I...
3    MR. GOSMAN:
4    Q. And you don't have to have an exact answer,
5    but did you understand that there were 10 or 11 of the
6    Powell police officers that were called to this, or 12?
7    A. I knew we had a lot of officers out at --
8    Q. Okay. And did you know that they were going
9    to be assembling in the extra body armor that was
10   available there at the Powell Police Department over
11   and above their uniform vest?
12       MS. WESTBY: Object to the form of the
13   question.
14       MR. THOMPSON: Join.
15       THE WITNESS: I don't recall that being
16   specifically discussed. But that is what I would have
17   expected.
18   MR. GOSMAN:
19   Q. And you did understand that the entry team
20   would have long rifles?
21   A. Again, I don't remember if that was
22   specifically discussed. But I would have expected some
23   of them to.
24   Q. Okay. And you did know that a distraction
25   device was going to be deployed?

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 45 of 117
Tricia Wachsmuth v.
City of Powell, et al.

Tim Feathers
November 23, 2010

1   A. Yes, I knew that.
2   Q. And you knew that the perimeter of the
3   home --
4   A. I knew that a distraction device was part of
5   the contingency plan and could potentially be deployed.
6   Q. And was the perimeter of the home to be
7   secured? Was that your understanding?
8   A. Yes.
9   Q. And did the team plan a second diversion of
10  breaking out a window in the rear of the home? Did you
11  know that?
12  A. I don't remember if I was aware of that at
13  the time or not.
14  Q. And was the door breached using a mechanical
15  breaching device?
16  A. My understanding is, yes, it was.
17  Q. And that was part of the contingency plan,
18  was it not?
19  A. Yes.
20  Q. And there was a team leader?
21  A. Well, Sergeant Chretien was the one who was
22  responsible to plan and oversee the entry and securing
23  of the residence, if that's what you mean by team
24  leader.
25  Q. Yes. And there was an entry plan apparently?

1   A. Yes, there was.
2   Q. And how was this team any different than a
3   fully trained SWAT team in terms of the composition of
4   the team and what they did that night?
5   MS. WESTBY: Object to the form of the
6   question.
7   MR. THOMPSON: Join.
8   THE WITNESS: The force and effect of a SWAT
9   team is, is that a SWAT team will be used for planned,
10  intentional, tactical solutions to extremely high risk
11  critical incidents.
12  MR. GOSMAN:
13  Q. Well, and this wasn't an extremely high risk
14  critical incident, was it?
15  A. This was not what I would call an extremely
16  high risk critical incident.
17  Q. Other than that, it had all the elements of a
18  SWAT-type entry, did it not?
19  MS. WESTBY: Object to the form of the
20  question.
21  MR. THOMPSON: Join.
22  THE WITNESS: It shares some common ground in
23  equipment, tactics, et cetera.
24  MR. GOSMAN:
25  Q. Well, what's missing? What would you expect

1   in a normal SWAT-type entry, if you know, that is
2   missing from what was planned and executed that night
3   at the Wachsmuth residence?
4   A. Are you asking me if a trained SWAT team were
5   doing this, would they do it in the same way?
6   Q. No. I'm asking you if it would involve the
7   same forces and same equipment.
8   A. Yes, I believe they would.
9   MS. WESTBY: How much longer do you have,
10  because I may need to go turn off my car.
11  MR. GOSMAN: No, we're really close here.
12  MR. GOSMAN:
13  Q. Was there ever any question about this being
14  a no-knock warrant?
15  Was there a discussion about whether or not
16  there should be an application for a no-knock warrant?
17  MR. THOMPSON: What point in time?
18  MR. GOSMAN:
19  Q. Any time.
20  A. I don't remember.
21  Q. Let's go back for just a second to
22  Exhibit 16.
23  What is the process for approving these
24  reports, officer reports?
25  Is this something that's covered in the

1   policy and procedures manual?
2   A. I don't think so. It's a function of our
3   records management system.
4   Q. Okay. And when it says approved by, can we
5   take that literally?
6   A. Yes. If I understand what you mean by
7   literally, what that means is that person would
8   have read this report, reviewed it for content, form,
9   completeness, and would have signed off on it that it
10  was approved in all those areas.
11  Q. Do you remember approximately when it was
12  that you learned that Officer Miner had received
13  information from the confidential informant that he had
14  alerted Bret Wachsmuth to what was going to take place?
15  A. What time, no. I believe it was in one of
16  the phone calls that evening. But what time that
17  was...
18  Q. You don't know whether it was early afternoon
19  or later in the evening?
20  A. It would have been evening.
21  MR. GOSMAN: I don't think I have any further
22  questions.
23  MS. WESTBY: I need to have a quick
24  conversation.
25  (Discussion held off the

TIM FEATHERS - November 23, 2010                Page 173
Direct Examination by Mr. Gosman

1        record.)
2           MS. WESTBY: We'll read and sign.
3              (Proceedings concluded at 8:00
4           p.m., November 23, 2010.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

TIM FEATHERS - November 23, 2010                Page 174
Direct Examination by Mr. Gosman
                    DEPONENT'S CERTIFICATE
1
2           I, TIM FEATHERS, do hereby certify, under
3    penalty of perjury,that I have read the foregoing
4    transcript of my testimony consisting of 173 pages,
5    taken on November 23, 2010 and that the same is, with
6    any changes noted below, a full, true and correct
7    record of my deposition.
8    PAGE  LINE      CORRECTION      REASON FOR CORRECTION
9    ___  ____  _____  _____
10   ___  ____  _____  _____
11   ___  ____  _____  _____
12   ___  ____  _____  _____
13   ___  ____  _____  _____
14   ___  ____  _____  _____
15   ___  ____  _____  _____
16   ___  ____  _____  _____
17   ___  ____  _____  _____
18   ___  ____  _____  _____
19   ___  ____  _____  _____
20   ___  ____  _____  _____
21   ___  ____  _____  _____
22
23
24                      _____
25                      TIM FEATHERS    Date

---

TIM FEATHERS - November 23, 2010                Page 175
Direct Examination by Mr. Gosman
                         CERTIFICATE
2           I, VONNI R. BRAY, Registered Professional
3    Reporter, and Notary Public for the State of Montana,
4    do hereby certify that TIM FEATHERS was by me first
5    duly sworn to testify to the truth, the whole truth,
6    and nothing but the truth;
7           That the foregoing transcript, consisting of
8    174 pages, is a true record of the testimony given by
9    said deponent, together with all other proceedings
10   herein contained.
11          IN WITNESS WHEREOF, I have hereunto set my
12   hand this 10th day of December, 2010.
13
14
15
16
17
18
19
20
21   _____
     Vonni R. Bray, RPR
22   P. O. Box 125
     Laurel, MT 59044
23   (406) 670-9533 Cell
     (888) 277-9372 Fax
24   vonni.bray@yahoo.com
25

**0**

**02 (1)**
79:23
**05 (1)**
18:18
**05098 (1)**
109:20
**05908 (2)**
93:16;123:4
**06 (1)**
18:24
**06388 (1)**
96:8
**06-388 (1)**
122:6
**07540 (2)**
89:9;111:5
**07-540 (1)**
101:2
**07606 (2)**
90:19;113:20
**07-606 (1)**
120:3
**07-98 (1)**
120:18
**08 (3)**
19:3;28:3,17
**09 (3)**
19:5;28:3;31:6
**091443 (4)**
104:16;106:5;107:10;
111:23

**1**

**1 (7)**
41:20;52:17,20;60:10,
24;157:1,4
**1.2.01 (1)**
6:19
**10 (14)**
19:5;64:10,13,14,15,
21;134:2,4,6,9;153:15,
16;156:22;168:5
**11 (2)**
78:16;168:5
**12 (1)**
168:6
**13 (3)**
47:17,19;52:15
**14 (1)**
26:19
**14-week (1)**
26:18
**16 (3)**
158:4,6;171:22
**17 (1)**
164:19
**18 (3)**
56:20;137:4,7
**19 (1)**

60:7
**1981 (1)**
5:2
**1991 (1)**
44:1
**1998 (1)**
4:24
**1999 (1)**
80:2
**1A (1)**
61:16
**1I (1)**
154:21

**2**

**2 (12)**
34:2;35:15;36:7;48:7;
52:18;55:2,14;60:11,24;
81:11;104:20;157:5
**20 (1)**
117:18
**2001 (1)**
44:1
**2002 (1)**
80:4
**2005 (11)**
16:25;20:15;22:25;
23:12;24:23;25:15;26:1;
41:8;49:14;64:1;155:17
**2009 (15)**
14:10;17:2;  8:12;
23:4,13;24:21;25:11,11.
19;29:22;42  1;46:17;
87:25;125:2;158:10
**2010 (5)**
36:3;75:23; 6:8;
119:24;173:4
**23 (5)**
36:3;75:23; 6:8;
119:24;173:4
**24 (1)**
115:8
**24th (3)**
14:10;46:16  125:2
**27 (8)**
63:20,22;64:7;75:19,
25;76:2,14;120:7
**29 (4)**
43:20,23;79  20,22

**3**

**3 (8)**
35:15;45:25  48:3;
51:25;60:12  25;121:1;
157:6
**3/2 (1)**
158:10
**3:58 (1)**
36:2
**30 (2)**
29:6;120:7

**31 (6)**
9:20;10:3;11:20;41:5,
20,22
**31A (1)**
42:14
**33 (2)**
161:1,4
**35 (9)**
10:23;11:2;13:3,20;
17:5,6;19:8;27:2;29:14
**36 (5)**
162:4,6,7;164:17,17
**37 (1)**
79:12
**38 (4)**
32:18;35:19,20;80:24
**39 (3)**
32:8,11;87:13

**4**

**4 (4)**
60:13;61:9;157:7,9
**4:09 (1)**
36:3
**40 (2)**
9:25;42:6
**45-degree (1)**
47:6
**49 (2)**
32:5,9

**5**

**5 (7)**
44:15;50:13,25;51:12,
17;137:19;157:11
**5.4 (1)**
81:13
**5:03 (1)**
75:22
**5:10 (1)**
75:23
**5:26 (1)**
86:7
**5:30 (1)**
86:8
**52 (3)**
6:12,17;40:19
**55 (3)**
164:2,4,9
**59 (3)**
88:16,18,20
**5A (1)**
56:22

**6**

**6 (3)**
80:2;81:12;157:12
**6:33 (1)**
119:23
**6:46 (1)**

119:24
**60 (1)**
34:22

**7**

**7 (3)**
84:8;157:1,14
**70 (1)**
34:22

**8**

**8 (1)**
162:5
**8/8/2008 (1)**
42:6
**8:00 (1)**
173:3

**9**

**9mm (1)**
117:23

**A**

**ability (1)**
100:2
**able (7)**
14:19;22:6;28:24;
43:5;67:12,15;84:1
**above (1)**
168:11
**absence (2)**
9:1;38:19
**absolutely (6)**
42:19;75:3;88:12;
163:16,17;166:21
**accept (2)**
11:24;16:6
**accepted (2)**
46:13,16
**access (4)**
40:5;63:9,14;117:16
**accomplish (1)**
23:15
**accomplished (1)**
158:13
**according (2)**
50:1;124:16
**accuracy (1)**
145:18
**accurate (2)**
51:22;52:12
**accusation (1)**
141:16
**acknowledge (1)**
161:7
**acquired (1)**
126:20
**act (2)**
9:2;152:17

**action (10)**
37:24;42:2;60:12;
61:4;97:15;99:10;
104:20;105:5,13;112:6
**actions (3)**
7:17;142:13,19
**active (2)**
48:4;76:12
**activities (4)**
21:18,22,24;45:22
**acts (1)**
151:23
**actual (1)**
87:20
**actually (9)**
6:15;83:20;92:3;
100:18;104:14;123:19;
124:9;132:21;139:11
**Ada (1)**
5:9
**adapt (1)**
60:16
**add (4)**
38:15;68:20;141:8;
145:14
**addition (1)**
18:5
**additional (2)**
21:19;22:6
**adequately (1)**
84:14
**administration (1)**
8:13
**administrator (1)**
7:23
**administrators (1)**
40:15
**admit (2)**
11:9;162:8
**admitted (2)**
88:4;165:23
**adopt (1)**
8:11
**adopted (3)**
8:17;79:24;80:1
**adult (1)**
142:11
**advise (1)**
137:16
**advised (5)**
104:15;107:11;
117:20;120:7;138:23
**advises (1)**
137:14
**advising (1)**
138:25
**affect (1)**
7:5
**affidavit (4)**
126:4;128:10;146:17,
25
**affirmative (1)**
161:10

**afforded (1)**
  21:14
**afternoon (4)**
  128:21;129:4;140:9;
  172:18
**afterwards (3)**
  102:1;157:8,10
**again (45)**
  4:6;10:17;17:10,13;
  26:4;28:21;30:23;41:13,
  25;62:24;67:7;68:10,20;
  69:4,12,15;71:15,25;
  72:25;74:8,12,15;80:24;
  81:18;84:10;85:19;87:5,
  5;88:10;89:12;93:19;
  97:11;108:15;109:8;
  110:12;112:14;113:16;
  116:3;118:8;120:2;
  122:21;124:14;163:12;
  166:3;168:21
**against (3)**
  141:19;151:19;152:18
**agencies (8)**
  24:4,9,11,17;31:21;
  37:13,15;78:6
**agency (18)**
  8:13;30:11;31:13;
  37:20;38:5;39:21;40:4,
  14;45:21;77:16;80:11;
  82:14;86:21;96:16;
  98:10,10;139:7,9
**Agent (3)**
  114:20,25;115:14
**agents (1)**
  24:15
**ago (7)**
  12:6;17:24;31:25;
  36:12,23;38:18;40:13
**agree (9)**
  65:24;66:5;78:5;79:7;
  85:9;115:23;116:3;
  123:14;157:15
**agreement (8)**
  31:20;37:18,19;38:21;
  39:12,17,23;40:12
**agreements (2)**
  31:23;34:14
**ahead (62)**
  4:13;6:14;8:4,9;13:5;
  32:4;35:8,13;37:3,5;
  41:19,24;43:3;44:7,15;
  45:17;50:13;55:21;
  57:19;59:23;60:6;63:19;
  64:8;65:16;67:3;68:14;
  69:2;71:4;73:16,21;
  75:6,19;77:11;79:11;
  80:23;82:18;84:7,16;
  86:10;88:17;90:10;
  95:13;98:23;102:15;
  103:24;116:19,21;
  127:19;131:10;133:3;
  139:25;150:6;156:21,
  25;158:4;161:3,23;

162:4,5;163:25.164:19;
  166:16
**aid (1)**
  31:22
**Alan (4)**
  25:25;143:17,21;
  144:1
**alerted (1)**
  172:14
**allegation (1)**
  125:8
**allege (1)**
  158:21
**allow (3)**
  35:1;81:6;163:5
**allowed (3)**
  28:7,22;72:1
**almost (4)**
  89:1,2;102:21;108:5
**along (5)**
  30:22;96:10;115:11;
  122:18;133:10
**although (1)**
  60:25
**always (5)**
  11:17;89:2,2;112:23;
  121:20
**amended (1)**
  8:24
**Amendment (4)**
  65:22;74:22;75:11;
  156:18
**amount (8)**
  9:8;45:23;54:5:75:13;
  154:17,24;157:21;
  159:20
**angle (1)**
  47:6
**animals (1)**
  129:19
**announce (5)**
  71:13;74:23;75:12;
  158:17;162:10
**announcing (4)**
  74:5;120:24;156:12;
  157:20
**annual (4)**
  9:3,14;16:4;40:12
**answered (5)**
  85:8;100:15;108:15;
  153:5;157:23
**anymore (1)**
  65:2
**apart (1)**
  17:14
**apartment (4)**
  100:7,8;111:6,7
**apologized (2)**
  167:2,7
**Apparently (7)**
  20:19;40:9;113 22;
  121:5;123:5,20;169:25
**appear (3)**

12:15;120:18;139:8
**appearance (2)**
  141:15;142:2
**appeared (1)**
  128:20
**appears (7)**
  34:21;63:24;83:22,23;
  108:19;137:8;161:11
**application (1)**
  171:16
**apply (10)**
  26:14;50:5;53:15,16;
  58:3,6;61:9,22,24;86:21
**appreciate (1)**
  11:18
**apprehension (1)**
  37:15
**apprized (2)**
  117:6,12
**approach (2)**
  73:5.6
**approached (2)**
  104:18;115:14
**appropriate (13)**
  47:16;62:5,13;71:3,6;
  74:22;79:3,5,7;84:20;
  89:15;116:23;118:15
**approval (3)**
  8:25;133:17,22
**approve (2)**
  7:17;132:11
**approved (9)**
  8:18;153:17;158:5;
  159:23;160:2,17,22;
  172:4,10
**approving (1)**
  171:23
**approximately (4)**
  34:22;47:6;57:13;
  172:11
**aptitude (1)**
  54:9
**area (13)**
  14:9;15:3;20:9,20;
  23:12;24:4;31:21;34:6;
  53:2;104:21;112:7;
  113:22;121:3
**areas (8)**
  29:21;31:8;37:14;
  46:1;63:9;86:25;104:13;
  172:10
**arguably (1)**
  96:1
**argue (1)**
  51:4
**argument (1)**
  58:7
**argumentative (1)**
  160:12
**armed (4)**
  89:21;93:19;100:13;
  117:22
**armor (4)**

91:20,22;130:3;168:9
**around (2)**
  129:16,23
**arrangement (1)**
  39:24
**arrest (7)**
  59:11;90:8;93:17;
  111:11;121:5,10;124:7
**arrested (4)**
  93:23;108:8;110:12;
  151:10
**arrests (1)**
  58:1
**arrival (1)**
  37:23
**arrived (2)**
  109:21,24
**arrives (1)**
  47:23
**arrow (1)**
  157:6
**articulate (1)**
  97:18
**articulated (1)**
  93:19
**asleep (1)**
  110:17
**assemble (2)**
  21:4;130:16
**assembled (8)**
  78:16;89:25;132:4;
  133:9;135:12;154:5;
  167:18,22
**assembling (1)**
  168:9
**assertion (1)**
  161:10
**assessment (4)**
  58:14;63:5;65:10;
  155:1
**assigned (6)**
  25:12,14,18;85:16;
  113:2;122:13
**assigning (1)**
  133:14
**assignment (3)**
  26:9;60:19;154:3
**assist (7)**
  122:8;128 25;136:8,
  22;139:7,9,21
**assistance (5)**
  127:14,21;137:17;
  138:13,15
**assisted (1)**
  135:22
**assisting (6)**
  96:8;98:9;128:10;
  135:25;138:2,19
**associated (2)**
  80:15;90:7
**Association (5)**
  32:22;34:5,5;82:13;
  142:23

assume (6)
  4:10;41:20;118:4;
  120:9;122:10;126:23
**assumed (1)**
  87:15
**assuming (1)**
  33:19
**assumptions (1)**
  131:8
**assurance (2)**
  142:5;143:11
**attach (1)**
  81:4
**attempt (1)**
  48:17
**attempting (2)**
  105:6;109:9
**attend (2)**
  20:23;23:15
**attendance (1)**
  19:6
**attended (2)**
  20:24;21:9
**attendees (3)**
  15:13;17:3;18:14
**attending (1)**
  5:12
**attention (3)**
  63:7;76:1;81:12
**attorney (8)**
  146:24;161:16,22;
  162:18;163:1;164:11;
  165:21;166:14
**attorney-client (2)**
  165:17,25
**attorneys (1)**
  12:22;83:10
**August (3)**
  28:3,3,4
**author (1)**
  44:11
**authority (7)**
  6:21;7:16;8:1,11,22;
  30:5,20
**authorized (3)**
  40:23,25;127:21
**authors (1)**
  44:14
**available (9)**
  12:24;23:11;27:20,23;
  28:19;40:6;53:22;104:5;
  168:10
**aware (18)**
  30:21;39:8,9;43:7;
  117:13;125:5,7;128:12;
  130:7;135:21;136:13;
  151:8,12;154:16,22;
  156:2,3;169:12
**away (6)**
  63:8;101:24;107:16;
  113:17;116:14;119:12

**B**

**B1 (3)**
45:18;47:19.21
**bachelor's (1)**
5:13
**back (34)**
20:18;25:15,16,25;
33:2;38:15;40:19;47:24;
50:13;59:25;69:18;
74:20;85:21;86:5,11;
87:11,13;88:18;94:21;
95:6;99:24;104:15;
108:20,22;110:19;
111:14,25;123:20;
127:1;153:15:157:13,
13;161:5;171:21
**background (1)**
128:8
**backyard (2)**
104:16;112:1
**barricaded (1)**
55:22
**base (1)**
30:25
**based (24)**
19:8;44:23,23:53:19;
59:24;62:18,19;63:4;
65:10;67:18;68:3;79:6;
80:11;89:5;91:13;93:6;
96:15;98:16;99:7;
107:11;111:21;116:4;
118:8;119:2
**basement (1)**
147:4
**basic (4)**
22:25;23:2,12;26:7
**basing (1)**
145:6
**basis (3)**
9:14;71:18;165:21
**Bates (1)**
64:14
**battering (1)**
89:14
**became (4)**
4:20,23;5:16;125:7
**become (3)**
4:19;125:5;143:12
**bed (2)**
108:23;111:12
**bedroom (7)**
68:7;101:20;110:18,
20;154:9;157:8,10
**bedrooms (2)**
100:9;111:8
**began (3)**
18:17,17,18
**begin (2)**
126:3;129:6
**beginning (3)**
22:23;49:9,14

**begins (1)**
34:16
**behalf (4)**
9:2;161:6;164:10,14
**below (3)**
21:18;48:3.113:7
**beneficial (1)**
27:24
**best (6)**
89:6;100:2 103:11;
104:1,4;125:24
**bet (1)**
32:13
**better (1)**
52:24
**beyond (3)**
17:17;19:1 23:1
**Bible (1)**
51:8
**big (2)**
14:18;29:1
**bipolar (6)**
148:11,13,19,23;
149:12;152:14
**bit (3)**
5:13;18:25.75:19
**Blackmore (1)**
109:24
**block (2)**
20:13;107:16
**blow (1)**
163:22
**board (1)**
163:23
**body (4)**
8:18;91:20:130:3;
168:9
**boils (1)**
163:19
**bold (1)**
79:23
**book (2)**
11:12;32:12
**both (3)**
24:19,20;28:25
**bottom (2)**
138:22;158:16
**Boulevard (1)**
117:21
**bound (1)**
105:2
**Bradley (7)**
27:6;90:21;91:16;
110:6;115:10,10;117:18
**breach (5)**
28:22;154:8,18;
156:11:157 18
**breached (3)**
120:23;157 21;169:14
**breaching (2)**
120:19;169:15
**break (4)**
35:24;75:20.157:6,12

**breaking (1)**
169:10
**breath (1)**
13:16
**Bret (17)**
25:22;125:3,9;129:22;
130:3,5,6;138:8;145:14;
147:8,19;148:3;151:6,
18.20;153:13;172:14
**brevity (1)**
16:8
**briefing (5)**
125:21;130:21,23;
132:23;133:7
**Brilakis (2)**
41:7;42:12
**bringing (1)**
30:24
**broad (2)**
7:11;10:22
**broke (1)**
157:23
**brought (2)**
115:15;140:16
**Brown (3)**
32:13,14;108:21
**budgetary (1)**
45:22
**building (3)**
28:24;61:20;62:2
**buildings (2)**
27:20,23
**built (1)**
28:15
**bunch (2)**
96:4;109:13
**business (2)**
4:9;142:24
**butt (1)**
47:10

**C**

**calendar (1)**
18:19
**call (20)**
20:16;38:23;39:5,13;
47:24;48:15;61:8;
130:10:131:2.25;133:5;
140:4;143:15,17,25;
144:17,18;150:23;
165:10;170:15
**called (19)**
10:19;46:21;47:9;
94:17;111:1;112:2;
129:8;130:5,16;133:11;
135:13,21;136:5;
142:24;143:2,20,23;
144:13;168:6
**calling (1)**
139:1
**calls (5)**
66:12;67:16;72:1;

135:9;172:16
**came (16)**
5:10;20:20,21;32:21;
33:4;93:23;101:24;
104:17;107:7;110:3;
111:25;113:21;120:5;
123:7;144:22;145:7
**can (48)**
14:23,24;29:14;35:13;
43:21;47:7;63:20;65:14;
66:18,19,21;69:3,5;
73:23.75:6,20,21;76:4;
79:6,12,18;82:21;83:19;
86:1;93:9;98:1;99:12;
102:7,14,19;103:9;
106:22;109:9;110:24;
111:16;114:3;116:3,4;
119:5 21,22;123:24;
140:22,22;142:18;
151:2;163:14;172:4
**canceled (1)**
8:24
**capability (1)**
46:2
**capacity (1)**
161:10
**car (2)**
91:1;171:10
**care (3)**
19:22;51:4;124:24
**career (1)**
5:4
**carried (1)**
129:24
**carry (2)**
57:13;60:18
**carrying (2)**
46:10;149:15
**case (64)**
63:16;66:4;71:6;87:7;
89:9;90:11,18;93:16,18;
94:6;96:8,19;99:18,23;
100:12;101:2,19,22,23;
102:12;104:16;107:9;
108:5.19:110:16;111:4,
5,16,17,23,24;112:13;
113:14,16,19,20,21;
114:9;120:2,3,17,18,19;
121:19;122:6;123:4,9;
124:11;125:18;126:16;
127:2;128:3;130:15;
135:22;136:17;137:17;
138:12,16,23;141:3;
144:20;145:22;147:6;
163:19
**cases (21)**
96:4,17;97:17,24;
98:1;103:3,4,22;104:1,8,
14;106:23;108:6,18;
109:8,10,13,18;110:23;
111:4;116:5
**Casper (1)**
30:1

**category (1)**
142:21
**cause (5)**
50:9;63:4;102:9;
140:23;163:11
**causes (1)**
118:25
**certain (8)**
6:16;9:8;15:20:26:6;
31:14;78:23;89:24;
148:10
**certainly (6)**
4:11;58:20;115:20;
131:4;160:20;165:24
**certificate (2)**
29:25;30:5
**certificates (1)**
31:13
**certification (7)**
9:10,12;14:17;16:9;
30:4,13,17
**certifications (1)**
9:19
**certified (19)**
9:9,24;10:1;14:9,11;
15:3,8;16:9,12,14,15;
17:2,8,9;18:15;29:21,23;
42:5,9
**certify (1)**
15:19
**certifying (1)**
30:2
**cetera (2)**
112:9;170:23
**Chad (2)**
25:20;120:23
**chain (1)**
6:9
**changed (4)**
16:1,23;46:18;160:21
**changes (2)**
79:24,24
**Chapman (2)**
27:5.8
**characteristic (3)**
34:16;37:4,6
**characteristics (1)**
36:7
**characterize (1)**
46:9
**charge (1)**
128:13
**charged (2)**
6:8;121:9
**Chief (20)**
4:5,16,19,20,23:5:16;
6:22;8:10.25;11:6;20:1;
40:16;65:24;95:6;
103:24;104:12;107:11;
109:7,23:150:6
**child (5)**
68:7;69:21,22;70:8;
142:10

**children (1)**
142:19
**chips (1)**
142:12
**choice (1)**
56:13
**choose (1)**
18:4
**chose (2)**
17:17;143:14
**chosen (2)**
85:11;155:8
**Chretien (19)**
131:18;132:1,22;
133:5,14;135:17;
143:22;144:21;154:1;
156:10;157:16;158:9,
22;159:5;160:15;
166:23;167:1,7;169:21
**church (1)**
107:16
**circumstance (7)**
62:6,7;106:9;123:25;
149:25;150:8,16
**circumstances (38)**
7:22;47:15;57:6;
58:14;60:16;62:13;63:5;
65:10,18;66:3;67:6,11;
68:1,4;70:5,14,19;71:2,
5,8,11,22;72:18;73:1,3;
74:2;96:2;115:23;
131:14,20;149:13,13,24;
150:8,16;152:11;155:1;
159:21
**City (14)**
6:1;7:16,23;8:10,16;
88:3;113:5;122:16;
126:12;138:24;139:10;
161:8,12,13
**clarification (1)**
20:5
**clarify (2)**
102:16;156:16
**class (1)**
30:1
**classes (1)**
17:20
**clear (17)**
11:5;14:8;41:25;57:3;
75:3;89:22;90:22;92:4;
94:10;115:11,19;
116:23;118:15;128:20;
131:10;133:4;158:22
**cleared (22)**
89:25;91:2,13;94:1,9;
95:4,13,15;97:23;99:22;
104:21;105:14;112:7;
114:21,25;115:16,17;
120:6,9,11;122:4,22
**clearing (24)**
27:11,19;28:25;42:9;
43:15,18;46:8,11;94:11;
100:13;105:14;106:15;

170:3
**comprehend (1)**
7:13
**concept (2)**
64:17,25
**concerning (3)**
7:6;39:21;145:16
**concerns (1)**
147:7
**concluded (1)**
173:3
**conclusion (4)**
66:13;67:16,16;72:2
**concoct (1)**
70:13
**condensed (1)**
114:6
**condition (3)**
17:4;148:14;149:12
**conduct (2)**
7:7;22:20
**conducted (7)**
16:15;21:18;23:8;
29:16;30:11;93:25;
94:23
**confidential (14)**
126:9,11,13,17;
144:18,19,23;145:1,7;
146:6,14;147:7,17;
172:13
**confirm (2)**
41:11;121:14
**confirmed (1)**
146:20
**confirms (2)**
31:13;41:6
**confronted (1)**
105:8
**confused (1)**
53:13
**connected (4)**
91:3;93:17;149:2,12
**connection (3)**
97:7;122:23;128:3
**consent (2)**
110:8;123:10
**consequences (1)**
142:19
**consider (11)**
40:18;51:21;52:11;
58:16;71:10;129:6;
132:17;141:7,25;142:4;
144:3
**considerable (1)**
19:11
**consideration (5)**
55:20,24;56:5,11;
58:21
**considered (9)**
26:7;58:18,22,25;
132:8;134:10;140:17;
141:20;144:9
**considering (4)**

48:20;128:22;129:3;
141:19
**consistent (3)**
146:21;157:16,19
**consisting (2)**
113:2;162:9
**constitutes (1)**
43:18
**consult (1)**
128:23
**consulted (2)**
128:3,7
**contact (5)**
105:7;137:15;140:4;
162:18;163:1
**contacted (1)**
125:13
**contacting (2)**
138:24
**contain (4)**
46:4;52:3;64:3;88:25
**contained (4)**
8:15;38:20;84:8;
103:13
**containment (1)**
37:24
**contains (1)**
156:23
**contemplated (1)**
113:1
**content (2)**
43:6;172:8
**context (6)**
68:1;82:20;83:25;
109:8;159:15;160:16
**contingencies (1)**
132:7
**contingency (5)**
131:12;133:22;156:6;
169:5,17
**continue (3)**
31:3;98:23;105:15
**continued (2)**
44:3;94:2
**continuing (1)**
165:9
**continuum (14)**
57:1,2,10,11,15,16,17;
64:11,18,20,22;65:1,6,
20
**continuums (1)**
65:2
**contributed (2)**
145:16;146:22
**contributions (1)**
130:15
**control (3)**
13:11;140:24;142:16
**conversation (4)**
155:23;159:5;160:15;
172:24
**conversations (2)**
161:19;163:4

**convey (1)**
30:4
**conveyed (1)**
129:11
**cooperate (4)**
32:2;141:23;142:6;
143:14
**cooperation (1)**
31:25
**copied (3)**
14:19,22;93:14
**copies (1)**
97:12
**cops (1)**
94:17
**copy (2)**
91:8;161:5
**copyright (1)**
83:24
**copyrighted (1)**
83:23
**corners (1)**
103:16
**correctly (1)**
77:9
**couch (1)**
110:2
**Counsel (10)**
11:4;73:6;82:15;83:9;
86:4;101:3;112:16;
114:7;119:9;163:3
**Countermeasures (11)**
20:12,19;22:24;24:20,
22;30:24;31:5;44:6;
49:8,13;63:24
**County (16)**
24:12,19;31:20;38:5,
21;39:7,25;40:16;
122:10;127:22;128:13;
137:17,25;138:8,14;
146:24
**couple (7)**
4:6;16:24;29:7;35:19;
36:11,17,23
**course (25)**
14:8,16,15;12;21:9,
12;22:24;30:6,11;41:8;
42:1,2;43:9,17,22;44:3;
56:3;63:24,25;76:3,16;
87:24;90:3;94:20;
123:24;128:20
**courses (2)**
15:15;17:3
**coursework (1)**
10:4
**courts (2)**
154:22,24
**cover (6)**
10:21;46:21;57:10;
63:23;79:21;109:23
**covered (3)**
42:10;57:8;171:25
**covert (3)**

107:19;108:9;111:19,
20;112:9;115:4;116:15;
121:11,15;122:22;
123:13;124:21
**client (1)**
82:1
**close (1)**
171:11
**Cody (7)**
20:20;24:1:,19;25:3;
27:13;40:16;156:3
**collect (1)**
88:15
**collection (1)**
17:7
**collective (2)**
96:15;103::
**coming (1)**
141:21
**command (5)**
6:9;37:23;107:13,15;
120:7
**commanding (1)**
47:3
**committed (1)**
152:17
**committing (1)**
107:5
**common (1)**
170:22
**commonly (3)**
27:22;45:2::;160:3
**communicate (2)**
127:7,10
**communicated (2)**
118:5;125:17
**communication (1)**
165:21
**communications (2)**
125:10;165:18
**companions (1)**
110:7
**complaint (6)**
161:5,17;1(:2:8,15;
164:10,14
**complete (4)**
17:6;19:8;26:20;68:1
**completed (1)**
31:14
**completely (13)**
42:23,24;4::17;50:16,
25;51:20;5::6;53:1;
139:14;142 6;145:25;
160:10,10
**completeness (1)**
172:9
**compliance (1)**
156:20
**comply (1)**
116:8
**components (1)**
97:15
**composition (1)**

