# Appendix Two

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powel, et al.*

*Mike Chretien*
*October 05, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 10-5-10 Mike Chretien_scoped.txt
Min-U-Script® with Word Index

---

MIKE CHRETIEN - October 5, 2010                                      Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF WYOMING

 3       -------------------------------------------------

 4    TRICIA WACHSMUTH,                  )
                                         )
 5              Plaintiff,               )
                                         )
 6        vs.                            )   NO. 10-CV-041J
                                         )
 7    CITY OF POWELL, AND IN THEIR       )
      INDIVIDUAL CAPACITY, TIM           )
 8    FEATHERS, CHAD MINER, MIKE         )
      CHRETIEN, ROY ECKERDT, DAVE        )
 9    BROWN, MIKE HALL, BRETT LARA,      )
      MATT MCCASLIN, ALAN KENT, MATT     )
10    DANZER, OFFICER BRILAKIS, LEE      )
      BLACKMORE, CODY BRADLEY, KIRK      )
11    CHAPMAN, JOHN DOES #1-#4,          )
                                         )
12              Defendants.              )
                                         )
13       _____

14             DEPOSITION OF MIKE CHRETIEN
              9:09 a.m., Tuesday, October 5, 2010
15
       _____
16

17

18              Pursuant to notice, the deposition of MIKE

19    CHRETIEN was taken in behalf of Plaintiff in accordance

20    with the applicable Federal Rules of Civil Procedure at

21    270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22    Registered Professional Reporter and Notary Public of

23    the State of Montana.

24

25
```

---

MIKE CHRETIEN - October 5, 2010                                      Page 2

```
 1                        APPEARANCES

 2    FOR PLAINTIFF:

 3              Mr. Jeffrey C. Gosman
                Gosman Law Office
 4              123 W 1st Street
                P.O. Box 51267
 5              Casper, WY 82601-2481
                Telephone: (307)265-1082 - Fax: (307)265-6715
 6              E-mail: jeff@gosmanlawoffices.com

 7

 8    FOR INDIVIDUAL DEFENDANTS:

 9              Ms. Misha Westby
                Senior Assistant Attorney General
10              2424 Pioneer Avenue, 2nd Floor
                Cheyenne, WY 82002
11              Telephone: (307)777 5477 Fax: (307)777-8920
                E-mail: mwest@state.wy.us
12

13    FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
      CAPACITY:
14

15              Mr. Tom Thompson
                MacPerson, Kelly & Thompson
16              616 West Buffalo
                P.O. Box 999
17              Rawlins, WY 82301-0999
                Telephone: (307)324-2713 - Fax: (307)324-7348
18              E-mail: tthompson@wyomingattorneys.net

19

20    Also Present:  Tim Feathers

21

22

23

24

25
```

---

MIKE CHRETIEN - October 5, 2010                                      Page 3

```
 1                     INDEX TO WITNESSES

 2                                                         PAGE

 3    MIKE CRETIEN

 4         Direct Examination by Mr. Gosman ..............5
           Signature Page .............................252
 5         Reporter's Certificate .....................253

 6

 7                        EXHIBITS

 8    EXHIBIT           DESCRIPTION                        PAGE
```

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Wyoming P.O.S.T. Training Records | 17 |
| 2 | 52-hour Basic SWAT Course Syllabus | 22 |
| 3 | NTOA Mechanical and Shotgun Breaching Training | 30 |
| 4 | NTOA SWAT Supervision & Command-Making Training | 28 |
| 5 | NTOA High Risk Warrant Service | 29 |
| 6 | After Action Reviews | 50 |
| 7 | DEF-TEC Label | 113 |
| 8 | Countermeasures Tactical, Inc. Document | 118 |
| 9 | Distraction Device Document | 120 |
| 10 | Notes of Wachsmuth Warrant | 48 |
| 11 | Carry Positions | 72 |
| 13 | Search and Seizure Affidavit | 225 |
| 14 | Affidavit of Probable Cause | 225 |
| 15 | Affidavit of Probable Cause | 225 |

---

MIKE CHRETIEN - October 5, 2010                                      Page 4

```
 1                     EXHIBITS (Cont.)

 2    EXHIBIT           DESCRIPTION                        PAGE
```

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 16 | PPD Supplement 7 by Mike Chretien | 167 |
| 27 | Countermeasures Tactical Institute Patrol Officer Specialized Tactics Course | 61 |
| 28 | Countermeasures Tactical Institute Immediate Action for Patrol | 63 |
| 29 | Crisis Response Tactics | 65 |
| 31 | Wyoming P.O.S.T. Training Records | 99 |
| 33 | Answer filed by Mr. Thompson | 231 |
| 35 | PPD Patrol Friday Training | 107 |
| 36 | E-mail | 248 |
| 40 | Drawing by Mr. Chretien | 191 |
| 41 | Drawing by Mr. Chretien | 212 |

---

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 4 of 91
Tricia Wachsmuth v.                                                    Mike Chretien
City of Powel, et al.                                                October 05, 2010

| MIKE CHRETIEN - October 5, 2010 Page 5 | MIKE CHRETIEN - October 5, 2010 Page 7 |

**Page 5**

Direct Examination by Mr. Gosman

1        MIKE CHRETIEN,
2 having been first duly sworn, testified as follows:
3        DIRECT EXAMINATION
4 BY MR. GOSMAN:
5    Q. Officer Chretien, have you ever given a
6 deposition before?
7    A. No, sir.
8    Q. And you participated in a couple of
9 depositions in the last day?
10   A. Yes.
11   Q. So you're familiar with the process for
12 conducting a deposition. correct?
13   A. Yes.
14   Q. I'm going to go ahead and review those with
15 you again.
16      You do understand that you're under oath
17 today?
18   A. Yes.
19   Q. And your answers can be recorded -- or are
20 being recorded and can be used against you at trial?
21   A. Yes.
22   Q. That makes it important for you to ask for
23 clarification if you have any trouble with my
24 questions, do you understand?
25   A. I understand.

**Page 7**

Direct Examination by Mr. Gosman

1 sergeants, of which I'm one.
2    Q. So the sergeants report directly to Chief
3 Feathers?
4    A. Yes.
5    Q. Are you in a supervisory capacity of the
6 patrol officers?
7    A. Yes.
8    Q. Are you in a supervisory capacity over all
9 the patrol officers or just a certain group that are in
10 the investigation unit?
11   A. I'm not sure I understand.
12   Q. Do you supervise a specific group of
13 employees or police officers?
14   A. Yes.
15   Q. Which ones are they?
16   A. It changes from year to year.
17   Q. Okay. Do you share supervisory
18 responsibility with the other sergeants over the same
19 employee?
20   A. Not generally.
21   Q. 2009, who were you responsible for in a
22 supervisory capacity?
23   A. Anna Paris, Kirk Chapman, Kevin Schmidt,
24 Matthew Danzer.
25   Q. Okay. And let's go ahead and visit for just

**Page 6**

Direct Examination by Mr. Gosman

1    Q. Okay. And again, we all seem to have a
2 little trouble with finishing our questions before the
3 answer begins, and I will as well. So we both got to
4 kind of cooperate on that end of it?
5    A. Okay.
6    Q. If you need to take a break at any time, we
7 will do so.
8    A. Okay.
9    Q. However, if a question is pending, you will
10 be required to answer the question before the break
11 begins.
12   A. I understand.
13   Q. What is your full name?
14   A. Michael George Chret en.
15   Q. And your current address, Officer?
16   A. 250 North Clark Street, Powell, Wyoming.
17   Q. Your occupation?
18   A. Police officer.
19   Q. And what is your rank with the Powell Police
20 Department?
21   A. Sergeant.
22   Q. Could you give me a brief overview of the
23 chain of command of the Powell Police Department
24 starting with Chief Feathers?
25   A. There's Chief Feathers. and then the three

**Page 8**

Direct Examination by Mr. Gosman

1 a minute about the other sergeants and who they were
2 responsible for, to the best of your knowledge.
3    A. I don't remember exactly who they had on
4 their squads.
5    Q. That's fine. Are you currently on any
6 medication that would impair your ability to give
7 truthful answers here today?
8    A. No.
9    Q. Do you have any medical problems or illnesses
10 that might interfere with your ability to give truthful
11 answers to this deposition?
12   A. No.
13   Q. Have you ever been arrested for any crime,
14 other than a traffic violation?
15   A. No.
16   Q. Have you ever been accused of a crime
17 involving dishonesty?
18   A. No.
19   Q. Are you married?
20      MS. WESTBY: Do you have a specific reason?
21 You asked about divorce and restraining orders
22 yesterday. I guess, I'm --
23      MR. GOSMAN: Yes, I'm trying to get some
24 background on the officers.
25      MS. WESTBY: For what reason?

1    MR. GOSMAN: This is an excessive force case,
2  and if an officer has had a restraining order against
3  him, I think that's significant. I don't know if
4  anyone else would agree with that, but I do. It's
5  background information.
6    MS. WESTBY: Okay Then let's go with that.
7    MR. GOSMAN: Let's go with what?
8    MS. WESTBY: Well, I mean, does personal life
9  have any relevance to anything in this case?
10   MR. GOSMAN: It may have, yes.
11   MS. WESTBY: How so?
12   MR. GOSMAN: Well, I know that I'm entitled
13  to get information on personal life. And it's not
14  something you want to bring up with the Magistrate, so
15  this is just going to be a couple of questions, and
16  we'll be on with it.
17    THE WITNESS: Yes
18  BY MR. GOSMAN:
19   Q.  And you have a family, Officer Chretien?
20   A.  Yes.
21   Q.  Have you ever been divorced?
22   A.  No.
23   Q.  Do you have any children the age of Bret
24  Wachsmuth or Josh Bessler?
25   A.  No.

1    Q.  Have you ever had a restraining order placed
2  against you?
3    A.  No.
4    Q.  All right. Let's go ahead and move on to
5  your educational background.
6     Where did you go to high school, Officer
7  Chretien?
8    A.  Stockbridge, Georgia.
9    Q.  And did you graduate from high school there?
10   A.  Yes.
11   Q.  And what year was that?
12   A.  1991.
13   Q.  And have you had any education or schooling
14  beyond high school?
15   A.  Yes.
16   Q.  Would you describe your education beyond high
17  school?
18   A.  I attended Georgia Military College in
19  Milledgeville, Georgia.
20   Q.  And how long were you there?
21   A.  Two years.
22   Q.  Did you receive a degree?
23   A.  I did.
24   Q.  And what was that degree in?
25   A.  Associate's in general studies.

1    Q.  What year was that that you received that
2  degree?
3    A.  1993.
4    Q.  And then did you continue with your education
5  after that?
6    A.  Yes.
7    Q.  And where did you go, and tell me about your
8  next schooling experience.
9    A.  Georgia Southwestern college.
10   Q.  And how long were you there?
11   A.  Two years.
12   Q.  And did you obtain a degree there?
13   A.  Yes.
14   Q.  And I assume these are associate degrees,
15  correct?
16   A.  No.
17   Q.  Okay. Let's go back to the degree you
18  obtained at the military college. What kind of degree
19  was that?
20   A.  That was an associate's degree.
21   Q.  Okay. And then you went on to another school
22  for two years?
23   A.  Yes.
24   Q.  And I'm sorry. What was the name of that
25  school again?

1    A.  Georgia Southwestern college.
2    Q.  Okay. That was a four-year college?
3    A.  Yes, sir.
4    Q.  And you obtained a degree from that school?
5    A.  I did.
6    Q.  And what was that degree in?
7    A.  History.
8    Q.  What year did you graduate from that school?
9    A.  1995.
10   Q.  When was it that you decided to get into law
11  enforcement?
12   A.  2002.
13   Q.  Okay. From 1995 to 2002, why don't you tell
14  me what you did.
15   A.  I was on active duty as an infantry officer
16  in the Army from '95 to 2000.
17   Q.  Were you deployed overseas?
18   A.  No.
19   Q.  What branch of the service?
20   A.  The Army.
21   Q.  You said that. Thank you. All right.
22     What -- I assume that you were honorably
23  discharged; is that correct?
24   A.  Yes.
25   Q.  And when you got out of the Army -- in 2002,

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 6 of 91
Tricia Wachsmuth v.                                                          Mike Chretien
City of Powel, et al.                                                      October 05, 2010

MIKE CHRETIEN - October 5, 2010                          Page 13
Direct Examination by Mr. Gosman

1   was it?  Did you say?
2       A.  2000.
3       Q.  What did you do for the next couple of years?
4       A.  For one year I worked at a steel mill in
5   Louisiana.
6       Q.  And your next job was with law enforcement?
7       A.  No.  My next job was with Taco Bell in
8   Macedonia, Georgia.
9       Q.  Okay.  You began your law enforcement career
10  in 2002?
11      A.  Yes.
12      Q.  Tell me about that.
13      A.  I applied for a job with the city of College
14  Park, and I was selected.
15      Q.  And did they put you through the law
16  enforcement academy?
17      A.  Yes.
18      Q.  And what -- at what time did you finish your
19  requirements at the law enforcement academy?
20      A.  I don't remember the date.  It would have
21  been the fall of 2002.
22      Q.  And did you begin serving as a police officer
23  in the fall of 2002?
24      A.  I started my field training after the
25  academy.

MIKE CHRETIEN - October 5, 2010                          Page 14
Direct Examination by Mr. Gosman

1       Q.  And when did you complete your field
2   training?
3       A.  Christmas Eve, 2002.
4       Q.  And did you have any problems during your
5   probationary period with College Park Police
6   Department?
7       A.  No.
8       Q.  How long did you work for the College Park
9   Police Department?
10      A.  From June of 2002 until August of 2007.
11      Q.  And where did you go when you left the
12  College Park Police Department?
13      A.  Powell Police Department.
14      Q.  What was your rank when you left the College
15  Park Police Department?
16      A.  Sergeant.
17      Q.  Did you complete a probationary program at
18  the Powell Police Department?
19      A.  Yes.
20      Q.  And what year did you complete that program?
21      A.  2008.
22      Q.  And were you certified as a Wyoming police
23  officer sometime during that period?
24      A.  Yes.
25      Q.  And approximately when was that?

MIKE CHRETIEN - October 5, 2010                          Page 15
Direct Examination by Mr. Gosman

1       A.  I think they issued a temporary certification
2   as soon as I was hired that was good for a year.
3   Within that year's time, I completed the challenge
4   course at the law enforcement academy and got my full
5   certification around the spring.
6       Q.  Spring of -- 2008?
7       A.  Yes.
8       Q.  Did you have to take courses in order to
9   complete the challenge requirements?
10      A.  They were courses at the law enforcement
11  academy.
12      Q.  So you completed a session at the law
13  enforcement academy?
14      A.  Yes.
15      Q.  And approximately how many hours were
16  involved in that, hours of training?
17      A.  I believe it was 80.
18      Q.  Were you hired as a sergeant for the Powell
19  Police Department?
20      A.  I was.
21      Q.  And did you begin immediately to assume
22  supervisory duties once you completed your probationary
23  term?
24      A.  At some point in my field training, I started
25  over as a probationary sergeant.  I did field training

MIKE CHRETIEN - October 5, 2010                          Page 16
Direct Examination by Mr. Gosman

1   just like everyone else.
2       Q.  Okay.
3       A.  Initially.
4       Q.  When did you achieve the rank of sergeant
5   with the Powell Police Department, then?
6       A.  I don't remember the exact date.
7       Q.  That's okay.  Just give me a rough idea.
8       A.  Winter.
9       Q.  Winter of 2009?
10      A.  '7.
11      Q.  Okay.  Have you ever had any claims filed
12  against you involving discipline that are not in your
13  personnel file?
14          MS. WESTBY: I'm sorry.  Say that again.
15          MR. GOSMAN: I'll ask the reporter to repeat
16  it.
17          MS. WESTBY: Okay.  Well, do you want the
18  reporter to read the Judge's question?
19          MR. GOSMAN: Actually, I'm fine with that.
20  As a matter of fact, that's just fine.
21          MR. THOMPSON: And I have it verbatim, too.
22          MR. GOSMAN: Okay.
23          MR. THOMPSON: Have you ever received any
24  kind of disciplinary action that is not reflected in
25  your personnel records?

Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

---

MIKE CHRETIEN - October 5, 2010                    Page 17
Direct Examination by Mr. Gosman

1   MR. GOSMAN: Okay. That's fine. Let's ask
2   that question.
3   BY MR. GOSMAN:
4   Q. Officer, can you answer that question?
5   A. At the Powell Police Department?
6   Q. Yes.
7   A. No, I have not.
8   Q. You've never been brought in and reprimanded
9   for any action as a Powell police officer?
10  A. No.
11              (Exhibit 1 identified)
12  BY MR. GOSMAN:
13  Q. Let me ask you to turn to Exhibit 1 in your
14  exhibit notebook, sir. That. I believe, are the
15  P.O.S.T. training records, both within the State of
16  Wyoming and from your previous training in Georgia.
17         Would you take a look at those and tell me if
18  that is a complete record of your P.O.S.T. training?
19  A. Up until February of 2009, yes.
20  Q. Okay. Let's go ahead and take a look at your
21  Georgia P.O.S.T. training records, which are on Page 2.
22  Can you tell me what the "intermediate certified"
23  means? It's displayed under the heading "Officer
24  Certifications".
25  A. I don't recall the exact requirements. But

---

MIKE CHRETIEN - October 5, 2010                    Page 18
Direct Examination by Mr. Gosman

1   in order to obtain an intermediate certification
2   through the Georgia Peace Officer Standards and
3   Training Council, you had to have a certain number of
4   college credit hours, certain number of years'
5   experience. And then there was a specific list of
6   courses that were required.
7          They are listed in my P.O.S.T. profile. I
8   just don't recall what that specific list was. It was
9   maybe five or six courses.
10  Q. And those courses are reflected in your
11  P.O.S.T. training records; is that correct?
12  A. Yes.
13  Q. And I see that you have two certifications.
14  What are those certifications?
15  A. I'm not sure which ones you're referring to.
16  Q. Oh, it says "Instructor Certifications."
17  It's the Document No. 2.
18  A. Okay. General and firearms.
19  Q. Okay. Did you have a certification in SWAT
20  training?
21  A. There is no Georgia P.O.S.T. certification
22  for SWAT training.
23  Q. Okay. Does the Georgia P.O.S.T. have a
24  certification for specially trained units?
25  A. No.

---

MIKE CHRETIEN - October 5, 2010                    Page 19
Direct Examination by Mr. Gosman

1   Q. How about certification for deployment of
2   flashbang devices?
3   A. No.
4   Q. When you say that Georgia doesn't have
5   certification, does that mean Georgia doesn't require a
6   certification?
7   A. I don't know.
8   Q. Okay. Certainly you can take courses and
9   qualify as a certified -- or as certified in a given
10  area, such as the deployment of flashbang devices,
11  wouldn't you agree with that?
12              MR. THOMPSON: Objection as to form.
13              THE WITNESS: Repeat the question.
14  BY MR. GOSMAN:
15  Q. Do you understand you can be trained and
16  certified in the area of deployment of flashbang
17  devices?
18  A. Not to my knowledge by a P.O.S.T.
19  Q. How about Wyoming, do you know anything about
20  what Wyoming recognizes?
21  A. Not to my knowledge.
22  Q. So in other words, Wyoming wouldn't have a
23  certification -- if you applied for training
24  recognition under the Wyoming P.O.S.T. requirements,
25  they would not recognize a certification for flashbang

---

MIKE CHRETIEN - October 5, 2010                    Page 20
Direct Examination by Mr. Gosman

1   devices, as far as you know?
2   A. There's a difference between certification
3   and recognizing training.
4   Q. All right. Go ahead and clear that up for
5   me.
6   A. I would say that both Georgia and Wyoming
7   would recognize training in the devices. However, I'm
8   not aware that either state issues any certifications.
9   Q. All right. Under the heading
10  "Investigations" on that page that we're looking at, it
11  indicates there were no cases in the file. What does
12  that mean, do you know?
13  A. Yes.
14  Q. What does it mean?
15  A. If you were involved in some sort of
16  incident, it could be Internal Affairs, it could be a
17  complaint directly to P.O.S.T., it could be a
18  termination with cause, things of that nature, that's
19  where a P.O.S.T. investigator would be assigned to look
20  into the officer to determine whether or not they
21  should retain that certification as a peace officer in
22  Georgia.
23  Q. It appears that you have had SWAT training;
24  is that correct?
25  A. Yes.

---

MIKE CHRETIEN - October 5, 2010                    Page 21
Direct Examination by Mr. Gosman

1   Q.  And let's go ahead and review the SWAT
2   training that you had.  And we'll start with the last
3   year first.  That was in 2007; is that correct?
4   A.  That was SWAT training by the name "SWAT
5   Training," yes.
6   Q.  Okay.  Who picks the names?  Do you know?
7   A.  I don't.
8   Q.  All right.  How many hours of SWAT training
9   did you have in 2007?
10  A.  That's reflected on my P.O.S.T. profile --
11  can I write on this?
12  Q.  Yes, you can.  That's not even going to go
13  into the record.
14  A.  Eighty hours are reflected on my P.O.S.T.
15  profile.
16  Q.  Okay.  And go ahead and do the same thing for
17  the year 2006, and we're going to go all the way back
18  to 2002.  And we're going to add them all up, too.
19  Just to let you know that.
20  A.  Well, I want to correct 2007, there's one
21  two-hour course that was SWAT training, but it's titled
22  something else; is that okay?
23  Q.  That's fine.  What course is that?
24  A.  Submachine gun.
25  Q.  Okay.

MIKE CHRETIEN - October 5, 2010                    Page 22
Direct Examination by Mr. Gosman

1   A.  That would make the total for 2007 82 hours
2   on my P.O.S.T. profile.  Looks like 80 hours for 2006.
3   116 hours for 2005.
4   Q.  Did you say 187?
5   A.  116 for 2005.  And I don't see any past that,
6   no.
7   Q.  Okay.  Roughly 280 hours during those years?
8   A.  Roughly.
9   Q.  Is that correct?
10  A.  Yes.
11              (Exhibit 2 identified)
12  BY MR. GOSMAN:
13  Q.  Let's go ahead and turn to Exhibit No. 2, and
14  was this your first SWAT training course; is the
15  document represented there part of your first SWAT
16  training course?
17  A.  This was the first SWAT training class that I
18  attended as a student.
19  Q.  All right.  And would that have been in the
20  year -- was it 2005, did we decide?
21  A.  Yes.
22  Q.  Okay.  I notice that we have the first page,
23  and the table of contents, but we don't have any other
24  documents relative to that training.
25  A.  Uh-huh.

MIKE CHRETIEN - October 5, 2010                    Page 23
Direct Examination by Mr. Gosman

1   Q.  I also notice, Officer, that it appears, at
2   least, that you were taking a picture of -- this was
3   being copied.
4   A.  Uh-huh.
5   Q.  And it was -- well, I can't say that about
6   this particular document.
7       Let me just ask this question:  Where are the
8   rest of these training materials?
9   A.  This book is a book about as thick as the
10  binder that you got here.
11  Q.  Okay.
12  A.  The course didn't have an outline, per se.
13  It was a bunch of different articles that they put
14  together.
15  Q.  I see.  Okay.
16  A.  I just didn't think.
17  Q.  All right.
18  A.  I mean, you're welcome to look at it, if you
19  want I can get it.
20  Q.  I'm not sure I want to copy it, but I think I
21  will want to look at it.  Can we make an arrangement to
22  get that before the end of the week?
23  A.  I can get that for you first break.
24  Q.  Okay.  Very good.  Thank you.
25      All right.  Why don't we go ahead and review

MIKE CHRETIEN - October 5, 2010                    Page 24
Direct Examination by Mr. Gosman

1   the course syllabus and talk about what it was that you
2   learned as a basic SWAT officer.
3   A.  Okay.
4   Q.  That's Exhibit 2.  I notice that this was a
5   multi-day course, four days it looks like, a five-day
6   course.  "Introduction to SWAT and SWAT Theory."  It
7   talks about SWAT team mission and composition.
8       What can you tell me about SWAT team mission
9   and SWAT composition, Officer?
10      MS. WESTBY:  I'm going to object to the form
11  of the question.
12      Go ahead.
13      THE WITNESS:  Okay.  The SWAT teams primarily
14  handle two specific missions.
15  BY MR. GOSMAN:
16  Q.  Okay.  What are they?
17  A.  Hostage rescue and barricaded gunman.
18  Q.  They also perform high-risk warrant service?
19  A.  As do all officers.
20  Q.  Well -- okay.  But I mean, SWAT teams perform
21  high-risk warrant service, correct?
22  A.  They do.
23  Q.  Okay.  And what is the theory behind the SWAT
24  team?  What's the difference between the SWAT team and
25  all officers, for instance, handling these kinds of

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 9 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1  situations?
2    A.  I'm not sure I understand.
3       MR. THOMPSON: Objection as to form, as to
4  all these.  Vague.
5       MS. WESTBY: Same.
6  BY MR. GOSMAN:
7    Q.  You mentioned high - I mentioned high-risk
8  warrant service.  And you indicated all officers
9  participate in high-risk warrant service.
10   A.  Correct, that's a requirement for advanced
11 certification in Georgia.  That particular class,
12 called high-risk warrant service that every officer
13 attends.
14   Q.  Every officer?
15   A.  Every officer that wants to obtain the
16 advanced certification.
17   Q.  Did you obtain your advanced certification in
18 Georgia?
19   A.  No.
20   Q.  All right.  So back to my question.  What is
21 the difference between the philosophy and the training
22 for a SWAT team, and having officers on the street
23 perform high-risk warrant service?
24   A.  They would do it the same.  The only
25 difference is that one is assigned to a special unit.

1    Q.  Isn't that group trained, specially trained?
2    A.  They would receive the same type of training
3  that the other officers would.
4    Q.  And do they have special training
5  requirements, the SWAT team?
6    A.  I think that depends on the agency.
7    Q.  Well, based on what you know.  Let's just use
8  College Park as an example
9    A.  In College Park, we did have specific
10 requirements.
11   Q.  Do you know whether there are standard --
12 standards throughout the country regarding the training
13 and use of SWAT teams?
14   A.  There's the NTOA Best Practices.
15   Q.  Okay.  As far as you know, did College Park
16 try to use and follow the NTOA Best Practices?
17   A.  We tried to.
18   Q.  And so what were the training requirements
19 for your serving on a SWAT team in College Park,
20 Georgia?
21   A.  To maintain our weapons proficiency average
22 of 90 percent or better.
23   Q.  Okay.  And did the team have in-service
24 training during the course of the year, other than
25 firearms proficiency?

1    A.  Yes.
2    Q.  Okay.  And did you cover elements such as
3  dynamic entry?
4    A.  Yes.
5    Q.  And did you cover elements such as room
6  clearing?
7    A.  Yes.
8    Q.  Use of flashbang devises?
9    A.  Yes.
10   Q.  Entry into the premises?
11   A.  Yes.
12   Q.  And did you practice as a team?
13   A.  Yes.
14   Q.  And did you do this every year?
15   A.  Yes.
16   Q.  And how often did you do it during the course
17 of the year?
18   A.  We tried to do it at least twice a month.
19   Q.  Did you have to be -- could any member of the
20 College Park Police Department just walk in and serve
21 on the SWAT team?
22   A.  They all had the opportunity.
23   Q.  All right.  They had to meet training
24 requirements though, correct?
25   A.  Yes.

1    Q.  And did you have officers that from time to
2  time were dropped from the SWAT team?
3    A.  Yes.
4    Q.  For one issue or another?
5    A.  Yes.
6    Q.  What were the standards that allowed the SWAT
7  commander to drop members?
8    A.  Physical fitness standards and a firearms
9  standard.
10   Q.  Okay.  Other training issues that could have
11 been used to eliminate team members, substandard
12 performance in any of the other training areas?
13   A.  Those are the only two that we used when I
14 was there.
15         (Exhibit 4 identified)
16 BY MR. GOSMAN:
17   Q.  All right.  Well, go ahead and take a look
18 here at some of your other materials.  Let's look at
19 Exhibit No. -- I think we'll jump ahead to Exhibit
20 No. 4.  What is that document?
21   A.  There's nothing between the 4 and 5 in my
22 book.
23   Q.  So you don't have an Exhibit 4?
24   A.  No.
25   Q.  Okay.  Well, I'm going to bring my computer

Case 1:10-cv-00041-ABJ Document 65-3 Filed 01/10/11 Page 10 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1  over, and I'm going to show you a document and ask you
2  if you can identify it.
3      A. It might be that some thing is just not in the
4  right place.
5      Q. It's very possible.
6      A. Yes.
7      Q. Do you recognize that document?
8      A. I do.
9      Q. Go ahead and tell me what it is?
10     A. SWAT Supervision & Command Decision-Making
11  Training.
12     Q. Do you have that manual?
13     A. Yes.
14     Q. Will you bring that?
15     A. I will.
16         MR. THOMPSON: Counsel, for the record, can
17  we identify that so that we --
18         MR. GOSMAN: Yes.
19         MR. THOMPSON: At least by Bates number?
20         MR. GOSMAN: Twenty-five, 26, 27. That's
21  Chretien Training.
22         (Exhibit 5 identified)
23  BY MR. GOSMAN:
24     Q. Okay. And let's go ahead and take a look at
25  Exhibit 5. We'll hope it's there.

1      By the way, did you find Exhibit 4?
2      A. I did.
3      Q. Okay. Where was it?
4      A. In three.
5      Q. Okay. We'll take care of that in a minute.
6      A. You want me to look at five?
7      Q. Yes. What is that?
8      A. National Tactical Officers Association, High
9  Risk Warrant Service.
10     Q. Training manual?
11     A. It's part of that command decision-making
12  training book.
13     Q. Okay. And that's the book that you're going
14  to bring this afternoon?
15     A. Yes.
16     Q. As a matter of fact, is there any way you
17  could bring that book before lunch?
18     A. I can, again, bring it at the first break.
19         (Exhibit 3 identified)
20     Q. Very good. All right. Let's go back to
21  Exhibit 3. I'll ask you to describe that for me,
22  please.
23     A. National Tactical Officers Association
24  Mechanical Breaching Introduction.
25     Q. Okay. And are you a member of the NTOA?

1      A. No.
2      Q. Were you?
3      A. We had a team membership at one time.
4      Q. And you took this course in 2005?
5      A. I did.
6      Q. And was this your first training in
7  mechanical and shotgun breaching?
8      A. This would have been my first formal training
9  class.
10     Q. Was this your first formal training class
11  relative to your SWAT training?
12     A. Yes.
13     Q. So at the time you engaged in your first
14  formal SWAT training program, you covered, among other
15  things, I assume, the field of mechanical and shotgun
16  breaching, correct?
17     A. Yes.
18     Q. And is that part of the basic SWAT policeman
19  training?
20     A. It was also part of the basic program that I
21  took.
22     Q. I'm sorry. I just didn't really understand
23  where you're going with that answer. Why don't you go
24  ahead and clear it up for me.
25     A. This was a specific class on mechanical and

1  shotgun breaching.
2      Q. And it was part of your SWAT training,
3  correct? Yes or no?
4      A. I wasn't on the SWAT team at the time that I
5  attended.
6      Q. Did you take this course in connection with
7  meeting the training requirements for performance on
8  the SWAT team?
9      A. There was no requirement of me to take this
10  training.
11     Q. There wasn't. Okay. All right. Did you --
12  let me ask this question: Did your SWAT team require
13  training in the area of a mechanical and shotgun
14  breaching?
15     A. We didn't require that somebody attend this
16  formal training, no.
17     Q. All right. Did they require training in the
18  field of mechanical and shotgun breaching?
19     A. Mechanical breaching.
20     Q. Okay. To serve on your SWAT team, correct?
21     A. Officers were trained in mechanical breaching
22  that were assigned to the SWAT team.
23     Q. Well, could you be an officer on the SWAT
24  team without having training in mechanical breaching?
25     A. You might.

Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1   Q.  You might?
2   A.  You might.
3   Q.  Okay.  You might have a specific assignment
4   as -- on the SWAT team that didn't involve mechanical
5   breaching, correct?
6   A.  Correct.
7   Q.  Is that what you're talking about?
8   A.  No.
9   Q.  All right.  Go ahead and tell me what you're
10  talking about when you say you might have had it?
11  A.  You might try out for the SWAT team and make
12  it.
13  Q.  Without taking the mechanical breaching
14  course?
15  A.  Without taking any course.
16  Q.  Without taking any course.  Okay.
17      And once you made the SWAT team, then you
18  were required to engage in the training program that
19  the SWAT team engaged in '
20  A.  That's correct.
21  Q.  And I think we decided that that involved, at
22  least at College Park, training twice a month?
23  A.  Yes.
24  Q.  In all areas of dynamic entry and SWAT team
25  tactics, correct?

1   A.  At one point or another during the year.  It
2   didn't cover everything every month.
3   Q.  Fair enough.  Did the SWAT team -- other than
4   the practical training exercises, did the SWAT team
5   meet and train together in other contexts?
6   A.  Aside from our monthly training?
7   Q.  Yes.
8   A.  No.
9   Q.  Okay.  You did take this course, Exhibit 3,
10  correct?
11  A.  Yes.
12  Q.  And part of these materials, these course
13  materials, describe the mechanical and shotgun
14  breaching team, do they not?
15  A.  I'd have to look at it.
16  Q.  Let's go ahead and do that.  It's probably on
17  that first page.
18  A.  There's a definition of breach.
19  Q.  Okay.
20  A.  Safety protocol for this course.
21  Q.  Okay.
22  A.  I don't see --
23  Q.  "The purpose of the breaching team is to
24  provide a safe and swift egress of the tactical team
25  members through any obstacle or environment," do you

1   see that?
2   A.  No, I don't.  What page are you on?
3   Q.  Let's see here.  That would be Document
4   No. -- it's Page 4, Document No. 16?
5   A.  Okay.
6   Q.  The breaching team.
7   A.  Okay.
8   Q.  Okay.  How many members are on a typical
9   breaching team?
10  A.  I don't know.
11  Q.  Well, in your experience, how many members
12  were on the breaching team in the College Park SWAT
13  team?
14  A.  It would depend on the situation.
15  Q.  Okay.  Go ahead and explain that.
16  A.  It would depend on the situation.
17  Q.  What situations?
18  A.  What situation the SWAT team was faced with.
19  Q.  Well, I certainly can understand that,
20  Officer.  I'm asking you for what situations, be
21  specific?
22      MR. THOMPSON: Objection as to form.
23      MS. WESTBY: Join.
24      THE WITNESS: I can't be.  I participated in
25  I don't know how many.

1   BY MR. GOSMAN:
2   Q.  All right.  What's the minimum number of
3   persons that serve on a breaching team?
4   A.  One.
5   Q.  And that's the person that actually knocks
6   down the door?
7   A.  Yes.
8   Q.  All right.  Maybe I've used the wrong
9   terminology.  How many persons serve on an entry team?
10  A.  Again, situation dictates.
11  Q.  Is it ever less than two?
12  A.  I would not think so.
13  Q.  Okay.  So the operator of the breaching team
14  or the ram is responsible for ensuring the safe and
15  swift egress of the tactical team through any obstacle
16  or environment, correct?
17  A.  That's what this page says.
18  Q.  Is that true?
19  A.  That's what the NTOA teaches.
20  Q.  Well, do you take issue with that statement,
21  Officer?
22  A.  I don't take issue with it.
23  Q.  And if an officer is going to perform the
24  breaching function, would you agree with me that he
25  would have to have training and also practice

1  performing this function in order to safely perform it?
2      A.  Ideally.
3          MR. THOMPSON: Objection as to form.
4  BY MR. GOSMAN:
5      Q.  What do you mean by "ideally"?
6      A.  I mean, that we don't work in ideal
7  situations all the time.
8      Q.  Well, it's true.  I mean, there are
9  emergencies where you just don't have the luxury of
10 sitting down and thinking things out and planning,
11 correct?
12         MS. WESTBY: Object to the form of the
13 question.
14         MR. THOMPSON: Join.
15         THE WITNESS: Can you repeat that?
16 BY MR. GOSMAN:
17     Q.  You don't have the luxury in every
18 circumstance of planning your entry, correct?
19     A.  (No response.)
20     Q.  In emergency situations, there may arise
21 occasions when you do not have the opportunity to
22 reflect and plan the entry, correct?
23     A.  That may happen.
24     Q.  Well, Officer, let's do it this way:  If you
25 have the time to sit down and think about what you're

1  going to do, certainly you would want to employ an
2  entry team that was well-trained, correct?
3          MR. THOMPSON: Object to form.
4          MS. WESTBY: Join.
5  BY MR. GOSMAN:
6      Q.  If you had that opportunity.
7          MR. THOMPSON: Same objection.
8          THE WITNESS: In the ideal situation, sure.
9  BY MR. GOSMAN:
10     Q.  Okay.  All right.  Well, do you have a
11 specific example or thought in mind that would involve
12 a less-than-ideal situation where you had the time to
13 reflect and to plan an entry that you wouldn't want a
14 trained entry team?
15         MS. WESTBY: Object to the form of the
16 question.
17         THE WITNESS: I don't understand the
18 question.
19 BY MR. GOSMAN:
20     Q.  I'm going to ask the reporter to read that
21 back, and I'll take it from that.
22         (The record was read as
23          requested.).
24         THE WITNESS: Can you read that one more
25 time?

1          MR. GOSMAN: We can read it two more times if
2  we need it.
3          THE WITNESS: You might have to.  It's kind
4  of lengthy.
5              (The record was read as
6               requested.)
7          MS. WESTBY: And answer if you can.  But if
8  you don't understand, you can -- I have --
9          MR. GOSMAN: That's a speaking objection.
10         MS. WESTBY: I have no idea what your
11 question means.
12         MR. GOSMAN: You weren't asked the question,
13 Misha.  Your objection is to form, correct?
14         MS. WESTBY: And the question needs to be
15 understandable.  We need to understand.
16         THE WITNESS: Can you break it down?
17 BY MR. GOSMAN:
18     Q.  All right.  When would you -- if you had the
19 time to actually plan a breach, when would you face a
20 situation where you wouldn't have a trained breaching
21 team?
22         MR. THOMPSON: Objection as to form.
23         MS. WESTBY: Join.
24         THE WITNESS: When I had time to plan, when
25 would I not use a trained team?  Was that the question?

1  BY MR. GOSMAN:
2      Q.  That is the very question, sir.  That's it.
3      A.  I don't know.
4          MS. WESTBY: Don't be rude.  I don't
5  understand why you're rude.
6  BY MR. GOSMAN:
7      Q.  As a matter of fact, there's no circumstance
8  where you would take an entry team into a home that
9  wasn't trained if you had the opportunity to plan in
10 advance for the operation, correct?
11         MS. WESTBY: Object to the form.
12 BY MR. GOSMAN:
13     Q.  If you had the opportunity.
14         THE COURT REPORTER: I did not get your
15 answer.
16         THE WITNESS: I said, "If I had the
17 opportunity."  And that was it.
18 BY MR. GOSMAN:
19     Q.  Okay.  Let's take a look there at that next
20 box, it is headed "Breaching Decision Logic."  Do you
21 see that, sir?
22     A.  Yes.
23     Q.  And it identifies certain factors that are
24 involved in the decision to employ a breaching team,
25 would you agree with that?

MIKE CHRETIEN - October 5, 2010       Page 41
Direct Examination by Mr. Gosman

1   A. Yes.

2   Q. And one of those is reasonableness; would you

3 agree with that?

4   A. Yes.

5   Q. In other words, it is important to know

6 beforehand whether it's reasonable to use a breaching

7 team in a given case, correct?

8      MS. WESTBY: Object to the form.

9      THE WITNESS: I'm not sure what the context

10 of that slide is.

11 BY MR. GOSMAN:

12   Q. I'm asking you the question. I didn't ask

13 you the context of the slide, sir.

14   A. You asked me if it said reasonableness.

15   Q. No. I asked you if it was reasonable -- if

16 reasonableness was an important consideration in the

17 decision to employ a breaching team.

18      MR. THOMPSON: Object as to form.

19      MS. WESTBY: Join.

20      THE WITNESS: Yes

21 BY MR. GOSMAN:

22   Q. And it's part of -- let's just assume for a

23 moment that you were making a decision to employ a

24 breaching team, it would be part of your job to

25 determine whether it was reasonable to deploy a

MIKE CHRETIEN - October 5, 2010       Page 42
Direct Examination by Mr. Gosman

1 breaching team in the very first instance, correct?

2      MR. THOMPSON: Object to form.

3      MS. WESTBY: Join.

4      THE WITNESS: I thought I just answered that.

5 BY MR. GOSMAN:

6   Q. Well, go ahead and do it again, sir.

7   A. Can you repeat the question?

8      MR. GOSMAN: Can you repeat the question?

9      (The record was read as

10      requested.)

11      THE WITNESS: What do you mean by "the very

12 first instance"?

13 BY MR. GOSMAN:

14   Q. I mean before you made any other decisions,

15 you want to know whether you really needed a breaching

16 team, correct?

17   A. I don't know what you're talking about.

18   Q. Well, you don't need a breaching team to

19 serve a little old lady a traffic citation, correct, in

20 most cases?

21      MR. THOMPSON: Objection as to form.

22      THE WITNESS: In most cases, no.

23 BY MR. GOSMAN:

24   Q. All right. So you got to be reasonable when

25 you decide under what circumstances you were going to

MIKE CHRETIEN - October 5, 2010       Page 43
Direct Examination by Mr. Gosman

1 deploy a breaching team, correct?

2      MR. THOMPSON: Object as to form.

3      MS. WESTBY: Join.

4      THE WITNESS: Yes.

5 BY MR. GOSMAN:

6   Q. Let's go ahead and take a look on the next

7 page, Officer. It's Page 5, and there's another little

8 heading there says, "Don't dismiss the obvious." And

9 one of the bulleted items there is "knocking on the

10 door." Would you agree with me that knocking on the

11 door is appropriate in every case unless it's a

12 no-knock situation?

13      MS. WESTBY: Object to the form of the

14 question.

15      MR. THOMPSON: Join.

16      THE WITNESS: Knocking on the door is

17 appropriate when you're using a knock-and-announce

18 warrant.

19 BY MR. GOSMAN:

20   Q. Let's just clear this up right now. The

21 warrant in the Wachsmuth case was a knock-and-announce

22 warrant, correct?

23   A. Correct.

24   Q. And then it also -- under the next bulleted

25 item there says, "Try the doorknob first."

MIKE CHRETIEN - October 5, 2010       Page 44
Direct Examination by Mr. Gosman

1   A. Yes.

2   Q. Okay. And you'd agree with me, would you

3 not, that the breaching team should always try the

4 doorknob first?

5   A. No.

6   Q. Well, if it's a knock-and-announce warrant?

7   A. No.

8   Q. Under what circumstances would you not try

9 the doorknob?

10   A. It would depend on the situation.

11   Q. Well, go ahead and explain that.

12      Let's do this: Let's back up and we'll be

13 specific, and I'll help you out here. Let's take the

14 Wachsmuth situation, February 24th, 2009, why wouldn't

15 you have tried the doorknob first before you knocked

16 the door in?

17   A. I wasn't the breaching officer.

18   Q. I didn't say that, and I don't care.

19   A. You're asking me to speculate on another

20 officer.

21   Q. No.

22      MS. WESTBY: Okay. Badgering.

23      THE WITNESS: Yes, you are.

24      MR. GOSMAN: I'm not badgering the witness.

25 We're simply trying to get an answer.

1      MS. WESTBY: You absolutely are.
2      MR. GOSMAN: This witness is not answering
3  the questions. He's being completely evasive.
4      MS. WESTBY: That is not true.
5      MR. THOMPSON: Well, Counsel, just because
6  you don't get the answer that you want from the
7  witness --
8      MR. GOSMAN: No, it's not about getting the
9  answer I --
10     MR. THOMPSON: Let me finish and put my
11 objection on the record. Because this is getting to
12 the point of stopping these depositions and getting a
13 protective order. We put up with it yesterday. I'm
14 not going to put up with it for the rest of the week.
15     You're badgering the witness. You're trying
16 to intimidate the witness. Because he doesn't give you
17 the answer to your question doesn't mean he's being
18 evasive. He's answering honestly.
19     MR. GOSMAN: All right. Let's go ahead and
20 ask for the last question to be repeated.
21         (The record was read as
22         requested.)
23     MS. WESTBY: And then go -- finish the rest
24 of that because there's -- if you will, please. He
25 answered.

1      MR. GOSMAN: Well, that's the question. It's
2  my deposition at this point.
3      MS. WESTBY: But here's the problem: I'm not
4  going to allow you to treat witnesses that way. I'm
5  not sure what's going on here. But it's inappropriate.
6  And I'm not going to allow it. So please refrain from
7  behaving that way.
8      MR. GOSMAN: All right. Well, we're going to
9  have to ask the question again now. So let's go ahead
10 and start over. And then we'll ask the witness to
11 answer the question.
12     Just repeat what you read a moment ago.
13         (The record was read as
14         requested.)
15     MR. GOSMAN: All right.
16 BY MR. GOSMAN:
17 Q.   Officer, the question was: In the Wachsmuth
18 warrant service on the 24th of February, 2009, the
19 battering ram was applied, and it appears that no one
20 made an effort to try the doorknob. And I'm asking
21 you: Was that appropriate?
22 A.   Going back to Page 4, Breaching Decision
23 Logic: Safety, speed, noise.
24 Q.   Okay. So --
25 A.   Would be the specific reasons why.

1  Q.   In other words, you didn't feel that it
2  was -- that it was appropriate to try the door to the
3  Wachsmuth residence because of safety, speed, noise?
4  A.   Correct.
5  Q.   And how was officer safety implicated by
6  failing to -- or by knocking on the doorknob -- I'm
7  sorry -- by trying the doorknob before you entered the
8  residence?
9      MR. THOMPSON: Objection as to form.
10     MS. WESTBY: Join.
11     THE WITNESS: How was officer safety --
12 BY MR. GOSMAN:
13 Q.   Affected?
14 A.   -- affected by not trying the doorknob?
15 Q.   Yes.
16     MR. THOMPSON: Objection as to form.
17     THE WITNESS: It increased the time that we
18 were standing outside the door.
19 BY MR. GOSMAN:
20 Q.   By how much?
21 A.   I don't know.
22 Q.   Less than a second?
23 A.   I don't know.
24 Q.   Okay. Then we have another box on the bottom
25 of Page 5, "Breach Point Intelligence," debriefs of the

1  UC or CI involvement and have them diagram and describe
2  the structure. Did you do that in this case, Officer?
3  A.   Not personally.
4  Q.   Did anyone have the CI diagram the structure?
5  A.   Yes.
6          (Exhibit 10 identified)
7  BY MR. GOSMAN:
8  Q.   And let's go ahead and take a quick peek at
9  Exhibit 10. Does the information on Page 1 describe
10 the information given to you by the -- or given to
11 Officer Miner by the confidential informant?
12 A.   No, it was more detailed.
13     MR. THOMPSON: Objection as to the form.
14 BY MR. GOSMAN:
15 Q.   Where are those diagrams?
16 A.   They were written on the dry erase board
17 downstairs.
18 Q.   Did you serve on a SWAT team, then, during
19 your employment with the College Park Police
20 Department?
21 A.   I did.
22 Q.   Was it -- did College Park have its own SWAT
23 team or was it a joint agency team?
24 A.   We had our own SWAT team.
25 Q.   How many SWAT operations were you involved

MIKE CHRETIEN - October 5, 2010                                   Page 49
Direct Examination by Mr. Gosman

1   in?

2   A.   I couldn't begin to guess a specific number.

3   Q.   Well, was it more than 50?

4   A.   I would say that wou d be accurate.

5   Q.   Were you ever a team leader?

6   A.   Yes.

7   Q.   Were you ever involved in training team

8   members?

9   A.   Yes.

10  Q.   How long were you -- in how many of the

11  operations that you were involved in were you a team

12  leader?

13  A.   Close to half.

14  Q.   Twenty-five?

15  A.   Ballpark.

16  Q.   Okay.  And what was nvolved in training team

17  members?

18  A.   There was -- you war t me to make a list

19  or ...

20  Q.   Yes, I do.

21  A.   Okay.  Physical fitness, marksmanship,

22  building and room clearing.  Training on the different

23  weapon systems, less lethal training, distraction

24  device training, sniper training, breaching training.

25  Covered pile training, felony vehicle assault training,

---

MIKE CHRETIEN - October 5, 2010                                   Page 50
Direct Examination by Mr. Gosman

1   officer rescue training, active shooter training.  I

2   don't know if I'm repeating myself here, but barricaded

3   gunman situations, hostage situations, high-risk

4   warrants.  Not an all inclusive list, but ...

5   Q.   And those are things you actually trained

6   other officers in connection with your SWAT team?

7   A.   Yes.

8   Q.   And this is part of the training that you

9   repeated over and over twice a month during the period

10  that you were with the College Park SWAT team?

11  A.   Some aspects of this, yes.

12       (Exhibit 6 iden ified)

13  BY MR. GOSMAN:

14  Q.   Let's go ahead and take a look at Exhibit 6,

15  Officer.  You provided us with a selection of

16  after-action reviews for SWAT jobs that you were on,

17  correct?

18  A.   Yes.

19  Q.   And do you have any others in your

20  possession?

21  A.   Not that I'm aware of  I'd have to check

22  these against my computer file.

23  Q.   Okay.

24  A.   But it looks like they are all there.

25  Q.   All right.  Let me ask this question:  Why

---

MIKE CHRETIEN - October 5, 2010                                   Page 51
Direct Examination by Mr. Gosman

1   did you keep these five or six?

2   A.   Well, I started doing this for the captain

3   that was over the patrol division at the time.  Because

4   we had expressed to him that we needed additional

5   equipment.  This was a means for me to show him that we

6   were doing things that were less than ideal.  It wasn't

7   a requirement.

8   Q.   After-action reviews are a requirement,

9   though, of a SWAT team commander, are they not?

10  A.   No.

11  Q.   When you performed on a SWAT team for College

12  Park, and you were the team leader, did you prepare

13  a -- an action plan beforehand?

14       MR. THOMPSON: Objection as to form.

15  BY MR. GOSMAN:

16  Q.   An entry plan?

17       I'll rephrase that.

18  A.   When I was the team leader, and I was

19  present, it usually fell to me to come up with a plan.

20  Q.   Well, that's the team leader's job, correct,

21  to create the entry plan?

22  A.   When he's there.

23  Q.   Okay.  And when you're done with the SWAT

24  operation, there's a debriefing, correct?

25  A.   Ideally.

---

MIKE CHRETIEN - October 5, 2010                                   Page 52
Direct Examination by Mr. Gosman

1   Q.   All right.  And then there is an after-action

2   review, a document that substantiates the actions

3   taken, the problems, and any thoughts about improving

4   the SWAT team performance?

5   A.   Again, I started doing that on my own.  No

6   requirement.

7   Q.   Did you prepare such a document after the

8   Wachsmuth warrant?

9   A.   No.

10  Q.   Why not?

11  A.   Because we don't have a SWAT team.

12  Q.   Take a look at the documents that we've

13  identified as Exhibit 6, and tell me if any of those

14  are knock-and-announce warrants.

15       And while you're looking, there are several

16  things that we're going to be asking about this group

17  of documents.  Were they felony warrants?  Were they

18  knock-and-announce warrants?  And were they locations

19  in high-crime areas?

20       MR. THOMPSON: You got one question pending,

21  and you just asked three more.

22       MR. GOSMAN: I know, but he's going to look

23  at all these things --

24       THE WITNESS: Yes, there is.  At least one of

25  these talks about a warrant where there was not a

---

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 16 of 91
Tricia Wachsmuth v.                                                              Mike Chretien
City of Powel, et al.                                                        October 05, 2010

MIKE CHRETIEN - October 5, 2010                                Page 53
Direct Examination by Mr. Gosman

1  no-knock clause.
2  BY MR. GOSMAN:
3    Q.  Okay.  Was there a knock-and-announce clause
4  in that?
5    A.  Yes.
6    Q.  Now, were these all felony warrants?
7    A.  I don't know.
8    Q.  What's your guess?
9        MR. THOMPSON: Objection as to form.
10       MS. WESTBY: Join.
11       THE WITNESS: I really don't have any idea.
12  BY MR. GOSMAN:
13   Q.  You've got barricaded subjects, doors that
14  are locked, windows that are barred.  Does that sound
15  like misdemeanor service to you?
16       MR. THOMPSON: Objection to form.  Asked and
17  answered.
18       MS. WESTBY: Join.
19       THE WITNESS: I don't know.
20  BY MR. GOSMAN:
21   Q.  You don't know?
22   A.  No.
23   Q.  Were these locations in high-crime areas?
24   A.  Yes.
25   Q.  Were there drug trafficking operations

MIKE CHRETIEN - October 5, 2010                                Page 54
Direct Examination by Mr. Gosman

1  suspected at these locations?
2    A.  Yes.
3    Q.  Generally, drug trafficking is a felony,
4  wouldn't you agree with me there?
5        MR. THOMPSON: Objection as to form.
6        THE WITNESS: Let me back up one.  I would
7  say that there's drug dealing, not drug trafficking.
8  BY MR. GOSMAN:
9    Q.  What's the difference?
10   A.  Weight.
11   Q.  What's the difference in weight?
12   A.  I don't know specifically.  I know that in
13  Georgia it wouldn't be considered trafficking unless
14  you had a certain -- but there was a difference
15  between -- it was called something different.  It
16  wasn't called delivery.  It was called intent to
17  distribute or something along those lines.
18   Q.  Okay.
19   A.  It differentiated that between that and
20  trafficking.
21   Q.  Were you the team leader for each of the
22  operations that are reflected in Exhibit 6?
23   A.  Yes.
24   Q.  Do you know what SWAT stands for?
25   A.  Special Weapons and Tactics.

MIKE CHRETIEN - October 5, 2010                                Page 55
Direct Examination by Mr. Gosman

1    Q.  What are the special weapons available to
2  SWAT teams?
3    A.  Automatic weapons, grenade launchers.
4    Q.  They include automatic weapons, correct?
5  Does that include semiautomatic long rifles?
6    A.  No.
7    Q.  Do they include battering rams or other
8  devices?
9    A.  Are you talking about special weapons, or are
10  you talking about something else?
11   Q.  Tactics.
12   A.  Tactics, I wouldn't think, describes pieces
13  of equipment.
14   Q.  Well, the battering rams or other entry
15  devices are special tools used by SWAT teams, are they
16  not?
17   A.  And other groups of officers, yes.
18   Q.  And do they include noise distractions or
19  flashbang devices?
20   A.  They could.
21   Q.  And what are the special tactics that are
22  used by SWAT teams?
23   A.  I don't -- I don't know that anymore they are
24  any different than what all officers are trained in.
25  The difference is that SWAT teams train as a unit

MIKE CHRETIEN - October 5, 2010                                Page 56
Direct Examination by Mr. Gosman

1  together on some kind of frequency.
2    Q.  Okay.  So basically, what you're telling me
3  is that all officers can function as a SWAT team in a
4  given situation; is that true?
5        MR. THOMPSON: Objection as to form.
6        THE WITNESS: That's not what I'm telling
7  you.
8  BY MR. GOSMAN:
9    Q.  What are you telling me?
10   A.  I'm telling you the tactics that we train
11  SWAT officers on are the same tactics that we train
12  street officers on.
13  BY MR. GOSMAN:
14   Q.  What's the difference then?
15   A.  Some agencies have the luxury of having
16  enough people, time, equipment, to designate certain
17  people to be on some kind of team.  They don't all call
18  it a SWAT team.
19   Q.  So the difference is if a community is large
20  enough to have a SWAT team, they can call it a SWAT
21  team.  And if they are smaller and don't have the
22  resources, they just use officers to perform the same
23  function?
24       MS. WESTBY: Object to the form of the
25  question.

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 17 of 91
Tricia Wachsmuth v.                                                    Mike Chretien
City of Powel, et al.                                               October 05, 2010

1    MR. THOMPSON: Join.

2    THE WITNESS: You can call it whatever you

3    want. I've seen SWAT teams that were less qualified

4    than street officers that I've worked with.

5    BY MR. GOSMAN:

6    Q. Well, that wasn't my question, though,

7    Officer. We're talking about the difference between

8    SWAT team and just a group of officers.

9    A. And I told you what the difference was.

10   Q. And what is it?

11   A. That they meet on some kind of regular basis

12   and train as a unit.

13   Q. Okay. And smaller communities don't have the

14   luxury of doing that. Did you say that?

15   A. I don't know. I did not say that.

16   Q. Okay. Well, what is t about a smaller

17   community that has a bearing on whether you're a SWAT

18   team or whether you're a group of officers functioning

19   as a SWAT team?

20   MR. THOMPSON: Objection as to form.

21   MS. WESTBY: Join.

22   THE WITNESS: I don't know. Small community

23   was your words.

24   BY MR. GOSMAN:

25   Q. All right. So does the City of Powell have a

1    SWAT team?

2    A. No.

3    Q. Do they have officers that train as a unit?

4    A. We all train together.

5    Q. Do you have the training that would qualify

6    you for a SWAT team?

7    MR. THOMPSON: Objection as to form.

8    MS. WESTBY: Join.

9    THE WITNESS: What qualifications?

10   BY MR. GOSMAN:

11   Q. I'm going to use your experience as a SWAT

12   team leader and as a member of a SWAT team for several

13   years at College Park.

14   A. I would say any member of this agency would

15   have been able to serve on the SWAT team at College

16   Park.

17   Q. So were you function ng -- did you have a

18   group that functioned as a SWAT team, then?

19   MR. THOMPSON: Objection as to form.

20   MS. WESTBY: Join.

21   THE WITNESS: We didn't have anything called

22   a SWAT team here.

23   BY MR. GOSMAN:

24   Q. And you didn't have the training for a SWAT

25   team, at least based even on your experience that you

1    had as a SWAT team leader in Georgia?

2    MR. THOMPSON: Objection as to form.

3    MS. WESTBY: Join.

4    MR. THOMPSON: Go ahead.

5    THE WITNESS: We did not have the same

6    training in Powell that we had in College Park.

7    BY MR. GOSMAN:

8    Q. What is the difference between a typical SWAT

9    team high-risk warrant service and the warrant service

10   that was performed by the Powell police officers on the

11   4th of February 2009?

12   MR. THOMPSON: Objection as to form.

13   MS. WESTBY: Join.

14   THE WITNESS: What's the difference between a

15   SWAT team executing a high-risk warrant service and

16   what we did on February 2009?

17   BY MR. GOSMAN:

18   Q. Yes.

19   A. The name.

20   Q. Would you agree that SWAT teams are reserved

21   for special assignments involving risks, which exceed

22   the capability of an agency's first responders?

23   MR. THOMPSON: Objection as to form.

24   MS. WESTBY: Join.

25   THE WITNESS: Again, ideally, in a perfect

1    world.

2    BY MR. GOSMAN:

3    Q. Does Park County have a SWAT team?

4    A. I don't know.

5    Q. Does the Park County sheriff's office have a

6    SWAT team?

7    A. They have a group of officers. I'm not sure

8    what they call it. I don't think they call it SWAT.

9    Q. It's a specially trained unit, correct?

10   A. I don't know. I don't have any firsthand

11   knowledge of that.

12   Q. Have you ever asked anybody?

13   MR. THOMPSON: Asked anybody what?

14   BY MR. GOSMAN:

15   Q. Whether or not Park County had a specially

16   trained unit that performed SWAT functions.

17   A. I may have had conversations with deputies.

18   Q. You may have?

19   A. I may have. I don't recall specifically.

20   Q. If there was time to plan an entry where you

21   felt the SWAT team was needed, would it have been

22   appropriate in your mind, Officer, to consult with a --

23   an agency that actually had a unit trained for that

24   purpose?

25   A. I think we did ask the sheriff's office.

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 18 of 91
Tricia Wachsmuth v.                                                                    Mike Chretien
City of Powel, et al.                                                                  October 05, 2010

1  Q.  Thank you.
2       What is the formal training, of which you're
3  aware, of the officers of the Powell Police Department
4  in dynamic police tactics?
5       MS. WESTBY: Object to the form of the
6  question.
7       MR. THOMPSON: Join.
8       THE WITNESS: The training that I've had
9  consisted of Doug Pechtel coming here, and my field
10 training. When I was hired initially, we covered the
11 subjects that they had covered in previous training
12 with Doug.
13      (Exhibit 27 identified)
14 BY MR. GOSMAN:
15 Q.  Why don't you go ahead and take a look at
16 Exhibit No. 27. And identify that for me, if you can?
17 A.  "Patrol Officer Specialized Tactics Course."
18 Q.  Is that the course that Doug Pechtel offered
19 to some of the Powell police officers?
20 A.  I don't know. I don't know when this is
21 from.
22 Q.  Well, let's take a look at the first page.
23 A.  Okay.
24 Q.  Did you take that course?
25 A.  I don't remember if this is what it was

1  called.
2  Q.  Let's go back to Exhibit I and look at your
3  Wyoming P.O.S.T. records and see if we could clear it
4  up.
5  A.  Well, it wouldn't be on here because the
6  training I had with Pechtel occurred in the fall of
7  2009. This only goes up to February.
8  Q.  Okay. Did you understand that the training
9  that you were receiving in the course that you took
10 from Doug Pechtel was not intended to provide a
11 SWAT-type team?
12 A.  No.
13 Q.  Okay. You've got Exhibit 27 there in front
14 of you. Let's go ahead and turn to Page 27. You're
15 familiar with the P.I.E.R. philosophy?
16 A.  Yeah, I'm sure he covered it.
17 Q.  Okay. Do you see down from -- in the third
18 photograph, "P.I.E.R. is not intended to be used as a
19 SWAT team"?
20      MS. WESTBY: What page?
21      THE WITNESS: I'm on Page 27. I don't see
22 that.
23      MS. WESTBY: Bates stamped?
24      MR. GOSMAN: Miner training 30. One, two,
25 three --

1       THE WITNESS: Page 30.
2       MR. GOSMAN: Yeah, it is. Bates-stamped 30.
3  It's Page 27.
4       THE WITNESS: Okay. I was looking at that
5  stamp.
6       MR. GOSMAN: Okay.
7       THE WITNESS: What was the question again?
8  BY MR. GOSMAN:
9  Q.  "P.I.E.R. is not intended to be used as a
10 SWAT team"?
11 A.  I see that.
12 Q.  Okay. It's not intended to be used as a
13 means of resolving any type of critical incident, other
14 than a immediate life-threatening crisis?
15 A.  I see that.
16      (Exhibit 28 identified)
17 BY MR. GOSMAN:
18 Q.  Now, I'm going to ask you to go ahead and
19 take a look at Exhibit 28.
20 A.  Okay.
21 Q.  Have you ever had this course, "Immediate
22 Action for Patrol"?
23 A.  I think this is what -- I think this is the
24 one that I attended.
25 Q.  And what was the purpose of that course?

1       MR. THOMPSON: Objection as to form.
2       THE WITNESS: To train your officers in the
3  techniques and procedures used to handle these types of
4  situations.
5  BY MR. GOSMAN:
6  Q.  Situations that require immediate action,
7  correct?
8       MR. THOMPSON: Objection as to form.
9       THE WITNESS: Whatever situations we might
10 have to deal with.
11 BY MR. GOSMAN:
12 Q.  Well, let's go ahead and take a look at the
13 course goals, Officer. It's on page -- it's
14 Bates-stamped 39.
15 A.  Uh-huh.
16 Q.  And you'll see there under "Course Goals,"
17 that the training is to enhance and develop tactics,
18 techniques, and procedures to resolve in-progress calls
19 where innocent lives are in imminent jeopardy. Do you
20 see that?
21 A.  I do.
22 Q.  And do you see -- I'm going to ask you to
23 turn to Page 42 now of those documents?
24 A.  Bates-stamped?
25 Q.  I'm sorry. I'm referring now to Bates

1   stamps, so it's Page 42.
2      A.   Okay.
3      Q.   And there's a heading there, "IA for Patrol
4   Fundamentals"?
5      A.   Uh-huh.
6      Q.   And do you see that third bulleted item, "not
7   intended to be used as a means of resolving any type of
8   critical incident, other than an immediate
9   life-threatening crisis"?
10     A.   I do.
11            (Exhibit 29 identified)
12  BY MR. GOSMAN:
13     Q.   Now, let's take a look at Exhibit 29.  Have
14  you ever seen this document before?
15     A.   I believe I did during my field training.
16     Q.   Did you participate in a course involving
17  these materials, do you recognize your field training?
18     A.   We would have covered these materials during
19  field training, I believe.
20     Q.   Let's go ahead and turn to the Bates-stamp
21  No. 67 in that document, sir.  Critical incidents are
22  defined on this page; would you agree with that?
23     A.   Yes.
24     Q.   And I want you to go ahead and read, under
25  Paragraph B, that text into the record, please.

1      A.   "Types we are most likely to face: It would
2   take a fully trained SWAT or hostage rescue team to
3   deal with many of these.  As an agency, we cannot
4   justify a SWAT team by these types of activity being
5   commonly present here or by budgetary means, as SWAT
6   teams require a great amount of training time."
7      Q.   Let's take that last clause first.  Would you
8   agree that SWAT teams require a great amount of
9   training time?
10     A.   I don't -- I'm not aware of any specific
11  requirement.
12     Q.   Do you disagree with that statement, then?
13     A.   No.
14     Q.   And wouldn't it be true, Officer, that if you
15  were faced with a situation that required a SWAT team
16  or a SWAT-type entry, and you had the opportunity to
17  engage a SWAT team, that you would want to do so?
18            MS. WESTBY: Object to the form of the
19  question.
20            MR. THOMPSON: Join.
21            THE WITNESS: Can you repeat the question?
22  BY MR. GOSMAN:
23     Q.   If you had time prior to the entry into a
24  home that required dynamic tactics, SWAT-type tactics,
25  and you had available an agency that had a SWAT team in

1   your community, would you agree with me that you should
2   employ that SWAT team, if at all possible?
3            MR. THOMPSON: Objection as to form.
4            MS. WESTBY: Join.
5            THE WITNESS: Depend on the circumstances.
6   BY MR. GOSMAN:
7      Q.   Well, as a general proposition, if you had
8   the time, all of the things being equal, to consult
9   with and employ a SWAT team that was trained in your
10  area, wouldn't it be preferable to use a SWAT team for
11  that entry?
12            MR. THOMPSON: Objection as to form.
13            MS. WESTBY: Asked and answered.
14            THE WITNESS: In a perfect world.
15  BY MR. GOSMAN:
16     Q.   Well, let's go ahead and talk about the world
17  as it existed on February 24th, 2009.  Let me ask
18  first: Did you make an effort to employ -- I believe
19  you may have testified that you did -- a SWAT team that
20  was trained in your area?
21     A.   I was aware that somebody had contacted the
22  sheriff's department, and we were told that they were
23  not going to assist us.
24     Q.   Did they say why?
25     A.   I don't remember.  I didn't talk to them.

1      Q.   Did that seem to be important to you at all?
2            MR. THOMPSON: Objection as to form.
3            MS. WESTBY: Join.
4            THE WITNESS: Not really.
5   BY MR. GOSMAN:
6      Q.   We heard Officer Danzer yesterday describe
7   his weapon position as he entered the home and
8   performed the room clearing operations.
9            Let me ask first: Was he assigned to clear
10  rooms?
11     A.   He was a member of the entry team.
12     Q.   Did he have --
13     A.   One of those -- the duties of the entry team
14  would have been to secure the residence.
15     Q.   Did he have a specific duty beyond just
16  simply being on the entry team?
17     A.   He wasn't assigned to any particular room, if
18  that's what you mean.  Our general duty was to secure
19  the residence.
20     Q.   That was as far as it went?
21     A.   Unless you have something specific in mind,
22  yeah, that was it.
23     Q.   Okay.  Officer Danzer described his weapon
24  position as he performed the room-clearing operations
25  as being in the down position.  It would be the gun was

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 20 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1  pointed down?
2      A.  Correct.
3      Q.  Is that the correct position to perform a
4  room-clearing operations in a tactical setting?
5      A.  Absolutely.
6      Q.  Let's go ahead and take a look at -- we're in
7  Exhibit 29. It's Page 73. Go ahead. I'll let you get
8  there.
9      A.  Bates-stamped 73?
10      Q.  Yes, sir.
11      A.  Okay.
12      Q.  And at the top of the page, it has a heading,
13  says, "Weapon Position," do you see that?
14      A.  I do.
15      Q.  And what is the weapon position for this type
16  of entry?
17      MS. WESTBY: Object to the form of question.
18  Type of entry?
19      MR. GOSMAN: Yes
20      MR. THOMPSON: Join.
21  BY MR. GOSMAN:
22      Q.  In a dynamic situation?
23      MR. THOMPSON: Object as to form.
24      MS. WESTBY: Join.
25      THE WITNESS: You want me to describe the

1  weapon position?
2  BY MR. GOSMAN:
3      Q.  Yeah, I do. I want you to describe the
4  weapon position that's listed there.
5      A.  Okay. I'm not familiar with the term
6  "constant ready." But the term that we use is ready.
7  The ready position is that the weapon is lowered. It's
8  slung around your neck and shoulder. The weapon is
9  lowered so that you can observe with both eyes,
10  unobstructed.
11      Q.  Okay. When you go room to room in a home,
12  there are certain procedures for actually entering the
13  rooms, correct?
14      A.  Uh-huh.
15      Q.  Such as the Israeli Lean or slicing the pie?
16      A.  That's a tactic.
17      Q.  And you'll notice in Paragraph 8 just below
18  there, there is the Israeli Lean described.
19      A.  Yes.
20      Q.  Okay. And do you see under Paragraph B -- by
21  the way, that is highlighted, isn't it?
22      A.  Uh-huh.
23      Q.  Why don't you read that into the record.
24      A.  Paragraph B reads: "Weapon acquisition,
25  viewing the target area just off of your sight picture

1  with your weapon aimed where your eyes are looking."
2      Q.  Do you disagree with that?
3      A.  I don't disagree that when you have a target,
4  your weapon is aimed where your eyes are looking.
5      Q.  That wasn't what I asked. Do you disagree
6  with the paragraph as it's written?
7      MS. WESTBY: Object to the form of the
8  question.
9      MR. THOMPSON: Join.
10  BY MR. GOSMAN:
11      Q.  Well, the question doesn't say when you're
12  viewing a target. It says viewing a target area, does
13  it not?
14      MS. WESTBY: Object to the form of the
15  question.
16      MR. THOMPSON: Join.
17      THE WITNESS: Again, I don't know exactly
18  what it's referring to.
19  BY MR. GOSMAN:
20      Q.  Do you disagree with it?
21      A.  I guess I don't understand it.
22      Q.  So you don't understand it, and therefore
23  you're not able to agree or disagree with it?
24      A.  Correct.
25      Q.  You performed Israeli Leans?

1      A.  I have.
2      Q.  You taught people the Israeli Lean?
3      A.  I have.
4      Q.  All right. Let's take a look at Paragraph
5  No. 9, "Slicing the Pie."
6      A.  Okay.
7      Q.  Under paragraph -- and by the way, slicing
8  the pie is another tactic for clearing rooms in a
9  tactical situation?
10      A.  Or corners, yes.
11      Q.  And let's take a look at Paragraph D. I want
12  you to read that into the record for me, please?
13      A.  Looks like it's identical to Paragraph B
14  under eight. "Weapon acquisition, viewing the target
15  area just off of your sight picture with your weapon
16  aimed where your eyes are looking."
17      Q.  Okay. And do you not understand that
18  sentence either then, sir?
19      A.  No.
20      Q.  No, you do not understand it?
21      A.  No, I don't.
22          (Exhibit 11 identified)
23  BY MR. GOSMAN:
24      Q.  Okay. Let's go back for just a moment to
25  Exhibit 11. There are three diagrams there.

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 21 of 91

Tricia Wachsmuth v.                                                      Mike Chretien
City of Powel, et al.                                                    October 05, 2010

MIKE CHRETIEN - October 5, 2010                        Page 73
Direct Examination by Mr. Gosman

1   A.  Okay.
2   Q.  Are those diagrams accurate in terms of the
3   labels that are attached to it?
4   A.  This is not the ready position that I'm
5   familiar with.
6   Q.  Do you know where these materials came from?
7   A.  No, I don't.
8   Q.  They are from the firearms training materials
9   that were supplied by the City of Powell. And you're
10  telling me that you don't recognize that as the ready
11  position?
12  A.  No. That's not how I train people in the
13  ready position. That's not how I was trained in the
14  ready position.
15  Q.  Let's go ahead and take a look at Exhibit 12.
16  Oh, well, let's see. Before we do that, we have one
17  last page in Exhibit 11.
18  A.  Okay.
19  Q.  Let's see here. Take a minute and read that.
20  A.  Out loud?
21  Q.  Yes.
22  A.  "Universal Cover Mode."
23  Q.  Okay.
24  A.  "UCM. One, weapon shouldered. Two, sights
25  just below the threat, hands visible. Front side in

MIKE CHRETIEN - October 5, 2010                        Page 74
Direct Examination by Mr. Gosman

1   peripheral vision. Safety off. Finger off trigger."
2   Q.  Okay. Have you ever seen that before?
3   A.  Yes.
4   Q.  Do you disagree with that description?
5   A.  No.
6   Q.  All right. Let's go back to Exhibit 29,
7   Page 73, under the heading "Weapon Position,"
8   Paragraph 7.
9   A.  Uh-huh.
10  Q.  The weapon position is the cover position,
11  correct?
12  A.  That's not what it says
13  Q.  Okay. It says "constant ready" or "cover
14  position"?
15  A.  Yes.
16  Q.  All right.
17  A.  Dependent upon the circumstances.
18  Q.  So in other words, the cover position we just
19  described from Exhibit 11 is a position that is
20  employed in room clearing?
21  A.  Again, the universal cover mode is used when
22  you have a threat.
23  Q.  Well, when you go into -- when you're doing a
24  dynamic entry into a home, you assume there's a threat
25  in every room, correct?

MIKE CHRETIEN - October 5, 2010                        Page 75
Direct Examination by Mr. Gosman

1   A.  I try not to assume anything.
2   Q.  But you're trained to assume worst-case
3   scenario as Officer Danzer put it so eloquently last
4   night?
5   A.  We generally don't assume the best case.
6       MR. THOMPSON: Can we take a break, Counsel?
7   We've been going at it for almost two hours.
8       MR. GOSMAN: Yes, we can.
9       (Recess taken 10:43 to 11:26
10      a.m., October 5, 2010)
11  BY MR. GOSMAN:
12  Q.  Officer, we're still sort of working our way
13  through Exhibit 29. I'll ask you to turn there again
14  for a moment. And I'm going to refer specifically to
15  Page 81, and under Paragraph D --
16  A.  Mr. Gosman.
17  Q.  Yes.
18  A.  I've got Defendant's 80, and then it looks
19  like 84. The page numbers go from 18 to 22.
20  Q.  Okay.
21  A.  Is this the page?
22  Q.  No, it's not. Hang on here just a second,
23  and I'll get this squared up for you because we added
24  some pages last night. Let's see, I made copies --
25  what did I do with them? I gave everybody a copy, but

MIKE CHRETIEN - October 5, 2010                        Page 76
Direct Examination by Mr. Gosman

1   myself it would appear.
2       MR. GOSMAN: Tom, I see the pages that I'm
3   looking for right there. I may have two sets there, as
4   a matter of fact.
5       Okay. So 18, 19, 20, 21 and 22. Okay.
6   BY MR. GOSMAN:
7   Q.  Okay. You see Paragraph D there?
8   A.  On Page 81?
9   Q.  It's actually Document 81, Page 18.
10  A.  Okay.
11  Q.  Would you read the principles of dynamic
12  entry into the record for me?
13  A.  "One, surprise; two, speed; three, violence
14  of action; four, still need a definite plan. The goal
15  of which is to stop the threat. You must not deviate
16  from the plan under any circumstances. You may have to
17  adapt to overcome the unexpected. But do not deviate
18  from the plan. The difference between these two is if
19  you still carry out your assignment at the designated
20  time with the desired results. Never deviate from the
21  plan."
22  Q.  Have you been taught those principles?
23  A.  I recognize the first three.
24  Q.  Okay. Do you have any reason to disagree
25  with Paragraph No 4 regarding the planning?

1   A.  Yes.
2   Q.  Okay.  Go ahead and tell me about it.
3   A.  You do need a plan.   agree, you do need a
4   plan.
5   Q.  Okay.  Is it -- it says, "Never deviate from
6   the plan."  It's capped and bolded.  Do you agree with
7   that statement?
8   A.  No.
9   Q.  Would you agree that the warrant service that
10  was performed on the Wachsmuth home on the 24th of
11  February 2009, involved the principles of dynamic
12  entry, surprise, speed, action?
13  A.  Yes.
14      MS. WESTBY: Object to the form of the
15  question.
16  BY MR. GOSMAN:
17  Q.  Now, let's take a look on Page 18, which is
18  Bates-stamped 60 of this same document.  And we're
19  going to take a look at Paragraph 5, the introduction
20  to dynamic entry -- dynamic force, and then under
21  Paragraph B, you'll see the question, "Why dynamic?"
22  Do you see that?
23  A.  I do.
24  Q.  Okay.  And these are from the training
25  materials that were on hand at the Powell Police

1   Department.  And pertain to a course which you took as
2   part of your field training, correct?
3   A.  I believe so.
4   Q.  Why don't you go ahead and read into the
5   record Paragraph B.
6   A.  "Why dynamic?  One  if life is threatened:
7   A, suicide; B, harm others.
8        Number 2, if evidence may be destroyed: A,
9   drug arrests."
10  Q.  Okay.  Do you agree that those are the
11  reasons why a dynamic entry would be used by a police
12  team?
13      MR. THOMPSON: Objection as to form.
14      MS. WESTBY: Join.
15      THE WITNESS: Those are some reasons.
16  BY MR. GOSMAN:
17  Q.  All right.  So you're telling me that the
18  course materials have left out reasons why dynamic
19  force would be used by law enforcement?
20  A.  Possibly.
21  Q.  What are they?
22  A.  I don't know.
23  Q.  All right.  Let's go ahead and address the
24  information contained in Paragraph No. 2.  Would you
25  agree with me that if evidence may be destroyed,

1   dynamic entry would be appropriate?
2   A.  Yes.
3   Q.  And based on what you knew from the
4   confidential informant, on the 24th of February 2009,
5   was there any significant risk that the evidence would
6   be destroyed?
7   A.  I don't know.
8   Q.  How do you destroy a marijuana grow operation
9   between the time it takes to knock on a door and wait
10  for somebody to answer it?
11  A.  I can only testify to my personal experience.
12  Q.  Go ahead.
13  A.  Well in College Park, we had a drug search
14  warrant served on an apartment where the subjects put
15  their entire stash of marijuana into the oven and
16  burned it.
17  Q.  How long did that take?
18  A.  I don't know.
19  Q.  Okay.  Well, it didn't happen within a
20  minute, though, did it?
21  A.  I don't know.
22  Q.  It's hard to flush two marijuana plants that
23  are 2 feet tall and down in the basement down the
24  toilet; isn't that true?
25  A.  I don't grow marijuana.  I don't know.

1   Q.  Well, and I'm not going to doubt for one
2   minute that you don't grow marijuana.  But you were
3   involved in the drug arrest here and you and I both
4   know that these are questions that you considered that
5   night before you went into the home, correct?
6   A.  I didn't know what the extent of the grow
7   operation was.  I didn't know how big the plants were.
8   I just knew that there was a marijuana grow operation.
9   Q.  Okay.  We'll talk more about that later.
10      And getting back to my question, was it
11  realistic that the plants would be flushed down the
12  toilet before you could get into the residence in a
13  reasonable period of time?
14  A.  Would depend on how big the plants were.
15  Q.  And you had no idea how big the plants were?
16  That's your testimony, as you sit here today?
17  A.  Correct.
18  Q.  And was it realistic that they could have
19  been placed in the oven and burned?
20  A.  As I said, I had personal experience, was
21  working when that happened.  I wasn't part of the SWAT
22  team that went into that apartment.  I was just working
23  on the street at the time.  I knew that that's what
24  they had done.
25  Q.  Did they recover marijuana in the oven?

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 23 of 91
Tricia Wachsmuth v.
City of Powel, et al.                                                    Mike Chretien
                                                                   October 05, 2010

1   A.  I don't know.

2   Q.  Well, they knew it had been burned there,

3   correct?

4   A.  Yes.

5   Q.  Now, let's take a look at Paragraph E, which

6   is on the next page.  That's 81 again.

7   A.  Okay.

8   Q.  E1A, Diversion Devices.  Would you please

9   read the information contained in that subheading into

10  the record.

11  A.  Paragraph No. 1?

12  Q.  Yes, E1?

13  A.  "Diversion Devices.  A diversion device

14  should be used when you are sure or reasonably sure

15  there is a subject in a building that you feel is about

16  to take his or her own life or another person's life."

17       Do you want me to continue?

18  Q.  Yes.

19  A.  Subparagraph B: "Team leader will announce

20  when a diversion device will be used.  C, point man

21  will be the one to detonate device; D, all team members

22  will take proper precautions during 'cook off'" -- in

23  quotations.  "After device"  - "E, after device is

24  detonated, a dynamic entry will be made into the room

25  with a preplanned entry."

1   Q.  What was the preplanned entry into the

2   bedroom at the Wachsmuth home to the 24th of February

3   where the flashbang device was detonated?

4        MS. WESTBY: Object to the form of the

5   question.

6        THE WITNESS: There was no preplanned entry

7   into that room in connection with the diversionary

8   device.

9   BY MR. GOSMAN:

10  Q.  Was there any preplanned entry into any room

11  in that house?

12  A.  Not to the extent that officers were directed

13  to take specific routes or to turn certain directions

14  or to go through a door a certain way or anything like

15  that.

16  Q.  Were the officers instructed when they

17  cleared a room to announce it to the other officers?

18  A.  Common practice for us, when we were done

19  inside of a room, would be to announce before we came

20  out of the room, that the room was clear.

21  Q.  Okay.  And I appreciate that, and thank you

22  for that.

23       But what I asked was:  Is that what happened

24  that night in the Wachsmuth residence?

25       MS. WESTBY: No, it isn't.

1   BY MR. GOSMAN:

2   Q.  Was that part of the planning for the entry

3   into the Wachsmuth residence?

4   A.  Was part of the plan to announce that the

5   room was clear?

6   Q.  Yes, by the team members.

7   A.  I don't know that we specifically addressed

8   it -- that's something that would have been covered,

9   just in room entry training.

10  Q.  Were clear command signals with the team used

11  to identify situations, such as clear, move, and

12  identification of a suspect?

13       MS. WESTBY: Object to the form of the

14  question.

15       MR. THOMPSON: Join.

16       THE WITNESS: I don't recall discussing any

17  specific signals.

18  BY MR. GOSMAN:

19  Q.  Handling of suspects, was that specifically

20  discussed?

21  A.  Yes.

22  Q.  That's the important part of any dynamic

23  entry, would you agree with me?

24       MS. WESTBY: Object to the form.

25       THE WITNESS: It's certainly a part of it.

1   BY MR. GOSMAN:

2   Q.  Well, you're using the dynamic entry because

3   of the threat of suspects?

4   A.  That's within reason.

5   Q.  Yes.  And it's really the most important

6   reason that you have for being there is the threat of

7   dangerous suspects, correct?

8        MR. THOMPSON: Objection as to form.

9        THE WITNESS: Again, that's a reason.

10  BY MR. GOSMAN:

11  Q.  All right.  So let's go ahead and take a

12  minute here and jump ahead to Exhibit 10.  I wish you

13  would have kept your finger in that page.

14  A.  I've got these pages in here.

15  Q.  Okay.  Thank you.

16       First of all, is this your entry plan?

17  A.  No.

18  Q.  What is it?

19  A.  These are notes that someone took.

20  Q.  You didn't take them?

21  A.  No.  That's not my handwriting.

22  Q.  Okay.  Do we have any idea whose handwriting

23  it is?

24  A.  Yes.

25  Q.  Whose?

1    A.   Marrisa Torczon. She's a dispatcher.
2    Q.   Was she called into the planning meeting?
3    A.   She was there.
4    Q.   Did you ask her to take notes to prepare the
5  entry plan or document the entry plan?
6    A.   I didn't specifically ask her. I'm not sure
7  who did.
8    Q.   Have you seen those notes before?
9    A.   I think I did see her taking notes on a --
10  like a yellow tablet. I don't recall seeing this
11  before today, though.
12    Q.   Okay. I want you to take a look at it, and I
13  want you to tell me if it is -- if it does, in fact,
14  document the information you covered in the planning
15  phase of the entry into the Wachsmuth home.
16    MS. WESTBY: Object to form.
17    THE WITNESS: It looks like shorthand notes
18  from our discussion.
19  BY MR. GOSMAN:
20    Q.   Okay. But you didn't direct her to prepare
21  or document your entry plan?
22    A.   No, I did not.
23    Q.   And you didn't prepare a written entry plan?
24    MR. THOMPSON: Objection as to form.
25    THE WITNESS: Not on paper.

1  BY MR. GOSMAN:
2    Q.   Well, when you say "not on paper," where was
3  it prepared -- I assume by that you're saying that you
4  prepared an entry plan, but you didn't prepare it on
5  paper; am I correct?
6    A.   Yes.
7    Q.   All right. So where was it prepared?
8    A.   As I said earlier, on the dry erase boards
9  downstairs.
10    Q.   So what did the dry erase boards contain?
11  What information?
12    A.   Sketch of what we knew of the layout of the
13  house. What officers were going to be where.
14    Q.   That information is also apparently --
15    A.   Some of it is on this sheet also.
16    Q.   Since this is the only document we have,
17  what's missing from the entry plan that you prepared on
18  the chalkboard -- or the dry erase board?
19    A.   I don't know.
20    Q.   You don't know?
21    A.   No.
22    Q.   Well, take a minute and look at it. Is there
23  anything important about the planning of that mission
24  that night that is not on that document?
25    MS. WESTBY: Object to the form of the

1  question.
2    MR. THOMPSON: Join.
3    THE WITNESS: I can't answer that. I don't
4  have the plan to compare it with.
5  BY MR. GOSMAN:
6    Q.   Well, I want you to take a minute and go
7  through your mind mentally. You've had time to think
8  about this.
9    What elements of the entry plan did you
10  describe to the officers that are not on this document?
11    MR. THOMPSON: Objection as to form.
12    MS. WESTBY: Join.
13    THE WITNESS: Again, I just -- I couldn't say
14  for sure.
15  BY MR. GOSMAN:
16    Q.   All right. Have you taken enough time to
17  satisfy yourself that you just don't know?
18    A.   I can't say for certain that this -- that
19  everything that's on this piece of paper was exactly
20  what we had discussed and what I had put on the dry
21  erase boards.
22    Q.   Okay. All right. We'll take up that
23  question in a moment.
24    But is there anything that is missing from
25  the plan that you prepared that night --

1    A.   I don't remember what I wrote on the board a
2  year-and-a-half ago.
3    Q.   Well, you know what's necessary to put a
4  SWAT-type entry together?
5    MR. THOMPSON: I'm going to object the
6  witness not to answer. You've asked it three different
7  times now, and he's told you he doesn't remember. What
8  else do you want from him?
9    MR. GOSMAN: Let's have him resort to his
10  training and experience in performing SWAT-type
11  entries.
12  BY MR. GOSMAN:
13    Q.   I want you to tell me if there's anything
14  that is missing from that document that would or should
15  have been discussed that night in planning the
16  operation.
17    MR. THOMPSON: Objection as to form.
18    MS. WESTBY: It's precisely the same
19  question.
20  BY MR. GOSMAN:
21    Q.   What is missing?
22    A.   All kinds of stuff.
23    Q.   Well, I only care about the important things.
24    MS. WESTBY: Yeah.
25    MR. THOMPSON: I'm going to object as to

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 25 of 91
Tricia Wachsmuth v.                                                          Mike Chretien
City of Powel, et al.                                                     October 05, 2010

1   relevance. He's told you there was a dynamic entry or
2   a plan that was on dry erase board. I don't know what
3   the relevance is to what was on this tablet and what
4   wasn't.
5          MR. GOSMAN: Well, I don't have what was on
6   the dry erase board, Tom.
7          MR. THOMPSON: Exactly, and neither does he.
8          MR. GOSMAN: Well, he planned the raid. I
9   didn't. What I have is this document.
10         MR. THOMPSON: I understand, Counsel. But
11  he's told you that he can't remember what was on the
12  dry erase board. So now you're asking him to speculate
13  and to guess. And I'm not going to put him in a
14  position being on the stand in federal court subject to
15  that type of speculation and conjecture.
16         MR. GOSMAN: I'm not asking him to speculate
17  and guess about anything.
18         MR. THOMPSON: You certainly are.
19         MR. GOSMAN: I'm asking him to resort to his
20  training and experience and tell me if there's anything
21  that's missing from this document that was part or
22  should have been part of the entry plan that night.
23         THE WITNESS: I'm sure --
24         MS. WESTBY: Object to the form of the
25  question.

1   BY MR. GOSMAN:
2      Q. Go ahead. We're going to have to try to get
3   to the bottom of this since we don't have an entry
4   plan.
5          MS. WESTBY: Well, why don't you ask him what
6   he recalls about the entry plan instead of asking him
7   what is not on or on some document that he is not the
8   author of.
9          MR. GOSMAN: Before the witness forgets the
10  question, can you just answer the question, Officer?
11         MS. WESTBY: He did. He answered the
12  question.
13         THE WITNESS: Again, I'm sure there was more
14  on the dry erase board than is on this piece of paper.
15  BY MR. GOSMAN:
16     Q. Okay. And you've already testified you don't
17  remember what that was.
18         So what I've asked you is: Based on your
19  training and experience, what should be on this page
20  relative to a SWAT-type entry that is not there?
21         MS. WESTBY: Okay Wait just a second. Just
22  a second.
23         Again, he is not the author of this document.
24  That's how you're phrasing your questions. Asked and
25  answered over and over again. Badgering.

1   Argumentative.
2          MR. THOMPSON: Join.
3          MS. WESTBY: Enough is enough.
4          MR. GOSMAN: All right. The witness answered
5   the question, so that's fine. He doesn't know.
6   BY MR. GOSMAN:
7      Q. Okay. Well, we're going to go back to
8   Exhibit 29, Officer. Okay. Handling suspects. I
9   think we sort of touched on that subject.
10         And I believe that you indicated that you --
11  there were instructions that evening regarding the
12  handling of -- the handling of suspects -- I'm sorry --
13  correct?
14     A. We did discuss who would be designated to
15  handle suspects.
16     Q. And who was that?
17     A. To the best of my recollection, that would
18  have been Kent and McCaslin.
19     Q. They didn't even come in the door first.
20     A. Nope.
21     Q. In fact, they deployed the diversion device,
22  correct, outside the house?
23     A. Correct.
24     Q. How are they going to see suspects if they
25  are outside the house when the entry team breaks in and

1   goes into the house?
2          MS. WESTBY: Object to the form of the
3   question.
4          THE WITNESS: They were not equipped with
5   Long guns, only pistols. It's a lot easier to holster
6   a pistol and place two hands on a suspect than dangle
7   your rifle between you.
8   BY MR. GOSMAN:
9      Q. So what were you going to do, just leave the
10  suspects sitting in the home until Kent and McCaslin
11  finished their diversion tactics and came back in the
12  house and gathered them up?
13         MS. WESTBY: Object to the form of the
14  question.
15         MR. THOMPSON: Go ahead.
16         THE WITNESS: When the entry team encountered
17  someone, if you encountered someone, then you stayed
18  with that person until the arrest team could come in
19  and handcuff them.
20  BY MR. GOSMAN:
21     Q. Okay. And under Paragraph 4 of the training
22  materials that we're looking at on Exhibit 29, it
23  indicates with regard to handling suspects, must stop
24  any threat now exclamation point. Arrest immediately
25  and remove suspects, correct?

MIKE CHRETIEN - October 5, 2010                                    Page 93
Direct Examination by Mr. Gosman

1    A.  It says "arrest immed ately and remove."
2    Q.  Okay.  And it's just simply true that you
3  weren't able to do that if you had an arrest team that
4  was outside the house when the entry team came into the
5  house?
6        MS. WESTBY: Object to the form of the
7  question.
8        MR. THOMPSON: Join.
9        THE WITNESS: That's not correct.
10  BY MR. GOSMAN:
11    Q.  Why not?
12    A.  'Cause they weren't that far away.
13    Q.  They weren't with the entry team though; is
14  that true?
15    A.  I don't know.
16    Q.  When the entry team went into the house, you
17  don't know whether McCaslin and Kent were there with
18  you?
19    A.  I don't know how quickly they were able to
20  follow us in.
21    Q.  Well, all right.  You just said, "follow us
22  in." They weren't with you when you entered the home,
23  correct?
24        MS. WESTBY: Object to the form of the
25  question.

MIKE CHRETIEN - October 5, 2010                                    Page 94
Direct Examination by Mr. Gosman

1        THE WITNESS: I can testify to what I saw,
2  and they were not in front o' me.
3  BY MR. GOSMAN:
4    Q.  All right.  Where were you in that order of
5  things?
6    A.  I would have been one of the first two or
7  three officers.  I know I wasn't the first officer.
8  But I would have been towards the front.
9    Q.  And who was first?
10    A.  The best I can recall that would have been
11  Chapman, because he was the one that was knocking on
12  the door.
13    Q.  And who was second?
14    A.  I don't recall.
15    Q.  Would it have been Miner with the ram?
16        MR. THOMPSON: Object as to the form.  Asked
17  and answered.  He doesn't recall.
18        THE WITNESS: I just don't know.  I don't
19  think so, though.
20  BY MR. GOSMAN:
21    Q.  Was it the duty of the first officer that
22  entered the home -- or the first officer that
23  encountered the suspect to stay with the suspect until
24  McCaslin and Kent arrived?
25    A.  Not necessarily.

MIKE CHRETIEN - October 5, 2010                                    Page 95
Direct Examination by Mr. Gosman

1    Q.  You didn't have any directive as to how the
2  team was to handle the suspect when they entered the
3  house?
4    A.  You have to be flexible.
5    Q.  So is your answer, I didn't have a specific
6  assignment that the first officer that encountered the
7  suspect was to take control of the suspect?
8        MS. WESTBY: Object to the form the question.
9        THE WITNESS: That's not what I said.
10  BY MR. GOSMAN:
11    Q.  Well, that's my question, though.
12    A.  I didn't know exactly where we were going to
13  encounter anyone.
14    Q.  True.  And that's true in every one of these
15  cases, correct?
16    A.  Yes.
17    Q.  And it's also true that the first officer
18  that encounters the suspect is normally the officer
19  that takes control of the suspect?
20    A.  Until someone relieves them.
21    Q.  All right.  So was that the directive that
22  was given that night?
23    A.  I don't recall specifically.
24    Q.  Well, where was Tricia Wachsmuth when you
25  entered -- when you entered the home?

MIKE CHRETIEN - October 5, 2010                                    Page 96
Direct Examination by Mr. Gosman

1    A.  In the living room.
2    Q.  Okay.  And so that we don't beat around the
3  bush about this, she was sitting on the couch just next
4  to the door, wasn't she?
5    A.  I don't remember.
6    Q.  In any event, the first officer that entered
7  the house, would have been the first officer to
8  encounter the suspect, correct?
9    A.  That makes sense.
10    Q.  Did that officer take control of Tricia
11  Wachsmuth?
12    A.  I don't know, because I continued.
13    Q.  Did you see Tricia Wachsmuth?
14    A.  I don't recall seeing her initially.  I was
15  aware that there was someone in the living room,
16  another officer was dealing with her.  I continued to
17  my -- I just continued on clearing the residence.
18    Q.  Okay.  Well, you were the third one in, so it
19  had to either --
20    A.  I didn't say I was the third one in.
21    Q.  You didn't?
22    A.  No.  I said I was towards the front.
23    Q.  Towards the front?
24    A.  I would have been towards the front.  I don't
25  know if I was second or third or fourth.  I don't think

MIKE CHRETIEN - October 5, 2010                                Page 97
Direct Examination by Mr. Gosman

1  I would have been any farther back than that. But I
2  can't say for sure I was number two or number three.
3  Q. Did anybody push themselves around you to get
4  in the door?
5  A. No.
6  Q. When you went in the door, an officer had
7  already taken control of Tricia; is that correct, or
8  was standing by her?
9  A. I believe so.
10  Q. Was she arrested immediately?
11  MR. THOMPSON: Objection as to form.
12  THE WITNESS: Not by me.
13  BY MR. GOSMAN:
14  Q. By anyone?
15  A. I didn't hear anyone say "you're under
16  arrest."
17  Q. Was she removed immediately?
18  A. No.
19  Q. Okay. Other than yourself, did anyone who
20  participated in the execution of the search warrant on
21  the Bret and Tricia Wachsmuth home have SWAT training?
22  MS. WESTBY: Object to the form of the
23  question.
24  MR. THOMPSON: Join.
25  THE WITNESS: I don't know that they had SWAT

MIKE CHRETIEN - October 5, 2010                                Page 98
Direct Examination by Mr. Gosman

1  training by that name.
2  BY MR. GOSMAN:
3  Q. You were the team leader that evening,
4  correct?
5  A. Yes.
6  Q. And you called -- you selected the officers
7  for this operation, correct?
8  A. Yes.
9  Q. Did you know the training background of the
10  officers you selected for this dynamic entry?
11  A. The ones on the entry team I was very
12  familiar with.
13  Q. How about the ones that were involved in
14  the deployment of the flashbang, did you know what
15  their training was?
16  A. I knew that they had been trained.
17  Q. Trained in the deployment of the flashbang?
18  A. Yes.
19  Q. Did you train them?
20  A. I did not personally train them.
21  Q. How did you know they had been trained?
22  A. They had attended the training that Pechtel
23  held here before I was here.
24  Q. How did you know that?
25  A. We talked about it.

MIKE CHRETIEN - October 5, 2010                                Page 99
Direct Examination by Mr. Gosman

1  Q. And that -- the training that Pechtel had, if
2  you will, is the Countermeasures Tactical Institute
3  training that he provides, correct?
4  A. Yes.
5  (Exhibit 31 identified)
6  BY MR. GOSMAN:
7  Q. Let's go ahead and take a minute and look at
8  Exhibit 31. And let's see, we have -- we have Kent and
9  McCaslin on -- I think it starts to the third or fourth
10  page of that. Yeah, third page, starting on the third
11  page.
12  A. Okay.
13  Q. Up first, did you assign Chretien -- sorry --
14  McCaslin, Officer Chretien. Did you assign McCaslin
15  the job of deploying the flashbang device?
16  A. Yes.
17  Q. And you assigned Kent the duty of using the
18  rake, correct?
19  A. Yes.
20  Q. All right. Did you have any discussions with
21  Kent about McCaslin's deployment of the device?
22  A. We did talk about how we were going to deploy
23  the device, the three of us.
24  Q. Very good. What did you say?
25  A. That if we were going to use it, Kent would

MIKE CHRETIEN - October 5, 2010                               Page 100
Direct Examination by Mr. Gosman

1  break the window, McCaslin would deploy the device
2  inside the northeast bedroom.
3  Q. That was it?
4  A. Yep. We talked about how you deploy a
5  flashbang.
6  Q. What did you say?
7  A. Look in the area you're going to put it and
8  then put it there.
9  Q. Let's go ahead and take a look at McCaslin's
10  training. And that is Bates-stamped 1220. It's LGLP
11  Wachsmuth 1220.
12  A. Okay.
13  Q. So what course specifically did McCaslin take
14  that would have involved flashbang training?
15  MS. WESTBY: Object to the form of the
16  question.
17  MR. THOMPSON: Join.
18  THE WITNESS: I wasn't here when he took it.
19  BY MR. GOSMAN:
20  Q. Well, I know that. But I'm saying what --
21  you told me that he took a course?
22  A. Uh-huh.
23  Q. In the course he used a flashbang and was
24  trained in it. So which course was it?
25  MR. THOMPSON: Objection as to form.

1  MS. WESTBY: Object to the form of the
2  question.
3  THE WITNESS: It would have been one of the
4  classes that Pechtel taught.
5  BY MR. GOSMAN:
6  Q. Okay. Well, let's see what classes that
7  Pechtel taught that Officer McCaslin participated in
8  prior to February 24, 2009. I see one, Patrol Tactical
9  Response. Do you see another one?
10  A. I don't.
11  Q. So it would have had to have been in the body
12  of the Tactical Control Response Training, correct?
13  MS. WESTBY: Object to the form of the
14  question. Honestly.
15  THE WITNESS: How can I answer that? I
16  wasn't there.
17  BY MR. GOSMAN:
18  Q. Officer, you told me hat Pechtel was the one
19  that trained him.
20  MS. WESTBY: Object to the form of the
21  question. You asked him to speculate about where he
22  received this training. You re asking him about
23  another officer's training.
24  MR. GOSMAN: I hope he's not speculating.
25  MS. WESTBY: Well, I'm sure he said that it

1  must have been.
2  MR. GOSMAN: Okay. All right. Let's try to
3  get back to the deposition, if we can.
4  MS. WESTBY: If you don't want to depose all
5  of the officers, then I have no problem with you asking
6  this officer if he knows about their training. But if
7  you're going to depose them, ask them about their
8  training.
9  MR. GOSMAN: Thank you. I'll take that under
10  consideration.
11  BY MR. GOSMAN:
12  Q. Okay. Officer, you didn't want to send
13  someone out that night to deploy a flashbang device
14  that had never done it before, wouldn't that be fair to
15  say?
16  MS. WESTBY: I'll object to the form of the
17  question.
18  MR. THOMPSON: Join.
19  BY MR. GOSMAN:
20  Q. Go ahead.
21  A. Ideally.
22  Q. So there are circumstances where you may send
23  somebody out who's never been trained to deploy a
24  flashbang?
25  A. That was not the question.

1  MS. WESTBY: Object to the form of the
2  question.
3  BY MR. GOSMAN:
4  Q. You said "ideally."
5  A. You said, would I send someone who had never
6  deployed a flashbang, not who had never been trained.
7  Q. Yes.
8  A. The follow-up question referred to training.
9  Which is it? Do you want to know if they had been
10  trained, or do you want to know if they had ever done
11  it?
12  Q. Well, we're talking about training at this
13  point.
14  A. Okay.
15  Q. So let's stick with that. And I think that
16  we don't need to revisit this subject from top to
17  bottom. It's been established that you understood that
18  McCaslin had training --
19  A. Correct.
20  Q. -- in this device. And that his training
21  would have been from Doug Pechtel?
22  A. Correct.
23  Q. Who does the Countermeasures Tactical,
24  Incorporated training seminars?
25  A. Correct.

1  Q. And the Patrol Tactical Response Training
2  program there at 9/3/2005 for McCaslin is a course that
3  that gentleman teaches, correct?
4  A. Yes.
5  Q. That is the course that he teaches, correct?
6  A. Yes.
7  MS. WESTBY: Object to the form of the
8  question.
9  BY MR. GOSMAN:
10  Q. I don't care about this. Sorry.
11  And do you see any other courses that Pechtel
12  would have taught officer McCaslin -- no, nevermind.
13  Do you know whether the 50-hour course that
14  has been identified as the Patrol Tactics Response
15  course contained -- or involves training with a --
16  actual training with a diversionary device?
17  A. Not particularly.
18  Q. Is that to say, then, that you really didn't
19  know whether Officer McCaslin had training in the
20  deployment of a diversionary device?
21  A. No.
22  MS. WESTBY: Object to the form of the
23  question.
24  BY MR. GOSMAN:
25  Q. How did you know that he had that training?

MIKE CHRETIEN - October 5, 2010                    Page 105
Direct Examination by Mr. Gosman

1    A.  I asked him.
2    Q.  Oh, you asked him that night?
3    A.  Yes.
4    Q.  So you didn't know until you asked him?
5        MS. WESTBY: Object to the form of the
6  question.
7  BY MR. GOSMAN:
8    Q.  Is that correct?
9    A.  Yes.
10   Q.  Yes, you didn't know until you asked him?
11 This may just be me on this one, I'll give you that.
12   A.  Yes.
13   Q.  Okay.  Thank you.
14       MR. THOMPSON: Sounds like the dialogue from
15 Forest Gump.
16       MR. GOSMAN: I'll take ownership of that one
17 and probably a lot of other things, too.
18 BY MR. GOSMAN:
19   Q.  Okay.  To the best of your recollection, what
20 did Officer McCaslin tell you that night about his
21 training with the diversionary device?
22   A.  He said he had flashbang training before.
23   Q.  Had the officers you selected or who
24 participated in the warrant served on the plaintiff's
25 home -- and I'm going to refer to the entry team and

MIKE CHRETIEN - October 5, 2010                    Page 106
Direct Examination by Mr. Gosman

1  the diversion team.  And I'm not too concerned about
2  your perimeter fellows -- had they ever conducted a
3  joint operation together before?
4        MS. WESTBY: Object to the form of the
5  question.
6        THE WITNESS: I don't know.
7  BY MR. GOSMAN:
8    Q.  You don't know?
9    A.  No.
10   Q.  And you didn't know on the 24th of
11 February 2009; is that true?
12   A.  Yes.
13   Q.  Does that include training exercises as a
14 team?
15   A.  Nope.
16   Q.  Had the officers involved in the warrant
17 service on the Wachsmuth home ever conducted joint
18 training exercises as a team before?
19   A.  Yes.
20   Q.  When?
21   A.  I don't recall the specific date.  But I know
22 that we used the old high school.
23   Q.  Was it a joint operation?
24   A.  When you say "joint," do you mean members of
25 the Powell Police Department with other members of the

MIKE CHRETIEN - October 5, 2010                    Page 107
Direct Examination by Mr. Gosman

1  Powell Police Department, because that was the only
2  joint aspect to this operation.
3    Q.  Okay.  That's fine.  That answers that
4  question.
5        Was that training exercise documented?
6    A.  I don't know.  It would have been one of our
7  Friday trainings.
8    Q.  Okay.  You do document your Friday trainings,
9  do you not?
10   A.  We do.  The instructor does.
11       (Exhibit 35 identified)
12 BY MR. GOSMAN:
13   Q.  Okay.  Well, let's go ahead and take a look
14 at them.  And that's Exhibit 35.  It looks like we've
15 got about five years' worth of those in-service
16 training records.
17   A.  Okay.
18   Q.  You might need a minute.
19   A.  I think I found it, it starts with 4th
20 Quarter 2005?
21   Q.  Yes, sir.
22   A.  Okay.  Did I miss something?  Is there a
23 question, or you just want me to look at them?
24   Q.  No, there's a question.
25   A.  I'm sorry.

MIKE CHRETIEN - October 5, 2010                    Page 108
Direct Examination by Mr. Gosman

1    Q.  We're looking for --
2    A.  Oh, that specific one.  I'm sorry.
3    Q.  As a matter of fact, let's broaden it up.
4  I'm looking for any evidence that the Powell Police
5  Department trained as a unit.
6    A.  Okay.
7    Q.  In connection with dynamic entry tactical
8  response, that kind of thing.
9        MR. THOMPSON: Other than the officer's
10 testimony under oath?
11       MR. GOSMAN: What was that?  An objection?
12       MR. THOMPSON: No.
13       MR. GOSMAN: Significance --
14       MR. THOMPSON: It's a misstatement of what's
15 already been testified to.  He stated that they
16 trained.
17       MR. GOSMAN: And he also stated it's
18 documented and so, you know, let's just go ahead --
19       MR. THOMPSON: Counsel, he did not state that
20 it was documented.
21       MR. GOSMAN: Well, thank you for that.
22       MR. THOMPSON: He stated that those trainings
23 are documented by the instructor is what his testimony
24 was.
25       MR. GOSMAN: I see.  And there's a difference

Case 1:10-cv-00041-ABJ  Document 65-3  Filed 01/10/11  Page 30 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1  there. Well, we'll parch that out later.
2        THE WITNESS: Would you like me just to read
3  it as I see it?
4  BY MR. GOSMAN:
5     Q. Yeah.
6     A. December of -- December 9th search warrants.
7     Q. Search warrants, 12 of '09?
8     A. 12/9 of '05.
9     Q. Search warrants, is that how -- this just
10  says "search warrants," are you telling me this
11  documents a dynamic team practice in the execution of a
12  SWAT-type entry?
13        MR. THOMPSON: Objection as to form.
14        MS. WESTBY: Join.
15        THE WITNESS: I wasn't there.
16  BY MR. GOSMAN:
17     Q. All right.
18     A. You asked me to identify training.
19     Q. No, I'm asking you to identify SWAT-type
20  training in dynamic entry.
21     A. That's not how you phrased it.
22        MS. WESTBY: That isn't.
23  BY MR. GOSMAN:
24     Q. Well, I apologize. Let's go forward --
25     A. Do you want me to identify things, or do you

1  want to identify things? I identified search warrants.
2     Q. We have a misunderstanding about the
3  question. Because I don't care about search warrants.
4  I care about dynamic team entry into a home.
5        MR. THOMPSON: And, Counsel, in fairness,
6  that wasn't the question that you asked. You asked him
7  whether or not they had trained jointly as a team.
8        MR. GOSMAN: I'm sorry. I could have made
9  that mistake, and that's certainly possible.
10  BY MR. GOSMAN:
11     Q. So if I did, I apologize to you, Officer, and
12  I appreciate the opportunity to clear that up.
13     A. Would you like me to go through and identify
14  what I identified as that type of training?
15     Q. Yes.
16     A. Okay. Again, 12/9 of '05, search warrants.
17  June of '06, high-risk warrant service And search
18  warrants is a separate entry. November of '06, active
19  threat response. February 27th of '06, single-room
20  clearing. March 20th of '06, building clearing,
21  cuffing, and searching. April of '06, squad movement.
22  May of '06, squad movement, weapon retention.
23     Q. You know, I hate to admit this, but I'm not
24  following your page. What page are you on?
25     A. 1818. It's sideways.

1     Q. Okay.
2     A. Okay. The next one would be June of '06,
3  barricaded gunman. July of '06, barricaded gunman
4  scenario. August of '06, multiroom clearing.
5  September of '06, multiroom clearing. That's all I
6  see.
7     Q. Okay. Did you -- did you participate in any
8  one of these classes?
9     A. No.
10     Q. Now, you've told me that you understood that
11  Officer McCaslin had training in the deployment of a
12  noise distraction device. Had he ever practiced with
13  such a device before? Did you know of that?
14     A. He said he was trained in the deployment of a
15  flashbang.
16     Q. So you never were involved in any practice
17  with him involving that device?
18     A. I believe I was when we did the training in
19  the old high school. Again, I didn't see that listed
20  here.
21     Q. Did you deploy a flashbang in the old high
22  school?
23     A. It would have been just the body, not the
24  actual charge.
25     Q. Do you remember doing that?

1     A. Yes.
2     Q. And have you received training in the
3  deployment after a noise distraction device?
4     A. Yes.
5     Q. Describe your training.
6     A. Initially, I believe it was in-service SWAT
7  training in College Park. Was presented by one of the
8  other officers that attended the DEF-TEC weeklong, less
9  lethal N.F.D.D. noise blast diversion device.
10        It's one of mine buzzing. Sorry.
11        We had one officer that had been to the
12  school. I knew that I had training on it from him
13  before I was on the team. When I was on the team, we
14  had practiced flashbangs that we used during training.
15  Also, when I was on the team we sent another officer to
16  that course. When he came back, he updated us on all
17  the different things he'd learned.
18     Q. And that was a one-week course, did you say?
19     A. The course that they attended through DEF-TEC
20  was a weeklong course, yes.
21     Q. Did you attend that course?
22     A. No.
23     Q. Did you practice with the College Park SWAT
24  team deploying flashbang devices?
25     A. Yes.

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 31 of 91
Tricia Wachsmuth v.                                                    Mike Chretien
City of Powel, et al.                                              October 05, 2010

MIKE CHRETIEN - October 5, 2010                           Page 113
Direct Examination by Mr. Gosman

1   Q. How often?
2   A. I'm not sure. Probably not every month.
3   Several times a year.
4   Q. Did they have anything like that set up in
5   Powell for training using the flashbang device?
6          MR. THOMPSON: Objection as to form.
7          MS. WESTBY: Join.
8          THE WITNESS: Anything like the way that we
9   trained on the SWAT team n College Park?
10  BY MR. GOSMAN:
11  Q. Yes.
12  A. No.
13          (Exhibit 7 identified)
14  BY MR. GOSMAN:
15  Q. Okay. Lets turn to Exhibit 7. And this is
16  the product and labeling documentation relative to the
17  DEF-TEC 25, I believe, it's called.
18  A. Yeah.
19  Q. Have you seen this product label before?
20  A. I think so.
21  Q. And do you see the caption at the top of the
22  page?
23  A. To only be used by law enforcement?
24  Q. Yes.
25  A. Uh-huh.

MIKE CHRETIEN - October 5, 2010                           Page 114
Direct Examination by Mr. Gosman

1   Q. Why don't you go ahead and read that.
2   A. "To only be used by law enforcement,
3   corrections, or military personnel who have
4   successfully completed a training program in the use of
5   distraction devices."
6   Q. Would you agree that in order to deploy this
7   device properly, a -- only law enforcement,
8   corrections, or military personnel should do it who
9   have successfully completed a training program in the
10  use of distraction devices?
11          MR. THOMPSON: Objection as to form.
12  BY MR. GOSMAN:
13  Q. Let me strike that and ask you if you agree
14  with the language that's contained in that legend at
15  the top of the label on Exhibit 7?
16  A. I agree only trained personnel should use
17  them.
18  Q. And it does say by trained personnel, the
19  legend says, "those who have successfully completed a
20  training program in the use of the device should use
21  it," correct?
22  A. It does say that.
23  Q. Let's go ahead and take a look at the -- I
24  think it's the fourth page of this same exhibit. And
25  this has another legend that is down there sort of the

MIKE CHRETIEN - October 5, 2010                           Page 115
Direct Examination by Mr. Gosman

1   at the bottom of the page. It's in a box, says
2   "warning." Could you read that into the record for me,
3   please?
4   A. "Warning: This product is to be used only by
5   authorized and trained law enforcement, correction, or
6   military personnel. This product may cause serious
7   injury or death to you or others. This product may
8   cause serious damage to property. Handle, store, and
9   use with extreme care and caution. Use only as
10  instructed."
11  Q. Okay. Anything in that that you disagree
12  with?
13  A. No.
14  Q. And then over on the left-hand side of the
15  page, there's some information under the heading
16  application.
17  A. Uh-huh.
18  Q. And I'm referring to the third paragraph
19  there. "It is recommended that the immediate area for
20  deployment be visually affirmed." I want you to take a
21  second and read that. And why don't we go ahead and
22  have you read it into the record?
23  A. "It is recommended that the immediate area
24  for deployment be visually affirmed to be clear of
25  person or persons and that the device is delivered so

MIKE CHRETIEN - October 5, 2010                           Page 116
Direct Examination by Mr. Gosman

1   that it remains free of obstructions or walls. The
2   cleared area for deployment should be 5 to 6 feet
3   around which the device is expected to come to rest.
4   If the device is deployed in such a manner that a wall
5   or obstruction should block the bottom port, then the
6   distraction device may move slightly."
7   Q. Do you disagree with the language that you've
8   just read into the record there about how the device
9   should be deployed?
10  A. I don't disagree with the language that I
11  just read.
12  Q. Did you instruct Officer McCaslin with regard
13  to this information that we've just read?
14          MR. THOMPSON: Objection as to form.
15          MS. WESTBY: Join.
16          THE WITNESS: I didn't read this to him
17  verbatim.
18  BY MR. GOSMAN:
19  Q. Fair enough. But did you discuss this, the
20  information contained in what we just read to Officer
21  McCaslin?
22          MR. THOMPSON: Objection as to form.
23          MS. WESTBY: Join.
24          THE WITNESS: Okay. I talked with McCaslin
25  about deploying the device.

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 32 of 91

Tricia Wachsmuth v.                                                                    Mike Chretien
City of Powel, et al.                                                              October 05, 2010

1   BY MR. GOSMAN:
2      Q.  Did you tell him that he needed to look where
3   he was throwing it?
4      A.  I told him to look before he placed it, not
5   throw it.
6      Q.  In this case, he had to throw in because it
7   was going through a window, correct?
8      A.  No.
9      Q.  Okay.  So what else could he have down?
10     A.  Place it inside the window.
11     Q.  Just dropped it?
12         MS. WESTBY: Object to the form of the
13  question.
14  BY MR. GOSMAN:
15     Q.  Did you instruct him to just drop it inside
16  the window?
17     A.  No.  I told him just what I told you before.
18     Q.  Which was to place -
19     A.  Look, place.
20     Q.  Okay.  So it didn't matter to you whether he
21  threw it or dropped it; you just wanted to make sure he
22  looked and saw where it was going, correct?
23         MR. THOMPSON: Objection as to form.
24         MS. WESTBY: Objection to form.
25         THE WITNESS: I did say specifically not to

1   throw it.
2   BY MR. GOSMAN:
3      Q.  You did tell him specifically not to throw
4   it?
5      A.  Not to throw it.
6      Q.  So what does that mean?  Does that mean he
7   was to simply place it in the room by dropping it?
8          MS. WESTBY: Object to the form of the
9   question.
10         MR. THOMPSON: Join.
11         THE WITNESS: I couldn't tell exactly what to
12  do.  I wasn't going to be there.  I trusted his
13  judgment.
14  BY MR. GOSMAN:
15     Q.  Okay.
16     A.  He understood the correct way to deploy a
17  flashbang device.
18     Q.  But you told him not to throw it?
19     A.  Correct.
20         (Exhibit 8 identified)
21  BY MR. GOSMAN:
22     Q.  All right.  Okay.  Let's go ahead and take a
23  look at Exhibit No. 8.  And I'm going to ask you if
24  you've seen this document before?
25     A.  No.

1      Q.  You'll notice it has the heading
2   "Countermeasures Tactical, Inc.," correct?
3      A.  Yes.
4      Q.  I want you to take a look -- and frankly,
5   we're focusing on the second page because the second
6   page deals with standards for deploying the device
7   through a window.
8      A.  Okay.
9      Q.  Could you run through those standards for me
10  on that second page of the exhibit, and tell me whether
11  or not those standards were met based on -- not what
12  you saw, but on what you discussed with the officers in
13  terms of how the device was to be deployed?
14         MS. WESTBY: Object to the form of the
15  question.
16         MR. THOMPSON: Join.
17         THE WITNESS: Okay, I didn't discuss with
18  McCaslin exactly how he was going to hold it in his
19  hand.
20  BY MR. GOSMAN:
21     Q.  Okay.
22     A.  I didn't go over this list with him.  This is
23  the first time I've seen it.
24     Q.  Okay.  But you -- would you agree that you
25  told him that the device should be placed while he was

1   looking at the desired location?
2          MS. WESTBY: Object to the form of the
3   question.
4          MR. THOMPSON: Join.
5          THE WITNESS: We discussed that.
6              (Exhibit 9 identified)
7          MR. GOSMAN:
8   BY MR. GOSMAN:
9      Q.  And now, let's take a look at Plaintiff's
10  Exhibit 9.  Have you ever seen this document before?
11     A.  No.
12     Q.  Okay.  It has certain headings and one of the
13  headings -- the second heading under -- on paragraph --
14  or on Exhibit 9 is identified as "The Primary Effects
15  of a Distraction Device."  And the second bulleted item
16  is entitled, "Over pressure-No distraction if children
17  under 12 years old inside."  Do you see that?
18     A.  I do.
19     Q.  Did you learn that from your training?
20     A.  No, I had not.
21     Q.  Did -- had you ever been told that you should
22  not deploy a distraction device if there were young
23  children in the room where it was being deployed?
24     A.  No, I had not.
25     Q.  Was it your informing that it was okay to do

MIKE CHRETIEN - October 5, 2010                                    Page 121
Direct Examination by Mr. Gosman

1  that then?
2      A.  Yes.
3      Q.  Okay.  Back to Exhibit 10 for a moment.  What
4  was this woman's name that prepared this document?
5      A.  Marrisa Torezon.
6      Q.  Okay.  Did she make a comment in that
7  document regarding the presence of a child in the
8  residence?
9      A.  There is a notation on the paper.
10     Q.  Okay.  What does it say?
11     A.  10 YOA child.
12     Q.  Is it safe to assume that that means year?
13     A.  Yes.  YOA would be.
14     Q.  Year old child?
15     A.  Years of age.
16     Q.  And was that something that was discussed
17  that night?
18     A.  Absolutely.
19     Q.  All right.  So what did you know about the
20  presence of a ten-year-old child in the residence?
21     A.  First of all, that was an estimation on the
22  part of Officer Blackmore who was conducting
23  surveillance.
24     Q.  You accepted it, I assume?
25     A.  He said that it appeared to him that a child

MIKE CHRETIEN - October 5, 2010                                    Page 122
Direct Examination by Mr. Gosman

1  around middle school age, around ten years of age --
2  that he had seen what he believed was a child enter the
3  residence with an adult.  I can't remember if the adult
4  was male or female.  And that just the adult left in a
5  vehicle.
6      Q.  This document is not dated, and we don't know
7  when it was prepared; is that true?
8      A.  True.
9      Q.  Was it ever submitted as part of your
10  reporting?
11     A.  Not that I'm aware of.  Unless it was added
12  as an attachment, and I'm just not aware of that.
13     Q.  Is there anything on that document that would
14  identify it as having been -- as containing information
15  that was available only after the entry was completed?
16         MR. THOMPSON: Objection as to form.
17         MS. WESTBY: Join.
18         THE WITNESS: Not that I see.
19  BY MR. GOSMAN:
20     Q.  And you do see that the estimate there that
21  there were 20 to 30 plants?
22     A.  I see that.
23     Q.  Okay.  Is that something that was discussed
24  that night?
25     A.  I don't recall the number of plants being

MIKE CHRETIEN - October 5, 2010                                    Page 123
Direct Examination by Mr. Gosman

1  discussed specifically.
2      Q.  Do you have any reason to doubt that that
3  information was communicated that night?
4         MR. THOMPSON: Objection as to form.
5         MS. WESTBY: Join.
6         THE WITNESS: I'm not sure where that number
7  came from.
8  BY MR. GOSMAN:
9      Q.  Do you see the reference on Exhibit 10 that
10  everyone gets cuffed?
11     A.  Yes.
12     Q.  Okay.  And that's standard procedure,
13  correct, in that type of entry?
14         MR. THOMPSON: Objection as to form.
15         THE WITNESS: That's pretty standard police
16  procedure for serving a warrant.
17  BY MR. GOSMAN:
18     Q.  And for serving a dynamic warrant it's even
19  more important because you want to control the
20  suspects, isn't it?
21         MS. WESTBY: Object to form.
22         MR. THOMPSON: Join.
23         THE WITNESS: I don't think it's more or less
24  important.  Officers are injured by nondynamic entry
25  type situations every day.

MIKE CHRETIEN - October 5, 2010                                    Page 124
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2      Q.  Was Tricia Wachsmuth supposed to have been
3  handcuffed as soon as she was identified in the house?
4      A.  We didn't know that Tricia Wachsmuth was in
5  the house.
6      Q.  I'm okay with that.  But that isn't what I
7  asked, Officer.
8         My question was: Was she supposed to be
9  handcuffed -- were any suspects in that house supposed
10  to be handcuffed?
11     A.  Yes.
12         MR. THOMPSON: Object to the form, compound.
13         MS. WESTBY: And it's an entirely different
14  question than you asked the first time.
15  BY MR. GOSMAN:
16     Q.  Well, Tricia Wachsmuth was in the house,
17  correct?
18     A.  She was.
19     Q.  We're past that, aren't we?
20     A.  (Witness nods head.)
21     Q.  And was Tricia Wachsmuth, as a suspect in
22  that house, to have been handcuffed as soon as the
23  officers saw her?
24         MR. THOMPSON: Objection as to form.
25         MS. WESTBY: Join.

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 34 of 91
Tricia Wachsmuth v.                                                    Mike Chretien
City of Powel, et al.                                                 October 05, 2010

MIKE CHRETIEN - October 5, 2010                          Page 125
Direct Examination by Mr. Gosman

1   THE WITNESS: No
2   BY MR. GOSMAN:
3   Q. No?
4   A. No, not as you stated it.
5   Q. Okay. Well, tell me how it was to have been?
6   A. As I explained to you before, the entry team
7   would secure her in place. That means just keeping an
8   eye on her.
9   Q. With a gun pointed a. her?
10  A. Until the arrest team came in to handcuff
11  her.
12  Q. You said, "keep an eye on her," and you sort
13  of used your hands to indicate that a weapon would be
14  at least pointed in her direction?
15  A. No, I didn't.
16      MR. THOMPSON: Objection as to form.
17  Mischaracterizes the witness's testimony.
18      MS. WESTBY: Objection.
19      MR. THOMPSON: And argumentative.
20  BY MR. GOSMAN:
21  Q. So you've got a dynamic entry. You're
22  concerned about threats to officer safety, and the
23  officer that took control of Tricia Wachsmuth or anyone
24  in the house was simply to keep an eye on them until
25  the other officers could come in and --

MIKE CHRETIEN - October 5, 2010                          Page 126
Direct Examination by Mr. Gosman

1   A. They were to do what would be reasonable. I
2   wasn't in every place --
3   Q. I understand that.
4   A. -- to make decisions for every officer. It
5   was up to them to determine what kind of a threat a
6   person was. If they thought they needed to point their
7   weapon at someone, then by all means, they should have.
8   Whether anyone pointed their weapon at Tricia Wachsmuth
9   and for how long, I don't know. I can testify as to
10  what I did. I did not point my weapon at Tricia
11  Wachsmuth ever.
12  BY MR. GOSMAN:
13  Q. Do you know how long it was before Tricia
14  Wachsmuth was handcuffed and taken outside?
15  A. It would have been after she went downstairs.
16  Q. About how long was that?
17  A. Not very long. I have no idea.
18  Q. Ten minutes?
19  A. I don't know.
20  Q. That's another statement on Exhibit 10 that
21  indicates that handguns were loaded everywhere in the
22  house; do you see that statement?
23  A. I see that.
24  Q. And was that a comment that was made that
25  evening?

MIKE CHRETIEN - October 5, 2010                          Page 127
Direct Examination by Mr. Gosman

1       MS. WESTBY: Object to the form of the
2   question.
3       MR. THOMPSON: Join.
4   BY MR. GOSMAN:
5   Q. And I'm talking about the planning stage of
6   the operation.
7   A. I understand. Some of the information that
8   we received was that there were loaded weapons
9   throughout the house.
10  Q. And I assume that that was documented in the
11  information you took from the confidential informant
12  and submitted to the Court in the form of the
13  affidavits for probable cause in the affidavit for
14  search warrant?
15      MS. WESTBY: Object to the form of the
16  question.
17      THE WITNESS: I'd have to speculate. I
18  didn't talk to the confidential informant.
19  BY MR. GOSMAN:
20  Q. Okay. That was Officer Miner?
21  A. Yes, sir.
22  Q. Now, would you agree with me, Officer, that
23  in Powell, Wyoming, many people have loaded guns in
24  their house?
25      MS. WESTBY: Object to the form of the

MIKE CHRETIEN - October 5, 2010                          Page 128
Direct Examination by Mr. Gosman

1   question.
2       THE WITNESS: I don't know.
3   BY MR. GOSMAN:
4   Q. Would you agree with me that most people who
5   keep guns for self-protection have them loaded, at
6   least ammunition in the magazine?
7       MS. WESTBY: Object to the form of the
8   question.
9   BY MR. GOSMAN:
10  Q. Based on your experience.
11  A. I don't know what other people do.
12  Q. Do you keep your handguns loaded in the
13  house, shells at least in the magazine?
14  A. I keep my duty weapon loaded, yes.
15  Q. Do you have any other handguns in the house?
16  A. Yes.
17  Q. Are they loaded? Do they have shells in the
18  magazine?
19  A. Most of the time not.
20  Q. Would the fact that an individual had a
21  loaded gun in his house standing alone justify the use
22  of a SWAT team?
23      MR. THOMPSON: Objection as to form.
24      MS. WESTBY: Join.
25      THE WITNESS: We don't look at things

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 35 of 91
Tricia Wachsmuth v.                                                                    Mike Chretien
City of Powel, et al.                                                               October 05, 2010

1  standing alone. We look at the totality of the
2  circumstances.
3  BY MR. GOSMAN:
4      Q.  On the other hand, if you knew somebody was
5  wanted for murder and was armed, that, standing alone,
6  would justify the use of a SWAT team, wouldn't it?
7      A.  It certainly might.
8      MS. WESTBY: Object to the form of the
9  question.
10     THE WITNESS: If you had a SWAT team.
11  BY MR. GOSMAN:
12     Q.  All right. Well, if you were deploying a
13  SWAT team, would the fact that somebody had guns in the
14  house be sufficient evidence to call out a SWAT team?
15     MR. THOMPSON: Objection as to form.
16     MS. WESTBY: Join.
17     THE WITNESS: No.
18  BY MR. GOSMAN:
19     Q.  Okay. And would it be sufficient basis
20  standing alone to conduct a SWAT-type operation, even
21  if you didn't have a SWAT team, or particularly if you
22  didn't have a SWAT team?
23     MR. THOMPSON: Objection as to form.
24     MS. WESTBY: Join.
25     THE WITNESS: Standing alone?

1  BY MR. GOSMAN:
2      Q.  Yes.
3      A.  The presence of weapons?
4      Q.  Yes.
5      A.  Would not determine whether or not we'd
6  deploy a SWAT team. Does that answer your question?
7      Q.  Yes. Well, I think I understood what you
8  meant by that. But are you saying, by your answer,
9  that you would not deploy a SWAT team or perform a
10  SWAT-type entry if the only information you had about
11  the entry was that the person had loaded guns in his
12  house?
13     MS. WESTBY: Object to the form of the
14  question.
15     MR. THOMPSON: Join.
16     MS. WESTBY: Misstates his testimony. He
17  already answered your question, and he answered it
18  precisely as you asked it.
19     THE WITNESS: I can tell you that if I knew
20  that there were drugs in the house, drug dealers or
21  drug users with weapons, I know, based on my training
22  and experience, that they are willing to use those to
23  defend themselves and their stash.
24  BY MR. GOSMAN:
25     Q.  So you see -- you do not see a difference

1  between a drug dealer and guns and someone who is a pot
2  user who owns a gun?
3      MS. WESTBY: Object to the form of the
4  question.
5      MR. THOMPSON: Join.
6      THE WITNESS: That's not what I said.
7  BY MR. GOSMAN:
8      Q.  I think it is. You said in your experience
9  people who use marijuana and have guns present --
10  present a danger to police officers that would justify
11  a dynamic entry. I mean, that's what you're saying;
12  isn't it?
13     MS. WESTBY: Object to the form of the
14  question.
15     THE WITNESS: Okay. I have fought and
16  personally taken guns off of people who had marijuana
17  on them who ran or fought us or whatever else, that
18  were not dealers. But that didn't want to go to jail.
19  I'm lucky they didn't use their guns on me.
20  BY MR. GOSMAN:
21     Q.  All right. So do you see a difference
22  between a person who is a drug dealer and who has a gun
23  in his residence, and for purposes of deciding whether
24  to deploy a SWAT team, and a person who is a marijuana
25  user and has a gun in his home?

1      MS. WESTBY: Object to the form of the
2  question.
3      MR. THOMPSON: Join.
4      THE WITNESS: I don't understand where you're
5  going with this. Again, it's not one issue or one
6  piece of information that we look at when we decide
7  what course of action to take.
8  BY MR. GOSMAN:
9      Q.  You understand whether there's a difference
10  between a person who is a drug dealer and has a gun in
11  his home and a person who is a marijuana user and has a
12  gun in his home, and for purposes of calling out a SWAT
13  team?
14     MR. THOMPSON: Object to the form.
15     MS. WESTBY: Join.
16     THE WITNESS: I understand the difference.
17  If I had personal knowledge that one person only used
18  drugs, only used marijuana, and another person was a
19  drug seller. In this case, I didn't.
20  BY MR. GOSMAN:
21     Q.  You didn't know that?
22     A.  I didn't know whether he was a dealer or not.
23  Most of the people that I know or knew of or had
24  contact with that smoke marijuana did not grow it.
25     Q.  It's your testimony that you didn't know the

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 36 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1 size of the operation. Could there have been 20 to 30
2 plants down there as far as you know?
3    A. Very well could have been.
4    Q. And this was based on the information that
5 you received from Officer Miner, correct?
6    A. Correct.
7    Q. You didn't receive any information from Josh
8 Bessler?
9    A. I don't know what you're talking about.
10    Q. The confidential informant, correct?
11    A. I never spoke with the confidential
12 informant.
13    Q. Did you ever speak with Officer Patterson?
14    A. I don't think I spoke with him the day that
15 we did the search warrant.
16    Q. You knew he was being consulted for his
17 expert advice?
18       MR. THOMPSON: Objection as to form.
19       MS. WESTBY: Join.
20       THE WITNESS: At some point, somebody
21 mentioned talking to Patterson.
22 BY MR. GOSMAN:
23    Q. And, in fact, he was invited to participate
24 in the operation, was he not?
25    A. I don't remember.

1    Q. You don't remember that?
2    A. No.
3    Q. Did you know that Officer Patterson had
4 spoken with the confidential informant?
5    A. No.
6    Q. And Officer Miner didn't share that with you?
7    A. My recollection is that he consulted
8 Patterson because Patterson had served on some type of
9 drug team at a previous department and was familiar
10 with grow operations. Beyond that, I don't know what
11 their conversation consisted of.
12    Q. All right. So Officer Miner didn't tell you
13 what Patterson told him about the marijuana grow
14 operation?
15       MS. WESTBY: Object to the form of the
16 question.
17       THE WITNESS: I don't remember.
18 BY MR. GOSMAN:
19    Q. Well, let's assume that Officer Patterson had
20 told you that it was a small grow operation and that it
21 was limited to personal use. Would that have changed
22 anything?
23       MS. WESTBY: Object to the form of the
24 question.
25       THE WITNESS: I don't know.

1 BY MR. GOSMAN:
2    Q. You don't know?
3    A. No.
4    Q. Well, just a minute ago, you indicated that
5 if you had -- that if you knew that someone was engaged
6 in a small marijuana use offense and not engaged in
7 dealing, and they had guns in their house, that
8 wouldn't be a basis for calling out a SWAT team?
9       MS. WESTBY: No. Objection. That's
10 absolutely untrue.
11 BY MR. GOSMAN:
12    Q. Okay. Isn't that true, though?
13    A. No.
14    Q. If you knew the person was involved in
15 personal use?
16    A. No.
17    Q. So you'd use a SWAT team to effect a warrant
18 even if somebody was engaged in purely personal use and
19 just had guns in their house?
20       MR. THOMPSON: Objection as to form.
21 Argumentative. Misstates his testimony.
22       MS. WESTBY: Join.
23       THE WITNESS: Possibly.
24 BY MR. GOSMAN:
25    Q. Possibly?

1       Is that what happened here?
2       MS. WESTBY: Object to the form of the
3 question. Is -- I can't allow you to answer that
4 question. Is what, what happened here?
5 BY MR. GOSMAN:
6    Q. Okay. If you knew that an individual was
7 engaged in the personal use of marijuana and that you
8 were going to effect a warrant to uncover the evidence
9 for this charge, a misdemeanor charge --
10    A. Uh-huh.
11    Q. -- and you knew that this individual had guns
12 in his house, would that be an appropriate basis for
13 calling out or calling for a dynamic entry involving 11
14 police officers or whatever it was?
15       MS. WESTBY: Object to the form of the
16 question.
17 BY MR. GOSMAN:
18    Q. If that's what you knew?
19       MS. WESTBY: It's an incomplete hypothetical.
20 It's improper.
21       MR. THOMPSON: Join.
22       THE WITNESS: A, I didn't know. B, it could.
23 BY MR. GOSMAN:
24    Q. B, it could?
25    A. It could.

1  Q.  Form the basis for a dynamic entry?
2  A.  Sure.
3  Q.  Okay.  Why?
4      MR. THOMPSON: Objection as to form.
5      THE WITNESS: It doesn't look like I recorded
6  what the narcotics found in all the search warrants
7  that I accompanied them with in College Park.  But as
8  often as not, it was nothing.  Regardless, the warrants
9  were still served.
10  BY MR. GOSMAN:
11  Q.  I'm not talking about what was found.
12  A.  So it doesn't matter what we found.
13  Q.  I'm talking about the information you had
14  going in and the decision to employ a SWAT-type team?
15  A.  We based our decision to deploy the team that
16  way we did based on the information that we had, not
17  some hypothetical situation that you're bringing up
18  now.
19  Q.  I'm asking you to consider this hypothetical:
20  If you knew, before you made the decision, whether to
21  just go up and knock on the door or to deploy a 10- or
22  11- or 12-man SWAT team to effect a warrant, that what
23  you were going to be doing was to be serving a warrant
24  against a person who was involved in the personal use
25  of marijuana and who had guns in his house?

1      MR. THOMPSON: Objection as to form.
2      MS. WESTBY: Incomplete hypothetical.
3  Improper.  Join.
4      THE WITNESS: I would want to execute the
5  warrant the safest way possible.
6  BY MR. GOSMAN:
7  Q.  Along that line, Officer, would you agree
8  that by deploying a tactical unit with 11 officers, who
9  had never done it before, could pose extra risks in the
10  service of a misdemeanor marijuana warrant?
11      MR. THOMPSON: Objection as to form.
12  Misstates the evidence.  Mischaracterizes the execution
13  of the warrant.
14      MS. WESTBY: Join.
15  BY MR. GOSMAN:
16  Q.  Okay.
17  A.  I didn't know whether it was a misdemeanor or
18  a felony going into it.
19  Q.  I know that.  But I'm -- well, that's what
20  you say.  And I'm not going to ask you that, Officer.
21  A.  You keep implying that I knew --
22  Q.  No.
23  A.  -- exactly what was there, that it was a
24  misdemeanor.  I didn't.  I didn't know that.
25  Q.  Did you have any information that it wasn't a

1  misdemeanor?
2  A.  I had information that it was a grow
3  operation.
4  Q.  You didn't know how big it was?
5  A.  I didn't know how big it was.
6  Q.  And that wasn't important to you?
7      MS. WESTBY: Object to the form of the
8  question.
9      MR. THOMPSON: Join.
10      THE WITNESS: It could have been the entire
11  basement.  It could have been one plant.  I don't know.
12  BY MR. GOSMAN:
13  Q.  And it wouldn't have made any difference
14  whether -- in your decision to deploy that SWAT-type
15  team?
16      MS. WESTBY: Object to the form of the
17  question.
18      MR. THOMPSON: Join.
19  BY MR. GOSMAN:
20  Q.  It's a simple yes or no question, Officer,
21  and we can move on.
22      MS. WESTBY: And he needs to answer it the
23  way he needs to answer it.
24      THE WITNESS: Can you ask me the question
25  again.

1      MR. GOSMAN: I'm going to ask the reporter to
2  read that one back.
3          (The record was read as
4           requested.)
5      THE WITNESS: The number of plants would have
6  no impact whatsoever.
7  BY MR. GOSMAN:
8  Q.  So what were the factors that were important
9  to the use of a SWAT-type team that night, if the size
10  of the operation was irrelevant?
11      MS. WESTBY: Object to the form of the
12  question.
13      MR. THOMPSON: Join.
14      MS. WESTBY: Misstates the facts.
15      THE WITNESS: The fact that it was a grow
16  operation, the information that we had in regards to
17  the semiautomatic accessibility of weapons in the
18  house, throughout the house, and the information that
19  we had in regards to the disposition of Bret Wachsmuth.
20  BY MR. GOSMAN:
21  Q.  And what information was that?
22  A.  That he was paranoid; that he was a peeper,
23  meaning that he was constantly looking out windows to
24  see if anybody was outside of his house; that he was --
25  I don't remember the exact, like, diagnosis or

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 38 of 91

Tricia Wachsmuth v.                                          Mike Chretien
City of Powel, et al.                                        October 05, 2010

MIKE CHRETIEN - October 5, 2010                    Page 141
Direct Examination by Mr. Gosman

1   whatever, but that there was some mental instability;
2   all of those things were things that we considered.
3       Q. Okay. Did you have any objective evidence
4   that Mr. Wachsmuth presented a danger to the officers?
5           MR. THOMPSON: Objection as to form.
6           MS. WESTBY: Join.
7   BY MR. GOSMAN:
8       Q. I mean, I assume the fact that someone tells
9   you he's paranoid is not objective evidence that the
10  officers were faced with a threat?
11          MR. THOMPSON: Objection as to form.
12          MS. WESTBY: Same, join.
13          THE WITNESS: What I had was the information
14  that Miner provided us as to his disposition.
15  BY MR. GOSMAN:
16      Q. Okay.
17      A. And Brett Lara confirming that there were
18  some issues with Bret Wachsmuth in regards to his
19  mental health.
20      Q. Did you speak personally with Officer Lara?
21      A. I did.
22      Q. And what did he tell you?
23      A. He told us all that there was something with
24  Bret. He wasn't sure exactly what it was. But there
25  was some form of mental -- either disorder or illness

MIKE CHRETIEN - October 5, 2010                    Page 142
Direct Examination by Mr. Gosman

1   history with him.
2       Q. All right. Did he tell you whether he was
3   being medicated?
4       A. No.
5       Q. Did he tell you that this mental disorder
6   tended to produce violence n Mr. Wachsmuth?
7       A. No.
8       Q. Did he tell you that this mental disorder
9   caused him to be erratic and unpredictable?
10      A. No.
11      Q. Did he tell you that this mental disorder had
12  ever led to an act of violence by Mr. Wachsmuth?
13      A. He did not.
14      Q. And other than the fact that Mr. Miner told
15  you that he was paranoid, was there any objective
16  evidence of how this paranoia had ever manifested
17  itself?
18          MR. THOMPSON: Objection as to form.
19          MS. WESTBY: Join.
20          THE WITNESS: Aside from what Miner told us
21  about him constantly peeking out the windows.
22  BY MR. GOSMAN:
23      Q. What does that have to do with somebody being
24  a threat to officer safety?
25          MR. THOMPSON: Objection as to form.

MIKE CHRETIEN - October 5, 2010                    Page 143
Direct Examination by Mr. Gosman

1           THE WITNESS: My experience with drug abusers
2   is that they are constantly worried about losing
3   whatever it is they have. Their drugs, their money,
4   whatever.
5   BY MR. GOSMAN:
6       Q. Does that make them a threat -- an objective
7   threat to officer safety, drug users?
8           MR. THOMPSON: Objection as to form.
9           THE WITNESS: I lost my train of thought. I
10  was trying to answer when you interrupted me.
11          Can you read back my answer?
12              (The record was read as
13              requested.)
14          THE WITNESS: Okay. I'd encountered on
15  search warrants barricaded doors in the past, fairly
16  often there were weapons there. They tried to dispose
17  of whatever it is they had. If they had the
18  opportunity, the demeanor of drug users, including
19  people that I knew, just in my personal life in
20  Georgia, that I knew smoked marijuana, was that they
21  were always paranoid. I don't know because I don't
22  smoke drugs.
23  BY MR. GOSMAN:
24      Q. Well, I guess what we're looking for here,
25  Officer, is evidence that there was an objective threat

MIKE CHRETIEN - October 5, 2010                    Page 144
Direct Examination by Mr. Gosman

1   to the safety of the officers that night. And you've
2   told me that you heard from the confidential informant
3   that Bret Wachsmuth was paranoid.
4           And I want to know if that is your objective
5   evidence that he posed a threat to the safety of
6   officers that night?
7           MR. THOMPSON: Objection as to form. Asked
8   and answered.
9           Go ahead, if you can.
10          THE WITNESS: I went with the information
11  that I had available to me.
12  BY MR. GOSMAN:
13      Q. And that was it, that he was paranoid?
14          MR. THOMPSON: Objection as to form.
15          He's told you a number of times that there
16  was guns in the house, and you're just trying to
17  mischaracterize his testimony.
18          MR. GOSMAN: No, I'm looking for objective
19  evidence relative to paranoia that he was a threat to
20  the officers.
21          MR. THOMPSON: Well, he's told you it's not
22  limited to one thing. It is the totality of the
23  circumstances. A grow operation. Guns. Paranoid.
24          MR. GOSMAN: I'm asking the questions.
25          MR. THOMPSON: You're starting to badger the

1 witness.
2 　　　MR. GOSMAN: No, I'm not.
3 　　　MR. THOMPSON: We'll stop the deposition and
4 call the Magistrate. I'm not going to tolerate this.
5 　　　THE WITNESS: I can list all the things
6 again.
7 BY MR. GOSMAN:
8 　　Q. Have you listed all the things that went into
9 the decision to deploy the SWAT-type team that night?
10 　　　MR. THOMPSON: Objection as to form.
11 　　　THE WITNESS: Guns, grow operation, his
12 mental status. The fact that they may be abusing
13 narcotics, that was something else that was brought up
14 about the stuffed animals and shipping prescription
15 medications in their stuffed animals. I don't know how
16 that affects someone.
17 　　　And one of the other things that I took into
18 consideration was the possibility that there was a
19 child in the house.
20 　　　Again, I did what I thought was the safest
21 for everyone involved, not just the officers.
22 BY MR. GOSMAN:
23 　　Q. We're going to talk more about the entry and
24 the information contained in your report relating to
25 the entry. But before I leave this question of

1 paranoia, we talked about mental instability, and I
2 think you gave me all the information you had regarding
3 mental instability.
4 　　　But regarding paranoia, was other than the
5 fact that he peeked out the windows when somebody came
6 by, was there any objective evidence of paranoia that
7 led you to believe that there was a threat to officer
8 safety that night?
9 　　A. I don't recall.
10 　　　MR. GOSMAN: All right. We can go ahead and
11 take a lunch break. And thank you very much.
12 　　　(Recess taken 12:51 to 2:25
13 　　　p.m., October 5, 2010)
14 　　　MR. GOSMAN: We're back on the record.
15 BY MR. GOSMAN:
16 　　Q. Mr. Chretien, lets talk about the
17 confidential informant for a few minutes.
18 　　　How important is the reliability of the
19 informant in gathering information for a SWAT-type
20 operation?
21 　　　MS. WESTBY: Object to the form of the
22 question.
23 　　　THE WITNESS: I think the informant has to
24 show that he's reliable.
25

1 BY MR. GOSMAN:
2 　　Q. What did you know about the reliability of
3 the informant used to gain information in this case?
4 　　A. Nothing.
5 　　Q. Did you know the informant's name?
6 　　A. Not at the time.
7 　　Q. He was referred to you as the confidential
8 informant, then?
9 　　A. Uh-huh.
10 　　Q. And that would be by Officer Miner?
11 　　A. (Witness nods head.)
12 　　Q. And were you aware that the confidential
13 informant had a substantial criminal history?
14 　　　MR. THOMPSON: Objection as to form.
15 　　　THE WITNESS: Again, I didn't know who he
16 was, so I didn't know his history.
17 BY MR. GOSMAN:
18 　　Q. You didn't know anything about his criminal
19 history?
20 　　A. The only thing I knew is that he had lived
21 with them.
22 　　Q. Did you know whether other agencies would use
23 this confidential informant as a source of information?
24 　　A. No, I didn't know.
25 　　Q. I think I've asked this question, but I need

1 to be clear on this subject. You did not personally
2 speak to the confidential informant at any time?
3 　　A. Correct.
4 　　Q. So would it be fair to say, sir, that you've
5 never met the confidential informant?
6 　　A. To my knowledge, I have not met the
7 confidential informant.
8 　　Q. And other than the confidential informant,
9 what other sources did you have for the intelligence
10 that you acquired in preparation for entry into the
11 Wachsmuth home?
12 　　　MR. THOMPSON: Objection as to form.
13 　　　MS. WESTBY: Join.
14 　　　THE WITNESS: The information I was getting
15 from other officers.
16 BY MR. GOSMAN:
17 　　Q. All right. And we've talked about Officer
18 Lara. Was there any other information that you
19 acquired from other officers about Bret or Tricia
20 Wachsmuth or their home?
21 　　A. Aside from what Miner and Lara told me, no.
22 　　Q. Okay. We do know that Officer Blackmore was
23 assigned to drive by the premises?
24 　　A. Right. He was -- he was telling us what was
25 going on. But I never spoke to him directly.

1    Q.   All right.  Is intelligence gathering of the
2    kind that Officer Blackmore performed that night
3    typical in the preplanning phase of a dynamic entry?
4          MR. THOMPSON: Objection as to form.
5          MS. WESTBY: Join
6          THE WITNESS: In my specific experience, that
7    was some of the best surveillance that I'd had prior to
8    execution of a search warrant.
9    BY MR. GOSMAN:
10   Q.   All right.  Well, you know -- and I
11   appreciate that, and we'll talk about that in a minute.
12   But the question wasn't whether it was the best
13   information you'd ever gotten.
14        The question is:  Is this typical of the
15   preplanning phase of a SWAT-type entry.  I think I said
16   dynamic entry, but SWAT-type entry to have an officer
17   go by the residence and view the residence and make
18   sure you're at the right place and that sort of thing?
19        MR. THOMPSON: Objection as to form.
20        MS. WESTBY: Join.
21        THE WITNESS: It was not typical in my
22   experience.
23   BY MR. GOSMAN:
24   Q.   All right.  I want to take just a minute.
25   You can relax for just a minute because I'm going to go

1    locking for something.
2          (Discussion held off the
3          record.)
4    BY MR. GOSMAN:
5    Q.   Okay.  Exhibit 3 is a document that
6    represents course materials for a mechanical breaching
7    seminar that you attended; am I correct?
8    A.   Yes.
9    Q.   And I want you to turn to Page 5 of those
10   materials.  And there's a box there at the bottom of
11   the page entitled, "Breach Point Intelligence."
12   A.   Uh-huh.
13   Q.   And there is a -- there's handwriting in that
14   box; is there not?
15   A.   Yes.
16   Q.   And I assume that's your handwriting?
17   A.   Yes.
18   Q.   Okay.  And the first bulleted entry there
19   does say, "Debriefs of UC or CI involvement, have them
20   diagram and describe structure," correct?
21   A.   Yes.
22   Q.   Did you have -- well, that's a --
23        You didn't actually speak to the CI, so if
24   there was any diagramming of the residence by the CI,
25   it would have occurred under Miner's watch; is that

1    correct?
2          MR. THOMPSON: Objection as to form.
3          MS. WESTBY: Join.
4    BY MR. GOSMAN:
5    Q.   As far as you know?
6          MR. THOMPSON: Objection as to form.
7          MS. WESTBY: Join.
8          THE WITNESS: I know that Miner drew the
9    layout of the house on the dry erase board.
10   BY MR. GOSMAN:
11   Q.   What else was on that dry erase board?  Let's
12   take a minute and finish that one off.
13   A.   I don't remember everything that was on the
14   board.
15   Q.   Do you remember anything specifically that
16   was on the board?
17   A.   I think I had probably listed who was
18   assigned what duties.
19   Q.   Anything else?
20   A.   The diagram of the residence.  I may have
21   listed some intelligence, whatever intelligence that we
22   had on a bulleted list or something.
23   Q.   All right.  And I'm sort of cutting you off
24   here.  And I don't mean to do that.
25        Was there anything else?

1    A.   No, not that I can think of.
2    Q.   Okay.  The second bulleted item there under
3    Breach Point Intelligence is: "Visit location, not
4    drive by."  Do you see that?
5    A.   I do.
6    Q.   And that is a standard protocol, is it not?
7    A.   This represents the NTOA's best practices.
8    This is what they suggest.
9    Q.   All right.  I'll accept that.  Is it what you
10   suggest?
11   A.   During ideal situations, sure.  This instance
12   where there is a peeper constantly looking out the
13   window, cars driving by, an unknown car sitting outside
14   his residence would raise suspicions.
15   Q.   Do you have any unmarked patrol cars at the
16   Powell Police Department?
17   A.   Two that are not marked.  But they are the
18   same model vehicle that the patrol officers drive.
19   Q.   All right.  So in other words, you didn't
20   visit the location or you didn't have an officer drive
21   by the location, confirm the identification of the
22   location, because you were afraid that Mr. Wachsmuth,
23   who had been described as a peeper would see you drive
24   by?
25        MS. WESTBY: Object to the form of the

MIKE CHRETIEN - October 5, 2010                          Page 153
Direct Examination by Mr. Gosman

1   question.
2        MR. THOMPSON: Join.
3        THE WITNESS: First of all, I didn't say we
4   had anybody do that. Second of all, I'm not aware of
5   exactly where Officer Blackmore was. But he did
6   confirm that that was the residence, and he had eyes on
7   it. He was the one who told us he saw somebody go in
8   and come out of the house.
9   BY MR. GOSMAN:
10  Q.  Okay. And I knew that.
11       So Officer Blackmore did perform this
12  intelligence function prior to the entry into the
13  residence?
14  A.  He was watching the house, described it to
15  us.
16  Q.  Did he get the right house?
17  A.  Yes.
18  Q.  How do you know that?
19  A.  Found pot in the basement.
20  Q.  No. I'm saying, did Officer Blackmore
21  observe the right house?
22  A.  Yes.
23  Q.  How do you know that?
24  A.  He described it to us.
25  Q.  How was it that he came to the information

MIKE CHRETIEN - October 5, 2010                          Page 154
Direct Examination by Mr. Gosman

1   that a young child had driven -- or had been taken into
2   the house and had not come out?
3        MS. WESTBY: Object to the form of the
4   question.
5        THE WITNESS: He was watching the house. I
6   don't know exactly.
7   BY MR. GOSMAN:
8   Q.  He could have been watching the wrong house
9   though, correct?
10       MR. THOMPSON: Objection to form.
11       MS. WESTBY: Join.
12       THE WITNESS: I don't know.
13  BY MR. GOSMAN:
14  Q.  Well, we know a young child didn't go into
15  the house and fail to come out before the entry team
16  arrived because there was no young child in the
17  residence, correct?
18       MR. THOMPSON: Objection as to form.
19       MS. WESTBY: Join.
20       THE WITNESS: You're correct that there was
21  no young child in the house
22  BY MR. GOSMAN:
23  Q.  And your intelligence was that there was a
24  young child in the house, based on Officer Blackmore's
25  observation, correct?

MIKE CHRETIEN - October 5, 2010                          Page 155
Direct Examination by Mr. Gosman

1        MR. THOMPSON: Objection as to form.
2        THE WITNESS: No.
3        MS. WESTBY: Join.
4   BY MR. GOSMAN:
5   Q.  Okay. Well, what was it based on then?
6   A.  Based on what Officer Blackmore reported to
7   us, and he did not report for certain that a young
8   child went in the house. He described to us the build,
9   said it appeared to be a young child. He couldn't be
10  sure. He couldn't even tell if it was male or female.
11  Q.  Did he describe the vehicle that this -- that
12  was involved in this situation?
13  A.  He did.
14  Q.  Was it either one of the Wachsmuth's
15  vehicles?
16  A.  I don't know if it was either one of their
17  vehicles. I remember it was an SUV.
18  Q.  You say that officer Blackmore provided some
19  of the best intelligence you've ever had in one of
20  these operations?
21  A.  That's what I said.
22  Q.  Yeah. What was it that made that
23  intelligence so good?
24  A.  That it was current, that he was there
25  watching.

MIKE CHRETIEN - October 5, 2010                          Page 156
Direct Examination by Mr. Gosman

1   Q.  Well, anybody who is there just before an
2   arrest or a raid is there currently, wouldn't that be
3   true? I'm trying to figure out why it would make that
4   information so valuable or so superior?
5   A.  Because I'd never had it before.
6   Q.  All right. It's true, is it not, that
7   Officer Blackmore was wrong in his estimate that this
8   was a young child, young male child, that was still in
9   the residence when you performed the SWAT operation,
10  SWAT-type operation?
11  A.  Like I said before, there was no child in the
12  house.
13  Q.  And that -- well -- and that information came
14  from Officer Blackmore, correct?
15  A.  Correct.
16  Q.  Based on your training and experience,
17  Officer, what are some of the things that you need from
18  an informant if he's going to be a reliable source of
19  information for you?
20       MS. WESTBY: Object to the form of the
21  question.
22       THE WITNESS: I haven't had the opportunity
23  to work with informants. Aside from knowing that they
24  need to be reliable, I don't know.
25

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 42 of 91
Tricia Wachsmuth v.                                                                    Mike Chretien
City of Powel, et al.                                                                  October 05, 2010

1   BY MR. GOSMAN:
2   Q.  Okay.  Lets go ahead and turn to Exhibit 10
3   again.  There's a list of seven items on the right-hand
4   side of that list.
5   A.  Uh-huh.
6   Q.  I want you to go ahead and read them into the
7   record?
8   A.  "One, knock door; two, police search warrant;
9   three, break window; four, flashbang" -- I think it's
10  bedroom after that" -- "five, wait for noise; six,
11  break window" -- and again, it looks like back to
12  me" -- "and seven, door."
13  Q.  Okay.  Is that the sequence of events that
14  you discussed that night before you sent the team out
15  to the Wachsmuth residence?
16  A.  Those are some of the things we discussed
17  that night.
18  Q.  Okay.  Are they in the proper order?
19      MR. THOMPSON: Objection as to form.
20      THE WITNESS: There wasn't -- there wasn't an
21  order per se.
22  BY MR. GOSMAN:
23  Q.  Is that order inaccurate?
24      MR. THOMPSON: Objection as to form.
25      THE WITNESS: I just told you there was no

1   order per se.
2   BY MR. GOSMAN:
3   Q.  Does that mean that none of the officers were
4   instructed as to the order in which these events were
5   to be sequenced?
6       MR. THOMPSON: Objection as to form.
7       MS. WESTBY: Join.
8       THE WITNESS: Again, there was no order per
9   se.
10  BY MR. GOSMAN:
11  Q.  Well, okay.  I'm going to be fine with that.
12  I can live with that.  But what were the officers told
13  in terms of the sequence of events when they left your
14  building that night?
15      MR. THOMPSON: Objection as to form.
16      MS. WESTBY: Join.
17  BY MR. GOSMAN:
18  Q.  Are you telling me there was no order
19  described to them?
20  A.  That's not what I'm telling you.
21  Q.  Well, that's what you just said, so go ahead
22  and clear it up for me, please.
23      MR. THOMPSON: Objection as to form.
24  Argumentative.  Badgering the witness.
25      MS. WESTBY: Join.

1       THE WITNESS: What I had told the officers
2   were that we would prepare for the worst-case scenario.
3   We would attempt to knock and announce.  Best-case
4   scenario, the occupants open the door.  We conduct a
5   search.  Worst-case scenario, they don't open the door,
6   we have to force it in.
7       If that is the case, I wanted three things to
8   happen as near simultaneous as I could.  And that was
9   the front door being rammed, the bedroom window being
10  broken, the back window being broken to cause a
11  diversion.  The introduction of the flashbang into the
12  bedroom where we knew that there were -- or we had
13  information that there were more than one weapon was
14  kept in the bedroom.
15  BY MR. GOSMAN:
16  Q.  So that's why the diversionary device went
17  into the bedroom window?
18  A.  I wanted to deny the area that I was told
19  contained the most weapons to someone who could
20  potentially use them against us.  I knew that --
21  according to the CI's information, that that was Bret
22  and Tricia's bedroom.  To our knowledge, they did not
23  have a child.
24      The reason that that would be the least
25  likely place for a child to be, and that --

1   Q.  The bedroom is the least likely?
2   A.  You going to let me finish?
3   Q.  No.
4       MS. WESTBY: No.  You asked the question,
5   he's answering.  You need to let him finish his answer.
6   BY MR. GOSMAN:
7   Q.  All right.  Go ahead and finish.
8   A.  That were they to discover us and go for
9   weapons, that would be the room they would go to.  I
10  wanted to keep people out of that room.
11  Q.  Now, you said something in the course of that
12  answer that I wanted to visit about.  You said that the
13  bedroom was the least likely place for the child to be.
14  Why would you say that?
15      MR. THOMPSON: Objection as to form.  It
16  misstates his testimony.
17      MS. WESTBY: He said the parent's bedroom,
18  the adults in the house.  Don't deliberately misstate
19  testimony, please.
20  BY MR. GOSMAN:
21  Q.  Well, why would that be, tell me?
22  A.  Because they didn't have a ten-year-old
23  child.  If there was a child in the house, it wouldn't
24  have been theirs, therefore, I reasoned that that child
25  wouldn't be in their bedroom.  I knew that there was a

1 spare bedroom and a living room.
2 Q. Did you know which was which?
3 A. Which bedroom was theirs?
4 Q. Yeah.
5 A. Yes.
6 Q. How did you know that?
7    MR. THOMPSON: Asked and answered.
8 BY MR. GOSMAN:
9 Q. Well, I want to hear it again.
10 A. 'Cause Miner drew the diagram of the house
11 based on the information he received from the CI. He
12 told us where he had been living when he was there and
13 where Bret and Tricia slept.
14 Q. All right. So you assumed the child would
15 not be in the bedroom?
16 A. No, I reasoned.
17 Q. All right. You reasoned that the child
18 wouldn't be in the bedroom. Did you know where the
19 child was?
20    MR. THOMPSON: Objection to form.
21    MS. WESTBY: Join.
22    THE WITNESS: There was no child.
23 BY MR. GOSMAN:
24 Q. I understand that. But you understood, based
25 on Officer Blackmore's apparently faulty intelligence,

1 that there was a ten-year-old child in the residence?
2    MR. THOMPSON: Objection as to form.
3    MS. WESTBY: Join.
4    THE WITNESS: I don't know how far away
5 Officer Blackmore was when he made that determination.
6 I'm assuming he wouldn't be right across the street,
7 right out front. It was dark. He could have been a
8 block away. There's a number of things that go into
9 Officer Blackmore's inaccurate description of Tricia.
10 BY MR. GOSMAN:
11 Q. Of Tricia now? Is that what we've decided,
12 is that this was Tricia that got out of this vehicle?
13 A. Again, I'm reasoning. There was one person
14 that did not go back to the vehicle. When we got back
15 to the house, there was one person in the house.
16 You're drawing conclusions. This is just what I did.
17 Q. Okay. I understand that. Fair enough.
18    Now, Officer Blackmore, who a minute ago you
19 said provided some of the most outstanding intelligence
20 you've seen in one of these cases, was too far away to
21 see what he reported?
22    MR. THOMPSON: Objection as to form.
23    MS. WESTBY: And, you know, I just have to
24 tell you, I cannot imagine that you're going to want
25 the Court to review some of these questions. And if

1 we're forced to stop and go to the Court, I just would
2 like you to think about how you're handling this. And
3 really think whether or not you would like the Court to
4 be reviewing these questions.
5 BY MR. GOSMAN:
6 Q. Officer, the point is that you felt that
7 there was a ten-year-old child in the residence before
8 the team went in. Now, am I telling you something that
9 is new to you, or is this the truth?
10    MS. WESTBY: Object to the form of the
11 question.
12    MR. THOMPSON: Join.
13    THE WITNESS: We weren't sure.
14 BY MR. GOSMAN:
15 Q. Well, one of the reasons why you deployed the
16 SWAT-type team that night was because there was a young
17 child in the house and you wanted to protect it, right?
18 A. If.
19 Q. Yes, if.
20 A. If, like we if'd all morning. If there was a
21 young child in the house, obviously I want to take
22 whatever precautions I can to minimize the trauma on a
23 young child. Our intent wouldn't be to traumatize a
24 kid. We were going to use the tactics that we thought
25 were the safest.

1 Q. All right. Well, the intelligence you had
2 that evening was that there was a young child in the
3 residence, correct or incorrect?
4 A. Possibly.
5 Q. All right. If there was a young child in the
6 residence, did you know where the child was?
7 A. There was no child, but no, we didn't know.
8 We knew that the lights were on in the living room, not
9 in the bedroom.
10 Q. You didn't know whether the child was lying
11 down?
12 A. Nope.
13 Q. Okay. We're going to go back to this little
14 list that is on Exhibit 10. And it's the -- on the
15 right-hand side of the document, seven items. And I
16 want you to tell me what's wrong with the order of that
17 list as it's described there, if anything?
18    MR. THOMPSON: Objection as to form.
19    MS. WESTBY: We've gone over this. We have
20 gone over this and over it.
21    MR. GOSMAN: No, we haven't.
22    MS. WESTBY: Yes, we have.
23    THE WITNESS: Again, it's a list.
24 BY MR. GOSMAN:
25 Q. It is a list. Do you have any reason to

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 44 of 91
Tricia Wachsmuth v.                                                                          Mike Chretien
City of Powel, et al.                                                                  October 05, 2010

1  doubt that this list was prepared based on information
2  that was being communicated to the officers that night
3  prior to the entry into the Wachsmuth residence?
4         MS. WESTBY: Object to the form of the
5  question. Calls for speculation. You know who
6  prepared this document. You know that it is not the
7  witness sitting here today. We have been over this.
8  I ...
9         THE WITNESS: I told you what my plan was as
10 I understood it. What somebody else wrote down, I
11 can't testify to.
12 BY MR. GOSMAN:
13 Q.  So what's wrong with what's written down
14 there, is it inconsistent with the plan you had in your
15 mind?
16        MS. WESTBY: Object to the form of the
17 question. Misstates the testimony.
18        MR. THOMPSON: Join.
19        MS. WESTBY: Calls for speculation.
20        THE WITNESS: Once again, I told you that
21 there was no order per se, that I envisioned several
22 things happening simultaneously.
23 BY MR. GOSMAN:
24 Q.  Okay. So can we leave it at that, that you
25 envisioned these events to be occurring essentially

1  simultaneously?
2         THE WITNESS: No, not these events.
3         MS. WESTBY: Object to the question.
4         THE WITNESS: What I told you earlier.
5  BY MR. GOSMAN:
6  Q.  What did you tell me earlier?
7  A.  Go back and have her read it.
8  Q.  No.
9  A.  When you can't remember a question, you have
10 her go back and read it.
11        MR. THOMPSON: Stop. We're going to go to
12 the Court for a protective order if this continues.
13 I've told you once today. He's told you the sequence
14 of the events. He told you exactly what happened.
15        Now you're trying to ask the witness the same
16 question and get him to give you a different answer so
17 it's inconsistent testimony. That's not going to be
18 allowed, Jeff. That is not going to be allowed.
19        MR. GOSMAN: The witness just testified that
20 these events were to occur simultaneously.
21        MR. THOMPSON: He told you earlier what his
22 interpretation of that document was. He told you how
23 the plan was supposed to happen. You're not going to
24 ask him the same question time after time to get
25 inconsistent testimony. It's not allowed under the

1  rules.
2         MR. GOSMAN: I'm simply--
3         MR. THOMPSON: And we'll not allow it in this
4  deposition.
5         MR. GOSMAN: I'm simply asking him how the
6  events occurred simultaneously.
7         MR. THOMPSON: You've asked him that.
8         MS. WESTBY: He told you that.
9         MR. THOMPSON: He's told you that. You're
10 not going to get two answers to the same question time
11 and time again. It's gone on now since 9:00 this
12 morning.
13            (Exhibit 16 identified)
14 BY MR. GOSMAN:
15 Q.  All right. Let's take a look at Exhibit 16.
16 And I think at some point on Exhibit -- let's see --
17 16, and I'll direct your attention to this. Okay.
18 It's down towards the bottom of the page it says, "The
19 plan was to knock-and-announce on the front door." Do
20 you see that?
21 A.  Yes.
22 Q.  Let's just have you read up to the backyard
23 team, that first couple of sentences into the record?
24        MS. WESTBY: And, you know, you had Officer
25 Danzer do this yesterday.

1         MR. GOSMAN: Well, he didn't prepare the
2  report.
3         MS. WESTBY: Precisely. That is absolutely
4  true. But you --
5         MR. GOSMAN: He participated in the event.
6         MS. WESTBY: But you had him read it into the
7  record yesterday. Is it absolutely necessary to have
8  this witness read this entire document into the record,
9  or can you simply ask him questions about it?
10        Yes, it is his -- well, I believe it's his --
11        THE WITNESS: Yeah, that is mine.
12 BY MR. GOSMAN:
13 Q.  All right. We've established this is your
14 report, correct?
15 A.  Yes.
16 Q.  All right. I want you to read those first
17 two sentences under, the plan was to knock?
18        MS. WESTBY: Out loud?
19 BY MR. GOSMAN:
20 Q.  Out loud, please.
21 A.  "The plan was to knock on the front door and
22 announce, 'police, search warrant.' If the door did
23 not open immediately, we would use the ram to force
24 entry. The primary entry team's responsibility was to
25 secure the residence and ensure the safety of everyone

MIKE CHRETIEN - October 5, 2010                               Page 169
Direct Examination by Mr. Gosman

1   involved."
2       Q.  Okay.  Is that -- is that what happened?  Is
3   that what you planned?
4       A.  That was an element of the plan.
5       Q.  All right.  And are there any other documents
6   in this case that describe the plan any differently
7   than what you see right there?
8           MR. THOMPSON: Objection as to form.
9   BY MR. GOSMAN:
10      Q.  Any other reports, any other descriptions?  I
11  mean, we've got Exhibit 10.  And we've got Exhibit 16.
12  Is there anything else that describes the plan with
13  regard to the entry into the residence?
14          MR. THOMPSON: Objection as to form.
15          MS. WESTBY: And just for clarification, are
16  you talking about what he just read, or are you talking
17  about this entire document?
18          MR. GOSMAN: I'm talking about what he just
19  read.  I said the entry plan.
20          THE WITNESS: Sure, there's plenty on this
21  same page that describes parts to the plan.
22  BY MR. GOSMAN:
23      Q.  I'm talking about the actual entry, from
24  staging on the front door to knocking it in and going
25  inside, that's the sequence of events?

MIKE CHRETIEN - October 5, 2010                               Page 170
Direct Examination by Mr. Gosman

1           MR. THOMPSON: Objection as to form.
2           MS. WESTBY: Objection.
3           THE WITNESS: That was not the only part of
4   the plan.
5   BY MR. GOSMAN:
6       Q.  I know that.
7           The question was:  Are these the only two
8   documents, Exhibit 10 and Exhibit 16, that reference
9   this particular part of the plan?
10          MR. THOMPSON: Counsel, how can he answer
11  that question?  Really, is that --
12          MR. GOSMAN: He was the team leader.
13          MR. THOMPSON: Is that -- when you gave us
14  400 pages of documents, is that really fair?
15          MR. GOSMAN: I mean, you gave me these
16  documents.  They are all part of the police reports.
17          MR. THOMPSON: What we can do, Counsel, is we
18  can have him sit here and review every one of these.
19  If you want to take up that time in your deposition,
20  and then he can answer the question.
21          But you're asking him, has he reviewed 400
22  pages of documents, and is there any other document out
23  there which evidences this plan.  That's just unfair.
24          MR. GOSMAN: Okay.  I'll tend to agree with
25  that.

MIKE CHRETIEN - October 5, 2010                               Page 171
Direct Examination by Mr. Gosman

1           MR. THOMPSON: I mean, we need to move this
2   on.
3   BY MR. GOSMAN:
4       Q.  Okay.  Let me ask this question:  Are there
5   any other documents that you're aware of that provide a
6   description for the entry into the residence, other
7   than what we see here as Exhibit 16 and what was
8   contained on Exhibit 10?
9           MS. WESTBY: Object to the form of the
10  question.
11          THE WITNESS: Not that I know of.  This is my
12  report.
13  BY MR. GOSMAN:
14      Q.  All right.  So when you arrived that night at
15  the house, I understand that a dog barked; is that
16  correct?
17      A.  Uh-huh.
18      Q.  Where was everyone when the dog barked?  Do
19  you know?
20      A.  I know that we weren't where we wanted to be.
21      Q.  Okay.  And how far was the entry team from
22  the door when the dog barked?
23      A.  I don't know.  In the front yard.
24      Q.  Okay.  And where was Officer McCaslin and
25  Officer Kent, if you know?

MIKE CHRETIEN - October 5, 2010                               Page 172
Direct Examination by Mr. Gosman

1       A.  I don't.  I would think that they would be on
2   the side yard.
3       Q.  You don't know?
4       A.  I don't know for certain, no.
5       Q.  And when the dog barked, what did you do as
6   the team leader?
7       A.  I don't think I took any specific action.
8       Q.  Did you quicken your gait toward the front
9   porch?
10      A.  I don't remember.
11      Q.  Well, you just told me that it caused the
12  plan to be hurried.  In what way did it cause the plan
13  to be hurried?
14      A.  I didn't say it caused the plan to be
15  hurried.  Those are your words.
16      Q.  Did it cause the plan to be hurried?
17      A.  It added an element of -- I can't think of
18  the word.  Maybe just added stress.
19      Q.  And how did the entry team arrange themselves
20  on the front porch?
21      A.  We didn't.  As I recall, the front porch was
22  pretty small.  And I don't remember if it was concrete
23  or wood.  But from what I recall, it was only an area
24  of about 4 feet by 4 feet.  So the entry team would
25  have been in the front yard.

1   Q.  Behind which officers?
2   A.  Chapman was knocking on the door, Miner would
3  have been to the side with the ram.  Beyond that, I'm
4  not sure of the exact order.
5   Q.  And did you hear the expression, "police,
6  search warrant" before the door was breached?
7   A.  Yes.
8   Q.  Okay.  How much time elapsed?
9   A.  A reasonable amount of time.
10   Q.  It was?  It wasn't immediately thereafter
11  that the door was breached?
12   A.  Considering the circumstances, I'd say that a
13  reasonable amount of time elapsed between the time that
14  Chapman knocked on the door announced police, search
15  warrant, and Miner hit the door with the ram.
16   Q.  All right.  So what's a reasonable amount of
17  time in your mind?
18   A.  Depends on the circumstances.
19   Q.  We're only talking about one set of
20  circumstances here, Officer.  And that's the
21  circumstances that occurred that night.
22       MS. WESTBY:  Ob --
23       THE WITNESS:  And as I said, I don't know.
24  BY MR. GOSMAN:
25   Q.  You don't know?

1   A.  I don't know a specific number of seconds or
2  minutes.  I know that the time, I thought, was
3  reasonable.
4   Q.  Okay.  How many seconds elapsed from the time
5  the door was breached until the diversion device was
6  detonated?
7   A.  I don't know.  Other than to say that I was
8  inside the house when it happened.
9   Q.  And had Tricia Wachsmuth gotten up from the
10  couch by the time you were in the house?
11       MR. THOMPSON:  Objection as to form.  Asked
12  and answered.
13       THE WITNESS:  I don't know what she did.  I
14  wasn't the first one in the house.  When I came into
15  the house, somebody was addressing her.  I don't
16  remember if she was standing or sitting.
17  BY MR. GOSMAN:
18   Q.  You'll agree with me, will you not, that the
19  materials contained in Exhibit 16 were prepared at or
20  near the time that the entry occurred or shortly
21  thereafter, I should say -- strike that.
22       The information contained in your report was
23  prepared shortly after the event occurred, correct?
24   A.  Yes.
25   Q.  And is the information contained in your

1  report accurate?
2   A.  It was to the best of my knowledge at the
3  time.
4   Q.  Well, is it now, as you sit here today?
5   A.  The only thing that I see is not accurate is
6  the second to the last paragraph on the first page, the
7  last sentence.
8   Q.  Yes.
9   A.  "Officer McCaslin then checked the area
10  immediately inside the window for people or obstacles
11  and deployed the N.F.D.D."  He did that to the best of
12  his ability.  But because of the window height, he
13  couldn't see everything.  I didn't sit down with
14  McCaslin when I wrote the police report.
15   Q.  Okay.
16   A.  I wrote it on my own.  I wrote it based on
17  what we had talked about.
18   Q.  And you found out since then that Officer
19  McCaslin couldn't see clearly through the window -- in
20  the window?
21       MS. WESTBY:  Object to the form of the
22  connection.  Misstates the testimony.
23       MR. GOSMAN:  Well, whatever it is.
24       MR. THOMPSON:  Join.
25       MS. WESTBY:  No, it's not whatever it was.

1       MR. GOSMAN:  Yes, it is.
2       MS. WESTBY:  No, it isn't.
3  BY MR. GOSMAN:
4   Q.  Did you talk to Officer McCaslin and find out
5  that that statement that you got in your report was not
6  accurate?
7   A.  Was not 100 percent accurate due to the
8  height of the window.
9   Q.  All right.  And that's it?  Is that the only
10  thing in the months that you've had since this lawsuit
11  was filed and since this night occurred, that you would
12  take issue with in terms of what's contained in this
13  report?
14       MR. THOMPSON:  Take your time and read it.
15       MR. GOSMAN:  Yes, you can do that.  We can
16  take a break for five, six, seven minutes if you'd
17  like.
18            (Recess taken 3:04 to 3:10
19            p.m., October 5, 2010)
20  BY MR. GOSMAN:
21   Q.  Officer, have you taken time to examine your
22  report, which we've identified as Exhibit 16?
23   A.  Yes.
24   Q.  And we talked a moment ago about an issue
25  with Officer McCaslin's deployment of the N.F.D.D., and

MIKE CHRETIEN - October 5, 2010                                    Page 177
Direct Examination by Mr. Gosman

1   how you had received new information since the report
2   was prepared.  Is there anyt ing else in this report
3   that you would take issue with?
4       A.  Probably the wording in the third paragraph
5   from the bottom.
6       Q.  Okay.  Go ahead.
7       A.  The second sentence.
8       Q.  Yes.
9       A.  "If the door did not open immediately."
10      Q.  Okay.  And why would you take issue with
11  that?
12      A.  It was like I just said, we would want to
13  give a reasonable amount of time for a --
14      Q.  Well, that's what you just said here today,
15  correct?
16      A.  Yes.
17      Q.  Okay.  So you'll agree, then, that that's not
18  what you wrote in your report back in March of 2009,
19  correct?
20      A.  Correct.
21      Q.  All right.  Okay.  Back to Exhibit 10 for
22  another moment.  Is there anything in Exhibit 10 that
23  indicates that you waited -- or that you were to wait
24  for the occupant to open the door before proceeding
25  with the sequence of events that are listed in

MIKE CHRETIEN - October 5, 2010                                    Page 178
Direct Examination by Mr. Gosman

1   Paragraphs I through 7 on that document?
2       MS. WESTBY: Object to the form of the
3   question.  Again, I mean, I think at some point, we
4   have to --
5       MR. GOSMAN: Move on?
6       MS. WESTBY: We have to move on.  And we have
7   to not allow this witness to testify as to the meaning
8   of a document that he did not create, that you know.
9       MR. GOSMAN: All right.  Well, I'm going to
10  ask that one last question, and move on.
11      MS. WESTBY: No.  That -- you're not asking
12  him to look at this document and see what's on it.
13  You're asking him to make a judgment about it.
14      MR. GOSMAN: I'm asking him to look at the
15  document and see what's on it.
16      MS. WESTBY: No, you didn't.
17      MR. GOSMAN: Yes, I did.
18      MS. WESTBY: I'm instructing him not to
19  answer.
20  BY MR. GOSMAN:
21      Q.  Officer, is there anyth ng on that -- if
22  there is anything on that document that indicates that
23  the officers were to wait for the occupant to open the
24  door before employing the ram; would I be able to find
25  it?

MIKE CHRETIEN - October 5, 2010                                    Page 179
Direct Examination by Mr. Gosman

1       MS. WESTBY: Object to the form of the
2   question.  No.  He cannot answer that question.
3   BY MR. GOSMAN:
4       Q.  Where is it on the document?
5       MS. WESTBY: He cannot answer that question.
6       MR. GOSMAN: Of course he can.  You know he
7   can.
8       MS. WESTBY: No, he can't.
9       MR. GOSMAN: Yes, he can.  As a matter of
10  fact, you're going to win this argument simply because
11  the document speaks for itself.  So we'll move on.
12  BY MR. GOSMAN:
13      Q.  It is true that Exhibit 10 also states, "If
14  the father shows up, he stays in the lobby."  Do you
15  see that?
16      A.  Tom Wachsmuth stays in the lobby, uh-huh.
17      Q.  Did that statement take place or discussion
18  take place?
19      A.  I believe so.
20      Q.  Why?
21      MR. THOMPSON: Object as to form.
22      MS. WESTBY: Join.
23      MR. GOSMAN: Yeah, why is it, a tough
24  question.
25      MR. THOMPSON: Well, why did the discussion

MIKE CHRETIEN - October 5, 2010                                    Page 180
Direct Examination by Mr. Gosman

1   take place?  Who?
2       MR. GOSMAN: As a matter of fact, that's a
3   good question.
4   BY MR. GOSMAN:
5       Q.  Why was Tom Wachsmuth to be kept in the lobby
6   and not have any participation?
7       A.  We didn't want to treat Tom any differently
8   than we would anybody else.  We wouldn't allow any
9   other suspect's parent to come into the scene of a
10  search warrant if they showed up.  We'd ask them to
11  stay in the lobby of the police department and wait
12  also.
13      Q.  Even though Tom Wachsmuth was a DCI agent and
14  was the father of the boy that was the subject of the
15  warrant?
16      A.  Again, we didn't want to treat him any
17  differently, better or worse.
18      Q.  All right.  Would you agree with me that Tom
19  Wachsmuth could have been a valuable source of
20  intelligence concerning where his son was and what was
21  going on?
22      MR. THOMPSON: Objection as to form.
23      MS. WESTBY: Join.
24      THE WITNESS: I don't know.
25

Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

MIKE CHRETIEN - October 5, 2010                                    Page 181
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.   All right.  Why did this conversation come
3   up?  Was there any concern about Tom Wachsmuth showing
4   up that night?
5       A.   I think there was just concern in general
6   that a fellow law enforcement officer was somehow
7   connected to this, be it just by relation or whatever.
8   And that we wanted to do things right.  We wanted to do
9   things -- we didn't want to show any favoritism, you
10  know.  We didn't want to do anything differently than
11  we would for anyone else.
12      Q.   All right.  In fact, Officer Patterson had
13  suggested to Officer Miner that you -- involved Tom
14  Wachsmuth and talk and have him bring his son either
15  out or to the police station.  And that would be a
16  better, simpler, easier way to handle this problem?
17          MR. THOMPSON: Objection.
18          MS. WESTBY: Object to form.
19  BY MR. GOSMAN:
20      Q.   Did you know that?
21      A.   I didn't know that Patterson had had that
22  conversation with Miner.
23      Q.   Well, that would certainly explain why we had
24  that notation to the plan that Tom was to stay in the
25  lobby.

MIKE CHRETIEN - October 5, 2010                                    Page 182
Direct Examination by Mr. Gosman

1          MR. THOMPSON: Objection as to form.
2          MS. WESTBY: Join
3          THE WITNESS: You're speculating.  I have no
4   idea.  I didn't write it.
5   BY MR. GOSMAN:
6       Q.   The conversation did occur, though, correct?
7          MR. THOMPSON: Objection to form.  He just
8   said he didn't know.
9          THE WITNESS: Which conversation?
10         MR. GOSMAN: That's a good point.
11  BY MR. GOSMAN:
12      Q.   The conversation there in the station before
13  the raid was put into effect regarding Tom Wachsmuth?
14      A.   We did talk about we would defer to Tom, come
15  to the LEC -- or lobby of the police department and
16  wait.
17      Q.   Were you concerned that Tom Wachsmuth might
18  suggest to you an alternative to a SWAT-type entry into
19  his son's home that night if you talked to him?
20         MR. THOMPSON: Object as to form.
21         MS. WESTBY: Join
22         THE WITNESS: No, that wasn't a concern of
23  ours.
24  BY MR. GOSMAN:
25      Q.   You were conducting all these operations and

MIKE CHRETIEN - October 5, 2010                                    Page 183
Direct Examination by Mr. Gosman

1   all these plans in order to provide for the safety, not
2   only of the officers, but of the occupants of the home,
3   correct?
4       A.   Yes.
5       Q.   And can you tell me why it would have been
6   unsafe for Officer Wachsmuth, Tom, to have gone with
7   the officers to the house and talked his son out the
8   front door?
9          MR. THOMPSON: Objection as to form.
10         MS. WESTBY: Join.
11         THE WITNESS: I can tell you the reason we
12  didn't do that is because we wouldn't do that for any
13  other suspect.  Again, we were going to treat Tom and
14  his son just like we would any other person.  No
15  special treatment.
16  BY MR. GOSMAN:
17      Q.   Well, wouldn't it have been safer for you to
18  have done that in any other situation where you are
19  actually threatening to use a SWAT-type entry into
20  someone's home if the father was available and
21  cooperative and had information that would have made
22  this easier to get the suspect out of the house?
23         MS. WESTBY: Object to the form.
24         MR. THOMPSON: Join.
25         MR. GOSMAN: That was a bad question.  I'll

MIKE CHRETIEN - October 5, 2010                                    Page 184
Direct Examination by Mr. Gosman

1   give you that.
2   BY MR. GOSMAN:
3       Q.   Go ahead, though, if you can.
4       A.   Again, I don't know that we would consider
5   that as an option.
6       Q.   In all your SWAT training, you never learned
7   that you were to use the SWAT entry as an entry of last
8   resort?
9       A.   I didn't say that.
10         MS. WESTBY: Object.
11  BY MR. GOSMAN:
12      Q.   Is that true?  Isn't the SWAT entry an entry
13  of last resort?
14         MS. WESTBY: Object to the form.
15         MR. THOMPSON: Join.
16         THE WITNESS: No.
17  BY MR. GOSMAN:
18      Q.   All right.  If you have other means of
19  effecting an arrest and accomplishing the objectives of
20  officer safety, you would certainly employ those means
21  before you would place a SWAT team on the location and
22  enter the residence dynamically?
23         MS. WESTBY: Object to the form.
24         MR. THOMPSON: Join.
25         THE WITNESS: Again, it depends on the

1  situation. And as I've stated before, the decision to
2  do things the way we did then, was based on, we wanted
3  to do what was safest for everyone involved: Officers,
4  occupants, suspects, whatever. We didn't want to show
5  any favoritism one way or the other towards Tom or his
6  family.
7  BY MR. GOSMAN:
8      Q. Well, that sounds like two different things.
9  On one hand, you're talking about doing things as
10 safely as possible. And on the other hand, you're
11 talking about not showing any favoritism to Tom
12 Wachsmuth. Which was it '
13     MS. WESTBY: Object to the form of the
14 question.
15     MR. THOMPSON: Join.
16     THE WITNESS: Both those were considerations.
17 BY MR. GOSMAN:
18     Q. All right. Okay. Let's go ahead and take
19 the list of officers on Exhibit 10. I want you to go
20 through that list and review everyone's role and then
21 let me know if there are any inaccuracies in that list.
22     MS. WESTBY: I'm sorry. I lost my train of
23 thought. I didn't hear that.
24     MR. GOSMAN: If there are any inaccuracies in
25 the list that's mentioned or written on Exhibit 10 that

1  has the officers and their assignments.
2      THE WITNESS: It looks like I remember it.
3  The assignments are consistent.
4  BY MR. GOSMAN:
5      Q. All right. So to the best of your ability,
6  where were the officers in order as they entered the
7  house that evening?
8      MR. THOMPSON: Objection as to the form.
9  Asked and answered.
10     MS. WESTBY: Object to the form of the
11 question.
12 BY MR. GOSMAN:
13     Q. I think you described you were second or
14 third. And maybe you have gone over this.
15     MS. WESTBY: Yes.
16 BY MR. GOSMAN:
17     Q. Do you know where anybody was?
18     MR. THOMPSON: He's told you about the entry
19 team, and he said he didn't know where anybody else was
20 at because he couldn't observe them.
21     MS. WESTBY: He was second, third, or fourth.
22 He couldn't tell you for sure  We've gone over and
23 over this.
24 BY MR. GOSMAN:
25     Q. Okay. Chapman had the duty of knocking and

1  announcing, correct?
2      A. Yes.
3      Q. He probably went through the door first?
4      A. I believe that's accurate.
5      Q. And whether he went through the door first or
6  not, it was most likely that either Chapman, who
7  knocked on the door, or Miner, who had the battering
8  ram, went through the door first, correct?
9      A. It wouldn't have been Miner.
10     Q. Miner, okay. And why is that?
11     A. Because he was holding the ram.
12     Q. Okay.
13     A. He would have had to place it down and got in
14 behind us.
15     Q. So it would be fair to say Miner came in last
16 possibly?
17     A. Most likely. Again, I don't know that for
18 sure because he was behind me.
19     Q. Okay. He was behind you --
20     A. I can say he was behind me.
21     Q. Okay. After you entered the room?
22     A. (Witness nods head.)
23     Q. Where was Danzer relative to you? He
24 testified last night that he was in the middle of the
25 group.

1      A. He was -- again, the front four would have
2  been Chapman, who I'm fairly sure was first, Danzer and
3  Hall and I were two, three, and four in some order. I
4  believe I was four. I'm not -- but I'm not sure on
5  that.
6      Q. Okay. And then we know that Miner was behind
7  you?
8      A. He was -- when I say he was behind me, he
9  came into the house after me. Whether he was the
10 person that was directly behind me, I don't know.
11     Q. Okay. And so what other officers do we have
12 in that entry team?
13     A. Roy Eckerdt.
14     Q. Okay. So Eckerdt was probably behind you,
15 then?
16     A. Probably.
17     Q. All right. Once you entered the house, what
18 did you do?
19     MR. THOMPSON: Objection. Asked and
20 answered.
21     THE WITNESS: I went past the living room
22 because there were -- there was an officer or officers
23 that were -- that had already taken care of the
24 occupant that was in the house in the living room. The
25 next area that we would have gone to would have been

Case 1:10-cv-00041-ABJ Document 65-3 Filed 01/10/11 Page 50 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1 the bedrooms. Another officer went into the -- maybe
2 two officers went into the northeast bedroom, the one
3 that we'd identified as Bret and Tricia's. I went to
4 the next door, which turned out to be the bathroom.
5 And that door, I was facing east.
6 BY MR. GOSMAN:
7 Q. Okay. So you went into the bathroom, clearly
8 that didn't take much time. The other officers were
9 clearing the bedrooms?
10 A. Somebody had gone into the bedroom to my left
11 after I had gone into the bathroom there. Somebody had
12 gone into the bedroom on the right. I think I might
13 have gone in there with them to look in the closet.
14 And then I came back out into that area between the two
15 bedrooms and the bathroom. And someone else had gone
16 to the kitchen.
17 Q. Okay. Did you all meet back in that area
18 then?
19 MS. WESTBY: Object to the form.
20 THE WITNESS: No. I was in that area. There
21 were officers in the living room. There were officers
22 in the kitchen. There was an officer or officers still
23 in what we had identified as their bedroom, the
24 northeast bedroom.
25

1 BY MR. GOSMAN:
2 Q. Let me see if I can find a sheet of paper. I
3 know I've got one here. Well, I don't know that I've
4 got a piece of paper here.
5 Okay. We're going to mark this Plaintiff's
6 Exhibit 40. We'll have to get a stamp on that in a
7 minute when you're done.
8 Officer, do me the honor of drawing a diagram
9 of the house based on what you recollect from what you
10 saw while you were in the house. And then let me know
11 where you stopped after you had finished the sweep of
12 the house.
13 A. Okay. I'm done drawing.
14 Q. Okay. Put an X where you were located.
15 A. (witness complies.)
16 Q. This was after the house was cleared?
17 A. Once we were done sweeping the upstairs,
18 that's where I was located. Right there.
19 Q. All right. And where are -- I see. The
20 stairs to the basement --
21 A. The stairs to the basement would be -- there
22 was a door there down from the kitchen.
23 MR. GOSMAN: Do you have an exhibit sticker?
24
25

1 (Exhibit 40 marked)
2 BY MR. GOSMAN:
3 Q. All right. Now at some point, Ms. Wachsmuth
4 led the officers down the stairs, is that true?
5 A. She went down the stairs in front of us.
6 Q. Just prior to -- where was Ms. Wachsmuth when
7 you found yourself in the position you've marked on
8 Exhibit 40 with the X?
9 A. She was in the living room. I don't
10 remember -- it seems to me like she was seated over
11 here somewhere.
12 Q. Do you know that's where the couch was?
13 A. I thought the couch was over here. But for
14 some reason, I remember her being seated over here.
15 Q. Okay. Let's go ahead and draw in the couch
16 for now.
17 A. (witness complies.)
18 Q. And at the time that you asked Ms. Wachsmuth
19 to -- or at the time that the decision was made to go
20 down the stairs, let's start with that, where were the
21 other officers? Had they all gathered together again
22 after clearing the upstairs portion of the house?
23 A. Again, there was at least one in this
24 bedroom. There were one or two in the living room.
25 Q. All right. Where were --

1 A. One or two to the kitchen.
2 Q. Where were they in the living room, if you
3 know? Roughly?
4 A. I seem to remember them being over here. In
5 this area with Tricia being seated on something over
6 here.
7 Q. Okay. You put a little teeny dot. Let's go
8 ahead and make some larger X's and a little caption off
9 to the side that says Tricia?
10 A. How about TW?
11 Q. That's fine. Thank you.
12 A. Okay.
13 Q. All right. How many officers?
14 A. I don't know.
15 Q. Do you know who the officers were?
16 A. I don't remember specifically.
17 Q. Were you -- were you looking at the officers
18 as you were standing in Position X?
19 A. Not specifically, no.
20 Q. Did you see what they were doing?
21 A. They were just standing in the living room
22 with their backs to me.
23 Q. They had their backs to you. Do you know
24 what they were doing with their weapons?
25 A. They were slung, if they had a long gun. The

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 51 of 91
Tricia Wachsmuth v.                                                    Mike Chretien
City of Powel, et al.                                              October 05, 2010

1  guys with pistols, I don't know.
2      Q.  Did you see anyone pointing a weapon at
3  Tricia Wachsmuth at that ti ne?
4      A.  No.
5      Q.  As far as you know, I think you've testified
6  to this, no one ever pointed a weapon at Ms. Wachsmuth;
7  is that correct?
8      A.  I didn't testify to that.
9      Q.  All right.  Well, what is your testimony on
10 that question?
11     A.  That I didn't see what officer was dealing
12 with her or how they conducted himself.  Whether they
13 were pointing their weapon at her for a second or five
14 seconds or -- I don't know.
15     Q.  Okay.
16     A.  Nobody was standing around with their weapon
17 pointed at her at this point.
18     Q.  Okay.  And then after that point, were you --
19 I think -- when you say "that point" in Exhibit 40,
20 when you have gone back ir to the hallway, the only
21 other officers in the picture were those standing right
22 next to Tricia Wachsmuth?
23     A.  Those are the ones you asked me about, I said
24 there was one in the bedroo n.
25     Q.  Okay.

1      A.  At least one.  And I told you there was one
2  or two in the kitchen, too.
3      Q.  Okay.  One or two in the kitchen.
4      A.  And there may have been one in here.
5      Q.  Okay.  Now, did Officer Miner have a long gun
6  or pistol?
7      A.  I don't remember.  It would have been
8  difficult to use the ram with a long gun.  But that
9  doesn't mean he didn't sling it over his shoulder.  I
10 don't know.  I just don't remember.
11     Q.  You talked about one two, three, four, five,
12 six, possibly six officers in the house at this time.
13 Is that how many you remember being in the house,
14 roughly, at that time?
15     A.  Roughly.
16     Q.  Did other officers come in the house shortly
17 thereafter?
18     A.  McCaslin and Kent would have come in as soon
19 as they were finished deploying the flashbang on the
20 northeast bedroom.
21     Q.  Do you know where t hey were?
22     A.  I don't specifically.
23     Q.  Do you know -- were they in the living room?
24     A.  Since they were the last two in the front
25 door, that's where I would think they would be.

1      Q.  And they were also tasked with controlling
2  Tricia Wachsmuth, were they not?
3      A.  That was the plan.
4      Q.  Did they carry out the plan?
5          MS. WESTBY: If you know.
6          THE WITNESS: I'm not sure who secured her.
7  BY MR. GOSMAN:
8      Q.  When the decision was made to go downstairs,
9  were the officers all gathered together in the hall
10 area around you?
11     A.  No.
12     Q.  Did you issue the command to go down the
13 stairs and clear the basement?
14     A.  I made the decision to go down the stairs.
15     Q.  Did you issue a command?
16         MR. THOMPSON: Objection as to form.
17         MS. WESTBY: Join.
18         THE WITNESS: To who?
19 BY MR. GOSMAN:
20     Q.  Well, you're the team leader, so I'm assuming
21 it's to the other officers.
22     A.  It would have been my decision to go
23 downstairs.
24     Q.  That wasn't so hard, was it, officer?
25         MS. WESTBY: I need to take a break for a

1  minute, so...
2          MR. GOSMAN: All right.  That's fine.
3          (Recess taken  3:37 to 3:45
4          p.m., October 5, 2010)
5  BY MR. GOSMAN:
6      Q.  Okay.  Officer, if you don't feel comfortable
7  placing the location of the other team members on this
8  Exhibit 40 at the time that you were located where
9  you've marked an X on the exhibit, then let's just say
10 so and go on.
11         Otherwise, I'd like you to put a location for
12 every officer that you knew about at that moment.
13     A.  There's only one that I'm sure.
14     Q.  Okay.  And who was that?
15     A.  And that was Danzer.  I know that he was
16 there because he told me that the door to the stairs
17 was unlocked.
18     Q.  Okay.  What happened next?  You're at this
19 point in the house.  What happened next?
20     A.  I asked Tricia if there was anyone else in
21 the house or if there was anyone else downstairs.  I
22 don't remember the exact wording.
23     Q.  Yes.
24     A.  She hesitated, and then said, "No."
25     Q.  All right.  Then what happened?

MIKE CHRETIEN - October 5, 2010                                     Page 197
Direct Examination by Mr. Gosman

1   A.   I asked her more firmly, "Is anyone
2   downstairs or is Bret downstairs?" She answered more
3   quickly, no.
4   Q.   Go ahead. Let's just carry this out till we
5   get to the stairs.
6   A.   At that point, I had two contradicting
7   impressions as to her answer. The first time she said
8   no, it seemed like she had to think about it. The
9   second time she said no she answered right away. I
10  wanted to confirm that there was no one downstairs. So
11  when she said no the second time, I said, "Good.
12  You're going first." To call her bluff.
13  Q.   Okay. All right. Well, you not only called
14  her bluff, but you sent her downstairs first, correct?
15  A.   No.
16  Q.   All right. What happened next?
17  A.   Before I knew it, she got up, walked over to
18  the stairs, and started going down and we followed her.
19  Q.   I see. So it was a voluntary movement on her
20  part to lead you downstairs into the basement?
21        MS. WESTBY: Object to the form --
22  BY MR. GOSMAN:
23  Q.   Is that what you're saying?
24        MS. WESTBY: Object to the form of the
25  question.

MIKE CHRETIEN - October 5, 2010                                     Page 198
Direct Examination by Mr. Gosman

1        MR. THOMPSON: Join.
2        MR. GOSMAN: Okay.
3        MS. WESTBY: You can go ahead and answer.
4        THE WITNESS: Again, the second time I asked
5   her, she said no quickly. As soon as she got done
6   saying no quickly, the first thing I said was, "Good,
7   you're going down first," to call her bluff. She got
8   up, went right to the stairs and started going down.
9   BY MR. GOSMAN:
10  Q.   Did you communicate with her before you got
11  down to the bottom of the stairs?
12  A.   No.
13  Q.   So you didn't tell her that you were just
14  bluffing her?
15  A.   No, I didn't. It happened pretty quick.
16  Q.   Okay. Now, in your training as a SWAT
17  officer, did you understand any circumstances where
18  a -- an individual suspect should be used as a shield
19  in front of the officers to take them into areas of the
20  house that hadn't been cleared?
21        MR. THOMPSON: Objection as to form.
22        MS. WESTBY: Join.
23        THE WITNESS: We didn't use anyone as a human
24  shield.
25

MIKE CHRETIEN - October 5, 2010                                     Page 199
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.   Well, again, that's fine. But that's not
3   what I asked
4   A.   Okay. What did you ask?
5   Q.   I asked, was there anything in your training
6   as a SWAT commander that led you to believe it was
7   appropriate in any way to use an individual as a human
8   shield to clear areas of a home that had not been
9   cleared?
10        MS. WESTBY: Objection as to the form of the
11  question.
12        MR. THOMPSON: Join.
13        THE WITNESS: No.
14  BY MR. GOSMAN:
15  Q.   In fact. would it be fair to say, Officer,
16  that you knew that was just wrong?
17        MS. WESTBY: Object to the form of the
18  question.
19        MR. THOMPSON: Join.
20        MS. WESTBY: Knew what was wrong?
21        MR. GOSMAN: To use a suspect as a human
22  shield to effect a clearing of a home in a SWAT-type
23  situation.
24        THE WITNESS: That was never discussed in any
25  SWAT training that I attended.

MIKE CHRETIEN - October 5, 2010                                     Page 200
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.   What do you think? Do you think that's right
3   or wrong?
4        MR. THOMPSON: Object as to form.
5        MS. WESTBY: Join.
6        THE WITNESS: We didn't use Tricia as a human
7   shield.
8   BY MR. GOSMAN:
9   Q.   Well, we've already talked about that. You
10  got to answer the question as I ask it, though?
11  A.   No.
12  Q.   You don't think it's wrong?
13  A.   No. That's not what I meant. I'm sorry.
14  Q.   Okay. Is it --
15  A.   Yes, I would say that it would be wrong to
16  use someone as a human shield.
17  Q.   Is it your testimony, then, that you didn't
18  know whether there was someone in the basement when you
19  followed Tricia down those stairs?
20        MS. WESTBY: Object to the form of the
21  question.
22        MR. THOMPSON: Join.
23        THE WITNESS: When I called her bluff, the
24  quickness with which she got up to go down the stairs
25  led me to believe that there was no threat.

Case 1:10-cv-00041-ABJ  Document 65-3  Filed 01/10/11  Page 53 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1  BY MR. GOSMAN:
2  Q.  Okay.  Let's see here, when Tricia started
3  for the stairs, did you follow immediately after her?
4  A.  I walked towards the stairs after she did.  I
5  wouldn't say I was immediately after her, though.
6  Q.  All right.  Well, somebody was immediately
7  after her.  Was it Danzer?
8  A.  Danzer was the officer that was closest to
9  the stairs.
10  Q.  Was he the officer that followed her down the
11  stairs?
12  A.  I don't remember for sure that he was the
13  first officer.
14  Q.  Well, who else might have been?
15  MR. THOMPSON: Objection as to form.
16  THE WITNESS: I don't know.
17  BY MR. GOSMAN:
18  Q.  All right.  So you're standing in the
19  hallway; you've presented a bluff to Ms. Wachsmuth.
20  You've seen Danzer standing at the head of the stairs.
21  You saw Ms. Wachsmuth get up and walk down the stairs
22  and apparently march down the stairs?
23  A.  She walked down the stairs.
24  Q.  Did she wait for everybody to form a line
25  behind her?

1  A.  No, we just walked down the stairs behind
2  her.
3  Q.  All right.  And so you had a clear view of
4  Ms. Wachsmuth from the time she got up to walk down the
5  stairs until she actually started in the stairwell
6  itself heading down the stairs, correct?
7  A.  I think so.
8  Q.  And you're telling me you can't remember what
9  officers followed her down the stairs?
10  MS. WESTBY: Object to the form of the
11  question.
12  MR. THOMPSON: Join.
13  THE WITNESS: I remember going down the
14  stairs.  I know that Danzer and Chapman also went down
15  the stairs.  What order we were in, I don't remember
16  who was first, second, third.  I don't recall.
17  BY MR. GOSMAN:
18  Q.  You didn't put out your hand to try to block
19  Ms. Wachsmuth from going down the stairs, did you?
20  A.  No.
21  Q.  Did you call out to Officer Danzer and say,
22  "Stop her"?
23  A.  No.
24  Q.  All right.  Where was Officer Chapman then?
25  A.  I think he was in the kitchen as well.  But I

1  don't know for certain.
2  Q.  Okay.  And I realize that we've only taken
3  two depositions, yours and officer Danzer.  But so far
4  neither you nor Officer Danzer know where anybody was
5  during this clearing of the house.
6  MR. THOMPSON: Object as to form.  Misstates
7  the testimony that's been provided by both witnesses.
8  THE WITNESS: Danzer testified as to where he
9  was.  I testified as to where I was.
10  MS. WESTBY: There's no question pending.
11  BY MR. GOSMAN:
12  Q.  Okay.  So Danzer did testify that he followed
13  Ms. Wachsmuth down the stairs, correct?  He was the
14  first after Ms. Wachsmuth down the stairs?
15  A.  That's what he said.
16  Q.  Were you behind Danzer?
17  MS. WESTBY: Object to the form of the
18  question.  Asked and answered.
19  MR. THOMPSON: Join.
20  THE WITNESS: I was behind Danzer.  I don't
21  know if I was directly behind Danzer or not though.
22  BY MR. GOSMAN:
23  Q.  There may have been one other officer between
24  you and Danzer, correct?
25  A.  Correct.

1  Q.  And there were other officers in the
2  procession that followed Tricia Wachsmuth down the
3  stairs?
4  MS. WESTBY: Object to the form.
5  BY MR. GOSMAN:
6  Q.  Other than you, Danzer, and Chapman?
7  MR. THOMPSON: Object as to form.
8  THE WITNESS: There was at least one officer
9  behind me.
10  BY MR. GOSMAN:
11  Q.  Could there have been two or three?
12  A.  I don't think so based on the size of the
13  basement.  But I don't remember.
14  Q.  All right.  Let's go ahead and prepare
15  another diagram with -- we'll call it Exhibit 41.  I
16  want you to put Tricia Wachsmuth on the first or second
17  step, and then I want you, to the best of your
18  recollection, locate the other officers, whether you
19  can identify them by name or not.
20  Could we borrow another paper?
21  MR. THOMPSON: No.
22  MR. GOSMAN: Okay.
23  MS. WESTBY: I mean it.
24  MR. GOSMAN: Yeah.  Well, we can find other
25  paper, I assume.

Case 1:10-cv-00041-ABJ Document 65-3 Filed 01/10/11 Page 54 of 91
Tricia Wachsmuth v.
City of Powel, et al.
Mike Chretien
October 05, 2010

1  MR. THOMPSON: I can draw this based on his
2  testimony if you want. It will look something like
3  this.
4  MR. GOSMAN: Actually, he does a nice job
5  with that drawing, so let's go ahead and let him do
6  that.
7  MS. WESTBY: Before we get started, are you
8  asking him just to draw the stairs or do you want him
9  to draw the whole diagram --
10  MR. GOSMAN: Of the house? The stairs and
11  kitchen are all we need, because we're going to put
12  Tricia Wachsmuth on the stairs as she's starting down
13  the stairs.
14  THE WITNESS: Okay. You want her --
15  BY MR. GOSMAN:
16  Q. I tell you what. Let's put her in the stairs
17  where she stopped and pushed her hands against the wall
18  and leaned against the wall.
19  A. I don't remember her stopping.
20  Q. You don't remember her stopping?
21  A. No.
22  Q. Okay. Let's just put her in the middle of
23  the stairs.
24  Okay. Now, we know where Danzer was based on
25  his testimony, correct?

1  Q. All right. Would it be safe to assume that
2  the entry team went downstairs?
3  A. No.
4  MR. THOMPSON: Object as to form.
5  BY MR. GOSMAN:
6  Q. Why not?
7  A. We knew that it wasn't a very big area.
8  Q. Was there any communication on that subject?
9  A. No. But the whole entry team didn't come
10  into the bathroom with me either.
11  Q. Well -- okay. But I mean, you were going
12  downstairs. You didn't know how big the basement was
13  as you were going down the stairs.
14  A. I just told you, we knew it was small.
15  Q. But there was no discussion about who was or
16  was not to come down the stairs?
17  MS. WESTBY: Object to the form of the
18  question.
19  THE WITNESS: Again, not specifically.
20  BY MR. GOSMAN:
21  Q. When you say "not specifically," let me know
22  what you mean. What discussion was there?
23  A. That we would clear the house.
24  Q. That's it?
25  A. That's it.

1  A. He was the first officer down the stairs.
2  Q. So lets go ahead and put Danzer where he said
3  he was, and that's directly behind Tricia. And was
4  there an officer between you and Danzer?
5  A. I don't remember.
6  Q. All right. How far behind Tricia were you on
7  the stairs?
8  A. I don't remember. There was at least Danzer
9  between me and her.
10  Q. And there were -- at least one other officer
11  behind you?
12  A. Yes.
13  Q. Okay. Now, could there have been as many as
14  three? Do you know?
15  A. I don't.
16  Q. You don't know?
17  A. No.
18  Q. Is there -- did the entry team have any
19  instructions that there was a group that was assigned
20  to clear the upper section of the home and a group
21  assigned to clear the basement?
22  A. Not specifically.
23  Q. The entry team was assigned to clear the
24  house, correct?
25  A. Yes.

1  Q. All right. Now, while you were on those
2  stairs, did anyone point their weapon at Ms. Wachsmuth
3  that you saw?
4  A. No.
5  Q. And that would include yourself?
6  A. Absolutely.
7  Q. And it's your testimony that you didn't
8  direct Ms. Wachsmuth to go downstairs, you simply
9  called her bluff?
10  A. I did.
11  Q. How was she supposed to know the difference?
12  MR. THOMPSON: Object as to form.
13  BY MR. GOSMAN:
14  Q. Between directing her down the stairs ahead
15  of a group of officers and bluffing her into confessing
16  whether or not her husband was in the basement?
17  MR. THOMPSON: Objection as to form.
18  MS. WESTBY: Join.
19  THE WITNESS: I don't know what she was
20  thinking.
21  BY MR. GOSMAN:
22  Q. You didn't give her any signal that would
23  have clarified that what you were doing was a bluff?
24  MR. THOMPSON: Objection as to form.
25  MS. WESTBY: Join.

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 55 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

1  THE WITNESS: Again, the reason that I told
2  her what I told her was to call her bluff. When I saw
3  that she was willing to go down the stairs, that made
4  me think that there was no threat.
5  BY MR. GOSMAN:
6  Q. Officer, how could she possibly have been
7  willing to go down the stairs if she didn't know that
8  you were bluffing her when you told her to go down the
9  stairs ahead of the officers'.
10  MR. THOMPSON: Object as to form. You're
11  starting to argue with the witness. And we'll stop the
12  deposition now.
13  MR. GOSMAN: All right. Well, let's not do
14  that.
15  MS. WESTBY: And you're asking him what's
16  going through her mind. What she's thinking.
17  MR. GOSMAN: Come on. Okay. Let's repeat
18  the question.
19  (The record was read as
20  requested.)
21  MR. THOMPSON: Now I object that it makes no
22  sense.
23  MR. GOSMAN: I agree.
24  BY MR. GOSMAN:
25  Q. Okay. Officer, how could Tricia Wachsmuth

1  have known that you were bluffing her when you told her
2  to go down the stairs?
3  MR. THOMPSON: Objection. Calls for
4  speculation.
5  MS. WESTBY: He already told you to that
6  exact same question that he could not possible know
7  what she was thinking. Or what was going through her
8  mind. He answered that specific question.
9  MR. GOSMAN: Okay.
10  BY MR. GOSMAN:
11  Q. Officer, you testified also that when you saw
12  that she was willing to go down the stairs on her
13  own -- you aren't telling me that she was volunteering
14  to go down the stairs, were you?
15  A. She appeared willing to show us that there
16  was no danger by going down the stairs.
17  Q. I see. Okay. And that's different than
18  saying that she was willing to go down the stairs?
19  MS. WESTBY: Object to the form of the
20  question.
21  THE WITNESS: I don't know what she was
22  feeling. She knew that there was no one else in the
23  house. That's why she went down the stairs.
24  BY MR. GOSMAN:
25  Q. Okay. You don't think that she would have --

1  do you think she would not have gone down the stairs if
2  she'd thought there was someone down there?
3  A. Absolutely.
4  Q. Even though you're ordering her to go down
5  the stairs?
6  A. I didn't order.
7  MR. THOMPSON: Object as to form.
8  MS. WESTBY: Join.
9  BY MR. GOSMAN:
10  Q. Well, your words do speak for themselves.
11  You directed her to go into the basement, correct?
12  A. I called her bluff.
13  Q. You directed her to go into the basement --
14  MS. WESTBY: Object to the form of the
15  question.
16  MR. THOMPSON: Object to form.
17  MS. WESTBY: That's enough. He's answered
18  the question.
19  MR. GOSMAN: I called her bluff? That's not
20  an answer to the question.
21  MS. WESTBY: Yes, it is.
22  MR. GOSMAN: He's answered the question, and
23  I stated that he had not answered the question when he
24  said he called her bluff.
25  MS. WESTBY: He will continue to answer the

1  question the same way, because it's the truthful,
2  honest answer. And he's going to give it to you every
3  single time that you ask him, whether you ask it
4  another three or four times. And if you continue to
5  ask it, then we'll just go to the Court. And
6  honestly -- honestly, it's ridiculous.
7  MR. GOSMAN: What was my last question?
8  (The record was read as
9  requested.)
10  BY MR. GOSMAN:
11  Q. All right. You called her bluff by directing
12  her to go to the basement?
13  MS. WESTBY: Object to form.
14  MR. GOSMAN: You know, as a matter of fact,
15  it's on the record. I don't know why I'm doing this.
16  Let's go on.
17  MR. THOMPSON: Can you read that back to me?
18  MR. GOSMAN: Yeah.
19  THE WITNESS: Did you need to put a sticker
20  on my stairs?
21  MR. GOSMAN: We do.
22  (Exhibit 41 marked)
23  MR. GOSMAN: Well, I'm glad I'm providing a
24  little humor.
25  MS. WESTBY: You've just made me rummy.

Case 1:10-cv-00041-ABJ  Document 65-3  Filed 01/10/11  Page 56 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

MIKE CHRETIEN - October 5, 2010                      Page 213
Direct Examination by Mr. Gosman

1   You've worn me down to the point where I'm rummy.
2   BY MR. GOSMAN:
3       Q.  Okay.  Back to Exhibit 10 for a minute.
4   There is a note on the document that says it's PPD Tac
5   1 coded.  Can you tell me what that means?
6       A.  PPD Tac I is our -- it's an internal channel.
7   And coded means that we -- that the transmissions are
8   somehow encrypted.  I don't know how else to explain
9   that.  I'm not the radio guy.
10      Q.  Okay.  And who is Scott Bagnell?
11      A.  He is the -- he is an EMT.  He would have
12  probably been the crew chief.  He's a senior EMT at the
13  hospital.
14      Q.  The hospital was contacted?
15      A.  Uh-huh.
16      Q.  For standby?
17      A.  Uh-huh.
18          MS. WESTBY: You have to answer yes.
19          THE WITNESS: I'm sorry.  Yes.
20  BY MR. GOSMAN:
21      Q.  And let's look on the second page of
22  Exhibit 10 for a moment.  You didn't prepare this
23  document.  Was this information part of the information
24  that was discussed, or is this information that
25  occurred -- that was discussed after the entry?

MIKE CHRETIEN - October 5, 2010                      Page 214
Direct Examination by Mr. Gosman

1       A.  I don't know.
2       Q.  When you went into the basement, did you know
3   that there was a crawl space in the basements?
4       A.  I don't remember.
5       Q.  Okay.
6       A.  I don't remember knowing that ahead of time.
7       Q.  As you stood at the bottom of the basement,
8   what became of Ms. Wachsmuth, or as she stood at the
9   bottom of the basement stairs, what became of
10  Ms. Wachsmuth?
11      A.  She stood at the bottom of the stairs, Danzer
12  and I and whoever else was on the stairs with us walked
13  by her.  The last person walking down the stairs put
14  her in handcuffs.  I don't remember who that was,
15  though.
16      Q.  Did you find any drugs at the Wachsmuth
17  residence that were -- other than the marijuana, that
18  were not prescription drugs?
19          MR. THOMPSON: Is the question for him?
20          MR. GOSMAN: Yes.
21          MR. THOMPSON: Object as to form.
22  BY MR. GOSMAN:
23      Q.  Let me ask you this question:  You weren't
24  part of the evidence team; is that true?
25      A.  I was not.

MIKE CHRETIEN - October 5, 2010                      Page 215
Direct Examination by Mr. Gosman

1       Q.  You didn't search the house; is that true
2   then?
3       A.  Correct.
4       Q.  Was there ever any question that Tricia
5   Wachsmuth did not pose a threat to the officers?
6           MS. WESTBY: Object to the form of the
7   question.
8           MR. THOMPSON: Join.
9           THE WITNESS: Let me make sure I understand
10  the question.  Was there ever any discussion that
11  Tricia Wachsmuth did not pose a threat?  Is that what
12  you --
13  BY MR. GOSMAN:
14      Q.  I didn't ask about discussion.  Go ahead and
15  tell me, was there any discussion about whether
16  Ms. Wachsmuth presented a threat to the officers?
17      A.  She was an unknown threat.  She's in a dope
18  house.
19      Q.  Was there any objective evidence that
20  Ms. Wachsmuth posed a threat to the officers?
21          MS. WESTBY: Object to the form of the
22  question.
23          MR. THOMPSON: Join.
24          THE WITNESS: The CI's knowledge of there
25  being weapons throughout the house, whoever was in the

MIKE CHRETIEN - October 5, 2010                      Page 216
Direct Examination by Mr. Gosman

1   house could potentially have access to those weapons.
2   BY MR. GOSMAN:
3       Q.  In other words, other than the fact that
4   Ms. Wachsmuth was in the house and there were weapons
5   in the house, there's no evidence that she posed a
6   threat to the officers?
7           MS. WESTBY: Object to the form of the
8   question.
9           MR. THOMPSON: Join.
10          THE WITNESS: That's not what I said.
11  BY MR. GOSMAN:
12      Q.  What threat did she pose?
13      A.  The same threat that anyone who, again, was
14  in a dope house where there were weapons would pose to
15  law enforcement.
16      Q.  Okay.  And was it the same threat that Bret
17  Wachsmuth posed?
18      A.  Potentially.
19      Q.  Did you have any evidence that Tricia
20  Wachsmuth had a criminal record?
21      A.  No, I don't think the Virginia Tech shooter
22  had a criminal record either, though.
23      Q.  Okay.  Did you have any evidence that Tricia
24  Wachsmuth had ever been involved in a -- in any
25  violence, had ever committed any violent act against

1  another person?
2      A.  Not that I know of.
3      Q.  And did you have any of this information --
4  any information about Tricia Wachsmuth before you
5  entered the home that night?
6      A.  We had her name and where she worked.  And we
7  knew she was not at work.
8      Q.  And did you have any evidence that Bret
9  Wachsmuth had a prior criminal record?
10     A.  No, we did not.
11     Q.  Did you have any evidence that Bret Wachsmuth
12 had ever committed a violent act against any other
13 person?
14     A.  No.
15     Q.  And when you entered the home, did
16 Ms. Wachsmuth cooperate with the officers?  Was she
17 cooperative?
18         MS. WESTBY: Object to the form of the
19 question as vague.
20         Go ahead.
21         MR. THOMPSON: Join.
22         THE WITNESS: Prior to me talking to her, I
23 don't know what occurred.
24 BY MR. GOSMAN:
25     Q.  Okay.  When you talked to her.

1      A.  She answered my questions.
2      Q.  Did she attempt to flee?
3      A.  No.
4      Q.  Did she make any effort to resist arrest?
5         MR. THOMPSON: Once he entered the home?
6         MR. GOSMAN: Yes
7         THE WITNESS: Once we were inside, no.
8  BY MR. GOSMAN:
9      Q.  Did you see anything that indicated to you
10 that Tricia Wachsmuth posed a threat to the safety of
11 any officer in that operation?
12     A.  The gun is in the bedroom, the gun on the --
13 I don't remember the counter or shelf or whatever it
14 was, between the living room and the kitchen.
15     Q.  All right.  She didn't make a move for any of
16 those guns, did she?
17     A.  Not to my knowledge.
18     Q.  Well -- and I asked -- and maybe you've
19 answered the question as well.  But my question was:
20 Did you see anything that Ms. Wachsmuth did that posed
21 a threat to any officer in the house?
22         MS. WESTBY: Objection.
23 BY MR. GOSMAN:
24     Q.  I'm not talking about whether there were guns
25 in the house.  I'm talking about what Ms. Wachsmuth

1  did.
2         MS. WESTBY: Again, you don't like the
3  answer.  But the answer to that is that there were guns
4  right there, right in her proximity.  He gave you that
5  answer.
6  BY MR. GOSMAN:
7      Q.  What did she do that would have considered --
8  would have been considered a threat to the safety of
9  any officer in that operation?
10         MS. WESTBY: Object to form.
11         MR. THOMPSON: Join.
12         THE WITNESS: I didn't see her do anything,
13 partly as a result of our plan working.
14 BY MR. GOSMAN:
15     Q.  Did you consult with Chief Feathers before
16 this plan was executed?
17     A.  I believe I talked to him on the phone to let
18 him know what I planned to do.  What information I had
19 at the time and why.
20     Q.  Did he see -- did you tell him that you
21 planned to use a knock-and-announce and then deploy the
22 battering ram immediately?
23         MR. THOMPSON: Object as to form.
24 BY MR. GOSMAN:
25     Q.  The door did not open immediately?

1         MR. THOMPSON: Object to form.
2         THE WITNESS: No, I didn't because that's not
3  what we discussed.
4  BY MR. GOSMAN:
5      Q.  Well, that's one of the things that's in your
6  report though, correct?
7         MS. WESTBY: And it's one of the things that
8  when you asked him about inaccuracies in the report, he
9  told you.
10         THE WITNESS: I've already answered that
11 question twice.
12 BY MR. GOSMAN:
13     Q.  Well, the report speaks for itself.  Did you
14 tell him the same things that you said to him about
15 your entry plan as are contained in the report, except
16 to the extent that you've already corrected them on the
17 record today?
18         MS. WESTBY: Object to the form of the
19 question.
20         THE WITNESS: Substantially --
21 BY MR. GOSMAN:
22     Q.  I'm talking about Exhibit 16.
23     A.  I understand.  Substantially, I believe so.
24     Q.  All right.  What did he say?
25     A.  I don't recall exactly.  I'm sure that he

MIKE CHRETIEN - October 5, 2010                                    Page 221
Direct Examination by Mr. Gosman

1   asked some clarifying questions, asked the reasons why
2   I made certain decisions.
3       Q.  What -- what did you tell him about the
4   reasons why you made the decisions to use a SWAT-type
5   entry on this home at that t me?
6           MS. WESTBY: Object to the form of the
7   question, use of the term. That's your term.
8           THE WITNESS: What reasons did I give him as
9   to why I wanted to do things the way I wanted to do
10  them?
11  BY MR. GOSMAN:
12      Q.  Yes.
13      A.  It would have been the reasons that I talked
14  about earlier, in that I felt the way that we did it
15  was the safest way for everybody involved.
16      Q.  Did he ask you about whether it would have
17  been appropriate to do a knock-and-talk or some kind of
18  scenario that would have involved less than -- less
19  force than the dynamic entry that was used for this
20  particular operation?
21      A.  We discussed using Tom.
22      Q.  What did you discuss?
23      A.  Using Tom to do a knock-and-talk.
24      Q.  And?
25      A.  And we would not do that for anybody else.

MIKE CHRETIEN - October 5, 2010                                    Page 222
Direct Examination by Mr. Gosman

1   We cannot show special privileges to other people just
2   because they are in the same profession that we are.
3       Q.  But you mentioned it to Chief Feathers in any
4   event?
5       A.  We discussed it.
6       Q.  Other than the fact that it was something
7   that you say would not have been extended to a regular
8   citizen, was there a reason why using Tom Smith [sic]
9   might not have worked or mig ht not have accomplished
10  exactly what you were trying to set out to do that
11  night?
12          MR. THOMPSON: Object to form.
13  BY MR. GOSMAN:
14      Q.  Tom Wachsmuth.
15          MS. WESTBY: Join
16          THE WITNESS: Was there a reason besides that
17  we wouldn't do it for anybody else?
18  BY MR. GOSMAN:
19      Q.  Was there something about Tom Wachsmuth that
20  made you concerned that -- or Bret Wachsmuth that made
21  you concerned that if you simply called Tom and asked
22  him to go get his son, that he would do that and it
23  could be taken care of without the need for a dynamic
24  entry?
25          MR. THOMPSON: Object to form.

MIKE CHRETIEN - October 5, 2010                                    Page 223
Direct Examination by Mr. Gosman

1           MS. WESTBY: Join.
2           THE WITNESS: No. My recollection is that we
3   wouldn't do that for anybody else.
4   BY MR. GOSMAN:
5       Q.  And why wouldn't you do it for anybody else?
6           MR. THOMPSON: Asked and answered. Objection
7   as to form.
8           MS. WESTBY: Join. And vague. Speculation.
9           THE WITNESS: That's never been offered as an
10  option in any of the numerous search warrants that I've
11  conducted, it would not even have been considered. The
12  only reason it was considered in this case was because
13  we knew who Tom was.
14  BY MR. GOSMAN:
15      Q.  And you knew you could trust Tom to assist
16  you in a professional manner, correct?
17          MR. THOMPSON: Object as to form.
18          MS. WESTBY: Join.
19          THE WITNESS: We didn't want to put Tom in a
20  bad position. And we didn't want to show any kind of
21  preferential treatment.
22          MR. GOSMAN: I'm going to take a minute. If
23  you'd like to take a break, go ahead. I'm going to
24  look for something here for a few minutes.
25          (Recess taken 4:21 to 4:27

MIKE CHRETIEN - October 5, 2010                                    Page 224
Direct Examination by Mr. Gosman

1           p.m., October 5, 2010)
2   BY MR. GOSMAN:
3       Q.  Let's look at Exhibit 16 for a moment. There
4   is a reference to armor-piercing ammunition?
5       A.  Uh-huh.
6       Q.  Where did that information come from?
7       A.  It would have come from Miner.
8       Q.  And that would have been information that
9   would have come from the confidential informant?
10      A.  Yes.
11      Q.  Is the presence of armor piercing ammunition
12  significant?
13          MR. THOMPSON: Object as to form. Vague.
14          MS. WESTBY: Same.
15          THE WITNESS: It could be.
16  BY MR. GOSMAN:
17      Q.  Okay.
18      A.  It could show certain intent. That's all I
19  got.
20      Q.  All right. With respect to armor-piercing
21  ammunition, do you understand it was armor-piercing
22  ammunition or was it just a hard jacketed ammunition?
23      A.  You know, I didn't know. I wrote it down in
24  quotation marks because I think a lot of people call
25  things one thing -- that's their impression of it. I

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 59 of 91
Tricia Wachsmuth v.                                                          Mike Chretien
City of Powel, et al.                                                      October 05, 2010

1  think people probably think that we carry
2  armor-piercing ammunition. Armor-piercing ammunition,
3  I think, is pretty rare in pistols. It's not that
4  uncommon to find it for rifles, though.
5      Q. So is it fair to say that you -- when you
6  heard this phrase, you weren't sure whether it was true
7  armor-piercing ammunition or not? Or, whether the
8  person who spoke of it was -- knew what he was talking
9  about?
10         MS. WESTBY: Object to the form of the
11  question.
12         THE WITNESS: I took it as meaning he had
13  some kind of special ammunition. What exactly it was,
14  don't know. We were told it was armor-piercing.
15             (Exhibits 13, 14, and 15
16             identified)
17  BY MR. GOSMAN:
18     Q. Let's go ahead and take a look at
19  Exhibits 13, 14, and 15. And those are the affidavits
20  of Officer Miner that reference his discussions with
21  the confidential informant.
22         And I want you to let me know if you find any
23  reference to armor-piercing information in those
24  affidavits.
25     A. Armor-piercing information?

1      Q. I'm sorry. Armor-piercing ammunition.
2      A. Okay.
3      Q. It might help for you to know that there is a
4  portion of those affidavits that deal specifically with
5  discussions of the confidential informant and there are
6  portions of the affidavit that don't. And I'm just
7  interested in the information that Officer Miner
8  supplied to the Court regarding the confidential
9  informant. And whether there was reference to
10  armor-piercing ammunition.
11         MS. WESTBY: I'm going to object to the form.
12         THE WITNESS: I didn't see any reference to
13  armor-piercing ammunition in the affidavits.
14  BY MR. GOSMAN:
15     Q. When you arrived at the residence of the
16  Wachsmuth's, did you arrive in more than one vehicle?
17     A. Yes.
18     Q. How many vehicles were involved?
19     A. I don't know. We don't have, like, a van or
20  anything that could house a bunch of officers. So we
21  would have wanted to take as few cars as we could. But
22  we would have had to take several.
23     Q. Okay. Who was with you in your car?
24     A. I don't remember. I don't remember if anyone
25  was with me in my car.

1      Q. Did you conduct any intelligence,
2  surveillance at the home before -- after you arrived at
3  the house, but before you conducted the entry?
4      A. No.
5      Q. Did you notice whether or not Bret
6  Wachsmuth's vehicle was at the house?
7      A. I don't remember which vehicles were in the
8  driveway.
9      Q. Did you know or have information about the
10  identity of Bret Wachsmuth's vehicle?
11     A. I knew that he had an SUV.
12     Q. Okay. It's actually described in Officer
13  Miner's affidavit for search warrant, is it not?
14     A. He -- from what I recall just reading, he
15  described three vehicles: A Cadillac, an SUV, and a
16  truck.
17     Q. He also has the license plate numbers on the
18  vehicles, correct?
19     A. Yes.
20     Q. And you had that information before you went
21  to the Wachsmuth home, correct, about the vehicles that
22  were owned by the parties?
23     A. I believe so. I don't remember specifically.
24     Q. If you had known that Bret Wachsmuth was not
25  home, would you have deployed the dynamic entry tactics

1  that were used that night?
2          MR. THOMPSON: Objection as to form.
3          MS. WESTBY: Join.
4          THE WITNESS: It wasn't who was home that
5  determined what tactics were used so much as their
6  actions.
7  BY MR. GOSMAN:
8      Q. Whose actions?
9      A. Whoever was home.
10     Q. So in other words, it didn't make any
11  difference whether Bret Wachsmuth was even home in
12  terms of whether you were going to go forward with a
13  dynamic entry in that house?
14     A. I didn't say that.
15         MS. WESTBY: Object to the form.
16  BY MR. GOSMAN:
17     Q. Well, what are you saying, Officer?
18         MS. WESTBY: Object to the form.
19         MR. THOMPSON: Join.
20         THE WITNESS: I'm saying it was up to the
21  occupants of the house. They determined the amount of
22  force we used. Had they opened the door immediately,
23  we wouldn't have forced it. Wouldn't have broken
24  windows.
25

1  BY MR. GOSMAN:
2      Q.  And they didn't open the door immediately,
3  did they?
4      A.  They did not.
5      Q.  I think, then, what you've said, is that it
6  didn't matter whether Bret Wachsmuth was home or not
7  that night?
8          MS. WESTBY: Object to the form of the
9  question.
10         MR. THOMPSON: Join.
11         THE WITNESS: I didn't know whether Bret
12 Wachsmuth was home or not that night.
13 BY MR. GOSMAN:
14     Q.  Fair enough.
15         My question was:  It didn't matter to you
16 whether Mr. Wachsmuth was home that night or not in
17 terms of going forward with your form?
18         MS. WESTBY: Object to the form.
19         MR. THOMPSON: Join.
20         THE WITNESS: I wouldn't say that it didn't
21 matter.
22 BY MR. GOSMAN:
23     Q.  Well, if it did matter. how did it matter?
24         MR. THOMPSON: Object as to form.
25         MS. WESTBY: Join.

1          THE WITNESS: I thought he was home. I
2  don't -- I don't know where you're going.
3  BY MR. GOSMAN:
4      Q.  Even though his vehicle wasn't there?
5          MS. WESTBY: Object to the form.
6          MR. THOMPSON: Join.
7          THE WITNESS: I didn't know who drove his
8  vehicle.
9  BY MR. GOSMAN:
10     Q.  Well --
11     A.  Again, there were three vehicles listed.  I
12 didn't know who drove which one.  I had never had
13 contact with either one of these individuals.
14     Q.  I think you said that you knew that he drove
15 the dark SUV.
16         MR. THOMPSON: Objection as to form.
17 Misstates his testimony.
18         THE WITNESS: I said I knew he had an SUV.
19 BY MR. GOSMAN:
20     Q.  And that SUV was not in front of the house
21 that night, was it?
22     A.  I don't remember, again, which vehicles were
23 or were not in the driveway  I still don't remember
24 which vehicles were in the driveway.
25     Q.  Was that something that you considered

1  important?
2      A.  Something that I considered --
3      Q.  What vehicles were in or around the house?
4          MS. WESTBY: Object to the form.
5          THE WITNESS: It's a piece of intelligence.
6  It's certainly something that I would try to consider.
7                  (Exhibit 33 identified)
8  BY MR. GOSMAN:
9      Q.  Let's have you go ahead and turn to
10 Exhibit 33.
11     A.  Okay.
12     Q.  Okay.  Do you see that this is an answer
13 filed by the City of Powell and all other named
14 defendants in their official capacities?
15     A.  Yes.
16     Q.  Did you speak with Mr. Thompson at all, prior
17 to the time an answer was filed in your case?
18     A.  Yes.
19     Q.  And you provided him information relative to
20 what happened that night?
21         MR. THOMPSON: Object as to form.  I'm going
22 to direct you not to answer.
23         MR. GOSMAN: Fair enough.
24 BY MR. GOSMAN:
25     Q.  Let's go ahead and turn to Page 8,

1  Paragraph 36. And I want you to read that paragraph
2  into the record.
3          MS. WESTBY: Which paragraph?
4          THE WITNESS: Thirty-six.
5          MS. WESTBY: Okay.
6          THE WITNESS: "In response to Paragraph 36 of
7  the Plaintiff's Complaint, Defendants admit that a
8  primary team consisting of six officers, and five with
9  long guns were to announce, 'police, search warrant'
10 and if the door did not open immediately, the ram was
11 to be used for entry. Defendants deny the remainder of
12 the paragraph."
13 BY MR. GOSMAN:
14     Q.  Okay. And then I want you to go to
15 Exhibit 16. And I want you to look again at the first
16 sentence of the paragraph that begins, "the plan was to
17 knock on the front door."
18     A.  Okay.
19     Q.  And would you agree with me that the
20 statement in Exhibit 16 that you've just looked at is
21 consistent with Paragraph 36 of the answer to the
22 Plaintiff's Complaint?
23         MS. WESTBY: Object to the form of the
24 question. The answer is prepared by the attorneys,
25 probably in large part based on the report. So we're

1   not -- I'm not going to have him testifying about
2   what's in the answer.
3        MR. GOSMAN: I'm asking him if those two
4   statements are consistent.
5        MS. WESTBY: And I'm not going to have him
6   testifying about what's in the answer.
7        MR. GOSMAN: You're not?
8        MS. WESTBY: I'm not.
9        MR. GOSMAN: Well, then we're going to have
10  to call the Magistrate.
11       MS. WESTBY: Okay.
12       MR. GOSMAN: You're refusing to allow him to
13  answer questions about the answer that was filed in
14  this case.
15       MS. WESTBY: I'm not going to have him
16  testifying about what the attorneys put in the answer,
17  whether or not it's consistent with what his report
18  says. No, I'm not.
19       MR. GOSMAN: All right. Then we're going to
20  have to call the Magistrate. Do we have another phone
21  here that we can use?
22       MS. WESTBY: Before we do that. If we're
23  going to go to the Magistrate, I want to get a group of
24  your questions.
25       MR. GOSMAN: You can do that any other time

1   you want. This deposition can't go forward until we
2   get that question answered.
3        MS. WESTBY: Absolutely not. We're going to
4   do this at the same time.
5        MR. GOSMAN: I'm telling you what, I'm going
6   to call the Magistrate and we're going to discuss the
7   question, which is presently in front of us, and that's
8   whether or not this witness will be permitted to
9   testify about the answer that his lawyers filed.
10       MS. WESTBY: Is this really how you want to
11  handle this situation?
12       MR. GOSMAN: No, I'd just assume that you
13  allow this witness to talk about the answer that his
14  lawyers filed for him. It's a pleading. It's answered
15  on his behalf. There's no reason why he cannot answer
16  that question.
17       MR. THOMPSON: Well, the pleading is filed,
18  first of all, on behalf of all of the defendants named
19  in the lawsuit.
20       MR. GOSMAN: I know what a pleading is, Tom.
21       MR. THOMPSON: Well, then --
22       MR. GOSMAN: How many times have you used a
23  complaint to visit with a plaintiff about the actions
24  that they brought in a lawsuit?
25       MR. THOMPSON: I've done that before and

1   usually met with objection from counsel.
2        MR. GOSMAN: Okay. Well --
3        MR. THOMPSON: To be honest with you.
4        MR. GOSMAN: Did somebody tell you that they
5   would not allow their party to answer questions
6   regarding their own pleading?
7        MR. THOMPSON: You know, I don't know.
8        MS. WESTBY: Here's the deal: How long is
9   this going? Are you going to continue to go through
10  our pleadings that were prepared by the attorneys in
11  this case and ask him questions about it, or is this
12  one time and you're just going to ask him if it's
13  consistent with what his report says?
14       MR. GOSMAN: There aren't very many. There's
15  two or three.
16       MR. THOMPSON: And by the way, Counsel,
17  you've got about 25 minutes before the deposition is
18  shut down. You've got seven hours under the rules.
19       MR. GOSMAN: Okay. Well, that doesn't
20  include what it's going to take to take care of this
21  call.
22       I'm happy to go forward if you'll allow just
23  several questions on this issue.
24       MR. THOMPSON: We'll go off.
25       MR. GOSMAN: It's okay.

1                   (Discussion held off the
2                   record.)
3   BY MR. GOSMAN:
4        Q. You've had a chance to look at Paragraph 36
5   of the answer that your attorneys filed in this case.
6        MS. WESTBY: And I'm going to have to -- I
7   don't know. It's filed for the City and defendants in
8   their official capacity. If you will, please be
9   specific about which document you're referring to.
10       MR. GOSMAN: I can do that.
11  BY MR. GOSMAN:
12       Q. Lets start over with the question. You've
13  had a chance to look at Paragraph 36 of the answer of
14  the defendant, City of Powell, and all other named
15  defendants in their official capacities. Which
16  includes your name, does it not? And that would be on
17  Page 1 of 36?
18       A. It's misspelled, but yes.
19       Q. All right. Now, you've also had a chance to
20  look at Exhibit 16, which was the report you filed in
21  this matter. And specifically, the statement: "The
22  plan was to knock on the front door and announce
23  'police, search warrant'. If the door did not open
24  immediately, we would use the ram to force entry."
25       Is that statement in your report consistent

1  with the answer that was fi ed in this case, Exhibit
2  No. 33?
3       MS. WESTBY: Object.
4       MR. THOMPSON: Objection as to form. And I'd
5  note, Counsel, that this is responsive to a
6  Paragraph 36 of the complaint, which we don't have in
7  front of us. And the witness isn't able to review and
8  able to provide an answer to.
9       MR. GOSMAN: All right. Thirty-six, we do
10 have that. It's -- as a matter of fact, at the end of
11 the exhibit, we have Plaintiff's Complaint. So if
12 you'd like to take another minute and look at the
13 paragraph that is referenced in the answer given in
14 Paragraph 36, please do so.
15      MR. THOMPSON: Go ahead, if you can.
16      THE WITNESS: I think I know what the
17 question is, but just to clarify, the information in
18 the answer is substantially the same as the information
19 that is in my report.
20 BY MR. GOSMAN:
21      Q.  All right. And you knew that, correct?
22      MS. WESTBY: Object to the form --
23 BY MR. GOSMAN:
24      Q.  Did you know that at the time the answer was
25 filed?

1       MS. WESTBY: Know what?
2  BY MR. GOSMAN:
3       Q.  That the information -- that you gave -- that
4  the information contained in the answer would be
5  consistent with the information you gave in your
6  reports?
7       MS. WESTBY: Object to the form of the
8  question. You're getting into the attorney-client
9  privilege. You're asking about what we put in the
10 answer. And our discussion with him about what is in
11 the answer. You can't get into that.
12      MR. GOSMAN: I'm simply responding to
13 information that he gave me.
14      MS. WESTBY: And again...
15      THE WITNESS: I just answered the question
16 that -- you asked if they were the same, and I said
17 that they are substantially the same.
18 BY MR. GOSMAN:
19      Q.  And the reason for that you said --
20      A.  I didn't say.
21      Q.  All right. Is the reason for that because
22 the information was contained in the report?
23      MR. THOMPSON: Object. He's not going to
24 answer that question.
25      MS. WESTBY: Object.

1       MR. GOSMAN: All right. I think he did
2  volunteer that information. That's fine, though. 1
3  agree.
4  BY MR. GOSMAN:
5       Q.  Is that information incorrect?
6       MR. THOMPSON: Which information?
7       MR. GOSMAN: The information contained in
8  Paragraph 36 of the answer.
9       THE WITNESS: To the same extent that I would
10 say that the report is not accurate.
11 BY MR. GOSMAN:
12      Q.  Did you -- when did you first discover that
13 the report was not accurate?
14      A.  Probably after we received notice that we
15 were being sued was probably the first time I'd looked
16 at it since I wrote it.
17      Q.  And that would have been before this answer
18 was filed, correct?
19      A.  Probably.
20      Q.  Did you make any effort to correct that
21 mistake before the answer was filed?
22      MS. WESTBY: Object to the form of the
23 question. That's attorney-client privilege.
24      MR. GOSMAN: No.
25      MS. WESTBY: Yes. We prepared the answer.

1  Any communication that he had with us about the answer
2  is attorney-client privilege.
3       MR. GOSMAN: I'm not talking about
4  communication. I'm saying did he make any effort to
5  correct the mistake.
6       MS. WESTBY: Who would he have had to call to
7  correct that mistake? His attorneys. We were the ones
8  to prepare the answer.
9       MR. GOSMAN: It's not attorney-client
10 information.
11      MS. WESTBY: It is attorney-client
12 communication. Absolutely.
13      THE WITNESS: You want me to answer?
14      MS. WESTBY: No.
15      MR. GOSMAN: Yes.
16      MS. WESTBY: No. It's attorney-client
17 privilege.
18 BY MR. GOSMAN:
19      Q.  All right. You were aware that there was a
20 mistake in your report prior to the time that the
21 attorneys answered the complaint?
22      MR. THOMPSON: Objection as to form.
23 BY MR. GOSMAN:
24      Q.  Filed the answer. I'm sorry. It's well
25 taken.

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 63 of 91
Tricia Wachsmuth v.                                                                    Mike Chretien
City of Powel, et al.                                                             October 05, 2010

1  A.  With the verbiage, yes.

2  Q.  All right.  Now, I don't want to know what
3  you said to your attorneys.  But did you undertake any
4  effort to correct that mistake?

5        MS. WESTBY: Object to the form of the
6  question.

7  BY MR. GOSMAN:

8  Q.  Prior to the time the answer was filed?

9        MS. WESTBY: Object.  It's attorney-client
10  privilege.  Instruct him not to answer.

11       You're asking him if he made any effort to
12  correct our answer to his -- to the complaint.

13       MR. GOSMAN: I an..  And I certainly can ask
14  him that question.

15       MR. THOMPSON: No.  No, you can't.  Because
16  it's communication.  She's exactly -- Misha is exactly
17  right.  How would he correct?  Would he get on PACER
18  and do an interlineation?

19       MR. GOSMAN: No.  No.  I think we all
20  know what I mean here.

21       MR. THOMPSON: Yeah.

22       MR. GOSMAN: Did he make any effort to
23  correct that information before it went into the
24  answer.

25       MR. THOMPSON: Counsel, we can get the

1  Magistrate on the phone now, if you like, but he is not
2  going to answer any questions about communication with
3  me.  Absolutely not.

4        MR. GOSMAN: All right.  Let's get him on the
5  phone.

6        MR. THOMPSON: Call him.

7        THE COURT REPORTER: Am I off the record?

8        MR. GOSMAN: Yes you're off the record.

9        (Recess taken 4:57 to 5:02

10       p.m., October 5, 2010)

11       MS. WESTBY: That is a yes or no.

12  BY MR. GOSMAN:

13  Q.  What effort did you make -- I'm sorry.

14       Did you make an effort to correct the mistake
15  that you discovered in your report after the action had
16  been filed, but before the answer had been filed?

17       MS. WESTBY: Or -- I don't know.  But don't
18  provide additional informat on.

19       THE WITNESS: I understand.

20       No.

21  BY MR. GOSMAN:

22  Q.  Thank you.  We are so close.

23       The distraction device was thrown in the
24  window in order to protect the child?

25  A.  No.

1  Q.  It was thrown in the window why?

2  A.  It wasn't thrown.

3  Q.  Dropped and placed in the window.

4  A.  For a number of reasons.  One of which was to
5  cause a distraction as it is a distraction device.

6  Q.  One of which was -- go ahead.

7        The other reasons being?

8  A.  As we understood it, there were numerous
9  firearms kept in that particular room.

10       MR. THOMPSON: Counsel, he's already answered
11  all of this.

12       MR. GOSMAN: Well, he has answered that.

13  BY MR. GOSMAN:

14  Q.  All right.  It was basically to create a
15  distraction because of the threat that you felt to
16  officer safety, correct?

17  A.  That was one of the reasons, yes.

18  Q.  One of the reasons.  Now, this will go a lot
19  faster if you can just tie it up for me.

20       What other reasons were there for deploying a
21  distraction device in that house?

22       MS. WESTBY: Object to the form.  Asked and
23  answered.

24       THE WITNESS: Like I said before, in addition
25  to just a distraction, to deny that room to someone who

1  could potentially be going into it for weapons.

2        One other reason was we did not believe there
3  was a child in the house, which there was not, that
4  they would be in Bret and Tricia's bedroom.

5  BY MR. GOSMAN:

6  Q.  Okay.  Is there any evidence that that issue
7  was ever discussed by anybody in the record that we
8  have here -- the reports?

9        MR. THOMPSON: Objection as to form.

10       MS. WESTBY: Join.

11       MR. THOMPSON: I want you to look through all
12  457 pages --

13  BY MR. GOSMAN:

14  Q.  You've got Exhibit 16 in front of you.
15  There's no reference to deployment of the flashbang
16  device in that bedroom upon the belief that the child
17  would not have been in that room, correct?

18  A.  I didn't make any reference to any of the
19  other reasons either.

20  Q.  All right.  And there's no reference in
21  Exhibit 10, which we have been talking about quite a
22  bit today as well?

23  A.  What Exhibit 16 says is based on the
24  information received and my knowledge, training, and
25  experience on numerous narcotics search warrants.  1

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 64 of 91
Tricia Wachsmuth v.                                                Mike Chretien
City of Powel, et al.                                          October 05, 2010

1   decided to take extra precautions to minimize the
2   chance of someone getting hurt. Someone would include
3   a child.
4         Those extra precautions included planning
5   multiple breaches, simultaneously using as many
6   officers as I had available. And introducing the noise
7   flash distraction device or flashbang.
8   Q.  All right. Did you participate in any of the
9   interviews with the Wachsmuth's?
10  A.  No. I was present at both locations, but I
11  didn't interview either one.
12  Q.  And do you know whether Bret Wachsmuth was
13  armed when he was found?
14  A.  He did not have a firearm.
15  Q.  Did he put up any resistance?
16  A.  No.
17  Q.  Did you really expect he would?
18        MR. THOMPSON: Objection as to form.
19        MS. WESTBY: Join
20        THE WITNESS: I'll tell you, I was a little
21  anxious.
22  BY MR. GOSMAN:
23  Q.  Well, of course you're a little anxious any
24  time you're involved in an operation like that, aren't
25  you? I mean, you just broke in his house --

1         MR. THOMPSON: I won't object.
2   BY MR. GOSMAN:
3   Q.  -- with five police officers at least.
4         Oh, let me ask this question: Did you know
5   that you'd started a fire in the bedroom?
6   A.  We didn't.
7   Q.  You didn't know that?
8   A.  We didn't start a fire.
9   Q.  Did you know the flashbang device started a
10  fire?
11  A.  The flashbang device didn't start a fire.
12  Q.  Pardon?
13  A.  The flashbang device did not start a fire
14  either.
15  Q.  What started the fire in the bedroom?
16  A.  There was no fire in the bedroom.
17  Q.  There was no fire in the bedroom?
18  A.  That's exactly what I just said.
19  Q.  All right. That's fine. Did you notice any
20  smoke in the house?
21  A.  There was some smoke associated with the
22  flashbang.
23  Q.  Did the smoke alarm go off?
24  A.  I don't recall.
25  Q.  Have you seen the photographs that the

1   Wachsmuth's provided where there was a -- it was of the
2   interior of the house and there was a picture of the
3   pillow that had been burned out and bedding that had
4   been burned out?
5         MS. WESTBY: Object --
6   BY MR. GOSMAN:
7   Q.  Have you seen those, that's all I want to
8   know?
9         MS. WESTBY: I'm going to object to the form
10  of the question. It misstates the evidence.
11        THE WITNESS: I think the only pictures I'm
12  familiar with would be the ones that were attached to
13  the case, the ones we would have taken.
14  BY MR. GOSMAN:
15  Q.  Did you know that the bed was located
16  directly under the window where the flashbang device
17  was dropped?
18        MS. WESTBY: Object to the form of the
19  question.
20        MR. THOMPSON: Join.
21        THE WITNESS: Not before we did the search
22  warrant.
23  BY MR. GOSMAN:
24  Q.  Did you learn that afterwards?
25  A.  I did.

1   Q.  Do you have an e-mail address by which you
2   have communicated with any of the other police officers
3   in this case about this occasion?
4   A.  Yes.
5   Q.  What is that e-mail address?
6   A.  Mchretien@cityofpowell.com. I even got a
7   special folder for it.
8   Q.  Okay. And have you produced all of that
9   e-mail to your attorneys, other than the e-mail that
10  would be directed to the attorneys?
11  A.  All of the e-mails prior to the lawsuit would
12  have gone to the attorneys. Anything since then, like
13  I said, I've kept it in a special folder so that if
14  somebody needs to look at it, they can.
15  Q.  Okay.
16  A.  But every time there's an e-mail, I don't
17  send it. It usually just deals with when something is
18  going to occur or something.
19        (Exhibit 36 identified)
20        MR. GOSMAN:
21  Q.  Go ahead and take a look at Exhibit 36 for a
22  second. Oh, you can't do that. All right.
23        MR. THOMPSON: I'm trying to get it to 36.
24        MR. GOSMAN: Sure.
25        MR. THOMPSON: There's two exhibits marked

MIKE CHRETIEN - October 5, 2010                    Page 249
Direct Examination by Mr. Gosman

1  35, Counsel.
2      MR. GOSMAN: Yes there are. I'm looking for
3  the e-mail. I think it's the first one. It's that
4  one. I've got to get that pulled out of there.
5      THE WITNESS: This e-mail?
6  BY MR. GOSMAN:
7  Q.  Yes. There's group of e-mail. I'd like you
8  to look through there and see -- I don't see anything
9  with your name on it. And I'll represent to you that
10 this was the e-mail that was provided by counsel in
11 response to my request for all e-mail.
12 A.  There's one sent to me from Al Kent. Do you
13 want me to read it?
14 Q.  Which one is it? Go ahead. It's short.
15 A.  "Mike, could you make sure that Chapman
16 writes his evidence report for Miner's 09-223" --
17 Q.  Okay.
18 A.  -- "job assignments, what was found and
19 where. I asked him to Saturday, and it didn't get
20 done. Miner has to have the report to the county
21 attorney first thing Monday morning. Alan."
22 Q.  All right.
23 A.  Okay. That was the only one that I saw.
24 Q.  All right. And were there other e-mail that
25 you sent back and forth in connection with this case?

MIKE CHRETIEN - October 5, 2010                    Page 251
Direct Examination by Mr. Gosman

1      MS. WESTBY: And that's fine. We'll update
2  it if it's something that you're entitled to.
3      MR. GOSMAN: Okay. Very good. I don't
4  believe I have any other questions, Officer. Thank you
5  very much. Appreciate your time.
6      MS. WESTBY: Okay. We'll read and sign.
7      (Proceedings concluded at 5:14
8      p.m., October 5, 2010.)

MIKE CHRETIEN - October 5, 2010                    Page 250
Direct Examination by Mr. Gosman

1  A.  I think that was the only one from Alan. I
2  would have just responded okay.
3  Q.  You got another folder now that has
4  additional e-mail in it?
5      MR. THOMPSON: Since the lawsuit started.
6      THE WITNESS: Since the lawsuit started.
7  BY MR. GOSMAN:
8  Q.  Since the lawsuit started.
9  A.  It would have been instructions from Tim or
10 the attorneys.
11     MR. THOMPSON: And there's an objection,
12 Counsel, on the record, as to e-mails that are subject
13 to the attorney-client privilege or --
14     MR. GOSMAN: I understand that. Certainly.
15 BY MR. GOSMAN:
16 Q.  But I take it that some of these e-mails are
17 not directed to your attorney. They are directed to
18 the other officers in this folder?
19 A.  I'm sure.
20     MR. GOSMAN: I'm going to ask for them. I
21 think I've already asked for them. And you can review
22 them and decide what you're going to do with them. But
23 I'm going to ask that you supply those to your counsel
24 as part of something -- I've already previously
25 requested.

MIKE CHRETIEN - October 5, 2010                    Page 252
Direct Examination by Mr. Gosman

1          DEPONENT'S CERTIFICATE
2      I, Mike Chretien, do hereby certify, under
3  penalty of perjury, that I have read the foregoing
4  transcript of my testimony consisting of 251 pages,
5  taken on October 5, 2010 and that the same is, with any
6  changes noted below, a full, true and correct record of
7  my deposition.
8  PAGE  LINE      CORRECTION        REASON FOR CORRECTION
9  ___  ___  _____   _____
10 ___  ___  _____   _____
11 ___  ___  _____   _____
12 ___  ___  _____   _____
13 ___  ___  _____   _____
14 ___  ___  _____   _____
15 ___  ___  _____   _____
16 ___  ___  _____   _____
17 ___  ___  _____   _____
18 ___  ___  _____   _____
19 ___  ___  _____   _____
20 ___  ___  _____   _____
21 ___  ___  _____   _____
22
23
24              _____
25               Mike Chretien    Date

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 66 of 91
Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

 1                    CERTIFICATE

 2          I, VONNI R. BRAY, Registered Professional

 3   Reporter, and Notary Public for the State of Montana,

 4   do hereby certify that MIKE CHRETIEN was by me first

 5   duly sworn to testify to the truth, the whole truth,

 6   and nothing but the truth;

 7          That the foregoing transcript, consisting of

 8   252 pages, is a true record of the testimony given by

 9   said deponent, together with all other proceedings

10   herein contained.

11          IN WITNESS WHEREOF, I have hereunto set my

12   hand this 19th day of October, 2009.

13

14

15

16

17

18

19

20

21   _____

22   Vonni R. Bray, RPR
     P. O. Box 125
23   Laurel, MT 59044
     (406) 670-9533 Cell
24   (888) 277-9372 Fax
     vonni.bray@yahoo.com
25

**[**

**[sic] (1)**
222:8

**0**

**05 (2)**
109:8;110:16
**06 (10)**
110:17,18,19,20,21,
22;111:2,3,4,5
**09 (1)**
109:7
**09-223 (1)**
249:16

**1**

**1 (9)**
17:11,13;48:9;62:2;
81:11;178:1;213:5,6;
236:17
**10 (20)**
48:6,9;84:12;121:3,
11;123:9;126:20;157:2;
164:14;169:11;170:8;
171:8;177:21,22;
179:13;185.19.25:213:3,
22;244:21
**10- (1)**
137:21
**10:43 (1)**
75:9
**100 (1)**
176:7
**11 (6)**
72:22.25;73:17;74:19;
136:13;138:8
**11- (1)**
137:22
**116 (2)**
22:3,5
**12 (3)**
73:15;109:7;120:17
**12/9 (2)**
109:8;110:16
**12:51 (1)**
146:12
**1220 (2)**
100:10,11
**12-man (1)**
137:22
**13 (2)**
225:15,19
**14 (2)**
225:15,19
**15 (2)**
225:15,19
**16 (16)**
35:4;167:13,15,17;
169:11;170:8;171:7;

174:19;176 22;220:22;
224:3;232:15,20;
236:20;244:14,23
**18 (4)**
75:19;76:5,9;77:17
**1818 (1)**
110:25
**187 (1)**
22:4
**19 (1)**
76:5
**1991 (1)**
10:12
**1993 (1)**
11:3
**1995 (2)**
12:9,13

**2**

**2 (8)**
17:21;18:17;22:11,13;
24:4;78:8,2-;79:23
**2:25 (1)**
146:12
**20 (3)**
76:5;122:21,133:1
**2000 (2)**
12:16;13:2
**2002 (9)**
12:12,13,25 13:10,21,
23;14:3,10;15:1:18
**2005 (5)**
22:3,5,20;31:4;107:20
**2006 (2)**
21:17;22:2
**2007 (5)**
14:10;21:3,9,20;22:1
**2008 (2)**
14:21;15:6
**2009 (14)**
7:21;16:9;17:19;
44:14;46:18 59:11,16;
62:7;67:17;77:11;79:4;
101:8;106:11;177:18
**2010 (7)**
75:10;146:13;176:19;
196:4;224:1 242:10;
251:8
**20th (1)**
110:20
**21 (1)**
76:5
**22 (2)**
75:19;76:5
**24 (1)**
101:8
**24th (7)**
44:14;46:18.67:17;
77:10;79:4:8 :2;106:10
**25 (2)**
113:17;235:17
**250 (1)**

6:16
**26 (1)**
29:20
**27 (7)**
29:20;61:13,16;62:13,
14,21;63:3
**27th (1)**
110:19
**28 (2)**
63:16,19
**280 (1)**
22:7
**29 (7)**
65:11,13;69:7;74:6;
75:13;91:8:92:22

**3**

**3 (4)**
30:19,21;34:9;150:5
**3:04 (1)**
176:18
**3:10 (1)**
176:18
**3:37 (1)**
196:3
**3:45 (1)**
196:3
**30 (5)**
62:24;63:1,2;122:21;
133:1
**31 (2)**
99:5,8
**33 (3)**
231:7,10;237:2
**35 (3)**
107:11,14;249:1
**36 (12)**
232:1,6,21;236:4,13,
17;237:6,14;239:8;
248:19,21,23
**39 (1)**
64:14

**4**

**4 (11)**
28:15,20,21,23;30:1;
35:4;46:22;76:25;92:21;
172:24,24
**4:21 (1)**
223:25
**4:27 (1)**
223:25
**4:57 (1)**
242:9
**40 (5)**
190:6;191:1,8;193:19;
196:8
**400 (2)**
170:14,21
**41 (2)**
204:15;212:22

**42 (2)**
64:23;65:1
**457 (1)**
244:12
**4th (2)**
59:11;107:19

**5**

**5 (15)**
28:21;29:22,25;43:7;
47:25;75:10;77:19;
116:2;146:13;150:9;
176:19;196:4;224:1;
242:10;251:8
**5:02 (1)**
242:9
**5:14 (1)**
251:7
**50 (1)**
49:3
**50-hour (1)**
104:13

**6**

**6 (5)**
50:12,14;52:13;54:22;
116:2
**67 (1)**
65:21

**7**

**7 (6)**
16:10;74:8;113:13,15;
114:15;178:1
**73 (3)**
69:7,9;74:7

**8**

**8 (4)**
70:17;118:20,23;
231:25
**80 (4)**
15:17;22:2;75:18;
77:18
**81 (4)**
75:15;76:8,9;81:6
**82 (1)**
22:1
**84 (1)**
75:19

**9**

**9 (4)**
72:5;120:6,10,14
**9/3/2005 (1)**
104:2
**9:00 (1)**
167:11

**90 (1)**
26:22
**95 (1)**
12:16
**9th (1)**
109:6

**A**

**ability (4)**
8:6,10;175:12;186:5
**able (7)**
58:15;71:23;93:3,19;
178:24;237:7,8
**absolutely (11)**
45:1;69:5;121:18;
135:10;168:3,7;208:6;
211:3;234:3;240:12;
242:3
**abusers (1)**
143:1
**abusing (1)**
145:12
**academy (6)**
13:16,19.25;15:4,11,
13
**accept (1)**
152:9
**accepted (1)**
121:24
**access (1)**
216:1
**accessibility (1)**
140:17
**accompanied (1)**
137:7
**accomplished (1)**
222:9
**accomplishing (1)**
184:19
**according (1)**
159:21
**accurate (9)**
49:4;73:2;175:1,5;
176:6,7;187:4;239:10,13
**accused (1)**
8:16
**achieve (1)**
16:4
**acquired (1)**
148:10,19
**acquisition (2)**
70:24;72:14
**across (1)**
162:6
**act (3)**
142:12;216:25;217:12
**action (10)**
16:24;17:9;51:13;
63:22;64:6;76:14;77:12;
132:7;172:7;242:15
**actions (4)**
52:2;228:6,8;234:23

Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

**active (3)**
12:15;50:1;110:18
**activity (1)**
66:4
**actual (3)**
104:16;111:24;169:23
**Actually (12)**
16:19;36:5;39:19;
50:5;60:23;70:12;76:9;
150:23;183:19;202:5;
205:4;227:12
**adapt (1)**
76:17
**add (1)**
21:18
**added (4)**
75:23;122:11;172:17,
18
**addition (1)**
243:24
**additional (3)**
51:4;242:18;250:4
**address (4)**
6:15;78:23;248:1,5
**addressed (1)**
83:7
**addressing (1)**
174:15
**admit (2)**
110:23;232:7
**adult (3)**
122:3,3,4
**adults (1)**
160:18
**advance (1)**
40:10
**advanced (3)**
25:10,16,17
**advice (1)**
133:17
**Affairs (1)**
20:16
**Affected (2)**
47:13,14
**affects (1)**
145:16
**affidavit (1)**
127:13;226:6;227:13
**affidavits (5)**
127:13;225:19,24;
226:4,13
**affirmed (2)**
115:20,24
**afraid (1)**
152:22
**after-action (3)**
50:16;51:8;52:1
**afternoon (1)**
30:14
**afterwards (1)**
247:24
**again (54)**
5:15;6:1;11:25;16:14;

30:18;36:10.42:6;46:9;
52:5;59:25;63:7;71:17;
74:21;75:13.81:6;84:9;
87:13;90:13.23,25;
110:16;111:19;132:5;
139:25;145:6,20;
147:15;157:3,11;158:8;
161:9;162:14;164:23;
165:20;167:11;178:3;
180:16;183:13;184:4,
25;187:17;188:1;
191:21,23;198:4;199:2;
207:19;209:1;216:13;
219:2;230:11,22;
232:15;238:14
**against (11)**
5:20;9:2;10:2;16:12;
50:22;137:21;159:20;
205:17,18,2 6:25;
217:12
**age (4)**
9:23;121:15;122:1,1
**agencies (2)**
56:15;147:22
**agency (6)**
26:6;48:23;58:14;
60:23;66:3,25
**agency's (1)**
59:22
**agent (1)**
180:13
**ago (5)**
46:12;88:2;135:4;
162:18;176:24
**agree (33)**
9:4;19:11;36:24;
40:25;41:3;43:10;44:2;
54:4;59:20;65:22;66:8;
67:1;71:23;77:3,6,9;
78:10,25;83 23;114:6,
13,16;119:24;127:22;
128:4;138:7 170:24;
174:18;177:17;180:18;
209:23;232: 9;239:3
**ahead (82)**
5:14;7:25;10:4;17:20;
20:4;21:1,16;22:13;
23:25;24:12.28:17,19;
29:9,24;31:24;33:9;
34:16;35:15 42:6;43:6;
44:11;45:19 46:9;48:8;
50:14;59:4;61:15;62:14;
63:18;64:12.65:20,24;
67:16;69:6,7;73:15;
77:2;78:4.23;79:12;
84:11,12;90 2;92:15;
99:7;100:9;102:20;
107:13;108: 8;114:1,
23;115:21;1 8:22;
144:9;146:10;157:2,6;
158:21;160:7;177:6;
184:3;185:13;191:15;
192:8;197:4.198:3;

204:14;205:5;206:2;
208:14;209:9;214:6;
215:14;217:20;223:23;
225:18;231:9,25;
237:15;243:6;248:21;
249:14
**aimed (3)**
71:1,4;72:16
**Al (1)**
249:12
**Alan (2)**
249:21;250:1
**alarm (1)**
246:23
**allow (10)**
46:4,6;136:3;167:3;
178:7;180:8;233:12;
234:13;235:5,22
**allowed (4)**
28:6;166:18,18,25
**almost (1)**
75:7
**alone (5)**
128:21;129:1,5,20,25
**along (2)**
54:17;138:7
**alternative (1)**
182:18
**always (2)**
44:3;143:21
**ammunition (13)**
128:6;224:4,11,21,22,
22;225:2,2,7,13;226:1,
10,13
**among (1)**
31:14
**amount (7)**
66:6,8;173:9,13,16;
177:13;228:21
**animals (2)**
145:14,15
**Anna (1)**
7:23
**announce (8)**
81:19;82:17,19;83:4;
159:3;168:22;232:9;
236:22
**announced (1)**
173:14
**announcing (1)**
187:1
**answered (33)**
42:4;45:25;53:17;
67:13;90:11,25;91:4;
94:17;130:17,17;144:8;
161:7;174:12;186:9;
188:20;197:2,9;203:18;
210:8;211:17,22,23;
218:1,19;220:10;223:6;
234:2,14;238:15;
240:21;243:10,12,23
**anxious (2)**
245:21,23

**anymore (1)**
55:23
**apartment (2)**
79:14;80:22
**apologize (2)**
109:24;110:11
**apparently (3)**
86:14;161:25;201:22
**appear (1)**
76:1
**appeared (3)**
121:25;155:9;210:15
**appears (3)**
20:23;23:1;46:19
**application (1)**
115:16
**applied (3)**
13:13;19:23;46:19
**appreciate (3)**
82:21;110:12;149:11;
251:5
**appropriate (9)**
43:11,17;46:21;47:2;
60:22;79:1;136:12;
199:7;221:17
**approximately (2)**
14:25;15:15
**April (1)**
110:21
**area (22)**
19:10,16;32:13;67:10,
20;70:25;71:12;72:15;
100:7;115:19,23;116:2;
159:18.172:23;175:9;
188:25.189:14,17,20;
192:5;195:10;207:7
**areas (6)**
28:12;33:24;52:19;
53:23;198:19;199:8
**argue (1)**
209:11
**argument (1)**
179:10
**Argumentative (4)**
91:1;125:19;135:21;
158:24
**arise (1)**
37:20
**armed (2)**
129:5;245:13
**armor (1)**
224:11
**armor-piercing (12)**
224:4,20,21;225:2,2,7,
14,23,25;226:1,10,13
**Army (3)**
12:16,20,25
**around (10)**
15:5;70:8;96:2;97:3;
116:3;122:1,1;193:16;
195:10;231:3
**arrange (1)**
172:19

**arrangement (1)**
23:21
**arrest (10)**
80:3;92:18,24;93:1,3;
97:16;125:10;156:2;
184:19;218:4
**arrested (2)**
8:13;97:10
**arrests (1)**
78:9
**arrive (1)**
226:16
**arrived (5)**
94:24;154:16;171:14;
226:15;227:2
**articles (1)**
23:13
**Aside (4)**
34:6;142:20;148:21;
156:23
**aspect (1)**
107:2
**aspects (1)**
50:11
**assault (1)**
49:25
**assign (2)**
99:13,14
**assigned (11)**
20:19;25:25;32:22;
68:9,17;99:17;148:23;
151:18;206:19.21,23
**assignment (3)**
33:3;76:19;95:6
**assignments (1)**
59:21;186:1,3;249:18
**assist (2)**
67:23;223:15
**associate (1)**
11:14
**associated (1)**
246:21
**Associate's (2)**
10:25;11:20
**Association (2)**
30:8,23
**assume (19)**
11:14;12:22;15:21;
31:15;41:22;74:24;75:1,
2,5;86:3;121:12,24;
127:10;134:19;141:8;
150:16;204:25;207:1;
234:12
**assumed (1)**
161:14
**assuming (2)**
162:6;195:20
**attached (2)**
73:3;247:12
**attachment (1)**
122:12
**attempt (2)**
159:3;218:2

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 69 of 91

Tricia Wachsmuth v.                                                    Mike Chretien
City of Powel, et al.                                              October 05, 2010

**attend (2)**
 32:15;112:21
**attended (9)**
 10:18;22:18;32:5;
 63:24;98:22;112:8,19;
 150:7;199:25
**attends (1)**
 25:13
**attention (1)**
 167:17
**attorney (2)**
 249:21;250:17
**attorney-client (8)**
 238:8;239:23;240:2,9,
 11,16;241:9;250:13
**attorneys (11)**
 232:24;233:16;
 235:10;236:5:240:7,21;
 241:3;248:9,10.12;
 250:10
**August (2)**
 14:10;111:4
**author (2)**
 90:8,23
**authorized (1)**
 115:5
**Automatic (2)**
 55:3,4
**available (6)**
 55:1;66:25;122:15;
 144:11;183:20;245:6
**average (1)**
 26:21
**aware (12)**
 20:8;50:21;61:3;
 66:10;67:21;96:15;
 122:11,12;147:12;
 153:4;171:5;240:19
**away (5)**
 93:12;162:4,8,20;
 197:9

**B**

**back (36)**
 11:17;21:17;25:20;
 30:20;38:21;44:12;
 46:22;54:6;62:2;72:24;
 74:6;80:10:91:7;92:11;
 97:1;102:3;112:16;
 121:3;140:2;143:11;
 146:14;157:11;159:10;
 162:14,14;164:13:166:7,
 10;177:18,21;189:14,17;
 193:20;212:17;213:3;
 249:25
**background (4)**
 8:24:9:5:10:5;98:9
**backs (2)**
 192:22,23
**backyard (1)**
 167:22
**bad (2)**

 183:25;223 20
**badger (1)**
 144:25
**Badgering (5)**
 44:22,24;45:15;90:25;
 158:24
**Bagnell (1)**
 213:10
**Ballpark (1)**
 49:15
**barked (4)**
 171:15,18,22;172:5
**barred (1)**
 53:14
**barricaded (6)**
 24:17;50:2;53:13;
 111:3,3;143:15
**based (25)**
 26:7;58:25;79:3;
 90:18;119:11;128:10;
 130:21;133 4;137:15,
 16;154:24;155:5,6;
 156:16;161 11,24;
 165:1;175:16;185:2;
 190:9;204:12;205:1,24;
 232:25;244 23
**basement (18)**
 79:23;139:11;153:19;
 190:20,21;195:13:
 197:20;200·18;204:13;
 206:21;207:12;208:16;
 211:11,13;212:12;214:2,
 7,9
**basements (1)**
 214:3
**basic (3)**
 24:2;31:18,20
**basically (2)**
 56:2;243:14
**basis (5)**
 57:11;129:19;135:8;
 136:12;137:1
**Bates (3)**
 29:19;62:23;64:25
**Bates-stamp (1)**
 65:20
**Bates-stamped (6)**
 63:2;64:14,14;69:9;
 77:18;100:10
**bathroom (5)**
 189:4,7,11,·5;207:10
**battering (5)**
 46:19;55:7,.4;187:7;
 219:22
**bearing (1)**
 57:17
**beat (1)**
 96:2
**became (2)**
 214:8,9
**bed (1)**
 247:15
**bedding (1)**

 247:3
**bedroom (32)**
 82:2;100:2;157:10;
 159:9,12,14,17,22;
 160:1,13,17,25;161:1,3,
 15,18;164:9;189:2,10,
 12,23,24;191:24;193:24;
 194:20;218:12;244:4,
 16;246:5,15,16,17
**bedrooms (3)**
 189:1,9,15
**beforehand (2)**
 41:6;51:13
**began (1)**
 13:9
**begin (3)**
 13:22;15:21;49:2
**begins (3)**
 6:3,11;232:16
**behalf (2)**
 234:15,18
**behaving (1)**
 46:7
**behind (19)**
 24:23;173:1;187:14,
 18,19,20;188:6,8,10,14;
 201:25;202:1;203:16,20,
 21;204:9;206:3,6,11
**belief (1)**
 244:16
**Bell (1)**
 13:7
**below (2)**
 70:17;73:25
**besides (1)**
 222:16
**Bessler (2)**
 9:24;133:8
**best (15)**
 8:2;26:14,16;75:5;
 91:17;94:10;105:19;
 149:7,12;152:7;155:19;
 175:2,11;186:5;204:17
**Best-case (1)**
 159:3
**better (3)**
 26:22;180:17;181:16
**beyond (5)**
 10:14,16;68:15;
 134:10;173:3
**big (7)**
 80:7,14,15;139:4,5;
 207:7,12
**binder (1)**
 23:10
**bit (1)**
 244:22
**Blackmore (12)**
 121:22;148:22;149:2;
 153:5,11,20;155:6,18;
 156:7,14;162:5,18
**Blackmore's (3)**
 154:24;161:25;162:9

 247:3
**blast (1)**
 112:9
**block (3)**
 116:5;162:8;202:18
**bluff (12)**
 197:12,14;198:7;
 200:23;201:19;208:9,
 23;209:2;211:12,19,24;
 212:11
**bluffing (4)**
 198:14;208:15;209:8;
 210:1
**board (11)**
 48:16;86:18;88:1;
 89:2,6,12;90:14;151:9,
 11,14,16
**boards (3)**
 86:8,10;87:21
**body (2)**
 101:11;111:23
**bolded (1)**
 77:6
**book (6)**
 23:9,9;28:22;30:12,
 13,17
**borrow (1)**
 204:20
**both (8)**
 6:3;17:15;20:6;70:9;
 80:3;185:16;203:7;
 245:10
**bottom (12)**
 47:24;90:3;103:17;
 115:1;116:5;150:10;
 167:18;177:5;198:11;
 214:7,9,11
**boy (1)**
 180:14
**branch (1)**
 12:19
**breach (5)**
 34:18;39:19;47:25;
 150:11;152:3
**breached (3)**
 173:6,11;174:5
**breaches (1)**
 245:5
**Breaching (34)**
 30:24;31:7,16;32:1,
 14,18,19,21,24;33:5.13;
 34:14,23;35:6,9,12;36:3,
 13,24;39:20;40:20,24;
 41:6,17,24;42:1,15,18;
 43:1;44:3,17;46:22;
 49:24;150:6
**break (13)**
 6:6,10:23:23;30:18;
 39:16;75:6;100:1;
 146:11;157:9,11;
 176:16;195:25;223:23

**breaks (1)**
 91:25
**Bret (23)**
 9:23;97:21;140:19;
 141:18,24;144:3;
 148:19;159:21;161:13;
 189:3;197:2;216:16;
 217:8,11;222:20;227:5,
 10,24;228:11;229:6.11;
 244:4;245:12
**Brett (1)**
 141:17
**brief (1)**
 6:22
**bring (7)**
 9:14;28:25;29:14;
 30:14,17,18;181:14
**hringing (1)**
 137:17
**broaden (1)**
 108:3
**broke (1)**
 245:25
**hroken (3)**
 159:10,10;228:23
**brought (3)**
 17:8;145:13;234:24
**budgetary (1)**
 66:5
**build (1)**
 155:8
**building (4)**
 49:22;81:15;110:20;
 158:14
**bulleted (7)**
 43:9,24;65:6;120:15;
 150:18;151:22;152:2
**bunch (2)**
 23:13;226:20
**burned (5)**
 79:16;80:19;81:2;
 247:3,4
**bush (1)**
 96:3
**buzzing (1)**
 112:10

**C**

**Cadillac (1)**
 227:15
**call (19)**
 56:17,20;57:2;60:8,8;
 129:14;145:4;197:12;
 198:7;202:21;204:15;
 209:2;224:24;233:10,
 20;234:6;235:21;240:6;
 242:6
**called (17)**
 25:12;54:15,16,16;
 58:21;62:1;85:2;98:6;
 113:17;197:13;200:23;
 208:9;211:12,19,24;

212:11;222:21

**calling (4)**
132:12;135:8:136:13,
13

**calls (4)**
64:18;165:5,19;210:3

**came (14)**
73:6;82:19;92:11;
93:4;112:16;123:7;
125:10;146:5:153:25;
156:13;174:14;187:15;
188:9;189:14

**can (81)**
5:19,20;17:4,22;19:8,
15;21:11,12;23:19,21,
23;24:8;29:2,16;30:18;
35:19;37:15;38:24;39:1,
7,8,16;42:7,8:56:3,20;
57:2;61:16;66:21;70:9;
75:6,8;79:11;90:10;
94:1,10;101:15;102:3;
126:9;130:19;139:21,
24;143:11;144:9;145:5;
146:10;149:25;152:1;
158:12;163:22;165:24;
168:9;170:10.17,18,20;
176:15,15;179:6,7,9;
183:5,11;184:3;187:20;
190:2;198:3;204:19,24;
205:1;212:17;213:5;
233:21,25;236:10;
237:15;241:13,25;
243:19;248:14;250:21

**capability (1)**
59:22

**capacities (2)**
231:14;236:15

**capacity (4)**
7:5,8,22;236:8

**capped (1)**
77:6

**captain (1)**
51:2

**caption (2)**
113:21;192:8

**car (3)**
152:13;226:23,25

**care (10)**
30:5;44:18;88:23;
104:10;110:3,4;115:9;
188:23;222:23;235:20

**career (1)**
13:9

**carry (4)**
76:19;195:4;197:4;
225:1

**cars (3)**
152:13,15;226:21

**case (21)**
9:1,9;41:7;43:11,21;
48:2;75:5;117:6;132:19;
147:3;159:7;169:6;
223:12;231:17;233:14;

**certain (16)**
7:9;18:3,4;40:23;
54:14;56:16;70:12;
82:13,14;87 18;120:12;
155:7;172:4;203:1;
221:2;224:18

**Certainly (12)**
19:8;35:19:38:1;
83:25;89:18;110:9;
129:7;181:33;184:20;
231:6;241:13;250:14

**certification (16)**
15:1,5;18:1 19,21,24;
19:1,5,6,23.25;20:2,21;
25:11,16,17

**Certification (5)**
17:24;18:13,14,16;
20:8

**certified (5)**
14:22;17:23;19:9,9,16

**chain (1)**
6:23

**chalkboard (1)**
86:18

**challenge (2)**
15:3,9

**chance (4)**
236:4,13,19;245:2

**changed (1)**
134:21

**changes (1)**
7:16

**channel (1)**
213:6

**Chapman (11)**
7:23;94:11;173:2,14;
186:25;187 6;188:2;
202:14,24:204:6;249:15

**charge (3)**
111:24;136 9,9

**check (1)**
50:21

**checked (1)**
175:9

**Chief (6)**
6:24,25;7:2 213:12;
219:15;222 3

**child (41)**
121:7,11,14,20,25;
122:2;145:19;154:1,14,

**cases (5)**
20:11;42:20 ,22;95:15;
162:20

**cause (10)**
20:18;93:12 ;115:6,8;
127:13;159:10;161:10;
172:12,16;243:5

**caused (3)**
142:9;172:11,14

**caution (1)**
115:9

16,21,24;155:8,9;156:8,
8,11;159:23,25:160:13,
23,23,24;161:14,17,19,
22;162:1;163:7,17,21,
23;164:2,5,6,7,10;
242:24;244:3,16;245:3

**children (3)**
9:23;120:16,23

**CHRETIEN (9)**
5:1,5;6:14;9:19;10:7;
29:21;99:13,14;146:16

**Christmas (1)**
14:3

**CI (6)**
48:1,4;150:19,23,24;
161:11

**circumstance (2)**
37:18;40:7

**circumstances (13)**
42:25;44:8:67:5;
74:17;76:16;102:22;
129:2;144.23;173:12,18,
20,21;198:17

**CI's (2)**
159:21;215:24

**citation (1)**
42:19

**citizen (1)**
222:8

**city (6)**
13:13;57:25;73:9;
231:13;236:7,14

**claims (1)**
16:11

**clarification (2)**
5:23;169:15

**clarified (1)**
208:23

**clarify (1)**
237:17

**clarifying (1)**
221:1

**Clark (1)**
6:16

**class (5)**
22:17;25:11;31:9,10,
25

**classes (3)**
101:4,6;111:8

**clause (3)**
53:1,3;66:7

**clear (20)**
20:4;31:24;43:20;
62:3;68:9;82:20;83:5,
10,11;110:12;115:24;
148:1;158:22;195:13;
199:8;202:3;206:20,21,
23;207:23

**cleared (5)**
82:17;116:2;190:16;
198:20;199:9

**clearing (14)**
27:6;49:22;68:8;72:8;

74:20;96:17;110:20,20;
111:4,5;189:9;191:22;
199:22;203:5

**clearly (2)**
175:19;189:7

**Close (2)**
49:13;242:22

**closest (1)**
201:8

**closet (1)**
189:13

**coded (2)**
213:5,7

**College (30)**
10:18;11:9,18;12:1,2;
13:13;14:5,8,12,14;18:4;
26:8,9,15,19;27:20;
33:22;35:12;48:19,22;
50:10;51:11;58:13,15;
59:6;79:13;112:7,23;
113:9;137:7

**comfortable (1)**
196:6

**coming (1)**
61:9

**command (6)**
6:23;29:10;30:11;
83:10;195:12,15

**commander (3)**
28:7;51:9;199:6

**comment (2)**
121:6;126:24

**committed (2)**
216:25;217:12

**Common (1)**
82:18

**commonly (1)**
66:5

**communicate (1)**
198:10

**communicated (3)**
123:3;165:2;248:2

**communication (6)**
207:8;240:1,4,12;
241:16;242:2

**communities (1)**
57:13

**community (4)**
56:19;57:17,22;67:1

**compare (1)**
87:4

**complaint (8)**
20:17;232:7,22;
234:23;237:6,11;
240:21;241:12

**complete (5)**
14:1,17,20;15:9;17:18

**completed (7)**
15:3,12,22;114:4,9,19;
122:15

**completely (1)**
45:3

**complies (2)**

190:15;191:17

**composition (2)**
24:7,9

**compound (1)**
124:12

**computer (2)**
28:25;50:22

**concern (3)**
181:3,5;182:22

**concerned (5)**
106:1;125:22;182:17;
222:20,21

**concerning (1)**
180:20

**concluded (1)**
251:7

**conclusions (1)**
162:16

**concrete (1)**
172:22

**conduct (3)**
129:20;159:4;227:1

**conducted (5)**
106:2,17;193:12;
223:11;227:3

**conducting (3)**
5:12;121:22;182:25

**confessing (1)**
208:15

**confidential (20)**
48:11;79:4;127:11,18;
133:10,11;134:4;144:2;
146:17;147:7,12,23;
148:2,5,7,8;224:9;
225:21;226:5,8

**confirm (3)**
152:21;153:6;197:10

**confirming (1)**
141:17

**conjecture (1)**
89:15

**connected (1)**
181:7

**connection (6)**
32:6;50:6;82:7;108:7;
175:22;249:25

**consider (3)**
137:19;184:4;231:6

**consideration (3)**
41:16;102:10;145:18

**considerations (1)**
185:16

**considered (9)**
54:13;80:4;141:2;
219:7,8;223:11,12;
230:25;231:2

**Considering (1)**
173:12

**consisted (2)**
61:9;134:11

**consistent (7)**
186:3;232:21;233:4,
17;235:13;236:25;238:5

Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

**consisting (1)**
232:8
**constant (2)**
70:6;74:13
**constantly (4)**
140:23;142:21;143:2;
152:12
**consult (3)**
60:22;67:8;219:15
**consulted (2)**
133:16;134:7
**contact (2)**
132:24;230:13
**contacted (2)**
67:21;213:14
**contain (1)**
86:10
**contained (16)**
78:24;81:9;104:15;
114:14;116:20;145:24;
159:19;171:8;174:19,22,
25;176:12;220:15;
238:4,22;239:7
**containing (1)**
122:14
**contents (1)**
22:23
**context (2)**
41:9,13
**contexts (1)**
34:5
**continue (5)**
11:4;81:17;211:25;
212:4;235:9
**continued (3)**
96:12,16,17
**continues (1)**
166:12
**contradicting (1)**
197:6
**control (7)**
95:7,19;96:10;97:7;
101:12;123:19;125:23
**controlling (1)**
195:1
**conversation (6)**
134:11;181:2,22;
182:6,9,12
**conversations (1)**
60:17
**cook (1)**
81:22
**cooperate (2)**
6:4;217:16
**cooperative (2)**
183:21;217:17
**copied (1)**
23:3
**copies (1)**
75:24
**copy (2)**
23:20;75:25
**corners (1)**

72:10
**corrected (1)**
220:16
**correction (1)**
115:5
**corrections (2)**
114:3,8
**couch (5)**
96:3;174:10;191:12,
13,15
**Council (1)**
18:3
**Counsel (17)**
29:16;45:5;75:6;
89:10;108:19;110:5;
170:10,17;235:1,16;
237:5;241:25;243:10;
249:1,10;250:12,23
**counter (1)**
218:13
**Countermeasures (3)**
99:2;103:23;119:2
**country (1)**
26:12
**County (4)**
60:3,5,15;2-9:20
**couple (4)**
5:8;9:15;13:3;167:23
**course (48)**
15:4;21:21,23;22:14,
16;23:12;24:1,5,6;
26:24;27:16,31:4;32:6;
33:14,15,16;34:9,12,20;
61:17,18,24;62:9;63:21,
25;64:13,16;55:16;78:1,
18;100:13,21,23,24;
104:2,5,13,15;112:16,
18,19,20,21 132:7;
150:6;160:11;179:6;
245:23
**courses (7)**
15:8,10;18:6,9,10;
19:8;104:11
**COURT (10)**
40:14;89:14;127:12;
162:25;163: ,3;166:12;
212:5;226:8;242:7
**cover (8)**
27:2,5;34:2-73:22;
74:10,13,18 21
**covered (8)**
31:14;49:25;61:10,11;
62:16;65:18 83:8;85:14
**crawl (1)**
214:3
**create (3)**
51:21;178:8 243:14
**credit (1)**
18:4
**crew (1)**
213:12
**crime (2)**
8:13,16

**criminal (5)**
147:13,18;216:20,22;
217:9
**crisis (2)**
63:14;65:9
**critical (3)**
63:13;65:8,21
**cuffed (1)**
123:10
**cuffing (1)**
110:21
**current (2)**
6:15;155:24
**currently (2)**
8:5;156:2
**cutting (1)**
151:23

**D**

**damage (1)**
115:8
**danger (3)**
131:10;141:4;210:16
**dangerous (1)**
84:7
**dangle (1)**
92:6
**Danzer (27)**
7:24;68:6,23;75:3;
167:25;187:23;188:2;
196:15;201:7,8,20;
202:14,21;203:3,4,8,12,
16,20,21,24;204:6;
205:24;206:2,4,8;214:11
**dark (2)**
162:7;230:15
**date (3)**
13:20;16:6;106:21
**dated (1)**
122:6
**day (3)**
5:9;123:25;133:14
**days (1)**
24:5
**DCI (1)**
180:13
**deal (4)**
64:10;66:3;226:4;
235:8
**dealer (4)**
131:1,22;132:10,22
**dealers (2)**
130:20;131:18
**dealing (4)**
54:7;96:16;135:7;
193:11
**deals (2)**
119:6;248:17
**death (1)**
115:7
**debriefing (1)**
51:24

**debriefs (2)**
47:25;150:19
**December (2)**
109:6,6
**decide (4)**
22:20;42:25;132:6;
250:22
**decided (4)**
12:10;33:21;162:11;
245:1
**deciding (1)**
131:23
**Decision (15)**
40:20,24;41:17,23;
46:22;137:14,15,20;
139:14;145:9;185:1;
191:19;195:8,14,22
**Decision-Making (2)**
29:10;30:11
**decisions (4)**
42:14;126:4;221:2,4
**defend (1)**
130:23
**defendant (1)**
236:14
**defendants (6)**
231:14;232:7,11;
234:18;236:7,15
**Defendant's (1)**
75:18
**defer (1)**
182:14
**defined (1)**
65:22
**definite (1)**
76:14
**definition (1)**
34:18
**DEF-TEC (3)**
112:8,19;113:17
**degree (9)**
10:22,24;11:2,12,17,
18,20;12:4,6
**degrees (1)**
11:14
**deliberately (1)**
160:18
**delivered (1)**
115:25
**delivery (1)**
54:16
**demeanor (1)**
143:18
**deny (3)**
159:18;232:11;243:25
**Department (23)**
6:20,23;14:6,9,12,13,
15,18;15:19;16:5;17:5;
27:20;48:20;61:3;67:22;
78:1;106:25;107:1;
108:5;134:9;152:16;
180:11;182:15
**depend (5)**

35:14.16;44:10;67:5;
80:14
**Dependent (1)**
74:17
**depends (3)**
26:6;173:18;184:25
**deploy (19)**
41:25;43:1;99:22;
100:1,4;102:13,23;
111:21;114:6;118:16;
120:22;130:6,9;131:24;
137:15,21;139:14;
145:9;219:21
**deployed (20)**
12:17;91:21;103:6;
116:4,9;119:13;120:23;
163:15;175:11;227:25
**deploying (8)**
99:15;112:24;116:25;
119:6;129:12;138:8;
194:19;243:20
**deployment (15)**
19:1,10,16;98:14,17;
99:21;104:20;111:11,
14;112:3;115:20,24;
116:2;176:25;244:15
**depose (2)**
102:4,7
**deposition (11)**
5:6,12;8:11;46:2;
102:3;145:3;167:4;
170:19;209:12;234:1;
235:17
**depositions (3)**
5:9;45:12;203:3
**deputies (1)**
60:17
**describe (13)**
10:16;30:21;34:13;
48:1,9;68:6;69:25;70:3;
87:10;112:5;150:20;
155:11;169:6
**described (12)**
68:23;70:18;74:19;
152:23;153:14,24;
155:8;158:19;164:17;
186:13;227:12,15
**describes (3)**
55:12;169:12,21
**description (3)**
74:4;162:9;171:6
**descriptions (1)**
169:10
**designate (1)**
56:16
**designated (2)**
76:19;91:14
**desired (2)**
76:20;120:1
**destroy (1)**
79:8
**destroyed (3)**
78:8,25;79:6

**detailed (1)**
    48:12
**determination (1)**
    162:5
**determine (4)**
    20:20;41:25;126:5;
    130:5
**determined (2)**
    228:5,21
**detonate (1)**
    81:21
**detonated (3)**
    81:24;82:3;174:6
**develop (1)**
    64:17
**deviate (4)**
    76:15,17,20;77:5
**device (49)**
    49:24;81:13,20,21,23,
    23;82:3,8;91:21;99:15,
    21,23;100:1;102:13;
    103:20;104:16,20;
    105:21;111:12,13,17;
    112:3,9;113:5;114:7,20;
    115:25;116:3,4,6,8,25;
    118:17;119:6,13,25;
    120:15,22;159:16;
    174:5;242:23;243:5,21;
    244:16;245:7;246:9,11,
    13;247:16
**devices (13)**
    19:2,10,17;20:1,7;
    55:8,15,19;81:8,13;
    112:24;114:5,10
**devises (1)**
    27:8
**diagnosis (1)**
    140:25
**diagram (8)**
    48:1,4;150:20:151:20;
    161:10;190:8;204:15;
    205:9
**diagramming (1)**
    150:24
**diagrams (3)**
    48:15;72:25;73:2
**dialogue (1)**
    105:14
**dictates (1)**
    36:10
**difference (23)**
    20:2;24:24;25:21,25;
    54:9,11,14;55:25;56:14,
    19;57:7,9;59:8,14;
    76:18;108:25;130:25;
    131:21;132:9,16;
    139:13;208:11;228:11
**different (10)**
    23:13;49:22;54:15;
    55:24;88:6;112:17;
    124:13;166:16;185:8;
    210:17
**differentiated (1)**

    54:19
**differently (4**
    169:6;180:7,17;
    181:10
**difficult (1)**
    194:8
**DIRECT (5)**
    5:3;85:20;107:17;
    208:8;231:22
**directed (6)**
    82:12;211:11,13;
    248:10;250 17,17
**directing (2)**
    208:14;212 11
**direction (1)**
    125:14
**directions (1)**
    82:13
**directive (2)**
    95:1,21
**directly (7)**
    7:2;20:17;1 18:25;
    188:10;203 21;206:3;
    247:16
**disagree (11)**
    66:12;71:2.,5,20,23;
    74:4;76:24; 15:11;
    116:7,10
**discharged (1**
    12:23
**disciplinary (1)**
    16:24
**discipline (1)**
    16:12
**discover (2)**
    160:8;239:12
**discovered (1**
    242:15
**discuss (5)**
    91:14;116:19;119:17;
    221:22;234:6
**discussed (17)**
    83:20;87:20 88:15;
    119:12;120:5;121:16;
    122:23;123:1;157:14,
    16;199:24:2 3:24.25;
    220:3;221:21;222:5;
    244:7
**discussing (1)**
    83:16
**discussion (11**
    85:18;150:2 179:17,
    25;207:15,22 215:10,14,
    15;236:1;23.8:10
**discussions (3**
    99:20;225:20;226:5
**dishonesty (1)**
    8:17
**dismiss (1)**
    43:8
**disorder (4)**
    141:25;142:5,8,11
**dispatcher (1)**

    85:1
**displayed (1)**
    17:23
**dispose (1)**
    143:16
**disposition (2)**
    140:19;141:14
**distraction (16)**
    49:23;111:12;112:3;
    114:5,10;116:6;120:15,
    16,22;242:23;243:5,5,
    15,21,25;245:7
**distractions (1)**
    55:18
**distribute (1)**
    54:17
**Diversion (10)**
    81:8,13,13,20;91:21;
    92:11;106:1;112:9;
    159:11;174:5
**diversionary (5)**
    82:7;104:16,20;
    105:21;159:16
**division (1)**
    51:3
**divorce (1)**
    8:21
**divorced (1)**
    9:21
**Document (49)**
    18:17;22:15;23:6;
    28:20;29:1,7;35:3,4;
    52:2,7;65:14,21;76:9;
    77:18;85:5,14,21;86:16,
    24;87:10;88:14;89:9,21;
    90:7,23;107:8;118:24;
    120:10;121:4,7;122:6,
    13;150:5;164:15;165:6;
    166:22;168:8;169:17;
    170:22;178:1,8,12,15,
    22;179:4,11;213:4,23;
    236:9
**documentation (1)**
    113:16
**documented (5)**
    107:5;108:18,20,23;
    127:10
**documents (11)**
    22:24;52:12,17;64:23;
    109:11;169:5;170:8,14,
    16,22;171:5
**dog (4)**
    171:15,18,22;172:5
**done (13)**
    51:23;80:24;82:18;
    102:14;103:10;138:9;
    183:18;190:7,13,17;
    198:5;234:25;249:20
**door (51)**
    36:6;43:10,11,16;
    44:16;47:2,18;79:9;
    82:14;91:19;94:12;96:4;
    97:4,6;137:21;157:8,12;

    159:4,5,9;167:19;
    168:21,22;169:24;
    171:22;173:2.6.11,14,
    15;174:5;177:9.24;
    178:24;183:8;187:3,5,7,
    8;189:4,5;190:22;
    194:25;196:16;219:25;
    228:22;229:2;232:10,
    17;236:22,23
**doorknob (8)**
    43:25;44:4,9,15;
    46:20;47:6,7,14
**doors (2)**
    53:13;143:15
**dope (2)**
    215:17;216:14
**dot (1)**
    192:7
**doubt (3)**
    80:1;123:2;165:1
**Doug (5)**
    61:9,12,18;62:10;
    103:21
**down (66)**
    36:6;37:10,25;39:16;
    62:17;68:25;69:1;79:23.
    23;80:11;114:25;117:9;
    133:2;164:11;165:10,
    13;167:18;175:13;
    187:13.190:22;191:4,5,
    20;195:12,14;197:18;
    198:7,8,11;200:19,24;
    201:10.21,22,23;202:1,
    4,6,9,13,14,19;203:13,
    14;204:2;205:12;206:1;
    207:13,16;208:14;209:3,
    7,8;210:2,12,14,16,18,
    23;211:1,2,4;213:1;
    214:13;224:23;235:18
**downstairs (14)**
    48:17;86:9;126:15;
    195:8,23;196:21;197:2,
    2,10,14,20;207:2,12;
    208:8
**draw (4)**
    191:15;205:1,8,9
**drawing (4)**
    162:16;190:8,13;
    205:5
**drew (2)**
    151:8;161:10
**drive (5)**
    148:23.152:4,18,20,23
**driven (1)**
    154:1
**driveway (3)**
    227:8;230:23,24
**driving (1)**
    152:13
**drop (2)**
    28:7;117:15
**dropped (5)**
    28:2;117:11,21;243:3;

    247:17
**dropping (1)**
    118:7
**drove (3)**
    230:7,12,14
**drug (17)**
    53:25;54:3,7,7;78:9;
    79:13;80:3;130:20,21;
    131:1,22;132:10,19;
    134:9;143:1,7,18
**drugs (6)**
    130:20;132:18;143:3,
    22;214:16,18
**dry (11)**
    48:16;86:8,10,18;
    87:20;89:2,6,12;90:14;
    151:9,11
**due (1)**
    176:7
**duly (1)**
    5:2
**during (14)**
    14:4,23;22:7;26:24;
    27:16;34:1;48:18;50:9;
    65:15,18;81:22;112:14;
    152:11;203:5
**duties (3)**
    15:22;68:13;151:18
**dnty (7)**
    12:15;68:15,18;94:21;
    99:17;128:14;186:25
**dynamic (35)**
    27:3;324:61:4;
    66:24;69:22;74:24;
    76:11;77:11,20,20,21;
    78:6,11,18:79:1;81:24;
    83:22;84:2;89:1;98:10;
    108:7;109:11,20;110:4;
    123:18;125:21;131:11;
    136:13;137:1;149:3,16;
    221:19;222:23;227:25;
    228:13
**dynamically (1)**
    184:22

**E**

**E1 (1)**
    81:12
**E1A (1)**
    81:8
**earlier (5)**
    86:8;166:4,6,21;
    221:14
**easier (3)**
    92:5;181:16;183:22
**east (1)**
    189:5
**Eckerdt (2)**
    188:13,14
**education (3)**
    10:13,16;11:4
**educational (1)**

10:5
**effect (5)**
  135:17;136:8;137:22;
  182:13;199:22
**effecting (1)**
  184:19
**Effects (1)**
  120:14
**effort (10)**
  46:20;67:18;218:4;
  239:20;240:4;241:4,11,
  22;242:13,14
**egress (2)**
  34:24;36:15
**eight (1)**
  72:14
**Eighty (1)**
  21:14
**either (14)**
  20:8;72:18;96:19;
  141:25;155:14,16;
  181:14;187:6;207:10;
  216:22;230:13;244:19;
  245:11;246:14
**elapsed (3)**
  173:8,13;174:4
**element (2)**
  169:4;172:17
**elements (3)**
  27:2,5;87:9
**eliminate (1)**
  28:11
**eloquently (1)**
  75:3
**else (28)**
  9:4;16:1;21:22;55:10;
  88:8;117:9;131:17;
  145:13;151:11,19,25;
  165:10;169:12;177:2;
  180:8;181:11;186:19;
  189:15;196:20,21;
  201:14;210:22;213:8;
  214:12;221:25;222:17;
  223:3,5
**e-mail (12)**
  248:1,5,9,9,16;249:3,
  5,7,10,11,24;250:4
**e-mails (3)**
  248:11;250:12,16
**emergencies (1)**
  37:9
**emergency (1)**
  37:20
**employ (9)**
  38:1;40:24;41:17,23;
  67:2,9,18;137:14;184:20
**employed (1)**
  74:20
**employee (1)**
  7:19
**employees (1)**
  7:13
**employing (1)**

178:24
**employment (1)**
  48:19
**EMT (2)**
  213:11,12
**encounter (2)**
  95:13;96:8
**encountered (5)**
  92:16,17;94:23;95:6;
  143:14
**encounters (1)**
  95:18
**encrypted (1)**
  213:8
**end (3)**
  6:4;23:22:2 :7:10
**enforcement (15)**
  12:11;13:6,0,16,19;
  15:4,10,13;9:8:19;
  113:23;114:2,7;115:5;
  181:6;216:15
**engage (2)**
  33:18;66:17
**engaged (6)**
  31:13;33:19,135:5,6,
  18;136:7
**enhance (1)**
  64:17
**enough (11)**
  34:3;56:16,20;87:16;
  91:3,3;116:19;162:17;
  211:17;229:14;231:23
**ensure (1)**
  168:25
**ensuring (1)**
  36:14
**enter (2)**
  122:2;184:2 ?
**entered (14)**
  47:7;68:7;9 :22;
  94:22;95:2,25,25;96:6;
  186:6;187:2 ;188:17;
  217:5,15;218:5
**entering (1)**
  70:12
**entire (4)**
  79:15;139:10;168:8;
  169:17
**entirely (1)**
  124:13
**entitled (4)**
  9:12;120:16;150:11;
  251:2
**entries (1)**
  88:11
**entry (118)**
  27:3,10;33:24;36:9;
  37:18,22;38 2,13,14;
  40:8;51:16,21;55:14;
  60:20;66:16.23;67:11;
  68:11,13,16:59:16,18;
  74:24;76:12 77:12,20;
  78:11;79:1;81:24,25;

82:1,6,10;83:2,9,23;
  84:2,16;85:5,5,15,21,23;
  86:4,17;87:9;88:4;89:1,
  22;90:3,6,20;91:25;
  92:16;93:4,13,16;98:10,
  11;105:25;108:7:
  109:12,20;110:4,18;
  122:15;123:13,24;125:6,
  21;130:10,11;131:11;
  136:13;137:1;145:23,
  25;148:10;149:3,15,16,
  16;150:18;153:12;
  154:15;165:3;168:24,
  24;169:13,19,23;171:6,
  21;172:19,24;174:20;
  182:18;183:19;184:7,7,
  12,12;186:18;188:12;
  206:18,23;207:2,9;
  213:25;220:15;221:5,
  19;222:24;227:3,25;
  228:13;232:11;236:24
**environment (2)**
  34:25;36:16
**envisioned (2)**
  165:21,25
**equal (1)**
  67:8
**equipment (3)**
  51:5;55:13;56:16
**equipped (1)**
  92:4
**erase (11)**
  48:16;86:8,10,18;
  87:21;89:2,6,12;90:14;
  151:9,11
**erratic (1)**
  142:9
**essentially (1)**
  165:25
**established (2)**
  103:17;168:13
**estimate (2)**
  122:20;156:7
**estimation (1)**
  121:21
**evasive (2)**
  45:3,18
**Eve (1)**
  14:3
**even (13)**
  21:12;58:25;91:19;
  123:18;129:20;135:18;
  155:10;180:13;211:4;
  223:11;228:11;230:4;
  248:6
**evening (5)**
  91:11;98:3;126:25;
  164:2;186:7
**event (4)**
  96:6;168:5;174:23;
  222:4
**events (10)**
  157:13;158:4,13;

165:25;166:2,14,20;
  167:6;169:25;177:25
**everybody (3)**
  75:25;201:24;221:15
**everyone (6)**
  16:1;123:10;145:21;
  168:25;171:18;185:3
**everyone's (1)**
  185:20
**everywhere (1)**
  126:21
**evidence (24)**
  78:8,25;79:5;108:4;
  129:14;136:8;138:12;
  141:3,9;142:16;143:25;
  144:5,19;146:6;214:24;
  215:19;216:5,19,23;
  217:8,11;244:6;247:10;
  249:16
**evidences (1)**
  170:23
**exact (6)**
  16:6;17:25;140:25;
  173:4;196:22;210:6
**exactly (18)**
  8:3;71:17;87:19;89:7;
  95:12;118:11;119:18;
  138:23;141:24;153:5;
  154:6;166:14;220:25;
  222:10;225:13;241:16,
  16;246:18
**EXAMINATION (1)**
  5:3
**examine (1)**
  176:21
**example (2)**
  26:8;38:11
**exceed (1)**
  59:21
**except (1)**
  220:15
**excessive (1)**
  9:1
**exclamation (1)**
  92:24
**execute (1)**
  138:4
**executed (1)**
  219:16
**executing (1)**
  59:15
**execution (4)**
  97:20;109:11;138:12;
  149:8
**exercise (1)**
  107:5
**exercises (3)**
  34:4;106:13,18
**Exhibit (102)**
  17:11,13,14;22:11,13;
  24:4;28:15,19,19,23;
  29:22,25;30:1,19,21;
  34:9;48:6,9;50:12,14;

52:13;54:22;61:13,16;
  62:2,13;63:16,19;65:11,
  13;69:7;72:22,25;73:15,
  17;74:6,19;75:13;84:12;
  91:8;92:22;99:5,8;
  107:11,14;113:13,15;
  114:15,24;118:20,23;
  119:10;120:6,10,14;
  121:3;123:9;126:20;
  150:5;157:2;164:14;
  167:13,15,16;169:11,11;
  170:8,8;171:7,8;174:19;
  176:22;177:21,22;
  179:13;185:19,25;190:6,
  23;191:1,8;193:19;
  196:8,9;204:15;212:22;
  213:3,22;220:22;224:3;
  231:7,10,232:15,20;
  236:20;237:1,11;244:14,
  21,23;248:19,21
**Exhibits (3)**
  225:15,19;248:25
**existed (1)**
  67:17
**expect (1)**
  245:17
**expected (1)**
  116:3
**experience (18)**
  11:8;18:5;35:11;
  58:11,25;79:11;80:20;
  88:10;89:20;90:19;
  128:10;130:22;131:8;
  143:1;149:6,22;156:16;
  244:25
**expert (1)**
  133:17
**explain (4)**
  35:15;44:11;181:23;
  213:8
**explained (1)**
  125:6
**expressed (1)**
  51:4
**expression (1)**
  173:5
**extended (1)**
  222:7
**extent (4)**
  80:6;82:12;220:16;
  239:9
**extra (3)**
  138:9;245:1,4
**extreme (1)**
  115:9
**eye (3)**
  125:8,12,24
**eyes (5)**
  70:9;71:1,4;72:16;
  153:6

**F**

face (2)
39:19;66:1
faced (3)
35:18;66:15;141:10
facing (1)
189:5
fact (23)
16:20;30:16;40:7;
76:4;85:13;91:21;108:3;
128:20;129:13;133:23;
140:15;141:8;142:14;
145:12;146:5;179:10;
180:2;181:12;199:15;
212:14;216:3;222:6;
237:10
factors (2)
40:23;140:8
facts (1)
140:14
fail (1)
154:15
failing (1)
47:6
Fair (11)
34:3;102:14;116:19;
148:4;162:17;170:14;
187:15;199:15;225:5;
229:14;231:23
fairly (2)
143:15;188:2
fairness (1)
110:5
fall (3)
13:21,23;62:6
familiar (7)
5:11;62:15;70:5;73:5;
98:12;134:9;247:12
family (2)
9:19;185:6
far (12)
20:1;26:15;68:20;
93:12;133:2;151:5;
162:4,20;171:21;193:5;
203:3;206:6
farther (1)
97:1
faster (1)
243:19
father (3)
179:14;180:14;183:20
faulty (1)
161:25
favoritism (3)
181:9;185:5,11
Feathers (5)
6:24,25;7:3;219:15;
222:3
February (13)
17:19;44:14;46:18;
59:11,16;62:7;67:17;
77:11;79:4;82:2;101:8;
106:11;110:19
federal (1)

89:14
feel (3)
47:1;81:15;196:6
feeling (1)
210:22
feet (4)
79:23;116:2;172:24,
24
fell (1)
51:19
fellow (1)
181:6
fellows (1)
106:2
felony (5)
49:25;52:17;53:6;
54:3;138:18
felt (4)
60:21;163:6;221:14;
243:15
female (2)
122:4;155:10
few (3)
146:17;223 24;226:21
field (11)
13:24;14:1; 5:24,25;
31:15;32:18;51:9;65:15.
17,19;78:2
figure (1)
156:3
file (3)
16:13;20:11.50:22
filed (19)
16:11;176:11;231:13,
17;233:13:2 4:9,14,17;
236:5,7,20;237:1,25;
239:18,21;240:24;
241:8;242:16,16
find (8)
30:1;176:4;178:24:
190:2;204 24;214:16;
225:4,22
fine (14)
8:5;16:19,2(;17:1;
21:23;91:5;107:3;
158:11;192:11;196:2;
199:2;239:2 246:19;
251:1
Finger (2)
74:1;84:13
finish (7)
13:18;45:10.23;
151:12;160:2.5,7
finished (1)
92:11;190:11;194:19
finishing (1)
6:2
fire (8)
246:5,8,10,11,13,15,
16,17
firearm (1)
245:14
firearms (5)

18:18;26:25;28:8;
73:8;243:9
firmly (1)
197:1
first (65)
5:2;21:3;22:14,15,17,
22;23:23;30:18;31:6,8,
10,13;34:17;42:1,1,2;
43:25;44:4,15;59:22;
61:22;66:7;67:18;68:9;
76:23;84:16;91:19;94:6,
7,9,21,22;95:6,17;96:6,
7;99:13;119:23;121:21;
124:14;150:18;153:3;
167:23;168:16;174:14;
175:6;187:3,5,8;188:2;
197:7,12,14;198:6,7;
201:13;202:16;203:14;
204:16;206:1;232:15;
234:18;239:12,15;249:3,
21
firsthand (1)
60:10
fitness (2)
28:8;49:21
five (10)
18:9;30:6;51:1;
107:15;157:10;176:16;
193:13;194:11;232:8;
246:3
five-day (1)
24:5
flash (1)
245:7
flashbang (32)
19:2,10,16,25;27:8;
55:19;82:3;98:14,17;
99:15;100:5,14,23;
102:13,24;103:6;
105:22;111:15,21;
112:24;113:5;118:17;
157:9;159:11;194:19;
244:15;245:7;246:9,11,
13,22;247:16
flashbangs (1)
112:14
flee (1)
218:2
flexible (1)
95:4
flush (1)
79:22
flushed (1)
80:11
focusing (1)
119:5
folder (4)
248:7,13;250:3,18
follow (4)
26:16;93:20,21;201:3
followed (6)
197:18;200:19;
201:10;202:9;203:12;

204:2
following (1)
110:24
follows (1)
5:2
follow-up (1)
103:8
force (8)
9:1;77:20;78:19;
159:6;168:23;221:19;
228:22;236:24
forced (2)
163:1;228:23
Forest (1)
105:15
forgets (1)
90:9
form (242)
19:12;24:10;25:3;
35:22;37:3,12;38:3,15;
39:13,22;40:11;41:8,18;
42:2,21;43:2,13;47:9,16;
48:13;51:14;53:9,16;
54:5;56:5,24;57:20;
58:7,19;59:2,12,23;61:5;
64:1,8;66:18;67:3,12;
68:2;69:17,23;71:7,14;
77:14;78:13;82:4;83:13,
24;84:8;85:16,24;86:25;
87:11;88:17;89:24;92:2,
13;93:6,24;94:16;95:8;
97:11,22;100:15,25;
101:1,13,20;102:16;
103:1;104:7,22;105:5;
106:4;109:13;113:6;
114:11;116:14,22;
117:12,23,24;118:8;
119:14;120:2;122:16;
123:4,14,21;124:12,24;
125:16;127:1,12,15,25;
128:7,23;129:8,15,23;
130:13;131:3,13;132:1,
14;133:18;134:15,23;
135:20;136:2,15;137:1,
4;138:1,11;139:7,16;
140:11,141:5,11,25;
142:18,25;143:8;144:7,
14;145 10;146:21;
147:14,148:12;149:4,
19;151:2,6;152:25;
154:3,10,18;155:1;
156:20;157:19,24;158:6,
15,23;160:15;161:20;
162:2,22;163:10;
164:18;165:4,16;169:8,
14;170:1;171:9;174:11;
175:21;178:2;179:1,21;
180:22;181:18;182:1,7,
20;183:9,23;184:14,23;
185:13;186:8,10;
189:19;195:16;197:21,
24;198:21;199:10,17;
200:4,20;201:15,24;

202:10;203:6,17;204:4,
7;207:4.17;208:12,17.
24;209:10;210:19;
211:7,14,16;212:13;
214:21;215:6,21;216:7;
217:18;219:10,23;220:1,
18;221:6;222:12,25;
223:7,17;224:13;
225:10;226:11;228:2,15,
18;229:8,17,18,24;
230:5,16;231:4,21;
232:23;237:4,22;238:7;
239:22;240:22;241:5;
243:22;244:9;245:18;
247:9,18
formal (5)
31:8,10,14;32:16;61:2
forth (1)
249:25
forward (5)
109:24;228:12;
229:17;234:1;235:22
fought (2)
131:15,17
found (9)
107:19;137:6,11,12;
153:19;175:18;191:7;
245:13;249:18
four (8)
24:5;76:14;157:9;
188:1,3,4;194:11;212:4
fourth (4)
96:25;99:9;114:24;
186:21
four-year (1)
12:2
frankly (1)
119:4
free (1)
116:1
frequency (1)
56:1
Friday (2)
107:7,8
front (28)
62:13;73:25;94:2,8;
96:22,23,24;159:9;
162:7;167:19;168:21;
169:24;171:23;172:8,20,
21,25;183:8;188:1;
191:5;194:24;198:19;
230:20;232:17;234:7;
236:22;237:7;244:14
full (2)
6:13;15:4
fully (1)
66:2
function (5)
36:24;37:1;56:3,23;
153:12
functioned (1)
58:18
functioning (2)

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 75 of 91

Tricia Wachsmuth v.                                                                    Mike Chretien
City of Powel, et al.                                                              October 05, 2010

57:18;58:17

functions (1)
60:16

Fundamentals (1)
65:4

**G**

gain (1)
147:3

gait (1)
172:8

gathered (3)
92:12;191:21;195:9

gathering (2)
146:19;149:1

gave (8)
75:25;146:2;170:13,
15;219:4;238:3,5,13

general (5)
10:25;18:18;67:7;
68:18;181:5

generally (3)
7:20;54:3;75:5

gentleman (1)
104:3

George (1)
6:14

Georgia (21)
10:8,18,19;11:9;12:1;
13:8;17:16,21;18:2,21,
23;19:4,5;20:6,22;25:11,
18;26:20;54:13;59:1;
143:20

gets (1)
123:10

given (8)
5:5;19:9;41:7;48:10,
10;56:4;95:22;237:13

glad (1)
212:23

goal (1)
76:14

goals (2)
64:13,16

goes (2)
62:7;92:1

good (10)
15:2;23:24;30:20;
99:24;155:23;180:3;
182:10;197:11;198:6;
251:3

GOSMAN (450)
5:4:8:23;9:1,7,10,12,
18;16:15,19,22;17:1,3,
12;19:14;22:12;24:15;
25:6;28:16;29:18.20,23;
36:1;37:4,16;38:5,9,19;
39:1,9,12,17;40:1,6,12,
18;41:11,21;42:5,8,13,
23;43:5,19;44:24;45:2,8,
19;46:1,8,15,16;47:12,
19;48:7,14;50:13:51:15;

52:22;53:2, 2,20;54:8;
56:8,13;57:5,24;58:10,
23;59:7,17;60:2,14;
61:14;62:24:53:2,6,8,17;
64:5,11;65:12;66:22;
67:6,15;68:5;69:19,21;
70:2;71:10,19;72:23;
75:8,11,16;76:2,6,27:16;
78:16;82:9;83:1,18;
84:1,10;85:19;86:1;
87:5,15;88:9 12,20;89:5,
8,16,19;90:1,9,15;91:4,
6;92:8,20;93:10;94:3,
20;95:10;97:13;98:2;
99:6;100:19;101:5,17,
24;102:2,9,11,19;103:3;
104:9,24;105:7,16,18;
106:7;107:12;108:11,13,
17,21,25;109:4,16,23;
110:8,10;113:10,14;
114:12;116 18;117:1,
14;118:2,14 21;119:20;
120:7,8;122:19;123:8,
17;124:1,15;125:2,20;
126:12;127:4,19;128:3,
9;129:3,11,18;130:1,24;
131:7,20;132:8,20;
133:22;134:18;135:1,11,
24;136:5,17 23;137:10;
138:6,15;139:12,19;
140:1,7,20;141:7,15;
142:22;143::,23;144:12,
18,24;145:2,7,22;
146:10,14,15;147:1,17;
148:16;149:9,23;150:4;
151:4,10;153:9;154:7,
13,22;155:4;157:1,22;
158:2,10,17;159:15;
160:6,20;161:8,23;
162:10;163:5,14;164:21,
24;165:12,23;166:5,19;
167:2,5,14;168:1,5,12,
19;169:9,18,22;170:5,
12,15,24;171:3,13;
173:24;174:17;175:23;
176:1,3,15,20;178:5,9,
14,17,20;179:3,6,9,12,
23;180:2,4;181:1,19;
182:5,10,11 24;183:16,
25;184:2,11,17;185:7,
17,24;186:4,12,16,24;
189:6;190:4,23;191:2;
195:7,19;196:2,5;
197:22;198 2,9;199:1,
14,21;200:1,8;201:1,17;
202:17;203:11,22;204:5,
10,22,24;205:4,10,15;
207:5,20;208:13,24;
209:5,13,17,23,24;
210:9,10,24;211:9,19,
22;212:7,10,14,18,21,
23;213:2,20 214:20,22;
215:13;216 2,11;

217:24;218:6,8,23;
219:6,14,24;220:4,12,
21;221:11;222:13,18;
225:17;226:14;228:7,
16;229:1,13,22;230:3,9,
19;231:8,23,24;232:13;
233:3,7,9,12,19,25;
234:5,12,20,22;235:2,4,
14,19,25;236:3,10,11;
237:9,20,23;238:2,12,
18;239:1,4,7,11,24;
240:3,9,15,18,23;241:7,
13,19,22;242:4,8,12,21;
243:12,13;244:5,13;
245:22;246:2;247:6,14,
23;248:20,24;249:2,6;
250:7,14,15,20;251:3

graduate (2)
10:9;12:8

great (2)
66:6,8

grenade (1)
55:3

group (14)
7:9,12;26:1;52:16;
57:8,18;58:18;60:7;
187:25;206:19,20;
208:15;233:23;249:7

groups (1)
55:17

grow (13)
79:8,25;80:2,6,8;
132:24;134:10,13,20;
139:2;140:15;144:23;
145:11

guess (7)
8:22;49:2;53:8;71:21;
89:13,17;143:24

Gump (1)
105:15

gun (14)
21:24;68:25;125:9;
128:21;131:2,22,25;
132:10,12;192:25;194:5,
8;218:12,12

gunman (4)
24:17;50:3;111:3,3

guns (20)
92:5;127:23;128:5;
129:13;130:11;131:1,9,
16,19;135:7,19;136:11;
137:25;144:16,23;
145:11;218:16,24;
219:3;232:9

guy (1)
213:9

guys (1)
193:1

**H**

half (1)

49:13

Hall (2)
188:3;195:9

hallway (2)
193:20;201:19

hand (6)
77:25;119:19;129:4;
185:9,10;202:18

handcuff (2)
92:19;125:10

handcuffed (5)
124:3,9,10,22;126:14

handcuffs (1)
214:14

handguns (3)
126:21;128:12,15

handle (7)
24:14;64:3;91:15;
95:2;115:8;181:16;
234:11

handling (7)
24:25;83:19;91:8,12,
12;92:23;163:2

hands (4)
73:25;92:6;125:13;
205:17

handwriting (4)
84:21,22;150:13,16

Hang (1)
75:22

happen (4)
37:23;79:19;159:8;
166:23

happened (13)
80:21;82:23;136:1,4;
166:14;169:2;174:8;
196:18,19,25;197:16;
198:15;231:20

happening (1)
165:22

happy (1)
235:22

hard (3)
79:22;195:24;224:22

harm (1)
78:7

hate (1)
110:23

head (4)
124:20;147:11;
187:22;201:20

headed (1)
40:20

heading (10)
17:23;20:9;43:8;65:3;
69:12;74:7;115:15;
119:1;120:13;202:6

headings (2)
120:12,13

health (1)
141:19

hear (4)
97:15;161:9;173:5;

185:23

heard (3)
68:6;144:2;225:6

height (2)
175:12;176:8

held (3)
98:23;150:2;236:1

help (2)
44:13;226:3

here's (2)
46:3;235:8

hesitated (1)
196:24

high (9)
10:6,9,14,16;25:7;
30:8;106:22;111:19,21

high-crime (2)
52:19;53:23

highlighted (1)
70:21

high-risk (10)
24:18,21;25:7,9,12,23;
50:3;59:9,15;110:17

himself (1)
193:12

hired (3)
15:2,18;61:10

History (5)
12:7;142:1;147:13,16,
19

hit (1)
173:15

hold (1)
119:18

holding (1)
187:11

holster (1)
92:5

home (42)
40:8;66:24;68:7;
70:11;74:24;77:10;80:5;
82:2;85:15;92:10;93:22;
94:22;95:25;97:21;
105:25;106:17;110:4;
131:25;132:11,12;
148:11,20;182:19;183:2,
20;199:8,22;206:20;
217:5,15;218:5;221:5;
227:2,21,25;228:4,9,11;
229:6,12,16;230:1

honest (2)
212:2;235:3

honestly (4)
45:18;101:14;212:6,6

honor (1)
190:8

honorably (1)
12:22

hope (2)
29:25;101:24

hospital (2)
213:13,14

Hostage (3)

24:17;50:3;66:2

**hours (11)**
15:15,16;18:4;21:8,
14;22:1,2,3,7;75:7;
235:18

**house (103)**
82:11;86:13;91:22,25;
92:1,12;93:4,5,16;95:3;
96:7;124:3,5,9,16,22;
125:24;126:22;127:9,
24;128:13.15.21;129:14;
130:12,20;135:7,19;
136:12;137:25;140:18,
18,24;144:16;145:19;
151:9;153:8,14,16,21;
154:2,5,8,15,21,24;
155:8;156:12;160:18,
23;161:10;162:15,15;
163:17,21;171:15;174:8,
10,14,15;183:7,22;
186:7;188:9,17,24;
190:9,10,12,16;191:22;
194:12,13,16;196:19,21;
198:20;203:5;205:10;
206:24;207:23;210:23;
215:1,18,25;216:1,4,5,
14;218:21,25;226:20;
227:3,6;228:13,21;
230:20;231:3;243:21;
244:3;245:25;246:20;
247:2

**human (5)**
198:23;199:7,21;
200:6,16

**humor (1)**
212:24

**hurried (4)**
172:12,13,15,16

**hurt (1)**
245:2

**husband (1)**
208:16

**hypothetical (4)**
136:19;137:17,19;
138:2

## I

**IA (1)**
65:3

**idea (7)**
16:7;39:10;53:11;
80:15;84:22;126:17;
182:4

**ideal (4)**
37:6;38:8;51:6;152:11

**Ideally (6)**
37:2,5;51:25;59:25;
102:21;103:4

**identical (1)**
72:13

**identification (2)**
83:12;152:21

**identified (29)**
17:11;22:11;28:15;
29:22;30:19.48:6;50:12;
52:13;61:13;63:16;
65:11;72:22;99:5;
104:14;107:11;110:1,
14;113:13;118:20;
120:6;14;124:3;167:13;
176:22;189:3,23;
225:16;231:7;248:19

**identifies (1)**
40:23

**identify (11)**
29:2,17;61:.6;83:11;
109:18,19,25;110:1,13;
122:14;204:19

**identity (1)**
227:10

**if'd (1)**
163:20

**illness (1)**
141:25

**illnesses (1)**
8:9

**imagine (1)**
162:24

**immediate (6)**
63:14,21;64 6;65:8;
115:19,23

**immediately (18)**
15:21;92:24.93:1;
97:10,17;163:23;
173:10;175:10;177:9;
201:3,5,6;219:22,25;
228:22;229:2;232:10;
236:24

**imminent (1)**
64:19

**impact (1)**
140:6

**impair (1)**
8:6

**implicated (1)**
47:5

**implying (1)**
138:21

**important (14)**
5:22;41:5,16;68:1;
83:22;84:5;86:23;88:23;
123:19,24;139:6;140:8;
146:18;231:

**impression (1)**
224:25

**impressions (1)**
197:7

**improper (2)**
136:20;138:5

**improving (1)**
52:3

**inaccuracies (3)**
185:21,24;210:8

**inaccurate (2)**
157:23;162:9

**inappropriate (1)**
46:5

**Inc (1)**
119:2

**incident (3)**
20:16;63:13;65:8

**incidents (1)**
65:21

**include (8)**
55:4,5,7,18;106:13;
208:5;235:20;245:2

**included (1)**
245:4

**includes (1)**
236:16

**including (1)**
143:18

**inclusive (1)**
50:4

**incomplete (2)**
136:19;138:2

**inconsistent (3)**
165:14;166:17,25

**Incorporated (1)**
103:24

**incorrect (2)**
164:3;239:5

**increased (1)**
47:17

**indicate (1)**
125:13

**indicated (4)**
25:8;91:10;135:4;
218:9

**indicates (5)**
20:11;92:23;126:21;
177:23;178:22

**individual (5)**
128:20;136:6,11;
198:18;199:7

**individuals (1)**
230:13

**infantry (1)**
12:15

**informant (24)**
48:11;79:4;127:11,18;
133:10,12;134:4;144:2;
146:17,19,23;147:3,8,
13,23;148:2,5,7,8;
156:18;224:9;225:21;
226:5,9

**informants (1)**
156:23

**informant's (1)**
147:5

**information (78)**
9:5,13;48:9,10;78:24;
81:9;85:14;86:11,14;
115:15;116:13,20;
122:14;123:3;127:7,11;
130:10;132:6;133:4,7;
137:13,16;138:25;
139:2;140:16,18,21;

141:13;144:10;145:24;
146:2,19;147:3,23;
148:14,18;149:13;
153:25;156:4,13,19;
159:13,21;161:11;
165:1;174:22,25;177:1;
183:21;213:23,23,24;
217:3,4;219:18;224:6,8;
225:23,25;226:7;227:9,
20;231:19;237:17,18;
238:3,4,5,13,22;239:2,5,
6,7;240:10;241:23;
242:18;244:24

**informing (1)**
120:25

**Initially (4)**
16:3;61:10;96:14;
112:6

**injured (1)**
123:24

**injury (1)**
115:7

**innocent (1)**
64:19

**in-progress (1)**
64:18

**in-service (3)**
26:23;107:15;112:6

**inside (9)**
82:19;100:2;117:10,
15;120:17;169:25;
174:8;175:10;218:7

**instability (3)**
141:1;146:1,3

**instance (4)**
24:25;42:1,12;152:11

**instead (1)**
90:6

**Institute (1)**
99:2

**instruct (3)**
116:12.117:15;241:10

**instructed (3)**
82:16;115:10;158:4

**instructing (1)**
178:18

**instructions (3)**
91:11;206:19;250:9

**Instructor (3)**
18:16;107:10;108:23

**Intelligence (17)**
47:25;148:9;149:1;
150:11;151:21,21;
152:3;153:12;154:23;
155:19,23;161:25;
162:19;164:1;180:20;
227:1;231:5

**intended (5)**
62:10,18;63:9,12;65:7

**intent (3)**
54:16;163:23;224:18

**interested (1)**
226:7

**interfere (1)**
8:10

**interior (1)**
247:2

**interlineation (1)**
241:18

**intermediate (2)**
17:22;18:1

**Internal (2)**
20:16;213:6

**interpretation (1)**
166:22

**interrupted (1)**
143:10

**interview (1)**
245:11

**interviews (1)**
245:9

**intimidate (1)**
45:16

**into (75)**
12:10;20:20;21:13;
27:10;40:8;65:25;66:23;
70:23;72:12;74:23,24;
76:12;78:4;79:15;80:5,
12,22;81:9,24;82:1,7,10;
83:3;85:2,15;92:1;93:4,
16;110:4;115:2,22;
116:8;138:18;145:8,17;
148:10;153:12;154:1,
14;157:6;159:11,17;
162:8;165:3;167:23;
168:6,8;169:13;171:6;
174:14;180:9;182:13,
18;183:19;188:9;189:1,
2,7,10,11,12,14;193:20;
197:20;198:19;207:10;
208:15;211:11,13;
214:2;232:2;238:8,11;
241:23;244:1

**introducing (1)**
245:6

**Introduction (4)**
24:6;30:24;77:19;
159:11

**investigation (1)**
7:10

**Investigations (1)**
20:10

**investigator (1)**
20:19

**invited (1)**
133:23

**involve (2)**
33:4;38:11

**involved (26)**
15:16;20:15;33:21;
40:24;48:25;49:7,11,16;
77:11;80:3;98:13;
100:14;106:16;111:16;
135:14;137:24;145:21;
155:12;169:1;181:13;
185:3;216:24;221:15,

18;226:18;245:24
**involvement (2)**
48:1;150:19
**involves (1)**
104:15
**involving (6)**
8:17;16:12;59:21;
65:16;111:17;136:13
**irrelevant (1)**
140:10
**Israeli (4)**
70:15,18;71:25;72:2
**issue (12)**
28:4;36:20,22;132:5;
176:12,24;177:3,10;
195:12,15;235:23;244:6
**issued (1)**
15:1
**issues (3)**
20:8;28:10;141:18
**item (4)**
43:25;65:6;120:15;
152:2
**items (3)**
43:9;157:3;164:15

**J**

**jacketed (1)**
224:22
**jail (1)**
131:18
**Jeff (1)**
166:18
**jeopardy (1)**
64:19
**job (8)**
13:6,7,13;41:24;
51:20;99:15;205:4;
249:18
**jobs (1)**
50:16
**Join (121)**
35:23;37:14;38:4;
39:23;41:19;42:3;43:3,
15;47:10:53:10,18;57:1,
21;58:8,20;59:3,13,24;
61:7;66:20;67:4;68:3;
69:20,24;71:9,16;78:14;
83:15;87:2,12;91:2;
93:8;97:24;100:17;
102:18;109:14;113:7;
116:15,23:118:10;
119:16;120:4;122:17;
123:5,22;124:25;127:3;
128:24;129:16,24;
130:15;131:5;132:3,15;
133:19;135:22;136:21;
138:3,14;139:9,18;
140:13;141:6,12;
142:19;148:13;149:5,
20;151:3,7;153:2;
154:11,19;155:3;158:7,

16;25;161:21;162:3;
163:12;165 18;175:24;
179:22;180:23;182:2,
21;183:10,24;184:15,24;
185:15;195:17;198:1,
22;199:12,19;200:5,22;
202:12;203 19;208:18,
25;211:8;215:8,23;
216:9;217:21;219:11;
222:15;223 1,8,18;
228:3,19;229:10,19,25;
230:6;244:10;245:19;
247:20
**joint (6)**
48:23;106:3,17,23,24;
107:2
**jointly (1)**
110:7
**Josh (2)**
9:24;133:7
**Judge's (1)**
16:18
**judgment (2)**
118:13;178:13
**July (1)**
111:3
**jump (2)**
28:19;84:12
**June (3)**
14:10;110:17;111:2
**justify (4)**
66:4;128:21:129:6;
131:10

**K**

**keep (8)**
51:1;125:12.24;128:5,
12,14;138:21;160:10
**keeping (1)**
125:7
**Kent (11)**
91:18;92:10.93:17;
94:24;99:8,17,21,25;
171:25;194:18;249:12
**kept (5)**
84:13;159:1-;180:5;
243:9;248:13
**Kevin (1)**
7:23
**kid (1)**
163:24
**kind (13)**
6:4;11:18;16 24;39:3;
56:1,17;57:11;108:8;
126:5;149:2;221:17;
223:20;225:13
**kinds (2)**
24:25;88:22
**Kirk (1)**
7:23
**kitchen (9)**
189:16,22;190:22;

192:1;194:2,3;202:25;
205:11;218:14
**knew (41)**
79:3;80:8,23;81:2;
86:12;98:16;112:12;
129:4;130:19;132:23;
133:16;135:5,14;136:6,
11,18;137:20;138:21;
143:19,20;147:20;
153:10;159:12,20;
160:25;164:8;196:12;
197:17;199:16,20;207:7,
14;210:22;217:7;
223:13,15;225:8;
227:11;230:14,18;
237:21
**knock (8)**
79:9;137:21;157:8;
159:3;168:17,21;
232:17;236:22
**knock-and-announce (8)**
43:17,21;44:6;52:14,
18:53:3;167:19;219:21
**knock-and-talk (2)**
221:17,23
**knocked (3)**
44:15;173:14;187:7
**knocking (8)**
43:9,10,16;47:6;
94:11;169:24;173:2;
186:25
**knocks (1)**
36:5
**knowing (2)**
156:23;214:6
**knowledge (11)**
8:2;19:18.21;60:11;
132:17;148:6;159:22;
175:2;215:24;218:17;
244:24
**known (2)**
210:1;227:24
**knows (1)**
102:6

**L**

**label (2)**
113:19;114:15
**labeling (1)**
113:16
**labels (1)**
73:3
**lady (1)**
42:19
**language (3)**
114:14;116:7,10
**Lara (4)**
141:17,20;148:18.21
**large (2)**
56:19;232:25
**larger (1)**
192:8

**last (17)**
5:9;21:2;45:20;66:7;
73:17;75:3,24;175:6,7;
178:10.184:7,13;187:15,
24;194:24;212:7;214:13
**later (2)**
80:9;109:1
**launchers (1)**
55:3
**law (15)**
12:10;13:6,9,15,19;
15:4,10,12;78:19;
113:23;114:2,7;115:5;
181:6;216:15
**lawsuit (7)**
176:10;234:19,24;
248:11;250:5,6,8
**lawyers (2)**
234:9,14
**layout (2)**
86:12;151:9
**lead (1)**
197:20
**leader (12)**
49:5,12;51:12,18;
54:21;58:12;59:1;81:19;
98:3;170:12;172:6;
195:20
**leader's (1)**
51:20
**Lean (3)**
70:15,18;72:2
**leaned (1)**
205:18
**Leans (1)**
71:25
**learn (2)**
120:19;247:24
**learned (3)**
24:2;112:17;184:6
**least (18)**
23:2;27:18;29:19;
33:22;52:24;58:25;
125:14;128:6,13;
159:24;160:1,13;
191:23;194:1;204:8;
206:8,10;246:3
**leave (3)**
92:9;145:25;165:24
**LEC (1)**
182:15
**led (5)**
142:12;146:7;191:4;
199:6;200:25
**left (6)**
14:11,14;78:18;122:4;
158:13;189:10
**left-hand (1)**
115:14
**legend (3)**
114:14,19,25
**lengthy (1)**
39:4

**less (9)**
36:11;47:22;49:23;
51:6;57:3;112:8;123:23;
221:18,18
**less-than-ideal (1)**
38:12
**lethal (2)**
49:23;112:9
**Lets (5)**
113:15;146:16;157:2;
206:2;236:12
**LGLP (1)**
100:10
**license (1)**
227:17
**life (6)**
9:8,13;78:6;81:16.16;
143:19
**life-threatening (2)**
63:14;65:9
**lights (1)**
164:8
**likely (6)**
66:1;159:25;160:1,13;
187:6,17
**limited (2)**
134:21;144:22
**line (2)**
138:7;201:24
**lines (1)**
54:17
**list (18)**
18:5,8;49:18;50:4;
119:22;145:5;151:22;
157:3,4;164:14,17,23,
25;165:1;185:19,20,21,
25
**listed (8)**
18:7;70:4;111:19;
145:8;151:17,21;
177:25;230:11
**little (9)**
6:2;42:19;43:7;
164:13;192:7,8;212:24;
245:20,23
**live (1)**
158:12
**lived (1)**
147:20
**lives (1)**
64:19
**living (14)**
96:1,15;161:1,12;
164:8;188:21,24;
189:21;191:9,24;192:2,
21;194:23;218:14
**loaded (9)**
126:21;127:8,23;
128:5,12,14,17,21;
130:11
**lobby (6)**
179:14,16;180:5,11;
181:25;182:15

Case 1:10-cv-00041-ABJ    Document 65-3    Filed 01/10/11    Page 78 of 91

Tricia Wachsmuth v.                                          Mike Chretien
City of Powel, et al.                                        October 05, 2010

**locate (1)**
204:18
**located (4)**
190:14,18;196:8;
247:15
**location (8)**
120:1;152:3,20,21,22;
184:21;196:7,11
**locations (4)**
52:18;53:23;54:1;
245:10
**locked (1)**
53:14
**locking (1)**
150:1
**Logic (2)**
40:20;46:23
**long (16)**
10:20;11:10;14:8;
49:10;55:5;79:17;92:5;
126:9,13,16,17;192:25;
194:5,8;232:9;235:8
**look (64)**
17:17,20;20:19;23:18,
21;28:17,18;29:24;30:6;
34:15;40:19;43:6;50:14;
52:12,22;61:15,22;62:2;
63:19;64:12;65:13;69:6;
72:4,11;73:15;77:17,19;
81:5;85:12;86:22;99:7;
100:7,9;107:13,23;
114:23;117:2,4,19;
118:23;119:4;120:9;
128:25;129:1;132:6;
137:5;167:15;178:12,
14;189:13;205:2;
213:21;223:24;224:3;
225:18;232:15;236:4,13,
20;237:12;244:11;
248:14,21;249:8
**looked (3)**
117:22;232:20;239:15
**looking (17)**
20:10;52:15;63:4;
71:1,4;72:16;76:3;
92:22;108:1,4;120:1;
140:23;143:24;144:18;
152:12;192:17;249:2
**Looks (9)**
22:2;24:5;50:24;
72:13;75:18;85:17;
107:14;157:11;186:2
**losing (1)**
143:2
**lost (2)**
143:9;185:22
**lot (4)**
92:5;105:17;224:24;
243:18
**loud (3)**
73:20;168:18,20
**Louisiana (1)**
13:5

**lowered (2)**
70:7,9
**lucky (1)**
131:19
**luuch (2)**
30:17;146:11
**luxury (3)**
37:9,17;56:  5;57:14
**lying (1)**
164:10

---

**M**

**Macedonia (1)**
13:8
**magazine (3)**
128:6,13,18
**Magistrate (7)**
9:14;145:4;133:10,20,
23;234:6;242:1
**maintain (1)**
26:21
**makes (3)**
5:22;96:9;209:21
**making (1)**
41:23
**male (3)**
122:4;155:10;156:8
**man (1)**
81:20
**manifested (1)**
142:16
**manner (2)**
116:4;223:15
**manual (2)**
29:12;30:10
**many (18)**
15:15;21:8; 5:8,11,
25;36:9;48::5;49:10;
66:3;127:23.174:4;
192:13;194:13;206:13:
226:18;234:12;235:14;
245:5
**March (2)**
110:20;177:18;201:22
**marijuana (20)**
79:8,15,22,75;80:2,8,
25;131:9,16,24;132:11,
18,24;134:13;135:6;
136:7;137:25;138:10;
143:20;214:17
**mark (1)**
190:5
**marked (6)**
152:17;191:1,7;196:9;
212:22;248:25
**marks (1)**
224:24
**marksmanship (1)**
49:21
**married (1)**
8:19
**Marrisa (2)**

85:1;121:5
**materials (14)**
23:8;28:18;34:12,13;
65:17,18;73:6,8;77:25;
78:18;92:22;150:6,10;
174:19
**matter (17)**
16:20;30:16;40:7;
76:4;108:3;117:20;
137:12;179:9;180:2;
212:14;229:6,15,21,23,
23;236:21;237:10
**Matthew (1)**
7:24
**may (21)**
9:10;37:20,23;60:17,
18,19;67:19;76:3,16;
78:8,25;102:22;105:11;
110:22;115:6,7;116:6;
145:12;151:20;194:4;
203:23
**maybe (6)**
18:9;36:8;172:18;
186:14;189:1;218:18
**McCaslin (26)**
91:18;92:10;93:17;
94:24;99:9,14,14;100:1,
13;101:7;103:18;104:2,
12,19;105:20;111:11;
116:12,21,24;119:18;
171:24;175:9,14,19;
176:4;194:18
**McCaslin's (3)**
99:21;100:9;176:25
**Mchretien@cityofpowellcom (1)**
248:6
**mean (30)**
9:8;19:5;20:12,14;
23:18;24:20;37:5,6,8;
42:11,14;45:17;68:18;
106:24;118:6,6;131:11;
141:8;151:24;158:3;
169:11;170:15;171:1;
178:3;194:9;204:23;
207:11,22;241:20;
245:25
**meaning (3)**
140:23;178:7;225:12
**means (13)**
17:23;39:11;51:5;
63:13;65:7;66:5;121:12;
125:7;126:7;184:18,20;
213:5,7
**meant (2)**
130:8;200:13
**Mechanical (13)**
30:24;31:7,15,25;
32:13,18,19,21,24;33:4,
13;34:13;150:6
**medical (1)**
8:9
**medicated (1)**
142:3

**medication (1)**
8:6
**medications (1)**
145:15
**meet (4)**
27:23;34:5;57:11;
189:17
**meeting (2)**
32:7;85:2
**member (5)**
27:19;30:25;58:12,14;
68:11
**members (12)**
28:7,11;34:25;35:8,
11;49:8,17;81:21;83:6;
106:24,25;196:7
**membership (1)**
31:3
**mental (9)**
141:1,19,25;142:5,8,
11;145:12;146:1,3
**mentally (1)**
87:7
**mentioned (5)**
25:7,7;133:21;185:25;
222:3
**met (4)**
119:11;148:5,6;235:1
**Michael (1)**
6:14
**middle (3)**
122:1;187:24;205:22
**might (18)**
8:10;29:3;32:25;33:1,
2,3,10,11;39:3;64:9;
107:18;129:7;182:17;
189:12,201:14;222:9,9;
226:3
**MIKE (2)**
5:1;249:15
**Military (5)**
10:18;11:18;114:3,8;
115:6
**mill (1)**
13:4
**Milledgeville (1)**
10:19
**mind (8)**
38:11;60:22;68:21;
87:7;165:15;173:17;
209:16;210:8
**mine (2)**
112:10;168:11
**Miner (28)**
48:11;62:24;94:15;
127:20;133:5;134:6,12;
141:14;142:14,20;
147:10;148:21;151:8;
161:10;173:2,15;181:13,
22;187:7,9,10,15;188:6;
194:5;224:7;225:20;
226:7;249:20
**Miner's (3)**

150:25;227:13;249:16
**minimize (2)**
163:22;245:1
**minimum (1)**
36:2
**minute (21)**
8:1;30:5;73:19;79:20;
80:2;84:12;86:22;87:6;
99:7;107:18;135:4;
149:11,24,25;151:12;
162:18;190:7;196:1;
213:3;223:22;237:12
**minutes (6)**
126:18;146:17;174:2;
176:16;223:24;235:17
**mischaracterize (1)**
144:17
**Mischaracterizes (2)**
125:17;138:12
**misdemeanor (6)**
53:15;136:9;138:10,
17,24;139:1
**Misha (1)**
39:13;241:16
**miss (1)**
107:22
**missing (5)**
86:17;87:24;88:14;21:
89:21
**mission (3)**
24:7,8;86:23
**missions (1)**
24:14
**misspelled (1)**
236:18
**misstate (1)**
160:18
**misstatement (1)**
108:14
**Misstates (10)**
130:16;135:21;
138:12;140:14;160:16;
165:17;175:22;203:6;
230:17;247:10
**mistake (7)**
110:9;239:21;240:5,7,
20;241:4;242:14
**misunderstanding (1)**
110:2
**Mode (2)**
73:22;74:21
**model (1)**
152:18
**moment (11)**
41:23;46:12;72:24;
75:14;87:23;121:3;
176:24;177:22;196:12;
213:22;224:3
**Monday (1)**
249:21
**money (1)**
143:3
**month (5)**

27:18;33:22;34:2;
50:9;113:2

**monthly (1)**
34:6

**months (1)**
176:10

**more (14)**
38:24;39:1;48:12;
49:3;52:21;80:9;90:13;
123:19,23;145:23;
159:13;197:1,2;226:16

**morning (3)**
163:20;167:12;249:21

**most (11)**
42:20,22;66:1;84:5;
128:4,19;132:23;
159:19;162:19;187:6,17

**move (10)**
10:4;83:11;116:6;
139:21;171:1;178:5,6.
10;179:11;218:15

**movement (3)**
110:21,22;197:19

**much (6)**
47:20;146:11;173:8;
189:8;228:5;251:5

**multi-day (1)**
24:5

**multiple (1)**
245:5

**multiroom (2)**
111:4,5

**murder (1)**
129:5

**must (3)**
76:15;92:23;102:1

**myself (2)**
50:2;76:1

**N**

**name (11)**
6:13;11:24;21:4;
59:19;98:1;121:4;147:5;
204:19;217:6;236:16;
249:9

**named (3)**
231:13;234:18;236:14

**names (1)**
21:6

**narcotics (3)**
137:6;145:13;244:25

**National (2)**
30:8,23

**nature (1)**
20:18

**near (2)**
159:8;174:20

**necessarily (1)**
94:25

**necessary (2)**
88:3;168:7

**neck (1)**

70:8

**need (18)**
6:6;39:2,15 42:18;
76:14;77:3,3;103:16;
107:18;147 25;156:17,
24;160:5;171:1;195:25;
205:11;212 19;222:23

**needed (5)**
42:15;51:4;60:21;
117:2;126:6

**needs (4)**
39:14;139:22,23;
248:14

**neither (2)**
89:7;203:4

**nevermind (1)**
104:12

**new (2)**
163:9;177:1

**next (16)**
11:8;13:3,6.7;40:19;
43:6,24;81:0;96:3;
111:2;188:25;189:4;
193:22;196 18,19;
197:16

**NFDD (3)**
112:9;175:11;176:25

**nice (1)**
205:4

**night (40)**
75:4,24;80:5;82:24;
86:24;87:25;88:15;
89:22;95:22;102:13;
105:2,20;121:17;
122:24;123:3;140:9;
144:1,6;145 9;146:8;
149:2;157:14,17;
158:14;163:16;165:2;
171:14;173:21;176:11;
181:4;182:13;187:24;
217:5;222:11;228:1;
229:7,12,16 230:21;
231:20

**Nobody (1)**
193:16

**nods (3)**
124:20;147:11;187:22

**noise (8)**
46:23;47:3;5 5:18;
111:12;112:3,9;157:10;
245:6

**no-knock (2)**
43:12;53:1

**nondynamic (1)**
123:24

**none (1)**
158:3

**Nope (3)**
91:20;106:15;164:12

**nor (1)**
203:4

**normally (1)**
95:18

**North (1)**
6:16

**northeast (4)**
100:2;189:2,24;
194:20

**notation (2)**
121:9;181:24

**note (2)**
213:4;237:5

**notebook (1)**
17:14

**notes (5)**
84:19;85:4.8,9,17

**notice (8)**
22:22;23:1;24:4;
70:17;119:1;227:5;
239:14;246:19

**November (1)**
110:18

**NTOA (4)**
26:14,16;30:25;36:19

**NTOA's (1)**
152:7

**number (15)**
18:3,4;29:19;36:2;
49:2;78:8;97:2,2;
122:25;123:6;140:5;
144:15;162:8;174:1;
243:4

**numbers (2)**
75:19;227:17

**numerous (3)**
223:10;243:8;244:25

**O**

**oath (2)**
5:16;108:10

**Ob (1)**
173:22

**object (146)**
24:10;37:12;38:3,15;
40:11;41:8,18;42:2;
43:2,13;56:24;61:5;
66:18;69:17,23;71:7,14;
77:14;82:4;83:13,24;
85:16;86:25;88:5,25;
89:24;92:2,13;93:6,24;
94:16;95:8;97:22;
100:15;101:1,13,20;
102:16;103:1;104:7,22;
105:5;106:4;117:12;
118:8;119:14;120:2;
123:21;124:12;127:1,15,
25;128:7;129:8;130:13;
131:3,13;132:1,14;
134:15,23;136:2,15;
139:7,16;140:11;
146:21;152:25;154:3;
156:20;163:10;165:4,
16;166:3;171:9;175:21;
178:2;179:1,21;181:18;
182:20;183:23;184:10,

14,23;185:13;186:10;
189:19;197:21,24;
199:17;200:4,20;
202:10;203:6,17;204:4,
7;207:4,17;208:12;
209:10.21;210:19;211:7,
14,16;212:13;214:21;
215:6,21;216:7;217:18;
219:10,23;220:1,18;
221:6;222:12,25;
223:17;224:13;225:10;
226:11.228:15,18;229:8,
18.24;230:5;231:4.21;
232:23;237:3,22;238:7,
23,25;239:22;241:5,9;
243:22;246:1;247:5,9,18

**Objection (115)**
19:12;25:3;35:22;
37:3;38:7;39:9,13,22;
42:21;45:11;47:9,16;
48:13;51:14;53:9,16;
54:5;56:5;57:20;58:7,
19;59:2,12,23;64:1,8;
67:3,12;68:2;78:13;
84:8;85:24;87:11;88:17;
97:11;100:25;108:11;
109:13;113:6;114:11;
116:14,22;117:23,24;
122:16;123:4,14;
124:24;125:16,18;
128:23;129:15,23;
133:18.135:9,20;137:4;
138:1,11;141:5,11;
142:18.25;143:8;144:7,
14;145:10;147:14;
148:12.149:4,19;151:2,
6;154:10,18;155:1;
157:19.24;158:6,15,23;
160:15;161:20;162:2.
22;164:18;169:8,14;
170:1,2;174:11;180:22;
181:17;182:1,7;183:9;
186:8;188:19;195:16;
198:21;199:10;201:15;
208:17,24;210:3;
218:22;223:6;228:2;
230:16;235:1;237:4;
240:22;244:9;245:18;
250:11

**objective (9)**
141:3,9;142:15;143:6,
25;144 4,18;146:6;
215:19

**objectives (1)**
184:19

**observation (1)**
154:25

**observe (3)**
70:9;153:21;186:20

**obstacle (2)**
34:25;36:15

**obstacles (1)**
175:10

**obstruction (1)**
116:5

**obstructions (1)**
116:1

**obtain (4)**
11:12;18:1;25:15,17

**obtained (2)**
11:18;12:4

**obvious (1)**
43:8

**obviously (1)**
163:21

**occasion (1)**
248:3

**occasions (1)**
37:21

**occupant (3)**
177:24;178:23;188:24

**occupants (4)**
159:4;183:2;185:4;
228:21

**occupation (1)**
6:17

**occur (3)**
166:20;182:6;248:18

**occurred (9)**
62:6;150:25;167:6;
173:21;174:20,23;
176:11;213:25;217:23

**occurring (1)**
165:25

**October (7)**
75:10;146:13;176:19;
196:4;224:1;242:10;
251:8

**off (14)**
70:25;72:15;74:1,1;
131:16;150:2;151:12,
23;192:8;235:24;236:1;
242:7,8;246:23

**off' (1)**
81:22

**offense (1)**
135:6

**offered (2)**
61:18;223:9

**office (2)**
60:5,25

**Officer (163)**
5:5;6:15,18;9:2,19;
10:6;12:15;13:22;14:23;
17:4,9,23;18:2;20:20,21;
23:1;24:2,9;25:12,14,15;
32:23;35:20;36:21,23;
37:24;43:7;44:17,20;
46:17;47:5,11;48:2,11;
50:1,15;57:7;60:22;
61:17;64:13;66:14;68:6,
23;75:3,12;90:10;91:8;
94:7,21,22;95:6.17,18;
96:6,7,10,16;97:6;99:14;
101:7,18;102:6,12;
104:12,19;105:20;

Case 1:10-cv-00041-ABJ   Document 65-3   Filed 01/10/11   Page 80 of 91

Tricia Wachsmuth v.                                                        Mike Chretien
City of Powel, et al.                                                  October 05, 2010

110:11;111:11;112:11,
15;116:12,20;121:22;
124:7;125:22,23;126:4;
127:20,22;133:5,13;
134:3,6,12,19;138:7,20;
139:20;141:20;142:24;
143:7,25;146:7;147:10;
148:17,22;149:2,16;
152:20;153:5,11,20;
154:24;155:6,18;156:7,
14,17;161:25;162:5,9,
18;163:6;167:24;
171:24,25;173:20;175:9,
18;176:4,21,25;178:21;
181:6,12,13;183:6;
184:20;188:22;189:1,
22;190:8;193:11;194:5;
195:24;196:6,12;
198:17;199:15;201:8,10,
13;202:21,24;203:3,4,
23;204:8;206:1,4,10;
209:6,25;210:11;218:11,
21;219:9;225:20;226:7;
227:12;228:17;243:16;
251:4

**officers (103)**
7:6,9,13;8:24;24:19,
25;25:8,22;26:3;28:1;
30:8,23;32:21;50:6;
55:17,24;56:3,11,12,22;
57:4,8,18;58:3;59:10;
60:7;61:3,19;64:2;
82:12,16,17;86:13;
87:10;94:7;98:6,10;
102:5;105:23;106:16;
112:8;119:12;123:24;
124:23;125:25;131:10;
136:14;138:8;141:4,10;
144:1,6,20;145:21;
148:15,19;152:18;158:3,
12;159:1;165:2;173:1;
178:23;183:2,7;185:3,
19;186:1,6;188:11,22;
189:2,8,21,21,22;191:4,
21;192:13,15,17;193:21;
194:12,16;195:9,21;
198:19;202:9;204:1,18;
208:15;209:9;215:5,16,
20;216:6;217:16;
226:20;232:8;245:6;
246:3;248:2;250:18

**officer's (2)**
101:23;108:9

**official (3)**
231:14;236:8,15

**often (4)**
27:16;113:1;137:8;
143:16

**old (6)**
42:19;106:22;111:19,
21;120:17;121:14

**once (8)**
15:22;33:17;165:20;

166:13;188:17;190:17;
218:5,7

**one (104)**
7:1;13:4;21:20;25:25;
28:4;31:3,3-:1;36:4;
38:24;41:2;43:9;46:19:
52:20,24;54 6;62:24;
63:24;68:13 73:16,24;
76:13;78:6;80:1;81:21:
94:6,11;95:1-;96:18,20;
101:3,8,9,18:105:11,16;
107:6;108:2 111:2,8;
112:7,10,11 120:12;
132:5,5,17;39:11;
140:2;144:22;145:17;
151:12;153:7 155:14,16,
19;157:8;159:13;
162:13,15,20;163:15;
170:18:173: 9;174:14;
178:10;185:5,9;189:2;
190:3;191:23,24;192:1;
193:6,24;194 1,1,3,4,11;
196:13;197: 0;203:23;
204:8;206:10;210:22;
220:5,7;224:25;226:16;
230:12,13;235:12;243:4,
6,17,18;244:2;245:11;
249:3,4,12,14,23;250:1

**ones (8)**
7:15;18:15;98:11,13;
193:23;240:7 247:12,13

**one-week (1)**
112:18

**only (34)**
25:24;28:13:62:7;
79:11;86:16;:8:23;92:5;
107:1;113:23;114:2,7,
16;115:4,9;122:15;
130:10;132: 7,18;
147:20;170:3,7;172:23;
173:19;175:5;176:9;
183:2;193:20;196:13;
197:13;203:1;223:12;
247:11;249: !3;250:1

**open (10)**
159:4,5;168 23;177:9,
24;178:23;2 9:25;
229:2;232:10;236:23

**opened (1)**
228:22

**operation (28)**
40:10;51:24,79:8;
80:7,8;88:16;98:7;
106:3,23;107:2;127:6;
129:20;133:1,24;134:14,
20;139:3;140:10,16;
144:23;145:11;146:20;
156:9,10;218 11;219:9;
221:20;245::4

**operations (10)**
48:25;49:11.53:25;
54:22;68:8,24;69:4;
134:10;155::0;182:25

**operator (1)**
36:13

**opportunity (10)**
27:22;37:21;38:6;
40:9,13,17;66:16;
110:12;143:18;156:22

**option (2)**
184:5;223:10

**order (25)**
9:2;10:1;15:8;18:1;
37:1;45:13;94:4;114:6;
157:18,21,23;158:1,4,8,
18;164:16;165:21;
166:12;173:4;183:1;
186:6;188:3;202:15;
211:6;242:24

**ordering (1)**
211:4

**orders (1)**
8:21

**others (3)**
50:19;78:7;115:7

**Otherwise (1)**
196:11

**ours (1)**
182:23

**out (45)**
12:25;33:11;37:10;
44:13;73:20;76:19;
78:18;82:20;102:13,23;
109:1;129:14;132:12;
135:8;136:13;140:23;
142:21;146:5;152:12;
153:8;154:2,15;156:3;
157:14;160:10;162:7,
12;168:18,20;170:22;
175:18;176:4;181:15;
183:7,22;189:4,14;
195:4;197:4;202:18,21;
222:10;247:3,4;249:4

**outline (1)**
23:12

**outside (7)**
47:18;91:22,25;93:4;
126:14;140:24;152:13

**outstanding (1)**
162:19

**oven (3)**
79:15;80:19,25

**over (28)**
7:8,18;15:25;29:1;
46:10;50:9,9;51:3;
90:25,25;115:14;
119:22;120:16;164:19,
20,20;165:7;186:14,22,
23;191:10,13,14;192:4,
5;194:9;197:17;236:12

**overcome (1)**
76:17

**overseas (1)**
12:17

**overview (1)**
6:22

**own (7)**
48:22,24;52:5;81:16;
175:16;210:13;235:6

**owned (1)**
227:22

**ownership (1)**
105:16

**owns (1)**
131:2

**P**

**PACER (1)**
241:17

**Page (55)**
17:21;20:10;22:22;
34:17;35:2,4;36:17;
43:7,7;46:22;47:25;
48:9;61:22;62:14,20,21;
63:1,3;64:13,23;65:1,22;
69:7,12;73:17;74:7;
75:15,19,21;76:8,9;
77:17;81:6;84:13;90:19;
99:10,10,11;110:24,24;
113:22,114:24;115:1,
15;119:5,6,10;150:9,11;
167:18,169:21;175:6;
213:21,231:25;236:17

**pages (6)**
75:24;76:2;84:14;
170:14 22;244:12

**paper (10)**
85:25;86:2,5;87:19;
90:14;121:9;190:2,4;
204:20,25

**Paragraph (37)**
65:25;70:17,20,24;
71:6;72:4,7,11,13;74:8;
75:15;76:7,25;77:19,21;
78:5,24;81:5,11;92:21;
115:18  120:13;175:6;
177:4;232:1,1,3,6,12,16,
21;236:4,13;237:6,13,
14;239:8

**Paragraphs (1)**
178:1

**paranoia (5)**
142:16;144:19;146:1,
4,6

**paranoid (5)**
140:22;141:9;142:15;
143:21;144:3,13,23

**parch (1)**
109:1

**Pardon (1)**
246:12

**parent (1)**
180:9

**parent's (1)**
160:17

**Paris (1)**
7:23

**Park (27)**
13:14;14:5,8,12,15;
26:8,9,15,19;27:20;
33:22;35:12;48:19,22;
50:10;51:12;58:13,16;
59:6;60:3,5,15;79:13;
112:7,23;113:9;137:7

**part (27)**
22:15;30:11;31:18,20;
32:2;34:12;41:22,24;
50:8;78:2;80:21;83:2,4,
22,25;89:21,22,121:22;
122:9;170:3,9,16;
197:20;213:23;214:24;
232:25;250:24

**participate (5)**
25:9;65:16;111:7;
133:23;245:8

**participated (6)**
5:8;35:24;97:20;
101:7;105:24;168:5

**participation (1)**
180:6

**particular (6)**
23:6;25:11;68:17;
170:9;221:20;243:9

**particularly (2)**
104:17;129:21

**parties (1)**
227:22

**partly (1)**
219:13

**parts (1)**
169:21

**party (1)**
235:5

**past (4)**
22:5;124:19;143:15;
188:21

**patrol (11)**
7:6,9;51:3;61:17;
63:22;65:3;101:8;104:1,
14;152:15,18

**Patterson (9)**
133:13,21;134:3,8,8,
13,19;181:12,21

**Peace (2)**
18:2;20:21

**Pechtel (11)**
61:9,18;62:6,10;
98:22;99:1;101:4,7,18;
103:21;104:11

**peek (1)**
48:8

**peeked (1)**
146:5

**peeking (1)**
142:21

**peeper (3)**
140:22;152:12,23

**pending (3)**
6:9;52:20:203:10

**people (16)**
56:16,17;72:2;73:12;

127:23;128:4,11;131:9,
16;132:23;143:19;
160:10;175:10;222:1;
224:24;225:1
per (5)
23:12;157:21;158:1,8;
165:21
percent (2)
26:22;176:7
perfect (2)
59:25;67:14
perform (9)
24:18,20;25:23;36:23;
37:1;56:22;69:3;130:9;
153:11
performance (3)
28:12;32:7;52:4
performed (9)
51:11;59:10;60:16;
68:8,24;71:25;77:10;
149:2;156:9
performing (2)
37:1;88:10
perimeter (1)
106:2
period (4)
14:5,23;50:9;80:13
peripheral (1)
74:1
permitted (1)
234:8
person (21)
36:5;92:18;115:25;
126:6;130:11;131:22,
24;132:10,11,17,18;
135:14;137:24;162:13,
15;183:14;188:10;
214:13;217:1,13;225:8
personal (11)
9:8,13;79:11;80:20;
132:17;134:21;135:15,
18;136:7;137:24;143:19
personally (5)
48:3;98:20;131:16;
141:20;148:1
personnel (7)
16:13,25;114:3,8,16,
18;115:6
persons (3)
36:3,9;115:25
person's (1)
81:16
pertain (1)
78:1
phase (3)
85:15;149:3,15
philosophy (2)
25:21;62:15
phone (4)
219:17;233:20;242:1,
5
photograph (1)
62:18

photographs (1)
246:25
phrase (1)
225:6
phrased (1)
109:21
phrasing (1)
90:24
Physical (2)
28:8;49:21
picks (1)
21:6
picture (5)
23:2;70:25;72:15;
193:21;247:2
pictures (1)
247:11
pie (3)
70:15;72:5,8
piece (5)
87:19;90:14 132:6;
190:4;231:5
pieces (1)
55:12
PIER (3)
62:15,18;63:9
piercing (1)
224:11
pile (1)
49:25
pillow (1)
247:3
pistol (2)
92:6;194:6
pistols (3)
92:5;193:1;225:3
place (16)
29:4;92:6;117:10,18,
19;118:7;12ⁿ:7;126:2;
149:18;159:25;160:13;
179:17,18;180:1;
184:21;187:13
placed (5)
10:1;80:19;117:4;
119:25;243:7
placing (1)
196:7
plaintiff (1)
234:23
plaintiff's (6)
105:24;120:9;190:5;
232:7,22;237:11
plan (58)
37:22;38:13;39:19,24;
40:9;51:13,16,19,21;
60:20;76:14,16,18,21;
77:3,4,6;83:4;84:16;
85:5,5,21,23.86:4,17;
87:4,9,25;89:2,22;90:4,
6;165:9,14;166:23;
167:19;168:17,21;169:4,
6,12,19,21;170:4,9,23;
172:12,12,14,16;181:24;

195:3,4;219:13,16;
220:15;232:16;236:22
planned (4)
89:8;169:3;219:18,21
planning (10)
37:10,18;76:25;83:2;
85:2,14;86:23;88:15;
127:5;245:4
plans (1)
183:1
plant (1)
139:11
plants (9)
79:22;80:7,11,14,15;
122:21,25;133:2;140:5
plate (1)
227:17
pleading (4)
234:14,17,20;235:6
pleadings (1)
235:10
please (12)
30:22;45:24;46:6;
65:25;72:12;81:8;115:3;
158:22;160:19;168:20;
236:8;237:14
plenty (1)
169:20
pm (6)
146:13;176:19;196:4;
224:1;242:10;251:8
point (25)
15:24;34:1;45:12;
46:2;47:25;81:20;92:24;
103:13;126:6,10;
133:20;150:11;152:3;
163:6;167:16;178:3;
182:10;191:3;193:17,18,
19;196:19;197:6;208:2;
213:1
pointed (6)
69:1;125:9,14;126:8;
193:6,17
pointing (2)
193:2,13
Police (44)
6:18,19,23;7:13;
13:22;14:5,9,12,13,15,
18,22;15:19;16:5;17:5,
9;27:20;48:19;59:10;
61:3,4,19;77:25;78:11;
106:25;107:1;108:4;
123:15;131:10;136:14;
152:16;157:8;168:22;
170:16;173:5,14;
175:14;180:11;181:15;
182:15;232:9;236:23;
246:3;248:2
policeman (1)
31:18
porch (3)
172:9,20,21
port (1)

116:5
portion (2)
191:22;226:4
portions (1)
226:6
pose (5)
138:9;215:5,11;
216:12,14
posed (6)
144:5;215:20;216:5,
17;218:10,20
position (23)
68:7,24,25;69:3,13,15;
70:1,4,7;73:4,11,13,14;
74:7,10,10,14,18,19;
89:14;191:7;192:18;
223:20
possession (1)
50:20
possibility (1)
145:18
possible (6)
29:5;67:2;110:9;
138:5;185:10;210:6
Possibly (7)
78:20;135:23,25;
164:4;187:16;194:12;
209:6
POST (15)
17:15,18,21;18:7,11,
21,23,19:18,24;20:17,
19;21:10,14;22:2;62:3
pot (2)
131:1;153:19
potentially (4)
159:20;216:1,18;
244:1
Powell (24)
6:16,19,23;14:13,18;
15:18;16:5;17:5,9;
57:25;59:6,10;61:3,19;
73:9;77:25;106:25;
107:1;108:4;113:5;
127:23;152:16;231:13;
236:14
PPD (2)
213:4,6
practical (1)
34:4
practice (6)
27:12;36:25;82:18;
109:11;111:16;112:23
practiced (2)
111:12;112:14
Practices (3)
26:14,16;152:7
precautions (4)
81:22;163:22;245:1,4
precisely (3)
88:18;130:18;168:3
preferable (1)
67:10
preferential (1)

223:21
premises (2)
27:10;148:23
preparation (1)
148:10
prepare (11)
51:12;52:7;85:4,20,
23;86:4;159:2;168:1;
204:14;213:22;240:8
prepared (15)
86:3,4,7,17;87:25;
121:4;122:7;165:1,6;
174:19,23;177:2;
232:24;235:10;239:25
preplanned (4)
81:25;82:1,6,10
preplanning (2)
149:3,15
prescription (2)
145:14;214:18
presence (4)
121:7,20;130:3;
224:11
present (5)
51:19;66:5;131:9,10;
245:10
presented (4)
112:7;141:4;201:19;
215:16
presently (1)
234:7
pressure-No (1)
120:16
pretty (4)
123:15;172:22;
198:15;225:3
previous (3)
17:16;61:11;134:9
previously (1)
250:24
primarily (1)
24:13
Primary (3)
120:14;168:24;232:8
principles (3)
76:11,22;77:11
prior (12)
66:23;101:8;149:7;
153:12;165:3;191:6;
217:9;22;231:16;
240:20;241:8;248:11
privilege (6)
238:9;239:23;240:2,
17;241:10;250:13
privileges (1)
222:1
probable (3)
127:13
probably (14)
34:16;105:17;113:2;
151:17;177:4;187:3;
188:14,16;213:12;
225:1;232:25;239:14,15,

19
**probationary (4)**
14:5,17;15:22,25
**problem (3)**
46:3;102:5;181:16
**problems (3)**
8:9;14:4;52:3
**procedure (2)**
123:12,16
**procedures (3)**
64:3,18;70:12
**proceeding (1)**
177:24
**Proceedings (1)**
251:7
**process (1)**
5:11
**procession (1)**
204:2
**produce (1)**
142:6
**produced (1)**
248:8
**product (5)**
113:16,19;115:4,6,7
**profession (1)**
222:2
**professional (1)**
223:16
**proficiency (2)**
26:21,25
**profile (4)**
18:7;21:10,15;22:2
**program (9)**
14:17,20;31:14,20;
33:18;104:2;114:4,9,20
**proper (2)**
81:22;157:18
**properly (1)**
114:7
**property (1)**
115:8
**proposition (1)**
67:7
**protect (2)**
163:17;242:24
**protective (2)**
45:13;166:12
**protocol (2)**
34:20;152:6
**provide (6)**
34:24;62:10;171:5;
183:1;237:8;242:18
**provided (8)**
50:15;141:14;155:18;
162:19;203:7;231:19;
247:1;249:10
**provides (1)**
99:3
**providing (1)**
212:23
**proximity (1)**
219:4

**pulled (1)**
249:4
**purely (1)**
135:18
**purpose (3)**
34:23;60:24:63:25
**purposes (2)**
131:23;132: 2
**push (1)**
97:3
**pushed (1)**
205:17
**put (28)**
13:15;23:13.45:10,13,
14;75:3;79:14:87:20;
88:3;89:13;100:7,8;
182:13;190:14;192:7;
196:11;202:18;204:16;
205:11,16,22 :206:2;
212:19;214:13;223:19;
233:16;238:10;245:15

**Q**

**qualifications (1)**
58:9
**qualified (1)**
57:3
**qualify (2)**
19:9;58:5
**Quarter (1)**
107:20
**quick (2)**
48:8;198:15
**quicken (1)**
172:8
**quickly (4)**
93:19;197:3;198:5,6
**quickness (1)**
200:24
**quite (1)**
244:21
**quotation (1)**
224:24
**quotations (1)**
81:23

**R**

**radio (1)**
213:9
**raid (3)**
89:8;156:2;182:13
**raise (1)**
152:14
**rake (1)**
99:18
**ram (13)**
36:14;46:19;04:15;
168:23;173:3 15;
178:24;187:8,11;194:8;
219:22;232:10;236:24
**rammed (1)**

159:9
**rams (2)**
55:7,14
**ran (1)**
131:17
**rank (3)**
6:19;14:14;16:4
**rare (1)**
225:3
**read (47)**
16:18;38:20,22,24;
39:1,5;42:9;45:21;
46:12,13;65:24;70:23;
72:12;73:19;76:11;78:4;
81:9;109:2;114:1;115:2,
21,22;116:8,11,13,16,
20;140:2,3;143:11,12;
157:6;166:7,10;167:22;
168:6,8,16;169:16,19;
176:14;209:19;212:8,
17;232:1;249:13;251:6
**reading (1)**
227:14
**reads (1)**
70:24
**ready (8)**
70:6.6,7;73:4,10,13,
14;74:13
**realistic (2)**
80:11,18
**realize (1)**
203:2
**really (11)**
31:22;42:15;53:11;
68:4;84:5;104:18;163:3;
170:11,14;234:10;
245:17
**reason (19)**
8:20,25;76:24;84:4,6,
9;123:2;159:24;164:25;
183:11;191:14;209:1;
222:8,16;223:12;
234:15;238:19,21;244:2
**reasonable (11)**
41:6,15,25;42:24;
80:13;126:1;173:9,13,
16;174:3;177:13
**reasonableness (3)**
41:2,14,16
**reasonably (1)**
81:14
**reasoned (3)**
160:24;161:16,17
**reasoning (1)**
162:13
**reasons (15)**
46:25;78:11,15,18;
163:15;221:1,4,8,13;
243:4,7,17,18,20;244:19
**recall (19)**
17:25;18:8;60:19;
83:16;85:10;94:10,14,
17;95:23;96:14;106:21;

122:25;146:9;172:21,
23;202:16;220:25;
227:14;246:24
**recalls (1)**
90:6
**receive (3)**
10:22;26:2;133:7
**received (10)**
11:1;16:23;101:22;
112:2;127:8;133:5;
161:11:177:1;239:14;
244:24
**receiving (1)**
62:9
**Recess (6)**
75:9;146:12;176:18;
196:3;223:25;242:9
**recognition (1)**
19:24
**recognize (6)**
19:25;20:7;29:7;
65:17;73:10;76:23
**recognizes (1)**
19:20
**recognizing (1)**
20:3
**recollect (1)**
190:9
**recollection (5)**
91:17;105:19;134:7;
204:18;223:2
**recommended (2)**
115:19,23
**record (39)**
17:18;21:13;29:16;
38:22;39:5;42:9;45:11,
21;46:13;65:25;70:23;
72:12;76:12;78:5;81:10;
115:2,22;116:8;140:3;
143:12;146:14;150:3;
157:7;167:23;168:7.8:
209:19;212:8,15;216:20,
22;217:9;220:17;232:2;
236:2;242:7,8;244:7;
250:12
**recorded (3)**
5:19,20:137:5
**records (6)**
16:25;17:15,21;18:11;
62:3;107:16
**recover (1)**
80:25
**refer (2)**
75:14;105:25
**reference (10)**
123:9;170:8;224:4;
225:20,23;226:9,12;
244:15,18,20
**referenced (1)**
237:13
**referred (2)**
103:8;147:7
**referring (5)**

18:15;64:25;71:18;
115:18;236:9
**reflect (2)**
37:22;38:13
**reflected (5)**
16:24;18:10;21:10,14;
54:22
**refrain (1)**
46:6
**refusing (1)**
233:12
**regard (3)**
92:23;116:12;169:13
**regarding (9)**
26:12;76:25;91:11;
121:7;146:2,4;182:13;
226:8;235:6
**Regardless (1)**
137:8
**regards (3)**
140:16,19;141:18
**regular (2)**
57:11;222:7
**relating (1)**
145:24
**relation (1)**
181:7
**relative (7)**
22:24;31:11;90:20;
113:16;144:19;187:23;
231:19
**relax (1)**
149:25
**relevance (3)**
9:9;89:1,3
**reliability (2)**
146:18;147:2
**reliable (3)**
146:24;156:18,24
**relieves (1)**
95:20
**remainder (1)**
232:11
**remains (1)**
116:1
**remember (51)**
8:3;13:20;16:6;61:25;
67:25;88:1,7;89:11;
90:17;96:5;111:25;
122:3;133:25;134:1,17;
140:25;151:13,15;
155:17;166:9;172:10,
22;174:16;186:2;
191:10,14;192:4,16;
194:7,10,13;196:22;
201:12;202:8,13,15;
204:13;205:19,20;206:5,
8;214:4,6,14;218:13;
226:24,24;227:7,23;
230:22,23
**remove (2)**
92:25;93:1
**removed (1)**

**97**:17

**repeat (8)**
16:15;19:13;37:15;
42:7,8;46:12;66:21;
209:17
**repeated (2)**
45:20;50:9
**repeating (1)**
50:2
**rephrase (1)**
51:17
**report (32)**
7:2;145:24;155:7;
168:2,14;171:12;
174:22;175:1,14;176:5,
13,22;177:1,2,18;220:6,
8,13,15;232:25;233:17;
235:13;236:20,25;
237:19;238:22;239:10,
13;240:20;242:15;
249:16,20
**reported (2)**
155:6;162:21
**reporter (6)**
16:15;18:38:20;40:14;
140:1;242:7
**reporting (1)**
122:10
**reports (4)**
169:10;170:16;238:6;
244:8
**represent (1)**
249:9
**represented (1)**
22:15
**represents (2)**
150:6;152:7
**reprimanded (1)**
17:8
**request (1)**
249:11
**requested (10)**
38:23;39:6;42:10;
45:22;46:14;140:4;
143:13;209:20;212:9;
250:25
**require (7)**
19:5;53:12,15,17;
64:6;66:6,8
**required (5)**
6:10;18:6;33:18;
66:15,24
**requirement (6)**
25:10;32:9;51:7,8;
52:6;66:11
**requirements (9)**
13:19;15:9;17:25;
19:24;26:5,10,18;27:24;
32:7
**rescue (3)**
24:17;50:1;66:2
**reserved (1)**
59:20

**residence (33)**
47:3,8;68:14,19;
80:12;82:24;83:3;96:17;
121:8,20;122:3;131:23;
149:17,17:1:0:24;
151:20;152: :4;153:6,
13;154:17;156:9;
157:15;162: :;163:7;
164:3,6;165:3;168:25;
169:13;171:6;184:22;
214:17;226: 5
**resist (1)**
218:4
**resistance (1)**
245:15
**resolve (1)**
64:18
**resolving (2)**
63:13;65:7
**resort (4)**
88:9;89:19;184:8,13
**resources (1)**
56:22
**respect (1)**
224:20
**responded (1)**
250:2
**responders (1)**
59:22
**responding (1)**
238:12
**response (9)**
37:19;101:9,12;104:1,
14;108:8;110 19;232:6;
249:11
**responsibility (2)**
7:18;168:24
**responsible (3)**
7:21;8:2;36:14
**responsive (1)**
237:5
**rest (4)**
23:8;45:14,23;116:3
**restraining (3)**
8:21;9:2;10:1
**result (1)**
219:13
**results (1)**
76:20
**retain (1)**
20:21
**retention (1)**
110:22
**review (9)**
5:14;21:1;23 25;52:2;
162:25;170:18;185:20;
237:7;250:21
**reviewed (1)**
170:21
**reviewing (1)**
163:4
**reviews (2)**
50:16;51:8

**revisit (1)**
103:16
**ridiculous (1)**
212:6
**rifle (1)**
92:7
**rifles (2)**
55:5;225:4
**right (137)**
10:4;12:21;20:4,9;
21:8;22:19;23:17,25;
25:20;27:23;28:17:29:4;
30:20;32:11,17;33:9;
36:2,8;38:10;39:18;
42:24;43:20;45:19;46:8,
15;50:25;52:1;57:25;
72:4;74:6,16;76:3;
78:17,23;84:11;86:7;
87:16,22;91:4;93:21;
94:4;95:21;99:20;102:2;
109:17;118:22;121:19;
129:12;131:21;134:12;
142:2;146:10;148:17,
24;149:1,10,18,24;
151:23;152:9,19;153:16,
21;156:6;160:7;161:14,
17;162:6,7;163:17;
164:1,5;167:15;168:13,
16;169:5,7;171:14;
173:16;176:9;177:21;
178:9;180:18;181:2,8,
12;184:18;185:18;
186:5;188:17;189:12;
190:18,19;191:3,25;
192:13;193:9,21;196:2,
25;197:9,13,16;198:8;
200:2;201:6,18;202:3,
24;204:14;206:6;207:1;
208:1;209:13;212:11;
218:15;219:4,4;220:24;
224:20;233:19;236:19;
237:9,21;238:21;239:1;
240:19;241:2,17;242:4;
243:14;244:20;245:8;
246:19;248:22;249:22,
24
**right-hand (2)**
157:3;164:15
**Risk (2)**
30:9;79:5
**risks (2)**
59:21;138:9
**role (1)**
185:20
**room (38)**
27:5;49:22;68:8,17;
70:11,11;74:20,25;
81:24;82:7,10,17,19,20,
20;83:5,9;96:1,15;
118:7;120:23;160:9,10;
161:1;164:8;187:22;
188:21,24;189:21;191:9,
24;192:2,21;194:23;

218:14;243:9,25;244:17
**room-clearing (2)**
68:24;69:4
**rooms (3)**
68:10;70:13;72:8
**rough (1)**
16:7
**Roughly (5)**
22:7,8;192:3;194:14,
15
**routes (1)**
82:13
**Roy (1)**
188:13
**rude (2)**
40:4,5
**rules (2)**
167:1;235:18
**rummy (2)**
212:25;213:1
**run (1)**
119:9

**S**

**safe (4)**
34:24;36:14;121:12;
207:1
**safely (2)**
37:1;185:10
**safer (1)**
183:17
**safest (5)**
138:5;145:20;163:25;
185:3;221:15
**Safety (18)**
34:20;46:23;47:3,5,
11;74:1;125:22;142:24;
143:7;144:1,5;146:8;
168:25;183:1;184:20;
218:10;219:8;243:16
**same (30)**
7:18;21:16;25:5,24;
26:2;38:7;56:11,22;
59:5;77:18;88:18;
114:24;141:12;152:18;
166:15,24;167:10;
169:21;210:6;212:1;
216:13,16;220:14;
222:2;224:14;234:4;
237:18;238:16,17;239:9
**satisfy (1)**
87:17
**Saturday (1)**
249:19
**saw (11)**
94:1;117:22;119:12;
124:23;153:7;190:10;
201:21;208:3;209:2;
210:11;249:23
**saying (1)**
86:3;100:20;130:8;
131:11;153:20;197:23;

198:6;210:18;228:17,
20;240:4
**scenario (6)**
75:3;111:4;159:2,4,5;
221:18
**scene (1)**
180:9
**Schmidt (1)**
7:23
**school (13)**
10:6,9,14,17;11:21,25;
12:4,8;106:22;111:19,
22;112:12;122:1
**schooling (2)**
10:13;11:8
**Scott (1)**
213:10
**se (5)**
23:12;157:21;158:1,9;
165:21
**search (28)**
79:13;97:20;109:6,7,
9,10;110:1,3,16,17;
127:14;133:15;137:6;
143:15;149:8;157:8;
159:5;168:22;173:6,14;
180:10;215:1;223:10;
227:13;232:9;236:23;
244:25;247:21
**searching (1)**
110:21
**seated (3)**
191:10,14;192:5
**second (26)**
47:22;75:22;90:21,22;
94:13;96:25;115:21;
119:5,5,10;120:13,15;
152:2;153:4;175:6;
177:7;186:13,21;
193:13;197:9,11;198:4;
202:16;204:16;213:21;
248:22
**seconds (3)**
174:1,4;193:14
**section (1)**
206:20
**secure (4)**
68:14,18;125:7;
168:25
**secured (1)**
195:6
**seeing (2)**
85:10;96:14
**seem (3)**
6:1;68:1;192:4
**seemed (1)**
197:8
**seems (1)**
191:10
**selected (4)**
13:14;98:6,10;105:23
**selection (1)**
50:15

Tricia Wachsmuth v.
City of Powel, et al.

Mike Chretien
October 05, 2010

**self-protection (1)**
128:5
**seller (1)**
132:19
**semiautomatic (2)**
55:5;140:17
**seminar (1)**
150:7
**seminars (1)**
103:24
**send (4)**
102:12,22;103:5;
248:17
**senior (1)**
213:12
**sense (2)**
96:9;209:22
**sent (5)**
112:15;157:14;
197:14;249:12,25
**sentence (4)**
72:18;175:7;177:7;
232:16
**sentences (2)**
167:23;168:17
**separate (1)**
110:18
**September (1)**
111:5
**sequence (5)**
157:13;158:13;
166:13;169:25;177:25
**sequenced (1)**
158:5
**Sergeant (5)**
6:21;14:16;15:18,25;
16:4
**sergeants (4)**
7:1,2,18;8:1
**serious (2)**
115:6,8
**serve (7)**
27:20;32:20;36:3,9;
42:19;48:18;58:15
**served (4)**
79:14;105:24;134:8;
137:9
**service (17)**
12:19;24:18,21;25:8,
9,12,23;30:9;46:18;
53:15;59:9,9,15;77:9;
106:17;110:17;138:10
**serving (5)**
13:22;26:19;123:16,
18;137:23
**session (1)**
15:12
**set (3)**
113:4;173:19;222:10
**sets (1)**
76:3
**setting (1)**
69:4

**seven (5)**
157:3,12;164:15;
176:16;235:18
**several (6)**
52:15;58:12 113:3;
165:21;226:22;235:23
**share (2)**
7:17;134:6
**sheet (2)**
86:15;190:2
**shelf (1)**
218:13
**shells (2)**
128:13,17
**sheriff's (3)**
60:5,25;67:22
**shield (6)**
198:18,24;199:8,22;
200:7,16
**shipping (1)**
145:14
**shooter (2)**
50:1;216:21
**short (1)**
249:14
**shorthand (1)**
85:17
**shortly (3)**
174:20,23;194:16
**shotgun (6)**
31:7,15;32:1 13,18:
34:13
**shoulder (2)**
70:8;194:9
**shouldered (1)**
73:24
**show (9)**
29:1;51:5;145:24;
181:9;185:4;210:15;
222:1;223:20;224:18
**showed (1)**
180:10
**showing (2)**
181:3;185:11
**shows (1)**
179:14
**shut (1)**
235:18
**side (7)**
73:25;115:14;157:4;
164:15;172:2;173:3;
192:9
**sideways (1)**
110:25
**sight (2)**
70:25;72:15
**sights (1)**
73:24
**sign (1)**
251:6
**signal (1)**
208:22
**signals (2)**

83:10,17
**Significance (1)**
108:13
**significant (3)**
9:3;79:5;224:12
**simple (1)**
139:20
**simpler (1)**
181:16
**simply (11)**
44:25;68:16;93:2;
118:7;125:24;167:5;
168:9;179:10;208:8;
222:21;238:12
**simply- (1)**
167:2
**simultaneous (1)**
159:8
**simultaneously (5)**
165:22;166:1,20;
167:6;245:5
**single (1)**
212:3
**single-room (1)**
110:19
**sit (5)**
37:25;80:16;170:18;
175:4,13
**sitting (6)**
37:10;92:10;96:3;
152:13;165:7;174:16
**situation (20)**
35:14,16,18;36:10;
38:8,12;39:20;43:12;
44:10,14;56:4;66:15;
69:22;72:9;137:17;
155:12;183:18;185:1;
199:23;234:11
**situations (13)**
25:1;35:17,20;37:7,
20;50:3,3;64:4,6,9;
83:11;123:25;152:11
**six (7)**
18:9:51:1;157:10;
176:16;194:12,12;232:8
**size (3)**
133:1;140:9;204:12
**Sketch (1)**
86:12
**slept (1)**
161:13
**slicing (3)**
70:15;72:5,7
**slide (2)**
41:10,13
**slightly (1)**
116:6
**sling (1)**
194:9
**slung (2)**
70:8;192:25
**Small (5)**
57:22;134:20;135:6;

172:22;207:14
**smaller (3)**
56:21;57:13,16
**Smith (1)**
222:8
**smoke (5)**
132:24;143:22;
246:20,21,23
**smoked (1)**
143:20
**sniper (1)**
49:24
**somebody (18)**
32:15;67:21;79:10;
102:23;129:4,13;
133:20;135:18;142:23;
146:5;153:7;165:10;
174:15;189:10,11;
201:6;235:4;248:14
**somehow (2)**
181:6;213:8
**someone (20)**
84:19;92:17,17;95:20;
96:15;102:13;103:5;
126:7;131:1;135:5;
141:8;145:16;159:19;
189:15;200:16,18;
211:2;243:25;245:2,2
**someone's (1)**
183:20
**sometime (1)**
14:23
**somewhere (1)**
191:11
**son (5)**
180:20;181:14;183:7,
14;222:22
**son's (1)**
182:19
**soon (5)**
15:2;124:3,22;194:18;
198:5
**sorry (18)**
11:24;16:14;31:22;
47:7;64:25;91:12;99:13;
104:10;107:25;108:2;
110:8;112:10;185:22;
200:13;213:19;226:1;
240:24;242:13
**sort (7)**
20:15;75:12;91:9;
114:25;125:12;149:18;
151:23
**sound (1)**
53:14
**Sounds (2)**
105:14;185:8
**source (3)**
147:23;156:18;180:19
**sources (1)**
148:9
**Southwestern (2)**
11:9;12:1

**space (1)**
214:3
**spare (1)**
161:1
**speak (6)**
133:13;141:20;148:2;
150:23;211:10;231:16
**speaking (1)**
39:9
**speaks (2)**
179:11;220:13
**special (13)**
25:25;26:4;54:25;
55:1,9,15,21;59:21;
183:15;222:1;225:13;
248:7,13
**Specialized (1)**
61:17
**specially (4)**
18:24;26:1;60:9.15
**specific (26)**
7:12;8:20;18:5,8;
24:14;26:9;31:25;33:3;
35:21;38:11;44:13;
46:25;49:2;66:10;68:15,
21;82:13;83:17;95:5;
106:21;108:2;149:6;
172:7;174:1;210:8;
236:9
**specifically (21)**
54:12;60:19;75:14;
83:7,19;85:6;95:23;
100:13;117:25;118:3;
123:1;151:15;192:16,
19;194:22;206:22;
207:19,21;226:4;
227:23;236:21
**speculate (5)**
44:19;89:12,16;
101:21;127:17
**speculating (2)**
101:24;182:3
**speculation (5)**
89:15;165:5,19;210:4;
223:8
**speed (4)**
46:23;47:3;76:13;
77:12
**spoke (4)**
133:11,14;148:25;
225:8
**spoken (1)**
134:4
**spring (2)**
15:5,6
**squad (2)**
110:21,22
**squads (1)**
8:4
**squared (1)**
75:23
**stage (1)**
127:5

**staging (1)**
169:24
**stairs (60)**
190:20,21;191:4,5,20;
195:13,14;196:16;197:5,
18;198:8,11;200:19,24;
201:3,4,9,11,20,21,22,
23;202:1,5,6,9,14,15,19;
203:13,14;204:3;205:8,
10,12,13,16,23;206:1,7;
207:13,16;208:2,14;
209:3,7,9;210:2,12,14,
16,18,23;211:1,5;
212:20;214:9,11,12,13
**stairwell (1)**
202:5
**stamp (2)**
63:5;190:6
**stamped (1)**
62:23
**stamps (1)**
65:1
**stand (1)**
89:14
**standard (5)**
26:11;28:9;123:12,15;
152:6
**Standards (7)**
18:2;26:12;28:6,8;
119:6,9,11
**standby (1)**
213:16
**standing (14)**
47:18;97:8;128:21;
129:1,5,20,25;174:16;
192:18,21;193:16,21;
201:18,20
**stands (1)**
54:24
**start (7)**
21:2;46:10;191:20;
236:12;246:8,11,13
**started (15)**
13:24;15:24;51:2;
52:5;197:18;198:8;
201:2;202:5;205:7;
246:5,9,15;250:5,6,8
**starting (5)**
6:24;99:10;144:25;
205:12;209:11
**starts (2)**
99:9;107:19
**stash (2)**
79:15;130:23
**State (3)**
17:15;20:8;108:19
**stated (6)**
108:15,17,22;125:4;
185:1;211:23
**statement (10)**
36:20;66:12;77:7;
126:20,22;176:5;
179:17;232:20;236:21,

25
**statements (1)**
233:4
**states (1)**
179:13
**station (2)**
181:15;182:12
**status (1)**
145:12
**stay (3)**
94:23;180:11;181:24
**stayed (1)**
92:17
**stays (2)**
179:14,16
**steel (1)**
13:4
**step (1)**
204:17
**stick (1)**
103:15
**sticker (2)**
190:23;212:19
**still (7)**
75:12;76:14,19;137:9;
156:8;189:22 230:23
**Stockbridge (1)**
10:8
**stood (3)**
214:7,8,11
**stop (7)**
76:15;92:23;145:3;
163:1;166:11 202:22;
209:11
**stopped (2)**
190:11;205:17
**stopping (3)**
45:12;205:19,20
**store (1)**
115:8
**Street (6)**
6:16;25:22;56:12;
57:4;80:23;16.2:6
**stress (1)**
172:18
**strike (2)**
114:13;174:21
**structure (3)**
48:2,4;150:20
**student (1)**
22:18
**studies (1)**
10:25
**stuff (1)**
88:22
**stuffed (2)**
145:14,15
**subheading (1)**
81:9
**subject (8)**
81:15;89:14;91:9;
103:16;148:1;180:14;
207:8;250:12

**subjects (3)**
53:13;61:11;79:14
**Submachine (1)**
21:24
**submitted (2)**
122:9;127:12
**Subparagraph (1)**
81:19
**substandard (1)**
28:11
**substantial (1)**
147:13
**Substantially (4)**
220:20,23;237:18;
238:17
**substantiates (1)**
52:2
**successfully (3)**
114:4,9,19
**sued (1)**
239:15
**sufficient (2)**
129:14,19
**suggest (3)**
152:8;10;182:18
**suggested (1)**
181:13
**suicide (1)**
78:7
**superior (1)**
156:4
**supervise (1)**
7:12
**Supervision (1)**
29:10
**supervisory (5)**
7:5,8,17,22;15:22
**supplied (2)**
73:9;226:8
**supply (1)**
250:23
**supposed (5)**
124:2,8,9;166:23;
208:11
**sure (41)**
7:11;18:15;23:20;
25:2;38:8;41:9;46:5;
60:7;62:16;81:14,14;
85:6;87:14;89:23;90:13;
97:2;101:25;113:2;
117:21;123:6;137:2;
141:24;149:18;152:11;
155:10;163:13;169:20;
173:4;186:22;187:18;
188:2,4;195:6;196:13;
201:12;215:9;220:25;
225:6;248:24;249:15;
250:19
**surprise (2)**
76:13;77:12
**surveillance (3)**
121:23;149:7;227:2
**suspect (15)**

83:12;92:6;94:23,23;
95:2,7,7,18,19;96:8;
124:21;183:13,22;
198:18;199:21
**suspected (1)**
54:1
**suspects (13)**
83:19;84:3,7;91:8,12,
15,24;92:10,23,25;
123:20;124:9;185:4
**suspect's (1)**
180:9
**suspicions (1)**
152:14
**SUV (6)**
155:17;227:11,15;
230:15,18,20
**SWAT (132)**
18:19,22;20:23;21:1,
4,4,8,21;22:14,15,17;
24:2,6,6 7,8,9,13,20,23,
24;25:22;26:5,13,19;
27:21;28:2,6;29:10;
31:11,14,18;32:2,4,8,12,
20,22,23;33:4,11,17,19,
24;34:3,4;35:12,18;
48:18,22,24,25;50:6,10,
16;51:9,11,23;52:4,11;
54:24;55:2,15,22,25;
56:3,11,18,20,20;57:3,8,
17,19;58:1,6,11,12,15,
18,22,24;59:1,8,15,20;
60:3,6,8,16,21;62:19;
63:10;66 2,4,5,8,15,17,
25;67:2,9,10,19;80:21;
97:21,25;112:6,23;
113:9;128:22;129:6,10,
13,14,21,22;130:6,9;
131:24;132:12;135:8,
17;137:22;156:9;184:6,
7,12,21;198:16;199:6,25
**SWAT-type (23)**
62:11;66:16,24;88:4,
10;90:20;109:12,19;
129:20;130:10;137:14;
139:14;140:9;145:9;
146:19;149:15,16;
156:10;163:16;182:18;
183:19;199:22;221:4
**sweep (1)**
190:11
**sweeping (1)**
190:17
**swift (2)**
34:24;36:15
**sworn (1)**
5:2
**syllabus (1)**
24:1
**systems (1)**
49:23

**T**

**table (1)**
22:23
**tablet (2)**
85:10;89:3
**Tac (2)**
213:4,6
**Taco (1)**
13:7
**tactic (2)**
70:16;72:8
**Tactical (14)**
30:8,23;34:24;36:15;
69:4;72:9;99:2;101:8,
12;103:23;104:1;108:7;
119:2;138:8
**tactics (17)**
33:25;54:25;55:11,12,
21;56:10,11;61:4,17;
64:17;66:24,24;92:11;
104:14;163:24;227:25;
228:5
**talk (13)**
24:1;67:16,25;80:9;
99:22;127:18;145:23;
146:16;149:11;176:4;
181:14;182:14;234:13
**talked (14)**
98:25;100:4;116:24;
146:1;148:17;175:17;
176:24;182:19;183:7;
194:11;200:9;217:25;
219:17;221:13
**talking (26)**
33:7,10;42:17;55:9,
10;57:7;103:12;127:5;
133:9,21;137:11,13;
169:16,16,18,23;173:19;
185:9,11;217:22;218:24,
25;220:22;225:8;240:3;
244:21
**talks (2)**
24:7;52:25
**tall (1)**
79:23
**target (5)**
70:25;71:3,12,12;
72:14
**tasked (1)**
195:1
**taught (5)**
72:2;76:22;101:4,7;
104:12
**teaches (1)**
36:19;104:3,5
**team (178)**
24:7,8,24,24;25:22;
26:5,19,23;27:12,21;
28:2,11;31:3;32:4,8,12,
20,22,24;33:4,11,17,19,
24:34:3,4,14,23,24:35:6,

9,12,13,18;36:3,9,13,15;
38:2,14:39:21,25:40:8,
24;41:7,17,24:42:1,16,
18;43:1;44:3;48:18,23,
23,24;49:5,7,11,16;50:6,
10;51:9,11,12,18,20;
52:4,11;54:21;56:3,17,
18,20,21;57:8,18,19;
58:1,6,12,12,15,18,22,
25;59:1,9,15;60:3,6,21;
62:11,19;63:10;66:2,4,
15,17,25;67:2,9,10,19;
68:11,13,16;78:12;
80:22;81:19,21;83:6,10;
91:25;92:16,18;93:3,4,
13,16;95:2;98:3,11;
105:25;106:1,14,18;
109:11;110:4,7;112:13,
13,15,24;113:9;125:6,
10;128:22;129:6.10,13,
14,21,22;130:6,9;
131:24;132:13;134:9;
135:8.17;137:14,15,22;
139:15;140:9;145:9;
154:15:157:14;163:8,
16;167:23;170:12;
171:21;172:6,19,24;
184:21;186:19;188:12;
195:20;196:7;206:18,
23;207:2,9,214:24;
232:8

teams (11)
24:13,20;26:13:55:2.
15,22,25;57:3;59:20;
66:6,8

team's (1)
168:24

Tech (1)
216:21

techniques (2)
64:3,18

teeny (1)
192:7

telling (14)
56:2,6,9,10;73:10;
78:17;109:10;148:24;
158:18,20;163:8;202:8;
210:13;234:5

tells (1)
141:8

temporary (1)
15:1

ten (2)
122:1;126:18

tend (1)
170:24

tended (1)
142:6

ten-year-old (4)
121:20;160:22;162:1:
163:7

term (5)
15:23;70:5,6;221:7,7

termination (1)
20:18

terminology (1)
36:9

terms (6)
73:2;119:13 158:13;
176:12;228:12;229:17

testified (10)
5:2;67:19;9(,:16;
108:15;166:19;187:24;
193:5;203:8.9;210:11

testify (8)
79:11;94:1;126:9;
165:11;178:7;193:8;
203:12;234:9

testifying (3)
233:1,6,16

testimony (21)
80:16;108:10,23;
125:17;130:15;132:25;
135:21;144:17;160:16,
19;165:17;165:17,25;
175:22;193:9 200:17;
203:7;205:2,25;208:7;
230:17

theirs (2)
160:24;161:3

Theory (2)
24:6,23

thereafter (3)
173:10;174:21;194:17

therefore (2)
71:22;160:24

thick (1)
23:9

thinking (4)
37:10;208:20;209:16;
210:7

third (13)
62:17;65:6;96 18,20,
25;99:9,10,10;115:18;
177:4;186:14.21;202:16

Thirty-six (2)
232:4;237:9

THOMPSON (249)
16:21,23;19:12;25:3;
29:16,19;35:22;37:3,14;
38:3,7;39:22;4  18;
42:2,21;43:2,15;45:5,10;
47:9,16;48:13;51:14;
52:20;53:9,16;54:5;
56:5;57:1,20;58:7,19;
59:2,4,12,23:60: 3;61:7;
64:1,8;66:20;6 :3,12;
68:2;69:20,23;71:9,16;
75:6;78:13;83:15;84:8;
85:24;87:2,11;83:5.17,
25;89:7,10,18;91:2;
92:15;93:8;94:16;97:11,
24;100:17,25;1(2:18;
105:14;108:9,12 14,19,
22;109:13;110:5 113:6;
114:11;116:14,22;

117:23;118:10;119:16;
120:4;122:16;123:4,14,
22;124:12,24;125:16,19;
127:3;128:23;129:15,
23;130:15;131:5;132:3,
14;133:18;135:20;
136:21;137:4;138:1,11;
139:9,18;140:13;141:5,
11;142:18,25;143:8;
144:7,14,21,25;145:3,
10;147:14;148:12;
149:4,19;151:2,6;153:2;
154:10,18;155:1;157:19,
24;158:6,15,23;160:15;
161:7,20;162:2,22;
163:12;164:18;165:18;
166:11,21;167:3,7,9;
169:8,14;170:1,10,13,
17;171:1;174:11;
175:24;176:14;179:21,
25;180:22;181:17;
182:1,7,20;183:9,24;
184:15,24;185:15;186:8,
18;188:19;195:16;
198:1,21;199:12,19;
200:4,22;201:15;
202:12;203:6,19;204:7,
21;205:1;207:4;208:12,
17,24;209:10,21;210:3;
211:7,16:212:17:214:19.
21;215:8,23;216:9;
217:21;218:5;219:11,
23;220:1;222:12,25;
223:6,17;224:13;228:2,
19;229:10,19,24;230:6,
16;231:16,21;234:17,21,
25;235:3,7,16,24;237:4,
15;238:23;239:6;
240:22;241:15,21,25;
242:6;243:10;244:9,11;
245:18;246:1;247:20;
248:23,25;250:5,11

though (23)
27:24;51:9;57:6;
79:20;85:11;93:13;
94:19;95:11;135:12;
154:9;180:13;182:6;
184:3;200:10;201:5;
203:21;211:4;214:15;
216:22;220:6;225:4;
230:4;239:2

thought (11)
38:11;42:4;126:6;
143:9;145:20;163:24;
174:2;185:23;191:13;
211:2;230:1

thoughts (1)
52:3

threat (32)
73:25;74:22,24;76:15;
84:3,6;92:24;110:19;
126:5;141:10;142:24;
143:6,7,25;144:5,19;

146:7;200:25;209:4;
215:5,11,16,17,20;
216:6,12,13,16;218:10,
21;219:8;243:15

threatened (1)
78:6

threatening (1)
183:19

threats (1)
125:22

three (21)
6:25:30:4;52:21;
62:25;72:25;76:13,23;
88:6;94:7;97:2;99:23;
157:9;159:7;188:3;
194:11;204:11;206:14;
212:4;227:15;230:11;
235:15

threw (1)
117:21

throughout (4)
26:12;127:9;140:18;
215:25

throw (6)
117:5,6;118:1,3,5,18

throwing (1)
117:3

thrown (3)
242:23;243:1,2

tie (1)
243:19

till (1)
197:4

Tim (1)
250:9

times (4)
39:1;88:7;113:3;
144:15;212:4;234:22

titled (1)
21:21

today (10)
5:17;8:7;80:16;85:11;
165:7;166:13;175:4;
177:14;220:17;244:22

together (8)
23:14;34:5;56:1;58:4;
88:4;106:3;191:21;
195:9

toilet (2)
79:24;80:12

told (51)
57:9;67:22;88:7;89:1,
11;100:21;101:18;
111:10;117:4,17,17;
118:18;119:25;120:21;
134:13,20;141:23;
142:14,20;144:2,15,21;
148:21;153:7;157:25;
158:12;159:1,18;
161:12;165:9,20;166:4,
13,13,14,21,22;167:8,9;
172:11;186:18;194:1;
196:16;207 14;209:1,2,

8;210:1,5;220:9;225:14

tolerate (1)
145:4

Tom (27)
76:2;89:6;179:16;
180:5,7,13,18;181:3,13,
24;182:13,14,17;183:6,
13;185:5,11;221:21,23;
222:8,14,19,21;223:13,
15,19;234:20

took (12)
31:4,21;62:9;78:1;
84:19;100:18,21:
125:23;127:11;145:17;
172:7;225:12

tools (1)
55:15

top (4)
69:12;103:16;113:21;
114:15

Torczon (2)
85:1;121:5

total (1)
22:1

totality (2)
129:1;144:22

touched (1)
91:9

tough (1)
179:23

toward (1)
172:8

towards (7)
94:8;96:22,23,24;
167:18;185:5;201:4

traffic (2)
8:14;42:19

trafficking (5)
53:25;54:3,7,13,20

train (3)
34:5;55:25;56:10,11;
57:12;58:3,4;64:2;
73:12;98:19,20;143:9;
185:22

trained (5)
18:24;19:15;26:1,1;
32:21;38:14;39:20,25;
40:9;50:5;55:24;60:9,
16,23;66:2;67:9,20;
73:13;75:2;98:16,17,21;
100:24;101:19;102:23;
103:6,10;108:5,16;
110:7;111:14;113:9;
114:16,18;115:5

training (146)
13:24;14:2;15:16,24,
25;17:15,16,18,21;18:3,
11,20,22;19:23;20:3,7,
23;21:2,4,5,8,21;22:14,
16,17,24;23:8;25:21;
26:2,4,12,18,24;27:23;
28:10,12;29:11,21;
30:10,12;31:6,8,10,11,

14,19;32:2,7,10,13,16,
17,24;33:18,22;34:4,6;
36:25;49:7,16,22,23,24,
24,24,25,25;50:1,1,8;
58:5,24;59:6;61:2,8,10,
11;62:6,8,24;64:17;
65:15,17,19;66:6,9;73:8;
77:24;78:2;83:9;88:10;
89:20;90:19;92:21;
97:21;98:1,9,15,22;99:1,
3;100:10,14;101:12,22,
23;102:6,8;103:8,12,18,
20,24;104:1,15,16,19,
25;105:21,22;106:13,18;
107:5,16;109:18,20;
110:14;111:11,18;112:2,
5,7,12,14;113:5;114:4,9,
20;120:19;130:21;
156:16;184:6;198:16;
199:5,25;244:24

**trainings (3)**
107:7,8;108:22

**transmissions (1)**
213:7

**trauma (1)**
163:22

**traumatize (1)**
163:23

**treat (4)**
46:4;180:7,16;183:13

**treatment (2)**
183:15;223:21

**trial (1)**
5:20

**Tricia (40)**
95:24;96:10,13;97:7,
21;124:2,4,16,21;
125:23;126:8,10,13;
148:19;161:13;162:9,11,
12;174:9;192:5,9;193:3,
22;195:2;196:20;200:6,
19;201:2;204:2,16;
205:12;206:3,6;209:25;
215:4,11;216:19,23;
217:4;218:10

**Tricia's (2)**
159:22;189:3;244:4

**tried (4)**
26:17;27:18;44:15;
143:16

**trigger (1)**
74:1

**trouble (2)**
5:23;6:2

**truck (1)**
227:16

**true (24)**
36:18;37:8;45:4;56:4;
66:14;79:24;93:2,14;
95:14,14,17;106:11;
122:7,8;135:12;156:3,6,
168:4;179:13;184:12;
191:4;214:24;215:1;

225:6

**trust (1)**
223:15

**trusted (1)**
118:12

**truth (1)**
163:9

**truthful (3)**
8:7,10;212:1

**try (12)**
26:16;33:11;13:25;
44:3,8;46:20;47:2;75:1;
90:2;102:2;202:18;
231:6

**trying (11)**
8:23;44:25;45:15;
47:7,14;143:11;144:16;
156:3;166:15;222:10;
248:23

**turn (12)**
17:13;22:13;62:14;
64:23;65:20;75:13;
82:13;113:15,150:9;
157:2;231:9,25

**turned (1)**
189:4

**TW (1)**
192:10

**Twenty-five (2)**
29:20;49:14

**twice (4)**
27:18;33:22;50:9;
220:11

**Two (39)**
10:21;11:11,22;18:13;
24:14;28:13;36.11;39:1;
62:24;73:24;75:7;76:3,
13,18;79:22;92:6;94:6;
97:2;152:17;157:8;
167:10;168:17:170:7;
185:8;188:3;189:2,14;
191:24;192:1;194:2,3,
11,24;197:6;203.3;
204:11;233:3;235:15;
248:25

**two-hour (1)**
21:21

**type (10)**
26:2;63:13;65:7;
69:15,18;89:15;  10:14;
123:13,25;134:8

**types (3)**
64:3;66:1,4

**typical (1)**
35:8;59:8;149:3,14,21

**U**

**UC (2)**
48:1;150:19

**UCM (1)**
73:24

**uncommon (1)**

225:4

**uncover (1)**
136:8

**under (29)**
5:16;17:23;19:24;
20:9;42:25;43:24;44:8;
64:16;65:24;70:20;72:7,
14;74:7;75:15;76:16;
77:20;92:21;97:15;
102:9;108:10;115:15;
120:13,17;150:25;
152:2;166:25;168:17;
235:18;247:16

**understandable (1)**
39:15

**understood (7)**
103:17;111:10;
118:16;130:7;161:24;
165:10;243:8

**undertake (1)**
241:3

**unexpected (1)**
76:17

**unfair (1)**
170:23

**unit (10)**
7:10;25:25;55:25;
57:12;58:3;60:9,16,23;
108:5;138:8

**units (1)**
18:24

**Universal (2)**
73:22;74:21

**unknown (2)**
152:13;215:17

**unless (4)**
43:11;54:13;68:21;
122:11

**unlocked (1)**
196:17

**unmarked (1)**
152:15

**unobstructed (1)**
70:10

**unpredictable (1)**
142:9

**unsafe (1)**
183:6

**untrue (1)**
135:10

**up (40)**
9:14;17:19;20:4;
21:18;31:24;43:20;
44:12;45:13,14;51:19;
54:6;62:4,7;75:23;
87:22;92:12;99:13;
108:3;110:12;113:4;
126:5;137:17,21;
145:13;158:22;167:22;
170:19;174:9;179:14;
180:10;181:3,4;197:17;
198:8;200:24;201:21;
202:4;228:20;243:19;

245:15

**update (1)**
251:1

**updated (1)**
112:16

**upon (2)**
74:17;244:16

**upper (1)**
206:20

**upstairs (2)**
190:17;191:22

**use (48)**
26:7,13,16;27:8;
39:25;41:6;56:22;58:11;
67:10;70:6;99:25;114:4,
10,16,20,20;115:9,9;
128:21;129:6;130:22;
131:9,19;134:21;135:6,
15,17,18;136:7;137:24;
140:9;147:22;159:20;
163:24;168:23;183:19;
184:7;194:8;198:23;
199:7,21;200:6,16;
219:21;221:4,7;233:21;
236:24

**used (34)**
5:20;28:11,13;36:8;
55:15,22;62:18;63:9,12;
64:3;65:7;74:21;78:11,
19;81:14,20;83:10;
100:23;106:22;112:14;
113:23;114:2;115:4;
125:13;132:17,18;
147:3;198:18;221:19;
228:1,5,22;232:11;
234:22

**user (3)**
131:2,25;132:11

**users (3)**
130:21;143:7,18

**using (8)**
43:17;84:2;99:17;
113:5;221 21,23;222:8;
245:5

**usually (3)**
51:19;235:1;248:17

**V**

**Vague (4)**
25:4;217:19;223:8;
224:13

**valuable (2)**
156:4;180:19

**van (1)**
226:19

**vehicle (11)**
49:25;122:5;152:18;
155:11;162:12,14;
226:16;227:6,10;230:4,8

**vehicles (11)**
155:15,17;226:18;
227:7,15,18,21;230:11,

22,24;231:3

**verbatim (1)**
16:21;116:17

**verbiage (1)**
241:1

**view (2)**
149:17;202:3

**viewing (4)**
70:25;71:12,12;72:14

**violation (1)**
8:14

**violence (4)**
76:13;142:6,12;
216:25

**violent (2)**
216:25;217:12

**Virginia (1)**
216:21

**visible (1)**
73:25

**vision (1)**
74:1

**visit (5)**
7:25;152:3,20;160:12;
234:23

**visually (2)**
115:20,24

**voluntary (1)**
197:19

**volunteer (1)**
239:2

**volunteering (1)**
210:13

**W**

**Wachsmuth (94)**
9:24;43:21;44:14;
46:17;47:3;52:8;77:10;
82:2,24;83:3;85:15;
95:24;96:11,13;97:21;
100:11;106:17;124:2,4,
16,21;125:23;126:8,11,
14;140:19;141:4,18;
142:6,12;144:3;148:11,
20;152:22;157:15;
165:3;174:9;179:16;
180:5,13,19;181:3,14;
193:3,6,22;195:2;
201:19,21;202:4,19;
203:13,14;204:2,16;
205:12;208:2,8;209:25;
214:8,10,16;215:5,11,
16,20;216:4,17,20,24;
217:4,9,11,16;218:10,
20,25;222:14,19,20;
227:21,24;228:11;229:6,
12,16;245:12

**Wachsmuth's (6)**
155:14;226:16;227:6,
10;245:9;247:1

**wait (8)**
79:9;90:21;157:10;
177:23;178:23;180:11;
182:16;201:24

**waited (1)**
177:23

**walk (3)**
27:20;201:21;202:4

**walked (5)**
197:17;201:4,23;
202:1;214:12

**walking (1)**
214:13

**wall (3)**
116:4;205:17,18

**walls (1)**
116:1

**wants (1)**
25:15

**warning (2)**
115:2,4

**warrant (42)**
24:18,21;25:8,9,12,23;
30:9;43:18,21,22;44:6;
46:18;52:8,25;59:9,9,15;
77:9;79:14;97:20;
105:24;106:16;110:17;
123:16,18;127:14;
133:15;135:17;136:8;
137:22,23;138:5,10,13;
149:8;157:8;173:6,15;
180:10,15;227:13;
247:22

**warrant' (3)**
168:22;232:9;236:23

**warrants (18)**
50:4;52:14,17,18;
53:6;109:6,7,9,10;110:1,
3,16,18;137:6,8;143:15;
223:10;244:25

**watch (1)**
150:25

**watching (4)**
153:14;154:5,8;
155:25

**way (25)**
21:17;30:1,16;37:24;
46:4,7;70:21;72:7;
75:12;82:14;113:8;
118:16;137:16;138:5;
139:23;172:12;181:16;
185:2,5;199:7;212:1;
221:9,14,15;235:16

**weapon (29)**
49:23;68:7,23;69:13,
15;70:1,4,7,8,24;71:1,4;
72:14,15;73:24;74:7,10;
110:22;125:13;126:7,8,
10;128:14;159:13;
193:2,6,13,16;208:2

**weapons (19)**
26:21;54:25;55:1,3,4,
9;127:8;130:3,21;

**week (3)**
23:22;45:14

**weeklong (2)**
112:8,20

**Weight (2)**
54:10,11

**welcome (1)**
23:18

**well-trained (1)**
38:2

**weren't (9)**
39:12;93:3,12,13,22;
163:13;171:20;214:23;
225:6

**WESTBY (288)**
8:20,25;9:6,8,11;
16:14,17;24:10;25:5;
35:23;37:12;58:4,15;
39:7,10,14,23 40:4,11;
41:8;19;42:3;-:3:3,13;
44:22;45:1,4,23;46:3;
47:10;53:10,13;56:24;
57:21:58:8,20:59:3,13,
24;61:5;62:20,.3;66:18;
67:4,13;68:3;69:17,24;
71:7,14;77:14:78:14;
82:4,25;83:13,24;85:16;
86:25;87:12;88:18,24;
89:24;90:5,11,21;91:3;
92:2,13;93:6,24;95:8;
97:22;100:15;101:1,13,
20,25;102:4,10;103:1;
104:7,22;105:5;106:4;
109:14,22;113:7;116:15,
23;117:12,24;118:8;
119:14;120:2;122:17;
123:5,21;124:13,25;
125:18;127:1,15,25;
128:7,24;129:8,16,24;
130:13,16;131:3,13;
132:1,15;133:19 134:15,
23;135:9,22;135:2,15.
19;138:2,14;139:7,16,
22;140:11,14;141:6,12;
142:19;146:21; 48:13;
149:5,20;151:3,7;
152:25;154:3,1  ,19;
155:3;156:20;158:7,16,
25;160:4,17;161:21;
162:3,23;163:10;164:19,
22;165:4,16,19;166:3;
167:8,24;168:3,5,18;
169:15;170:2;171:9;
173:22;175:21,25;
176:2;178:2,6,11 16,18;
179:1,5,8,22;180:23;
181:18;182:2,21;183:10,
23;184:10,14,23;185:13,
22;186:10,15,21;-89:19;
195:5,17,25;197 21,24;

**198:**3,22;199:10,17,20;
200:5,20;202:10;203:10,
17;204:4,23;205:7;
207:17;208:18,25;
209:15;210:5,19;211:8,
14,17,21,25;212:13,25;
213:18;215:6,21;216:7;
217:18;218:22;219:2,
10;220:7,18;221:6;
222:15;223:1,8,18;
224:14;225:10;226:11;
228:3,15,18;229:8,18,
25;230:5;231:4;232:3,5,
23;233:5,8,11,15,22;
234:3,10;235:8;236:6;
237:3,22;238:1,7,14,25;
239:22,25;240:6,11,14,
16;241:5,9;242:11,17;
243:22;244:10;245:19;
247:5,9,18;251:1,6

**What's (21)**
24:24;36:2;46:5;53:8;
54:9,11;56:14:59:14;
86:17;88:3;108:14;
164:16;165:13,13;
173:16;176:12;178:12,
15;209:15;233:2,6

**whatsoever (1)**
140:6

**whole (2)**
205:9;207:9

**who's (1)**
102:23

**whose (3)**
84:22,25;228:8

**willing (6)**
130:22;209:3,7;
210:12,15,18

**win (1)**
179:10

**window (20)**
100:1;117:7,10,16;
119:7;152:13;157:9,11;
159:9,10,17;175:10,12,
19,20;176:8;242:24;
243:1,3;247:16

**windows (5)**
53:14;140:23;142:21;
146:5;228:24

**Winter (2)**
16:8,9

**wish (1)**
84:12

**Within (4)**
15:3;17:15;79:19;84:4

**without (5)**
32:24;33:13,15,16;
222:23

**WITNESS (238)**
9:17;19:13;24:13;
35:24;37:15;38:8,17,24;
39:3,16,24;40:16;41:9,
20;42:4,11,22;43:4,16;

**44:**23,24;45:2,7,15,16;
46:10;47:11,17;52:24;
53:11,19;54:6;56:6;
57:2,22;58:9,21;59:5,14,
25;61:8:62:21;63:1,4,7;
64:2,9;66:21;67:5,14;
68:4;69:25;71:17;78:15;
82:6;83 16.25;84:9;
85:17,25;87:3,13;88:6;
89:23;90:9,13;91:4;
92:4,16;93:9;94:1,18;
95:9:97:12,25;100:18;
101:3,15;106:6;109:2,
15;113:8;116:16,24;
117:25;118:11;119:17;
120:5;122:18;123:6,15,
23;124:20;125:1;
127:17;128:2,25;129:10,
17,25;130:19;131:6,15;
132:4,16;133:20;134:17,
25;135:23;136:22;
137:5;138:4;139:10,24;
140:5,15;141:13;
142:20;143:1,9,14;
144:10;145:1,5,11;
146:23;147:11,15;
148:14;149:6,21;151:8;
153:3;154:5,12,20;
155:2;156:22;157:20,
25;158:8.24;159:1;
161:22;162:4;163:13;
164:23;165:7,9,20;
166:2,4,15,19;168:8,11;
169:20;170:3;171:11;
173:23;174:13;178:7;
180:24;182:3,9,22;
183:11;184:16,25;
185:16;186:2;187:22;
188:21;189:20;190:15;
191:17;195:6,18;198:4,
23;199:13 24;200:6,23;
201:16;202:13;203:8,
20;204:8;205:14;
207:19;208:19;209:1,
11;210:21;212:19;
213:19;215:9,24;
216:10;217:22;218:7;
219:12;220:2,10,20;
221:8;222 16;223:2,9,
19;224:15;225:12;
226:12;228 4,20;229:11,
20;230:1,7,18;231:5;
232:4,6;234:8,13;237:7,
16;238:15;239:9;
240:13;242:19;243:24;
245:20;247:11,21;
249:5;250:6

**witnesses (2)**
46:4;203:7

**witness's (1)**
125:17

**woman's (1)**
121:4

**wood (1)**
172:23

**word (1)**
172:18

**wording (2)**
177:4;196:22

**words (10)**
19:22;45:1;47:1;
57:23;74:18;152:19;
172:15;211:10;216:3;
228:10

**work (4)**
14:8;37:6;156:23;
217:7

**worked (4)**
13:4;57:4;217:6;222:9

**working (4)**
75:12;80:21,22;
219:13

**world (3)**
60:1;67:14,16

**worn (1)**
213:1

**worried (1)**
143:2

**worse (1)**
180:17

**worst-case (3)**
75:2;159:2,5

**worth (1)**
107:15

**write (2)**
21:11;182:4

**writes (1)**
249:16

**written (5)**
48:16;71:6;85:23;
165:13;185:25

**wrong (10)**
36:8;154:8;156:7;
164:16;165:13;199:16,
20;200:3,12,15

**wrote (8)**
88:1;165:10;175:14,
16,16;177:18;224:23;
239:16

**Wyoming (10)**
6:16;14:22;17:16;
19:19,20,22,24;20:6;
62:3;127:23

---

**X**

**X's (1)**
192:8

---

**Y**

**yard (3)**
171:23;172:2,25

**year (18)**
7:16,16;10:11;11:1;
12:8;13:4;14:20;15:2;

21:3,17;22:20;26:24;
27:14,17;34:1;113:3;
121:12,14
**year-and-a-half (1)**
    88:2
**years (9)**
    10:21;11:11,22;13:3;
    22:7;58:13;120:17;
    121:15;122:1
**years' (2)**
    18:4;107:15
**year's (1)**
    15:3
**yellow (1)**
    85:10
**Yep (1)**
    100:4
**yesterday (5)**
    8:22;45:13;68:6;
    167:25;168:7
**YOA (2)**
    121:11,13
**young (15)**
    120:22;154:1,14,16,
    21,24;155:7,9;156:8,8;
    163:16,21,23;164:2,5



POWELL POLICE DEPARTMENT

250 N. CLARK ST   POWELL, WY 82435   307-754-22

SUPPLEMENT 7

WACHSMUTH v. CITY OF
POWELL— CV 10-041J
PLAINTIFF'S EXHIBIT
# **16**

## INVESTIGATION CONTINUED: SGT M.G. Chretien

On 02/24/2009 I was informed by SGT Kent that we would be serving a narcotics search warrant on Bret Wachsmuth's residence. I was tasked with organizing the intial entry into the residence and securing the scene for evidence collection. I received a briefing from SGT Kent and Officer Miner detailing the layout of the house and the information provided by the informant pertaining to Bret Wachsmuth. Particularly that Bret was paranoid and was a "peeper", meaning that he was always looking out his windows, especially when the dog barked.

I was told that Bret was on several medications, was mentally unstable, kept firearms in the living room and the north east bedroom, and carried a firearm on his person. I was also told that he had "armor piercing" ammunition. According to the informant, Bret was growing marijuana in his basement. The informant also said that his wife was receiving prescription medication through the mail, from her mother. This medication was supposedly placed inside of a rubber glove, which was then placed inside of stuffed animals. We did not know the extent of the grow operation.

Officer Blackmore had been watching the residence at 870 E North Street, while we planned the operation. While he was there, he reported seeing a suburban type vehicle pull into the driveway and a male adult and male child exit and enter the house. We did not know who else was at the house. Before we left the station he said that an adult male had left the house in the car, but he did not see a passenger.

Based on the information received, and my knowledge, training, and experience on numerous narcotics search warrants, I decided to take extra precautions to minimize the chance of someone getting hurt. Those extra precautions included planning multiple breaches simultaneously, using as many officers as I had available, and introducing a Noise Flash Distraction Device (NFDD), or "flashbang".

The plan was for three officers to approach the back door via a wooden privacy fence in the back yard. Their purpose was to secure the back door and create a distraction by breaking a window in either the south east bedroom, or the back door itself.

Another officer, along with Officer Blackmore, would secure the detached garage from outside the fence. The fence connected the house to the garage, and we did not know where a gate was located.

Six officers would form the primary entry team. One officer would carry the ram, the rest were equipped with long guns. Two other officers would form a distraction team and follow the entry team in to secure prisoners, and would be armed with pistols. One of these two would carry the window rake, the other the NFDD.

The plan was to knock on the front door and announce "police, search warrant". If the door did not open immediately, we would use the ram to force entry. The primary entry teams responsibility was to secure the residence and ensure the safety of everyone involved. The follow on officers would secure prisoners. Once everyone was secure and the residence checked for threats, the evidence team would take over. We planned to immediately remove any occupants to the police station for interviews.

As officers arrived and approached the house, the dog started to bark out the front living room window. Officer Chapman knocked on the front door and announced "police search warrant". When the door did not open, Officer Miner forced it open with the ram. The back yard team of officers were not in position when this happened, so they secured the back yard and door area by sight initially, and no windows or doors were broken on the back of the residence. As the door was being rammed, SGT Kent used the window rake to break and rake the window to the north east bedroom. Officer McCaslin then checked the area immediatley inside the window for people or obstacles, and deployed the NFDD.

As the entry team entered the living room we encountered a white female sitting on the couch. Officers cleared the living room, kitchen, bedrooms, bathroom, and basement without encountering anyone else. There were several guns in the north east bedroom. While officers were clearing the

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| P06 | CHRETIEN, MICHAEL | 3/2/2009 | P01 | FEATHERS, TIM | 4/6/2009 |



house, the family dog ran out the front door. We were unable to find the dog. We discovered that Bret was at his dad's house, located outside of the city limits of Powell.There were two marijuana plants growing under the stairs to the basement. Assitant County Attorney Jonathon Davis instructed us to take him into custody. Officer Danzer, SGT Eckerdt, and I went to the residence and informed his dad that we had just served a search warrant on Bret's house, and that we were there to arrest Bret.

Officer Danzer and SGT Eckerdt took Bret into custody and transported him to the station. I stayed at the residence until Officers Danzer and Bradley returned to inventory Brett's vehicle, which was named in the search warrant, and parked at his dad's house. I assisted Danzer and Bradley with the search, and then gave the keys to Bret's dad.

### EVIDENCE:
None.

### UNDEVELOPED LEADS:
None.

### ATTACHMENTS:
None.

### STATUS:
Closed.

### VICTIM/WITNESS FOLLOW UP:
None.

| Prepared By: | Date: | Approved By: | Date: |
| --- | --- | --- | --- |
| P06    CHRETIEN, MICHAEL | 3/2/2009 | P01    FEATHERS, TIM | 4/6/2009 |