# Appendix Three

**SUBMITTED BY:**
JEFFREY C. GOSMAN
GOSMAN LAW OFFICE
PO Box 51267
Casper, WY 82601-2481
(307) 265-6715 (fax.)
(307) 265-3082 (ph.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

TRICIA WACHSMUTH,                                    CASE NO.  *10*  *cv*  *041J*

        Plaintiff,

vs.

City of Powell, and in their individual capacity,
Tim Feathers, Chad Miner,
Mike Chretien, Roy Eckerdt, Dave Brown,
Mike Hall, Brett Lara, Matt McCaslin,
Alan Kent, Matt Danzer, Officer Brilakis,
Lee Blackmore, Cody Bradley, Kirk Chapman
John Does #1 - #4

                Defendants.

Comes Now, David Patterson, and declares under penalty of perjury the following:

1.    I, David Patterson, have personal knowledge of all matters contained herein.

2.    I am under no disability and competent to testify.

3.    I am a Lieutenant for the Park County Sheriff's office.

4.    I am the Team Leader of the Park County Special Response Group which is the only

trained tactical team in Park County, Wyoming.

5.   I have over five years on a Drug Enforcement Task Force in the State of Washington, and have been the Team Leader of the Park County SRG team for two years.

6.   I have given my deposition in the case of Tricia Wachsmuth v. the City of Powell and numerous Powell police officers.

7.   On the day that the Powell Police Department searched the home of Bret and Tricia Wachsmuth, I was consulted by Officer Chad Miner of the Powell Police Department, as I was told, for my expert se in marijuana grow operations.

8.   I assisted in some of the interview of the confidential informant who supplied the information concerning the marijuana grow operation to Officer Miner, and visited with Officer Miner after he had completed his interview with the confidential informant.

9.   At no time after the interview with the confidential informant on the day the warrant was served, did Officer Miner mention that the confidential informant had informed Officer Miner that he had alerted Bret or Tricia Wachsmuth that he, the confidential informant, had spoken to the police about the Wachsmuth marijuana grow operation.

10.  Since I asked him what the hurry was, that would have been information I would think he would have shared.

11.  The first time I heard about this, that the informant had disclosed to the Wachsmuths that he had turned them in, was several months after the incident.

12.  On the afternoon that the warrant was being prepared for the search of the Wachsmuth home, Officer Miner came in my office and said he had a grow operation out in the County and we, the Powell Police Department, are probably going to need your "team".

13.  Our "SRG" team was the Park County Sheriff's Office, Special Response Group, which

was a specially trained unit used to perform tactical operations.

14.     After listening to Officer Miner, and interviewing the confidential informant, I informed
        Officer Miner that I felt the operation was being rushed, and that he needed to do more
        homework and asked what the hurry was.

15.     He responded by saying that administration was on his ass, and that he really needed to
        boot a door.

16.     I asked him why he didn't tighten up his information more, and he said he was going on
        days off.

17.     I later told him that it didn't look like they needed us. I said this because the operation
        was now in the city and not in the County, information was changing that was critical and
        because they hadn't done their homework based upon my prior experience with these
        types of operations. They didn't have enough information concerning Bret Wachsmuth to
        justify the use of our SRG team.

18.     I told Miner that I did not feel they needed anything like an entry team and suggested
        other options.

19.     I said to Miner that I did not feel SRG was needed because it was a small grow operation
        and there wasn't sufficient evidence that Bret Wachsmuth posed a threat to officer safety
        just because there were weapons at the house.

20.     That is when I threw out the options of a knock and talk, or conducting a surround and
        call out and or using Tom Wachsmuth as a call out option.

21.     Chad Miner then said something to the effect that they were not going to do it like that
        and Jonathon Davis, the Assistant District Attorney chimed in agreeing with Miner. I

understood from that statement, that they were going to disregard my suggestions and this made me even more uncomfortable with the rate and manner things were progressing. At this point I left and contacted the Sheriff again to suggest we not participate with the Powell Police Department in this operation. He concurred.

**I declare and certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on Friday, January 7, 2011.**

Lieutenant David Patterson
Park County Sheriff's Office
Park County SRG Team Leader

# Appendix Four

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powel, et al.*

*Matt McCaslin*
*October 6, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 10-6-10 Ma t McCaslin_scoped.txt
Min-U-Script® w th Word Index

MATT MCCASLIN - October 6, 2010                              Page 1

1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF WYOMING
3    ------------------------------ ------------------------
4    TRICIA WACHSMUTH,                  )
5                    Plaintiff,         )
6         vs.                           )   NO. 10-CV-041J
7                                       )
8    CITY OF POWELL, AND IN THEIR       )
     INDIVIDUAL CAPACITY, TIM           )
     FEATHERS, CHAD MINER, MIKE         )
9    CHRETIEN, ROY ECKERDT, DAVE        )
     BROWN, MIKE HALL, BRETT LARA,      )
10   MATT MCCASLIN, ALAN KENT, MATT     )
     DANZER, OFFICER BRILAKIS, LEE      )
11   BLACKMORE, CODY BRADLEY, KIRK      )
     CHAPMAN, JOHN DOES #1-#4,          )
12                                      )
                Defendants.             )
13   _____

14          DEPOSITION OF MATT MCCASLIN
15        9:07 a.m., Wednesday, October 6, 2010

16
17
18          Pursuant to notice, the deposition of MATT
19   MCCASLIN was taken in behalf of Plaintiff in accordance
20   with the applicable Federal Rules of Civil Procedure at
21   270 North Clark, Powell, Wyoming, before Vonni R. Bray,
22   Registered Professional Reporter and Notary Public of
23   the State of Montana.
24
25

MATT MCCASLIN - October 6, 2010                              Page 2

1                    APPEARANCES
2    FOR PLAINTIFF:
3              Mr. Jeffrey C. Gosman
               Gosman Law Office
4              123 W 1st Street
               P.O. Box 51267
5              Casper, WY 82601-2481
               Telephone: (307)265-3382 - Fax: (307)265-6715
6              E-mail: jeff@gosmanlawoffices.com
7
8    FOR INDIVIDUAL DEFENDANTS:
9              Ms. Misha Westby
               Senior Assistant Attorney General
10             2424 Pioneer Avenue, 2nd Floor
               Cheyenne, WY 82002
11             Telephone: (307)777-5477 Fax: (307)777-8920
               E-mail: mwest@state.wy.us
12
13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:
14
15             Mr. Tom Thompson
               MacPerson, Kelly & Thompson
16             616 West Buffalo
               P.O. Box 999
17             Rawlins, WY 82301-0999
               Telephone: (307)324-2713 - Fax: (307)324-7348
18             E-mail: tthompson@wyomingattorneys.net
19
20   Also Present:  Tim Feathers
21
22
23
24
25

MATT MCCASLIN - October 6, 2010                              Page 3

1                  INDEX TO WITNESSES
2                                                        PAGE
3    MATT MCCASLIN
4         Direct Examination by Mr. Gosman ..............4
5         Signature Page ..............................132
          Reporter's Certificate ......................133
6
7
8                      EXHIBITS
9    EXHIBIT          DESCRIPTION                       PAGE
10   7       DEF-TECH Label ..........................38
11   9       Distraction Device Document .............47
12   10      Notes of Wachsmuth Warrant ..............54
13   16      PPD Supplement 7 by Mike Chretien .......69
14   19      PPD CAD Incident Report ................117
15   23      PPD Supplement 6 by Kirk Chapman .......102
16   27      Countermeasures Tactical Institute ......29
             Patrol Officer Specialized Tactics
17           Course
18   31      Wyoming P.O.S.T. Training Records .......10
19   32      PPD Receipt ............................111
20   35      PPD Patrol Friday Training .............15
21
22
23
24
25

MATT MCCASLIN - October 6, 2010                              Page 4
Direct Examination by Mr. Gosman

1                    MATT MCCASLIN,
2    having been first duly sworn, testified as follows:
3                  DIRECT EXAMINATION
4    BY MR. GOSMAN:
5         Q.  Officer, have you ever given a deposition
6    before?
7         A.  No, I have not.
8         Q.  And since you have not given a deposition
9    before, I'm going to take a couple of minutes and
10   discuss some of the ground rules that apply to every
11   deposition?
12        A.  Okay.
13        Q.  And the first one that I'll start with is
14   that under the format of a deposition, I will ask you
15   questions, and you will be required to answer them
16   truthfully, unless your attorneys instruct you not to
17   answer the question, do you understand that?
18        A.  Yes, sir.
19        Q.  And the answer you give today will be
20   recorded and can be used against you at trial, do you
21   understand that?
22        A.  Yes, sir.
23        Q.  Is it important for you to ask for
24   clarification if you don't understand a question. Will
25   you do that?

MATT MCCASLIN - October 6, 2010                          Page 5
Direct Examination by Mr. Gosman

1   A. Yes.
2   Q. And this may or may not be a problem, but
3   allow, if you will, me to finish my questions before
4   you begin your answer. And that way we'll have a clear
5   record of the deposition. Will you agree to that?
6   A. Yes.
7   Q. What is your -- there is one last issue, and
8   that is we can take a break at anytime. So when you
9   feel like a break, that's fine.
10      The only rule is that a break cannot occur
11  when a question is pending. If there's a question
12  pending, you'll need to provide an answer before we can
13  go ahead and break.
14  A. Okay.
15  Q. What is your full name, sir?
16  A. Matt James McCaslin.
17  Q. And what is your current address?
18  A. 250 North Clark. That's my work address.
19  Q. And what is your current employment?
20  A. I'm a police officer.
21  Q. With the City of Powell?
22  A. That's correct.
23  Q. And what is your current rank?
24  A. I'm currently the school resource officer.
25  Q. How long have you been working with the

MATT MCCASLIN - October 6, 2010                          Page 6
Direct Examination by Mr. Gosman

1   Powell Police Department?
2   A. Just over six years.
3   Q. During that time, have you had any advance or
4   increase in grade?
5   A. Yes, sir.
6   Q. Can you describe that for me, please?
7   A. Yearly, at our anniversary, we have merit
8   increases, that kind of thing. Citywide COLA
9   increases, cost of living adjustments.
10  Q. Are you still a patrol officer?
11  A. I am a patrol officer.
12  Q. Slash?
13  A. Slash school resource officer.
14  Q. Very good. Thank you.
15      Now, sir, are you currently on any medication
16  that would impair your ability to give truthful answers
17  today?
18  A. No, sir.
19  Q. Do you have any medical problems or illnesses
20  that might interfere with your ability to give truthful
21  answers to this deposition?
22  A. No, sir.
23  Q. Have you ever been arrested for a crime,
24  other than a traffic violation?
25  A. No, sir.

MATT MCCASLIN - October 6, 2010                          Page 7
Direct Examination by Mr. Gosman

1   Q. Have you ever been accused of a crime
2   involving dishonesty?
3   A. No, sir.
4   Q. Officer, are you married?
5   A. I am.
6   Q. And do you have children?
7   A. I do.
8   Q. Are any of those children old enough to be
9   familiar with the parties -- or the party in this case,
10  Tricia Wachsmuth, her husband, or the confidential
11  informant?
12  A. No, sir.
13  Q. Have you ever been divorced?
14  A. No, sir.
15  Q. Have you ever had a restraining order placed
16  against you?
17  A. No, sir.
18  Q. Let's go ahead and begin with your
19  educational background. Could you take me through your
20  high school years, where did you go to high school and
21  when did you graduate?
22  A. I went to high school for two years in Ennis,
23  Montana. Freshman and sophomore year. Junior and
24  senior year, Bozeman, Montana. Graduated there.
25  Q. And what year was that?

MATT MCCASLIN - October 6, 2010                          Page 8
Direct Examination by Mr. Gosman

1   A. 1990.
2   Q. Okay. And what is your work history from
3   1990 up until the time you started with the Powell
4   Police Department, which I assume would have been 2004;
5   is that correct?
6   A. That's correct. I was in college -- while in
7   college, I had several jobs, from working in fast food
8   restaurants, worked the front desk of couple a of the
9   dormitories. I worked with a private security company
10  out of Bozeman for a period of time before we moved.
11  Q. Okay.
12  A. Let's see, we moved to -- I can't remember
13  when we moved to Wyoming here. '95, I believe, when we
14  moved down here. I did my student teaching here in
15  Wyoming.
16  Q. Let me stop you. I'm sorry to interrupt.
17      But it appears that you went beyond high
18  school and attended college. You just mentioned
19  student teaching; did you obtain a degree in education?
20  A. Yes.
21  Q. What university was that?
22  A. Montana State University in Bozeman.
23  Q. All right. What year did you get that
24  degree?
25  A. I finally received the degree in 2000.

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 10 of 54
Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

1    Q.  Okay.  And since that time, did you function
2    as a teacher?
3    A.  No, I didn't.  Shortly after my student
4    teaching, I worked with a freight brokerage business
5    that a family member had.  I didn't care for that.
6    Ended up working at a saddle shop over in Cody for
7    about eight or nine years.
8    Q.  And then did you obtain a teaching
9    certificate and start teaching school?
10   A.  No, I never did teach.
11   Q.  All right.  So you -- what was the last job
12   you held before you started work for the Powell Police
13   Department?
14   A.  Saddle maker.
15   Q.  And that was in Cody'.
16   A.  Correct.
17   Q.  Did you go to work for the Powell Police
18   Department and complete your law enforcement training
19   at about the same time?
20   A.  I'm sorry?
21   Q.  Your certification at the Law Enforcement
22   Academy?
23   A.  That was done later, after I was hired.
24   Q.  Okay.  Okay.  You were hired in 2004.  Why
25   don't you describe your work history since 2004

1    be difficult to find it because they are not sequenced
2    at all.
3         MR. THOMPSON: Well, and I have a general
4    idea.
5         MR. GOSMAN: Thirty-one is towards the back
6    of the records.  The beginning Bates-Number is 1162.
7    That's interesting.  They came with the exhibit
8    stickers.  I don't know how that happened.  Sometimes
9    PDFs don't pick up comments.  They call them comments.
10   And the stickers are under the category of comments.
11        MR. THOMPSON: We can go off the record.
12        (Discussion held off the
13           record.)
14   BY MR. GOSMAN:
15   Q.  Okay.  Let's take a look at Exhibit 31.  And
16   I believe -- let's see, starting with the Bates-stamp
17   1220, we'll have to ask you to turn to that document if
18   we can, sir.
19   A.  And these aren't in --
20   Q.  No, they are not.
21   A.  Okay.
22   Q.  Okay.  You found that, sir?
23   A.  Yes.
24   Q.  All right.  Does this exhibit and document
25   accurately reflect your training history as a law

1    briefly.  Well, scratch that question.  That's not a
2    good question.
3         Let's do this:  You started as a police
4    officer, and I assume you filled a probationary period,
5    correct?
6    A.  That's correct.
7    Q.  And when did you begin your training at the
8    academy?
9    A.  I believe that it was in April of '05.
10   Q.  And you successfully completed that program?
11   A.  Yes, sir.
12   Q.  And since that time, you've had certain
13   professional training, correct?
14   A.  Yes.
15        (Exhibit 31 identified)
16   BY MR. GOSMAN:
17   Q.  Why don't we go ahead and take a look at
18   Exhibit 31 for a moment.  And it's in this notebook
19   there in front of you, Officer
20        MR. THOMPSON: Counsel, for some reason, the
21   Exhibits didn't -- on the printed version that I
22   received did not contain the pages, did not contain the
23   exhibit reference.  So is there a way to refer to the
24   Bates Number also?
25        MR. GOSMAN: Yes, there is but it's going to

1    enforcement officer?
2    A.  Through P.O.S.T., yes, sir.
3    Q.  Okay.  And would you please identify your
4    training relative to dynamic entry by pointing it out
5    to me from your P.O.S.T. records?
6    A.  Would be the date of 9/3/2005, patrol
7    tactical response.
8    Q.  Okay.
9    A.  Another time listed here in the P.O.S.T.
10   record is 11/14/2009, immediate action for patrol.
11   Q.  Okay.  All right.  The second training that
12   you received on 11/14/2009 occurred after the date that
13   the Wachsmuth warrant was served; is that correct?
14   A.  That's correct.
15   Q.  Let me ask this question:  Has there been any
16   other training that you received prior to the 24th of
17   February 2009, that focused or dealt with dynamic
18   entry?
19   A.  Yes, sir.
20   Q.  All right.  What other training was that?
21   A.  Training that we've done in-house at various
22   times.  I've also had -- another officer and I had gone
23   over and attended a training over in Cody at one point,
24   I don't recall what date that was.
25   Q.  All right.  Now, that sounds like this may

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 11 of 54
Tricia Wachsmuth v.                                                                Matt McCaslin
City of Powel, et al.                                                              October 6, 2010

1  have been something that occurred outside of your
2  in-service training?
3      A. Correct.
4      Q. Do you understand what I mean when I say
5  in-service training?
6      A. I believe so. Can you clarify that?
7      Q. What we had labeled here at these depositions
8  as the Friday training sessions?
9      A. It's not always on Friday.
10     Q. I know it's not always on Friday.
11     A. All right.
12         MS. WESTBY: I think there's a difference
13 between in-service and the Friday trainings
14 potentially. I'm just wondering if you're limiting
15 your question to all in-service if there's something
16 out there or just Friday.
17         MR. GOSMAN: We will address that in just a
18 moment.
19 BY MR. GOSMAN:
20     Q. I think you mentioned a training that you had
21 in Cody that may not have been part of the in-service;
22 is that correct?
23     A. It wasn't our regular -- what we put on here.
24 It was just our guys.
25     Q. Was it P.O.S.T. qualified?

1      A. No, sir, I don't believe that one was -- had
2  any P.O.S.T. training hours in it.
3      Q. When did you go to Cody?
4      A. That, I don't recall.
5      Q. What was the course -- what was the name of
6  the course?
7      A. I'm not aware that it had any particular
8  name. If it did, I don't remember.
9      Q. Who taught the course?
10     A. There were several people there. It was in
11 conjunction with the -- we had Cody PD and sheriff's
12 office there, Park County Sheriff's Office. And I
13 don't recall who was doing the training, who was -- who
14 the instructors were.
15     Q. About how long ago was it?
16     A. I don't recall.
17     Q. Was it within the last year?
18     A. No.
19     Q. The last two years?
20     A. I think it was further out than that.
21     Q. Okay. What was the subject of that course?
22     A. In that course we were training on dynamic
23 entries. We were practicing with raking windows,
24 deploying flashbangs, breaching doors, room entry, room
25 clearing, those types of things.

1      Q. Were you there with another officer from the
2  Powell Police Department?
3      A. I was.
4      Q. Who was that?
5      A. Officer Bradley.
6      Q. Who were the officers that were present from
7  the Park County Sheriff's Office.
8      A. Deputy Walton, Jeremy Walton. He's not with
9  them anymore. I'm trying to think. Joe Wagers, I
10 believe. I don't recall who else.
11     Q. How about the Cody Police Department?
12     A. There was Beau Eggers. I don't remember who
13 all was there.
14     Q. About how many people were there?
15     A. I believe there were about a dozen.
16     Q. How long did the session last?
17     A. I believe it was a full day.
18              (Exhibit 35 identified)
19 BY MR. GOSMAN:
20     Q. Let's go ahead and look at another exhibit
21 here. Oh, yes, Exhibit 35. Sorry about that.
22         Okay. I'm going to represent to you that
23 these have been produced as copies of the in-service
24 training provided by the Powell Police Department. And
25 I'd like you to take a look at that. And I think

1  you've indicated that you had some additional training
2  in the area of dynamic entry in connection with these
3  in-service training sessions?
4      A. Yes.
5      Q. And if you could, please identify the ones
6  that you attended. And you're going to need just a
7  minute to go through that and that's fine.
8      A. I'm sorry. What are you asking here?
9      Q. I'm asking you for identification of training
10 that you received in-service in connection with the
11 records that are generated here in Exhibit 35 that
12 pertain to dynamic entry.
13     A. I'm still not understanding there.
14     Q. Okay. Exhibit 35 contains the in-service
15 training records Have you received training on issues
16 related to dynamic entry in an in-service setting?
17     A. Yes, I have.
18     Q. Okay. They should be identified somewhere in
19 that body of records. Would you go through that body
20 of records and please tell me which courses you were
21 involved in?
22         MS. WESTBY: Which courses he attended or
23 which courses he attended that were relevant to that?
24 BY MR. GOSMAN:
25     Q. Yes, of course, the courses that are relevant

1   to dynamic entry.
2        A.  The NIMS training, I don't know what that is.
3   I haven't seen this sheet here  I don't know what I'm
4   looking at here.
5        Q.  I'm going to back you up for just a second
6   and let you know that each one of those sheets
7   represents a time period in which an in-service
8   training period was conducted.  And I think that first
9   sheet starts with 2005, if I'm not mistaken.
10       A.  Okay.
11       Q.  So you're going to need to go through all of
12  those sheets and just examine the training that's
13  identified.  I think it's generally in the middle
14  column once we get past the first page.
15       A.  Okay.  So there's more than just the first
16  page?
17       Q.  Yes, there is.
18       A.  Looking through these, I don't recall the
19  active -- or the, you know, exactly what was trained on
20  under each section.
21       Q.  Can you recall -- well, let's do this:  I'll
22  ask you if you were present at the high-risk warrant
23  service training in June of '05?
24       A.  I believe so, but I don't recall.
25       Q.  On November '06, the active threat response?

1        A.  That was what date?
2        Q.  November of '06.
3        A.  I believe so.  But again, I'm not for certain
4   of what dates.
5        Q.  All right.  Did you go to all of the Friday
6   training sessions?
7        A.  Most of them.
8        Q.  On the next page, we have the -- we have a
9   building clearing session and -- yes, March of '06, I
10  believe.  Yes.  Do you remember being at that?
11       A.  I can't recall what day -- specifically what
12  days I was at what training.
13       Q.  All right.  So there's no need to go through
14  each one of these then; is that correct?
15            MR. THOMPSON:  Objection as to form.
16            MS. WESTBY:  Join.
17            THE WITNESS:  We can certainly take a look at
18  them.
19  BY MR. GOSMAN:
20       Q.  Well --
21       A.  They --
22       Q.  All right.  We'll do that.  We don't have
23  that much more to go.
24       A.  Looking at what we have here and where they
25  are at, it -- yeah, it looks like stuff I had been to

1   at training.  As to the specific days, that, I don't
2   recall.
3        Q.  Okay.  Did you ever train with a team of
4   officers in a dynamic entry setting?
5        A.  Yes.
6        Q.  Who were the officers that you trained with?
7        A.  Pretty much everyone I work with.
8        Q.  Well, you're going to have to list those
9   officers.
10       A.  Okay.  Chief Feathers, Sergeant Kent,
11  Sergeant Eckerdt, Sergeant Chretien, Officer Hall,
12  Officer Bradley, officer Brown, Officer Blackmore,
13  Officer Schmidt.  Who else am I missing?  Officer
14  Brilakis, Officer Lara, Officer Glick, Miner, Officer
15  Sapp, Officer Danzer, and Officer Chapman.  Officer
16  Kelly, former employee.
17       Q.  Prior to the 24th of February 2009, when had
18  you most recently trained as a group?
19       A.  I don't recall.
20       Q.  And I can appreciate that.  But just give me
21  an estimate.  Was it within six months prior to that,
22  year, year-and-a-half?
23       A.  I can't give you an estimate.  I just don't
24  remember.
25       Q.  How many times have you met with the group

1   and trained in these tactics involving dynamic entry?
2        A.  Our training is an ongoing thing.  There are
3   times where a few of us will train as we have time
4   during a shift as well.
5        Q.  Okay.
6        A.  So I don't know the answer.
7        Q.  I'm going to make that a little easier,
8   because I'm only interested in the occasions that you
9   trained as a group, a dynamic entry group, a team.
10       A.  And I can't recall.
11       Q.  You can't recall -- can you recall ever
12  training as a dynamic entry team together?
13            MS. WESTBY:  Object to the form of the
14  question.  Asked and answered.
15            MR. THOMPSON:  Join.
16  BY MR. GOSMAN:
17       Q.  Go ahead.
18       A.  Can you restate the question, please?
19       Q.  Yes.  Have you practiced as a team doing
20  dynamic entry where all of the officers were present in
21  one setting, performing a dynamic entry, and there was
22  instruction and training, review, assessment?
23            MS. WESTBY:  Object to the form of the
24  question.
25            Go ahead and answer if you can.

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

1      THE WITNESS: There have been several times
2 that we have trained on dynamic entry tactics.
3 BY MR. GOSMAN:
4    Q. I understand that. I'm clear on that.
5    A. Okay.
6      MS. WESTBY: He's answering your question.
7 Let him.
8 BY MR. GOSMAN:
9    Q. Officer, I want to know how many times you
10 have trained as a team. I understand that you have had
11 multiple training sessions, according to your
12 testimony.
13    A. So you're wanting a number?
14    Q. Yes.
15    A. Of times that we have trained --
16    Q. As a team.
17    A. Okay. I don't know. I have not kept track
18 of how many times.
19    Q. Approximately how many times have you
20 practiced as a team?
21      MS. WESTBY: Object to the form of the
22 question.
23      MR. THOMPSON: Join.
24      THE WITNESS: Sir, I can't answer that. It
25 would be just a guess. So I don't know.

1 BY MR. GOSMAN:
2    Q. Well, have you ever practiced as a team?
3      MS. WESTBY: Object to the form of the
4 question. Asked and answered several times.
5      MR. THOMPSON: Join.
6      THE WITNESS: Can you describe what you mean
7 "as a team"?
8 BY MR. GOSMAN:
9    Q. Okay. I'm talking about a group of officers
10 that assemble together, they are given assignments,
11 there is a team leader, and there is, if you will, a
12 practice run of a dynamic entry where all of the
13 elements of dynamic entry are put together in one
14 setting with a group of officers who train together as
15 a unit.
16      MS. WESTBY: Object to the form of the
17 question.
18      MR. THOMPSON: Join.
19      THE WITNESS: We have gotten together and
20 trained as a group. And in practicing these different
21 tactics, yes.
22 BY MR. GOSMAN:
23    Q. All right. When you say that you've gotten
24 together as a group, are you addressing my question
25 where I've talked about a team as a structure, with a

1 team leader, and specific assignments are given and the
2 group functions as a team with those specific
3 assignments and carries them out in a training setting
4 that simulates a live dynamic entry?
5      MS. WESTBY: Object to the form of the
6 question.
7      MR. THOMPSON: Join.
8      MS. WESTBY: Go ahead.
9      THE WITNESS: As our team is also dynamic in
10 that there's not -- everybody is training in the
11 different positions. So sometimes during trainings,
12 those positions change. So, I'm not sure where
13 you're ...
14 BY MR. GOSMAN:
15    Q. All right. I'll break it down.
16      MS. WESTBY: No. You've asked it over and
17 over and over again. So --
18      MR. GOSMAN: He's not sure, so he hasn't
19 answered.
20      MS. WESTBY: Yeah, he has. He's answered it
21 four times.
22      MR. GOSMAN: Well, I'm --
23      THE WITNESS: I'm sorry. What I'm not sure
24 of is, I guess, what you're asking and why my answer
25 wasn't -- didn't fit.

1 BY MR. GOSMAN:
2    Q. How about yes or no to this question: Have
3 you trained in a setting that involved a team leader,
4 specific assignments in a simulation of an actual
5 dynamic entry where there was room clearing, deployment
6 of a dynamic entry device, battering ram, long guns
7 involved?
8      MS. WESTBY: Object to the form of the
9 question.
10      MR. THOMPSON: Join.
11      THE WITNESS: Can you break that down?
12 BY MR. GOSMAN:
13    Q. What I want to know, Officer, is if your
14 Powell Police Department has ever trained as a specific
15 group in a simulation of a dynamic entry. I've already
16 established that you have trained in various aspects of
17 dynamic entry with your other fellow officers of the
18 Powell Police Department, and now I want to know if
19 you've trained together as a team where there was
20 specific assignments and you were simulating an actual
21 dynamic entry?
22      MS. WESTBY: Object to the form of the
23 question.
24      MR. THOMPSON: Join.
25      THE WITNESS: I apologize. I guess I'm not

MATT MCCASLIN - October 6, 2010                                    Page 25
Direct Examination by Mr. Gosman

1   seeing the difference from what I had said we had done
2   and what you're asking now.
3   BY MR. GOSMAN:
4      Q.   Then it's going to be easy to answer the
5   question. Have you trained in that setting were it was
6   a simulation of an actual dynamic entry, a team leader
7   was identified, there were members of the group that
8   were given assignments, and you did a dry run or
9   practice run of what would have been an actual dynamic
10  entry?
11         MS. WESTBY: Object as to form.
12         MR. THOMPSON: Join.
13         THE WITNESS: It sounds like what I had
14  already answered. We have trained that way.
15  BY MR. GOSMAN:
16     Q.   In other words, your answer is yes, you have
17  trained in a simulated dynamic entry setting where you
18  were assembled as a team and you were performing the
19  operations that you would be assigned in real life?
20     A.   Yes, we practiced that trained that.
21     Q.   Okay. When was the last time that you
22  trained that prior to the -- trained in that setting
23  prior to the 24th of February 2009?
24         MS. WESTBY: Object to the form of the
25  question.

