# Appendix Five

## In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Alan Kent*
*November 22, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 11-22-10 Alar Kent_SCOPED.txt
Min-U-Script® with Word Index

Tricia Wachsmuth v.
City of Powell, et al.

---

```
 1            IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF WYOMING

 3     -------------------------------------------------

 4     TRICIA WACHSMUTH,                    )
                                            )
 5              Plaintiff,                  )
                                            )
 6         vs.                              )   NO. 10-CV-041J
                                            )
 7                                          )
       CITY OF POWELL, AND IN THEIR         )
 8     INDIVIDUAL CAPACITY, TIM             )
       FEATHERS, CHAD MINER, MIKE           )
 9     CHRETIEN, ROY ECKERDT, DAVE          )
       BROWN, MIKE HALL, BRETT LARA,        )
10     MATT MCCASLIN, ALAN KENT, MATT       )
       DANZER, OFFICER BRILAKIS, LEE        )
11     BLACKMORE, CODY BRADLEY, KIRK        )
       CHAPMAN, JOHN DOES #1-#4,            )
12                                          )
                Defendants.                 )

13

14            DEPOSITION OF ALAN KENT
          11:22 a.m., Monday, November 22, 2010
15

16

17

18            Pursuant to notice, the deposition of ALAN

19     KENT was taken in behalf of Plaintiff in accordance

20     with the applicable Federal Rules of Civil Procedure at

21     270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22     Registered Professional Reporter and Notary Public of

23     the State of Montana.

24

25
```

```
 1                    APPEARANCES

 2     FOR PLAINTIFF:

 3              Mr. Jeffrey C. Gosman
                Gosman Law Office
 4              125 W 2nd Street
                P.O. Box 51267
 5              Casper, WY 82601-2431
                Telephone: (307)265-3082 - Fax: (307)265-6715
 6              E-mail: jeff@gosmanlawoffices.com

 7

 8     FOR INDIVIDUAL DEFENDANTS:

 9              Ms. Misha Westby
                Senior Assistant Attorney General
10              2424 Pioneer Avenue, 2nd Floor
                Cheyenne, WY 82002
11              Telephone: (307)777-8477 Fax: (307)777-8920
                E-mail: mwestb@state.wy.us
12

13     FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
       CAPACITY:
14

15              Mr. Tom Thompson
                MacPerson, Kelly & Thompson
16              616 West Buffalo
                P.O. Box 999
17              Rawlins, WY 82301-0999
                Telephone: (307)324-2713 - Fax: (307)324-7348
18              E-mail: tthompson@wyomingattorneys.net

19

20     Also Present:  Tim Feathers

21

22

23

24

25
```

```
 1                INDEX TO WITNESSES

 2                                                  PAGE

 3     ALAN KENT

 4         Direct Examination by Mr. Gosman ..............5
           Signature page ..............................186
 5         Reporter's Certificate ......................187

 6

 7

 8                    EXHIBITS

 9     EXHIBIT          DESCRIPTION                     PAGE

10      7      DEF-TECH Label .........................158

11      10     Notes of Wachsmuth Warrant ..............90

12      13     Search and Seizure Affidavit ............67

13      14     Affidavit of Probable Cause ............180

14      15     Affidavit of Probable Cause ............180

15      16     PPD Supplement 7 by Mike Chretien .......90

16      20     PPD Narrative by Chad Miner .............69

17      21     PPD Supplement 3 by Dave Brown .........180

18      26     Cody Police Department Person's .........55
               Record
19
        28     Countermeasure Tactical Institute ......17
20             Immediate Action for Patrol

21      29     Crisis Response Tactics ...............111

22      31     WY P.O.S.T. Training Records ...........15

23      35     PPD Patrol Friday Training .............21

24      36     Email .................................177

25      51     Drawing by Alan Kent ...................11
```

```
 1                 EXHIBITS (Cont.)

 2     EXHIBIT          DESCRIPTION                     PAGE

 3      52     PPD Policies and Procedures Manual ......26

 4      53     Drawing by Alan Kent ..................138

 5      54     Drawing by Alan Kent ..................149

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 4 of 67

Tricia Wachsmuth v.                                                                    Alan Kent
City of Powell, et al.                                                           November 22, 2010

1    ALAN KENT,
2  having been first duly sworn, testified as follows:
3    DIRECT EXAMINATION
4  BY MR. GOSMAN:
5    Q.  Officer, before we begin today, there's some
6  general instructions that I would like to visit with
7  you about. Let me ask you first: Have you given a
8  deposition before?
9    A.  No.
10   Q.  Have you discussed with your attorneys the
11 procedure that we'll be using today?
12   A.  Yes.
13   Q.  I will be asking you questions and you will
14 be required to answer the questions unless you're
15 instructed by your counsel not to answer them; do you
16 understand that?
17   A.  Yes.
18   Q.  And you will be required to answer the
19 questions truthfully because they are given under oath;
20 do you understand that?
21   A.  Yes.
22   Q.  And if you have any problems with a question
23 I ask, I would appreciate it if you would ask for
24 clarification so that we can get matters cleared up
25 before you give an answer and we go on. Would that be

1  okay?
2    A.  Okay.
3    Q.  And if you will allow me to finish my
4  questions before you begin your answer, that will also
5  be helpful. And there's one other small problem that
6  does come up from time to time, and that is that the
7  reporter is unable to really decipher on the record
8  what an uh-huh means or huh-uh means. So we try to use
9  just yes or no for answers to those questions, okay?
10   A.  Okay.
11   Q.  And if we -- if you would like to take a
12 break at any time, you're free to do so; however, we
13 will not take a break while a question is pending.
14   A.  Okay.
15   Q.  What is your full name, Officer?
16   A.  Lynn Alan Kent.
17   Q.  And what is your current address?
18   A.  250 North Clark Street, Powell.
19   Q.  Are you currently on any medication that
20 would impair your ability to give truthful answers here
21 today?
22   A.  No.
23   Q.  Do you have any medical problems or illnesses
24 that might interfere with your ability to give truthful
25 answers to this deposition?

1    A.  No.
2    Q.  Have you ever been arrested for any crime
3  other than a traffic violation?
4    MS. WESTBY: You know, this is another one of
5  those ones that it's got to be a felony or a truth --
6    MR. GOSMAN: This is a discovery deposition,
7  Ann.
8    MS. WESTBY: And, again, those are the
9  questions that you're entitled to ask that has some
10 basis and relevance. And you did it all last -- the
11 last depositions, but you've gone back again.
12   MR. GOSMAN: Okay. Well, I'm going to ask
13 the question.
14 BY MR. GOSMAN:
15   Q.  Have you ever been arrested for any crime
16 other than a traffic violation?
17   A.  Yes.
18   MS. WESTBY: And, again, my objection is that
19 you are entitled to felonies or crimes of dishonesty
20 within the last ten years. That's what you're entitled
21 to. Those are the questions that you need to ask.
22   MR. GOSMAN: Well, that's evidence that may
23 be used to impeach the witness, but it doesn't limit
24 the questions that I'm entitled to ask. And we've
25 already gotten an answer to the question.

1  BY MR. GOSMAN:
2    Q.  Why don't you go ahead and tell me what other
3  crimes that you've been arrested for other than a
4  traffic violation and when that occurred. We'll get
5  this out of the way and move on.
6    MS. WESTBY: And -- I guess go ahead.
7    THE WITNESS: In 1975, petty theft.
8  BY MR. GOSMAN:
9    Q.  And were you convicted of that?
10   A.  Yes, I pled guilty.
11   Q.  And anything else?
12   A.  No.
13   Q.  All right. Have you ever been accused of a
14 crime involving dishonesty?
15   A.  Petty theft.
16   Q.  Okay. All right. Have you ever had a
17 restraining order placed against you?
18   A.  No.
19   Q.  Let's go ahead and start with your
20 educational background, Officer Kent.
21   Could you tell me where you went to high
22 school?
23   A.  I graduated from Thomas Downey High School in
24 Modesto, California, in 1975.
25   Q.  Okay. And did you have any education after

1   you received your high school diploma?
2      A.  Some college.
3      Q.  Okay.  And you did receive a high school
4   diploma; is that correct?
5      A.  Yes.
6      Q.  And where did you attend college?
7      A.  I attended some college at Modesto Junior
8   College in Modesto, California.  And also attended some
9   college here at Northwest in Powell.
10     Q.  When did you move to Powell?
11     A.  In July or August of 1990.
12     Q.  And did you go to work for the Powell Police
13  Department at that time?
14     A.  No.
15     Q.  What did you move to Powell for?
16     A.  To get out of California.
17     Q.  Okay.  And you worked -- when did you go to
18  work for the Powell Police Department?
19     A.  February 1st, 1995.
20     Q.  And after arriving in Powell and before you
21  went to work for the Powell Police Department, what
22  jobs did you hold here in the Powell area?
23     A.  Immediately before the Powell Police
24  Department, I worked for Dick Jones Trucking for three
25  years.

1      Q.  What did you do for them?
2      A.  Drove truck.  And before that, I worked as
3   the warehouse manager for Schwan's.
4      Q.  And have you worked for the Powell Police
5   Department since 1995?
6      A.  Yes.
7      Q.  And what was the position that you held when
8   you started with the Powell Police Department?
9      A.  Police officer.
10     Q.  And so what position do you hold now?
11     A.  Sergeant.
12     Q.  And you were a sergeant at the time of the
13  execution of the Wachsmuth search warrant, which was
14  February 24, 2009 --
15     A.  Yes.
16     Q.  -- is that correct?
17         Would you take a minute for me and draw on
18  this piece of paper the chain of command at the Powell
19  Police Department?  I don't think I actually have that.
20  This will be Exhibit 51.
21         If you could pass that pen back to me, I'd
22  appreciate it.  It's the only one I've got.
23     A.  Oh, I'm sorry.
24
25

1         (Exhibit 51 identified)
2   BY MR. GOSMAN:
3      Q.  You've listed three sergeants and a
4   communication supervisor directly underneath the chief;
5   is that correct?
6      A.  Yes.
7      Q.  And then you have citizens of Powell over the
8   Chief.  I think I understand what you mean by that,
9   Chief Feathers does not report to the citizens of
10  Powell; is that correct?
11     A.  He doesn't report to them, but he answers to
12  them.
13     Q.  I understand.
14         All right.  Who are the other sergeants
15  involved in the Powell Police Department?
16     A.  Sergeant Mike Chretien and Sergeant Roy
17  Eckerdt.
18     Q.  And who is the communications supervisor?
19     A.  Teri Cozzens .
20     Q.  And was Teri Cozzens the communications
21  supervisor in February of 2009?
22     A.  Yes.
23     Q.  And do you report directly to the Chief?
24     A.  Yes, I do.
25     Q.  And who are your reports?  Which Powell

1   police officers?
2      A.  All of them.
3      Q.  All of them, all right.
4         So all of the Powell Police Department
5   officers report to each of the sergeants?
6      A.  It's broke down into squads.
7      Q.  Okay.
8      A.  Right now my squad includes Officer Miner and
9   Officer Brilakis.  I'm also the direct supervisor for
10  the community service officer, Anna Paris.
11     Q.  Okay.
12     A.  But I have authority over all officers in the
13  department.
14     Q.  All right.  And that would be true of the
15  other sergeants as well?
16     A.  Yes.
17     Q.  All right.  As a law enforcement officer, do
18  you have certain minimum training requirements?
19     A.  Yes.
20     Q.  Do you know what they are?
21     A.  You're required, I believe -- the basic is to
22  graduate from the academy.  And then you have to
23  maintain your training with -- I believe it's 20 hours
24  a year minimum.
25     Q.  And do you know if the in-service training

ALAN KENT - November 22, 2010                    Page 13
Direct Examination by Mr. Gosman

1   that's offered by the Powell Police Department
2   qualifies for those training hours, those 20 training
3   hours that you're required to have a year?
4       A.  If the requirements are met.
5       Q.  Do you know what the requirements are?
6       A.  I'm not a training officer, but -- per se --
7   but you have to submit a lesson plan.  It has to be
8   approved by POST.  And then there's some recordkeeping
9   that goes along with that before POST approves the
10  hours.
11      Q.  Do you know what recordkeeping is involved?
12      A.  It's a class roster attendance.
13      Q.  Okay.  Have you ever had any discipline,
14  including verbal discipline, within the last five
15  years --
16          MS. WESTBY: That's not the question.
17          MR. GOSMAN: Isn't it?
18          MS. WESTBY: Nope.
19  BY MR. GOSMAN:
20      Q.  All right.  Have you ever been disciplined
21  for something within the last five years that is not
22  reflected in your personnel file?
23      A.  No.
24      Q.  Has your standing as a peace officer ever
25  been challenged or under investigation?

ALAN KENT - November 22, 2010                    Page 14
Direct Examination by Mr. Gosman

1       A.  No.
2       Q.  When you meet your 20 hours of required
3   training each year to remain certified as a police
4   officer, do you include in-service training or do you
5   take POST recognized training courses?
6          MS. WESTBY: Object to the form of the
7   question.
8          MR. GOSMAN: That is -- strike that.
9   BY MR. GOSMAN:
10      Q.  How do you get your training every year?
11      A.  I'm not sure I understand what you're asking.
12      Q.  Let's do this: When you train -- when you
13  apply for credits with your -- when you apply for
14  credits for training with the State, do you use -- do
15  you use in-service training that's supplied by the
16  Powell Police Department?
17      A.  If it's recognized by POST, that goes to
18  count towards your total for the year, yes.
19      Q.  Do you know if that's happened in your case?
20      A.  Yes.
21      Q.  So you have had in-service training with the
22  Powell Police Department that has been recognized as
23  POST training?
24      A.  Yes.
25      Q.  All right.  And so there would have been a

ALAN KENT - November 22, 2010                    Page 15
Direct Examination by Mr. Gosman

1   roster generated for the training that occurred on
2   those dates?
3       A.  The POST sends out a summary of your training
4   that -- on that POST hours list that would be
5   recognized.
6              (Exhibit 31 identified)
7   BY MR. GOSMAN:
8       Q.  Let's go ahead and turn to Exhibit 31.
9       A.  I'm assuming in this big book?
10      Q.  Yes.  And I believe that your POST training
11  records are at the documents that are identified 1038
12  and 1039.  It's near the -- it's towards the back, I
13  think.  No, actually it's towards the front.  Do you
14  see that?
15      A.  Yes.
16      Q.  Does this document, these two pages, Bates
17  Number 1038 and 1039, accurately reflect your training
18  history as a law enforcement officer, your POST
19  training?
20      A.  Through September 1st of 2009.
21      Q.  And I noticed that you received your basic
22  law enforcement training in 1982; is that correct?
23      A.  That was the first time I went to the
24  academy.
25      Q.  Okay.  And how long did you work for law

ALAN KENT - November 22, 2010                    Page 16
Direct Examination by Mr. Gosman

1   enforcement in California?
2       A.  Less than a year.
3       Q.  Why did you leave?
4       A.  I became self-employed.
5       Q.  What was your position with the Modesto --
6   was it the Modesto, California Police Department?
7       A.  Sonora Police Department.  Sonora,
8   California.
9       Q.  And what was your position with them?
10      A.  Police officer.
11      Q.  Would you take a moment and go through this
12  record and identify for me all the training that you've
13  had relative to dynamic entry?
14      A.  Shall I start at the top and just work my way
15  down?
16      Q.  Yes, sir.
17      A.  2/9/1995 -- or 5/4/1995, Interior Tactics.
18      Q.  Okay.
19      A.  There was some training involved in
20  9/21/2001, 40 hours of basic drug investigation.  There
21  was training 3/8/2002, DEA Basic Narcotics Course.
22  6/13/2003, Patrol Interdiction Emergency Response.
23  10/5/2005, Patrol Tactical Response.  That's all I can
24  see.
25      Q.  The basic drug investigation course consisted

ALAN KENT - November 22, 2010                Page 17
Direct Examination by Mr. Gosman

1   generally of what? That was the course that you took
2   in September of 2001.
3       A.   That was a course taught by DCI.
4       Q.   Okay.
5       A.   And week-long course in Sheridan. Basic drug
6   investigation, including surveillance, covert drug
7   buys. There was some entry hostage situations in
8   there, scenarios that we worked on.
9       Q.   About what part of the class would you say
10  those scenarios involved? What percentage?
11          MS. WESTBY: Object to the form of the
12  question.
13          THE WITNESS: Probably less than 10 percent.
14  BY MR. GOSMAN:
15      Q.   Okay. Let's go through that same question
16  with regard to the DEA basic narcotics course.
17          MS. WESTBY: Same objection.
18  BY MR. GOSMAN:
19      Q.   Approximately, how much of that course was
20  centered on dynamic entry?
21      A.   There was two days of training, I believe, on
22  that.
23          (Exhibit 28 identified)
24  BY MR. GOSMAN:
25      Q.   Let's take a look at Exhibit 28 for a moment.

ALAN KENT - November 22, 2010                Page 18
Direct Examination by Mr. Gosman

1   Is this a course manual that you received in connection
2   with your Countermeasures Technical Institute Course?
3   I believe it was in 2003.
4       A.   I don't know.
5       Q.   Why don't you take a minute and look at it.
6       A.   Well, I'm looking at the copyright and it
7   says 2008. And the course was in 2005.
8       Q.   Yeah, the copyright is 2008, that's correct.
9           Take a minute and look at that and tell me if
10  that -- do you have that manual? Let me ask that
11  question.
12      A.   I did at one time. I believe I submitted it.
13      Q.   Okay. Take a look at the manual and tell me
14  if that is, in fact, a reflection of the course that
15  you took in 2003.
16          MS. WESTBY: I'm going to object to the form
17  of the question. What are the Bates numbers at the
18  bottom of that document?
19          MR. GOSMAN: Which one?
20          MS. WESTBY: The one that you're having him
21  look at.
22          MR. GOSMAN: Thirty-seven. Miner, this is
23  Miner's training.
24          MS. WESTBY: The documents produced relevant
25  to this witness are listed Kent-Training.

ALAN KENT - November 22, 2010                Page 19
Direct Examination by Mr. Gosman

1       MR. GOSMAN: Give me a minute. I'm going to
2   take just a minute and see if I can find that. I think
3   I've got that outside.
4           (Recess taken 11:43 a.m.,
5           November 22, 2010)
6   BY MR. GOSMAN:
7       Q.   Okay. Officer, I'm going to hand you a sheaf
8   of documents, which we're not going to mark at this
9   time, at least. And I'll represent to you that those
10  are documents that were produced in connection with
11  your training.
12          And why don't you take just a moment and
13  identify the beginning and ending page numbers and the
14  document Bates stamp, it will be on that first page
15  there.
16      A.   This one here?
17      Q.   Yes.
18      A.   The 1036?
19      Q.   Okay. And it's L -- what is the --
20      A.   LGLP Wachsmuth.
21      Q.   Okay. 1036. And what's the last number?
22      A.   1161.
23      Q.   Okay. Go through those documents, if you
24  could, and tell me if you could see any of those
25  training manuals that we were talking about with

ALAN KENT - November 22, 2010                Page 20
Direct Examination by Mr. Gosman

1   respect to your courses in 2003 and 2005.
2           MS. WESTBY: Those aren't the Kent-Training
3   documents.
4           MR. GOSMAN: Those are the Kent-Training
5   documents I have.
6           MS. WESTBY: Well, no, we submitted documents
7   to you that are Bates stamped Kent-Training-number.
8           MR. GOSMAN: They were submitted to me under
9   what cover?
10          The documents that I pulled out -- we're on
11  the record. The documents that I pulled out are
12  documents that were produced pursuant to the
13  defendant's responses to plaintiff's first discovery
14  request directed to all defendants.
15          MS. WESTBY: And these are the responses that
16  we submitted to you on your first discovery.
17          MR. GOSMAN: Would you mind showing me the
18  cover on that?
19          MS. WESTBY: The cover of the pleading?
20          MR. GOSMAN: Well, just the first page that
21  identifies what you're sending me.
22          MS. WESTBY: But are you talking about the
23  cover of the pleading or --
24          MR. GOSMAN: Yes. Maybe I've got it and I'm
25  just in the wrong place.

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 8 of 67
Tricia Wachsmuth v.                                                                    Alan Kent
City of Powell, et al.                                                          November 22, 2010

1    MR. THOMPSON: And, Counsel, so that -- we
2  can go off?
3    MR. GOSMAN: Yes.
4        (Discussion held off the
5        record.)
6    MR. GOSMAN: All right. We're going to
7  continue the deposition for a few minutes until lunch
8  and then I'll see if I can get that straightened out.
9  Thank you.
10    MS. WESTBY: All of ours are for each
11  individual officer, the officer's last
12  name-training-documents.
13        (Exhibit 35 identified)
14  BY MR. GOSMAN:
15    Q. Okay, let's now turn to Exhibit 35. And I'll
16  tell you that this exhibit is a compilation of the
17  in-service training records that have been kept by the
18  Powell Police Department for, I believe, a 5-year
19  period going back to 2009.
20        And what I'd like you to do is go through
21  these for a moment and tell me which of these programs
22  that you have participated in that dealt specifically
23  with dynamic entry.
24    A. The ones that I personally attended?
25    Q. Yes, sir.

1    A. I have no idea which ones I personally
2  attended.
3    Q. You do not?
4    A. If I was not sick or on vacation, I would
5  have been at any training that our department offered.
6  But specific date, I...
7    Q. Okay. Why don't you take a minute and go
8  through that group of documents and tell me which
9  courses are specifically related to dynamic entry.
10    A. I would assume -- do you want the number at
11  the bottom of the page?
12    Q. Yes. Well, we need to identify where you're
13  at in the document, so go ahead.
14    A. So you do want the number at the bottom of
15  the page?
16    Q. Go ahead. Yes, let's do that.
17    A. On the first one, it's numbered 1814.
18    Q. Uh-huh.
19    A. I'm identifying, what, again?
20    Q. The in-service training that would have
21  related specifically to dynamic entry.
22    A. At the very top of the list is 10/21 roll
23  call video, "Your Vest Won't Stop This Bullet."
24    Q. Right. Would you agree with me that that
25  training could apply generally to self-defense,

1  self-protection measures that police officers take in a
2  host of scenarios?
3    MS. WESTBY: Object to the form of the
4  question.
5    MR. THOMPSON: Join.
6    THE WITNESS: I would agree to that, but I
7  would agree that it would also apply to dynamic
8  entries.
9  BY MR. GOSMAN:
10    Q. How so?
11    A. You're liable to get shot while making a
12  dynamic entry.
13    Q. So -- all right. So that's the relationship
14  that this course had to dynamic entries?
15    A. In my opinion, yes.
16    Q. All right. Go ahead.
17        Do you remember that course, by the way?
18    A. No.
19    Q. Okay. Go ahead.
20    A. Probably 1209, search warrants.
21    Q. It doesn't say anything specifically about
22  the use of dynamic entry or no-knock warrants or
23  anything like that, does it?
24    MS. WESTBY: Object to the form of the
25  question.

1    THE WITNESS: Not specifically.
2  BY MR. GOSMAN:
3    Q. All right. Now, I'm not talking about things
4  that could apply to dynamic entry. I'm talking about
5  things that it's clear did involve dynamic entry
6  training.
7    A. Okay.
8    MS. WESTBY: Object to the form of the
9  question.
10    MR. THOMPSON: Join.
11    THE WITNESS: I'm not sure I can answer that.
12  BY MR. GOSMAN:
13    Q. Well, let's just do the best you can. If
14  there's anything in this list that deals specifically
15  with dynamic entry, call it to my attention.
16    A. So I'm assuming you're wanting something in
17  the title?
18    Q. Well, you know, either dynamic entry or room
19  entry or Israeli Lean or flashbang devices or something
20  that is clearly associated with dynamic entry.
21    MS. WESTBY: Object to the form of the
22  question. Your question lists some of the things but
23  not all of the things --
24    MR. GOSMAN: I didn't pretend to list all of
25  the things.

Tricia Wachsmuth v.
City of Powell, et al.

**Alan Kent**
**November 22, 2010**

ALAN KENT - November 22, 2010                Page 25
Direct Examination by Mr. Gosman

1  MS. WESTBY: Yes, but then whenever he brings
2  up other items, you tell him that those are not
3  appropriate items. I object to the form of the
4  question.
5  MR. THOMPSON: Join.
6  THE WITNESS: Again, in June of '06, search
7  warrants is listed.
8  BY MR. GOSMAN:
9  Q. June of '06, would that be -- oh, I see,
10  search warrants. Yes, there's also high-risk warrant
11  service, correct?
12  A. Yes, I missed that one
13  Q. Okay. I've got a copy of the policy and
14  procedures manual. Let's go ahead and turn to that
15  section.
16  You'll notice in the column on the right-hand
17  side of the page there that it refers to a section of
18  the policy and procedures manual; is that correct?
19  A. Yes.
20  Q. All right. Well, let's go ahead and take a
21  look at 3.6.16.
22  THE REPORTER: Is that is date?
23  MR. GOSMAN: No, that is a policy number
24  3.6.16. And I think we will go ahead and -- we'll mark
25  that as an exhibit. We'll mark it as Exhibit 52.

ALAN KENT - November 22, 2010                Page 26
Direct Examination by Mr. Gosman

1  (Exhibit 52 identified)
2  THE WITNESS: 3.6.16?
3  BY MR. GOSMAN:
4  Q. Yes.
5  A. It has confidential info mant.
6  Q. Okay. Well, do you -- can you tell me why --
7  or what the entry on the right-hand column, next to
8  search warrants that says policy, page 3.6.16 refers
9  to?
10  A. I can't tell you. I didn't make this list.
11  Q. Okay. Let me ask this question: Is it your
12  understanding that the materials that are discussed in
13  the in-service training are identified in that third
14  column there to the right?
15  MS. WESTBY: I object to the form of the
16  question.
17  MR. THOMPSON: Join.
18  THE WITNESS: They appear to be, since it
19  says policy.
20  BY MR. GOSMAN:
21  Q. Okay. Now, do you know for a fact that when
22  you had these in-service trainings that occasionally
23  they will pull out a policy from the policy and
24  procedures manual and review that policy as the
25  in-service training?

ALAN KENT - November 22, 2010                Page 27
Direct Examination by Mr. Gosman

1  A. Yes.
2  Q. All right. So that certainly isn't
3  inconsistent with what you've experienced, what you see
4  on the page here?
5  A. Well, I know that there has been updates to
6  the policy manual, so numbers may move down the line or
7  move up the line.
8  Q. I see, okay. All right.
9  Let's see if you can find in the index there
10  a reference to search warrants, to the policy on search
11  warrants.
12  I'm sorry, you're looking at the wrong
13  document.
14  A. No, there was two different ones. You talked
15  about search warrants and then there was --
16  Q. High-risk warrant search.
17  A. -- high risk. Which ones do you want me to
18  look for?
19  Q. Well, right now I want you to just go into
20  the index and look for search warrants and let's see if
21  we can figure out whether we've got the correct
22  numbering format for this training.
23  MS. WESTBY: Object to the form of the
24  question.
25

ALAN KENT - November 22, 2010                Page 28
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2  Q. While you're looking, do you have a copy of
3  this policy and procedures manual, personal copy?
4  A. Not with me, no.
5  Q. Do you have one, though?
6  A. In my office, yes.
7  I found it.
8  Q. All right. What is the policy number?
9  A. 3.6.09.
10  Q. And that's for search warrants.
11  Okay. Well, 3.6.09 is the policy that
12  references search warrants in the document that I've
13  handed you, which is Exhibit 52. And that's a copy of
14  the policy and procedures manual, correct?
15  A. Yes.
16  Q. And is there anything in that policy on
17  search warrants that deals specifically with training
18  for dynamic entry?
19  MS. WESTBY: With training for dynamic entry?
20  MR. GOSMAN: Yes.
21  MS. WESTBY: Object to the form of the
22  question.
23  THE WITNESS: What was the question again?
24  BY MR. GOSMAN:
25  Q. Do you find anything in that policy on search

1  warrants that deals specifically with training for
2  dynamic entry?
3          MS. WESTBY: Same objection.
4          THE WITNESS: I find on the second page of
5  the policy under letter six, "Safety of personnel
6  conducting the search in terms of potential resistance
7  to the search and possible presence of others who may
8  be endangered by resistance to the search warrant may
9  require the use of an entry team or special weapons
10 team."
11         MR. GOSMAN: Did you get that?
12 BY MR. GOSMAN:
13 Q.  All right. Well, that has to do with the
14 policy about when to use a special entry team and not
15 training in the tactics that would be deployed by a
16 special entry team; wouldn't you agree with me there?
17 A.  Yes.
18         MS. WESTBY: Object to the form of the
19 question.
20 BY MR. GOSMAN:
21 Q.  All right. Now, let's just make sure that
22 we're -- we've got our bases covered here.
23         Under search warrants on the June 6
24 in-service training, we have policy page 3.6.16, and
25 you've indicated that's the policy that relates to

1  confidential informants.
2          I want you to take a look at that and tell me
3  if there's anything in that policy relating to
4  confidential informants that deals specifically with
5  training for dynamic entry.
6          MS. WESTBY: Are you asking him if the policy
7  refers to training for dynamic entry?
8          MR. GOSMAN: Uh-huh.
9          THE WITNESS: What was the question again?
10 BY MR. GOSMAN:
11 Q.  Do you see anything in that policy regarding
12 confidential informants that relates specifically to
13 training for dynamic entry?
14 A.  No.
15 Q.  And before we go for lunch, I'll just have
16 one other little exercise here. Let's look at the
17 policy that's identified as 3.7.23. That's the
18 high-risk warrant service.
19         MS. WESTBY: It's .23, right?
20         MR. GOSMAN: Yes.
21 BY MR. GOSMAN:
22 Q.  And I'll give you a preview of the question
23 here. The question is going to be: Does that policy
24 describe the policies for initiating high-risk warrant
25 service or does it identify specific training for

1  high-risk warrant service?
2          MS. THOMPSON: Objection as to form.
3          MS. WESTBY: Join.
4          THE WITNESS: What was the number?
5  BY MR. GOSMAN:
6  Q.  3.7.23.
7  A.  There is no 3.7.23.
8  Q.  I was aware that there was one of them
9  missing and that may be it.
10         Maybe we could check during lunch to see if
11 there is a policy 3.7.23. And I think -- where does it
12 end there in that manual that you're looking at?
13 A.  The end of this section?
14 Q.  Yes. 3.7.15 or something, or 6?
15 A.  Oh, you're looking at the page number.
16 3.7.23 is the page number. The policy number would be
17 3.7.13.
18 Q.  Okay. All right. Thank you. Is it there,
19 the high-risk warrant service policy?
20 A.  Yeah.
21 Q.  All right.
22 A.  What was the question again?
23 Q.  The question is: Is there anything specific
24 to training for dynamic entry that is contained in the
25 policy on high-risk warrant service that you just

1  looked at?
2          MS. WESTBY: Object to the form of the
3  question.
4          MR. THOMPSON: Join.
5          THE WITNESS: Not specific, but it alludes to
6  it.
7          MR. GOSMAN: Okay. All right. Okay. Let's
8  go ahead and have lunch and we can be back here in an
9  hour and 15 minutes.
10         (Recess taken 12:12 p.m.,
11         November 22, 2010)
12 BY MR. GOSMAN:
13 Q.  Officer, we were going through and -- I'm
14 sorry, Sergeant Kent. We were going through the
15 in-service training records, and we sort of finished up
16 before lunch on the June 6th high-risk warrant service
17 and search warrants and in-service training.
18         And I'd like you to go ahead and continue on
19 from there. And, again, calling attention to any
20 training that specifically deals with dynamic entry.
21 A.  So the words dynamic entry need to be in the
22 title?
23 Q.  Well, no, they don't, because we know that
24 there are different components in dynamic entry
25 training, such as room entry, room clearing, breaching,

ALAN KENT - November 22, 2010                          Page 33
Direct Examination by Mr. Gosman

1  flashbang devices, and there are others. So, you know,
2  I'm referring specifically to things that are directly
3  relevant to dynamic entry training.
4          MR. THOMPSON: Objection as to form.
5          MS. WESTBY: Join.
6          THE WITNESS: On July of '06, less lethal
7  munitions.
8  BY MR. GOSMAN:
9      Q.  Just out of curiosity, do you know what less
10  lethal munitions were involved in the event of the
11  24th of February involving the Wachsmuth warrant?
12     A.  Do you mean carried or used?
13     Q.  Were there any carried?
14     A.  Yeah -- yes, excuse me.
15     Q.  Let's take just a minute and talk about that.
16         What less lethal munitions were involved in
17  that warrant service that night?
18     A.  All officers in the department are issued
19  tasers that we carry on our belts at all times.
20     Q.  And a taser can be used in a host of
21  circumstances, so it's not directly relevant to dynamic
22  entry.
23         MS. WESTBY: Object to the form of the
24  question.
25         MR. THOMPSON: Join.

ALAN KENT - November 22, 2010                          Page 34
Direct Examination by Mr. Gosman

1          THE WITNESS: It can be.
2  BY MR. GOSMAN:
3      Q.  Well, you can use a taser in a dynamic entry,
4  correct?
5      A.  Correct.
6      Q.  The same that you can use a handgun?
7      A.  Correct.
8      Q.  So if you were -- if your in-service training
9  involved handgun or firearms training, that would cover
10  a host of circumstances in which the officer might find
11  himself, correct?
12     A.  I'm not sure I understand where you're going
13  --
14     Q.  Well, there's a difference between a firearms
15  training program and, for instance, a flashbang
16  development program, because the flashbang is used
17  almost exclusively in this kind of situation, whereas,
18  firearms are used in a host of other situations.
19  They -- used in chase -- police chases. They can be
20  used in running down suspects. They can be used in
21  making arrests on the street and so on.
22         Do you see the difference I'm getting at
23  there?
24     A.  Not really because you can -- a firearm can
25  be used in a -- different occasions. A diversionary

ALAN KENT - November 22, 2010                          Page 35
Direct Examination by Mr. Gosman

1  device can be used in different occasions. A taser can
2  be used in multiple occasions. I mean, they are tools
3  at our disposal.
4      Q.  Let's go to policy page 3.3.5. And, again,
5  that's the page. I'm not sure which policy it is.
6      A.  3.3.5?
7      Q.  Yes, I believe so. It's the policy regarding
8  less lethal munitions.
9      A.  3.3.07.
10     Q.  Is it?
11     A.  Uh-huh.
12     Q.  How long is that?
13     A.  About half page, total.
14     Q.  Okay. Go ahead and take a look at it.
15     A.  Okay.
16     Q.  Okay. Does it deal specifically with dynamic
17  entry in any way?
18     A.  It deals with if there are shotgun rounds.
19     Q.  Shotgun?
20     A.  They are impact weapons, beanbag rounds.
21     Q.  Yes. And what does it say about them? I
22  don't have my copy of it. Just read it into the
23  record.
24     A.  The whole policy?
25     Q.  No, just that that pertains to the shotgun.

ALAN KENT - November 22, 2010                          Page 36
Direct Examination by Mr. Gosman

1      A.  The whole policy pertains to less lethal
2  shotgun munitions.
3      Q.  Less lethal munitions, shotgun munitions.
4  Does it describe when they are to be deployed?
5      A.  At one point it says subdue a subject
6  displaying a level of aggression that is at or above
7  being assaultive without a weapon.
8      Q.  Okay. All right. And does it describe the
9  procedures for deploying this device?
10     A.  The question you're asking is what I just
11  basically said, if I'm understanding the question
12  right.
13     Q.  Does it mention anything about taser in that
14  policy?
15     A.  Not in that section. There's a separate
16  taser policy.
17     Q.  Do you know if there were less lethal
18  munitions described in that policy section that were in
19  use the night of the Wachsmuth warrant service?
20         MS. WESTBY: Object to the form of the
21  question.
22         MR. THOMPSON: Join.
23         THE WITNESS: There was none used.
24  BY MR. GOSMAN:
25     Q.  Okay. All right. Let's continue on our

1   search through Exhibit 31, the in-service records.
2   A.   November of '06, active threat response.
3   Q.   Okay.   And let's go ahead and turn to the
4   policy section that's referenced there.
5        Do you understand what the term active threat
6   means in police terminology?
7   A.   I know what it means to me.
8   Q.   Okay.   What does it mean?
9   A.   It means that there's somebody you're going
10  to engage that could do you harm.
11  Q.   Okay, very good.
12  A.   Okay.
13  Q.   Okay.   Take a minute and read that.
14       And by the way, you don't have to read it
15  word for word, just generally familiarize yourself with
16  that document if you can.
17  A.   I'd feel more comfortable reading it word for
18  word if you're going to ask me questions about it.
19  Q.   Okay.   And the question I'm going to ask you
20  is, is there anything specific in that active threat
21  response policy that relates to training for dynamic
22  entry?
23       MR. THOMPSON: Objection as to form.
24       MS. WESTBY: Join.
25       THE WITNESS: What was the question again?

1   BY MR. GOSMAN:
2   Q.   Is there anything in that policy that you
3   just read regarding active threat response that
4   specifically relates to training for a dynamic entry?
5   A.   The whole policy goes towards the training
6   we've had dynamic entry.   I mean, it talks about
7   rapid deployment, safe approach routes, number of
8   suspects, types of weapons.   I mean, that all goes back
9   to the training that we received.
10  Q.   Okay.   Well, I'm talking about something
11  different than an announcement of the policy regarding
12  active threat and what resources are available for --
13  to respond to active threat.   I m talking about
14  specific training.
15       In other words, is there anything in that
16  policy that specifically identifies how you would
17  breach a door or how you would enter a room or how you
18  would respond to a shooter?
19       MR. THOMPSON: Objection as to form.
20       THE WITNESS: It talks about rapid
21  deployment.
22  BY MR. GOSMAN:
23  Q.   What does it say?
24  A.   "Is rapid deployment necessary or are there
25  other reasonable options available?   What is the risk

1   of rapid deployment compared to the gain of potentially
2   saving lives?"
3   Q.   Those are policy considerations, are they
4   not?
5   A.   Yeah.
6   Q.   All right.   They don't have anything to do
7   with training you how to respond in that situation,
8   correct?
9        MS. WESTBY: Objection as to form.
10       MR. THOMPSON: Join.
11       THE WITNESS: The training we get helps us to
12  respond to these situations.
13  BY MR. GOSMAN:
14  Q.   And the training that you get may be relevant
15  to that.   But it's not contained in that policy.
16  You're not receiving any training if you attend
17  in-service on such and such a date and review this
18  policy; you're not actually receiving training for
19  dynamic entry.
20       MR. THOMPSON: Object to the form of the
21  question.
22  BY MR. GOSMAN:
23  Q.   You're simply reviewing the policy, correct?
24       MS. WESTBY: Object to the form of the
25  question.

1        MR. THOMPSON: Join.
2        THE WITNESS: I told you I didn't remember
3   the exact -- this -- our training involves where we
4   would do hands-on training.   And we would also at times
5   review policies at the same time.
6   BY MR. GOSMAN:
7   Q.   Let's separate which is which at this point,
8   and we can talk about the hands-on training later.
9   This in-service training deals simply with studying the
10  policy, correct?
11  A.   I don't remember what this training was.   You
12  asked me to go through and list the ones --
13  Q.   Thank you.   That is a fair statement.
14       Nevertheless, the policy itself that is
15  referred to next to the entry Active Threat Response is
16  the policy that defines when an active threat response
17  is appropriate and the considerations to be taken,
18  correct?
19  A.   Yes.
20  Q.   All right.   Now, you mentioned that there was
21  actual hands-on training that you do in connection with
22  these activities.   Why don't you tell me about that.
23  A.   Which one?   I mean, I've had training --
24  ongoing training since I started in 1995.
25  Q.   And would that be the courses we talked about

ALAN KENT - November 22, 2010                  Page 41
Direct Examination by Mr. Gosman

1   previously that are relevant to dynamic entry? Your --
2       A.   The courses that are mentioned on the POST
3   hours?
4       Q.   Yes.
5       A.   Or the stuff that we've done as a department,
6   as a team together?
7       Q.   That's what I want to know about. I want to
8   know about the stuff that you've done together as a
9   department that's not reflected in your POST records.
10  And it's not apparently reflected in the in-service
11  training.
12          MS. WESTBY: Object to the form of the
13  question. Misstates the documents.
14          MR. THOMPSON: Jo n.
15          THE WITNESS: Well for instance, at the
16  beginning of my POST record, it mentioned interior
17  tactics. That was when I first started. That was my
18  first introduction to diversionary devices in 1995.
19  BY MR. GOSMAN:
20      Q.   And that's on your POST record, and we talked
21  about that, correct?
22      A.   No, I haven't talked about that one.
23      Q.   I believe you did.
24          But anyway, what are we missing from the POST
25  records that you can refer to specifically that involve

ALAN KENT - November 22, 2010                  Page 43
Direct Examination by Mr. Gosman

1       A.   Yes.
2       Q.   Where?
3       A.   The time I used it was when we went through
4   the countermeasures training at the fairgrounds. And I
5   threw one at the range in Cody.
6       Q.   All right. Let's take the first -- your
7   first statement first. The countermeasures program,
8   which countermeasures program was it that involved the
9   use of a diversionary device?
10      A.   The one I can remember was in 2005.
11      Q.   All right. So you threw a diversionary
12  device in 2005?
13      A.   Yes.
14      Q.   Then you mentioned something else, something
15  in Cody?
16      A.   That was part of that training.
17      Q.   That same training?
18      A.   Yes.
19      Q.   So those two events are actually one event?
20      A.   Yeah, we had to use the range in Cody because
21  our range was too sloppy with mud.
22      Q.   All right. So have you had any other
23  training with regard to diversionary devices from the
24  Powell Police Department?
25      A.   Yes.

ALAN KENT - November 22, 2010                  Page 42
Direct Examination by Mr. Gosman

1   training in dynamic entry that you have received from
2   the Powell Police Department?
3       A.   We've done Simunitions training. We've done
4   training at the range on impact munitions, on
5   diversionary devices. I mean, I can't give you a date
6   based on these because I don't know what they are.
7       Q.   Was there just one date that you did these
8   things?
9       A.   We've done them since 1995. I've trained
10  since 1995.
11      Q.   All right. Well, let's take diversionary
12  devices. When have you trained on diversionary devices
13  with the Powell Police Department? I think you
14  mentioned that you may have done that --
15      A.   My first time was in 1995 when I first
16  started on that interior tactics course.
17      Q.   All right. Was that with the Powell Police
18  Department?
19      A.   Yes.
20      Q.   And then you did it again here this -- just
21  within the last few months, didn't you?
22      A.   Well, the last time we did it was last month,
23  I believe.
24      Q.   And between 1995 and last month, had you ever
25  trained using a diversionary device?

ALAN KENT - November 22, 2010                  Page 44
Direct Examination by Mr. Gosman

1       Q.   When?
2       A.   Since -- ongoing since 1995. I mean, I -- I
3   don't have a specific date. But we've trained with
4   live ones. We've trained with simulated ones where we
5   throw an empty body.
6       Q.   Do you have a record of any of those training
7   days, or do you guys just grab a diversionary device
8   out of the locker room and go out and toss it?
9           MR. THOMPSON: Objection as to form.
10          MS. WESTBY: Join.
11          THE WITNESS: I don't know. I'm not
12  responsible for keeping the records.
13  BY MR. GOSMAN:
14      Q.   Well, tell me about how we can know that
15  these training events with the diversionary device
16  actually occurred.
17      A.   Because I'm under oath and I told you they
18  did.
19      Q.   And you're telling me they have occurred on
20  more occasions than the ones that we've talked about
21  that actually have some record?
22      A.   Yes.
23      Q.   All right. And how about room entry as an
24  element of dynamic entry?
25      A.   Have we trained more than once on that?

ALAN KENT - November 22, 2010                    Page 45
Direct Examination by Mr. Gosman

1  Q.  Yeah.
2  A.  Yes.
3  Q.  When and where?
4  A.  We've trained at the police department.
5  We've trained at the fairgrounds. We've trained in a
6  deserted house north of my house that I procured for
7  the training.
8  Q.  All right --
9  A.  We trained at the school, at the high school.
10 We've trained at the old high school, the new high
11 school. We've trained at Southside School.
12 Q.  All right. And when did these -- how do you
13 document these events? Or who documents these events?
14 A.  I don't know if -- usually -- I'm assuming
15 it's the training officer.
16 Q.  Who was the training officer for room entry
17 for Powell Police Department?
18 MS. WESTBY: Object to the form of the
19 question.
20 MR. THOMPSON: Join.
21 BY MR. GOSMAN:
22 Q.  Who was the training officer?
23 A.  I'm not sure. We get together and train as a
24 team. There's no specific training officer. There's a
25 supervisor that keeps records of the training.

ALAN KENT - November 22, 2010                    Page 46
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2  Q.  Well, you're a sergeant, right?
3  A.  Yes.
4  Q.  And you'd be a logical person to at least
5  know who is responsible for keeping records of the
6  training, correct?
7  MS. WESTBY: Object to the form of the
8  question, Jeff. This is becoming fairly argumentative
9  and a little over the top.
10 MR. GOSMAN: Okay. All right. I'll keep
11 that in mind.
12 BY MR. GOSMAN:
13 Q.  So, my question was: You are a sergeant with
14 the Powell Police Department, and you should be in a
15 position to at least know who keeps track of these
16 records, correct?
17 A.  I know who keeps records.
18 Q.  Who is it?
19 A.  Up until July of this year it was
20 Sergeant Eckerdt. And then Sergeant Chretien took it
21 over in July of this year.
22 Q.  All right. And so has Sergeant Eckerdt been
23 responsible for keeping records of these trainings that
24 you talked about, and specifically room entry at the
25 old high school and the new high school and in an

ALAN KENT - November 22, 2010                    Page 47
Direct Examination by Mr. Gosman

1  abandoned house and so on and so forth?
2  MS. WESTBY: Object to the form of the
3  question.
4  MR. THOMPSON: Join.
5  THE WITNESS: As far as I know.
6  BY MR. GOSMAN:
7  Q.  And I suppose that Chief Feathers would also
8  be aware of his responsibilities in this regard?
9  MR. THOMPSON: Objection as to form.
10 MS. WESTBY: Same objection.
11 THE WITNESS: That the Chief would know what
12 the sergeant's duties are?
13 BY MR. GOSMAN:
14 Q.  That the chief would know if the sergeant's
15 duties specifically included keeping records of these
16 training programs?
17 A.  I'm assuming the chief would know, yes.
18 Q.  When you say that the team meets, which team
19 are you referring to?
20 A.  The team is every officer of the Powell
21 Police Department.
22 Q.  Okay. Does the Powell Police Department have
23 a, quote, unquote, special operations team?
24 A.  No.
25 Q.  Does the Powell Police Department train as a

ALAN KENT - November 22, 2010                    Page 48
Direct Examination by Mr. Gosman

1  team on a regular basis to perform dynamic entry?
2  A.  Yes.
3  Q.  Where are the records for that training,
4  Sergeant?
5  A.  I think I answered that I don't know.
6  Q.  Are there records for that training?
7  A.  I don't know. I don't keep the records.
8  There should be.
9  Q.  With regard to these meetings that we've been
10 talking about, these training sessions, have you
11 observed all or nearly all of the Powell Police
12 Department officers at these trainings?
13 MR. THOMPSON: Objection as to form.
14 MS. WESTBY: Join.
15 THE WITNESS: At one time or another every
16 officer has attended the trainings.
17 BY MR. GOSMAN:
18 Q.  Over a period of how many years?
19 A.  Since I started here in 1995.
20 Q.  Do you know the difference between a SWAT
21 team and a group of officers who get together to
22 perform a dynamic entry such as the one that was
23 performed at the Wachsmuth residence?
24 MS. WESTBY: Object to the form of the
25 question.

ALAN KENT - November 22, 2010                        Page 49
Direct Examination by Mr. Gosman

1    MR. THOMPSON: Jo n.
2    THE WITNESS: We don't have a SWAT team. So
3    I guess that would put us in the group of the officers
4    that get together to perform a dynamic entry.
5    BY MR. GOSMAN:
6    Q.  Okay.  Do you know what a SWAT team is?
7    A.  Yes.
8    Q.  What's the difference between a SWAT team and
9    the group that assembled that night to perform the
10   Wachsmuth entry?
11   MS. WESTBY: Object to the form of the
12   question.
13   MR. THOMPSON: Jo n.
14   BY MR. GOSMAN:
15   Q.  Based on what you know.
16   A.  A SWAT team is a specialized unit that
17   doesn't do anything but serve warrants and make
18   entries.  They are a dedicated team that that's their
19   sole function in the police department.
20   Q.  How about a special operations team, do you
21   understand the difference between a special operations
22   team and a SWAT team?
23   MS. WESTBY: Object to the form of the
24   question.
25   MR. THOMPSON: Join.

ALAN KENT - November 22, 2010                        Page 50
Direct Examination by Mr. Gosman

1    THE WITNESS: I don't know what a special
2    operations team is.
3    BY MR. GOSMAN:
4    Q.  Is there a SWAT team in Park County?
5    A.  I believe the sheriff's department has one.
6    Q.  Do you know if the sheriff's department was
7    consulted on the evening of the 24th of November, 2009?
8    A.  Yes, I do.
9    Q.  And they were, correct?
10   A.  Yeah.
11   Q.  And were they consulted, in part, for their
12   participation and their expertise as a SWAT team?
13   A.  I was told by the commander of the SWAT team
14   that since it was in the city, they were going home.
15   Q.  That wasn't my question at all, Officer.
16   My question was: Were they consulted based
17   on their expertise?
18   A.  Well, I couldn't consult them if they went
19   home.
20   Q.  Well, actually, you were consulting them,
21   though, because Lt. Patterson l ad been communicating
22   with Officer Miner and you that evening; isn't that --
23   MS. WESTBY: Objection to the form of the
24   question.
25   MR. THOMPSON: Join.

ALAN KENT - November 22, 2010                        Page 51
Direct Examination by Mr. Gosman

1    THE WITNESS: I talked to him on the phone
2    when he told me he was going home.
3    BY MR. GOSMAN:
4    Q.  And did Officer Miner consult with
5    Lt. Patterson?
6    MS. WESTBY: Object to the form of the
7    question.
8    THE WITNESS: Officer Miner was with
9    Lt. Patterson at the Park County Annex.
10   BY MR. GOSMAN:
11   Q.  And the Park County SWAT team was invited to
12   participate or direct this operation, was it not?
13   A.  Not by me.
14   Q.  Was it?
15   A.  I don't know what Officer Miner talked about.
16   I wasn't there.
17   Q.  And you still don't know to this day whether
18   the Park County SWAT team was asked to participate in
19   this warrant service?
20   MR. THOMPSON: Objection as to form.
21   MS. WESTBY: Join.
22   THE WITNESS: All I can tell you is he called
23   me and said he talked to the sheriff's department.
24   Since it was inside the city limits, they weren't going
25   to be involved   They were going home.

ALAN KENT - November 22, 2010                        Page 52
Direct Examination by Mr. Gosman

1    BY MR. GOSMAN:
2    Q.  Does the City of Powell have an agreement
3    with any law enforcement agency to provide SWAT
4    support?
5    A.  We have a mutual aid agreement with Park
6    County and Cody PD, I believe.
7    Q.  Okay.
8    A.  I don't know if it has anything to do with
9    the SWAT.
10   Q.  Is it in writing?  It's a mutual agreement?
11   A.  I don't handle that, so -- that's one of
12   Chief Feathers' duties.  So I believe there's something
13   in writing.
14   Q.  Does the City of Powell, as far as you know,
15   have a specially trained unit for narcotics
16   investigation or felony apprehension?
17   A.  A special unit?
18   Q.  Yes, a specially trained unit.
19   A.  Not a unit.  We have officers that have been
20   trained in that.
21   Q.  Does the City of Powell have a P.I.E.R.
22   trained response team?
23   A.  The Powell Police Department has officers
24   that have been through the P.I.E.R. training.
25   Q.  Were you involved in the selection of the

| ALAN KENT - November 22, 2010 | Page 53 | ALAN KENT - November 22, 2010 | Page 55 |
|---|---|---|---|
| Direct Examination by Mr. Gosman | | Direct Examination by Mr. Gosman | |

**Page 53 / Page 55 (left and right columns)**

**Page 53**

1  officers for the service of the Wachsmuth warrant?
2  A.  Yes.
3  Q.  Let's go ahead and talk about the evening of
4  the 24th of November, 2009
5      When did you first become aware that a
6  warrant might be obtained in the Wachsmuth case?
7  A.  When I first became aware of the incident and
8  the warrant are two different things.  I first became
9  aware of the incident of the reported grow operation
10  sometime right around the beginning of my shift, which
11  would have been at 2:00 in the afternoon.
12  Q.  All right.  And who did you learn this
13  information from?
14  A.  Officer Miner.
15  Q.  And what did he tell you?
16  A.  That he had information on a grow operation
17  in Powell.
18  Q.  Okay.  Did he tell you where he got the
19  information?
20  A.  Yes.
21  Q.  What did he say?
22  A.  He got it from a confidential informant.
23  Q.  Did you know the confidential informant?
24  A.  Personally?
25  Q.  Yes.

**Page 55**

1  investigating, no.
2  Q.  Who would it have been?
3      MS. WESTBY: Object to the form of the
4  question.
5      MR. THOMPSON: Join.
6      THE WITNESS: I have no idea who would have
7  been investigating him.
8  BY MR. GOSMAN:
9  Q.  Well, it would have been somebody that was
10  involved in narcotics, wouldn't it?
11      MR. THOMPSON: Objection as to form.
12      THE WITNESS: Not necessarily.
13          (Exhibit 26 identified)
14  BY MR. GOSMAN:
15  Q.  All right.  I want you to go ahead and take a
16  look at Exhibit 26.  And I want you to go to page 5 of
17  this report.  And if you could, there -- at the very
18  last entry on 2/24 of '09, there is an acronym.  It
19  says RP.  Do you know what RP means?
20  A.  Yes.
21  Q.  What does it mean?
22  A.  Reporting party.
23  Q.  Reporting party.
24      And then next to that it's the Powell Police
25  Department.

| ALAN KENT - November 22, 2010 | Page 54 | ALAN KENT - November 22, 2010 | Page 56 |
|---|---|---|---|
| Direct Examination by Mr. Gosman | | Direct Examination by Mr. Gosman | |

**Page 54**

1  A.  No.
2  Q.  Had you heard of him before?
3      MS. WESTBY: And before we go further into
4  this, we're not disclosing the name of the confidential
5  informant, so just refer to him as the confidential
6  informant if you know his name.
7  BY MR. GOSMAN:
8  Q.  Did you know of him before?
9  A.  I believe I'd heard his name before.
10  Q.  In what regard?
11  A.  General police work.
12  Q.  Did you know that he had an extensive
13  criminal record?
14  A.  No.
15  Q.  Did you know that he was being investigated
16  that day for felony possession and delivery and
17  manufacture of methamphetamine?
18      MS. WESTBY: Object to the form of the
19  question.  Misstates the testimony or records.
20      MR. THOMPSON: Join.
21      THE WITNESS: Being investigated at that
22  moment?
23  BY MR. GOSMAN:
24  Q.  Yes.
25  A.  I have no idea if someone else was

**Page 56**

1      MS. WESTBY: Jeff, object to the form of the
2  question.  This exhibit violates the Court's ruling, so
3  I don't know --
4      MR. GOSMAN: No, this exhibit does not
5  violate any court ruling.  This exhibit was produced by
6  me months before the Court even ventured into the area.
7      MS. WESTBY: Please be professional.
8      MR. GOSMAN: Yes --
9      MR. THOMPSON: And, Counsel, for the record,
10  I think what the Court's -- we can pull it up -- but I
11  believe what the Court's ruling was is that the
12  identity of the confidential informant not be
13  disclosed.
14      MR. GOSMAN: All right.  That's fine, and
15  I'll agree with that.  I won't agree with it, but I'm
16  willing to work on this assumption to get this
17  deposition done.
18      MS. WESTBY: Then this exhibit is part of the
19  deposition.  If you're planning on sealing this
20  deposition, it needs to be --
21      MR. GOSMAN: We can certainly seal this
22  exhibit.  And I'd agree to that right now.
23      MR. THOMPSON: Okay.
24      MR. GOSMAN: Okay.  So Exhibit 26 will be
25  sealed.

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 17 of 67
Tricia Wachsmuth v.                                                          Alan Kent
City of Powell, et al.                                              November 22, 2010

ALAN KENT - November 22, 2010                          Page 57
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.  Do you agree with me that on the 24th of
3   February, 2009, there is a reference to the Powell
4   Police Department either filing charges or referring
5   charges or something with regard to this confidential
6   informant for the manufacture, delivery, and possession
7   of methamphetamine?
8       A.  Well, actually, what this is is this is
9   the -- would be -- Case 09-223 is the Wachsmuth case.
10  He was the reporting party.
11      Q.  Okay. All right. Very good. So how did we
12  get meth manufacture, delivery, and possession out of
13  growing a couple of marijuana plants?
14          MR. THOMPSON: Object to the form of the
15  question.
16          MS. WESTBY: Join.
17          MR. THOMPSON: Go ahead.
18          THE WITNESS: Part of that may be the way
19  it's listed in our recordkeeping system. That
20  35-7-1031 is a fairly large state statute that
21  encompasses a whole different range of narcotics,
22  drugs, controlled substances.
23  BY MR. GOSMAN:
24      Q.  And what is the entry just above that?
25  It's -- under the "Nature" column, it has an S. Can

ALAN KENT - November 22, 2010                          Page 58
Direct Examination by Mr. Gosman

1   you tell me what that is?
2       A.  Suspect.
3       Q.  And do you know what those charges,
4   12-6-101-a, 12-6-101-b --
5       A.  Those are underage drinking offenses.
6       Q.  And on 2/18 of '09 there was apparently a
7   warrant that was issued.
8       A.  Appears to be a Cody PD warrant.
9       Q.  Okay. And why don't you take just a minute
10  and go ahead and go through this. And I'm going to ask
11  you some questions about this man's criminal record.
12  And I'll go ahead and start with the questions, and
13  then you can -- we'll see if we can get together here
14  on where I'm referring to.
15          MS. WESTBY: Object to the form of the
16  question, your use of the word criminal record.
17          MR. GOSMAN: Okay. Thank you.
18  BY MR. GOSMAN:
19      Q.  It's the person record, is it not? This
20  document is actually called a person record?
21      A.  Yeah, it appears to be a Cody Police
22  Department person record.
23          MS. WESTBY: And, again, it's out of the Cody
24  Police Department.
25

ALAN KENT - November 22, 2010                          Page 59
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.  Would this document contain the same
3   information that a criminal report would contain if it
4   were run on this individual?
5       A.  What do you mean by a criminal report? You
6   mean criminal history?
7       Q.  Yes.
8       A.  No.
9       Q.  What would be the difference?
10      A.  Criminal history would show somebody that was
11  charged with a crime and convicted. If you go through
12  this -- like right above the one you were talking about
13  with the meth, manufacture. The one right above it,
14  Powell Police Department, it says S for suspect. If
15  they are arrested for it, it would be SA, subject
16  arrested. And there wouldn't be any dispositions in
17  this.
18      Q.  What does the letter M mean?
19      A.  Mentioned.
20      Q.  Mentioned. How about W?
21      A.  Witness.
22      Q.  And S is suspect?
23      A.  Yes.
24      Q.  And what does CHG mean?
25      A.  Change.

ALAN KENT - November 22, 2010                          Page 60
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.  Okay. Do you know whether this suspect had
3   any warrants out for his arrest at the time he was
4   providing information in the Wachsmuth case --
5       A.  No.
6       Q.  This confidential informant?
7       A.  I don't know.
8       Q.  You don't know that?
9       A.  I don't know.
10      Q.  Would this document provide that information?
11      A.  If he had warrants out?
12      Q.  Yes.
13      A.  If that's what W-A-R-R means.
14      Q.  Okay. Looks like 1/27 he had a warrant for
15  possession of drug -- I don't know whether it's drug
16  paraphernalia or drugs. But there is a reference to a
17  municipal code, I think, though.
18          And on 1/28, there was a warrant for
19  violation of protection order. Do you see that?
20      A.  Yes.
21      Q.  So there are two warrants that appear to have
22  been outstanding just before he provided testimony in
23  the Wachsmuth case. Would you agree?
24          MS. WESTBY: Object to the form of the
25  question.

1    MR. THOMPSON: Join.
2    THE WITNESS: I don t know. One is Cody PD
3  and the other is Park County SO.
4  BY MR. GOSMAN:
5    Q.  On 12/27 of 2007, this confidential informant
6  apparently was mentioned in connection with falsely
7  reporting a crime.
8    Would that have shown up on a criminal
9  history report? This incident?
10   A.  When a criminal history -- you mean through
11 the national statewide compt ter?
12   Q.  Yes.
13   A.  No.
14   Q.  And what does W mean again? Witness?
15   A.  Witness.
16   Q.  Were you aware on the evening of the 24th of
17 February, 2009 whether Josh Bessler had been arrested
18 and charged with any felony crimes involving
19 dishonesty, such as forgery --
20   MR. THOMPSON: Objection as to form.
21 BY MR. GOSMAN:
22   Q.  -- obtaining property by false pretenses?
23   MS. WESTBY: Join.
24   MR. THOMPSON: First of all, it's a violation
25 of the Court's order.

1  BY MR. GOSMAN:
2    Q.  Go ahead.
3    A.  What was the question again?
4    Q.  Yeah, were you aware on the 24th of
5  November -- February 2009, that the confidential
6  informant had been arrested and charged with felonies
7  involving dishonesty, such as forgery and obtaining
8  property by false pretenses?
9    MR. THOMPSON: Objection as to form.
10   MS. WESTBY: Join.
11   THE WITNESS: No.
12 BY MR. GOSMAN:
13   Q.  Did you recognize the name Bret Wachsmuth
14 when Officer Miner told you that he was working on a
15 marijuana grow operation that day?
16   A.  I recognized the last name.
17   Q.  Did you know that he was related to Tom
18 Wachsmuth?
19   A.  When Officer Miner told me, I did.
20   Q.  Do you know Tom Wachsmuth?
21   A.  Yes.
22   Q.  You know he works for DCI?
23   A.  Yes.
24   Q.  What kind of a relationship did you have with
25 Tom Wachsmuth at that time?

1    A.  Working relationship. We weren't friends.
2    Q.  Did you have any reason to believe that Tom
3  Wachsmuth would not fully cooperate with you if he were
4  asked to assist in serving this warrant?
5    A.  I don't know how to answer that. I guess I
6  didn't really want to put him in that position.
7    Q.  All right. I'm not interested in that.
8  though. What I want to know is, was there any reason
9  why he couldn't have been consulted in terms of his
10 reliability or his ability to help diffuse the
11 situation to get Mr. Wachsmuth out of the house without
12 having to break in the door and enter the home with 11
13 police officers?
14   MS. WESTBY: Object to the form of the
15 question.
16   MR. THOMPSON: Join.
17   Go ahead.
18   THE WITNESS: Was there any reason?
19 BY MR. GOSMAN:
20   Q.  Yeah.
21   A.  Yeah.
22   Q.  What?
23   A.  That it was his son. I didn't want him to
24 confuse his job -- or have to choose between his job
25 and his son.

1    Q.  All right. But that doesn't have anything to
2  do with whether or not Tom Wachsmuth could have
3  performed that service, correct?
4    MS. WESTBY: Object to the form of the
5  question. Asked and answered.
6    MR. THOMPSON: Join.
7    THE WITNESS: I guess he could have.
8  BY MR. GOSMAN:
9    Q.  There was nothing in his character or your
10 knowledge of his history that would have led you to
11 believe that he wasn't capable of doing that or
12 wouldn't have cooperated fully with you?
13   A.  Not that I was aware of.
14   Q.  After you first spoke with Officer Miner,
15 what was the next event that occurred that afternoon in
16 connection with this matter?
17   A.  We had a meeting with Chief Feathers.
18   Q.  What time was that?
19   A.  Within a few minutes after Officer Miner told
20 me.
21   Q.  All right. And what did you discuss with
22 Chief Feathers?
23   A.  We informed him what was going on.
24   Q.  And what was that?
25   A.  That we had a suspected grow operation and

ALAN KENT - November 22, 2010                                    Page 65
Direct Examination by Mr. Gosman

1 that it involved Tom's son.
2    Q.  Did you have a discussion, then, about
3 whether or not you should involve Tom in trying to
4 serve this warrant?
5    A.  Not at that point.
6    Q.  What else was discussed with Officer Feathers
7 at that time?
8    A.  It's Chief Feathers.
9    Q.  Chief Feathers, I'm sorry.
10   A.  Told us we would handle it like we would
11 handle any other criminal violation.
12   Q.  What did that mean? Did you understand --
13   A.  That we're not going to play favorites.
14   Q.  All right.  And have you ever used a dynamic
15 entry to execute a misdemeanor search warrant before?
16       MS. WESTBY: Object to the form of the
17 question.
18       MR. THOMPSON: Join.
19       MS. WESTBY: Misstates the evidence.
20       THE WITNESS: I've used dynamic entries to
21 execute search warrants, yes
22 BY MR. GOSMAN:
23   Q.  In what circumstances?
24   A.  Well, when I was assigned to DCI, we served
25 search warrants in Lovell, Casper, Riverton -- drug

ALAN KENT - November 22, 2010                                    Page 66
Direct Examination by Mr. Gosman

1 offenses.
2    Q.  They weren't misdemeanor drug possession
3 offenses, though, were they?
4       MS. WESTBY: Object to the form of the
5 question.
6       THE WITNESS: At the time we didn't know this
7 was a misdemeanor.
8 BY MR. GOSMAN:
9    Q.  You thought this was a felony marijuana grow
10 operation?
11   A.  Yes.
12   Q.  Based on what?
13   A.  Several things.  There's weight.  I didn't
14 realize until later that a grow operation is a
15 misdemeanor in the state of Wyoming.  But if you take
16 weight, it's a felony, felony possession.
17   Q.  Do you know what the weight is that's
18 required to upgrade the possession to a felony?
19   A.  Yes.
20   Q.  What is it?
21   A.  Three ounces.
22   Q.  Three ounces.
23       That doesn't include the roots and the
24 potting soil, though, does it?
25   A.  It includes the plant, roots and everything.

ALAN KENT - November 22, 2010                                    Page 67
Direct Examination by Mr. Gosman

1 There's THC in the roots.
2    Q.  And you weren't aware that a marijuana grow
3 operation was not a felony in Wyoming?
4    A.  Not at the time, no.
5    Q.  But if you had checked the statutes, you
6 would have discovered that, correct?
7    A.  But if there's more than 3 ounces, it would
8 have been a felony possession.
9            (Exhibit 13 identified)
10 BY MR. GOSMAN:
11   Q.  Well, let's take a look at Exhibit -- I
12 believe it's 13.
13       Okay, have you seen this document before?
14   A.  Yes.
15   Q.  Did you assist in its preparation?
16   A.  No.
17   Q.  When did you see it first?
18   A.  When Officer Miner had it signed by
19 Judge Waters and brought it back to the police
20 department.
21   Q.  Well, all right.  Of course, Judge Walters
22 (sic) didn't sign the affidavit, correct?
23       MR. THOMPSON: Waters, I believe he said.
24 BY MR. GOSMAN:
25   Q.  Waters, I'm sorry.

ALAN KENT - November 22, 2010                                    Page 68
Direct Examination by Mr. Gosman

1       THE WITNESS: Judge Waters wouldn't have
2 signed the affidavit, he would have signed the search
3 warrant.
4 BY MR. GOSMAN:
5    Q.  All right.  So you saw this search and
6 seizure affidavit when the warrant was returned from
7 Judge Waters' office?
8    A.  Yes.
9    Q.  Did you look at it?
10   A.  Yes.
11   Q.  And did you notice what the confidential
12 informant reported to Officer Miner about the marijuana
13 grow operation in the house?
14   A.  At the time I'm sure I did.  I can look
15 now --
16   Q.  Yeah, go ahead.  I think it's actually
17 probably contained on page -- it's page 4 of the
18 affidavit.
19       First question I'd like to ask you is:  Is
20 there any reference in this affidavit that Bret or
21 Tricia Wachsmuth sold marijuana, ever, or any other
22 drugs?
23   A.  In this document?
24   Q.  Yes.
25   A.  Not in this one.

1  Q.  All right.  Well, was there ever any evidence
2  that Bret or Tricia Wachsmuth sold marijuana or any
3  other drugs?
4      A.  There was evidence they provided it to
5  others, which is a delivery.
6      Q.  And where did that evidence come from?
7      A.  From the confidential informant.
8      Q.  Really?  Did you speak to the confidential
9  informant?
10     A.  No.
11     Q.  Where is that evidence --
12         MS. WESTBY:  Object to the form of the
13  question.  Argumentative.
14  BY MR. GOSMAN:
15     Q.  -- that Mr. Wachsmuth provided drugs to other
16  persons?
17     A.  If I remember correctly, it's in
18  Officer Miner's report.
19     Q.  Well, let's go ahead and take a look at that.
20     A.  Where is that at?
21         (Exhibit 20 identified)
22  BY BY MR. GOSMAN:
23     Q.  It's Exhibit 20.
24         By the way, did you read -- you did read this
25  report, didn't you; you signed it?

1      A.  I approved it, yes.
2      Q.  Did you read it?
3      A.  Yeah.
4      Q.  All right.  Where is the reference in there
5  about --
6      A.  "CI-2009-02 has smoked marijuana with Tricia
7  and Bret frequently up until approximately one month
8  ago."
9      Q.  Well, how do we know that Bret and Tricia
10  provided it to him or delivered it to him?
11     A.  Because he was living there and Bret was
12  growing it in the basement.
13     Q.  So that's it, then, huh?  That he smoked
14  marijuana with the Wachsmuths?
15     A.  Yes.
16     Q.  And that's the only evidence that you have
17  that there was delivery of drugs by Tricia and Bret
18  Wachsmuth?
19         MS. WESTBY:  Object to the form of the
20  question.  Argumentative.
21         MR. THOMPSON:  Join.
22         THE WITNESS:  If somebody provides drugs to
23  somebody else, it's a delivery.
24  BY MR. GOSMAN:
25     Q.  So if one person passes a marijuana cigarette

1  to another person in a park, that person is guilty of
2  delivery of marijuana?
3      A.  Yes.
4      Q.  Have you ever charged anybody for that crime?
5      A.  Yes.  It's a state statute.  It's a delivery.
6  Money doesn't have to change hands.
7      Q.  All right.  Well, you certainly understood
8  that this operation at the Wachsmuths' did not involve
9  the sale of drugs from the home, correct?
10     A.  I didn't know that for sure.  But, no.
11     Q.  You had no reason to believe that that was
12  the case?
13     A.  I had no reason to believe it, no.
14     Q.  All right.  Let's go back to the affidavit,
15  which is Exhibit 13.
16         How many plants are referenced in the
17  affidavit?
18     A.  Say that again.
19     Q.  How many marijuana plants are referenced in
20  the affidavit?
21     A.  I don't believe there's a number given.
22     Q.  Let's go to page 4.
23     A.  What was the number of the affidavit again,
24  I'm sorry?  Thirteen?
25     Q.  It's -- yeah, 13.

1         Okay.  I'm on page 4 of Exhibit 13, and I'm
2  going to read this to you:  "CI has also stated that he
3  has smoked marijuana with both Bret and Tricia on
4  numerous occasions during his stay in the residence."
5         Are you telling me that's your evidence that
6  Bret and Tricia Wachsmuth were delivering drugs to
7  other persons?
8         MS. WESTBY:  Object to the form of the
9  question.
10         MR. THOMPSON:  Join.
11         THE WITNESS:  Yes.
12  BY MR. GOSMAN:
13     Q.  All right.  That's fine.  And then it says:
14  "The CI then stated that when he first moved into the
15  residence, he noticed an already harvested marijuana
16  plant," correct?
17     A.  I don't know where you're at.
18     Q.  Just the next sentence there on page 4.
19     A.  Is it like the --
20     Q.  I'm sorry.  It's in the second paragraph.
21  It's towards the bottom of the second paragraph,
22  Sergeant.
23         MR. THOMPSON:  Is there a question?
24  BY MR. GOSMAN:
25     Q.  Yes.  So there is a reference to one

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 21 of 67
Tricia Wachsmuth v.                                                                              Alan Kent
City of Powell, et al.                                                                    November 22, 2010

1  marijuana plant in this affidavit, correct?
2  A. An already harvested one, yes.
3  Q. Let's see here.
4     Okay. And then on page 3 of this affidavit,
5  there's the statement in the -- it's the second
6  paragraph of paragraph number four. And it's the last
7  sentence there: "During December of 2008, CI
8  discovered approximately six marijuana plants that were
9  approximately 6 inches tall in the basement of the
10 residence."
11 A. Yes.
12 Q. All right. Do you know of any other evidence
13 that the confidential informant provided regarding the
14 amount of marijuana that was in that basement?
15 A. Other than his statements, no.
16 Q. All right. Did it appear to you that
17 Mr. Wachsmuth was growing this marijuana for personal
18 use --
19    MS. WESTBY: Object to --
20 BY MR. GOSMAN:
21 Q. -- from all the information that you had that
22 afternoon?
23    MS. WESTBY: Object to the form of the
24 question.
25    MR. THOMPSON: Join.

1     THE WITNESS: I don t know if there's -- I
2  don't know how you would tell it somebody was growing
3  it for themselves or to sell.
4  BY MR. GOSMAN:
5  Q. Okay. Well, how about the size of the
6  operation, Officer?
7  A. Well, the initial information was that there
8  was 12 to 15 plants.
9  Q. Where is that? I'm not doubting it, but just
10 show me where that is.
11 A. That's what I recollect that was told to me
12 by Officer Miner.
13 Q. See if you can find that in the affidavit.
14 A. Well, I can't find it there, but I can find
15 it in his grow log after we served the search warrant,
16 where it said that he had seed ings plus three mature
17 plants.
18 Q. All right. Well, that's something that you
19 discovered after you reviewed the logs that were taken
20 in the search of the Wachsmuth residence, correct?
21 A. Yes. But it confirmed what the CI had told
22 us.
23 Q. Well, what the CI told you, at least based on
24 what Officer Miner says in his affidavit, was that
25 there was six to eight plants back in December of 2008.

1     MR. THOMPSON: Objection as to form.
2     MS. WESTBY: Join.
3  BY MR. GOSMAN:
4  Q. Correct?
5  A. Back in December, yes.
6  Q. Pardon?
7  A. Back in December, yes.
8  Q. Yeah. All right. So what evidence is there
9  in this affidavit. other than what you remember Miner
10 telling you -- let's look at the record as it exists.
11    What evidence is there in this affidavit for
12 search warrant that there was a large number of
13 marijuana plants in the Wachsmuth residence that would
14 lead anyone to believe that maybe he was growing them
15 for sale, for delivery?
16    MR. THOMPSON: Objection as to form.
17    MS. WESTBY: Join.
18    THE WITNESS: There's no number listed for
19 the plants that he had currently in his basement.
20 BY MR. GOSMAN:
21 Q. And the same is true of Miner's report, isn't
22 that true? And that's the report that you signed. I
23 believe it's Exhibit 20.
24    MR. THOMPSON: Objection as to the form.
25    MS. WESTBY: Join.

1     THE WITNESS: The question again, please?
2  BY MR. GOSMAN:
3  Q. Yeah. There isn't any evidence in Officer
4  Miner's report that he was growing marijuana plants in
5  a sufficient quantity that would indicate that he was
6  growing them for sale?
7  A. Not for sale, no.
8     MR. THOMPSON: Objection as to form.
9  BY MR. GOSMAN:
10 Q. So the objective evidence was that this was a
11 small marijuana grow operation in Bret Wachsmuth's
12 basement, correct?
13    MR. THOMPSON: Objection as to form.
14    MS. WESTBY: Join.
15    THE WITNESS: I don't know if you'd define it
16 small if there was 11 to 15 plants.
17 BY MR. GOSMAN:
18 Q. How many plants were there? Hold it, back up
19 just a second. I'll strike that.
20    I think you just said 11 to 15 plants. Where
21 did that number come from, Officer?
22 A. I told you that's what Officer Miner had told
23 me.
24 Q. That's what Officer Miner told you.
25 A. Yes.

ALAN KENT - November 22, 2010                                    Page 77
Direct Examination by Mr. Gosman

1    Q.  Did you write that down in any reports that
2    you filed in this case?
3    A.  I didn't file any reports in this case.
4    Q.  Did you call out to Officer Miner when you
5    approved his report, which is Exhibit 20, that, in
6    fact, he had told you that there were 11 to 15 plants
7    in the house?
8    A.  He didn't put --
9        MS. WESTBY: Object to the form of the
10   question.
11       THE WITNESS: He didn't put a number of
12   plants in his report.
13   BY MR. GOSMAN:
14   Q.  He put a number of plants in the affidavit
15   for the search warrant, did he not?
16   A.  From December.  This is now February.
17   Q.  Well, and certainly, if there were -- if
18   there was evidence of 11 to 15 plants, that would have
19   been pertinent to the affidavit for the search warrant,
20   correct?
21       MR. THOMPSON: Objection as to form.
22       MS. WESTBY: Join.
23       THE WITNESS: The evidence came from the --
24   what the CI had told Miner.
25

ALAN KENT - November 22, 2010                                    Page 78
Direct Examination by Mr. Gosman

1    BY MR. GOSMAN:
2    Q.  My question was that if he had, in fact,
3    heard from the confidential informant that there were
4    currently in the house 11 to 15 marijuana plants, that
5    would certainly have been pertinent to the affidavit
6    for the search warrant, correct?
7        MR. THOMPSON: Objection as to form.
8        MS. WESTBY: Join.
9        THE WITNESS: Not necessarily.
10   BY MR. GOSMAN:
11   Q.  Well, it's not in there; isn't that true?
12   A.  It's not in there, but not necessarily --
13   it's a grow operation.  I mean, there's not a
14   difference defined by law for a grow operation between
15   1 and 20.
16   Q.  But he did place in his affidavit that in
17   December of 2008 there were six to eight -- there were
18   six -- I believe it was six plants that were in the
19   residence, correct?
20   A.  Yes.
21   Q.  And there's no reference to any of the number
22   of plants that the confidential informant told him
23   about currently on the date that the warrant was
24   issued, correct?
25   A.  Not on that date, no.

ALAN KENT - November 22, 2010                                    Page 79
Direct Examination by Mr. Gosman

1    Q.  All right.  Were you -- no, you weren't.  You
2    were elk hunting, I think, when we took Officer Miner's
3    deposition.  You didn't --
4    A.  No, I was in North Carolina.
5    Q.  Okay.  Do you remember where it was that
6    Miner -- when and where it was that Miner told you that
7    there were 11 to 15 plants in the Wachsmuth residence,
8    based on what he'd heard from the confidential
9    informant?
10   A.  I believe it was in the garage.
11   Q.  In the garage?
12   A.  At the police department.
13   Q.  All right.  Well, Officer, did you make a
14   judgment that afternoon about whether or not you were
15   dealing with a felony drug grow operation?
16   A.  I made a judgment we were dealing with a
17   felony.
18   Q.  You did?
19   A.  Yes.
20   Q.  All right.  And that was based on the
21   statement that Miner told you that there were 11 to 15
22   plants in the home?
23   A.  That was based on the statement that there
24   was a grow operation, yes.
25   Q.  And you're misunderstanding that the grow

ALAN KENT - November 22, 2010                                    Page 80
Direct Examination by Mr. Gosman

1    operation was a felony?
2        MR. THOMPSON: Objection as to form.
3        Go ahead.
4        THE WITNESS: At the time, I didn't know that
5    all grow operations are misdemeanors, no.
6    BY MR. GOSMAN:
7    Q.  It's a felony to sell marijuana, though,
8    isn't it?
9    A.  Yes.
10   Q.  And there was no evidence that Mr. Wachsmuth
11   was engaged in selling marijuana, correct?
12       MR. THOMPSON: Objection as to form.
13       MS. WESTBY: Join.
14       THE WITNESS: Not that I knew of.
15   BY MR. GOSMAN:
16   Q.  All right.  So you met with Chief Feathers
17   and Miner shortly after you first talked with Officer
18   Miner about the developing information on the Wachsmuth
19   marijuana grow operation, correct?
20   A.  Yes.
21   Q.  And how long did that meeting last?
22   A.  I have no idea.  It wasn't very long.
23   Q.  Was there any discussion at that time about
24   the possibility of using a dynamic entry to serve the
25   warrant?

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 23 of 67
Tricia Wachsmuth v.                                                              Alan Kent
City of Powell, et al.                                               November 22, 2010

ALAN KENT - November 22, 2010                                          Page 81
Direct Examination by Mr. Gosman

1   A.  We didn't even have a warrant then, so there
2   was no discussion about that
3   Q.  All right.  So what happened next?
4   A.  Officer Miner went out and met with the
5   county attorney at the annex
6   Q.  Okay.  And did he take the confidential
7   informant with him?
8   A.  I don't know if they rode together, but
9   eventually the confidential informant was there with
10  him.
11  Q.  Okay.  And do you know if Lt. Patterson was
12  called to the office where Miner met with the
13  confidential informant and the prosecutor?
14  A.  I don't know how he got there, but I knew
15  eventually he was involved with the interview and
16  the -- and writing the affidavit.
17  Q.  Was Miner reporting to you that afternoon?
18  A.  He was checking in periodically.
19  Q.  Okay.  Were you his direct report that
20  afternoon?  I mean, was he reporting to you, as his
21  sergeant, the progress of this drug investigation?
22  A.  Yes.
23  Q.  All right.  And did you ask him about the
24  communications he was having with Lt. Patterson?
25  A.  He was keeping me informed of what was going

ALAN KENT - November 22, 2010                                          Page 82
Direct Examination by Mr. Gosman

1   on.
2   Q.  Well, what did he say?
3   A.  That Lt. Patterson, with his experience, was
4   helping write the affidavit and interview the
5   confidential informant.
6   Q.  He didn't tell you that he'd invited
7   Officer Patterson to participate with his SWAT team?
8   A.  I don't recall that, no.
9   Q.  But you knew that because Officer Patterson
10  said he wasn't going to do it, correct?
11  A.  When we talked on the phone, he said -- yeah,
12  he said he was going home.
13  Q.  When did you speak with Officer Patterson --
14  Lt. Patterson?
15  A.  I don't know the exact time of day.  I mean,
16  it was later in the evening, I think.
17  Q.  Was it before dark?
18  A.  I don't recall.  I mean, it was February, so
19  it gets dark fairly early.
20  Q.  You only spoke to Lt. Patterson one time?
21  A.  That I remember.
22  Q.  And did you know at that time that you spoke
23  with Lt. Patterson that Officer Miner at least was
24  planning a SWAT-type entry into the Wachsmuth home?
25      MS. WESTBY: Object to the form of the

ALAN KENT - November 22, 2010                                          Page 83
Direct Examination by Mr. Gosman

1   question.
2       MR. THOMPSON: Join.
3       THE WITNESS: It wasn't Officer Miner's
4   decision to do a SWAT-type entry.
5   BY MR. GOSMAN:
6   Q.  Okay.  But that wasn't the question I asked.
7       Did you know that he was considering that at
8   that time?
9   A.  No.
10  Q.  Why would Lt. Patterson have been called in
11  and have told you that his SWAT team was not going to
12  be involved if Officer Miner hadn't made some -- drawn
13  some conclusions about the use of a SWAT team in
14  connection with this investigation?
15      MS. WESTBY: Object to the form of the
16  question.  Misstates the testimony.
17      MR. THOMPSON: Join.
18      THE WITNESS: I don't know what they talked
19  about.  I wasn't there.
20  BY MR. GOSMAN:
21  Q.  All right.  When did you first talk with
22  Officer Miner about the use of a SWAT-type entry into
23  the Wachsmuth home?
24  A.  I never talked to him about a SWAT-type
25  entry.

ALAN KENT - November 22, 2010                                          Page 84
Direct Examination by Mr. Gosman

1   Q.  What did you talk to him about in relation to
2   the entry?
3   A.  I don't think I talked to him about any of
4   it.
5   Q.  Officer Miner?
6   A.  Yeah.
7   Q.  Well, you didn't just show up at the meeting
8   later that evening where all the officers were
9   assembled and learn for the first time that
10  Officer Chretien had put together a plan for a dynamic
11  entry, did you?
12  A.  No.  Sergeant Chretien was called in to plan
13  the entry.
14  Q.  Did you know about that?
15  A.  Yes.
16  Q.  And when did that happen?
17  A.  I don't have a time.  I mean, he was one of
18  the first phone calls I made.
19  Q.  Did you -- so you called Sergeant Chretien?
20  A.  Yeah.
21  Q.  And did you tell him that you wanted him to
22  plan a dynamic entry into the Wachsmuth home?
23  A.  I told him, after conferring with the Chief,
24  that we had a search warrant to serve and that he
25  needed to put a plan together.  Whether it was tactical

1   or not was his call.

2      Q.   All right.  So at this point in time that
3   you'd spoken with Sergeant Chretien, you've talked
4   again with Chief Feathers?

5      A.   I talked to Chief Feathers through the course
6   of the whole evening by phone or in person when he was
7   still at the office.

8      Q.   And did you discuss with Chief Feathers the
9   use of a dynamic entry in this case before you called
10  Chretien?

11     A.   Chief Feathers and I talked about all kinds
12  of options.

13     Q.   And that would be one of them, correct?

14     A.   Yes.

15     Q.   And why were you talking about a dynamic
16  entry into the Wachsmuth home based on the information
17  you had at that time?

18     A.   Based on the information we had from Bret
19  that he was paranoid, he was always looking out the
20  window.  There was guns in the house.  He carried a
21  gun.  Also that we had information he was getting pills
22  from his mother-in-law, so I didn't know if he was
23  going to be under the influence of something.  Plus the
24  part that scared me the most was that he knew we were
25  coming.

1      Q.   Why did that scare you so bad?

2      A.   To know that we're going to go break down the
3   door of somebody's house and they know we're coming?

4      Q.   Well, I think we've got an assumption going
5   on there and that is that you were going to break down
6   the door.  Why did you feel that you had to break down
7   the door?

8      A.   So that might have been a bad choice of
9   words, but to do anything when they know we're coming
10  isn't a good thing.

11     Q.   Well, this was a knock-and-announce warrant,
12  correct?

13     A.   Yes.

14     Q.   And in a knock-and-announce warrant, you
15  knock and announce your presence before you enter the
16  home, correct?

17         MS. WESTBY: Object to the form of the
18  question.

19         THE WITNESS: Yes.

20  BY MR. GOSMAN:

21     Q.   So even if everything had gone according to
22  plan, Bret Wachsmuth would have known you were coming
23  before he opened the door, correct?

24         MR. THOMPSON: Objection as to form.

25         MS. WESTBY: Join.

1          THE WITNESS: He would have had a few
2   moments' notice, but not several hours like he had.

3   BY MR. GOSMAN:

4      Q.   Several hours like he had?

5      A.   Yes.

6      Q.   So when did you first learn that the
7   confidential informant had communicated with Bret
8   Wachsmuth?

9      A.   He had told Officer Miner and Officer Miner
10  told me.

11     Q.   When?

12     A.   One of the points we met during the afternoon
13  or communicated during that -- the afternoon.

14     Q.   Okay.  You considered that important
15  information, correct?

16     A.   Yes.

17     Q.   And certainly, that would have been
18  information that would have been important for the --
19  in obtaining the search warrant, correct?

20         MS. WESTBY: Object to the form of the
21  question.

22         MR. THOMPSON: Join.

23         THE WITNESS: I didn't write the search
24  warrant.

25

1   BY MR. GOSMAN:

2      Q.   Well, go to Exhibit 13 and tell me if
3   Officer Miner says anything in there about the
4   confidential informant alerting Bret Wachsmuth that you
5   were coming.

6      A.   I don't think it's in there.

7      Q.   It's not in any -- is it in any of the
8   reports?

9      A.   Yeah.  Yes.

10     Q.   And let's go ahead and turn to Exhibit 20.

11         This document was prepared by Chad Miner on
12  the 25th, correct?

13     A.   Yes.

14     Q.   And that was a day after the incident,
15  correct?

16     A.   Yes.

17     Q.   And that was also after Bret Wachsmuth had
18  been interviewed by Officer Brown and whoever else was
19  with him that day, correct?

20     A.   Yes.

21     Q.   Do you know if Sergeant Chretien was alerted
22  to the fact that the -- as you allege, the confidential
23  informant informed Officer Miner that he had contacted
24  Bret Wachsmuth and told him that you were coming?

25     A.   I would have told him, yeah.

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 25 of 67
Tricia Wachsmuth v.                                                         Alan Kent
City of Powell, et al.                                            November 22, 2010

ALAN KENT - November 22, 2010                     Page 89
Direct Examination by Mr. Gosman

1   Q.  Well, I'm not interested really in what you
2   would have told him.  If you remember telling him that,
3   fine.  And if you don't remember telling him that,
4   that's fine, too.
5       Do you remember telling him that?
6   A.  I don't remember specifically.  I told him
7   all the information that I had
8   Q.  And he was charged with devising the entry
9   plan based on the information that you gave him,
10  correct?
11  A.  Yes.
12  Q.  Did he speak with Officer Miner, do you know?
13  A.  Officer Miner, when he returned from Cody,
14  came into the basement and spoke with Sergeant
15  Chretien, yes.
16  Q.  And what time was that?
17  A.  When he got back from Cody. I don't know the
18  time.
19  Q.  And do you know whether Officer Chretien was
20  aware that the confidential informant had spoken to
21  Bret Wachsmuth earlier in the day and told him you were
22  coming?
23      MS. WESTBY: Object to the form.
24      MR. THOMPSON: Join.
25      THE WITNESS: I told Sergeant Chretien all

ALAN KENT - November 22, 2010                     Page 90
Direct Examination by Mr. Gosman

1   the information I had.  So I would have told him.
2   BY MR. GOSMAN:
3   Q.  To the best of your recollection --
4   A.  Yeah.
5   Q.  -- you would have told him that?
6   A.  Yes.
7       (Exhibit 16 identified)
8   BY BY MR. GOSMAN:
9   Q.  All right.  Well, let's take a look at his
10  report, which is Exhibit 16.   want you to see if you
11  can find any reference in that report to this
12  knowledge.
13  A.  I don't see it.
14      (Exhibit 10 identified)
15  BY MR. GOSMAN:
16  Q.  Let's take a quick look at Exhibit 10.  Do
17  you know what this document is?
18  A.  Yes.  It's notes that were taken.
19  Q.  And these were notes that were
20  taken documenting the entry plan, correct?
21  A.  Yes.
22  Q.  All right.  Is there any reference in this
23  document to the confidential informant alerting Bret
24  Wachsmuth, allegedly, that he had turned him in?
25  A.  No, but I don't see any reference to any of

ALAN KENT - November 22, 2010                     Page 91
Direct Examination by Mr. Gosman

1   the other concerns either.
2   Q.  Well, it does say handguns loaded everywhere
3   in the house, doesn't it?
4   A.  That's one of the concerns we had, yes.
5   Q.  Okay.  So, Officer, when were the other
6   police officers of the Powell Police Department
7   contacted to come down to the police station?
8   A.  Sometime during that evening before we served
9   the search warrant.
10  Q.  All right.  And was that done after
11  Sergeant Chretien had devised the plan to conduct the
12  entry into the home?
13  A.  I think they were arriving at roughly the
14  same times that he was working on the plan.
15  Q.  All right.  Well, let's go back for a minute.
16  You instructed Officer Chretien to devise the plan,
17  correct?
18  A.  I asked him to, yes.
19  Q.  Asked him to, all right.
20      And that was also based on information that
21  you had discussed with Chief Feathers, correct?
22  A.  Yes.
23  Q.  And so Chief Feathers was aware that
24  Officer Chretien was being asked to devise a plan for
25  entry into the Wachsmuth residence, correct?

ALAN KENT - November 22, 2010                     Page 92
Direct Examination by Mr. Gosman

1   A.  Yes.
2   Q.  And when did you speak to Chretien again --
3   next?
4   A.  I spoke to him off and on through the whole
5   evening.
6   Q.  All right.  And after you had made this -- or
7   given him this charge and asked him to prepare a plan,
8   when did you learn that he had prepared a plan?
9   A.  When he was explaining to everybody in the
10  basement.
11  Q.  You didn't know before then what his plan
12  was?
13  A.  I don't think the specifics were worked out.
14  Q.  Well, all right.  But did you know that he
15  was planning a dynamic entry into the Wachsmuth home?
16  A.  I knew he was planning an entry, yes.
17  Q.  Well, you've been talking to him through the
18  evening, as you say, correct, before you actually met
19  with him at the police station?
20  A.  Yes.
21  Q.  And you're telling me that you didn't know he
22  was planning a dynamic entry?
23  A.  I knew he was planning an entry.  And at the
24  end I knew it was a dynamic entry.  When the plans were
25  finalized.

Case 1:10-cv-00041-ABJ Document 65-5 Filed 01/10/11 Page 26 of 67
Tricia Wachsmuth v.
City of Powell, et al.

Alan Kent
November 22, 2010

ALAN KENT - November 22, 2010                                Page 93
Direct Examination by Mr. Gosman

1   Q. Did you communicate with Chief Feathers
2   regarding the finalized plans that evening?
3   A. Yes.
4   Q. And what did you tell him?
5   A. I don't recall specifically. But I laid out
6   what we were going to do.
7   Q. All right. And was that -- what you laid out
8   for him, was that the information that you had received
9   from Chretien as to what the plan would be and how it
10  would proceed?
11  A. Yes.
12  Q. Did he have a veto power over the execution
13  of this plan?
14      MR. THOMPSON: Objection as to form.
15      MS. WESTBY: Join.
16      THE WITNESS: Yes.
17  BY MR. GOSMAN:
18  Q. Did he specifically approve this plan after
19  you explained it to him?
20  A. Yes.
21  Q. When did you visit with him about this and
22  attain his approval?
23  A. Sometime during the evening before the
24  warrant was served.
25  Q. Was it before the meeting with the police

ALAN KENT - November 22, 2010                                Page 94
Direct Examination by Mr. Gosman

1   officers?
2   A. It was ongoing through the whole evening. I
3   was in communication --
4   Q. Yeah, but --
5   A. -- with the chief.
6   Q. -- I didn't ask you that question.
7       MS. WESTBY: You need to let him finish his
8   answer.
9   BY MR. GOSMAN:
10  Q. Did you communicate with Chief Feathers about
11  the elements of the plan before the meeting where the
12  police officers were all called down to the station?
13  A. Yes.
14  Q. Let's go ahead and take a look at Exhibit 10
15  for a moment. There is a list of officers on the upper
16  left-hand corner and a description of their positions
17  in this warrant service, the roles that they were going
18  to play.
19      Is that list accurate as far as you remember
20  it?
21  A. As far as I remember it.
22  Q. Let me back up for just a second and ask you
23  this: Were you in communication with Sergeant Eckerdt
24  that evening before you met at the police station?
25  A. Before we met downstairs?

ALAN KENT - November 22, 2010                                Page 95
Direct Examination by Mr. Gosman

1   Q. Yes.
2   A. When I called him in.
3   Q. And that was before -- that was to let him
4   know that you wanted him to come down to the station?
5   A. Yes.
6   Q. So Officer Eckerdt wasn't involved in the
7   planning of the search warrant, correct?
8   A. Well, I think he was involved.
9   Q. How?
10  A. Well, I know for one thing, he informed us
11  that there was a picture on the social networking site
12  of Bret Wachsmuth with a M16, M4 military type and
13  wearing a bullet resistant vest. I remember him making
14  us aware of that.
15  Q. Okay. And did you think that was
16  significant?
17  A. Yes.
18  Q. All right. And what did he say about it?
19  A. That he saw it on the website. And he talked
20  to Tom about it that -- that it probably wasn't
21  appropriate for a drug agent's son to be on a website
22  with that. And I think it was taken down.
23  Q. Do you remember him telling you that?
24  A. Yes.
25  Q. All right. And I think you just told me a

ALAN KENT - November 22, 2010                                Page 96
Direct Examination by Mr. Gosman

1   minute ago that you first talked to Sergeant Eckerdt
2   when you called him to tell him to come down to the
3   police station, correct?
4   A. Yes.
5   Q. All right. And so you didn't actually visit
6   with Sergeant Eckerdt about this photo until after he
7   arrived at the police station that night, along with
8   the other officers, correct?
9   A. Correct.
10  Q. Hadn't you already made up your mind that you
11  were going to do a dynamic entry at that point?
12  A. No.
13      MR. THOMPSON: Objection as to form.
14  BY MR. GOSMAN:
15  Q. What were the other options that were
16  considered?
17  A. The chief and I talked about getting Tom
18  involved.
19  Q. And that was earlier in the afternoon,
20  correct?
21  A. It was ongoing through the whole evening.
22  Q. Well, you first started talking about that
23  earlier in the afternoon, correct?
24  A. When we first started, but it was ongoing
25  through the whole evening.

ALAN KENT - November 22, 2010                                    Page 97
Direct Examination by Mr. Gosman

1  Q. All right. You discussed with Chief Feathers
2  earlier in the afternoon the possibility of getting Tom
3  Wachsmuth involved in the case, correct?
4  A. Yes, along with other options.
5  Q. And he told you that he didn't want this case
6  to be treated any differently than any other case at
7  that time, correct?
8  A. Well, I know that he had conversations with
9  Tom's boss, Steve Hermann about it. And they made the
10 decision that Tom wasn't going to be involved.
11 Q. And he told you that?
12 A. Yes.
13 Q. All right. And did he tell you that in the
14 afternoon?
15 A. He told me that some point during the
16 evening -- afternoon, evening -- somewhere in there
17 after he contacted Agent Hermann.
18 Q. Okay. Who is Agent Hermann?
19 A. He's the agent in charge -- he's the
20 northwest enforcement team leader for the local DCI
21 office. He oversees this office and Riverton and Park,
22 Washakie, Big Horn and Hot Springs County and Fremont
23 County.
24 Q. What's his name, again?
25 A. Steve Hermann.

ALAN KENT - November 22, 2010                                    Page 98
Direct Examination by Mr. Gosman

1  Q. Okay. Was he Bret Wachsmuth's supervisor, as
2  you know?
3  MR. THOMPSON: You mean Tom Wachsmuth?
4  BY MR. GOSMAN:
5  Q. I'm sorry, Tom Wachsmuth's.
6  A. He is Tom Wachsmuth's supervisor.
7  Q. Okay. So what other alternatives were
8  discussed that night?
9  A. There was an alternative of maybe getting him
10 out of the house on the pretense of having somebody go
11 meet him for a drink, dinner
12 Q. Who was this conversation with?
13 A. The chief.
14 Q. Okay.
15 A. There was talk of knock and talk.
16 Q. Those all sound pretty reasonable to me.
17 Why weren't any of those measures attempted
18 first before we had the door rammed in and the dynamic
19 entry?
20 A. I think it was the -- the thing with Tom, he
21 wasn't involved because that was the decision made by
22 my boss and his boss.
23 The knock and talk, I remember talking to the
24 chief about that, where if we sent somebody to the door
25 and a guy inside may be high, carrying a gun, is a

ALAN KENT - November 22, 2010                                    Page 99
Direct Examination by Mr. Gosman

1  peeper, paranoid, has mental issues, it may be tough to
2  find a volunteer to go knock on the door, and I agreed
3  with that.
4  Q. All right. Well, let's stop there for a
5  second.
6  Did we have any objective evidence that Bret
7  Wachsmuth had ever committed a crime of violence in his
8  life?
9  A. I didn't know Bret Wachsmuth. So, no, I
10 don't have any --
11 Q. Well, you know, if you're talking about
12 whether or not you're going to go to the door with an
13 officer and knock on it and just visit with the man,
14 and you're worried about the fact that he's been
15 reported as being paranoid, wouldn't it be important to
16 find out whether he had any history of violence in his
17 life?
18 MS. WESTBY: Object to the form of the
19 question.
20 MR. THOMPSON: Argumentative.
21 BY MR. GOSMAN:
22 Q. That's something you'd want to know before
23 you make a final decision about how to go about this
24 search warrant, correct?
25 A. Well, I know that Officer Lara talked to Tom,

ALAN KENT - November 22, 2010                                   Page 100
Direct Examination by Mr. Gosman

1  and they discussed Bret's mental issues. That was a
2  concern.
3  Q. Well, but my question was: Did you -- or did
4  anybody bother to find out whether Bret Wachsmuth had
5  any history of violence?
6  MR. THOMPSON: Objection as to form.
7  MS. WESTBY: Join.
8  THE WITNESS: By running a criminal history
9  or something?
10 BY MR. GOSMAN:
11 Q. Yes.
12 A. I mean, it's tough to talk to his dad since
13 we weren't going to get him involved.
14 Q. Well, actually, was there any real reason why
15 you couldn't have talked to his dad and asked him about
16 that? Asked him the kind of threat his son posed?
17 MR. THOMPSON: Objection as to form.
18 MS. WESTBY: Join.
19 THE WITNESS: I would think a trained drug
20 officer would be curious of why the police are calling
21 to ask if his son's violent.
22 BY MR. GOSMAN:
23 Q. Why would that be so strange?
24 A. I know that --
25 Q. You're going to serve a warrant on his house.

ALAN KENT - November 22, 2010                    Page 101
Direct Examination by Mr. Gosman

1   A.  If somebody called me, a police officer, and
2   asked me if my son was violen , I would want to know
3   why.
4   Q.  Sure.  And what's wrong with telling him?
5   A.  That we're going to serve a search warrant on
6   his house?
7   Q.  Yeah, exactly.
8   A.  Because the decision was made not to get him
9   involved.
10  Q.  Well, that doesn't involve him necessarily in
11  terms of having him come down to the house and get in
12  the way.
13  A.  Well, what's to keep him from coming to the
14  house?
15  Q.  All right.  So you're telling me that rather
16  than call Tom Wachsmuth, the boy's father, who you knew
17  was a reputable peace officer in this area, to find out
18  whether or not Bret Wachsmuth posed a danger and
19  whether there was anything he might be able to do to
20  help diffuse the situation, you elected to completely
21  forego that possibility simply because you didn't want
22  to have Tom Wachsmuth involved in the case?
23       MR. THOMPSON: Objection as to form.
24       MS. WESTBY: Objection as to form of the
25  question.  That completely misstates the testimony.

ALAN KENT - November 22, 2010                    Page 102
Direct Examination by Mr. Gosman

1        MR. THOMPSON: Join.
2        THE WITNESS: I'm not sure of the question
3   you're asking.
4   BY MR. GOSMAN:
5   Q.  You elected to forego any communication with
6   Tom Wachsmuth simply because he was a law enforcement
7   officer, correct?
8   A.  No.
9        MR. THOMPSON: Objection as to form.
10  BY MR. GOSMAN:
11  Q.  What were the other reasons?
12  A.  He was Bret's father.
13  Q.  All right.  He was Bret's father and he was a
14  law enforcement officer.
15       But let me ask this question:  Would you have
16  consulted with the father of someone else in
17  circumstances like this if it wasn't a police officer?
18  A.  No.
19  Q.  You would never do that?
20  A.  Not if we were going to serve a search
21  warrant, no.
22  Q.  All right.  And so in lieu of that, you
23  assembled 11 police officers and knocked the door down,
24  correct?
25       MS. WESTBY: Object to the form of the

ALAN KENT - November 22, 2010                    Page 103
Direct Examination by Mr. Gosman

1   question.
2   BY MR. GOSMAN:
3   Q.  Now, if we wait, what is the safest approach?
4   A.  We knocked the door down pursuant to a search
5   warrant, yes.
6   Q.  Yes.  And you entered the house with loaded
7   semiautomatic rifles.  Correct?
8   A.  Correct.
9   Q.  And a flashbang device was deployed into a
10  bedroom window, and you were there when that happened,
11  correct?
12  A.  Yes.
13  Q.  And in your mind, it was a safer procedure to
14  go forward with that -- with what happened that night
15  than it was to simply call Tom Wachsmuth or if it had
16  been someone else, their father, and if you knew that
17  they were reliable and could be trusted and visit with
18  them about helping you serve this warrant?
19       MR. THOMPSON: Objection as to form.
20       MS. WESTBY: Join.
21       MR. THOMPSON: Asked and answered, misstates
22  the testimony.
23       MS. WESTBY: Join.
24       THE WITNESS: For the safety of the officers,
25  for the residents, and because I had already talked to

ALAN KENT - November 22, 2010                    Page 104
Direct Examination by Mr. Gosman

1   the chief, who was in communication with Tom's boss,
2   that was the decision that was made, yes.
3   BY MR. GOSMAN:
4   Q.  All right.  Well, the safety of the officers
5   is certainly important, correct?
6   A.  Uh-huh.
7   Q.  And the safety of the occupants of the house?
8   A.  Yes.
9   Q.  And certainly, the safety of all occupants is
10  threatened in a normal situation when you enter a home
11  with armed officers in a dynamic entry situation as
12  opposed to just knocking on the door, unless there's a
13  real reason why you don't just knock on the door.
14       MS. WESTBY: Okay.  Enough.  Object to the
15  form of the question.  It -- I don't know if you
16  haven't read the law, if you don't have any idea of
17  what it is that you're talking about.  But you're
18  misstating the law in your questions, which I guess I
19  don't really care about.  But you're also being
20  absolutely, unreasonably argumentative and awful with
21  these witnesses.  So please refrain.
22  BY MR. GOSMAN:
23  Q.  Officer Kent --
24       MR. THOMPSON: He needs to take a break.
25       MR. GOSMAN: Oh, sure.

ALAN KENT - November 22, 2010                                          Page 105
Direct Examination by Mr. Gosman

1        (Recess taken 3:01 to 3:11
2        p.m., November 22, 2010)
3        MR. GOSMAN: Okay  Go ahead and read the
4    last question if you could, please.
5        (The record was read as
6        requested.)
7    BY MR. GOSMAN:
8    Q.   That's a question to you, sir.
9        MR. THOMPSON: Object as to the form.
10       MS. WESTBY: Join.
11       THE WITNESS: We considered all the options
12   and with all the circumstances that we knew at the time
13   that was the best option.
14   BY MR. GOSMAN:
15   Q.   And those were the circumstances that the
16   confidential informant had related to Officer Miner
17   about Bret Wachsmuth, correct?
18   A.   The concerns we had, yes.
19   Q.   Is there some kind of rule as a police
20   officer that you don't involve the public in assisting
21   in relatives, family members  et cetera, if it can be
22   accomplished safely?
23   A.   I don't know what you're trying to ask there.
24   I mean, is there a rule?
25   Q.   Yeah -- yes, is there a rule?

ALAN KENT - November 22, 2010                                          Page 106
Direct Examination by Mr. Gosman

1    A.   That we can't call the parents?
2    Q.   Yes.
3    A.   Well, when my Chief and Tom's boss say not
4    to, then I consider that a rule to me.
5    Q.   All right.  And I am in perfect agreement
6    with that.  I want to know if there's any other
7    protocol that you're aware of as a law enforcement
8    officer in your career that says you just don't do
9    that?
10   A.   When you're serving a warrant, no.
11   Q.   When you're serving a warrant.  What is your
12   answer?
13   A.   When you're serving a warrant, you're not
14   going to call the parents or the relatives to tip off
15   the people that you're serving the warrant on.
16   Q.   Okay.  And that's based on your training as a
17   law enforcement officer?
18   A.   That and common sense.
19   Q.   Okay.  One of the other thoughts that you had
20   was just simply knocking on the -- or one of the
21   thoughts that you had was seeing if you could get Bret
22   Wachsmuth out of the house.  What happened to that
23   idea?
24   A.   That was one of the options that was
25   discussed, and we decided to do it the way we did it.

ALAN KENT - November 22, 2010                                          Page 107
Direct Examination by Mr. Gosman

1    Q.   Okay.
2        All right.  Now, were there any other options
3    that you discussed, other than calling Mr. Wachsmuth,
4    Sr., and inviting him to call his son out or provide
5    information about his actual threat status to his
6    officers?
7        Using a ruse to bring him out of the house
8    and get him to a bar, for instance, or just going to
9    the door and knocking on it, were there any other
10   options that were discussed?
11       MS. WESTBY: Object to the form of the
12   question.  Misstates the testimony.
13       MR. THOMPSON: Join.
14       THE WITNESS: Not that I recall, other than
15   serving the warrant.
16   BY MR. GOSMAN:
17   Q.   Okay.  And let's go to Exhibit 10 again for a
18   moment.  And I want you to tell me if there's any
19   reference in Exhibit 10 to any of those alternatives
20   being discussed.
21   A.   Not that I can see.
22   Q.   Were they discussed at that meeting that
23   Marissa Torczon was at?
24   A.   They were discussed between -- I don't know
25   if they were discussed at that meeting.  They were

ALAN KENT - November 22, 2010                                          Page 108
Direct Examination by Mr. Gosman

1    discussed between myself and the Chief.
2    Q.   All right.  Let's go to Exhibit 16.  And we
3    have officer -- Sergeant Chretien's report.  And --
4    one, two, three, four -- four paragraphs down, it's
5    just a very short paragraph, I think it's two
6    sentences.  Would you read that into the record,
7    please?
8    A.   Is that the one that starts "Based on the
9    information received"?
10   Q.   Yes.
11   A.   "Based on the information received and my
12   knowledge, training and experience on numerous narcotic
13   search warrants, I decided to take extra precautions to
14   minimize the chance of someone getting hurt.
15       These extra precautions included planning
16   multiple breaches simultaneously, using as many
17   officers I had available and introducing a noise flash
18   distraction device, NFDD, or flashbang."
19   Q.   Okay.  Can you tell me how many times the
20   Powell Police Department has trained for situations
21   involving multiple breaches simultaneously using as
22   many officers as you have -- as were available and
23   introducing a noise flash distraction device?
24   A.   We have trained on it.  I can't give you a
25   number.

1    Q.  All right.  So is there any reference in
2    there to other considerations being made or entering
3    into the decision that Officer Chretien was involved
4    with here?
5    A.  Not in Officer Chretien's report -- Sergeant
6    Chretien's report.
7    Q.  So those were things that you were weighing
8    with the Chief before the decision was finally made to
9    go ahead with this dynamic entry; is that correct?
10   A.  Sergeant Chretien would have been involved in
11   those considerations also.
12   Q.  He doesn't mention any of them in his report,
13   though, does he?
14   A.  Not that I see, no.
15   Q.  Did you know that Lt. Patterson had suggested
16   that Tom Wachsmuth perhaps be consulted in this case in
17   order to avoid having to use a SWAT team to go into his
18   son's home?
19   A.  Not until later when I read his report.
20   Q.  Do you remember a discussion that Tom
21   Wachsmuth was to be held at bay if he came down to the
22   police station that night?
23   A.  Be held at bay?
24   Q.  Or to be kept from what was going on?
25        I think -- let's look at Exhibit 10 and see

1    what it says exactly.
2        "Tom Wachsmuth stays in lobby."  Do you
3    remember discussing that?
4    A.  Not specifically, no.
5    Q.  In fact, wasn't it Lt. Patterson that first
6    came up with the idea of involving Tom Wachsmuth?
7    A.  I said a minute ago I don't know what his --
8    conversation until I read his report.
9    Q.  Well, how did the subject of Tom Wachsmuth
10   come up as you remember it?
11   A.  What part of the subject are you talking
12   about?
13   Q.  About whether or not he should be consulted
14   in this case.
15   A.  That would be a standard question that --
16   when you're running all the scenarios through your
17   head.
18   Q.  Well, why would it be a standard question if
19   you never do something like that when you serve a
20   warrant?
21   A.  Well, if we never do it, it doesn't mean we
22   don't talk about it.
23   Q.  Oh, I see.
24        I want you to turn to Exhibit 29 for just a
25   moment.

1        (Exhibit 29 identified)
2    BY MR. GOSMAN:
3    Q.  Have you ever seen that document before?
4    A.  Yes.
5    Q.  What is it?
6    A.  It's a crisis response tactics training from
7    the Powell Police Department.
8    Q.  Have you taken it?
9    A.  Yeah.
10   Q.  Is it part of the Powell Police Department
11   policies regarding crisis response?
12   A.  No, it's a training document.
13   Q.  Okay.  Let's go to page 18 of that document
14   for a moment.  See the heading there, "Dynamic"?
15   A.  Yes.
16   Q.  And there's an introduction, do you see that?
17   A.  Yes.
18   Q.  And in the introduction it describes the
19   levels of response that are appropriate in a given
20   situation.  Correct?
21   A.  Yes.
22   Q.  Have you ever heard of the force continuum?
23   A.  Yes.
24   Q.  What is it?  What do you understand that term
25   to mean?

1    A.  Well, it's -- it's a level of force that we'd
2    use in a given instance for resistance or threats
3    against you.
4    Q.  All right.  And so it goes up as the threat
5    increases, correct?
6    A.  Yes.
7    Q.  All right.  And is it true that in every
8    situation, if the force -- or if the threat is low, the
9    force should also be low?
10        MS. WESTBY: Object to the form of the
11   question.
12        MR. THOMPSON: Join.
13        MS. WESTBY: That completely misstates the
14   law.
15        MR. GOSMAN: I'm not talking about the law.
16   I'm talking about the force continuum.
17        MS. WESTBY: And I'm objecting as to the fact
18   that your question --
19        MR. GOSMAN: And that misstates the law.
20   That's your testimony here today?
21        THE WITNESS: What is the question?
22   BY MR. GOSMAN:
23   Q.  If the threat is low, then the force should
24   also be low to meet the threat, correct?
25        MS. WESTBY: Object to the form of the

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 31 of 67

Tricia Wachsmuth v.                                                                    Alan Kent
City of Powell, et al.                                                          November 22, 2010

ALAN KENT - November 22, 2010                    Page 113
Direct Examination by Mr. Gosman

1  question.
2        MR. THOMPSON: Join.
3        THE WITNESS: Correct.
4  BY MR. GOSMAN:
5     Q.  All right. And it's only when the threat
6  becomes higher that you would move into a situation
7  where you would employ something like a dynamic entry?
8     A.  Well, any amount of force can escalate and
9  then de-escalate also.
10    Q.  All right. Well, let me have the reporter
11  read my question back.
12              (The record was read as
13              requested.)
14        THE WITNESS: Yes.
15  BY MR. GOSMAN:
16    Q.  And in these training materials that we're
17  looking at right now from Exhibit 29, under paragraph
18  B, it says "Why dynamic," and then it lists the reasons
19  why you would utilize a dynamic entry, correct?
20    A.  Uh-huh.
21    Q.  If life is threatened?
22    A.  Yes.
23    Q.  Suicide or harm to others?
24    A.  Yes.
25    Q.  And let's go ahead and talk about the second

ALAN KENT - November 22, 2010                    Page 114
Direct Examination by Mr. Gosman

1  paragraph. If evidence may be destroyed or, for
2  instance -- and then under subparagraph A, in a drug
3  arrest; was that a concern in this case?
4     A.  It could have been a concern that the
5  evidence was destroyed.
6     Q.  I don't care about what it could have been.
7  Was it a concern in this case?
8        MS. WESTBY: Object to the form of the
9  question.
10        MR. THOMPSON: Counsel, you're arguing and
11  badgering the witness.
12        MR. GOSMAN: All right. I'll try to keep
13  that in mind. I will. Thank you.
14  BY MR. GOSMAN:
15    Q.  Was it a concern in this case, Officer?
16    A.  Yes, we were serving a drug warrant.
17    Q.  Did anybody say that there was a threat to
18  destruction of evidence in this case in any of these
19  conversations that you had leading up to the actual
20  service of this warrant?
21    A.  Did anybody say it specifically?
22    Q.  Yeah.
23    A.  No.
24    Q.  How easy is it to dispose of 11 to 15
25  marijuana plants in the time it takes to knock on the

ALAN KENT - November 22, 2010                    Page 115
Direct Examination by Mr. Gosman

1  door and wait for somebody to answer it?
2     A.  You can do a lot of things with it in a
3  matter of seconds. You can flush it down the toilet --
4     Q.  Oh, really?
5     A.  -- there's all kinds of stuff.
6     Q.  You can flush --
7        MS. WESTBY: Excuse me. The witness is
8  trying to answer your question. Please do not
9  interrupt.
10  BY MR. GOSMAN:
11    Q.  So it's your testimony that you could flush
12  11 to 15 plants down the toilet in a matter of seconds?
13        MS. WESTBY: Object to the form of the
14  question.
15        THE WITNESS: Before you make it to the
16  basement, yes. You can throw them in the furnace. You
17  can run up the stairs and --
18  BY MR. GOSMAN:
19    Q.  Throw them in the furnace? How do you throw
20  11 to 15 marijuana plants in the typical home furnace?
21    A.  Well, I've got a wood stove at my house, so I
22  can throw it in the wood stove. A lot of people in
23  Wyoming have wood stoves. So you can throw it in a
24  wood stove type furnace.
25

ALAN KENT - November 22, 2010                    Page 116
Direct Examination by Mr. Gosman

1     Q.  All right. Was life threatened in the
2  service of the Wachsmuth warrant?
3     A.  No.
4     Q.  Did you know whether Bret Wachsmuth had any
5  prior criminal history whatsoever?
6     A.  No, I think -- I believe I answered no when
7  you asked that earlier.
8     Q.  No, I asked you if you were aware of whether
9  he had any history of violence.
10    A.  Okay. No.
11    Q.  And you didn't know whether he had any
12  history of violence and you didn't know whether he had
13  any criminal history?
14    A.  No.
15    Q.  Do you understand the difference between
16  being a violent person and being a depressed person?
17    A.  Yes.
18        MS. WESTBY: Object to the form of the
19  question.
20  BY MR. GOSMAN:
21    Q.  And do you understand the difference between
22  being a paranoid person and being a violent person?
23    A.  Yes.
24    Q.  So what evidence was there that day that Bret
25  Wachsmuth was a violent person?

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 32 of 67
Tricia Wachsmuth v.                                                    Alan Kent
City of Powell, et al.                                      November 22, 2010

ALAN KENT - November 22, 2010                                Page 117
Direct Examination by Mr. Gosman

1    MS. WESTBY: Object to the form of the
2  question.
3    MR. THOMPSON: Join.
4    THE WITNESS: I've dealt with depressed
5  people that have been violent in my experience.
6  BY MR. GOSMAN:
7    Q. And you've probably dealt with Caucasians
8  that have been violent and Hispanics that have been
9  violent, too?
10   A. Yes.
11   Q. So that doesn't really -- the fact that he
12 was depressed does not mean he was violent, correct?
13   MS. WESTBY: Object to the form of the
14 question.
15   MR. THOMPSON: Join.
16   THE WITNESS: All I can go by is my
17 experience. I've dealt with depressed people that have
18 been violent.
19 BY MR. GOSMAN:
20   Q. The question is, and I think you've already
21 answered it: Depression is not synonymous with
22 violence, correct?
23   A. Not synonymous, no.
24   Q. All right. And what you were interested in
25 and what you needed to know was whether Bret Wachsmuth

ALAN KENT - November 22, 2010                                Page 118
Direct Examination by Mr. Gosman

1  was a violent person, correct?
2    A. Yes.
3    MS. WESTBY: Object to the form of the
4  question.
5  BY MR. GOSMAN:
6    Q. Because if he wasn't a violent person, he
7  probably wasn't a threat to the officers, correct?
8    MS. WESTBY: Object to the form of the
9  question.
10 BY MR. GOSMAN:
11   Q. Unless there was some other special
12 circumstance that you were aware of, suicide or
13 something like that?
14   MS. WESTBY: Same objection.
15   THE WITNESS: Based on what we knew, the
16 totality of the circumstances, the information we had
17 from the confidential informant --
18 BY MR. GOSMAN:
19   Q. Was that he was depressed?
20   A. Was that he was depressed, that he had guns,
21 that he was a peeper, that he was taking narcotics that
22 he was getting in the mail, that he knew that we were
23 coming.
24   The whole situation rolled into one big
25 package, that's what we -- the information we were

ALAN KENT - November 22, 2010                                Page 119
Direct Examination by Mr. Gosman

1  going off of.
2    Q. All right. Does the fact that a person looks
3  out his window mean that he's violent?
4    A. When he's looking out his window to see if
5  the cops are coming or if the bad guys are coming.
6    Q. Well, is there any evidence that that's why
7  Bret Wachsmuth looked out the windows?
8    A. That's the impression I got when they said he
9  was a peeper.
10   Q. But you didn't have any other information in
11 the fact that you were told that he was a peeper,
12 correct?
13   MS. WESTBY: Object to the form of the
14 question.
15   THE WITNESS: I'm not sure where you're going
16 with this because, I mean, that was the information we
17 got from the confidential informant.
18 BY MR. GOSMAN:
19   Q. That he was a peeper; that he looked out his
20 window?
21   A. Looking for people that were coming to his
22 house, such as the cops and the bad guys.
23   Q. All right. So did Bret Wachsmuth -- was
24 there any specific evidence that Bret Wachsmuth was
25 using large quantities of prescription medication?

ALAN KENT - November 22, 2010                                Page 120
Direct Examination by Mr. Gosman

1    MR. THOMPSON: Objection as to form.
2    MS. WESTBY: Join.
3    THE WITNESS: The information that the CI
4  provided.
5  BY MR. GOSMAN:
6    Q. Well -- and I'd prefer if we could, to go to
7  the record for that information. Why don't we take a
8  look at Exhibit 13. And I want you to tell me if
9  there's any reference in there to Mr. Wachsmuth
10 using -- okay, other drugs. And as a matter of fact, I
11 just found it myself. So it's on page 4.
12   The Wachsmuths would take these controlled
13 substances, either by crushing the pills or snorting
14 them or by injecting the controlled substances with
15 needles. This is according to the CI.
16   Now, is there anything about the fact that
17 someone is taking a controlled substance that indicates
18 that they are violent and represent a threat to police
19 officers?
20   A. It depends on what they are taking.
21   Q. Okay. Well, it looks like it's mostly
22 oxycodone and morphine.
23   A. Okay.
24   Q. All right. Do people who take oxycodone and
25 morphine become violent towards police officers?

ALAN KENT - November 22, 2010                          Page 121
Direct Examination by Mr. Gosman

1   A.  They can.
2   Q.  Well, if they took methamphetamine, they
3   might be more inclined to be violent; isn't that true?
4   A.  More inclined, yes.  But any narcotic can
5   trigger violent responses.
6   Q.  All right.  So I've heard you say, and I've
7   heard every officer in these depositions say over and
8   over again the totality of the circumstances, but I
9   want to take each one of these circumstances
10  individually.  And I want you to tell me what it is
11  about the fact that Bret Wachsmuth was known to take
12  pills that's in and of itself indicated that he was a
13  threat to the safety of anyone else in that home or to
14  the police officers who might come to the door to
15  execute a search warrant.
16  A.  It depends, I suppose, on the amount of pills
17  he took.  But taking narcotics can make you violent.
18  Q.  Well, if he took a lot of oxycodone or
19  morphine, he certainly wouldn't be violent, he'd be
20  lethargic, wouldn't he?
21  A.  Probably be in a coma.
22  Q.  Yeah.  So the question remains:  Is there
23  anything in the evidence that Bret Wachsmuth was taking
24  prescription medication that would support the
25  inference that he was a violent person and represented

ALAN KENT - November 22, 2010                          Page 122
Direct Examination by Mr. Gosman

1   a threat to police officers?
2   MS. WESTBY: Other than the fact that he's
3   committing a crime?
4   MR. GOSMAN: I'm asking the questions, thank
5   you.
6   MR. THOMPSON: Objection as to form.  Asked
7   and answered.
8   THE WITNESS: If you take narcotics, you can
9   be violent.  I don't know how else to answer that.
10  BY MR. GOSMAN:
11  Q.  All right.  Was there any evidence that Bret
12  Wachsmuth had ever taken narcotic medication and had
13  been violent in the past?  Any specific instance?
14  A.  I'd never met him before.  So, no, not to my
15  knowledge.
16  Q.  And the confidential informant had no
17  specific information about Bret Wachsmuth being violent
18  at any time; isn't that true?
19  MR. THOMPSON: Objection as to form.
20  MS. WESTBY: Join.
21  THE WITNESS: I believe there was a statement
22  somewhere that the confidential informant was afraid of
23  him.
24  BY MR. GOSMAN:
25  Q.  Where is that?

ALAN KENT - November 22, 2010                          Page 123
Direct Examination by Mr. Gosman

1   A.  I don't remember if it's written down in a
2   report or if I recall --
3   Q.  All right.  We're not going to waste time
4   tracking that one down.  I'm talking about specific
5   instances where Bret Wachsmuth had, because of his
6   narcotic use or because of the fact that he peeped out
7   windows, had ever been violent or threatened violence
8   to any person?
9   A.  Not to my knowledge, no.
10  Q.  Bret Wachsmuth had loaded -- there was
11  information from the confidential informant that he had
12  loaded guns in his house, correct?
13  A.  Yes.
14  Q.  Do you have loaded guns in your house?
15  A.  Yes.  But I don't use drugs.
16  Q.  Okay.  Do you know whether having loaded guns
17  in your house in and of itself poses any objective
18  danger to police officers who would be serving a
19  warrant?
20  MS. WESTBY: Object to the form of the
21  question.
22  MR. THOMPSON: Join.
23  THE WITNESS: If there's loaded guns in the
24  house and you're serving a search warrant, that would
25  be a danger to police officers?  Certainly.

ALAN KENT - November 22, 2010                          Page 124
Direct Examination by Mr. Gosman

1   Q.  Why?
2   A.  Because they could be used against you.
3   Q.  Well, of course they could be used against
4   you, but there has to be some evidence that they may be
5   used against you, isn't that true, in order for it to
6   be a threat of violence?
7   MS. WESTBY: Object to the form of the
8   question.
9   THE WITNESS: Other than somebody pointing it
10  at you, I don't know what you're going for here.
11  Because if somebody has a gun in their house, you're
12  serving a search warrant, they can use that gun against
13  you.
14  BY MR. GOSMAN:
15  Q.  All right.  Would that be the basis for a
16  dynamic entry, the fact that they have a gun in their
17  house?
18  MR. THOMPSON: Objection as to form.
19  MS. WESTBY: Join.
20  THE WITNESS: Our entry was to serve a search
21  warrant.
22  BY MR. GOSMAN:
23  Q.  It was a dynamic entry?
24  A.  When nobody answered the door it became a
25  dynamic entry, yes.  But it was to serve a search

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 34 of 67
Tricia Wachsmuth v.                                                      Alan Kent
City of Powell, et al.                                              November 22, 2010

| ALAN KENT - November 22, 2010 Page 125 | ALAN KENT - November 22, 2010 Page 127 |
|---|---|
| Direct Examination by Mr. Gosman | Direct Examination by Mr. Gosman |

ALAN KENT - November 22, 2010                                  Page 125
Direct Examination by Mr. Gosman

1   warrant.
2       Q.  I see.  Well, it was a dynamic entry.  It was
3   planned as a dynamic entry, and the question is:  Does
4   the fact that someone has a gun in their house justify
5   that rising level of forcing the -- in the force
6   continuum?
7           MS. WESTBY: Object to the form of the
8   question.  Misstates his testimony.  You can't just
9   change his testimony because you don't like it.
10          MR. THOMPSON: Join.
11          THE WITNESS: That he had guns in the house
12  and with everything else, that was the reason the
13  decision was made to do what we did.
14  BY MR. GOSMAN:
15      Q.  And everything else included the fact that
16  you knew that he was -- or you heard that he was
17  depressed, paranoid, and peeped out his windows?
18      A.  And he had guns in the house, he used
19  narcotics, he knew we were coming.  There's a picture
20  of him on the Internet of him wearing a vest carrying a
21  military style weapon.  I mean, you take it all and add
22  it together and, yes, we were concerned.
23  BY MR. GOSMAN:
24      Q.  What if we take away a couple of those
25  things.  What if we take away, for instance, the fact

ALAN KENT - November 22, 2010                                  Page 127
Direct Examination by Mr. Gosman

1       A.  Paragraph C, you said?
2       Q.  Yes.
3       A.  Okay.
4       Q.  Okay, the traditional slow methodical
5   approach has as its primary objective officer safety.
6   Do you agree with that?
7       A.  Depending on the situation.
8       Q.  Well, do you agree with that or not?
9       A.  Depending on the situation.
10      Q.  As you move up the continuum, your primary
11  objective changes to apprehension of the suspect.
12          Do you agree with that, we're talking about
13  the force continuum?
14      A.  Yes.
15      Q.  At this point, you begin taking calculated
16  risks, correct?
17      A.  At which point?
18      Q.  At the point where you change the objective
19  and move up the continuum of force.
20      A.  I'm not sure I understand.
21      Q.  Any time you inject a dynamic entry into a
22  situation and you are having officers involved with
23  semiautomatic weapons, flashbang devices, et cetera,
24  the overwhelming show of force, you are moving up the
25  force continuum, yes?

ALAN KENT - November 22, 2010                                  Page 126
Direct Examination by Mr. Gosman

1   that Officer Lara testified concerning his knowledge of
2   Bret Wachsmuth, and that -- and Sergeant Eckerdt's
3   testimony regarding these photographs?
4           MR. THOMPSON: Objection as to form.
5   Relevance.
6   BY MR. GOSMAN:
7       Q.  Is there any substantive difference in your
8   mind between the scenario that would justify dynamic
9   entry --
10          MR. THOMPSON: Object.
11  BY MR. GOSMAN:
12      Q.  -- without those two pieces of evidence?
13          MR. THOMPSON: Objection as to form.
14          MS. WESTBY: Join.
15          THE WITNESS: I don't know how I could even
16  speculate on that.  I mean, I would have to guess.  How
17  do I guess -- I mean, if he came down and turned
18  himself in at the police department, then we wouldn't
19  have had to worry about any of this.  I mean, that
20  doesn't -- to me, that question doesn't make any sense.
21  BY MR. GOSMAN:
22      Q.  All right.  Okay.  Let's go ahead and look at
23  subparagraph C on page 18 of Exhibit 29.
24      A.  What page?
25      Q.  Eighteen.

ALAN KENT - November 22, 2010                                  Page 128
Direct Examination by Mr. Gosman

1       A.  Yes.
2       Q.  And when you do that, you begin taking
3   calculated risks.
4       A.  You take calculated risks that offset the
5   overall safety of the residents, the officers, and the
6   destruction of evidence.
7       Q.  So there must be some fairly significant
8   threat to the overall safety of the officers in order
9   for you to move up this continuum of force?
10      A.  On this particular search warrant, yes.
11      Q.  Okay.  Now, let's go ahead and take a look at
12  page 19, "Principles of Dynamic Entry."
13          Why don't you read the first three items that
14  are listed there.
15      A.  Surprise, speed, violence of action.
16      Q.  Okay.  And the violence of action is
17  countering the threat, the realistic threat of violence
18  coming from the suspect, correct?
19      A.  No.
20      Q.  What is it?
21      A.  Violence of action would be like rapid
22  movement, noise, distractions.
23      Q.  Right.  As part of the overwhelming show of
24  force?
25      A.  Yes.

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 35 of 67

Tricia Wachsmuth v.                                                                    Alan Kent
City of Powell, et al.                                                      November 22, 2010

ALAN KENT - November 22, 2010                          Page 129
Direct Examination by Mr. Gosman

1   Q. And those are designed to counter the threat
2   from a suspect?
3   A. Yes.
4   Q. And we have, then, under "Dynamic Tactics,"
5   the heading "Diversion Devices." And I want you to
6   read paragraph A into the record for me, please.
7   A. "A diversion device should be used when you
8   are sure or reasonably sure there is a subject in a
9   building that you feel is about to take his or her own
10  life and other persons' lives."
11  Q. Do you agree with that?
12  A. At the time this training was current, yes.
13  Q. Okay.
14  A. Since then it's been updated.
15  Q. Well, when did you take this training?
16  A. This particular training I took in 1995.
17  Q. Okay. How has it been updated?
18  A. Well, with the countermeasures training --
19  and the P.I.E.R. training that we had.
20  Q. Do you know whether the rules have changed
21  for the deployment of a diversion device?
22  A. This is a training manual. It's not a policy
23  manual. So the training has changed.
24  Q. How so?
25  A. On when to use a diversion device?

ALAN KENT - November 22, 2010                          Page 130
Direct Examination by Mr. Gosman

1   Q. Yes.
2   A. You use it -- in this case, on this
3   particular instance, we used it as a distraction device
4   in another room to keep people from going into that
5   room.
6   Q. How did you know the whole family wasn't in
7   that room?
8   A. There was no lights on in there. All the
9   lights were in the living room.
10  Q. Well, but when you planned to use the
11  diversion device, you didn't know that, correct?
12  A. No, but the bedroom is where the threat was,
13  the weapons.
14  Q. Okay. Then on page 5 of this document, let's
15  go ahead and go there for a moment. There's a list of
16  critical incidents, correct?
17  A. Yes.
18  Q. And under paragraph B on that page there is a
19  statement that's -- it's B1, why don't you read that
20  into the record.
21  A. "It would take a fully trained SWAT or
22  hostage rescue team to deal with many of these. As an
23  agency, we cannot justify a SWAT team by these types of
24  activity being commonly present here or by budgetary
25  means as SWAT teams require a great amount of training

ALAN KENT - November 22, 2010                          Page 131
Direct Examination by Mr. Gosman

1   time."
2   Q. Okay. And then read the first part of
3   paragraph 2.
4   A. "However, if you look at some of these types
5   of critical incidents, you will see that with
6   additional training in a few skilled areas our patrol
7   personnel would deal with it. Some of these are" --
8   Q. Do you know what additional training was made
9   available to the officers that were involved in this
10  dynamic entry that evening?
11      MR. THOMPSON: Objection as to form.
12      MS. WESTBY: Join.
13      THE WITNESS: Additional training?
14  BY MR. GOSMAN:
15  Q. Yes.
16  A. The countermeasures training.
17  Q. Is that it?
18  A. Plus the training that we do in-house.
19  Q. Was it Sergeant Chretien that assigned you
20  and Officer McCaslin to deploy the distraction device?
21  A. Yes.
22  Q. Did you have any input in that?
23  A. I agreed to it.
24  Q. Did you know that Officer McCaslin had only
25  deployed a device once during his training with

ALAN KENT - November 22, 2010                          Page 132
Direct Examination by Mr. Gosman

1   Countermeasures Tactical Institute?
2       MS. WESTBY: Object to the form of the
3   question. Misstates the testimony.
4       MR. THOMPSON: Join.
5       THE WITNESS: I don't know how many times
6   Officer McCaslin --
7   BY MR. GOSMAN:
8   Q. Did you ask him?
9   A. No.
10  Q. Why not?
11  A. Because nobody in the department has thrown
12  it more than two or three times total, or each officer.
13  So I would assume that he had probably not deployed one
14  more than two or three times.
15  Q. I thought you told me that you deployed one
16  numerous times over the course of the years with the
17  Powell Police Department?
18  A. I said I've been involved in the training.
19  I've thrown dummy ones. I've thrown live ones once.
20  Q. When did you do that?
21  A. At the countermeasures training at the range
22  in Cody.
23  Q. That was probably the same time McCaslin did
24  it.
25      Do you know if he was there with you during

Tricia Wachsmuth v.
City of Powell, et al.

**Alan Kent**
**November 22, 2010**

ALAN KENT - November 22, 2010                                    Page 133
Direct Examination by Mr. Gosman

1  that training session?
2  A.  I don't know if he was present.  Half the
3  department was.
4  Q.  All right.  So you've got a team that's been
5  assembled, and one of the functions of the team is to
6  deploy a distraction device and nobody has thrown one
7  more than two or three times, and you've only thrown a
8  live one once, correct?
9  A.  Up until this point, yeah.
10 Q.  All right.  And so was there any discussion
11 about how the diversionary device was to be deployed?
12 A.  Yes.
13 Q.  What was that discussion?
14 A.  That it was to be placed inside that room.
15 Q.  Who said that?
16 A.  Sergeant Chretien.
17 Q.  And did you have any input in that?
18 A.  I didn't have any input to offer, no.
19 Q.  How was it to be placed inside that room?
20 A.  Dropped in the window.
21 Q.  And was there any discussion about looking to
22 make sure that the device wasn t dropped on the head of
23 the child that may be in the room?
24     MR. THOMPSON: Objection as to form.
25     MS. WESTBY: Join.

ALAN KENT - November 22, 2010                                    Page 134
Direct Examination by Mr. Gosman

1      THE WITNESS: There was a discussion of
2  looking in the window, yes.
3  BY MR. GOSMAN:
4  Q.  Okay.  And, in fact, if the officer couldn't
5  see in the window, that would be a good reason for not
6  deploying the distraction device, wouldn't it?
7      MS. WESTBY: Object to the form of the
8  question.
9      MR. THOMPSON: Join.
10     THE WITNESS: He could see in the window.
11 BY MR. GOSMAN:
12 Q.  I didn't say that, though.  I said if you
13 could not see in the window, that would be a good
14 reason for not deploying the distraction device.
15     MS. WESTBY: Object to the form of the
16 question.
17     MR. THOMPSON: Join.
18     THE WITNESS: Yes.
19 BY MR. GOSMAN:
20 Q.  So could McCaslin see in the window?
21 A.  I don't know.  You'd have to ask McCaslin.
22 Q.  Well, you were there standing right next to
23 him, correct?
24 A.  Yes.
25 Q.  Could he see in the window?

ALAN KENT - November 22, 2010                                    Page 135
Direct Examination by Mr. Gosman

1      MR. THOMPSON: Objection as to form.  Asked
2  and answered.
3      MS. WESTBY: Join.
4      THE WITNESS: I know what I could see.
5  BY MR. GOSMAN:
6  Q.  You were the one that broke out the window,
7  correct?
8  A.  Yes.
9  Q.  How tall are you?
10 A.  Six-foot.
11 Q.  Did you look in the window?
12 A.  Yes.
13 Q.  How did you do that?
14 A.  I looked in the window.
15 Q.  Okay.  Who did you see?
16 A.  I saw -- first I saw the glass and the shade.
17 When I broke it and ripped the shade down, then I could
18 see the walls behind it.
19 Q.  Okay.  All right.  Could you see the bed
20 underneath the window?
21 A.  No.
22 Q.  Did you know the distraction device was being
23 placed in the middle of a bed in the bedroom?
24     MR. THOMPSON: Objection as to form.
25     MS. WESTBY: Join.

ALAN KENT - November 22, 2010                                    Page 136
Direct Examination by Mr. Gosman

1      THE WITNESS: I didn't know it was under the
2  window, no.
3  BY MR. GOSMAN:
4  Q.  Because you couldn't see it, correct?
5  A.  Not underneath the window, no.
6  Q.  The window was about 6 feet off the ground,
7  wasn't it?
8  A.  I don't recall.  It was about like this to
9  me.
10 Q.  Okay.  You left the station that evening
11 after the decision had been made to forego all the
12 other options that had been considered and to conduct
13 the dynamic entry; am I correct?
14 A.  We left the station to serve a search
15 warrant.
16 Q.  You left the station to serve a search
17 warrant.  And who were -- who did you go with to the
18 Wachsmuth residence?
19 A.  I drove my own car.
20 Q.  Was anyone with you?
21 A.  I believe McCaslin was with me.
22 Q.  Okay.  Did you and he have any discussion
23 about what you were going to do there that night?
24 A.  No, we knew what we were going to do.
25 Q.  And were you aware of the fact that you

Case 1:10-cv-00041-ABJ  Document 65-5  Filed 01/10/11  Page 37 of 67
Tricia Wachsmuth v.                                                                    Alan Kent
City of Powell, et al.                                                       November 22, 2010

| ALAN KENT - November 22, 2010          Page 137 | ALAN KENT - November 22, 2010          Page 139 |
|---|---|
| Direct Examination by Mr. Gosman | Direct Examination by Mr. Gosman |

**Page 137**

Direct Examination by Mr. Gosman

1  simply do not put a distraction device somewhere where
2  you don't know where it's going to go?
3          MS. WESTBY: Object to the form of the
4  question.
5          MR. THOMPSON: Join.
6  BY MR. GOSMAN:
7      Q. Isn't that part of your training?
8      A. No.
9      Q. So it's okay to throw a distraction device
10  blindly into a room?
11          MS. WESTBY: Object to the form of the
12  question.
13          MR. THOMPSON: Join.
14          THE WITNESS: Not to throw blindly. But
15  there may be circumstances where you don't know where
16  it's going to end up.
17  BY MR. GOSMAN:
18      Q. All right. But the point is that all of the
19  training materials for distraction devices indicate
20  that you should look before you throw the device at
21  where it's going to go, understanding that there may be
22  circumstances where it won't end up where you thought
23  it was going to go.
24      A. I don't know which training materials you're
25  talking about.

**Page 139**

Direct Examination by Mr. Gosman

1      Q. That's fine. But go ahead and put your name
2  there and also McCaslin's if he was with you.
3      A. (Witness complies.)
4      Q. Okay. Were you able to see the entry team?
5      A. Not while I was breaking the window, but they
6  were around the corner from me.
7      Q. Did you hear a dog bark as you drove up?
8      A. Yes.
9      Q. How did you react to that?
10      A. It worried me that they knew we were coming.
11      Q. And, of course, this is a knock-and-announce
12  warrant, right?
13      A. Yes.
14      Q. So you're going to knock on the door and
15  announce you're there?
16      A. Yes.
17      Q. So -- would have been, what, in another few
18  seconds from the time the dog started barking, correct?
19          MS. WESTBY: Object to the form of the
20  question.
21          MR. THOMPSON: Join.
22          THE WITNESS: It would have been when the
23  team got to the front door.
24  BY MR. GOSMAN:
25      Q. When did the dog start barking?

**Page 138**

Direct Examination by Mr. Gosman

1      Q. Well, is that true or not, based on the
2  training materials that you've viewed?
3      A. The only -- I don't remember seeing any
4  training materials on a distraction device.
5      Q. Okay. All right. Why don't we go ahead and
6  take a piece of paper, and let's make an exhibit and
7  identify this as Exhibit 53.
8          (Exhibit 53 identified)
9  BY MR. GOSMAN:
10      Q. And I'd like you to put a perimeter around
11  the lot of the Wachsmuth residence and the street
12  perhaps, and where you were when you arrived and when
13  you began executing this warrant.
14      A. You want me to draw a picture of the house?
15      Q. Yes. And there is a diagram there on
16  Exhibit 10 that contains an outline of the house.
17      A. (Witness complies.)
18      Q. Okay. Have you located yourself on the
19  diagram?
20      A. Oh, at which point?
21      Q. That would be when you first arrived.
22          And when I say first arrived, I don't mean
23  the moment, but as soon as you got out of the car and
24  got set up for what you were about to do.
25      A. Just with an X?

**Page 140**

Direct Examination by Mr. Gosman

1      A. As the team was approaching the door.
2      Q. So it was a matter of no more than a few
3  seconds --
4          MS. WESTBY: Objection.
5  BY MR. GOSMAN:
6      Q. -- before the team made it to the front door
7  after the dog started barking?
8          MS. WESTBY: Object to the form of the
9  question.
10          THE WITNESS: I don't have an idea about the
11  time. It wasn't very long.
12  BY MR. GOSMAN:
13      Q. Okay. Did you see the entry team approaching
14  the front door after the dog barked?
15      A. Yes, we were behind them.
16      Q. Did they hurry up?
17      A. They weren't running, but they were walking
18  quickly.
19      Q. Did they walk more quickly after they heard
20  the dog bark?
21      A. I don't know.
22      Q. Were you wearing protective armor that was
23  different from the typical vest that you wear every day
24  when you go out on patrol?
25      A. I was wearing my raid vest, yes.

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 38 of 67
Tricia Wachsmuth v.                                                    Alan Kent
City of Powell, et al.                                        November 22, 2010

1    Q. Okay. Was everyone else wearing those raid
2  vests, as you call them?
3    A. I don't know what everybody was wearing.
4  They should have been.
5    Q. And that's not something that they wear
6  normally, is that correct, on patrol?
7    A. No.
8    Q. And were you able to position yourself at the
9  window before the officers arrived at the porch and
10 announced their presence?
11   A. I believe we arrived right about the same
12 time.
13   Q. Did you hear them say "Police, search
14 warrant"?
15   A. Yes.
16   Q. And what did you -- did you hear the door
17 being rammed?
18   A. Yes.
19   Q. How much time elapsed?
20   A. I don't know.
21   Q. Were you surprised that the window was as
22 high as it was off the ground in the bedroom?
23   A. Not really. That style of house is pretty
24 common in Powell.
25   Q. Did you try to get on your tiptoes and look

1  in the window and look inside the window sill and down
2  at the area where the device was going to be deployed?
3    A. No.
4    Q. Prior to your arrival at the house, did you
5  have any information about where the child was located?
6       MR. THOMPSON: Objection as to form.
7       MS. WESTBY: Join.
8       THE WITNESS: I'm not sure there was a child.
9  BY MR. GOSMAN:
10   Q. Well, I think we understand now that there
11 wasn't a child. But at the time, there was --
12   A. Officer Blackmore said there appeared to be a
13 child.
14   Q. Well, I don't see where he says that there
15 appeared to be a child. He said he saw a child go into
16 the residence and he didn't see a child come out.
17      MS. WESTBY: Object to --
18 BY MR. GOSMAN:
19   Q. Isn't that what Officer Blackmore said?
20      MS. WESTBY: Object to the form of the
21 question.
22      MR. THOMPSON: Join.
23      THE WITNESS: I remember him saying it
24 appeared there was a child.
25 BY MR. GOSMAN:

1    Q. All right. And, in fact, on Exhibit 10, it's
2  identified as a ten-year-old child. Do you see that?
3       MR. THOMPSON: Objection as to form.
4       MS. WESTBY: And as to questioning this
5  witness on this document.
6       THE WITNESS: That's what's written there,
7  yes.
8  BY MR. GOSMAN:
9    Q. Did you remember discussing that? Was that
10 mentioned at all in the plan to serve this search
11 warrant?
12   A. Yes.
13   Q. And so my question was, and is, then: Do you
14 remember anyone saying where the child was located?
15   A. We had no idea where the child was located.
16 I do remember that in conversations with Officer Lara
17 and his conversations with Tom, he knew that Bret and
18 Tricia didn't have children.
19   Q. All right. Let's take a look at the list on
20 the second page of Exhibit 10 again. It says
21 "Chretien, LG4; Danzer, LG3; Hall, LG2; Chapman, LG1."
22 Do you know what those numbers represent?
23   A. I'm assuming that the numbers are where they
24 line up. I'm not sure what LG stands for.
25   Q. Was that discussed prior to leaving for the

1  Wachsmuth home that night at the police station, how
2  the officers would line up on the porch?
3    A. Yes.
4    Q. And it was -- was it Chretien that prepared
5  this list?
6    A. No, I think Marissa wrote this list.
7    Q. I'm sorry, that's right. Marissa prepared
8  the list. Was it Chretien that determined this order?
9    A. Yes.
10   Q. All right. The -- Plaintiff's Exhibit 10
11 also contains a numbered list on the front page, it has
12 numbers 1 through 7, and it lists knock door, police,
13 search warrant, break window, flashbang, et cetera.
14      Do you remember those items being
15 specifically discussed?
16   A. Yes.
17   Q. Do you remember them being discussed in that
18 order?
19   A. Well, not in that order. I mean, it appears
20 to me you need to break the window before you deploy
21 the flashbang.
22   Q. Well, I think that's the order that they are
23 in, though, is to break the window --
24   A. It says flashbang and then underneath that it
25 says break window.

ALAN KENT - November 22, 2010                          Page 145
Direct Examination by Mr. Gosman

1   Q.  I'm looking at something different than you
2   are, then, because I see knock door, Number 1; police,
3   search warrant, Number 2; 3. break window; and 4,
4   flashbang.
5   A.  And 5, wait for noise; 6, break window --
6   Q.  Oh, I see.
7   A.  -- seven, door.
8   Q.  That's true.
9       Oh, well, that's breaking the window in the
10  back of the residence, correc ?
11  A.  I don't know.  It just says break window on
12  my -- well, there's like the BA --
13  Q.  Yeah, it's cut off, I'll g ant you that.
14      But up on Number 4, it says "flashbang,
15  bedroom."  And above that it says break window,
16  correct?
17  A.  It says flashbang.
18      MS. WESTBY: Object to form.
19  BY MR. GOSMAN:
20  Q.  Let's do this.  Let me ask you, were you
21  aware that there was another distraction method that
22  was going to be used that evening and that involved
23  officers at the back of the house breaking a window?
24  A.  Yes.
25  Q.  Makes sense that that would be what's

ALAN KENT - November 22, 2010                          Page 146
Direct Examination by Mr. Gosman

1   referred to in the item Number 6 in this list that
2   we're referring to, wouldn't it?
3   A.  Yes.
4   Q.  Okay.  Let's take a look at Deposition
5   Exhibit 16 again for just a moment.
6       Do you see that paragraph that's down towards
7   the bottom of the page, it says "The plan was to knock
8   on the front door"?
9   A.  Yes.
10  Q.  Okay.  "The plan was to knock on the front
11  door and announce, 'Police, search warrant.'  If the
12  door did not open immediately we would use the ram to
13  force entry."
14      Was that in fact the plan?
15      MS. WESTBY: Object to the form of the
16  question.
17      MR. THOMPSON: Join.
18      MS. WESTBY: Misstates the testimony.
19      THE WITNESS: It's not the plan I remember.
20  BY MR. GOSMAN:
21  Q.  It's the plan that's written down in this
22  report, though, correct?
23  A.  But I didn't write this report.
24  Q.  All right.  What plan did you remember?
25  A.  Well, when you're serving a search warrant,

ALAN KENT - November 22, 2010                          Page 147
Direct Examination by Mr. Gosman

1   you -- knock-and-announce means that.  You knock, say
2   "police department," and then you give them a chance to
3   open the door.
4   Q.  Unless it's a no-knock warrant, right?
5   A.  Unless it's a no-knock.
6   Q.  And then you would open the door immediately,
7   correct?
8   A.  You wouldn't announce.
9   Q.  You wouldn't announce.
10      All right.  So you heard the statement,
11  "Police, search warrant," at the front of the house,
12  correct?
13  A.  Yes.
14  Q.  Do you know who made that statement?
15  A.  I know now from reading the report.  But at
16  the time, no.
17  Q.  Who was it that made that --
18  A.  Chapman.
19  Q.  Chapman.
20      All right.  And what was your cue for
21  deploying the diversion device?
22  A.  As soon as I heard the door rammed --
23  Q.  Okay.
24  A.  -- was my cue to break the window.
25  Q.  Okay.  And you don't -- all right.  And you

ALAN KENT - November 22, 2010                          Page 148
Direct Examination by Mr. Gosman

1   did hear the door ram -- or the door being rammed,
2   correct?
3   A.  Yes.
4   Q.  And you broke the window?
5   A.  Yes.
6   Q.  And Officer McCaslin, then, did he -- how did
7   he deploy the diversionary device?
8   A.  Dropped.
9   Q.  Okay.
10  A.  I mean, I'm not sure, you know, where I was
11  standing.  I saw his arm from here.  But there was no
12  throwing motion.  It was a drop.
13  Q.  What did you do after you had completed this
14  task of deploying the diversionary device?
15  A.  Eventually I went in the house.
16  Q.  How much later?
17  A.  I don't remember the exact amount of time.
18  But I wasn't in any hurry to get in.
19  Q.  What did you see when you first walked in the
20  house?
21  A.  I saw -- to the right of me, I saw Tricia
22  Wachsmuth sitting on the couch and Sergeant Eckerdt
23  standing next to her.
24  Q.  All right.  Let's go ahead and do another
25  diagram.

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 40 of 67
Tricia Wachsmuth v.                                                          **Alan Kent**
City of Powell, et al.                                                   **November 22, 2010**

1        (Exhibit 54 marked)
2        THE WITNESS: You didn't tell me what to
3    draw.
4    BY MR. GOSMAN:
5    Q.   Oh, yes.  I want you to draw the interior of
6    the house.
7    A.   The whole house or just the living room?
8    Q.   Well, actually, so much of the house as you
9    can see coming in the front door.
10       MR. THOMPSON: Do you want him to refer to
11   Exhibit 10?
12   BY MR. GOSMAN:
13   Q.   You may.  There's a diagram of the interior
14   of the home on the second page of Exhibit 10.
15   A.   Do you want it labeled, the rooms?
16   Q.   What I want you to do yes, is label the
17   rooms.  I think we should do that.
18   A.   (Witness complies.)
19   Q.   Okay.  Now, since we haven't completed this
20   prior exhibit -- and I want to just put a finishing
21   touch on it before we leave this document.  At the time
22   that you arrived at the side of the house next to the
23   window, where was the entry team?
24       Put an X with the location of the entry team,
25   the approximate location.

1    A.   (Witness complies.)
2    Q.   They were at the porch ?
3    A.   Well, I said I followed them up.  So we both
4    kind of arrived at our positions at the same time.
5    Q.   Okay.  Very good.  Thank you.
6        And then could you put entry team next to
7    that X?
8    A.   (Witness complies.)
9    Q.   Okay.  Now, let's go back to the other
10   exhibit, which is 54, or will be.
11       And as you walked in the front door, you -- I
12   want you to put, to the best of your recollection, I
13   want you to place Tricia Wachsmuth and all the officers
14   that you saw.
15   A.   (Witness complies.)
16   Q.   And was that it?  You didn't see anyone else
17   in the house?
18   A.   Well, there was officers all over the house.
19   Q.   Do you remember where any of them were?
20   A.   Walking around the whole house.
21   Q.   All right.  So they were moving?
22   A.   Yeah.
23   Q.   All right.
24   A.   Yes.
25   Q.   And --

1        MR. THOMPSON: And for the record so that
2    we're clear, he's got a TW for Tricia Wachsmuth, and
3    then Sergeant Eckerdt's name is spelled out.
4    BY MR. GOSMAN :
5    Q.   All right.  Okay.
6        MR. THOMPSON: And I assume that this
7    rectangular shape is the couch?
8        THE WITNESS: The couch.
9    BY MR. GOSMAN:
10   Q.   Did you see Officer Chretien -- or did you
11   hear Officer Chretien direct any remarks to Tricia
12   Wachsmuth about going into the basement?
13   A.   No.
14   Q.   How long did you stay in the position that
15   you were in when you made these initial observations?
16   A.   When I walked in and I was right here by the
17   front door, I looked over and saw Tricia, who was
18   dialing her cell phone.  And I told her -- or I asked
19   her who she was dialing.  She said, "My husband."  I
20   told her to hang up the phone.
21   Q.   Okay.  All right.  And that would be pretty
22   good evidence that her husband wasn't in the house,
23   wouldn't it?
24   A.   Well, I guess he could have been in the
25   basement.

1    Q.   Okay.  All right.  So you asked her to hang
2    up the phone.  Did she comply?
3    A.   Yes.
4    Q.   Was she compliant to all the commands that
5    you heard being made to Tricia Wachsmuth?
6    A.   That was the only thing that I had heard.
7    Q.   All right.
8    A.   What I said.  I didn't hear anybody else --
9    Q.   Well, did Sergeant Eckerdt have his gun
10   pointed at Tricia Wachsmuth?
11   A.   No.
12   Q.   Did any of the other officers in the house
13   have their guns pointed at Tricia Wachsmuth at the time
14   you entered the house?
15   A.   Not when I entered.  Sergeant Eckerdt was the
16   only one there
17   Q.   All right.  So then what happened?
18   A.   Then I ended up going into the spare bedroom
19   when somebody had asked if the closet in there had been
20   cleared.
21   Q.   So you did participate in the clearing of the
22   house to that extent?
23   A.   Well, what you do in a situation like that is
24   the first team goes in and looks for people quickly to
25   diffuse any situation.  And then whoever comes in

Tricia Wachsmuth v.
City of Powell, et al.

**Alan Kent**
**November 22, 2010**

ALAN KENT - November 22, 2010                                    Page 153
Direct Examination by Mr. Gosman

1  behind will do a secondary search to make sure that --
2  under the beds and closets, that kind of stuff.
3  everything is clear.
4     Q.  Was that something that you were assigned to
5  do?
6     A.  I wasn't assigned, no.
7     Q.  Did someone ask you to do that?
8     A.  I just heard somebody say "Has that closet
9  been cleared?"
10    Q.  And you went into the spare bedroom. And how
11 long were you there?
12    A.  I don't know the amount of time.
13    Q.  When you came out, what did you see?
14    A.  When I came out, I believe -- I don't really
15 remember if I went into the master bedroom or if I went
16 outside to check on the guys that were searching the
17 garage.
18    Q.  When you came out of the bedroom, what did
19 you see?
20    A.  All I remember is if I went into the
21 master -- I don't remember seeing anything.
22    Q.  Was Tricia Wachsmuth still on the couch?
23    A.  I don't know where she was. I didn't see
24 her.
25    Q.  Did you go into the master bedroom and then

ALAN KENT - November 22, 2010                                    Page 154
Direct Examination by Mr. Gosman

1  leave the house?
2     A.  At some point I went out to the garage,
3  within a short amount of time.
4     Q.  And how short? I mean, was it within a
5  minute?
6     A.  Within several minutes. I don't want to --
7  it wasn't that long.
8     Q.  And as you walked out of the door of the
9  house, you don't remember seeing Tricia Wachsmuth?
10    A.  No. She wasn't there.
11    Q.  She wasn't there.
12       Were any other officers there at that time?
13    A.  I don't remember any.
14    Q.  Do you know where Tricia Wachsmuth was?
15    A.  No.
16    Q.  Did you hear Officer Chretien say you're
17 going first?
18    A.  No.
19    Q.  Did you hear Officer Chretien say anything?
20    A.  No.
21    Q.  Did you see anyone assembled in the living
22 room taking Tricia Wachsmuth down the stairs?
23    A.  No.
24    Q.  When you went into the master bedroom, did
25 you notice that there was -- that the bedding was

ALAN KENT - November 22, 2010                                    Page 155
Direct Examination by Mr. Gosman

1  smoldering and there either was a fire or had been a
2  fire in the bedroom?
3     A.  I didn't see any evidence of a fire.
4     Q.  Did you go into the bathroom?
5     A.  Yes.
6     Q.  Did you notice the burned out pillow in the
7  shower?
8     A.  There was something in the shower. I didn't
9  pay attention to what it was.
10    Q.  Were you clearing the shower?
11    A.  No.
12    Q.  And --
13    A.  That would have been later on when the
14 searching was taking effect that I saw that.
15    Q.  Okay. Did you smell smoke?
16    A.  Yes.
17    Q.  Did you hear the smoke alarm?
18    A.  Yes. But a flashbang creates a lot of smoke.
19    Q.  Did you see the bedding in the bedroom?
20    A.  Yes.
21    Q.  Did you see that it was burned?
22    A.  I didn't see any burn marks.
23    Q.  I take it, then, that you didn't see any
24 evidence of a fire?
25    A.  There was a -- behind the bed, there was a

ALAN KENT - November 22, 2010                                    Page 156
Direct Examination by Mr. Gosman

1  V-shaped scorch mark.
2     Q.  A funnel scorch mark.
3        So you observed that but you didn't observe
4  that the bedding itself was burned?
5     A.  No.
6     Q.  When you were in the house, did you ever see
7  Sergeant Chretien?
8     A.  Yes.
9     Q.  All right. Where was he and when?
10    A.  I don't know exactly when and where he was.
11 But at one point, when we determined that Bret was at
12 his dad's house, I talked to Sergeant Chretien and
13 Sergeant Eckerdt about going out to Tom's house.
14    Q.  What was that discussion?
15    A.  That they needed to go out and get Bret.
16    Q.  Did you talk to Tom Wachsmuth?
17    A.  No, I didn't.
18    Q.  Who did?
19    A.  I would assume that Sergeant Chretien and
20 Sergeant Eckerdt did when they arrived at his house.
21    Q.  You didn't go with them to his house?
22    A.  No.
23    Q.  But there was a discussion that you had with
24 Sergeant Chretien apparently after -- was this after
25 the house had been secured?

1    A.  Yes.
2    Q.  Ten, 15, 20 minutes later?
3    A.  I don't know the timeframe.  It wasn't very
4  long.
5    Q.  Chretien and Eckerdt went out to Wachsmuth's?
6    A.  I -- along with Danzer.
7    Q.  Okay.
8    A.  Now, to follow up on an earlier point, there
9  was some consideration to that because at the time, our
10  task force officer was in Afghanistan or Iraq or
11  somewhere, so Sergeant Chretien and Sergeant Eckerdt
12  were working at DCI on a monthly rotating basis.  So
13  they had a closer relationship with Tom.  So that's one
14  of the reasons I asked them to go out there.
15    Q.  So you were the one that asked those two
16  officers to go out to the Wachsmuth residence?
17    A.  Yes.
18    Q.  I want you to describe that conversation to
19  me as completely as you can
20    A.  All I remember is asking them to go out to
21  the Wachsmuth residence.
22    Q.  You told them that Bret was out there?
23    A.  Yes.
24    Q.  All right.  Do you know what kind of
25  diversionary device it was that was dropped into the

1  window at the Wachsmuth residence?
2    A.  The brand name is DEF-TEC.
3    Q.  And do you know if the device contains any
4  warning materials?
5    A.  There's a piece of paper that comes with it
6  in the box.
7    Q.  Was it in the box when you took it out of the
8  police station?
9    A.  I didn't take it out of the police station.
10    Q.  Did McCaslin do that?
11    A.  I don't know who took it out.  I'm assuming
12  he did since he was the one that was to deploy it.
13    Q.  Okay.  Had he removed it from the box by the
14  time you got into the car with him?
15    A.  I don't remember.
16    Q.  Did either you or he examine the warning
17  labels that were either in the box or on the device
18  itself?
19    A.  I've read them before, yes.
20    Q.  Did you examine them that night?
21    A.  No, I didn't hand it to him, so...
22           (Exhibit 7 identified)
23  BY BY MR. GOSMAN:
24    Q.  Okay.  Let's go to Exhibit 7.  The first page
25  of Exhibit 7 is the warning label for the defense

1  technology DEF-TEC 25.  And I'm going to ask you if
2  that is -- if you've seen that document before or
3  something like it?
4    A.  Yes.
5    Q.  You've seen this document before?
6    A.  That's what comes in the box.
7    Q.  All right.  And do you see at the top of the
8  label that this device is only to be used by law
9  enforcement, corrections or military personnel who have
10  successfully completed a training program in the use of
11  distraction devices?
12    A.  Yes.
13    Q.  And you knew that when you went out there on
14  the evening of February 24th, 2009, correct?
15    A.  I knew that we were trained in the use of
16  distraction devices, yes.
17    Q.  Officer, what I asked you was:  Did you know
18  that this warning label stated that it was only to be
19  used by law enforcement, corrections or military
20  personnel who had successfully completed a training
21  program in the use of distraction devices that night.
22         MR. THOMPSON:  Objection to form.  It's been
23  asked and answered.  He said he didn't open the box.
24  BY MR. GOSMAN:
25    Q.  By that night?

1         MR. THOMPSON:  What do you mean "by that
2  night"?
3  BY MR. GOSMAN:
4    Q.  You knew before you went out there that
5  evening on the 24th of February that this warning
6  device was in the box and that, in fact, it stated that
7  it was only to be used by law enforcement personnel who
8  had completed a training program in the use of
9  distraction devices, correct?
10         MS. WESTBY:  Object to the form of the
11  question.
12         MR. THOMPSON:  Join.
13         THE WITNESS:  I don't know if it was in that
14  box because I didn't hand it to them.
15  BY MR. GOSMAN:
16    Q.  Well, you've seen it before and you knew the
17  material, though, correct?
18    A.  Yes.
19    Q.  And then under "Instructions For Use," under
20  Number 4, it states "Throw the device in an underhand
21  manner into an observed area, free of personnel, loose
22  debris or ignitable materials," correct?
23    A.  That's what it says, yes.
24    Q.  And you knew that before you went out to the
25  Wachsmuth residence that night, correct?

1    MR. THOMPSON: Objection as to form.
2    MS. WESTBY: Join.
3    THE WITNESS: Yes.
4    MR. GOSMAN: We can go ahead and get
5  Sergeant Eckerdt ready. We'll get started at least.
6    MS. WESTBY: At 4:30?
7    MR. GOSMAN: Yeah  I think we better.
8    (Discussion held off the
9    record.)
10  BY BY MR. GOSMAN:
11    Q.  Were you aware of the danger of a fire from
12  deploying the flashbang device into flammable
13  materials?
14    A.  Yes.
15    Q.  Is it your testimony that you didn't see any
16  of the other officers in the living room area with
17  Tricia Wachsmuth and Sergeant Eckerdt at the time you
18  entered the house?
19    A.  When I entered the house, he was the only one
20  standing next to her, yes. There may have been
21  somebody in the kitchen, but I don't remember who.
22    Q.  All right. And you went into the bedroom --
23  the bedrooms?
24    A.  There was two or three of us went into the
25  spare bedroom. There was -- I know Officer Miner was

1  in the master bedroom, and -- you know, when I came out
2  of the spare and went into there.
3    Q.  You went into the spare bedroom with two or
4  three other persons?
5    A.  Yeah.
6    Q.  Who were they?
7    A.  One was McCaslin, I believe.
8    Q.  He followed you in the house?
9    A.  I don't know if he followed me or I followed
10  him.
11    Q.  Okay. Who else?
12    A.  I don't remember.
13    Q.  Did you pick someone up as you went through
14  the door and into the bedroom from inside the house
15  that joined you?
16    A.  I think it was more of a spontaneous. When
17  we decided something needed to be done, we just went
18  and did it.
19    Q.  As you walked back out of the bedroom and out
20  of the house, did you see anyone in the living room?
21    A.  No.
22    Q.  Did you go back into the house after that
23  before the house had been secured?
24    A.  At this point, the house was secured.
25    Q.  When did you go back in the house after you

1  walked out?
2    A.  Well, at one point I went out and got my car
3  and brought it around because McCaslin's bags and
4  evidence stuff was in my car.
5    Another point, I was in the garage. So
6  during the course of the evening, I was in and out of
7  the house quite a few times.
8    Q.  Well, how much time elapsed between your
9  first -- your leaving the house after you first went
10  into it, which we've documented with Exhibit No. -- I
11  think it's 53 or 4, it's 4 -- 54, until you went back
12  into the house?
13    A.  I have no idea.
14    Q.  Was it more than ten minutes?
15    A.  I wouldn't think it was that long.
16    Q.  When you went back in the house, what did you
17  see?
18    A.  Officers milling around.
19    Q.  Had Tricia Wachsmuth been removed from the
20  home at that time?
21    A.  I didn't see her, so I'd assumed she was
22  transported down to the police department.
23    Q.  Did you participate in the search of the
24  house?
25    A.  Yes.

1    Q.  What was your role in the search?
2    A.  I didn't have a specific role, other than
3  searcher.
4    Q.  What did you do?
5    A.  Searched.
6    Q.  Which rooms?
7    A.  At one point, the living room, the
8  kitchen, the spare bedroom, the bathroom, the master
9  bedroom and downstairs and the garage.
10    Q.  Okay. Did you -- was officer -- were any of
11  the officers that were there recording the information
12  present with you?
13    A.  Was the evidence collected documented, is
14  that --
15    Q.  Yes.
16    A.  Yes.
17    Q.  Who was with you documenting the evidence
18  that you collected?
19    A.  When you collect evidence, you don't collect
20  it. You don't pick it up.
21    Q.  Right, I understand that.
22    A.  You locate it and then you photo it and then
23  it's collected by one of the evidence technicians,
24  which would have been Officer McCaslin or
25  Officer Chapman.

ALAN KENT - November 22, 2010          Page 165
Direct Examination by Mr. Gosman

1  Q. All right. Did you take any pictures?
2  A. No.
3  Q. Did you have a camera?
4  A. No.
5  Q. Did you notice any of the officers out in
6  front of the house making signs with their hands for a
7  photograph?
8  A. There was no officers out front making signs.
9  Q. That you saw?
10  A. I was out front for the last third of the
11  operation watching the cars wh le they were loading the
12  evidence and there was nobody out there making signs.
13  Q. Of course by that time Tricia Wachsmuth was
14  long gone, correct?
15  A. Yes.
16  Q. Did you find any evidence in the home,
17  personally?
18  A. I don't remember if I located anything
19  specific.
20  Q. Did you see the marijuana plants?
21  A. Yes.
22  Q. How tall were they?
23  A. Two feet.
24  Q. You think they would have flushed down the
25  toilet?

ALAN KENT - November 22, 2010          Page 166
Direct Examination by Mr. Gosman

1  A. Well, I know basement toilets have more
2  suction power than the ones up above, so they may have.
3  Q. Was there a bathroom in the basement?
4  A. No.
5  Q. Did you understand that at some point Tricia
6  Wachsmuth had been used as a human shield and led
7  downstairs?
8  MR. THOMPSON: Objection as to form.
9  MS. WESTBY: Join.
10  THE WITNESS: I learned at one point she went
11  downstairs.
12  BY MR. GOSMAN:
13  Q. Did Officer Chretien ever say anything to you
14  about the fact that he had led her down the stairs as a
15  human shield and that he regretted that?
16  A. No.
17  Q. Would you agree with me that if
18  Officer Chretien led her down the stairs and he was
19  accompanied by most of the rest of the entry team, and
20  they had their weapons trained on her during the course
21  of her being led down the stairs, that that would be
22  excessive force?
23  MR. THOMPSON: Objection as to form.
24  MS. WESTBY: Join.
25  MR. THOMPSON: Misstates the facts and calls

ALAN KENT - November 22, 2010          Page 167
Direct Examination by Mr. Gosman

1  for a legal conclusion.
2  THE WITNESS: No.
3  BY MR. GOSMAN:
4  Q. That would not be excessive force?
5  A. No, I know that the Powell Police Department
6  wouldn't do that.
7  Q. Well, okay. And I can appreciate how you
8  would want to get that in the record. But that wasn't
9  my question, Officer.
10  A. Yes, it was.
11  Q. Would it have been an excessive use of force
12  to lead Tricia Wachsmuth down the stairs or have her
13  lead you down the stairs with your weapons trained on
14  her?
15  MR. THOMPSON: Objection as to form.
16  Misstates the evidence.
17  MS. WESTBY: Join.
18  THE WITNESS: Yes, it would have been.
19  BY MR. GOSMAN :
20  Q. Would it have been excessive force to have
21  Tricia Wachsmuth in front of the officers being led
22  into an uncleared area of the home?
23  MS. WESTBY: Object to the form of the
24  question. Misstates the evidence and testimony.
25  MR. THOMPSON: Join. Calls for a legal

ALAN KENT - November 22, 2010          Page 168
Direct Examination by Mr. Gosman

1  conclusion.
2  MS. WESTBY: Join.
3  THE WITNESS: I wasn't there, so I can't
4  answer whether she was led anywhere.
5  BY MR. GOSMAN:
6  Q. Well, you were there, of course. Whether you
7  saw it or not, I guess remains to be seen.
8  But you were there, and my question had
9  nothing to do with that.
10  My question was: Would you agree with me
11  that if Officer Chretien led her -- or had her lead him
12  down the stairs into an uncleared area, that that would
13  be an excessive use of force?
14  MR. THOMPSON: Counsel, you're asking him
15  questions which are hypothetical, they call for a legal
16  conclusion, and he's not been retained to provide
17  expert opinion in this case. He's a fact witness.
18  MR. GOSMAN: I think you listed every one of
19  your officers as expert witnesses.
20  MS. WESTBY: To testify in their own defense.
21  There's case law about it.
22  MR. GOSMAN: I'm not arguing that. I just --
23  I want an answer to this question.
24  MR. THOMPSON: Well, it's a hypothetical.
25  MR. GOSMAN: It is a hypothetical.

ALAN KENT - November 22, 2010                                    Page 169
Direct Examination by Mr. Gosman

1    MS. WESTBY: And we're done with
2  hypotheticals.
3    MR. GOSMAN: No, we're not.
4    MS. WESTBY: Yeah, we are not going to ask
5  him opinions and he's not going to give you expert --
6    MR. GOSMAN: I am entitled to know what this
7  officer's perceptions are of excessive force because
8  they do have relevance in terms of what his duties were
9  there that evening.
10    MS. WESTBY: No, you've already established
11  that he didn't hear it. He didn't know what was going
12  on. There's nothing -- there's no place to go further
13  with it.
14    MR. THOMPSON: You've got a right to ask him
15  what his personal knowledge is and what his opinions
16  are of the events that he witnessed, but not a
17  hypothetical question which he's already testified he
18  didn't see any of this.
19  BY MR. GOSMAN:
20    Q. Would you agree that i would be an excessive
21  use of force to use an individual who was in a
22  residence being searched as a human shield?
23    MS. WESTBY: Object to the form of the
24  question. And, again, this -- he's already testified.
25    MR. GOSMAN: Yes or no?

---

ALAN KENT - November 22, 2010                                    Page 170
Direct Examination by Mr. Gosman

1    MS. WESTBY: No, he's already testified that
2  that's not his understanding of his perception of what
3  happened in this instance. So if you're asking him his
4  opinion about whether a hypothetical set of facts
5  constitute excessive force, that is an expert opinion
6  that you are not entitled to try to elicit from him.
7    MR. THOMPSON: Objection as to form.
8  BY MR. GOSMAN:
9    Q. All right. Was the -- or is the use of an
10  individual as a human shield in clearing operations
11  under a dynamic entry an excessive use of force as you
12  understand it?
13    MS. WESTBY: No.
14  BY MR. GOSMAN:
15    Q. As you understand it?
16    MS. WESTBY: No, same objection. He --
17    MR. GOSMAN: You made your objections.
18    MS. WESTBY: He already testified that that
19  was not his understanding of what happened in this
20  case. So you are not allowed to ask him hypotheticals
21  and then ask his opinion about that, Jeff.
22    MR. GOSMAN: Are you instructing him not to
23  answer?
24    MS. WESTBY: Yes, I am.
25    MR. GOSMAN: I'm not calling the magistrate.

---

ALAN KENT - November 22, 2010                                    Page 171
Direct Examination by Mr. Gosman

1  I can tell you that. But if I did, he'd be answering
2  the question.
3  BY MR. GOSMAN:
4    Q. Do you understand that as an officer, you are
5  responsible to ensure that your fellow officers do not
6  violate the constitutional rights of others in their
7  presence?
8    MS. WESTBY: Object to the form of the
9  question. You didn't state that right. You mean in
10  your --
11    MR. GOSMAN: I didn't state that right.
12    MS. WESTBY: -- in your presence?
13    MR. GOSMAN: Yeah, in their presence.
14    MS. WESTBY: If you understand the question.
15    THE WITNESS: I don't.
16  BY MR. GOSMAN:
17    Q. All right. Do you understand that an officer
18  is responsible to ensure that his fellow officers do
19  not violate the constitutional rights of others in
20  their presence?
21    A. In whose presence?
22    Q. That would be the officer observing the
23  constitutional rights.
24    A. Yes.
25    Q. Was there any damage done to the home

---

ALAN KENT - November 22, 2010                                    Page 172
Direct Examination by Mr. Gosman

1  incidental to this execution of this search warrant?
2    A. Damage I saw was to the front door. I
3  believe there was a hole in the bathroom door. And the
4  scorch mark on the wall was the only thing I can
5  remember.
6    Q. Of course, you broke the window?
7    A. Oh, and the window, yes, I'm sorry.
8    Q. Right. You didn't see anything else?
9    A. Not that I remember.
10    Q. All right. Were you aware that someone
11  apparently placed a piece of plywood over the window
12  and screwed it into the siding of the house? Did you
13  know about that?
14    A. I thought Bret's dad did that, Tom.
15    Q. So you don't know whether -- you don't know
16  who did?
17    A. It wasn't done while I was there, no.
18    Q. Was there a debriefing of this warrant
19  service after it was all said and done?
20    A. I don't remember if there was one that night
21  or if there was one the next day or if everybody was
22  present. I really don't remember.
23    Q. You don't remember anything about it?
24    A. Not a
25  everybody-get-together-as-a-group-and-debrief, no, I

---

1 don't think so.

2 Q. Did you get together with anyone after the
3 warrant had been served to discuss what happened that
4 night?

5 A. Not that night. I did the next day with
6 Chief Feathers.

7 Q. Okay. What did you discuss?

8 A. Serving the warrant.

9 Q. What was said in that conversation? What did
10 you say? What did Chief Feathers say?

11 A. I don't remember specifically. I think I
12 just filled him in on the operation, what happened.

13 Q. And you weren't aware that Tricia Wachsmuth
14 had been used as a human shield that night?

15 MR. THOMPSON: Objection as to form.

16 MS. WESTBY: Object to the form of the
17 question.

18 THE WITNESS: I was aware that she went
19 downstairs. I don't know where human shield came from.

20 BY MR. GOSMAN:

21 Q. Okay. And you weren't aware that she was
22 taken downstairs with the officers pointing their
23 rifles at her, behind her?

24 MR. THOMPSON: Objection as to the form.
25 Misstates the evidence.

1 MS. WESTBY: Join.

2 THE WITNESS: No.

3 BY MR. GOSMAN:

4 Q. And you weren't aware that the officers, when
5 they entered the house, trained their rifles on Tricia
6 Wachsmuth?

7 MR. THOMPSON: Objection as to form.

8 THE WITNESS: I wasn't there, so I don't
9 know.

10 BY MR. GOSMAN:

11 Q. And you weren't aware that Chretien commanded
12 Tricia Wachsmuth to go down the stairs first?

13 MS. WESTBY: Objection.

14 MR. THOMPSON: Objection as to form.

15 THE WITNESS: I think I answered that already
16 and said no.

17 BY MR. GOSMAN:

18 Q. And you weren't aware that the officers who
19 went down the stairs with Tricia Wachsmuth had their
20 rifles trained on her from the time she got up from the
21 couch to take them down the stairs?

22 MS. WESTBY: Object to the form of the
23 question. Misstates testimony and evidence.

24 MR. THOMPSON: Join.

25 BY MR. GOSMAN:

1 Q. Yes or no?

2 A. I wasn't aware, because it didn't happen.

3 Q. Well, Officer, you told me that you didn't
4 see anything in the living room.

5 A. Well, then you just asked me if I was aware.
6 So, no.

7 Q. But you didn't see it. You don't know
8 whether it happened or not.

9 A. I know the officers of Powell Police
10 Department.

11 Q. Well, did you know that -- Officer Chretien
12 well enough to know that he wouldn't take Tricia
13 Wachsmuth down the stairs as a human shield?

14 MR. THOMPSON: Objection as to form.

15 MS. WESTBY: Join.

16 THE WITNESS: I don't understand what you're
17 asking.

18 BY MR. GOSMAN:

19 Q. Well, you're telling me that you know the
20 officers of the Powell Police Department and you're
21 prepared to stand here and certify to their good
22 behavior. And I want to know if you knew
23 Officer Chretien well enough to know that he would
24 never take Tricia Wachsmuth down the stairs and use her
25 as a human shield?

1 MR. THOMPSON: Objection as to form.

2 THE WITNESS: I don't know if he did take her
3 down the stairs and use her as a human shield, no.

4 BY MR. GOSMAN:

5 Q. You don't know any of this stuff, do you?

6 MS. WESTBY: Object to the form of the
7 question. Jeff --

8 BY MR. GOSMAN:

9 Q. Any of these last few questions we talked
10 about in terms of officers pointing rifles at Tricia
11 Wachsmuth and leading her down the stairs, you don't
12 know whether that's true or not?

13 A. I didn't see it, no.

14 Q. Well, I think you did say that officer --
15 that the other officers were not training their weapons
16 at Tricia Wachsmuth, but you weren't so sure whether
17 Mike Chretien would use her as a human shield and lead
18 her down the stairs. Is that true?

19 MS. WESTBY: Object --

20 THE WITNESS: No, I didn't say that.

21 MS. WESTBY: -- to the form of the question.
22 That completely, completely misstates his testimony.

23 THE WITNESS: I said I saw Sergeant Eckerdt
24 standing next to her and his weapon was not pointed at
25 her.

ALAN KENT - November 22, 2010                          Page 177
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.  Okay.  Let's take a look at Exhibit -- I
3   think it's 36 -- 35.  No, it's not 35, it's 36.  I'm
4   sorry.
5               (Exhibit 36 identified)
6   BY MR. GOSMAN:
7       Q.  Looks like we have some e-mail from Alan
8   Kent.  Interestingly enough, you're the only officer
9   that has produced any e-mail in this case.
10          Can you tell me what these e-mails are about?
11  Let's go ahead and look at Exhibit 36 and take each one
12  of these e-mails one by one.
13      A.  They were e-mails I got from my sent file.
14  That was the only e-mails I could find that I had when
15  I was asked to produce them.
16      Q.  Okay.  The first one there is to Kirk
17  Chapman, correct?
18      A.  Yes.
19      Q.  And was Kirk Chapman on the entry team?
20      A.  Yes.
21      Q.  And he also was responsible for the evidence
22  report?
23      A.  He was part of the evidence collection team,
24  yes.  And he wrote the evidence report, yes.
25      Q.  And you wanted him to get it first thing on

ALAN KENT - November 22, 2010                          Page 178
Direct Examination by Mr. Gosman

1   Monday morning, and that was dated March 1, correct?
2       A.  Yes.
3       Q.  On March 16, "Guys, do not throw away,
4   dispose of, or return any evidence from the Wachsmuth
5   case.  It probably will be needed."  What was that
6   about?
7       A.  I think we found out we were getting sued.
8       Q.  Okay.  And then on March 5th, this is 2009,
9   back in 2009 again, you were communicating with Dave
10  Brown over the computer, correct?
11      A.  Yes.
12      Q.  Did you understand that the computer
13  contained pornographic images that had been placed
14  there by the confidential informant?
15      A.  I understood the confidential informant said
16  that Bret Wachsmuth was looking at child porn.
17      Q.  The confidential informant said Bret
18  Wachsmuth was looking at child porn.  Is that what you
19  just said?
20      A.  Yes.
21      Q.  All right.  Where -- who told you that?
22      A.  I believe it was in the briefing.  I don't
23  know.  That's why we sent the computer off.
24      Q.  Well, Dave Brown has filed a report in this
25  case and I'll just represent to you that Dave Brown

ALAN KENT - November 22, 2010                          Page 179
Direct Examination by Mr. Gosman

1   indicates that he interviewed Bret Wachsmuth and
2   learned from Bret Wachsmuth that the confidential
3   informant had put child porn on his computer.
4           Does that ring a bell with you?
5           MS. WESTBY:  That was his excuse for why
6   there was child porn --
7           MR. GOSMAN:  I'm not asking for a narrative
8   on why this evidence is relevant.
9           MS. WESTBY:  Don't represent to this witness
10  that he's incorrect in his understanding, because he's
11  not.
12          MR. GOSMAN:  Oh, he's not, okay.
13          MS. WESTBY:  No, he's not.
14  BY MR. GOSMAN:
15      Q.  All right.  So I want you to go to the record
16  and show me where in any of this material there's any
17  allegation from the confidential informant that Bret
18  Wachsmuth was putting pornographic material on his
19  computer, child porn.
20          MS. WESTBY:  In an effort to save time, the
21  probable cause affidavit -- I don't know what...
22          MR. GOSMAN:  That's 13 -- oh, no, that's 15.
23          MS. WESTBY:  It's the second one is one place
24  where that's located.
25          MR. GOSMAN:  I believe that's 15.

ALAN KENT - November 22, 2010                          Page 180
Direct Examination by Mr. Gosman

1           MS. WESTBY:  It's 00089.
2           THE WITNESS:  0089?
3           MS. WESTBY:  Well, let me make sure.
4               (Exhibits 14, 15, and 21
5               identified)
6           MR. GOSMAN:  Let's see.  Affidavit of
7   probable cause is 137.  Okay.  Yeah, there are two
8   affidavits of probable cause.  They start at 137 and go
9   to approximately 49.
10          But it's not consecutive.  Because there's
11  three pages.  One is Exhibit 15 and one is Exhibit 14.
12  Two affidavits of probable cause.
13          And the Brown report is Exhibit 21.  And
14  there's two pages.  And it's the second page.
15          And as you'll notice on Exhibit No. 21, the
16  second page, Brown's report of his interview with Bret
17  Wachsmuth, he says that -- and this is at the -- I
18  think it's -- it says -- he stated that -- Wachsmuth
19  stated that -- had been looking at child porn and doing
20  meth.  He stated that they kicked him out the first
21  week of February and noticed the porn a week after he
22  moved out.  You see that?
23          MR. THOMPSON:  Is there a question pending?
24  BY MR. GOSMAN:
25      Q.  Yeah.  That's, do you see that?

ALAN KENT - November 22, 2010                                    Page 181
Direct Examination by Mr. Gosman

1   A.  Where is that at?

2   Q.  That's in Exhibit 22 -- 21, second page of

3   Exhibit 21.

4   A.  Yes.

5   Q.  Okay.  Now --

6       MS. WESTBY:  No, there's still a question

7   about...

8       MR. GOSMAN:  Do you want to take over the

9   deposition?

10      MS. WESTBY:  No, I want him to answer your

11  question.

12      MR. GOSMAN:  I do too, and I'm going to ask

13  him again.

14  BY MR. GOSMAN:

15  Q.  I want you to go through this record and tell

16  me where in this record there's a statement that the

17  confidential informant had stated that Bret Wachsmuth

18  was looking at child porn.

19      Going to take just a break for a minute while

20  you do that.

21      But let me say that it's probably going to be

22  in the affidavits of probable cause, the affidavit for

23  search warrant, or in Chad Miner's report since he was

24  the only one that talked to the confidential informant.

25      (Recess taken 4:49 to 4:52

---

ALAN KENT - November 22, 2010                                    Page 183
Direct Examination by Mr. Gosman

1   unknown.  So you wanted to...

2   A.  Tim Black was the Assistant County Attorney.

3   Q.  Okay.

4   A.  And the discussion was weighing the plants,

5   and they totaled up to be felony amounts.

6   Q.  Okay.  Did you want to see the charges

7   upgraded to a felony?  Is that why you were having this

8   discussion?

9       MS. WESTBY:  Object to the form of the

10  question.

11      MR. THOMPSON:  Join.

12      THE WITNESS:  I don't know in the first place

13  why they weren't a felony.  That was my question.

14  BY MR. GOSMAN:

15  Q.  Okay.  At that point you still didn't realize

16  that the marijuana grow was a misdemeanor?

17  A.  No.  And I can't remember the -- seems to me

18  the law changed in there somewhere.  So, no, I didn't.

19  Q.  All right.

20  A.  But the weight would have been because it was

21  almost 400 grams.

22  Q.  Four hundred grams?

23  A.  (Witness nods head.)

24  Q.  Did that include -- that included the entire

25  plant?

---

ALAN KENT - November 22, 2010                                    Page 182
Direct Examination by Mr. Gosman

1   p.m., November 22, 2010)

2       MR. GOSMAN:  Officer, have you found

3   anything?

4   A.  No, not yet.

5   Q.  All right.  Well, we're going to go ahead and

6   move on.  Did you read Miner's report?

7   A.  Yeah, I know I've read it somewhere.  I just

8   can't find it at the moment.

9   Q.  Okay.  Let me turn your attention to the

10  e-mail dated March 3rd, 2009.

11  A.  What was the number of the e-mails, again,

12  I'm sorry?

13  Q.  Yes, it's 36.

14  A.  Okay.  Which one now?

15  Q.  It's dated March 3rd.  It's from Alan Kent to

16  Chad Miner.  It's Bates numbered 585.

17  A.  Okay.

18  Q.  Okay.  Tell me about this e-mail.  Had you

19  talked with Tim Feathers about these charges?

20  A.  This e-mail, I believe, is Tim Black.

21  Q.  Alan Kent to Chad Miner, talked -- oh, I see,

22  Tim.  So this is Tim Black?

23  A.  Yeah.

24  Q.  Talked with Tim about why Bret was charged

25  with a misdemeanor.  The reason was the weight was

---

ALAN KENT - November 22, 2010                                    Page 184
Direct Examination by Mr. Gosman

1   A.  Less the potting soil and the pot.

2   Q.  All right.

3       THE WITNESS:  If this is going to go on much

4   longer, I'm going to have to take a break, I'm about

5   ready to bust.

6       MR. GOSMAN:  And I certainly understand that.

7   BY MR. GOSMAN:

8   Q.  All right.  One last question.  Have you had

9   any conversations with any of the officers about this

10  warrant service where the officers expressed regret

11  over the way things were handled?

12      MS. WESTBY:  Object to the form of the

13  question.

14      MR. THOMPSON:  Join.

15      THE WITNESS:  Yes.

16  BY MR. GOSMAN:

17  Q.  Yes?  Tell me what those discussions were.

18  A.  There was some concerns about Tricia going

19  downstairs.

20  Q.  Tricia going down the stairs?

21  A.  Yeah.

22  Q.  All right.  Who did you have that discussion

23  with?

24  A.  I talked with Chief Feathers about it.  I

25  talked to Sergeant Eckerdt, Officer Miner, Investigator

---

| ALAN KENT - November 22, 2010 | Page 185 |
| --- | --- |

Direct Examination by Mr. Gosman

1  Brown. Investigator Brown and Officer Miner approached
2  me.
3      Q.  So apparently, it was widely known that
4  Tricia Wachsmuth had been taken down the stairs first
5  into an uncleared area of the house?
6          MS. WESTBY: Object to the form of the
7  question.
8          MR. THOMPSON: Join.
9          MS. WESTBY: Misstates the testimony.
10         THE WITNESS: It was widely known that she
11  went downstairs.
12  BY MR. GOSMAN:
13      Q.  Did you know that she'd gone downstairs first
14  with the officers behind her?
15      A.  That night?
16      Q.  No, when you had these discussions with
17  Chief Feathers and the others about these regrets.
18      A.  I don't know where she was in line. I don't
19  remember.
20      Q.  All right. Thank you very much.
21      A.  Is that it?
22      Q.  See you later. You bet.
23             (Proceedings concluded at 4:57
24         p.m., 11/22/10.)
25

| ALAN KENT - November 22, 2010 | Page 186 |
| --- | --- |

Direct Examination by Mr. Gosman

DEPONENT'S CERTIFICATE

2          I, ALAN KENT, do hereby certify, under
3  penalty of perjury, that I have read the foregoing
4  transcript of my testimony consisting of 185 pages,
5  taken on November 22, 2010 and that the same is, with
6  any changes noted below, a full, true and correct
7  record of my deposition.
8  PAGE  LINE       CORRECTION      REASON FOR CORRECTION
9  ____  ____  _____ __ _____
10  ____  ____  _____ __ _____
11  ____  ____  _____ __ _____
12  ____  ____  _____ __ _____
13  ____  ____  _____ __ _____
14  ____  ____  _____ __ _____
15  ____  ____  _____ __ _____
16  ____  ____  _____ __ _____
17  ____  ____  _____ __ _____
18  ____  ____  _____ __ _____
19  ____  ____  _____ __ _____
20  ____  ____  _____ __ _____
21  ____  ____  _____ __ _____
22
23
24             _____
                ALAN KENT    Date
25

| ALAN KENT - November 22, 2010 | Page 187 |
| --- | --- |

Direct Examination by Mr. Gosman

CERTIFICATE

2          I, VONNI R. BRAY, Registered Professional
3  Reporter, and Notary Public for the State of Montana,
4  do hereby certify that ALAN KENT was by me first duly
5  sworn to testify to the truth, the whole truth, and
6  nothing but the truth;
7          That the foregoing transcript, consisting of
8  186 pages, is a true record of the testimony given by
9  said deponent, together with all other proceedings
10  herein contained.
11          IN WITNESS WHEREOF, I have hereunto set my
12  hand this 11th day of December, 2010.
13
14
15
16
17
18
19
20
21  _____
22  Vonni R. Bray, RPR
    P. O. Box 125
    Laurel, MT 59044
22  (406) 670-9533 Cell
    (888) 277-9372 Fax
23  vonni.bray@yahoo.com
24
25

**0**

**00089 (1)**
180:1
**0089 (1)**
180:2
**06 (4)**
25:6,9;33:6;37:2
**09 (2)**
55:18;58:6
**09-223 (1)**
57:9

**1**

**1 (4)**
78:15;144:12;145:2;
178:1
**1/27 (1)**
60:14
**1/28 (1)**
60:18
**10 (13)**
17:13;90:14,16;94:14;
107:17,19;109:25;
138:16;143:1,20;
144:10;149:11,14
**10/21 (1)**
22:22
**10/5/2005 (1)**
16:23
**1036 (2)**
19:18,21
**1038 (2)**
15:11,17
**1039 (2)**
15:12,17
**11 (12)**
63:12;76:16,20;77:6,
18;78:4;79:7,21;102:23;
114:24;115:12,20
**11/22/10 (1)**
185:24
**11:43 (1)**
19:4
**1161 (1)**
19:22
**12 (1)**
74:8
**12/27 (1)**
61:5
**12:12 (1)**
32:10
**1209 (1)**
23:20
**12-6-101-a (1)**
58:4
**12-6-101-b (1)**
58:4
**13 (8)**
67:9,12;71:15,25;
72:1;88:2;120:8;179:22

**137 (2)**
180:7,8
**14 (2)**
180:4,11
**15 (17)**
32:9;74:8;76:16,20;
77:6,18;78:4;79:7,21;
114:24;115:12,20;
157:2;179:22,25;180:4,
11
**16 (5)**
90:7,10;108:2,146:5;
178:3
**18 (2)**
111:13;126:23
**1814 (1)**
22:17
**19 (1)**
128:12
**1975 (2)**
8:7,24
**1982 (1)**
15:22
**1990 (1)**
9:11
**1995 (11)**
9:19;10:5;40:24;
41:18;42:9,10,15,24;
44:2;48:19;129:16
**1st (2)**
9:19;15:20

**2**

**2 (2)**
131:3;145:3
**2/18 (1)**
58:6
**2/24 (1)**
55:18
**2/9/1995 (1)**
16:17
**2:00 (1)**
53:11
**20 (10)**
12:23;13:2;14:2;
69:21,23;75:23;77:5;
78:15;88:10;157:2
**2001 (1)**
17:2
**2003 (3)**
18:3,15;20:1
**2005 (4)**
18:7;20:1;43:10,12
**2007 (1)**
61:5
**2008 (5)**
18:7,8;73:7;74:25;
78:17
**2009 (13)**
10:14;11:21;15:20;
21:19;50:7;53:4;57:3;
61:17;62:5;159:14;

178:8,9;182:10
**2010 (4)**
19:5;32:11;105:2;
182:1
**21 (5)**
180:4,13,15;181:2,3
**22 (5)**
19:5;32:11;105:2;
181:2;182:1
**23 (1)**
30:19
**24 (1)**
10:14
**24th (8)**
33:11;50:7;53:4;57:2;
61:16;62:4;159:14;
160:5
**25 (1)**
159:1
**250 (1)**
6:18
**25th (1)**
88:12
**26 (3)**
55:13,16;56:24
**28 (2)**
17:23,25
**29 (4)**
110:24;111:1;113:17;
126:23

**3**

**3 (3)**
67:7;73:4;145:3
**3.3.07 (1)**
35:9
**3.3.5 (2)**
35:4,6
**3.6.09 (2)**
28:9,11
**3.6.16 (5)**
25:21,24;26:2,8;29:24
**3.7.13 (1)**
31:17
**3.7.15 (1)**
31:14
**3.7.23 (5)**
30:17;31:6,7,11,16
**3/8/2002 (1)**
16:21
**3:01 (1)**
105:1
**3:11 (1)**
105:1
**31 (3)**
15:6,8;37:1
**35 (4)**
21:13,15;177:3,3
**35-7-1031 (1)**
57:20
**36 (5)**
177:3,3,5,11;182:13

**3rd (2)**
182:10,15

**4**

**4 (10)**
68:17;71:22;72:1,18;
120:11;145:3,14;
160:20;163:11,11
**4:30 (1)**
161:6
**4:49 (1)**
181:25
**4:52 (1)**
181:25
**4:57 (1)**
185:23
**40 (1)**
16:20
**400 (1)**
183:21
**49 (1)**
180:9

**5**

**5 (3)**
55:16;130:14;145:5
**5/4/1995 (1)**
16:17
**51 (2)**
10:20;11:1
**52 (3)**
25:25;26:1;28:13
**53 (3)**
138:7,8;163:11
**54 (3)**
149:1;150:10;163:11
**585 (1)**
182:16
**5th (1)**
178:8
**5-year (1)**
21:18

**6**

**6 (6)**
29:23;31:14;73:9;
136:6;145:5;146:1
**6/13/2003 (1)**
16:22
**6th (1)**
32:16

**7**

**7 (4)**
144:12;158:22,24,25

**9**

**9/21/2001 (1)**

16:20

**A**

**abandoned (1)**
47:1
**ability (3)**
6:20,24;63:10
**able (3)**
101:19;139:4;141:8
**above (6)**
36:6;57:24;59:12,13;
145:15;166:2
**absolutely (1)**
104:20
**academy (2)**
12:22;15:24
**accompanied (1)**
166:19
**accomplished (1)**
105:22
**according (2)**
86:21;120:15
**accnrate (1)**
94:19
**accurately (1)**
15:17
**accused (1)**
8:13
**acronym (1)**
55:18
**action (3)**
128:15,16,21
**active (8)**
37:2,5,20;38:3,12,13;
40:15,16
**activities (1)**
40:22
**activity (1)**
130:24
**actual (3)**
40:21;107:5;114:19
**actually (14)**
10:19;15:13;39:18;
43:19;44:16,21;50:20;
57:8;58:20;68:16;92:18;
96:5;100:14;149:8
**add (1)**
125:21
**additional (3)**
131:6,8,13
**address (1)**
6:17
**affidavit (24)**
67:22;68:2,6,18,20;
71:14,17,20,23;73:1,4;
74:13,24;75:9,11;77:14,
19;78:5,16;81:16;82:4;
179:21;180:6;181:22
**affidavits (3)**
180:8,12;181:22
**Afghanistan (1)**
157:10

Tricia Wachsmuth v.
City of Powell, et al.

Alan Kent
November 22, 2010

**afraid (1)**
122:22
**afternoon (13)**
53:11;64:15;73:22;
79:14;81:17,20;87:12,
13;96:19,23;97:2,14,16
**again (29)**
7:8,11,18;22:19;25:6;
28:23;30:9;31:22;32:19;
35:4;37:25;42:20;58:23;
61:14;62:3;71:18.23;
76:1;85:4;92:2;97:24;
107:17;121:8;143:20;
146:5;169:24;178:9;
181:13;182:11
**against (6)**
8:17;112:3;124:2,3,5,
12
**agency (2)**
52:3;130:23
**Agent (3)**
97:17,18,19
**agent's (1)**
95:21
**aggression (1)**
36:6
**ago (3)**
70:8;96:1;110:7
**agree (16)**
22:24;23:6,7;29:16;
56:15,15,22;57:2;60:23;
127:6,8,12;129:11;
166:17;168:10;169:20
**agreed (2)**
99:2;131:23
**agreement (4)**
52:2,5,10;106:5
**ahead (39)**
8:2,6,19;15:8;22:13,
16;23:16,19;25:14,20,
24;32:8,18;35:14;37:3;
53:3;55:15;57:17;58:10,
12;62:2;63:17;68:16;
69:19;80:3;88:10;94:14;
105:3;109:9;113:25;
126:22;128:11;130:15;
138:5;139:1;148:24;
161:4;177:11;182:5
**aid (1)**
52:5
**ALAN (5)**
5:1;6:16;177:7;
182:15,21
**alarm (1)**
155:17
**alerted (1)**
88:21
**alerting (2)**
88:4;90:23
**allegation (1)**
179:17
**allege (1)**
88:22

**allegedly (1)**
90:24
**allow (1)**
6:3
**allowed (1)**
170:20
**alludes (1)**
32:5
**almost (2)**
34:17;183:21
**along (4)**
13:9;96:7;97:4;157:6
**alternative (1)**
98:9
**alternatives (2)**
98:7;107:19
**always (1)**
85:19
**amount (7)**
73:14;113:8;.21:16;
130:25;148:1';153:12;
154:3
**amounts (1)**
183:5
**Ann (1)**
7:7
**Anna (1)**
12:10
**Annex (2)**
51:9;81:5
**announce (5)**
86:15;139:15 146:11;
147:8,9
**announced (1)**
141:10
**announcement (1)**
38:11
**answered (10)**
48:5;64:5;103:21;
116:6;117:21·122:7;
124:24;135:2 159:23;
174:15
**apparently (6)**
41:10;58:6;61:6;
156:24;172:1 ;185:3
**appear (3)**
26:18;60:21;73:16
**appeared (3)**
142:12,15,24
**Appears (3)**
58:8,21;144:19
**apply (5)**
14:13;13:22:25;23:7;
24:4
**appreciate (3)**
5:23;10:22;167:7
**apprehension (2)**
52:16;127:11
**approach (3)**
38:7;103:3;127:5
**approached (1)**
185:1
**approaching (2)**

**140:1,13**
**appropriate (4)**
25:3;40:17;95:21;
111:19
**approval (1)**
93:22
**approve (1)**
93:18
**approved (3)**
13:8;70:1;77:5
**approves (1)**
13:9
**approximate (1)**
149:25
**Approximately (5)**
17:19;70:7;73:8,9;
180:9
**area (9)**
9:22;56:6;101:17;
142:2;160:21;161:16;
167:22;168:12;185:5
**areas (1)**
131:6
**arguing (2)**
114:10;168:22
**argumentative (5)**
46:8;69:13;70:20;
99:20;104:20
**arm (1)**
148:11
**armed (1)**
104:11
**armor (1)**
140:22
**around (6)**
53:10;138:10;139:6;
150:20;163:3,18
**arrest (2)**
60:3;114:3
**arrested (7)**
7:2,15;8:3;59:15,16;
61:17;62:6
**arrests (1)**
34:21
**arrival (1)**
142:4
**arrived (9)**
96:7;138:12,21,22;
141:9,11;149:22;150:4;
156:20
**arriving (2)**
9:20;91:13
**assaultive (1)**
36:7
**assembled (5)**
49:9;84:9;102:23;
133:5;154:21
**assigned (1)**
65:24;131:19;153:4,6
**assist (2)**
63:4;67:15
**Assistant (1)**
183:2

**assisting (1)**
105:20
**associated (1)**
24:20
**assume (4)**
22:10;132:13;151:6;
156:19
**assumed (1)**
163:21
**assuming (6)**
15:9;24:16;45:14;
47:17;143:23;158:11
**assumption (2)**
56:16;86:4
**attain (1)**
93:22
**attempted (1)**
98:17
**attend (2)**
9:6;39:16
**attendance (1)**
13:12
**attended (5)**
9:7,8;21:24;22:2;
48:16
**attention (4)**
24:15;32:19;155:9;
182:9
**attorney (2)**
81:5;183:2
**attorneys (1)**
5:10
**August (1)**
9:11
**authority (1)**
12:12
**available (5)**
38:12,25;108:17,22;
131:9
**avoid (1)**
109:17
**aware (27)**
31:8;47:8;53:5,7,9;
61:16;62:4;64:13;67:2;
89:20;91:23;95:14;
106:7;116:8;118:12;
136:25;145:21;161:11;
172:10;173:13,18,21;
174:4,11,18;175:2,5
**away (3)**
125:24,25;178:3
**awful (1)**
104:20

**B**

**B1 (1)**
130:19
**BA (1)**
145:12
**back (25)**
7:11;10:21;15:12;
21:19;32:8;38:8;67:19;

71:14;74:25;75:5,7;
76:18;89:17;91:15;
94:22;113:11;145:10,
23;150:9;162:19,22,25;
163:11,16;178:9
**background (1)**
8:20
**bad (4)**
86:1,8;119:5,22
**badgering (1)**
114:11
**bags (1)**
163:3
**bar (1)**
107:8
**bark (2)**
139:7;140:20
**barked (1)**
140:14
**barking (3)**
139:18,25;140:7
**based (17)**
42:6;49:15;50:16;
66:12;74:23;79:8,20,23;
85:16,18;89:9;91:20;
106:16;108:8,11;
118:15;138:1
**basement (12)**
70:12;73:9,14;75:19;
76:12;89:14;92:10;
115:16;151:12,25;166:1,
3
**bases (1)**
29:22
**basic (7)**
12:21;15:21;16:20,21,
25;17:5,16
**basically (1)**
36:11
**basis (4)**
7:10;48:1;124:15;
157:12
**Bates (5)**
15:16;18:17;19:14;
20:7;182:16
**bathroom (4)**
155:4;164:8;166:3;
172:3
**bay (2)**
109:21,23
**beanbag (1)**
35:20
**became (4)**
16:4;53:7,8;124:24
**become (2)**
53:5;120:25
**becomes (1)**
113:6
**becoming (1)**
46:8
**bed (1)**
135:19,23;155:25
**bedding (3)**

154:25;155:19;156:4

**bedroom (21)**
103:10;130:12;
135:23;141:22;145:15;
152:18;153:10,15,18,25;
154:24;155:2,19;161:22,
25;162:1,3,14,19;164:8,
9

**bedrooms (1)**
161:23

**beds (1)**
153:2

**began (1)**
138:13

**begin (4)**
5:5;6:4;127:15;128:2

**beginning (3)**
19:13;41:16;53:10

**behavior (1)**
175:22

**behind (6)**
135:18;140:15;153:1;
155:25;173:23;185:14

**bell (1)**
179:4

**belts (1)**
33:19

**Bessler (1)**
61:17

**best (4)**
24:13;90:3;105:13;
150:12

**bet (1)**
185:22

**better (1)**
161:7

**big (3)**
15:9;97:22;118:24

**Black (3)**
182:20,22;183:2

**Blackmore (2)**
142:12,19

**blindly (2)**
137:10,14

**body (1)**
44:5

**book (1)**
15:9

**boss (5)**
97:9;98:22,22;104:1;
106:3

**both (2)**
72:3;150:3

**bother (1)**
100:4

**bottom (5)**
18:18;22:11,14;72:21;
146:7

**box (8)**
158:6,7,13,17;159:6,
23;160:6,14

**boy's (1)**
101:16

**brand (1)**
158:2

**breach (1)**
38:17

**breaches (2)**
108:16,21

**breaching (1)**
32:25

**break (18)**
6:12,13;63:12.86:2,5,
6;104:24;144:13,20,23,
25;145:3,5,11 15;
147:24;181:19;184:4

**breaking (3)**
139:5;145:9.2 3

**Bret (51)**
62:13;68:20:69:2;
70:7,9,11,17;72:3,6;
76:11;85:18:86 22;87:7;
88:4,17,24;89:2 1;90:23;
95:12;98:1;99 6,9;
100:4;101:18;105:17;
106:21;116:4. 14;
117:25;119:7,23,24;
121:11,23;122:11,17;
123:5,10;126:2;143:17;
156:11,15;157:22;
178:16,17;179:1,2,17;
180:16;181:17;182:24

**Bret's (4)**
100:1;102:12,13;
172:14

**briefing (1)**
178:22

**Brilakis (1)**
12:9

**bring (1)**
107:7

**brings (1)**
25:1

**broke (5)**
12:6;135:6,17 148:4;
172:6

**brought (2)**
67:19;163:3

**Brown (7)**
88:18;178:10,24,25;
180:13;185:1,1

**Brown's (1)**
180:16

**budgetary (1)**
130:24

**building (1)**
129:9

**Bullet (2)**
22:23;95:13

**burn (1)**
155:22

**burned (3)**
155:6,21;156:4

**bust (1)**
184:5

**buys (1)**

17:7

---

# C

**calculated (3)**
127:15;128:3,4

**California (6)**
8:24;9:8,16;16:1,6,8

**call (11)**
22:23;24:15;77:4;
85:1;101:16;103:15;
106:1,14;107:4;141:2;
168:15

**called (11)**
51:22;58:20;81:12;
83:10;84:12,19;85:9;
94:12;95:2;96:2;101:1

**calling (4)**
32:19;100:20;107:3;
170:25

**calls (3)**
84:18;166:25;167:25

**came (10)**
77:23;89:14;109:21;
110:6;126:17:153:13,14,
18;162:1;173:19

**camera (1)**
165:3

**can (60)**
5:24;16:23;19:2;21:2,
8;24:11,13;26:6;27:9,
21;32:8;33:20;34:1,3,6,
19,20,24,24;35:1,1,
37:16;40:8;41:25;43:10;
44:14;51:22;56:10,21;
57:25;58:13,13;68:14;
74:13,14;90:11;105:21;
107:21;108:19;113:8;
115:2,3,6,16,17,22,23;
117:16;121:1,4,17;
122:8;124:12;149:9;
157:19;161:4;167:7;
171:1;172:4;177:10

**capable (1)**
64:11

**car (5)**
136:19;138:23;
158:14;163:2,4

**care (2)**
104:19;114:6

**career (1)**
106:8

**Carolina (1)**
79:4

**carried (3)**
33:12,13;85:20

**carry (1)**
33:19

**carrying (2)**
98:25;125:20

**cars (1)**
165:11

**case (27)**

14:19;53:6;57:9,9;
60:4,23;71:12;77:2,3;
85:9;97:3,5,6;101:22;
109:16;110:14;114:3,7,
15,18;130:2;168:17,21;
170:20;177:9;178:5,25

**Casper (1)**
65:25

**Caucasians (1)**
117:7

**cause (5)**
179:21;180:7,8,12;
181:22

**cell (1)**
151:18

**centered (1)**
17:20

**certain (1)**
12:18

**certainly (11)**
27:2;56:21;71:7;
77:17;78:5;87:17;104:5,
9;121:19 123:25;184:6

**certified (1)**
14:3

**certify (1)**
175:21

**cetera (3)**
105:21;127:23;144:13

**Chad (4)**
88:11;181:23;182:16,
21

**chain (1)**
10:18

**challenged (1)**
13:25

**chance (2)**
108:14;147:2

**Change (4)**
59:25;71:6;125:9;
127:18

**changed (3)**
129:20,23;183:18

**changes (1)**
127:11

**Chapman (6)**
143:21;147:18,19;
164:25;177:17,19

**character (1)**
64:9

**charge (2)**
92:7;97:19

**charged (6)**
59:11;61:18;62:6;
71:4;89:8;182:24

**charges (1)**
57:4,5;58:3;182:19;
183:6

**chase (1)**
34:19

**chases (1)**
34:19

**check (2)**

31:10;153:16

**checked (1)**
67:5

**checking (1)**
81:18

**CHG (1)**
59:24

**chief (36)**
11:4,8,9,23;47:7,11,
14,17;52:12;64:17,22;
65:8,9;80:16;84:23;
85:4,5,8,11;91:21,23;
93:1;94:5,10;96:17;
97:1;98:13,24;104:1;
106:3;108:1;109:8;
173:6,10;184:24;185:17

**child (19)**
133:23;142:5,8,11,13,
15,15,16,24;143:2,14,
15;178:16,18;179:3,6,
19;180:19;181:18

**children (1)**
143:18

**choice (1)**
86:8

**choose (1)**
63:24

**Chretien (40)**
11:16;46:20;84:10,12,
19;85:3,10;88:21;89:15,
19,25;91:11,16,24;92:2;
93:9;109:3,10;131:19;
133:16;143:21;144:4,8;
151:10,11;154:16,19;
156:7,12,19,24;157:5,
11;166:13,18;168:11;
174:11;175:11,23;
176:17

**Chretien's (3)**
108:3;109:5,6

**CI (8)**
72:2,14;73:7;74:21,
23;77:24;120:3,15

**CI-2009-02 (1)**
70:6

**cigarette (1)**
70:25

**circumstance (1)**
118:12

**circumstances (11)**
33:21;34:10;65:23;
102:17;105:12,15;
118:16;121:8,9;137:15,
22

**citizens (2)**
11:7,9

**city (5)**
50:14;51:24;52:2,14,
21

**clarification (1)**
5:24

**Clark (1)**
6:18

**class (2)**
13:12;17:9
**clear (3)**
24:5;151:2;153:3
**cleared (3)**
5:24;152:20;153:9
**clearing (4)**
32:25;152:21;155:10;
170:10
**clearly (1)**
24:20
**closer (1)**
157:13
**closet (2)**
152:19;153:8
**closets (1)**
153:2
**code (1)**
60:17
**Cody (11)**
43:5,15,20;52:6;58:8,
21,23;61:2;89:13,17;
132:22
**collect (2)**
164:19,19
**collected (3)**
164:13,18,23
**collection (1)**
177:23
**college (5)**
9:2,6,7,8,9
**column (4)**
25:16;26:7,14;57:25
**coma (1)**
121:21
**comfortable (1)**
37:17
**coming (16)**
85:25;86:3,9,22;88:5,
24;89:22;101:13;
118:23;119:5,5,21;
125:19;128:18;139:10;
149:9
**command (1)**
10:18
**commanded (1)**
174:11
**commander (1)**
50:13
**commands (1)**
152:4
**committed (1)**
99:7
**committing (1)**
122:3
**common (2)**
106:18;141:24
**commonly (1)**
130:24
**communicate (2)**
93:1;94:10
**communicated (2)**
87:7,13

**communicating (2)**
50:21;178:9
**communication (5)**
11:4;94:3,23;102:5;
104:1
**communications (3)**
11:18,20;81:24
**community (1)**
12:10
**compared (1)**
39:1
**compilation (1)**
21:16
**completed (5)**
148:13;149:10;
159:10,20;160:8
**completely (1)**
101:20,25;111: :13;
157:19;176:2:,22
**compliant (1)**
152:4
**complies (6)**
138:17;139:3 149:18;
150:1,8,15
**comply (1)**
152:2
**components (1)**
32:24
**computer (6)**
61:11;178:10 12,23;
179:3,19
**concern (5)**
100:2;114:3,4,7,15
**concerned (1)**
125:22
**concerning (1)**
126:1
**concerns (4)**
91:1,4;105:18;184:18
**concluded (1)**
185:23
**conclusion (3)**
167:1;168:1,16
**conclusions (1)**
83:13
**conduct (2)**
91:11;136:12
**conducting (1)**
29:6
**conferring (1)**
84:23
**confidential (42)**
26:5;30:1,4,1;53:22,
23;54:4,5;56:12;57:5;
60:6;61:5;62:5;68:11;
69:7,8;73:13;78:3,22;
79:8;81:6,9,13;82:5;
87:7;88:4,22;89:20;
90:23;105:16 118:17;
119:17;122:10,22;
123:11;178:1;178:17,24
**confirmed (1)**

74:21
**confuse (1)**
63:24
**connection (6)**
18:1;19:10;40:21;
61:6;64:16;83:14
**consecutive (1)**
180:10
**consider (1)**
106:4
**consideration (1)**
157:9
**considerations (4)**
39:3;40:17;109:2,11
**considered (4)**
87:14;96:16;105:11;
136:12
**considering (1)**
83:7
**consisted (1)**
16:25
**constitute (1)**
170:5
**constitutional (3)**
171:6,19,23
**consult (2)**
50:18;51:4
**consulted (7)**
50:7,11,16;63:9;
102:16;109:16;110:13
**consulting (1)**
50:20
**contacted (3)**
88:23;91:7;97:17
**contain (2)**
59:2,3
**contained (4)**
31:24;39:15;68:17;
178:13
**contains (3)**
138:16;144:11;158:3
**continue (3)**
21:7;32:18;36:25
**continuum (8)**
111:22;112:16;125:6;
127:10,13,19,25;128:9
**controlled (4)**
57:22;120:12,14,17
**conversation (4)**
98:12;110:8;157:18;
173:9
**conversations (5)**
97:8;114:19;143:16,
17;184:9
**convicted (2)**
8:9;59:11
**cooperate (1)**
63:3
**cooperated (1)**
64:12
**cops (2)**
119:5,22
**copy (5)**

25:13;28:2,3,13;35:22
**copyright (2)**
18:6,8
**corner (2)**
94:16;139:6
**corrections (2)**
159:9,19
**correctly (1)**
69:17
**couch (5)**
148:22;151:7,8;
153:22;174:21
**counsel (5)**
5:15;21:1;56:9;
114:10;168:14
**count (1)**
14:18
**counter (1)**
129:1
**countering (1)**
128:17
**Countermeasures (8)**
18:2;43:4,7,8;129:18;
131:16;132:1,21
**County (10)**
50:4;51:9,11,18;52:6;
61:3;81:5;97:22,23;
183:2
**couple (2)**
57:13;125:24
**Course (24)**
16:21,25;17:1,3,5,16,
19;18:1,2,7,14;23:14,17;
42:16;67:21;85:5;124:3;
132:16;139:11;163:6;
165:13;166:20;168:6;
172:6
**courses (5)**
14:5;20:1;22:9;40:25;
41:2
**court (2)**
56:5,6
**Court's (4)**
56:2,10,11;61:25
**cover (5)**
20:9,18,19,23;34:9
**covered (1)**
29:22
**covert (1)**
17:6
**Cozzens (2)**
11:19,20
**creates (1)**
155:18
**credits (2)**
14:13,14
**crime (8)**
7:2,15;8 14;59:11;
61:7;71:4;99:7;122:3
**crimes (3)**
7:19;8:3,61:18
**criminal (13)**
54:13;58:11,16;59:3,

5,6,10;61:8,10;65:11;
100:8;116:5,13
**crisis (2)**
111:6,11
**critical (2)**
130:16;131:5
**crushing (1)**
120:13
**cue (2)**
147:20,24
**curiosity (1)**
33:9
**curious (1)**
100:20
**current (2)**
6:17;129:12
**currently (4)**
6:19;75:19;78:4,23
**cut (1)**
145:13

**D**

**dad (3)**
100:12,15;172:14
**dad's (1)**
156:12
**damage (2)**
171:25;172:2
**danger (4)**
101:18;123:18,25;
161:11
**Danzer (2)**
143:21;157:6
**dark (2)**
82:17,19
**date (8)**
22:6;25:22;39:17;
42:5,7;44:3;78:23,25
**dated (3)**
178:1;182:10,15
**dates (1)**
15:2
**Dave (3)**
178:9,24,25
**day (11)**
51:17;54:16;62:15;
82:15;88:14,19;89:21;
116:24;140:23;172:21;
173:5
**days (2)**
17:21;44:7
**DCI (5)**
17:3;62:22;65:24;
97:20;157:12
**DEA (2)**
16:21;17:16
**deal (3)**
35:16;130:22;131:7
**dealing (2)**
79:15,16
**deals (7)**
24:14;28:17;29:1;

Tricia Wachsmuth v.
City of Powell, et al.

Alan Kent
November 22, 2010

30:4;32:20;35:18;40:9
**dealt (4)**
21:22;117:4,7,17
**debriefing (1)**
172:18
**debris (1)**
160:22
**December (6)**
73:7;74:25;75:5,7;
77:16;78:17
**decided (3)**
106:25;108:13;162:17
**decipher (1)**
6:7
**decision (10)**
83:4;97:10;98:21;
99:23;101:8;104:2;
109:3,8;125:13;136:11
**dedicated (1)**
49:18
**de-escalate (1)**
113:9
**defendants (1)**
20:14
**defendant's (1)**
20:13
**defense (2)**
158:25;168:20
**define (1)**
76:15
**defined (1)**
78:14
**defines (1)**
40:16
**DEF-TEC (2)**
158:2;159:1
**delivered (1)**
70:10
**delivering (1)**
72:6
**delivery (9)**
54:16;57:6,12;69:5;
70:17,23;71:2,5;75:15
**Department (56)**
9:13,18,21,24;10:5,8,
19;11:15;12:4,13;13:1;
14:16,22;16:6,7;21:18;
22:5;33:18;41:5,9;42:2,
13,18;43:24;45:4,17;
46:14;47:21,22,25;
48:12;49:19;50:5,6;
51:23;52:23;55:25;57:4;
58:22,24;59:14;67:20;
79:12;91:6;108:20;
111:7,10;126:18;132:11,
17;133:3;147:2;163:22;
167:5;175:10,20
**Depending (2)**
127:7,9
**depends (2)**
120:20;121:16
**deploy (5)**
131:20;133:6;144:20;

148:7;158:12
**deployed (8)**
29:15;36:4;103:9;
131:25;132:1:,,15;
133:11;142:2
**deploying (6)**
36:9;134:6,14,147:21;
148:14;161:1.
**deployment (5)**
38:7,21,24;39 1;
129:21
**deposition (10)**
5:8;6:25;7:6;21:7;
56:17,19,20;79 3;146:4;
181:9
**depositions (2)**
7:11;121:7
**depressed (7)**
116:16;117:4,12,17;
118:19,20;125:17
**Depression (1)**
117:21
**describe (4)**
30:24;36:4,8;157:18
**described (1)**
36:18
**describes (1)**
111:18
**description (1)**
94:16
**deserted (1)**
45:6
**designed (1)**
129:1
**destroyed (2)**
114:1,5
**destruction (2)**
114:18;128:6
**determined (2)**
144:8;156:11
**developing (1)**
80:18
**development (1)**
34:16
**device (38)**
35:1;36:9;42:25;43:9,
12;44:7,15;10 :9;
108:18,23;129 7,21,25;
130:3,11;131:.0,25;
133:6,11,22:1 14:6,14;
135:22;137:1,:,20;
138:4;142:2;1 17:21;
148:7,14;157:25;158:3,
17;159:8;160:6,20;
161:12
**devices (14)**
24:19;33:1;41:18;
42:5,12,12;43 23;
127:23;129:5; .37:19;
159:11,16,21;  60:9
**devise (2)**
91:16,24
**devised (1)**

91:11
**devising (1)**
89:8
**diagram (4)**
138:15,19;148:25;
149:13
**dialing (2)**
151:18,19
**Dick (1)**
9:24
**difference (10)**
34:14,22;48:20;49:8,
21;59:9;78:14;116:15,
21;126:7
**different (9)**
27:14;32:24;34:25;
35:1;38:11;53:8;57:21;
140:23;145:1
**differently (1)**
97:6
**diffuse (3)**
63:10;101:20;152:25
**dinner (1)**
98:11
**diploma (2)**
9:1,4
**DIRECT (5)**
5:3;12:9;51:12;81:19;
151:11
**directed (1)**
20:14
**directly (4)**
11:4,23;33:2,21
**discipline (2)**
13:13,14
**disciplined (1)**
13:20
**disclosed (1)**
56:13
**disclosing (1)**
54:4
**discovered (1)**
67:6;73:8;74:19
**discovery (3)**
7:6;20:13,16
**discuss (4)**
64:21;85:8;173:3,7
**discussed (18)**
5:10;26:12;65:6;
91:21;97:1;98:8;100:1;
106:25;107:3,10,20,22,
24,25;108:1;143:25;
144:15,17
**discussing (2)**
110:3;143:9
**Discussion (16)**
21:4;65:2;80:23;81:2;
109:20;133:10,13,21;
134:1;136:22;156:14,
23;161:8;183:4,8;
184:22
**discussions (2)**
184:17;185:16

**dishonesty (4)**
7:19;8:14;61:19;62:7
**displaying (1)**
36:6
**disposal (1)**
35:3
**dispose (2)**
114:24;178:4
**dispositions (1)**
59:16
**distraction (17)**
108:18,23;130:3;
131:20;133:6;134:6,14;
135:22;137:1,9,19;
138:4;145:21;159:11,16,
21;160:9
**distractions (1)**
128:22
**Diversion (6)**
129:5,7,21,25;130:11;
147:21
**diversionary (15)**
34:25;41:18;42:5,11,
12,25;43:9,11,23;44:7,
15;133:11;148:7,14;
157:25
**document (24)**
15:16;18:18;19:14;
22:13;27:13;28:12;
37:16;45:13;58:20;59:2;
60:10;67:13;68:23;
88:11;90:17,23;111:3,
12,13;130:14;143:5;
149:21;159:2,5
**documented (2)**
163:10;164:13
**documenting (2)**
90:20;164:17
**documents (14)**
15:11;18:24;19:8,10,
23;20:3,5,6,10,11,12;
22:8;41:13;45:13
**dog (6)**
139:7,18,25;140:7,14,
20
**done (13)**
41:5,8;42:3,3,9,14;
56:17;91 10;162:17;
169:1;171:25;172:17,19
**door (42)**
38:17;63 12;86:3,6,7,
23;98:18.24;99:2,12;
102:23;103:4;104:12,
13;107:9;115:1;121:14;
124:24;139:14,23;140:1,
6,14;141:16;144:12;
145:2,7;146:8,11,12;
147:3,6,22;148:1,1;
149:9;150:11;151:17;
154:8;162:14;172:2,3
**doubting (1)**
74:9
**down (46)**

12:6;16:15;27:6;
34:20;77:1;86:2,5,6;
91:7;94:12;95:4,22;
96:2;101:11;102:23;
103:4;108:4;109:21;
115:3,12;123:1,4;
126:17;135:17;142:1;
146:6,21;154:22;
163:22;165:24;166:14.
18,21;167:12,13;168:12;
174:12,19,21;175:13,24;
176:3,11,18;184:20;
185:4
**Downey (1)**
8:23
**downstairs (9)**
94:25;164:9;166:7,11;
173:19,22;184:19;
185:11,13
**draw (4)**
10:17;138:14;149:3,5
**drawn (1)**
83:12
**drink (1)**
98:11
**drinking (1)**
58:5
**drop (1)**
148:12
**Dropped (4)**
133:20,22;148:8;
157:25
**Drove (3)**
10:2;136:19;139:7
**drug (14)**
16:20,25;17:5,6;
60:15,15;65:25;66:2;
79:15;81:21;95:21;
100:19;114:2,16
**drugs (11)**
57:22;60:16;68:22;
69:3,15;70:17,22;71:9;
72:6;120:10;123:15
**duly (1)**
5:2
**dummy (1)**
132:19
**during (12)**
31:10;72:4;73:7;
87:12,13;91:8;93:23;
97:15;131:25;132:25;
163:6;166:20
**duties (4)**
47:12,15;52:12;169:8
**dynamic (68)**
16:13;17:20;21:23;
22:9,21;23:7,12,14,22;
24:4,5,15,18,20;28:18,
19;29:2;30:5,7,13;
31:24;32:20,21,24;33:3,
21;34:3;35:16;37:21;
38:4,6;39:19;41:1;42:1;
44:24;48:1,22;49:4;

65:14,20;80:24;84:10,
22;85:9,15;92:15,22,24;
96:11;98:18;104:11;
109:9;111:14;113:7,18,
19;124:16,23,25;125:2,
3;126:8;127:21;128:12;
129:4;131:10;136:13;
170:11

**E**

**earlier (6)**
89:21;96:19,23;97:2;
116:7;157:8
**early (1)**
82:19
**easy (1)**
114:24
**Eckerdt (18)**
11:17;46:20,22;94:23;
95:6;96:1,6;148:22;
152:9,15;156:13,20;
157:5,11;161:5,17;
176:23;184:25
**Eckerdt's (2)**
126:2;151:3
**education (1)**
8:25
**educational (1)**
8:20
**effect (1)**
155:14
**effort (1)**
179:20
**eight (2)**
74:25;78:17
**Eighteen (1)**
126:25
**either (7)**
24:18;57:4;91:1;
120:13;155:1;158:16,17
**elapsed (2)**
141:19;163:8
**elected (2)**
101:20;102:5
**element (1)**
44:24
**elements (1)**
94:11
**elicit (1)**
170:6
**elk (1)**
79:2
**else (17)**
8:11;43:14;54:25;
65:6;70:23;88:18;
102:16;103:16;121:13;
122:9;125:12,15;141:1;
150:16;152:8;162:11;
172:8
**e-mail (5)**
177:7,9;182:10,18,20
**e-mails (5)**

177:10,12,13,14;
182:11
**Emergency (1)**
16:22
**employ (1)**
113:7
**empty (1)**
44:5
**encompasses (1)**
57:21
**end (5)**
31:12,13;92:21;
137:16,22
**endangered (1)**
29:8
**ended (1)**
152:18
**ending (1)**
19:13
**enforcement (1.5)**
12:17;15:18.2.2;16:1;
52:3;97:20;102:6,14;
106:7,17;159:9 19;160:7
**engage (1)**
37:10
**engaged (1)**
80:11
**Enough (4)**
104:14;175:12,23;
177:8
**ensure (2)**
171:5,18
**enter (4)**
38:17;63:12;86:15;
104:10
**entered (6)**
103:6;152:14,15;
161:18,19;174:5
**entering (1)**
109:2
**entire (1)**
183:24
**entitled (6)**
7:9,19,20,24;169:6;
170:6
**entries (4)**
23:8,14;49:18 65:20
**entry (97)**
16:13;17:7,20 21:23;
22:9,21;23:12,22;24:4,5,
15,18,19,20;26 7:28:18,
19;29:2,9,14,15;30:5,7,
13;31:24;32:20,21,24
25;33:3,22;34 3:35:17;
37:22;38:4,6;39:19;
40:15;41:1;42 1:44:23,
24;45:16;46:24 48:1,22;
49:4,10;55:18:57:24;
65:15;80:24;82 24;83:4,
22,25;84:2,11 13,22;
85:9,16;89:8;90:20;
91:12,25;92:15,16,22,
23,24;96:11;93:19;

104:11;109:9;113:7,19;
124:16,20,23,25;125:2,
3;126:9;127:21;128:12;
131:10;136:13;139:4;
140:13;146:13;149:23,
24;150:6;166:19;
170:11;177:19
**escalate (1)**
113:8
**established (1)**
169:10
**et (3)**
105:21;127:23;144:13
**even (4)**
56:6;81:1;86:21;
126:15
**evening (25)**
50:7,22;53:3;61:16;
82:16;84:8;85:6;91:8;
92:5,18;93:2,23;94:2,24;
96:21,25;97:16,16;
131:10;136:10;145:22;
159:14;160:5;163:6;
169:9
**event (3)**
33:10;43:19;64:15
**events (5)**
43:19;44:15;45:13,13;
169:16
**eventually (3)**
81:9,15;148:15
**everybody (3)**
92:9;141:3;172:21
everybody-get-together-as-a-group-and-debrief (1)
172:25
**everyone (1)**
141:1
**everywhere (1)**
91:2
**evidence (47)**
7:22;65:19;69:1,4,6,
11;70:16;72:5;73:12;
75:8,11;76:3,10;77:18,
23;80:10;99:6;114:1,5,
18;116:24;119:6,24;
121:23;122:11;124:4;
126:12;128:6;151:22;
155:3,24;163:4;164:13,
17,19,23;165:12,16;
167:16,24;173:25;
174:23;177:21,23,24;
178:4;179:8
**exact (3)**
40:3;82:15;148:17
**exactly (3)**
101:7;110:1;156:10
**EXAMINATION (1)**
5:3
**examine (2)**
158:16,20
**excessive (9)**
166:22;167:4,11,20;
168:13;169:7,20;170:5,

11
**exclusively (1)**
34:17
**excuse (3)**
33:14;115:7;179:5
**execute (3)**
65:15,21;121:15
**executing (1)**
138:13
**execution (3)**
10:13;93:12;172:1
**exercise (1)**
30:16
**Exhibit (72)**
10:20;11:1;15:6,8;
17:23,25;21:13,15,16;
25:25,25;26:1;28:13;
37:1;55:13,16;56:2,4,5,
18,22,24;67:9,11;69:21,
23;71:15;72:1;75:23;
77:5;88:2 10;90:7,10,14,
16;94:14;107:17,19;
108:2;109:25;110:24;
111:1;113:17;120:8;
126:23;138:6,7,8,16;
143:1,20;144:10;146:5;
149:1,11,14,20;150:10;
158:22,24,25;163:10;
177:2,5,11;180:11,11,
13,15;181:2,3
**Exhibits (1)**
180:4
**exists (1)**
75:10
**experience (4)**
82:3;108:12;117:5,17
**experienced (1)**
27:3
**expert (4)**
168:17,19;169:5;
170:5
**expertise (2)**
50:12,17
**explained (1)**
93:19
**explaining (1)**
92:9
**expressed (1)**
184:10
**extensive (1)**
54:12
**extent (1)**
152:22
**extra (2)**
108:13,15

**F**

**fact (27)**
18:14;26 21;77:6;
78:2;88:22;99:14;110:5;
112:17;117:11;119:2,
11;120:10,16;121:11;

122:2;123:6;124:16;
125:4,15,25;134:4;
136:25;143:1;146:14;
160:6;166:14;168:17
**facts (2)**
166:25;170:4
**fair (1)**
40:13
**fairgrounds (2)**
43:4;45:5
**fairly (4)**
46:8;57:20;82:19;
128:7
**false (2)**
61:22;62:8
**falsely (1)**
61:6
**familiarize (1)**
37:15
**family (2)**
105:21;130:6
**far (4)**
47:5;52:14;94:19,21
**father (5)**
101:16;102:12,13,16;
103:16
**favorites (1)**
65:13
**Feathers (22)**
11:9;47:7;64:17,22;
65:6,8,9;80:16;85:4,5,8,
11;91:21,23;93:1;94:10;
97:1;173:6,10;182:19;
184:24;185:17
**Feathers' (1)**
52:12
**February (2)**
9:19;10:14;11:21;
33:11;57:3;61:17;62:5;
77:16;82:18;159:14;
160:5;180:21
**feel (3)**
37:17;86:6;129:9
**feet (2)**
136:6;165:23
**fellow (1)**
171:5,18
**felonies (2)**
7:19;62:6
**felony (17)**
7:5;52:16;54:16;
61:18;66:9,16,16,18;
67:3,8;79:15,17;80:1,7;
183:5,7,13
**few (9)**
21:7;42:21;64:19;
87:1;131:6;139:17;
140:2;163:7;176:9
**figure (1)**
27:21
**file (3)**
13:22;77:3;177:13
**filed (2)**

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 56 of 67

Tricia Wachsmuth v.                                                    Alan Kent
City of Powell, et al.                                          November 22, 2010

77:2;178:24

**filing (1)**
57:4

**filled (1)**
173:12

**final (1)**
99:23

**finalized (2)**
92:25;93:2

**finally (1)**
109:8

**find (16)**
19:2;27:9;28:25;29:4;
34:10;74:13,14,14;
90:11;99:2,16;100:4;
101:17;165:16;177:14;
182:8

**fine (5)**
56:14;72:13;89:3,4;
139:1

**finish (2)**
6:3;94:7

**finished (1)**
32:15

**finishing (1)**
149:20

**fire (5)**
155:1,2,3,24;161:11

**firearm (1)**
34:24

**firearms (3)**
34:9,14,18

**first (51)**
5:2,7;15:23;19:14;
20:13,16,20;22:17;
41:17,18;42:15,15;43:6,
7,7;53:5,7,8;61:24;
64:14;67:17;68:19;
72:14;80:17;83:21;84:9,
18;87:6;96:1,22,24;
98:18;110:5;128:13;
131:2;135:16;138:21,
22;148:19;152:24;
154:17;158:24;163:9,9;
174:12;177:16,25;
180:20;183:12;185:4,13

**five (2)**
13:14,21

**flammable (1)**
161:12

**flash (2)**
108:17,23

**flashbang (15)**
24:19;33:1;34:15,16;
103:9;108:18;127:23;
144:13,21,24;145:4,14,
17;155:18;161:12

**flush (3)**
115:3,6,11

**flushed (1)**
165:24

**follow (1)**
157:8

**followed (4)**
150:3;162:8,9,9

**follows (1)**
5:2

**force (25)**
111:22;112:1 8,9,16,
23;113:8;125:9;127:13,
19,24,25;128:9,24;
146:13;157:10;166:22;
167:4,11,20;158:13;
169:7,21;170 5,11

**forcing (1)**
125:5

**forego (3)**
101:21;102:5 136:11

**forgery (2)**
61:19;62:7

**form (139)**
14:6;17:11;18:16;
23:3,24;24:8,11;25:3;
26:15;27:23;28:21;
29:18;31:2;32:2;33:4,
23;36:20;37:23;38:19;
39:9,20,24;41 12;44:9;
45:18;46:7;47:2,9;
48:13,24;49:11,23;
50:23;51:6,20;54:18;
55:3,11;56:1;57:14;
58:15;60:24;61:20;62:9;
63:14;64:4;65:16;66:4;
69:12;70:19;7:8;73:23;
75:1,16,24;76:3,13;77:9,
21;78:7;80:2, 2;82:25;
83:15;86:17,24;87:20;
89:23;93:14;96:13;
99:18;100:6,1';101:23,
24;102:9,25;103:19;
104:15;105:9 107:11;
112:10,25;114:8;
115:13;116:13;117:1,
13;118:3,8;119:13;
120:1;122:6,19;123:20;
124:7,18;125 7;126:4,
13;131:11;13;2;
133:24;134:7,.5;135:1,
24;137:3,11;139:19;
140:8;142:6,20;143:3;
145:18;146:1;159:22; .
160:10;161:1;166:8,23;
167:15,23;169:23;
170:7;171:8;173:15,16,
24;174:7,14,2;175:14;
176:1,6,21;183:9;
184:12;185:6

**format (1)**
27:22

**forth (1)**
47:1

**forward (1)**
103:14

**found (4)**
28:7;120:11;178:7;
182:2

**four (4)**
73:6;108:4,4;183:22

**free (2)**
6:12;160:21

**Fremont (1)**
97:22

**frequently (1)**
70:7

**friends (1)**
63:1

**front (16)**
15:13;139:23;140:6,
14;144:11;146:8,10;
147:11;149:9;150:11;
151:17;165:6,8,10;
167:21;172:2

**full (1)**
6:15

**fully (3)**
63:3;64:12;130:21

**function (1)**
49:19

**functions (1)**
133:5

**funnel (1)**
156:2

**furnace (4)**
115:16,19,20,24

**further (2)**
54:3;169:12

**G**

**gain (1)**
39:1

**garage (6)**
79:10,11;153:17;
154:2;163:5;164:9

**gave (1)**
89:9

**general (2)**
5:6;54:11

**generally (3)**
17:1;22:25;37:15

**generated (1)**
15:1

**gets (1)**
82:19

**given (6)**
5:7,19;71:21;92:7;
111:19;112:2

**glass (1)**
135:16

**goes (6)**
13:9;14:17;38:5,8;
112:4;152:24

**good (8)**
37:11;57:11;86:10;
134:5,13;150:5;151:22;
175:21

**GOSMAN (244)**
5:4;7:6,12,14,22;8:1,
8;11:2;13:17,19;14:8,9;

15:7;17:14,18,24;18:19,
22;19:1,6;20:4,8,17,20,
24;21:3,6,14;23:9;24:2,
12,24;25:8,23;26:3,20;
28:1,20,24;29:11,12,20;
30:8,10,20,21;31:5;32:7,
12;33:8;34:2;36:24;
38:1,22;39:13,22;40:6;
41:19;44:13;45:21;46:1,
10,12;47:6,13;48:17;
49:5,14;50:3;51:3,10;
52:1;54:7,23;55:8,14;
56:4,8,14,21,24;57:1,23;
58:17,18;59:1;60:1;
61:4,21;62:1,12;63:19;
64:8;65:22;66:8;67:10,
24;68:4;69:14,22;70:24;
72:12,24;73:20;74:4;
75:3,20;76:2,9,17;77:13;
78:1,10;80:6,15;83:5,20;
86:20;87:3;88:1;90:2,8,
15;93:17;94:9;96:14;
98:4;99:21;100:10,22;
102:4,10;103:2;104:3,
22,25;105:3,7,14;
107:16;111:2;112:15,19,
22;113:4,15;114:12,14;
115:10,18;116:20;117:6,
19;118:5,10,18;119:18;
120:5;122:4,10,24;
124:14,22;125:14,23;
126:6,11,21;131:14;
132:7;134:3,11,19;
135:5;136:3;137:6,17;
138:9;139:24;140:5,12;
142:9,18,25;143:8;
145:19;146:20;149:4,
12;151:4,9;158:23;
159:24;160:3,15;161:4,
7,10;166:12;167:3,19;
168:5,18 22,25;169:3,6,
19,25;170:8,14,17,22,
25;171:3,11,13,16;
173:20;174:3,10,17,25;
175:18;176:4,8;177:1,6;
179:7,12,14,22,25;
180:6,24;181:8,12,14;
182:2;183:14;184:6,7,
16;185:12

**grah (1)**
44:7

**graduate (1)**
12:22

**graduated (1)**
8:23

**grams (2)**
183:21,22

**grant (1)**
145:13

**great (1)**
130:25

**ground (2)**
136:6;141:22

**group (4)**
22:8;48:21;49:3,9

**grow (18)**
53:9,16;62:15;64:25;
66:9,14;67:2;68:13;
74:15;76:11;78:13,14;
79:15,24,25;80:5,19;
183:16

**growing (7)**
57:13;70:12;73:17;
74:2;75:14;76:4,6

**guess (9)**
8:6;49:3;63:5;64:7;
104:18;126:16,17;
151:24;168:7

**guilty (2)**
8:10;71:1

**gun (7)**
85:21;98:25;124:11,
12,16;125:4;152:9

**guns (9)**
85:20;118:20;123:12,
14,16,23;125:11,18;
152:13

**guy (1)**
98:25

**guys (5)**
44:7;119:5,22;153:16;
178:3

**H**

**half (2)**
35:13;133:2

**Hall (1)**
143:21

**hand (3)**
19:7;158:21;160:14

**handed (1)**
28:13

**handgun (2)**
34:6,9

**handguns (1)**
91:2

**handle (3)**
52:11;65:10,11

**handled (1)**
184:11

**hands (2)**
71:6;165:6

**hands-on (3)**
40:4,8,21

**hang (2)**
151:20;152:1

**happen (2)**
84:16;175:2

**happened (11)**
14:19;81:3;103:10,14;
106:22;152:17;170:3,
19;173:3,12;175:8

**harm (2)**
37:10;113:23

**harvested (2)**

72:15;73:2

**head (3)**
110:17;133:22;183:23
**heading (2)**
111:14;129:5
**hear (10)**
139:7;141:13,16;
148:1;151:11;152:8;
154:16,19;155:17;
169:11
**heard (14)**
54:2,9;78:3;79:8;
111:22;121:6,7;125:16;
140:19;147:10,22;152:5,
6;153:8
**held (5)**
10:7;21:4;109:21,23;
161:8
**help (2)**
63:10;101:20
**helpful (1)**
6:5
**helping (2)**
82:4;103:18
**helps (1)**
39:11
**Hermann (4)**
97:9,17,18,25
**high (12)**
8:21,23;9:1,3;27:17;
45:9,10,10;46:25,25;
98:25;141:22
**higher (1)**
113:6
**high-risk (8)**
25:10;27:16;30:18,24;
31:1,19,25;32:16
**himself (1)**
34:11;126:18
**Hispanics (1)**
117:8
**history (13)**
15:18;59:6,10;61:9,
10;64:10;99:16;100:5,8;
116:5,9,12,13
**hold (3)**
9:22;10:10;76:18
**hole (1)**
172:3
**home (25)**
50:14,19;51:2,25;
63:12;71:9;79:22;82:12,
24;83:23;84:22;85:16;
86:16;91:12;92:15;
104:10;109:18;115:20;
121:13;144:1;149:14;
163:20;165:16;167:22;
171:25
**Horn (1)**
97:22
**host (4)**
23:2;33:20;34:10,18
**hostage (2)**

17:7;130:22

**Hot (1)**
97:22
**hour (1)**
32:9
**hours (10)**
12:23;13:2,3, 0;14:2;
15:4;16:20;41 3;87:2,4
**house (75)**
45:6,6;47:1;6 :11;
68:13;77:7;78 4;85:20;
86:3;91:3;98:1);100:25;
101:6,11,14;1 33:6;
104:7;106:22 107:7;
115:21;119:2';123:12,
14,17,24;124:11,17;
125:4,11,18:1 8:14,16;
141:23;142:4 145:23;
147:11;148:15 20;149:6,
7,8,22;150:17 18,20;
151:22;152:1',14,22;
154:1,9;156:6,12,13,20,
21,25;161:18, 9;162:8,
14,20,22,23,24 25;163:7,
9,12,16,24;16 5:6;
172:12;174:5 185:5
**huh (1)**
70:13
**huh-uh (1)**
6:8
**human (10)**
166:6,15;169:22;
170:10;173:14,19;
175:13,25;17(:3,17
**hundred (1)**
183:22
**hunting (1)**
79:2
**hurry (2)**
140:16;148:18
**hurt (1)**
108:14
**husband (2)**
151:19,22
**hypothetical (5)**
168:15,24,25; 69:17;
170:4
**hypotheticals (2)**
169:2;170:20

**I**

**idea (10)**
22:1;54:25;55.6;
80:22;104:16;1 06:23;
110:6;140:10;143:15;
163:13
**identified (19)**
11:1;15:6,11;17:23;
21:13;26:1,13.30:17;
55:13;67:9;69 21;90:7,
14;111:1;138:8;143:2;
158:22;177:5; 80:5

**identifies (2)**
20:21;38:16
**identify (5)**
16:12;19:13;22:12:
30:25;138:7
**identifying (1)**
22:19
**identity (1)**
56:12
**ignitable (1)**
160:22
**illnesses (1)**
6:23
**images (1)**
178:13
**Immediately (3)**
9:23;146:12;147:6
**impact (2)**
35:20;42:4
**impair (1)**
6:20
**impeach (1)**
7:23
**important (4)**
87:14,18;99:15;104:5
**impression (1)**
119:8
**inches (1)**
73:9
**incident (4)**
53:7,9;61:9;88:14
**incidental (1)**
172:1
**incidents (2)**
130:16;131:5
**inclined (2)**
121:3,4
**include (3)**
14:4;66:23;183:24
**included (4)**
47:15;108:15;125:15;
183:24
**includes (2)**
12:8;66:25
**including (2)**
13:14;17:6
**inconsistent (1)**
27:3
**incorrect (1)**
179:10
**increases (1)**
112:5
**index (2)**
27:9,20
**indicate (2)**
76:5;137:19
**indicated (2)**
29:25;121:12
**indicates (2)**
120:17;179:1
**individual (4)**
21:11;59:4;169:21;
170:10

**individually (1)**
121:10
**inference (1)**
121:25
**influence (1)**
85:23
**informant (39)**
26:5;53:22,23;54:5,6;
56:12;57:6,60:6;61:5;
62:6;68:12;69:7,9;
73:13;78:3,22;79:9;
81:7,9,13;82:5;87:7;
88:4,23;89:20;90:23;
105:16;118:17;119:17;
122:16,22;123:11;
178:14,15,17;179:3,17;
181:17,24
**informants (3)**
30:1,4,12
**information (32)**
53:13,16,19;59:3;
60:4,10;73:21;74:7;
80:18;85:16,18,21;
87:15,18;89:7,9;90:1;
91:20;93:8;107:5;108:9,
11;118:16,25;119:10,16;
120:3,7;122:17;123:11;
142:5;164:11
**informed (4)**
64:23;81:25;88:23;
95:10
**in-house (1)**
131:18
**initial (2)**
74:7;151:15
**initiating (1)**
30:24
**inject (1)**
127:21
**injecting (1)**
120:14
**input (3)**
131:22;133:17,18
**in-service (17)**
12:25;14:4,15,21;
21:17;22 20;26:13,22,
25;29:24;32:15,17;34:8;
37:1;39:17;40:9;41:10
**inside (6)**
51:24;98 25;133:14,
19;142:1,162:14
**instance (9)**
34:15;41 15;107:8;
112:2;114:2;122:13;
125:25;130:3;170:3
**instances (1)**
123:5
**Institute (2)**
18:2;132:1
**instructed (2)**
5:15;91:16
**instructing (1)**
170:22

**instructions (2)**
5:6;160:19
**Interdiction (1)**
16:22
**interested (3)**
63:7;89:1;117:24
**Interestingly (1)**
177:8
**interfere (1)**
6:24
**Interior (5)**
16:17;41:16;42:16;
149:5,13
**Internet (1)**
125:20
**interrupt (1)**
115:9
**interview (3)**
81:15;82:4;180:16
**interviewed (2)**
88:18;179:1
**into (50)**
12:6;27:19;35:22;
54:3;56:6;72:14;82:24;
83:22;84:22;85:16;
89:14;91:12,25;92:15;
103:9;108:6;109:13,17;
113:6;118:24;127:21;
129:6;130:4,20;137:10;
142:15;151:12;152:18;
153:10,15,20,25;154:24;
155:4;157:25;158:14;
160:21;161:12,22,24;
162:2,3,14,22;163:10,
12;167:22;168:12;
172:12;185:5
**introducing (2)**
108:17,23
**introduction (3)**
41:18;111:16,18
**investigated (2)**
54:15,21
**investigating (2)**
55:1,7
**investigation (7)**
13:25;16:20,25;17:6;
52:16;81:21;83:14
**Investigator (2)**
184:25;185:1
**invited (2)**
51:11;82:6
**inviting (1)**
107:4
**involve (6)**
24:5;41:25;65:3;71:8;
101:10;105:20
**involved (29)**
11:15;13:11;16:19;
17:10;33:10,16;34:9;
43:8;51:25;52:25;55:10;
65:1;81:15;83:12;95:6,
8;96:18;97:3,10;98:21;
100:13;101:9,22;109:3.

10;127:22;131:9;
132:18;145:22
**involves (1)**
40:3
**involving (6)**
8:14;33:11;61:18;
62:7;108:21;110:6
**Iraq (1)**
157:10
**Israeli (1)**
24:19
**issued (3)**
33:18;58:7;78:24
**issues (2)**
99:1;100:1
**item (1)**
146:1
**items (4)**
25:2,3;128:13;144:14

**J**

**Jeff (4)**
46:8;56:1;170:21;
176:7
**job (2)**
63:24,24
**jobs (1)**
9:22
**Join (90)**
23:5;24:10;25:5;
26:17;31:3;32:4;33:5.
25;36:22;37:24;39:10;
40:1;41:14;44:10;45:20;
47:4;48:14;49:1,13,25;
50:25;51:21;54:20;55:5;
57:16;61:1,23;62:10;
63:16;64:6;65:18;70:21;
72:10;73:25;75:2,17,25;
76:14;77:22;78:8;80:13;
83:2,17;86:25;87:22;
89:24;93:15;100:7,18;
102:1;103:20,23;
105:10;107:13;112:12;
113:2;117:3,15;120:2;
122:20;123:22;124:19;
125:10;126:14;131:12;
132:4;133:25;134:9,17;
135:3,25;137:5,13;
139:21;142:7,22;
146:17;160:12;161:2;
166:9,24;167:17,25;
168:2;174:1,24;175:15;
183:11;184:14;185:8
**joined (1)**
162:15
**Jones (1)**
9:24
**Josh (1)**
61:17
**Judge (4)**
67:19,21;68:1,7
**judgment (2)**

79:14,16
**July (4)**
9:11;33:6;46:19,21
**June (4)**
25:6,9;29:23;32:16
**Junior (1)**
9:7
**justify (3)**
125:4;126:8:130:23

**K**

**keep (5)**
46:10;48:7;101:13;
114:12;130:4
**keeping (5)**
44:12;46:5,23.47:15;
81:25
**keeps (3)**
45:25;46:15,17
**KENT (8)**
5:1;6:16;8:20;32:14;
104:23;177:8:182:15,21
**Kent-Training (3)**
18:25;20:2,4
**Kent-Training-number (1)**
20:7
**kept (2)**
21:17;109:24
**kicked (1)**
180:20
**kind (7)**
34:17;62:24;100:16;
105:19;150:4;153:2;
157:24
**kinds (2)**
85:11;115:5
**Kirk (2)**
177:16,19
**kitchen (2)**
161:21;164:8
**knew (23)**
80:14;81:14;82:9;
85:24;92:16,23,24;
101:16;103:16.105:12;
118:15,22;125 16,19;
136:24;139:10 143:17;
159:13,15;160:4,16,24;
175:22
**knock (13)**
86:15;98:15,25;99:2,
13;104:13;114 25;
139:14;144:12.145:2;
146:7,10;147:1
**knock-and-announce (4)**
86:11,14;139:11;
147:1
**knocked (2)**
102:23;103:4
**knocking (3)**
104:12;106:20 107:9
**knowledge (7)**
64:10;90:12;108:12;

122:15;123:9;126:1;
169:15
**known (4)**
86:22;121:11;185:3,
10

**L**

**label (4)**
149:16;158:25;159:8,
18
**labeled (1)**
149:15
**labels (1)**
158:17
**laid (2)**
93:5,7
**Lara (3)**
99:25;126:1;143:16
**large (3)**
57:20;75:12;119:25
**last (19)**
7:10,11,20;13:14,21;
19:21;21:11;42:21,22,
22,24,55;18:62:16;73:6;
80:21;105:4;165:10;
176:9;184:8
**later (9)**
40:8;66:14;82:16;
84:8;109:19;148:16;
155:13;157:2;185:22
**law (20)**
12:17;15:18,22,25;
52:3;78:14;102:6,14;
104:16,18;106:7,17;
112:14,15,19;159:8,19;
160:7;168:21;183:18
**lead (5)**
75:14;167:12,13;
168:11;176:17
**leader (1)**
97:20
**leading (2)**
114:19;176:11
**Lean (1)**
24:19
**learn (4)**
53:12;84:9;87:6;92:8
**learned (2)**
166:10;179:2
**least (6)**
19:9;46:4,15;74:23;
82:23;161:5
**leave (3)**
16:3;149:21;154:1
**leaving (2)**
143:25;163:9
**led (8)**
64:10;166:6,14,18,21;
167:21;168:4,11
**left (3)**
136:10,14,16
**left-hand (1)**

94:16
**legal (3)**
167:1,25;168:15
**Less (10)**
16:2;17:13;33:6,9,16;
35:8;36:1,3,17;184:1
**lesson (1)**
13:7
**lethal (7)**
33:6,10,16;35:8;36:1,
3,17
**lethargic (1)**
121:20
**letter (2)**
29:5;59:18
**level (3)**
36:6;112 1;125:5
**levels (1)**
111:19
**LG (1)**
143:24
**LG1 (1)**
143:21
**LG2 (1)**
143:21
**LG3 (1)**
143:21
**LG4 (1)**
143:21
**LGLP (1)**
19:20
**liable (1)**
23:11
**lieu (1)**
102:22
**life (5)**
99:8,17;113:21;116:1;
129:10
**lights (2)**
130:8,9
**limit (1)**
7:23
**limits (1)**
51:24
**line (5)**
27:6,7;143:24;144:2;
185:18
**list (15)**
15:4;22:22;24:14,24;
26:10;40:12;94:15,19;
130:15;143:19;144:5,6,
8,11;146:1
**listed (7)**
11:3;18:25;25:7;
57:19;75:18;128:14;
168:18
**lists (3)**
24:22;113:18;144:12
**little (2)**
30:16;46:9
**live (3)**
44:4;132:19;133:8
**lives (2)**

39:2;129:10
**living (8)**
70:11;130:9;149:7;
154:21;161:16;162:20;
164:7;175:4
**loaded (7)**
91:2;103:6;123:10,12,
14,16,23
**loading (1)**
165:11
**lobby (1)**
110:2
**local (1)**
97:20
**locate (1)**
164:22
**located (6)**
138:18;142:5;143:14,
15;165:18;179:24
**location (2)**
149:24,25
**locker (1)**
44:8
**log (1)**
74:15
**logical (1)**
46:4
**logs (1)**
74:19
**long (11)**
15:25;35:12;80:21.22:
140:11;151:14;153:11;
154:7;157:4;163:15;
165:14
**longer (1)**
184:4
**look (33)**
17:25;18:5,9,13,21;
25:21;27:18,20;30:2,16;
35:14;55:16;67:11;68:9,
14;69:19;75:10;90:9,16;
94:14;109:25;120:8;
126:22;128:11;131:4;
135:11;137:20;141:25;
142:1;143:19;146:4;
177:2,11
**looked (5)**
32:1;119:7,19;135:14;
151:17
**looking (16)**
18:6;27:12;28:2;
31:12,15;85:19;113:17;
119:4,21;133:21;134:2;
145:1;178:16,18;
180:19;181:18
**Looks (5)**
60:14;119:2;120:21;
152:24;177:7
**loose (1)**
160:21
**lot (5)**
115:2,22;121:18;
138:11;155:18

**Lovell (1)**
65:25
**low (4)**
112:8,9,23.24
**Lt (12)**
50:21;51:5.9;81:11,
24;82:3,14,20,23;83:10;
109:15;110:5
**lunch (5)**
21:7;30:15;31:10;
32:8,16
**Lynn (1)**
6:16

**M**

**M16 (1)**
95:12
**M4 (1)**
95:12
**magistrate (1)**
170:25
**mail (1)**
118:22
**maintain (1)**
12:23
**Makes (1)**
145:25
**making (6)**
23:11;34:21;95:13;
165:6,8,12
**man (1)**
99:13
**manager (1)**
10:3
**manner (1)**
160:21
**man's (1)**
58:11
**manual (12)**
18:1,10,13;25:14,18;
26:24;27:6;28:3,14;
31:12;129:22,23
**manuals (1)**
19:25
**manufacture (4)**
54:17;57:6,12;59:13
**many (9)**
48:18;71:16,19;76:18;
108:16,19,22;130:22;
132:5
**March (5)**
178:1,3,8;182:10.15
**marijuana (29)**
57:13;62:15;66:9;
67:2;68:12,21;69:22;
70:6,14,25;71:2,19;72:3,
15:73:1,8,14,17;75:13;
76:4,11;78:4;80:7,11,19;
114:25;115:20;165:20;
183:16
**Marissa (3)**
107:23;144:6,7

**mark (6)**
19:8;25:24,25 156:1,
2;172:4
**marked (1)**
149:1
**marks (1)**
155:22
**master (6)**
153:15,21,25;  54:24;
162:1;164:8
**material (3)**
160:17;179:16,18
**materials (9)**
26:12;113:16; .37:19,
24;138:2,4;155:4;
160:22;161:13
**matter (5)**
64:16;115:3.1.;
120:10;140:2
**matters (1)**
5:24
**mature (1)**
74:16
**may (18)**
7:22;27:6;29:7,8;31:9;
39:14;42:14;5"':18;
98:25;99:1;114.1;124:4;
133:23;137:15.21;
149:13;161:20,166:2
**Maybe (4)**
20:24;31:10;75:14;
98:9
**McCaslin (11)**
131:20.24;132 6,23;
134:20,21;136 21;
148:6;158:10;162:7;
164:24
**McCaslin's (2)**
139:2;163:3
**mean (40)**
11:8;33:12;35:2;37:8;
38:6,8;40:23;4:':5;44:2;
55:21;59:5,6,13,24;
61:10,14;65:1~;78:13;
81:20;82:15,18;84:17;
98:3;100:12;1(15:24;
110:21;111:25.117:12;
119:3,16;125:21;126:16,
17,19;138:22;144:19;
148:10;154:4;'60:1;
171:9
**means (9)**
6:8,8;37:6,7,9;55:19;
60:13;130:25;147:1
**measures (2)**
23:1;98:17
**medical (1)**
6:23
**medication (4)**
6:19;119:25;121:24;
122:12
**meet (3)**
14:2;98:11;112:24

**meeting (7)**
64:17;80:21;84:7;
93:25;94:11;107:22,25
**meetings (1)**
48:9
**meets (1)**
47:18
**members (1)**
105:21
**mental (2)**
99:1;100:1
**mention (2)**
36:13;109:12
**mentioned (9)**
40:20;41:2,16;42:14;
43:14;59:19,20;61:6;
143:10
**met (9)**
13:4;80:16;81:4,12.
87:12;92:18;94:24,25;
122:14
**metb (3)**
57:12;59:13;180:20
**methamphetamine (3)**
54:17;57:7;121:2
**method (1)**
145:21
**methodical (1)**
127:4
**middle (1)**
135:23
**might (7)**
6:24;34:10;53:6;86:8;
101:19;121:3,14
**Mike (2)**
11:16;176:17
**military (4)**
95:12;125:21;159:9,
19
**milling (1)**
163:18
**mind (6)**
20:17;46:11;96:10;
103:13;114:13;126:8
**Miner (45)**
12:8;18:22;50:22;
51:4,8,15;53:14;62:14,
19;64:14,19;67:18;
68:12;74:12,24;75:9;
76:22,24;77:4,24;79:6,6,
21;80:17,18;81:4,12,17;
82:23;83:12,22;84:5;
87:9,9;88:3,11,23;89:12,
13;105:16;161:25;
182:16,21;184:25;185:1
**Miner's (8)**
18:23;69:18;75:21;
76:4;79:2;83:3;181:23;
182:6
**minimize (1)**
108:14
**minimum (2)**
12:18.24

**minute (14)**
10:17;18:5.9;19:1.2;
22:7;33:15;37:13;58:9;
91:15;96:1;110:7;154:5;
181:19
**minutes (6)**
21:7;32:9;64:19;
154:6;157:2;163:14
**misdemeanor (6)**
65:15;66 2,7,15;
182:25;183:16
**misdemeanors (1)**
80:5
**missed (1)**
25:12
**missing (2)**
31:9:41:24
**Misstates (19)**
41:13;54:19;65:19;
83:16;101:25;103:21;
107:12;112:13,19;
125:8;132:3;146:18;
166:25;167:16,24;
173:25;174:23;176:22;
185:9
**misstating (1)**
104:18
**misunderstanding (1)**
79:25
**Modesto (5)**
8:24;9:7,8;16:5,6
**moment (13)**
16:11;17:25;19:12;
21:21;54:22;94:15;
107:18;110:25;111:14;
130:15;138:23;146:5;
182:8
**moments' (1)**
87:2
**Monday (1)**
178:1
**Money (1)**
71:6
**month (3)**
42:22,24;70:7
**monthly (1)**
157:12
**months (2)**
42:21;56:6
**more (14)**
37:17;44:20,25;67:7;
121:3,4;132:12,14;
133:7;140:2,19;162:16;
163:14;166:1
**morning (1)**
178:1
**morphine (3)**
120:22.25;121:19
**most (2)**
85:24;166:19
**mostly (1)**
120:21
**mother-in-law (1)**

85:22
**motion (1)**
148:12
**move (10)**
8:5;9:10,15;27:6,7;
113:6;127:10,19;128:9;
182:6
**moved (2)**
72:14;180:22
**movement (1)**
128:22
**moving (2)**
127:24;150:21
**much (7)**
17:19;141:19;148:16;
149:8;163:8;184:3;
185:20
**mud (1)**
43:21
**multiple (3)**
35:2;108:16,21
**municipal (1)**
60:17
**munitions (9)**
33:7,10,16;35:8;36:2,
3,3,18;42:4
**must (1)**
128:7
**mutual (2)**
52:5,10
**myself (2)**
108:1;120:11

**N**

**name (10)**
6:15;54:4.6.9;62:13,
16;97:24;139:1;151:3;
158:2
**name-training-documents (1)**
21:12
**narcotic (4)**
108:12;121:4;122:12;
123:6
**Narcotics (9)**
16:21;17:16;52:15;
55:10;57:21;118:21;
121:17;122:8;125:19
**narrative (1)**
179:7
**national (1)**
61:11
**Nature (1)**
57:25
**near (1)**
15:12
**nearly (1)**
48:11
**necessarily (4)**
55:12;78:9,12;101:10
**necessary (1)**
38:24
**need (5)**

Case 1:10-cv-00041-ABJ   Document 65-5   Filed 01/10/11   Page 60 of 67
Tricia Wachsmuth v.
City of Powell, et al.
Alan Kent
November 22, 2010

7:21;22:12;32:21;
94:7;144:20
**needed (5)**
84:25;117:25;156:15;
162:17;178:5
**needles (1)**
120:15
**needs (2)**
56:20;104:24
**networking (1)**
95:11
**Nevertheless (1)**
40:14
**new (2)**
45:10;46:25
**next (15)**
26:7;40:15;55:24;
64:15;72:18;81:3;92:3;
134:22;148:23;149:22;
150:6;161:20;172:21;
173:5;176:24
**NFDD (1)**
108:18
**night (19)**
33:17;36:19;49:9;
96:7;98:8;103:14;
109:22;136:23;144:1;
158:20;159:21,25;160:2,
25;172:20;173:4,5,14;
185:15
**nobody (4)**
124:24;132:11;133:6;
165:12
**nods (1)**
183:23
**noise (4)**
108:17,23;128:22;
145:5
**no-knock (3)**
23:22;147:4,5
**none (1)**
36:23
**Nope (1)**
13:18
**normal (1)**
104:10
**normally (1)**
141:6
**North (3)**
6:18;45:6;79:4
**Northwest (2)**
9:9;97:20
**notes (2)**
90:18,19
**notice (7)**
25:16;68:11;87:2;
154:25;155:6;165:5;
180:15
**noticed (3)**
15:21;72:15;180:21
**November (8)**
19:5;32:11;37:2;50:7;
53:4;62:5;105:2;182:1

**Number (27)**
15:17;19:21;22:10,14;
25:23;28:8;31:4,15,16,
16;38:7;71:21 23;73:6;
75:12,18;76:2 ,77:11,
14;78:21;108:25;145:2,
3,14;146:1;160:20;
182:11
**numbered (3)**
22:17;144:11;,82:16
**numbering (1)**
27:22
**numbers (6)**
18:17;19:13:2?:6;
143:22,23;144:12
**numerous (3)**
72:4;108:12;1 32:16

**O**

**oath (2)**
5:19;44:17
**Object (87)**
14:6;17:11;18 16;
23:3,24;24:8,21;25:3;
26:15;27:23;2x:21;
29:18;32:2;33:2;36:20;
39:20,24;41:1?;45:18;
46:7;47:2;48:24;49:11,
23;51:6;54:18:55:3;
56:1;57:14;58:15;60:24;
63:14;64:4;65:16;66:4;
69:12;70:19;72 8;73:19,
23;77:9;82:25;33:15;
86:17;87:20;8* :23;
99:18;102:25;:04:14;
105:9;107:11;: 12:10,
25;114:8;115::3;
116:18;117:1,1},118:3,
8;119:13;123:20;124:7;
125:7;126:10;132:2;
134:7,15;137:5,11;
139:19;140:8;142:17,
20;145:18;146 15;
160:10;167:23:169:23;
171:8;173:16;174:22;
176:6,19;183:9 184:12;
185:6
**objecting (1)**
112:17
**objection (63)**
7:18;17:17;29:3;31:2;
33:4;37:23;38:19;39:9;
44:9;47:9,10;4%:13;
50:23;51:20;55:11,
61:20;62:9;75:1,16,24;
76:8,13;77:21;78:7;
80:2,12;86:24;93:14;
96:13;100:6,17;101:23,
24;102:9;103:1);
118:14;120:1;1?2:6,19;
124:18;126:4,1*;
131:11;133:24;135:1,

24;140:4;142:6;143:3;
159:22;161:1;166:8.23;
167:15;170:7,16;173:15,
24;174:7,13,14;175:14;
176:1
**objections (1)**
170:17
**objective (6)**
76:10;99:6;123:17;
127:5,11,18
**observations (1)**
151:15
**observe (1)**
156:3
**observed (3)**
48:11;156:3;160:21
**observing (1)**
171:22
**obtained (1)**
53:6
**obtaining (3)**
61:22;62:7;87:19
**occasionally (1)**
26:22
**occasions (5)**
34:25;35:1,2;44:20;
72:4
**occupants (2)**
104:7,9
**occurred (5)**
8:4;15:1;44:16,19;
64:15
**off (10)**
21:2,4;92:4;106:14;
119:1;136:6;141:22;
145:13;161:8;178:23
**offenses (3)**
58:5;66:1,3
**offer (1)**
133:18
**offered (2)**
13:1;22:5
**office (6)**
28:6;68:7;81:12;85:7;
97:21,21
**Officer (124)**
5:5;6:15:8:20;10:9;
12:8,9,10,17;13:6,24;
14:4;15:18;16:10;19:7;
21:11;32:13;34:10;
45:15,16,22,24;47:20;
48:16;50:15,22;51:4,8,
15;53:14;62:14,19;
64:14,19;65:6;67:18;
68:12;69:18;74:6,12,24;
76:3,21,22,24;77:4;79:2,
13;80:17;81:4;82:7,9,13,
23;83:3,12,22;84:5,10;
87:9,9;88:3,18,23;89:12,
13,19;91:5,16,24;95:6;
99:13,25;100:20;101:1,
17;102:7,14,17;104:23;
105:16,20;106:8,17;

108:3;109:3,5;114:15;
121:7;126:1;127:5;
131:20,24;132:6,12;
134:4;142:12,19;
143:16;148:6;151:10,
11;154:16,19;157:10;
159:17;161:25;164:10,
24,25;166:13,18;167:9;
168:11;171:4,17,22;
175:3,11,23;176:14;
177:8;182:2;184:25;
185:1
**officers (63)**
12:1,5,12;23:1;33:18;
48:12,21;49:3;52:19,23;
53:1;63:13;84:8;91:6;
94:1,12,15;96:8;102:23;
103:24;104:4,11;107:6;
108:17,22,118:7;120:19,
25;121:14;122:1;
123:18,25,127:22;128:5,
8;131:9;141:9;144:2;
145:23;150:13,18;
152:12;154:12;157:16;
161:16;163:18;164:11;
165:5,8;167:21;168:19;
171:5,18:173:22;174:4,
18;175:9,20;176:10,15;
184:9,10;185:14
**officer's (2)**
21:11;169:7
**offset (1)**
128:4
**old (2)**
45:10;46:25
**once (4)**
44:25;131:25;132:19;
133:8
**one (76)**
6:5;7:4;10:22;18:12,
19,20;19:16;22:17;
25:12;28:5;30:16;31:8;
36:5;40:23;41:22;42:7;
43:5,10,19;48:15,22;
50:5;52:11;59:12,13;
61:2;68:25;70:7,25;
72:25;73:2;82:20;84:17;
85:13;87:12;91:4;95:10;
106:19,20,24;108:4,8;
118:24;121:9;123:4;
132:13,15;133:5,6,8;
135:6;152:16;156:11;
157:13,15;158:12;
161:19;162:7;163:2;
164:7,23;166:10;
168:18;172:20,21;
177:11,12,12,16;179:23,
23;180:11,11;181:24;
182:14;184:8
**ones (12)**
7:5;21:24;22:1;27:14,
17;40:12;44:4,4,20;
132:19,19,166:2

**ongoing (5)**
40:24;44:2;94:2;
96:21,24
**only (17)**
10:22;70:16;82:20;
113:5;131:24;133:7;
138:3;152:6,16;159:8,
18;160:7;161:19;172:4;
177:8,14;181:24
**open (4)**
146:12;147:3,6;
159:23
**opened (1)**
86:23
**operation (20)**
51:12;53:9,16;62:15;
64:25;66:10,14;67:3;
68:13;71:8;74:6;76:11;
78:13,14;79:15,24;80:1,
19;165:11;173:12
**operations (6)**
47:23;49:20,21;50:2;
80:5;170:10
**opinion (5)**
23:15;168:17;170:4,5,
21
**opinions (2)**
169:5,15
**opposed (1)**
104:12
**option (1)**
105:13
**options (9)**
38:25;85:12;96:15;
97:4;105:11;106:24;
107:2,10;136:12
**order (10)**
8:17;60:19;61:25;
109:17;124:5;128:8;
144:8,18,19,22
**others (7)**
29:7;33:1;69:5;
113:23;171:6,19;185:17
**ounces (3)**
66:21,22;67:7
**ours (1)**
21:10
**out (72)**
8:5;9:16;15:3;20:10,
11;21:8;26;23;27:21;
33:9;44:8,8;57:12;
58:23;60:3,11;63:11;
77:4;81:4;85:19;92:13;
93:5,7;98:10;99:16;
100:4;101:17;106:22;
107:4,7;119:3,4,7,19;
123:6;125:17;135:6;
138:23;140:24;142:16;
151:3;153:13,14,18;
154:2,8;155:6;156:13,
15;157:5,14,16,20,22;
158:7,9,11;159:13;
160:4,24;162:1,19,19;

163:1,2,6;165:5,8,10,12;
178:7;180:20,22
**outline (1)**
138:16
**outside (2)**
19:3;153:16
**outstanding (1)**
60:22
**over (15)**
11:7;12:12;46:9,21;
48:18;93:12;121:7,8;
132:16;150:18;151:17;
172:11;178:10;181:8;
184:11
**overall (2)**
128:5,8
**oversees (1)**
97:21
**overwhelming (2)**
127:24;128:23
**own (3)**
129:9;136:19;168:20
**oxycodone (3)**
120:22,24;121:18

**P**

**package (1)**
118:25
**page (37)**
19:13,14;20:20;22:11,
15;25:17;26:8;27:4;
29:4,24;31:15,16;35:4,5,
13;55:16;68:17,17;
71:22;72:1,18;73:4;
111:13;120:11;126:23,
24;128:12;130:14,18;
143:20;144:11;146:7;
149:14;158:24;180:14,
16;181:2
**pages (3)**
15:16;180:11,14
**paper (3)**
10:18;138:6;158:5
**paragraph (5)**
72:20,21;73:6,6;
108:5;113:17;114:1;
127:1;129:6;130:18;
131:3;146:6
**paragraphs (1)**
108:4
**paranoid (5)**
85:19;99:1,15;116:22;
125:17
**paraphernalia (1)**
60:16
**Pardon (1)**
75:6
**parents (2)**
106:1,14
**Paris (1)**
12:10
**Park (8)**

50:4;51:9,11,18;52:5;
61:3;71:1;97:1
**part (12)**
17:9;43:16;50 11;
56:18;57:18:8:5:24;
110:11;111:10,128:23;
131:2;137:7:1'7:23
**participate (5)**
51:12,18;82:7;152:21;
163:23
**participated (1)**
21:22
**participation (1)**
50:12
**particular (3)**
128:10;129:16 130:3
**party (3)**
55:22,23;57:10
**pass (1)**
10:21
**passes (1)**
70:25
**past (1)**
122:13
**Patrol (5)**
16:22,23;131:6
140:24;141:6
**Patterson (15)**
50:21;51:5,9;81:11,
24;82:3,7,9,13,1,20,23;
83:10;109:15:1 0:5
**pay (1)**
155:9
**PD (3)**
52:6;58:8;61:2
**peace (2)**
13:24;101:17
**peeped (2)**
123:6;125:17
**peeper (5)**
99:1;118:21;11 :9,11,
19
**pen (1)**
10:21
**pending (2)**
6:13;180:23
**people (8)**
106:15;115:22;117:5,
17;119:21;120:24;
130:4;152:24
**per (1)**
13:6
**percent (1)**
17:13
**percentage (1)**
17:10
**perception (1)**
170:2
**perceptions (1)**
169:7
**perfect (1)**
106:5
**perform (4)**

48:1,22;49:4,9
**performed (2)**
48:23;64:3
**perhaps (2)**
109:16;138:12
**perimeter (1)**
138:10
**period (2)**
21:19;48:18
**periodically (1)**
81:18
**person (18)**
46:4;58:19,20,22;
70:25;71:1,1;85:6;
116:16,16,22,22,25;
118:1,6;119:2;121:25;
123:8
**personal (3)**
28:3;73:17;169:15
**personally (4)**
21:24;22:1;53:24;
165:17
**personnel (7)**
13:22;29:5;131:7;
159:9,20;160:7,21
**persons (3)**
69:16;72:7;162:4
**persons' (1)**
129:10
**pertains (2)**
35:25;36:1
**pertinent (2)**
77:19;78:5
**petty (2)**
8:7,15
**phone (7)**
51:1;82:11;84:18;
85:6;151:18,20;152:2
**photo (2)**
96:6;164:22
**photograph (1)**
165:7
**photographs (1)**
126:3
**pick (2)**
162:13;164:20
**picture (3)**
95:11;125:19;138:14
**pictures (1)**
165:1
**piece (4)**
10:18;138:6;158:5;
172:11
**pieces (1)**
126:12
**PIER (3)**
52:21,24;129:19
**pillow (1)**
155:6
**pills (4)**
85:21;120:13;121:12,
16
**place (6)**

20:25;78:16;150:13;
169:12;179:23;183:12
**placed (6)**
8:17;133 14,19;
135:23;172:11;178:13
**plaintiff's (2)**
20:13;144:10
**plan (26)**
13:7;84:10,12,22,25;
86:22;89:9;90:20;91:11,
14,16,24;92:7,8,11;93:9,
13,18;94:11;143:10;
146:7,10,14,19,21,24
**planned (2)**
125:3;130:10
**planning (8)**
56:19;82:24;92:15,16,
22,23;95:7;108:15
**plans (2)**
92:24;93:2
**plant (4)**
66:25;72:16;73:1;
183:25
**plants (27)**
57:13;71:16,19;73:8;
74:8,17,25;75:13,19;
76:4,16,18,20;77:6,12,
14,18;78:4,18,22;79:7,
22;114:25;115:12,20;
165:20;183:4
**play (2)**
65:13;94:18
**pleading (2)**
20:19,23
**Please (7)**
56:7;76:1;104:21;
105:4;108:7;115:8;
129:6
**pled (1)**
8:10
**plus (3)**
74:16;85:23;131:18
**plywood (1)**
172:11
**pm (4)**
32:10;105:2;182:1;
185:24
**point (22)**
36:5;40:7;65:5;85:2;
96:11;97:15;127:15,17,
18;133:9;137:18;
138:20;154:2;156:11;
157:8;162:24;163:2,5;
164:7;166:5,10;183:15
**pointed (3)**
152:10,13;176:24
**pointing (3)**
124:9;173:22;176:10
**points (1)**
87:12
**Police (83)**
9:12,18,21,23;10:4,8,
9,19;11:15;12:1,4:13:1;

14:3,16,22;16:6,7,10;
21:18;23:1;34:19;37:6;
42:2,13,17;43:24;45:4,
17;46:14;47:21,22,25;
48:11;49:19;52:23;
54:11;55:24;57:4;58:21,
24;59:14;63:13;67:19;
79:12;91:6,6,7;92:19;
93:25;94:12,24;96:3,7;
100:20;101:1;102:17,
23;105:19;108:20;
109:22;111:7,10;120:18,
25;121:14;122:1;
123:18,25;126:18:
132:17;141:13;144:1,
12;145:2;146:11;147:2,
11;158:8,9;163:22;
167:5;175:9,20
**policies (1)**
30:24;40:5;111:11
**policy (51)**
25:13,18,23;26:8,19,
23,23,24;27:6,10;28:3,8,
11,14,16,25;29:5,14,24,
25;30:3,6,11,17,23;
31:11,16,19,25;35:4,5,7,
24;36:1,14,16,18;37:4,
21;38:2,5,11,16;39:3,15,
18,23;40:10,14,16;
129:22
**porch (3)**
141:9;144:2;150:2
**porn (8)**
178:16,18;179:3,6,19;
180:19,21;181:18
**pornographic (2)**
178:13;179:18
**posed (2)**
100:14;101:18
**poses (1)**
123:17
**position (8)**
10:7,10;16:5,9;46:15;
63:6;141:8;151:14
**positions (2)**
94:16;150:4
**possession (8)**
54:16;57:6,12;60:15;
66:2,16,18;67:8
**possibility (5)**
80:24;97:2;101:21
**possible (1)**
29:7
**POST (14)**
13:8,9;14:5,17,23;
15:3,4,10,18;41:2,9,16,
20,24
**pot (1)**
184:1
**potential (1)**
29:6
**potentially (1)**
39:1

Tricia Wachsmuth v.
City of Powell, et al.

Alan Kent
November 22, 2010

**potting (2)**
66:24;184:1
**Powell (49)**
6:18;9:9,10,12,15,18,
20,21,22,23;10:4,8,18;
11:7,10,15,25;12:4;13:1;
14:16,22;21:18;42:2,13,
17;43:24;45:17;46:14;
47:20,22,25;48:11;52:2,
14,21,23;53:17;55:24;
57:3;59:14;91:6;108:20;
111:7,10;132:17;
141:24;167:5;175:9.20
**power (2)**
93:12;166:2
**precautions (2)**
108:13,15
**prefer (1)**
120:6
**preparation (1)**
67:15
**prepare (1)**
92:7
**prepared (5)**
88:11;92:8;144:4,7;
175:21
**prescription (2)**
119:25;121:24
**presence (8)**
29:7;86:15;141:10;
171:7,12,13,20,21
**present (4)**
130:24;133:2;164:12;
172:22
**pretend (1)**
24:24
**pretense (1)**
98:10
**pretenses (2)**
61:22;62:8
**pretty (3)**
98:16;141:23;151:21
**preview (1)**
30:22
**previously (1)**
41:1
**primary (2)**
127:5,10
**Principles (1)**
128:12
**prior (4)**
116:15;142:4;143:25;
149:20
**probable (5)**
179:21;180:7,8,12;
181:22
**Probably (11)**
17:13;23:20;68:17;
95:20;117:7;118:7;
121:21;132:13,23;
178:5;181:21
**problem (1)**
6:5

**problems (2)**
5:22;6:23
**procedure (2)**
5:11;103:13
**procedures (6)**
25:14,18;26:21;28:3,
14;36:9
**proceed (1)**
93:10
**Proceedings (1)**
185:23
**procured (1)**
45:6
**produce (1)**
177:15
**produced (5)**
18:24;19:10;20:12;
56:5;177:9
**professional (1)**
56:7
**program (7)**
34:15,16;43:7.3;
159:10,21;160 8
**programs (2)**
21:21;47:16
**progress (1)**
81:21
**property (2)**
61:22;62:8
**prosecutor (1)**
81:13
**protection (1)**
60:19
**protective (1)**
140:22
**protocol (1)**
106:7
**provide (4)**
52:3;60:10;107 4;
168:16
**provided (6)**
60:22;69:4,15;7;:10;
73:13;120:4
**provides (1)**
70:22
**providing (1)**
60:4
**public (1)**
105:20
**pull (2)**
26:23;56:10
**pulled (2)**
20:10,11
**pursuant (2)**
20:12;103:4
**put (15)**
49:3;63:6;77:8,11,14;
84:10,25;137:1,1,38:10;
139:1;149:20,24;  50:6,
12;179:3
**putting (1)**
179:18

**Q**

**qualifies (1)**
13:2
**quantities (1)**
119:25
**quantity (1)**
76:5
**quick (1)**
90:16
**quickly (3)**
140:18,19;152:24
**quite (1)**
163:7
**quote (1)**
47:23

**R**

**raid (2)**
140:25;141:1
**ram (2)**
146:12;148:1
**rammed (4)**
98:18;141:17;147:22;
148:1
**range (6)**
42:4;43:5,20,21;
57:21;132:21
**rapid (5)**
38:7,20,24;39:1;
128:21
**rather (1)**
101:15
**react (1)**
139:9
**read (23)**
35:22;37:13,14;38:3;
69:24,24;70:2;72:2;
104:16;105:3,5;108:6;
109:19;110:8;113:11,
12;128:13;129:6;
130:19;131:2;158:19;
182:6,7
**reading (2)**
37:17;147:15
**ready (2)**
161:5;184:5
**real (2)**
100:14;104:13
**realistic (1)**
128:17
**realize (2)**
66:14;183:15
**really (11)**
6:7;34:24;63:6;69:8;
89:1;104:19;115:4;
117:11;141:23;153:14;
172:22
**reason (11)**
63:2,8,18;71:11,13;
100:14;104:13;125:12;

134:5,14;182:25
**reasonable (2)**
38:25;98:16
**reasonably (1)**
129:8
**reasons (3)**
102:11;113:18;157:14
**recall (6)**
82:8;183:9;5;107:14;
123:2;136:8
**receive (1)**
9:3
**received (8)**
9:1;15:21;18:1;38:9;
42:1;93:8;108:9,11
**receiving (2)**
39:16,18
**Recess (4)**
19:4;32:10;105:1;
181:25
**recognize (1)**
62:13
**recognized (5)**
14:5,17,22;15:5;62:16
**recollect (1)**
74:11
**recollection (2)**
90:3;150:12
**record (29)**
6:7;16:12;20:11;21:5;
35:23;41:16,20;44:6.21;
54:13;56:9:58:11,16,19,
20,22;75:10;105:5;
108:6;113 12;120:7;
129:6;130:20;151:1;
161:9;167:8;179:15;
181:15,16
**recording (1)**
164:11
**recordkeeping (3)**
13:8,11:57:19
**records (17)**
15:11;21:17;32:15;
37:1;41:9,25;44:12;
45:25;46:5.16,17,23;
47:15;48:3.6,7;54:19
**rectangular (1)**
151:7
**refer (3)**
41:25;54:5:149:10
**reference (13)**
27:10;57:3:60:16;
68:20;70:4;72:25;78:21;
90:11,22,25;107:19;
109:1;120:9
**referenced (3)**
37:4;71:16,19
**references (1)**
28:12
**referred (2)**
40:15;146:1
**referring (5)**
33:2;47:19;57:4;

58:14;146:2
**refers (2)**
25:17;26:8;30:7
**reflect (1)**
15:17
**reflected (3)**
13:22;41:9,10
**reflection (1)**
18:14
**refrain (1)**
104:21
**regard (6)**
17:16;43:23;47:8;
48:9;54:10;57:5
**regarding (8)**
30:11;35:7;38:3,11;
73:13;93:2;111:11;
126:3
**regret (1)**
184:10
**regrets (1)**
185:17
**regretted (1)**
166:15
**regular (1)**
48:1
**related (4)**
22:9,21;62:17;105:16
**relates (4)**
29:25;30:12;37:21;
38:4
**relating (1)**
30:3
**relation (1)**
84:1
**relationship (4)**
23:13;62:24;63:1;
157:13
**relative (1)**
16:13
**relatives (2)**
105:21;106:14
**relevance (3)**
7:10;126:5;169:8
**relevant (6)**
18:24;33:3.21;39:14;
41:1;179:8
**reliability (1)**
63:10
**reliable (1)**
103:17
**remain (1)**
14:3
**remains (2)**
121:22;168:7
**remarks (1)**
151:11
**remember (50)**
23:17;40:2,11;43:10;
69:17;75:9;79:5;82:21;
89:2,3,5,6;94:19,21;
95:13,23;98:23;109:20;
110:3,10;123:1;138:3;

142:23;143:9,14,16;
144:14,17;146:19,24;
148:17;150:19;153:15,
20,21;154:9,13;157:20;
158:15;161:21;162:12;
165:18;172:5,9,20,22,
23;173:11;183:17;
185:19
removed (2)
  158:13;163:19
report (35)
  11:9,11,23;12:5;
  55:17;59:3,5;61:9;
  69:18,25;75:21,22;76:4;
  77:5,12;81:19;90:10,11;
  108:3;109:5,6,12,19;
  110:8;123:2;146:22,23;
  147:15;177:22,24;
  178:24;180:13,16;
  181:23;182:6
reported (3)
  53:9;68:12;99:15
reporter (3)
  6:7;25:22;113:10
Reporting (6)
  55:22,23;57:10;61:7;
  81:17,20
reports (4)
  11:25;77:1,3;88:8
represent (5)
  19:9;120:18;143:22;
  178:25;179:9
represented (1)
  121:25
reputable (1)
  101:17
request (1)
  20:14
requested (2)
  105:6;113:13
require (2)
  29:9;130:25
required (6)
  5:14,18;12:21;13:3;
  14:2;66:18
requirements (3)
  12:18;13:4,5
rescue (1)
  130:22
residence (18)
  48:23;72:4,15;73:10;
  74:20;75:13;78:19;79:7;
  91:25;136:18;138:11;
  142:16;145:10;157:16,
  21;158:1;160:25;169:22
residents (2)
  103:25;128:5
resistance (3)
  29:6,8;112:2
resistant (1)
  95:13
resources (1)
  38:12

respect (1)
  20:1
respond (4)
  38:13,18;39:7,12
Response (11)
  16:22,23;37:2,21;
  38:3;40:15,16,52:22;
  111:6,11,19
responses (3)
  20:13,15;121:5
responsibilities (1)
  47:8
responsible (6)
  44:12;46:5,23,171:5,
  18;177:21
rest (1)
  166:19
restraining (1)
  8:17
retained (1)
  168:16
return (1)
  178:4
returned (2)
  68:6;89:13
review (3)
  26:24;39:17;40:5
reviewed (1)
  74:19
reviewing (1)
  39:23
rifles (5)
  103:7;173:23;174:5,
  20;176:10
right (160)
  8:13,16;11:14;12:3,8,
  14,17;13:20;14:25;21:6;
  22:24;23:13,16:24:3;
  25:20;26:14,27:2,8,19;
  28:8;29:13,21;23:19;
  31:18,21;32:7;36:8,12,
  25;39:6;40:20;42:11,17;
  43:6,11,22;44:2:,;45:8,
  12;46:2,10,22;53:10,12;
  55:15;56:14,22;57:11;
  59:12,13;63:7;6.:1,21;
  65:14;67:21;68::,;69:1;
  70:4;71:7,14;72,13;
  73:12,16;74:18;'5:8;
  79:1,13,20;80:1;81:3,
  23;83:21;85:2:9;9,22;
  91:10,15,19;92:.,14;
  93:7;95:18,25;9;:5;
  97:1,13;99:4;10:15;
  102:13,22;104:4; 06:5;
  107:2;108:2;109.1;
  112:4,7;113:5,10,17;
  114:12;116:1;11':24;
  119:2,23;120:24;121:6;
  122:11;123:3;12-:15;
  126:22;128:23;1::3:4,
  10;134:22;135:1';
  137:18;138:5;13':12;

141:11;143:1,19;144:7,
  10;146:24;147:4,10,20,
  25;148:21,24;150:21,23;
  151:5,16,21;152:1,7,17;
  156:9;157:24;159:7;
  161:22;164:21;165:1;
  169:14;170:9;171:9,11,
  17;172:8,10;178:21;
  179:15;182:5;183:19;
  184:2,8,22;185:20
right-hand (2)
  25:16;26:7
rights (3)
  171:6,19,23
ring (1)
  179:4
ripped (1)
  135:17
rising (1)
  125:5
risk (2)
  27:17;38:25
risks (3)
  127:16;128:3,4
Riverton (2)
  65:25;97:21
rode (1)
  81:8
role (2)
  164:1,2
roles (1)
  94:17
roll (1)
  22:22
rolled (1)
  118:24
room (22)
  24:18;32:25,25;38:17;
  44:8,23;45:16;46:24;
  130:4,5,7,9;133:14,19,
  23;137:10;149:7;
  154:22;161:16;162:20;
  164:7;175:4
rooms (3)
  149:15,17;164:6
roots (3)
  66:23,25;67:1
roster (2)
  13:12;15:1
rotating (1)
  157:12
roughly (1)
  91:13
rounds (2)
  35:18,20
routes (1)
  38:7
Roy (1)
  11:16
RP (2)
  55:19,19
rule (4)
  105:19,24,25;106:4

rules (1)
  129:20
ruling (3)
  56:2,5,11
run (2)
  59:4;115:17
running (4)
  34:20;100:8;110:16;
  140:17
ruse (1)
  107:7

S

SA (1)
  59:15
safe (1)
  38:7
safely (1)
  105:22
safer (1)
  103:13
safest (1)
  103:3
Safety (9)
  29:5;103:24;104:4,7,
  9;121:13;127:5;128:5,8
sale (4)
  71:9;75:15;76:6,7
same (15)
  17:15,17;29:3;34:6;
  40:5;43:17;47:10;59:2;
  75:21;91:14;118:14;
  132:23;141:11;150:4;
  170:16
save (1)
  179:20
saving (1)
  39:2
saw (15)
  68:5;95:19;135:16,16;
  142:15;148:11,21,21;
  150:14;151:17;155:14;
  165:9;168:7;172:2;
  176:23
saying (2)
  142:23;143:14
scare (1)
  86:1
scared (1)
  85:24
scenario (1)
  126:8
scenarios (4)
  17:8,10;23:2;110:16
school (11)
  8:22,23;9:1,3;45:9,9,
  10,11,11;46:25,25
Schwan's (1)
  10:3
scorch (3)
  156:1,2;172:4
screwed (1)

172:12
se (1)
  13:6
seal (1)
  56:21
sealed (1)
  56:25
sealing (1)
  56:19
search (61)
  10:13;23:20;25:6,10;
  26:8;27:10,10,15,16,20;
  28:10,12,17,25;29:6,7,8,
  23;32:17;37:1;65:15,21,
  25;68:2,5;74:15,20;
  75:12;77:15,19;78:6;
  84:24;87:19,23;91:9;
  95:7;99:24;101:5;
  102:20;103:4;108:13;
  121:15;123:24;124:12,
  20,25;128:10;136:14,16;
  141:13;143:10;144:13;
  145:3;146:11,25;
  147:11;153:1;163:23;
  164:1;172:1;181:23
Searched (2)
  164:5;169:22
searcher (1)
  164:3
searching (2)
  153:16;155:14
second (14)
  29:4;72:20,21;73:5;
  76:19;94:22;99:5;
  113:25;143:20;149:14;
  179:23;180:14,16;181:2
secondary (1)
  153:1
seconds (4)
  115:3,12;139:18;
  140:3
section (6)
  25:15,17;31:13;36:15,
  18;37:4
secured (3)
  156:25;162:23,24
seedlings (1)
  74:16
seeing (4)
  106:21;138:3;153:21;
  154:9
seems (1)
  183:17
seizure (1)
  68:6
selection (1)
  52:25
self-defense (1)
  22:25
self-employed (1)
  16:4
self-protection (1)
  23:1

sell (2)
74:3;80:7
selling (1)
80:11
semiautomatic (2)
103:7;127:23
sending (1)
20:21
sends (1)
15:3
sense (3)
106:18;126:20;145:25
sent (3)
98:24;177:13;178:23
sentence (2)
72:18;73:7
sentences (1)
108:6
separate (2)
36:15;40:7
September (2)
15:20;17:2
Sergeant (45)
10:11,12;11:16,16;
32:14;46:2,13,20,20,22;
48:4;72:22;81:21;84:12,
19;85:3;88:21;89:14,25;
91:11;94:23;96:1,6;
108:3;109:5,10;126:2;
131:19;133:16;148:22;
151:3;152:9,15;156:7,
12,13,19,20,24;157:11,
11;161:5,17;176:23;
184:25
sergeants (4)
11:3,14;12:5,15
sergeant's (2)
47:12,14
serve (14)
49:17;65:4;80:24;
84:24;100:25;101:5;
102:20;103:18;110:19;
124:20,25;136:14,16;
143:10
served (5)
65:24;74:15;91:8;
93:24;173:3
service (18)
12:10;25:11;30:18.25;
31:1,19,25;32:16;33:17;
36:19;51:19;53:1;64:3;
94:17;114:20;116:2;
172:19;184:10
serving (12)
63:4;106:10,11,13,15;
107:15;114:16;123:18,
24;124:12;146:25;173:8
session (1)
133:1
sessions (1)
48:10
set (2)
138:24;170:4

seven (1)
145:7
Several (4)
66:13;87:2,4;154:6
shade (2)
135:16,17
Shall (1)
16:14
shape (1)
151:7
sheaf (1)
19:7
Sheridan (1)
17:5
sheriff's (3)
50:5,6;51:23
shield (10)
166:6,15;169:22;
170:10;173:14 19;
175:13,25;176 3,17
shift (1)
53:10
shooter (1)
38:18
short (3)
108:5;154:3,4
shortly (1)
80:17
shot (1)
23:11
shotgun (5)
35:18,19,25;36 2,3
show (6)
59:10;74:10;84 7;
127:24;128:23;179:16
shower (3)
155:7,8,10
showing (1)
20:17
shown (1)
61:8
sic (1)
67:22
sick (1)
22:4
side (2)
25:17;149:22
siding (1)
172:12
sign (1)
67:22
signed (5)
67:18;68:2,2;69:25;
75:22
significant (2)
95:16;128:7
signs (3)
165:6,8,12
sill (1)
142:1
simply (7)
39:23;40:9;101:21;
102:6;103:15;10( :20;

137:1
simulated (1)
44:4
simultaneously (2)
108:16,21
Simunitions (1)
42:3
site (1)
95:11
sitting (1)
148:22
situation (15)
34:17;39:7;63:11;
101:20;104:10,11;
111:20;112:8;113:6;
118:24;127:7,9,22;
152:23,25
situations (4)
17:7;34:18;39:12;
108:20
six (6)
29:5;73:8;74:25;
78:17,18,18
Six-foot (1)
135:10
size (1)
74:5
skilled (1)
131:6
sloppy (1)
43:21
slow (1)
127:4
small (3)
6:5;76:11,16
smell (1)
155:15
smoke (3)
155:15,17,18
smoked (3)
70:6,13;72:3
smoldering (1)
155:1
snorting (1)
120:13
social (1)
95:11
soil (2)
66:24;184:1
sold (2)
68:21;69:2
sole (1)
49:19
somebody (15)
37:9;55:9;59:10;
70:22,23;74:2;98:10,24;
101:1;115:1;124:9,11;
152:19;153:8;161:21
somebody's (1)
86:3
someone (9)
54:25;102:16;103:16;
108:14;120:17;125:4;

153:7;162:13;172:10
sometime (3)
53:10;91:8;93:23
somewhere (6)
97:16;122:22;137:1;
157:11;182:7;183:18
son (7)
63:23,25 65:1;95:21;
100:16;101:2;107:4
Sonora (2)
16:7,7
son's (2)
100:21;109:18
soon (2)
138:23;147:22
sorry (12)
10:23;27:12;32:14;
65:9;67:25;71:24;72:20;
98:5;144:7;172:7;177:4;
182:12
sort (1)
32:15
sound (1)
98:16
Southside (1)
45:11
spare (6)
152:18;153:10;
161:25;162:2,3;164:8
speak (4)
69:8;82:13;89:12;92:2
special (9)
29:9,14,16;47:23;
49:20,21;50:1;52:17;
118:11
specialized (1)
49:16
specially (2)
52:15,18
specific (14)
22:6;30:25;31:23;
32:5;37:20 38:14;44:3;
45:24;119:24;122:13,
17;123:4;164:2;165:19
specifically (25)
21:22;22:9,21;23:21;
24:1,14;28:17;29:1;
30:4,12;32:20;33:2;
35:16;38:4,16;41:25;
46:24;47:15;89:6;93:5,
18;110:4;114:21;
144:15;173 11
specifics (1)
92:13
speculate (1)
126:16
speed (1)
128:15
spelled (1)
151:3
spoke (5)
64:14;82:20,22;89:14;
92:4

spoken (2)
85:3;89:20
spontaneous (1)
162:16
Springs (1)
97:22
squad (1)
12:8
squads (1)
12:6
Sr (1)
107:4
stairs (18)
115:17;154:22;
166:14,18,21;167:12,13;
168:12;174:12,19,21;
175:13,24;176:3,11,18;
184:20;185:4
stamp (1)
19:14
stamped (1)
20:7
stand (1)
175:21
standard (2)
110:15,18
standing (6)
13:24;134:22;148:11,
23;161:20;176:24
stands (1)
143:24
start (5)
8:19;16:14;58:12;
139:25;180:8
started (10)
10:8;40:24:41:17;
42:16;48:19;96:22,24;
139:18;140:7;161:5
starts (1)
108:8
State (6)
14:14;57:20;66:15;
71:5;171:9,11
stated (8)
72:2,14;159:18;160:6;
180:18,19,20;181:17
statement (10)
40:13;43:7;73:5;
79:21,23;122:21;
130:19;147:10,14;
181:16
statements (1)
73:15
states (1)
160:20
statewide (1)
61:11
station (14)
91:7;92:19;94:12,24;
95:4;96:3,7;109:22;
136:10,14,16;144:1;
158:8,9
status (1)

107:5

**statute (2)**
57:20;71:5

**statutes (1)**
67:5

**stay (2)**
72:4;151:14

**stays (1)**
110:2

**Steve (2)**
97:9,25

**still (5)**
51:17;85:7;153:22;
181:6;183:15

**Stop (2)**
22:23;99:4

**stove (3)**
115:21,22,24

**stoves (1)**
115:23

**straightened (1)**
21:8

**strange (1)**
100:23

**Street (3)**
6:18;34:21;138:11

**strike (2)**
14:8;76:19

**studying (1)**
40:9

**stuff (6)**
41:5,8;115:5;153:2;
163:4;176:5

**style (2)**
125:21;141:23

**subdue (1)**
36:5

**subject (5)**
36:5;59:15;110:9,11;
129:8

**submit (1)**
13:7

**submitted (4)**
18:12;20:6,8,16

**subparagraph (2)**
114:2;126:23

**substance (1)**
120:17

**substances (3)**
57:22;120:13,14

**substantive (1)**
126:7

**successfully (2)**
159:10,20

**suction (1)**
166:2

**sued (1)**
178:7

**sufficient (1)**
76:5

**suggested (1)**
109:15

**Suicide (2)**

113:23;118:12

**summary (1)**
15:3

**supervisor (7)**
11:4,18,21;12 9;
45:25;98:1,6

**supplied (1)**
14:15

**support (2)**
52:4;121:24

**suppose (2)**
47:7;121:16

**sure (22)**
14:11;24:11;29:21;
34:12;35:5;45:23;68:14;
71:10;101:4;102:2;
104:25;119:15;127:20;
129:8,8;133:22;142:8;
143:24;148:10 153:1;
176:16;180:3

**Surprise (1)**
128:15

**surprised (1)**
141:21

**surveillance (1)**
17:6

**Suspect (7)**
58:2;59:14,22;60:2;
127:11;128:18;  29:2

**suspected (1)**
64:25

**suspects (2)**
34:20;38:8

**SWAT (20)**
48:20;49:2,6,8,16,22;
50:4,12,13;51:11,18;
52:3,9;82:7;83:11,13;
109:17;130:21,23,25

**SWAT-type (4)**
82:24;83:4,22,24

**sworn (1)**
5:2

**synonymous (2)**
117:21,23

**system (1)**
57:19

**T**

**Tactical (3)**
16:23;84:25;132:1

**Tactics (6)**
16:17;29:15;41:17;
42:16;111:6;129 4

**talk (12)**
33:15;40:8;53:3;
83:21;84:1;98:15,15,23;
100:12;110:22;113:25;
156:16

**talked (31)**
27:14;40:25;41:20,22;
44:20;46:24;51:1,15,23;
80:17;82:11;83:13,24;

84:3;85:3,5,11;95:19;
96:1,17;99:25;100:15;
103:25;156:12;176:9;
181:24;182:19,21,24;
184:24,25

**talking (20)**
19:25;20:22;24:3,4;
38:10,13;48:10;59:12;
85:15;92:17;96:22;
98:23;99:11;104:17;
110:11;112:15,16;
123:4;127:12;137:25

**talks (2)**
38:6,20

**tall (3)**
73:9;135:9;165:22

**taser (5)**
33:20;34:3;35:1;
36:13,16

**tasers (1)**
33:19

**task (2)**
148:14;157:10

**taught (1)**
17:3

**team (48)**
29:9,10,14,16;41:6;
45:24;47:18,18,20,23;
48:1,21;49:2,6,8,16,18,
20,22,22;50:2,4,12,13;
51:11,18;52:22;82:7;
83:11,13;97:20;109:17;
130:22,23;133:4,5;
139:4,23;140:1,6,13;
149:23,24;150:6;
152:24;166:19;177:19.
23

**teams (1)**
130:25

**Technical (1)**
18:2

**technicians (1)**
164:23

**technology (1)**
159:1

**telling (11)**
44:19;72:5;75:10;
89:2,3,5;92:21;95:23;
101:4,15;175:19

**ten (3)**
7:20;157:2;163:14

**ten-year-old (1)**
143:2

**Teri (2)**
11:19,20

**term (2)**
37:5;111:24

**terminology (1)**
37:6

**terms (5)**
29:6;63:9;101:11;
169:8;176:10

**testified (6)**

5:2;126:1;169:17,24;
170:1,18

**testify (1)**
168:20

**testimony (18)**
54:19;60 22;83:16;
101:25;103:22;107:12;
112:20;115:11;125:8,9;
126:3;132:3;146:18;
161:15;167:24;174:23;
176:22;185:9

**THC (1)**
67:1

**theft (2)**
8:7,15

**third (2)**
26:13;165:10

**Thirteen (1)**
71:24

**Thirty-seven (1)**
18:22

**Thomas (1)**
8:23

**THOMPSON (128)**
21:1;23:5;24:10;25:5;
26:17;31:2;32:4;33:4,
25;36:22;37:23;38:19;
39:10,20;40:1;41:14;
44:9;45:20;47:4,9;
48:13;49:1,13,25;50:25;
51:20;54:20;55:5,11;
56:9,23;57:14,17;61:1,
20,24;62:9;63:16;64:6;
65:18;67:23;70:21;
72:10,23;73:25;75:1,16,
24;76:8,13 77:21;78:7;
80:2,12;83:2,17;86:24;
87:22;89:24;93:14;
96:13;98:3;99:20;100:6,
17;101:23;102:1,9;
103:19,21;104:24;
105:9;107:13;112:12;
113:2;114:10;117:3,15;
120:1;122:6,19;123:22;
124:18;125:10;126:4,10,
13;131:11;132:4;
133:24;134:9,17;135:1,
24;137:5,15;139:21;
142:6,22;143:3;146:17;
149:10;151:1,6;159:22;
160:1,12;161:1;166:8,
23,25;167:15,25;168:14,
24;169:14;170:7;
173:15,24;174:7,14,24;
175:14;176:1;180:23;
183:11;184:14;185:8

**though (12)**
28:5;50:21;60:17;
63:8;66:3,24;80:7;
109:13;134:12;144:23;
146:22;160:17

**thought (4)**
66:9;132:15:137:22;

172:14

**thoughts (2)**
106:19,21

**threat (26)**
37:2,5,20;38:3,12,13;
40:15,16;100:16;107:5;
112:4,8,23,24;113:5;
114:17;118:7;120:18;
121:13;122:1;124:6;
128:8,17,17;129:1;
130:12

**threatened (4)**
104:10;113:21;116:1;
123:7

**threats (1)**
112:2

**three (13)**
9:24;11:3;66:21,22;
74:16;108:4;128:13;
132:12,14;133:7;
161:24;162:4;180:11

**threw (2)**
43:5,11

**throw (11)**
44:5;115:16,19,19,22,
23;137:9,14,20;160:20;
178:3

**throwing (1)**
148:12

**thrown (5)**
132:11,19,19;133:6,7

**Tim (6)**
182:19,20,22,22,24;
183:2

**timeframe (1)**
157:3

**times (10)**
33:19;40:4;91:14;
108:19;132:5,12,14,16;
133:7;163:7

**tip (1)**
106:14

**tiptoes (1)**
141:25

**title (2)**
24:17;32:22

**today (4)**
5:5,11;6:21;112:20

**together (11)**
41:6,8;45:23;48:21;
49:4;58:13;81:8;84:10,
25;125:22;173:2

**toilet (3)**
115:3,12;165:25

**toilets (1)**
166:1

**told (42)**
40:2;44:17;50:13;
51:2;62:14,19;64:19;
65:10;74:11,21,23;
76:22,22,24;77:6,24;
78:22;79:6,21;83:11;
84:23;87:9,10;88:24,25;

89:2,6,21,25;90:1,5;
95:25;97:5,11,15;
119:11;132:15;151:18,
20;157:22;175:3;178:21

**Tom (28)**
62:17,20,25;63:2;
64:2;65:3;95:20;96:17;
97:2,10;98:3,5,6,20;
99:25;101:16,22;102:6;
103:15;109:16,20;110:2,
6,9;143:17;156:16;
157:13;172:14

**Tom's (5)**
65:1;97:9;104:1;
106:3;156:13

**took (10)**
17:1;18:15;46:20;
79:2;121:2,17,18;
129:16;158:7,11

**tools (1)**
35:2

**top (4)**
16:14;22:22;46:9;
159:7

**Torczon (1)**
107:23

**toss (1)**
44:8

**total (3)**
14:18;35:13;132:12

**totaled (1)**
183:5

**totality (2)**
118:16;121:8

**touch (1)**
149:21

**tough (2)**
99:1;100:12

**towards (7)**
14:18;15:12,13;38:5;
72:21;120:25;146:6

**track (1)**
46:15

**tracking (1)**
123:4

**traditional (1)**
127:4

**traffic (3)**
7:3,16;8:4

**train (3)**
14:12;45:23;47:25

**trained (25)**
42:9,12,25;44:3,4,25;
45:4,5,5,9,10,11;52:15,
18,20,22;100:19;108:20,
24;130:21;159:15;
166:20;167:13;174:5,20

**training (124)**
12:18,23,25;13:2,2,6;
14:3,4,5,10,14,15,21,23;
15:1,3,10,17,19,22;
16:12,19,21;17:21;
18:23;19:11,25;21:17;

22:5,20,25;24:5;26:13,
25;27:22;28:17 19;29:1,
15,24;30:5,7,13,25;
31:24;32:15,17,20,25;
33:3;34:8,9,15,37:21;
38:4,5,9,14;39 7,11,14,
16,18;40:3,4,8,9,11,21,
23,24;41:11;42:1,3,4;
43:4,16,17,23;44:6,15;
45:7,15,16,22,24,25;
46:6;47:16;48:3,6,10;
52:24;106:16;108:12;
111:6,12;113:16;129:12,
15,16,18,19,22 23;
130:25;131:6,8,13,16,
18,25;132:18,21;133:1;
137:7,19,24;138:2,4;
159:10,20;160:8;176:15

**trainings (4)**
26:22;46:23;48 12,16

**transported (1)**
163:22

**treated (1)**
97:6

**Tricia (37)**
68:21;69:2;70:6,9,17;
72:3,6;143:18;148:21;
150:13;151:2,1  ,17;
152:5,10,13;15 :22;
154:9,14,22;161:17;
163:19;165:13;166:5;
167:12,21;173:13;174:5,
12,19;175:12,24; 76:10,
16;184:18,20;185:4

**trigger (1)**
121:5

**truck (1)**
10:2

**Trucking (1)**
9:24

**true (12)**
12:14;75:21,22;¹8:11;
112:7;121:3;122:18;
124:5;138:1;145 8;
176:12,18

**trusted (1)**
103:17

**truth (1)**
7:5

**truthful (2)**
6:20,24

**truthfully (1)**
5:19

**try (4)**
6:8;114:12;141:25;
170:6

**trying (3)**
65:3;105:23;115:8

**turn (7)**
15:8;21:15;25:14
37:3;88:10;110:24;
182:9

**turned (2)**

90:24;126:17

**TW (1)**
151:2

**two (19)**
15:16;17:21;27:14;
43:19;53:8;60:21;108:4,
5;126:12;132:12,14;
133:7;157:15;161:24;
162:3;165:23:180:7,12,
14

**type (2)**
95:12;115:24

**types (3)**
38:8;130:23;131:4

**typical (2)**
115:20;140:23

## U

**unable (1)**
6:7

**uncleared (3)**
167:22;168:12;185:5

**under (17)**
5:19;13:25;20:8;29:5,
23;44:17;57:25;85:23;
113:17;114:2;129:4;
130:18;136:1;153:2;
160:19,19;170:11

**underage (1)**
58:5

**underhand (1)**
160:20

**underneath (4)**
11:4;135:20;136:5;
144:24

**understood (2)**
71:7;178:15

**unit (5)**
49:16;52:15,17,18,19

**unknown (1)**
183:1

**unless (5)**
5:14;104:12;118:11;
147:4,5

**unquote (1)**
47:23

**unreasonably (1)**
104:20

**up (41)**
5:24;6:6:25:2;27:7;
32:15;46:19;56:10;61:8;
70:7;76:18;84:7;94:22;
96:10;110:6,10;112:4;
114:19;115:17;127:10.
19,24;128:9;133:9;
137:16,22;138:24;
139:7;140:16;143:24;
144:2;145:14;150:3;
151:20;152:2,18;157:8;
162:13;164:20;166:2;
174:20;183:5

**updated (2)**

129:14,17

**updates (1)**
27:5

**upgrade (1)**
66:18

**upgraded (1)**
183:7

**upper (1)**
94:15

**use (39)**
6:8;14:14,15;23:22;
29:9,14;34:3,6;36:19;
43:9,20;58:16;73:18;
83:13,22;85:9;109:17;
112:2;123 6,15;124:12;
129:25;130:2,10;
146:12;159:10,15,21;
160:8,19;167:11;
168:13;169:21,21;170:9,
11;175:24;176:3,17

**used (27)**
7:23;33:12,20;34:16,
18,19,20,20,25;35:1,2;
36:23;43:3;65:14,20;
124:2,3,5;125:18;129:7;
130:3;145:22;159:8,19;
160:7;166 6;173:14

**using (8)**
5:11;42:25;80:24;
107:7;108:16,21;
119:25;120:10

**usually (1)**
45:14

**utilize (1)**
113:19

## V

**vacation (1)**
22:4

**ventured (1)**
56:6

**verbal (1)**
13:14

**Vest (5)**
22:23;95:13;125:20;
140:23,25

**vests (1)**
141:2

**veto (1)**
93:12

**video (1)**
22:23

**viewed (1)**
138:2

**violate (3)**
56:5;171:6,19

**violates (1)**
56:2

**violation (6)**
7:3,16;8:4;60:19;
61:24;65:11

**violence (12)**

129:14,17

99:7,16;100:5;116:9,
12;117:22;123:7;124:6:
128:15,16,17,21

**violent (24)**
100:21;101:2;116:16,
22,25;117:5,8,9,12,18;
118:1,6;119:3;120:18,
25;121:3,5,17,19,25;
122:9,13,17;123:7

**visit (5)**
5:6;93:21;96:5;99:13;
103:17

**volunteer (1)**
99:2

**V-shaped (1)**
156:1

## W

**Wachsmuth (119)**
10:13;19:20:33:11;
36:19;48:23;49:10;53:1,
6;57:9;60:4,23;62:13,18,
20,25;63:3,11;64:2;
68:21;69:2,15;70:18;
72:6;73:17;74:20;75:13;
79:7;80:10,18;82:24;
83:23;84:22;85:16;
86:22;87:8;88:4,17,24;
89:21;90:24;91:25;
92:15;95:12;97:3;98:3;
99:7,9;100:4;101:16,18,
22;102:6;103:15;
105:17;106:22;107:3;
109:16,21;110:2,6,9;
116:2,4,25;117:25;
119:7,23,24;120:9;
121:11,23;122:12,17;
123:5,10;126:2:136:18;
138:11;144:1;148:22;
150:13;151:2,12;152:5,
10,13;153:22;154:9,14,
22;156:16;157:16,21;
158:1;160:25:161:17;
163:19;165:13;166:6;
167:12,21;173:13;174:6,
12,19;175:13,24;176:11,
16;178:4,16,18;179:1,2,
18;180:17,18;181:17;
185:4

**Wachsmuths (2)**
70:14;120:12

**Wachsmuths' (1)**
71:8

**Wachsmuth's (5)**
76:11;98:1,5,6;157:5

**wait (3)**
103:3;115:1;145:5

**walk (1)**
140:19

**walked (2)**
148:19;150:11;
151:16;154:8;162:19;

Tricia Wachsmuth v.
City of Powell, et al.

Alan Kent
November 22, 2010

163:1

**walking (2)**
140:17;150:20

**wall (1)**
172:4

**walls (1)**
135:18

**Walters (1)**
67:21

**warehouse (1)**
10:3

**waruing (5)**
158:4,16,25;159:18;
160:5

**W-A-R-R (1)**
60:13

**warrant (82)**
10:13;25:10;27:16;
29:8;30:18,24;31:1,19,
25;32:16;33:11,17;
36:19;51:19;53:1,6,8;
58:7,8;60:14,18;63:4;
65:4,15;68:3,6;74:15;
75:12;77:15,19;78:6,23;
80:25;81:1;84:24;86:11,
14;87:19,24;91:9;93:24;
94:17;95:7;99:24;
100:25;101:5;102:21;
103:5,18;106:10,11,13,
15;107:15;110:20;
114:16,20;116:2;
121:15;123:19,24;
124:12,21;125:1;
128:10;136:15,17;
138:13;139:12;141:14;
143:11;144:13;145:3;
146:25;147:4,11;172:1,
18;173:3,8;181:23;
184:10

**warrant' (1)**
146:11

**warrants (22)**
23:20,22;25:7,10;
26:8;27:10,11,15,20;
28:10,12,17;29:1,23;
32:17;49:17;60:3,11,21;
65:21,25;108:13

**Washakie (1)**
97:22

**waste (1)**
123:3

**watching (1)**
165:11

**Waters (4)**
67:19,23,25;68:1

**Waters' (1)**
68:7

**way (10)**
8:5;16:14;23:17;
35:17;37:14;57:18;
69:24;101:12;106:25;
184:11

**weapon (3)**

36:7;125:21;176:24

**weapons (8)**
29:9;35:20;38 8;
127:23;130:13;166:20;
167:13;176:15

**wear (2)**
140:23;141:5

**wearing (6)**
95:13;125:20;  40:22,
25;141:1,3

**website (2)**
95:19,21

**week (2)**
180:21,21

**week-long (1)**
17:5

**weighing (2)**
109:7;183:4

**weight (5)**
66:13,16,17;182:25;
183:20

**weren't (15)**
51:24;63:1;66: 1;67:2;
79:1;98:17;100 13;
140:17;173:13.2 1;174:4,
11,18;176:16;1 33:13

**WESTBY (183)**
7:4,8,18;8:6;13 16,18;
14:6;17:11,17;1 :16,20,
24;20:2,6,15,19.22;
21:10;23:3,24;2 4:8,21;
25:1;26:15;27:2 ;28:19,
21;29:3,18;30:6 19;
31:3;32:2;33:5, 23;
36:20;37:24;39 9,24;
41:12;44:10;45: 18;46:7;
47:2,10;48:14,2 4 49:11,
23;50:23;51:6,2 ;54:3,
18;55:3;56:1,7, 18;
57:16;58:15,23; 0:24;
61:23;62:10;63: 1;64:4;
65:16,19;66:4:6 ;12;
70:19;72:8;73:1 ,23;
75:2,17,25;76:1 ;77:9,
22;78:8;80:13:8 :25;
83:15;86:17,25; 37:20;
89:23;93:15;94: 99:18;
100:7,18;101:24
102:25;103:20,2 ;
104:14;105:10:1 07:11;
112:10,13,17,25; 114:8;
115:7,13;116:18; 17:1,
13;118:3,8,14;1 19:13;
120:2;122:2,20;1 3:20;
124:7,19;125:7:1 6:14;
131:12;132:2;13 :25;
134:7,15;135:3,2 ;
137:3,11;139:19; 40:4,
8;142:7,17,20;143:4;
145:18;146:15,1 ;
160:10;161:2,6;1 56:9,
24;167:17,23;168 2,20;
169:1,4,10,23;170 1,13,

16,18,24;171:8,12,14;
173:16;174:1,13,22;
175:15;176:6,19,21;
179:5,9,13,20,23;180:1,
3;181:6,10;183:9;
184:12;185:6,9

**what's (7)**
19:21;49:8;97:24;
101:4,13;143:6;145:25

**whatsoever (1)**
116:5

**whenever (1)**
25:1

**whereas (1)**
34:17

**whole (13)**
35:24;36:1;38:5;
57:21;85:6;92:4;94:2;
96:21,25;118:24;130:6;
149:7;150:20

**whose (1)**
171:21

**widely (2)**
185:3,10

**willing (1)**
56:16

**window (41)**
85:20;103:10;119:3,4,
20;133:20;134:2,5,10,
13,20,25;135:6,11,14,
20;136:2,5,6;139:5;
141:9,21;142:1,1;
144:13,20,23,25;145:3,
5,9,11,15,23;147:24;
148:4;149:23;158:1;
172:6,7,11

**windows (3)**
119:7;123:7;125:17

**within (8)**
7:20;13:14,21;42:21;
64:19;154:3,4,6

**without (3)**
36:7;63:11;126:12

**witness (134)**
7:23;8:7;17:13;18:25;
23:6;24:1,11;25:6;26:2,
18;28:23;29:4;30:9;
31:4;32:5;33:6;34:1;
36:23;37:25;38:20;
39:11;40:2;41:15;44:11;
47:5,11;48:15;49:2;
50:1;51:1,8,22;54:21;
55:6,12;57:18;59:21;
61:2,14,15;62:11;63:18;
64:7;65:20;66:6;68:1;
70:22;72:11;74:1;75:18;
76:1,15;77:11,23;78:9;
80:4,14;83:3,18;86:19;
87:1,23;89:25;93:16;
100:8,19;102:2;103:24;
105:11;107:14;112:21;
113:3,14;114:11;115:7,
15;117:4,16;118:15;

119:15;120:3;122:8,21;
123:23;124:9,20;
125:11;126:15;131:13;
132:5;134:1,10,18;
135:4;136:1;137:14;
138:17;139:3,22;
140:10;142:8,23;143:5,
6;146:19;149:2,18;
150:1,8,15;151:8;
160:13;161:3;166:10;
167:2,18;168:3,17;
171:15;173:18;174:2,8,
15;175:16;176:2,20,23;
179:9;180:2;183:12,23;
184:3,15;185:10

**witnessed (1)**
169:16

**witnesses (2)**
104:21;168:19

**wood (4)**
115:21,22,23,24

**word (5)**
37:15,15,17,18;58:16

**words (3)**
32:21;38:15;86:9

**work (7)**
9:12,18,21;15:25;
16:14;54:11;56:16

**worked (6)**
9:17,24;10:2,4;17:8;
92:13

**working (4)**
62:14;63:1;91:14;
157:12

**works (1)**
62:22

**worried (2)**
99:14;139:10

**worry (1)**
126:19

**write (4)**
77:1;82:4;87:23;
146:23

**writing (3)**
52:10,13;81:16

**written (3)**
123:1;143:6;146:21

**wrong (3)**
20:25;27:12;101:4

**wrote (2)**
144:6;177:24

**Wyoming (3)**
66:15;67:3;115:23

**Y**

**year (8)**
12:24;13:3;14:3,10,
18;16:2;46:19,21

**years (6)**
7:20;9:25;13:15,21;
48:18;132:16