# Appendix Eight

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Chad Miner*
*October 6, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 10-6-10 Chad Miner_scoped.txt
Min-U-Script® with Word Index

---

## Page 1

CHAD MINER - October 6, 2010                                    Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3    ------------------------------  ---------------------

4    TRICIA WACHSMUTH,                    )
                                          )
5              Plaintiff,                 )
                                          )
6         vs.                             )   NO. 10-CV-041J
                                          )
7                                         )
     CITY OF POWELL, AND IN THEIR         )
8    INDIVIDUAL CAPACITY, TIM             )
     FEATHERS, CHAD MINER, MIKE           )
9    CERETIEN, ROY ECKERDT, DAVE          )
     BROWN, MIKE HALL, BRETT LARA,        )
10   MATT MCCASLIN, ALAN KENT MATT        )
     DANZER, OFFICER BRILAKIS, LEE        )
11   BLACKMORE, CODY BRADLEY, KIRK        )
     CHAPMAN, JOHN DOES #1-#4,            )
12                                        )
              Defendants.                 )
13   ------------------------------

14            DEPOSITION OF CHAD MINER
              2:41 p.m., Wednesday, October 6, 2010
15

16

17

18            Pursuant to notice, the deposition of CHAD

19   MINER was taken in behalf of Plaintiff in accordance

20   with the applicable Federal Rules of Civil Procedure at

21   270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22   Registered Professional Reporter and Notary Public of

23   the State of Montana.

24

25

---

## Page 2

CHAD MINER - October 6, 2010                                    Page 2

1                        APPEARANCES

2    FOR PLAINTIFF:

3              Mr. Jeffrey C. Gosman
               Gosman Law Office
4              123 W 1st Street
               P.O. Box 51267
5              Casper, WY 82601-2181
               Telephone: (307)265-3082 - Fax: (307)265-6715
6              E-mail: jeff@gosmanlawoffices.com

7

8    FOR INDIVIDUAL DEFENDANTS:

9              Ms. Misha Westby
               Senior Assistant Attorney General
10             2424 Pioneer Avenue, 2nd Floor
               Cheyenne, WY 82002
11             Telephone: (307)777-5477 Fax: (307)777-8920
               E-mail: mwest@state.wy.us
12

13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:
14

15             Mr. Tom Thompson
               MacPherson, Kelly & Thompson
16             616 West Buffalo
               P.O. Box 999
17             Rawlins, WY 82301-0999
               Telephone: (307)324-2713 - Fax: (307)324-7348
18             E-mail: tthompson@wyomingattorneys.net

19

20   Also Present:  Tim Feathers

21

22

23

24

25

---

## Page 3

CHAD MINER - October 6, 2010                                    Page 3

1                     INDEX TO WITNESSES

2                                                        PAGE

3    CHAD MINER

4         Direct Examination by Mr. Gosman ...............5
          Signature Page ..............................168
5         Reporter's Certificate ......................169

6

7

8                        EXHIBITS

9    EXHIBIT              DESCRIPTION                    PAGE

10   7      DEF-TECH Label ...........................30

11   10     Notes of Wachsmuth Warrant ..............117

12   13     Search and Seizure Affidavit .............68

13   14     Affidavit of Probable Cause ..............85

14   15     Affidavit of Probable Cause ..............85

15   16     PPD Supplement 7 by Mike Chretien .......89

16   17     Search and Seizure Warrant ...............52

17   19     PPD CAD Incident Report .................160

18   20     PPD Narrative by Chad Miner ..............87

19   23     PPD Supplement 6 by Kirk Chapman ........81

20   26     Cody Police Department Person's .........46
            Record

21
     27     Countermeasures Tactical Institute ......14
22          Patrol Officer Specialized Tactics
            Course
23
     28     Countermeasures Tactical Institute ......12
24          Immediate Action for Patrol
            Handbook
25

---

## Page 4

CHAD MINER - October 6, 2010                                    Page 4

1                      EXHIBITS (Cont.)

2    EXHIBIT              DESCRIPTION                    PAGE

3    31     Wyoming P.O.S.T. Training Records ........11

4    32     PPD Receipt ..............................83

5    35     PPD Patrol Friday Training ...............20

6    36     E-mail ..................................162

7    41-A   Drawing by Mr. Miner ....................128

8

9

10               REQUESTED ON THE RECORD

11   REQUEST                              PAGE   LINE

12   Portion to be stricken per the ..............51     10
     protective order
13   Portion to be stricken per the ..............77      3
     protective order

14

15

16

17

18

19

20

21

22

23

24

25

1    CHAD MINER,
2  having been first duly sworn, testified as follows:
3         DIRECT EXAMINATION
4  BY MR. GOSMAN:
5    Q.  Officer, is it Miner?  May I call you officer
6  Miner?
7    A.  Yes.
8    Q.  Have you given a deposition before?
9    A.  No.
10   Q.  Do you understand the format for taking a
11  deposition?
12   A.  I believe so.
13   Q.  I'm going to ask you questions today, and you
14  will be required to answer them unless your attorneys
15  direct you not to answer them; do you understand that?
16   A.  Yes.
17   Q.  And the answers you give today will be
18  recorded and can be used against you at trial; do you
19  understand that?
20   A.  Yes.
21   Q.  If you have any trouble understanding
22  anything that I have said, please ask for a
23  clarification before you answer the question.  And
24  there is one other -- in that regard -- thing that
25  occurs from time to time, and that is oftentimes I will

1  not complete my question before you will be starting
2  the answer, and we'll have to be careful of that, okay?
3    A.  Okay.
4    Q.  And we can take a break at any time.  But not
5  while a question is pending, do you understand that?
6    A.  Yes.
7    Q.  Officer, you go to work tonight at 10:00?
8    A.  Actually, no.  I got off at 6:00 a.m. this
9  morning.  I go back to work at 6:00 a.m. tomorrow
10  morning.
11   Q.  Have you had plenty of rest for this
12  deposition?
13   A.  Yes.
14   Q.  Are you currently on any medication that
15  would impair your ability to give truthful answers?
16   A.  No.
17   Q.  Have you ever -- had any medical problems or
18  illnesses that might interfere with your ability to
19  give truthful answers to this deposition?
20   A.  No.
21   Q.  Have you ever been arrested for any crime,
22  other than a traffic violation?
23   A.  You talking about felony crimes or
24  misdemeanor crimes?
25   Q.  Actually, I'm talking about misdemeanor

1  crimes, yes.
2         MS. WESTBY:  No.  Felony or, you know, crime
3  of truth or dishonesty.
4         MR. GOSMAN:  This is a discovery deposition.
5  All right.  I'm not here really to embarrass you,
6  believe it or not.
7  BY MR. GOSMAN:
8    Q.  Have you ever been arrested for a crime,
9  other than a traffic violation that constituted or
10  could have constituted a felony?
11   A.  No.
12   Q.  Have you ever been accused of a crime
13  involving dishonesty?
14   A.  Accused?
15   Q.  Yes, accused.
16   A.  No.
17   Q.  Are you married?
18   A.  Yes.
19   Q.  Do you know a Miranda Leigh Miner?
20   A.  No.
21   Q.  Have you ever been divorced?
22   A.  Yes.
23   Q.  In what court were the divorce proceedings
24  penalized?
25   A.  Fifth Judicial here, Park County.

1    Q.  Over in Cody?
2    A.  Correct.
3    Q.  And did you have a restraining order placed
4  against you?
5    A.  No.
6    Q.  Was an application for restraining order
7  filed against you?
8    A.  No.
9    Q.  Let's -- did you grow up in this area,
10  Officer?
11   A.  No.
12   Q.  Where did you grow up?
13   A.  Montana.
14   Q.  What part?
15   A.  Billings.
16   Q.  And did you go to high school in Billings,
17  then?
18   A.  I did.
19   Q.  Did you complete your high school education?
20   A.  I did.
21   Q.  What year was that?
22   A.  1995.
23   Q.  Did you graduate with a diploma?
24   A.  I did.
25   Q.  Did you have any schooling beyond high

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

---

CHAD MINER - October 6, 2010                                    Page 9
Direct Examination by Mr. Gosman

1 school?
2    A.  One year of college.
3    Q.  Where was that?
4    A.  Billings.
5    Q.  Did you have any particular emphasis in the
6 coursework that you took?
7    A.  Diesel mechanics.
8    Q.  What have you done in terms of work history
9 from the time that you graduated -- or, rather,
10 finished your one year of college until the time that
11 you became employed with the Powell Police Department?
12   A.  I worked for Little Rock Express for
13 approximately a year.  At which time I was laid off.  I
14 worked for a farmer for three months, at which time I
15 was rehired by Little Rock Express, and stayed employed
16 there until -- I don't remember the exact time.
17       But after that, I went to work for Warren
18 Transport.  After that, GK Construction.  And after
19 that Powell Police Department.
20   Q.  And what year did you begin working for the
21 Powell Police Department?
22   A.  2003.
23   Q.  And did you -- did you complete your law
24 enforcement academy curriculum before you started at
25 the Powell Police Department, or was it afterwards?

---

CHAD MINER - October 6, 2010                                    Page 10
Direct Examination by Mr. Gosman

1    A.  After.
2    Q.  And had you completed it by the time you
3 finished your probationary term with the Powell Police
4 Department?
5    A.  Yes.
6    Q.  And I take it you successfully completed your
7 probationary term at the Powell Police Department?
8    A.  Yes.
9    Q.  Have you had any discipline matters that
10 involve discipline of any kind taken against you that
11 are not in your personnel file?
12   A.  No.
13   Q.  What is your rank with the Powell Police
14 Department at this time?
15   A.  Officer.
16   Q.  And you started in what year again, 2006 --
17 or '3?
18   A.  '3.
19   Q.  Have you received any increase in rank since
20 you started with the Powell Police Department?
21   A.  Yes.
22   Q.  Go ahead and explain that for me, please.
23   A.  I progressed from entry level every year
24 receiving a step raise every year of employment until
25 this year, which we -- the entire city is on,

---

CHAD MINER - October 6, 2010                                    Page 11
Direct Examination by Mr. Gosman

1 obviously, a pay increase freeze.  So to my knowledge,
2 nobody has received any kind of raise.
3            (Exhibit 31 identified)
4 BY MR. GOSMAN:
5    Q.  Let's turn to Exhibit 31 in the notebook that
6 you've got.
7    A.  Is it going to be these numbers right here?
8    Q.  Yes, it is.  And we have your P.O.S.T.
9 training records.  And I believe they are first in that
10 exhibit.
11       So starting with the page that's marked
12 Exhibit 31, will you take just a moment and review
13 those?
14   A.  (Witness Complies.)
15       Okay.
16   Q.  Is this record complete?
17   A.  Actually, there's one that I found that's --
18 it's complete by P.O.S.T. records, yeah.
19   Q.  Okay.  There's one that you found that's not
20 on the P.O.S.T. training records?
21   A.  But I guess maybe it may not have been
22 P.O.S.T. recognized training.
23   Q.  Do you know what that course was about?
24   A.  It was P I.E.R active shooter course.
25   Q.  Is that a Countermeasures Technology,

---

CHAD MINER - October 6, 2010                                    Page 12
Direct Examination by Mr. Gosman

1 Incorporated course?
2    A.  I don't know for sure, but I believe it was
3 that curriculum, yes.
4    Q.  Do you remember when you took that course?
5    A.  2004, 2005.
6            (Exhibit 28 identified)
7 BY MR. GOSMAN:
8    Q.  Let's take just a minute and look at Exhibit
9 Number 28.  And I want you to tell me if that -- that,
10 by the way, exhibit is a Countermeasures Tactical
11 Institute Immediate Action -- Immediate Action for
12 Patrol handbook.
13   A.  It appears to be.
14   Q.  And is that the course that you believe you
15 took in 2004, I think you mentioned?
16   A.  I couldn't say.  I have no idea what the
17 exact curriculum of that was.  But it was under the
18 same P.I.E.R. active shooter heading.  But I don't know
19 what the handbook looked like.
20   Q.  Okay.  You didn't keep the handbook?
21   A.  I don't believe so.
22   Q.  And is there any reason why that didn't end
23 up on your P.O.S.T. records?  It seems like CTI
24 training sessions are generally recognized as
25 P.O.S.T -- for P.O.S.T. purposes.

---

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 6 of 83
Tricia Wachsmnth v.
City of Powell, et al.
Chad Miner
October 6, 2010

CHAD MINER - October 6, 2010    Page 13
Direct Examination by Mr. Gosman

1  A.  I couldn't say.  We took it in another city.
2  And they are generally in charge with sending the
3  records to P.O.S.T., the rosters and all of those
4  things.
5  Q.  Okay.  And it's your recollection that that
6  course -- you took that course in the year 2004?
7  A.  '4 or '5.
8  Q.  All right.  Getting back to Exhibit 31 for
9  just a moment, I'd like you to go through that list and
10  tell me what P.O.S.T. recognized training you have had
11  as a peace officer relative to dynamic entry.
12  A.  Actually, may I correct myself from earlier?
13  Q.  Yes.
14  A.  I was looking for the Green River.  There is,
15  on the fifth line down, 4/23/2004, a 40-hour P.I.E.R.
16  course.  But there is no city listed.
17  Q.  Okay.
18  A.  I'm sure that's the one we just talked about.
19  Q.  Uh-huh.
20  A.  So that one would be one.
21  Q.  Yes.  I'm not sure how many lines down it was
22  dated 9/3/2005, 50 hours Patrol Tactical Response in
23  Powell, Wyoming.  And again, in 11/9 of 2009, 28 hours
24  for Immediate Action for Patrol, Powell, Wyoming.
25  Those are the three I know deal with dynamic entry.

CHAD MINER - October 6, 2010    Page 14
Direct Examination by Mr. Gosman

1           (Exhibit 27 identified)
2  BY MR. GOSMAN:
3  Q.  Let's go ahead and turn to Exhibit 27.  And
4  these are -- this particular document was produced as
5  part of your training records, officer Miner.  I want
6  you to take a look at it and tell me if, in fact, you
7  recognize those training materials.
8  A.  Yes, sir, I do recognize them.
9  Q.  And I will tell you that I realize that it's
10  been some time ago that you took that course, but can
11  you tell me generally what the subject matters of that
12  course were?
13  A.  Which course was this?  Is this the 2004 or
14  the 2009?
15  Q.  This would be the 2005, I believe, 50-hour
16  Patrol Tactical Response in September.
17  A.  The general idea of the course is specialized
18  tactics for patrol officers and all that encompasses,
19  which is very broad.
20  Q.  And what were some of the things that you did
21  in that course, if you remember?
22  A.  There was active gunman training and/or
23  active gunman interdiction and response.  Movement,
24  cover issues, teamwork.  Those are the big ones that I
25  can think of off the top of my head.

CHAD MINER - October 6, 2010    Page 15
Direct Examination by Mr. Gosman

1  Q.  Okay.  Did you train in the use of
2  diversionary devices at that time?
3  A.  I believe I did, yes.
4  Q.  And do you remember whether or not you
5  actually detonated a live diversionary device during
6  the course of that training?
7  A.  Forgive me, I'm trying to discern which
8  memories are from which class.
9  Q.  I understand that.
10  A.  I believe everybody in the class deployed a
11  device, yes.
12  Q.  And from that time until February of 2009,
13  had you had the opportunity to deploy additional
14  diversionary devices in training settings?
15  A.  I don't recall if I had or had not.
16  Q.  Okay.  It appears that you have obtained a
17  certification in the use of diversionary devices; is
18  that true?
19  A.  That is.
20  Q.  And that is the second page of your
21  P.O.S.T. -- of Exhibit 31.  And I'd like you to take
22  just a minute and explain to me the nature of that
23  course, how long it was, what happened.
24  A.  The major of the course is to discuss the
25  deployment and use of specialty impact munitions,

CHAD MINER - October 6, 2010    Page 16
Direct Examination by Mr. Gosman

1  distraction devices, and chemical munitions.  Also, OC
2  aerosol projectors.  If I remember correctly, it was a
3  30-hour course, but I may not be exact on that.
4          What was the rest of your question about
5  that?
6  Q.  You learned -- how many times did you
7  practice with these devices in that course?
8  A.  We handled -- we handled lots of devices and
9  deployed them lots of times.  So that number, I
10  wouldn't be able to put on it.
11  Q.  All right.  Were there any course materials
12  associated with that seminar?  That training?
13  A.  There was.
14  Q.  Do you have those?
15  A.  With me now?
16  Q.  In your possession?
17  A.  I have them in my possession, yes.
18  Q.  Would you be willing to provide those to me?
19  I have asked --
20  A.  With the permission of counsel, yeah.
21          MS. WESTBY: You can provide them to me and
22  we'll go from there.
23  BY MR. GOSMAN:
24  Q.  Well, we'll take some breaks today.  We may
25  need to take a break for dinner.  I'm not sure whether

1 that will be necessary.
2        How long would it take for you to retrieve
3 those materials?
4    A.   Five minutes.
5    Q.   All right.  At the next break I'd ask if you
6 could do that and you could give them to your attorney.
7    A.   All right.
8    Q.   Okay.  As far as you know, is anyone else in
9 the Powell Police Department certified in the use of
10 these devices, the diversionary devices?
11       MR. THOMPSON: Objection as to form.
12       MS. WESTBY: Join.
13       THE WITNESS: I'm not aware that there is a
14 certification for the use of them.
15 BY MR. GOSMAN:
16    Q.   Okay.  All right.  Is there anyone that is
17 certified to -- well, it looks to me like this
18 certification involves a basic instructor course; is
19 that correct?
20    A.   Correct.
21    Q.   Are you a certified instructor, then, for the
22 use of this device, as of the date of this training?
23       MS. WESTBY: Object to the form.
24       MR. THOMPSON: Join.
25       THE WITNESS: It's certified that I went to

1 the class and got the instruction.
2 BY MR. GOSMAN:
3    Q.   Okay.  That's all I need to know.
4        Have you taught any of the Powell police
5 force in the use of this device since you received this
6 training?
7    A.   Yes.
8    Q.   Explain that to me.
9    A.   What is it exactly you want to know?
10    Q.   What was the setting of the training, and
11 then we'll talk about the number of officers involved
12 and how many times you met and that sort of thing?
13    A.   The diversionary device setting was in the
14 classroom.  And it was to go over -- familiarizing them
15 with ways to deploy the device, considerations for
16 deploying the device, and possible side effects of
17 deploying a device.
18    Q.   And are the concepts that you've just
19 discussed, are they contained in training materials
20 that you have in your possession from this seminar that
21 you received the certificate of attendance for?
22    A.   Yes.  All the training I give comes from what
23 I was taught.
24    Q.   Now, with regard to the training that you
25 have received relative to dynamic entry, have you --

1 since your P.O.S.T. recognized training with
2 Countermeasures Tactical Institute in 2004, have you
3 had any additional training in those areas since that
4 time?
5        MS. WESTBY: Wait.  I'm going to object.  He
6 talked about two separate trainings.  One in 2004, and
7 one in 2005.
8 BY MR. GOSMAN:
9    Q.   You know, I'm sorry, you're right.  And I
10 misspoke.  Yes, it looks to me like it was September of
11 2005 that you completed your Patrol Tactical Response
12 course.
13        And so my question is:  Was that the -- prior
14 to the 24th of February, 2009, was that the last
15 training that you had dynamic entry?
16        MS. WESTBY: Are you limiting it to
17 P.O.S.T. --
18        MR. GOSMAN: No, I'm not.
19        MS. WESTBY: -- training?
20        MR. GOSMAN: I'm not.
21        MS. WESTBY: So any training, P.O.S.T. or
22 otherwise.
23        THE WITNESS: I don't know if we had any
24 in-house training or not after that day.
25

1        (Exhibit 35 identified)
2        MR. GOSMAN:
3 BY MR. GOSMAN:
4    Q.   All right.  Let's go ahead and take a look at
5 Exhibit 35 for a moment.  And 35 is beyond the end of
6 the tabs there.
7    A.   Got it.
8    Q.   Very good.  Let's have you -- I'll identify
9 this record as being the in-service training records
10 that were provided to me.  And I'd like you to go
11 through those records and see if you can refresh your
12 recollection of any training that you have had in an
13 in-service setting relative to dynamic entry.
14    A.   I would say June 6, high-risk warrant would
15 have something to do with it.
16    Q.   Do you remember whether you attended that
17 session or not?
18    A.   I don't.
19    Q.   Okay.
20    A.   Possibly November 6th, active threat
21 response.
22    Q.   That would be November of '06 probably?
23    A.   November of '06, correct.
24    Q.   Do you remember whether you attended that
25 training?

Case 1:10-cv-00041-ABJ  Document 65-7  Filed 01/10/11  Page 8 of 83
Tricia Wachsmuth v.                                                                    Chad Miner
City of Powell, et al.                                                              October 6, 2010

CHAD MINER - October 6, 2010                    Page 21
Direct Examination by Mr. Gosman

1   A. I do not. This entire page looks like it has
2   to do with room clearing, dynamic entry kind of things.
3   Q. Do you remember part cipating in any of
4   those?
5   A. I don't, no. It doesn't have a number.
6       MS. WESTBY: For purposes of the record it's
7   LGLP Wachsmuth 1818.
8       MR. GOSMAN: Thank you.
9       THE WITNESS: Okay. That's all that I saw
10  when I went through there.
11  BY MR. GOSMAN:
12  Q. Do you have a recollection of ever having
13  trained as a team in simulated dynamic entry settings?
14  A. Yes.
15  Q. Explain to me when and who was involved.
16  A. I can't tell you when they were or who was
17  present at the time.
18  Q. Did the Powell Police Department have a
19  tactical team?
20  A. No.
21  Q. Do you have any recol ection of ever
22  executing a dynamic entry in connection with a search
23  warrant before?
24  A. Yes.
25  Q. And that would have been before February of

CHAD MINER - October 6, 2010                    Page 22
Direct Examination by Mr. Gosman

1   2009?
2   A. Have I done it before then?
3   Q. Yes.
4   A. Yes.
5   Q. Okay. Tell me about that.
6   A. Well, there's been several -- I don't
7   remember specifics -- with several different agencies.
8   Q. Several different agencies?
9       In other words, were these collaborative
10  efforts involving other agenc es?
11  A. Correct.
12  Q. Did those -- did that warrant service involve
13  the use of the Park County SWAT team, sheriff's
14  department SWAT team?
15  A. I have done them with members of them. Not
16  with that team together, no.
17  Q. Were there other members of the Powell Police
18  Department that were with you when those entries were
19  made?
20  A. Yes.
21  Q. Who?
22  A. It would be impossible for me to say who was
23  present at those.
24  Q. Do you remember anyone specifically that was
25  with you in any of those occasions?

CHAD MINER - October 6, 2010                    Page 23
Direct Examination by Mr. Gosman

1   A. The one Powell police officer that I remember
2   being with me on one of these dynamic entries on a
3   search warrant would have been Officer Michael Funke.
4   He no longer works here.
5   Q. And describe generally what these entries --
6   what type of warrant was being served.
7   A. Virtually all guns and/or -- correction,
8   drugs and/or guns.
9   Q. Were they felony drug warrants?
10  A. Some, yes; some no.
11  Q. Some were misdemeanor drug warrants?
12  A. Correct.
13  Q. And so you've been involved in the deployment
14  of a -- the deployment of a tactical team that
15  conducted a dynamic entry for the effect of a
16  misdemeanor search warrant?
17      MS. WESTBY: Object to the form of the
18  question.
19  BY MR. GOSMAN:
20  Q. Did you understand that? That was kind of a
21  complicated question.
22      MS. WESTBY: Answer if you know.
23      THE WITNESS: I'll clarify with you to make
24  sure I understand.
25

CHAD MINER - October 6, 2010                    Page 24
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q. Okay.
3   A. Have I been on a deployment with a tactical
4   team for a misdemeanor search warrant; is that correct?
5   Q. Yes.
6   A. I have never been involved with a, per se,
7   tactical team.
8   Q. Okay. Have you done dynamic entries on
9   misdemeanor search warrants?
10  A. Yes.
11  Q. Explain -- let's just start with the one that
12  comes to your mind easiest. Tell me a little bit about
13  it.
14  A. The one that comes to mind, let me think of a
15  misdemeanor one. That would be a felony. And of
16  course I don't recall exactly what the charges were
17  when I helped with other agencies. So I guess the one
18  that sticks out in my mind was not a drug dynamic
19  entry. It was not for drugs. This was for other
20  things --
21  Q. Other things?
22  A. -- which was a misdemeanor. Do you want me
23  to explain?
24  Q. I do, but let's start with the date.
25  A. I have no idea what the date was. None.

CHAD MINER - October 6, 2010                                     Page 25
Direct Examination by Mr. Gosman

1   Q. Was it more than five years ago?
2   A. No.
3   Q. More than two years ago?
4   A. Probably two years is getting close to what
5   it was, but I can't say the date.
6   Q. Go ahead and explain what that was about.
7   A. It involved two Powell police officers,
8   myself and -- forgive me for forgetting this person
9   earlier, and Sergeant Alan Kent, and a deputy from the
10  sheriff's office.
11      The domestic violence call turns into a
12  warrant service at the same time. And we were forced
13  to make entry on both counts. To A, take care of the
14  domestic violence; and B, serve the warrant.
15  Q. All right. Was there a threat of physical
16  violence in the home that night? It was a domestic
17  violence call.
18  A. To whom?
19  Q. To anyone in the home.
20  A. We really didn't know. We were dispatched to
21  a domestic, and when we got there, we couldn't gain
22  entry to the house. They would not answer the door.
23  Q. How long did you give them to answer the
24  door, do you remember?
25  A. Long time.

CHAD MINER - October 6, 2010                                     Page 26
Direct Examination by Mr. Gosman

1   Q. Do you remember, with respect to the domestic
2   violence call, whether there was, in fact, a report of
3   domestic violence occurring in the home, someone being
4   injured?
5   A. We were dispatched to a domestic. That's
6   about as definitive as I can get into that call.
7   Q. All right. Do you remember any of the others
8   involving dynamic entry from the service of a
9   misdemeanor warrant?
10  A. I can't recall any specifically, any others.
11  Correction.
12  Q. Yes, go ahead.
13  A. I do recall a misdemeanor search warrant for
14  underage drinking on two occasions.
15  Q. All right. And you forced your way into the
16  home?
17  A. The Powell police did. I don't know that it
18  was me.
19  Q. Oh, you're not sure you were --
20  A. No, I was there, but I don't believe I'm the
21  one that forced the door, if that's what you're asking.
22  What are you asking?
23  Q. I was asking if you were there?
24  A. Okay. I was there.
25  Q. And did these events occur after February 24

CHAD MINER - October 6, 2010                                     Page 27
Direct Examination by Mr. Gosman

1   of 2009?
2   A. I don't believe either one of them did, no.
3   Q. Tell me what circumstances were these
4   underage drinking situations?
5   A. The first that I can recall is -- I don't
6   have any details of the call as I wasn't involved in
7   the initial call. It was progressing as I came on
8   duty. So I went to assist with the search warrant. At
9   which time entry was made into the home and persons
10  were secured and so on and so forth.
11  Q. Were you there when the entry was made into
12  the home?
13  A. Yes.
14  Q. Did -- were you there when the officers
15  knocked and announced their presence at the home?
16  A. Yes.
17  Q. And did someone answer the door?
18  A. No.
19  Q. Was there a -- how long did it take for the
20  officer --
21  A. I have no idea. I can't tell you the time
22  frame.
23  Q. Was it more than a minute?
24  A. I couldn't even tell you that. I don't know.
25  I have no recollection of that.

CHAD MINER - October 6, 2010                                     Page 28
Direct Examination by Mr. Gosman

1   Q. All right. And the other one, then?
2   A. The second one was actually a similar
3   situation. I was not on duty when it started. I was
4   called in to assist prior to my shift. It was another
5   underage drinking party. The officers had not been
6   able to get entry, and they felt that they needed to.
7   And they obtained a search warrant and I assisted with
8   execution of that warrant.
9   Q. So you were there from the time the warrant
10  was brought back to the premises?
11  A. Correct.
12  Q. And officers knock on the door?
13  A. I was perimeter security there. So I really
14  can't tell you anything about what they did or didn't
15  do at the door.
16  Q. Was a battering ram used?
17  A. I don't remember.
18  Q. And in the previous instance, was a battering
19  ram used?
20  A. I don't know.
21  Q. Lets go back to the domestic violence case.
22  Was a battering ram used in that case?
23  A. No. This last one, I believe it was. But I
24  couldn't swear to that, but I believe it was.
25  Q. There may have been a battering ram involved?

1   A.  That's my freshest recollection.
2   Q.  And were the officers on the scene that night
3   part -- was it a tactical unit or was it simply
4   officers responding to the call?
5       MS. WESTBY: Object to the form of the
6   question.
7       MR. THOMPSON: Join.
8       THE WITNESS: Answer?
9       MS. WESTBY: Go ahead.
10      THE WITNESS: It was just officers responding
11  to the call.
12  BY MR. GOSMAN:
13  Q.  Before we completely leave the subject, you
14  mentioned that you were on several calls involving
15  other agencies that did involve tactical teams in the
16  use of dynamic entry?
17  A.  Correct.
18      MS. WESTBY: Object to the form of the
19  question.
20      MR. THOMPSON: Join.
21  BY MR. GOSMAN:
22  Q.  And what were the other agencies involved?
23  There was the Park County sheriff's office; were there
24  other agencies involved in these calls?
25  A.  The Park County sheriff's office, the Wyoming

1   Game and Fish, the Cody Police Department, Riverton
2   Police Department, the county that -- Fremont County
3   deputies, DEA, DCI.
4   Q.  Okay.
5   A.  I think that covers most of them.
6   Q.  It sounds like you've -- that didn't all
7   happen in Park County, of course?
8   A.  No.
9   Q.  Have you worked in other police departments?
10  A.  I've worked with other police departments.
11  Q.  Okay. How did you become associated with
12  Fremont County Police Department and Sheriff's
13  Department?
14  A.  I was invited to help them execute a number
15  of warrants. DCI, actually.
16  Q.  What were those warrants for?
17  A.  Drugs. I believe it was all somebody else's
18  case. I was merely assisting.
19          (Exhibit 7 identified)
20  BY MR. GOSMAN:
21  Q.  Let's take a look at Exhibit 7.
22      Officer, prior to February 2009, had you ever
23  been involved in in-service training for diversionary
24  device, the use of diversionary devices?
25  A.  What was the date you gave me? 2009?

1   Q.  It would have been the date that the
2   Wachsmuth warrant was served?
3   A.  Yes, I have.
4   Q.  You have?
5   A.  Yes.
6   Q.  Okay. What kinds of training was that?
7   A.  Room clearing, hostage, barricade, gunman,
8   active shooters.
9   Q.  And were any distraction devices deployed?
10  A.  In our training, sometimes yes, sometimes no.
11  Q.  I think you said you had only -- prior to
12  2009 only deployed the devices that were deployed in
13  your Patrol Tactical Response training, did I get that
14  right? Actually detonated them?
15  A.  I think I told you that was one time that I
16  could recall definitely having done it. The other
17  times I can't -- I know as a department in departmental
18  training we have deployed live distraction devices
19  during training.
20  Q.  Exhibit 7, you'll notice that the first page
21  of that exhibit contains product warnings. Let me ask
22  you first if those product warnings are applicable to
23  the device that the Powell Police Department purchased,
24  and particularly the device that was used that night in
25  2009 when the Wachsmuth warrant was served.

1       MR. THOMPSON: Object to form.
2       MS. WESTBY: Join.
3       THE WITNESS: It looks like a warning device
4   for the ones we have, yes.
5   BY MR. GOSMAN:
6   Q.  And do you see the legend? I think it's at
7   the top of the page -- that talks about how the -- who
8   should use the device?
9   A.  Yep.
10  Q.  Is that consistent with the training you've
11  had?
12  A.  Yes.
13  Q.  Have you ever trained Officer McCaslin?
14  A.  Yes.
15  Q.  In the use of an N.F.D.D. device?
16  A.  Correction. No.
17  Q.  Okay. Let's go ahead and take a look at
18  the -- it's actually the second page of that exhibit.
19      Were you aware of the purchase of these
20  distraction devices in March of 2007?
21      MS. WESTBY: You know, before we go any
22  further down this path, I -- you know, you've deposed
23  the officer who deployed the diversionary device. This
24  officer did not. You're not allowed under the rules to
25  turn a defendant into an expert witness. I don't

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 11 of 83
Tricia Wachsmuth v.                                                                    **Chad Miner**
City of Powell, et al.                                                                **October 6, 2010**

CHAD MINER - October 6, 2010                                                             Page 33
Direct Examination by Mr. Gosman

1   see -- or to try to attempt to do that based on his
2   training and experience.
3       I guess I'm having a hard time seeing what
4   purpose it is, of a potential relevant nature, this
5   information. I mean, tell me if I'm wrong, but I don't
6   see what you're -- where you're going.
7       MR. GOSMAN: Well, the easy answer to that
8   question is all of the officers are responsible for the
9   actions of the other officers to the extent that they
10  are conducted in their presence, and to the extent they
11  may have violated constitutional violations.
12      MS. WESTBY: And if you want to ask him, you
13  know, who assigned Officer McCaslin to do the --
14  perform that function, if they thought he was
15  qualified. I mean, I get those questions. But I don't
16  understand this line of questioning that you're going
17  down. And I can think of only one purpose for it,
18  which is not an admissible purpose. And I don't have
19  to allow my defendant to go down that route.
20  BY MR. GOSMAN:
21  Q. Okay. Officer, you want to take a look at
22  the second page of Exhibit 7.
23  A. Okay.
24  Q. All right. Apparently, 24 of these devices
25  were purchased in March of 2007. Do you know how many

CHAD MINER - October 6, 2010                                                             Page 34
Direct Examination by Mr. Gosman

1   of those devices had been used by February of 2009?
2   A. No.
3   Q. Is there anybody at the police department
4   that's in control of the distraction devices, has
5   custody of those devices?
6   A. It's not me.
7   Q. Do you know who it is?
8   A. I would assume that the supervisors and the
9   equipment officer.
10  Q. And who would that be?
11  A. Sergeant Kent, Sergeant Eckerdt, sergeant
12  Chretien, and Kirk Chapman
13  Q. Okay. Did the training that you had in
14  connection with the noise distraction device include --
15  and this is as of February 2009, did it include the
16  information that is contained on the third page of
17  Exhibit 7 regarding the deployment or occurring in an
18  area that was clear of obstructions within a certain
19  diameter?
20      MS. WESTBY: Again, you know, I can't
21  possibly think of any other purpose for this line of
22  questioning. I mean, if you can explain something to
23  me, please do so. But I just don't --
24      MR. GOSMAN: I want to know how the officers
25  of the Powell Police Department were trained with this

CHAD MINER - October 6, 2010                                                             Page 35
Direct Examination by Mr. Gosman

1   device. Not just the one who deployed it. But the
2   officers in general.
3       MS. WESTBY: What's the relevance of that?
4       MR. GOSMAN: Well, that I don't have to spend
5   a lot of time, you know, talking about. Because
6   honestly, the relevance is -- if it even can lead to
7   discoverable evidence, it's admissible in a discovery
8   deposition. And if I were you, I wouldn't make a big
9   point of this area.
10      MS. WESTBY: You know what? Don't tell me
11  what to do.
12      MR. GOSMAN: All right.
13      MS. WESTBY: You know that you are not
14  allowed to try to turn this witness into an expert.
15  Don't ask him any opinions about it. Don't ask him
16  any -- I see no relevance to it. And --
17      MR. GOSMAN: I think I get your position.
18      MR. THOMPSON: And, Counsel, I would note for
19  the record, that the training that he received was
20  after the incident. So you're asking him --
21      MR. GOSMAN: No.
22      MR. THOMPSON: Can you let me finish what I
23  was stating.
24      MR. GOSMAN: Of course.
25      MR. THOMPSON: You're asking him questions

CHAD MINER - October 6, 2010                                                             Page 36
Direct Examination by Mr. Gosman

1   about how he was trained on the -- this device after
2   the incident and after the device was used.
3       MR. GOSMAN: Well, I don't know where you
4   were when you said that he trained on this device, I
5   think it was September of 2005. But I'm talking about
6   the period of time before the 24th of February 2009.
7   And I think I made that clear in my last question.
8   BY MR. GOSMAN:
9   Q. Why don't you take a look at the third
10  paragraph on Document 1807.
11      And starts with this language: "It is
12  recommended that the immediate area for the deployment
13  be visually affirmed." And then I'd like you to tell
14  me whether or not the recommendations contained in that
15  paragraph are consistent with the training that you
16  received prior to the 24th of February, 2009, in the
17  use of a distraction device.
18  A. Your question is what the paragraph says
19  consistent with the way we were trained, or is this
20  document consistent?
21  Q. That paragraph, sir.
22  A. Okay. I would say yes.
23  Q. And then there's a warning in a little box
24  just off to the right. I want you to take a minute and
25  read that warning. And tell me -- answer the same

---

CHAD MINER - October 6, 2010      Page 37
Direct Examination by Mr. Gosman

1   question, if you can.

2    A. Yes to your question.

3    Q. All right. Now, prior to the 24th of

4   February, 2009, were you aware that distraction devices

5   do create an effect called overpressure?

6    A. Let me differentiate my memories. So I'm

7   certain that it was talked about. I don't recall the

8   context of that conversation.

9    Q. Prior to the 24th of February, 2009, were you

10   aware, based on your training with these devices, that

11   they should not be deployed in rooms where small

12   children were present?

13      MS. WESTBY: Object to the form of the

14   question.

15      MR. THOMPSON: Join.

16      THE WITNESS: I believe that would be a

17   consideration of deployment

18   BY MR. GOSMAN:

19    Q. And let's jump ahead now to the time frame

20   following the completion of your course on these

21   devices. Was that consistent with the training you

22   received at that time?

23      MS. WESTBY: At which time? Are we talking

24   about the later training, the earlier training?

25

---

CHAD MINER - October 6, 2010      Page 38
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:

2    Q. The later training where the certificate was

3   issued. It's the second page of Exhibit 31. I think

4   it was August of 2009.

5    A. So this is the training you were talking

6   about?

7    Q. I am.

8    A. It was discussed, again, as a consideration

9   prior to deploying one of these devices.

10    Q. What does it mean when you say "it was

11   discussed as a consideration"?

12    A. That it's part of the circumstances used to

13   make the decision, where, when, how to deploy this

14   device.

15    Q. And if you know that a young child is present

16   in a residence, what is the consideration in terms of

17   deploying these devices in the residence?

18      MR. THOMPSON: Objection as to form.

19      MS. WESTBY: Join.

20      THE WITNESS: Are you asking for my

21   considerations or from -- all persons are a

22   consideration in the home. The small child, it would

23   definitely depend on the age -- the age of the child.

24   BY MR. GOSMAN:

25    Q. Is there a cutoff in terms of age that makes

---

CHAD MINER - October 6, 2010      Page 39
Direct Examination by Mr. Gosman

1   that consideration more significant?

2    A. The effects of this key device, there is,

3   yes.

4    Q. All right. What would be that age?

5    A. According to this training that I received

6   last August, a newborn child is specifically stated as

7   the most at risk. So that's the cutoff I'm referring

8   to.

9    Q. All right I understand that there was

10   intelligence that placed a ten-year-old child, or a

11   child of the approximate age of ten years old, in the

12   residence the night that the search warrant was

13   executed. Is that consistent with your knowledge?

14      MS. WESTBY: Object to the form of the

15   question. Misstates the testimony and evidence.

16      MR. THOMPSON: Join.

17      Go ahead, if you can.

18      THE WITNESS: To clear up a lot of, maybe,

19   further questions, I wasn't present in the planning and

20   preparation of the execution portion of this. So maybe

21   that will help alleviate some of your questioning.

22      But I was aware that there was discussion

23   about the possibility of a child being at the home at

24   one point in time.

25

---

CHAD MINER - October 6, 2010      Page 40
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:

2    Q. What do you remember about that discussion?

3    A. That's about what I remember of that

4   discussion.

5    Q. Did you participate in the planning of, to

6   the extent that Officer McCaslin was identified as the

7   officer that would deploy distraction device?

8    A. I didn't actually participate in the planning

9   of the execution at all.

10    Q. Have you received any professional training

11   in the area of using confidential informants?

12    A. P.O.S.T. certified training or training?

13    Q. P.O.S.T., we'll start there.

14    A. Yes, I have.

15    Q. And let's go back to Exhibit 31 and ask you

16   to identify that for the record, please.

17    A. Line 8/10/2007, 40 hours, drug investigation,

18   Riverton, Wyoming.

19    Q. Have you had any in-service training, then,

20   in addition to the training you received in 2007?

21    A. Not structured training, as you're relating

22   it.

23    Q. What additional training have you had?

24    A. I wouldn't call it -- it would be more like

25   working with those that know.

---

Case 1:10-cv-00041-ABJ  Document 65-7  Filed 01/10/11  Page 13 of 83
Tricia Wachsmuth v.                                                                    Chad Miner
City of Powell, et al.                                                              October 6, 2010

CHAD MINER - October 6, 2010                                          Page 41
Direct Examination by Mr. Gosman

1  Q. Okay.
2  A. Rather than training.
3  Q. And you have worked with other officers who
4  have had experience in using confidential informants
5  and using their information to develop cases?
6  A. Officers and agents, yes.
7  Q. Is it true that at the time of the Wachsmuth
8  warrants you had never done a marijuana grow operation
9  before?
10       MR. THOMPSON: Objection as to form.
11       MS. WESTBY: Join.
12       THE WITNESS: I don't believe I had.
13 BY MR. GOSMAN:
14  Q. I assume that you had done drug
15 investigations previous to that t me where you had used
16 confidential informants, correct?
17  A. Yes, sir.
18  Q. How many times, approximately?
19  A. Are we speaking specifically of ones I was
20 involved with or my own cases that I did the reports?
21  Q. I think ones that you're involved with.
22  A. Probably between 50 and 100.
23  Q. And how many of those were you in charge of,
24 approximately?
25  A. Probably between 25 and 50.

CHAD MINER - October 6, 2010                                          Page 43
Direct Examination by Mr. Gosman

1  informant was or he had identified himself, I take it,
2  at this point?
3  A. At some point, yeah, he did.
4  Q. And did you -- could you understand what his
5  motive was for calling you? Did you understand what
6  his motive was?
7  A. He told me what it was.
8  Q. What was it?
9  A. That he had a warrant for his arrest, and
10 that his request was not to have to go to jail if he
11 provided this information.
12  Q. Okay. Do you know what that warrant was for?
13  A. It was some misdemeanor of ill consequence is
14 all I can tell you. It wasn't anything major.
15  Q. Did you bother to check that, then?
16       MS. WESTBY: Object to the form of the
17 question.
18       MR. THOMPSON: Join.
19       THE WITNESS: I did. At the time, I knew
20 what the warrant was for.
21 BY MR. GOSMAN:
22  Q. But you don't remember, as we sit here
23 today --
24  A. A year-and-a-half later, I don't remember.
25  Q. Are you sure it was for a simple misdemeanor?

CHAD MINER - October 6, 2010                                          Page 42
Direct Examination by Mr. Gosman

1  Q. Based on what you heard from the confidential
2  informant, did you think you had a commercial operation
3  on your hands that evening of the 24th of February,
4  2009?
5       MR. THOMPSON: Objection as to form.
6       MS. WESTBY: Join.
7       THE WITNESS: I'm sorry. You're asking my
8  opinion, was it a commercial operation? Was that your
9  question?
10 BY SPEAKER 5:
11  Q. Basically, yes.
12  A. It was my first marijuana grow operation that
13 I believe I had worked. So it sounded like a
14 relatively small grow. As far as commercial, I didn't
15 know.
16  Q. All right. How was it that you came in
17 contact with the confidential informant?
18  A. The confidential informant contacted me.
19  Q. Does that happen very often?
20  A. It has happened before.
21  Q. What did the confidential informant contact
22 you about?
23  A. Advised me that he had information regarding
24 a marijuana grow.
25  Q. And -- you knew who the confidential

CHAD MINER - October 6, 2010                                          Page 44
Direct Examination by Mr. Gosman

1       MR. THOMPSON: Objection as to form.
2       MS. WESTBY: Join.
3       THE WITNESS: Yes.
4  BY MR. GOSMAN:
5  Q. And did you weigh the charge, which the
6  confidential informant had against him, against the
7  potential charge that would be brought based on the
8  information that the confidential informant would
9  provide to you?
10       MR. THOMPSON: Objection as to form.
11       MS. WESTBY: Join.
12       THE WITNESS: I don't recall comparing the
13 two, no, if that's your question.
14 BY MR. GOSMAN:
15  Q. Did you strike a bargain, then, with the
16 confidential informant?
17  A. Myself and the county attorney did, yes.
18  Q. What was that arrangement?
19  A. I don't recall exactly. But my recollection
20 is that he was to appear in court for the warrant that
21 was currently out for him in lieu of going to the Park
22 County Jail and being arraigned.
23  Q. So he was issued a ticket, then, if you will?
24  A. No. He was going to show up for
25 arraignments, which are weekly.

1   Q.  Okay.

2   A.  To answer to that.

3   Q.  When was he going to show for the

4   arraignment?

5   A.  I don't remember the date that was given.

6   I'm sure it was the first available court date or

7   arraignment date.

8   Q.  Do you know whether he showed up?

9   A.  I don't.

10   Q.  After this evening, the 24th of

11   February 2009, did you ever have any contact with the

12   confidential informant?

13   A.  I have not.

14   Q.  Did you check to see if the confidential

15   informant had other warrants outstanding against him on

16   the day you interviewed him?

17   A.  Just what was available in his personal file

18   here that he was talking about  That's what I knew he

19   had. I don't recall if there was one or two or 20.

20   But I'm sure there wasn't 20.

21   Q.  There may have been more than one or two?

22   A.  I don't know how many, if there was more than

23   one that he had.

24   Q.  You don't remember that as being significant

25   to your discussions with the confidential informant?

1       MS. WESTBY:  Object to the form of the

2   question.

3       MR. THOMPSON:  Join.

4       THE WITNESS:  If it would have been

5   significant enough for me not to use him, I wouldn't

6   have.

7   BY MR. GOSMAN:

8   Q.  If he had outstanding warrants?

9   A.  If those warrants were significant enough for

10   me not to use him, I wouldn't have.

11   Q.  Did you know whether this confidential

12   informant had been used before by --

13   A.  I did not.

14   Q.  Did you know whether this confidential

15   informant had been rejected before by other agencies as

16   unreliable?

17   A.  No.

18   Q.  Had this individual ever served as a

19   confidential informant before?

20   A.  I don't know.

21           (Exhibit 26 identified)

22   BY MR. GOSMAN:

23   Q.  Let's go ahead and take a look at Exhibit 26.

24   And can you identify that document for me, sir?

25   A.  Yes.

1   Q.  What is it?

2   A.  Looks like a Cody Police Department person's

3   record.

4   Q.  And is the person that is the subject of that

5   record the confidential informant?

6       MR. THOMPSON:  Counsel, I believe that that

7   violates the protective order.

8       MR. GOSMAN:  Well, we'll seal it.

9       MR. THOMPSON:  No, there's nothing in the

10   protective order about sealing it.  The protective

11   order says the identity of the confidential informant

12   shall not be disclosed.

13       MR. GOSMAN:  Well, we can redact it or call

14   the Magistrate again.  I'm going to get this document

15   into evidence.  At least in this deposition.  Now,

16   whether it goes to trial or not, I don't know.

17       MR. THOMPSON:  Well ...

18       MR. GOSMAN:  And if you want, we can go ahead

19   and call Magistrate Beaman again.  Let's try to solve

20   this before we call the Magistrate.

21       MR. THOMPSON:  I agree.  So let's pull the

22   protective order and take a look at it together.

23   Because I believe it specifically excludes disclosure

24   of the identity of the confidential informant.  So I

25   don't know how you can introduce a deposition exhibit

1   with the confidential informant on it.  I mean --

2       MR. GOSMAN:  I had that record before the

3   request for production was even made.  That's how.  So

4   the identity of the confidential informant was not

5   produced by the Powell Police Department.  I had it.  I

6   had possession of the record.  And I am now using the

7   record in a deposition.

8       MR. THOMPSON:  I'm asking you, before we call

9   the Magistrate, for us to look at the protective order.

10       MS. WESTBY:  And I'm curious.  I mean, this

11   is -- how did you get this record?

12       MR. GOSMAN:  You know, I don't really have to

13   even discuss that with you, and I don't intend to.

14       MS. WESTBY:  I'm not going to let the witness

15   testify about it until we figure out if it was from a

16   reliable source, so that we know if this information is

17   the accurate information.  It's not --

18       MR. THOMPSON:  Yeah, it's from the Cody

19   Police Department.

20       MR. GOSMAN:  Well, it's from the Cody Police

21   Department, then.

22       MR. THOMPSON:  Is that how you got it?

23       MR. GOSMAN:  You know, frankly, I will go

24   ahead and tell you that that document was produced as

25   part of the criminal discovery.  That document came to

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 15 of 83

Tricia Wachsmuth v.                                                                    Chad Miner
City of Powell, et al.                                                            October 6, 2010

CHAD MINER - October 6, 2010                                            Page 49
Direct Examination by Mr. Gosman

1   me when the case was filed or before the case was
2   filed. That's all I know about it.
3        MS. WESTBY: Criminal discovery from what?
4        MR. GOSMAN: That's what I understood, that
5   it was part of this criminal discovery in the cases
6   involving Tricia and Bret Wachsmuth.
7        MR. THOMPSON: I would like, before we call
8   the Magistrate, to take a look at the protective order.
9   Because I don't want to violate an order that I
10  requested from the Court. And I think that's making an
11  attempt to work this out before we get the Court
12  involved.
13       MS. WESTBY: I don't think there's a question
14  pending, is there? I mean, you just had him turn to
15  this. So I'm going to -- is that right?
16       MR. THOMPSON: He asked him if he recognized
17  it.
18       MR. GOSMAN: What was his answer?
19       MR. THOMPSON: It's a --
20       THE WITNESS: It's a Cody Police Department
21  personal record.
22            (Recess taken 3:44 to 4:02
23            p.m., October 6, 2010)
24  BY MR. GOSMAN:
25       Q.  Were you aware that the confidential

CHAD MINER - October 6, 2010                                            Page 50
Direct Examination by Mr. Gosman

1   informant had been convicted of offenses involved in
2   dishonesty on numerous occasions?
3        A.  No.
4        Q.  I thought you told me that you, in fact,
5   pulled up his police record and looked at it?
6        A.  Are you asking me what I recall now or then?
7   Because I don't recall what I knew about him then as
8   you're asking.
9        Q.  Okay. That's fine. I understand that.
10            Let me ask this: Did you pull up his police
11  record and check it before you went ahead with the
12  information he gave to you?
13       A.  Yes.
14       Q.  All right. Did you understand that the
15  manufacture and delivery of methamphetamine was a
16  felony under Wyoming statute?
17       A.  Yes.
18       Q.  Did you -- were you aware of whether or not
19  this was, in fact, the City of Powell or the Powell
20  Police Department that was involved in charges against
21  the confidential informant for the manufacturing and
22  distribution of methamphetamine?
23       A.  I don't recall what I knew at that time.
24       Q.  Would you agree with me that the manufacture
25  and delivery of methamphetamine was a substantially

CHAD MINER - October 6, 2010                                            Page 51
Direct Examination by Mr. Gosman

1   more serious crime than the one you investigated of
2   Bret Wachsmuth?
3        A.  In hindsight?
4        Q.  Yeah, that's fine, Officer.
5        A.  Yes, in hindsight.
6        Q.  Do you remember noting at the time that you
7   spoke with the confidential informant that he had
8   multiple felony convictions?
9        A.  No.
10       Q.  Let's go ahead and turn to -- let me ask one
11  last question about this. Do you know whether
12  Mr. Jonathan Davis knew about the history of Josh
13  Bessler?
14       MS. WESTBY: Object to the form of the
15  question.
16       MR. THOMPSON: That needs to be stricken.
17  That violates the protective order.
18       MR. GOSMAN: No, I didn't identify the
19  informant. I want to know if there was any information
20  that may have came from --
21       MS. WESTBY: You just said it.
22       MR. THOMPSON: You just violated the
23  protective order.
24       MS. WESTBY: You just said it.
25       MR. GOSMAN: All right. Well, we'll strike

CHAD MINER - October 6, 2010                                            Page 52
Direct Examination by Mr. Gosman

1   that question, and I'll restate it.
2   BY MR. GOSMAN:
3        Q.  Did Mr. Davis share any information with you
4   about the confidential informant?
5        A.  No.
6            (Exhibit 17 identified)
7   BY MR. GOSMAN:
8        Q.  Let's go ahead and turn to Exhibit 17,
9   Officer. Can you describe that document for me?
10       A.  Appears to be a search and seizure warrant in
11  the Fifth Judicial District, Park County, Wyoming.
12       Q.  And does it identify the premises that you
13  searched?
14       A.  Certainly does.
15       Q.  And are the items that are listed on the --
16  do the items listed on the search warrant include the
17  vehicles owned by the Wachsmuth's?
18       A.  It includes a '99 Tan Chevrolet SUV. A '93
19  Blue Ford Ranger. Those are the vehicles it indicates,
20  sir.
21       Q.  And did you get the information regarding
22  those vehicles from the confidential informant?
23       A.  Which information regarding those vehicles?
24       Q.  Well, that's an excellent question.
25            Did you get information regarding those

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 16 of 83
Tricia Wachsmuth v.                                                        Chad Miner
City of Powell, et al.                                                  October 6, 2010

CHAD MINER - October 6, 2010                                                Page 53
Direct Examination by Mr. Gosman

1   vehicles from the confidential informant?
2   A.   Yes.
3   Q.   All right. And did you conduct any follow-up
4   to further identify those vehicles?
5   A.   Yes, sir.
6   Q.   All right. And were you able -- did you ever
7   look at the titles or registration for those vehicles?
8   A.   Before or after you mean?
9   Q.   Before. It would be before the warrant was
10  effected that night.
11  A.   I don't recall whether I did.
12  Q.   Okay. Were you aware of which of the
13  vehicles belonged to Bret Wachsmuth?
14  A.   I don't recall what the registration was.
15  Q.   Okay. Do you recall whether the confidential
16  informant provided you with information concerning who
17  owned what vehicle or who drove what vehicle?
18  A.   I believe there was some mention of that.
19  But I can't tell you exactly what that conversation
20  was.
21  Q.   Looking at that affidavit today and
22  understanding that you've had plenty of time to reflect
23  on that affidavit, is there anything in that affidavit
24  that you would change today if you had the ability to
25  do so?

CHAD MINER - October 6, 2010                                                Page 54
Direct Examination by Mr. Gosman

1   MS. WESTBY: Object to the form of the
2   question.
3   MR. THOMPSON: Join.
4   THE WITNESS: That I would change today?
5   BY MR. GOSMAN:
6   Q.   Yes, sir.
7   A.   This correction by the judge, I probably
8   would have left that out.
9   Q.   I don't remember what that was. But I
10  remember it was not very significant. Let's see,
11  second page?
12  A.   Did you --
13  Q.   Yes, financial ledgers  Financial ledger
14  thing that the judge crossed out?
15  A.   Correct.
16  Q.   Okay. And do you know why he crossed that
17  out? Were you there when he did that?
18  A.   I was.
19  Q.   What did he say, if you remember?
20  A.   I don't remember. For some reason he didn't
21  think it should be in here, so he took it out.
22  Q.   Okay. You spent time visiting with the
23  confidential informant. Did he come down to the Powell
24  Police Department?
25  A.   I believe he did initial y, yes.

CHAD MINER - October 6, 2010                                                Page 55
Direct Examination by Mr. Gosman

1   Q.   And how long did you spend with him?
2   A.   I can't give you an exact time frame. Would
3   you like me to estimate?
4   Q.   Yes, that would be fine.
5   A.   From my total contact with him?
6   Q.   Yes.
7   A.   Probably a couple hours.
8   Q.   And did you understand that -- or, rather,
9   that the confidential informant had a reason for
10  turning in Bret Wachsmuth, other than the fact that he
11  was trying to make a deal on charges that were pending
12  against him?
13  A.   Sure.
14  Q.   What was that reason?
15  A.   It had something to do with a custody dispute
16  he was currently involved in.
17  Q.   Do you remember what that was?
18  A.   I told you what I remember about it. There
19  was some custody dispute that he was involved in.
20  Q.   I don't know --
21  A.   The confidential informant was involved in.
22  And that's how it related to him coming to me and these
23  things transpired.
24  Q.   Okay. So in addition to a warrant that was
25  outstanding for his arrest that he wanted to be able to

CHAD MINER - October 6, 2010                                                Page 56
Direct Examination by Mr. Gosman

1   appear in court on rather than be arrested, there was a
2   custody dispute?
3   A.   I don't know to what level the custody
4   dispute was. But, yes --
5   Q.   How could you help him with the custody
6   dispute?
7   A.   You asked me what his motivations were
8   against Bret. Is that what your question was?
9   Q.   Yes, it was.
10  A.   So that was one.
11  Q.   All right. And frankly, I'm just sort of at
12  a loss here to understand how a custody dispute would
13  involve Bret or Tricia Wachsmuth. Custody of his
14  children or something?
15  A.   I would imagine, yes.
16  Q.   How did it impact the Wachsmuth's?
17  A.   I believe there was information that the
18  Wachsmuth's were trying to divulge or -- some
19  information that the Wachsmuth's were divulging that
20  was hindering his ability to go forward with the
21  custody case. But that's about all I can tell you
22  about it.
23  Q.   Okay. And did that information cause you to
24  reflect on the motives that Mr. Bessler might have in
25  providing information against the Wachsmuth family?

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 17 of 83

Tricia Wachsmuth v.                                                                          Chad Miner
City of Powell, et al.                                                                       October 6, 2010

1  A.  They were considered, yes.
2  Q.  And how were they considered?
3  A.  Every confidential informant has motives.
4  They don't do it because they are good people.  So
5  whether his information was accurate or made up because
6  of this motivation.
7  Q.  I see.
8  A.  That's what was considered.
9  Q.  Were you able to undertake any additional
10  steps to verify the information of the confidential
11  informant?
12  A.  Yes.
13  Q.  What steps were those?
14  A.  Myself, Deputy County Attorney Jonathan
15  Davis, and Lieutenant Patterson with the sheriff's
16  office interviewed the confidential informant.
17  Q.  And so you had -- basically, you had the
18  perspective of three individuals evaluating the
19  credibility of the witness?
20  A.  Correct.
21  Q.  Did you reach a consensus or agreement, if
22  you will, about the reliability of his information?
23  A.  Yes.
24  Q.  Now, you mentioned Officer Patterson with the
25  Park County Sheriff's Office; how was it that he became

1  involved in a discussion with the confidential
2  informant?
3  A.  I requested him to become involved.
4  Q.  And can you tell me why you did that?
5  A.  For two reasons: Initially, I assumed the
6  location was in Park County, not in the City of Powell.
7  The second of which is he is, to my knowledge, had a
8  great deal of experience working drug crimes, namely
9  marijuana grows.
10  Q.  How long was Lieutenant Patterson with the
11  confidential informant in your estimation?
12  A.  Probably 45 minutes.
13  Q.  Were you present with Officer Patterson
14  during the entire time he was with the confidential
15  informant?
16  A.  I may have stepped out to give something to
17  the secretary or done a multitude of things.  But I did
18  not leave the building.
19  Q.  And based on what you heard with
20  Mr. Patterson from the confidential informant, was it a
21  recital of the information that he had given to you
22  previously?
23  MR. THOMPSON: Objection as to form.
24  MS. WESTBY: Join.
25  THE WITNESS: My initial meeting with the

1  confidential informant before I included Jonathan Davis
2  and Dave Patterson was brief.  So -- so the
3  confidential informant expanded on his brief interview
4  I did with him initially.
5  BY MR. GOSMAN:
6  Q.  And that was in the presence of Officer
7  Patterson?
8  A.  Lieutenant Patterson, yes.
9  Q.  After you concluded the interview with the
10  confidential informant and Officer Patterson and
11  Mr. Davis, what did you do?
12  A.  At some point in time, I went with the
13  confidential informant so he could show me the physical
14  house.
15  Q.  And did you identify the home, then?
16  A.  I did.
17  Q.  I'm going to go ahead and jump ahead for a
18  moment, because I understand that Officer Blackmore
19  provided some surveillance just prior to the execution
20  of the warrant; is that your understanding as well?
21  A.  Yes.
22  Q.  Was officer Blackmore at the right house?
23  Was he conducting surveillance on the right place?
24  A.  I don't know where he was.
25  Q.  Did you have anything to do with his being

1  there?  Did you tell him where to go?
2  A.  No, sir.
3  Q.  And you are aware -- I think you've
4  mentioned -- that you had heard that there was a small
5  child at the residence?
6  A.  I heard that there is a possibility that
7  there was a child at the residence.
8  Q.  Okay.  That's fine.  You didn't hear that it
9  was necessarily a small child?
10  A.  No, sir.
11  Q.  And that information turned out not to be
12  true, correct?
13  A.  There was no child present in the home.
14  Q.  Do you know whether -- did anyone ever
15  determine that Officer Blackmore was at the right place
16  when he made that observation?
17  A.  I did not.
18  Q.  Did you -- have you drawn any conclusions
19  about that?
20  A.  No.
21  Q.  All right.  Let's go ahead and go back.
22  Before you left the police station, did you
23  have any discussions with Officer Patterson about what
24  would be the appropriate response to this information
25  given you by the confidential informant?

CHAD MINER - October 6, 2010                          Page 61
Direct Examination by Mr. Gosman

1  A.  The interview with Lieutenant Patterson and
2  Jonathan Davis took place at Jonathan Davis' office at
3  the annex.
4  Q.  Okay.  Thank you.
5      Did you have any discussion with
6  Lieutenant Patterson at Jonathan Davis' office in
7  connection with how to proceed with this case?
8  A.  We did.
9  Q.  What was discussed?
10  A.  Lieutenant Patterson told me he was going to
11  contact the sheriff's office or the sheriff and let
12  him know what was going on and go from there.
13  Q.  Anything else?
14  A.  There was some discussions as to how we were
15  going to proceed.
16  Q.  Well, what was discussed in terms of how you
17  were going to proceed?
18  A.  An actual verbatim account, I don't have for
19  you, obviously.  There was some discussion about
20  contacting Tom, not contacting Tom, his kid, how we
21  were going to -- the discussions were how we were going
22  to achieve this safely, the execution of a warrant,
23  should it be granted by the judge.
24  Q.  Okay.  Did Lieutenant Patterson tell you that
25  he was under the impression that this was a small,

CHAD MINER - October 6, 2010                          Page 62
Direct Examination by Mr. Gosman

1  one-light operation involving one or two plants?
2  A.  I recall his determination to be it was a
3  small one-light grow.
4  Q.  Did that strike you as being a misdemeanor
5  marijuana grow operation?
6      MS. WESTBY: Object to the form of the
7  question.
8      MR. THOMPSON: Join.
9      THE WITNESS: Go ahead?
10     MS. WESTBY: Yeah.
11  BY MR. GOSMAN:
12  Q.  Yes.
13  A.  All growing of marijuana in Wyoming is a
14  misdemeanor.
15  Q.  Did Officer Patterson have the opportunity
16  to -- Lieutenant Patterson -- hear the information
17  provided by the confidential informant concerning the
18  threat that Tom -- rather, Bret Wachsmuth may have
19  presented to the safety of the officers in any
20  operation to execute the search warrant?
21     MS. WESTBY: Object to the form of the
22  question.
23     MR. THOMPSON: Join.
24     THE WITNESS: I believe that there was
25  discussion about Bret, his personality, and the dangers

CHAD MINER - October 6, 2010                          Page 63
Direct Examination by Mr. Gosman

1  that were present in the home while Patterson was
2  there.  I can't say for sure that Patterson was there
3  when that conversation took place.  You'll have to ask
4  Dave Patterson.
5  BY MR. GOSMAN:
6  Q.  Did Officer Patterson indicate to you that he
7  felt that a dynamic entry was uncalled for in this
8  case?
9  A.  I don't recall him expressing what his
10  opinion of uncalled for or not.  No, he never said that
11  was uncalled for, that I can recall.
12  Q.  Did he argue against a dynamic entry?
13  A.  There was no argument.
14  Q.  Did he raise concerns about a dynamic entry?
15  A.  Not to me.
16  Q.  Did you feel that he joined with you in the
17  decision to conduct this as a dynamic entry operation?
18  A.  I don't believe he was ever involved in the
19  discussions of having a dynamic entry.
20     Can I just offer you something to prevent you
21  from keep going on this?
22  Q.  Yes.
23  A.  Most of Lieutenant Patterson's conversations
24  were with Sergeant Kent after that.  So any discussions
25  after he left the confidential informant, you're going

CHAD MINER - October 6, 2010                          Page 64
Direct Examination by Mr. Gosman

1  to have to ask him or Sergeant Kent about.  Not me.
2  Q.  Did you have much of a discussion with him
3  after the interview with the confidential informant had
4  been concluded?
5  A.  Yeah.  He was standing there and we dictated
6  the affidavit for the warrant together.  So that
7  discussion.
8  Q.  You mentioned that he discussed with you the
9  possibility of approaching Tom Wachsmuth in connection
10  with the service of this warrant?
11     MS. WESTBY: Object to the form of the
12  question.  Misstates the testimony.
13     MR. THOMPSON: Join.
14     MS. WESTBY: Go ahead.
15     THE WITNESS: We discussed together the
16  options of what are we -- about Tom being involved,
17  essentially.
18  BY MR. GOSMAN:
19  Q.  Did you discuss the option of a dynamic
20  entry?
21  A.  No.
22  Q.  Had dynamic entry even been considered at
23  that point?
24  A.  By me?
25  Q.  Yes, I guess it would be by you.

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 19 of 83
Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

CHAD MINER - October 6, 2010                    Page 65
Direct Examination by Mr. Gosman

1  A. By me?
2  Q. Yes.
3  A. There was all kinds of considerations about
4  how we were going to execute this. So you're asking me
5  if I remember that being part of my thoughts; is that
6  correct?
7  Q. Yes, I am.
8  A. I don't recall if that was part of my
9  thoughts at that time.
10 Q. What were your thoughts at that time,
11 Officer?
12 A. My primary concerns were of how we were going
13 to deal with Tom.
14 Q. And why was that?
15 A. 'Cause Tom is an officer -- or an agent.
16 Q. Is he -- does he have a good reputation?
17 A. With me?
18 Q. Yes, with you.
19 A. At that time?
20 Q. Thank you.
21 Yes, at that time.
22 A. Yes.
23 Q. Did you have any discussion with anyone else
24 at the Powell Police Department about this idea of
25 contacting Tom Wachsmuth'

CHAD MINER - October 6, 2010                    Page 66
Direct Examination by Mr. Gosman

1  A. I believe I may have talked to Sergeant Kent
2  briefly.
3  Q. Do you remember that discussion at all?
4  A. I don't. Just nearly bringing the fact up of
5  how are we going to handle Tom? What are we going to
6  do?
7  Q. Did officer Patterson suggest contacting Tom
8  Wachsmuth to help in the service of this warrant?
9  MS. WESTBY: Object to the form of the
10 question.
11 THE WITNESS: I probably suggested that,
12 actually.
13 BY MR. GOSMAN:
14 Q. Did he agree with that idea?
15 A. I don't recall.
16 Q. Is there any reason why you couldn't have
17 contacted Tom Wachsmuth and had him call his son out
18 from the residence? Or have him bring his son down to
19 the police station or something else?
20 MR. THOMPSON: Objection as to form.
21 MS. WESTBY: Join.
22 THE WITNESS: That decision was made above my
23 head.
24 BY MR. GOSMAN:
25 Q. I do appreciate that, Officer.

CHAD MINER - October 6, 2010                    Page 67
Direct Examination by Mr. Gosman

1  But based on what you knew at the time, is
2  there any reason why that couldn't have happened?
3  MR. THOMPSON: Object as to form.
4  MS. WESTBY: Join.
5  THE WITNESS: Again, that decision was made
6  by others. So the information they used to make that
7  decision, I didn't have.
8  BY MR. GOSMAN:
9  Q. Okay. And I can appreciate that. But let's
10 take the information that you had, based on what you
11 had heard from the confidential informant, based on
12 your discussions with Jonathan Davis and
13 Lieutenant Patterson, was there any reason why Tom
14 Wachsmuth could not have been brought into the service
15 of this warrant to prevent the use of it, as it turns
16 out, a dynamic entry?
17 MS. WESTBY: Object to the form of the
18 question.
19 THE WITNESS: You're asking my personal
20 opinions of reasons why I think Tom shouldn't have been
21 involved?
22 BY MR. GOSMAN:
23 Q. I am in a direct and real sense. But I'm
24 also asking that based on your training and experience
25 as a law enforcement officer, what you knew at that

CHAD MINER - October 6, 2010                    Page 68
Direct Examination by Mr. Gosman

1  time, were there any reasons why Mr. Wachsmuth could
2  not have been involved in the search of that warrant?
3  A. Probably the biggest reason is to put Tom in
4  a position, a bad position, is not really fair to Tom,
5  for one. That forces Tom to make a decision. Between
6  his family or us, police.
7  Q. It does appear that you quoted
8  Lieutenant Patterson extensively for the information
9  concerning the marijuana grow operation in -- or
10 concerning the marijuana grow operations generally in
11 your affidavit for the search warrant, which is
12 Exhibit 17; is that true?
13 A. Seventeen is the search warrant?
14 Q. I'm sorry. Was it?
15 MS. WESTBY: And for clarification, he just
16 testified that the affidavit was done by both of them.
17 (Exhibit 13 identified)
18 BY MR. GOSMAN:
19 Q. Yes. Okay. Let's turn to Exhibit 13. I've
20 given you the wrong exhibit number, and I apologize for
21 that.
22 This is the search and seizure affidavit.
23 Take a moment and look at that and let me know if, in
24 fact, you were relying on Officer Patterson's expertise
25 for that portion of the affidavit related to marijuana

CHAD MINER - October 6, 2010                          Page 69
Direct Examination by Mr. Gosman

1  grow operations.
2      A.  Yes, I was.
3      Q.  I believe that there's a place in that
4  affidavit where you indicate that based on your
5  experience, people who grow and/or sell controlled
6  substances have firearms to protect themselves, their
7  product, and to intimidate others, do you see that?
8          And you'll want to take a moment.  I don't
9  mean to hurry you.
10     A.  Which paragraph was that in?
11     Q.  I'm trying to find it.  I'm sorry.  I don't
12  have it marked.
13         Yes, it is in the last sentence.  It's
14  actually part of a sentence.  In the second paragraph
15  on Page 2 of the affidavit.
16         Are you having trouble finding it, Officer?
17     A.  Yes, I am.  Oh, okay.  Okay.  Your question
18  as it refers to -- what was the question again?
19     Q.  Was this information information you
20  received from Officer Patterson, or was this
21  information information based on your experience?
22     A.  Based on my knowledge and experience and also
23  his.
24     Q.  Okay.  Do you remember Officer Patterson
25  telling you that people who grow marijuana have

CHAD MINER - October 6, 2010                          Page 71
Direct Examination by Mr. Gosman

1  marijuana oftentimes protect themselves -- have
2  firearms to protect themselves, their products, and to
3  intimidate others, correct?
4          MS. WESTBY:  Object to the form of the
5  question.
6          MR. THOMPSON:  Join.
7          THE WITNESS:  I said in my affidavit, which I
8  believe is what you're referring to, persons who grow
9  and/or sell controlled substances have firearms to
10  protect themselves, their products, and to intimidate
11  others.  That's what I said in my affidavit.
12  BY MR. GOSMAN:
13     Q.  And I'll ask one more question about this.
14  Is it your -- based on your experience and
15  understanding, do people who grow marijuana have an
16  equal likelihood as those who sell it, to have and use
17  firearms to protect themselves, their products, and to
18  intimidate others?
19     A.  In my experience?
20     Q.  Yes.
21     A.  Yes.  Now or before February?
22     Q.  Well, before February of 2009?
23     A.  I think we've stated that I didn't have a lot
24  of experience with marijuana grows.
25     Q.  Have you had experience since then with

CHAD MINER - October 6, 2010                          Page 70
Direct Examination by Mr. Gosman

1  firearms to protect themselves, their products, and to
2  intimidate others?
3      A.  I'm sure that he -- I can't recall him saying
4  that exactly.
5      Q.  I think we've already established that you
6  didn't have a lot of experience, at least, in marijuana
7  grow operations prior to this event; is that true?
8      A.  That's true.
9      Q.  Do you see the difference between persons who
10  grow and use marijuana for their personal use and those
11  who grow and sell marijuana to others?
12     A.  Sure.
13     Q.  And would you agree with me that persons who
14  grow and sell marijuana to others and have possession
15  of firearms may be more inclined to use those firearms
16  in the protection of their business interests than
17  those who use marijuana for personal use?
18         MS. WESTBY:  Object to the form of the
19  question.
20         MR. THOMPSON:  Join.
21         THE WITNESS:  I can't say as to what they
22  think.
23  BY MR. GOSMAN:
24     Q.  Okay.  But apparently you did, in fact, say
25  what they think when you said that people who grow

CHAD MINER - October 6, 2010                          Page 72
Direct Examination by Mr. Gosman

1  regard to additional marijuana grow operations?
2      A.  Yes.
3      Q.  Let's take just a minute and talk about the
4  experience -- no, let's not.  We don't need to do that.
5  We don't want to get in any discussions that are going
6  to take extra time here this afternoon.
7          MS. WESTBY:  Or if they are going to elicit
8  testimony that you don't want to hear.
9          MR. GOSMAN:  Well, that's a possibility, too,
10  as a matter of fact.
11         MR. THOMPSON:  No objection.
12  BY MR. GOSMAN:
13     Q.  Officer, you do understand that many people
14  in Wyoming own firearms, correct?
15     A.  Yes.
16     Q.  And owning a firearm and having a loaded
17  firearm in your house is not an indication that a
18  person possesses a threat to law enforcement; isn't
19  that true?
20         MS. WESTBY:  Object to the form of the
21  question.
22         MR. THOMPSON:  Join.
23         THE WITNESS:  I would say true.
24  BY MR. GOSMAN:
25     Q.  And the fact that a person owns a firearm and

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 21 of 83
Tricia Wachsmuth v.                                                    Chad Miner
City of Powell, et al.                                            October 6, 2010

1   uses marijuana does not significantly increase the
2   threat to law enforcement officers in dealing with that
3   person; isn't that true?
4        MS. WESTBY: Objec. to the form of the
5   question.
6        MR. THOMPSON: Jo n.
7        THE WITNESS: I would disagree with that.
8   BY MR. GOSMAN:
9   Q.   It does significantly increase --
10  A.   Using drugs and using loaded guns
11  significantly increases the risk of danger to us, yes.
12  Q.   Did you know -- let me ask this question:
13  Are there any areas in Powel., Wyoming that are
14  considered high-crime areas'
15  A.   By my definition?
16  Q.   Yes.
17  A.   No.
18  Q.   The area where the Wachsmuth home was located
19  is almost on the edge of towr, correct?
20  A.   No.
21  Q.   All right. That hardly natters in any event.
22       Would you consider that area a high-crime
23  area?
24  A.   No.
25  Q.   And at the time you left Jonathan Davis'

1   office, did the confidential informant leave as well?
2   A.   Yes, sir.
3   Q.   And did you have any mpression that Tom
4   Wachsmuth was involved in a drug selling operation?
5   A.   No.
6   Q.   On Page 4 of the affidavit -- let's see, I
7   guess that would be -- which is the affidavit or search
8   warrant, there is the statement that the confidential
9   informant informed you that Tricia's mother forwarded
10  mostly Oxycodone and morphine and latex gloves inside
11  stuffed animals?
12  A.   Yes, it says that.
13  Q.   Do you remember that '
14  A.   I do.
15  Q.   And did you have the cpportunity to run an
16  NCIC check on Tricia Wachsmuth?
17  A.   Did I have the opportunity or did I?
18  Q.   Well, I do need to know if you had the
19  opportunity, yes. Because it's possible that you
20  didn't do it because you felt like you didn't have the
21  chance or an opportunity?
22  A.   I did have the opportunity.
23  Q.   And did you do that?
24  A.   No.
25  Q.   Did you run such a check on Tricia's mother?

1   A.   No, sir.
2   Q.   And was that done after the search, do you
3   know?
4   A.   I don't know when it was done.
5   Q.   Do you know that it was done?
6   A.   I don't know that it was done for certain, I
7   guess.
8   Q.   Do you know whether physicians order these
9   drugs for their patients in lots of this size -- I'm
10  sorry -- lots of this size. Let's back up for a
11  second.
12       MR. THOMPSON: Something you want to tell us'
13       MR. GOSMAN: Yeah, there is.
14  BY MR. GOSMAN:
15  Q.   I notice in the affidavit that the
16  confidential informant stated that as many as 100 of
17  these pills were sent in these latex gloves from Tricia
18  Wachsmuth's mother. Do you see that?
19  A.   I'm having incredible trouble finding things
20  today.
21  Q.   I understand. I should have had it marked.
22  A.   In any event, I recall what you're talking
23  about.
24  Q.   Did you believe that Tricia's mother was
25  sending lots of 100 of these narcotics to her daughter

1   and son-in-law?
2   A.   I don't recall what my opinion was at the
3   time. Whether I believed it or not, I put it in the
4   affidavit.
5   Q.   Had you had any training in abuse of
6   prescription medication prior to this event on the 24th
7   of February?
8   A.   Yes.
9   Q.   Did you have an opinion about whether or not
10  physicians normally order these drugs in lots of that
11  size, 100 pills?
12  A.   I have seen that before.
13  Q.   And did you -- were you -- you were told why
14  Tricia's mother had these pills, correct?
15  A.   Do you want me to read my affidavit?
16  Q.   You don't have to read it to me, but review
17  it if you need to.
18  A.   Okay. Yes, I was told.
19  Q.   Okay. And did you -- did it occur to you
20  that it was sort of stretching the imagination to think
21  that a woman would be sending her medication of
22  treatment for cancer to her daughter in latex gloves in
23  that size?
24       MS. WESTBY: I have to object to the --
25       MR. GOSMAN: Is that a question'?

CHAD MINER - October 6, 2010                                    Page 77
Direct Examination by Mr. Gosman

1      MR. THOMPSON: I'm not sure.
2   BY MR. GOSMAN:
3   Q. Did you feel that Mr. Bessler --
4      MR. THOMPSON: Objection as to the --
5   Counsel, you're violating the protective order. And
6   that needs to be stricken from the record.
7      MR. GOSMAN: Well, I don't know that it does.
8   I don't agree with that at all. But I'm not going to
9   get in that argument. So we'll strike that and we'll
10  go on.
11  BY MR. GOSMAN:
12  Q. Did you have any concerns about the
13  credibility of this confidential informant when he gave
14  you that information about Tricia's mother?
15  A. As it pertains to the pills and Tricia's
16  mother, I had no way to verify that, correct.
17  Q. Did you know that in addition to this custody
18  dispute, the confidential informant had been kicked out
19  of the Wachsmuth home recently?
20  A. I did.
21  Q. Did you know that he had threatened the
22  Wachsmuth's?
23     MS. WESTBY: Object to the form of the
24  question.
25     MR. THOMPSON: Join.

CHAD MINER - October 6, 2010                                    Page 78
Direct Examination by Mr. Gosman

1      THE WITNESS: I wasn't aware of any threats.
2   Are you referring to violent, physical threats?
3   BY MR. GOSMAN:
4   Q. Yes.
5   A. No, I was not aware of any of that.
6   Q. Did you probe the confidential informant to
7   determine whether what he was telling you was true or
8   whether it was motivated -- whether it was untrue and
9   motivated by a desire for revenge?
10     MS. WESTBY: Object to the form of the
11  question.
12     MR. THOMPSON: Join.
13     THE WITNESS: Probe him as to whether his
14  custody dispute and their interference with that?
15  BY MR. GOSMAN:
16  Q. And the fact that he'd been kicked out of the
17  Wachsmuth residence, in fact, motivated him to lie to
18  you?
19     MR. THOMPSON: Object as to form.
20     MS. WESTBY: Join.
21     THE WITNESS: If I thought he was lying to me
22  about the marijuana grow, I wouldn't have applied for a
23  search warrant.
24  BY MR. GOSMAN:
25  Q. Did you think he was lying to you about

CHAD MINER - October 6, 2010                                    Page 79
Direct Examination by Mr. Gosman

1   anything that he told you?
2   A. I don't remember suspecting him of lying of
3   anything.
4   BY MR. GOSMAN:
5   Q. You did indicate that you were unable to
6   verify any of the information regarding Tricia
7   Wachsmuth and the prescription pills being sent to her,
8   correct?
9      MS. WESTBY: Object to the question.
10  Misstates the testimony.
11     MR. GOSMAN: And it may. You can certainly
12  say that's not correct. In which case you'll be able
13  to clear this up.
14     THE WITNESS: You lost me. The question you
15  asked me was what again?
16  BY MR. GOSMAN:
17  Q. Let's see. That you were unable to verify
18  that Tricia Wachsmuth's mother was sending her
19  prescription medication through the mail.
20     MS. WESTBY: Object to form.
21     MR. THOMPSON: Join.
22     THE WITNESS: Prior to the execution of the
23  search warrant?
24  BY MR. GOSMAN:
25  Q. Prior to, yes.

CHAD MINER - October 6, 2010                                    Page 80
Direct Examination by Mr. Gosman

1   A. Prior to the execution of the warrant, we
2   were unable to verify that, yes.
3   Q. And subsequent to the execution of the
4   warrant, what happened?
5   A. We were able to verify that.
6   Q. How were you able to verify that?
7   A. Because everything he said was accurate with
8   the exception of -- do you want me to stop.
9   Q. No, I certainly don't.
10  A. With the exception of there were no drugs
11  located inside the animals that we found. They were as
12  he described them, cut open in the back and packaged
13  with a letter to her mother to be sent back to her
14  mother.
15  Q. Okay. There was a letter in the package to
16  her mother?
17  A. A letter or an envelope addressed to her mom
18  or something in reference to Tricia's mother.
19  Q. Now, you were one of the officers that was
20  involved in the search of the house after it had been
21  cleared, correct?
22  A. Correct.
23  Q. And so did you find this box or see it?
24  A. I saw it. I don't recall who found it.
25  Q. You saw the box with the stuffed animals in

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

CHAD MINER - October 6, 2010                                Page 81
Direct Examination by Mr. Gosman

1  them?
2      A.  Correct.
3      Q.  And you saw a letter in the box?
4      A.  A letter or an envelope addressed to Tricia's
5  mother.
6      Q.  You don't remember whether it was just an
7  envelope without a letter in it?
8          MS. WESTBY: Object to the --
9          THE WITNESS: I don't remember.
10         MS. WESTBY: Object to the form of the
11 question.
12              (Exhibit 23 identified)
13 BY MR. GOSMAN:
14     Q.  Let's jump ahead for just a moment and look
15 at the inventory that was done on the search that
16 night, and I believe that's Exhibit 23.  And I want you
17 to go through that.
18         And by the way, I don't think we need to go
19 through the whole thing -- where did you find this box?
20     A.  I didn't find the box.
21     Q.  Where did you see the box?
22     A.  I believe it was in the living room.
23     Q.  In the living room.  So this report, which is
24 Exhibit 23, breaks down the search and the items found
25 by room.  So let's start with the living room, at

CHAD MINER - October 6, 2010                                Page 82
Direct Examination by Mr. Gosman

1  least.
2          Where is the -- oh, there we go.  I see it
3  actually in the kitchen.  Do you see that box
4  containing stuffed animals and letter?
5          MS. WESTBY: Oh, my God.  It's the smoking
6  gun.
7          MR. THOMPSON: Bottom of the 9th, two outs.
8  BY MR. GOSMAN:
9      Q.  So, here we go.  We found it.  Apparently
10 there was a letter.
11     A.  Maybe we should take a break.
12     Q.  If you'd like to, we can do that.
13     A.  Yes, I would like to.
14     Q.  Very good.
15              (Recess taken 4:47 to 5:17
16              p.m., October 6, 2010)
17 BY MR. GOSMAN:
18     Q.  Officer, did you get a chance to read the
19 letter that was in the box containing the stuffed
20 animals?
21     A.  I can't say if I did or didn't.  I don't
22 remember.
23     Q.  Okay.  In any event, as we have discovered,
24 there is listed on the inventory, Chapman's
25 inventory -- or Chapman's report, a box containing

CHAD MINER - October 6, 2010                                Page 83
Direct Examination by Mr. Gosman

1  stuffed animals and a letter.  Is that the letter that
2  you're referring to, as far as you know?
3      A.  Yes, sir.
4      Q.  Okay.  And was that letter logged into
5  evidence, as far as you know?
6      A.  Yes, sir.
7              (Exhibit 32 identified)
8  BY MR. GOSMAN:
9      Q.  There is another document that refers to the
10 evidence in the case.  It's Exhibit 32.  Let's just see
11 if we can find that letter in this document.  It was
12 prepared by Officer McCaslin.
13         MS. WESTBY: What was the exhibit number?
14         MR. GOSMAN: Thirty-two.
15         THE WITNESS: Number 32 in that list.
16 BY MR. GOSMAN:
17     Q.  Do you see that little notation in connection
18 with that box -- or that entry, two stuffed animals in
19 box with letter?  Oh, does it say "drugs in them, no"?
20     A.  I don't know what it says.
21     Q.  Okay.  It's hard to tell, isn't it?  Oh,
22 drugs -- it may be "drugs there, no."  I have the
23 benefit of being able to magnify that.
24         All right.  That doesn't matter.
25         Now, we've talked for just a minute about the

CHAD MINER - October 6, 2010                                Page 84
Direct Examination by Mr. Gosman

1  discovery of this box with the stuffed animals in it,
2  which tends to corroborate the story that the CI gave
3  you that evening about stuffed animals being used to
4  transfer drugs, correct?
5      A.  Correct.
6      Q.  And were you aware of any evidence taken at
7  the scene or any evidence that was developed in these
8  cases after that evening that substantiated whether any
9  of the pills in that house were, in fact, pills, other
10 than those which were under prescription for Bret
11 Wachsmuth?
12         MR. THOMPSON: Objection as to form.
13         MS. WESTBY: Join.
14         THE WITNESS: To my knowledge, there were no
15 prescription drugs that we could deem were not in
16 conjunction with a valid prescription.
17         Is that a long answer to your question?
18 BY MR. GOSMAN:
19     Q.  Just what I was looking for.  Thank you.
20         Were you the officer that was associated with
21 either one of these two cases going forward?  The
22 testifying officer --
23     A.  On the criminal matter?
24     Q.  Yes.
25     A.  I would have been the case officer for this

1   case.
2      Q.  All right.  And that would have been for both
3   Bret and Tricia Wachsmuth?
4      A.  Correct.  Might I clarify for you?
5      Q.  Yes.
6      A.  As it pertains to the drugs, I was the case
7   officer for that.
8      Q.  Okay.  Was there any other aspect of the
9   case, other than the drugs?
10     A.  There was a separate computer case that
11  Investigator Brown and Officer Lara were --
12     Q.  Were involved with?
13     A.  Correct.
14            (Exhibit 14 and 15 identified)
15  BY MR. GOSMAN:
16     Q.  Let's go ahead and turn to exhibits -- we
17  started with 13.  And I'll ask you now to turn to
18  Exhibit 14 and 15.  And let's identify these exhibits
19  as a group if we can, first.
20     A.  You want me to identify 14 for you?
21     Q.  Yes.
22     A.  Affidavit of probable cause for Bret
23  Wachsmuth in Fifth Judicial District, Park County,
24  Wyoming.
25     Q.  Okay.

1      A.  Number 15 is an affidavit of probable cause
2   in the Fifth Judicial District of Park County for
3   Tricia Wachsmuth.
4      Q.  And going forward, would it be fair for us
5   to -- well, let me put it this way:  Are the content of
6   these Exhibits, 14 and 15, as they pertain to the
7   information that you received from the confidential
8   informant, identical?  So we can refer to one without
9   referring to them both?
10     A.  I would concede that, yes.
11     Q.  Let's go ahead and take Exhibit 14, and I
12  want you to review the information in the affidavit and
13  tell me if there was any additional information
14  concerning, or that relates to Bret Wachsmuth posing a
15  threat to the safety of the officers than what is
16  present in that document?
17         MS. WESTBY:  Object to the form of the
18  question.
19         MR. THOMPSON: Join.
20  BY MR. GOSMAN:
21     Q.  Of which you have knowledge -- or had
22  knowledge at the time of the execution of the search
23  warrant.
24         MR. THOMPSON: Same objection.
25         MS. WESTBY: Join.

1         THE WITNESS: I think your question was:  Is
2   there any direct knowledge I have from the CI of
3   information that's not contained in this affidavit?
4   BY MR. GOSMAN:
5      Q.  Yes.
6      A.  The CI provided me with some information
7   pertaining to the computer of Bret Wachsmuth and
8   certain images of child pornography possibly being on
9   there.
10     Q.  Now, are you sure that information came from
11  the CI and not from Bret Wachsmuth himself?
12     A.  I've never spoke to Bret Wachsmuth.
13     Q.  All right.
14     A.  The way it was relayed to me by the CI is
15  that, "Bret is accusing me of looking up child porn on
16  this and is going to use it against me in this custody
17  fight.  But it wasn't me, it was" -- he said it was
18  Bret that looked up the pornography.  So that's the
19  allegation I don't see in this affidavit.
20            (Exhibit 20 identified)
21  BY MR. GOSMAN:
22     Q.  Let's go ahead and turn to Exhibit 20, which
23  is a report that you filed in the case.  And was that
24  document filed after the affidavit that we've just been
25  looking at in Exhibit 14?

1      A.  Is your question whether this police report
2   was completed after the affidavit?
3      Q.  Yes.
4      A.  Completed --
5         MS. WESTBY: And I guess I have to object.
6   This isn't his report -- oh, is this your report?
7         THE WITNESS: Yes, this is.
8         MS. WESTBY: Oh, okay.  I'm sorry.
9         THE WITNESS: I guess I answered it already.
10  BY MR. GOSMAN:
11     Q.  Okay.  I think the question was:  Was this
12  document prepared after the affidavits?
13     A.  Prepared.  I don't recall the sequence of
14  events.  But my normal procedure for preparing an
15  affidavit is to type my narrative, what you see here in
16  Exhibit 20, and then use that to create my affidavit.
17  That's my normal procedure for preparing an affidavit.
18  So I have no reason to believe that I deviated from
19  that.
20     Q.  In this document, there is an additional
21  statement that you were informed by the confidential
22  informant that Bret was paranoid and always looking out
23  the windows.
24     A.  Okay.
25     Q.  And other than the fact that Bret was -- Bret

1  always looked out the windows, did the confidential
2  informant give you any objective information about Bret
3  Wachsmuth's paranoia?
4      In other words, how it manifested itself?
5      MS. WESTBY: Object to the form of the
6  question.
7      MR. THOMPSON: Join.
8      THE WITNESS: So your question was, did he
9  give me any information as to the course of Bret's
10 anxiety?
11 BY MR. GOSMAN:
12     Q.  No.  Right now I'm asking you if he told you
13 anything specific that would have identified Bret as
14 paranoid, other than the fact that he looked out the
15 windows.
16     A.  No, that was just a description he used to
17 describe Bret.
18     Q.  That he was paranoid?
19     A.  Right.
20         (Exhibit 16 identified)
21 BY MR. GOSMAN:
22     Q.  We're going to clear up one other issue in
23 Chretien's report, which is Exhibit 16, he indicates
24 that he was told that Bret has armor-piercing
25 ammunition, did that come from you?

1      A.  No, sir, I don't believe so.  I don't recall
2  that statement at all.
3      Q.  Your report doesn't mention anything about
4  Bret being mentally unstable, but there is evidence,
5  and I believe it's in Chretien's report, that Bret
6  Wachsmuth was described as mentally unstable, do you
7  know where that information came from?
8      A.  Probably the descriptions I relayed that the
9  CI had given to me about.
10     Q.  And in other words, his conclusion that Bret
11 was unstable would have been -- at least as far as you
12 know, would have been based on the information that you
13 supplied him from the confidential informant?
14     MS. WESTBY: Object to the form of the
15 question.
16 BY MR. GOSMAN:
17     Q.  As far as you know?  I'm not really looking
18 for anything deeper than that.
19     A.  I don't know how he concluded that.
20     Q.  All right.  As a matter of fact, he indicated
21 that Officer Lara had told him that Bret was unstable.
22     A.  Okay.
23     Q.  Did you hear that?
24     A.  No.
25     Q.  Now, in the statements that are contained in

1  your affidavit of probable cause and in your report,
2  there is the reference to the fact that the
3  confidential informant had called Mr. Wachsmuth and
4  told him that the cops were coming.  When did you first
5  learn about this?
6      A.  At the end of my interview with the CI.
7      Q.  CI?
8      A.  Right.
9      Q.  With you -- when you were with Patterson and
10 Jonathan Davis?
11     A.  It was that interview.  I don't recall who
12 was present in the room at that point in time.
13     Q.  What time of the day was it that you
14 concluded your discussions with the confidential
15 informant?
16     A.  I would say late afternoon.
17     Q.  And you then prepared the affidavit for the
18 search warrant, correct?
19     A.  Correct.
20     Q.  And was that submitted to the judge before
21 5:00?
22     A.  No.
23     Q.  Submitted to the judge after 5:00?
24     A.  Yes.
25     Q.  Approximately when?

1      A.  I don't recall the time.  It was evening.
2      Q.  Had you discussed the warrant with any other
3  officers to alert them that you would be needing some
4  assistance in effecting a search?
5      A.  I communicated my findings to Sergeant Kent.
6      Q.  About what time was that, do you know?
7      A.  In reference to what information, I guess
8  would be ...
9      Q.  The information that you would be applying
10 for a search warrant and that you may need help
11 executing this search warrant -- I'm sorry.  I'm
12 putting words in your mouth.
13         What did you visit with Officer Kent about?
14     A.  I just advised we would be applying for a
15 search warrant.
16     Q.  And approximately what time was that?
17     A.  Late afternoon.
18     Q.  Do you know -- I think I asked you this
19 question.  But do you know what time the search warrant
20 was issued?
21     A.  The time it was signed by the judge?
22     Q.  Is there a time that's on the affidavit
23 itself?
24     A.  I don't believe so.
25     Q.  Do you know what time that was, roughly?

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 26 of 83
Tricia Wachsmuth v.                                                        Chad Miner
City of Powell, et al.                                                  October 6, 2010

CHAD MINER - October 6, 2010                                    Page 93
Direct Examination by Mr. Gosman

1   A. Evening. I can't tell you. I don't know.
2   Q. And the warrant was executed at approximately
3   9:15. Was it in relationship to that time of evening,
4   approximately how much earl er was it that the search
5   warrant had been granted?
6   A. I would say within the hour probably. I'm
7   guessing. So I don't know for certain what time it
8   was.
9   Q. Was there any reason why the search warrant
10  needed to be served that night?
11  A. Because we had fresh information. We knew
12  Bret Wachsmuth knew about the possibility of police
13  being notified.
14  Q. That was it, huh?
15  A. That was one consideration.
16  Q. Was there anything else?
17  A. Any other reasons why?
18  Q. Yes.
19  A. I would say that would be the reason why. We
20  had the warrant.
21  Q. Is that information contained in the
22  affidavit for the search warrant, Exhibit 13?
23  A. What information are you referring to?
24  Q. I'm referring to the information that Bret
25  Wachsmuth had been informed about the impending search

CHAD MINER - October 6, 2010                                    Page 94
Direct Examination by Mr. Gosman

1   warrant.
2   A. What exhibit are you on?
3   Okay.
4   Q. Well, first of all, let's make sure that
5   exhibit is complete. Because I don't know whether this
6   is true in the case you have in front of you, but I
7   don't see Page 5 of the exhibit.
8   A. You're speaking of Exhibit 13, correct?
9   Q. I am, yes.
10  MS. WESTBY: What's the pending question?
11  MR. GOSMAN: Right now we're trying to find
12  out whether Exhibit 13 is complete as it appears in the
13  notebook.
14  THE WITNESS: It seems to me there would be a
15  signature page.
16  BY MR. GOSMAN:
17  Q. I have a signature page, and I'm going to
18  bring that over to you. We will produce that signature
19  page.
20  This is Page 5 of Exhibit 13. I think you
21  can tell from the context that that's true. But go
22  ahead and examine that for yourself and be satisfied
23  that that is the last page.
24  A. Yeah, I'm satisfied. Let me scroll all the
25  way through the document. It must be a new document.

CHAD MINER - October 6, 2010                                    Page 95
Direct Examination by Mr. Gosman

1   Okay.
2   Q. All right. And have you taken the
3   opportunity to look at Paragraph 5, and then I'll ask
4   you the question again.
5   A. Yes.
6   Q. Okay. Is there anything in that affidavit
7   about this information that the confidential informant
8   had alerted Bret Wachsmuth that he had contacted police
9   and that he had turned the Wachsmuth's in?
10  A. I'm going to have to read the entire
11  affidavit.
12  Q. That's okay.
13  MR. GOSMAN: I'm going to go ahead and take a
14  break for just a second.
15  (Recess taken 5:42 to 5:45
16  p.m., October 6, 2010)
17  BY MR. GOSMAN:
18  Q. All right. Officer, have you reviewed
19  Exhibit 13, the affidavit for the search warrant?
20  A. I have.
21  Q. Is there any reference there to the
22  information you received from the confidential
23  informant that he had, in fact, called Bret Wachsmuth?
24  A. No.
25  Q. That is important information, would you

CHAD MINER - October 6, 2010                                    Page 96
Direct Examination by Mr. Gosman

1   agree?
2   MR. THOMPSON: Objection as to form.
3   MS. WESTBY: Join.
4   THE WITNESS: Important to who?
5   BY MR. GOSMAN:
6   Q. Important to the timing of the operation and
7   to everyone involved.
8   MR. THOMPSON: Object as to form.
9   MS. WESTBY: Join.
10  THE WITNESS: Important to the people
11  involved, yes, and the timing of the execution.
12  BY MR. GOSMAN:
13  Q. Did you take possession of the search warrant
14  that was issued?
15  A. I did.
16  Q. And what did you do with it?
17  A. When?
18  Q. Well, after you received it.
19  A. Put it in my car.
20  Q. Okay. Let's go ahead and turn to Exhibit --
21  I think it's -- oh, 17.
22  This is the search warrant that was issued in
23  this case?
24  A. Yes, sir.
25  Q. Did you understand this to be an announced

1   warrant?

2   A.  Yes, sir.

3   Q.  Did you deliver the search warrant to another

4   officer?

5   A.  I believe I kept it.

6   Q.  Did you have it with you as -- when you went

7   to the Wachsmuth residence that evening?

8   A.  I did.

9   Q.  After you put the search warrant in your car,

10  did you go back to the police station?

11  A.  I did.

12  Q.  And who did you meet with there?

13  A.  There was lots of officers there.

14  Q.  About what time was that, do you know?

15  A.  I would say between 8 00 and 9:00.

16  Q.  All right.  So let's back up a bit.  When you

17  contacted Sergeant Kent, other than the fact that you

18  had -- or were applying for a search warrant, what did

19  you tell him?

20  A.  I don't recall any other content of that

21  conversation.

22  Q.  Did you tell him that it was a grow

23  operation?

24  A.  Yeah, I think he'd known the allegation of

25  that since the beginning.

1   Q.  And -- okay.  Since the beginning.  That

2   would have been earlier that afternoon?

3   A.  Correct.

4   Q.  So there were other officers that were aware

5   of the fact that you were visiting with a confidential

6   informant about a marijuana grow operation?

7   A.  I believe a team was being assembled to

8   execute a search warrant in the event it was granted.

9   Q.  What do you base that belief on?

10  A.  Because they were all there when I got back.

11  Q.  Who did you talk to about your confidential

12  informant during the course of that afternoon, that

13  would have been responsible for making the decision to

14  assemble a team?

15  A.  The person, like I told you, the one I

16  remember, that I relayed information to was Sergeant

17  Kent.

18  Q.  Okay.  And about what time of the day was

19  that?

20  A.  That was in phone contact with him at various

21  times of the day.

22  Q.  Okay.  And I believe you indicated that you

23  first spoke with a confidential informant -- I don't

24  know what time it was.  So could you tell me about what

25  time it was?

1   A.  I believe it was afternoon when we met at the

2   county attorney's office.

3   Q.  All right.  And you had spoken to him briefly

4   before that?

5   A.  Briefly.

6   Q.  At what point in these discussions did you

7   alert another officer to what was going on?

8   A.  After I talked with the confidential

9   informant at the police department, I immediately

10  informed Sergeant Kent because of the sensitive nature

11  of what we were talking about, the CI and I.

12  Q.  And when you say "sensitive nature," are you

13  talking about the fact that it was Bret Wachsmuth, Tom

14  Wachsmuth's son?

15  A.  Because it was Tom Wachsmuth's son, yes.

16  Q.  And would that have been around 4:00 in the

17  afternoon that you spoke with Officer Kent?

18  A.  I told you, I have no idea what time that

19  was.

20  Q.  So the information that you gave officer Kent

21  was that there was a marijuana grow operation and that

22  it involved Tom Wachsmuth's son, correct?

23  A.  Correct.

24  Q.  Did you give him any other information at

25  that time?

1           MS. WESTBY: Object to the form of the

2   question.

3           MR. THOMPSON: Join.

4           THE WITNESS: I don't recall.

5   BY MR. GOSMAN:

6   Q.  Did you tell him that the confidential

7   informant had told you that there were guns in the

8   house?

9   A.  I'm certain that I would have relayed that

10  information.

11  Q.  Did you -- do you think that you relayed the

12  information concerning the potential threat that Bret

13  Wachsmuth would have posed to Officer Kent that

14  afternoon as you discussed with him what was going on?

15  A.  I'm sure I relayed the information about

16  his -- the CI stated mental issues that maybe Bret had,

17  his paranoia that the CI described.

18  Q.  Okay.  When you learned that Bret Wachsmuth

19  was, according to the CI, paranoid and looked out the

20  windows and that he had guns in the house, did you make

21  any effort to confirm whether or not there was a

22  criminal history for Mr. Wachsmuth that would tend to

23  support that -- those statements?

24          MS. WESTBY: Object to the form.

25          MR. THOMPSON: Objection. Join.

CHAD MINER - October 6, 2010                                    Page 101
Direct Examination by Mr. Gosman

1    THE WITNESS: At what time?
2    BY MR. GOSMAN:
3    Q. Well, this would have been during the period
4    that you were visiting with the confidential informant
5    and before you went to the judge's chambers to pick up
6    the search warrant. Really during the period you were
7    with the confidential informant.
8    A. Well, the answer is no. either way.
9    Q. Okay. Did you have any knowledge of whether
10   Bret Wachsmuth had a history of violence?
11   MS. WESTBY: Object to the form of the
12   question.
13   MR. THOMPSON: Join.
14   THE WITNESS: To clarify further down this
15   line, I had no knowledge of -- Bret Wachsmuth existed
16   prior to visiting with this confidential informant.
17   BY MR. GOSMAN:
18   Q. Did you have the time that afternoon to check
19   his criminal record?
20   A. Yes.
21   Q. Did you have the time to consult with other
22   sources, as to whether or not Bret Wachsmuth had a
23   history of violence?
24   MS. WESTBY: Object to the form of the
25   question.

CHAD MINER - October 6, 2010                                    Page 102
Direct Examination by Mr. Gosman

1    MR. THOMPSON: Join.
2    MS. WESTBY: Calls for speculation.
3    THE WITNESS: I'm not aware of anybody else's
4    feelings. Restate your question, please.
5    BY MR. GOSMAN:
6    Q. Yes. Well, did you visit with Officer
7    Patterson, for instance, about whether or not Bret
8    Wachsmuth had a history of violence?
9    A. My recollection is that Lt. Patterson didn't
10   know Bret Wachsmuth either.
11   Q. How about Jonathan Davis?
12   A. I'm certain that Jonathan Davis didn't know
13   Bret Wachsmuth either.
14   Q. Did you have more than one conversation with
15   Officer Kent?
16   A. Yes.
17   Q. How many times did you talk to him?
18   A. I have no idea.
19   Q. More than twice?
20   A. Yes.
21   Q. And what did you talk about?
22   A. Everything we've already talked about that we
23   talked about.
24   Q. All right. Subject to the conversations that
25   we -- with Sergeant Kent, was the information we

CHAD MINER - October 6, 2010                                    Page 103
Direct Examination by Mr. Gosman

1    already talked about in terms of when you first spoke
2    to him?
3    A. Correct.
4    Q. Did he tell you that he was assembling a
5    team?
6    A. I believe the information, as it came to me,
7    was that a team was being assembled, and at some point
8    I was told Sergeant Chretien was running that portion
9    of the operation.
10   Q. And was this before you arrived at the police
11   station that night, then?
12   A. Correct.
13   Q. And were you consulted or asked about the
14   type of operation that would be appropriate in this
15   case?
16   A. I was not.
17   Q. Did you discuss with Officer Kent the
18   comments that were made by Sergeant Patterson?
19   A. No.
20   MS. WESTBY: Object to the form of the
21   question. What comments?
22   MR. GOSMAN: Lieutenant Patterson. Sorry
23   about that.
24   MS. WESTBY: What comments?
25   MR. GOSMAN: The comments that he made about

CHAD MINER - October 6, 2010                                    Page 104
Direct Examination by Mr. Gosman

1    contacting Bret -- rather, Tom Wachsmuth.
2    MS. WESTBY: That completely misstates the
3    testimony. This witness testified that he's the one
4    that brought that up.
5    BY MR. GOSMAN:
6    Q. Did you discuss that with Sergeant Kent?
7    A. Okay. Run me through one more time. Did I
8    discuss what?
9    Q. With Sergeant Kent the possibility of
10   visiting with Tom Wachsmuth and having him go to the
11   door with the police officers and bring his son out, if
12   you felt there was a danger to the officers?
13   A. I don't recall having that conversation with
14   Sergeant Kent.
15   Q. You did have that conversation with
16   Lieutenant Patterson, correct?
17   A. Yes, of that substance. I don't recall the
18   exact words used in that conversation.
19   Q. By the time you went to the police station
20   that evening, was it clear to you that there would be a
21   team of officers performing a dynamic entry into the
22   Wachsmuth residence?
23   A. Yes.
24   Q. When you arrived at the police station that
25   night, did you see most of the officers that were

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 29 of 83
Tricia Wachsmuth v.
City of Powell, et al.
Chad Miner
October 6, 2010

1   actually present at the operation there at the police
2   station?
3   A.  Yes.
4   Q.  And have you trained with those officers
5   before in a simulated dynamic entry?
6   A.  Yes.
7   Q.  Let's go ahead and turn to Exhibit 16 for a
8   moment.  And I'm going to turn your attention to the
9   third paragraph from the bottom of the page starting
10  with the language, "the plan was to knock on the door."
11  I want you to read that paragraph into the record for
12  me.
13          MR. THOMPSON: Object as to form.  The
14  document speaks for itself.
15          MS. WESTBY: Join.
16          THE WITNESS: The third paragraph you said?
17  BY MR. GOSMAN:
18  Q.  Third paragraph from the bottom starting with
19  "the."
20  A.  You want me to read you that entire
21  paragraph?
22  Q.  Yes.
23  A.  "The plan was to knock on the front door and
24  announce 'police, search warrant' -- in quotations --
25  if the door did not open immediately, we would use the

1   ram to force entry. The primary entry teams'
2   responsibility was to secure the residence and ensure
3   the safety of everyone involved."
4           You want me to continue?
5   Q.  Actually, I don't know that you need to
6   continue.  That's fine.
7           Is there anything in that two or three
8   sentences that is not as you understood it that night,
9   in terms of the plan to enter the Wachsmuth residence?
10          MS. WESTBY: Wait.  Wait.  Say that --
11          MR. GOSMAN: Can we let the witness answer
12  the question.
13          MS. WESTBY: No.  I was going to say can I
14  hear that question again?  I'm sorry.  I didn't hear
15  it.  I didn't hear your question.
16          MR. GOSMAN: Okay.  Let's have the reporter
17  read that question.
18          MS. WESTBY: That is fine.
19              (The record was read as
20              requested.)
21          MR. THOMPSON: Objection as to form.
22          MS. WESTBY: I don't understand the question.
23  BY MR. GOSMAN:
24  Q.  Well, let the witness answer it, if he can?
25          MS. WESTBY: Object to form.

1           THE WITNESS: I would say with the exception
2   of immediately, that was the plan.
3   BY MR. GOSMAN:
4   Q.  Have you ever seen this report before?
5   A.  I'm sure I read it at some point in time.
6   Q.  Do you remember noticing that word
7   immediately being out of place?
8   A.  I'm sure I read it.
9   Q.  Okay.  Do you remember noticing that it was
10  out of place?
11          MR. THOMPSON: Objection as to form.
12          MS. WESTBY: Join.
13          THE WITNESS: No.
14  BY MR. GOSMAN:
15  Q.  Do you know of any other report that
16  describes the entry plan and the actual entry into the
17  Wachsmuth residence, than what is contained here in
18  Exhibit 16 by Officer Chretien?
19  A.  I would have to look at them all.  But I
20  don't know of one, off hand, that describes it in
21  detail.
22  Q.  Okay.  You didn't prepare such a report,
23  correct?
24  A.  I think mine briefly describes the events.
25  Q.  Yes, it does.  Okay.  All right.  Let's go to

1   Exhibit 20.  And I'm on the second page.  That's Page 8
2   of your narrative, "A search warrant was prepared and
3   presented to the honorable Bruce Walters."
4           And then it starts, "Myself along with
5   several Officers."  Why don't you go ahead and -- let's
6   see, read down to the point where the officers entered
7   the residence and found one occupant.
8   A.  You want me to read it?
9   Q.  Yes.
10  A.  You want me to start where the officers
11  entered or before that?
12  Q.  Yes, it would be, "Myself along with several
13  Officers."
14  A.  Okay.  "Myself, along with several Officers
15  from Powell Police Department executed said search
16  warrant at approximately 2116 hours on 2/24/09.
17  Officer Chapman knocked on the front door and announced
18  'Police, Search Warrant.'  I open the door" -- "I
19  opened the front door using a ram at the same time as
20  Officer McCaslin and Sergeant Kent deployed a
21  diversionary device in the northeast bedroom window."
22  Q.  Okay.  Is that account accurate of what
23  happened?
24  A.  It's representative of what happened, yes.
25  Q.  Okay.  And did you ever feel the need to

CHAD MINER - October 6, 2010                                    Page 109
Direct Examination by Mr. Gosman

1  modify language in that report?
2  A.  In mine?
3  Q.  Yes.
4  A.  No.
5  Q.  Now, let's go back to Exhibit 16.  And now
6  we'll go down to the second to the last paragraph on
7  that page, "As the officers arrived."  And I'll ask you
8  to go ahead and read that paragraph into the record,
9  please?
10  A.  "As officers arrived and approach the house,
11  the dog started to bark out the front living room
12  window.  Officer Chapman knocked on the front door and
13  announced 'police, search warrant.'  When the door did
14  not open, Officer Miner forced it open with the ram.
15  The back yard team of officers were not in position
16  when this happened, so they secured the backyard and
17  door area by sight initially, and no windows or doors
18  were broken on the back of the residence.  As the door
19  was being rammed, Sergeant Kent used the window rake to
20  break and rake the window to the north east bedroom.
21  Officer McCaslin then checked the area immediately
22  inside the window for people or obstacles and deployed
23  the NFDD."
24  Q.  Okay.  Now, I want you to, in your mind, go
25  through each one of those sentences again and tell me

CHAD MINER - October 6, 2010                                    Page 110
Direct Examination by Mr. Gosman

1  if there is anything in that paragraph that is
2  inconsistent with what you recollect happened.
3  A.  Seems representative.
4  Q.  Did you hear a dog bark out front?
5  A.  I did.
6  Q.  Did you make the statement, "Someone is
7  peeking out the window"?
8  A.  No.
9  Q.  Did officer Chapman make the statement,
10  "Someone is peeking out the window"?
11  A.  I don't know who made that statement.
12  Q.  Did you hear it?
13  A.  I'm trying to remember exactly what I heard.
14  One of the officers said something, but I can't tell
15  you exactly what that was now.  So I did hear something
16  from another officer, but I don't know what that was.
17  Q.  Was it directed towards the occupants of the
18  house?
19  MR. THOMPSON:  Objection as to form.
20  MS. WESTBY:  Join.
21  BY MR. GOSMAN:
22  Q.  In other words, was it a comment about an
23  occupant inside the house?
24  MR. THOMPSON:  Same objection.
25  MS. WESTBY:  Join.

CHAD MINER - October 6, 2010                                    Page 111
Direct Examination by Mr. Gosman

1  THE WITNESS:  I don't recall what it was.
2  BY MR. GOSMAN:
3  Q.  Where was the dog?  Did you see the dog?
4  A.  I saw the dog in the front window.
5  Q.  How far away from the dog were you, at that
6  moment?
7  A.  When I first saw it?
8  Q.  Yes.
9  A.  It's hard for me to say.  We weren't at the
10  house yet when I first saw the dog.  We hadn't arrived
11  at the front door yet when I first saw the dog.
12  Q.  Okay.  How far away from the dog were you
13  when you heard the dog bark?
14  A.  You want me to estimate that, because I don't
15  have an exact for you?
16  Q.  Let me back up.  Were you on the porch?
17  A.  No.
18  Q.  You were approaching the porch?
19  A.  Correct.
20  Q.  And you heard the dog bark?
21  A.  Correct.
22  Q.  And everyone understood that if the dog
23  barked, that Bret would be looking out the window if he
24  was there, would that be fair to say?  That was
25  information you had at least?

CHAD MINER - October 6, 2010                                    Page 112
Direct Examination by Mr. Gosman

1  MR. THOMPSON:  Objection as to form.
2  MS. WESTBY:  Objection.
3  MR. GOSMAN:  Yeah, asked a compound question
4  there.
5  BY MR. GOSMAN:
6  Q.  What was your thought or reaction when you
7  heard the dog bark?
8  A.  Our element of surprise is diminishing.
9  Q.  Okay.  So what did you do in response to that
10  thought?
11  A.  The entry team's pace was sped up when the
12  dog started to bark.
13  Q.  Was that why the backyard team was unable to
14  be in position when the door was rammed?
15  A.  I don't know why they weren't able to be in
16  position.  I was never in the backyard.
17  Q.  All right.  So you -- were you sort of
18  running to the front door then?
19  A.  No.
20  Q.  But you were hurrying?
21  A.  We picked up our pace, yes.
22  Q.  And what happened when you got to the front
23  door?
24  A.  Officer Chapman knocked on the door.
25  Q.  Okay.  And at some point in that few moments

Case 1:10-cv-00041-ABJ  Document 65-7  Filed 01/10/11  Page 31 of 83
Tricia Wachsmuth v.                                                    Chad Miner
City of Powell, et al.                                               October 6, 2010

CHAD MINER - October 6, 2010                    Page 113
Direct Examination by Mr. Gosman

1  when officer -- or before Officer Chapman knocked on
2  the door, did you hear someone make a comment?
3      A. Prior to knocking on the door, yes.
4      Q. After officer Chapman knocked on the door,
5  what happened next? Did he just knock on the door?
6      A. He said, "police, search warrant."
7      Q. Okay. And then what happened?
8      A. And then shortly thereafter, nobody answered
9  the door, so I opened the door.
10     Q. How long did you wait?
11     A. Are you looking for my approximation or an
12 exact number?
13     Q. Well, of course, if you've got an exact
14 number, I'll take it.
15     A. That means I don't.
16     Q. Yes. An approximation.
17     A. My approximation would be between five and
18 ten seconds.
19     Q. Okay. What was the dog doing during this
20 period of time?
21         MR. THOMPSON: Objection as to form.
22         Go ahead.
23         THE WITNESS: I heard the dog barking. I
24 don't know what it was doing.
25

CHAD MINER - October 6, 2010                    Page 114
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2      Q. You saw the dog in the yard. Did you see the
3  dog when you were on the porch?
4      A. No.
5      Q. For how long had the dog been barking when
6  you arrived at the porch?
7      A. Since it started when we were approaching.
8      Q. Good answer, officer. I'm going to give you
9  A plus for that. I'm talking about time. How much
10 time elapsed?
11     A. Between 30 seconds and a minute.
12     Q. Okay. All right. And did you notice anyone
13 looking out the window?
14     A. I did not.
15     Q. When you got inside the door, did you see
16 where Tricia Wachsmuth was located?
17     A. Yes.
18     Q. And where was that?
19     A. In the living room.
20     Q. And was she on the couch right next to the
21 front door?
22     A. She was on the couch.
23     Q. And the couch was right next to the front
24 door, wasn't it?
25     A. Correct.

CHAD MINER - October 6, 2010                    Page 115
Direct Examination by Mr. Gosman

1      Q. Were you the first officer through the door?
2      A. No.
3      Q. Where were you in that line?
4      A. Not first.
5      Q. Okay.
6      A. I don't know. I don't know.
7      Q. Nobody seems to know what happened after the
8  door got knocked in.
9      A. I don't know where I was. I know what
10 happened.
11         MS. WESTBY: Object to the form of the
12 question.
13         BY MR. GOSMAN:
14     Q. Were you inside that door within a second or
15 two?
16         MS. WESTBY: Object to the form of the
17 question.
18         MR. THOMPSON: Join.
19         THE WITNESS: I was inside the door pretty
20 quickly.
21         BY MR. GOSMAN:
22     Q. Okay. What was Tricia Wachsmuth doing when
23 you saw her first?
24     A. I think we already said she was sitting on
25 the couch.

CHAD MINER - October 6, 2010                    Page 116
Direct Examination by Mr. Gosman

1      Q. Had she -- was she in the process of standing
2  up?
3      A. I don't recall what else she was doing other
4  than ...
5      Q. Okay. We're going to go back to the police
6  station before the warrant was served. And I want you
7  to tell me when you arrived at the police station, what
8  happened?
9      A. When I arrived at the police station, the
10 officers were assembled in our training room
11 downstairs. They had apparently already discussed a
12 plan, came up with a plan. They told me what my
13 portion of the plan was, where I fit into the plan. I
14 relayed to them quickly the information I had again
15 that the CI had provided about Bret Wachsmuth's
16 possible paranoia, the guns in the house, the fact that
17 Bret possibly sometimes carried a loaded .22 caliber
18 pistol, as reported by the CI, and the sensitive nature
19 of it due to Tom Wachsmuth's involvement. The end.
20         BY MR. GOSMAN:
21     Q. Now, I take it by that time the decision to
22 use the SWAT team or dynamic entry had already been
23 made?
24     A. Yes, sir.
25     Q. Were you briefed as to the plan?

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 32 of 83
Tricia Wachsmuth v.                                                      Chad Miner
City of Powell, et al.                                              October 6, 2010

1   A. Yes.
2   Q. How long did that take?
3   A. Minutes.
4   Q. Were the other officers present at a briefing
5   or was this something that happened one on one with you
6   and Sergeant Chretien?
7   A. There were other officers there. I don't
8   know who all was there and who was not.
9   Q. Was there -- as far as you know, was there a
10  time when all the officers were assembled together and
11  the plan was reviewed with all the officers present?
12  A. I don't know if there was that time. I don't
13  know.
14           (Exhibit 10 identified)
15  BY MR. GOSMAN:
16  Q. Take a look at Exhibit 10 for a moment.
17  First of all, do you recognize the handwriting there?
18  A. No.
19  Q. We were told by, I believe it was Officer
20  Chretien, that that handwriting looked like someone who
21  worked at the police department as a
22  receptionist/secretary?
23  A. Okay.
24  Q. What are their names?
25  A. All the dispatchers' names?

1   Q. Well, I don't think it was a dispatcher. But
2   I don't remember the name. Are there
3   receptionist/secretaries that are there in the police
4   department?
5   A. Just dispatchers.
6   Q. Okay. Do you know who was present there that
7   night as a dispatcher?
8   A. If my recollection serves me right, it was
9   Marrisa Torczon.
10  Q. Did you see her taking notes?
11  A. I did not.
12  Q. But you did see her there, apparently?
13  A. I believe so, yes.
14  Q. I want you to go ahead and tell me in as much
15  detail as you can the information that you received
16  from Officer Chretien about your role in the plan.
17  A. That I was going to be the one to ram the
18  door should it not open.
19  Q. And were you -- did he show you diagrams of
20  the house?
21  A. There was a diagram of the house on the board
22  downstairs.
23  Q. You'd seen the house earlier that day,
24  correct?
25  A. I had.

1   Q. So that was it. Officer Chretien told you
2   that you were going to deploy the ram?
3   A. Correct.
4   Q. Did you have any follow-up duties after
5   deploying the ram?
6   A. To then clear the house with the rest of the
7   officers.
8   Q. Did you carry a rifle?
9   A. No.
10  Q. Officer, have you had any training in terms
11  of constitutional law and particularly excessive force?
12       MS. WESTBY: Wait. I'm sorry. I'm sorry.
13  I'm losing my train of thought. I need to hear the
14  question again. I'm sorry.
15           (The record was read as
16           requested.)
17       MS. WESTBY: Okay. Objecting as to form.
18       THE WITNESS: There is a small block of
19  training in that realm at the WLEA, Law Enforcement
20  Academy.
21  BY MR. GOSMAN:
22  Q. Did you understand that the use of force is
23  always to be reasonable based on the governmental
24  interests that are being protected?
25       MS. WESTBY: Object to the form of the

1   question. Misstates the law.
2       MR. THOMPSON: Join.
3       THE WITNESS: My understanding of the
4   application of force is what a reasonable officer would
5   do in the totality of the circumstances.
6   BY MR. GOSMAN:
7   Q. Do you understand that as an officer, that
8   you can be liable for constitutional violations that
9   are committed in your presence?
10  A. Sure.
11  Q. All right. So we're now entering the
12  Wachsmuth home. You see Tricia Wachsmuth on the couch.
13  And at the time you entered the residence, was she in
14  the control or custody of any one of the officers?
15       MS. WESTBY: Object to the form of the
16  question.
17       MR. THOMPSON: Join.
18       THE WITNESS: There was an officer with her.
19  BY MR. GOSMAN:
20  Q. Was he pointing his weapon at her?
21  A. I don't know where his weapon was pointed.
22  Q. Do you know who that officer was?
23  A. I do not recall exactly who that was.
24  Q. Well -- in this case, I want you to -- give
25  me the best guess that you've got, and we'll try to

CHAD MINER - October 6, 2010                         Page 121
Direct Examination by Mr. Gosman

1  take it from there.
2         MS. WESTBY: No. No. Object to the form of
3  the question, and I'm not going to let you have the
4  witness speculate.
5  BY MR. GOSMAN:
6     Q. You don't know exactly who the officer was?
7  Who do you think the officer was?
8         MR. THOMPSON: Object as to form of the
9  question. Calls for speculation.
10         MS. WESTBY: Answer if you know. If you
11  don't know --
12         THE WITNESS: If I knew, I would have told
13  you. I don't know who that was.
14  BY MR. GOSMAN:
15     Q. All right. And you were the second or third
16  person to go through the door? And I may have just
17  picked that out of thin air.
18     A. I don't know where in line I was. The
19  chances are, I would have been towards the back because
20  of my role as the door ram.
21     Q. All right. Did you understand that and --
22  let me ask this question: Is it your understanding
23  that generally -- and I understand that you have done
24  this on more than one occasion -- the first officer
25  into the room that's being cleared that identifies a

CHAD MINER - October 6, 2010                         Page 122
Direct Examination by Mr. Gosman

1  suspect takes control of the suspect?
2         MS. WESTBY: Object to the form of the
3  question.
4         MR. THOMPSON: Join.
5         THE WITNESS: Not necessarily.
6  BY MR. GOSMAN:
7     Q. Okay. Tell me who you know was ahead of you
8  going through the door that night.
9     A. Officer Chapman. Who I know for a fact. I'm
10  certain Officer Chapman was before me. I can't tell
11  you with certainty who else was before me.
12     Q. Okay. Well, let's go to Exhibit 10 for a
13  moment, and we're going to take a look at the officers
14  that were involved in the operation and those that were
15  specifically assigned to the entry team.
16         And I want you to take a look at the list and
17  the officers that were assigned to the entry team, and
18  I want you to tell me if that's accurate as you
19  remember it, the officers that were assigned?
20     A. According to this document?
21     Q. Yes.
22     A. Again, I'm not certain who went through the
23  door before or after me. But this seems to be an
24  accurate picture of the initial plan, yes.
25     Q. And did you understand that the initial plan

CHAD MINER - October 6, 2010                         Page 123
Direct Examination by Mr. Gosman

1  was for the entry team to enter the house?
2     A. Yes.
3     Q. And so it would be fair to say that every
4  member listed there on Exhibit 10, who was a part of
5  the entry team, would have gone into the house shortly
6  after the door was breached?
7     A. All --
8         MS. WESTBY: Object to the form of the
9  question.
10         MR. THOMPSON: Join.
11         THE WITNESS: All of the entry team went into
12  the house.
13  BY MR. GOSMAN:
14     Q. And did it occur shortly after the door was
15  breached?
16     A. Yes.
17     Q. Did you hear the flashbang device being
18  deployed?
19     A. Certainly.
20     Q. When was that in relation to the ram, your
21  use of the ram?
22     A. It was after.
23     Q. Was it a very short period of time?
24         MS. WESTBY: Object to the form of the
25  question.

CHAD MINER - October 6, 2010                         Page 124
Direct Examination by Mr. Gosman

1         THE WITNESS: A short period of time I would
2  say, yes, sure.
3  BY MR. GOSMAN:
4     Q. Depending on your perspective, that could be
5  years?
6     A. Correct.
7     Q. Was it within ten seconds?
8     A. Yes.
9     Q. Five?
10     A. Don't know.
11     Q. All right. So did you assist with the
12  custody and control of Tricia Wachsmuth, or did you
13  enter the house and participate in the clearing
14  operation?
15     A. I continued into the house.
16     Q. And where did you go?
17     A. To the master bedroom.
18     Q. All right. Was the light on?
19     A. I don't recall.
20     Q. Did you -- did you turn -- let's put this
21  way: Were you able to see in the bedroom when you did
22  what you did in the bedroom?
23     A. Yes.
24     Q. Did you turn the light out?
25     A. I don't know.

CHAD MINER - October 6, 2010                          Page 125
Direct Examination by Mr. Gosman

1  Q.  Okay.  Did you notice that there was a fire
2  in the bedroom?
3  A.  No.
4  Q.  Did you notice where the flashbang device had
5  been deployed?
6  A.  Yes.
7  Q.  And where was that?
8  A.  The bed, under the window.
9  Q.  Did you recover the casing for the flashbang
10 device?
11 A.  I don't know who recovered that.
12 Q.  Did you see a pillow or pillows on the bed?
13 A.  Yes.
14 Q.  How long were you in the bedroom clearing it?
15 A.  Minute or two maybe, or probably less.
16 Q.  Okay.  And what did you do after you got out
17 of the bedroom?
18 A.  I believe the first thing I did was grab the
19 pillow and put it in the bathtub.
20 Q.  Because it was what, smoldering?
21 A.  No, because that's where the flashbang device
22 had landed.  And I wanted to eliminate any danger of a
23 fire.
24 Q.  Did the pillow -- was the pillow on fire at
25 that time?

CHAD MINER - October 6, 2010                          Page 126
Direct Examination by Mr. Gosman

1  A.  No.
2  Q.  You put the pillow in the bathtub to
3  eliminate the danger of a fire but the pillow wasn't
4  on fire when you did that?
5  A.  Right.
6  Q.  And it wasn't smoldering either?
7  A.  Not that I remember.
8  Q.  And was the bedding smoldering?
9  A.  No.
10 Q.  But the flashbang device had landed on the
11 bed, correct?
12       MR. THOMPSON: Objection as to form.
13       MS. WESTBY: Correct.
14       THE WITNESS: On the pillow.
15 BY MR. GOSMAN:
16 Q.  How did you know that?
17 A.  Because the burn mark from the flashbang was
18 on the pillow.
19 Q.  Okay.  Did you ever notice that the pillow
20 was burning or smoldering in the bathtub after you took
21 it in there?
22 A.  No, sir.
23 Q.  There are pictures that were taken by Tom
24 Wachsmuth after the search that night.  Probably within
25 a few hours.  And one of those pictures shows a pillow,

CHAD MINER - October 6, 2010                          Page 127
Direct Examination by Mr. Gosman

1  and I believe it is in the bathtub that has significant
2  burning to the pillow into the center of the pillow.
3  How would you explain that?
4       MR. THOMPSON: Objection as to form.
5       MS. WESTBY: Join.
6       THE WITNESS: Sounds like I already did.  The
7  flashbang landed there and burned it.
8  BY MR. GOSMAN:
9  Q.  Okay.  But you didn't notice any burning in
10 the pillow when you picked it up and put it --
11 A.  It was not on fire.
12 Q.  It was not on fire.  All right.
13       MS. WESTBY: Counsel, have you provided those
14 photographs?
15       MR. GOSMAN: Yes.
16       MR. THOMPSON: In what, self-executing
17 discovery?
18       MR. GOSMAN: Yeah, I assume.
19       MS. WESTBY: I don't think so.
20       MR. GOSMAN: Well, we can address that later.
21       MS. WESTBY: Well, if you're going to be
22 talking to the witnesses about it, you need to produce
23 it.
24       MR. GOSMAN: If it hasn't been produced, I
25 certainly will.  I believe that it has.

CHAD MINER - October 6, 2010                          Page 128
Direct Examination by Mr. Gosman

1       MS. WESTBY: I'm looking.
2       THE WITNESS: Shall we take a break?
3       MR. GOSMAN: That's fine.  We can do that.
4       (Recess taken 6:30 to 6:43
5       p.m., October 6, 2010)
6  BY MR. GOSMAN:
7  Q.  Did you take the pillow from the northeast
8  bedroom into the bathroom at the time that you left the
9  room after you cleared it?
10 A.  I don't recall when I put -- exactly what I
11 was doing, where I was going when I put that in the
12 bathroom.
13 Q.  Okay.  Where did you go after you left the
14 northeast bedroom?
15 A.  To the hallway.
16 Q.  What did you observe when you went into the
17 hallway?
18 A.  Sergeant Eckerdt and Tricia were in the
19 living room area.  She was on the couch, Sergeant
20 Eckerdt was standing up.  That's what I observed.
21       (Exhibit 41-A identified)
22 BY MR. GOSMAN:
23 Q.  All right.  Let's go ahead and give you a
24 blank piece of paper.  We'll mark this as Plaintiff's
25 Exhibit 42 [sic]; and I've got a pen.

CHAD MINER - October 6, 2010                                    Page 129
Direct Examination by Mr. Gosman

1    A.  I got one.

2    Q.  Would you go ahead and diagram the house and

3  your location at the time that you returned to the hall

4  after completing the clearing operation of the

5  northeast bedroom?

6    A.  You want me to write -H on there?

7    Q.  No, that's fine.

8    A.  How would you like to indicate my position?

9    Q.  Well, go ahead and do that with an X and then

10  away from the interior of the house a caption that

11  says --

12    A.  X marks the spot?

13    Q.  Yeah, however you'd like to do that.

14        Okay.  So you indicated that X equals Officer

15  Miner.  Okay.  Thank you.

16        And let's go ahead and identify the living

17  room and the front door.

18    A.  Is that all right for front door?

19    Q.  That's all right.  You might mark front.

20        When you were standing on the front porch,

21  other than Officer Chapman, was there anyone standing

22  on the front porch with you?

23    A.  I don't recall how big - I don't know.

24    Q.  And the door to the basement, the stairway.

25    A.  Oh, yeah.

CHAD MINER - October 6, 2010                                    Page 130
Direct Examination by Mr. Gosman

1    Q.  When you arrived at that spot you marked X

2  after clearing the bedroom, you noticed Officer Eckerdt

3  standing near Tricia Wachsmuth?

4    A.  Correct.

5    Q.  And let's go ahead and draw the couch and the

6  location of Tricia Wachsmuth, and then the location of

7  Officer Eckerdt.

8    A.  You want me to use designators for everybody?

9    Q.  Yeah, that's fine.  Okay.  Good.

10        Your drawing is not to scale.  Approximately

11  how far away from Tricia Wachsmuth was Officer Eckerdt?

12    A.  5 feet.

13    Q.  And was Officer Eckerdt pointing his weapon

14  at Tricia Wachsmuth?

15    A.  No.

16    Q.  Where was his weapon if you know?

17    A.  In front of him pointed at the ground.

18    Q.  And where were the other officers at that

19  time?  Any other officers that you can identify.

20    A.  I can't tell you who was where.  I mean,

21  there was officers close to me here.  There was

22  officers in the kitchen.

23    Q.  Do you know where Officer Chretien was?

24    A.  Not at this point in time.

25    Q.  Were you in the same location that you've

CHAD MINER - October 6, 2010                                    Page 131
Direct Examination by Mr. Gosman

1  marked on Exhibit 41 when Tricia Wachsmuth went down

2  the stairs?

3    A.  I was.

4    Q.  And did you hear Officer Chretien give her

5  the command, "Bring her over here, she's going first"?

6        MR. THOMPSON: Objection.

7        MS. WESTBY: Objecting to the form of the

8  question.  That completely misstates the testimony.

9        MR. GOSMAN: Everybody but Tricia's.

10        But go ahead.

11        THE WITNESS: No.

12  BY MR. GOSMAN:

13    Q.  You did not hear that?

14    A.  What you just said, I did not hear that.

15    Q.  As you think about it at this moment, do have

16  any idea where Officer Chretien was when Tricia

17  Wachsmuth started down the stairs?

18    A.  I'm going to back you up just a second to

19  clarify what I was talking about.  Officer Chretien

20  approached Ms. Wachsmuth on the couch after I came out

21  here.  So I don't know where he was coming from.

22    Q.  All right.

23    A.  So he ended up here with Tricia prior to

24  going down the stairs.

25    Q.  He was next to Tricia at that time?

CHAD MINER - October 6, 2010                                    Page 132
Direct Examination by Mr. Gosman

1    A.  Yes.

2    Q.  Was he pointing his weapon at Tricia

3  Wachsmuth?

4    A.  No, sir.

5    Q.  And did you hear him issue a command to

6  Tricia Wachsmuth?

7        MS. WESTBY: Object to the form of the

8  question.

9        MR. THOMPSON: Join.

10        THE WITNESS: Yes.  Isn't that --

11  BY MR. GOSMAN:

12    Q.  What did he say?

13    A.  Do you want the whole conversation or do you

14  want that piece?

15    Q.  Well, let's go ahead and do the whole

16  conversation.

17    A.  Sergeant Chretien asked Tricia either who is

18  downstairs or is there anyone downstairs.  I don't

19  recall which exact one that was.  And I didn't hear her

20  exact answer, but it was words to the effect of no one.

21  Again, he asked, again she stated the same.

22        Sergeant Chretien said, verbatim, I don't

23  understand, but I know he said you first.

24    Q.  Okay.

25    A.  So the rest of the phrase I can't say

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 36 of 83
Tricia Wachsmuth v.
City of Powell, et al.
Chad Miner
October 6, 2010

1  verbatim. so I'd really hate to say.
2      Q.  Let's go ahead and put Officer Chretien in
3  his location at the time that he issued that command to
4  Tricia Wachsmuth?
5          MS. WESTBY: Object to the form of the
6  question.  Misstates the testimony.
7          Go ahead.
8          MR. THOMPSON: Join.
9  BY MR. GOSMAN:
10     Q.  Approximately how far away from Tricia
11 Wachsmuth was Officer Chretien when that conversation
12 took place?
13     A.  3 feet.
14     Q.  Now, do you know at that moment when Officer
15 Chretien was communicating with Tricia Wachsmuth where
16 anyone else was in the house?
17     A.  I can't tell you which officer was where, no.
18     Q.  Was the entire entry team assembled in the
19 living room or the kitchen?
20     A.  No, I believe there was another officer or
21 two in this vicinity, in this bedroom, or on this side
22 of the house somewhere.
23         MR. THOMPSON: Let the record reflect that
24 the officer is pointing towards the side of the house
25 where the two bedrooms are located.

1          MR. THOMPSON: Objection as to form.
2          MS. WESTBY: Join.
3          THE WITNESS: The basement was to be cleared.
4  That's all I know. I don't know what the plan was, I
5  guess, to clear the basement. If they had discussions
6  prior to my arrival about clearing the basement, I
7  don't know that.
8  BY MR. GOSMAN:
9      Q.  Did you go down to the basement?
10     A.  I did.
11     Q.  And where were you in the procession that
12 went down to the basement?
13         MS. WESTBY: Object to the form of the
14 question.
15         MR. THOMPSON: Join.
16         THE WITNESS: I was not in the procession
17 that went down involving Ms. Wachsmuth.
18 BY MR. GOSMAN:
19     Q.  All right.  What happened?
20     A.  Sergeant Chretien, Ms. Wachsmuth -- and I
21 believe there were two other officers that went down
22 also. I don't remember who was where, who went where.
23 But after they went down, I followed shortly
24 thereafter, within a minute.
25     Q.  Okay.  And when you started down the stairs,

1  BY MR. GOSMAN:
2      Q.  Were they in the bedrooms?
3      A.  I don't know where they were exactly.
4      Q.  Was there anyone in the hallway with you?
5      A.  I don't recall anybody being in the hallway
6  with me, no.
7      Q.  Were there any other officers in the living
8  room or the kitchen?
9      A.  None in the living room. Besides Sergeant
10 Eckerdt and Sergeant Chretien, I didn't see who was in
11 the kitchen. There were officers in there.
12     Q.  Do you know where they were in the kitchen?
13     A.  I do not.
14     Q.  After Sergeant Chretien made the statement to
15 Ms. Wachsmuth, what happened next?
16     A.  Ms. Wachsmuth got up and walked through the
17 living room into the kitchen.
18     Q.  And did you understand from officer Chretien,
19 that the team, if you will, the entry team was ready to
20 clear the basement?
21     A.  I don't understand your question.
22     Q.  He said she's going first or something to
23 that effect. I assume that was in connection with the
24 remaining operation, which involved clearing the
25 basement.

1  where was everyone else?
2      A.  They were disbursed into the basement. And
3  Tricia was at the bottom of the stairs.
4      Q.  Who was with Tricia at that time?
5      A.  There was nobody standing next to her, that I
6  remember.
7      Q.  They just left her alone?
8      A.  Apparently.
9          MS. WESTBY: Object to the form of the
10 question.
11         THE WITNESS: The basement is about 10 by 10.
12 BY MR. GOSMAN:
13     Q.  She wasn't very alone then, huh?
14     A.  Right.
15     Q.  All right. So you went down the stairs. Did
16 you take control of Tricia Wachsmuth at that point?
17     A.  I did.
18     Q.  Was that something that you'd been assigned
19 to do?
20     A.  No.
21     Q.  Did you handcuff Tricia Wachsmuth at that
22 point?
23     A.  Downstairs, yes.
24     Q.  And did you then lead her out of the house?
25     A.  I took her upstairs, got her some essentials

CHAD MINER - October 6, 2010                          Page 137
Direct Examination by Mr. Gosman

1  to -- and then we left the house.
2  Q.  How was she dressed?
3  A.  Casually.
4  Q.  Was she in pajamas or clothes, do you
5  remember?
6  A.  I don't know.
7  Q.  And she -- you allowed her to put a coat on
8  or something to that effect?
9  A.  Yeah, she asked for things, and I got them
10 for her.
11 Q.  And then you took her outside?
12 A.  Right.
13 Q.  And put her in the patrol car?
14 A.  Correct.
15 Q.  Were there other officers outside at that
16 time?
17 A.  Yes, sir.
18 Q.  Did you see anyone performing for the camera
19 that was there that night?
20     MR. THOMPSON: Objection as to form.
21     MS. WESTBY: Join.
22 BY MR. GOSMAN:
23 Q.  Officers making signs and gestures in front
24 of the camera?
25 A.  No, sir, I do not recall that.

CHAD MINER - October 6, 2010                          Page 138
Direct Examination by Mr. Gosman

1  Q.  Who had the camera?
2  A.  I couldn't even tell you that. I don't know.
3  Q.  Once you got outside, did you -- and place
4  Tricia Wachsmuth in the car, did you stay with her?
5  A.  No.
6  Q.  Was there another officer with her at that
7  time?
8  A.  Yes.
9  Q.  Who was that officer?
10 A.  Don't know. I don't know.
11 Q.  Do you remember any of the officers that were
12 outside when you came up with Tricia Wachsmuth?
13 A.  Is your question, do I remember specifically
14 who I saw when I came outside or who was assigned to be
15 outside?
16 Q.  Who you saw.
17 A.  I don't recall who I saw when I came out of
18 the house.
19 Q.  When you came back up the stairs, did you see
20 anyone in the house at that time?
21 A.  I encountered Sergeant Kent at some point. I
22 don't know whether that was still inside the house or
23 out in front of the house. He was the first officer I
24 had contact with after coming out from the stairs.
25 Q.  Do you remember any other officers that were

CHAD MINER - October 6, 2010                          Page 139
Direct Examination by Mr. Gosman

1  upstairs or outside when you came upstairs with Tricia
2  Wachsmuth?
3  A.  I do not. I can't tell you with certainty
4  where everybody was.
5  Q.  Let's go ahead and -- let's see, perhaps we
6  can just use the exhibit that we've got.
7      I'm going to ask you to do another drawing.
8  I hate to do that to you. But let's do the house.
9  Actually, what we're interested in is the kitchen area
10 and the stairs, the living room. So we don't have to
11 have as much detail as before.
12     Because I'm going to ask you, Officer, to
13 describe for me what you know about the position of the
14 individuals as Ms. Wachsmuth was led down the stairs.
15 A.  I think I told you I don't know.
16 Q.  Okay.
17 A.  So I'm not going to be able to help you any
18 further than that.
19     MS. WESTBY: That's the testimony. Do you
20 want him to keep drawing this?
21 BY MR. GOSMAN:
22 Q.  Let me ask this question: When Officer
23 Chretien went to the stairs with Tricia Wachsmuth, did
24 you move into view of the officers as they assembled to
25 go down the stairs behind her?

CHAD MINER - October 6, 2010                          Page 140
Direct Examination by Mr. Gosman

1  A.  I did not. I was -- I couldn't see them.
2  There's a bunch of stuff on this side of the wall in
3  the kitchen obstructing my view of the doorway and
4  down.
5  Q.  All right.
6  A.  You want me to continue with this?
7  Q.  No, that's fine. When you arrived at the
8  residence, did you arrive with the entire group of
9  officers?
10 A.  No, I arrived with the entry team.
11 Q.  Was the entry team together then?
12 A.  In separate vehicles.
13 Q.  Okay. And did the entry team assemble away
14 from the Wachsmuth house?
15 A.  Yes, sir.
16 Q.  And you walked toward the Wachsmuth house,
17 then?
18 A.  Correct.
19 Q.  And as you walked towards the Wachsmuth
20 house, did you notice the vehicles that were outside
21 the residence?
22 A.  I don't know what vehicles were outside the
23 residence.
24 Q.  When you approached the door to the house
25 that night, how many people did you understand were in

CHAD MINER - October 6, 2010                                    Page 141
Direct Examination by Mr. Gosman

1  the house?
2  A. I believe there was discussion of up to three
3  people. I can't tell you exactly. I didn't know how
4  many people were in that house.
5  Q. Those three people would have been Bret and
6  Tricia Wachsmuth and the child that had been described,
7  the young child that had been described?
8  MS. WESTBY: Object to the form.
9  MR. THOMPSON: Join.
10  THE WITNESS: The conversation I had after
11  arriving back from getting the search warrant was that
12  they thought there was one person present at the home,
13  and they thought that two people had arrived and one
14  possibly had left. So I guess my assumption would have
15  been Bret and Tricia and possibly one more person is
16  what I anticipated possibly being in the house.
17  BY MR. GOSMAN:
18  Q. Okay. Was that discussed with any of the
19  entry team as you approached the house?
20  A. No.
21  Q. Was it discussed prior to leaving the station
22  who might be at the house?
23  A. Yes.
24  Q. And was it the same three people?
25  A. That was the conversation I recall and where

CHAD MINER - October 6, 2010                                    Page 142
Direct Examination by Mr. Gosman

1  it took place.
2  Q. When you drove by the house that afternoon
3  with the confidential information, did you notice the
4  vehicles that were there?
5  A. There were vehicles there.
6  Q. Were they the vehicles that were described in
7  the search warrant?
8  A. One of which was, yes.
9  Q. And one of which was not?
10  A. I did not see.
11  Q. All right. The house had an attached garage,
12  correct? Not -- it was a detached garage. I'm sorry.
13  It was a separate structure, I believe?
14  A. A detached garage, yes
15  Q. Was there any suspicion that a vehicle might
16  be in that garage?
17  A. Well, it's a garage.
18  Q. And not all garages are equal when it comes
19  to parking vehicles in them?
20  A. Well, there's a possibility that there could
21  be a vehicle in the garage, yes.
22  Q. You did not see one of the vehicles when you
23  drove by that afternoon with the confidential
24  informant?
25  A. Correct.

CHAD MINER - October 6, 2010                                    Page 143
Direct Examination by Mr. Gosman

1  Q. And about what time was that?
2  A. Midafternoon.
3  Q. Did you relay that information to Sergeant
4  Kent or to Sergeant Chretien prior to going to the
5  house?
6  A. I don't know.
7  Q. And you didn't notice whether or not that
8  vehicle was still gone when you arrived at the house
9  later in the evening.
10  A. I believe I told you there was a vehicle
11  there, but I can't -- there was a vehicle at the house.
12  I don't know what vehicle that was. I can't tell you
13  make, model, color, or anything.
14  Q. All right. And that was the vehicle -- so
15  there was a vehicle in front of the house at the time
16  that you assembled to execute the warrant?
17  A. I don't remember where the vehicle was.
18  There was a vehicle at the house.
19  Q. All right. Did you make any mental note of
20  whether the vehicle that was missing when you drove by
21  earlier was Bret Wachsmuth's vehicle?
22  A. I don't recall making that mental note.
23  Q. When you arrived at the house later that
24  evening to conduct the entry, was it the same vehicle
25  that you had seen earlier in front of the house?

CHAD MINER - October 6, 2010                                    Page 144
Direct Examination by Mr. Gosman

1  A. Again, I don't remember what vehicle.
2  Q. You don't remember what -- you don't remember
3  whether it was the same vehicle or another one?
4  A. Correct.
5  Q. In the planning stage of this, did you tell
6  me that you were not involved in the planning stage of
7  this at all?
8  A. Correct, just briefly.
9  Q. All right. And so during the time that you
10  were there, was there any discussion about any other
11  threats from the Wachsmuth residence, other than Bret?
12  A. Are you referring to people?
13  Q. Yes.
14  MS. WESTBY: Object to the form of the
15  question.
16  BY MR. GOSMAN:
17  Q. Yes, I am. I'm not referring to the fact
18  there were guns in the house.
19  A. Again, at that time I believe we thought
20  there was a possibility of three people being in the
21  house and possibly more because we don't know who's in
22  the house.
23  Q. All right. I think you said a minute ago
24  that you thought there were up to three people in the
25  house, correct?

CHAD MINER - October 6, 2010                                    Page 145
Direct Examination by Mr. Gosman

1   A.   Correct.
2   Q.   All right.  And one of those had been
3   identified as a young child?
4   A.   That was --
5        MS. WESTBY: Object to the form of the
6   evidence.  Misstates his testimony.  He said, "not
7   young child."
8        MR. GOSMAN: That could be right.
9   BY MR. GOSMAN:
10  Q.   One of them was a child?
11  A.   Possibly was a child.
12  Q.   Now, I don't want to spend any more time than
13  we have to on this, but did you not understand that it
14  was a -- did you understand that that child was, say,
15  younger, as opposed to high school age?
16  A.   I understood that it wasn't a baby, and it
17  wasn't a grown-up.  So somewhere in between.
18  Q.   Okay.  Was there any discussion about whether
19  the child -- no one was able to identify the child,
20  correct?
21  A.   Correct.
22  Q.   So there was no -- was there any reason to
23  believe that the child would have presented a threat to
24  the safety of the officers or anyone else there that
25  night?

CHAD MINER - October 6, 2010                                    Page 146
Direct Examination by Mr. Gosman

1   A.   Well, anyone can be a threat.  I guess your
2   question was reasonably?
3   Q.   Yes?
4   A.   No.  Sorry.
5   Q.   And was there any reason to believe that
6   Tricia Wachsmuth posed a threat to the safety of the
7   officers?
8   A.   Only in the possible defense of herself, her
9   husband, or her marijuana.
10  Q.   But there was no objective evidence that she
11  posed a threat to the officers?
12       MS. WESTBY: Object to the form of the
13  question.
14       MR. THOMPSON: Join.
15       MS. WESTBY: Use of the word objective.
16  Go ahead.
17       THE WITNESS: I'm trying to think of how I
18  want to state this so we don't have to revisit it
19  again.
20       There were no statements by the CI that
21  directly implicated Tricia in any form of violence.
22  Does that answer your question?
23  BY MR. GOSMAN:
24  Q.   Yes, it does.  And being paranoid is
25  different than being violent, isn't it?

CHAD MINER - October 6, 2010                                    Page 147
Direct Examination by Mr. Gosman

1   A.   Yes.
2   Q.   Peeking out the window is different than
3   being violent?
4   A.   Yes.
5   Q.   During the encounter with Ms. Wachsmuth in
6   the house in your presence, did you ever observe
7   anything about Ms. Wachsmuth that would lead you to
8   believe that she was posing a threat to the safety of
9   the officers?
10  A.   No.
11  Q.   And did she appear to be in the process of
12  trying to flee the residence at any time?
13  A.   No.
14  Q.   Did she appear to be compliant with the
15  officers?
16  A.   Yes.
17  Q.   After you were done that evening, did you --
18  was there a debriefing of the dynamic entry?
19  A.   No.  Let me restate that.  No, not with me
20  there wasn't.
21  Q.   Did you see the marijuana in the home that
22  evening?
23  A.   Which marijuana?
24  Q.   The marijuana plants.
25  A.   I did.

CHAD MINER - October 6, 2010                                    Page 148
Direct Examination by Mr. Gosman

1   Q.   How tall were they?
2   A.   Do you want me to estimate because I'm going
3   to have to unless I refer to my report.
4   Q.   I think, as a matter of fact, we better let
5   you refer to your report, if it helps?
6   A.   Which exhibit was that again, if you know?
7   Q.   Twenty.
8   A.   Twenty it is.  Looks like I didn't put how
9   tall they were in my report.
10  Q.   You did see them?
11  A.   Yes.
12  Q.   Would it have been easy to dispose of those
13  marijuana plants in the time it would take for someone
14  to knock on the door and answer?
15  A.   Depends on how long a time that was.
16  Q.   Let's pick a minute.
17  A.   A minute.
18       MR. THOMPSON: Objection as to form.
19       MS. WESTBY: Join.
20       THE WITNESS: It really depends on the
21  circumstances that the folks are in.
22  BY MR. GOSMAN:
23  Q.   How would they have disposed of those plants
24  in a minute so they couldn't have been recovered?
25       MR. THOMPSON: Objection as to form.

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 40 of 83
Tricia Wachsmuth v.                                                    Chad Miner
City of Powell, et al.                                              October 6, 2010

CHAD MINER - October 6, 2010                                    Page 149
Direct Examination by Mr. Gosman

1   MS. WESTBY: Join.
2   THE WITNESS: Would you like me to give you
3   some ideas?
4   BY MR. GOSMAN:
5   Q. Uh-huh.
6   A. They could chuck it out the window. They
7   could run it down the garbage disposal. Bury it in the
8   crawl space. Shit, I don't know. Put it in a suitcase
9   and hide it. Throw it on the roof. There's a lot of
10  creative ways.
11  Q. We're talking -- all right. Let's go back --
12  you did see the plants, correct?
13  A. Yes.
14  Q. And is it true that they were about 2 feet
15  tall?
16  A. That would be a fair estimation.
17  Q. Let me ask this question: Did the
18  confidential informant give you any information about
19  the size of the marijuana plants before you went into
20  the residence?
21  A. He did.
22  Q. And what was that information?
23  A. Again, I don't recall exactly how tall he
24  said he thought the plants were when he had last seen
25  them. Are you talking about when he last saw them?

CHAD MINER - October 6, 2010                                    Page 150
Direct Examination by Mr. Gosman

1   Q. Yes?
2   A. I don't recall.
3   Q. Let's go to Exhibit 14 because I'm pretty
4   sure it's there and we can find it fairly quickly.
5   A. Okay, I got it here.
6   Q. Good.
7   A. Very bottom of the first page of that
8   Exhibit 14.
9   Q. Yes.
10  A. You want me to read it to you?
11  Q. Well, let's be careful because I think that
12  was the first week of January 2009?
13  A. I think that was the only size reference that
14  he had given me.
15  Q. Seemed like there was another one in here.
16  Let's go ahead and take a minute and look for it.
17  MS. WESTBY: Did you find it?
18  THE WITNESS: I think I found what you're
19  talking about.
20  BY MR. GOSMAN:
21  Q. Go ahead. There it is.
22  A. Page 2.
23  Q. Page 2. It's Document No. 138.
24  A. Four paragraphs down.
25  Q. Yes.

CHAD MINER - October 6, 2010                                    Page 151
Direct Examination by Mr. Gosman

1   THE WITNESS: Tom, have you found it?
2   MR. THOMPSON: Uh-huh.
3   THE WITNESS: You want me to read that to
4   you?
5   BY MR. GOSMAN:
6   Q. Summarize it, read it, either one?
7   A. "CI had contacted acquaintance of his
8   approximately 1 week ago and was told Bret and Tricia
9   had marijuana plants and they were approximately
10  two feet tall."
11  Q. And that was the information that you had
12  before the entry was made?
13  A. That's part of it.
14  Q. Okay. What do you mean by "that's part of
15  it"? I mean, I'm talking about the size of the
16  marijuana plants?
17  A. In reference to that, yes.
18  Q. All right.
19  MR. THOMPSON: Did you need a break?
20  MS. WESTBY: How much longer?
21  MR. GOSMAN: Very well. I think we can push
22  through and be done in a very few minutes.
23  BY MR. GOSMAN:
24  Q. All right Let's go ahead and turn to
25  Exhibit 23 again. You were one of the officers that

CHAD MINER - October 6, 2010                                    Page 152
Direct Examination by Mr. Gosman

1   conducted the search that night, correct, after the
2   entry team had left the home?
3   A. Yes.
4   Q. And do you know if the entry team announced
5   that they had cleared the residence in any formal way
6   that night?
7   A. I believe as the rooms were cleared, we said
8   it. I know I said it when I cleared the room I
9   cleared.
10  Q. Do you know approximately how long after you
11  had entered the house until how much time elapsed from
12  your entering the house and your securing Tricia
13  Wachsmuth in the basement?
14  A. Less than five minutes.
15  Q. All right. Turning to Exhibit 23, you
16  indicated that -- well, strike that.
17  On Exhibit 23, we have a -- an inventory of
18  the items found in the house, correct?
19  A. Yes.
20  Q. Now, one of the things that was mentioned in
21  one of the reports -- and perhaps it was yours, I'm not
22  sure. I believe it was, Exhibit 20 -- was that someone
23  had seen a gun in the hallway.
24  A. Did you want me to go back to 20 and look for
25  that?

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 41 of 83
Tricia Wachsmuth v.
City of Powell, et al.
Chad Miner
October 6, 2010

CHAD MINER - October 6, 2010                          Page 153
Direct Examination by Mr. Gosman

1   Q.  Yes, I think we better do that.  As a matter
2   of fact, I see it.  It's on Page 8, and it's
3   Document 17.
4       MS. WESTBY:  What's the Bates stamp number?
5       MR. GOSMAN:  Seventeen.
6   BY MR. GOSMAN:
7   Q.  And it's the second paragraph, second
8   sentence.  Do you remember seeing that semiautomatic
9   pistol lying in the hallway?
10  A.  I do.
11  Q.  And did you pick it up or move it?
12  A.  I did not.
13  Q.  Let's go back up to Exhibit 23 and let me
14  know -- I don't think it's there, but let me know if
15  that gun lying in the hallway was identified in the
16  inventory taken that night, Chapman's report.
17  A.  No, sir, I don't see it.
18  Q.  Do you know how many guns were found at that
19  residence?  And that's kind of a -- I know you probably
20  don't know that, as we sit here tonight.
21  A.  You are correct.  I don t know.
22  Q.  This was a handgun that you saw in the
23  hallway, according to the report?
24  A.  Yes, sir.
25  Q.  And I noticed that there were two handguns

CHAD MINER - October 6, 2010                          Page 154
Direct Examination by Mr. Gosman

1   listed in the bedroom.  A .45 and a .357.  Oh, there's
2   three, a Ruger P85, correct?
3   A.  By this report I see three, yes.
4   Q.  And then there is another handgun listed as
5   being found in the living room.  That's at the bottom
6   of page -- it's at the top, actually, of Page 25.  That
7   was a Beretta .22 caliber.
8   A.  Yes, sir.
9   Q.  And that was on the top shelf of the
10  bookshelf, correct?
11  A.  According to this, yes.
12  Q.  Did you see that gun?
13  A.  I did not.
14  Q.  Did you see any of the other three handguns?
15  A.  I did.
16  Q.  Okay.  Which ones?
17  A.  I was involved in the search of the northeast
18  bedroom, so all of those.
19  Q.  So you saw all three of those handguns?
20  A.  Yes, sir.
21  Q.  Now, let's go ahead and go to Exhibit 32.
22  A.  Thirty-two is the unmarked?
23  Q.  It's at the end of the tabs.
24  A.  Thirty-two, got it.
25  Q.  Okay.  We're going to go through this

CHAD MINER - October 6, 2010                          Page 155
Direct Examination by Mr. Gosman

1   document.  I haven't done this before.  So I can't
2   really help you, but we're going to look for all the
3   handguns that are listed on this Powell Police
4   Department receipt.  And I see as Item No. 14, a .22
5   caliber Beretta?
6   A.  Agreed.
7   Q.  And then there's the .45-caliber Colt
8   handgun.
9   A.  Number 21.
10  Q.  And Number 22 is the .357 handgun.
11  A.  Agreed.
12  Q.  There's three.
13      MS. WESTBY:  Are we just doing handguns?
14      MR. GOSMAN:  Yes.
15      MS. WESTBY:  Thirty-seven.
16  BY MR. GOSMAN:
17  Q.  And 37 is the Ruger P85.
18      Now, do you see another handgun anywhere on
19  this document?  Go ahead and take a minute.
20  A.  No.
21  Q.  At some point, were the handguns given back
22  to Bret Wachsmuth?
23  A.  I believe they were released to Tom.  But I
24  didn't do it.
25  Q.  All right.  When that happens, is there

CHAD MINER - October 6, 2010                          Page 156
Direct Examination by Mr. Gosman

1   normally a receipt generated for the return of the
2   items?
3   A.  Yes.
4   Q.  All right.  Let's go ahead and stay on
5   Exhibit 32 since we're there now.  There is some
6   reference in this case to the existence of cocaine
7   residue in a small bag.  Do you remember seeing that
8   that night?
9   A.  I do.
10  Q.  And did you log it in?
11  A.  I'm sure it's logged in here somewhere.
12  Q.  Okay.
13  A.  Well, I didn't log it on this log.  This
14  isn't my log.
15  Q.  I understand that.  Officer McCaslin prepared
16  this log.  He's already told us that.  Well, let's go
17  ahead and go to 23.  And I want you to find that entry.
18  A.  Thirty-two or 23?
19  Q.  Yes, the Chapman inventory, which is 23.
20  A.  Okay.
21  Q.  I'm sorry. the question --
22  A.  Oh, there is a question?
23  Q.  Yes.  I'm sorry.
24      The question is:  In Exhibit 23, do you see
25  any reference to a baggie with what you thought may

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

---

CHAD MINER - October 6, 2010                          Page 157
Direct Examination by Mr. Gosman

1   have been cocaine residue?
2   A.  I see nothing that references a baggie with
3   cocaine residue.
4   Q.  Where did you find it?
5   A.  Under the bed in the northeast bedroom.
6   Q.  Do you remember thinking this looks like it
7   may be cocaine residue?
8   A.  Or meth, yes.
9   Q.  Who did you hand it to?
10  A.  I have no idea.
11  Q.  I don't see any reference in any of the
12  reports to the fact that Ms. Wachsmuth went downstairs
13  ahead of the officers.  Is there any reason why it
14  wasn't in your report?
15       MS. WESTBY: Object to the form of the
16  question.
17       MR. THOMPSON: Join.
18       THE WITNESS: It had no factual bearing on
19  the case that I was investigating.
20  BY MR. GOSMAN:
21  Q.  And why did it not have a factual basis?
22  A.  It wasn't part of the investigation of a
23  marijuana grow operation.
24  Q.  Actually, your report really doesn't contain
25  much more than just a bare bones account of what

---

CHAD MINER - October 6, 2010                          Page 158
Direct Examination by Mr. Gosman

1   happened in the residence that night, does it?
2       MR. THOMPSON: Objection as to form.
3       MS. WESTBY: Join.
4   BY MR. GOSMAN:
5   Q.  Is that true?
6   A.  My report indicates my impressions of that
7   evening.
8   Q.  Okay.  Did you go with Sergeant Chretien,
9   Eckerdt, and Danzer to meet with Bret?
10  A.  No.  Again, I've never talked to Bret.
11  Q.  Okay.  And do you know how the location of
12  Bret was identified?
13  A.  I do not.
14  Q.  Were you -- okay.  You were not involved in
15  the interview, then, of Bret at the police station?
16  A.  No.
17  Q.  Were you involved in the interview of Tricia
18  Wachsmuth at the police station?
19  A.  No.
20  Q.  Okay.  We're very close here.
21  A.  Oh, goody.
22  Q.  Did you notice any other damage to the home
23  than -- well, and you didn't notice any damage caused
24  by the fire, so did you notice any damage --
25  A.  Sorry.

---

CHAD MINER - October 6, 2010                          Page 159
Direct Examination by Mr. Gosman

1   Q.  All right.
2   A.  Go ahead.
3   Q.  So did you notice any damage to the home as
4   you went through the home?
5   A.  Yes.
6   Q.  What did you see?
7   A.  Front door was broken.
8   Q.  Okay.  What else?
9   A.  The window was broken in the bedroom.
10  Q.  Okay.
11  A.  And there was a hole in the bathroom door.
12  Q.  Did you have the opportunity to go back into
13  the northeast bedroom after you cleared it the first
14  time that night?
15  A.  Yeah, I searched it.
16  Q.  You searched it.  I knew that.  Were you in
17  there at any other time that night?
18  A.  I'm certain that I was.
19  Q.  And it's your testimony that you just don't
20  remember when it was that you took the pillow into the
21  bathroom?
22  A.  It was sometime at the beginning of this.
23  Q.  How long were you at that residence?
24  A.  I don't know.
25  Q.  Give me your best --

---

CHAD MINER - October 6, 2010                          Page 160
Direct Examination by Mr. Gosman

1   A.  I'm sure there should be a dispatch log that
2   would indicate that.
3   Q.  Let's go ahead and turn to that.  You would
4   have to say that.
5   A.  If you want an exact number, that's what
6   you're going to have to do.
7       (Exhibit 19 identified)
8   BY MR. GOSMAN:
9   Q.  Let's go to Exhibit 19.
10  A.  What are you doing for the next hour?
11      MS. WESTBY: Just whether he cleared the
12  residence?
13      MR. GOSMAN: Well, that's where we'll start.
14      THE WITNESS: That would indicate how long I
15  was there.
16      Man, this is long, huh?
17      MS. WESTBY: I know.  That's what I'm saying.
18      THE WITNESS: May I write this down?
19      MR. GOSMAN: Sure.
20      THE WITNESS: That can't be correct.
21      MS. WESTBY: I think that's the whole event.
22  So there may be lots for you.
23      THE WITNESS: That's exciting.  There we go
24  to Cody.
25

---

CHAD MINER - October 6, 2010                    Page 161
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.  Pardon?
3   A.  We're going to Cody. So hang on. I'm
4   getting close.
5   Q.  Did you go to Cody that day?
6   A.  Yeah.
7   Q.  Is that where you picked up the CI?
8   A.  No.
9   Q.  Did it have anything to do with this case?
10  A.  We already covered it.
11  Q.  Did we?  Why did you go to Cody?
12  A.  To see the judge.
13  Q.  Thank you.
14  A.  You're welcome.
15  Q.  Well, that would tell us what time the
16  warrant was issued, wouldn't it?
17  A.  That would be very roughly.
18  Q.  Give us the times you were in Cody?
19  A.  Which one you want me to do first?
20  Q.  Excellent question. Let's do that first.
21  When did you get back from Cody?
22  A.  2018 hours and 24 seconds.
23  Q.  2018. So about an hour before the warrant
24  was executed, yes?
25  A.  2116 looks like when we arrived at the

CHAD MINER - October 6, 2010                    Page 162
Direct Examination by Mr. Gosman

1   residence to serve the warrant
2   Q.  Okay.
3   A.  You want me to go ahead and answer the first
4   question?
5   Q.  Yes.
6   A.  Two hours and 42 minutes, roughly.
7   Q.  That was the total time you were there at the
8   residence?
9   A.  Roughly.
10  Q.  Did you douse the pillow with water when you
11  put it in the bathtub?
12  A.  I thought he was going to say gasoline.
13      No, I did not.
14  Q.  In that two hours you were there at the
15  residence you didn't notice the pillow smoking away in
16  the bathroom?
17  A.  I did not.
18  Q.  All right. Lets look at Exhibit 36 for just
19  a minute.
20      (Exhibit 36 identified)
21      MS. WESTBY: Do you mean the second
22  thirty-five?
23      MR. GOSMAN: Well, there was some confusion
24  about that exhibit. There it is. It's -- my printer
25  ran out of ink.

CHAD MINER - October 6, 2010                    Page 163
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.  Okay. Do you remember getting that e-mail
3   which is on page 585 of Exhibit 36?
4   A.  Yes.
5   Q.  Can you tell me, if you know, why it was Alan
6   Kent that sent you that e-mail?
7   A.  Because it looked like he talked to Tim.
8   Q.  And Tim is who?
9   A.  Tim Feathers.
10  Q.  I see. And did you know anything about this
11  discussion of why -- between Tim and Alan Kent about
12  why Bret was charged with a misdemeanor?
13  A.  I wasn't at that conversation.
14  Q.  Okay. Did Alan Kent relate to you what he
15  had visited with the chief about?
16  A.  Yeah, I guess. Yes.
17  Q.  Okay. What did he say?
18  A.  Just that he wanted the weights for the
19  plants.
20  Q.  Okay. Well, and in connection -- how does
21  that connect with the question why Bret -- why was Bret
22  charged with a misdemeanor?
23  A.  Are you asking me why Bret was charged with a
24  misdemeanor?
25  Q.  No. No. I'm asking you if Officer Kent told

CHAD MINER - October 6, 2010                    Page 164
Direct Examination by Mr. Gosman

1   you why the chief was asking that question.
2       MR. THOMPSON: Object.
3       MS. WESTBY: Object to form.
4       MR. THOMPSON: Yeah. Join.
5       THE WITNESS: You want me to try to interpret
6   why Alan Kent would ask Chief Feathers a question?
7   BY MR. GOSMAN:
8   Q.  No. I'm asking if Alan Kent relayed to you
9   why it was that the chief wanted to know why Bret was
10  charged with a misdemeanor?
11      MR. THOMPSON: Object as to form.
12      MS. WESTBY: Join.
13      THE WITNESS: Whoa.
14  BY MR. GOSMAN:
15  Q.  Did officer Kent relate to you why Chief
16  Feathers wanted to know why Bret was charged with a
17  misdemeanor?
18      MR. THOMPSON: Objection as to form.
19      THE WITNESS: I don't know.
20      MS. WESTBY: Join.
21  BY MR. GOSMAN:
22  Q.  All right. And your response to him was the
23  weight was unknown?
24  A.  I don't know what my response to him was.
25      MS. WESTBY: Object to form.

CHAD MINER - October 6, 2010                    Page 165
Direct Examination by Mr. Gosman

1      THE WITNESS: Do you have a response for me?
2      MS. WESTBY: Are you looking at a document?
3      MR. GOSMAN: I am. But this is Alan Kent's
4  e-mail to Chad. So that was a poor question.
5  BY MR. GOSMAN:
6      Q. Did you go back, then. to the marijuana and
7  kick the dirt off of it and get the weights so that
8  Davis could charge Bret Wachsmuth with a felony?
9      A. Sergeant Kent and I cleaned the roots of dirt
10 and weighed the plants so that Davis could make a
11 decision on what he was going to charge.
12     Q. And what was the weight?
13     A. I have no idea.
14     Q. Okay. Apparently, it wasn't enough to charge
15 for a felony, correct?
16     MR. THOMPSON: Objection as to form.
17     MS. WESTBY: Object.
18     THE WITNESS: Apparently, whoever ended up
19 prosecuting this case didn't feel like charging a
20 felony. That's what I would say.
21 BY MR. GOSMAN:
22     Q. It looks like Chief Tim Feathers wanted to
23 have Tim Wachsmuth [sic] charged with a felony if that
24 was possible. Is that the impression you got?
25     MR. THOMPSON: Object as to form.

CHAD MINER - October 6, 2010                    Page 166
Direct Examination by Mr. Gosman

1      MS. WESTBY: Object as to form.
2      THE WITNESS: I think you should ask Tim
3  Feathers.
4  BY MR. GOSMAN:
5      Q. All right. Let me ask this question: Do you
6  have an e-mail address of which you have used to
7  exchange information with the other officers relating
8  to the Wachsmuth case, other than this one e-mail that
9  we've seen?
10     A. Okay. Which question you want me to answer?
11 Yes, I have an e-mail account.
12     Q. I assume that, but I'm interested in an
13 e-mail account that you had communicated about this
14 case with?
15     A. Sure, our city e-mail. I don't know what --
16     Q. Do you have another e-mail --
17     A. No.
18     Q. -- address that you used to communicate about
19 this case?
20     A. No.
21     Q. And were there any other e-mail, than the one
22 we've seen, that you received in connection with this
23 case?
24     MR. THOMPSON: Other than those from your
25 attorneys.

CHAD MINER - October 6, 2010                    Page 167
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2      Q. Yes, correct.
3      A. There may have been. I don't know. I can't
4  tell you.
5      Q. Have you provided them to your attorneys?
6      A. I provided them with the things I knew I had.
7  So from the discovery request.
8      Q. Did you respond to the document that we've
9  identified as Number 585 of Exhibit 36?
10     A. I responded in some fashion. I don't know
11 whether that was an e-mail. I don't know if that was
12 talking to Alan.
13     MR. GOSMAN: All right. Thank you very much,
14 officer. You're free to go.
15     (Proceedings concluded at 7:40
16     p.m., October 6, 2010.)
17
18
19
20
21
22
23
24
25

CHAD MINER - October 6, 2010                    Page 168
Direct Examination by Mr. Gosman

1            DEPONENT'S CERTIFICATE
2      I, CHAD MINER, do hereby certify, under
3  penalty of perjury, that I have read the foregoing
4  transcript of my testimony consisting of 167 pages,
5  taken on October 6, 2010 and that the same is, with any
6  changes noted below, a full, true and correct record of
7  my deposition.
8  PAGE  LINE        CORRECTION        REASON FOR CORRECTION
9  ____  ____  _____  _____
10 ____  ____  _____  _____
11 ____  ____  _____  _____
12 ____  ____  _____  _____
13 ____  ____  _____  _____
14 ____  ____  _____  _____
15 ____  ____  _____  _____
16 ____  ____  _____  _____
17 ____  ____  _____  _____
18 ____  ____  _____  _____
19 ____  ____  _____  _____
20 ____  ____  _____  _____
21 ____  ____  _____  _____
22
23
24                     _____
                       CHAD MINER   Date
25

CHAD MINER - October 6, 2010                    Page 169
Direct Examination by Mr. Gosman

1                       CERTIFICATE

2          I, VONNI R. BRAY, Registered Professional

3   Reporter, and Notary Public for the State of Montana,

4   do hereby certify that CHAD MINER was by me first duly

5   sworn to testify to the truth, the whole truth, and

6   nothing but the truth;

7          That the foregoing transcript, consisting of

8   168 pages, is a true record of the testimony given by

9   said deponent, together with all other proceedings

10  herein contained.

11          IN WITNESS WHEREOF, I have hereunto set my

12  hand this 19th day of October, 2009.

13

14

15

16

17

18

19

20

21   _____
     Vonni R. Bray, RPR
22   P. O. Box 125
     Laurel, MT 59044
23   (406) 670-9533 Cell
     (888) 277-9372 Fax
24   vonni.bray@yahoo.com

25

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

19:2,6

**[**

**[sic] (2)**
128:25;165:23

**0**

**06 (2)**
20:22,23

**1**

**1 (1)**
151:8
**10 (6)**
117:14,16;122:12;
123:4;136:11,11
**10:00 (1)**
6:7
**100 (4)**
41:22;75:16,25;76:11
**11/9 (1)**
13:23
**13 (8)**
68:17,19;85:17;93:22;
94:8,12,20;95:19
**138 (1)**
150:23
**14 (9)**
85:14,18.20;86:6.11;
87:25;150:3,8;155:4
**15 (4)**
85:14,18;86:1,6
**16 (5)**
89:20,23;105:7;
107:18;109:5
**17 (5)**
52:6,8;68:12;96:21;
153:3
**1807 (1)**
36:10
**1818 (1)**
21:7
**19 (2)**
160:7,9
**1995 (1)**
8:22

**2**

**2 (4)**
69:15;149:14;150:22,
23
**2/24/09 (1)**
108:16
**20 (8)**
45:19,20;87:20,22;
88:16;108:1;152:22,24
**2003 (1)**
9:22
**2004 (6)**
12:5,15;13:6;14:13;

**2005 (5)**
12:5;14:15;19:7,11;
36:5
**2006 (1)**
10:16
**2007 (3)**
32:20;33:25;40:20
**2009 (21)**
13:23;14:14;15:12;
19:14;22:1:27 1;30:22,
25;31:12,25;34:1,15;
36:6,16;37:4,9;38:4;
42:4;45:11;71:22;
150:12
**2010 (5)**
49:23;82:16;95:16;
128:5;167:16
**2018 (2)**
161:22,23
**21 (1)**
155:9
**2116 (2)**
108:16;161:25
**22 (4)**
116:17;154:7;155:4,
10
**23 (11)**
81:12,16,24:151:25;
152:15,17;153:13;
156:17,18,19,24
**24 (3)**
26:25;33:24:161:22
**24th (8)**
19:14;36:6,16.37:3,9;
42:3;45:10;76:6
**25 (2)**
41:25;154:6
**26 (2)**
46:21,23
**27 (2)**
14:1,3
**28 (3)**
12:6,9;13:23

**3**

**3 (3)**
10:17,18;133:13
**3:44 (1)**
49:22
**30 (1)**
114:11
**30-hour (1)**
16:3
**31 (7)**
11:3,5,12;13:8:15:21;
38:3;40:15
**32 (5)**
83:7,10,15;154:21;
156:5
**35 (3)**
20:1,5,5

**357 (2)**
154:1;155:10
**36 (4)**
162:18,20;163:3;
167:9
**37 (1)**
155:17

**4**

**4 (2)**
13:7;74:6
**4/23/2004 (1)**
13:15
**4:00 (1)**
99:16
**4:02 (1)**
49:22
**4:47 (1)**
82:15
**40 (1)**
40:17
**40-hour (1)**
13:15
**41 (2)**
129:6;131:1
**41-A (1)**
128:21
**42 (2)**
128:25;162:6
**45 (2)**
58:12;154:1
**45-caliber (1)**
155:7

**5**

**5 (6)**
13:7;42:10;94:7,20;
95:3;130:12
**5:00 (2)**
91:21,23
**5:17 (1)**
82:15
**5:42 (1)**
95:15
**5:45 (1)**
95:15
**50 (3)**
13:22;41:22,25
**50-hour (1)**
14:15
**585 (2)**
163:3;167:9

**6**

**6 (6)**
20:14;49:23;82:16;
95:16;128:5;167:16
**6:00 (2)**
6:8,9
**6:30 (1)**

128:4
**6:43 (1)**
128:4
**6th (1)**
20:20

**7**

**7 (5)**
30:19,21;31:20;33:22;
34:17
**7:40 (1)**
167:15

**8**

**8 (2)**
108:1;153:2
**8/10/2007 (1)**
40:17
**8:00 (1)**
97:15

**9**

**9/3/2005 (1)**
13:22
**9:00 (1)**
97:15
**9:15 (1)**
93:3
**93 (1)**
52:18
**99 (1)**
52:18
**9th (1)**
82:7

**A**

**ability (4)**
6:15,18;53:24;56:20
**able (5)**
16:10;28:6;53:6;
55:25;57:9;79:12;80:5,
6;83:23;112:15;124:21;
139:17;145:19
**above (1)**
66:22
**abuse (1)**
76:5
**academy (2)**
9:24;119:20
**According (5)**
39:5;100:19;122:20;
153:23;154:11
**account (5)**
61:18;108:22;157:25;
166:11,13
**accurate (6)**
48:17;57:5;80:7;
108:22;122:18,24
**accused (3)**

7:12,14,15
**accusing (1)**
87:15
**achieve (1)**
61:22
**acquaintance (1)**
151:7
**Action (3)**
12:11,11;13:24
**actions (1)**
33:9
**active (6)**
11:24;12:18;14:22,23;
20:20;31:8
**actual (2)**
61:18;107:16
**Actually (18)**
6:8,25;11:17;13:12;
15:5;28:2;30:15;31:14;
32:18;40:8;66:12;69:14;
82:3;105:1;106:5;139:9;
154:6;157:24
**addition (3)**
40:20;55:24;77:17
**additional (7)**
15:13;19:3;40:23;
57:9;72:1;86:13;88:20
**address (3)**
127:20;166:6,18
**addressed (2)**
80:17;81:4
**admissible (2)**
33:18;35:7
**Advised (2)**
42:23;92:14
**aerosol (1)**
16:2
**affidavit (34)**
53:21,23,23;64:6;
68:11,16,22,25;69:4,15;
71:7,11;74:6,7;75:15;
76:4,15;85:22;86:1,12;
87:3,19,24;88:2,15,16.
17;91:1,17;92:22;93:22;
95:6.11,19
**affidavits (1)**
88:12
**affirmed (1)**
36:13
**afternoon (11)**
72:6;91:16;92:17;
98:2.12;99:1,17;100:14;
101:18;142:2,23
**afterwards (1)**
9:25
**again (24)**
10:16;13:23;34:20;
38:8;47:14.19;67:5;
69:18;79:15;95:4;
106:14;109:25;116:14;
119:14;122:22;132:21,
21;144:1,19;146:19;
148:6;149:23;151:25;

158:10
**against (13)**
  5:18;8:4,7:10:10;44:6,
  6;45:15;50:20;55:12;
  56:8,25;63:12;87:16
**age (6)**
  38:23,23,25;39:4,11;
  145:15
**agencies (8)**
  22:7,8,10;24:17;
  29:15,22,24;46:15
**agent (1)**
  65:15
**agents (1)**
  41:6
**ago (5)**
  14:10;25:1,3;144:23;
  151:8
**agree (6)**
  47:21;50:24;66:14;
  70:13;77:8;96:1
**Agreed (2)**
  155:6,11
**agreement (1)**
  57:21
**ahead (55)**
  10:22;14:3;20:4;25:6;
  26:12;29:9;32:17;37:19;
  39:17;46:23;47:18;
  48:24;50:11;51:10;52:8;
  59:17,17;60:21;62:9;
  64:14;81:14;85:16;
  86:11;87:22;94:22;
  95:13;96:20;105:7;
  108:5;109:8;113:22;
  118:14;122:7;128:23;
  129:2,9,16;130:5;
  131:10;132:15;133:2,7;
  139:5;146:16;150:16,
  21;151:24;154:21;
  155:19;156:4,17;
  157:13;159:2;160:3;
  162:3
**air (1)**
  121:17
**Alan (8)**
  25:9;163:5,11,14;
  164:6,8;165:3;167:12
**alert (1)**
  92:3;99:7
**alerted (1)**
  95:8
**allegation (2)**
  87:19;97:24
**alleviate (1)**
  39:21
**allow (1)**
  33:19
**allowed (3)**
  32:24;35:14;137:7
**almost (1)**
  73:19
**alone (2)**

136:7,13
**along (3)**
  108:4,12,14
**always (3)**
  88:22;89:1;119:23
**ammunition (1)**
  89:25
**and/or (5)**
  14:22;23:7,8;69:5;
  71:9
**animals (9)**
  74:11;80:11,25;82:4,
  20;83:1,18;84 1,3
**annex (1)**
  61:3
**announce (1)**
  105:24
**announced (5)**
  27:15;96:25;108:17;
  109:13;152:4
**answered (2)**
  88:9;113:8
**anticipated (1)**
  141:16
**anxiety (1)**
  89:10
**apologize (1)**
  68:20
**Apparently (8)**
  33:24;70:24:8 2:9;
  116:11;118:12;136:8;
  165:14,18
**appear (5)**
  44:20;56:1;68 7;
  147:11,14
**appears (4)**
  12:13;15:16:5 :10;
  94:12
**applicable (1)**
  31:22
**application (2)**
  8:6;120:4
**applied (1)**
  78:22
**applying (3)**
  92:9,14;97:18
**appreciate (2)**
  66:25;67:9
**approach (1)**
  109:10
**approached (3)**
  131:20;140:24 141:19
**approaching (3)**
  64:9;111:18;114:7
**appropriate (2)**
  60:24;103:14
**approximate (1)**
  39:11
**approximately (13)**
  9:13;41:18,24;91:25;
  92:16;93:2,4:108:16;
  130:10;133:10; 51:8,9;
  152:10

**approximation (3)**
  113:11,16,17
**area (12)**
  8:9;34:18;35:9;36:12;
  40:11;73:18,22,23;
  109:17,21;128:19;139:9
**areas (3)**
  19:3;73:13,14
**argue (1)**
  63:12
**argument (2)**
  63:13;77:9
**armor-piercing (1)**
  89:24
**around (1)**
  99:16
**arraigned (1)**
  44:22
**arraignment (2)**
  45:4,7
**arraignments (1)**
  44:25
**arrangement (1)**
  44:18
**arrest (2)**
  43:9;55:25
**arrested (3)**
  6:21;7:8;56:1
**arrival (1)**
  135:6
**arrive (1)**
  140:8
**arrived (15)**
  103:10;104:24;109:7,
  10;111:10;114:6;116:7,
  9;130:1;140:7,10;
  141:13;143:8,23;161:25
**arriving (1)**
  141:11
**aspect (1)**
  85:8
**assemble (2)**
  98:14;140:13
**assembled (7)**
  98:7;103:7;116:10;
  117:10;133:18;139:24;
  143:16
**assembling (1)**
  103:4
**assigned (6)**
  33:13;122:15,17,19;
  136:18;138:14
**assist (3)**
  27:8;28:4;124:11
**assistance (1)**
  92:4
**assisted (1)**
  28:7
**assisting (1)**
  30:18
**associated (3)**
  16:12;30:11;84:20
**assume (5)**

34:8;41:14;127:18;
  134:23;166:12
**assumed (1)**
  58:5
**assumption (1)**
  141:14
**attached (1)**
  142:11
**attempt (2)**
  33:1;49:11
**attendance (1)**
  18:21
**attended (2)**
  20:16,24
**attention (1)**
  105:8
**attorney (3)**
  17:6;44:17;57:14
**attorneys (3)**
  5:14;166:25;167:5
**attorney's (1)**
  99:2
**August (2)**
  38:4;39:6
**available (2)**
  45:6,17
**aware (14)**
  17:13;32:19;37:4,10;
  39:22;49:25;50:18;
  53:12;60:3;78:1,5;84:6;
  98:4;102 3
**away (7)**
  111:5,12,129:10;
  130:11;133:10;140:13;
  162:15

**B**

**baby (1)**
  145:16
**back (28)**
  6:9;13:8;28:10,21;
  40:15;60:21;75:10;
  80:12,13;97:10,16;
  98:10;109:5,15,18;
  111:16;116:5;121:19;
  131:18;158:19;141:11;
  149:11;152:24;153:13;
  155:21;159:12;161:21;
  165:6
**backyard (3)**
  109:16;112:13,16
**bad (1)**
  68:4
**bag (1)**
  156:7
**baggie (2)**
  156:25;157:2
**bare (1)**
  157:25
**bargain (1)**
  44:15
**bark (6)**

109:11;110:4;111:13,
  20;112:7,12
**barked (1)**
  111:23
**barking (2)**
  113:23;114:5
**barricade (1)**
  31:7
**base (1)**
  98:9
**based (15)**
  33:1;37:10;42:1;44:7;
  58:19;67:1,10,11,24;
  69:4,21,22;71:14;90:12;
  119:23
**basement (11)**
  129:24;134:20,25;
  135:3,5,6,9,12;136:2,11;
  152:13
**basic (1)**
  17:18
**Basically (2)**
  42:11;57:17
**basis (1)**
  157:21
**Bates (1)**
  153:4
**bathroom (5)**
  128:8,12;159:11,21;
  162:16
**bathtub (5)**
  125:19;126:2,20;
  127:1;162:11
**battering (4)**
  28:16,18,22,25
**Beaman (1)**
  47:19
**bearing (1)**
  157:18
**became (2)**
  9:11;57:25
**become (2)**
  30:11;58:3
**bed (4)**
  125:8,12;126:11;
  157:5
**bedding (1)**
  126:8
**bedroom (18)**
  108:21;109:20;
  124:17,21,22;125:2,14,
  17;128:8,14;129:5;
  130:2;133:21;154:1,18;
  157:5;159:9,13
**bedrooms (2)**
  133:25;134:2
**begin (1)**
  9:20
**beginning (3)**
  97:25;98:1;159:22
**behind (1)**
  139:25
**belief (1)**

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

98:9

**belonged (1)**
53:13

**benefit (1)**
83:23

**Beretta (2)**
154:7;155:5

**Besides (1)**
134:9

**Bessler (3)**
51:13;56:24;77:3

**best (2)**
120:25;159:25

**better (2)**
148:4;153:1

**beyond (2)**
8:25;20:5

**big (3)**
14:24;35:8;129:23

**biggest (1)**
68:3

**Billings (3)**
8:15,16;9:4

**bit (2)**
24:12;97:16

**Blackmore (3)**
59:18,22;60:15

**blank (1)**
128:24

**block (1)**
119:18

**Blue (1)**
52:19

**board (1)**
118:21

**bones (1)**
157:25

**bookshelf (1)**
154:10

**both (4)**
25:13;68:16;85:2;86:9

**bother (1)**
43:15

**Bottom (6)**
82:7;105:9,18;136:3;
150:7;154:5

**box (13)**
36:23;80:23,25;81:3,
19,20,21;82:3,19,25;
83:18,19;84:1

**breached (2)**
123:6,15

**break (8)**
6:4;16:25;17:5;82:11;
95:14;109:20;128:2;
151:19

**breaks (2)**
16:24;81:24

**Bret (63)**
49:6;51:2;53:13;
55:10;56:8,13;62:18,25;
84:10;85:3,22;86:14;
87:7,11,12,15,18;88:22,

25,25;89:2,13,17,24;
90:4,5,10,21;93:12,24;
95:8,23;99:13;100:12,
16,18;101:10,15,22;
102:7,10,13;104:1;
111:23;116:15,17;141:5,
15;143:21;144:11;
151:8;155:22; 58:9,10,
12,15;163:12,21,23;
164:9,16;165:8

**Bret's (1)**
89:9

**brief (2)**
59:2,3

**briefed (1)**
116:25

**briefing (1)**
117:4

**briefly (5)**
66:2;99:3,5;107:24;
144:8

**bring (4)**
66:18;94:18;104:11;
131:5

**bringing (1)**
66:4

**broad (1)**
14:19

**broken (3)**
109:18;159:7,9

**brought (4)**
28:10;44:7;67 14;
104:4

**Brown (1)**
85:11

**Bruce (1)**
108:3

**building (1)**
58:18

**bunch (1)**
140:2

**burn (1)**
126:17

**burned (1)**
127:7

**burning (3)**
126:20;127:2,9

**Bury (1)**
149:7

**business (1)**
70:16

**C**

**caliber (3)**
116:17;154:7;155:5

**call (16)**
5:5;25:11,17;26:2,6;
27:6,7;29:4,11;40:24;
47:13,19,20;48 8;49:7;
66:17

**called (4)**
28:4;37:5;91:3;95:23

**calling (1)**
43:5

**calls (4)**
29:14,24;102:2;121:9

**came (14)**
27:7;42:16;48:25;
51:20;87:10;90:7;103:6;
116:12;131:20;138:12,
14,17,19;139:1

**camera (3)**
137:18,24;138:1

**can (44)**
5:18;6:4:14:10,25;
16:21;20:11;26:6;27:5;
33:17;34:22;35:6,22;
37:1;39:17;43:14;46:24;
47:13,18,25;52:9;56:21;
58:4;63:11,20;67:9;
79:11;82:12;83:11;
85:19;86:8;94:21;
106:11,13,24;118:15;
120:8;127:20;128:3;
130:19;139:6;146:1;
150:4;151:21;163:5

**cancer (1)**
76:22

**caption (1)**
129:10

**car (4)**
96:19;97:9;137:13;
138:4

**care (1)**
25:13

**careful (2)**
6:2;150:11

**carried (1)**
116:17

**carry (1)**
119:8

**case (28)**
28:21,22;30:18;49:1,
1;56:21;61:7:63:8;
79:12;83:10;84:25;85:1,
6,9,10;87:23;94:6;
96:23;103:15;120:24;
156:6;157:19;161:9;
165:19;166:8,14,19,23

**cases (5)**
41:5,20;49:5;84:8,21

**easing (1)**
125:9

**Casually (1)**
137:3

**cause (5)**
56:23;65:15;85:22;
86:1;91:1

**caused (1)**
158:23

**center (1)**
127:2

**certain (10)**
34:18;37:7:75:6;87:8;
93:7;100:9;102:12;

122:10,22;159:18

**Certainly (5)**
52:14;79:11;80:9;
123:19;127:25

**certainty (2)**
122:11;139:3

**certificate (2)**
18:21;38:2

**certification (3)**
15:17;17:14,18

**certified (5)**
17:9,17,21,25;40:12

**CHAD (2)**
5:1;165:4

**chambers (1)**
101:5

**chance (2)**
74:21;82:18

**chances (1)**
121:19

**change (2)**
53:24;54:4

**Chapman (11)**
34:12;108:17;109:12;
110:9;112:24;113:1,4;
122:9,10;129:21;156:19

**Chapman's (3)**
82:24,25:153:16

**charge (7)**
13:2;41:23;44:5,7;
165:8,11,14

**charged (6)**
163:12,22,23;164:10,
16;165:23

**charges (3)**
24:16;50:20;55:11

**charging (1)**
165:19

**check (6)**
43:15;45:14;50:11;
74:16,25;101:18

**checked (1)**
109:21

**chemical (1)**
16:1

**Chevrolet (1)**
52:18

**chief (6)**
163:15;164:1,6,9,15;
165:22

**child (23)**
38:15,23,22;39:6,10,
11,23;60:5,7,9,13;87:8,
15;141:6,7;145:3,7,10,
11,14,19,19,23

**children (2)**
37:12;56:14

**Chretien (23)**
34:12;103:8;107:18;
117:6,20;118:16;119:1;
130:23;131:4,16,19;
132:17,22;133:2,11,15;
134:10,14,18;135:20;

139:23;143:4;158:8

**Chretien's (2)**
89:23;90:5

**chuck (1)**
149:6

**CI (17)**
84:2;87:2,6,11,14;
90:9;91:6,7;99:11;
100:16,17,19;116:15,18;
146:20;151:7;161:7

**circumstances (4)**
27:3;38:12;120:5;
148:21

**city (6)**
10:25;13:1,16;50:19;
58:6;166:15

**clarification (1)**
5:23;68:15

**clarify (4)**
23:23;85:4;101:14;
131:19

**class (3)**
15:8,10;18:1

**classroom (1)**
18:14

**cleaned (1)**
165:9

**clear (9)**
34:18;36:7;39:18;
79:13;89:22;104:20;
119:6;134:20;135:5

**cleared (10)**
80:21;121:25;128:9;
135:3;152:5,7,8,9;
159:13;160:11

**clearing (8)**
21:2;31:7;124:13;
125:14;129:4;130:2;
134:24;135:6

**close (4)**
25:4;130:21;158:20;
161:4

**clothes (1)**
137:4

**coat (1)**
137:7

**cocaine (4)**
156:6;157:1,3,7

**Cody (12)**
8:1;30:1;47:2;48:18,
20;49:20;160:24;161:3,
5,11,18,21

**collaborative (1)**
22:9

**college (2)**
9:2,10

**color (1)**
143:13

**Colt (1)**
155:7

**coming (3)**
55:22;91:4;131:21;
138:24

**command (3)**
131:5;132:5;133:3
**comment (2)**
110:22;113:2
**comments (4)**
103:18,21,24,25
**commercial (3)**
42:2,8,14
**committed (1)**
120:9
**communicate (1)**
166:18
**communicated (2)**
92:5;166:13
**communicating (1)**
133:15
**comparing (1)**
44:12
**complete (7)**
6:1;8:19;9:23;11:16,
18;94:5,12
**completed (5)**
10:2,6;19:11;88:2,4
**completely (3)**
29:13;104:2;131:8
**completing (1)**
129:4
**completion (1)**
37:20
**compliant (1)**
147:14
**complicated (1)**
23:21
**Complies (1)**
11:14
**compound (1)**
112:3
**computer (2)**
85:10;87:7
**concede (1)**
86:10
**concepts (1)**
18:18
**concerning (6)**
53:16;62:17;68:9,10;
86:14;100:12
**concerns (3)**
63:14;65:12;77:12
**concluded (5)**
59:9;64:4;90:19;
91:14;167:15
**conclusion (1)**
90:10
**conclusions (1)**
60:18
**conduct (3)**
53:3;63:17;143:24
**conducted (3)**
23:15;33:10;152:1
**conducting (1)**
59:23
**confidential (73)**
40:11;41:4,16;42:1,

17,18,21,25;44:6,8,16,
45:12,14,25;46:11,14,
19;47:5,11,24;48:1,4;
49:25;50:21;51:7;52:4,
22;53:1,15;54:23;55:9,
21;57:3,10,16;58:1,11,
14,20;59:1,3,.0,13;
60:25;62:17:6,.25;64:3;
67:11;74:1,8;75:16;
77:13,18;78:6;86:7;
88:21;89:1;90:13;91:3,
14;95:7,22;98:5,11,23;
99:8;100:6;1(1:4,7,16;
142:3,23;149 18
**confirm (1)**
100:21
**confusion (1)**
162:23
**conjunction (1)**
84:16
**connect (1)**
163:21
**connection (8)**
21:22;34:14;61:7;
64:9;83:17;13.4:23;
163:20;166:2.
**consensus (1)**
57:21
**consequence (1'**
43:13
**consider (1)**
73:22
**consideration (7)**
37:17;38:8,11 16,22;
39:1;93:15
**considerations (3)**
18:15;38:21;65:3
**considered (5)**
57:1,2,8;64:2.;73:14
**consistent (6)**
32:10;36:15,19,20;
37:21;39:13
**constituted (2)**
7:9,10
**constitutional (5)**
33:11;119:11;120:8
**Construction (1)**
9:18
**consult (1)**
101:21
**consulted (1)**
103:13
**contact (7)**
42:17,21;45:1 ;55:5;
61:11;98:20:1.8:24
**contacted (5)**
42:18;66:17;95:8;
97:17;151:7
**contacting (5)**
61:20,20;65:2.;66:7;
104:1
**contain (1)**
157:24

**contained (7)**
18:19;34:16;36:14;
87:3;90:25;93:21;
107:17
**containing (3)**
82:4,19,25
**contains (1)**
31:21
**content (2)**
86:5;97:20
**context (2)**
37:8;94:21
**continue (3)**
106:4,6;140:6
**continued (1)**
124:15
**control (5)**
34:4;120:14;122:1;
124:12;136:16
**controlled (2)**
69:5;71:9
**conversation (14)**
37:8;53:19;63:3;
97:21;102:14;104:13,15,
18;132:13,16;133:11;
141:10,25;163:13
**conversations (2)**
63:23;102:24
**convicted (1)**
50:1
**convictions (1)**
51:8
**cops (1)**
91:4
**correction (4)**
23:7;26:11;32:16;54:7
**correctly (1)**
16:2
**corroborate (1)**
84:2
**couch (8)**
114:20,22,23;115:25;
120:12;128:19;130:5;
131:20
**counsel (5)**
16:20;35:18;47:6;
77:5;127:13
**Countermeasures (3)**
11:25;12:10;19:2
**counts (1)**
25:13
**County (17)**
7:25;22:13;29:23,25;
30:2,2,7,12;44:17,22;
52:11;57:14,25;58:6;
85:23;86:2;99:2
**couple (1)**
55:7
**course (28)**
11:23,24;12:1,4,14;
13:6,6,16,16;14:10,12,13,
17,21;15:6,23,24;16:3,7,
11;17:18,19;19:12;24:16;

30:7;35:24;37:20;89:9;
98:12;113:13
**coursework (1)**
9:6
**court (6)**
7:23;44:20;45:6;
49:10,11;56:1
**cover (1)**
14:24
**covered (1)**
161:10
**covers (1)**
30:5
**crawl (1)**
149:8
**create (2)**
37:5;88:16
**creative (1)**
149:10
**credibility (2)**
57:19;77:13
**crime (5)**
6:21;7:2,8,12;51:1
**crimes (4)**
6:23,24;7:1;58:8
**criminal (6)**
48:25;49:3,5;84:23;
100:22;101:19
**crossed (2)**
54:14,16
**CTI (1)**
12:23
**curious (1)**
48:10
**currently (3)**
6:14;44:21;55:16
**curriculum (3)**
9:24;12:3,17
**custody (14)**
34:5;55:15,19;56:2,3,
5,12,13,21;77:17;78:14;
87:16;120:14;124:12
**cut (1)**
80:12
**cutoff (2)**
38:25;39:7

# D

**damage (4)**
158:22,23,24;159:3
**danger (4)**
73:11;104:12;125:22;
126:3
**dangers (1)**
62:25
**Danzer (1)**
158:9
**date (9)**
17:22;24:24,25;25:5;
30:25;31:1;45:5,6,7
**dated (1)**
13:22

**daughter (2)**
75:25;76:22
**Dave (2)**
59:2;63:4
**Davis (12)**
51:12;52:3;57:15;
59:1,11;61:2;67:12;
91:10;102:11,12;165:8,
10
**Davis' (3)**
61:2,6;73:25
**day (7)**
19:24;45:16;91:13;
98:18,21;118:23;161:5
**DCI (2)**
30:3,15
**DEA (1)**
30:3
**deal (3)**
13:25;55:11;58:8;
65:13
**dealing (1)**
73:2
**debriefing (1)**
147:18
**decision (9)**
38:13;63:17;66:22;
67:5,7;68:5;98:13;
116:21;165:11
**deem (1)**
84:15
**deeper (1)**
90:18
**defendant (2)**
32:25;33:19
**defense (1)**
146:8
**definitely (2)**
31:16;38:23
**definition (1)**
73:15
**definitive (1)**
26:6
**deliver (1)**
97:3
**delivery (2)**
50:15,25
**Department (33)**
9:11,19,21,25;10:4,7,
14,20:17:9;21:18;22:14,
18;30:1,2,12,13;31:17,
23;34:3,25;47:2;48:5,19,
21;49:20;50:20;54:24;
65:24;99:9;108:15;
117:21;118:4;155:4
**departmental (1)**
31:17
**departments (2)**
30:9,10
**depend (1)**
38:23
**Depending (1)**
124:4

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

**Depends (2)**
148:15,20
**deploy (5)**
15:13;18:15;38:13;
40:7;119:2
**deployed (13)**
15:10;16:9;31:9,12,
12,18;32:23;35:1;37:11;
108:20;109:22;123:18;
125:5
**deploying (5)**
18:16,17;38:9,17;
119:5
**deployment (7)**
15:25,23:13,14;24:3;
34:17,36:12;37:17
**deposed (1)**
32:22
**deposition (9)**
5:8,11;6:12,19;7:4;
35:8;47:15,25;48:7
**deputies (1)**
30:3
**deputy (2)**
25:9;57:14
**describe (4)**
23:5;52:9;89:17;
139:13
**described (6)**
80:12;90:6;100:17;
141:6,7;142:6
**describes (3)**
107:16,20,24
**description (1)**
89:16
**descriptions (1)**
90:8
**designators (1)**
130:8
**desire (1)**
78:9
**detached (2)**
142:12,14
**detail (3)**
107:21;118:15;139:11
**details (1)**
27:6
**determination (1)**
62:2
**determine (2)**
60:15;78:7
**detonated (2)**
15:5;31:14
**develop (1)**
41:5
**developed (1)**
84:7
**deviated (1)**
88:18
**device (30)**
15:5,11;17:22;18:5,
13,15,16,17:30:24;
31:23,24;32:3,8,15,23;

34:14;35:1;36 1,2,4,17;
38:14;39:2;40:7;108:21;
123:17;125:4,10,21;
126:10
**devices (22)**
15:2,14,17;16:1,7,8;
17:10,10;30:24;31:9,12,
18;32:20:33:24;34:1,4,
5;37:4,10,21; 8:9,17
**diagram (2)**
118:21;129:2
**diagrams (1)**
118:19
**diameter (1)**
34:19
**dictated (1)**
64:5
**Diesel (1)**
9:7
**difference (1)**
70:9
**different (4)**
22:7,8;146:25 147:2
**differentiate (1)**
37:6
**diminishing (1)**
112:8
**dinner (1)**
16:25
**diploma (1)**
8:23
**DIRECT (4)**
5:3,15;67:23;87:2
**directed (1)**
110:17
**directly (1)**
146:21
**dirt (2)**
165:7,9
**disagree (1)**
73:7
**disbursed (1)**
136:2
**discern (1)**
15:7
**discipline (2)**
10:9,10
**disclosed (1)**
47:12
**disclosure (1)**
47:23
**discoverable (1)**
35:7
**discovered (1)**
82:23
**discovery (8)**
7:4;35:7;48:25,49:3,5;
84:1;127:17;167:7
**discuss (6)**
15:24;48:13;64 19;
103:17;104:6,8
**discussed (12)**
18:19;38:8,11;( 1:9,

16;64:8,15;92:2;100:14;
116:11;141:18,21
**discussion (15)**
39:22;40:2,4;58:1;
61:5,19;62:25;64:2,7;
65:23;66:3;141:2;
144:10;145:18;163:11
**discussions (11)**
45:25;60:23;61:14,21;
63:19,24;67:12;72:5;
91:14;99:6;135:5
**dishonesty (3)**
7:3,13;50:2
**dispatch (1)**
160:1
**dispatched (2)**
25:20;26:5
**dispatcher (2)**
118:1,7
**dispatchers (1)**
118:5
**dispatchers' (1)**
117:25
**disposal (1)**
149:7
**dispose (1)**
148:12
**disposed (1)**
148:23
**dispute (8)**
55:15,19;56:2,4,6,12;
77:18;78:14
**distraction (9)**
16:1;31:9,18;32:20;
34:4,14;36:17;37:4;40:7
**distribution (1)**
50:22
**District (3)**
52:11;85:23;86:2
**diversionary (10)**
15:2,5,14,17;17:10;
18:13;30:23,24;32:23;
108:21
**divorce (1)**
7:23
**divorced (1)**
7:21
**divulge (1)**
56:18
**divulging (1)**
56:19
**document (24)**
14:4;36:10,20;46:24;
47:14;48:24,25;52:9;
83:9,11;86:16;87:24;
88:12,20;94:25,25;
105:14;122:20;150:23;
153:3;155:1,19;165:2;
167:8
**dog (19)**
109:11;110:4;111:3,3,
4,5,10,11,12,13,20,22;
112:7,12;113:19,23;

114:2,3,5
**domestic (8)**
25:11,14,16,21;26:1,3,
5;28:21
**done (18)**
9:8;22:2,15;24:8;
31:16;41:8,14;58:17;
68:16;75:2,4,5,6;81:15;
121:23;147:17;151:22;
155:1
**door (49)**
25:22,24;26:21;27:17;
28:12,15;104:11;105:10,
23,25;108:17,18,19;
109:12,13,17,18;111:11;
112:14,18,23,24;113:2,
3,4,5,9,9.114:15,21,24;
115:1,8,14,19;118:18;
121:16,20;122:8,23;
123:6,14;129:17,18,24;
140:24;148:14;159:7,11
**doors (1)**
109:17
**doorway (1)**
140:3
**douse (1)**
162:10
**down (27)**
13:15,21·32:22;33:17,
19;54:23.66:18;81:24;
101:14;108:6;109:6;
131:1,17,24;135:9,12,
17,21,23,25;136:15;
139:14,25;140:4;149:7;
150:24;160:18
**downstairs (6)**
116:11;118:22;
132:18,18;136:23;
157:12
**draw (1)**
130:5
**drawing (3)**
130:10;139:7,20
**drawn (1)**
60:18
**dressed (1)**
137:2
**drinking (3)**
26:14;27:4;28:5
**drove (4)**
53:17;142:2,23;
143:20
**drug (7)**
23:9,11;24:18;40:17;
41:14;58:8;74:4
**drugs (14)**
23:8;24:19;30:17;
73:10;75:9;76:10;80:10;
83:19,22,22;84:4,15;
85:6,9
**due (1)**
116:19
**duly (1)**

5:2
**during (9)**
15:5;31:19;58:14;
98:12;101:3,6;113:19;
144:9;147:5
**duties (1)**
119:4
**duty (2)**
27:8;28:3
**dynamic (26)**
13:11,25;18:25;19:15;
20:13;21:2,13,22;23:2,
15;24:8,18;26:8;29:16;
63:7,12,14,17,19;64:19,
22;67:16;104:21;105:5;
116:22;147:18

## E

**earlier (8)**
13:12;25:9:37:24;
93:4;98:2;118:23;
143:21,25
**easiest (1)**
24:12
**east (1)**
109:20
**easy (2)**
33:7;148:12
**Eckerdt (9)**
34:11;128:18,20;
130:2,7,11,13;134:10;
158:9
**edge (1)**
73:19
**education (1)**
8:19
**effect (5)**
23:15;37:5;132:20;
134:23;137:8
**effected (1)**
53:10
**effecting (1)**
92:4
**effects (2)**
18:16;39:2
**effort (1)**
100:21
**efforts (1)**
22:10
**either (8)**
27:2;84:21;101:8;
102:10,13;126:6;
132:17;151:6
**elapsed (2)**
114:10;152:11
**element (1)**
112:8
**elicit (1)**
72:7
**eliminate (2)**
125:22;126:3
**else (11)**

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

17:8;61:13;65:23;
66:19;93:16;116:3;
122:11;133:16;136:1;
145:24;159:8
**else's (2)**
30:17;102:3
**e-mail (11)**
163:2,6;165:4;166:6,
8,11,13,15,16,21;167:11
**embarrass (1)**
7:5
**emphasis (1)**
9:5
**employed (2)**
9:11,15
**employment (1)**
10:24
**encompasses (1)**
14:18
**encounter (1)**
147:5
**encountered (1)**
138:21
**end (5)**
12:22;20:5;91:6;
116:19;154:23
**ended (2)**
131:23;165:18
**enforcement (5)**
9:24;67:25;72:18;
73:2;119:19
**enough (3)**
46:5,9;165:14
**ensure (1)**
106:2
**enter (3)**
106:9;123:1;124:13
**entered (4)**
108:6,11;120:13;
152:11
**entering (2)**
120:11;152:12
**entire (7)**
10:25;21:1;58:14;
95:10;105:20;133:18;
140:8
**entries (4)**
22:18;23:2,5;24:8
**entry (52)**
10:23;13:11,25;18:25;
19:15;20:13,21:2,13,22;
23:15;24:19;25:13,22;
26:8;27:9,11;28:6;
29:16;63:7,12,14,17,19;
64:20,22;67:16;83:18;
104:21;105:5;106:1,1;
107:16,16;112:11;
116:22;122:15,17;123:1,
5,11;133:18;134:19;
140:10,11,13;141:19;
143:24;147:18;151:12;
152:2,4;156:17
**envelope (3)**

**equal (2)**
71:16;142:18
**equals (1)**
129:14
**equipment (1)**
34:9
**essentially (1)**
64:17
**essentials (1)**
136:25
**established (1)**
70:5
**estimate (3)**
55:3;111:14;148:2
**estimation (2)**
58:11;149:16
**evaluating (1)**
57:18
**even (6)**
27:24;35:6;48:3,13;
64:22;138:2
**evening (14)**
42:3;45:10;84 3,8;
92:1;93:1,3;97:7;
104:20;143:9,21;147:17,
22;158:7
**event (7)**
70:7;73:21;75 22;
76:6;82:23;98:3;160:21
**events (3)**
26:25;88:14;107:24
**everybody (4)**
15:10;130:8;131:9;
139:4
**everyone (4)**
96:7;106:3;111:22;
136:1
**evidence (10)**
35:7;39:15;47:15;
83:5,10;84:6,7 90:4;
145:6;146:10
**exact (11)**
9:16;12:17;16:3;55:2;
104:18;111:15 113:12,
13;132:19,20;160:5
**exactly (13)**
18:9;24:16;44:19;
53:19;70:4;110:13,15;
120:23;121:6;128:10;
134:3;141:3;149:23
**EXAMINATION (1)**
5:3
**examine (1)**
94:22
**excellent (2)**
52:24;161:20
**exception (3)**
80:8,10;107:1
**excessive (1)**
119:11
**exchange (1)**
166:7

**exciting (1)**
160:23
**excludes (1)**
47:23
**execute (5)**
30:14;62:20;65:4;
98:8;143:16
**executed (4)**
39:13;93:2;108:15;
161:24
**executing (2)**
21:22;92:11
**execution (10)**
28:8;39:20;40:9;
59:19;61:22;79:22;80:1,
3;86:22;96:11
**Exhibit (85)**
11:3,5,10,12;12:6,8,
10;13:8;14:1,3;15:21;
20:1,5;30:19,21;31:20,
21;32:18;33:22;34:17;
38:3;40:15;46:21,23;
47:25;52:6.8;68:12,17,
19,20;81:12,16,24;83:7,
10,13;85:14,18;86:11;
87:20,22,25;88:16;
89:20,23;93:22;94:3,7,
8,12,20;95:19;96:20;
105:7;107:18;108:1;
109:5;117:14,16;
122:12;123:4;128:21,
25;131:1;139:6;148:6;
150:3,8;151:25;152:15,
17,22;153:13;154:21;
156:5,24;160:7,9;
162:18,20,24;163:3;
167:9
**exhibits (3)**
85:16,18;86:6
**existed (1)**
101:15
**existence (1)**
156:6
**expanded (1)**
59:3
**experience (13)**
33:2;41:4;58:8;67:24;
69:5,21,22;70:6;71:14,
19,24,25;72:4
**expert (2)**
32:25;35:14
**expertise (1)**
68:24
**explain (9)**
10:22;15:22;18:8;
21:15;24:11,23;25:6;
34:22;127:3
**Express (2)**
9:12,15
**expressing (1)**
63:9
**extensively (1)**
68:8

**extent (3)**
33:9,10.40:6
**extra (1)**
72:6

**F**

**fact (27)**
14:6;26:2;50:4,19;
55:10;66:4;68:24;70:24;
72:10,25;78:16,17;84:9;
88:25;89 14;90:20;91:2;
95:23;97 17;98:5;99:13;
116:16;122:9;144:17;
148:4;153:2;157:12
**factual (2)**
157:18,21
**fair (5)**
68:4;86:4;111:24;
123:3;149:16
**fairly (1)**
150:4
**familiarizing (1)**
18:14
**family (2)**
56:25;68:6
**far (11)**
17:8;42:14;83:2,5;
90:11,17;111:5,12;
117:9;130:11;133:10
**farmer (1)**
9:14
**fashion (1)**
167:10
**Feathers (5)**
163:9;164:6,16;
165:22;166:3
**February (16)**
15:12;19:14;21:25;
26:25;30:22;34:1,15;
36:6,16;37:4,9;42:3;
45:11;71:21,22;76:7
**feel (4)**
63:16;77:3;108:25;
165:19
**feelings (1)**
102:4
**feet (4)**
130:12;133:13;
149:14;151:10
**felony (11)**
6:23;7:2,10;23:9;
24:15:50:16;51:8;165:8,
15,20,23
**felt (4)**
28:6;63:7;74:20;
104:12
**few (3)**
112:25;126:25;151:22
**Fifth (5)**
7:25;13:15;52:11;
85:23;86:2
**fight (1)**

87:17
**figure (1)**
48:15
**file (2)**
10:11;45:17
**filed (5)**
8:7;49:1,2;87:23,24
**Financial (2)**
54:13,13
**find (10)**
69:11;80:23;81:19,20;
83:11;94:11;150:4,17;
156:17;157:4
**finding (2)**
69:16;75:19
**findings (1)**
92:5
**fine (10)**
50:9;51:4;55:4;60:8;
106:6,18;128:3;129:7;
130:9;140:7
**finish (1)**
35:22
**finished (2)**
9:10;10:3
**fire (8)**
125:1,23,24;126:3,4;
127:11,12;158:24
**firearm (3)**
72:16,17,25
**firearms (8)**
69:6;70:1,15,15;71:2,
9,17;72:14
**first (31)**
5:2;11:9;27:5;31:20,
22;42:12;45:6;85:19;
91:4;94:4;98:23;103:1;
111:7,10,11;115:1,4,23;
117:17;121:24;125:18;
131:5;132:23;134:22;
138:23;150:7,12;
159:13;161:19,20;162:3
**Fish (1)**
30:1
**fit (1)**
116:13
**Five (5)**
17:4;25:1;113:17;
124:9;152:14
**flashbang (7)**
123:17;125:4,9,21;
126:10,17;127:7
**flee (1)**
147:12
**folks (1)**
148:21
**followed (1)**
135:23
**following (1)**
37:20
**follows (1)**
5:2
**follow-up (2)**

53:3;119:4
**force (5)**
18:5;106:1;119:11,22;
120:4
**forced (4)**
25:12;26:15,21;
109:14
**forces (1)**
68:5
**Ford (1)**
52:19
**forgetting (1)**
25:8
**Forgive (2)**
15:7;25:8
**form (87)**
17:11,23;23:17;29:5.
18:32:1;37:13;38:18;
39:14;41:10;42:5;43:16;
44:1,10;46:1;51:14:
54:1;58:23;62:6,21;
64:11;66:9;20;67:3,17;
70:18;71:4;72:20;73:4;
77:23;78:10,19;79:20;
81:10;84:12;86:17;89:5;
90:14;96:2,8;100:1,24;
101:11,24;103:20;
105:13;106:21,25;
107:11;110:19;112:1;
113:21;115:11,16;
119:17,25;120:15;121:2,
8;122:2;123:8,24;
126:12;127:4;131:7;
132:7;133:5;135:1,13;
136:9;137:20;141:8;
144:14;145:5;146:12,
21;148:18,25;157:15;
158:2;164:3,11,18,25;
165:16,25;166:1
**formal (1)**
152:5
**format (1)**
5:10
**forth (1)**
27:10
**forward (3)**
56:20;84:21;86:4
**forwarded (1)**
74:9
**found (12)**
11:17,19;80:11,24;
81:24;82:9;108:7;
150:18;151:1;152:18;
153:18;154:5
**Four (1)**
150:24
**frame (3)**
27:22;37:19;55:2
**frankly (2)**
48:23;56:11
**free (1)**
167:14
**freeze (1)**

11:1
**Fremont (2)**
30:2.12
**fresh (1)**
93:11
**freshest (1)**
29:1
**front (24)**
94:6;105:23;108:17,
19;109:11,12;110:4;
111:4,11;112 18,22;
114:21,23;129 17,18,19,
20,22;130:17.137:23;
138:23;143:15 25;159:7
**function (1)**
33:14
**Funke (1)**
23:3
**further (5)**
32:22;39:19;53:4;
101:14;139:18

**G**

**gain (1)**
25:21
**Game (1)**
30:1
**garage (6)**
142:11,12,14, 6,17,21
**garages (1)**
142:18
**garbage (1)**
149:7
**gasoline (1)**
162:12
**gave (5)**
30:25;50:12;7 *:13;
84:2;99:20
**general (2)**
14:17;35:2
**generally (6)**
12:24;13:2;14 11;
23:5;68:10;121:23
**generated (1)**
156:1
**gestures (1)**
137:23
**given (8)**
5:8;45:5;58:21 60:25;
68:20;90:9;156:14;
155:21
**GK (1)**
9:18
**gloves (3)**
74:10;75:17;76:22
**God (1)**
82:5
**goes (1)**
47:16
**good (7)**
20:8;57:4;65:16;
82:14;114:8;130:9;

150:6
**goody (1)**
158:21
**GOSMAN (187)**
5:4;7:4,7;11:4;12:7;
14:2;16:23;17:15;18:2;
19:8,18,20;20:2,3;21:8,
11;23:19;24:1:29:12,21;
30:20;32:5;33:7,20;
34:24;35:4,12,17,21,24;
36:3,8;37:18:38:1,24;
40:1;41:13;43:21;44:4,
14;46:7,22;47:8,13,18;
48:2,12,20,23;49:4,18,
24;51:18,25;52:2,7;
54:5;59:5;62:11;63:5;
64:18;66:13,24;67:8,22;
68:18;70:23;71:12;72:9,
12,24;73:8;75:13,14;
76:25;77:2,7,11;78:3,15,
24;79:4,11,16,24;81:13;
82:8,17;83:8,14,16;
84:18;85:15;86:20;87:4,
21;88:10;89:11,21;
90:16;94:11,16;95:13,
17;96:5,12;100:5;101:2,
17;102:5;103:22,25;
104:5;105:17;106:11,16,
23;107:3,14;110:21;
111:2;112:3,5;114:1;
115:13,21;116:20;
117:15;119:21;120:6,
19;121:5,14;122:6;
123:13;124:3;126:15;
127:8,15,18,20,24;
128:3,6,22;131:9,12;
132:11;133:9;134:1;
135:8,18;136:12;
137:22;139:21;141:17;
144:16;145:8,9;146:23;
148:22;149:4;150:20;
151:5,21,23;153:5,6;
155:14,16;157:20;
158:4;160:8,13,19;
161:1;162:23;163:1;
164:7,14,21;165:3,5,21;
166:4;167:1,13
**governmental (1)**
119:23
**grab (1)**
125:18
**graduate (1)**
8:23
**graduated (1)**
9:9
**granted (3)**
61:23;93:5;98:8
**great (1)**
58:8
**Green (1)**
13:14
**ground (1)**
130:17

**group (2)**
85:19;140:8
**grow (26)**
8:9,12;41:8;42:12,14,
24;62:3,5;68:9,10;69:1,
5,25;70:7,10,11,14,25;
71:8,15;72:1;78:22;
97:22;98:6;99:21;
157:23
**growing (1)**
62:13
**grown-up (1)**
145:17
**grows (2)**
58:9;71:24
**guess (14)**
11:21;24:17;33:3;
64:25;74 7;75:7;88:5,9;
92:7;120:25;135:5;
141:14;146:1;163:16
**guessing (1)**
93:7
**gun (4)**
82:6;152:23;153:15;
154:12
**gunman (3)**
14:22,23;31:7
**guns (8)**
23:7,8;73:10;100:7,
20;116:16;144:18;
153:18

**H**

**hall (1)**
129:3
**hallway (8)**
128:15,17;134:4,5;
152:23;153:9,15,23
**hand (2)**
107:20;157:9
**handbook (3)**
12:12,19,20
**handcuff (1)**
136:21
**handgun (5)**
153:22;154:4;155:8,
10,18
**handguns (6)**
153:25;154:14,19;
155:3,13,21
**handle (1)**
66:5
**handled (2)**
16:8.8
**hands (1)**
42:3
**handwriting (2)**
117:17.20
**hang (1)**
161:3
**happen (2)**
30:7;42:19

**happened (18)**
15:23;42:20;67:2;
80:4;108:23,24;109:16;
110:2;112:22;113:5,7;
115:7,10;116:8;117:5;
134:15;135:19;158:1
**happens (1)**
155:25
**hard (3)**
33:3;83:21;111:9
**hardly (1)**
73:21
**hate (2)**
133:1;139:8
**head (2)**
14:25;66:23
**heading (1)**
12:18
**hear (18)**
60:8;62:16.72:8;
90:23;106:14,14,15;
110:4,12,15;113:2;
119:13;123:17;131:4,13,
14;132:5,19
**heard (10)**
42:1;58:19:60:4,6;
67:11;110:13;111:13,
20;112:7;113:23
**help (7)**
30:14;39:21;56:5;
66:8;92:10;139:17;
155:2
**helped (1)**
24:17
**helps (1)**
148:5
**herself (1)**
146:8
**hide (1)**
149:9
**high (4)**
8:16,19,25;145:15
**high-crime (2)**
73:14,22
**high-risk (1)**
20:14
**himself (2)**
43:1;87:11
**hindering (1)**
56:20
**hindsight (2)**
51:3.5
**history (6)**
9:8;51:12;100:22;
101:10,23;102:8
**hole (1)**
159:11
**home (21)**
25:16,19;26:3,16;
27:9,12,15;38:22;39:23;
59:15;60:13;63:1;73:18;
77:19;120:12;141:12;
147:21;152:2;158:22;

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

159:3,4

**honestly (1)**
35:6

**honorable (1)**
108:3

**hostage (1)**
31:7

**hour (3)**
93:6;160:10;161:23

**hours (9)**
13:22,23;40:17;55:7;
108:16;126:25;161:22;
162:6,14

**house (9)**
25:22;59:14,22;72:17;
80:20;84:9;100:8,20;
109:10;110:18,23;
111:10;116:16;118:20,
21,23;119:6;123:1,5,12;
124:13,15;129:2,10;
133:16,22,24;136:24;
137:1;138:18,20,22,23;
139:8;140:14,16,20,24;
141:1,4,16,19,22;142:2,
11;143:5,8,11,15,18,23,
25;144:18,21,22,25;
147:6;152:11,12,18

**huh (3)**
93:14;136:13;160:16

**hurry (1)**
69:9

**hurrying (1)**
112:20

**husband (1)**
146:9

# I

**idea (11)**
12:16;14:17;24:25;
27:21;65:24;66:14;
99:18;102:18;131:16;
157:10;165:13

**ideas (1)**
149:3

**identical (1)**
86:8

**identified (24)**
11:3;12:6;14:1;20:1;
30:19;40:6;43:1;46:21;
52:6;68:17;81:12;83:7;
85:14;87:20;89:13,20;
117:14;128:21;145:3;
153:15;158:12;160:7;
162:20;167:9

**identifies (1)**
121:25

**identify (12)**
20:8;40:16;46:24;
51:18;52:12;53:4;59:15;
85:18,20;129:16;
130:19;145:19

**identity (3)**

47:11,24;48:4

**ill (1)**
43:13

**illnesses (1)**
6:18

**images (1)**
87:8

**imagination (1)**
76:20

**imagine (1)**
56:15

**Immediate (4)**
12:11,11;13:24;36:12

**immediately (5)**
99:9;105:25;107:2,7;
109:21

**impact (2)**
15:25;56:16

**impair (1)**
6:15

**impending (1)**
93:25

**implicated (1)**
146:21

**important (4)**
95:25;96:4,6,10

**impossihle (1)**
22:22

**impression (3)**
61:25;74:3;165:24

**impressions (1)**
158:6

**incident (2)**
35:20;36:2

**inclined (1)**
70:15

**include (3)**
34:14,15;52:16

**included (1)**
59:1

**includes (1)**
52:18

**inconsistent (1)**
110:2

**Incorporated (1'**
12:1

**increase (4)**
10:19;11:1;73:1,9

**increases (1)**
73:11

**incredible (1)**
75:19

**indicate (6)**
63:6;69:4;79:5 129:8;
160:2,14

**indicated (4)**
90:20;98:22;129:14;
152:16

**indicates (3)**
52:19;89:23;158:6

**indication (1)**
72:17

**individual (1)**

46:18

**individuals (2)**
57:18;139:14

**informant (71)**
42:2,17,18,21;43:1;
44:6,8,16;45:12,15,25;
46:12,15,19;47:5,11,24;
48:1,4;50:1,21;51:7,19;
52:4,22;53:1,16;54:23;
55:9,21;57:3,11,16;58:2,
11,15,20;59:1,3,10,13;
60:25;62:17;63:25;64:3;
67:11;74:1,9;75:16;
77:13,18;78:6;86:8;
88:22;89:2;90:13;91:3,
15;95:7,23;98:6,12,23;
99:9;100:7;101:4,7,16;
142:3,24;149:18

**informants (3)**
40:11;41:4,16

**information (70)**
33:5;34:16;41:5;
42:23;43:11;44:8;48:16,
17;50:12;51:19;52:3,21,
23,25;53:16;56:17,19,
23,25;57:5,10,22;58:21;
60:11,24;62:16;67:6,10;
68:8;69:19,19,21,21;
77:14;79:6:86:7,12,13;
87:3,6,10;89:2,9;90:7,
12;92:7,9;93:11,21,23,
24;95:7,22,25;98:16;
99:20,24;100:10,12,15;
102:25;103:6;111:25;
116:14;118:15;143:3;
149:18,22;151:11;166:7

**informed (4)**
74:9;88:21;93:25;
99:10

**in-house (1)**
19:24

**initial (4)**
27:7;58:25;122:24,25

**initially (4)**
54:25;58:5;59:4;
109:17

**injured (1)**
26:4

**ink (1)**
162:25

**in-service (4)**
20:9,13;30:23;40:19

**inside (8)**
74:10;80:11;109:22;
110:23;114:15;115:14,
19;138:22

**instance (2)**
28:18;102:7

**Institute (2)**
12:11;19:2

**instruction (1)**
18:1

**instructor (2)**

17:18,21

**intelligence (1)**
39:10

**intend (1)**
48:13

**interdiction (1)**
14:23

**interested (2)**
139:9;166:12

**interests (2)**
70:16;119:24

**interfere (1)**
6:18

**interference (1)**
78:14

**interior (1)**
129:10

**interpret (1)**
164:5

**interview (8)**
59:3,9;61:1;64:3;91:6,
11;158:15,17

**interviewed (2)**
45:16;57 16

**intimidate (5)**
69:7;70:2;71:3,10,18

**into (28)**
25:11;26:6,15;27:9,
11;32:25:35:14;47:15;
67:14;83:4;104:21;
105:11;107:16;109:8;
116:13;121:25;123:5,
11;124:15;127:2;128:8,
16;134:17;136:2;
139:24;149:19;159:12,
20

**introduce (1)**
47:25

**inventory (6)**
81:15;82:24,25;
152:17;153:16;156:19

**investigated (1)**
51:1

**investigating (1)**
157:19

**investigation (2)**
40:17;157:22

**investigations (1)**
41:15

**Investigator (1)**
85:11

**invited (1)**
30:14

**involve (4)**
10:10;22:12;29:15;
56:13

**involved (37)**
18:11;21:15;23:13;
24:6;25:7.27:6;28:25;
29:22,24;30:23;41:20,
21;49:12;50:1,20;55:16,
19,21;58:1,3;63:18;
64:16;67:21;68:2;74:4;

80:20;85:12;96:7,11;
99:22;106:3;122:14;
134:24;144:6;154:17;
158:14,17

**involvement (1)**
116:19

**involves (1)**
17:18

**involving (7)**
7:13;22:10;26:8;
29:14;49:6;62:1;135:17

**issue (2)**
89:22;132:5

**issued (7)**
38:3;44:23;92:20;
96:14,22;133:3;161:16

**issues (2)**
14:24;100:16

**Item (1)**
155:4

**items (5)**
52:15,16;81:24;
152:18;156:2

# J

**jail (2)**
43:10;44:22

**January (1)**
150:12

**Join (63)**
17:12,24;29:7,20;
32:2;37:15;38:19;39:16;
41:11;42:6;43:18;44:2,
11;46:3;54:3;58:24;
62:8,23;64:13;66:21;
67:4;70:20;71:6;72:22;
73:6;77:25;78:12,20;
79:21;84:13;86:19,25;
89:7;96:3,9;100:3,25;
101:13;102:1;105:15;
107:12;110:20,25;
115:18;120:2,17;122:4:
123:10;127:5;132:9;
133:8;135:2,15;137:21;
141:9;146:14;148:19;
149:1;157:17;158:3;
164:4,12,20

**joined (1)**
63:16

**Jonathan (11)**
51:12;57:14;59:1;
61:2,2,6;67:12;73:25;
91:10;102:11,12

**Josh (1)**
51:12

**judge (7)**
54:7,14;61:23;91:20,
23;92:21;161:12

**judge's (1)**
101:5

**Judicial (4)**
7:25;52:11;85:23;86:2

Case 1:10-cv-00041-ABJ   Document 65-7   Filed 01/10/11   Page 54 of 83
Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

**jump (3)**
37:19;59:17;81:14
**June (1)**
20:14

**K**

**keep (3)**
12:20;63:21;139:20
**Kent (31)**
25:9;34:11;63:24;
64:1;66:1;92:5,13;
97:17;98:17;99:10,17,
20;100:13;102:15,25;
103:17;104:6,9,14;
108:20;109:19;138:21;
143:4;163:6,11,14,25;
164:6,8,15;165:9
**Kent's (1)**
165:3
**kept (1)**
97:5
**key (1)**
39:2
**kick (1)**
165:7
**kicked (2)**
77:18;78:16
**kid (1)**
61:20
**kind (5)**
10:10;11:2;21:2;
23:20;153:19
**kinds (2)**
31:6;65:3
**Kirk (1)**
34:12
**kitchen (9)**
82:3;130:22;133:19;
134:8,11,12,17;139:9;
140:3
**knew (13)**
42:25;43:19;45:18;
50:7,23;51:12;67:1,25;
93:11,12;121:12;
159:16;167:6
**knock (5)**
28:12;105:10,23;
113:5;148:14
**knocked (7)**
27:15;108:17;109:12;
112:24;113:1,4;115:8
**knocking (1)**
113:3
**knowledge (10)**
11:1;39:13;58:7;
69:22;84:14;86:21,22;
87:2;101:9,15
**known (1)**
97:3

**L**

**laid (1)**
9:13
**landed (3)**
125:22;126:10;127:7
**language (3)**
36:11;105:10 109:1
**Lara (2)**
85:11;90:21
**last (10)**
19:14;28:23;36:7;
39:6;51:11;69:13;94:23;
109:6;149:24.25
**late (2)**
91:16;92:17
**later (6)**
37:24;38:2;43:24;
127:20;143:9.23
**latex (3)**
74:10;75:17;76:22
**law (7)**
9:23;67:25;72:18;
73:2;119:11,19;120:1
**lead (3)**
35:6;136:24;147:7
**listed (8)**
13:16;52:15,16;82:24;
123:4;154:1,4;155:3
**learn (1)**
91:5
**learned (2)**
16:6;100:18
**least (5)**
47:15;70:6;82 1;
90:11;111:25
**leave (3)**
29:13;58:18;74:1
**leaving (1)**
141:21
**led (1)**
139:14
**ledger (1)**
54:13
**ledgers (1)**
54:13
**left (10)**
54:8;60:22;63.25;
73:25;128:8,15;136:7;
137:1;141:14; 52:2
**legend (1)**
32:6
**Leigh (1)**
7:19
**less (2)**
125:15;152:14
**Lets (2)**
28:21;162:18
**letter (14)**
80:13,15,17;81:3,4,7;
82:4,10,19;83:1,1,4,11,
19
**level (2)**
10:23;56:3
**LGLP (1)**
21:7
**liable (1)**
120:8

**lie (1)**
78:17
**lieu (1)**
44:21
**Lieutenant (13)**
57:15;58:10;59:8;
61:1,6,10,24;62:16;
63:23;67:13;68:8;
103:22;104:16
**light (2)**
124:18.24
**likelihood (1)**
71:16
**limiting (1)**
19:16
**line (7)**
13:15;33:16;34:21;
40:17;101:15;115:3;
121:18
**lines (1)**
13:21
**list (3)**
13:9;83:15;122:16
**Little (5)**
9:12,15;24:12;36:23;
83:17
**live (2)**
15:5;31:18
**living (13)**
81:22.23,25;109:11;
114:19;128:19;129:16;
133:19;134:7.9,17;
139:10;154:5
**loaded (3)**
72:16;73:10;116:17
**located (4)**
73:18;80:11;114:16;
133:25
**location (7)**
58:6;129:3;130:6,6,
25;133:3;158:11
**log (6)**
156:10,13,13,14,16;
160:1
**logged (2)**
83:4;156:11
**long (17)**
15:23;17:2;25:23,25;
27:19;55:1;58:10;84:17;
113:10;114:5;117:2;
125:14;148:15;152:10;
159:23;160:14,16
**longer (2)**
23:4;151:20
**look (23)**
12:8;14:6;20:4;30:21;
32:17;33:21;36:9;46:23;
47:22;48:9;49:8;53:7;
68:23;81:14,95:3;
107:19;117:16;122:13,

16;150:16;152:24;
155:2;162:18
**looked (8)**
12:19;50:5;87:18;
89:1,14;100:19;117:20;
163:7
**looking (12)**
13:14;53:21;84:19;
87:15,25;88:22;90:17;
111:23;113:11;114:13;
128:1;165:2
**looks (9)**
17:17;19:10;21:1;
32:3;47:2;148:8;157:6;
161:25;165:22
**losing (1)**
119:13
**loss (1)**
56:12
**lost (1)**
79:14
**lot (5)**
35:5;39:18;70:6;
71:23;149:9
**lots (8)**
16:8,9;75:9,10,25;
76:10;97:13;160:22
**Lt (1)**
102:9
**lying (5)**
78:21,25:79:2;153:9,
15

**M**

**Magistrate (5)**
47:14,19.20;48:9;49:8
**magnify (1)**
83:23
**mail (1)**
79:19
**major (2)**
15:24;43:14
**makes (1)**
38:25
**making (4)**
49:10;98:13;137:23;
143:22
**Man (1)**
160:16
**manifested (1)**
89:4
**manufacture (2)**
50:15,24
**manufacturing (1)**
50:21
**many (13)**
13:21;16:6;18:12;
33:25;41:18,23;45:22;
72:13;75:16;102:17;
140:25;141:4;153:18
**March (2)**
32:20;33:25

**marijuana (33)**
41:8;42:12,24;58:9;
62:5,13;68:9,10,25;
69:25;70:6,10,11,14,17;
71:1,15,24;72:1;73:1;
78:22;98:6;99:21;146:9;
147:21,23,24;148:13;
149:19;151:9,16;
157:23;165:6
**mark (3)**
126:17;128:24;129:19
**marked (5)**
11:11;69:12;75:21;
130:1;131:1
**marks (1)**
129:12
**married (1)**
7:17
**Marrisa (1)**
118:9
**master (1)**
124:17
**materials (4)**
14:7;16:11;17:3;18:19
**matter (6)**
72:10;83:24;84:23;
90:20;148:4;153:1
**matters (3)**
10:9;14:11;73:21
**May (22)**
5:5;11:21;13:12;16:3,
24;28:25;33:11;45:21;
51:20;58:16;62:18;66:1;
70:15;79:11;83:22;
92:10;121:16;156:25;
157:7;160:18.22;167:3
**maybe (6)**
11:21;39:18,20;82:11;
100:16;125:15
**McCaslin (7)**
32:13;33:13;40:6;
83:12;108:20;109:21;
156:15
**mean (13)**
33:5,15;34:22;38:10;
48:1,10;49:14;53:8;
69:9;130:20;151:14,15;
162:21
**means (1)**
113:15
**mechanics (1)**
9:7
**medical (1)**
6:17
**medication (4)**
6:14;76:6,21;79:19
**meet (2)**
97:12;158:9
**meeting (1)**
58:25
**member (1)**
123:4
**members (2)**

22:15,17

memories (2)
15:8;37:6

mental (3)
100:16;143:19,22

mentally (2)
90:4,6

mention (2)
53:18;90:3

mentioned (6)
12:15;29:14;57:24;
60:4;64:8;152:20

merely (1)
30:18

met (2)
18:12;99:1

meth (1)
157:8

methamphetamine (3)
50:15,22,25

Michael (1)
23:3

Midafternoon (1)
143:2

might (6)
6:18;56:24;85:4;
129:19;141:22;142:15

mind (4)
24:12,14,18;109:24

mine (2)
107:24;109:2

MINER (7)
5:1,5,6;7:19;14:5;
109:14;129:15

minute (16)
12:8;15:22;27:23;
36:24;72:3;83:25;
114:11;125:15;135:24;
144:23;148:16,17,24;
150:16;155:19;162:19

minutes (6)
17:4;58:12;117:3;
151:22;152:14;162:6

Miranda (1)
7:19

misdemeanor (19)
6:24,25;23:11,16;
24:4,9,15,22;26:9,13;
43:13,25;62:4,14;
163:12,22,24;164:10,17

missing (1)
143:20

misspoke (1)
19:10

Misstates (8)
39:15;64:12;79:10;
104:2;120:1;131:8;
133:6;145:6

model (1)
143:13

modify (1)
109:1

mom (1)

80:17

moment (13)
11:12;13:9;20:5;
59:18;68:23;69:8;81:14;
105:8;111:6;117:16;
122:13;131:15;133:14

moments (1)
112:25

Montana (1)
8:13

months (1)
9:14

more (18)
25:1,3;27:23;39:1;
40:24;45:21,22;51:1;
70:15;71:13;102:14,19;
104:7;121:24 141:15;
144:21;145:13;157:25

morning (2)
6:9,10

morphine (1)
74:10

most (4)
30:5;39:7;63:23;
104:25

mostly (1)
74:10

mother (13)
74:9,25;75:18,24;
76:14;77:14,15;79:18;
80:13,14,16,13;81:5

motivated (3)
78:8,9,17

motivatiou (1)
57:6

motivations (1)
56:7

motive (2)
43:5,6

motives (2)
56:24;57:3

mouth (1)
92:12

move (2)
139:24;153:11

Movement (1)
14:23

much (9)
64:2;93:4;114 9;
118:14;139:11;151:20;
152:11;157:25;167:13

multiple (1)
51:8

multitude (1)
58:17

munitions (2)
15:25;16:1

must (1)
94:25

myself (7)
13:12;25:8;44 17;
57:14;108:4,12,14

**N**

name (1)
118:2

namely (1)
58:8

names (2)
117:24,25

narcotics (1)
75:25

narrative (2)
88:15;108:2

nature (5)
15:22;33:4;99:10,12;
116:18

NCIC (1)
74:16

near (1)
130:3

nearly (1)
66:4

necessarily (2)
60:9;122:5

necessary (1)
17:1

need (12)
16:25;18:3;72:4;
74:18;76:17;81:18;
92:10;106:5;108:25;
119:13;127:22;151:19

needed (2)
28:6;93:10

needing (1)
92:3

needs (2)
51:16;77:6

new (1)
94:25

newborn (1)
39:6

next (8)
17:5;113:5;114:20,23;
131:25;134:15;136:5;
160:10

NFDD (2)
32:15;109:23

night (23)
25:16;29:2;31:24;
39:12;53:10;81:16;
93:10;103:11;104:25;
106:8;118:7;122:8;
126:24;137:19;140:25;
145:25;152:1,6;153:16;
156:8;158:1;159:14,17

nobody (4)
11:2;113:8;115:7;
136:5

noise (1)
34:14

None (2)
24:25;134:9

normal (2)

88:14,17

normally (2)
76:10;156:1

north (1)
109:20

northeast (7)
108:21;128:7,14;
129:5;154:17;157:5;
159:13

notation (1)
83:17

note (3)
35:18;143:19,22

notebook (2)
11:5;94:13

notes (1)
118:10

notice (15)
31:20;75:15;114:12;
125:1,4;126:19;127:9;
140:20;142:3;143:7;
158:22,23,24;159:3;
162:15

noticed (2)
130:2;153:25

noticing (2)
107:6,9

notified (1)
93:13

noting (1)
51:6

November (3)
20:20,22,23

Number (16)
12:9;16:9;18:11;21:5;
30:14;68:20;83:13,15;
86:1;113:12,14;153:4;
155:9,10;160:5;167:9

numbers (1)
11:7

numerous (1)
50:2

**O**

Object (67)
17:23;19:5;23:17;
29:5,18;32:1;37:13;
39:14;43:16;46:1;51:14;
54:1;62:6,21;64:11;
66:9;67:3,17;70:18;
71:4;72:20;73:4;76:24;
77:23;78:10,19;79:9,20;
81:8,10;86:17;88:5;
89:5;90:14;96:8;100:1,
24;101:11,24;103:20;
105:13;106:25;115:11,
16;119:25;120:15;
121:2,8;122:2;123:8,24;
132:7;133:5;135:13;
136:9;141:8;144:14;
145:5;146:12;157:15;
164:2,3,11,25;165:17,

25;166:1

Objecting (2)
119:17;131:7

Objection (31)
17:11;38:18;41:10;
42:5;44:1,10;58:23;
66:20;72:11;77:4;84:12;
86:24;96:2;100:25;
106:21;107:11;110:19,
24;112:1,2;113:21;
126:12;127:4;131:6;
135:1;137:20;148:18,
25;158:2;164:18;165:16

objective (3)
89:2;146:10,15

observation (1)
60:16

observe (2)
128:16;147:6

observed (1)
128:20

obstacles (1)
109:22

obstructing (1)
140:3

obstructions (1)
34:18

obtained (2)
15:16;28:7

obviously (2)
11:1;61:19

OC (1)
16:1

occasion (1)
121:24

occasions (3)
22:25;26:14;50:2

occupant (2)
108:7;110:23

occupants (1)
110:17

occur (3)
26:25;76:19;123:14

occurring (2)
26:3;34:17

occurs (1)
5:25

October (5)
49:23;82:16;95:16;
128:5;167:16

off (6)
6:8;9:13;14:25;36:24;
107:20;165:7

offenses (1)
50:1

offer (1)
63:20

office (10)
25:10;29:23,25;57:16,
25;61:2,6,11;74:1;99:2

Officer (112)
5:5,5;6:7;8:10;10:15;
13:11;14:5;23:1,3;

27:20;30:22;32:13,23,
24;33:13,21;34:9;40:6,
7;51:4;52:9;57:24;
58:13;59:6,10,18,22;
60:15,23;62:15:63:6;
65:11,15;66:7,25;67:25;
68:24;69:16,20,24;
72:13;82:18;83:12;
84:20,22,25;85:7,11;
90:21;92:13;95:18;97:4;
99:7,17,20;100:13;
102:6,15;103:17;
107:18;108:17,20;
109:12,14,21;110:9,16;
112:24;113:1,1,4;114:8;
115:1;117:19;118:16;
119:1,10;120:4,7,18,22;
121:6,7,24;122:9,10;
129:14,21;130:2,7,11,
13,23;131:4,16,19;
133:2,11,14,17,20,24;
134:18;138:6,9,23;
139:12,22;156:15;
163:25;164:15;167:14

**officers (67)**
14:18;18:11;25:7;
27:14;28:5,12;29:2,4,10;
33:8,9;34:24;35:2;41:3,
6;62:19;73:2;80:19;
86:15;92:3;97:13;98:4;
104:11,12,21,25;105:4;
108:5,6,10,13,14;109:7,
10,15;110:14;116:10;
117:4,7,10,11;119:7;
120:14;122:13,17,19;
130:18,19,21,22;134:7,
11;135:21;137:15,23;
138:11,25;139:24;
140:9;145:24;146:7,11;
147:9,15;151:25;
157:13;166:7

**often (1)**
42:19

**oftentimes (2)**
5:25;71:1

**old (1)**
39:11

**Once (1)**
138:3

**one (75)**
5:24;9:2,10;11:17,19;
13:18,20,20;19:6,7;23:1,
2;24:11,14,15,17;26:21;
27:2;28:1,2,23;31:15;
33:17;35:1;38:9;39:24;
45:19,21,23;51:1,10;
56:10;62:1;68:5:71:13;
80:19;84:21;86:8;89:22;
93:15;98:15;102:14;
104:3,7;107:20;108:7;
109:25;110:14;117:5,5;
118:17;120:14;121:24;
126:25;129:1;132:19,

20;141:12,13,15;142:8,
9,22;144:3;145:2,10,19;
150:15;151:6,25;152:20,
21;161:19;165:8.21

**one-light (2)**
62:1,3

**ones (5)**
14:24;32:4;41:19,21;
154:16

**only (5)**
31:11,12;33:17;146:8;
150:13

**open (6)**
80:12;105:25.108:18;
109:14,14;118:18

**opened (2)**
108:19;113:9

**operation (22)**
41:8;42:2,8,12;62:1,5,
20;63:17;68:9;74:4;
96:6;97:23;98:6;99:21;
103:9,14;105: .;122:14;
124:14;129:4:134:24;
157:23

**operations (4)**
68:10;69:1;70:7;72:1

**opinion (4)**
42:8;63:10;76:2,9

**opinions (2)**
35:15;67:20

**opportunity (9)**
15:13;62:15;74:15,17,
19,21,22;95:3;159:12

**opposed (1)**
145:15

**option (1)**
64:19

**options (1)**
64:16

**order (14)**
8:3,6;47:7,10.11,22;
48:9;49:8,8,9;51:17,23;
75:8;76:10;77:5

**others (10)**
26:7,10;67:6;69:7;
70:2,11,14;71 3,11,18

**otherwise (1)**
19:22

**out (39)**
24:18;44:21;43:15;
49:11;54:8,14 17,21:
58:16;60:11;65:17;
67:16;77:18;73:16;
88:22;89:1,14 94:12;
100:19;104:11;107:7,
10;109:11;11(:4,7,10;
111:23;114:13;121:17;
124:24;125:16;131:20;
136:24;138:17,23,24;
147:2;149:6;162:25

**outs (1)**
82:7

**outside (9)**

137:11,15;138:3,12,
14,15;139:1;140:20,22

**outstanding (3)**
45:15;46:8;55:25

**Over (4)**
8:1;18:14;94:18;131:5

**overpressure (1)**
37:5

**own (2)**
41:20;72:14

**owned (2)**
52:17;53:17

**owning (1)**
72:16

**owns (1)**
72:25

**Oxycodone (1)**
74:10

---

# P

**P85 (2)**
154:2;155:17

**pace (2)**
112:11,21

**package (1)**
80:15

**packaged (1)**
80:12

**page (29)**
11:11;15:20;21:1;
31:20;32:7,18;33:22;
34:16;38:3;54:11;69:15;
74:6;94:7,15,17,19,20,
23;105:9;108:1,1;109:7;
150:7,22,23;153:2;
154:6,6;163:3

**pajamas (1)**
137:4

**paper (1)**
128:24

**paragraph (16)**
36:10,15,18,21;69:10,
14;95:3;105:9.11,16,18,
21;109:6,8;110:1;153:7

**paragraphs (1)**
150:24

**paranoia (3)**
89:3;100:17;116:16

**paranoid (5)**
88:22;89:14,18;
100:19;146:24

**Pardon (1)**
161:2

**Park (11)**
7:25;22:13;29:23,25;
30:7;44:21:52:11;57:25;
58:6;85:23;86:2

**parking (1)**
142:19

**part (13)**
8:14;14:5;29:3;38:12;
48:25:49:5;65:5,8;

69:14;123:4;151:13,14;
157:22

**participate (3)**
40:5,8;124:13

**participating (1)**
21:3

**particular (2)**
9:5;14:4

**particularly (2)**
31:24;119:11

**party (1)**
28:5

**path (1)**
32:22

**patients (1)**
75:9

**Patrol (8)**
12:12;13:22,24;14:16,
18;19:11:31:13;137:13

**Patterson (31)**
57:15,24;58:10,13,20;
59:2,7,8,10;60:23;61:1,
6,10,24:62:15,16;63:1,2,
4,6;66:7.67:13;68:8;
69:20,24;91:9;102:7,9;
103:18,22;104:16

**Patterson's (2)**
63:23;68:24

**pay (1)**
11:1

**peace (1)**
13:11

**peeking (3)**
110:7,10;147:2

**pen (1)**
128:25

**penalized (1)**
7:24

**pending (4)**
6:5;49:14;55:11;94:10

**people (17)**
57:4;69:5,25;70:25;
71:15;72:13;96:10;
109:22;140:25;141:3,4,
5,13,24;144:12,20,24

**per (1)**
24:6

**perform (1)**
33:14

**performing (2)**
104:21;137:18

**perhaps (2)**
139:5;152:21

**perimeter (1)**
28:13

**period (6)**
36:6;101:3,6;113:20;
123:23;124:1

**permission (1)**
16:20

**person (9)**
25:8;47:4;72:18,25;
73:3;98:15;121:16;

141:12,15

**personal (5)**
45:17;49:21;67:19;
70:10,17

**personality (1)**
62:25

**personnel (1)**
10:11

**persons (5)**
27:9;38:21;70:9,13;
71:8

**person's (1)**
47:2

**perspective (2)**
57:18;124:4

**pertain (1)**
86:6

**pertaining (1)**
87:7

**pertains (2)**
77:15;85:6

**phone (1)**
98:20

**photographs (1)**
127:14

**phrase (1)**
132:25

**physical (3)**
25:15;59:13;78:2

**physicians (2)**
75:8;76:10

**pick (3)**
101:5;148:16;153:11

**picked (4)**
112:21;121:17;
127:10;161:7

**picture (1)**
122:24

**pictures (2)**
126:23,25

**piece (2)**
128:24;132:14

**PIER (3)**
11:24;12:18;13:15

**pillow (17)**
125:12,19,24,24;
126:2,3,14,18,19,25;
127:2,2,10;128:7;
159:20;162:10,15

**pillows (1)**
125:12

**pills (7)**
75:17;76:11,14;77:15;
79:7;84:9,9

**pistol (2)**
116:18;153:9

**place (10)**
59:23;60:15;61:2;
63:3;69:3;107:7,10;
133:12;138:3;142:1

**placed (2)**
8:3;39:10

**Plaintiff's (1)**

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

128:24

**plan (15)**
105:10,23;106:9;
107:2,16;116:12,12,13,
13,25;117:11;118:16;
122:24,25;135:4

**planning (5)**
39:19;40:5,8;144:5,6

**plants (11)**
62:1;147:24;148:13,
23;149:12,19,24;151:9,
16;163:19;165:10

**please (6)**
5:22;10:22;34:23;
40:16;102:4;109 9

**plenty (2)**
6:11;53:22

**plus (1)**
114:9

**pm (5)**
49:23;82:16;95:16;
128:5;167:16

**point (17)**
35:9;39:24;43:2,3;
59:12;64:23;91:12;99:6;
103:7;107:5;108:6;
112:25;130:24;136:16,
22;138:21;155:21

**pointed (2)**
120:21;130:17

**pointing (4)**
120:20;130:13;132:2;
133:24

**Police (59)**
9:11,19,21,25;10:3,7,
13,20;17:9;18:4;21:18;
22:17;23:1;25:7;26:17;
30:1,2,9,10,12;31:23;
34:3,25;47:2;48:5,19,20;
49:20;50:5,10,20;54:24;
60:22;65:24;66:19;68:6;
88:1;93:12;95:8;97:10;
99:9;103:10;104:11,19,
24;105:1,24;108:15,18;
109:13;113:6;116:5,7,9;
117:21;118:3;155:3;
158:15,18

**poor (1)**
165:4

**porch (6)**
111:16,18;114:3,6;
129:20,22

**porn (1)**
87:15

**pornography (2)**
87:8,18

**portion (4)**
39:20;68:25;103:8;
116:13

**posed (3)**
100:13;146:6,11

**posing (2)**
86:14;147:8

**position (8)**
35:17;68:4,4;109:15;
112:14,16;129:8;139:13

**possesses (1)**
72:18

**possession (6)**
16:16,17;18:20;48:6;
70:14;96:13

**possibility (8)**
39:23;60:6;64:9;72:9;
93:12;104:9;142:20;
144:20

**possible (5)**
18:16;74:19;116:16;
146:8;165:24

**Possibly (9)**
20:20;34:21;87:8;
116:17;141:11,15,16;
144:21;145:1

**POST (15)**
11:8,18,20,22,12:23,
25,25;13:3,10,15:21;
19:1,17,21;40 12,13

**potential (3)**
33:4;44:7;100:12

**Powell (28)**
9:11,19,21,25 10:3,7,
13,20;13:23,2t;17:9;
18:4;21:18;22 17;23:1;
25:7;26:17;31: :3;34:25;
48:5;50:19,19 54:23;
58:6;65:24;73 13;
108:15;155:3

**practice (1)**
16:7

**premises (2)**
28:10;52:12

**preparation (1)**
39:20

**prepare (1)**
107:22

**prepared (6)**
83:12;88:12.1 i;91:17;
108:2;156:15

**preparing (2)**
88:14,17

**prescription (6)**
76:6;79:7,19;84:10,
15,16

**presence (5)**
27:15;33:10;50:6;
120:9;147:6

**present (15)**
21:17;22:23;37:12;
38:15;39:19;58:13;
60:13;63:1;86:15;91:12;
105:1;117:4,17;118:6;
141:12

**presented (3)**
62:19;108:3;145:23

**pretty (2)**
115:19;150:3

**prevent (2)**

63:20;67:15

**previous (2)**
28:18;41:15

**previously (1)**
58:22

**primary (2)**
65:12;106:1

**printer (1)**
162:24

**prior (20)**
19:13;28:4;30:22;
31:11;36:16;37:3,9;
38:9;59:19;70:7;76:6;
79:22,25;80:1;101:16;
113:3;131:23;135:6;
141:21;143:4

**probable (3)**
85:22;86:1;91:1

**probably (14)**
20:22;25:4;41:22,25;
54:7;55:7;58:12;66:11;
68:3;90:8;93:6;125:15;
126:24;153:19

**probationary (2)**
10:3,7

**probe (2)**
78:6,13

**problems (1)**
6:17

**procedure (2)**
88:14,17

**proceed (3)**
61:7,15,17

**proceedings (2)**
7:23;167:15

**process (2)**
116:1;147:11

**procession (2)**
135:11,16

**produce (2)**
94:18;127:22

**produced (4)**
14:4;48:5,24;127:24

**product (3)**
31:21,22;69:7

**production (1)**
48:3

**products (4)**
70:1;71:2,10,17

**professional (1)**
40:10

**progressed (1)**
10:23

**progressing (1)**
27:7

**projectors (1)**
16:2

**prosecuting (1)**
165:19

**protect (6)**
69:6;70:1;71:1,2,10,
17

**protected (1)**

119:24

**protection (1)**
70:16

**protective (9)**
47:7,10,10,22;48:9;
49:8;51:17.23;77:5

**provide (3)**
16:18,21;44:9

**provided (10)**
20:10;43:11;53:16;
59:19;62:17;87:6;
116:15;127:13;167:5,6

**providing (1)**
56:25

**pull (2)**
47:21;50:10

**pulled (1)**
50:5

**purchase (1)**
32:19

**purchased (2)**
31:23;33:25

**purpose (4)**
33:4,17,18;34:21

**purposes (2)**
12:25;21:6

**push (1)**
151:21

**put (18)**
16:10;68:3;76:3;86:5;
96:19;97:9;124:20;
125:19;126:2;127:10;
128:10,11;133:2;137:7,
13;148:8,149:8;162:11

**putting (1)**
92:12

**Q**

**qualified (1)**
33:15

**quickly (3)**
115:20;116:14;150:4

**quotations (1)**
105:24

**quoted (1)**
68:7

**R**

**raise (3)**
10:24;11:2;63:14

**rake (2)**
109:19,20

**ram (13)**
28:16,19,22,25;106:1;
108:19;109:14;118:17;
119:2,5;121:20;123:20,
21

**rammed (2)**
109:19;112:14

**ran (1)**
162:25

**Ranger (1)**
52:19

**rank (2)**
10:13,19

**rather (6)**
9:9;41:2;55:8;56:1;
62:18;104:1

**reach (1)**
57:21

**reaction (1)**
112:6

**read (18)**
36:25;76:15,16;82:18;
95:10;105:11,20;106:17,
19;107:5,8;108:6,8;
109:8;119:15;150:10;
151:3,6

**ready (1)**
134:19

**real (1)**
67:23

**realize (1)**
14:9

**really (11)**
7:5;25:20;28:13;
48:12;68:4;90:17;101:6;
133:1;148:20;155:2;
157:24

**realm (1)**
119:19

**reason (14)**
12:22;54:20;55:9,14;
66:16;67:2,13;68:3;
88:18;93:9,19;145:22;
146:5;157:13

**reasonable (2)**
119:23;120:4

**reasonably (1)**
146:2

**reasons (4)**
58:5;67:20;68:1;93:17

**recall (47)**
15:15;24:16;26:10,13;
27:5;31:16;37:7;44:12,
19;45:19;50:6,7,23;
53:11,14,15;62:2;63:9,
11;65:8;66:15;70:3;
75:22;76:2;80:24;88:13;
90:1;91:11;92:1;97:20;
100:4;104:13,17;111:1;
116:3;120:23;124:19;
128:10;129:23;132:19;
134:5;137:25;138:17;
141:25;143:22;149:23;
150:2

**receipt (2)**
155:4;156:1

**received (17)**
10:19;11:2;18:5,21,
25;35:19;36:16;37:22;
39:5;40:10,20;69:20;
86:7;95:22;96:18;
118:15;166:22

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

**receiving (1)**
  10:24
**recently (1)**
  77:19
**receptionist/secretaries (1)**
  118:3
**receptionist/secretary (1)**
  117:22
**Recess (4)**
  49:22;82:15;95:15;
  128:4
**recital (1)**
  58:21
**recognize (3)**
  14:7,8;117:17
**recognized (5)**
  11:22;12:24;13:10;
  19:1;49:16
**recollect (1)**
  110:2
**recollection (9)**
  13:5;20:12;21:12,21;
  27:25;29:1;44:19;102:9;
  118:8
**recommendations (1)**
  36:14
**recommended (1)**
  36:12
**record (21)**
  11:16;20:9;21:6;
  35:19;40:16;47:3,5;
  48:2,6,7,11;49:21;50:5,
  11;77:6;101:19;105:11;
  106:19;109:8;119:15;
  133:23
**recorded (1)**
  5:18
**records (8)**
  11:9,18,20;12:23;
  13:3;14:5;20:9,11
**recover (1)**
  125:9
**recovered (2)**
  125:11;148:24
**redact (1)**
  47:13
**refer (3)**
  86:8;148:3,5
**reference (9)**
  80:18;91:2;92:7:
  95:21;150:13;151:17;
  156:6,25;157:11
**references (1)**
  157:2
**referring (9)**
  39:7;71:8;78:2;83:2;
  86:9;93:23,24;144:12,17
**refers (2)**
  69:18;83:9
**reflect (3)**
  53:22;56:24;133:23
**refresh (1)**
  20:11

**regard (3)**
  5:24;18:24;77:1
**regarding (6)**
  34:17;42:23;52:21,23,
  25;79:6
**registration (2)**
  53:7,14
**rehired (1)**
  9:15
**rejected (1)**
  46:15
**relate (2)**
  163:14;164:15
**related (2)**
  55:22;68:25
**relates (1)**
  86:14
**relating (2)**
  40:21;166:7
**relation (1)**
  123:20
**relationship (1)**
  93:3
**relative (3)**
  13:11;18:25;20:13
**relatively (1)**
  42:14
**relay (1)**
  143:3
**relayed (8)**
  87:14;90:8;98:16;
  100:9,11,15;116:14;
  164:8
**released (1)**
  155:23
**relevance (3)**
  35:3,6,16
**relevant (1)**
  33:4
**reliability (1)**
  57:22
**reliable (1)**
  48:16
**relying (1)**
  68:24
**remaining (1)**
  134:24
**remember (58)**
  9:16;12:4;14:21;15:4;
  16:2;20:16,24.21:3;
  22:7,24;23:1;25:24;
  26:1,7;28:17;40:2,3;
  43:22,24;45:5.24;51:6;
  54:9,10,19,20;55:17,18;
  65:5;66:3;69:24;74:13;
  79:2;81:6,9;82:22;
  98:16;107:6,9.110:13;
  118:2;122:19;  26:7;
  135:22;136:6;  37:5;
  138:11,13,25;143:17;
  144:1,2,2;153:3;156:7;
  157:6;159:20;  63:2
**report (24)**

26:2;81:23;82:25;
  87:23;88:1,6,6;89:23;
  90:3,5;91:1;107:4,15,22;
  109:1;148:3,5,9;153:16,
  23;154:3;157:14,24;
  158:6
**reported (1)**
  116:18
**reporter (1)**
  106:16
**reports (3)**
  41:20;152:21;157:12
**representative (2)**
  108:24;110:3
**reputation (1)**
  65:16
**request (3)**
  43:10;48:3;167:7
**requested (4)**
  49:10;58:3;106:20:
  119:16
**required (1)**
  5:14
**residence (29)**
  38:16,17;39:12;60:5,
  7;66:18;78:17;97:7;
  104:22;106:2,9;107:17;
  108:7;109:18;120:13;
  140:8,21,23;144:11;
  147:12;149:20;152:5;
  153:19;158:1;159:23;
  160:12;162:1,8,15
**residue (1)**
  156:7;157:1,3,7
**respect (1)**
  26:1
**respond (1)**
  167:8
**responded (1)**
  167:10
**responding (2)**
  29:4,10
**Response (11)**
  13:22;14:16,23;19:11;
  20:21;31:13;60:24;
  112:9;164:22,24;165:1
**responsibility (1)**
  106:2
**responsible (2)**
  33:8;98:13
**rest (4)**
  6:11;16:4;119:6;
  132:25
**restate (3)**
  52:1;102:4;147:19
**restraining (2)**
  8:3,6
**retrieve (1)**
  17:2
**return (1)**
  156:1
**returned (1)**
  129:3

**revenge (1)**
  78:9
**review (3)**
  11:12;76:16;86:12
**reviewed (2)**
  95:18;117:11
**revisit (1)**
  146:18
**rifle (1)**
  119:8
**right (85)**
  7:5;11:7;13:8;16:11;
  17:5,7,16;19:9;20:4;
  25:15;26:7,15;28:1;
  31:14;33:24;35:12;
  36:24;37:3;39:4,9;
  42:16;49:15;50:14;
  51:25;53:3,6;56:11;
  59:22,23;60:15,21;
  73:21;83:24;85:2;87:13;
  89:12,19;90:20;91:8;
  94:11;95:2,18;97:16;
  99:3;102:24;107:25;
  112:17;114:12,20,23;
  118:8;120:11;121:15,
  21;124:11,18;126:5;
  127:12;128:23;129:18,
  19;131:22;135:19;
  136:14,15;137:12;
  140:5;142:11;143:14,
  19;144:9,23;145:2,8;
  149:11;151:18,24;
  152:15;155:25;156:4;
  159:1;162:18;164:22;
  166:5;167:13
**risk (2)**
  39:7;73:11
**River (1)**
  13:14
**Riverton (2)**
  30:1;40:18
**Rock (2)**
  9:12,15
**role (2)**
  118:16;121:20
**roof (1)**
  149:9
**room (21)**
  21:2;31:7;81:22,23,
  25,25;91:12;109:11;
  114:19;116:10;121:25;
  128:9,19;129:17;
  133:19;134:8,9,17;
  139:10;152:8;154:5
**rooms (2)**
  37:11;152:7
**roots (1)**
  165:9
**rosters (1)**
  13:3
**roughly (4)**
  92:25;161:17;162:6,9
**route (1)**

33:19
**Ruger (2)**
  154:2;155:17
**rules (1)**
  32:24
**run (2)**
  74:15,25;104:7;149:7
**running (2)**
  103:8;112:18

## S

**safely (1)**
  61:22
**safety (6)**
  62:19;86:15;106:3;
  145:24;146:6;147:8
**same (11)**
  12:18;25:12;36:25;
  86:24;108:19;110:24;
  130:25;132:21;141:24;
  143:24;144:3
**satisfied (2)**
  94:22,24
**saw (16)**
  21:9;80:24,25;81:3;
  111:4,7,10,11;114:2;
  115:23;138:14,16,17;
  149:25;153:22;154:19
**saying (2)**
  70:3;160:17
**scale (1)**
  130:10
**scene (2)**
  29:2;84:7
**school (4)**
  8:16,19;9:1;145:15
**schooling (1)**
  8:25
**scroll (1)**
  94:24
**se (1)**
  24:6
**seal (1)**
  47:8
**sealing (1)**
  47:10
**search (53)**
  21:22;23:3,16;24:4,9;
  26:13;27:8;28:7;39:12;
  52:10,16;62:20;68:2,11,
  13,22;74:7;75:2;78:23;
  79:23;80:20;81:15,24;
  15,19;93:4,9,22,25;
  95:19;96:13,22;97:3,9,
  18;98:8;101:6;105:24;
  108:2,15,18;109:13;
  113:6;126:24;141:11;
  142:7;152:1;154:17
**searched (3)**
  52:13;159:15,16
**second (18)**

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

15:20;28:2;32:18;
33:22;38:3;54:11;58:7;
69:14;75:11;95:14;
108:1;109:6;115:14;
121:15;131:18;153:7,7;
162:21
**seconds (4)**
113:18;114:11;124:7;
161:22
**secretary (1)**
58:17
**secure (1)**
106:2
**secured (2)**
27:10;109:16
**securing (1)**
152:12
**security (1)**
28:13
**seeing (3)**
33:3;153:8;156:7
**Seemed (1)**
150:15
**seems (5)**
12:23;94:14;110:3;
115:7;122:23
**seizure (2)**
52:10;68:22
**self-executing (1)**
127:16
**sell (5)**
69:5;70:11,14;71:9.16
**selling (1)**
74:4
**semiautomatic (1)**
153:8
**seminar (2)**
16:12;18:20
**sending (4)**
13:2;75:25;76:21;
79:18
**sense (1)**
67:23
**sensitive (3)**
99:10,12;116:18
**sent (4)**
75:17;79:7;80:13;
163:6
**sentence (3)**
69:13,14;153:8
**sentences (2)**
106:8;109:25
**separate (4)**
19:6;85:10;140:12;
142:13
**September (3)**
14:16;19:10;36:5
**sequence (1)**
88:13
**Sergeant (33)**
25:9;34:11,11,11;
63:24;64:1:66:1;92:5;
97:17;98:16;99:10;

102:25;103:8.18;104:6,
9,14;108:20;109:19;
117:6;128:18,19;132:17,
22;134:9,10,14;135:20;
138:21;143:3 4;158:8;
165:9
**serious (1)**
51:1
**serve (2)**
25:14;162:1
**served (6)**
23:6;31:2,25;46:18;
93:10;116:6
**serves (1)**
118:8
**service (6)**
22:12;25:12;26:8;
64:10;66:8;67:14
**session (1)**
20:17
**sessions (1)**
12:24
**setting (3)**
18:10,13;20:13
**settings (2)**
15:14;21:13
**Seventeen (2)**
68:13;153:5
**several (7)**
22:6,7,8;29:1↔;108:5,
12,14
**shall (2)**
47:12;128:2
**share (1)**
52:3
**shelf (1)**
154:9
**sheriff (1)**
61:11
**sheriff's (7)**
22:13;25:10;29:23,25;
30:12;57:15.25
**sheriff's' (1)**
61:11
**shift (1)**
28:4
**Shit (1)**
149:8
**shooter (2)**
11:24;12:18
**shooters (1)**
31:8
**short (2)**
123:23;124:1
**shortly (4)**
113:8;123:5,1↔;
135:23
**show (4)**
44:24;45:3;59 13;
118:19
**showed (1)**
45:8
**shows (1)**

126:25
**side (4)**
18:16;133:21,24;
140:2
**sight (1)**
109:17
**signature (1)**
94:15,17,18
**signed (1)**
92:21
**significant (6)**
39:1;45:24;46:5,9;
54:10;127:1
**significantly (3)**
73:1,9,11
**signs (1)**
137:23
**similar (1)**
28:2
**simple (1)**
43:25
**simply (1)**
29:3
**simulated (2)**
21:13;105:5
**sit (2)**
43:22;153:20
**sitting (1)**
115:24
**situation (1)**
28:3
**situations (1)**
27:4
**size (7)**
75:9,10;76:11,23;
149:19;150:13;151:15
**small (9)**
37:11;38:22;42:14;
60:4,9;61:25;62:3;
119:18;156:7
**smoking (2)**
82:5;162:15
**smoldering (4)**
125:20;126:6,8,20
**solve (1)**
47:19
**somebody (1)**
30:17
**someone (8)**
26:3;27:17;110:6,10;
113:2;117:20;148:13;
152:22
**sometime (1)**
159:22
**sometimes (3)**
31:10,10;116:17
**somewhere (3)**
133:22;145:17;156:11
**son (6)**
66:17,18;99:14,15,22;
104:11
**son-in-law (1)**
76:1

**sorry (17)**
19:9;42:7;68:14;
69:11;75:10;88:8;92:11;
103:22;106:14;119:12,
12,14;142:12;146:4;
156:21,23;158:25
**sort (4)**
18:12;56:11;76:20;
112:17
**sounded (1)**
42:13
**sounds (2)**
30:6;127:6
**source (1)**
48:16
**sources (1)**
101:22
**space (1)**
149:8
**SPEAKER (1)**
42:10
**speaking (2)**
41:19;94:8
**speaks (1)**
105:14
**specialized (1)**
14:17
**specialty (1)**
15:25
**specific (1)**
89:13
**specifically (7)**
22:24;26:10;39:6;
41:19;47:23;122:15;
138:13
**specifics (1)**
22:7
**speculate (1)**
121:9
**speculation (2)**
102:2;121:9
**sped (1)**
112:11
**spend (3)**
35:4;55:1;145:12
**spent (1)**
54:22
**spoke (5)**
51:7;87:12;98:23;
99:17;103:1
**spoken (1)**
99:3
**spot (2)**
129:12;130:1
**stage (2)**
144:5,6
**stairs (12)**
131:2,17,24;135:25;
136:3,15;138:19,24;
139:10,14,23,25
**stairway (1)**
129:24
**stamp (1)**

153:4
**standing (7)**
64:5;116:1;128:20;
129:20,21;130:3;136:5
**start (6)**
24:11,24;40:13;81:25;
108:10;160:13
**started (10)**
9:24;10:16,20;28:3;
85:17;109:11;112:12;
114:7;131:17;135:25
**starting (4)**
6:1;11:11;105:9,18
**starts (2)**
36:11;108:4
**state (1)**
146:18
**stated (5)**
39:6;71:23;75:16;
100:16;132:21
**statement (7)**
74:8;88:21;90:2;
110:6,9,11;134:14
**statements (3)**
90:25;100:23;146:20
**stating (1)**
35:23
**station (13)**
60:22;66:19;97:10;
103:11;104:19,24;
105:2;116:6,7,9;141:21;
158:15,18
**statute (1)**
50:16
**stay (2)**
138:4;156:4
**stayed (1)**
9:15
**step (1)**
10:24
**stepped (1)**
58:16
**steps (2)**
57:10,13
**sticks (1)**
24:18
**still (2)**
138:22;143:8
**stop (1)**
80:8
**story (1)**
84:2
**stretching (1)**
76:20
**stricken (2)**
51:16;77:6
**strike (5)**
44:15;51:25;62:4;
77:9;152:16
**structure (1)**
142:13
**structured (1)**
40:21

Tricia Wachsmuth v.
City of Powell, et al.

Chad Miner
October 6, 2010

**stuff (1)**
140:2
**stuffed (8)**
74:11;80:25;82:4,19;
83:1,18;84:1,3
**subject (4)**
14:11;29:13;47:4;
102:24
**submitted (2)**
91:20,23
**subsequent (1)**
80:3
**substance (1)**
104:17
**substances (2)**
69:6;71:9
**substantially (1)**
50:25
**substantiated (1)**
84:8
**successfully (1)**
10:6
**suggest (1)**
66:7
**suggested (1)**
66:11
**suitcase (1)**
149:8
**Summarize (1)**
151:6
**supervisors (1)**
34:8
**supplied (1)**
90:13
**support (1)**
100:23
**sure (27)**
12:2;13:18,21;16:25;
23:24;26:19;43:25;45:6,
20;55:13;63:2;70:3,12;
77:1;87:10;94:4;100:15;
107:5,8;120:10;124:2;
150:4;152:22;156:11;
160:1,19;166:15
**surprise (1)**
112:8
**surveillance (2)**
59:19,23
**suspect (2)**
122:1,1
**suspecting (1)**
79:2
**suspicion (1)**
142:15
**SUV (1)**
52:18
**SWAT (3)**
22:13,14;116:22
**swear (1)**
28:24
**sworn (1)**
5:2

**T**

**tabs (2)**
20:6;154:23
**Tactical (12)**
12:10;13:22; 4:16;
19:2,11;21:1 ;23:14;
24:3,7;29:3,15;31:13
**tactics (1)**
14:18
**talk (5)**
18:11;72:3;9 :11;
102:17,21
**talked (11)**
13:18;19:6;3 :7;66:1;
83:25;99:8;1( 2:22,23;
103:1;158:10 163:7
**talking (18)**
6:23,25;35:5;36:5;
37:23;38:5;45 18:75:22;
99:11,13;114:9;127:22;
131:19;149:1 ,25;
150:19;151:1 ;167:12
**talks (1)**
32:7
**tall (5)**
148:1,9;149:15,23;
151:10
**Tan (1)**
52:18
**taught (2)**
18:4,23
**team (30)**
21:13,19;22:13,14,16;
23:14;24:4,7; 8:7,14;
103:5,7;104:2 ;109:15;
112:13;116:2 ;122:15,
17;123:1,5,11,133:18;
134:19,19;140:10,11,13;
141:19;152:2 4
**teams (1)**
29:15
**teams' (1)**
106:1
**team's (1)**
112:11
**teamwork (1)**
14:24
**Technology (1)**
11:25
**telling (2)**
69:25;78:7
**ten (3)**
39:11;113:18;124:7
**tend (1)**
100:22
**tends (1)**
84:2
**ten-year-old (1)**
39:10
**term (2)**
10:3,7

**terms (7)**
9:8;38:16,25;61:16;
103:1;106:9;119:10
**testified (3)**
5:2;68:16;104:3
**testify (1)**
48:15
**testifying (1)**
84:22
**testimony (10)**
39:15;64:12;72:8;
79:10;104:3;131:8;
133:6;139:19;145:6;
159:19
**thereafter (2)**
113:8;135:24
**thin (1)**
121:17
**thinking (1)**
157:6
**third (6)**
34:16;36:9;105:9,16,
18;121:15
**thirty-five (1)**
162:22
**Thirty-seven (1)**
155:15
**Thirty-two (4)**
83:14;154:22,24;
156:18
**THOMPSON (97)**
17:11,24;29:7,20;
32:1;35:18,22,25;37:15;
38:18;39:16;41:10;42:5;
43:18;44:1,10;46:3;
47:6,9,17,21;48:8,18,22;
49:7,16,19;51:16,22;
54:3;58:23;62:8,23;
64:13;66:20;67:3;70:20;
71:6;72:11,22;73:6;
75:12;77:1,4,25;78:12,
19;79:21;82:7;84:12;
86:19,24;89:7;96:2,8;
100:3,25;101:13;102:1;
105:13;106:21;107:11;
110:19,24;112:1;
113:21;115:18;120:2,
17;121:8;122:4;123:10;
126:12;127:4,16;131:6;
132:9;133:8,23;135:1,
15;137:20;141:9;
146:14;148:18,25;151:2,
19;157:17;158:2;164:2,
4,11,18;165:16,25;
166:24
**thought (13)**
33:14;50:4;78:21;
112:6,10;119:13;141:12,
13;144:19,24;149:24;
156:25;162:12
**thoughts (3)**
65:5,9,10
**threat (12)**

20:20;25:15;62:18;
72:18;73:2;86:15;
100:12;145:23;146:1,6,
11;147:8
**threatened (1)**
77:21
**threats (3)**
78:1,2;144:11
**three (14)**
9:14;13:25;57:18;
106:7;141:2,5,24;
144:20,24;154:2,3,14,
19;155:12
**Throw (1)**
149:9
**ticket (1)**
44:23
**Tim (7)**
163:7,8,9,11;165:22,
23;166:2
**times (8)**
16:6,9;18:12;31:17;
41:18;98:21;102:17;
161:18
**timing (2)**
96:6,11
**titles (1)**
53:7
**today (8)**
5:13,17;16:24;43:23;
53:21,24;54:4;75:20
**together (6)**
22:16;47:22;64:6,15;
117:10;140:11
**told (25)**
31:15;43:7;50:4;
55:18;61:10;76:13,18;
79:1;89:12,24;90:21;
91:4;98:15;99:18;100:7;
103:8;116:12;117:19;
119:1;121:12;139:15;
143:10;151:8;156:16;
163:25
**Tom (26)**
61:20,20;62:18;64:9,
16;65:13,15,25;66:5,7,
17;67:13,20;68:3,4,5;
74:3;99:13,15,22;104:1,
10;116:19;126:23;
151:1;155:23
**tomorrow (1)**
6:9
**tonight (2)**
6:7;153:20
**took (15)**
9:6;12:4,15;13:1,6;
14:10;54 21;61:2;63:3;
126:20;133:12;136:25;
137:11;142:1;159:20
**top (4)**
14:25;32:7;154:6,9
**Torczon (1)**
118:9

**total (2)**
55:5;162:7
**totality (1)**
120:5
**toward (1)**
140:16
**towards (4)**
110:17;121:19;
133:24;140:19
**town (1)**
73:19
**traffic (2)**
6:22;7:9
**train (2)**
15:1;119:13
**trained (7)**
21:13;32:13;34:25;
36:1,4,19;105:4
**training (57)**
11:9,20,22;12:24;
13:10;14:5,7,22;15:6,14;
16:12;17:22;18:6,10,19,
22,24;19:1,3,15,19,21,
24;20:9,12,25;30:23;
31:6,10,13,18,19;32:10;
33:2;34:13;35:19;36:15;
37:10,21,24,24;38:2,5;
39:5;40:10,12,12,19,20,
21,23;41:2;67:24;76:5;
116:10;119:10,19
**trainings (1)**
19:6
**transfer (1)**
84:4
**transpired (1)**
55:23
**Transport (1)**
9:18
**treatment (1)**
76:22
**trial (2)**
5:18;47:16
**Tricia (42)**
49:6;56:13;74:16;
75:17;79:6,18;85:3;
86:3;114:16;115:22;
120:12;124:12;128:18;
130:3,6,11,14;131:14,16,
23,25;132:2,6,17;133:4,
10,15;136:3,4,16,21;
138:4,12;139:1,23;
141:6,15;146:6,21;
151:8;152:12;158:17
**Tricia's (9)**
74:9,25;75:24;76:14;
77:14,15;80:18;81:4;
131:9
**trouble (3)**
5:21;69:16;75:19
**true (14)**
15:18;41:7;60:12;
68:12;70:7,8;72:19,23;
73:3;78:7;94:6,21;

149:14;158:5

truth (1)
  7:3
truthful (2)
  6:15,19
try (5)
  33:1;35:14;47:19;
  120:25;164:5
trying (8)
  15:7;55:11;56:18;
  69:11;94:11;110:13;
  146:17;147:12
turn (18)
  11:5;14:3;32:25;
  35:14;49:14;51:10;52:8;
  68:19;85:16,17;87:22;
  96:20;105:7,8;124:20,
  24;151:24:160:3
turned (2)
  60:11;95:9
turning (2)
  55:10;152:15
turns (2)
  25:11;67:15
Twenty (2)
  148:7,8
twice (1)
  102:19
two (24)
  19:6;25:3,4,7;26:14;
  44:13;45:19,21;58:5;
  62:1;82:7:83:18;84:21;
  106:7;115:15;125:15;
  133:21,25;135:21;
  141:13;151:10;153:25;
  162:6.14
type (3)
  23:6;88:15;103:14

U

unable (4)
  79:5,17:80:2;112:13
uncalled (3)
  63:7,10,11
under (7)
  12:17;32:24;50:16;
  61:25;84:10;125:8;
  157:5
underage (3)
  26:14;27:4;28:5
understood (4)
  49:4;106:8;111:22;
  145:16
undertake (1)
  57:9
unit (1)
  29:3
unknown (1)
  164:23
unless (2)
  5:14;148:3
unmarked (1)

154:22
unreliable (1)
  46:16
unstable (4)
  90:4,6,11,21
untrue (1)
  78:8
up (36)
  8:9,12;12:23;39:18;
  44:24;45:8;50:5,10;
  57:5;66:4;75:10;79:13;
  87:15,18;89:22;97:16;
  101:5;104:4;111:16;
  112:11,21;116:2,12;
  127:10;128:20;131:18,
  23;134:16;133:12,19;
  141:2;144:24 153:11,
  13;161:7;165.18
upstairs (3)
  136:25;139:1.1
use (31)
  15:1,17,25;17 9,14,22;
  18:5;22:13;29:16;30:24;
  32:8,15;36:17,46:5,10;
  67:15;70:10,10,15,17,
  17;71:16;87:16;88:16;
  105:25;116:22 ;119:22;
  123:21;130:8:139:6;
  146:15
used (17)
  5:18;28:16,19,22;
  31:24;34:1;36 2;38:12;
  41:15;46:12;67:6;84:3;
  89:16;104:18 109:19;
  166:6,18
uses (1)
  73:1
using (7)
  40:11;41:4,5;-8:6;
  73:10,10;108:19

V

valid (1)
  84:16
various (1)
  98:20
vehicle (17)
  53:17,17;142:15,21;
  143:8,10,11,12,14,15,17,
  18,20,21,24;144:1,3
vehicles (16)
  52:17,19,22,23;53:1,4,
  7,13;140:12,20,22;
  142:4,5,6,19,22
verbatim (3)
  61:18;132:22;133:1
verify (7)
  57:10;77:16,79:6,17;
  80:2,5,6
vicinity (1)
  133:21
view (2)

139:24;140:3
violate (1)
  49:9
violated (2)
  33:11;51:22
violates (2)
  47:7;51:17
violating (1)
  77:5
violation (2)
  6:22;7:9
violations (2)
  33:11;120:8
violence (11)
  25:11,14,16,17;26:2,3;
  28:21;101:10.23;102:8;
  146:21
violent (3)
  78:2;146:25;147:3
Virtually (1)
  23:7
visit (2)
  92:13;102:6
visited (1)
  163:15
visiting (5)
  54:22;98:5;101:4.16;
  104:10
visually (1)
  36:13

W

Wachsmuth (97)
  21:7;31:2,25;41:7;
  49:6;51:2;53:13;55:10;
  56:13,25;62:18;64:9;
  65:25;66:8,17;67:14;
  68:1;73:18;74:4,16;
  77:19;78:17;79:7;84:11;
  85:3,23;86:3,14;87:7,11,
  12;90:6;91:3;93:12,25;
  95:8,23;97:7;99:13;
  100:13,18,22;101:10,15,
  22;102:8,10,13;104:1,
  10,22;106:9;107:17;
  114:16;115:22;120:12,
  12;124:12;126:24;
  130:3,6,11,14;131:1,17,
  20;132:3,6;133:4.11,15;
  134:15,16;135:17,20;
  136:16,21;138:4,12;
  139:2,14,23;140:14,16,
  19;141:6;144:11;146:6;
  147:5,7;152:13;155:22;
  157:12;158:18;165:8,
  23;166:8
Wachsmuth's (15)
  52:17;56:16,18,19;
  75:18;77:22;79:18;89:3;
  95:9;99:14,15,22;
  116:15,19;143:21
Wait (5)

19:5;106:10,10;
  113:10;119:12
walked (3)
  134:16;140:16,19
wall (1)
  140:2
Walters (1)
  108:3
warning (3)
  32:3;36:23,25
warnings (2)
  31:21,22
warrant (73)
  20:14;21:23;22:12;
  23:3,6,16;24:4;25:12,14;
  26:9,13;27:8;28:7,8,9;
  31:2,25;39:12;43:9.12.
  20:44:20.52:10,16:53:9;
  55:24;59:20;61:22;
  62:20;64:6,10;66:8;
  67:15;68:2,11,13;74:8;
  78:23;79:23;80:1,4;
  86:23;91:18;92:2,10,11,
  15,19;93:2,5,9,20,22;
  94:1;95:19;96:13,22;
  97:1,3,9,18;98:8;101:6;
  108:2.16;113:6:116:6;
  141:11;142:7;143:16;
  161:16,23;162:1
warrant' (3)
  105:24;108:18;109:13
warrants (9)
  23:9,11;24:9;30:15,
  16;41:8;45:15;46:8,9
Warren (1)
  9:17
water (1)
  162:10
way (11)
  12:10;26:15;36:19;
  77:16;81:18;86:5;87:14;
  94:25;101:8;124:21;
  152:5
ways (2)
  18:15;149:10
weapon (5)
  120:20,21;130:13,16;
  132:2
week (2)
  150:12;151:8
weekly (1)
  44:25
weigh (1)
  44:5
weighed (1)
  165:10
weight (2)
  164:23;165:12
weights (2)
  163:18;165:7
welcome (1)
  161:14
weren't (2)

111:9;112:15
WESTBY (143)
  7:2;16:21;17:12.23;
  19:5,16,19,21;21:6;
  23:17,22;29:5,9,18;32:2,
  21:33:12;34:20;35:3,10,
  13;37:13,23;38:19;
  39:14;41:11:42:6;43:16;
  44:2,11;46:1;48:10,14;
  49:3,13;51:14,21,24;
  54:1;58:24;62:6,10.21;
  64:11,14;66:9,21:67:4,
  17;68:15;70:18;71:4;
  72:7,20;73:4;76:24;
  77:23;78:10,20;79:9,20;
  81:8,10;82:5;83:13;
  84:13;86:17,25;88:5.8;
  89:5;90:14;94:10;96:3,
  9;100:1,24;101:11,24;
  102:2;103:20,24;104:2;
  105:15;106:10,13,18,22,
  25;107:12;110:20,25;
  112:2;115:11,16;119:12,
  17,25;120:15;121:2,10;
  122:2;123:8,24;126:13;
  127:5,13,19,21;128:1;
  131:7;132:7;133:5;
  135:2,13;136:9;137:21;
  139:19;141:8;144:14;
  145:5;146:12,15;
  148:19;149:1;150:17;
  151:20;153:4;155:13,
  15;157:15;158:3;
  160:11,17,21;162:21;
  164:3,12,20,25;165:2,
  17;166:1
What's (3)
  35:3;94:10;153:4
Whoa (1)
  164:13
whole (4)
  81:19;132:13,15;
  160:21
who's (1)
  144:21
willing (1)
  16:18
window (14)
  108:21;109:12,19,20,
  22;110:7,10;111:4,23;
  114:13;125:8;147:2;
  149:6;159:9
windows (5)
  88:23;89:1,15;100:20;
  109:17
within (6)
  34:18;93:6;115:14;
  124:7;126:24;135:24
without (3)
  81:7;86:8
Witness (98)
  11:14;17:13,25;19:23;
  21:9;23:23;29:8,10;

32:3,25;35:14;37:16;
38:20;39:18;41:12;42:7;
43:19;44:3,12;46:4;
48:14;49:20;54:4;57:19;
58:25;62:9,24;64:15;
66:11,22;67:5,19;70:21;
71:7;72:23;73:7;78:1,
13,21;79:14,22;81:9;
83:15;84:14;87:1;88:7,
9;89:8;94:14;96:4,10;
100:4;101:1,14;102:3;
104:3;105:16;106:11,
24;107:1,13;111:1;
113:23;115:19;119:18;
120:3,18;121:4,12;
122:5;123:11;124:1;
126:14;127:6;128:2;
131:11;132:10;135:3,
16;136:11;141:10;
146:17;148:20;149:2;
150:18;151:1,3;157:18;
160:14,18,20,23;164:5,
13,19;165:1,18;166:2

**witnesses (1)**
127:22

**WLEA (1)**
119:19

**woman (1)**
76:21

**word (2)**
107:6;146:15

**words (7)**
22:9;89:4;90:10;
92:12;104:18;110:22;
132:20

**work (5)**
6:7,9;9:8,17;49:11

**worked (7)**
9:12,14;30:9,10;41:3;
42:13;117:21

**working (3)**
9:20;40:25;58:8

**works (1)**
23:4

**write (2)**
129:6;160:18

**wrong (2)**
33:5;68:20

**Wyoming (10)**
13:23,24;29:25;40:18;
50:16;52:11;62:13;
72:14;73:13;85:24

# Y

**yard (2)**
109:15;114:2

**year (10)**
8:21;9:2,10,13,20;
10:16,23,24,25;13:6

**year-and-a-half (1)**
43:24

**years (5)**

25:1,3,4;39:11;124:5

**Yep (1)**
32:9

**young (4)**
38:15;141:7;145:3,7

**younger (1)**
145:15

WACHSMUTH V. CITY OF
POWELL CV 10-041J
**PLAINTIFF'S EXHIBIT**
# _____ **7**

 **TO ONLY BE USED BY LAW ENFORCEMENT, COR-
RECTIONS, OR MILITARY PERSONNEL WHO HAVE
SUCCESSFULLY COMPLETED A TRAINING PRO-
GRAM IN THE USE OF DISTRACTION DEVICES.**

# 15 GRAM
# #25 TACTICAL DISTRACTION DEVICE

## WARNING!

1. Do not attempt to reload or remove the charge.
2. Do not use in any manner if the device has been subject to poor storage conditions or stored longer than five (5) years form date of manufacture.
3. DO NOT attempt to launch from a handgun, shotgun or any weapon. This device is NOT LAUNCHABLE.

## INSTRUCTIONS FOR USE:

- Hold device with fuze lever in web of hand, with the pull ring facing the officer.
1. Straighten the pull pin, leaving only a small "V" of bend.
2. While continuing to hold the fuze lever against the body of the device, remove the pull pin. Retain the pull pin.
3. Throw the device in an underhand manner into an observed area free of personnel, loose debris and ignitable materials.
4. DO NOT HOLD DEVICE AFTER RELEASE OF FUZE LEVER.

## RENDERING SAFE PROCEDURES:

1. Allow 30 minutes cook-down period
2. Approach device from side, remove Mylar tabs with knife or screwdriver
3. Deposit device into container of water.
4. Allow 24-hour soaking period.
5. Dispose of contents.

## CAUTION:

Defense Technology/Federal Laboratories guarantees the exercise of reasonable care in manufacture, but in view of the inherently hazardous nature of this device no further guarantee or warranty is made and no further responsibility is assumed.

## STORAGE:

Store in a cool dry place. Keep away from flame. Store in packaging provided until ready to use. Store in a cool dry area not to exceed 90F (32ºC).

Part # 700*08          Made in U.S.A.



WACHSMUTH V. CITY OF
POWELL- CV 10-0410
PLAINTIFF'S EXHIBIT
#____ **13**____

## IN THE CIRCUIT COURT, FIFTH JUDICIAL DISTRICT
## PARK COUNTY, WYOMING (POWELL)

**STATE OF WYOMING**                          Criminal Docket No.

       *Plaintiff,*

  vs.

**A WHITE CADILLAC, BEARING
WYOMING LICENSE PLATE
1182AS, REGISTERED TO BRETT
AND/OR TRISHA WACHSMUTH;
A 1999 TAN CHEVROLET SUV,
BEARING WYOMING LICENSE
PLATE 1159BL, REGISTERED TO
BRETT AND/OR TRISHA WACHSMUTH;
A 1993 BLUE FORD RANGER, BEARING
WYOMING LICENSE PLATE 11809T,
RIGISTERED TO BRETT AND/OR
TRISHA WACHSMUTH; AND A GRAY
SINGLE FAMILY RESIDENCE,
WITH WHITE TRIM AND BROWN
ROOF, AND UNATTACHED TAN GARAGE
WITH BROWN ROOF AND WOOD TRIM,
LOCATED AT 870 EAST NORTH
STREET IN POWELL, PARK COUNTY,
WYOMING,**

       *Defendant.*

## SEARCH AND SEIZURE AFFIDAVIT

    **THE UNDERSIGNED,** being of lawful age, and being first duly sworn upon oath, deposes and states as follows:

    1.    I, Chad Miner, have personal knowledge of the matters set forth herein, upon information and belief.

    2.    I am employed as a Police Officer with the Powell, Wyoming Police Department.

    3.    Your Affiant is a certified peace officer in the State of Wyoming. Your Affiant has prior training and experience in the investigation, arrest and prosecution of the violations of controlled substances under Wyoming Statutes. Your Affiant has communicated with Lieutenant Dave Patterson of the Park County Sheriff's Office who has extensive training and knowledge regarding controlled substances. From Lieutenant Patterson, I have learned the following: Lieutenant Patterson has attended the basic and advanced narcotics

investigations taught through the Washington State Criminal Justice Training Center for a total of 160 hours. Lieutenant Patterson also attended the advanced undercover operations course in Glynco, Georgia for a total of 80 hours. Lieutenant Patterson has investigated approximately fifty (50) marihuana grow operations over the course of six years of narcotics investigation assignments in Washington State. Specially related to marihuana grow operations, it is common that most operations are ongoing. The specific life cycle of a growing marihuana plant is approximately ninety days from its starting stage to the point where it's capable of producing marihuana in a usable fashion in the drug community for cultivation. It is common in marihuana grow operations to have various plant stages from mature and budding to currently non-budding to starters or clones. It is common that growers will clone from an original plant and repeat this cycle. At other times, it is also common to start a marihuana grow, if not from clones, but from seeds. Due to the nature of a marihuana grow, it is not uncommon to find these various stages at any given time of the operation.

Your Affiant knows through my training and experience that people who grow marihuana commonly have in their possession seeds, packaging materials, pots, containers, lamps, heat sources, plants, leaves, stems, plant food, receipts, computers, marihuana grow books, controlled substances, paraphernalia, needles, bongs, rolling papers, scales and weapons, namely firearms and ammunition. Persons who grow and/or sell controlled substances have firearms to protect themselves, their products and to intimidate others. Additional equipment used in marihuana grows are items such as halogen lights, lights, ballasts, power strips, fertilizers, potting soils, books, cellular telephones and all information contained therein, including records of all calls sent and received, directories or address books;

Your Affiant knows through his training and experience that persons who sell controlled substances commonly keep ledgers, directories and/or address books of people they receive controlled substances from and their customers. Furthermore, these individuals deal primarily in U.S. currency when selling to their customers and frequently keep that U.S. currency hidden. They typically have in their possession and hidden in vehicles and

residences scales and packing materials to prepare those controlled substances for sale. They also typically carry and possess firearms and ammunition in their homes, vehicles and during transactions.

    4.   I believe that in the vehicles described as a white Cadillac, bearing Wyoming license plate 1182AS, registered to Brett and/or Trisha Wachsmuth; a 1999 tan Chevrolet SUV, bearing Wyoming license plate 1159BL, registered to Brett and/or Trisha Wachsmuth; a 1993 blue Ford Ranger, bearing Wyoming license plate 11809T, registered to Brett and/or Trisha Wachsmuth; and the residence described as a gray single family residence, with white trim and brown roof, and the unattached tan garage with brown roof and wood trim, located at 870 East North Street in Powell, Park County, Wyoming, there is now being concealed certain evidence of a crime, namely: seeds, packaging materials, pots, containers, lamps, heat sources, plants, leaves, stems, plant food, receipts, computers, controlled substances, paraphernalia, bongs, rolling papers, scales, halogen lights, ballasts, power strips, fertilizers, potting soils, ledgers, directories and/or address books, U.S. currency, financial ledgers or records, monies that may relate to drug sales, cellular and/or land line telephones and all information contained herein, including records of all calls sent and received, directories or address books; in violation of Wyoming State Statute §35-7-1031.

    On February 24, 2009, I spoke with a Confidential Informant (hereafter referred to as CI) and learned the following: CI previously lived at 870 East North Street in Powell, Park County, Wyoming, with Bret and Trisha Wachsmuth from December of 2008 to January of 2009. The CI also has knowledge that the Wachsmuths purchased marihuana seeds and began a growing operation in the basement of this house in December of 2008. During December of 2008, CI discovered approximately six marihuana plants that were approximately six inches tall in the basement of the residence.

    In January of 2009, CI had knowledge that the Wachsmuths purchased marihuana growing containers, machines and paraphernalia off of the internet via the desk top computer in the kitchen of the residence. These items were purchased in late December of 2008 or early January of 2009, and shipped via United Parcel Service to the residence

located at 870 East North Street. CI stated that Brett Wachsmuth carried the old equipment out into his garage for storage. CI stated that Brett and Trisha Wachsmuth also keep potting soil in the garage.

The CI stated that the Wachsmuths received controlled substances in pill form, mostly oxycodone and morphine from the mail from Trisha Wachsmuth's mother, who has cancer and is prescribed these substances. The prescription drugs are shipped in a latex glove concealed inside of a stuffed animal. The Wachsmuths would take these controlled substances, either by crushing the pills and snorting them or by injecting the controlled substances with needles. The controlled substances were generally kept in Brett Wachsmuth's night table in their bedroom. The CI also stated that he has smoked marihuana with both Brett and Trisha Wachsmuth on numerous occasions during his stay in the residence. The CI stated that when he first moved into the residence, he noticed an already harvested marihuana plant. Brett Wachsmuth has talked with the CI about growing marihuana, including the appropriate light cycle and watering times of plants.

Your Affiant knows through my training and experience regarding the growing, manufacturing and distributing of controlled substances that often times, firearms are possessed and used by the individuals who grow, manufacture or distribute the controlled substances. The CI also stated that Brett and Trisha Wachsmuth have numerous firearms in the residence, including handguns and rifles. Many of the firearms were kept in the chest at the foot of the Wachsmuth's bed in their bedroom.

CI stated that Brett and Trisha Wachsmuth generally carries a one-hitter marihuana pipe in a dugout with her. CI also stated that Brett Wachsmuth at times carries a .22 caliber pistol concealed on his person.

Search and Seizure Affidavit
Page 4

foregoing is not to be construed as a statement of all information pertinent to the charge(s)

which may be brought in this matter.

**DATED** February _____, 2009.

_____

Chad Miner

The above and foregoing Search and Seizure Affidavit was sworn to and signed before me personally by the above-named Affiant on February _____, 2009.

_____

**CIRCUIT COURT JUDGE**

WACHSMUTH V. CITY OF
POWELL- CV 10-041J
PLAINTIFF'S EXHIBIT
#     14

IN THE CIRCUIT COURT, FIFTH JUDICIAL DISTRICT
PARK COUNTY, WYOMING (POWELL)

STATE OF WYOMING
                                        Plaintiff,

Bret Wachsmuth
D.O.B 12-6-81
S.S.N. 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
                                        Defendant.

**F I L E D**

MAR 0 2 2009

CIRCUIT COURT OF FIFTH JUDICIAL DISTRICT
PARK COUNTY, WYOMING
Peggy Parenus, Clerk

By  DEBORAH A. STAMBAUGH   Deputy

\*          \*          \*

## AFFIDAVIT OF PROBABLE CAUSE

THE UNDERSIGNED OF LAWFUL AGE, BEING FIRST DULY SWORN,
UPON OATH, STATES AND ALLEGES AS FOLLOWS:

1.    I, Chad Miner am a Law Enforcement Officer employed by the Powell
      Police Department

2.    On 2-24-09, at approximately 2200 hours, I arrested the above-named
      Defendant for 35-7-1031 c-i-A possession of marijuana and 35-7-1040
      cultivation of marijuana.

3.    The offense occurred at 870 E North St., which is located in Powell,
      Park County, State of Wyoming.

4.    The following describes the probable cause I used to effect the arrest of
      Bret Wachsmuth, the Defendant.

Probable Cause Statement
        Lt. Dave Patterson of the Park County Sheriff's Office, Deputy County
Attorney Jonathan Davis and I met with an interviewed CI-2009-02 at the Park County
Attorney's Office in Powell at approximately 1600 hrs 2-24-09. During the interview I
learned substantially the following:
        CI-2009-02 stated that he had knowledge of an active marijuana grow operation
in Powell, Park County, Wyoming. CI-2009-02 lived at 870 E. North with Bret and
Tricia Wachsmuth from December 2008 thru January 2009. During this time CI-2009-02
observed a marijuana plant that had recently been harvested of it "Buds" and was down to
a bare stalk. CI-2009-02 said that Bret was unable to clone the harvested plant. Bret had
some fluorescent light for growing. Bret and Tricia then obtained credit cards and began
purchasing marijuana growing equipment and seeds from the Internet in late December
2008 or early January 2009. CI-2009-02 signed for the equipment when UPS dropped it
off. Bret had ordered a timer, light, and seed from the Internet. Bret frequently talked to
CI-2009-02 about growing marijuana and how he'd grown marijuana when he lived in
Minnesota. Bret researched growing methods and techniques on the Internet and
possessed marijuana growing guidebooks. CI-2009-02 described the plants as being
downstairs and underneath the stairs in a painted white room. CI-2009-02 stated that the
door to the downstairs has a dead bolt lock and Bret and Tricia don't let anyone
downstairs. CI-2009-02 further described the growing room as having a sodium light,
fan and timer to turn the light on at the appropriate time and painted white. CI-2009-02
described the plants as being approximately 6 inches tall in the first week of January
2009. I know through my training and experiences that most grow operations are

continuous and ongoing. The typical life cycle of a plant is approximately 90 days from start to the initial harvest of product.

CI-2009-02 further stated that Tricia and Bret have numerous prescription pills in the house. Bret currently takes many medications and has prescriptions for them however CI-2009-02 knows that Tricia's mother sends prescription pills to Tricia from Minnesota namely Oxycontin and Morphine. CI-2009-02 has knowledge of two such deliveries. CI-2009-02 stated that Tricia's mother packages the pills inside a latex glove and then inserts then into a cut open stuffed animal. These pills arrive in large prescription bottles approximately 100 at a time. Bret and Tricia crushed and snorted the pills or sometimes inject them.

CI-2009-02 has smoked marijuana with Tricia and Bret frequently up until approximately 1 month ago. CI-2009-02 left the residence after being kicked out. CI-2009-02 had brought some friends home from the bar and Bret had the new growing plants sitting on the kitchen table. The friends saw the marijuana plants on the table, which is why CI-2009-02 was kicked out of the house.

CI-2009-02 stated that Bret has several guns in the house and he keeps his handguns loaded. Bret sometimes carries a small 22-caliber pistol.

CI-2009-02 had contact with an acquaintance of his approximately 1 week ago and was told that Bret and Tricia still had the marijuana plants and they were approximately two feet tall.

CI-2009-02 was in phone contact with Bret on 2-24-09. During these conversations that CI-2009-02 stated to Bret that he was going to turn him into the Police.

A search warrant was prepared and presented to the Honorable Judge Bruce Waters. Judge Waters signed the search and seizure warrant. Myself along with several Officers from the Powel Police department executed said search warrant at approximately 2116 hrs. on 2-24-09. Officer Chapman knocked on the front door and announced "Police Search Warrant". I opened the front door using a ram at the same time as Officer McCaslin deployed a diversionary device in the northeast bedroom window. The Officers entered the residence and found one occupant in the front living room that was identified as Tricia Wachsmuth. I placed Tricia in handcuffs checking them for tightness and double locking them. Tricia was provided a coat and shoes and transported to the PD where Investigator Brown interviewed her. There were no other occupants in the house at the time the search warrant was executed.

A search of the residence of 870 E North St. including the garage and blue Ford pickup was conducted by Officers Chapman, McCaslin, Brown, Lara, Kent, Brilakis, Bradley, Hall and myself. There was one semi-automatic pistol laying in the hallway, two revolvers loaded in the master bedroom one laying on the bed and the other hope chest, and one unloaded 9mm semi-automatic pistol in the night stand on the north side of the bed in the north bedroom. In the basement underneath the stairs there was located two marijuana plants underneath a light with a fan blowing on them. The growing room was painted white. The basement smelled strongly of raw marijuana. There were also several fluorescent lights in the basement that were not currently being used. There were numerous grow logs and marijuana growing guidebooks located in the house. There were numerous prescription pill bottles found throughout the house, some having marijuana residue in them and some having pills. Underneath the bed in the north bedroom there were three containers that contained marijuana, seeds, residue and paraphernalia. Pictures of Bret with large amounts of marijuana plants were located in the north bedroom and other pictures with Bret and marijuana. Numerous other paraphernalia, growing lights and other items used for growing marijuana plants were found. There was loose marijuana on the coffee table in the living room. All of these items and others were collected as evidence.

I was informed that Bret was currently located at 524 Rd. 7. Sgt Chretien, Sgt. Eckerdt and Officer Danzer met with Bret there and placed him in custody. Bret was interviewed by investigator Brown see his narrative.

On Tuesday, February 24, 2009, SRO Bradley and Investigator Brown interviewed Tricia Wachsmuth at the LEC. During the interview, Wachsmuth stated substantially as follows:

On Tuesday, February 24, 2009, Sgt Eckerdt and Invetigator Brown interviewed Bret Wachsmuth at the LEC. During the interview, Wachsmuth stated substantially as follows:

Wachsmuth lives at 870 E. North Street, Powell, Wyoming with his wife, Tricia Wachsmuth. He was informed why we needed to talk with him. Wachsmuth stated that

most pills are his and that he has are legal. He is on disability. Wachsmuth stated that he takes Paxal, Lorazipan, Carisaprotal, Hydrocodone, a celibrex type drug and oxecoton.

Wachsmuth stated that he had two (2) Marijuana plants under the stairs that were approximately 1-1/2 months old. He had three plants but one was a male so he burnt it. He stated that the male plant does not have much THC so if you smoked it with would give you a headache.

Wachsmuth stated that he had plants when he lived in Minnesota for personal use, this way he did not have to buy any. He stated that he hadn't smoked Marijuana in 5 years until recently.

I asked him about the Marijuana that was found on the table. He stated that Tricia found it under the couch today.

Wachsmuth stated that he takes care of the plants and that his wife smokes it. He denied selling Marijuana and grew it so he did not have to deal with others.

Wachsmuth stated that he smoked Marijuana 4-5 days ago.

5.    The foregoing statement is accurate to the best information available to me as of the date of this affidavit. Investigation of the matter may not be completed and the foregoing is not to be construed as a statement of all information pertinent to the charge(s) which is/are brought in this matter.


_____
Officer Chad Miner


**STATE of WYOMING }**
                                 **}SS**
**COUNTY OF PARK    }**

The foregoing Affidavit of Probable Cause was signed and sworn to before me by _Chas Q Miner_____, on _feb 25_____, 200_9_.

Witness my hand and official seal.

_____
Notary Public

00139

WACHSMUTH v. CITY OF
POWELL- CV 10-041J
PLAINTIFF'S EXHIBIT
#    15

## IN THE CIRCUIT COURT, FIFTH JUDICIAL DISTRICT
## PARK COUNTY, WYOMING (POWELL)

**STATE OF WYOMING**
                        **Plaintiff,**

**Tricia Wachsmuth**
**D.O.B 8-19-84**
**S.S.N. 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**

                        **Defendant.**

# FILED

MAR 0 2 2009

CIRCUIT COURT OF FIFTH JUDICIAL DISTRICT
PARK COUNTY, WYOMING
Peggy Farman, Clerk
By  DEBORAH A. STAMBAUGH  Deputy

\*          \*          \*

## AFFIDAVIT OF PROBABLE CAUSE

THE UNDERSIGNED OF LAWFUL AGE, BEING FIRST DULY SWORN,
UPON OATH, STATES AND ALLEGES AS FOLLOWS:

1.    I, Chad Miner am a Law Enforcement Officer employed by the Powell
      Police Department

2.    On 2-24-09, at approximately 2130 hours, I arrested the above-named
      Defendant for 35-7-1031 c-i-A possession of marijuana and 35-7-1040
      cultivating marijuana.

3.    The offense occurred at 870 E. North St., which is located in Powell,
      Park County, State of Wyoming.

4.    The following describes the probable cause I used to effect the arrest of
      Tricia Wachsmuth, the Defendant.

Probable Cause Statement:

      Lt. Dave Patterson of the Park County Sheriff's Office, Deputy County Attorney
Jonathan Davis and I met with an interviewed CI-2009-02 at the Park County Attorney's
Office in Powell at approximately 1600 hrs 2-24-09. During the interview I learned
substantially the following:

      CI-2009-02 stated that he had knowledge of an active marijuana grow operation
in Powell, Park County, Wyoming. CI-2009-02 lived at 870 E. North with Bret and
Tricia Wachsmuth from December 2008 thru January 2009. During this time CI-2009-02
observed a marijuana plant that had recently been harvested of it "Buds" and was down to
a bare stalk. CI-2009-02 said that Bret was unable to clone the harvested plant. Bret had
some fluorescent light for growing. Bret and Tricia then obtained credit cards and began
purchasing marijuana growing equipment and seeds from the Internet in late December
2008 or early January 2009. CI-2009-02 signed for the equipment when UPS dropped it
off. Bret had ordered a timer, light, and seed from the Internet. Bret frequently talked to
CI-2009-02 about growing marijuana and how he'd grown marijuana when he lived in
Minnesota. Bret researched growing methods and techniques on the Internet and
possessed marijuana growing guidebooks. CI-2009-02 described the plants as being
downstairs and underneath the stairs in a painted white room. CI-2009-02 stated that the
door to the downstairs has a dead bolt lock and Bret and Tricia don't let anyone
downstairs. CI-2009-02 further described the growing room as having a sodium light,
fan and timer to turn the light on at the appropriate time and painted white. CI-2009-02
described the plants as being approximately 6 inches tall in the first week of January
2009. I know through my training and experiences that most grow operations are

continuous and ongoing. The typical life cycle of a plant is approximately 90 days from start the initial harvest of product.

CI-2009-02 further stated that Tricia and Bret have numerous prescription pills in the house. Bret currently takes many medications and has prescriptions for them however CI-2009-02 knows that Tricia's mother sends prescription pills to Tricia from Minnesota namely Oxycontin and Morphine. CI-2009-02 has knowledge of two such deliveries. CI-2009-02 stated that Tricia's mother packages the pills inside a latex glove and then inserts then into a cut open stuffed animal. These pills arrive in large prescription bottles approximately 100 at a time. Bret and Tricia crushed and snorted the pills or sometimes inject them.

CI-2009-02 has smoked marijuana with Tricia and Bret frequently up until approximately 1 month ago. CI-2009-02 left the residence after being kicked out. CI-2009-02 had brought some friends home from the bar and Bret had the new growing plants sitting on the kitchen table. The friends saw the marijuana plants on the table, which is why CI-2009-02 was kicked out of the house.

CI-2009-02 stated that Bret has several guns in the house and he keeps his handguns loaded. Bret sometimes carries a small 22-caliber pistol.

CI-2009-02 had contact with an acquaintance of his approximately 1 week ago and was told that Bret and Tricia still had the marijuana plants and they were approximately two feet tall.

CI-2009-02 was in phone contact with Bret on 2-24-09. During these conversations that CI-2009-02 stated to Bret that he was going to turn him into the Police.

A search warrant was prepared and presented to the Honorable Judge Bruce Waters. Judge Waters signed the search and seizure warrant. Myself along with several Officers from the Powell Police department executed said search warrant at approximately 2116 hrs. on 2-24-09. Officer Chapman knocked on the front door and announced "Police Search Warrant". I opened the front door using a ram at the same time as Officer McCaslin deployed a diversionary device in the northeast bedroom window. The Officers entered the residence and found one occupant in the front living room that was identified as Tricia Wachsmuth. I placed Tricia in handcuffs checking them for tightness and double locking them. Tricia was provided a coat and shoes and transported to the PD where Investigator Brown interviewed her. There were no other occupants in the house at the time the search warrant was executed.

A search of the residence of 870 E North St. including the garage and blue Ford pickup was conducted by Officers Chapman, McCaslin, Brown, Lara, Kent, Brilakis, Bradley, Hall and myself. There was one semi-automatic pistol laying in the hallway, two revolvers loaded in the master bedroom one laying on the bed and the other hope chest, and one unloaded 9mm semi-automatic pistol in the night stand on the north side of the bed in the north bedroom. In the basement underneath the stairs there was located two marijuana plants underneath a light with a fan blowing on them. The growing room was painted white. The basement smelled strongly of raw marijuana. There were also several fluorescent lights in the basement that were not currently being used. There were numerous grow logs and marijuana growing guidebooks located in the house. There were numerous prescription pill bottles found throughout the house, some having marijuana residue in them and some having pills. Underneath the bed in the north bedroom there were three containers that contained marijuana, seeds, residue and paraphernalia. Pictures of Bret with large amounts of marijuana plants were located in the north bedroom and other pictures with Bret and marijuana. Numerous other paraphernalia, growing lights and other items used for growing marijuana plants were found. There was loose marijuana on the coffee table in the living room. All of these items and others were collected as evidence.

I was informed that Bret was currently located at 524 Rd. 7. Sgt Chretien, Sgt. Eckerdt and Officer Danzer met with Bret there and placed him in custody. Bret was interviewed by investigator Brown see his narrative.

On Tuesday, February 24, 2009, SRO Bradley and Investigator Brown interviewed Tricia Wachsmuth at the LEC. During the interview, Wachsmuth stated substantially as follows:

She was given her Rights per Miranda and talked with us. She lives at 870 E.
North Street, Powell Wyoming with her husband, Bret Wachsmuth. She was informed of
why she was being interviewed. She denied any pills being sent to her. She also stated
that the plants that were in the residence were for personal use.

Wachsmuth stated that she did not want to answer any more questions until she
talk with her husband.

5.     The foregoing statement is accurate to the best information
available to me as of the date of this affidavit. Investigation of the matter
may not be completed and the foregoing is not to be construed as a statement
of all information pertinent to the charge(s) which is/are brought in this
matter.

Officer Chad Miner

STATE of WYOMING }
                         }SS
COUNTY OF PARK  }

The foregoing Affidavit of Probable Cause was signed and sworn to
before me by _Chad g Miner_____, on _feb 25_____,
2009.

Witness my hand and official seal.

Mina L Meyer
Notary Public



# POWELL POLICE DEPARTMENT

## CAD INCIDENT REPORT
### 090224086

WACHSMUTH v. CITY OF
POWELL- CV 10-041J

PLAINTIFF'S EXHIBIT
# ___ 19

| Location | Cross Streets | City |
|---|---|---|
| 870 E NORTH ST | S HAMILTON ST/S INGAL | PO# |

| Incident Type | Call Taker | Dispatcher |
|---|---|---|
| DRUGS - DRUG RELATED | TORCZON, MARISSA | TORCZON, MARISSA |

| Date | Priority | Primary Unit | Beat | Fire Zone | Area | Map | Source |
|---|---|---|---|---|---|---|---|
| 02/24/2009 | 3 | P04 | P | | 76 | | TELEPHONE CALL |

| Caller Name | | Caller Address | | Caller Phone |
|---|---|---|---|---|

| Dispositions | Weapon | Alm Level | Case Number |
|---|---|---|---|
| See Report, See Case, See Case | | | 09-223 |

| Vehicles | Associated Incidents |
|---|---|

| Incident Times | | Special Circumstances |
|---|---|---|
| Received | 14:58:34 | |
| Created | 14:59:00 | |
| Dispatched | 15:01:09 | |
| En Route | 15:01:09 | |
| On Scene | 15:01:12 | |
| Closed | 01:12:00 | |
| Rcvd-Closed | 10:13:26 | |

| Persons | Sex | DOB | Race | DL | SSN |
|---|---|---|---|---|---|
| Wachsmuth, Tricia Lynn | F | 08/19/1984 | White | 108038-704/WY | 477068104 |

| Unit Times | Officer | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | On Scene-Clear | Disp-Clear |
|---|---|---|---|---|---|---|---|---|
| P09 | Miner, Chad | 15:01:09 | 15:01:09 | 15:01:12 | 23:58:59 | 00:03 | 8:57:47 | 8:57:50 |
| P08 | Blackmore, Lee | 19:22:16 | 19:22:16 | 19:22:16 | 22:00:03 | | 2:37:47 | 2:37:47 |
| MS113 | MS113 Crew | 21:11:38 | 21:11:38 | 21:19:45 | 21:56:53 | 08:07 | 37:08 | 45:15 |
| P02 | Brilakis, Matthew | 21:12:30 | 21:12:30 | 21:16:48 | 21:59:25 | 04:18 | 42:37 | 46:55 |
| P03 | Bradley, Cody | 21:12:48 | 21:12:48 | 21:16:50 | 23:52:16 | 04:02 | 2:35:26 | 2:39:28 |
| P04 | Brown, Dave | 21:12:51 | 21:12:51 | 21:16:52 | 23:57:38 | 04:01 | 2:40:46 | 2:44:47 |
| P05 | Lara, Brett | 21:12:56 | 21:12:56 | 21:16:54 | 23:51:20 | 03:58 | 2:34:26 | 2:38:24 |
| P06 | Chretien, Michael | 21:12:58 | 21:12:58 | 21:16:57 | 23:59:52 | 03:59 | 2:42:55 | 2:46:54 |
| P10 | Eckerdt, Roy | 21:13:01 | 21:13:01 | 21:17:02 | 23:59:48 | 04:01 | 2:42:46 | 2:46:47 |
| P14 | Kent, Alan | 21:13:04 | 21:13:04 | 21:17:04 | 00:00:00 | 04:00 | 2:42:56 | 2:46:56 |
| P15 | Danzer, Matthew | 21:13:05 | 21:13:05 | 21:17:06 | 23:24:43 | 04:01 | 2:07:37 | 2:11:38 |
| P16 | McCaslin, Matt | 21:13:07 | 21:13:07 | 21:17:08 | 00:00:05 | 04:01 | 2:42:57 | 2:46:58 |
| P17 | Hall, Michael | 21:13:10 | 21:13:10 | 21:17:11 | 23:52:24 | 04:01 | 2:35:13 | 2:39:14 |
| P18 | Chapman, Kirk | 21:13:13 | 21:13:13 | 21:17:13 | 23:58:54 | 04:00 | 2:41:41 | 2:45:41 |
| P08 | Blackmore, Lee | 22:15:48 | 22:15:48 | 22:15:49 | 23:12:12 | 00:01 | 56:23 | 56:24 |
| P08 | Blackmore, Lee | 23:12:31 | 23:12:31 | | 00:02:45 | N/A | N/A | 50:14 |
| P15 | Danzer, Matthew | 23:26:43 | 23:26:43 | 00:40:58 | 00:42:28 | 1:14:15 | 01:30 | 1:15:45 |
| P03 | Bradley, Cody | 00:01:40 | 00:01:40 | 00:01:44 | 00:25:51 | 00:04 | 24.07 | 24:11 |
| P04 | Brown, Dave | 00:01:48 | 00:01:48 | 00:01:51 | 00:02:16 | 00:03 | 00:25 | 00:28 |
| P05 | Lara, Brett | 00:01:54 | 00:01:54 | 00:01:57 | 00:25:54 | 00:03 | 23:57 | 24:00 |
| P06 | Chretien, Michael | 00:02:02 | 00:02:02 | 00:02:05 | 00:49:46 | 00:03 | 47:41 | 47:44 |
| P09 | Miner, Chad | 00:02:55 | 00:02:55 | 00:02:58 | 00:28:29 | 00:03 | 25:31 | 25:34 |
| P10 | Eckerdt, Roy | 00:03:01 | 00:03:01 | 00:03:05 | 00:08:19 | 00:04 | 05.14 | 05:18 |
| P14 | Kent, Alan | 00:03:07 | 00:03:07 | 00:03:10 | 00:41:16 | 00:03 | 38:06 | 38:09 |
| P16 | McCaslin, Matt | 00:03:16 | 00:03:16 | 00:03:19 | 01:11:57 | 00:03 | 1:08:38 | 1:08:41 |
| P17 | Hall, Michael | 00:03:23 | 00:03:23 | 00:03:27 | 00:10:19 | 00:04 | 06:52 | 06:56 |
| P18 | Chapman, Kirk | 00:03:29 | 00:03:29 | 00:03:32 | 01:12:00 | 00:03 | 1:08:28 | 1:08:31 |
| P09 | Miner, Chad | 08:33:55 | 08:33:55 | 08:34:00 | 15:45:50 | 00:05 | 7:11:50 | 7:11:55 |
| P18 | Chapman, Kirk | 08:43:55 | 08:43:55 | 08:44:01 | 09:05:03 | 00:06 | 21:02 | 21:08 |
| P18 | Chapman, Kirk | 09:41:08 | 09:41:08 | 09:41:08 | 10:24:17 | | 43:09 | 43.09 |
| P08 | Blackmore, Lee | 14:13:57 | 14:13:57 | 14:14:02 | 14:35:31 | 00:05 | 21:29 | 21:34 |
| P05 | Lara, Brett | 14:53:55 | 14:53:55 | 14:54:01 | 15:41:32 | 00:06 | 47:31 | 47:37 |
| P15 | Danzer, Matthew | 17:49:16 | 17:49:16 | 17:49:24 | 18:32:24 | 00:08 | 43:00 | 43:08 |
| P09 | Miner, Chad | 04:07:18 | 04:07:18 | 04:07:26 | 06:40:18 | 00:08 | 2:32:52 | 2:33:00 |
| P09 | Miner, Chad | 05:23:49 | 05:23:49 | 05:25:10 | 06:07:44 | 01.21 | 42:34 | 43:55 |
| P18 | Chapman, Kirk | 14:46:59 | 14:46:59 | 14:47:07 | 14:52:16 | 00:08 | 05:09 | 05:17 |
| P09 | Miner, Chad | 22:03:08 | 22:13:08 | 22:13:15 | 23:17:22 | 00.07 | 1:04:07 | 1:04:14 |
| P09 | Miner, Chad | 00:04:39 | 00:04:39 | 00:04:51 | 00:49:16 | 00:12 | 44:25 | 44:37 |
| P09 | Miner, Chad | 01:41:02 | 01:41:02 | 01:41:10 | 06:19:17 | 00:08 | 4:38:07 | 4:38:15 |
| P04 | Brown, Dave | 09:44:23 | 09:44:23 | 09:44:28 | 11:04.20 | 00.05 | 1:19:52 | 1:19:57 |
| P04 | Brown, Dave | 11:38:52 | 11:38:52 | 11:38:52 | 11:54:01 | | 15:09 | 15:09 |

**00001**

| Unit | Officer | Dispatched | Enroute | On Scene | Clear | Disp-On Scene | On Scene-Clear | Disp-Clear |
|------|---------|-----------|---------|----------|-------|---------------|----------------|------------|
| P15 | Danzer, Matthew | 16:52:25 | 16:52:25 | 16:52:25 | 23:37:32 | | 6:45:07 | 6:45:07 |
| P09 | Miner, Chad | 03:13:58 | 03:13:58 | 03:14:03 | 05:24:24 | 00:05 | 2:10:21 | 2:10:26 |
| P04 | Brown, Dave | 10:01:56 | 10:01:56 | 10:02:02 | 12:01:02 | 00:06 | 1:59:00 | 1:59:06 |
| P04 | Brown, Dave | 13:04:12 | 13:04:12 | 13:10:19 | 13:50:31 | 06:07 | 40:12 | 46:19 |
| P04 | Brown, Dave | 14:00:27 | 14:00:27 | 14:00:33 | 14:55:57 | 00:06 | 55:24 | 55:30 |
| P05 | Lara, Brett | 03:24:01 | 03:24:01 | 03:24:02 | 06:12:19 | 00:01 | 2:48:17 | 2:48:18 |
| P09 | Miner, Chad | 23:23:50 | 23:23:50 | 23:23:51 | 01:21:26 | 00:01 | 1:57:35 | 1:57:36 |
| P09 | Miner, Chad | 04:06:39 | 04:06:39 | 04:06:39 | 04:41:44 | | 35:05 | 35:05 |
| P09 | Miner, Chad | 04:42:21 | 04:42:21 | 04:42:22 | 05:03:21 | 00:01 | 20:59 | 21:00 |
| P05 | Lara, Brett | 12:17:56 | 12:17:56 | 12:18:02 | 12:53:39 | 00:06 | 35:37 | 35:43 |
| P05 | Lara, Brett | 13:24:09 | 13:24:09 | 13:24:13 | 13:54:28 | 00:04 | 30:15 | 30:19 |
| P05 | Lara, Brett | 08:28:22 | 08:28:22 | 08:28:30 | 10:40:47 | 00:08 | 2:12:17 | 2:12:25 |
| P05 | Lara, Brett | 12:05:23 | 12:05:23 | 12:05:27 | 13:19:58 | 00:04 | 1:14:31 | 1:14:35 |
| P04 | Brown, Dave | 14:10:20 | 14:10:20 | 14:10:21 | 16:04:22 | 00:01 | 1:54:01 | 1:54:02 |
| P04 | Brown, Dave | 13:15:19 | 13:15:19 | 13:15:20 | 13:18:03 | 00:01 | 02:43 | 02:44 |
| P04 | Brown, Dave | 13:53:56 | 13:53:56 | 13:54:08 | 14:16:18 | 00:12 | 22:10 | 22:22 |
| P04 | Brown, Dave | 09:26:06 | 09:26:06 | 09:26:07 | 10:27:07 | 00:01 | 1:01:00 | 1:01:01 |
| P04 | Brown, Dave | 09:54:24 | 09:54:24 | 09:54:24 | 12:10:12 | | 2:15:48 | 2:15:48 |
| P04 | Brown, Dave | 08:06:54 | 08:06:54 | 08:07:12 | 10:07:37 | 00:18 | 2:00:25 | 2:00:43 |
| P04 | Brown, Dave | 14:51:28 | 14:51:28 | 14:52:38 | 16:14:56 | 01:10 | 1:22:18 | 1:23:28 |
| P04 | Brown, Dave | 09:08:24 | 09:08:24 | 09:08:30 | 09:30:05 | 00:06 | 21:35 | 21:41 |
| P04 | Brown, Dave | 11:00:20 | 11:00:20 | 11:00:25 | 11:44:14 | 00:05 | 43:49 | 43:54 |
| P04 | Brown, Dave | 08:55:22 | 08:55:22 | 08:55:23 | 11:58:58 | 00:01 | 3:03:35 | 3:03:36 |
| P04 | Brown, Dave | 10:38:19 | 10:38:19 | 10:38:20 | 11:47:53 | 00:01 | 1:09:33 | 1:09:34 |
| P04 | Brown, Dave | 09:58:45 | 09:58:45 | | 10:01:56 | N/A | N/A | 03:11 |
| P04 | Brown, Dave | 10:14:08 | 10:14:08 | 10:17:45 | 11:11:17 | 03:37 | 53:32 | 57:09 |

**Incident Comments**

-- Wanted to speak with an Officer regarding people selling drugs from the above location.

| TIME | EVENT |
|------|-------|
| 14:59:00 | Incident initiated at 870 E North St, Powell |
| 15:01:09 | P09 ENRT. 870 E North St, Powell |
| 15:01:12 | P09 ARRIV. LEC |
| 15:24:44 | P09 ENRT. ANNEX |
| 15:28:58 | P09 ARRIV. ANNEX |
| 16:10:58 | P09 ENRT. 10-6 FOR AWHILE |
| 16:41:26 | P09 ARRIV. ANNEX |
| 18:26:19 | P09 ENRT. |
| 18:32:17 | P09 ARRIV. LEC |
| 18:56:04 | P09 ENRT. TO CODY |
| 19:22:16 | P08 ENRT. 870 E North St, Powell |
| 19:22:16 | P08 ARRIV. |
| 20:18:24 | P09 ARRIV. LEC |
| 21:09:58 | Powell Ambulance was advised to stage at the fire department. no lights |
| 21:09:58 | no sirens. travel on monroe to road 8 from road 8 to south st. |
| 21:11:38 | MS113 ENRT. 870 E North St, Powell |
| 21:12:30 | P02 ENRT. 870 E North St, Powell |
| 21:12:45 | P09 ENRT. 870 E NORTH ST |
| 21:12:48 | P03 ENRT. 870 E North St, Powell |
| 21:12:51 | P04 ENRT. 870 E North St, Powell |
| 21:12:56 | P05 ENRT. 870 E North St, Powell |
| 21:12:58 | P06 ENRT. 870 E North St, Powell |
| 21:13:01 | P10 ENRT. 870 E North St, Powell |
| 21:13:04 | P14 ENRT. 870 E North St, Powell |
| 21:13:05 | P15 ENRT. 870 E North St, Powell |
| 21:13:07 | P16 ENRT. 870 E North St, Powell |
| 21:13:10 | P17 ENRT. 870 E North St, Powell |
| 21:13:13 | P18 ENRT. 870 E North St, Powell |
| 21:16:45 | P06 Back door team we are headed to the front |
| 21:16:48 | P02 ARRIV. |
| 21:16:50 | P03 ARRIV. |

| TIME | EVENT |
|------|-------|
| 21:16:52 | P04 ARRIV. |
| 21:16:54 | P05 ARRIV. |
| 21:16:57 | P06 ARRIV. |
| 21:17:00 | P09 ARRIV. |
| 21:17:02 | P10 ARRIV. |
| 21:17:04 | P14 ARRIV. |
| 21:17:06 | P15 ARRIV. |
| 21:17:08 | P16 ARRIV. |
| 21:17:11 | P17 ARRIV. |
| 21:17:13 | P18 ARRIV. |
| 21:19:45 | MS113 ARRIV. 2118HRS AT THE FIRE HALL |
| 21:21:24 | P04 P16 |
| 21:21:27 | P09 Go ahead |
| 21:21:32 | P09 Can you bring a car around |
| 21:21:37 | P09 thats what i am doing |
| 21:21:41 | P09 copy on with a cage |
| 21:21:44 | P09 whats that |
| 21:21:52 | P09 perferably one with a cage |
| 21:26:10 | P09 p14 did anyone give you a 10-4 yet (negative) were 10-4 |
| 21:29:35 | P09 p06 (p06) can you let ems know they are clear also we wont need them |
| 21:29:40 | P09 anymore (copy) |
| 21:30:38 | P09 MS113 was advised they may return to the hospital |
| 21:30:43 | MS113 ENRT. HOSP |
| 21:31:04 | P09 Danzer, Chretien and Eckerdt running to 524 Road 7 to see if suspects |
| 21:31:35 | P09 dad is home. Information received by p36 over px |
| 21:32:11 | Suspect may be at his dads house. |
| 21:32:23 | P06 ENRT. 524 ROAD 7 |
| 21:32:33 | P15 ENRT. 524 ROAD 7 |
| 21:32:41 | P10 ENRT. 524 ROAD 7 |
| 21:38:37 | P06 advised he said he is going to bring him out. |
| 21:38:53 | P06 ARRIV. |
| 21:38:56 | P15 ARRIV. |
| 21:38:58 | P10 ARRIV. |
| 21:41:18 | P03 ENRT. CLEAR WITH ONE FEMALE BEGIN MILES 13221 |
| 21:41:22 | P04 ARRIV. LEC |
| 21:42:59 | P03 ARRIV. LEC END MILES 13222 |
| 21:43:22 | P14 ARRIV. LEC |
| 21:42:08 | P09 Case number PPD 09-273 assigned to 090224086 |
| 21:45:30 | WACHSMUTH, TRICIA LYNN (08/19/1984) 108038-704/WY added to incident |
| 21:52:18 | P10 ENRT. WITH ONE 10-35 |
| 21:52:25 | P15 ENRT. WITH P10 |
| 21:52:41 | P06 out at the location 524 road 7 for a bit more |
| 21:56:53 | MS113 CLR. Freed |
| 21:59:25 | P02 CLR. |
| 21:59:51 | P10 ARRIV. |
| 21:59:54 | P15 ARRIV. |
| 22:00:03 | P08 CLR. |
| 22:07:00 | P15 ENRT. 524 ROAD 7 |
| 22:07:05 | P03 ENRT. 524 ROAD 7 |
| 22:15:48 | P08 ENRT. 870 E North St, Powell |
| 22:15:49 | P08 ARRIV. |
| 22:16:14 | P03 ARRIV. 524 ROAD 7 |
| 22:16:21 | P15 ARRIV. 524 ROAD 7 |
| 22:28:40 | P03 ENRT. |
| 22:28:44 | P15 ENRT. |
| 22:40:57 | P06 ARRIV. LEC |
| 22:41:14 | P06 ARRIV. 524 ROAD 7 |

| TIME | EVENT |
|------|-------|
| 22:41:21 | P03 ARRIV. LEC |
| 22:41:28 | P15 ARRIV. LEC |
| 22:50:23 | P08 ARRIV. LEC |
| 23:01:57 | P03 ARRIV. 870 E NORTH ST |
| 23:12:12 | P08 CLR. Freed |
| 23:12:31 | P08 ENRT. 870 E North St, Powell |
| 23:12:52 | P08 ENRT. TO CODY, 1 FEMALE 10-95, BEGIN MILES 123172 |
| 23:19:24 | P04 ENRT. 870 E NORTH ST |
| 23:20:17 | P04 ARRIV. |
| 23:24:43 | P15 CLR. Freed |
| 23:26:43 | P15 ENRT. 870 E North St, Powell |
| 23:26:50 | P15 ENRT. TO CODY 1 MALE 10-95 |
| 23:27:05 | P10 ENRT. 870 E NORTH ST |
| 23:34:27 | P10 ARRIV. |
| 23:39:06 | P08 JAIL. END MILES 23197 |
| 23:47:20 | P08 ENRT. BACK TO POWELL |
| 23:50:01 | P15 JAIL. |
| 23:50:18 | P15 ENRT. TO JAIL |
| 23:51:20 | P05 CLR. |
| 23:52:05 | P15 JAIL. |
| 23:52:16 | P03 CLR. |
| 23:52:24 | P17 CLR. |
| 23:57:38 | P04 CLR. |
| 23:58:54 | P18 CLR. |
| 23:58:59 | P09 CLR. |
| 23:59:48 | P10 CLR. |
| 23:59:52 | P06 CLR. |
| [ 02/25/2009 ] | |
| 00:00:00 | P14 CLR. |
| 00:00:05 | P16 CLR. |
| 00:01:40 | P03 ENRT. 870 E North St, Powell |
| 00:01:44 | P03 ARRIV. LEC |
| 00:01:48 | P04 ENRT. 870 E North St, Powell |
| 00:01:51 | P04 ARRIV. LEC |
| 00:01:54 | P05 ENRT. 870 E North St, Powell |
| 00:01:57 | P05 ARRIV. LEC |
| 00:02:02 | P06 ENRT. 870 E North St, Powell |
| 00:02:16 | P06 ARRIV |
| 00:02:16 | P04 CLR. |
| 00:02:45 | P08 CLR. |
| 00:02:55 | P09 ENRT. 870 E North St, Powell |
| 00:02:58 | P09 ARRIV. LEC |
| 00:03.01 | P10 ENRT. 870 E North St, Powell |
| 00:03:05 | P10 ARRIV. LEC |
| 00:03:07 | P14 ENRT. 870 E North St, Powell |
| 00:03:10 | P14 ARRIV. LEC |
| 00:03:16 | P16 ENRT. 870 E North St, Powell |
| 00:03:19 | P16 ARRIV. LEC |
| 00:03:23 | P17 ENRT. 870 E North St, Powell |
| 00:03:27 | P17 ARRIV. LEC |
| 00:03:29 | P18 ENRT. 870 E North St, Powell |
| 00:03:32 | P18 ARRIV. LEC |
| 00:08:19 | P10 CLR. |
| 00:10:19 | P17 CLR. |
| 00:13:05 | P15 ENRT. |
| 00:13:15 | P15 ENRT. BACK TO POWELL |
| 00:25:51 | P03 CLR. |

| TIME | EVENT |
|------|-------|
| 00:25:54 | P05 CLR. |
| 00:26:43 | P06 ARRIV. LEC |
| 00:28:29 | P09 CLR. |
| 00:40:58 | P15 ARRIV. LEC |
| 00:41:16 | P14 CLR. |
| 00:42:28 | P15 CLR. |
| 00:49:46 | P06 CLR. |
| 01:11:57 | P16 CLR. |
| 01:12:00 | P18 CLR. |
| 01:12:01 | P18 Closed - Disposition SC |
| 08:33:50 | Reopened |
| 08:33:55 | P09 ENRT. 870 E North St, Powell |
| 08:34:00 | P09 ARRIV. LEC WORK.NG ON CASE |
| 08:43:55 | P18 ENRT. 870 E North S', Powell |
| 08:44:01 | P18 ARRIV. LEC WORKING ON CASE |
| 09:05:03 | P18 CLR. Freed |
| 09:41:08 | P18 ENRT. 870 E North St, Powell |
| 09:41:08 | P18 ARRIV. |
| 09:41:11 | P18 ARRIV. LEC |
| 10:24:17 | P18 CLR. Freed |
| 14:13:57 | P08 ENRT. 870 E North St, Powell |
| 14:14:02 | P08 ARRIV. LEC WITH RP |
| 14:35:31 | P08 CLR. Freed |
| 14:53:55 | P05 ENRT. 870 E North St. Powell |
| 14:54:01 | P05 ARRIV. LEC WORKING ON CASE |
| 15:41:32 | P05 CLR. |
| 15:45:50 | P09 CLR. |
| 15:45:51 | P09 Closed - Disposition SC |
| [ 02/26/2009 ] | |
| 17:49:09 | Reopened |
| 17:49:16 | P15 ENRT. 870 E North St, Powell |
| 17:49:24 | P15 ARRIV. LEC WORKING ON CASE |
| 18:32:24 | P15 CLR. |
| 18:32:24 | P15 Closed - Disposition SC |
| [ 02/28/2009 ] | |
| 04:07:13 | Reopened |
| 04:07:18 | P09 ENRT. 870 E North St, Powell |
| 04:07:26 | P09 ARRIV. LEC WORKING ON CASE |
| 06:40:18 | P09 CLR. |
| 06:40:19 | P09 Closed - Disposition SC |
| [ 03/01/2009 ] | |
| 05:23:44 | Reopened |
| 05:23:49 | P09 ENRT. 870 E North St, Powell |
| 05:25:10 | P09 ARRIV. LEC @ ABOUT 0400 |
| 06:07:44 | P09 CLR. |
| 06:07:46 | P09 Closed - Disposition SC |
| 14:46:48 | Reopened |
| 14:46:59 | P18 ENRT. 870 E North St. Powell |
| 14:47:07 | P18 ARRIV. LEC WORKING ONC ASE |
| 14:47:15 | P18 ARRIV. LEC WORKING ON CASE |
| 14:52:16 | P18 CLR. 8.8 GALLONS |
| 14:52:17 | P18 Closed - Disposition SC |
| 22:12:56 | Reopened |
| 22:13:08 | P09 ENRT. 870 E North St, Powell |
| 22:13:15 | P09 ARRIV. WORKING ON CASE |
| 23:17:22 | P09 CLR. |

| TIME | EVENT |
|------|-------|
| 23:17:23 | P09 Closed - Disposition SC |
| [ 03/02/2009 ] | |
| 00.04:33 | Reopened |
| 00:04:39 | P09 ENRT. 870 E North St, Powell |
| 00:04:51 | P09 ARRIV. LEC WORKING ON CASE |
| 00:49:16 | P09 CLR. |
| 00:49:16 | P09 Closed - Disposition SC |
| 01:40:57 | Reopened |
| 01:41:02 | P09 ENRT. 870 E North St, Powell |
| 01:41:10 | P09 ARRIV. LEC WORKING ON CASE |
| 06:19:17 | P09 CLR. |
| 06:19:17 | P09 Closed - Disposition SC |
| 09:44:15 | Reopened |
| 09:44:23 | P04 ENRT. 870 E North St, Powell |
| 09:44:28 | P04 ARRIV. LEC WORKING ON CASE |
| 11:04:20 | P04 CLR. Freed |
| 11:04:20 | P04 Incident returned to pending status |
| 11:38:52 | P04 ENRT. 870 E North St Powell |
| 11:38:52 | P04 ARRIV. |
| 11:38:55 | P04 ARRIV. LEC |
| 11:54:01 | P04 CLR. |
| 11:54:02 | P04 Closed - Disposition SR |
| 16:52:16 | Reopened |
| 16:52:25 | P15 ENRT. 870 E North St. Powell |
| 16:52:25 | P15 ARRIV. |
| 16:52:31 | P15 ARRIV. LEC |
| 23:37:32 | P15 CLR. |
| 23:37:33 | P15 Closed - Disposition SC |
| [ 03/04/2009 ] | |
| 03:13:46 | Reopened |
| 03:13:58 | P09 ENRT. 870 E North St, Powell |
| 03:14:03 | P09 ARRIV. LEC ON CASE |
| 05:24:24 | P09 CLR. |
| 05:24:24 | P09 Closed - Disposition SC |
| 10:01:48 | Reopened |
| 10:01:56 | P04 ENRT. 870 E North St, Powell |
| 10:02:02 | P04 ARRIV. 443 W COULTER AVE |
| 10:18:37 | P04 ENRT. |
| 10:21:08 | P04 ARRIV. LEC WORKING ON CASE |
| 11:30:07 | P04 ENRT. CLEAR WORKING ON SAME CASE |
| 11:32:44 | P04 ARRIV. CA |
| 12:01:02 | P04 CLR. |
| 12:01:03 | P04 Closed - Disposition SC |
| 13.03:58 | Reopened |
| 13 04:12 | P04 ENRT. 870 E North St, Powell |
| 13:10:19 | P04 ARRIV. LEC WORKING ON CASE |
| 13:50:31 | P04 CLR. Freed |
| 13:50:32 | P04 Incident returned to pending status |
| 14:00:27 | P04 ENRT. 870 E North St, Powell |
| 14:00:33 | P04 ARRIV. LEC WORKING ON CASE |
| 14:52:58 | P04 ENRT. |
| 14:55:57 | P04 CLR. |
| 14:55:57 | P04 Closed - Disposition SC |
| [ 03/06/2009 ] | |
| 03:22:35 | Reopened |
| 03:24:01 | P05 ENRT. 870 E North St, Powell |
| 03:24:02 | P05 ARRIV. |
| 03:24:08 | P05 ARRIV. LEC WORKING ON CASE |
| 06:12:19 | P05 CLR |
| 06:12:19 | P05 Closed - Disposition SC |

00006

| TIME | EVENT |
|------|-------|
| [ 03/08/2009 ] | |
| 23:23:43 | Reopened |
| 23:23:50 | P09  ENRT. 870 E North St, Powell |
| 23:23:51 | P09  ARRIV. |
| 23:23:59 | P09  ARRIV. LEC WORKING ON CASE |
| [ 03/09/2009 ] | |
| 01:21:26 | P09  CLR. |
| 01:21:26 | P09  Closed - Disposition SC |
| 04:06:35 | Reopened |
| 04:06:39 | P09  ENRT. 870 E North St Powell |
| 04:06 39 | P09  ARRIV. |
| 04:06:46 | P09  ARRIV. LEC WORKING ON CASE |
| 04:41:44 | P09  CLR. Freed |
| 04:41:44 | P09  Incident returned to pending status |
| 04:42:21 | P09  ENRT. 870 E North St. Powell |
| 04:42:22 | P09  ARRIV. |
| 04:42:31 | P09  ARRIV. LEC |
| 05:03:21 | P09  CLR. |
| 05:03:21 | P09  Closed - Disposition SC |
| [ 03/28/2009 ] | |
| 12:17:35 | Reopened |
| 12:17:56 | P05  ENRT. 870 E North St, Powell |
| 12:18:02 | P05  ARRIV. LEC ON CASE |
| 12:53:39 | P05  CLR. Freed |
| 12:53:40 | P05  Incident returned to pending status |
| 13:24:09 | P05  ENRT. 870 E North St, Powell |
| 13:24:13 | P05  ARRIV. LEC |
| 13:54:28 | P05  CLR. |
| 13:54:28 | P05  Closed - Disposition SC |
| [ 03/29/2009 ] | |
| 08:28:16 | Reopened |
| 08:28 22 | P05  ENRT. 870 E North St, Powell |
| 08:28:30 | P05  ARRIV. LEC WORKING ON CASE |
| 10:40:47 | P05  CLR. Freed |
| 10:40:47 | P05  Incident returned to pending status |
| 12:05:23 | P05  ENRT. 870 E North St, Powell |
| 12:05:27 | P05  ARRIV. LEC |
| 13:19:58 | P05  CLR. |
| 13:19:59 | P05  Closed - Disposition SC |
| [ 03/30/2009 ] | |
| 14:10:11 | Reopened |
| 14:10:20 | P04  ENRT. 870 E North St, Powell |
| 14:10:21 | P04  ARRIV. |
| 14:10:24 | P04  ARRIV. LEC |
| 15:23:51 | P04  ARRIV. ANX WORKING ON CASE |
| 15:42:07 | P04  ENRT. |
| 15:45:12 | P04  ARRIV. LEC WORKING ON CASE |
| 16:04:22 | P04  CLR. |
| 16:04:23 | P04  Closed - Disposition SC |
| [ 03/31/2009 ] | |
| 13:15:07 | Reopened |
| 13:15:19 | P34  ENRT. 870 E North St, Powell |
| 13:15:20 | P04  ARRIV. |
| 13:15:22 | P04  ENRT. CA |
| 13:18:03 | P04  CLR. Freed |
| 13:18:03 | P04  Incident returned to pending status |
| 13:53:56 | P04  ENRT. 870 E North St, Powell |
| 13:54:08 | P04  ARRIV. COUNTY ATTORNEY |
| 14:16:15 | P04  ARRIV |
| 14:16:18 | P04  CLR. Freed |
| 14:16:18 | P04  Incident returned to pending status |
| 14:43.04 | Closed - Disposition SC |
| [ 04/09/2009 ] | |
| 00:26:00 | Reopened |

00007

| TIME | EVENT |
|------|-------|
| 09:26:06 | P04 ENRT. 870 E North St. Powell |
| 09:26:07 | P04 ARRIV. |
| 09:26:09 | P04 ARRIV. LEC |
| 10:27:07 | P04 CLR. Freed |
| 10:27.07 | P04 Incident returned to pending status |
| 10:27:57 | Closed - Disposition SC |
| [ 04/21/2009 ] | |
| 09:54:12 | Reopened |
| 09:54:24 | P04 ENRT. 870 E North St Powell |
| 09:54:24 | P04 ARRIV. |
| 09:54:37 | P04 ARRIV. COURT WAITING FOR THE JUDGE |
| 10:50:26 | P04 ARRIV. LEC |
| 12:10:12 | P04 CLR. Freed |
| 12:10:12 | P04 Incident returned to pending status |
| 13:02:48 | Closed - Disposition SC |
| [ 04/23/2009 ] | |
| 08:06:45 | Reopened |
| 08:06:54 | P04 ENRT. 870 E North St. Powell |
| 08:07:12 | P04 ARRIV. LEC WORKING ON CASE |
| 10:07:37 | P04 CLR. |
| 10:07:38 | P04 Closed - Disposition SC |
| [ 04/28/2009 ] | |
| 14:51:15 | Reopened |
| 14:51:28 | P04 ENRT. 870 E North St. Powell |
| 14:51:36 | P04 doing warrant return |
| 14:52:38 | P04 ARRIV. COURT |
| 16:14:56 | P04 CLR. Freed |
| 16:14:56 | P04 Incident returned to pending status |
| 19:00:35 | Closed - Disposition SC |
| [ 08/28/2009 ] | |
| 09:08:16 | Reopened |
| 09:08:24 | P04 ENRT. 870 E North St. Powell |
| 09:08:30 | P04 ARRIV. LEC WORKING ON CASE |
| 09:30:05 | P04 CLR. Freed |
| 09:30:05 | P04 Incident returned to pending status |
| 09:31:04 | Closed - Disposition SC |
| 11:00:11 | Reopened |
| 11:00:20 | P04 ENRT. 870 E North St, Powell |
| 11:00:25 | P04 ARRIV. LEC WORKING ON CASE |
| 11:44:14 | P04 CLR. Freed |
| 11:44:14 | P04 Incident returned to pending status |
| 13:36:01 | Closed - Disposition SC |
| [ 08/31/2009 ] | |
| 08:54.45 | Reopened |
| 08:55:22 | P04 ENRT. 870 E North St, Powell |
| 08:55:23 | P04 ARRIV. |
| 08:55:32 | P04 ARRIV. LEC ON CASE |
| 10:13:55 | P04 ENRT. |
| 10:15:42 | P04 ARRIV. 2019 A MINUTE |
| 10:24:07 | P04 ENRT. |
| 10:24:26 | P04 ARRIV. POWELL OFFICE SUPPLY |
| 10:30:22 | P04 ARRIV. LEC |
| 11:18:44 | P04 ENRT. |
| 11:58:58 | P04 CLR. |
| 11:58:59 | P04 Closed - Disposition SC |
| [ 09/16/2009 ] | |
| 10:32:08 | Reopened |
| 10:38:19 | P04 ENRT. 870 E North St, Powell |
| 10:38:20 | P04 ARRIV |
| 10:38:23 | P04 ENRT. |
| 10:51:29 | P04 ARRIV. ANNEX, ON 514 ALSO |
| 11:45:07 | P04 ENRT. ON CASE |
| 11:47:23 | P04 ARRIV. LEC |

00008

| TIME | EVENT |
|---|---|
| 11:47:53 | P04 CLR. |
| 11:47:54 | P04 Closed - Disposition SR |
| [ 11/30/2009 ] | |
| 09:58:17 | Reopened |
| 09:58:45 | P04 ENRT. 870 E North St. Powell |
| 10:01:56 | P04 CLR. Freed |
| 10:01:56 | P04 Incident returned to pending status |
| 10:14:08 | P04 ENRT. 870 E North St, Powell |
| 10:17:45 | P04 ARRIV. CO ATTY ON CASE |
| 11:05:12 | P04 ENRT. ON CASE |
| 11:11:17 | P04 CLR. Freed |
| 11:11:17 | P04 Incident returned to pending status |
| 14:07:02 | Closed - Disposition SC |