# Appendix Nine

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Bret Lara*
*October 07, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 10-7-10 Brett Lara_scoped.txt
Min-U-Script® with Word Index

---

BRETT LARA - October 7, 2010                                    Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2             FOR THE DISTRICT OF WYOMING

 3   -------------------------------------------------

 4   TRICIA WACHSMUTH,              )
                                    )
 5            Plaintiff,            )
                                    )
 6       vs.                        )   NO. 10-CV-041J
                                    )
 7                                  )
     CITY OF POWELL, AND IN THEIR   )
 8   INDIVIDUAL CAPACITY, TIM       )
     FEATHERS, CHAD MINER, MIKE     )
 9   CHRETIEN, ROY ECKERDT, DAVE    )
     BROWN, MIKE HALL, BRETT LARA,  )
10   MATT MCCASLIN, ALAN KENT, MATT )
     DANZER, OFFICER BRILAKIS, LEE  )
11   BLACKMORE, CODY BRADLEY, KIRK  )
     CHAPMAN, JOHN DOES #1-#4,      )
12                                  )
              Defendants.           )
13   -------------------------------------------------

14             DEPOSITION OF BRETT LARA
           4:55 p.m., Thursday, October 7, 2010
15

16

17

18          Pursuant to notice, the deposition of BRETT

19   LARA was taken in behalf of Plaintiff in accordance

20   with the applicable Federal Rules of Civil Procedure at

21   270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22   Registered Professional Reporter and Notary Public of

23   the State of Montana.

24

25
```

---

BRETT LARA - October 7, 2010                                    Page 2

```
 1                    APPEARANCES

 2   FOR PLAINTIFF:

 3          Mr. Jeffrey C. Gosman
            Gosman Law Office
 4          123 W 1st Street
            P.O. Box 51267
 5          Casper, WY 82601-2481
            Telephone: (307)265-3382 - Fax: (307)265-6715
 6          E-mail: jeff@gosmanlawoffices.com

 7

 8   FOR INDIVIDUAL DEFENDANTS:

 9          Ms. Misha Westby
            Senior Assistant Attorney General
10          2424 Pioneer Avenue, 2nd Floor
            Cheyenne, WY 82002
11          Telephone: (307)777-5477 Fax: (307)777-8920
            E-mail: mwest@state.wy.us
12

13   FOR CITY OF POWELL & OFFICERS' IN THEIR OFFICIAL
     CAPACITY:
14

15          Mr. Tom Thompson
            MacPerson, Kelly & Thompson
16          616 West Buffalo
            P.O. Box 999
17          Rawline, WY 82301-0999
            Telephone: (307)324-2713 - Fax: (307)324-7348
18          E-mail: tthompson@wyomingattorneys.net

19

20   Also Present:  Tim Feathers

21

22

23

24

25
```

---

BRETT LARA - October 7, 2010                                    Page 3

```
 1                 INDEX TO WITNESSES

 2                                               PAGE

 3   BRETT LARA

 4       Direct Examination by Mr. Gosman ..............4
         Signature Page ...............................50
 5       Reporter's Certificate .......................51

 6

 7                    EXHIBITS

 8   EXHIBIT          DESCRIPTION              PAGE

 9

10   10       Notes of Wachsmuth Warrant ..............26

11   27       Countermeasures Tactical Institute ......15
                 Patrol Officer Specialized Tactics
12               Course

13   28       Countermeasures Tactical Institute ......19
                 Immediate Action for Patrol
14

15   29       Crisis Response Tactics .................26

16   35       PPD Patrol Friday Training ..............22

17   37       Powell Police Crisis Response ..........27
                 Tactics

