# Appendix Eleven

**SUBMITTED BY:**
JEFFREY C. GOSMAN
GOSMAN LAW OFFICE
PO Box 51267
Casper, WY 82601-2481
(307) 265-6715 (fax.)
(307) 265-3082 (ph.)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Tricia Wachsmuth, | ) | Case No. **10  cv  041J** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Powell, and in their individual capacity, | ) | |
| Tim Feathers, Chad Miner, | ) | |
| Mike Chretien, Roy Eckerdt, Dave Brown, | ) | |
| Mike Hall, Brett Lara, Matt McCaslin, | ) | |
| Alan Kent, Matt Danzer, Officer Brilakis, | ) | |
| Lee Blackmore, Cody Bradley, Kirk Chapman | ) | |
| John Does #1 - #4, | ) | |
| | ) | |
| Defendants. | ) | |

*Comes Now*, Sean Wachsmuth, and testifies as follows:

1.    I am over the age of majority, competent to testify and have personal

knowledge of all matters contained herein.

2.    I have a MySpace page which I started in May 7, 2006, at 6:08 p.m.

3.    From time to time, I have posted pictures on my MySpace page.

4.    I have attached all of the pictures I have ever posted to MySpace as *Exhibit*

*One* to this sworn declaration.

5.   These photographs were produced by MySpace.com pursuant to a consent letter for the release of the information and a subpoena set out more fully below.

6.   All of the pictures can still be found on my MySpace page.

7.   I know Sergeant Eckerdt of the Powell Police Department because he and I were involved in Scouting together.

8.   I have learned that Sergeant Eckerdt has stated that he viewed pictures on my MySpace page of my brother Bret Wachsmuth and I posing in tactical gear.

9.   I know that statement to be untrue.

10.  I never posed with my brother Bret in tactical gear, and the photos to which he referred are those of myself and Amy Johnson.

11.  My father was cleaning out his car one day and the gear was lying on the lawn.

12.  Amy and I put on the gear and were joking around.  The photos were the only photographs depicting anyone in tactical gear that were ever posted to my MySpace page.

13.     As further proof of this, I signed a consent form, a copy of which is attached
        hereto as *Exhibit Two* seeking production of all photographs I have ever posted
        to my MySpace page.

14.     I gave my sister-in-law permission to obtain the records from MySpace that
        would show all the pictures I ever posted on the account, and the date the
        pictures were posted.

15.     My sister-in-law subpoenaed the records from MySpace.

16.     A copy of the subpoena with the return of service is attached hereto as *Exhibit
        Three* together with the sworn declaration of Jeff Gosman.

17.     The records produced by MySpace.com consist of the following items:

        a.      One letter directed to the California process server who served the
                subpoena from the legal compliance officer of MySpace.com which
                identifies that my request letter has been honored and that all the records
                requested have been produced. I have attached the letter which is *Exhibit
                Four*.

        b.      Copy of all Photographs ever posted to my account, whether or not
                subsequently deleted, *Exhibit One*.

        c.      Copy of information showing when I started the MySpace page and

basic information about the MySpace page. *Exhibit 5.*

d.     Documentation showing the posting information for every picture I ever placed on my MySpace page. *Exhibit 6*

18.     I have had only one MySpace page, which is confirmed in Exhibit 5 above.

**I declare and certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on Friday, January 7, 2011.**

SEAN WACHSMUTH

EXHIBIT 1













EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

TRICIA WACHSMUTH,
          Plaintiff,

vs.

City of Powell, and in their Individual Capacity,
Tim Feathers, Chad Miner,
Mike Chretien, Roy Eckerdt, Dave Brown,
Mike Hall, Brett Lara, Matt McCaslin,
Alan Kent, Matt Danzer, Officer Brilakis,
Lee Blackmore, Cody Bradley, Kirk Chapman
John Does #1 - #4

          Defendants.

CASE NO. *10 cv 041J*

## CONSENT TO RELEASE INFORMATION

I, Sean Thomas Wachsmuth, being duly sworn, on this December 14, 2010 do hereby state the following:

1.    I have one profile on MySpace.com.

2.    The URL / FriendID is: http://www.myspace.com/76464621.

3.    My sister-in-law, who is the Plaintiff in the above captioned action, is requesting all the pictures that I have posted on my MySpace page as part of a civil action against the City of Powell, Wycming and a number of it's police officers.

4.    I grant my consent and authorize the Plaintiff in the above-captioned action to access, request, rece ve, review, copy and otherwise utilize, as she deems appropriate, the following information from the above profiles:

**Consent to Release MySpace Photographs for Account with
URL/FriendID – http://www.myspace.com/76464621.**
Page 1

a)     the date the account was established,

b)     copies of any and all photographs posted on the account and the dates the photographs were posted.

c)     record of any photographs that have been deleted from the account, together with the dates they were deleted, if available, and copies or remnants of the photos deleted.

d)     A Certificate that states the records produced are in compliance with the subpoena which shall be served contemporaneously with this consent form and are authentic copies of the original materials requested.

5.     This consent is accompanied by a civil subpoena issued out of the Federal Court for the Central District of California.

6.     I hereby authorize MySpace.com to provide to Plaintiff at the address listed below the above-specified information associated with my identified MySpace.com profile/account.  The address where the documents are to be sent is set out in the subpoena which will accompany this consent form.

7.     The following information should be used to verify my identity:
       a)     Email address for account: stwachsmuth@mac.com.
       b)     Password for account: flintlock05.
       c)     Date of birth for account: 07/24/1979.
       d)     Zip Code for account: 82414.

8.     Pursuant to this Consent, I waive any claims against, indemnify and hold harmless MySpace.com, its affiliates, and their respective directors, officers, agents, and employees from and against any claims, damages or expenses relating to or arising from, in whole or in part, the disclosure of such information, records and data.

9.     I have not been promised anything in exchange for providing this consent and

authorization.

In witness whereof, the undersigned makes the above statements under penalty of perjury this Tuesday, December 14, 2010.

Sean Wachsmuth, December 12, 2010



SUBMITTED BY:
JEFFREY C. GOSMAN
**GOSMAN LAW OFFICE**
PO Box 51267
Casper, WY 82601-2481
(307) 265-6715 (**fax.**)
(307) 265-3082 (ph.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Tricia Wachsmuth, | ) | Case No. **10  cv  041J** |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Powell, and in their individual capacity, | ) | |
| Tim Feathers, Chad Miner, | ) | |
| Mike Chretien,Roy Eckerdt, Dave Brown, | ) | |
| Mike Hall, Brett Lara, Matt McCaslin, | ) | |
| Alan Kent, Matt Danzer, Officer Brilakis, | ) | |
| Lee Blackmore, Cody Bradley, Kirk Chapman | ) | |
| John Does #1 - #4, | ) | |
| | ) | |
| Defendants. | ) | |

### UNSWORN DECLARATION OF JEFF GOSMAN

*Comes Now*, Jeff Gosman, and testifies as follows:

1.      I am the attorney for Tricia Wachsmuth in the captioned action.

2.      I over the age of majority, competent to testify and have personal knowledge

of all matters contained herein.

2.    On the 16th of December, 2010, I prepared and issued a subpoena Duces Tecum to MySpace.com requesting all evidence of photographs posted to Sean Wachsmuth's MySpace page.

3.    I received the information concerning the identity of the account from Sean Wachsmuth, and that information is set out in his consent form.

4.    I forwarded the subpoena to Richard Reese in Los Angeles, California for service.

5.    Richard returned the subpoena after serving it. The Return of Service has been filled out by him on the original subpoena, an accurate copy of which is attached

6.    I requested a certificate that would authenticate or verify that the material supplied by MySpace conformed to the request set out in the subpoena.

7.    My process server received a response to the subpoena enclosing a disk, a copy of which is submitted with this affidavit, containing three files. One was an image file containing six photographs, which are the photographs set out in Exhibit One to the Sean Wachsmuth declaration, one excel document showing information about Sean Wachsmuth's MySpace account, Exhibit Five to that

declaration, and one excel document showing the date and time each of the pictures were posted on the MySpace account, Exhibit Six to the Sean Wachsmuth declaration. The excel document on the disk, which is attached, contains a hyperlink next to each data entry showing the date and time each photograph was posted that links it directly to the photos.

8.  A letter, dated December 20, 2010, from Victor Maciel, LegalCompliance Officer for MySpace.com accompanied the materials. That letter has been attached as Exhibit Four to the Sean Wachsmuth deposition. It was addressed to Richard Reese, whom I appointed to serve the subpoena in Los Angeles, California.

**I declare and certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on Monday, January 10, 2011.**

JEFF GOSMAN



CD attached to original
pleading & Appendix II

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

TRICIA WACHSMUTH,

   Plaintiff,

vs.

City of Powell, and in their Individual Capacity,
Tim Feathers, Chad Miner,
Mike Chretien, Roy Eckerdt, Dave Brown,
Mike Hall, Brett Lara, Matt McCaslin,
Alan Kent, Matt Danzer, Officer Brilakis,
Lee Blackmore, Cody Bradley, Kirk Chapman
John Does #1 - #4

   Defendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING

CASE No. **10 CV 041J**

## SUBPOENA TO PRODUCE DOCUMENTS

TO: MySpace
  C/O Registered Agent
  2121 Avenue of the Stars
  Los Angeles, CA 90067

☐ YOU ARE COMMANDED to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

### SEE ATTACHMENT ONE.

PLACE OF PRODUCTION

Richard Reese
1333 Meadowbrook Ave.
Los Angeles, California 90019

DATE AND TIME:

December 30, 2010
10:00 am to Noon
In the alternative the materials may be mailed
to the address at 1333 Meadowbrook, Los
Angeles, 90019.

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, managing agents or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

12/16/10

ISSUING OFFICER'S SIGNATURE AND TITLE (ATTORNEY FOR PLAINTIFF)          DATE

ISSUING OFFICE'S NAME, ADDRESS AND PHONE NUMBER
Jeffrey C. Gosman
GOSMAN LAW OFFICE
125 West Second Street
P.O. Box 51267
Casper, WY 82601
(307) 265-3082
*jeffg@gosmanlawoffices.com*

## PROOF OF SERVICE

PATRICK T. GILLHAM                12/17/2010          2121 AVE. OF THE STARS
                                                       Los ANGELES, CA. 90067
SERVED                           DATE                 PLACE

PATRICK GILLHAM          HAND DELIVERED               SERVED ON
(PRINT NAME)             MANNER OF SERVICE

RICHARD L. REESE
SERVED BY (PRINT NAME)                    TITLE

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

12/17/2010
Date of Execution                          Signature of Server

                                           Address of Server.
                                           1332 MEADOWBROOK AVE
                                           LOS ANGELES, CA. 90019

Rule 45 (c), (d)  Federal Rules of Civil Procedure:
(c)  PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1)       A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee

(2)(A)     A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of procuction or inspection unless commanded to appear for deposition, hearing or trial.
(B)       Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded

(3)(A)     On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i)       fails to allow reasonable time for compliance;
(ii)      requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii)     requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)     subjects a person to undue burden.

(B)       If a subpoena
(i)       requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)      requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the experts' study made not at the request of any party, or
(iii)     requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial,
the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA

(1)    A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2)    When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# ATTACHMENT ONE

The items to be produced are as follows:

1. The principal document showing the date the below referenced account was established;
2. copies of any and all photographs posted on the below referenced account and the dates the photographs were posted;
3. Copies of any photographs or remnants of photographs that have been deleted from the account, together with the dates they were deleted.
4. A certificate complying with Rule 902 of the Federal Rules of Evidence certifying the authenticity of the records produced and their completeness.

The Account for which the above items are to be produced is as follows:

1. The URL / FriendID is: http://www.myspace.com/76464621.
2. The following information should be used to verify the identity of the account holder:
   i. Email address for account: stwachsmuth@mac.com.
   ii. Password for account: flintlock05.
   iii. Date of birth for account: 07/24/1979.
   iv. Zip Code for account: 82414.

EXHIBIT 4

 **myspace**.

December 20, 2010

Via UPS

Richard Reese
1333 Meadowbrook Avenue
Los Angeles, CA 90019

Re: MySpace.com consent letter results

Dear Mr. Reese:

Enclosed are the results to the consent letter you sent to MySpace for Friend ID 76464621. I have included the subscriber information, images, and IP Report.

All time stamps are Pacific Standard or Pacific Daylight Time, depending on the date of login. MySpace allows users to login for a period of one year from a single IP address. If you see account activity that does not exactly match a recorded IP address, that activity is associated with IP address recorded prior to the activity date. *Please note that for log-in dates prior to May 2, 2008, complete IP information may not be available. We have provided any and all available IP information on this report.*

If you requested more than one set of information (such as IP Logs AND Subscriber Information), please look at the bottom of the Excel spreadsheet for the appropriately labeled tabs. Each segment of information is in its own Excel tab.

Please let me know if you have any questions.

Thank you,

V. M.

Victor Maciel
Legal Compliance Officer
MySpace.com
888-309-1314
Fax: 310-356-3485



# Subscriber Report for User # 76464621

**User # :**                          76464621
**First Name :**
**Last Name :**                       Wachsmuth
**Country :**                         US
**City :**                            Cody
**Postal Code :**                     82414
**Region :**                          WYOMING
**Email :**                           stwachsmuth@mac.com
**Vanity Url :**                      76464621
**Sign up IP :**                      209.181.18.177
**Sign up Date :**                    2006-05-07 06:08:00 PM
**Delete Date :**

EXHIBIT 6

# Pictures Report for User # 76464621

**User ID :**               76464621
**Image ID :**              1049226
**Uploaded :**              2006-06-09 08:34:25 PM
**IP :**
**Image State :**           Viewable
**Title :**
Image.jpg

**User ID :**               76464621
**Image ID :**              1049215
**Uploaded :**              2006-06-09 08:33:51 PM
**IP :**
**Image State :**           Viewable
**Title :**
Image.jpg

**User ID :**               76464621
**Image ID :**              1049208
**Uploaded :**              2006-06-09 08:33:27 PM
**IP :**
**Image State :**           Viewable
**Title :**
Image.jpg

**User ID :**               76464621
**Image ID :**              1049199
**Uploaded :**              2006-06-09 08:32:55 PM
**IP :**
**Image State :**           Viewable
**Title :**
Image.jpg

**User ID :**               76464621
**Image ID :**              1023158
**Uploaded :**              2006-06-06 09:24:34 PM
**IP :**
**Image State :**           Viewable
**Title :**
Image.jpg

**User ID :**               76464621
**Image ID :**              249756
**Uploaded :**              2006-05-07 06:17:41 PM
**IP :**
**Image State :**           Viewable
**Title :**
Image.jpg

# Appendix Twelve

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Tom Wachsmuth*
*November 24, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 11-24-10 Tom Wachsmuth_SCOPED.txt

Min-U-Script® with Word Index

Tricia Wachsmuth v.
City of Powell, et al.

Tom Wachsmuth
November 24, 2010

---

```
 1           IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF WYOMING

 3   ------------------------------------------------------

 4   TRICIA WACHSMUTH,              )
                                    )
 5           Plaintiff,            )
                                    )
 6       vs.                       )   NO. 10-CV-041J
                                    )
 7                                  )
     CITY OF POWELL, AND IN THEIR   )
 8   INDIVIDUAL CAPACITY, TIM       )
     FEATHERS, CHAD MINER, MIKE     )
 9   CHRETIEN, ROY ECKERDT, DAVE    )
     BROWN, MIKE HALL, BRETT LARA   )
10   MATT MCCASLIN, ALAN KENT, MATT )
     DANZER, OFFICER BRILAKIS, LEE  )
11   BLACKMORE, CODY BRADLEY, KIRK  )
     CHAPMAN, JOHN DOES #1-#4,      )
12                                  )
             Defendants.           )
13

14          DEPOSITION OF TOM WACHSMUTH
          10:53 a.m., Wednesday, November 24, 2010
15

16

17

18          Pursuant to notice, the deposition of TOM

19   WACHSMUTH was taken in behalf of Defendants in

20   accordance with the applicable Federal Rules of Civil

21   Procedure at 270 North Clark, Powell, Wyoming, before

22   Vonni R. Bray, Registered Professional Reporter and

23   Notary Public of the State of Montana.

24

25
```

```
 1                 INDEX TO WITNESSES

 2                                            PAGE

 3   TOM WACHSMUTH

 4       Direct Examination by Mr. Thompson .............4
         Cross-Examination by Ms. Westby ...............55
 5       Cross-Examination by Mr. Gosman ...............57
         Signature Page ................................60
 6       Reporter's Certificate ........................61

 7

 8

 9                      EXHIBITS

10   EXHIBIT          DESCRIPTION              PAGE

11    21       PPD Supplement 3 by Dave Brown ..........44

12    47       Photographs ............................35

13    64       Photographs ............................33

14

15

16

17

18

19

20

21

22

23

24

25
```

---

```
 1                  APPEARANCES

 2   FOR PLAINTIFF:

 3              Mr. Jeffrey C. Gosman
                Gosman Law Office
 4              125 W 2nd Street
                P.O. Box 51267
 5              Casper, WY 82601-2481
                Telephone: (307)265-3082 - Fax: (307)265-6715
 6              E-mail: jeff@gosmanlawoffices.com

 7

 8   FOR INDIVIDUAL DEFENDANTS:

 9              Ms. Misha Westby
                Senior Assistant Attorney General
10              2424 Pioneer Avenue, 2nd Floor
                Cheyenne, WY 82002
11              Telephone: (307)777-6477 Fax: (307)777-8920
                E-mail: mwestb@state.wy.us

12

13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:
14

15              Mr. Tom Thompson
                MacPerson, Kelly & Thompson
16              616 West Buffalo
                P.O. Box 999
17              Rawlins, WY 82301-0999
                Telephone: (307)324-2713 - Fax: (307)324-7348
18              E-mail: tthompson@wyomingattorneys.net

19

20   Also Present:  Tim Feathers

21

22

23

24

25
```

Direct Examination by Mr. Thompson

1    　　　　TOM WACHSMUTH,

2  having been first duly sworn, testified as follows:

3    　　　　DIRECT EXAMINATION

4  BY MR. THOMPSON:

5    Q.  Sir, would you please state your full name

6  for the record.

