# Appendix Thirteen

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Dave Brown*
*October 7, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 10-7-10 Dave Brown_scoped.txt
**Min-U-Script® with Word Index**

**DAVE BROWN - October 7, 2010**                                      Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF WYOMING

 3  --------------------------------------------------

 4  TRICIA WACHSMUTH,                  )
                                       )
 5           Plaintiff,                )
                                       )
 6      vs.                            )  NO. 10-CV-041J
                                       )
 7                                     )
    CITY OF POWELL, AND IN THEIR       )
 8  INDIVIDUAL CAPACITY, TIM           )
    FEATHERS, CHAD MINER, MIKE         )
 9  CHRETIEN, ROY ECKERDT, DAVE        )
    BROWN, MIKE HALL, BRETT LARA,      )
10  MATT McCASLIN, ALAN KENT, MATT     )
    DANZER, OFFICER BRILAKIS, LEE      )
11  BLACKMORE, CODY BRADLEY, KIRK      )
    CHAPMAN, JOHN DOES #1-#4,          )
12                                     )
             Defendants.               )
13

14         DEPOSITION OF DAVE BROWN
           9:22 a.m., Thursday, October 7, 2010
15

16

17

18           Pursuant to notice, the deposition of DAVE

19  BROWN was taken in behalf of Plaintiff in accordance

20  with the applicable Federal Rules of Civil Procedure at

21  270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22  Registered Professional Reporter and Notary Public of

23  the State of Montana.

24

25
```

**DAVE BROWN - October 7, 2010**                                      Page 2

```
 1                    APPEARANCES

 2  FOR PLAINTIFF:

 3           Mr. Jeffrey C. Gosman
             Gosman Law Office
 4           123 W 1st Street
             P.O. Box 51267
 5           Casper, WY 82601-2481
             Telephone: (307)265-3382 - Fax: (307)265-6715
 6           E-mail: jeff@gosmanlawoffices.com

 7

 8  FOR INDIVIDUAL DEFENDANTS:

 9           Ms. Misha Westby
             Senior Assistant Attorney General
10           2424 Pioneer Avenue, 2nd Floor
             Cheyenne, WY 82002
11           Telephone: (307)777-5477 Fax: (307)777-8920
             E-mail: mwest@state.wy.us
12

13  FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
    CAPACITY:
14

15           Mr. Tom Thompson
             MacPerson, Kelly & Thompson
16           616 West Buffalo
             P.O. Box 999
17           Rawlins, WY 82301-0999
             Telephone: (307)324-2713 - Fax: (307)324-7348
18           E-mail: tthompson@wyomingattorneys.net

19

20  Also Present:  Tim Feathers

21

22

23

24

25
```

**DAVE BROWN - October 7, 2010**                                      Page 3

```
 1              INDEX TO WITNESSES

 2                                          PAGE

 3  DAVE BROWN

 4     Direct Examination by Mr. Gosman ..............5
       Signature Page ...............................61
 5     Reporter's Certificate .......................62

 6

 7

 8                   EXHIBITS

 9  EXHIBIT          DESCRIPTION              PAGE

10    10      Notes of Wachsmuth Warrant .............34

11    19      PPD CAD Incident Report ................30

12    27      Countermeasures Tactical Institute ......21
              Patrol Officer Specialized Tactics
13            Course

14    31      Wyoming P.O.S.T. Training Records .......17

15    35      PPD Patrol Friday Training .............23

16    39      PPD Supplement 4 by Dave Brown .........54

17    44      Photographs ............................47

18

19

20

21

22

23

24

25
```

**DAVE BROWN - October 7, 2010**                                      Page 4

