# Appendix Fifteen

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Kirk Chapman*
*November 23, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 11-23-10 Kirk Chapman_SCOPED.txt
Min-U-Script® with Word Index

Tricia Wachsmuth v.
City of Powell, et al.

KIRK CHAPMAN - November 23, 2010                                  Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF WYOMING

 3     --------------------------------   ------------------

 4     TRICIA WACHSMUTH,                   )

 5                    Plaintiff,           )

 6           vs.                           )   NO. 10-CV-041J
                                           )
 7     CITY OF POWELL, AND IN THEIR        )
 8     INDIVIDUAL CAPACITY, TIM            )
       FEATHERS, CHAD MINER, MIKE          )
 9     CHRETIEN, ROY ECKERDT, DAVE         )
       BROWN, MIKE HALL, BRETT LARJ.,      )
10     MATT MCCASLIN, ALAN KENT, MATT      )
       DANZER, OFFICER BRILAKIS, LEE       )
11     BLACKMORE, CODY BRADLEY, KIRK       )
       CHAPMAN, JOHN DOES #1-#4,           )
12                                         )
       Defendants.                         )
13     _____

14              DEPOSITION OF KIRK CHAPMAN
                1:23 p.m., Tuesday, November 23, 2010
15

16

17

18              Pursuant to notice, the deposition of KIRK

19     CHAPMAN was taken in behalf of Plaintiff in accordance

20     with the applicable Federal Rules of Civil Procedure at

21     270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22     Registered Professional Reporter and Notary Public of

23     the State of Montana.

24

25
```

KIRK CHAPMAN - November 23, 2010                                  Page 2

```
 1                        APPEARANCES

 2     FOR PLAINTIFF:

 3              Mr. Jeffrey C. Gosman
                Gosman Law Office
 4              125 W 2nd Street
                P.O. Box 51267
 5              Casper, WY 82601-2481
                Telephone: (307)265-3082 - Fax: (307)265-6715
 6              E-mail: jeff@gosmanlawoffices.com

 7

 8     FOR INDIVIDUAL DEFENDANTS:

 9              Ms. Misha Westby
                Senior Assistant Attorney General
10              2424 Pioneer Avenue, 2nd Floor
                Cheyenne, WY 82002
11              Telephone: (307)777-5477 Fax: (307)777-8920
                E-mail: mwestb@state.wy.us
12

13     FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
       CAPACITY:
14

15              Mr. Tom Thompson
                MacPerson, Kelly & Thompson
16              616 West Buffalo
                P.O. Box 999
17              Rawlins, WY 82301-0999
                Telephone: (307)324-2713 - Fax: (307)324-7348
18              E-mail: tthompson@wyomingattorneys.net

19

20     Also Present:  Tim Feathers

21

22

23

24

25
```

KIRK CHAPMAN - November 23, 2010                                  Page 3

```
 1                      INDEX TO WITNESSES

 2                                                          PAGE

 3     KIRK CHAPMAN

 4          Direct Examination by Mr. Gosman ...............4
 5          Signature Page ................................78
            Reporter's Certificate ........................79

 6

 7

 8                          EXHIBITS

 9     EXHIBIT            DESCRIPTION                       PAGE

10     10       Notes of the Wachsmuth Warrant ..........37

11     23       PPD Supplement 6 by Kirk Chapman ........76

12     31       WY P.O.S.T. Training Records ............10

13     59       Defendants' Responses to ...............19
                Plaintiff's First Discovery
14              Request

15

16

17

18

19

20

21

22

23

24

25
```

KIRK CHAPMAN - November 23, 2010                                  Page 4
Direct Examination by Mr. Gosman

```
 1                    KIRK CHAPMAN,

 2    having been first duly sworn, testified as follows:

 3                  DIRECT EXAMINATION

 4    BY MR. GOSMAN:

 5       Q.  Officer, have you given a deposition before?

 6       A.  No.

 7       Q.  I'm going to go ahead and review a couple of

 8    the ground rules for taking depositions with you before

 9    we start.

10            Your testimony, as you understand, is taken

11    under oath.  And, of course, you're required to answer

12    the questions truthfully.  And you will answer each of

13    the questions that I ask you today unless your

14    attorneys direct you otherwise.

15       A.  (Witness nods head.)

16       Q.  Let's see.  It is important that you ask for

17    clarification if you do not understand one of my

18    questions.  Would you agree to that?

19       A.  Yes.

20       Q.  And we're free to take a break at any time

21    today, but we do not take a break during the pendency

22    of a question.  So we'll need to wait until the

23    question that has been asked has been answered before

24    we can go ahead and take a break, okay?

25       A.  Okay.
```

1   Q.   And if you want to take a break, just let us
2   know.  What is your full name, sir?
3   A.   Brian Chapman.
4   Q.   And what is your address?  You can use your
5   P.E. address if you like.
6   A.   250 North Clark, Powell, Wyoming 82435.
7   Q.   Are you currently on any medications that
8   would impair your judgment today?
9   A.   No.
10   Q.   You're tired?
11   A.   Yes.
12   Q.   Do you think you're going to be able to
13   remember the events as well as you could in any setting
14   here this afternoon?
15   A.   Yes.
16   Q.   All right.  Have you ever been arrested for a
17   crime that was classified as a felony?
18   A.   No.
19   Q.   Have you ever been accused of a crime
20   involving dishonesty?
21   A.   No.
22   Q.   Have you ever had a restraining order placed
23   against you?
24   A.   No.
25   Q.   Have you ever been a party to a lawsuit?

1   A.   No.
2   Q.   Could you describe your educational
3   background, starting with high school?
4   A.   Graduated high school in Powell here.
5   Q.   What year?
6   A.   1992.
7   Q.   And what did you do after you got out of high
8   school?
9   A.   Went into the service.
10   Q.   How long were you in the service?
11   A.   Ten years.
12   Q.   Which branch?
13   A.   Marine Corps.
14   Q.   And were you -- how were you discharged?
15   A.   Honorably.
16   Q.   And did you receive training in law
17   enforcement in the Marine Corps?
18   A.   In law enforcement?
19   Q.   Yes.
20   A.   In some law enforcement capacities.
21   Q.   All right.  When did you join the Powell
22   Police Department?
23   A.   In 2007, January 15.
24   Q.   And what did you do from the time you got out
25   of the service until you joined the Powell Police

1   Department?
2   A.   Well, I was in school from '98 to 2004 -- or
3   2003, where I went to a couple of different schools.
4   Q.   And did you obtain a degree?
5   A.   Yes.
6   Q.   In what area is your degree?
7   A.   Criminal justice.
8   Q.   And do you have -- do you hold a bachelor
9   degree in criminal justice?
10   A.   It's an associate's degree.
11   Q.   And so then after you graduated with that
12   degree, what did you do?
13   A.   Worked different jobs.  And I was a
14   corrections officer in Outagamie County, Wisconsin.
15   Q.   How long did you do that?
16   A.   Was there for approximately four months.
17   Q.   And why did you leave?
18   A.   I was offered a position with the Neenah
19   Police Department.
20   Q.   How long were you there?
21   A.   I was there for approximately four months.
22   Q.   And why did you leave?
23   A.   I resigned due to personal issues within the
24   department.
25   Q.   Did they involve any claims against you?

1   A.   No.
2   Q.   Was it just a matter of not getting along
3   with somebody?
4   A.   Yes.
5   Q.   Were charges -- were any -- was any official
6   action taken in connection with your leaving?
7   A.   No.
8   Q.   You went to work for the Powell Police
9   Department after that job?
10   A.   I worked security at a high school in
11   Appleton, Wisconsin, for a couple of years.
12   Q.   And then you came to Wyoming?
13   A.   Yes.
14   Q.   All right.  Was the Powell Police Department
15   aware of the circumstances surrounding your leaving the
16   Neenah Police Department?
17   A.   I'm sorry?
18   Q.   Was the Powell Police Department aware of the
19   circumstances of your leaving the Neenah Police
20   Department?
21   A.   Yes.
22   Q.   Prior to your coming to work for the Powell
23   Police Department, did you have any SWAT training?
24   A.   Yes.
25   Q.   Where?

1   A.  In the military.
2   Q.  In the military.
3       And how long ago was that?  What year?
4   A.  The last training that I did?
5   Q.  Yes.
6   A.  That would have been 2000.
7   Q.  What kind of training did you have?
8   A.  Oh, everything from room clearing, dynamic
9   entries to breaching.
10  Q.  And were you involved in a SWAT team there
11  with the Air Force?
12  A.  I wasn't with the Air Force.
13  Q.  I'm sorry, I just made that up.
14      What branch -- I'm sorry, Marine Corps.
15      Were you involved with any military -- or a
16  SWAT team -- I'm sorry, were you involved with a SWAT
17  team with the Marine Corps?
18  A.  Marine Corps doesn't have a SWAT team.
19  Q.  Do they have anything like a SWAT team?
20  A.  They have quite a few different teams.
21  Q.  Do they have any teams that are like SWAT
22  teams that are associated with internal policing?
23  A.  Internal policing?
24  Q.  Yeah.
25  A.  I didn't have any SWAT training as far as

1   internal.
2   Q.  What was your SWAT training for?
3   A.  Antiterrorism.
4   Q.  All right.  And did you ever serve on an
5   antiterrorism SWAT team?
6   A.  Yes.
7   Q.  For how long?
8   A.  I was an antiterrorism force protection
9   instructor for three years.
10  Q.  Okay.  And did you obtain any certifications?
11  A.  They send you to classes.  They don't
12  necessarily give you certifications.
13  Q.  Were you a certified instructor?
14  A.  I was a certified instructor, yes.
15  Q.  All right.  Did you have a certificate?
16  A.  In antiterrorism force protection, yes.
17  Q.  Have you maintained any training in that
18  field since you left the military?
19  A.  In antiterrorism force protection?
20  Q.  Or SWAT-type training
21  A.  Nothing certified.
22      (Exhibit 31 identified)
23  BY MR. THOMPSON:
24  Q.  All right.  Let's go ahead and take a look at
25  Exhibit 31.  And this is a group of POST training

1   records.  You're in here somewhere.  Let's see if we
2   can find it.
3   BY MR. GOSMAN:
4   Q.  I may not have your POST records here.  Oh,
5   well...
6       Okay.  We're going to get back to this.
7   We'll come back to this later.
8       Let me ask you this question:  Did you
9   participate in the Patrol Tactical Response Course in
10  September or October of 2005?
11      No, you were not with the Powell Police
12  Department then, were you?
13  A.  No, I wasn't.
14  Q.  You came in 2007?
15  A.  Yes.
16  Q.  All right.  Have you had any training as a
17  Powell police officer in dynamic entry tactics?
18  A.  We have gone over -- as far as FTO training
19  and stuff like that, we've touched on dynamic entries.
20  Q.  All right.
21  A.  And room clearing procedures.
22  Q.  Do you have any POST-certified training?
23  A.  No.
24  Q.  And when you say -- did you say -- that was
25  FTO, did you say?

1   A.  Yes.
2   Q.  And why don't you explain the FTO program.
3   A.  The FTO program, the Field Training Officer
4   program is where you're paired with other officers
5   within the department where they have -- they have been
6   selected as having the correct mindset and training to
7   train new officers in the field of law enforcement,
8   where you ride along with them and they train you as
9   far as everything from simple traffic stops to room
10  clearing procedures, open doors, burglary alarms,
11  responses.
12  Q.  And the field training program is described
13  in the policy and procedures manual of the City of
14  Powell, correct?
15  A.  It is described.
16  Q.  And is it your testimony that the dynamic
17  entry tactics that you've been trained on or have
18  received training concerning since you arrived at the
19  Powell Police Department were in connection with the
20  field training program?
21  A.  We did touch on it when we were -- when I was
22  on FTO, as far as dynamic entry and room clearing
23  procedures.
24  Q.  Were you the instructor?
25  A.  No.

Case 1:10-cv-00041-ABJ  Document 65-11  Filed 01/10/11  Page 6 of 77

Tricia Wachsmuth v.                                                    Kirk Chapman
City of Powell, et al.                                                November 23, 2010

1   Q.   Were you one of the officers that was being
2   trained?
3   A.   Yes.
4   Q.   And that was during your probationary term?
5   A.   Correct.
6   Q.   Who was your trainer?
7   A.   I've had three trainers  Officer Schmidt,
8   Officer Lara, and I believe it was Sergeant Eckerdt.
9   Kind of going back and forth between Sergeant Eckerdt
10  and Sergeant Kent.
11  Q.   And do you remember specifically if all of
12  the officers you just mentioned, Lara -- was it
13  Schmidt?
14  A.   Yes.
15  Q.   -- Kent, and Eckerdt were involved in dynamic
16  entry tactics?
17  A.   I believe it was Officer Schmidt was the main
18  one. He's the firearms instructor as well.
19  Q.   All right. Was anyone else present?
20  A.   Not to my knowledge.
21  Q.   And since that time, have you had any dynamic
22  entry specific training?
23  A.   Yes.
24  Q.   Where?
25  A.   Last November we had training with Doug

1   Pechtel.
2   Q.   So he came back to the Cody area with --
3   from -- the man from Countermeasures Tactical Institute
4   and put on another program for the officers here?
5   A.   Yes.
6   Q.   Do you remember what it was called?
7   A.   It was Active Shooter Response by Patrol.
8   Something like that.
9   Q.   All right. And prior to that time, this
10  would be November of 2009? Was it November of 2009?
11  Let me make sure --
12  A.   Yes, I believe it was 2009.
13  Q.   Prior to November of 2009 and after you
14  completed your field training program, had you had any
15  training specific to dynamic entry with the Powell
16  Police Department?
17      MS. WESTBY: Object to the form of the
18  question.
19      MR. THOMPSON: Join.
20      MS. WESTBY: And go ahead and answer.
21  BY MR. GOSMAN:
22  Q.   Yes, please.
23  A.   Could you ask it again?
24  Q.   Yeah. Prior to November of 2009 and
25  following your field training in the area of -- or that

1   touched upon dynamic entry, have you had any additional
2   training specific to dynamic entry?
3       MS. WESTBY: Object to form.
4       Go ahead.
5       MR. THOMPSON: Join.
6       THE WITNESS: Prior to 2009? I'm not for
7   certain.
8   BY MR. GOSMAN:
9   Q.   Have you ever participated with the Powell
10  Police Department as a team in training exercises
11  specific to dynamic entry?
12  A.   Yes.
13  Q.   When and where?
14  A.   We've done active shooter drills within the
15  schools, other buildings. Mainly the school buildings,
16  I believe, when they are unoccupied.
17  Q.   Unoccupied? When did those events occur?
18  A.   I'm not for sure. They kind of go, you know,
19  couple of times a year.
20  Q.   Okay. Do you remember participating in any
21  of that training prior to February 24th, 2009?
22  A.   Yes.
23  Q.   Do you know if that training is documented?
24  A.   I'm not sure.
25  Q.   Was it a joint agency training?

1   A.   No.
2   Q.   Is it part -- does the Powell Police
3   Department have a P.I.E.R. team?
4   A.   Explain.
5   Q.   Do you know what P.I.E.R. is?
6   A.   No.
7   Q.   Okay. Patrol Interdiction Emergency Response
8   team?
9   A.   We don't, no.
10  Q.   All right. The times that you trained with
11  the Powell Police Department in room clearing at the
12  schools, who was there?
13      And you don't have to remember every name,
14  but let me say this: Was it most of the Powell Police
15  Department?
16  A.   Yes.
17  Q.   All right. And who was the instructor?
18  A.   I'm thinking Kevin -- Officer Schmidt was one
19  of the primary instructors.
20  Q.   Do you know if he's certified in any of the
21  areas that are pertinent to dynamic entry?
22  A.   I'm not sure what his certifications -- all
23  certifications are.
24  Q.   And this was in the context of school
25  emergency situations?

1    A.   Immediate action.
2    Q.   Immediate action.
3         And, of course, that does involve room
4    clearing tactics. But have you been involved in any
5    specific training as a team where you were simulating a
6    warrant service or a dynamic entry into a premises?
7    A.   Where we've done dynamic entries?  Yes.
8    Q.   Okay.  When and where?
9    A.   I'm not exactly sure.  We trained on all the
10   equipment when we got new breaching tools and
11   everything.  We all sat down and went over the door
12   breachers and stuff like that.
13   Q.   Mechanical devices that are involved in
14   breaching?
15   A.   Correct.
16   Q.   What kind of mechanical devices do you have?
17   A.   Well, we have a door ram.  At that time we
18   had a door ram and a window rake.
19   Q.   Okay.  And you had the whole police
20   department come in and sit down and go over those uses
21   of the --
22   A.   I believe at that time those were just done
23   at a squad level.
24   Q.   Okay.  Is any of that documented, do you
25   know?

1    A.   Not that I'm aware of.  I'm not sure.
2    Q.   All right.  Have you ever used one of those
3    rakes since you were out of the Marine Corps?
4    A.   Since I was out?
5    Q.   Yes.
6    A.   No.
7    Q.   Have you ever employed a battering ram?
8    A.   Yes.
9    Q.   When and where?
10   A.   Prior to getting out of the service?
11   Q.   No, after you got out of the service.
12   A.   Deployed the door ram on a couple of
13   misdemeanor warrants.
14   Q.   Where?
15   A.   One was on North Absaroka.  The other one,
16   I'm not sure.  Prior to 2009?
17   Q.   Yeah.
18   A.   Yes.
19   Q.   Was there a team involved in that?
20   A.   There was a team of of icers.
21   Q.   Okay.  Well, I'll tell you what, I've got a
22   document here that should have a reference to that.  We
23   haven't marked this yet, but we'll just go ahead and do
24   that right now.  We'll mark it as Exhibit 59.  And we
25   don't have to mark it right now.

1         (Exhibit 59 identified)
2    BY MR. GOSMAN:
3    Q.   But I want you to take a look at the incident
4    reports that are behind the group of pages there at the
5    front and tell me which ones you were involved in,
6    whether it was a battering ram and dynamic entry into
7    misdemeanor warrants.
8         And I think you can -- frankly, if you could
9    just go to the first page of each one of those
10   incidents, and I think you get a pretty good picture
11   from that first page what it's about.  And you can tell
12   which ones are yours, so you don't have to go through
13   the whole sheaf of documents.
14        While you're going through those, if you can,
15   can you tell me why you used a battering ram to serve a
16   misdemeanor warrant?
17   A.   Because there was circumstances where
18   evidence may be lost.
19   Q.   All right.  What evidence was it that you
20   were looking for?
21   A.   We were looking for alcohol and underage
22   drinking on one of them.
23   Q.   So you went to a party with underage drinking
24   and used a battering ram to gain entrance into the
25   house?

1    A.   Yes.
2    Q.   Was this after February of 2009?
3    A.   I'm not exactly sure what the date was on
4    that one.  I believe it was prior to 2009.
5    Q.   Had the kids barricaded the door or
6    something?
7    A.   Yes.
8    Q.   So they wouldn't open it.
9         MS. WESTBY:  And just for clarification, when
10   you're answering these questions about other incidents,
11   don't provide any names.
12        THE WITNESS:  Okay.
13   BY MR. GOSMAN:
14   Q.   Did you get a search warrant?
15   A.   Yes.
16   Q.   And so they had been -- had you gone to the
17   door and knocked on it before you got the search
18   warrant?
19   A.   Yes.
20   Q.   And they wouldn't open the door?
21   A.   Correct.
22   Q.   Okay.  Let's go ahead.  Tell me about the
23   second one.
24   A.   I'm not exactly sure what the second one was.
25   Q.   Is it possible there may not have been a

1   second one?
2       A.  No, 'cause I'm fairly clear that I did use
3   the battering ram on two occasions.
4       Q.  Okay.  Well, they should -- were they both
5   after November -- or February of 2009?
6       A.  I'm not sure when the second one was.
7       Q.  All right.
8       A.  The second one might have been.
9       Q.  After February of 2009?
10      A.  Yes.
11      Q.  The underage drinking thing, you think, was
12  before?
13      A.  Yes.
14      Q.  Who was with you that night?
15      A.  Sergeant Chretien was there.  I believe
16  Officer Lara was there as well.
17      Q.  All right.  So there were three of you,
18  correct?
19      A.  Yes.
20      Q.  That's not quite the team that was assembled
21  for the Wachsmuth warrants service, though.
22          MS. WESTBY:  Object to the form of the
23  question.
24          MR. THOMPSON: Join.
25

1   BY MR. GOSMAN:
2       Q.  And did you have your extra protection gear
3   on to serve the warrant on the underage drinking party?
4       A.  No.
5       Q.  Did you have long rifles?
6       A.  I didn't.
7       Q.  Did anyone else?
8       A.  I'm not sure.
9       Q.  Was a flashbang deployed?
10      A.  I believe no.
11      Q.  Did you perform room clearing operations when
12  you went into the house?
13      A.  Yes.
14      Q.  Did you have your weapon drawn?
15      A.  Yes.
16      Q.  Did you meet any resistance?
17      A.  Just kids hiding at that point.
18      Q.  Okay.
19      A.  No resistance.
20      Q.  Again, I think there are incident sheets at
21  the first -- on the first page of each one of these
22  reports.
23      A.  I am, but I'm not seeing nine here, so...
24      Q.  Okay.  It looks like you're only about
25  halfway through.

1       A.  Are they in --
2       Q.  Order?  I can't say that they are.
3       A.  -- order of date?
4       Q.  Tell you what, let's save this project for a
5   break if we take one, and we'll let you finish looking
6   through those to see if you can find reference to
7   either one of those misdemeanor warrants that involve
8   door breaches.
9       A.  Okay.
10      Q.  All right.  Thank you.
11          Have you ever performed as a team with the
12  Powell Police Department in an operational setting
13  where you had, in fact, an entry team with long rifles,
14  extra body armor, and the deployment of a flashbang
15  device, along with a battering ram?
16          MR. THOMPSON: Objection.
17          MS. WESTBY: Object to the form of the
18  question.
19          MR. THOMPSON: Join.
20  BY MR. GOSMAN:
21      Q.  Other than the Wachsmuth warrant service?
22          MR. THOMPSON: Same objection.
23          THE WITNESS: I believe in 2007, we did have
24  an incident where a guy was barricaded with a handgun
25  and possible other weapons.

1   BY MR. GOSMAN:
2       Q.  Okay.  Okay.  And did you go into the home?
3       A.  I did not.
4       Q.  Did -- I assume -- did anyone go into the
5   home or was the man called out of the house?
6       A.  The individual ended up coming out.
7       Q.  Was he called out?
8       A.  No.
9       Q.  Do you know why he came out?  Had his wife
10  called him?
11      A.  No, I believe he came out to smoke a
12  cigarette and tried to flee in his car.
13      Q.  That was the guy that got shot?
14      A.  Yes.
15      Q.  All right.  By the way, how -- whatever
16  became of him?
17      A.  He's still here.
18      Q.  Still alive?  All right.
19          All right.  And that incident is documented
20  in the paperwork that's been provided to me, so we'll
21  leave that at that.
22          Anything else -- now, by the way, there was
23  no dynamic entry at that time, correct?
24      A.  Correct.
25      Q.  And so we didn't use a battering ram and we

KIRK CHAPMAN - November 23, 2010    Page 25
Direct Examination by Mr. Gosman

1  didn't use a flashbang device?
2      A.  Correct.
3      Q.  You had officers who secured a perimeter;
4  isn't that really what happened that night?
5      A.  Correct.
6          MS. WESTBY: Object to the form of the
7  question.
8          MR. THOMPSON: Join.
9  BY MR. GOSMAN:
10     Q.  All right. So I'm referring to specific
11 situations involving dynamic entry with a team that
12 included long rifles, battering ram, diversionary
13 device and -- well, that's about it.
14         MS. WESTBY: Object to the form of the
15 question.
16         MR. THOMPSON: Join.
17         THE WITNESS: I don't recall any other
18 situations at this time.
19 BY MR. GOSMAN:
20     Q.  Okay. And when you say you've trained with
21 the other Powell police officers on some of the
22 elements of dynamic entry -- and you've gone to the
23 school and practiced immediate action response to an
24 emergency school situation, correct?
25     A.  Correct.

KIRK CHAPMAN - November 23, 2010    Page 26
Direct Examination by Mr. Gosman

1      Q.  Have you ever met and actually practiced as a
2  team in the performance of SWAT-type entries other than
3  in the settings that you've described to me?
4          MS. WESTBY: Object to the form of the
5  question.
6          MR. THOMPSON: Join.
7          THE WITNESS: Have we ever met as a team?
8  BY MR. GOSMAN:
9      Q.  Have you ever gathered as a team and actually
10 been assigned roles and functioned as a team from
11 beginning to end in a planned type of setting?
12     A.  Yes. And the dates escape me, but the last
13 one, major one that we did was up at the new high
14 school prior to it --
15     Q.  When was that?
16     A.  The dates -- it's been a couple years, I
17 believe, when we had --
18     Q.  Is this one of those school actions that
19 we've talked about?
20     A.  Yes.
21     Q.  All right. We don't want to talk about
22 something twice if we don't have to, so -- although
23 I'll do it more than once. And I'll forgive you for
24 doing it too.
25         But, I mean, have there been any other

KIRK CHAPMAN - November 23, 2010    Page 27
Direct Examination by Mr. Gosman

1  situations where you have functioned as a team, other
2  than going up to the high school and practicing
3  emergency --
4      A.  As far as practicing?
5      Q.  Yes.
6      A.  We practiced dynamic entries multiple times.
7      Q.  Where and when?
8      A.  Well, couple of years ago, the major one up
9  at the high school where we had EMS.
10     Q.  Right.
11     A.  And we've had other ones at old Southside
12 school, been over there three times, I believe.
13     Q.  Okay. Now, we already talked about these?
14 I'm not interested in the school settings.
15     A.  Well, these are the ones that we practiced a
16 lot of our training on.
17     Q.  Okay.
18     A.  And where we have access to these buildings
19 when they are not occupied.
20     Q.  All right. And do you know what was behind
21 those training events? Was it in response to some kind
22 of a statewide effort to react to, you know, school
23 shootings or something like that?
24     A.  What was behind it?
25     Q.  Yes.

KIRK CHAPMAN - November 23, 2010    Page 28
Direct Examination by Mr. Gosman

1      A.  To be trained and be able to respond to a
2  situation if anything ever happened.
3      Q.  Okay. All right. Who were your trainers in
4  these school settings?
5      A.  Well, we've had Sergeant Eckerdt, had
6  Sergeant Chretien, had Officer Schmidt. I think those
7  are the three main instructors in those areas at that
8  time.
9      Q.  All right. Where were you on the night of
10 the 24th of February when you first learned that there
11 was going to be warrant service on the Wachsmuth
12 residence?
13     A.  Wrestling practice.
14     Q.  Do you teach -- coach wrestling?
15     A.  Yes.
16     Q.  And you were off duty, then?
17     A.  Yes.
18     Q.  And do you remember what time it was?
19     A.  Approximately -- it was in the evening.
20     Q.  Well, what time was your wrestling practice?
21     A.  I believe the wrestling for the younger kids
22 was 6:00 to 7:00 that night. So it would have been
23 probably a little after 7:00 -- or actually, I might
24 have received the call prior to 7:00.
25     Q.  Okay. Who called you?

KIRK CHAPMAN - November 23, 2010                    Page 29
Direct Examination by Mr. Gosman

1  A.  Dispatch.
2  Q.  And was it Marissa Torczon?
3  A.  I don't recall.
4  Q.  How long did it take you to get down to the
5  police station?
6  A.  After I left wrestling practice.
7  Q.  Did you complete wrestling practice or did
8  you just leave right then?
9  A.  No.  They called back a second time and asked
10  me to come in.
11  Q.  Okay.  So what happened the first time?
12  A.  The first time was just I was made aware of
13  the situation that there was a warrant getting signed
14  and that they would call when the warrant was signed
15  and were ready to meet.
16  Q.  So at the time that you first heard about
17  this, the warrant hadn't even been signed?
18  A.  At this time, I'm not exactly sure.
19  Q.  But anyway, you had a call from somebody who
20  said the warrant was being signed and that you'd be
21  called back?
22  A.  Yes.
23  Q.  All right.  And did you understand that other
24  members of the Powell Police Department were going to
25  be involved in this warrant service at that time?

KIRK CHAPMAN - November 23, 2010                    Page 31
Direct Examination by Mr. Gosman

1  A.  Yes.
2  Q.  What did you -- who did you speak to?
3  A.  I'm not exactly sure.
4  Q.  What did you talk about?
5  A.  How their day was going.
6  Q.  Was there any discussion about the warrant
7  service?
8  A.  When I first arrived, no.
9  Q.  When did you first hear about the warrant
10  service?
11  A.  When we were downstairs in the classroom.
12  Q.  And was the entire team assembled at that
13  point?
14  A.  At that time, we were prepping.
15  Q.  Yes.  Okay.  Was the team there?
16  A.  Most everybody was there.
17  Q.  What do you mean by prepping?
18  A.  We were going over the layout, the situation,
19  the information that we had at the time.  Then we were
20  talking about how we would approach, how we'd execute
21  the search warrant, countermeasures to that if certain
22  things weren't done.
23  Q.  Well, let's just stop there.
24  Countermeasures, what kind of countermeasures did you
25  discuss?

KIRK CHAPMAN - November 23, 2010                    Page 30
Direct Examination by Mr. Gosman

1  A.  I was assuming.
2  Q.  Okay.  And the second call occurred about how
3  much later?
4  A.  Probably within 15, 20 minutes.
5  Q.  Okay.  Was that after 7:00, then?
6  A.  I believe so.
7  Q.  And did you go immediately to the police
8  station?
9  A.  I went home, where I then changed over, and
10  then responded back to the police department.
11  Q.  Okay.  And did you arrive around 7:30?
12  MS. WESTBY: Object --
13  THE WITNESS: I'm not sure --
14  MS. WESTBY: -- to the form of the question.
15  Go ahead.
16  BY MR. GOSMAN:
17  Q.  You're not sure?
18  A.  Not exactly sure what my arrival time was.
19  Q.  When you arrived, who was there?
20  A.  Officer Miner, Sergeant Chretien,
21  Sergeant Kent, Officer Hall, Officer McCaslin.
22  Q.  Did others arrive after you arrived?
23  A.  I believe so.
24  Q.  And did you speak to any of these officers
25  when you first arrived?

KIRK CHAPMAN - November 23, 2010                    Page 32
Direct Examination by Mr. Gosman

1  A.  Well, we talked about all the incidents on
2  the information that we had at the time.
3  Q.  And what was that information?
4  A.  We had information that the individuals in
5  the house were paranoid, window peekers, extremely
6  emotional, up and down as far as their emotions, and
7  that there were loaded weapons in the house, drugs.
8  Information that drugs were being sent through the
9  mail.
10  Q.  Is that it, as best you remember?
11  A.  As best I remember.
12  Q.  All right.  Did you discuss whether or not it
13  was appropriate to ask Bret Wachsmuth's father, Tom
14  Wachsmuth, to participate in any way in calling his son
15  out of the house?
16  A.  I believe it was mentioned.
17  Q.  Okay.  What was mentioned?
18  A.  If we should contact Tom Wachsmuth.
19  Q.  Was it sort of a vote, or what was the deal?
20  A.  It wasn't a vote.
21  Q.  Okay.  How was it discussed and how did it
22  end up?
23  A.  I believe an officer had mentioned, you know,
24  if Tom Wachsmuth was informed about this, and he
25  wasn't, and the reasons why he wasn't.

KIRK CHAPMAN - November 23, 2010                    Page 33
Direct Examination by Mr. Gosman

1    Q.   Okay.  So one of the officers raised the
2  question about why Tom Wachsmuth hadn't been notified?
3    A.   Correct.
4    Q.   Do you know which officer that was?
5    A.   No.
6    Q.   Do you know which officer responded?
7    A.   No, I don't.
8    Q.   Was there any other discussion in your
9  presence about Bret Wachsmuth?
10   A.   I'm sorry?
11   Q.   Was there any other discussion in your
12 presence about Bret Wachsmuth, and I'm referring
13 specifically to further information regarding his
14 depression or his -- or something that would have added
15 information about what was taking place that night?
16   A.   About his erratic behavior, and how he's
17 paranoid, carries a loaded handgun with him.
18   Q.   Carries a loaded handgun with him?
19   A.   (Witness nods head.)
20   Q.   When -- I'm sorry, when he's alone?
21   A.   When he's at home.
22   Q.   You heard that he carried a loaded handgun
23 with him when he was at home?
24   A.   Yes.
25   Q.   Who told you that?

KIRK CHAPMAN - November 23, 2010                    Page 34
Direct Examination by Mr. Gosman

1    A.   That was the information we had from the CI.
2    Q.   From the CI.  You didn't talk to the CI,
3  though, right?
4    A.   Correct.
5    Q.   Well, as a matter of fact, the only
6  person that apparently talked -- well, actually,
7  Jonathan Davis talked to him.  And Lt. Patterson talked
8  to him.  Did you know that, Lt. Patterson from the Park
9  County Sheriff's Office?
10   A.   I believe it was mentioned at that time, yes.
11   Q.   Okay.  Other than that, Chad Miner was the
12 only person who communicated with the CI, correct?
13   A.   At that time, yes.
14   Q.   At that time.  Did somebody else communicate
15 with him later?
16   A.   I'm not exactly sure who communicated with
17 him.
18   Q.   All right.  In any event, that would be
19 pretty important information, if someone were carrying
20 a gun around with them in the house; would you agree
21 with that?
22   A.   Yes.
23   Q.   And you would certainly expect that to show
24 up in one of the reports or somewhere if that
25 information had, in fact, been conveyed by a

KIRK CHAPMAN - November 23, 2010                    Page 35
Direct Examination by Mr. Gosman

1  confidential informant?
2            MR. THOMPSON: Objection as to the form.
3            MS. WESTBY: Join.
4  BY MR. GOSMAN:
5    Q.   You can answer that question, sir.
6            THE WITNESS: What was the question?
7  BY MR. GOSMAN:
8    Q.   That would certainly be information you would
9  expect to see in the documentation of the
10 communications with the confidential informant?
11           MR. THOMPSON: Objection as to form.
12           MS. WESTBY: Join.
13           THE WITNESS: Is that a statement?
14 BY MR. GOSMAN:
15   Q.   Yes, it's a question.
16   A.   It's a question, okay.  I would think that
17 that was imperative information.
18   Q.   Do you remember hearing anything else?
19       This is contributions from the other officers
20 there at the police department.
21   A.   Well, we went over everything that the CI had
22 related to Officer Miner and talked about basically the
23 urgency in it and in officer safety.
24   Q.   Okay.  What was the urgency?
25   A.   The urgency was that there was a lot of drugs

KIRK CHAPMAN - November 23, 2010                    Page 36
Direct Examination by Mr. Gosman

1  coming in and out of that house and that there was
2  drugs being sent through the mail, and that these
3  people are unstable.
4    Q.   Do you know how long Officer Miner had known
5  the confidential informant?
6    A.   No.
7    Q.   Do you know how reliable the confidential
8  informant was?
9    A.   No.
10   Q.   Have you ever met the confidential informant?
11   A.   No.
12   Q.   You haven't had any dealings with him
13 professionally?
14   A.   I'm not sure.
15   Q.   All right.  Okay.  So -- and we've already
16 talked about the officer safety issues, correct?
17   A.   Correct.
18   Q.   Is there anything we haven't talked about in
19 connection with the officer safety issues that was
20 discussed that evening?
21           MS. WESTBY: Object to the form of the
22 question.
23           MR. THOMPSON: Join.
24           THE WITNESS: No.
25

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 12 of 77
Tricia Wachsmuth v.                                                                 **Kirk Chapman**
City of Powell, et al.                                                            **November 23, 2010**

1  BY MR. GOSMAN:
2      Q.  All right.  So how long did the meeting take?
3      A.  Not exactly sure how long we were down there.
4  I believe it was probably longer than 30 minutes.
5      Q.  All right.  Let's go ahead and have you take
6  a look at Exhibit 10.  It's in the notebook there in
7  front of you.
8              (Exhibit 10 identified)
9  BY MR. GOSMAN:
10     Q.  And while you're getting to that, do you know
11  Marissa Torczon?
12     A.  Yes.
13     Q.  Did you see her there that night?
14     A.  Yes.
15     Q.  Did you understand that she was keeping a
16  record of the discussions about the entry plan and the
17  warrant service?
18     A.  Yes.
19         MR. THOMPSON: Objection as to form.
20         Go ahead.
21         THE WITNESS: Yes.
22  BY MR. GOSMAN:
23     Q.  I'll represent to you that Exhibit 10 is that
24  record.
25         Would you take a look at the list there on

1  the left-hand column and let me know if, in fact, you
2  were assigned the entry team that night.
3         MS. WESTBY: Object to the form of the
4  question.  Misstates the testimony and evidence.
5         MR. THOMPSON: Join.
6         THE WITNESS: It has my name there and it
7  says entry.
8  BY MR. GOSMAN:
9      Q.  Okay.  And were you assigned as part of the
10  entry team?
11     A.  That night I was.
12     Q.  All right.  Was there any discussion held in
13  your presence about who should participate on the entry
14  team?
15     A.  Yes, that was part of the prep.
16     Q.  All right.  And what was -- do you remember
17  what factors were considered in selecting the entry
18  team?
19     A.  I don't know what the factors were.
20     Q.  All right.  My question really is this: Had
21  the entry team already been selected when you arrived?
22     A.  No.
23     Q.  Did they ask you if you wanted to be on the
24  entry team?
25         Did Sergeant Chretien, for instance, ask you

1  if you wanted to be on the entry team?
2      A.  I believe the positions were already -- they
3  were assigned as we were sitting down there on the
4  prep.
5      Q.  All right.  So there wasn't really any
6  discussion about who wants to serve where and who feels
7  like they would best -- be in the best position to,
8  say, deploy the flashbang device?
9      A.  Correct.  There was no discussion as far as
10  who fits what role better.
11     Q.  All right.  You were assigned the position on
12  the entry team, and that was without any feedback from
13  you, correct?
14     A.  Correct.
15     Q.  Did you understand that this was a
16  knock-and-announce warrant?
17     A.  Yes.
18     Q.  What does a knock-and-announce warrant mean
19  to you, Officer?
20     A.  It means you knock on the door, state your
21  presence, what you were there for.
22     Q.  Okay.  Then what?
23     A.  Give them a reasonable amount of time.  If no
24  contact is made, then that's when entry would be made.
25     Q.  What's a reasonable amount of time?

1      A.  Reasonable amount of time is subjective to
2  the situation at hand.
3      Q.  Is there any minimum, as far as you know?
4      A.  No.
5      Q.  Well, you were on that door that night,
6  correct?
7      A.  Correct.
8      Q.  And you knocked on the door?
9      A.  Correct.
10     Q.  And you announced, "Police, search warrant"?
11     A.  I did.
12     Q.  All right.  Let me back up for just a second.
13         Did you see Tricia Wachsmuth before you
14  knocked on the door?
15     A.  Would I be able to recognize her prior to
16  that?
17     Q.  No.  Let me put it this way: Did you see
18  someone in the house sitting on the couch as you
19  approached the front door?
20     A.  Yes.
21     Q.  And what was that person doing?
22     A.  Sitting on the couch.
23     Q.  Was she looking -- he or she looking out the
24  window?
25     A.  When we started up to the house, the dog

Tricia Wachsmuth v.
City of Powell, et al.

Kirk Chapman
November 23, 2010

KIRK CHAPMAN - November 23, 2010                                    Page 41
Direct Examination by Mr. Gosman

1  alerted to our presence. And then I saw a female reach
2  back, grab the dog, pull the shades back.
3     Q.  Where were you when that happened?
4     A.  On the front stoop.
5     Q.  How far was she away from the door?
6     A.  Estimate from that window to the front door,
7  probably six feet.
8     Q.  Okay. You saw her in the window. Was this
9  before you knocked?
10    A.  Yes.
11    Q.  And you -- did you then immediately knock on
12 the door?
13    A.  Yes.
14    Q.  And you announced -- what were your words?
15    A.  "Powell Police Department. We have a search
16 warrant."
17    Q.  Okay. And what happened next?
18    A.  There was a delay of about five to six
19 seconds and then the door was breached.
20    Q.  And where was -- did you go in the house
21 first?
22    A.  I was the first one in.
23    Q.  Where was Tricia Wachsmuth?
24    A.  She was standing facing towards the kitchen
25 about three feet from the couch headed towards the

KIRK CHAPMAN - November 23, 2010                                    Page 42
Direct Examination by Mr. Gosman

1  kitchen.
2     Q.  She was, what, now, I'm sorry? She was
3  standing about thee feet from the kitchen?
4     A.  She was standing three feet from the couch,
5  approximately three feet from he couch, and she was
6  heading towards the kitchen.
7     Q.  Okay. All right. So what did you do?
8     A.  At that time, I had my weapon when I entered
9  the house, ordered her down.
10    Q.  Uh-huh.
11    A.  At that point, I slung my rifle, took ahold
12 of her left arm and directed her to the couch, where
13 she was sat back down and told not to move.
14    Q.  Had the other officers entered the room at
15 this time?
16    A.  I'm not sure. I'm assuming yes.
17    Q.  Well, they were right behind you, correct?
18    A.  It's a dynamic entry, yes.
19    Q.  And did you have your rifle in the cover
20 position, as you entered the house?
21    A.  When I entered the house, I was at the ready.
22    Q.  All right. Ready is like this?
23    A.  Ready is --
24    Q.  Describe it. I'm sorry.
25    A.  Ready is when the rifle -- butt stocks in the

KIRK CHAPMAN - November 23, 2010                                    Page 43
Direct Examination by Mr. Gosman

1  pocket of the shoulder, weapon is raised, and you're
2  basically searching in front of you. You don't have
3  the sites fixed on anything.
4     Q.  But the weapon is raised in the area where
5  you're looking?
6     A.  Correct.
7     Q.  And did you tell me that you slung your
8  weapon --
9     A.  Yes.
10    Q.  -- before you took control of Mrs. Wachsmuth?
11       MS. WESTBY: Object to the form of the
12 question.
13       MR. THOMPSON: Join.
14 BY MR. GOSMAN:
15    Q.  Is that correct?
16    A.  Correct.
17    Q.  And you then grabbed her by the hand?
18    A.  Her left arm.
19    Q.  Her left arm. And you -- did you sit her
20 back down on the couch?
21    A.  Yes.
22    Q.  And I assume that during the period of time
23 that it took you to sling your weapon and take hold of
24 her arm and put her back on the couch that the entire
25 entry team had made it into the house. Wouldn't that

KIRK CHAPMAN - November 23, 2010                                    Page 44
Direct Examination by Mr. Gosman

1  be a fair assumption?
2     MS. WESTBY: Object to the form of the
3  question.
4     Go ahead if you know.
5     MR. THOMPSON: Join.
6     THE WITNESS: I believe that it would be safe
7  to say that the rest of the team was either through the
8  doorway or making entry at that point.
9  BY MR. GOSMAN:
10    Q.  What did you do after you sat Ms. Wachsmuth
11 down?
12    A.  Told her not to move.
13    Q.  What did she say?
14    A.  She didn't say anything.
15    Q.  Was she compliant?
16    A.  I believe so.
17    Q.  All right. Then what did you do after you
18 told her to sit down?
19    A.  And I resumed my role as the clearing officer
20 and retained my rifle again and entered further into
21 the house.
22    Q.  Behind everybody else?
23    A.  No.
24    Q.  Had everybody else sort of stopped there at
25 the -- inside the front door waiting for you to resume

1  your position in clearing the house?
2  A.  I don't know what they did.  My reaction was
3  so quick that -- and I didn't want them bottlenecked in
4  the entryway.  So it was a pretty quick movement
5  through the house --
6  Q.  Okay.
7  A.  -- for me.
8  Q.  This was after you got Tricia sat back down?
9  A.  Correct.
10  Q.  Did you turn her over to another officer?
11  A.  That would --
12      MS. WESTBY: Object to the form of the
13  question.  Go ahead.
14      MR. THOMPSON: Join.
15      THE WITNESS: When she was told not to move,
16  then I was assuming that the last officers through the
17  door, whoever was going to be taking that sector on
18  that side of the room, would take over.
19  BY MR. GOSMAN:
20  Q.  So you left her alone.  You turned around and
21  left her then --
22      MS. WESTBY: Object --
23      MR. GOSMAN: -- assuming that somebody was
24  going to take control of her?
25      MS. WESTBY: Object to the form of the

1  question.
2      THE WITNESS: She was not left alone, if
3  that's what you're implying.
4  BY MR. GOSMAN:
5  Q.  Well, there was no officer that was
6  specifically there controlling her?
7  A.  There was no specific officer assigned to
8  controlling her.
9  Q.  Well, of course -- well let me ask you this:
10  When you do a dynamic entry and you find a suspect, you
11  want to keep control of them, right, and you don't want
12  to just let them go sitting somewhere in the house by
13  themselves?
14  A.  And that's not what happened.
15  Q.  No.  But on the other hand, you did turn away
16  from her and leave her before she was handed off to
17  another officer --
18      MS. WESTBY: Object to the form of the
19  question.
20      MR. THOMPSON: Join.
21  BY MR. GOSMAN:
22  Q.  -- correct?
23  A.  She was not specifically handed over to a
24  specific officer.
25  Q.  No, because you just turned and after you sat

1  her down in the house and told her not to move on the
2  couch and told her not to move, you turned away from
3  her and began your clearing operations?
4  A.  Correct.
5      MS. WESTBY: Object to the form of the
6  question.
7      Go ahead.
8  BY MR. GOSMAN:
9  Q.  So, where did you go first?
10      Let me back up for a second and ask:  When
11  you say you began clearing operations, again, I assume
12  you got your rifle off your shoulder?
13  A.  Off my shoulder, right.
14  Q.  Well, it was on the sling.  You had a sling
15  over your shoulder, didn't you?
16  A.  I had it slung in front of me.
17  Q.  All right.  I see.  And so was it across your
18  chest?
19  A.  Yes.
20  Q.  All right.  And so you grabbed the rifle
21  again and you brought it to the ready position and you
22  continued searching the house?
23  A.  Correct.
24  Q.  Were the other officers holding their long
25  rifles in the ready position as they entered the house

1  and began clearing operations?
2  A.  I don't know what the other officers were
3  doing.  They were all trained to be holding them at the
4  ready position, or at the alert when entering into any
5  type of room where there's unknown suspects.
6  Q.  All right.  Did you see any other officers in
7  the house when you resumed the clearing operation?
8  A.  Yes.
9  Q.  Who did you see?
10  A.  I believe I saw Officer Danzer and
11  Officer Hall off to my left.
12  Q.  Okay.  What were they doing?
13  A.  They were clearing as well.
14  Q.  Okay.  And where did you go?
15  A.  I started through the living room and headed
16  towards the kitchen.
17  Q.  You were in the living room, correct?
18  A.  Correct.  So I went through the remainder of
19  the living room and headed towards the kitchen.
20  Q.  Took the few steps that it took to get
21  through the living room and into the kitchen.
22      Was there anything left to do in the living
23  room after you saw Tricia Wachsmuth, as you say,
24  three feet from the couch?
25      MS. WESTBY: Object to the form of the

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 15 of 77
Tricia Wachsmuth v.                                                                                          Kirk Chapman
City of Powell, et al.                                                                                   November 23, 2010

1   question.
2         THE WITNESS: We I, there's corners that you
3   have to clear, there's obstacles that you have to clear
4   behind couches.
5   BY MR. GOSMAN:
6     Q. Did you do that?
7     A. Yes.
8     Q. I mean, did you actually go look behind any
9   of the furniture in the room?
10    A. Yes.
11    Q. And then you went into the kitchen?
12    A. No. I paused at the edge of the living room
13  because there was a hallway with three doors coming off
14  of it, one into the bathroom and one off of each room.
15    Q. All right. You paused there, and what did
16  you do?
17    A. Waited for the rest of the officers to clear
18  that area before moving further into the house.
19    Q. Okay. And so then you went into the kitchen?
20    A. Yes.
21    Q. All right. You saw the officers had cleared
22  the three rooms before you went into the kitchen?
23    A. It was stated that they were cleared.
24    Q. All right. And who stated it?
25    A. Officer Danzer and Officer Hall.

1     Q. Okay. Were they the ones that cleared those
2   three rooms, as far as you know?
3     A. As far as I know.
4     Q. All right. Where was everybody else?
5     A. They were filing and taking over different
6   positions so other officers could move up.
7     Q. Did you all go into the house one after
8   another; isn't that the purpose of a dynamic entry?
9     A. There's only so many officers that you can
10  get through a doorway.
11    Q. Well, single file, you can do it all day
12  long, right?
13    A. Correct.
14    Q. And so did the officers from the entry team
15  all go into the house immediately after the door was
16  breached?
17    A. I believe so.
18        MR. THOMPSON: Object to the form of the
19  question.
20  BY MR. GOSMAN:
21    Q. And you say Hall and Danzer. What happened
22  to the other three men on the entry team?
23    A. I believe they were somewhere behind me.
24    Q. Well, you grabbed Tricia Wachsmuth, you took
25  your gun off -- from the ready position, you've

1   strapped it around the front of your chest and you sat
2   her down. And that had to take a few seconds, correct?
3         MS. WESTBY: Object to the form of the
4   question.
5         MR. THOMPSON: Join.
6         THE WITNESS: Probably took about less than a
7   few seconds, because I don't have to strap it to my
8   chest. It was already slung across my chest. All I
9   have to do is take it off my shoulder.
10  BY MR. GOSMAN:
11    Q. And in that timeframe, you didn't see any
12  other officers entering the house?
13        MS. WESTBY: Object to the form of the
14  question.
15        MR. THOMPSON: Join.
16        THE WITNESS: No.
17  BY MR. GOSMAN:
18    Q. You did not.
19        And as you began clearing the rest of the
20  living room, checking behind the furniture, et cetera,
21  you didn't see any of the other officers enter the
22  house?
23    A. No, I didn't. I believe they were already in
24  the living room by that time.
25    Q. Well, they would have been in the living room

1   with you, correct?
2     A. Correct.
3     Q. And that room is, what, about 120 square
4   feet?
5     A. I'm not sure of the dimensions.
6     Q. All right. It's not very big, is it?
7     A. It's not very big, no.
8         MS. WESTBY: Will you please let him finish
9   his answer before you talk over him?
10        MR. GOSMAN: Sorry, I will.
11  BY MR. GOSMAN:
12    Q. And so you believe the officers were in the
13  living room with you, but you didn't see them. Is that
14  your testimony?
15    A. I did see Officer Danzer and Officer Hall off
16  to my left.
17    Q. Right. And there were three other officers
18  involved in the entry team?
19    A. That would have been behind me, one probably
20  covering the door that we breached. So there would
21  have been two others that would have had to take up
22  positions with inside the living room.
23    Q. Oh, so one of the officers is assigned to
24  cover the door that you've entered?
25    A. In a dynamic entry, yes.

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 16 of 77
Tricia Wachsmuth v.
City of Powell, et al.
Kirk Chapman
November 23, 2010

KIRK CHAPMAN - November 23, 2010                          Page 53
Direct Examination by Mr. Gosman

1   Q. That would have been Officer Miner?
2   A. I'm not sure.
3   Q. Well, he was the one that breached the door.
4   Isn't the door breacher the one that goes in last?
5   A. Usually.
6   Q. All right.
7   A. But I'm not sure what position he was in when
8   he entered the house.
9   Q. Okay. Did you go into the kitchen alone?
10  A. No.
11  Q. Who was with you?
12  A. Officer Danzer.
13  Q. And where was Officer Hall?
14  A. I believe he was holding position in between
15  the two rooms in the hallway.
16  Q. Okay. And did you see any other officers in
17  the house at that time?
18  A. I saw once Officer Danzer and I made way into
19  the kitchen, we posted up on a door, and at that time I
20  saw Sergeant Eckerdt with Mrs. Wachsmuth. And I saw
21  Sergeant Chretien in the living room.
22      Officer Danzer was in the kitchen next to the
23  unlocked back door to the basement, the basement entry
24  door. And Officer Hall was back by that hallway.
25  Q. When you stacked up on the door, you were

KIRK CHAPMAN - November 23, 2010                          Page 54
Direct Examination by Mr. Gosman

1   Number 1. Who was behind you?
2   A. That would have been Officer Miner.
3   Q. He --
4   A. Are we talking prior to entry in the house?
5   Q. Yes. Do you know who was behind him?
6   A. No.
7   Q. All right. Let's go ahead and take one of
8   those sheets of paper there, and I'm going to have you
9   draw the inside of the house, and we're going to go
10  forward to the time that you have cleared the kitchen.
11  And I want you to show me where the officers were that
12  you remember.
13  A. (Witness complies.)
14  Q. And, Officer, if you could go ahead and
15  identify each of these persons that you've placed on
16  the map, who was who.
17  A. Sergeant Roy Eckerdt, Number 10.
18      That would have been Sergeant Chretien,
19  Number 6.
20  Q. Can you put six and Chretien off to the side,
21  outside the diagram.
22  A. (Witness complies.)
23  Q. Oh, these are their police officer numbers?
24  A. Uh-huh.
25  Q. PO number. Okay.

KIRK CHAPMAN - November 23, 2010                          Page 55
Direct Examination by Mr. Gosman

1       And Eckerdt is 10.
2       Who is that last person?
3   A. Danzer.
4   Q. Danzer, okay. And where were you, again?
5   A. Right here by the back door.
6   Q. Oh, yes, right. Okay.
7       All right. Did you see from that position --
8   well, let's back up for just a second.
9       Is Tricia Wachsmuth sitting on the couch at
10  this time?
11  A. Suspect.
12  Q. Suspect. That's fine.
13      All right. And did you see Sergeant Chretien
14  at any point come into the room and speak to Tricia
15  Wachsmuth?
16  A. Did I see that? No.
17  Q. You did not see that?
18  A. I did not see it.
19  Q. What were you -- what were you doing, that --
20  we understand that Sergeant Chretien came into the
21  living room shortly after this timeframe that you have
22  diagrammed here and began speaking to Tricia Wachsmuth.
23      What did you do that prevented you from
24  seeing that?
25  A. Well, I was focused on the entry door to the

KIRK CHAPMAN - November 23, 2010                          Page 56
Direct Examination by Mr. Gosman

1   basement.
2   Q. Entry door to the basement.
3   A. So I didn't see anyone speaking .
4   Q. Did you go down the stairs with
5   Officer Chretien and Tricia Wachsmuth?
6   A. I went downstairs with Officer Danzer and
7   myself, and the suspect opened the door, turned on the
8   light and started down the stairs and stated that,
9   "See, there's no one else down here."
10  Q. Huh. Okay. So she just got up from the
11  couch, came over and turned on the light and said,
12  "See, there's nobody else down here." Is that your
13  testimony?
14  A. That's my testimony.
15  Q. All right. Thank you.
16      Did anybody point a gun at her while she got
17  up and just walked over to the door like that?
18  A. No.
19  Q. And you didn't hear Chretien say, Get up and
20  you're going downstairs first?
21      MR. THOMPSON: Objection as to the form.
22      MS. WESTBY: And I join. Go ahead.
23      THE WITNESS: I heard Sergeant Chretien ask
24  the suspect if there was anyone else in the house, to
25  which I heard her say, "There's no one else in the

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 17 of 77
Tricia Wachsmuth v.                                                              Kirk Chapman
City of Powell, et al.                                                      November 23, 2010

1  house."
2        At that time, I relayed to the other officers
3  that the basement door was unlocked, which we had
4  information that if the door was unlocked, that there
5  is probably somebody down there --
6  BY MR. GOSMAN:
7    Q.  That --
8    A.  -- because that room is not unlocked.
9        MS. WESTBY: You need to let him finish his
10 answer.
11       MR. GOSMAN: Yeah, I do.  And I'm sorry.
12       THE WITNESS: And then I heard
13 Sergeant Chretien ask her again if there was anyone in
14 the house or downstairs.  I did not hear her answer at
15 that time.
16       And at that point, is when I saw her walk in
17 front of Officer Danzer and myself, open up the
18 basement door, turn on the light, and she walked --
19 started to go down the stairs.
20 BY MR. GOSMAN:
21   Q.  Okay.  And you all just followed her down the
22 stairs?
23   A.  We're not going to let her go into a room
24 that we haven't cleared.
25   Q.  Well, I assume, then, by your saying that,

1  that you mean, yes.
2    A.  Yes.
3    Q.  You just followed her down the stairs?
4    A.  Correct.
5    Q.  All right.  I want to go back and see some of
6  this, and take it one step at a time here.
7        MR. GOSMAN: Can we go back up?
8        THE REPORTER: Can we go off the record,
9  then?
10       MR. GOSMAN: Yes.
11           (Discussion held off the
12           record.)
13 BY MR. GOSMAN:
14   Q.  Okay.  So what information, Officer, did you
15 have that if the door was unlocked, somebody was
16 probably down there?
17   A.  That would have been the information that was
18 relayed in the prep prior to the service of the
19 warrant.  It was stated that from the CI to Officer
20 Miner that if the base -- the door to the basement has
21 a hasp and lock on it, and that that room is not
22 unlocked unless there's usually somebody down there
23 because of the paranoid situation of the subjects.
24   Q.  Okay.  All right.  And I assume, again, if
25 that information either is or isn't in the reports that

1  Miner filed.  You're the first officer to mention that,
2  I will say that in all rights.
3        Were you the one that tried the door to the
4  basement?
5    A.  We could see that the hasp and the paddle
6  lock were not on.
7    Q.  Who is we?
8    A.  Officer Danzer and myself.
9    Q.  Did you communicate this to Officer Chretien?
10   A.  Yes.
11   Q.  So it's your testimony that you said to
12 Officer Chretien, oh, by the way, the door is unlocked
13 to the basement?
14       MR. THOMPSON: Objection as to the form.
15       MS. WESTBY: Join.
16       MR. THOMPSON: Misstates his testimony.
17       THE WITNESS: The form would have been
18 verbal, and it would have been the basement door is
19 unsecure.
20 BY MR. GOSMAN:
21   Q.  And did Officer Chretien understand what that
22 meant?
23       MR. THOMPSON: Objection as to form.
24       MS. WESTBY: Join.
25       THE WITNESS: Did he understand?  I'm not

1  sure what his mental capacity was at that time.
2  BY MR. GOSMAN:
3    Q.  Okay.  And I'm not sure what it was either.
4  But we'll pass on that.
5        Let me ask this question:  Was Officer
6  Chretien aware, as far as you know, that if the door
7  was unlocked to the basement, that there was probably
8  someone down there?
9    A.  I believe since --
10       MR. THOMPSON: Hold on for a second.
11 Objection as to the form.
12       Go ahead.
13       THE WITNESS: Since it was relayed in the
14 prep prior to that, that that information was passed
15 on.
16 BY MR. GOSMAN:
17   Q.  Did you see that Officer Chretien was present
18 when that information was passed on?
19   A.  Yes.
20   Q.  And was it directed to the entire group?
21   A.  Yes.
22   Q.  So Officer Chretien, then, was aware when
23 Tricia Wachsmuth led you all downstairs, that you were
24 going into an uncleared room where there was probably a
25 paranoid suspect who was armed?

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 18 of 77
Tricia Wachsmuth v.                                                    Kirk Chapman
City of Powell, et al.                                                November 23, 2010

KIRK CHAPMAN - November 23, 2010                      Page 61
Direct Examination by Mr. Gosman

1    MR. THOMPSON: Objection as to the form.
2    MS. WESTBY: Object to the form of the
3  question.
4  BY MR. GOSMAN:
5    Q.  I mean, that certainly is a realistic
6  scenario, isn't it?
7    MR. THOMPSON: Objection as to form.
8    MS. WESTBY: Objection to the form of
9  question, argumentative, harassing.
10  BY MR. GOSMAN:
11    Q.  Give it your best shot.
12    A.  Well, you're going to have to repeat that.
13    Q.  Okay.  Based on what you've told me about
14  this information being disseminated in the meeting and
15  Officer Chretien being present, he was probably aware
16  that Tricia Wachsmuth was leading the officers into an
17  unsecured area with a paranoid suspect, correct?
18    MR. THOMPSON: Objection as to form. Calls
19  for speculation.
20    MS. WESTBY: And completely misstates the
21  testimony and the evidence.
22  BY MR. GOSMAN:
23    Q.  Be that as it may.
24    A.  I believe that Sergeant Chretien, in asking
25  if there was anyone else in the house or downstairs,

KIRK CHAPMAN - November 23, 2010                      Page 62
Direct Examination by Mr. Gosman

1  was looking for some type of truthfulness from
2  Ms. Wachsmuth.
3    I did not hear her answer his question, but
4  as soon as he asked the question, I did not hear the
5  answer, then I saw Tricia Wachsmuth walk between
6  Officer Danzer and myself, open up the door, turn on
7  the light, and turn around and say, "There is no one
8  else down there."
9    Q.  Okay.  Who went downstairs?
10    MS. WESTBY: Object to the form of the
11  question.
12  BY MR. GOSMAN:
13    Q.  And I mean we know that Tricia Wachsmuth went
14  first, right?
15    A.  She led the way down about four steps and she
16  stopped and paused.  And at that time, Officer Danzer
17  and myself went around her.  And we cleared the
18  remainder of the downstairs portion.
19    Q.  All right.  Well, that wasn't my question at
20  all, but thanks for that.
21    What I wanted to know is who was with you
22  when you went down the stairs, Officer.
23    A.  Officer Danzer was in front of me.
24    Q.  Yes.
25    A.  Tricia Wachsmuth was in front of him.

KIRK CHAPMAN - November 23, 2010                      Page 63
Direct Examination by Mr. Gosman

1    Q.  We know that.
2    A.  I was behind Officer Danzer.  And when she
3  stopped halfway down the stairs, that's when
4  Officer Danzer and I went around her and continued the
5  clearing and search of the basement.
6    Q.  So you just left her alone on the stairs
7  again?
8    MR. THOMPSON: Objection as to form.
9    MS. WESTBY: Join.
10  BY MR. GOSMAN:
11    Q.  Well, you went around her and just left her
12  there and cleared the basement --
13    MS. WESTBY: And, again, please, be
14  professional.
15  BY MR. GOSMAN:
16    Q.  Is that your testimony?
17    MS. WESTBY: Object to the form of the
18  question and your behavior.
19    Go ahead.
20    THE WITNESS: What was the question?
21  BY MR. GOSMAN:
22    Q.  You left her alone on the stairs to finish
23  clearing the basement -- or to clear the basement,
24  correct?
25    MR. THOMPSON: Objection as to form.

KIRK CHAPMAN - November 23, 2010                      Page 64
Direct Examination by Mr. Gosman

1    MS. WESTBY: Join.
2    THE WITNESS: Yes, I left her there on the
3  stairs so I could go continue clearing the basement.
4  BY MR. GOSMAN:
5    Q.  Had Tricia Wachsmuth been handcuffed at that
6  time?
7    A.  Unaware.
8    Q.  Okay.
9    A.  When she was going down the stairs, no,
10  because she opened the door and turned the light on.
11    Q.  Yeah.  All right.  Take a look at Exhibit 10
12  again for a second.
13    Do you see the statement there under
14  knock-and-announce, "everyone gets cuffed"?
15    A.  Yeah, right there.
16    Q.  That's sort of standard procedure, isn't it,
17  in a dynamic entry?
18    MS. WESTBY: Object to the form of the
19  question.
20    MR. THOMPSON: Join.
21    MS. WESTBY: Go ahead.
22    THE WITNESS: Is it standard procedure?
23  BY MR. GOSMAN:
24    Q.  Yes, to secure the suspects.
25    A.  In what standard procedure are you going off

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 19 of 77
Tricia Wachsmuth v.                                                                        **Kirk Chapman**
City of Powell, et al.                                                                      **November 23, 2010**

1 of?

2 Q. I'm talking about SWAT dynamic entry,

3 anything that involves a dangerous situation where

4 you're there with extra body armor, long guns,

5 diversion devices and you've got a suspect that you've

6 taken control of in the house --

7 MS. WESTBY: Objection --

8 BY MR. GOSMAN:

9 Q. -- and this is a suspect.

10 A. I cannot testify to what other department's

11 standard procedures are.

12 Q. Okay. That's fine.

13 Well, in any event, it appears from

14 Exhibit 10 that everyone was to be cuffed, correct?

15 MS. WESTBY: Object to the form of the

16 question. You're asking him to speculate about what's

17 on this document --

18 MR. GOSMAN: It's written there.

19 MS. WESTBY: -- that he didn't prepare.

20 MR. GOSMAN: Only one person can compare.

21 MS. WESTBY: Object to the form of the

22 question.

23 THE WITNESS: I believe that Tricia Wachsmuth

24 was cuffed. And I believe under any circumstances, it

25 doesn't specify when they are cuffed.

1 BY MR. GOSMAN:

2 Q. All right. You didn't cuff her when you came

3 in the house and first took control of her?

4 A. I did not.

5 MS. WESTBY: Object to the form of the

6 question.

7 MR. GOSMAN: And Eckerdt didn't cuff her when

8 he took control of her?

9 MS. WESTBY: Object to the form of the

10 question.

11 MR. THOMPSON: Join.

12 THE WITNESS: And I cannot testify to what

13 Sergeant Eckerdt did or did not do.

14 BY MR. GOSMAN:

15 Q. Even though you know she wasn't cuffed when

16 she went down the stairs?

17 A. Correct.

18 Q. You didn't make any effort to stop her when

19 she went between you and Danzer to go down the stairs?

20 A. Well, it happened so quick that we were kind

21 of -- well, I was, anyway, I was taken aback.

22 Q. You're a professional there to execute a

23 search warrant in a dynamic entry and you allow the

24 suspect to walk past you and go down the stairs, and

25 you're so taken aback that you didn't have time to

1 react; is that your testimony?

2 MS. WESTBY: Object to the form of the

3 question. Argumentative, harassing.

4 MR. THOMPSON: Join.

5 MS. WESTBY: And, honestly, you know, I mean,

6 you need to --

7 THE WITNESS: Very tense, rapidly evolving,

8 and, yes, she walked right in front of us, opened up

9 the door. It was a split second and she was heading

10 down the stairs.

11 BY MR. GOSMAN:

12 Q. Okay.

13 A. With no time to react.

14 Q. Well, and a few minutes ago, I asked the

15 question -- I don't think I got an answer to it, maybe

16 I did, but the question was: Who else was with you on

17 the stairs besides Tricia, whom we know went first, and

18 you and Officer Danzer?

19 A. Well, I can only attest to who was in front

20 of me, so those would be the officers.

21 Q. You can only attest to those who were in

22 front of you?

23 A. Yes, because I do not have eyes in the back

24 of my head.

25 Q. Well, you went around Tricia Wachsmuth. Did

1 you look back up the stairs or make any effort to see

2 who was there to take over?

3 MS. WESTBY: Object to the form of the

4 question -- just a second. Object to the form of the

5 question. Honestly, it's absolutely ridiculous.

6 MR. GOSMAN: Yeah, it is ridiculous.

7 MS. WESTBY: And I think the Court would be

8 horrified at your behavior.

9 MR. GOSMAN: Just leave off with the --

10 MS. WESTBY: Please be professional. Please

11 be professional and --

12 MR. GOSMAN: -- allocution, okay.

13 MS. WESTBY: Go ahead.

14 THE WITNESS: Okay. I believe that my threat

15 was more attained to what was down in the basement, if

16 there was a threat. Everything else upstairs had

17 already been cleared.

18 So at that point -- and I knew that there was

19 other officers up there in the house, in the kitchen --

20 there was no reason for me to pause and look behind me

21 when what was not cleared was in front of me.

22 BY MR. GOSMAN:

23 Q. Did you and Officer Danzer clear the basement

24 alone?

25 A. Yes.

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 20 of 77
Tricia Wachsmuth v.                                                    Kirk Chapman
City of Powell, et al.                                              November 23, 2010

1  Q. All right. Draw me a picture of the bottom
2  of the stairs and the basement.
3      Yeah, we'll leave it right on that exhibit.
4  A. (Witness complies.)
5  Q. All right. Was there a wall on the
6  right-hand side of those stairs going down them?
7  A. Was there a wall on the right-hand side going
8  down them?
9  Q. Yes.
10  A. Yes.
11  Q. All right. Draw that in.
12  A. (Witness complies.)
13  Q. And there's a little square there at the
14  bottom of the stairs. Is that a landing?
15  A. Yes.
16  Q. All right. And was the stairway open so that
17  you could see into the basement from the -- what would
18  be the left-hand side of the stairwell going down the
19  stairs?
20  A. Yes, there was. Where the ceiling and the
21  stairs came down, that was open.
22  Q. All right. Did you go around the perimeter
23  of the basement when you went down there with Danzer?
24  A. Yes.
25  Q. How long did that take?

1  hole, you saw Officer Miner in the basement?
2  A. Yes.
3  Q. Did you see Chretien?
4  A. Not at that time. It might have been --
5  Officer Chretien might have been there when I came out
6  of the other side.
7  Q. Okay. So Officer Chretien might have been
8  there when you got out of the other side.
9      Where was Officer Chretien if he was there?
10  A. He would have been right here in the room.
11  Q. Okay. Go ahead and put Chretien there and
12  Miner.
13  A. And of course we still had --
14  Q. Danzer.
15  A. (Witness complies.)
16  Q. And let's make it clear that the view that
17  you've given me with these officers is the view that
18  you acquired when you came out of the cubby hole or the
19  crawl space, correct?
20  A. I'm not exactly sure if Sergeant Chretien was
21  down here at that point or not.
22  Q. I want to be clear about one thing. Did you
23  hear Officer Chretien say she's going first?
24  A. No, I didn't.
25  Q. Did you ever hear Officer Chretien apologize

1  A. As far as clearing this area right here?
2  Q. Uh-huh.
3  A. Not very long. Probably 30 seconds.
4  Q. Okay. Did you have any idea what Tricia
5  Wachsmuth was doing in that 30 seconds?
6  A. No.
7  Q. Okay. When did you see her again?
8  A. I didn't.
9  Q. You didn't see her again?
10  A. No.
11  Q. When you got to the basement and started
12  working your way around, I assume you were on the alert
13  for any other persons who would be there, correct?
14  A. Correct.
15  Q. Did you see any of the other officers in the
16  basement?
17  A. I believe at that point I saw -- I want to
18  say it was Officer Miner that came down there.
19      At that point, we had two open cubbies going
20  to a crawl space that was up off the ground that had
21  not been cleared. I entered from this side with my
22  weapon, crawled through the cubby and crawled through
23  on my stomach all the way around and out that cubby
24  there.
25  Q. All right. And before you went in the cubby

1  for sending Tricia Wachsmuth down the stairs first?
2      MR. THOMPSON: Objection as to the form.
3      MS. WESTBY: Objection as to form, misstates
4  the testimony.
5      Go ahead.
6  BY MR. GOSMAN:
7  Q. Yes, go ahead.
8  A. No, I didn't.
9  Q. That would be thoroughly inconsistent with
10  what you just told me, wouldn't it?
11      MS. WESTBY: Object to the form of the
12  question.
13      MR. GOSMAN: Well, all right.
14      MS. WESTBY: It's not inconsistent.
15  BY MR. GOSMAN:
16  Q. Yes, well, because you saw Ms. Wachsmuth get
17  up without any prompting and pass between you before
18  you even had time to react and turn on the light and go
19  downstairs.
20      MR. THOMPSON: Counsel, would you sit down
21  instead of standing over the witness.
22      MS. WESTBY: Be professional. honest to God.
23      MR. GOSMAN: Enough.
24      MS. WESTBY: Your behavior is --
25      MR. GOSMAN: I'll go ahead and sit down and

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 21 of 77
Tricia Wachsmuth v.                                                              Kirk Chapman
City of Powell, et al.                                                        November 23, 2010

1   I'll try to keep you quiet.
2        THE WITNESS: And, again, how was that
3   inconsistent?
4   BY MR. GOSMAN:
5        Q.   Yes, well, because what I just said was
6   Chretien apologized for sending Tricia Wachsmuth down
7   the stairs first.
8        A.   And that's what you said.
9        MS. WESTBY: Object.
10  BY MR. GOSMAN:
11       Q.   Yeah, that's what I said.  And I'm saying if
12  that's true, that's inconsistent with what you said,
13  isn't it, Officer?
14       MS. WESTBY: Just a second.
15       Object to the form of the question, misstates
16  the testimony, misstates the evidence.  Go ahead.
17       THE WITNESS: I don't think anywhere in my
18  testimony where I stated that Officer Chretien
19  apologized for anything about what he did or did not
20  do.
21  BY MR. GOSMAN:
22       Q.   All right.  That's fine.
23       Okay.  Did you participate in a debriefing
24  after this incident was over?
25       A.   Yes.

1        Q.   Who was there?
2        A.   I believe everybody from the -- that was
3   present.
4        Q.   Okay.  And what was discussed?
5        A.   We were discussing as far as basically what
6   people saw from their points of advantage, how the
7   deployment of the flashbang went, how the people that
8   were on the rear perimeter, what issues they had, and
9   then the search team, how the search went.
10       Q.   Everything go A-okay?
11       A.   Well, there were some snags.  We had
12  Officer Bradley and Officer Lara and Detective Brown
13  that were snagged up in the backyard.
14       We had Officer Brilakis, who could not gain
15  entry to the backyard from the gate because it was
16  locked.
17       Q.   Was there any discussion about the flashbang?
18       A.   Flashbang, how it was deployed, somebody said
19  that a towel or something was smoldering at that time.
20  I didn't see that, though.
21       Q.   Did you hear the smoke alarm go off?
22       A.   No, I didn't.
23       Q.   Did you have anything to do with going out to
24  Tom Wachsmuth's place and picking up Bret?
25       A.   No, I didn't.

1        Q.   Were you part of the evidence gathering team?
2        A.   Yes.
3        Q.   Okay.  What role did you play in that?
4        A.   I first started out with Officer Hall in Room
5   Number 2.  I designate it as Room Number 2, which would
6   have been the guest room.  He was searching and I was
7   documenting at that time.  And then when somebody would
8   come in and take pictures -- pictures were taken --
9   then the evidence was collected.
10       Had another officer take over for there so I
11  could assist Officer Miner in Room Number 1, which I
12  designate as the master room or the main bedroom.
13       And basically still maintain the same role as
14  far as documenting what was found, where it was found,
15  and assuring that pictures were taken prior to
16  collecting.
17       Q.   Did you find any drugs in the upstairs, in
18  the master bedroom?
19       A.   Yes.
20       Q.   What did you find?
21       A.   Found remnants of hash, found prescription
22  bottles not associated with anyone that lived in the
23  residence, marijuana stems, other drug paraphernalia,
24  pipes with residue.
25       Q.   Did you find prescription bottles with

1   prescription medication in them from someone other than
2   persons who were at the residence?
3        A.   No, just empty bottles with other people's
4   names on them.
5        Q.   Were they logged into evidence?
6        A.   Yes, they were.
7        Q.   All right.  Let's turn to that exhibit for a
8   second.  Let's go to Exhibit 23.
9             (Exhibit 23 identified)
10  BY MR. GOSMAN:
11       Q.   Now, you're talking about in the master
12  bedroom, right?
13       A.   Correct.
14       Q.   So northeast bedroom.  That would be the
15  master bedroom; is that correct?
16       A.   Correct.
17       Q.   Okay.  So let's see.  There is one pill
18  bottle -- let's see.  Where did I see that?
19       All right.  Pill bottle, Tom Wachsmuth, next
20  to TV.  Do you know what that pill bottle was?
21       A.   I believe it was oxycodone.
22       Q.   Oxycodone.  And it had Tom Wachsmuth's name
23  on it?
24       A.   Correct.
25       Q.   Okay.  And did you ever find out what that

1   was about?

2      A.  I never did, no.

3      Q.  Okay.  I think I'm done with you, Officer.

4   Thank you very much for coming here today.

5      A.  All right.  Would you like my diagram?

6      Q.  Yes, I would.

7      A.  Would you like me to sign it?

8      Q.  I would like you to go ahead and put the

9   names of the officers in the basement there next to

10  their officers' numbers.  And you do not need to sign

11  it.

12                  (Proceedings concluded 2:53

13                  p.m., November 23, 2010)

14

15

16

17

18

19

20

21

22

23

24

25

1                  DEPONENT'S CERTIFICATE

2           I, KIRK CHAPMAN, do hereby certify, under

3   penalty of perjury, that I have read the foregoing

4   transcript of my testimony consisting of 77 pages,

5   taken on November 23, 2010 and that the same is, with

6   any changes noted below, a full, true and correct

7   record of my deposition.

8   PAGE  LINE       CORRECTION        REASON FOR CORRECTION

9   ____  ____  _____  _____

10  ____  ____  _____  _____

11  ____  ____  _____  _____

12  ____  ____  _____  _____

13  ____  ____  _____  _____

14  ____  ____  _____  _____

15  ____  ____  _____  _____

16  ____  ____  _____  _____

17  ____  ____  _____  _____

18  ____  ____  _____  _____

19  ____  ____  _____  _____

20  ____  ____  _____  _____

21  ____  ____  _____  _____

22

23

24                            _____
                                 KIRK CHAPMAN    Date
25

1                       CERTIFICATE

2           I, VONNI R. BRAY, Registered Professional

3   Reporter, and Notary Public for the State of Montana,

4   do hereby certify that KIRK CHAPMAN was by me first

5   duly sworn to testify to the truth, the whole truth,

6   and nothing but the truth;

7           That the foregoing transcript, consisting of

8   78 pages, is a true record of the testimony given by

9   said deponent, together with all other proceedings

10  herein contained.

11          IN WITNESS WHEREOF, I have hereunto set my

12  hand this 11th day of December, 2010.

13

14

15

16

17

18

19

20

21         _____
           Vonni R. Bray, RPR
22         P. O. Box 125
           Laurel, MT 59044
23         (406) 670-9533 Cell
           (888) 277-9372 Fax
24         vonni.bray@yahoo.com

25

Tricia Wachsmuth v.
City of Powell, et al.

Kirk Chapman
November 23, 2010

**1**

**1 (2)**
54:1;75:11
**10 (7)**
37:6,8,23;54:17;55:1;
64:11;65:14
**120 (1)**
52:3
**15 (2)**
6:23;30:4
**1992 (1)**
6:6

**2**

**2 (2)**
75:5,5
**2:53 (1)**
77:12
**20 (1)**
30:4
**2000 (1)**
9:6
**2003 (1)**
7:3
**2004 (1)**
7:2
**2005 (1)**
11:10
**2007 (3)**
6:23;11:14;23:23
**2009 (12)**
14:10,10,12,13,24;
15:6,21;18:16;20:2,4;
21:5,9
**2010 (1)**
77:13
**23 (3)**
76:8,9;77:13
**24th (2)**
15:21;28:10
**250 (1)**
5:6

**3**

**30 (3)**
37:4;70:3,5
**31 (2)**
10:22,25

**5**

**59 (2)**
18:24;19:1

**6**

**6 (1)**
54:19
**6:00 (1)**

**7**

**7:00 (4)**
28:22,23,24;30:5
**7:30 (1)**
30:11

**8**

**82435 (1)**
5:6

**9**

**98 (1)**
7:2

**A**

**aback (2)**
66:21,25
**able (3)**
5:12;28:1;40:15
**Absaroka (1)**
18:15
**absolutely (1)**
68:5
**access (1)**
27:18
**accused (1)**
5:19
**acquired (1)**
71:18
**across (2)**
47:17;51:8
**action (4)**
8:6;17:1,2;25:23
**actions (1)**
26:18
**Active (2)**
14:7;15:14
**actually (5)**
26:1,9;28:23;34:6;
49:8
**added (1)**
33:14
**additional (1)**
15:1
**address (2)**
5:4,5
**advantage (1)**
74:6
**afternoon (1)**
5:14
**again (14)**
14:23;22:20;44:20;
47:11,21;55:4;57:13;
58:24;63:7,13;64:12;
70:7,9;73:2
**against (2)**
5:23;7:25

**28:22**

**agency (1)**
15:25
**ago (3)**
9:3;27:8;67:14
**agree (2)**
4:18;34:20
**ahead (6)**
4:7,24;10:24;14:20;
15:4;18:23;20:22;30:15;
37:5,20;44:4;45:13;
47:7;54:7,14,56:22;
60:12;63:19;64:21;
68:13;71:11;72:5,7,25;
73:16;77:8
**ahold (1)**
42:11
**Air (2)**
9:11,12
**alarm (1)**
74:21
**alarms (1)**
12:10
**alcohol (1)**
19:21
**alert (2)**
48:4;70:12
**alerted (1)**
41:1
**alive (1)**
24:18
**allocution (1)**
68:12
**allow (1)**
66:23
**alone (7)**
33:20;45:20;46:2;
53:9;63:6,22;68:24
**along (3)**
8:2;12:8;23:15
**although (1)**
26:22
**amount (3)**
39:23,25;40:1
**announced (2)**
40:10;41:14
**answered (1)**
4:23
**Antiterrorism (5)**
10:3,5,8,16,19
**A-okay (1)**
74:10
**apologize (1)**
71:25
**apologized (2)**
73:6,19
**apparently (1)**
34:6
**appears (1)**
65:13
**Appleton (1)**
8:11
**approach (1)**
31:20

**approached (1)**
40:19
**appropriate (1)**
32:13
**approximately (4)**
7:16,21;28:19;42:5
**area (7)**
7:6;14:2,25;43:4;
49:18;61:17;70:1
**areas (2)**
16:21;28:7
**argumentative (2)**
61:9;67:3
**arm (4)**
42:12;43:18,19,24
**armed (1)**
60:25
**armor (2)**
23:14;65:4
**around (12)**
30:11;34:20;45:20;
51:1;62:7,17;63:4,11;
67:25;69:22;70:12,23
**arrested (1)**
5:16
**arrival (1)**
30:18
**arrive (2)**
30:11,22
**arrived (6)**
12:18;30:19,22,25;
31:8;38:21
**assembled (2)**
21:20;31:12
**assigned (2)**
26:10;38:2.9;39:3,11;
46:7;52:23
**assist (1)**
75:11
**associated (2)**
9:22;75:22
**associate's (1)**
7:10
**assume (6)**
24:4;43:22;47:11;
57:25;58:24;70:12
**assuming (4)**
30:1;42:16;45:16,23
**assumption (1)**
44:1
**assuring (1)**
75:15
**attained (1)**
68:15
**attest (2)**
67:19,21
**attorneys (1)**
4:14
**aware (7)**
8:15,18;18:1;29:12;
60:6,22;61:15
**away (3)**
41:5;46:15;47:2

**B**

**bachelor (1)**
7:8
**back (23)**
11:6,7;13:9;14:2;29:9,
21;30:10;40:12;41:2,2;
42:13;43:20,24;45:8;
47:10;53:23,24;55:5,8;
58:5,7;67:23;68:1
**background (1)**
6:3
**backyard (2)**
74:13,15
**barricaded (2)**
20:5;23:24
**base (1)**
58:20
**Based (1)**
61:13
**basement (25)**
53:23,23;56:1,2;57:3,
18;58:20;59:4,13,18;
60:7;63:5,12,23,23;64:3;
68:15,23;69:2,17,23;
70:11,16;71:1;77:9
**basically (4)**
35:22;43:2;74:5;75:13
**bathroom (1)**
49:14
**battering (8)**
18:7;19:6,15,24;21:3;
23:15;24:25;25:12
**became (1)**
24:16
**bedroom (5)**
75:12,18;76:12.14,15
**began (3)**
47:3,11;48:1;51:19;
55:22
**beginning (1)**
26:11
**behavior (4)**
33:16;63:18;68:8;
72:24
**behind (14)**
19:4;27:20,24;42:17;
44:22;49:4.8;50:23;
51:20;52:19;54:1,5;
63:2;68:20
**besides (1)**
67:17
**best (5)**
32:10,11;39:7,7;61:11
**better (1)**
39:10
**big (2)**
52:6,7
**body (2)**
23:14;65:4
**both (1)**
21:4

bottle (3)
  76:18.19,20
bottlenecked (1)
  45:3
bottles (3)
  75:22,25;76:3
bottom (2)
  69:1,14
Bradley (1)
  74:12
branch (2)
  6:12;9:14
breached (4)
  41:19;50:16;52:20;
  53:3
breacher (1)
  53:4
breachers (1)
  17:12
breaches (1)
  23:8
breaching (3)
  9:9;17:10,14
break (5)
  4:20,21,24;5:1;23:5
Bret (4)
  32:13;33:9,12;74:24
Brian (1)
  5:3
Brilakis (1)
  74:14
brought (1)
  47:21
Brown (1)
  74:12
buildings (3)
  15:15,15;27:18
burglary (1)
  12:10
butt (1)
  42:25

C

call (4)
  28:24;29:14,19;30:2
called (7)
  14:6;24:5,7,10;28:25;
  29:9,21
calling (1)
  32:14
Calls (1)
  61:18
came (12)
  8:12;11:14.14:2;24:9,
  11;55:20;56:11;66:2;
  69:21;70:18;71:5.18
can (7)
  4:24;5:4;11:2;19:8,11,
  14,15;23:6;35:5;50:9,
  11;54:20;58:7,8;65:20;
  67:19,21
capacities (1)

6:20
capacity (1)
  60:1
car (1)
  24:12
carried (1)
  33:22
carries (2)
  33:17,18
carrying (1)
  34:19
cause (1)
  21:2
ceiling (1)
  69:20
certain (2)
  15:7;31:21
certainly (3)
  34:23;35:8;61:5
certificate (1)
  10:15
certifications (4)
  10:10,12;16:22,23
certified (4)
  10:13,14,21;  6:20
cetera (1)
  51:20
Chad (1)
  34:11
changed (1)
  30:9
CHAPMAN (2)
  4:1;5:3
charges (1)
  8:5
checking (1)
  51:20
chest (4)
  47:18;51:1,8,8
Chretien (31)
  21:15;28:6;30:20;
  38:25;53:21;54:18,20;
  55:13,20;56:5,19,23;
  57:13;59:9,12 21;60:6,
  17,22:61:15,24 71:3,5,7,
  9,11,20,23,25 73:6,18
CI (6)
  34:1,2,2,12;35:21;
  58:19
cigarette (1)
  24:12
circumstances (4)
  8:15,19;19:17 65:24
City (1)
  12:13
claims (1)
  7:25
clarification (2)
  4:17;20:9
Clark (1)
  5:6
classes (1)
  10:11

classified (1)
  5:17
classroom (1)
  31:11
clear (8)
  21:2;49:3,3,17;63:23;
  68:23;71:16,22
cleared (10)
  49:21,23;50:1;54:10;
  57:24;62:17;63:12;
  68:17,21;70:21
clearing (19)
  9:8;11:21;12:10,22;
  16:11;17:4;22:11;44:19;
  45:1;47:3,11;48:1,7,13;
  51:19;63:5,23;64:3;70:1
coach (1)
  28:14
Cody (1)
  14:2
collected (1)
  75:9
collecting (1)
  75:16
column (1)
  38:1
coming (5)
  8:22;24:6;36:1;49:13;
  77:4
communicate (2)
  34:14;59:9
communicated (2)
  34:12,16
communications (1)
  35:10
compare (1)
  65:20
complete (1)
  29:7
completed (1)
  14:14
completely (1)
  61:20
compliant (1)
  44:15
complies (5)
  54:13,22;69:4,12;
  71:15
concerning (1)
  12:18
concluded (1)
  77:12
confidential (5)
  35:1,10;36:5,7,10
connection (3)
  8:6;12:19;36:19
considered (1)
  38:17
contact (2)
  32:18;39:24
context (1)
  16:24
continue (1)

64:3
continued (2)
  47:22;63:4
contributions (1)
  35:19
control (5)
  43:10;45:24;46:11;
  65:6;66:3,8
controlling (2)
  46:6,8
conveyed (1)
  34:25
corners (1)
  49:2
Corps (6)
  6:13,17;9:14,17,18;
  18:3
corrections (1)
  7:14
couch (12)
  40:18,22;41:25;42:4,
  5,12;43:20,24;47:2;
  48:24;55:9;56:11
couches (1)
  49:4
Counsel (1)
  72:20
Countermeasures (4)
  14:3;31:21,24,24
County (2)
  7:14;34:9
couple (7)
  4:7;7:3;8:11;15:19;
  18:12;26:16;27:8
course (5)
  4:11;11:9;17:3;46:9;
  71:13
Court (1)
  68:7
cover (2)
  42:19;52:24
covering (1)
  52:20
crawl (2)
  70:20;71:19
crawled (2)
  70:22,22
crime (2)
  5:17,19
Criminal (2)
  7:7,9
cubbies (1)
  70:19
cubby (4)
  70:22,23,25;71:18
cuff (2)
  66:2,7
cuffed (5)
  64:14;65:14,24,25;
  66:15
currently (1)
  5:7

64:3

D

dangerous (1)
  65:3
Danzer (22)
  48:10;49:25;50:21;
  52:15;53:12,18,22;55:3,
  4;56:6;57:17;59:8;62:6,
  16,23;63:2,4;66:19;
  67:18;68:23;69:23;
  71:14
date (2)
  20:3;23:3
dates (2)
  26:12,16
Davis (1)
  34:7
day (2)
  31:5;50:11
deal (1)
  32:19
dealings (1)
  36:12
debriefing (1)
  73:23
degree (5)
  7:4,6,9,10,12
delay (1)
  41:18
Department (24)
  6:22;7:1,19,24;8:9,14,
  16,18,20,23;11:12;12:5,
  19;14:16;15:10;16:3,11,
  15;17:20;23:12;29:24;
  30:10;35:20;41:15
department's (1)
  65:10
deploy (1)
  39:8
Deployed (3)
  18:12;22:9;74:18
deployment (2)
  23:14;74:7
deposition (1)
  4:5
depositions (1)
  4:8
depression (1)
  33:14
describe (2)
  6:2;42:24
described (3)
  12:12,15;26:3
designate (2)
  75:5.12
Detective (1)
  74:12
device (4)
  23:15;25:1,13;39:8
devices (3)
  17:13,16;65:5
diagram (2)

Tricia Wachsmuth v.
City of Powell, et al.

54:21;77:5
**diagrammed (1)**
  55:22
**different (4)**
  7:3,13;9:20;50:5
**dimensions (1)**
  52:5
**DIRECT (2)**
  4:3,14
**directed (2)**
  42:12;60:20
**discharged (1)**
  6:14
**discuss (2)**
  31:25;32:12
**discussed (3)**
  32:21;36:20;74:4
**discussing (1)**
  74:5
**discussion (8)**
  31:6;33:8,11;38:12;
  39:6,9;58:11;74:17
**discussions (1)**
  37:16
**dishonesty (1)**
  5:20
**Dispatch (1)**
  29:1
**disseminated (1)**
  61:14
**diversion (1)**
  65:5
**diversionary (1)**
  25:12
**document (2)**
  18:22;65:17
**documentation (1)**
  35:9
**documented (3)**
  15:23;17:24;24:19
**documenting (2)**
  75:7,14
**documents (1)**
  19:13
**dog (2)**
  40:25;41:2
**done (5)**
  15:14;17:7,22;31:22;
  77:3
**door (45)**
  17:11,17,18;18:12;
  20:5,17,20;23:8;39:20;
  40:5,8,14,19;41:5,6,12,
  19;44:25;45:17;50:15;
  52:20,24;53:3,4,19,23,
  24,25;55:5,25;56:2,7,17;
  57:3,4,18;58:15,20;59:3,
  12,18;60:6;62:6;64:10;
  67:9
**doors (2)**
  12:10;49:13
**doorway (2)**
  44:8;50:10

**Doug (1)**
  13:25
**down (46)**
  17:11,20;29 4;32:6;
  37:3;39:3;42:9,13;
  43:20;44:11,18;45:8;
  47:1;51:2;56:4,8,9,12;
  57:5,19,21;58:3,16,22;
  60:8;62:8,15,22;63:3;
  64:9;66:16,1 ,24;67:10;
  68:15;69:6,8,18,21,23;
  70:18;71:21;72:1,20,25;
  73:6
**downstairs (9)**
  31:11;56:6,29;57:14;
  60:23;61:25;62:9,18;
  72:19
**draw (3)**
  54:9;69:1,11
**drawn (1)**
  22:14
**drills (1)**
  15:14
**drinking (4)**
  19:22,23;21:11;22:3
**drug (1)**
  75:23
**drugs (5)**
  32:7,8;35:25:36:2;
  75:17
**due (1)**
  7:23
**duly (1)**
  4:2
**during (3)**
  4:21;13:4;43:22
**duty (1)**
  28:16
**dynamic (26)**
  9:8;11:17,19;12:16,
  22;13:15,21:14;15;15:1,
  2,11;16:21;17 6;7;19:6;
  24:23;25:11,22;27:6;
  42:18;46:10:50:8;52:25;
  64:17;65:2;66 23

**E**

**Eckerdt (9)**
  13:8,9,15;28:3;53:20;
  54:17;55:1;66:7,13
**edge (1)**
  49:12
**educational (1)**
  6:2
**effort (3)**
  27:22;66:18;68:1
**either (4)**
  23:7;44:7;58::5;60:3
**elements (1)**
  25:22
**else (16)**
  13:19;22:7;24 22;

34:14;35:18;44:22,24;
  50:4;56:9,12,24,25;
  61:25;62:8;67:16;68:16
**Emergency (4)**
  16:7,25;25:24;27:3
**emotional (1)**
  32:6
**emotions (1)**
  32:6
**employed (1)**
  18:7
**empty (1)**
  76:3
**EMS (1)**
  27:9
**end (2)**
  26:11;32:22
**ended (1)**
  24:6
**enforcement (4)**
  6:17,18,20;12:7
**Enough (1)**
  72:23
**enter (1)**
  51:21
**entered (9)**
  42:8,14,20,21;44:20;
  47:25;52:24;53:8;70:21
**entering (2)**
  48:4;51:12
**entire (3)**
  31:12;43:24;60:20
**entrance (1)**
  19:24
**entries (5)**
  9:9;11:19;17:7;26:2;
  27:6
**entry (44)**
  11:17;12:17,22;13:16,
  22;14:15;15:1,2,11;
  16:21;17:6;19:6;23:13;
  24:23;25:11,22;37:16;
  38:2,7,10,13,17,21,24;
  39:1,12,24;42:18;43:25;
  44:8;46:10;50:8,14,22;
  52:18,25;53:23;54:4;
  55:25;56:2;64:17;65:2;
  66:23;74:15
**entryway (1)**
  45:4
**equipment (1)**
  17:10
**erratic (1)**
  33:16
**escape (1)**
  26:12
**Estimate (1)**
  41:6
**et (1)**
  51:20
**even (3)**
  29:17;66:15;72:18
**evening (2)**

28:19;36:20
**event (2)**
  34:18;65:13
**events (3)**
  5:13;15:17;27:21
**everybody (5)**
  31:16;44:22,24;50:4;
  74:2
**everyone (2)**
  64:14;65:14
**evidence (8)**
  19:18,19;38:4;61:21;
  73:16;75:1,9;76:5
**evolving (1)**
  67:7
**exactly (9)**
  17:9;20:3,24;29:18;
  30:18;31:3;34:16;37:3;
  71:20
**EXAMINATION (1)**
  4:3
**execute (2)**
  31:20;66:22
**exercises (1)**
  15:10
**Exhibit (13)**
  10:22,25;18:24;19:1;
  37:6,8,23;64:11;65:14;
  69:3;76:7,8,9
**expect (2)**
  34:23;35:9
**explain (2)**
  12:2;16:4
**extra (3)**
  22:2;23:14;65:4
**extremely (1)**
  32:5
**eyes (1)**
  67:23

**F**

**facing (1)**
  41:24
**fact (4)**
  23:13;34:5,25;38:1
**factors (2)**
  38:17,19
**fair (1)**
  44:1
**fairly (1)**
  21:2
**far (15)**
  9:25;11:18;12:9,22;
  27:4;32:6;39:9;40:3;
  41:5;50:2,3;60:6;70:1;
  74:5;75:14
**father (1)**
  32:13
**February (5)**
  15:21;20:2;21:5,9;
  28:10
**feedback (1)**

39:12
**feels (2)**
  39:6
**feet (7)**
  41:7,25;42:3,4,5;
  48:24;52:4
**felony (1)**
  5:17
**female (1)**
  41:1
**few (5)**
  9:20;48:20;51:2,7;
  67:14
**field (7)**
  10:18;12:3,7,12,20;
  14:14,25
**file (1)**
  50:11
**filed (1)**
  59:1
**filing (1)**
  50:5
**find (7)**
  11:2;23:6;46:10;
  75:17,20,25;76:25
**fine (3)**
  55:12;65:12;73:22
**finish (4)**
  23:5;52:8;57:9;63:22
**firearms (1)**
  13:18
**first (24)**
  4:2;19:9,11;22:21,21;
  28:10;29:11,12,16;
  30:25;31:8,9;41:21,22;
  47:9;56:20;59:1;62:14;
  66:3;67:17;71:23;72:1;
  73:7;75:4
**fits (1)**
  39:10
**five (1)**
  41:18
**fixed (1)**
  43:3
**flashbang (7)**
  22:9;23:14;25:1;39:8;
  74:7,17,18
**flee (1)**
  24:12
**focused (1)**
  55:25
**followed (2)**
  57:21;58:3
**following (1)**
  14:25
**follows (1)**
  4:2
**Force (5)**
  9:11,12;10:8,16,19
**forgive (1)**
  26:23
**form (49)**
  14:17;15:3;21:22;

23:17;25:6,14;26:4;
30:14;35:2,11;36:21;
37:19;38:3;43:11;44:2;
45:12,25;46:18;47:5;
48:25;50:18;51:3,13;
56:21;59:14,17,23;
60:11;61:1,2,7,8,18;
62:10:63 8,17,25;64:18;
65:15,21;66:5.9;67:2;
68:3,4;72:2,3,11;73:15
**forth (1)**
13:9
**forward (1)**
54:10
**found (4)**
75:14,14,21,21
**four (3)**
7:16,21;62:15
**frankly (1)**
19:8
**free (1)**
4:20
**front (16)**
19:5;37:7;40:19;41:4,
6;43:2;44:25;47:16;
51:1;57:17;62:23,25;
67:8,19,22;68:21
**FTO (5)**
11:18,25;12:2,3,22
**full (1)**
5:2
**functioned (2)**
26:10;27:1
**furniture (2)**
49:9;51:20
**further (3)**
33:13;44:20;49:18

**G**

**gain (2)**
19:24;74:14
**gate (1)**
74:15
**gathered (1)**
26:9
**gathering (1)**
75:1
**gear (1)**
22:2
**gets (1)**
64:14
**given (2)**
4:5;71:17
**God (1)**
72:22
**goes (1)**
53:4
**good (1)**
19:10
**GOSMAN (71)**
4:4;11:3;14:21;15:8;
19:2;20:13;22:1;23:20;

24:1;25:9,19;26:8;
30:16;35:4,7,14;37:1,9,
22;38:8;43:  4;44:9;
45:19,23;46 4,21;47:8;
49:5;50:20;51:10,17;
52:10,11;57 6,11,20;
58:7,10,13;59:20;60:2,
16;61:4,10,22;62:12;
63:10,15,21 64:4,23;
65:8,18,20;66:1,7,14;
67:11;68:6,9,12,22;72:6,
13,15,23,25;  3:4,10,21;
76:10
**grab (1)**
41:2
**grabbed (3)**
43:17;47:20,50:24
**Graduated (2)**
6:4;7:11
**ground (2)**
4:8;70:20
**group (3)**
10:25;19:4;60:20
**guest (1)**
75:6
**gun (3)**
34:20;50:25;56:16
**guns (1)**
65:4
**guy (2)**
23:24;24:13

**H**

**halfway (2)**
22:25;63:3
**Hall (8)**
30:21;48:11;49:25;
50:21;52:15;53:13,24;
75:4
**hallway (3)**
49:13;53:15;  4
**hand (3)**
40:2;43:17;46:15
**handcuffed (1)**
64:5
**handed (2)**
46:16,23
**handgun (4)**
23:24;33:17,18,22
**happened (8)**
25:4;28:2;29:11;41:3,
17;46:14;50:21;66:20
**harassing (2)**
61:9;67:3
**hash (1)**
75:21
**hasp (2)**
58:21;59:5
**head (3)**
4:15;33:19;67:24
**headed (3)**
41:25;48:15,19

**heading (2)**
42:6;67:9
**hear (8)**
31:9;56:19;57:14;
62:3,4;71:23,25;74:21
**heard (5)**
29:16;33:22;56:23,25;
57:12
**hearing (1)**
35:18
**held (2)**
38:12;58:11
**hiding (1)**
22:17
**high (7)**
6:3,4,7;8:10;26:13;
27:2,9
**hold (3)**
7:8;43:23;60:10
**holding (3)**
47:24;48:3;53:14
**hole (2)**
71:1,18
**home (5)**
24:2,5;30:9;33:21,23
**honest (1)**
72:22
**honestly (2)**
67:5;68:5
**Honorably (1)**
6:15
**horrified (1)**
68:8
**house (39)**
19:25;22:12;24:5;
32:5,7,15;34:20;36:1;
40:18,25;41:20;42:9,20,
21;43:25;44:21;45:1,5;
46:12;47:1,22,25;48:7;
49:18;50:7,15;51:12,22;
53:8,17;54:4,9;56:24;
57:1,14;61:25;65:6;
66:3;68:19
**Huh (1)**
56:10

**I**

**idea (1)**
70:4
**identified (4)**
10:22;19:1;37:8;76:9
**identify (1)**
54:15
**Immediate (3)**
17:1,2;25:23
**immediately (3)**
30:7;41:11;50:15
**impair (1)**
5:8
**imperative (1)**
35:17
**implying (1)**

46:3
**important (2)**
4:16;34:19
**incident (5)**
19:3;22:20;23:24;
24:19;73:24
**incidents (3)**
19:10;20:10;32:1
**included (1)**
25:12
**inconsistent (4)**
72:9;14:73:3,12
**individual (1)**
24:6
**individuals (1)**
32:4
**informant (5)**
35:1,10;36:5,8,10
**information (19)**
31:19;32:2,3,4,8;
33:13,15;34:1,19,25;
35:8,17;57:4;58:14,17,
25;60:14,18;61:14
**informed (1)**
32:24
**inside (3)**
44:25;52:22;54:9
**instance (1)**
38:25
**instead (1)**
72:21
**Institute (1)**
14:3
**instructor (6)**
10:9,13,14;12:24;
13:18;16:17
**instructors (2)**
16:19;28:7
**Interdiction (1)**
16:7
**interested (1)**
27:14
**internal (3)**
9:22,23;10:1
**into (26)**
6:9;17:6;19:24;22:12;
24:2,4;43:25;44:20;
48:4,21;49:11,14,18,19,
22;50:7,15;53:9,18;
55:14,20;57:23;60:24;
61:16;69:17;76:5
**involve (3)**
7:25;17:3;23:7
**involved (10)**
9:10,15,16;13:15;
17:4,13;18:19;19:5;
29:25;52:18
**involves (1)**
65:3
**involving (2)**
5:20;25:11
**issues (4)**
7:23;36:16,19;74:8

46:3

**J**

**January (1)**
6:23
**job (1)**
8:9
**jobs (1)**
7:13
**join (26)**
6:21;14:19;15:5;
21:24;23:19;25:8,16;
26:6;35:3,12;36:23;
38:5;43:13;44:5;45:14;
46:20;51:5,15;56:22;
59:15,24;63:9;64:1,20;
66:11;67:4
**joined (1)**
6:25
**joint (1)**
15:25
**Jonathan (1)**
34:7
**judgment (1)**
5:8
**justice (2)**
7:7,9

**K**

**keep (2)**
46:11;73:1
**keeping (1)**
37:15
**Kent (3)**
13:10,15;30:21
**Kevin (1)**
16:18
**kids (3)**
20:5;22:17;28:21
**kind (7)**
9:7;13:9;15:18;17:16;
27:21;31:24;66:20
**KIRK (1)**
4:1
**kitchen (15)**
41:24;42:1,3,6;48:16,
19,21;49:11,19,22;53:9,
19,22;54:10;68:19
**knew (1)**
68:18
**knock (2)**
39:20;41:11
**knock-and-announce (3)**
39:16,18;64:14
**knocked (3)**
20:17;40:8,14;41:9
**knowledge (1)**
13:20
**known (1)**
36:4

## L

**landing (1)**
69:14
**Lara (4)**
13:8,12;21:16;74:12
**last (6)**
9:4;13:25;26:12;
45:16;53:4;55:2
**later (3)**
11:7;30:3;34:15
**law (4)**
6:16,18,20;12:7
**lawsuit (1)**
5:25
**layout (1)**
31:18
**leading (1)**
61:16
**learned (1)**
28:10
**leave (7)**
7:17,22;24:21;29:8;
46:16;68:9;69:3
**leaving (3)**
8:6,15,19
**led (2)**
60:23;62:15
**left (15)**
10:18;29:6;42:12;
43:18,19;45:20,21;46:2;
48:11,22;52:16;63:6,11,
22;64:2
**left-hand (2)**
38:1;69:18
**less (1)**
51:6
**level (1)**
17:23
**light (6)**
56:8,11;57:18;62:7;
64:10;72:18
**list (1)**
37:25
**little (2)**
28:23;69:13
**lived (1)**
75:22
**living (13)**
48:15,17,19,21,22;
49:12;51:20,24,25;
52:13,22;53:21;55:21
**loaded (4)**
32:7;33:17,18,22
**lock (2)**
58:21;59:6
**locked (1)**
74:16
**logged (1)**
76:5
**long (17)**
6:10;7:15,20;9:3;10:7;
22:5;23:13;25:12;29:4;
36:4;37:2,3;47:24;
50:12;65:4;69:25;70:3
**longer (1)**
37:4
**look (8)**
10:24;19:3;37:6,25;
49:8;64:11;68:1,20
**looking (7)**
19:20,21;23:5;40:23,
23;43:5;62:1
**looks (1)**
22:24
**lost (1)**
19:18
**lot (2)**
27:16;35:25
**Lt (2)**
34:7,8

## M

**mail (2)**
32:9;36:2
**main (3)**
13:17;28:7;75:12
**Mainly (1)**
15:15
**maintain (1)**
75:13
**maintained (1)**
10:17
**major (2)**
26:13;27:8
**making (1)**
44:8
**man (2)**
14:3;24:5
**manual (1)**
12:13
**many (1)**
50:9
**map (1)**
54:16
**marijuana (1)**
75:23
**Marine (6)**
6:13,17;9:14,17,18;
18:3
**Marissa (2)**
29:2;37:11
**mark (2)**
18:24,25
**marked (1)**
18:23
**master (4)**
75:12,18;76:11,15
**matter (2)**
8:2;34:5
**may (4)**
11:4;19:18;20:25;
61:23
**maybe (1)**

**McCaslin (1)**
30:21
**mean (8)**
26:25;31:17;39:18;
49:8;58:1;61:5;62:13;
67:5
**means (1)**
39:20
**meant (1)**
59:22
**Mechanical (2)**
17:13,16
**medication (1)**
76:1
**medications (1)**
5:7
**meet (2)**
22:16;29:15
**meeting (2)**
37:2;61:14
**members (1)**
29:24
**men (1)**
50:22
**mental (1)**
60:1
**mention (1)**
59:1
**mentioned (5)**
13:12;32:16,17,23;
34:10
**met (3)**
26:1;7,36:10
**might (5)**
21:8;28:23;71:4,5,7
**military (4)**
9:1,2,15;10:18
**mindset (1)**
12:6
**mine (1)**
22:23
**Miner (12)**
30:20;34:11;35:22;
36:4;53:1;54:2;58:20;
59:1;70:18;71:1,12;
75:11
**minimum (1)**
40:3
**minutes (3)**
30:4;37:4;67:14
**misdemeanor (4)**
18:13;19:7,16;23:7
**Misstates (6)**
38:4;59:16;61:20;
72:3;73:15,16
**months (2)**
7:16,21
**more (2)**
26:23;68:15
**most (2)**
16:14;31:16
**move (6)**

**67:15**
**McCaslin (1)**
[duplicate]

**mean (8)**

**42:13;44:12;45:15;**
47:1,2;50:6
**movement (1)**
45:4
**moving (1)**
49:18
**Mrs (2)**
43:10;53:20
**much (2)**
30:3;77:4
**multiple (1)**
27:6
**myself (5)**
56:7;57:17;59:8;62:6,
17

## N

**name (4)**
5:2;16:13;38:6;76:22
**names (3)**
20:11;76:4;77:9
**necessarily (1)**
10:12
**need (4)**
4:22;57:9;67:6;77:10
**Neenah (3)**
7:18;8:16,19
**new (3)**
12:7;17:10;26:13
**next (4)**
41:17;53:22;76:19;
77:9
**night (9)**
21:14;25:4;28:9,22;
33:15;37:13;38:2,11;
40:5
**nobody (1)**
56:12
**nods (2)**
4:15;33:19
**North (2)**
5:6;18:15
**northeast (1)**
76:14
**notebook (1)**
37:6
**notified (1)**
33:2
**November (7)**
13:25;14:10,10,13,24;
21:5;77:13
**Number (7)**
54:1,17,19,25;75:5,5,
11
**numbers (2)**
54:23;77:10

## O

**oath (1)**
4:11
**Object (35)**

**14:17;15:3;21:22;**
23:17;25:6,14;26:4;
30:12;36:21;38:3;43:11;
44:2;45:12,22,25;46:18;
47:5;48:25;50:18;51:3,
13;61:2;62:10;63:17;
64:18;65:15,21;66:5,9;
67:2;68:3,4;72:11;73:9,
15
**Objection (18)**
23:16,22;35:2,11;
37:19;56:21;59:14,23;
60:11;61:1,7,8,18;63:8,
25;65:7;72:2,3
**obstacles (1)**
49:3
**obtain (2)**
7:4;10:10
**occasions (1)**
21:3
**occupied (1)**
27:19
**occur (1)**
15:17
**occurred (1)**
30:2
**October (1)**
11:10
**off (17)**
28:16;46:16;47:12,13;
48:11;49:13,14;50:25;
51:9;52:15;54:20;58:8,
11;64:25;68:9;70:20;
74:21
**offered (1)**
7:18
**Office (1)**
34:9
**Officer (81)**
4:5;7:14;11:17;12:3;
13:7,8,17;16:18;21:16;
28:6;30:20,21,21;32:23;
33:4,6;35:22,23;36:4,16,
19;39:19;44:19;45:10;
46:5,7,17,24;48:10,11;
49:25,25;52:15,15;53:1,
12,13,18,22,24;54:2,14,
23;56:5,6;57:17;58:14,
19;59:1,8,9,12,21;60:5,
17,22;61:15;62:6,16,22,
23;63:2,4;67:18;68:23;
70:18;71:1,5,7,9,23,25;
73:13,18;74:12,12,14;
75:4,10,11;77:3
**officers (35)**
12:4,7;13:1,12;14:4;
18:20;25:3,21;30:24;
33:1;35:19;42:14;45:16;
47:24;48:2,6;49:17,21;
50:6,9,14;51:12,21;
52:12,17,23;53:16;
54:11;57:2;61:16;67:20;
68:19;70:15;71:17;77:9

officers' (1)
    77:10
official (1)
    8:5
old (1)
    27:11
once (2)
    26:23;53:18
one (41)
    4:17;13:1,18;16:18;
    18:2,15,15;19:9,22;20:4,
    23,24;21:1,6,8;22:21;
    23:5,7;26:13,13,18;27:8;
    33:1;34:24;41:22;49:14,
    14;50:7;52:19,23;53:3,
    4;54:7;56:9,25;58:6;
    59:3;62:7;65:20;71:22;
    76:17
ones (5)
    19:5,12;27:11,15;50:1
only (7)
    22:24;34:5,12;50:9;
    65:20;67:19,21
open (8)
    12:10;20:8,20:57:17;
    62:6;69:16,21;70:19
opened (3)
    56:7;64:10;67:8
operation (1)
    48:7
operational (1)
    23:12
operations (4)
    22:11;47:3,11;48:1
order (3)
    5:22;23:2,3
ordered (1)
    42:9
others (2)
    30:22;52:21
otherwise (1)
    4:14
out (21)
    6:7,24;18:3,4,10,11;
    24:5,6,7,9,11;32:15;
    36:1;40:23;70:23;71:5,
    8,18;74:23;75:4;76:25
Outagamie (1)
    7:14
outside (1)
    54:21
over (19)
    11:18;17:11,20;27:12;
    30:9;31:18;35:21;45:10,
    18;46:23;47:15;50:5;
    52:9;56:11,17;68:2;
    72:21;73:24;75:10
oxycodone (2)
    76:21,22

**P**

paddle (1)

59:5
page (3)
    19:9,11;22:21
pages (1)
    19:4
paired (1)
    12:4
paper (1)
    54:8
paperwork (1)
    24:20
paranoid (5)
    32:5;33:17;58:23;
    60:25;61:17
paraphernalia (1)
    75:23
Park (1)
    34:8
part (4)
    16:2;38:9,15 75:1
participate (4)
    11:9;32:14;33:13;
    73:23
participated (1)
    15:9
participating (1)
    15:20
party (3)
    5:25;19:23;2?:3
pass (2)
    60:4;72:17
passed (2)
    60:14,18
past (1)
    66:24
Patrol (3)
    11:9;14:7;16:7
Patterson (2)
    34:7,8
pause (1)
    68:20
paused (3)
    49:12,15;62:16
PE (1)
    5:5
Pechtel (1)
    14:1
peekers (1)
    32:5
pendency (1)
    4:21
people (3)
    36:3;74:6,7
people's (1)
    76:3
perform (1)
    22:11
performance (1)
    26:2
performed (1)
    23:11
perimeter (3)
    25:3;69:22;74 8

period (1)
    43:22
person (5)
    34:6,12;40:21;55:2;
    65:20
personal (1)
    7:23
persons (3)
    54:15;70:13;76:2
pertinent (1)
    16:21
picking (1)
    74:24
picture (2)
    19:10;69:1
pictures (3)
    75:8,8,15
PIER (2)
    16:3,5
pill (3)
    76:17,19,20
pipes (1)
    75:24
place (2)
    33:15;74:24
placed (2)
    5:22;54:15
plan (1)
    37:16
planned (1)
    26:11
play (1)
    75:3
please (5)
    14:22;52:8;63:13;
    68:10,10
pm (1)
    77:13
PO (1)
    54:25
pocket (1)
    43:1
point (11)
    22:17;31:13;42:11;
    44:8;55:14;56:16;57:16;
    68:18;70:17,19;71:21
points (1)
    74:6
Police (28)
    6:22,25;7:19;8:8,14,
    16,18,19,23;11:11,17;
    12:19;14:16;15:10;16:2,
    11,14;17:19;23:12;
    25:21;29:5,24;30:7,10;
    35:20;40:10;41:15;
    54:23
policing (2)
    9:22,23
policy (1)
    12:13
portion (1)
    62:18
position (12)

7:18;39:7,11;42:20;
    45:1;47:21,25;48:4;
    50:25;53:7,14;55:7
positions (3)
    39:2;50:6;52:22
possible (2)
    20:25;23:25
POST (2)
    10:25;11:4
POST-certified (1)
    11:22
posted (1)
    53:19
Powell (21)
    5:6;6:4,21,25;8:8,14,
    18,22;11:11,17;12:14,
    19:14:15;15:9;16:2,11,
    14;23:12;25:21;29:24;
    41:15
practice (4)
    28:13,20;29:6,7
practiced (4)
    25:23;26:1:27:6,15
practicing (2)
    27:2,4
premises (1)
    17:6
prep (4)
    38:15;39:4:58:18;
    60:14
prepare (1)
    65:19
prepping (2)
    31:14,17
prescription (3)
    75:21,25;76:1
presence (5)
    33:9,12;38:13;39:21;
    41:1
present (4)
    13:19;60:17;61:15;
    74:3
pretty (3)
    19:10;34:19;45:4
prevented (1)
    55:23
primary (1)
    16:19
Prior (16)
    8:22;14:9,13,24;15:6,
    21;18:10,16;20:4;26:14;
    28:24;40:15;54:4;58:18;
    60:14;75:15
probably (12)
    28:23;30:4:37:4;41:7;
    51:6;52:19;57:5;58:16;
    60:7,24;61:15;70:3
probationary (1)
    13:4
procedure (3)
    64:16,22,25
procedures (5)
    11:21;12:10,13,23;

65:11
Proceedings (1)
    77:12
professional (5)
    63:14;66:22;68:10,11;
    72:22
professionally (1)
    36:13
program (7)
    12:2,3,4,12,20;14:4,14
project (1)
    23:4
prompting (1)
    72:17
protection (2)
    10:8,16,19;22:2
provide (1)
    20:11
provided (1)
    24:20
pull (1)
    41:2
purpose (1)
    50:8
put (6)
    14:4;40:17;43:24;
    54:20;71:11;77:8

**Q**

quick (3)
    45:3,4;66:20
quiet (1)
    73:1
quite (2)
    9:20;21:20

**R**

raised (3)
    33:1;43:1,4
rake (1)
    17:18
rakes (1)
    18:3
ram (11)
    17:17,18;18:7,12;
    19:6,15,24:21:3;23:15;
    24:25;25:12
rapidly (1)
    67:7
reach (1)
    41:1
react (4)
    27:22;67:1,13;72:18
reaction (1)
    45:2
ready (9)
    29:15;42:21,22,23,25;
    47:21,25;48:4;50:25
realistic (1)
    61:5
really (3)

25:4;38:20;39:5
**rear (1)**
  74:8
**reason (1)**
  68:20
**reasonable (3)**
  39:23,25;40:1
**reasons (1)**
  32:25
**recall (2)**
  25:17;29:3
**receive (1)**
  6:16
**received (2)**
  12:18;28:24
**recognize (1)**
  40:15
**record (4)**
  37:16,24;58:8,12
**records (2)**
  11:1,4
**reference (2)**
  18:22;23:6
**referring (2)**
  25:10;33:12
**regarding (1)**
  33:13
**related (1)**
  35:22
**relayed (3)**
  57:2;58:18;60:13
**reliable (1)**
  36:7
**remainder (2)**
  48:18;62:18
**remember (11)**
  5:13;13:11;14:6;
  15:20;16:13;28:18;
  32:10,11;35:18;38:16;
  54:12
**remnants (1)**
  75:21
**repeat (1)**
  61:12
**REPORTER (1)**
  58:8
**reports (4)**
  19:4;22:22;34:24;
  58:25
**represent (1)**
  37:23
**required (1)**
  4:11
**residence (3)**
  28:12;75:23;76:2
**residue (1)**
  75:24
**resigned (1)**
  7:23
**resistance (2)**
  22:16,19
**respond (1)**
  28:1

**responded (2)**
  30:10;33:6
**Response (5)**
  11:9;14:7;16:7;25:23;
  27:21
**responses (1)**
  12:11
**rest (3)**
  44:7;49:17;51:19
**restraining (1)**
  5:22
**resume (1)**
  44:25
**resumed (2)**
  44:19;48:7
**retained (1)**
  44:20
**review (1)**
  4:7
**ride (1)**
  12:8
**ridiculous (2)**
  68:5,6
**rifle (6)**
  42:11,19,25;-4:20;
  47:12,20
**rifles (4)**
  22:5;23:13;25:12;
  47:25
**right (87)**
  5:16;6:21;8:14;10:4,
  15,24:11;16,20;13:19;
  14:9;16:10,17;18:2,24,
  25;19:19;21:7,17;23:10;
  24:15,18,19;25:10;
  26:21;27:10,20;28:3,9;
  29:8,23;32:12;34:18;
  36:15;37:2,5,:8:12,16,
  20;39:5,11;40 12;42:7,
  17,22,44:17;46:11;
  47:13,17,20;48:6;49:15,
  21,24;50:4,12 52:6,17;
  53:6;54:7;55:5,6,7,13;
  56:15;58:5,24;o2:14,19;
  64:11,15;66:2 67:8;
  69:1,3,5,11,16 22;70:1,
  25;71:10;72:13;73:22;
  76:7,12,19;77 5
**right-hand (2)**
  69:6,7
**rights (1)**
  59:2
**role (4)**
  39:10;44:19;75:3,13
**roles (1)**
  26:10
**room (37)**
  9:8;11:21;12:9,22;
  16:11;17:3;22:11;42:14;
  45:18;48:5,15,17,19,21,
  23;49:9,12,14;51:20,24,
  25;52:3,13,22;53:21;
  55:14,21;57:8,23;58:21;

60:24;71:10;75:4,5,6,11,
12
**rooms (3)**
  49:22;50:2;53:15
**Roy (1)**
  54:17
**rules (1)**
  4:8

## S

**safe (1)**
  44:6
**safety (1)**
  35:23;36:16,19
**Same (2)**
  23:22;75:13
**sat (6)**
  17:11;42:13;44:10;
  45:8;46:25;51:1
**save (1)**
  23:4
**saw (14)**
  41:1,8;48:10,23;
  49:21;53:18,20,20;
  57:16;62:5;70:17;71:1;
  72:16;74:6
**saying (2)**
  57:25;73:11
**scenario (1)**
  61:6
**Schmidt (5)**
  13:7,13,17;16:18;28:6
**school (17)**
  6:3,4,8:7:2;8:10;
  15:15;16:24;25:23,24;
  26:14,18;27:2,9,12,14,
  22;28:4
**schools (3)**
  7:3;15:15;16:12
**search (9)**
  20:14,17;31:21;40:10;
  41:15;63:5;66:23;74:9,9
**searching (3)**
  43:2;47:22;75:6
**second (16)**
  20:23,24;21:1,6,8;
  29:9;30:2;40:12;47:10;
  55:8;60:10;64:12;67:9;
  68:4;73:14;76:8
**seconds (5)**
  41:19;51:2,7;70:3,5
**sector (1)**
  45:17
**secure (1)**
  64:24
**secured (1)**
  25:3
**security (1)**
  8:10
**seeing (2)**
  22:23;55:24
**selected (2)**

12:6;38:21
**selecting (1)**
  38:17
**send (1)**
  10:11
**sending (2)**
  72:1;73:6
**sent (2)**
  32:8;36:2
**September (1)**
  11:10
**Sergeant (20)**
  13:8,9,10;21:15;28:5,
  6;30:20,21;38:25;53:20,
  21;54:17,18;55:13,20;
  56:23;57:13;61:24;
  66:13;71:20
**serve (4)**
  10:4;19:15;22:3;39:6
**service (14)**
  6:9,10,25;17:6;18:10,
  11;21:21,23;21;28:11;
  29:25;31:7,10;37:17;
  58:18
**setting (3)**
  5:13;23:12;26:11
**settings (3)**
  26:3;27:14;28:4
**shades (1)**
  41:2
**sheaf (1)**
  19:13
**sheets (2)**
  22:20;54:8
**Sheriff's (1)**
  34:9
**Shooter (2)**
  14:7;15:14
**shootings (1)**
  27:23
**shortly (1)**
  55:21
**shot (2)**
  24:13;61:11
**shoulder (5)**
  43:1;47:12,13,15;51:9
**show (2)**
  34:23;54:11
**side (8)**
  45:18;54:20;69:6,7,
  18;70:21;71:6,8
**sign (2)**
  77:7,10
**signed (4)**
  29:13,14,17,20
**simple (1)**
  12:9
**simulating (1)**
  17:5
**single (1)**
  50:11
**sit (5)**
  17:20;43:19;44:18;

72:20,25
**sites (1)**
  43:3
**sitting (5)**
  39:3;40:18,22;46:12;
  55:9
**situation (7)**
  25:24;28:2;29:13;
  31:18;40:2;58:23;65:3
**situations (4)**
  16:25;25:11,18;27:1
**six (3)**
  41:7,18;54:20
**sling (3)**
  43:23;47:14,14
**slung (4)**
  42:11;43:7;47:16;51:8
**smoke (2)**
  24:11;74:21
**smoldering (1)**
  74:19
**snagged (1)**
  74:13
**snags (1)**
  74:11
**somebody (9)**
  8:3;29:19;34:14;
  45:23;57:5;58:15,22;
  74:18;75:7
**someone (4)**
  34:19;40:18;60:8;76:1
**somewhere (4)**
  11:1;34:24;46:12;
  50:23
**son (1)**
  32:14
**soon (1)**
  62:4
**sorry (10)**
  8:17;9:13,14,16;
  33:10,20;42:2,24;52:10;
  57:11
**sort (3)**
  32:19;44:24;64:16
**Southside (1)**
  27:11
**space (2)**
  70:20;71:19
**speak (3)**
  30:24;31:2;55:14
**speaking (2)**
  55:22;56:3
**specific (8)**
  13:22;14:15;15:2,11;
  17:5;25:10;46:7,24
**specifically (4)**
  13:11;33:13;46:6,23
**specify (1)**
  65:25
**speculate (1)**
  65:16
**speculation (1)**
  61:19

split (1)
  67:9
squad (1)
  17:23
square (2)
  52:3;69:13
stacked (1)
  53:25
stairs (24)
  56:4,8;57:19,22;58:3;
  62:22;63:3,6,22;64:3,9;
  66:16,19,24;67:10,17;
  68:1;69:2,6,14,19,21;
  72:1;73:7
stairway (1)
  69:16
stairwell (1)
  69:18
standard (4)
  64:16,22,25;65:11
standing (4)
  41:24;42:3,4;72:21
start (1)
  4:9
started (6)
  40:25;48:15;56:8;
  57:19;70:11;75:4
starting (1)
  6:3
state (1)
  39:20
stated (5)
  49:23,24;56:8;58:19;
  73:18
statement (2)
  35:13;64:13
statewide (1)
  27:22
station (2)
  29:5;30:8
stems (1)
  75:23
step (1)
  58:6
steps (2)
  48:20;62:15
still (4)
  24:17,18;71:13;75:13
stocks (1)
  42:25
stomach (1)
  70:23
stoop (1)
  41:4
stop (2)
  31:23;66:18
stopped (3)
  44:24;62:16;63:3
stops (1)
  12:9
strap (1)
  51:7
strapped (1)

stuff (2)
  11:19;17:12
subjective (1)
  40:1
subjects (1)
  58:23
sure (26)
  14:11;15:18,24;16:22;
  17:9;18:1,16;20:3,24;
  21:6;22:8;29.18;30:13,
  17,18;31:3;34:16,16,14;
  37:3;42:16:5?:5;53:2,7;
  60:1,3;71:20
surrounding (1)
  8:15
suspect (10)
  46:10;55:11,12;56:7,
  24;60:25;61:  7;65:5,9;
  66:24
suspects (2)
  45:5;64:24
SWAT (11)
  8:23;9:10,16,16,18,19,
  21,25;10:2,5;55:2
SWAT-type (2)
  10:20;26:2
sworn (1)
  4:2

               T

Tactical (2)
  11:9;14:3
tactics (4)
  11:17;12:17;13:16;
  17:4
talk (4)
  26:21;31:4;34 2;52:9
talked (9)
  26:19;27:13;3?:1;
  34:6,7,7;35:22;36:16,18
talking (4)
  31:20;54:4;65:2;76:11
teach (1)
  28:14
team (38)
  9:10,16,17,18,  9;10:5;
  15:10;16:3,8;17:5;
  18:19,20;21:2C;23:11,
  13;25:11;26:2,7,9,10;
  27:1;31:12,15;:8:2,10,
  14,18,21,24;39:1,12;
  43:25;44:7;50:  4,22;
  52:18;74:9;75:
teams (3)
  9:20,21,22
Ten (1)
  6:11
tense (1)
  67:7
term (1)
  13:4

testified (1)
  4:2
testify (2)
  65:10;66:12
testimony (14)
  4:10;12:16;38:4;
  52:14;56:13,14;59:11,
  16;61:21;63:16;67:1;
  72:4;73:16,18
thanks (1)
  62:20
thee (1)
  42:3
thinking (1)
  16:18
THOMPSON (37)
  10:23;14:19;15:5;
  21:24;23:16,19,22;25:8,
  16;26:6;35:2,11;36:23;
  37:19;38:5;43:13;44:5;
  45:14;46:20;50:18;51:5,
  15;56:21;59:14,16,23;
  60:10;61:1,7,18;63:8,25;
  64:20;66:11;67:4;72:2,
  20
thoroughly (1)
  72:9
though (4)
  21:21;34:3;66:15;
  74:20
threat (2)
  68:14,16
three (14)
  10:9;13:7;21:17;
  27:12;28:7;41:25;42:4,
  5;48:24;49:13,22;50:2,
  22;52:17
timeframe (2)
  51:11;55:21
times (4)
  15:19;16:10;27:6,12
tired (1)
  5:10
today (4)
  4:13,21;5:8;77:4
told (9)
  33:25;42:13;44:12,18;
  45:15;47:1,2;61:13;
  72:10
Tom (7)
  32:13,18,24;33:2;
  74:24;76:19,22
took (9)
  42:11;43:10,23;48:20,
  20;50:24;51:6:66:3,8
tools (1)
  17:10
Torczon (2)
  29:2;37:11
touch (1)
  12:21
touched (2)
  11:19;15:1

towards (5)
  41:24,25;42:6;48:16,
  19
towel (1)
  74:19
traffic (1)
  12:9
train (2)
  12:7,8
trained (7)
  12:17;13:2;16:10;
  17:9;25:20;28:1;48:3
trainer (1)
  13:6
trainers (2)
  13:7;28:3
training (30)
  6:16;8:23;9:4,7,25;
  10:2,17,20,25;11:16,18,
  22;12:3,6,12,18,20;
  13:22,25;14:14,15,25;
  15:2,10,21,23,25;17:5;
  27:16,21
Tricia (21)
  40:13;41:23;45:8;
  48:23;50:24;55:9,14,22;
  56:5;60:23;61:16;62:5,
  13,25;64:5;65:23;67:17,
  25;70:4;72:1;73:6
tried (2)
  24:12;59:3
true (1)
  73:12
truthfully (1)
  4:12
truthfulness (1)
  62:1
try (1)
  73:1
turn (7)
  45:10;46:15;57:18;
  62:6,7;72:18;76:7
turned (6)
  45:20;46:25;47:2;
  56:7,11;64:10
TV (1)
  76:20
twice (1)
  26:22
two (4)
  21:3;52:21;53:15;
  70:19
type (3)
  26:11;48:5;62:1

               U

Unaware (1)
  64:7
uncleared (1)
  60:24
under (3)
  4:11;64:13;65:24

underage (4)
  19:21,23;21:11;22:3
unknown (1)
  48:5
unless (2)
  4:13;58:22
unlocked (8)
  53:23;57:3,4,8;58:15,
  22;59:12;60:7
unoccupied (1)
  15:16,17
unsecure (1)
  59:19
unsecured (1)
  61:17
unstable (1)
  36:3
up (29)
  9:13;24:6;26:13;27:2,
  8;32:6,22;34:24;40:12,
  25;47:10;50:6;52:21;
  53:19,25;55:8;56:10,17,
  19;57:17;58:7;62:6;
  67:8;68:1,19;70:20;
  72:17;74:13,24
upon (1)
  15:1
upstairs (2)
  68:16;75:17
urgency (1)
  35:23,24,25
use (4)
  5:4;21:2;24:25;25:1
used (3)
  18:2;19:15,24
uses (1)
  17:20
Usually (2)
  53:5;58:22

               V

verbal (1)
  59:18
view (2)
  71:16,17
vote (2)
  32:19,20

               W

Wachsmuth (34)
  21:21;23:21;28:11;
  32:14,18,24;33:2,9,12;
  40:13;41:23;43:10;
  44:10;48:23;50:24;
  53:20;55:9,15,22;56:5;
  60:23;61:16;62:2,5,13,
  25;64:5;65:23;67:25;
  70:5;72:1,16;73:6;76:19
Wachsmuth's (2)
  32:13;74:24;76:22
wait (1)

4:22
**Waited (1)**
49:17
**waiting (1)**
44:25
**walk (3)**
57:16;62:5;66:24
**walked (3)**
56:17;57:18;67:8
**wall (2)**
69:5,7
**wants (1)**
39:6
**warrant (22)**
17:6;19:16;20:14,18;
22:3;23:21;28:11;29:13,
14,17,20,25;31:6,9,21;
37:17;39:16,18;40:10;
41:16;58:19;66:23
**warrants (4)**
18:13;19:7;21:21;23:7
**way (9)**
24:15,22;32:14;40:17;
53:18;59:12;62:15;
70:12,23
**weapon (7)**
22:14;42:8;43:1,4,8,
23;70:22
**weapons (2)**
23:25;32:7
**weren't (1)**
31:22
**WESTBY (59)**
14:17,20;15:3;20:9;
21:22;23:17;25:6,14;
26:4;30:12,14;35:3,12;
36:21;38:3;43:11;44:2;
45:12,22,25;46:18;47:5;
48:25;51:3,13;52:8;
56:22;57:9;59:15,24;
61:2,8,20;62:10;63:9,13,
17;64:1,18,21;65:7,15,
19,21;66:5,9;67:2,5;
68:3,7,10,13;72:3,11,14,
22,24;73:9,14
**What's (2)**
39:25;65:16
**whole (2)**
17:19;19:13
**wife (1)**
24:9
**window (5)**
17:18;32:5;40:24;
41:6,8
**Wisconsin (2)**
7:14;8:11
**within (4)**
7:23;12:5;15:14;30:4
**without (2)**
39:12;72:17
**Witness (39)**
4:15;15:6;20:12;
23:23;25:17;26:7;30:13;

33:19;35:6,13;36:24;
37:21;38:6;44:6;45:15;
46:2;49:2;51:6,16;
54:13,22;56:23;57:12;
59:17,25;60:13;63:20;
64:2,22;65:23;66:12;
67:7;68:14;69:4,12;
71:15;72:21;73:2,17
**words (1)**
41:14
**work (2)**
8:8,22
**Worked (2)**
7:13;8:10
**working (1)**
70:12
**Wrestling (6)**
28:13,14,20,21;29:6,7
**written (1)**
65:18
**Wyoming (2)**
5:6;8:12

## Y

**year (3)**
6:5;9:3;15:19
**years (5)**
6:11;8:11;10:9;26:16;
27:8
**younger (1)**
28:21

# Appendix Sixteen

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Mike Hall*
*October 7, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Vonni R. Bray, RPR
2010.10 22 19 16 45

Signer:
CN=Vonni R. Bray, RPR
O=VenSign Inc.
E=vonni.bray@yahoo.com

Original File 10-7-10 Mike Hall_scoped.txt
Min-U-Script® with Word Index

MIKE HALL - October 7, 2010                    Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2           FOR THE DISTRICT OF WYOMING
 3   ------------------------------- ------------------
 4   TRICIA WACHSMUTH,                    )
 5              Plaintiff,                )
 6        vs.                            )   NO. 10-CV-041J
                                         )
 7                                       )
 8   CITY OF POWELL, AND IN THEIR        )
     INDIVIDUAL CAPACITY, TIM            )
     FEATHERS, CHAD MINER, MIKE          )
 9   CHRETIEN, ROY ECKERDT, DAVE         )
     BROWN, MIKE HALL, BRETT LARJ.,      )
10   MATT MCCASLIN, ALAN KENT, MATT      )
     DANZER, OFFICER BRILAKIS, LEE       )
11   BLACKMORE, CODY BRADLEY, KIRK       )
     CHAPMAN, JOHN DOES #1-#4,           )
12                                       )
             Defendants.                 )
13   _____)
14           DEPOSITION OF MIKE HALL
15        10:44 a.m., Thursday, October 7, 2010
16
17
18        Pursuant to notice, the deposition of MIKE
19   HALL was taken in behalf of Plaintiff in accordance
20   with the applicable Federal Rules of Civil Procedure at
21   270 North Clark, Powell, Wyoming, before Vonni R. Bray,
22   Registered Professional Reporter and Notary Public of
23   the State of Montana.
24
25
```

MIKE HALL - October 7, 2010                    Page 2

```
 1                  APPEARANCES
 2   FOR PLAINTIFF:
 3            Mr. Jeffrey C. Gosman
              Gosman Law Office
 4            123 W 1st Street
              P.O. Box 51267
 5            Casper, WY 82601-2481
              Telephone: (307)265-3382 - Fax: (307)265-6715
 6            E-mail: jeff@gosmanlawoffices.com
 7
 8   FOR INDIVIDUAL DEFENDANTS:
 9            Ms. Misha Westby
              Senior Assistant Attorney General
10            2424 Pioneer Avenue, 2nd Floor
              Cheyenne, WY 82002
11            Telephone: (307)777-5477 Fax: (307)777-8920
              E-mail: mwest@state.wy.us
12
13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:
14
15            Mr. Tom Thompson
              MacPherson, Kelly & Thompson
16            616 West Buffalo
              P.O. Box 999
17            Rawlins, WY 82301-0999
              Telephone: (307)324-2713 - Fax: (307)324-7348
18            E-mail: tthompson@wyomingattorneys.net
19
20   Also Present:   Tim Feathers
21
22
23
24
25
```

MIKE HALL - October 7, 2010                    Page 3

```
 1                  INDEX TO WITNESSES
 2                                          PAGE
 3   MIKE HALL
 4        Direct Examination by Mr. Gosman ...............4
 5        Signature Page ..............................123
          Reporter's Certificate ......................124
 6
 7
 8                      EXHIBITS
 9   EXHIBIT          DESCRIPTION               PAGE
10     10     Notee of Wachsmuth Warrant ..............58
11     11     Carry Positions .........................31
12     12     PPD Firearms Training Lesson Plan .......33
13     23     PPD Supplement 6 by Kirk Chapman .......110
14     28     Countermeasures Tactical Institute ......29
                Immediate Action for Patrol
15     29     Crisis Response Tactics .................27
16     31     Wyoming P.O.S.T. Training Records ........9
17     35     PPD Patrol Friday Training .............16
18     37     Powell Police Crisis Response ..........40
                Tactics
20     42     Raid Planning ..........................11
21     43     Drawing by Mr. Hall ...................111
22
23
24
25
```

MIKE HALL - October 7, 2010                    Page 4
Direct Examination by Mr. Gosman

1            MIKE HALL,
2    having been first duly sworn, testified as follows:
3            DIRECT EXAMINATION
4    BY MR. GOSMAN:
5        Q. Officer Hall, have you ever given a
6    deposition before?
7        A. No.
8        Q. Are you familiar with the process for giving
9    depositions?
10       A. I think so.
11       Q. I will ask you questions today, and you will
12   be under oath when you give your answers, do you
13   understand that?
14       A. Yes, I do.
15       Q. For that reason, it's important for you to
16   ask for clarification if you do not understand a
17   question. Could we have an agreement that if you don't
18   understand something that I've asked you, that you will
19   not answer without obtaining clarification from me?
20       A. Yeah.
21       Q. Thank you.
22           Please allow me to finish my question before
23   you begin your answer. And if you wish to take a break
24   at any time, we will do so. But if there is a question
25   pending, we cannot break at that time, okay?

Case 1:10-cv-00041-ABJ    Document 65-11    Filed 01/10/11    Page 35 of 77

Tricia Wachsmuth v.                                                    Mike Hall
City of Powell, et al.                                          October 7, 2010

MIKE HALL - October 7, 2010                                    Page 5
Direct Examination by Mr. Gosman

1    A. Okay.
2    Q. All right. What is your full name, Officer?
3    A. Michael Hall.
4    Q. What is your current address?
5    A. 250 North Clark Street, Powell, Wyoming.
6    Q. Are you currently on any medication that
7    would impair your ability to give a truthful answer
8    here today?
9    A. No.
10   Q. Is there any other reason why you would not
11   be able to give truthful and complete answers here
12   today, that you're aware of?
13   A. No.
14   Q. Have you ever been arrested for a felony?
15   A. No.
16   Q. Have you ever been accused of a crime
17   involving dishonesty?
18   A. No.
19   Q. Have you ever been divorced?
20   A. No.
21   Q. Where did you go to high school, Officer?
22   A. In northern Michigan.
23   Q. And did you graduate from high school?
24   A. Yes.
25   Q. What year did you graduate?

MIKE HALL - October 7, 2010                                    Page 7
Direct Examination by Mr. Gosman

1    City. Didn't like the company I was at.
2        So next job I had I was at Rimrock Auto Group
3    selling cars. I don't remember when I started there.
4    Sorry. I don't remember. I was there for maybe a few
5    months and decided I didn't like selling cars. And
6    went to high-tech motor sports, which was a power
7    sports, like ATVs, motorcycles. That kind of
8    dealership. I was with them for maybe just over a
9    year. Something like that. Did a quick stint at a
10   different dealership up there.
11       And then moved to Cody, Wyoming in July of
12   2002. And moved down there for the same type of work,
13   place called Mountain Valley Motorsports -- Mountain
14   Valley Engine at this time, it's Motorsports now.
15   Worked for them until June of 2007 when I started at
16   the Powell PD.
17   Q. Did you complete your training at the law
18   enforcement academy after you were hired at the Powell
19   Police Department?
20   A. Yeah.
21   Q. And what is the probationary period for a
22   Powell police officer?
23   A. Probationary for what?
24   Q. Well, I understand there's a probationary
25   period for all new hires and once you pass that period,

MIKE HALL - October 7, 2010                                    Page 6
Direct Examination by Mr. Gosman

1    A. 1998.
2    Q. And have you had any schooling beyond high
3    school?
4    A. One year of college.
5    Q. Where was that?
6    A. That was in Michigan as well.
7    Q. Okay. And when did you begin your work
8    history? And I'm talking after college.
9    A. That would have been July of '99, I think.
10   Q. Why don't you go ahead and take me through
11   your work history. Describe the jobs that you've had
12   briefly and when you left and why you left?
13   A. Okay. From July of '99?
14   Q. Yes.
15   A. I moved to Rapid City South Dakota to do
16   some cable and phone work, was a contract company for
17   AT&T called CND, like the letters CND.
18   Q. Okay.
19   A. I left CND -- I don't know -- maybe in about
20   March or so of 2000. Same type of work, just a
21   different company in the same area.
22   Q. Okay.
23   A. And then from there, I moved to Billings,
24   Montana for the same type of work. When I got there,
25   it was quite a bit different from what it was in Rapid

MIKE HALL - October 7, 2010                                    Page 8
Direct Examination by Mr. Gosman

1    you become a -- I'll use the term permanent employee?
2    A. I believe it's one year.
3    Q. Are you current on your Wyoming law
4    enforcement continuing legal education requirements?
5        MS. WESTBY: Object.
6    BY MR. GOSMAN:
7    Q. Continuing law enforcement requirements?
8        MS. WESTBY: Go ahead.
9        THE WITNESS: I believe I am, yes.
10   BY MR. GOSMAN:
11   Q. Have you ever had any discipline, including
12   verbal discipline while employed at the Powell Police
13   Department, that is not in your personnel file?
14       MR. THOMPSON: Objection as to the form of
15   question. And, Counsel, that's not a question that's
16   been posed or allowed by the Court. Any disciplinary
17   matters within the last five years that are not in your
18   personnel file.
19       MR. GOSMAN: He's only been there for two, so
20   I don't think we need to worry about that particular
21   part of it, but I appreciate your point, and I
22   understand that as well.
23       THE WITNESS: Can you clarify, I guess.
24   BY MR. GOSMAN:
25   Q. Have you ever had any discipline, including

MIKE HALL - October 7, 2010                                    Page 9
Direct Examination by Mr. Gosman

1  verbal discipline within the last five years, that is
2  not in your personnel file?
3     A.  No.
4           (Exhibit 31 identified)
5  BY MR. GOSMAN:
6     Q.  Let's start by turning to Exhibit 31.  Your
7  P.O.S.T. training reports are about in the middle of
8  that document.  And I believe they are Document 1000.
9     A.  Okay.
10    Q.  Is this -- does this document reflect all of
11 your P.O.S.T. training as far as you know?
12    A.  There's been some things added to it since --
13 I guess since this was printed in April.
14    Q.  What courses have you completed since April?
15    A.  I've been to Drug Enforcement Administration
16 basic drug investigations class.  I've done some other
17 firearms training.  Just did some less lethal training.
18 And I guess, without looking at it -- without looking
19 at a more updated one, I'm not sure what all is on
20 there, other than that.
21    Q.  That's fine.  Prior to the 24th of
22 February 2009, had you had any formal P.O.S.T. training
23 in the area of dynamic entry?
24    A.  Yes.
25    Q.  And what class would have represented that

MIKE HALL - October 7, 2010                                   Page 10
Direct Examination by Mr. Gosman

1  training?
2     A.  Out of this list?
3     Q.  Yes.
4     A.  It would be the drug investigations class on
5  8/8 of 2008.
6     Q.  Okay.  Talk to me -- do you have a training
7  manual for that class?
8     A.  Yes.
9     Q.  Have you produced that manual to your
10 attorneys?
11    A.  Yes.
12          MR. GOSMAN: And I don't believe I've gotten
13 that manual.  And I believe that's a manual that I
14 should have.
15          MS. WESTBY: Every training manual that was
16 produced to us, we produced to you.
17          MR. GOSMAN: Okay.  Well ...
18          MS. WESTBY: So I would anticipate -- well,
19 maybe at the next break you can show it to me, and I'll
20 see if I can find it on the stuff.
21 BY MR. GOSMAN:
22    Q.  Let me just ask you this:  If you have that
23 in your in your possession, can you bring it in here
24 today?
25    A.  It's out in my car.  A copy of it.

MIKE HALL - October 7, 2010                                   Page 11
Direct Examination by Mr. Gosman

1     Q.  Why don't we go ahead and take a brief break
2  and have you bring that in.
3     A.  So we're clear, that's not --
4     Q.  All?
5     A.  I don't have a manual for the whole class,
6  specific to a certain class.  That's the only manual I
7  had.
8          MS. WESTBY: The one you just gave me?
9          THE WITNESS: Yeah.
10         MS. WESTBY: Oh, I gave it to you.
11         MR. GOSMAN: The one you gave me yesterday?
12         THE WITNESS: Yes.
13         MR. GOSMAN: All right.  Then I'll have to go
14 to my car.
15          (Discussion held off the
16          record.)
17          (Exhibit 42 marked)
18 BY MR. GOSMAN:
19    Q.  Officer, could you go ahead and turn to
20 this -- let's see, drug -- a portion of the drug
21 investigations manual that you produced here for us
22 today --
23    A.  Sure.
24    Q.  -- which we marked as Exhibit 42.  And let's
25 first make sure that we can identify this document.

MIKE HALL - October 7, 2010                                   Page 12
Direct Examination by Mr. Gosman

1  Would you go through it and tell me what it is?
2     A.  This is a – I think it was a PowerPoint
3  printout from the raid planning and execution class
4  that was part of the drug investigations class in 8/8
5  of '08.  Anything else to identify it?
6     Q.  No, that's fine.
7          This was a 40-hour course.  Can you tell me
8  approximately how many hours you spent training in this
9  particular segment of the course that is represented by
10 Exhibit 42?
11    A.  There were several practicals spread out over
12 two or three days, I think.  Between the class itself
13 and the practicals, I would say probably ten to 12
14 hours.
15    Q.  While I'm looking through this document, are
16 there any other P.O.S.T. training courses that you've
17 taken prior to the 24th of February 2009, that deal
18 with dynamic entry?
19    A.  Not that's on my P.O.S.T. record anyway.
20    Q.  Do you remember, in taking this course,
21 whether you were trained in -- I guess I'll hold on to
22 this.  You got your copy, correct?
23    A.  Yes.
24    Q.  Whether you were trained in the area of
25 room-clearing tactics?

MIKE HALL - October 7, 2010                                    Page 13
Direct Examination by Mr. Gosman

1    A. Yes.
2    Q. And were you -- were you taught in the area
3    of weapon position in the execution of room-clearing
4    tactics in a dynamic entry of the type that you have
5    trained for here in Exhibit 42?
6        MS. WESTBY: Object to the form of the
7    question.
8        Go ahead.
9        THE WITNESS: Just in this class?
10   BY MR. GOSMAN:
11   Q. Yes.
12   A. I don't remember for sure if they talked
13   about weapon position in this class.
14   Q. What is the weapon position that you've been
15   taught when you're clearing a room or house?
16   A. At what point?
17   Q. After the entry team has entered the house
18   and begins the actual room-clearing operation.
19   A. I think there's several positions that could
20   be used. I mean, are we talking there's a threat or no
21   threat?
22   Q. Well, I assume that you don't generally clear
23   a room in a dynamic entry if there's no threat. So
24   let's assume there's a threat.
25       MS. WESTBY: Object to the form of the

MIKE HALL - October 7, 2010                                    Page 14
Direct Examination by Mr. Gosman

1    question.
2        MR. THOMPSON: Join.
3        THE WITNESS: I guess what I'm saying is you
4    can encounter a threat anywhere. You may not see that
5    threat right away, okay. But without knowing who
6    you're looking at in the room, there could be several
7    positions your gun could be in.
8    BY MR. GOSMAN:
9    Q. Okay. I have turned to a page in these
10   training materials that's near the end. It's entitled
11   "The 12-Second Rule." Could you turn to that?
12   A. Okay.
13   Q. Do you remember discussing this issue in your
14   training?
15   A. A little bit.
16   Q. Okay. First of all, it sounds like the
17   Springfield, Missouri Police Department has had a lot
18   of experience with high-risk warrant, doesn't it?
19       MS. WESTBY: Object to the form of the
20   question.
21       MR. GOSMAN: Okay.
22   BY MR. GOSMAN:
23   Q. What is the 12-Second Rule?
24   A. Down at the bottom?
25   Q. Of the page there.

MIKE HALL - October 7, 2010                                    Page 15
Direct Examination by Mr. Gosman

1    A. Yeah, the last bullet.
2    Q. So that is the 12-Second Rule, then, correct?
3    A. That's what they are referring to in the
4    12-Second Rule.
5    Q. Would you go ahead and read that bulleted
6    statement into the record?
7        MR. THOMPSON: Object as to form.
8        MS. WESTBY: Go ahead.
9        THE WITNESS: "Approximately 12 seconds after
10   noise compromise, suspects will have perceived the
11   entry team's presence, formulated a response, and began
12   to act on that formulated response."
13   BY MR. GOSMAN:
14   Q. And when does the 12-Second Rule apply?
15   A. I believe it's right about the time that your
16   presence is compromised and your presence is known.
17   Q. All right. Thank you.
18       All right. Have you had additional training,
19   then, other than what we've identified in your P.O.S.T.
20   records relative to the specific issue of dynamic
21   entry?
22   A. Before or after this incident?
23   Q. Before.
24   A. Other than what's on my P.O.S.T. record?
25   Q. Yes.

MIKE HALL - October 7, 2010                                    Page 16
Direct Examination by Mr. Gosman

1    A. Yeah, department trainings, here locally.
2        (Exhibit 35 identified)
3    BY MR. GOSMAN:
4    Q. Okay. Why don't we go ahead and take a look
5    at Exhibit -- I believe it's 35. And it's off the end
6    of the tabs, unfortunately.
7    A. Okay.
8    Q. Okay. And I understand that you began your
9    service with the Powell Police Department in 2007, so
10   we don't have to go through those records from 2005 and
11   2006. Let's just start with -- well, I won't tell you
12   where to start. Just start with the training that you
13   have had relative to this issue of dynamic entry
14   since -- before February of 2009.
15   A. Just from this list or exhibit?
16   Q. We're going to start there.
17   A. Okay. I don't know if this is a complete
18   list of all the training or not. It seems like it
19   jumps around a little.
20   Q. Did you find anything there?
21   A. I guess with what's here, no.
22   Q. Well, so then let's go ahead and talk about
23   training that you have had in the area of dynamic entry
24   that's represented in the list which we have identified
25   as Exhibit 35.

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 38 of 77
Tricia Wachsmuth v.                                                                          Mike Hall
City of Powell, et al.                                                                  October 7, 2010

1   MS. WESTBY: Object to the form of the
2   question.
3   MR. THOMPSON: Join.
4   THE WITNESS: Training -- can you say that
5   again? I'm sorry.
6   BY MR. GOSMAN:
7   Q. Yes. Let's talk about the training that
8   you've had in -- relative to dynamic entry since your
9   course on drug investigations that's listed on your
10  P.O.S.T. records.
11  A. Okay. Training in dynamic entry -- just
12  dynamic entry or room-clearing?
13  Q. Yeah, good question. By dynamic entry, I
14  mean the whole gamut of entry into the residence,
15  breaching the doors, deploy ng flashbang devices,
16  room-clearing tactics, that scenario.
17  A. I don't know dates or anything like that.
18  But there's been training at the police department in
19  that type stuff. Usually, I think, we do it down in
20  the basement with room clears, room entries, things of
21  that nature.
22  And are we talking just prior to February of
23  2009 or since I've been with Powell?
24  Q. Well, actually, I'm talking about the entire
25  period that you were with the City Of Powell prior to

1   February 24th, 2009?
2   A. There's training sessions that I can think of
3   that we have done down in the basement with movement,
4   tactical movement, entry into rooms, clearing of rooms.
5   Q. Who was your trainer'.
6   A. I think there was a couple. Couple different
7   in those areas. I couldn't say for sure on any one
8   date.
9   Q. That's fine with me, Officer. But I do want
10  you to try to identify the trainers that have provided
11  you this training.
12  A. I want to say one day Sergeant Eckerdt took
13  the lead on one. Gosh, maybe Sergeant Chretien. I
14  can't say for sure.
15  Q. Those training sessions that you've just
16  described are not reflected in the in-service training
17  records which we've looked at here on Exhibit 35; is
18  that true?
19  A. Not from this list. I don't know if this is
20  a whole list. Like I said, there's a lot of months
21  missing. I don't know whose lists these are.
22  Q. Have you ever had any SWAT training?
23  A. How do you want the term "SWAT" used?
24  Q. Well, SWAT is a law enforcement term, but I
25  think it stands for special weapons and tactical

1   training?
2   A. Okay. So I've been trained in SWAT-type
3   tactics. I've never been to a SWAT school.
4   Q. Have you ever taken a course that was
5   designated a SWAT training course?
6   A. No. Not by that title.
7   Q. Do you understand the difference between
8   being a trained officer participating on a SWAT team
9   and taking a course in drug investigations?
10  MS. WESTBY: Object to the form of the
11  question.
12  MR. THOMPSON: Join.
13  THE WITNESS: I'm not sure.
14  MS. WESTBY: Exactly.
15  BY MR. GOSMAN:
16  Q. You're not sure you understand the difference
17  between the two?
18  A. No, I'm not sure I understand your question.
19  Q. Okay. Do you understand the difference
20  between being a trained officer participating on a SWAT
21  team and taking a course in drug investigations?
22  MS. WESTBY: Object to form.
23  MR. THOMPSON: Join.
24  THE WITNESS: I would say that I would know
25  the difference between an officer that's part of a SWAT

1   team and someone trained in drug investigations, yes,
2   if that's what you're getting at.
3   BY MR. GOSMAN:
4   Q. Prior to February of 2009, had you ever
5   participated in an actual operation involving a team of
6   officers where dynamic entry was used?
7   A. As opposed to a training scenario?
8   Q. Yes.
9   A. I don't believe I had.
10  Q. Okay. And getting back to the training
11  scenarios for just a moment, what was the setting for
12  these training sessions? Who was the -- was it a day
13  that was set aside as -- for instance, I think
14  Exhibit 35 speaks to the Friday training sessions that
15  oftentimes occur on other days.
16  A. Well, I guess I'm also thinking about the
17  scenario, the training scenarios at the school.
18  Q. Okay. That was the drug school?
19  A. Correct.
20  Q. All right. So you did actually engage in
21  some simulated dynamic entries at the drug
22  investigations course, correct?
23  A. Correct.
24  Q. But I am actually referring to the training
25  outside of your drug investigations course. And what I

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 39 of 77
Tricia Wachsmuth v.                                                    Mike Hall
City of Powell, et al.                                           October 7, 2010

MIKE HALL - October 7, 2010                                            Page 21
Direct Examination by Mr. Gosman

1  want to know is the setting for those training courses.
2     A.  The ones that I can think of specifically
3  were in the basement of our police department.
4     Q.  Okay.  It was a -- was it something that had
5  been -- were you required to attend?
6     A.  I don't remember for sure if it said it was
7  mandatory.  It usually came to us in the form of
8  e-mails that there would be training on this date.  I
9  can only assume, because that was so long ago, I don't
10  know.
11     Q.  How long ago was it?
12     A.  You're talking before February of 2009.  So
13  almost two years ago, at least.
14     Q.  Okay.  And let's see, prior to February 24th
15  of 2009, you'd been with the police force how long?
16     A.  A year-and-a-half or maybe a little over.
17     Q.  Okay.  And at some point in that year and a
18  half, you had participated in one of these training
19  exercises that you're talking about?
20     A.  At least one.
21     Q.  And let's take just a minute and think about
22  it.  Was there another one that you can think of?
23     A.  Like I said, there were several instances
24  down in the basement of our police department where we
25  trained.

MIKE HALL - October 7, 2010                                            Page 22
Direct Examination by Mr. Gosman

1     Q.  Okay.  And when you trained, did you train as
2  a team?  Or did you simply have each officer review the
3  principles involved in room-clearing or dynamic entry
4  into a home by use of a ram or something?
5     A.  Review the principles on paper?
6     Q.  Well, yes.
7     A.  We trained, physically trained.
8     Q.  Okay.
9     A.  Is that what you're asking?
10     Q.  I am.  But I'm also asking if you physically
11  trained in sort of an individual setting, if you will,
12  as opposed to the entire team practicing this room
13  entry together.
14     A.  I'm not sure I'm getting it.  Like, did I
15  clear a room by myself?  Is that what you mean?
16  Individually?
17     Q.  For instance, Officer, Sergeant Eckerdt stand
18  at the door and review with you -- in a classroom
19  setting perhaps, what the principles of room clearing
20  were and then ask you to get up and, you know, practice
21  it?
22     A.  You know, yeah, typically there's review.
23  And kind of an agenda of what we're going to go
24  through.  I can't say I remember a time where, you
25  know, as an example, Sergeant Eckerdt would say, "Okay.

MIKE HALL - October 7, 2010                                            Page 23
Direct Examination by Mr. Gosman

1  Now you stand up and do it," if that's what you mean.
2     Q.  Okay.  But did you do that?  Did you actually
3  clear rooms in these sessions?
4     A.  Yes.
5     Q.  Okay.  And were you doing that as a team?
6     A.  It was a group.
7     Q.  How many were -- members of the group were
8  there?
9     A.  I don't remember.  Whoever was there.
10     Q.  Okay.  Does the Powell Police Department have
11  a special operations unit, as far as you know, a unit
12  that is trained specifically as a team to perform
13  dynamic entries in an operational setting?
14     A.  I mean, are you talking like a group of guys
15  set aside to go?
16     Q.  Well, I don't know that set aside is the
17  correct term.  But a group of guys who train together
18  and who are designated or appointed to be part of a
19  team that is called upon in situations that require
20  dynamic entry.
21     A.  No, sir, not a team like that.  I mean, we're
22  just -- we're trained in it.
23     Q.  Okay.  When you were involved in these
24  training sessions, did you understand that they were
25  being documented, that there was some record being

MIKE HALL - October 7, 2010                                            Page 24
Direct Examination by Mr. Gosman

1  created of who attended and what was done?
2          MR. THOMPSON: Objection as to form.
3          Go ahead.
4          THE WITNESS: I didn't.  That wasn't anything
5  I had anything to do with.
6  BY MR. GOSMAN:
7     Q.  Okay.  Have you ever detonated a flashbang
8  device before?
9     A.  Before the incident?
10     Q.  Yes.
11     A.  No, not before the incident.
12     Q.  Have you detonated one since then?
13     A.  I've been part of the flashbang training
14  since then.
15     Q.  And that would be perhaps the training that
16  Officer Miner has conducted?
17     A.  No.  Then there was also, in November of '09,
18  Immediate Action Response for Patrol or something to
19  that effect.
20     Q.  And you detonated a flashbang device in that
21  course?
22     A.  I didn't detonate one.  We had a lot of
23  dummies that we were using as part of that training.
24  So I've thrown dummies.  I've placed dummies.
25     Q.  Have you been trained in the use of a long

MIKE HALL - October 7, 2010                    Page 25
Direct Examination by Mr. Gosman

1  gun rifle in a dynamic entry setting?
2    A. Yes.
3    Q. Would that be part of this Exhibit 42 that we
4  looked at, your drug investigations course?
5    A. The training in the gun part wasn't part of
6  that.
7    Q. Okay.
8    A. In that Exhibit 42, was your planning and
9  execution of the warrant. It wasn't specific to
10 weapons or weapon choices.
11   Q. All right. So when did this training occur?
12   A. Which training?
13   Q. The training involving the use of a rifle in
14 a dynamic entry setting?
15   A. Well, you're kind of talking two things.
16 You're talking training in a rifle and training in a
17 dynamic entry.
18   Q. Well, I assume that you've had firearms
19 training in the use of rifles?
20   A. Correct.
21   Q. Their safe use?
22   A. Correct.
23   Q. And have you ever trained with a rifle in a
24 dynamic setting?
25   A. Yes.

MIKE HALL - October 7, 2010                    Page 26
Direct Examination by Mr. Gosman

1    Q. And when was that?
2    A. I guess, then, part of that was part of that
3  class. Because in the training scenarios, we did have
4  rifles, we had handguns. I don't remember what all we
5  were using in the training in the basement.
6        Do you want it limited to before February of
7  '09?
8    Q. I do.
9    A. Okay. Then in the training scenarios
10 involved in the Exhibit 42, yes, we did have some
11 rifles.
12   Q. So I understood this -- and I'm sorry. I was
13 a little distracted. The training you had in
14 connection with the use of a long rifle in a dynamic
15 setting was in connection with your drug investigations
16 class that is part of your P.O S.T. record?
17   A. You're saying the use of a rifle during?
18   Q. During --
19   A. What I'm saying is we had rifles during that
20 training. Are you asking --
21   Q. Yes, I'm asking something a little more
22 specific than that.
23       If the training for the dynamic entry
24 involved the use of a rifle.
25       MS. WESTBY: Object to the form of the

MIKE HALL - October 7, 2010                    Page 27
Direct Examination by Mr. Gosman

1  question.
2        THE WITNESS: I would say it involved the
3  carrying of a rifle. Okay. In every scenario, we
4  weren't using a rifle. And by use, I'm assuming you're
5  talking about shooting it.
6  BY MR. GOSMAN:
7    Q. I'm talking carrying and training with it in
8  this dynamic entry, such as room-clearing tactics?
9    A. Yes, we had rifles for that.
10   Q. And did you have rifles when you were
11 training downstairs in the police department?
12   A. Again, I can't remember for sure what we had,
13 whether it was rifles, pistols, or both.
14       (Exhibit 29 identified)
15 BY MR. GOSMAN:
16   Q. Okay. Let's look at Exhibit 29, Officer.
17 This is a document entitled "Crisis Response Tactics."
18 And it is part of the training materials that were
19 supplied by the City of Powell, it's a 40-hour course.
20       And I am wondering if you have -- if you're
21 familiar with this course, if you've taken it before.
22   A. There's parts of it in the first couple of
23 pages that seem familiar. Being that the instructors
24 listed, there's two of them in the instructor list that
25 have not been here since I've been employed. I don't

MIKE HALL - October 7, 2010                    Page 28
Direct Examination by Mr. Gosman

1  know that I've been part of this specific class with
2  this specific training manual.
3    Q. Have you seen that training manual before?
4    A. I don't know if I have or not.
5    Q. Go ahead and take a look at it and we'll make
6  sure and carry on.
7    A. I guess what I'm saying is I don't know if
8  I've seen the manual, seen this laid out like this. We
9  train on critical incidents, okay. But as to whether
10 or not I went through this specific course, I don't
11 know.
12   Q. Okay. It would appear -- it was September of
13 2009 or perhaps it was November of 2009 that you did
14 complete the Immediate Action for Patrol course offered
15 by Countermeasures Technology Institute; is that true?
16   A. Yeah, that would have been November of 2009.
17   Q. Okay. And at that time were you trained
18 in -- specifically in room-clearing techniques?
19   A. In that course?
20   Q. Yes.
21   A. Yes.
22   Q. And were you trained, for instance, in the
23 Israeli Lean?
24   A. I had been trained in the Israeli Lean prior
25 to that.

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 41 of 77
Tricia Wachsmuth v.
City of Powell, et al.
Mike Hall
October 7, 2010

MIKE HALL - October 7, 2010                                    Page 29
Direct Examination by Mr. Gosman

1    Q. And there's something called the immediate --
2  let's see, cross-over into an Israeli Lean. Do you
3  know what that is?
4       If you'd like to look, I'm looking at -- it's
5  Exhibit 28. And it's page -- I'm on page 16 right now,
6  which is --
7    A. Page 16?
8       (Exhibit 28 identified)
9  BY MR. GOSMAN:
10   Q. Yes, and I'll tell you that this exhibit is
11 an Immediate Action for Patrol manual that Officer
12 Miner supplied.
13   A. Uh-huh.
14      MS. WESTBY: And just for purposes of the
15 record -- no objection. Nevermind.
16      THE WITNESS: The cross-over into the Israeli
17 Lean.
18 BY MR. GOSMAN:
19   Q. Yes. Okay. Have you trained in that
20 deployment?
21   A. Similar. I mean, all it is is a picture.
22   Q. Okay. I understand.
23   A. But it looks familiar.
24   Q. And are -- there's several pages here.
25 There's the T-formation with three officers, and that's

MIKE HALL - October 7, 2010                                    Page 30
Direct Examination by Mr. Gosman

1  on Page 17.
2    A. Okay.
3    Q. And actually, there are a number of pages
4  here that deal with formations or room and
5  structure-clearing tactics; is that correct?
6    A. That's correct. Yes.
7    Q. And in that training, did you go through
8  those exercises?
9    A. In the formations?
10   Q. Yes.
11   A. Yes.
12   Q. Okay. And were you -- were you taught about
13 weapon position as you were engaged in those
14 room-clearing tactics?
15   A. In this class?
16   Q. Yes.
17   A. Yes.
18   Q. Okay. Let's go to Page 22. Were you taught
19 you should move no faster than you could see threats
20 and shoot accurately?
21   A. Yes.
22   Q. And the purpose of room-clearing in a dynamic
23 setting is to make sure there's no one in the house, or
24 no one in the room that poses a threat to officer
25 safety, correct?

MIKE HALL - October 7, 2010                                    Page 31
Direct Examination by Mr. Gosman

1    A. Well -- or safety of others.
2       (Exhibit 11 identified)
3  BY MR. GOSMAN:
4    Q. Such as in a hostage situation?
5       Let's go ahead and take a look now at Exhibit
6  No. 11. And this document contains diagrams involving
7  several weapon positions. Are these the weapon
8  positions that you're familiar with?
9    A. It's not -- the drawings don't appear to be
10 accurate. I mean, I guess the presentation one is
11 accurate.
12   Q. Okay. Weapon presentation?
13   A. Okay.
14   Q. All right.
15   A. Yeah, that one -- that one looks okay.
16   Q. Okay. And do you have a problem with the
17 diagram that represents the ready position, which is
18 the second page of the exhibit?
19   A. I do.
20   Q. And what is the problem with that?
21   A. The ready position that we're trained in is
22 specifically with a rifle like this is tucked tight to
23 your chest, barrel pointing toward the ground as
24 opposed to -- I mean, I can't say I've ever been
25 trained to be in a ready position with your gun pointed

MIKE HALL - October 7, 2010                                    Page 32
Direct Examination by Mr. Gosman

1  at a target.
2    Q. Okay.
3    A. Like I said, my ready position is slung over
4  my shoulder and pointing toward the ground.
5    Q. Have you been taught in the weapon
6  presentation that is identified as -- what you call, I
7  believe, the cover mode, which is the third page of
8  this diagram?
9    A. Say that again.
10   Q. Have you been trained in that particular
11 weapon position?
12      MS. WESTBY: There isn't anything titled
13 "Cover Mode."
14      MR. GOSMAN: Okay.
15 BY MR. GOSMAN:
16   Q. So let me clear that up. Have you been
17 trained in the weapon presentation position that's
18 identified on the third?
19   A. 1 would -- weapon presentation in a cover
20 type situation or weapon presentation as I'm going to
21 engage a threat?
22   Q. Let's talk about weapon presentation in a
23 cover situation first.
24   A. Similarly, the way I've been trained is you
25 have weapon presentation in a cover mode is right there

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 42 of 77
Tricia Wachsmuth v.
City of Powell, et al.
Mike Hall
October 7, 2010

MIKE HALL - October 7, 2010                                    Page 33
Direct Examination by Mr. Gosman

1   and ready. Your finger is still off the trigger.
2   You're just covering that person.
3       Q. Okay. And would you agree with me that that
4   is also called the cover posi ion that you've just
5   described?
6       A. We call it the universal cover mode.
7       Q. Okay. And if you'll notice, we have a little
8   photographic here on the next page. Page Number 415.
9   And it's the last page of Exhibit 11.
10      A. Okay.
11      Q. And would you agree with me that the
12  universal cover mode includes the items that are listed
13  in that list?
14      A. That's how I've been trained, yes.
15              (Exhibit 12 identified)
16      Q. All right. Let's take a look at Exhibit 12.
17  And on the first page of that exhibit, there is a
18  description of various weapon positions, correct?
19      A. It says ready positions.
20      Q. Okay. And you have ust looked at weapon
21  positions in a sort of a graphic mode. And the ready
22  position was described in one of those diagrams. And
23  now we have a written description of ready positions,
24  correct?
25      A. Yeah. In the ready po ition?

MIKE HALL - October 7, 2010                                    Page 34
Direct Examination by Mr. Gosman

1       Q. Yes.
2       A. Yes.
3       Q. Okay. Can you identify the position that you
4   were taught for what you have called the ready
5   position, if you see it there on either one of those
6   pages? It's a two-page exhibit.
7       MR. THOMPSON: Other than his demonstration
8   of it?
9       MR. GOSMAN: Yes.
10      MR. THOMPSON: Are you asking him if it's in
11  the document or if he can?
12      MR. GOSMAN: Yeah  Yes.
13      THE WITNESS: So you're asking if I can find
14  a written description of what I've demonstrated?
15  BY MR. GOSMAN:
16      Q. For what you call the ready position.
17      A. Okay. The closest one is number two, the
18  inside ready.
19      Q. Okay.
20      A. And it's talking about the tight up
21  against -- the weapon being tight up against the body
22  in a downward angle to the weak side, which is how I
23  demonstrated.
24      Q. Okay.
25      A. You know, it's talking about bringing the

MIKE HALL - October 7, 2010                                    Page 35
Direct Examination by Mr. Gosman

1   weapon up to the threat very quickly to find a good
2   sight alignment. It's there and it's ready. You can
3   bring it up very quickly.
4       Q. Okay. Now, on the second page you'll notice
5   that there are additional positions described. And
6   let's go to that paragraph that is numbered E or has
7   the letter E.
8       A. Okay.
9       Q. And tell me what the weapon -- what you
10  understand the weapon presentation to be.
11      A. Okay. I've read it. I'm sorry. Tell you
12  what?
13      Q. What you understand the weapon presentation
14  to be?
15      MS. WESTBY: And I'm going to -- do you mean
16  from reading this document? From his own knowledge?
17  Whether he agrees with? What's your question?
18      MR. GOSMAN: Well, I'm allowing him to review
19  the document. And I think he's already described -- or
20  he's mentioned weapon presentation. And I'm just
21  asking him what his definition of weapon presentation
22  is. And he's referring to that language. He can
23  disagree with it in any way he wants.
24      THE WITNESS: The weapon presentation to me
25  would be with your weapon pointed at the target or the

MIKE HALL - October 7, 2010                                    Page 36
Direct Examination by Mr. Gosman

1   threat. You know, you're starting to find your front
2   site picture. Beyond that with this, you know. with
3   this description -- I mean, that's basically it. It's
4   described fairly well.
5   BY MR. GOSMAN:
6       Q. Basically, the weapon is being aimed at that
7   point, at a target?
8       A. That's how I understand it, yes.
9       Q. Okay. And let's go ahead and look again at
10  the cover position.
11      A. Okay.
12      Q. And I think this is very nearly identical to
13  the cover position that was described in Exhibit 11.
14  Is it fair to say that in the cover position, the
15  weapon is shouldered, as you understand, the universal
16  cover position?
17      A. Yes.
18      Q. All right. And the sights are just below the
19  threat so you can see their hands?
20      A. Yes.
21      Q. And the safety is off?
22      A. I guess some of that would depend on what's
23  going on.
24      Q. And I do understand that, Officer. But at
25  least in terms of how the universal cover position is

Case 1:10-cv-00041-ABJ Document 65-11 Filed 01/10/11 Page 43 of 77

Tricia Wachsmuth v.                                                    Mike Hall
City of Powell, et al.                                          October 7, 2010

1  defined, the safety is off, correct?
2      MS. WESTBY: I'm sorry.
3      THE WITNESS: There's facts that aren't being
4  presented. I mean, there's a lot of variables there
5  that could make your safety be on or off.
6  BY MR. GOSMAN:
7  Q. I understand that.
8      MR. THOMPSON: I'm going to object to the
9  extent that the document that you're having him read
10 into the record speaks for itself.
11 BY MR. GOSMAN:
12 Q. All right. So in other words, the
13 description of the cover position that's described here
14 and provided at the end of Exhibit 11, it is not
15 correct or accurate, as you understand the cover
16 position, because it depends on circumstances whether
17 or not the safety is on or off?
18     MS. WESTBY: Object to the form of the
19 question. Completely misstates his testimony.
20     MR. THOMPSON: Objection.
21 BY MR. GOSMAN:
22 Q. Okay. See if you can straighten that out.
23     MS. WESTBY: If you understand the question.
24 I don't even understand your question, other than that
25 it misstated what he just said.

1      THE WITNESS: I guess I would agree that it
2  misstated what I said.
3  BY MR. GOSMAN:
4  Q. Okay.
5  A. I'm just saying that in the book it says
6  safety off.
7  Q. Right.
8  A. But are we talking real world scenarios?
9  Q. We're talking training.
10 A. Again, it would depend. It would depend if
11 we're just engaging our target. Are there other
12 targets that might pop up? We don't know. There's a
13 lot of things we don't know here.
14 Q. Have you ever been trained in the universal
15 cover position?
16 A. Yes.
17 Q. Were you trained to have your safety off?
18 A. I can't remember in the training because
19 you're put through scenarios. I don't know if they
20 ever said one way or another, if at any time you're in
21 the cover position, this is where your safety should
22 be. I don't know.
23 Q. And when you're conducting room-clearing
24 operations, tell me which weapon position that you've
25 been trained to use.

1  A. Out of what's in here?
2  Q. Yes. Are there any weapon positions that we
3  haven't covered that are relevant to the question of
4  the use of a weapon in a room-clearing --
5  A. I mean, honestly, we haven't talked about
6  your weapon being slung. You haven't talked about
7  holstered.
8  Q. That's true.
9  A. Repeat the question, please.
10 Q. Sure.
11     Which of the weapon positions that we've
12 reviewed here most accurately describes how you've been
13 trained to clear rooms in a dynamic entry situation?
14     MR. THOMPSON: Objection as to form.
15     MS. WESTBY: Join.
16     THE WITNESS: I don't think there's just one
17 position that we've been trained in.
18 BY MR. GOSMAN:
19 Q. Well, go ahead and explain that.
20 A. Okay. I mean, at what point during a
21 room-clear? At what point? Where are you asking as
22 far as in a scenario?
23 Q. Does it make a difference where you are in a
24 room?
25 A. I'm not talking where I am in a room. I'm

1  talking about where a threat might be or objects may
2  be.
3  Q. All right. And that's a fair statement.
4  Let's assume that you are clearing rooms and you have
5  not encountered a threat, but you're engaged in a
6  room-clearing operation as you've been trained to do
7  that. What is your weapon position?
8  A. I would say it would either be in the ready
9  position or in a cover mode.
10 Q. All right.
11 A. And that's assuming you haven't encountered
12 anybody.
13 Q. Okay.
14 A. Can we break for some water?
15     MR. GOSMAN: Sure.
16     MS. WESTBY: Absolutely.
17     (Recess taken 11:43 to 11:53
18     a.m., October 7, 2010)
19     (Exhibit 37 identified)
20 BY MR. GOSMAN:
21 Q. Officer, what was your role in the execution
22 of the search warrant -- whoops. I'm sorry. Let's
23 strike that.
24     Let's turn to Exhibit 37. There's no 37, so
25 I'm going to just hand it to you. This is the City of

1   Powell Crisis Response Tactics.
2           Have you seen that document before?
3   A.  I can't say for sure. It looks familiar.
4       Q.  Did you know that the City of Powell --
5   what -- actually, I'm asking does the Powell Police
6   Department have a response tactics document? Do you
7   know? It's like available to the police officers as a
8   reference to it.
9   A.  Did I know that we did?
10  Q.  Yes.
11  A.  I don't think I knew that we did.
12      Q.  And you're not sure you'd seen that document
13  before?
14  A.  I can -- like I said, it looks familiar. I
15  don't know for sure if I've seen this whole document.
16      Q.  Okay. That's fine.
17          What was your role in the execution of the
18  search warrant on the Wachsmuth residence?
19  A.  I was on the entry team.
20      Q.  How did you learn about this warrant service?
21  A.  I was called at home.
22      Q.  Do you know about what time it was?
23  A.  I think I got two calls  One to make sure I
24  was around that night, like maybe around dinner time.
25  And then the one that called and said, "Okay. We need

1   you to come on in." I think there was two calls.
2       Q.  What is dinner time at your place?
3   A.  Whenever it's ready.
4       Q.  Okay. That's the way it's always been at my
5   place, too. And nobody argues with that.
6           So is it around 6:00? I assume it's after
7   5:00?
8   A.  I would say on average, it's between 4:00 and
9   6:00. Just depending.
10      Q.  Who did you receive the first call from?
11  A.  Sergeant Kent.
12      Q.  And who did you receive the second call?
13  A.  No, I believe it was also Sergeant Kent.
14      Q.  And why don't you take just a minute and tell
15  me, as best you can recollect, what Sergeant Kent told
16  you when he called you the first time.
17  A.  As best as I can remember, he just -- like I
18  said, he was just checking to see if I was around.
19  Said that they were working on maybe having a search
20  warrant to do later and wanted to know if I was
21  available.
22      Q.  Okay. When you say 'a search warrant later,"
23  did you understand that to be a search warrant that
24  would probably involve a dynamic entry?
25  A.  It didn't come up. It was just a search

1   warrant.
2       Q.  Okay. And then the second call.
3   A.  I think that one was really quick as well.
4   Just basically, "Okay. Come in if you're still
5   available."
6       Q.  Okay. Was it optional?
7   A.  It was never posed either way. Like I said,
8   I remember the term, "if you're available," or "are you
9   available." And I do remember, I just needed somebody
10  to sit with my kids.
11      Q.  Okay. About what time did you get down to
12  the police station, then?
13  A.  I don't remember for sure.
14      Q.  How long did it take you to get a babysitter
15  for your children?
16  A.  Probably a little over an hour.
17      Q.  When you arrived at the station, at what
18  stage was the search warrant planned, if you understand
19  what I meant. Did you arrive, you know, at the
20  beginning of the planning session? Were you in the
21  middle? Did you come late?
22  A.  I don't think it was any portion of the
23  planning. Because I was just sitting in the basement
24  waiting. Waiting for the rest of the guys to get back.
25  I think officer Miner had gone to get the warrant

1   signed, and we were waiting on him to get back. I
2   don't remember for sure. But it seemed like the plan
3   was already made.
4       Q.  Okay. And when you first arrived at the
5   police station, had Officer Miner returned with the
6   warrant?
7   A.  No. No, he was still gone.
8       Q.  Did you go directly to the basement?
9   A.  I don't know that I did.
10      Q.  Did you understand that the officers were
11  assembling in the basement for the execution of this
12  warrant?
13  A.  That -- yeah, that was what I gathered.
14      Q.  And when you went to the basement, who was
15  there?
16  A.  I don't remember.
17      Q.  Was it a fairly large group?
18          MR. THOMPSON: Objection as to form.
19          MS. WESTBY: Join.
20          THE WITNESS: I really don't remember. I
21  couldn't say for sure.
22  BY MR. GOSMAN:
23      Q.  Did you recognize anyone at that time that
24  was there in the basement with you?
25  A.  Like recognize their faces?

Case 1:10-cv-00041-ABJ Document 65-11 Filed 01/10/11 Page 45 of 77
Tricia Wachsmuth v.
City of Powell, et al.

Mike Hall
October 7, 2010

MIKE HALL - October 7, 2010                    Page 45
Direct Examination by Mr. Gosman

1   Q. Remember their names, I guess, is really what
2   I'm asking, because I have no --
3   A. Do I remember anybody that was in the
4   basement specifically?
5   Q. Yes.
6   A. I think the only one specifically that I
7   remember seeing was maybe Officer Danzer.
8   Q. There were more officers assembled in the
9   basement than Officer Danzer, would that be true?
10  A. I believe so.
11  Q. And after you arrived and went to the
12  basement, did you notice other people coming into the
13  room?
14  A. While we waited?
15  Q. Yes.
16  A. Yeah, seemed like there was a couple other
17  guys that trickled in.
18  Q. Do you have any idea how large that group was
19  when you were given your instructions and left?
20  A. Left to go do the warrant?
21  Q. Yes.
22  A. There must have been a dozen or so of us.
23  That would have been after the briefing.
24  Q. After the briefing?
25  A. Yes.

MIKE HALL - October 7, 2010                    Page 46
Direct Examination by Mr. Gosman

1   Q. Okay. So when did the briefing occur?
2   A. Time wise?
3   Q. Yes, roughly. No, let's back up.
4   You were in the basement. How long had you
5   been in the basement when the briefing occurred?
6   A. I have no idea. It was almost two years ago.
7   Q. Did the briefing take place in the basement?
8   A. Yes.
9   Q. And was the briefing presented to the entire
10  team, as far as you know?
11  A. I think the only one that didn't hear the
12  briefing was officer Blackmore.
13  Q. Where was he, do you know?
14  A. He was out doing surveillance on the house.
15  Q. Did you hear anything about officer
16  Blackmore's surveillance?
17          MR. THOMPSON: At what point in time,
18  Counsel?
19          MR. GOSMAN: Yes.
20  BY MR. GOSMAN:
21  Q. While you were in the basement and being
22  briefed.
23  A. I remember he said he was just in the
24  vicinity of the house.
25  Q. We'll talk more about that in a minute. Who

MIKE HALL - October 7, 2010                    Page 47
Direct Examination by Mr. Gosman

1   conducted the briefing?
2   A. As best I remember, it was Officer Miner and
3   Sergeant Chretien.
4   Q. And was Sergeant Kent present?
5   A. I don't specifically remember seeing him
6   there.
7   Q. Was Sergeant Eckerdt present?
8   A. I don't know. I mean, I'm sure he was. But
9   I can't say I remember seeing him.
10  Q. Go ahead and tell me now what it was that you
11  learned in the briefing.
12  A. From where to where? There was a lot --
13  Q. Start to finish, and I understand we may
14  cover quite a bit of territory here. But let's start
15  at the beginning --
16          MR. THOMPSON: Object as to form.
17          MS. WESTBY: Join.
18          MR. THOMPSON: Go ahead.
19          THE WITNESS: We were given the address of
20  the residence. We were told that it was a marijuana
21  grow. We were told that the suspect, Bret Wachsmuth,
22  was indeed DCI Wachsmuth's son. The other suspect was
23  his wife. We were told that Bret Wachsmuth had guns
24  placed throughout the house, more or less
25  strategically. Some in the bedroom, some potentially

MIKE HALL - October 7, 2010                    Page 48
Direct Examination by Mr. Gosman

1   in other places in the house. He and Tricia were both
2   paranoid, that they peeked out the windows. I think we
3   called them window peekers or peepers or something like
4   that.
5       We were given a description of the house,
6   description of their lot, the fenced backyard, I think,
7   where the garage sat. Given a description of their
8   vehicles, because the vehicles were part of the search
9   warrant.
10      Sergeant Eckerdt brought up that he'd seen a
11  photo somewhere with Bret and another male, maybe
12  Bret's brother, wearing, like, bulletproof vests, kind
13  of like raid gear and holding assault rifles.
14  BY MR. GOSMAN:
15  Q. Okay. Now I will stop you there.
16  A. Okay.
17  Q. You were shown this photo?
18  A. No, that's not what I said.
19  Q. All right. You were not shown the photo?
20  A. Correct.
21  Q. You were told about the photo?
22  A. Correct.
23  Q. In the planning session that evening?
24  A. Yeah.
25  Q. Who told you?

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 46 of 77
Tricia Wachsmuth v.                                                                    Mike Hall
City of Powell, et al.                                                         October 7, 2010

MIKE HALL - October 7, 2010                                              Page 49
Direct Examination by Mr. Gosman

1    A.  In the briefing.  Not from the planning.
2    Q.  Okay.  Fair enough.  That's a good point.
3        In the briefing meeting.  Who told you?
4    A.  That was Sergeant Eckerdt.
5    Q.  That was Sergeant Eckerdt?
6    A.  Yes.  So he was there.  And I can say that
7    for sure now.
8    Q.  Do you know where he got the photo?
9        MR. THOMPSON: Objection as to form.
10       MS. WESTBY: Join.
11   BY MR. GOSMAN:
12   Q.  Do you know?
13   A.  I want to say he saw it on MySpace or
14   something on the computer.
15   Q.  Okay.  So that was information that Sergeant
16   Eckerdt contributed, and he had personal knowledge of
17   it; would that be a fair statement?
18   A.  I would say he had personal knowledge of
19   seeing the photo.
20   Q.  All right.  That's fine.
21       Okay.  Go ahead.  I interrupted you.
22   A.  We were told there may be armor-piercing
23   bullets inside the house.  We were told --
24   Q.  Let me stop you there  Who told you that?
25   A.  I want to say it was Officer Miner just in

MIKE HALL - October 7, 2010                                              Page 51
Direct Examination by Mr. Gosman

1    Blackmore had seen a vehicle leave.
2    Q.  Go ahead.
3    A.  And I know Officer Miner went through what
4    the search and seizure warrant was for, specifically
5    marijuana plants and things associated with growing
6    marijuana.  He also talked about stuffed animals that
7    were being used to ship pills from Tricia's mother.  So
8    we're looking for that type of stuff.
9        Seems like there was some talk of other
10   prescription pills.  But it may have been in the same
11   conversation with Tricia's stuffed animals.  I don't
12   remember for sure.
13   Q.  Well, you've done a pretty good job --
14       MS. WESTBY: Well, I think you need to ask if
15   he's finished before you proceed.
16       MR. GOSMAN: That's just about what I was
17   going to do.
18       See, you didn't let me finish my question.
19   BY MR. GOSMAN:
20   Q.  We haven't, of course, talked about your role
21   in the plan at this point yet --
22       MS. WESTBY: And again --
23       MR. GOSMAN: Excuse me.  May I finish my
24   question?
25       MS. WESTBY: No, because you interrupted him.

MIKE HALL - October 7, 2010                                              Page 50
Direct Examination by Mr. Gosman

1    the -- in the intel section of this is what we know
2    about our suspects.
3    Q.  And that would have been Officer Miner that
4    conducted the intel portion of the briefing, in terms
5    of the knowledge of the suspects?
6    A.  Yeah.
7    Q.  All right.  Go ahead.
8    A.  We were told that -- I guess it would have
9    been Officer Blackmore had seen maybe a male and a
10   child enter the house at one point.  And that -- I
11   don't remember if that was during the briefing or
12   during the planning.  I know that was given to us
13   during the briefing.  I don't know when he saw that.
14   Does that make sense?
15   Q.  Yes, it does.
16   A.  Okay.  So that was given to us in the
17   briefing.
18   Q.  When you learned about this, were you told
19   the age of the child?  The approximate age of the
20   child?
21   A.  I can't remember if I -- I mean, I can't
22   remember if it came out that -- I remember it was a
23   child.
24   Q.  Okay.  Go ahead.
25   A.  And I believe they related to us that Officer

MIKE HALL - October 7, 2010                                              Page 52
Direct Examination by Mr. Gosman

1    Were you finished answering his question?
2        THE WITNESS: That's what I remember we
3    talked about.
4    BY MR. GOSMAN:
5    Q.  Okay.  All right.  Did anyone say anything
6    about whether or not Bret Wachsmuth had a prior
7    criminal history?
8    A.  Not that I remember.
9    Q.  And did anyone say anything about whether or
10   not Bret Wachsmuth had a history of violence?
11       MR. THOMPSON: Objection as to form.
12       MS. WESTBY: Join.
13       THE WITNESS: Not that I remember.
14   BY MR. GOSMAN:
15   Q.  And did anyone say that Tricia Wachsmuth had
16   a criminal history?
17   A.  Again, not that I remember.
18   Q.  Or that she had a history of violence?
19       MS. WESTBY: Object as to form.
20       MR. THOMPSON: Join.
21       THE WITNESS: I don't remember.
22   BY MR. GOSMAN:
23   Q.  Did that thought occur to you as you sat
24   there during the portion of the meeting?
25   A.  Which thought?

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 47 of 77
Tricia Wachsmuth v.                                                                    Mike Hall
City of Powell, et al.                                                         October 7, 2010

1   Q. That no one mentioned anything about criminal
2   history or history of violence on the part of these two
3   kids?
4           MR. THOMPSON: Objection as to form.
5   Misstates his testimony.
6           MS. WESTBY: Join.
7           THE WITNESS: Sorry. Can you repeat that?
8   BY MR. GOSMAN:
9   Q. Did the thought occur to you that no one had
10  mentioned anything about criminal history or history of
11  violence on the part of these two kids?
12          MR. THOMPSON: Objection as to form.
13          MS. WESTBY: Join.
14          THE WITNESS: I think being that I can't
15  remember if it was or wasn't mentioned, I can't say
16  that I thought about it. I don't know.
17  BY MR. GOSMAN:
18  Q. Well, you didn't mention it in the narrative
19  that you just gave me relating all of the information
20  that you remember receiving from the officers there
21  that were speaking about the threat that was present in
22  the home.
23          MR. THOMPSON: Objection as to form.
24  Misstates his testimony.
25

1   BY MR. GOSMAN:
2   Q. Let's not use threat present in the home,
3   because I don't think we have said that at this point.
4           You didn't mention in the narrative you gave
5   me, correct, that, in fact, you were informed that
6   Tricia or Bret Wachsmuth had either a criminal history
7   or a history of violence?
8           MR. THOMPSON: Objection as to form.
9   Misstates his testimony.
10          Counsel, he stated that he saw him in
11  tactical gear with a bulletproof vest.
12          MR. GOSMAN: You don't need to testify to
13  that.
14          MR. THOMPSON: No, I don't. But I'm trying
15  to move this along so we're not here -- I objected as
16  to form -- objected as to form. And the third time I
17  stated something that I thought would be helpful.
18          MR. GOSMAN: If we're going to really try to
19  get things hurried along here, let's get back to the
20  question.
21          THE WITNESS: So we're clear, Sergeant
22  Eckerdt is the one that talked about the picture. I
23  never saw the picture.
24  BY MR. GOSMAN:
25  Q. All right. Now that your counsel has

1   mentioned it, did you think that the picture that
2   Sergeant Eckerdt mentioned was circumstantial evidence
3   of violence on the part of Bret Wachsmuth?
4   A. No. It was a concern knowing that he
5   potentially could have vests similar to ours, guns
6   similar to ours. It was a concern.
7   Q. Did any officer tell you that there was a
8   potential threat at the Wachsmuth home that the weapons
9   would, in fact, be employed and that -- and that that
10  was the reason that you were gathered together that
11  night to go serve the warrant?
12          MR. THOMPSON: Objection as to form.
13          MS. WESTBY: Join.
14          THE WITNESS: That's like three questions.
15  Which one do you want?
16  BY MR. GOSMAN:
17  Q. All right. The one that I'm looking for is:
18  Were you told that night that Tom -- rather, Bret
19  Wachsmuth presented a threat to the officer's safety,
20  and that was the reason why you were going into the
21  home as a team, a tactical team?
22          MR. THOMPSON: Objection as to form.
23          MS. WESTBY: Join.
24          THE WITNESS: Were we told that Bret was a
25  threat? Is that what you're asking?

1   BY MR. GOSMAN:
2   Q. Yes.
3           MR. THOMPSON: Objection as to form.
4           MS. WESTBY: Join.
5           THE WITNESS: Okay. We were not told Bret
6   was a threat. The totality of everything that we knew
7   in the intel that we had could lead us to believe that
8   he was a threat.
9   BY MR. GOSMAN:
10  Q. All right. Were you told that?
11  A. Told what?
12  Q. That the information that you had gathered in
13  the totality of circumstances led the plan organizers
14  to believe that Bret posed a threat?
15          MR. THOMPSON: Objection as to form.
16          MS. WESTBY: Join.
17          THE WITNESS: If I remember correctly, we
18  were just given all of the info. And I think
19  reasonably we could conclude that there was a threat.
20  BY MR. GOSMAN:
21  Q. All right. And I assume that during this
22  briefing, assignments were made; is that correct?
23  A. Yes.
24  Q. And what was your assignment?
25  A. The entry team.

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 48 of 77
Tricia Wachsmuth v.                                                          Mike Hall
City of Powell, et al.                                                  October 7, 2010

MIKE HALL - October 7, 2010                    Page 57
Direct Examination by Mr. Gosman

1   Q. Had you ever done that before?
2   A. The entry team?
3   Q. Yes.
4   A. In training? In scenarios?
5   Q. In training.
6   A. Yes.
7   Q. Had you ever done it in an actual operational
8   setting?
9   A. Aside from training?
10  Q. Yes.
11  A. No.
12  Q. Why don't you turn for a moment -- let me ask
13  one other question before I leave this subject.
14     Did there come a time when Chief Feathers
15  actually made an appearance at the briefing?
16     MS. WESTBY: Object to the form of the
17  question.
18     MR. THOMPSON: Join.
19     THE WITNESS: I don't remember if I did or
20  not.
21  BY MR. GOSMAN:
22  Q. Did you understand that the Chief had
23  approved of the operation?
24     MR. THOMPSON: Objection as to form.
25     THE WITNESS: I don't know that that ever

MIKE HALL - October 7, 2010                    Page 58
Direct Examination by Mr. Gosman

1   came up.
2   BY MR. GOSMAN:
3   Q. Okay. When did you first learn that you
4   would be doing a dynamic entry of the Wachsmuth
5   residence that night?
6   A. During the briefing.
7        (Exhibit 10 identified)
8   BY MR. GOSMAN:
9   Q. Let's go ahead and take a look at Exhibit 10
10  for a moment. And I can tell you that it appears from
11  other officer's testimony that this document was
12  actually prepared by a woman who was a dispatcher at
13  the time. I think her name was Torczon. Do you
14  recognize that name?
15     MR. THOMPSON: Objection as to form.
16     MS. WESTBY: Yeah, I mean, I don't think you
17  can represent that to this witness. I think you can
18  say that this might be her document.
19  BY MR. GOSMAN:
20  Q. Okay. People have testified that this might
21  be her document. Do you know a woman by the name --
22  who works for dispatch named Torczon?
23  A. There's no one named Torczon.
24  Q. Who was working at dispatch that night, do
25  you know?

MIKE HALL - October 7, 2010                    Page 59
Direct Examination by Mr. Gosman

1   A. I believe one was Marrisa Torczon.
2   Q. Okay. I'm going to write that down. Do you
3   know how to spell her name?
4   A. Not accurately, no.
5   Q. Okay. That's fine.
6      Did you see her there that night?
7   A. I believe I did.
8   Q. Okay. Did you notice that she was taking
9   notes?
10  A. No, I didn't notice.
11  Q. Do those -- do the notes that are placed on
12  that -- those two pages, Exhibit 10, correspond with
13  the information that you received at the briefing that
14  night?
15  A. Which part?
16  Q. I'm actually looking -- it seems to me that
17  whole body of the two pages of notes deal with the
18  planning stage of the operation.
19  A. Okay. So what were you asking? I'm sorry.
20  Q. Yes. Do those notes correspond with what you
21  understood the planning and the operational information
22  that was given that night to be?
23     MR. THOMPSON: Objection as to form.
24     MR. GOSMAN: That was a bad question. Poorly
25  stated.

MIKE HALL - October 7, 2010                    Page 60
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q. Do those notes correspond with what you heard
3   that night?
4      MS. WESTBY: Object to the form of the
5   question.
6      MR. THOMPSON: Join.
7      THE WITNESS: There's things in here that do
8   seem inaccurate.
9   BY MR. GOSMAN:
10  Q. Go ahead. What things?
11  A. I don't remember talking anything about 20 to
12  30 plants.
13  Q. Okay. How many plants do you remember
14  talking about?
15  A. I don't know that we ever assigned a number
16  to it. I think it was a few or something to that
17  effect.
18  Q. Did you get the impression that this was a
19  commercial operation where the plants were being grown
20  for sale?
21  A. I don't know how to answer that.
22  Q. Well, did anybody ever -- did anybody say
23  during this briefing, that Bret or Tricia Wachsmuth
24  were suspected of selling drugs?
25  A. I don't remember for sure.

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 49 of 77
Tricia Wachsmuth v.                                                    Mike Hall
City of Powell, et al.                                          October 7, 2010

| MIKE HALL - October 7, 2010                            Page 61 | MIKE HALL - October 7, 2010                            Page 63 |
|---|---|
| Direct Examination by Mr. Gosman | Direct Examination by Mr. Gosman |

**Page 61**

Direct Examination by Mr. Gosman

1    Q. Okay.
2    A. I mean, that's honest. I don't remember.
3    Q. And so you don't remember hearing that there
4 were 20 to 30 plants in the residence?
5    A. I don't remember that number, no.
6    Q. Okay. And is there any other information
7 that you see there that is not accurate?
8       MS. WESTBY: Object to the form of the
9 question.
10      MR. THOMPSON: Join.
11      MS. WESTBY: And this exercise in general.
12      THE WITNESS: Can you maybe be more specific?
13 BY MR. GOSMAN:
14    Q. Well -- and I will be more specific. But for
15 right now, I just am asking for your first impression
16 of the document, and you said you saw some things that
17 you didn't think were accurate. And I want to make
18 sure that we haven't left anything behind that you do
19 recognize looking at the document that are -- that
20 don't represent information that you remember receiving
21 that night.
22      MS. WESTBY: Same objection.
23      THE WITNESS: So are we talking about what I
24 remember seeing or are we talking inaccuracies?
25

**Page 63**

Direct Examination by Mr. Gosman

1    A. That list looks the way I remember it.
2    Q. Okay. The warrant was to be a
3 knock-and-announce warrant, did you understand that?
4    A. Yes.
5    Q. Was it represented to you that there was one
6 male and, possibly in the home, one female in the home,
7 and then it does say ten-year-old child?
8    A. The ten-year-old, I couldn't tell you. I
9 remember child.
10    Q. Okay.
11    A. Possibly a child. And that we believed that
12 Bret and Tricia were both in the house.
13    Q. And were you told that no more than -- there
14 were no more than three adults in the home?
15    A. That, I don't remember.
16    Q. Were you told that everyone gets cuffed?
17    A. I believe we were.
18    Q. Okay. And who is Scott Bagnell?
19    A. He's a EMT at the hospital.
20    Q. Do you know if he was contacted?
21    A. I don't know.
22    Q. "Scoop Wachsmuth out;" were you told that
23 Wachsmuth would be removed from the house immediately?
24    A. I believe we were.
25    Q. And was that Bret or Tricia or both?

| MIKE HALL - October 7, 2010                            Page 62 | MIKE HALL - October 7, 2010                            Page 64 |
|---|---|
| Direct Examination by Mr. Gosman | Direct Examination by Mr. Gosman |

**Page 62**

1 BY MR. GOSMAN:
2    Q. We're talking what you remember, whether it
3 corresponds with what you see on that page, Officer.
4    A. Okay. There's a lot of things in here that I
5 can't say that I remember for sure.
6    Q. Okay.
7    A. The drawings on the second page are what I
8 remember. Okay. Now, this -- we've established I
9 didn't make this drawing. The drawings that I'm
10 comparing these to is what was drawn for us on the
11 board. So these seem --
12    Q. Okay. Do you remember specifically seeing a
13 drawing of the basement?
14    A. More so the upstairs than the downstairs.
15 The upstairs is what sticks in my mind.
16    Q. Okay. Other officers have testified that the
17 list contained on Exhibit 10 with the officer
18 assignments was accurate as far as they were aware.
19      Do you see anything with that list that you
20 would take issue with?
21    A. The front or the back?
22    Q. Yes, there are two lists. I'm talking about
23 the one on the front page?
24    A. With all our numbers next to them?
25    Q. Uh-huh.

**Page 64**

1    A. That, I don't know. I think we had talked
2 about getting them both out of the house right away.
3    Q. And it says Chad or Dave talked to Wachsmuth.
4 What was that about?
5    A. I don't remember.
6    Q. Probably Chad Miner or Dave Chretien?
7    A. Dave Brown.
8    Q. Oh, okay. "Scoop Wachsmuth out. Chad or
9 Dave talk to Wachsmuth. He is a pill crusher." Do you
10 remember hearing that?
11    A. Not specifically.
12    Q. "Handguns loaded everywhere in the house,"
13 exclamation point.
14    A. I don't know if we were told everywhere. I
15 know we were specifically told in the bedroom and
16 possibly in the living room. I don't know if the word
17 "everywhere" came up.
18    Q. "Wife drives a Jimmy"?
19    A. It's possible.
20    Q. Okay.
21    A. I don't know.
22    Q. "Growing stuff under the stairs;" were you
23 told that?
24    A. That we were told. By stuff, marijuana.
25    Q. Okay. Do you know what PPD Tac I coded

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 50 of 77
Tricia Wachsmuth v.                                                                           Mike Hall
City of Powell, et al.                                                              October 7, 2010

MIKE HALL - October 7, 2010                    Page 65
Direct Examination by Mr. Gosman

1   means?
2       A.  That's our tactical channel.
3       Q.  I see.  Okay.  That's how you were going to
4   communicate?
5       A.  Correct.
6       Q.  On the right-hand side of that page, there's
7   a list with seven entries on it.  Does that describe
8   the -- basically, the operation?
9           MS. WESTBY:  Object to the form of the
10  question.
11          MR. THOMPSON: Join.
12          THE WITNESS: I don't know.  I mean, I didn't
13  write it.  But it -- I don't think that's an accurate
14  reflection of how it was supposed to go.
15  BY MR. GOSMAN:
16      Q.  Okay.  Why not?
17      A.  In the briefing, we talked specifically about
18  the flashbang being reactive to what happened at the
19  door.
20      Q.  Okay.
21      A.  As opposed to here, she's got it reversed.
22      Q.  Okay.
23      A.  Does that make sense?
24      Q.  Yes, it does.
25      A.  Okay.  I don't know why, but like I said, in

MIKE HALL - October 7, 2010                    Page 66
Direct Examination by Mr. Gosman

1   the briefing, it was mentioned that if we don't crash
2   the door, we don't flashbang the house.
3       Q.  Okay.
4       A.  So in a nutshell, if they answer the door and
5   there's no threats, they don't flashbang the bedroom.
6   Is that fair?
7       Q.  It's what you said.
8       A.  I guess what I'm saying, is that understood?
9       Q.  Well, let me ask you this question:  This was
10  a knock-and-announce warrant, you understood that?
11      A.  Absolutely.
12      Q.  What is a knock-and-announce warrant?
13      A.  Knock-and-announce warrant is that you knock
14  on the door, announce your presence and your purpose,
15  give them a reasonable amount of time to answer the
16  door, and then if they do not you have the authority
17  to gain entry.
18      Q.  Okay.  And what is a no-knock warrant?
19      A.  That would be a warrant that you don't have
20  to knock and announce your presence.  You can just show
21  up, gain entry by whatever means you need to do to gain
22  entry.
23      Q.  So everyone was clear -- well, everyone was
24  clear -- you were clear that this was a
25  knock-and-announce warrant and not a no-knock

MIKE HALL - October 7, 2010                    Page 67
Direct Examination by Mr. Gosman

1   situation, correct?
2       A.  Correct.
3       Q.  All right.  And so you knew that it was
4   inappropriate -- in fact, it would be a violation of
5   the Fourth Amendment to fail to allow the homeowner to
6   respond to the door after you knocked on it; wouldn't
7   that be true?
8           MS. WESTBY:  Object to the form of the
9   question.  Misstates the law absolutely completely.  So
10  I'm not going to allow him to --
11  BY MR. GOSMAN:
12      Q.  What is your understanding of the law as it
13  pertains to the Fourth Amendment of knock and announce?
14          MS. WESTBY:  Object to the form of the
15  question.
16          THE WITNESS: That's a pretty broad law.
17  BY MR. GOSMAN:
18      Q.  Actually, we're talking about knock and
19  announce and the Fourth Amendment to the Constitution.
20  What do you understand the Fourth Amendment requires
21  with regard to knock-and-announce warrants?
22          MR. THOMPSON: Objection as to form.
23  BY MR. GOSMAN:
24      Q.  If anything.  And if you don't know anything
25  about it that's fine.

MIKE HALL - October 7, 2010                    Page 68
Direct Examination by Mr. Gosman

1           MS. WESTBY:  Join.
2           MR. THOMPSON: Objection as to form.  Asked
3   and answered.
4           MS. WESTBY:  Join.
5           THE WITNESS: Can you repeat the question,
6   please?
7   BY MR. GOSMAN:
8       Q.  What does the Fourth Amendment to the
9   Constitution say about knock-and-announce warrants that
10  you know about?
11          MR. THOMPSON: Objection as to form.
12          MS. WESTBY:  Yeah.  And the Fourth Amendment
13  does not say anything about knock-and-announce
14  warrants.  So I'm not going to allow him to answer
15  your --
16          MR. GOSMAN: You got me there.
17  BY MR. GOSMAN:
18      Q.  All right.  Do you understand that the Fourth
19  Amendment has been interpreted to encompass
20  knock-and-announce situations?
21          MS. WESTBY:  Object to the form of the
22  question.
23          MR. THOMPSON: Join.
24          MS. WESTBY:  Your questions aren't consistent
25  with law.  I can't allow my client to answer your

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 51 of 77

Tricia Wachsmuth v.                                                                    Mike Hall
City of Powell, et al.                                                           October 7, 2010

MIKE HALL - October 7, 2010                                          Page 69
Direct Examination by Mr. Gosman

1   questions that are inconsistent.
2          MR. GOSMAN: I didn't make any statement on
3   the law.
4          MS. WESTBY: Yes, you did. That's precisely
5   what you did, and it's inaccurate. I can't allow him
6   to answer a question based on a legally inaccurate
7   premise.
8          MR. GOSMAN: Yes. Well, I wouldn't want that
9   to happen either. So my question was limited strictly
10  to his knowledge of whether the Fourth Amendment has
11  been interpreted to apply to knock-and-announce
12  warrants.
13         MR. THOMPSON: I'm going to object as to
14  form.
15         MS. WESTBY: Yeah
16  BY MR. GOSMAN:
17  Q.  Well, Officer, if you can?
18  A.  You're asking if the Fourth Amendment --
19  Q.  If you know whether the Fourth Amendment has
20  interpreted knock-and-announce warrants -- has been
21  interpreted by the courts in reference to
22  knock-and-announce warrants?
23  A.  I can't say that I know that.
24  Q.  Okay.
25         MS. WESTBY: And I just want to object to the

MIKE HALL - October 7, 2010                                          Page 70
Direct Examination by Mr. Gosman

1   form of the question.
2          MR. THOMPSON: Jo n.
3   BY MR. GOSMAN:
4   Q.  Okay. There's a little sort of notation at
5   the bottom right-hand of the page on Exhibit 10. It
6   says, "Called ambulance. No lights, no sirens." Do
7   you know what that was about?
8   A.  We talked about having ambulance staging
9   nearby, fire department. It says that right below
10  that. We had talked about normally when the ambulance
11  is called out, they can use lights and sirens and
12  things like that. We did not want them to use lights
13  and sirens in this case so that they couldn't be heard
14  by the people inside the house. We also asked they
15  take a different route instead of passing by on South
16  Street.
17  Q.  So did the ambulance stage at the residence,
18  then, with you, with the other police officers? Was
19  there an ambulance there?
20  A.  No, he'd asked them to stage at the fire
21  department. Or I should say that was the plan.
22  Q.  I see. But you didn't want them using their
23  sirens to drive to the fire department?
24  A.  Right.
25  Q.  All right. Oh, it says here, "Father, if

MIKE HALL - October 7, 2010                                          Page 71
Direct Examination by Mr. Gosman

1   shows up, Tom Wachsmuth stays in lobby." What do you
2   know about that?
3   A.  I can't say I remember it being talked about
4   specifically.
5   Q.  Do you remember anything about it?
6   A.  Only that Tom Wachsmuth was the father of
7   Bret.
8   Q.  Okay. Now, do you know why you were selected
9   for the entry team?
10  A.  I don't.
11  Q.  Okay. Did you -- were you aware of the
12  identity of the other officers who had been selected
13  for the entry team?
14  A.  Did I know who they were?
15  Q.  Did you know that they had been assigned the
16  entry team?
17  A.  Yes.
18  Q.  And did you know that other assignments on
19  this team had been made?
20  A.  On the entry team?
21  Q.  No, with respect to surveillance. There was
22  a back door team and there was, of course, the
23  flashbang, if you will, team. Were you aware of those
24  other assignments?
25  A.  I don't know that I knew what everybody

MIKE HALL - October 7, 2010                                          Page 72
Direct Examination by Mr. Gosman

1   else's assignment was. But I knew there were other
2   assignments.
3   Q.  Did you know what the assignments were?
4   A.  As far as teams go?
5   Q.  Yes.
6   A.  Yeah, there was a team with the flashbang to
7   go to the bedroom window. There was a team to go
8   toward the back of the house, and there was your entry
9   team.
10  Q.  Okay. So you all left the police station and
11  headed to the Wachsmuth residence, correct?
12  A.  Correct.
13  Q.  And you rode with whom?
14  A.  I believe I drove. And I don't know if
15  anyone else was with me.
16  Q.  How many cars were in that neighborhood that
17  night?
18  A.  I don't know.
19  Q.  Police cars.
20  A.  Don't know.
21  Q.  Did you assemble in front of the Wachsmuth
22  residence, then?
23  A.  No.
24  Q.  Where did you assemble?
25  A.  On Ingalls Street toward the intersection of

MIKE HALL - October 7, 2010                    Page 73
Direct Examination by Mr. Gosman

1 North Street.
2 Q. And how far is that from the Wachsmuth house?
3 A. Do you want just an estimate?
4 Q. Yes. A block, half a block?
5 A. A half a block maybe.
6 Q. And where was it again that you gathered
7 together -- I'm sorry -- the police?
8 A. Where we parked?
9 Q. Was that where you parked all together and
10 then you got out of your vehicles and sort of assembled
11 there where the vehicles were parked?
12 A. I don't know where everybody -- I know there
13 was a few cars around mine or in that area. But I
14 don't know where everybody parked. That's where I
15 parked was Ingalls and North.
16 Q. All right. And you met as a group about a
17 half a block from the Wachsmuth's house. Was that to
18 the west, to the east?
19 A. Which group?
20 Q. Well, the entry.
21 A. The entry team, we met and assembled right
22 there on the corner of Ingalls and North.
23 Q. Okay. And do you know where the other teams
24 assembled?
25 A. I don't.

MIKE HALL - October 7, 2010                    Page 74
Direct Examination by Mr. Gosman

1 Q. And how long did it take for you to move from
2 that place where you had assembled to the Wachsmuth
3 residence?
4 A. I'm not sure.
5 Q. And who was present with you in the entry
6 group?
7 A. Specifically, I remember Officer Chapman,
8 Officer Miner, and those are the only ones I can say
9 for sure.
10 Q. Well, let's go back to Exhibit 10 for a
11 moment and take a look at that list on the left-hand
12 column, which is on the front page, the first page.
13 And see if you can use that list to refresh your
14 memory. I assume the entry team was fully composed
15 when it arrived at the Wachsmuth residence; would that
16 be fair?
17 A. I believe so.
18 Q. So Chapman was there?
19 A. Yes.
20 Q. Danzer was there?
21 A. All I'm saying is I don't remember because we
22 lined up in order. So Chapman and Miner were in front
23 of me.
24 Q. Yes, that makes sense.
25 A. I couldn't tell you for sure who was behind

MIKE HALL - October 7, 2010                    Page 75
Direct Examination by Mr. Gosman

1 me.
2 Q. Did you know the order in which you were to
3 line up before you arrived there?
4 A. We had the order, but going out there, I
5 don't specifically remember what the order was, other
6 than where I was supposed to be and who was in front of
7 me.
8 Q. Okay. And where was Officer Miner in this
9 order?
10 A. He had the ram so he was toward the front
11 with Officer Chapman and I.
12 Q. All right. And where was Officer Chretien?
13 A. I don't know.
14 Q. Behind you apparently?
15 A. Behind me, yeah.
16 Q. Along with Sergeant Eckerdt?
17 A. I would assume so.
18 Q. You knew he was there, correct, even if you
19 didn't know right where he was?
20 MS. WESTBY: Object to the form of the
21 question.
22 Don't assume. Just answer what you know and
23 he can't ask you to.
24 THE WITNESS: I don't know that those guys
25 were behind me is what I'm saying.

MIKE HALL - October 7, 2010                    Page 76
Direct Examination by Mr. Gosman

1 BY MR. GOSMAN:
2 Q. But you know that they were there that night?
3 A. I know they were at the briefing.
4 Q. And did you see them again as the team
5 assembled?
6 A. Not -- no. That's what I'm saying. I can't
7 remember who I saw as we assembled, other than who was
8 directly in front of me.
9 Q. So you formed a line as you assembled there
10 and marched to the house?
11 A. Correct.
12 Q. You didn't notice anyone not being there;
13 would that be fair to say?
14 MS. WESTBY: Object to the form of the
15 question.
16 BY MR. GOSMAN:
17 Q. I mean, for instance, you didn't notice that
18 Roy Eckerdt just wasn't there?
19 A. Being that I can't say I saw Roy in the line,
20 I couldn't say he was there or wasn't there either.
21 Q. And as you approached the house, did
22 something happen that caused the group to sort of hurry
23 up?
24 A. I don't know that it caused us to hurry up
25 any more than we were trying to hurry.

1    Q.   Well, what happened?

2    A.   As we got close to the house, the dog started

3    barking.

4    Q.   And how long did the dog bark?

5    A.   Don't know.

6    Q.   Where were you when the dog started barking?

7    A.   We were still up by the sidewalk.  Kind of

8    cutting toward the porch.

9    Q.   And where was the -- did you have any idea

10   where the other groups were?

11   A.   I hadn't seen them from the time we left,

12   because we all had our specific assignments.

13   Q.   Did you learn later that the back door group

14   had not been able to get in position when the door was

15   breached and the flashbang went off?

16   A.   Did I learn that later?

17   Q.   Uh-huh.

18   A.   Yeah, I did.

19   Q.   But you don't think there was any effort to

20   hurry things up on the front end of this operation

21   before you arrived there on the porch?

22        MS. WESTBY: Object to the form of the

23   question.

24        MR. THOMPSON: Join.

25        THE WITNESS: That wasn't what I said.  You

1    asked if something happened that caused us to hurry.

2    BY MR. GOSMAN:

3    Q.   Yes.

4    A.   And I said no.  Nothing happened to cause us

5    to hurry.  We were just hust ing to get there.

6    Q.   I see.  So you weren't hurrying, but your

7    pace was accelerated, correct?

8    A.   Just to get from -- there was no last point

9    of cover anywhere.  So we wanted to get set up and in

10   position before anything could happen within that

11   house, if they knew we were coming.  There was no place

12   to hide, nothing like that.

13   Q.   Sounds like you were really concerned about a

14   pretty serious threat?

15        MS. WESTBY: Object to the form of the

16   question.

17        MR. THOMPSON: Join.

18        THE WITNESS: Why do you say that?

19   BY MR. GOSMAN:

20   Q.   Because you're talking about no place of

21   cover and you wanted to be on the front porch before

22   anyone in the house could observe you.  Did you feel

23   that the officers --

24        MS. WESTBY: Object -- object to the form of

25   the question.

1        MR. GOSMAN: Didn't you just say that?

2        MS. WESTBY: No, that misstates his

3    testimony.

4        MR. GOSMAN: Let's go back and read that

5    answer.

6             (The record was read as

7             requested.)

8    BY MR. GOSMAN:

9    Q.   So were you personally concerned that there

10   was a threat posed to your safety as you walked up to

11   the Wachsmuth house that night?

12   A.   In what way?

13   Q.   In the way that you just described, there was

14   no cover, and you wanted to get --

15   A.   Okay.  Now, we -- through the briefing and

16   the info we learned during that briefing, we believed

17   that there were threats to officer safety and potential

18   safety of others.

19   Q.   Okay.  Well, you've testified that you

20   believe that, but you haven't said that anyone else

21   actually said that.

22        MS. WESTBY: Object to the form of the

23   question.

24        MR. GOSMAN: All right.

25

1    BY MR. GOSMAN:

2    Q.   Well, you believe there were threats,

3    correct?

4    A.   I did.

5    Q.   Based on the information that you were given?

6    A.   And my training.

7    Q.   Well, I'm talking about the briefing.

8    A.   Okay.

9    Q.   All right.  So you were concerned about the

10   possibility of something happening to your personal

11   safety between that time that you were approaching the

12   house and actually got in a position where you could

13   have some cover?

14        MS. WESTBY: Object to the form of the

15   question.

16        MR. THOMPSON: Join.

17        THE WITNESS: Yes, I was concerned.

18   BY MR. GOSMAN:

19   Q.   And you accelerated your pace?

20   A.   No.  I didn't say we accelerated anything.

21   Q.   What did you say?

22   A.   I just said that we hustled.  We never

23   accelerated.

24   Q.   Okay.  Did it concern you that the element of

25   surprise had been lost when the dog started barking?

MIKE HALL - October 7, 2010                                          Page 81
Direct Examination by Mr. Gosman

1    A. Yes.
2    Q. And you arrived, then, on the porch, Officer
3  Hall, and were you still in the same order that you
4  assembled in?
5    A. The guys that were in front of me were the
6  same as when we left where we staged.
7    Q. And what happened? Did you -- well, let me
8  ask this question: As you arrived on the porch, did
9  someone say something about a person inside the home
10  peeking out the window?
11    A. Yes.
12    Q. Who was that?
13    A. I don't know said -- something to the
14  effect of somebody is looking or something like that.
15    Q. Okay.
16    A. I don't know who that was.
17    Q. Well, you were third in line, correct?
18    A. Correct.
19    Q. It probably wasn't somebody behind you,
20  correct?
21    A. Could have been somebody behind me.
22        MS. WESTBY: I'm not going to let him engage
23  in speculation. So he said he didn't know.
24  BY MR. GOSMAN:
25    Q. It could have been someone behind you, you

MIKE HALL - October 7, 2010                                          Page 82
Direct Examination by Mr. Gosman

1  said?
2    A. Very easily could have been someone behind
3  me.
4    Q. You don't remember who said it or know?
5    A. No, I don't.
6    Q. Did you know at the time?
7    A. Did I know what?
8    Q. Who said, "somebody is looking out the
9  window," or something to that effect?
10        MR. THOMPSON: Objection as to form.
11        THE WITNESS: I knew somebody said something
12  to that effect. I don't remember who.
13  BY MR. GOSMAN:
14    Q. All right. And so was that just before
15  Officer Chapman knocked on the door?
16    A. Well, I don't know about just before. But
17  that was said, I believe, as we were still approaching
18  the porch. Okay. So we had not yet set up on the
19  porch when somebody noticed her looking out the window.
20    Q. How do you know it was her looking out the
21  window?
22    A. That's what -- I'm say ng somebody said,
23  like, she's looking out the window, or something to
24  that effect. I'm not saying I knew it was her. I'm
25  saying somebody said something about somebody looking

MIKE HALL - October 7, 2010                                          Page 83
Direct Examination by Mr. Gosman

1  out the window.
2    Q. Okay. So did that cause you to hustle a
3  little more?
4    A. I don't think it did 'cause we were fairly
5  close to the porch.
6    Q. So you arrived on the porch, and why don't
7  you go ahead and give me the sequence of events between
8  that moment and when the door was breached?
9    A. Officer Chapman and Officer Miner went on to
10  the top of the porch right in front of the door. I was
11  kind of on the steps still. That -- I was looking
12  toward the window and could see somebody looking out
13  the window. Looked like a female.
14        And I said, "She knows we're here, guys."
15  Officer Chapman knocked on the door, announced,
16  "police, search warrant." It looked like -- as this
17  person's face came away from the window and the drapes,
18  it looked like they sat back down.
19    Q. So you had apparently observed that they were
20  standing before?
21    A. No. That's not what I'm saying. I'm saying
22  that it looked like they were leaning over the back of
23  a couch, okay?
24    Q. Okay.
25    A. Looking out the window, however it was,

MIKE HALL - October 7, 2010                                          Page 84
Direct Examination by Mr. Gosman

1  looking out the window. And as they came away from the
2  window, it looked like they spun around and --
3    Q. Sat back down?
4    A. -- sat back down.
5    Q. Did you consider that a threatening gesture?
6    A. Not in and of itself.
7    Q. Okay. Well, what does that mean, "not in and
8  of itself"?
9    A. Sitting down gesture in and of itself is not
10  necessarily a threatening gesture.
11    Q. So you saw that happen, and you said, "Guys,
12  she knows we're here"?
13    A. I said guys, she knows we're here while she's
14  still looking out the window.
15    Q. You were on the porch?
16    A. I was kind of on the steps.
17    Q. And what happened next?
18    A. After it looked like that person sat back
19  down. In fact, it went guys, she knows we're here.
20  Officer Chapman knocked, said, "police, search
21  warrant." Looked like this person turned around, sat
22  back down.
23    Q. Okay.
24    A. Didn't look like that person came toward the
25  door or anything. Just sat back down. Didn't move.

1   Q. Well, I'm certainly with you. Go ahead.
2   A. Okay. So we waited. Nothing happened.
3   There was no other movement. Officer Miner rammed the
4   door.
5   Q. Okay. How long did you wait?
6   A. I don't know.
7   Q. Give me your best estimate?
8       MR. THOMPSON: Objection as to form.
9       MS. WESTBY: Join.
10      THE WITNESS: I can't give a good estimate.
11  In that situation, it seems like an eternity.
12  BY MR. GOSMAN:
13  Q. What situation?
14  A. You're getting ready to do a high-risk search
15  warrant with guns and potentially bulletproof vests and
16  armor-piercing rounds and paranoid people, okay?
17  All -- I mean, I don't know the psychology of it, but
18  it seemed like an eternity. It seemed like a long time
19  we were on that porch.
20  Q. But you can't even begin to estimate the
21  length of time that elapsed between the knock on the
22  door and the battering ram being deployed?
23      MS. WESTBY: And again, object to the form of
24  the question. This is the third time. He's already
25  told you no.

1       THE WITNESS: I can't.
2   BY MR. GOSMAN:
3   Q. Okay. That's fine. Thank you. All right.
4       All right. So then Officer Miner breached
5   the door. And I would assume that Officer Miner sort
6   of stepped out of the way. He had the ram?
7   A. Yes.
8   Q. And everybody went in?
9   A. I know Officer Chapman and I went in.
10  Q. Okay. Now, are you trying to tell me that
11  you don't know whether anyone else went through that
12  door with the entry team that night?
13      MS. WESTBY: Object to the form of the
14  question.
15  BY MR. GOSMAN:
16  Q. Go ahead and tell me.
17      MS. WESTBY: Honestly, please do not treat
18  the witness that way. It's uncalled for.
19      MR. GOSMAN: All right.
20      MR. THOMPSON: And I would join.
21      MR. GOSMAN: Just to save some time here.
22      What was my question again? Did the witness
23  answer the question no? Because we don't want to ask
24  it again if we've got an answer.
25      (The record was read as

1       requested.)
2   BY MR. GOSMAN:
3   Q. Okay. Go ahead and answer that question, if
4   you can.
5   A. Because I was facing forward, okay, I don't
6   know who all came in behind us and when. I know
7   Officer Chapman was in front of me and then it was me.
8   I was number two.
9   Q. Did you learn later that the remaining entry
10  team had managed to get through the door with you?
11  A. I don't think it was ever said that it was
12  with me.
13      MR. GOSMAN: Let's go ahead and take lunch.
14  How about 2:00?
15      MR. THOMPSON: Okay.
16          (Recess taken 12:57 to 2:12
17          p.m., October 7, 2010)
18  BY MR. GOSMAN:
19  Q. Officer, I think we left off before lunch
20  with your coming through the door in the Wachsmuth
21  residence that night. Why don't you take me through
22  what happened for the next couple of minutes at
23  least -- well, and perhaps that is a bad reference.
24  I'm not sure that you'll know what happened for the
25  next couple of minutes. But tell me what happened

1   after you entered that house.
2   A. As we were going through the door, Officer
3   Chapman took an immediate right to go toward
4   Ms. Wachsmuth. She was still on the couch kind of down
5   toward the end of the couch away from the door.
6   Q. Yes. And I apologize for this, but I will
7   interrupt you from time to time in this narrative.
8       Was Ms. Wachsmuth sitting at that time?
9   A. Yes. Well, appeared to be sitting.
10  Q. All right. Go ahead.
11  A. So Officer Chapman went over toward her. As
12  I kept going straight I looked to my right to make sure
13  there was nobody else in that room from where Officer
14  Chapman went to the rest of the living room there.
15      When I got to the end of the wall, before you
16  would turn left to go into the bedrooms and where the
17  bathroom is, I thought I'd heard a gunshot and seen a
18  flash. It was the flashbang going off.
19      So I was at the corner right before you would
20  hook into the master bedroom when that went off.
21  Q. Were you with anyone?
22  A. There was nobody in front me.
23  Q. Was there anyone with you? At your side?
24  Just behind you?
25  A. I don't know where they were. I know

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 56 of 77
Tricia Wachsmuth v.                                                                    Mike Hall
City of Powell, et al.                                                         October 7, 2010

MIKE HALL - October 7, 2010                    Page 89
Direct Examination by Mr. Gosman

1   somebody wasn't to my side.
2       Q.   Officer, as you came through the door and
3   observed Officer Chapman take control of Tricia
4   Wachsmuth, did you notice his weapon position?
5       A.   I did.
6       Q.   What was it?
7       A.   He had -- his rifle was slung. He had his
8   right hand kind of on the grip. And he was motioning
9   toward Tricia with his left hand. And I believe
10  telling her to get on the ground. And he was motioning
11  like this. The gun was pointed down at an angle.
12      Q.   Did you have a chance to observe in that
13  short period of time Ms. Wachsmuth's reaction to the
14  command of Officer Chapman?
15      A.   The only thing I remember was when she was on
16  the couch, and he was doing that, she kind of had her
17  legs tucked up, kind of, on the couch. And I do
18  remember she hollered. She screamed about the same
19  time we hit the door, like we scared her.
20      Q.   Okay. I'm going to back you up for just a
21  second and ask you if when you -- let me ask this
22  question as a precursor to that question. Were you
23  told in your briefing the type of automobiles that the
24  Wachsmuth's drove?
25      A.   We were. I don't know up until a couple of

MIKE HALL - October 7, 2010                    Page 90
Direct Examination by Mr. Gosman

1   days ago. I could have said for sure what they were in
2   the briefing.
3       Q.   So when you arrived on the scene, did you
4   notice that one of the vehicles was missing?
5       A.   No. I think partly because we came from the
6   other side of the house from where the driveway was.
7   We came from the east.
8       Q.   Did anyone in your group, as you remember it,
9   take the time to go sort of around the perimeter of the
10  house, at least to the area where the garage was, to
11  see the vehicles that might have been there?
12      A.   My group being the entry team?
13      Q.   Yes.
14      A.   Not out of our group.
15      Q.   Did you see anyone else do that?
16      A.   I didn't see anybody else do that.
17      Q.   The garage is on the opposite side of the
18  window where the flashbang was detonated, correct?
19      A.   Yes.
20      Q.   Were you communicating by radio with any of
21  the other teams?
22      A.   I wasn't specifically.
23      Q.   All right. Do you know whether that was
24  something that was planned?
25      A.   What was planned?

MIKE HALL - October 7, 2010                    Page 91
Direct Examination by Mr. Gosman

1       Q.   To have radio communication to coordinate the
2   events of the team prior to the entry?
3       A.   I know we talked about going on the Powell PD
4   tac channel, tactical channel. I don't remember if
5   anybody specifically was communicating or had said
6   anything to that effect.
7       Q.   You heard the blast of the flashbang, and
8   apparently you saw the light that had emitted, correct?
9       A.   It was a flash, yes.
10      Q.   And you were not in the bedroom when that
11  happened?
12      A.   Correct.
13      Q.   But you had already breached the door?
14      A.   Yes.
15      Q.   All right. And did you change your weapon
16  position at that time?
17      A.   I don't know if I had necessarily changed it.
18  I don't remember -- I know I wasn't completely up in a
19  weapon presentation. I may have just been down a
20  little as I walked --
21      Q.   Into the house?
22      A.   -- into the house. Because like I said,
23  Officer Chapman went right, so now I was the lead guy
24  going further into the house. So instead of having my
25  vision obstructed -- I don't remember if I was here

MIKE HALL - October 7, 2010                    Page 92
Direct Examination by Mr. Gosman

1   or -- say to the ready position. I don't remember.
2   But like I said, I thought it was a gunshot.
3       Q.   All right. But you did describe a weapon
4   position where you weren't quite in the cover position
5   because the rifle wasn't shouldered and you weren't
6   focusing on the front sight. But you had the gun
7   shouldered with the muzzle lowered slightly?
8           MS. WESTBY: Object to the form of the
9   question.
10          MR. THOMPSON: Join.
11          THE WITNESS: That wasn't what I said.
12  BY MR. GOSMAN:
13      Q.   We'll leave the record the way it is.
14      A.   I can't remember which way it was.
15      Q.   All right. And did you enter the bedroom,
16  then, after the flashbang was detonated?
17      A.   Yes.
18      Q.   And what did you find in the bedroom?
19      A.   Very first thing I saw was at least one
20  handgun laying on the foot of the bed.
21      Q.   Did you turn on the light then?
22      A.   No.
23      Q.   Okay.
24      A.   I have a flashlight on the end of my gun.
25      Q.   Did there come a time when you did turn on

Case 1:10-cv-00041-ABJ Document 65-11 Filed 01/10/11 Page 57 of 77
Tricia Wachsmuth v.
City of Powell, et al.
Mike Hall
October 7, 2010

1  the light in that room while you were there?
2    A. I don't think I turned it on.
3    Q. So what you observed, you observed with the
4  flashlight, correct?
5    A. Correct.
6    Q. Did you observe the area where the flashbang
7  detonated?
8    A. Immediately?
9    Q. Well, while you were in that room?
10   A. Yeah, at some point while I was in that
11 bedroom.
12   Q. And by the way, when I say while you were in
13 that bedroom, I mean while you were in that bedroom
14 after you entered it just shortly after coming into the
15 house. You may have gone back to that bedroom on
16 several different occasions. I don't know that. But I
17 am referring specifically to that first instance.
18   A. I know I did see -- I saw what the bed looked
19 like or where the flashbang had gone off. But I think
20 that was after I'd cleared the room.
21   Q. Did you recover the casing for the flashbang
22 device?
23   A. No.
24   Q. Did you notice where it was? Did you see it
25 in the room?

1    Q. What was his weapon position while he was in
2  that room?
3    A. I don't have a clue.
4    Q. When he said that he would cover you, did he
5  have his weapon in the cover position?
6    A. I don't know. I don't think he was talking
7  about covering me with his weapon pointed at me.
8    Q. Of course not. I don't think so either.
9    A. I think he just meant, like, he would watch
10 out, you know, for what was going on. But I really
11 don't know.
12   Q. All right. Did you and Officer Miner leave
13 the bedroom together?
14   A. No, he left before I did.
15   Q. Did you stay in the bedroom to look around
16 for anything?
17   A. I didn't really -- I mean, I guess I was in
18 the bedroom, but I didn't make it a point to stay
19 there, I guess.
20   Q. Okay. How long do you think you were in the
21 bedroom?
22   A. I mean -- when?
23   Q. The first time.
24   A. I don't know.
25   Q. Could it have been a couple of minutes?

1    A. I don't know that I did.
2    Q. Did you notice any smoke?
3    A. A little.
4    Q. Does the flashbang itself emit quite a bit of
5  smoke? Do you remember?
6    A. I don't remember.
7    Q. Did you notice a fire --
8    A. No.
9    Q. -- at that time?
10   A. No.
11   Q. And so you were -- at that point, you were
12 clearing the room, correct?
13   A. Correct.
14   Q. Was there anyone else with you at that time
15 while you were in the bedroom?
16   A. I know fairly quickly, Officer Miner joined
17 me in that bedroom.
18   Q. And did you and he clear the bedroom
19 together?
20   A. I had pretty much the whole bedroom cleared
21 except under the bed. And he said, "Clear under the
22 bed, I'll cover you."
23   Q. Okay.
24   A. So I backed up, bent down, and cleared under
25 the bed.

1         MS. WESTBY: Object to the form of the
2  question.
3         MR. THOMPSON: Join.
4         THE WITNESS: I think it's possible. I don't
5  know. I mean. in that situation, you don't check your
6  watch. You don't keep track of say, when you entered a
7  room and when you left the room. I really don't know.
8  BY MR. GOSMAN:
9    Q. Okay. So what did you -- Officer Miner left
10 the room before you did, it's your recollection?
11   A. Yes.
12   Q. And when you left the room, did you see
13 Officer Miner?
14   A. Not right away.
15   Q. We'll go ahead and ask you to prepare another
16 one of these little drawings of the interior of the
17 house. And to the best of your recollection, I'd like
18 you to describe for me what you saw when you walked out
19 of the bedroom.
20         And we'll go ahead -- I want you to hold that
21 thought and we'll give you some paper, if I can find
22 some.
23   A. What do you want me to draw?
24   Q. Your location as you came out of the bedroom,
25 then we'll take it from there.

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 58 of 77
Tricia Wachsmuth v.                                                          Mike Hall
City of Powell, et al.                                                  October 7, 2010

1   A. What is it you want me to draw?
2     Q. Draw the perimeter of the house and the rooms
3   of the house as you remember them, then your location
4   as you came out of the bedroom, then we'll take it from
5   there.
6     A. (Witness complies.)
7       You want it labeled, living room, bedroom,
8   such and such?
9     Q. Yes, probably a good idea.
10    A. Okay.
11    Q. Okay. So go ahead and put an X, if you will,
12  where you were located immediately after you exited the
13  bedroom. Of course, that's kind of a dumb thing.
14      You left the bedroom; did you stop in the
15  hallway between the bedrooms?
16    A. When I left the bedroom the first time, I
17  stood kind of right on that corner.
18    Q. All right. Very good. Why don't we put a
19  little circle around that X, and then we'll off to the
20  side write your name with an X by it. That's how I
21  think it was Officer Miner did that, and it worked
22  good.
23    A. On the drawing?
24    Q. Actually, I'd do it outside the drawing.
25    A. Okay.

1     Q. Okay. What did you see at that time?
2     A. When I came out of the bedroom, Ms. Wachsmuth
3   and the other officers were starting down the stairs.
4     Q. Okay. So let's see, did you see any of the
5   officers?
6     A. I saw the officers.
7     Q. Yes.
8     A. I mean, by uniform, I saw the officers.
9     Q. Okay.
10    A. But realistically, my focus was, since we
11  didn't find Bret in the bedroom, living room, kitchen,
12  where was Bret? I knew that I'd located several guns
13  in the bedroom.
14    Q. Yes.
15    A. So I wanted to make sure that nobody came
16  through the front door and have access to that bedroom.
17    Q. Okay. Very good.
18    A. So I was focused on --
19    Q. The front door?
20    A. -- the front door.
21    Q. All right. So describe to me, even if you
22  can't identify the individuals, the number of persons
23  that you saw in the kitchen near the stairway when you
24  observed that Tricia was going down the stairs.
25    A. Two in the picture that I've got in my head.

1     Q. Two. Where were they?
2     A. One was -- I think the back door is right by
3   the stairs.
4     Q. Yes.
5     A. One was by the back door.
6     Q. Go ahead and make another circle, and we
7   won't bother to put a letter inside of it.
8     A. Okay.
9     Q. And then one more for the other person that
10  you saw.
11    A. The other one kind of had his back to me,
12  kind of facing Tricia and the stairs.
13    Q. Did you know whether -- was Tricia on the
14  stairs?
15    A. Yeah, she'd actually -- I mean, she'd already
16  started kind of disappearing behind the door, the wall,
17  whatever. I could see about the back half of her.
18    Q. Okay. Let's go ahead and put Tricia in that
19  location, then, and we'll mark her with a T, if you
20  want or something else.
21      Was there anyone in the living room at that
22  time?
23    A. Like other officers?
24    Q. Yes.
25    A. I don't remember.

1     Q. Was there anyone behind you in the other
2   bedroom at that time?
3     A. Not that I'm aware of.
4     Q. And was there anyone in the bathroom at that
5   time?
6     A. No, I don't believe so.
7     Q. And you had just finished clearing the
8   northeast bedroom. And when you walked out of it, you
9   were alone; is that correct?
10    A. Correct.
11    Q. All right. Did you hear Officer Chretien say
12  anything to Tricia Wachsmuth prior to their
13  disappearing down the stairs?
14    A. I did.
15    Q. What did you hear him say?
16    A. I heard him ask Tricia where Bret was.
17    Q. Yes.
18    A. I believe Tricia said, "He's not here."
19  Officer Chretien asked or Sergeant Chretien asked,
20  "He's not in the basement?" Like in the form of a
21  question, he's not in the basement or something to that
22  effect.
23    Q. Okay.
24    A. And I believe then she said, "No, he's at his
25  dad's."

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 59 of 77

Tricia Wachsmuth v.                                                                 Mike Hall
City of Powell, et al.                                                       October 7, 2010

1    Q. Okay.
2    A. Referring to Bret, Tricia said basically Bret
3  was at his dad's.
4    Q. Yes.
5    A. And then Sergeant Chretien said something to
6  the effect of, "Then you can go first."
7    Q. Then you can go first?
8    A. Something like that.
9    Q. So in other words, as you understood it, I
10 assume, Officer Chretien made sure that there was no
11 one in the basement before he invited Tricia to go down
12 first?
13        MR. THOMPSON: Objection as to form.
14        MS. WESTBY: Join.
15 BY MR. GOSMAN:
16    Q. Correct?
17    A. I don't know.
18        MR. THOMPSON: Misstates the evidence. Go
19 ahead.
20        THE WITNESS: I don't know 'cause I wasn't
21 with him.
22 BY MR. GOSMAN:
23    Q. All right. Now, let's go ahead and take it
24 from -- let me back up for just a second. Have you
25 ever talked to anyone about this event where Tricia is

1  being led down the stairs or is actually going down the
2  stairs first with the officers following her?
3        MR. THOMPSON: And to the extent that those
4  conversations occurred in the presence of Misha and
5  myself or the city attorney, I'm going to direct you
6  not to address those conversations. So any
7  conversations outside the presence of your attorneys.
8  BY MR. GOSMAN:
9    Q. Yes, of course.
10    A. Yeah. You know, I think it was the next day
11 or maybe within a couple of other days following that,
12 Sergeant Chretien addressed us about it.
13    Q. What did he say?
14    A. What did he say? Just like more or less that
15 he shouldn't have sent a suspect into an unsecured area
16 like that, that hadn't been cleared. There was an
17 apology, and that was about it.
18    Q. Do you know if he ever apologized to Tricia
19 Wachsmuth?
20    A. I don't.
21    Q. Okay. Was that apology directed towards the
22 other officers?
23    A. Yeah.
24    Q. Who else was present?
25    A. I don't know. There was a few of us. I

1  couldn't say for sure. I know it was Sergeant
2  Chretien. He was the one addressing us. But I don't
3  know for sure who else was there. I don't think it was
4  everybody.
5    Q. Did you ever tell anyone that you heard
6  Officer Chretien order Tricia Wachsmuth down the
7  stairs?
8    A. No.
9        MS. WESTBY: Object to the form of the
10 question, just the same objection as Tom stated.
11 BY MR. GOSMAN:
12    Q. Did you ever tell anyone that you didn't know
13 what to do? You were too far away to go get Tricia and
14 pull her out of the stairway or words to that effect?
15        MR. THOMPSON: Objection as to form.
16        MS. WESTBY: Join.
17        THE WITNESS: I have said that potentially I
18 could have maybe hollered at Tricia or something to
19 that effect or grabbed her and kept her from going down
20 the stairs.
21 BY MR. GOSMAN:
22    Q. Did you feel that that was wrong, Officer?
23        MS. WESTBY: Object to the form of the
24 question.
25        MR. THOMPSON: Join.

1        THE WITNESS: What was wrong?
2  BY MR. GOSMAN:
3    Q. That Tricia was going down the stairs first
4  in front of the officers?
5        MS. WESTBY: Object to the form of the
6  question.
7        MR. THOMPSON: Join.
8        THE WITNESS: I don't think necessarily that
9  it was wrong. I think it concerned me because she was
10 going first into an area that we had not cleared yet.
11 For weapons, for people.
12 BY MR. GOSMAN:
13    Q. Okay. That's fine. Getting back to our
14 drawing, how long were you in the area that you've
15 identified on Exhibit 43?
16    A. I don't know how long it was. But I was
17 there when Tricia and, I believe, Officer Miner came
18 back up the stairs. I was still there.
19    Q. Did you see Officer Miner go down the stairs?
20    A. I don't know that I specifically saw him. I
21 just -- like I said, I know there are people that went.
22 There are officers that went.
23    Q. Went down the stairs with Tricia?
24    A. Correct.
25    Q. All right. You don't specifically remember

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 60 of 77
Tricia Wachsmuth v.                                                                    Mike Hall
City of Powell, et al.                                                          October 7, 2010

1   Officer Miner going down the stairs afterwards? Let me
2   take that back.
3         You don't remember Officer Miner going down
4   the stairs after the officers took her down the stairs
5   or went with her down the stairs?
6         MS. WESTBY: Object to the form of the
7   question.
8         MR. THOMPSON: Join.
9         THE WITNESS: I don't remember seeing Officer
10  Miner go down the stairs.
11  BY MR. GOSMAN:
12  Q. Okay. Fair enough. Do you remember seeing
13  him in the living room after the officers went down the
14  stairs?
15  A. Not until he came back up.
16  Q. And did you -- well -- and of course, I said
17  living room. But I should say living room and/or
18  kitchen. Did you see him in either the living room or
19  kitchen after the officers went downstairs?
20        MS. WESTBY: Object to the form of the
21  question.
22        THE WITNESS: I mean, are we talking right
23  after? Or like I said before, I mean, I don't remember
24  specifically seeing Chad Miner until him and Tricia
25  came back up.

1   Q. Was it more than two or three?
2   A. Could have been.
3   Q. Were they part of the perimeter team?
4   A. You know, without recognizing their faces, I
5   don't remember who it was.
6   Q. As far as you knew, did any member of the
7   entry team go back outside the house and come back in
8   in the period that you were in the bedroom?
9   A. Not as far as I knew. I don't know how I
10  could know that if I was in the bedroom.
11  Q. I understand that. That's true. Did you
12  notice whether any of the officers coming into the
13  house had rifles as opposed to pistols?
14  A. That, I didn't notice.
15  Q. Did you notice the weapon positions of the
16  officers that were behind Tricia Wachsmuth as she
17  walked down the stairs?
18        MR. THOMPSON: Objection as to form.
19        MS. WESTBY: Join.
20        THE WITNESS: I didn't.
21  BY MR. GOSMAN:
22  Q. Did you stay more or less in that position
23  until after Tricia Wachsmuth was led out of the house?
24  A. At least until her and Officer Miner were in
25  the living room.

1   BY MR. GOSMAN:
2   Q. Okay. I think that covers it.
3   A. I mean, specifically I don't remember seeing
4   him in either of those two rooms until they came.
5   Q. Did you see anyone else enter the house
6   during that time frame?
7         MS. WESTBY: What time frame?
8   BY MR. GOSMAN:
9   Q. That would be the time frame commencing with
10  your posting yourself there at the corner of the
11  bedroom in the living room until Tricia Wachsmuth
12  appeared with Officer Miner at the top of the stairs.
13  A. I did. And I can't think of who -- I guess
14  what my focus was, was on uniforms. Because like I
15  said, I had more or less the weapons covered. So to
16  make sure -- you know, I was looking for Bret to be
17  walking through the house.
18  Q. And you didn't see him, correct?
19  A. Correct. But I know there were some other
20  officers that came in the house. I wasn't paying
21  attention to who the officers were. I was recognizing
22  uniforms, I guess.
23  Q. How many officers came in the house during
24  that time period that we've established?
25  A. I'm not sure.

1   Q. And then what did you do?
2   A. I don't remember specifically where I would
3   have went or if I stayed there. But at least while
4   they were in the living room I was there.
5   Q. Do you know how much -- can you estimate how
6   much time elapsed from the time that the door was
7   breached until Tricia Wachsmuth walked out of the
8   house?
9   A. I can't.
10  Q. Could it have been ten minutes?
11        MR. THOMPSON: Objection as to form.
12        MS. WESTBY: Join.
13        THE WITNESS: I don't know if it was ten
14  minutes. Again, it's not something you look at your
15  watch.
16  BY MR. GOSMAN:
17  Q. Okay. What did you do after Tricia -- you
18  observed Tricia Wachsmuth and Officer Miner in the
19  living room?
20  A. Immediately after that, I can't remember. I
21  know once the house was cleared, I became part of the
22  search team.
23  Q. Okay. When you were in the bedroom with
24  Officer Miner, did you observe him pick up the pillow
25  from the bed?

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 61 of 77

Tricia Wachsmuth v.                                                                                        Mike Hall
City of Powell, et al.                                                                              October 7, 2010

1   A.  Just the pillow?

2   Q.  Yes.

3   A.  I don't know -- I don't think it was just the

4   pillow.

5   Q.  What else -- what else do you think he picked

6   up?

7   A.  It seems -- I'm pretty sure he picked up the

8   pillow and -- there was a comforter on the bed and took

9   those out of the room.

10  Q.  Were they smoking?

11  A.  No.

12  Q.  Then of course they weren't on fire, correct?

13  A.  Correct.

14  Q.  Do you know what he did with them?

15  A.  At the time I don't think I knew where he

16  took them. And then it was when we started searching I

17  think is when I saw them.

18  Q.  Okay. Did you actually examine those

19  articles?

20  A.  No.

21  Q.  Did they appear to be smoldering or on fire

22  at any time that evening, that you saw?

23      MR. THOMPSON: Objection as to form.

24      Go ahead.

25      MS. WESTBY: Join.

1       THE WITNESS: No, not that I saw.

2       (Exhibit 23 identified)

3   BY MR. GOSMAN:

4   Q.  Okay. Let's go ahead and take a look at

5   Exhibit 23 -- excuse me -- and I'll hand this diagram

6   to the reporter and we can go ahead and get it marked.

7       Before we finish with this exhibit, though,

8   could I ask you to clarify that the two individuals

9   that you saw by Tricia Wachsmuth are unknown to you?

10  Their identity is unknown to you?

11  A.  (Witness complies.)

12  Q.  Thank you. And let's just make sure we're

13  clear on one other thing, and that is that there were

14  no other people, officers or otherwise -- although it

15  would have been officers -- of course. There were no

16  other officers in that house that you were aware of

17  that you could see?

18  A.  When?

19  Q.  When you were standing on the corner of that

20  door as Tricia was walking downstairs?

21  A.  That's not what I said.

22      MR. THOMPSON: Object as to form.

23      THE WITNESS: We talked about other officers

24  walking in.

25

1   BY MR. GOSMAN:

2   Q.  That was later. Let's leave it alone. We'll

3   mark it.

4       (Exhibit 43 marked)

5   BY MR. GOSMAN:

6   Q.  Can you identify Exhibit 23 for me?

7   A.  Looks like a police report.

8   Q.  Now, Officer Hall, were you involved in the

9   evidence team?

10  A.  Well, I was part of the search team.

11  Q.  The search team. Okay. Fine.

12      And what part did you have in that capacity?

13  A.  I mean, searching the house for items

14  described in the warrant.

15  Q.  Okay. So you didn't have the camera. I'm

16  trying to piece this together. There were some

17  officers who had cameras, at least one. And there were

18  other officers who were sort of logging in the

19  evidence. I think McCaslin was doing that and perhaps

20  Brown. And so you were one of the officers gathering

21  evidence?

22  A.  Looking for it.

23  Q.  All right. And as far as you know, did

24  anyone move any of the evidence in that home before the

25  search team entered the -- or began performing their

1   duties?

2   A.  I don't know.

3   Q.  All right. You -- did you see anyone move

4   any evidence?

5   A.  So I'm clear, did I see it moved before we

6   searched?

7   Q.  Yes.

8   A.  You know, the only thing that comes to mind

9   is it seemed like somebody picked up one of the pistols

10  on the bed to see if it was loaded.

11  Q.  Did they put it back on the bed as far as you

12  know?

13  A.  I don't know.

14  Q.  Okay. All right. So what rooms did you

15  search?

16  A.  I started in what would have been the

17  southeast bedroom.

18  Q.  And where did you go from there?

19  A.  When that room was done?

20  Q.  Yes.

21  A.  Out into the living room.

22  Q.  Do you have any idea how long it took before

23  you were able to start searching the house from the

24  time that it was first breached?

25  A.  No, I don't have any idea.

MIKE HALL - October 7, 2010                          Page 113
Direct Examination by Mr. Gosman

1    Q.  As you were standing in the hallway there or
2  at the corner of the hallway in Exhibit 43, did you
3  notice anything in the hallway?  Did you notice this --
4  did you notice any guns in the hallway?
5    A.  I don't think I ever saw the gun in the
6  hallway.
7    Q.  Okay.  You've -- have you reviewed Exhibit 23
8  before?
9    A.  Just recently.
10   Q.  Okay.  There doesn't appear to be any gun
11 listed as being present in the hallway, would you agree
12 with me?
13   A.  I don't see anything from the hallway.
14   Q.  Okay.  Were you with Officer Miner when he
15 searched the bedroom?  The northeast bedroom?
16   A.  No, that was when I was in the southeast
17 bedroom.
18   Q.  Were you the officer that discovered the box
19 with the teddy bears in them and a letter?
20   A.  That doesn't ring a bell.
21   Q.  It was found in the kitchen.
22   A.  Okay.  I didn't search the kitchen.
23   Q.  Okay.  All right.  Do you remember reading
24 the letter that was found in the box with the stuffed
25 animals?

MIKE HALL - October 7, 2010                          Page 114
Direct Examination by Mr. Gosman

1    A.  I never saw the letter.
2    Q.  Very good.  All right.  Did you file any
3  reports in this case?
4    A.  No.
5    Q.  Did you see Tricia Wachsmuth at any time
6  indicate in any way an attitude that was -- would be
7  considered noncompliant with the officers' request?
8        MR. THOMPSON: Objection as to form.
9        MS. WESTBY: Join.
10       THE WITNESS: At any time?
11 BY MR. GOSMAN:
12   Q.  Yes.  And by the way, if she flipped you off
13 while you were driving down the street last week, we're
14 not interested in that.
15   A.  I know.  Other than when it appeared she sat
16 down on the couch as opposed to answering the knock at
17 the door.
18   Q.  I see.  Okay.  Very good.  That would be it?
19   A.  I believe -- I took that as a little
20 resistance.
21   Q.  Okay.  Now, if I remember correctly, and this
22 doesn't really matter -- so as a matter of fact, if it
23 doesn't matter, we won't go back there.  Thank you.
24       Did you hear any information from Officer
25 Lara about Bret Wachsmuth?

MIKE HALL - October 7, 2010                          Page 115
Direct Examination by Mr. Gosman

1    A.  That night?
2    Q.  Yes, in the planning -- in the briefing
3  session before you went to the residence.
4    A.  Nothing sticks out.
5    Q.  Did you hear anything from any of the other
6  officers about Bret Wachsmuth as it pertained to the
7  potential threat that he posed, other than from
8  Sergeant Eckerdt who described a picture which we've
9  talked about, and Officer Miner who had been with the
10 confidential informant?
11       MR. THOMPSON: Objection as to form.
12       MS. WESTBY: Join.
13       THE WITNESS: Can you clarify that maybe?
14 BY MR. GOSMAN:
15   Q.  Did anyone else volunteer any firsthand
16 information about the potential threat that Bret
17 Wachsmuth posed, than Officer Miner, who spoke with the
18 confidential informant, and Sergeant Eckerdt, who
19 discussed a photograph that apparently had been on a
20 MySpace page?
21       MS. WESTBY: Object to the form.
22       MR. THOMPSON: Join.
23       THE WITNESS: I don't remember.
24 BY MR. GOSMAN:
25   Q.  Did you hear any other officer conversation

MIKE HALL - October 7, 2010                          Page 116
Direct Examination by Mr. Gosman

1  or any comments made in the house that evening from the
2  time the door was breached until you began searching
3  the residence?
4    A.  Any other officer make any other comments?
5    Q.  Yes, or any communication.  Did you hear
6  Tricia Wachsmuth speak?
7        MS. WESTBY: Object to the form of the
8  question.
9        MR. THOMPSON: Join.
10       THE WITNESS: I did hear Tricia speak.
11 BY MR. GOSMAN:
12   Q.  Was that in connection to the response that
13 she gave Officer Chretien?
14   A.  No.
15   Q.  What did you hear her say?
16   A.  When her and, I believe, Officer Miner got
17 back into the living room area, it seems like they were
18 getting her some shoes or something.  And maybe a coat.
19 She asked where her dog was.  I said, "The dog jumped
20 out the window."
21   Q.  Did you see the dog jump out the window?
22   A.  I did.
23   Q.  Did you hear the smoke alarm go off?
24   A.  Yes.
25   Q.  When did that go off?

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 63 of 77
Tricia Wachsmuth v.                                                        Mike Hall
City of Powell, et al.                                                 October 7, 2010

MIKE HALL - October 7, 2010                                    Page 117
Direct Examination by Mr. Gosman

1   A. Obviously, after we were in the house. I
2   can't guess as to when, but it was -- it was at least
3   before -- I mean, before she had been back out of the
4   house or taken out of the house. It was sometime while
5   she was in the house.
6   Q. Did you observe any damage to the home as a
7   result -- while you were conducting your search?
8   A. What kind of damage?
9   Q. Damage to doors -- we understand the door was
10  breached, and we understand the window in the northeast
11  bedroom was broken?
12  A. Correct.
13  Q. And there was damage to the drapes or window
14  coverings, in any event. Did you observe any other
15  damage as you went through the house?
16  A. There was a little bit of black, I think, on
17  one of the walls in their bedroom.
18  Q. From the flashbang device?
19  A. I mean, yeah. I don't know what part of the
20  flashbang going off necessarily. It was just kind of a
21  black mark.
22  Q. Does the Powell Police Department, in your
23  experience, ever take photographs of a home that is
24  being searched in order to establish the condition of
25  the home before and after the search?

MIKE HALL - October 7, 2010                                    Page 118
Direct Examination by Mr. Gosman

1       MR. THOMPSON: Objection as to form.
2       MS. WESTBY: Join.
3       THE WITNESS: I'm sorry. Say that one more
4   time.
5   BY MR. GOSMAN:
6   Q. Well, let me put it this way: It is a
7   practice in some police departments to conduct either a
8   video or take photographic evidence of the house during
9   the search in order to document the condition of the
10  home and the location of evidence.
11      Were there any -- as far as you know, does
12  the City of Powell do that part of the documentation
13  where the condition of the home is preserved in
14  photographs or videos?
15      MS. WESTBY: Object to the form of the
16  question.
17      MR. THOMPSON: Join.
18      THE WITNESS: I think it would depend on who
19  is behind the camera.
20  BY MR. GOSMAN:
21  Q. Who was behind the camera that night?
22  A. I think at least for a while it was Dave
23  Brown.
24  Q. Was there more than one camera?
25  A. I don't know if there was more than one.

MIKE HALL - October 7, 2010                                    Page 119
Direct Examination by Mr. Gosman

1   Q. Did you have someone with you taking
2   pictures?
3   A. The first room we searched, that I searched,
4   being the southeast bedroom, I want to say at that time
5   when we found something we had to have somebody, you
6   know, like tell them, hey, I got something else, and
7   they would take a photo. I don't think someone was
8   right there with us.
9   Q. Okay. Have you used your -- do you have an
10  e-mail at the Powell Police Department, an e-mail
11  address?
12  A. Yeah.
13  Q. Have you used that e-mail to communicate with
14  other officers about this case prior to the time the
15  lawsuit was filed?
16  A. Not that I remember.
17  Q. And have you had any other communications
18  with the other officers following the completion of the
19  search and prior to the filing of the lawsuit?
20      MR. THOMPSON: Again, as to those
21  conversations that occurred in the presence of either
22  of your attorneys, I'd direct you not to answer
23  concerning any of those -- any of the substance of
24  those conversations.
25      MS. WESTBY: Join.

MIKE HALL - October 7, 2010                                    Page 120
Direct Examination by Mr. Gosman

1       THE WITNESS: Repeat it once for me, please.
2   BY MR. GOSMAN:
3   Q. Have you had any conversations with any
4   officers involved in this case since the search was --
5   since that evening and prior to the filing of the
6   lawsuit?
7       MR. THOMPSON: Same objection.
8       MS. WESTBY: Join.
9       THE WITNESS: Yeah, I think we talked about
10  it.
11  BY MR. GOSMAN:
12  Q. Has anyone else ever expressed any regret or
13  remorse about things that happened that night?
14      MS. WESTBY: Object to the form of the
15  question.
16      MR. THOMPSON: Join.
17  BY MR. GOSMAN:
18  Q. To you personally?
19      MS. WESTBY: Same objection.
20      THE WITNESS: Really, other than Sergeant
21  Chretien a couple days following, no one has shown
22  regret or remorse.
23  BY MR. GOSMAN:
24  Q. Has there been any other discussion about
25  what happened in terms of what might have been done

MIKE HALL - October 7, 2010                          Page 121
Direct Examination by Mr. Gosman

1  differently?

2       MS. WESTBY: Objection.

3       MR. THOMPSON: Join. Same advice in regards

4  to attorney-client privilege.

5       THE WITNESS: You're asking about

6  conversations about things being done differently?

7  BY MR. GOSMAN:

8  Q.  Yes.

9  A.  And I guess really more than anything, not to

10 send a suspect into an unsecured area. That's really

11 all that stands out.

12 Q.  Okay. I think we're done. Just give me a

13 second.

14    Oh, okay. Did you conduct any debriefing

15 after this operation at the Wachsmuth residence?

16    MS. WESTBY: Object to the form of the

17 question.

18    Go ahead and answer

19    THE WITNESS: Tell me about debriefing, I

20 guess. What are you referring to?

21 BY MR. GOSMAN:

22 Q.  Well, as a matter of fact, when I say

23 debriefing, I mean, did the team get together and

24 discuss what happened that night, what might have been

25 done differently, what went well, you know, in the form

---

MIKE HALL - October 7, 2010                          Page 122
Direct Examination by Mr. Gosman

1  of a discussion about the operation?

2       MR. THOMPSON: Object as to form.

3       MS. WESTBY: Join.

4       THE WITNESS: I don't remember if we did or

5  not.

6       MR. GOSMAN: Okay. All right. Thank you

7  very much, Officer. Appreciate you coming here today.

8            (Proceedings concluded at 3:01

9            p.m., October 7  2010.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

MIKE HALL - October 7, 2010                          Page 123
Direct Examination by Mr. Gosman

1            DEPONENT'S CERTIFICATE

2       I, MIKE HALL, do hereby certify, under

3  penalty of perjury, that I have read the foregoing

4  transcript of my testimony consisting of 122 pages,

5  taken on October 7, 2010 and that the same is, with any

6  changes noted below, a full, true and correct record of

7  my deposition.

8  PAGE  LINE        CORRECTION        REASON FOR CORRECTION

9  ____  ____  _____  _____

10 ____  ____  _____  _____

11 ____  ____  _____  _____

12 ____  ____  _____  _____

13 ____  ____  _____  _____

14 ____  ____  _____  _____

15 ____  ____  _____  _____

16 ____  ____  _____  _____

17 ____  ____  _____  _____

18 ____  ____  _____  _____

19 ____  ____  _____  _____

20 ____  ____  _____  _____

21 ____  ____  _____  _____

22

23

24            _____
              MIKE HALL    Date
25

---

MIKE HALL - October 7, 2010                          Page 124
Direct Examination by Mr. Gosman

1            CERTIFICATE

2       I, VONNI R. BRAY, Registered Professional

3  Reporter, and Notary Public for the State of Montana,

4  do hereby certify that MIKE HALL was by me first duly

5  sworn to testify to the truth, the whole truth, and

6  nothing but the truth;

7       That the foregoing transcript, consisting of

8  123 pages, is a true record of the testimony given by

9  said deponent, together with all other proceedings

10 herein contained.

11      IN WITNESS WHEREOF, I have hereunto set my

12 hand this 19th day of October, 2009.

13

14

15

16

17

18

19

20

21 _____
   Vonni R. Bray, RPR
22 P. O. Box 125
   Laurel, MT 59044
23 (406) 670-9533 Cell
   (888) 277-9372 Fax
24 vonni.bray@yahoo.com

25

**0**

**08 (1)**
   12:5
**09 (2)**
   24:17;26:7

**1**

**1 (1)**
   64:25
**10 (6)**
   58:7,9;59:12;62:17;
   70:5;74:10
**1000 (1)**
   9:8
**11 (5)**
   31:2,6;33:9;36:13;
   37:14
**11:43 (1)**
   40:17
**12 (4)**
   12:13;15:9;33:15,16
**12:57 (1)**
   87:16
**12-Second (5)**
   14:11,23;15:2,4,14
**16 (2)**
   29:5,7
**17 (1)**
   30:1
**1998 (1)**
   6:1

**2**

**2:00 (1)**
   87:14
**2:12 (1)**
   87:16
**20 (2)**
   60:11;61:4
**2000 (1)**
   6:20
**2002 (1)**
   7:12
**2005 (1)**
   16:10
**2006 (1)**
   16:11
**2007 (2)**
   7:15;16:9
**2008 (1)**
   10:5
**2009 (11)**
   9:22;12:17;16:14;
   17:23;18:1;20:4;21:12,
   15;28:13,13,16
**2010 (3)**
   40:18;87:17;122:9
**22 (1)**
   30:18
**23 (4)**
   110:2,5;111:6;113:7
**24th (4)**
   9:21;12:17;13:1;21:14
**250 (1)**
   5:5
**28 (2)**
   29:5,8
**29 (2)**
   27:14,16

**3**

**3:01 (1)**
   122:8
**30 (2)**
   60:12;61:4
**31 (2)**
   9:4,6
**35 (5)**
   16:2,5,25;18:17;20:14
**37 (3)**
   40:19,24,24

**4**

**4:00 (1)**
   42:8
**40-hour (2)**
   12:7;27:19
**415 (1)**
   33:8
**42 (7)**
   11:17,24;12:10;13:5;
   25:3,8;26:10
**43 (3)**
   104:15;111:4;113:2

**5**

**5:00 (1)**
   42:7

**6**

**6:00 (2)**
   42:6,9

**7**

**7 (3)**
   40:18;87:17;22:9

**8**

**8/8 (2)**
   10:5;12:4

**9**

**99 (2)**
   6:9,13

**A**

**ability (1)**
   5:7
**able (3)**
   5:11;77:14;112:23
**Absolutely (3)**
   40:16;66:11;67:9
**academy (1)**
   7:18
**accelerated (4)**
   78:7;80:19,20,23
**access (1)**
   98:16
**accurate (7)**
   31:10,11;37:15;61:7,
   17;62:18;65:13
**accurately (3)**
   30:20;39:12;59:4
**accused (1)**
   5:16
**act (1)**
   15:12
**Action (3)**
   24:18;28:14;29:11
**actual (3)**
   13:18;20:5;57:7
**actually (16)**
   17:24;20:20,24;23:2;
   30:3;41:5;57:15;58:12;
   59:16;67:18;79:21;
   80:12;97:24;99:15;
   102:1;109:18
**added (1)**
   9:12
**additional (2)**
   15:18;35:5
**address (4)**
   5:4;47:19;102:6;
   119:11
**addressed (1)**
   102:12
**addressing (1)**
   103:2
**Administration (1)**
   9:15
**adults (1)**
   63:14
**advice (1)**
   121:3
**afterwards (1)**
   105:1
**again (14)**
   17:5;27:12;32:9;36:9;
   38:10;51:22;52:17;73:6;
   76:4;85:23;86:22,24;
   108:14;119:20
**against (1)**
   34:21,21
**age (2)**
   50:19,19
**agenda (1)**

**22:23**
**ago (5)**
   21:9,11,13;46:6;90:1
**agree (4)**
   33:3,11;38:1;113:11
**agreement (1)**
   4:17
**agrees (1)**
   35:17
**ahead (39)**
   6:10;8:8;11:1,19;13:8;
   15:5,8;16:4,22;24:3;
   28:5;31:5;36:9;39:19;
   47:10,18;49:21;50:7,24;
   51:2;58:9;60:10;83:7;
   85:1;86:16;87:3,13;
   88:10;96:15,20;97:11;
   99:6,18;101:19,23;
   109:24;110:4,6;121:18
**aimed (1)**
   36:6
**alarm (1)**
   116:23
**alignment (1)**
   35:2
**allow (6)**
   4:22;67:5,10;68:14,
   25;69:5
**allowed (1)**
   8:16
**allowing (1)**
   35:18
**almost (2)**
   21:13;46:6
**alone (2)**
   100:9;111:2
**along (3)**
   54:15,19;75:16
**although (1)**
   110:14
**always (1)**
   42:4
**ambulance (5)**
   70:6,8,10,17,19
**Amendment (10)**
   67:5,13,19,20;68:8,12,
   19;69:10,18,19
**amount (1)**
   66:15
**and/or (1)**
   105:17
**angle (2)**
   34:22;89:11
**animals (3)**
   51:6,11;113:25
**announce (4)**
   66:14,20;67:13,19
**announced (1)**
   83:15
**answered (1)**
   68:3
**anticipate (1)**
   10:18

**apologize (1)**
   88:6
**apologized (1)**
   102:18
**apology (2)**
   102:17,21
**apparently (4)**
   75:14;83:19;91:8;
   115:19
**appear (4)**
   28:12;31:9;109:21;
   113:10
**appearance (1)**
   57:15
**appeared (3)**
   88:9;106:12;114:15
**appears (1)**
   58:10
**apply (2)**
   15:14;69:11
**appointed (1)**
   23:18
**appreciate (2)**
   8:21;122:7
**approached (1)**
   76:21
**approaching (2)**
   80:11;82:17
**approved (1)**
   57:23
**approximate (1)**
   50:19
**approximately (2)**
   12:8;15:9
**April (2)**
   9:13,14
**area (13)**
   6:21;9:23;12:24;13:2;
   16:23;73:13;90:10;93:6;
   102:15;104:10,14;
   116:17;121:10
**areas (1)**
   18:7
**argues (1)**
   42:5
**armor-piercing (2)**
   49:22;85:16
**around (11)**
   16:19;41:24,24;42:6,
   18;73:13;84:2,21;90:9;
   95:15;97:19
**arrested (1)**
   5:14
**arrive (1)**
   43:19
**arrived (10)**
   43:17;44:4;45:11;
   74:15;75:3;77:21;81:2,
   8;83:6;90:3
**articles (1)**
   109:19
**aside (4)**
   20:13;23:15,16;57:9

Tricia Wachsmuth v.
City of Powell, et al.

Mike Hall
October 7, 2010

assault (1)
  48:13
assemble (2)
  72:21,24
assembled (9)
  45:8;73:10,21,24;
  74:2;76:5,7,9;81:4
assembling (1)
  44:11
assigned (2)
  60:15;71:15
assignment (2)
  56:24;72:1
assignments (7)
  56:22;62:18;71:18,24;
  72:2,3;77:12
associated (1)
  51:5
assume (12)
  13:22,24;21:9;25:18;
  40:4;42:6;56:21;74:14;
  75:17,22;86:5;101:10
assuming (2)
  27:4;40:11
AT&T (1)
  6:17
attend (1)
  21:5
attended (1)
  24:1
attention (1)
  106:21
attitude (1)
  114:6
attorney (1)
  102:5
attorney-client (1)
  121:4
attorneys (3)
  10:10;102:7;119:22
ATVs (1)
  7:7
authority (1)
  66:16
Auto (1)
  7:2
automobiles (1)
  89:23
available (5)
  41:7;42:21;43:5,8,9
average (1)
  42:8
aware (6)
  5:12;62:18;71:11,23;
  100:3;110:16
away (7)
  14:5;64:2;83:17;84:1;
  88:5;96:14;103:13

**B**

babysitter (1)
  43:14

back (36)
  20:10;43:24:44:1;
  46:3;54:19:6.:21;71:22;
  72:8;74:10;77:13;79:4;
  83:18,22;84:3,4,18,22,
  25;89:20;93:15;99:2,5,
  11,17;101:24;104:13,18;
  105:2,15,25;107:7,7;
  112:11;114:23;116:17;
  117:3
backed (1)
  94:24
backyard (1)
  48:6
bad (2)
  59:24;87:23
Bagnell (1)
  63:18
bark (1)
  77:4
barking (3)
  77:3,6;80:25
barrel (1)
  31:23
based (2)
  69:6;80:5
basement (21)
  17:20;18:3;21:3,24;
  26:5;43:23;44:8,11,14,
  24;45:4,9,12;46:4,5,7,
  21:62:13;100:20,21;
  101:11
basic (1)
  9:16
basically (5)
  36:3,6;43:4;65:8;
  101:2
bathroom (2)
  88:17;100:4
battering (1)
  85:22
bears (1)
  113:19
became (1)
  108:21
become (1)
  8:1
bed (9)
  92:20;93:18;54:21,22,
  25;108:25;109:8;
  112:10,11
bedroom (44)
  47:25;64:15;66:5;
  72:7;88:20;91:10;92:15,
  18;93:11,13,13,15;
  94:15,17,18,20;95:13,
  15,18,21;96:19,24;97:4,
  7,13,14,16;98:2,11,13,
  16;100:2,8;106:11;
  107:8,10;108:23;
  112:17;113:15,15,17;
  117:11,17;119:4
bedrooms (2)

88:16;97:15
began (4)
  15:11;16:8;111:25;
  116:2
begin (3)
  4:23;6:7;85:20
beginning (2)
  43:20;47:15
begins (1)
  13:18
behind (16)
  61:18;74:25;75:14,15,
  25;81:19,21,25;82:2;
  87:6;88:24;99:16;100:1;
  107:16;118:19,21
bell (1)
  113:20
below (2)
  36:18;70:9
bent (1)
  94:24
best (5)
  42:15,17;47:2;85:7;
  96:17
beyond (2)
  6:2;36:2
Billings (1)
  6:23
bit (5)
  6:25;14:15;47:14;
  94:4;117:16
black (2)
  117:16,21
Blackmore (3)
  46:12;50:9;51:1
Blackmore's (1)
  46:16
blast (1)
  91:7
block (4)
  73:4,4,5,17
board (1)
  62:11
body (2)
  34:21;59:17
book (1)
  38:5
both (5)
  27:13;48:1;63:12,25;
  64:2
bother (1)
  99:7
bottom (2)
  14:24;70:5
box (2)
  113:18,24
breached (8)
  77:15;83:8;86:4;
  91:13;108:7;112:24;
  116:2;117:10
breaching (1)
  17:15
break (5)

4:23,25;10:19;11:1;
  40:14
Bret (24)
  47:21,23;48:11;52:6,
  10;54:6:55:3,18,24;56:5,
  14;60:23;63:12,25;71:7;
  98:11,12;100:16;101:2,
  2;106:16;114:25;115:6,
  16
Bret's (1)
  48:12
brief (1)
  11:1
briefed (1)
  46:22
briefing (29)
  45:23,24;46:1,5,7,9,
  12;47:1,11,49:1,3;50:4,
  11,13,17;56:22;57:15;
  58:6;59:13;60:23;65:17;
  66:1;76:3;79:15,16;
  80:7;89:23;90:2;115:2
briefly (1)
  6:12
bring (3)
  10:23;11:2;35:3
bringing (1)
  34:25
broad (1)
  67:16
broken (1)
  117:11
brother (1)
  48:12
brought (1)
  48:10
Brown (3)
  64:7;111:20;118:23
bullet (1)
  15:1
bulleted (1)
  15:5
bulletproof (3)
  48:12;54:11;85:15
bullets (1)
  49:23

**C**

cable (1)
  6:16
call (6)
  32:6;33:6;34:16;
  42:10,12;43:2
called (12)
  6:17;7:13;23:19;29:1;
  33:4;34:4;41:21,25;
  42:16;48:3;70:6,11
calls (2)
  41:23;42:1
came (21)
  21:7;50:22;58:1;
  64:17;83:17;84:1,24;

4:23,25;10:19;11:1;
  40:14
camera (4)
  111:15;118:19,21,24
cameras (1)
  111:17
Can (43)
  8:23;10:19,20,23;
  11:25;12:7;14:4;17:4;
  18:2;21:2,9,22;34:3,11,
  13;35:2,22;36:19;37:22;
  40:14;41:14;42:15,17;
  49:6;53:7;58:10,17,17;
  61:12;66:20;68:5;69:17;
  70:11;74:8,13;87:4;
  96:21;101:6,7;108:5;
  110:6;111:6;115:13
capacity (1)
  111:12
car (2)
  10:25;11:14
carry (1)
  28:6
carrying (2)
  27:3,7
cars (5)
  7:3,5;72:16,19;73:13
case (4)
  70:13;114:3;119:14;
  120:4
casing (1)
  93:21
cause (4)
  78:4;83:2,4;101:20
caused (3)
  76:22,24;78:1
certain (1)
  11:6
certainly (1)
  85:1
Chad (4)
  64:3,6,8;105:24
chance (1)
  89:12
change (1)
  91:15
changed (1)
  91:17
channel (3)
  65:2;91:4,4
Chapman (16)
  74:7,18,22;75:11;
  82:15;83:9,15;84:20;
  86:9;87:7;88:3,11,14;
  89:3,14;91:23
check (1)
  96:5
checking (1)
  42:18
chest (1)
  31:23
Chief (2)

57:14,22

**child (7)**
50:10,19,20,23;63:7,9,
11

**children (1)**
43:15

**choices (1)**
25:10

**Chretien (14)**
18:13;47:3;64:6;
75:12;100:11,19,19;
101:5,10;102:12;103:2,
6;116:13;120:21

**circle (2)**
97:19;99:6

**circumstances (2)**
37:16;56:13

**circumstantial (1)**
55:2

**City (8)**
6:15;7:1;17:25;27:19;
40:25;41:4;102:5;
118:12

**clarification (2)**
4:16,19

**clarify (3)**
8:23;110:8;115:13

**Clark (1)**
5:5

**class (15)**
9:16,25;10:4,7,11:5,6,
12:3,4,12:13:9,13;26:3,
16;28:1;30:15

**classroom (1)**
22:18

**clear (14)**
11:3;13:22;22:15;
23:3;32:16;39:13;54:21;
66:23,24,24;94:18,21;
110:13;112:5

**cleared (6)**
93:20;94:20,24;
102:16;104:10;108:21

**clearing (6)**
13:15;18:4;22:19;
40:4;94:12;100:7

**clears (1)**
17:20

**client (1)**
68:25

**close (2)**
77:2;83:5

**closest (1)**
34:17

**clue (1)**
95:3

**CND (3)**
6:17,17,19

**coat (1)**
116:18

**coded (1)**
64:25

**Cody (1)**

7:11

**college (2)**
6:4,8

**column (1)**
74:12

**comforter (1)**
109:8

**coming (6)**
45:12;78:11;37:20;
93:14;107:12;122:7

**command (1)**
89:14

**commencing (1)**
106:9

**comments (2)**
116:1,4

**commercial (1)**
60:19

**communicate (2)**
65:4;119:13

**communicating (2)**
90:20;91:5

**communication (2)**
91:1;116:5

**communications (1)**
119:17

**company (3)**
6:16,21;7:1

**comparing (1)**
62:10

**complete (4)**
5:11;7:17;16 17;28:14

**completed (1)**
9:14

**Completely (3)**
37:19;67:9;91:18

**completion (1)**
119:18

**complies (2)**
97:6;110:11

**composed (1)**
74:14

**compromise (1)**
15:10

**compromised (1)**
15:16

**computer (1)**
49:14

**concern (3)**
55:4,6;80:24

**concerned (5)**
78:13;79:9;80:9,17;
104:9

**concerning (1)**
119:23

**conclude (1)**
56:19

**concluded (1)**
122:8

**condition (3)**
117:24;118:9,13

**conduct (2)**
118:7;121:14

conducted (3)
24:16;47:1;50:4

**conducting (2)**
38:23;117:7

**confidential (2)**
115:10,18

**connection (3)**
26:14,15;116:12

**consider (1)**
84:5

**considered (1)**
114:7

**consistent (1)**
68:24

**Constitution (2)**
67:19;68:9

**contacted (1)**
63:20

**contained (1)**
62:17

**contains (1)**
31:6

**continuing (2)**
8:4,7

**contract (1)**
6:16

**contributed (1)**
49:16

**control (1)**
89:3

**conversation (2)**
51:11;115:25

**conversations (7)**
102:4,6,7;119:21,24;
120:3;121:6

**coordinate (1)**
91:1

**copy (2)**
10:25;12:22

**corner (2)**
73:22;88:19;97:17;
106:10;110:19;113:2

**correctly (2)**
56:17;114:21

**correspond (3)**
59:12,20;60:2

**corresponds (1)**
62:3

**couch (6)**
83:23;88:4,5;89:16,
17;114:16

**Counsel (4)**
8:15;46:18;54:10,25

**Countermeasures (1)**
28:15

**Couple (10)**
18:6,6;27:22;45:16;
87:22,25;89:25;95:25;
102:11;120:21

**course (25)**
12:7,9,20;17:9;19:4,5,
9,21;20:22,25;24:21;
25:4;27:19,21;28:10,14,

19;51:20;71:22;95:8;
97:13;102:9;105:16;
109:12;110:15

**courses (3)**
9:14;12:16;21:1

**Court (1)**
8:16

**courts (1)**
69:21

**cover (27)**
32:7,13,19,23,25;33:4,
6,12;36:10,13,14,16,25;
37:13,15;38:15,21;40:9;
47:14;78:9,21;79:14;
80:13;92:4;94:22;95:4,5

**covered (2)**
39:3;106:15

**covering (2)**
33:2;95:7

**coverings (2)**
117:14

**covers (1)**
106:2

**crash (1)**
66:1

**created (1)**
24:1

**crime (1)**
5:16

**criminal (5)**
52:7,16;53:1,10;54:6

**Crisis (2)**
27:17;41:1

**critical (1)**
28:9

**cross-over (2)**
29:2,16

**crusher (1)**
64:9

**cuffed (1)**
63:16

**current (2)**
5:4;8:3

**currently (1)**
5:6

**cutting (1)**
77:8

**D**

**dad's (2)**
100:25;101:3

**Dakota (1)**
6:15

**damage (5)**
117:6,8,9,13,15

**Danzer (3)**
45:7,9;74:20

**date (2)**
18:8;21:8

**dates (1)**
17:17

**Dave (5)**

64:3,6,7,9;118:22

**day (3)**
18:12;20:12;102:10

**days (5)**
12:12;20:15;90:1;
102:11;120:21

**DCI (1)**
47:22

**deal (3)**
12:17;30:4;59:17

**dealership (2)**
7:8,10

**debriefing (3)**
121:14,19,23

**decided (1)**
7:5

**defined (1)**
37:1

**definition (1)**
35:21

**demonstrated (2)**
34:14,23

**demonstration (1)**
34:7

**Department (16)**
7:19;8:13:14:17;16:1,
9;17:18;21:3,24;23:10;
27:11;41:6;70:9,21,23;
117:22;119:10

**departments (1)**
118:7

**depend (2)**
36:22;38:10,10;
118:18

**depending (1)**
42:9

**depends (1)**
37:16

**deployed (1)**
85:22

**deploying (1)**
17:15

**deployment (1)**
29:20

**deposition (1)**
4:6

**depositions (1)**
4:9

**Describe (5)**
6:11;65:7;92:3;96:18;
98:21

**described (11)**
18:16;33:5,22;35:5,
19;36:4,13;37:13;79:13;
111:14;115:8

**describes (1)**
39:12

**description (8)**
33:18,23;34:14;36:3;
37:13;48:5,6,7

**designated (2)**
19:5;23:18

**detonate (1)**

24:22
**detonated (6)**
24:7,12,20;90:18;
92:16;93:7
**device (4)**
24:8,20;93:22;117:18
**devices (1)**
17:15
**diagram (3)**
31:17;32:8;110:5
**diagrams (2)**
31:6;33:22
**difference (5)**
19:7,16,19,25;39:23
**different (6)**
6:21,25;7:10;18:6;
70:15;93:16
**differently (3)**
121:1,6,25
**dinner (2)**
41:24;42:2
**DIRECT (3)**
4:3;102:5;119:22
**directed (1)**
102:21
**directly (2)**
44:8;76:8
**disagree (1)**
35:23
**disappearing (2)**
99:16;100:13
**disciplinary (1)**
8:16
**discipline (4)**
8:11,12,25;9:1
**discovered (1)**
113:18
**discuss (1)**
121:24
**discussed (1)**
115:19
**discussing (1)**
14:13
**Discussion (3)**
11:15;120:24;122:1
**dishonesty (1)**
5:17
**dispatch (2)**
58:22,24
**dispatcher (1)**
58:12
**distracted (1)**
26:13
**divorced (1)**
5:19
**document (21)**
9:8,8,10;11:25;12:15;
27:17;31:6;34:11;35:16,
19;37:9;41:2,6,12,15;
58:11,18,21;61:16,19;
118:9
**documentation (1)**
118:12

**documented (1)**
23:25
**dog (7)**
77:2,4,6;80:25;
116:19,19,21
**done (11)**
9:16;18:3;24 1:51:13;
57:1,7;112:19;120:25;
121:6,12,25
**door (37)**
22:18;65:19;56:2,4,
14,16;67:6;71:22;77:13,
14;82:15;83:3,10,15;
84:25;85:4,23;86:5,12;
87:10,20;88:2 5;89:2,19;
91:13;98:16,19,20;99:2,
5,16;108:6;110:20;
114:17;116:2;117:9
**doors (2)**
17:15;117:9
**down (38)**
7:12;14:24;17:19;
18:3;21:24;43:11;59:2;
83:18;84:3,4,9,19,22,25;
88:4;89:11;91:19:94:24;
98:3,24;100:13;101:11;
102:1,1;103:6,19;104:3,
19,23;105:1,3,4,5,10,13;
107:17;114:13,16
**downstairs (4)**
27:11;62:14;105:19;
110:20
**downward (1)**
34:22
**dozen (1)**
45:22
**drapes (2)**
83:17;117:13
**draw (3)**
96:23;97:1,2
**drawing (5)**
62:9,13;97:23,24;
104:14
**drawings (4)**
31:9;62:7,9;56:16
**drawn (1)**
62:10
**drive (1)**
70:23
**drives (1)**
64:18
**driveway (1)**
90:6
**driving (1)**
114:13
**drove (2)**
72:14;89:24
**Drug (15)**
9:15,16;10:4:11:20,
20;12:4;17:9 19:9,21;
20:1,18,21,25;25:4;
26:15
**drugs (1)**

60:24
**duly (1)**
4:2
**dumb (1)**
97:13
**dummies (3)**
24:23,24,24
**during (15)**
26:17,18,19;39:20;
50:11,12,13;52:24;
56:21;58:6;60:23;79:16;
106:6,23;118:8
**duties (1)**
112:1
**dynamic (27)**
9:23;12:18;13:4,23;
15:20;16:13,23;17:8,11,
12,13;20:6,21;22:3;
23:13,20;25:1,14,17,24;
26:14,23;27:8;30:22;
39:13;42:24;58:4

**E**

**easily (1)**
82:2
**east (2)**
73:18;90:7
**Eckerdt (14)**
18:12;22:17,25;47:7;
48:10;49:4,5,16;54:22;
55:2;75:16;76:18;115:8,
18
**education (1)**
8:4
**effect (11)**
24:19;60:17;81:14;
82:9,12,24;91:6;100:22;
101:6;103:14,19
**effort (1)**
77:19
**either (11)**
34:5;40:8;43:7;54:6;
69:9;76:20;95:8;105:18;
106:4;118:7;119:21
**elapsed (2)**
85:21;108:6
**element (1)**
80:24
**else (17)**
12:5;72:15;79:20;
86:11;88:13;90:15,16;
94:14;99:20;102:24;
103:3;106:5;109:5,5;
115:15;119:6;120:12
**else's (1)**
72:1
**e-mail (3)**
119:10,10,13
**e-mails (1)**
21:8
**emit (1)**
94:4

**emitted (1)**
91:8
**employed (3)**
8:12;27:25;55:9
**employee (1)**
8:1
**EMT (1)**
63:19
**encompass (1)**
68:19
**encounter (1)**
14:4
**encountered (2)**
40:5,11
**end (7)**
14:10;16:5;37:14;
77:20;88:5,15;92:24
**enforcement (5)**
7:18;8:4,7;9:15;18:24
**engage (3)**
20:20;32:21;81:22
**engaged (2)**
30:13;40:5
**engaging (1)**
38:11
**Engine (1)**
7:14
**enough (2)**
49:2;105:12
**enter (3)**
50:10;92:15;106:5
**entered (5)**
13:17;88:1;93:14;
96:6;111:25
**entire (3)**
17:24;22:12;46:9
**entitled (2)**
14:10;27:17
**entries (4)**
17:20;20:21;23:13;
65:7
**entry (47)**
9:23;12:18;13:4,17,
23;15:11,21;16:13,23;
17:8,11,12,13,14;18:4;
20:6;22:3,13;23:20;
25:1,14,17;26:23;27:8;
39:13;41:19;42:24;
56:25;57:2;58:4;66:17,
21,22;71:9,13,16,20;
72:8;73:20,21;74:5,14;
86:12;87:9;90:12;91:2;
107:7
**establish (1)**
117:24
**established (2)**
62:8;106:24
**estimate (5)**
73:3;85:7,10,20;108:5
**eternity (2)**
85:11,18
**even (4)**
37:24;75:18;85:20;

98:21
**evening (4)**
48:23;109:22;116:1;
120:5
**event (2)**
101:25;117:14
**events (2)**
83:7;91:2
**everybody (5)**
71:25;73:12,14;86:8;
103:4
**everyone (3)**
63:16;66:23,23
**everywhere (3)**
64:12,14,17
**evidence (9)**
55:2;101:18;111:9,19,
21,24;112:4;118:8,10
**Exactly (1)**
19:14
**EXAMINATION (1)**
4:3
**examine (1)**
109:18
**example (1)**
22:25
**except (1)**
94:21
**exclamation (1)**
64:13
**Excuse (2)**
51:23;110:5
**execution (6)**
12:3;13:3;25:9;40:21;
41:17;44:11
**exercise (1)**
61:11
**exercises (2)**
21:19;30:8
**Exhibit (46)**
9:4,6;11:17,24;12:10;
13:5;16:2,5,15,25;18:17;
20:14;25:3,8;26:10;
27:14,16;29:5,8,10;31:2,
5,18;33:9,15,16,17;34:6;
36:13;37:14;40:19,24;
58:7,9;59:12;62:17;
70:5;74:10;104:15;
110:2,5,7;111:4,6;113:2,
7
**exited (1)**
97:12
**experience (2)**
14:18;117:23
**explain (1)**
39:19
**expressed (1)**
120:12
**extent (2)**
37:9;102:3

**F**

face (1)
83:17
faces (2)
44:25;107:4
facing (2)
87:5;99:12
fact (6)
54:5;55:9;67:4;84:19;
114:22;121:22
facts (1)
37:3
fail (1)
67:5
fair (8)
36:14;40:3;49:2,17;
66:6;74:16;76:13;
105:12
fairly (4)
36:4;44:17;83:4;94:16
familiar (7)
4:8;27:21,23;29:23;
31:8;41:3,14
far (13)
9:11;23:11;39:22;
46:10;62:18;72:4;73:2;
103:13;107:6,9;111:23;
112:11;118:11
faster (1)
30:19
Father (2)
70:25;71:6
Feathers (1)
57:14
February (9)
9:22;12:17;16:14;
17:22;18:1;20:4;21:12,
14;26:6
feel (2)
78:22;103:22
felony (1)
5:14
female (2)
63:6;83:13
fenced (1)
48:6
few (4)
7:4;60:16;73:13;
102:25
file (4)
8:13,18;9:2;114:2
filed (1)
119:15
filing (2)
119:19;120:5
find (8)
10:20;16:20;34:13;
35:1;36:1;92:18;96:21;
98:11
fine (10)
9:21;12:6;18:9;41:16;
49:20;59:5;67:25;86:3;
104:13;111:11
finger (1)

33:1
finish (5)
4:22;47:13;51:18,23;
110:7
finished (3)
51:15;52:1;100:7
fire (6)
70:9,20,23;94:7;
109:12,21
firearms (2)
9:17;25:18
first (24)
4:2;11:25;14:16;
27:22;32:23;33:17;
42:10,16;44:4;58:3;
61:15;74:12;92:19;
93:17;95:23;97:16;
101:6,7,12;102:2;104:3,
10;112:24;119:3
firsthand (1)
115:15
five (2)
8:17;9:1
flash (2)
88:18;91:9
flashbang (20)
17:15;24:7,13,20;
65:18;66:2,5;71:23;
72:6;77:15;88:18;90:18;
91:7;92:16;93:6,19.21;
94:4;117:18.20
flashlight (2)
92:24;93:4
flipped (1)
114:12
focus (2)
98:10;106:14
focused (1)
98:18
focusing (1)
92:6
following (4)
102:2,11;119:18;
120:21
follows (1)
4:2
foot (1)
92:20
force (1)
21:15
form (78)
8:14;13:6,25;14:19;
15:7;17:1;19:10,22;
21:7;24:2;26 25;37:18;
39:14;44:18;47:16;49:9;
52:11,19;53:4,12,23;
54:8,16,16;55:12,22;
56:3,15;57:16,24;58:15;
59:23;60:4;61:8;65:9;
67:8,14,22;63:2,11,21;
69:14;70:1;75:20;76:14;
77:22;78:15,24;79:22;
80:14;82:10;85:8,23;

86:13;92:8;96:1;100:20;
101:13;103:9,15.23;
104:5;105:6,20;107:18;
108:11;109:23;110:22;
114:8;115:11,21;116:7;
118:1,15;120:14;121:16,
25;122:2
formal (1)
9:22
formations (2)
30:4,9
formed (1)
76:9
formulated (2)
15:11,12
forward (1)
87:5
found (3)
113:21,24;119:5
Fourth (10)
67:5,13,19,20;68:8,12,
18;69:10,18,19
frame (3)
106:6,7,9
Friday (1)
20:14
front (20)
36:1;62:21,23;72:21;
74:12,22;75:6,10;76:8;
77:20;78:21;81:5;83:10;
87:7;88:22;92:6;98:16,
19,20;104:4
full (1)
5:2
fully (1)
74:14
further (1)
91:24

**G**

gain (3)
66:17,21,21
gamut (1)
17:14
garage (3)
48:7;90:10,17
gathered (4)
44:13;55:10;56:12;
73:6
gathering (1)
111:20
gave (6)
11:8,10,11;53:19;
54:4;116:13
gear (2)
48:13;54:11
general (1)
61:11
generally (1)
13:22
gesture (3)
84:5,9,10

gets (1)
63:16
given (10)
4:5;45:19;47:19;48:5,
7;50:12,16;56:18;59:22;
80:5
giving (1)
4:8
good (11)
17:13;35:1;49:2;
51:13;85:10;97:9,18,22;
98:17;114:2,18
Gosh (1)
18:13
GOSMAN (132)
4:4;8:6,10,19,24;9:5;
10:12,17,21;11:11,13,
18;13:10;14:8,21,22;
15:13;16:3;17:6;19:15;
20:3;24:6;27:6,15;29:9,
18;31:3;32:14,15;34:9,
12,15;35:18;36:5;37:6,
11,21;38:3;39:18;40:15,
20;44:22;46:19,20;
48:14;49:11;51:16,19,
23;52:4,14,22;53:8,17;
54:1,12,18,24;55:16;
56:1,9,20;57:21;58:2,8,
19;59:24;60:1,9;61:13;
62:1;65:15;67:11,17,23;
68:7,16,17;69:2,8,16;
70:3;76:1,16;78:2,19;
79:1,4,8,24;80:1,18;
81:24;82:13;85:12;86:2,
15,19,21;87:2,13,18;
92:12;96:8;101:15,22;
102:8;103:11,21;104:2,
12;105:11;106:1,8;
107:21;108:16;110:3;
111:1,5;114:11;115:14,
24;116:11;118:5,20;
120:2,11,17,23;121:7,
21;122:6
grabbed (1)
103:19
graduate (2)
5:23,25
graphic (1)
33:21
grip (1)
89:8
ground (3)
31:23;32:4;89:10
Group (15)
7:2;23:6,7,14,17;
44:17;45:18;73:16,19;
74:6;76:22;77:13;90:8,
12,14
groups (1)
77:10
grow (1)
47:21
growing (2)

51:5;64:22
grown (1)
60:19
guess (22)
8:23;9:13,18;12:21;
14:3;16:21;20:16;26:2;
28:7;31:10;36:22;38:1;
45:1;50:8;66:8;95:17,
19;106:13,22;117:2;
121:9.20
gun (9)
14:7;25:1,5;31:25;
89:11;92:6,24;113:5,10
guns (5)
47:23;55:5;85:15;
98:12;113:4
gunshot (2)
88:17;92:2
guy (1)
91:23
guys (10)
23:14,17;43:24;45:17;
75:24;81:5;83:14;84:11,
13,19

**H**

half (5)
21:18;73:4.5,17;99:17
HALL (5)
4:1.5;5:3;81:3;111:8
hallway (8)
97:15;113:1,2,3,4,6,
11,13
hand (4)
40:25;89:8,9;110:5
handgun (1)
92:20
handguns (2)
26:4;64:12
hands (1)
36:19
happen (4)
69:9;76:22;78:10;
84:11
happened (14)
65:18;77:1;78:1,4;
81:7;84:17;85:2;87:22,
24,25;91:11;120:13,25;
121:24
happening (1)
80:10
head (1)
98:25
headed (1)
72:11
hear (11)
46:11,15;100:11,15;
114:24;115:5,25;116:5,
10,15,23
heard (6)
60:2;70:13;88:17;
91:7;100:16;103:5

**hearing (2)**
61:3;64:10
**held (1)**
11:15
**helpful (1)**
54:17
**hey (1)**
119:6
**hide (1)**
78:12
**high (3)**
5:21,23;6:2
**high-risk (2)**
14:18;85:14
**high-tech (1)**
7:6
**hired (1)**
7:18
**hires (1)**
7:25
**history (12)**
6:8,11;52:7,10,16,18;
53:2,2,10,10;54:6,7
**hit (1)**
89:19
**hold (2)**
12:21;96:20
**holding (1)**
48:13
**hollered (2)**
89:18;103:18
**holstered (1)**
39:7
**home (16)**
22:4;41:21;53:22;
54:2;55:8,21;63:6,6,14;
81:9;111:24;117:6,23,
25;118:10,13
**homeowner (1)**
67:5
**honest (1)**
61:2
**honestly (2)**
39:5;86:17
**hook (1)**
88:20
**hospital (1)**
63:19
**hostage (1)**
31:4
**hour (1)**
43:16
**hours (2)**
12:8,14
**house (55)**
13:15,17;30:23;46:14,
24;47:24;48:1,5;49:23;
50:10;63:12,23;64:2,12;
66:2;70:14;72:8;73:2,
17;76:10,21;77:2;78:11,
22;79:11;80:12;88:1;
90:6,10;91:21,22,24;
93:15;96:17;97:2,3;

106:5,17,20,23;107:7,
13,23;108:8,21;110:16;
111:13;112:23;116:1;
117:1,4,4,5,15;118:8
**hurried (1)**
54:19
**hurry (6)**
76:22,24,25;77:20;
78:1,5
**hurrying (1)**
78:6
**hustle (1)**
83:2
**hustled (1)**
80:22
**hustling (1)**
78:5

**I**

**idea (6)**
45:18;46:6;77:9;97:9;
112:22,25
**identical (1)**
36:12
**identified (14)**
9:4;15:19;16:2,24;
27:14;29:8,3  :2;32:6,
18;33:15;40:  9;58:7;
104:15;110:2
**identify (6)**
11:25;12:5:18:10;
34:3;98:22:1  1:6
**identity (2)**
71:12;110:10
**Immediate (5)**
24:18;28:14;29:1,11;
88:3
**immediately (4)**
63:23;93:8;97:12;
108:20
**impair (1)**
5:7
**important (1)**
4:15
**impression (2)**
60:18;61:15
**inaccuracies (1)**
61:24
**inaccurate (3)**
60:8;69:5,6
**inappropriate (1)**
67:4
**incident (3)**
15:22;24:9,11
**incidents (1)**
28:9
**includes (1)**
33:12
**including (2)**
8:11,25
**inconsistent (1)**
69:1

**indeed (1)**
47:22
**indicate (1)**
114:6
**individual (1)**
22:11
**Individually (1)**
22:16
**individuals (2)**
98:22;110:8
**info (2)**
56:18;79:16
**informant (2)**
115:10,18
**information (10)**
49:15;53:19;56:12;
59:13,21;61:6,20;80:5;
114:24;115:16
**informed (1)**
54:5
**Ingalls (3)**
72:25;73:15,22
**in-service (1)**
18:16
**inside (5)**
34:18;49:23;70:14;
81:9;99:7
**instance (5)**
20:13;22:17;28:22;
76:17;93:17
**instances (1)**
21:23
**instead (2)**
70:15;91:24
**Institute (1)**
28:15
**instructions (1)**
45:19
**instructor (1)**
27:24
**instructors (1)**
27:23
**intel (3)**
50:1,4;56:7
**interested (1)**
114:14
**interior (1)**
96:16
**interpreted (4)**
68:19;69:11,20,21
**interrupt (1)**
88:7
**interrupted (2)**
49:21;51:25
**intersection (1)**
72:25
**into (21)**
15:6;17:14;18:4;22:4;
29:2,16;37:10;45:12;
55:20;88:16,20;91:21,
22,24;93:14;102:15;
104:10;107:12;112:21;
116:17;121:10

**investigations (12)**
9:16;10:4;11:21;12:4;
17:9;19:9;21;20:1,22,25;
25:4;26:15
**invited (1)**
101:11
**involve (1)**
42:24
**involved (7)**
22:3;23:23;26:10,24;
27:2;111:8;120:4
**involving (4)**
5:17;20:5;25:13;31:6
**Israeli (4)**
28:23,24;29:2,16
**issue (4)**
14:13;15:20;16:13;
62:20
**items (2)**
33:12;111:13

**J**

**Jimmy (1)**
64:18
**job (2)**
7:2;51:13
**jobs (1)**
6:11
**Join (50)**
14:2;17:3;19:12,23;
39:15;44:19;47:17;
49:10;52:12,20;53:6,13;
55:13,23;56:4,16;57:18;
60:6;61:10;65:11;68:1,
4,23;70:2;77:24;78:17;
80:16;85:9;86:20;92:10;
96:3;101:14;103:16,25;
104:7;105:8;107:19;
108:12;109:25;114:9;
115:12,22;116:9;118:2,
17;119:25;120:8,16;
121:3;122:3
**joined (1)**
94:16
**July (3)**
6:9,13;7:11
**jump (1)**
116:21
**jumped (1)**
116:19
**jumps (1)**
16:19
**June (1)**
7:15

**K**

**keep (1)**
96:6
**Kent (4)**
42:11,13,15;47:4
**kept (2)**

88:12;103:19
**kids (3)**
43:10;53:3,11
**kind (18)**
7:7;22:23;25:15;
48:12;77:7;83:11;84:16;
88:4;89:8,16,17;97:13,
17;99:11,12,16;117:8,20
**kitchen (6)**
98:11,23;105:18,19;
113:21,22
**knew (12)**
41:11;56:6;67:3;
71:25;72:1;75:18;78:11;
82:24;98:12;107:6,9;
109:15
**knock (6)**
66:13,20;67:13,18;
85:21;114:16
**knock-and-announce (12)**
63:3;66:10,12,13,25;
67:21;68:9,13,20;69:11,
20,22
**knocked (4)**
67:6;82:15;83:15;
84:20
**knowing (2)**
14:5;55:4
**knowledge (5)**
35:16;49:16,18:50:5;
69:10
**known (1)**
15:16
**knows (4)**
83:14;84:12,13,19

**L**

**labeled (1)**
97:7
**laid (1)**
28:8
**language (1)**
35:22
**Lara (1)**
114:25
**large (2)**
44:17;45:18
**last (6)**
8:17;9:1;15:1;33:9;
78:8;114:13
**late (1)**
43:21
**later (6)**
42:20,22;77:13,16;
87:9;111:2
**law (9)**
7:17;8:3,7;18:24;67:9,
12,16;68:25;69:3
**lawsuit (3)**
119:15,19;120:6
**laying (1)**
92:20

lead (3)
  18:13;56:7;91:23
Lean (4)
  28:23,24;29:2,17
leaning (1)
  83:22
learn (5)
  41:20;58:3;77:13,16;
  87:9
learned (3)
  47:11;50:18;79:16
least (11)
  21:13,20;36:25;87:23;
  90:10;92:19;107:24;
  108:3;111:17;117:2;
  118:22
leave (5)
  51:1;57:13;92:13;
  95:12;111:2
led (3)
  56:13;102:1;107:23
left (18)
  6:12,12,19;45:19,20;
  61:18;72:10;77:11;81:6;
  87:19;88:16;89:9;95:14;
  96:7,9,12;97:14,16
left-hand (1)
  74:11
legal (1)
  8:4
legally (1)
  69:6
legs (1)
  89:17
length (1)
  85:21
less (5)
  9:17;47:24;102:14;
  106:15;107:22
lethal (1)
  9:17
letter (5)
  35:7;99:7;113:19,24;
  114:1
letters (1)
  6:17
light (3)
  91:8;92:21;93:1
lights (3)
  70:6,11,12
limited (2)
  26:6;69:9
line (4)
  75:3;76:9,19;81:17
lined (1)
  74:22
list (14)
  10:2;16:15,18,24;
  18:19,20;27:24;33:13;
  62:17,19;63:1;65:7;
  74:11,13
listed (4)
  17:9;27:24;33:12;

113:11
lists (2)
  18:21;62:22
little (15)
  14:15;16:19:21:16;
  26:13,21;33:7;43:16;
  70:4;83:3;91:20;94:3;
  96:16;97:19:114:19;
  117:16
living (15)
  64:16;88:14;97:7;
  98:11;99:21;105:13,17,
  17,18;106:1  ;107:25;
  108:4,19;112 21;116:17
loaded (2)
  64:12;112:10
lobby (1)
  71:1
locally (1)
  16:1
located (2)
  97:12;98:12
location (4)
  96:24;97:3;99:19;
  118:10
logging (1)
  111:18
long (15)
  21:9,11,15;24:25;
  26:14;43:14;46:4;74:1;
  77:4;85:5,18;95:20;
  104:14,16;1  2:22
look (13)
  16:4;27:16;28:5;29:4;
  31:5;33:16;36:9;58:9;
  74:11;84:24:95:15;
  108:14;110:4
looked (12)
  18:17;25:4;33:20;
  83:13,16,18,2;84:2,18,
  21;88:12;93:18
looking (22)
  9:18,18;12:15;14:6;
  29:4;51:8;55:17;59:16;
  61:19;81:14;8:2,8,19,20,
  23,25;83:11,12,25;84:1,
  14;106:16;1 .1:22
looks (6)
  29:23;31:15:41:3,14;
  63:1;111:7
lost (1)
  80:25
lot (8)
  14:17;18:20:24:22;
  37:4;38:13;47:12;48:6;
  62:4
lowered (1)
  92:7
lunch (2)
  87:13,19

                  M

makes (1)
  74:24
male (3)
  48:11;50:9;63:6
managed (1)
  87:10
mandatory (1)
  21:7
manual (12)
  10:7,9,13,13,15;11:5,
  6,21;28:2,3,8;29:11
many (5)
  12:8;23:7;60:13;
  72:16;106:23
March (1)
  6:20
marched (1)
  76:10
marijuana (4)
  47:20;51:5,6;64:24
mark (3)
  99:19;111:3;117:21
marked (4)
  11:17,24;110:6;111:4
Marrisa (1)
  59:1
master (1)
  88:20
materials (2)
  14:10;27:18
matter (4)
  114:22,22,23;121:22
matters (1)
  8:17
may (8)
  14:4;40:1;47:13;
  49:22;51:10,23;91:19;
  93:15
maybe (17)
  6:19;7:4,8;10:19;
  18:13;21:16;41:24;
  42:19;45:7;48:11;50:9;
  61:12;73:5;102:11;
  103:18;115:13;116:18
McCaslin (1)
  111:19
mean (35)
  13:20;17:14;22:15;
  23:1,14,21;29:21;31:10,
  24;35:15;36:3;37:4;
  39:5,20;47:8;50:21;
  58:16;61:2;65:12;76:17;
  84:7;85:17;93:13;95:17,
  22;96:5;98:8;99:15;
  105:22,23;106:3;
  111:13;117:3,19;121:23
means (2)
  65:1;66:21
meant (2)
  43:19;95:9
medication (1)
  5:6
meeting (2)

49:3;52:24
member (1)
  107:6
members (1)
  23:7
memory (1)
  74:14
mention (2)
  53:18;54:4
mentioned (7)
  35:20;53:1,10,15;
  55:1,2;66:1
met (2)
  73:16,21
Michael (1)
  5:3
Michigan (2)
  5:22;6:6
middle (2)
  9:7;43:21
might (7)
  38:12;40:1;58:18,20;
  90:11;120:25;121:24
MIKE (1)
  4:1
mind (2)
  62:15;112:8
mine (1)
  73:13
Miner (35)
  24:16;29:12;43:25;
  44:5;47:2;49:25;50:3;
  51:3;64:6;74:8,22;75:8;
  83:9;85:3;86:4,5;94:16;
  95:12;96:9,13;97:21;
  104:17,19;105:1,3,10,
  24;106:12;107:24;
  108:18,24;113:14;115:9,
  17;116:16
minute (3)
  21:21;42:14;46:25
minutes (5)
  87:22,25;95:25;
  108:10.14
Misha (1)
  102:4
missing (2)
  18:21;90:4
Missouri (1)
  14:17
misstated (2)
  37:25;38:2
misstates (5)
  37:19;53:5,24;54:9;
  67:9;79:2;101:18
mode (7)
  32:7,13,25;33:6,12,21;
  40:9
moment (5)
  20:11;57:12;58:10;
  74:11;83:8
Montana (1)
  6:24

months (2)
  7:5;18:20
more (21)
  9:19;26:21;45:8;
  46:25;47:24;61:12,14;
  62:14;63:13,14;76:25;
  83:3;99:9;102:14;
  106:15;107:1,22;118:3,
  24,25;121:9
most (1)
  39:12
mother (1)
  51:7
motioning (1)
  89:8,10
motor (1)
  7:6
motorcycles (1)
  7:7
Motorsports (2)
  7:13,14
Mountain (2)
  7:13,13
move (5)
  30:19;54:15;74:1;
  84:25;111:24;112:3
moved (5)
  6:15,23;7:11,12;112:5
movement (3)
  18:3,4;85:3
much (4)
  94:20;108:5,6;122:7
must (1)
  45:22
muzzle (1)
  92:7
myself (2)
  22:15;102:5
MySpace (2)
  49:13;115:20

                  N

name (6)
  5:2;58:13,14,21;59:3;
  97:20
named (2)
  58:22,23
names (1)
  45:1
narrative (3)
  53:18;54:4;88:7
nature (1)
  17:21
near (2)
  14:10;98:23
nearby (1)
  70:9
nearly (1)
  36:12
necessarily (4)
  84:10;91:17;104:8;
  117:20

need (5)
  8:20;41:25;51:14;
  54:12;66:21
needed (1)
  43:9
neighborhood (1)
  72:16
Nevermind (1)
  29:15
new (1)
  7:25
next (8)
  7:2;10:19;33:8;62:24;
  84:17;87:22,25;102:10
night (19)
  41:24;55:11,18;58:5,
  24;59:6,14,22;60:3;
  61:21;72:17;76:2;79:11;
  86:12;87:21;115:1;
  118:21;120:13;121:24
nobody (4)
  42:5;88:13,22;98:15
noise (1)
  15:10
no-knock (2)
  66:18,25
noncompliant (1)
  114:7
normally (1)
  70:10
North (4)
  5:5;73:1,15,22
northeast (3)
  100:8;113:15;117:10
northern (1)
  5:22
notation (1)
  70:4
notes (5)
  59:9,11,17,20;60:2
notice (18)
  33:7;35:4;45:12;59:8,
  10;76:12,17;89:4;90:4;
  93:24;94:2,7;107:12,14,
  15;113:3,3,4
noticed (1)
  82:19
November (3)
  24:17;28:13,16
number (7)
  30:3;33:8;34:17;
  60:15;61:5;87:8;98:22
numbered (1)
  35:6
numbers (1)
  62:24
nutshell (1)
  66:4

**O**

oath (1)
  4:12

Object (46)
  8:5;13:6,25;14:19;
  15:7;17:1:19 10,22;
  26:25;37:8,13;47:16;
  52:19;57:16;60:4;61:8;
  65:9;67:8,14 68:21;
  69:13,25;75:20;76:14;
  77:22;78:15,24,24;
  79:22;80:14;35:23;
  86:13;92:8;96:1;103:9,
  23;104:5;105:6,20;
  110:22;115:21;116:7;
  118:15;120:14;121:16;
  122:2
objected (2)
  54:15,16
Objection (37)
  8:14;24:2;29:15;
  37:20;39:14;41:18;49:9;
  52:11;53:4,12,23;54:8;
  55:12,22;56:3,15;57:24;
  58:15;59:23;61:22;
  67:22;68:2,13;82:10;
  85:8;101:13;103:10,15;
  107:18;108:11;109:23;
  114:8;115:11;118:1;
  120:7,19;121 2
objects (1)
  40:1
observe (6)
  78:22;89:12;93:6;
  108:24;117:6 14
observed (6)
  83:19;89:3;93:3,3;
  98:24;108:18
obstructed (1)
  91:25
obtaining (1)
  4:19
Obviously (1)
  117:1
occasions (1)
  93:16
occur (5)
  20:15;25:11;46:1;
  52:23;53:9
occurred (3)
  46:5;102:4;119:21
October (3)
  40:18;87:17;122:9
off (19)
  11:15;16:5;33:1;
  36:21;37:1,5,17;38:6,17;
  77:15;87:19;88:18,20;
  93:19;97:19;114:12;
  116:23,25;117:20
offered (1)
  28:14
Officer (88)
  4:5;5:2,21;7:22;11:19;
  18:9;19:8,20,25;22:2,17;
  24:16;27:16;29:11;
  30:24;36:24;40:21;

43:25;44:5;45:7,9;
  46:12,15;47:2;49:25;
  50:3,9,25;51:3;55:7;
  62:3,17;69:17;74:7,8;
  75:8,11,12;79:17;81:2;
  82:15;83:9,9,15;84:20;
  85:3;86:4,5,9;87:7,19;
  88:2,11,13;89:2,3,14;
  91:23;94:16;95:12;96:9,
  13;97:21;100:11,19;
  101:10;103:6,22;104:17,
  19;105:1,3,9;106:12;
  107:24;108:18,24;
  111:8;113:14,18;
  114:24;115:9,17,25;
  116:4,13,16;122:7
officers (38)
  20:6;29:25;41:7;
  44:10;45:8;53:20;62:16;
  70:18;71:12;78:23;98:3,
  5,6,8;99:23;102:2,22;
  104:4,22;105:4,13,19;
  106:20,21,23;107:12,16;
  110:14,15,16,23;111:17,
  18,20;115:6;119:14,18;
  120:4
officers' (1)
  114:7
officer's (2)
  55:19;58:11
oftentimes (1)
  20:15
once (3)
  7:25;108:21;120:1
One (58)
  6:4;8:2;9:19;11:8,11;
  18:7,12,13;21:18,20,22;
  24:12,22;30:23,24:
  31:10,15,15;33:22;34:5,
  17;38:20;39:16;41:23,
  25;43:3;45:6;46:11;
  50:10;53:1,9;54:22;
  55:15,17;57:13;58:23;
  59:1;62:23;63:5,6;90:4;
  92:19;96:16;99:2,5,9,11;
  101:11;103:2;110:13;
  111:17,20;112:9;
  117:17;118:3,24,25;
  120:21
ones (2)
  21:2;74:8
only (9)
  8:19;11:6;21:9;45:6;
  46:11;71:6;74:8;89:15;
  112:8
operation (10)
  13:18;20:5;40:6;
  57:23;59:18;60:19;65:8;
  77:20;121:15;122:1
operational (3)
  23:13;57:7;59:21
operations (2)
  23:11;38:24

opposed (6)
  20:7;22:12;31:24;
  65:21;107:13;114:16
opposite (1)
  90:17
optional (1)
  43:6
order (9)
  74:22;75:2,4,5,9;81:3;
  103:6;117:24;118:9
organizers (1)
  56:13
others (2)
  31:1;79:18
otherwise (1)
  110:14
ours (2)
  55:5,6
Out (44)
  10:2,25;12:11;28:8;
  37:22;39:1;46:14;48:2;
  50:22;63:22;64:2,8;
  70:11;73:10;75:4;81:10;
  82:8,19,20,23;83:1,12,
  25;84:1,14;86:6;90:14;
  95:10;96:18,24;97:4;
  98:2;100:8;103:14;
  107:23;108:7;109:9;
  112:21;115:4;116:20,
  21;117:3,4;121:11
outside (4)
  20:25;97:24;102:7;
  107:7
over (7)
  7:8;12:11;21:16;32:3;
  43:16;83:22;88:11
own (1)
  35:16

**P**

pace (2)
  78:7;80:19
page (22)
  14:9,25;29:5,5,7;30:1,
  18;31:18:32:7;33:8,8,9,
  17;35:4;62:3,7,23;65:6;
  70:5;74:12,12;115:20
pages (6)
  27:23;29:24;30:3;
  34:6;59:12,17
paper (2)
  22:5;96:21
paragraph (1)
  35:6
paranoid (2)
  48:2;85:16
parked (5)
  73:8,9,11,14,15
part (25)
  8:21;12:4;19:25;
  23:18;24:13,23;25:3,5,5;
  26:2,2,16;27:18;28:1;

48:8;53:2,11;55:3;
  59:15;107:3;108:21;
  111:10,12;117:19;
  118:12
participated (2)
  20:5;21:18
participating (2)
  19:8,20
particular (3)
  8:20;12:9;32:10
partly (1)
  90:5
parts (1)
  27:22
pass (1)
  7:25
passing (1)
  70:15
Patrol (3)
  24:18;28:14;29:11
paying (1)
  106:20
PD (2)
  7:16;91:3
peeked (1)
  48:2
peekers (1)
  48:3
peeking (1)
  81:10
peepers (1)
  48:3
pending (1)
  4:25
people (7)
  45:12;58:20;70:14;
  85:16;104:11,21;110:14
perceived (1)
  15:10
perform (1)
  23:12
performing (1)
  111:25
perhaps (5)
  22:19;24:15;28:13;
  87:23;111:19
perimeter (3)
  90:9;97:2;107:3
period (7)
  7:21,25,25;17:25;
  89:13;106:24;107:8
permanent (1)
  8:1
person (6)
  33:2;81:9;84:18,21,
  24;99:9
personal (3)
  49:16,18;80:10
personally (2)
  79:9;120:18
personnel (3)
  8:13,18;9:2
persons (1)

98:22
**person's (1)**
  83:17
**pertained (1)**
  115:6
**pertains (1)**
  67:13
**phone (1)**
  6:16
**photo (7)**
  48:11,17,19,21;49:8,
  19;119:7
**photograph (1)**
  115:19
**photographic (2)**
  33:8;118:8
**photographs (2)**
  117:23;118:14
**physically (2)**
  22:7,10
**pick (1)**
  108:24
**picked (3)**
  109:5,7;112:9
**picture (7)**
  29:21;36:2;54:22,23;
  55:1;98:25;115:8
**pictures (1)**
  119:2
**piece (1)**
  111:16
**pill (1)**
  64:9
**pillow (4)**
  108:24;109:1,4,8
**pills (2)**
  51:7,10
**pistols (3)**
  27:13;107:13;112:9
**place (7)**
  7:13;42:2,5;46:7;74:2;
  78:11,20
**placed (3)**
  24:24;47:24;59:11
**places (1)**
  48:1
**plan (4)**
  44:2;51:21;56:13;
  70:21
**planned (3)**
  43:18;90:24,25
**planning (10)**
  12:3;25:8;43:20,23;
  48:23;49:1;50:12;59:18,
  21;115:2
**plants (5)**
  51:5;60:12,13,19;61:4
**Please (5)**
  4:22;39:9;68:6;86:17;
  120:1
**pm (2)**
  87:17;122:9
**point (16)**

8:21;13:16;21:17;
  36:7;39:20,21;46:17;
  49:2;50:10;51:21;54:3;
  64:13;78:8;93:10;94:11;
  95:18
**pointed (4)**
  31:25;35:25:39:11;
  95:7
**pointing (2)**
  31:23;32:4
**Police (25)**
  7:19,22;8:12 14:17;
  16:9;17:18;2 :3,15,24;
  23:10;27:11;41:5,7;
  43:12;44:5;70 18;72:10,
  19;73:7;83:16;84:20;
  111:7;117:22;118:7;
  119:10
**Poorly (1)**
  59:24
**pop (1)**
  38:12
**porch (12)**
  77:8,21;78:21;81:2,8;
  82:18,19;83:5,6,10;
  84:15;85:19
**portion (4)**
  11:20;43:22;50:4;
  52:24
**posed (6)**
  8:16;43:7;56:14;
  79:10;115:7,17
**poses (1)**
  30:24
**position (40)**
  13:3,13,14;30:13;
  31:17,21,25;32:3,11,17;
  33:4,22,25;34 3,5,16;
  36:10,13,14,15,25;
  37:13.16;38:15,21,24;
  39:17;40:7,9;.7:14;
  78:10;80:12;89:4;91:16;
  92:1,4,4;95:1,5;107:22
**positions (12)**
  13:19;14:7;31 7,8;
  33:18,19,21,23;35:5;
  39:2,11;107:15
**possession (1)**
  10:23
**possibility (1)**
  80:10
**possible (2)**
  64:19;96:4
**possibly (3)**
  63:6,11;64:16
**POST (9)**
  9:7,11,22;12:15,19;
  15:19,24;17:10;26:16
**posting (1)**
  106:10
**potential (4)**
  55:8;79:17;115:7,16
**potentially (4)**

47:25;55:5;85:15;
  103:17
**Powell (17)**
  5:5;7:16,18,22;8:12;
  16:9;17:23,25;23:10;
  27:19;41:1,4,5;91:3;
  117:22;118:12;119:10
**power (1)**
  7:6
**PowerPoint (1)**
  12:2
**PPD (1)**
  64:25
**practicals (2)**
  12:11,13
**practice (2)**
  22:20;118:7
**practicing (1)**
  22:12
**precisely (1)**
  69:4
**precursor (1)**
  89:22
**premise (1)**
  69:7
**prepare (1)**
  96:15
**prepared (1)**
  58:12
**prescription (1)**
  51:10
**presence (8)**
  15:11,16,16;66:14,20;
  102:4,7;119:21
**present (7)**
  47:4,7;53:21:54:2;
  74:5;102:24;113:11
**presentation (14)**
  31:10,12;32:6,17,19,
  20,22,25;35:10,13,20,21,
  24;91:19
**presented (3)**
  37:4;46:9;55:19
**preserved (1)**
  118:13
**pretty (5)**
  51:13;67:16;78:14;
  94:20;109:7
**principles (3)**
  22:3,5,19
**printed (1)**
  9:13
**printout (1)**
  12:3
**Prior (13)**
  9:21;12:17;17:22,25;
  20:4;21:14;28:24;52:6;
  91:2;100:12;119:14,19;
  120:5
**privilege (1)**
  121:4
**probably (6)**
  12:13;42:24;43:16;

64:6;81:19;97:9
**probationary (3)**
  7:21,23,24
**problem (2)**
  31:16.20
**proceed (1)**
  51:15
**Proceedings (1)**
  122:8
**process (1)**
  4:8
**produced (4)**
  10:9,16.16;11:21
**provided (2)**
  18:10;37:14
**psychology (1)**
  85:17
**pull (1)**
  103:14
**purpose (2)**
  30:22;66:14
**purposes (1)**
  29:14
**put (7)**
  38:19;97:11,18;99:7,
  18;112:11;118:6

## Q

**quick (2)**
  7:9;43:3
**quickly (3)**
  35:1,3;94:16
**quite (4)**
  6:25;47:14;92:4;94:4

## R

**radio (2)**
  90:20;91:1
**raid (2)**
  12:3;48:13
**ram (4)**
  22:4;75:10;85:22;86:6
**rammed (1)**
  85:3
**Rapid (2)**
  6:15,25
**rather (1)**
  55:18
**reaction (1)**
  89:13
**reactive (1)**
  65:18
**read (6)**
  15:5;35:11;37:9;79:4,
  6;86:25
**reading (2)**
  35:16;113:23
**ready (17)**
  31:17,21,25;32:3;
  33:1,19,21,23,25;34:4,
  16,18;35:2;40:8;42:3;

85:14;92:1
**real (1)**
  38:8
**realistically (1)**
  98:10
**really (12)**
  43:3;44:20;45:1;
  54:18;78:13;95:10,17;
  96:7;114:22;120:20;
  121:9,10
**reason (4)**
  4:15;5:10;55:10,20
**reasonable (1)**
  66:15
**reasonably (1)**
  56:19
**receive (2)**
  42:10,12
**received (1)**
  59:13
**receiving (2)**
  53:20;61:20
**recently (1)**
  113:9
**Recess (2)**
  40:17;87:16
**recognize (4)**
  44:23,25;58:14;61:19
**recognizing (2)**
  106:21;107:4
**recollect (1)**
  42:15
**recollection (2)**
  96:10,17
**record (11)**
  11:16;12:19;15:6,24;
  23:25;26:16;29:15;
  37:10;79:6;86:25;92:13
**records (4)**
  15:20;16:10;17:10;
  18:17
**recover (1)**
  93:21
**reference (3)**
  41:8;69:21;87:23
**referring (6)**
  15:3;20:24;35:22;
  93:17;101:2;121:20
**reflect (1)**
  9:10
**reflected (1)**
  18:16
**reflection (1)**
  65:14
**refresh (1)**
  74:13
**regard (1)**
  67:21
**regards (1)**
  121:3
**regret (2)**
  120:12.22
**related (1)**

50:25

**relating (1)**
53:19

**relative (3)**
15:20;16:13;17:8

**relevant (1)**
39:3

**remaining (1)**
87:9

**remember (90)**
7:3,4;12:20;13:12;
14:13;21:6;22:24;23:9;
26:4;27:12;38:18;42:17;
43:8,9,13;44:2,16,20;
45:1,3,7;46:23;47:2,5,9;
50:11,21,22,22;51:12;
52:2,8,13,17,21;53:15,
20;56:17;57:19;60:11,
13,25;61:2,3,5,20,24;
62:2,5,8,12;63:1,9,15;
64:5,10;71:3,5;74:7,21;
75:5;76:7;82:4,12;
89:15,18;90:8;91:4,18,
25;92:1,14;94:5,6;97:3;
99:25;104:25;105:3,9,
12,23;106:3;107:5;
108:2,20;113:23;
114:21;115:23;119:16;
122:4

**remorse (2)**
120:13,22

**removed (1)**
63:23

**Repeat (4)**
39:9;53:7;68:5;120:1

**report (1)**
111:7

**reporter (1)**
110:6

**reports (2)**
9:7;114:3

**represent (2)**
58:17;61:20

**represented (4)**
9:25;12:9;16:24;63:5

**represents (1)**
31:17

**request (1)**
114:7

**requested (2)**
79:7;87:1

**require (1)**
23:19

**required (1)**
21:5

**requirements (2)**
8:4,7

**requires (1)**
67:20

**residence (14)**
17:14;41:18;47:20;
58:5;61:4;70:17;72:11,
22;74:3,15;87:21;115:3;

116:3;121:15

**resistance (1)**
114:20

**respect (1)**
71:21

**respond (1)**
67:6

**response (7)**
15:11,12;24:18;27:17;
41:1,6;116:12

**rest (2)**
43:24;88:14

**result (1)**
117:7

**returned (1)**
44:5

**reversed (1)**
65:21

**review (5)**
22:2,5,18,22;35:18

**reviewed (2)**
39:12;113:7

**rifle (12)**
25:1,13,16,23;26:14,
17,24;27:3,4;31:22;
89:7;92:5

**rifles (9)**
25:19;26:4,11,19;
27:9,10,13;48: 3;107:13

**right (70)**
5:2;11:13;14:5;15:15,
17,18;20:20;25:11;29:5;
31:14;32:25;33:16;
36:18;37:12;33:7;40:3,
10;48:19;49:23;50:7;
52:5;54:25;55: 7;56:10,
21;61:15;64:2.67:3;
68:18;70:9,24,25;73:16,
21;75:12,19;79 24;80:9;
82:14;83:10;86:3,4,19;
88:3,10,12,19;89:8;
90:23;91:15,23 92:3,15;
95:12;96:14;97:17,18;
98:21;99:2;100:11;
101:23;104:25 105:22;
111:23;112:3,,4;
113:23;114:2; 19:8;
122:6

**right-hand (2)**
65:6;70:5

**Rimrock (1)**
7:2

**ring (1)**
113:20

**rode (1)**
72:13

**role (3)**
40:21;41:17;51:20

**room (42)**
13:15,23;14:6; 7:20,
20;22:12,15,19;30:4,24;
39:24,25;45:13,64:16;
88:13,14;93:1,9,20,25;

94:12;95:2;96:7,7,10,12;
97:7;98:11;99:21;
105:13,17,17,18;106:11;
107:25;108:4,19;109:9;
112:19,21;116:17;119:3

**room-clear (1)**
39:21

**room-clearing (13)**
12:25;13:3,18;17:12,
16;22:3;27:8;28:18;
30:14,22;38:23;39:4;
40:6

**rooms (8)**
18:4,4;23:3;39:13;
40:4;97:2;106:4;112:14

**roughly (1)**
46:3

**rounds (1)**
85:16

**route (1)**
70:15

**Roy (2)**
76:18,19

**Rule (5)**
14:11,23;15:2,4,14

# S

**safe (1)**
25:21

**safety (14)**
30:25;31:1;36:21;
37:1,5,17;38:6,17,21;
55:19;79:10,17,18;80:11

**sale (1)**
60:20

**Same (13)**
6:20,21,24;7:12;
51:10;61:22;81:3,6;
89:18;103:10;120:7,19;
121:3

**sat (9)**
48:7;52:23;83:18;
84:3,4,18,21,25;114:15

**save (1)**
86:21

**saw (23)**
49:13;50:13;54:10,23;
61:16;76:7,19;84:11;
91:8;92:19;93:18;96:18;
98:6,8,23;99:10;104:20;
109:17,22;110:1,9;
113:5;114:1

**saying (14)**
14:3;26:17,19;28:7;
38:5;66:8;74:21;75:25;
76:6;82:22,24.25;83:21,
21

**scared (1)**
89:19

**scenario (5)**
17:16;20:7,17;27:3;
39:22

**scenarios (7)**
20:11,17;26:3,9;38:8,
19;57:4

**scene (1)**
90:3

**school (6)**
5:21,23;6:3;19:3;
20:17,18

**schooling (1)**
6:2

**Scoop (2)**
63:22;64:8

**Scott (1)**
63:18

**screamed (1)**
89:18

**search (23)**
40:22;41:18;42:19,22,
23,25;43:18;48:8;51:4;
83:16;84:20;85:14;
108:22;111:10,11,25;
112:15;113:22;117:7,
25;118:9;119:19;120:4

**searched (5)**
112:6;113:15;117:24;
119:3,3

**searching (4)**
109:16;111:13;
112:23;116:2

**second (8)**
31:18;35:4;42:12;
43:2;62:7;89:21;101:24;
121:13

**seconds (1)**
15:9

**section (1)**
50:1

**seeing (10)**
45:7;47:5,9;49:19;
61:24;62:12;105:9,12,
24;106:3

**seem (3)**
27:23;60 8;62:11

**seemed (5)**
44:2;45:16;85:18,18;
112:9

**seems (6)**
16:18;51:9;59:16;
85:11;109:7;116:17

**segment (1)**
12:9

**seizure (1)**
51:4

**selected (2)**
71:8,12

**selling (3)**
7:3,5;60:24

**send (1)**
121:10

**sense (3)**
50:14;65:23;74:24

**sent (1)**
102:15

**September (1)**
28:12

**sequence (1)**
83:7

**Sergeant (24)**
18:12,13;22:17,25;
42:11,13,15;47:3,4,7;
48:10;49:4,5,15;54:21;
55:2;75:16;100:19;
101:5;102:12;103:1;
115:8,18;120:20

**serious (1)**
78:14

**serve (1)**
55:11

**service (2)**
16:9;41:20

**session (3)**
43:20;48:23;115:3

**sessions (6)**
18:2,15;20:12,14;
23:3,24

**set (5)**
20:13;23:15,16;78:9;
82:18

**setting (11)**
20:11;21:1;22:11,19;
23:13;25:1,14,24;26:15;
30:23;57:8

**seven (1)**
65:7

**several (8)**
12:11;13:19;14:6;
21:23;29:24;31:7;93:16;
98:12

**ship (1)**
51:7

**shoes (1)**
116:18

**shoot (1)**
30:20

**shooting (1)**
27:5

**short (1)**
89:13

**shortly (1)**
93:14

**shoulder (1)**
32:4

**shouldered (3)**
36:15;92:5,7

**show (2)**
10:19;66:20

**shown (3)**
48:17,19;120:21

**shows (1)**
71:1

**side (7)**
34:22;65:6;88:23;
89:1;90:6,17;97:20

**sidewalk (1)**
77:7

**sight (2)**

35:2;92:6
sights (1)
  36:18
signed (1)
  44:1
Similar (3)
  29:21;55:5,6
Similarly (1)
  32:24
simply (1)
  22:2
simulated (1)
  20:21
sirens (4)
  70:6,11,13,23
sit (1)
  43:10
site (1)
  36:2
sitting (4)
  43:23;84:9;88:8,9
situation (8)
  31:4;32:20,23;39:13;
  67:1;85:11,13;96:5
situations (2)
  23:19;68:20
slightly (1)
  92:7
slung (3)
  32:3;39:6;89:7
smoke (3)
  94:2,5;116:23
smoking (1)
  109:10
smoldering (1)
  109:21
somebody (14)
  43:9;81:14,19,21;
  82:8,11,19,22,25,25;
  83:12;89:1;112:9;119:5
someone (6)
  20:1;81:9,25;82:2;
  119:1,7
sometime (1)
  117:4
somewhere (1)
  48:11
son (1)
  47:22
Sorry (10)
  7:4;17:5;26:12;35:11;
  37:2;40:22;53:7;59:19;
  73:7;118:3
sort (8)
  22:11;33:21;70:4;
  73:10;76:22;86:5;90:9;
  111:18
sounds (2)
  14:16;78:13
South (2)
  6:15;70:15
southeast (3)
  112:17;113:16;119:4

speak (2)
  116:6,10
speaking (1)
  53:21
speaks (2)
  20:14;37:10
special (2)
  18:25;23:11
specific (10)
  11:6;15:20;25:9;
  26:22;28:1,2,10;61:12,
  14;77:12
specifically (23)
  21:2;23:12;28:18;
  31:22;45:4,6;47:5;51:4;
  62:12;64:11,15;65:17;
  71:4;74:7;75:5;90:22;
  91:5;93:17;104:20,25;
  105:24;106:3 108:2
speculation (1)
  81:23
spell (1)
  59:3
spent (1)
  12:8
spoke (1)
  115:17
sports (2)
  7:6,7
spread (1)
  12:11
Springfield (1)
  14:17
spun (1)
  84:2
stage (4)
  43:18;59:18;70:17,20
staged (1)
  81:6
staging (1)
  70:8
stairs (23)
  64:22;98:3,24;99:3,
  12,14;100:13; 02:1,2;
  103:7,20;104:3,18,19,
  23;105:1,4,4,5,10,14;
  106:12;107:17
stairway (2)
  98:23;103:14
stand (2)
  22:17;23:1
standing (3)
  83:20;110:19;113:1
stands (2)
  18:25;121:11
start (8)
  9:6;16:11,12,12,16;
  47:1,3,14;112:23
started (8)
  7:3,15;77:2,6;80:25;
  99:16;109:16;112:16
starting (2)
  36:1;98:3

stated (4)
  54:10,17;59:25;
  103:10
statement (4)
  15:6;40:3;49:17;69:2
station (4)
  43:12,17;44:5;72:10
stay (3)
  95:15,18;107:22
stayed (1)
  108:3
stays (1)
  71:1
stepped (1)
  86:6
steps (2)
  83:11;84:16
sticks (2)
  62:15;115:4
still (10)
  33:1;43:4;44:7;77:7;
  81:3;82:17;83:11;84:14;
  88:4;104:18
stint (1)
  7:9
stood (1)
  97:17
stop (3)
  48:15;49:24;97:14
straight (1)
  88:12
straighten (1)
  37:22
strategically (1)
  47:25
Street (5)
  5:5;70:16;72:25;73:1;
  114:13
strictly (1)
  69:9
strike (1)
  40:23
structure-clearing (1)
  30:5
stuff (5)
  10:20;17:19;51:8;
  64:22,24
stuffed (3)
  51:6,11;113:24
subject (1)
  57:13
substance (1)
  119:23
supplied (2)
  27:19;29:12
supposed (2)
  65:14;75:6
sure (43)
  9:19;11:23,25;13:12;
  18:7,14;19:13,16,18;
  21:6;22:14;27:12;28:6;
  30:23;39:10;40:15;41:3,
  12,15,23;43:13;44:2,21;

47:8;49:7;51:12;60:25;
  61:18;62:5;74:4,9,25;
  87:24;88:12;90:1;98:15;
  101:10;103:1,3;106:16,
  25;109:7;110:12
surprise (1)
  80:25
surveillance (3)
  46:14,16;71:21
suspect (4)
  47:21,22;102:15;
  121:10
suspected (1)
  60:24
suspects (3)
  15:10;50:2,5
SWAT (8)
  18:22,23,24;19:3,5,8,
  20,25
SWAT-type (1)
  19:2
sworn (1)
  4:2

**T**

tabs (1)
  16:6
Tac (2)
  64:25;91:4
tactical (6)
  18:4,25;54:11;55:21;
  65:2;91:4
tactics (10)
  12:25;13:4;17:16;
  19:3;27:8,17;30:5,14;
  41:1,6
Talk (7)
  10:6;16:22;17:7;
  32:22;46:25;51:9;64:9
talked (18)
  13:12;39:5,6;51:6,20;
  52:3;54:22;64:1,3;
  65:17;70:8,10;71:3;
  91:3;101:25;110:23;
  115:9;120:9
talking (28)
  6:8;13:20;17:22,24;
  21:12,19;23:14;25:15,
  16;27:5,7;34:20,25;38:8,
  9:39:25;40:1;60:11,14;
  61:23,24;62:2,22;67:18;
  78:20;80:7;95:6;105:22
target (4)
  32:1;35:25;36:7;38:11
targets (1)
  38:12
taught (6)
  13:2,15;30:12,18;
  32:5;34:4
team (42)
  13:17;19:8,21;20:1,5;
  22:2,12;23:5,12,19,21;

41:19;46:10;55:21,21;
  56:25;57:2;71:9,13,16,
  19,20,22,23;72:6,7,9;
  73:21;74:14;76:4;86:12;
  87:10;90:12;91:2;107:3,
  7;108:22;111:9,10,11,
  25;121:23
teams (3)
  72:4;73:23;90:21
team's (1)
  15:11
techniques (1)
  28:18
Technology (1)
  28:15
teddy (1)
  113:19
telling (1)
  89:10
ten (3)
  12:13;108:10,13
ten-year-old (2)
  63:7,8
term (5)
  8:1;18:23,24;23:17;
  43:8
terms (3)
  36:25;50:4;120:25
territory (1)
  47:14
testified (4)
  4:2;58:20;62:16;79:19
testify (1)
  54:12
testimony (6)
  37:19;53:5,24;54:9;
  58:11;79:3
T-formation (1)
  29:25
thinking (1)
  20:16
third (5)
  32:7,18;54:16;81:17;
  85:24
THOMPSON (72)
  8:14;14:2;15:7;17:3;
  19:12,23,24:2;34:7,10,
  37:8,20;39:14;44:18;
  46:17;47:16,18;49:9;
  52:11,20;53:4,12,23;
  54:8,14;55:12,22;56:3,
  15;57:18,24;58:15;
  59:23;60:6;61:10;65:11;
  67:22;68:2,11,23;69:13;
  70:2;77:24;78:17;80:16;
  82:10;85:8;86:20;87:15;
  92:10;96:3;101:13,18;
  102:3;103:15,25;104:7;
  105:8;107:18;108:11;
  109:23;110:22;114:8;
  115:11,22;116:9;118:1,
  17;119:20;120:7,16;
  121:3;122:2

Case 1:10-cv-00041-ABJ   Document 65-11   Filed 01/10/11   Page 76 of 77

Tricia Wachsmuth v.                                                                    Mike Hall
City of Powell, et al.                                                              October 7, 2010

**though (1)**
 110:7
**thought (8)**
 52:23,25;53:9,16;
 54:17;88:17;92:2;96:21
**threat (26)**
 13:20,21,23,24;14:4,5;
 30:24;32:21;35:1;36:1,
 19;40:1,5;53:21;54:2;
 55:8,19,25;56:6,8,14,19;
 78:14;79:10;115:7,16
**threatening (2)**
 84:5,10
**threats (4)**
 30:19;66:5;79:17;80:2
**three (5)**
 12:12;29:25;55:14;
 63:14;107:1
**throughout (1)**
 47:24
**thrown (1)**
 24:24
**tight (3)**
 31:22;34:20,21
**title (1)**
 19:6
**titled (1)**
 32:12
**today (6)**
 4:11;5:8,12;10:24;
 11:22;122:7
**together (9)**
 22:13;23:17;55:10;
 73:7,9;94:19;95:13;
 111:16;121:23
**told (26)**
 42:15;47:20,21,23;
 48:21,25;49:3,22,23,24;
 50:8,18;55:18,24;56:5,
 10,11;63:13,16,22;
 64:14,15,23,24;85:25;
 89:23
**Tom (4)**
 55:18;71:1,6;103:10
**took (7)**
 18:12;88:3;105:4;
 109:8,16;112:22;114:19
**top (2)**
 83:10;106:12
**Torczon (4)**
 58:13,22,23;59:1
**totality (2)**
 56:6,13
**toward (12)**
 31:23;32:4;72:8,25;
 75:10;77:8;83:12;84:24;
 88:3,5,11;89:9
**towards (1)**
 102:21
**track (1)**
 96:6
**train (3)**
 22:1;23:17;28:9

**trained (32)**
 12:21,24;13:5;19:2,8,
 20;20:1;21:25;22:1,7,7,
 11;23:12,22;24:25;
 25:23;28:17,22,24;
 29:19;31:21,25;32:10,
 17,24;33:14;38:14,17,
 25;39:13,17;40:6
**trainer (1)**
 18:5
**trainers (1)**
 18:10
**training (66)**
 7:17;9:7,11,17,17,22;
 10:1,6,15;12:8,16;14:10,
 14;15:18;16:12,18,23;
 17:4,7,11,18;13:2,11,15,
 16,22;19:1,5;20:7,10,12,
 14,17,24;21:1,8,18;
 23:24;24:13,15,23;25:5,
 11,12,13,16,16,19;26:3,
 5,9,13,20,23;27:7,11,18;
 28:2,3;30:7;33:9,18;
 57:4,5,9;80:6
**trainings (1)**
 16:1
**treat (1)**
 86:17
**Tricia (37)**
 48:1;52:15;54:6;
 60:23;63:12,23;89:3,9;
 98:24;99:12,13,18;
 100:12,16,18;101:2,11,
 25;102:18;103 6,13,18;
 104:3,17,23;105:24;
 106:11;107:16,23;108:7,
 17,18;110:9,20;114:5;
 116:6,10
**Tricia's (2)**
 51:7,11
**trickled (1)**
 45:17
**trigger (1)**
 33:1
**true (6)**
 18:18;28:15;39:8;
 45:9;67:7;107:11
**truthful (2)**
 5:7,11
**try (2)**
 18:10;54:18
**trying (4)**
 54:14;76:25;86:10;
 111:16
**tucked (2)**
 31:22;89:17
**turn (7)**
 11:19;14:11;40 24;
 57:12;88:16;92 21,25
**turned (3)**
 14:9;84:21;93:2
**turning (1)**
 9:6

**two (21)**
 8:19;12:12;19:17;
 21:13;25:15;27:24;
 34:17;41:23;42:1;46:6;
 53:2,11;59:12,17;62:22;
 87:8;98:25;99:1;106:4;
 107:1;110:8
**two-page (1)**
 34:6
**type (8)**
 6:20,24;7:12;13:4;
 17:19;32:20;51:8;89:23
**typically (1)**
 22:22

**U**

**uncalled (1)**
 86:18
**under (5)**
 4:12;64:22;94:21,21,
 24
**understood (5)**
 26:12;59:21;66:8,10;
 101:9
**unfortunately (1)**
 16:6
**uniform (1)**
 98:8
**uniforms (2)**
 106:14,22
**unit (2)**
 23:11,11
**universal (5)**
 33:6,12;36:15,25;
 38:14
**unknown (2)**
 110:9,10
**unsecured (2)**
 102:15;121:10
**up (38)**
 7:10;22:20;23:1;
 32:16;34:20,21;35:1,3;
 38:12;42:25;46:3;48:10;
 58:1;64:17;66:21;71:1;
 74:22;75:3;76:23,24;
 77:7,20;78:9;79:10;
 82:18;89:17,20,25;
 91:18;94:24;101:24;
 104:18;105:15,25;
 108:24;109:6,7;112:9
**updated (1)**
 9:19
**upon (1)**
 23:19
**upstairs (2)**
 62:14,15
**use (16)**
 8:1;22:4;24:25;25:13,
 19,21;26:14,17,24;27:4;
 38:25;39:4;54:2;70:11,
 12;74:13
**used (6)**

 13:20;18:23;20:6;
 51:7;119:9,13
**using (4)**
 24:23;26:5;27:4;70:22
**Usually (2)**
 17:19;21:7

**V**

**Valley (2)**
 7:13,14
**variables (1)**
 37:4
**various (1)**
 33:18
**vehicle (1)**
 51:1
**vehicles (6)**
 48:8,8;73:10,11;90:4,
 11
**verbal (2)**
 8:12;9:1
**vest (1)**
 54:11
**vests (3)**
 48:12;55:5;85:15
**vicinity (1)**
 46:24
**video (1)**
 118:8
**videos (1)**
 118:14
**violation (1)**
 67:4
**violence (6)**
 52:10,18;53:2,11;
 54:7;55:3
**vision (1)**
 91:25
**volunteer (1)**
 115:15

**W**

**Wachsmuth (45)**
 41:18;47:21,23;52:6,
 10,15;54:6;55:3,8,19;
 58:4;60:23;63:22,23;
 64:3,8,9;71:1,6;72:11,
 21;73:2;74:2,15;79:11;
 87:20;88:4,8;89:4;98:2;
 100:12;102:19;103:6;
 106:11;107:16,23;108:7,
 18;110:9;114:5,25;
 115:6,17;116:6;121:15
**Wachsmuth's (1)**
 47:22;73:17;89:13,24
**wait (1)**
 85:5
**waited (2)**
 45:14;85:2
**Waiting (3)**
 43:24,24;44:1

**walked (4)**
 79:10;91:20;96:18;
 100:8;107:17;108:7
**walking (3)**
 106:17;110:20,24
**wall (2)**
 88:15;99:16
**walls (1)**
 117:17
**wants (1)**
 35:23
**warrant (29)**
 14:18;25:9;40:22;
 41:18,20;42:20,22,23;
 43:1,18,25;44:6,12;
 45:20;48:9;51:4;55:11;
 63:2,3;66:10,12,13,18,
 19,25;83:16;84:21;
 85:15;111:14
**warrants (1)**
 67:21;68:9,14;69:12,
 20,22
**watch (3)**
 95:9;96:6;108:15
**water (1)**
 40:14
**way (16)**
 32:24;35:23;38:20;
 42:4;43:7;63:1;79:12,
 13;86:6,18;92:13,14;
 93:12;114:6,12;118:6
**weak (1)**
 34:22
**weapon (42)**
 13:3,13,14;25:10;
 30:13;31:7,7,12;32:5,11,
 17,19,20,22,25;33:18,
 20;34:21;35:1,9,10,13,
 20,21,24,25;36:6,15;
 38:24;39:2,4,6,11;40:7;
 89:4;91:15,19;92:3;
 95:1,5,7;107:15
**weapons (5)**
 18:25;25:10;55:8;
 104:11;106:15
**wearing (1)**
 48:12
**week (1)**
 114:13
**weren't (5)**
 27:4;78:6;92:4,5;
 109:12
**west (1)**
 73:18
**WESTBY (93)**
 8:5,8;10:15,18;11:8,
 10;13:6,25;14:19;15:8;
 17:1;19:10,14,22,26:25;
 29:14;32:12;35:15;37:2,
 18,23,39:15;40:16;
 44:19;47:17;49:10;
 51:14,22,25;52:12,19;
 53:6,13;55:13,23;56:4,

16;57:16;58:16;60:4;
61:8,11,22;65:9;67:8,14;
68:1,4,12,21,24;69:4,15,
25;75:20;76:14;77:22;
78:15,24;79:2,22;80:14;
81:22;85:9,23;86:13,17;
92:8;96:1;101:14;103:9,
16,23;104:5;105:6,20;
106:7;107:19;108:12;
109:25;114:9;115:12,
21;116:7;118:2,15;
119:25;120:8,14,19;
121:2,16;122:3

**what's (5)**
15:24;16:21;35:17;
36:22;39:1

**Whenever (1)**
42:3

**whole (6)**
11:5;17:14;18:20;
41:15;59:17;94:20

**whoops (1)**
40:22

**whose (1)**
18:21

**wife (2)**
47:23;64:18

**window (20)**
48:3;72:7;81:10;82:9,
19,21,23;83:1,12,13,17,
25;84:1,2,14;90:18;
116:20,21;117:10,13

**windows (1)**
48:2

**wise (1)**
46:2

**wish (1)**
4:23

**within (4)**
8:17;9:1;78:10;102:11

**without (5)**
4:19;9:18,18;14:5;
107:4

**WITNESS (74)**
8:9,23;11:9,12;13:9;
14:3;15:9;17:4;19:13,
24;24:4;27:2;29:16;
34:13;35:24;37:3;38:1;
39:16;44:20;47:19;52:2,
13,21;53:7,14;54:21;
55:14,24;56:5,17;57:19,
25;58:17;60:7;61:12,23;
65:12;67:16;68:5;75:24;
77:25;78:18;80:17;
82:11;85:10;86:1,18,22;
92:11;96:4;97:6;101:20;
103:17;104:1,8;105:9,
22;107:20;108:13;
110:1,11,23;114:10;
115:13,23;116:10;118:3,
18;120:1,9,20;121:5,19;
122:4

**woman (2)**

58:12,21

**wondering (1)**
27:20

**word (1)**
64:16

**words (3)**
37:12;101:9;103:14

**work (6)**
6:7,11,16,20,24;7:12

**Worked (2)**
7:15;97:21

**working (2)**
42:19;58:24

**works (1)**
58:22

**world (1)**
38:8

**worry (1)**
8:20

**write (3)**
59:2;65:13;97:20

**written (2)**
33:23;34:14

**wrong (3)**
103:22;104:1,9

**Wyoming (3)**
5:5;7:11;8:3

## Y

**year (5)**
5:25;6:4;7:9;8 2;
21:17

**year-and-a-half (1)**
21:16

**years (4)**
8:17;9:1;21:13;46:6

**yesterday (1)**
11:11