47:18,22;50:6

**creation (1)**
44:10

**credit (1)**
16:6

**Criminal (6)**
43:12;151:11,12,15,
23;153:4

**crisis (1)**
28:1

**critical (13)**
21:24;37:11;44:16,19;
45:1,6,7;56:25;77:3,15;
170:11,14,16

**crossing (1)**
163:3

**current (4)**
65:21;76:19;77:2;
80:13

**Currently (3)**
25:18;46:13,16

**curriculum (1)**
49:7

**custody (9)**
13:10;47:3;89:20;
95:17;105:9,10;107:22;
117:14;121:3

**custom (1)**
18:13

**cut (3)**
98:10;103:16;157:13

## D

**damage (1)**
45:10

**danger (7)**
59:16;97:5;109:2;
149:19;150:3,12,19

**dangers (1)**
108:17

**Danzer (2)**
113:15;120:6

**darn (1)**
100:23

**date (6)**
79:22;88:12;90:15;
155:22,25;156:1

**dates (1)**
18:20

**day (1)**
28:10

**days (1)**
19:12

**DCI (20)**
24:15;25:5,6;26:6;
42:7;43:13;91:4,10;
92:12;93:4,17;96:8;
98:9;110:6,8;114:11,15;
115:14;122:8,11

**DEA (3)**
25:7;26:3,6

**deal (3)**

45:20;51:18;57:9

**dealing (1)**
52:16

**deals (1)**
48:7

**dealt (6)**
86:19;142:9,14,17;
148:19,21

**debrief (1)**
129:8;167:15

**debriefing (1)**
167:13

**December (1)**
44:1

**decided (4)**
49:1;98:25; 35:5;
141:20

**Deciding (2)**
55:3,15

**decision (10)**
58:13,23;131:2,5;
132:11,17,21;144:1;
147:23;148:1

**decisions (3)**
7:5,6;131:14

**defendant (3)**
68:24;161:8 13

**defendants (3)**
161:9;162:8 12

**defense (1)**
114:7

**defenses (1)**
161:10

**define (4)**
29:23;72:4;79:7;97:14

**defined (8)**
31:23;61:3;99:9;
101:5;124:4;134:16;
160:3;163:10

**defining (1)**
154:24

**definite (1)**
60:13

**definition (21)**
44:16;45:13 15;85:24;
100:3;101:9,15;103:3,5;
104:9;109:1 ,17,19;
112:17;113:4,8,10;
116:4,6;119:3;166:3

**definitions (1)**
109:11

**DEF-TEC (1)**
14:16

**degree (3)**
5:13;45:8;142:5

**deliver (1)**
20:13

**demonstrated (1)**
11:20

**deny (2)**
63:8;162:12

**Department (54)**
4:15,17,19:5 1,8,9,14;

6:2,10,11,24;7:5,7,16;
10:7;12:7;15:5;17:14,
17,21,25;18:8,13;20:9;
21:7;22:4,19;23:3;24:2,
10,13;29:20;31:18;38:7;
44:4;54:7;75:15;80:7;
84:19;85:5;94:24;100:1;
102:25;107:11;113:6;
114:1,13;115:18;
121:22;131:4;136:2;
138:12;140:3;168:10

**departments (1)**
13:9

**Department's (1)**
6:17

**depend (3)**
16:20;149:1,11

**dependent (1)**
9:9

**depending (3)**
7:21;29:7;47:15

**depends (1)**
57:5

**deploy (4)**
133:15;147:23;152:4;
155:9

**deployed (7)**
68:9;70:7;104:12;
155:19;157:24;168:25;
169:5

**deploying (1)**
155:22

**deployment (1)**
150:23

**deponent (2)**
23:19;119:12

**deposed (1)**
27:7

**deposition (5)**
4:9;24:1;33:5;165:9;
166:11

**depositions (4)**
33:21;82:4;134:7;
167:11

**depressed (3)**
47:5,11;148:3

**Deputy (3)**
96:11;122:9,19

**describe (4)**
44:18;64:25;99:20;
130:23

**described (3)**
11:3;15:7;154:6

**describes (1)**
45:1

**describing (1)**
147:8

**description (6)**
5:17,19;7:1,3;10:16;
96:12

**designated (3)**
9:1;37:20;60:19

**designed (2)**

76:9,11

**desired (1)**
60:19

**destroy (2)**
63:14;144:15

**destroyed (4)**
57:25;58:20;59:2,17

**destruction (1)**
58:22

**detail (2)**
80:19;153:23

**determining (1)**
152:4

**develop (3)**
22:4;31:9;138:3

**developed (4)**
31:25;130:25;131:11;
133:6

**developing (4)**
6:9;126:8,10;131:18

**development (2)**
6:22;18:18

**deviate (3)**
60:15,17,20

**device (20)**
61:18;62:1,6,8,14;
63:15;68:6,9;69:19;
70:6,7;88:4;112:24;
133:16;155:14,19,22;
168:25;169:4,15

**devices (6)**
13:16;14:3;15:9;
61:15,17;156:3

**difference (5)**
15:17;44:25;60:18;
78:15,20

**differences (1)**
78:19

**different (5)**
18:1,2;61:1,8;170:2

**difficult (1)**
97:13

**DIRECT (2)**
4:3;7:22

**directly (2)**
4:14;101:20

**discern (1)**
83:15

**discharge (2)**
28:23;115:2

**discovery (28)**
11:8,16,22;33:2,11;
36:22;82:3,4;88:14;
96:16;97:11,24;98:2,14;
99:13;100:4;101:5,12;
102:24;103:4;106:23;
109:10,16;113:7;116:5;
119:3,19;124:5

**discuss (2)**
35:24;163:2

**discussed (13)**
96:2;114:10;129:10;
135:19;140:17,19;

143:19,21;162:20;
166:2;168:16:22

**discusses (1)**
46:8

**discussing (2)**
76:15;140:8

**discussion (8)**
19:11;32:16;71:18;
140:7;157:19;159:15;
171:15;172:25

**discussions (3)**
153:9;162:24;163:6

**disorder (1)**
149:3

**dispute (2)**
107:6;111:25

**distinguishes (1)**
37:7

**distract (1)**
63:7

**distraction (4)**
14:3;15:9;168:24;
169:4

**district (1)**
27:22

**diversion (7)**
61:15,17,18,25;62:6,8;
169:9

**diversionary (3)**
62:14;63:15;112:23

**divert (1)**
63:7

**Division (1)**
43:12

**document (60)**
6:25;12:12;13:2;
32:19,21,23;33:20;
34:21;35:4,10,17;36:10,
11,21;38:14,16,41;20;
42:13;44:8,10,16,23;
45:2;47:17;48:18,25;
50:10;51:7;54:2;63:21;
64:21;76:13;79:12,17;
80:25;81:25;82:3,12,16,
19,20;83:7,22,25;84:4,
12;96:22;102:7;134:24;
135:2,9,14;136:24,24;
137:6,11;164:1,1;
166:14,18

**documentation (6)**
9:15;13:19;18:22;
29:17;94:4;98:17

**documented (7)**
24:6;27:1,3;29:1,2,9;
41:5

**documenting (1)**
18:20

**documents (8)**
11:1,7,21;12:5;42:15;
89:1;99:25;108 5

**domestic (3)**
104:25;107:5;111:25

**done (12)**

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 52 of 117

Tricia Wachsmuth v.                                                                    Tim Feathers
City of Powell, et al.                                                                November 23, 2010

4:11;14:24;28:25;
30:23;89:20;99:15,20;
124:15;126:23.25;166:9,
10
**door (34)**
48:14;71:13;72:6;
73:8;74:24;90:24;
101:20;110:2,19;115:13,
16;120:19,21,24;123:7;
154:7,8,18;156:7,11;
157:4,13,14,18,20,23;
158:17,18,23,24;159:8,
22;162:11;169:14
**doors (1)**
28:22
**double-checking (1)**
111:13
**doubt (2)**
82:10;83:3
**down (15)**
47:11,14;48:3:51:25;
55:5;66:1;67:3:74:17;
119:11;121:9:130:16;
141:21;157:7;163:19;
167:2
**dozen (1)**
129:16
**drafting (1)**
128:10
**draw (1)**
146:25
**drawn (1)**
153:16
**dressed (1)**
111:12
**drew (2)**
100:7;111:6
**drill (1)**
31:3
**drills (1)**
20:16
**drive (1)**
101:24
**driving (1)**
13:13
**drop (3)**
68:6;69:19;70:6
**drug (10)**
25:5,7;26:6;42:6,7;
43:8,9;58:1;93:17;
149:14
**duly (1)**
4:2
**duration (1)**
15:22
**during (7)**
5:14;27:18;94:20;
129:4;130:21;132:23;
135:15
**dynamic (88)**
19:14,24,24;20:9;
22:10;24:17;27:12;
29:21;30:17;41:10;

47:24;48:20 50:5;56:21;
57:4,10,20;58:17,23;
59:3,8,17;6:2,5,9;
61:14;78:1;;87:4,22;
88:1;89:13,30;92:11;
93:25;94:11,23;96:1,13,
18;97:12,14,16;99:1,9,
14,17,25;100:3,13;
101:9;104:9;105:13;
106:10;107:19,20;108:2,
12;109:3;110:10;111:1,
2,2,18;112:3,17,25;
113:6;115:21;120:10;
122:24;123: 3;124:1,4,
20;128:22:1.9:3;131:7;
132:11,12,18.18;134:15;
135:18,18;136:4;
141:24;150:24;152:5
**dynamically (1)**
94:12

**E**

**earlier (4)**
38:16;61:3;79:15,19
**early (3)**
128:21;140:9;172:18
**easiest (1)**
25:17
**Eckerdt (7)**
96:10;122:9,18;130:2,
14;145:13:1 7:20
**effect (7)**
38:17;40:18 113:3;
127:25;147::0;160:4;
170:8
**effected (1)**
122:24
**effecting (1)**
140:5
**effective (1)**
8:12
**efficient (1)**
8:12
**effort (4)**
22:23;109:15;162:17;
163:1
**efforts (1)**
37:8
**eight-by-ten (1)**
163:23
**either (13)**
28:3:30:10;3 ·:14;
63:8;81:7;108.7;121:11;
125:18;126:7.140:4;
141:21;144:21;153:3
**element (2)**
141:10,13
**elements (6)**
88:1,2;153:9;156:22,
24;170:17
**eligible (1)**
16:9

**eliminate (1)**
59:1
**eliminated (1)**
135:7
**else (10)**
82:2;95:11,21;105:11,
20,21,24;106:5;117:15;
123:9
**em (1)**
47:23
**emblem (1)**
83:23
**embodied (1)**
65:7
**Emergency (5)**
13:13;37:24;76:6;
105:5,12
**employed (4)**
46:10;47:7;126:17;
156:2
**employee (1)**
122:16
**Employees (1)**
8:16
**employment (2)**
4:14;26:19
**empty (6)**
115:18,19;116:12,13,
24;117:2
**EMS (1)**
28:13
**enable (1)**
57:9
**encompass (1)**
29:13
**end (5)**
22:23;36:8;42:15;
57:2,4
**ended (1)**
115:4
**enforcement (10)**
5:4;28:14;46:4;52:3;
56:25;57:3;78:6;104:13;
141:9;143:3
**engage (3)**
37:22;59:3;70:13
**engaged (1)**
115:20
**enough (10)**
40:13;46:25;67:11;
69:16;75:5;135:11;
142:25;143:9,10;146:24
**ensure (1)**
156:19
**enter (3)**
63:6;94:10,12
**entered (22)**
71:14;74:4;87:23;
94:9;95:4,13,16;96:11;
97:4;99:21,22;104:20;
105:13;106:14;112:6,
15;113:18;118:21;
122:19;123:16;124:2,5

**entering (4)**
95:19;100:8;111:7;
112:20
**entire (5)**
35:4;51:2,6;81:4;
145:6
**entirety (1)**
8:17
**entitled (1)**
68:23
**entries (3)**
30:17:50:5;59:8
**entry (115)**
19:14,24,25;20:9;
22:10;24:17;27:12,19;
28:25;29:21;41:10;42:8;
47:18,22,24;48:20;50:6;
52:17,19,20;54:20.25;
56:13.21;58:17,23;59:3,
17;60:2,5,9;63:8;78:17;
87:4,22,22;88:2;89:13,
20;94:1,11,23;96:1,13,
18;97:12,14,16.22;99:1,
9,14,17,25;100:3,13;
101:10;104:9;106:10;
107:19.20;108:2,12;
109:3;110:10;111:1,2,2,
18;112 8,17,21,25,25;
113:3,7,11;115:21;
116:6;118:5;120:10;
122:24;123:13;124:1,4,
6.20;128:22;129:4;
131:7;132:11,12,18,19;
133:15;134:15,15;
135:18,18;136:4;
141:24;150:24;152:5;
154:4;158:19;160:4;
162:12;167:18,20,21;
168:19;169:22,25;
170:18;171:1
**equal (1)**
21:14
**equip (1)**
22:20
**equipment (2)**
170:23;171:7
**escape (1)**
63:11
**essence (1)**
70:12
**essentially (2)**
32:1;93:25
**establish (1)**
22:25
**established (3)**
30:13;82:14;83:4
**establishing (1)**
146:23
**estimated (1)**
129:15
**et (2)**
112:9;170:23
**evacuate (1)**

120:13
**evacuated (1)**
120:8
**evacuation (1)**
120:15
**Evaluate (1)**
48:10
**evaluating (3)**
48:7:49:22,25
**evaluative (1)**
48:18
**even (18)**
38:17;40:9;45:9;
65:12;96:1;97:17;99:10;
105:24;106:5,17;
110:11;111:2;112:15;
118:25;141:18;143:12;
146:2;155:11
**evening (10)**
115:18;128:21;129:7;
131:25;133:6;135:16;
140:10;172:16,19,20
**event (2)**
14:10,12;49:5;91:15
**events (3)**
21:24;76:20;77:3
**everybody (1)**
90:12
**everybody's (1)**
23:18
**everyday (1)**
7:6
**evidence (27)**
49:4;57:25;58:20,22;
59:2,17;63:13;66:11;
67:9;73:11,12;94:22;
98:16;104:1,5;108:24;
112:3,4;118:4;122:21;
123:1,12;124:9,16;
136:11;144:15;151:6
**EVO (2)**
13:11,12
**evolution (1)**
18:18
**evolving (3)**
16:25:30:24;143:13
**exact (2)**
142:15;168:4
**exactly (3)**
141:2:154:23;163:21
**EXAMINATION (1)**
4:3
**examples (1)**
110:25
**except (3)**
8:17;23:19;145:22
**exception (1)**
110:15
**exclude (1)**
109:16
**excluding (1)**
57:12
**Excuse (2)**

52:23;164:18
**execute (2)**
138:4,13
**executed (1)**
153:24;171:2
**execution (5)**
97:7;127:9,11;131:19;
156:24
**exercise (4)**
17:21;23:21;28:8,13
**exercises (7)**
16:14;20:16;24:3,6;
27:11;29:15;31:10
**exhibit (60)**
5:23,24;6:12,17;9:20;
10:3,23:11:2,11,20:12:2;
13:2,20;17:5,6,15;19:8;
27:2;29:14;32:5,8,9,11,
18;35:18;40:19;41:5,20,
22;43:20,23;63:20,22;
75:19,25;79:12,18,22;
80:24;87:13;88:16,18,
20;134:2,4,6,9;137:4,7;
153:15,16;156:22:158:4,
6;161:1,4;164:2,4,9;
171:22
**exhibits (2)**
11:5;33:5
**exist (1)**
38:4
**existed (1)**
73:3
**existence (1)**
8:22
**expand (3)**
86:10,16,18
**expanded (1)**
18:25
**expect (2)**
118:13;170:25
**expected (2)**
168:17,22
**expend (1)**
139:7
**experience (4)**
127:3,4;128:8;148:18
**expert (7)**
68:21,22,23;71:25,25;
72:1;75:4
**expertise (1)**
34:6;128:24,24
**explain (1)**
77:11
**explained (3)**
118:24;143:3;156:17
**extent (1)**
81:23
**extra (2)**
91:20;168:9
**extremely (3)**
170:10,13,15

## F

**facility (4)**
27:25;28:11,21;63:9
**fact (23)**
28:9;54:7;77:2,17;
83:3;84:3;102:20;106:1;
108:6,17;114:15;118:9;
124:1;128:  2;135:2;
136:20;137  16;140:14;
147:3;149:17;150:1,10,
18
**factor (2)**
152:3,10
**factors (2)**
58:25;152:13
**facts (4)**
71:24;117:6,8,9
**fail (2)**
71:13;72:4
**failed (1)**
143:13
**fair (4)**
79:1;84:18;  33:13;
135:11
**fairly (1)**
80:14
**faith (1)**
109:15
**fall (1)**
142:12
**familiar (5)**
32:5,7;34:10  ;64:17;
88:24
**family (1)**
140:21
**far (5)**
57:8;110:14.111:3;
133:9;140:1.1
**fashion (2)**
122:22;160:14
**fault (1)**
119:10
**favorites (1)**
141:16
**favoritism (1)**
142:3
**feasible (1)**
48:15
**FEATHERS (6)**
4:1;11:6;104:12;
107:11;109:24;161:13
**features (1)**
19:24
**February (12)**
14:10;17:2;18:12;
23:4,13;25:11;29:22;
42:1;46:17;80  2;87:24;
125:2
**feel (3)**
61:20;62:2;110:24
**fellow (2)**

107:4;153:11
**felony (1)**
37:14
**felt (6)**
116:5;142:20,25;
143:4;146:14;147:9
**few (2)**
19:12;103:16
**field (5)**
10:14;13:17;26:13,21;
53:22
**fifth (1)**
165:13
**figure (4)**
92:9,10;98:15;108:11
**figuring (1)**
141:25
**file (2)**
9:17;127:2
**filed (7)**
161:6,16;164:10;
165:2,6;166:7,18
**final (8)**
6:1,5;131:14;132:21;
133:16,22;144:1;148:1
**finalized (2)**
131:22,24
**find (9)**
34:2;51:23;61:1;
95:23;96:7;97:13;
109:10;141:14;142:3
**fine (8)**
11:18;36:1;40:24;
46:15,19;66:24;69:10;
82:21
**finger (1)**
46:23
**finish (2)**
141:5;165:15
**finishing (1)**
5:12
**fire (1)**
28:13
**firearm (3)**
100:8;111:7;129:24
**firearms (11)**
12:16;13:1,10;16:5;
17:11;31:1,2;118:12;
129:23;149:15,15
**fired (1)**
117:23
**first (27)**
4:2;8:7,8;22:22;26:19;
33:4;34:4;42:13;57:9;
61:14;86:19;100:6,20,
20;101:18;111:4,17;
113:14;115:13;125:7,14,
17;130:9;140:7;142:21;
164:3;167:3
**firsthand (2)**
102:23;103:7
**fiscal (1)**
80:12

**Fish (1)**
24:14
**fit (1)**
103:5
**five (1)**
162:9
**flash (1)**
15:9
**flashbang (13)**
68:6;69:19;70:6;88:2,
4,9;112:24;133:15;
154:9;155:9,14;157:9,24
**flashbangs (1)**
28:23
**floor (1)**
123:17
**Florida (2)**
43:4,6
**focus (3)**
29:8;37:8;94:7
**focused (2)**
34:13;37:8
**focusing (1)**
113:11
**folks (3)**
31:4;91:2;120:12
**followed (1)**
80:21
**following (1)**
37:22
**follows (1)**
4:2
**follow-up (1)**
94:2
**foolish (1)**
118:14
**force (17)**
38:17;40:9,18;57:16;
64:10,18,20,22;65:1,2,6,
20;66:3;113:1;122:14;
158:19;170:8
**forced (1)**
67:3
**forces (1)**
171:7
**forego (2)**
4:7,8
**forewarned (1)**
130:7
**form (114)**
6:3;7:9,18;19:16;20:3;
21:20;22:8,11;23:5;
30:8,14:34:7;38:24;
39:15;41:13;44:20;
48:21;49:23;52:8:53:7,
23;54:17;58:9;59:21;
60:22;62:15,21;66:9;
67:7,13,23;69:8,11,23;
70:9,22;73:10;74:7,25;
76:21;77:5,18;78:9;
79:4;80:17;83:18;84:22;
85:18;92:6,13,18,25;
94:25;98:19;99:3;

100:14;102:2;103:14,18,
23;106:11,16,20;107:23;
108:14;109:4:115:24;
116:16,25;118:1,6,18;
121:17,22;124:12;
127:14,16;128:14;
129:1;130:1,18;132:13,
25;133:18;136:10;
137:20;139:13,23;145:9,
24;146:8,17;147:11;
148:5,16;149:4,9,20;
150:5,13,21;152:7,20;
153:18;157:25;159:1;
160:6;161:18;167:4,25;
168:12;170:5,19;172:8
**forms (1)**
18:2
**forth (2)**
98:3;133:16
**forward (4)**
96:17,19;103:2;
133:17
**forwarded (2)**
104:8;119:4
**found (4)**
95:11;100:9;111:8;
121:2
**four (2)**
15:25;50:1
**Fourth (3)**
65:21;74:21;75:11;
137:13;156:18
**front (9)**
93:23;96:11;104:5;
110:2;122:19;123:7;
143:18;158:17,163:23
**FTO (4)**
10:19,20;26:16,17
**full (3)**
5:12;29:12;129:8
**full-scale (1)**
28:13
**fully (6)**
45:19;46:5;51:17;
52:4;80:21;170:3
**function (3)**
22:7;85:17;172:2
**functioning (1)**
86:25
**functions (2)**
22:20;37:9
**further (2)**
31:7;172:21

## G

**Game (1)**
24:14
**Gather (1)**
56:17
**gathered (1)**
130:24
**gathering (1)**

135:23
gave (5)
  115:15;116:9;146:21;
  154:1;155:5
general (14)
  10:21;13:18;19:1;
  26:24;27:1;31:24;32:1;
  45:3,5;59:9;104:7;
  125:25;154:2;155:6
generalists (1)
  86:21
generally (2)
  44:18;140:20
given (14)
  4:9;30:20;45:13;
  67:11,19;84:2;98:16;
  126:2;131:19;149:23;
  150:7,15;153:23:159:20
giving (2)
  71:23,23
glean (1)
  103:9
Glick (1)
  25:20
goal (2)
  57:6;60:13
goes (1)
  79:14
good (10)
  50:9;52:14;59:13;
  65:23;86:6;93:13;95:20;
  109:15;114:5;143:9
GOSMAN (254)
  4:4;6:7,13;7:14,24;
  11:9,13,17,23;12:3;
  14:21;19:21;21:23;22:9,
  16;23:9;30:9,18;32:15,
  21,25;33:3,7,14,16,18,
  22,24;34:1,12;35:3,5,16,
  22;36:1,4,15,24;37:1;
  38:1;39:4,19;41:17,23;
  42:20;43:2;44:2,25;
  45:4;49:1,3,15;50:3,11,
  12,19,22;51:4,8,15;
  52:13;53:11,18,21;54:3,
  19;58:15;60:3;61:5;
  62:17;63:1;64:2;66:16,
  22;67:13,21;68:2,13,16;
  69:1,6,10,13,17;70:2,15;
  71:1,7,17;72:5,12;73:2,
  7,12,15,18,20:74:9,12,
  19;75:7,14,21,24;77:1,
  10,24;78:14;79:8;80:22;
  81:3,9,21;82:6,17,21;
  83:1,11,13;84:5,15,17;
  85:2,12,20;86:2,6,9,15;
  87:15,16;88:24;89:7;
  92:8,16,21;93:3;95:5;
  97:11;98:21,22;99:16;
  100:18,23;101:1,8,11,
  14,17;102:4,8,11;
  103:16,20;104:10;
  106:12,18;107:1;108:3,

16;109:1,6;112:19;
  113:4,9,13,114:5,8;
  116:11,20;  17:4;118:3,
  8,19;119:6,13,15,22;
  120:1;122:5;124:17,18;
  127:23;128:18;129:5;
  130:22;131:20;133:2,
  23;134:3,14,21;135:1;
  136:15;137:1,3,10;
  138:10;139:18,24;
  141:11;144:7,11;
  145:12;146:4,12;
  147:15;148:12,22;149:6,
  16;150:9,17,22;151:3;
  152:12,24;153:10,20;
  155:24;158:3,8;159:16;
  160:8,19;161:2,20;
  162:1,22:5;163:7,13,
  18,24;164:7,8;165:5,9,
  13,19,23;166:5,10,13,
  19;167:8;168:3,18;
  170:12,24;171:11,12,18;
  172:21
governing (1
  8:18
great (2)
  45:23;143:  0
ground (3)
  47:12;110:5;170:22
group (9)
  12:4;39:9;42:15;87:3,
  5;108:5;136:5,6,9
groups (1)
  87:17
grow (8)
  125:8;127:5;128:8;
  129:13;130 7;145:18,
  23;146:21
growing (1)
  150:18
guard (1)
  46:24
guess (9)
  7:21;36:9;62:9;73:19;
  95:22;149:1;154:25;
  163:14;167 10
guessing (1)
  151:16
gunpoint (1)
  105:8
guns (11)
  67:4;89:14,::1;91:18;
  112:3,4;113:22;147:18;
  150:1;152:15;162:10
guy (1)
  108:22

H

half (4)
  57:9,11;83:10;107:16
Hall (4)
  25:18;41:7;42:1;43:8

Hall's (1)
  41:19
hand (4)
  5:22;32:4;99:23;164:9
Handbook (1)
  8:16
handcuffed (1)
  123:18
handcuffs (2)
  104:18;111:12
handed (2)
  17:25;83:21
handgun (5)
  93:21;109:23;110:4;
  117:23;150:11
handguns (1)
  150:11
handle (1)
  37:20
hands (2)
  47:1;111:11
happen (4)
  66:21;70:14;73:24;
  123:25
happened (6)
  66:6,7;73:22;74:17;
  113:18;159:12
happens (1)
  141:13
hard (3)
  88:11;90:12;114:11
harm (1)
  57:24
hate (1)
  11:9
hauled (1)
  90:4
head (1)
  121:7
health (3)
  130:1;148:10;151:25
hear (1)
  167:9
heard (8)
  4:5;19:11,14,19;27:6,
  13;34:9;167:10
heavily (1)
  31:2
held (5)
  28:13;32:16;105:2;
  109:24;172:25
help (5)
  32:2;102:16;112:16;
  143:4.7
helpful (1)
  143:1
Here's (4)
  96:8;104:11;109:20;
  156:8
Hermann (4)
  115:14;143:2,15;
  153:11
hesitation (3)

72:11;73:9;74:24
hidden (1)
  129:19
hiding (1)
  55:22
high (9)
  28:2,6,12,14;45:8;
  142:5;170:10,13,16
higher (1)
  7:17
high-risk (3)
  21:25;45:14;46:11
Highway (1)
  24:13
hinder (1)
  143:5
hired (4)
  4:16,18,20;5:2
his/her (1)
  61:20
history (13)
  4:13;130:1;148:10;
  149:2;151:9,11,12,15,
  18,23,25;152:6;153:4
hit (1)
  159:7
hold (4)
  11:19;17:19;60:21;
  93:11
holding (1)
  130:4
home (23)
  68:7;69:20;70:6;74:5;
  87:22,24;94:12;96:24;
  97:4;112:1;114:10,12,
  13;125:3;129:9,23;
  147:4;150:2,11;160:5;
  169:3,6,10
honestly (1)
  164:5
honor (4)
  97:25;98:14;100:4;
  109:15
hope (1)
  141:22
hospital (1)
  117:10
hostage (6)
  45:20;46:2;51:18;
  52:2;57:5,12
hosted (2)
  24:21;25:3
hot (3)
  48:1,4,13
hour (1)
  145:3
hours (6)
  9:9,22,25;15:22;16:1;
  29:7
hours' (1)
  42:6
house (55)
  93:23,24;94:1;95:14,

16,20;96:12;101:24;
  102:1;104:17,21;105:20,
  22,24;106:2;107:7,21,
  22;108:8,9;109:22,23,
  25;110:7,9,16,17;
  111:15;112:7,15;
  113:18;120:11,22;121:3,
  4,8,9,11,15;122:4,20,20,
  22;123:10,11,14,16,19,
  20,22;124:2,5,21;
  147:18;152:15
hurry (1)
  56:9
hypothetical (10)
  59:21,24;66:10;67:10;
  69:15,25;71:16,19;
  72:23;109:5
hypotheticals (1)
  71:23

I

idea (7)
  21:3;40:15;82:2,23;
  83:6;114:5;118:16
identified (21)
  6:12,16;10:23;11:1;
  32:18;41:22;43:23:
  46:23;63:22:88:20;97:6;
  100:10;111:9;134:2;
  137:7;148:11;152:14;
  155:11;158:6;161:1;
  164:4
identify (4)
  29:18;31:7;63:20;
  79:12
identity (1)
  75:12
ignition (1)
  114:23
illegal (1)
  149:14
immediate (4)
  42:2;104:20;112:6;
  154:20
immediately (25)
  72:6;73:8;74:5,16,16,
  24;154:8;156:11,17;
  157:18;158:18,23;159:3,
  8,13,19;160:2,17;
  162:11;163:10,14,16,19;
  166:4,24
impact (1)
  14:2
implemented (2)
  79:25;80:1
important (3)
  53:4;67:9;152:3
inaccurate (1)
  160:11
inch (1)
  119:11
incident (24)

44:17,19;45:1,6,7,8;
77:3;78:22;87:7;89:1,9,
19;90:16,17;92:10;
100:20;104:22,24,25;
105:4;115:4;123:5;
170:14,16
**incidents (21)**
37:11,21;57:1;77:15;
78:23;87:11,20,21;
88:11,25;89:6,12;93:10;
97:12;99:7,8;102:20,25;
103:12;151:25;170:11
**include (11)**
14:1,3;18:25;43:14;
45:12,14;88:9;98:8,9;
101:14,15
**included (4)**
19:5;27:18;87:18;
101:7
**including (2)**
17:7;42:8
**inclusive (2)**
11:7,15
**incomplete (11)**
58:12;66:10;67:10;
69:12,15,24;71:16,19,
23;72:22;109:5
**inconsistent (1)**
160:3
**incorporating (1)**
20:14
**incorrect (1)**
162:19
**increase (1)**
37:10
**independent (1)**
147:17
**indicate (8)**
97:9;99:11;111:18;
124:10;148:14;149:18;
150:2,11
**indicated (2)**
38:4;146:14
**indicates (7)**
42:4;89:24;91:9;
106:5;120:5;124:20;
134:10
**indication (1)**
92:22;123:12
**individual (8)**
7:17;13:6,7;17:16;
23:14;86:20;92:23;
111:8;114:9;120:20;
123:7;152:19
**individually (3)**
52:21;54:15,24
**individuals (1)**
53:5
**inform (1)**
162:18
**informant (25)**
126:1,9,11,13,17;
128:9;129:8,17;130:5;

137:24;138:3,20;144:13,
19,23;145:1,8,20 146:3,
7,14,21,23;147:18;
172:13
**informant's (2)**
145:17;147:7
**information (33)**
18:21;67:19,22;59:16;
88:16;93:18;103 12,13;
107:12;113:19;119:8;
125:16,19;126:7,8,10,
20;129:9,11;13( :21;
131:20;134:17;138:4;
140:5:144:20;14 5:7,17,
19;146:20;147:1 5;
148:8,9;172:13
**informed (2)**
111:11;117:19
**in-house (2)**
23:3,8
**initial (5)**
26:17;89:3;125:21;
167:20,21
**initially (5)**
46:3;52:2;140:3
**iuitiate (2)**
46:4;52:3
**initiating (1)**
125:22
**inject (1)**
141:10
**injecting (1)**
143:11
**inquire (3)**
151:13,17;153:3
**inquired (2)**
151:14,20
**inquiries (1)**
153:1
**insert (1)**
154:9
**in-service (15)**
10:20;11:2;12:5 17;
15:21,24;16:7:1 7:7;
20:15;26:24,25:2 2,17;
29:1,3
**inside (3)**
47:9,13;117:16
**instance (6)**
15:7;16:4;17:10.
29:24;30:1;95:23
**instances (1)**
99:1
**instead (1)**
37:16
**Institute (4)**
20:13,20;49:14;63:25
**instruct (1)**
131:16
**instructed (1)**
165:14
**instructing (1)**
36:16

**instruction (1)**
30:25
**instructional (1)**
31:1
**instructor (6)**
13:23;14:11;17:16;
18:3,4,21
**instructors (12)**
13:7,10,11,11;15:4;
17:15,19;18:11,15;30:3;
31:1,3
**instructor's (1)**
30:17
**intelligence (1)**
56:17
**intended (5)**
37:12;54:1;76:16;
77:16;78:1
**intending (1)**
77:21
**intent (1)**
54:22
**intentional (1)**
170:10
**Interdiction (1)**
76:5
**interest (1)**
95:11
**interested (5)**
4:12;22:1;53:13,14;
109:14
**interior (1)**
120:24
**internal (2)**
30:2,12
**interpreted (1)**
79:6
**interrogatories (1)**
112:18
**interview (1)**
128:9
**into (56)**
20:15;28:2,12,17;
34:15;35:11,18;45:17;
47:3,21;48:9;50:16,25;
52:18;56:23;60:6;61:16;
68:7,21;69:20;70:6;
81:17;84:14;87:22;93:4;
95:17;100:7;102:1;
105:9;107:22,22;112:20,
21;114:11,13,15;115:19;
117:5,14;118:11;121:3;
123:20;124:20;130:6;
141:10;143:12;144:14;
160:4;162:6,23;163:4;
164:20;165:4,8,11;167:3
**Intoximeter (1)**
13:15
**introduce (2)**
82:19;140:22
**introduction (1)**
56:22
**invading (2)**