MATT MCCASLIN - October 6, 2010                                    Page 26
Direct Examination by Mr. Gosman

1          MR. THOMPSON: Join.
2          THE WITNESS: I don't remember.
3          MS. WESTBY: And I'm sorry. I was running
4   around before we started. I have to take a break. I'm
5   sorry.
6          MR. GOSMAN: Okay. Very good. No problem.
7          (Recess taken 9:39 to 9:45
8          a.m., October 6, 2010)
9   BY MR. GOSMAN:
10     Q.   Prior to the 24th of February 2009, can you
11  give me an idea of how many times the Powell Police
12  Department trained in a simulated dynamic entry where
13  specific assignments were made, a team leader was
14  appointed, and you were, in fact, practicing what would
15  occur in an actual situation?
16         MS. WESTBY: Objection. Asked and answered.
17         MR. THOMPSON: Join.
18         THE WITNESS: I can't answer that. I don't
19  know how many times.
20  BY MR. GOSMAN:
21     Q.   Was it more than once?
22     A.   Yes.
23     Q.   All right. Was it more than three times?
24         MS. WESTBY: Object to form.
25         MR. THOMPSON: Join.

MATT MCCASLIN - October 6, 2010                                    Page 27
Direct Examination by Mr. Gosman

1          THE WITNESS: Yes.
2   BY MR. GOSMAN:
3      Q.   Do you have any formal SWAT training,
4   Officer?
5      A.   No, sir.
6      Q.   Do you know what SWAT training is?
7      A.   Well, I believe -- I believe I know what
8   you're talking about. What are you talking about when
9   you say "SWAT"?
10     Q.   Special weapons and tactical training.
11     A.   Okay. What was your question again?
12     Q.   Well, my question was: Do you know what SWAT
13  is?
14     A.   Okay.
15     Q.   Are you okay with your answer a moment ago
16  that you have not had SWAT training?
17     A.   I have not trained as a SWAT team, but I have
18  trained in the tactics that SWAT trains in.
19     Q.   In your mind, are the tactics that you
20  trained in the same tactics that a SWAT team uses to
21  perform a dynamic entry?
22     A.   I believe so.
23     Q.   Have you had any training in evidence
24  collection?
25     A.   Yes, sir.

MATT MCCASLIN - October 6, 2010                                    Page 28
Direct Examination by Mr. Gosman

1      Q.   Let's go ahead and turn to your training
2   relative to the use of the noise flash distraction
3   devices. Do you have any P.O.S.T. training in those
4   devices?
5      A.   I'm sorry. Can you clarify that question for
6   me?
7      Q.   Yes. Do you have any P.O.S.T., patrol
8   officer training, recognized as a P.O.S.T. accepted
9   course in diversionary devices?
10     A.   So I'm understanding, are you asking for
11  something specific on just the P.O.S.T. training
12  record?
13     Q.   Yes. I am. And that's on Exhibit 31.
14     A.   That is just specific to the distraction
15  devices?
16     Q.   Well, we'll start with that just --
17     A.   Is that what your question was?
18         Okay. There isn't anything specific to the
19  distraction devices.
20     Q.   Do you have any P.O.S.T. training coursework
21  that involves the use and deployment of flashbang
22  devices?
23     A.   Yes, sir.
24     Q.   All right. And which one or ones are those?
25     A.   What was that?

MATT MCCASLIN - October 6, 2010                    Page 29
Direct Examination by Mr. Gosman

1  Q.  I think it's 1220.
2      MS. WESTBY: And it's not in any order, I
3  don't think.
4  BY MR. GOSMAN:
5  Q.  It's just the third or fourth page in.
6  A.  That would be the patrol tactical response.
7  Q.  Okay.
8  A.  September 30, 2005.
9  Q.  Okay.  Have you had any P.O.S.T. training
10 since then prior to the 24th of November that involved
11 the use of distraction devices?
12 A.  P.O.S.T. training, no.
13     (Exhibit 27 identified)
14 BY MR. GOSMAN:
15 Q.  And let's go ahead and take a minute and look
16 at Exhibit 27.  And, you know, this is a time where we
17 could have taken a break.
18     I'm going to ask you, I notice, for instance,
19 on the table of contents it's a 4-day program.  Is that
20 how you remember it?
21 A.  I believe it was four days.
22 Q.  Okay.  And does Exhibit 27 reflect the course
23 materials that were involved in that course?
24 A.  That appears to be it.
25 Q.  Okay.  Do you remember performing simulations

MATT MCCASLIN - October 6, 2010                    Page 30
Direct Examination by Mr. Gosman

1  of tactical situations in that course?
2  A.  Yes, sir.
3  Q.  And tell me about the training that was
4  involved in the use of the flashbang device.
5  A.  Can you be more specific on that?  I'm sorry.
6  Q.  Well, what did you do in that course that
7  involved training with diversionary devices or the
8  flashbang device.
9  A.  We used it in practice with room clearing,
10 entries, hostage barricade situations, high-risk
11 warrant service.
12 Q.  And did you deploy a live device?
13 A.  At that one, I did.
14 Q.  You did?  Explain how that occurred.  Where
15 were you?  What was the setting?  Was it in a room?
16 Was it outside?
17 A.  We were at the fairgrounds.  And I don't
18 remember right now if it was in the room or outside.
19 Q.  And did you have an instructor present?
20 A.  I did.
21 Q.  And did he identify any rules that he wanted
22 you to follow in deploying the device?
23 A.  As to how he trained us, yeah.
24 Q.  Now, are you sure that this event that
25 occurred -- did the patrol tactical response training

MATT MCCASLIN - October 6, 2010                    Page 31
Direct Examination by Mr. Gosman

1  that is reflected on your P.O.S.T. records occur at the
2  Park County fairgrounds?
3  A.  It did.  Some of it was at the range.
4  Q.  And I think I interrupted you.  The rules
5  that were discussed that day in connection with your
6  deployment of the live flashbang device were what
7  again?  The rules of deployment?
8  A.  Were --
9  Q.  In other words, were you given any
10 instructions about what you needed to do in order to
11 effectively deploy this device?
12 A.  Yes.
13 Q.  Okay.  What were those instructions?
14 A.  Those instructions included how to hold it in
15 your hand, how to -- how to deploy it into a room or
16 into an area.
17 Q.  Anything else you can remember?  And let's
18 scratch that.  We'll strike that question.
19     You've described the training that you
20 received during this course that included the
21 deployments of a live device, and I assume other
22 situations involving the deployment of the flashbang
23 device that didn't actually involve using one live; is
24 that true?
25 A.  Correct.

MATT MCCASLIN - October 6, 2010                    Page 32
Direct Examination by Mr. Gosman

1  Q.  All right.  So what situations were involved
2  in the use of the flashbang device?  What type of
3  deployment situations?
4  A.  We discussed deploying through windows.  We
5  discussed deploying -- discussed and practiced
6  deploying through windows and doors, in the open air.
7  Q.  And were there any special instructions in
8  regard to deployment through a window?
9  A.  There were.
10 Q.  What were they?
11 A.  Same as for doors, that look where you're
12 throwing, control the deployment.
13 Q.  All right.  Let's go back to Exhibit 27 for a
14 moment.  And I want you to go ahead and take a few
15 minutes and go through those course materials, and
16 identify for me any course materials that reflect on
17 the training or practice involving a flashbang device.
18 A.  Can you repeat what you want me to look for,
19 please?
20 Q.  Yes, I can.  As you're going through
21 Exhibit 27, what you're looking for is evidence in the
22 course materials that there was, in fact, a section
23 devoted in flashbang devices.
24     MS. WESTBY: Object to the form of the
25 question.

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 16 of 54
Tricia Wachsmuth v.
City of Powel, et al.
Matt McCaslin
October 6, 2010

1   MR. THOMPSON: Join.

2   THE WITNESS: And you're asking something

3   specific for --

4   BY MR. GOSMAN:

5   Q. Something that mentions a diversionary

6   device.

7   A. Page 1 it talks about diversionary device.

8   Q. Page 1?

9   A. Twenty-one. In looking through there, I see

10  the -- in the written stuff, I see the one mention of

11  it.

12  Q. Okay. That's on Page 21?

13  A. Yes, sir.

14  Q. Okay. Why don't you go ahead and read the

15  language into the record relative to the flashbang.

16  And I'll ask you, it looks like it's an outline. And

17  it's under the heading, "techniques that stack up."

18  Why don't you go ahead and just read all of the

19  information there, Paragraphs 1 through 5.

20  A. Just right below "stack up"?

21  Q. Yes.

22  A. Roman Numeral I, mental condition orange,

23  visualize. Roman Numeral II, team assembles at

24  breaching point. III, soft pin diversionary device; if

25  necessary, device secure in pouch. IV, low ready. V,

1   last man in stack initiates squeeze. Sub one, do not

2   squeeze until ready. Sub two, squeeze leg of forward

3   team member.

4   Q. And that's the only reference to a soft pin

5   diversionary device, N.F.D.D. flashbang in the course

6   materials, correct?

7   A. That I saw in the book yeah.

8   Q. Have you had any in-service training on that

9   device with the Powell Police Department?

10  A. Yes.

11  Q. Is it in the record that we've previously

12  looked at? I believe it's Exhibit 31. It's not 31. I

13  think it's 35. Yes, Exhibit 35.

14  A. And what was your question again?

15  Q. A report of your in-service training using a

16  diversionary device.

17  MS. WESTBY: Object to the form of the

18  question.

19  THE WITNESS: I'm sorry. Was that the

20  question? That sounded leak a statement. I didn't --

21  BY MR. GOSMAN:

22  Q. Okay.

23  A. I'm sorry.

24  Q. Yeah, a lot of my questions sound like

25  statements. Yes, that was a question, Officer.

1   A. Okay.

2   Q. I want you to look through that record and

3   tell me where in that record you can identify

4   in-service trying that involved a diversionary device

5   that you attended.

6   A. Okay.

7   MR. THOMPSON: Objection as to form.

8   MS. WESTBY: Join.

9   THE WITNESS: I don't know what all was

10  involved under each of these headings as far as

11  training. So exactly what trainings involved using a

12  diversionary device, I'm not sure. I haven't seen

13  these before. I don't know what trainings were called

14  what.

15  BY MR. GOSMAN:

16  Q. Do you remember when you received additional

17  service training on a flashbang device?

18  A. Not specifically, no, not dates.

19  Q. And that's why we keep records, Officer. Can

20  you go through Exhibit 32 and show me any reference to

21  the use of a diversionary device?

22  MS. WESTBY: Object to the form of the

23  question.

24  MR. THOMPSON: Join.

25  MS. WESTBY: Argumentative.

1   THE WITNESS: That was exhibit what?

2   BY MR. GOSMAN:

3   Q. Thirty-two.

4   MS. WESTBY: So your question is not what

5   training has he received. It's if he can pick out

6   something in Exhibit 32?

7   MR. GOSMAN: Well, more or less, yes, that's

8   the question.

9   THE WITNESS: It appears Exhibit 32 is --

10  BY MR. GOSMAN:

11  Q. I'm sorry. I gave you the wrong number.

12  It's Exhibit 35.

13  A. Okay. If you could restate.

14  Q. Yes. I'd like you to go through that

15  document and tell me if you can find any reference to

16  the term "diversionary device" or any of its synonyms.

17  A. I don't see diversionary device listed.

18  Q. Prior to the 24th of February 2009, how many

19  times had you deployed a live diversionary device?

20  A. Prior to?

21  Q. The 24th of February.

22  A. I believe twice, a live one.

23  Q. All right. And I think we've talked about at

24  least one occasion, and that would have been in the

25  Patrol Tactical Course that you took?

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

1   A. Correct.
2   Q. Okay. When was the other one deployed?
3   A. I believe the other one was out at the range
4   during that class as well.
5   Q. So you deployed two devices in October of
6   2005?
7   A. September.
8   Q. September of 2005. Are you certified in the
9   use of an N.F.D.D.?
10  A. I'm not aware of any certification.
11  Q. Do you know what kind of device you used on
12  the 24th of February 2009?
13  A. Can you be more specific?
14  Q. The name of it.
15  A. No, sir, I don't know.
16  Q. Do you remember what it looked like?
17  A. Yes.
18  Q. Was it the same device that you deployed a
19  few years earlier at your training with the Patrol
20  Tactical Response course?
21  A. I don't recall if it was the same or not.
22  Q. Are they pretty easy to deploy?
23  A. Yes, sir.
24  Q. It wasn't something that you asked about,
25  whether or not this was the same device and whether

1   there were any differences in the way it should be
2   handled?
3   A. No, sir.
4          (Exhibit 7 identified)
5   BY MR. GOSMAN:
6   Q. Let's go ahead and take a look at Exhibit 7,
7   Officer. There is a label on the first page of
8   Exhibit 7, which pertains to the use of a DEF-TEC 25.
9   And I want you to tell me if you've seen that label
10  before.
11  A. I believe so.
12  Q. Where would you have seen it?
13  A. I can't recall if I saw it on a box of them
14  or on the item itself.
15  Q. Do you notice the warning label -- it's
16  actually, I believe, on a box on the top of that
17  page -- to only be used by law enforcement, et cetera?
18  A. Correct. Yes.
19  Q. And do you see that it indicates that it is
20  only to be used by personnel who have successfully
21  completed the training program in the use of
22  distraction devices?
23  A. Correct.
24  Q. And what programs specifically did you
25  successfully complete to meet that requirement?

1   A. The patrol -- I forget the name of it.
2   Q. I think it's Exhibit 31 -- I'm sorry.
3   Twenty-seven.
4   A. Patrol Tactical Response Course.
5   Q. Now, let's go ahead and take a look at the
6   third -- I believe it's the third page -- fourth page,
7   apparently -- of this Exhibit 7. Do you see, under the
8   heading there at the bottom on the left-hand column,
9   the term "application"?
10  A. Yes.
11         MR. THOMPSON: Counsel, for the record,
12  you're addressing Bates-Number LBHP Wachsmuth 1807?
13         MR. GOSMAN: Yes. Thank you.
14  BY MR. GOSMAN:
15  Q. I want you to read that third paragraph into
16  the record for me.
17         MR. THOMPSON: I'm going to object as to
18  form. The document speaks for itself.
19         MS. WESTBY: Join.
20         Go ahead.
21         THE WITNESS: Okay. That's where it starts,
22  "it is recommended"?
23  BY MR. GOSMAN:
24  Q. Yes.
25  A. "It is recommended that the immediate area

1   for deployment be visually affirmed to be clear of
2   person or persons and that the device is delivered so
3   that it remains free of obstructions or calls. The
4   cleared area for deployment should be 5 to 6 feet
5   around which the device is expected to come to rest.
6   If the device is deployed in such a manner that a wall
7   or obstruction should block the bottom port, then the
8   distraction device may move slightly."
9   Q. Do you agree with that statement as it
10  pertains to the deployment of the device in a room that
11  has been visually cleared?
12         MR. THOMPSON: Objection as to form.
13         MS. WESTBY: Join.
14         THE WITNESS: I'm sorry. Can you ask that
15  again for me, please?
16  BY MR. GOSMAN:
17  Q. Do you agree with the statement that the
18  immediate area for deployment be visually affirmed to
19  be clear of person or persons?
20         MR. THOMPSON: Objection as to form.
21         MS. WESTBY: Join.
22         THE WITNESS: In certain situations, yes.
23  BY MR. GOSMAN:
24  Q. What situations are you referring to?
25  A. Provided you have the opportunity to view --

MATT MCCASLIN - October 6, 2010                    Page 41
Direct Examination by Mr. Gosman

1    Q.  The room?
2    A.  -- the whole room.
3    Q.  And certainly there are emergency situations
4  where an officer may not have the opportunity to have a
5  clear view of a room where a distraction device is
6  deployed?
7    A.  Could you restate, please.
8    Q.  There are circumstances where an officer, in
9  an emergency situation, would not have the opportunity
10  to visually clear the room before the device is
11  deployed; would you agree with that?
12    A.  Yes.
13    Q.  And in those circumstances where there is an
14  opportunity to determine who or what is in the room,
15  that opportunity should, in every case, be taken; would
16  you agree with that?
17        MR. THOMPSON: Objection as to form.
18        MS. WESTBY: Join.
19        THE WITNESS: State it again, please.
20  BY MR. GOSMAN:
21    Q.  Yes.
22        When there is the opportunity to view the
23  room and to determine whether it is clear of persons,
24  that opportunity should be taken?
25        MR. THOMPSON: Objection as to form.

MATT MCCASLIN - October 6, 2010                    Page 42
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2    Q.  Would you agree with that?
3        MS. WESTBY: Join.
4        THE WITNESS: You can check -- when given the
5  opportunity, yes.
6  BY MR. GOSMAN:
7    Q.  Let's go ahead and look at one other aspect
8  of this language. Would it be advisable to see that
9  the device is delivered so that it remains free of
10  obstructions or walls?
11        MS. WESTBY: Object as to form.
12        MR. THOMPSON: Join.
13        THE WITNESS: Can you restate for me, please?
14  BY MR. GOSMAN:
15    Q.  Would it be advisable to make sure that the
16  device is delivered so that it remains free of
17  obstructions or walls?
18        MS. WESTBY: Same objection.
19        MR. THOMPSON: Join.
20        THE WITNESS: Would it be advisable to?
21  BY MR. GOSMAN:
22    Q.  Yes.
23    A.  Given the circumstances, yes.
24    Q.  And if the circumstances included the
25  opportunity to determine where the device was to be

MATT MCCASLIN - October 6, 2010                    Page 43
Direct Examination by Mr. Gosman

1  placed, would you want to make sure that it was
2  delivered so that it remained free of obstructions or
3  walls?
4        MS. WESTBY: Object as to form.
5        Go ahead.
6        MR. THOMPSON: Join.
7        THE WITNESS: Yes.
8  BY MR. GOSMAN:
9    Q.  And the cleared area for deployment should be
10  5 to 6 feet around which the device is expected to come
11  to rest; would you agree with that?
12        MS. WESTBY: Objection as to form.
13        MR. THOMPSON: Join.
14        THE WITNESS: Can you restate that for me?
15  BY MR. GOSMAN:
16    Q.  The cleared area for deployment should be 5
17  to 6 feet around which the device is expected to come
18  to rest?
19        MS. WESTBY: Objection to form.
20        THE WITNESS: That's what this is
21  recommending.
22  BY MR. GOSMAN:
23    Q.  And would that be your recommendation as
24  well?
25        MS. WESTBY: Objection as to --

MATT MCCASLIN - October 6, 2010                    Page 44
Direct Examination by Mr. Gosman

1        THE WITNESS: That's their recommendation.
2  BY MR. GOSMAN:
3    Q.  Do you take any issue with it?
4        MS. WESTBY: Objection as to form.
5        THE WITNESS: There are circumstances where
6  it may not work.
7  BY MR. GOSMAN:
8    Q.  Exactly. And those circumstances involve
9  emergency situations where you simply don't have the
10  opportunity to determine where the device is going to
11  come to rest, correct?
12        MS. WESTBY: Objection as to form.
13        THE WITNESS: Not always just emergency, I
14  don't suppose.
15  BY MR. GOSMAN:
16    Q.  All right. Well, if you had the opportunity
17  to determine where the device was going to come to
18  rest, would you want to make sure that it was deployed
19  in an area that was 5 to 6 feet around?
20        MS. WESTBY: Object to form.
21        MR. THOMPSON: Join. Asked and answered.
22        THE WITNESS: That's their recommendation.
23  BY MR. GOSMAN:
24    Q.  If you had the opportunity to make sure that
25  it could be deployed in such an area, would you -- is

1 that how the device should be deployed?
2      MS. WESTBY: Objection as to form.
3      THE WITNESS: That's what they recommend.
4 BY MR. GOSMAN:
5   Q.  I take it your answer is yes, that if you
6 have the opportunity to see where you're going to
7 deploy it, that it should, in fact, be deployed in an
8 area where there is a clear area of 5 to 6 feet?
9      MS. WESTBY: Object as to form. We're again
10 getting in the situation where we're asking the same
11 question over and over and over again. Honestly, it's
12 just ridiculous.
13      MR. GOSMAN: Okay.
14      THE WITNESS: That's their recommendation.
15 BY MR. GOSMAN:
16   Q.  I know it's their recommendation.
17      MS. WESTBY: And that's his answer. So we're
18 not -- we're done. This --
19      MR. GOSMAN: No, it's not his --
20      MS. WESTBY: This question has been asked.
21      MR. GOSMAN: It's not the answer to the
22 question.
23      MS. WESTBY: This has been asked four times.
24 It's his answer to your question. Just because you
25 don't like it doesn't mean you get to keep asking him

1 the same question over and over again. So we're done.
2 Move on to something else.
3      MR. GOSMAN: Okay. That's fine.
4 BY MR. GOSMAN:
5   Q.  Let's go ahead and take a look at the legend
6 that's on the right-hand side of that page. And it's
7 contained almost at the bottom, it's in a little box
8 that says "warning." Could you read that warning into
9 the record, please, Officer?
10   A.  In the bottom right-hand corner?
11   Q.  Yes.
12   A.  "This product is to be used only by
13 authorized and trained law enforcement, correction, or
14 military personnel. This product may cause serious
15 injury or death to you or others. This product may
16 cause serious damage to property. Handle, store, and
17 use with extreme care and caution. Use only as
18 instructed."
19   Q.  Had you seen that warning before you deployed
20 that device on the 24th of February 2009 in the
21 Wachsmuth residence?
22   A.  I don't believe I'd seen this sheet before.
23   Q.  Were you aware of that information, the
24 information contained in that box that you've just
25 read?

1   A.  In parts, yes.
2   Q.  Did you know that the device could cause
3 serious injury or death to you or others?
4   A.  Yes.
5   Q.  And that it might cause serious damage to
6 property?
7   A.  Yes.
8      (Exhibit 9 identified)
9 BY MR. GOSMAN:
10   Q.  Let's go ahead and take a look at Exhibit 9.
11 Have you seen this document before?
12   A.  No, sir, I haven't.
13   Q.  Under the primary effects of a diversionary
14 device, there is a bulleted statement under the -- that
15 states "over pressure." And that, "No distraction if
16 children under 12 years old inside." Do you see that?
17   A.  I do.
18   Q.  Do you know what "over pressure" is, Officer?
19   A.  I believe so.
20   Q.  Go ahead.
21   A.  It would be a build up of pressure.
22   Q.  Okay. Is there a build up of pressure
23 connected with a flashbang device?
24   A.  I'm sorry. Can you --
25   Q.  Is there a build up of pressure in the

1 detonation of a flashbang device?
2   A.  I don't believe there's a build up of it.
3   Q.  Does it create a pressure blast?
4   A.  Yes.
5   Q.  And is it a danger to children?
6   A.  It can be.
7   Q.  And would you agree that if there are
8 children under 12 years old inside, that a flashbang
9 device should not be deployed?
10      MR. THOMPSON: Objection as to form.
11      MS. WESTBY: Before we get into this, this
12 document is not identified. I don't know where it
13 comes from. You know, can we -- there's no title, no
14 information about it. Is there some source that this
15 comes from? Would be --
16      MR. GOSMAN: Well, I'll tell you what. The
17 document is not being introduced as an exhibit that the
18 officer is familiar with. It's simply being referred
19 to as information containing standards and material
20 relative to flashbang devices.
21      MS. WESTBY: Okay. What standards, where
22 does it come from?
23      MR. GOSMAN: Well, listen, I'm asking the
24 questions. Let's get back to --
25      MS. WESTBY: I'd note for the record that

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 20 of 54

Tricia Wachsmuth v.                                                                    Matt McCaslin
City of Powel, et al.                                                                  October 6, 2010

1  you're asking this witness about a document that you've
2  refused to provide source information.
3       MR. THOMPSON: Or produce prior to these
4  depositions.
5       MS. WESTBY: Yeah. Absolutely.
6       MR. GOSMAN: Okay.
7  BY MR. GOSMAN:
8    Q. Would you agree with me that a distraction
9  device should not be employed in a room if there was a
10 child under 12 years old in that room?
11   A. No.
12   Q. Under what circumstances should a distraction
13 device be employed in a room if a child under 12 years
14 old was in that room?
15   A. Can you restate for me one more time.
16   Q. Under what circumstances would you consider
17 it safe to deploy a flashbang device in a room with a
18 12 year old -- or a child 12 or under inside?
19       MR. THOMPSON: Objection as to form.
20 Relevance.
21       MS. WESTBY: Join.
22       THE WITNESS: In what -- are you wanting an
23 example?
24 BY MR. GOSMAN:
25   Q. Yes, I am. Under what circumstances would

1  that ever be appropriate?
2    A. We have trained in school shooting
3  situations. The deployment of flashbangs in a school
4  room with potentially several kids under that age.
5    Q. Uh-huh. And I assume that it's not just a
6  roomful of school children, there's an active shooter
7  or a hostage situation, something that presents a truly
8  imminent threat of safety to everyone?
9    A. Correct.
10       MS. WESTBY: Object to the form of the
11 question.
12       MR. THOMPSON: Join.
13 BY MR. GOSMAN:
14   Q. Okay. So other than a situation where there
15 was an imminent threat to the safety of others, when
16 would you deploy a flashbang device in a room with
17 children under the age -- or a child under the age of
18 12 years old was present?
19       MR. THOMPSON: Objection. Misstates his
20 testimony.
21       MS. WESTBY: Object to form.
22       THE WITNESS: One more time.
23 BY MR. GOSMAN:
24   Q. Yes.
25       Other than an emergency situation where there

1  was an imminent threat to the life and safety of
2  others, would you deploy a flashbang device in a room
3  with children under the age of 12 or a child under the
4  age of 12?
5       MR. THOMPSON: Objection as to form.
6       MS. WESTBY: Join.
7       THE WITNESS: I think that would be the time.
8  BY MR. GOSMAN:
9    Q. Under the heading on that page that's
10 identified as "Special Considerations," do you see the
11 bullet comment "look before deploying"?
12   A. Yes.
13   Q. Do you disagree with that?
14       MS. WESTBY: Object to the form.
15       MR. THOMPSON: Join.
16       THE WITNESS: Do I -- okay. Do I disagree
17 with what?
18 BY MR. GOSMAN:
19   Q. The statement, "look before deploying."
20   A. No.
21   Q. And then down at the last entry on -- the
22 last page of this exhibit, there's a heading called
23 "deployment hazards." And listed as deployment hazards
24 are children, elderly, fire --may start a fire, fire
25 extinguisher, and smoke -- obscures the officer's

1  vision. Do you agree that these are all deployment
2  hazards in the use of a flashbang device.
3       MS. WESTBY: Object to form.
4       MR. THOMPSON: Join.
5       THE WITNESS: They could be.
6  BY MR. GOSMAN:
7    Q. And do you know whether there was a fire
8  extinguisher available to you that evening or any of
9  the officers in connection with the deployment of the
10 flashbang device?
11   A. Yes, I believe there was.
12   Q. And who carried it?
13   A. That, I don't know.
14   Q. When you say you believe there was, what
15 gives you that belief? What information do you base
16 that on?
17       MR. THOMPSON: Object as to form.
18       MS. WESTBY: Join.
19       THE WITNESS: I believe that someone was to
20 bring a fire extinguisher, keep it handy.
21 BY MR. GOSMAN:
22   Q. Okay. Would you agree with me that it would
23 be inappropriate to engage in a dynamic entry where a
24 flashbang device was being deployed and not have some
25 kind of fire suppression available?

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 21 of 54

Tricia Wachsmuth v.                                                                    Matt McCaslin
City of Powel, et al.                                                                  October 6, 2010

1    MS. WESTBY: Object to the form.
2        MR. THOMPSON: Join.
3        THE WITNESS: Can you restate that for me,
4    please?
5    BY MR. GOSMAN:
6    Q.   Would you agree with me that the
7    deployment -- that in a situation where you're
8    deploying a flashbang device that there should be some
9    kind of fire suppression available, either in the form
10   of a fire extinguisher or fire department, something
11   go?
12       MR. THOMPSON: Objection as to form.
13       MS. WESTBY: Same objection.
14       THE WITNESS: Yes, I think it's good to have
15   a fire extinguisher on hand.
16   BY MR. GOSMAN:
17   Q.   How were you first made aware of the warrant
18   service to be done on the Wachsmuth home?
19   A.   By phone call.
20   Q.   And where -- do you remember where you were,
21   what you were doing?
22   A.   I don't.
23   Q.   Were you on duty?
24   A.   No, I was off duty.
25   Q.   What were you told?

1    arrived. And so I'm talking now about as you assembled
2    and the mission was planned, who was present?
3    A.   I don't know. I wasn't part of that.
4    Q.   You weren't part of what?
5    A.   The preplanning.
6    Q.   How did you -- how were you informed of the
7    role you would play in this warrant service?
8    A.   I was asked by Sergeant Chretien if I would
9    take that role.
10   Q.   Which role?
11   A.   Of deploying the flashbang?
12   Q.   Okay. Did you meet in a conference room and
13   discuss the deployment of the flashbang device?
14   A.   Yeah, we discussed it briefly.
15   Q.   Where were you when you discussed it?
16   A.   Downstairs in the conference room.
17   Q.   Okay.
18   A.   At the police department.
19   Q.   And who else was present at that time?
20   A.   I don't know who else -- who all else was in
21   there.
22   Q.   Was there a large group of men in there, or
23   was it just you and one or two other officers?
24   A.   It was -- at that time, I don't remember who
25   was there or how many.