18   43-A     Photographs .............................46

19   44       Photographs .............................46

20

21

22

23

24

25
```

---

BRETT LARA - October 7, 2010                                    Page 4
Direct Examination by Mr. Gosman

1                    BRETT LARA,

2   having been first duly sworn, testified as follows:

3                DIRECT EXAMINATION

4   BY MR. GOSMAN:

5        Q.  Officer Lara, have you ever given a

6   deposition before?

7        A.  Yes.

8        Q.  And can you tell me in what case?

9        A.  It was a case -- personal case with workers'

10  comp.

11       Q.  You're familiar, then, with the process for

12  questioning -- questions and answers in a deposition?

13       A.  Pretty familiar.

14       Q.  Okay. I'm going to be asking you some

15  questions today. You will be required to answer them

16  unless your attorney instructs you that you are not to

17  answer the question, do you understand that?

18       A.  Yes.

19       Q.  And of course, the answers that you give

20  today are being recorded and can be used at trial, do

21  you understand that?

22       A.  Yes.

23       Q.  And it is important, therefore, that if

24  there's any misunderstanding between you and I in terms

25  of what a question means, that you clear that up before

---

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 4 of 67
Tricia Wachsmuth v.                                                                          Bret Lara
City of Powell, et al.                                                                October 07, 2010

BRETT LARA - October 7, 2010                                          Page 5
Direct Examination by Mr. Gosman

1  you answer. Will you agree to do that?
2  A. Yes.
3  Q. And we can take a break at any time this
4  afternoon. This deposition shouldn't last very long.
5  I'll tell you that at the outset. But we will not take
6  a break while a question is pending.
7      What is your full name for the record?
8  A. Brett David Lara.
9  Q. And what is your current address?
10 A. 250 North Clark Street.
11 Q. Do you take any medication that would impair
12 your ability to participate in the deposition fully?
13 A. No.
14 Q. And are there any other issues that would
15 affect your ability to give truthful answers here
16 today?
17 A. No.
18 Q. Now, there has been some testimony in
19 connection with this case that you, at the time of the
20 execution of the Wachsmuth search warrant, provided
21 some information about Bret Wachsmuth; is that true?
22 A. Yes.
23 Q. All right. Do you want to tell me -- let's
24 start with how you were first approached about that and
25 what happened. First approached about Bret Wachsmuth

BRETT LARA - October 7, 2010                                          Page 6
Direct Examination by Mr. Gosman

1  in connection with the execution of the search warrant.
2  A. When I -- I guess I'm wanting to know -- when
3  I came across that information?
4  Q. No. When you passed it along.
5  A. Oh, okay. When I passed it along?
6  Q. We'll talk about when you came across it in a
7  moment.
8  A. I passed it along during the briefing that we
9  had before we were -- during the planning stages of the
10 search warrant before we were getting ready to go.
11 Q. All right. Let's back up for a minute, then.
12 On that evening, where were you when you first learned
13 about the execution of this search warrant?
14 A. I had -- if I remember, I had finished with
15 Jujitsu class downstairs and I think it was Sergeant
16 Kent told me that they needed help on a search warrant,
17 that I needed to go home and get dressed out.
18 Q. Did you wear any special clothing that night?
19 A. Just my patrol uniform and one of our heavier
20 vests that we have.
21 Q. All right. As far as you know, that was how
22 everyone was dressed that night?
23 A. From what I can remember.
24 Q. So do you remember about what time that was?
25 And when I say what time that was, I really am more

BRETT LARA - October 7, 2010                                          Page 7
Direct Examination by Mr. Gosman

1  interested in when you got back to the police station
2  after you'd gone home and changed.
3  A. I don't remember.
4  Q. Do you know whether or not at that time, it
5  had been decided that the team would be assembled and
6  that what we've termed here a dynamic entry approach
7  would be used at the Wachsmuth residence?
8      MS. WESTBY: Object to the form of the
9  question.
10     MR. THOMPSON: Join.
11     THE WITNESS: It was being discussed. I
12 mean, when they first got there, they were writing on
13 dry erase boards and talking about different ideas
14 based on the information we had. So it was being
15 discussed.
16 BY MR. GOSMAN:
17 Q. When you were contacted, you were told that
18 they needed some help executing a search warrant; is
19 that correct?
20 A. Yes.
21 Q. When you arrived and these things were being
22 discussed, did you discuss, for instance, some
23 alternatives to using a dynamic entry team such as
24 having Tom Wachsmuth called in and have him call his
25 son out from the residence that night, or using what

BRETT LARA - October 7, 2010                                          Page 8
Direct Examination by Mr. Gosman

1  they call a knock-and-talk warrant, as opposed to the
2  entry team -- use of the entry team?
3      MS. WESTBY: Object to the form of the
4  question.
5      MR. THOMPSON: Join.
6      THE WITNESS: I don't remember any of the
7  discussions about that. Not that I had heard. We were
8  just discussing putting the plans together by the time
9  I got there -- putting the plans together for what we
10 were going to do. I think it had already been planned
11 out or discussed or something.
12 BY MR. GOSMAN:
13 Q. Okay. Did Officer Kent ask you for any
14 information that you had or did you volunteer
15 information about Bret Wachsmuth at that time?
16 A. I had volunteered it during the planning
17 stages. Once I heard kind of what was going on.
18 Q. Okay. How did you know Bret Wachsmuth?
19 A. I didn't know him personally. But I worked
20 with his father, Tom.
21 Q. Had you worked with his father, Tom, at DCI?
22 A. Yes.
23 Q. And how long ago -- well, when did you learn
24 the information about Tom's son, Bret?
25 A. When I was on the team, somewhere between '04

BRETT LARA - October 7, 2010                                Page 9
Direct Examination by Mr. Gosman

1   and '06.
2   Q.  And what did you learn?
3   A.  Tom and I were riding together on the way
4   down to Cheyenne, one time.  And he started
5   discussing his son Bret and some of the problems he
6   had.
7   Q.  Okay.  To the best of your ability to
8   recollect that, what did you discuss that day about
9   Bret?
10  A.  He had some depression issues.  And Tom was
11  trying to understand -- he couldn't understand kind of
12  where Bret was coming from.  We were discussing that.
13  Q.  Okay.  Did he say anything else?
14  A.  Not that I remember concerning Bret.
15  Q.  Yes, and I'm sure there was other
16  conversation.  But concerning Bret, you don't remember
17  anything else being discussed?
18  A.  Not that I can -- comes to mind.
19  Q.  What did you offer, then, that evening during
20  the briefing session about that conversation?
21  A.  That he does have some problems with
22  either -- I don't know if it was being bipolar or
23  problems with depression, anxiety, that kind of stuff.
24  Q.  Did you know whether or not he was medicated
25  for those conditions?

BRETT LARA - October 7, 2010                               Page 10
Direct Examination by Mr. Gosman

1   A.  During the conversation with Tom, I believed
2   him to say that he had tried out some different
3   medications that he was on.
4   Q.  And do you know whether the medication was
5   successful in treating whatever condition he had?
6   A.  I kind of got the impression in the
7   conversation with Tom that that was still kind of an
8   ongoing thing.
9   Q.  You hadn't had any follow-up conversations
10  with Tom since -- did you say 2006?
11  A.  Between '04 and '06 is when I was on the
12  team.
13  Q.  Did you have any follow-up conversations with
14  Tom after that time?
15  A.  Not that I can remember.
16  Q.  Was that -- the information that you offered
17  that night, information that was used by your team
18  leaders as part of the overall assessment for the need
19  of a dynamic entry into the home, if you know?
20  MR. THOMPSON: Objection as to form.
21  MS. WESTBY: Join.
22  THE WITNESS: I think so.  I believe it was
23  considered.
24  BY MR. GOSMAN:
25  Q.  All right.  Well, let's make sure, before we

BRETT LARA - October 7, 2010                               Page 11
Direct Examination by Mr. Gosman

1   leave that subject that we covered everything that was
2   said that night.  Have you told me everything that you
3   mentioned that evening in the briefing session
4   concerning Bret Wachsmuth?
5   A.  That I can remember, yes.
6   Q.  Did you offer an opinion about whether or not
7   he was mentally stable or represented a threat or a
8   danger to himself or others?
9   A.  I just gave the information that seemed
10  pertinent with what we were doing.
11  Q.  All right.  I take it by that answer that you
12  didn't offer any opinions about Bret's mental
13  stability?
14  MR. THOMPSON: Objection as to form.
15  MS. WESTBY: Join.
16  THE WITNESS: I don't know the guy.  So I'm
17  just going off of what was said.  And I just passed it
18  on.  I don't know him enough to offer an opinion as to
19  what his mental condition was.
20  BY MR. GOSMAN:
21  Q.  Okay.  So let's take a look at Exhibit --
22  let's go ahead and take a look at your P.O.S.T.
23  records, which are right there in front of you and
24  we'll take care of that issue now.
25  A.  Okay.

BRETT LARA - October 7, 2010                               Page 12
Direct Examination by Mr. Gosman

1   Q.  Does this represent your complete P.O.S.T.
2   training record with the -- as a law enforcement
3   officer in Wyoming?
4   A.  It's not complete.
5   Q.  What was the date of that report?
6   A.  Well, the last -- this says April 1st, 2010.
7   And I'm looking at the last entry for the date of a
8   class that I had was November 14, 2009.
9   Q.  All right.  Would it be fair to say that that
10  record is complete and represents your P.O.S.T.
11  training as of February 24, 2009?
12  A.  Appears so, yes.
13  Q.  And I'm going to try to summarize some of
14  this as much as I can.  Did you start as a law
15  enforcement officer in 1996?
16  A.  I was a detention officer.  I went through
17  detention officer basic in '96.  I was a correctional
18  officer in Montana.
19  Q.  And how long did you function in that
20  capacity?
21  A.  In the correctional officer?
22  Q.  Yes.
23  A.  About two-and-a-half years.
24  Q.  Okay.  And then you had your basic peace
25  officer certification in April of 2001.  Where were you

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 6 of 67
Tricia Wachsmuth v.                                                      Bret Lara
City of Powell, et al.                                          October 07, 2010

BRETT LARA - October 7, 2010                                    Page 13
Direct Examination by Mr. Gosman

1  employed at that time?
2  A. April 2001?
3  Q. Uh-huh.
4  A. With the Powell Police Department.
5  Q. Okay. Was that your first job as a police
6  officer?
7  A. Yes.
8  Q. You've been with the Powell Police Department
9  since 2001, correct?
10  A. 2000.
11  Q. All right. And during that time -- take a
12  minute and go through the lis. and point out to me the
13  training that you've had relative to what we've termed
14  here today in these depositions as "dynamic entry," an
15  entry where there is generally a forced entry into the
16  home, room-clearing activities, and the use of a
17  flashbang device in a tactical setting.
18  A. Some of that was covered when I was a new
19  officer during field training.
20  Q. Okay.
21  A. That would have been -- I started July 24,
22  2000. My field training went to -- I think it was the
23  end of October 2001, roughly.
24  Q. Okay.
25  A. First class, going off this, was the P.I.E.R.

BRETT LARA - October 7, 2010                                    Page 15
Direct Examination by Mr. Gosman

1           (Exhibit 27 identified)
2  BY MR. GOSMAN:
3  Q. Let's see, there is a -- yeah, okay.
4  Exhibit 27, which consists of training records that
5  Officer Miner supplied us, contains the P.I.E.R.
6  training.
7           Was your training offered by Countermeasures
8  Tactical Institute, Inc, do you know?
9           MS. WESTBY: Which training?
10  BY MR. GOSMAN:
11  Q. I'm talking about the P.I.E.R. training?
12  A. Based off of the date of this course
13  schedule, what I had preceded this by a couple of
14  years. So I don't believe it was Countermeasures that
15  put that on.
16  Q. Okay.
17  A. It was -- I can't remember. Somebody out of
18  Utah.
19  Q. I think that's where these guys are from.
20  A. I had an earlier course -- because it was
21  2003 when I had this. And this here shows 2005 course
22  schedule. So I don't know if it's the same or not.
23  Q. Do you have those training materials?
24  A. Yes, I should. That should have been
25  property of discovery, I believe.

BRETT LARA - October 7, 2010                                    Page 14
Direct Examination by Mr. Gosman

1  class on June 13, 2003. I first started learning some
2  of the skills.
3  Q. Yes, Patrol Interdiction Emergency Response
4  Course?
5  A. Yes.
6  Q. All right. Let's stop there for just a
7  minute. Does the City of Powell have a P.I.E.R.
8  trained team?
9  A. No.
10  Q. Okay. And Patrol Interdiction and Emergency
11  Response is actually designed to handle first responder
12  situations, isn't that true?
13           MR. THOMPSON: Objection as to form.
14           MS. WESTBY: Join.
15  BY MR. GOSMAN:
16  Q. In other words, it's designed to handle
17  situations where you have an emergency situation and
18  you haven't had the opportuni y yet to call in another
19  team, trained team if it's necessary?
20           MS. WESTBY: Object to the form of the
21  question. It misstates the specific documents you have
22  in there.
23           MR. GOSMAN: Okay.
24           MR. THOMPSON: Join.
25

BRETT LARA - October 7, 2010                                    Page 16
Direct Examination by Mr. Gosman

1  Q. I don't believe I've gotten those training
2  materials. I'll check and make another list here. And
3  that's the P.I.E.R. course?
4           MS. WESTBY: You don't have the documents
5  that we provided for his training in here, I don't
6  believe.
7           MR. GOSMAN: Okay. Are you telling me they
8  have been provided?
9           MS. WESTBY: Is this it?
10           THE WITNESS: What I've got here, it's dated
11  2005. But like I said -- and I don't know if I -- I
12  don't know if I had anything left from that. Like I
13  said, it was -- but this document here is a later
14  document.
15  BY MR. GOSMAN:
16  Q. Okay. We can work that out later.
17           In any event, you have those materials,
18  correct?
19  A. I don't think that I do. I think I looked
20  all over, and I don't think I kept any of that stuff
21  'cause it wasn't -- it was more hands-on than it
22  was ...
23           MS. WESTBY: For the record, we've
24  produced -- the officers looked through their files for
25  your requests and produced them to us and we produced

1   everything to you on training.
2       MR. GOSMAN: I understand.
3   BY MR. GOSMAN:
4       Q. Okay. There is a document, and it's Page 27.
5   It's Document No. 30 in that exhibit. And that's 27.
6   It's called P.I.E.R. Philosophy.
7       A. Is it the page --
8       MS. WESTBY: Exhibit 30 or Exhibit 27?
9       MR. GOSMAN: Twenty-seven.
10      THE WITNESS: Is that Page 30?
11  BY MR. GOSMAN:
12      Q. It's Page, 27 and it's Document No. 30.
13      MS. WESTBY: Page 27 and Document 30?
14      MR. GOSMAN: Yes.
15      THE WITNESS: It's tab 27, right?
16  BY MR. GOSMAN:
17      Q. Yes, that's correct.
18      A. Okay.
19      Q. Document 30 or Page 27 of the document. And
20  I think those pages are pretty --
21      A. Tab 27, Page 27. I think this is what you're
22  looking at.
23      Q. Yes, it is, P.I.E.R. Philosophy.
24      It appears that the P.I.E.R. Philosophy
25  involves the use of this Patrol Interdiction Emergency

1   Response program or team to interdict and save human
2   lives. It is based on immediate action by patrol. Is
3   that what you were taught about the P.I.E.R.?
4       MS. WESTBY: Object to the form of the
5   question. You're misstating the rest of what that
6   training says. You are.
7       MR. GOSMAN: Well, I'm not going to recite
8   the entire training.
9       MS. WESTBY: So you're misrepresenting what
10  the training says, and that's my objection.
11      MR. GOSMAN: All right.
12      MR. THOMPSON: Join.
13  BY MR. GOSMAN:
14      Q. Why don't you take a minute and look at this
15  document called P.I.E.R. Philosophy, and tell me if
16  this document comports with what you understand to be
17  the purpose of P.I.E.R.
18      A. Yes.
19      Q. All right. That's fine. Okay.
20      So that was part of your P.O.S.T. record that
21  relates to dynamic entry as you have stated?
22      MR. THOMPSON: Objection as to form.
23      MS. WESTBY: Join.
24  BY MR. GOSMAN:
25      Q. And let's just go again down through this

1   record and see what else is there.
2       A. It would be the Patrol Tactical Response, I
3   believe.
4           (Exhibit 28 identified)
5   BY MR. GOSMAN:
6       Q. All right. And we have another -- let's see,
7   that was 10/5 of '05, we have another exhibit from
8   Miner's records Exhibit 28. Take a look -- actually,
9   it's 27. And tell me if that is the manual or course
10  materials that are associated with that course you took
11  in October of 2005.
12      A. Appears to be so far.
13      Q. And during the conduct of that course, you
14  were taught room-clearing tactics, correct?
15      A. Yes.
16      Q. And you were taught weapon position in
17  clearing rooms?
18      A. Yes.
19      Q. What is the weapon position in a
20  room-clearing situation when you are called into a
21  residence? The door has been breached, and you have an
22  entry team, and your job is to clear rooms in the house
23  of active threats.
24      MR. THOMPSON: Objection as to form.
25      MS. WESTBY: Join.

1   BY MR. GOSMAN:
2       Q. Weapon position.
3       MR. THOMPSON: Same objection.
4       THE WITNESS: For pistol or rifle?
5   BY MR. GOSMAN:
6       Q. Rifle.
7       A. It's a down position. The barrel is pointed
8   down.
9       Q. Okay. Let's see, in this course, you were
10  also taught breaching methods, correct?
11      A. Yes.
12      Q. And how about the use of distraction devices?
13      A. Yes.
14      Q. And did you actually perform these tactics in
15  a simulated training environment?
16      A. Yes.
17      Q. And do you remember whether the group
18  actually discharged a flashbang device in that
19  training?
20      A. We did.
21      Q. Did everyone discharge a flashbang device?
22      A. I think so.
23      Q. Did you?
24      A. Yes.
25      Q. Okay. Let's go on, then. Following this

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 8 of 67
Tricia Wachsmuth v.                                                                              Bret Lara
City of Powell, et al.                                                                    October 07, 2010

BRETT LARA - October 7, 2010                                    Page 21
Direct Examination by Mr. Gosman

1   Patrol Tactical Response training that occurred in
2   October of 2005, what was your next training that
3   related to this area, before February 24 of 2009?
4       A.  Okay.  That was those two, 'cause the third
5   class that I had was November of that year.  So it
6   would have happened after.
7       Q.  Okay.
8       A.  So just the two before that.
9       Q.  Have you trained with the Powell Police
10  Department in the use of these tactics that we've been
11  talking about:  Room clearing, breaching tactics,
12  deployment of diversionary devices, et cetera?
13      A.  Yes.
14      Q.  And explain when and where.
15      A.  Besides these two classes, we're talking
16  before the incident -- search warrant?
17      Q.  Yes.  Exactly.
18      A.  Of course, there's these two classes, and I
19  had some stuff that was covered when I was a new
20  officer.  And then there's also in-service training,
21  which is done to review what we learned at a class to
22  keep your skills sharp.
23           How many times, I don't know.
24
25

BRETT LARA - October 7, 2010                                    Page 22
Direct Examination by Mr. Gosman

1               (Exhibit 35 identified)
2   BY MR. GOSMAN:
3       Q.  Let's go ahead and take a look at Exhibit 35.
4   And I want you to tell me if this is the in-service
5   training -- if these are records of the in-service
6   training as you understand them.
7       A.  Okay.  Exhibit 35?
8       Q.  Yes.  And I think my question was:  Do you
9   recognize those as records of the in-service training
10  that's offered by the Powell Police Department?
11      A.  I don't think I've ever seen one of these
12  before.
13      Q.  That's fine.  Let's turn to 1815, which is
14  one of the pages in that exhibit.
15      A.  Okay.
16      Q.  And we have entries for different months that
17  year.  And then, for instance, in June of '06, we have
18  mass arrest, high-risk warrant service, mutual aid, and
19  search warrants.
20           Do you know if that was conducted as one
21  training session or was it conducted as individual
22  training sessions?
23      A.  Which one?
24      Q.  Well, I just picked one.  And that's June of
25  '06, and I identified the four entries there on that

BRETT LARA - October 7, 2010                                    Page 23
Direct Examination by Mr. Gosman

1   second column.
2       A.  I don't remember.
3       Q.  Well, you met once a month, didn't you?  Does
4   that help?
5       A.  Sometimes.  Sometimes -- some training we go
6   once a month.  And other times stuff would be covered
7   on every Friday, what's called a Friday Training.  And
8   just kind of depended on what it was.
9       Q.  Do you see that third column over there?  For
10  instance, next to mass arrest, it says Policy
11  Page 3.7.12?
12      A.  Uh-huh.
13      Q.  Do you know what that refers to?
14      A.  Looks like the notation for policy procedure
15  manual, which policies that covers.
16      Q.  So the Powell Police Department does have a
17  policy and procedures manual?
18      A.  Uh-huh.
19           MR. GOSMAN:  I don't think I've gotten that.
20           MR. THOMPSON:  You'd requested it, Counsel
21  and we objected to it.  You never did anything with
22  your second set of discovery.
23           MR. GOSMAN:  Oh, you didn't produce it.
24  Okay.  Well, I'll have to take care of that.  Thank
25  you.

BRETT LARA - October 7, 2010                                    Page 24
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.  All right.  About how big is that policy and
3   procedures manual?
4       A.  About that thick (indicating).
5       Q.  And you've indicated about between an
6   inch-and-a-half and 2 inches?
7       A.  You know, the small three-ring binders?  It's
8   one of those, about that thick.
9       Q.  Again, I think you indicated about 2 inches,
10  guessing of course?
11      A.  Roughly.
12      Q.  All right.  And so when you would have these
13  Friday Trainings and there's that reference there to
14  the policy page, was that a training session where you
15  simply reviewed the policy?
16      A.  Sometimes it would just be a policy review.
17      Q.  Okay.
18      A.  And sometimes we would do -- like, review the
19  policy and then do our hands-on work.
20      Q.  Okay.
21      A.  So, you know, it would be, okay, here's the
22  policy on it.  Let's practice doing this.
23      Q.  Okay.  How many times did you -- before
24  February 24th of 2009, did you practice as a team with
25  the Powell Police Department in performing simulated

BRETT LARA - October 7, 2010                              Page 25
Direct Examination by Mr. Gosman

1  dynamic entries?
2  A. I don't know. I don't remember.
3  Q. Was it -- did it ever happen?
4  A. Yes.
5  Q. Okay. Did it happen more than once?
6  A. Yes.
7  Q. Okay. Did it happen more than twice?
8  A. Yes.
9  Q. Did it happen more than three times?
10 A. Yes.
11 Q. Okay. Where do I stop? I mean, at what
12 number do you think?
13 A. Over three times. I mean -- I mean, I'm
14 saying that because I don't even venture a number. But
15 that seems pretty accurate.
16 Q. Okay. As far as you know, on the three times
17 that you practiced, was that with most of the other
18 officers of the Powell Police Department?
19 A. Yes.
20 Q. Were you aware of any other times when the
21 Powell Police Department met and practiced these
22 tactics that you were not present?
23 A. A few times.
24
25

BRETT LARA - October 7, 2010                              Page 26
Direct Examination by Mr. Gosman

1         (Exhibit 10 identified)
2  BY MR. GOSMAN:
3  Q. Okay. Let's go ahead and take a look at
4  Exhibit 10 for a minute. Over what period of years
5  would you have conducted this training involving
6  dynamic entry? And this is prior to February of 2009.
7  A. I'm not really sure. Could you rephrase
8  that, please?
9  Q. Well, in other words, you've indicated that
10 you were personally involved in several instances of
11 training as a team doing dynamic entry tactics. Do you
12 know over how many years that those training sessions
13 would have spanned?
14 A. I think probably since 2003 when we got
15 introduced to the P.I.E.R. school and learned those new
16 skills and started practicing them.
17        (Exhibit 29 identified)
18 BY MR. GOSMAN:
19 Q. All right. I turned you to Exhibit 10, but
20 before I leave off this issue, let me ask you if you
21 have seen Exhibit 29?
22 A. This stuff looks familiar, it's been a long
23 time since I have seen it, though.
24 Q. It appears that this is a -- it's a program
25 that was -- has been put on by officers of the Powell

BRETT LARA - October 7, 2010                              Page 27
Direct Examination by Mr. Gosman

1  Police Department. Do you know if these crisis
2  response tactics have been embodied in the Powell
3  Police Department policy and procedures manual, to the
4  extent that you know?
5  A. I don't know.
6  Q. Okay. Do you remember taking this course?
7  A. To be honest, I can't remember. I'm sure I
8  did. But I'm trying to remember something back that
9  far.
10 Q. Well, it does have dates indicating that it
11 was last updated in September 2002. But I'm not sure
12 that's the last time the course was actually given.
13 A. I think that I did. Some of this stuff kind
14 of looks familiar. Like I said, it's been a long time.
15 Q. It was, it appears, a 40-hour course. Do you
16 remember doing a training with the Powell Police
17 Department for that period of time?
18 A. I'm sure that I did. But I don't recall any
19 instance, like going through the training and stuff.
20 Like I said, it's been a long time ago.
21        (Exhibit 37 identified)
22 BY MR. GOSMAN:
23 Q. Okay. I think we have an Exhibit 38 around
24 here. Let's see -- or maybe 37. Yes, 37. And we had
25 two copies. But I only see one right now. Let's see

BRETT LARA - October 7, 2010                              Page 28
Direct Examination by Mr. Gosman

1  if perhaps it's --
2  A. Thirty-seven?
3  MR. GOSMAN: Does anyone else know where the
4  other copy of this went to?
5  MS. WESTBY: What is it?
6  MR. GOSMAN: Oh, there it is.
7  Could you hand that to the witness?
8  BY MR. GOSMAN:
9  Q. Have you seen this document before?
10 A. Yes, it looks familiar to me.
11 Q. Do you know what it is?
12 A. This looks like the Patrol Tactical Response.
13 It looks like it was from that class in -- was it '05?
14 Q. Okay.
15 A. It looks like it was from that class, October
16 of 2005.
17 Q. Is it something that's kept on hand at the
18 police department?
19 A. I can only speak for myself.
20 Q. Yes.
21 A. But I have my stuff in certain places where I
22 need to access it. I don't know what the other guys
23 do.
24 Q. Anyway, you may have a copy of this Police
25 Crisis Response Tactics document?

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 10 of 67
Tricia Wachsmuth v.                                                                    Bret Lara
City of Powell, et al.                                                          October 07, 2010

1    A.  I think that I do.
2    Q.  Do you know whether it was given to you?
3    A.  It was through that class.  It would have
4    been in October of 2005.
5    Q.  Is that your best recollection?
6    A.  Well, that's what the class says.
7    Q.  Yes, I agree.
8    A.  October 5th, 2005, is what it looks like.
9    Q.  So is it your best recollection that you
10   received this document, Exhibit 37, at the time you
11   were taking the 40-hour Patrol Tactics Response course?
12   A.  Yes.
13   Q.  Did you take that course in Powell, Tactics
14   Response course?
15   A.  Yes.
16   Q.  Okay.  All right.  All right.  So you --
17   let's take a look at Exhibit 10.  And have you ever
18   seen that before?
19   A.  Some parts of it.
20   Q.  And what do you mean by that?
21   A.  The diagram looks familiar.
22   Q.  Okay.
23   A.  Our assignments were --
24   Q.  Okay.
25   A.  Some of the notations -- some notations and

1    stuff I didn't really look at.  But like the diagrams
2    and assignments.
3    Q.  Okay.  You've -- have you seen this document
4    before this moment?
5    A.  Yes.
6    Q.  Okay.
7    A.  Parts of it.
8    Q.  All right.  Did you look at it in preparation
9    for this deposition, or had you seen it at the time
10   that the warrant service was effected?
11   A.  It was before the warrant was served.
12   Q.  Okay.  And do you know Marrisa Torczon, I
13   think is her name?
14   A.  Yes.
15   Q.  Do you remember whether she was present that
16   evening at the briefing?
17   A.  She was.
18   Q.  Did you observe her taking notes?
19   A.  Yes.
20   Q.  Did you understand that there was no more
21   than three adults in the residence?  I'm starting with
22   a list that follows the names of the officers and the
23   perimeter of the property.
24   A.  Okay.  What was that again?
25   Q.  Do you remember being told that there were no

1    more than three adults in the home?
2    A.  I remember something along those lines.
3    Q.  Okay.  And that's off to the right, the
4    left-hand language is that there's one male -- well,
5    actually, two males are crossed out and one male.  Do
6    you know why that was crossed out?
7    A.  No.
8    Q.  One female, did you understand that there was
9    one female in the residence?
10   A.  Yes.
11   Q.  Did you understand that there was one male in
12   the residence?
13   A.  I don't remember that part.
14   Q.  Did you understand -- you don't remember
15   whether you were told that there was one male in the
16   residence?
17   A.  We were discussing the possibilities of who
18   was there, what -- I don't remember the discussion
19   accurately.
20   Q.  Okay.  Do you remember the -- anything about
21   this notation here that there was a ten-year-old child
22   in the residence?
23   A.  I remember it being discussed.
24   Q.  Okay.  Do you remember that age coming up,
25   ten years old?

1    A.  No.
2    Q.  Did you get the impression at the time of
3    that discussion that the child was a young child?
4    A.  No.
5    Q.  Let's see, do you remember hearing that there
6    were 20 to 30 plants at the residence, as you see it's
7    located there on the page just a little down from where
8    we were?
9    A.  I remember hearing something along those
10   lines.
11   Q.  Did you understand that Bret and Tricia
12   Wachsmuth may have been involved in a drug selling
13   operation?
14   A.  I don't remember that coming up while I was
15   there.
16   Q.  All right.  And there's a list off to the
17   right.  Starts with: Knock door, police, search
18   warrant, break window.  Do you remember discussing
19   those things?
20   A.  Yes.
21   Q.  Do you remember discussing them in the order
22   they appear here?
23       MR. THOMPSON: Objection as to form.
24       MS. WESTBY: Join.
25       THE WITNESS: I remember discussing them, but

BRETT LARA - October 7, 2010                                    Page 33
Direct Examination by Mr. Gosman

1   not necessarily in the order it appears on this
2   document.
3   BY MR. GOSMAN:
4       Q.  If you were to rearrange the order of that
5   document, based on what you recollect having been
6   discussed that night, how would you do it?
7           MR. THOMPSON: Objection as to form.
8           MS. WESTBY: Join.
9           THE WITNESS: As to what order stuff was
10  being discussed?
11  BY MR. GOSMAN:
12      Q.  No. I'm sorry. The order in which the entry
13  would be accomplished.
14      A.  Pretty much to form what was on here. Pretty
15  close.
16      Q.  Okay. Did you hear anyone say "If Tom shows
17  up, he's to stay in the lobby"?
18      A.  I don't recall that.
19      Q.  Do you remember any discussion about Tom
20  Wachsmuth while you were at the briefing?
21      A.  Something -- his name, of course, came up
22  because of who the search warrant was against.
23      Q.  That's all you remember?
24      A.  I don't -- just that it was Bret was Tom's
25  son.

BRETT LARA - October 7, 2010                                    Page 35
Direct Examination by Mr. Gosman

1       A.  I believe that he was actually sitting,
2   watching the house.
3       Q.  Okay. Was he there when you arrived, Officer
4   Blackmore?
5       A.  When I arrived where?
6       Q.  At the house. Do you know?
7       A.  I didn't see him. I just heard he was in the
8   area.
9       Q.  Did you understand that he was in the area
10  and that he was -- that he would meet you out there?
11  In other words, he didn't come back to the station and
12  go back out to the residence with you?
13      A.  He stayed put.
14      Q.  All right. When you arrived at the Wachsmuth
15  residence, from what direction did you approach the
16  house?
17      A.  From the south side of the fence. There was
18  a fence in the backyard. The south fence walking
19  north.
20      Q.  And did you then have the opportunity to see
21  what vehicles were in front of that house that night?
22      A.  Not from the angle that I was at. It was
23  dark back there, so I didn't get a chance to see around
24  the front of the house.
25      Q.  Do you remember Sergeant Chretien or Sergeant

BRETT LARA - October 7, 2010                                    Page 34
Direct Examination by Mr. Gosman

1       Q.  Okay. Was there any discussion about -- you
2   don't remember any discussion about why, if Tom showed
3   up, he was to stay in the lobby?
4       A.  No, I don't.
5       Q.  Second page of Exhibit 10, there's two
6   diagrams. One -- they are both of the interior of the
7   house. One is the upstairs and one is the downstairs.
8   Did you see those diagrams that night?
9       A.  I think I remember seeing them on the dry
10  erase board as opposed to what she wrote here.
11      Q.  Did you prepare a report of what happened
12  that night, Officer?
13      A.  No, I didn't.
14      Q.  What was your assignment in the plan?
15      A.  I was to cover the back door of the house,
16  south side of the house.
17      Q.  How did you -- let's see, do you remember a
18  discussion about the kind of vehicles that the
19  Wachsmuth family owned?
20      A.  I remember it being discussed, but I don't
21  remember anything about the vehicles. I remember we
22  were talking about the vehicles, what -- there was two
23  or three of them maybe.
24      Q.  While you were at the briefing, do you
25  know where Officer Blackmore was?

BRETT LARA - October 7, 2010                                    Page 36
Direct Examination by Mr. Gosman

1   Kent or Sergeant Eckerdt saying anything about the --
2   about Bret Wachsmuth posing a threat to the officers
3   and that threat was the reason why the team was
4   assembled and why the entry into the home was being
5   made?
6           MR. THOMPSON: Object as to form.
7           MS. WESTBY: Join.
8           Go ahead.
9           THE WITNESS: Could you rephrase that a
10  little bit, please?
11  BY MR. GOSMAN:
12      Q.  Do you remember during the briefing session
13  hearing any of the sergeants mention that Bret
14  Wachsmuth was considered a threat to the safety of the
15  officers and that was the reason why the dynamic entry
16  was being planned and done?
17          MS. WESTBY: Object to form.
18          MR. THOMPSON: Join.
19          Go ahead.
20          THE WITNESS: I remember it being discussed,
21  but I don't remember who was saying what because we
22  were all discussing it, giving our input.
23  BY MR. GOSMAN:
24      Q.  You offered input regarding your knowledge of
25  Bret Wachsmuth; did you hear anyone else offer input

BRETT LARA - October 7, 2010                                            Page 37
Direct Examination by Mr. Gosman

1  similar to that?

2      A.  Just what was in the search warrant that

3  there were guns in the house, for example, and his

4  supposed mental state.

5      Q.  That he was paranoid?

6      A.  Yes.

7          MR. THOMPSON: Object as to form.

8          MR. GOSMAN: We're not going to take a look

9  at the warrant, they speak for themselves.  And since

10  I'm running out of gas tonight.

11  BY MR. GOSMAN:

12     Q.  Let's see here, did you see Jonathan Davis

13  while you were at the briefing session that evening?

14     A.  Yes.

15     Q.  Did he participate in the briefing?

16     A.  How do you mean "participate"?

17     Q.  Did he supply information to the officers?

18     A.  I don't remember him supplying information.

19     Q.  What did he do?

20     A.  Just -- I kind of got the impression he was

21  along for the ride.  Just wanted to go with.

22     Q.  Okay.

23     A.  That was kind of what I understood.

24     Q.  Okay.  Did you -- how did you get to the

25  Wachsmuth residence?

BRETT LARA - October 7, 2010                                            Page 38
Direct Examination by Mr. Gosman

1      A.  I drove my patrol vehicle.

2      Q.  Were you alone?

3      A.  Yes.

4      Q.  And there must have been a lot of vehicles

5  around that residence that night?

6      A.  A few.

7      Q.  Okay.  And were you assigned any team members

8  to cover the back door?

9      A.  There was me, Investigator Brown, Officer

10  Bradley.  That was our designation.

11     Q.  Okay.  And what were you supposed to do?

12     A.  Well -- sorry.

13     Q.  Everybody seems to laugh at this particular

14  part.

15     A.  There was a 6-foot high privacy fence that

16  separated the backyard from where we were at.  And we

17  were to climb over this fence to get into the backyard

18  so that we could approach the back door.

19     Q.  All right.  And was there an understanding

20  that you would be in radio contact with the other team

21  members?

22     A.  Yes.

23     Q.  Was it part of the plan that you would

24  coordinate your efforts so that you were at the house

25  at the same time?

BRETT LARA - October 7, 2010                                            Page 39
Direct Examination by Mr. Gosman

1      A.  Yes.

2      Q.  And was it part of the plan that you were

3  going to supply a diversionary at the back door by

4  either breaking a window in the back of the house or in

5  the back of the door at the same time that the entry

6  was made?

7      A.  That was the general idea that was discussed.

8      Q.  Okay.  Okay.  Did you have a tool to break

9  the window, or were you just going to break it out with

10  your weapon or something?

11     A.  I think we were just going to use, like, one

12  of our tools, like something on our belts or whatever.

13     Q.  Okay.  So there was a privacy fence, and you

14  understood at the point that you arrived at the privacy

15  fence that the other team members were positioning

16  themselves?

17     A.  Yes.

18     Q.  And how did you learn that?

19     A.  That was discussed before we left to go over

20  there.

21     Q.  Uh-huh.

22     A.  And there was radio conversation of where the

23  guys were staging at, that we were on scene, and I

24  think we had a certain period of time that we had to

25  get to where we needed to be.

BRETT LARA - October 7, 2010                                            Page 40
Direct Examination by Mr. Gosman

1      Q.  Do you remember what that period of time was?

2      A.  No, I don't.

3      Q.  So you arrive at the privacy fence and go

4  ahead and take me through it from there.

5      A.  I had a little footstool, a little -- and I

6  started helping Officer Bradley over the fence.  And we

7  were climbing the fence over at the southwest corner

8  that was kind of behind a shed so we had some cover,

9  concealment.  I was helping him over the fence but he

10  got caught up on a chunk of wood that came between his

11  duty belt and his belt.  And I was trying to get him

12  unsnagged.  And plus, he knew there was garbage down

13  there and was stepping on it and it was making a little

14  noise.

15     Q.  That caused a little delay then?

16     A.  Yeah.

17     Q.  About how long did it take to get it

18  straightened out?

19     A.  Seemed like forever.  But actually, it was --

20  well, you know, as I'm doing this, when I heard the

21  commotion from the front.  And so we kind of went into

22  hurry-up mode.

23     Q.  Okay.  So you were still at the fence trying

24  to help Officer Chapman --

25     A.  Bradley.

BRETT LARA - October 7, 2010                              Page 41
Direct Examination by Mr. Gosman

1  Q. -- when the entry team apparently entered the
2  house?
3  A. Yes.
4  Q. And did you hear any of the conversation that
5  occurred at the front of the house? Apparently, there
6  was a couple of comments that were made?
7  A. No. No conversations.
8  Q. And did you hear the door being breached?
9  A. Yes.
10 Q. And did you hear the flashbang going off?
11 A. Yes.
12 Q. And how close together were those two events?
13    MS. WESTBY: Objection.
14    THE WITNESS: I have no idea.
15 BY MR. GOSMAN:
16 Q. Okay. Within a couple of seconds?
17    MR. THOMPSON: Object to form.
18    MS. WESTBY: Object to form. Asked and
19 answered.
20    THE WITNESS: I don't know.
21 BY MR. GOSMAN:
22 Q. Okay. So what happened next with you, then,
23 Officer?
24 A. I realized when that was going on in the
25 front, I had Officer Bradley's rifle, and I kind of

BRETT LARA - October 7, 2010                              Page 42
Direct Examination by Mr. Gosman

1  gave it to him, and he kind of fell over into the
2  trash. And Officer -- I mean, Investigator Brown was
3  saying, "We need to get over the fence." So I was
4  helping him over. And on the way over he kicked me in
5  the head. And I didn't make it over the fence.
6  Q. You didn't make it over the fence?
7  A. No. I just -- at that point, I just took the
8  perimeter from the fence.
9  Q. Okay. Did you go into the house that night?
10 A. Later on.
11 Q. Was it after it had been cleared?
12 A. Yes.
13 Q. How long after, do you know?
14 A. Minutes. Two, three minutes. Three minutes
15 maybe.
16 Q. Okay. Was it radio traffic that alerted you
17 that the house had been cleared?
18 A. You know, I don't remember if it was that or
19 somebody opened the back door. I don't recall which it
20 was.
21 Q. Okay. Did you have a camera with you that
22 night?
23 A. Later on I did.
24 Q. Okay. Was that the same camera that Officer
25 Brown brought to the scene?

BRETT LARA - October 7, 2010                              Page 43
Direct Examination by Mr. Gosman

1  A. Yes.
2  Q. And did you take photographs of the evidence?
3  A. Yes.
4  Q. All right. Do you remember specifically
5  taking a photograph of a baggie or cellophane wrapper
6  or something along that line that was suspected to
7  contain cocaine or methamphetamine?
8  A. I remember something like that, a little
9  baggie. In a drawer with some other stuff, I believe.
10 Q. Okay. Did you take a picture of it?
11 A. I believe I did.
12 Q. Why don't you go ahead, if you can, we'll see
13 if it's in that group. I think most of them are there.
14 A. Let me take a look here real quick.
15 Q. While you're looking, do you remember who
16 showed you that item?
17 A. I can't be sure of that, no.
18    Probably going to be the last one.
19 Q. It may not even be in there. I can't say for
20 sure that's all the pictures, unfortunately.
21 A. It looks like this one right here.
22 Q. Yes. And what you are showing me, apparently
23 is -- was this something that was part of a drawer?
24 A. I think it was underneath the bed. I think
25 it was one of these items here.

BRETT LARA - October 7, 2010                              Page 44
Direct Examination by Mr. Gosman

1  Q. Go ahead.
2  A. Let me take a look. It might have been that
3  one.
4  Q. Oh, I see.
5  A. That was what was underneath the bed.
6  Q. Okay. And is there a plastic bag in this
7  photo that you can identify?
8  A. It looked like it was this right here.
9  Q. Okay.
10 A. Can you see that?
11 Q. I can see that. Why don't we do this,
12 though, we can draw a circle around that item.
13 A. I believe it was that one there.
14 Q. Okay. And by the way, are these two pictures
15 of the same thing?
16 A. It appears to be so.
17 Q. Okay.
18 A. Looks like. I don't know why they printed
19 out two.
20 Q. Did you take any other pictures of this --
21 when you saw that bag in the photograph, did you
22 suspect that there was a drug in it or that it had drug
23 residue in it?
24 A. I was -- really my duty was to take pictures.
25 I was working with the evidence custodians. And before

BRETT LARA - October 7, 2010                                    Page 45
Direct Examination by Mr. Gosman

1  I -- I instructed everybody, before you pick something
2  up, let me take a picture of it. So there was
3  discussion as to what was -- what is this, whatever. I
4  was focusing on trying to take good pictures.
5      Q.  You've gone through all of these other
6  pictures, correct?
7      A.  It's been a while, but I've seen all of them.
8      Q.  Does it appear -- I'm not going to ask that.
9          Is this pretty much the collection of
10 pictures that you took that night or that were taken?
11         MR. THOMPSON: Objection as to form.
12         MS. WESTBY: Join.
13         THE WITNESS: I took the majority of them, I
14 believe. But Investigator Brown took some initial
15 pictures and he just handed the camera off to me.
16         MR. GOSMAN: I think we marked the entire
17 body of pictures as Exhibit 43, and I think I
18 provisionally --
19         MR. THOMPSON: I don't think you did.
20         MR. GOSMAN: All right. I'm going to do that
21 right now. We've identified those. So we now have an
22 Exhibit 43. And I pulled out the page that you've
23 identified as containing the small plastic bag that may
24 have contained the cocaine or methamphetamine residue.
25 And we'll mark that as Exhibit 44.

BRETT LARA - October 7, 2010                                    Page 46
Direct Examination by Mr. Gosman

1          And I think -- go ahead. We'll mark that as
2  Exhibit 44.
3          (Exhibits 43-A and 44 marked)
4  BY MR. GOSMAN:
5      Q.  I think you started to explain to me why you
6  didn't actually -- if you suspected cocaine in that bag
7  why you didn't pull it out and take a picture of it.
8  Can you tell me why that wasn't done?
9      A.  No.
10     Q.  All right. Okay. Did you take a picture of
11 the box with the stuffed animals in them?
12     A.  Yes, I did.
13     Q.  It's in there?
14     A.  Should be in there, yes.
15     Q.  And did you see the letter that was in the
16 box?
17     A.  There was a letter, I remember, that was --
18 I'm not sure which box it was. But I remember seeing a
19 letter.
20     Q.  Do you remember -- and I --
21     A.  I think it was in the box.
22     Q.  Do you remember taking a picture of the
23 letter?
24     A.  I'm not sure if I did or not. Like I said,
25 it's been a while since I looked at those pictures.

BRETT LARA - October 7, 2010                                    Page 47
Direct Examination by Mr. Gosman

1      Q.  While you were in the house taking these
2  photographs, did you notice the smoke detector going
3  off? Was there -- or did you hear the smoke detector
4  going off?
5      A.  I don't remember.
6      Q.  Do you remember seeing evidence that the
7  flashbang device had burned bedding in the home?
8      A.  Yes.
9      Q.  Did you see the pillow in the bathroom?
10     A.  I don't remember seeing a pillow in the
11 bathroom.
12     Q.  Okay. Was there a debriefing after this
13 warrant service where the group got back together?
14     A.  We all came back to the station. I don't
15 think it happened that night, though.
16     Q.  Was there a debriefing later?
17     A.  I believe so.
18     Q.  What happened in the debriefing?
19     A.  Just discussed what happened and kind of let,
20 you know, like we were the back team and the front what
21 happened with the guys in the front because we had
22 questions like why did you guys -- what happened, you
23 know, from your perspective because we didn't know
24 because we weren't there. That kind of thing.
25     Q.  Do you remember Officer Chretien -- or

BRETT LARA - October 7, 2010                                    Page 48
Direct Examination by Mr. Gosman

1  Sergeant Chretien saying that he felt bad or
2  apologized -- and this is not a direct quote -- for
3  having taken Tricia Wachsmuth down the stairs before
4  the basement was cleared?
5          MS. WESTBY: Object to the form of the
6  question.
7          MR. THOMPSON: Join.
8          THE WITNESS: I don't remember him saying
9  anything about that.
10 BY MR. GOSMAN:
11     Q.  Okay. Did you observe any damage in the
12 house when you went through it that night to document
13 the evidence?
14         MS. WESTBY: Object to the form of the
15 question.
16         MR. THOMPSON: Join.
17 BY MR. GOSMAN:
18     Q.  We know the door was broken and we know that
19 the window was broken, correct? Did you see any other
20 damage?
21         MS. WESTBY: Object to the form of the
22 question.
23         MR. THOMPSON: Join.
24         THE WITNESS: The door, the window, and some
25 of the burn marks where the flashbang entered are the

BRETT LARA - October 7, 2010                                    Page 49
Direct Examination by Mr. Gosman

1  things I remember.

2  BY MR. GOSMAN:

3      Q.  Do you have an e-mail that you use at the

4  City of Powell?

5      A.  Yes.

6      Q.  Did you communicate by e-mail with any of the

7  other officers after this incident?

8      MS. WESTBY: Object to the form of the

9  question.

10 BY MR. GOSMAN:

11     Q.  Did you send an e-mail saying, you know,

12 where is this report or what happened or officer

13 Chretien says this or anything like that?

14     A.  I don't remember sending any e-mails about it

15 'cause we just got together and talked about it in

16 debriefing. So I don't remember sending any e-mails

17 out about anything relating to that.

18     MR. GOSMAN: I think I'm done.  Thank you

19 very much.

20     MS. WESTBY: We'll read and sign.

21         (Proceedings concluded at 6:04

22          p.m., October 7, 2010.)

23

24

25

BRETT LARA - October 7, 2010                                    Page 50
Direct Examination by Mr. Gosman

1              DEPONENT'S CERTIFICATE

2          I, BRETT LARA, do hereby certify, under

3  penalty of perjury, that I have read the foregoing

4  transcript of my testimony consisting of 49 pages,

5  taken on October 7, 2010 and that the same is, with any

6  changes noted below, a full, true and correct record of

7  my deposition.

8  PAGE  LINE      CORRECTION        REASON FOR CORRECTION

9  ____  ____  _____   _____

10 ____  ____  _____   _____

11 ____  ____  _____   _____

12 ____  ____  _____   _____

13 ____  ____  _____   _____

14 ____  ____  _____   _____

15 ____  ____  _____   _____

16 ____  ____  _____   _____

17 ____  ____  _____   _____

18 ____  ____  _____   _____

19 ____  ____  _____   _____

20 ____  ____  _____   _____

21 ____  ____  _____   _____

22

23

24            _____

25             BRETT LARA    Date

BRETT LARA - October 7, 2010                                    Page 51
Direct Examination by Mr. Gosman

1                    CERTIFICATE

2          I, VONNI R. BRAY, Registered Professional

3  Reporter, and Notary Public for the State of Montana,

4  do hereby certify that BRETT LARA was by me first duly

5  sworn to testify to the truth, the whole truth, and

6  nothing but the truth;

7          That the foregoing transcript, consisting of

8  50 pages, is a true record of the testimony given by

9  said deponent, together with all other proceedings

10 herein contained.

11          IN WITNESS WHEREOF, I have hereunto set my

12 hand this 16th day of October, 2010.

13

14

15

16

17

18

19

20         _____

21

22 Vonni R. Bray, RPR
   P. O. Box 125
   Laurel, MT 59044

23 (406) 670-9533 Cell
   (888) 277-9372 Fax

24 vonni.bray@yahoo.com

25

Tricia Wachsmuth v.
City of Powell, et al.

Bret Lara
October 07, 2010

**0**

**04 (2)**
8:25;10:11
**05 (2)**
19:7;28:13
**06 (4)**
9:1;10:11;22:17,25

**1**

**10 (5)**
26:1,4,19;29:17;34:5
**10/5 (1)**
19:7
**13 (1)**
14:1
**14 (1)**
12:8
**1815 (1)**
22:13
**1996 (1)**
12:15
**1st (1)**
12:6

**2**

**2 (2)**
24:6,9
**20 (1)**
32:6
**2000 (2)**
13:10.22
**2001 (4)**
12:25;13:2,9,23
**2002 (1)**
27:11
**2003 (3)**
14:1;15:21;26:14
**2005 (7)**
15:21;16:11;19:11;
21:2;28:16;29:4.8
**2006 (1)**
10:10
**2009 (5)**
12:8,11;21:3;24:24;
26:6
**2010 (2)**
12:6;49:22
**24 (3)**
12:11;13:21;21:3
**24th (1)**
24:24
**250 (1)**
5:10
**27 (12)**
15:1,4;17:4,5,8,12,13,
15,19,21,21;19:9
**28 (2)**
19:4,8
**29 (2)**

26:17,21

**3**

**3.7.12 (1)**
23:11
**30 (7)**
17:5,8,10,12,  3,19;
32:6
**35 (3)**
22:1,3,7
**37 (4)**
27:21,24,24;29:10
**38 (1)**
27:23

**4**

**40-hour (2)**
27:15;29:11
**43 (2)**
45:17,22
**43-A (1)**
46:3
**44 (3)**
45:25;46:2,3

**5**

**5th (1)**
29:8

**6**

**6:04 (1)**
49:21
**6-foot (1)**
38:15

**7**

**7 (1)**
49:22

**9**

**96 (1)**
12:17

**A**

**ability (3)**
5:12,15;9:7
**access (1)**
28:22
**accomplished (1)**
33:13
**accurate (1)**
25:15
**accurately (1)**
31:19
**across (2)**
6:3,6

**action (1)**
18:2
**active (1)**
19:23
**activities (1)**
13:16
**actually (9)**
14:11;19:8;20:14,18;
27:12;31:5;35:1;40:19;
46:6
**address (1)**
5:9
**adults (2)**
30:21;31:1
**affect (1)**
5:15
**afternoon (1)**
5:4
**again (3)**
18:25;24:9:30:24
**against (1)**
33:22
**age (1)**
31:24
**ago (2)**
8:23;27:20
**agree (2)**
5:1;29:7
**ahead (9)**
11:22;22:3;26:3;36:8,
19;40:4;43:12;44:1;46:1
**aid (1)**
22:18
**alerted (1)**
42:16
**alone (1)**
38:2
**along (7)**
6:4,5,8;31:2;32:9;
37:21;43:6
**alternatives (1)**
7:23
**angle (1)**
35:22
**animals (1)**
46:11
**answered (1)**
41:19
**anxiety (1)**
9:23
**apologized (1)**
48:2
**apparently (3)**
41:1,5;43:22
**appear (2)**
32:22;45:8
**Appears (7)**
12:12;17:24;19:12;
26:24;27:15;33:1;44:16
**approach (3)**
7:6;35:15;38:18
**approached (2)**
5:24,25

**April (3)**
12:6,25;13:2
**area (3)**
21:3;35:8,9
**around (4)**
27:23;35:23;38:5:
44:12
**arrest (2)**
22:18;23:10
**arrive (1)**
40:3
**arrived (5)**
7:21;35:3,5,14;39:14
**assembled (2)**
7:5;36:4
**assessment (1)**
10:18
**assigned (1)**
38:7
**assignment (1)**
34:14
**assignments (2)**
29:23;30:2
**associated (1)**
19:10
**attorney (1)**
4:16
**aware (1)**
25:20

**B**

**back (16)**
6:11;7:1:27:8;34:15;
35:11,12,23;38:8,18;
39:3,4,5;42:19;47:13,14,
20
**backyard (3)**
35:18;38:16,17
**bad (1)**
48:1
**bag (4)**
44:6,21;45:23;46:6
**baggie (2)**
43:5,9
**barrel (1)**
20:7
**based (4)**
7:14;15:12;18:2;33:5
**basement (1)**
48:4
**basic (2)**
12:17,24
**bathroom (2)**
47:9.11
**bed (2)**
43:24;44:5
**bedding (1)**
47:7
**behind (1)**
40:8
**helt (2)**
40:11,11

**belts (1)**
39:12
**Besides (1)**
21:15
**best (3)**
9:7;29:5,9
**big (1)**
24:2
**binders (1)**
24:7
**bipolar (1)**
9:22
**bit (1)**
36:10
**Blackmore (2)**
34:25;35:4
**board (1)**
34:10
**boards (1)**
7:13
**body (1)**
45:17
**both (1)**
34:6
**box (4)**
46:11,16,18,21
**Bradley (2)**
38:10;40:6,25
**Bradley's (1)**
41:25
**breached (2)**
19:21;41:8
**breaching (2)**
20:10;21:11
**break (5)**
5:3,6;32:18;39:8,9
**breaking (1)**
39:4
**Bret (16)**
5:21,25;8:15,18,24;
9:5,9,12,14,16;11:4;
32:11;33:24;36:2,13,25
**Bret's (1)**
11:12
**BRETT (2)**
4:1;5:8
**briefing (9)**
6:8;9:20;11:3;30:16;
33:20;34:24;36:12;
37:13,15
**broken (2)**
48:18,19
**brought (1)**
42:25
**Brown (4)**
38:9;42:2,25;45:14
**burn (1)**
48:25
**burned (1)**
47:7

**C**

Tricia Wachsmuth v.
City of Powell, et al.

Bret Lara
October 07, 2010

**call (3)**
7:24;8:1;14:18
**called (5)**
7:24;17:6;18:15;
19:20;23:7
**came (5)**
6:3,6;33:21;40:10;
47:14
**camera (3)**
42:21,24;45:15
**can (16)**
4:8,20;5:3;6:23;9:18;
10:15;11:5;12:14;16:16;
28:19;43:12;44:7,10,11,
12;46:8
**capacity (1)**
12:20
**care (2)**
11:24;23:24
**case (4)**
4:8,9,9;5:19
**caught (1)**
40:10
**cause (3)**
16:21;21:4;49:15
**caused (1)**
40:15
**cellophane (1)**
43:5
**certain (2)**
28:21;39:24
**certification (1)**
12:25
**cetera (1)**
21:12
**chance (1)**
35:23
**changed (1)**
7:2
**Chapman (1)**
40:24
**check (1)**
16:2
**Cheyenne (1)**
9:4
**child (3)**
31:21;32:3,3
**Chretien (4)**
35:25;47:25;48:1;
49:13
**chunk (1)**
40:10
**circle (1)**
44:12
**City (2)**
14:7;49:4
**Clark (1)**
5:10
**class (10)**
6:15;12:8;13:25;14:1;
21:5,21;28:13,15;29:3,6
**classes (2)**
21:15,18

**clear (2)**
4:25;19:22
**cleared (3)**
42:11,17;48:4
**clearing (2)**
19:17;21:11
**climb (1)**
38:17
**climbing (1)**
40:7
**close (2)**
33:15;41:12
**clothing (1)**
6:18
**cocaine (3)**
43:7;45:24;46:6
**collection (1)**
45:9
**column (2)**
23:1,9
**coming (3)**
9:12;31:24;32:14
**comments (1)**
41:6
**commotion (1)**
40:21
**communicate (1)**
49:6
**comp (1)**
4:10
**complete (3)**
12:1,4,10
**comports (1)**
18:16
**concealment (1)**
40:9
**concerning (3)**
9:14,16;11:4
**concluded (1)**
49:21
**condition (2)**
10:5;11:19
**conditions (1)**
9:25
**conduct (1)**
19:13
**conducted (3)**
22:20,21;26:5
**connection (1)**
5:19;6:1
**considered (2)**
10:23;36:14
**consists (1)**
15:4
**contact (1)**
38:20
**contacted (1)**
7:17
**contain (1)**
43:7
**contained (1)**
45:24
**containing (1)**

45:23
**contains (1)**
15:5
**conversation (6)**
9:16,20;10:1,7;39:22;
41:4
**conversations (3)**
10:9,13;41:7
**coordinate (1)**
38:24
**copies (1)**
27:25
**copy (2)**
28:4,24
**corner (1)**
40:7
**correctional (2)**
12:17,21
**Counsel (1)**
23:20
**Countermeasures (2)**
15:7,14
**couple (3)**
15:13;41:6,16
**course (19)**
4:19;14:4;15:12,20,
21;16:3;19:9,10,13;
20:9;21:18;24:10;27:6,
12,15;29:11,13,14;33:21
**cover (3)**
34:15;38:8;40:8
**covered (4)**
11:1;13:18;21:19;23:6
**covers (1)**
23:15
**crisis (2)**
27:1;28:25
**crossed (2)**
31:5,6
**current (1)**
5:9
**custodians (1)**
44:25

**D**

**damage (2)**
48:11,20
**danger (1)**
11:8
**dark (1)**
35:23
**date (3)**
12:5,7;15:12
**dated (1)**
16:10
**dates (1)**
27:10
**David (1)**
5:8
**Davis (1)**
37:12
**day (1)**

9:8
**DCI (1)**
8:21
**debriefing (4)**
47:12,16,18;49:16
**decided (1)**
7:5
**delay (1)**
40:15
**Department (12)**
13:4,8;21:10;22:10;
23:16;24:25;25:18,21;
27:1,3,17;28:18
**depended (1)**
23:8
**deployment (1)**
21:12
**deposition (5)**
4:6,12;5:4,12;30:9
**depositions (1)**
13:14
**depression (2)**
9:10,23
**designation (1)**
38:10
**designed (2)**
14:11,16
**detector (2)**
47:2,3
**detention (2)**
12:16,17
**device (2)**
13:17;20:18,21;47:7
**devices (2)**
20:12;21:12
**diagram (1)**
29:21
**diagrams (3)**
30:1;34:6,8
**different (3)**
7:13;10:2;22:16
**DIRECT (2)**
4:3;48:2
**direction (1)**
35:15
**discharge (1)**
20:21
**discharged (1)**
20:18
**discovery (2)**
15:25;23:22
**discuss (2)**
7:22;9:8
**discussed (13)**
7:11,15,22;8:11;9:17;
31:23;33:6,10;34:20;
36:20;39:7,19;47:19
**discussing (8)**
8:8;9:5,12;31:17;
32:18,21,25;36:22
**discussion (7)**
31:18;32:3;33:19;
34:1,2,18;45:3

**discussions (1)**
8:7
**distraction (1)**
20:12
**diversionary (2)**
21:12;39:3
**document (17)**
16:13,14;17:4,5,12,13,
19,19;18:15,16;28:9,25;
29:10;30:3;33:2,5;48:12
**documents (2)**
14:21;16:4
**done (4)**
21:21;36:16;46:8;
49:18
**door (11)**
19:21;32:17;34:15;
38:8,18;39:3,5;41:8;
42:19;48:18,24
**down (7)**
9:4;18:25;20:7,8;32:7;
40:12;48:3
**downstairs (2)**
6:15;34:7
**draw (1)**
44:12
**drawer (2)**
43:9,23
**dressed (2)**
6:17,22
**drove (1)**
38:1
**drug (3)**
32:12;44:22,22
**dry (2)**
7:13;34:9
**duly (1)**
4:2
**during (9)**
6:8,9;8:16;9:19;10:1;
13:11,19;19:13;36:12
**duty (2)**
40:11;44:24
**dynamic (9)**
7:6,23;10:19;13:14;
18:21;25:1;26:6,11;
36:15

**E**

**earlier (1)**
15:20
**Eckerdt (1)**
36:1
**effected (1)**
30:10
**efforts (1)**
38:24
**either (2)**
9:22;39:4
**else (5)**
9:13,17;19:1;28:3;
36:25

Tricia Wachsmuth v.
City of Powell, et al.

**e-mail (3)**
49:3,6,11

**e-mails (2)**
49:14,16

**embodied (1)**
27:2

**Emergency (4)**
14:3,10,17;17:25

**employed (1)**
13:1

**end (1)**
13:23

**enforcement (2)**
12:2,15

**enough (1)**
11:18

**entered (1)**
41:1;48:25

**entire (2)**
18:8;45:16

**entries (3)**
22:16,25;25:1

**entry (18)**
7:6,23;8:2,2;10:19;
12:7;13:14,15,15;18:21;
19:22;26:6,11;33:12;
36:4,15;39:5;41:1

**environment (1)**
20:15

**erase (2)**
7:13;34:10

**et (1)**
21:12

**even (2)**
25:14;43:19

**evening (5)**
6:12;9:19;11:3;30:16;
37:13

**event (1)**
16:17

**events (1)**
41:12

**Everybody (2)**
38:13;45:1

**everyone (2)**
6:22;20:21

**evidence (4)**
43:2;44:25;47:6;48:13

**Exactly (1)**
21:17

**EXAMINATION (1)**
4:3

**example (1)**
37:3

**executing (1)**
7:18

**execution (3)**
5:20;6:1,13

**Exhibit (27)**
11:21;15:1,4;17:5,8,8;
19:4,7,8;22:1,3,7,14;
26:1,4,17,19,21;27:21,
23;29:10,17;34:5;45:17,

22,25;46:2

**Exhibits (1)**
46:3

**explain (2)**
21:14;46:5

**extent (1)**
27:4

**F**

**fair (1)**
12:9

**familiar (6)**
4:11,13;26:23;27:14;
28:10;29:21

**family (1)**
34:19

**far (4)**
6:21;19:12;25:16;27:9

**father (2)**
8:20,21

**February (1)**
12:11;21:3;24:24;26:6

**fell (1)**
42:1

**felt (1)**
48:1

**female (2)**
31:8,9

**fence (16)**
35:17,18,18,23:8:15,17;
39:13,15;40:3,6,7,9,23;
42:3,5,6,8

**few (2)**
25:23;38:6

**field (2)**
13:19,22

**files (1)**
16:24

**fine (2)**
18:19;22:13

**finished (1)**
6:14

**first (9)**
4:2;5:24,25;6:12;7:12;
13:5,25;14:1,11

**flashbang (6)**
13:17;20:18,21;41:10;
47:7;48:25

**focusing (1)**
45:4

**Following (1)**
20:25

**follows (2)**
4:2;30:22

**follow-up (2)**
10:9,13

**footstool (1)**
40:5

**forced (1)**
13:15

**forever (1)**
40:19

**form (22)**
7:8;8:3;10:20;11:14;
14:13;20;18:4,22;19:24;
32:23;33:7,14;36:6,17;
37:7;41:17,18;45:11;
48:5,14,21;49:8

**four (1)**
22:25

**Friday (3)**
23:7,7;24:13

**front (8)**
11:23;35:21,24;40:21;
41:5,25;47:20,21

**full (1)**
5:7

**fully (1)**
5:12

**function (1)**
12:19

**G**

**garbage (1)**
40:12

**gas (1)**
37:10

**gave (2)**
11:9;42:1

**general (1)**
39:7

**generally (1)**
13:15

**given (3)**
4:5;27:12;29:2

**giving (1)**
36:22

**good (1)**
45:4

**GOSMAN (50)**
4:4;7:16;8:12;10:24;
11:20;14:15,23;15:2,10;
16:7,15;17:2,3,9,11,14,
16;18:7,11,13,24;19:5;
20:1,5;22:2;23:19,23;
24:1;26:2,18;27:22;
28:3,6,8;33:3,11;36:11,
23;37:8,11;41:15,21;
45:16,20;46:4;48:10,17;
49:2,10,18

**group (2)**
20:17;43:13;47:13

**guess (1)**
6:2

**guessing (1)**
24:10

**guns (1)**
37:3

**guy (1)**
11:16

**guys (5)**
15:19;28:22;39:23;
47:21,22

**H**

**hand (2)**
28:7,17

**handed (1)**
45:15

**handle (2)**
14:11,16

**hands-on (2)**
16:21;24:19

**happen (4)**
25:3,5,7,9

**happened (10)**
5:25;21:6;34:11;
41:22;47:15,18,19,21,
22;49:12

**head (1)**
42:5

**hear (6)**
33:16;36:25;41:4,8,
10;47:3

**heard (4)**
8:7,17;35:7;40:20

**hearing (3)**
32:5;9;36:13

**heavier (1)**
6:19

**help (4)**
6:16;7:18;23:4;40:24

**helping (3)**
40:6,9;42:4

**here's (1)**
24:21

**high (1)**
38:15

**high-risk (1)**
22:18

**himself (1)**
11:8

**home (7)**
6:17;7:2;10:19;13:16;
31:1;36:4;47:7

**honest (1)**
27:7

**house (18)**
19:22;34:7,15,16;
35:2,6,16,21,24;37:3;
38:24;39:4;41:2,5;42:9,
17;47:1;48:12

**human (1)**
18:1

**hurry-up (1)**
40:22

**I**

**idea (2)**
39:7;41:14

**ideas (1)**
7:13

**identified (9)**
15:1;19:4;22:1,1,25;

26:1,17;27:21;45:21,23

**identify (1)**
44:7

**immediate (1)**
18:2

**impair (1)**
5:11

**important (1)**
4:23

**impression (3)**
10:6;32:2;37:20

**Inc (1)**
15:8

**inch-and-a-half (1)**
24:6

**inches (2)**
24:6,9

**incident (2)**
21:16;49:7

**indicated (3)**
24:5,9;26:9

**indicating (2)**
24:4;27:10

**individual (1)**
22:21

**information (11)**
5:21;6:3;7:14;8:14,15,
24;10:16,17;11:9;37:17,
18

**initial (1)**
45:14

**input (1)**
36:22,24,25

**in-service (4)**
21:20;22:4,5,9

**instance (4)**
7:22;22:17;23:10;
27:19

**instances (1)**
26:10

**Institute (1)**
15:8

**instructed (1)**
45:1

**instructs (1)**
4:16

**interdict (1)**
18:1

**Interdiction (3)**
14:3,10;17:25

**interested (1)**
7:1

**interior (1)**
34:6

**into (8)**
10:19;13:15;19:20;
36:4;38:17;40:21;42:1,9

**introduced (1)**
26:15

**Investigator (3)**
38:9;42:2;45:14

**involved (2)**
26:10;32:12

involves (1)
  17:25
involving (1)
  26:5
issue (2)
  11:24;26:20
issues (2)
  5:14;9:10
item (2)
  43:16;44:11
items (1)
  43:25

**J**

job (2)
  13:5;19:22
Join (17)
  7:10;8:5;10:21;11:15;
  14:14,24;18:12,23;
  19:25;32:24;33:8;36:7,
  18;45:12;48:7,16,23
Jonathan (1)
  37:12
Jujitsu (1)
  6:15
July (1)
  13:21
June (3)
  14:1;22:17,24

**K**

keep (1)
  21:22
Kent (3)
  6:16;8:13;36:1
kept (2)
  16:20;28:17
kicked (1)
  42:4
kind (16)
  8:17;9:11,23;10:6,7;
  23:8;27:13;34:18;37:20,
  23;40:8,21;41:25;42:1;
  47:19,24
knew (1)
  40:12
Knock (1)
  32:17
knock-and-talk (1)
  8:1
knowledge (1)
  36:24

**L**

language (1)
  31:4
LARA (3)
  4:1,5;5:8
last (6)
  5:4;12:6,7;27:11,12;

43:18
later (5)
  16:13,16;42:10,23;
  47:16
laugh (1)
  38:13
law (2)
  12:2,14
leaders (1)
  10:18
learn (3)
  8:23;9:2;39:13
learned (3)
  6:12;21:21;26:15
learning (1)
  14:1
leave (2)
  11:1;26:20
left (2)
  16:12;39:19
left-hand (1)
  31:4
letter (4)
  46:15,17,19,23
line (1)
  43:6
lines (2)
  31:2;32:10
list (4)
  13:12;16:2;30:22;
  32:16
little (7)
  32:7;36:10;40:5,5,13,
  15;43:8
lives (1)
  18:2
lobby (2)
  33:17;34:3
located (1)
  32:7
long (8)
  5:4;8:23;12:19;26:22;
  27:14,20;40:17;42:13
look (12)
  11:21,22;18:14;19:8;
  22:3;26:3;29:17;30:1,8;
  37:8;43:14;44:2
looked (4)
  16:19,24;44:8;46:25
looking (3)
  12:7;17:22;43:15
Looks (11)
  23:14;26:22;27:14;
  28:10,12,13,15,29:8,21;
  43:21;44:18
lot (1)
  38:4

**M**

majority (1)
  45:13
making (1)

40:13
male (4)
  31:4,5,11,15
males (1)
  31:5
manual (5)
  19:9;23:15,17;24:3;
  27:3
many (3)
  21:23;24:23;26:12
mark (2)
  45:25;46:1
marked (2)
  45:16;46:3
marks (1)
  48:25
Marrisa (1)
  30:12
mass (2)
  22:18;23:10
materials (4)
  15:23;16:2,17;19:10
may (4)
  28:24;32:12;43:19;
  45:23
maybe (3)
  27:24;34:23;42:15
mean (7)
  7:12;25:11,13,13;
  29:20;37:16;42:2
means (1)
  4:25
medicated (1)
  9:24
medication (2)
  5:11;10:4
medications (1)
  10:3
meet (1)
  35:10
members (3)
  38:7,21;39:15
mental (3)
  11:12,19;37:4
mentally (1)
  11:7
mention (1)
  36:13
mentioned (1)
  11:3
met (2)
  23:3;25:21
methamphetamine (2)
  43:7;45:24
methods (1)
  20:10
might (1)
  44:2
mind (1)
  9:18
Miner (1)
  15:5
Miner's (1)

19:8
minute (5)
  6:11;13:12;14:7;
  18:14;26:4
minutes (3)
  42:14,14,14
misrepresenting (1)
  18:9
misstates (1)
  14:21
misstating (1)
  18:5
misunderstanding (1)
  4:24
mode (1)
  40:22
moment (2)
  6:7;30:4
Montana (1)
  12:18
month (2)
  23:3,6
months (1)
  22:16
more (7)
  6:25;16:21;25:5,7,9;
  30:20;31:1
most (2)
  25:17;43:13
much (4)
  12:14;33:14;45:9;
  49:19
must (1)
  38:4
mutual (1)
  22:18
myself (1)
  28:19

**N**

name (3)
  5:7;30:13;33:21
names (1)
  30:22
necessarily (1)
  33:1
necessary (1)
  14:19
need (3)
  10:18;28:22;42:3
needed (4)
  6:16,17;7:18;39:25
new (3)
  13:18;21:19;26:15
next (3)
  21:2;23:10;41:22
night (15)
  6:18,22;7:25;10:17;
  11:2;33:6;34:8,12;
  35:21;38:5;42:9,22;
  45:10;47:15;48:12
noise (1)

40:14
North (2)
  5:10;35:19
notation (2)
  23:14;31:21
notations (2)
  29:25,25
notes (1)
  30:18
notice (1)
  47:2
November (2)
  12:8;21:5
number (2)
  25:12,14

**O**

Object (13)
  7:8;8:3;14:20;18:4;
  36:6,17;37:7;41:17,18;
  48:5,14,21;49:8
objected (1)
  23:21
Objection (11)
  10:20;11:14;14:13;
  18:10,22;19:24;20:3;
  32:23;33:7;41:13;45:11
observe (2)
  30:18;48:11
occurred (2)
  21:1;41:5
October (7)
  13:23;19:11;21:2;
  28:15;29:4,8;49:22
off (10)
  11:17;13:25;15:12;
  26:20;31:3;32:16;41:10;
  45:15;47:3,4
offer (5)
  9:19;11:6,12,18;36:25
offered (4)
  10:16;15:7;22:10;
  36:24
Officer (25)
  4:5;8:13;12:3,15,16,
  17,18,21,25;13:6,19;
  15:5;21:20;34:12,25;
  35:3;38:9;40:6,24;
  41:23;25;42:2,24;47:25;
  49:12
officers (8)
  16:24;25:18;26:25;
  30:22;36:2,15;37:17;
  49:7
old (1)
  31:25
Once (2)
  8:17;23:3,6;25:5
one (24)
  6:19;9:4;22:11,14,20,
  23,24;24:8;27:25;31:4,5,
  8,9,11,15;34:6,7,7,

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 20 of 67

Tricia Wachsmuth v.                                                                    Bret Lara
City of Powell, et al.                                                            October 07, 2010

39:11;43:18,21.25;44:3,
13
**ongoing (1)**
10:8
**only (2)**
27:25;28:19
**opened (1)**
42:19
**operation (1)**
32:13
**opinion (2)**
11:6,18
**opinions (1)**
11:12
**opportunity (2)**
14:18;35:20
**opposed (2)**
8:1;34:10
**order (5)**
32:21;33:1,4,9,12
**others (1)**
11:8
**out (18)**
6:17;7:25;8:11;10:2;
13:12;15:17;16:16;31:5,
6;35:10,12;37:10;39:9;
40:18;44:19;45:22;46:7;
49:17
**outset (1)**
5:5
**over (16)**
16:20;23:9;25:13;
26:4,12;38:17;39:19;
40:6,7,9;42:1,3,4,4,5,6
**overall (1)**
10:18
**owned (1)**
34:19

**P**

**Page (12)**
17:4,7,10,12,13,19,21;
23:11;24:14;32:7;34:5;
45:22
**pages (2)**
17:20;22:14
**paranoid (1)**
37:5
**part (7)**
10:18;18:20;31:13;
38:14,23;39:2;43:23
**participate (3)**
5:12;37:15,16
**particular (1)**
38:13
**parts (2)**
29:19;30:7
**passed (4)**
6:4,5,8;11:17
**patrol (10)**
6:19;14:3,10;17:25;
18:2;19:2;21:1;28:12;

29:11;38:1
**peace (1)**
12:24
**pending (1)**
5:6
**perform (1)**
20:14
**performing (1)**
24:25
**perhaps (1)**
28:1
**perimeter (2)**
30:23;42:8
**period (4)**
26:4;27:17;39:24;40:1
**personal (1)**
4:9
**personally (2)**
8:19;26:10
**perspective (1)**
47:23
**pertinent (1)**
11:10
**Philosophy (4)**
17:6,23,24;18:15
**photo (1)**
44:7
**photograph (2)**
43:5;44:21
**photographs (2)**
43:2;47:2
**pick (1)**
45:1
**picked (1)**
22:24
**picture (5)**
43:10;45:2;46:7,10,22
**pictures (10)**
43:20;44:14,20,24;
45:4,6,10,15,17;46:25
**PIER (12)**
13:25;14:7;15:5,11;
16:3;17:6,23,2--;18:3,15,
17;26:15
**pillow (2)**
47:9,10
**pistol (1)**
20:4
**places (1)**
28:21
**plan (3)**
34:14;38:23;39:2
**planned (2)**
8:10;36:16
**planning (2)**
6:9;8:16
**plans (2)**
8:8,9
**plants (1)**
32:6
**plastic (2)**
44:6;45:23
**please (2)**

26:8;36:10
**plus (1)**
40:12
**pm (1)**
49:22
**point (3)**
13:12;39:14;42:7
**pointed (1)**
20:7
**police (16)**
7:1;13:4,5,8;21:9;
22:10;23:16;24:25;
25:18,21;27:1,3,16;
28:18,24;32:17
**policies (1)**
23:15
**Policy (10)**
23:10,14,17;24:2,14,
15,16,19,22;27:3
**posing (1)**
36:2
**position (4)**
19:16,19;20:2,7
**positioning (1)**
39:15
**possibilities (1)**
31:17
**POST (4)**
11:22;12:1,10;18:20
**Powell (14)**
13:4,8;14:7;21:9;
22:10;23:16;24:25;
25:18,21;26:25;27:2,16;
29:13;49:4
**practice (2)**
24:22,24
**practiced (2)**
25:17,21
**practicing (1)**
26:16
**preceded (1)**
15:13
**preparation (1)**
30:8
**prepare (1)**
34:11
**present (2)**
25:22;30:15
**Pretty (6)**
4:13;17:20;25:15;
33:14,14;45:9
**printed (1)**
44:18
**prior (1)**
26:6
**privacy (4)**
38:15;39:13,14;40:3
**probably (2)**
26:14;43:18
**problems (3)**
9:5.21,23
**procedure (1)**
23:14

**procedures (3)**
23:17;24:3;27:3
**Proceedings (1)**
49:21
**process (1)**
4:11
**produce (1)**
23:23
**produced (3)**
16:24,25,25
**program (2)**
18:1;26:24
**property (2)**
15:25;30:23
**provided (3)**
5:20;16:5,8
**provisionally (1)**
45:18
**pull (1)**
46:7
**pulled (1)**
45:22
**purpose (1)**
18:17
**put (3)**
15:15;26:25;35:13
**putting (2)**
8:8,9

**Q**

**quick (1)**
43:14
**quote (1)**
48:2

**R**

**radio (3)**
38:20;39:22;42:16
**read (1)**
49:20
**ready (1)**
6:10
**real (1)**
43:14
**realized (1)**
41:24
**really (4)**
6:25;26:7;30:1;44:24
**rearrange (1)**
33:4
**reason (2)**
36:3,15
**recall (3)**
27:18;33:18;42:19
**received (1)**
29:10
**recite (1)**
18:7
**recognize (1)**
22:9
**recollect (2)**

9:8;33:5
**recollection (2)**
29:5,9
**record (6)**
5:7;12:2,10;16:23;
18:20;19:1
**recorded (1)**
4:20
**records (5)**
11:23;15:4;19:8;22:5,
9
**reference (1)**
24:13
**refers (1)**
23:13
**regarding (1)**
36:24
**related (1)**
21:3
**relates (1)**
18:21
**relating (1)**
49:17
**relative (1)**
13:13
**remember (62)**
6:14,23,24;7:3;8:6;
9:14,16;10:15;11:5;
15:17;20:17;23:2:25:2;
27:6,7,8,16;30:15,25;
31:2,13.14,18.20.23.24;
32:5,9,14,18,21,25;
33:19,23;34:2,9.17,20,
21,21;35:25;36:12,20,
21;37:18;40:1;42:18;
43:4,8,15;46:17.18.20,
22;47:5,6,10,25;48:8;
49:1,14,16
**rephrase (2)**
26:7;36:9
**report (3)**
12:5;34:11;49:12
**represent (1)**
12:1
**represented (1)**
11:7
**represents (1)**
12:10
**requested (1)**
23:20
**requests (1)**
16:25
**required (1)**
4:15
**residence (5)**
7:7,25;19:21;30:21;
31:9,12,16,22;32:6;
35:12,15;37:25;38:5
**residue (2)**
44:23;45:24
**responder (1)**
14:11
**Response (10)**

Tricia Wachsmuth v.
City of Powell, et al.

Bret Lara
October 07, 2010

14:3,11;18:1;19:2;
21:1;27:2;28:12,25;
29:11,14
**rest (1)**
  18:5
**review (1)**
  21:21;24:16,18
**reviewed (1)**
  24:15
**ride (1)**
  37:21
**riding (1)**
  9:3
**rifle (1)**
  20:4,6;41:25
**right (31)**
  5:23;6:11,21;10:25;
  11:11,23;12:9;13:11;
  14:6;17:15;18:11,19;
  19:6;24:2,12;26:19;
  27:25;29:16,16;30:8;
  31:3;32:16,17;35:14;
  38:19;43:4,21;44:8;
  45:20,21;46:10
**Room (1)**
  21:11
**room-clearing (3)**
  13:16;19:14,20
**rooms (2)**
  19:17,22
**roughly (2)**
  13:23;24:11
**running (1)**
  37:10

---

**S**

**safety (1)**
  36:14
**same (6)**
  15:22;20:3;38:25;
  39:5;42:24;44:15
**save (1)**
  18:1
**saw (1)**
  44:21
**saying (7)**
  25:14;36:1,21;42:3;
  48:1,8;49:11
**scene (2)**
  39:23;42:25
**schedule (2)**
  15:13,22
**school (1)**
  26:15
**search (11)**
  5:20;6:1,10,13,16;
  7:18;21:16;22:19;32:17;
  33:22;37:2
**second (3)**
  23:1,22;34:5
**seconds (1)**
  41:16

**seeing (4)**
  34:9;46:18;47:6,10
**seemed (2)**
  11:9;40:19
**seems (2)**
  25:15;38:13
**selling (1)**
  32:12
**send (1)**
  49:11
**sending (2)**
  49:14,16
**separated (1)**
  38:16
**September (1)**
  27:11
**Sergeant (5)**
  6:15;35:25,25;36:1;
  48:1
**sergeants (1)**
  36:13
**served (1)**
  30:11
**service (3)**
  22:18;30:10;47:13
**session (6)**
  9:20;11:3;22:21;
  24:14;36:12;37:13
**sessions (2)**
  22:22;26:12
**set (1)**
  23:22
**setting (1)**
  13:17
**several (1)**
  26:10
**sharp (1)**
  21:22
**shed (1)**
  40:8
**showed (2)**
  34:2;43:16
**showing (1)**
  43:22
**shows (2)**
  15:21;33:16
**side (2)**
  34:16;35:17
**sign (1)**
  49:20
**similar (1)**
  37:1
**simply (1)**
  24:15
**simulated (2)**
  20:15;24:25
**sitting (1)**
  35:1
**situation (2)**
  14:17;19:20
**situations (2)**
  14:12,17
**skills (3)**

**14:2;21:22;26:16**
**small (2)**
  24:7;45:23
**smoke (2)**
  47:2,3
**Somebody (2)**
  15:17;42:19
**Sometimes (4)**
  23:5,5;24:16,18
**somewhere (1)**
  8:25
**son (4)**
  7:25;8:24;9:5;33:25
**sorry (1)**
  33:12;38:12
**south (3)**
  34:16;35:17,18
**southwest (1)**
  40:7
**spanned (1)**
  26:13
**speak (2)**
  28:19;37:9
**special (1)**
  6:18
**specific (1)**
  14:21
**specifically (1)**
  43:4
**stability (1)**
  11:13
**stable (1)**
  11:7
**stages (2)**
  6:9;8:17
**staging (1)**
  39:23
**stairs (1)**
  48:3
**start (2)**
  5:24;12:14
**started (6)**
  9:4;13:21;14:1;26:16;
  40:6;46:5
**starting (1)**
  30:21
**Starts (1)**
  32:17
**state (1)**
  37:4
**stated (1)**
  18:21
**station (3)**
  7:1;35:11;47:14
**stay (2)**
  33:17;34:3
**stayed (1)**
  35:13
**stepping (1)**
  40:13
**still (2)**
  10:7;40:23
**stop (2)**

**14:6;25:11**
**straightened (1)**
  40:18
**Street (1)**
  5:10
**stuff (11)**
  9:23;16:20;21:19;
  23:6;26:22;27:13,19;
  28:21;30:1;33:9;43:9
**stuffed (1)**
  46:11
**subject (1)**
  11:1
**successful (1)**
  10:5
**summarize (1)**
  12:13
**supplied (1)**
  15:5
**supply (2)**
  37:17;39:3
**supplying (1)**
  37:18
**supposed (2)**
  37:4;38:11
**sure (10)**
  9:15;10:25;26:7;27:7,
  11,18;43 17,20;46:18,24
**suspect (1)**
  44:22
**suspected (2)**
  43:6;46:6
**sworn (1)**
  4:2

---

**T**

**tab (2)**
  17:15,21
**tactical (5)**
  13:17;15:8;19:2;21:1;
  28:12
**tactics (10)**
  19:14;20:14;21:10,11;
  25:22;26 11;27:2;28:25;
  29:11,13
**talk (1)**
  6:6
**talked (1)**
  49:15
**talking (5)**
  7:13;15:11;21:11,15;
  34:22
**taught (4)**
  18:3;19:14,16;20:10
**team (20)**
  7:5,23;8:2,2,25;10:12,
  17;14:8,19,19;18:1;
  19:22;24:24;26:11;36:3;
  38:7,20;39:15;41:1;
  47:20
**telling (1)**
  16:7

**ten (1)**
  31:25
**ten-year-old (1)**
  31:21
**termed (2)**
  7:6;13:13
**terms (1)**
  4:24
**testified (1)**
  4:2
**testimony (1)**
  5:18
**therefore (1)**
  4:23
**thick (2)**
  24:4,8
**third (2)**
  21:4;23:9
**Thirty-seven (1)**
  28:2
**THOMPSON (22)**
  7:10;8:5;10:20;11:14;
  14:13,24;18:12,22;
  19:24;20:3;23:20;32:23;
  33:7;36:6,18;37:7;
  41:17;45:11,19;48:7,16,
  23
**though (3)**
  26:23;44:12;47:15
**threat (2)**
  11:7;36:2,3,14
**threats (1)**
  19:23
**three (8)**
  25:9,13,16;30:21;
  31:1;34:23;42:14,14
**three-ring (1)**
  24:7
**times (8)**
  21:23;23:6;24:23;
  25:9,13,16,20,23
**today (4)**
  4:15,20;5:16;13:14
**together (6)**
  8:8,9;9:3;41:12;47:13;
  49:15
**told (5)**
  6:16;7:17;11:2;30:25;
  31:15
**Tom (12)**
  7:24;8:20,21;9:3,10;
  10:1,7,10,14;33:16,19;
  34:2
**Tom's (2)**
  8:24;33:24
**tonight (1)**
  37:10
**took (5)**
  19:10;42:7;45:10,13,
  14
**tool (1)**
  39:8
**tools (1)**

39:12
**Torczon (1)**
   30:12
**traffic (1)**
   42:16
**trained (3)**
   14:8,19;21:9
**training (35)**
   12:2,11;13:13,19,22;
   15:4,6,7,9,11,23;16:1,5;
   17:1;18:6,8,10;20:15,19;
   21:1,2,20;22:5,6,9,21,
   22;23:5,7;24:14;26:5,11,
   12;27:16,19
**Trainings (1)**
   24:13
**trash (1)**
   42:2
**treating (1)**
   10:5
**trial (1)**
   4:20
**Tricia (2)**
   32:11;48:3
**tried (1)**
   10:2
**true (2)**
   5:21;14:12
**truthful (1)**
   5:15
**try (1)**
   12:13
**trying (5)**
   9:11;27:8;40:11,23;
   45:4
**turn (1)**
   22:13
**turned (1)**
   26:19
**Twenty-seven (1)**
   17:9
**twice (1)**
   25:7
**two (12)**
   21:4,8,15,18;27:25;
   31:5;34:5,22;41:12;
   42:14;44:14,19
**two-and-a-half (1)**
   12:23

## U

**underneath (2)**
   43:24;44:5
**understood (2)**
   37:23;39:14
**unfortunately (1)**
   43:20
**uniform (1)**
   6:19
**unless (1)**
   4:16
**unsnagged (1)**

40:12
**up (9)**
   4:25;6:11;31:24;
   32:14;33:17,21;34:3;
   40:10;45:2
**updated (1)**
   27:11
**upstairs (1)**
   34:7
**use (7)**
   8:2;13:16;17 25;
   20:12;21:10;39:11;49:3
**used (3)**
   4:20;7:7;10:17
**using (2)**
   7:23,25
**Utah (1)**
   15:18

## V

**vehicle (1)**
   38:1
**vehicles (5)**
   34:18,21,22;35:21;
   38:4
**venture (1)**
   25:14
**vests (1)**
   6:20
**volunteer (1)**
   8:14
**volunteered (1)**
   8:16

## W

**Wachsmuth (17)**
   5:20,21,25;7:7,24;
   8:15,18;11:4;32:12;
   33:20;34:19;35:14;36:2,
   14,25;37:25;48:3
**walking (1)**
   35:18
**warrant (16)**
   5:20;6:1,10,13,16;
   7:18;8:1;21:16;22:18;
   30:10,11;32:18;33:22;
   37:2,9;47:13
**warrants (1)**
   22:19
**watching (1)**
   35:2
**way (3)**
   9:3;42:4;44:14
**weapon (4)**
   19:16,19;20:2;39:10
**wear (1)**
   6:18
**weren't (1)**
   47:24
**WESTBY (29)**
   7:8;8:3;10:21;11:15;

14:14,20;15:9;16:4,9,23;
   17:8,13;18:4,9,23;19:25;
   28:5;32:24;33:8;36:7,
   17;41:13,18;45:12;48:5,
   14,21;49:8,20
**what's (1)**
   23:7
**window (5)**
   32:18;39:4,9;48:19,24
**Within (1)**
   41:16
**WITNESS (18)**
   7:11;8:6;10:22;11:16;
   16:10;17:10,15;20:4;
   28:7;32:25;33:9;36:9,
   20;41:14,20;45:13;48:8,
   24
**wood (1)**
   40:10
**words (3)**
   14:16;26:9;35:11
**work (2)**
   16:16;24:19
**worked (2)**
   8:19,21
**workers' (1)**
   4:9
**working (1)**
   44:25
**wrapper (1)**
   43:5
**writing (1)**
   7:12
**wrote (1)**
   34:10
**Wyoming (1)**
   12:3

## Y

**year (2)**
   21:5;22:17
**years (5)**
   12:23;15:14;26:4,12;
   31:25
**young (1)**
   32:3

# Appendix Ten

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Roy Eckerdt*
*November 22, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 11-22-10 Roy Eckerdt_SCOPED.txt
Min-U-Script® with Word Index

## Page 1

ROY ECKERDT - November 22, 2010                         Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF WYOMING

 3   ------------------------------------------------

 4   TRICIA WACHSMUTH,                    )
                                          )
 5            Plaintiff,                  )
                                          )
 6      vs.                               )  NO. 10-CV-041J
                                          )
 7                                        )
     CITY OF POWELL, AND IN THEIR         )
 8   INDIVIDUAL CAPACITY, TIM             )
     FEATHERS, CHAD MINER, MIKE           )
 9   CHRETIEN, ROY ECKERDT, DAVE          )
     BROWN, MIKE HALL, BRETT LARA,        )
10   MATT MCCASLIN, ALAN KENT, MATT       )
     DANZER, OFFICER BRILAKIS, LEE        )
11   BLACKMORE, CODY BRADLEY, KIRK        )
     CHAPMAN, JOHN DOES #1-#4,            )
12                                        )
              Defendants.                 )
13   _____

14           DEPOSITION OF ROY ECKERDT

15         5:02 p.m., Monday, November 22, 2010

16   _____

17

18          Pursuant to notice, the deposition of ROY

19   ECKERDT was taken in behalf of Plaintiff in accordance

20   with the applicable Federal Rules of Civil Procedure at

21   270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22   Registered Professional Reporter and Notary Public of

23   the State of Montana.

24

25
```