7    A.  Sure, I'm Thomas Everett Wachsmuth.

8    Q.  And how would you like to be referred to

9  through the deposition? Mr. Wachsmuth? Tom?

10   A.  Tom is fine.

11   Q.  Very good. I didn't introduce myself prior

12  to the deposition starting, but my name is Tom

13  Thompson. I represent the City of Powell and all those

14  officers who have been named in their official

15  capacity.

16   　　　And you may also have some questions today

17  from Misha Westby, who is with the Attorney General's

18  Office and represents those officers who have been

19  named in their individual capacity.

20   　　　I want to go ahead and first ask you, have

21  you ever been deposed before?

22   A.  Yes.

23   Q.  How many different times?

24   A.  A couple of times.

25   Q.  Has it been some time or?

---

Case 1:10-cv-00041-ABJ   Document 65-9   Filed 01/10/11   Page 35 of 59
Tricia Wachsmuth v.
City of Powell, et al.

Tom Wachsmuth
November 24, 2010

1    A.  It's been a long time.
2    Q.  All right.  Let me just go through some of
3    the basic ground rules so that we're both on the same
4    sheet of music.  And if you have any questions, stop me
5    and ask me.
6        The purpose of your deposition today is to
7    get your testimony under oath.  And you understand
8    that?
9    A.  Yes, I do.
10   Q.  And your testimony can be used for
11   impeachment purposes at the trial in this matter, which
12   is set for February 14th, and you understand that?
13   A.  Yes.
14   Q.  And during the deposition as I ask you
15   questions, if you provide me an answer, I'm going to
16   assume that you understood my question; is that a fair
17   assumption?
18   A.  All right.
19   Q.  Is that a fair assumption?
20   A.  Well, if I don't understand your question,
21   I'll certainly ask you to clarify it.
22   Q.  Very good.  So if you answer, I'm going to
23   assume that you understood the question.
24   A.  Okay.
25   Q.  Is that fair?

1    A.  Yeah.  If that's what you want to assume,
2    sure.
3    Q.  Well --
4    A.  I just don't understand where you're going
5    here.
6    Q.  If you don't understand the question, I want
7    you to ask me to repeat it and to let me know that you
8    don't understand it, okay?
9    A.  I will do that.
10   Q.  Because my assumption is if I ask you a
11   question and you provide me an answer and you don't
12   voice an objection as to the question, I'm going to
13   assume that you understood it.
14   A.  Okay.
15   Q.  All right.  If you need a break at any time,
16   you let me know.  This isn't an endurance contest.
17   We'll take a break.  And as long there's not a question
18   pending, all right?
19   A.  All right.
20   Q.  Are you represented by counsel today?
21   A.  Mr. Gosman.
22   Q.  Mr. Gosman is your attorney?
23   A.  He's a family-type attorney at this point I
24   know is what's going on, yes.
25   Q.  Is he your attorney?

1        THE WITNESS:  Jeff, do you want to answer?
2    Are you my attorney?
3        MR. GOSMAN:  Yes, I am.  I'm representing
4    you.
5        THE WITNESS:  Yes, he's representing me.
6    BY MR. THOMPSON:
7    Q.  And when did you retain Mr. Gosman to
8    represent you in this matter?
9    A.  I don't know a date.  I know that back
10   sometime ago Tricia had contact with Mr. Gosman, asked
11   me to go with when she met with Mr. Gosman, and we had
12   conversation at that time.
13       And just -- my part of the conversation was
14   basically saying, you know, it would appear that our
15   family could use some help throughout this thing.  And
16   that would be when he would have become an attorney.
17   Q.  And so you took part in those initial
18   meetings with Mr. Gosman prior to the filing of this
19   lawsuit?
20   A.  I took place in -- I took -- I was there for
21   at least one or two.
22   Q.  Prior to the filing of this lawsuit?
23   A.  Yes.
24   Q.  And I don't want to know about the substance
25   of any of those conversations, but did you pay to

1    retain Mr. Gosman?
2    A.  No, I did not.
3    Q.  Sir, what is your current address?
4    A.  524 Road 7, Powell, Wyoming.
5    Q.  And what is your current age?
6    A.  Fifty-four.
7    Q.  And what is your occupation?
8    A.  I'm a special agent with the Wyoming Division
9    of Criminal Investigation.
10   Q.  How long have you been employed in law
11   enforcement?
12   A.  Oh, 34 years.
13   Q.  And would you, if you could, take me through
14   and summarize your employment in law enforcement for
15   the past 34 years.
16   A.  I started in 1976 with the Roseau County
17   Minnesota Sheriff's Office.  I went from there to a
18   short time with the Brainerd Minnesota Police
19   Department, about a year or less.  And then I took a
20   chief's job with the town of Greenbush in Minnesota.
21       From there, I went to the Kanabec County
22   Sheriff's Office in Minnesota.  And then from there to
23   Wyoming, to the DCI.
24   Q.  Did you work -- at any time during your law
25   enforcement career, did you work for Minnesota DCI or

Case 1:10-cv-00041-ABJ   Document 65-9   Filed 01/10/11   Page 36 of 59
Tricia Wachsmuth v.                                                        Tom Wachsmuth
City of Powell, et al.                                                   November 24, 2010

TOM WACHSMUTH - November 24, 2010                                  Page 9
Direct Examination by Mr. Thompson

1  an agency similar to Wyoming's DCI?
2      A.  Work for them?
3      Q.  Yes.
4      A.  No, I did not.
5      Q.  Did you work with them?
6      A.  Yes.
7      Q.  Did you work in a capacity as an agent or
8  officer assigned to a drug task force in Minnesota?
9      A.  Yes.
10     Q.  And tell me about that.
11     A.  I was assigned to the East Central Minnesota
12  drug task force.
13     Q.  Is that in Kanabec County? Am I saying that
14  right?
15     A.  Well, it covers -- it covered five counties,
16  Kanabec.
17     Q.  Kanabec.
18     A.  Pine, Isanti, Mille Lacs and Aitkin counties.
19     Q.  What were your duties working with that
20  agency in Minnesota?
21     A.  Well, it really wasn't an agency, it was a
22  multi-jurisdictional task force.
23     Q.  Okay.
24     A.  And my duties were to investigate crime and
25  specifically when working with and for the task force,

TOM WACHSMUTH - November 24, 2010                                 Page 10
Direct Examination by Mr. Thompson

1  narcotics, drug crimes.
2      Q.  Did you have a special training in drug
3  interdiction?
4      A.  Drug interdiction, as in traffic stop drug
5  interdictions?
6      Q.  Traffic stops, drug related crimes.
7      A.  Yes.
8      Q.  And when did you move to Wyoming?
9      A.  I think it was 2004.
10     Q.  And during the time that you've been in
11  Wyoming, you've been gainfully employed in law
12  enforcement, correct?
13     A.  Yes.
14     Q.  And that employment has been with the Wyoming
15  Department of Criminal Investigations?
16     A.  The Wyoming Division of Criminal
17  Investigation.
18     Q.  As a -- as what?
19     A.  As a special agent.
20     Q.  Okay. Were you aware of the fact that you've
21  been listed as a witness in this case?
22     A.  I assumed I was. You know, I don't know that
23  I have ever seen anything formally that I was listed as
24  a witness.
25     Q.  Do you know what testimony you're going to

TOM WACHSMUTH - November 24, 2010                                 Page 11
Direct Examination by Mr. Thompson

1  provide at trial in this matter?
2      A.  Not specifically, no.
3      Q.  Okay. You've not been retained as an expert
4  witness, correct?
5      A.  No, I have not.
6      Q.  As a matter of fact, isn't there a policy
7  with Wyoming DCI that prohibits your testimony as an
8  expert witness in cases?
9      A.  I don't know if there is.
10     Q.  Okay. Do you intend to provide any expert
11  testimony in this case?
12     A.  No, if I'm not an expert witness. I'm
13  assuming I won't.
14     Q.  That's my assumption. But I just want to
15  make sure -- this is my one chance to talk to you --
16  you don't intend to provide any expert testimony in
17  this case?
18     A.  No.
19     Q.  And, therefore, I assume that you're not
20  going to provide any testimony in regards to the
21  execution of the search warrant?
22     A.  I wasn't there during the execution of the
23  search warrant.
24     Q.  So can I understand that to be a yes, you're
25  not going to provide any testimony in regards to the

TOM WACHSMUTH - November 24, 2010                                 Page 12
Direct Examination by Mr. Thompson

1  execution of the search warrant?
2      A.  I don't know --
3          MR. GOSMAN: That's a pretty broad question.
4      Objection to form.
5      BY MR. THOMPSON:
6      Q.  Go ahead.
7      A.  I don't know if I will or not.
8      Q.  What testimony could you provide in regards
9  to the execution of the search warrant other than
10  expert testimony?
11     A.  I'm not sure.
12     Q.  Do you have any knowledge of the execution of
13  the search warrant?
14     A.  In which way?
15     Q.  How the search warrant was executed.
16     A.  I have some knowledge of that, yes.
17     Q.  Through whom?
18     A.  Through police officers, through police
19  reports, things like that.
20     Q.  What police officers do you have knowledge
21  from?
22     A.  Oh, Officer -- Sergeant Chretien,
23  Officer Miner, and Officer Mike Hall.
24     Q.  Any other officers who you have obtained
25  knowledge from in regards to the execution of the

Case 1:10-cv-00041-ABJ   Document 65-9   Filed 01/10/11   Page 37 of 59
Tricia Wachsmuth v.
City of Powell, et al.
Tom Wachsmuth
November 24, 2010

TOM WACHSMUTH - November 24, 2010                    Page 13
Direct Examination by Mr. Thompson

1  search warrant?
2  A. Yes. Lieutenant Dave Patterson.
3  Q. For each one of those four individuals, I
4  want you to take me through and tell me all of the
5  information that you've obtained, and let's start with
6  Sergeant Chretien.
7  A. Okay. My initial conversations with
8  Sergeant Chretien were on the evening of -- I believe
9  it was February 24th, 2009. And he called me on my
10  work cell phone, I was at home and asked me if my son,
11  Bret, was at the house. And I told him that he was.
12       Chretien told me that they were -- they were
13  doing -- or executing a search warrant at his house and
14  they wanted to come out and talk to him. And I said,
15  come on out.
16       After hanging up the phone, a few minutes
17  later, I received another phone call from Chretien.
18  Chretien said that they were at my house, which I knew
19  they were. You know, I could see them. And he asked
20  me to send Bret outside.
21       And I just -- I said, Well, Mike, why don't
22  you guys just come on into the house.
23       And he hung up the phone and -- well, they
24  came to the door and I waved them in and they walked
25  into the house.

TOM WACHSMUTH - November 24, 2010                    Page 14
Direct Examination by Mr. Thompson

1       There were three people that walked into the
2  house. It was Chretien -- I'm just stuck on a name
3  here. The other sergeant.
4       MR. GOSMAN: Eckerdt.
5       THE WITNESS: Sergeant Eckerdt and one other
6  officer. I believe it was Danzer, but I'm not sure
7  about the third one. And we had some small talk,
8  just -- Bret was sitting on the couch in the living
9  room. I was sitting on the couch in the living room.
10       And it was Eckerdt, looked over at Bret and
11  said, "Is that Bret?" And Bret said, "Yes." And a
12  short time later, Eckerdt asked Bret if he'd come with
13  them.
14       Bret said, "Yes," got up off the couch. They
15  did a pat-down frisk. Eckerdt did a pat-down frisk on
16  Bret and then handcuffed him, and Eckerdt and the other
17  officer left.
18       Sergeant Chretien stayed at my house in the
19  living room and discussed and told us, my wife and I,
20  what was going on. Mr. Chretien said that they had --
21  the Powell Police Department had done, and were in the
22  process of executing, a search warrant at Bret's house,
23  Bret and Tricia's house. He said that they were doing
24  it because there were marijuana plants in the house.
25       He -- I asked him just basically what other

TOM WACHSMUTH - November 24, 2010                    Page 15
Direct Examination by Mr. Thompson

1  circumstances -- what's going on?
2       And Chretien -- after the other two left, it
3  was Donna and I and Chretien. And he said that they
4  had information that Bret had some marijuana plants in
5  the house, and they did a search warrant.
6       He went on to say that, I tried to convince
7  them, and it was my idea that we should have called you
8  and had you bring us into the house, but I was told no.
9  And I was ordered with the task of putting together an
10  entry plan.
11       He said, and you can put two and two together
12  who has the authority over me to tell me that we
13  couldn't call you, and we'd have to do an entry plan --
14  an entry into the house.
15       He apologized for things that had happened.
16  He didn't specifically say what they were. He just
17  apologized. He said, I'm sorry that things went this
18  way. And I had no idea what he meant by that.
19  BY MR. THOMPSON:
20  Q. Could have meant just the fact that your son
21  was being taken into custody?
22       MR. GOSMAN: Object to form.
23       THE WITNESS: I don't know what he said, what
24  he meant by that.
25

TOM WACHSMUTH - November 24, 2010                    Page 16
Direct Examination by Mr. Thompson

1  BY MR. THOMPSON:
2  Q. Okay. Fair enough.
3  A. He said that -- again, he went on to say that
4  when I was told no, that we couldn't call you and have
5  you come in and get us into the house, he said, then I
6  made the decision then that if I was going to be
7  charged with doing and assembling an entry team, that I
8  was going to do it right.
9       And, again, I -- you know, I don't know what
10  it was in his head when he said he was going to do it
11  right. But those were his words.
12       The next conversation I had -- would you like
13  me to go into the next conversation I had with
14  Chretien? That's basically the conversation with
15  Chretien at the house.
16  Q. Obviously, the Powell Police Department did
17  not call you prior to the execution of the search
18  warrant, correct?
19  A. That's correct.
20  Q. Do you believe they should have called you?
21  A. I don't know.
22  Q. Do you have an opinion as to whether or not
23  they should have called you?
24  A. You know what, it isn't my position to -- and
25  wouldn't have been my position to interfere. They made

Case 1:10-cv-00041-ABJ   Document 65-9   Filed 01/10/11   Page 38 of 59
Tricia Wachsmuth v.                                                           Tom Wachsmuth
City of Powell, et al.                                                        November 24, 2010

1  decisions that they made, whatever those decisions
2  were. And it is what it is.
3      Q. Okay. And what I want to make sure is that
4  I'm not going to get to trial and for the first time
5  you're going to -- by questioning of your attorney,
6  he's going to elicit an opinion from you that somehow
7  you're critical of the fact that they didn't call. So
8  I want to make sure I understand this area completely.
9          You don't have an opinion and you are not
10  critical of the fact that based upon the totality of
11  the circumstances that they are aware of that they did
12  not make the call?
13     A. At that time I had no idea what they were
14  aware of or anything. I didn't know.
15     Q. Okay. But now you do.
16     A. I do.
17     Q. And so I'm asking you whether or not you have
18  an opinion now.
19     A. Yeah, I do have an opinion about that.
20     Q. Okay. What is that opinion?
21     A. My opinion would have been that, yeah -- you
22  know, to do what -- I think a phone call to me would
23  have been a reasonable thing to do.
24     Q. Okay.
25     A. I can tell you that through my experience in