```
 1        MR. GOSMAN: Yesterday, I asked officer Miner
 2  to produce the training materials for his Distraction
 3  Device Certificate, which was part of his P.O.S.T.
 4  training.  And he kindly offered to do so and
 5  apparently brought the book here yesterday afternoon.
 6  But I didn't get a chance to take a look at it.  It's
 7  gone this morning.
 8        I did submit a request for production in May
 9  of 2010 requesting all documentation, handbooks, or
10  other materials for the entire training of each
11  individual defendant in the areas of dynamic entry,
12  deployment or use of diversionary device, execution of
13  search warrants, use of long guns or rifles in aid of
14  any police activity and any other professional law
15  enforcement training received by the individual
16  defendants.
17        There was no objection to that made at the
18  time.  And -- actually, I think there was an objection.
19  But it wasn't relative to whether or not the training
20  occurred before or after the date that the Wachsmuth
21  residence was searched.
22        And so I would request that those materials
23  be supplied to me.  And this request is pursuant to
24  Rule 37.  And I think that's all I need to say about
25  it.  Thank you very much.
```

Tricia Wachsmuth v.
City of Powell, et al.

**Dave Brown**
**October 7, 2010**

DAVE BROWN - October 7, 2010                               Page 5

1      MS. WESTBY: What's Rule 37?
2      MR. GOSMAN: That is the Rule that requires
3  that you make a good faith effort to resolve any
4  discovery disputes before we bring them to the
5  attention of the Court.
6      MS. WESTBY: I guess I would take issue with
7  your phrasing of this being a certificate. It was a
8  certificate of completion. As the officer stated,
9  there is no certification in that kind of class. That
10  being said, we will duly supplement our discovery
11  responses.
12      MR. GOSMAN: Thank you very much.
13          DAVE BROWN,
14  having been first duly sworn testified as follows:
15      DIRECT EXAMINATION
16  BY MR. GOSMAN:
17      Q. Officer Brown, have you ever given a
18  deposition before?
19      A. No, sir.
20      Q. We will go through a process today in which I
21  will ask you questions, and you will be required to
22  answer them.
23      Do you understand that you are under oath
24  here today, sir?
25      A. Yes, sir.

DAVE BROWN - October 7, 2010                               Page 7
Direct Examination by Mr. Gosman

1      Q. Have you ever been arrested for a felony?
2      A. No.
3      Q. Have you ever been accused of a crime
4  involving dishonesty?
5      A. No.
6      Q. Have you ever been divorced?
7      A. Yes.
8      Q. And in what court were the divorce
9  proceedings finalized?
10      A. I don't remember. It was either in Arizona
11  or California, because it was split and papers were
12  sent back and forth. So I can't remember.
13      Q. It was a long time ago?
14      A. It was 1984, I want to say. Yes.
15      Q. Did you have a restraining order placed
16  against you at that time?
17      A. No.
18      Q. Was there an application for a restraining
19  order in that or in any other case?
20      A. No.
21      Q. Where did you go to high school, Officer
22  Brown?
23      A. Victor Valley Senior High in Victorville,
24  California.
25      Q. Did you graduate from that high school?

DAVE BROWN - October 7, 2010                               Page 6
Direct Examination by Mr. Gosman

1      Q. And because of that, it's important that you
2  ask for clarification if there is any question that you
3  don't understand.
4      A. Yes, sir.
5      Q. And if you would allow me to finish my
6  question before you begin your answer. We haven't had
7  as much trouble with that as we might have thus far,
8  but it's always an issue. So there is a tendency to
9  sort of jump in with answers when you can figure out my
10  question before I'm done with it.
11      And we can take a break at any time, and will
12  do so. However, we cannot take a break while a
13  question is pending, do you understand that?
14      A. Yes, sir.
15      Q. What is your full name, Officer?
16      A. David C. Brown.
17      Q. What is your current address?
18      A. 250 North Clark, Powell, Wyoming.
19      Q. Are you currently on any medication that
20  would impair your ability to give truthful answers?
21      A. No, sir.
22      Q. Do you have any medical problems or issues
23  that might interfere with your ability to give truthful
24  answers to this deposition?
25      A. No, sir.

DAVE BROWN - October 7, 2010                               Page 8
Direct Examination by Mr. Gosman

1      A. Yes, I did.
2      Q. What year was that.
3      A. 1980.
4      Q. Did you have any schooling beyond high
5  school?
6      A. Yes.
7      Q. Describe that, please.
8      A. Victor Valley Junior College, Victorville,
9  California. I have an associates of fire science. I
10  went to Northern Arizona University. I have a
11  bachelors degree in criminal justice. And I went to
12  Boston University and have a masters in criminal
13  justice.
14      Q. And what years did you attend Boston
15  University?
16      A. I graduated in 2006 from there.
17      Q. And let's go ahead and talk about your work
18  history. And let's start after your 2-year college in
19  Victorville.
20      A. I'll have to explain that, if you don't mind.
21      Q. That's fine.
22      A. I worked for the fire service in California
23  while I was going to school. And then I left to get my
24  bachelors degree. So a couple of my classes that I had
25  in northern Arizona, I transferred back to Victor

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 5 of 60
Tricia Wachsmuth v.                                                    Dave Brown
City of Powell, et al.                                             October 7, 2010

DAVE BROWN - October 7, 2010                                          Page 9
Direct Examination by Mr. Gosman

1  Valley College and got my two-year degree.
2  Q.  I understand that. So you started working in
3  some capacity related to fire control or something?
4  A.  Right out of high school, yes.
5  Q.  Why don't you run through your employment
6  history for me until you started with the Powell Police
7  Department?
8  A.  Well, from '80 to '83, I was a full-time
9  firefighter with the City of Victorville, California.
10 Left there, went to college. Had a lot of different
11 jobs. I was a bartender. I cleaned carpets. And I
12 worked for Sears, I believe, as an apartment manager.
13 So I had numerous jobs to fit my schedule.
14         When I graduated, moved to Las Vegas with my
15 wife, worked for Sears there until 1990, I believe it
16 was, and then came here.
17 Q.  You've been in Powell since 1990?
18 A.  Yes.
19 Q.  Have you worked for the Powell Police
20 Department since then?
21 A.  Yes, sir.
22 Q.  Had you had any prior police experience
23 before coming to Powell?
24 A.  No.
25 Q.  And had you been trained in any law

DAVE BROWN - October 7, 2010                                          Page 10
Direct Examination by Mr. Gosman

1  enforcement prior to that time?
2  A.  Just my degree. But the answer to that is
3  no.
4  Q.  Okay. When you began working for the Powell
5  Police Department, what was your rank?
6  A.  Patrol officer.
7  Q.  And have you worked continuously for the
8  Powell Police Department since 1990?
9  A.  Yes.
10 Q.  And are you a sergeant at this time?
11 A.  No, I'm not.
12 Q.  Let's see, your law enforcement required that
13 you complete a certification from the law enforcement
14 academy, correct?
15 A.  Yes.
16 Q.  And did you go through that program?
17 A.  Yes.
18 Q.  When did you do that?
19 A.  It was 1990. It was fall of 1990.
20 Q.  And are there certain requirements for
21 continuing education under Wyoming law that apply to
22 you, Officer?
23 A.  As in P.O.S.T. training hours?
24 Q.  Yes.
25 A.  Yes, sir.

DAVE BROWN - October 7, 2010                                          Page 11
Direct Examination by Mr. Gosman

1  Q.  How many hours do they require a year, do you
2  know?
3  A.  You know, that's changed. I don't know. I
4  want to say 20 or 40 every two years. I'm not exactly
5  sure.
6  Q.  Have you maintained those standards?
7  A.  Yes, I have.
8  Q.  And has your standing as a peace officer ever
9  been challenged or under investigation?
10 A.  No.
11 Q.  Have you ever had any discipline, including
12 verbal discipline in the last five years, that's not in
13 your personnel file?
14 A.  No.
15 Q.  Do you know if the Powell Police Department
16 places disciplinary matters in personnel files?
17     MR. THOMPSON: Objection as to form.
18     MS. WESTBY: Join.
19     THE WITNESS: Can you repeat that?
20 BY MR. GOSMAN:
21 Q.  If there is a disciplinary matter that comes
22 to the attention of the Chief of Police with the Powell
23 Police Department and there's some action taken, does
24 that action -- is it reflected in the personnel file as
25 far as you know?

DAVE BROWN - October 7, 2010                                          Page 12
Direct Examination by Mr. Gosman

1  A.  I don't know.
2      MR. THOMPSON: Objection as to form.
3      MS. WESTBY: Join.
4  BY MR. GOSMAN:
5  Q.  Officer, do you know what witness tampering
6  is?
7  A.  Yes.
8  Q.  Do you realize that witness tampering is
9  against the law?
10 A.  Yes.
11 Q.  Why don't you tell me in your own words what
12 happened between you and Lieutenant Patterson last
13 weekend at the high school football game?
14     MS. WESTBY: Object to the form of the
15 question. You know, the way you phrase that, had we
16 been in Court, Judge Downes would have sanctioned you.
17 Don't ever threaten. And in fact -- you know, before
18 we go any further, let's go take a minute.
19     MR. GOSMAN: That's fine. Take a minute.
20         (Recess taken 9:32 to 10:11
21         a.m., October 7, 2010)
22     MS. WESTBY: Back on the record. I've had an
23 opportunity to talk to the witness, advised him of his
24 rights. He is going to take the opportunity to go talk
25 to independent counsel and decide how to proceed. And

Tricia Wachsmuth v.
City of Powell, et al.

Dave Brown
October 7, 2010

DAVE BROWN - October 7, 2010                                    Page 13
Direct Examination by Mr. Gosman

1  so we will take a break, or you can call somebody else
2  in between.
3          MR. GOSMAN: We can put it off. And if we
4  have to, we can continue the deposition for that issue.
5          MS. WESTBY: No, we're not going forward.
6  He's going to go talk to someone. We'll take a
7  break --
8          MR. GOSMAN: No. we're not going to take a
9  break.
10         MS. WESTBY: We're taking a break.
11         MR. GOSMAN: I'm going to pass on that
12  subject. At the next opportunity --
13         MS. WESTBY: No.
14         MR. GOSMAN: -- he can visit with somebody
15  else --
16         MS. WESTBY: No.
17         MR. GOSMAN: -- an attorney about his rights.
18         MS. WESTBY: This deposition has been stopped
19  at this point.
20         MR. GOSMAN: No, it hasn't.
21         MS. WESTBY: We don't know what's going to
22  come up in this deposition. It's been stopped at this
23  point. If you would like to call another officer to
24  depose while he is doing what he needs to do, based on
25  your behavior at the beginning of this deposition, we

DAVE BROWN - October 7, 2010                                    Page 14
Direct Examination by Mr. Gosman

1  can do that. But we're taking a break until he has the
2  opportunity to do what he needs to do based on your
3  questions.
4          MR. GOSMAN: Okay. Let's go ahead -- I don't
5  want to call the magistrate again. You may take
6  pleasure in that, but I don't.
7          MS. WESTBY: Well, I would rather call the
8  judge on this one.
9          MR. GOSMAN: I'm sure you would. We can call
10  Downes maybe.
11         MS. WESTBY: Absolutely. I would love to put
12  this in front of Judge Downes. I know what his
13  reaction would be to it.
14         MR. GOSMAN: Okay.
15         MS. WESTBY: I've actually seen it.
16         MR. GOSMAN: All right. Let's go ahead --
17  now, you're available this afternoon?
18         MS. WESTBY: Well, he will let us know when
19  he has had the opportunity to talk to someone.
20         MR. GOSMAN: All right. You're telling me
21  that you're stopping this deposition from proceeding on
22  every other topic, even though I have agreed to go
23  forward without any further discussion on this topic.
24         MS. WESTBY: I don't know where this is
25  going. I'm not going to hold the deposition open. It

DAVE BROWN - October 7, 2010                                    Page 15
Direct Examination by Mr. Gosman

1  needs to proceed in one session. We need to take a
2  break for him to have the opportunity to talk to
3  someone. And then we can pick the deposition back up
4  and we will know what his determination is.
5          MR. GOSMAN: All right. I wouldn't disagree
6  with a break. But if you -- I have no intention of
7  coming back to Powell to take Officer Brown's
8  deposition. So maybe we will have to call the judge.
9          But if Officer Brown needs the opportunity to
10  visit with an attorney about this, I'm okay with that.
11  Actually, I think we could proceed with the deposition
12  and still permit him that opportunity. But I'll work
13  with you on that.
14         And then we can do Officer Brown later today.
15         MS. WESTBY: If he's had the opportunity to
16  meet with someone.
17         MR. GOSMAN: I think he better --
18         MS. WESTBY: I think you better not make any
19  threats --
20         MR. GOSMAN: All right.
21         MS. WESTBY: -- to this witness again.
22         MR. GOSMAN: I'm not making any threats to
23  the witness.
24         MS. WESTBY: You have already threatened this
25  witness.

DAVE BROWN - October 7, 2010                                    Page 16
Direct Examination by Mr. Gosman

1          MR. GOSMAN: No, I haven't threatened this
2  witness.
3          MS. WESTBY: Enough. Enough.
4          MR. GOSMAN: Okay. Well, I guess we settled
5  that then, huh?
6          Officer Brown you're free to go consult with
7  an attorney. And I would encourage you to do that this
8  morning.
9          MS. WESTBY: I would encourage you to stop
10  advising this witness.
11         MR. GOSMAN: All right. That's fair enough.
12         MS. WESTBY: The deposition is at an end.
13              (Recess taken 10:14 a.m. to
14               3:16 p.m., October 7, 2010)
15  BY MR. GOSMAN:
16     Q.   Officer, we began a discussion about
17  something that happened at the high school football
18  game last Friday. You've had a chance to visit with an
19  attorney. Have you been instructed by your attorney --
20  for instance, you would be advised to exercise a
21  constitutional right not to discuss that conversation,
22  or are you free to discuss that conversation?
23         MS. WESTBY: I am going to advise my client
24  not to answer that question or any question related to
25  that or related to Patterson because you have inferred

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 7 of 60
Tricia Wachsmuth v.                                                                    Dave Brown
City of Powell, et al.                                                              October 7, 2010

1  criminal conduct. And it has nothing to do with this
2  case.
3        MR. GOSMAN: Very good. All right. That's
4  fine.
5        (Exhibit 31 identified)
6  BY MR. GOSMAN:
7    Q. That's going to shorten this deposition a
8  little bit. Not much, frankly.
9        Let's go ahead and start with Exhibit 31.
10 And your training is in there somewhere, Officer Brown.
11 I believe -- let's see if I can find it. It begins
12 with the Document No. 658 in Exhibit 31.
13   A. Okay.
14   Q. Would you take a minute and summarize your
15 training as it pertains to the field of dynamic entry,
16 which is a topic we've been discussing at length in
17 these depositions. And by dynamic entry, I mean with a
18 team of officers, usually a breaching team perhaps
19 involving flashbang devices and a superior show of
20 force. I'll stop there. Your training as it relates
21 to those -- that type of tactical entry.
22   A. Just tell you which ones?
23   Q. Yes.
24   A. Well, I took a Patrol Response Critical
25 Incident, 4/22/93. Looks like on 8/6/01, Patrol

1  Response to the Active Shooter was a class. 9/13/01
2  was Patrol Response to an Active Shooter.
3        You want me to go all the way to the end?
4    Q. I tell you what, in order to help me,
5  frankly, keep track of this, let's stop after each one
6  of those.
7        Going back to the -- I believe it was in
8  August of '01 -- yes, the Patrol Response to the Active
9  Shooter.
10   A. Okay.
11   Q. That was a ten-hour course, and that course
12 was held in Worland, Wyoming. Do you still have the
13 training materials for that course?
14   A. If I didn't turn them in with the other
15 stuff, I don't know where they are at.
16   Q. And do you remember who instructed in that
17 course?
18   A. No, I don't.
19   Q. Describe for me, if you can, what that course
20 was about.
21   A. If I remember right, it was responding to an
22 active shooter in a school.
23   Q. I see. Okay. A school setting?
24   A. Yes.
25   Q. Very good. Okay. Now, let's go ahead and go

1  back up. I believe your first one was in '93. That
2  was a long time ago. But if you can remember anything
3  about that course and, let's see, can you point it out?
4  The previous course that you had -- I believe it was in
5  '93 that dealt with dynamic entry? Or -- yes, dynamic
6  entry.
7    A. I don't see one for dynamic entry in '93.
8    Q. Okay. Let's start on the first page then.
9  If there's anything on that first page, let's talk
10 about it.
11   A. Is it the Patrol Response to Critical
12 Incident?
13   Q. Yes. it is.
14   A. That's on 4/22/93.
15   Q. Okay. Very good. And that was a 24-hour
16 course, and it was held in Powell, Wyoming?
17   A. Yes.
18   Q. Do you remember anything about that training?
19   A. It was in Powell, Wyoming.
20   Q. Okay. Let's go ahead and go on. So we made
21 it through 2001. Well, we've identified two courses
22 and we got to 2001. But I may have missed one, so make
23 sure I haven't done that.
24       Let's see, 8/22 of '02, Patrol Interdiction
25 Emergency Response. 8/22/02 -- oh, that's 2002. I'm

1  sorry.
2    A. Yes, I got that.
3    Q. And that looks like it may be the next one.
4  We discussed the ten-hour course in August of 2001,
5  Patrol Response to the Active Shooter. And then in --
6  on 8/22 of '02, there was the Patrol Interdiction
7  Emergency Response, and that was, apparently, put on by
8  the law enforcement academy?
9    A. Yes.
10   Q. And do you remember -- do you have those
11 training materials?
12   A. I believe I turned those in.
13   Q. And I don't believe I have them. So I'll
14 just -- let's see, if I can keep track of this stuff.
15       Okay. Tell me a little bit about that
16 course.
17   A. That was held in Douglas. It was held at
18 the -- I want to say the high school. It could be a
19 middle school or a high school. But we did some
20 classroom stuff and we did a lot of stuff in the high
21 school. And it was, again, an active shooter in a
22 school.
23   Q. The entire 40-hour course?
24   A. I believe so.
25   Q. Okay. Let's look for the next class, again,

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 8 of 60

Tricia Wachsmuth v.                                                    Dave Brown
City of Powell, et al.                                               October 7, 2010

DAVE BROWN - October 7, 2010                                          Page 21
Direct Examination by Mr. Gosman

1  dealing with dynamic entry.
2     A. Looks like 10/5 of '05.
3     Q. And that would be the Patrol Tactical
4  Response course. Let's see, that's the course that's
5  put on by Countermeasures Tactical Institute; is that
6  correct?
7     A. I believe so.
8     Q. Or Incorporated?
9        And there were several other officers of the
10 Powell Police Department that took that course at the
11 same time. Do you remember that?
12    A. Yes.
13           (Exhibit 27 identified)
14    Q. And what was -- let's see, there is a manual
15 for that, and we have it in evidence. It's Officer
16 Miner's. It's Exhibit 27. I want you to look at
17 Exhibit No. 27, and tell me if that is the manual that
18 you remember or the course materials for the Patrol
19 Tactical Response.
20       MS. WESTBY: Just for the record, I believe
21 that you do have all of those records. I think that
22 first one that you were looking for starts at Brown
23 Training 00045.
24       MR. GOSMAN: The Patrol Interdiction
25 Response?

DAVE BROWN - October 7, 2010                                          Page 22
Direct Examination by Mr. Gosman

1        MS. WESTBY: No. The one that you asked
2  earlier about and said you didn't have.
3        MR. GOSMAN: Earlier today?
4        MS. WESTBY: Just a couple minutes ago.
5        MR. GOSMAN: Okay. I don't even remember
6  which one that was.
7        MS. WESTBY: It was the school shooter.
8        MR. GOSMAN: Okay. That was the ten-hour
9  course. Thank you.
10       THE WITNESS: It looks familiar.
11 BY MR. GOSMAN:
12    Q. Okay. We're still back on the P.O.S.T.
13 records, and we were at 50-hour Patrol Tactical
14 Response course in October of '05.
15       And let's go ahead and run through the rest
16 of that list and make sure we've covered everything.
17    A. There's one at the end, too.
18    Q. And that would be Immediate Action for
19 Patrol?
20    A. Yes.
21    Q. 11/14 of '09?
22    A. Yes.
23    Q. Have you ever had any training that was
24 specifically identified as SWAT training?
25    A. No.

DAVE BROWN - October 7, 2010                                          Page 23
Direct Examination by Mr. Gosman

1     Q. Have you ever trained in part of a designated
2  team at the Powell Police Department?
3        MS. WESTBY: Object to the form of the
4  question.
5        MR. THOMPSON: Join.
6  BY MR. GOSMAN:
7     Q. And that would be a sort of a special tactics
8  team that was designated to handle tactical situations?
9        MS. WESTBY: Object to the form of the
10 question.
11       MR. THOMPSON: Join.
12 BY MR. GOSMAN:
13    Q. You can answer.
14       MS. WESTBY: Go ahead, yes.
15       THE WITNESS: No.
16 BY MR. GOSMAN:
17    Q. Have you ever participated in in-service
18 training at the Powell Police Department that focused
19 on dynamic entry tactics, including chemical flashbang
20 devices, entry itself, room clearing?
21    A. Yes.
22           (Exhibit 35 identified)
23 BY MR. GOSMAN:
24    Q. Let's go ahead and take a look at Exhibit 35.
25 And if you could go through the documents in Exhibit 35

DAVE BROWN - October 7, 2010                                          Page 24
Direct Examination by Mr. Gosman

1  and identify for me --
2     A. Yes, sir.
3     Q. If you could go through those documents and
4  identify for me the in-service training that you
5  participated in that dealt with dynamic entry.
6        MS. WESTBY: That he recognizes referred to
7  in this document, correct?
8        MR. GOSMAN: Yes, ma'am.
9        THE WITNESS: Do you want policy or hands-on?
10 BY MR. GOSMAN:
11    Q. Let's do both, and we'll talk about the
12 difference. When you get to one, call it out and we'll
13 go through it one by one.
14    A. These two I don't recognize these. It
15 doesn't mean they are not ours. I just don't recognize
16 this format and stuff.
17    Q. And you're referring to -- let's see,
18 Document No. 1818 and 1819?
19    A. Yes. I'm not saying they are not ours, it's
20 just this doesn't look familiar.
21    Q. That's fine.
22    A. I know these are records. I can't tell you
23 which ones I was in unless we have a list of who
24 attended.
25    Q. Okay. What do you know, Officer, about the

DAVE BROWN - October 7, 2010                                      Page 25
Direct Examination by Mr. Gosman

1  City of Powell Police Department in-service training
2  program?
3       MR. THOMPSON: Objection as to form.
4       MS. WESTBY: Join.
5  BY MR. GOSMAN:
6  Q.  Can you tell me about it?
7  A.  We try to train monthly, if we can.
8  Q.  Is it once a month?
9  A.  They try to do in-squad training on Fridays,
10 if they can, because of overtime. And then we'll spend
11 time out at the range, I think it's every other month
12 we'll go out to the range and do that. Or different
13 types of training, not necessarily go to the range, we
14 may run through something, a scenario based.
15 Q.  So at least once a month on a Friday, the
16 squads meet together?
17 A.  If they're available, yes.
18 Q.  And when I say meet together, do the squads
19 meet just with the squad members and train as a squad?
20 A.  It could be -- yeah, it could be hands-on.
21 It could be going over a policy. It could be anything.
22 Q.  All right. Do you know if those
23 in-service -- is it fair to call that Friday Training
24 in-service training?
25 A.  I call it Friday Training.

DAVE BROWN - October 7, 2010                                      Page 26
Direct Examination by Mr. Gosman

1  Q.  Do you know if there's any kind of a document
2  kept to confirm that the training occurred, what took
3  place, and who attended?
4  A.  I don't know.
5  Q.  Have you ever trained with the Powell Police
6  Department in a setting where a significant group of
7  officers, more than -- let's say more than six, have
8  actually done simulations of tactical entries involving
9  room clearing, breaching tactics, flashbang, that kind
10 of thing?
11      MR. THOMPSON: Objection as to form.
12      MS. WESTBY: Join.
13      Go ahead and answer the question.
14      THE WITNESS: I've trained, I can't tell you
15 if there were six people or four people. We have
16 trained.
17 BY MR. GOSMAN:
18 Q.  On the evening of the 24th of February, I
19 believe there were over ten officers involved. The
20 exact number is not in my mind. Have you ever trained
21 with a group that large in these Friday sessions?
22      MS. WESTBY: Object to the form of the
23 question.
24      MR. THOMPSON: Join.
25      Unless I tell you not to, just go ahead and

DAVE BROWN - October 7, 2010                                      Page 27
Direct Examination by Mr. Gosman

1  answer.
2       THE WITNESS: Okay. We have had training
3  with the department there, if that's what you're
4  asking, yes. We've had department training days with
5  the whole department there. Minus a couple of officers
6  who were covering the street.
7  BY MR. GOSMAN:
8  Q.  Sure.
9       And on those department training days, did
10 you cover the subject of dynamic entry, do you know?
11 A.  I'm pretty sure we have, yes.
12 Q.  Would they have been part of the in-service
13 training that we've been talking about, or is this
14 something else?
15 A.  This is just one of our training days.
16 Q.  Training days. Describe what training days
17 are for me, then.
18 A.  When I talk about in-service, I'm -- it's
19 Friday Training. I mean, some people may call it
20 in-service. Some may call it something else. But it's
21 Friday Training where the shifts get together their own
22 shifts, maybe a group of four will train, school
23 resource officers and myself may be in the morning
24 group or the afternoon group.
25      And then we have range day or whatever where

DAVE BROWN - October 7, 2010                                      Page 28
Direct Examination by Mr. Gosman

1  we all go out to the range and it may be a qualifying
2  shoot day. It may be a moving and shoot. It may be
3  something different.
4  Q.  Okay. And in that setting, you have the --
5  more or less, the whole department together?
6  A.  More or less, yes.
7  Q.  Okay. And have you trained in simulations of
8  dynamic entries as a group in that setting before?
9       MS. WESTBY: Object to the form of the
10 question. Asked and answered.
11      MR. THOMPSON: Join.
12      THE WITNESS: We have trained, yes. I'm not
13 saying all together, all 15 or 18 of us at one time.
14 But we've been out there and trained.
15 BY MR. GOSMAN:
16 Q.  And is that in the groups you talked about,
17 you know, between four and six?
18      MS. WESTBY: Object to the form of the
19 question. That misstates his testimony.
20 BY MR. GOSMAN:
21 Q.  If it does, I'll ask the officer to clear it
22 up.
23      MS. WESTBY: And I make my objection.
24      MR. GOSMAN: Yes.
25      MR. THOMPSON: Join.

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 10 of 60
Tricia Wachsmuth v.                                                                    Dave Brown
City of Powell, et al.                                                              October 7, 2010

DAVE BROWN - October 7, 2010                                    Page 29
Direct Examination by Mr. Gosman

1    THE WITNESS: If I could back up a second.
2    BY MR. GOSMAN:
3    Q.  Yes.
4    A.  It may not always be at the range. We may
5    have gone to the fairgrounds one day. So it could be
6    different.
7        And if you would repeat your last question,
8    please.
9    Q.  Were you training in groups of larger numbers
10   than the four to six that we talked about previously?
11   A.  I don't remember.
12   Q.  Okay. What was your role in the execution of
13   the search warrant on the Wachsmuth residence on the
14   24th of February 2009?
15   A.  My assignment was the backyard.
16   Q.  And how did you learn about this warrant
17   service?
18   A.  I was called at home.
19   Q.  Do you know approximately what time that was?
20   A.  It was in the evening
21   Q.  The warrant apparently was served around
22   9:15, when in relation to 9:15 was it that you first
23   received the call?
24   A.  I don't remember. There's probably something
25   I could look at that would tell me the time I arrived.

DAVE BROWN - October 7, 2010                                    Page 31
Direct Examination by Mr. Gosman

1    time relative to the 9:15 period when the Wachsmuth
2    house was searched?
3    A.  No, sir.
4    Q.  When you arrived in the police station, what
5    did you first see in terms of -- relevant to this case?
6    A.  I believe we all went downstairs to the
7    classroom where we briefed.
8    Q.  Okay. And what do you remember of the
9    briefing?
10   A.  We were told what was going on and informed
11   of a plan.
12   Q.  And who was present when you arrived there?
13   A.  I don't -- myself, I believe Sergeant Kent
14   was there. And some other officers. I can't tell you
15   exactly when I arrived.
16   Q.  Was all of the group assembled there at some
17   point before you left for the Wachsmuth residence?
18   MS. WESTBY: Object to the form of the
19   question.
20   MR. THOMPSON: Join.
21   THE WITNESS: No.
22   BY MR. GOSMAN:
23   Q.  Okay. Who wasn't there?
24   A.  I believe Officer Lee Blackmore was over
25   towards the residence.

DAVE BROWN - October 7, 2010                                    Page 30
Direct Examination by Mr. Gosman

1    (Exhibit 19 identified)
2    BY MR. GOSMAN:
3    Q.  Okay. Let's look at Exhibit 19 briefly
4    because I believe that's the document that we're
5    referring to. And can you quickly find the time of
6    your arrival at the police station that night? I see
7    some entries on Page 2 of that CAD report. Dave Brown
8    and it's dispatched at 1410. That's quite a bit
9    earlier in the day.
10   A.  Yeah, these are -- I'm trying to remember how
11   these work. These are going to be different dates and
12   stuff. That -- 1410 could have been the next day I was
13   working on the case or something. Because it goes 1410
14   and 0926 then 1451. So it could have been I was
15   working on the report when I called and said, "Put me
16   on this case."
17   Q.  I see.