165:16,25
**investigating (2)**
80:21;125:8
**investigation (15)**
25:5,7;37:10;43:12;
91:4;94:3,8,20;95:8;
105:15;109:21;125:22;
126:3;131:17;143:5
**investigations (3)**
37:14;42:6;43:9
**inviting (1)**
136:21
**involve (6)**
46:22;99:1,8;108:9;
112:23;171:6
**involved (38)**
10:5;13:17;19:9;24:3,
18;27:10;31:2;41:7;
87:2,19,20;91:15,24;
95:19;96:18,20;97:17;
99:7,25;100:12;103:1,
21;104:1,8,12,14;
123:13;129:14;135:25;
140:20,21;141:9;
142:20;143:10,14;
167:13,15,18
**involvement (4)**
98:9;127:8,11;133:10
**involves (1)**
47:4
**involving (2)**
27:11;125:9
**issue (3)**
58:18;84:4;166:23
**issued (1)**
8:24
**issues (1)**
64:4
**issuing (1)**
30:20
**item (1)**
61:14
**items (1)**
13:14

**J**

**jail (2)**
112:14;113:17
**January (2)**
19:5,5
**Jeff (1)**
165:7
**job (4)**
5:17,19;7:1,3
**Join (76)**
6:4;7:10,20;19:18;
22:13;23:6;30:15;34:8;
35:9;39:1,16;41:15;
48:23;49:24;52:10;53:8,
24;54:18;58:10;59:22;
60:23;62:23;66:13;
67:17,24;68:12,25;

69:24;70:11,24;72:3,10,
24;73:14;74:14;75:2;
76:23;77:7,20;78:11;
84:23;85:9;92:15;93:1;
95:2;106:21;107:25;
115:25;116:18;117:1;
118:7;121:24;127:18;
129:2;130:19;132:15;
133:1,20;136:12;
145:10;146:1,18;
147:12;148:7,17;149:10,
22;150:14;151:1;152:9,
22;153:19;167:5;
168:14;170:7,21
**joint (3)**
24:3,18;25:3
**jointly (1)**
28:9
**Judge (1)**
147:2
**judgments (1)**
67:1
**Juliet (1)**
25:24
**July (1)**
25:19
**jurisdiction (6)**
138:1,5,9,17;139:3,5
**jury (1)**
163:23
**justified (1)**
73:5
**justify (2)**
45:21;74:3

**K**

**keep (10)**
9:11;15:13;16:18;
17:17;18:4,8;71:21,22;
80:13;111:10
**keeping (2)**
17:3;18:17
**Kelly (3)**
90:21;115:10,11
**Keut (25)**
25:25;100:7;101:19;
108:20;109:21;111:6;
113:15;115:9,10;117:19,
19;120:23,25;122:7;
125:12;126:8;127:8;
129:8,12;131:16;140:8;
143:17;144:1,21,22
**Keut's (2)**
140:13,14
**kept (3)**
12:19;13:6;17:15
**Kevin (1)**
113:25
**key (1)**
47:22
**keys (1)**
91:1;114:21,22;

115:15
kind (18)
16:7;18:17;21:4;
22:14;26:7;38:3;39:12;
45:7;48:18;58:12;65:5;
70:5;89:2;118:13;
137:22;146:13;154:22;
155:5
kinds (2)
12:13;61:7
kitchen (1)
121:2
knew (16)
105:18;127:6;135:25;
136:2,5;140:12;141:3;
145:22;147:22,25;
151:21;160:1;168:7;
169:1,2,4
knock (6)
71:12;75:12;156:7;
157:4;158:17;159:22
knock-and-announce (20)
71:12;72:7,20;73:9;
74:3,22;75:11;96:14;
134:20,21,22,23;141:22;
154:5,7,13,17;156:19;
157:17;159:7
knocking (1)
157:20
knowing (1)
105:10
knowledge (4)
102:23;103:7;153:13;
165:22
known (9)
57:16;68:8;69:22;
92:19;94:14;117:13;
118:9;144:25;145:3
knows (2)
11:6,14

L

landing (1)
132:17
language (4)
91:9,13;124:10;
162:18
lapse (1)
74:16
Lara (9)
25:22;96:11;122:10,
11,19;130:14;145:14;
147:21;148:3
last (20)
16:24;19:12;23:19;
27:6,8;32:24;33:20;
56:13;69:4;75:9;79:16,
22;80:1,2;86:12;94:7;
95:9;99:21;115:7;123:4
later (8)
51:23;101:16;104:19;
129:7;131:25;133:6;

143:21;172:19
latter (1)
62:9
law (8)
5:3;28:14;46:4;52:3;
56:25;57:2;78:5;141:9
lawn (1)
93:23
lawsuit (1)
10:5
lead (2)
65:25;70:18
leader (3)
143:3;169:20,24
leading (1)
65:25
learned (2)
139:11;172.12
least (8)
18:14;21:6;23:4;
76:20;108:19;131:7;
148:3;158:10
leave (8)
10:18;14:15,20,25;
78:4;113:22;114:22;
154:17
LEC (1)
110:6
led (1)
67:3
left (3)
57:1;117:25;141:14
legal (5)
66:12;67:16;68:22;
72:2;75:4
length (1)
34:23
less (6)
13:23;14:1,6;15:8;
16:2;87:17
lesson (10)
43:24;49:6,12;50:6;
51:3,6;79:15,18,21;80:2
lethal (4)
13:23;14:2,6;15:8
level (16)
9:10,24;21:13,18;
22:19,25;23:2,12;26:7;
29:1,2;30:5.25;31:14;
142:9,23
life (11)
45:9;57:22;58:16,18;
59:2,16;61:21,21;62:3,4;
152:19
light (3)
93:11;100:10;111:9
likelihood (1)
37:11
likely (1)
102:23
likewise (1)
25:8
limit (2)

24:16;154:23
limited (3)
28:20;58:12;67:18
limiting (1)
59:7
line (3)
47:7;161:11;163:4
list (3)
18:14;55:5;156:22
listed (3)
50:1;61:14;82:11
listen (1)
74:10
literally (2)
172:5,7
little (3)
5:13;75:18;97:13
live (1)
156:2
lived (2)
105:16;138:8
lives (1)
118:14
loaded (4)
118:12;129:23,24;
150:10
lobby (1)
135:3
lobs (1)
79:9
local (2)
77:16;78:5
locate (1)
124:6
located (1)
101:21
location (2)
69:22;137:25
locked (2)
90:25;115:13
log (3)
9:11;15:13;17:3
long (13)
4:25;38:17;40:13;
43:7;67:4;75:5;89:14,
21;91:17;143:17;
144:25;162:9;168:20
longer (4)
35:20;51:21;52:11;
171:9
look (15)
38:8,11;41:19,24;
63:19;64:11;80:24;
81:15;90:2;101:4,16;
156:21;161:3;162:2;
163:25
looked (4)
33:2;79:15,19;134:4
looking (10)
26:4;76:14;88:10;
89:12;111:17;116:9;
119:20;121:25;127:2;
137:2

looks (5)
13:20;18:24;19:2;
113:14;157:7
lost (1)
49:10
lot (8)
4:7;19 23;107:17;
116:1;129:25;163:14,
15;168:7
lots (1)
61:7
low (2)
46:25;47:22
lower (1)
57:2
Lt (13)
127:8,11,13,24;128:2,
23;135:21;137:8,14;
139:20;140:2;145:16;
146:20
lying (1)
110:1

M

ma'am (1)
166:10
magistrate (1)
165:10
mail (1)
129:19
mainly (1)
13:21
making (8)
7:4;58:17;98:18;
102:10;116:1;131:8;
138:3;147:25
male (3)
117:20,22,23
man (7)
101:23;105:1,16;
111:24;113:21;120:3,5
management (2)
8:13;172:3
mandatory (1)
21:1
manpower (1)
80:12
man's (1)
101:20
manual (8)
8:15;40:20;45:18;
63:24;64:13;81:5;82:13;
172:1
many (5)
45:20;51:18;79:6;
102:20;167:17
marijuana (8)
125:8;127:5;128:8;
129:13;145:23;146:21;
147:4;150:19
Marissa (2)
134:11;135:13

mark (1)
6:15
marked (3)
5:22;32:5,8
master (1)
68:7
material (3)
31:15;49:18;50:24
materials (5)
14:16;18:22;49:17;
60:25;65:12
Matt (1)
120:6
matter (3)
19:1;20:17;147:3
matters (1)
32:12
may (27)
11:1;13:6,8;15:24;
16:8;18:4;23:14;40:9;
41:18;56:9;57:25;58:20;
59:2;60:16;63:12,13,13;
86:17;103:9;106:3;
112:23;113:7;129:20;
142:12;148:11;155:11;
171:10
maybe (4)
18:21;33:7;109:12,18
McCaslin (10)
90:21;91:16;96:10;
115:8,11;120:6;122:9,
18;155:11,13
McGuffey (1)
5:7
mean (38)
6:5;10:9;14:18;21:22,
24;29:23;34:18;39:2,22;
46:15;48:1;49:25;50:17;
51:9;54:14;59:19;61:24,
25;65:5;71:18;75:3;
78:12;81:22;83:21;
85:10;87:6;92:4;104:4;
107:20;126:10;127:10;
146:10;154:19;159:19;
163:11,14;169:23;172:6
means (11)
45:23;74:16;79:23;
112:20,21,25;139:16;
163:10,19;166:24;172:7
meant (9)
39:6;55:4;155:3;
156:16;159:2,9,10,12;
160:16
meantime (1)
50:23
mechanical (1)
169:14
medication (2)
129:18;148:4
meds (1)
129:20
meet (12)
15:21,25;18:4;84:25;

89:12;100:3;106:23;
109:12,17,19;116:6,9
**meeting (1)**
104:9
**meets (2)**
37:18;89:17
**memhers (1)**
140:21
**memorandum (7)**
31:19,19,24;37:17;
38:3,20;40:8
**memorandums (1)**
34:13
**memory (1)**
103:2
**mental (4)**
130:1;148:10,14;
151:25
**mentioned (3)**
12:6;36:6;82:8
**met (2)**
109:11;148:23
**method (2)**
118:15,16
**methodical (1)**
57:3
**methodology (1)**
94:10
**Michael (1)**
158:9
**midafternoon (1)**
125:9
**middle (1)**
137:22
**might (12)**
25:16;29:6,6,7;70:16,
18;101:4;105:22;
112:16;128:22;142:2;
143:18
**Mike (2)**
25:18;143:22
**mind (6)**
21:4;37:2;66:8;67:6;
70:17;84:6
**Miner (27)**
14:1,9;15:8;29:25;
95:19;109:23,24;110:4,
9;120:23;123:10,16;
125:11,12;126:7;127:4,
5,7;130:10;135:22;
136:8,20;137:15;
138:23;139:21;144:25;
172:12
**Miner's (1)**
14:14
**minimum (6)**
9:22;15:22;81:16;
82:11;83:16;84:7
**minute (10)**
29:19;32:24;33:3;
35:8;48:8;49:16;64:24;
81:15;121:13;154:11
**minutes (5)**

29:7;36:12,23;110:2;
123:6
**Misha (2)**
164:11,14
**missing (4)**
11:21;12:1,3;170:25;
171:2
**mission (1)**
57:7
**misstated (1)**
49:4
**misstates (18**
19:17;38:2,;41:14;
42:24;66:10,67:8:73:11,
12;100:16;108:24;
127:17;132,14;136:11;
139:14;145,25;148:6;
152:21;159,4
**misstating (1)**
77:23
**mode (1)**
46:21
**moment (17)**
10:17,25;12:6;17:24;
40:20;43:21,56:24;64:9,
11;86:1,4;96:23;104:6;
153:15;158.5;159:22;
164:18
**months (1)**
5:7
**moot (1)**
65:5
**more (9)**
18:25;48:16;51:9;
67:9;96:4;113:2;143:12,
22;145:20
**morning (2)**
105:3;109:22
**most (9)**
13:18;23:7;64:6;
88:25;96:3;,02:23;
110:14;116,22;144:22
**mother (1)**
129:20
**move (3)**
57:19;79:11,84:16
**moved (4)**
28:2,6,12,1,
**movement (6)**
61:7;112:22,113:12;
116:7;124:6,6
**much (9)**
19:2;49:18;,6:17;
65:12;125:1,127:3,4;
153:23;171:9
**multiple (2)**
89:14,21
**munitions (3)**
14:2,6;15:9
**must (2)**
60:15;154:16
**mutual (1)**
31:22

**mutually (1)**
27:24
**muzzle (4)**
46:24;47:5,11,13
**myself (4)**
64:8;75:19;103:17;
120:24
**MySpace (1)**
130:3

# N

**name (4)**
123:17,18;161:11;
164:12
**named (1)**
161:9
**names (1)**
93:12
**narcotics (1)**
37:14
**narrow (1)**
59:25
**National (3)**
32:22;34:4;82:12
**nationally (2)**
81:19,22
**nature (2)**
7:22;16:8
**near (2)**
104:13;109:25
**nearly (2)**
108:18;131:3
**necessarily (2)**
21:5;166:11
**necessary (1)**
131:5
**need (18)**
32:3;39:13,24;40:5;
46:3;47:23;48:10;50:17;
52:2;60:1,13;67:22,25;
71:17;110:11;136:24;
171:10;172:23
**needed (4)**
22:21;120:13;137:15;
147:9
**negotiator (1)**
105:7
**neighhorhood (2)**
120:13,14
**neither (3)**
41:5,7,8
**nevertheless (2)**
39:24;87:18
**new (9)**
10:15,18;28:2,12,14,
15;52:6;53:19;164:1
**next (6)**
35:7;60:4;113:20;
120:17;122:6;123:4
**NFDDs (1)**
14:2
**NFDT (1)**

30:1
**night (10)**
73:4,23;78:17;91:18;
153:24;157:17;166:24;
167:19;170:4;171:2
**noise (4)**
14:3;15:9;61:7;157:11
**no-knock (3)**
154:1;171:14,16
**None (7)**
72:14,15;77:14;99:14,
19;112:10,12
**nonspecific (2)**
32:1;104:7
**Nope (1)**
122:5
**nor (3)**
54:8;83:8;127:20
**normal (1)**
171:1
**Normally (1)**
141:7
**northwest (1)**
143:3
**note (3)**
33:1,10;41:4
**notebook (3)**
14:14,18;137:5
**noted (2)**
8:17;36:19
**notice (6)**
40:21;46:1;76:13;
79:21;137:13;158:15
**noticed (2)**
17:11;120:2
**November (6)**
23:4;36:3;75:23;86:8;
119:24;173:4
**NTOA (9)**
32:5,7,80:25;81:21;
83:4,17;84:2,3;88:19
**NTOA's (2)**
83:21,23
**number (30)**
9:22;10:14;15:22;
31:25;40:15;54:7;64:15;
78:19;89:1;90:18,22,22;
93:16,25;107:9;111:5;
117:20;120:3,18;129:14,
15;157:1,4,5,6,7,9,11,12,
14
**numbered (1)**
81:13
**numerous (1)**
134:7

# O

**oath (1)**
101:13
**Object (72)**
7:9,18;19:16;21:20;
22:8,11;36:9;38:24;

41:13;44:20;48:21;52:8;
59:19,21;62:15,21;66:9;
67:7,13;69:8;70:9,21,22;
74:7,25;76:21;77:5,18;
78:9;79:4;80:17;84:10,
11;92:6,13;94:25;98:19;
99:3;100:14;102:2;
103:14,18;106:16,20;
107:23;108:14;109:4;
116:16;118:1;121:17,
22;124:12;127:16;
128:14;132:13;133:18;
136:10;137:20;145:24;
146:8,17;148:5;149:9,
20;152:7,20;157:25;
159:1;167:25;168:12;
170:5,19
**objected (2)**
69:11;71:18
**Objection (67)**
6:3;23:5:30:8,14;34:7;
35:10;39:15;49:23;53:7,
17,20;54:17;58:9;60:22;
67:23;68:10,11;69:23;
71:4,15:72:8,9,22;73:10,
18,19;74:8,9;75:1;
83:18;84:22;85:8,18;
92:18,25;99:5;103:23;
106:11;108:25;115:24;
116:25;118:6,18;
121:16;129:1;130:18;
132:25;134:18;139:13,
23;145:9;147:11;
148:16;149:4,5;150:4,5,
13,21,25;153:5,18;
158:25;160:6;161:18;
165:16;167:4
**objective (10)**
65:9;68:3;97:6;106:9;
108:17;109:2;149:19;
150:3,12,19
**objectively (8)**
65:17;66:2,7;67:5;
68:6;71:10;72:17;
159:20
**observe (1)**
47:1
**observed (2)**
120:20;121:4
**observing (1)**
136:19
**obtain (1)**
140:5
**obtained (2)**
29:25;130:11
**obviously (2)**
13:10;27:24
**occupants (4)**
63:18;93:24;117:24;
158:24
**occurred (6)**
19:13;23:2;24:24;
124:9,11;159:21

**October (1)**
    33:5
**off (12)**
    5:23;18:9;32:15,16;
    46:23;90:4;117:23;
    141:17;157:13;171:10;
    172:9,25
**offensive (1)**
    119:14
**offer (1)**
    145:21
**offering (1)**
    36:12
**office (11)**
    11:16;24:12;31:20;
    38:5,21;39:8,25;122:10;
    127:22;133:9;139:6
**officer (93)**
    9:1,4,14,19,24,25;
    10:15,18,21;14:1,9,14;
    15:8;25:4,20,22,23;
    26:17;27:5,6,8;29:25;
    34:2;36:5;37:2;41:7,7;
    42:1,12;43:8;51:11;
    52:23;61:3;65:9,17;
    68:14;75:8;81:12;84:2;
    91:24;95:19;96:10;
    101:25;102:13;103:10;
    104:17;105:8;110:4,6,
    18;113:23;115:1;
    117:17,18;122:7,13,14,
    18;123:16;125:11,12,18;
    126:7;127:3,5,7;130:10,
    14,14;131:3;135:22;
    136:8,8,16,20;137:15;
    138:23;139:20,21;
    141:9;145:21;146:6;
    147:21;148:19;152:18;
    155:11,13;156:9,10;
    158:22;167:1;171:24;
    172:12
**officer-involved (1)**
    91:3
**officers (122)**
    7:7;8:2;10:5;13:17;
    17:9;20:4,10,23,24;
    22:18;23:11,14,23;24:2,
    10,14,18,20;25:2,6,10;
    26:14,22;29:13,20;
    32:22;34:5;41:4;43:25;
    44:4;46:10;48:16;52:4;
    54:6,8;63:6,17;66:1;
    67:2;71:12,14;74:4;
    78:16,24,24,25;79:2;
    82:12;85:1,10;86:21;
    87:2,6,12,18,18,23;
    88:12;89:14,21,25;90:1,
    20;91:6,11,15,22;92:1,
    24;93:5,25;94:20,23;
    96:17,19;97:4,16;99:7;
    100:1,11,13;103:2;
    104:2,8;106:14;108:21;
    111:10;112:8;113:1,2,

**15;114:12,24;1** 5:4,9;
    117:5;118:10;119:4,18:
    120:4;124:2;130:24;
    132:4,24;133:9 15;
    134:11,16;135:12;
    145:19;147:10;148:15;
    149:8,19;150:3 12,20;
    162:9;167:17,23;168:6,7
**officers' (1)**
    19:19
**officer's (3)**
    9:10,11,16
**official (2)**
    41:1;161:9
**officially (1)**
    17:21
**Ohio (1)**
    5:8,9,14
**old (2)**
    28:6,18
**once (4)**
    26:14,20;51:9;105:10
**one (77)**
    4:7;6:8,25;15:2 ;22:1;
    24:24;26:2;27:8 28:5;
    32:2;33:5;35:4;. 7:23;
    40:22;44:13;46:21;
    47:15;52:24;57:22;
    58:11,19,25;61:17;79:9;
    89:11,16;91:8;9 1,24;
    94:7:95:9;99:21 25:
    100:9,20;101:22;
    102:13;104:11;106:2;
    107:2,3,4;108:18,19,21;
    109:20,20;110.7 11,14,
    15,23;111:4;8:1 .2:2;
    117:11,13;119:18;
    121:12;122:24;123:5,
    15;135:19;140:19;
    143:20;149:24;150:8,
    16;152:10;154:9;
    164:13,21;166:6,12,16;
    169:21;172:15
**ones (6)**
    31:10;94:17;98: 3;
    111:3;119:5;157:1
**ongoing (5)**
    12:15;13:18;16:5;
    20:8;26:23
**only (17)**
    6:15;22:1;35:3,19;
    37:22;62:7,10;91:8;
    96:12;106:2;110 24;
    113:17,19;138:2;142:4,
    20;147:6
**onto (1)**
    91:10
**open (8)**
    48:14;71:14;109 25;
    141:15,22;156:7
    158:18;162:11
**opened (1)**
    90:24;110:2,19;123:7;

**154:8;159:8**
**opening (1)**
    157:20
**operate (1)**
    85:11
**operating (3)**
    85:6;86:25;87:7
**operation (8)**
    94:8;106:15;125:9;
    129:14;130:8;145:6,18;
    146:22
**operational (1)**
    87:4
**operationally (2)**
    85:17;88:5
**operations (7)**
    13:13;21:6;37:22;
    85:6;127:5;128:9;
    145:23
**operator (1)**
    13:15
**opinion (2)**
    75:4;142:25
**opportunities (1)**
    29:4
**opportunity (15)**
    23:14;34:20,21;35:2,
    6;81:8,25;82:1,7;83:7;
    84:14;144:15;160:20;
    161:15,21
**opposed (1)**
    37:9
**opposite (1)**
    142:15
**option (5)**
    131:7;134:13;135:7;
    140:16;142:5
**options (14)**
    56:8;129:10;130:12;
    132:17;134:10;135:19;
    140:8,17,19;141:21;
    143:18,19,21;144:3
**order (4)**
    31:15;149:7;156:23;
    160:4
**ordered (1)**
    110:5
**orientation (2)**
    10:15;26:18
**original (5)**
    44:11,13;72:16;90:14;
    101:5
**originally (2)**
    5:2;54:1
**others (3)**
    18:11;57:24;63:6
**ourselves (2)**
    100:10;111:10
**out (55)**
    5:3;6:21;8:6;10:18;
    28:6;30:20;32:2,10;
    36:21;46:10;47:6;48:15;
    51:23;56:9;57:13;60:18;

**82:20;84:1;86:3;88:14;**
    92:9,10;93:23;94:13,19;
    96:17;98:15;101:24;
    103:1;104:17;106:7;
    107:6,7;108:8,11,23;
    110:3,11,16;111:12,25;
    113:21;119:21;120:5;
    123:17;126:20;129:25;
    138:8;139:12;140:5,24;
    142:10,16;168:7;169:10
**outdated (7)**
    49:17,18,20;50:16;
    51:1;58:12;79:15
**outer (2)**
    47:24;48:11
**outline (1)**
    79:19
**outlined (1)**
    58:3
**outside (13)**
    13:9;46:24;93:22;
    104:15;105:5,7;106:8;
    111:25;114:10;123:7,18,
    19;138:9
**over (27)**
    4:6,6;17:25;18:10;
    19:12;23:18;25:2;28:10;
    46:5,25;52 4;74:12,12;
    91:4;108:15,15;111:6;
    124:13,13,13;133:11;
    138:16;143:23;154:2;
    166:2,3;168:10
**overcome (1)**
    60:16
**overnight (1)**
    105:2
**oversee (3)**
    31:9;131:17;169:22
**overtime (2)**
    139:2,7
**overview (2)**
    155:6;156:5
**own (5)**
    13:8;18:5;37:16;
    61:20;113:8
**owners (1)**
    110:7

**P**

**page (38)**
    32:10;34:2;35:6,7;
    36:7,8;44:15,17;47:17,
    19;50:13,25;51:12,17;
    52:15;56:20;60:5,7;
    63:23;64:7,10,13,15,21;
    76:2,14;79:21;81:11,12,
    12;84:8;115:8;117:18;
    121:1;138:22;156:23;
    162:5;164:3
**pages (4)**
    34:22;35:4,14,15
**paperwork (1)**

**16:11**
**paragraph (50)**
    8:7,8;34:16;36:6,17;
    37:3;45:11,16,18,25;
    47:19;48:3,7;49:20;
    50:15;52:16,19,25;55:2,
    14,16,21,25;56:16,22,
    23;57:20;58:3;60:4;
    81:13;82:8;83:15,20;
    95:9,12;123:15;137:14,
    18,19;138:22;158:16;
    162:4,6,7,13,14;164:17,
    17,19,20
**paragraphs (3)**
    48:17;52:17,25
**parameters (2)**
    60:1;98:2
**paranoia (3)**
    149:14,24;152:14
**paranoid (3)**
    129:24;147:19;149:18
**parent (2)**
    141:9,19
**parentheses (2)**
    157:8,10
**parenthesis (2)**
    48:11;157:12
**parents (6)**
    140:25;141:1;142:9,
    10,14,17
**Park (12)**
    24:12,19;31:20;38:5,
    21;39:7,25;40:16;
    122:10;127:21;128:13;
    138:8
**parking (1)**
    107:17
**part (16)**
    12:16;13:2;17:15,20;
    26:22;27:17;42:11;
    86:19,23;95:12;120:16;
    151:9;155:2;167:22;
    169:4,17
**participate (1)**
    44:9
**participated (1)**
    24:10
**particular (7)**
    49:19;63:9,10;85:10;
    97:5;103:6;104:22
**particularly (3)**
    4:12;140:25;141:1
**particulars (3)**
    18:25;99:20;102:22
**parties (1)**
    164:13
**part-time (1)**
    5:13
**past (3)**
    26:14;65:6;151:7
**Patrol (11)**
    20:18;24:13;41:8;
    42:2;76:2,5,11;78:24:

Tricia Wachsmuth v.
City of Powell, et al.

79:2;114:12;155:16

**Patterson (15)**
127:8,13,24;128:2,23;
135:21;136:8;137:14,
14;139:20;140:2;
145:16,21;146:6,20

**Patterson's (3)**
127:11;136:16;137:8

**Paulding (1)**
5:14

**pay (1)**
114:4

**paying (1)**
68:22

**PD (1)**
24:19

**peace (4)**
9:4,25;65:9;148:18

**peek (3)**
43:4;95:7;129:25

**pending (2)**
35:21;125:5

**people (8)**
31:10,12;54:10;94:2,
16;148:19,23;163:15

**Per (3)**
30:19,20;89:1

**percentage (1)**
43:17

**perfectly (1)**
71:19

**perform (4)**
22:6;54:9;78:17;136:3

**performed (1)**
87:3

**perhaps (4)**
27:13;30:12;108:21;
152:14

**perimeter (4)**
47:24;48:11;169:2,6

**period (7)**
5:11;19:9;26:15;78:1;
132:23;159:11;163:20

**periodic (1)**
20:15

**person (18)**
6:9;30:6;40:23,25;
52:21;54:15,24;95:17;
123:17;148:14;149:17;
150:1,10,18;152:17;
154:3;155:8;172:7

**personal (2)**
142:8,23

**personally (3)**
18:7;103:21,25

**personnel (2)**
9:16;139:2

**persons (2)**
63:12;118:9

**person's (2)**
61:21;62:3

**pertain (2)**
6:23;34:14

**pertains (2)**
19:23;77:3

**philosophy (2)**
76:2;77:22

**phone (9)**
131:25;133 5;135:9;
143:17,25;144:17,18;
157:17;172 16

**photographed (1)**
114:23

**photos (1)**
33:12

**picked (1)**
95:13

**picture (1)**
130:2

**pictures (1)**
123:11

**PIER (11)**
76:1,5,6,7,9,11,15,16,
20;77:22,25

**place (16)**
16:22,23;18:3;29:14;
30:11;40:22;38:13;95:4;
97:22,23;115:22;
124:22;131:12;139:12;
167:14;172 14

**placed (6)**
47:8;54:10,11;111:12;
121:10;129:22

**places (2)**
63:12,13

**plaintiff's (2)**
161:17;162:3

**plan (42)**
43:24;49:6,12;50:6;
51:7;60:13,15,17,20;
79:15,18,22 80:2;
130:25;131:18,21,23;
132:10;133:6,12,17,22;
143:23;153:16,17,24;
154:2;155:2,4 ;156:5,6,6,
11,19,24;158:16;159:7;
169:5,9,17,22,25

**planned (4)**
108:13;157:17;170:9;
171:2

**planning (3)**
34:25;131:1 ,,12

**plants (2)**
129:14,16

**pleading (1)**
166:1

**please (10)**
47:21;48:9;61:16;
67:14;74:10,11;79:13;
119:11;141:5;164:20

**plus (1)**
18:21

**pm (8)**
36:2,3;75:22,23;86:7,
8;119:23;17.:4

**point (16)**

8:6;38:15;65:5;79:14;
82:3;91:1;92:4;128:20;
129:4;131:15;133:7;
135:15,16;138:7;139:9;
171:17

**pointed (1)**
110:4

**pointing (4)**
46:22;47:13;66:1;
157:7

**Police (89)**
4:14,16,17,18,19,21,
23,25;5:8,9,14,16;6:2,
10,17,22,24:7:5,7,15,17;
8:1,10;9:1;10:7,21;12:7;
15:4;17:25;20:3,9,22;
21:7;22:4,19;23:3,11;
24:2,9,12,18;26:24;27:1;
29:20;31:18;38:7;40:16;
43:25;44:4;67:2;74:6,
23;75:15;78:24;80:7;
84:19;85:5;89:9;94:24;
100:1,11;101:25;
111:10;112:2;113:5,23;
114:1,13;115:18;
121:22;122:13;130:16;
131:3;135:13;138:12;
140:3;147:9;149:8,19;
150:3,12,19;152:18;
156:12;157:5;158:17;
162:10;168:6,10

**policies (14)**
6:18,23;8:11,14,19,20,
23;30:12;40:22;65:7,8;
107:18;126:12,21

**policy (11)**
6:9,19;7:25;8:3,7;
18:13;40:20;41:1,1;
127:1;172:1

**policymaker (2)**
6:1,6

**porch (5)**
104:15,18;105:8;
107:8;111:25

**portion (3)**
8:5;36:14;76:15

**portions (2)**
82:16;84:12

**position (9)**
5:17;36:20;46:9;47:2,
4;52:22;54:16,25;
142:10

**positions (4)**
46:21;47:16;53:5;
109:24

**possess (1)**
54:8

**possessed (1)**
129:10

**possession (1)**
149:14

**possibility (2)**
59:2;117:15

**possible (5)**
7:22;40:1;56:17;
135:18;140:6

**Possibly (4)**
70:1,4,16;117:22

**POST (28)**
9:8,12,13,19,23,25;
10:3,4,10;15:15,19;
23:10,16,19,23,25;26:5,
10,12;41:3;42:5;9,13,16;
43:1;107:13,15;120:7

**POST-certified (1)**
41:9

**potential (5)**
46:20;56:1;132:18;
141:15;142:2

**potentially (6)**
45:9;63:11,11;109:17;
140:23;169:5

**Powell (65)**
4:14,17,18,25;5:4,10;
6:1,10,17,22,23;7:5,6,15,
16;8:10,16,10:7;12:7;
15:4;20:3,9,21,22,22;
21:6;22:19;23:3,11;
24:2,9,17;27:13;29:20;
31:18;38:7;43:25;44:4;
75:15;80:7;84:18;85:5;
89:9;94:23;100:1;
101:25;113:5,25;
114:12;115:17;122:13,
16;126:12;131:3;
137:16;138:12;139:10,
11;140:3;147:9;161:8,
12,13;168:6,10

**power (1)**
79:14

**practice (4)**
18:10;20:16;28:24;
139:6

**preclude (2)**
37:13;117:15

**prepare (4)**
57:11,13;98:12;
135:14

**prepared (3)**
134:12,158:9;166:13

**preparing (1)**
146:16

**prescription (2)**
129:18,20

**present (12)**
45:22;68:8;69:21;
70:8;73 1;102:21;123:5;
149:18;150:2,19;167:1,6

**presented (4)**
63:18;65:18;106:24;
131:20

**presume (2)**
118:10;120:15

**presumed (1)**
117:2

**presumption (1)**

120:16

**presumptions (1)**
116:2

**pretty (5)**
5:3;7:11:19:2;65:12;
93:12

**previous (1)**
8:20

**previously (4)**
36:6;50:16;84:13;
114:10

**primarily (1)**
27:3

**primary (7)**
34:16;36:7;37:4,6;
78:20,22;162:8

**principle (6)**
53:16;60:24,25;61:9,
22;156:24

**principles (6)**
53:15;58:2;60:5,9,21;
105:14

**prior (18)**
18:12;25:10,19,22,23,
24;29:21;42:3;80:3;
82:4;87:24;100:16;
130:1;132:17;147:25;
148:9;151:8;153:4

**privilege (2)**
165:17,25

**probable (1)**
63:4

**probably (6)**
16:10;29:9;78:20;
102:20;128:17;133:14

**probationary (1)**
26:15

**problem (5)**
46:3;81:24;82:5;
120:12;144:12

**procedure (2)**
46:14,16

**procedures (13)**
6:10,18,23;8:11,14,19,
21,23;30:2,13;40:20;
126:13;172:1

**proceed (1)**
35:14

**Proceedings (1)**
173:3

**process (12)**
30:4;24;48:18;105:6;
130:10,21,23,24;133:8;
135:15;138:7;171:23

**produce (2)**
38:14;130:14

**produced (5)**
36:22,23;119:2,19;
124:14

**production (1)**
124:15

**Professional (2)**
9:25;142:24

**program (15)**
10:15,16;20:2,19,23,
24;21:1;26:13,16,17,18,
20,22;43:14;46:8
**programs (1)**
10:8
**progressed (1)**
18:20
**prone (1)**
123:17
**proper (2)**
55:6,10
**property (1)**
45:10
**proposed (1)**
79:24
**protect (2)**
63:13;142:18
**provide (13)**
15:4,19;21:13;22:18;
26:23;27:1;30:25;33:13;
44:4;78:21;84:25;
127:14;139:21
**provided (22)**
10:3;11:8,16,22;12:6,
12,21;17:8,9;18:15;
27:18;33:23;36:11;
43:25;49:8,13;54:6;
64:1;84:13;109:18;
145:19;160:16
**provider (1)**
31:7
**provides (1)**
20:10
**providing (2)**
20:2;138:19
**pull (1)**
84:1
**purely (1)**
142:24
**purpose (7)**
22:24;34:19;36:13;
37:10;75:13;84:11;
109:3
**purposes (1)**
27:24
**put (11)**
9:16;11:4,11;20:19;
43:11;79:2;91:22;96:19;
98:3;104:18;163:23