1    A.   I don't remember specifically what I was
2    told.
3    Q.   And what did you do in response to that phone
4    call?
5    A.   I got my uniform on, came to work.
6    Q.   And who was there when you arrived?
7    A.   I don't recall who was all here when I got
8    here.
9        (Exhibit 10 identified)
10   BY MR. GOSMAN:
11   Q.   I'm going to go ahead and hand you an extra
12   copy of what we've previously identified as Exhibit 10.
13   A.   Okay.
14   Q.   And there's a list of officers present on the
15   left-hand column.
16   A.   Okay.
17   Q.   And those officers have been identified as
18   participating in the execution of the warrant that
19   night. And I want you to tell me who was present at
20   the preplanning stage of the execution of this warrant.
21       MS. WESTBY: Object to the form of the
22   question. He just answered your question.
23       THE WITNESS: I don't know.
24   BY MR. GOSMAN:
25   Q.   Well, actually, my question was when he first

1    Q.   And describe specifically the entire
2    conversation, as best you can remember it, that you had
3    with Officer Chretien that night before you went to the
4    Wachsmuth residence.
5    A.   Okay. Officer Chretien had asked if anybody
6    had deployed a flashbang before. I told him I had
7    deployed one -- had deployed them in training. He
8    asked me if I wanted to take on that role here. And I
9    said I did. I would.
10   Q.   All right. And what happened next?
11   A.   And we discussed the layout of the house and
12   where they had decided to have -- to deploy the
13   flashbang.
14   Q.   You say you discussed the layout of the
15   house. Tell me about that discussion.
16   A.   I believe -- I don't -- I haven't seen these
17   before. I don't know where Exhibit 10 came from. I
18   believe it was up on the board drawn out, the layout of
19   the house, as far as rooms and windows and doors. And
20   I was directed that the flashbang would be introduced
21   into the northeast bedroom.
22   Q.   Did you ever meet with the entire team and
23   discuss and review the assignments that were being
24   made?
25   A.   Not with the entire team, no.

MATT MCCASLIN - October 6, 2010                          Page 57
Direct Examination by Mr. Gosman

1    Q.   And once you had this conversation with
2    Officer Chretien, what did you do?
3    A.   I don't remember what happened after that,
4    what we did then.
5    Q.   Okay.   Did you go from there directly to a
6    patrol car to head to the Wachsmuth residence?
7    A.   Not directly, no.
8    Q.   What other events occurred?  And you know, if
9    you went to the men's room. I don't care.  But if it's
10   a significant event.
11   A.   When I arrived, we had -- the plans had been
12   in place, to my knowledge.  And I was given a run-down
13   of what was going on, getting a run-down of the plans
14   that had been made, talked with Sergeant Chretien about
15   deploying a flashbang.  And I believe after that, it
16   was waiting until we headed out.
17   Q.   Were all of these discussions that you had
18   pertaining to the nature of the warrant, the reason for
19   the warrant, how it was to take place, were these
20   conversations all with Officer Chretien?
21        MR. THOMPSON:  Objection as to form.
22        THE WITNESS:  There were other officers
23   present, too, that also spoke.  I don't remember
24   specifically who.
25

MATT MCCASLIN - October 6, 2010                          Page 58
Direct Examination by Mr. Gosman

1    BY MR. GOSMAN:
2    Q.   What were you told about the reason for the
3    dynamic entry with the multiple officers involved?
4    A.   The information I received when I got to work
5    was that one of the officers had gotten information
6    about an individual that had a grow operation, a
7    marijuana grow operation in their house.  That there
8    were known weapons around the house, specifically in
9    the living room, in the master bedroom.  That the
10   individual carried the -- often times carried a loaded,
11   concealed weapon.  That they were very paranoid, always
12   checking out the window, especially when the dog barks.
13   That they were mentally unstable.  That they had -- at
14   this point, when I got there, I believe I was one of
15   the last ones to get to the office.
16        That there was -- at that point, they had a
17   plan in place, and I believe someone had talked to me
18   about they had some other options that they had talked
19   about, they had discussed.  And this is where they were
20   when I got here.
21   Q.   Okay.   Did they discuss the other options
22   that were considered?
23   A.   Not with me, no.
24   Q.   And did you have any personal knowledge of
25   any of the information concerning Mr. Wachsmuth?

MATT MCCASLIN - October 6, 2010                          Page 59
Direct Examination by Mr. Gosman

1    A.   No, sir.
2    Q.   Were you aware of any information concerning
3    anyone else in the house that would have posed a threat
4    to the officers?
5        MS. WESTBY:  Object to the form of the
6    question.
7        MR. THOMPSON:  Join.
8        THE WITNESS:  No, I wasn't.
9    BY MR. GOSMAN:
10   Q.   So all of the information you had concerned
11   Mr. Wachsmuth, and that would be Bret Wachsmuth?
12   A.   Yes.
13   Q.   Were you told the size of the marijuana grow
14   operation?
15   A.   I don't recall the number, as far as plants.
16   I don't remember.
17   Q.   Did you see Officer Patterson there?
18   A.   No, sir.
19   Q.   Did you speak to Officer Lara that evening?
20   A.   At some point that evening, yes.
21   Q.   Well, that's a bad question.
22        Do you remember Officer Lara saying something
23   about the mental stability of Bret Wachsmuth?
24   A.   I don't recall if he did or not.
25   Q.   To the best of your recollection, with regard

MATT MCCASLIN - October 6, 2010                          Page 60
Direct Examination by Mr. Gosman

1    to the information you received about Bret Wachsmuth,
2    who gave you that information?
3    A.   I don't recall.  I believe Sergeant Chretien,
4    because he was giving me the basic run-down of what was
5    going on.
6    Q.   Did you understand that Sergeant Chretien was
7    the leader of this operation?
8        MR. THOMPSON:  Objection as to form.
9        MS. WESTBY:  Join.
10       THE WITNESS:  I knew that he was planning the
11   tactics on this.
12   BY MR. GOSMAN:
13   Q.   Was there a team leader designated for the
14   actions that evening?
15       MR. THOMPSON:  Objection as to form.
16       THE WITNESS:  Not as to that title, no.
17   BY MR. GOSMAN:
18   Q.   And you were given a specific assignment, and
19   that was to deploy the flashbang device, correct?
20   A.   Correct.
21   Q.   Were there any officers appointed to assist
22   you?
23   A.   Sergeant Kent.
24   Q.   And did you have any other assignments that
25   evening?

Case 1:10-cv-00041-ABJ  Document 65-4  Filed 01/10/11  Page 23 of 54

Tricia Wachsmuth v.                                                          Matt McCaslin
City of Powel, et al.                                                       October 6, 2010

MATT MCCASLIN - October 6, 2010                    Page 61
Direct Examination by Mr. Gosman

1   A.  Also in assisting with evidence.
2   Q.  Was that it?
3   A.  After -- yeah.
4   Q.  Did you -- were you in a setting where you
5   reviewed the assignments of each of the officers prior
6   to going into the Wachsmuth home that night?
7   A.  Can you restate that for me, please?
8   Q.  Prior to leaving the police station and
9   heading out to the Wachsmuth residence, did you have
10  the opportunity to meet with the other officers and
11  understand what everyone's assignment was?
12  A.  That was all explained to me.  I didn't speak
13  with each officer individually, no.
14  Q.  Why don't you tell me what was explained to
15  you.
16       MR. THOMPSON: Objection as to form.
17  BY MR. GOSMAN:
18  Q.  And I'm assuming this is by Officer Chretien.
19  I don't care who explained it.  What was explained to
20  you specifically about the operation, the role of the
21  officers in performing the operation?
22       MR. THOMPSON: Objection as to form.
23       MS. WESTBY: Join.
24       THE WITNESS: My understanding, what was
25  explained to me, was that there would be one team that

MATT MCCASLIN - October 6, 2010                    Page 62
Direct Examination by Mr. Gosman

1   would make contact at the front door.  And as they did
2   that, Sergeant Kent and I were to go to the window on
3   the northeast bedroom as another team came from the
4   rear to provide security on the back door.  The team on
5   the front was to -- they were going to knock, announce,
6   "police, search warrant."  If they didn't get an
7   answer, they were going to breach the door.
8        As that happened, Sergeant Kent was going to
9   rake the window.  I was to deploy the flashbang through
10  the window, and then the rear team was to cause a
11  distraction in the rear.
12  BY MR. GOSMAN:
13  Q.  Did you know Bret Wachsmuth before that
14  evening?
15  A.  No, sir.
16  Q.  Did you know his father, Tom Wachsmuth?
17  A.  I did.
18  Q.  Do you remember any discussion about what
19  would happen if Tom Wachsmuth came to the police
20  station?
21  A.  No, I don't.
22  Q.  Was there any discussion about Tom Wachsmuth
23  that night?
24       MS. WESTBY: Object to the form of the
25  question.

MATT MCCASLIN - October 6, 2010                    Page 63
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.  Prior to your leaving -- I'm sorry.
3        Was there any discussion that night about Tom
4   Wachsmuth prior to you leaving for the Wachsmuth
5   residence?
6        MS. WESTBY: Same objection.
7        THE WITNESS: I don't know.  I wasn't aware
8   of any.
9   BY MR. GOSMAN:
10  Q.  Let's go ahead now and take a look at
11  Exhibit 10.  And you do have a copy of that in front of
12  you there.  And I think you just mentioned that you
13  hadn't seen it before.
14       Does this document describe the events of
15  that evening as they were -- the planning for the
16  events of that evening as they were described to you?
17       MR. THOMPSON: Objection as to form.  He's
18  just answered that whole issue.
19       MS. WESTBY: Join.
20       THE WITNESS: I would assume that this is
21  notes taken of the briefing.
22  BY MR. GOSMAN:
23  Q.  Do those notes comport with your
24  recollection?  And what I'm looking for is if there's
25  anything there that you've -- that doesn't seem right

MATT MCCASLIN - October 6, 2010                    Page 64
Direct Examination by Mr. Gosman

1   in any way --
2        MR. THOMPSON: Objection as to form.
3        MS. WESTBY: Join.
4   BY MR. GOSMAN:
5   Q.  -- point that out to me.
6   A.  Okay.  I've looked it over.  What was your
7   question?
8   Q.  Is there anything on that document that
9   doesn't seem right to you?
10       MR. THOMPSON: Objection as to form.
11       MS. WESTBY: Join.
12       THE WITNESS: I don't know that I can answer
13  that 'cause I -- I mean, I wasn't there as these notes
14  were taken.  So I don't know where it came from, who
15  did it.  I don't know.
16  BY MR. GOSMAN:
17  Q.  You weren't there when the notes were taken?
18  A.  No.  I was one of the last to arrive.
19  Q.  I see.  Okay.  Let's go ahead and take a
20  look.  There's a little box -- actually, it's not a
21  box.  It's a list on the right-hand corner there.  And
22  it lists major sequence of events, at least for the
23  entry.
24       I want you to take a look at that and see if
25  that list comports with what you were told by Officer

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 24 of 54
Tricia Wachsmuth v.                                                                          Matt McCaslin
City of Powel, et al.                                                                        October 6, 2010

1   Chretien?

2          MR. THOMPSON: Objection to form.

3   Mischaracterizes the document and the prior testimony

4   of the officers in regards to the document.

5          MR. GOSMAN: I think your objection was to

6   form.

7          MR. THOMPSON: Well, Counsel, you're

8   misstating what two other witnesses have testified to.

9          MR. GOSMAN: I'm not misstating anything.

10         MR. THOMPSON: Yes, you are. There is no

11  sequence and it's not been testified to as a sequence

12  of events.

13         MR. GOSMAN: That's enough.

14         MR. THOMPSON: No, it's not enough.

15         MR. GOSMAN: Yeah, it is.

16         MR. THOMPSON: You're not going to put the

17  witness in a position that he's relying upon your

18  statement of what the testimony was.

19         MR. GOSMAN: I am not putting him in the

20  position.

21         MR. THOMPSON: Then don't mischaracterize the

22  evidence.

23         MS. WESTBY: I join in that objection.

24         MR. GOSMAN: Well. the list speaks for

25  itself.

1          MR. THOMPSON: Exactly. And he has no

2   knowledge of the document. And now you're telling him

3   this is a sequence of events. Two witnesses in the

4   past two days have testified.

5          MR. GOSMAN: Enough, Tom.

6          MR. THOMPSON: No, Jeff, I'm going to put

7   this on the record.

8          MR. GOSMAN: It's on the record.

9          MR. THOMPSON: I'm going to put it on the

10  record. Because you're mischaracterizing the evidence.

11         MR. GOSMAN: I am not mischaracterizing the

12  evidence.

13         MR. THOMPSON: I am not going to have an

14  officer that I am responsible for in this deposition --

15         MR. GOSMAN: You're not responsible for

16  McCaslin.

17         MR. THOMPSON: Sure am. I'm responsible for

18  his actions. At least that's my reading of the law.

19         MS. WESTBY: And he's already responded that

20  he doesn't know of this document. He doesn't know when

21  it was done.

22         MR. GOSMAN: I understand all of that.

23         MS. WESTBY: And that it was done before he

24  got there.

25         MR. GOSMAN: That's stuff you can put in your

1   brief.

2   BY MR. GOSMAN:

3          Q. Officer, take a look at that exhibit, and I

4   want you to look at the list of items on the right-hand

5   side of the page that deal with the entry into the

6   home, and I want you to tell me if that list comports

7   with your understanding of the sequence of events that

8   night?

9          MR. THOMPSON: Objection as to form.

10         MS. WESTBY: I join.

11         THE WITNESS: Those are -- to my knowledge,

12  those are events that were to take place.

13  BY MR. GOSMAN:

14         Q. Okay. Are they in the order that they were

15  to take place?

16         MR. THOMPSON: Objection as to form.

17         MS. WESTBY: Join.

18  BY MR. GOSMAN:

19         Q. It's not that hard of a question.

20         MR. THOMPSON: Objection as to form.

21         MS. WESTBY: Wait. Before we go on, will

22  you -- is there some way -- can I write down where

23  we're at? Is there some way to find that notation in

24  the record if we need to call the judge? You mark it?

25         THE REPORTER: (Reporter nods head.)

1          MS. WESTBY: Okay.

2   BY MR. GOSMAN:

3          Q. And your answer to my last question was "not

4   necessarily"?

5          A. Yeah, I guess I'm not clear on what you're

6   trying to ask here.

7   BY MR. GOSMAN:

8          Q. I'm trying to ask, with great difficulty

9   here, if the order of the items on that list is the

10  order that you remember the events to be carried out

11  in --

12         MR. THOMPSON: Objection as to form.

13         MS. WESTBY: Join.

14         THE WITNESS: No, I don't think it is totally

15  in order.

16  BY MR. GOSMAN:

17         Q. What was the order of the events as you

18  remember being informed of them that evening?

19         MR. THOMPSON: Object as to form.

20         THE WITNESS: I had already stated that what

21  I recall is, as the door is -- what I recall is as the

22  door is being breached, if it got to that, that we were

23  to rake the window and deploy the flashbang.

24  BY MR. GOSMAN:

25         Q. All right. So let's go ahead and go back out

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 25 of 54
Tricia Wachsmuth v.                                                                    Matt McCaslin
City of Powel, et al.                                                              October 6, 2010

MATT MCCASLIN - October 6, 2010                                     Page 69
Direct Examination by Mr. Gosman

1   to the scene, then.
2         You arrived at the Wachsmuth residence,
3   correct?
4         A.  Correct.  And I apolog ze, but I do need to
5   take a break.
6         MS. WESTBY: Absolutely.
7         MR. GOSMAN: Not a problem.
8         (Recess taken 10:59 to 11:09
9   a.m., October 6, 2010)
10
11        (Exhibit 16 iden ified)
12  BY MR. GOSMAN:
13  Q.  Okay.  Let's go ahead and turn to Exhibit 16.
14        And, Officer, have you seen this document
15  before?
16        A.  This is -- looks like Se geant Chretien's
17  supplement.
18        Q.  Yes, it is.  Have you seen it before?
19        A.  I have.
20        Q.  Have you -- did you see it at the time that
21  these reports were being generated?
22        A.  I don't think I actually looked at it until
23  much later.
24        Q.  Okay.  Would it have been after this lawsuit
25  was filed?

MATT MCCASLIN - October 6, 2010                                     Page 70
Direct Examination by Mr. Gosman

1         A.  No.  It was before that
2         Q.  Okay.  When you looked at it, was there
3   anything about that document that stood out in your
4   mind as being inaccurate?
5         A.  Excuse me.
6         Q.  Not a problem.
7         A.  Based on his knowledge, I don't see anything.
8         Q.  Okay.  I want you to take a minute and take a
9   look at it.
10        A.  Okay.  What was your question?
11        Q.  Is there anything you see in that report that
12  is inaccurate in terms of what took place that night or
13  what the planning for the entry was?
14        MR. THOMPSON: Based upon his personal
15  knowledge?
16        MR. GOSMAN: Yes.
17        THE WITNESS: I don t see anything that
18  stands out at this point.
19  BY MR. GOSMAN:
20        Q.  Okay.  And you've take n a few minutes to read
21  it; is that fair to say?
22        A.  Yes.
23        Q.  Now, I want you to go ahead and go directly
24  to the paragraph that begins with "six officers would
25  form the primary entry team."  I want you to look at

MATT MCCASLIN - October 6, 2010                                     Page 71
Direct Examination by Mr. Gosman

1   that paragraph and tell me if you were informed of the
2   information contained in that paragraph.
3         A.  (Witness Complies.)
4         Okay.
5         Q.  And were you aware of the information
6   contained in that paragraph that night before you went
7   to the Wachsmuth residence?
8         A.  The only thing I don't recall is to secure
9   prisoners.  That's the only thing specifically I don't
10  recall.
11        Q.  When you say that you do not recall language
12  involving the entry team securing prisoners, was there
13  any discussion in your presence -- and I realize you
14  came late -- was there any discussion in your presence
15  about how the entry team would handle prisoners?
16        A.  That, I don't recall.
17        Q.  Okay.  And let's go ahead and look at the
18  next paragraph.  "The plan was to knock on the front
19  door and announce, 'police, search warrant.'"  Is that
20  the plan as you understood it?
21        A.  Yes.
22        Q.  And I'm referring now to that entire
23  paragraph.
24        A.  Okay.
25        Q.  And is that the plan as you were informed of

MATT MCCASLIN - October 6, 2010                                     Page 72
Direct Examination by Mr. Gosman

1   it?
2         A.  Parts of it or things that I recall.
3         Q.  Okay.  What do you recall?
4         A.  The knocking and announcing, forcing entry if
5   they didn't --
6         Q.  Open immediately?
7         A.  I don't remember ever hearing that phrase put
8   in there, that term used.  The primary team, the entry
9   team was to secure the house.  Here it says "the
10  follow-on officers would secure prisoners," which
11  looking at the previous paragraph, again, I don't
12  recall that part.  "Once everyone was secure, check for
13  threats."  That's all part of clearing the house.  Be
14  turned over to gather evidence.
15        Q.  You say that you do not remember if the door
16  did not open immediately, you would use the ram to
17  force entry; is that correct?
18        A.  That wasn't the term or the phrase that I
19  recall hearing.
20        Q.  Were you there when that was discussed?
21        A.  No, I wasn't present when that was discussed.
22        Q.  All right.  Do you know whether there were
23  other officers of the Powell Police Department who had
24  more experience handling diversionary devices than you
25  did?

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 26 of 54
Tricia Wachsmuth v.                                                    Matt McCaslin
City of Powel, et al.                                                 October 6, 2010

MATT MCCASLIN - October 6, 2010                              Page 73
Direct Examination by Mr. Gosman

1    MS. WESTBY: At what time?
2    BY MR. GOSMAN:
3    Q. As of the 24th of February?
4    A. Can you ask that again, please?
5    Q. Yes.
6    Were you aware of any other officers who had
7    more training and experience than you did in the
8    deployment of a diversionary device as of the 24th of
9    February 2009?
10   A. I believe Chretien had  I don't know who
11   else.
12   Q. Did you retrieve the DIEF-TEC 25 device from
13   the police station? How was that handled?
14   A. In what way -- how was it handled?
15   Q. Well, I assume it's kept in a -- let's ask
16   this question: Where is that device normally kept?
17   A. It's kept, I believe, in -- well, I don't
18   know.
19   Q. Okay.
20   A. I'm not sure.
21   Q. So you didn't go get it that night?
22   A. I didn't, no.
23   Q. Who gave it to you?
24   A. I believe Sergeant Chretien. But I don't
25   recall specifically.

MATT MCCASLIN - October 6, 2010                              Page 74
Direct Examination by Mr. Gosman

1    Q. Do you know whether the device was new, or
2    was it reloaded?
3    A. I believe it was new.
4    Q. Did you leave the station with Officer Kent?
5    A. I don't remember who I rode over with.
6    Q. How many cars left the station that night?
7    A. I don't know.
8    Q. Had you been informed that there was
9    intelligence that had been conducted on the home?
10   A. Yes.
11   Q. Were you informed that there was the
12   possibility of a small child in the home?
13   A. Yes.
14   Q. Did you have any discussion about the
15   location of the small child in the home?
16   A. How do you mean?
17   Q. I mean, was there any discussion about where
18   the child was, any intelligence about where the child
19   was in the house?
20   A. No, sir.
21   Q. And did Officer Chretien visit with you about
22   the presence of a child in the home in connection with
23   your deployment of the diversionary device?
24   A. Not that I recall.
25   Q. Did you know what vehicle Bret Wachsmuth

MATT MCCASLIN - October 6, 2010                              Page 75
Direct Examination by Mr. Gosman

1    drove?
2    A. No.
3    Q. That hadn't been discussed with you?
4    A. No.
5    Q. When you arrived at the residence, did you
6    notice any vehicles out front?
7    A. It seems that there was one, but -- or two.
8    I don't remember.
9    Q. And you weren't charged with conducting
10   surveillance of the residence before --
11   A. No, sir.
12   Q. -- the entry, correct?
13   Well, after you arrived, I'm just curious to
14   know how everybody sort of grouped up. What happened?
15   You had several patrol cars arrive in the neighborhood.
16   Did you park down the block?
17   A. I believe so. But I don't recall
18   specifically how we all got there and how we assembled
19   before.
20   Q. Once you got there and started towards the
21   house, what's the first thing you remember?
22   A. As we started towards the house?
23   Q. Yes.
24   A. Sergeant Kent and I went to our position on
25   the northeast corner of the house. The front team went

MATT MCCASLIN - October 6, 2010                              Page 76
Direct Examination by Mr. Gosman

1    to the front door. From there, I heard somebody say
2    something about somebody peeking out the window.
3    Q. Then what happened?
4    A. From there, I heard knocking on the door,
5    heard "police, search warrant." Then I heard the door
6    being breached. At that point, Sergeant Kent raked the
7    window.
8    Q. All right. Let's stop there. Sergeant Kent
9    apparently heard the door being breached, as you did.
10   Going back to the moments that you heard somebody say
11   something about someone peeking out the window, you
12   said, until the time that Officer Kent began raking the
13   window, how much time elapsed?
14   A. I have no idea.
15   Q. Was it less than a few seconds?
16   MR. THOMPSON: Objection as to form.
17   MS. WESTBY: Join.
18   THE WITNESS: I don't recall. It's been too
19   long, and I wasn't keeping track of the time.
20   BY MR. GOSMAN:
21   Q. Were those events, did they occur one after
22   the other in close sequence?
23   MS. WESTBY: Object to the form of the
24   question.
25   MR. THOMPSON: Join.

Case 1:10-cv-00041-ABJ  Document 65-4  Filed 01/10/11  Page 27 of 54
Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

MATT MCCASLIN - October 6, 2010                    Page 77
Direct Examination by Mr. Gosman

1  THE WITNESS: Did what events happen?
2  BY MR. GOSMAN:
3  Q. The information that someone was peeking out
4  the door, the knock on the door, the ram being
5  deployed.
6  A. And did they happen?
7  Q. One after another?
8  MR. THOMPSON: Objection as to form.
9  MS. WESTBY: Join.
10  THE WITNESS: They did happen -- as I recall,
11  that was the order.
12  BY MR. GOSMAN:
13  Q. All right.
14  A. The time length, I don't know.
15  Q. Did it seem to you that there was any extra
16  time that was taken between a ny one of those three or
17  four events that you've talked about?
18  MS. WESTBY: Object to the form of the
19  question.
20  THE WITNESS: I don't know. I wasn't over
21  there. I was keying off of what I could hear and not
22  paying attention to how far apart anything was. So I
23  don't know.
24  BY MR. GOSMAN:
25  Q. All right. Did you hear a dog bark?

MATT MCCASLIN - October 6, 2010                    Page 78
Direct Examination by Mr. Gosman

1  A. I don't recall if I did.
2  Q. Did you -- were you in a position where you
3  could see the breaching team as these events unfolded?
4  And I'm talking about the comment from one of the
5  officers that someone was peeking out the window, the
6  knock on the door, and the deployment of the ram.
7  A. Where I was at, no.
8  Q. After Officer -- describe how Officer Kent
9  raked the window. Were you there to see that?
10  A. Yes, I was with him.
11  Q. All right. And what did he do? Describe his
12  actions in raking the window
13  A. With our window rake, specific tool that we
14  have, it started up in one corner, raked across and
15  down, clearing out the glass, pulling shades and
16  curtains out of the way.
17  Q. And what kind of coverings were over that
18  window, do you remember?
19  A. I believe, if I recall, it seems that there
20  was a set of blinds and I think a curtain as well.
21  Q. And after he had completed raking the window,
22  were the blinds removed, or were they hanging on in the
23  window?
24  A. Back up and say that again, please.
25  Q. Yeah.

MATT MCCASLIN - October 6, 2010                    Page 79
Direct Examination by Mr. Gosman

1  After Officer Kent finished raking the
2  window, had the blinds been removed from the window, or
3  were they still hanging in the window?
4  A. I believe they were still partially hanging
5  in the window.
6  Q. Was the light on in the bedroom?
7  A. No.
8  Q. And if someone had been in the bedroom, would
9  they have had time to get out of the bedroom between
10  the time that the door was being battered and the time
11  that the window was broken? I'll strike that.
12  Would there have been time for someone to get
13  out of the bedroom in the interim from the raking of
14  the window and deployment of the flashbang?
15  MR. THOMPSON: Objection as to form.
16  MS. WESTBY: Join.
17  THE WITNESS: It was -- I believe that they
18  may have been able to.
19  BY MR. GOSMAN:
20  Q. How much time do you think elapsed between
21  Officer Kent raking the window, commencing that action,
22  and your actual deployment of the flashbang device into
23  the room?
24  A. That, I don't know. I was not keeping track
25  of time.

MATT MCCASLIN - October 6, 2010                    Page 80
Direct Examination by Mr. Gosman

1  Q. Again -- a few seconds?
2  MS. WESTBY: Object to the form --
3  BY MR. GOSMAN:
4  Q. Let me ask this question: Was there any
5  delay in your deploying the device through the window
6  after the window had been raked?
7  MS. WESTBY: Object to the form of the
8  question.
9  THE WITNESS: Yes.
10  BY MR. GOSMAN:
11  Q. Okay. What was that delay?
12  A. I don't know how long it was.
13  Q. Okay. What did you do?
14  A. As --
15  Q. The window was being raked?
16  A. As the window was being raked, the shades and
17  blinds were moved out of the way. He took that
18  opportunity to scan that immediate area right inside
19  the window. And it was dark outside, dark inside the
20  room. Scanned that immediate area, could see that
21  there was nobody right there by the window. He
22  finished raking. I gave him time to get back out of
23  the way as I reached up and deployed the flashbang into
24  the window.
25  Q. Did you just drop it into the window, then?

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

MATT MCCASLIN - October 6, 2010                                    Page 81
Direct Examination by Mr. Gosman

1    A.  That's correct.
2    Q.  And did you know whether there was a bed
3  underneath the window where the device was dropped?
4    A.  No, sir.
5    Q.  And why didn't you know whether there was a
6  bed there?
7    A.  Because the window was high up, was above my
8  eye level, and I couldn't see right below the window.
9    Q.  And how tall are you, Officer?
10   A.  About 5'10".
11   Q.  That's what I tell my doctor, too.  And he
12  swears I'm not that tall anymore, but I refuse to
13  believe it.  But I was 5'11" when I was in my 20s.
14       Okay.  Was the ground level outside the house
15  where you deployed the device?
16   A.  Was it level?  Flat?
17   Q.  Yes.
18   A.  Yes.
19   Q.  What did you do after the device was
20  deployed?
21   A.  After it was deployed, Sergeant Kent and I
22  entered the house.
23   Q.  And at that time, where was everyone in the
24  house?
25   A.  I'm not sure where everybody was.  I don't

MATT MCCASLIN - October 6, 2010                                    Page 82
Direct Examination by Mr. Gosman

1  know.
2    Q.  Okay.  When you first entered the house, did
3  you recognize any of the officers in a certain
4  location?
5    A.  Well, I know all the officers, but I can't
6  tell you who was where when we came in.  I don't know.
7    Q.  You don't recall that?
8    A.  Yeah, I don't remember.
9    Q.  Do you remember that there were any officers
10  in the living room when you entered the house?
11   A.  There was.
12   Q.  Do you remember where Tricia Wachsmuth was?
13   A.  Yes.
14   Q.  Where was she?
15   A.  She was by the couch.
16   Q.  And where was the couch?
17   A.  The couch was next to the window, if I
18  recall.
19   Q.  And where was the window relative to the
20  front door?
21   A.  It would be right next to the front door.
22   Q.  Would it be fair to say that she was sitting
23  right next to the front door?
24   A.  Pretty close, yeah.  I don't know if that's
25  where she was to begin with.