## Page 2

ROY ECKERDT - November 22, 2010                         Page 2

```
 1                      APPEARANCES

 2   FOR PLAINTIFF:

 3            Mr. Jeffrey C. Gosman
              Gosman Law Office
 4            125 W 2nd Street
              P.O. Box 51267
 5            Casper, WY 82601-2481
              Telephone: (307)265-3082 - Fax: (307)265-6715
 6            E-mail: jeff@gosmanlawoffices.com

 7

 8   FOR INDIVIDUAL DEFENDANTS:

 9            Ms. Misha Westby
              Senior Assistant Attorney General
10            2424 Pioneer Avenue, 2nd Floor
              Cheyenne, WY 82002
11            Telephone: (307)777-5477 Fax: (307)777-8920
              E-mail: mwestb@state.wy.us

12

13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:
14

15            Mr. Tom Thompson
              MacPherson, Kelly & Thompson
16            616 West Buffalo
              P.O. Box 999
17            Rawlins, WY 82301-0999
              Telephone: (307)324-2713 - Fax: (307)324-7348
18            E-mail: tthompson@wyomingattorneys.net

19

20   Also Present:  Tim Feathers

21

22

23

24

25
```

## Page 3

ROY ECKERDT - November 22, 2010                         Page 3

```
 1                   INDEX TO WITNESSES

 2                                              PAGE

 3   ROY ECKERDT

 4        Direct Examination by Mr. Gosman ...............4
          Cross-Examination by Ms. Westby ..............103
 5        Signature Page ...............................105
          Reporter's Certificate .......................106
 6

 7

 8                      EXHIBITS

 9   EXHIBIT          DESCRIPTION                   PAGE

10     10      Notes of Wachsmuth Warrant ..............21

11     13      Search and Seizure Affidavit ............31

12     20      PPD Narrative by Chad Miner .............27

13     25      PPD Supplement 9 by Dave Brown ..........89

14     31      WY P.O.S.T. Training Records .............7

15     47      Photographs .............................39

16     56      Drawing by Roy Eckerdt ..................53

17     57      Drawing by Mr. Eckerdt ..................54

18

19

20

21

22

23

24

25
```

## Page 4

ROY ECKERDT - November 22, 2010                         Page 4
Direct Examination by Mr. Gosman

```
 1                  ROY ECKERDT,
 2   having been first duly sworn, testified as follows:
 3               DIRECT EXAMINATION
 4   BY MR. GOSMAN:
 5      Q.  Sergeant, have you ever given a deposition
 6   before?
 7      A.  Yes, I have.
 8      Q.  Okay.  You're familiar with the process?
 9      A.  Yes.
10      Q.  When did you give a deposition?
11      A.  I gave one about year and a half ago for a
12   civil lawsuit involving a in-car video company that
13   sold us cameras.  And their investors are suing them
14   and they wanted to know about the Powell PD contact,
15   and I was deposed in that.
16      Q.  Have you been deposed on any other occasions?
17      A.  Yeah, one other time, in Nebraska for a
18   federal grand jury.
19      Q.  Okay.  You're familiar with the process,
20   then, that we use in these depositions?
21      A.  Yes.
22      Q.  I'm not going to go over them.  There is one
23   thing, and that is that we can take a break any time,
24   but we don't take a break if a question is pending.
25      A.  Understood.
```

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 26 of 67
Tricia Wachsmuth v.                                                                              Roy Eckerdt
City of Powell, et al.                                                                    November 22, 2010

1   Q. Unless I get buffaloed into not realizing the
2   question is pending, and then we can take a break any
3   time.
4         Okay. What is your educational background,
5   Officer -- or Sergeant? I'll refer to you as sergeant.
6   A. Some college. I've almost finished a
7   bachelor's degree.
8   Q. And where did you get your college
9   educational credits?
10  A. Some through the community college of the
11  Air Force, some through Bellview University in
12  Nebraska, and some through Northwest University here in
13  town.
14  Q. When did you graduate from high school?
15  A. 1987.
16  Q. And was that in Nebraska?
17  A. That was in Texas.
18  Q. And describe briefly your work history from
19  the time you graduated from high school?
20  A. When I graduated from high school, I enlisted
21  in the Air Force, was in the Air Force for ten years.
22  Got out of the Air Force in Cheyenne, worked for the
23  Larimer County Sheriff's Office for a year.
24        Went into construction for two years, which
25  took me out to Nebraska. I went to work for the Sutton

1   Police Department out there.
2   Q. Sorry, which police department?
3   A. Sutton, S-u-t-t-o-n.
4   Q. Was that your first job in law enforcement?
5   A. No.
6   Q. Okay.
7   A. Civilian law enforcement, the first job would
8   have been Larimer [sic] County Sheriff's Office in
9   Cheyenne.
10  Q. What year was that?
11  A. 1997.
12  Q. And did you work for the Cheyenne Police
13  Department?
14  A. No, for the Larimer County Sheriff's Office.
15  Q. Laramie County is where?
16  A. Laramie, I'm sorry. Yeah, Laramie is
17  Fort Collins.
18  Q. So go ahead and continue.
19  A. Was in Sutton for five years and then came to
20  Powell from Sutton.
21  Q. So you've been in law enforcement, and I've
22  already forgot the year that you started in Laramie --
23  or Cheyenne?
24  A. '97.
25  Q. You've been in law enforcement since 1997?

1   A. Yes.
2   Q. And when did you start with the Powell Police
3   Department?
4   A. December of 2003.
5   Q. And you started as a patrol officer, I take
6   it?
7   A. Correct.
8   Q. And you were a sergeant by February 24 of
9   2009, correct?
10  A. Correct.
11          (Exhibit 31 identified)
12  BY MR. GOSMAN:
13  Q. Let's go ahead and take a look at Exhibit 31.
14  We're going to review your POST training records. And
15  I think they are in the middle of this stack. They are
16  document numbers 200 and 201, I believe. But they are
17  not in any kind of order, so knowing that doesn't help
18  much.
19          Okay. What I'd like you to do is go through
20  this list and tell me what training you have had, POST
21  training that you've had, that is related specifically
22  to dynamic entry.
23  A. Related as in entirety or as in portions of
24  or?
25  Q. Significant -- more than 10 percent. You

1   know, such as the patrol tactics course and the
2   P.I.E.R. course.
3   A. I didn't know if like the cell extraction
4   would be -- I mean, it's a different environment, but
5   it's very dynamic.
6   Q. Yeah, okay.
7   A. I guess could I have you define dynamic?
8   Q. Dynamic involves a team of officers, it can
9   involve breaching, it can involve distraction devices.
10  It involves an entry team, overwhelming show of force,
11  violence of action, room clearing.
12  A. Okay. I'd say start off with just the peace
13  officer basic. The Hazwoper Clandestine Laboratory.
14  That would be meth labs.
15  Q. Okay.
16  A. DEA Site Safety Officer Training, Patrol
17  Tactical Response.
18  Q. And that was -- let me see -- in
19  September 2005, correct?
20  A. Correct.
21  Q. By the way, we can stop at February 24, 2009.
22  A. Okay.
23  Q. Have we identified the training that you've
24  taken that deals specifically with dynamic entry?
25  A. I think POST certified, yes.

Tricia Wachsmuth v.
City of Powell, et al.

**Roy Eckerdt**
**November 22, 2010**

1   Q.  Okay.  Now, you're a sergeant in the Powell
2   Police Department, correct?
3   A.  Correct.
4   Q.  And you are one of three sergeants -- or were
5   on February 24th of 2009; is that correct?
6   A.  That's correct.
7   Q.  And Sergeant Kent testified earlier today
8   that you were responsible for main -- or he felt you
9   were responsible for maintaining records of training in
10  dynamic entry exercises by members of the Powell Police
11  Department.  Is that true?
12  A.  I was responsible for scheduling and
13  arranging training, that's true.
14  Q.  Did you generate any record of any of these
15  events?
16  A.  I generated some training records as we were
17  going through it.  It was a new process that we were
18  building at the time.
19  Q.  What time was that?
20  A.  I moved into training -- I guess I'm not sure
21  when I moved into training.  We rotate our positions of
22  responsibility.
23  Q.  Was it within the last couple of years?
24  A.  No.  It would have been probably within the
25  last three or four years.

1   Q.  You moved into training, so within the last
2   three or four years it became your responsibility to
3   conduct training?
4   A.  To oversee the training.
5   Q.  Okay.  And were you required to generate any
6   kind of record or document of the training, such as an
7   attendance list and the subject of the class?
8   A.  No.
9   Q.  Do you know if any of this training was
10  utilized for reporting to the law enforcement -- for
11  purposes of meeting continuing educational requirements
12  for law enforcement officers?
13  A.  Some was, yes.
14  Q.  We've also had some testimony that in order
15  to qualify for recognition as -- toward your law
16  enforcement credits, that there has to be at least an
17  attendance list and some record kept of the
18  proceedings.  Do you know if that's true?
19  A.  Yes, it is.
20  Q.  So there would be a record of those training
21  activities, correct?
22  A.  The training activities that were POST
23  certified, there would be a record of.  Those would be
24  on file with POST.
25  Q.  Okay.