1  doing hundreds of search warrants over the years, we
2  have done that on several occasions. And I think
3  safety -- I think things like that really need to be
4  talked about and discussed and go the safest route and
5  the easiest route.
6          So, yeah, I think -- I think that a phone
7  call to me would have been a good idea.
8      Q. Are you aware of the fact now that that plan
9  was at least considered?
10     A. Well, I was aware of that when Chretien told
11  me that he tried to convince people that that's what
12  should have been done.
13     Q. Who is Steve Herman?
14     A. Steve Herman is a DCI agent.
15     Q. Is he your supervisor?
16     A. Yes.
17     Q. Is he your supervisor - or was he your
18  supervisor at the time this incident occurred?
19     A. Yes.
20     Q. Were you aware that a phone call was placed
21  to Steve Herman to determine whether or not you should
22  be called and the search warrant discussed?
23     A. No.
24     Q. When an individual is called by a law
25  enforcement agency and told of the fact that a search

1  warrant is going to be executed upon a family member,
2  is there a risk there that the family member who is
3  called can then call the residents of the house where
4  the search warrant is going to be executed?
5      A. Well, I would suppose it would depend on the
6  circumstances.
7      Q. Is there potentially a risk?
8      A. Depending on the circumstances there could be
9  a risk.
10     Q. Is there a possibility?
11         MR. GOSMAN: Object to the form of the
12  question.
13  BY MR. THOMPSON:
14     Q. Is there a possibility?
15     A. Yes.
16     Q. Okay.
17     A. There's certainly a possibility.
18     Q. And if the search warrant is executed upon
19  under those circumstances, where the individual, the
20  relative is called and the evidence is not found, the
21  subject matter of the search warrant is not found, is
22  there a possibility that the perception is that the
23  individual who was called tipped them off and the
24  evidence was thrown away?
25         MR. GOSMAN: Object --

1          THE WITNESS: I truly don't understand where
2  you're going.
3  BY MR. THOMPSON:
4      Q. You don't understand that?
5      A. I don't understand where you're going with
6  your statement or comment.
7      Q. On this case, Mr. Wachsmuth, Tom, you're a
8  DCI agent, correct?
9      A. Yes.
10     Q. The Powell Police Department could have
11  called you. And if they went to the house and executed
12  the search warrant and did not find any marijuana, at
13  least there's the possibility that the public
14  perception was that they were playing favorites. Would
15  you agree?
16     A. You know, that's such a hypothetical. Is
17  anything possible? I suppose that is a possibility,
18  yes.
19     Q. Well, let's talk realistic scenarios that
20  you've been involved in.
21         Why don't you give me cases where you've
22  called a relative and discussed with them prior to the
23  execution of the search warrant that this was going to
24  occur.
25     A. Okay. You know, it's difficult to give a

TOM WACHSMUTH - November 24, 2010                     Page 21
Direct Examination by Mr. Thompson

1  specific because throughout -- there's been so many
2  times. You know, I can tell you that --
3     Q. And let's narrow it so it might help you,
4  because I thought your testimony was that there's been
5  hundreds of times where this has occurred?
6     A. I said I've done hundreds of search warrants
7  or been involved in hundreds of search warrants.
8     Q. How many search warrants have you been
9  involved in where you called the relative?
10    A. Oh, boy, there's been several. And, again,
11 it depends on the circumstances and it depends on how
12 you do it.
13       You know, we have done everything from
14 pulling up to a yard and opening up our hood of the car
15 like we were broken down to get the person outside in
16 order to make it safer.
17       We've done dynamic entries, we've done
18 walk-through type entries, slow entries, slow and
19 deliberate entries.
20       You know, in -- on those occasions when we
21 would call, whether it's a family member or a friend or
22 whatever it may be, the way that we did that would be
23 to ask that person to come in, talk to us, we needed to
24 talk to them. And then ask them -- tell them the
25 circumstances and ask them if they would be willing to

TOM WACHSMUTH - November 24, 2010                     Page 22
Direct Examination by Mr. Thompson

1  go to the house with us with them, or do a ruse, so to
2  speak, and ask the person to meet them somewhere.
3       If we felt that the danger was to a point
4  where we really didn't want to go into that house
5  without a call out or things like that, and we felt
6  there was a reasonable way to get the person out of the
7  house, we did that.
8       And, specifically -- I can't give you an
9  absolute specific, but we have, our team did that on
10 more than one occasion.
11    Q. Okay. Can you give me reference to a case
12 number or specific incident when this occurred?
13    A. I can't give you a case number.
14    Q. Okay.
15    A. I certainly can't.
16    Q. Did this happen with Wyoming DCI?
17    A. No, it did not. Not that I've been involved
18 in, no.
19    Q. That's never been done while you've been
20 employed with Wyoming DCI?
21       MR. GOSMAN: Object to the form.
22       THE WITNESS: I don't know that -- oh, let me
23 think about that.
24       I can't remember any circumstances that I've
25 been involved with that that was done with DCI. We

TOM WACHSMUTH - November 24, 2010                     Page 23
Direct Examination by Mr. Thompson

1  don't -- with what we do, if there's an entry team or
2  that type of an entry that needs to be done, typically
3  we don't do those. We go in afterwards and process or
4  whatever we're going to do.
5  BY MR. THOMPSON:
6     Q. Well, would you agree with me that, based
7  upon your knowledge, this was not -- this plan was not
8  to execute a dynamic entry, this plan was to execute a
9  knock-and-announce search warrant?
10    A. I would not agree with that.
11    Q. Okay. And what's the basis for that?
12    A. The reports that I've read and things like
13 that. I guess that when the plan, as I understood it,
14 as I read reports, was to knock on the door and
15 immediately ram the door, that is not a
16 knock-and-announce search warrant, in my judgment.
17    Q. Okay. The officers have explained, both
18 Sergeant Chretien as well as Chief Feathers, that that
19 exact discussion took place, on the word immediately.
20 And that Sergeant Chretien understood that he was to
21 knock and wait a reasonable amount of time before
22 hitting the door.
23       MR. GOSMAN: Object to the form of that
24 question.
25

TOM WACHSMUTH - November 24, 2010                     Page 24
Direct Examination by Mr. Thompson

1  BY MR. THOMPSON:
2     Q. Based upon that testimony, do you have any
3  critical opinion of the fact that it was a
4  knock-and-announce, not a dynamic entry?
5     A. Well, I think you're mixing up some things
6  here. First of all, when it comes to entries and what
7  a dynamic entry is versus a knock-and-announce and
8  things like that, my knowledge is that on a
9  knock-and-announce entry, you knock on the door. You
10 wait 10 to 15 seconds.
11       As a matter of fact, you should be counting
12 out loud, as officers, 10 to 15 seconds. And then if
13 the door isn't answered, then you take the steps to
14 gain entry into the house or whatever building or
15 whatever you're going into.
16       The word immediately doesn't say reasonable
17 time. It doesn't say ten to 15 seconds. It says
18 without delay. Immediately is without delay. And
19 it's -- it is what it is.
20    Q. Okay. That's your interpretation of the word
21 immediately?
22    A. That's exactly my interpretation of the word
23 immediately.
24    Q. Can you point me to a standard or to a task
25 manual which sets forth that 10 to 15-second officer

TOM WACHSMUTH - November 24, 2010                    Page 25
Direct Examination by Mr. Thompson

1   count rule?
2       A.  Well, I will tell you that that is the rule
3   that I have been trained on.  That is what we did.
4   That's what we were advised to do by attorneys,
5   prosecutors, when we were serving knock-and-announce
6   warrants.
7       Q.  Who is we?
8       A.  We -- my entry team, the entry team I was a
9   part of in Minnesota.
10      Q.  How about -- is that the rule of the Wyoming
11  DCI, that you wait 10 to 15 seconds?
12      A.  The rule is that you wait a reasonable amount
13  of time.  And the reasonable amount of time is kind of
14  a general thing of 10 to 15 seconds.
15      Q.  Would you agree that it's based upon the
16  totality of the circumstances as to whether or not
17  that's 10 or 15 or something less?
18          MR. GOSMAN:  Object to the form of that
19  question.
20          THE WITNESS:  Well, I would -- as officers
21  executing a search warrant, we have the obligation when
22  we are going to execute a search warrant to assess the
23  immediate situation and reassess.
24          There have been times that no-knock warrants
25  turn into knock-and-announce warrants.  There are times

TOM WACHSMUTH - November 24, 2010                    Page 26
Direct Examination by Mr. Thompson

1   when knock-and-announce warrants can turn into a
2   no-knock warrant.  And as police officers, we have some
3   latitude there.
4           But there have to be, in my mind, some
5   exigent circumstances to make a knock-and-announce
6   warrant a no-knock warrant.
7       Q.  Were you involved in a lawsuit in the state
8   of Minnesota, State of Minnesota versus Brissett?
9       A.  I was not.
10      Q.  You were not?
11      A.  A lawsuit?
12      Q.  Well, a decision that was rendered by the
13  Minnesota Supreme Court in 2003.
14      A.  I know that I was involved in a case with a
15  Brissett, I can't remember his first name.
16      Q.  Maynard?
17      A.  Maynard Brissett.
18      Q.  Maynard George Brissett?
19      A.  Yes.
20      Q.  What kind of search warrant did that involve?
21      A.  That involved a methamphetamine laboratory.
22      Q.  Was it a knock-and-announce or was it a
23  no-knock?
24      A.  I don't remember.  I believe it was a
25  no-knock.  But I don't remember.

TOM WACHSMUTH - November 24, 2010                    Page 27
Direct Examination by Mr. Thompson

1       Q.  Tell me about the other conversations that
2   you had with Sergeant Chretien.
3       A.  The next conversation was a very short
4   conversation later that night.  The next morning,
5   actually, whatever it was, I don't remember the time,
6   telling me that they were done at the house.
7           The next conversation was a day or two later.
8   I can't -- I don't know exactly when it was.  It --
9   when Chretien was in our office.  And he was in the
10  office, I was in -- sitting at my desk, and we had a
11  short conversation at that time.
12      Q.  What was the conversation?
13      A.  The conversation, again, was he was
14  apologetic the way things happened and the things that
15  happened there at the house.
16          He apologized, actually, for using Tricia as
17  a human shield that day.  And he expressed some -- he
18  told me how he was, in his words, pissed off about Dave
19  Brown's actions and things he was saying.
20      Q.  Did he discuss anything else with you other
21  than what you've just testified to?
22      A.  No, not that I remember.
23      Q.  Did you have any subsequent conversations
24  with Sergeant Chretien after that?
25      A.  Not that I can recall.

TOM WACHSMUTH - November 24, 2010                    Page 28
Direct Examination by Mr. Thompson

1       Q.  What other conversations have you had with
2   Officer Miner?
3       A.  Officer Miner called me, again, it was a day
4   or two later on my cell phone.  And Officer Miner was
5   apologizing for what had happened and things that
6   happened during the execution of that warrant.
7           Said he really didn't want things to go that
8   way and was sorry that things happened in that house
9   that shouldn't have happened.  He did not get specific
10  to what those things were.
11          And he went on to say that this was
12  absolutely nothing personal.  And went on to talk about
13  the -- how they respect me and the police department
14  personnel respect me and it is nothing personal.
15      Q.  Any subsequent conversations with
16  Officer Miner?
17      A.  Not that I can -- no, not that I can recall.
18      Q.  How about Officer Hall?
19      A.  Officer Hall.  I've had many conversations
20  with Officer Hall.  Only one conversation about this
21  incident.  Officer Hall is a task force officer out at
22  our office.  So needless to say, I talk with him all
23  the time, and work with him all the time.
24          The only conversation about this particular
25  incident was in Casper.  We were working a case in

Case 1:10-cv-00041-ABJ   Document 65-9   Filed 01/10/11   Page 41 of 59
Tricia Wachsmuth v.                                                      Tom Wachsmuth
City of Powell, et al.                                                   November 24, 2010

TOM WACHSMUTH - November 24, 2010                          Page 29
Direct Examination by Mr. Thompson

1   Casper. He called me one evening, asked me if I wanted
2   to have a beer. And I told him sure. And it was -- I
3   don't know, the motel he was staying at.
4          And the conversation about this particular
5   incident started out with putting me back on the
6   schedule for listening -- for the listening post
7   because the -- I believe it was because the initial
8   deposition dates have been changed. And I told him
9   yes, might as well put me back on the schedule.
10         And he went on to say, Tom, I don't know what
11  I could have done different. When I saw what was going
12  on, when Chretien made Tricia go down those stairs. He
13  said, I was standing there and hearing and seeing what
14  was going on, the dog is trying to get out the window.
15  I didn't know what to do.
16         The only thing that I could have done was to
17  run down there and try to get Tricia out of that
18  situation. But he said, I literally froze. He said, I
19  was just so shocked at what I was seeing.
20         And that's when he apologized for it
21  happening. Although, he just said, I just don't know
22  what I could have done different because -- other than
23  to -- in his words again, to run down and get Tricia
24  out of that situation.
25     Q. Any other conversations with Officer Hall?

TOM WACHSMUTH - November 24, 2010                          Page 30
Direct Examination by Mr. Thompson

1      A. About this case, no.
2      Q. How about Lieutenant Patterson?
3      A. Lieutenant Patterson and I have -- probably
4   didn't talk about this until several days after it had
5   happened. And, you know, we've had a lot of
6   conversations about it. Dave and I have more of a
7   similar past, I think. We worked in busier, bigger
8   areas, a lot of things going on.
9          Both of us were involved in entry teams and
10  things like that, so, you know, we had those types of
11  things in common. So there have been quite a few
12  conversations between Patterson and I.
13     Q. Tell me what they were.
14     A. Man, it's really difficult.
15     Q. Just do the best you can.
16     A. Conversations from, really, critiquing in
17  some ways what had happened and what had happened and
18  what -- I mean, how the Powell Police Department
19  conducted themselves during this search warrant
20  execution.
21     Q. The only part of -- the only factual issues
22  which you can testify to would have been the
23  officers -- other than conversations you've described,
24  would be the officers coming to your house to pick up
25  Bret that evening, correct?

TOM WACHSMUTH - November 24, 2010                          Page 31
Direct Examination by Mr. Thompson

1      A. No, I don't think that's correct.
2      Q. Okay. Do you have personal knowledge of any
3   of the events, other than the officers coming to your
4   house that evening?
5      A. Yes.
6      Q. What do you have personal knowledge of?
7      A. I went into the house after all the police
8   officers left.
9      Q. Okay.
10     A. And saw what they had done to the house.
11     Q. Okay. But let's -- let's break that down.
12  Let's talk about up to that point in time.
13         So through the execution of the search
14  warrant until the time the officers came to your house,
15  do you have any firsthand, personal knowledge of the
16  events of that evening?
17     A. From the point that they came to my house,
18  from that point, no.
19     Q. Okay. Up to that point, is the question?
20     A. Up to that point, no.
21     Q. Okay. But you do have knowledge of the house
22  or the condition of the house subsequent to the
23  execution of the search warrant?
24     A. Well, yeah. You know, after Chretien left my
25  house, I drove into town and sat a short distance from

TOM WACHSMUTH - November 24, 2010                          Page 32
Direct Examination by Mr. Thompson

1   there and sat and watched. And then after that, I went
2   into the house.
3      Q. Tom, describe for me your relationship with
4   Bret as it existed in February 2009. How would you
5   characterize it?
6      A. I would characterize it as very good. He's
7   my son.
8      Q. Close?
9      A. Yes.
10     Q. Describe for me the types of activities that
11  you and Bret would do.
12     A. We fished, we hunted, we target shot, we shot
13  trap, we shot skeet, we worked on cars, we visited, we
14  played dominoes, played cards, things like that.
15     Q. Did you ever work on any of his house?
16     A. Yes.
17     Q. What?
18     A. What what?
19     Q. What parts of his house did you work on?
20     A. When they purchased the house, we put
21  flooring in the -- sometime after they purchased it, we
22  put flooring in the living room.
23         After the cable -- the fiber optic came in --
24  when they were running the fiber optic, they had ran
25  over or destroyed the septic system lines or whatever.