18   A.  So I want to -- looking at this, 2112, I was
19   en route. So I would say it was prior to that.
20   Q.  So let's see, 2112, that was -- that was just
21   a few -- that was en route to the Wachsmuth residence?
22   A.  Yes, they don't have me logged in when I
23   arrived at the station.
24   Q.  And -- all right. So you just don't remember
25   when it was that you arrived at the station in terms of

DAVE BROWN - October 7, 2010                                    Page 32
Direct Examination by Mr. Gosman

1    Q.  You didn't see him there at the briefing?
2    A.  Not at the briefing, no.
3    Q.  What were you told about Bret Wachsmuth and
4    the potential threat that might be involved there?
5    A.  I was informed that Bret Wachsmuth was
6    paranoid, would peek out the windows, had guns, and
7    would carry a gun on him.
8    Q.  Do you remember anything else specifically?
9    A.  He was growing marijuana plants there.
10   Q.  Did you know how many marijuana plants were
11   being grown?
12   A.  I want to say I heard the number ten to 20.
13   Q.  Okay. And so who was in charge?
14   A.  I believe Sergeant Kent was in charge.
15   Sergeant Chretien was in charge of the planning.
16   Q.  Did either of those two Sergeants at any time
17   say to you that we believe that Bret Wachsmuth may pose
18   a threat to officer safety, and for that reason we are
19   going to use a tactical team to enter his home?
20   MS. WESTBY: Object to the form of the
21   question.
22   MR. THOMPSON: Join.
23   THE WITNESS: I don't remember that.
24   BY MR. GOSMAN:
25   Q.  Had the decision already been made to use the

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 11 of 60
Tricia Wachsmuth v.                                                                Dave Brown
City of Powell, et al.                                                          October 7, 2010

DAVE BROWN - October 7, 2010                                Page 33
Direct Examination by Mr. Gosman

1   tactical team when you arrived?
2      A.  We don't have a tactical team.
3      Q.  Okay.  Thank you.
4          Had the decision already been made to use a
5   group of officers to accomplish a dynamic entry at that
6   time?
7      A.  Yes.
8      Q.  Okay.  Did you participate in that decision
9   at all?
10     A.  I was there during it, yes.
11     Q.  During the decision to use a tactical team?
12     A.  We don't have a tactical team.
13     Q.  I'm sorry.  To use a group of officers for
14  the dynamic entry.
15     A.  I was there during the planning process, yes.
16     Q.  And I think it's fair to say, Officer, that
17  they wouldn't have -- that they had already decided to
18  use the dynamic entry before they called you from home
19  to come down to the station; is that fair to say?
20         MS. WESTBY:  Object to the form of the
21  question.
22         MR. THOMPSON:  Join.
23         THE WITNESS:  You would have to ask Sergeant
24  Chretien and Sergeant Kent --
25

DAVE BROWN - October 7, 2010                                Page 34
Direct Examination by Mr. Gosman

1      BY MR. GOSMAN:
2      Q.  So was there, in fact, while you were at the
3   briefing session, a discussion about what approach to
4   take to accomplish this warrant service?
5      A.  Yes.
6      Q.  And what were the items that were discussed?
7      A.  They were talking about securing, you know,
8   who's going to go to the front, who's going to go to
9   the back, those things.
10     Q.  Okay.  You didn't participate in any
11  discussion about whether or not you could just simply
12  perform a knock-and-talk warrant service in this case?
13     A.  No, I didn't.
14     Q.  Or whether there were other methods of
15  accomplishing the service of that warrant, other than
16  the use of a team in a dynamic entry setting?
17     A.  I don't remember if we discussed that or not.
18     Q.  Do you know if the Chief showed up that
19  night, and that would have been prior -- during the
20  briefing phase of the operation?
21     A.  I don't know.  Not while I was there.
22              (Exhibit 10 identified)
23     BY MR. GOSMAN:
24     Q.  Take a minute and let's turn to Exhibit 10
25  for a moment.  It appears that Marrisa Torczon may have

DAVE BROWN - October 7, 2010                                Page 35
Direct Examination by Mr. Gosman

1   prepared these notes.  Do you know her?
2      A.  Yes.
3      Q.  Did you see her that night?
4      A.  Yes, I did.
5      Q.  Did you observe her taking notes?
6      A.  Yes, I did.
7      Q.  Do you know whether she was designated to
8   take notes that night?
9      A.  I don't know.
10     Q.  Have you ever seen -- did you -- have you
11  seen this document before, Exhibit 10?
12     A.  Yes.
13     Q.  And do you understand that these are the
14  notes that Marrisa Torczon took of the previous session
15  that night?
16         MS. WESTBY:  Object to the form of the
17  question.
18         MR. THOMPSON:  Join.
19         THE WITNESS:  I don't know if these are the
20  exact notes, but they look familiar.
21     BY MR. GOSMAN:
22     Q.  Do you recognize Ms. Torczon's handwriting?
23     A.  No.
24     Q.  Take a minute and look at Exhibit 10 -- let's
25  do this:  There's a list of officers on the left-hand

DAVE BROWN - October 7, 2010                                Page 36
Direct Examination by Mr. Gosman

1   column of that first page, do you see that?
2      A.  Yes.
3      Q.  And there appears an assignment to the right
4   of each name?
5      A.  Yes.
6      Q.  Is this -- does this list accurately reflect
7   the assignments that you understood that were given
8   that night for the Wachsmuth warrant service?
9          MS. WESTBY:  Object to the form of the
10  question.
11         THE WITNESS:  It looks -- the top of this
12  where they have Brown, Brilakis, and Blackmore in the
13  garage, they had me in that area on the back door.  So
14  otherwise, it looks familiar, yes.
15     BY MR. GOSMAN:
16     Q.  Okay.  Were you aware, for instance, that the
17  entry team was to consist of officer Chapman, Officer
18  Danzer, Officer Eckerdt -- Sergeant Eckerdt -- is it
19  Sergeant Chretien?
20     A.  Yes, sir.
21     Q.  Sergeant Chretien, Officer Hall, and Officer
22  Hall?
23     A.  And then I believe Miner, too.
24     Q.  Yes.
25     A.  I don't know if you said Miner.

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 12 of 60

Tricia Wachsmuth v.                                                                                    Dave Brown
City of Powell, et al.                                                                              October 7, 2010

1   Q. I did not.
2   A. That sounds familiar  yes.
3   Q. And were you aware that Sergeant Kent and
4   Officer McCaslin were to deploy the flashbang device?
5   A. Yes.
6   Q. Were you told this was a knock-and-announce
7   warrant?
8   A. Yes.
9   Q. Were you told that -- now, I'm sort of going
10  down through this document here.
11  A. Okay.
12  Q. There are no more than three adults in the
13  home, do you remember being given that information that
14  night?
15  A. I know they talked about who was in the
16  house. I don't remember if it was three adults or not.
17  Q. Okay. It says there that there was a
18  ten-year-old child, do you remember hearing anything
19  about a child being present in the house?
20  A. I heard somebody say there was a young person
21  that went in. I couldn't tell you age.
22  Q. Okay. And did you understand that if Bret
23  Wachsmuth were encountered, he was to be taken from the
24  home? It says, "Scoop Wachsmuth out."
25  A. I believe everyone was under arrest there,

1   yes.
2   Q. Were you given the description of the
3   vehicles that the Wachsmuth's drove?
4   A. I believe I was.
5   Q. And jumping ahead just a moment. When you
6   arrived at the scene that night, did you notice that
7   one of the vehicles was missing -- was not in front of
8   the house?
9   A. I was not in that area. I couldn't.
10  Q. Okay. Do you remember a discussion about the
11  sequence of events that were to take place with respect
12  to the entry into the home?
13  A. As in?
14  Q. Well, I'm referring specifically to a list of
15  things that are on the right-hand side of that
16  Exhibit 10, about halfway down, knock door, police,
17  search warrant, et cetera.
18  A. Yes.
19      MR. THOMPSON: Objection as to form.
20      Go ahead.
21      MS. WESTBY: Join.
22      THE WITNESS: Yes
23  BY MR. GOSMAN:
24  Q. Do you remember those things being discussed?
25  A. Yes.

1   Q. Do you remember officer -- Sergeant Chretien
2   telling you that the plan was that the -- one of the
3   officers would knock and announce and if the door did
4   not open immediately, the door would be breached?
5       MR. THOMPSON: Objection as to form.
6       MS. WESTBY: Join.
7       THE WITNESS: I don't remember that.
8   BY MR. GOSMAN:
9   Q. Okay. Now, there is something here, 20 to 30
10  plants. And I think you mentioned ten to 20 plants,
11  you thought you may have heard that number?
12  A. Right.
13  Q. And as you'll notice, the document does have
14  a notation indicating 20 to 30 plants.
15  A. Twenty sounds familiar, yes.
16  Q. So 20 to 30 was probably what you heard?
17      MS. WESTBY: Object to the form of the
18  question.
19      MR. THOMPSON: Join.
20      MS. WESTBY: No. It completely misstates his
21  testimony.
22      MR. GOSMAN: He did say ten to 20.
23  BY MR. GOSMAN:
24  Q. I'm not trying to get you to change your
25  testimony. But when you look at the document, does the

1   number 20 to 30 sound correct?
2       MS. WESTBY: Object to the form of the
3   question.
4       MR. THOMPSON: Join.
5       Go ahead.
6       THE WITNESS: Ten to 30. Twenty sounds
7   correct, but ten to 20.
8   BY MR. GOSMAN:
9   Q. Very good. Do you remember seeing a diagram
10  of the interior of the house there at the briefing?
11  A. I believe I did, yes.
12  Q. Do you remember seeing any diagram of the
13  downstairs?
14  A. I don't remember that. I mean, I don't
15  remember yes or no.
16  Q. Do you remember -- let's see, who spoke at
17  the briefing?
18  A. Sergeant Chretien did.
19  Q. Did anyone else?
20  A. I'm sure others spoke, too.
21  Q. But in terms of the briefing and the
22  assignments made, the information that was provided to
23  the officers at the briefing; who provided that
24  information?
25  A. Well, Sergeant Chretien was one. I'm sure --

1 I don't know if there were any others or not.
2    Q.  Did Sergeant Kent actually address the group
3 and supply information about the operation and the
4 information that was available?
5    A.  I don't remember.
6    Q.  After the briefing, who did you travel to the
7 Wachsmuth residence with?
8    A.  Deputy County Attorney Jonathan Davis went in
9 my vehicle.
10    Q.  So Deputy County Attorney Jonathan Davis was
11 present for the service of the warrant, correct?
12    A.  He went to the scene with me, yes.
13    Q.  What did he do?
14    A.  He stayed back while we did everything.  And
15 then I left and couldn't tell you.
16    Q.  When you say "he stayed back," where did he
17 stay?
18    A.  He was behind the fence.
19    Q.  Was Jonathan Davis in the briefing session?
20    A.  I don't remember.
21    Q.  Well, how did you happen to hook up with him
22 to go over to the Wachsmuth residence?
23    A.  At the station.  I don't remember if he was
24 in the briefing or not.
25    Q.  Do you know if Jonathan Davis assisted in the

1 planning for the execution of the warrant?
2    A.  I believe he did.
3    Q.  What do you base that on?
4    A.  I'm sorry.  The execution of the warrant?
5    Q.  Yes.
6    A.  No.  I don't know.  I'm sorry.
7    Q.  Okay.  You arrived at the residence with the
8 Deputy County Attorney; and what did you do then?
9    A.  We parked probably half a block to the south
10 of the residence, so the residence is on North Street.
11 We were on South Street.  Also parking there was
12 Officer Bradley and Officer Lara.
13    Q.  Officer Lara was a member of the entry team,
14 correct?
15    A.  No, he was on the rear fence with me.
16    Q.  Officer Lara was?
17    A.  Brett Lara.
18    Q.  All right.  So had you guys sort of agreed
19 where you would meet before you went to the
20 Wachsmuth's?
21    A.  The group I was with:
22    Q.  Yes.
23    A.  Yes.
24    Q.  And you guys assembled, then, in the south of
25 the house.  What was the plan.  Officer, in terms of how

1 you were going to coordinate your efforts to accomplish
2 this entry?
3    A.  There would be radio contact, that maybe the
4 guys in the front were moving up.  And we were moving
5 to the fence and we were to get over the fence.
6    Q.  Okay.  The idea was that you would coordinate
7 the efforts of the different teams so that they could
8 be at the house at the same time?
9    A.  Yes.
10    Q.  All right.  And if I remember correctly, your
11 team was to create a distraction by breaking a window;
12 is that correct?
13    A.  Yes.
14    Q.  What was the cue for you to have broken the
15 window and created that distraction?
16    A.  I believe it was when they
17 knock-and-announced.
18    Q.  Okay.  And apparently that didn't happen?
19    A.  No.
20    Q.  And tell me what did happen.  You're
21 approaching the house with your team, correct?
22    A.  Yes.
23    Q.  And Jonathan Davis is not actually with the
24 group at that time?
25    A.  He's behind us.  He's not -- he's with us but

1 not participating.
2    Q.  Okay.  All right.  And you -- was there a
3 fence that you had to climb over?
4    A.  Yes.
5    Q.  And so what happened from your perspective?
6    A.  Apologize for laughing.  But we had a little
7 stool and we were to go over the fence and officer
8 Bradley was the first one over the fence and fell into
9 a pile of bagged aluminum cans.  So by the time we
10 wanted to make sure we were secure before we moved
11 forward because, you know, there was noise there.  And
12 Brett and I, by the time we got over the fence, they
13 were already entering the residence.  We stayed back.
14    Q.  Did you have any radio contact with them at
15 all?
16    A.  Not once they went in, no.
17    Q.  No, before.
18    A.  I believe we did.  I believe they said they
19 were moving up and that's why we started to go over.
20    Q.  Did you have some kind of signaling system
21 where you were going to signal them back that you were
22 in position?
23    A.  We would have called them on our radio.
24    Q.  Was that something that was preplanned?
25    A.  I don't remember.

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 14 of 60
Tricia Wachsmuth v.
City of Powell, et al.

Dave Brown
October 7, 2010

DAVE BROWN - October 7, 2010                                    Page 45
Direct Examination by Mr. Gosman

1   Q. So -- and this is Officer Bradley that -- I
2   think you said fell into the aluminum cans?
3      A. Not fall, he went over the fence and went
4   into them.
5      Q. And so did that -- and that caused a delay?
6      A. Yes, we waited a second then continued to go
7   over.
8      Q. I see. From the back of the house, did you
9   hear the door being breached?
10     A. I don't remember hearing the door, no.
11     Q. Do you remember -- you probably didn't hear
12  the knock-and-announce then?
13     A. No.
14     Q. Did you hear the flashbang being deployed?
15     A. Yes.
16     Q. In relation -- did you say that the officers
17  had contacted you by radio and said they were
18  approaching the front of the house?
19     A. I believe they did, yes.
20     Q. Were they supposed to wait for you to get
21  into position before they knocked on the door, do you
22  know?
23     A. We were supposed to get over.
24     Q. Do you know why they didn't wait for you?
25     A. Just what I've read in the report.

DAVE BROWN - October 7, 2010                                    Page 46
Direct Examination by Mr. Gosman

1   Q. What is it that you've read in the report?
2      A. That Tricia Wachsmuth looked out the window
3   and saw them.
4      Q. All right. So you got there a little late,
5   in any event?
6      A. (Witness nods head.)
7      Q. And what did you do next then?
8      A. After everything was secure, somebody opened
9   the back door and said they were secure. I then left
10  the area, went back to my vehicle, drove my vehicle
11  back to the front of the house. And I took the initial
12  pictures, kind of presearch pictures before they
13  started searching.
14     Q. Approximately how much time elapsed from the
15  detonation of the flashbang until the door was opened
16  for you to come in?
17     A. I don't remember. It wasn't a long time.
18     Q. It wasn't 20 minutes?
19     A. No.
20     Q. Was it ten possibly?
21     A. It wasn't a long time. That was back, what?
22  A year-and-a-half ago?
23     Q. You went to your car and got a camera. Was
24  there another camera there that night?
25     A. Not that I know of.

DAVE BROWN - October 7, 2010                                    Page 47
Direct Examination by Mr. Gosman

1   Q. And you took some pictures first of the scene
2   before you began recording the evidence?
3      A. I took pictures presearch. So before
4   evidence was collected and everything, I went through
5   the house and pretty much documented each room.
6      Q. Okay. What do they call that? Do you know?
7   I think there's a name for it.
8      A. I don't. I had the camera and documented it.
9      Q. Okay. So you took pictures -- did you take
10  pictures of the bathroom?
11     A. I'd have to look at the pictures, and I could
12  tell you which pictures I took.
13     Q. I think I've got them out in my car. Let me
14  run out and grab them real quick.
15            (Recess taken 4:05 to 4:08
16            p.m., October 7, 2010)
17         MR. GOSMAN: We will mark this for
18  identification as 44.
19         MR. THOMPSON: You're going to mark all the
20  photos?
21         MR. GOSMAN: No. Just the group.
22            (Exhibit 44 identified)
23  BY MR. GOSMAN:
24     Q. Officer, go ahead and take a look as far as
25  you know if that's complete. Because I do not

DAVE BROWN - October 7, 2010                                    Page 48
Direct Examination by Mr. Gosman

1   represent to you that that's a complete set.
2      A. Sir, I'll tell you now. These pictures look
3   fairly familiar. And I know I took them, but before I
4   go on the record and answer, I'd rather look at one of
5   my disks that has the pictures on it. Just so I can
6   say who took them, okay?
7      Q. That's fine.
8         How do we do that? Do you have a disk handy?
9         Do you have the disk handy?
10     A. I could probably go print them real quick.
11        MR. THOMPSON: It's up to you.
12        THE WITNESS: It doesn't matter to me.
13        MR. THOMPSON: I'd represent to you, counsel,
14  that the photographs that were provided to us by the
15  Powell Police Department are the photographs that were
16  produced.
17        MR. GOSMAN: I don't have any doubt about
18  that. The problem is I'm not sure I have every one of
19  them in that group. I'm not trying to pull anything
20  here. I don't remember if that includes every single
21  picture.
22        THE WITNESS: And I didn't take all the
23  pictures.
24  BY MR. GOSMAN:
25     Q. Okay. Who else took pictures?

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 15 of 60
Tricia Wachsmuth v.                                                                    Dave Brown
City of Powell, et al.                                                                October 7, 2010

1   A.  I believe Brett Lara did.
2   Q.  But just one camera?
3   A.  Yes, that I know of.
4   Q.  Okay.  You know what?  I am just not entirely
5   sure that's going to be productive for us.
6       And let's -- let me as this question:  Do
7   you remember taking a picture of the smoldering pillow
8   in the bathtub or bathroom"
9       MS. WESTBY:  Object to the form of the
10  question.
11      MR. THOMPSON:  Object.
12  BY MR. GOSMAN:
13  Q.  Of a pillow in the bathtub?  That's fine.
14  A.  I don't -- I took a picture of the bathroom
15  door.  I don't know if that would show the bathtub or
16  not.
17  Q.  Do you remember the smoke alarm going off in
18  that house?
19  A.  No.
20  Q.  Do you remember seeing an officer pose for
21  the camera -- a camera in front of the house after
22  Tricia Wachsmuth had been removed?
23  A.  What do you mean by "pose"?
24  Q.  Well, Tricia Wachsmuth described an officer
25  who stood in front of the camera and, you know, made

1   some kind of a signal with his hands and was posing for
2   the camera.
3   A.  I did not see that.
4   Q.  Okay.  Did you have -- were you in possession
5   of the camera when you first arrived?
6   A.  Yes.
7   Q.  When did you pass possession -- do you know
8   if there were any other officers on the scene that had
9   possession of cameras at that time?
10  A.  I have no idea.
11  Q.  All right.  When you were told that the house
12  was secure, did you -- did you wait at the back door
13  until you were given that clear signal?
14  A.  We waited in the backyard.  We weren't right
15  up to the door.
16  Q.  Would that have been documented on the CAD
17  report, that radio contact?
18  A.  I have no idea.
19  Q.  Let's take a look real quick at Exhibit 19.
20  A.  It looks like -- looks like there was one
21  right here.
22  Q.  Go ahead.
23  A.  It could be -- and I'm just reading what it
24  says.  I don't remember it that night.  Powell 9 --
25  Q.  I'm with you.  212610 Powell 9 to Powell 14,

1   Powell 14, did anyone give you a 10-4 yet?  Negative.
2   We're 10-4?
3   A.  Right.
4   Q.  How do you interpret that?
5   A.  I don't remember.  Like I say, that was a
6   year-and-a-half ago.  To me, it's -- everyone's 10-4,
7   which is okay.
8   Q.  Okay.  All right.  Now, let's back up here.
9   I do see that radio traffic at 211645, this is
10  Powell 6.  Are you Powell 6?
11  A.  No, sir.
12  Q.  Who is Powell 6?
13  A.  That would be, I believe, Sergeant Chretien.
14  Q.  And you know what?  It's listed on
15  Exhibit 10, if anything else.  Powell 6 is Chretien.
16  Thank you.
17      All right.  So was that the radio traffic to
18  you indicating that the -- that the front door team was
19  in position?
20      MR. THOMPSON:  Objection as to form.
21      MS. WESTBY:  Join.
22      THE WITNESS:  Which one --
23  BY MR. GOSMAN:
24  Q.  Sorry.  Let me withdraw that.
25      This is the 211645 radio traffic from

1   Powell 6, "Back door team, we are headed to the front."
2   I assume that was to you?
3   A.  Yes.
4   Q.  Do you remember that radio transmission?
5   A.  I think I said earlier there was radio
6   transmission.  I don't remember exactly what it said.
7   Q.  It's probably it, wouldn't you agree?
8       MS. WESTBY:  Object to the form of the
9   question.
10      MR. THOMPSON:  Join.
11  BY MR. GOSMAN:
12  Q.  Wouldn't you agree with that?
13      MS. WESTBY:  Same objection.
14      MR. THOMPSON:  Join.
15  BY MR. GOSMAN:
16  Q.  You can answer that question.
17  A.  This is what the dispatch typed in.  I can't
18  tell you for sure if that's exactly the words that were
19  used or not.
20  Q.  Now, it looks like within three seconds,
21  there is a series of officers who are under the event
22  portion of the log, it says -- I assume that's arrive,
23  ARRIV.  Do you know what that means?
24  A.  Yes.
25  Q.  What does it mean?

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 16 of 60
Tricia Wachsmuth v.
City of Powell, et al.

Dave Brown
October 7, 2010

1   A.  Arrive.

2   Q.  And little anticlimactic there. Okay. Thank
3   you.

4       How would the dispatcher know when the
5   officers arrived at the 2116 and 48 seconds?

6   A.  That's going to need a little explanation.

7   Q.  Go ahead.

8   A.  This is what the dispatcher types in.

9   Q.  Right.

10  A.  It doesn't mean that at 211645 Powell 6, back
11  door team we are headed to the front. That's when she
12  typed it in. It could have happened at the 211630.
13  The Powell 2 arrived -- and I mean, again, it all could
14  have happened at the same time. She's typing it in.

15  Q.  I got you.

16      So actually what's being recorded here is
17  when she makes the entry?

18  A.  Yes.

19  Q.  Or I presume perhaps starts the entry. Okay.
20      In any event, she -- it looks like about
21  three seconds later she begins typing arrive for a
22  group of officers?

23  A.  Yes, sir.

24  Q.  Is there anything on that log that tells us
25  when the officers went through the door?

1       MS. WESTBY: Object to the form of the
2   question.

3       MR. THOMPSON: Join.

4       THE WITNESS: Yeah, I don't see anything on
5   here.

6   BY MR. GOSMAN:

7   Q.  Okay. You prepared a couple of reports in
8   this case. And by the way, it's about 4:15.

9   A.  We're okay, sir.

10          (Exhibit 39 identified)

11  BY MR. GOSMAN:

12  Q.  Okay. All right. Let's go ahead and take a
13  look at the -- at Exhibit 39, and I think that's right
14  underneath that page there. Yes.

15      This was your interview of Bret Wachsmuth,
16  correct?

17  A.  Yes.

18  Q.  Bret Wachsmuth stated to you that most of the
19  pills are his and that they are legal. Do you -- were
20  you able to confirm that? Or if you know?

21  A.  Wachsmuth stated that most pills are his --

22  most pills are his and that what he has are legal; is
23  that what you mean?

24  Q.  Yes?

25  A.  No. The other officers, case officer,

1   whoever is in charge, did that.

2   Q.  Okay. All right. Fine. So you asked him
3   about the stuffed animals, and he stated that his wife
4   has stuffed animals, and they are cut open but that she
5   did that when she was a child. What did you understand
6   about that?

7   A.  Where is that?

8   Q.  The very next paragraph.

9       MR. THOMPSON: Objection as to form.

10      MS. WESTBY: Join.

11      THE WITNESS: What she tells me is that her
12  mom sends her stuff all the time and that she cut this
13  open. That this happened when she was a child.

14  BY MR. GOSMAN:

15  Q.  Do you remember anything about that?

16  A.  Just what I said.

17  Q.  Oh. Well, that's -- I thought you were
18  reading from the document, frankly.

19      Did you understand that she cut those animals
20  open as some kind of a therapy that she used in
21  relation to depression?

22      MS. WESTBY: Object to the form.

23      MR. THOMPSON: Join.

24      THE WITNESS: No.

25

1   BY MR. GOSMAN:

2   Q.  Okay. And then down here, oh, it's about the
3   fourth or fifth paragraph from the bottom says,
4   "Wachsmuth informed us that he received a message from
5   Josh Bessler that said, 'get your shit out of the
6   house. I'm turning you in for illegal guns, meth,
7   pipes, and pot.'"

8       I assume that's you, Officer Brown, asked if
9   you could see his cell phone. Did you know that the CI
10  had informed Josh -- sorry -- that the CI had informed
11  Bret Wachsmuth to get your stuff out of the house I'm
12  turning you in before you heard it from Bret Wachsmuth?

13  A.  I'm not sure.

14  Q.  Did you -- okay. You asked him if you could
15  see his cell phone?

16  A.  Yes.

17  Q.  And did you see the cell phone?

18  A.  Yes.

19  Q.  Were you able to confirm at all whether or
20  not that call was from Josh Bessler?

21      MR. THOMPSON: Objection as to form.

22      MS. WESTBY: Join.

23      THE WITNESS: No, I wasn't.

24  BY MR. GOSMAN:

25  Q.  "I looked and found at 1:42 p.m. on 2/24

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 17 of 60

Tricia Wachsmuth v.                                                          Dave Brown
City of Powell, et al.                                                  October 7, 2010

DAVE BROWN - October 7, 2010                                    Page 57
Direct Examination by Mr. Gosman

1  there was a call."  Did you look at the phone and
2  record that time?
3     A.  No, I didn't.
4     Q.  How does that end up in your report: "I
5  looked at it and found at 1:42 p.m. on 2/24/09 there
6  was a call"?
7        MS. WESTBY: Object to the form of the
8  question.
9        MR. GOSMAN: Okay.
10       MR. THOMPSON: Join.
11       THE WITNESS: It was a restricted number.  I
12  noticed on the phone, a restricted number at 1:42 p.m.
13  on 2/24/09.
14  BY MR. GOSMAN:
15     Q.  So you saw the time for that restricted call?
16     A.  Yes.
17     Q.  You asked him why he had guns lying around
18  the house and he stated that he was afraid of Josh
19  Bessler?
20     A.  Yes.
21     Q.  Okay. I think that's it for that.
22        You also interviewed Tricia Wachsmuth?
23     A.  Yes.
24     Q.  And you heard her in her deposition -- I
25  recollect that you were there -- when she testified

DAVE BROWN - October 7, 2010                                    Page 58
Direct Examination by Mr. Gosman

1  that after she told you that she wanted to see a lawyer
2  that you stood up and slammed your hands on the table
3  and said, "You will tell us where Bret Wachsmuth was."
4        Now, I am not pretending to quote you
5  directly.  But did you, in fact, say words to that
6  effect to Tricia Wachsmuth after she indicated she
7  wanted to see a lawyer?
8     A.  She never asked for a lawyer.  She only asked
9  to see her husband.  She was only in my office for a
10  couple minutes.  She went back into the booking area
11  and was put in there.  I never slammed my hands.  I
12  never did any of that of what she said.
13     Q.  Okay.  Do you have an official e-mail address
14  at the City of Powell?
15     A.  Dbrown@cityofpowell.com.
16     Q.  D. Brown?
17     A.  D, first initial, last name
18  @cityofpowell.com.
19     Q.  Have you communicated with officers about
20  this case prior to the filing of this lawsuit?
21     A.  Not on e-mail, no.
22        MR. GOSMAN: I don't think I have any further
23  questions.  Thank you very much.
24            (Recess taken 4:23 to 4:26
25            p.m., October 7, 2010)

DAVE BROWN - October 7, 2010                                    Page 59
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2     Q.  There was one other question that I wanted to
3  ask, and that is:  Do you remember taking a photograph
4  of a small baggie or bag, cellophane package, that
5  appeared to contain cocaine or methamphetamine residue?
6     A.  I would have to look at the pictures.  If --
7  and it needs explanation.
8     Q.  Go ahead.
9     A.  If it was sitting out in the open and I took
10  the picture of the room for the presearch, okay,
11  then -- and if it's in that picture, yes, I did but I
12  didn't know what this was.  Anything that was found
13  where there is close-ups, I did not take that picture.
14     Q.  Okay.  I can tell you that Officer Miner
15  indicated he found it under the bed, so I assume he
16  retrieved it and then brought it to the attention of
17  the officers that took the photograph?
18     A.  I was gone at that time.
19     Q.  You were gone at that time?
20     A.  Yes.
21     Q.  Oh, I see.  So you just took the photos of
22  the -- sort of the civil damage photos of the house
23  before the search started?
24        MS. WESTBY: Object to the form of the
25  question.

DAVE BROWN - October 7, 2010                                    Page 60
Direct Examination by Mr. Gosman

1        MR. THOMPSON: Objection.
2  BY MR. GOSMAN:
3     Q.  I'm calling it something I just made up.
4  Sorry about that.
5     A.  I took the pictures of the presearch.
6     Q.  Okay.
7     A.  Okay.  And then I went down and interviewed
8  them at the law enforcement center while everyone else
9  did the search.  I did not search.
10       MR. GOSMAN: Thank you.  You're free to go.
11  Appreciate it.
12            (Proceedings concluded at 4:28
13            p.m., October 7, 2010.)

DAVE BROWN - October 7, 2010                                Page 61