11:23
**Queens (2)**
115:12;117:21
**quick (1)**
172:23
**quickly (1)**
140:24
**quite (1)**
17:23
**quote (1)**
143:7

**R**

**ram (9)**
74:5,24;87:23;88:2;
89:14;158:19,22;159:8;
162:11
**ramblings (1)**
114:3
**rammed (2)**
71:14;72:6
**Ramming (1)**
73:8
**ran (1)**
143:23
**range (3)**
10:22;57:14;140:17
**Rapid (10)**
61:7;112:21,22;
113:11,12;116:6,6,14;
124:6,6
**rapidly (2)**
47:7;143:15
**rather (1)**
51:19
**reach (1)**
103:1
**read (48)**
8:4;34:15,2 ;35:6,13,
15,18;36:5,16,20;37:3;
45:17;47:21;48:9;50:16,
20,22,25;51:16;52:17;
56:23;57:20;50:6;61:15;
68:16,18;81:16;82:16,
19;83:16,19;84:7,12;
85:20,22;86:11,13;
93:12;108:19;112:16;
156:25;159 14,14;
162:5;164:19,22;172:8;
173:2
**reading (8)**
35:11;36:10,13,21;
83:15;84:15;117:17;
120:25
**ready (2)**
47:4,9
**really (18)**
19:22;38:16;40:3;
55:7;69:5;70:15;71:17;
73:23;92:9; 02:10;
118:16,25;147:6,13;
166:24;167 10,11;

**Q**

**qualification (3)**
16:5,6;80:15
**qualifications (1)**
89:13
**qualified (9)**
15:15;47:25;52:20,22;
53:5;54:12,15,24;78:6
**qualify (3)**
30:6;84:25;97:17
**quarrel (1)**

171:11
**realm (1)**
13:9
**rear (1)**
169:10
**reason (3)**
82:10;83:3;111:1
**reasonable (13)**
65:9,17;71:11;72:17;
75:13;154:17,24;
157:21;158:23;159:11,
20;160:4;163:20
**reasonableness (2)**
65:9;68:4
**reasonably (2)**
61:19;62:1
**recall (2)**
100:2;168:15
**receive (1)**
26:8
**received (2)**
31:13;172:12
**receiving (1)**
129:18
**recently (1)**
134:5
**recertification (3)**
9:3,6,23
**Recess (4)**
36:2;75:22;86:7;
119:23
**recognize (2)**
34:4;93:9
**recognized (2)**
81:19,22
**Recognizing (1)**
79:5
**recollect (1)**
50:23
**recollection (7)**
89:6;91:6,21;96:15;
99:8;114:14;115:3
**recommended (1)**
83:21
**record (43)**
10:10;11:6;12:14;
15:13;16:13;23:19,22,
25;24:1;26:5;32:15,17;
33:1,9,11,13;34:15;
35:11,19;42:4,10;43:1,4,
6;45:17;47:21;48:9;
50:16,25;52:18;56:23;
60:6;61:16,68:18;81:17;
84:14;85:22;86:13;
89:23;102:4;162:6;
164:20;173:1
**recordkeeping (5)**
13:8;16:22,23;18:2;
19:8
**records (31)**
9:20;10:2;11:2;12:11,
16,18;13:2,6,20;16:18;
17:4,11,14,14,17,24,25;

18:5,17;19:7:23:16,23;
26:11,12;27:2;41:3,19,
24;42:13,16;172:3
**redact (1)**
114:3
**redacted (4)**
90:13,22;123:17,18
**redaction (1)**
93:12
**redo (1)**
26:21
**refer (3)**
29:14;39:9;136:23
**reference (6)**
35:4;111:2,14;113:8;
121:14,20
**references (1)**
35:18
**referred (2)**
90:18;100:19
**referring (2)**
30:3;137:23
**reflect (4)**
10:3;11:2;12:5,8
**reflected (4)**
10:10;17:5;23:25;
26:10
**refused (1)**
120:21
**regard (3)**
8:1;41 3;86:23
**regarding (9)**
7:6;18 25;19:20;
23:24;31:24;93:18;
115:1;128:8;134:17
**regards (2)**
49:21;163:6
**regimen (1)**
80:15
**regularly (1)**
27:25
**regulations (5)**
8:12,15,20,21,23
**relate (1)**
76:20
**relationship (1)**
135:9
**relative (4)**
8:1;19 13;23:2;29:21
**reliability (4)**
145:17;146:3,23;
147:7
**reliable (1)**
146:15
**remain (1)**
118:12
**remainder (1)**
162:12
**remained (1)**
65:11
**remember (37)**
16:3;19:4;25:17,20;
28:4;90:9;92:2,10;

94:21;97:1;98:1;99:12;
103:10;104:22;106:3;
114:19;121:6;125:13,24,
25;127:24;128:19;
129:15;136:19;143:16;
151:14,21,22,24;152:2;
153:7,14;155:12;
168:21;169:12;171:20;
172:11
**removed (9)**
65:8,13;92:17,20;
104:19;108:18;109:2;
118:9;121:9
**repeat (1)**
159:6
**repetitive (1)**
16:8
**replaced (1)**
65:8
**report (45)**
89:3,9,24;90:2,25;
91:7;93:6,20;94:22;
95:8;96:20;97:9;98:10,
12;100:6;103:9;106:13;
110:18;111:21;114:11;
117:18;118:20;120:17;
121:1,15;123:1,3,12;
124:10,19,23;125:21,23;
129:13;134:12;136:16,
20;137:9;158:5;159:14,
23;160:2,17,21;172:8
**reported (2)**
105:3;129:17
**REPORTER (4)**
49:10;68:16;85:20;
86:11
**reports (14)**
94:7;97:12,18;99:10,
14,19;103:13;104:7;
112:10;115:8;119:2;
121:19;171:24,24
**represented (2)**
64:20,22
**represents (1)**
148:15
**request (21)**
33:2,11;38:13;96:16;
97:11,24,25;98:2,14;
100:4;101:5,10;102:25;
103:4;106:23;109:10,
16;116:4;124:5;136:14;
138:6
**requested (8)**
68:19;85:23;86:14;
115:9;122:7;125:17;
139:9,20
**requesting (3)**
137:16;138:13,15
**requests (2)**
119:3;124:15
**require (3)**
45:23;46:2;47:12;
52:1;80:20;106:10

**required (4)**
9:22.25;18:8;75:12
**requirements (8)**
9:4,7;15:20;18:3;19:9;
84:20;156:18,20
**requires (1)**
9:8
**requiring (1)**
88:1
**rescue (6)**
45:20;46:2;51:18;
52:2;57:5,12
**reservations (1)**
84:6
**residence (26)**
63:18;71:14;73:4;
74:4;78:18;89:21,22,25;
94:16;105:5,11,12,13,
15;107:14;108:13;
111:19;112:5,21,22;
113:15;115:5;122:25;
139:11;169:23;171:3
**resolve (3)**
46:3,6;52:5
**resolving (1)**
37:11
**resources (4)**
39:14;77:15;78:7;
80:12
**respect (1)**
6:22
**respond (6)**
40:1;46:3;52:3;91:22;
113:7;160:14
**responded (2)**
33:12;105:4
**responding (1)**
164:14
**Response (14)**
20:18;21:5;46:4;52:4;
56:25;76:6,11;79:3;
101:6;116:14;136:6;
143:7;162:7;164:24
**responses (1)**
57:14
**responsibilities (1)**
26:23
**responsible (3)**
31:11;142:13;169:22
**responsive (3)**
101:10;112:17;124:15
**rest (1)**
94:1
**restate (4)**
20:5;22:14;68:15;
77:13
**restroom (1)**
119:21
**result (1)**
57:12
**results (1)**
60:20
**retain (1)**

9:15
**retaining (1)**
18:13
**retrieviug (1)**
114:21
**reverse (1)**
59:20
**review (10)**
35:2;81:8,25;82:7;
83:7;84:14;120:4;
131:21,23;166 17
**reviewed (6)**
98:4;112:11;162:14;
165:24;166:7;  72:8
**reviewing (3)**
23:16;87:11;90:13;
127:1;165:25
**reviews (1)**
20:17
**revisited (1)**
40:14
**ridiculous (1)**
51:13
**rifle (5)**
47:5,10,13;93:21;
109:22
**rifles (3)**
67:4;130:4;168:20
**right (134)**
5:25;6:14;7:4;10:21,21;
10:2;12:9;13:1,4;14:13;
15:17;17:6;18:5;19:7,
22;20:11;21:1;22:22;
24:16;25:1;26: .3;27:9;
28:6;30:22;31:17,18;
33:16,24,34:13;36:24;
38:2,13,19;39:11,20;
43:3,20;44:12;45:11,16;
46:19;48:7,17;49:19;
50:8,11;51:23;53:12;
54:23;55:14;56:19;57:4,
19;58:2,7,19;61 13:64:3,
16;65:23;67:13;69:18;
75:18;76:4,18;77:25;
80:5,14,23;81:20;83:11;
86:4;87:2,17;88:10,14;
90:15,24;91:14;92:3;
95:18,20;96:21;97:3;
98:7,21;99:12,  3;
101:21;102:4;103:25;
104:5;106:4;108:4;
111:22;112:13;119:16;
122:17;123:24.124:8;
125:13,23;128:12;
129:15;133:24 134:4;
135:2;137:1;139:4,19;
140:11,18;141:2;
142:11;147:3;1.48:2,13;
149:17;154:14;156:14,
21;157:15;158:14;
159:17,23;160:1;161:3;
163:7,13,21,25.164:16,
24;166:22

**right-hand (2)**
156:23;157:2
**risk (6)**
45:9;63:6;142:2;
170:10,13,16
**risks (1)**
118:14
**Riverton (2)**
42:7;43:9
**roaring (1)**
5:23
**role (1)**
128:5
**roles (2)**
54:9;134:16
**room (23)**
27:11,19;28:24;43:14,
18;46:8,11;100:10,13;
106:15,15;107:18;111:9,
19,19;112:9;116:15;
120:11,20;122:22;
123:13;124:21;167:3
**room-clearing (2)**
92:11;115:21
**rooms (1)**
122:3
**rosters (1)**
19:6
**rotate (1)**
47:12
**round (2)**
117:24
**routine (1)**
48:14
**rule (2)**
71:11;72:18
**rules (6)**
8:12,14,19,21,23;
124:16
**run (2)**
142:2;146:22
**run-down (1)**
154:1
**rural (1)**
22:4
**rush (1)**
47:22

**S**

**safe (4)**
90:23;103:11;118:14;
131:19
**safely (1)**
37:11
**safest (2)**
116:22;140:6
**safety (4)**
45:9;46:23;58:18;
148:20
**same (22)**
4:5;5:19;8:22;68:10,
11;71:4,15;72:9,22;

74:8;75:1:81:22;108:12,
25;117:17;150:25;
151:2,5;164:21;171:5,7,
21
**Sapp (1)**
104:17
**satisfactory (1)**
71:20
**saw (2)**
91:22;136:19
**saying (14)**
16:17,18;18:1;38:10,
11;49:17;66:6;74:15;
91:12;96:6;97:24;
160:13;161:21;162:25
**scanned (1)**
82:9
**scenario (1)**
67:3
**scenarios (1)**
59:20
**scene (5)**
91:10,10;104:19;
120:4;167:23
**SCG (1)**
39:5
**schedule (1)**
15:23
**Schmidt (2)**
113:25;115:1
**school (17)**
5:12;25:5,6,7,8,10;
26:6,7:27:22;28:2,6,13,
14,15,19;29:15;42:7
**schools (3)**
26:10;27:12,22
**scope (1)**
104:7
**se (2)**
30:19,20
**search (32)**
47:18,20;50:7;57:3;
59:11,13,15;62:25;63:3;
74:6,23;90:7;96:9;
110:8;123:10;126:5;
127:9,12;128:10;131:13,
13,19;135 23;136:1,22;
138:4;140:6;152:5;
156:12;157:5;158:17;
162:10
**searched (5)**
104:19;110:9;122:4,
20;123:11
**searching (4)**
111:15,15;121:11,15
**second (16)**
50:14;57:11;58:19;
74:20;84:9;101:22;
102:12;111:22;113:16;
123:21,23;124:1;
138:21;161:11;169:9;
171:21
**section (2)**

50:6;95:8
**sections (1)**
6:16
**secure (5)**
47:24;48:11;89:22;
90:21;91:10
**secured (10)**
91:11;94:1,15;97:23;
99:21;105:14;106:7;
112:14;123:8;169:7
**securing (2)**
120:4;169:22
**seeing (1)**
87:12
**seeking (1)**
22:18
**seem (2)**
5:24;106:23
**select (1)**
52:20
**selection (1)**
52:16
**selective (1)**
54:10
**send (2)**
97:23,24
**sends (1)**
9:13
**senior (1)**
13:15
**sense (1)**
120:10
**sent (10)**
24:19;25:2,4,7;33:11;
88:14;90:20;96:16;
99:13;103:4
**sentence (1)**
95:9
**September (2)**
79:23;80:4
**Sergeant (41)**
25:25;29:13;96:10;
100:7:101:19;108:20;
109:21;111:5;115:9;
117:19;120:23,25;122:8;
18;125:12;126:8;127:8;
129:8,12;130:2;131:16,
18;132:1,22;133:5,14;
135:17;137:14;140:8,12,
14;144:21,21,22;147:20;
154:1;159:5;160:15;
166:23;167:7;169:21
**sergeants (1)**
29:3;135:10
**serve (5)**
131:4,6;138:2;141:13;
152:5
**served (5)**
5:6;96:10;122:18;
125:3;131:1
**service (32)**
17:2;21:25;22:10;
25:6;42:8;43:14;45:13,

Case 1:10-cv-00041-ABJ   Document 65-1   Filed 01/10/11   Page 62 of 117
Tricia Wachsmuth v.
City of Powell, et al.

Tim Feathers
November 23, 2010

14:46:11;59:4,5,8,11,12,
14;62:25;63:3;87:3,19;
88:6;96:9;107:19;122:8;
125:6;128:25;130:17;
139:10,22;143:23;
158:12;167:14,16
**services (1)**
38:6
**serving (4)**
93:16;131:13,13;
150:20
**session (2)**
15:24;24:23
**sessions (1)**
16:19
**set (8)**
6:21;48:11;59:25;
93:22;105:4;107:6;
126:20;154:22
**setting (1)**
87:4
**several (11)**
5:7;25:2;48:15;
100:15;105:1;110:2;
123:6;140:19;141:20;
143:19;159:3
**shakes (1)**
121:7
**shall (7)**
8:11,15,21,24;37:17,
19,21
**shared (1)**
130:21
**shares (1)**
170:22
**Shawn (1)**
130:3
**sheriff (3)**
40:16;137:15;138:1
**Sheriff's (10)**
24:12;31:20;38:5,21;
39:8,25;122:10;127:22;
138:1;139:6
**shoot (1)**
47:23
**shooter (1)**
48:4
**shooting (2)**
91:3,25
**short (4)**
39:23;75:20;87:11;
88:10
**shot (10)**
92:1,4,24;101:23,25;
102:13;113:23;114:10;
117:10;120:4
**shoulder (1)**
47:10
**shouldered (1)**
47:5
**show (3)**
111:16;120:2;136:24
**showed (3)**

18:19;31:8.114:25
**showing (1)**
141:16
**shut (1)**
120:24
**side (3)**
109:25;156 23;157:2
**sign (3)**
40:25;147:2;173:2
**signature (2)**
8:25;40:23
**signed (6)**
40:14,24;101:12;
110:8;123:10;172:9
**significant (1)**
80:14
**similar (2)**
115:21;122 24
**simple (1)**
69:14
**simply (7)**
16:18;36:21;39:11;
80:20;86:20;108:9;
144:9
**sit (1)**
119:11
**situation (22)**
46:6;47:23;.8:1,4,5,8,
10,19;49:22 50:1;52:5;
57:6;79:2;9:.2,11;
108:9;115:21;117:6,19;
118:12;122:7;140:23
**situations (6)**
38:22;46:12 51:19;
52:1;55:11;108:12
**six (1)**
162:9
**size (1)**
80:11
**skill (5)**
22:25;23:2,12;31:8,14
**skills (5)**
10:21;13:18.26:24;
27:1;57:8
**sleeping (2)**
100:9;111:8
**slow (1)**
57:3
**small (3)**
22:4;47:19;63:7
**softest (1)**
79:9
**solution (1)**
78:21,22
**solutions (2)**
37:9;170:10
**somebody (2)**
14:13;109:21
**someone (6)**
105:24;117:15;123:9;
135:17;142:24;155:9
**someplace (1)**
54:11

**sometimes (1)**
129:23
**somewhere (2)**
5:23;129:16
**son (2)**
112:2;140:5
**soon (1)**
14:22
**sorry (13)**
17:8;49:10,10;55:4;
64:9;73:19;90:17;95:12;
116:9;132:12;137:19;
144:17;162:15
**south (2)**
109:23,25
**Southside (2)**
28:15,18
**speak (2)**
80:19;94:19
**speaks (2)**
23:22;35:10
**special (8)**
21:6;38:22;39:3;
70:14;85:6,15;86:23;
136:5
**specialists (1)**
86:22
**specially (2)**
85:16;136:3
**specially-assigned (1)**
86:20
**specially-trained (4)**
37:13.17,21;38:6
**specific (10)**
20:3;87:6;88:11;91:9;
121:20;151:22,23;
153:8;154:3,22
**specifically (14)**
19:13;59:8;85:11;
89:11;97:18;98:4;
151:14;152:1;153:8;
155:7;156:10;159:2;
168:16,22
**specifies (1)**
39:18
**specify (1)**
37:19
**speculation (1)**
70:13
**speed (5)**
60:11;97:14;99:9;
101:4;102:18
**spend (1)**
35:8
**spin (2)**
140:24;142:16
**spoke (1)**
132:22
**spoken (1)**
136:20
**squad (4)**
29:2,5,8,12
**squads (2)**

29:4,11
**squares (1)**
98:17
**SRG (15)**
39:6.6,10,24;40:5;
127:14,22;128:13,23;
136:3,9,14;137:21;
138:6;139:21
**staff (5)**
28:10,10;29:12;31:1;
80:13
**staffing (1)**
80:11
**stairs (1)**
66:1;67:3;167:3
**stamp (1)**
64:14
**standalone (1)**
85:11
**standard (7)**
65:8,21;67:10;71:16,
22;84:25;139:6
**standardized (1)**
30:16
**standards (17)**
15:25;34:6;37:12,18;
80:25;81:16,19,20,21;
82:11,13,14;83:4,16,21;
84:8;88:19
**standing (2)**
31:22;119:11
**stands (1)**
76:5
**start (5)**
4:13;5:3,24;44:15;
89:2
**started (1)**
18:16
**starting (3)**
25:15;36:7;37:3
**starts (1)**
81:13
**state (3)**
31:23;35:10;74:9
**stated (10)**
58:4,6;59:25;61:1,12;
85:24;89:23;91:7;
110:18;124:13
**statement (15)**
7:12;8:7;47:20;51:16.
19,22;52:12;54:22;58:8;
77:22;98:20;101:11;
116:3;122:3;146:13
**statements (7)**
50:24;95:3;98:17;
102:10;104:6;147:20,23
**station (3)**
130:16;132:5;135:13
**statute (1)**
31:23
**stayed (2)**
19:2;114:24
**stays (1)**

135:3
**step (4)**
22:22;31:6;86:3;
119:21
**stepped (1)**
105:7
**Steve (4)**
115:14;143:2,15.20
**still (19)**
38:17;40:18;53:15,16;
54:14;55:18;58:16;
60:13,18,21;65:3;75:19;
76:19;94:16;105:11;
113:25;122:16;138:7;
164:22
**stop (8)**
10:25;21:25;25:9;
52:24;60:14;61:22;
65:14;86:1
**straight (2)**
47:11,14
**strategically (1)**
129:22
**strength (1)**
31:8
**strike (1)**
71:9
**structure (2)**
112:21,22
**students (1)**
28:11
**stuffed (1)**
129:19
**Sub (16)**
48:10,13,14,15;52:20,
21;55:17;57:23,24;58:1;
60:7,10,11,12,13;61:18
**subheading (1)**
57:21
**subject (8)**
15:13;19:1;20:17;
61:19;62:2;93:17;
123:21,23
**subjects (1)**
42:10
**submitted (3)**
16:11;108:7;112:11
**subordinate (1)**
8:16
**subparagraph (6)**
51:25;56:6,12,16;
61:13,15
**subparagraphs (1)**
57:21
**subs (1)**
50:1
**subsequent (2)**
51:20;53:1
**Substance (1)**
125:25
**substantively (1)**
163:9
**substitute (2)**

22:5;78:8
**substituted (1)**
65:19
**successful (1)**
142:1
**sufficient (1)**
29:17
**sufficiently (1)**
146:24
**suggested (2)**
135:17;140:3
**suggesting (1)**
140:15
**suggestion (1)**
140:13
**suggests (1)**
106:14
**suicidal (1)**
117:22
**suicide (2)**
57:23;107:5
**suited (5)**
52:22;53:5;54:12,15,
24
**summary (1)**
9:13
**supercede (1)**
8:20
**superseded (13)**
44:5,21;49:2,3,4,7,13;
51:7,10,20;53:1,10,14
**supervisor (3)**
7:23;138:24;143:2
**supplement (3)**
32:13,14;33:13
**supplemented (1)**
52:6
**supplied (3)**
33:4;113:10;134:17
**supply (1)**
38:6
**support (1)**
123:2
**supporting (1)**
18:22
**suppose (1)**
48:5
**sure (25)**
7:12;11:9;24:13,14;
33:8;39:6;61:19,19;
62:1,2;70:17;89:10;
90:23;93:4;100:23;
102:1;109:15;112:4;
125:15;127:6;143:8;
147:13;153:22;154:23;
167:11
**surprise (3)**
60:10;97:15;99:9
**surrendered (1)**
94:13
**surrounding (1)**
151:25
**suspect (39)**

47:1;55:17,22;56:2;
63:9;89:19;90:4;91:24;
92:1,4;93:18;94:13;
96:24;100:9; 01:21,24;
104:15,18;105:18;
106:7;107:21;108:7;
110:1,3,5,11 15,16,17;
112:14;113:16;116:13;
117:9,14;121 2,4;124:2,
7;152:6
**suspected (1)**
106:6
**SWAT (48)**
21:5,14,19;22:3,5;
30:2;34:6,14 17;36:8;
37:7,8,10,16,18,19,23;
45:19,21,23;45:2;47:25;
50:14;51:17;5 2:2;75:16;
76:17,20;77:15,17;78:1,
8,16,20;79:3;80:9,16,25;
81:14,16;82:13;83:4,17;
85:1;170:3,8,9;171:4
**SWAT-qualified (2)**
80:7;84:20
**SWAT-specific (1)**
37:20
**SWAT-type (2)**
170:18;171:1
**switch (1)**
32:9
**sworn (1)**
4:2
**system (5)**
13:8;16:22,2 :;18:17;
172:3

**T**

**Tactic (1)**
20:18
**Tactical (22)**
20:12,20;21:5,13;
32:22;34:5;37:8,23;
39:7;41:9,10;42:4,5;
43:25;49:14;6 :25;64:4;
78:7,21;82:12;85:15;
170:10
**tactics (14)**
24:17;38:22;39:3;
41:8,10;46:8,11;47:18,
20;61:14;76:2;116:15;
155:17;170:23
**talk (3)**
10:17;29:19;82:1
**talked (10)**
50:14;81:11;89:13;
111:23;114:20;130:12;
134:7;144:1,4,8
**talking (13)**
35:8;40:2,3;47:18;
48:2;62:24;64:5,13;
87:21,22;109:9;122:23;
157:1

**talks (1)**
81:14
**target (1)**
47:8
**taser (3)**
14:2;15:11,12
**task (2)**
122:14;131:18
**tasks (2)**
31:4;37:15
**taught (1)**
31:4
**teach (2)**
30:6;31:15
**teaches (1)**
15:12
**teaching (1)**
30:7
**team (84)**
21:4,5,5,6,15,19;22:3,
5;25:13,14,18;37:18,20,
23;39:7,7,13,21,25;
45:20,21;47:25;51:18;
52:17,20;54:20,25;
75:16;76:6,8,17;77:16,
17;78:1,8,16,20;79:3;
80:8,9;81:16;83:17;
84:21;85:1;87:23;96:1;
104:20,20;105:5,13;
106:14;107:6;112:6;
113:1,18;118:5;122:14;
127:22;128:23,25;
131:3;133:15;134:15;
136:3,21;143:3;147:9,
24;150:24;152:5;154:4;
162:9;167:18,22;
168:19;169:9,20,23;
170:2,3,4,9,9;171:4
**teams (12)**
30:2;34:14;37:8,16;
45:23;50:14;55:6,10;
76:20;78:7;85:15;
104:13
**techniques (2)**
27:12;112:9
**telling (10)**
35:15;54:21;94:9;
99:24;100:12;126:1;
152:16,23,25;153:1
**tense (1)**
143:13
**term (9)**
25:21,23;68:5;113:6;
120:9;159:13;160:2,18;
166:23
**terminology (3)**
26:16;61:2;121:21
**terms (5)**
145:22;147:8;159:18,
19;170:3
**test (1)**
13:16
**testified (5)**

4:2;27:10;61:2;
127:13;144:6
**testify (1)**
27:13
**testifying (1)**
127:24
**testimony (26)**
19:14,17,20;36:12;
38:16,25;41:6,14;42:24;
66:11;67:8;83:14;99:6;
100:17;104:2;127:17;
132:14;136:7,11;
139:15;145:25;147:22;
148:6;156:9;159:4,5
**TFO (4)**
25:13;96:11;122:10,
19
**TFOs (3)**
25:3,4;26:2
**theirs (2)**
39:21;40:4
**thinking (9)**
51:20;52:7;53:1;
76:19;77:2,12;90:16;
107:5;128:19
**third (6)**
28:16;47:9;95:9;
123:15;138:22;158:15
**THOMPSON (144)**
6:3;7:9,20;10:24;11:4,
11,14,19,25;19:18;
22:13;23:5;30:8,14;
33:1,10,15,17;34:7;35:9,
25;39:1,15;41:15;48:23;
49:23;50:9;52:10;53:7,
17,20,23;54:17;58:9;
59:22;60:22;62:23;
66:12,18;67:17,23;
68:12,25;69:3,23;70:11,
21,24;72 3,8,10,24;73:6,
10,17;74:14;75:2;76:23;
77:7,20;78:11;79:4;
81:1;82:15,18;83:9,18;
84:9,22;85:8,18;87:13;
88:22;92 15,18,25;95:2;
99:5;100 16;101:3,9,12;
102:6;103:23;106:11,
20;107:25;108:24;
112:16,20;113:5;114:3,
6;115:24;116:18,25;
118:6,18;119:9,17;
121:6,24;127:18;
129:1;130:18;132:15,
25;133:20;134:18;
136:12;139:13,23;
144:5;145:9;146:1,18;
147:11;148:7,16;149:4,
10,22;150:5,13,21,25;
152:9,22;153:5,18;
155:21;158:25;160:12;
161:6,18,23;163:3,8,22;
167:4;168:14;170:7,21;
171:17

**though (17)**
34:11;87:21;95:15;
97:17;99:10;107:2;
141:18
**thought (5)**
69:21;81:1;91:6;
143:6,20
**threat (13)**
46:23;59:1,16;60:14;
63:17;76:12;92:17,19;
94:14;118:11;148:15,
20;149:8
**threatened (3)**
57:22;58:17;105:1
**threatening (1)**
74:13
**threats (2)**
92:23;97:6
**three (6)**
29:13;37:24;46:20;
47:16;71:24;113:2
**three-fourths (1)**
57:14
**three-year (1)**
25:21
**tightness (1)**
111:13
**TIM (2)**
4:1;161:13
**timeframe (1)**
27:18
**timely (1)**
119:19
**times (4)**
18:1;24:20;100:15;
159:3
**tip (1)**
141:16
**title (2)**
19:2;43:6
**today (16)**
5:20;11:20;54:23;
55:7,12,18,23;56:3,10,
14;58:3;60:21;61:10,23,
25;165:13
**together (8)**
11:5,11;85:16,17;
86:25;87:7,20;131:4
**told (25)**
44:21;48:25;50:18;
51:2,6;70:16;100:21;
103:10;111:10;114:22,
22,25;115:1;121:19;
130:5;144:13,16;153:7;
156:10,14;157:16;159:2,
3,7;166:3
**Tom (18)**
73:19;84:15;135:2,5;
139:12;140:4,20;141:3;
142:6,8,20,22,22;143:4,
6,9,14;145:14
**tomorrow (1)**
165:10

Tricia Wachsmuth v.
City of Powell, et al.

tonight (1)
79:10
took (9)
26:8;31:6;95:16;
109:23;115:22;121:3;
123:11;124:22;167:14
top (5)
6:9;40:22;44:17;
46:25;164:13
topic (2)
19:2;166:13
topics (1)
18:19
Torczon (1)
134:12
Total (1)
167:23
totality (20)
58:13;63:5;65:10,18;
66:3;67:6,10;68:1,4;
71:11,22;72:18;131:19;
149:13,23;150:7,15;
152:11;154:25;159:21
towards (1)
146:2
traditional (1)
57:2
trailer (31)
90:22,23;93:5;106:6,
6,7,8;108:22;113:21;
114:15,17,21,24;115:12,
16,17;116:12,13,24;
117:2,5,11,13,20,24,25,
25;118:10,15,21;120:5
trailers (1)
120:7
train (5)
26:2,22;29:5;31:3;
80:13
trained (14)
42:8;45:19;46:5;
51:17;52:4;67:5;77:17;
78:25;80:3;85:6,16;
136:3;170:3;171:4
trainers (2)
16:15;17:2
training (143)
9:9,13,19;10:1,4,4,8,
10,15,16,20;11:3;12:5,
16,17;13:1,17,18,24;
15:4,19,21,24;16:7,14,
14,19,21;17:7,8,9,11,21;
18:14,16,19,19,23;19:1,
6,12,20,23;20:2,3,8,13,
14,15;21:3,13,19;22:6,
19,23;23:1,10,15;24:3,6,
18,20,22;25:3,5,8;26:8,
13,18,22,23,24,25;27:2,
11,17,18,23,25;28:7,19,
20;29:1,3,6,8,9,15;30:5;
31:6,7,9,15;41:3,9,10;
42:5,5,9,11;43:1,4,6,25;
44:5,6,22;45:18.23;46:8;

49:7,8,13;53:19;54:6,8;
55:6;56:21 57:10,12;
60:25;62:18,19;63:25;
64:4;65:3,11;80:15;
81:14,16;82 11,13;83:3,
16;84:7,19,25;86:24;
155:10,14, 7,25;156:3
trains (1)
13:16
transcript (1
50:21
transition (1)
28:5
translated (1
51:9
transported ( 1)
110:6
Tricia (6)
65:25;66:2 ;125:3;
129:19;138 8;167:2
tried (3)
93:11;101::4;109:10
trigger (1)
46:24
true (38)
10:5;11:19:21:14;
33:22,24;40 :10;41:12,
16,18,18;42:19,20,21;
54:14;55:7,12,18,23;
56:3,10,14;62:1;61:25;
66:25;67:2;92:11,17;
97:8;99:2;101:8;106:19;
121:14;122 12;130:13;
145:4,11,13;163:11
trust (1)
143:1
try (1)
81:4
trying (12)
54:10;63:12,14;68:21;
92:9,10;98: 5;102:24;
103:16;108 11;113:22;
116:8
turn (10)
6:18;56:20;68:21;
76:1;81:11;130:6;137:4;
138:16;158 4;171:10
turned (3)
91:4;100:16;111:9
turning (3)
46:5;52:4;1 14:14
turns (1)
56:21
two (14)
10:1;25:21;.5:4,24;
37:23;55:4;57:25;58:12;
60:18;71:24 95:9;
104:12;113:15;123:15
two-hour-duration (1)
15:24
two-year (1)
25:23
type (2)

16:5.20
types (3)
45:21;78:23;149:15
typo (1)
56:7

U

unable (1)
83:14
uncertain (2)
140:22;143:13
unclear (3)
91:2.12;93:7
uncleared (1)
167:3
under (20)
8:7;45:11;57:21;
60:15;61:13;62:6,7;
65:18,21;70:14,18;71:8,
11;72:17;75:11;83:17;
101:13;111:11;121:10;
131:14
underneath (1)
50:1
understood (2)
139:19;159:18
undocumented (1)
19:13
unexpected (1)
60:17
uniform (1)
168:11
unit (10)
38:7,22;39:3;40:5;
80:13;85:11;127:14;
128:13;136:3,3
units (7)
37:7,14,17,21;85:6;
86:20,23
universal (1)
46:21
unknown (1)
143:11
unless (3)
36:15;124:4;131:5
unlocked (5)
100:8;101:19;110:19;
111:7;115:15
unreasonable (4)
66:2,7;67:5;68:6
unsecured (1)
105:12
untrue (1)
42:23
up (30)
17:16;23:3;33:4,20;
47:23,24;48:12;50:13;
59:20;69:18;74:20;
93:11,22;95:13;97:16;
101:4;102:18;105:4;
107:6;115:4;131:10;
133:4,12;140:16;

141:22;143:24;146:25;
153:16;163:22;167:10
update (1)
80:1
updated (3)
44:3;64:3;79:22
upgrade (1)
23:11
upon (4)
7:21;9:9;39:13;145:18
upper (1)
57:4
use (28)
27:20:28:7;38:22;
39:13,21;59:17;62:6,8;
63:7,8;65:2,16;66:2;
78:7,24;94:10;107:20;
108:1;118:14;121:21;
132:10,18;138:3;141:20.
23;147:9;149:14;158:19
used (22)
15:25;18:22;57:5;
61:18;62:1;63:15;76:16;
77:16;78:1,21;79:17;
88:5;96:19;97:13;99:17;
112:25;120:10;124:4,
20;126:16;162:12;170:9
uses (1)
121:22
using (7)
28:20;30:25;105:13;
112:9;113:10;141:19;
169:14
usually (2)
47:12;112:23
utilize (1)
37:16
utilizing (2)
37:13;126:13
utter (1)
70:13