MATT MCCASLIN - October 6, 2010                                    Page 83
Direct Examination by Mr. Gosman

1    Q.  Do you have any idea how much time elapsed
2  from your deployment of the device and your actually
3  entering the residence?
4    A.  And my actually going in?
5    Q.  Yes.
6    A.  Again, I don't know.
7    Q.  Did you see Officer Chretien when you entered
8  the house?
9    A.  At some point, yes.  But whether it was when
10  I first came in, I don't know.
11   Q.  Officer, what did you do when you entered the
12  home?
13   A.  When I first entered the house, I stayed in
14  the living room briefly.  And then something was
15  mentioned about whether a couple of rooms got cleared,
16  totally cleared  I believe --
17   Q.  Who mentioned that?
18   A.  I don't know.
19   Q.  And I may interrupt you as you go through
20  this little narrative.
21   A.  That's fine.
22   Q.  You don't know who said a couple rooms had
23  not been cleared?
24   A.  I don't know who brought that up.  But it was
25  mentioned.  There were -- there was another officer in

MATT MCCASLIN - October 6, 2010                                    Page 84
Direct Examination by Mr. Gosman

1  the living room.  I don't recall who that was.  And I
2  believe Officer -- or Sergeant Kent also stayed in the
3  living room.
4    Q.  And where did you go then?
5    A.  And then I went into, I think -- it was
6  either the northeast or southeast bedroom.  I don't
7  remember which, with -- and I can't even remember which
8  officer I was with at that time.
9    Q.  Okay.  And the northeast bedroom was the
10  bedroom in which you had deployed the flashbang device,
11  correct?
12   A.  Correct.
13   Q.  What did you do when you went into that
14  bedroom?
15   A.  I could see the blinds had been -- I believe
16  there was a curtain that had been pulled down.  The
17  blinds were all askew.  There was a scorch mark, I
18  believe, on the wall when the device had gone off.  And
19  there were -- there was a gun, I believe, on the bed in
20  that room.  I know there were some in the corner, I
21  believe.
22   Q.  I assume the light was on?
23   A.  It was when -- and I don't remember if it was
24  on when we came in or if we turned it on.
25   Q.  You did not have a rifle with you that night,

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 29 of 54

Tricia Wachsmuth v.                                                                    Matt McCaslin
City of Powel, et al.                                                               October 6, 2010

MATT MCCASLIN - October 6, 2010                                Page 85
Direct Examination by Mr. Gosman

1  correct?
2     A.  I don't recall if I had a rifle or my pistol
3  that night.
4     Q.  All right.  Did you retrieve the casing for
5  the flashbang device?
6     A.  I don't believe that I did, no.
7     Q.  Did you see it?
8     A.  I can't remember if I saw it in -- where it
9  was at.  I don't know.
10    Q.  Did you notice that the flashbang device was
11 on the bed?  I'm sorry.  Strike that.  You said you
12 didn't see the flashbang device.
13        Did you notice that the bed was underneath
14 the window where you dropped the flashbang device?
15    A.  I did.
16    Q.  Would it be fair to say that the flashbang
17 device detonated on the bed in the northeast bedroom?
18        MR. THOMPSON:  Objection as to form.
19        MS. WESTBY:  Join.
20        THE WITNESS:  Can you restate, please?
21 BY MR. GOSMAN:
22    Q.  Would it be fair to say that the flashbang
23 device detonated on the bed in the northeast bedroom?
24        MR. THOMPSON:  Objection as to form.
25        THE WITNESS:  I believe that's where it

MATT MCCASLIN - October 6, 2010                                Page 86
Direct Examination by Mr. Gosman

1  detonated.
2  BY MR. GOSMAN:
3     Q.  And did you notice any smoke coming from the
4  area where it had detonated?
5     A.  No.
6     Q.  Did you notice any pillows or -- any pillows
7  in the area where the device had detonated?
8     A.  I don't remember what there was on the bed.
9     Q.  How long did you stay in the bedroom?
10    A.  I was in there for a little bit.  Long enough
11 to search the area good, make sure there was no threats
12 in there, nobody else in there.
13    Q.  Did you ever understand that the flashbang
14 device had started a fire in that bedroom, Officer?
15        MR. THOMPSON:  Objection as to form.
16        THE WITNESS:  I'm sorry.  Can you restate?
17 BY MR. GOSMAN:
18    Q.  Did you ever learn that the flashbang device
19 had started a fire in the bedroom?
20        MR. THOMPSON:  Objection as to form.
21        THE WITNESS:  No.
22 BY MR. GOSMAN:
23    Q.  You did not know that?
24    A.  No.
25    Q.  What did you do after you left the bedroom?

MATT MCCASLIN - October 6, 2010                                Page 87
Direct Examination by Mr. Gosman

1     A.  I think, then, probably went and checked the
2  other bedroom.
3     Q.  Do you know if those two bedrooms had been
4  cleared at the time that you entered them?
5     A.  That's why we were checking them.  To make
6  sure that they were -- had been totally cleared.
7     Q.  All right.  You don't remember the other
8  officer that was with you as you cleared the rooms?
9     A.  I don't.
10    Q.  What type of entry did you use into the
11 rooms?  Was it an Israeli Lean?  Was it any kind of
12 tactical entry into the rooms?
13    A.  In the sense, yes.  I remember -- I don't
14 know what the other officer did.  But I seem to
15 remember moving in through the doorway and out of the
16 way to assess the room.
17    Q.  Did you --
18    A.  I believe at that point that the room had
19 been just initially cleared.  But not checking under
20 beds and things like that.
21    Q.  Did you have your weapon drawn?
22    A.  At that point, I don't remember.
23    Q.  Did the officer you were with have his weapon
24 drawn?
25    A.  I believe whoever I was with had a long gun,

MATT MCCASLIN - October 6, 2010                                Page 88
Direct Examination by Mr. Gosman

1  so they would have had it out.
2     Q.  Do you know what position that weapon was in
3  as you cleared those two bedrooms?
4     A.  It would have been in a low position.
5     Q.  Is that how you were taught to clear a room,
6  Officer?
7     A.  Yes.
8     Q.  After you cleared the second bedroom, what
9  did you do?
10    A.  I think at that point, I think Ms. Wachsmuth
11 had been taken out.  And I had gone back outside at one
12 point.  I don't know if that was prior or after her
13 being taken out of the house.
14    Q.  When you got done with the bedroom, do you
15 remember seeing Ms. Wachsmuth?
16    A.  I don't.
17    Q.  Were you present when Ms. Wachsmuth was taken
18 downstairs?
19    A.  No, sir, I wasn't.
20    Q.  Where had you gone?
21    A.  I -- at that point, I was either in one of
22 those rooms or possibly outside.
23    Q.  What did you do when you got done with
24 clearing the last of the bedrooms?  Did you go directly
25 outside?

1   A. I don't remember. I believe so, but I don't
2   remember.
3   Q. Did any officer go outside with you?
4   A. I know Sergeant Eckerdt was out with me at
5   one point.
6   Q. All right. Let's try to pinpoint that time
7   that Officer Eckerdt was outside the home with you. I
8   assume it was after the entry had been accomplished.
9   A. Right.
10   Q. Was it at the time that you exited the house?
11   A. I don't recall.
12   Q. All right. What officers were outside at the
13   time you exited the house?
14   A. I don't recall. I know we had some officers
15   that were on the outside perimeter, outside security.
16   But I don't know.
17   Q. Where was Officer Kent?
18   A. I don't know.
19   Q. You don't remember talking to one of the
20   Powell police officers while you were outside or
21   acknowledging that they were there?
22       MR. THOMPSON: Objection as to form.
23       MS. WESTBY: Join.
24       THE WITNESS: At this point, I don't. I
25   don't remember where everybody was at.

1   BY MR. GOSMAN:
2   Q. I'm asking where anybody was at.
3       MR. THOMPSON: Objection as to form.
4       MS. WESTBY: Join.
5       THE WITNESS: I don't remember.
6   BY MR. GOSMAN:
7   Q. You don't remember where anybody was at?
8       MR. THOMPSON: Objection as to form. Asked
9   and answered.
10   BY MR. GOSMAN:
11   Q. Is that true?
12   A. Specifically at that time, no.
13   Q. Was Ms. Wachsmuth outside when you exited the
14   residence after clearing the bedroom?
15   A. I don't know.
16   Q. Do you remember seeing Mr. Wachsmuth outside?
17   A. No.
18   Q. What did you do after you left the residence,
19   then? This is immediately after clearing the bedrooms.
20   A. When I went back outside?
21   Q. Yes.
22   A. I think at that point, I had gone to get bags
23   and gloves and stuff for evidence collection.
24   Q. Did you wait until the house had been secured
25   and the evidence team was directed to go back into the

1   house?
2   A. I don't know what point I went back in.
3   Q. When you went back in, what did you see?
4   A. See as far as what?
5   Q. Well, did you see officers in the house
6   still?
7   A. There were still some in there.
8   Q. And did you recognize any of the officers
9   that you saw?
10   A. Yes. I would have recognized them all. But
11   who was in there doing what at that point, I don't
12   know.
13   Q. Do you remember anyone specifically being in
14   the house at the time you went back into it?
15   A. I know that officer Chapman and I were
16   working on evidence, Officer Hall, and that's all I can
17   really say for sure, yes, they were in there.
18   Q. At that time, had the house been secured and
19   the entry team done with their business and out of the
20   house?
21   A. Pretty much. They were still around. We all
22   have -- in a small department, we all have several
23   roles. So, you know, there were still some of them
24   there.
25   Q. Well, I appreciate the fact that they were

1   there in terms of being in the neighborhood that night.
2   But were they in the house when you went in to collect
3   evidence?
4       MS. WESTBY: Object to the form of the
5   question.
6       THE WITNESS: Some who were assisting with
7   that.
8   BY MR. GOSMAN:
9   Q. Those are the officers that were assisting
10   with the collection of evidence, that were in the house
11   with you when you went back into the house?
12   A. I believe so.
13   Q. All right. Had the entry team completed its
14   duties when you went back in to collect the evidence?
15   A. By the time we started collecting, yes.
16   Q. Do you have any idea how much time elapsed
17   between the time that you deployed the flashbang device
18   and you went back into the house to collect the
19   evidence?
20   A. I don't know, sir.
21   Q. Could it have been 15 or 20 minutes?
22       MR. THOMPSON: Objection as to form.
23       THE WITNESS: I just don't know.
24   BY MR. GOSMAN:
25   Q. About how tall is Officer Kent, do you know?

MATT MCCASLIN - October 6, 2010                              Page 93
Direct Examination by Mr. Gosman

1  A.  He's approximately my height.
2  Q.  When you looked inside the window, were you
3  able to see anything below the -- well, let me back up.
4  I'll strike that question.
5      Were you standing beneath the window when you
6  looked in it?
7  A.  I was standing back a little ways.
8  Q.  How far back?
9  A.  I'm not sure.
10 Q.  What did you have a view of when you looked
11 in the window?
12 A.  That immediate area right inside the window.
13 Q.  And that would have been the view that was
14 presented to you from a few feet back as you looked
15 through the window, correct'
16     MS. WESTBY: Object to the form of the
17 question.
18     THE WITNESS: Approximately a few feet, yes.
19 BY MR. GOSMAN:
20 Q.  When you went back in and collected the
21 evidence, you saw no evidence that there had been a
22 fire in the bedroom?
23 A.  No. I recall that there was some singed
24 bedding maybe, but no evidence of a fire.
25 Q.  Did you see a pillow that had been thrown in

MATT MCCASLIN - October 6, 2010                              Page 94
Direct Examination by Mr. Gosman

1  a shower?
2  A.  No, I didn't see that.
3  Q.  You're collecting evidence -- did you collect
4  evidence out of that bedroom?
5  A.  Out of the --
6  Q.  Northeast bedroom.
7  A.  I don't believe that I did.
8  Q.  Was there a bathroom in the northeast
9  bedroom?
10 A.  No.
11 Q.  Did you collect evidence out of the bathroom?
12 A.  I don't believe that I did.
13 Q.  None of the officers mentioned anything about
14 a fire starting in the pillow and burning the bedding?
15 A.  No.
16     MR. THOMPSON: Objection as to form.
17 BY MR. GOSMAN:
18 Q.  Did you have any idea how many people were in
19 that house at the time that you executed the warrant?
20 A.  No, sir.
21 Q.  Did you have any idea where any of them were
22 at the time that you executed the warrant? And that
23 would be at the time the entry was done into the house.
24 A.  Evidently there was one right by the front
25 window, and that's all I knew.

MATT MCCASLIN - October 6, 2010                              Page 95
Direct Examination by Mr. Gosman

1  Q.  Did you see anyone point a weapon at
2  Ms. Wachsmuth?
3  A.  No, sir.
4  Q.  Did you know that Ms. Wachsmuth had been led
5  down the stairs?
6  A.  I learned that later.
7  Q.  What did you learn about it? What were you
8  told?
9  A.  That she had gone down the stairs as they
10 were going to clear that area.
11 Q.  Did you understand that the other officers
12 had followed her?
13 A.  I did.
14 Q.  Who were those officers?
15 A.  I don't know. I wasn't there.
16 Q.  Do you have any idea who went down those
17 stairs?
18     MR. THOMPSON: Objection as to form.
19     MS. WESTBY: Join.
20     THE WITNESS: At the time, no.
21 BY MR. GOSMAN:
22 Q.  How about now?
23 A.  Now I know of Officer Danzer, I believe -- or
24 Sergeant Chretien, and I don't recall who else was
25 on -- was with them, if anybody.

MATT MCCASLIN - October 6, 2010                              Page 96
Direct Examination by Mr. Gosman

1  Q.  You have talked to the officers after this
2  incident about what happened that night?
3      MR. THOMPSON: To the extent that you're
4  asking about conversations that may have occurred in
5  the presence of counsel, I'm going to direct him not to
6  answer.
7      MR. GOSMAN: That will be fine.
8      MR. THOMPSON: So any conversations that
9  occurred between you, me, the officers, or you, Misha,
10 and the officers, you're not to address.
11     THE WITNESS: Any conversations between us?
12     MR. THOMPSON: Yes.
13     THE WITNESS: Okay.
14     MR. THOMPSON: With other officers present.
15     THE WITNESS: Okay.
16 BY MR. GOSMAN:
17 Q.  Did you ever talk about this without the
18 attorneys present?
19 A.  I have.
20 Q.  Did you ever learn who was in those
21 conversations, who was with Ms. Wachsmuth when she went
22 down the stairs?
23     MS. WESTBY: Object to the form of the
24 question. Asked and answered.
25     THE WITNESS: The only two I know of or

1  believe is Sergeant Chretien and officer Danzer.
2  BY MR. GOSMAN:
3    Q.  All right.  Did you see Ms. Wachsmuth, other
4  than at the time that you entered the residence?
5    A.  No.
6    Q.  You didn't see her in handcuffs after the
7  incident was -- the house had been cleared?
8    A.  No.
9    Q.  You didn't see her being taken away in a
10  patrol car?
11    A.  No.
12    Q.  And when you did see her, what was her --
13  what was she doing?
14    A.  I don't recall if she was sitting down or
15  standing up.  I believe she was sitting down.  And kept
16  her hands up.
17    Q.  Did she seem to be compliant with the
18  officers that were in charge of her custody?
19        MR. THOMPSON: Objection as to form.
20        MS. WESTBY: Join.
21        THE WITNESS: To my knowledge and what I saw,
22  she appeared to be compliant.
23  BY MR. GOSMAN:
24    Q.  Did you ever hear that Ms. Wachsmuth said or
25  did anything that was not completely compliant with the

1  officer's commands, directives?
2        MS. WESTBY: Object to form.
3        THE WITNESS: I'm sorry.  Repeat that,
4  please.
5  BY MR. GOSMAN:
6    Q.  All right.  Nevermind
7        Did you ever hear, from any of the other
8  officers, that Ms. Wachsmuth was not compliant to every
9  command or every directive toward her issued by the
10  police officers that night?
11        MS. WESTBY: Object to form.
12        MR. THOMPSON: Join.
13        THE WITNESS: I didn't -- I never heard of
14  any noncompliance.
15  BY MR. GOSMAN:
16    Q.  You were not present when Ms. Wachsmuth got
17  up from the couch and went to the stairway and down the
18  stairs?
19    A.  No, sir.
20    Q.  Did you hear anything?
21        MS. WESTBY: Object to the form of the
22  question.
23  BY MR. GOSMAN:
24    Q.  During that time frame.
25        MS. WESTBY: During what time frame?

1  BY MR. GOSMAN:
2    Q.  The time frame that Ms. Wachsmuth went from
3  the couch to the stairs.
4    A.  Not that I recall, no.
5    Q.  What did Officer Kent do after you entered
6  the residence with him, if you know?
7    A.  That, I don't know.
8    Q.  When do you remember seeing Officer Kent
9  again next?
10    A.  I don't have any idea when I -- any time that
11  I can remember seeing him.
12    Q.  That night?
13    A.  I know I saw him, but when and where, I don't
14  recall.  I wasn't keeping track of where the officers
15  were.
16    Q.  So you don't know where you saw him either?
17    A.  True.
18    Q.  Did you see any of the officers with their
19  rifles in the house that were part of the entry team?
20        MR. THOMPSON: Object as to form.
21  BY MR. GOSMAN:
22    Q.  You mentioned Chretien.
23    A.  Restate that again.
24    Q.  Did you see any officers that were part of
25  the entry team that had the long rifles in the house?

1    A.  Yes.
2    Q.  Okay.  Who?
3    A.  Sergeant Chretien, Officer Danzer, I believe,
4  Chapman and Miner.
5    Q.  Where were they when you saw them?
6        MS. WESTBY: Object to the form of the
7  question.
8        THE WITNESS: I don't recall specifically
9  where everybody was.
10  BY MR. GOSMAN:
11    Q.  Was this during the time frame that you were
12  in the house clearing the rooms?
13    A.  Partly, when I had first arrived and then
14  when I first entered the house and then moved on to
15  double-check the rooms.
16    Q.  Were there any other officers in any of the
17  bedrooms?
18    A.  The one that was with me, which I don't
19  recall.
20    Q.  How many bedrooms are in the house?
21    A.  There are two upstairs.
22    Q.  And you went into both of them?
23    A.  Yes.
24    Q.  Were there any officers in the bathroom?
25    A.  Not that I recall.

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

MATT MCCASLIN - October 6, 2010                                    Page 101
Direct Examination by Mr. Gosman

1   Q.  Were there any other officers in any other
2   room of the house?
3   A.  In the kitchen area.
4   Q.  Do you know how many officers were in the
5   kitchen?
6   A.  I don't.
7   Q.  What rooms were you assigned to log evidence?
8   A.  We didn't have -- that I recall, we didn't
9   have a specific assignment, prearranged assignment. I
10  think we had discussed it there.
11  Q.  What rooms did you take?
12  A.  I believe I had the southeast bedroom, living
13  room. I don't remember if I had the kitchen or not, if
14  I was in there.
15  Q.  Who had the hallway?
16  A.  I don't know. It's not much of a hallway, as
17  I recall.
18  Q.  Did you remember finding anything in the
19  hallway?
20  A.  No, I didn't.
21  Q.  Do you know whether any of the officers moved
22  any of the evidence prior to your entry as an evidence
23  team?
24      MR. THOMPSON: Objection as to form.
25      MS. WESTBY: Join.

MATT MCCASLIN - October 6, 2010                                    Page 102
Direct Examination by Mr. Gosman

1       THE WITNESS: I'm not aware of anything.
2   BY MR. GOSMAN:
3   Q.  And you didn't hear afterwards that any of
4   the evidence had been moved?
5   A.  No.
6       (Exhibit 23 identified)
7   BY MR. GOSMAN:
8   Q.  Let's see here. Let's go ahead and take a
9   look at Exhibit 23, if we can for a minute.
10  A.  Okay.
11  Q.  What is that document?
12  A.  Twenty-three is Officer Chapman's supplement.
13  Q.  It says "assigned search officers were
14  Officer Hall and Officer Miner"; is that your
15  understanding?
16  A.  That's correct.
17  Q.  Did you attend with them as they searched the
18  rooms? Were you there logging in the evidence as it
19  was being identified?
20  A.  Yes. Officer Chapman and I were both doing
21  that. I believe I was with Officer Hall most of the
22  time.
23  Q.  And officer Chapman, then, would have been
24  with Officer Miner?
25  A.  I believe so.

MATT MCCASLIN - October 6, 2010                                    Page 103
Direct Examination by Mr. Gosman

1   Q.  And there were two officers assigned to take
2   digital photos of the evidence?
3   A.  That's correct.
4   Q.  And was that your understanding?
5   A.  Yes.
6   Q.  Did you see them taking pictures?
7   A.  I saw Officer Lara taking pictures.
8   Q.  Do you know if Officer Lara and Investigator
9   Brown each had a camera?
10  A.  No, I believe they were using the same one.
11  Q.  While you were logging in the evidence, do
12  you know what the other officers who had participated
13  in the entry were doing?
14  A.  No, sir.
15  Q.  Did they stay on the scene?
16      MR. THOMPSON: Objection as to form.
17      THE WITNESS: I don't know.
18  BY MR. GOSMAN:
19  Q.  When you left, after logging in the evidence,
20  who was there?
21  A.  I don't know.
22  Q.  Did it seem to you that most of the officers
23  were still there?
24      MR. THOMPSON: Objection as to form.
25      MS. WESTBY: Join.

MATT MCCASLIN - October 6, 2010                                    Page 104
Direct Examination by Mr. Gosman

1       THE WITNESS: I don't know.
2   BY MR. GOSMAN:
3   Q.  Approximately how many officers were still
4   there?
5   A.  I don't remember that.
6   Q.  Let's go through this Exhibit 23, and I want
7   you to tell me if you see anything there indicating
8   that a gun was found in the hallway.
9   A.  I don't see any mention of a gun in the
10  hallway.
11  Q.  Do you see any mention of a bulletproof vest?
12  A.  Not that was seized as evidence.
13  Q.  Do you remember anything about that?
14  A.  Anything about what?
15  Q.  About a bulletproof vest, any officer
16  mentioning that?
17  A.  I recall some -- I remember somebody making
18  mention of that. At -- prior to heading over to the
19  house. But that's the only mention that I recall.
20  Q.  Somebody. Do you know who that somebody was?
21  A.  Specifically, no, sir.
22  Q.  Okay. Let's go ahead and identify the guns
23  that were found in the house. Was there a gun found on
24  the bed?
25  A.  According to this, there was a .45 Colt with

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 34 of 54
Tricia Wachsmuth v.
City of Powel, et al.
Matt McCaslin
October 6, 2010

MATT MCCASLIN - October 6, 2010                    Page 105
Direct Examination by Mr. Gosman

1  six rounds located on the bed.
2     Q.  And did you log that in?
3     A.  No, I believe the northeast bedroom was
4  Officer Chapman.
5     Q.  And there was others, a .357-caliber handgun
6  with six rounds on the chest''
7     A.  Correct.
8     Q.  And I take it that the chest is the chest of
9  drawers?  Do you know?
10    A.  I don't recall.  It seems that there was a
11 chest at the foot of the bed.  But I don't remember
12 specifically if it was.
13    Q.  And on the nightstand there was a Ruger P85
14 handgun?
15    A.  Where are you at here?
16    Q.  I'm still on the first page.  And this is all
17 in the northeast bedroom?
18    A.  That's correct.
19    Q.  Do you know whether that handgun was loaded?
20    A.  I do not know.
21    Q.  And there was a 12-gauge shotgun in the
22 bedroom.  And do you know whether that shotgun had any
23 shells in it?
24    A.  I do not know.
25    Q.  And there was a Browning rifle in the

MATT MCCASLIN - October 6, 2010                    Page 106
Direct Examination by Mr. Gosman

1  bedroom, correct?  Do you know -- that is correct,
2  isn't it?  It's about five -- it's the fifth item down
3  on the first page.
4     A.  Okay.  Oh, okay.  There we go.  Okay.
5     Q.  Do you know whether that gun was loaded?
6     A.  I don't know.
7     Q.  Did you take those -- did you personally take
8  those guns out of the house?  Or any of them?
9     A.  I don't remember if I took them out or if
10 Officer Chapman took them out.
11    Q.  When the guns were taken into the evidence
12 locker or evidence room, who was responsible for
13 receiving custody of those items?  Which officer?
14    A.  Officer Chapman and I are both -- at that
15 time were both -- worked with evidence.  So we both, at
16 that time, had access to them, had that responsibility.
17    Q.  Okay.  Do you remember checking the guns when
18 you got down to the police station to determine which
19 ones had ammunition in the guns?
20    A.  I didn't do that, no.
21    Q.  Did anyone do that, as far as you know?
22    A.  That is standard -- something that we do
23 standard at the scene when we have them there.  So
24 whether -- I don't know whether they were loaded or
25 not.  I know I didn't check them.  Those that I didn't

MATT MCCASLIN - October 6, 2010                    Page 107
Direct Examination by Mr. Gosman

1  handle, I don't know.
2     Q.  Did you handle some of the guns that night?
3     A.  I believe there was one that I can recall
4  right now.
5     Q.  Okay.  Which one was that?
6     A.  That was from the bookshelf.  It was in the
7  living room.  There was a Beretta .22-caliber handgun.
8     Q.  And did that gun have shells in the magazine?
9     A.  I believe that it did.
10    Q.  Was there a shell in the chamber, do you
11 know?
12    A.  That, I don't recall.
13    Q.  That's the only gun that you specifically
14 remember handling that night?
15    A.  That one, yes, sir.
16    Q.  I notice that the document that we're looking
17 at doesn't indicate whether the handgun was loaded.
18    A.  No, sir.
19    Q.  You found evidence of prescription medication
20 in the home that night, correct?
21    A.  I believe there was some found, yes, sir.
22    Q.  Did you find any?
23    A.  I'd have to look here.  I don't remember what
24 Officer Hall and I found and what we didn't.  I believe
25 I found some.  Looking here, I can't tell exactly what

MATT MCCASLIN - October 6, 2010                    Page 108
Direct Examination by Mr. Gosman

1  it was.
2     Q.  You did find some prescription medication,
3  was it in the living room?
4     A.  This was in the southeast bedroom.
5     Q.  And you were looking for drugs, I take it?
6     A.  Sorry?
7     Q.  You were looking for drugs?
8     A.  Yes, sir.
9     Q.  And drug paraphernalia?
10    A.  Yes, sir.
11    Q.  And did you find any loose marijuana, other
12 than the two plants that were downstairs?
13    A.  Yes.
14    Q.  And where did you find that?
15    A.  I believe that was on the coffee table in the
16 living room.
17    Q.  And you found two marijuana plants in the
18 basement; is that correct?
19    A.  Yes, sir.
20    Q.  And were there -- was there any evidence of
21 any other marijuana plants in the residence?
22       MR. THOMPSON:  Objection as to form.
23       MS. WESTBY:  Join.
24       THE WITNESS:  Can you restate that for me?
25

MATT MCCASLIN - October 6, 2010                          Page 109
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.  Was there any other evidence of marijuana
3   plants in the house?
4           MR. THOMPSON: Objection as to form.
5           MS. WESTBY: Join.
6           THE WITNESS: There was, in the southeast
7   bedroom, what appeared to be a dead plant, one that had
8   been started.
9   BY MR. GOSMAN:
10      Q.  Did it appear to you to be a marijuana plant?
11      A.  I believe so.
12      Q.  How tall was it?
13      A.  I don't know. It was dead. It wasn't very
14  big at that point.
15      Q.  How tall were the two marijuana plants that
16  you recovered from the basement?
17      A.  I don't know. I saw them only briefly.
18  After that, I believe, Officer Chapman and Officer
19  Miner had collected those. So I didn't see them.
20      Q.  How easy would it have been to flush them
21  down the toilet?
22          MR. THOMPSON: Objection as to form.
23          MS. WESTBY: Join.
24          THE WITNESS: I don't know.
25

MATT MCCASLIN - October 6, 2010                          Page 110
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.  Do you think they would have gone down the
3   toilet?
4           MR. THOMPSON: Objection as to form.
5           MS. WESTBY: Join.
6           THE WITNESS: I think they could have if they
7   were cut up.
8   BY MR. GOSMAN:
9       Q.  Okay. Did you find any other evidence of
10  drugs in the house?
11      A.  Can you be more specific?
12      Q.  Did you find any hard drugs in the house that
13  weren't prescription medication?
14          MR. THOMPSON: Objection as to form.
15          THE WITNESS: Not that I recall.
16  BY MR. GOSMAN:
17      Q.  Any residue of hard drugs in the house, other
18  than the marijuana and the prescription pills?
19          MR. THOMPSON: Objection as to form.
20          MS. WESTBY: Join.
21          THE WITNESS: Not that I'm aware of.
22  BY MR. GOSMAN:
23      Q.  Did you log in the dead plant in the north --
24  what would be southeast bedroom?
25      A.  Yeah, we have it on here as one of the items

MATT MCCASLIN - October 6, 2010                          Page 111
Direct Examination by Mr. Gosman

1   that was seized, yes.
2       Q.  Okay. Oh, there it is. One dead plant?
3       A.  Yeah.
4       Q.  Okay. Very good.
5           MR. GOSMAN: Okay. We can go ahead and
6   break. We're almost done.
7           (Recess taken 12:16 to 12:29
8           p.m., October 6, 2010)
9   BY MR. GOSMAN:
10      Q.  Approximately what time did you complete
11  gathering the evidence that night?
12      A.  Without anything else to go by, looking at
13  this Exhibit 23 --
14      Q.  Okay.
15      A.  Let me see here. The last times that I see
16  on here is probably 2321 hours, 11:21 p.m, is the last
17  time noted in this entry.
18      Q.  And then did you create a separate log for
19  that evidence when it was logged into the evidence room
20  at the Powell Police Department?
21      A.  Ask that again, please.
22          (Exhibit 32 identified)
23  BY MR. GOSMAN:
24      Q.  Well, let's go ahead and turn to Exhibit 32.
25      A.  Okay.