1   A.  They sent out a sign-in log and also
2   requested a copy of what was going to be trained on and
3   basically a syllabus of the course.
4   Q.  All right.  So in other words, if it applied
5   towards your credits for upkeep of your certification,
6   it had to be POST recognized training?
7   A.  To be credited as POST certified hours,
8   correct.
9   Q.  All right.  So did you keep any records,
10  then, of the training that you conducted while you were
11  responsible for overseeing the training at the Powell
12  Police Department?
13  A.  Yes, I kept some.
14  Q.  What happened to them?
15  A.  Everything I had was sent in.
16  Q.  Sent in to where?
17  A.  To -- I was --
18  Q.  Your attorneys?  I've got in-service records
19  that were supplied to me, but I don't have any other
20  training records.  And you're telling me --
21  A.  That's -- that's all there would be is the
22  in-service training records.
23  Q.  All right.  Well, are the in-service training
24  records the records that you're talking about that --
25  or rather, do they document training that you supplied

1   or oversaw to the Powell Police Department?
2   A.  Yes.
3   Q.  All right.
4   A.  Not necessarily all the POST certified
5   training, though.
6   Q.  Right.  Did you participate in dynamic entry
7   training with the Powell police officers as a team?
8   A.  Yes.
9   Q.  And did you document that training?
10  A.  No.
11  Q.  When did you do this?
12  A.  We did it once in -- I think POST reflects
13  2005.  And then we did a second one later on.
14  Q.  Is that it?
15  A.  No.  That would be it for POST certified
16  hours, though.
17  Q.  All right.  Well, what else was there?
18  A.  Training is a constant and ongoing item.  So
19  not everything is documented.  Not everything is done
20  as a department.  Our squads train as a squad under the
21  individual sergeants.  And that's what the majority of
22  the in-service stuff was, was identify topic areas.
23  And then the sergeant on that squad was responsible to
24  see that that training took place on his squad.
25       Outside of that, there's dates that aren't

1 identified that's left open to that sergeant to develop
2 his own training for any areas he might see weaknesses
3 or deficiencies within his squad.
4   Q. Okay. Well, I'm talking specifically -- and
5 I don't care about any other training except that
6 training that relates specifically to dynamic entry
7 where you get together as a team with the Powell Police
8 Department officers and you perform dynamic entry
9 exercises.
10   A. Which could be on a Friday afternoon, a
11 four-man squad goes downstairs in the basement of the
12 PD and we'll work through the hallway, making entries
13 into the rooms down there, just practicing room entry
14 and clearing.
15   Q. And you say it could be.
16     Do you have any specific recollection of
17 those training exercises? Were you involved in any of
18 them?
19   A. On a squad level. My squad did it, yes.
20   Q. As far as you know, did the Powell Police
21 Department ever train using all of the officers that
22 were involved in the Wachsmuth warrant service as a
23 team performing dynamic entry exercises?
24   A. I know that all the officers were trained on
25 it, but I don't know that they all --

1   Q. Ever trained together?
2   A. Without looking at a roster or who was
3 working that day, I wouldn't know.
4   Q. Where would we find that document?
5   A. The two POST certified courses, we would know
6 which officers were in attendance for those courses,
7 and they would have worked together in those courses.
8   Q. Other than that, has the Powell Police
9 Department ever assembled the group of officers that
10 were involved in the Wachsmuth warrant and practiced
11 dynamic entry?
12     MS. WESTBY: Object to the form of the
13 question --
14     THE WITNESS: Yes.
15     MS. WESTBY: -- asked and answered.
16 BY MR. GOSMAN:
17   Q. Yes? When?
18   A. Our training is set up -- three Fridays are
19 left to the squad; the fourth Friday is department
20 training. On that fourth Friday, we've practiced
21 portions of it. Might be on the live fire range.
22 We've been out to the fairgrounds and used buildings
23 out there for entry.
24   Q. How many times have you done that?
25   A. In what timeframe?

1   Q. Well, prior to February 24 of 2009, within
2 the three-year period before that.
3   A. As a whole department?
4   Q. Well, as nearly a whole department, at least.
5   A. Right, right. I don't know if it would be
6 fair to venture a guess, but I'd say maybe a dozen.
7   Q. As an entire department?
8   A. Uh-huh.
9     MS. WESTBY: Yes?
10     THE WITNESS: Yes, I'm sorry.
11 BY MR. GOSMAN:
12   Q. Okay. Officer, how would you describe the
13 difference between a SWAT team, trained as a SWAT team,
14 and the group of Powell police officers that have
15 trained together in dynamic entry?
16   A. I start off initially, a SWAT team is usually
17 a full-time unit. That is their function in life.
18 They train and practice and respond to calls. Their
19 primary mission is to service the high-risk environment
20 things, special weapons. Obviously with the name,
21 Special Weapons and Tactics.
22   Q. Okay. And does the Powell Police Department
23 have anything like a SWAT team?
24   A. No.
25   Q. Are there any agencies in Park County that

1 have a SWAT team?
2   A. No.
3   Q. Does Park County, the sheriff's office have a
4 SWAT team?
5   A. No. They --
6   Q. They have -- go ahead.
7   A. I'm sorry. They have a -- I'm not sure what
8 they call --
9   Q. SRG?
10   A. SRG.
11   Q. What is their SRG team?
12   A. Their SRG team is made up of a handful of
13 group of deputies, patrol deputies that come in and
14 fill out that team.
15   Q. And do they train together on a regular
16 basis, do you know?
17   A. I don't know.
18   Q. Do you know if you have -- if the City of
19 Powell Police Department has an agreement with Park
20 County for the use of its SWAT team?
21   A. Not for sure, no. My assumption would be a
22 mutual aid agreement that's statewide. But that would
23 be an assumption.
24   Q. Okay. Did you take the -- let's see -- the
25 P.I.E.R. course from tactical -- Countermeasures

1    Tactical Institute?
2        A. Not under that name.
3        Q. Okay. What was it called? Specialized
4    tactics? I think you did take the specialized tactics
5    course.
6        A. Patrol Tactical Response, I think is what
7    they listed it in here as, anyway.
8        Q. Okay. And when did you take that course?
9        A. 2005.
10       Q. 2005. Okay. All right. Do you have any
11   SWAT training?
12       A. Not civilian. I have -- do I have any SWAT
13   training? I have tactical training similar to what
14   would be used in a SWAT operation, but I haven't been
15   part of a SWAT team.
16       Q. And you didn't train with a SWAT team or as a
17   member -- you've never trained as a member of a SWAT
18   team?
19       A. I've trained with SWAT members.
20       Q. You've trained with SWAT members in these
21   courses that you've taken, these POST courses we talked
22   about?
23       A. With the meth lab clandestine operation labs
24   teams. We did entries with SWAT teams. I also
25   attended the week SWAT course in Salt Lake City.

1        Q. Was that on your POST records?
2        A. No, it wasn't POST certified.
3        Q. When did you that?
4        A. I believe 2007.
5        Q. All right. How did you learn about the
6    warrant service on the Wachsmuth home?
7        A. I was called in from home. I was off-duty.
8        Q. Had you had any discussions prior to the time
9    that you were called into the office, or called in,
10   with either Chief Feathers or Sergeant Kent or
11   Officer Miner regarding this warrant service?
12       A. I don't believe so.
13       Q. And about what time was it that you were
14   contacted, do you know?
15       A. In the evening. I don't know.
16       Q. What were you told?
17       A. I was told that they were calling everyone in
18   to serve a search warrant.
19       Q. Have you ever had that call before where
20   everyone is called in to serve a search warrant?
21       A. Here?
22       Q. Yes.
23       A. I recall being called in as a department more
24   than once, but I don't recall being specifically for
25   search warrants. Maybe another incident that led to a

1    search warrant.
2        Q. When you arrived at the police station, who
3    was there?
4        A. The majority of the department was already
5    downstairs when I got here. I live out of town, so...
6        Q. How long did it take you, do you think?
7        A. Twenty minutes.
8        Q. And did you leave immediately after you
9    received the phone call?
10       A. No, I had to get my uniform together and on.
11       Q. And do you remember whether you wore an extra
12   vest that night, body armor, over what you would
13   normally wear with your uniform?
14       A. Yes, I did.
15       Q. Why?
16       A. The tactical vest that we have is -- provides
17   carriers for extra magazines, handcuffs, first aid
18   pouches, equipment.
19       Q. Does it provide better protection?
20       A. It has a rifle plate in the front, yes.
21       Q. Theoretically, that would withstand a impact
22   of a bullet from a rifle?
23       A. Theoretically.
24       Q. And who did you first talk to when you
25   arrived at the police station?

1        A. I believe initially it would have been just
2    several of the patrol officers when I walked in the
3    room and then Sergeant Kent.
4        Q. What did you -- did you and the patrol
5    officers talk about what you were going to be doing?
6        A. No.
7        Q. And then you visited with Officer Kent?
8        A. Yes.
9        Q. What did he tell you?
10       A. Just gave me a real quick rundown that
11   Officer Miner had obtained a search warrant for the
12   Wachsmuth residence, and that Sergeant Chretien was
13   getting ready to give a briefing on it.
14       Q. That was it?
15       A. Uh-huh.
16       Q. And did you know the Wachsmuth name?
17       A. Yes.
18       Q. You are familiar with Tom Wachsmuth?
19       A. Yes, I am.
20       Q. And you knew his sons?
21       A. I knew Shawn.
22       Q. You knew Shawn.
23          About how long did it take before
24   Officer Chretien arrived and discussed with you what it
25   was that he talked about?

ROY ECKERDT - November 22, 2010                                   Page 21
Direct Examination by Mr. Gosman

1   A.  He was in the building and up and down the
2   stairs. I'd say it was maybe, estimating, 15 minutes
3   before we started.
4   Q.  What did he say when he came downstairs and
5   talked to you?
6   A.  Talked as a group and discussed the warrant
7   itself, the information that was obtained to get the
8   warrant, had a -- can't remember if the diagram was
9   already up or if they drew the diagram as they were
10  talking of the layout of the house. And assignments.
11  Q.  All right. Let's turn real quick to
12  Exhibit 10. And I'll tell you that this is the
13  document that was created by Marissa Torczon, who was
14  apparently there that night.
15          (Exhibit 10 identified)
16  BY MR. GOSMAN:
17  Q.  And I'm going to ask you, first of all, did
18  you understand that Marissa Torczon was there to make a
19  record of the entry plan?
20  A.  I knew that she was there and taking notes.
21  Q.  All right. When did you first learn what
22  your role in the plan would be?
23  A.  I think on the final assignment when they put
24  it on the board.
25  Q.  And I'm trying to find out where you're at on

ROY ECKERDT - November 22, 2010                                   Page 22
Direct Examination by Mr. Gosman

1   this list. There's a list on the left-hand column of
2   the -- Exhibit 10, at the top of the page, first page.
3   Where are you on this list?
4   A.  Right in the middle. Powell 10.
5   Q.  Okay, Roy Eckerdt, P10. And you were part of
6   the entry team, correct?
7   A.  Correct.
8   Q.  Have you had the opportunity to look at this
9   document before?
10  A.  I've seen it, yes.
11  Q.  Do you remember when you first saw it?
12  A.  I think when you were here last time.
13  Q.  Why don't you take a minute and look at that
14  document and tell me if there's anything specific that
15  you remember about the plan or the information you were
16  given that is not on Exhibit 10.
17          MS. WESTBY: Object to the form of the
18  question.
19          MR. THOMPSON: Join.
20          MR. GOSMAN: I'm trying to save some time
21  here. Actually, I think that is a poor question. I'm
22  going to withdraw it.
23  BY MR. GOSMAN:
24  Q.  Let's go down to the middle of the page. It
25  says "knock-and-announce." Do you see that?

ROY ECKERDT - November 22, 2010                                   Page 23
Direct Examination by Mr. Gosman

1   A.  Yes.
2   Q.  Did you understand that this was a
3   knock-and-announce warrant?
4   A.  Yes.
5   Q.  Was that fact discussed?
6   A.  Yes.
7   Q.  Every officer that participated in this entry
8   knew that this was a knock-and-announce warrant?
9          MR. THOMPSON: Objection as to form.
10  BY MR. GOSMAN:
11  Q.  As far as you know?
12  A.  As far as I know, every officer should know.
13  Q.  And just below the phrase knock-and-announce,
14  it indicates that there was one male, one female and a
15  ten-year-old child. Do you remember that discussion?
16  A.  Yes.
17  Q.  Do you know where that information came from?
18  A.  Yes.
19  Q.  Who?
20  A.  Officer Blackmore.
21  Q.  And was he at the scene?
22  A.  He was near the scene.
23  Q.  And when I say scene, I mean the location of
24  the Wachsmuth residence.
25  A.  Yeah, he was at the scene, correct.

ROY ECKERDT - November 22, 2010                                   Page 24
Direct Examination by Mr. Gosman

1   Q.  And what was said about the presence of the
2   ten-year-old child, do you remember?
3   A.  I remember something about a vehicle had
4   pulled up and several people had got out of the
5   vehicle, and he thought one of them was smaller,
6   possibly a child. And then the vehicle later left.
7   Q.  And the child was not in the vehicle; is that
8   what you understood?
9   A.  They didn't know for sure if the child was in
10  the vehicle or the house at that point, is what I
11  understood.
12  Q.  Was there an assumption made that evening
13  that the child was still in the home?
14  A.  The possibility was recognized, yes.
15  Q.  Okay. How did that affect what happened that
16  night?
17  A.  It heightens your awareness in entering the
18  building, or entering the structure, that there may be
19  an issue with the safety of a child.
20  Q.  Did anyone stop to consider whether it was
21  advisable to enter the house in these conditions where
22  you had an entry team with long rifles, a diversionary
23  device and a battering ram when there was a young child
24  in the home and his presence couldn't be accounted for?
25          MS. WESTBY: Object to the form of the

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 31 of 67
Tricia Wachsmuth v.                                                    Roy Eckerdt
City of Powell, et al.                                          November 22, 2010

ROY ECKERDT - November 22, 2010                    Page 25
Direct Examination by Mr. Gosman

1   question.
2        MR. THOMPSON: Join.
3   BY MR. GOSMAN:
4   Q. His or her presence.
5   A. I wouldn't know if anyone thought of that.
6   Q. You don't remember it being discussed?
7   A. I remember a discussion, but I don't remember
8   the details of it.
9   Q. Do you know whether the presence of this
10  ten-year-old child was a -- was used to justify the
11  show of force that was applied in the Wachsmuth warrant
12  service?
13  A. No.
14       MR. THOMPSON: Objection as to form.
15       MS. WESTBY: Join.
16  BY MR. GOSMAN:
17  Q. It says here that handguns were loaded
18  everywhere in the house. Do you remember that
19  statement?
20  A. I remember a statement about handguns being
21  loaded and seems like stashed around the house.
22  Q. Okay. And what else did you hear about guns
23  in the house?
24  A. That there were numerous guns in the house
25  and that they were loaded. And put in positions where

ROY ECKERDT - November 22, 2010                    Page 26
Direct Examination by Mr. Gosman

1   they could be accessed quickly.
2   Q. And do you know who told you that?
3   A. I don't. I don't know it that was during the
4   briefing from Sergeant Chretien or if it was during
5   Officer Miner's portion. I don't know.
6   Q. Do you know if Officer Chretien ever spoke to
7   the confidential informant?
8   A. I don't know.
9   Q. Do you know whether Officer Miner ever spoke
10  to the confidential informant'
11  A. Yes, he did. And I don't know that, I guess,
12  from firsthand facts. I just know that from reports.
13  Q. Now, it's easy to conclude that if guns are
14  being stashed around the house that they're being
15  stashed around the house so that they could be readily
16  recovered and used, but do you remember specifically
17  someone saying that, that guns were stashed around the
18  house specifically for self-defense so that they could
19  be easily accessed by Mr. Wachsmuth or his wife?
20       MS. WESTBY: Object to the form of the
21  question.
22       MR. THOMPSON: Join.
23       MS. WESTBY: Go ahead.
24       THE WITNESS: Yes, I believe it was. And
25  there was a reference to being paranoid or paranoia and

ROY ECKERDT - November 22, 2010                    Page 27
Direct Examination by Mr. Gosman

1   having the guns readily accessible.
2   BY MR. GOSMAN:
3   Q. Okay. Well, let's go ahead and take a look
4   at Officer Miner's report, Exhibit 20. And I'd like
5   you to tell me if Officer Miner makes any reference in
6   this report to guns being stashed around the house.
7             (Exhibit 20 identified)
8   BY MR. GOSMAN:
9   Q. Let's go to the third paragraph from the
10  bottom, it says CI2902. This is the reference,
11  "Confidential informant stated that Bret has several
12  guns in the house and keeps his handguns loaded. He
13  also sometimes conceals on his person a small
14  .22 caliber pistol, and that he" -- and the
15  confidential informant described Bret as paranoid and
16  always looking out the windows.
17       Could that be the reference that you're
18  referring to?
19       MS. WESTBY: I object to the form of the
20  question.
21       MR. THOMPSON: Join.
22       MS. WESTBY: Since this document --
23       MR. THOMPSON: Take your time.
24  BY MR. GOSMAN:
25  Q. Yeah, take your time. Look through the rest

ROY ECKERDT - November 22, 2010                    Page 28
Direct Examination by Mr. Gosman

1   of the document.
2        MR. THOMPSON: Look through whatever
3   documents you need to.
4        MR. GOSMAN: Well, we're just talking about
5   this one for now.
6        MR. THOMPSON: Well, the question was whether
7   or not he had recalled that.
8        MR. GOSMAN: Yes, it is.
9        MR. THOMPSON: And how he had recalled that.
10       MR. GOSMAN: Yes, it is.
11       THE WITNESS: I guess -- can I ask for some
12  clarification?
13  BY MR. GOSMAN:
14  Q. Yes. My question is there is -- regarding
15  the reference that I just read into the record, could
16  that have been the reference that Officer Miner made
17  from which you drew the conclusion that there were guns
18  stashed around the house and that he was paranoid and
19  he kept guns handy so he could use them if he needed
20  them?
21       MS. WESTBY: Objection to the form of the
22  question.
23       MR. THOMPSON: Join.
24       THE WITNESS: I guess what I remember is that
25  being said. So I'm not sure what I'm looking for.

ROY ECKERDT - November 22, 2010                                    Page 29
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2      Q.  You're looking for that being said on Miner's
3  report.
4      A.  Well -- I'm sorry.
5          MS. WESTBY: No, go ahead.
6  BY MR. GOSMAN:
7      Q.  Yeah, go ahead.
8      A.  This isn't dictated from the conversation
9  that was had downstairs.  So what's here and what I
10 heard aren't necessarily the same thing.
11     Q.  Well, that's true.  That's true.
12         I'm just asking you -- on the other hand --
13 unfortunately, we only have certain documents that were
14 actually prepared at that time.  We have a lot of
15 recollections over the course of the last couple of
16 years and an intervening law suit.
17         And so what I'm trying to do is find out
18 where, in the documents that were generated at that
19 time, such a statement was made.
20         So go ahead and take a look at Exhibit 20 and
21 see if there's any other references there --
22         MS. WESTBY: So, then, do you want him to go
23 through every single one of these documents and find
24 that statement, because --
25         MR. GOSMAN: I've asked a question.

ROY ECKERDT - November 22, 2010                                    Page 30
Direct Examination by Mr. Gosman

1          MS. WESTBY: You've asked him where that
2  statement is --
3          MR. GOSMAN: In Exhibit 20.
4          MS. WESTBY: -- in Officer Chretien's report.
5          MR. GOSMAN: It's actually Miner's.  But,
6  yes.
7          MS. WESTBY: Miner's.
8          MR. GOSMAN: But that is correct, that's
9  exactly what I've done.
10         MS. WESTBY: And I think he's answered the
11 question.  This is his recollection of what was said.
12         MR. GOSMAN: No.
13         MS. WESTBY: What you're asking him to look
14 at is not a transcription of the conversation that took
15 place.  I think he answered it appropriately.
16         MR. GOSMAN: Well, thank you for that.
17 BY MR. GOSMAN:
18     Q.  Now that we know that your attorney thinks
19 you've answered the question appropriately, I'd like
20 you to tell me where in this document there's a
21 reference to a statement that guns were stashed around
22 the house.
23         MR. THOMPSON: Objection as to form.
24         MS. WESTBY: Join.
25         THE WITNESS: I don't see anything in the

ROY ECKERDT - November 22, 2010                                    Page 31
Direct Examination by Mr. Gosman

1  narrative of this report that says that they were
2  stashed around the house.
3  BY MR. GOSMAN:
4      Q.  And that report was prepared on the 25th of
5  February, at least that's when it's dated by next to
6  the signature of Officer Miner, correct?
7      A.  According to the date.  Yes.
8      Q.  Now, let's go ahead and turn to Exhibit 14.
9          Okay.  No, let's go to Exhibit 13.  And we're
10 looking for the same thing in this document.
11             (Exhibit 13 identified)
12         MS. WESTBY: Are you asking him a question
13 about this document or are you having him read this
14 document?
15         MR. GOSMAN: No, I asked him to tell me,
16 based on this document, whether there was any statement
17 that guns had been stashed around the house, that Bret
18 was paranoid and that he kept them stashed around the
19 house in order to have access to them.
20         MS. WESTBY: Same objection.
21         THE WITNESS: The reference to Bret
22 specifically in both forms, I guess, that he carries --
23 sometimes carries a .22 pistol concealed on his person.
24 In the warrant of affidavit, it references at the
25 beginning -- at the beginning and the end it references

ROY ECKERDT - November 22, 2010                                    Page 32
Direct Examination by Mr. Gosman

1  in the affidavit that the people that conduct such
2  operations often do have firearms for the purposes of
3  defending themselves and their grow.
4  BY MR. GOSMAN:
5      Q.  Do you have much experience in this area of
6  drug arrests involving marijuana grow operations?
7      A.  Marijuana grows, no.
8      Q.  Do you know whether -- well, I'm going to
9  tell you that Miner admitted that he had no experience
10 with marijuana grow operations before this evening.
11         How do you suppose he came by the experience
12 to make the statement that people who grow marijuana
13 keep firearms and use them to protect themselves?
14     A.  I wouldn't know.  I would know that based on
15 my training and experience involving other narcotics
16 that that's a common statement, that that's a common
17 fact.
18     Q.  That people who grow marijuana --
19     A.  No.  With other narcotics.  Marijuana, I
20 don't have experience.
21     Q.  So people who use other narcotics carry
22 firearms and use them to protect themselves?
23     A.  Manufacture and sell.
24     Q.  Yeah, there's a big difference between using
25 and manufacturing and selling, though; isn't that true?

1  A. Depends.

2  Q. Well.

3  A. In the case of methamphetamine, people that

4  manufacture, sell.

5  Q. All right. I'll give you that. But the

6  question that I have is that: Do you understand the

7  distinction between the threat level to a police

8  officer from somebody who is merely a drug user and

9  someone who is manufacturing and selling drugs?

10  MR. THOMPSON: Objection as to form.

11  MS. WESTBY: Join.

12  THE WITNESS: No, I don't.

13  BY MR. GOSMAN:

14  Q. You don't?

15  A. No.

16  Q. In other words, they both represent the same

17  threat to you?

18  MR. THOMPSON: Objection as to form.

19  MS. WESTBY: Join.

20  BY MR. GOSMAN:

21  Q. Or potential threat?

22  MR. THOMPSON: Same objection.

23  THE WITNESS: They could all be a potential

24  threat.

25

1  BY MR. GOSMAN:

2  Q. Well, they could be a potential threat, but

3  based on your training and experience, does one group

4  represent a higher threat of danger to the police

5  officer than the other?

6  MR. THOMPSON: Objection as to the form.

7  MS. WESTBY: Join.

8  THE WITNESS: Yes.

9  BY MR. GOSMAN:

10  Q. All right. Which group is it that presents

11  the higher threat of danger to the police officer?

12  A. Generally speaking, again, this is referring

13  to methamphetamine because that's where my experience

14  is, a lab is a more dangerous place than somebody on

15  the street with meth in their pocket.

16  Q. Officer Chretien made the assignments for the

17  entry plan and he provided information concerning the

18  suspect, Bret Wachsmuth. Is that true?

19  A. To the best of my knowledge, he made the

20  assignments.

21  Q. He made the assignments?

22  A. He's the one that wrote it on the board.

23  Q. Okay.

24  A. And Officer Miner also provided some

25  information at the beginning of the briefing.

1  Q. So what were you told about the danger of the

2  situation, the threat to officer safety that existed in

3  this warrant service?

4  A. That there was a state of paranoia, that

5  there were loaded weapons in the house, and that there

6  were loaded weapons positioned around the room where

7  he'd have access to them.

8  Q. When you learned this information, had the

9  decision already been made to conduct this operation as

10  a dynamic entry?

11  MR. THOMPSON: Objection as to form.

12  MS. WESTBY: Join.

13  THE WITNESS: It was conducted as a

14  knock-and-announce.

15  BY MR. GOSMAN:

16  Q. All right. And had the decision already been

17  made to conduct this operation as a knock-and-announce

18  with an entry team ready in case the door wasn't

19  opened?

20  A. I would assume so, yes.

21  Q. All right. And let's go back to Exhibit 10

22  for just a moment. There's a list of seven items in

23  the right-hand column, about halfway down. I want you

24  to tell me if that list represents the order in which

25  the major events in this warrant service were to occur.

1  MS. WESTBY: Object to the form of the

2  question.

3  MR. THOMPSON: Join.

4  THE WITNESS: I believe so, yes. Each step

5  required something else to happen before it continued

6  on, though.

7  BY MR. GOSMAN:

8  Q. How so?

9  A. If we gained entry to the front door, then --

10  if we gained compliance at the door, then some of the

11  other things wouldn't have happened.

12  BY MR. GOSMAN:

13  Q. If you gained compliance at the door, there

14  wouldn't have been a diversionary device, probably;

15  wouldn't you agree?

16  A. I guess I don't know.

17  Q. All right. Well, we've heard it said that

18  apparently you had some information to offer that

19  evening about the threat that Bret Wachsmuth may have

20  posed to officer safety.

21  Do you want to tell me about that?

22  A. Yeah. Sometime prior to the search warrant,

23  I'd say probably within the year or less prior to that,

24  it's an investigative practice to look through social

25  websites like MySpace, especially having a community

1 college in town. It's amazing what kids will post
2 online.
3  Q. I'll go along with you there.
4  A. Doing that one evening, I had searched for
5 males 18 to probably 25 years old, plus or minus, 10,
6 15 miles of Powell, Wyoming, and was just going through
7 the different sites. And one of them that came up
8 belonged to Shawn Wachsmuth. And the picture posted on
9 there was Shawn and another male wearing tactical gear
10 and holding tactical rifles.
11      Knowing Tom and knowing Shawn, my thought was
12 this is probably Tom's children and they were playing
13 in the backyard or -- I mean, they weren't little kids,
14 they were relatively recent pictures.
15      So I went to Tom, and told Tom, you know,
16 hey, I don't know if you know Shawn's got this picture
17 up, but if that's your stuff, I don't want to see you
18 get jammed up. And he said, no, that's not issued
19 gear.
20      And that's when I found out who the other
21 male was, as being Bret, because I had never met Bret.
22 Didn't know Bret. I knew Shawn and I knew Tom.
23  Q. So these pictures were found on Shawn
24 Wachsmuth's MySpace page?
25  A. Correct.

1  Q. It doesn't sound to me like you really
2 thought that was much of an issue in terms of threat.
3      MR. THOMPSON: Objection as to form.
4      MS. WESTBY: Join.
5      THE WITNESS: At which point?
6  BY MR. GOSMAN:
7  Q. Well.
8  A. At the point that they were involved in
9 criminal activity or at the point that I found the
10 picture?
11  Q. The point you found the picture.
12  A. No, at that point I didn't think it was a
13 threat. I was just concerned about Tom.
14  Q. All right. And somehow that all changed,
15 then, by the 24th of February, when you were sitting in
16 the basement of the police station.
17  A. Correct.
18  Q. What was it that changed?
19  A. It wasn't department issued gear, so
20 therefore, I knew he had access to -- or had had access
21 to, at least, ballistic gear and tactical rifles.
22  Q. Did you think that Bret Wachsmuth was posing
23 that evening because he was trying to express something
24 about himself and tactical weapons and SWAT-type gear?
25      MR. THOMPSON: Objection as to form.

1      MS. WESTBY: Join.
2      THE WITNESS: When I found the picture or the
3 night of the search warrant?
4  BY MR. GOSMAN:
5  Q. Night of the search warrant.
6  A. I had no thought of any expression
7 whatsoever, just the fact that he had access to the
8 equipment.
9  Q. Well, you talked to Tom. Did Tom tell you
10 that, in fact, he had access to that equipment, that
11 that was his equipment?
12  A. Tom told me it wasn't department issued gear.
13  Q. Well, did you know whether it was Tom's gear
14 that they left at the house there when they were done
15 taking the pictures?
16  A. I didn't pursue it.
17      (Exhibit 47 identified)
18  BY MR. GOSMAN:
19  Q. All right. Let's go ahead and take a look at
20 some of these pictures. And wouldn't you know I've got
21 them -- I'll hand you what I've marked as Exhibit 47.
22 Are those the pictures?
23      MR. THOMPSON: Counsel, have you disclosed
24 any of these prior to the deposition here?
25      MR. GOSMAN: I just got them.

1      MR. THOMPSON: So the answer is no?
2      MR. GOSMAN: Well, they are being disclosed
3 right now, Tom.
4      MR. THOMPSON: Well --
5      MR. GOSMAN: And here's another set. And
6 I'll let you -- Misha, you may have these.
7      You'll have to share these because I only
8 have one other set.
9  BY MR. GOSMAN:
10  Q. Okay. These photos in Exhibit 47 -- did you
11 answer my last question?
12  A. No.
13  Q. Well, let's get that taken care of.
14  A. Can I get you to say the question again?
15  Q. Yes.
16      MR. GOSMAN: Could you just read it, please?
17      (The record was read as
18      requested.)
19      MS. WESTBY: Before you answer, object on the
20 basis that we have not been provided these documents
21 prior to this time and that they don't appear to be all
22 the photographs that there are.
23      THE WITNESS: No, I have not.
24  BY MR. GOSMAN:
25  Q. All right. Would you agree with me,

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 35 of 67

Tricia Wachsmuth v.                                                      Roy Eckerdt
City of Powell, et al.                                              November 22, 2010

ROY ECKERDT - November 22, 2010                    Page 41
Direct Examination by Mr. Gosman

1  Officer -- I want you to have that set of pictures in
2  front of you when I ask these questions.
3          Would you agree with me that the pictures
4  that are contained in Exhibit 47 are pictures from
5  Shawn's MySpace?
6          MR. THOMPSON: Objection as to form. He
7  doesn't know where these pictures came from.
8  BY MR. GOSMAN:
9  Q.  They do contain a caption, though, correct?
10         MR. THOMPSON: The document speaks for
11 itself. Counsel, we've not had an opportunity to look
12 at these photos, to talk to witnesses about these
13 photos.
14 BY MR. GOSMAN:
15 Q.  It certainly appears that they are from
16 Shawn's MySpace page, correct?
17         MR. THOMPSON: Objection as to form.
18         MS. WESTBY: Objection.
19 BY MR. GOSMAN:
20 Q.  You can answer the question, Officer?
21 A.  It would appear so.
22 Q.  Do you recognize Shawn in these pictures?
23 A.  Yes.
24 Q.  And would you agree with me that that is not
25 a picture of a young adult male next to him?

ROY ECKERDT - November 22, 2010                    Page 43
Direct Examination by Mr. Gosman

1  testimony.
2          THE WITNESS: I would agree that it would
3  make sense that if I knew Bret was not in the picture
4  with Shawn. I got lost in the question myself.
5  BY MR. GOSMAN:
6  Q.  Well, you were on the right track. If, in
7  fact, you knew that it was not Bret in the picture with
8  Shawn, what?
9  A.  Yes, that would make sense.
10 Q.  Yeah, and you wouldn't -- you certainly
11 wouldn't --
12         MS. WESTBY: I'm going to stop you before you
13 go ask another question. I'm going to take a break and
14 talk to my client about this newly produced -- these
15 newly produced pictures. And we'll see whether we can
16 continue tonight or whether we need to start tomorrow.
17         MR. GOSMAN: Well, I'm prepared to finish
18 this deposition tonight.
19         MS. WESTBY: How much longer do you have?
20         MR. GOSMAN: Well, I don't really have that
21 much longer.
22         MR. THOMPSON: And, for the record, if you
23 had these documents when you came into the deposition
24 today, you waited nine hours to give them to us.
25         Just stop for a second. You didn't give them

ROY ECKERDT - November 22, 2010                    Page 42
Direct Examination by Mr. Gosman

1  A.  Yes.
2  Q.  And isn't it true that Tom Wachsmuth
3  discussed with you these pictures that night that you
4  called him and explained that this was a picture of
5  Shawn and a girlfriend?
6  A.  I don't recall that, no. I didn't call him.
7  I went out and saw him.
8  Q.  Did you show him the pictures?
9  A.  No. The only access I had to Shawn's site is
10 the public page that comes up. I didn't -- I wasn't
11 part of the MySpace stuff to be able to go into his
12 actual site and see all the other pictures in there.
13 Q.  Have you ever been back?
14 A.  Yes.
15 Q.  Are those pictures still there?
16 A.  As far as what's in his site, I don't know.
17 But as far as his public page. no.
18 Q.  It doesn't make sense that you would accuse
19 Bret Wachsmuth of being in a picture with his brother
20 in SWAT gear if, in fact, you knew that it wasn't his
21 brother -- or that it wasn't Bret Wachsmuth that was in
22 the pictures. Don't you agree with me?
23         MS. WESTBY: Object to the form of the
24 question.
25         MR. THOMPSON: Completely misstates his

ROY ECKERDT - November 22, 2010                    Page 44
Direct Examination by Mr. Gosman

1  to us over lunch. So he wasn't prepared to look at
2  these up until the time his deposition occurred.
3          MR. THOMPSON: It's called impeachment, Tom.
4          MR. THOMPSON: No, it's called self-executing
5  disclosure, Jeff.
6          MR. GOSMAN: No, it's not.
7          MR. THOMPSON: Yes, it is.
8          MR. GOSMAN: In case you haven't read the
9  rule lately, what happened, it's not part of the
10 self-executing discovery.
11         MS. WESTBY: If you're planning on using
12 this --
13         MR. THOMPSON: This is discovery.
14         MR. GOSMAN: You better believe I am.
15         MR. THOMPSON: You have to disclose under the
16 rules.
17         MR. GOSMAN: It's disclosed.
18         MR. THOMPSON: When?
19         MR. GOSMAN: Tonight. It's --
20         MR. THOMPSON: Just wait. When the deponent
21 is put under oath?
22         MR. GOSMAN: That's correct.
23         MR. THOMPSON: Well, you've got a duty to --
24         MR. GOSMAN: There's no point in having this
25 argument.