Case 1:10-cv-00041-ABJ   Document 65-9   Filed 01/10/11   Page 42 of 59
Tricia Wachsmuth v.
City of Powell, et al.
Tom Wachsmuth
November 24, 2010

1  I helped with that a little bit. I helped them move
2  in. Just little things like that. Painting, I
3  suppose, things like that.
4        Afterwards, after -- I helped do a lot of
5  work on the house after the search warrant.
6        MR. THOMPSON: I was going to grab some of
7  those exhibits.
8        MR. GOSMAN: I'll pass them over to you.
9        (Exhibit 64 identified)
10 BY MR. THOMPSON:
11  Q. I'm going to hand you what's been marked
12 Deposition Exhibit 64 and ask you to take a look
13 through those photographs.
14  A. Uh-huh.
15  Q. You've had a chance to look through those?
16  A. I have.
17  Q. Have you ever seen those photographs before
18 today?
19  A. I think I have.
20  Q. Okay. I'd represent to you that these
21 photographs are photos taken by the Powell Police
22 Department subsequent to the execution of the search
23 warrant and they depict items found in your son's
24 house.
25        Did you ever see any of the "High Times"

1  magazines when you were in his house?
2  A. Not that I recall, no. You know -- no, I
3  don't recall ever seeing them.
4  Q. Did you ever see any of the books, such as
5  the "Cannabis Bible" or "The Cannabible", the book
6  titled "The Cannabible" that were in the living room of
7  the house?
8  A. Boy, I don't remember seeing them.
9  Q. Did you ever see any drug paraphernalia in
10 the house?
11  A. Not that I can recall, no. I just didn't.
12  Q. Did you ever smell marijuana in the house?
13  A. No, I did not.
14  Q. Were you aware of the fact that your son was
15 using marijuana?
16  A. No. I had some suspicions that years ago he
17 was using marijuana, but I didn't have any knowledge of
18 him using marijuana.
19  Q. Did you have any knowledge of Tricia using
20 marijuana?
21  A. No, I did not.
22  Q. Were you ever aware that your son had
23 addiction issues of any kind?
24  A. No. Other than cigarettes.
25  Q. Are the firearms, the pistols that are

1  depicted in those photographs, specifically the .45 and
2  .357, are those guns that belong to you?
3  A. I think that they probably do.
4  Q. You recovered a couple of items from the
5  Powell Police Department subsequent to these items
6  being placed in evidence, didn't you?
7  A. Yes.
8  Q. Do you recall what items you recovered?
9  A. It -- there were some guns, some ammunition
10 and just a few things, very few things.
11  Q. Why did Bret have your firearms?
12  A. Well, because we target shoot a lot. My
13 other son has got several of my firearms as well. Just
14 had them.
15        (Exhibit 47 identified)
16 BY MR. THOMPSON:
17  Q. I'm going to hand you what's been marked as
18 Plaintiff's Exhibit 47 and ask you to take a look at
19 that photograph -- or those photographs.
20        Do you recognize the individuals that are in
21 those photographs?
22  A. Yes, I do.
23  Q. How do you recognize them?
24  A. The one on the left, the male, is my son,
25 Shawn.

1  Q. Okay.
2  A. The one on the right is Amy Johnson.
3  Q. Do you know where those photographs were
4  taken?
5  A. Yes, I do.
6  Q. Where was that?
7  A. They were at my house.
8  Q. What kind of clothing do they have on in
9  those photographs?
10  A. They've got jeans, shirts and a -- vests,
11 bulletproof-type vests.
12  Q. Are those vests, vests that belong to you?
13  A. They may very well belong to me. Might be --
14 some might be -- one might be DCI, one might be mine,
15 both might be mine. I'm not sure.
16  Q. And the guns in the photographs, are those
17 your guns?
18  A. Yes.
19  Q. Are those guns that belong to you as a -- or
20 used by you in your capacity as a agent for DCI?
21  A. Two of them are, yes.
22  Q. Which two?
23  A. The shotgun and the rifle.
24  Q. Do you know why your son and the female
25 depicted in the photographs were taking these pictures

Case 1:10-cv-00041-ABJ   Document 65-9   Filed 01/10/11   Page 43 of 59
Tricia Wachsmuth v.                                                    Tom Wachsmuth
City of Powell, et al.                                                 November 24, 2010

TOM WACHSMUTH - November 24, 2010                    Page 37
Direct Examination by Mr. Thompson

1   of themselves dressed in bulletproof vests with the
2   weapons they are holding in their hands? Do you know
3   why that occurred?
4       A. Yes, I do.
5       Q. Why is that?
6       A. I was actually cleaning my car, straightening
7   it out and I had stuff laid out there. Amy was over
8   that day with Shawn because they were talking about Amy
9   was going to start working at Many Point Scout Camp
10  where Shawn had worked for 10 or 15 years in the
11  summers.
12          And Shawn, I think was either going to hire
13  her or she was going to be hired by someone else at the
14  scout camp.
15          And the stuff was laying there, as I was
16  cleaning out my car, they put it on and took some
17  pictures.
18      Q. You had knowledge that they put it on and
19  took the photographs?
20      A. Oh, yes.
21      Q. At the time it occurred?
22      A. Oh, yes.
23      Q. When did you first see those photographs?
24      A. When did I first see them?
25      Q. Yeah.

TOM WACHSMUTH - November 24, 2010                    Page 38
Direct Examination by Mr. Thompson

1       A. When Shawn -- actual y, the first time I
2   actually saw the photographs were in -- it was August
3   or September of 2006.
4       Q. Do you know when those photographs were
5   posted on his MySpace page?
6       A. Yes.
7       Q. When?
8       A. June 9 of 2006.
9       Q. Do you know if they a e still on his MySpace
10  page?
11      A. They are.
12      Q. Do you have bulletproof vests that belong to
13  you and are not the property of Wyoming DCI?
14      A. Yes.
15      Q. Have you ever given a bulletproof vest to
16  your son, Bret Wachsmuth?
17      A. Not specifically. I had a lot of things
18  stored over there. And actually, he did have a vest
19  that I had back in the '80s, and there's kind of a life
20  cycle on a vest. And actually, that was in a shell
21  that my mother-in-law actually made so I could wear
22  this vest and it didn't look like I was wearing a vest.
23          And it was no longer of any use. It was old
24  and I know Bret had that ves..
25      Q. So the answer is yes?

TOM WACHSMUTH - November 24, 2010                    Page 39
Direct Examination by Mr. Thompson

1           MR. GOSMAN: His answer is what it is.
2       Object to form.
3           MR. THOMPSON: Well, I don't understand his
4       answer, Counsel, and that's why I'm asking the
5       question.
6   BY MR. THOMPSON:
7       Q. Did you give a vest to your son, Bret, a
8   bulletproof vest?
9       A. Not specifically. The vest was at his house,
10  along with a lot of my other things were at his house.
11      Q. Okay. Were you aware of your son's mental
12  condition as far as his diagnosis of bipolar disorder?
13      A. Yes.
14      Q. How long were you aware of that?
15      A. I believe he was diagnosed with bipolar
16  disorder -- I can't remember the year. It's been quite
17  a while.
18      Q. More than ten years?
19      A. It could be. I'm not sure.
20      Q. Did you ever express your son's mental
21  condition, either bipolar or any other condition, to
22  Officer Lara of the Powell Police Department?
23      A. Yes.
24      Q. Okay. What was that discussion?
25      A. Well, Brett Lara was a task force officer

TOM WACHSMUTH - November 24, 2010                    Page 40
Direct Examination by Mr. Thompson

1   working in our office back -- I think it was 2005.
2   Maybe even 2006. I don't know. And Bret was
3   struggling with what gets to be sometimes a fairly high
4   pace, split-second things that we have to do sometimes
5   when -- particularly during that time because we were
6   working some fairly complicated cases.
7           And he told me at that time -- and it was
8   just he and I talking, that he was struggling and that
9   he was on medication because of his mental condition
10  and the anxieties and things like that.
11          And, you know, I tried -- in trying to
12  understand, trying to actually console him, just -- and
13  at that time I told him that Bret, my son Bret, suffers
14  from depression sometimes as well.
15          And I don't know if I specifically told him
16  that Bret had bipolar. I may have. And I told him
17  that my son Bret, with proper medications and things,
18  he does okay. And told him that he could do the same
19  thing.
20          And obviously had been because he was
21  medicated for the same -- Brett Lara was medicated as
22  well.
23      Q. And I want you to understand I know this is
24  probably difficult, and I'm not doing this to embarrass
25  you, I'm just doing it for the purpose of trying to

1  find out and sort out facts in this litigation, okay?
2       A.  Are you going to ask me something that's
3  embarrassing?
4       Q.  No.
5       A.  Is that what you're saying?
6            Well, I'm not embarrassed about my answer and
7  I'm not embarrassed about Bret's condition of bipolar.
8       Q.  Did Bret ever exhibit episodes of paranoid
9  behavior?
10      A.  Not -- not ever.
11      Q.  Where is he currently being treated for his
12  bipolar disorder?
13      A.  I think it's -- I think her name is
14  Dr. Walter or Dr. Walters in Billings, Montana.
15      Q.  Do you know what medications he's on for his
16  bipolar disorder?
17      A.  You know, I believe he takes Ativan. Other
18  than that, I'm not sure what medications he takes.
19      Q.  Do you know if he has any other medical
20  condition which would require him to be on prescription
21  medication?
22      A.  I think -- I don't know. I know that for
23  some -- a while he was getting some pain medications
24  just -- I think he was getting -- if I remember right,
25  he was getting 10 or 15 a month for back pain.

1       Q.  Do you know what kind of medication?
2       A.  I don't.
3       Q.  Do you know if he's ever been on oxycodone?
4       A.  I'm not aware of him being on oxycodone. I
5  don't know.
6       Q.  Do you know if he's ever been on hydrocodone?
7       A.  I don't know.
8       Q.  Have you ever given him any prescription
9  medication to use?
10      A.  No.
11      Q.  Do you know whether Tricia suffers from any
12  medical condition that would require her to be on
13  prescription medication?
14      A.  Yes.
15      Q.  What's that?
16      A.  She's been diagnosed with severe PTSD.
17      Q.  Okay. How about prior to the incident of
18  February 24th, 2009?
19      A.  I think -- now, I don't know this other than
20  her talking, she said that -- I think when her father
21  and her brother died in a fairly short time, and I
22  think she was being treated for some depression at that
23  time. I don't know if she was on any medications at
24  that time or not.
25           I don't know that she's necessarily -- well,

1  I suppose -- I think she saw a doctor over that.
2       Q.  Okay. Other than being treated for
3  depression, were you aware of any medical conditions
4  which required her to be on prescription medication?
5       A.  Not that I'm aware of.
6       Q.  Can you tell me what time Bret came to your
7  house on February 24th, 2009?
8       A.  No, I can't. I can tell you it was in the
9  evening. We had earlier worked on his car -- or his
10  pickup. And I don't know what time it was. It was in
11  the evening he came out.
12      Q.  Where did you work on his pickup?
13      A.  In his garage at his house.
14      Q.  So you were at his house that day?
15      A.  Yes.
16      Q.  When were you there?
17      A.  It was in the afternoon, after I was done
18  with work, helping him put a timing chain -- I think it
19  was a timing chain cover and gasket on a Ford pickup
20  that he had.
21      Q.  Were you there by yourself?
22      A.  No, Bret was there.
23      Q.  Did you arrive at the house by yourself?
24      A.  Yes.
25      Q.  What kind of vehicle were you driving?

1       A.  I don't even know what I had.
2       Q.  Did you leave the house by yourself?
3       A.  Yes.
4       Q.  And how long after you left the house did
5  Bret leave the house, or was it before you left?
6       A.  No. I left, went home. I don't remember.
7  I'm sure that my wife and I had supper and after supper
8  Bret came out.
9       Q.  What happened when he got to the house, can
10  you recall?
11      A.  Sure.
12      Q.  What happened?
13      A.  We were sitting, talking in the living room
14  about finishing up on his truck, things like that.
15  Television was going. And then sometime in there, I
16  can't remember the time exactly, it was when I got the
17  phone call from Chretien.
18           (Exhibit 21 identified)
19  BY MR. THOMPSON:
20      Q.  Let me have you turn to Deposition Exhibit 21
21  if you would, please. And if you'd turn to the second
22  page of that exhibit.
23      A.  Okay.
24      Q.  And if you'd look towards the bottom of the
25  exhibit, where it states "Wachsmuth stated that he went

TOM WACHSMUTH - November 24, 2010                    Page 45
Direct Examination by Mr. Thompson

1   to his father's house prior to being arrested to work
2   on his vehicle." And just read the rest of that
3   paragraph.
4      A.  I haven't found it yet.  Towards the bottom?
5         MR. GOSMAN: The bottom of the page.
6         THE WITNESS: The last paragraph.
7         "Wachsmuth stated that he went to his
8   father's house prior to being arrested" --
9   BY MR. THOMPSON:
10     Q.  You can read to yourself.
11     A.  Okay.
12     Q.  In regards to the name that's mentioned
13  there, the Court has ordered us to keep the identity of
14  the confidential informant as CI or confidential
15  informant.  So for the purposes of your answer, I'd ask
16  you not to mention that name, okay?
17     A.  All right.
18     Q.  Did he tell you about a phone message from,
19  let's call him confidential informant?
20     A.  No.
21     Q.  Never at any time during the -- from the time
22  that he arrived at the home until -- your home -- until
23  the Powell Police Department arrived?
24     A.  Not that I'm -- no.
25     Q.  Tell me what happened once you received the

TOM WACHSMUTH - November 24, 2010                    Page 46
Direct Examination by Mr. Thompson

1   phone call from Sergeant Chretien about something over
2   to the house to pick up Bret.
3      A.  To come and talk to Bret, is what you said?
4      Q.  Yeah.
5      A.  Oh, after I hung up the phone from Chretien,
6   I asked Bret what's going on?  And Bret said, "I have
7   two marijuana plants in my house."  And I was very
8   upset that he had two marijuana plants in his house.
9      Q.  Is that the extent of the conversation?
10     A.  Generally.  I definitely expressed my
11  displeasure that he had marijuana plants in his house.
12     Q.  Did you ask him what he was doing with the
13  marijuana plants?
14     A.  No. I don't recall asking him that
15  specifically, no.
16     Q.  Did you ask him if he was using marijuana?
17     A.  I don't think I specifically asked him that
18  question.
19     Q.  Did you ask him if he was selling marijuana?
20     A.  No, I did not.
21     Q.  In the photographs that you reviewed, there
22  was also a test kit, is there not?
23         And go ahead and feel free --
24     A.  Sure.
25     Q.  You saw that?

TOM WACHSMUTH - November 24, 2010                    Page 47
Direct Examination by Mr. Thompson

1      A.  Yes, I did.  Actually, there are two of them.
2      Q.  One for THC and one for methamphetamine?
3      A.  I didn't see what they were, but I'll go
4   along with that.
5      Q.  Why don't you go ahead and look at it because
6   I don't want you to provide testimony...
7      A.  It seems to me that one says marijuana and
8   one says codeine.
9      Q.  Okay.
10     A.  It's out of focus.
11     Q.  Let me see that.
12        Okay.  Do you recognize those test kits?
13     A.  I've been using test kits for -- since they
14  have come out.  You know, actually -- I can't say for
15  sure -- I'm not sure.  My guess is these are very old
16  ones that were in stuff that I had stored over at
17  Bret's.
18     Q.  There's lot numbers on the test kits?
19     A.  Yeah, there are lot numbers on test kits.
20     Q.  Can you look at a lot number and determine
21  where it came from or the agency that it was issued to?
22     A.  I think you can look -- I think you probably
23  can.
24     Q.  So you think that that was probably something
25  that you had that ended up being stored at Bret's?

TOM WACHSMUTH - November 24, 2010                    Page 48
Direct Examination by Mr. Thompson

1      A.  Yeah, probably -- it could have been a test
2   kit from when I was in Minnesota, it could have been a
3   test kit from here.  It's just really difficult to say.
4      Q.  Other than the vests that we talked about and
5   the test kits, can you tell me what other property you
6   had that was stored at Bret's house?
7      A.  Well, I had some guns over there.  I had
8   tools over there.  I had some boxes up in the loft.
9   There were probably a lot of my things over there at
10  that time.  And I don't know specifically what they
11  were.
12     Q.  Can you identify anything in the photographs
13  that you looked at, other than the guns and the test
14  kit, that are your property?
15     A.  This "Drug Identification Bible" probably
16  came from my stuff, probably stuff I had stored over
17  there.  The "High Times," I have no clue.  When I
18  worked marijuana grows on a regular basis, we had a
19  "High Times" subscription for the sheriff's office.
20  And there were "High Times" around then.  But I don't
21  know that.  I'm just saying that I've subscribed to
22  "High Times" when I worked marijuana grow operations.
23     Q.  What is "High Times"?
24     A.  "High Times" is a magazine about marijuana.
25     Q.  Specifically does it relate to marijuana grow

Case 1:10-cv-00041-ABJ   Document 65-9   Filed 01/10/11   Page 46 of 59

Tricia Wachsmuth v.                                                Tom Wachsmuth
City of Powell, et al.                                            November 24, 2010

TOM WACHSMUTH - November 24, 2010                    Page 49
Direct Examination by Mr. Thompson

1   operations?