Direct Examination by Mr. Gosman

DEPONENT'S CERTIFICATE

  I, DAVE BROWN, do hereby certify, under
penalty of perjury, that I have read the foregoing
transcript of my testimony consisting of 60 pages,
taken on October 7, 2010 and that the same is, with any
changes noted below, a full, true and correct record of
my deposition.

PAGE  LINE       CORRECTION        REASON FOR CORRECTION

9     ____  ____  _____  _____
10    ____  ____  _____  _____
11    ____  ____  _____  _____
12    ____  ____  _____  _____
13    ____  ____  _____  _____
14    ____  ____  _____  _____
15    ____  ____  _____  _____
16    ____  ____  _____  _____
17    ____  ____  _____  _____
18    ____  ____  _____  _____
19    ____  ____  _____  _____
20    ____  ____  _____  _____
21    ____  ____  _____  _____
22
23
24                        _____
25                          DAVE BROWN   Date


DAVE BROWN - October 7, 2010                                Page 62
Direct Examination by Mr. Gosman

CERTIFICATE

  I, VONNI R. BRAY, Registered Professional
Reporter, and Notary Public for the State of Montana,
do hereby certify that DAVE BROWN was by me first duly
sworn to testify to the truth, the whole truth, and
nothing but the truth;

  That the foregoing transcript, consisting of
61 pages, is a true record of the testimony given by
said deponent, together with all other proceedings
herein contained.

  IN WITNESS WHEREOF, I have hereunto set my
hand this 16th day of October, 2010.

Vonni R. Bray, RPR
P. O. Box 125
Laurel, MT 59044
(406) 670-9533 Cell
(888) 277-9372 Fax
vonni.bray@yahoo.com

Tricia Wachsmuth v.
City of Powell, et al.

Dave Brown
October 7, 2010

**@**

**@cityofpowellcom (1)**
  58:18

**0**

**00045 (1)**
  21:23
**01 (1)**
  18:8
**02 (2)**
  19:24;20:6
**05 (2)**
  21:2;22:14
**09 (1)**
  22:21
**0926 (1)**
  30:14

**1**

**1:42 (3)**
  56:25;57:5,12
**10 (6)**
  34:22,24;35:11,24;
  38:16;51:15
**10/5 (1)**
  21:2
**10:14 (1)**
  16:13
**10-4 (3)**
  51:1,2,6
**11/14 (1)**
  22:21
**14 (2)**
  50:25;51:1
**1410 (3)**
  30:8,12,13
**1451 (1)**
  30:14
**15 (1)**
  28:13
**18 (1)**
  28:13
**1818 (1)**
  24:18
**1819 (1)**
  24:18
**19 (3)**
  30:1,3;50:19
**1980 (1)**
  8:3
**1984 (1)**
  7:14
**1990 (5)**
  9:15,17;10:8,19,19

**2**

**2 (2)**
  30:7;53:13

**2/24 (1)**
  56:25
**2/24/09 (2)**
  57:5,13
**20 (10)**
  11:4;32:12;39:9,10,
  14,16,22;40 1,7;46:18
**2001 (3)**
  19:21,22;20 4
**2002 (1)**
  19:25
**2006 (1)**
  8:16
**2009 (1)**
  29:14
**2010 (6)**
  4:9;12:21;16:14;
  47:16;58:25 60:13
**2112 (2)**
  30:18,20
**2116 (1)**
  53:5
**211630 (1)**
  53:12
**211645 (3)**
  51:9,25;53:10
**212610 (1)**
  50:25
**24-hour (1)**
  19:15
**24th (2)**
  26:18;29:14
**250 (1)**
  6:18
**27 (3)**
  21:13,16,17
**2-year (1)**
  8:18

**3**

**3:16 (1)**
  16:14
**30 (5)**
  39:9,14,16;40:1,6
**31 (3)**
  17:5,9,12
**35 (3)**
  23:22,24,25
**37 (2)**
  4:24;5:1
**39 (2)**
  54:10,13

**4**

**4/22/93 (2)**
  17:25;19:14
**4:05 (1)**
  47:15
**4:08 (1)**
  47:15
**4:15 (1)**

**54:8**
**4:23 (1)**
  58:24
**4:26 (1)**
  58:24
**4:28 (1)**
  60:12
**40 (1)**
  11:4
**40-hour (1)**
  20:23
**44 (2)**
  47:18,22
**48 (1)**
  53:5

**5**

**50-hour (1)**
  22:13

**6**

**6 (6)**
  51:10,10,12,15;52:1;
  53:10
**658 (1)**
  17:12

**7**

**7 (5)**
  12:21;16:14;47:16;
  58:25;60:13

**8**

**8/22 (2)**
  19:24;20:6
**8/22/02 (1)**
  19:25
**8/6/01 (1)**
  17:25
**80 (1)**
  9:8
**83 (1)**
  9:8

**9**

**9 (2)**
  50:24,25
**9/13/01 (1)**
  18:1
**9:15 (3)**
  29:22,22;31:1
**9:32 (1)**
  12:20
**93 (3)**
  19:1,5,7

**A**

**ability (2)**
  6:20,23
**able (2)**
  54:20;56:19
**Absolutely (1)**
  14:11
**academy (2)**
  10:14;20:8
**accomplish (3)**
  33:5;34:4;43:1
**accomplishing (1)**
  34:15
**accurately (1)**
  36:6
**accused (1)**
  7:3
**action (3)**
  11:23,24;22:18
**Active (6)**
  18:1,2,8,22;20:5,21
**activity (1)**
  4:14
**actually (7)**
  4:18;14:15;15:11;
  26:8;41:2;43:23;53:16
**address (3)**
  6:17;41:2;58:13
**adults (2)**
  37:12,16
**advise (1)**
  16:23
**advised (2)**
  12:23;16:20
**advising (1)**
  16:10
**afraid (1)**
  57:18
**afternoon (3)**
  4:5;14:17;27:24
**again (5)**
  14:5;15:21;20:21,25;
  53:13
**against (2)**
  7:16;12:9
**age (1)**
  37:21
**ago (5)**
  7:13;19:2;22:4;46:22;
  51:6
**agree (2)**
  52:7,12
**agreed (2)**
  14:22:42:18
**ahead (19)**
  8:17;14:4,16;17:9;
  18:25;19:20;22:15;
  23:14,24;26:13,25;38:5,
  20;40:5;47:24;50:22;
  53:7;54:12;59:8
**aid (1)**
  4:13
**alarm (1)**
  49:17

**allow (1)**
  6:5
**aluminum (2)**
  44:9;45:2
**always (2)**
  6:8;29:4
**animals (3)**
  55:3,4,19
**announce (1)**
  39:3
**answered (1)**
  28:10
**anticlimactic (1)**
  53:2
**apartment (1)**
  9:12
**Apologize (1)**
  44:6
**apparently (4)**
  4:5;20:7;29:21;43:18
**appeared (1)**
  59:5
**appears (2)**
  34:25;36:3
**application (1)**
  7:18
**apply (1)**
  10:21
**Appreciate (1)**
  60:11
**approach (1)**
  34:3
**approaching (2)**
  43:21;45:18
**approximately (2)**
  29:19;46:14
**area (4)**
  36:13;38:9;46:10;
  58:10
**areas (1)**
  4:11
**Arizona (3)**
  7:10;8:10,25
**around (2)**
  29:21;57:17
**arrest (1)**
  37:25
**arrested (1)**
  7:1
**ARRIV (1)**
  52:23
**arrival (1)**
  30:6
**arrive (3)**
  52:22;53:1,21
**arrived (12)**
  29:25;30:23,25;31:4,
  12,15;33:1;38:6;42:7;
  50:5;53:5,13
**assembled (2)**
  31:16;42:24
**assignment (2)**
  29:15;36:3

Tricia Wachsmuth v.
City of Powell, et al.

Dave Brown
October 7, 2010

**assignments (2)**
36:7;40:22
**assisted (1)**
41:25
**associates (1)**
8:9
**assume (4)**
52:2,22;56:8;59:15
**attend (1)**
8:14
**attended (2)**
24:24;26:3
**attention (3)**
5:5;11:22;59:16
**attorney (8)**
13:17;15:10;16:7,19,
19;41:8,10;42:8
**August (2)**
18:8;20:4
**available (3)**
14:17;25:17;41:4
**aware (2)**
36:16;37:3

**B**

**bachelors (2)**
8:11,24
**back (25)**
7:12;8:25;12:22;15:3,
7;18:7;19:1;22:12;29:1;
34:9;36:13;41:14,16;
44:13,21;45:8;46:9,10,
11,21;50:12;51:8;52:1;
53:10;58:10
**backyard (2)**
29:15;50:14
**bag (1)**
59:4
**bagged (1)**
44:9
**baggie (1)**
59:4
**bartender (1)**
9:11
**base (1)**
42:3
**based (3)**
13:24;14:2;25:14
**bathroom (3)**
47:10;49:8,14
**bathtub (3)**
49:8,13,15
**bed (1)**
59:15
**began (3)**
10:4;16:16;47:2
**begin (1)**
6:6
**beginning (1)**
13:25
**begins (2)**
17:11;53:21

**behavior (1)**
13:25
**behind (2)**
41:18;43:25
**Bessler (3)**
56:5,20;57:19
**better (2)**
15:17,18
**beyond (1)**
8:4
**bit (3)**
17:8;20:15;30:8
**Blackmore (2)**
31:24;36:12
**block (1)**
42:9
**book (1)**
4:5
**booking (1)**
58:10
**Boston (2)**
8:12,14
**both (1)**
24:11
**bottom (1)**
56:3
**Bradley (3)**
42:12;44:8;45:1
**breached (2)**
39:4;45:9
**breaching (2)**
17:18;26:9
**break (9)**
6:11,12;13:1,7,9,10;
14:1;15:2,6
**breaking (1)**
43:11
**Bret (9)**
32:3,5,17;37:22;
54:15,18;56: 1,12;58:3
**Brett (3)**
42:17;44:12;49:1
**briefed (1)**
31:7
**briefing (12)**
31:9;32:1,2;34:3,20;
40:10,17,21,23;41:6,19,
24
**briefly (1)**
30:3
**Brilakis (1)**
36:12
**bring (1)**
5:4
**broken (1)**
43:14
**brought (2)**
4:5;59:16
**BROWN (13)**
5:13,17;6:16;7:22;
15:9,14;16:6;17:10;
21:22;30:7;36:12;56:8;
58:16

**Brown's (1)**
15:7

**C**

**CAD (2)**
30:7;50:16
**California (5)**
7:11,24;8:9,22;9:9
**call (17)**
13:1,23;14:5,7,9;15:8;
24:12;25:23,25;27:19,
20;29:23;47:6;56:20;
57:1,6,15
**called (4)**
29:18;30:15;33:18;
44:23
**calling (1)**
60:3
**came (1)**
9:16
**camera (9)**
46:23,24;47:8;49:2,
21,21,25;50:2,5
**cameras (1)**
50:9
**can (24)**
6:9,11;11:19;13:1,3,4,
14;14:1,9;15:3,14;
17:11;18:19;19:2,3;
20:14;23:13;25:6.7,10;
30:5;48:5;52:16;59:14
**cans (2)**
44:9;45:2
**capacity (1)**
9:3
**car (2)**
46:23;47:13
**carpets (1)**
9:11
**carry (1)**
32:7
**case (9)**
7:19;17:2;30:13,16;
31:5;34:12;54:8,25;
58:20
**caused (1)**
45:5
**cell (3)**
56:9,15,17
**cellophane (1)**
59:4
**center (1)**
60:8
**certain (1)**
10:20
**Certificate (3)**
4:3;5:7,8
**certification (2)**
5:9;10:13
**cetera (1)**
38:17
**challenged (1)**

**11:9**
**chance (2)**
4:6;16:18
**change (1)**
39:24
**changed (1)**
11:3
**Chapman (1)**
36:17
**charge (4)**
32:13,14,15;55:1
**chemical (1)**
23:19
**Chief (2)**
11:22;34:18
**child (4)**
37:18,19;55:5,13
**Chretien (9)**
32:15;33:24;36:19,21;
39:1;40:18,25;51:13,15
**CI (2)**
56:9,10
**City (3)**
9:9;25:1;58:14
**civil (1)**
59:22
**clarification (1)**
6:2
**Clark (1)**
6:18
**class (3)**
5:9;18:1;20:25
**classes (1)**
8:24
**classroom (2)**
20:20;31:7
**cleaned (1)**
9:11
**clear (2)**
28:21;50:13
**clearing (2)**
23:20;26:9
**client (1)**
16:23
**climb (1)**
44:3
**close-ups (1)**
59:13
**cocaine (1)**
59:5
**collected (1)**
47:4
**College (4)**
8:8,18;9:1,10
**column (1)**
36:1
**coming (2)**
9:23;15:7
**communicated (1)**
58:19
**complete (3)**
10:13;47:25;48:1
**completely (1)**

**39:20**
**completion (1)**
5:8
**concluded (1)**
60:12
**conduct (1)**
17:1
**confirm (3)**
26:2;54:20;56:19
**consist (1)**
36:17
**constitutional (1)**
16:21
**consult (1)**
16:6
**contact (3)**
43:3;44:14;50:17
**contacted (1)**
45:17
**contain (1)**
59:5
**continue (1)**
13:4
**continued (1)**
45:6
**continuing (1)**
10:21
**continuously (1)**
10:7
**control (1)**
9:3
**conversation (2)**
16:21,22
**coordinate (2)**
43:1,6
**correctly (1)**
43:10
**counsel (2)**
12:25;48:13
**Countermeasures (1)**
21:5
**County (3)**
41:8,10;42:8
**couple (5)**
8:24;22:4;27:5;54:7;
58:10
**course (17)**
18:11,11,13,17,19;
19:3,4,16;20:4,16,23;
21:4,4,10,18;22:9,14
**courses (1)**
19:21
**Court (3)**
5:5;7:8;12:16
**cover (1)**
27:10
**covered (1)**
22:16
**covering (1)**
27:6
**create (1)**
43:11
**created (1)**

43:15
**crime (1)**
7:3
**criminal (3)**
8:11,12;17:1
**Critical (2)**
17:24;19:11
**cue (1)**
43:14
**current (1)**
6:17
**currently (1)**
6:19
**cut (3)**
55:4,12,19

**D**

**damage (1)**
59:22
**Danzer (1)**
36:18
**date (1)**
4:20
**dates (1)**
30:11
**DAVE (2)**
5:13;30:7
**David (1)**
6:16
**Davis (5)**
41:8,10,19,25;43:23
**day (5)**
27:25;28:2;29:5;30:9,
12
**days (5)**
27:4,9,15,16,16
Dbrown@cityofpowellcom (1)
58:15
**dealing (1)**
21:1
**dealt (2)**
19:5;24:5
**decide (1)**
12:25
**decided (1)**
33:17
**decision (4)**
32:25;33:4,8,11
**defendant (1)**
4:11
**defendants (1)**
4:16
**degree (4)**
8:11,24;9:1;10:2
**delay (1)**
45:5
**Department (17)**
9:7,20;10:5,8;11:15,
23;21:10;23:2,18;25:1;
26:6;27:3,4,5,9;28:5;
48:15
**deploy (1)**

37:4
**deployed (1)**
45:14
**deployment (1)**
4:12
**depose (1)**
13:24
**deposition (14)**
5:18;6:24;13:4,18,22,
25;14:21,25;15:3,8,11;
16:12;17:7;57:24
**depositions (1)**
17:17
**depression (1)**
55:21
**Deputy (3)**
41:8,10;42:8
**Describe (3)**
8:7;18:19;2?:16
**described (1)**
49:24
**description (1)**
38:2
**designated (3)**
23:1,8;35:7
**determination (1)**
15:4
**detonation (1)**
46:15
**Device (3)**
4:3,12;37:4
**devices (2)**
17:19;23:20
**diagram (2)**
40:9,12
**difference (1)**
24:12
**different (6)**
9:10;25:12;28:3;29:6;
30:11;43:7
**DIRECT (1)**
5:15
**directly (1)**
58:5
**disagree (1)**
15:5
**disciplinary (2)**
11:16,21
**discipline (2)**
11:11,12
**discovery (2)**
5:4,10
**discuss (2)**
16:21,22
**discussed (4)**
20:4;34:6,17;38:24
**discussing (1)**
17:16
**discussion (5)**
14:23;16:16;34:3,11;
38:10
**dishonesty (1)**
7:4

disk (2)
48:8,9
**disks (1)**
48:5
**dispatch (1)**
52:17
**dispatched (1)**
30:8
**dispatcher (2)**
53:4,8
**disputes (1)**
5:4
**Distraction (3)**
4:2;43:11,15
**diversionary (1)**
4:12
**divorce (1)**
7:8
**divorced (1)**
7:6
**Document (10)**
17:12;24:7,18;26:1;
30:4;35:11;37:10;39:13,
25;55:18
**documentation (1)**
4:9
**documented (3)**
47:5,8;50:16
**documents (2)**
23:25;24:3
**done (3)**
6:10;19:23;26:8
**door (16)**
36:13;38:16;39:3,4;
45:9,10,21;46:9,15;
49:15;50:12,15;51:18;
52:1;53:11,25
**doubt (1)**
48:17
**Douglas (1)**
20:17
**down (5)**
33:19;37:10;38:16;
56:2;60:7
**Downes (3)**
12:16;14:10,12
**downstairs (2)**
31:6;40:13
**drove (2)**
38:3;46:10
**duly (2)**
5:10,14
**during (4)**
33:10,11,15;34:19
**dynamic (15)**
4:11;15:17;19:5,5,
7;21:1;23:19;24:5;
27:10;28:8;33:5,14,18;
34:16

**E**

**earlier (4)**

22:2,3;30:9;52:5
**Eckerdt (2)**
36:18,18
**education (1)**
10:21
**effect (1)**
58:6
**effort (1)**
5:3
**efforts (2)**
43:1,7
**either (2)**
7:10;32:16
**elapsed (1)**
46:14
**else (9)**
13:1,15;27:14,20;
32:8;40:19;48:25;51:15;
60:8
**e-mail (2)**
58:13,21
**Emergency (2)**
19:25;20:7
**employment (1)**
9:5
**en (2)**
30:19,21
**encountered (1)**
37:23
**encourage (2)**
16:7,9
**end (4)**
16:12;18:3;22:17;57:4
**enforcement (6)**
4:15;10:1,12,13;20:8;
60:8
**Enough (3)**
16:3,3,11
**enter (1)**
32:19
**entering (1)**
44:13
**entire (2)**
4:10;20:23
**entirely (1)**
49:4
**entries (3)**
26:8;28:8;30:7
**entry (22)**
4:11;17:15,17,21;
19:5,6,7;21:1;23:19,20;
24:5;27 10;33:5,14,18;
34:16;36:17;38:12;
42:13;43:2;53:17,19
**et (1)**
38:17
**even (2)**
14:22;22:5
**evening (2)**
26:18;29:20
**event (3)**
46:5;52:21;53:20
**events (1)**

38:11
**everyone (2)**
37:25;60:8
**everyone's (1)**
51:6
**evidence (3)**
21:15;47:2,4
**exact (2)**
26:20;35:20
**exactly (4)**
11:4;31:15;52:6,18
**EXAMINATION (1)**
5:15
**execution (4)**
4:12;29:12;42:1,4
**exercise (1)**
16:20
**Exhibit (21)**
17:5,9,12;21:13,16,17;
23:22,24,25;30:1,3;
34:22,24;35:11,24;
38:16;47:22;50:19;
51:15;54:10,13
**experience (1)**
9:22
**explain (1)**
8:20
**explanation (2)**
53:6;59:7

**F**

**fact (3)**
12:17;34:2;58:5
**fair (4)**
16:11;25:23;33:16,19
**fairgrounds (1)**
29:5
**fairly (1)**
48:3
**faith (1)**
5:3
**fall (2)**
10:19;45:3
**familiar (7)**
22:10;24:20;35:20;
36:14;37:2;39:15;48:3
**far (3)**
6:7;11:25;47:24
**February (2)**
26:18;29:14
**fell (2)**
44:8;45:2
**felony (1)**
7:1
**fence (9)**
41:18;42:15;43:5,5;
44:3,7,8,12;45:3
**few (1)**
30:21
**field (1)**
17:15
**fifth (1)**

56:3
**figure (1)**
6:9
**file (2)**
11:13.24
**files (1)**
11:16
**filing (1)**
58:20
**finalized (1)**
7:9
**find (2)**
17:11;30:5
**fine (7)**
8:21;12:19;17:4;
24:21;48:7;49:13;55:2
**finish (1)**
6:5
**fire (3)**
8:9,22;9:3
**firefighter (1)**
9:9
**first (12)**
5:14;19:1,8,9;21:22;
29:22;31:5;36:1;44:8;
47:1;50:5;58:17
**fit (1)**
9:13
**five (1)**
11:12
**flashbang (6)**
17:19;23:19;26:9;
37:4;45:14;46:15
**focused (1)**
23:18
**follows (1)**
5:14
**football (2)**
12:13;16:17
**force (1)**
17:20
**form (28)**
11:17;12:2,14;23:3,9;
25:3;26:11,22;28:9,18;
31:18;32:20;33:20;
35:16;36:9;38:19;39:5,
17;40:2;49:9;51:20;
52:8;54:1;55:9,22;
56:21;57:7;59:24
**format (1)**
24:16
**forth (1)**
7:12
**forward (3)**
13:5;14:23;44:11
**found (4)**
56:25;57:5;59:12,15
**four (4)**
26:15;27:22;28:17;
29:10
**fourth (1)**
56:3
**frankly (3)**

17:8;18:5:55:18
**free (3)**
16:6,22;60:  0
**Friday (7)**
16:18;25:15,23,25;
26:21;27:19,21
**Fridays (1)**
25:9
**front (11)**
14:12;34:8;38:7;43:4;
45:18;46:11;49:21,25;
51:18;52:1;53:11
**full (1)**
6:15
**full-time (1)**
9:8
**further (3)**
12:18;14:23;58:22

## G

**game (2)**
12:13;16:18
**garage (1)**
36:13
**given (5)**
5:17;36:7;37:13;38:2;
50:13
**goes (1)**
30:13
**good (5)**
5:3;17:3;18:25;19:15;
40:9
**GOSMAN (78)**
4:1:5:2,12,15;11:20;
12:4,19;13:3,8,11,14,17,
20;14:4,9,14,16,20;15:5,
17,20,22;16:1,4,11,15;
17:3,6;21:24;22:3,5,8,
11;23:6,12,16,23;24:8,
10;25:5;26:17;27:7;
28:15,20,24;29:2;30:2;
31:22;32:24 34:1,23;
35:21;36:15;38:23;39:8,
22,23;40:8:47:17,21,23;
48:17,24;49 12;51:23;
52:11,15;54:6,11;55:14;
56:1,24;57:9,14;58:22;
59:1;60:2,10
**grab (1)**
47:14
**graduate (1)**
7:25
**graduated (2)**
8:16;9:14
**group (15)**
26:6,21;27:22,24,24;
28:8;31:16;33:5,13;
41:2;42:21;4: :24;47:21;
48:19;53:22
**groups (2)**
28:16;29:9
**growing (1)**

32:9
**grown (1)**
32:11
**guess (2)**
5:6;16:4
**gun (1)**
32:7
**guns (4)**
4:13;32:6;56:6;57:17
**guys (3)**
42:18,24;43:4

## H

**half (1)**
42:9
**halfway (1)**
38:16
**Hall (2)**
36:21,22
**handbooks (1)**
4:9
**handle (1)**
23:8
**hands (3)**
50:1;58:2,11
**hands-on (2)**
24:9;25:20
**handwriting (1)**
35:22
**handy (2)**
48:8,9
**happen (3)**
41:21;43:18,20
**happened (6)**
12:12;16:17;44:5;
53:12,14;55:13
**head (1)**
46:6
**headed (2)**
52:1;53:11
**hear (3)**
45:9,11,14
**heard (6)**
32:12;37:20;39:11,16;
56:12;57:24
**hearing (2)**
37:18;45:10
**held (4)**
18:12;19:16;20:17,17
**help (1)**
18:4
**high (10)**
7:21,23,25;8:4;9:4;
12:13;16:17;20:18,19,20
**history (2)**
8:18;9:6
**hold (1)**
14:25
**home (6)**
29:18;32:19;33:18;
37:13,24;38:12
**hook (1)**

41:21
**hours (2)**
10:23;11:1
**house (19)**
31:2;37:16,19;38:8;
40:10;42:25;43:8,21;
45:8,18;46:11;47:5;
49:18,21;50:11;56:6,11;
57:18;59:22
**huh (1)**
16:5
**husband (1)**
58:9

## I

**idea (3)**
43:6;50:10,18
**identification (1)**
47:18
**identified (9)**
17:5;19:21;21:13;
22:24;23:22;30:1;34:22;
47:22;54:10
**identify (2)**
24:1,4
**illegal (1)**
56:6
**Immediate (1)**
22:18
**immediately (1)**
39:4
**impair (1)**
6:20
**important (1)**
6:1
**Incident (2)**
17:25;19:12
**includes (1)**
48:20
**including (2)**
11:11;23:19
**Incorporated (1)**
21:8
**independent (1)**
12:25
**indicated (2)**
58:6;59:15
**indicating (2)**
39:14;51:18
**individual (2)**
4:11,15
**inferred (1)**
16:25
**information (5)**
37:13;40:22,24;41:3,4
**informed (5)**
31:10;32:5;56:4,10,10
**initial (2)**
46:11;58:17
**in-service (8)**
23:17;24:4;25:1,23,
24;27:12,18,20

**in-squad (1)**
25:9
**instance (2)**
16:20;36:16
**Institute (1)**
21:5
**instructed (2)**
16:19;18:16
**intention (1)**
15:6
**Interdiction (3)**
19:24;20:6;21:24
**interfere (1)**
6:23
**interior (1)**
40:10
**interpret (1)**
51:4
**interview (1)**
54:15
**interviewed (2)**
57:22;60:7
**into (6)**
38:12;44:8;45:2,4,21;
58:10
**investigation (1)**
11:9
**involved (2)**
26:19;32:4
**involving (3)**
7:4;17:19;26:8
**issue (3)**
5:6;6:8;13:4
**issues (1)**
6:22
**items (1)**
34:6

## J

**jobs (2)**
9:11,13
**Join (25)**
11:18;12:3;23:5,11;
25:4;26:12,24;28:11,25;
31:20;32:22;33:22;
35:18;38:21;39:6,19;
40:4;51:21;52:10,14;
54:3;55:10,23;56:22;
57:10
**Jonathan (5)**
41:8,10,19,25;43:23
**Josh (4)**
56:5,10,20;57:18
**Judge (4)**
12:16;14:8,12;15:8
**jump (1)**
6:9
**jumping (1)**
38:5
**Junior (1)**
8:8
**justice (2)**

8:11,13

**K**

keep (2)
18:5;20:14
Kent (5)
31:13;32:14;33:24;
37:3;41:2
kept (1)
26:2
kind (7)
5:9;26:1,9;44:20;
46:12;50:1;55:20
kindly (1)
4:4
knock (2)
38:16;39:3
knock-and-announce (2)
37:6;45:12
knock-and-announced (1)
43:17
knock-and-talk (1)
34:12
knocked (1)
45:21

**L**

Lara (5)
42:12,13,16,17;49:1
large (1)
26:21
larger (1)
29:9
Las (1)
9:14
last (5)
11:12;12:12;16:18;
29:7;58:17
late (1)
46:4
later (2)
15:14;53:21
laughing (1)
44:6
law (8)
4:14;9:25;10:12,13,
21;12:9;20:8;60:8
lawsuit (1)
58:20
lawyer (3)
58:1,7,8
learn (1)
29:16
least (1)
25:15
Lee (1)
31:24
left (5)
8:23;9:10;31:17;
41:15;46:9
left-hand (1)

35:25
legal (2)
54:19,22
length (1)
17:16
less (2)
28:5,6
Lieutenant (1)
12:12
list (5)
22:16;24:23 35:25;
36:6;38:14
listed (1)
51:14
little (6)
17:8;20:15;44:6;46:4;
53:2,6
log (2)
52:22;53:24
logged (1)
30:22
long (5)
4:13;7:13;19:2;46:17,
21
look (18)
4:6;20:25;21:16;
23:24;24:20;:9:25;30:3;
35:20,24;39:25;47:11,
24;48:2,4;50:19;54:13;
57:1;59:6
looked (3)
46:2;56:25;57:5
looking (2)
21:22;30:18
Looks (10)
17:25;20:3;21:2;
22:10;36:11,14;50:20,
20;52:20;53:20
lot (2)
9:10;20:20
love (1)
14:11
lying (1)
57:17

**M**

ma'am (1)
24:8
magistrate (1)
14:5
maintained (1)
11:6
makes (1)
53:17
making (1)
15:22
manager (1)
9:12
manual (2)
21:14,17
many (2)
11:1;32:10

marijuana (2)
32:9,10
mark (2)
47:17,19
Marrisa (2)
34:25;35:14
masters (1)
8:12
materials (6)
4:2,10,22;18:13;
20:11;21:18
matter (2)
11:21;48:12
matters (1)
11:16
May (16)
4:8;14:5;19:22;20:3;
25:14;27:19,20,23;28:1,
2,2;29:4,4;32:17;34:25;
39:11
maybe (4)
14:10;15:8;27:22;43:3
McCaslin (1)
37:4
mean (9)
17:17;24:15;27:19;
40:14;49:23;52:25;
53:10,13;54:23
means (1)
52:23
medical (1)
6:22
medication (1)
6:19
meet (5)
15:16;25:16,18,19;
42:19
member (1)
42:13
members (1)
25:19
mentioned (1)
39:10
message (1)
56:4
meth (1)
56:6
methamphetamine (1)
59:5
methods (1)
34:14
middle (1)
20:19
might (3)
6:7,23;32:4
mind (2)
8:20;26:20
Miner (4)
4:1;36:23,25;59:14
Miner's (1)
21:16
Minns (1)
27:5

minute (5)
12:18,19;17:14;34:24;
35:24
minutes (3)
22:4;46:18;58:10
missed (1)
19:22
missing (1)
38:7
misstates (2)
28:19;39:20
mom (1)
55:12
moment (2)
34:25;38:5
month (3)
25:8,11,15
monthly (1)
25:7
more (5)
26:7,7;28:5,6;37:12
morning (3)
4:7;16:8;27:23
most (3)
54:18,21,22
moved (2)
9:14;44:10
moving (4)
28:2;43:4,4;44:19
much (7)
4:25;5:12;6:7;17:8;
46:14;47:5;58:23
myself (2)
27:23;31:13

**N**

name (4)
6:15;36:4;47:7;58:17
necessarily (1)
25:13
need (3)
4:24;15:1;53:6
needs (5)
13:24;14:2;15:1,9;
59:7
Negative (1)
51:1
next (6)
13:12;20:3,25;30:12;
46:7;55:8
night (10)
30:6;34:19;35:3,8,15;
36:8;37:14;38:6;46:24;
50:24
nods (1)
46:6
noise (1)
44:11
North (2)
6:18;42:10
Northern (2)
8:10,25

notation (1)
39:14
notes (5)
35:1,5,8,14,20
notice (1)
38:6;39:13
noticed (1)
57:12
number (6)
26:20;32:12;39:11;
40:1;57:11,12
numbers (1)
29:9
numerous (1)
9:13

**O**

oath (1)
5:23
Object (20)
12:14:23:3,9;26:22;
28:9,18;31:18;32:20;
33:20;35:16;36:9;39:17;
40:2;49:9,11;52:8;54:1;
55:22;57:7;59:24
objection (14)
4:17,18;11:17;12:2;
25:3;26:11;28:23;38:19;
39:5;51:20;52:13;55:9;
56:21;60:1
observe (1)
35:5
occurred (2)
4:20;26:2
October (6)
12:21;16:14;22:14;
47:16;58:25;60:13
off (2)
13:3;49:17
offered (1)
4:4
office (1)
58:9
officer (42)
4:1;5:8,17;6:15;7:21;
10:6,22;11:8;12:5;
13:23;15:7,9,14;16:6,16;
17:10;21:15;24:25;
28:21;31:24;32:18;
33:16;36:17,17,18,21,
21;37:4;39:1;42:12,12,
13,16,25;44:7;45:1;
47:24;49:20,24;54:25;
56:8;59:14
officers (21)
17:18;21:9;26:7,19;
27:5,23;31:14;33:5,13;
35:25;39:3;40:23;45:16;
50:8;52:21;53:5,22,25;
54:25;58:19;59:17
official (1)
58:13

**once (3)**
25:8,15;44:16

**one (27)**
14:8;15:1;18:5;19:1,7,
22;20:3;21:22;22:1,6,
17;24:12,13,13;27:15;
28:13;29:5;38:7;39:2;
40:25;44:8;48:4,18;
49:2;50:20;51:22;59:2

**ones (2)**
17:22;24:23

**only (2)**
58:8,9

**open (6)**
14:25;39:4;55:4,13,
20;59:9

**opened (2)**
46:8,15

**operation (2)**
34:20;41:3

**opportunity (9)**
12:23,24;13:12;14:2,
19;15:2,9,12,15

**order (3)**
7:15,19;18:4

**others (2)**
40:20;41:1

**otherwise (1)**
36:14

**ours (2)**
24:15,19

**out (16)**
6:9;9:4;19:3;24:12;
25:11,12;28:1,14;32:6;
37:24;46:2;47:13,14;
56:5,11;59:9

**over (13)**
25:21;26:19;31:24;
41:22;43:5;44:3,7,8,12,
19;45:3,7,23

**overtime (1)**
25:10

**own (2)**
12:11;27:21

**P**

**package (1)**
59:4

**page (5)**
19:8,9;30:7;36:1;
54:14

**papers (1)**
7:11

**paragraph (2)**
55:8;56:3

**paranoid (1)**
32:6

**parked (1)**
42:9

**parking (1)**
42:11

**part (3)**

**4:3;23:1;27.12**

**participate (2)**
33:8;34:10

**participated (2)**
23:17;24:5

**participating (1)**
44:1

**pass (2)**
13:11;50:7

**Patrol (14)**
10:6;17:24,25;18:2,8;
19:11,24;20:5,6;21:3,18,
24;22:13.19

**Patterson (2)**
12:12;16:25

**peace (1)**
11:8

**peek (1)**
32:6

**pending (1)**
6:13

**people (3)**
26:15,15;27 19

**perform (1)**
34:12

**perhaps (2)**
17:18;53:19

**period (1)**
31:1

**permit (1)**
15:12

**person (1)**
37:20

**personnel (3)**
11:13,16,24

**perspective (1)**
44:5

**pertains (1)**
17:15

**phase (1)**
34:20

**phone (5)**
56:9,15,17;57:1,12

**photograph (2)**
59:3,17

**photographs (2)**
48:14,15

**photos (3)**
47:20;59:21,22

**phrase (1)**
12:15

**phrasing (1)**
5:7

**pick (1)**
15:3

**picture (6)**
48:21;49:7,14;59:10,
11,13

**pictures (14)**
46:12,12;47:1,3,9,10,
11,12;48:2,5,5,3,25;59:6;
60:5

**pile (1)**

**44:9**

**pillow (2)**
49:7,13

**pills (3)**
54:19,21,22

**pipes (1)**
56:7

**place (2)**
26:3;38:11

**placed (1)**
7:15

**places (1)**
11:16

**plan (3)**
31:11;39:2;42:25

**planning (3)**
32:15;33:15;42:1

**plants (5)**
32:9,10;39:10,10,14

**please (2)**
8:7;29:8

**pleasure (1)**
14:6

**pm (7)**
16:14;47:16;56:25;
57:5,12;58:25;60:13

**point (4)**
13:19,23;19:3;31:17

**police (18)**
4:14;9:6,19,22;10:5,8;
11:15,22,23;21:10,23:2,
18;25:1;26:5;30:6:31:4;
38:16;48:15

**policy (2)**
24:9;25:21

**portion (1)**
52:22

**pose (3)**
32:17;49:20,23

**posing (1)**
50:1

**position (3)**
44:22;45:21;51:19

**possession (3)**
50:4,7,9

**possibly (1)**
46:20

**POST (3)**
4:3;10:23;22:12

**pot' (1)**
56:7

**potential (1)**
32:4

**Powell (30)**
6:18;9:6,17,19,23;
10:4,8;11:15,22;15:7;
19:16,19;21:10;23:2,18;
25:1;26:5;48:15;50:24,
25,25;51:1,10,10,12,15;
52:1;53:10,13;58:14

**prepared (2)**
35:1;54:7

**preplanned (1)**

**44:24**

**presearch (4)**
46:12;47:3;59:10;60:5

**present (3)**
31:12;37:19;41:11

**presume (1)**
53:19

**pretending (1)**
58:4

**pretty (2)**
27:11;47:5

**previous (2)**
19:4;35:14

**previously (1)**
29:10

**print (1)**
48:10

**prior (5)**
9:22;10:1;30:19;
34:19;58:20

**probably (6)**
29:24;39:16;42:9;
45:11;48:10;52:7

**problem (1)**
48:18

**problems (1)**
6:22

**proceed (3)**
12:25;15:1,11

**proceeding (1)**
14:21

**proceedings (2)**
7:9;60:12

**process (2)**
5:20;33:15

**produce (1)**
4:2

**produced (1)**
48:16

**production (1)**
4:8

**productive (1)**
49:5

**professional (1)**
4:14

**program (2)**
10:16;25:2

**provided (3)**
40:22,23;48:14

**pull (1)**
48:19

**pursuant (1)**
4:23

**put (6)**
13:3;14:11;20:7;21:5;
30:15;58:11

**Q**

**qualifying (1)**
28:1

**quick (3)**
47:14;48:10;50:19

**quickly (1)**
30:5

**quite (1)**
30:8

**quote (1)**
58:4

**R**

**radio (10)**
43:3;44:14,23;45:17;
50:17;51:9,17,25;52:4,5

**range (6)**
25:11,12,13;27:25;
28:1;29:4

**rank (1)**
10:5

**rather (2)**
14:7;48:4

**reaction (1)**
14:13

**read (2)**
45:25;46:1

**reading (2)**
50:23;55:18

**real (3)**
47:14;48:10;50:19

**realize (1)**
12:8

**rear (1)**
42:15

**reason (1)**
32:18

**received (3)**
4:15;29:23;56:4

**Recess (4)**
12:20;16:13;47:15;
58:24

**recognize (3)**
24:14,15;35:22

**recognizes (1)**
24:6

**recollect (1)**
57:25

**record (4)**
12:22;21:20;48:4;57:2

**recorded (1)**
53:16

**recording (1)**
47:2

**records (3)**
21:21;22:13;44:22

**referred (1)**
24:6

**referring (3)**
24:17;30:5;38:14

**reflect (1)**
36:6

**reflected (1)**
11:24

**related (3)**
9:3;16:24,25

**relates (1)**

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 25 of 60

Tricia Wachsmuth v.                                                                    Dave Brown
City of Powell, et al.                                                              October 7, 2010

17:20

relation (3)
29:22;45:16;55:21

relative (2)
4:19;31:1

relevant (1)
31:5

remember (48)
7:10,12;18:16,21;
19:2,18;20:10;21:11,18;
22:5;29:11,24;30:10,24;
31:8;32:8,23;34:17;
37:13,16,18;38:10,24;
39:1,7;40:9,12,14,15,16;
41:5,20,23;43:10;44:25;
45:10,11,46:17;48:20;
49:7,17,20;50:24;51:5;
52:4,6;55:15;59:3

removed (1)
49:22

repeat (2)
11:19;29:7

report (6)
30:7,15;45:25;46:1;
50:17;57:4

reports (1)
54:7

represent (2)
48:1,13

request (3)
4:8,22,23

requesting (1)
4:9

require (1)
11:1

required (2)
5:21;10:12

requirements (1)
10:20

requires (1)
5:2

residence (11)
4:21;29:13;30:21;
31:17,25;41:7,22;42:7,
10,10;44:13

residue (1)
59:5

resolve (1)
5:3

resource (1)
27:23

respect (1)
38:11

responding (1)
18:21

Response (12)
17:24;18:1,2,8;19:11,
25;20:5,7;21:4,19,25;
22:14

responses (1)
5:11

rest (1)
22:15

restraining (2)
7:15,18

restricted (3)
57:11,12,15

retrieved (1)
59:16

rifles (1)
4:13

Right (27)
9:4;14:16,20;15:5,20;
16:11,21:17 3;18:21;
25:22;30:24;16:3;39:12;
42:18;43:10 44:2;46:4;
50:11,14,21:51:3,8,17;
53:9;54:12,13;55:2

right-hand (1)
38:15

rights (2)
12:24;13:17

role (1)
29:12

room (4)
23:20;26:9;47:5;59:10

route (2)
30:19,21

Rule (3)
4:24;5:1,2

run (4)
9:5;22:15;25:14;47:14

S

safety (1)
32:18

same (4)
21:11;43:8;52:13;
53:14

sanctioned (1)
12:16

saw (2)
46:3;57:15

saying (2)
24:19;28:13

scenario (1)
25:14

scene (4)
38:6;41:12;47:1;50:8

schedule (1)
9:13

school (16)
7:21,25;8:5,23;9:4;
12:13;16:17;18:22,23;
20:18,19,19,21,22;22:7;
27:22

schooling (1)
8:4

science (1)
8:9

Scoop (1)
37:24

search (6)
4:13;29:13;38:17;
59:23;60:9,9

searched (2)
4:21;31:2

searching (1)
46:13

Sears (2)
9:12,15

second (2)
29:1;45:6

seconds (3)
52:20;53:5,21

secure (4)
44:10;46:8,9;50:12

securing (1)
34:7

seeing (3)
40:9,12;49:20

sends (1)
55:12

Senior (1)
7:23

sent (1)
7:12

sequence (1)
38:11

sergeant (15)
10:10;31:13;32:14,15;
33:23,24;36:18,19,21;
37:3;39:1;40:18,25;
41:2;51:13

Sergeants (1)
32:16

series (1)
52:21

served (1)
29:21

service (7)
8:22;29:17;34:4,12,
15;36:8;41:11

session (4)
15:1;34:3;35:14;41:19

sessions (1)
26:21

set (1)
48:1

setting (5)
18:23;26:6;28:4,8;
34:16

settled (1)
16:4

several (1)
21:9

shifts (2)
27:21,22

shit (1)
56:5

shoot (2)
28:2,2

Shooter (7)
18:1,2,9,22;20:5,21;
22:7

shorten (1)
17:7

show (2)

17:19;49:15

showed (1)
34:18

side (1)
38:15

signal (3)
44:21;50:1,13

signaling (1)
44:20

significant (1)
26:6

simply (1)
34:11

simulations (2)
26:8;28:7

single (1)
48:20

sitting (1)
59:9

situations (1)
23:8

six (4)
26:7,15;28:17;29:10

slammed (2)
58:2,11

small (1)
59:4

smoke (1)
49:17

smoldering (1)
49:7

somebody (4)
13:1,14;37:20;46:8

someone (4)
13:6;14:19;15:3,16

somewhere (1)
17:10

sorry (7)
20:1;33:13;42:4,6;
51:24;56:10;60:4

sort (5)
6:9;23:7;37:9;42:18;
59:22

sound (1)
40:1

sounds (3)
37:2;39:15;40:6

south (3)
42:9,11,24

special (1)
23:7

specifically (3)
22:24;32:8;38:14

spend (1)
25:10

split (1)
7:11

spoke (2)
40:16,20

squad (2)
25:19,19

squads (2)
25:16.18

standards (1)
11:6

standing (1)
11:8

start (3)
8:18;17:9;19:8

started (5)
9:2,6;44:19;46:13;
59:23

starts (2)
21:22;53:19

stated (5)
5:8;54:18.21;55:3;
57:18

station (6)
30:6,23,25;31:4;
33:19;41:23

stay (1)
41:17

stayed (3)
41:14,16;44:13

still (3)
15:12;18:12;22:12

stood (2)
49:25;58:2

stool (1)
44:7

stop (3)
16:9;17:20;18:5

stopped (2)
13:18,22

stopping (1)
14:21

street (3)
27:6;42:10,11

stuff (8)
18:15;20:14,20,20;
24:16;30:12;55:12;
56:11

stuffed (2)
55:3,4

subject (2)
13:12;27:10

submit (1)
4:8

summarize (1)
17:14

superior (1)
17:19

supplement (1)
5:10

supplied (1)
4:23

supply (1)
41:3

supposed (2)
45:20,23

sure (13)
11:5;14:9;19:23;
22:16;27:8,11;40:20,25;
44:10;48:18;49:5;52:18;
56:13

SWAT (1)

Tricia Wachsmuth v.
City of Powell, et al.

Dave Brown
October 7, 2010

22:24
sworn (1)
  5:14
system (1)
  44:20

**T**

table (1)
  58:2
tactical (12)
  17:21;21:3,5,19;
  22:13;23:8;26:8;32:19;
  33:1,2,11,12
tactics (3)
  23:7,19;26:9
talk (9)
  8:17;12:23,24;13:6;
  14:19;15:2;19:9;24:11;
  27:18
talked (3)
  28:16;29:10;37:15
talking (2)
  27:13;34:7
tampering (2)
  12:5,8
team (17)
  17:18,18;23:2,8;
  32:19;33:1,2,11,12;
  34:16;36:17;42:13;
  43:11,21;51:18;52:1;
  53:11
teams (1)
  43:7
telling (2)
  14:20;39:2
tells (2)
  53:24;55:11
ten (7)
  26:19;32:12;39:10,22;
  40:6,7;46:20
tendency (1)
  6:8
ten-hour (3)
  18:11;20:4;22:8
ten-year-old (1)
  37:18
terms (4)
  30:25;31:5;40:21;
  42:25
testified (2)
  5:14;57:25
testimony (3)
  28:19;39:21,25
therapy (1)
  55:20
THOMPSON (30)
  11:17;12:2;23:5,11;
  25:3;26:11,24;28.11,25;
  31:20;32:22;33:22;
  35:18;38:19;39:5,19;
  40:4;47:19;48:11,13;
  49:11;51:20;52:10,14;

54:3;55:9,23;56:21;
  57:10;60:1
though (1)
  14:22
thought (2)
  39:11;55:17
threat (2)
  32:4,18
threaten (1)
  12:17
threatened (2)
  15:24;16:1
threats (2)
  15:19,22
three (4)
  37:12,16;52:20;53:21
thus (1)
  6:7
today (4)
  5:20,24;15:14;22:3
together (5)
  25:16,18;27:21;28:5,
  13
told (6)
  31:10;32:3;37:6,9;
  50:11;58:1
took (17)
  17:24;21:10:26:2;
  35:14;46:11;47:1,3,9,12;
  48:3,6,25;49:14;59:9,17,
  21;60:5
top (1)
  36:11
topic (3)
  14:22,23;17:16
Torczon (2)
  34:25;35:14
Torczon's (1)
  35:22
towards (1)
  31:25
track (2)
  18:5;20:14
traffic (3)
  51:9,17,25
train (3)
  25:7,19;27:22
trained (9)
  9:25;23:1;26:5,14,16,
  20;28:7,12,14
training (34)
  4:2,4,10,15,19;10:23;
  17:10,15,20;18:13;
  19:18;20:11;21:23;
  22:23,24;23:18;24:4;
  25:1,9,13,23,2-,25:26:2;
  27:2,4,9,13,15,16,16,19,
  21;29:9
transferred (1)
  8:25
transmission (2)
  52:4,6
travel (1)

41:6
Tricia (5)
  46:2;49:22,24;57:22;
  58:6
trouble (1)
  6:7
truthful (2)
  6:20,23
try (2)
  25:7,9
trying (3)
  30:10;39:24;48:19
turn (2)
  18:14;34:24
turned (1)
  20:12
turning (2)
  56:6,12
Twenty (2)
  39:15;40:6
two (4)
  11:4;19:21;24:14;
  32:16
two-year (1)
  9:1
type (1)
  17:21
typed (2)
  52:17;53:12