V

vacated (1)
28:18
valid (1)
51:21
variable (2)
141:8;143:12
variables (1)
140:22
various (4)
19:24;129:10;130:12;
140:8
vehicle (1)
13:13
vehicle-related (1)
13:14
verbatim (1)
164:21
verification (1)
147:17

verified (1)
8:25
verify (2)
26:5;84:3
verifying (1)
146:3
version (2)
114:6,7
versions (1)
93:14
vest (1)
168:11
view (3)
40:17;47:7;74:13
viewed (1)
57:1
violence (11)
60:12;61:3;97:15;
99:10;104:25;149:2;
151:9,18;152:6,18;153:4
violent (6)
140:23;148:15,20;
151:7,23;152:2
visible (1)
111:11
visit (6)
56:24;86:4;126:7;
160:21;161:15,22
visited (1)
166:22
vouching (2)
146:6,11

W

Wachsmuth (36)
17:1;45:12;63:16;
65:25;66:23;71:6;73:4;
74:4;78:18;87.3,19;
88:5;91:15;108:13;
114:20,25;122:25;125:4,
9;129:22;135:3;136:22;
138:8;140:4;141:3;
145:14;147:8,19;148:3;
151:7,18,20;153:13;
167:2;171:3;172:14
Wachsmuths (1)
134:17
Wachsmuth's (4)
115:22;129:19;
139:12;153:25
Wait (8)
33:3;71:13;72:4;
75:13;154:10;157:11;
158:23;159:12
waited (1)
115:14
waiting (4)
144:10,14;157:22;
160:4
walk (1)
118:11
walked (3)

108:20,22;110:19
walking (1)
  101:19
Walton (3)
  96:11;122:9,19
Wardwell (7)
  25:24;90:21;110:9;
  115:10,11;123:11,16
warn (1)
  120:12
warrant (77)
  17:1;21:25;22:10;
  25:6;42:8;43:14;45:12,
  14;46:11;59:3,5,8,11,12,
  13,16;62:25;63:3;71:12;
  72:20;74:3,6,23,23;87:3,
  19;88:6;90:7;93:17;
  96:9,9,14,24;97:7;
  107:19;121:5;122:8,17;
  125:3,6;126:5;127:9,12;
  128:11,25;130:11,17,25;
  131:4,6,13,13,19;
  134:22;135:23;136:1;
  138:2,4,13;139:2,10,22;
  140:6;141:14;143:24;
  147:10;150:20;152:5;
  154:11,14;156:12;
  157:5;158:12;167:14,
  16;171:14,16
warrant' (2)
  158:18;162:10
warrants (1)
  156:19
waste (1)
  35:11
Waters (1)
  147:2
way (18)
  14:13;16:17;19:3;
  25:16,17;42:14;53:25;
  61:1;66:21;73:22,24;
  74:17;96:3;116:23;
  140:6;147:8;166:6;
  171:5
ways (1)
  79:6
weapon (8)
  46:9,20,22,25;47:1,10,
  11;115:2
weapons (10)
  55:10;56:1,1;63:10,
  11;66:2;94:15;105:1,12;
  117:16
wearing (1)
  130:3
website (1)
  84:2
week (1)
  14:15
weeks (2)
  4:6;26:19
weep (1)
  50:22

weight (1)
  141:18
weren't (6)
  17:20;28:22;94:17;
  103:21;109:14;118:20
WESTBY (175)
  6:4;7:10,18;14:18;
  19:16;21:20;22:3,11;
  23:6;30:15;32:19,23;
  33:6,19,23;34:8,18;
  35:13;36:9,19;37:5;
  38:24;39:16;41:13;
  42:19,23;44:20;45:2;
  48:21,24;49:2,24 50:18,
  20;51:2,6,13;52:8,53:8,
  24;54:18;58:10;59:19,
  23;60:23;62:15,21;66:9,
  14,19;67:7,15,24;68:10,
  20;69:8,12,15,24,70:9,
  22;71:4,15,21;73:9,22;
  73:14;74:7,11,14,25;
  75:3,9;76:21;77 5,18;
  78:9;80:17;81:2,6,18,24;
  83:6,10;84:10,23;85:9;
  92:6,13;93:1;94:25;
  98:19;99:3;100:14,21;
  102:2,9;103:14, 8;
  106:16,21;107:23;
  108:14,25;109:4;
  115:25;116:16;117:1;
  118:1,7,23;119: 4;
  121:17;124:12;127:16,
  19;128:14;129:2;
  130:19;132:13;133:1,
  18;134:13,19;136 10,23;
  137:20;139:14;141:5;
  145:10,24;146:8,16;
  147:12;148:5,17 149:5,
  9,20;150:4,14;151:1;
  152:7,20;153:6,19;
  157:25;159:1;161:6,10;
  162:21,23;163:9,16,21;
  164:5,11,14;165:3,7,11,
  15,20;166:2,8,13,14;
  167:5,25;168:12 170:5,
  19;171:9;172:23 173:2
What's (7)
  9:21;12:1;15:17;
  51:14;58:7;107:9;
  170:25
whatsoever (2)
  72:14,15
whereas (1)
  29:3
Whew (1)
  124:25
whole (3)
  19:22;82:3,20
whose (2)
  142:25;164:13
widespread (1)
  45:9
wife (4)

101:21;105:1,16;
107:6
willing (5)
  141:25;142:4,20;
  146:25;147:2
window (8)
  69:19;109:25;110:1;
  154:9;157:6,12,23;
  169:10
windows (1)
  129:25
wish (1)
  90:14
withdraw (2)
  35:17;81:4
withdrew (1)
  81:1
Within (6)
  6:11;16:24;98:1;
  139:2,5;163:19
without (8)
  8:24;23:16;26:4;35:1;
  74:24;94:21;127:1;
  133:16
WITNESS (119)
  6:5;7:11,21;12:1;
  19:19;21:22;22:14;23:7;
  30:16;34:9,20;35:21,23;
  37:6;39:2,17;41:6,16;
  42:25;43:24;49:6,12,25;
  51:14;52:11;53:9,25;
  58:11;59:24;60:24;
  62:24;63:23;66:15,20;
  67:18,25;69:4;70:1,12,
  25;71:5;72:4,11,25;
  74:15;75:10,20;76:24;
  77:8,21;78:12;79:5;
  80:19;82:23;83:19;
  84:24;85:10,19,24;86:3,
  11;88:21;89:5;92:19;
  93:2;95:3;99:6;103:25;
  106:22;108:1;110:25;
  113:11;116:1;117:2;
  118:8,24;119:20;121:7,
  25;127:20;128:16;
  129:3;130:20;132:16;
  133:21;134:23;136:13;
  137:8,23;139:16;141:7;
  144:9;145:11;146:2,10,
  19;147:13;148:8,18;
  149:11,23;150:7,15;
  151:2;152:10,23;153:7;
  158:2,7;159:4;160:13;
  161:24;165:14;166:17;
  167:6;168:2,15;170:8,22
woman (3)
  112:1;120:22;121:4
wonder (1)
  118:25
wondering (1)
  44:22
word (1)
  157:9

words (1)
  30:10
work (7)
  4:13;5:14;25:16;
  30:13;31:8;52:23;105:3
worked (2)
  4:25;5:7
working (3)
  5:12;113:6;122:11
worth (2)
  110:22;142:1
writing (1)
  40:2
written (11)
  5:17;12:14;31:22;
  39:17;54:1,5,22;82:4;
  135:9,12;158:2
wrong (6)
  88:3;90:11,95:12;
  131:8;133:3;142:11
Wyoming (8)
  9:3,12;24:13,14;42:7;
  43:1,9,12

## Y

year (3)
  5:8;9:22;28:16
years (5)
  10:1;16:24,18:10;
  31:25;40:15
yesterday (1)
  33:17
young (2)
  69:20;70:8

# WYOMING P.O.S.T. TRAINING RECO

WACHSMUTH v. CITY OF
POWELL– CV 10-041J
PLAINTIFF'S EXHIBIT
#    31

*ID     PO*
**NAME**    MINER, CHAD J.

| DATE | HOURS | COURSE | LOCATION |
|------|-------|--------|----------|
| 6/1/2003 | | TEMPORARY PEACE OFFICER CERTIFICATION | POST 03-TEMP-069 |
| 12/24/2003 | 16 | INTOXIMETER BASIC | POWELL, WY |
| 3/25/2004 | 511 | PEACE OFFICER BASIC TRAINING COURSE | WLEA DOUGLAS. |
| 3/25/2004 | | BASIC PEACE OFFICER CERTIFICATION | POST 04-100-020 |
| 4/23/2004 | 40 | PIER COURSE | |
| 7/9/2004 | 16 | STREET SURVIVAL TACTICAL EDGE | BOISE, ID |
| 8/12/2004 | 24 | REID INTERVIEW & INTERROGATION | POWELL, WY |
| 8/13/2004 | 8 | REID ADV INTERVIEWING & INTERROGATION | POWELL, WY |
| 3/25/2005 | | ADVANCED PEACE OFFICER CERTIFICATION | POST 05-300-020 |
| 4/22/2005 | 32 | CRIMINAL INTERDICTION & PATROL | WLEA DOUGLAS, |
| 7/13/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |
| 8/24/2005 | 16 | BULLETPROOF MIND | LOVELL, WY |
| 9/30/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL, WY |
| 2/24/2006 | 16 | TASER INSTRUCTOR CERTIFICATION | WLEA GREEN |
| 3/2/2006 | 16 | BASIC RADAR/WHP RADAR/LIDAR OPS | POWELL, WY |
| 5/25/2006 | 72 | FIRST LINE SUPERVISION | WLEA DOUGLAS, |
| 8/24/2006 | 40 | CANINE NARCOTIC OPERATIONS | CASPER, WY |
| 2/2/2007 | 4 | INTOXIMETER REFRESHER ECIR | POWELL. WY |
| 8/10/2007 | 40 | DRUG INVESTIGATIONS | RIVERTON, WY |
| 9/10/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 10/23/2007 | 8 | K-9 LEGAL UPDATE | JACKSON, WY |
| 2/22/2008 | 4 | REVIEW/UPDATE DWUI DETECT/SFST | POWELL, WY |
| 2/28/2008 | 16 | ADV TASER M26/X26 INSTRUCTOR TRAINING | MILLS, WY |
| 3/25/2008 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 08-400-111 |
| 4/8/2008 | 9 | LE STRATEGIEN/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 5/16/2008 | 18 | K-9 CERTIFICATION COURSE | JACKSON, WY |
| 6/5/2008 | 17 | ANNUAL LE COORDINATING COMMITTEE CONFER | JACKSON, WY |
| 2/6/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 4/6/2009 | 8 | PHARMACEUTICAL DRUG INVESTIGATIONS | CODY, WY |
| 5/21/2009 | 18 | K-9 NARCOTIC REFRESHER & CERTIFICATION | JACKSON, WY |
| 6/26/2009 | 4 | REVIEW/UPDATE:DWUI DETECTION-SFST | POWELL, WY |
| 8/10/2009 | 32 | OC/IMPACT MUN/DISTRCT/CHEMICAL INSTRUCTR | AURORA, CO |
| 10/27/2009 | 4 | VEHICLE TITLE & REGISTRATION TRAIN 8-12 | CODY, WY |
| 11/2/2009 | 8 | INTOXIMETER ECIR - BASIC | POWELL, WY |
| 11/9/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |
| 2/3/2010 | 16 | TASER INSTRUCTOR | ROCK SPRINGS, WY |
| 3/25/2010 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 10-400-117 |

Summary for 'NAME' = Training Records by Department (37 detail records)
Sum                                  1110

LGLP-Wachsmuth 1162



# SAFARILAND
### TRAINING GROUP



DEFENSE TECHNOLOGY

# CERTIFICATION OF COMPLETION

### THIS IS TO CERTIFY THAT

## Chad J. Miner

Has Completed the Basic Instructor Course Requirements For

### OC Aerosol Projectors, Specialty Impact Munitions, Distraction Devices and Chemical Munitions

**08/10/2009**
Date Completed

**08/31/2011**
Expiration Date

**Jeff Satur & Doug Ross**
Instructor

**Sandy Wall**
Director of Training

# WYOMING P.O.S.T. TRAINING RECORDS

*ID*    *PO*

**NAME**    KENT, LYNN A.

| DATE | HOURS | COURSE | LOCATION |
|---|---|---|---|
| 6/1/1982 | 480 | BASIC LAW ENFORCEMENT ACADEMY | MODESTO, CA |
| 6/1/1991 | 70 | COLLEGE TRANSCRIPT | NW COMM COLL. |
| 2/1/1995 | 0 | TEMPORARY PEACE OFFICER CERTIFICATION | POST 95-TEMP-036 |
| 2/6/1995 | 4 | CONTACT COVER | POWELL, WY |
| 2/6/1995 | 4 | OC DEFENSIVE AEROSOL SPRAY | POWELL, WY |
| 2/9/1995 | 24 | BASIC CUSTODY & CONTROL | POWELL, WY |
| 5/4/1995 | 32 | INTERIOR TACTICS | POWELL, WY |
| 5/15/1995 | 8 | BASIC LIFE SUPPORT/CPR | POWELL, WY |
| 6/1/1995 | 7 | FRANKLIN TIME MANAGEMENT | POWELL, WY |
| 6/13/1995 | 16 | INTOXIMETER 3000 | POWELL, WY |
| 10/27/1995 | 426 | PEACE OFFICER BASIC COURSE | WLEA DOUGLAS, |
| 10/27/1995 | | BASIC PEACE OFFICER CERTIFICATION | POST 95-100-066 |
| 2/28/1996 | 16 | ADVANCED ACCIDENT INVESTIGATION | CODY, WY |
| 11/21/1996 | 8 | NORTHWEST REGIONAL DRUG SCHOOL | CODY, WY |
| 2/27/1997 | 24 | STANDARD DUI FIELD SOBRIETY TESTING | CODY, WY |
| 3/4/1997 | 4 | DIRECTED PATROL | POWELL, WY |
| 3/17/1997 | 4 | GANG AWARENESS/RECOGNITION | POWELL, WY |
| 4/10/1997 | 24 | STREET SURVIVAL | WESTMINSTER, CO |
| 4/11/1997 | | ADVANCED PEACE OFF CERTIFICATION | POST 97-300-063 |
| 4/18/1997 | 5 | DYNAMIC OF DOMESTIC VIOLENCE | CODY, WY |
| 7/10/1997 | 4 | USE OF FORCE UPDATE | WLEA POWELL, WY |
| 3/6/1998 | 40 | KINESIC INTERVIEW & INTERROGATION | WLEA DOUGLAS, |
| 5/8/1998 | 40 | FIELD TRAINING OFFICER COURSE | WLEA DOUGLAS, |
| 8/14/1998 | 40 | FIRST LINE SUPERVISION | POWELL, WY |
| 8/12/1999 | 16 | BASICS ON IBM COMPUTER | POWELL, WY |
| 10/27/1999 | 24 | INVEST TECH/DETECTIVE/PATROL OFFICR | MONTANA |
| 12/6/1999 | 4 | EC/IR UPDATE | POWELL, WY |
| 4/11/2000 | | PROFESSIONAL PO CERTIFICATION | POST 00-400-135 |
| 1/3/2001 | 4 | LAW ENF OFFICERS FLYING ARMED | CHEYENNE, WY |
| 4/26/2001 | 8 | NWET REGIONAL DRUG SCHOOL | LOVELL, WY |
| 8/10/2001 | 20 | CRIME SCENE MANAGEMENT | LOVELL, WY |
| 9/21/2001 | 40 | BASIC DRUG INVESTIGATION | SHERIDAN, WY |
| 12/4/2001 | 4 | EMERGENCY FIRST AID | CASPER, WY |
| 12/4/2001 | 4 | ADULT CPR | CASPER, WY |
| 2/20/2002 | 4 | BASIC DIGITAL CAMERA | CHEYENNE, WY |
| 3/8/2002 | 80 | DEA BASIC NARCOTICS COURSE | MONTANA |
| 4/11/2002 | | PROFESSIONAL PO CERTIFICATION | POST 02-400-168 |
| 4/16/2002 | 16 | MNG PROPERTY & EVIDENCE IN LAW ENF | HELENA, MT |
| 5/24/2002 | 4 | POWELL PD HOLDING FACILITY PROCEDURES | POWELL, WY |
| 9/12/2002 | 4 | STRATEGIC PLANNING | CODY, WY |
| 1/23/2003 | 16 | BASIC SURVIVAL SPANISH | RIVERTON, WY |
| 2/28/2003 | 16 | ENFORCING WYOMING DRINKING LAWS BASIC | POWELL, WY |
| 3/14/2003 | 35 | ROCKY MTN NARCOTICS COMMANDER LEADERSHIP | DENVER, CO |
| 6/13/2003 | 40 | PATROL INTERDICTION EMERGENCY RESPONSE | POWELL, WY |
| 4/2/2004 | 16 | RESPONSE ANALYSIS (STATEMENT ANALYSIS) | LOVELL, WY |
| 4/8/2004 | 20 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS, |
| 4/11/2004 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 04-400-179 |
| 6/21/2004 | 4 | INTOXIMETER UPDATE | POWELL, WY |
| 3/4/2005 | 24 | CHILD FORENSIC INTERVIEW | CASPER, WY |
| 5/13/2005 | 36 | DEATH INVESTIGATIONS/DOMESTIC HOMICIDES | GILLETTE, WY |
| 7/13/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |

LGLP-Wachsmuth 1036

| 7/20/2005 | 12 | G290 BASIC PUBLIC INFORMATION OFFICER | CODY, WY |
|---|---|---|---|
| 10/5/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL, WY |
| 1/13/2006 | 8 | MANAGING SEARCH INCIDENTS | CODY, WY |
| 4/6/2006 | 20 | ADMINISTRATORS CONFERENCE #26 | WLEA DOUGLAS, |
| 4/11/2006 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 06-400-187 |
| 2/7/2007 | 16 | PUBLIC AGENCY BUDGETING | WLEA DOUGLAS, |
| 6/8/2007 | 40 | LE EXECUTIVE MANAGEMENT | W YELLOWSTONE, |
| 8/29/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 9/11/2007 | 3 | FEMA IS-800.A INTRO NATL RESPONSE PLAN | ONLINE |
| 10/17/2007 | 4 | IN CUSTODY DEATHS/EXCITED DELIRIUM | WLEA DOUGLAS, |
| 11/21/2007 | 4 | INTOXIMETER REFRESHER ECIR | POWELL, WY |
| 11/26/2007 | 5 | GRID SLUETH | POWELL, WY |
| 2/28/2008 | 10 | WASCOP ANNUAL LEGISLATIVE TRAINING MEET | CHEYENNE, WY |
| 3/26/2008 | 21 | TRAUMAS OF LAW ENFORCEMENT | CHEYENNE, WY |
| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 4/11/2008 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 08-400-188 |
| 2/13/2009 | 8 | EXPANDABLE BATON | POWELL, WY |

Summary for 'NAME' = Training Records by Department (68 detail records)
Sum                                      1940

LGLP-Wachsmuth 1037

# WYOMING P.O.S.T. TRAINING RECORDS

*ID*    PO

**NAME**   KENT, LYNN A.

| DATE | HOURS | COURSE | LOCATION |
|---|---|---|---|
| 6/1/1982 | 480 | BASIC LAW ENFORCEMENT ACADEMY | MODESTO, CA |
| 6/1/1991 | 70 | COLLEGE TRANSCRIPT | NW COMM COLL. |
| 2/1/1995 | 0 | TEMPORARY PEACE OFFICER CERTIFICATION | POST 95-TEMP-036 |
| 2/6/1995 | 4 | CONTACT/COVER | POWELL, WY |
| 2/6/1995 | 4 | OC DEFENSIVE AEROSOL SPRAY | POWELL, WY |
| 2/9/1995 | 24 | BASIC CUSTODY & CONTROL | POWELL, WY |
| 3/4/1995 | 32 | INTERIOR TACTICS | POWELL, WY |
| 5/15/1995 | 8 | BASIC LIFE SUPPORT/CPR | POWELL, WY |
| 6/1/1995 | 7 | FRANKLIN TIME MANAGEMENT | POWELL, WY |
| 6/13/1995 | 16 | INTOXIMETER 3000 | POWELL, WY |
| 10/27/1995 | 426 | PEACE OFFICER BASIC COURSE | WLEA DOUGLAS, |
| 10/27/1995 | | BASIC PEACE OFFICER CERTIFICATION | POST 95-100-066 |
| 2/28/1996 | 16 | ADVANCED ACCIDENT INVESTIGATION | CODY, WY |
| 11/21/1996 | 8 | NORTHWEST REGIONAL DRUG SCHOOL | CODY, WY |
| 2/27/1997 | 24 | STANDARD DUI FIELD SOBRIETY TESTING | CODY, WY |
| 3/4/1997 | 4 | DIRECTED PATROL | POWELL, WY |
| 3/17/1997 | 4 | GANG AWARENESS/RECOGNITION | POWELL, WY |
| 4/10/1997 | 24 | STREET SURVIVAL | WESTMINSTER, CO |
| 4/11/1997 | | ADVANCED PEACE OFF CERTIFICATION | POST 97-300-063 |
| 4/18/1997 | 5 | DYNAMIC OF DOMESTIC VIOLENCE | CODY, WY |
| 7/10/1997 | 4 | USE OF FORCE UPDATE | WLEA POWELL, WY |
| 3/6/1998 | 40 | KINESIC INTERVIEW & INTERROGATION | WLEA DOUGLAS, |
| 5/8/1998 | 40 | FIELD TRAINING OFFICER COURSE | WLEA DOUGLAS, |
| 8/14/1998 | 40 | FIRST LINE SUPERVISION | POWELL, WY |
| 8/12/1999 | 16 | BASICS ON IBM COMPUTER | POWELL, WY |
| 10/27/1999 | 24 | INVEST TECH/DETECTIVE/PATROL OFFICR | MONTANA |
| 12/6/1999 | 4 | EC/IR UPDATE | POWELL, WY |
| 4/11/2000 | | PROFESSIONAL PO CERTIFICATION | POST 00-400-135 |
| 1/3/2001 | 4 | LAW ENF OFFICERS FLYING ARMED | CHEYENNE, WY |
| 4/26/2001 | 8 | NWET REGIONAL DRUG SCHOOL | LOVELL, WY |
| 8/10/2001 | 20 | CRIME SCENE MANAGEMENT | LOVELL, WY |
| 9/21/2001 | 40 | BASIC DRUG INVESTIGATION | SHERIDAN, WY |
| 12/4/2001 | 4 | ADULT CPR | CASPER, WY |
| 12/4/2001 | 4 | EMERGENCY FIRST AID | CASPER, WY |
| 2/20/2002 | 4 | BASIC DIGITAL CAMERA | CHEYENNE, WY |
| 3/8/2002 | 80 | DEA BASIC NARCOTICS COURSE | MONTANA |
| 4/11/2002 | | PROFESSIONAL PO CERTIFICATION | POST 02-400-168 |
| 4/16/2002 | 16 | MNG PROPERTY & EVIDENCE IN LAW ENF | HELENA, MT |
| 5/24/2002 | 4 | POWELL PD HOLDING FACILITY PROCEDURES | POWELL, WY |
| 9/12/2002 | 4 | STRATEGIC PLANNING | CODY, WY |
| 1/23/2003 | 16 | BASIC SURVIVAL SPANISH | RIVERTON, WY |
| 2/28/2003 | 16 | ENFORCING WYOMING DRINKING LAWS BASIC | POWELL, WY |
| 3/14/2003 | 35 | ROCKY MTN NARCOTICS COMMANDER LEADERSHIP | DENVER, CO |
| 6/13/2003 | 40 | PATROL INTERDICTION EMBRGENCY RESPONSE | POWELL, WY |
| 4/2/2004 | 16 | RESPONSE ANALYSIS (STATEMENT ANALYSIS) | LOVELL, WY |
| 4/8/2004 | 20 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS, |
| 4/11/2004 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 04-400-179 |
| 6/21/2004 | 4 | INTOXIMETER UPDATE | POWELL, WY |
| 3/4/2005 | 24 | CHILD FORENS C INTERVIEW | CASPER, WY |
| 5/13/2005 | 36 | DEATH INVESTIGATIONS/DOMESTIC HOMICIDES | GILLETTE, WY |
| 7/13/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |

LGLP-Wachsmuth 1038

| 7/20/2005 | 12 | G290 BASIC PUBLIC INFORMATION OFFICER | CODY, WY |
|---|---|---|---|
| 10/5/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL, WY |
| 1/13/2006 | 8 | MANAGING SEARCH INCIDENTS | CODY, WY |
| 4/6/2006 | 20 | ADMINISTRATORS CONFERENCE #26 | WLEA DOUGLAS, |
| 4/11/2006 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 06-400-187 |
| 2/7/2007 | 16 | PUBLIC AGENCY BUDGETING | WLEA DOUGLAS, |
| 6/8/2007 | 40 | LE EXECUTIVE MANAGEMENT | W YELLOWSTONE, |
| 8/29/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 9/11/2007 | 3 | FEMA IS-800.A INTRO NATL RESPONSE PLAN | ONLINE |
| 10/17/2007 | 4 | IN CUSTODY DEATHS/EXCITED DELIRIUM | WLEA DOUGLAS, |
| 11/21/2007 | 4 | INTOXIMETER REFRESHER ECIR | POWELL, WY |
| 11/26/2007 | 5 | GRID SLUETH | POWELL, WY |
| 2/28/2008 | 10 | WASCOP ANNUAL LEGISLATIVE TRAINING MEET | CHEYENNE, WY |
| 3/26/2008 | 21 | TRAUMAS OF LAW ENFORCEMENT | CHEYENNE, WY |
| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 4/11/2008 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 08 400-188 |
| 2/13/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 5/29/2009 | 20 | LEADERSHP SKILLS FOR CHALLENGING TIMES | BOISE, ID |
| 6/3/2009 | 4 | REPORT BEAM WEB SERVER TRAINING | WORLAND, WY |
| 6/12/2009 | 4 | REVIEW/UPDATE:DWUI DETENTION-SFST | POWELL, WY |
| 8/14/2009 | 10 | ENFORCING UNDERAGE DRINGING LAWS CONF | DALLAS, TX |

Summary for 'NAME' = Training Records by Department (72 detail records)
Sum      1978

LGLP-Wachsmuth 1039

# WYOMING P.O.S.T. TRAINING RECORDS

**ID**   PO

**NAME**   MCCASLIN, MATT J.

| DATE | HOURS | COURSE | LOCATION |
|------|-------|--------|----------|
| 8/11/2000 | 500 | BS DEGREE ELEMENTARY EDUCATION | MONTANA STATE |
| 10/1/2004 | | TEMPORARY PEACE OFFICER CERTIFICATION | POST 04-TEMP 140 |
| 6/30/2005 | 515 | PEACE OFFICER BASIC TRAINING COURSE | WLEA DOUGLAS. |
| 6/30/2005 | | BASIC PEACE OFFICER CERTIFICATION | POST 05-100-054 |
| 7/13/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |
| 8/24/2005 | 16 | BULLETPROOF MIND | LOVELL, WY |
| 9/30/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL, WY |
| 3/2/2006 | 16 | BASIC RADAR/WHP RADAR/LIDAR OPS | POWELL, WY |
| 3/24/2006 | 8 | INTOXIMETER ECIR BASIC | POWELL, WY |
| 6/30/2006 | | ADVANCED PEACE OFFICER CERTIFICATION | POST 06-300-050 |
| 9/15/2006 | 3 | WEB BASED EVIDENCE PRE-LOG SUBMISSIONS | CODY, WY |
| 9/15/2006 | 4 | EVIDENCE PACKAGING & HANDLING | CODY, WY |
| 4/18/2007 | 16 | STREET SURVIVAL TACTICAL EDGE | DENVER, CO |
| 5/11/2007 | 80 | BASIC HOSTAGE NEGOTIATIONS | WLEA DOUGLAS, |
| 6/30/2007 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 07-400-649 |
| 8/31/2007 | 3 | FEMA IS-200 IC'S SINGLE RESRC/INITIAL ACT | ONLINE |
| 10/4/2007 | 72 | FIRST LINE SUPERVISION | WLEA, WY |
| 10/17/2007 | 4 | IN CUSTODY DEATHS/EXCITED DELIRIUM | WLEA DOUGLAS, |
| 1/25/2008 | 40 | FIELD TRAINING OFFICER DEVELOPMENT | WLEA DOUGLAS, |
| 2/22/2008 | 4 | REVIEW/UPDATE DWUI DETECT/SFST | POWELL, WY |
| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 6/11/2008 | 4 | EVIDENCE PACKAGING & HANDLING | CODY, WY |
| 8/15/2008 | 80 | CUSTODY AND CONTROL INSTRUCTOR CERTIFY | WLEA DOUGLAS. |
| 1/30/2009 | 16 | EXPANDABLE BATON/*IP | POWELL. WY |
| 3/25/2009 | 4 | INTOXIMETER ECIR-REFRESHER | POWELL, WY |
| 4/6/2009 | 8 | PHARMACEUTICAL DRUG INVESTIGATIONS | CODY, WY |
| 4/30/2009 | 4 | INTERVIEW & INTERROGATION BASICS | CODY, WY |
| 6/26/2009 | 4 | REVIEW/UPDATE:DWUI DETECTION-SFST | POWELL, WY |
| 6/30/2009 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 09-400-681 |
| 11/14/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |

Summary for 'NAME' = Training Records by Department (30 detail records)

**Sum**   '496

LGLP-Wachsmuth 1220

# WYOMING P.O.S.T. TRAINING RECORDS

*ID*      *PO*

**NAME**   BLACKMORE, ANTHONY L.

| DATE | HOURS | COURSE | LOCATION |
|---|---|---|---|
| 5/1/1996 | 250 | AS DEGREE | NW COLLEGE, WY |
| 12/1/2001 | | TEMPORARY PO CERTIFY (EXP 4/13/03) | POST 01-TEMP-145 |
| 12/24/2001 | 48 | BASIC FIREARMS HANDGUN & RIFLE | POWELL, WY |
| 8/9/2002 | 479 | PEACE OFFICER BASIC TRAINING COURSE | WLEA DOUGLAS, |
| 8/9/2002 | | BASIC PEACE OFFICER CERTIFICATION | POST 02-100-073 |
| 8/23/2002 | 4 | POWELL PD HOLDING FACILITY PROCEDURES | POWELL, WY |
| 8/27/2002 | 5 | SEARCH WARRANT PREPARATION & SERVICE | BASIN, WY |
| 9/12/2002 | 4 | SUDDEN CUSTODY DEATH | CODY, WY |
| 1/17/2003 | 16 | RADAR/LIDAR | DOUGLAS, WY |
| 1/23/2003 | 16 | BASIC SURVIVAL SPANISH | RIVERTON, WY |
| 2/26/2003 | 16 | ENFORCING WYOMING DRINKING LAWS BASIC | POWELL, WY |
| 3/5/2003 | 12 | CRIME SCENE MANAGEMENT & RECONSTRUCTION | BASIN, WY |
| 6/13/2003 | 40 | PATROL INTERDICTION EMERGENCY RESPONSE | POWELL, WY |
| 6/30/2003 | 64 | FIRST LINE SUPERVISION | WLEA POWELL, WY |
| 8/9/2003 | | ADVANCED PEACE OFFICER CERTIFICATION | POST 03-300-082 |
| 12/10/2003 | 16 | CRIME SCENE PROCESSING/EVIDENCE HANDLING | CODY, WY |
| 12/24/2003 | 16 | INTOXIMETER BASIC | POWELL, WY |
| 1/22/2004 | 8 | INCIDENT COMMAND SYSTEM BASIC | CODY, WY |
| 6/18/2004 | 40 | MODULAR EVO INSTRUCTOR COURSE | WLEA DOUGLAS, |
| 8/12/2004 | 24 | REID INTERVIEW & INTERROGATION | POWELL, WY |
| 8/13/2004 | 8 | REID ADV INTERVIEWING & INTERROGATION | POWELL, WY |
| 10/12/2004 | 8 | INCIDENT COMMAND SYSTEM INTERMEDIATE | CODY, WY |
| 1/21/2005 | 6 | REDUCING UNDERAGE ALCOHOL ABUSE | WYOMING |
| 7/13/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |
| 8/9/2005 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 05-400-458 |
| 8/24/2005 | 16 | BULLETPROOF MIND | LOVELL, WY |
| 9/30/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL, WY |
| 11/29/2005 | 3 | FEMA IS-100 INTRO ICS | ON LINE |
| 2/13/2006 | 3 | FEMA IS-700 INTRO NIMS | ON LINE |
| 4/7/2006 | 20 | SEXUAL ASSAULT SUMMIT V | LARAMIE, WY |
| 5/24/2006 | 24 | WY SCHOOL RESOURCE OFFICER LEADERSHIP | JACKSON, WY |
| 6/23/2006 | 40 | NATL BASIC SCHOOL RESOURCE COURSE | KALISPELL, MT |
| 8/6/2006 | 8 | BASIC EMERGENCY VEHICLE OPERATION/IP | POWELL, WY |
| 2/2/2007 | 4 | INTOXIMETER REFRESHER ECIR | POWELL, WY |
| 4/5/2007 | 18 | SEXUAL ASSAULT SUMMITT VI | SHERIDAN, WY |
| 8/9/2007 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 07-400-411 |
| 8/29/2007 | 23 | CHILD ABUSE FORENSIC INTERVIEW | CODY, WY |
| 9/4/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 9/20/2007 | 16 | SR OPERATOR COURSE-BASIC INTOX | CHEYENNE, WY |
| 10/17/2007 | 4 | IN CUSTODY DEATHS/EXCITED DELIRIUM | WLEA DOUGLAS, |
| 11/26/2007 | 5 | GRID SLUETH | POWELL, WY |
| 2/21/2008 | 2 | NATL WEATHER SERVICE DISPATCH CENTER | POWELL, WY |
| 2/22/2008 | 4 | REVIEW/UPDATE DWUI DETECT/SFST | POWELL, WY |
| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 11/14/2008 | 8 | SCHOOL SAFETY & PREPARATION | LANDER, WY |
| 1/30/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 3/25/2009 | 8 | INTOX ECIR - REFRESHER/*IP | POWELL, WY |
| 4/23/2009 | 19 | SEXUAL ASSAULT SUMMIT VIII | CASPER, WY |
| 5/12/2009 | 4 | INTERVIEW & INTERROGATION BASICS | CODY, WY |
| 6/12/2009 | 4 | REVIEW/UPDATE:DWUI DETENTION-SFST | POWELL, WY |
| 8/9/2009 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 09-400-442 |