MATT MCCASLIN - October 6, 2010                          Page 112
Direct Examination by Mr. Gosman

1       Q.  Have you seen that document before?
2       A.  Yes, sir.
3       Q.  What is it?
4       A.  Pardon me?
5       Q.  What is it?
6       A.  This is a copy of the receipt from the search
7   warrant.
8       Q.  So was all the evidence logged in a second
9   time on this document, then?
10      A.  I'm not -- I'm sorry. I'm not understanding
11  your question there. What do you mean "logged in a
12  second time"?
13      Q.  Okay. Well, while you were on the scene, you
14  prepared a list, correct? You actually had a notepad
15  and a piece of paper, and you prepared a list of the
16  evidence as it was seized in the house, correct?
17      A.  Correct.
18      Q.  And you converted that list into a report, I
19  assume?
20      A.  That's what Officer Chapman had done, yes.
21      Q.  And were you using forms, like a table that
22  had columns, and you would list what was found, where,
23  identified the thing that was found, and where it was
24  found?
25      A.  On --

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 36 of 54
Tricia Wachsmuth v.                                                          Matt McCaslin
City of Powel, et al.                                                       October 6, 2010

1   Q.  At the scene?
2   A.  On that night, I don't recall if we had --
3   because we had changed some of those forms around.  So
4   I don't remember specifically what we had that night.
5   Q.  Did you have a form, or was it just a blank
6   piece of paper?
7   A.  I believe we had a form.
8   Q.  And then when the evidence was taken to the
9   Powell Police Department, it was receipted into
10  evidence; is that correct?
11  A.  It was placed in our evidence lockers, yes.
12  Q.  And another list was created of the evidence
13  that was placed in the evidence locker, correct?
14  Exhibit 32.
15  A.  Okay.  This is -- Exhibit 32, I believe --
16  yes, is the -- this is what is written out as a receipt
17  for the search warrant for what items were taken from
18  the property.  Okay.
19  Q.  Was it prepared at a separate time?  And I
20  say separate from the evening that you were walking
21  through the house with your pen and these forms logging
22  the evidence in.
23  A.  I'm not sure what time it was -- when it was
24  prepared.
25  Q.  Did you prepare it?

1   Q.  The Chapman log.
2   A.  It is a separate part of the computer case
3   file.
4   Q.  All right.
5       MR. GOSMAN:  Counsel, I don't think I've
6   gotten that document.
7       MR. THOMPSON:  I don't know if the document
8   exists.
9       MR. GOSMAN:  All right.  I think that's
10  something that we ought to check.  And I did ask for
11  all of the RIMS file.
12      MR. THOMPSON:  And that was provided.
13      MR. GOSMAN:  All right.
14      MR. THOMPSON:  And just with the volumes of
15  documents that have been provided, I couldn't tell you
16  whether or not it was a document already provided or
17  not.  But we'll follow up with that request.
18      MR. GOSMAN:  Thank you.
19  BY MR. GOSMAN:
20  Q.  Now, was Exhibit 32 prepared at a separate
21  time than the notes that you took that night on the
22  24th of February, Officer Chapman, Officer Miner, and
23  whoever else was involved in logging the evidence?
24  A.  I believe it was prepared later that night.
25  I'm not sure exactly when, though, we did it.

1   A.  That is my handwriting, yes.
2   Q.  Okay.  Do you remember when you prepared it?
3   A.  I don't recall.  Officer Chapman and I had
4   worked on it together.  I don't remember exactly when
5   we did it.
6   Q.  Okay.  Does the Powell Police Department have
7   a process for logging evidence into the evidence room?
8   A.  Yes.  It gets locked into the case file.
9   Q.  All right.  And is it identified by item, and
10  is that identification then placed on a document or
11  log?
12  A.  It's in the computer, yes.
13  Q.  Do you know where that document is?  Would
14  that document still exist?
15  A.  Yes, sir.
16  Q.  And where is it?
17  A.  It's part of the computer case file.
18  Q.  All right.  And that document that you're
19  referring to, which is the computer generated log into
20  the evidence room, is not either Exhibit 32 or Exhibit,
21  I believe it was 23, which is the Chapman report.  Is
22  that true?
23  A.  Exhibit 32 or Exhibit --
24  Q.  Twenty-three.
25  A.  Which was?

1   Q.  Why do you create this list separate from the
2   list that you created earlier that night at the scene?
3   A.  This list is -- the list we have at the
4   scene, that's as we're collecting it, trying to keep it
5   organized, what rooms, time, et cetera.  This is just a
6   list that comes back with the -- it gets returned to
7   the property owners saying these were the items.
8   Q.  That were taken from the home?
9   A.  Yeah.
10  Q.  Okay.  Thank you.
11  A.  It's a return receipt, I guess.
12  Q.  Okay.  And does this document reflect the
13  existence of any piece of evidence that contained
14  cocaine or cocaine residue?
15      MS. WESTBY:  This document, which document?
16      MR. GOSMAN:  I'm sorry.  Exhibit 32.
17      MS. WESTBY:  And I'm going to object to the
18  form of the question.
19      MR. THOMPSON:  Join.
20      THE WITNESS:  I don't know what testing was
21  done on items.  So -- and what those results may or may
22  not have been.  So I can't answer that.
23  BY MR. GOSMAN:
24  Q.  Well, was there any reference in this
25  document to an item that may have contained residue of

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 37 of 54
Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

1   cocaine?
2      A.  Unless it specifically says here with
3   possible cocaine residue -- b ut let me check.
4      Q.  Go ahead.
5      A.  I see a straw with resi due.  The only thing I
6   see would be what's listed or this as Item 19, straw
7   with residue.  That's all it states.  I don't know
8   specifically what residue.
9              (Exhibit 19 identified)
10     Q.  I understand that.  Let s go ahead and take a
11  look at Exhibit 19 for a mon ent.
12     A.  Okay.
13     Q.  Can you identify that document for me?
14     A.  This appears to be our CAD sheet.  This has
15  the officers, kind of gives a running tally on what
16  happened in the incident itself.
17     Q.  Can you take me across the top of the -- the
18  columns on the first page of th.t document and describe
19  what those headings mean?
20     A.  I'm sorry.  Where are you at?
21     Q.  It's Page 1 of Exhibit 19, and it starts with
22  the multiple columns towards the middle of the page,
23  unit times, Officer dispatche d, en route, et cetera.
24     A.  Okay.
25     Q.  What does the heading unit, unit times mean?

1      A.  This portion of it I haven't used.  Unit
2   times, the very first number s the identifier of the
3   officer.
4      Q.  Is that the officer num )er?
5      A.  Yes, sir.
6      Q.  Okay.  Let's go down three lines in that far
7   left-hand column.  Do you know what MS113 means?
8      A.  Yes.
9      Q.  What does that mean?
10     A.  That is the ambulance crew.
11     Q.  Okay.  So we have the unit times, which is
12  the number that identifies the officer by number?
13     A.  Correct.
14     Q.  And then we have the officer?
15     A.  Correct.
16     Q.  And then we have the time that the officer
17  was dispatched to the residence?
18     A.  First time on the incident.  Or it could be
19  many things.
20     Q.  All right.
21     A.  I don't know.
22     Q.  All right.  You don't know what they all
23  mean, or you don't know what is -- specifically is the
24  dispatch time in this -- in this column means?
25     A.  It's -- really, I don't know how those work.

1   I don't do anything with these numbers.  I don't add
2   these numbers.
3      Q.  Let's go ahead and go on, then.
4          Do you know what the "on scene number" means?
5      A.  Again, it can mean several things, depending
6   on what an officer is doing.
7      Q.  Okay.  What can it mean?
8      A.  From my understanding, that could be when
9   they are put on an incident, they may actually be at a
10  physical scene.  They may be working on a case.
11     Q.  Okay.
12     A.  I don't know.
13     Q.  Okay.  And clear -- what does the term
14  "clear" mean, as you understand it?
15     A.  Clear is generally the time they are cleared
16  from that case, cleared from the --
17     Q.  Location?
18     A.  A location or that incident.
19     Q.  And do you know what the other column next to
20  it means?
21     A.  I'm not sure.
22     Q.  And how about the on-scene-clear and it's
23  Disp-Clear, those two columns?
24     A.  I really don't know how all those numbers are
25  used.

1      Q.  Okay.  Can you tell from looking at this
2   document when, roughly, you arrived on the scene and
3   when you departed?
4      A.  Not by looking at these.  If I -- this would
5   be -- my interpretation of this would be that arrival,
6   possibly at the house.  I don't know if that number is
7   actually arriving at the house, 2113 hours.  Clearing
8   the scene there at approximately midnight.
9      Q.  Would that be about right?
10     A.  To my recollection, that would be.
11     Q.  Okay.  This report has many pages.  And let
12  me ask you first of all:  Are you familiar with the
13  RIMS program?
14     A.  Uh-huh.
15     Q.  Describe what you know about the RIMS program
16  to me?
17     A.  In what aspect?
18     Q.  What is it?
19     A.  It's our reporting system.  It's our -- it
20  keeps track of the incidents that officers are on,
21  generally what times, approximately, what
22  information, where they are at.  It kind of keeps track
23  of all that.
24     Q.  When you generate a report, is that report
25  prepared within the RIMS software?

MATT MCCASLIN - October 6, 2010                    Page 121
Direct Examination by Mr. Gosman

1   A.  Yes.
2   Q.  And is the time that you begin the report
3   logged in to the RIMS software?
4       MS. WESTBY: Object to the form of the
5   question.
6       THE WITNESS: What do you mean by begin a
7   report?
8   BY MR. GOSMAN:
9   Q.  Well, when you open the screen and start
10  typing the report, is that logged into the system?
11  A.  Okay. That, I don't know.
12  Q.  Is it -- when you go back into the -- a
13  report that you have done and modify it or change it in
14  any way, is that noted in the system?
15      MS. WESTBY: Object to the form of the
16  question.
17      THE WITNESS: Possibly, I don't know.
18  BY MR. GOSMAN:
19  Q.  You don't know that?
20  A.  Yeah.
21  Q.  All right. Is there anything -- have you
22  seen many CAD reports before?
23  A.  Yes.
24  Q.  Does this document also include the RIMS
25  information about the entry of the reports and any

MATT MCCASLIN - October 6, 2010                    Page 122
Direct Examination by Mr. Gosman

1   additional work that was done on any report at a given
2   time?
3       MS. WESTBY: Object to the form of the
4   question.
5   BY MR. GOSMAN:
6   Q.  If you know.
7       MR. THOMPSON: Join.
8       THE WITNESS: That, I don't know.
9   BY MR. GOSMAN:
10  Q.  Let's go ahead and take a look at some of the
11  other pages in this report.
12  A.  Okay.
13  Q.  As we go down -- okay. Starting on, let's
14  see, would be Page -- it's Bates-stamped 2. I think
15  that's what it is, Page 2 of this exhibit. There are
16  two columns, time and event columns. And then we have
17  a running tally of information.
18      Is this the radio traffic for this incident,
19  do you know?
20  A.  There may be some radio traffic in there.
21  Q.  Okay. What else is in there?
22  A.  It has -- the way I understand the system and
23  what is here, as an officer calls out to a location,
24  the dispatcher enters that into the computer. And that
25  shows up down here at a line with a time stamp on it.

MATT MCCASLIN - October 6, 2010                    Page 123
Direct Examination by Mr. Gosman

1       For example, if you look at the third line
2   down there, 1501 hours, Powell 9, arrival LEC. It says
3   he's at the office.
4   Q.  Okay. Officer 9 arrives at the LEC. And
5   that would be the Powell Police Department office?
6   A.  Law Enforcement Center, yes.
7   Q.  All right. Very good. Let's go down to the
8   bottom of that same page.
9   A.  Okay.
10  Q.  211645, it's the third entry from the bottom
11  says "PO6 back door team, we're headed to the front."
12  A.  Okay.
13  Q.  Is that -- is that a verbatim of a
14  communication between the teams over a radio?
15      MR. THOMPSON: Objection.
16      MS. WESTBY: Object to form.
17      THE WITNESS: I don't know if it's verbatim.
18  BY MR. GOSMAN:
19  Q.  Okay. And then we have a 211245 -- what is
20  your officer number, Officer?
21  A.  Sixteen.
22  Q.  So we have officer -- do you know who
23  Officer 9 is?
24  A.  Yes, sir.
25  Q.  Who is that?

MATT MCCASLIN - October 6, 2010                    Page 124
Direct Examination by Mr. Gosman

1   A.  That is Officer Miner.
2   Q.  And Officer 3?
3   A.  That is Officer Bradley.
4   Q.  Officer 4?
5   A.  That would be Dave Brown.
6   Q.  Officer 5?
7   A.  Is -- that's Brett Lara.
8   Q.  Officer 6?
9   A.  Six is Chretien.
10  Q.  Officer 10?
11  A.  Sergeant Eckerdt.
12  Q.  Officer 14?
13  A.  Sergeant Kent. Did I say Eckerdt for 10?
14  Sorry.
15  Q.  So Officer 10 is Eckerdt?
16  A.  Correct.
17  Q.  Officer 14?
18  A.  Is Alan Kent.
19  Q.  And Officer 15?
20  A.  Officer Danzer.
21  Q.  Sixteen?
22  A.  Myself.
23  Q.  Seventeen?
24  A.  That was -- that's Officer Chapman.
25  Q.  And 18?

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

1   A.  Officer Hall.
2   Q.  Okay.  Do you know what this means: "Entry
3  870 East North Powell Street?"  Do you know what that
4  means, Officer?  ENRT?
5   A.  Yes.
6   Q.  What does it mean?
7   A.  En route.
8   Q.  So this was when the officers left the police
9  station, correct?
10   A.  It would appear so, yes.
11   Q.  Now, how is that logged?  Go ahead.  I'm
12  sorry.  You tell me?
13   A.  How is it logged?
14   Q.  Yes.
15   A.  That, I don't know.  The dispatchers handle
16  that.
17   Q.  Okay.  Is it a communication over the radio,
18  though?
19   A.  Generally.  Though it can also be as we are
20  leaving, notify them.
21   Q.  Sure.  And then at 2116, the next entry, back
22  door team heading to the front, correct?
23   A.  Correct.
24   Q.  This is Officer 6 -- and I'm sorry.  I'm not
25  going to remember who these guys are.  Officer 6 is who

1  again?
2   A.  Sergeant Chretien.
3   Q.  Oh, Sergeant Chretien communicating to the
4  back door team that we are leading to the front?
5   A.  That's what I would assume.
6   Q.  Okay.  And 2116 we have a number of officers
7  arriving, apparently, ARRIV; is that correct what that
8  means?
9   A.  That's correct.
10   Q.  And would that be at the scene?
11   A.  Correct.
12   Q.  And you're 16?
13   A.  That's correct.
14   Q.  All right.  And let's see, going down to 2121
15  and 21 seconds, Officer 4, what is P16?
16   A.  That would be, it appears, Investigator Brown
17  calling me to the radio.
18   Q.  Okay.
19   A.  I believe.
20   Q.  Okay.  All right.  And then at 212127,
21  Officer 9 says, "go ahead," do you have any idea what
22  that's about?  And there's -- here's several entries
23  there, just one right after another?
24   A.  Right.
25   MS. WESTBY: I'm going to object.  I mean,

1  answer to what you know.  Don't speculate.
2   THE WITNESS: Yeah, this is confusing here.
3  I'm not sure -- I see my number in there as to -- I see
4  Powell 16.  But then I see all this conversation I
5  don't know who it's between.  It's under Powell 9's
6  number.
7  BY MR. GOSMAN:
8   Q.  Okay.
9   A.  But it appears there's a couple of people
10  communicating.  So I don't know who is communicating.
11   Q.  That's fine.  At 212610, did anyone give you
12  a 10-4?  I hate to admit this, but what is a 10-4?
13   A.  Is everything okay.
14   Q.  Okay.  And at 212935 -- who is Powell 9
15  again?
16   A.  That would be Chad Miner.
17   Q.  Chad Miner.
18   A.  Where are you at?
19   Q.  212935, it says, "you can let EMS know they
20  are clear, we won't need them."  Correct?
21   A.  Correct.
22   Q.  Now, would -- is it fair to assume that at
23  that point, the house had been cleared and they had
24  been notified that there wouldn't be a need for EMS?
25   MS. WESTBY: Object to the form of the

1  question.  By the nature of your question, you're
2  asking him to assume.
3   Don't assume.  If you know, answer the
4  question.  If not ...
5  BY MR. GOSMAN:
6   Q.  That's fine.  If you know.
7   A.  Okay.  Powell -- go ahead and rephrase
8  your -- ask --
9   Q.  Powell 9, apparently says to Powell 6 -- and
10  who is Powell 6?
11   A.  Powell 6 is Sergeant Chretien.
12   Q.  Okay.  Can you let EMS know they are clear.
13  Also, we won't need them.
14   A.  And your question was?
15   Q.  Does -- would it be -- is it a fair
16  assumption that at that time the house had been cleared
17  and it was determined that it was not necessary for
18  emergency medical personnel?
19   MS. WESTBY: And again, same objection.
20  Don't assume.  If you know.
21   THE WITNESS: I don't know if that's what was
22  going on at that time.
23  BY MR. GOSMAN:
24   Q.  Is there any evidence -- well, let's do this:
25  Is there any other information we can glean from this

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

MATT MCCASLIN - October 6, 2010                    Page 129
Direct Examination by Mr. Gosman

1   time frame to figure out approximately when the house
2   had been cleared and the situation had been determined
3   to be under control?
4           MS. WESTBY: Object to the form of the
5   question.
6           MR. THOMPSON: Join.
7           MS. WESTBY: Go ahead and answer if you know.
8           THE WITNESS: Typically, as we say, when we
9   give a 10-4, that means everything is all right. It
10  doesn't necessarily mean that everything has been
11  finished up.
12  BY MR. GOSMAN:
13  Q.  Okay.
14  A.  But this -- I can't give you any time. I
15  can't give you any specifics as to at this point it was
16  clear.
17  Q.  Okay. Is it fair to say that at 21:26:10,
18  Officer 9, who would be Officer Miner, said, "Did
19  anyone give you a 10-4 yet,' and the response is,
20  "negative for 10-4"?
21  A.  That appears -- the column there is under
22  Powell 9. But with the Powell 14 in front of that, it
23  may have been Sergeant Kent that gave that radio
24  traffic. But it depends on how dispatchers put stuff
25  in. I'm not aware. That's not my end of it.

MATT MCCASLIN - October 6, 2010                    Page 131
Direct Examination by Mr. Gosman

1   A.  No.
2   Q.  All right. Okay. That's all we have for
3   that.
4           Did you prepare any -- did you prepare any
5   reports in this case, other than your assistance with
6   the evidence?
7   A.  No, sir, I did not.
8   Q.  Before this lawsuit was filed, did you
9   prepare any e-mail to any of the officers and
10  communicate about this case?
11  A.  Not that I recall.
12          MR. GOSMAN: Okay. Officer, thank you very
13  much for being here today.
14          THE WITNESS: Thank you.
15          MR. GOSMAN: You're free to go.
16              (Proceedings concluded at 1:02
17              p.m., October 6, 2010.)
18
19
20
21
22
23
24
25

MATT MCCASLIN - October 6, 2010                    Page 130
Direct Examination by Mr. Gosman

1   Q.  So that involves Miner and Kent, correct?
2   A.  I'm not sure.
3           MS. WESTBY: Object to the form of the
4   question.
5   BY MR. GOSMAN:
6   Q.  Okay. That's fine.
7           Okay. Now, let's go ahead and go down a few
8   more pages here. We obviously have a running tally
9   that involves several days. And for instance, on
10  three -- well, I'm just going to pick a page. This is
11  Page 6 of the report, and it's Document No. 6. Date is
12  entered as 3/2 of '09.
13          Now, let me simply ask this: Is the
14  information contained in these columns on this part of
15  the CAD report radio traffic information?
16  A.  Sometimes.
17  Q.  What else can it be?
18  A.  When we -- if I have a case, and I go to work
19  on the report, on the actual written part of it, I will
20  ask them to put me on it. They do their thing, they
21  open it up, put you on it, and it ends up here.
22  Q.  And you can go back and look at the report?
23  A.  And that just shows that at that particular
24  time, you were doing something on that case.
25  Q.  Okay. It doesn't show what necessarily?

MATT MCCASLIN - October 6, 2010                    Page 132
Direct Examination by Mr. Gosman

1                DEPONENT'S CERTIFICATE
2           I, MATT MCCASLIN, do hereby certify, under
3   penalty of perjury, that I have read the foregoing
4   transcript of my testimony consisting of 131 pages,
5   taken on October 6, 2010 and that the same is, with any
6   changes noted below, a full, true and correct record of
7   my deposition.
8   PAGE  LINE      CORRECTION        REASON FOR CORRECTION
9   ____  ____  _____   _____
10  ____  ____  _____   _____
11  ____  ____  _____   _____
12  ____  ____  _____   _____
13  ____  ____  _____   _____
14  ____  ____  _____   _____
15  ____  ____  _____   _____
16  ____  ____  _____   _____
17  ____  ____  _____   _____
18  ____  ____  _____   _____
19  ____  ____  _____   _____
20  ____  ____  _____   _____
21  ____  ____  _____   _____
22
23
24                            _____
25                            MATT MCCASLIN    Date

MATT MCCASLIN - October 6, 2010          Page 133
Direct Examination by Mr. Gosman

1                     CERTIFICATE

2              I, VONNI R. BRAY, Registered Professional

3    Reporter, and Notary Public for the State of Montana,

4    do hereby certify that MATT McCASLIN was by me first

5    duly sworn to testify to the truth, the whole truth,

6    and nothing but the truth;

7              That the foregoing transcript, consisting of

8    132 pages, is a true record of the testimony given by

9    said deponent, together with all other proceedings

10   herein contained.

11             IN WITNESS WHEREOF, I have hereunto set my

12   hand this 20th day of October, 2009.

13

14

15

16

17

18

19

20

21   _____
     Vonni R. Bray, RPR
22   P. O. Box 125
     Laurel, MT 59044
23   (406) 670-9533 Cell
     (888) 277-9372 Fax
24   vonni.bray@yahoo.com

25

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

**0**

**05 (1)**
10:9
**06 (4)**
17:23,25;18:2,9
**09 (1)**
130:12

**1**

**1 (4)**
33:7,8,19;117:21
**1:02 (1)**
131:16
**10 (7)**
54:9,12;56:17;63:11;
124:10,13,15
**10:59 (1)**
69:8
**10-4 (5)**
127:12,12;129:9,19,20
**11/14/2009 (2)**
12:10,12
**11:21 (1)**
111:16
**1162 (1)**
11:6
**12 (9)**
47:16;48:8;49:10,13,
18,18;50:18;51:3,4
**12:16 (1)**
111:7
**1220 (2)**
11:17;29:1
**12-gauge (1)**
105:21
**14 (3)**
124:12,17;129:22
**15 (2)**
92:21;124:19
**1501 (1)**
123:2
**16 (4)**
69:11,13;126:12;
127:4
**18 (1)**
124:25
**1807 (1)**
39:12
**19 (4)**
117:6,9,11,21
**1990 (2)**
8:1,3

**2**

**2 (2)**
122:14,15
**20 (1)**
92:21
**2000 (1)**

8:25
**2004 (3)**
8:4;9:24,25
**2005 (4)**
17:9;29:8;37:5,8
**2009 (8)**
12:17;19:17;25:23;
26:10;36:18;37:12;
46:20;73:9
**2010 (4)**
26:8;69:9;111:8;
131:17
**20s (1)**
81:13
**21 (2)**
33:12;126:15
**211245 (1)**
123:19
**2113 (1)**
120:7
**2116 (2)**
125:21;126:6
**211645 (1)**
123:10
**2121 (1)**
126:14
**212127 (1)**
126:20
**212610 (2)**
127:11;129:17
**212935 (2)**
127:14,19
**22-caliber (1)**
107:7
**23 (5)**
102:6,9;104:6;111:13;
114:21
**2321 (1)**
111:16
**24th (12)**
12:16;19:17;25:23;
26:10;29:10;36:18,21;
37:12;46:20;73:3,8;
115:22
**25 (2)**
38:8;73:12
**250 (1)**
5:18
**27 (5)**
29:13,16,22;32:13,21

**3**

**3 (1)**
124:2
**3/2 (1)**
130:12
**30 (1)**
29:8
**31 (7)**
10:15,18;11:15;28:13;
34:12,12;39:2
**32 (11)**

35:20;36:6,9;111:22,
24;113:14,15;114:20,23;
115:20;116:16
**35 (7)**
15:18,21;16:11,14;
34:13,13;36:12
**357-caliber (1)**
105:5

**4**

**4 (2)**
124:4;126:15
**45 (1)**
104:25
**4-day (1)**
29:19

**5**

**5 (7)**
33:19;40:4;43:10,16;
44:19;45:8;124:6
**5'10 (1)**
81:10
**5'11 (1)**
81:13

**6**

**6 (17)**
26:8;40:4;43:10,17;
44:19;45:8;69:9;111:8;
124:8;125:24,25;128:9,
10,11;130:11,11;131:17

**7**

**7 (4)**
38:4,6,8;39:7

**8**

**870 (1)**
125:3

**9**

**9 (10)**
47:8,10;123:2,4,23;
126:21;127:14;128:9;
129:18,22
**9/3/2005 (1)**
12:6
**9:39 (1)**
26:7
**9:45 (1)**
26:7
**95 (1)**
8:13
**9's (1)**
127:5

**A**

**ability (2)**
6:16,20
**able (2)**
79:18;93:3
**above (1)**
81:7
**Absolutely (2)**
49:5;69:6
**Academy (2)**
9:22;10:8
**accepted (1)**
28:8
**access (1)**
106:16
**accomplished (1)**
89:8
**according (2)**
21:11;104:25
**accurately (1)**
11:25
**accused (1)**
7:1
**acknowledging (1)**
89:21
**across (2)**
78:14;117:17
**action (2)**
12:10;79:21
**actions (3)**
60:14;66:18;78:12
**active (3)**
17:19,25;50:6
**actual (7)**
24:4,20;25:6,9;26:15;
79:22;130:19
**actually (10)**
31:23;38:16;54:25;
64:20;69:22;83:2,4;
112:14;119:9;120:7
**add (1)**
119:1
**additional (3)**
16:1;35:16;122:1
**address (4)**
5:17,18;13:17;96:10
**addressing (2)**
22:24;39:12
**adjustments (1)**
6:9
**admit (1)**
127:12
**advance (1)**
6:3
**advisable (3)**
42:8,15,20
**affirmed (2)**
40:1,18
**afterwards (1)**
102:3
**again (22)**

18:3;23:17;27:11;
31:7;34:14;40:15;41:19;
45:9,11;46:1;72:11;
73:4;78:24;80:1;83:6;
99:9,23;111:21;119:5;
126:1;127:15;128:19
**against (2)**
4:20;7:16
**age (5)**
50:4,17,17;51:3,4
**ago (2)**
14:15;27:15
**agree (12)**
5:5;40:9,17;41:11,16;
42:2;43:11;48:7;49:8;
52:1,22;53:6
**ahead (40)**
5:13;7:18;10:17;
15:20;20:17,25;23:8;
28:1;29:15;32:14;33:14,
18;38:6;39:5;20:42:7;
43:5;46:5;47:10,20;
54:11;63:10;64:19;
68:25;69:13;70:23;
71:17;102:8;104:22;
111:5,24;117:4,10;
119:3;122:10;125:11;
126:21;128:7;129:7;
130:7
**air (1)**
32:6
**Alan (1)**
124:18
**allow (1)**
5:3
**almost (2)**
46:7;111:6
**always (4)**
13:9,10;44:13;58:11
**ambulance (1)**
118:10
**ammunition (1)**
106:19
**anniversary (1)**
6:7
**announce (2)**
62:5;71:19
**announcing (1)**
72:4
**answered (11)**
20:14;22:4;23:19,20;
25:14;26:16;44:21;
54:22;63:18;90:9;96:24
**anymore (2)**
15:9;81:12
**apart (1)**
77:22
**apologize (2)**
24:25;69:4
**apparently (4)**
39:7;76:9;126:7;128:9
**appear (2)**
109:10;125:10

Tricia Wachsmuth v.
City of Powel, et al.