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 36 of 67

Tricia Wachsmuth v.                                                        Roy Eckerdt
City of Powell, et al.                                              November 22, 2010

ROY ECKERDT - November 22, 2010                    Page 45
Direct Examination by Mr. Gosman

1   MR. THOMPSON: Well, there is on the record,
2   because if there's a motion before the judge, you've
3   also got a duty, under the rule, to preserve any
4   electronic media. So when we subpoenaed the computer
5   that all of the sudden just appears on the 22nd of
6   November, it's going to be interesting to talk to Shawn
7   Wachsmuth about when he knew --
8   MR. GOSMAN: You'l have that opportunity, I
9   guarantee it.
10   MR. THOMPSON: Darn right we will.
11   MR. GOSMAN: All right.
12   MR. THOMPSON: We're taking a break.
13   MR. GOSMAN: All r.ght.
14   MS. WESTBY: And I need a time, a specific
15   amount of time that you have left for this witness so
16   we can make a decision about whether we continue
17   tonight.
18   MR. GOSMAN: Let's see here.
19   Probably another hour.
20   (Recess taken 6 04 p.m. to
21   6:12 p.m., November 22, 2010)
22   MR. GOSMAN: Okay. Because of the production
23   of Exhibit 47 at the deposition tonight, I've been
24   informed by Misha Westby that she will not permit the
25   witness to continue with this deposition at this time.

ROY ECKERDT - November 22, 2010                    Page 46
Direct Examination by Mr. Gosman

1   And I want to go on the record as saying that
2   we have a number of depositions to take care of
3   tomorrow. We had at least a verbal understanding
4   tonight that we would go on with Officer Eckerdt and
5   try to get him done tonight.
6   And I believe that my time to conduct these
7   depositions is being compressed by Ms. Westby and
8   Mr. Thompson for reasons that are not valid and have
9   nothing to do with whether or not the officer can
10   continue with his deposition this evening.
11   MS. WESTBY: And for the record, the
12   deposition is being continued until tomorrow based on
13   the fact that it's 6:15, based on the fact that we had
14   an agreement that we would start this witness, and
15   based on the fact that you are late disclosing
16   documents that should have, by your own admission, been
17   produced according to Rule 26, self-executing discovery
18   requirements because you planned to use them.
19   So that is the basis of continuing this
20   deposition at 6:15 at night until tomorrow.
21   MR. THOMPSON: And I'd also note for the
22   record that counsel initially informed both Ms. Westby
23   and myself that he would have two days of
24   depositions -- actually, a day and a half, and was
25   given two days to conduct the depositions that he had

ROY ECKERDT - November 22, 2010                    Page 47
Direct Examination by Mr. Gosman

1   remaining.
2   MR. GOSMAN: Well, you'll --
3   MR. THOMPSON: And this morning, as a matter
4   of fact, conferred with counsel and said that he
5   thought he'd be through with everybody today with the
6   exception of one witness.
7   And here we are at 6:15, and we are closing
8   down the deposition due to late disclosure of exhibits
9   and also because it's 6:15 at night.
10   MR. GOSMAN: Yeah, we're done.
11   (Recess taken from 6:14 p.m.,
12   November 22, 2010 to 8:44
13   a.m., November 23, 2010)
14   BY MR. GOSMAN:
15   Q.  Officer, I'd like to turn your attention this
16   morning to Exhibit No. 20 in the notebook that's in
17   front of you there. It's Chad Miner's report. And it
18   does appear that you approved this report on the 16th
19   of March, 2009, and I simply want to confirm that, in
20   fact, you -- I'm sorry, that is Alan Kent.
21   Let me ask this question. Do you approve any
22   of these police reports?
23   A.  No, I don't believe so.
24   Q.  Did you prepare a police report?
25   A.  No.

ROY ECKERDT - November 23, 2010                    Page 48
Direct Examination by Mr. Gosman

1   Q.  You've got a piece of paper next to you
2   there, it's a blank sheet of paper, and what I'd like
3   you to do is draw the perimeter of the Wachsmuth
4   residence and show where you were when the entry team
5   assembled in front of the house, and the order of the
6   officers if you know the order of officers at that
7   time.
8   If you are familiar, or if you know, rather,
9   where Chretien and Kent were located as the entry team
10   assembled, I would appreciate it if you'd put them down
11   too.
12   A.  The house specifically, right?
13   Q.  Outside the house, yes, at this point.
14   A.  (Witness complies.)
15   Q.  Okay. Can you go ahead and -- have you
16   placed the entry team at the house?
17   A.  Not yet.
18   Q.  All right. You've got -- you've got
19   Officer Kent and Officer McCaslin at the side window
20   where the flashbang was deployed?
21   A.  Correct.
22   Q.  All right. And go ahead and draw in the
23   entry team in the order in which you were stacked up
24   there.
25   A.  I'm not sure I can recall the order of the

ROY ECKERDT - November 23, 2010                                    Page 49
Direct Examination by Mr. Gosman

1  officers.
2  Q. Okay. Do the best you can.
3  MS. WESTBY: Well, no, don't -- don't --
4  don't guess. Don't guess. If you know, go ahead and
5  put them down. But if you can't, then you don't.
6  BY MR. GOSMAN:
7  Q. Yeah, that's exactly what I meant by that.
8  By the way, Officer, if you would like to
9  take just a moment and look at Exhibit 10, there's a
10  list on Exhibit 10 that has the entry team with the
11  numbers next to their names that could be the order of
12  the entry into the home. It's on the second page of
13  Exhibit 10.
14  Let's take just a minute and refer to that.
15  And let me ask you if, in fact, you recollect that
16  those numbers there next to the officers indicate the
17  order in which they were to enter the house, or be
18  stacked up on the porch?
19  MS. WESTBY: And I'm going to object. This
20  is not this witness's document. And as we've already
21  established --
22  MR. GOSMAN: Objection as to form, or we're
23  going to take all day listening to you talk.
24  MS. WESTBY: As we've already established,
25  this is an attempt to try to put down what was -- what

ROY ECKERDT - November 23, 2010                                    Page 50
Direct Examination by Mr. Gosman

1  was going on in the planning. And I'll make the
2  objections that I see appropriate.
3  BY MR. GOSMAN:
4  Q. Go ahead, Officer.
5  And, actually, I had a question, and that
6  was: Can you tell from this list whether, in fact,
7  those numbers there do represent the order in which the
8  officers were to enter the residence?
9  A. I can't, no.
10  Q. Okay. That's fine.
11  A. That's what it would indicate, but I can't
12  remember.
13  Q. Okay.
14  A. I know I was towards the end.
15  Q. What is the number next to your name on that
16  list?
17  A. Five.
18  Q. So that would be consistent with what you
19  remember?
20  A. Right.
21  Q. All right.
22  A. So that being said, I have a hard time
23  putting names -- I've got on here "officer" just where
24  people were.
25  Q. Okay.

ROY ECKERDT - November 23, 2010                                    Page 51
Direct Examination by Mr. Gosman

1  A. But I don't remember which one was --
2  Q. All right. You know where you were. And I
3  appreciate that you -- if you don't know where the
4  other officers were, it will be tough to place you in
5  some kind of line.
6  But was the entry team grouped together at
7  the front door?
8  A. Yes.
9  Q. All right. Did you hear a dog bark?
10  A. Yes.
11  Q. And where were you when you heard the dog
12  bark?
13  A. Moving towards the front of the house.
14  Q. Would you put an X where -- were you together
15  with the team at that point?
16  A. Yes.
17  Q. All right. Would you put an X and -- in the
18  area where you first heard the dog bark, and then put a
19  little legend next to it that says the dog -- well,
20  let's just say the team was here when the dog barked.
21  MR. THOMPSON: An X where he was when he
22  heard --
23  MR. GOSMAN: No, where the team was.
24  MR. THOMPSON: Do you understand the
25  question?

ROY ECKERDT - November 23, 2010                                    Page 52
Direct Examination by Mr. Gosman

1  THE WITNESS: Uh-huh.
2  (Witness complies.)
3  BY MR. GOSMAN:
4  Q. Okay. Approximately how many feet from the
5  house were you when you heard the dog bark?
6  A. From the house or from the door?
7  Q. From the door.
8  A. Would be approximately 15 to 20 feet.
9  Q. Okay. And was the dog barking from inside
10  the house?
11  A. Yes.
12  Q. Do you know what kind of dog it was?
13  A. Now?
14  Q. Yes.
15  A. Yes.
16  Q. What was it?
17  A. It was a Chihuahua.
18  Q. All right. So could you put on your exhibit
19  there 15 feet to front door, approximately?
20  MS. WESTBY: He said 15 to 20.
21  BY MR. GOSMAN:
22  Q. Fifteen to 20 is fine.
23  A. (Witness complies.)
24  Q. Okay. We're going to mark that as
25  Exhibit 56.

1   (Exhibit 56 marked)
2   BY MR. GOSMAN:
3   Q.  Now, Officer, you've got an extra piece of
4   paper there.  Could you go ahead and draw the position
5   of the officers just immediately after the door had
6   been rammed and the officers had entered the home.
7   A.  As far as who was where in the house?
8   Q.  Who was where in the house.
9       And, again, I'm not asking you to speculate.
10  I just want you to tell me what you know.  So you're
11  drawing the interior of the home now.
12  A.  (Witness complies.)  Okay.
13  Q.  Let me hand you Exhibit 56 back, and I'd like
14  you to identify, with respect to the first drawing that
15  you made on this little diagram, the time at which you
16  were assembled on the porch.
17      This was just before the entry into the
18  house, correct, when you were on the porch?
19      In other words, you have several X's there
20  with officers on or near the front porch, correct?
21  A.  Correct.
22  Q.  And that was just before you entered the
23  house?
24  A.  Depending on the definition of just.  But,
25  yes.

1   Q.  Well, I mean, it was where you were located
2   when the knock-and-announce --
3   A.  Correct.
4   Q.  -- was made, correct?
5       All right.  And that's also where Kent and
6   McCaslin were located when the knock-and-announce was
7   done?
8   A.  Correct.
9   Q.  Could you just identify that on this little
10  exhibit for us.
11      No, it's Number 56, the first one, the one on
12  top.
13  A.  Okay.
14  Q.  And just put location and time of
15  knock-and-announce.  And then draw an arrow to both
16  Kent and McCaslin and the group of X's you have at the
17  door.
18      (Exhibit 57 identified)
19  THE WITNESS:  (Witness complies.)
20  BY MR. GOSMAN:
21  Q.  All right.  Now, may I see the exhibit that
22  you've just completed, I can't quite tell which they
23  are?
24      Okay.  You've got Sergeant Eckerdt located in
25  the corner of the living room and there are no other

1   officers shown in this drawing.
2   Q.  Is that because you don't know where anyone
3   else was?
4   A.  Correct.
5   Q.  Where were you?
6   A.  In the front living room.
7   Q.  Where?  I want you to identify your location
8   as best you can.
9   A.  (Witness complies.)
10  Q.  You were standing right next to
11  Sergeant Eckerdt?
12  A.  No, I am Sergeant Eckerdt.
13  Q.  I'm sorry, okay.  Well, I hope it doesn't go
14  like this all day.
15      Let's see.  You don't know where anyone else
16  was?
17  A.  I don't, no.
18  Q.  All right.  Were you the one that was
19  assigned to take control of Tricia Wachsmuth?
20  A.  I was assigned to the front room and that's
21  where she was when we came in.
22  Q.  All right.  And where was Tricia Wachsmuth at
23  the time that you had located yourself there in the
24  front room?
25  A.  At the time that I stood in that point, she

1   was sitting on the couch.
2   Q.  All right.  And you've got living room over
3   where the couch would be.
4   A.  Correct.
5   Q.  But let's go ahead and try to draw a couch
6   underneath that somehow.
7       Okay.  And then let's put Tricia -- where on
8   the couch was Tricia Wachsmuth?  And you can just put
9   like a pointer --
10  A.  (Witness complies.)
11  Q.  Yes, okay, outside the drawing there, good.
12      All right.  Now, had Tricia moved from the
13  time you entered the residence at all?
14  A.  Yes.
15  Q.  What had she done?
16  A.  By the time I came through the door, she was
17  moving back over to the couch.
18  Q.  Where had she been?
19  A.  That, I don't know.  There's a coffee table
20  or table that was sitting in front of the couch, and I
21  believe she was standing up somewhere around that and
22  sat down when I came through the door.
23  Q.  Okay, all right.  So she perhaps just jumped
24  up when the officers came through the door?
25  A.  I don't know.

ROY ECKERDT - November 23, 2010                 Page 57
Direct Examination by Mr. Gosman

1  Q.  Does that sound about right, though?
2  A.  She might have jumped back when the officers
3  came through the door. I don't know.
4  Q.  You didn't see her sitting on the couch when
5  the officers approached the porch?
6  A.  I hadn't been in the house at that point.
7  Q.  Right.
8  A.  I did see her in front of the window, yes.
9  Q.  You did see her in front of the window?
10  A.  At some point.
11  Q.  And this was when you were outside the home?
12  A.  Correct.
13  Q.  And what was she doing?
14  A.  Looking out the window.
15  Q.  Okay. And was this prior to the
16  knock-and-announce?
17  A.  Yes.
18  Q.  Okay. How far was she from the door?
19  A.  I'm trying to recall the layout of the house,
20  but I'd say three feet.
21  Q.  From the time you first saw her looking out
22  the window until you entered the home and saw her
23  standing, as you say, by the couch, how much time
24  elapsed?
25  A.  I don't know if I could quantify it with a

ROY ECKERDT - November 23, 2010                 Page 58
Direct Examination by Mr. Gosman

1  time.
2  Q.  Well, do you feel comfortable making an
3  effort?
4  MS. WESTBY: And, again, don't speculate or
5  guess. Just if you know.
6  THE WITNESS: It would be pure speculation.
7  BY MR. GOSMAN:
8  Q.  All right.
9  Okay. So let's go ahead and move forward in
10  time just a few moments.
11  You've entered the house. Did you secure
12  Tricia Wachsmuth?
13  A.  No.
14  Q.  You did not point -- did you point your
15  weapon at Tricia Wachsmuth?
16  A.  When I came through the door, initially I had
17  my weapon down low. When I came through I saw
18  somebody, I brought the weapon up and brought it back
19  down. And that's when she sat down on the couch.
20  Q.  All right. Did she appear to be compliant?
21  MR. THOMPSON: Objection as to the form.
22  MS. WESTBY: Join.
23  THE WITNESS: She appeared to be -- yeah,
24  somewhat compliant.
25

ROY ECKERDT - November 23, 2010                 Page 59
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2  Q.  Did she offer any resistance at all?
3  A.  No.
4  Q.  And did you speak to her?
5  A.  I don't believe so.
6  Q.  You didn't tell her to sit down and stay
7  there, don't move, or anything like that?
8  A.  She was already sitting down. I did speak to
9  her, but I don't remember what was said.
10  Q.  All right. When you spoke to her, was it in
11  the form of a command?
12  MS. WESTBY: Object to the form of the
13  question.
14  MR. THOMPSON: Join.
15  THE WITNESS: I'm sure it would be perceived
16  that way.
17  BY MR. GOSMAN:
18  Q.  And did she comply with whatever it was that
19  you said or did she appear to?
20  A.  She was wanting to make a phone call and she
21  had her cell phone out and was trying to dial.
22  Q.  Did you tell her to put it away?
23  A.  I didn't, no.
24  Q.  Did someone else tell her to put it away?
25  A.  Yes.

ROY ECKERDT - November 23, 2010                 Page 60
Direct Examination by Mr. Gosman

1  Q.  Who was that?
2  A.  Sergeant Kent.
3  Q.  So at some point, Sergeant Kent was standing
4  next to you?
5  A.  Not next to me, I believe he was toward the
6  end of the couch just coming through the door, I
7  believe.
8  Q.  What did Officer Kent do?
9  A.  Told her to put her phone away.
10  Q.  And did he stay there and see that she
11  complied with that request?
12  A.  I'm not sure. I know he told her to put the
13  phone away. And she said she wanted to call her
14  husband or something. And he said, "Not right now."
15  And she put the phone down.
16  Q.  All right. So where was he when he made
17  these statements to Tricia Wachsmuth?
18  Put him on the diagram, please.
19  A.  (Witness complies.)
20  Q.  And let's go ahead and draw a line down below
21  towards the bottom of the page so we have enough room
22  to get all this information on this diagram.
23  And let's identify that Officer Kent
24  instructed Tricia to put her phone away.
25  A.  (Witness complies.)

---

ROY ECKERDT - November 23, 2010                    Page 61
Direct Examination by Mr. Gosman

1    Q.  Where was the team leader at this time?
2    A.  I have no idea.  My focus at that time was
3  right here in the front with Tricia.
4    Q.  Okay.  And Officer Kent, when he first came
5  in the door, told Tricia to put her phone away, that's
6  your recollection?
7    A.  That was the first time I heard from him in
8  the house, yeah.
9    Q.  All right.  Well, what happened after this
10  moment?
11       You've got Tricia sitting on the couch,
12  Officer Kent has asked her to put her phone away, she's
13  put her phone away, and the other officers -- who swept
14  the living room, let me start with that question?
15    A.  Whoever came through the door first would
16  have cleared those areas and moved on throughout the
17  house.
18    Q.  Okay.  Do you know who it was that -- I think
19  we've got Miner's report -- or Chretien's report.
20       Do we know who it was that knocked on the
21  door -- not -- that was first in line and came through
22  the door first?
23       MR. THOMPSON:  Objection as to form.
24       THE WITNESS:  I, myself, am not sure without
25  looking at the documentation.

ROY ECKERDT - November 23, 2010                    Page 62
Direct Examination by Mr. Gosman

1    BY MR. GOSMAN:
2    Q.  Without looking at the documentation?
3       Okay.  I'm going to read this now.
4  "Officer Chretien knocked on the front door and
5  announced, 'Police, search warrant.'"  This is in
6  Chretien's report.
7       So I guess the question is:  Do you know
8  whether he was the first one through the door?
9    A.  I do not know.
10    Q.  Did you see the team sweeping the living
11  room?
12    A.  When they passed through the living room, I
13  was still making entry through the front door.
14    Q.  All right.  So everybody had gone into the
15  other rooms of the house when you first entered the
16  house?
17    A.  As I was entering the house.
18    Q.  As you were entering the house.
19       All right.  Did there come a time when Tricia
20  was told to lead the officers down the stairs?
21    A.  No.
22    Q.  Did Tricia lead the officers down the stairs?
23       MS. WESTBY:  Object to the form of the
24  question.
25       MR. THOMPSON:  Join.

ROY ECKERDT - November 23, 2010                    Page 63
Direct Examination by Mr. Gosman

1       THE WITNESS:  Tricia did go downstairs, yes.
2    BY MR. GOSMAN:
3    Q.  And she was in front of the other officers,
4  was she not?
5    A.  I believe so, yes.
6    Q.  All right.  Did you go downstairs with her?
7    A.  No.
8    Q.  Okay.  Who went downstairs?
9    A.  The team that was in the kitchen initially
10  went downstairs.  I followed the team down.
11    Q.  You did follow the team down?
12    A.  Correct.
13    Q.  Were you like at the tail end of the group as
14  they went down the stairs, then?
15    A.  No, they were into the basement when I went
16  down.
17    Q.  They were in the basement when you went down
18  the stairs.
19       All right.  Did you stay in the living room
20  the entire time that Tricia was there before she went
21  down to the basement?
22    A.  At some point in there, I moved from the
23  living room to the doorway of the kitchen -- or the
24  entryway to the kitchen.  When I got to the kitchen,
25  she was already on the stairs.

ROY ECKERDT - November 23, 2010                    Page 64
Direct Examination by Mr. Gosman

1       I couldn't see her, I could just see the
2  officers at the top of the stairs.
3    Q.  Okay.  I want you to go ahead and draw on
4  this diagram the officers that you remember were
5  involved in going down the stairs with Tricia
6  Wachsmuth.
7    A.  (Witness complies.)
8       I remember Danzer and Chretien for sure.
9    Q.  Well, there were others, correct?
10    A.  Correct.
11    Q.  All right.  Was Kent in the house at that
12  time?
13    A.  I don't believe so.  I'm not sure.  He was
14  moving back and forth inside and out through the front
15  door.
16    Q.  How much time elapsed from the moment that
17  Tricia Wachsmuth was located by you until she went down
18  the stairs with the officers?
19    A.  I would estimate a matter of minutes.
20    Q.  And was Kent coming and going in and out of
21  the house during that timeframe?
22    A.  Yes.
23    Q.  Did Kent go down the stairs with Tricia
24  Wachsmuth?
25    A.  No, I don't believe so.

---

ROY ECKERDT - November 23, 2010                    Page 65
Direct Examination by Mr. Gosman

1   Q.  How about Officer McCaslin?
2   A.  I don't believe so, but I'm not sure.
3   Q.  How about Officer Chapman?
4   A.  That would be a possibility, but I don't
5   recall for sure.
6   Q.  Okay.  You don't know where Chapman was if he
7   was not going down the stairs; would that be a true
8   statement?
9   A.  That would be a true statement.
10  Q.  Did you know where Officer Danzer was -- I'm
11  sorry, McCaslin was?
12  A.  At that point, no.
13  Q.  And you really didn't know where Officer Kent
14  was, correct?
15  A.  Correct.
16  Q.  Where were you, again?
17      Have you located yourself at that time?
18  A.  At which time?
19  Q.  At the time that the officers assembled to
20  take Tricia Wachsmuth down the stairs.
21  A.  (Witness complies.)
22  Q.  Your view was unobstructed of the officers as
23  they assembled to go down the stairs?
24  A.  As they were going down the stairs,
25  correct -- or going to the stairs, I should say.

ROY ECKERDT - November 23, 2010                    Page 66
Direct Examination by Mr. Gosman

1   Q.  Where was Officer Hall at that time?
2       And we're talking about -- these questions
3   focus on the time that the officers assembled to go
4   down the stairs with Tricia Wachsmuth.
5   A.  I'm not sure.
6   Q.  You don't know where he was?
7   A.  I don't recall.
8   Q.  Could he have been with the team that went
9   down the stairs?
10      MS. WESTBY: Object to the form of the
11  question.  I'm not going to allow him to speculate.
12      MR. THOMPSON: Join.
13      MS. WESTBY: You've already asked him.  He
14  already said he didn't know.  That's the end of the
15  questions.
16      MR. GOSMAN: All right.  And that's the third
17  time in the last two days that you've instructed a
18  witness not to answer a question that had nothing to do
19  with privilege.
20      You realize that these questions can be
21  parched out later after the deposition is complete when
22  the evidence comes in to testimony.
23      MS. WESTBY: I'll do my depositions the way I
24  believe I need to.
25      MR. GOSMAN: Yes, I can see that.

ROY ECKERDT - November 23, 2010                    Page 67
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.  Officer, approximately, how many of the men
3   that were involved in the raid that night went down the
4   stairs with Tricia Wachsmuth?
5   A.  As I recall, four.
6   Q.  So there are at least two other individuals
7   that were -- that went down the stairs other than
8   Danzer and Chretien?
9   A.  (Witness nods head.)
10  Q.  What is your best recollection of who they
11  were?
12      MS. WESTBY: Object to the form of the
13  question.  Obviously --
14  BY MR. GOSMAN:
15  Q.  If you can answer.
16      MS. WESTBY: Obviously, only answer if you
17  know.  Don't speculate.  Don't guess.
18      THE WITNESS: And the question was who were
19  the four?
20  BY MR. GOSMAN:
21  Q.  Yes, who were the other two, to the best of
22  your recollection?
23  A.  The only two I recall for sure was Danzer and
24  Chretien.
25  Q.  Okay.  Can you place any of the other

ROY ECKERDT - November 23, 2010                    Page 68
Direct Examination by Mr. Gosman

1   officers in the home that would have been able to view
2   this assembly near the stairs before the officers went
3   downstairs?
4   A.  No, I cannot.
5   Q.  And how long was it -- how much time elapsed
6   between the officers going downstairs with Tricia
7   Wachsmuth and your following them?
8   A.  Maybe -- I'm thinking approximately 25, 30
9   seconds.
10  Q.  And when you went to the top of the stairs,
11  where were the other officers?
12  A.  They were off the stairs.  They made the turn
13  at the bottom.
14  Q.  Where was Tricia Wachsmuth?
15  A.  In the basement.
16  Q.  And who was with Tricia Wachsmuth?
17  A.  I think as I got down there -- I know at some
18  point Officer Miner placed handcuffs on her and took
19  her back upstairs.
20  Q.  Well, I mean, at some point.  What does that
21  mean?
22  A.  I don't recall if he came down before me or
23  after me when I went down the stairs, if he was in that
24  initial group or if he followed me down.
25  Q.  When you got down to the bottom of the

ROY ECKERDT - November 23, 2010                                    Page 69
Direct Examination by Mr. Gosman

1  stairs, was someone in possession of Tricia Wachsmuth?
2      MS. WESTBY: Object to the form of the
3  question.
4  BY MR. GOSMAN:
5      Q. Did someone have custody and control of
6  Tricia Wachsmuth?
7      MS. WESTBY: Same objection.
8      THE WITNESS: I don't recall that, no.
9      MR. THOMPSON: Join.
10 BY MR. GOSMAN:
11     Q. Was she just standing there alone in the
12 basement?
13     A. Keeping in mind the size of the basement,
14 it's very small.
15     Q. Well, was she alone?
16     A. To the best of my recollection, yes.
17     Q. The officers just left her down there at the
18 bottom of the stairs?
19     MS. WESTBY: Object to the form of the
20 question.
21     MR. THOMPSON: Join.
22     THE WITNESS: The room was very small, so the
23 officers were still around her, yes. But nobody was in
24 possession of her.
25

ROY ECKERDT - November 23, 2010                                    Page 70
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2      Q. They were clearing the room, correct?
3      A. Correct.
4      Q. As the officers went down the stairs, did you
5  see any of them train their weapons on Tricia
6  Wachsmuth?
7      A. No.
8      Q. When the officers -- were you there when
9  Tricia Wachsmuth was ordered off the couch?
10     A. Yes, I was there when she was taken off the
11 couch.
12     Q. All right. And who did that?
13     MS. WESTBY: Object to the form of the
14 question. Who did what?
15 BY MR. GOSMAN:
16     Q. Who took her off the couch?
17     A. I don't believe that anybody took her off the
18 couch.
19     Q. Who commanded her to get off the couch?
20     MS. WESTBY: Object to the form of the
21 question.
22     MR. THOMPSON: Join.
23     THE WITNESS: Best of my recollection would
24 be Sergeant Chretien.
25

ROY ECKERDT - November 23, 2010                                    Page 71
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2      Q. Who was standing next to him, do you know?
3      A. No.
4  BY MR. GOSMAN:
5      Q. What were you doing at this time?
6      A. Standing in the living room in front of
7  Tricia.
8      Q. All right. That room had been cleared?
9      A. Correct.
10     Q. And by the time the other officers assembled
11 to take Tricia downstairs, the upstairs of the house
12 had been cleared, correct?
13     MS. WESTBY: Object to the form of the
14 question.
15     THE WITNESS: I believe there were still
16 officers in the bedrooms.
17 BY MR. GOSMAN:
18     Q. Had the upstairs been cleared at that point?
19     MS. WESTBY: Object to the form of the
20 question. He just answered your question.
21     THE WITNESS: I believe it was in the process
22 of being cleared. There were officers in the bedrooms.
23 Nobody declared it safe or clear at that point, no.
24 BY MR. GOSMAN:
25     Q. Did anybody ever declare it safe or clear?

ROY ECKERDT - November 23, 2010                                    Page 72
Direct Examination by Mr. Gosman

1      A. I believe, in the basement.
2      Q. In the basement? Which officer did that?
3      A. I don't know. I remember hearing somebody
4  say "clear," and that's it.
5      Q. All right. You've been trained on room entry
6  and room clearing?
7      A. Yes.
8      Q. And I think you may have testified you've
9  been trained dozens of times in these techniques,
10 correct?
11     A. We have trained in them, yes, correct.
12     Q. And who conducts your training?
13     A. It depends on the training.
14     Q. Well, who?
15     MS. WESTBY: Object to the form of the
16 questions.
17     MR. THOMPSON: Object as to form.
18     THE WITNESS: POST-certified training, most
19 times we brought in an outside instructor.
20 BY MR. GOSMAN:
21     Q. Okay. We know about the POST records because
22 they are documented. I'm talking about the training
23 that you claim has occurred at the Powell Police
24 Department that is completely undocumented.
25     MS. WESTBY: Object to the form of the

1   question. That's completely inaccurate. You've spent
2   hours --
3        MR. GOSMAN: Objecting as to form?
4        MS. WESTBY: You've spent hours going over
5   the in-service training records.
6        MR. GOSMAN: All right.
7        MR. THOMPSON: Join.
8        THE WITNESS: The training is conducted on
9   the squad, it's either conducted by our FTOs, our field
10  training officers. And sometimes it's conducted by the
11  sergeants.
12  BY MR. GOSMAN:
13      Q.   Okay.
14      A.   I can expand on that further. I guess it's
15  not limited to the FTOs and the sergeants. We do have
16  other officers that sometimes conduct -- when we've
17  done our POST-certified training, they have spent extra
18  time with the instructors to bring them up to speed, so
19  they provide training also.
20      Q.   Who provides the training, the POST-certified
21  instructors?
22      A.   To our instructors, correct.
23      Q.   So the POST-certified instructors have
24  trained your instructors?
25      A.   Not to the instructor level, but they have

1   given them additional time, correct.
2        Q.   Now, is this training that's been conducted,
3   has it been conducted as in-service training?
4        A.   Some has, yes.
5        Q.   How much? What percentage?
6        A.   It depends on your definition of in-service,
7   I guess.
8        Q.   Well, you know what the in-service training
9   is, don't you?
10      A.   I'm not sure what your definition is.
11      Q.   Well, let's just use yours.
12           MR. THOMPSON: Object as to form.
13           THE WITNESS: In-service training as in
14  semi-scheduled as in our Friday training, or in-service
15  as in department training, or in-service as in
16  something that a sergeant does with his squad on a
17  night shift at 3:00 a.m. when it's quiet.
18  BY MR. GOSMAN:
19      Q.   All right, well, let's start with the last
20  one first.
21           As far as you know, has there been any
22  training at 3:00 a.m. with the Powell Police
23  Department?
24      A.   With officers of the Powell Police
25  Department, yes.

1        Q.   And that would be by their sergeants?
2        A.   Correct.
3        Q.   And would that be in dynamic entry
4   techniques?
5        A.   It can be room entry and clearing, yes.
6        Q.   Room entry and clearing?
7        A.   (Witness nods head.)
8        Q.   And that, of course, wouldn't be documented?
9        A.   Correct.
10      Q.   And do any of the sergeants with the Powell
11  Police Department have any certifications in room
12  clearing or SWAT-type tactics?
13           MR. THOMPSON: Objection as to form.
14           MS. WESTBY: Join.
15           THE WITNESS: Certifications as in
16  instructors?
17  BY MR. GOSMAN:
18      Q.   Yeah, certifications as instructors.
19      A.   As for myself, no. I don't know for sure on
20  the other ones.
21      Q.   You don't know whether Chretien and Kent
22  or -- have certifications for any kind of dynamic entry
23  techniques?
24           MS. WESTBY: Object to the form of the
25  question. Asked and answered.

1        MR. THOMPSON: Join.
2        THE WITNESS: Answer that?
3   BY MR. GOSMAN:
4        Q.   Yeah.
5        A.   I haven't reviewed their training records. I
6   don't know if they are certified to teach that stuff.
7        Q.   You don't know whether the other sergeants on
8   the Powell Police Department have any certifications in
9   any aspect of dynamic entry?
10           MR. THOMPSON: Objection as to form.
11           MS. WESTBY: That's the third time. Asked
12  and answered. He said no.
13           THE WITNESS: No.
14  BY MR. GOSMAN:
15      Q.   All right. So then we have Friday night --
16  or Friday afternoon trainings?
17      A.   Yes.
18      Q.   And do these take place once a week?
19      A.   We have squad training that takes place once
20  a week. We have department training that takes place
21  once a month. The only magic number about Fridays is
22  nobody is off on Fridays, so everyone is there.
23      Q.   I see. Okay.
24           So the officers that are available
25  participate in training on Friday afternoons?

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 44 of 67
Tricia Wachsmuth v.                                                    Roy Eckerdt
City of Powell, et al.                                           November 22, 2010

ROY ECKERDT - November 23, 2010                    Page 77
Direct Examination by Mr. Gosman

1   A.  During their shift, but, yes.
2   Q.  And is this Friday -- is this every Friday
3   afternoon, or most Friday afternoons?
4   A.  Most Friday afternoons.
5   Q.  And is it documented?
6   A.  Then or now?
7   Q.  Then.
8   A.  No.
9   Q.  Is it documented now?
10  A.  As far as who is in attendance?
11  Q.  Yes.
12  A.  Yes.
13  Q.  And have you had dynamic entry training on a
14  regular basis since you began documenting these
15  records?
16      MS. WESTBY: Object to the form of the
17  question.
18      MR. THOMPSON: Join.
19      THE WITNESS: I'm not sure, on a regular
20  basis, what would be defined as regular. Have we had
21  training in portions of it? Yes.
22  BY MR. GOSMAN:
23  Q.  And does this documentation contain a
24  description of the training that takes place?
25  A.  That, I don't know. I'm no longer in charge

ROY ECKERDT - November 23, 2010                    Page 78
Direct Examination by Mr. Gosman

1   of training, so. It has a title and who was there. I
2   don't know what goes into the background.
3   Q.  You signed the roster, I assume?
4   A.  Correct.
5   Q.  And you've attended most of those trainings?
6   A.  Correct.
7   Q.  When was this new policy implemented?
8   A.  I don't believe there is a policy.
9   Q.  Well, when was this practice implemented?
10      MS. WESTBY: Object to the form of the
11  question. Go ahead.
12      MR. THOMPSON: Join.
13      THE WITNESS: When the next person took over
14  scheduling the training.
15  BY MR. GOSMAN:
16  Q.  And was this the FTO training?
17  A.  Sorry?
18  Q.  Is it called FTO training?
19  A.  FTOs provide the majority of that training in
20  those, yes.
21  Q.  On the Friday afternoon training that is
22  supplied to the officers on duty during their shift,
23  are there any certified instructors that provide that
24  training, and I'm referring specifically, of course, to
25  dynamic entry techniques?