2   A.   It does relate to that, yes.

3       I think that screwdriver might be mine, but

4   I'm not sure. And that's all that I see.

5   Q.   Tom, other than the opinions that we've

6   already discussed, do you have any other opinions that

7   you believe you're going to provide testimony on in

8   regards to any involvement of the Powell Police

9   Department in this incident?

10  A.   I don't know. I don't know. Depends on what

11  questions are asked, I suppose.

12  Q.   Okay. Let me broaden the question. Do you

13  have any opinions?

14  A.   I have opinions inasmuch as I'm -- I'm upset

15  at the way things were done. And I'm upset at the

16  damage that was done to that house. I'm upset that --

17  of the damage that was done to the guns.

18      I'm very upset that -- how and where they

19  could possibly elevate to the point of flashbang a

20  house and using my daughter-in-law as a human shield.

21      I have -- and I'm upset about not waiting and

22  knocking on the door before busting the door in. I'm

23  upset about not turning the doorknob and just going

24  into the house.

25      I'm upset that a police officer would lie

TOM WACHSMUTH - November 24, 2010                    Page 50
Direct Examination by Mr. Thompson

1   about these photographs. So those are some things that

2   I have.

3   Q.   How did a police officer lie about the

4   photographs? And you're holding up what has been

5   marked as -- can you tell me the deposition exhibit

6   number on that?

7   A.   I don't see a deposition --

8       MR. GOSMAN: Forty-seven.

9       THE WITNESS: Oh, there it is. Forty-seven.

10  BY MR. THOMPSON:

11  Q.   How did a police officer lie about those

12  photographs? And tell me what specifically you know in

13  regards to testimony that police officers provided in

14  regards to those photographs?

15  A.   That police officer said that he saw a

16  photograph of Shawn and Bret in this stuff. And I can

17  tell you very specifically how I learned about these

18  photographs if you would like to know.

19  Q.   Certainly.

20  A.   I was at the Powell Police Department, I

21  believe I was talking to Brown, Officer Brown, about a

22  case, and Roy Eckerdt. This would have been in August

23  or September, I believe, of 2006. Roy Eckerdt was in

24  the office and as I was leaving, he said, Tom, I want

25  to show you something.

TOM WACHSMUTH - November 24, 2010                    Page 51
Direct Examination by Mr. Thompson

1       So I went into his office and he sat down at

2   his desk and he went into -- on to his computer, signed

3   on to a MySpace account through his -- it was actually

4   Roy Eckerdt's son's MySpace account, and he signed in

5   and showed me these photographs.

6       And he -- so I looked at them and I says,

7   "yeah, what about it?"

8       And he said, well, I think it's terrible that

9   these -- that there are photographs that say DCI on

10  them.

11      I said, Roy, take a look, a little closer

12  look at the photographs. And he looked at them and he

13  went through them, and he said, "oh, you're right.

14  They don't say DCI anywhere. I'm wrong. I'm sorry."

15      And then we went on to talk about it being

16  Shawn and Amy Johnson. And we talked about Amy

17  Johnson, that it was Bobby Johnson's daughter, who he

18  knows. And we spent some time on this conversation.

19      And at that point he apologized, knowing that

20  they were obviously done in humor and goofing around.

21  And he apologized for thinking -- not looking close

22  enough and realizing that DCI wasn't on any of the

23  photographs.

24      So then he actually went on to start talking

25  about how much he enjoyed working with scouts with

TOM WACHSMUTH - November 24, 2010                    Page 52
Direct Examination by Mr. Thompson

1   Shawn, with Shawn in scouts and things like that. And

2   we had a very -- a fairly long conversation about Amy

3   Johnson and Shawn.

4       And then I left and, actually, called Shawn

5   and told Shawn about Roy accusing him of putting these

6   pictures on that said DCI on them. And so Shawn

7   deleted Roy's kid as a friend on MySpace. That very

8   day, actually.

9       So that's how -- that was the first time I

10  actually saw the photographs. And that's exactly what

11  our conversation was. And it's bothersome because Roy

12  was very, very well aware that that was -- those were

13  photographs of Shawn and Amy Johnson.

14  Q.   Okay. When you say that you're very upset

15  the way this happened, and I think we've talked a

16  little bit about why you're upset, part of it is

17  because you weren't called, correct?

18  A.   Well, no. It's not my place to interfere

19  with what they did in their investigation. I'm saying

20  that that certainly would have been a very viable

21  option. I know it would have been a very good option

22  to call me.

23  Q.   Are you upset because you weren't called?

24  A.   I'm saying that that would have been a very

25  good option for them to call me. I feel very strong

TOM WACHSMUTH - November 24, 2010                    Page 53
Direct Examination by Mr. Thompson

1   that many of these things that happened, the
2   destruction of the house and things like that, using
3   Tricia as a human shield and things like that, wouldn't
4   have happened if they would have called me.
5       Q. And I understand and appreciate your
6   testimony that you thought it was a very good idea or
7   that you think it would have been a very good idea if
8   you would have been called, but were you upset because
9   you were not called?
10      A. And I think I've answered that. I said it's
11  not my place to interfere with what they were doing.
12      Q. I understand that.
13      A. I'm saying it would have been a very viable
14  option and would have been a very good option.
15      Q. And I appreciate your answer. And I don't
16  think you have answered it, so I'll ask it to you
17  again. Were you upset because you weren't called?
18      A. No, I wouldn't say upset.
19      Q. Okay. What would you say?
20      A. I would say that it would have been a very
21  viable option for them to have called me. And many of
22  these problems would almost certainly have been
23  eliminated if they would have used that option.
24      Q. Did you expend any of your own money in
25  repair of the house?

TOM WACHSMUTH - November 24, 2010                    Page 54
Direct Examination by Mr. Thompson

1       A. Yes.
2       Q. Do you have receipts for that?
3       A. Yes.
4       Q. Would you be willing to provide that to your
5   attorney so that he can provide it to us?
6       A. Yes.
7       Q. Do you know the amount?
8       A. I don't know the amount off the top of my
9   head. Had to replace the front door, door jam, the
10  whole thing, and it was an odd sized door, so that took
11  hours and hours to do.
12          The window that they busted out, that had to
13  be done. And plus they literally ruined the siding on
14  that side of the house by taking plywood and just
15  screwing screws into the siding. And things like that.
16  But I do have receipts. And there were many hours.
17      Q. Can you provide us an itemization of both the
18  money expended as well as the time that you expended on
19  the home?
20      A. Absolutely.
21          MR. GOSMAN: And I can tell you that the
22  Governmental tort claim contained an itemized list of
23  those damages.
24          MR. THOMPSON: Is that what you're
25  representing that all the damages are set forth in the

TOM WACHSMUTH - November 24, 2010                    Page 55
Direct Examination by Mr. Thompson

1   claim? That's what I'm trying to do is find out if
2   there's something additional.
3           MR. GOSMAN: I believe that we have some
4   receipts of the actual expenditures. And then we have
5   a list of hours used or taken.
6   BY MR. THOMPSON:
7       Q. So my request is, if you would, sir, look in
8   the governmental claim, and if there's anything
9   additional that's not set forth by the claim, if you'd
10  provide those to your attorney, both in hours expended
11  as well as materials purchased?
12      A. Sure, yeah.
13          MR. THOMPSON: I don't believe I have any
14  further questions for you.
15          Ms. Misha Westby may.
16          MS. WESTBY: I just have a couple.
17              CROSS EXAMINATION
18  BY MS. WESTBY:
19      Q. I understand your testimony about being upset
20  about these things and -- I mean, you have a connection
21  to this, you're Bret's father, you're Tricia's
22  father-in-law, correct?
23      A. Yes.
24      Q. That's different than offering expert
25  testimony based on your experience, education, training

TOM WACHSMUTH - November 24, 2010                    Page 56
Cross-Examination by Ms. Westby

1   about the technical aspects of this.
2           So I want to make sure that you're not
3   planning on offering any kind of expert opinion based
4   on your education, training and experience as a DCI
5   officer or agent about this event.
6       A. Well, first of all, my -- the vast majority
7   of my education and training, particularly when it
8   comes to entries and SWAT teams and things like that,
9   have not come from DCI. That is when I was in
10  Minnesota.
11          As far as I know, I have not been retained as
12  an expert. I know I have not been retained as an
13  expert. And I have a vast amount of experience in
14  these things. But I don't imagine that I will be
15  testifying as an expert.
16      Q. Okay. In your work in drug investigations,
17  did you ever see stuffed animals used to send drugs or
18  prescription medications through the mail?
19      A. I don't believe I've ever seen stuffed
20  animals. I've seen candles, I've seen peanut butter,
21  some coffee. But I don't recall any stuffed animals.
22      Q. Okay. In executing a drug search warrant,
23  did you ever allow the suspect to take you to the drugs
24  that you were looking for, you know, show me where the
25  drugs are, and allowed them to take you to the drugs?

---

TOM WACHSMUTH - November 24, 2010                    Page 57
Cross-Examination by Ms. Westby

1    A.  Oh, certainly, that's happened.
2    Q.  Have you ever, in executing a drug offense
3  search warrant, caused damage to a residence?
4    A.  Yes.
5    Q.  I think that's all I have.
6            CROSS EXAMINATION
7        MR. GOSMAN: I think I've just got a couple
8  questions relative to this photograph, which is from
9  Exhibit 64, I believe.
10  BY MR. GOSMAN:
11   Q.  Take a closer look at the name on that pill
12  bottle.
13   A.  Oh, man.
14   Q.  Do you see that?  I couldn't see it for a
15  while --
16   A.  It's out of focus.  I know Wachsmuth is
17  there.  Oh, Tom, there it is, yeah, that's mine.
18   Q.  Okay.  Do you know what that pill bottle
19  contained?
20   A.  Yes.
21   Q.  What was it?
22   A.  A Flexeril tablet.
23   Q.  And have you ever taken Oxycontin?
24   A.  No.
25   Q.  All right.  How did that pill bottle end up

---

TOM WACHSMUTH - November 24, 2010                    Page 58
Cross-Examination by Mr. Gosman

1  at your son's house, if you know?
2    A.  Actually, I do know how that got there.  I
3  was helping Bret work on that pickup.  And the bending
4  over, I had this -- if -- I'm sure it's the one if this
5  was at his house.  I had that pill bottle with me that
6  day with one Flexeril left in it.  And I knew my back
7  was going to get very sore working on the pickup.
8        I walked into the back door of the house, got
9  a glass of water, took the pill out of the thing and I
10  just left it sitting on the counter, the empty bottle.
11   Q.  Is Flexeril a drug that is abused by people?
12       MS. WESTBY: Objection as to form.
13       MR. THOMPSON: Objection as to form.
14  BY MR. GOSMAN:
15   Q.  Based on your experience?
16       MS. WESTBY: Same objection.
17       MR. THOMPSON: Join.
18       THE WITNESS: Flexeril is a muscle relaxer.
19  I don't know if it could be abused.  I suppose if
20  somebody wanted to get some sleep, you could probably,
21  but I've never heard of anybody abusing Flexeril, no.
22  BY MR. GOSMAN:
23   Q.  All right.  Thanks a lot  I have no further
24  questions.
25       MR. THOMPSON: Nothing further. Thank you

---

TOM WACHSMUTH - November 24, 2010                    Page 59
Cross-Examination by Mr. Gosman

1  for your time.
2            (Proceedings concluded at
3             12:14 p.m. November 24, 2010)

---

TOM WACHSMUTH - November 24, 2010                    Page 60
Cross-Examination by Mr. Gosman
1            DEPONENT'S CERTIFICATE
2        I, TOM WACHSMUTH, do hereby certify, under
3  penalty of perjury, that I have read the foregoing
4  transcript of my testimony consisting of 59 pages,
5  taken on November 24, 2010 and that the same is, with
6  any changes noted below, a full, true and correct
7  record of my deposition.
8  PAGE  LINE       CORRECTION        REASON FOR CORRECTION
9  ___  ___  _____  _____
10 ___  ___  _____  _____
11 ___  ___  _____  _____
12 ___  ___  _____  _____
13 ___  ___  _____  _____
14 ___  ___  _____  _____
15 ___  ___  _____  _____
16 ___  ___  _____  _____
17 ___  ___  _____  _____
18 ___  ___  _____  _____
19 ___  ___  _____  _____
20 ___  ___  _____  _____
21 ___  ___  _____  _____
22
23
24                    _____
25                    TOM WACHSMUTH       Date

---

TOM WACHSMUTH - November 24, 2010          Page 61
Cross-Examination by Mr. Gosman

1                         CERTIFICATE

2              I, VONNI R. BRAY, Registered Professional

3    Reporter, and Notary Public for the State of Montana,

4    do hereby certify that TOM WACHSMUTH was by me first

5    duly sworn to testify to the truth, the whole truth,

6    and nothing but the truth;

7              That the foregoing transcript, consisting of

8    60 pages, is a true record of the testimony given by

9    said deponent, together with all other proceedings

10   herein contained.

11             IN WITNESS WHEREOF, I have hereunto set my

12   hand this 11th day of December, 2010.

13

14

15

16

17

18

19

20   _____

21   Vonni R. Bray, RPR
22   P. O. Box 125
     Laurel, MT 59044
23   (406) 670-9533 Cell
     (888) 277-9372 Fax
24   vonni.bray@yahoo.com

25

Tricia Wachsmuth v.
City of Powell, et al.

Tom Wachsmuth
November 24, 2010

**1**

**10 (8)**
  24:10,12,25;25:11,14,
  17;37:10;41:25
**12:14 (1)**
  59:3
**14th (1)**
  5:12
**15 (8)**
  24:10,12,17;25:11,14,
  17;37:10;41:25
**15-second (1)**
  24:25
**1976 (1)**
  8:16

**2**

**2003 (1)**
  26:13
**2004 (1)**
  10:9
**2005 (1)**
  40:1
**2006 (4)**
  38:3,8;40:2;50:23
**2009 (4)**
  13:9;32:4;42:18;43:7
**2010 (1)**
  59:3
**21 (2)**
  44:18,20
**24 (1)**
  59:3
**24th (3)**
  13:9;42:18;43:7

**3**

**34 (2)**
  8:12,15
**357 (1)**
  35:2

**4**

**45 (1)**
  35:1
**47 (2)**
  35:15,18

**5**

**524 (1)**
  8:4

**6**

**64 (3)**
  33:9,12;57:9

**7**

**7 (1)**
  8:4

**8**

**80s (1)**
  38:19

**9**

**9 (1)**
  38:8

**A**

**absolute (1)**
  22:9
**absolutely (2)**
  28:12;54:20
**abused (2)**
  58:11,19
**abusing (1)**
  58:21
**account (2)**
  51:3,4
**accusing (1)**
  52:5
**actions (1)**
  27:19
**activities (1)**
  32:10
**actual (1)**
  55:4
**actually (17)**
  27:5,16;37:6;38:1,2,
  18,20,21;40:12 47:1,14;
  51:3,24;52:4,8,10;58:2
**addiction (1)**
  34:23
**additional (2)**
  55:2,9
**address (1)**
  8:3
**advised (1)**
  25:4
**afternoon (1)**
  43:17
**afterwards (2)**
  23:3;33:4
**again (7)**
  16:3,9;21:10;27:13;
  28:3;29:23;53:17
**age (1)**
  8:5
**agency (5)**
  9:1,20,21;18:25;47:21
**agent (7)**
  8:8;9:7;10:19;18:14;
  20:8;36:20;56:5
**ago (2)**