types (2)
  25:13;53:8
typing (2)
  53:14,21

**U**

under (6)
  5:23;10:21;11:9;
  37:25;52:21;59:15
underneath (1)
  54:14
understood (1)
  36:7
University (3)
  8:10,12,15
unless (2)
  24:23;26:25
up (15)
  13:22;15:3;19:1;
  28:22;29:1;34:18;41:21;
  43:4;44:19;48:11;50:15;
  51:8;57:4;58:2;60:3
use (9)
  4:12,13;32:19,25;
  33:4,11,13,18;34:16
used (2)
  52:19;55:20
usually (1)
  17:18

**V**

Valley (3)

7:23;8:8;9:1
Vegas (1)
  9:14
vehicle (3)
  41:9;46:10,10
vehicles (2)
  38:3,7
verbal (1)
  11:12
Victor (3)
  7:23;8:8,25
Victorville (1)
  7:23;8:8,19;9:9
visit (3)
  13:14;15:10;16:18

**W**

Wachsmuth (25)
  4:20;29:13;30:21;
  31:1,17;32:3,5,17;36:8;
  37:23,24;41:7,22;46:2;
  49:22,24;54:15,18,21;
  56:4,11,12;57:22;58:3,6
Wachsmuth's (2)
  38:3;42:20
wait (3)
  45:20.24;50:12
waited (2)
  45:6;50:14
warrant (12)
  29:13,16,21;34:4,12,
  15;36:8;37:7;38:17;
  41:11;42:1,4
warrants (1)
  4:13
way (3)
  12:15;18:3;54:8
weekend (1)
  12:13
weren't (1)
  50:14
WESTBY (59)
  5:1,6;11:18;12:3,14,
  22;13:5,10,13,16,18,21;
  14:7,11,15,18,24;15:15,
  18,21,24;16:3,9,12,23;
  21:20;22:1,4,7;23:3,9,
  14;24:6;25:4;26:12,22;
  28:9,18,23;31:18;32:20;
  33:20;35:16;36:9;38:21;
  39:6,17,20;40:2;49:9;
  51:21;52:8,13;54:1;
  55:10,22;56:22;57:7;
  59:24
What's (3)
  5:1;13:21;53:16
whole (2)
  27:5;28:5
who's (2)
  34:8,8
wife (2)
  9:15;55:3

window (3)
  43:11,15;46:2
windows (1)
  32:6
withdraw (1)
  51:24
within (1)
  52:20
without (1)
  14:23
WITNESS (33)
  11:19;12:5,8,23;
  15:21,23,25;16:2,10;
  22:10;23:15;24:9;26:14;
  27:2;28:12;29:1;31:21;
  32:23;33:23;35:19;
  36:11;38:22;39:7;40:6;
  46:6;48:12,22;51:22;
  54:4;55:11,24;56:23;
  57:11
words (3)
  12:11;52:18;58:5
work (3)
  8:17;15:12;30:11
worked (5)
  8:22;9:12,15,19;10:7
working (4)
  9:2;10:4;30:13,15
Worland (1)
  18:12
Wyoming (5)
  6:18;10:21;18:12;
  19:16,19

**Y**

year (2)
  8:2;11:1
year-and-a-half (2)
  46:22;51:6
years (3)
  8:14;11:4,12
Yesterday (2)
  4:1,5
young (1)
  37:20

# Appendix Fourteen

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Kirk Chapman*
*November 23, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 11-23-10 Kirk Chapman_SCOPED.txt
Min-U-Script® with Word Index

---

KIRK CHAPMAN - November 23, 2010                                Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF WYOMING

3        ---------------------------------------------------

4    TRICIA WACHSMUTH,                    )

5                    Plaintiff,           )

6        vs.                              )   NO. 10-CV-041J

7                                         )
     CITY OF POWELL, AND IN THEIR         )
8    INDIVIDUAL CAPACITY, TIM             )
     FEATHERS, CHAD MINER, MIKE           )
9    CHRETIEN, ROY ECKERDT, DAVE          )
     BROWN, MIKE HALL, BRETT LARA,        )
10   MATT MCCASLIN, ALAN KENT, MATT       )
     DANZER, OFFICER BRILAKIS, LEE        )
11   BLACKMORE, CODY BRADLEY, KIRK        )
     CHAPMAN, JOHN DOES #1-#4,            )
12                                        )
                      Defendants.         )
13   _____

14             DEPOSITION OF KIRK CHAPMAN
                1:23 p.m., Tuesday, November 23, 2010
15

16

17

18             Pursuant to notice, the deposition of KIRK

19   CHAPMAN was taken in behalf of Plaintiff in accordance

20   with the applicable Federal Rules of Civil Procedure at

21   270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22   Registered Professional Reporter and Notary Public of

23   the State of Montana.

24

25

---

KIRK CHAPMAN - November 23, 2010                                Page 2

1                        APPEARANCES

2    FOR PLAINTIFF:

3              Mr. Jeffrey C. Gosman
               Gosman Law Office
4              125 W 2nd Street
               P.O. Box 51267
5              Casper, WY 82601-2481
               Telephone: (307)265-3082 - Fax: (307)265-6715
6              E-mail: jeff@gosmanlawoffices.com

7

8    FOR INDIVIDUAL DEFENDANTS:

9              Ms. Misha Westby
               Senior Assistant Attorney General
10             2424 Pioneer Avenue, 2nd Floor
               Cheyenne, WY 82002
11             Telephone: (307)777-5477 Fax: (307)777-8920
               E-mail: mwestb@state.wy.us
12

13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:
14

15             Mr. Tom Thompson
               MacPerson, Kelly & Thompson
16             616 West Buffalo
               P.O. Box 999
17             Rawlins, WY 82301-0999
               Telephone: (307)324-2713 - Fax: (307)324-7348
18             E-mail: tthompson@wyomingattorneys.net

19

20   Also Present:  Tim Feathers

21

22

23

24

25

---

KIRK CHAPMAN - November 23, 2010                                Page 3

1                       INDEX TO WITNESSES

2                                                          PAGE

3    KIRK CHAPMAN

4        Direct Examination by Mr. Gosman ...............4
5        Signature Page .................................78
         Reporter's Certificate .........................79

6

7

8                          EXHIBITS

9    EXHIBIT           DESCRIPTION                        PAGE

10   10       Notes of the Wachsmuth Warrant ..........37

11   23       PPD Supplement 6 by Kirk Chapman ........76

12   31       WY P.O.S.T. Training Records ............10

13   59       Defendants' Responses to ................19
              Plaintiff's First Discovery
14            Request

15

16

17

18

19

20

21

22

23

24

25

---

KIRK CHAPMAN - November 23, 2010                                Page 4
Direct Examination by Mr. Gosman

1                   KIRK CHAPMAN,

2   having been first duly sworn, testified as follows:

3               DIRECT EXAMINATION

4   BY MR. GOSMAN:

5       Q.  Officer, have you given a deposition before?

6       A.  No.

7       Q.  I'm going to go ahead and review a couple of

8   the ground rules for taking depositions with you before

9   we start.

10              Your testimony, as you understand, is taken

11  under oath.  And, of course, you're required to answer

12  the questions truthfully.  And you will answer each of

13  the questions that I ask you today unless your

14  attorneys direct you otherwise.

15      A.  (Witness nods head.)

16      Q.  Let's see.  It is important that you ask for

17  clarification if you do not understand one of my

18  questions.  Would you agree to do that?

19      A.  Yes.

20      Q.  And we're free to take a break at any time

21  today, but we do not take a break during the pendency

22  of a question.  So we'll need to wait until the

23  question that has been asked has been answered before

24  we can go ahead and take a break, okay?

25      A.  Okay.

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 30 of 60
Tricia Wachsmuth v.
City of Powell, et al.

Kirk Chapman
November 23, 2010

KIRK CHAPMAN - November 23, 2010                Page 5
Direct Examination by Mr. Gosman

1   Q. And if you want to take a break, just let us
2   know. What is your full name, sir?
3   A. Brian Chapman.
4   Q. And what is your address? You can use your
5   P.E. address if you like.
6   A. 250 North Clark, Powell, Wyoming 82435.
7   Q. Are you currently on any medications that
8   would impair your judgment today?
9   A. No.
10  Q. You're tired?
11  A. Yes.
12  Q. Do you think you're going to be able to
13  remember the events as well as you could in any setting
14  here this afternoon?
15  A. Yes.
16  Q. All right. Have you ever been arrested for a
17  crime that was classified as a felony?
18  A. No.
19  Q. Have you ever been accused of a crime
20  involving dishonesty?
21  A. No.
22  Q. Have you ever had a restraining order placed
23  against you?
24  A. No.
25  Q. Have you ever been a party to a lawsuit?

KIRK CHAPMAN - November 23, 2010                Page 6
Direct Examination by Mr. Gosman

1   A. No.
2   Q. Could you describe your educational
3   background, starting with high school?
4   A. Graduated high school in Powell here.
5   Q. What year?
6   A. 1992.
7   Q. And what did you do after you got out of high
8   school?
9   A. Went into the service
10  Q. How long were you in the service?
11  A. Ten years.
12  Q. Which branch?
13  A. Marine Corps.
14  Q. And were you -- how were you discharged?
15  A. Honorably.
16  Q. And did you receive training in law
17  enforcement in the Marine Corps?
18  A. In law enforcement?
19  Q. Yes.
20  A. In some law enforcement capacities.
21  Q. All right. When did you join the Powell
22  Police Department?
23  A. In 2007, January 15.
24  Q. And what did you do from the time you got out
25  of the service until you joined the Powell Police

KIRK CHAPMAN - November 23, 2010                Page 7
Direct Examination by Mr. Gosman

1   Department?
2   A. Well, I was in school from '98 to 2004 -- or
3   2003, where I went to a couple of different schools.
4   Q. And did you obtain a degree?
5   A. Yes.
6   Q. In what area is your degree?
7   A. Criminal justice.
8   Q. And do you have -- do you hold a bachelor
9   degree in criminal justice?
10  A. It's an associate's degree.
11  Q. And so then after you graduated with that
12  degree, what did you do?
13  A. Worked different jobs. And I was a
14  corrections officer in Outagamie County. Wisconsin.
15  Q. How long did you do that?
16  A. Was there for approximately four months.
17  Q. And why did you leave?
18  A. I was offered a position with the Neenah
19  Police Department.
20  Q. How long were you there?
21  A. I was there for approximately four months.
22  Q. And why did you leave?
23  A. I resigned due to personal issues within the
24  department.
25  Q. Did they involve any claims against you?

KIRK CHAPMAN - November 23, 2010                Page 8
Direct Examination by Mr. Gosman

1   A. No.
2   Q. Was it just a matter of not getting along
3   with somebody?
4   A. Yes.
5   Q. Were charges -- were any -- was any official
6   action taken in connection with your leaving?
7   A. No.
8   Q. You went to work for the Powell Police
9   Department after that job?
10  A. I worked security at a high school in
11  Appleton, Wisconsin, for a couple of years.
12  Q. And then you came to Wyoming?
13  A. Yes.
14  Q. All right. Was the Powell Police Department
15  aware of the circumstances surrounding your leaving the
16  Neenah Police Department?
17  A. I'm sorry?
18  Q. Was the Powell Police Department aware of the
19  circumstances of your leaving the Neenah Police
20  Department?
21  A. Yes.
22  Q. Prior to your coming to work for the Powell
23  Police Department, did you have any SWAT training?
24  A. Yes.
25  Q. Where?

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 31 of 60
Tricia Wachsmuth v.                                                      Kirk Chapman
City of Powell, et al.                                              November 23, 2010

KIRK CHAPMAN - November 23, 2010                                    Page 9
Direct Examination by Mr. Gosman

1   A.  In the military.
2   Q.  In the military.
3       And how long ago was that?  What year?
4   A.  The last training that I did?
5   Q.  Yes.
6   A.  That would have been 2000.
7   Q.  What kind of training did you have?
8   A.  Oh, everything from room clearing, dynamic
9   entries to breaching.
10  Q.  And were you involved in a SWAT team there
11  with the Air Force?
12  A.  I wasn't with the Air Force.
13  Q.  I'm sorry, I just made that up.
14      What branch -- I'm sorry, Marine Corps.
15      Were you involved with any military -- or a
16  SWAT team -- I'm sorry, were you involved with a SWAT
17  team with the Marine Corps?
18  A.  Marine Corps doesn't have a SWAT team.
19  Q.  Do they have anything like a SWAT team?
20  A.  They have quite a few different teams.
21  Q.  Do they have any teams that are like SWAT
22  teams that are associated with internal policing?
23  A.  Internal policing?
24  Q.  Yeah.
25  A.  I didn't have any SWAT training as far as

KIRK CHAPMAN - November 23, 2010                                   Page 10
Direct Examination by Mr. Gosman

1   internal.
2   Q.  What was your SWAT training for?
3   A.  Antiterrorism.
4   Q.  All right.  And did you ever serve on an
5   antiterrorism SWAT team?
6   A.  Yes.
7   Q.  For how long?
8   A.  I was an antiterrorism force protection
9   instructor for three years.
10  Q.  Okay.  And did you obtain any certifications?
11  A.  They send you to classes.  They don't
12  necessarily give you certifications.
13  Q.  Were you a certified instructor?
14  A.  I was a certified instructor, yes.
15  Q.  All right.  Did you have a certificate?
16  A.  In antiterrorism force protection, yes.
17  Q.  Have you maintained any training in that
18  field since you left the military?
19  A.  In antiterrorism force protection?
20  Q.  Or SWAT-type training.
21  A.  Nothing certified.
22          (Exhibit 31 identified)
23  BY MR. THOMPSON:
24  Q.  All right.  Let's go ahead and take a look at
25  Exhibit 31.  And this is a group of POST training

KIRK CHAPMAN - November 23, 2010                                   Page 11
Direct Examination by Mr. Gosman

1   records.  You're in here somewhere.  Let's see if we
2   can find it.
3   BY MR. GOSMAN:
4   Q.  I may not have your POST records here.  Oh,
5   well...
6       Okay.  We're going to get back to this.
7   We'll come back to this later.
8       Let me ask you this question:  Did you
9   participate in the Patrol Tactical Response Course in
10  September or October of 2005?
11      No, you were not with the Powell Police
12  Department then, were you?
13  A.  No, I wasn't.
14  Q.  You came in 2007?
15  A.  Yes.
16  Q.  All right.  Have you had any training as a
17  Powell police officer in dynamic entry tactics?
18  A.  We have gone over -- as far as FTO training
19  and stuff like that, we've touched on dynamic entries.
20  Q.  All right.
21  A.  And room clearing procedures.
22  Q.  Do you have any POST-certified training?
23  A.  No.
24  Q.  And when you say -- did you say -- that was
25  FTO, did you say?

KIRK CHAPMAN - November 23, 2010                                   Page 12
Direct Examination by Mr. Gosman

1   A.  Yes.
2   Q.  And why don't you explain the FTO program.
3   A.  The FTO program, the Field Training Officer
4   program is where you're paired with other officers
5   within the department where they have -- they have been
6   selected as having the correct mindset and training to
7   train new officers in the field of law enforcement,
8   where you ride along with them and they train you as
9   far as everything from simple traffic stops to room
10  clearing procedures, open doors, burglary alarms,
11  responses.
12  Q.  And the field training program is described
13  in the policy and procedures manual of the City of
14  Powell, correct?
15  A.  It is described.
16  Q.  And is it your testimony that the dynamic
17  entry tactics that you've been trained on or have
18  received training concerning since you arrived at the
19  Powell Police Department were in connection with the
20  field training program?
21  A.  We did touch on it when we were -- when I was
22  on FTO, as far as dynamic entry and room clearing
23  procedures.
24  Q.  Were you the instructor?
25  A.  No.

KIRK CHAPMAN - November 23, 2010                    Page 13
Direct Examination by Mr. Gosman

1   Q.  Were you one of the officers that was being
2   trained?
3   A.  Yes.
4   Q.  And that was during your probationary term?
5   A.  Correct.
6   Q.  Who was your trainer?
7   A.  I've had three trainers. Officer Schmidt,
8   Officer Lara, and I believe it was Sergeant Eckerdt.
9   Kind of going back and forth between Sergeant Eckerdt
10  and Sergeant Kent.
11  Q.  And do you remember specifically if all of
12  the officers you just mentioned, Lara -- was it
13  Schmidt?
14  A.  Yes.
15  Q.  -- Kent, and Eckerdt were involved in dynamic
16  entry tactics?
17  A.  I believe it was Officer Schmidt was the main
18  one. He's the firearms instructor as well.
19  Q.  All right. Was anyone else present?
20  A.  Not to my knowledge.
21  Q.  And since that time, have you had any dynamic
22  entry specific training?
23  A.  Yes.
24  Q.  Where?
25  A.  Last November we had training with Doug

KIRK CHAPMAN - November 23, 2010                    Page 14
Direct Examination by Mr. Gosman

1   Pechtel.
2   Q.  So he came back to the Cody area with --
3   from -- the man from Countermeasures Tactical Institute
4   and put on another program for the officers here?
5   A.  Yes.
6   Q.  Do you remember what it was called?
7   A.  It was Active Shooter Response by Patrol.
8   Something like that.
9   Q.  All right. And prior to that time, this
10  would be November of 2009? Was it November of 2009?
11  Let me make sure --
12  A.  Yes, I believe it was 2009.
13  Q.  Prior to November of 2009 and after you
14  completed your field training program, had you had any
15  training specific to dynamic entry with the Powell
16  Police Department?
17        MS. WESTBY: Object to the form of the
18  question.
19        MR. THOMPSON: Join.
20        MS. WESTBY: And go ahead and answer.
21  BY MR. GOSMAN:
22  Q.  Yes, please.
23  A.  Could you ask it again?
24  Q.  Yeah. Prior to November of 2009 and
25  following your field training in the area of -- or that

KIRK CHAPMAN - November 23, 2010                    Page 15
Direct Examination by Mr. Gosman

1   touched upon dynamic entry, have you had any additional
2   training specific to dynamic entry?
3         MS. WESTBY: Object to form.
4         Go ahead.
5         MR. THOMPSON: Join.
6         THE WITNESS: Prior to 2009? I'm not for
7   certain.
8   BY MR. GOSMAN:
9   Q.  Have you ever participated with the Powell
10  Police Department as a team in training exercises
11  specific to dynamic entry?
12  A.  Yes.
13  Q.  When and where?
14  A.  We've done active shooter drills within the
15  schools, other buildings. Mainly the school buildings,
16  I believe, when they are unoccupied.
17  Q.  Unoccupied? When did those events occur?
18  A.  I'm not for sure. They kind of go, you know,
19  couple of times a year.
20  Q.  Okay. Do you remember participating in any
21  of that training prior to February 24th, 2009?
22  A.  Yes.
23  Q.  Do you know if that training is documented?
24  A.  I'm not sure.
25  Q.  Was it a joint agency training?

KIRK CHAPMAN - November 23, 2010                    Page 16
Direct Examination by Mr. Gosman

1   A.  No.
2   Q.  Is it part -- does the Powell Police
3   Department have a P.I.E.R. team?
4   A.  Explain.
5   Q.  Do you know what P.I.E.R. is?
6   A.  No.
7   Q.  Okay. Patrol Interdiction Emergency Response
8   team?
9   A.  We don't, no.
10  Q.  All right. The times that you trained with
11  the Powell Police Department in room clearing at the
12  schools, who was there?
13        And you don't have to remember every name,
14  but let me say this: Was it most of the Powell Police
15  Department?
16  A.  Yes.
17  Q.  All right. And who was the instructor?
18  A.  I'm thinking Kevin -- Officer Schmidt was one
19  of the primary instructors.
20  Q.  Do you know if he's certified in any of the
21  areas that are pertinent to dynamic entry?
22  A.  I'm not sure what his certifications -- all
23  certifications are.
24  Q.  And this was in the context of school
25  emergency situations?

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 33 of 60
Tricia Wachsmuth v.                                                                          Kirk Chapman
City of Powell, et al.                                                                 November 23, 2010

KIRK CHAPMAN - November 23, 2010                    Page 17
Direct Examination by Mr. Gosman

1   A.  Immediate action.
2   Q.  Immediate action.
3        And, of course, that does involve room
4   clearing tactics.  But have you been involved in any
5   specific training as a team where you were simulating a
6   warrant service or a dynamic entry into a premises?
7   A.  Where we've done dynamic entries?  Yes.
8   Q.  Okay.  When and where?
9   A.  I'm not exactly sure.  We trained on all the
10  equipment when we got new breaching tools and
11  everything.  We all sat down and went over the door
12  breachers and stuff like tha..
13  Q.  Mechanical devices that are involved in
14  breaching?
15  A.  Correct.
16  Q.  What kind of mechanical devices do you have?
17  A.  Well, we have a door ram.  At that time we
18  had a door ram and a window rake.
19  Q.  Okay.  And you had the whole police
20  department come in and sit down and go over those uses
21  of the --
22  A.  I believe at that time those were just done
23  at a squad level.
24  Q.  Okay.  Is any of that documented, do you
25  know?

KIRK CHAPMAN - November 23, 2010                    Page 18
Direct Examination by Mr. Gosman

1   A.  Not that I'm aware of.  I'm not sure.
2   Q.  All right.  Have you ever used one of those
3   rakes since you were out of the Marine Corps?
4   A.  Since I was out?
5   Q.  Yes.
6   A.  No.
7   Q.  Have you ever employed a battering ram?
8   A.  Yes.
9   Q.  When and where?
10  A.  Prior to getting out of the service?
11  Q.  No, after you got out of the service.
12  A.  Deployed the door ram on a couple of
13  misdemeanor warrants.
14  Q.  Where?
15  A.  One was on North Absaroka.  The other one,
16  I'm not sure.  Prior to 2009?
17  Q.  Yeah.
18  A.  Yes.
19  Q.  Was there a team involved in that?
20  A.  There was a team of officers.
21  Q.  Okay.  Well, I'll tell you what, I've got a
22  document here that should have a reference to that.  We
23  haven't marked this yet, but we'll just go ahead and do
24  that right now.  We'll mark it as Exhibit 59.  And we
25  don't have to mark it right now.

KIRK CHAPMAN - November 23, 2010                    Page 19
Direct Examination by Mr. Gosman

1              (Exhibit 59 identified)
2   BY MR. GOSMAN:
3   Q.  But I want you to take a look at the incident
4   reports that are behind the group of pages there at the
5   front and tell me which ones you were involved in,
6   whether it was a battering ram and dynamic entry
7   misdemeanor warrants.
8        And I think you can -- frankly, if you could
9   just go to the first page of each one of those
10  incidents, and I think you get a pretty good picture
11  from that first page what it's about.  And you can tell
12  which ones are yours, so you don't have to go through
13  the whole sheaf of documents.
14       While you're going through those, if you can,
15  can you tell me why you used a battering ram to serve a
16  misdemeanor warrant?
17  A.  Because there was circumstances where
18  evidence may be lost.
19  Q.  All right.  What evidence was it that you
20  were looking for?
21  A.  We were looking for alcohol and underage
22  drinking on one of them.
23  Q.  So you went to a party with underage drinking
24  and used a battering ram to gain entrance into the
25  house?

KIRK CHAPMAN - November 23, 2010                    Page 20
Direct Examination by Mr. Gosman

1   A.  Yes.
2   Q.  Was this after February of 2009?
3   A.  I'm not exactly sure what the date was on
4   that one.  I believe it was prior to 2009.
5   Q.  Had the kids barricaded the door or
6   something?
7   A.  Yes.
8   Q.  So they wouldn't open it.
9        MS. WESTBY: And just for clarification, when
10  you're answering these questions about other incidents,
11  don't provide any names.
12       THE WITNESS: Okay.
13  BY MR. GOSMAN:
14  Q.  Did you get a search warrant?
15  A.  Yes.
16  Q.  And so they had been -- had you gone to the
17  door and knocked on it before you got the search
18  warrant?
19  A.  Yes.
20  Q.  And they wouldn't open the door?
21  A.  Correct.
22  Q.  Okay.  Let's go ahead.  Tell me about the
23  second one.
24  A.  I'm not exactly sure what the second one was.
25  Q.  Is it possible there may not have been a

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 34 of 60
Tricia Wachsmuth v.
City of Powell, et al.

Kirk Chapman
November 23, 2010

1  second one?
2  A.  No, 'cause I'm fairly clear that I did use
3  the battering ram on two occasions.
4  Q.  Okay.  Well, they should -- were they both
5  after November -- or February of 2009?
6  A.  I'm not sure when the second one was.
7  Q.  All right.
8  A.  The second one might have been.
9  Q.  After February of 2009?
10  A.  Yes.
11  Q.  The underage drinking thing, you think, was
12  before?
13  A.  Yes.
14  Q.  Who was with you that night?
15  A.  Sergeant Chretien was there.  I believe
16  Officer Lara was there as well.
17  Q.  All right.  So there were three of you,
18  correct?
19  A.  Yes.
20  Q.  That's not quite the team that was assembled
21  for the Wachsmuth warrants service, though.
22  MS. WESTBY: Object to the form of the
23  question.
24  MR. THOMPSON: Join.
25

1  BY MR. GOSMAN:
2  Q.  And did you have your extra protection gear
3  on to serve the warrant on the underage drinking party?
4  A.  No.
5  Q.  Did you have long rifles?
6  A.  I didn't.
7  Q.  Did anyone else?
8  A.  I'm not sure.
9  Q.  Was a flashbang deployed?
10  A.  I believe no.
11  Q.  Did you perform room clearing operations when
12  you went into the house?
13  A.  Yes.
14  Q.  Did you have your weapon drawn?
15  A.  Yes.
16  Q.  Did you meet any res stance?
17  A.  Just kids hiding at that point.
18  Q.  Okay.
19  A.  No resistance.
20  Q.  Again, I think there are incident sheets at
21  the first -- on the first page of each one of these
22  reports.
23  A.  I am, but I'm not seeing mine here, so...
24  Q.  Okay.  It looks like you're only about
25  halfway through.

1  A.  Are they in --
2  Q.  Order?  I can't say that they are.
3  A.  -- order of date?
4  Q.  Tell you what, let's save this project for a
5  break if we take one, and we'll let you finish looking
6  through those to see if you can find reference to
7  either one of those misdemeanor warrants that involve
8  door breaches.
9  A.  Okay.
10  Q.  All right.  Thank you.
11  Have you ever performed as a team with the
12  Powell Police Department in an operational setting
13  where you had, in fact, an entry team with long rifles,
14  extra body armor, and the deployment of a flashbang
15  device, along with a battering ram?
16  MR. THOMPSON: Objection.
17  MS. WESTBY: Object to the form of the
18  question.
19  MR. THOMPSON: Join.
20  BY MR. GOSMAN:
21  Q.  Other than the Wachsmuth warrant service?
22  MR. THOMPSON: Same objection.
23  THE WITNESS: I believe in 2007, we did have
24  an incident where a guy was barricaded with a handgun
25  and possible other weapons.

1  BY MR. GOSMAN:
2  Q.  Okay.  Okay.  And did you go into the home?
3  A.  I did not.
4  Q.  Did -- I assume -- did anyone go into the
5  home or was the man called out of the house?
6  A.  The individual ended up coming out.
7  Q.  Was he called out?
8  A.  No.
9  Q.  Do you know why he came out?  Had his wife
10  called him?
11  A.  No, I believe he came out to smoke a
12  cigarette and tried to flee in his car.
13  Q.  That was the guy that got shot?
14  A.  Yes.
15  Q.  All right.  By the way, how -- whatever
16  became of him?
17  A.  He's still here.
18  Q.  Still alive?  All right.
19  All right.  And that incident is documented
20  in the paperwork that's been provided to me, so we'll
21  leave that at that.
22  Anything else -- now, by the way, there was
23  no dynamic entry at that time, correct?
24  A.  Correct.
25  Q.  And so we didn't use a battering ram and we

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 35 of 60
Tricia Wachsmuth v.                                                                    **Kirk Chapman**
City of Powell, et al.                                                                 **November 23, 2010**

1   didn't use a flashbang device?
2   A.  Correct.
3   Q.  You had officers who secured a perimeter;
4   isn't that really what happened that night?
5   A.  Correct.
6       MS. WESTBY: Object to the form of the
7   question.
8       MR. THOMPSON: Join.
9   BY MR. GOSMAN:
10  Q.  All right. So I'm referring to specific
11  situations involving dynamic entry with a team that
12  included long rifles, battering ram, diversionary
13  device and -- well, that's about it.
14      MS. WESTBY: Object to the form of the
15  question.
16      MR. THOMPSON: Join.
17      THE WITNESS: I don't recall any other
18  situations at this time.
19  BY MR. GOSMAN:
20  Q.  Okay. And when you say you've trained with
21  the other Powell police officers on some of the
22  elements of dynamic entry -- and you've gone to the
23  school and practiced immediate action response to an
24  emergency school situation, correct?
25  A.  Correct.

1   situations where you have functioned as a team, other
2   than going up to the high school and practicing
3   emergency --
4   A.  As far as practicing?
5   Q.  Yes.
6   A.  We practiced dynamic entries multiple times.
7   Q.  Where and when?
8   A.  Well, couple of years ago, the major one up
9   at the high school where we had EMS.
10  Q.  Right.
11  A.  And we've had other ones at old Southside
12  school, been over there three times, I believe.
13  Q.  Okay. Now, we already talked about these?
14  I'm not interested in the school settings.
15  A.  Well, these are the ones that we practiced a
16  lot of our training on.
17  Q.  Okay.
18  A.  And where we have access to these buildings
19  when they are not occupied.
20  Q.  All right. And do you know what was behind
21  those training events? Was it in response to some kind
22  of a statewide effort to react to, you know, school
23  shootings or something like that?
24  A.  What was behind it?
25  Q.  Yes.

1   Q.  Have you ever met and actually practiced as a
2   team in the performance of SWAT-type entries other than
3   in the settings that you've described to me?
4       MS. WESTBY: Object to the form of the
5   question.
6       MR. THOMPSON: Join.
7       THE WITNESS: Have we ever met as a team?
8   BY MR. GOSMAN:
9   Q.  Have you ever gathered as a team and actually
10  been assigned roles and functioned as a team from
11  beginning to end in a planned type of setting?
12  A.  Yes. And the dates escape me, but the last
13  one, major one that we did was up at the new high
14  school prior to it --
15  Q.  When was that?
16  A.  The dates -- it's been a couple years, I
17  believe, when we had --
18  Q.  Is this one of those school actions that
19  we've talked about?
20  A.  Yes.
21  Q.  All right. We don't want to talk about
22  something twice if we don't have to, so -- although
23  I'll do it more than once. And I'll forgive you for
24  doing it too.
25      But, I mean, have there been any other

1   A.  To be trained and be able to respond to a
2   situation if anything ever happened.
3   Q.  Okay. All right. Who were your trainers in
4   these school settings?
5   A.  Well, we've had Sergeant Eckerdt, had
6   Sergeant Chretien, had Officer Schmidt. I think those
7   are the three main instructors in those areas at that
8   time.
9   Q.  All right. Where were you on the night of
10  the 24th of February when you first learned that there
11  was going to be warrant service on the Wachsmuth
12  residence?
13  A.  Wrestling practice.
14  Q.  Do you teach -- coach wrestling?
15  A.  Yes.
16  Q.  And you were off duty, then?
17  A.  Yes.
18  Q.  And do you remember what time it was?
19  A.  Approximately -- it was in the evening.
20  Q.  Well, what time was your wrestling practice?
21  A.  I believe the wrestling for the younger kids
22  was 6:00 to 7:00 that night. So it would have been
23  probably a little after 7:00 -- or actually, I might
24  have received the call prior to 7:00.
25  Q.  Okay. Who called you?

KIRK CHAPMAN - November 23, 2010                    Page 29
Direct Examination by Mr. Gosman

1    A.  Dispatch.
2    Q.  And was it Marissa Torczon?
3    A.  I don't recall.
4    Q.  How long did it take you to get down to the
5    police station?
6    A.  After I left wrestling practice.
7    Q.  Did you complete wrestling practice or did
8    you just leave right then?