LGLP-Wachsmuth

| 10/27/2009 | 4 | VEHICLE TITLE & REGISTRATION TRAIN 1-5 | CODY, WY |
| 11/14/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |

Summary for 'NAME' = Training Records by Department (53 detail records)

Sum                                    1423

LGLP-Wachsmuth 2

# WYOMING P.O.S.T. TRAINING RECORDS

**ID**    **PO**

**NAME**    BRADLEY, CODY J.

| DATE | HOURS | COURSE | LOCATION |
|------|-------|--------|----------|
| 6/1/1998 | | AA DEGREE | BLUE MTN COMM |
| 6/16/2001 | 1000 | BS DEGREE LAW ENFORCEMENT | W OREGON |
| 7/8/2004 | | TEMPORARY PEACE OFFICER CERTIFICATION | POST 04-TEMP-092 |
| 6/30/2005 | | BASIC PEACE OFFICER CERTIFICATION | POST 05-100-053 |
| 6/30/2005 | 515 | PEACE OFFICER BASIC TRAINING COURSE | WLEA DOUGLAS. |
| 7/18/2005 | 8 | TASER X26 CERTIFICATION | POWELL. WY |
| 10/5/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL. WY |
| 11/27/2005 | 3 | FEMA IS-100 INTRO ICS | ON LINE |
| 3/2/2006 | 16 | BASIC RADAR/WHP RADAR/LIDAR OPS | POWELL, WY |
| 3/24/2006... | 8 | INTOXIMETER ECIR BASIC | POWELL, WY |
| 6/30/2006 | | ADVANCED PEACE OFFICER CERTIFICATION | POST 06:300 048 |
| 4/18/2007 | 16 | STREET SURVIVAL TACTICAL EDGE | DENVER, CO |
| 5/3/2007 | 24 | REID TECH/INTERVIEW & INTERROGATION | LARAMIE, WY |
| 6/30/2007 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 07-400-320 |
| 7/20/2007 | 40 | SCHOOL RESOURCE OFFICER BASIC | BILLINGS, MT |
| 8/12/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 8/29/2007 | 23 | CHILD ABUSE FORENSIC INTERVIEW | CODY. WY |
| 10/17/2007 | 4 | IN CUSTODY DEATHS/EXCITED DELIRIUM | WLEA DOUGLAS, |
| 11/26/2007 | 5 | GRID SLUETH | POWELL, WY |
| 2/21/2008 | 2 | NATL WEATHER SERVICE DISPATCH CENTER | POWELL, WY |
| 2/22/2008 | 4 | REVIEW/UPDATE DWUI DETECT/SFST | POWELL, WY |
| 4/2/2008 | 21 | ADV INVESTIGAT STRATEGIES/MULTIDISCIPLIN | THERMOPOLIS. WY |
| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 6/10/2008 | 4 | EVIDENCE PACKAGING & HANDLING | CODY. WY |
| 6/27/2008 | 24 | 2008 SCHOOL-BASED TRAINING SEMINAR | CHEYENNE. WY |
| 9/19/2008 | 36 | PREPARING FOR LEADERSHIP | WLEA DOUGLAS, |
| 12/11/2008 | 24 | ADVANCED SCHOOL RESOURCE OFFICER CLASS | RIVERTON. WY |
| 2/6/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 3/25/2009 | 4 | INTOXIMETER ECIR-REFRESHER | POWELL, WY |
| 4/6/2009 | 8 | PHARMACEUTICAL DRUG INVESTIGATIONS | CODY, WY |
| 5/12/2009 | 4 | INTERVIEW & INTERROGATION BASICS | CODY, WY |
| 6/25/2009 | 8 | INSIDE THE MIND OF A TEEN KILLER | CODY. WY |
| 6/30/2009 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 09-400-336 |
| 10/27/2009 | 4 | VEHICLE TITLE & REGISTRATION TRAIN 8-12 | CODY. WY |
| 11/9/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |

Summary for 'NAME' =   Training Records by Department (35 detail records)

Sum              1903

LGLP-Wachsmuth 917

# WYOMING P.O.S.T. TRAINING RECORDS

*ID*  *PO*

**NAME**  BROWN, DAVID C.

| DATE | HOURS | COURSE | LOCATION |
|------|-------|--------|----------|
| 10/1/1982 | 36 | FIRE INSTRUCTOR 1A | CALIFORNIA |
| 10/8/1982 | 36 | FIRE INSTJCTOR 1B | CALIFORNIA |
| 8/14/1987 | 800 | BS DEGREE CRIMINAL JUSTICE | FLAGSTAFF, AZ |
| 5/7/1990 | 0 | TEMPORARY CERTIFICATION | POST 90-TEMP-042 |
| 9/12/1990 | 4 | STRESS MANAGEMENT | WLEA CODY, WY |
| 12/21/1990 | 400 | PEACE OFFICER BASIC COURSE | WLEA DOUGLAS, |
| 12/21/1990 | 0 | BASIC CERTIFICATION | POST 90-100-063 |
| 5/30/1991 | 4 | TACTICAL COMMUNICATIONS | WLEA POWELL, WY |
| 12/12/1991 | 24 | STREET SURVIVAL | LAS VEGAS, NV |
| 12/21/1991 | 0 | ADVANCED CERTIFICATION | POST 91-300-069 |
| 4/20/1992 | 4 | OVERVIEW OF DEADLY FORCE DECISION | POWELL, WY |
| 4/21/1992 | 8 | INSTRUCTOR COURSE | MONTANA |
| 4/21/1992 | 8 | CHEMICAL AEROSOL SPRAY INSTRUCTOR | MONTANA |
| 5/14/1992 | 8 | REGINAL DRUG SCHOOL | CODY, WY |
| 6/4/1992 | 8 | OLEORISIN CAPSICUM INSTR PREP | POWELL, WY |
| 9/16/1992 | 4 | PSYCHOLOGICAL PROFILING | WLEA |
| 9/17/1992 | 4 | CARNIVAL SCAMS/GAMBLING | WLEA |
| 9/17/1992 | 4 | STALKING ISSUES | WLEA |
| 12/18/1992 | 40 | EMBEZZLEMENT & FRAUD CRIMES INVEST | WLEA DOUGLAS, |
| 12/21/1992 | 0 | PROFESSIONAL CERTIFICATION | POST 92-400-423 |
| 12/25/1992 | 1 | VEHICLE STOPS LEGAL ISSUES | LETN POWELL, WY |
| 12/27/1992 | 1 | PREPARING FOR COURT | LETN POWELL, WY |
| 12/29/1992 | 1 | BLOODBORNE PATHOGENS PART 1 | LETN POWELL, WY |
| 12/30/1992 | 1 | BLOODBORNE PATHOGENS PART 2 | LETN POWELL, WY |
| 12/31/1992 | 1 | BLOODBORNE PATHOGENS PART 3 | LETN POWELL, WY |
| 1/2/1993 | 1 | ICMA SERIES PART 3 PATROL FUNCTION | LETN POWELL, WY |
| 1/22/1993 | 1 | TRAFFIC CONTROL | LETN POWELL, WY |
| 2/1/1993 | 1 | PURSUIT DRIVING PART 1 | LETN POWELL, WY |
| 2/2/1993 | 1 | PURSUIT DRIVING PART 2 | LETN POWELL, WY |
| 2/3/1993 | 1 | PURSUIT DRIVING PART 3 | LETN POWELL, WY |
| 2/4/1993 | 1 | PURSUIT DRIVING PART 4 | LETN POWELL, WY |
| 2/8/1993 | 16 | SIDEHANDLE BATON BASIC | POWELL, WY |
| 2/16/1993 | 1 | GROUND DEFENSE SHOOTING TECHNIQUES | LETN POWELL, WY |
| 2/23/1993 | 1 | STUNNING TECHNIQUES | LETN POWELL, WY |
| 2/23/1993 | 1 | TRAFFIC CONTROL PART 2 | LETN POWELL, WY |
| 3/1/1993 | 1 | TRAINING TECHNIQUES GOAL ANALYSIS | LETN POWELL, WY |
| 3/28/1993 | 1 | DRAWING THE HANDGUN | LETN POWELL, WY |
| 4/22/1993 | 24 | PATROL RESPONSE CRITICAL INCIDENT | POWELL, WY |
| 4/29/1993 | 7 | FRANKLIN TIME MANAGEMENT | POWELL, WY |
| 8/22/1993 | 1 | HIGH STRESS SPEAKING | LETN POWELL, WY |
| 8/23/1993 | 1 | CONCERNS OF POLICE SURVIVORS PART 1 | LETN POWELL, WY |
| 8/28/1993 | 24 | BASIC CUSTODY & CONTROL | POWELL, WY |
| 10/10/1993 | 1 | HOSTAGE NEGOTIATIONS PART 1 | LETN POWELL, WY |
| 10/18/1993 | 1 | COLLAPSIBLE BATON | LETN POWELL, WY |
| 10/27/1993 | 1 | TRAFFIC STOPS | LETN POWELL, WY |
| 10/28/1993 | 1 | THE SCIENCE OF SURVIVAL PART 3 | LETN POWELL, WY |
| 12/1/1993 | 1 | COMMUNITY POLICING UPDATE PART 1 | LETN POWELL, WY |
| 12/1/1993 | 1 | VEHICLE STOPS INITIAL CONTACT | LETN POWELL, WY |
| 2/21/1994 | 4 | INTOXIMETER REFRESHER | POWELL, WY |
| 3/11/1994 | 40 | KINESIC INTERVIEW TECHNIQUES | WLEA DOUGLAS, |
| 4/18/1994 | 8 | CONTACT & COVER TRAINING | MONTANA |

LGLP-Wachsmuth 658

| | | | |
|---|---|---|---|
| 4/25/1994 | 8 | COMMUNITY POLICING | MONTANA |
| 8/16/1994 | 16 | OLEORESIN CAPS AEROSOL INSTRUCTOR | WLEA DOUGLAS, |
| 8/26/1994 | 40 | DRUG INVESTIGATION | CASPER, WY |
| 10/11/1994 | 16 | BASIC ACCIDENT INVESTIGATION | WLEA POWELL, WY |
| 12/21/1994 | | PROFESSIONAL CERTIFICATION | POST 94-400-444 |
| 2/6/1995 | 16 | CONTACT/COVER INSTR PREP | POWELL, WY |
| 4/7/1995 | 14 | UNDERCOVER INVESTIGATIVE TECHNIQUES | RIVERTON, WY |
| 5/4/1995 | 8 | INTERIOR TACTICS | POWELL, WY |
| 5/16/1995 | 8 | BASIC LIFE SUPPORT/CPR | POWELL, WY |
| 9/14/1995 | 4 | STRESS/BURNOUT/SHIFTWORK | TELECONFERENCE |
| 9/20/1996 | 20 | PROACTIVE PATROL | MONTANA |
| 12/21/1996 | | PROFESSIONAL CERTIFICATION | POST 96-400-427 |
| 3/17/1997 | 4 | GANG AWARENESS/RECOGNITION | POWELL, WY |
| 5/2/1997 | 86 | CUSTODY/CONTROL INSTRUCTOR CERT | WLEA DOUGLAS, |
| 6/6/1997 | 4 | USE OF FORCE UPDATE | WLEA CODY, WY |
| 8/21/1997 | 24 | SPECIALIZED SURVEILLANCE | CHEYENNE, WY |
| 4/24/1998 | 80 | DEA BASIC DRUG ENFORCEMENT | WLEA DOUGLAS, |
| 6/12/1998 | 40 | FIRST LINE SUPERVISION | WLEA DOUGLAS, |
| 8/26/1998 | 24 | CUSTODY CONTROL INSTRUCTOR UPDATE | WLEA DOUGLAS. |
| 9/8/1998 | 8 | BACKGROUND INVESTIGATION | WLEA DOUGLAS. |
| 12/18/1998 | 48 | CUSTODY CONTROL/INSTR PREP | POWELL, WY |
| 12/21/1998 | | PROFESSIONAL PO CERTIFICATION | POST 98-400-434 |
| 5/14/1999 | 36 | WIA HOMICIDE SCHOOL | GILLETTE. WY |
| 8/12/1999 | 16 | BASICS ON IBM COMPUTER | POWELL, WY |
| 8/16/1999 | 16 | BASIC SHOTGUN TRAINING | POWELL, WY |
| 12/6/1999 | 4 | EC/IR UPDATE | POWELL, WY |
| 4/27/2000 | 24 | CUSTODY CONTROL UPDATE | WLEA DOUGLAS. |
| 5/18/2000 | 12 | LECC CONFERENCE | JACKSON, WY |
| 12/21/2000 | | PROFESSIONAL PO CERTIFICATION | POST 00-400-446 |
| 3/30/2001 | 16 | PERSONAL INTEGRITY & PUBLIC TRUST | WLEA DOUGLAS, |
| 4/19/2001 | 24 | CUSTODY CONTROL INSTRUCTOR RECERT | WLEA DOUGLAS, |
| 6/11/2001 | 8 | MEDIA RELATIONS FOR LAW ENFORCEMENT | WLEA CODY, WY |
| 8/6/2001 | 10 | PATROL RESPONSE TO THE ACTIVE SHOOTER | WORLAND. WY |
| 9/12/2001 | 4 | USE OF FORCE UPDATE | WLEA CHEYENNE. |
| 9/13/2001 | 4 | CLANDESTINE LAB | WLEA CHEYENNE. |
| 9/13/2001 | 4 | PATROL RESPONSE TO ACTIVE SHOOTER | CHEYENNE, WY |
| 12/14/2001 | 8 | CHARACTER FIRST | POWELL, WY |
| 1/10/2002 | 16 | INTERVIEW STATEMENT ANALYSIS/ASSESS | CASPER, WY |
| 3/5/2002 | 16 | BASIC RADAR INSTRUCTION | CODY, WY |
| 4/11/2002 | 16 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS |
| 4/25/2002 | 18 | REID TECH INTERVIEWING & INTERROGATION | CODY, WY |
| 4/26/2002 | 6 | ADVANCED REID TECH INTERVIEW/INTERROGATE | CODY, WY |
| 5/24/2002 | 5 | POWELLL PD HOLDING FACILITY PROCEDURE/IP | POWELL, WY |
| 8/22/2002 | 40 | PATROL INTERDICTION EMERGENCY RESPONSE | WLEA DOUGLAS, |
| 10/30/2002 | 8 | CLANDESTINE LAB RECERTIFICATION | POWELL, WY |
| 11/15/2002 | 4 | PROJECT SAFE NEIGHBORHOODS | LOVELL, WY |
| 12/21/2002 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 02-400-567 |
| 1/9/2003 | 16 | HUMAN BEHAVIORAL ISSUES/AMER CULTURE | CASPER, WY |
| 2/28/2003 | 16 | ENFORCING WYOMING DRINKING LAWS BASIC | POWELL, WY |
| 3/13/2003 | 24 | BASIC CRIME SCENE PHOTOGRAPHY | RIVERTON, WY |
| 4/17/2003 | 20 | CUSTODY & CONTROL INSTRUCTOR | WLEA DOUGLAS. |
| 5/16/2003 | 36 | WIA HOMIC DE SCHOOL 2003 | GILLETTE, WY |
| 7/30/2003 | 8 | CLANDESTINE LAB FIRST RESPONDER | RIVERTON, WY |
| 9/24/2003 | 16 | CHILD SEXL AL ASSAULT INVESTIGATIONS | RIVERTON, WY |
| 12/10/2003 | 16 | CRIME SCENE PROCESSING/EVIDENCE HANDLING | CODY, WY |
| 1/8/2004 | 16 | JUVENILE AT RISK BEHAVIOR & LEGAL ISSUES | CASPER, WY |
| 1/22/2004 | 8 | INCIDENT COMMAND SYSTEM BASIC | CODY, WY |

LGLP-Wachsmuth 659

| | | | |
|---|---|---|---|
| 4/2/2004 | 16 | RESPONSE ANALYSIS (STATEMENT ANALYSIS) | LOVELL WY |
| 6/21/2004 | 4 | INTOXIMETER UPDATE | POWELL, WY |
| 12/21/2004 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 04-400-600 |
| 3/4/2005 | 24 | CHILD FORENSIC INTERVIEW | CASPER, WY |
| 4/7/2005 | 20 | CUSTODY & CONTROL INSTRUCTOR UPDATE | WLEA DOUGLAS |
| 5/13/2005 | 36 | DEATH INVESTIGATIONS/DOMESTIC HOMICIDES | GILLETTE, WY |
| 6/20/2005 | 8 | INTERNET FOR INVESTIGATORS | WLEA DOUGLAS. |
| 6/21/2005 | 8 | ADV INTERNET SEARCH FOR INVESTIGATORS | WLEA DOUGLAS. |
| 7/13/2005 | 8 | TASER X26 CERTIFICATION | POWELL. WY |
| 9/15/2005 | 6 | PEOPLE vs SCOTT PETERSON | WPOA CASPER. WY |
| 10/5/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL, WY |
| 12/5/2005 | 3 | FEMA IS-100 INTRO ICS | ON LINE |
| 1/12/2006 | 16 | TEAM INVESTIGATION/CHILD MALTREATMENT | CASPER, WY |
| 1/25/2006 | 360 | MASTER OF CRIMINAL JUSTICE DEGREE | BOSTON UNIVSITY |
| 4/27/2006 | 32 | SEIZED COMPUTER EVIDENCE RECOVERY | |
| 5/8/2006 | 8 | PHARMACEUTICAL DRUG INVESTIGATIONS | BILLINGS, MT |
| 5/24/2006 | 24 | WY SCHOOL RESOURCE OFFICER LEADERSHIP | JACKSON, WY |
| 6/29/2006 | 7 | SEX ASSAULT INVEST/DNA EVID COLLECTION | CASPER, WY |
| 8/17/2006 | 16 | FIRE INVESTIGATION FOR FIRST RESPONDERS | CODY, WY |
| 12/21/2006 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 06-400-589 |
| 1/11/2007 | 16 | VIOLENT CRIME CHILD FORENSIC INTERVIEW | CASPER, WY |
| 4/5/2007 | 20 | CUSTODY/CONTROL INSTR RECERT/UPDATE | WLEA DOUGLAS, |
| 8/29/2007 | 21 | CHILD ABUSE FORENSIC INTERVIEW | CODY, WY |
| 9/5/2007 | 4 | DOMESTIC TERRORISM | LANDER, WY |
| 9/5/2007 | 4 | LIFE & DEATH OF SEARCH & RESCUE | LANDER, WY |
| 9/6/2007 | 4 | FDNY-TWIN TOWERS | LANDER, WY |
| 9/7/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 10/17/2007 | 4 | IN CUSTODY DEATHS/EXCITED DELIRIUM | WLEA DOUGLAS, |
| 11/21/2007 | 4 | INTOXIMETER REFRESHER ECIR | POWELL, WY |
| 11/26/2007 | 5 | GRID SLUETH | POWELL, WY |
| 1/10/2008 | 32 | EXPANDABLE BATON/*INSTR PREP | BASIN, WY |
| 2/22/2008 | 4 | REVIEW/UPDATE DWUI DETECT/SFST | POWELL, WY |
| 4/2/2008 | 21 | ADV INVESTIGAT STRATEGIES/MULTIDISCIPLIN | THERMOPOLIS, WY |
| 5/9/2008 | 34 | HOMICIDE & COLD CASE INVESTIGATIONS CONF | CODY, WY |
| 9/16/2008 | 4 | GANGS & SECURITY THREAT GROUPS IN JAILS | LARAMIE. WY |
| 9/17/2008 | 4 | SEARCH & SEIZURE | LARAMIE, WY |
| 9/17/2008 | 4 | TERRORISM AWARENESS MEETING THE CHALLENG | LARAMIE, WY |
| 9/18/2008 | 4 | LESSONS FROM AMISH SCHOOL SHOOTINGS | LARAMIE, WY |
| 9/18/2008 | 4 | RECOGNIZING SPANISH DANGER WORDS | LARAMIE, WY |
| 12/21/2008 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 08-400-643 |
| 4/6/2009 | 8 | PHARMACEUTICAL DRUG INVESTIGATIONS | CODY, WY |
| 4/16/2009 | 20 | CUSTODY & CONTROL INSTRUCT RECERT UPDATE | WLEA DOUGLAS, |
| 6/26/2009 | 4 | REVIEW/UPDATE:DWUI DETECTION-SFST | POWELL, WY |
| 9/8/2009 | 4 | BASIC GANG INVEST-STREET GANGS | EVANSTON, WY |
| 9/9/2009 | 4 | PRISONER TRANSPORT & RESTRAINTS | EVANSTON, WY |
| 9/9/2009 | 4 | COURT SECURITY - US MARSHAL SERV | EVANSTON, WY |
| 9/10/2009 | 4 | BASIC GANG INVEST-OUTLAW MOTORCYCLE | EVANSTON, WY |
| 10/27/2009 | 4 | VEHICLE TITLE & REGISTRATION TRAIN 1-5 | CODY, WY |
| 11/14/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |

Summary for 'NAME' = Training Records by Department (157 detail records)
Sum                          3420

LGLP-Wachsmuth 660

# WYOMING P.O.S.T. TRAINING RECORDS

**ID      PO**

**NAME**   ECKERDT, ROY S.

| DATE | HOURS | COURSE | LOCATION |
|------|-------|--------|----------|
| 6/1/1989 | 40 | COLLEGE TRANSCRIPT | LCCC CHEYENNE, |
| 4/21/1997 | | TEMPORARY DETENTION CERTIFICATION | POST 97-TDET-030 |
| 4/23/1997 | 8 | CUSTODY & CONTROL | CHEYENNE, WY |
| 5/20/1997 | 4 | TASER | CHEYENNE, WY |
| 5/20/1997 | 4 | CELL EXTRACTION | CHEYENNE, WY |
| 7/2/1997 | 4 | EMERGENCY FIRST AID | CHEYENNE, WY |
| 11/18/1999 | 4 | HAZARDOUS MATERIALS | NEBRASKA |
| 12/1/1999 | 4 | CIVIL PROCESS | NEBRASKA |
| 12/10/1999 | 537 | PEACE OFFICER BASIC TRAINING | NEBRASKA |
| 10/31/2000 | 6 | KNOCK & TALK | NEBRASKA |
| 11/17/2000 | 32 | MANAGEMENT | NEBRASKA |
| 7/26/2001 | 24 | STREET SURVIVAL | SIOUX CITY |
| 8/17/2001 | 4 | DOMESTIC VIOLENCE & THE LAW TRAINING | LINCOLN, NE |
| 8/24/2001 | 40 | HAZWOPER CLANDESTINE LABORATORY | LINCOLN, NE |
| 12/20/2001 | 8 | IN CAR VIDEO | NEBRASKA |
| 1/9/2002 | 18 | REID BASIC INTERVIEW & INTERROGATION | SIOUX CITY |
| 4/25/2002 | 24 | DEA SITE SAFETY OFFICERS TRAINING | LINCOLN, NE |
| 1/23/2003 | 24 | STREET SURVIVAL MNG THE NEW LEADERS | SIOUX CITY, IA |
| 2/12/2003 | | CPR | NEBRASKA |
| 7/14/2003 | 4 | NATL DARE SCHOOL RESOURCE OFFICER | NEBRASKA |
| 9/26/2003 | 40 | INTRODUCTION TO SURVIVAL SPANISH | NEBRASKA |
| 12/8/2003 | | TEMPORARY PEACE OFFICER CERTIFICATION | POST 03-TEMP-169 |
| 12/24/2003 | 16 | INTOXIMETER BASIC | POWELL, WY |
| 2/22/2004 | | FIREARMS PROFICIENCY TEST (PO) | POWELL, WY |
| 4/27/2004 | 61 | WYOMING CRIMINAL LAW & PROCEDURES | WLEA DOUGLAS. |
| 4/27/2004 | 14 | FAMILY VIOLENCE TRAINING | WLEA DOUGLAS. |
| 4/27/2004 | | CHALLENGE EXAMINATION (PO) | POST |
| 4/28/2004 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 04-400-251 |
| 6/18/2004 | 40 | FIELD TRAINING OFFICER DEVELOPMENT | WLEA DOUGLAS. |
| 4/7/2005 | 20 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS, |
| 4/28/2005 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 05-400-268 |
| 5/25/2005 | 12 | AWR-160 WMD AWARENESS TRAIN THE TRAINER | WLEA CASPER, WY |
| 6/21/2005 | 8 | CLANDESTINE LAB RECERTIFICATION | RIVERTON, WY |
| 7/13/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |
| 7/20/2005 | 12 | G290 BASIC PUBLIC INFORMATION OFFICER | CODY, WY |
| 9/1/2005 | 24 | FIRST RESPONDER TRAINING PROGRAM | CODY, WY |
| 9/30/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL, WY |
| 11/28/2005 | 3 | FEMA IS-100 INTRO ICS | ON LINE |
| 7/14/2006 | 28 | DRUG TASK FORCE SUPERVISORS SCHOOL | CHEYENNE, WY |
| 9/15/2006 | 4 | EVIDENCE PACKAGING & HANDLING | CODY, WY |
| 9/15/2006 | 3 | WEB BASED EVIDENCE PRE-LOG SUBMISSIONS | CODY, WY |
| 2/2/2007 | 4 | INTOXIMETER REFRESHER ECIR | POWELL, WY |
| 4/4/2007 | 8 | 2007 AWR-160 CADRE CONFERENCE | WLEA DOUGLAS, |
| 4/11/2007 | 16 | LE ADMINISTRATORS' CONFERENCE #27 | WLEA DOUGLAS, |
| 4/12/2007 | 4 | WASCOP GENERAL MEMBERSHIP MEETING | DOUGLAS, WY |
| 4/28/2007 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 07-400-227 |
| 9/11/2007 | 12 | AWR160-WMD-AWARENESS LEVEL TRN/*IP | CODY, WY |
| 9/22/2007 | 3 | FEMA IS-800 A INTRO NATL RESPONSE PLAN | ONLINE |
| 10/23/2007 | 8 | K-9 LEGAL UPDATE | JACKSON, WY |
| 11/26/2007 | 5 | GRID SLUETH | POWELL, WY |
| 2/20/2008 | 16 | HIRING & BACKGROUND INVESTIGATIONS | LOVELAND, CO |

LGLP-Wachsmuth 200

| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 6/5/2008 | 17 | ANNUAL LE COORDINATING COMMITTEE CONFER | JACKSON, WY |
| 10/22/2008 | 16 | MANAGING CRIMINAL INVESTIGATIONS | LOVELAND, CO |
| 1/30/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 4/28/2009 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 09-400-232 |
| 6/17/2009 | 16 | PROPERTY & EVIDENCE MANAGEMENT LE AGENCY | CHEYENNE, WY |
| 6/26/2009 | 4 | REVIEW/UPDATE-DWUI DETECTION-SFST | POWELL, WY |
| 9/8/2009 | 4 | HUMAN DYNAMICS IN CRASH INVEST & AUTOPSY | BILLINGS, MT |
| 10/2/2009 | 40 | A PROGRAM IN MANAGING PERFORMANCE | POWELL, WY |
| 10/27/2009 | 4 | VEHICLE TITLE & REGISTRATION TRAIN 1-5 | CODY, WY |
| 11/9/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |
| 1/29/2010 | 4 | INTOXIMETER ECIR REFRESHER | POWELL, WY |
| 2/9/2010 | 2 | ENVIRONMENTAL SAMPLE COLLECTION 1ST RESP | CODY, WY |

Summary for 'NAME' = Training Records by Department (64 detail records)

Sum                                    1360

LGLP-Wachsmuth 201

# WYOMING P.O.S.T. TRAINING RECORDS

**ID**    *PO*

**NAME**   HALL, MICHAEL S.

| DATE | HOURS | COURSE | LOCATION |
|------|-------|--------|----------|
| 7/23/2007 | | TEMPORARY PEACE OFFICER CERTIFICATION | POST 07-TEMP-097 |
| 10/18/2007 | 4 | IN CUSTODY DEATHS/EXCITED DELIRIUM | WLEA DOUGLAS, |
| 10/30/2007 | 3 | FEMA IS-100.LE INTRO ICS LAW ENFORCEMENT | ONLINE |
| 11/12/2007 | 3 | FEMA IS-700 INTRO NIMS | ONLINE |
| 11/26/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 12/28/2007 | 8 | INTOXIMETER ECIR-BASIC | POWELL, WY |
| 3/27/2008 | 520 | PEACE OFFICER BASIC TRAINING COURSE | WLEA DOUGLAS, |
| 3/28/2008 | | BASIC PEACE OFFICER CERTIFICATION | POST 08-100-031 |
| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 8/8/2008 | 40 | DRUG INVESTIGATIONS | RIVERTON, WY |
| 2/13/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 4/6/2009 | 8 | PHARMACEUT CAL DRUG INVESTIGATIONS | CODY, WY |
| 4/7/2009 | | ADVANCED PEACE OFFICER CERTIFICATION | POST 09-300-035 |
| 4/29/2009 | 24 | REID INTERVIEW & INTERROGATION | LARAMIE, WY |
| 4/30/2009 | 8 | ADVANCED REID INTERVIEW & INTERROGATION | LARAMIE, WY |
| 6/26/2009 | 4 | REVIEW/UPDATE:DWUI DETECTION-SFST | POWELL, WY |
| 10/27/2009 | 4 | VEHICLE TITLE & REGISTRATION TRAIN 8-12 | CODY, WY |
| 11/9/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |

Summary for 'NAME' =  Training Records by Department (18 detail records)

**Sum**                                    674

LGLP-Wachsmuth 1000

# WYOMING P.O.S.T. TRAINING RECORDS

**ID**  **PO**
**NAME**  LARA, BRETT D.

| DATE | HOURS | COURSE | LOCATION |
|------|-------|--------|----------|
| 11/22/1996 | 0 | DETENTION OFFICER BASIC COURSE | MONTANA |
| 8/15/1997 | 500 | BS DEGREE BUSINESS ADMINISTRATION | MONTANA |
| 7/22/2000 | 0 | TEMPORARY PEACE OFFICER CERTIFICATION | POST 00-TEMP-101 |
| 4/6/2001 | | BASIC PEACE OFFICER CERTIFICATION | POST 01-100-021 |
| 4/6/2001 | 482 | PEACE OFFICER BASIC COURSE | WLEA DOUGLAS, |
| 4/26/2001 | 8 | NWET REGIONAL DRUG SCHOOL | LOVELL, WY |
| 7/12/2001 | 18 | REID INTERROGATION & INTERVIEW | LOVELL, WY |
| 1/30/2002 | 24 | OFFICER SURVIVAL/COMMUNICATION SPANISH | WLEA DOUGLAS, |
| 3/5/2002 | 16 | BASIC RADAR INSTRUCTION | CODY, WY |
| 3/27/2002 | 100 | SPANISH IMMERSION FOR LAW ENFORCEMENT | WLEA DOUGLAS, |
| 4/6/2002 | | ADVANCED PEACE OFFICER CERTIFICATION | POST 02-300-027 |
| 4/26/2002 | 6 | ADVANCED REID TECH INTERVIEW/INTERROGATE | CODY, WY |
| 5/24/2002 | 4 | POWELL PD HOLDING FACILITY PROCEDURES | POWELL, WY |
| 11/8/2002 | 16 | RURAL PATROL DRUG INVESTIGATE/INTERDICT | LOVELL, WY |
| 2/28/2003 | 16 | ENFORCING WYOMING DRINKING LAWS BASIC | POWELL, WY |
| 4/6/2003 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 03-400-285 |
| 6/13/2003 | 40 | PATROL INTERDICTION EMERGENCY RESPONSE | POWELL, WY |
| 6/20/2003 | 40 | FIELD TRAINING OFFICER DEVELOPMENT | WLEA DOUGLAS, |
| 6/30/2003 | 64 | FIRST LINE SUPERVISION | WLEA POWELL, WY |
| 12/24/2003 | 16 | INTOXIMETER BASIC | POWELL, WY |
| 8/13/2004 | 40 | DRUG INVESTIGATIONS | RIVERTON, WY |
| 11/6/2004 | 16 | CONSPIRACY INVESTIGATIONS | BASIN, WY |
| 3/25/2005 | 40 | NEW DETECTIVE & CRIMINAL INVESTIGATORS | WLEA DOUGLAS, |
| 4/6/2005 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 05-400-269 |
| 7/18/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |
| 10/5/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL, WY |
| 4/6/2007 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 07-400-228 |
| 9/4/2007 | 3 | FEMA IS100 INTO ICS 100 | ONLINE |
| 9/5/2007 | 3 | FEMA IS-700 INTRO NIMS | ONLINE |
| 9/8/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 11/21/2007 | 4 | INTOXIMETER REFRESHER ECIR | POWELL, WY |
| 11/26/2007 | 5 | GRID SLUETH | POWELL, WY |
| 2/22/2008 | 4 | REVIEW/UPDATE DWUI DETECT/SFST | POWELL, WY |
| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 5/9/2008 | 34 | HOMICIDE AND COLD CASE INVESTIGATIONS | CODY, WY |
| 1/15/2009 | 68 | INVESTIGATION OF COMPUTER CRIME | CHEYENNE, WY |
| 1/15/2009 | 68 | INVESTIGATION OF COMPUTER CRIMES | CHEYENNE, WY |
| 1/30/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 4/6/2009 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 09-400-233 |
| 4/23/2009 | 19 | SEXUAL ASSAULT SUMMIT VIII | CASPER, WY |
| 6/26/2009 | 4 | REVIEW/UPDATE DWUI DETECTION-SFST | POWELL, WY |
| 11/14/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |

Summary for 'NAME' = Training Records by Department (42 detail records)
Sum                    1764

.