**appeared (2)**
97:22;109:7
**appears (7)**
8:17;29:24;36:9;
117:14;126:16;127:9;
129:21
**application (1)**
39:9
**apply (1)**
4:10
**appointed (2)**
26:14;60:21
**appreciate (2)**
19:20:91:25
**appropriate (1)**
50:1
**Approximately (8)**
21:19;93:1,18;104:3;
111:10;120:8,21;129:1
**April (1)**
10:9
**area (19)**
16:2;31:16;39:25;
40:4,18;43:9,16;44:19,
25;45:8,8;80:18,20;86:4,
7,11;93:12;95:10;101:3
**Argumentative (1)**
35:25
**around (8)**
26:4;40:5;43:10,17;
44:19:58:8;91:21;113:3
**arrested (1)**
6:23
**ARRIV (1)**
126:7
**arrival (2)**
120:5;123 2
**arrive (2)**
64:18;75:15
**arrived (8)**
54:6;55:1;57:11;69:2;
75:5,13;100:13;120:2
**arrives (1)**
123:4
**arriving (1)**
120:7;126:7
**askew (1)**
84:17
**aspect (2)**
42:7;120:17
**aspects (1)**
24:16
**assemble (1)**
22:10
**assembled (3)**
25:18;55:1;75:18
**assembles (1)**
33:23
**assess (1)**
87:16
**assessment (1)**
20:22
**assigned (4)**

25:19;101:7;102:13;
103:1
**assignment (4)**
60:18;61:11;101:9,9
**assignments (10)**
22:10;23:1,3;24:4,20;
25:8;26:13;56 23;60:24;
61:5
**assist (1)**
60:21
**assistance (1)**
131:5
**assisting (3)**
61:1;92:6,9
**assume (14)**
8:4;10:4;31:21;50:5;
63:20;73:15:8 :22;89:8;
112:19;126:5 127:22;
128:2,3,20
**assuming (1)**
61:18
**assumption (1)**
128:16
**attend (1)**
102:17
**attended (6)**
8:18;12:23;1(:6,22,
23;35:5
**attention (1)**
77:22
**attorneys (2)**
4:16;96:18
**authorized (1)**
46:13
**available (3)**
52:8,25;53:9
**aware (11)**
14:7;37:10;4( :23;
53:17;59:2;6% :7;71:5;
73:6;102:1;1 0:21;
129:25
**away (1)**
97:9

**B**

**hack (29)**
11:5;17:5;32:13;
48:24;62:4;68 25;76:10;
78:24;80:22;8 8:11;
90:20,25;91:2,3,14;
92:11,14,18;9 :3,7,8,14,
20;116:6;121 12;
123:11;125:2 ;126:4;
130:22
**background (1)**
7:19
**bad (1)**
59:21
**hags (1)**
90:22
**bark (1)**
77:25

**barks (1)**
58:12
**barricade (1)**
30:10
**base (1)**
52:15
**Based (2)**
70:7,14
**basement (1)**
108:18;109:16
**basic (1)**
60:4
**Bates (1)**
10:24
**Bates-Number (2)**
11:6;39:12
**Bates-stamp (1)**
11:16
**Bates-stamped (1)**
122:14
**bathroom (3)**
94:8,11;100:24
**battered (1)**
79:10
**battering (1)**
24:6
**Beau (1)**
15:12
**bed (11)**
81:2,6;84:19;85:11,
13,17,23;86:8;104:24;
105:1,11
**bedding (2)**
93:24;94:14
**bedroom (33)**
56:21;58:9;62:3;79:6,
8,9,13;84:6,9,10,14;
85:17,23;86:9,14,19,25;
87:2;88:8,14;90:14;
93:22;94:4,6,9;101:12;
105:3,17,22;106:1;
108:4;109:7;110:24
**bedrooms (6)**
87:3;88:3,24;90:19;
100:17,20
**beds (1)**
87:20
**began (1)**
76:12
**begin (6)**
5:4;7:18;10:7;82:25;
121:2,6
**beginning (1)**
11:6
**begins (1)**
70:24
**belief (1)**
52:15
**below (3)**
33:20;81:8;93:3
**beneath (1)**
93:5
**Beretta (1)**

107:7
**best (2)**
56:2:59:25
**beyond (1)**
8:17
**big (1)**
109:14
**bit (1)**
86:10
**Blackmore (1)**
19:12
**blank (1)**
113:5
**blast (1)**
48:3
**blinds (6)**
78:20,22;79:2;80:17;
84:15,17
**block (2)**
40:7;75:16
**board (1)**
56:18
**body (2)**
16:19,19
**book (1)**
34:7
**bookshelf (1)**
107:6
**both (5)**
100:22;102:20;
106:14,15,15
**bottom (6)**
39:8;40:7;46:7,10;
123:8,10
**box (6)**
38:13,16;46:7,24;
64:20,21
**Bozeman (3)**
7:24:8:10,22
**Bradley (3)**
15:5;19:12;124:3
**breach (1)**
62:7
**hreached (3)**
68:22;76:6,9
**breaching (3)**
14:24;33:24;78:3
**break (10)**
5:8,9,10,13;23:15;
24:11;26:4;29:17;69:5;
111:6
**Bret (5)**
59:11,23;60:1;62:13;
74:25
**Brett (1)**
124:7
**brief (1)**
67:1
**briefing (1)**
63:21
**briefly (4)**
10:1;55:14;83:14;
109:17

**Brilakis (1)**
19:14
**bring (1)**
52:20
**broken (1)**
79:11
**brokerage (1)**
9:4
**brought (1)**
83:24
**Brown (4)**
19:12;103:9;124:5;
126:16
**Browning (1)**
105:25
**build (4)**
47:21,22,25;48:2
**building (1)**
18:9
**bullet (1)**
51:11
**bulleted (1)**
47:14
**bulletproof (2)**
104:11,15
**burning (1)**
94:14
**business (2)**
9:4;91:19

**C**

**CAD (3)**
117:14;121:22;130:15
**call (4)**
11:9;53:19;54:4;67:24
**called (2)**
35:13;51:22
**calling (1)**
126:17
**calls (2)**
40:3;122:23
**came (10)**
11:7;54:5;56:17;62:3,
19;64:14;71:14;82:6;
83:10;84:24
**camera (1)**
103:9
**can (61)**
4:20;5:8,12;6:6;11:11,
18;13:6;17:21;18:17;
19:20;20:11,18,25;22:6;
24:11;26:10;28:5;30:5;
31:17;32:18,20;35:3,19;
36:5,15;37:13;40:14;
42:4,13;43:14;47:24;
48:6,13;49:15;53:3;
56:2;61:7;64:12;66:25;
67:22;73:4;85:20;86:16;
91:16;99:11;102:9;
107:3;108:24;110:11;
111:5;117:13,17;119:5,
7;120:1;125:19;127:19;

128:12,25;130:17,22
**car (2)**
57:6;97:10
**care (4)**
9:5;46:17;57:9;61:19
**carried (4)**
52:12;58:10,10;68:10
**carries (1)**
23:3
**cars (2)**
74:6;75:15
**case (11)**
7:9;41:15;114:8,17;
115:2;119:10,16;130:18,
24;131:5,10
**casing (1)**
85:4
**category (1)**
11:10
**cause (6)**
46:14,16;47:2,5;
62:10;64:13
**caution (1)**
46:17
**Center (1)**
123:6
**certain (4)**
10:12;18:3;40:22;82:3
**certainly (2)**
18:17;41:3
**certificate (1)**
9:9
**certification (2)**
9:21;37:10
**certified (1)**
37:8
**cetera (2)**
38:17;116:5;117:23
**Chad (2)**
127:16,17
**chamber (1)**
107:10
**change (2)**
23:12;121:13
**changed (1)**
113:3
**Chapman (15)**
19:15;91:15;100:4;
102:20,23;105:4;106:10,
14;109:18;112:20;
114:3,21;115:1,22;
124:24
**Chapman's (1)**
102:12
**charge (1)**
97:18
**charged (1)**
75:9
**check (5)**
42:4;72:12;106:25;
115:10;117:3
**checked (1)**
87:1

**checking (4)**
58:12;87:5,19;106:17
**chest (4)**
105:6,8,8,11
**Chief (1)**
19:10
**child (10)**
49:10,13,18;50:17;
51:3;74:12,15 18,18,22
**children (9)**
7:6,8;47:16;43:5,8;
50:6,17;51:3,24
**Chretien (23)**
19:11;55:8;56 :3,5;
57:2,14,20;60:3,6;61:18;
65:1;73:10,24;74:21;
83:7;95:24;97:1;99:22;
100:3;124:9;126:2,3;
128:11
**Chretien's (1)**
69:16
**circumstances (9)**
41:8,13;42:23,24;
44:5,8;49:12,16,25
**City (1)**
5:21
**Citywide (1)**
6:8
**clarification (1)**
4:24
**clarify (2)**
13:6;28:5
**Clark (1)**
5:18
**class (1)**
37:4
**clear (17)**
5:4;21:4;40:1 19;41:5,
10,23;45:8;68:5;88:5;
95:10;119:13 14,15;
127:20;128 12;129:16
**cleared (19)**
40:4,11;43:9,16;
83:15,16,23;8? :4,6,8,19;
88:3,8;97:7;1 9:15,16;
127:23;128:1 );129:2
**clearing (11)**
14:25;18:9;2· :5;30:9;
72:13;78:15;' 8:24;
90:14,19;100 12;120:7
**close (2)**
76:22;82:24
**cocaine (4)**
116:14,14;11 7:1,3
**Cody (7)**
9:6,15;12:23;13:21;
14:3,11;15:11
**coffee (1)**
108:15
**COLA (1)**
6:8
**collect (5)**
92:2,14,18;94:3,11

**collected (2)**
93:20;109:19
**collecting (3)**
92:15;94:3;116:4
**collection (3)**
27:24;90:23;92:10
**college (3)**
8:6,7,18
**Colt (1)**
104:25
**column (7)**
17:14;39:8;54:15;
118:7;24;119:19;129:21
**columns (7)**
112:22;117:18,22;
119:23;122:16,16;
130:14
**coming (1)**
86:3
**command (1)**
98:9
**commands (1)**
98:1
**commencing (1)**
79:21
**comment (2)**
51:11;78:4
**comments (3)**
11:9,9,10
**communicate (1)**
131:10
**communicating (3)**
126:3;127:10,19
**communication (2)**
123:14;125:17
**company (1)**
8:9
**complete (3)**
9:18;38:25;111:10
**completed (4)**
10:10;38:21;78:21;
92:13
**completely (1)**
97:25
**compliant (4)**
97:17,22,25;98:8
**Complies (1)**
71:3
**comport (1)**
63:23
**comports (2)**
64:25;67:6
**computer (5)**
114:12,17,19;115:2;
122:24
**concealed (1)**
58:11
**concerned (1)**
59:10
**concerning (2)**
58:25;59:2
**concluded (1)**
131:16

**condition (1)**
33:22
**conducted (2)**
17:8;74:9
**conducting (1)**
75:9
**conference (2)**
55:12,16
**confidential (1)**
7:10
**confusing (1)**
127:2
**conjunction (1)**
14:11
**connected (1)**
47:23
**connection (5)**
16:2,10;31:5;52:9;
74:22
**consider (1)**
49:16
**Considerations (1)**
51:10
**considered (1)**
58:22
**contact (1)**
62:1
**contain (2)**
10:22,22
**contained (7)**
46:7,24;71:2,6;
116:13,25;130:14
**containing (1)**
48:19
**contains (1)**
16:14
**contents (1)**
29:19
**control (2)**
32:12;129:3
**conversation (3)**
56:2;57:1;127:4
**conversations (5)**
57:20;96:4,8,11,21
**converted (1)**
112:18
**copies (1)**
15:23
**copy (3)**
54:12;63:11;112:6
**corner (5)**
46:10;64:21;75:25;
78:14;84:20
**correction (1)**
46:13
**cost (1)**
6:9
**couch (3)**
82:15,16,17;98:17;
99:3
**Counsel (5)**
10:20;39:11;65:7;
96:5;115:5

**County (3)**
14:12;15:7;31:2
**couple (5)**
4:9;8:8;83:15,22;
127:9
**course (19)**
14:5,6,9,21,22;16:25;
28:9;29:22,23;30:1,6;
31:20;32:15,16,22;34:5;
36:25;37:20;39:4
**courses (4)**
16:20,22,23,25
**coursework (1)**
28:20
**coverings (1)**
78:17
**create (3)**
48:3;111:18;116:1
**created (2)**
113:12;116:2
**crew (1)**
118:10
**crime (2)**
6:23;7:1
**curious (1)**
75:13
**current (3)**
5:17,19,23
**currently (1)**
5:24;6:15
**curtain (1)**
78:20;84:16
**curtains (1)**
78:16
**custody (2)**
97:18;106:13
**cut (1)**
110:7

**D**

**damage (2)**
46:16;47:5
**danger (1)**
48:5
**Danzer (5)**
19:15;95:23;97:1;
100:3;124:20
**dark (2)**
80:19,19
**date (5)**
12:6,12,24;18:1;
130:11
**dates (2)**
18:4;35:18
**Dave (1)**
124:5
**day (2)**
15:17;31:5
**days (6)**
18:11,12;19:1;29:21;
66:4;130:9
**dead (4)**

109:7,13;110:23;
111:2
**deal (1)**
67:5
**dealt (1)**
12:17
**death (2)**
46:15;47:3
**decided (1)**
56:12
**DEF-TEC (2)**
38:8;73:12
**degree (3)**
8:19,24,25
**delay (2)**
80:5,11
**delivered (4)**
40:2;42:9,16;43:2
**departed (1)**
120:3
**Department (19)**
6:1;8:4;9:13,18;15:2,
11,24;24:14,18;26:12;
34:9;53:10;55:18;72:23;
91:22;111:20;113:9;
114:6;123:5
**depending (1)**
119:5
**depends (1)**
129:24
**deploy (12)**
30:12;31:11,15;37:22;
45:7;49:17;50:16;51:2;
56:12;60:19;62:9;68:23
**deployed (24)**
36:19;37:2,5,18;40:6;
41:6,11;44:18,25;45:17;
46:19;48:9;52:24;56:6,
7,7;77:5;80:23;81:15,20,
21;84:10;92:17
**deploying (11)**
14:24;30:22;32:4,5,6;
51:11,19;53:8;55:11;
57:15;80:5
**deployment (27)**
24:5;28:21;31:6,7,22;
32:3,8,12;40:1,4,10,18;
43:9,16;50:3;51:23,23;
52:1,9;53:7;55:13;73:8;
74:23;78:6;79:14,22;
83:2
**deployments (1)**
31:21
**deposition (7)**
4:5,8,11,14;5:5;6:21;
66:14
**depositions (2)**
13:7;49:4
**Deputy (1)**
15:8
**describe (9)**
6:6;9:25;22:6;56:1;
63:14;78:8,11;117:18;

120:15
**described (2)**
31:19;63:16
**designated (1)**
60:13
**desk (1)**
8:8
**determine (6)**
41:14,23;42:25;44:10,
17;106:18
**determined (2)**
128:17;129:2
**detonated (5)**
85:17,23;86:1,4,7
**detonation (1)**
48:1
**device (83)**
24:6;30:4,8,12,22;
31:6,11,21,23;32:2,17;
33:6,7,24,25;45:9,16;
35:4,12,17,21,36:16,17,
19;37:11,18,25;40:2,5,6,
8,10;41:5,10;42:9,16,25;
43:10,17;44:10,17;45:1;
46:20;47:2,14,23;48:1,9;
49:9,13,17;50:16;51:2;
52:2,10,24;53:8;55:13;
60:19;73:8,12,16;74:1,
23;79:22;80:5;81:3,15,
19;83:2;84:10,18;85:5,
10,12,14,17,2;86:7,14,
18;92:17
**devices (13)**
28:3,4,9,15,19,22;
29:11;30:7,32;23;37:5;
38:22;48:20;72:24
**devoted (1)**
32:23
**difference (2)**
13:12;25:1
**differences (1)**
38:1
**different (2)**
22:20;23:11
**difficult (1)**
11:1
**difficulty (1)**
68:8
**digital (1)**
103:2
**DIRECT (2)**
4:3;96:5
**directed (2)**
56:20;90:25
**directive (1)**
98:9
**directives (1)**
98:1
**directly (4)**
57:5,7;70:23;38:24
**disagree (2)**
51:13,16
**discuss (4)**

4:10;55:13;56:23;
58:21
**discussed (13)**
31:5;32:4,5,5;55:14,
15;56:11,14;58:19;
72:20,21;75:3;101:10
**Discussion (9)**
11:12;56:15;62:18,22;
63:3;71:13,14;74:14,17
**discussions (1)**
57:17
**dishonesty (1)**
7:2
**dispatch (1)**
118:24
**dispatched (2)**
117:23;118:17
**dispatcher (1)**
122:24
**dispatchers (2)**
125:15;129:24
**Disp-Clear (1)**
119:23
**distraction (11)**
28:2,14,19;29:11;
38:22;40:8;41:5;47:15;
49:8,12;62:11
**diversionary (17)**
28:9;30:7;33:5,7,24;
34:5,16;35:4,12,21;
36:16,17,19;47:13;
72:24;73:8;74:23
**divorced (1)**
7:13
**doctor (1)**
81:11
**document (36)**
11:17,24;36:15;39:18;
47:11;48:12,17;49:1;
63:14;64:8;65:3,4;66:2,
20;69:14;70:3;102:11;
107:16;112:1,9;114:10,
13,14,18;115:6,7,16;
116:12,15,15,25;117:13,
18;120:2;121:24;130:11
**documents (1)**
115:15
**dog (2)**
58:12;77:25
**done (17)**
9:23;12:21;25:1;
45:18;46:1;53:18;66:21,
23;88:14,23;91:19;
94:23;111:6;112:20;
116:21;121:13;122:1
**door (21)**
62:1,4,7;68:21,22;
71:19;72:15;76:1,4,5,9;
77:4,4;78:6;79:10;
82:20,21,23;123:11;
125:22;126:4
**doors (4)**
14:24;32:6,11;56:19

**doorway (1)**
87:15
**dormitories (1)**
8:9
**double-check (1)**
100:15
**down (26)**
8:14;23:15;24:11;
51:21;67:22;75:16;
78:15;84:16;95:5,9,16;
96:22;97:14,15;98:17;
106:2,18;109:21;110:2;
118:6;122:13,25;123:2,
7;126:14;130:7
**Downstairs (3)**
55:16;88:18;108:12
**dozen (1)**
15:15
**drawers (1)**
105:9
**drawn (3)**
56:18;87:21,24
**drop (1)**
80:25
**dropped (2)**
81:3;85:14
**drove (1)**
75:1
**drug (1)**
108:9
**drugs (5)**
108:5,7;110:10,12,17
**dry (1)**
25:8
**duly (1)**
4:2
**During (8)**
6:3;20:4;23:11;31:20;
37:4;98:24,25;100:11
**duties (1)**
92:14
**duty (2)**
53:23,24
**dynamic (30)**
12:4,17;14:22;16:2,
12,16;17:1;19:4;20:1,9,
12,20,21;21:2;22:12,13;
23:4,9;24:5,6,15,17,21;
25:6,9,17;26:12;27:21;
52:23;58:3

### E

**earlier (2)**
37:19;116:2
**easier (1)**
20:7
**East (1)**
125:3
**easy (3)**
25:4;37:22;109:20
**Eckerdt (6)**
19:11;89:4,7;124:11,

13,15
**education (1)**
8:19
**educational (1)**
7:19
**effectively (1)**
31:11
**effects (1)**
47:13
**Eggers (1)**
15:12
**eight (1)**
9:7
**either (5)**
53:9;84:6;88:21;
99:16;114:20
**elapsed (4)**
76:13;79:20;83:1;
92:16
**elderly (1)**
51:24
**elements (1)**
22:13
**else (15)**
15:10;19:13;31:17;
46:2;55:19,20,20;59:3;
73:11;86:12;95:24;
111:12;115:23;122:21;
130:17
**e-mail (1)**
131:9
**emergency (6)**
41:3,9;44:9,13;50:25;
128:18
**employed (2)**
49:9,13
**employee (1)**
19:16
**employment (1)**
5:19
**EMS (3)**
127:19,24;128:12
**en (2)**
117:23;125:7
**end (1)**
129:25
**Ended (1)**
9:6
**ends (1)**
130:21
**enforcement (6)**
9:18,21;12:1;38:17;
46:13;123:6
**engage (1)**
52:23
**Ennis (1)**
7:22
**enough (5)**
7:8;65:13,14;66:5;
86:10
**ENRT (1)**
125:4
**entered (11)**

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

81:22;82:2,10;83:7,
11,13;87:4;97:4;99:5;
100:14;130:12

**entering (1)**
83:3

**enters (1)**
122:24

**entire (4)**
56:1,22,25;71:22

**entries (3)**
14:23;30:10;126:22

**entry (55)**
12:4,18;14:24;16:2,
12,16;17:1;19:4;20:1,9,
12,20,21;21:2;22·12,13;
23:4;24:5,6,15,17,21;
25:6,10,17;26:12;27:21;
51:21;52:23;58:3;64:23;
67:5;70:13,25;71:12,15;
72:4,8,17;75:12;87:10,
12;89:8;91:19;92:13;
94:23;99:19,25;101:22;
103:13;111:17;121:25;
123:10;125:2,21

**especially (1)**
58:12

**established (1)**
24:16

**estimate (2)**
19:21,23

**et (3)**
38:17;116:5;117:23

**even (1)**
84:7

**evening (10)**
52:8;59:19,20;60:14,
25;62:14;63:15.16;
68:18;113:20

**event (3)**
30:24;57:10;122:16

**events (14)**
57:8;63:14,16;64:22;
65:12;66:3;67:7.12;
68:10,17;76:21;77:1,17;
78:3

**everybody (5)**
23:10;75:14;81:25;
89:25;100:9

**everyone (4)**
19:7;50:8;72:12;81:23

**everyone's (1)**
61:11

**evidence (54)**
27:23;32:21;61:1;
65:22;66:10,12;72:14;
90:23,25;91:16;92:3,10,
14,19;93:21,21,24;94:3,
4,11;101:7,22,22;102:4,
18;103:2,11,19;104:12;
106:11,12,15;107:19;
108:20;109:2;110:9;
111:11,19,19;112:8,16;
113:8,10,11,12,13,22;

114:7,7,20;115:23;
116:13;128:2· ;131:6

**Evidently (1)**
94:24

**exactly (7)**
17:19;35:11;44:8;
66:1;107:25;114:4;
115:25

**EXAMINATION (1)**
4:3

**examine (1)**
17:12

**example (2)**
49:23;123:1

**Excuse (1)**
70:5

**executed (2)**
94:19,22

**execution (2)**
54:18,20

**Exhibit (58)**
10:15,18,23;11:7,15,
24;15:18,20,21;16:11,
14;28:13;29:13,16,22;
32:13,21;34:12,13;
35:20:36:1,6,9 12;38:4,
6,8;39:2,7;47:3,10;
48:17;51:22;54:9,12;
56:17;63:11;67:3;69:11,
13;102:6,9;104:6;
111:13,22,24:1:3:14,15;
114:20,20,23.2:1:115:20;
116:16;117:9,11,21;
122:15

**Exhibits (1)**
10:21

**exist (1)**
114:14

**existence (1)**
116:13

**exists (1)**
115:8

**exited (3)**
89:10,13;90:13

**expected (3)**
40:5;43:10,17

**experience (2)**
72:24;73:7

**Explain (1)**
30:14

**explained (5)**
61:12,14,19,19,25

**extent (1)**
96:3

**extinguisher (5)**
51:25;52:8,20:53:10,
15

**extra (2)**
54:11;77:15

**extreme (1)**
46:17

**eye (1)**
81:8

**F**

**fact (4)**
26:14;32:22;45:7;
91:25

**fair (7)**
70:21;82:22;85:16,22;
127:22;128:15;129:17

**fairgrounds (2)**
30:17;31:2

**familiar (5)**
7:9;48:18;120:12

**family (1)**
9:5

**far (8)**
35:10;56:19;59:15;
77:22;91:4;93:8;106:21;
118:6

**fast (1)**
8:7

**father (I)**
62:16

**Feathers (1)**
19:10

**February (11)**
12:17;19:17:25:23:
26:10;36:18,21;37:12;
46:20;73:3,9;115:22

**feel (1)**
5:9

**feet (7)**
40:4;43:10,17;44:19;
45:8;93:14,18

**fellow (1)**
24:17

**few (9)**
20:3;32:14;37:19;
70:20;76:15;80:1;93:14.
18;130:7

**fifth (1)**
106:2

**figure (1)**
129:1

**file (4)**
114:8,17;115:3,11

**filed (2)**
69:25;131:8

**filled (1)**
10:4

**finally (1)**
8:25

**find (9)**
11:1;36:15;67:23;
107:22;108:2,11,14;
110:9,12

**finding (1)**
101:18

**fine (8)**
5:9;16:7;46:3;83:21;
96:7;127:11;128:6;
130:6

**finish (1)**

5:3

**finished (3)**
79:1;80:22;129:11

**fire (15)**
51:24,24,24;52:7,20,
25;53:9,10,10,15;86:14,
19;93:22,24;94:14

**first (20)**
4:2,13;17:8,14,15;
38:7;53:17;54:25;75:21;
82:2;83:10,13;100:13,
14;105:16;106:3;
117:18;118:2,18;120:12

**fit (1)**
23:25

**five (1)**
106:2

**flash (1)**
28:2

**flashbang (44)**
28:21;30:4,8;31:6,22;
32:2,17,23;33:15;34:5;
35:17;47:23;48:1,8,20;
49:17;50:16;51:2;52:2,
10,24;53:8;55:11,13;
56:6,13,20;57:15;60:19;
62:9;68:23;79:14,22;
80:23;84:10;85:5,10,12,
14,16,22;86:13,18;92:17

**flashbangs (2)**
14:24;50:3

**Flat (1)**
81:16

**flush (1)**
109:20

**focused (1)**
12:17

**follow (2)**
30:22;115:17

**followed (1)**
95:12

**follow-on (1)**
72:10

**follows (1)**
4:2

**food (1)**
8:7

**foot (1)**
105:11

**force (1)**
72:17

**forcing (1)**
72:4

**forget (1)**
39:1

**form (105)**
18:15;20 13,23;21:21;
22:3,16;23:5;24:8,22;
25:11,24;26:24;32:24;
34:17;35 7,22;39:18;
40:12,20:41:17,25;
42:11;43:4,12,19;44:4,
12,20;45:2,9;48:10;

49:19;50:10,21;51:5,14;
52:3,17;53:1,9,12;54:21;
57:21;59:5;60:8,15;
61:16,22;62:24;63:17;
64:2;10,0;65:2,6:67:9,16,
20;68:12,19;70:25;
76:16,23;77:8,18;79:15;
80:2,7;85:18,24;86:15,
20;89:22;90:3,8;92:4,
22;93:16;94:16;95:18;
96:23;97:19;98:2,11,21;
99:20;100:6;101:24;
103:16,24;108:22,109:4,
22;110:4,14,19;113:5,7;
116:18;121:4,15;122:3;
123:16;127:25;129:4;
130:3

**formal (1)**
27:3

**format (1)**
4:14

**former (1)**
19:16

**forms (3)**
112:21;113:3,21

**forward (1)**
34:2

**found (12)**
11:22;104:8,23,23;
107:19,21,24,25;108:17;
112:22,23,24

**four (4)**
23:21;29:21;45:23;
77:17

**fourth (2)**
29:5;39:6

**frame (5)**
98:24,25;99:2;100:11;
129:1

**free (5)**
40:3;42:9,16;43:2;
131:15

**freight (1)**
9:4

**Freshman (1)**
7:23

**Friday (6)**
13:8,9,10,13,16;18:5

**front (17)**
8:8;10:19;62:1,5;
63:11;71:18;75:6,25;
76:1;82:20,21,23;94:24;
123:11;125:22;126:4;
129:22

**full (2)**
5:15;15:17

**function (1)**
9:1

**functions (1)**
23:2

**further (1)**
14:20

**G**

**gather (1)**
72:14
**gathering (1)**
111:11
**gave (5)**
36:11;60:2;73:23;
80:22;129:23
**general (1)**
11:3
**generally (4)**
17:13;119:15;120:21;
125:19
**generate (1)**
120:24
**generated (3)**
16:11;69:21;114:19
**gets (2)**
114:8;116:6
**given (11)**
4:5,8;22:10;23:1;25:8;
31:9;42:4,23;57:12;
60:18;122:1
**gives (2)**
52:15;117:15
**giving (1)**
60:4
**glass (1)**
78:15
**glean (1)**
128:25
**Glick (1)**
19:14
**gloves (1)**
90:23
**good (7)**
6:14;10:2;26:6;53:14;
86:11;111:4;123:7
**GOSMAN (172)**
4:4;10:16,25;11:5,14;
13:17,19;15:19;16:24;
18:19;20:16;21:3,8;
22:1,8,22;23:14,18,22;
24:1,12;25:3,15;26:6,9,
20;27:2;29:4,14;33:4;
34:21;35:15;36:2,7,10;
38:5;39:13,14,23;40:16,
23;41:20;42:1,6,14,21;
43:8,15,22;44:2,7,15,23;
45:4,13,15,19,21;46:3,4;
47:9;48:16,23;49:6,7,24;
50:13,23;51:8,18;52:6,
21;53:5,16;54:10,24;
58:1;59:9;60:12,17;
61:17;62:12;63:1,9,22;
64:4,16;65:5,9,13,15,19,
24;66:5,8,11,15,22,25;
67:2,13,18;68:2,7,16,24;
69:7,12;70:16,19;73:2;
76:20;77:2,12,24;79:19;
80:3,10;85:21;86:2,17,