ROY ECKERDT - November 23, 2010                    Page 79
Direct Examination by Mr. Gosman

1       MR. THOMPSON: Objection as to form.
2       MS. WESTBY: Join.
3       THE WITNESS: Portions of it, yes.
4   BY MR. GOSMAN:
5   Q.  All right. Who is the qualified
6   instructor -- or the certified instructor?
7   A.  For portions of it we have firearms
8   instructors that are certified, we have less lethal
9   instructors that are certified. Officer Miner is our
10  less lethal instructor. Officer Schmidt, Sergeant
11  Chretien are our two primary firearms guys.
12      MS. WESTBY: Do you need anything?
13      THE WITNESS: I need to go to the bathroom
14  when we get to a pause.
15      MR. GOSMAN: Do you want to do that right
16  now?
17      THE WITNESS: Yeah.
18      (Recess taken 9:25 to 9:33
19      a.m., November 23, 2010)
20  BY MR. GOSMAN:
21  Q.  Do you know if the officers that are
22  certified in less lethal munitions and firearms were
23  certified in February of 2009?
24  A.  The firearms guys were. I'm not positive
25  when Miner got certified on the less lethal.

ROY ECKERDT - November 23, 2010                    Page 80
Direct Examination by Mr. Gosman

1   Q.  And just out of curiosity, if you do know
2   this, was Chretien certified in long rifle firearms?
3   A.  I don't know.
4   Q.  Is there anybody in the Powell Police
5   Department that's certified in long rifle?
6   A.  Officer Glick.
7   Q.  Officer Glick. Do you know when he was
8   certified?
9   A.  I don't know. He's been gone off and on for
10  the last few years. He's a reservist, so he's been
11  deployed a lot.
12  Q.  Do you remember any training with
13  Officer Glick?
14  A.  Yes.
15  Q.  And do you remember when that was?
16  A.  It would have been after the 2005 course and
17  before the timeframe of the second patrol response
18  course that we had.
19  Q.  And was that training documented?
20  A.  I don't believe so.
21  Well, yeah, the firearms stuff, anything on
22  the range where we shoot should have been documented.
23  Q.  Okay. And did you participate in a long
24  rifle training, then, with Officer Glick?
25  A.  Yes.

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 45 of 67
Tricia Wachsmuth v.                                                    Roy Eckerdt
City of Powell, et al.                                          November 22, 2010

1  Q. More than once, do you have any recollection
2  of that?
3  A. Yes.
4  Q. Approximately how many times?
5  A. Probably approximately two or three with
6  Glick.
7  Q. All right. Other than the Friday afternoon
8  trainings and then the other just random trainings that
9  can occur pretty much any time of the day that we
10 talked about, are there any other specific types of
11 training, or rather, training dates that you're
12 involved in?
13       MS. WESTBY: Object to the form of the
14 question.
15       MR. GOSMAN: That was a poor question.
16       MR. THOMPSON: Join.
17 BY MR. GOSMAN:
18  Q. Other than these Friday night trainings and
19 the trainings that can occur on shift with the
20 supervisor and his officers at 3:00 a.m. in the
21 morning, are there any other kinds of training that
22 take place other than, of course, the POST training and
23 the documented in-service training?
24       MR. THOMPSON: Objection as to form.
25       MS. WESTBY: Join.

1        THE WITNESS: Department wide or individual?
2  BY MR. GOSMAN:
3   Q. Well, let's start with where the entire
4  department is assembled and functioning as a team.
5   A. Predominantly, for the last few years, those
6  have been conducted on Fridays, department wide.
7   Q. All right. Is there any other training that
8  takes place that you haven't talked about?
9   A. Obviously, individual training, where they
10 are sent off to school somewhere else.
11  Q. Right.
12  A. Those are usually POST-certified.
13       Not always. There's been opportunities to
14 train, like over in Cody with Cody PD. We sent several
15 guys over there to train on some dynamic entry stuff.
16       So there's been some other in-service
17 training with other agencies where individual officers
18 have gone, but not as a police department.
19  Q. And when those officers went to the Cody
20 Police Department, was there a roster kept on a regular
21 class with a certified class instructor?
22  A. I don't know. Cody conducted those classes.
23 I believe Cody PD; it might have been the sheriff's
24 office. They were conducted in Cody by the agencies
25 over there.

1   Q. All right. Now, you've mentioned that -- was
2  it Glick that was the long rifle certified instructor
3  with the Powell Police Department?
4   A. He is a long rifle instructor.
5   Q. Are there any others that you know of?
6   A. I'm not aware of others that are specifically
7  long rifle instructors.
8   Q. Is the less lethal munitions training
9  conducted as the firearms training where it's
10 documented and it's out at the range?
11  A. Not necessarily. It doesn't necessarily have
12 to be at the range. Our initial training was actually
13 provided by an officer from a different agency because
14 we didn't have one certified at that point in time. So
15 that would be his documentation. Again, he was out of
16 Cody PD.
17  Q. And are there any other certifications that
18 you're aware of that are held by members of the Powell
19 Police Department that would qualify for training
20 purposes?
21       MS. WESTBY: Object to the form of the
22 question.
23       MR. THOMPSON: Join.
24       THE WITNESS: The majority of our officers
25 are certified in some type -- as some type of trainer.

1  BY MR. GOSMAN:
2   Q. All right. And I'm referring specifically to
3  dynamic entry.
4   A. Not that I can think of, no.
5   Q. Okay. Where did you go after you left the
6  basement, Officer -- or Sergeant?
7   A. Went back upstairs and outside.
8   Q. And were you one of the first ones outside?
9   A. I believe so, yes.
10  Q. Did you see any of the officers engaging in
11 celebration outside?
12  A. No.
13  Q. Did you see Tricia Wachsmuth outside?
14  A. Yes.
15  Q. And where was she when you saw her?
16  A. She was in the back of a patrol car.
17  Q. How long was that patrol car there, do you
18 know?
19  A. I don't.
20  Q. All right. Once you went outside, had the
21 clearing operations been completed?
22  A. To the best of my knowledge, yes.
23  Q. And when you went downstairs -- let's go
24 ahead and take a minute and describe what you did while
25 you were downstairs.

Case 1:10-cv-00041-ABJ   Document 65-8   Filed 01/10/11   Page 46 of 67
Tricia Wachsmuth v.                                              Roy Eckerdt
City of Powell, et al.                                           November 22, 2010

ROY ECKERDT - November 23, 2010                    Page 85
Direct Examination by Mr. Gosman

1  A.  Went downstairs, observed the plants, the
2  layout of the basement, some of the stuff laying
3  around, went back throughout the house.
4  Q.  You then went back upstairs and went back
5  through the entire house?
6  A.  Well, I just checked in each room.
7  Q.  Okay.
8  A.  There were officers working in each room, and
9  I went outside.
10  Q.  Did you notice smoke in the bedroom?
11  A.  At that point, no.
12  Q.  Did you notice smoke in the bedroom later?
13  A.  I was told about it later.
14  Q.  Did you notice that the bedding was on fire?
15  A.  No.
16  Q.  Did you notice that a pillow was missing from
17  the bed and had been placed in the shower?
18  A.  No, I was told about it later.
19  Q.  Did you hear the smoke alarm go off?
20  A.  I don't recall hearing the smoke alarm, no.
21  Q.  Were you assigned to gather any of the
22  evidence?
23  A.  No. I left shortly after Tricia was placed
24  in the car.
25  Q.  And while you were in the basement, did you

ROY ECKERDT - November 23, 2010                    Page 86
Direct Examination by Mr. Gosman

1  observe what became of Tricia?
2  MS. WESTBY: Object to the form of the
3  question.
4  THE WITNESS: When I was in the basement, I
5  observed her taken upstairs. When I went outside, I
6  observed her in the back of a police car.
7  BY MR. GOSMAN:
8  Q.  How did you learn that Bret wasn't in the
9  house?
10  A.  He wasn't found on the initial entry. And
11  then when I went outside, I was advised that we'd
12  received information he was out at his father's.
13  Q.  All right. What information did you receive
14  and who did you receive it from?
15  A.  I'm not sure which of the other two sergeants
16  told me that he was out there, but then I went out to
17  the house with another officer to pick him up.
18  Q.  Who did you go with?
19  A.  I believe it was Sergeant Chretien and
20  Officer Bradley.
21  Q.  Did anyone tell you that there had been a
22  fire in the Wachsmuth residence?
23  A.  At some point there was -- they put something
24  in the bathtub.
25  Q.  That was burning?

ROY ECKERDT - November 23, 2010                    Page 87
Direct Examination by Mr. Gosman

1  A.  Or smoldering or something.
2  Q.  Were you present -- did you hear Tricia
3  Wachsmuth say Bret was not home in the living room?
4  A.  Yes.
5  Q.  And who was it that asked her the question,
6  where is Bret?
7  A.  I don't recall.
8  Q.  Where were you when you -- when that question
9  was asked? Where were you standing in the home?
10  A.  Would have been the living room.
11  Q.  Were you still standing next to Tricia?
12  A.  I would have been that same area of the
13  living room in front of the couch, somewhere there.
14  Q.  All right. Did someone take custody and
15  control of Tricia when you moved into the kitchen to
16  observe the officers assemble to go downstairs?
17  A.  No.
18  MS. WESTBY: Object to the form of the
19  question.
20  MR. THOMPSON: Join.
21  MS. WESTBY: Asked for a legal conclusion.
22  BY MR. GOSMAN:
23  Q.  Did another officer take custody or control
24  of Tricia Wachsmuth?
25  MR. THOMPSON: Same objection.

ROY ECKERDT - November 23, 2010                    Page 88
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2  Q.  In the living room?
3  A.  No.
4  MS. WESTBY: Join.
5  BY MR. GOSMAN:
6  Q.  And did you leave her side -- you did leave
7  her side to go to another place in the kitchen. Was
8  she still sitting on the couch?
9  A.  No.
10  Q.  Where was she?
11  A.  When I went to the kitchen, she was already
12  in the kitchen.
13  Q.  So you followed her into the kitchen?
14  A.  Not directly, no.
15  Q.  Well, you moved from your location at her
16  side into the kitchen as she was going into the
17  kitchen, correct?
18  A.  No. I moved after she was in the kitchen.
19  Q.  Was she ever out of your sight?
20  A.  Yes.
21  Q.  All right. You left with -- was it
22  Officer Chapman and Brown to go find Bret Wachsmuth?
23  A.  No. I believe it was Sergeant Chretien and
24  Officer Bradley.
25  Q.  So Chretien, Bradley and yourself went to the

ROY ECKERDT - November 23, 2010                    Page 89
Direct Examination by Mr. Gosman

1  Wachsmuth residence?
2    A.  I believe so.  I guess I'm not positive on
3  the officer.  I know it was Chretien and I and
4  officer --
5              (Exhibit 25 identified)
6  BY MR. GOSMAN:
7    Q.  Okay.  Let's look at Exhibit 20 -- that's
8  Miner.  Let me find Brown's report here.  It's
9  Exhibit 25 for just a moment.
10             Okay.  We can talk about this at our next
11  break, but we seem to be missing one of Brown's
12  reports, and it's possible that I didn't put it in as
13  an exhibit.
14             You're the one that approved Dave Brown's
15  reports; is that correct?
16    A.  More than likely, yes, I guess.  You'd have
17  to narrow a window and report and the timeframe you say
18  that, but...
19    Q.  We're going to just go on right now.  And at
20  the very end of your deposition, I'm going to get my
21  other copy of Brown's supplement, and we'll get it in
22  the record here.
23             All right.  So you're not sure who you went
24  to Tom Wachsmuth's place with; is that correct?
25             MS. WESTBY: Object to the form of the

ROY ECKERDT - November 23, 2010                    Page 90
Direct Examination by Mr. Gosman

1  question.  Misstates the testimony.
2  BY MR. GOSMAN:
3    Q.  So all right, again, I hate to admit that I
4  don't remember it.  But who did you go to the Wachsmuth
5  residence with?
6    A.  Sergeant Chretien.
7    Q.  Yes?
8    A.  And there was an officer that went with me
9  and another officer that came out once we were there.
10    Q.  Okay.
11    A.  I believe the one that went out with me was
12  Officer Bradley, but I can't remember which order.
13    Q.  And you're not sure who it was that told you
14  that Bret Wachsmuth was at his father's house?
15    A.  Correct.
16    Q.  But you were told that Bret Wachsmuth had
17  been located at his father's house; is that true?
18    A.  Yes.
19    Q.  And was this while, for instance, Tricia
20  Wachsmuth was still in the patrol car?
21    A.  Yes.
22    Q.  Located there at the Wachsmuth residence?
23    A.  (Witness nods head.)
24    Q.  All right.  And so did you leave while Tricia
25  Wachsmuth was still located in the patrol car parked

ROY ECKERDT - November 23, 2010                    Page 91
Direct Examination by Mr. Gosman

1  there at the Wachsmuth residence?
2    A.  To the best of my recollection, yes.
3    Q.  And do you remember what time that was
4  approximately?
5    A.  I have no idea.
6    Q.  Did you go directly to Tom Wachsmuth's house?
7    A.  We -- yes.
8    Q.  All right.
9    A.  We stopped along the road prior to getting
10  there, but we went directly there.
11    Q.  What did you stop along the road to do?
12    A.  A call was placed to Tom.
13    Q.  You called Tom Wachsmuth?
14    A.  Uh-huh.
15    Q.  And what did you say to him?
16    A.  He was advised that we'd served a warrant,
17  that we needed to pick Bret up, that he was at his
18  house and ask that he have Bret step outside for us.
19    Q.  Okay.  And were you concerned at all that Tom
20  would -- let me ask you this question:  Did anybody
21  else know you were going to do this?
22    A.  Make the phone call?
23    Q.  Yeah.
24    A.  I don't know.
25    Q.  Was Sergeant Chretien with you when you made

ROY ECKERDT - November 23, 2010                    Page 92
Direct Examination by Mr. Gosman

1  the phone call?
2    A.  He would have been in his car.
3    Q.  So did you all go in separate cars?
4    A.  Yes.
5    Q.  Were you the one that made the phone call?
6    A.  I think Sergeant Chretien made the phone
7  call.
8    Q.  But you all stopped at the side of the road
9  and --
10    A.  Right.
11    Q.  -- took care of that business?
12             All right.  And were you concerned that Tom
13  Wachsmuth might interfere with the investigation once
14  he knew that his son was, in fact, being picked up on a
15  warrant?
16             MR. THOMPSON: Objection as to the form.
17             MS. WESTBY: Join.
18  BY MR. GOSMAN:
19    Q.  And by the way, I'm sorry, because I don't
20  know that the -- there was no warrant for his arrest at
21  that time, was there, for Bret Wachsmuth?
22    A.  No.
23    Q.  So you were going to his house and you were
24  going to take him down and -- you were going to take
25  him into custody and interrogate him in connection with

1  the information you uncovered with the search warrant,
2  correct?
3      MS. WESTBY: Object to the form of the
4  question.
5      MR. THOMPSON: Join.
6  BY MR. GOSMAN:
7      Q. I'm just trying to figure out, you know,
8  where we were at in terms of the warrants and the
9  process.
10     MS. WESTBY: Same objection.
11     THE WITNESS: My primary concern in going out
12  there at that point was it was a very uncomfortable
13  situation, in Tom being Tom, outside the DCI world, I
14  considered Tom a friend at that -- so it was just an
15  uncomfortable situation.
16  BY MR. GOSMAN:
17     Q. All right. Now, do you remember whether --
18  did Chretien say, we've got a warrant for -- he
19  wouldn't have said, I've got a warrant for Bret.
20  Because he didn't have a warrant for Bret, probably,
21  right?
22     A. Yeah, I don't know what he said.
23     Q. All right. So you went to Tom Wachsmuth's
24  residence, and did Bret come out of the house?
25     A. No.

1      Q. Did you go into the house?
2      A. Yes.
3      Q. Did you have your weapons drawn?
4      A. We had our weapons with us, but drawn, no.
5      Q. There were no long rifles?
6      A. Yes, there were long rifles.
7      Q. Did you actually carry a long rifle into Tom
8  Wachsmuth's home?
9      A. Yes, I did.
10     Q. But was it strapped over your shoulder?
11     A. Yes.
12     Q. All right. And why was it that you didn't
13  meet Bret out in front of the house?
14     A. Tom had requested that we come in.
15     Q. And did you have a problem with that?
16     A. No.
17     Q. Did any of the other officers have a problem
18  with that?
19     A. I don't know.
20     Q. And what did you do when you were inside the
21  residence?
22     A. Tom and Bret were on the couch when we walked
23  in. Tom's wife was in the kitchen cleaning. Advised
24  Tom that we needed to take Bret with us for right now
25  and let him know that I didn't want to be there anymore

1  than he wanted me to be there.
2      Q. And what did he say?
3      A. He voiced some concerns with the warrant and
4  where the information was received.
5      Q. Okay. What did he say, do you remember?
6      A. Not specifically. I think he had some issues
7  with the CI. And I just advised him I didn't have the
8  knowledge on all this. I was called in to serve the
9  warrant and here I am.
10     Q. Did he cooperate?
11     A. Yes.
12     Q. And was Bret Wachsmuth cooperative?
13     A. Yes.
14     Q. Was he armed?
15     A. No.
16     Q. Was his vehicle outside?
17     A. Yes.
18     Q. Did you search his vehicle?
19     A. I did not, no.
20     Q. Was it searched at that time?
21     A. It was searched after I left.
22     Q. Do you know whether there were any weapons in
23  the vehicle?
24     A. No, I don't.
25     Q. All right. You took Bret to the station?

1      A. Correct.
2      Q. Were you involved in the interrogation of
3  Bret Wachsmuth?
4      A. I witnessed it, yes.
5      Q. You were there present?
6      A. Correct.
7      Q. All right. I'm going to take just a moment
8  and get that Brown supplement because it contains the
9  interview notes.
10     A. Okay.
11          (Recess taken 9:54 to 9:55
12          a.m., November 23, 2010)
13     MR. GOSMAN: I have retrieved the Powell
14  Police Department Supplement Number 4 prepared by Dave
15  Brown, it's a two-page document. I intended that it be
16  part of Exhibit 25. It doesn't appear to be in the
17  original exhibit notebook.
18          And what I propose to do is to insert this
19  two-page document into Exhibit 25, and we'll have it
20  going forward. I think it's part of the materials that
21  I provided to opposing counsel prior to the
22  depositions.
23  BY MR. GOSMAN:
24     Q. Have you seen that document before?
25     A. Yes.

ROY ECKERDT - November 23, 2010                Page 97
Direct Examination by Mr. Gosman

1   Q.   All right. Let me get there.
2        All right. Officer, where was Bret Wachsmuth
3   interviewed?
4   A.   Investigator Brown in my office.
5   Q.   All right. And was the interview recorded?
6   A.   I didn't record it, no.
7   Q.   Do you know whether any of the other officers
8   recorded it?
9   A.   I don't know if he did or not.
10  Q.   And when you say he, would that be
11  Officer Brown?
12  A.   Correct.
13  Q.   Did Bret Wachsmuth identify -- let's see.
14  First of all, what time was this interview?
15  A.   I don't know approximate time. Evening, late
16  evening.
17  Q.   Evening?
18  A.   Uh-huh, after dark.
19  Q.   It was well after the raid on the Wachsmuth
20  home?
21       MS. WESTBY: Object to the form of the
22  question.
23       MR. THOMPSON: Join.
24       THE WITNESS: I guess depending on definition
25  of after. But, yes, it was sometime after.

ROY ECKERDT - November 23, 2010                Page 98
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.   Was it, say, around 9:00 or --
3   A.   I'm not sure what time we served the warrant
4   so I couldn't -- don't have a basis for that.
5   Q.   Does it have a time on it?
6   A.   Not that I see, no.
7   Q.   And do you remember specifically Bret
8   Wachsmuth informing Officer Brown and whoever else was
9   present that he had received a call from the
10  confidential informant that day telling them that the
11  police were going to arrive at his residence?
12  A.   For clarification, it would have been just
13  Investigator Brown and I present.
14  Q.   Okay. That's fine. Thank you.
15  A.   And, yes, I do remember that.
16  Q.   And do you remember Officer Brown saying that
17  he didn't -- he wasn't aware of that and he wanted to
18  see proof of it?
19       MS. WESTBY: Object to the form of the
20  question.
21       MR. THOMPSON: Join.
22       MS. WESTBY: Misstates the testimony.
23       THE WITNESS: No, I don't remember it being
24  placed that way.
25

ROY ECKERDT - November 23, 2010                Page 99
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.   All right. What do you remember? Go ahead
3   and tell me.
4   A.   I remember him, I believe, asking to see the
5   cell phone, the call log.
6   Q.   And did he?
7   A.   Yes.
8   Q.   And did he note the call?
9   A.   I don't know.
10  Q.   It doesn't appear that he made any specific
11  reference to the telephone message or the time that the
12  message was received or anything like that in his
13  report, does it?
14       I think it's all in about two sentences and
15  one paragraph there towards the bottom, so please don't
16  read the whole thing.
17       MS. WESTBY: I'm sorry, what was that
18  question, that it doesn't identify?
19       MR. GOSMAN: It doesn't identify the phone
20  call itself, the time the phone call was made or the
21  message -- the text message, whatever it was.
22       MS. WESTBY: Object to the form of the
23  question. And object generally on the basis that this
24  document, again, identifies the CI by name. It's in
25  violation of the Court's order.

ROY ECKERDT - November 23, 2010                Page 100
Direct Examination by Mr. Gosman

1        MR. THOMPSON: Join.
2   BY MR. GOSMAN:
3   Q.   So I don't want to lose this report, so let's
4   go ahead and agree that we'll redact the name of the CI
5   from this report. And I'd like to do that before we
6   leave today, so perhaps at the next break we can get a
7   marker and redact that name, and then we'll insert the
8   document into Exhibit 25.
9   BY MR. GOSMAN:
10  Q.   Go ahead.
11  A.   The report states that -- I looked at it and
12  found at 1:42 p.m. on 2/24/09 there was a call. And it
13  states it was from a restricted number.
14  Q.   And were you satisfied that that was the
15  phone call?
16  A.   I didn't look at the phone.
17  Q.   Did you secure the phone?
18  A.   I did not, no.
19  Q.   Did you make any effort to obtain a warrant
20  for the phone?
21  A.   I did not, no.
22  Q.   Did Officer Brown, do you know?
23  A.   I don't, no.
24  Q.   All right. If you can hand me that document.
25       Let's see. And after this interview, what

ROY ECKERDT - November 23, 2010                    Page 101
Direct Examination by Mr. Gosman

1   did you do?
2       A.  I think once the interview was done, I was
3   coming up on my shift, so I went to work.
4       Q.  And was there a debriefing within the next
5   day or so?
6       A.  I believe so.
7       Q.  Were you present at that debriefing?
8       A.  I believe so.  There's been so much in the
9   last two years, it's hard to recall what was what.
10      Q.  I understand that.
11      A.  And, obviously, a lot of conversation going
12  into this, so...
13      Q.  Was Chief Feathers at the debriefing, do you
14  know?
15      A.  I don't recall.
16      Q.  And do you recall Officer Chretien -- or
17  Sergeant Chretien, I'm sorry, Sergeant Chretien
18  apologizing for having Tricia Wachsmuth enter an
19  uncleared area of the house ahead of the officers?
20          MR. THOMPSON: Objection as to form.
21          MS. WESTBY: Join.
22          THE WITNESS: No, I do not.
23  BY MR. GOSMAN:
24      Q.  You never heard that?
25      A.  No.

ROY ECKERDT - November 23, 2010                    Page 102
Direct Examination by Mr. Gosman

1       Q.  You never talked about it since?
2       A.  With Sergeant Chretien?
3       Q.  Uh-huh.
4       A.  No.
5       Q.  With anyone else?
6           MR. THOMPSON: To the extent those
7   conversations occurred with either of your attorneys, I
8   direct you not to answer.
9           THE WITNESS: Yes.
10  BY MR. GOSMAN:
11      Q.  Okay.  With whom?
12      A.  With Chief Feathers.
13      Q.  What was said?
14      A.  Expressed a concern over it.
15      Q.  You did?
16      A.  Yes.
17      Q.  What was his response?
18      A.  I don't know where he went with it, being a
19  personnel matter, but I discussed my concerns with him,
20  and that was that.
21      Q.  Okay.  Did you ever communicate via e-mail
22  about this case with any of the other officers?
23      A.  No.
24      Q.  I think I'm done, sir.  And thank you very
25  much.

ROY ECKERDT - November 23, 2010                    Page 103
Direct Examination by Mr. Gosman

1           MS. WESTBY: Just a couple of questions.
2   Exhibit -- is it 47 or 48?
3           MR. GOSMAN: I think it's 47, yes.
4           THE WITNESS: Which one?
5               CROSS EXAMINATION
6   BY MS. WESTBY:
7       Q.  The pictures.
8       A.  Forty-seven.
9       Q.  Sergeant Eckerdt, have you ever seen those
10  photographs before?
11      A.  Last night.
12      Q.  Okay.  Are those the photographs that -- or
13  the photograph that you had seen prior to the
14  Wachsmuth --
15      A.  No.
16      Q.  -- warrant?
17          How do you know that those are not the
18  photographs that you saw?
19      A.  The photograph that was just one, was two
20  males.
21      Q.  Okay.
22          MS. WESTBY: I think that's all the questions
23  I have.
24          MR. GOSMAN: Sir, have a good day.
25          (Proceedings concluded at

ROY ECKERDT - November 23, 2010                    Page 104
Cross-Examination by Ms. Westby

1               10:05 a.m., November 23, 2010)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ROY ECKERDT - November 22, 2010                          Page 105
Cross-Examination by Ms. Westby

DEPONENT'S CERTIFICATE

2            I, ROY ECKERDT, do hereby certify, under

3    penalty of perjury, that I have read the foregoing

4    transcript of my testimony consiating of 104 pages,

5    taken on November 22 & 23, 2010 and that the same is,

6    with any changes noted below, a full, true and correct

7    record of my deposition.

8    PAGE  LINE       CORRECTION       REASON FOR CORRECTION

9    ____  ____  _____   _____

10   ____  ____  _____.  _____

11   ____  ____  _____.  _____

12   ____  _____ _____.  _____

13   ____  ____  _____.  _____

14   ____  ____  _____.  _____

15   ____  ____  _____.  _____

16   ____  ____  _____.  _____

17   ____  ____  _____.  _____

18   ____  ____  _____.  _____

19   ____  ____  _____.  _____

20   ____  ____  _____.  _____

21   ____  ____  _____.  _____

22

23

24                              _____
                                ROY ECKERDT   Date
25


ROY ECKERDT - November 22, 2010                          Page 106
Cross-Examination by Ms. Westby

CERTIFICATE

2            I, VONNI R. BRAY, Registered Professional

3    Reporter, and Notary Public for the State of Montana,

4    do hereby certify that ROY ECKERDT was by me first duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth;

7            That the foregoing transcript, consisting of

8    105 pages, is a true record of the testimony given by

9    aaid deponent, together with all other proceedings

10   herein contained.

11           IN WITNESS WHEREOF, I have hereunto set my

12   hand this 11th day of December, 2010.

13

14

15

16

17

18

19

20

21   _____
     Vonni R. Bray, RPR
22   P. O. Box 125
     Laurel, MT 59044
23   (406) 670-9533 Cell
     (888) 277-9372 Fax
24   vonni.bray@yahoo.com

25

Tricia Wachsmuth v.
City of Powell, et al.

Roy Eckerdt
November 22, 2010

**[**

**[sic] (1)**
6:8

**1**

**1:42 (1)**
100:12
**10 (11)**
7:25;21:12,15;22:2,4,
16;35:21;37:5;49:9,10,
13
**10:05 (1)**
104:1
**13 (2)**
31:9,11
**14 (1)**
31:8
**15 (5)**
21:2;37:6;52:8,19,20
**16th (1)**
47:18
**18 (1)**
37:5
**1987 (1)**
5:15
**1997 (2)**
6:11,25

**2**

**2/24/09 (1)**
100:12
**20 (9)**
27:4,7;29:20;30:3;
47:16;52:8.20,22;89:7
**200 (1)**
7:16
**2003 (1)**
7:4
**2005 (5)**
8:19;12:13:17:9,10;
80:16
**2007 (1)**
18:4
**2009 (6)**
7:9;8:21;9:5;15:1;
47:19;79:23
**201 (1)**
7:16
**2010 (6)**
45:21;47:12,13;79:19;
96:12;104:1
**22 (4)**
27:14;31:23;45:21;
47:12
**22nd (1)**
45:5
**23 (4)**
47:13;79:19;96:12;
104:1

**24 (3)**
7:8;8:21;15:1
**24th (2)**
9:5;38:15
**25 (7)**
37:5;68:8;89:5,9;
96:16,19;100:8
**25th (1)**
31:4
**26 (1)**
46:17

**3**

**3:00 (3)**
74:17,22;81:20
**30 (1)**
68:8
**31 (2)**
7:11,13

**4**

**4 (1)**
96:14
**47 (7)**
39:17,21;40:10;41:4;
45:23;103:2,3
**48 (1)**
103:2

**5**

**56 (4)**
52:25;53:1,13;54:11
**57 (1)**
54:18

**6**

**6:04 (1)**
45:20
**6:12 (1)**
45:21
**6:14 (1)**
47:11
**6:15 (4)**
46:13,20;47:7,9

**8**

**8:44 (1)**
47:12

**9**

**9:00 (1)**
98:2
**9:25 (1)**
79:18
**9:33 (1)**
79:18
**9:54 (1)**

96:11
**9:55 (1)**
96:11
**97 (1)**
6:24

**A**

**able (2)**
42:11;68:1
**access (7)**
31:19;35:7;38:20.20;
39:7,10;42:9
**accessed (2)**
26:1,19
**accessible (1)**
27:1
**According (2)**
31:7;46:17
**accounted (1)**
24:24
**accuse (1)**
42:18
**action (1)**
8:11
**activities (2)**
10:21,22
**activity (1)**
38:9
**actual (1)**
42:12
**Actually (7)**
22:21;29:14;30:5;
46:24;50:5;83:12;94:7
**additional (1)**
74:1
**admission (1)**
46:16
**admit (1)**
90:3
**admitted (1)**
32:9
**adult (1)**
41:25
**advisable (1)**
24:21
**advised (4)**
86:11;91:16;94:23;
95:7
**affect (1)**
24:15
**affidavit (2)**
31:24;32:1
**afternoon (5)**
13:10;76:16;77:3;
78:21;81:7
**afternoons (3)**
76:25;77:3,4
**again (8)**
34:12;40:14;53:9;
58:4;65:16;83:15;90:3;
99:24
**agencies (3)**

15:25;82:17,24
**agency (1)**
83:13
**ago (1)**
4:11
**agree (7)**
36:15;40:25;41:3,24;
42:22;43:2;100:4
**agreement (3)**
16:19.22;46:14
**ahead (25)**
6:18;7:13;16:6;26:23;
27:3;29:5,7,20;31:8;
39:19;48:15,22;49:4;
50:4;53:4;56:5;58:9;
60:20;64:3;78:11;84:24;
99:2;100:4,10;101:19
**aid (2)**
16:22;19:17
**Air (4)**
5:11,21,21,22
**Alan (1)**
47:20
**alarm (2)**
85:19,20
**allow (1)**
66:11
**almost (1)**
5:6
**alone (2)**
69:11.15
**along (3)**
37:3;91:9,11
**always (2)**
27:16;82 13
**amazing (1)**
37:1
**amount (1)**
45:15
**announced (1)**
62:5
**answered (7)**
14:15;30 10,15,19;
71:20;75 25;76:12
**anymore (1)**
94:25
**apologizing (1)**
101:18
**apparently (2)**
21:14;36 18
**appear (7)**
40:21;41.21;47:18;
58:20;59:19;96:16;
99:10
**appeared (1)**
58:23
**appears (2)**
41:15;45 5
**applied (2)**
11:4;25:11
**appreciate (2)**
48:10;51:3
**approached (1)**

57:5
**appropriate (1)**
50:2
**appropriately (2)**
30:15,19
**approve (1)**
47:21
**approved (2)**
47:18;89:14
**approximate (1)**
97:15
**Approximately (8)**
52:4,8,19;67:2;68:8;
81:4,5;91:4
**area (4)**
32:5;51:18;87:12;
101:19
**areas (3)**
12:22;13:2;61:16
**argument (1)**
44:25
**armed (1)**
95:14
**armor (1)**
19:12
**around (15)**
25:21;26:14,15,17;
27:6;28:18;30:21;31:2,
17,18;35:6;56:21;69:23;
85:3;98:2
**arranging (1)**
9:13
**arrest (1)**
92:20
**arrests (1)**
32:6
**arrive (1)**
98:11
**arrived (3)**
19:2.25;20:24
**arrow (1)**
54:15
**aspect (1)**
76:9
**assemble (1)**
87:16
**assembled (9)**
14:9;48:5,10;53:16;
65:19,23;66:3;71:10;
82:4
**assembly (1)**
68:2
**assigned (3)**
55:19,20;85:21
**assignment (1)**
21:23
**assignments (4)**
21:10;34:16,20,21
**assume (2)**
35:20;78:3
**assumption (3)**
16:21,23;24:12
**attempt (1)**

49:25

**attendance (4)**
10:7,17;14:6;77:10

**attended (2)**
17:25;78:5

**attention (1)**
47:15

**attorney (1)**
30:18

**attorneys (2)**
11:18;102:7

**available (1)**
76:24

**aware (3)**
83:6,18;98:17

**awareness (1)**
24:17

**away (8)**
59:22,24;60:9,13,24;
61:5,12,13

## B

**bachelor's (1)**
5:7

**back (14)**
35:21;42:13;53:13;
56:17;57:2;58:18;64:14;
68:19;84:7,16;85:3,4,4;
86:6

**background (2)**
5:4;78:2

**backyard (1)**
37:13

**ballistic (1)**
38:21

**bark (4)**
51:9,12,18;52:5

**barked (1)**
51:20

**barking (1)**
52:9

**based (6)**
31:16;32:14;34:3;
46:12,13,15

**basement (14)**
13:11;38:16;63:15,17,
21;68:15;69:12,13;72:1,
2;84:6;85:2,25;86:4

**basic (1)**
8:13

**basically (1)**
11:3

**basis (7)**
16:16;40:20;46:19;
77:14,20;98:4;99:23

**bathroom (1)**
79:13

**bathtub (1)**
86:24

**battering (1)**
24:23

**became (2)**

10:2;86:1

**bed (1)**
85:17

**bedding (1)**
85:14

**bedroom (2)**
85:10,12

**bedrooms (2)**
71:16,22

**began (1)**
77:14

**beginning (3)**
31:25,25;34:25

**Bellview (1)**
5:11

**belonged (1)**
37:8

**below (2)**
23:13;60:20

**best (9)**
34:19;49:2;55:8;
67:10,21;69:16;70:23;
84:22;91:2

**better (2)**
19:19;44:14

**big (1)**
32:24

**Blackmore (1)**
23:20

**blank (1)**
48:2

**board (2)**
21:24;34:22

**body (1)**
19:12

**both (4)**
31:22;33:16;46:22;
54:15

**bottom (6)**
27:10;60:21;68:13,25;
69:18;99:15

**Bradley (4)**
86:20;88:24,25;90:12

**breaching (1)**
8:9

**break (7)**
4:23,24;5:2;43:13;
45:12;89:11;100:6

**Bret (35)**
27:11,15;31:17,21;
34:18;36:19;37:21,21,
22;38:22;42:19,21;43:3,
7;86:8;87:3,6;88:22;
90:14,16;91:17,18;
92:21;93:19,23,24;
94:13,22,24;95:12,25;
96:3;97:2,13;98:7