  7:10;34:16
**agree (4)**
  20:15;23:6.10;25:15
**ahead (4)**
  4:20;12:6;46:23;47:5
**Aitkin (1)**
  9:18
**allow (1)**
  56:23
**allowed (1)**
  56:25
**almost (1)**
  53:22
**along (2)**
  39:10;47:4
**Although (1)**
  29:21
**ammunition (1)**
  35:9
**amount (6)**
  23:21;25:12,13;54:7,
  8;56:13
**Amy (7)**
  36:2;37:7,8;51:16.16;
  52:2,13
**animals (3)**
  56:17,20,21
**answered (3)**
  24:13;53:10,16
**anxieties (1)**
  40:10
**apologetic (1)**
  27:14
**apologized (6)**
  15:15.17;27:16;29:20;
  51:19.21
**apologizing (1)**
  28:5
**appear (1)**
  7:14
**appreciate (2)**
  53:5,15
**area (1)**
  17:8
**areas (1)**
  30:8
**around (2)**
  48:20;51:20
**arrested (2)**
  45:1,8
**arrive (1)**
  43:23
**arrived (2)**
  45:22,23
**aspects (1)**
  56:1
**assembling (1)**
  16:7
**assess (1)**
  25:22
**assigned (2)**
  9:8,11
**assume (5)**

  5:16,23;6:1,13;11:19
**assumed (1)**
  10:22
**assuming (1)**
  11:13
**assumption (4)**
  5:17,19;6:10;11:14
**Ativan (1)**
  41:17
**Attorney (9)**
  4:17;6:22,23,25;7:2,
  16;17:5;54:5;55:10
**attorneys (1)**
  25:4
**August (2)**
  38:2;50:22
**authority (1)**
  15:12
**aware (14)**
  10:20;17:11,14;18:8,
  10,20;34:14,22;39:11,
  14;42:4;43:3,5;52:12
**away (1)**
  19:24

**B**

**back (8)**
  7:9;29:5,9;38:19;40:1;
  41:25;58:6,8
**based (7)**
  17:10;23:6;24:2;
  25:15;55:25;56:3;58:15
**basic (1)**
  5:3
**basically (3)**
  7:14;14:25;16:14
**basis (2)**
  23:11;48:18
**become (1)**
  7:16
**beer (1)**
  29:2
**behavior (1)**
  41:9
**belong (5)**
  35:2;36:12,13,19;
  38:12
**bending (1)**
  58:3
**best (1)**
  30:15
**Bible (2)**
  34:5;48:15
**bigger (1)**
  30:7
**Billings (1)**
  41:14
**bipolar (7)**
  39:12,15,21;40:16;
  41:7,12,16
**bit (2)**
  33:1;52:16

**Bobby (1)**
  51:17
**book (1)**
  34:5
**books (1)**
  34:4
**both (6)**
  5:3;23:17;30:9;36:15;
  54:17;55:10
**bothersome (1)**
  52:11
**bottle (5)**
  57:12,18,25;58:5.10
**bottom (3)**
  44:24;45:4,5
**boxes (1)**
  48:8
**boy (2)**
  21:10;34:8
**Brainerd (1)**
  8:18
**break (3)**
  6:15,17;31:11
**Bret (34)**
  13:11,20;14:8,10,11,
  11,12,14,16,23;15:4;
  30:25;32:4.11;35:11;
  38:16,24;39:7;40:2,13,
  13,16,17;41:8;43:6,22;
  44:5,8;46:2,3,6,6;50:16;
  58:3
**Bret's (6)**
  14:22;41:7;47:17,25;
  48:6;55:21
**Brett (2)**
  39:25;40:21
**bring (1)**
  15:8
**Brissett (4)**
  26:8,15,17,18
**broad (1)**
  12:3
**broaden (1)**
  49:12
**broken (1)**
  21:15
**brother (1)**
  42:21
**Brown (2)**
  50:21.21
**Brown's (1)**
  27:19
**building (1)**
  24:14
**bulletproof (4)**
  37:1;38:12,15;39:8
**bulletproof-type (1)**
  36:11
**busier (1)**
  30:7
**busted (1)**
  54:12
**busting (1)**

49:22
**butter (1)**
56:20

# C

**cable (1)**
32:23
**call (17)**
13:17;15:13;16:4,17;
17:7,12,22;18:7,20;19:3;
21:21;22:5;44:17;45:19;
46:1;52:22.25
**called (22)**
13:9;15:7;16:20,23;
18:22,24;19:3,20,23;
20:11,22;21:9;28:3;
29:1;52:4,17,23;53:4,8,
9,17,21
**came (9)**
13:24;31:14,17;32:23;
43:6,11;44:8;47:21;
48:16
**Camp (2)**
37:9,14
**can (29)**
5:10;11:24;15:11;
17:25;19:3;21:2;22:11;
24:24;26:1;27:25;28:17,
17;30:15,22;34:11;43:6,
8;44:9;45:10;47:20,22,
23;48:5,12;50:5,16;54:5,
17,21
**candles (1)**
56:20
**Cannabible (2)**
34:5,6
**Cannabis (1)**
34:5
**capacity (4)**
4:15,19;9:7;36:20
**car (4)**
21:14;37:6,16;43:9
**cards (1)**
32:14
**career (1)**
8:25
**cars (1)**
32:13
**case (10)**
10:21;11:11,17;20:7;
22:11,13;26:14;28:25;
30:1;50:22
**cases (3)**
11:8;20:21;40:6
**Casper (2)**
28:25;29:1
**caused (1)**
57:3
**cell (2)**
13:10;28:4
**Central (1)**
9:11

**certainly (7)**
5:21;19:17;22 15;
50:19;52:20;53:22;57:1
**chain (2)**
43:18,19
**chance (1)**
11:15;33:15
**changed (1)**
29:8
**characterize (2)**
32:5,6
**charged (1)**
16:7
**Chief (1)**
23:18
**chief's (1)**
8:20
**Chretien (24)**
12:22;13:6,8,12,17,18;
14:2,18,20;15:2,3;16:14,
15;18:10:23:18 20;27:2,
9,24;29:12;31:24;44:17;
46:1,5
**CI (1)**
45:14
**cigarettes (1)**
34:24
**circumstances ( l0)**
15:1;17:11;19:6,8,19;
21:11,25;22:2~,25:16;
26:5
**City (1)**
4:13
**claim (4)**
54:22;55:1,8,9
**clarify (1)**
5:21
**cleaning (2)**
37:6,16
**Close (2)**
32:8;51:21
**closer (2)**
51:11;57:11
**clothing (1)**
36:8
**clue (1)**
48:17
**codeine (1)**
47:8
**coffee (1)**
56:21
**coming (2)**
30:24;31:3
**comment (1)**
20:6
**common (1)**
30:11
**completely (1)**
17:8
**complicated (1)**
40:6
**computer (1)**
51:2

**concluded (1)**
59:2
**condition (8)**
31:22;39:12,21,21;
40:9;41:7,20;42:12
**conditions (1)**
43:3
**conducted (1)**
30:19
**confidential (3)**
45:14,14,19
**connection (1)**
55:20
**considered (1)**
18:9
**console (1)**
40:12
**contact (1)**
7:10
**contained (2)**
54:22;57:19
**contest (1)**
6:16
**conversation (18)**
7:12,13;16:12,13,14;
27:3,4,7,11,12,13;28:20,
24;29:4;46:9;51:18;
52:2,11
**conversations (12)**
7:25;13:7;27:1,23;
28:1,15,19;29:25;30:6,
12,16,23
**convince (2)**
15:6;18:11
**couch (3)**
14:8,9,14
**counsel (2)**
6:20;39:4
**count (1)**
25:1
**counter (1)**
58:10
**counties (2)**
9:15,18
**counting (1)**
24:11
**County (3)**
8:16,21;9:13
**couple (4)**
4:24;35:4;55:16;57:7
**Court (2)**
26:13;45:13
**cover (1)**
43:19
**covered (1)**
9:15
**covers (1)**
9:15
**crime (1)**
9:24
**crimes (2)**
10:1,6
**Criminal (3)**

8:9;10:15,16
**critical (3)**
17:7,10;24:3
**critiquing (1)**
30:16
**CROSS (2)**
55:17;57:6
**current (2)**
8:3,5
**currently (1)**
41:11
**custody (1)**
15:21
**cycle (1)**
38:20

# D

**damage (3)**
49:16,17;57:3
**damages (2)**
54:23,25
**danger (1)**
22:3
**Danzer (1)**
14:6
**date (1)**
7:9
**dates (1)**
29:8
**daughter (1)**
51:17
**daughter-in-law (1)**
49:20
**Dave (3)**
13:2;27:18;30:6
**day (7)**
27:7,17;28:3;37:8;
43:14;52:8;58:6
**days (1)**
30:4
**DCl (19)**
8:23.25;9:1;11:7;
18:14;20:8;22:16,20,25;
25:11;36:14,20;38:13;
51:9,14,22;52:6;56:4,9
**decision (2)**
16:6;26:12
**decisions (2)**
17:1,1
**definitely (1)**
46:10
**delay (2)**
24:18,18
**deleted (1)**
52:7
**deliberate (1)**
21:19
**Department (13)**
8:19;10:15;14:21;
16:16;20:10;28:13;
30:18;33:22;35:5;39:22;
45:23;49:9;50:20

**depend (1)**
19:5
**Depending (1)**
19:8
**depends (3)**
21:11,11;49:10
**depict (1)**
33:23
**depicted (2)**
35:1;36:25
**deposed (1)**
4:21
**deposition (9)**
4:9,12;5:6,14;29:8;
33:12;44:20;50:5,7
**depression (3)**
40:14;42:22;43:3
**describe (2)**
32:3,10
**described (1)**
30:23
**desk (2)**
27:10;51:2
**destroyed (1)**
32:25
**destruction (1)**
53:2
**determine (2)**
18:21;47:20
**diagnosed (2)**
39:15;42:16
**diagnosis (1)**
39:12
**died (1)**
42:21
**different (4)**
4:23;29:11,22;55:24
**difficult (4)**
20:25;30:14;40:24;
48:3
**DIRECT (1)**
4:3
**discuss (1)**
27:20
**discussed (5)**
14:19;18:4,22;20:22;
49:6
**discussion (2)**
23:19;39:24
**disorder (4)**
39:12,16;41:12,16
**displeasure (1)**
46:11
**distance (1)**
31:25
**Division (2)**
8:8;10:16
**doctor (1)**
43:1
**dog (1)**
29:14
**dominoes (1)**
32:14

**done (21)**
14:21;18:2,12;21:6,
13,17,17;22:19,25;23:2;
27:6;29:11,16,22;31:10;
43:17;49:15,16,17;
51:20;54:13

**Donna (1)**
15:3

**door (12)**
13:24;23:14,15,22;
24:9,13;49:22,22;54:9,9,
10;58:8

**doorknob (1)**
49:23

**dowu (6)**
21:15;29:12,17,23;
31:11;51:1

**Dr (2)**
41:14,14

**dressed (1)**
37:1

**driving (1)**
43:25

**drove (1)**
31:25

**drug (13)**
9:8,12;10:1,2,4,4,6;
34:9;48:15;56:16,22;
57:2;58:11

**drugs (4)**
56:17,23,25,25

**duly (1)**
4:2

**during (8)**
5:14;8:24;10:10;
11:22;28:6;30:19;40:5;
45:21

**duties (2)**
9:19,24

**dynamic (4)**
21:17;23:8;24:4,7

**E**

**earlier (1)**
43:9

**easiest (1)**
18:5

**East (1)**
9:11

**Eckerdt (8)**
14:4,5,10,12,15,16;
50:22,23

**Eckerdt's (1)**
51:4

**education (3)**
55:25;56:4,7

**either (2)**
37:12;39:21

**elevate (1)**
49:19

**elicit (1)**
17:6

**eliminated (1)**
53:23

**else (2)**
27:20;37:13

**embarrass (1)**
40:24

**embarrassed (2)**
41:6,7

**embarrassing (1)**
41:3

**employed (3)**
8:10;10:11;22 20

**employment (2)**
8:14;10:14

**empty (1)**
58:10

**end (1)**
57:25

**ended (1)**
47:25

**enduranee (1)**
6:16

**enforcement (5)**
8:11,14,25;10:12;
18:25

**enjoyed (1)**
51:25

**enough (2)**
16:2;51:22

**entries (6)**
21:17,18,18,19;24:6;
56:8

**entry (14)**
15:10,13,14;16:7;
23:1,2,8;24:4,7,9,14;
25:8,8;30:9

**episodes (1)**
41:8

**even (2)**
40:2;44:1

**evening (7)**
13:8;29:1;30:25;31:4,
16;43:9,11

**event (1)**
56:5

**events (2)**
31:3,16

**Everett (1)**
4:7

**evidence (3)**
19:20,24;35:6

**exact (1)**
23:19

**exactly (4)**
24:22;27:8;44:16;
52:10

**EXAMINATION (3)**
4:3;55:17;57:6

**execute (3)**
23:8,8;25:22

**executed (5)**
12:15;19:1,4,18;20:11

**executing (5)**

13:13;14:22;25:21;
56:22;57:2

**execution (13)**
11:21,22;12:1,9,12,25;
16:17;20:23;28:6;30:20;
31:13,23;33:22

**Exhibit (11)**
33:9,12;35:15,18;
41:8;44:18,20,22,25;
50:5;57:9

**exhibits (1)**
33:7

**exigent (1)**
26:5

**existed (1)**
32:4

**expend (1)**
53:24

**expended (3)**
54:18,18;55:10

**expenditures (1)**
55:4

**experience (5)**
17:25;55:25;56:4,13;
58:15

**expert (11)**
11:3,8,10,12,16;12:10;
55:24;56:3,12,13,15

**explained (1)**
23:17

**express (1)**
39:20

**expressed (2)**
27:17;46:10

**extent (1)**
46:9

**F**

**fact (10)**
10:20;11:6;15:20;
17:7,10;18:8,25;24:3,11;
34:14

**facts (1)**
41:1

**factual (1)**
30:21

**fair (4)**
5:16,19,25;16:2

**fairly (4)**
40:3,6;42:21;52:2

**family (4)**
7:15;19:1,2;21:21

**family-type (1)**
6:23

**far (2)**
39:12;56:11

**father (2)**
42:20;55:21

**father-in-law (1)**
55:22

**father's (2)**
45:1,8

**favorites (1)**
20:14

**Feathers (1)**
23:18

**February (5)**
5:12;13:9;32:4;42:18;
43:7

**feel (2)**
46:23;52:25

**felt (2)**
22:3,5

**female (1)**
36:24

**few (4)**
13:16;30:11;35:10,10

**fiber (2)**
32:23,24

**Fifty-four (1)**
8:6

**filing (2)**
7:18,22

**find (3)**
20:12;41:1;55:1

**fine (1)**
4:10

**finishing (1)**
44:14

**firearms (3)**
34:25;35:11,13

**first (10)**
4:2,20;17:4;24:6;
26:15;37:23,24;38:1;
52:9;56:6

**firsthand (1)**
31:15

**fished (1)**
32:12

**five (1)**
9:15

**flashbang (1)**
49:19

**Flexeril (5)**
57:22;58:6,11,18,21

**flooring (2)**
32:21,22

**focus (2)**
47:10;57:16

**follows (1)**
4:2

**force (6)**
9:8,12,22.25;28:21;
39:25

**Ford (1)**
43:19

**form (9)**
12:4;15:22;19:11;
22:21;23:23;25:18;39:2;
58:12,13

**formally (1)**
10:23

**forth (3)**
24:25;54:25;55:9

**Forty-seven (2)**

50:8,9

**found (4)**
19:20,21;33:23;45:4

**four (1)**
13:3

**free (1)**
46:23

**friend (2)**
21:21;52:7

**frisk (2)**
14:15,15

**front (1)**
54:9

**froze (1)**
29:18

**full (1)**
4:5

**further (3)**
55:14;58:23,25

**G**

**gain (1)**
24:14

**gainfully (1)**
10:11

**garage (1)**
43:13

**gasket (1)**
43:19

**general (1)**
25:14

**Generally (1)**
46:10

**General's (1)**
4:17

**George (1)**
26:18

**gets (1)**
40:3

**given (2)**
38:15;42:8

**glass (1)**
58:9

**good (9)**
4:11;5:22;18:7;32:6;
52:21,25;53:6,7,14

**goofing (1)**
51:20

**Gosman (26)**
6:21,22;7:3,7,10,11,
18;8:1;12:3;14:4;15:22;
19:11,25;22:21;23:23;
25:18;33:8;39:1;45:5;
50:8;54:21;55:3;57:7,
10;58:14,22

**Governmental (2)**
54:22;55:8

**grab (1)**
33:6

**Greenbush (1)**
8:20

**ground (1)**

Tricia Wachsmuth v.
City of Powell, et al.