9    A.  No.  They called back a second time and asked
10   me to come in.
11   Q.  Okay.  So what happened the first time?
12   A.  The first time was just I was made aware of
13   the situation that there was a warrant getting signed
14   and that they would call when the warrant was signed
15   and were ready to meet.
16   Q.  So at the time that you first heard about
17   this, the warrant hadn't even been signed?
18   A.  At this time, I'm not exactly sure.
19   Q.  But anyway, you had a call from somebody who
20   said the warrant was being signed and that you'd be
21   called back?
22   A.  Yes.
23   Q.  All right.  And did you understand that other
24   members of the Powell Police Department were going to
25   be involved in this warrant service at that time?

KIRK CHAPMAN - November 23, 2010                    Page 30
Direct Examination by Mr. Gosman

1    A.  I was assuming.
2    Q.  Okay.  And the second call occurred about how
3    much later?
4    A.  Probably within 15, 20 minutes.
5    Q.  Okay.  Was that after 7:00, then?
6    A.  I believe so.
7    Q.  And did you go immediately to the police
8    station?
9    A.  I went home, where I then changed over, and
10   then responded back to the police department.
11   Q.  Okay.  And did you arrive around 7:30?
12       MS. WESTBY: Object --
13       THE WITNESS: I'm not sure --
14       MS. WESTBY: -- to the form of the question.
15       Go ahead.
16   BY MR. GOSMAN:
17   Q.  You're not sure?
18   A.  Not exactly sure what my arrival time was.
19   Q.  When you arrived, who was there?
20   A.  Officer Miner, Sergeant Chretien,
21   Sergeant Kent, Officer Hall, Officer McCaslin.
22   Q.  Did others arrive after you arrived?
23   A.  I believe so.
24   Q.  And did you speak to any of these officers
25   when you first arrived?

KIRK CHAPMAN - November 23, 2010                    Page 31
Direct Examination by Mr. Gosman

1    A.  Yes.
2    Q.  What did you -- who did you speak to?
3    A.  I'm not exactly sure.
4    Q.  What did you talk about?
5    A.  How their day was going.
6    Q.  Was there any discussion about the warrant
7    service?
8    A.  When I first arrived, no.
9    Q.  When did you first hear about the warrant
10   service?
11   A.  When we were downstairs in the classroom.
12   Q.  And was the entire team assembled at that
13   point?
14   A.  At that time, we were prepping.
15   Q.  Yes.  Okay.  Was the team there?
16   A.  Most everybody was there.
17   Q.  What do you mean by prepping?
18   A.  We were going over the layout, the situation,
19   the information that we had at the time.  Then we were
20   talking about how we would approach, how we'd execute
21   the search warrant, countermeasures to that if certain
22   things weren't done.
23   Q.  Well, let's just stop there.
24   Countermeasures, what kind of countermeasures did you
25   discuss?

KIRK CHAPMAN - November 23, 2010                    Page 32
Direct Examination by Mr. Gosman

1    A.  Well, we talked about all the incidents on
2    the information that we had at the time.
3    Q.  And what was that information?
4    A.  We had information that the individuals in
5    the house were paranoid, window peekers, extremely
6    emotional, up and down as far as their emotions, and
7    that there were loaded weapons in the house, drugs.
8    Information that drugs were being sent through the
9    mail.
10   Q.  Is that it, as best you remember?
11   A.  As best I remember.
12   Q.  All right.  Did you discuss whether or not it
13   was appropriate to ask Bret Wachsmuth's father, Tom
14   Wachsmuth, to participate in any way in calling his son
15   out of the house?
16   A.  I believe it was mentioned.
17   Q.  Okay.  What was mentioned?
18   A.  If we should contact Tom Wachsmuth.
19   Q.  Was it sort of a vote, or what was the deal?
20   A.  It wasn't a vote.
21   Q.  Okay.  How was it discussed and how did it
22   end up?
23   A.  I believe an officer had mentioned, you know,
24   if Tom Wachsmuth was informed about this, and he
25   wasn't, and the reasons why he wasn't.

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 37 of 60
Tricia Wachsmuth v.                                                    Kirk Chapman
City of Powell, et al.                                          November 23, 2010

KIRK CHAPMAN - November 23, 2010                                Page 33
Direct Examination by Mr. Gosman

1 Q. Okay. So one of the officers raised the
2 question about why Tom Wachsmuth hadn't been notified?
3 A. Correct.
4 Q. Do you know which officer that was?
5 A. No.
6 Q. Do you know which officer responded?
7 A. No, I don't.
8 Q. Was there any other discussion in your
9 presence about Bret Wachsmuth?
10 A. I'm sorry?
11 Q. Was there any other discussion in your
12 presence about Bret Wachsmuth, and I'm referring
13 specifically to further information regarding his
14 depression or his -- or something that would have added
15 information about what was taking place that night?
16 A. About his erratic behavior, and how he's
17 paranoid, carries a loaded handgun with him.
18 Q. Carries a loaded handgun with him?
19 A. (Witness nods head.)
20 Q. When -- I'm sorry, when he's alone?
21 A. When he's at home.
22 Q. You heard that he carried a loaded handgun
23 with him when he was at home?
24 A. Yes.
25 Q. Who told you that?

KIRK CHAPMAN - November 23, 2010                                Page 34
Direct Examination by Mr. Gosman

1 A. That was the information we had from the CI.
2 Q. From the CI. You didn't talk to the CI,
3 though, correct?
4 A. Correct.
5 Q. Well, as a matter of fact, the only
6 person that apparently talked -- well, actually,
7 Jonathan Davis talked to him. And Lt. Patterson talked
8 to him. Did you know that, Lt. Patterson from the Park
9 County Sheriff's Office?
10 A. I believe it was mentioned at that time, yes.
11 Q. Okay. Other than that, Chad Miner was the
12 only person who communicated with the CI, correct?
13 A. At that time, yes.
14 Q. At that time. Did somebody else communicate
15 with him later?
16 A. I'm not exactly sure who communicated with
17 him.
18 Q. All right. In any event, that would be
19 pretty important information, if someone were carrying
20 a gun around with them in the house; would you agree
21 with that?
22 A. Yes.
23 Q. And you would certainly expect that to show
24 up in one of the reports or somewhere if that
25 information had, in fact, been conveyed by a

KIRK CHAPMAN - November 23, 2010                                Page 35
Direct Examination by Mr. Gosman

1 confidential informant?
2      MR. THOMPSON: Objection as to the form.
3      MS. WESTBY: Join.
4 BY MR. GOSMAN:
5 Q. You can answer that question, sir.
6      THE WITNESS: What was the question?
7 BY MR. GOSMAN:
8 Q. That would certainly be information you would
9 expect to see in the documentation of the
10 communications with the confidential informant?
11      MR. THOMPSON: Objection as to form.
12      MS. WESTBY: Join.
13      THE WITNESS: Is that a statement?
14 BY MR. GOSMAN:
15 Q. Yes, it's a question.
16 A. It's a question, okay. I would think that
17 that was imperative information.
18 Q. Do you remember hearing anything else?
19      This is contributions from the other officers
20 there at the police department.
21 A. Well, we went over everything that the CI had
22 related to Officer Miner and talked about basically the
23 urgency in it and in officer safety.
24 Q. Okay. What was the urgency?
25 A. The urgency was that there was a lot of drugs

KIRK CHAPMAN - November 23, 2010                                Page 36
Direct Examination by Mr. Gosman

1 coming in and out of that house and that there was
2 drugs being sent through the mail, and that these
3 people are unstable.
4 Q. Do you know how long Officer Miner had known
5 the confidential informant?
6 A. No.
7 Q. Do you know how reliable the confidential
8 informant was?
9 A. No.
10 Q. Have you ever met the confidential informant?
11 A. No.
12 Q. You haven't had any dealings with him
13 professionally?
14 A. I'm not sure.
15 Q. All right. Okay. So -- and we've already
16 talked about the officer safety issues, correct?
17 A. Correct.
18 Q. Is there anything we haven't talked about in
19 connection with the officer safety issues that was
20 discussed that evening?
21      MS. WESTBY: Object to the form of the
22 question.
23      MR. THOMPSON: Join.
24      THE WITNESS: No.
25

1 BY MR. GOSMAN:
2    Q. All right. So how long did the meeting take?
3    A. Not exactly sure how long we were down there.
4 I believe it was probably longer than 30 minutes.
5    Q. All right. Let's go ahead and have you take
6 a look at Exhibit 10. It's in the notebook there in
7 front of you.
8         (Exhibit 10 identified)
9 BY MR. GOSMAN:
10    Q. And while you're getting to that, do you know
11 Marissa Torczon?
12    A. Yes.
13    Q. Did you see her there that night?
14    A. Yes.
15    Q. Did you understand that she was keeping a
16 record of the discussions about the entry plan and the
17 warrant service?
18    A. Yes.
19         MR. THOMPSON: Objection as to form.
20         Go ahead.
21         THE WITNESS: Yes.
22 BY MR. GOSMAN:
23    Q. I'll represent to you that Exhibit 10 is that
24 record.
25         Would you take a look at the list there on

1 the left-hand column and let me know if, in fact, you
2 were assigned the entry team that night.
3         MS. WESTBY: Object to the form of the
4 question. Misstates the testimony and evidence.
5         MR. THOMPSON: Join.
6         THE WITNESS: It has my name there and it
7 says entry.
8 BY MR. GOSMAN:
9    Q. Okay. And were you assigned as part of the
10 entry team?
11    A. That night I was.
12    Q. All right. Was there any discussion held in
13 your presence about who should participate on the entry
14 team?
15    A. Yes, that was part of the prep.
16    Q. All right. And what was -- do you remember
17 what factors were considered in selecting the entry
18 team?
19    A. I don't know what the factors were.
20    Q. All right. My question really is this: Had
21 the entry team already been selected when you arrived?
22    A. No.
23    Q. Did they ask you if you wanted to be on the
24 entry team?
25         Did Sergeant Chretier, for instance, ask you

1 if you wanted to be on the entry team?
2    A. I believe the positions were already -- they
3 were assigned as we were sitting down there on the
4 prep.
5    Q. All right. So there wasn't really any
6 discussion about who wants to serve where and who feels
7 like they would best -- be in the best position to,
8 say, deploy the flashbang device?
9    A. Correct. There was no discussion as far as
10 who fits what role better.
11    Q. All right. You were assigned the position on
12 the entry team, and that was without any feedback from
13 you, correct?
14    A. Correct.
15    Q. Did you understand that this was a
16 knock-and-announce warrant?
17    A. Yes.
18    Q. What does a knock-and-announce warrant mean
19 to you, Officer?
20    A. It means you knock on the door, state your
21 presence, what you were there for.
22    Q. Okay. Then what?
23    A. Give them a reasonable amount of time. If no
24 contact is made, then that's when entry would be made.
25    Q. What's a reasonable amount of time?

1    A. Reasonable amount of time is subjective to
2 the situation at hand.
3    Q. Is there any minimum, as far as you know?
4    A. No.
5    Q. Well, you were on that door that night,
6 correct?
7    A. Correct.
8    Q. And you knocked on the door?
9    A. Correct.
10    Q. And you announced, "Police, search warrant"?
11    A. I did.
12    Q. All right. Let me back up for just a second.
13         Did you see Tricia Wachsmuth before you
14 knocked on the door?
15    A. Would I be able to recognize her prior to
16 that?
17    Q. No. Let me put it this way: Did you see
18 someone in the house sitting on the couch as you
19 approached the front door?
20    A. Yes.
21    Q. And what was that person doing?
22    A. Sitting on the couch.
23    Q. Was she looking -- he or she looking out the
24 window?
25    A. When we started up to the house, the dog

KIRK CHAPMAN - November 23, 2010                    Page 41
Direct Examination by Mr. Gosman

1  alerted to our presence. And then I saw a female reach
2  back, grab the dog, pull the shades back.
3      Q.  Where were you when that happened?
4      A.  On the front stoop.
5      Q.  How far was she away from the door?
6      A.  Estimate from that window to the front door,
7  probably six feet.
8      Q.  Okay. You saw her in the window. Was this
9  before you knocked?
10     A.  Yes.
11     Q.  And you -- did you then immediately knock on
12  the door?
13     A.  Yes.
14     Q.  And you announced -- what were your words?
15     A.  "Powell Police Department. We have a search
16  warrant."
17     Q.  Okay. And what happened next?
18     A.  There was a delay of about five to six
19  seconds and then the door was breached.
20     Q.  And where was -- did you go in the house
21  first?
22     A.  I was the first one in.
23     Q.  Where was Tricia Wachsmuth?
24     A.  She was standing facing towards the kitchen
25  about three feet from the couch headed towards the

KIRK CHAPMAN - November 23, 2010                    Page 42
Direct Examination by Mr. Gosman

1  kitchen.
2      Q.  She was, what, now, I'm sorry? She was
3  standing about thee feet from the kitchen?
4      A.  She was standing three feet from the couch,
5  approximately three feet from the couch, and she was
6  heading towards the kitchen.
7      Q.  Okay. All right. So what did you do?
8      A.  At that time, I had my weapon when I entered
9  the house, ordered her down.
10     Q.  Uh-huh.
11     A.  At that point, I slung my rifle, took ahold
12  of her left arm and directed her to the couch, where
13  she was sat back down and told not to move.
14     Q.  Had the other officers entered the room at
15  this time?
16     A.  I'm not sure. I'm assuming yes.
17     Q.  Well, they were right behind you, correct?
18     A.  It's a dynamic entry, yes.
19     Q.  And did you have your rifle in the cover
20  position, as you entered the house?
21     A.  When I entered the house, I was at the ready.
22     Q.  All right. Ready is like this?
23     A.  Ready is --
24     Q.  Describe it. I'm sorry.
25     A.  Ready is when the rifle -- butt stocks in the

KIRK CHAPMAN - November 23, 2010                    Page 43
Direct Examination by Mr. Gosman

1  pocket of the shoulder, weapon is raised, and you're
2  basically searching in front of you. You don't have
3  the sites fixed on anything.
4      Q.  But the weapon is raised in the area where
5  you're looking?
6      A.  Correct.
7      Q.  And did you tell me that you slung your
8  weapon --
9      A.  Yes.
10     Q.  -- before you took control of Mrs. Wachsmuth?
11          MS. WESTBY: Object to the form of the
12  question.
13          MR. THOMPSON: Join.
14  BY MR. GOSMAN:
15     Q.  Is that correct?
16     A.  Correct.
17     Q.  And you then grabbed her by the hand?
18     A.  Her left arm.
19     Q.  Her left arm. And you -- did you sit her
20  back down on the couch?
21     A.  Yes.
22     Q.  And I assume that during the period of time
23  that it took you to sling your weapon and take hold of
24  her arm and put her back on the couch that the entire
25  entry team had made it into the house. Wouldn't that

KIRK CHAPMAN - November 23, 2010                    Page 44
Direct Examination by Mr. Gosman

1  be a fair assumption?
2          MS. WESTBY: Object to the form of the
3  question.
4          Go ahead if you know.
5          MR. THOMPSON: Join.
6          THE WITNESS: I believe that it would be safe
7  to say that the rest of the team was either through the
8  doorway or making entry at that point.
9  BY MR. GOSMAN:
10     Q.  What did you do after you sat Ms. Wachsmuth
11  down?
12     A.  Told her not to move.
13     Q.  What did she say?
14     A.  She didn't say anything.
15     Q.  Was she compliant?
16     A.  I believe so.
17     Q.  All right. Then what did you do after you
18  told her to sit down?
19     A.  And I resumed my role as the clearing officer
20  and retained my rifle again and entered further into
21  the house.
22     Q.  Behind everybody else?
23     A.  No.
24     Q.  Had everybody else sort of stopped there at
25  the -- inside the front door waiting for you to resume

KIRK CHAPMAN - November 23, 2010                    Page 45
Direct Examination by Mr. Gosman

1  your position in clearing the house?
2      A.  I don't know what they did.  My reaction was
3  so quick that -- and I didn't want them bottlenecked in
4  the entryway.  So it was a pretty quick movement
5  through the house --
6      Q.  Okay.
7      A.  -- for me.
8      Q.  This was after you got Tricia sat back down?
9      A.  Correct.
10     Q.  Did you turn her over to another officer?
11     A.  That would --
12         MS. WESTBY: Object to the form of the
13  question.  Go ahead.
14         MR. THOMPSON: Join.
15         THE WITNESS: When she was told not to move,
16  then I was assuming that the last officers through the
17  door, whoever was going to be taking that sector on
18  that side of the room, would take over.
19  BY MR. GOSMAN:
20     Q.  So you left her alone.  You turned around and
21  left her then --
22         MS. WESTBY: Object --
23         MR. GOSMAN: -- assuming that somebody was
24  going to take control of her?
25         MS. WESTBY: Object to the form of the

---

KIRK CHAPMAN - November 23, 2010                    Page 46
Direct Examination by Mr. Gosman

1  question.
2         THE WITNESS: She was not left alone, if
3  that's what you're implying.
4  BY MR. GOSMAN:
5      Q.  Well, there was no officer that was
6  specifically there controlling her?
7      A.  There was no specific officer assigned to
8  controlling her.
9      Q.  Well, of course -- we l, let me ask you this:
10  When you do a dynamic entry and you find a suspect, you
11  want to keep control of them, right, and you don't want
12  to just let them go sitting somewhere in the house by
13  themselves?
14     A.  And that's not what happened.
15     Q.  No.  But on the other hand, you did turn away
16  from her and leave her before she was handed off to
17  another officer --
18         MS. WESTBY: Object to the form of the
19  question.
20         MR. THOMPSON: Join.
21  BY MR. GOSMAN:
22     Q.  -- correct?
23     A.  She was not specifically handed over to a
24  specific officer.
25     Q.  No, because you just turned and after you sat

---

KIRK CHAPMAN - November 23, 2010                    Page 47
Direct Examination by Mr. Gosman

1  her down in the house and told her not to move on the
2  couch and told her not to move, you turned away from
3  her and began your clearing operations?
4      A.  Correct.
5         MS. WESTBY: Object to the form of the
6  question.
7         Go ahead.
8  BY MR. GOSMAN:
9      Q.  So, where did you go first?
10        Let me back up for a second and ask:  When
11  you say you began clearing operations, again, I assume
12  you got your rifle off your shoulder?
13     A.  Off my shoulder, right.
14     Q.  Well, it was on the sling.  You had a sling
15  over your shoulder, didn't you?
16     A.  I had it slung in front of me.
17     Q.  All right.  I see.  And so was it across your
18  chest?
19     A.  Yes.
20     Q.  All right.  And so you grabbed the rifle
21  again and you brought it to the ready position and you
22  continued searching the house?
23     A.  Correct.
24     Q.  Were the other officers holding their long
25  rifles in the ready position as they entered the house

---

KIRK CHAPMAN - November 23, 2010                    Page 48
Direct Examination by Mr. Gosman

1  and began clearing operations?
2      A.  I don't know what the other officers were
3  doing.  They were all trained to be holding them at the
4  ready position, or at the alert when entering into any
5  type of room where there's unknown suspects.
6      Q.  All right.  Did you see any other officers in
7  the house when you resumed the clearing operation?
8      A.  Yes.
9      Q.  Who did you see?
10     A.  I believe I saw Officer Danzer and
11  Officer Hall off to my left.
12     Q.  Okay.  What were they doing?
13     A.  They were clearing as well.
14     Q.  Okay.  And where did you go?
15     A.  I started through the living room and headed
16  towards the kitchen.
17     Q.  You were in the living room, correct?
18     A.  Correct.  So I went through the remainder of
19  the living room and headed towards the kitchen.
20     Q.  Took the few steps that it took to get
21  through the living room and into the kitchen.
22        Was there anything left to do in the living
23  room after you saw Tricia Wachsmuth, as you say,
24  three feet from the couch?
25        MS. WESTBY: Object to the form of the

1   question.
2        THE WITNESS: We l, there's corners that you
3   have to clear, there's obstac es that you have to clear
4   behind couches.
5   BY MR. GOSMAN:
6   Q.  Did you do that?
7   A.  Yes.
8   Q.  I mean, did you actua lly go look behind any
9   of the furniture in the room?
10  A.  Yes.
11  Q.  And then you went in to the kitchen?
12  A.  No.  I paused at the e dge of the living room
13  because there was a hallway with three doors coming off
14  of it, one into the bathroom and one off of each room.
15  Q.  All right.  You paused there, and what did
16  you do?
17  A.  Waited for the rest of the officers to clear
18  that area before moving further into the house.
19  Q.  Okay.  And so then you went into the kitchen?
20  A.  Yes.
21  Q.  All right.  You saw the officers had cleared
22  the three rooms before you went into the kitchen?
23  A.  It was stated that they were cleared.
24  Q.  All right.  And who stated it?
25  A.  Officer Danzer and Officer Hall.

1   Q.  Okay.  Were they the ones that cleared those
2   three rooms, as far as you know?
3   A.  As far as I know.
4   Q.  All right.  Where was everybody else?
5   A.  They were filing and taking over different
6   positions so other officers could move up.
7   Q.  Did you all go into the house one after
8   another; isn't that the purpose of a dynamic entry?
9   A.  There's only so many officers that you can
10  get through a doorway.
11  Q.  Well, single file, you can do it all day
12  long, right?
13  A.  Correct.
14  Q.  And so did the office rs from the entry team
15  all go into the house immediately after the door was
16  breached?
17  A.  I believe so.
18        MR. THOMPSON: Object to the form of the
19  question.
20  BY MR. GOSMAN:
21  Q.  And you say Hall and Danzer.  What happened
22  to the other three men on the entry team?
23  A.  I believe they were somewhere behind me.
24  Q.  Well, you grabbed Tricia Wachsmuth, you took
25  your gun off -- from the ready position, you've

1   strapped it around the front of your chest and you sat
2   her down.  And that had to take a few seconds, correct?
3        MS. WESTBY: Object to the form of the
4   question.
5        MR. THOMPSON: Join.
6        THE WITNESS: Probably took about less than a
7   few seconds, because I don't have to strap it to my
8   chest.  It was already slung across my chest.  All I
9   have to do is take it off my shoulder.
10  BY MR. GOSMAN:
11  Q.  And in that timeframe, you didn't see any
12  other officers entering the house?
13        MS. WESTBY: Object to the form of the
14  question.
15        MR. THOMPSON: Join.
16        THE WITNESS: No.
17  BY MR. GOSMAN:
18  Q.  You did not.
19        And as you began clearing the rest of the
20  living room, checking behind the furniture, et cetera,
21  you didn't see any of the other officers enter the
22  house?
23  A.  No, I didn't.  I believe they were already in
24  the living room by that time.
25  Q.  Well, they would have been in the living room

1   with you, correct?
2   A.  Correct.
3   Q.  And that room is, what, about 120 square
4   feet?
5   A.  I'm not sure of the dimensions.
6   Q.  All right.  It's not very big, is it?
7   A.  It's not very big, no.
8        MS. WESTBY: Will you please let him finish
9   his answer before you talk over him?
10        MR. GOSMAN: Sorry, I will.
11  BY MR. GOSMAN:
12  Q.  And so you believe the officers were in the
13  living room with you, but you didn't see them.  Is that
14  your testimony?
15  A.  I did see Officer Danzer and Officer Hall off
16  to my left.
17  Q.  Right.  And there were three other officers
18  involved in the entry team?
19  A.  That would have been behind me, one probably
20  covering the door that we breached.  So there would
21  have been two others that would have had to take up
22  positions with inside the living room.
23  Q.  Oh, so one of the officers is assigned to
24  cover the door that you've entered?
25  A.  In a dynamic entry, yes.

1   Q.   That would have been Officer Miner?
2   A.   I'm not sure.
3   Q.   Well, he was the one that breached the door.
4   Isn't the door breacher the one that goes in last?
5   A.   Usually.
6   Q.   All right.
7   A.   But I'm not sure what position he was in when
8   he entered the house.
9   Q.   Okay.  Did you go into the kitchen alone?
10  A.   No.
11  Q.   Who was with you?
12  A.   Officer Danzer.
13  Q.   And where was Officer Hall?
14  A.   I believe he was holding position in between
15  the two rooms in the hallway.
16  Q.   Okay.  And did you see any other officers in
17  the house at that time?
18  A.   I saw once Officer Danzer and I made way into
19  the kitchen, we posted up on a door, and at that time I
20  saw Sergeant Eckerdt with Mrs. Wachsmuth.  And I saw
21  Sergeant Chretien in the living room.
22         Officer Danzer was in the kitchen next to the
23  unlocked back door to the basement, the basement entry
24  door.  And Officer Hall was back by that hallway.
25  Q.   When you stacked up on the door, you were

1   Number 1.  Who was behind you?
2   A.   That would have been Officer Miner.
3   Q.   He --
4   A.   Are we talking prior to entry in the house?
5   Q.   Yes.  Do you know who was behind him?
6   A.   No.
7   Q.   All right.  Let's go ahead and take one of
8   those sheets of paper there, and I'm going to have you
9   draw the inside of the house, and we're going to go
10  forward to the time that you have cleared the kitchen.
11  And I want you to show me where the officers were that
12  you remember.
13  A.   (Witness complies.)
14  Q.   And, Officer, if you could go ahead and
15  identify each of these persons that you've placed on
16  the map, who was who.
17  A.   Sergeant Roy Eckerdt, Number 10.
18         That would have been Sergeant Chretien,
19  Number 6.
20  Q.   Can you put six and Chretien off to the side,
21  outside the diagram.
22  A.   (Witness complies.)
23  Q.   Oh, these are their police officer numbers?
24  A.   Uh-huh.
25  Q.   PO number.  Okay.

1         And Eckerdt is 10.
2         Who is that last person?
3   A.   Danzer.
4   Q.   Danzer, okay.  And where were you, again?
5   A.   Right here by the back door.
6   Q.   Oh, yes, right.  Okay.
7         All right.  Did you see from that position --
8   well, let's back up for just a second.
9         Is Tricia Wachsmuth sitting on the couch at
10  this time?
11  A.   Suspect.
12  Q.   Suspect.  That's fine.
13         All right.  And did you see Sergeant Chretien
14  at any point come into the room and speak to Tricia
15  Wachsmuth?
16  A.   Did I see that?  No.
17  Q.   You did not see that?
18  A.   I did not see it.
19  Q.   What were you -- what were you doing, that --
20  we understand that Sergeant Chretien came into the
21  living room shortly after this timeframe that you have
22  diagrammed here and began speaking to Tricia Wachsmuth.
23         What did you do that prevented you from
24  seeing that?
25  A.   Well, I was focused on the entry door to the

1   basement.
2   Q.   Entry door to the basement.
3   A.   So I didn't see anyone speaking .
4   Q.   Did you go down the stairs with
5   Officer Chretien and Tricia Wachsmuth?
6   A.   I went downstairs with Officer Danzer and
7   myself, and the suspect opened the door, turned on the
8   light and started down the stairs and stated that,
9   "See, there's no one else down here."
10  Q.   Huh.  Okay.  So she just got up from the
11  couch, came over and turned on the light and said,
12  "See, there's nobody else down here."  Is that your
13  testimony?
14  A.   That's my testimony.
15  Q.   All right.  Thank you.
16         Did anybody point a gun at her while she got
17  up and just walked over to the door like that?
18  A.   No.
19  Q.   And you didn't hear Chretien say, Get up and
20  you're going downstairs first?
21         MR. THOMPSON:  Objection as to the form.
22         MS. WESTBY:  And I join.  Go ahead.
23         THE WITNESS:  I heard Sergeant Chretien ask
24  the suspect if there was anyone else in the house, to
25  which I heard her say, "There's no one else in the

1  house."
2  　　　At that time, I relayed to the other officers
3  that the basement door was unlocked, which we had
4  information that if the door was unlocked, that there
5  is probably somebody down there --
6  BY MR. GOSMAN:
7  　　Q.　That --
8  　　A.　-- because that room is not unlocked.
9  　　　MS. WESTBY: You need to let him finish his
10  answer.
11  　　　MR. GOSMAN: Yean, I do.  And I'm sorry.
12  　　　THE WITNESS: And then I heard
13  Sergeant Chretien ask her again if there was anyone in
14  the house or downstairs.  I did not hear her answer at
15  that time.
16  　　　And at that point, is when I saw her walk in
17  front of Officer Danzer and myself, open up the
18  basement door, turn on the light, and she walked --
19  started to go down the stairs.
20  BY MR. GOSMAN:
21  　　Q.　Okay.  And you all just followed her down the
22  stairs?
23  　　A.　We're not going to let her go into a room
24  that we haven't cleared.
25  　　Q.　Well, I assume, then, by your saying that,

1  that you mean, yes.
2  　　A.　Yes.
3  　　Q.　You just followed her down the stairs?
4  　　A.　Correct.
5  　　Q.　All right. I want to go back and see some of
6  this, and take it one step at a time here.
7  　　　MR. GOSMAN: Can we go back up?
8  　　　THE REPORTER: Can we go off the record,
9  then?
10  　　　MR. GOSMAN: Yes.
11  　　　　(Discussion held off the
12  　　　　record.)
13  BY MR. GOSMAN:
14  　　Q.　Okay.  So what information, Officer, did you
15  have that if the door was unlocked, somebody was
16  probably down there?
17  　　A.　That would have been the information that was
18  relayed in the prep prior to the service of the
19  warrant.  It was stated that from the CI to Officer
20  Miner that if the base -- the door to the basement has
21  a hasp and lock on it, and that that room is not
22  unlocked unless there's usual y somebody down there
23  because of the paranoid situation of the subjects.
24  　　Q.　Okay.  All right.  And I assume, again, if
25  that information either is or isn't in the reports that

1  Miner filed.  You're the first officer to mention that,
2  I will say that in all rights.
3  　　　Were you the one that tried the door to the
4  basement?
5  　　A.　We could see that the hasp and the paddle
6  lock were not on.
7  　　Q.　Who is we?
8  　　A.　Officer Danzer and myself.
9  　　Q.　Did you communicate this to Officer Chretien?
10  　　A.　Yes.
11  　　Q.　So it's your testimony that you said to
12  Officer Chretien, oh, by the way, the door is unlocked
13  to the basement?
14  　　　MR. THOMPSON: Objection as to the form.
15  　　　MS. WESTBY: Join.
16  　　　MR. THOMPSON: Misstates his testimony.
17  　　　THE WITNESS: The form would have been
18  verbal, and it would have been the basement door is
19  unsecure.
20  BY MR. GOSMAN:
21  　　Q.　And did Officer Chretien understand what that
22  meant?
23  　　　MR. THOMPSON: Objection as to form.
24  　　　MS. WESTBY: Join.
25  　　　THE WITNESS: Did he understand?  I'm not

1  sure what his mental capacity was at that time.
2  BY MR. GOSMAN:
3  　　Q.　Okay.  And I'm not sure what it was either.
4  But we'll pass on that.
5  　　　Let me ask this question:  Was Officer