`□ □` **001**

LGLP-Wachsmuth 1262

# WYOMING P.O.S.T. TRAINING RECORDS

**ID**     **PO**

**NAME**   FEATHERS, TIMOTHY L.

| DATE | HOURS | COURSE | LOCATION |
|---|---|---|---|
| 8/4/1978 | 320 | BASIC TRAINING | OHIO |
| 1/19/1979 | 32 | PR-24 BATON TACTICS | OH |
| 12/13/1980 | 600 | BS DEGREE CRIMINAL JUSTICE | BOWLING, GREEN, |
| 9/4/1981 | 27 | FIREARMS TRAINING PROGRAM | POWELL, WY |
| 11/20/1981 | 40 | WYOMING CRIMINAL LAW & PROCEDURES | WLEA DOUGLAS, |
| 12/21/1981 | 0 | PROFESSIONAL CERTIFICATION | POST 81-400-660 |
| 2/4/1982 | 16 | BASIC PR-24 BATON | CODY, WY |
| 4/9/1982 | 80 | DEA NARCOTICS INVESTIGATION | WLEA DOUGLAS, |
| 1/1/1983 | 0 | PROFESSIONAL RECERTIFICATION | POST 82-400-510 |
| 1/25/1983 . . . | 8 | BASIC KUBOTAN | POWELL, WY |
| 3/31/1983 | 4 | BASIC OPERATOR IR3000 | POWELL, WY |
| 4/19/1983 | 12 | TRAIN THE TRAINER | POWELL, WY |
| 5/27/1983 | 44 | POLICE FIREARMS INSTRUCTOR | WLEA DOUGLAS, |
| 5/14/1984 | 16 | OFFICER SURVIVAL | CODY, WY |
| 9/7/1984 | 0 | INSTRUCTOR CERTIFICATION | POST 84-500-171 |
| 1/1/1985 | 0 | PROFESSIONAL RECERTIFICATION | POST 85-400-165 |
| 2/6/1985 | 16 | EXPLOSIVE FAMILIARIZATION | LOVELL, WY |
| 3/7/1985 | 24 | RADAR CERTIFICATION | WLEA DOUGLAS, |
| 5/23/1985 | 5 | EXPLOSIVE RECOGNITION & SAFETY | CODY, WY |
| 2/13/1986 | 4 | BASIC KUBOTAN | CODY, WY |
| 2/13/1986 | 4 | BASIC SIDEHANDLE BATON | CODY, WY |
| 6/12/1986 | 24 | ADVANCED DUI ENFORCEMENT | WLEA DOUGLAS, |
| 9/2/1986 | 0 | INSTRUCTOR CERTIFICATION | POST 86-500-199 |
| 1/1/1987 | 0 | PROFESSIONAL RECERTIFICATION | POST 87-400-132 |
| 2/5/1987 | 8 | INVESTIGATION OF SATANISM | LOVELL, WY |
| 10/15/1987 | 24 | FAMILY VIOLENCE TRAINING | CODY, WY |
| 3/18/1988 | 40 | FIRST LINE SUPERVISION | WLEA DOUGLAS, |
| 4/14/1988 | 4 | CRIMINAL INTELL TASK FORCE PART I | POWELL, WY |
| 4/22/1988 | 4 | CRIMINAL INTELL TASK FORCE PART II | CODY, WY |
| 5/11/1988 | 20 | ADVANCED POLICE PISTOL | THERMOPOLIS, WY |
| 10/13/1988 | 8 | STREET LEVEL NARCOTIC ENFORCEMENT | POWELL, WY |
| 12/6/1988 | 16 | BASIC SIDEHANDLE BATON | POWELL, WY |
| 12/7/1988 | 8 | BASIC KUBOTAN | POWELL, WY |
| 1/1/1989 | 0 | PROFESSIONAL CERTIFICATION | POST 89-400-125 |
| 1/22/1989 | 16 | MANAGING SEARCH OPERATIONS | CODY, WY |
| 2/7/1989 | 14 | FIREARMS INSTRUCTOR UPDATE | WLEA DOUGLAS, |
| 8/11/1989 | 80 | FIREARMS INSTRUCTOR CERTIFICATION | WLEA DOUGLAS, |
| 9/29/1989 | 32 | EXECUTIVE DEVELOPMENT | GILLETTE, WY |
| 11/30/1989 | 24 | PATROL RESPONSE CRITICAL INCIDENT | POWELL, WY |
| 2/13/1990 | 12 | WY LAW ENF FIREARMS INSTRUCT ASSOC | DOUGLAS, WY |
| 4/5/1990 | 20 | LAW ENFORCE ADMINISTRATORS CONF | WLEA DOUGLAS, |
| 8/31/1990 | 44 | NRA POLICE RIFLE INSTRUCTOR | JACKSON, WY |
| 11/28/1990 | 4 | REC & ID HAZ MAT | CODY, WY |
| 1/1/1991 | 0 | PROFESSIONAL CERTIFICATION | POST 91-400-096 |
| 1/12/1991 | 8 | CHILD PROTECTION WORKSHOP | CODY, WY |
| 2/15/1991 | 14 | WY LE FIREARMS INSTRUCTOR ASSOC | DOUGLAS, WY |
| 5/22/1991 | 24 | SMALL DEPARTMENT BUDGET | WLEA DOUGLAS, |
| 5/30/1991 | 4 | TACTICAL COMMUNICATIONS | WLEA POWELL, WY |
| 8/30/1991 | 17 | WASPC ANNUAL TRAINING | JACKSON, WY |
| 4/18/1992 | 16 | OVERVIEW OF DEADLY FORCE/INSTR PREP | POWELL, WY |
| 6/4/1992 | 4 | OLEORISIN CAPSICUM DEFENSIVE SPRAY | POWELL, WY |

LGLP-Wachsmuth 335

| | | | |
|---|---|---|---|
| 6/30/1992 | 16 | WLEA FIREARMS INSTRUCTOR UPDATE | WLEA DOUGLAS, |
| 10/16/1992 | 40 | MID-LEVEL MANAGEMENT | WLEA DOUGLAS, |
| 12/7/1992 | 96 | BASIC RIFLE TRAINING/INSTR PREP | DOUGLAS, WY |
| 12/14/1992 | 7 | FRANKLIN TIME MANAGEMENT | POWELL, WY |
| 12/25/1992 | 1 | VEHICLE STOPS LEGAL ISSUES | LETN POWELL, WY |
| 12/27/1992 | 1 | PREPARING FOR COURT | LETN POWELL, WY |
| 12/29/1992 | 1 | BLOODBORNE PATHOGENS PART 1 | LETN POWELL, WY |
| 12/30/1992 | 1 | BLOODBORNE PATHOGENS PART 2 | LETN POWELL, WY |
| 12/31/1992 | 1 | BLOODBORNE PATHOGENS PART 3 | LETN POWELL, WY |
| 1/1/1993 | 0 | PROFESSIONAL CERTIFICATION | POST 93-400-081 |
| 1/2/1993 | 1 | ICMA SERIES PART 3 PATROL FUNCTION | LETN POWELL, WY |
| 1/22/1993 | 1 | TRAFFIC CONTROL | LETN POWELL, WY |
| 2/1/1993 | 1 | PURSUIT DRIVING PART 1 | LETN POWELL, WY |
| 2/2/1993 | 1 | PURSUIT DRIVING PART 2 | LETN POWELL, WY |
| 2/3/1993 | 1 | PURSUIT DRIVING PART 3 | LETN POWELL, WY |
| 2/4/1993 | 1 | PURSUIT DRIVING PART 4 | LETN POWELL, WY |
| 2/8/1993 | 8 | SIDEHANDLE BATON RECERTIFICATION | POWELL, WY |
| 2/23/1993 | 1 | STUNNING TECHNIQUES | LETN POWELL, WY |
| 2/23/1993 | 1 | TRAFFIC CONTROL PART 2 | LETN POWELL, WY |
| 3/1/1993 | 1 | TRAINING TECHNIQUES GOAL ANALYSIS | LETN POWELL, WY |
| 3/3/1993 | 1 | FIELD TRAIN LAW ENF ESSENTIAL ELEM | LETN POWELL, WY |
| 3/28/1993 | 1 | DRAWING THE HANDGUN | LETN POWELL, WY |
| 3/31/1993 | 1 | CREATING THE CLIMATE FOR LEARNING | LETN POWELL, WY |
| 4/6/1993 | 24 | PATROL RESP TO CRIT INC/INSTR PREP | POWELL, WY |
| 6/21/1993 | 1 | EXERCISE PATROL PHYSIQUE PART 1 | LETN POWELL, WY |
| 6/22/1993 | 1 | ICMA PART 19 PERSPECTIVES | LETN POWELL, WY |
| 6/23/1993 | 1 | MNGT & THE USE OF FORCE PART 1 | LETN POWELL, WY |
| 6/24/1993 | 1 | POLICE VIDEOGRAPHY PT 1 THE BASICS | LETN POWELL, WY |
| 8/22/1993 | 1 | HIGH STRESS SPEAKING | LETN POWELL, WY |
| 8/23/1993 | 1 | CONCERNS OF POLICE SURVIVORS PART 1 | LETN POWELL, WY |
| 8/28/1993 | 24 | BASIC CUSTODY & CONTROL | POWELL, WY |
| 10/10/1993 | 1 | HOSTAGE NEGOTIATIONS PART 1 | LETN POWELL, WY |
| 10/18/1993 | 1 | COLLAPSIBLE BATON | LETN POWELL, WY |
| 10/27/1993 | 1 | TRAFFIC STOPS | LETN POWELL, WY |
| 10/28/1993 | 1 | THE SCIENCE OF SURVIVAL PART 3 | LETN POWELL, WY |
| 11/7/1993 | 1 | MANAGING DIVERSITY PART 1 | LETN POWELL, WY |
| 12/1/1993 | 1 | VEHICLE STOPS INITIAL CONTACT | LETN POWELL, WY |
| 12/1/1993 | 1 | COMMUNITY POLICING UPDATE PART 1 | LETN POWELL, WY |
| 1/16/1994 | 1 | SO NOW YOU'RE A SERGEANT | LETN POWELL, WY |
| 2/21/1994 | 4 | INTOXIMETER REFRESHER | POWELL, WY |
| 4/7/1994 | 20 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS, |
| 9/29/1994 | 24 | STREET SURVIVAL | CHEYENNE, WY |
| 10/13/1994 | 16 | BASIC ACCIDENT INVESTIGATION | WLEA POWELL, WY |
| 1/1/1995 | | PROFESSIONAL CERTIFICATION | POST 95-400-082 |
| 2/6/1995 | 4 | CONTACT/COVER | POWELL, WY |
| 2/6/1995 | 4 | OC DEFENSIVE AEROSOL SPRAY | POWELL, WY |
| 4/30/1995 | 64 | INTERIOR TACTICS/INSTR PREP | POWELL, WY |
| 5/15/1995 | 8 | BASIC LIFE SUPPORT/CPR | POWELL, WY |
| 6/21/1995 | 16 | WLEFIA CONFERENCE | WLEA DOUGLAS, |
| 6/23/1995 | 8 | WLEA FIREARMS INSTRUCTOR UPDATE | WLEA DOUGLAS, |
| 3/8/1996 | 40 | COMMAND POST OPERATIONS | CASPER, WY |
| 9/18/1996 | 20 | PROACTIVE PATROL | MONTANA |
| 1/1/1997 | | PROFESSIONAL CERTIFICATION | POST 97-400-069 |
| 2/27/1997 | 6 | DIRECTED PATROL/INSTR PREP | POWELL, WY |
| 3/17/1997 | 4 | GANG AWARENESS/RECOGNITION | POWELL, WY |
| 3/20/1997 | 16 | ICS FOR LAW ENFORCEMENT G190 | POWELL, WY |
| 6/20/1997 | 440 | FBI NATIONAL ACADEMY | QUANTICO, VA |

LGLP-Wachsmuth 336

| 7/10/1997 | 4 | USE OF FORCE UPDATE | WLEA POWELL. WY |
| 7/17/1998 | 40 | EXECUTIVE ISSUES SYMPOSIUM | WLEA DOUGLAS. |
| 9/18/1998 | 36 | LAW ENF EXECUTIVE DEVELOPMENT | LAWRENCE. KS |
| 1/1/1999 | | PROFESSIONAL PO CERTIFICATION | POST 99-400-054 |
| 4/15/1999 | 20 | LAW ENF ADMINISTRATORS CONFERENCE | WLEA DOUGLAS. |
| 8/17/1999 | 32 | M-14 RIFLE BASIC/INSTR PREP | CODY. WY |
| 9/2/1999 | 24 | WLEA FIREARMS INSTRUCTOR UPDATE | WLEA DOUGLAS. |
| 10/13/1999 | 6 | PREVENTION OF METHAMPHETAMINE USE | POWELL, WY |
| 12/6/1999 | 4 | EC/IR UPDATE. | POWELL, WY |
| 4/13/2000 | 20 | LAW ENF ADMINISTRATORS CONF | WLEA DOUGLAS. |
| 6/28/2000 | 24 | HIGH PROFILE INCIDENT MANAGEMENT | WLEA DOUGLAS. |
| 8/22/2000 | 16 | MULTI-HAZARD PROGRAMS FOR SCHOOLS | CASPER, WY |
| 9/14/2000 | 4 | WY PEACE OFFICER ASSOC CONFERENCE | WLEA RIVERTON. |
| 1/1/2001 | | PROFESSIONAL PO CERTIFICATION | POST 01-400-049 |
| 3/30/2001 | 16 | PERSONAL INTEGRITY & PUBLIC TRUST | WLEA DOUGLAS. |
| 4/12/2001 | 16 | LAW ENF ADMINISTRATORS CONFERENCE | WLEA DOUGLAS. |
| 9/12/2001 | 4 | USE OF FORCE UPDATE | WLEA CHEYENNE. |
| 9/13/2001 | 4 | PATROL RESPONSE TO ACTIVE SHOOTER | CHEYENNE. WY |
| 10/9/2001 | 4 | INTERNATIONAL TERRORISM | DOUGLAS, WY |
| 12/14/2001 | 8 | CHARACTER FIRST | POWELL, WY |
| 12/24/2001 | 48 | BASIC FIREARMS HANDGUN & RIFLE/IP | POWELL, WY |
| 3/29/2002 | 40 | PATROL INTERDICTION EMERGENCY RESPONSE | RIVERTON, WY |
| 4/11/2002 | 20 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS. |
| 5/1/2002 | 24 | WLEA FIREARMS INSTRUCTOR UPDATE | WLEA DOUGLAS, |
| 5/24/2002 | 4 | POWELL PD HOLDING FACILITY PROCEDURES | POWELL, WY |
| 5/30/2002 | 16 | WY ALCOHOL EDUCATION SHOWCASE | JACKSON, WY |
| 6/19/2002 | 16 | WMD THREAT & RISK ASSESSMENT | CODY. WY |
| 1/1/2003 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 03-400-136 |
| 2/26/2003 | 16 | ENFORCING WYOMING DRINKING LAWS BASIC | POWELL, WY |
| 4/10/2003 | 20 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS. |
| 1/22/2004 | 8 | INCIDENT COMMAND SYSTEM BASIC | CODY. WY |
| 3/31/2004 | 24 | FIREARMS INSTRUCTOR RE-CERT & UPDATE | WLEA DOUGLAS. |
| 4/2/2004 | 16 | LOW LIGHT TACTICAL INSTRUCTOR | WLEA DOUGLAS. |
| 4/8/2004 | 20 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS. |
| 6/30/2004 | 22 | WY CONF ON SCHOOL & COMMUNITY SAFETY | CASPER, WY |
| 9/15/2004 | 4 | SHERIFFS & CHIEFS ROUNDTABLE | SHERIDAN, WY |
| 9/15/2004 | 4 | BULLET PROOFING YOUR MIND | SHERIDAN, WY |
| 1/1/2005 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 05-400-099 |
| 1/27/2005 | 6 | UPDATE STATE/FEDERL & LEGISLATIVE ISSUES | CHEYENNE, WY |
| 4/7/2005 | 16 | LAW ENFORCEMENT ADMINISTRATORS CONF | WLEA DOUGLAS. |
| 6/9/2005 | 20 | LECC CONFERENCE | JACKSON, WY |
| 7/18/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |
| 9/14/2005 | 5 | SHERIFFS & CHIEFS ROUNDTABLE | CASPER, WY |
| 9/30/2005 | 50 | PATROL TACTICAL RESPONSE | POWELL. WY |
| 11/7/2005 | 3 | FEMA IS-100 INTRO ICS | ON LINE |
| 11/21/2005 | 3 | FEMA IS-700 INTRO NIMS | ON LINE |
| 2/23/2006 | 10 | ANNUAL LEG SLATIVE TRAINING & MEETING | CHEYENNE. WY |
| 4/5/2006 | 4 | WASC GENERAL MEMBERSHIP MEETING | DOUGLAS. WY |
| 4/6/2006 | 24 | PIREARMS INSTRUCTOR RECERT & UPDATE | WLEA DOUGLAS. |
| 6/8/2006 | 20 | LECC ANNUAL CONFERENCE | JACKSON, WY |
| 8/6/2006 | 2 | BASIC EMERGENCY VEHICLE OPERATION | POWELL, WY |
| 9/11/2006 | 3 | WASCOP ADMINISTRATION ISSUES MEETING | GILLETTE. WY |
| 1/1/2007 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 07-400-062 |
| 4/11/2007 | 16 | LE ADMINISTRATORS' CONFERENCE #27 | WLEA DOUGLAS |
| 4/12/2007 | 4 | WASCOP GENERAL MEMBERSHIP MEETING | DOUGLAS. WY |
| 6/21/2007 | 18 | 2007 LECC CONFERENCE | JACKSON. WY |
| 8/24/2007 | 3 | FEMA IS-200 ICS SINGLE RESRC/INITIAL ACT | ONLINE |

LGLP-Wachsmuth 337

| 8/25/2007 | 3 | FEMA IS-800 A INTRO NATL RESPONSE PLAN | ONLINE |
| 9/4/2007 | 5 | ANNUAL SHERIFFS/CHIEFS TRAIN MEETING | LANDER, WY |
| 12/5/2007 | 22 | PROJECT SAFE CHILDHOOD CONFERENCE | ST LOUIS, MO |
| 4/9/2008 | 16 | LAW ENFORCE ADMINISTRATORS CONFERENCE | WLEA DOUGLAS. |
| 4/10/2008 | 5 | WY ASSC C SHERIFFS & CHIEFS POLICE MEET | DOUGLAS. WY |
| 7/22/2008 | 10 | ASSESSMENT CENTER DEVELOPMENT | DOUGLAS. WY |
| 8/6/2008 | 5 | WASCOP GEN MEMBERSHIP MEETING &TRAINING | DOUGLAS. WY |
| 1/1/2009 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 09-400-046 |
| 2/4/2009 | 12 | WASCOP LEGISLATIVE TRAINING & MEETING | CHEYENNE. WY |
| 2/13/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 4/8/2009 | 16 | ADMINISTRATORS' CONFERENCE #29 | WLEA DOUGLAS. |
| 4/9/2009 | 4 | WASCOP GENERAL MEMBERSHIP MEETING/TRAIN | DOUGLAS. WY |
| 6/26/2009 | 4 | REVIEW/UPDATE:DWUI DETECTION-SFST | POWELL, WY |
| 9/23/2009 | 6 | WASCOP ANNUAL MEETING/TRAINING | LARAMIE, WY |
| 9/26/2009 | 8 | FANTASY BASED CRIMES | JACKSON. WY |
| 10/2/2009 | 40 | A PROGRAM IN MANAGING PERFORMANCE | POWELL, WY |
| 10/7/2009 | 7 | 116TH ANNUAL IACP CONFERENCE | DENVER, CO |
| 10/30/2009 | 15 | ASSESSMENT CENTER/ASSESSOR TRAINING | DOUGLAS. WY |
| 11/9/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL, WY |
| 1/13/2010 | 5 | ENFORCE UNDERAGE DRINKING LAWS TEAM MEET | LANDER, WY |

Summary for 'NAME' = Training Records by Department (185 detail records)

Sum                        3699

LGLP-Wachsmuth 338

| Name | CourseTitle | EndDate | Hours |
|------|-------------|---------|-------|
| BRILAKIS, MATTHEW | IS-100 | 1/25/2007 | 3 |
| BRILAKIS, MATTHEW | MDB Training | 1/10/2007 | 2 |
| BRILAKIS, MATTHEW | Master LED/Office of Professional Standards | 10/23/2006 | 2 |
| BRILAKIS, MATTHEW | Master LED/K-9 | 10/18/2006 | 2 |
| brilakis, matthew | IS-200 | 6/15/2006 | 3 |
| brilakis, matthew | Search and Seizure Seminar | 5/19/2006 | 6 |
| brilakis, matthew | 2006 In-Service Force On Force | 3/24/2006 | 8 |
| brilakis, matthew | 2006 In-Service Human Diversity | 3/23/2006 | 8 |
| Brilakis, Matthew | 2006 In-Service Mental Illness/Elderly | 3/22/2006 | 1 |
| Brilakis, Matthew | 2006 In-Service Blood Kits | 3/22/2006 | 1 |
| Brilakis, Matthew | 2006 In-Service Property Submission Reports | 3/22/2006 | 1 |
| Brilakis, Matthew | 2006 In-Service Child Abuse | 3/22/2006 | 1 |
| Brilakis, Matthew | 2006 In-Service VIN | 3/22/2006 | 1 |
| Brilakis, Matthew | 2006 In-Service In-Progress Calls | 3/22/2006 | 1 |
| Brilakis, Matthew | 2006 In-Service Domestic Violence | 3/22/2006 | 1 |
| Brilakis, Matthew | 2006 In-Service Economic Felony Lane | 3/22/2006 | 1 |
| Brilakis, matthew | FCIC Certification | 2/18/2006 | 1 |
| BRILAKIS, MATTHEW | Criminal Street Gang and Major Drug Crime Modules | 1/10/2006 | 40 |
| Brilakis, Matthew | SEARCH & SEIZURE | 5/13/2005 | 6 |
| Brilakis, Matthew | MASTER L.E.O./RECORDS | 4/12/2005 | 2 |
| Brilakis, Matthew | MASTER L.E.O./CAPS | 4/11/2005 | 2 |
| Brilakis, Matthew | SURVIVA_ AWARENESS IN-SERVICE | 4/1/2005 | 40 |
| Brilakis, Matthew | IN-SERV.FITFORDUTY | 1/28/2005 | 8 |
| Brilakis, Matthew | IN-SERV.D.T. | 1/27/2005 | 8 |
| Brilakis, Matthew | IN-SERV.CPR | 1/26/2005 | 2 |
| Brilakis, Matthew | IN-SERV.GANG | 1/26/2005 | 1 |
| Brilakis, Matthew | IN-SERV.BLOODBORNE | 1/26/2005 | 0 |
| Brilakis, Matthew | IN-SERV.ETHICS | 1/26/2005 | 1 |
| Brilakis, Matthew | IN-SERV.NARCOTICS | 1/26/2005 | 2 |
| Brilakis, Matthew | BREATH TEST OPERATOR RENEWAL | 11/15/2004 | 8 |
| Brilakis, Matthew | BREATH TEST OPERATOR RENEWAL | 11/15/2004 | 8 |
| Brilakis, Matthew | N.I.M.S. TRAINING | 10/20/2004 | 2 |
| Brilakis, Matthew | DEF. DRIVING | 6/16/2004 | 8 |
| Brilakis, Matthew | ASS./ACC./CIU | 5/6/2004 | 8 |
| Brilakis, Matthew | ADVANCED STREET GANGS | 4/30/2004 | 40 |
| Brilakis, Matthew | X-26 TASER TRANSITION COURSE | 4/29/2004 | 2 |
| Brilakis, Matthew | MASTER L.E.O./CHIEF'S OFFICE | 4/26/2004 | 2 |
| Brilakis, Matthew | MASTER L.E.O./K-9 | 4/23/2004 | 2 |
| Brilakis, Matthew | DEPO./TRAFFIC/BB/PPE | 4/9/2004 | 8 |
| Brilakis, Matthew | IN-SERVICE-DOM.VIOLENCE | 10/20/2003 | 2 |
| Brilakis, Matthew | IN-SERVICE DT/TASER/BATON | 10/9/2003 | 5 |
| Brilakis, Matthew | CHILD ABUSE | 10/9/2003 | 4 |
| Brilakis, Matthew | IN-SERVICE DT/TASER/BATON | 10/9/2003 | 5 |
| Brilakis, Matthew | IN-SERV.SCENARIO-LOW LIGHT | 10/8/2003 | 10 |
| Brilakis, Matthew | CPR/BLOODBORNE/HAZMAT | 10/7/2003 | 5 |
| Brilakis, Matthew | FIT-TESTING | 10/7/2003 | 0 |
| Brilakis, Matthew | IN-SERVICE RIFLE TRAINING | 10/7/2003 | 2 |
| Brilakis, Matthew | HUMAN DIVERSITY/RAC.PROF. | 10/6/2003 | 8 |
| Brilakis, Matthew | MASTER L.E.O./VIN | 4/23/2003 | 2 |
| Brilakis, Matthew | MASTER L.E.O./K-9 | 4/17/2003 | 2 |
| Brilakis, Matthew | TRAFFIC LASER OPERATOR TRANSITION COURSE | 3/21/2003 | 12 |

| Brilakis, Matthew | LANDLORD/TENANT TRAINING | 3/19/2003 | 2 |
|---|---|---|---|
| Brilakis, Matthew | CHEMICAL TEST REQUALIFICATION | 2/21/2003 | 8 |
| Brilakis, Matthew | SCENARIO'S-R.E.D./CELL | 6/11/2002 | 9 |
| Brilakis, Matthew | WEAPONS OF MASS DESTRUCTION | 5/27/2002 | 10 |
| Brilakis, Matthew | AR-15 FAMILIARIZATION | 4/8/2002 | 4 |
| Brilakis, Matthew | TASER | 4/8/2002 | 5 |
| Brilakis, Matthew | LEO FLYING ARMED | 3/18/2002 | 2 |
| Brilakis, Matthew | MASTER L.E.O./TAG | 3/11/2002 | 2 |
| Brilakis, Matthew | FCIC - RE-CERT. | 3/7/2002 | 1 |
| Brilakis, Matthew | STREET CRIMES & SURVEILLANCE TECHNIQUES | 2/27/2002 | 24 |
| Brilakis, Matthew | STREET CRIMES & SURVEILLANCE TECHNIQUES | 2/27/2002 | 24 |
| Brilakis, Matthew | STREET GANGS: I.D. & INVESTIGATION | 9/28/2001 | 40 |
| Brilakis, Matthew | STREET GANGS: I.D. & INVESTIGATION | 9/28/2001 | 40 |
| Brilakis, Matthew | HAZMAT | 8/20/2001 | 4 |
| Brilakis, Matthew | BLOODBORNE | 8/20/2001 | 3 |
| Brilakis, Matthew | REID METHOD OF CRIMINAL INVERVIEWS & INTERR( | 8/9/2001 | 24 |
| Brilakis, Matthew | GANG INVESTIGATION & INTERVENTION | 6/29/2001 | 8 |
| Brilakis, Matthew | UNDERCOVER SURVIVAL | 5/30/2001 | 16 |
| Brilakis, Matthew | INTOXILYZER 5000 REFRESHER | 5/14/2001 | 4 |
| Brilakis, Matthew | LANDLORD-TENANT & HOTEL-MOTEL TRAIN THE TR/ | 4/23/2001 | 8 |
| Brilakis, Matthew | VERBAL JUDO | 4/9/2001 | 8 |
| Brilakis, Matthew | C.P.R. RECERTIFICATION | 4/9/2001 | 1 |
| Brilakis, Matthew | VIDEO TRAINING | 1/22/2001 | 0 |
| Brilakis, Matthew | MASTER L.E.O./YLO | 12/28/2000 | 1 |
| Brilakis, Matthew | VIDEO TRAINING | 12/19/2000 | 0 |
| Brilakis, Matthew | INTERNAL AFFAIRS | 12/18/2000 | 1 |
| Brilakis, Matthew | HATE CRIMES/VIC.ADV. | 12/18/2000 | 1 |
| Brilakis, Matthew | OPERATIONAL PHILOSOPHY | 12/18/2000 | 3 |
| Brilakis, Matthew | DT - HANDCUFFING | 12/18/2000 | 4 |
| Brilakis, Matthew | SCENARIO'S - CELL MOVEMENT | 10/18/2000 | 9 |
| Brilakis, Matthew | CRITICAL INCIDENT | 10/17/2000 | 1 |
| Brilakis, Matthew | VIDEO TRAINING | 8/28/2000 | 1 |
| Brilakis, Matthew | VIDEO TRAINING | 7/31/2000 | 0 |
| Brilakis, Matthew | VIDEO TRAINING | 6/24/2000 | 0 |
| Brilakis, Matthew | SCENARIO-OFFICER SURVIVAL IV | 6/12/2000 | 9 |
| Brilakis, Matthew | SEARCH & SEIZURE | 5/15/2000 | 2 |
| Brilakis, Matthew | DT-2000 | 5/15/2000 | 5 |
| Brilakis, Matthew | CHECK FRAUD | 5/15/2000 | 2 |
| Brilakis, Matthew | NARCOTICS I.D. | 4/28/2000 | 40 |
| Brilakis, Matthew | LIMITED ACCESS RECERT/FCIC RECERT. | 3/15/2000 | 1 |
| Brilakis, Matthew | CRIME SCENE MANAGEMENT FOR DETECTIVES | 3/3/2000 | 20 |
| Brilakis, Matthew | AUTO THEFT | 2/29/2000 | 1 |
| Brilakis, Matthew | CHILD ABUSE | 2/29/2000 | 8 |
| Brilakis, Matthew | INSTRUCTOR TECHNIQUES | 1/28/2000 | 80 |
| Brilakis, Matthew | Hobble RIPP Restraint | 12/30/1999 | 2 |
| Brilakis, Matthew | FIELD FORCE TRAINING | 12/7/1999 | 9 |
| Brilakis, Matthew | BREATH ALCOHOL TESTING | 10/16/1999 | 80 |
| Brilakis, Matthew | FIELD FORCE TRAINING | 1/11/1999 | 9 |

# WYOMING P.O.S.T. TRAINING RECORDS

**ID      PO**

**NAME    DANZER, MATTHEW A.**

| DATE | HOURS | COURSE | LOCATION |
|------|-------|--------|----------|
| 5/5/2004 | 1000 | BS DEGREE CRIMINAL JUSTICE | PENSACOLA |
| 7/8/2004 | | TEMPORARY PEACE OFFICER CERTIFICATION | POST 04-TEMP-089 |
| 3/24/2005 | | BASIC PEACE OFFICER CERTIFICATION | POST 05-100-014 |
| 3/24/2005 | 515 | PEACE OFFICER BASIC TRAINING COURSE | WLEA DOUGLAS, |
| 7/13/2005 | 8 | TASER X26 CERTIFICATION | POWELL, WY |
| 10/5/2005 | 50 | PATROL TACTICAL RESPONSE . | POWELL, WY |
| 3/2/2006 | 16 | BASIC RADAR/WHP RADAR/LIDAR OPS | POWELL, WY |
| 3/9/2006 | 3 | FEMA IS-700 INTRO NIMS | ON LINE |
| 3/24/2006 | 8 | INTOXIMETER ECIR BASIC | POWELL, WY |
| 3/25/2006 | | ADVANCED PEACE OFFICER CERTIFICATION | POST 06-300-049 |
| 3/25/2007 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 07-400-158 |
| 4/18/2007 | 16 | STREET SURVIVAL TACTICAL EDGE | DENVER, CO |
| 5/26/2007 | 16 | DRUG RECOGNITION EXPERT PRELIMINARY SCHO | CASPER, WY |
| 6/15/2007 | 40 | RADAR/LIDAR INSTRUCTOR COURSE | LARAMIE, WY |
| 8/17/2007 | 40 | DWI INSTRUCTOR | LARAMIE. WY |
| 9/15/2007 | 3 | FEMA IS-700 ICS SINGLE RESRC/INITIAL ACT | ONLINE |
| 10/4/2007 | 72 | FIRST LINE SUPERVISION | WLEA, WY |
| 11/28/2007 | 3 | FEMA IS-00 INTRO ICS | ON LINE |
| 2/22/2008 | 8 | REVIEW/UPDATE DWUI DETECT/SFST/*IP | POWELL, WY |
| 4/8/2008 | 9 | LE STRATEGIES/REDUCE UNDERAGE DRINKING | POWELL, WY |
| 6/13/2008 | 40 | FIELD TRAINING OFFICER DEVELOPMENT | WLEA DOUGLAS, |
| 9/16/2008 | 4 | GANGS & SECURITY THREAT GROUPS IN JAILS | LARAMIE. WY |
| 9/17/2008 | 4 | TERRORISM AWARENESS MEETING THE CHALLENG | LARAMIE. WY |
| 9/17/2008 | 4 | SEARCH & SEIZURE | LARAMIE, WY |
| 9/18/2008 | 4 | LESSONS FROM AMISH SCHOOL SHOOTINGS | LARAMIE, WY |
| 9/18/2008 | 4 | RECOGNIZING SPANISH DANGER WORDS | LARAMIE. WY |
| 9/19/2008 | 8 | PATROL RESPONSE TO ACTIVE SHOOTER | LARAMIE. WY |
| 11/14/2008 | 8 | SCHOOL SAFETY & PREPARATION | LANDER. WY |
| 1/30/2009 | 8 | EXPANDABLE BATON | POWELL, WY |
| 3/25/2009 | | PROFESSIONAL PEACE OFFICER CERTIFICATION | POST 09-400-160 |
| 3/25/2009 | 4 | INTOXIMETER ECIR-REFRESHER | POWELL, WY |
| 5/28/2009 | 4 | HGN: ANATOMY TO PROSECUTE | CODY, WY |
| 10/9/2009 | 40 | THE SERGEANTS' ACADEMY | CODY. WY |
| 10/27/2009 | 4 | VEHICLE TITLE & REGISTRATION TRAIN 1-5 | CODY. WY |
| 11/14/2009 | 28 | IMMEDIATE ACTION FOR PATROL | POWELL. WY |