22;90:1,6,10;92:8,24;
93:19;94:17;9:21;96:7,
16;97:2,23;98:5,15,23;
99:1,21;100:1(;102:2,7;
103:18;104:2;109:1,9;
110:1,8,16,22;111:5,9,
23;115:5,9,1:,18,19;
116:16,23;12:8,18;
122:5,9;123:18;127:7;
128:5,23;129:2;130:5;
131:12,15
**grade (1)**
6:4
**graduate (1)**
7:21
**Graduated (1)**
7:24
**great (1)**
68:8
**ground (2)**
4:10;81:14
**group (12)**
19:18,25;20:9,9;22:9,
14,20,24;23:2,24:15;
25:7;55:22
**grouped (1)**
75:14
**grow (3)**
58:6,7;59:13
**guess (5)**
21:25;23:24;24:25;
68:5;116:11
**gun (8)**
84:19;87:25;1)4:8,9,
23;106:5;107:3,13
**guns (7)**
24:6;104:22;1)6:8,11,
17,19;107:2
**guys (2)**
13:24;125:25

**H**

**Hall (6)**
19:11;91:16;102:14,
21;107:24;125:1
**hallway (5)**
101:15,16,19; .04:8,10
**hand (3)**
31:15;53:15:54:11
**handcuffs (1)**
97:6
**handgun (5)**
105:5,14,19;107:7,17
**Handle (5)**
46:16;71:15;107:1,2;
125:15
**handled (3)**
38:2;73:13,14
**handling (2)**
72:24;107:14
**hands (1)**
97:16

**handwriting (1)**
114:1
**handy (1)**
52:20
**hanging (3)**
78:22;79:3,4
**happen (4)**
62:19;77:1,6,10
**happened (8)**
11:8;56:10;57:3;62:8;
75:14;76:3;96:2;117:16
**hard (3)**
67:19;110:12,17
**hate (1)**
127:12
**hazards (3)**
51:23,23;52:2
**head (2)**
57:6;67:25
**headed (2)**
57:16;123:11
**heading (9)**
33:17;39:8;51:9,22;
61:9;104:18;117:25;
125:22;126:4
**headings (2)**
35:10;117:19
**hear (6)**
77:21,25;97:24;98:7,
20;102:3
**heard (7)**
76:1,4,5,5,9,10;98:13
**hearing (2)**
72:7,19
**height (1)**
93:1
**held (2)**
9:12;11:12
**high (5)**
7:20,20,22;8:17;81:7
**high-risk (2)**
17:22;30:10
**hired (2)**
9:23,24
**history (3)**
8:2;9:25;11:25
**hold (1)**
31:14
**home (11)**
53:18;61:6;67:6;74:9,
12,15,22;83:12;89:7;
107:20;116:8
**Honestly (1)**
45:11
**hostage (2)**
30:10;50:7
**hours (4)**
14:2;111:16;120:7;
123:2
**house (55)**
56:11,15,19;58:7,8;
59:3;72:9,13;74:19;
75:21,22,25;81:14,22,

24;82:2,10;83:8,13;
88:13;89:10,13;90:24;
91:1,5,14,18,20;92:2,10,
11,18;94:19,23;97:7;
99:19,25;100:12,14,20;
101:2;104:19,23;106:8;
109:3;110:10,12,17;
112:16;113:21;120:6,7;
127:23;128:16;129:1
**husband (1)**
7:10

**I**

**idea (10)**
11:4;26:11;76:14;
83:1;92:16;94:18,21;
95:16;99:10;126:21
**identification (2)**
16:9;114:10
**identified (20)**
10:15;15:18;16:18;
17:13;25:7;29:13;38:4;
47:8;48:12;51:10;54:9,
12,17;69:11;102:6,19;
111:22;112:23;114:9;
117:9
**identifier (1)**
118:2
**identifies (1)**
118:12
**identify (7)**
12:3;16:5;30:21;
32:16;35:3;104:22;
117:13
**Il (1)**
33:23
**III (1)**
33:24
**illnesses (1)**
6:19
**immediate (6)**
12:10;39:25;40:18;
80:18,20;93:12
**immediately (3)**
72:6,16;90:19
**imminent (3)**
50:8.15;51:1
**impair (1)**
6:16
**important (1)**
4:23
**inaccurate (2)**
70:4,12
**inappropriate (1)**
52:23
**incident (7)**
96:2;97:7;117:16;
118:18;119:9,18;122:18
**incidents (1)**
120:20
**include (1)**
121:24

**included (3)**
31:14,20;42:24
**increase (1)**
6:4
**increases (2)**
6:8,9
**indicate (1)**
107:17
**indicated (1)**
16:1
**indicates (1)**
38:19
**indicating (1)**
104:7
**individual (2)**
58:6,10
**individually (1)**
61:13
**informant (1)**
7:11
**information (23)**
33:19;46:23,24;48:14,
19;49:2;52:15;58:4,5,
25:59:2,10;60:1,2;71:2,
5;77:3;120:22;121:25;
122:17;128:25;130:14,
15
**informed (6)**
55:6;68:18;71:1,25;
74:8,11
**in-house (1)**
12:21
**initially (1)**
87:19
**initiates (1)**
34:1
**injury (2)**
46:15;47:3
**in-service (14)**
13:2,5,13,15,21;15:23;
16:3,10,14,16;17:7;34:8,
15;35:4
**inside (7)**
47:16;48:8;49:18;
80:18,19;93:2,12
**instance (2)**
29:18;130:9
**instruct (1)**
4:16
**instructed (1)**
46:18
**instruction (1)**
20:22
**instructions (4)**
31:10,13,14;32:7
**instructor (1)**
30:19
**instructors (1)**
14:14
**intelligence (2)**
74:9,18
**interested (1)**
20:8

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

**interesting (1)**
  11:7
**interfere (1)**
  6:20
**interim (1)**
  79:13
**interpretation (1)**
  120:5
**interrupt (2)**
  8:16;83:19
**interrupted (1)**
  31:4
**into (32)**
  31:15,16;33:15;39:15;
  46:8;48:11;56:21;61:6;
  67:5;79:22;80:23,25;
  84:5,13;87:10,12;90:25;
  91:14;92:11,18;94:23;
  100:22;106:11;111:19;
  112:18;113:9;114:7,8,
  19;121:10,12;122:24
**introduced (2)**
  48:17;56:20
**Investigator (2)**
  103:8;126:16
**involve (2)**
  31:23;44:8
**involved (13)**
  16:21;24:3,7;29:10,
  23;30:4,7;32:1;35:4,10,
  11;58:3;115:23
**involves (2)**
  28:21;130:1,9
**involving (5)**
  7:2;20:1;31:22;32:17;
  71:12
**Israeli (1)**
  87:11
**issue (3)**
  5:7;44:3;63:18
**issued (1)**
  98:9
**issues (1)**
  16:15
**item (5)**
  38:14;106:2;114:9;
  116:25;117:6
**items (7)**
  67:4;68:9;106:13;
  110:25;113:17;116:7,21
**IV (1)**
  33:25

**J**

**James (1)**
  5:16
**Jeff (1)**
  66:6
**Jeremy (1)**
  15:8
**job (1)**
  9:11

**jobs (1)**
  8:7
**Joe (1)**
  15:9
**Join (62)**
  18:16;20:15;71:23;
  22:5,18;23:7;24:10,24;
  25:12;26:1,17,25;33:1;
  35:8,24;39:19;40:13,21;
  41:18;42:3,12,19;43:6,
  13;44:21;49:21;50:12;
  51:6,15;52:4, 8;53:2;
  59:7;60:9;61:13;63:19;
  64:3,11;65:23;67:10,17;
  68:13;76:17,25;77:9;
  79:16;85:19;89:23;90:4;
  95:19;97:20;98:12;
  101:25;103:25;108:23;
  109:5,23;110:5,20;
  116:19;122:7;129:6
**judge (1)**
  67:24
**June (1)**
  17:23
**Junior (1)**
  7:23

**K**

**keep (4)**
  35:19;45:25;52:20;
  116:4
**keeping (3)**
  76:19;79:24;99:14
**keeps (2)**
  120:20,22
**Kelly (1)**
  19:16
**Kent (22)**
  19:10;60:23;61:2,8;
  74:4;75:24;76:5,8,12;
  78:8;79:1,21;81:21;
  84:2;89:17;92:25;99:5,
  8;124:13,18;129:23;
  130:1
**kept (5)**
  21:17;73:15,16,17;
  97:15
**keying (1)**
  77:21
**kids (1)**
  50:4
**kind (8)**
  6:8;37:11;52:25;53:9;
  78:17;87:11;117:15;
  120:22
**kitchen (3)**
  101:3,5,13
**knew (2)**
  60:10;94:25
**knock (4)**
  62:5;71:18;77:4;78:6
**knocking (2)**

**72:4;76:4**
**knowledge (7)**
  57:12;58:24;66:2;
  67:11;70:7,15;97:21
**known (1)**
  58:8

**L**

**label (3)**
  38:7,9,15
**labeled (1)**
  13:7
**language (3)**
  33:15;42:8;71:11
**Lara (6)**
  19:14;59:19,22;103:7,
  8;124:7
**large (1)**
  55:22
**last (15)**
  5:7;9:11;14:17,19;
  15:16;25:21;34:1;51:21,
  22;58:15;64:18;68:3;
  88:24;111:15,16
**late (1)**
  71:14
**later (4)**
  9:23;69:23;95:6;
  115:24
**law (7)**
  9:18,21;11:25;38:17;
  46:13;66:18;123:6
**lawsuit (2)**
  69:24;131:8
**layout (3)**
  56:11,14,18
**LBHP (1)**
  39:12
**leader (7)**
  22:11;23:1;24:3;25:6;
  26:13;60:7,13
**leak (1)**
  34:20
**Lean (1)**
  87:11
**learn (3)**
  86:18;95:7;96:20
**learned (1)**
  95:6
**least (3)**
  36:24;64:22;66:18
**leave (1)**
  74:4
**leaving (4)**
  61:8;63:2,4;125:20
**LEC (2)**
  123:2,4
**led (1)**
  95:4
**left (5)**
  74:6;86:25;90:18;
  103:19;125:8

**left-hand (3)**
  39:8;54:15;118:7
**leg (1)**
  34:2
**legend (1)**
  46:5
**length (1)**
  77:14
**less (2)**
  36:7;76:15
**level (3)**
  81:8,14,16
**life (2)**
  25:19;51:1
**light (2)**
  79:6;84:22
**limiting (1)**
  13:14
**line (2)**
  122:25;123:1
**lines (1)**
  118:6
**list (18)**
  19:8;54:14;64:21,25;
  65:24;67:4,6;68:9;
  112:14,15,18,22;113:12;
  116:1,2,3,3,6
**listed (4)**
  12:9;36:17;51:23;
  117:6
**listen (1)**
  48:23
**lists (1)**
  64:22
**little (6)**
  20:7;46:7;64:20;
  83:20;86:10;93:7
**live (7)**
  23:4;30:12;31:6,21,
  23;36:19,22
**living (10)**
  6:9;58:9;82:10;83:14;
  84:1,3;101:12;107:7;
  108:3,16
**loaded (5)**
  58:10;105:19;106:5,
  24;107:17
**located (1)**
  105:1
**location (5)**
  74:15;82:4;119:17,18;
  122:23
**locked (1)**
  114:8
**locker (2)**
  106:12;113:13
**lockers (1)**
  113:11
**log (7)**
  101:7;105 2;110:23;
  111:18;114:11,19;115:1
**logged (7)**
  111:19;112:8,11;

**121:3,10;125:11,13**
**logging (6)**
  102:18;103:11,19;
  113:21;114:7;115:23
**long (10)**
  5:25;14:15;15:16;
  24:6;76:19;80:12;86:9,
  10;87:25;99:25
**look (30)**
  10:17;11:15;15:20,25;
  18:17;29:15;32:11,18;
  35:2;38:6;39:5;42:7;
  46:5;47:10;51:11,19;
  63:10;64:20,24;67:3,4;
  70:9,25;71:17;102:9;
  107:23;117:11;122:10;
  123:1;130:22
**looked (9)**
  34:12;37:16;64:6;
  69:22;70:2;93:2,6,10,14
**looking (14)**
  17:4,18;18:24;32:21;
  33:9;63:24;72:11;
  107:16,25;108:5,7;
  111:12;120:1,4
**looks (3)**
  18:25;33:16;69:16
**loose (1)**
  108:11
**lot (1)**
  34:24
**low (2)**
  33:25;88:4

**M**

**magazine (1)**
  107:8
**major (1)**
  64:22
**maker (1)**
  9:14
**making (1)**
  104:17
**man (1)**
  34:1
**manner (1)**
  40:6
**many (17)**
  15:14;19:25;21:9,18,
  19;26:11,19;36:18;
  55:25;74:6;94:18;
  100:20;101:4;104:3;
  118:19;120:11;121:22
**March (1)**
  18:9
**marijuana (9)**
  58:7;59:13;108:11,17,
  21;109:2,10,15;110:18
**mark (2)**
  67:24;84:17
**married (1)**
  7:4

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

**master (1)**
  58:9
**material (1)**
  48:19
**materials (5)**
  29:23;32:15,16,22;
  34:6
**MATT (2)**
  4:1;5:16
**may (20)**
  5:2,2;12:25;13:21;
  40:8;41:4;44:6;46:14,
  15;51:24;79:18;83:19;
  96:4;116:21,21,25;
  119:9,10;122:20;129:23
**maybe (1)**
  93:24
**MCCASLIN (3)**
  4:1;5:16;66:16
**mean (18)**
  13:4;22:6;45:25;
  64:13;74:16,17;112:11;
  117:19,25;118:9,23;
  119:5,7,14;121:6;125:6;
  126:25;129:10
**means (8)**
  118:7,24;119:4,20;
  125:2,4;126:8;129:9
**medical (2)**
  6:19;128:18
**medication (4)**
  6:15;107:19;108:2;
  110:13
**meet (4)**
  38:25;55:12;56:22;
  61:10
**member (2)**
  9:5;34:3
**members (1)**
  25:7
**men (1)**
  55:22
**men's (1)**
  57:9
**mental (2)**
  33:22;59:23
**mentally (1)**
  58:13
**mention (5)**
  33:10;104:9,11,18,19
**mentioned (8)**
  8:18;13:20;63:12;
  83:15,17,25;94:13;99:22
**mentioning (1)**
  104:16
**mentions (1)**
  33:5
**merit (1)**
  6:7
**met (1)**
  19:25
**middle (2)**
  17:13;117:22

**midnight (1)**
  120:8
**might (2)**
  6:20;47:5
**military (1)**
  46:14
**mind (2)**
  27:19;70:4
**Miner (11)**
  19:14;100:4;102:14,
  24;109:19;115:22;
  124:1;127:16,17;
  129:18;130:1
**minute (4)**
  16:7;29:15;70 8;102:9
**minutes (4)**
  4:9;32:15;70:20;92:21
**mischaracterize (1)**
  65:21
**Mischaracterizes (1)**
  65:3
**mischaracterizing (2)**
  66:10,11
**Misha (1)**
  96:9
**missing (1)**
  19:13
**mission (1)**
  55:2
**Misstates (1)**
  50:19
**misstating (2)**
  65:8,9
**mistaken (1)**
  17:9
**modify (1)**
  121:13
**moment (5)**
  10:18;13:18;27:15;
  32:14;117:11
**moments (1)**
  76:10
**Montana (3)**
  7:23,24;8:22
**months (1)**
  19:21
**more (13)**
  17:15;18:23;26 21,23;
  30:5;36:7;37:13;49:15;
  50:22;72:24;73:7;
  110:11;130:8
**Most (4)**
  18:7;19:18;102 21;
  103:22
**move (2)**
  40:8;46:2
**moved (8)**
  8:10,12,13,14;80:17;
  100:14;101:21;102:4
**moving (1)**
  87:15
**MSI13 (1)**
  118:7

**much (10)**
  18:23;19:7;69:23;
  76:13;79:20;83:1;91:21;
  92:16;101:16;131:13
**multiple (3)**
  21:11;58:3;117:22
**Myself (1)**
  124:22

## N

**name (5)**
  5:15;14:5,8;37:14;
  39:1
**narrative (1)**
  83:20
**nature (2)**
  57:18;128:1
**necessarily (3)**
  68:4;129:10;130:25
**necessary (2)**
  33:25;128:17
**need (9)**
  5:12;16:6;17:11;
  18:13;67:24;69:4;
  127:20,24;128:13
**needed (1)**
  31:10
**negative (1)**
  129:20
**neighborhood (2)**
  75:15;92:1
**Nevermind (1)**
  98:6
**new (2)**
  74:1,3
**next (9)**
  18:8;56:10;71:18;
  82:17,21,23;99:9;
  119:19;125:21
**NFDD (2)**
  34:5;37:9
**night (25)**
  54:19;56:3;61:6;
  62:23;63:3;67:8;70:12;
  71:6;73:21;74:6;84:25;
  85:3;92:1;96:2;98:10;
  99:12;107:2,14,20;
  111:11;113:2,4;115:21,
  24;116:2
**nightstand (1)**
  105:13
**NIMS (1)**
  17:2
**nine (1)**
  9:7
**nobody (2)**
  80:21;86:12
**nods (1)**
  67:25
**noise (1)**
  28:2
**noncompliance (1)**

**98:14**
**None (1)**
  94:13
**normally (1)**
  73:16
**North (3)**
  5:18;110:23;125:3
**northeast (11)**
  56:21;62:3;75:25;
  84:6,9;85:17,23;94:6,8;
  105:3,17
**notation (1)**
  67:23
**note (1)**
  48:25
**notebook (1)**
  10:18
**noted (2)**
  111:17;121:14
**notepad (1)**
  112:14
**notes (3)**
  63:21,23;64:13,17;
  115:21
**notice (8)**
  29:18;38:15;75:6;
  85:10,13;86:3,6;107:16
**notified (1)**
  127:24
**notify (1)**
  125:20
**November (3)**
  17:25;18:2;29:10
**Number (14)**
  10:24;21:13;36:11;
  59:15;118:2,4,12,12;
  119:4;120:6;123:20;
  126:6;127:3,6
**numbers (3)**
  119:1,2,24
**Numeral (2)**
  33:22,23

## O

**Object (50)**
  20:13,23;21:21;22:3,
  16;23:5;24:8,22;25:11,
  24;26:24;32:24;34:17;
  35:22;39:17;42:11;43:4;
  44:20;45:9;50:10,21;
  51:14;52:3,17;53:1;
  54:21;59:5;62:24;68:19;
  76:23;77:18;80:2,7;
  92:4;93:16;96:23;98:2,
  11,21;99:20;100:6;
  116:17;121:4,15;122:3;
  123:16;126:25;127:25;
  129:4;130:3
**Objection (61)**
  18:15;26:16;35:7;
  40:12,20;41:17,25;
  42:18;43:12,19,25;44:4,

**12;45:2;48:10;49:19;**
  50:19;51:5;53:12:13;
  57:21;60:8,15;61:16,22;
  63:6;17;64:2,10;65:2,5,
  23;67:9,16,20;68:12;
  76:16;77:8;79:15;85:18,
  24;86:15,20;89:22;90:3,
  8;92:22;94:16;95:18;
  97:19;101:24;103:16,
  24;108:22;109:4,22;
  110:4,14,19;123:15;
  128:19
**obscures (1)**
  51:25
**obstruction (1)**
  40:7
**obstructions (4)**
  40:3;42:10,17;43:2
**obtain (2)**
  8:19;9:8
**obviously (1)**
  130:8
**occasion (1)**
  36:24
**occasions (1)**
  20:8
**occur (4)**
  5:10;26:15;31:1;76:21
**occurred (7)**
  12:12;13:1;30:14,25;
  57:8;96:4,9
**October (5)**
  26:8;37:5;69:9;111:8;
  131:17
**off (5)**
  11:11,12;53:24;77:21;
  84:18
**Office (6)**
  14:12,12;15:7;58:15;
  123:3,5
**Officer (135)**
  4:5;5:20,24;6:10,11,
  13;7:4;10:4,19;12:1,22;
  15:1,5;19:11,12,12,12,
  13,13,14,14,14,15,15,15;
  21:9;24:13;27:4;28:8;
  34:25;35:19;38:7;41:4,
  4,8;46:9;47:18;48:18;
  56:3,5;57:2,20;59:17,19,
  22;61:13,18;64:25;
  66:14;67:3;69:14;74:4,
  21;76:12;78:8,8;79:1,
  21;81:9;83:7,11,25;84:2,
  8;86:14;87:8,14,23;
  88:6;89:3,7,17;91:15,16;
  92:25;95:23;97:1;99:5,
  8;100:3;102:12,14,14,
  20,21,23,24;103:7,8;
  104:15;105:4;106:10,13,
  14;107:24;109:18,18;
  112:20;114:3;115:22,
  22;117:23;118:3,4,12,
  14,16;119:6;122:23;

Case 1:10-cv-00041-ABJ   Document 65-4   Filed 01/10/11   Page 50 of 54

Tricia Wachsmuth v.                                                      Matt McCaslin
City of Powel, et al.                                                    October 6, 2010

123:4,20,20,22,23;
124:1,2,3,4,6,8,10,12,15,
17,19,20,24;125:1,4,24,
25;126:15,21;129:18,18;
131:12
**officers (63)**
15:6;19:4,6,9;20:20;
22:9,14;24:17;52:9;
54:14,17;55:23;57:22;
58:3,5;59:4;60:21;61:5,
10,21;65:4;70:24;72:10,
23;73:6;78:5;82:3,5,9;
89:12,14,20;91:5,8;92:9;
94:13;95:11,14;96:1,9,
10,14;97:18;98:8,10;
99:14,18,24;100:16,24;
101:1,4,21;102:13;
103:1,12,22;104:3;
117:15;120:20;125:8;
126:6;131:9
**officer's (2)**
51:25;98:1
**oftentimes (1)**
58:10
**old (7)**
7:8;47:16;48:8;49:10,
14,18;50:18
**once (5)**
17:14;26:21;57:1;
72:12;75:20
**one (46)**
4:13;5:7;12:23;14:1;
17:6;18:14;20:21;22:13;
28:24;30:13;31:23;
33:10;34:1;36:22,24;
37:2,3;42:7;49:15;
50:22;55:23;56:7;58:5,
14;61:25;64:18;75:7;
76:21;77:7,16;78:4,14;
88:11,21;89:5,19;94:24;
100:18;103:10;107:3,5,
15;109:7;110:25;111:2;
126:23
**ones (4)**
16:5;28:24;58:15;
106:19
**ongoing (1)**
20:2
**only (14)**
5:10;20:8;34:4;38:17,
20;46:12,17:71:8,9;
96:25;104:19;107:13;
109:17;117:5
**on-scene-clear (1)**
119:22
**open (5)**
32:6;72:6,16;121:9;
130:21
**operation (6)**
58:6,7;59:14;60:7;
61:20,21
**operations (1)**
25:19

**opportunity (15)**
40:25;41:4,9, 4,15,22,
24;42:5,25;44:10,16,24;
45:6;61:10;80:18
**options (2)**
58:18,21
**orange (1)**
33:22
**order (9)**
7:15;29:2;31:10;
67:14;68:9,10 15,17;
77:11
**organized (1)**
116:5
**others (5)**
46:15;47:3;50 15;
51:2;105:5
**ought (1)**
115:10
**out (42)**
8:10;12:4:13:16;
14:20;23:3;36 5;37:3;
56:18;57:16;58:12;61:9;
64:5;68:10,25;70:3,18;
75:6;76:2,11:7:3:78:5,
15,16;79:9,13;8:17,22;
87:15;88:1,11, 3;89:4;
91:19;94:4,5,11 106:8,9,
10;113:16;122:3;129:1
**outline (1)**
33:16
**outside (17)**
13:1;30:16,18;30:19;
81:14;88:11,22,25;89:3,
7,12,15,15,20;9):13,16,
20
**over (22)**
6:2;9:6;12:23,23;
23:16,17.17:45:11,11,
11;46:1,1;47:15,18;
64:6;72:14;74:5 ;77:20;
78:17;104:18;123:14;
125:17
**owners (1)**
116:7

**P**

**P16 (1)**
126:15
**P85 (1)**
105:13
**page (25)**
17:14,16;18:8;29:5;
33:7,8,12;38:7,17;39:6,
6;46:6;51:9,22;67:5;
105:16;106:3;117:18,21,
22;122:14,15;12 3:8;
130:10,11
**pages (4)**
10:22;120:11;12 2:11;
130:8
**paper (2)**

112:15;113:6
**paragraph (8)**
39:15;70:24;71:1,2,6,
18,23;72:11
**Paragraphs (1)**
33:19
**paranoid (1)**
58:11
**paraphernalia (1)**
108:9
**Pardon (1)**
112:4
**Park (4)**
14:12;15:7;31:2;75:16
**part (11)**
13:21;55:3,4;72:12.
13;99:19,24;114:17;
115:2;130:14,19
**partially (1)**
79:4
**participated (1)**
103:12
**participating (1)**
54:18
**particular (2)**
14:7;130:23
**parties (1)**
7:9
**Partly (1)**
100:13
**parts (2)**
47:1;72:2
**party (1)**
7:9
**past (2)**
17:14;66:4
**patrol (14)**
6:10,11;12:6,10;28:7;
29:6;30:25;36:25;37:19;
39:1,4;57:6;75:15;97:10
**Patterson (1)**
59:17
**paying (1)**
77:22
**PD (1)**
14:11
**PDFs (1)**
11:9
**peeking (4)**
76:2,11;77:3;78:5
**pen (1)**
113:21
**pending (2)**
5:11,12
**people (4)**
14:10;15:14;94:18;
127:9
**perform (1)**
27:21
**performing (4)**
20:21;25:18;29:25;
61:21
**perimeter (1)**

89:15
**period (4)**
8:10;10:4;17:7,8
**person (2)**
40:2,19
**personal (2)**
58:24;70:14
**personally (1)**
106:7
**personnel (3)**
38:20;46:14;128:18
**persons (3)**
40:2,19;41:23
**pertain (1)**
16:12
**pertaining (1)**
57:18
**pertains (2)**
38:8;40:10
**phone (2)**
53:19;54:3
**photos (1)**
103:2
**phrase (2)**
72:7,18
**physical (1)**
119:10
**pick (3)**
11:9;36:5;130:10
**pictures (2)**
103:6,7
**piece (3)**
112:15;113:6;116:13
**pillow (2)**
93:25;94:14
**pillows (2)**
86:6,6
**pills (1)**
110:18
**pin (2)**
33:24;34:4
**pinpoint (1)**
89:6
**pistol (1)**
85:2
**place (6)**
57:12,19;58:17;67:12,
15;70:12
**placed (5)**
7:15;43:1;113:11,13;
114:10
**plan (4)**
58:17;71:18,20,25
**planned (1)**
55:2
**planning (3)**
60:10;63:15;70:13
**plans (2)**
57:11,13
**plant (4)**
109:7,10;110:23;
111:2
**plants (6)**

59:15;108:12,17,21;
109:3,15
**play (1)**
55:7
**please (18)**
6:6;12:3;16:5,20;
20:18;32:19:40:15;41:7,
19;42:13;46:9;53:4;
61:7;73:4;78:24;85:20;
98:4;111:21
**pm (3)**
111:8,16;131:17
**PO6 (1)**
123:11
**point (23)**
12:23;33:24;58:14,16;
59:20;64:5;70:18;76:6;
83:9;87:18,22;88:10,12,
21;89:5,24;90:22;91:2,
11;95:1;109:14;127:23;
129:15
**pointing (1)**
12:4
**police (29)**
5:20;6:1;8:4;9:12,17;
10:3;15:2,11,24;24:14,
18;26:11;34:9;55:18;
61:8;62:6,19;71:19;
72:23;73:13;76:5;89:20;
98:10;106:18;111:20;
113:9;114:6;123:5;
125:8
**port (1)**
40:7
**portion (1)**
118:1
**posed (1)**
59:3
**position (6)**
65:17,20;75:24;78:2;
88:2,4
**positions (2)**
23:11,12
**possibility (1)**
74:12
**possible (1)**
117:3
**possibly (3)**
88:22;120:6;121:17
**POST (13)**
12:2,5,9;13:25;14:2;
28:3;7,8,11,20;29:9,12;
31:1
**potentially (2)**
13:14;50:4
**pouch (1)**
33:25
**Powell (29)**
5:21;6:1;8:3;9:12,17;
15:2;24:24;14,18;26:11;
34:9;72:23;89:20;
111:20;113:9;114:6;
123:2,5;125:3;127:4,5,