**briefing (3)**
20:13;26:4;34:25

**briefly (1)**
5:18

**bring (1)**
73:18

**brother (2)**
42:19,21

**brought (3)**
58:18,18;72:19

**Brown (9)**
88:22;96:8,15;97:4,
11;98:8,13,16;100:22

**Brown's (4)**
89:8,11,14,21

**buffaloed (1)**
5:1

**building (3)**
9:18;21:1;24:18

**buildings (1)**
14:22

**bullet (1)**
19:22

**burning (1)**
86:25

**business (1)**
92:11

## C

**caliber (1)**
27:14

**call (18)**
16:8;18:19;19:9;42:6;
59:20;60:13;91:12,22;
92:1,5,7;98:9;99:5,8,20,
20;100:12,15

**called (12)**
17:3;18:7,9,9,20,23;
42:4;44:3,4;78:18;
91:13;95:8

**calling (1)**
18:17

**calls (1)**
15:18

**came (19)**
6:19;21:4;23:17;
32:11;37:7;41:7;43:23;
55:21;56:16,22,24;57:3;
58:16,17;61:4,15,21;
68:22;90:9

**cameras (1)**
4:13

**can (29)**
4:23;5:2;8:8,9,21;
28:11;40:14;41:20;
43:15;45:16;46:9;48:15,
25;49:2;50:6;55:8;56:8;
66:20,25;67:15,25;
73:14;75:5;81:9,19;
84:4;89:10;100:6,24

**caption (1)**
41:9

**car (7)**
84:16,17;85:24;86:6;
90:20,25;92:2

**care (4)**
13:5;40:13;46:2;92:11

**carriers (1)**

19:17

**carries (2)**
31:22,23

**carry (2)**
32:21;94:7

**cars (1)**
92:3

**case (4)**
33:3;35:18;44:8;
102:22

**celebration (1)**
84:11

**cell (3)**
8:3;59:21;99:5

**certain (1)**
29:13

**certainly (2)**
41:15;43:10

**certification (1)**
11:5

**certifications (6)**
75:11,15,18,22;76:8;
83:17

**certified (22)**
8:25;10:23;11:7;12:4,
15;14:5;18:2;76:6;
78:23;79:6,8,9,22,23,25;
80:2,5,8;82:21;83:2,14,
25

**Chad (1)**
47:17

**changed (2)**
38:14,18

**Chapman (3)**
65:3,6;88:22

**charge (1)**
77:25

**checked (1)**
85:6

**Cheyenne (4)**
5:22;6:9,12,23

**Chief (3)**
18:10;101:13;102:12

**Chihuahua (1)**
52:17

**child (9)**
23:15;24:2,6,7,9,13,
19,23;25:10

**children (1)**
37:12

**Chretien (26)**
20:12,24;26:4,6;
34:16;48:9;62:4;64:8;
67:8,24;70:24;75:21;
79:11;80:2;86:19;88:23,
25;89:3;90:6;91:25;
92:6;93:18;101:16,17,
17;102:2

**Chretien's (3)**
30:4;61:19;62:6

**CI (3)**
95:7;99:24;100:4

**C12902 (1)**

27:10

**City (2)**
16:18;17:25

**civil (1)**
4:12

**Civilian (2)**
6:7;17:12

**claim (1)**
72:23

**Clandestine (2)**
8:13;17:23

**clarification (2)**
28:12;98:12

**class (3)**
10:7;82:21,21

**classes (1)**
82:22

**cleaning (1)**
94:23

**clear (3)**
71:23,25;72:4

**cleared (5)**
61:16;71:8,12,18,22

**clearing (8)**
8:11;13:14;70:2;72:6;
75:5,6,12;84:21

**client (1)**
43:14

**closing (1)**
47:7

**Cody (7)**
82:14,14,19,22,23,24;
83:16

**coffee (1)**
56:19

**college (4)**
5:6,8,10;37:1

**Collins (1)**
6:17

**column (2)**
22:1;35:23

**comfortable (1)**
58:2

**coming (3)**
60:6;64:20;101:3

**command (1)**
59:11

**commanded (1)**
70:19

**common (2)**
32:16,16

**communicate (1)**
102:21

**community (2)**
5:10;36:25

**company (1)**
4:12

**complete (1)**
66:21

**completed (2)**
54:22;84:21

**Completely (3)**
42:25;72:24;73:1

compliance (2)
36:10,13
compliant (2)
58:20,24
complied (1)
60:11
complies (11)
48:14;52:2,23;53:12;
54:19;55:9;56:10;60:19,
25;64:7;65:21
comply (1)
59:18
compressed (1)
46:7
computer (1)
45:4
concealed (1)
31:23
conceals (1)
27:13
concern (2)
93:11;102:14
concerned (3)
38:13;91:19;92:12
concerning (1)
34:17
concerns (2)
95:3;102:19
conclude (1)
26:13
concluded (1)
103:25
conclusion (2)
28:17;87:21
conditions (1)
24:21
conduct (7)
10:3;32:1;35:9,17;
46:6,25;73:16
conducted (7)
11:10;35:13;73:8,9,
10;74:2,3;82:6,22,24;
83:9
conducts (1)
72:12
conferred (1)
47:4
confidential (5)
26:7,10;27:11,15;
98:10
confirm (1)
47:19
connection (1)
92:25
consider (1)
24:20
considered (1)
93:14
consistent (1)
50:18
constant (1)
12:18
construction (1)

5:24
contact (1)
4:14
contacted (1)
18:14
contain (2)
41:9;77:23
contained (1)
41:4
contains (1)
96:8
continue (5)
6:18;43:16;45:16,25;
46:10
continued (2)
36:5;46:12
continuing (2)
10:11;46:19
control (4)
55:19;69:5;87:15,23
conversation (3)
29:8;30:14;101:11
conversations (1)
102:7
cooperate (1)
95:10
cooperative (1)
95:12
copy (2)
11:2;89:21
corner (1)
54:25
couch (19)
56:1,3,5,8,17,20;57:4,
23;58:19;60:6;61:11;
70:9,11,16,18,19;87:13;
88:8;94:22
Counsel (5)
39:23;41:11;46:22;
47:4;96:21
Countermeasures (1)
16:25
County (7)
5:23;6:8,14,15;15:25;
16:3,20
couple (3)
9:23;29:15;103:1
course (13)
8:1,2;11:3;16 25;17:5,
8,25;29:15;75:8;78:24;
80:16,18;81:22
courses (5)
14:5,6,7;17:21,21
Court's (1)
99:25
created (1)
21:13
credited (1)
11:7
credits (3)
5:9;10:16;11 5
criminal (1)
38:9

CROSS (1)
103:5
curiosity (1)
80:1
custody (4)
69:5;87:14,23;92:25

D

danger (3)
34:4,11;35:1
dangerous (1)
34:14
Danzer (4)
64:8;65:10;67:8,23
dark (1)
97:18
Darn (1)
45:10
date (1)
31:7
dated (1)
31:5
dates (2)
12:25;81:11
Dave (2)
89:14;96:14
day (8)
14:3;46:24;49:23;
55:14;81:9;98:10;101:5;
103:24
days (3)
46:23,25;66:17
DCI (1)
93:13
DEA (1)
8:16
deals (1)
8:24
debriefing (3)
101:4,7,13
December (1)
7:4
decision (3)
35:9,16;45:16
declare (1)
71:25
declared (1)
71:23
defending (1)
32:3
deficiencies (1)
13:3
define (1)
8:7
defined (1)
77:20
definition (4)
53:24;74:6.10;97:24
degree (1)
5:7
Department (38)
6:1,2,13;7:3;9:2,11;

11:12;12:1,20;13:8,21;
14:9,19;15:3,4,7,22;
16:19;18:23;19:4;38:19;
39:12;72:24;74:15,23,
25;75:11;76:8,20;80:5;
82:1,4,6,18,20;83:3,19;
96:14
Depending (2)
53:24;97:24
Depends (3)
33:1;72:13;74:6
deployed (2)
48:20;80:11
deponent (1)
44:20
deposed (2)
4:15,16
deposition (14)
4:5,10;39:24;43:18,
23;44:2;45:23,25;46:10,
12,20;47:8;66:21;89:20
depositions (7)
4:20;46:2,7,24,25;
66:23;96:22
deputies (2)
16:13,13
describe (3)
5:18;15:12;84:24
described (1)
27:15
description (1)
77:24
details (1)
25:8
develop (1)
13:1
device (2)
24:23;36:14
devices (1)
8:9
diagram (6)
21:8,9;53:15;60:18,
22;64:4
dial (1)
59:21
dictated (1)
29:8
difference (2)
15:13;32:24
different (3)
8:4;37:7;83:13
DIRECT (2)
4:3;102:8
directly (3)
88:14;91:6,10
disclose (1)
44:15
disclosed (3)
39:23;40:2;44:17
disclosing (1)
46:15
disclosure (2)
44:5;47:8

discovery (3)
44:10,13;46:17
discussed (6)
20:24;21:6;23:5;25:6;
42:3;102:19
discussion (2)
23:15;25:7
discussions (1)
18:8
distinction (1)
33:7
distraction (1)
8:9
diversionary (2)
24:22;36:14
document (23)
7:16;10:6;11:25;12:9;
14:4;21:13;22:9,14;
27:22;28:1;30:20;31:10,
13,14,16,41;10:49:20;
96:15,19,24;99:24;
100:8,24
documentation (4)
61:25;62:2;77:23;
83:15
documented (9)
12:19;72:22;75:8;
77:5,9;80:19,22;81:23;
83:10
documenting (1)
77:14
documents (7)
28:3;29:13,18,23;
40:20;43:23;46:16
dog (8)
51:9,11,18,19,20;52:5.
9,12
done (11)
12:19;14:24;30:9;
39:14;46:5;47:10;54:7;
56:15;73:17;101:2;
102:24
door (25)
35:18;36:9,10,13;
51:7;52:6,7,19;53:5;
54:17;56:16,22,24;57:3,
18;58:16;60:6;61:5,15,
21,22;62:4,8,13;64:15
doorway (1)
63:23
down (43)
13:13;21:1;22:24;
35:23;47:8;48:10;49:5,
25;56:22;58:17,19,19;
59:6,8;60:15,20;62:20,
22;63:10,11,14,16,17,
21;64:5,17,23;65:7,20,
23,24;66:4,9;67:3,7;
68:17,22,23,24,25;
69:17;70:4;92:24
downstairs (15)
13:11;19:5;21:4;29:9;
63:1,6,8,10;68:3,6,

71:11;84:23,25;85:1;
87:16
**dozen (1)**
15:6
**dozens (1)**
72:9
**draw (7)**
48:3,22;53:4;54:15;
56:5;60:20;64:3
**drawing (2)**
53:11,14;55:1;56:11
**drawn (2)**
94:3,4
**drew (2)**
21:9;28:17
**drug (2)**
32:6;33:8
**drugs (1)**
33:9
**due (1)**
47:8
**duly (1)**
4:2
**during (5)**
26:3,4;64:21;77:1;
78:22
**duty (3)**
44:23;45:3;78:22
**dynamic (20)**
7:22;8:5,7,8.24;9:10;
12:6;13:6,8,23;14:11;
15:15;35:10;75:3,22;
76:9;77:13;78:25;82:15;
84:3

**E**

**earlier (1)**
9:7
**easily (1)**
26:19
**easy (1)**
26:13
**ECKERDT (7)**
4:1;22:5;46:4;54:24;
55:11,12;103:9
**educational (3)**
5:4,9;10:11
**effort (2)**
58:3;100:19
**either (3)**
18:10;73:9;102:7
**elapsed (3)**
57:24;64:16;68:5
**electronic (1)**
45:4
**else (10)**
12:17;25:22;36:5;
55:3,15;59:24;82:10;
91:21;98:8;102:5
**e-mail (1)**
102:21
**end (6)**

31:25;50:14;60:6;
63:13;66:14;89:20
**enforcement (7)**
6:4,7,21,25;10:10,12,
16
**engaging (1)**
84:10
**enlisted (1)**
5:20
**enough (1)**
60:21
**enter (4)**
24:21;49:17;50:8;
101:18
**entered (6)**
53:6,22;56:13;57:22;
58:11;62:15
**entering (4)**
24:17,18;62:17,18
**entire (4)**
15:7;63:20;82:3;85:5
**entirety (1)**
7:23
**entries (2)**
13:12;17:24
**entry (40)**
7:22;8:10,24;9:10;
12:6;13:6.8,13.23;14:11,
23;15:15;21:19;22:6;
23:7;24:22;34:17;35:10,
18;36:9;48:4,9,16,23;
49:10,12;51:6;53:17;
62:13;72:5;75 3,5,6,22;
76:9;77:13;78:25;82:15;
84:3;86:10
**entryway (1)**
63:24
**environment (2)**
8:4;15:19
**equipment (4)**
19:18;39:8,10,11
**especially (1)**
36:25
**established (2)**
49:21,24
**estimate (1)**
64:19
**estimating (1)**
21:2
**evening (10)**
18:15;24:12;32:10;
36:19;37:4;38:23;46:10;
97:15,16,17
**events (2)**
9:15;35:25
**everybody (2)**
47:5;62:14
**everyone (3)**
18:17,20;76:22
**everywhere (1)**
25:18
**evidence (2)**
66:22;85:22

**exactly (2)**
30:9;49:7
**EXAMINATION (2)**
4:3;103:5
**except (1)**
13:5
**exception (1)**
47:6
**exercises (4)**
9:10;13:9,17,23
**Exhibit (39)**
7:11,13;21:12,15;
22:2,16;27:4.7;29:20;
30:3;31:8,9,11;35:21;
39:17,21;40:10;41:4;
45:23;47:16;49:9,10,13;
52:18,25;53:1,13;54:10,
18,21;89:5,7,9,13;96:16,
17,19;100:8;103:2
**exhibits (1)**
47:8
**existed (1)**
35:2
**expand (1)**
73:14
**experience (7)**
32:5,9,11,15.20;34:3,
13
**explained (1)**
42:4
**express (1)**
38:23
**Expressed (1)**
102:14
**expression (1)**
39:6
**extent (1)**
102:6
**extra (4)**
19:11,17;53:3;73:17
**extraction (1)**
8:3

**F**

**fact (14)**
23:5;32:17;39:7.10;
42:20;43:7;46:13,13,15;
47:4,20;49:15;50:6;
92:14
**facts (1)**
26:12
**fair (1)**
15:6
**fairgrounds (1)**
14:22
**familiar (4)**
4:8;19;20:18;48:8
**far (9)**
13:20;23:11,12;42:16,
17;53:7;57:18;74:21;
77:10
**father's (3)**

86:12;90:14,17
**Feathers (3)**
18:10;101:13;102:12
**February (7)**
7:8;8:21;9:5;15:1;
31:5;38:15;79:23
**federal (1)**
4:18
**feel (1)**
58:2
**feet (3)**
52:4,8,19;57:20
**felt (1)**
9:8
**female (1)**
23:14
**few (3)**
58:10;80:10;82:5
**field (1)**
73:9
**Fifteen (1)**
52:22
**figure (1)**
93:7
**file (1)**
10:24
**fill (1)**
16:14
**final (1)**
21:23
**find (6)**
14:4;21:25;29:17,23;
88:22;89:8
**fine (3)**
50:10;52:22;98:14
**finish (1)**
43:17
**finished (1)**
5:6
**fire (3)**
14:21;85:14;86:22
**firearms (10)**
32:2,13,22;79:7,11,22,
24;80:2,21;83:9
**first (23)**
4:2;6:4,7;19:17,24;
21:17,21;22:2,11;51:18;
53:14;54 11;57:21;61:4,
7,15,21,22;62:8,15;
74:20;84:8;97:14
**firsthand (1)**
26:12
**five (2)**
6:19;50:17
**flashbang (1)**
48:20
**focus (2)**
61:2;66:3
**follow (1)**
63:11
**followed (3)**
63:10;68:24;88:13
**following (1)**

68:7
**follows (1)**
4:2
**Force (6)**
5:11,21,21,22;8:10;
25:11
**forgot (1)**
6:22
**form (56)**
14:12;22:17;23:9;
24:25;25:14;26:20;
27:19;28:21;30:2,3;
33:10,18;34:6;35:11;
36:1;38:3,25;41:6,17;
42:23;49:22;58:21;
59:11,12;61:23;62:23;
66:10;67:12;69:2,19;
70:13,20;71:13,19;
72:15,17,25;73:3;74:12;
75:13,24;76:10;77:16;
78:10;79:1;81:13,24;
83:21;86:2;87:18;89:25;
92:16;93:3;97:21;98:19;
99:22;101:20
**forms (1)**
31:22
**Fort (1)**
6:17
**forth (1)**
64:14
**Forty-seven (1)**
103:8
**forward (2)**
58:9;96:20
**found (7)**
37:20,23;38:9,11;
39:2;86:10;100:12
**four (4)**
9:25;10:2;67:5,19
**four-man (1)**
13:11
**fourth (2)**
14:19,20
**Friday (14)**
13:10;14:19,20;74:14;
76:15,16,25;77:2.2,3,4;
78:21;81:7,18
**Fridays (4)**
14:18;76:21,22;82:6
**friend (1)**
93:14
**front (23)**
19:20;36:9;41:2;
47:17;48:5;51:7,13;
52:19;53:20;56:6,20,24;
56:20;57:8,9;61:3;62:4,
13;63:3;64:14;71:6;
87:13;94:13
**FTO (2)**
78:16,18
**FTOs (3)**
73:9,15;78:19
**full-time (1)**

Tricia Wachsmuth v.
City of Powell, et al.

Roy Eckerdt
November 22, 2010

15:17
**function (1)**
15:17
**functioning (1)**
82:4
**further (1)**
73:14

**G**

**gained (3)**
36:9,10,13
**gather (1)**
85:21
**gave (2)**
4:11;20:10
**gear (8)**
37:9,19;38:19,21,24;
39:12,13;42:20
**Generally (2)**
34:12;99:23
**generate (2)**
9:14;10:5
**generated (2)**
9:16;29:18
**girlfriend (1)**
42:5
**given (4)**
4:5;22:16;46:25;74:1
**Glick (6)**
80:6,7,13,24;81:6;
83:2
**goes (2)**
13:11;78:2
**good (2)**
56:11;103:24
**GOSMAN (130)**
4:4;7:12;14:16;15:11;
21:16;22:20,23;23:10;
25:3,16;27:2,8,24;28:4,
8,10,13;29:1,6,25;30:3,
5,8,12,16,17;31:3,15;
32:4;33:13,20;34:1,9;
35:15;36:7,12;38:6;
39:4,18,25;40:2,5,9,16,
24;41:8,14,19;43:5,17,
20;44:3,6,8,14,17,19,22,
24;45:8,11,13,18,22;
47:2,10,14;49:6,22;50:3;
51:23;52:3,21;53:2;
54:20;58:7;59:1,17;
62:1;63:2;66:16,25;
67:1,14,20;69:4,10;70:1,
15;71:1,4,17,24;72:20;
73:3,6,12;74:18;75:17;
76:3,14;77:22;78:15;
79:4,15,20;81:15,17;
82:2;84:1;86:7;87:22;
88:1,5;89:6;90:2;92:18;
93:6,16;96:13,23;98:1;
99:1,19;100:2,9;101:23;
102:10;103:3,24
**graduate (1)**

5:14
**graduated (2)**
5:19,20
**grand (1)**
4:18
**group (9)**
14:9;15:14;16 13;
21:6;34:3,10;:4:16;
63:13;68:24
**grouped (1)**
51:6
**grow (5)**
32:3,6,10,12,18
**grows (1)**
32:7
**guarantee (1)**
45:9
**guess (18)**
8:7;9:20;15:6;26:11;
28:11,24;31:22;36:16;
49:4,4;58:5;62.7;67:17;
73:14;74:7;89:2,16;
97:24
**guns (11)**
25:22,24;26:13,17;
27:1,6,12;28:17,19;
30:21;31:17
**guys (3)**
79:11,24;82:15

**H**

**half (2)**
4:11;46:24
**halfway (1)**
35:23
**Hall (1)**
66:1
**hallway (1)**
13:12
**hand (4)**
29:12;39:21;53:13;
100:24
**handcuffs (2)**
19:17;68:18
**handful (1)**
16:12
**handguns (3)**
25:17,20;27:12
**handy (1)**
28:19
**happen (1)**
36:5
**happened (5)**
11:14;24:15;36:11;
44:9;61:9
**hard (2)**
50:22;101:9
**hate (1)**
90:3
**Hazwoper (1)**
8:13
**head (3)**

67:9;75:7;90:23
**hear (4)**
25:22;51:9;85:19;87:2
**heard (8)**
29:10;36:17;51:11,18,
22;52:5;61:7;101:24
**hearing (2)**
72:3;85:20
**heightens (1)**
24:17
**held (1)**
83:18
**help (1)**
7:17
**here's (1)**
40:5
**hey (1)**
37:16
**high (3)**
5:14,19,20
**higher (2)**
34:4,11
**high-risk (1)**
15:19
**himself (1)**
38:24
**history (1)**
5:18
**holding (1)**
37:10
**home (14)**
18:6,7;24:13,24;
49:12;53:6,11;57:11,22;
68:1;87:3,9;94:8;97:20
**hope (1)**
55:13
**hour (1)**
45:19
**hours (5)**
11:7;12:16;43:24;
73:2,4
**house (57)**
21:10;24:10,21;25:18,
21,23,24;26:14,15,18;
27:6,12;28:18;30:22;
31:2,17,19;35:5;39:14;
48:5,12,13,16;49:17;
51:13;52:5,6,10;53:7,8,
18,23;57:6,19;58:11;
61:8,17;62:15,16,17,18;
64:11,21;71:11;85:3,5;
86:9,17;90:14,17;91:6,
18;92:23;93:24;94:1,13;
101:19
**husband (1)**
60:14

**I**

**idea (2)**
61:2;91:5
**identified (9)**
7:11;8:23;13:1;21:15;

27:7;31:11;39:17;54:18;
89:5
**identifies (1)**
99:24
**identify (8)**
12:22;53:14;54:9;
55:7;60:23;97:13;99:18,
19
**immediately (2)**
19:8;53:5
**impact (1)**
19:21
**impeachment (1)**
44:3
**implemented (2)**
78:7,9
**inaccurate (1)**
73:1
**in-car (1)**
4:12
**incident (1)**
18:25
**indicate (2)**
49:16;50:11
**indicates (1)**
23:14
**individual (4)**
12:21;82:1,9,17
**individuals (1)**
67:6
**informant (5)**
26:7,10;27:11,15;
98:10
**information (12)**
21:7;22:15;23:17;
34:17,25;35:8;36:18;
60:22;86:12,13;93:1;
95:4
**informed (2)**
45:24;46:22
**informing (1)**
98:8
**initial (3)**
68:24;83:12;86:10
**initially (5)**
15:16;20:1;46:22;
58:16;63:9
**insert (2)**
96:18;100:7
**in-service (13)**
11:18,22,23;12:22;
73:5;74:3,6,8,13,14,15;
81:23;82:16
**inside (3)**
52:9;64:14;94:20
**instance (1)**
90:19
**Institute (1)**
17:1
**instructed (2)**
60:24;66:17
**instructor (1)**
72:19;73:25;79:6,6,

10;82:21;83:2,4
**instructors (11)**
73:18,21,22,23,24;
75:16,18;78:23;79:8,9;
83:7
**intended (1)**
96:15
**interesting (1)**
45:6
**interfere (1)**
92:13
**interior (1)**
53:11
**interrogate (1)**
92:25
**interrogation (1)**
96:2
**intervening (1)**
29:16
**interview (5)**
96:9;97:5,14;100:25;
101:2
**interviewed (1)**
97:3
**into (25)**
5:1,24;9:20,21;10:1;
13:13;18:9;28:15;42:11;
43:23;49:12;53:17;
62:14;63:15;78:2;87:15;
88:13,16,16;92:25;94:1,
7;96:19;100:8;101:12
**investigation (1)**
92:13
**investigative (1)**
36:24
**Investigator (2)**
97:4;98:13
**investors (1)**
4:13
**involve (2)**
8:9,9
**involved (8)**
13:17,22;14:10;38:8;
64:5;67:3;81:12;96:2
**involves (2)**
8:8,10
**involving (3)**
4:12;32:6,15
**issue (2)**
24:19;38:2
**issued (1)**
37:18;38:19;39:12
**issues (1)**
95:6
**item (1)**
12:18
**items (1)**
35:22

**J**

**jammed (1)**
37:18

Tricia Wachsmuth v.
City of Powell, et al.

**Jeff (1)**
44:5
**job (2)**
6:4,7
**Join (38)**
22:19;25:2,15;26:22;
27:21;28:23;30:24;
33:11,19;34:7;35:12;
36:3;38:4;39:1;58:22;
59:14;62:25;66:12;69:9,
21;70:22;73:7;75:14;
76:1;77:18;78:12;79:2;
81:16,25;83:23;87:20;
88:4;92:17;93:5;97:23;
98:21;100:1;101:21
**judge (1)**
45:2
**jumped (2)**
56:23;57:2
**jury (1)**
4:18
**justify (1)**
25:10

**K**

**keep (2)**
11:9;32:13
**Keeping (1)**
69:13
**keeps (1)**
27:12
**Kent (20)**
9:7;18:10;20:3,7;
47:20;48:9,19;54:5,16;
60:2,3,8,23;61:4,12;
64:11,20,23;65:13;75:21
**kept (5)**
10:17;11:13;28:19;
31:18;82:20
**kids (2)**
37:1,13
**kind (5)**
7:17;10:6;51:5;52:12;
75:22
**kinds (1)**
81:21
**kitchen (13)**
63:9,23,24,24;87:15;
88:7,11,12,13,16,17,18;
94:23
**knew (13)**
20:20,21,22;21:20;
23:8;37:22,22;38:20;
42:20;43:3,7;45:7;92:14
**knock-and-announce (10)**
22:25;23:3,8,13;
35:14,17;54:2,6,15;
57:16
**knocked (2)**
61:20;62:4
**knowing (3)**
7:17;37:11,11

**knowledge (3)**
34:19;84:22;95:8

**L**

**lab (2)**
17:23;34:14
**Laboratory (1)**
8:13
**labs (2)**
8:14;17:23
**Lake (1)**
17:25
**Laramie (4)**
6:15,16.16,22
**Larimer (3)**
5:23;6:8,14
**last (12)**
9:23,25;10:1;22:12;
29:15;40:11;66:17;
74:19;80:10;82:5;101:9;
103:11
**late (3)**
46:15;47:8;97:15
**lately (1)**
44:9
**later (6)**
12:13;24:6;66:21;
85:12,13,18
**law (7)**
6:4,7,21,25;10:10,12,
15
**lawsuit (2)**
4:12;29:16
**laying (1)**
85:2
**layout (3)**
21:10;57:19;85:2
**lead (2)**
62:20,22
**leader (1)**
61:1
**learn (3)**
18:5;21:21;86:8
**learned (1)**
35:8
**least (6)**
10:16;15:4;31:5;
38:21;46:3;67:6
**leave (3)**
19:8;88:6,6;90:24;
100:6
**led (1)**
18:25
**left (10)**
13:1;14:19;24:6;
39:14;45:15;66:17;84:5;
85:23;88:21;95:21
**left-hand (1)**
22:1
**legal (1)**
87:21
**legend (1)**

51:19
**less (6)**
36:23;79:8,10,22,25;
83:8
**lethal (5)**
79:8,10,22,25;83:8
**level (3)**
13:19;33:7;73:25
**life (1)**
15:17
**likely (1)**
89:16
**limited (1)**
73:15
**line (3)**
51:5;60:20;61:21
**list (11)**
7:20;10:7,17;22:1,1,3;
35:22,24;49:10;50:6,16
**listed (1)**
17:7
**listening (1)**
49:23
**little (4)**
37:13;51:19;53:15;
54:9
**live (2)**
14:21;19:5
**living (13)**
54:25;55:6;56:2;
61:14;62:10,12;63:19,
23;71:6;87:3,10,13;88:2
**loaded (6)**
25:17,21,25;27:12;
35:5,6
**located (10)**
48:9;54:1,6,24;55:23;
64:17;65:17;90:17,22,25
**location (4)**
23:23;54:14;55:7;
88:15
**log (2)**
11:1;99:5
**long (14)**
19:6;20:23;24:22;
68:5;80:2,5,23;83:2,4,7;
84:17;94:5,6,7
**longer (3)**
43:19,21;77:25
**look (15)**
7:13;22:8,13;27:3,25;
28:2;29:20;30:13;36:24;
39:19;41:11;44:1;49:9;
89:7;100:16
**looked (1)**
100:11
**looking (9)**
14:2;21:16;28:25;
29:2;31:10;57:14,21;
61:25;62:2
**lose (1)**
100:3
**lost (1)**

43:4
**lot (3)**
29:14;80:11;101:11
**low (1)**
58:17
**lunch (1)**
44:1

**M**

**magazines (1)**
19:17
**magic (1)**
76:21
**main (1)**
9:8
**maintaining (1)**
9:9
**major (1)**
35:25
**majority (4)**
12:21;19:4;78:19;
83:24
**makes (1)**
27:5
**making (3)**
13:12;58:2;62:13
**male (4)**
23:14;37:9,21;41:25
**males (2)**
37:5;103:20
**Manufacture (2)**
32:23;33:4
**manufacturing (2)**
32:25;33:9
**many (4)**
14:24;52:4;67:2;81:4
**March (1)**
47:19
**marijuana (6)**
32:6,7,10,12,18,19
**Marissa (2)**
21:13,18
**mark (1)**
52:24
**marked (2)**
39:21;53:1
**marker (1)**
100:7
**materials (1)**
96:20
**matter (3)**
47:3;64:19;102:19
**may (5)**
24:18;36:19;40:6;
54:21;72:8
**maybe (4)**
15:6;18:25;21:2;68:8
**McCaslin (5)**
48:19;54:6,16;65:1,11
**mean (6)**
8:4;23:23;37:13;54:1;
68:20,21

**meant (1)**
49:7
**media (1)**
45:4
**meet (1)**
94:13
**meeting (2)**
10:11
**member (2)**
17:17,17
**members (4)**
9:10;17:19,20;83:18
**men (1)**
67:2
**mentioned (1)**
83:1
**merely (1)**
33:8
**message (4)**
99:11,12,21,21
**met (1)**
37:21
**meth (3)**
8:14;17:23;34:15
**methamphetamine (2)**
33:3;34:13
**middle (3)**
7:15;22:4,24
**might (5)**
13:2;14:21;57:2;
82:23;92:13
**miles (1)**
37:6
**mind (1)**
69:13
**Miner (12)**
18:11;20:11;26:9;
27:5;28:16;31:6;32:9;
34:24;68:18;79:9,25;
89:8
**Miner's (7)**
26:5;27:4;29:2;30:5,7;
47:17;61:19
**minus (1)**
37:5
**minute (3)**
22:13;49:14;84:24
**minutes (3)**
19:7;21:2;64:19
**Misha (2)**
40:6;45:24
**missing (2)**
85:16;89:11
**mission (1)**
15:19
**misstates (3)**
42:25;90:1;98:22
**moment (6)**
35:22;49:9;61:10;
64:16;89:9;96:7
**moments (1)**
58:10
**month (1)**

Tricia Wachsmuth v.
City of Powell, et al.