Tom Wachsmuth
November 24, 2010

5:3
grow (2)
  48:22,25
grows (1)
  48:18
guess (2)
  23:13;47:15
guns (8)
  35:2,9;36:16,17,19;
  48:7,13;49:17
guys (1)
  13:22

**H**

Hall (6)
  12:23;28:18,19,20,21;
  29:25
hand (2)
  33:11;35:17
handcuffed (1)
  14:16
hands (1)
  37:2
hanging (1)
  13:16
happen (1)
  22:16
happened (17)
  15:15;27:14,15;28:5,
  6,8,9;30:5,17,17;44:9,
  12;45:25;52:15;53:1,4;
  57:1
happening (1)
  29:21
head (2)
  16:10;54:9
heard (1)
  58:21
hearing (1)
  29:13
help (2)
  7:15;21:3
helped (3)
  33:1,1,4
helping (2)
  43:18;58:3
Herman (3)
  18:13,14,21
High (8)
  33:25;40:3;48:17,19,
  20,22,23,24
hire (1)
  37:12
hired (1)
  37:13
hitting (1)
  23:22
holding (2)
  37:2;50:4
home (5)
  13:10;44:6;45:22,22;
  54:19

hood (1)
  21:14
hours (5)
  54:11,11,16;55:5,10
house (70)
  13:11,13,18,22,25;
  14:2,18,22,23,24;15:5,8,
  14;16:5,15;19:3;20:11;
  22:1,4,7;24:14;27:6,15;
  28:8;30:24;31:4,7,10,14,
  17,21,22,25;32:2,15,19,
  20;33:5,24;34:1,7,10,12;
  36:7;39:9,10;43:7,13,14,
  23;44:2,4,5,9;45:1,8;
  46:2,7,8,11;48:6;49:16,
  20,24;53:2,25;54:14;
  58:1,5,8
human (3)
  27:17;49:20;53:3
humor (1)
  51:20
hundreds (4)
  18:1;21:5,6,7
hung (2)
  13:23;46:5
hunted (1)
  32:12
hydrocodone (1)
  42:6
hypothetical (1)
  20:16

**I**

idea (6)
  15:7,18;17:13 18:7;
  53:6,7
Identification (1)
  48:15
identified (3)
  33:9;35:15;44:18
identify (1)
  48:12
identity (1)
  45:13
imagine (1)
  56:14
immediate (1)
  25:23
immediately (6)
  23:15,19;24:16,18,21,
  23
impeachment (1)
  5:11
inasmuch (1)
  49:14
incident (7)
  18:18;22:12;28:21,25;
  29:5;42:17;49:9
individual (4)
  4:19;18:24;19: 9,23
individuals (2)
  13:3;35:20

informant (3)
  45:14,15,19
information (2)
  13:5;15:4
initial (3)
  7:17;13:7;29:7
intend (2)
  11:10,16
interdiction (2)
  10:3,4
interdictions (1)
  10:5
interfere (3)
  16:25;52:18;53:11
interpretation (2)
  24:20,22
into (21)
  13:22,25;14:1;15:8,
  14,21;16:5,13;22:4;
  24:14,15;25:25;26:1;
  31:7,25;32:2;49:24;
  51:1,2;54:15;58:8
introduce (1)
  4:11
investigate (1)
  9:24
Investigation (3)
  8:9;10:17;52:19
Investigations (2)
  10:15;56:16
involve (1)
  26:20
involved (9)
  20:20;21:7,9;22:17,
  25;26:7,14,21;30:9
involvement (1)
  49:8
Isanti (1)
  9:18
issued (1)
  47:21
issues (2)
  30:21;34:23
itemization (1)
  54:17
itemized (1)
  54:22
items (4)
  33:23;35:4,5,8

**J**

jam (1)
  54:9
jeans (1)
  36:10
Jeff (1)
  7:1
job (1)
  8:20
Johnson (5)
  36:2;51:16,17;52:3,13
Johnson's (1)

51:17
Join (1)
  58:17
judgment (1)
  23:16
June (1)
  38:8

**K**

Kanabec (4)
  8:21;9:13,16,17
keep (1)
  45:13
kid (1)
  52:7
kind (8)
  25:13;26:20;34:23;
  36:8;38:19;42:1;43:25;
  56:3
kit (4)
  46:2;48:2,3,14
kits (5)
  47:12,13,18,19;48:5
knew (2)
  13:18;58:6
knock (3)
  23:14,21;24:9
knock-and-announce (10)
  23:9,16;24:4,7,9;25:5,
  25;26:1,5,22
knocking (1)
  49:22
knowing (1)
  51:19
knowledge (13)
  12:12,16,20,25;23:7;
  24:8;31:2,6,15,21;34:17,
  19;37:18
knows (1)
  51:18

**L**

laboratory (1)
  26:21
Lacs (1)
  9:18
laid (1)
  37:7
Lara (3)
  39:22,25;40:21
last (1)
  45:6
later (5)
  13:17;14:12;27:4,7;
  28:4
latitude (1)
  26:3
law (5)
  8:10,14,24;10:11;
  18:24
lawsuit (4)

7:19,22;26:7,11
laying (1)
  37:15
learned (1)
  50:17
least (3)
  7:21;18:9;20:13
leave (2)
  44:2,5
leaving (1)
  50:24
left (11)
  14:17;15:2;31:8,24;
  35:24;44:4,5,6;52:4;
  58:6,10
less (2)
  8:19;25:17
lie (3)
  49:25;50:3,11
Lieutenant (3)
  13:2;30:2,3
life (1)
  38:19
lines (1)
  32:25
list (2)
  54:22;55:5
listed (2)
  10:21,23
listening (2)
  29:6,6
literally (2)
  29:18;54:13
litigation (1)
  41:1
little (4)
  33:1,2;51:11;52:16
living (6)
  14:8,9,19;32:22;34:6;
  44:13
loft (1)
  48:8
long (6)
  5:1;6:17;8:10;39:14;
  44:4;52:2
longer (1)
  38:23
look (12)
  33:12,15;35:18;38:22;
  44:24;47:5,20,22;51:11,
  12;55:7;57:11
looked (4)
  14:10;48:13;51:6,12
looking (2)
  51:21;56:24
lot (11)
  30:5,8;33:4;35:12;
  38:17;39:10;47:18,19,
  20;48:9;58:23
loud (1)
  24:12

## M

**magazine (1)**
48:24
**magazines (1)**
34:1
**mail (1)**
56:18
**majority (1)**
56:6
**male (1)**
35:24
**Man (2)**
30:14;57:13
**manual (1)**
24:25
**many (8)**
4:23;21:1,8;28:19;
37:9;53:1,21;54:16
**marijuana (19)**
14:24;15:4;20:12;
34:12,15,17,18,20;46:7,
8,11,13,16,19;47:7;
48:18,22,24,25
**marked (3)**
33:11;35:17;50:5
**materials (1)**
55:11
**matter (6)**
5:11;7:8;11:1,6;19:21;
24:11
**may (5)**
4:16;21:22;36:13;
40:16;55:15
**Maybe (1)**
40:2
**Maynard (3)**
26:16,17,18
**mean (2)**
30:18;55:20
**meant (3)**
15:18,20,24
**medical (3)**
41:19;42:12;43:3
**medicated (2)**
40:21,21
**medication (6)**
40:9;41:21;42:1,9,13;
43:4
**medications (6)**
40:17;41:15,18,23;
42:23;56:18
**meet (1)**
22:2
**meetings (1)**
7:18
**member (3)**
19:1,2;21:21
**mental (3)**
39:11,20;40:9
**mention (1)**
45:16

**mentioned (1)**
45:12
**message (1)**
45:18
**met (1)**
7:11
**methamphetamine (2)**
26:21;47:2
**might (8)**
21:3;29:9;36:13,14,
14,14,15;49:3
**Mike (2)**
12:23;13:21
**Mille (1)**
9:18
**mind (1)**
26:4
**mine (4)**
36:14,15;49:3 57:17
**Miner (5)**
12:23;28:2,3,4,16
**Minnesota (14)**
8:17,18,20,22,25;9:8,
11,20;25:9;26:8,8,13;
48:2;56:10
**minutes (1)**
13:16
**Misha (2)**
4:17;55:15
**mixing (1)**
24:5
**money (2)**
53:24;54:18
**Montana (1)**
41:14
**month (1)**
41:25
**more (3)**
22:10;30:6;39: 8
**morning (1)**
27:4
**motel (1)**
29:3
**mother-in-law (1)**
38:21
**move (2)**
10:8;33:1
**much (1)**
51:25
**multi-jurisdictional (1)**
9:22
**muscle (1)**
58:18
**music (1)**
5:4
**myself (1)**
4:11
**MySpace (5)**
38:5,9;51:3,4;52:7

## N

**name (8)**

4:5,12;14:2;26:15;
41:13;45:12.16;57:11
**named (2)**
4:14,19
**narcotics (1)**
10:1
**narrow (1)**
21:3
**necessarily (1)**
42:25
**need (2)**
6:15;18:3
**needed (1)**
21:23
**needless (1)**
28:22
**needs (1)**
23:2
**next (5)**
16:12,13;27:3,4,7
**night (1)**
27:4
**no-knock (5)**
25:24;26:2,6,23,25
**November (1)**
59:3
**number (4)**
22:12,13;47:20;50:6
**numbers (2)**
47:18,19

## O

**oath (1)**
5:7
**Object (7)**
15:22;19:11,25;22:21;
23:23;25:18;39:2
**objection (5)**
6:12;12:4;58:12,13,16
**obligation (1)**
25:21
**obtained (2)**
12:24;13:5
**Obviously (3)**
16:16;40:20;51:20
**occasion (1)**
22:10
**occasions (2)**
18:2;21:20
**occupation (1)**
8:7
**occur (1)**
20:24
**occurred (5)**
18:18;21:5;22:12;
37:3,21
**odd-sized (1)**
54:10
**off (4)**
14:14;19:23;27:18;
54:8
**offense (1)**

57:2
**offering (2)**
55:24;56:3
**Office (10)**
4:18;8:17,22;27:9,10;
28:22;40:1;48:19;50:24;
51:1
**officer (25)**
9:8;12:22,23,23;14:6,
17;24:25:28:2,3,4,16,18,
19,20,21,21;29:25;
39:22,25:49:25;50:3,11,
15,21;56:5
**officers (15)**
4:14,18;12:18,20,24;
23:17;24:12,25:20:26:2;
30:23,24;31:3,8,14;
50:13
**official (1)**
4:14
**old (2)**
38:23;47:15
**once (1)**
45:25
**one (18)**
7:21;11:15;13:3;14:5,
7,22:10;28:20;29:1;
35:24;36:2,14,14;47:2,2,
7,8;58:4.6
**ones (1)**
47:16
**Only (5)**
28:20,24;29:16;30:21,
21
**opening (1)**
21:14
**operations (2)**
48:22;49:1
**opinion (9)**
16:22;17:6,9,18,19,20,
21;24:3;56:3
**opinions (4)**
49:5,6,13,14
**optic (2)**
32:23,24
**option (7)**
52:21,21,25;53:14,14,
21,23
**order (1)**
21:16
**ordered (2)**
15:9;45:13
**out (23)**
13:14,15;22:5,6;
24:12;28:21;29:5,14,17,
24;37:7,7,16;41:1,1;
43:11;44:8;47:10,14;
54:12;55:1;57:16;58:9
**outside (2)**
13:20;21:15
**over (15)**
14:10;15:12;18:1;
32:25;33:8;37:7;38:18;

43:1;46:1;47:16:48:7,8,
9.16;58:4
**own (1)**
53:24
**oxycodone (2)**
42:3,4
**Oxycontin (1)**
57:23

## P

**pace (1)**
40:4
**page (4)**
38:5,10;44:22;45:5
**pain (2)**
41:23,25
**Painting (1)**
33:2
**paragraph (2)**
45:3.6
**paranoid (1)**
41:8
**paraphernalia (1)**
34:9
**part (5)**
7:13,17;25:9;30:21;
52:16
**particular (2)**
28:24;29:4
**particularly (2)**
40:5;56:7
**parts (1)**
32:19
**pass (1)**
33:8
**past (2)**
8:15;30:7
**pat-down (2)**
14:15,15
**Patterson (4)**
13:2;30:2,3,12
**pay (1)**
7:25
**peanut (1)**
56:20
**pending (1)**
6:18
**people (3)**
14:1;18:11;58:11
**perception (2)**
19:22;20:14
**person (4)**
21:15,23;22:2,6
**personal (5)**
28:12,14;31:2,6,15
**personnel (1)**
28:14
**phone (12)**
13:10,16,17,23;17:22;
18:6,20;28:4;44:17;
45:18;46:1.5
**photograph (3)**

35:19;50:16;57:8
**photographs (27)**
33:13,17,21;35:1,19,
21;36:3,9,16,25;37:19,
23;38:2,4;46:21;48:12;
50:1,4,12,14,18;51:5,9,
12,23;52:10,13
**photos (1)**
33:21
**pick (2)**
30:24;46:2
**pickup (5)**
43:10,12,19;58:3,7
**pictures (3)**
36:25;37:17;52:6
**pill (5)**
57:11,18,25;58:5,9
**Pine (1)**
9:18
**pissed (1)**
27:18
**pistols (1)**
34:25
**place (4)**
7:20;23:19;52:18;
53:11
**placed (2)**
18:20;35:6
**Plaintiff's (1)**
35:18
**plan (6)**
15:10,13;18:8;23:7,8,
13
**planning (1)**
56:3
**plants (6)**
14:24;15:4;46:7,8,11,
13
**played (2)**
32:14,14
**playing (1)**
20:14
**please (2)**
4:5;44:21
**plus (1)**
54:13
**plywood (1)**
54:14
**pm (1)**
59:3
**point (11)**
6:23;22:3;24:24;
31:12,17,18,19,20;37:9;
49:19;51:19
**Police (22)**
8:18;12:18,18,20;
14:21;16:16;20:10;26:2;
28:13;30:18;31:7;33:21;
35:5;39:22;45:23;49:8,
25;50:3,11,13,15,20
**policy (1)**
11:6
**position (2)**

16:24,25
**possibility (6)**
19:10,14,17 22;20:13,
17
**possible (1)**
20:17
**possibly (1)**
49:19
**post (1)**
29:6
**posted (1)**
38:5
**potentially (1)**
19:7
**Powell (12)**
4:13;8:4;14:21;16:16;
20:10;30:18;33:21;35:5;
39:22;45:23;49:8;50:20
**prescription (5)**
41:20;42:8,13;43:4;
56:18
**pretty (1)**
12:3
**prior (8)**
4:11;7:18,22;16:17;
20:22;42:17;45:1,8
**probably (10)**
30:3;35:3;40:24;
47:22,24;48:1,9,15,16;
58:20
**problems (1)**
53:22
**Proceedings (1)**
59:2
**process (2)**
14:22;23:3
**prohibits (1)**
11:7
**proper (1)**
40:17
**property (3)**
38:13;48:5,14
**prosecutors (1)**
25:5
**provide (14)**
5:15;6:11;11:1 10,16,
20,25;12:8;47:6;49:7;
54:4,5,17;55:10
**provided (1)**
50:13
**PTSD (1)**
42:16
**public (1)**
20:13
**pulling (1)**
21:14
**purchased (3)**
32:20,21;55:11
**purpose (2)**
5:6;40:25
**purposes (2)**
5:11;45:15
**put (7)**

15:11;29:9;32:20,22;
37:16,18;43:18
**putting (3)**
15:9;29:5;52:5

## Q

**quite (2)**
30:11;39:16

## R

**ram (1)**
23:15
**ran (1)**
32:24
**read (4)**
23:12,14;45:2,10
**realistic (1)**
20:19
**realizing (1)**
51:22
**really (7)**
9:21;18:3;22:4;28:7;
30:14,16;48:3
**reasonable (6)**
17:23;22:6;23:21;
24:16;25:12,13
**reassess (1)**
25:23
**recall (9)**
27:25;28:17;34:2,3,
11;35:8;44:10;46:14;
56:21
**receipts (3)**
54:2,16;55:4
**received (2)**
13:17;45:25
**recognize (3)**
35:20,23;47:12
**record (1)**
4:6
**recovered (2)**
35:4,8
**reference (1)**
22:11
**referred (1)**
4:8
**regards (8)**
11:20,25;12:8,25;
45:12;49:8;50:13,14
**regular (1)**
48:18
**relate (2)**
48:25;49:2
**related (1)**
10:6
**relationship (1)**
32:3
**relative (4)**
19:20;20:22;21:9;57:8
**relaxer (1)**
58:18