6  Chretien aware, as far as you know, that if the door
7  was unlocked to the basement, that there was probably
8  someone down there?
9  　　A.　I believe since --
10  　　　MR. THOMPSON: Hold on for a second.
11  Objection as to the form.
12  　　　Go ahead.
13  　　　THE WITNESS: Since it was relayed in the
14  prep prior to that, that that information was passed
15  on.
16  BY MR. GOSMAN:
17  　　Q.　Did you see that Officer Chretien was present
18  when that information was passed on?
19  　　A.　Yes.
20  　　Q.　And was it directed to the entire group?
21  　　A.　Yes.
22  　　Q.　So Officer Chretien, then, was aware when
23  Tricia Wachsmuth led you all downstairs, that you were
24  going into an uncleared room where there was probably a
25  paranoid suspect who was armed?

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 44 of 60
Tricia Wachsmuth v.                                                    Kirk Chapman
City of Powell, et al.                                            November 23, 2010

1   MR. THOMPSON: Objection as to the form.
2   MS. WESTBY: Object to the form of the
3   question.
4   BY MR. GOSMAN:
5   Q. I mean, that certainly is a realistic
6   scenario, isn't it?
7   MR. THOMPSON: Objection as to form.
8   MS. WESTBY: Objection to the form of
9   question, argumentative, harassing.
10  BY MR. GOSMAN:
11  Q. Give it your best shot.
12  A. Well, you're going to have to repeat that.
13  Q. Okay. Based on what you've told me about
14  this information being disseminated in the meeting and
15  Officer Chretien being present, he was probably aware
16  that Tricia Wachsmuth was leading the officers into an
17  unsecured area with a paranoid suspect, correct?
18  MR. THOMPSON: Objection as to form. Calls
19  for speculation.
20  MS. WESTBY: And completely misstates the
21  testimony and the evidence
22  BY MR. GOSMAN:
23  Q. Be that as it may.
24  A. I believe that Sergeant Chretien, in asking
25  if there was anyone else in the house or downstairs,

1   was looking for some type of truthfulness from
2   Ms. Wachsmuth.
3   I did not hear her answer his question, but
4   as soon as he asked the question, I did not hear the
5   answer, then I saw Tricia Wachsmuth walk between
6   Officer Danzer and myself, open up the door, turn on
7   the light, and turn around and say, "There is no one
8   else down there."
9   Q. Okay. Who went downstairs?
10  MS. WESTBY: Object to the form of the
11  question.
12  BY MR. GOSMAN:
13  Q. And I mean we know that Tricia Wachsmuth went
14  first, right?
15  A. She led the way down about four steps and she
16  stopped and paused. And at that time, Officer Danzer
17  and myself went around her. And we cleared the
18  remainder of the downstairs portion.
19  Q. All right. Well, that wasn't my question at
20  all, but thanks for that.
21  What I wanted to know is who was with you
22  when you went down the stairs, Officer.
23  A. Officer Danzer was in front of me.
24  Q. Yes.
25  A. Tricia Wachsmuth was in front of him.

1   Q. We know that.
2   A. I was behind Officer Danzer. And when she
3   stopped halfway down the stairs, that's when
4   Officer Danzer and I went around her and continued the
5   clearing and search of the basement.
6   Q. So you just left her alone on the stairs
7   again?
8   MR. THOMPSON: Objection as to form.
9   MS. WESTBY: Join.
10  BY MR. GOSMAN:
11  Q. Well, you went around her and just left her
12  there and cleared the basement --
13  MS. WESTBY: And, again, please, be
14  professional.
15  BY MR. GOSMAN:
16  Q. Is that your testimony?
17  MS. WESTBY: Object to the form of the
18  question and your behavior.
19  Go ahead.
20  THE WITNESS: What was the question?
21  BY MR. GOSMAN:
22  Q. You left her alone on the stairs to finish
23  clearing the basement -- or to clear the basement,
24  correct?
25  MR. THOMPSON: Objection as to form.

1   MS. WESTBY: Join.
2   THE WITNESS: Yes, I left her there on the
3   stairs so I could go continue clearing the basement.
4   BY MR. GOSMAN:
5   Q. Had Tricia Wachsmuth been handcuffed at that
6   time?
7   A. Unaware.
8   Q. Okay.
9   A. When she was going down the stairs, no,
10  because she opened the door and turned the light on.
11  Q. Yeah. All right. Take a look at Exhibit 10
12  again for a second.
13  Do you see the statement there under
14  knock-and-announce, "everyone gets cuffed"?
15  A. Yeah, right there.
16  Q. That's sort of standard procedure, isn't it,
17  in a dynamic entry?
18  MS. WESTBY: Object to the form of the
19  question.
20  MR. THOMPSON: Join.
21  MS. WESTBY: Go ahead.
22  THE WITNESS: Is it standard procedure?
23  BY MR. GOSMAN:
24  Q. Yes, to secure the suspects.
25  A. In what standard procedure are you going off

Tricia Wachsmuth v.
City of Powell, et al.

Kirk Chapman
November 23, 2010

1   of?
2       Q.  I'm talking about SWAT dynamic entry,
3   anything that involves a dangerous situation where
4   you're there with extra body armor, long guns,
5   diversion devices and you've got a suspect that you've
6   taken control of in the house --
7       MS. WESTBY: Objection --
8   BY MR. GOSMAN:
9       Q.  -- and this is a suspect.
10      A.  I cannot testify to what other department's
11  standard procedures are.
12      Q.  Okay. That's fine.
13          Well, in any event, it appears from
14  Exhibit 10 that everyone was to be cuffed, correct?
15      MS. WESTBY: Object to the form of the
16  question. You're asking him to speculate about what's
17  on this document --
18      MR. GOSMAN: It's written there.
19      MS. WESTBY: -- that he didn't prepare.
20      MR. GOSMAN: Only one person can compare.
21      MS. WESTBY: Object to the form of the
22  question.
23          THE WITNESS: I believe that Tricia Wachsmuth
24  was cuffed. And I believe under any circumstances, it
25  doesn't specify when they are cuffed.

1   BY MR. GOSMAN:
2       Q.  All right. You didn't cuff her when you came
3   in the house and first took control of her?
4       A.  I did not.
5       MS. WESTBY: Object to the form of the
6   question.
7       MR. GOSMAN: And Eckerdt didn't cuff her when
8   he took control of her?
9       MS. WESTBY: Object to the form of the
10  question.
11      MR. THOMPSON: Join.
12          THE WITNESS: And I cannot testify to what
13  Sergeant Eckerdt did or did not do.
14  BY MR. GOSMAN:
15      Q.  Even though you know she wasn't cuffed when
16  she went down the stairs?
17      A.  Correct.
18      Q.  You didn't make any effort to stop her when
19  she went between you and Danzer to go down the stairs?
20      A.  Well, it happened so quick that we were kind
21  of -- well, I was, anyway, I was taken aback.
22      Q.  You're a professional there to execute a
23  search warrant in a dynamic entry and you allow the
24  suspect to walk past you and go down the stairs, and
25  you're so taken aback that you didn't have time to

1   react; is that your testimony?
2       MS. WESTBY: Object to the form of the
3   question. Argumentative, harassing.
4       MR. THOMPSON: Join.
5       MS. WESTBY: And, honestly, you know, I mean,
6   you need to --
7       THE WITNESS: Very tense, rapidly evolving,
8   and, yes, she walked right in front of us, opened up
9   the door. It was a split second and she was heading
10  down the stairs.
11  BY MR. GOSMAN:
12      Q.  Okay.
13      A.  With no time to react.
14      Q.  Well, and a few minutes ago, I asked the
15  question -- I don't think I got an answer to it, maybe
16  I did, but the question was: Who else was with you on
17  the stairs besides Tricia, whom we know went first, and
18  you and Officer Danzer?
19      A.  Well, I can only attest to who was in front
20  of me, so those would be the officers.
21      Q.  You can only attest to those who were in
22  front of you?
23      A.  Yes, because I do not have eyes in the back
24  of my head.
25      Q.  Well, you went around Tricia Wachsmuth. Did

1   you look back up the stairs or make any effort to see
2   who was there to take over?
3       MS. WESTBY: Object to the form of the
4   question -- just a second. Object to the form of the
5   question. Honestly, it's absolutely ridiculous.
6       MR. GOSMAN: Yeah, it is ridiculous.
7       MS. WESTBY: And I think the Court would be
8   horrified at your behavior.
9       MR. GOSMAN: Just leave off with the --
10      MS. WESTBY: Please be professional. Please
11  be professional and --
12      MR. GOSMAN: -- allocution, okay.
13      MS. WESTBY: Go ahead.
14      THE WITNESS: Okay. I believe that my threat
15  was more attained to what was down in the basement, if
16  there was a threat. Everything else upstairs had
17  already been cleared.
18      So at that point -- and I knew that there was
19  other officers up there in the house, in the kitchen --
20  there was no reason for me to pause and look behind me
21  when what was not cleared was in front of me.
22  BY MR. GOSMAN:
23      Q.  Did you and Officer Danzer clear the basement
24  alone?
25      A.  Yes.

1    Q.  All right.  Draw me a picture of the bottom
2    of the stairs and the basement.
3            Yeah, we'll leave it right on that exhibit.
4    A.  (Witness complies.)
5    Q.  All right.  Was there a wall on the
6    right-hand side of those stairs going down them?
7    A.  Was there a wall on the right-hand side going
8    down them?
9    Q.  Yes.
10   A.  Yes.
11   Q.  All right.  Draw that in.
12   A.  (Witness complies.)
13   Q.  And there's a little square there at the
14   bottom of the stairs.  Is that a landing?
15   A.  Yes.
16   Q.  All right.  And was the stairway open so that
17   you could see into the basement from the -- what would
18   be the left-hand side of the stairwell going down the
19   stairs?
20   A.  Yes, there was.  Where the ceiling and the
21   stairs came down, that was open.
22   Q.  All right.  Did you go around the perimeter
23   of the basement when you went down there with Danzer?
24   A.  Yes.
25   Q.  How long did that take?

1    A.  As far as clearing this area right here?
2    Q.  Uh-huh.
3    A.  Not very long.  Probably 30 seconds.
4    Q.  Okay.  Did you have any idea what Tricia
5    Wachsmuth was doing in that 30 seconds?
6    A.  No.
7    Q.  Okay.  When did you see her again?
8    A.  I didn't.
9    Q.  You didn't see her again?
10   A.  No.
11   Q.  When you got to the basement and started
12   working your way around, I assume you were on the alert
13   for any other persons who would be there, correct?
14   A.  Correct.
15   Q.  Did you see any of the other officers in the
16   basement?
17   A.  I believe at that point I saw -- I want to
18   say it was Officer Miner that came down there.
19           At that point, we had two open cubbies going
20   to a crawl space that was up off the ground that had
21   not been cleared.  I entered from this side with my
22   weapon, crawled through the cubby and crawled through
23   on my stomach all the way around and out that cubby
24   there.
25   Q.  All right.  And before you went in the cubby

1    hole, you saw Officer Miner in the basement?
2    A.  Yes.
3    Q.  Did you see Chretien?
4    A.  Not at that time.  It might have been --
5    Officer Chretien might have been there when I came out
6    of the other side.
7    Q.  Okay.  So Officer Chretien might have been
8    there when you got out of the other side.
9            Where was Officer Chretien if he was there?
10   A.  He would have been right here in the room.
11   Q.  Okay.  Go ahead and put Chretien there and
12   Miner.
13   A.  And of course we still had --
14   Q.  Danzer.
15   A.  (Witness complies.)
16   Q.  And let's make it clear that the view that
17   you've given me with these officers is the view that
18   you acquired when you came out of the cubby hole or the
19   crawl space, correct?
20   A.  I'm not exactly sure if Sergeant Chretien was
21   down here at that point or not.
22   Q.  I want to be clear about one thing.  Did you
23   hear Officer Chretien say she's going first?
24   A.  No, I didn't.
25   Q.  Did you ever hear Officer Chretien apologize

1    for sending Tricia Wachsmuth down the stairs first?
2            MR. THOMPSON: Objection as to the form.
3            MS. WESTBY: Objection as to form, misstates
4    the testimony.
5            Go ahead.
6    BY MR. GOSMAN:
7    Q.  Yes, go ahead.
8    A.  No, I didn't.
9    Q.  That would be thoroughly inconsistent with
10   what you just told me, wouldn't it?
11           MS. WESTBY: Object to the form of the
12   question.
13           MR. GOSMAN: Well, all right.
14           MS. WESTBY: It's not inconsistent.
15   BY MR. GOSMAN:
16   Q.  Yes, well, because you saw Ms. Wachsmuth get
17   up without any prompting and pass between you before
18   you even had time to react and turn on the light and go
19   downstairs.
20           MR. THOMPSON: Counsel, would you sit down
21   instead of standing over the witness.
22           MS. WESTBY: Be professional, honest to God.
23           MR. GOSMAN: Enough.
24           MS. WESTBY: Your behavior is --
25           MR. GOSMAN: I'll go ahead and sit down and

Case 1:10-cv-00041-ABJ   Document 65-10   Filed 01/10/11   Page 47 of 60
Tricia Wachsmuth v.
City of Powell, et al.

Kirk Chapman
November 23, 2010

1  I'll try to keep you quiet.
2       THE WITNESS: And, again, how was that
3  inconsistent?
4  BY MR. GOSMAN:
5     Q.  Yes, well, because what I just said was
6  Chretien apologized for sending Tricia Wachsmuth down
7  the stairs first.
8     A.  And that's what you said.
9       MS. WESTBY: Object.
10  BY MR. GOSMAN:
11    Q.  Yeah, that's what I said.  And I'm saying if
12  that's true, that's inconsistent with what you said,
13  isn't it, Officer?
14      MS. WESTBY: Just a second.
15      Object to the form of the question, misstates
16  the testimony, misstates the evidence.  Go ahead.
17      THE WITNESS: I don't think anywhere in my
18  testimony where I stated that Officer Chretien
19  apologized for anything about what he did or did not
20  do.
21  BY MR. GOSMAN:
22    Q.  All right.  That's fine.
23      Okay.  Did you participate in a debriefing
24  after this incident was over?
25    A.  Yes.

1     Q.  Who was there?
2     A.  I believe everybody from the -- that was
3  present.
4     Q.  Okay.  And what was discussed?
5     A.  We were discussing as far as basically what
6  people saw from their points of advantage, how the
7  deployment of the flashbang went, how the people that
8  were on the rear perimeter, what issues they had, and
9  then the search team, how the search went.
10    Q.  Everything go A-okay?
11    A.  Well, there were some snags.  We had
12  Officer Bradley and Officer Lara and Detective Brown
13  that were snagged up in the backyard.
14      We had Officer Brilakis, who could not gain
15  entry to the backyard from the gate because it was
16  locked.
17    Q.  Was there any discuss on about the flashbang?
18    A.  Flashbang, how it was deployed, somebody said
19  that a towel or something was smoldering at that time.
20  I didn't see that, though.
21    Q.  Did you hear the smoke alarm go off?
22    A.  No, I didn't.
23    Q.  Did you have anything to do with going out to
24  Tom Wachsmuth's place and picking up Bret?
25    A.  No, I didn't.

1     Q.  Were you part of the evidence gathering team?
2     A.  Yes.
3     Q.  Okay.  What role did you play in that?
4     A.  I first started out with Officer Hall in Room
5  Number 2.  I designate it as Room Number 2, which would
6  have been the guest room.  He was searching and I was
7  documenting at that time.  And then when somebody would
8  come in and take pictures -- pictures were taken --
9  then the evidence was collected.
10      Had another officer take over for there so I
11  could assist Officer Miner in Room Number 1, which I
12  designate as the master room or the main bedroom.
13      And basically still maintain the same role as
14  far as documenting what was found, where it was found,
15  and assuring that pictures were taken prior to
16  collecting.
17    Q.  Did you find any drugs in the upstairs, in
18  the master bedroom?
19    A.  Yes.
20    Q.  What did you find?
21    A.  Found remnants of hash, found prescription
22  bottles not associated with anyone that lived in the
23  residence, marijuana stems, other drug paraphernalia,
24  pipes with residue.
25    Q.  Did you find prescription bottles with

1  prescription medication in them from someone other than
2  persons who were at the residence?
3     A.  No, just empty bottles with other people's
4  names on them.
5     Q.  Were they logged into evidence?
6     A.  Yes, they were.
7     Q.  All right.  Let's turn to that exhibit for a
8  second.  Let's go to Exhibit 23.
9       (Exhibit 23 identified)
10  BY MR. GOSMAN:
11    Q.  Now, you're talking about in the master
12  bedroom, right?
13    A.  Correct.
14    Q.  So northeast bedroom.  That would be the
15  master bedroom; is that correct?
16    A.  Correct.
17    Q.  Okay.  So let's see.  There is one pill
18  bottle -- let's see.  Where did I see that?
19      All right.  Pill bottle, Tom Wachsmuth, next
20  to TV.  Do you know what that pill bottle was?
21    A.  I believe it was oxycodone.
22    Q.  Oxycodone.  And it had Tom Wachsmuth's name
23  on it?
24    A.  Correct.
25    Q.  Okay.  And did you ever find out what that

KIRK CHAPMAN - November 23, 2010                    Page 77
Direct Examination by Mr. Gosman

1  was about?

2      A.  I never did, no.

3      Q.  Okay.  I think I'm done with you, Officer.

4  Thank you very much for coming here today.

5      A.  All right.  Would you like my diagram?

6      Q.  Yes, I would.

7      A.  Would you like me to sign it?

8      Q.  I would like you to go ahead and put the

9  names of the officers in the basement there next to

10  their officers' numbers.  And you do not need to sign

11  it.

12                  (Proceedings concluded 2:53

13                   p.m., November 23, 2010)

14

15

16

17

18

19

20

21

22

23

24

25

---

KIRK CHAPMAN - November 23, 2010                    Page 78
Direct Examination by Mr. Gosman

1                  DEPONENT'S CERTIFICATE

2          I, KIRK CHAPMAN, do hereby certify, under

3  penalty of perjury, that I have read the foregoing

4  transcript of my testimony consisting of 77 pages,

5  taken on November 23, 2010 and that the same is, with

6  any changes noted below, a full, true and correct

7  record of my deposition.

8  PAGE  LINE      CORRECTION        REASON FOR CORRECTION

9   ___  ___  _____  _____

10  ___  ___  _____  _____

11  ___  ___  _____  _____

12  ___  ___  _____  _____

13  ___  ___  _____  _____

14  ___  ___  _____  _____

15  ___  ___  _____  _____

16  ___  ___  _____  _____

17  ___  ___  _____  _____

18  ___  ___  _____  _____

19  ___  ___  _____  _____

20  ___  ___  _____  _____

21  ___  ___  _____  _____

22

23

24                          _____
                              KIRK CHAPMAN    Date
25

---

KIRK CHAPMAN - November 23, 2010                    Page 79
Direct Examination by Mr. Gosman

1                      CERTIFICATE

2          I, VONNI R. BRAY, Registered Professional

3  Reporter, and Notary Public for the State of Montana,

4  do hereby certify that KIRK CHAPMAN was by me first

5  duly sworn to testify to the truth, the whole truth,

6  and nothing but the truth;

7          That the foregoing transcript, consisting of

8  78 pages, is a true record of the testimony given by

9  said deponent, together with all other proceedings

10  herein contained.

11          IN WITNESS WHEREOF, I have hereunto set my

12  hand this 11th day of December, 2010.

13

14

15

16

17

18

19

20

21  _____

22  Vonni R. Bray, RPR
    P. O. Box 125
    Laurel, MT 59044
23  (406) 670-9533 Cell
    (888) 277-9372 Fax
24  vonni.bray@yahoo.com

25

---

|  |  |  |  |
|---|---|---|---|
| 28:22 | **agency (1)** | **approached (1)** | |
| | 15:25 | 40:19 | **B** |
| **1** | **ago (3)** | **appropriate (1)** | |
| | 9:3;27:8;67:14 | 32:13 | **bachelor (1)** |
| **1 (2)** | **7** | **agree (2)** | **approximately (4)** | 7:8 |
| 54:1;75:11 | | 4:18;34:20 | 7:16,21;28:19;42:5 | **back (23)** |
| **10 (7)** | **7:00 (4)** | **ahead (26)** | **area (7)** | 11:6,7;13:9;14:2;29:9, |
| 37:6,8,23;54:17;55:1; | 28:22,23,24;30:5 | 4:7,24;10:24;14:20; | 7:6;14:2,25;43:4; | 21;30:10;40:12;41:2,2; |
| 64:11;65:14 | **7:30 (1)** | 15:4;18:23;20:22;30:15; | 49:18;61:17;70:1 | 42:13;43:20,24;45:8; |
| **120 (1)** | 30:11 | 37:5,20;44:4;45:13; | **areas (2)** | 47:10;53:23,24;55:5,8; |
| 52:3 | | 47:7;54:7,14;56:22; | 16:21;28:7 | 58:5,7;67:23;68:1 |
| **15 (2)** | **8** | 60:12;63:19;64:21; | **argumentative (2)** | **background (1)** |
| 6:23;30:4 | | 68:13;71:11;72:5,7,25; | 61:9;67:3 | 6:3 |
| **1992 (1)** | **82435 (1)** | 73:16;77:8 | **arm (4)** | **backyard (2)** |
| 6:6 | 5:6 | **ahold (1)** | 42:12;43:18,19,24 | 74:13,15 |
| | | 42:11 | **armed (1)** | **barricaded (2)** |
| **2** | **9** | **Air (2)** | 60:25 | 20:5;23:24 |
| | | 9:11,12 | **armor (2)** | **base (1)** |
| **2 (2)** | **98 (1)** | **alarm (1)** | 23:14;65:4 | 58:20 |
| 75:5,5 | 7:2 | 74:21 | **around (12)** | **Based (1)** |
| **2:53 (1)** | | **alarms (1)** | 30:11;34:20;45:20; | 61:13 |
| 77:12 | **A** | 12:10 | 51:1;62:7,17;63:4,11; | **basement (25)** |
| **20 (1)** | | **alcohol (1)** | 67:25;69:22;70:12,23 | 53:23,23;56:1,2;57:3, |
| 30:4 | **aback (2)** | 19:21 | **arrested (1)** | 18;58:20;59:4,13,18; |
| **2000 (1)** | 66:21,25 | **alert (2)** | 5:16 | 60:7;63:5,12,23,23;64:3; |
| 9:6 | **able (3)** | 48:4;70:12 | **arrival (1)** | 68:15,23;69:2,17,23; |
| **2003 (1)** | 5:12;28:1;40 15 | **alerted (1)** | 30:18 | 70:11,16;71:1;77:9 |
| 7:3 | **Absaroka (1)** | 41:1 | **arrive (2)** | **basically (4)** |
| **2004 (1)** | 18:15 | **alive (1)** | 30:11,22 | 35:22;43:2;74:5;75:13 |
| 7:2 | **absolutely (1)** | 24:18 | **arrived (6)** | **bathroom (1)** |
| **2005 (1)** | 68:5 | **allocution (1)** | 12:18;30:19,22,25; | 49:14 |
| 11:10 | **access (1)** | 68:12 | 31:8;38:21 | **battering (8)** |
| **2007 (3)** | 27:18 | **allow (1)** | **assembled (1)** | 18:7;19:6,15,24;21:3; |
| 6:23;11:14;23:23 | **accused (1)** | 66:23 | 21:20;31:12 | 23:15;24:25;25:12 |
| **2009 (12)** | 5:19 | **alone (7)** | **assigned (7)** | **became (1)** |
| 14:10,10,12,13,24; | **acquired (1)** | 33:20;45:20;46:2; | 26:10;38:2,9;39:3,11; | 24:16 |
| 15:6,21;18:16;20:2,4; | 71:18 | 53:9;63:6,22;68:24 | 46:7;52:23 | **bedroom (5)** |
| 21:5,9 | **across (2)** | **along (3)** | **assist (1)** | 75:12,18;76:12,14,15 |
| **2010 (1)** | 47:17;51:8 | 8:2;12:8;23:15 | 75:11 | **began (3)** |
| 77:13 | **action (4)** | **although (1)** | **associated (2)** | 47:3,11;48:1;51:19; |
| **23 (3)** | 8:6;17:1,2;25:23 | 26:22 | 9:22;75:22 | 55:22 |
| 76:8,9;77:13 | **actions (1)** | **amount (3)** | **associate's (1)** | **beginning (1)** |
| **24th (2)** | 26:18 | 39:23,25;40:1 | 7:10 | 26:11 |
| 15:21;28:10 | **Active (2)** | **announced (2)** | **assume (6)** | **behavior (4)** |
| **250 (1)** | 14:7;15:14 | 40:10;41:14 | 24:4;43:22;47:11; | 33:16;63:18;68:8; |
| 5:6 | **actually (5)** | **answered (1)** | 57:25;58:24;70:12 | 72:24 |
| | 26:1,9;28:23 34:6; | 4:23 | **assuming (4)** | **behind (14)** |
| **3** | 49:8 | **Antiterrorism (5)** | 30:1;42:16;45:16,23 | 19:4;27:20,24;42:17; |
| | **added (1)** | 10:3.5,8,16,19 | **assumption (1)** | 44:22;49:4,8;50:23; |
| **30 (3)** | 33:14 | **A-okay (1)** | 44:1 | 51:20;52:19;54:1,5; |
| 37:4;70:3,5 | **additional (1)** | 74:10 | **assuring (1)** | 63:2;68:20 |
| **31 (2)** | 15:1 | **apologize (1)** | 75:15 | **besides (1)** |
| 10:22,25 | **address (2)** | 71:25 | **attained (1)** | 67:17 |
| | 5:4,5 | **apologized (2)** | 68:15 | **best (5)** |
| **5** | **advantage (1)** | 73:6,19 | **attest (2)** | 32:10,11;39:7,7;61:11 |
| | 74:6 | **apparently (1)** | 67:19,21 | **better (1)** |
| **59 (2)** | **afternoon (1)** | 34:6 | **attorneys (1)** | 39:10 |
| 18:24;19:1 | 5:14 | **appears (1)** | 4:14 | **big (2)** |
| | **again (14)** | 65:13 | **aware (7)** | 52:6,7 |
| **6** | 14:23;22:20;14:20; | **Appleton (1)** | 8:15,18;18:1;29:12; | **body (2)** |
| | 47:11,21;55:4;57:13; | 8:11 | 60:6,22;61:15 | 23:14;65:4 |
| **6 (1)** | 58:24;63:7,13;64:12; | **approach (1)** | **away (3)** | **both (1)** |
| 54:19 | 70:7,9;73:2 | 31:20 | 41:5;46:15;47:2 | 21:4 |
| **6:00 (1)** | **against (2)** | | | |
| | 5:23;7:25 | | | |

**bottle (3)**
76:18,19,20
**bottlenecked (1)**
45:3
**bottles (3)**
75:22,25;76:3
**bottom (2)**
69:1,14
**Bradley (1)**
74:12
**branch (2)**
6:12;9:14
**breached (4)**
41:19;50:16;52:20;
53:3
**breacher (1)**
53:4
**breachers (1)**
17:12
**breaches (1)**
23:8
**breaching (3)**
9:9;17:10,14
**break (5)**
4:20,21,24;5:1;23:5
**Bret (4)**
32:13;33:9,12;74:24
**Brian (1)**
5:3
**Brilakis (1)**
74:14
**brought (1)**
47:21
**Brown (1)**
74:12
**buildings (3)**
15:15,15;27:18
**burglary (1)**
12:10
**butt (1)**
42:25

**C**

**call (4)**
28:24;29:14,19;30:2
**called (7)**
14:6;24:5,7,10;28:25;
29:9,21
**calling (1)**
32:14
**Calls (1)**
61:18
**came (12)**
8:12;11:14;14:2;24:9,
11;55:20;56:11;66:2;
69:21;70:18;71:5,18
**can (17)**
4:24;5:4;11:2;19:8,11,
14,15;23:6;35:5;50:9,
11;54:20;58:7,8;65:20;
67:19,21
**capacities (1)**

**6:20**
**capacity (1)**
60:1
**car (1)**
24:12
**carried (1)**
33:22
**carries (2)**
33:17,18
**carrying (1)**
34:19
**cause (1)**
21:2
**ceiling (1)**
69:20
**certain (2)**
15:7;31:21
**certainly (3)**
34:23;35:8;6::5
**certificate (1)**
10:15
**certifications (1)**
10:10,12;16::2,23
**certified (4)**
10:13,14,21;:6:20
**cetera (1)**
51:20
**Chad (1)**
34:11
**changed (1)**
30:9
**CHAPMAN (2)**
4:1;5:3
**charges (1)**
8:5
**checking (1)**
51:20
**chest (4)**
47:18;51:1,8,8
**Chretien (31)**
21:15;28:6;30:20;
38:25;53:21;54:18,20;
55:13,20;56:5,19,23;
57:13;59:9,12,21;60:6,
17,22;61:15,2::71:3,5,7,
9,11,20,23,25;73:6,18
**CI (6)**
34:1,2,2,12;35:21;
58:19
**cigarette (1)**
24:12
**circumstances (4)**
8:15,19;19:17;65:24
**City (1)**
12:13
**claims (1)**
7:25
**clarification (2)**
4:17;20:9
**Clark (1)**
5:6
**classes (1)**
10:11

**classified (1)**
5:17
**classroom (1)**
31:11
**clear (8)**
21:2;49:3,3,17;63:23;
68:23;71:16,22
**cleared (10)**
49:21,23;50:1;54:10;
57:24;62:17;63:12;
68:17,21;70:21
**clearing (19)**
9:8;11:21;12:10,22;
16:11;17:4;22:11;44:19;
45:1;47:3,11;48:1,7,13;
51:19;63:5,23;64:3;70:1
**coach (1)**
28:14
**Cody (1)**
14:2
**collected (1)**
75:9
**collecting (1)**
75:16
**column (1)**
38:1
**coming (5)**
8:22;24:6;36:1;49:13;
77:4
**communicate (2)**
34:14;59:9
**communicated (2)**
34:12,16
**communications (1)**
35:10
**compare (1)**
65:20
**complete (1)**
29:7
**completed (1)**
14:14
**completely (1)**
61:20
**compliant (1)**
44:15
**complies (5)**
54:13,22;69:4,12;
71:15
**concerning (1)**
12:18
**concluded (1)**
77:12
**confidential (5)**
35:1,10;36:5,7,10
**connection (3)**
8:6;12:19;36:19
**considered (1)**
38:17
**contact (2)**
32:18;39:24
**context (1)**
16:24
**continue (1)**

**64:3**
**continued (2)**
47:22;63:4
**contributions (1)**
35:19
**control (6)**
43:10;45:24;46:11;
65:6;66:3,8
**controlling (2)**
46:6,8
**conveyed (1)**
34:25
**corners (1)**
49:2
**Corps (6)**
6:13,17;9:14,17,18;
18:3
**corrections (1)**
7:14
**couch (12)**
40:18,22;41:25;42:4,
5,12;43:20,24;47:2;
48:24;55:9;56:11
**couches (1)**
49:4
**Counsel (1)**
72:20
**Countermeasures (4)**
14:3;31:21,24,24
**County (2)**
7:14;34:9
**couple (7)**
4:7;7:3;8:11;15:19;
18:12;26:16;27:8
**course (5)**
4:11;11:9;17:3;46:9;
71:13
**Court (1)**
68:7
**cover (2)**
42:19;52:24
**covering (1)**
52:20
**crawl (2)**
70:20;71:19
**crawled (2)**
70:22,22
**crime (2)**
5:17,19
**Criminal (2)**
7:7,9
**cubbies (1)**
70:19
**cubby (4)**
70:22,23,25;71:18
**cuff (2)**
66:2,7
**cuffed (5)**
64:14;65:14,24,25;
66:15
**currently (1)**
5:7

**64:3**

**D**

**dangerous (1)**
65:3
**Danzer (22)**
48:10;49:25;50:21;
52:15;53:12,18,22;55:3,
4;56:6;57:17;59:8;62:6,
16,23;63:2,4;66:19;
67:18;68:23;69:23;
71:14
**date (2)**
20:3;23:3
**dates (2)**
26:12,16
**Davis (1)**
34:7
**day (2)**
31:5;50:11
**deal (1)**
32:19
**dealings (1)**
36:12
**debriefing (1)**
73:23
**degree (5)**
7:4,6,9,10,12
**delay (1)**
41:18
**Department (24)**
6:22;7:1,19,24;8:9,14,
16,18,20,23;11:12;12:5,
19;14:16;15:10;16:3,11,
15;17:20;23:12;29:24;
30:10;35:20;41:15
**department's (1)**
65:10
**deploy (1)**
39:8
**Deployed (3)**
18:12;22:9;74:18
**deployment (2)**
23:14;74:7
**deposition (1)**
4:5
**depositions (1)**
4:8
**depression (1)**
33:14
**describe (2)**
6:2;42:24
**described (3)**
12:12,15;26:3
**designate (2)**
75:5,12
**Detective (1)**
74:12
**device (4)**
23:15;25:1,13;39:8
**devices (3)**
17:13,16;65:5
**diagram (2)**

54:21;77:5
**diagrammed (1)**
  55:22
**different (4)**
  7:3,13;9:20;50:5
**dimensions (1)**
  52:5
**DIRECT (2)**
  4:3,14
**directed (2)**
  42:12;60:20
**discharged (1)**
  6:14
**discuss (2)**
  31:25;32:12
**discussed (3)**
  32:21;36:20;74:4
**discussing (1)**
  74:5
**discussion (8)**
  31:6;33:8,11;38:12;
  39:6,9;58:11;74:17
**discussions (1)**
  37:16
**dishonesty (1)**
  5:20
**Dispatch (1)**
  29:1
**disseminated (1)**
  61:14
**diversion (1)**
  65:5
**diversionary (1)**
  25:12
**document (2)**
  18:22;65:17
**documentation (1)**
  35:9
**documented (3)**
  15:23;17:24;24:19
**documenting (2)**
  75:7,14
**documents (1)**
  19:13
**dog (2)**
  40:25;41:2
**done (5)**
  15:14;17:7,22;31:22;
  77:3
**door (45)**
  17:11,17,18;18:12;
  20:5,17,20;23:8;39:20;
  40:5,8,14,19;41:5,6,12,
  19;44:25;45:17;50:15;
  52:20,24;53:3,4,19,23,
  24,25;55:5,25;56:2,7,17;
  57:3,4,18;58:15,20;59:3,
  12,18;60:6;62:6;64:10;
  67:9
**doors (2)**
  12:10;49:13
**doorway (2)**
  44:8;50:10

**Doug (1)**
  13:25
**down (46)**
  17:11,20;29:1;32:6;
  37:3;39:3;42 9,13;
  43:20;44:11,18;45:8;
  47:1;51:2;56 4,8,9,12;
  57:5,19,21;58:3,16,22;
  60:8;62:8,15 22;63:3;
  64:9;66:16,19,24;67:10;
  68:15;69:6,8,18,21,23;
  70:18;71:21;72:1,20,25;
  73:6
**downstairs (9)**
  31:11;56:6,20;57:14;
  60:23;61:25;62:9,18;
  72:19
**draw (3)**
  54:9;69:1,11
**drawn (1)**
  22:14
**drills (1)**
  15:14
**drinking (4)**
  19:22,23;21:11;22:3
**drug (1)**
  75:23
**drugs (5)**
  32:7,8;35:25 36:2;
  75:17
**due (1)**
  7:23
**duly (1)**
  4:2
**during (3)**
  4:21;13:4;43 22
**duty (1)**
  28:16
**dynamic (26)**
  9:8;11:17,19 12:16,
  22;13:15,21;14:15;15:1,
  2,11;16:21;17:6,7;19:6;
  24:23;25:11,22;27:6;
  42:18;46:10;50:8;52:25;
  64:17;65:2;65:23

**E**

**Eckerdt (9)**
  13:8,9,15;28 5;53:20;
  54:17;55:1;65:7,13
**edge (1)**
  49:12
**educational (1)**
  6:2
**effort (3)**
  27:22;66:18;58:1
**either (4)**
  23:7;44:7;58 25;60:3
**elements (1)**
  25:22
**else (16)**
  13:19;22:7;24:22;

34:14;35:18;44:22,24;
  50:4;56:9,12,24,25;
  61:25;62:8;67:16;68:16
**Emergency (4)**
  16:7,25;25:24;27:3
**emotional (1)**
  32:6
**emotions (1)**
  32:6
**employed (1)**
  18:7
**empty (1)**
  76:3
**EMS (1)**
  27:9
**end (2)**
  26:11;32:22
**ended (1)**
  24:6
**enforcement (4)**
  6:17,18,20;12:7
**Enough (1)**
  72:23
**enter (1)**
  51:21
**entered (9)**
  42:8,14,20,21;44:20;
  47:25;52:24;53:8;70:21
**entering (2)**
  48:4;51:12
**entire (3)**
  31:12;43:24;60:20
**entrance (1)**
  19:24
**entries (5)**
  9:9;11:19;17:7;26:2;
  27:6
**entry (44)**
  11:17;12:17,22;13:16,
  22;14:15;15:1,2,11;
  16:21;17:6;19:6;23:13;
  24:23;25:11,22;37:16;
  38:2,7,10,13,17,21,24;
  39:1,12,24;42:18;43:25;
  44:8;46:10;50:8,14,22;
  52:18,25;53:23;54:4;
  55:25;56:2;64:17;65:2;
  66:23;74:15
**entryway (1)**
  45:4
**equipment (1)**
  17:10
**erratic (1)**
  33:16
**escape (1)**
  26:12
**Estimate (1)**
  41:6
**et (1)**
  51:20
**even (3)**
  29:17;66:15;72:18
**evening (2)**

28:19;36:20
**event (2)**
  34:18;65:13
**events (3)**
  5:13;15:17;27:21
**everybody (5)**
  31:16;44:22,24;50:4;
  74:2
**everyone (2)**
  64:14;65:14
**evidence (8)**
  19:18,19;38:4;61:21;
  73:16;75:1,9;76:5
**evolving (1)**
  67:7
**exactly (9)**
  17:9;20:3,24;29:18;
  30:18;31:3;34:16;37:3;
  71:20
**EXAMINATION (2)**
  4:3
**execute (2)**
  31:20;66:22