Summary for 'NAME' =  Training Records by Department (35 detail records)
Sum                              1971

LGLP-Wachsmuth 612

WACHSMUTH V. CITY OF
POWELL- CV 10-041J
PLAINTIFF'S EXHIBIT
# __35__

Powell Police Department
4th Quarter 2005
Patrol Friday Training

10/21   Roll Call Video (Your Vest Won't Stop This Bullet)
10/28   NIMS Training
11/04   NIMS Training
11/11   NIMS Training
11/18   Proper use and collection of blood kits
11/25   Proper use and collection of UA kits
12/02   Pursuits
12/09   Search Warrants
12/16   Proper use and collection of Sexual Assault kits
12/23   K-9
12/30   Handcuffing

Powell Police Department
Friday Training 2006

| Date | Training | Research POC |
|------|----------|--------------|
| February '06 | | |
| | Blair's Market Trespass | Hand Out |
| | Vehicle Consent Searches | Hand Out |
| | Night Time Traffic Stops | SOP |
| | Felony Stops | SOP |
| March '06 | | |
| | K-9 | Chad & Section 3.9 |
| | Prisoner Handling and Transport | Policy Page #3.4.06 |
| | Booking Room Security and Control | Policy Page #3.5.02 |
| | Pursuits | Policy Page #3.1.11 |
| April '06 | | |
| | Miranda | Policy Page #3.6.2 / Hand Out |
| | Crime Scene Initial Response | Alan and Dave |
| | Evidence Packaging | Lee |
| | EDP's | |
| May '06 | | |
| | Proper Use and Collection – Blood Kits | |
| | Proper Use and Collection – UA Kits | |
| | Proper Use and Collection – Sexual Assault Kits | |
| | Mobile Video/Audio | Policy Page #3.6.11 |
| June '06 | Mass Arrest | Policy Page #3.7.12 & 3.7.15 |
| | High Risk Warrant Service | Policy Page #3.7.23 |
| | Mutual Aid | Policy Page #3.7.1 |
| | Search Warrants | Policy Page #3.6.16 / Hand Out |
| July '06 | | |
| | Involuntary Committals | |
| | Investigative Detentions | Hand Out |
| | Law of Arrest | Hand Out/ Policy Page #3.4.1 |
| | Less Lethal Munitions | Policy Page #3.3.5 |
| | | |

LGLP-Wachsmuth 1815

Powell Police Department
Friday Training 2006

| August '06 | | |
|---|---|---|
| | DWUI Forms | Hand Out |
| | Juvenile Arrest & Parental Notification | Policy Page #3.4.9 & 3.2.7 |
| | Blood Borne Pathogens (PPE) | Hand Out |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

LGLP-Wachsmuth 1816

Powell Police Department
Friday Training 2006

| Date | Training | Research POC |
|------|----------|--------------|
| October '06 | | |
| | | |
| | | |
| | | |
| | | |
| November '06 | | |
| | Mass Arrest | Policy 3.7.12 & 3.7.15 |
| | Code of Ethics | Policy 1.2.05 |
| | Active Threat Response | Policy 3.7.11 |
| | Confidential Informants | Policy 3.6.16 |
| December '06 | | |
| | Indicators for a K9 Search | Chad |
| | K9 Deployment | Chad |
| | Consent Search | |
| | Plain View (Vehicle) | |

LGLP-Wachsmuth 1817

| Training | Date and Time/Place | Counter measures Task | Weapons Task |
|---|---|---|---|
| Handgun/Rifle/Custody Control | 2-27-06/1400/classroom/Range | Single Room Clearing | Skill Lessons 1,2 |
| Simmunitions | 3-20-06/1400/Classroom | Building Clearing/cuffing/searching | N/A |
| Handgun/Rifle/Custody Control | 4-17-06/1400/Range | Squad Movement | Skill Lessons 3,4 |
| Simmunitions | 5-12-06/1400hrs/Fairgrounds | Squad Movement/weapon retention | N/A |
| Handgun/Rifle/Custody Control | 6-12-06/1400hrs/PD/Range | Barricaded Gunmen | Skill Lessons 5,6 |
| Simmunitions | 7-21-06/1400hrs/Fairgrounds | Barricaded Gunmen Scenario | N/A |
| Handgun/Rifle/Custody Control | 8-21-06/1400hrs/PD/Range | Multi Room Clearing | Skill Lessons 7,8 |
| Simmunitions | 9-25-06/1400hrs/Fairgrounds | Multi-Room Clearing | N/A |
| Handgun/Rifle/Custody Control | 10-30-06/All Day/Range | N/A | Qualification Day Skill Lessons 9,10 |
| Handgun/Rifle/Custody Control | 11-27-06/All Day/Range | N/A | Skill Lessons 11,12,13,14,15 |
| Handgun/Rifle/Custody Control | 12-18-06/Range | N/A | Dim/Light Qualification |

| Custody Control Task |
|---|
| Handcuffing/Searching |
| N/A |
| Weapon Retention |
| N/A |
| Self Defense |
| N/A |
| Proper Prisoner Booking Refresher |
| N/A |
| N/A |
| N/A |

LGLP-Wachsmuth 1819

LGLP-Wachsmuth 1820

Instructor
Miner

Schmidt/Glick
Brown

Schmidt/Glick

Schmidt/Glick

UOF Instructors

WHP/Danzer

Blackmore/Kent/Firearms/Brown

Kosicheck/Brown

UOF/Blackmore

Firearms/Brown

Eckerdt

All

Firearms

Firearms

LGLP-Wachsmuth 1821

Powell Police Department
Friday Training December '08 thru February "09

| Date | Training | Research POC |
|------|----------|--------------|
| December '08 | | |
| | Review from 08-1125 | Hand Out |
| | Sexual Assault | Hand Out |
| | Missing Child | Hand Out |
| | | |
| January '09 | | |
| | Custody & Control | Brown/Chapman/McCaslin |
| | All 5 Fridays | |
| | | |
| | | |
| February '09 | | |
| | Custody & Control | Brown/Chapman/McCaslin |
| | 1st 3 Fridays | |
| | NSF / Check Forgery | Hand Out |
| | | |

LGLP-Wachsmuth 1822

2008
Custody and Control

March 2008

Baton: Four Friday training sessions, 1 hour long.

3-7 Strikes and movement

3-14 Dept Training, change to Blocking and strikes.

3-21 Blocking and takedowns (possible jury trial this week)

3-28 I will be out of town, have each squad review and document

April 2008

Takedowns: Four Fridays, 1 hour long.

4-4 Baton, (test), grabs and takedowns (Jaw Thrust)

4-11 Takedowns (Jaw Thrust)

4-18 Takedowns

4-25 Test on takedowns

May 2009

Weapon Retention: Five Fridays, 1 hour long.

5-2 Front Grab

5-9 Rear Grab

5-16 Out of holster Grab

5-23 Test on Weapon Retention

This will take us through May 2008, we will see if this works and if officers can pass this way. It will be up to the Sgt's to make arraignments with me to set up this training. The 1 and 2 shift should not be a problem; the night shift can come in around 3pm and go through this. If officers learn quickly, they can review themselves on other Friday's and practice.

LGLP-Wachsmuth 1823

# Table of Contents

## Section 1:   Administration

**Strategic Plan**
| | |
|---|---|
| 1.1.01 | Mission Statement |
| 1.1.02 | Vision Statement |
| 1.1.03 | Organizational Philosophy |
| 1.1.04 | Core Values |

**Department Organization**
| | |
|---|---|
| 1.2.01 | Policy Manual – Authority |
| 1.2.02 | Policy Manual – Purpose |
| 1.2.03 | Command Structure |
| 1.2.04 | Oath of Office |
| 1.2.05 | Code of Ethics |
| 1.2.06 | Obedience to Orders |
| 1.2.07 | Use of Authority |
| 1.2.08 | Reserve Officers/Dispatchers |
| 1.2.09 | Citizen Volunteer Program |

**Personnel Procedures**
| | |
|---|---|
| 1.3.01 | Personal Information |
| 1.3.02 | General Duty Requirements |
| 1.3.03 | Absenteeism/Sick Leave |
| 1.3.04 | Leave Requests |
| 1.3.05 | On Call Status |
| 1.3.06 | General Fitness |
| 1.3.07 | Drug/Alcohol/Tobacco Use |
| 1.3.08 | Breaks |
| 1.3.09 | Falsification of Time |
| 1.3.10 | Compensation –Damages Off-Duty |
| 1.3.11 | Resignations |
| 1.3.12 | Outside Employment |
| 1.3.13 | Contract Employment |
| 1.3.14 | Duty to Respond |
| 1.3.15 | Patrolling the City |
| 1.3.16 | Workplace Discrimination |

**Internal Affairs**
| | |
|---|---|
| 1.4.01 | Internal Affairs |
| 1.4.02 | Misconduct Defined |
| 1.4.03 | Accepting/Filing of Complaints |
| 1.4.04 | Supervisor's Role/Responsibility |
| 1.4.05 | Administrative Investigation Process |



Kent
DEPOSITION
EXHIBIT
52

| 1.4.06 | **Duty to Cooperate** |
| 1.4.07 | **Employee Interviews** |
| 1.4.08 | **Investigative Procedures** |
| 1.4.09 | **Complaint Disposition** |
| 1.4.10 | **Discipline – Due Process** |
| 1.4.11 | **Confidentiality of Investigation** |
| 1.4.12 | **Employee Protection** |
| 1.4.13 | **Application** |

## Section 2:   Personnel

### Code of Conduct

| 2.1.01 | **General Conduct** |
| 2.1.02 | **Compromising Conduct** |
| 2.1.03 | **Loyalty to Department** |
| 2.1.04 | **Internal Problem Resolution** |
| 2.1.05 | **Civil Processes** |
| 2.1.06 | **Personal Business/Solicitations** |
| 2.1.07 | **Impartiality** |
| 2.1.08 | **Political Activity** |
| 2.1.09 | **Organization Membership** |
| 2.1.10 | **Debts** |
| 2.1.11 | **Public Addresses/Publications** |
| 2.1.12 | **Advertising Publicity** |
| 2.1.13 | **Police Credentials** |
| 2.1.14 | **Business Cards** |
| 2.1.15 | **Correspondence** |
| 2.1.16 | **Gratuities and Gifts** |
| 2.1.17 | **Purchasing** |
| 2.1.18 | **Employment Reference Checks** |

### Uniforms and Equipment

| 2.2.01 | **Uniforms** |
| 2.2.02 | **Plain Clothes** |
| 2.2.03 | **Uniform Wear** |
| 2.2.04 | **Personal Hygiene** |
| 2.2.05 | **Department Equipment** |
| 2.2.06 | **Workplace Security and Inspection** |

### Selection, Training, Probation

| 2.3.01 | **Peace Officer Selection** |
| 2.3.02 | **Peace Officer Probation** |
| 2.3.03 | **Field Training Program** |
| 2.3.04 | **Selection, Training, and Supervision of FTOs** |
| 2.3.05 | **Annual Training** |

**Discipline**
| | |
|---|---|
| **2.4.01** | **Professional Development** |
| **2.4.02** | **Character Development** |
| **2.4.03** | **Awards Program** |
| **2.4.04** | **Training** |
| **2.4.05** | **Punitive Discipline** |
| **2.4.06** | **Appeal of Punitive Discipline** |
| **2.4.07** | **Documentation of Discipline** |

## Section 3:        Operations

**Vehicle Operations**
| | |
|---|---|
| **3.1.01** | **Marked Vehicles** |
| **3.1.02** | **Unmarked Vehicles** |
| **3.1.03** | **Vehicle Use** |
| **3.1.04** | **Vehicle Care and Inspection** |
| **3.1.05** | **Vehicle Deployment** |
| **3.1.06** | **Vehicle Security** |
| **3.1.07** | **Police Vehicle Crashes** |
| **3.1.08** | **Vehicle Operations: Response Driving** |
| **3.1.09** | **Vehicle Operations: Emergency** |
| **3.1.10** | **Vehicle Operations: Pursuit Driving** |
| **3.1.11** | **Roadblocks** |
| **3.1.12** | **Road Spikes** |
| **3.1.13** | **Driver Training** |
| **3.1.14** | **Rider-Observer Program** |
| **3.1.15** | **Vehicle Assignment** |

**Patrol**
| | |
|---|---|
| **3.2.01** | **Manpower Allocation** |
| **3.2.02** | **Directed Patrol** |
| **3.2.03** | **Patrol Area** |
| **3.2.04** | **Traffic Crash Investigations** |
| **3.2.05** | **Vehicle Impound and Towing** |
| **3.2.06** | **Vehicle Inventory** |
| **3.2.07** | **Vicious Animals** |
| **3.2.08** | **Contact/Cover** |
| **3.2.09** | **Parental Notification of Juveniles** |
| **3.2.10** | **Missing Person/Runaway** |
| **3.2.11** | **Alarm Response** |
| **3.2.12** | **Burglary Response** |
| **3.2.13** | **Robbery Response** |
| **3.2.14** | **Bomb Threats** |
| **3.2.15** | **Civil Stand-bys** |

3.2.16          On-Call Supervisor/Chief of Police Notification

**Use of Force**
3.3.01          Reasonable Force
3.3.02          Use of Force Reporting and Review
3.3.03          Use of Baton
3.3.04          Oleoresin Capsicum Spray
3.3.05          Chemical Agents
3.3.06          Electronic Control Devices
3.3.07          Less than Lethal Munitions
3.3.08          Use of Handcuffs
3.3.09          Deadly Force
3.3.10          Duty to Render Aid
3.3.11          Investigation
3.3.12          Firearms Handling
3.3.13          Firearms Care
3.3.14          Firearms Training and Proficiency
3.3.15          Off-Duty/Back-up Firearms

**Arrest**
3.4.01          Rules of Arrest
3.4.02          Arrest Warrants
3.4.03          Warnings
3.4.04          Arrests/Personal
3.4.05          Prisoner Welfare
3.4.06          Prisoner Handling and Transportation
3.4.07          Prisoner Fraternization
3.4.09          Booking Procedures
3.4.10          Citations
3.4.11          Release of Prisoners
3.4.12          Arraignment
3.4.13          Prisoner Transport
3.4.14          Juveniles

**Prisoners**
3.5.01          Holding Facility
3.5.02          Security and Control
3.5.03          Booking Procedures
3.5.04          Visitation and Telephone Calls
3.5.05          Ill, Injured, or Disabled Prisoners
3.5.06          Prisoner Release
3.5.07          Bail
3.5.08          Public/Media Access
3.5.09          Juvenile Holding

### Investigations

| | | |
|---|---|---|
| 3.6.01 | Criminal Investigations |
| 3.6.02 | Advice of Rights |
| 3.6.03 | Investigator Notification |
| 3.6.04 | Use of Electronic Recording Devices for Consensual Monitoring |
| 3.6.05 | Video Monitoring of Public Area |
| 3.6.06 | Audio/Visual Recorded Evidence |
| 3.6.07 | Mobile Video/Audio Recording Equipment |
| 3.6.08 | Surveillance |
| 3.6.09 | Search Warrants |
| 3.6.10 | Crime Scene Response |
| 3.6.11 | Death Investigation |
| 3.6.12 | Robbery Scene Investigation |
| 3.6.13 | Domestic Violence |
| 3.6.14 | Sexual Assault |
| 3.6.15 | Traffic Crash Fatalities |
| 3.6.16 | Confidential Informants |
| 3.6.17 | Property Crimes |
| 3.6.18 | Investigative Priorities |
| 3.6.19 | Case Management |
| 3.6.20 | Alcohol/Tobacco Compliance Checks |
| 3.6.21 | Fire Response and Investigation |

### Special Events

| | | |
|---|---|---|
| 3.7.01 | Mutual Aid |
| 3.7.02 | Incident Command System |
| 3.7.03 | Homeland Security |
| 3.7.04 | Special Events Planning |
| 3.7.05 | Disaster Response |
| 3.7.06 | Parades, Marches and Demonstrations |
| 3.7.07 | Civil Disturbances |
| 3.7.08 | Dignitary Protection |
| 3.7.09 | Mass Arrest |
| 3.7.10 | Hostage/Barricaded Suspects |
| 3.7.11 | Active Threat Response |
| 3.7.12 | Stakeouts |
| 3.7.13 | High Risk Warrant Service |

### Evidence

| | | |
|---|---|---|
| 3.8.01 | Evidence and Property |
| 3.8.02 | Found Property |
| 3.8.03 | Annual Evidence and Found Property Audit |

**K-9**
| | |
|---|---|
| 3.9.01 | **K-9 Authorization, Training and Application** |
| 3.9.02 | **K-9 Deployment** |
| 3.9.03 | |
| 3.9.04 | **K-9 Drug Search Procedures** |
| 3.9.05 | **K-9 Demonstrations** |
| 3.9.06 | **K-9 Role** |
| 3.9.07 | **K-9 Training Aids** |

**Victim Assistance**
| | |
|---|---|
| 3.10.01 | **Victim's Services** |
| 3.10.02 | **Death Notification to Next of Kin** |
| 3.10.03 | **Line of Duty Death/Injury** |
| 3.10.04 | **Americans with Disabilities** |

**Media**
| | |
|---|---|
| 3.11.01 | **Media Relations** |
| 3.11.02 | **Press Releases** |

**Court**
| | |
|---|---|
| 3.12.01 | **Court Appearances** |
| 3.12.02 | **Civil Court** |

**Section 4:    Support Services**

**Communications**
| | |
|---|---|
| 4.1.01 | **Radio Communications** |
| 4.1.02 | **Status Checks** |
| 4.1.03 | **Officer/Dispatcher Hostage Code** |
| 4.1.04 | **Telephone Communications** |
| 4.1.05 | **Teletype Communications** |
| 4.1.06 | **Communications Recording System** |

**Records**
| | |
|---|---|
| 4.2.01 | **Incident Records** |
| 4.2.02 | **Reports** |
| 4.2.03 | **Reports, Records, Information Confidentiality** |
| 4.2.04 | **Records Release and Inspection** |
| 4.2.05 | **Dispatch and Records Room Security** |
| 4.2.06 | **Money Receipting** |
| 4.2.07 | **NIBERS Participation** |

**Computers**

| | |
|---|---|
| 4.3.01 | **Computer Information System** |
| 4.3.02 | **Computer System Use** |
| 4.3.03 | **Network Administrator Responsibilities** |
| 4.3.04 | **Computer Hardware and Software Installation and Maintenance** |
| 4.3.05 | **Computer Security and Violations** |

**Legal Process**

| | |
|---|---|
| 4.4.01 | **Municipal Court Legal Process** |

*Powell Police*
**Policies and Procedures**

**Section 1**                                                        **Administration**
**Chapter 2**                                      **Department Organization**

**1.2.01 Policy Manual - Authority**              Effective Date: March 15, 2001

**Authorizing Signature:__ _____**

### Policy Statement

The Chief of Police of the City of Powell shall have the authority to adopt policies, procedures, rules and regulations for the effective and efficient administration and management of the agency. All policies, procedures, rules and regulations contained in this manual shall be subordinate to the Powell City Employees Handbook, which is adopted in its entirety, except where noted and approved by the governing body. These policies, procedures, rules and regulations supercede all previous policies, procedures, rules and regulations and shall have the same authority as those in existence. Policies, procedures, rules and regulations shall not be cancelled, amended, or issued without the approval of and verified by the signature of the Chief of Police, or in his absence, the officer designated to act in his behalf.

All policies, procedures, rules and regulations are applicable to the specified employees of the agency. The failure of an employee, either willfully or through negligence or incompetence, to perform the duties at his rank or assignment; or violations by any employee of any policies, procedures, rules or regulations may be considered sufficient cause for disciplinary action as set forth in this manual. Therefore, it is the responsibility of every employee to have knowledge of the policies, procedures, rules and regulations contained in this manual and to abide by them.

### Procedure

None.

### Rules/Regulations

1.   Employees will keep their manuals secure. Any information which could hamper the operations of the department, if released, will be kept strictly confidential. Strict confidentiality is especially important in regard to information on emergency response and criminal activity.
2.   Loss of the manual or any of its components will be reported immediately to a supervisor.
3.   All requests for the manual or any of its contents must be cleared through the Chief of Police.
4.   Employees will keep their manuals in good condition and repair. Broken covers or torn pages will be repaired. When necessary, replacement of these parts will be requested through their supervisor.
5.   Employees will be responsible for maintaining their manual in an up-to-date manner by making any changes or additions as directed. Upon being issued manual updates, employees will sign a dated form indicating that they have received **and** updated the manual. Employees are responsible for familiarizing themselves with all changes to the manual.

00010

Thomas A. Thompson
MacPherson, Kelly & Thompson, LLC
616 West Buffalo St.
P.O. Box 999
Rawlins WY  82301
(307) 324-2713
(307) 324-7348 (fax)
Attorneys for Defendants, City of Powell, Tim
Feathers, Chad Minor, Mike Cretien, Roy Eckerdt,
Dave Brown, Mike Hall, Brett Lara, Matt McCauslin,
Alan Kent, Mike Danzer, Matt Brikalis, Lee
Blackmore and Cody Bradley, all in their official
capacities

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

TRICIA WACHSMUTH,

      Plaintiff,

vs.                      Civil Action No. 10- CV-041-J

THE CITY OF POWELL, TIM FEATHERS,
CHAD MINOR, MIKE CRETIEN, ROY ECKERDT,
DAVE BROWN, MIKE HALL, BRETT LARA,
MATT McCAUSLIN, ALAN KENT, MIKE DANZER,
MATT BRILAKIS, LEE BLACKMORE,
CODY BRADLEY, and
John Does #1-#5.

      Defendants.

## DEFENDANTS' RESPONSES TO PLAINTIFF'S FIRST DISCOVERY REQUEST
## DIRECTED TO ALL DEFENDANTS

**COMES NOW**, the above named Defendants, City of Powell and all individually named

Defendants in their official capacities, by and through their attorney, Thomas A. Thompson, and

hereby submits, under oath, the following responses to *Plaintiff's Third Discovery Set Directed to*

*City of Powell and Chief Feathers*, as follows:

Page 1 of 10



Chapman
DEPOSITION
EXHIBIT
59

## GENERAL STATEMENT AND OBJECTION

A.     The *Plaintiff's Third Discovery Set Directed to City of Powell and Chief Feathers*, impose upon these Defendants burdens and obligations beyond those contemplated by the applicable Federal Rules of Civil Procedure. Defendants will respond pursuant to the Federal Rules of Civil Procedure and any purported instructions, definitions, requirements or requests to the contrary will be disregarded.

B.     Defendants object to any Interrogatories or Request for Production of Documents to the extent that they demand information which is protected by the attorney-client privilege, is attorney work product, or is irrelevant to the subject matter of the pending litigation and unlikely to lead to the discovery of admissible evidence.

C.     To the extent any Request for Production of Documents can be interpreted as requiring Defendants to produce documents that are not available to Defendants or are equally available or accessible to Plaintiff, Defendants object thereto.

D.     The answer and responses contained herein are to the best present ability and information of Defendants. Defendants reserve the right to supplement after completion of discovery and to introduce evidence at the time of trial or hearing based on information and/or documents located, developed or discovered subsequent to the date hereof, which evidence may supplement, modify, or be in conflict with the answers and responses contained herein which are based on present information only. Defendants acknowledge their continuing obligations to supplement their answers and responses contained herein, and remind Plaintiff of her identical obligation.

E.     Any answer to these Interrogatories and Request for Production of Documents, which in whole or in part, voluntarily provides information or refers to materials which may be inadmissible on any evidentiary ground is not intended as a waiver of objection of any nature, including privilege, to the discoverability or admissibility of any and all information and materials. Furthermore, Defendants reserve the right to object to the admissibility or legal applicability of any such information or materials provided herein during the course of other discovery, pleading, motions or trial of this matter.

F.     Defendants specifically object to the use of any information or materials provided in answer to Interrogatories and Request for Production of Documents in any proceeding to which Defendants are not a party.

## PLAINTIFF'S THIRD DISCOVERY SET DIRECTED
## TO CITY OF POWELL
## AND CHIEF TIM FEATHERS

INTERROGATORY NO. 5. Please identify each occasion in which the Powell Police Department has engaged in a dynamic entry in the last seven years together with a brief explanation of the

facts of the entry, including whether it was in aid of a misdemeanor warrant, a felony warrant, whether it was hostage situation or a suicide attempt and whether deadly force was used. (You may omit the dynamic entry into the Plaintiff's home from this account).

ANSWER:
      Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise burdensome and requires inquiry into matters outside the scope of those matters permitted by discovery.

By:      _____
          Thomas A. Thompson

      Without waiving said objection, Defendants have attached hereto responsive to Plaintiff's requests for production, a copy of reports on those matters which may be responsive to said interrogatory. Said reports do not necessarily meet Plaintiff's definition of "dynamic entry", but Defendants have attempted to reply in good faith and in accordance with the applicable rules governing discovery.

      SUBPART 1. Please identify the dates the entries occurred and the names of the officers involved. You may redact any information pertaining to the individuals named in the search warrant or identifying information about them.

ANSWER:
      Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise burdensome and requires inquiry into matters outside the scope of those matters permitted by discovery.

By:      _____
          Thomas A. Thompson

      Without waiving said objection see those reports attached hereto.

      SUBPART 2. Please provide a basic description of the reason for the dynamic entry.

ANSWER:
      Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise burdensome and requires inquiry into matters outside the scope of those matters permitted by discovery.

By:      _____
          Thomas A. Thompson

Without waiving said objection see those reports attached hereto.


SUBPART 3. For each entry how many long guns were involved?

ANSWER:
Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise burdensome and requires inquiry into matters outside the scope of those matters permitted by discovery.

By: _____
        Thomas A. Thompson

Without waiving said objection see those reports attached hereto.


SUBPART 4. For each entry were distraction devices employed, and if so, by which officers?


ANSWER:
Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise burdensome and requires inquiry into matters outside the scope of those matters permitted by discovery.

By: _____
        Thomas A. Thompson

Without waiving said objection see those reports attached hereto. It does not appear as if any distraction devices were employed.


SUBPART 5. For each entry was the entry to the residence accomplished by force (i.e. was a battering ram used to break down the door)?

ANSWER:
Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise burdensome and requires inquiry into matters outside the scope of those matters permitted by discovery.

By: _____
        Thomas A. Thompson

Without waiving said objection see those reports attached hereto.

SUBPART 6. For each entry were weapons pointed at residents of the home, and if so, by which officers?

ANSWER:

Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise burdensome and requires inquiry into matters outside the scope of those matters permitted by discovery.

By: _____
Thomas A. Thompson

Without waiving said objection see those reports attached hereto.

INTERROGATORY NO. 6. For each dynamic entry employed by the Powell Police Department identify whether there was any prior history of violence, threats of violence or threats to officer safety from those mentioned in the warrant or warrants and describe the evidence of the threat.

ANSWER:

Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise burdensome and requires inquiry into matters outside the scope of those matters permitted by d scovery.

By: _____
Thomas A. Thompson

Without waiving said objection see those reports attached hereto.

INTERROGATORY NO. 7. For each dynamic entry, please identify whether outside assistance was sought or provided from other agencies, and the identity of any individual who provided assistance, advice or expertise.

ANSWER:

Objection as to relevance. Defendants further object as said interrogatory is vague, ambiguous and otherwise bu densome and requires inquiry into matters outside the scope of those matters permitted by discovery.

By: _____
Thomas A. Thompson

Without waiving said objection see those reports attached hereto.

INTERROGATORY NO. 8. Please identify each claim filed against the City of Powell, or any individual officer including complaints filed with internal affairs for excessive force by officers of the Powell Police Department within the last five years.

ANSWER:

Objection as to relevance. Defendants further assert that said interrogatory is outside the scope of those matters subject to discovery as per this Court's Protective Order

By:      *7.7L*

Thomas A. Thompson

INTERROGATORY NO. 9. Please identify who has final authority to act for the City of Powell as the policy maker for the Powell Police Department.

ANSWER:

Objection as said interrogatory calls for a legal conclusion.

By:

Thomas A. Thompson

Without waiving said objection, Defendants refer Plaintiff to those documents already produced and those documents attached hereto.

INTERROGATORY NO. 10. Please identify each occasion on which a flashbang or noise distraction device such as that deployed in the instant case has been deployed by members of the Powell Police Department in the last seven years in furtherance of a search or arrest warrant or other police emergency.

ANSWER:

Objection as to relevance.

By:

Thomas A. Thompson

Without waiving said objection, no flashbang or noise distraction device such as that deployed in the instance case has been deployed by members of the Powell Police Department in the last seven years in furtherance of a search warrant or arrest warrant or other police emergency, other than training.

SUBPART 1. Please ider.tify which officers were involved in the deployment of the flashbang or distraction devices set out above and for which dates.

ANSWER: N/A.

## *PLAINTIFF'S THIRD REQUEST FOR PRODUCTION OF DOCUMENTS*

Plaintiff requests the production of the following documents and tangible things pursuant to Rule 34 of the FRCP and Rule 34.1 of the USDCLR. *Plaintiff requests timely supplementation of Plaintiff's Third Discovery Set – Page 5 each document request pursuant to Rule 26(e) FRCP.* As set out in Rule 34.1(b) *U.S.D.C.L.R.*:

> *A request for production . . . shall be read reasonably in the recognition that the attorney serving it generally does not have knowledge of the documents being sought and the attorney receiving the request . . . generally has such knowledge or can obtain it from the client.*

### ALL OF THE DOCUMENTS REQUESTED BELOW MAY BE INCLUDED IN THE PROTECTIVE ORDER

**REQUEST FOR PRODUCTION NO. 10.** Please produce the warrants and the officer reports associated with each o`'` the dynamic entries identified in your answer to Interrogatory No.5. (You may redact the identity of the person or persons whose home or structure was searched, the names of any suspects, hostage taker or hostages including their street address or other identifying information).

RESPONSE:
Objection as to relevance.

By: _____
Thomas A. Thompson

Without waiving said objection, please see those reports attached hereto.

**REQUEST FOR PRODUCTION NO. 11.** Please produce the evidence that suggested a suspect or suspects had a history of violence or presented a threat to the officers in response to Interrogatory No. 6 above. (You may redact the identity of the person or persons whose home or structure was searched, the names of any suspects, hostage taker or hostages including their street address or other identifying information).

RESPONSE:

       Objection as to relevance.

By: _____

       Thomas A. Thompson

Without waiving said objection, please see those reports attached hereto.

**REQUEST FOR PRODUCTION NO. 12.** Please produce any document that confirms the authority of the final decision maker for the City of Powell Police Department.

RESPONSE:

       Objection as said interrogatory calls for a legal conclusion.

By: _____

       Thomas A. Thompson

Without waiving said objection, please see those documents attached hereto.

**REQUEST FOR PRODUCTION NO. 13.** Please provide a copy of each claim filed against the City of Powell or any individual City of Powell police officer named in the complaint for excessive force in the last five years. (You may redact the identity of the person or persons making the claim unless the claim is a public document).

RESPONSE:

       Objection as to relevance. Defendants further assert that said request is outside the scope of those materials subject to discovery as per this Court's Protective Order.

By: _____

       Thomas A. Thompson

*(Remainder of page intentionally left blank)*

**DATED** this ____ day of _____, 2010.

**CITY OF POWELL AND ALL NAMED DEFENDANTS IN THEIR OFFICIAL CAPACITY ONLY**

By:   **Tim Feathers**
       **Chief of Police**
       **Powell Police Department**

STATE OF WYOMING    )
                   : ss.
COUNTY OF PARK      )

The undersigned, being first duly sworn, deposes and says that he is the duly appointed representative for the City of Powell and acting in that capacity, he has read the foregoing, knows the contents thereof, and that it is true and correct to the best of his knowledge and belief.

**Chief Tim Feathers**

Subscribed to and sworn to (or affirmed) before me on _____ by **Tim Feathers** as Chief of Police for the City of Powell, Wyoming.

Notary Public

My commission expires: _____.

**DATED** this 22nd day of October, 2010.

Thomas A. Thompson, #6-2640
MacPherson, Kelly & Thompson, LLC
PO Box 999
616 W. Buffalo
Rawlins, WY 82301
(307) 324-2713
(307) 324-7348 - fax

Page 9 of 10

**DATED** this 21 day of October, 2010.

**CITY OF POWELL AND ALL NAMED
DEFENDANTS IN THEIR OFFICIAL
CAPACITY ONLY**

By:    **Tim Feathers
Chief of Police
Powell Police Department**

STATE OF WYOMING      )
                      : ss.
COUNTY OF PARK        )

The undersigned, being first duly sworn, deposes and says that he is the duly appointed representative for the City of Powell and acting in that capacity, he has read the foregoing, knows the contents thereof, and that it is true and correct to the best of his knowledge and belief.

**Chief Tim Feathers**

Subscribed to and sworn to (or affirmed) before me on ___10/21/10___ by **Tim Feathers** as Chief of Police for the City of Powell, Wyoming.

_Lisa R Baker_

Notary Public

My commission expires: 7-16-13

LISA R. BAKER – NOTARY PUBLIC
COUNTY OF PARK     STATE OF WYOMING
My Commission Expires 7-16-13

**DATED** this 19th day of October, 2010.

Thomas A. Thompson, #6-2640
MacPherson, Kelly & Thompson, LLC
PO Box 999

Page 10 of 11

## CERTIFICATE OF SERVICE

This is to certify that on the 22nd day of October, 2010, at Rawlins, Wyoming, I served the foregoing instrument by causing to be deposited a full, true and correct copy thereof in the United States Mail, duly enveloped with postage prepaid, and addressed to:

Jeffrey C. Gosman                        Misha Westby
Gosman Law Office                        Wyoming Attorney General's Office
P.O. Box 51267                           Herschler Building, 1st Floor West
Casper, WY 82601                         Cheyenne, WY 82002


Mailed By: _____        _____
                                 For MacPherson, Kelly, & Thompson, LLC