14;128:7,9,9,10,11:
129:22,22
**practice (4)**
22:12;25:9;30:9;32:17
**practiced (5)**
20:19;21:20;22:2;
25:20;32:5
**practicing (3)**
14:23;22:20;26:14
**prearranged (1)**
101:9
**prepare (4)**
113:25;131:4,4,9
**prepared (8)**
112:14,15;113:19,24;
114:2;115:20,24;120:25
**preplanning (2)**
54:20;55:5
**prescription (4)**
107:19;108:2;110:13.
18
**presence (4)**
71:13,14;74:22;96:5
**present (15)**
15:6;17:22;20:20;
30:19;50:18;54:14,19;
55:2,19;57:23;72:21;
88:17;96:14,18;98:16
**presented (1)**
93:14
**presents (1)**
50:7
**pressure (6)**
47:15,18,21,22,25;
48:3
**Pretty (4)**
19:7;37:22;82:24;
91:21
**previous (1)**
72:11
**previously (2)**
34:11;54:12
**primary (3)**
47:13;70:25;72:8
**printed (1)**
10:21
**prior (18)**
12:16;19:17,21;25:22,
23;26:10:29:10;36:18,
20;49:3;61:5,8;63:2,4;
65:3;88:12;101:22;
104:18
**prisoners (4)**
71:9,12,15;72:10
**private (1)**
8:9
**probably (2)**
87:1;111:16
**probationary (1)**
10:4
**problem (4)**
5:2;26:6;69:7;70:6
**problems (1)**

6:19
**Proceedings (1)**
131:16
**process (1)**
114:7
**prodnce (1)**
49:3
**produced (1)**
15:23
**product (3)**
46:12,14,15
**professional (1)**
10:13
**program (5)**
10:10;29:19;33:21;
120:13,15
**programs (1)**
38:24
**property (4)**
46:16;47:6;113:18;
116:7
**provide (3)**
5:12;49:2;62:4
**provided (5)**
15:24;40:25;115:12.
15,16
**pulled (1)**
84:16
**pulling (1)**
78:15
**put (11)**
13:23;22:13;65:16;
66:6,9,25;72:7.119:9;
129:24;130:20.21
**putting (1)**
65:19

**Q**

**qualified (1)**
13:25

**R**

**radio (7)**
122:18,20;123:14;
125:17;126:17;129:23;
130:15
**rake (3)**
62:9;68:23;78:13
**raked (6)**
76:6;78:9,14;80:6,15,
16
**raking (8)**
14:23;76:12;78:12,21;
79:1,13,21;80:22
**ram (4)**
24:6;72:16;77:4;78:6
**range (2)**
31:3;37:3
**rank (1)**
5:23
**reached (1)**

80:23
**read (6)**
33:14,18;39:15;46:8,
25;70:20
**reading (1)**
66:18
**ready (2)**
33:25;34:2
**real (1)**
25:19
**realize (1)**
71:13
**really (3)**
91:17;118:25;119:24
**rear (3)**
62:4,10,11
**reason (3)**
10:20;57:18;58:2
**recall (62)**
12:24;14:4,13,16;
15:10;17:18,21,24;
18:11;19:2,19;20:10,11,
11;37:21;38:13;54:7;
59:15,24;60:3;68:21,21;
71:8,10,11.16:72:2,3,12,
19;73:25;74:24;75:17;
76:18;77:10;78:1,19;
82:7,18;84:1;85:2;
89:11,14;93:23;95:24;
97:14;99:4,14;100:8,19,
25;101:8,17;104:17,19;
105:10;107:3,12;
110:15;113:2;114:3;
131:11
**receipt (3)**
112:6;113:16;116:11
**receipted (1)**
113:9
**received (11)**
8:25;10:22;12:12,16;
16:10,15;31:20;35:16;
36:5;58:4;60:1
**receiving (1)**
106:13
**recently (1)**
19:18
**Recess (3)**
26:7;69:8;111:7
**recognize (2)**
82:3;91:8
**recognized (2)**
28:8;91:10
**recollection (3)**
59:25;63:24;120:10
**recommend (1)**
45:3
**recommendation (5)**
43:23;44:1,22;45:14,
16
**recommended (2)**
39:22,25
**recommending (1)**
43:21

**record (17)**
5:5;11:11,13;12:10;
28:12;33:15:34:11:35:2,
3;39:11,16;46:9;48:25;
66:7,8,10;67:24
**recorded (1)**
4:20
**records (8)**
11:6;12:5;16:11,15,
19,20;31:1;35:19
**recovered (1)**
109:16
**refer (1)**
10:23
**reference (5)**
10:23;34:4;35:20;
36:15;116:24
**referred (1)**
48:18
**referring (3)**
40:24;71:22;114:19
**reflect (4)**
11:25;29:22;32:16;
116:12
**reflected (1)**
31:1
**refuse (1)**
81:12
**refused (1)**
49:2
**regard (2)**
32:8:59:25
**regards (1)**
65:4
**regular (1)**
13:23
**related (1)**
16:16
**relative (5)**
12:4;28:2.33:15;
48:20;82:19
**Relevance (1)**
49:20
**relevant (2)**
16:23,25
**reloaded (1)**
74:2
**relying (1)**
65:17
**remained (1)**
43:2
**remains (3)**
40:3;42:9,16
**remember (66)**
8:12;14:8;15:12;
18:10;19:24;26:2;29:20,
25;30:18;31:17;35:16;
37:16;53:20;54:1;55:24;
56:2;57:3,23;59:16.22;
62:18;68:10,18;72:7,15;
74:5;75:8,21;78:18;
82:8,9,12;84:7,7,23;
85:8;86:8;87:7,13,15,22;

88:15;89:1,2,19,25;90:5,
7,16;91:13;99:8.11;
101:13,18;104:5,13,17;
105:11;106:9,17;107:14,
23;113:4;114:2,4;
125:25
**removed (2)**
78:22;79:2
**repeat (2)**
32:18;98:3
**rephrase (1)**
128:7
**report (17)**
34:15;70:11;112:18;
114:21;120:11,24,24;
121:2,7,10,13;122:1.11;
130:11,15,19,22
**Reporter (2)**
67:25,25
**reporting (1)**
120:19
**reports (4)**
69:21;121:22,25;
131:5
**represent (1)**
15:22
**represents (1)**
17:7
**request (1)**
115:17
**required (1)**
4:15
**requirement (1)**
38:25
**residence (16)**
46:21;56:4;57:6;61:9;
63:5;69:2;71:7;75:5,10;
83:3;90:14,18;97:4;
99:6;108:21;118:17
**residue (7)**
110:17;116:14,25;
117:3,5,7,8
**resource (2)**
5:24;6:13
**responded (1)**
66:19
**response (8)**
12:7;17:25;29:6;
30:25;37:20;39:4;54:3;
129:19
**responsibility (1)**
106:16
**responsible (4)**
66:14,15,17;106:12
**rest (5)**
40:5;43:11,18;44:11,
18
**restate (12)**
20:18;36:13;41:7;
42:13;43:14;49:15;53:3;
61:7;85:20;86:16;99:23;
108:24
**restaurants (1)**

8:8
**restraining (1)**
 7:15
**results (1)**
 116:21
**retrieve (2)**
 73:12;85:4
**return (1)**
 116:11
**returned (1)**
 116:6
**review (2)**
 20:22;56:23
**reviewed (1)**
 61:5
**ridiculous (1)**
 45:12
**rifle (3)**
 84:25;85:2;105:25
**rifles (2)**
 99:19,25
**right (61)**
 8:23;9:11;11:24;
 12:11,20,25;13:11;18:5,
 13,22;22:23;23:15;
 26:23;28:24;30:18;32:1,
 11;33:20;36:23;44:16;
 56:10;63:25;64:9;68:25;
 72:22;76:8;77:13,25;
 78:11;80:18,21;81:8;
 82:21,23;85:4;87:7;
 89:6,9,12;92:13;93:12;
 94:24;97:3;98:6;107:4;
 114:9,18;115:4,9,13;
 118:20,22;120:9;
 121:21;123:7;126.14,20,
 23,24;129:9;131:2
**right-hand (4)**
 46:6,10;64:21;67:4
**RIMS (6)**
 115:11;120:13,15,25;
 121:3,24
**rode (1)**
 74:5
**role (2)**
 55:7,9,10;56:8;61:20
**roles (1)**
 91:23
**Roman (2)**
 33:22,23
**room (45)**
 14:24,24;24:5;30:9,
 15,18;31:15;40:10;41:1,
 2,5,10,14,23;49:9,10,13,
 14,17;50:4,16;51:2;
 55:12,16;57:9;58:9;
 79:23;80:20;82:10;
 83:14;84:1,3,20;87:16,
 18;88:5;101:2.13;
 106:12;107:7;108:3,16;
 111:19;114:7,20
**roomful (1)**
 50:6

**rooms (13)**
 56:19;83:15,22;87:8.
 11,12;88:22;100:12,15;
 101:7,11;102:18;116:5
**roughly (1)**
 120:2
**rounds (2)**
 105:1,6
**route (2)**
 117:23;125:7
**Ruger (1)**
 105:13
**rule (1)**
 5:10
**rules (4)**
 4:10;30:21;31 4,7
**run (3)**
 22:12;25:8,9
**run-down (1)**
 57:12,13;60:4
**running (4)**
 26:3;117:15;1.:2:17;
 130:8

## S

**saddle (2)**
 9:6,14
**safe (1)**
 49:17
**safety (3)**
 50:8,15;51:1
**same (14)**
 9:19;27:20;32: 1;
 37:18,21,25;42 18;
 45:10;46:1;53:13;63:6;
 103:10;123:8;128:19
**Sapp (1)**
 19:15
**saw (11)**
 34:7;38:13;85:?;91:9;
 93:21;97:21;99 13,16;
 100:5;103:7;109:17
**saying (2)**
 59:22;116:7
**scan (1)**
 80:18
**Scanned (1)**
 80:20
**scene (12)**
 69:1;103:15;106:23;
 112:13;113:1;116:2,4;
 119:4,10;120:2.8·126:10
**Schmidt (1)**
 19:13
**school (10)**
 5:24;6:13;7:20.70,22;
 8:18;9:9;50:2,3,6
**scorch (1)**
 84:17
**scratch (2)**
 10:1;31:18
**screen (1)**

121:9
**search (7)**
 62:6;71:19;76:5;
 86:11;102:13;112:6;
 113:17
**searched (1)**
 102:17
**second (5)**
 12:11;17:5;88:8;
 112:8,12
**seconds (3)**
 76:15;80:1;126:15
**section (2)**
 17:20;32:22
**secure (5)**
 33:25;71:8;72:9,10,12
**secured (2)**
 90:24;91:18
**securing (1)**
 71:12
**security (3)**
 8:9;62:4;89:15
**seeing (5)**
 25:1;88:15;90:16;
 99:8,11
**seem (6)**
 63:25;64:9;77:15;
 87:14;97:17;103:22
**seems (3)**
 75:7;78:19;105:10
**seized (3)**
 104:12;111:1;112:16
**senior (1)**
 7:24
**sense (1)**
 87:13
**separate (6)**
 111:18;113:19,20;
 115:2,20;116:1
**September (3)**
 29:8;37:7,8
**sequence (6)**
 64:22;65:11,11;66:3;
 67:7;76:22
**sequenced (1)**
 11:1
**Sergeant (27)**
 19:10,11,11;55:8;
 57:14;60:3,6,23;62:2,8;
 69:16;73:24;75:24;76:6,
 8;81:21;84:2;89:4;
 95:24;97:1;100:3;
 124:11,13;126:2,3;
 128:11;129:23
**serious (4)**
 46:14,16;47:3,5
**served (1)**
 12:13
**service (5)**
 17:23;30:11;35:17;
 53:18;55:7
**session (2)**
 15:16;18:9

**sessions (4)**
 13:8;16:3;18:6;21:11
**set (1)**
 78:20
**setting (11)**
 16:16;19:4;20:21;
 22:14;23:3;24:3;25:5,
 17,22;30:15;61:4
**Seventeen (1)**
 124:23
**several (10)**
 8:7;14:10;21:1;22:4;
 50:4;75:15;91:22;119:5;
 126:22;130:9
**shades (2)**
 78:15;80 16
**sheet (4)**
 17:3,9;46:22;117:14
**sheets (2)**
 17:6,12
**shell (1)**
 107:10
**shells (2)**
 105:23;107:8
**sheriff's (3)**
 14:11,12;15:7
**shift (1)**
 20:4
**shooter (1)**
 50:6
**shooting (1)**
 50:2
**shop (1)**
 9:6
**Shortly (1)**
 9:3
**shotgun (2)**
 105:21,22
**show (2)**
 35:20;130:25
**shower (1)**
 94:1
**shows (2)**
 122:25;130:23
**side (2)**
 46:6;67:5
**significant (1)**
 57:10
**simply (3)**
 44:9;48:18;130:13
**simulated (2)**
 25:17;26:12
**simulates (1)**
 23:4
**simulating (1)**
 24:20
**simulation (3)**
 24:4,15;25 6
**simulations (1)**
 29:25
**singed (1)**
 93:23
**sitting (3)**

82:22;97:14,15
**situation (8)**
 26:15;41:9;45:10;
 50:7,14,25;53:7;129:2
**situations (10)**
 30:1,10;31:22;32:1,3;
 40:22,24;41:4;44:9;50:3
**six (6)**
 6:2;19:21;70:24;
 105:1,6;124:9
**Sixteen (2)**
 123:21;124:21
**size (1)**
 59:13
**Slash (2)**
 6:12,13
**slightly (1)**
 40:8
**small (3)**
 74:12,15;91:22
**smoke (2)**
 51:25;86:3
**soft (2)**
 33:24;34:4
**software (2)**
 120:25;121:3
**somebody (6)**
 76:1,2,10;104:17,20.
 20
**someone (7)**
 52:19;58:17;76:11;
 77:3;78:5;79:8,12
**Sometimes (3)**
 11:8;23:11;130:16
**somewhere (1)**
 16:18
**sophomore (1)**
 7:23
**sorry (26)**
 8:16;9:20;15:21;16:8;
 23:23;26:3,5;28:5;30:5;
 34:19,23;36:11;39:2;
 40:14;47:24;63:25;81:11;
 86:16;98:3;108:6;
 112:10;116:16;117:20;
 124:14;125:12,24
**sort (1)**
 75:14
**sound (1)**
 34:24
**sounded (1)**
 34:20
**sounds (2)**
 12:25;25:13
**source (2)**
 48:14;49:2
**southeast (5)**
 84:6;101:12;108:4;
 109:6;110:24
**speak (2)**
 59:19;61:12
**speaks (2)**
 39:18;65:24

**Special (3)**
27:10;32:7;51:10
**specific (17)**
19:1;23:1.2;24:4,14,
20;26:13;28:11,14,18;
30:5;33:3;37:13;60:18;
78:13;101:9;110:11
**specifically (21)**
18:11;35:18;38:24;
54:1;56:1;57:24;58:8;
61:20;71:9;73:25:75:18;
90:12;91:13;100:8;
104:21;105:12;107:13;
113:4;117:2,8;118:23
**specifics (1)**
129:15
**speculate (1)**
127:1
**spoke (1)**
57:23
**squeeze (3)**
34:1,2,2
**stability (1)**
59:23
**stack (3)**
33:17,20;34:1
**stage (1)**
54:20
**stairs (6)**
95:5,9,17;96:22;
98:18;99:3
**stairway (1)**
98:17
**stamp (1)**
122:25
**standard (2)**
106:22.23
**standards (2)**
48:19.21
**standing (3)**
93:5,7;97:15
**stands (1)**
70:18
**start (5)**
4:13;9:9;28:16;51:24;
121:9
**started (11)**
8:3;9:12;10:3;26:4;
75:20.22;78:14;86:14.
19;92:15;109:8
**starting (3)**
11:16;94:14;122:13
**starts (3)**
17:9;39:21;117:21
**State (2)**
8:22;41:19
**stated (1)**
68:20
**statement (6)**
34:20;40:9,17;47:14;
51:19;65:18
**statements (1)**
34:25

**states (2)**
47:15;117:7
**station (7)**
61:8;62:20;73:13;
74:4,6;106:18;125:9
**stay (2)**
86:9;103:15
**stayed (2)**
83:13;84:2
**stickers (2)**
11:8,10
**still (12)**
6:10;16:13;79 3,4;
91:6,7,21,23;103:23;
104:3;105:16:114:14
**stood (1)**
70:3
**stop (2)**
8:16;76:8
**store (1)**
46:16
**straw (2)**
117:5,6
**Street (1)**
125:3
**strike (4)**
31:18;79:11:8 5:11;
93:4
**structure (1)**
22:25
**student (3)**
8:14,19;9:3
**stuff (5)**
18:25;33:10;60:25;
90:23;129:24
**Sub (2)**
34:1.2
**subject (1)**
14:21
**successfully (3)**
10:10;38:20.25
**supplement (2)**
69:17;102:12
**suppose (1)**
44:14
**suppression (2)**
52:25;53:9
**sure (22)**
23:12,18,23;30 24;
35:12;42:15;43: :44:18,
24;66:17;73:20.81:25;
86:11;87:6;91:.7;93:9;
113:23;115:25;119:21;
125:21;127:3;130:2
**surveillance (1)**
75:10
**SWAT (8)**
27:3.6,9,12,16. 7,18,
20
**swears (1)**
81:12
**sworn (1)**
4:2

**synonyms (1)**
36:16
**system (4)**
120:19;121:10,14;
122:22

# T

**table (3)**
29:19;108:15;112:21
**tactical (9)**
12:7;27:10;29:6;30:1,
25;36:25;37:20;39:4;
87:12
**tactics (7)**
20:1;21:2;22:21;
27:18,19,20;60:11
**talk (1)**
96:17
**talked (7)**
22:25;36:23;57:14;
58:17,18;77:17;96:1
**talking (6)**
22:9;27:8,8;55:1;78:4;
89:19
**talks (1)**
33:7
**tall (5)**
81:9,12;92:25;109:12,
15
**tally (3)**
117:15;122:17;130:8
**taught (2)**
14:9;88:5
**teach (1)**
9:10
**teacher (1)**
9:2
**teaching (5)**
8:14,19;9:4,8,9
**team (46)**
19:3;20:9,12,19;
21:10,16,20;22:2,7,11,
25;23:1,2,9;24:3,19;
25:6,18;26:13;27:17.20;
33:23;34:3;56:22,25;
60:13;61:25;62:3,4,10;
70:25;71:12,15;72:8,9;
75:25;78:3;90:25;91:19;
92:13;99:19,25;101:23;
123:11;125:22:126:4
**teams (1)**
123:14
**techniques (1)**
33:17
**telling (1)**
66:2
**term (5)**
36:16;39:9;72:8,18;
119:13
**terms (2)**
70:12;92:1
**testified (4)**

4:2;65:8,11;66:4
**testimony (4)**
21:12;50:20;65:3,18
**testing (1)**
116:20
**third (6)**
29:5;39:6,6,15;123:1.
10
**Thirty-one (1)**
11:5
**Thirty-two (1)**
36:3
**THOMPSON (103)**
10:20:11:3,11;18:15;
20:15;21:23;22:5,18;
23:7;24:10,24;25:12;
26:1,17,25;33:1;35:7,24;
39:11,17;40:12,20;
41:17,25;42:12,19;43:6,
13:44:21;48:10;49:3,19;
50:12,19:51:5,15;52:4,
17;53:2,12;57:21;59:7;
60:8,15;61:16,22;63:17;
64:2,10;65:2,7,10,14,16,
21;66:1.6,9,13,17;67:9,
16,20;68:12,19;70:14;
76:16.25:77:8;79:15;
85:18.24;86:15,20;
89:22;90:3,8;92:22;
94:16;95:18:96:3,8,12,
14;97:19;98:12;99:20;
101:24;103:16,24;
108:22;109:4,22;110:4,
14,19;115:7,12,14;
116:19;122:7;123:15;
129:6
**though (3)**
115:25;125:18,19
**threat (5)**
17:25;50:8,15;51:1;
59:3
**threats (2)**
72:13;86:11
**three (4)**
26:23;77:16;118:6;
130:10
**throwing (1)**
32:12
**thrown (1)**
93:25
**times (21)**
12:22;19:25;20:3;
21:1,9,15,18,19;22:4;
23:21;26:11,19,23;
36:19;45:23;111:15;
117:23,25.118:2,11;
120:21
**title (2)**
48:13:60:16
**today (3)**
4:19;6:17;131:13
**together (8)**
20:12;22:10,13,14,19,

24;24:19;114:4
**toilet (2)**
109:21;110:3
**told (7)**
53:25;54:2;56:6;58:2;
59:13;64:25;95:8
**Tom (5)**
62:16,19,22;63:3;66:5
**took (6)**
36:25;70:12;80:17;
106:9,10;115:21
**tool (1)**
78:13
**top (2)**
38:16;117:17
**totally (3)**
68:14;83:16;87:6
**toward (1)**
98:9
**towards (4)**
11:5;75:20,22;117:22
**track (6)**
21:17;76:19;79:24;
99:14;120:20.22
**traffic (5)**
6:24;122:18,20;
129:24;130:15
**train (3)**
19:3;20:3;22:14
**trained (26)**
17:19;19:6,18;20:1,9;
21:2,10.15;22:20;24:3,
14,16,19;25:5,14,17,20,
22,22;26:12;27:17.18,
20;30:23;46:13;50:2
**traiuing (62)**
9:18;10:7,13;11:25;
12:4,11,16,20,21,23;
13:2,5,8,20;14:2,13,22;
15:24:16:1,3,9,15,15;
17:2,8.12,23;18:6,12;
19:1;20:2,12,22;21:11;
23:3,10;27:3,6,10,16,23;
28:1,3,8,11,20:29 9,12;
30:3,7,25;31:19;32:17;
34:8,15;35:11,17;36:5;
37:19;38:21;56:7;73:7
**trainings (4)**
13:13;23:11;35:11.13
**trains (1)**
27:18
**trial (1)**
4:20
**Tricia (2)**
7:10;82:12
**true (4)**
31:24;90:11;99:17;
114:22
**truly (1)**
50:7
**truthful (2)**
6:16,20
**truthfully (1)**

Tricia Wachsmuth v.
City of Powel, et al.

Matt McCaslin
October 6, 2010

4:16

**try (1)**
89:6

**trying (5)**
15:9;35:4;68:6,8;
116:4

**turn (4)**
11:17;28:1;69:13;
111:24

**turned (2)**
72:14;84:24

**Twenty-one (1)**
33:9

**Twenty-seven (1)**
39:3

**Twenty-three (2)**
102:12;114:24

**twice (1)**
36:22

**two (19)**
7:22;14:19;34:2;37:5;
55:23;65:8;66:3,4;75:7;
87:3;88:3;96:25;100:21;
103:1;108:12,17;
109:15;119:23;122:16

**type (2)**
32:2;87:10

**types (1)**
14:25

**Typically (1)**
129:8

**typing (1)**
121:10

**U**

**under (26)**
4:14;11:10;17:20;
33:17;35:10;39:7;47:13,
14,16;48:8;49:10,12,13,
16,18,25;50:4,17,17;
51:3,3,9;87:19;127:5;
129:3,21

**underneath (2)**
81:3;85:13

**understood (1)**
71:20

**unfolded (1)**
78:3

**uniform (1)**
54:5

**unit (6)**
22:15;117:23,25,25;
118:1,11

**university (2)**
8:21,22

**unless (2)**
4:16;117:2

**unstable (1)**
58:13

**up (27)**
8:3;9:6;11:9;17:5;
33:17,20;47:21,22,25;

48:2;56:18;75:14;78:14,
24;80:23;81:7;83:24;
93:3;97:15,16;98:17;
110:7;115:17;122:25;
129:11;130:2 ,21

**upon (2)**
65:17;70:14

**upstairs (1)**
100:21

**use (14)**
28:2,21;29:11,30:4;
32:2;35:21;37 9;38:8,
21;46:17,17;52 2;72:16;
87:10

**used (9)**
4:20;30:9;37:11;
38:17,20;46:1 ;72:8;
118:1;119:25

**uses (1)**
27:20

**using (5)**
31:23;34:15;3 :11;
103:10;112:21

**V**

**various (2)**
12:21;24:16

**vehicle (1)**
74:25

**vehicles (1)**
75:6

**verbatim (2)**
123:13.17

**version (1)**
10:21

**vest (2)**
104:11.15

**view (5)**
40:25;41:5,22;93:10.
13

**violation (1)**
6:24

**vision (1)**
52:1

**visit (1)**
74:21

**visualize (1)**
33:23

**visually (4)**
40:1,11,18;41:10

**volumes (1)**
115:14

**W**

**Wachsmuth (37)**
7:10;12:13;39:12;
46:21;53:18;56 4;57:6;
58:25;59:11,11,23;60:1;
61:6,9;62:13,16 19,22;
63:4,4;69:2;71:7;74:25;
82:12;88:10,15.17;

90:13,16;95:2,4;96:21;
97:3,24;98:8,16;99:2

**Wagers (1)**
15:9

**Wait (2)**
67:21;90:24

**waiting (1)**
57:16

**walking (1)**
113:20

**wall (2)**
40:6;84:18

**walls (3)**
42:10.17;43:3

**Walton (2)**
15:8,8

**warning (4)**
38:15;46:8,8,19

**warrant (15)**
12:13;17:22;30:11;
53:17;54:18,20;55:7;
57:18,19;62:6;76:5;
94:19,22;112:7;113:17

**warrant' (1)**
71:19

**way (14)**
5:4;10:23;25:14;38:1;
64:1;67:22,23;73:14;
78:16;80:17,23;87:16;
121:14;122:22

**ways (1)**
93:7

**weapon (5)**
58:11;87:21,23;88:2;
95:1

**weapons (2)**
27:10;58:8

**weren't (4)**
55:4;64:17;75:9;
110:13

**WESTBY (117)**
13:12;16:22;18:16;
20:13,23;21:6,21;22:3,
16;23:5,8,16,20;24:8,22;
25:11,24;26:3,16,24;
29:2;32:24;34:17;35:8,
22,25;36:4;39:19;40:13,
21;41:18;42:3,11,18;
43:4,12,19,25;44:4,12,
20;45:2,9,17,20,23;
48:11,21,25;49:5,21;
50:10,21;51:6,14;52:3,
18;53:1,13;54:21;59:5;
60:9;61:23;62:24;63:6,
19;64:3,11;65:23;66:19,
23;67:10,17,21;68:1,13;
69:6;73:1;76:17,23;
77:9,18;79:16;80:2,7;
85:19;89:23;90:4;92:4;
93:16;95:19;96:23;
97:20;98:2,11,21,25;
100:6;101:25;103:25;
108:23;109:5,23;110:5,

20;116:15,17;121:4,15;
122:3;123:16;126:25;
127:25;128:19;129:4,7;
130:3

**what's (2)**
75:21;117:6

**whole (2)**
41:2;63:18

**window (44)**
32:8;58:12;62:2,9,10;
68:23;76:2,7,11,13;78:5,
9,12,13,18,21,23;79:2,2,
3,5,11,14,21;80:5,6,15,
16,19,21,24,25;81:3,7,8;
82:17,19 85:14;93:2,5,
11,12,15.94:25

**windows (4)**
14:23;32:4,6;56:19

**within (3)**
14:17;19 21;120:25

**without (2)**
96:17;111:12

**WITNESS (100)**
18:17;21:1,24;22:6,
19;23:9,23;24:11,25;
25:13;26:2,18;27:1;
33:2;34:19;35:9;36:1,9;
39:21;40:14,22;41:19;
42:4,13,20;43:7,14,20;
44:1,5,13,22;45:3,14;
49:1,22;50:22;51:7,16;
52:5,19;53:3,14;54:23;
57:22;59:8;60:10,16;
61:24;63:7,20;64:12;
65:17;67:11;68:14,20;
70:17;71:3;76:18;77:1,
10,20;79:17;80:9;85:20,
25;86:16,21;89:24;90:5;
92:6,23;93:18;95:20;
96:11,13,15,25;97:21;
98:3,13;100:8;102:1;
103:17;104:1;108:24;
109:6,24;110:6,15,21;
116:20;121:6,17;122:8;
123:17;127:2;128:21;
129:8;131:14

**witnesses (2)**
65:8;66:3

**wondering (1)**
13:14

**words (2)**
25:16;31:9

**work (12)**
5:18;8:2;9:12,17,25;
19:7;44:6;54:5;58:4;
118:25;122:1;130:18

**worked (5)**
8:8,9;9:4;106:15;
114:4

**working (5)**
5:25;8:7;9:6;91:16;
119:10

**write (1)**

67:22

**written (3)**
33:10;113:16;130:19

**wrong (1)**
36:11

**Wyoming (2)**
8:13,15

**Y**

**year (7)**
7:23,24,25;8:23;
14:17;19:22;49:18

**year-and-a-half (1)**
19:22

**Yearly (1)**
6:7

**years (11)**
6:2;7:20,22;9:7;14:19;
37:19;47:16;48:8;49:10,
13;50:18