Roy Eckerdt
November 22, 2010

76:21

**more (5)**
7:25;18:23;34:14;
81:1;89:16

**morning (3)**
47:3,16;81:21

**most (4)**
72:18;77:3,4;78:5

**motion (1)**
45:2

**move (2)**
58:9;59:7

**moved (9)**
9:20,21;10:1;56:12;
61:16;63:22;87:15;
88:15,18

**Moving (1)**
51:13;56:17;64:14

**much (12)**
7:18;32:5;38:2;43:19,
21;57:23;64:16;68:5;
74:5;81:9;101:8;102:25

**munitions (2)**
79:22;83:8

**mutual (1)**
16:22

**myself (2)**
43:4;46:23;61:24;
75:19

**MySpace (5)**
36:25;37:24;41:5,16;
42:11

## N

**name (7)**
15:20;17:2;20:16;
50:15;99:24;100:4,7

**names (2)**
49:11;50:23

**narcotics (3)**
32:15,19,21

**narrative (1)**
31:1

**narrow (1)**
89:17

**near (3)**
23:22;53:20;68:2

**nearly (1)**
15:4

**Nebraska (4)**
4:17;5:12,16,25

**necessarily (4)**
12:4;29:10;83:11,11

**need (6)**
28:3;43:16;45:14;
66:24;79:12,13

**needed (3)**
28:19;91:17;94:24

**new (2)**
9:17;78:7

**newly (2)**
43:14,15

**next (16)**
31:5;41:25;48:1;
49:11,16;50:15;51:19;
55:10;60:4,5;71:2;
78:13;87:11;89:10;
100:6;101:4

**night (13)**
19:12;21:14;24:16;
39:3,5;42:3;46:20;47:9;
67:3;74:17;76:15;81:18;
103:11

**nine (1)**
43:24

**nobody (3)**
69:23;71:23;75:22

**nods (3)**
67:9;75:7;90:23

**normally (1)**
19:13

**Northwest (1)**
5:12

**note (2)**
46:21;99:8

**notebook (2)**
47:16;96:17

**notes (2)**
21:20;96:9

**notice (4)**
85:10,12,14,16

**November (7)**
45:6,21;47:12,13;
79:19;96:12;104:1

**number (6)**
46:2;50:15;54:11;
76:21;96:14;100:13

**numbers (4)**
7:16;49:11,16;50:7

**numerous (1)**
25:24

## O

**oath (1)**
44:21

**Object (36)**
14:12;22:17;24:25;
26:20;27:19;36:14;40:19;
42:23;49:19;59:12;
62:23;66:10;67:12;69:2,
19;70:13,20;71:13,19;
72:15,17,25;74:12;
75:24;77:16;78:10;
81:13;83:21;86:2;87:18;
89:25;93:3;97:21;98:19;
99:22,23

**Objecting (1)**
73:3

**Objection (27)**
23:9;25:14;28:21;
30:23;31:20;33:10,18,
22;34:6;35:11;38:3,25;
41:6,17,18;49:22;58:21;
61:23;69:7;75:13;76:10;

79:1;81:24;87:25;92:16;
93:10;101:20

**objections (1)**
50:2

**observe (2)**
86:1;87:16

**observed (3)**
85:1;86:5,6

**obtain (1)**
100:19

**obtained (2)**
20:11;21:7

**Obviously (5)**
15:20;67:13,16;82:9;
101:11

**occasions (1)**
4:16

**occur (3)**
35:25;81:9,19

**occurred (3)**
44:2;72:23;102:7

**off (12)**
8:12;15:16;68:12;
70:9,10,16,17,19;76:22;
80:9;82:10;85:19

**off-duty (1)**
18:7

**offer (2)**
36:18;59:2

**Office (7)**
5:23;6:8,14;16:3;18:9;
82:24;97:4

**Officer (75)**
5:5;7:5;8:13,16;15:12;
18:11;20:7,11,24;23:7,
12,20;26:5,6,9;27:4,5;
28:16;30:4;31:6;33:8;
34:5,11,16,24;35:2;
36:20;41:1,20;46:4,9;
47:15;48:19,19;49:8;
50:4,23;53:3;60:8,23;
61:4,12;62:4;65:1,3,10,
13;66:1;67:2;68:18;
72:2;79:9,10;80:6,7,13,
24;83:13;84:6;86:17,20;
87:23;88:22,24;89:3,4;
90:8,9,12;97:2,11;98:8,
16;100:22;101:16

**officers (62)**
8:8;10:12;12:7;13:8,
21,24;14:6,9;15:14;20:2,
5;48:6,6;49:1,16;50:8;
51:4;53:5,6,20;55:1;
56:24;57:2,5;61:13;
62:20,22;63:3;64:2,4,18;
65:19;22;66:3;68:1,2,6,
11;69:17,23;70:4,8;
71:10,16,22;73:10,16;
74:24;76:24;78:22;
79:21;81:20;82:17,19;
83:24;84:10;85:8;87:16;
94:17;97:7;101:19;
102:22

**often (1)**
32:2

**old (1)**
37:5

**once (10)**
12:12;18:24;76:18,19,
21;81:1;84:20;90:9;
92:13;101:2

**one (31)**
4:11,17,22;9:4;12:13;
23:14,14;24:5;28:5;
29:23;34:3,22;37:4,7;
40:8;47:6;51:1;54:11,
11;55:18;62:8;74:20;
83:14;84:8;89:11,14;
90:11;92:5;99:15;103:4,
19

**ones (2)**
75:20;84:8

**ongoing (1)**
12:18

**online (1)**
37:2

**only (6)**
29:13;40:7;42:9;
67:16,23;76:21

**open (1)**
13:1

**opened (1)**
35:19

**operation (4)**
17:14;23:35:9,17

**operations (4)**
32:2,6,10;84:21

**opportunities (1)**
82:13

**opportunity (3)**
22:8;41:11;45:8

**opposing (1)**
96:21

**order (13)**
7:17;10:14;31:19;
35:24;48:5,6,23,25;
49:11,17;50:7;90:12;
99:25

**ordered (1)**
70:9

**original (1)**
96:17

**others (3)**
64:9;83:5,6

**out (33)**
5:22,25;6:1;11:1;
14:22,23;16:14,19;5;
21:25;24:4;27:16;29:17;
37:20;42:7;57:14,21;
59:21;64:14,20;66:21;
80:1;83:10,15;86:12,16,
16;88:19;90:9,11;93:7,
11,24;94:13

**Outside (6)**
12:25;48:13;56:11;
57:11;72:19;84:7,8,11,

13,20;85:9;86:5,11;
91:18;93:13;95:16

**over (13)**
4:22;19:12;29:15;
44:1;56:2,17;73:4;
78:13;82:14,15,25;
94:10;102:14

**oversaw (1)**
12:1

**oversee (1)**
10:4

**overseeing (1)**
11:11

**overwhelming (1)**
8:10

**own (2)**
13:2;46:16

## P

**P10 (1)**
22:5

**page (9)**
22:2,2,24;37:24;
41:16;42:10,17;49:12;
60:21

**paper (3)**
48:1,2;53:4

**paragraph (2)**
27:9;99:15

**paranoia (2)**
26:25;35:4

**paranoid (4)**
26:25;27:15;28:18;
31:18

**parched (1)**
66:21

**Park (3)**
15:25;16:3,19

**parked (1)**
90:25

**part (6)**
17:15;22:5;42:11;
44:9;96:16,20

**participate (3)**
12:6;76:25;80:23

**participated (1)**
23:7

**passed (1)**
62:12

**patrol (12)**
7:5;8:1,16;16:13;17:6;
20:2,4;80:17;84:16,17;
90:20,25

**pause (1)**
79:14

**PD (5)**
4:14;13:12;82:14,23;
83:16

**peace (1)**
8:12

**pending (2)**
4:24;5:2

Tricia Wachsmuth v.
City of Powell, et al.

Roy Eckerdt
November 22, 2010

**people (7)**
24:4;32:1,12,18,21;
33:3;50:24
**perceived (1)**
59:15
**percent (1)**
7:25
**percentage (1)**
74:5
**perform (1)**
13:8
**performing (1)**
13:23
**perhaps (2)**
56:23;100:6
**perimeter (1)**
48:3
**period (1)**
15:2
**permit (1)**
45:24
**person (3)**
27:13;31:23;78:13
**personnel (1)**
102:19
**phone (21)**
19:9;59:20,21;60:9,
13,15,24;61:5,12,13;
91:22;92:1,5,6;99:5,19,
20;100:15,16,17,20
**photograph (2)**
103:13,19
**photographs (4)**
40:22;103:10,12,18
**photos (3)**
40:10;41:12,13
**phrase (1)**
23:13
**pick (2)**
86:17;91:17
**picked (1)**
92:14
**picture (10)**
37:8,16;38:10,11;
39:2;41:25:42:4,19;
43:3,7
**pictures (17)**
37:14,23;39:15,20,22;
41:1,3,4,7,22;42:3,8,12,
15,22;43:15;103:7
**piece (2)**
48:1;53:3
**PIER (2)**
8:2;16:25
**pillow (1)**
85:16
**pistol (2)**
27:14;31:23
**place (13)**
12:24;30:15;34:14;
51:4;67:25;76:18,19,20;
77:24;81:22;82:8;88:7;
89:24

**placed (6)**
48:16;68:18;85:17,23;
91:12;98:24
**plan (4)**
21:19,22;22:15;34:17
**planned (1)**
46:18
**planning (2)**
44:11;50:1
**plants (1)**
85:1
**plate (1)**
19:20
**playing (1)**
37:12
**please (3)**
40:16;60:18;99:15
**plus (1)**
37:5
**pm (4)**
45:20,21;47:11;
100:12
**pocket (1)**
34:15
**point (25)**
24:10;38:5,8,9,11,12;
44:24;48:13;51:15;
55:25;57:6,10;58:14,14;
60:3;63:22;65:12;68:18,
20;71:18,23;8 1:14;
85:11;86:23;9 1:12
**pointer (1)**
56:9
**Police (37)**
6:1,2,12;7:2:9 2,10;
11:12;12:1,7;13:7,20;
14:8;15:14,22;16:19;
19:2,25;33:7;34:4,11;
38:16;47:22,24;62:5;
72:23;74:22,24;75:11;
76:8;80:4;82:18,20;
83:3,19;86:6;96:14;
98:11
**policy (2)**
78:7,8
**poor (2)**
22:21;81:15
**porch (5)**
49:18;53:16.18,20;
57:5
**portion (1)**
26:5
**portions (5)**
7:23;14:21;77 21;
79:3,7
**posed (1)**
36:20
**posing (1)**
38:22
**position (1)**
53:4
**positioned (1)**
35:6

**positions (2)**
9:21;25:25
**positive (2)**
79:24;89:2
**possession (2)**
69:1,24
**possibility (2)**
24:14;65:4
**possible (1)**
89:12
**possibly (1)**
24:6
**POST (17)**
7:14,20;8:25;10:22,
24;11:6,7;12:4,12,15;
14:5;17:21;18:1,2;37:1;
72:21;81:22
**POST-certified (5)**
72:18;73:17,20,23;
82:12
**posted (1)**
37:8
**potential (3)**
33:21,23;34:2
**pouches (1)**
19:18
**Powell (25)**
4:14;6:20;7:2;9:1,10;
11:11;12:1,7;13:7,20;
14:8;15:14,22;16:19;
22:4;37:6;72:23;74:2,
24;75:10;76:8;80:4;
83:3,18;96:13
**practice (3)**
15:18;36:24;78:9
**practiced (2)**
14:10,20
**practicing (1)**
13:13
**Predominantly (1)**
82:5
**prepare (1)**
47:24
**prepared (5)**
29:14;31:4;43:17;
44:1;96:14
**presence (4)**
24:1,24;25:4,9
**present (5)**
87:2;96:5;98:9,13;
101:7
**presents (1)**
34:10
**preserve (1)**
45:3
**pretty (1)**
81:9
**primary (3)**
15:19;79:11;93:11
**prior (10)**
15:1;18:8;36:22,23;
39:24;40:21;57:15;91:9;
96:21;103:13

**privilege (1)**
66:19
**probably (8)**
9:24;36:14,23;37:5,
12;45:19;81:5;93:20
**problem (2)**
94:15,17
**proceedings (2)**
10:18;103:25
**process (5)**
4:8,19;9:17;71:21;
93:9
**produced (3)**
43:14,15;46:17
**production (1)**
45:22
**proof (1)**
98:18
**propose (1)**
96:18
**protect (2)**
32:13,22
**protection (1)**
19:19
**provide (4)**
19:19;73:19;78:19,23
**provided (5)**
34:17,24;40:20;83:13;
96:21
**provides (2)**
19:16;73:20
**public (2)**
42:10,17
**pulled (1)**
24:4
**pure (1)**
58:6
**purposes (3)**
10:11;32:2;83:20
**pursue (1)**
39:16
**put (25)**
21:23;25:25;44:21;
48:10;49:5,25;51:14,17,
18;52:18;54:14;56:7,8;
59:22,24;60:9,12,15,18,
24;61:5,12,13;86:23;
89:12
**putting (1)**
50:23

**Q**

**qualified (1)**
79:5
**qualify (2)**
10:15;83:19
**quantify (1)**
57:25
**quick (2)**
20:10;21:11
**quickly (1)**
26:1

**quiet (1)**
74:17
**quite (1)**
54:22

**R**

**raid (2)**
67:3;97:19
**ram (1)**
24:23
**rammed (1)**
53:6
**random (1)**
81:8
**range (4)**
14:21;80:22;83:10,12
**rather (3)**
11:25;48:8;81:11
**read (7)**
28:15;31:13;40:16,17;
44:8;62:3;99:16
**readily (2)**
26:15;27:1
**ready (2)**
20:13;35:18
**real (2)**
20:10;21:11
**realize (1)**
66:20
**realizing (1)**
5:1
**really (3)**
38:1;43:20;65:13
**reasons (1)**
46:8
**recall (16)**
18:23,24;42:6;48:25;
57:19;65:5;66:7;67:5,
23;68:22;69:8;85:20;
87:7;101:9.15,16
**recalled (2)**
28:7,9
**receive (2)**
86:13,14
**received (5)**
19:9;86:12;95:4;98:9;
99:12
**recent (1)**
37:14
**Recess (4)**
45:20;47:11;79:18;
96:11
**recognition (1)**
10:15
**recognize (1)**
41:22
**recognized (2)**
11:6;24:14
**recollect (1)**
49:15
**recollection (9)**
13:16;30:11;61:6;

Tricia Wachsmuth v.
City of Powell, et al.

67:10,22;69:16;70:23;
81:1;91:2
**recollections (1)**
29:15
**record (15)**
9:14;10:6,17,20,23;
21:19;28:15;40:17;
43:22;45:1;46:1,11,22;
89:22;97:6
**recorded (2)**
97:5,8
**records (14)**
7:14;9:9,16;11:9,18,
20,22,24,24;18:1;72:21;
73:5;76:5;77:15
**recovered (1)**
26:16
**redact (2)**
100:4,7
**refer (2)**
5:5;49:14
**reference (9)**
26:25;27:5,10,17;
28:15,16;30:21;31:21;
99:11
**references (3)**
29:21;31:24,25
**referring (4)**
27:18;34:12;78:24;
84:2
**reflects (1)**
12:12
**regarding (2)**
18:11;28:14
**regular (5)**
16:15;77:14,19,20;
82:20
**related (2)**
7:21,23
**relates (1)**
13:6
**relatively (1)**
37:14
**remaining (1)**
47:1
**remember (34)**
19:11;21:8;22:11,15;
23:15;24:2,3;25:6,7,7,
18,20;26:16;28:24;
50:12,19;51:1;59:9;
64:4,8;72:3;80:12,15;
90:4,12;91:3;93:17;
95:5;98:7,15,16,23;99:2,
4
**report (18)**
27:4,6;29:3;30:4;31:1,
4;47:17,18,24;61:19,19;
62:6;89:8,17;99:13;
100:3,5,11
**reporting (1)**
10:10
**reports (4)**
26:12;47:22;89:12,15

**represent (3)**
33:16;34:4;50:7
**represents (1)**
35:24
**request (1)**
60:11
**requested (3)**
11:2;40:18;94 14
**required (2)**
10:5;36:5
**requirements (2)**
10:11;46:18
**reservist (1)**
80:10
**residence (13)**
20:12;23:24;43:4;
50:8;56:13;86:22;89:1;
90:5,22;91:1;93:24;
94:21;98:11
**resistance (1)**
59:2
**respect (1)**
53:14
**respond (1)**
15:18
**Response (4)**
8:17;17:6;80:17;
102:17
**responsibility (2)**
9:22;10:2
**responsible (5)**
9:8,9,12;11:11,12:23
**rest (1)**
27:25
**restricted (1)**
100:13
**retrieved (1)**
96:13
**review (1)**
7:14
**reviewed (1)**
76:5
**rifle (7)**
19:20,22;80:2,5,24;
83:2,4,7;94:7
**rifles (5)**
24:22;37:10;38:21;
94:5,6
**right (94)**
11:4,9,23;12:3,6,17;
15:5,5;17:10;18:5;
21:11,21;22:4;33:5;
34:10;35:16,21;36:17;
38:14;39:19;40:3,25;
43:6;45:10,11,1 ;48:12,
18,22;50:20;51:2,9,
17;52:18;54:5,21;55:10,
18,22;56:2,12,23;57:1,7;
58:8,20;59:10;60:14,16;
61:3,9;62:14,19;63:6,19;
64:11;66:16;70:12;71:8;
72:5;73:6;74:19;76:15;
79:5,15;81:7;82:7,11;

83:1;84:2,20;86:13;
87:14;88:21;89:19,23;
90:3,24;91:8;92:10,12;
93:17,21,23;94:12,24;
95:25;96:7;97:1,2,5;
99:2;100:24
**right-hand (1)**
35:23
**road (3)**
91:9,11;92:8
**role (1)**
21:22
**room (30)**
8:11;13:13;20:3;35:6;
54:25;55:6,20,24;56:2;
60:21;61:14;62:11,12;
63:19,23;69:22;70:2;
71:6,8;72:5,6;75:5,6,11;
85:6,8;87:3,10,13;88:2
**rooms (2)**
13:13;62:15
**roster (3)**
14:2;78:3;82:20
**rotate (1)**
9:21
**ROY (2)**
4:1;22:5
**rule (3)**
44:9;45:3;46:17
**rules (1)**
44:16
**rundown (1)**
20:10

---

# S

**safe (2)**
71:23,25
**Safety (4)**
8:16;24:19;35:2;36:20
**Salt (1)**
17:25
**same (9)**
29:10;31:10,20;33:16,
22;69:7;87:12,25;93:10
**sat (2)**
56:22;58:19
**satisfied (1)**
100:14
**save (1)**
22:20
**saw (7)**
22:11;42:7;57:21,22;
58:17;84:15;103:18
**saying (3)**
26:17;46:1;98:16
**scene (4)**
23:21,22,23,25
**scheduling (2)**
9:12;78:14
**Schmidt (1)**
79:10
**school (4)**

5:14,19,20;82:10
**search (11)**
18:18,20,25;19:1;
20:11;36:22;39:3,5;
62:5;93:1;95:18
**searched (3)**
37:4;95:20,21
**second (4)**
12:13;43:25;49:12;
80:17
**seconds (1)**
68:9
**secure (2)**
58:11;100:17
**seem (1)**
89:11
**seems (1)**
25:21
**self-defense (1)**
26:18
**self-executing (3)**
44:4,10;46:17
**sell (2)**
32:23;33:4
**selling (2)**
32:25;33:9
**semi-scheduled (1)**
74:14
**sense (3)**
42:18;43:3,9
**sent (5)**
11:1,15,16;82:10,14
**sentences (1)**
99:14
**separate (1)**
92:3
**September (1)**
8:19
**Sergeant (30)**
4:5;5:5,5;7:8;9:1,7;
12:23;13:1;18:10;20:3,
12;26:4;54:24;55:11,12;
60:2,3;70 24;74:16;
79:10;84:6;86:19;88:23;
90:6;91:25;92:6;101:17,
17;102:2;103:9
**sergeants (8)**
9:4;12:21.73:11,15;
75:1,10;76:7;86:15
**serve (3)**
18:18,20;95:8
**served (2)**
91:16;98:3
**service (7)**
13:22;15:19;18:6,11;
25:12;35:3,25
**set (4)**
14:18;40:5,8;41:1
**seven (1)**
35:22
**several (5)**
20:2;24:4;27:11;
53:19;82:14

**share (1)**
40:7
**Shawn (12)**
20:21,22;37:8,9,11,22,
23;41:22;42:5;43:4,8;
45:6
**Shawn's (4)**
37:16;41:5,16;42:9
**sheet (1)**
48:2
**Sheriff's (5)**
5:23;6:8,14;16:3;
82:23
**shift (5)**
74:17;77:1;78:22;
81:19;101:3
**shoot (1)**
80:22
**shortly (1)**
85:23
**shoulder (1)**
94:10
**show (4)**
8:10;25:11;42:8;48:4
**shower (1)**
85:17
**shown (1)**
55:1
**side (5)**
48:19;88:6,7,16;92:8
**sight (1)**
88:19
**signature (1)**
31:6
**signed (1)**
78:3
**Significant (1)**
7:25
**sign-in (1)**
11:1
**similar (1)**
17:13
**simply (1)**
47:19
**single (1)**
29:23
**sit (1)**
59:6
**Site (4)**
8:16;42:9,12,16
**sites (1)**
37:7
**sitting (7)**
38:15;56:1,20;57:4;
59:8;61:11;88:8
**situation (3)**
35:2;93:13,15
**size (1)**
69:13
**small (3)**
27:13;69:14,22
**smaller (1)**
24:5

**smoke (4)**
85:10,12,19,20
**smoldering (1)**
87:1
**social (1)**
36:24
**sold (1)**
4:13
**somebody (4)**
33:8;34:14;58:18;72:3
**somehow (2)**
38:14;56:6
**someone (6)**
26:17;33:9:59:24;
69:1,5;87:14
**Sometime (2)**
36:22;97:25
**sometimes (4)**
27:13;31:23;73:10,16
**somewhat (1)**
58:24
**somewhere (3)**
56:21;82:10;87:13
**son (1)**
92:14
**sons (1)**
20:20
**Sorry (12)**
6:2,16;15:10;16:7;
29:4;47:20:55:13;65:11;
78:17;92:19;99:17;
101:17
**sound (2)**
38:1;57:1
**speak (2)**
59:4,8
**speaking (1)**
34:12
**speaks (1)**
41:10
**special (2)**
15:20,21
**Specialized (2)**
17:3,4
**specific (5)**
13:16;22:14;45:14;
81:10;99:10
**specifically (14)**
7:21;8:24;13:4,6;
18:24;26:16,18;31:22;
48:12;78:24;83:6;84:2;
95:6;98:7
**speculate (4)**
53:9;58:4;66:11;67:17
**speculation (1)**
58:6
**speed (1)**
73:18
**spent (3)**
73:1,4,17
**spoke (3)**
26:6,9;59:10
**squad (11)**

12:20,23,24;13:3,11,
19,19;14:19;73:9;74:16;
76:19
**squads (1)**
12:20
**SRG (4)**
16:9,10,11,12
**stack (1)**
7:15
**stacked (2)**
48:23;49:18
**stairs (26)**
21:2;62:20,22;63:14,
18,25:64:2,5,18,25;67:7,
20,23,24,25;66:4,9;67:4,
7;68:2,10,12,23 69:1,18;
70:4
**standing (9)**
55:10;56:21;57:23;
60:3;69:11;71:2,6;87:9,
11
**start (8)**
7:2;8:12;15:16,43:16;
46:14;61:14;74 19;82:3
**started (3)**
6:22;7:5;21:3
**stashed (10)**
25:21;26:14,15,17;
27:6;28:18;30:21;31:2,
17,18
**state (1)**
35:4
**stated (1)**
27:11
**statement (11)**
25:19,20;29:19 24;
30:2,21;31:16;32:12,16;
65:8,9
**statements (1)**
60:17
**states (2)**
100:11,13
**statewide (1)**
16:22
**station (4)**
19:2,25;38:16;95:25
**stay (3)**
59:6;60:10;63:19
**step (2)**
36:4;91:18
**still (9)**
24:13;42:15;62:13;
69:23;71:15;87:11;88:8;
90:20,25
**stood (1)**
55:25
**stop (5)**
8:21;24:20;43:13,25;
91:11
**stopped (2)**
91:9;92:8
**strapped (1)**
94:10

**street (1)**
34:15
**structure (1)**
24:18
**stuff (7)**
12:22;37:17;42:11;
76:6;80:21;82:15;85:2
**subject (1)**
10:7
**subpoenaed (1)**
45:4
**sudden (1)**
45:5
**suing (1)**
4:13
**supervisor (1)**
81:20
**supplement (3)**
89:21;96:8,14
**supplied (3)**
11:19,25;78:22
**suppose (1)**
32:11
**sure (22)**
9:20;16:7,21;24:9;
28:25;48:25;59:15;
60:12;61:24;64:8,13;
65:2,5;66:5;67:23;
74:10;75:19;77:19;
86:15;89:23;90:13;98:3
**suspect (1)**
34:18
**Sutton (4)**
5:25;6:3,19,20
**S-u-t-t-o-n (1)**
6:3
**SWAT (18)**
15:13,13,16,23;16:1,4,
20;17:11,12,14,15,16,17,
19,20,24,25;42:20
**SWAT-type (2)**
38:24;75:12
**sweeping (1)**
62:10
**swept (1)**
61:13
**sworn (1)**
4:2
**syllabus (1)**
11:3

**T**

**table (2)**
56:19,20
**Tactical (10)**
8:17;16:25;17:1,6,13;
19:16;37:9,10;38:21,24
**tactics (5)**
8:1;15:21;17:4,4;
75:12
**tail (1)**
63:13

**talk (7)**
19:24;20:5;41:12;
43:14;45 6;49:23;89:10
**talked (8)**
17:21;20:25;21:5,6;
39:9;81:10;82:8;102:1
**talking (6)**
11:24;13:4;21:10;
28:4;66:2;72:22
**teach (1)**
76:6
**team (37)**
8:8,10;12:7;13:7,23;
15:13,13,16,23;16:1,4,
11,12,14,20;17:15,16,
18:22;6:24:22;35:18;
48:4,9,16,23;49:10;51:6,
15,20,23;61:1;62:10;
63:9,10,11;66:8;82:4
**teams (2)**
17:24,24
**techniques (4)**
72:9;75:4,23;78:25
**telephone (1)**
99:11
**telling (2)**
11:20;98:10
**ten (1)**
5:21
**ten-year-old (3)**
23:15;24:2;25:10
**terms (2)**
38:2;93:8
**testified (3)**
4:2;9:7;72:8
**testimony (5)**
10:14;43:1;66:22;
90:1;98:22
**Texas (1)**
5:17
**Theoretically (2)**
19:21,23
**therefore (1)**
38:20
**thinking (1)**
68:8
**third (3)**
27:9;66:16;76:11
**THOMPSON (72)**
22:19;23:9;25:2,14;
26:22;27:21,23;28:2,6,9,
23;30:23;33:10,18,22;
34:6;35:11;36:3;38:3,
25:39:23;40:1,4;41:6,10,
17;42:25;43:22;44:4,7,
13,15,18,20,23;45:1,10,
12;46:8,21;47:3;51:21,
24;58:21;59:14;61:23;
62:25;66:12;69:9,21;
70:22;72:17;73:7;74:12;
75:13;76:1,10;77:18;
78:12;79:1;81:16,24;
83:23;87:20,25;92:16;

93:5;97:23;98:21;100:1;
101:20;102:6
**though (6)**
12:5,16;32:25;36:6;
41:9;57:1
**thought (6)**
24:5;25:5;37:11;38:2;
39:6;47:5
**threat (11)**
33:7,17,21,24;34:2,4,
11;35:2;36:19;38:2,13
**three (6)**
9:4,25;10:2;14:18;
57:20;81:5
**three-year (1)**
15:2
**throughout (2)**
61:16;85:3
**timeframe (4)**
14:25;64:21;80:17;
89:17
**times (4)**
14:24;72:9,19;81:4
**title (1)**
78:1
**today (4)**
9:7;43:24;47:5;100:6
**together (8)**
13:7;14:1,7;15:15;
16:15;19:10;51:6,14
**told (15)**
18:16,17;26:2;35:1;
37:15;39:12;60:9,12;
61:5;62:20;85:13,18;
86:16;90:13,16
**Tom (26)**
20:18;37:11,15,15,22;
38:13;39:9,9,12;40:3;
42:2;44:3;89:24;91:6,
12,13,19;92:12;93:13,
13,14,23;94:7,14,22,24
**tomorrow (4)**
43:16;46:3,12,20
**Tom's (3)**
37:12;39:13;94:23
**tonight (7)**
43:16,18;44:19;45:17,
23;46:4,5
**took (9)**
5:25;12:24;30:14;
68:18;70:16,17;78:13;
92:11;95:25
**top (4)**
22:2;54:12;64:2;68:10
**topic (1)**
12:22
**Torczon (2)**
21:13,18
**tough (1)**
51:4
**toward (2)**
10:15;60:5
**towards (5)**

11:5;50:14;51:13;
60:21;99:15

**town (3)**
5:13;19:5;37:1

**track (1)**
43:6

**train (8)**
12:20;13:21;15:18;
16:15;17:16;70:5;82:14,
15

**trained (12)**
11:2;13:24:14:1;
15:13,15;17:17,19,20;
72:5;9,11;73:24

**trainer (1)**
83:25

**training (86)**
7:14,20,21;8:16,23;
9:9,13,16,20,21;10:1,3,4,
6,9,20,22;11:6,10,11,20,
22,23,25;12:5,7,9,18,24;
13:2,5,6,17;14:18,20;
17:11,13,13;32:15;34:3;
72:12,13,18,22;73:5,8,
10,17,19,20;74:2,3,8,13,
14,15,22;76:5,19,20,25;
77:13,21,24;78:1,14,16,
18,19,21,24;80:12,19,
24;81:11,11,21,22,23;
82:7,9,17;83:8,9,12,19

**trainings (6)**
76:16;78:5;81:8,8,18,
19

**transcription (1)**
30:14

**Tricia (41)**
55:19,22;56:7,8,12;
58:12,15;60:17,24:61:3,
5,11;62:19,22;63:1,20;
64:5,17,23;65:20;66:4;
67:4;68:6,14,16;69:1,6;
70:5,9;71:7,11;84:13;
85:23;86:1;87:2,11,15,
24;90:19,24;101:18

**true (11)**
9:11,13;10:18;29:11,
11;32:25;34:18;42:2;
65:7,9;90:17

**try (3)**
46:5;49:25;56:5

**trying (7)**
21:25;22:20;29:17;
38:23;57:19;59:21;93:7

**turn (4)**
21:11;31:8;47:15;
68:12

**Twenty (1)**
19:7

**two (14)**
5:24;14:5;46:23,25;
66:17;67:6,21,23;79:11;
81:5;86:15;99:14;101:9;
103:19

**two-page (2)**
96:15,19

**type (2)**
83:25,25

**types (1)**
81:10

---

**U**

**uncleared (1)**
101:19

**uncomfortable (2)**
93:12,15

**uncovered (1)**
93:1

**under (5)**
12:20;17:2;44:15,21;
45:3

**underneath (1)**
56:6

**Understood (3)**
4:25;24:8,11

**undocumented (1)**
72:24

**unfortunately (1)**
29:13

**uniform (2)**
19:10,13

**unit (1)**
15:17

**University (2)**
5:11,12

**Unless (1)**
5:1

**unobstructed (1)**
65:22

**up (20)**
14:18;16:12;21:1,9;
24:4;37:7,17,18;42:10;
44:2;48:23;49:18;56:21,
24;58:18;73:18 86:17;
91:17;92:14;101:3

**upkeep (1)**
11:5

**upstairs (6)**
68:19;71:11,18.84:7;
85:4;86:5

**use (8)**
4:20;16:20;28:19;
32:13,21,22;46:13;74:11

**used (4)**
14:22;17:14;25:10;
26:16

**user (1)**
33:8

**using (3)**
13:21;32:24;44:11

**usually (2)**
15:16;82:12

**utilized (1)**
10:10

---

**V**

**valid (1)**
46:8

**vehicle (8)**
24:3,5,6,7,10;95:16,
18,23

**venture (1)**
15:6

**verbal (1)**
46:3

**vest (2)**
19:12,16

**via (1)**
102:21

**video (1)**
4:12

**view (2)**
65:22;68:1

**violation (1)**
99:25

**violence (1)**
8:11

**visited (1)**
20:7

**voiced (1)**
95:3

---

**W**

**Wachsmuth (61)**
13:22;14:10;18:6;
20:12,16,18;23:24;
25:11;26:19;34:18;
36:19;37:8;38:22;42:2,
19,21;45:7;48:3;55:19,
22;56:8;58:12,15;60:17;
64:6,17,24;65:20;66:4;
67:4;68:7,14,16;69:1,6;
70:6,9;84:13;86:22;
87:3,24;88:22;89:1;
90:4,14,16,20,22,25;
91:1,13;92:13,21;95:12;
96:3;97:2,13,19;98:8;
101:18;103:14

**Wachsmuth's (5)**
37:24;89:24;91:6;
93:23;94:8

**wait (1)**
44:20

**waited (1)**
43:24

**walked (2)**
20:2;94:22

**warrant (31)**
13:22;14:10;18:6,11,
18,20;19:1;20:11;21:6,
8;23:3,8;25:11;31:24;
35:3,25;36:22;39:3,5;
91:16;92:15,20;93:1,18,
19,20;95:3,9;98:3;
100:19;103:16

**warrant' (1)**
62:5

**warrants (2)**
18:25;93:8

**way (6)**
8:21;49:8;59:16;
66:23;92:19;98:24

**weaknesses (1)**
13:2

**weapon (3)**
58:15,17.18

**weapons (9)**
15:20,21;35:5,6;
38:24;70:5;94:3,4;95:22

**wear (1)**
19:13

**wearing (1)**
37:9

**websites (1)**
36:25

**week (3)**
17:25;76:18,20

**weren't (1)**
37:13

**WESTBY (89)**
14:12,15;15:9;22:17;
24:25;25:15;26:20,23;
27:19,22;28:21;29:5,22;
30:1,4,7,10,13,24;31:12,
20;33:11,19;34:7;35:12;
36:1;38:4;39:1;40:19;
41:18;42:23;43:12,19;
44:11;45:14,24;46:7,11,
22;49:3,19,24;52:20;
58:4,22;59:12;61:13,23;
66:10,13,23;67:12,16;
69:2,7,19;70:13,20;
71:13,19;72:15,25;73:4;
75:14,24;76:11;77:16;
78:10;79:2,12;81:13,25;
83:21;86:2;87:18,21;
88:4;89:25;92:17;93:3,
10;97:21;98:19,22;
99:17,22;101:21;103:1,
6,22

**what's (2)**
29:9;42:16

**whatsoever (1)**
39:7

**whole (3)**
15:3,4;99:16

**wide (2)**
82:1.6

**wife (2)**
26:19;94:23

**window (6)**
48:19;57:8,9,14,22;
89:17

**windows (1)**
27:16

**withdraw (1)**
22:22

**within (7)**
9:23,24;10:1,13:3;
15:1;36:23;101:4

**Without (3)**
14:2;61:24:62:2

**withstand (1)**
19:21

**WITNESS (68)**
14:14;15:10;26:24;
28:11,24;30:25;31:21;
33:12,23;34:8;35:13;
36:4;38:5;39:2;40:23;
43:2;45:15,25;46:14;
47:6;48:14;52:1,2,23;
53:12;54:19,19;55:9;
56:10;58:6,23;59:15;
64:7;65:21;66:18;67:9,
18;69:8,22;70:23;71:15.
21;72:18;73:8;74:13;
75:7,15;76:2,13;77:19;
78:13;79:3,13,17;82:1;
83:24;86:4;90:23;93:11;
97:24;98:23;101:22;
102:9;103:4

**witnessed (1)**
96:4

**witnesses (1)**
41:12

**witness's (1)**
49:20

**words (3)**
11:4;33:16;53:19

**wore (1)**
19:11

**work (5)**
5:18,25;6:12;13:12;
101:3

**worked (2)**
5:22;14:7

**working (2)**
14:3;85:8

**world (1)**
93:13

**wrote (1)**
34:22

**Wyoming (1)**
37:6

---

**X**

**X's (2)**
53:19;54:16

---

**Y**

**year (5)**
4:11;5:23;6:10,22;
36:23

**years (11)**
5:21,24;6:19;9:23,25;
10:2;29:16;37:5;80:10;
82:5;101:9

**young (2)**

24:23;41:25

 **myspace.com**
*a place for friends.*

WACHSMUTH V. CITY OF
POWELL– CV 10-041J
PLAINTIFF'S EXHIBIT
#_____47_____

## Sean – My Photos



**1 views since 01/2009**

MySpace

10/7/10 6:59 PM



## Sean – My Photos



**1 views since 01/2009**

**myspace.com**
a place for friends.

## Sean – My Photos



1 views since 01/2009

MySpace

10/7/10 7:01 PM



**Sean – My Photos**



**1 views since 01/2009**

| From | Comment |
|------|---------|
|      |         |