**remember (11)**
22:24;26:15,24,25;
27:5,22;34:8;39:16;
41:24;44:6,16
**rendered (1)**
26:12
**repair (1)**
53:25
**repeat (1)**
6:7
**replace (1)**
54:9
**reports (3)**
12:19;23:12,14
**represent (3)**
4:13;7:8;33:20
**represented (1)**
6:20
**representing (3)**
7:3,5;54:25
**represents (1)**
4:18
**request (1)**
55:7
**require (2)**
41:20;42:12
**required (1)**
43:4
**residence (1)**
57:3
**residents (1)**
19:3
**respect (2)**
28:13,14
**rest (1)**
45:2
**retain (2)**
7:7;8:1
**retained (3)**
11:3;56:11,12
**reviewed (1)**
46:21
**rifle (1)**
36:23
**right (14)**
5:2,18;6:15,18,19;
9:14;16:8,11;36:2;
41:24;45:17;51:13;
57:25;58:23
**risk (3)**
19:2,7,9
**Road (1)**
8:4
**room (6)**
14:9,9,19;32:22;34:6;
44:13
**Roseau (1)**
8:16
**route (2)**
18:4,5
**Roy (6)**
50:22,23;51:4,11;
52:5,11

**Roy's (1)**
52:7
**ruined (1)**
54:13
**rule (4)**
25:1,2,10,12
**rules (1)**
5:3
**run (2)**
29:17,23
**running (1)**
32:24
**ruse (1)**
22:1

## S

**safer (1)**
21:16
**safest (1)**
18:4
**safety (1)**
18:3
**same (4)**
5:3;40:18,21;58:16
**sat (3)**
31:25;32:1;51:1
**saw (7)**
29:11;31:10;38:2;
43:1;46:25;50:15;52:10
**saying (8)**
7:14;9:13;27:19;41:5;
48:21;52:19,24;53:13
**scenarios (1)**
20:19
**schedule (2)**
29:6,9
**Scout (2)**
37:9,14
**scouts (2)**
51:25;52:1
**screwdriver (1)**
49:3
**screwing (1)**
54:15
**screws (1)**
54:15
**search (34)**
11:21,23;12:1,9,13,15;
13:1,13;14:22;15:5;
16:17;18:1,22,25;19:4,
18,21;20:12,23;21:6,7,8;
23:9,16;25:21,22;26:20;
30:19;31:13,23;33:5,22;
56:22;57:3
**second (1)**
44:21
**seconds (5)**
24:10,12,17;25:11,14
**seeing (4)**
29:13,19;34:3,8
**seems (1)**
47:7

**selling (1)**
46:19
**send (2)**
13:20;56:17
**September (2)**
38:3;50:23
**septic (1)**
32:25
**Sergeant (11)**
12:22;13:6,8;14:3,5,
18;23:18,20;27:2,24;
46:1
**serving (1)**
25:5
**set (3)**
5:12;54:25;55:9
**sets (1)**
24:25
**several (4)**
18:2;21:10;30:4;35:13
**severe (1)**
42:16
**Shawn (14)**
35:25;37:8,10,12;
38:1;50:16;51:16;52:1,
1,3,4,5,6,13
**sheet (1)**
5:4
**shell (1)**
38:20
**Sheriff's (3)**
8:17,22;48:19
**shield (3)**
27:17;49:20;53:3
**shirts (1)**
36:10
**shocked (1)**
29:19
**shoot (1)**
35:12
**short (6)**
8:18;14:12;27:3,11;
31:25;42:21
**shot (3)**
32:12,12,13
**shotgun (1)**
36:23
**show (2)**
50:25;56:24
**showed (1)**
51:5
**side (1)**
54:14
**siding (2)**
54:13,15
**signed (2)**
51:2,4
**similar (2)**
9:1;30:7
**sitting (5)**
14:8,9;27:10;44:13;
58:10
**situation (3)**

25:23;29:18,24
**skeet (1)**
32:13
**sleep (1)**
58:20
**slow (2)**
21:18,18
**small (1)**
14:7
**smell (1)**
34:12
**somebody (1)**
58:20
**somehow (1)**
17:6
**someone (1)**
37:13
**sometime (3)**
7:10;32:21;44:15
**sometimes (3)**
40:3,4,14
**somewhere (1)**
22:2
**son (12)**
13:10;15:20;32:7;
34:14,22;35:13,24;
36:24;38:16;39:7;40:13,
17
**son's (5)**
33:23;39:11,20;51:4;
58:1
**sore (1)**
58:7
**sorry (3)**
15:17;28:8;51 14
**sort (1)**
41:1
**speak (1)**
22:2
**special (3)**
8:8;10:2,19
**specific (4)**
21:1;22:9,12;23:9
**specifically (14)**
9:25;11:2;15:16;22:8;
35:1;38:17;39:9;40:15;
46:15,17;48:10,25;
50:12,17
**spent (1)**
51:18
**split-second (1)**
40:4
**stairs (1)**
29:12
**standard (1)**
24:24
**standing (1)**
29:13
**start (3)**
13:5;37:9;51:24
**started (2)**
8:16;29:5
**starting (1)**

4:12
**state (3)**
4:5;26:7,8
**stated (2)**
44:25;45:7
**statement (1)**
20:6
**states (1)**
44:25
**stayed (1)**
14:18
**staying (1)**
29:3
**steps (1)**
24:13
**Steve (3)**
18:13,14,21
**still (1)**
38:9
**stop (2)**
5:4;10:4
**stops (1)**
10:6
**stored (5)**
38:18;47:16,25;48:6,
16
**straightening (1)**
37:6
**strong (1)**
52:25
**struggling (2)**
40:3,8
**stuck (1)**
14:2
**stuff (6)**
37:7,15;47:16;48:16,
16;50:16
**stuffed (3)**
56:17,19,21
**subject (1)**
19:21
**subscribed (1)**
48:21
**subscription (1)**
48:19
**subsequent (5)**
27:23;28:15;31:22;
33:22;35:5
**substance (1)**
7:24
**suffers (2)**
40:13;42:11
**summarize (1)**
8:14
**summers (1)**
37:11
**supervisor (3)**
18:15,17,18
**supper (2)**
44:7,7
**suppose (6)**
19:5;20:17;33:3;43:1;
49:11;58:19

Supreme (1)
26:13
**Sure (20)**
4:7;6:2;11:15;12:11;
14:6;17:3,8;29:2;36:15;
39:19;41:18;44:7,11;
46:24;47:15,15;49:4;
55:12;56:2;58:4
**suspect (1)**
56:23
**suspicions (1)**
34:16
**SWAT (1)**
56:8
**sworn (1)**
4:2
**system (1)**
32:25

**T**

**tablet (1)**
57:22
**talk (12)**
11:15;13:14;14:7;
20:19;21:23,24;28:12,
22;30:4;31:12;46:3;
51:15
**talked (4)**
18:4;48:4;51:16;52:15
**talking (6)**
37:8;40:8;42:20;
44:13;50:21;51:24
**target (2)**
32:12;35:12
**task (8)**
9:8,12,22,25;15:9;
24:24;28:21;39:25
**team (5)**
16:7;22:9;23:1;25:8,8
**teams (2)**
30:9;56:8
**technical (1)**
56:1
**Television (1)**
44:15
**telling (1)**
27:6
**ten (2)**
24:17;39:18
**terrible (1)**
51:8
**test (9)**
46:22;47:12,13,18,19;
48:1,3,5,13
**testified (2)**
4:2;27:21
**testify (1)**
30:22
**testifying (1)**
56:15
**testimony (18)**
5:7,10;10:25;11:7,11,

16,20,25;12:8,10;21:4;
24:2;47:6;49:7;50:13;
53:6;55:19,25
**Thanks (1)**
58:23
**THC (1)**
47:2
**therefore (1)**
11:19
**thinking (1)**
51:21
**third (1)**
14:7
**Thomas (1)**
4:7
**THOMPSON (24)**
4:4,13;7:6;12:5;15:19;
16:1;19:13;20:3;23:5;
24:1;33:6,10;35:16;
39:3,6;44:19;45:9;
50:10;54:24;55:6,13;
58:13,17,25
**thought (2)**
21:4;53:6
**three (1)**
14:1
**throughout (2)**
7:15;21:1
**thrown (1)**
19:24
**times (13)**
4:23,24;21:2,5;25:24,
25;33:25;48:17,19,20,
22,23,24
**timing (2)**
43:18,19
**tipped (1)**
19:23
**titled (1)**
34:6
**today (4)**
4:16;5:6;6:20;33:18
**together (2)**
15:9,11
**told (16)**
13:11,12;14:19;15:8;
16:4;18:10,25;27:18;
29:2,8;40:7,13,15,16,18;
52:5
**TOM (10)**
4:1,9,10,12;20:7;
29:10;32:3;49:5;50:24;
57:17
**took (9)**
7:17,20,20;8:19;
23:19;37:16,19;54:10;
58:9
**tools (1)**
48:8
**top (1)**
54:8
**tort (1)**
54:22

**totality (2)**
17:10;25:16
**towards (2)**
44:24;45:4
**town (2)**
8:20;31:25
**traffic (2)**
10:4,6
**trained (1)**
25:3
**training (4)**
10:2;55:25;56:4,7
**trap (1)**
32:13
**treated (3)**
41:11;42:22;43:2
**trial (3)**
5:11;11:1:17:4
**Tricia (8)**
7:10;27:16;29:12,17,
23;34:19;42:11;53:3
**Tricia's (2)**
14:23;55:21
**tried (3)**
15:6;18:11;40:11
**truck (1)**
44:14
**truly (1)**
20:1
**try (1)**
29:17
**trying (5)**
29:14;40:11,12,25;
55:1
**turn (4)**
25:25;26:1;44:20,21
**turning (1)**
49:23
**two (11)**
7:21;15:2,11,11;27:7;
28:4;36:21,22;46:7,8;
47:1
**type (2)**
21:18;23:2
**types (2)**
30:10;32:10
**typically (1)**
23:2

**U**

**under (2)**
5:7;19:19
**understood (5)**
5:16,23;6:13;23:13,20
**up (17)**
13:16,23;14:14;21:14,
14;24:5;30:24;31:12,19,
20;44:14;46:2,5;47:25;
48:8;50:4;57:25
**upon (6)**
17:10;19:1,18;23:7;
24:2;25:15

**upset (15)**
46:8;49:14,15,16,18,
21,23,25;52.14,16,23;
53:8,17,18;55:19
**use (3)**
7:15;38:23;42:9
**used (5)**
5:10;36:20;53:23;
55:5;56:17
**using (9)**
27:16;34:15.17,18,19;
46:16;47:13;: 9:20;53:2

**V**

**vast (2)**
56:6,13
**vehicle (2)**
43:25;45:2
**versus (2)**
24:7;26:8
**vest (9)**
38:15,18,20,22,22,24;
39:7,8,9
**vests (7)**
36:10,11,12,12;37:1;
38:12;48:4
**viable (3)**
52:20;53:13,21
**visited (1)**
32:13
**voice (1)**
6:12

**W**

**WACHSMUTH (8)**
4:1,7,9;20:7:38:16;
44:25;45:7;57:16
**wait (4)**
23:21;24:10;2::11,12
**waiting (1)**
49:21
**walked (3)**
13:24;14:1;58:3
**walk-through (1)**
21:18
**Walter (1)**
41:14
**Walters (1)**
41:14
**warrant (34)**
11:21,23;12:1,9,13,15;
13:1,13;14:22;15:5;
16:18;18:22;19:1,4,18,
21;20:12,23;23:9,16;
25:21,22;26:2,6,6,20;
28:6;30:19;31:14,23;
33:5,23;56:22;57:3
**warrants (8)**
18:1;21:6.7,8;2: :6.24,
25;26:1
**watched (1)**

**32:1**
**water (1)**
58:9
**waved (1)**
13:24
**way (8)**
12:14;15:18;21:22;
22:6;27:14;28:8;49:15;
52:15
**ways (1)**
30:17
**weapons (1)**
37:2
**wear (1)**
38:21
**wearing (1)**
38:22
**weren't (3)**
52:17,23;53:17
**Westby (6)**
4:17;55:15,16,18;
58:12,16
**what's (7)**
6:24;15:1;23:11;
33:11;35:17;42:15;46:6
**whole (1)**
54:10
**wife (2)**
14:19;44:7
**willing (2)**
21:25;54:4
**window (1)**
29:14;54:12
**without (3)**
22:5;24:18,18
**WITNESS (15)**
7:1,5;10:21,24;11:4,8,
12;14:5;15:23;20:1:
22:22;25:20;45:6;50:9;
58:18
**word (4)**
23:19;24:16,20,22
**words (3)**
16:11;27:18;29:23
**work (15)**
8:24,25;9:2,5,7;13:10;
28:23;32:15,19;33:5;
43:12,18;45:1;56:16;
58:3
**worked (6)**
30:7;32:13;37:10;
43:9;48:18,22
**working (8)**
9:19,25;28:25;37:9;
40:1,6;51:25;58:7
**wrong (1)**
51:14
**Wyoming (12)**
8:4,8,23;10:8,11,14,
16;11:7;22:16,20;25:10;
38:13
**Wyoming's (1)**
9:1

**Y**

**yard (1)**
21:14
**year (2)**
8:19;39:16
**years (6)**
8:12,15;18:1;34:16;
37:10;39:18



POWELL POLICE DEPARTMENT

250 N. CLARK ST    POWELL, WY 82435    307-754-221

SUPPLEMENT 4

___ v. City of
Powell- CV 10-041J
Plaintiff's Exhibit
# _____ 39

## INVESTIGATION CONTINUED: Inv D.C. Brown

On Tuesday, February 24, 2009, Sgt Eckerdt and I interviewed Bret Wachsmuth at the LEC. During the interview, Wachsmuth stated substantially as follows:

Wachsmuth lives at 870 E. North Street. Powell Wyoming with his wife, Tricia Wachsmuth. He was informed why we needed to talk with him. Wachsmuth stated that most pills are his and that what he has are legal. He is on disability. Wachsmuth stated that he takes Paxal, Lorazipan, Carisaprotal, Hydrocodone, a Celibrex type drug and Oxecoton. Wachsmuth denied dealing in prescription drugs. He was asked if his wife would be doing this without his knowledge and he stated no.

I asked him about the stuffed animals that were sent to them with pills inside. He stated that his wife has stuffed animals and that they are cut open but that when she was a child she did that. He stated that her mother sends her stuff all the time

Wachsmuth stated that he had two (2) Marijuana plants under the stairs that were approximately 1-1/2 months old. He had three plants but one was a male so he burnt it. He stated that the male plant does not have much THC so if you smoked it, it would give you a headache.

Wachsmuth stated that he had plants when he lived in Minnesota for personal use, this way he did not have to buy any. He stated that he hadn't smoked Marijuana in 5 years until recently.

Wachsmuth stated that he is Bi-polar and that Marijuana helps him.

I asked him about the Marijuana bud that was found on the table. He stated that Tricia found it under the couch today, we would find hair on it.

Wachsmuth stated that he takes care of the plants and that his wife smokes it. He denied selling Marijuana and grew it so he did not have to deal with others.

Wachsmuth stated that he smoked Marijuana 4-5 days ago and that he got it from Josh Bessler.

Wachsmuth stated that they own a 1993 Ford Ranger and his wife drives a 1999 Chevy Blazer.

Wachsmuth informed us that he received a message from Josh Bessler that stated "get your shit out of the house, I'm turning you in for illegal guns, Meth, pipes and pot. I asked him if I could see his cell phone. He agreed and stated it was from a restricted number. I looked at it and found at 1:42 pm, on 2-24-09 there was a call.

I asked him why he has guns laying around and he stated that he was afraid of Josh Bessler.

Wachsmuth stated that they met Bessler through body piercing's. He stated that Bessler needed a place to stay. Wachsmuth stated that Bessler had been looking at child porn and doing Meth..

Wachsmuth stated that Bessler lived with them for 3-4 weeks and that approximately 2 weeks ago they kicked him out. He stated that they kicked him out the first week of February and noticed the porn a week after he moved out.

Wachsmuth wife, Tricia, was looking up the history on their computer approximately 3 weeks ago and found child porn. Wachsmuth stated that it looked like young kids, 12 years of age.

Wachsmuth stated that he went to his fathers house prior to being arrested to work on his vehicle. He was there for approximately 50 minutes before the police arrived. He stated that he mentioned to his father about the phone message from Bessler but his father did not say anything.

Wachsmuth was informed that he was under arrest and would be going to the Park County Jail.

### EVIDENCE:
Above statement.

### UNDEVELOPED LEADS:
None.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| P04 | BROWN, DAVE | 2/25/2009 | P10 | ECKERDT, ROY | 3/23/2009 |



**ATTACHMENTS:**
None.

**STATUS:**
Open.

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| P04 | BROWN, DAVE | 2/25/2009 | P10 | ECKERDT, ROY | 3/23/2009 |