**exercises (1)**
  15:10
**Exhibit (13)**
  10:22,25;18:24;19:1;
  37:6,8,23;64:11;65:14;
  69:3;76:7,8,9
**expect (2)**
  34:23;35:9
**explain (2)**
  12:2;16:4
**extra (3)**
  22:2;23:14;65:4
**extremely (1)**
  32:5
**eyes (1)**
  67:23

**F**

**facing (1)**
  41:24
**fact (4)**
  23:13;34:5,25;38:1
**factors (2)**
  38:17,19
**fair (1)**
  44:1
**fairly (1)**
  21:2
**far (15)**
  9:25;11:18;12:9,22;
  27:4;32:6;39:9;40:3;
  41:5;50:2,3;60:6;70:1;
  74:5;75:14
**father (1)**
  32:13
**February (5)**
  15:21;20:2;21:5,9;
  28:10
**feedback (1)**

39:12
**feels (1)**
  39:6
**feet (7)**
  41:7,25;42:3,4,5;
  48:24;52:4
**felony (1)**
  5:17
**female (1)**
  41:1
**few (5)**
  9:20;48:20;51:2,7;
  67:14
**field (7)**
  10:18;12:3,7,12,20;
  14:14,25
**file (1)**
  50:11
**filed (1)**
  59:1
**filing (1)**
  50:5
**find (7)**
  11:2;23:6;46:10;
  75:17,20,25;76:25
**fine (3)**
  55:12;65:12;73:22
**finish (4)**
  23:5;52:8;57:9;63:22
**firearms (1)**
  13:18
**first (24)**
  4:2;19:9,11;22:21,21;
  28:10;29:11,12,16;
  30:25;31:8,9;41:21,22;
  47:9;56:20;59:1;62:14;
  66:3;67:17;71:23;72:1;
  73:7;75:4
**fits (1)**
  39:10
**five (1)**
  41:18
**fixed (1)**
  43:3
**flashbang (7)**
  22:9;23:14;25:1;39:8;
  74:7,17,18
**flee (1)**
  24:12
**focused (1)**
  55:25
**followed (2)**
  57:21;58:3
**following (1)**
  14:25
**follows (1)**
  4:2
**Force (5)**
  9:11,12;10:8,16,19
**forgive (1)**
  26:23
**form (49)**
  14:17;15:3;21:22;

Tricia Wachsmuth v.
City of Powell, et al.

Kirk Chapman
November 23, 2010

23:17;25:6,14;26:4;
30:14;35:2,11;36:21;
37:19;38:3;43:11;44:2;
45:12,25;46:18;47:5;
48:25;50:18;51:3,13;
56:21;59:14,17,23;
60:1;61:1,2,7,8,18;
62:10;63:8,17,25;64:18;
65:15,21;66:5,9;67:2;
68:3,4;72:2,3,11;73:15
**forth (1)**
13:9
**forward (1)**
54:10
**found (4)**
75:14,14,21,21
**four (3)**
7:16,21;62:15
**frankly (1)**
19:8
**free (1)**
4:20
**front (16)**
19:5;37:7;40:19;41:4,
6;43:2;44:25;47:16;
51:1;57:17;62:23,25;
67:8,19,22;68:21
**FTO (5)**
11:18,25;12:2,3,22
**full (1)**
5:2
**functioned (2)**
26:10;27:1
**furniture (2)**
49:9;51:20
**further (3)**
33:13;44:20;49:18

**G**

**gain (2)**
19:24;74:14
**gate (1)**
74:15
**gathered (1)**
26:9
**gathering (1)**
75:1
**gear (1)**
22:2
**gets (1)**
64:14
**given (2)**
4:5;71:17
**God (1)**
72:22
**goes (1)**
53:4
**good (1)**
19:10
**GOSMAN (71)**
4:4;11:3;14:21;15:8;
19:2;20:13;22:1;23:20;

24:1;25:9,19 26:8;
30:16;35:4,7,14;37:1,9,
22;38:8;43:14;44:9;
45:19,23;46:4,21;47:8;
49:5;50:20;51:10,17;
52:10,11;57:6,11,20;
58:7,10,13;59:20,60:2,
16;61:4,10,22;62:12;
63:10,15,21;64:4,23;
65:8,18,20;66:1,7,14;
67:11;68:6,9,12,22;72:6,
13,15,23,25;73:4,10,21;
76:10
**grab (1)**
41:2
**grabbed (3)**
43:17;47:20;50:24
**Graduated (1)**
6:4;7:11
**ground (2)**
4:8;70:20
**group (3)**
10:25;19:4;60:20
**guest (1)**
75:6
**gun (3)**
34:20;50:25;56:16
**guns (1)**
65:4
**guy (2)**
23:24;24:13

**H**

**halfway (2)**
22:25;63:3
**Hall (8)**
30:21;48:11;49:25;
50:21;52:15;53:13,24;
75:4
**hallway (3)**
49:13;53:15;54
**hand (3)**
40:2;43:17;46:15
**handcuffed (1)**
64:5
**handed (2)**
46:16,23
**handgun (4)**
23:24;33:17,18,22
**happened (8)**
25:4;28:2;29:11;41:3,
17;46:14;50:21;66:20
**harassing (2)**
61:9;67:3
**hash (1)**
75:21
**hasp (2)**
58:21;59:5
**head (3)**
4:15;33:19;67:24
**headed (3)**
41:25;48:15,19

heading (2)
42:6;67:9
**hear (8)**
31:9;56:19;57:14;
62:3,4;71:23,25;74:21
**heard (5)**
29:16;33:22;56:23,25;
57:12
**hearing (1)**
35:18
**held (2)**
38:12;58:11
**hiding (1)**
22:17
**high (7)**
6:3,4,7;8:10;26:13;
27:2,9
**hold (3)**
7:8;43:23;60:10
**holding (3)**
47:24;48:3;53:14
**hole (2)**
71:1,18
**home (5)**
24:2,5;30:9;33:21,23
**honest (1)**
72:22
**honestly (2)**
67:5;68:5
**Honorably (1)**
6:15
**horrified (1)**
68:8
**house (39)**
19:25;22:12;24:5;
32:5,7,15;34:20;36:1;
40:18,25;41:20;42:9,
21;43:25;44:21;45:1,5;
46:12;47:1,22,25;48:7;
49:18;50:7,15;51:12,22;
53:8,17;54:4,9;56:24;
57:1,14;61:25;65:6;
66:3;68:19
**Huh (1)**
56:10

**I**

**idea (1)**
70:4
**identified (4)**
10:22;19:1;37:8;76:9
**identify (1)**
54:15
**Immediate (1)**
17:1,2;25:23
**immediately (3)**
30:7;41:11;50:15
**impair (1)**
5:8
**imperative (1)**
35:17
**implying (1)**

46:3
**important (2)**
4:16;34:19
**incident (5)**
19:3;22:20;23:24;
24:19;73:24
**incidents (3)**
19:10;20:10;32:1
**included (1)**
25:12
**inconsistent (4)**
72:9,14,73:3,12
**individual (1)**
24:6
**individuals (1)**
32:4
**informant (5)**
35:1,10,36:5,8,10
**information (19)**
31:19;32:2,3,4,8;
33:13,15;34:1,19,25;
35:8,17;57:4;58:14,17,
25;60:14,18;61:14
**informed (1)**
32:24
**inside (3)**
44:25;52:22;54:9
**instance (1)**
38:25
**instead (1)**
72:21
**Institute (1)**
14:3
**instructor (6)**
10:9,13,14;12:24;
13:18;16:17
**instructors (2)**
16:19;28:7
**Interdiction (1)**
16:7
**interested (1)**
27:14
**internal (3)**
9:22,23;10:1
**into (26)**
6:9;17:6;19:24;22:12;
24:2,4;43:25;44:20;
48:4,21;49:11,14,18,19,
22;50:7,15;53:9,18;
55:14,20;57:23;60:24;
61:16;69:17;76:5
**involve (3)**
7:25;17:3;23:7
**involved (10)**
9:10,15,16;13:15;
17:4,13;18:19;19:5;
29:25;52:18
**involves (1)**
65:3
**involving (2)**
5:20;25:11
**issues (4)**
7:23;36:16,19;74:8

**J**

**January (1)**
6:23
**job (1)**
8:9
**jobs (1)**
7:13
**join (26)**
6:21;14:19;15:5;
21:24;23:19;25:8,16;
26:6;35:3,12;36:23;
38:5;43:13;44:5;45:14;
46:20;51:5,15;56:22;
59:15,24;63:9;64:1,20;
66:11;67:4
**joined (1)**
6:25
**joint (1)**
15:25
**Jonathan (1)**
34:7
**judgment (1)**
5:8
**justice (2)**
7:7,9

**K**

**keep (2)**
46:11;73:1
**keeping (1)**
37:15
**Kent (3)**
13:10,15;30:21
**Kevin (1)**
16:18
**kids (3)**
20:5;22:17;28:21
**kind (7)**
9:7;13:9;15:18;17:16;
27:21;31:24;66:20
**KIRK (1)**
4:1
**kitchen (15)**
41:24;42:1,3,6;48:16,
19,21;49:11,14,18,19,
22,25;54:10;68:19
**knew (1)**
68:18
**knock (2)**
39:20;41:11
**knock-and-announce (3)**
39:16,18;64:14
**knocked (2)**
20:17;40:8,14;41:9
**knowledge (1)**
13:20
**known (1)**
36:4

## L

**landing (1)**
69:14
**Lara (4)**
13:8,12;21:16;74:12
**last (6)**
9:4;13:25;26:12;
45:16;53:4;55:2
**later (3)**
11:7;30:3;34:15
**law (4)**
6:16,18,20;12:7
**lawsuit (1)**
5:25
**layout (1)**
31:18
**leading (1)**
61:16
**learned (1)**
28:10
**leave (7)**
7:17,22;24:21;29:8;
46:16;68:9;69:3
**leaving (3)**
8:6,15,19
**led (2)**
60:23;62:15
**left (15)**
10:18;29:6;42:12;
43:18,19;45:20,21;46:2;
48:11,22;52:16;63:6,11,
22;64:2
**left-hand (2)**
38:1;69:18
**less (1)**
51:6
**level (1)**
17:23
**light (6)**
56:8,11;57:18;62:7;
64:10;72:18
**list (1)**
37:25
**little (2)**
28:23;69:13
**lived (1)**
75:22
**living (13)**
48:15,17,19,21,22;
49:12;51:20,24,25;
52:13,22;53:21;55:21
**loaded (4)**
32:7;33:17,18,22
**lock (2)**
58:21;59:6
**locked (1)**
74:16
**logged (1)**
76:5
**long (17)**
6:10;7:15,20;9:3;10:7;

22:5;23:13;25:12;29:4;
36:4;37:2,3;-7:24;
50:12;65:4;69:25;70:3
**longer (1)**
37:4
**look (8)**
10:24;19:3;37:6,25;
49:8;64:11;63:1,20
**looking (7)**
19:20,21;23:5;40:23,
23;43:5;62:1
**looks (1)**
22:24
**lost (1)**
19:18
**lot (2)**
27:16;35:25
**Lt (2)**
34:7,8

## M

**mail (2)**
32:9;36:2
**main (3)**
13:17;28:7;75:12
**Mainly (1)**
15:15
**maintain (1)**
75:13
**maintained (1)**
10:17
**major (2)**
26:13;27:8
**making (1)**
44:8
**man (2)**
14:3;24:5
**manual (1)**
12:13
**many (1)**
50:9
**map (1)**
54:16
**marijuana (1)**
75:23
**Marine (6)**
6:13,17;9:14,17,18;
18:3
**Marissa (2)**
29:2;37:11
**mark (2)**
18:24,25
**marked (1)**
18:23
**master (4)**
75:12,18;76:11,15
**matter (2)**
8:2;34:5
**may (4)**
11:4;19:18;20:25;
61:23
**maybe (1)**

67:15
**McCaslin (1)**
30:21
**mean (8)**
26:25;31:17;39:18;
49:8;58:1;61:5;62:13;
67:5
**means (1)**
39:20
**meant (1)**
59:22
**Mechanical (2)**
17:13,16
**medication (1)**
76:1
**medications (1)**
5:7
**meet (2)**
22:16;29:15
**meeting (2)**
37:2;61:14
**members (1)**
29:24
**men (1)**
50:22
**mental (1)**
60:1
**mention (1)**
59:1
**mentioned (5)**
13:12;32:16,17,23;
34:10
**met (3)**
26:1,7;36:10
**might (5)**
21:8;28:23;71:4,5,7
**military (4)**
9:1,2,15;10:18
**mindset (1)**
12:6
**mine (1)**
22:23
**Miner (12)**
30:20;34:11;35:22;
36:4;53:1;54:2;58:20;
59:1;70:18;71:1,12;
75:11
**minimum (1)**
40:3
**minutes (3)**
30:4;37:4;67:14
**misdemeanor (4)**
18:13;19:7,16;23:7
**Misstates (6)**
38:4;59:16;61:20;
72:3;73:15,16
**months (2)**
7:16,21
**more (2)**
26:23;68:15
**most (2)**
16:14;31:16
**move (6)**

42:13;44:12;45:15;
47:1,2;50:6
**movement (1)**
45:4
**moving (1)**
49:18
**Mrs (2)**
43:10;53:20
**much (2)**
30:3;77:4
**multiple (1)**
27:6
**myself (5)**
56:7;57:17;59:8;62:6,
17

## N

**name (4)**
5:2;16:13;38:6;76:22
**names (3)**
20:11;76:4;77:9
**necessarily (1)**
10:12
**need (4)**
4:22;57:9;67:6;77:10
**Neenah (3)**
7:18;8:16,19
**new (3)**
12:7;17 10;26:13
**next (4)**
41:17;53:22;76:19;
77:9
**night (9)**
21:14;25:4;28:9,22;
33:15;37:13;38:2,11;
40:5
**nobody (1)**
56:12
**nods (2)**
4:15;33:19
**North (2)**
5:6;18:15
**northeast (1)**
76:14
**notebook (1)**
37:6
**notified (1)**
33:2
**November (7)**
13:25;14:10,10,13,24;
21:5;77:13
**Number (7)**
54:1,17,19,25;75:5,5,
11
**numbers (2)**
54:23;77:10

## O

**oath (1)**
4:11
**Object (35)**

14:17;15:3;21:22;
23:17;25:6,14;26:4;
30:12;36:21;38:3;43:11;
44:2;45:12,22,25;46:18;
47:5;48:25;50:18;51:3,
13;61:2;62:10;63:17;
64:18;65:15,21;66:5,9;
67:2;68:3,4;72:11;73:9,
15
**Objection (18)**
23:16,22;35:2,11;
37:19;56:21;59:14,23;
60:11;61:1,7,8,18;63:8,
25;65:7;72:2,3
**obstacles (1)**
49:3
**obtain (2)**
7:4;10:10
**occasions (1)**
21:3
**occupied (1)**
27:19
**occur (1)**
15:17
**occurred (1)**
30:2
**October (1)**
11:10
**off (17)**
28:16;46:16;47:12,13;
48:11;49:13,14;50:25;
51:9;52:15;54:20;58:8,
11;64:25;68:9;70:20;
74:21
**offered (1)**
7:18
**Office (1)**
34:9
**Officer (81)**
4:5;7:14,11:17;12:3;
13:7,8,17;16:18;21:16;
28:6;30:20,21,21;32:23;
33:4,6;35:22,23;36:4,16,
19;39:19;44:19;45:10;
46:5,7,17,24;48:10,11;
49:25,25;52:15,15;53:1,
12,13,18,22,24;54:2,14,
23;56:5,6;57:17;58:14,
19;59:1,8,9,12,21;60:5,
17,22;61:15;62:6,16,22;
23;63:2,4;67:18;68:23;
70:18;71:1,5,7,9,23,25;
73:13,18;74:12,12,14,
75:4,10,11;77:3
**officers (35)**
12:4,7;13:1,12;14:4;
18:20;25:3,21;30:24;
33:1;35:19;42:14;45:16;
47:24;48:2,6;49:17,21;
50:6,9,14;51:12,21;
52:12,17,23;53:16;
54:11;57:2;61:16;67:20;
68:19;70:15;71:17;77:9

**officers' (1)**
77:10
**official (1)**
8:5
**old (1)**
27:11
**once (2)**
26:23;53:18
**one (41)**
4:17;13:1,18;16:18;
18:2,15,15;19:9,22;20:4,
23,24;21:1,6,8;22:21;
23:5,7;26:13,13,18;27:8;
33:1;34:24;41:22;49:14,
14;50:7;52:19,23;53:3,
4;54:7;56:9,25;58:6;
59:3;62:7;65:20;71:22;
76:17
**ones (5)**
19:5,12;27:11,15;50:1
**only (7)**
22:24;34:5,12;50:9;
65:20;67:19,21
**open (8)**
12:10;20:8,20;57:17;
62:6;69:16,21;70:19
**opened (3)**
56:7;64:10;67:8
**operation (1)**
48:7
**operational (1)**
23:12
**operations (4)**
22:11;47:3,11;48:1
**order (2)**
5:22;23:2,3
**ordered (1)**
42:9
**others (2)**
30:22;52:21
**otherwise (1)**
4:14
**out (21)**
6:7,24;18:3,4,10,11;
24:5,6,7,9,11;32:15;
36:1;40:23;70:23;71:5,
8,18;74:23;75:4;76:25
**Outagamie (1)**
7:14
**outside (1)**
54:21
**over (19)**
11:18;17:11,20;27:12;
30:9;31:18;35:21;45:10,
18;46:23;47:15;50:5;
52:9;56:11,17;68:2;
72:21;73:24;75:10
**oxycodone (2)**
76:21,22

**P**

**paddle (1)**

59:5
**page (3)**
19:9,11;22:21
**pages (1)**
19:4
**paired (1)**
12:4
**paper (1)**
54:8
**paperwork (1)**
24:20
**paranoid (5)**
32:5;33:17;58:23;
60:25;61:17
**paraphernalia (1)**
75:23
**Park (1)**
34:8
**part (4)**
16:2;38:9,15;75:1
**participate (4)**
11:9;32:14;38:13;
73:23
**participated (1)**
15:9
**participating (1)**
15:20
**party (3)**
5:25;19:23;22:3
**pass (2)**
60:4;72:17
**passed (2)**
60:14,18
**past (1)**
66:24
**Patrol (3)**
11:9;14:7;16:7
**Patterson (2)**
34:7,8
**pause (1)**
68:20
**paused (3)**
49:12,15;62:16
**PE (1)**
5:5
**Pechtel (1)**
14:1
**peekers (1)**
32:5
**pendency (1)**
4:21
**people (3)**
36:3;74:6,7
**people's (1)**
76:3
**perform (1)**
22:11
**performance (1)**
26:2
**performed (1)**
23:11
**perimeter (3)**
25:3;69:22;74:8

**period (1)**
43:22
**person (5)**
34:6,12;40:21;55:2;
65:20
**personal (1)**
7:23
**persons (3)**
54:15;70:13;76:2
**pertinent (1)**
16:21
**picking (1)**
74:24
**picture (2)**
19:10;69:1
**pictures (3)**
75:8,8,15
**PIER (2)**
16:3,5
**pill (3)**
76:17,19,20
**pipes (1)**
75:24
**place (2)**
33:15;74:24
**placed (2)**
5:22;54:15
**plan (1)**
37:16
**planned (1)**
26:11
**play (1)**
75:3
**please (5)**
14:22;52:8;63:13;
68:10,10
**pm (1)**
77:13
**PO (1)**
54:25
**pocket (1)**
43:1
**point (11)**
22:17;31:13;42:11;
44:8;55:14;56:16;57:16;
68:18;70:17,19;71:21
**points (1)**
74:6
**Police (28)**
6:22,25;7:19;8:8,14,
16,18,19,23;11:11,17;
12:19;14:16;15:10;16:2,
11,14;17:19;23:12;
25:21;29:5,24;30:7,10;
35:20;40:10;41:15;
54:23
**policing (2)**
9:22,23
**policy (1)**
12:13
**portion (1)**
62:18
**position (12)**

7:18;39:7,11;42:20;
45:1;47:21,25;48:4;
50:25;53:7,14;55:7
**positions (3)**
39:2;50:6;52:22
**possible (2)**
20:25;23:25
**POST (2)**
10:25;11:4
**POST-certified (1)**
11:22
**posted (1)**
53:19
**Powell (21)**
5:6;6:4,21,25;8:8,14,
18,22;11:11,17;12:14,
19;14:15;15:9;16:2,11,
14;23:12;25:21;29:24;
41:15
**practice (4)**
28:13,20;29:6,7
**practiced (1)**
25:23;26:1,27:6,15
**practicing (2)**
27:2,4
**premises (1)**
17:6
**prep (4)**
38:15;39:4;58:18;
60:14
**prepare (1)**
65:19
**prepping (2)**
31:14,17
**prescription (3)**
75:21,25;76:1
**presence (5)**
33:9,12;38:13;39:21;
41:1
**present (4)**
13:19;60:17;61:15;
74:3
**pretty (3)**
19:10;34:19;45:4
**prevented (1)**
55:23
**primary (1)**
16:19
**Prior (16)**
8:22;14:9,13,24;15:6,
21;18:10,16;20:4;26:14;
28:24;40:15;54:4;58:18;
60:14;75:15
**probably (12)**
28:23;30:4;37:4;41:7;
51:6;52:19;57:5;58:16;
60:7,24;61:15;70:3
**probationary (1)**
13:4
**procedure (3)**
64:16,22,25
**procedures (5)**
11:21;12:10,13,23;

65:11
**Proceedings (1)**
77:12
**professional (5)**
63:14;66:22;68:10,11;
72:22
**professionally (1)**
36:13
**program (7)**
12:2,3,4,12,20;14:4,14
**project (1)**
23:4
**prompting (1)**
72:17
**protection (3)**
10:8,16,19;22:2
**provide (1)**
20:11
**provided (1)**
24:20
**pull (1)**
41:2
**purpose (1)**
50:8
**put (6)**
14:4;40:17;43:24;
54:20;71:11;77:8

**Q**

**quick (3)**
45:3,4;66:20
**quiet (1)**
73:1
**quite (2)**
9:20;21:20

**R**

**raised (3)**
33:1;43:1,4
**rake (1)**
17:18
**rakes (1)**
18:3
**ram (11)**
17:17,18;18:7,12;
19:6,15,24;21:3;23:15;
24:25;25:12
**rapidly (1)**
67:7
**reach (1)**
41:1
**react (4)**
27:22;67:1,13;72:18
**reaction (1)**
45:2
**ready (9)**
29:15;42:21,22,23,25;
47:21,25;48:4;50:25
**realistic (1)**
61:5
**really (3)**

25:4;38:20;39:5

**rear (1)**
74:8

**reason (1)**
68:20

**reasonable (3)**
39:23,25;40:1

**reasons (1)**
32:25

**recall (2)**
25:17;29:3

**receive (1)**
6:16

**received (2)**
12:18;28:24

**recognize (1)**
40:15

**record (4)**
37:16,24;58:8,12

**records (2)**
11:1,4

**reference (2)**
18:22;23:6

**referring (2)**
25:10;33:12

**regarding (1)**
33:13

**related (1)**
35:22

**relayed (3)**
57:2;58:18;60:13

**reliable (1)**
36:7

**remainder (2)**
48:18;62:18

**remember (11)**
5:13;13:11;14:6;
15:20;16:13;28:18;
32:10,11;35:18;38:16;
54:12

**remnants (1)**
75:21

**repeat (1)**
61:12

**REPORTER (1)**
58:8

**reports (4)**
19:4;22:22;34:24;
58:25

**represent (1)**
37:23

**required (1)**
4:11

**residence (3)**
28:12;75:23;76:2

**residue (1)**
75:24

**resigned (1)**
7:23

**resistance (2)**
22:16,19

**respond (1)**
28:1

**responded (2)**
30:10;33:6

**Response (5)**
11:9;14:7;16:7;25:23;
27:21

**responses (1)**
12:11

**rest (3)**
44:7;49:17;51:19

**restraining (1)**
5:22

**resume (1)**
44:25

**resumed (2)**
44:19;48:7

**retained (1)**
44:20

**review (1)**
4:7

**ride (1)**
12:8

**ridiculous (1)**
68:5,6

**rifle (6)**
42:11,19,25;44:20;
47:12,20

**rifles (4)**
22:5;23:13;25:12;
47:25

**right (87)**
5:16;6:21;8:14;10:4,
15,24;11:16,2,3;13:19;
14:9;16:10,17 18:2,24,
25;19:19;21:7, 7:23:10;
24:15,18,19;25:10;
26:21;27:10,20;28:3,9;
29:8,23;32:12 34:18;
36:15;37:2,5;38:12,16,
20;39:5,11;40:12;42:7,
17,22;44:17;46:11;
47:13,17,20:48 6:49:15,
21,24;50:4,12;52:6,17;
53:6;54:7;55:5,6,7,13;
56:15;58:5,24;62:14,19;
64:11,15;66:2;67:8;
69:1,3,5,11,16,22;70:1,
25;71:10;72:13;73:22;
76:7,12,19;77:5

**right-hand (2)**
69:6,7

**rights (1)**
59:2

**role (4)**
39:10;44:19;75:3,13

**roles (1)**
26:10

**room (37)**
9:8;11:21;12:9,22;
16:11;17:3;22:11;42:14;
45:18;48:5,15,17,19,21,
23;49:9,12,14:5 :20,24,
25;52:3,13,22;:5:3:21;
55:14,21;57:8,23;58:21;

60:24;71:10;75:4,5,6,11,
12

**rooms (3)**
49:22;50:2;53:15

**Roy (1)**
54:17

**rules (1)**
4:8

---

# S

**safe (1)**
44:6

**safety (3)**
35:23;36:16,19

**Same (2)**
23:22;75:13

**sat (6)**
17:11;42:13;44:10;
45:8;46:25;51:1

**save (1)**
23:4

**saw (14)**
41:1,8;48:10,23;
49:21;53:18,20,20;
57:16;62:5;70:17;71:1;
72:16;74:6

**saying (2)**
57:25;73:11

**scenario (1)**
61:6

**Schmidt (5)**
13:7,13,17;16:18;28:6

**school (17)**
6:3,4,8;7:2;8:10;
15:15;16:24;25:23,24;
26:14,18;27:2,9,12,14,
22;28:4

**schools (3)**
7:3;15:15;16:12

**search (9)**
20:14,17;31:21;40:10;
41:15;63:5;66:23;74:9,9

**searching (3)**
43:2;47:22;75:6

**second (16)**
20:23,24;21:1,6,8;
29:9;30:2;40:12;47:10;
55:8;60:10;64:12;67:9;
68:4;73:14;76:8

**seconds (5)**
41:19;51:2,7;70:3,5

**sector (1)**
45:17

**secure (1)**
64:24

**secured (1)**
25:3

**security (1)**
8:10

**seeing (2)**
22:23;55:24

**selected (2)**

12:6;38:21

**selecting (1)**
38:17

**send (1)**
10:11

**sending (2)**
72:1;73:6

**sent (2)**
32:8;36:2

**September (1)**
11:10

**Sergeant (20)**
13:8,9,10;21:15;28:5,
6;30:20,21;38:25;53:20,
21;54:17,18;55:13,20;
56:23;57:13;61:24;
66:13;71:20

**serve (4)**
10:4;19:15;22:3;39:6

**service (14)**
6:9,10,25;17:6;18:10,
11;21:21;23:21;28:11;
29:25;31:7,10;37:17;
58:18

**setting (3)**
5:13;23:12;26:11

**settings (3)**
26:3;27:14;28:4

**shades (1)**
41:2

**sheaf (1)**
19:13

**sheets (2)**
22:20;54:8

**Sheriff's (1)**
34:9

**Shooter (2)**
14:7;15:14

**shootings (1)**
27:23

**shortly (1)**
55:21

**shot (2)**
24:13;61:11

**shoulder (5)**
43:1;47:12,13,15;51:9

**show (2)**
34:23;54:11

**side (8)**
45:18;54:20;69:6,7,
18;70:21;71:6,8

**sign (2)**
77:7,10

**signed (4)**
29:13,14,17,20

**simple (1)**
12:9

**simulating (1)**
17:5

**single (1)**
50:11

**sit (5)**
17:20;43:19;44:18;

72:20,25

**sites (1)**
43:3

**sitting (5)**
39:3;40:18,22;46:12;
55:9

**situation (7)**
25:24;28:2;29:13;
31:18;40:2;58:23;65:3

**situations (4)**
16:25;25:11,18;27:1

**six (3)**
41:7,18;54:20

**sling (3)**
43:23;47:14,14

**slung (4)**
42:11;43:7;47:16;51:8

**smoke (2)**
24:11;74:21

**smoldering (1)**
74:19

**snagged (1)**
74:13

**snags (1)**
74:11

**somebody (9)**
8:3;29:19;34:14;
45:23;57:5;58:15,22;
74:18;75:7

**someone (4)**
34:19;40:18;60:8;76:1

**somewhere (4)**
11:1;34:24;46:12;
50:23

**son (1)**
32:14

**soon (1)**
62:4

**sorry (10)**
8:17;9:13,14,16;
33:10,20;42:2,24;52:10;
57:11

**sort (3)**
32:19;44:24;64:16

**Southside (1)**
27:11

**space (2)**
70:20;71:19

**speak (3)**
30:24;31:2;55:14

**speaking (2)**
55:22;56:3

**specific (8)**
13:22;14:15;15:2,11;
17:5;25:10;46:7,24

**specifically (4)**
13:11;33:13;46:6,23

**specify (1)**
65:25

**speculate (1)**
65:16

**speculation (1)**
61:19

**split (1)**
  67:9
**squad (1)**
  17:23
**square (2)**
  52:3;69:13
**stacked (1)**
  53:25
**stairs (24)**
  56:4,8;57:19,22;58:3;
  62:22;63:3,6,22;64:3,9;
  66:16,19,24;67:10,17;
  68:1;69:2,6,14,19,21;
  72:1;73:7
**stairway (1)**
  69:16
**stairwell (1)**
  69:18
**standard (4)**
  64:16,22,25;65:11
**standing (4)**
  41:24;42:3,4;72:21
**start (1)**
  4:9
**started (6)**
  40:25;48:15;56:8;
  57:19;70:11;75:4
**starting (1)**
  6:3
**state (1)**
  39:20
**stated (5)**
  49:23,24;56:8;58:19;
  73:18
**statement (2)**
  35:13;64:13
**statewide (1)**
  27:22
**station (2)**
  29:5;30:8
**stems (1)**
  75:23
**step (1)**
  58:6
**steps (2)**
  48:20;62:15
**still (4)**
  24:17,18;71:13;75:13
**stocks (1)**
  42:25
**stomach (1)**
  70:23
**stoop (1)**
  41:4
**stop (2)**
  31:23;66:18
**stopped (3)**
  44:24;62:16;63:3
**stops (1)**
  12:9
**strap (1)**
  51:7
**strapped (1)**

**stuff (2)**
  11:19;17:12
**subjective (1)**
  40:1
**subjects (1)**
  58:23
**sure (26)**
  14:11;15:18,24;16:22;
  17:9;18:1,16;20:3,24;
  21:6;22:8;29:18;30:13,
  17,18;31:3;34:16;36:14;
  37:3;42:16;52:5;53:2,7;
  60:1,3;71:20
**surrounding (1)**
  8:15
**suspect (10)**
  46:10;55:11,12;56:7,
  24;60:25;61:17;65:5,9;
  66:24
**suspects (2)**
  48:5;64:24
**SWAT (11)**
  8:23;9:10,16,16,18,19,
  21,25;10:2,5;65:2
**SWAT-type (2)**
  10:20;26:2
**sworn (1)**
  4:2

**T**

**Tactical (2)**
  11:9;14:3
**tactics (4)**
  11:17;12:17;13:16;
  17:4
**talk (4)**
  26:21;31:4;34:2;52:9
**talked (9)**
  26:19;27:13;32:1;
  34:6,7,7;35:22;36:16,18
**talking (4)**
  31:20;54:4;65:2;76:11
**teach (1)**
  28:14
**team (38)**
  9:10,16,17,18,19;10:5;
  15:10;16:3,8;17:5;
  18:19,20;21:20,23:11,
  13;25:11;26:2,7,9,10;
  27:1;31:12,15;38:2,10,
  14,18,21,24;39:1,12;
  43:25;44:7;50:14,22;
  52:18;74:9;75:1
**teams (3)**
  9:20,21,22
**Ten (1)**
  6:11
**tense (1)**
  67:7
**term (1)**
  13:4

**testified (1)**
  4:2
**testify (2)**
  65:10;66:12
**testimony (14)**
  4:10;12:16;38:4;
  52:14;56:13,14;59:11,
  16;61:21;63:16;67:1;
  72:4;73:16,18
**thanks (1)**
  62:20
**thee (1)**
  42:3
**thinking (1)**
  16:18
**THOMPSON (37)**
  10:23;14:19;15:5;
  21:24;23:16,19,22;25:8,
  16;26:6;35:2,11;36:23;
  37:19;38:5;43:13;44:5;
  45:14;46:20;50:18;51:5,
  15;56:21;59:14,16,23;
  60:10;61:1,7,18;63:8,25;
  64:20;66:11;67:4;72:2,
  20
**thoroughly (1)**
  72:9
**though (4)**
  21:21;34:3;66:15;
  74:20
**threat (2)**
  68:14,16
**three (14)**
  10:9;13:7;21:17;
  27:12;28:7;41:25;42:4,
  5;48:24;49:13,22;50:2,
  22;52:17
**timeframe (2)**
  51:11;55:21
**times (4)**
  15:19;16:10;27:6,12
**tired (1)**
  5:10
**today (4)**
  4:13,21;5:8;77:4
**told (9)**
  33:25;42:13;44:12,18;
  45:15;47:1,2;61:13;
  72:10
**Tom (7)**
  32:13,18,24;33:2;
  74:24;76:19,22
**took (9)**
  42:11;43:10,23;48:20,
  20;50:24;51:6;66:3,8
**tools (1)**
  17:10
**Torczon (2)**
  29:2;37:11
**touch (1)**
  12:21
**touched (2)**
  11:19;15:1

**towards (5)**
  41:24,25;42:6;48:16,
  19
**towel (1)**
  74:19
**traffic (1)**
  12:9
**train (2)**
  12:7,8
**trained (7)**
  12:17;13:2;16:10;
  17:9;25:20;28:1;48:3
**trainer (1)**
  13:6
**trainers (2)**
  13:7;28:3
**training (30)**
  6:16;8:23;9:4,7,25;
  10:2,17,20,25;11:16,18,
  22;12:3,6,12,18,20;
  13:22,25;14:14,15,25;
  15:2,10,21,23,25;17:5;
  27:16,21
**Tricia (21)**
  40:13;41:23;45:8;
  48:23;50:24;55:9,14,22;
  56:5;60:23;61:16;62:5,
  13,25;64:5;65:23;67:17,
  25;70:4;72:1;73:6
**tried (2)**
  24:12;59:3
**true (1)**
  73:12
**truthfully (1)**
  4:12
**truthfulness (1)**
  62:1
**try (1)**
  73:1
**turn (7)**
  45:10;46:15;57:18;
  62:6,7;72:18;76:7
**turned (6)**
  45:20;46:25;47:2;
  56:7,11;64:10
**TV (1)**
  76:20
**twice (1)**
  26:22
**two (4)**
  21:3;52:21;53:15;
  70:19
**type (3)**
  26:11;48:5;62:1

**U**

**Unaware (1)**
  64:7
**uncleared (1)**
  60:24
**under (3)**
  4:11;64:13;65:24

**underage (4)**
  19:21,23;21:11;22:3
**unknown (1)**
  48:5
**unless (2)**
  4:13;58:22
**unlocked (8)**
  53:23;57:3,4,8;58:15,
  22;59:12;60:7
**unoccupied (2)**
  15:16,17
**unsecure (1)**
  59:19
**unsecured (1)**
  61:17
**unstable (1)**
  36:3
**up (29)**
  9:13;24:6;26:13;27:2,
  8;32:6,22;34:24;40:12,
  25;47:10;50:6;52:21;
  53:19,25;55:8;56:10,17,
  19;57:17;58:7;62:6;
  67:8;68:1,19;70:20;
  72:17;74:13,24
**upon (1)**
  15:1
**upstairs (2)**
  68:16;75:17
**urgency (1)**
  35:23,24,25
**use (4)**
  5:4;21:2;24:25;25:1
**used (3)**
  18:2;19:15,24
**uses (1)**
  17:20
**Usually (2)**
  53:5;58:22

**V**

**verbal (1)**
  59:18
**view (2)**
  71:16,17
**vote (2)**
  32:19,20

**W**

**Wachsmuth (34)**
  21:21;23:21;28:11;
  32:14,18,24;33:2,9,12;
  40:13;41:23;43:10;
  44:10;48:23;50:24;
  53:20;55:9,15,22;56:5;
  60:23;61:16;62:2,5,13,
  25;64:5;65:23;67:25;
  70:5;72:1,16;73:6;76:19
**Wachsmuth's (3)**
  32:13;74:24;76:22
**wait (1)**

4:22
**Waited (1)**
49:17
**waiting (1)**
44:25
**walk (3)**
57:16;62:5;66:24
**walked (3)**
56:17;57:18;67:8
**wall (2)**
69:5,7
**wants (1)**
39:6
**warrant (22)**
17:6;19:16;20:14,18;
22:3;23:21;28:11;29:13,
14,17,20,25;31:6,9,21;
37:17;39:16,18;40:10;
41:16;58:19;66:23
**warrants (4)**
18:13;19:7;21:21;23:7
**way (9)**
24:15,22;32:14;40:17;
53:18;59:12;62:15;
70:12,23
**weapon (7)**
22:14;42:8;43:1,4,8,
23;70:22
**weapons (2)**
23:25;32:7
**weren't (1)**
31:22
**WESTBY (59)**
14:17,20;15:3;20:9;
21:22;23:17;25:6,14;
26:4;30:12,14;35:3,12;
36:21;38:3;43:11;44:2;
45:12,22,25;46:18;47:5;
48:25;51:3,13;52:8;
56:22;57:9;59:15,24;
61:2,8,20;62:10;63:9,13,
17;64:1,18,21;65:7,15,
19,21;66:5,9;67:2,5;
68:3,7,10,13;72:3,11,14,
22,24;73:9,14
**What's (2)**
39:25;65:16
**whole (2)**
17:19;19:13
**wife (1)**
24:9
**window (5)**
17:18;32:5;40:24;
41:6,8
**Wisconsin (2)**
7:14;8:11
**within (4)**
7:23;12:5;15:14;30:4
**without (2)**
39:12;72:17
**Witness (39)**
4:15;15:6;20:12;
23:23;25:17;26:7;30:13;

33:19;35:6,13;36:24;
37:21;38:6;44:6;45:15;
46:2;49:2;51 6,16;
54:13,22;56 23;57:12;
59:17,25;60:13;63:20;
64:2,22;65:23;66:12;
67:7;68:14;69:4,12;
71:15;72:21;73:2,17
**words (1)**
41:14
**work (2)**
8:8,22
**Worked (2)**
7:13;8:10
**working (1)**
70:12
**Wrestling (6)**
28:13,14,20,21;29:6,7
**written (1)**
65:18
**Wyoming (2)**
5:6;8:12

# Y

**year (3)**
6:5;9:3;15:19
**years (5)**
6:11;8:11;10:9;26:16;
27:8
**younger (1)**
28:21



**POWELL POLICE DEPARTMENT**

250 N. CLARK ST     POWELL, WY 82435     307-754-2212

**SUPPLEMENT 6**

TH v. CITY OF
POWELL- CV 10-041J
PLAINTIFF'S EXHIBIT
#    23

## INVESTIGATION CONTINUED: Officer K. Chapman

On February 24, 2009 I assisted in a search warrant at the residence located at 870 E North Street in Powell, Park County Wyoming. The following describes the events of the search and the officers activities and assignments during the search of the residence.

Assigned search officers were Officer Hall, Officer Miner. Their duties were to search assigned rooms for evidence pertaining to the search warrant. Officer Lara and Investigator Brown were assigned to take digital photos of the evidence as it was found. Officer McCaslin and myself were assigned to logging all the evidence, the location and the time it was found. We were also assigned to gather the evidence. Officer Miner and Sgt. Kent transported the evdience to the Powell LEC where it was secured into the established evidence lockers.

The rooms in the house were searched by a team of officers to insure that each room was systematically searched and all evidence was collected. The following rooms were searched by Officer Miner and I and, describes what was found and collected in each of our assigned rooms.

### Items found and collected from the NE bedroom

| Location | Description | Time |
|---|---|---|
| Bed | .45 Colt with 6 rounds | 2158 |
| Chest | .357 cal handgun with 6 rounds | 2159 |
| Closet/1st shelf | Horse pipe | 2159 |
| On top of T.V | Glass pipe | 2200 |
| 1st drawer in dresser | Marijuana Grow Book | 2201 |
| Left side of T.V | Plastic bag w/ pill bottles | 2202 |
| Floor/Right of dresser | Browning rifle (unknown caliber) | 2203 |
| Floor/Right of dresser | 12 GA shot gun | 2204 |
| Floor/ N side of room | Wooden box with Marijuana Leaf | 2205 |
| Night stand N. side | Dugout with one hitter | 2206 |
| Night stand N. side | Tire spike system (used by LE) | 2207 |
| Night stand N. side | Dugout with one hitter | 2209 |
| Night stand N. side | Colored glass bottle with leafy plant material | 2210 |
| Night stand N. side | Boxes of ammunition (various calibers) | 2214 |
| Night stand N. side | Ruger P85 handgun | 2215 |
| Night stand N. side | Pill bottle with leafy plant material | 2215 |
| Floor next to bed | Box of pictures | 2216 |
| Next to T.V. | Pill bottle (Tom Wachsmuth) | 2225 |
| Night stand S. side | Pill bottle with .22 cal ammo | 2227 |
| Night stand S. side | Pill cutter | 2228 |
| Under bed | Box of Ammunition | 2238 |
| Under bed | Brown box with drug paraphernalia | 2238 |
| Under bed | Black box with drug paraphernalia | 2238 |
| Under bed | Rubber maid container with tar like substance | 2238 |
| Under bed | Leather man Knife on Rubber maid container | 2238 |
| Next to dresser | .45 cal ammunition w/ leather gun belt | 2241 |
| Next to dresser | 12 GA shot gun ammo w/ belt | 2241 |
| Next to dresser | Box of .22 cal ammo | 2241 |
| Next to dresser | (2) 2 ft Fluorescent light | 2245 |

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| P18 | CHAPMAN, KIRK | 3/1/2009 | P06 | CHRETIEN, MICHAEL | 3/2/2009 |



**POWELL POLICE DEPARTMENT**

250 N. CLARK ST    POWELL, WY 82435    307-754-2212

**SUPPLEMENT 6**

Page 15

09-223

#### Items found and collected from the bathroom

| Location | Description | Time |
|---|---|---|
| Bathroom medicine cabinet | Pill bottle wrapped in black tape | 2250 |

#### Items found and collected from the kitchen

| Location | Description | Time |
|---|---|---|
| Kitchen cabinet (west wall) | Miracle grow/plant fertilizers | 2252 |
| Kitchen by computer desk | Box containing stuffed animals and letter | 2256 |
| Kitchen computer desk | Computer Hewitt Packard CPU | 2301 |

#### Items found and collected from the basement

| Location | Description | Time |
|---|---|---|
| West wall | Grow lamps | 2307 |
| South wall (under stairs) | 2 ft Fluorescent lamp | 2308 |
| South wall (under stairs) | Seed start grow box | 2311 |
| South wall (under stairs) | Box w/ grow light | 2312 |
| South wall (under stairs) | Grow light (active) | 2313 |
| South wall (under stairs) | Commercial power timer | 2313 |
| South wall (under stairs) | Box with a PH meter | 2314 |
| South wall (under stairs) | Plastic jug containing plant fertilizer | 2315 |
| South wall (under stairs) | 2 Marijuana plants (growing) | 2316 |

The following rooms were searched by Officers Hall and McCaslin and describes what was found and collected in each of their assigned rooms.

#### Items found and collected from the SE bedroom

| Location | Description | Time |
|---|---|---|
| Dresser top | 2 Starter potting samples (1 w/dead plant) | 2153 |
| Top dresser drawer | Grow light bulb | 2154 |
| Floor to right of dresser | Box w/ grow lamp, timer, electric cords, control box | 2155 |
| Bedroom floor | Gun cleaning box w/ Hydrocodone w/ .22 cal ammo | 2158 |
| Closet | Teddy bear w/ back seam open | 2203 |
| Closet | Heat lamp | 2206 |
| Closet | 2 bags Miracle grow potting mix | 2209 |

#### Items found and collected from the Garage

| Location | Description | Time |
|---|---|---|
| Loft | The Grow Book | 2233 |
| West side top shelf | The encyclopedia of Psychoactive Drugs-Mushrooms | 2235 |
| Loft | Scale | 2245 |
| Loft | 2 NIK drug test pouches | 2248 |

#### Items found and collected from the Living room

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| P18 | CHAPMAN, KIRK | 3/1/2009 | P06 | CHRETIEN, MICHAEL | 3/2/2009 |

00024



**POWELL POLICE DEPARTMENT**

250 N. CLARK ST  POWELL, WY 82435  307-754-2212

**SUPPLEMENT 6**

Page 16

09-223

| Location | Description | Time |
|---|---|---|
| Coffee table | Marijuana Leaf | 2255 |
| Coffee table | Marijuana Grow Book | 2259 |
| Book Shelf (top shelf) | Beretta 21A .22 cal handgun (17753u) | 2311 |
| Book shelf | (12) High times Magazines | 2316 |
| Book shelf | 1 marijuana book "The Cannibal" | 2316 |
| Book shelf | Note pad w/ sketches | 2321 |
| Book shelf | 2 Drug Bibles | 2321 |

Officer present during the search were as follows:

Officers Miner, Kent, Lara, Chretien, Hall, Danzer, Eckerdt, McCaslin, Brilakis, Blackmore, Breadley; Investigator Brown and myself.

All items were collected and taken to the Powell LEC where they were placed into the secure lockers until they can all be logged into the established evidence system.

**EVIDENCE:**
All items listed above

**UNDEVELOPED LEADS:**
None

**ATTACHMENTS:**
None

**STATUS:**
Closed

**VICTIM/WITNESS FOLLOW UP:**
None

| Prepared By: | | Date: | Approved By: | | Date: |
|---|---|---|---|---|---|
| P18 | CHAPMAN, KIRK | 3/1/2009 | P06 | CHRETIEN, MICHAEL | 3/2/2009 |

**00025**