# Appendix Seventeen

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Matt Brilakis*
*November 22, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 11-22-10 Matt Brilakis_SCOPED.txt
Min-U-Script® with Word Index

Tricia Wachsmuth v.
City of Powell, et al.

Matt Brilakis
November 22, 2010

---

MATT BRILAKIS - November 22, 2010                                    Page 1

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF WYOMING

3    -------------------------------------------------------

4    TRICIA WACHSMUTH,                    )

5               Plaintiff,               )

6        vs.                             )   NO. 10-CV-041J

7                                        )

8    CITY OF POWELL, AND IN THEIR        )
     INDIVIDUAL CAPACITY, TIM            )
     FEATHERS, CHAD MINER, MIKE          )

9    CHRETIEN, ROY ECKERDT, DAVE         )
     BROWN, MIKE HALL, BRETT LARA        )

10   MATT MCCASLIN, ALAN KENT, MATT      )
     DANZER, OFFICER BRILAKIS, LEE       )

11   BLACKMORE, CODY BRADLEY, KIRK       )
     CHAPMAN, JOHN DOES #1-#4,           )

12                                       )

13             Defendants.               )

14          DEPOSITION OF MATT BRILAKIS
             9:53 a.m., Monday, November 22, 2010

15

16

17

18          Pursuant to notice, the deposition of MATT

19   BRILAKIS was taken in behalf of Plaintiff in accordance

20   with the applicable Federal Rules of Civil Procedure at

21   270 North Clark, Powell, Wyoming, before Vonni R. Bray,

22   Registered Professional Reporter and Notary Public of

23   the State of Montana.

24

25

---

MATT BRILAKIS - November 22, 2010                                    Page 2

1                      APPEARANCES

2    FOR PLAINTIFF:

3            Mr. Jeffrey C. Gosman
             Gosman Law Office

4            125 W 2nd Street
             P.O. Box 51267

5            Casper, WY 82601-2481
             Telephone: (307)265-3082 - Fax: (307)265-6715

6            E-mail: jeff@gosmanlawoffices.com

7

8    FOR INDIVIDUAL DEFENDANTS:

9            Ms. Misha Westby
             Senior Assistant Attorney General

10           2424 Pioneer Avenue, 2nd Floor
             Cheyenne, WY 82002

11           Telephone: (307)777-5477 Fax: (307)777-8920
             E-mail: mwestb@state.wy.us

12

13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:

14

15           Mr. Tom Thompson
             MacPerson, Kelly & Thompson

16           616 West Buffalo
             P.O. Box 999

17           Rawlins, WY 82301-0999
             Telephone: (307)324-2713 - Fax: (307)324-7348

18           E-mail: tthompson@wyomingattorneys.net

19

20   Also Present:  Tim Feathers

21

22

23

24

25

---

MATT BRILAKIS - November 22, 2010                                    Page 3

1                   INDEX TO WITNESSES

2                                                        PAGE

3    MATT BRILAKIS

4        Direct Examination by Mr. Gosman ...............4
         Signature Page ...............................53

5        Reporter's Certificate .......................54

6

7

8                       EXHIBITS

9    EXHIBIT            DESCRIPTION                     PAGE

10     10      Notes of Wachsmuth Warrant ..............32

11     31      WY P.O.S.T. Training Records .............9

12     35      PPD Patrol Friday Training ..............20

13     50      Drawing by Matt Brilakis ................42

14

15

16

17

18

19

20

21

22

23

24

25

---

MATT BRILAKIS - November 22, 2010                                    Page 4
Direct Examination by Mr. Gosman

1                   MATT BRILAKIS,

2    having been first duly sworn, testified as follows:

3                 DIRECT EXAMINATION

4    BY MR. GOSMAN:

5        Q.  Officer, before we begin today, I'd like to

6    go over some general instructions concerning the

7    deposition. Have you ever given a deposition before?

8        A.  Yes, sir, I have.

9        Q.  And approximately how many times?

10       A.  Twenty, 25.

11       Q.  Okay.  In connection with what kinds of cases

12   did you give depositions?

13       A.  Criminal cases, also civil cases.

14       Q.  Okay.  And have you ever been a party to a

15   lawsuit?

16       A.  No, sir, I haven't.

17       Q.  You're familiar, then, with the process for

18   giving depositions, correct?

19       A.  Yes, sir.

20       Q.  I'll ask the questions here today, and you're

21   under oath with respect to your answers; do you

22   understand that?

23       A.  Yes, sir, I do.

24       Q.  If there is a problem understanding any of my

25   questions, please take the time to ask me to clarify

---

Case 1:10-cv-00041-ABJ Document 65-12 Filed 01/10/11 Page 4 of 92
Tricia Wachsmuth v.
City of Powell, et al.

Matt Brilakis
November 22, 2010

MATT BRILAKIS - November 22, 2010                Page 5
Direct Examination by Mr. Gosman

1  what I've asked of you before you give an answer. Will
2  you agree to that?
3     A.  Yes, sir, I will.
4     Q.  And it is important that you answer with an
5  audible yes or no, rather than an uh-huh or huh-uh.
6  Those types of statements don't add up very well on the
7  record. Will that be okay?
8     A.  Yes, sir.
9     Q.  And we can take a break at any time, but not
10 while a question is pending, okay?
11    A.  Yes, sir.
12    Q.  What is your full name, Officer?
13    A.  Matthew Brilakis.
14    Q.  And what is your current address?
15    A.  My work address is 250 North Clark Street,
16 Powell, Wyoming 82435.
17    Q.  And are you currently on any medication that
18 would impair your ability to give truthful answers here
19 today?
20    A.  No, sir, I am not.
21    Q.  Is there any other med cal reason why you
22 might not be able to answer the questions truthfully
23 and fully in this deposition today?
24    A.  No, sir.
25    Q.  Have you ever been arrested for any crime

MATT BRILAKIS - November 22, 2010                Page 6
Direct Examination by Mr. Gosman

1  other than a traffic violation?
2     A.  No, sir.
3     Q.  Have you ever been accused of a crime
4  involving dishonesty?
5     A.  No, sir.
6     Q.  Have you ever been divorced?
7     A.  No, sir.
8     Q.  Have you ever had a restraining order placed
9  against you?
10    A.  No, sir, I have not.
11    Q.  What is your educational background,
12 Officer Brilakis?
13    A.  I've got an associate's degree in criminal
14 justice.
15    Q.  And where did you obtain that associate's
16 degree?
17    A.  Broadview Community College down in Florida.
18    Q.  What year was that?
19    A.  I think it was 2006.
20    Q.  And you graduated from high school in what
21 year?
22    A.  1979.
23    Q.  And take a minute and describe your work
24 history from the time you graduated from high school.
25    A.  I was in the United States Coast Guard for 6

MATT BRILAKIS - November 22, 2010                Page 7
Direct Examination by Mr. Gosman

1  years. I started with the Coral Springs Police
2  Department down in Coral Springs, Florida, from January
3  of 1986 through June of 2007. And then I moved out
4  here to Powell.
5     Q.  What brought you to Powell?
6     A.  I retired from Coral Springs PD and wanted to
7  move to Wyoming.
8     Q.  And what was your starting position with the
9  Powell Police Department?
10    A.  Patrol officer.
11    Q.  And what is your position -- what was your
12 position on the 24th of February, 2009?
13    A.  Patrol officer.
14    Q.  I understand that you have continuing
15 education requirements as a law enforcement officer in
16 the state of Wyoming. Is that correct?
17    A.  Yes, sir, it is.
18    Q.  How many hours do you have to attend of
19 continuing education?
20    A.  I do not know.
21    Q.  Are you current with your requirements in
22 that area?
23    A.  As far as I know, yes.
24    Q.  Do you know whether the in-service training
25 that is provided by the Powell Police Department

MATT BRILAKIS - November 22, 2010                Page 8
Direct Examination by Mr. Gosman

1  qualifies for the education or training requirements of
2  the -- for a Wyoming police officer?
3     A.  I would think so.
4     Q.  You don't know for sure?
5     A.  No, sir.
6     Q.  Do you know whether you have applied any of
7  your in-service training to your certification as a
8  police officer?
9     A.  In Wyoming?
10    Q.  Yes.
11    A.  Yes, sir, I have.
12    Q.  You have applied your in-service training
13 with the Powell Police Department for -- to meet your
14 requirements for continuing education with the State of
15 Wyoming?
16    A.  I'm not sure what you're asking, sir.
17    Q.  Yes, it wasn't the best question.
18        The State of Wyoming requires law enforcement
19 officers, by law, to maintain a certain level of
20 training and education every year, correct?
21    A.  Yes.
22    Q.  And do you -- have you applied your
23 in-service training with the Powell Police Department
24 to meet those requirements?
25    A.  If you're asking if I applied my in-service

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 5 of 92
Tricia Wachsmuth v.                                                                    **Matt Brilakis**
City of Powell, et al.                                                          **November 22, 2010**

MATT BRILAKIS - November 22, 2010                                        Page 9
Direct Examination by Mr. Gosman

1   training to my patrol duties, the answer is yes. Is
2   that what you're asking? I'm not quite sure what
3   you're trying to say.
4       Q.  Well, I'm not sure what you mean by patrol
5   duties.
6       A.  Well, my regular day-to-day duties as a
7   police officer.
8       Q.  All right. Now, I'm talking about whether or
9   not those in-service training hours were applied to the
10  number of hours that you're required to take every year
11  to maintain your certification as a peace officer in
12  the state --
13      A.  I would think so, yes.
14      Q.  Have you ever had any discipline, including
15  verbal discipline, within the last five years that is
16  not in your personnel file?
17      A.  No.
18              (Exhibit 31 identified)
19  BY MR. GOSMAN:
20      Q.  Let's go ahead and take a look at Exhibit 31
21  there if we can.
22      A.  Okay.
23      Q.  And I believe that your training records,
24  which are contained in this exhibit, are sort of in the
25  middle of the document. Could you find those for me,

MATT BRILAKIS - November 22, 2010                                        Page 10
Direct Examination by Mr. Gosman

1   please?
2       Oh, I'm sorry, they are towards the end.
3       A.  Okay.
4           MR. THOMPSON: Counsel, he's on Bates LGLP
5   Wachsmuth 88.
6   BY MR. GOSMAN:
7       Q.  And 89. Yes, all right.
8       First, Officer, can you tell me if this is a
9   complete record of all your POST training?
10      A.  Yes, sir, it looks to be.
11      Q.  I don't see anything after 1/25 of 2007. Can
12  you explain that?
13      A.  No, I can't.
14      Q.  Have you had any training since January of
15  2007 that would be POST qualified?
16      A.  I went through the Wyoming certification
17  class. We've had in-service training.
18          MS. WESTBY: To make this easier, it's
19  probably just an oversight on our part in producing
20  those records, I'm sure he's up to date. You probably
21  just don't have the most recent one.
22          MR. GOSMAN: Well, can you check and see if,
23  in fact, there's more to the record than what I've got,
24  and if there is, could you send it to me, I would
25  appreciate that?

MATT BRILAKIS - November 22, 2010                                        Page 11
Direct Examination by Mr. Gosman

1           MS. WESTBY: We will do that.
2           MR. GOSMAN: Thank you.
3   BY MR. GOSMAN:
4       Q.  Do you know whether since January 2007, you
5   were involved in any POST recognized training that
6   dealt with dynamic entry or patrol tactical response?
7       A.  A dynamic entry, no, I don't believe so, not
8   here.
9       Q.  Then let's go ahead and look at the record as
10  it exists on document numbers 88 and 89. And I'll ask
11  you to identify all of the training you've had
12  previously that deal specifically with -- and I'll
13  limit the question to dynamic entry.
14      A.  Okay.
15      Q.  Have you had a chance to take a look at that
16  list, Officer?
17      A.  Yes, sir, I have.
18      Q.  Okay. Is there anything in that list that
19  reflects POST training relevant to -- or involving
20  specifically dynamic entry?
21      A.  Well, training record goes to 1999. I got
22  certified as a police officer in '86, so...
23      Q.  Do you know if the Powell Police Department
24  has a copy of those earlier training records?
25      A.  They should, sir, yes.

MATT BRILAKIS - November 22, 2010                                        Page 12
Direct Examination by Mr. Gosman

1       Q.  Do you have a copy of those earlier training
2   records?
3       A.  In my personal files, probably, yes.
4           MR. GOSMAN: Could we take just a minute and
5   see if we can get this cleared up so we can get a
6   complete copy of those.
7           MS. WESTBY: Chief Feathers just went over to
8   get the newer records. Do you want him to get the
9   older records, too?
10          MR. GOSMAN: Yes, ma'am.
11          THE WITNESS: I don't know if we have them at
12  the station or I got them at my residence. I'm not
13  sure.
14          MS. WESTBY: Can you --
15          THE WITNESS: Take a walk over there and see
16  what I can find?
17          MS. WESTBY: Yeah.
18          MR. GOSMAN: Thank you very much.
19              (Recess taken 10:05 to 10:17
20              a.m., November 22, 2010)
21  BY MR. GOSMAN:
22      Q.  Officer, we're back on the record, and I'm
23  looking at a Wyoming POST training record for Matt
24  Brilakis. And this document was just given to me, and
25  it apparently reflects your POST training from -- well,

| MATT BRILAKIS - November 22, 2010 Page 13 | MATT BRILAKIS - November 22, 2010 Page 15 |
|---|---|
| Direct Examination by Mr. Gosman | Direct Examination by Mr. Gosman |

**Page 13**

Direct Examination by Mr. Gosman

1  it actually -- it does go back to 1986, although I'm
2  not sure that it has the complete record of all POST
3  hours from 1986.
4       Would you take a minute and review that
5  document and then let's talk about what's there and
6  what's not there?
7       A.  Yes, sir.
8       Q.  Okay.  Go ahead.
9       A.  All right.  Sir.
10      Q.  Are the entries that are contained in the
11  documents numbered 88 and 89 of Exhibit 31 summarized
12  in the Wyoming POST training records as law enforcement
13  in-service from Florida from the years 1990 to the
14  year -- through the year 2005?
15      A.  Yes, sir.  But there might be some other
16  training that I had that is not on this -- on the
17  paper.  It could have been in-service.
18      Q.  The paper --
19      A.  I'm sorry, on the Wyoming certification or
20  the Florida certification.  It could have been
21  in-service, I know back in my old department, there was
22  a transition for the way to enter training records, and
23  some of that may not have made it on the training
24  records themselves.
25      Q.  Well, and I notice that the documents, they

**Page 14**

Direct Examination by Mr. Gosman

1  are Bates stamped 88 and 89, only go back to 1999, and
2  then they end essentially at the end of 2006.  There's
3  two entries in 2007, both occurring in January.
4       A.  Yes, sir, I see that.
5       Q.  All right.  So there may have been law
6  enforcement in-service prior to January of 1999 that is
7  not reflected in your -- in the document that we've
8  identified as Bates stamped Number 88 and 89?
9       A.  Yes, that would be true.
10      Q.  All right.  Is it fair to say that since the
11  first of January, 1999, we have a complete record of
12  your POST training?
13      A.  Well, with all due respect to my old agency,
14  I wouldn't say that.  But you never know.
15      Q.  Okay.  To the best of your knowledge, these
16  documents, and I'm referring to also the one that was
17  just produced, which is your Wyoming POST training
18  documents, do contain your POST recognized training
19  from January of 1999 to present?
20      A.  Yes.  But, again, there could be some
21  stuff -- there could have been -- there were other
22  things that, sir, that wouldn't be reflected in this.
23  I was a field training officer for 17 out of my 20
24  years in Springs.
25      I would have done different types of training

**Page 15**

Direct Examination by Mr. Gosman

1  with my officers as well as refresher training for
2  myself that would not show up in this record.
3       Q.  Do you have a recollection, as you sit here
4  today, of any specific POST recognized training that
5  dealt with dynamic entry?
6       A.  I don't know if it would be POST recognized.
7  I did -- whether it was stuff that we did in-service
8  training or stuff that I would -- did with my trainees
9  on dynamic entries, building searches, things along
10  those lines, sir.
11      Q.  Now, going back to 1999 and the documents
12  that we've identified as Bates numbers 88 and 89, I
13  don't see anything that reflects dynamic entry
14  training.
15      Can you point it out to me if it's there, if
16  I've missed it?
17      A.  I don't see it on here, sir.  But it doesn't
18  mean it didn't occur.
19      Q.  Is it possible that the training that you're
20  referring to that would have related to dynamic entry
21  occurred before January of 1999?
22      A.  I don't think so, no.  I can remember going
23  to -- there was a ten-hour class at some point, which
24  I -- it was within the last ten years or so, that dealt
25  with dynamic entries and things along those lines.

**Page 16**

Direct Examination by Mr. Gosman

1       Q.  Anything else that you can specifically
2  remember?
3       A.  Specifically, no.  But we did a lot of
4  training down in my old department.  I did a lot of
5  training with new officers that I trained.
6       While I was training them, it might have been
7  a few minutes here, ten minutes, 15 minutes, 30
8  minutes, that was just never documented.
9       Q.  Let's go ahead and identify the Wyoming POST
10  training records.  We don't have a Bate Number on this.
11  but I am looking at the document which was just
12  produced, and it does have your name, correct?
13      A.  Yes, sir, it does.
14      Q.  And it lists Wyoming POST training records.
15      And is it your understanding that this is an
16  accurate record of your POST training -- I think I may
17  have asked that question, but I'll ask it again -- as
18  it's stated on this record?
19      MS. WESTBY: Object to the form of the
20  question.
21      MR. THOMPSON: Join.
22      MS. WESTBY: And go ahead and answer if you
23  can.
24      THE WITNESS: Can you repeat the question for
25  me, sir?

MATT BRILAKIS - November 22, 2010                   Page 17
Direct Examination by Mr. Gosman

1    BY MR. GOSMAN:
2      Q.  Is the document that you and I are looking
3    at, which contains your name and refers to Wyoming POST
4    records, an accurate collection of your POST training
5    period?
6          MS. WESTBY: Same objection.
7          MR. THOMPSON: Join.
8          MS. WESTBY: Go ahead.
9          THE WITNESS: You want me to answer that?
10   I'm sorry.  My apologies.
11         MS. WESTBY: Go ahead and answer unless I
12   instruct you not to.
13         THE WITNESS: Okay.  This record shows
14   classes on there.  I do not believe that it shows all
15   the in-service training that we've had or general
16   discussion training or things along those lines.
17   BY MR. GOSMAN:
18     Q.  And since you came to Wyoming, does this
19   record contain an accurate account of all of the POST
20   recognized training that you've had in Wyoming?
21         MS. WESTBY: Object to the form of the
22   question.
23         MR. THOMPSON: Join.
24         MS. WESTBY: Go ahead and answer.
25         THE WITNESS: No, I don't -- again, my

MATT BRILAKIS - November 22, 2010                   Page 18
Direct Examination by Mr. Gosman

1    question on the paperwork would be, sir, that it does
2    not reflect all the in-service training that we've had
3    at the police department.
4    BY MR. GOSMAN:
5      Q.  Is that the only exception that you can think
6    of to the training that is listed on these POST
7    training records in terms of its being complete?
8      A.  In reviewing the classes -- I'm looking at
9    the classes, sir, that I took down in Douglas, which is
10   the academy down there.  When I look at the document,
11   sir, I don't see some of the in-service training that
12   we've had.
13     Q.  That would be in-service at the Powell Police
14   Department?
15     A.  Yes, sir.
16     Q.  Do you know whether the Powell Police
17   Department in-service training is qualified as Wyoming
18   POST training?
19     A.  That's a question I couldn't answer.
20     Q.  Okay.  We're going to take this document
21   which we've just received, the Wyoming POST training
22   records with your name on it, and we're going to insert
23   it in Exhibit 31 of the deposition exhibits.  And it
24   will be inserted just in front of the documents that we
25   previously talked about, Bates Number 88 and 89.

MATT BRILAKIS - November 22, 2010                   Page 19
Direct Examination by Mr. Gosman

1          MS. WESTBY: And I would just note that this
2    exhibit does not reflect all of the training material
3    that was provided, just so the record is clear.
4    BY MR. GOSMAN:
5      Q.  Have you ever had any SWAT training?
6      A.  I have had training in my career on entries,
7    building entries.  I've had training -- we had a little
8    bit on -- yes.  The answer to your question is yes.
9      Q.  All right.  And you understand what the term
10   SWAT means?
11     A.  Special Weapons and Tactics.
12     Q.  And do you understand that SWAT is a term
13   that applies to special teams that are trained to
14   perform dynamic entries and other types of tactical
15   operations?
16     A.  Yes, sir.
17     Q.  And have you ever trained with a SWAT team?
18     A.  No, sir.  I've had training -- in Florida it
19   was called special response team, SRT team.  We had
20   training where the SRT team members would conduct
21   in-service training, whether it be on firearms,
22   entries, things along those lines, sir.
23     Q.  Did you serve on a special response team in
24   Florida?
25     A.  No, sir, I did not.

MATT BRILAKIS - November 22, 2010                   Page 20
Direct Examination by Mr. Gosman

1      Q.  Do you know if the Powell Police Department
2    has a special operations team?
3      A.  No, sir, we do not.
4      Q.  When was the last time the Powell Police
5    Department performed a dynamic entry with a team
6    similar to the one that was used in the Wachsmuth
7    residence, and that would be prior to that night?
8      A.  I couldn't tell you that, sir.
9      Q.  Have you ever participated in a dynamic entry
10   with the Powell Police Department involving a team
11   similar to the one that was assembled to effect the
12   Wachsmuth warrant?
13     A.  No, sir, I had not.
14              (Exhibit 35 identified)
15   BY MR. GOSMAN:
16     Q.  Let's go ahead and take a look at Exhibit 35
17   for a moment.  It looks like you arrived at the Powell
18   Police Department in 2007.  Would that be correct?
19     A.  Yes, sir, I started here July 5th, 2007.
20     Q.  So we don't need to worry about any of the
21   in-service training records that are in Exhibit 35
22   prior to that date.
23         Let's go ahead and go to the year 2007.  I'm
24   not sure there are any records for in-service training
25   in the year 2007.  Take a look though and make sure I'm

MATT BRILAKIS - November 22, 2010                    Page 21
Direct Examination by Mr. Gosman

1  correct.
2      A.  (Witness complies.)
3      Q.  Do you see any training records there for the
4  year 2007?
5      A.  No, sir, I don't.
6      Q.  Have you been involved in any of the
7  in-service training that is reflected in these records
8  beginning in the year 2008?
9      A.  Well, this stuff here from Friday training
10  from December '08 through February '09.
11     Q.  Yes. Were you involved in those training
12  exercises or classes?
13     A.  Well, without having a roster here to make
14  sure that I was there. But I would say, yes, I've been
15  involved in some of them.
16     Q.  You're not sure which ones?
17     A.  No. No, sir, I am not.
18     Q.  Have you been involved in any training since
19  you arrived at the Powell Police Department that dealt
20  with dynamic entry?
21     A.  No, I don't think so.
22     Q.  Do you know if Officer McCaslin had ever
23  detonated a flashbang device before the 24th of
24  February, 2009?
25         MS. WESTBY: Object to the form of the

MATT BRILAKIS - November 22, 2010                    Page 22
Direct Examination by Mr. Gosman

1  question.
2         MR. THOMPSON: Jo n.
3         Go ahead.
4         THE WITNESS: I don't know the answer to that
5  question, sir.
6  BY MR. GOSMAN:
7      Q.  When I use the phrase dynamic entry, I also
8  include the use of devices such as flashbang devices.
9         Have you trained in -- with the Powell Police
10  Department -- ever, in the use of a flashbang device?
11     A.  Ever?
12     Q.  Yes.
13     A.  Yes, sir, I have.
14     Q.  In connection with your service with the
15  Powell Police Department?
16     A.  Yes, sir, I have.
17     Q.  When was that?
18     A.  It was recently. In the last month or so,
19  two months.
20     Q.  Tell me about that. What did you do?
21     A.  We went out to the range and we set up a
22  simulated room with simulated targets, we deployed
23  flashbangs and engaged a few targets.
24     Q.  When was that?
25     A.  Within the last two months or so.

MATT BRILAKIS - November 22, 2010                    Page 23
Direct Examination by Mr. Gosman

1      Q.  And was there an officer in charge of that
2  training exercise?
3      A.  Yes, sir.
4      Q.  Who was that?
5      A.  I think it was Officer Miner.
6      Q.  And did you have any classroom instruction
7  relative to the flashbang devices before they were
8  deployed?
9      A.  We talked about it at the range.
10     Q.  What did you talk about?
11     A.  And actually we talked -- we had an
12  in-service training on it. We had -- we talked about
13  it before we went out to the range a week or two
14  beforehand.
15     Q.  What did you talk about?
16     A.  Basically the proper way of room entry and
17  the proper way to deploy the flashbang.
18     Q.  Do you remember anything about the training
19  that you had in terms of the proper way to deploy the
20  flashbang?
21     A.  No. Just basically put it in a room. The
22  proper way to pull the pin, release it, where to throw
23  it in the room.
24         MR. GOSMAN: By the way -- we'll leave this
25  on the record, but we're going to interrupt the

MATT BRILAKIS - November 22, 2010                    Page 24
Direct Examination by Mr. Gosman

1  deposition for just a moment. I have never gotten the
2  manual that Miner received from his DEF-TEC training on
3  the flashbang device.
4         I want to call that to your attention and let
5  you know that I haven't gotten it and I do need that.
6         MR. THOMPSON: I believe he's got it
7  individually, doesn't he? I mean he's got -- outside
8  of...
9         MR. GOSMAN: He did have the manual, I know
10  that. And I think he brought it here, but I just
11  didn't get a copy.
12         MS. WESTBY: Is this the one that's after?
13         MR. GOSMAN: Yes. This was in 2009, fall of
14  2009, I believe.
15  BY MR. GOSMAN:
16     Q.  Officer, when did you first learn that you
17  would be doing a dynamic entry in the Wachsmuth warrant
18  service?
19     A.  That day. That evening.
20     Q.  And why don't you take just a minute and tell
21  me what you were doing and who you spoke with when you
22  first learned about this.
23     A.  Well, we had a briefing. We had a briefing
24  beforehand. We were called in and -- I was not part of
25  the entry team.

---

MATT BRILAKIS - November 22, 2010                   Page 25
Direct Examination by Mr. Gosman

1  Q.  Right.  You were assigned to secure the back
2  door?
3  A.  Back gate, originally, sir, yes.
4  Q.  Back gate.  Were you assigned to supply the
5  diversion at the back of the house by breaking a
6  window --
7  A.  No, sir, I was not.
8  Q.  -- original plan?
9      Do you know who was involved in that?
10  A.  I do not.
11  Q.  So you weren't asked to participate in
12  breaking a window in the back of the house?
13  A.  No, sir, not as far as I know, no.
14  Q.  And did somebody call you before you were
15  asked to come down to the station?
16  A.  Yes, sir, I was called -- yes.
17  Q.  And were you at home?
18  A.  Yes.
19  Q.  And do you know what time it was?
20  A.  No.
21  Q.  Was it after dark?
22  A.  I believe it was early evening.
23  Q.  What time was your shift over that day?
24  A.  I worked mid -- I worked 10:00 p.m. to
25  6:00 a.m. that night -- that evening.

---

MATT BRILAKIS - November 22, 2010                   Page 26
Direct Examination by Mr. Gosman

1  Q.  At night?
2  A.  Yes, sir.
3  Q.  And who did you speak to?
4  A.  I don't remember who called me in.
5  Q.  What were you told when you were called in?
6  A.  Just to come in for a warrant -- or I was
7  called in.  I don't remember exactly what was -- what
8  the conversation was.
9  Q.  And when you arrived at the police station,
10  who was there, if you remember?
11  A.  I don't remember exactly who.
12  Q.  But were there a number of officers
13  assembled?
14  A.  Yes, sir, there were.
15  Q.  And did officers arrive after you arrived at
16  the police station?
17  A.  I don't remember what order we arrived in,
18  sir.
19  Q.  Who was in charge of the meeting?
20  A.  I believe Sergeant Chretien was.
21  Q.  Was Chief Feathers there?
22  A.  No, he was not.
23  Q.  Was Officer Kent there?
24  A.  Yes.
25  Q.  And Sergeant Eckerdt?

---

MATT BRILAKIS - November 22, 2010                   Page 27
Direct Examination by Mr. Gosman

1  A.  Yes, sir.
2  Q.  Who spoke at the meeting?
3  A.  Sergeant Chretien did, and I'm sure other
4  officers did.  I don't remember exactly who spoke.
5  Q.  What was -- what did Sergeant Chretien
6  announce when he had everyone there?
7  A.  As far as what?
8  Q.  As far as what you were doing.
9  A.  We were doing -- it was a search warrant was
10  being conducted.
11  Q.  Okay.  And were you told that you would be
12  using an entry team?
13  A.  Yes.
14  Q.  And were you told that there would be a
15  diversionary device employed?
16  A.  Yes, sir, there was.
17  Q.  And were you told that there would be
18  multiple diversions at the house?
19  A.  I don't remember the conversation about the
20  multiple diversions, no.
21  Q.  And you were given a specific assignment
22  relative to the back of the house?
23  A.  Yes, sir.
24  Q.  What was that assignment?
25  A.  Basically I was to be on the southwest corner

---

MATT BRILAKIS - November 22, 2010                   Page 28
Direct Examination by Mr. Gosman

1  of the house by the back gate, and then eventually move
2  up to the northwest corner by the -- there was a
3  gate -- there's a fence surrounding the property.  And
4  I was to standby by the gate.  By the -- it would be
5  the northwest corner of the house.
6  Q.  Was there any other discussion about
7  alternatives to the entry plan that was being
8  discussed?
9  A.  I don't recall if there were, no.  There may
10  have been but, you know, I just found out pretty much
11  what my role was.
12  Q.  Did it appear to you that the plan had been
13  made by the time you arrived and that you were -- the
14  officers were simply being informed of what roles they
15  would play?
16  A.  Well, I would think that the role -- the plan
17  was set, but if we had any specific concerns or
18  anything else, that would have been brought up at that
19  time.
20  Q.  Did anyone voice any concerns about using a
21  dynamic entry at the Wachsmuth residence?
22  A.  I don't recall.
23  Q.  Did you have any concerns about it?
24  A.  No, sir, I didn't.
25  Q.  Why not?

MATT BRILAKIS - November 22, 2010                Page 29
Direct Examination by Mr. Gosman

1   A.   I did what I was told.
2   Q.   Did you learn any reasons why it was felt to
3   be necessary to use a dynamic entry for the service of
4   this warrant?
5   A.   The information that I learned was that they
6   felt that the dynamic entry was the best for this
7   scenario.
8   Q.   That was it?
9   A.   Well, what are you asking me, sir?
10  Q.   What specific information was there provided
11  that demonstrated that that was the best scenario for
12  this situation?
13  A.   Well, it was possibly --
14       MR. THOMPSON: Hold on.  Objection as to
15  form.
16       MS. WESTBY: Join.
17  BY MR. GOSMAN:
18  Q.   Go ahead.
19       MS. WESTBY: And go ahead and answer if you
20  can.
21       THE WITNESS: I'm sorry, can I get the
22  question again, sir?
23  BY MR. GOSMAN:
24  Q.   What specific information was discussed about
25  the reasons why a dynamic entry was considered --

MATT BRILAKIS - November 22, 2010                Page 30
Direct Examination by Mr. Gosman

1   A.   Well, it was possibly a narcotics grow house
2   and there were weapons inside the house.
3   Q.   Do you remember anything else?
4   A.   There was -- the person involved, the target
5   of the investigation, was -- possibly had some issues
6   where it could have been a threat to law enforcement.
7   Q.   What issues, do you remember specifically?
8   A.   I think there were mental health issues.
9   Q.   Anything else?
10  A.   Nothing that really sticks out in my mind
11  right now, sir.
12  Q.   Do you know who assigned Chretien to serve as
13  the team leader for this warrant service?
14  A.   No, sir, I don't.
15  Q.   Were you consulted in the decision to use
16  this dynamic entry into the Wachsmuth home?
17  A.   No, sir, I wasn't.
18  Q.   Were any of the other officers that were
19  there that night consulted in the decision to use a
20  SWAT-type entry into this home?
21       MS. WESTBY: Object to the form of the
22  question.  Go ahead.
23       MR. THOMPSON: Join.
24       THE WITNESS: I can't answer that question
25  'cause I don't know.

MATT BRILAKIS - November 22, 2010                Page 31
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q.   You didn't hear anything, though, correct?
3   A.   No, sir, not that I can recall, no.
4   Q.   Did you wear body armor that night?
5   A.   Yes, sir. I always wear body armor when I'm
6   at work.
7   Q.   Did you wear any extra body armor that night?
8   A.   No, sir.
9   Q.   And did you bring your body armor with you to
10  the police station?
11  A.   My body armor is on my body when I put my
12  uniform on, sir.
13  Q.   And is that true of the other officers?
14  A.   Yes, sir. It's a policy.
15  Q.   One of the officers testified that there was
16  additional body armor that was used that night. Do you
17  remember anything about that?
18  A.   No, sir, I don't.
19  Q.   Were the long rifles distributed while you
20  were in the meeting?
21  A.   Were they distributed?
22  Q.   Given to the officers on the entry team?
23  A.   Well, I believe -- they had them. I don't
24  know how they -- I don't know how they were given out,
25  sir.

MATT BRILAKIS - November 22, 2010                Page 32
Direct Examination by Mr. Gosman

1   Q.   They had them when you were there?
2   A.   I don't know. Were they at the briefing?
3   No, I don't believe so.
4        But, again, I don't know how -- sir, I don't
5   remember how the officers got the weapons, if that's
6   what you're asking me.
7   Q.   That's what I'm asking.
8   A.   Okay.
9            (Exhibit 10 identified)
10  BY MR. GOSMAN:
11  Q.   Why don't you go ahead and take a look for
12  just a moment at Exhibit 10. And we're going to have
13  to take -- I've got a question pending.
14       Well, actually, I don't.  You take a look at
15  that and I'll be right back.
16           (Recess taken 10:43 to 10:45
17           a.m., November 22, 2010)
18  BY MR. GOSMAN:
19  Q.   Okay. Have you ever seen this document
20  before?
21  A.   Have I ever seen this document?
22  Q.   I'm sorry, we're on Exhibit 10.
23  A.   Oh, I'm sorry. I'm on 11.
24       Have I ever seen the document before, sir?
25  Q.   Yes.

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 11 of 92
Tricia Wachsmuth v.                                                          Matt Brilakis
City of Powell, et al.                                                 November 22, 2010

1  A. I don't know if I seen the actual document.
2  I know that Marissa had it the last few days at the
3  station. I didn't take a look at it, though.
4  Q. Did you see Marissa there that evening taking
5  notes?
6  A. She was at the briefing sir.
7  Q. Do you know whether she was actually assigned
8  to keep a record of the meeting that night?
9  A. That, I don't know, sir
10  Q. Why don't you go ahead and take a minute and
11  look at Exhibit 10, and let's start with the list that
12  is on the left-hand column there towards the top.
13      As far as you know, does that list accurately
14  reflect the assignments that were made that night for
15  the officers that served the Wachsmuth warrant?
16  A. Yes, sir, it does, as far as I know. Again,
17  I didn't take part in the actual writing of this
18  document. I was in the briefing.
19  Q. Did you know that the warrant was a
20  knock-and-announce warrant?
21  A. I'm sure it was discussed, but can I say for
22  sure that I recall that, sir? No, I can't.
23  Q. And did you know that -- did you understand
24  that there was intelligence being gathered at the
25  Wachsmuth home that was going to be used in connection

1  with the entry of the residence?
2  A. I was told that there was an officer watching
3  the residence while we were in the briefing.
4  Q. And do you know if that entry below
5  knock-and-announce there in the middle of the page,
6  which says one male, one female, one 10 years of age
7  child, was information that came from that source?
8  A. That, I could not tell you, sir.
9  Q. Did you hear that there was a young child in
10  the residence?
11  A. I heard there was a ten-year-old -- there was
12  a child possibly in the residence. Whether it was
13  accurate or not, I don't know.
14  Q. Well, you know now that there was no small
15  child in the residence, correct?
16  A. Yes, sir, I do.
17  Q. Were you informed that there were no more
18  than three adults in the residence?
19  A. That there were no more than three adults,
20  sir?
21  Q. Yes. Do you see that entry there?
22  A. Yes, sir, I'm looking at it now where it says
23  one male, one female, ten-year-old child, no more than
24  three adults.
25  Q. Do you remember hearing that?

1  A. Do I remember hearing that? No.
2      Again, so you're asking me questions that
3  happened at a briefing, whenever it was. I don't
4  recall every little detail of that briefing, sir.
5  Q. I certainly understand that. So what we're
6  interested in here is what you do recall.
7  A. Okay. Which isn't going to be a whole lot.
8  Q. All right. Were you aware that everyone was
9  to get cuffed? Do you remember that being discussed?
10  A. No, I do not -- no, I don't.
11  Q. And that Wachsmuth was to be scooped out of
12  the house?
13  A. No. Again, sir, if you're asking me if I
14  recall specific recollections of that briefing where
15  these words were actually said, the answer is no.
16  Q. Okay. And handguns loaded everywhere in the
17  house, do you remember that statement or something like
18  that?
19  A. I remember something about that there were
20  handguns in the residence, sir.
21  Q. And do you remember hearing that there was
22  stuff being grown under the stairs?
23  A. I recall hearing that there was stuff being
24  grown inside the residence. Where exactly it was, I
25  wasn't sure.

1  Q. Did you understand that was the purpose of
2  the search warrant, was to locate the existence of
3  growing marijuana plants?
4  A. Yes, sir.
5  Q. And we have an entry at the bottom of the
6  page there that says "Tom Wachsmuth stays in lobby."
7  Do you remember that being discussed?
8  A. No, sir, I don't.
9  Q. On the right-hand side of the page, towards
10  the bottom there, we have a list. There are seven
11  items listed in order. Do you remember those items
12  being discussed?
13  A. I remember that it was being discussed about
14  an ambulance in case one was needed. We're talking --
15  oh, I'm sorry. We're talking about call ambulance,
16  sir, or we're talking about --
17  Q. Talking about the numbered list, yeah.
18  A. My apologies, sir.
19  Q. Go ahead.
20  A. Yeah, I believe that was the plan. Do I
21  remember the actual discussion? No, sir, I don't.
22  Q. And what do you remember about the ambulance
23  being called?
24  A. Just that it's always a -- I would think it
25  would be a good idea in case of an entry like this to

1   have an ambulance in the area.

2       Q.  Sure.  And do you remember that specifically

3   being discussed?

4       A.  I remember a conversation about it.

5       Q.  Then on the second page of the exhibit, we

6   have a list again.  And we have -- we have these

7   numbers, LG4, and then that's next to Chretien; and

8   next to Danzer we have LG3; Hall is LG2; Chapman, LG1.

9   Do you know what those terms mean?

10      A.  No, sir, not now, no.

11      Q.  Not now, you say?

12      A.  I don't know what the numbers mean.  I don't

13  know what LG4, the other LG numbers mean.

14      Q.  Yeah.  Do you know if it was discussed what

15  order the men would enter the residence in?

16      A.  It was discussed.  I don't recall what the

17  exact order was, no.

18      Q.  Do you know anything about this notation at

19  the bottom of the page that says open window?

20      A.  No, sir, I don't.

21      Q.  Did you speak with any of the other officers

22  there that evening?

23      A.  I'm sure I did.

24      Q.  Do you remember any specific conversations

25  you had?

1       A.  No, other than what my assignment was, no.

2       Q.  All right.  Now, let's take a look at

3   Exhibit 10, and we have at the very top of the page --

4          MR. THOMPSON:  First page, Counsel?

5          MR. GOSMAN:  Yes, top of the first page.

6   BY MR. GOSMAN:

7       Q.  -- the entry Brown/Brilakis/Blackmore and

8   then, space, garage.

9       A.  Yes, sir.

10      Q.  Does that ring a bell with you?

11      A.  Yes, sir, it does.

12      Q.  What does it mean?

13      A.  It means that that was the area I was to

14  search.

15      Q.  You were to search the garage?

16      A.  Yes, sir.  After everything was concluded.

17      Q.  All right.  So once the area had been

18  secured, then you were to begin the search operation?

19      A.  Yes, sir.

20      Q.  And did you have -- and you did have a role

21  prior to the search of the garage, correct?

22      A.  Yes, sir, I did.

23      Q.  And that was to secure the perimeter?

24      A.  It was to be on the back perimeter, on the

25  southwest side of the fence area, the backyard, and

1   then eventually move up to the northwest corner of the

2   fence area, which would have been towards the back of

3   the house.

4       Q.  Do you remember -- and I'm still on

5   Exhibit 10.  In the middle of that page there's a

6   reference there to 20 to 30 plants.

7          Do you remember anything being said about the

8   number of plants that were in the residence, that were

9   suspected of being in the residence that night?

10      A.  I don't remember any specific conversation.

11  I know that there were supposed to be plants inside the

12  residence.

13      Q.  Did you speak with Officer Miner that night?

14      A.  I'm sure I did.

15      Q.  Did you have any discussions with him about

16  the confidential informant?

17      A.  No, sir, I did not.

18      Q.  Did you learn the name of the confidential

19  informant?

20      A.  I don't know who it was, no.  I'm sure I

21  learned about it, but I don't know who it was.

22      Q.  Do you remember thinking that you knew that

23  name, that individual?

24      A.  No, sir, I do not.

25      Q.  Okay.  About how long did the meeting last at

1   the police station, do you know?  Can you guess?

2       A.  No.

3       Q.  No, I don't want you to guess.  I'm sorry.

4   Do you know?

5       A.  No, sir, I do not know.

6       Q.  Was it more than --

7          MS. WESTBY:  Jeff.

8          MR. GOSMAN:  Yes.

9          MS. WESTBY:  Just for purposes of scheduling,

10  if you get to the point where you think you have 15, 20

11  minutes, half hour left, let me know so that we can

12  call the next witness.

13         MR. GOSMAN:  Okay.  We're probably pretty

14  close to that right now.

15  BY MR. GOSMAN:

16      Q.  Did you speak with Officer Blackmore that

17  evening?

18      A.  No, I don't -- I don't think I did, other

19  than maybe passing conversation.

20      Q.  Were you teamed with Officer Blackmore at any

21  point that evening?

22      A.  I know he was there.  I don't remember if I

23  saw him or not.

24      Q.  Who did you leave the station with?

25      A.  Oh, good question.  It might have been

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 13 of 92
Tricia Wachsmuth v.                                                                    Matt Brilakis
City of Powell, et al.                                                          November 22, 2010

MATT BRILAKIS - November 22, 2010                                        Page 41
Direct Examination by Mr. Gosman

1   Officer Lara, but I'm not sure. I can't recall exactly
2   who I drove to the scene with, sir.
3       Q.  It was just you and one other individual?
4       A.  Yeah, I believe so.
5       Q.  Do you know if that individual had been given
6   the same assignment you had, or were you teamed up that
7   way at the station?
8       A.  I'm pretty -- that we went -- since we were
9   all -- since my area of responsibility, I would --
10  again, without recalling exactly was -- I would have
11  ridden to the scene with another officer who was on
12  that assignment. But, no. I don't remember exactly who
13  I went to the scene with, sir.
14      Q.  Let's go back -- okay, to Exhibit 10 for just
15  a moment. And it does appear that Officer Lara was
16  assigned the back door. And that's on the second page
17  of Exhibit 10. Do you remember that?
18      A.  I do know that it was Officer Lara,
19  Officer Bradley and Investigator Brown and I were
20  assigned to that back fence area.
21      Q.  What is Officer Lara's first name?
22      A.  Brett.
23      Q.  Okay. Do you remember being with anyone else
24  when you arrived at the Wachsmuth residence?
25      A.  You asking me specific names of officers,

MATT BRILAKIS - November 22, 2010                                        Page 42
Direct Examination by Mr. Gosman

1   sir.?
2       Q.  Yes.
3       A.  You're talking by the back gate, sir?
4       Q.  No, I'm talking about when you arrived at the
5   Wachsmuth house in the vehicle.
6       A.  I spoke to Investigator Brown, Officer Lara,
7   Officer Bradley and myself.
8       Q.  What was that conversation?
9       A.  Well, basically, how we were going -- what
10  roles each of us was going to take.
11      Q.  So you assembled with the team that was going
12  to secure the back perimeter; is that correct?
13      A.  Yes.
14      Q.  I'm going to hand you a piece of paper, and
15  we'll mark it as -- I think we'll mark it as
16  Exhibit 50.
17              (Exhibit 50 identified)
18  BY MR. GOSMAN:
19      Q.  And what I'd like you to do is show me where
20  you were at when you first arrived at the Wachsmuth
21  residence, who was with you, and to the best of your
22  ability to remember, where everyone else was.
23      A.  You want me to draw a picture?
24      Q.  Yes, I do.
25      A.  All right. No credit for my artwork, right,

MATT BRILAKIS - November 22, 2010                                        Page 43
Direct Examination by Mr. Gosman

1   sir?
2       Q.  That's correct.
3       A.  All right.
4       Q.  And you might start with sort of the
5   perimeter of the house.
6       A.  Okay.
7       Q.  And by the way, when I say perimeter of the
8   house, I think it would help us if we have the sidewalk
9   and sort of the lot area, because we understand that
10  the officers were in the lot area and not in the house
11  at that time.
12      A.  I made a mistake. Can I start over?
13      Q.  Yep, you can. If you'd like, you can look at
14  Exhibit 10, which has the perimeter of that lot, I
15  think, fairly accurate.
16      A.  Yeah, I think I'd like to do that.
17      Q.  I think it's right there.
18      A.  Right here?
19      Q.  I believe so.
20      A.  I think I need to do -- that's the house --
21  okay. You don't want this to scale, do you, sir?
22      Q.  No.
23      A.  That would be the wood fence. You want me to
24  show you this, sir?
25      Q.  Yeah, let's do that.

MATT BRILAKIS - November 22, 2010                                        Page 44
Direct Examination by Mr. Gosman

1       A.  This is the wood fence back here, sir. This
2   is the wood fence here. I believe this was chain link.
3   And this is a wood fence here. The driveway, the
4   garage and the main residence.
5       Q.  Okay.
6       A.  Investigator Brown, Officer Bradley,
7   Officer Lara and myself -- now, again, to the best of
8   my recollection -- were in this position back here.
9           At some point, to the best of my
10  recollection, Officer Lara, Investigator Brown and
11  myself moved up to this point.
12      Q.  Did you go into the backyard?
13      A.  There was a gate here that we moved up to.
14  And I don't think I went in the backyard, no.
15      Q.  So at some point during the entry phase of
16  this operation you moved up to the gate that was next
17  to the house?
18      A.  Yes, sir.
19      Q.  Okay. Why don't you go ahead and mark that
20  gate and then put an X there and just describe it as
21  the place you ended up.
22      A.  (Witness complies.)
23      Q.  And you did not enter the house, then,
24  Officer; is that correct?
25      A.  No, sir, I did not.

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 14 of 92
Tricia Wachsmuth v.                                                                 Matt Brilakis
City of Powell, et al.                                                       November 22, 2010

MATT BRILAKIS - November 22, 2010                         Page 45
Direct Examination by Mr. Gosman

1   Q.  And did you hear the announcement, "Police,
2   search warrant"?
3   A.  I don't recall if I did, r.o.
4   Q.  Did you hear a dog barking?
5   A.  I don't recall that either. But, again, if
6   you're asking me specifically, sir, if I specifically
7   remember hearing that stuff, no, I do not.
8   Q.  Okay. You were unable to see the entry team
9   at the front of the house; is that correct?
10  A.  Yes, sir, I was.
11  Q.  What was the signal that you were to operate
12  on in terms of taking your next step in this -- in the
13  unfolding of this plan?
14  A.  Probably be the signal of the flashbang.
15  Q.  Did you hear the flashbang go off?
16  A.  Yes.
17  Q.  What did you do when you heard the flashbang
18  go off?
19  A.  We moved up towards the -- I moved north
20  along the fence line.
21  Q.  Did you see anything in the backyard?
22  A.  No, sir, I did not. The fence was pretty
23  high.
24  Q.  Did you know that there were officers in the
25  backyard?

MATT BRILAKIS - November 22, 2010                         Page 46
Direct Examination by Mr. Gosman

1   A.  No. Not that I recall, no.
2   Q.  It seemed to me that Officer Brown indicated
3   that several officers tried to jump the fence, one of
4   them got stuck on the fence. That would have been at
5   the back of the house. Do you remember that?
6   A.  That might have been Officer Bradley. I
7   remember we took a ladder, a step stool.
8   Q.  To get over the fence?
9   A.  Yes.
10  Q.  Okay. Go ahead.
11  A.  Officer Bradley is kind of short.
12  Q.  He had a little trouble getting over the
13  fence, do you remember?
14  A.  Yes, sir. I don't remember -- I didn't
15  actually watch him go over the fence. I heard it was
16  kind of comical, though.
17  Q.  You heard about it?
18  A.  Yeah.
19  Q.  So you weren't with the group that went over
20  the fence in the backyard?
21  A.  No, sir, I didn't go over the fence, no.
22  Q.  Did you see anyone during the time that you
23  proceeded from the corner where you arrived, on
24  Exhibit 50, up to the gate next to the house, anyone
25  other than the officer that you were with -- or

MATT BRILAKIS - November 22, 2010                         Page 47
Direct Examination by Mr. Gosman

1   officers you were where?
2   A.  I don't believe so, no.
3   Q.  Was there a signal that was to be understood
4   for when the -- when the house was secured?
5   A.  Was there a signal?
6   Q.  Yes. In other words, was there some kind of
7   sign that was to be given to the officers saying, okay,
8   the house is secured?
9   A.  I don't know. There might have been radio
10  traffic, but I don't recall that.
11  Q.  After you arrived at the gate, what was the
12  next event that occurred?
13  A.  I was to stand by the gate.
14  Q.  And you stood there for how long?
15  A.  Oh, few minutes.
16  Q.  Five? Ten?
17  A.  I don't know.
18  Q.  And did officers eventually come out of the
19  house then?
20  A.  Yes.
21  Q.  Is that how you knew that the house had been
22  secured?
23  A.  Yes.
24  Q.  And do you remember how long that took?
25  A.  No, sir.

MATT BRILAKIS - November 22, 2010                         Page 48
Direct Examination by Mr. Gosman

1   Q.  Was it more than ten minutes?
2   A.  I don't know.
3   Q.  And were you simply standing there at the
4   gate for the time that it took for the officers to
5   clear the house?
6   A.  Yes. Crouched.
7   Q.  Did you have your weapon drawn?
8   A.  No, I'm sure -- I think I put it away by that
9   point. Or I might have had it out. I don't recall.
10  Q.  Was there a debriefing after this warrant had
11  been served?
12  A.  No. Not that I attended.
13  Q.  Were you involved in any kind of session
14  where this search warrant was discussed after the
15  search warrant had been executed?
16  A.  No, sir. I was not.
17  Q.  Did you prepare a report in this case?
18  A.  No, sir, I did not.
19  Q.  Let's go ahead and mark this as Exhibit 50.
20  A.  Do you want me to sign and date that, too?
21  Q.  That would be fine. It's really not
22  necessary, though, frankly, Officer, that we sign and
23  date it.
24      Have you discussed this case with any of the
25  officers that were involved since the search warrant

1  was served that night?
2     A.  Yes.
3     Q.  Did you learn that Tricia Wachsmuth had been
4  used as a human shield?
5         MS. WESTBY: Object to the form of the
6  question.
7         MR. THOMPSON: Objection to the form of the
8  question. And to the extent that any of those
9  conversations took place in the presence of your
10 attorney, you're not to discuss those. Do you
11 understand that?
12        THE WITNESS: Say that again, sir.
13        MR. THOMPSON: To the extent that any of
14 those conversations took place in the presence of your
15 attorney --
16        THE WITNESS: Okay.
17        MR. THOMPSON: -- or attorneys, you're not to
18 discuss that.
19        THE WITNESS: Okay.
20 BY MR. GOSMAN:
21    Q.  Did you hear from any of the other officers
22 that Tricia Wachsmuth had been used as a human shield
23 to go down the stairs?
24    A.  Yeah, months later I learned about that.
25    Q.  Who told you that?

1     A.  Officer Miner did.
2     Q.  What did he say?
3     A.  We just had a general conversation one night
4  months later after this whole thing occurred, and he
5  told me that there might have been a few issues with
6  the case.
7     Q.  Okay. And was that one of them?
8     A.  Yes.
9     Q.  And did he -- were you aware that the
10 flashbang device started a fire in the Wachsmuth
11 residence?
12    A.  No, sir, I was not.
13    Q.  Did you hear the fire alarm go off or the
14 smoke alarm go off?
15    A.  I don't recall, sir.
16    Q.  Did you ever go into the Wachsmuth residence
17 that night?
18    A.  No, sir, I did not.
19    Q.  You did search the garage?
20    A.  Yes, sir, I did.
21    Q.  What did you find in the garage?
22    A.  I didn't find anything in the garage.
23    Q.  When you spoke with Officer Miner, were there
24 any other specific issues that might have been a
25 problem in the case other than that Tricia Wachsmuth

1  had been used as a human shield?
2         MS. WESTBY: Object to the form of the
3  question. That misstates his testimony entirely.
4         MR. THOMPSON: Join.
5         Go ahead if you can.
6         THE WITNESS: Officer Miner and I had a
7  conversation again months later after this occurred.
8  It was a general conversation about the case. I didn't
9  really ask a whole lot of questions about it. And I
10 figured whatever was -- that was pretty much it.
11        Now, can I clarify something, sir?
12 BY MR. GOSMAN:
13    Q.  Yes, you may.
14    A.  Okay. When I went in the garage, I looked
15 around for property inside the garage. I moved stuff.
16 I did not damage anything. I did not throw anything
17 around inside the garage or anything along those lines.
18    Q.  Did you hear from any of the other officers
19 whether or not they had trained their weapons on Tricia
20 Wachsmuth?
21    A.  No, I did not. Again, I don't recall any
22 specific conversations either.
23    Q.  Have you communicated via e-mail about this
24 case with any of the other officers?
25    A.  No, I don't think so, no.

1     Q.  I don't believe I have any other questions.
2  Thank you very much.
3     A.  All right, sir. Thank you.
4         (Proceedings concluded at
5         11:10 a.m., November 22, 2010)

Tricia Wachsmuth v.
City of Powell, et al.

MATT BRILAKIS - November 22, 2010                                    Page 53
Direct Examination by Mr. Gosman

1                  DEPONENT'S CERTIFICATE

2          I, MATT BRILAKIS, do hereby certify, under

3   penalty of perjury, that I have read the foregoing

4   transcript of my testimony consisting of 52 pages,

5   taken on November 22, 2010 and that the same is, with

6   any changes noted below, a full, true and correct

7   record of my deposition.

8   PAGE  LINE       CORRECTION       REASON FOR CORRECTION

9   ____  ____  _____   _____

10  ____  ____  _____   _____

11  ____  ____  _____   _____

12  ____  ____  _____   _____

13  ____  ____  _____   _____

14  ____  ____  _____   _____

15  ____  ____  _____   _____

16  ____  ____  _____   _____

17  ____  ____  _____   _____

18  ____  ____  _____   _____

19  ____  ____  _____   _____

20  ____  ____  _____   _____

21  ____  ____  _____   _____

22

23

24                         _____
                           MATT BRILAKIS    Date
25


MATT BRILAKIS - November 22, 2010                                    Page 54
Direct Examination by Mr. Gosman

1                     CERTIFICATE

2          I, VONNI R. BRAY, Registered Professional

3   Reporter, and Notary Public for the State of Montana,

4   do hereby certify that MATT BRILAKIS was by me first

5   duly sworn to testify to the truth, the whole truth,

6   and nothing but the truth;

7          That the foregoing transcript, consisting of

8   53 pages, is a true record of the testimony given by

9   said deponent, together with all other proceedings

10  herein contained.

11          IN WITNESS WHEREOF, I have hereunto set my

12  hand this 11th day of December, 2010.

13

14

15

16

17

18

19

20

21  _____
    Vonni R. Bray, RPR
22  P. O. Box 125
    Laurel, MT 59044
23  (406) 670-9533 Cell
    (888) 277-9372 Fax
24  vonni.bray@yahoo.com

25

Tricia Wachsmuth v.
City of Powell, et al.

**Matt Brilakis**
**November 22, 2010**

**0**

**08 (1)**
 21:10
**09 (1)**
 21:10

**1**

**1/25 (1)**
 10:11
**10 (10)**
 32:9,12,22;33:11;
 34:6;38:3;39:5;41:14,
 17;43:14
**10:00 (1)**
 25:24
**10:05 (1)**
 12:19
**10:43 (1)**
 32:16
**11 (1)**
 32:23
**11:10 (1)**
 52:5
**15 (2)**
 16:7;40:10
**17 (1)**
 14:23
**1979 (1)**
 6:22
**1986 (3)**
 7:3;13:1,3
**1990 (1)**
 13:13
**1999 (7)**
 11:21;14:1,6,11,19;
 15:11,21

**2**

**20 (3)**
 14:23;39:6;40:10
**2005 (1)**
 13:14
**2006 (2)**
 6:19;14:2
**2007 (10)**
 7:3;10:11,15;11:4;
 14:3;20:18,19,23,25;
 21:4
**2008 (1)**
 21:8
**2009 (4)**
 7:12;21:24;24:13,14
**2010 (3)**
 12:20;32:17;52:5
**22 (3)**
 12:20;32:17;52:5
**24th (2)**
 7:12;21:23
**25 (1)**

 4:10
**250 (1)**
 5:15

**3**

**30 (2)**
 16:7;39:6
**31 (4)**
 9:18,20;13:11;18:23
**35 (3)**
 20:14,16,21

**5**

**50 (4)**
 42:16,17;46:24;48:19
**5th (1)**
 20:19

**6**

**6 (1)**
 6:25
**6:00 (1)**
 25:25

**8**

**82435 (1)**
 5:16
**86 (1)**
 11:22
**88 (7)**
 10:5;11:10;13:11;
 14:1,8;15:12;  8:25
**89 (7)**
 10:7;11:10;13:11;
 14:1,8;15:12;  8:25

**A**

**ability (2)**
 5:18;42:22
**able (1)**
 5:22
**academy (1)**
 18:10
**account (1)**
 17:19
**accurate (5)**
 16:16;17:4,19 34:13;
 43:15
**accurately (1)**
 33:13
**accused (1)**
 6:3
**actual (3)**
 33:1,17;36:21
**actually (6)**
 13:1;23:11;32 14;
 33:7;35:15;46 15
**add (1)**

 5:6
**additional (1)**
 31:16
**address (2)**
 5:14,15
**adults (3)**
 34:18,19,24
**again (15)**
 14:20;16:17;17:25;
 29:22;32:4;33:16;35:2,
 13;37:6;41:10;44:7;
 45:5;49:12;51:7,21
**against (1)**
 6:9
**age (1)**
 34:6
**agency (1)**
 14:13
**agree (1)**
 5:2
**ahead (21)**
 9:20;11:9;13:8;16:9,
 22;17:8,11,24;20:16,23;
 22:3;29:18,19;30:22;
 32:11;33:10;36:19;
 44:19;46:10;48:19;51:5
**alarm (2)**
 50:13,14
**along (6)**
 15:9,25;17:16;19:22;
 45:20;51:17
**alternatives (1)**
 28:7
**although (1)**
 13:1
**always (2)**
 31:5;36:24
**ambulance (4)**
 36:14,15,22;37:1
**announce (1)**
 27:6
**announcement (1)**
 45:1
**apologies (2)**
 17:10;36:18
**apparently (1)**
 12:25
**appear (2)**
 28:12;41:15
**applied (5)**
 8:6,12,22,25;9:9
**applies (1)**
 19:13
**appreciate (1)**
 10:25
**approximately (1)**
 4:9
**area (10)**
 7:22;37:1;38:13,17,
 25;39:2;41:9,20;43:9,10
**armor (6)**
 31:4,5,7,9,11,16
**around (2)**

 51:15,17
**arrested (1)**
 5:25
**arrive (1)**
 26:15
**arrived (11)**
 20:17;21:19;26:9,15,
 17;28:13;41:24;42:4,20;
 46:23;47:11
**artwork (1)**
 42:25
**assembled (3)**
 20:11;26:13;42:11
**assigned (6)**
 25:1,4;30:12;33:7;
 41:16,20
**assignment (5)**
 27:21,24;38:1;41:6,12
**assignments (1)**
 33:14
**associate's (2)**
 6:13,15
**attend (1)**
 7:18
**attended (1)**
 48:12
**attention (1)**
 24:4
**attorney (2)**
 49:10,15
**attorneys (1)**
 49:17
**audible (1)**
 5:5
**aware (2)**
 35:8;50:9
**away (1)**
 48:8

**B**

**back (23)**
 12:22;13:1,21;14:1;
 15:11;25:1,3,4,5,12;
 27:22;28:1;32:15;38:24;
 39:2;41:14,16,20;42:3,
 12:44:1,8;46:5
**background (1)**
 6:11
**backyard (6)**
 38:25;44:12,14;45:21,
 25;46:20
**barking (1)**
 45:4
**Basically (4)**
 23:16,21;27:25;42:9
**Bate (1)**
 16:10
**Bates (5)**
 10:4;14:1,8;15:12;
 18:25
**beforehand (2)**
 23:14;24 24

 **begin (2)**
 4:5;38:18
**beginning (1)**
 21:8
**bell (1)**
 38:10
**below (1)**
 34:4
**best (7)**
 8:17;14:15;29:6,11;
 42:21;44:7,9
**bit (1)**
 19:8
**Blackmore (2)**
 40:16,20
**body (7)**
 31:4,5,7,9,11,11,16
**both (1)**
 14:3
**bottom (3)**
 36:5,10;37:19
**Bradley (5)**
 41:19;42:7;44:6;46:6,
 11
**break (1)**
 5:9
**breaking (2)**
 25:5,12
**Brett (1)**
 41:22
**briefing (9)**
 24:23,23;32:2;33:6,
 18;34:3;35:3,4,14
**BRILAKIS (4)**
 4:1;5:13;6:12;12:24
**bring (1)**
 31:9
**Broadview (1)**
 6:17
**brought (3)**
 7:5;24:10;28:18
**Brown (5)**
 41:19;42:6;44:6;6:10;
 46:2
**Brown/Brilakis/Blackmore (1)**
 38:7
**building (2)**
 15:9;19:7

**C**

**call (4)**
 24:4;25:14;36:15;
 40:12
**called (7)**
 19:19;24:24;25:16;
 26:4,5,7;36:23
**came (2)**
 17:18;34:7
**can (26)**
 5:9;9:21;10:8,11,22;
 12:5,5,14,16;15:15,22;
 16:1,23,24;18:5;29:20,

Tricia Wachsmuth v.
City of Powell, et al.

Matt Brilakis
November 22, 2010

21;31:3;33:21;40:1,11;
43:12,13,13;51:5,11
**career (1)**
19:6
**case (8)**
36:14,25;48:17,24;
50:6,25;51:8,24
**cases (3)**
4:11,13,13
**cause (1)**
30:25
**certain (1)**
8:19
**certainly (1)**
35:5
**certification (5)**
8:7;9:11;10:16;13:19,
20
**certified (1)**
11:22
**chain (1)**
44:2
**chance (1)**
11:15
**Chapman (1)**
37:8
**charge (2)**
23:1;26:19
**check (1)**
10:22
**Chief (2)**
12:7;26:21
**child (5)**
34:7,9,12,15,23
**Chretien (5)**
26:20;27:3,5;30:12;
37:7
**civil (1)**
4:13
**clarify (2)**
4:25;51:11
**Clark (1)**
5:15
**class (2)**
10:17;15:23
**classes (4)**
17:14;18:8,9;21:12
**classroom (1)**
23:6
**clear (2)**
19:3;48:5
**cleared (1)**
12:5
**close (1)**
40:14
**Coast (1)**
6:25
**collection (1)**
17:4
**College (1)**
6:17
**column (1)**
33:12

**comical (1)**
46:16
**communicated (1)**
51:23
**Community (1)**
6:17
**complete (5)**
10:9;12:6;13:2;14:11;
18:7
**complies (2)**
21:2;44:22
**concerning (1)**
4:6
**concerns (3)**
28:17,20,23
**concluded (2)**
38:16;52:4
**conduct (1)**
19:20
**conducted (1)**
27:10
**confidential (1)**
39:16,18
**connection (3)**
4:11;21:14;33:25
**considered (1)**
29:25
**consulted (2)**
30:15,19
**contain (2)**
14:18;17:19
**contained (1)**
9:24;13:10
**contains (1)**
17:3
**continuing (3)**
7:14,19;8:14
**conversation (9)**
26:8;27:19;37:4;
39:10;40:19;42:8;50:3;
51:7,8
**conversations (4)**
37:24;49:9,14;51:22
**copy (4)**
11:24;12:1,6;24:11
**Coral (3)**
7:1,2,6
**corner (5)**
27:25;28:2,5;39:1;
46:23
**Counsel (2)**
10:4;38:4
**credit (1)**
42:25
**crime (2)**
5:25;6:3
**Criminal (2)**
4:13;6:13
**Crouched (1)**
48:6
**cuffed (1)**
35:9
**current (2)**

5:14;7:21
**currently (1)**
5:17

## D

**damage (1)**
51:16
**Danzer (1)**
37:8
**dark (1)**
25:21
**date (4)**
10:20;20:22;48:20,23
**day (2)**
24:19;25:23
**days (1)**
33:2
**day-to-day (1)**
9:6
**deal (1)**
11:12
**dealt (4)**
11:6;15:5,24;21:19
**debriefing (1)**
48:10
**December (1)**
21:10
**decision (2)**
30:15,19
**DEF-TEC (1)**
24:2
**degree (2)**
6:13,16
**demonstrated (1)**
29:11
**Department (18)**
7:2,9,25;8:13,23;
11:23;13:21;16:4;18:3,
14,17;20:1,5,10,18;
21:19;22:10,15
**deploy (2)**
23:17,19
**deployed (2)**
22:22;23:8
**deposition (5)**
4:7,7,5:23;18:23;24:1
**depositions (2)**
4:12,18
**describe (2)**
6:23;44:20
**detail (1)**
35:4
**detonated (1)**
21:23
**device (5)**
21:23;22:10;24:3;
27:15;50:10
**devices (3)**
22:8,8;23:7
**different (1)**
14:25
**DIRECT (1)**

4:3
**discipline (2)**
9:14,15
**discuss (2)**
49:10,18
**discussed (12)**
28:8;29:24;33:21;
35:9;36:7,12,13;37:3,14,
16;48:14,24
**discussion (3)**
17:16;28:6;36:21
**discussions (1)**
39:15
**dishonesty (1)**
6:4
**distributed (2)**
31:19,21
**diversion (1)**
25:5
**diversionary (1)**
27:15
**diversions (2)**
27:18,20
**divorced (1)**
6:6
**document (14)**
9:25;11:10;12:24;
13:5;14:7;16:11;17:2;
18:10,20;32:19,21,24;
33:1,18
**documented (1)**
16:8
**documents (6)**
13:11,25;14:16,18;
15:11;18:24
**dog (1)**
45:4
**done (1)**
14:25
**door (2)**
25:2;41:16
**Douglas (1)**
18:9
**down (7)**
6:17;7:2;16:4;18:9,10;
25:15;49:23
**draw (1)**
42:23
**drawn (1)**
48:7
**driveway (1)**
44:3
**drove (1)**
41:2
**due (1)**
14:13
**duly (1)**
4:2
**during (2)**
44:15;46:22
**duties (2)**
9:1,5,6
**dynamic (20)**

11:6,7,13,20;15:5,9,
13,20,25;19:14;20:5,9;
21:20;22:7;24:17;28:21;
29:3,6,25;30:16

## E

**earlier (2)**
11:24;12:1
**early (1)**
25:22
**easier (1)**
10:18
**Eckerdt (1)**
26:25
**education (5)**
7:15,19;8:1,14,20
**educational (1)**
6:11
**effect (1)**
20:11
**either (2)**
45:5;51:22
**else (6)**
16:1;28:18;30:3,9;
41:23;42:22
**e-mail (1)**
51:23
**employed (1)**
27:15
**end (3)**
10:2;14:2,2
**ended (1)**
44:21
**enforcement (5)**
7:15;8:18;13:12;14:6;
30:6
**engaged (1)**
22:23
**enter (3)**
13:22;37:15;44:23
**entirely (1)**
51:3
**entries (8)**
13:10;14:3;15:9,25;
19:6,7,14,22
**entry (31)**
11:6,7,13,20;15:5,13,
20;20:5,9;21:20;22:7;
23:16;24:17,25;27:12;
28:7,21;29:3,6,25;30:16,
20;31:22;34:1,4,21;36:5,
25;38:7;44:15;45:8
**essentially (1)**
14:2
**evening (7)**
24:19;25:22,25;33:4;
37:22;40:17,21
**event (1)**
47:12
**eventually (3)**
28:1;39:1;47:18
**everyone (3)**

Tricia Wachsmuth v.
City of Powell, et al.

27:6;35:8;42:22
**everywhere (1)**
35:16
**exact (1)**
37:17
**exactly (7)**
26:7,11;27:4;35:24;
41:1,10,12
**EXAMINATION (1)**
4:3
**exception (1)**
18:5
**executed (1)**
48:15
**exercise (1)**
23:2
**exercises (1)**
21:12
**Exhibit (23)**
9:18,20,24;13:11;
18:23;19:2;20:14,16,21;
32:9,12,22;33:11;37:5;
38:3;39:5;41:14,17;
42:16,17;43:14;46:24;
48:19
**exhibits (1)**
18:23
**existence (1)**
36:2
**exists (1)**
11:10
**explain (1)**
10:12
**extent (2)**
49:8,13
**extra (1)**
31:7

**F**

**fact (1)**
10:23
**fair (1)**
14:10
**fairly (1)**
43:15
**fall (1)**
24:13
**familiar (1)**
4:17
**far (6)**
7:23;25:13;27:7,8;
33:13,16
**Feathers (2)**
12:7;26:21
**February (3)**
7:12;21:10,24
**felt (2)**
29:2,6
**female (2)**
34:6,23
**fence (17)**
28:3;38:25;39:2;

41:20;43:23;44:1,2,3;
45:20,22;46:3,4,8,13,15,
20,21
**few (5)**
16:7;22:23;33:2;
47:15;50:5
**field (1)**
14:23
**figured (1)**
51:10
**file (1)**
9:16
**files (1)**
12:3
**find (4)**
9:25;12:16;50:21,22
**fine (1)**
48:21
**fire (1)**
50:10,13
**firearms (1)**
19:21
**first (9)**
4:2;10:8:14:11;24:16,
22;38:4,5;41:21;42:20
**five (2)**
9:15;47:16
**flashbang (11)**
21:23;22:8,10;23:7,
17,20;24:3;45:14,15,17;
50:10
**flashbangs (1)**
22:23
**Florida (6)**
6:17;7:2;13:13,20;
19:18,24
**follows (1)**
4:2
**form (8)**
16:19;17:21;21:25;
29:15;30:21;49:5,7;51:2
**found (1)**
28:10
**frankly (1)**
48:22
**Friday (1)**
21:9
**front (2)**
18:24;45:9
**full (1)**
5:12
**fully (1)**
5:23

**G**

**garage (10)**
38:8,15,21;44 4;
50:19,21,22;51 14,15,17
**gate (13)**
25:3,4;28:1,3,4;42:3;
44:13,16,20;46:24;
47:11,13;48:4

**gathered (1)**
33:24
**general (4)**
4:6;17:15;50:3;51:8
**given (7)**
4:7;12:24;27:21;
31:22,24;41:5;47:7
**giving (1)**
4:18
**goes (1)**
11:21
**good (2)**
36:25;40:25
**GOSMAN (33)**
4:4;9:19;10:6,22;11:2,
3;12:4,10,18,21;17:1,17;
18:4;19:4;20:15;22:6;
23:24;24:9,13,15;29:17,
23;31:1;32:10,18;38:5,
6;40:8,13,15;42:18;
49:20;51:12
**graduated (2)**
6:20,24
**group (1)**
46:19
**grow (1)**
30:1
**growing (1)**
36:3
**grown (2)**
35:22,24
**Guard (1)**
6:25
**guess (2)**
40:1,3

**H**

**half (1)**
40:11
**Hall (1)**
37:8
**hand (1)**
42:14
**handguns (2)**
35:16,20
**happened (1)**
35:3
**health (1)**
30:8
**hear (8)**
31:2;34:9;45:1,4,15;
49:21;50:13;51:18
**heard (4)**
34:11;45:17;46:15,17
**hearing (5)**
34:25;35:1,21,23;45:7
**help (1)**
43:8
**high (3)**
6:20,24;45:23
**history (1)**
6:24

**Hold (1)**
29:14
**home (4)**
25:17;30:16,20;33:25
**hour (1)**
40:11
**hours (4)**
7:18;9:9,10;13:3
**house (26)**
25:5,12;27:18,22;
28:1,5;30:1,2;35:12,17;
39:3;42:5;43:5,8,10,20;
44:17,23;45:9;46:5,24;
47:4,8,19,21;48:5
**huh-uh (1)**
5:5
**human (3)**
49:4,22;51:1

**I**

**idea (1)**
36:25
**identified (6)**
9:18;14:8;15:12;
20:14;32:9;42:17
**identify (2)**
11:11;16:9
**impair (1)**
5:18
**important (1)**
5:4
**include (1)**
22:8
**including (1)**
9:14
**indicated (1)**
46:2
**individual (3)**
39:23;41:3,5
**individually (1)**
24:7
**informant (2)**
39:16,19
**information (4)**
29:5,10,24;34:7
**informed (2)**
28:14;34:17
**insert (1)**
18:22
**inserted (1)**
18:24
**in-service (22)**
7:24;8:7,12,23,25;9:9;
10:17;13:13,17,21;14:6;
15:7;17:15;18:2,11,13,
17;19:21;20:21,24;21:7;
23:12
**inside (5)**
30:2;35:24;39:11;
51:15,17
**instruct (1)**
17:12

**instruction (1)**
23:6
**instructions (1)**
4:6
**intelligence (1)**
33:24
**interested (1)**
35:6
**interrupt (1)**
23:25
**into (4)**
30:16,20;44:12;50:16
**investigation (1)**
30:5
**Investigator (4)**
41:19;42:6;44:6,10
**involved (9)**
11:5;21:6,11,15,18;
25:9;30:4;48:13,25
**involving (3)**
6:4;11:19;20:10
**issues (2)**
30:5,7,8;50:5,24
**items (2)**
36:11,11

**J**

**January (8)**
7:2;10:14;11:4;14:3,6,
11,19;15:21
**Jeff (1)**
40:7
**Join (7)**
16:21;17:7,23;22:2;
29:16;30:23;51:4
**July (1)**
20:19
**jump (1)**
46:3
**June (1)**
7:3
**justice (1)**
6:14

**K**

**keep (1)**
33:8
**Kent (1)**
26:23
**kind (4)**
46:11,16;47:6;48:13
**kinds (1)**
4:11
**knew (2)**
39:22;47:21
**knock-and-announce (2)**
33:20;34:5
**knowledge (1)**
14:15

Tricia Wachsmuth v.
City of Powell, et al.

Matt Brilakis
November 22, 2010

## L

**ladder (1)**
46:7
**Lara (6)**
41:1,15,18;42:6;44:7,
10
**Lara's (1)**
41:21
**last (7)**
9:15;15:24;20:4;
22:18,25;33:2;39:25
**later (3)**
49:24;50:4;51:7
**law (6)**
7:15;8:18,19;13:12;
14:5;30:6
**lawsuit (1)**
4:15
**leader (1)**
30:13
**learn (4)**
24:16;29:2;39:18;49:3
**learned (4)**
24:22;29:5;39:21;
49:24
**leave (2)**
23:24;40:24
**left (1)**
40:11
**left-hand (1)**
33:12
**level (1)**
8:19
**LG (1)**
37:13
**LG1 (1)**
37:8
**LG2 (1)**
37:8
**LG3 (1)**
37:8
**LG4 (2)**
37:7,13
**LGLP (1)**
10:4
**limit (1)**
11:13
**line (1)**
45:20
**lines (5)**
15:10,25;17:16;19:22;
51:17
**link (1)**
44:2
**list (7)**
11:16,18;33:11,13;
36:10,17;37:6
**listed (2)**
18:6;36:11
**lists (1)**
16:14

**little (3)**
19:7;35:4;46:12
**loaded (1)**
35:16
**lobby (1)**
36:6
**locate (1)**
36:2
**long (4)**
31:19;39:25;47:14,24
**look (12)**
9:20;11:9,15;18:10;
20:16,25;32:11,14;33:3,
11;38:2;43:13
**looked (1)**
51:14
**looking (5)**
12:23;16:11;17:2;
18:8;34:22
**looks (2)**
10:10;20:17
**lot (7)**
16:3,4;35:7;43:9,10,
14;51:9

## M

**ma'am (1)**
12:10
**main (1)**
44:4
**maintain (2)**
8:18;9:11
**male (2)**
34:6,23
**manual (2)**
24:2,9
**many (2)**
4:9;7:18
**marijuana (1)**
36:3
**Marissa (2)**
33:2,4
**mark (4)**
42:15,15;44:19;48:19
**material (1)**
19:2
**MATT (2)**
4:1;12:23
**Matthew (1)**
5:13
**may (5)**
13:23;14:5;16:16;
28:9;51:13
**maybe (1)**
40:19
**McCaslin (1)**
21:22
**mean (7)**
9:4;15:18;24:7;37:9,
12,13;38:12
**means (2)**
19:10;38:13

**medical (1)**
5:21
**medication (1)**
5:17
**meet (2)**
8:13,24
**meeting (5)**
26:19;27:2;31:20;
33:8;39:25
**members (1)**
19:20
**men (1)**
37:15
**mental (1)**
30:8
**mid (1)**
25:24
**middle (3)**
9:25;34:5;39:5
**might (10)**
5:22;13:15;16:6;
40:25;43:4;46:6;47:9;
48:9;50:5,24
**mind (1)**
30:10
**Miner (6)**
23:5;24:2;39:13;50:1,
23;51:6
**minute (5)**
6:23;12:4;13:4;24:20;
33:10
**minutes (7)**
16:7,7,7,8;40:11;
47:15;48:1
**missed (1)**
15:16
**misstates (1)**
51:3
**mistake (1)**
43:12
**moment (4)**
20:17;24:1;32:12;
41:15
**month (1)**
22:18
**months (5)**
22:19,25;49:24;50:4;
51:7
**more (6)**
10:23;34:17,19,23;
40:6;48:1
**most (1)**
10:21
**move (3)**
7:7;28:1;39:1
**moved (5)**
7:3;44:11,13,16;
45:19,19;51:15
**much (4)**
12:18;28:10;51:10;
52:2
**multiple (2)**
27:18,20

**myself (4)**
15:2;42:7;44:7,11

## N

**name (7)**
5:12;16:12;17:3;
18:22;39:18,23;41:21
**names (1)**
41:25
**narcotics (1)**
30:1
**necessary (2)**
29:3;48:22
**need (3)**
20:20;24:5;43:20
**needed (1)**
36:14
**new (1)**
16:5
**newer (1)**
12:8
**next (7)**
37:7,8;40:12;44:16;
45:12;46:24;47:12
**night (14)**
20:7;25:25;26:1;
30:19;31:4,7,16;33:8,14:
39:9,13;49:1;50:3,17
**North (2)**
5:15;45:19
**northwest (3)**
28:2,5;39:1
**notation (1)**
37:18
**note (1)**
19:1
**notes (1)**
33:5
**notice (1)**
13:25
**November (3)**
12:20;32:17;52:5
**number (6)**
9:10;14:8;16:10;
18:25;26:12;39:8
**numbered (2)**
13:11;36:17
**numbers (5)**
11:10;15:12;37:7,12,
13

## O

**oath (1)**
4:21
**Object (6)**
16:19;17:21;21:25;
30:21;49:5;51:2
**objection (3)**
17:6;29:14;49:7
**obtain (1)**
6:15

**occur (1)**
15:18
**occurred (4)**
15:21;47:12;50:4;51:7
**occurring (1)**
14:3
**off (4)**
45:15,18;50:13,14
**Officer (26)**
4:5;5:12;6:12;7:10,13,
15;8:2,8;9:7,11;10:8;
11:16,22;12:12;14:23;
21:22;23:1,5;24:16;
26:23;34:2;39:13;40:16,
20;41:1,11,15,18,19,21;
42:6,7;44:6,7,10,24;
46:2,6,11,25;48:22;50:1,
23;51:6
**officers (26)**
8:19;15:1;16:5;26:12,
15;27:4;28:14;30:18;
31:13,15,22;32:5;33:15;
37:21;41:25;43:10;
45:24;46:3;47:1,7,18;
48:4,25;49:21;51:18,24
**old (3)**
13:21;14:13;16:4
**older (1)**
12:9
**once (1)**
38:17
**one (16)**
10:21;14:16;20:6,11;
24:12;31:15;34:6,6,6,23,
23;36:14;41:3;46:3;
50:3,7
**ones (1)**
21:16
**only (2)**
14:1;18:5
**open (1)**
37:19
**operate (1)**
45:11
**operation (2)**
38:18;44:16
**operations (2)**
19:15;20:2
**order (5)**
6:8;26:17;36:11;
37:15,17
**original (1)**
25:8
**originally (1)**
25:3
**out (11)**
7:3;14:23;15:15;
22:21;23:13;28:10;
30:10;31:24;35:11;
47:18;48:9
**outside (1)**
24:7
**over (10)**

Tricia Wachsmuth v.
City of Powell, et al.

Matt Brilakis
November 22, 2010

4:6;12:7,15;25:23;
43:12;46:8,12,15,19,21
oversight (1)
10:19

**P**

page (10)
34:5;36:6,9;37:5,19;
38:3,4,5;39:5;41:16
paper (3)
13:17,18;42:14
paperwork (1)
18:1
part (3)
10:19;24:24;33:17
participate (1)
25:11
participated (1)
20:9
party (1)
4:14
passing (1)
40:19
Patrol (5)
7:10,13;9:1,4;11:6
PD (1)
7:6
peace (1)
9:11
pending (2)
5:10;32:13
perform (1)
19:14
performed (1)
20:5
perimeter (6)
38:23,24;42:12;43:5,
7,14
period (1)
17:5
person (1)
30:4
personal (1)
12:3
personnel (1)
9:16
phase (1)
44:15
phrase (1)
22:7
picture (1)
42:23
piece (1)
42:14
pin (1)
23:22
place (3)
44:21;49:9,14
placed (1)
6:8
plan (6)
25:8;28:7,12,16;

36:20;45:13
plants (4)
36:3;39:6,8,11
play (1)
28:15
please (2)
4:25;10:1
pm (1)
25:24
point (8)
15:15,23;40:10,21;
44:9,11,15;48:9
Police (25)
7:1,9,25;8:2,8,13,23;
9:7;11:22,23;13:3,13,16;
20:1,4,10,18;21:19;22:9,
15;26:9,16;31:10;40:1;
45:1
policy (1)
31:14
position (4)
7:8,11,12;44:3
possible (1)
15:19
possibly (4)
29:13;30:1,5;34:12
POST (22)
10:9,15;11:5,19;
12:23,25;13:2,12;14:12,
17,18;15:4,6;16:9,14,16;
17:3,4,19;18:6,18,21
Powell (17)
5:16;7:4,5,9,25;8:13,
23;11:23;18:13,16;20:1,
4,10,17;21:19;22:9,15
prepare (1)
48:17
presence (2)
49:9,14
present (1)
14:19
pretty (5)
28:10;40:13;41:8;
45:22;51:10
previously (2)
11:12;18:25
prior (4)
14:6;20:7,22;58:21
probably (5)
10:19,20;12:3;40:13;
45:14
problem (2)
4:24;50:25
proceeded (1)
46:23
Proceedings (1)
52:4
process (1)
4:17
produced (2)
14:17;16:12
producing (1)
10:19

proper (4)
23:16,17,19,22
property (2)
28:3;51:15
provided (3)
7:25;19:3;29:10
pull (1)
23:22
purpose (1)
36:1
purposes (1)
40:9
put (4)
23:21;31:11;44:20;
48:8

**Q**

qualified (2)
10:15;18:17
qualifies (1)
8:1
quite (1)
9:2

**R**

radio (1)
47:9
range (3)
22:21;23:9,13
rather (1)
5:5
really (3)
30:10;48:21;51:9
reason (1)
5:21
reasons (2)
29:2,25
recall (17)
28:9,22;31:3;33:22;
35:4,6,14,23;37:16;41:1;
45:3,5;46:1;47:10;48:9;
50:15;51:21
recalling (1)
41:10
received (2)
18:21;24:2
recent (1)
10:21
recently (1)
22:18
Recess (2)
12:19;32:16
recognized (5)
11:5;14:18;15:4,6;
17:20
recollection (3)
15:3;44:8,10
recollections (1)
35:14
record (17)
5:7;10:9,23;11:9,21;

12:22,23;13:2;14:11;
15:2;16:16,18;17:13,19;
19:3;23:25;33:8
records (18)
9:23;10:20;11:24;
12:2,8,9;13:12,22,24;
16:10,14;17:4,18;7,22;
20:21,24;21:3,7
reference (1)
39:6
referring (2)
14:16;15:20
refers (1)
17:3
reflect (3)
18:2;19:2;33:14
reflected (3)
14:7,22;21:7
reflects (3)
11:19;12:25;15:13
refresher (1)
15:1
regular (1)
9:6
related (1)
15:20
relative (2)
23:7;27:22
release (1)
23:22
relevant (1)
11:19
remember (43)
15:22;16:2;23:18;
26:4,7,10,11,17;27:4,19;
30:3,7;31:17;32:5;
34:25;35:1,9,17,19,21;
36:7,11,13,21,22;37:2,4,
24;39:4,7,10,22;40:22;
41:12,17,23;42:22;45:7;
46:5,7,13,14;47:24
repeat (1)
16:24
report (1)
48:17
required (1)
9:10
requirements (5)
7:15,21;8:1,14,24
requires (1)
8:18
residence (20)
12:12;20:7;28:21;
34:1,3,10,12,15,18;
35:20,24;37:15;39:8,9,
12;41:24;42:21;44:4;
50:11,16
respect (2)
4:21;14:13
response (3)
11:6;19:19,23
responsibility (1)
41:9

restraining (1)
6:8
retired (1)
7:6
review (1)
13:4
reviewing (1)
18:8
ridden (1)
41:11
rifles (1)
31:19
right (19)
9:8;10:7;13:9;14:5,10;
19:9;25:1;30:11;32:15;
35:8;38:2,17;40:14;
42:25,25;43:3,17,18;
52:3
right-hand (1)
36:9
ring (1)
38:10
role (3)
28:11,16;38:20
roles (2)
28:14;42:10
room (1)
22:22;23:16,21,23
roster (1)
21:13

**S**

Same (2)
17:6;41:6
saw (1)
40:23
saying (1)
47:7
scale (1)
43:21
scenario (2)
29:7,11
scene (3)
41:2,11,13
scheduling (1)
40:9
school (2)
6:20,24
scooped (1)
35:11
search (11)
27:9;36:2;38:14,15,
18,21;45:2;48:14,15,25;
50:19
searches (1)
15:9
second (2)
37:5;41:16
secure (3)
25:1;38:23;42:12
secured (4)
38:18;47:4,8,22

Tricia Wachsmuth v.
City of Powell, et al.

Matt Brilakis
November 22, 2010

seemed (1)
46:2
send (1)
10:24
Sergeant (4)
26:20,25;27:3,5
serve (2)
19:23;30:12
served (3)
33:15;48:11;49:1
service (4)
22:14;24:18;29:3;
30:13
session (1)
48:13
set (2)
22:21;28:17
seven (1)
36:10
several (1)
46:3
shield (3)
49:4,22;51:1
shift (1)
25:23
short (1)
46:11
show (3)
15:2;42:19;43:24
shows (2)
17:13,14
side (2)
36:9;38:25
sidewalk (1)
43:8
sign (3)
47:7;48:20,22
signal (4)
45:11,14;47:3,5
similar (2)
20:6,11
simply (2)
28:14;48:3
simulated (2)
22:22,22
sit (1)
15:3
situation (1)
29:12
small (1)
34:14
smoke (1)
50:14
somebody (1)
25:14
sorry (8)
10:2;13:19;17:10;
29:21;32:22,23;36:15;
40:3
sort (3)
9:24;43:4,9
source (1)
34:7

southwest (2)
27:25;38:25
space (1)
38:8
speak (4)
26:3;37:21;39:13;
40:16
Special (5)
19:11,13,19,23;20:2
specific (11)
15:4;27:21;28:17;
29:10,24;35:14;37:24;
39:10;41:25;50:24;
51:22
specifically (8)
11:12,20;16:1,3;30:7;
37:2;45:6,6
spoke (5)
24:21;27:2,4;42:6;
50:23
Springs (4)
7:1,2,6;14:24
SRT (2)
19:19,20
stairs (2)
35:22;49:23
stamped (2)
14:1,8
stand (1)
47:13
standby (1)
28:4
standing (1)
48:3
start (3)
33:11;43:4,12
started (3)
7:1,20:19;50:10
starting (1)
7:8
state (4)
7:16;8:14,18;9:12
stated (1)
16:18
statement (1)
35:17
statements (1)
5:6
States (1)
6:25
station (9)
12:12;25:15;26:9,16;
31:10;33:3;40:1,24;41:7
stays (1)
36:6
step (2)
45:12;46:7
sticks (1)
30:10
still (1)
39:4
stood (1)
47:14

stool (1)
46:7
Street (1)
5:15
stuck (1)
46:4
stuff (8)
14:21;15:7,8;21:9;
35:22,23;45:7;51:15
summarized (1)
13:11
supply (1)
25:4
supposed (1)
39:11
sure (21)
8:4,16;9:2,4;10:20;
12:13;13:2;20:24,25;
21:14,16;27:3;33:21,22;
35:25;37:2,23;39:14,20;
41:1;48:8
surrounding (1)
28:3
suspected (1)
39:9
SWAT (4)
19:5,10,12,17
SWAT-type (1)
30:20
sworn (1)
4:2

## T

tactical (2)
11:6;19:14
Tactics (1)
19:11
talk (3)
13:5;23:10,15
talked (4)
18:25;23:9,11,12
talking (7)
9:8;36:14,15,16,17;
42:3,4
target (1)
30:4
targets (2)
22:22,23
team (14)
19:17,19,19,20,23;
20:2,5,10;24:25;27:12;
30:13;31:22;42:11;45:8
teamed (2)
40:20;41:6
teams (1)
19:13
ten (4)
15:24;16:7;47:16;48:1
ten-hour (1)
15:23
ten-year-old (2)
34:11,23

term (2)
19:9,12
terms (4)
18:7;23:19;37:9;45:12
testified (2)
4:2;31:15
testimony (1)
51:3
thinking (1)
39:22
THOMPSON (13)
10:4;16:21;17:7,23;
22:2;24:6;29:14;30:23;
38:4;49:7,13,17;51:4
though (5)
20:25;31:2;33:3;
46:16;48:22
threat (1)
30:6
three (3)
34:18,19,24
throw (2)
23:22;51:16
times (1)
4:9
today (5)
4:5,20;5:19,23;15:4
told (8)
26:5;27:11,14,17;
29:1;34:2;49:25;50:5
Tom (1)
36:6
took (6)
18:9;46:7;47:24;48:4;
49:9,14
top (3)
33:12;38:3,5
towards (5)
10:2;33:12;36:9;39:2;
45:19
traffic (2)
6:1;47:10
trained (7)
16:5;19:13,17;22:9;
51:19
trainees (1)
15:8
training (69)
7:24;8:1,7,12,20,23;
9:1,9,23;10:9,14,17;
11:5,11,19,21,24;12:1,
23,25;13:12,16,22,23;
14:12,17,18,23,25;15:1,
4,8,14,19;16:4,5,6,10,14,
16;17:4,15,16,20;18:2,6,
7,11,11,18,25;19:2,5,6,7,
18,20,21,20:21,24;21:3,
7,9,11,18;23:2,12,18;
24:2
transition (1)
13:22
Tricia (4)
49:3,22;50:25;51:19

tried (1)
46:3
trouble (1)
46:12
true (2)
14:9;31:13
truthful (1)
5:18
truthfully (1)
5:22
trying (1)
9:3
Twenty (1)
4:10
two (4)
14:3;22:19,25;23:13
types (3)
5:6;14:25;19:14

## U

unable (1)
45:8
under (2)
4:21;35:22
understood (1)
47:3
unfolding (1)
45:13
uniform (1)
31:12
United (1)
6:25
unless (1)
17:11
up (15)
5:6;10:20;12:5;15:2;
22:21;28:2,18;39:1;
41:6;44:11,13,16,21;
45:19;46:24
use (6)
22:7,8,10;29:3;30:15,
19
used (6)
20:6;31:16;33:25;
49:4,22;51:1
using (2)
27:12;28:20

## V

vehicle (1)
42:5
verbal (1)
9:15
via (1)
51:23
violation (1)
6:1
voice (1)
28:20

## W

**Wachsmuth (19)**
  10:5;20:6,12;24:17;
  28:21;30:16;33:15,25;
  35:11;36:6;41:24;42:5,
  20;49:3,22;50:10,16,25;
  51:20
**walk (1)**
  12:15
**warrant (15)**
  20:12;24:17;26:6;
  27:9;29:4;30:13;33:15,
  19,20;36:2;45:2;48:10,
  14,15,25
**watch (1)**
  46:15
**watching (1)**
  34:2
**way (8)**
  13:22;23:16,17,19,22,
  24;41:7;43:7
**weapon (1)**
  48:7
**Weapons (4)**
  19:11;30:2;32:5;51:19
**wear (3)**
  31:4,5,7
**week (1)**
  23:13
**weren't (2)**
  25:11;46:19
**WESTBY (22)**
  10:18;11:1;12:7,14,
  17;16:19,22;17:6,8,11,
  21,24;19:1;21:25;24:12;
  29:16,19;30:21;40:7,9;
  49:5;51:2
**what's (2)**
  13:5,6
**whenever (1)**
  35:3
**whole (3)**
  35:7;50:4;51:9
**window (3)**
  25:6,12;37:19
**within (3)**
  9:15;15:24;22:25
**without (2)**
  21:13;41:10
**WITNESS (16)**
  12:11,15;16:24;17:9,
  13,25;21:2;22:4;29:21;
  30:24;40:12;44:22;
  49:12,16,19;51:6
**wood (4)**
  43:23;44:1,2,3
**words (2)**
  35:15;47:6
**work (3)**
  5:15;6:23;31:6
**worked (2)**
  25:24,24
**worry (1)**
  20:20
**writing (1)**
  33:17
**Wyoming (19)**
  5:16;7:7,16;8:2,9,15,
  18;10:16;12:23;13:12,
  19;14:17;16:9,14;17:3,
  18,20;18:17,21

## Y

**year (10)**
  6:18,21;8:20;9:10;
  13:14,14;20:23,25;21:4,
  8
**years (6)**
  7:1;9:15;13:13;14:24;
  15:24;34:6
**Yep (1)**
  43:13
**young (1)**
  34:9

# Appendix Eighteen

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Cody Bradley*
*November 23, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 11-23-10 Cody Bradley_SCOPED.txt

Min-U-Script® with Word Index

---

CODY BRADLEY - November 23, 2010                                Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF WYOMING
 3   -----------------------------------------------
 4   TRICIA WACHSMUTH,              )
                                    )
 5              Plaintiff,          )
                                    )
 6        vs.                       )   NO. 10-CV-041J
                                    )
 7                                  )
     CITY OF POWELL, AND IN THEIR   )
 8   INDIVIDUAL CAPACITY, TIM       )
     FEATHERS, CHAD MINER, MIKE     )
 9   CHRETIEN, ROY ECKERDT, DAVE    )
     BROWN, MIKE HALL, BRETT LARA,  )
10   MATT MCCASLIN, ALAN KENT, MATT )
     DANZER, OFFICER HRILAKIS, LEE  )
11   BLACKMORE, CODY BRADLEY, KIRK  )
     CHAPMAN, JOHN DOES #1-#4,      )
12                                  )
                Defendants.         )
13   _____
14           DEPOSITION OF CODY BRADLEY
            11:43 a.m., Tuesday, November 23, 2010
15
16
17
18          Pursuant to notice, the deposition of CODY
19   BRADLEY was taken in behalf of Plaintiff in accordance
20   with the applicable Federal Rules of Civil Procedure at
21   270 North Clark, Powell, Wyoming, before Vonni R. Bray,
22   Registered Professional Reporter and Notary Public of
23   the State of Montana.
24
25
```

---

CODY BRADLEY - November 23, 2010                                Page 2

```
 1                    APPEARANCES
 2   FOR PLAINTIFF:
 3           Mr. Jeffrey C. Gosman
             Gosman Law Office
 4           125 W 2nd Street
             P.O. Box 51267
 5           Casper, WY 82601-2481
             Telephone: (307)265-3082 - Fax: (307)265-6715
 6           E-mail: jeff@gosmanlawoffices.com
 7
 8   FOR INDIVIDUAL DEFENDANTS:
 9           Ms. Misha Westby
             Senior Assistant Attorney General
10           2424 Pioneer Avenue, 2nd Floor
             Cheyenne, WY 82002
11           Telephone: (307)777-5477 Fax: (307)777-8920
             E-mail: mwestb@state.wy.us
12
13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:
14
15           Mr. Tom Thompson
             MacPherson, Kelly & Thompson
16           616 West Buffalo
             P.O. Box 999
17           Rawlins, WY 82301-0999
             Telephone: (307)324-2713 - Fax: (307)324-7348
18           E-mail: tthompson@wyomingattorneys.net
19
20   Also Present:  Tim Feathers
21
22
23
24
25
```

---

CODY BRADLEY - November 23, 2010                                Page 3

```
 1                 INDEX TO WITNESSES
 2                                                   PAGE
 3   CODY BRADLEY
 4      Direct Examination by Mr. Gosman ..............4
        Signature Page ...............................33
 5      Reporter's Certificate .......................34
 6
 7
 8                     EXHIBITS
 9   EXHIBIT          DESCRIPTION                    PAGE
10      10      Notes of Wachsmuth Warrant ...........16
11      31      WY P.O.S.T. Training Records ..........8
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

CODY BRADLEY - November 23, 2010                                Page 4

Direct Examination by Mr. Gosman

1                    CODY BRADLEY,

2  having been first duly sworn, testified as follows:

3                 DIRECT EXAMINATION

4  BY MR. GOSMAN:

5     Q.  How are you today, Officer?

6     A.  Tired.

7     Q.  I'm sorry to hear that.  Well, have you ever

8  given a deposition before?

9     A.  No.

10    Q.  All right.  I'm going to go over a couple of

11 ground results with you before we start; will that be

12 okay?

13    A.  Sure.

14    Q.  I will ask questions today.  And unless

15 you're instructed by your attorneys not to answer them,

16 you'll be required to answer the questions that I've

17 asked.

18    A.  Okay.

19    Q.  Of course your testimony is being taken under

20 oath, and it can be used later in proceedings in this

21 case.

22    A.  Uh-huh.

23    Q.  And it's very important if you don't

24 understand one of my questions for you to ask for

25 clarification; will you do that?

---

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 27 of 92
Tricia Wachsmuth v.                                                              Cody Bradley
City of Powell, et al.                                                   November 23, 2010

| CODY BRADLEY - November 23, 2010                                Page 5 | CODY BRADLEY - November 23, 2010                                Page 7 |
|---|---|

Direct Examination by Mr. Gosman (Page 5)

1  A. Yes.
2  Q. And we've had a little trouble, not much,
3  about witnesses answering with uh-huh or huh-uh rather
4  than yes or no, and those phrases don't turn up on the
5  record very well. It's hard to tell what was meant.
6  So if you could answer yes or no and audibly to each
7  question.
8  A. Okay.
9  Q. And we can take a break at any time.
10  Hopefully we won't need much in the way of breaks this
11  afternoon, it shouldn't take long. But when you take a
12  break, it must be at the end of the answer to one of
13  your questions. We will not take a break while a
14  question is pending?
15  A. Yes.
16  Q. Could you recite your full name for the
17  record, sir?
18  A. Cody Joe Bradley.
19  Q. What is your current address?
20  A. 250 North Clark Street.
21  Q. You're tired today, but can you give truthful
22  testimony today? Do you feel comfortable with that?
23  A. Yes.
24  Q. Are you currently on medication that would
25  impair your ability to give truthful answers here

Direct Examination by Mr. Gosman (Page 7)

1  Q. And your bachelor's degree, then?
2  A. Criminal justice.
3  Q. And how long have you been employed by the
4  Powell Police Department?
5  A. A little over six years.
6  Q. Were you employed as a police officer before
7  that time?
8  A. No. Not full-time.
9  Q. Explain to me what your previous law
10  enforcement experience was.
11  A. I worked as a reserve or part-time deputy for
12  a county in Oregon.
13  Q. What years were those?
14  A. 2000 through 2004.
15  Q. Okay. And why did you leave?
16  A. I was seeking full-time employment.
17  Q. And did you find it here in Powell?
18  A. Yes, I did.
19  Q. Had you already completed your academy
20  training, law enforcement academy training?
21  A. Where?
22  Q. When you came to Wyoming?
23  A. I completed it when I came to Wyoming.
24
25

| CODY BRADLEY - November 23, 2010                                Page 6 | CODY BRADLEY - November 23, 2010                                Page 8 |
|---|---|

Direct Examination by Mr. Gosman (Page 6)

1  today?
2  A. No.
3  Q. Have you ever been arrested for a felony?
4  A. No.
5  Q. Have you ever been accused of a crime
6  involving dishonesty?
7  A. No.
8  Q. Have you ever had a restraining order placed
9  against you?
10  A. No.
11  Q. Have you ever been sued?
12  A. No.
13  Q. Have you ever been a party to a lawsuit?
14  A. No.
15  Q. What is your educational background, starting
16  with high school?
17  A. I have a high school diploma.
18  Q. From where?
19  A. From Hermiston, Oregon, Hermiston High
20  School. I have an associates of art degree from Blue
21  Mountain Community College and a bachelor's degree from
22  Western Oregon University.
23  Q. What was the associate's degree? In what
24  topic or field?
25  A. Criminal justice.

Direct Examination by Mr. Gosman (Page 8)

1  (Exhibit 31 identified)
2  BY MR. THOMPSON:
3  Q. Okay. And let's turn to Exhibit 31. It's
4  document number 917 in this case. And it's about --
5  it's just about halfway through this Exhibit 31. Yes,
6  if you'll turn to tab 31 there, officer.
7  A. Okay.
8  Q. All right. Before we start, as a reservist,
9  were you trained as a SWAT officer?
10  A. No.
11  Q. Have you ever had -- prior to your coming to
12  the Powell Police Department, have you ever had any
13  SWAT training?
14  A. No.
15  Q. And after you arrived at the Powell Police
16  Department, and I'm looking at your training records,
17  and I notice that you -- let's see on October 5th, of
18  2005 you participated in the Patrol Tactical Response
19  course; is that correct?
20  A. Yes.
21  Q. And since that time, have you had any
22  specific training in tactics associated with dynamic
23  entry?
24  A. I don't know.
25  Did we do entries last time?

CODY BRADLEY - November 23, 2010                    Page 9
Direct Examination by Mr. Gosman

1   Q.  And by the way, when I -- I sort of left that
2   question open-ended.  But I'm referring specifically to
3   the timeframe of October 5th of 2009 through the
4   24th of February -- October 5th, 2005 through
5   February 24, 2009.
6   A.  I did do training over in Cody.  But it
7   wasn't a POST training.
8   Q.  Okay.  Tell me about that.
9   A.  They were getting ready to tear down the high
10  school and rebuild it.  So they let us practice raking
11  windows, throwing flashbangs, and using a ram on doors.
12  Q.  Was that a multi-agency exercise?
13  A.  Yes.
14  Q.  Did you say it was not POST training?
15  A.  No.
16  Q.  Do you know if -- who was the officer in
17  charge, do you remember?
18  A.  I don't know.
19  Q.  Was it from another agency?
20  A.  Yeah, I believe it was Cody Police
21  Department.
22  Q.  And who was there with you from the Powell
23  Police Department?
24  A.  Matt McCaslin.
25  Q.  He was the only other individual?

CODY BRADLEY - November 23, 2010                    Page 10
Direct Examination by Mr. Gosman

1   A.  Yes.
2   Q.  And do you remember when that was?
3   A.  I don't.
4   Q.  Can we pinpoint it within the last couple of
5   years?
6   A.  Probably in the last three years, to my best
7   recollection.
8   Q.  And other than that, you don't at least
9   recollect having any training specific to dynamic
10  entry?
11  A.  No.
12  Q.  Have you ever trained with the Powell police
13  officers as a team in areas, including dynamic entry?
14      Strike that.  Have you ever participated with
15  the Powell Police Department as a team in any training
16  related to dynamic entry?
17  A.  I'm not understanding.
18  Q.  Have you ever trained with the Powell Police
19  Department as a team?  In other -- all right -- have
20  you ever trained with the members of the Powell Police
21  Department as a team in dynamic entry?
22  A.  I guess I don't understand what you mean by
23  team.
24  Q.  I mean -- by team, I mean most, if not all,
25  of the Powell Police Department.

CODY BRADLEY - November 23, 2010                    Page 11
Direct Examination by Mr. Gosman

1   A.  When we do our training, most of the guys are
2   there, yes.
3   Q.  Well, all right.  But let's try to stay
4   focused on my question.  I'm interested in whether you
5   trained as a team with the Powell Police Department,
6   and you don't need to look at the Chief every time you
7   answer a question.
8       MS. WESTBY: You know, objection.  That's
9   ridiculous.
10      MR. GOSMAN: All right.
11      MS. WESTBY: I don't think you need to be
12  making comments like that.
13  BY MR. GOSMAN:
14  Q.  All right.  Have you ever trained as a team
15  with the entire Powell Police Department or most of the
16  officers specifically directed to dynamic entry?
17      MS. WESTBY: Object to the form of the
18  question.
19      MR. THOMPSON: Join.
20      MS. WESTBY: And your tone.
21      Go ahead.
22      THE WITNESS: Yeah.
23  BY MR. GOSMAN:
24  Q.  When?
25  A.  When Doug Pechtel was here training us.

CODY BRADLEY - November 23, 2010                    Page 12
Direct Examination by Mr. Gosman

1   Q.  Okay.  And that would have been your POST
2   training in October of 2005, correct?
3   A.  Yes.
4   Q.  Let's take a minute -- well, first of all,
5   have there been any other occasions?
6   A.  No.
7   Q.  All right.  Now, let's talk for a minute
8   about this Doug Pechtel course in October of 2005.  It
9   looks like a lot of the officers that are involved in
10  this case attended that course either in October or
11  late September.  What do you remember about that?
12  A.  What specific...
13  Q.  Did you understand that the -- that most of
14  the members of the Powell Police Department were to be
15  taking that course?
16  A.  Yes.
17  Q.  Do you know why?
18  A.  Because we were told to.
19  Q.  Chief told you to?
20  A.  Yeah.
21  Q.  All right.  Tell me a little bit about the
22  training that you had with Officer McCaslin over at the
23  old high school in Cody.  Did you in fact deploy
24  flashbang devices at that time?
25  A.  Yes.

1  Q.  Were they live rounds or were they dummies?
2  A.  Live.
3  Q.  And did you deploy one?
4  A.  Yes.
5  Q.  Did you deploy two?
6  A.  I can't say for sure.
7  Q.  Okay.  Did you see Officer McCaslin deploy a
8  flashbang device?
9  A.  I don't remember.
10 Q.  Were you broken into groups at any time and
11 given different training segments?
12      MR. THOMPSON:  Objection as to form.
13      MS. WESTBY:  Join.
14      THE WITNESS:  Yes
15 BY MR. GOSMAN:
16 Q.  Were you with Officer McCaslin that day?
17 A.  Nope, he was not in my group.
18 Q.  Did you -- as far as you know, did each group
19 participate in each of the different exercises that
20 were made available that day?
21 A.  As far as I know.
22 Q.  All right.  And did you have any specific
23 training, other than the deployment of the flashbang
24 device?  In other words, were you shown how to do it?
25 A.  I don't remember.

1  Q.  Do you remember having any training materials
2  that were circulated that dealt with -- specifically
3  with flashbang devices?
4  A.  No.
5  Q.  Do you remember whether an instructor told
6  you -- well, let me ask you this question:  Do you know
7  how to deploy a flashbang device?
8  A.  Yes.
9  Q.  What are the rules of deployment for that?
10      MS. WESTBY:  Object to the form of the
11 question.
12      MR. THOMPSON:  Join.
13      THE WITNESS:  I guess I don't understand.
14 BY MR. GOSMAN:
15 Q.  As you understand it.  What rules -- are
16 there any rules that you need to follow when you deploy
17 a flashbang device?
18 A.  As to --
19 Q.  Looking where it's going, for instance.
20      MR. THOMPSON:  Objection as to form.
21      MS. WESTBY:  Join.
22      THE WITNESS:  I can't recall off the top of
23 my head.
24 BY MR. GOSMAN:
25 Q.  Have you had any training since then with

1  regard to this -- to the flashbang device?
2  A.  Yes.
3  Q.  And when was that?
4  A.  When Doug Pechtel came back in -- I don't
5  remember.  Not prior to this incident, no.
6  Q.  Okay.  All right.  So when did you first
7  become aware of the Wachsmuth warrant service?
8  A.  I received a phone call.
9  Q.  Who from?
10 A.  I don't know.
11 Q.  And what did you do in response to that phone
12 call?
13 A.  I came into the office.
14 Q.  Do you know what time it was?
15 A.  I have no idea.
16 Q.  Were you -- were you on duty?
17 A.  No.
18 Q.  What time did your shift end on that day, do
19 you know?  Do you remember that?
20 A.  I don't remember what shift I was on that
21 day.
22 Q.  Okay.  And when you -- when you came down to
23 the police station, who was there?
24 A.  Specifically, I don't remember who was there
25 when I got there.

1  Q.  Was it most of the group of officers that was
2  involved in the Wachsmuth warrant service that night?
3  A.  I can't say for sure.
4  Q.  Did Officer Chretien address you as a group?
5  A.  Yeah.
6  Q.  Did you talk to anybody after you arrived
7  before Officer Chretien addressed you as a group and
8  learn anything about why you were there?
9  A.  No.
10 Q.  What did Officer Chretien say when he came
11 in?
12 A.  I don't remember.
13 Q.  Did he give you an assignment?
14 A.  Yes.
15 Q.  Did he specifically give you that assignment?
16 A.  I don't remember if he did or somebody else
17 did.
18      (Exhibit 10 identified)
19 BY MR. THOMPSON:
20 Q.  And do you remember -- let's go ahead and
21 take a look at Exhibit 10 for a minute.  Do you know
22 Marissa Torczon?
23 A.  Yes, I do.
24 Q.  Do you remember seeing her there that night?
25 A.  Yes, I do.

Case 1:10-cv-00041-ABJ    Document 65-12    Filed 01/10/11    Page 30 of 92
Tricia Wachsmuth v.                                                                    Cody Bradley
City of Powell, et al.                                                         November 23, 2010

CODY BRADLEY - November 23, 2010                    Page 17
Direct Examination by Mr. Gosman

1    Q. Do you remember that she was taking notes?
2    A. Yes, I do.
3    Q. And I want you to take a -- I want you to
4    refer to these notes from time to time to help refresh
5    your recollection about what you may have heard that
6    evening. When you arrived and Sergeant Chretien began
7    addressing the officers, did you learn that a team was
8    being assembled to do a dynamic entry At the Wachsmuth
9    residence?
10         MR. THOMPSON: Objection as to form.
11         MS. WESTBY: Join.
12         THE WITNESS: No.
13   BY MR. GOSMAN:
14   Q. What did you learn about that?
15   A. I learned we were going to do a search
16   warrant on a residence.
17   Q. Okay. You don't normally involve 11 or 12
18   Powell police officers to serve a search warrant,
19   correct?
20         MR. THOMPSON: Objection as to form.
21         MS. WESTBY: Join.
22         THE WITNESS: It would depend on the warrant.
23   BY MR. GOSMAN:
24   Q. My question was you don't normally do it with
25   the entire Powell police force, correct?

CODY BRADLEY - November 23, 2010                    Page 19
Direct Examination by Mr. Gosman

1    A. No.
2    Q. So you didn't have any idea that they were
3    planning a dynamic entry that night?
4         MR. THOMPSON: Objection as to form.
5         MS. WESTBY: Join.
6         THE WITNESS: Would you say it again? I'm
7    sorry.
8    BY MR. GOSMAN:
9    Q. Yeah, did you have any idea they were
10   planning a dynamic entry that night?
11         MR. THOMPSON: Same objection.
12         MS. WESTBY: Join.
13         THE WITNESS: No.
14   BY MR. GOSMAN:
15   Q. You didn't know they were going to deploy a
16   flashbang device?
17   A. I knew it was a possibility.
18   Q. All right. So I think what you're trying to
19   say is you were going to try to serve the warrant, and
20   if nobody came to the door or it was barricaded or
21   somebody started shooting, then they would be prepared
22   for an entry into the house; is that correct?
23         MS. WESTBY: Object to the form.
24         MR. THOMPSON: Join.
25         THE WITNESS: Can you ask or read --

CODY BRADLEY - November 23, 2010                    Page 18
Direct Examination by Mr. Gosman

1         MS. WESTBY: Object to form. Asked and
2    answered. Just because you don't like his answer does
3    not mean it's not an answer.
4         MR. THOMPSON: Objection.
5         MR. GOSMAN: Thank you, counsel. Objections
6    as to form, please.
7         MS. WESTBY: I will make the objections that
8    I feel necessary.
9         Go ahead.
10         THE WITNESS: Depending on the warrant, how
11   many guys we use.
12   BY MR. GOSMAN:
13   Q. Okay. Have you ever been involved in another
14   warrant service prior to February 24, 2009 that
15   involved nearly the entire Powell Police Department?
16   A. I've been in warrant services that involved
17   multiple officers from different agencies.
18   Q. Since you've been with the Powell Police
19   Department?
20   A. Yes.
21   Q. And that would be serving warrants, say, for
22   DCI or Park County or something like that?
23   A. Yes.
24   Q. And were those high risk warrant services, do
25   you know?

CODY BRADLEY - November 23, 2010                    Page 20
Direct Examination by Mr. Gosman

1    BY MR. GOSMAN:
2    Q. Put it in your own words, Officer. What was
3    your understanding of what you were doing that night
4    and why you had a team assembled?
5         MR. THOMPSON: Objection as to form. Asked
6    and answered.
7         MS. WESTBY: Join.
8         THE WITNESS: We were going to the residence
9    to serve a search warrant, and if needed, we were going
10   to make entry into the house.
11   BY MR. GOSMAN:
12   Q. What does if needed mean?
13   A. For safety of us, the occupants of the
14   residence.
15   Q. For the safety of the occupants of the
16   residence?
17   A. Yes.
18   Q. Okay. What occupants specifically are you
19   talking about?
20   A. Whoever happened to be in the residence at
21   the time.
22   Q. Did you hear that there were other occupants
23   in the residence at that time?
24   A. No.
25   Q. Did you hear anything about questions

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 31 of 92
Tricia Wachsmuth v.                                                                    Cody Bradley
City of Powell, et al.                                                          November 23, 2010

CODY BRADLEY - November 23, 2010                              Page 21
Direct Examination by Mr. Gosman

1  concerning officer safety?
2          MS. WESTBY: Object to the form.
3          THE WITNESS: Say that again.
4  BY MR. GOSMAN:
5      Q.  Did you hear anything concerning officer
6  safety at that meeting?
7      A.  Yes.
8      Q.  What did you hear?
9      A.  I heard that there was multiple guns in the
10 house and that the people who lived there, the
11 residents, were paranoid, looked out the window a lot.
12     Q.  Okay.  Did you see Officer Eckerdt that
13 night, Sergeant Eckerdt?
14     A.  I know he was present, yes.
15     Q.  Did you hear him talk about some photos that
16 he'd seen of Bret Wachsmuth?
17     A.  Yes.
18     Q.  Do you know what got that going?  How it came
19 that he shared that information?
20     A.  I don't know.
21     Q.  What did he say, if you remember?  What do
22 you remember about what he said?
23     A.  I don't remember the specifics.  I remember
24 talking about photos of Bret in a tactical vest with
25 rifles.

CODY BRADLEY - November 23, 2010                              Page 22
Direct Examination by Mr. Gosman

1      Q.  An assault rifle?
2      A.  Yes.
3      Q.  Did you get the impression that he had
4  actually seen these photographs?
5      A.  I don't know.
6      Q.  Was there any mention of Tom Wachsmuth that
7  night?
8      A.  I don't know.
9      Q.  Were you aware that an entry team with long
10 rifles would be standing at the door when the
11 knock-and-announce was made?
12     A.  Yes.
13     Q.  And were you aware that there was a ram that
14 was next to the officer that was knocking and
15 announcing?
16     A.  I don't know where the ram was.  I was aware
17 there was one.
18     Q.  How long were you at the police department
19 that night?
20     A.  I don't know for sure.
21     Q.  And who did you leave the police department
22 with to go to the scene?
23     A.  I left with Investigator Brown.
24     Q.  And what did you do when you arrived at the
25 scene?

CODY BRADLEY - November 23, 2010                              Page 23
Direct Examination by Mr. Gosman

1      A.  I jumped over the back fence and covered the
2  back door.
3      Q.  When you use the word cover, what do you mean
4  by that?
5      A.  I had a rifle with me, and I made sure nobody
6  came out the back door.
7      Q.  Were you pointing it at the back door?
8      A.  Yes.
9      Q.  What does the word cover position mean to
10 you, based on your training?
11     A.  To make sure that - I guess I don't
12 understand.
13     Q.  What does cover position mean?  Have you
14 heard the term cover position?
15     A.  Yes.
16     Q.  What does it mean?
17     A.  You're there in the ready in case you need to
18 use it.
19     Q.  Rifles up?
20     A.  Depending on the situation, yes.
21     Q.  All right.  Does cover position include a
22 position with the rifle down, to point the barrel of
23 the rifle down?
24     A.  If you had another person in front of you,
25 yes.

CODY BRADLEY - November 23, 2010                              Page 24
Direct Examination by Mr. Gosman

1      Q.  What if you didn't?
2      A.  Then I would have my rifle up.
3      Q.  Have you been taught that that's the
4  appropriate way to clear a room?
5      A.  I guess I don't understand.
6      Q.  When you -- have you ever been involved in
7  room clearing exercises?
8      A.  Yes.
9      Q.  And when you enter a room in a room clearing
10 exercise, do you have your rifle in the cover position?
11     A.  Depends on which position you enter the room
12 in.
13     Q.  Right.  If you're first in the room, is that
14 rifle in the cover position?
15     A.  Yes.
16     Q.  And when you enter the room and you have
17 another officer ahead of you, do you bring your rifle
18 to the cover position and sweep another portion of the
19 room?
20         MS. WESTBY: Object to the form of the
21 question.  Incomplete hypothetical.
22         MR. THOMPSON: Join.
23         THE WITNESS: I guess I don't understand.
24 BY MR. GOSMAN:
25     Q.  Well, if you were the second man in a room

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 32 of 92
Tricia Wachsmuth v.
City of Powell, et al.
Cody Bradley
November 23, 2010

CODY BRADLEY - November 23, 2010                    Page 25
Direct Examination by Mr. Gosman

1  and you were clearing that room, and the officer ahead
2  of you had his rifle in the cover positon and you
3  entered the room behind him, would you bring your rifle
4  to the cover position and clear another portion of the
5  room?
6      MS. WESTBY: Same objection, incomplete
7  hypothetical.
8      MR. THOMPSON: Join.
9      THE WITNESS: Depending on the situation.
10 BY MR. GOSMAN:
11     Q.  All right. So you scaled the fence, and you
12 covered the back door, correct?
13     A.  Yes.
14     Q.  And did you hear a dog bark in the house
15 before? Let me ask this question: Where were you when
16 the flashbang device went off?
17     A.  Just about the top of the fence.
18     Q.  And did you hear the door being rammed?
19     A.  No, I didn't.
20     Q.  You didn't see any of the officers in the
21 front of the house?
22     A.  No.
23     Q.  Did you go in the house?
24     A.  After everything was done, somebody opened
25 the book door, and I walked through the house: In the

CODY BRADLEY - November 23, 2010                    Page 26
Direct Examination by Mr. Gosman

1  back door, out the front door.
2      Q.  Did you see Tricia Wachsmuth in the house?
3      A.  No.
4      Q.  Did you see her at all?
5      A.  I transported her to the police department.
6      Q.  Where was she when you first saw her?
7      A.  In the back of the patrol car.
8      Q.  Did she say anything on the way to the police
9  station?
10     A.  No.
11     Q.  Did you say anything to her?
12     A.  No.
13     Q.  Was she cooperative?
14     A.  Yes.
15     Q.  Who were you with in the backyard?
16     A.  Investigator Brown, Officer Lara.
17     Q.  What was Brown doing at the time that you
18 scaled the fence?
19     A.  I'm not sure.
20     Q.  Was he assigned to cover the back door with
21 you?
22     A.  Yes.
23     Q.  In fact, you guys were assigned to break out
24 a window initially, weren't you?
25     A.  Yes.

CODY BRADLEY - November 23, 2010                    Page 27
Direct Examination by Mr. Gosman

1      Q.  That didn't make sense, though, after the
2  flashbang went off and you were still at the fence,
3  correct?
4      A.  Yes.
5      Q.  So you didn't break a window?
6      A.  No.
7      Q.  Was Officer Lara assigned to participate with
8  you as a group in providing a second diversion in the
9  back of the home?
10     A.  I don't know.
11     Q.  Was Officer Brown assigned that with you?
12     A.  I don't know.
13     Q.  You were specifically assigned that?
14     A.  Yes.
15     Q.  You went to the site and you didn't know who
16 the -- what Officer Brown's role was going to be?
17     A.  I knew he was going to be in the backyard
18 with me.
19     Q.  Did you know that Officer Lara was going to
20 be in the backyard with you?
21     A.  I knew he was -- that's where he was assigned
22 to, yes.
23     Q.  Did you see Officer Lara in the backyard
24 after you scaled the fence?
25     A.  No.

CODY BRADLEY - November 23, 2010                    Page 28
Direct Examination by Mr. Gosman

1      Q.  Which officer was it that had trouble getting
2  over the fence?
3      A.  I think all of us did.
4      Q.  Okay. After you transported Tricia Wachsmuth
5  to the police department, what did you do?
6      A.  I believe I removed her handcuffs. I don't
7  know if I did or not. And then they took her in to
8  interview.
9      Q.  And what did you do after that?
10     A.  I sat in Investigator Brown's office while he
11 interviewed her.
12     Q.  Did you hear Officer Brown yelling at Tricia
13 Wachsmuth?
14     A.  No.
15     Q.  Is it something that you may have just
16 forgotten?
17     A.  No.
18     Q.  What do you remember about that interview?
19     A.  I remember it was very short. And she said
20 she wanted to talk to her husband before she talked to
21 us.
22     Q.  You don't remember Officer Brown slamming his
23 fist on the table and saying you will tell us where
24 your husband is?
25     A.  No.

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 33 of 92
Tricia Wachsmuth v.                                                              Cody Bradley
City of Powell, et al.                                                     November 23, 2010

CODY BRADLEY - November 23, 2010                                    Page 29
Direct Examination by Mr. Gosman

1   Q. Anything like that? You don't remember
2   anything like that?
3   A. No.
4   Q. Was anyone else present?
5   A. No.
6   Q. Have you been with Officer Brown in other
7   interviews?
8   A. Yes.
9   Q. Has he ever displayed that type of behavior?
10  A. No.
11       MR. THOMPSON: Objection as to form.
12  BY MR. GOSMAN:
13  Q. Have you?
14  A. No.
15  Q. Would you agree with me that that type of
16  behavior would be not only unprofessional, but that it
17  might violate the constitutional rights --
18       MR. THOMPSON: Objection as to form.
19       MS. WESTBY: Object to the form of the
20  question, and you're not going to ask him those kind of
21  questions.
22  BY MR. GOSMAN:
23  Q. All right. That's the fourth time you've
24  directed a witness not to answer.
25       MS. WESTBY: Well, I'm not going to -- I'm

CODY BRADLEY - November 23, 2010                                    Page 30
Direct Examination by Mr. Gosman

1   not going to allow you to ask him --
2       MR. GOSMAN: We don't need to know why you're
3   not going to allow me to do anything. You've already
4   stated that you're not going to --
5       MS. WESTBY: -- to turn him into an expert.
6       MR. GOSMAN: You've already listed him as an
7   expert, for crying out loud.
8       All right. I don't have any further
9   questions. Well, I do. Let me just ask a couple other
10  things.
11  BY MR. GOSMAN:
12  Q. Were you involved in the debriefing that
13  occurred after the warrant service?
14  A. Yes.
15  Q. Who was there?
16  A. I can't say for sure, but I believe everybody
17  that was involved was there.
18  Q. All right. It seemed like it was a fairly
19  large group?
20  A. Yes.
21       MS. WESTBY: Object to the form of the
22  question.
23  BY MR. GOSMAN:
24  Q. Do you know if Chief Feathers was there?
25  A. I don't believe he was.

CODY BRADLEY - November 23, 2010                                    Page 31
Direct Examination by Mr. Gosman

1   Q. What was discussed at that debriefing?
2   A. I don't remember.
3   Q. Do you remember Sergeant Chretien apologizing
4   to the officers for taking Tricia Wachsmuth down the
5   stairs first?
6       MS. WESTBY: Object to the form of the
7   question, misstates the testimony.
8       MR. THOMPSON: Join.
9       MS. WESTBY: Go ahead.
10      THE WITNESS: No, I don't.
11  BY MR. GOSMAN:
12  Q. Did you ever hear Officer Chretien apologize
13  for that?
14      MS. WESTBY: Object to form.
15      THE WITNESS: No.
16  BY MR. GOSMAN:
17  Q. Have you had any communication -- do you know
18  Tom Wachsmuth?
19  A. Yes, I do.
20  Q. All right. Have you had any communication
21  with Tom Wachsmuth about this case?
22  A. No.
23  Q. You don't remember Tom Wachsmuth's name
24  coming up at all in the meeting that you had with the
25  officers that evening before you assembled at the

CODY BRADLEY - November 23, 2010                                    Page 32
Direct Examination by Mr. Gosman

1   Wachsmuth home?
2       MR. THOMPSON: Objection as to form.
3       MS. WESTBY: Join.
4       THE WITNESS: No, I don't remember.
5       MR. GOSMAN: No further questions. Thank you
6   very much.
7       MS. WESTBY: We'll read and sign.
8           (Proceedings concluded at
9           12:14 p.m., November 23,
10          2010.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Tricia Wachsmuth v.
City of Powell, et al.

CODY BRADLEY - November 23, 2010                    Page 33
Direct Examination by Mr. Gosman

1                    DEPONENT'S CERTIFICATE

2           I, CODY BRADLEY, do hereby certify, under

3    penalty of perjury,that I have read the foregoing

4    transcript of my testimony consisting of 32 pages,

5    taken on November 23, 2010 and that the same is, with

6    any changes noted below, a full, true and correct

7    record of my deposition.

8    PAGE  LINE      CORRECTION        REASON FOR CORRECTION

9    ____  ____  _____  _____

10   ____  ____  _____  _____

11   ____  ____  _____  _____

12   ____  ____  _____  _____

13   ____  ____  _____  _____

14   ____  ____  _____  _____

15   ____  ____  _____  _____

16   ____  ____  _____  _____

17   ____  ____  _____  _____

18   ____  ____  _____  _____

19   ____  ____  _____  _____

20   ____  ____  _____  _____

21   ____  ____  _____  _____

22

23

24                    _____
                      CODY BRADLEY   Date
25


CODY BRADLEY - November 23, 2010                    Page 34
Direct Examination by Mr. Gosman

1                       CERTIFICATE

2           I, VONNI R. BRAY, Registered Professional

3    Reporter, and Notary Public for the State of Montana,

4    do hereby certify that CODY BRADLEY was by me first

5    duly sworn to testify to the truth, the whole truth,

6    and nothing but the truth;

7           That the foregoing transcript, consisting of

8    33 pages, is a true record of the testimony given by

9    said deponent, together with all other proceedings

10   herein contained.

11          IN WITNESS WHEREOF, I have hereunto set my

12   hand this 11th day of December, 2010.

13

14

15

16

17

18

19

20   _____
21
22   Vonni R. Bray, RPR
     P. O. Box 125
     Laurel, MT 59044
23   (406) 670-9533 Cell
     (888) 277-9372 Fax
24   vonni.bray@yahoo.com
25

Tricia Wachsmuth v.
City of Powell, et al.

Cody Bradley
November 23, 2010

17:7

**1**

**10 (2)**
16:18,21
**11 (1)**
17:17
**12 (1)**
17:17
**12:14 (1)**
32:9

**2**

**2000 (1)**
7:14
**2004 (1)**
7:14
**2005 (4)**
8:18;9:4;12:2,8
**2009 (3)**
9:3,5;18:14
**2010 (1)**
32:10
**23 (1)**
32:9
**24 (2)**
9:5;18:14
**24th (1)**
9:4
**250 (1)**
5:20

**3**

**31 (4)**
8:1,3,5,6

**5**

**5th (3)**
8:17;9:3,4

**9**

**917 (1)**
8:4

**A**

**ability (1)**
5:25
**academy (2)**
7:19,20
**accused (1)**
6:5
**actually (1)**
22:4
**address (2)**
5:19;16:4
**addressed (1)**
16:7
**addressing (1)**

**afternoon (1)**
5:11
**again (2)**
19:6;21:3
**against (1)**
6:9
**agencies (1)**
18:17
**agency (1)**
9:19
**agree (1)**
29:15
**ahead (6)**
11:21;16:20:18:9;
24:17;25:1;31:9
**allow (2)**
30:1,3
**announcing (1)**
22:15
**answered (2)**
18:2;20:6
**apologize (1)**
31:12
**apologizing (1)**
31:3
**appropriate (1)**
24:4
**areas (1)**
10:13
**arrested (1)**
6:3
**arrived (4)**
8:15;16:6;17:6;22:24
**art (1)**
6:20
**assault (1)**
22:1
**assembled (3)**
17:8;20:4;31:25
**assigned (6)**
26:20,23;27:7,11,13,
21
**assignment (2)**
16:13,15
**associated (1)**
8:22
**associates (1)**
6:20
**associate's (1)**
6:23
**attended (1)**
12:10
**attorneys (1)**
4:15
**audibly (1)**
5:6
**available (1)**
13:20
**aware (4)**
15:7;22:9,13,16

**B**

**bachelor's (2)**
6:21;7:1
**back (10)**
15:4;23:1,2,6,7;25:12;
26:1,7,20;27:9
**background (1)**
6:15
**backyard (4)**
26:15;27:17,20,23
**bark (1)**
25:14
**barrel (1)**
23:22
**barricaded (1)**
19:20
**based (1)**
23:10
**become (1)**
15:7
**began (1)**
17:6
**behavior (2)**
29:9,16
**behind (1)**
25:3
**best (1)**
10:6
**bit (1)**
12:21
**Blue (1)**
6:20
**book (1)**
25:25
**BRADLEY (2)**
4:1;5:18
**break (5)**
5:9,12,13;26:23;27:5
**breaks (1)**
5:10
**Bret (2)**
21:16,24
**bring (2)**
24:17;25:3
**broken (1)**
13:10
**Brown (7)**
22:23;26:16,17;27:11;
28:12,22;29:6
**Brown's (2)**
27:16;28:10

**C**

**call (2)**
15:8,12
**came (9)**
7:22,23;15:4,13,22;
16:10;19:20;21:18;23:6
**can (5)**
4:20;5:9,21;10:4;

19:25

**car (1)**
26:7
**case (5)**
4:21;8:4;12:10;23:17;
31:21
**charge (1)**
9:17
**Chief (3)**
11:6;12:19;30:24
**Chretien (6)**
16:4,7,10;17:6;31:3,
12
**circulated (1)**
14:2
**clarification (1)**
4:25
**Clark (1)**
5:20
**clear (2)**
24:4;25:4
**clearing (3)**
24:7,9;25:1
**CODY (5)**
4:1;5:18;9:6,20;12:23
**College (1)**
6:21
**comfortable (1)**
5:22
**coming (2)**
8:11;31:24
**comments (1)**
11:12
**communication (2)**
31:17,20
**Community (1)**
6:21
**completed (2)**
7:19,23
**concerning (2)**
21:1,5
**concluded (1)**
32:8
**constitutional (1)**
29:17
**cooperative (1)**
26:13
**counsel (1)**
18:5
**county (2)**
7:12;18:22
**couple (3)**
4:10;10:4;30:9
**course (5)**
4:19;8:19;12:8,10,15
**cover (11)**
23:3,9,13,14,21;24:10,
14,18;25:2,4;26:20
**covered (2)**
23:1;25:12
**crime (1)**
6:5
**Criminal (2)**

6:25;7:2
**crying (1)**
30:7
**current (1)**
5:19
**currently (1)**
5:24

**D**

**day (4)**
13:16,20;15:18,21
**DC1 (1)**
18:22
**dealt (1)**
14:2
**debriefing (2)**
30:12;31:1
**degree (4)**
6:20,21,23;7:1
**Department (18)**
7:4;8:12,16;9:21,23;
10:15,19,21,25;11:5,15;
12:14;18:15,19;22:18,
21;26:5;28:5
**depend (1)**
17:22
**Depending (3)**
18:10;23:20;25:9
**Depends (1)**
24:11
**deploy (7)**
12:23;13:3,5,7;14:7,
16;19:15
**deployment (2)**
13:23;14:9
**deposition (1)**
4:8
**deputy (1)**
7:11
**device (7)**
13:8,24;14:7,17;15:1;
19:16;25:16
**devices (2)**
12:24;14:3
**different (3)**
13:11,19;18:17
**diploma (1)**
6:17
**DIRECT (1)**
4:3
**directed (2)**
11:16;29:24
**discussed (1)**
31:1
**dishonesty (1)**
6:6
**displayed (1)**
29:9
**diversion (1)**
27:8
**document (1)**
8:4

**dog (1)**
  25:14
**done (1)**
  25:24
**door (11)**
  19:20;22:10;23:2,6,7;
  25:12,18,25;26:1,1,20
**doors (1)**
  9:11
**Doug (3)**
  11:25;12:8;15:4
**down (5)**
  9:9;15:22;23:22,23;
  31:4
**duly (1)**
  4:2
**dummies (1)**
  13:1
**duty (1)**
  15:16
**dynamic (9)**
  8:22;10:9,13,16,21;
  11:16;17:8;19:3,10

**E**

**Eckerdt (2)**
  21:12,13
**educational (1)**
  6:15
**either (1)**
  12:10
**else (2)**
  16:16;29:4
**employed (2)**
  7:3,6
**employment (1)**
  7:16
**end (2)**
  5:12;15:18
**enforcement (2)**
  7:10,20
**enter (3)**
  24:9,11,16
**entered (1)**
  25:3
**entire (3)**
  11:15;17:25;18:15
**entries (1)**
  8:25
**entry (12)**
  8:23;10:10,13,16,21;
  11:16;17:8;19:3,10,22;
  20:10;22:9
**evening (2)**
  17:6;31:25
**everybody (1)**
  30:16
**EXAMINATION (1)**
  4:3
**exercise (2)**
  9:12;24:10
**exercises (2)**

**F**

**fact (2)**
  12:23;26:23
**fairly (1)**
  30:18
**far (2)**
  13:18,21
**Feathers (1)**
  30:24
**February (3)**
  9:4,5;18:14
**feel (2)**
  5:22;18:8
**felony (1)**
  6:3
**fence (7)**
  23:1;25:11,17;26:18;
  27:2,24;28:2
**field (1)**
  6:24
**find (1)**
  7:17
**first (6)**
  4:2;12:4;15:6;24:13;
  26:6;31:5
**fist (1)**
  28:23
**flashbang (10)**
  12:24;13:8,2,;14:3,7,
  17;15:1;19:16;25:16;
  27:2
**flashbangs (1)**
  9:11
**focused (1)**
  11:4
**follow (1)**
  14:16
**follows (1)**
  4:2
**force (1)**
  17:25
**forgotten (1)**
  28:16
**form (20)**
  11:17;13:12;14:10,20;
  17:10,20;18:1,6;19:4,23;
  20:5;21:2;24:,20;29:11,
  18,19;30:21;31:6,14;
  32:2
**fourth (1)**
  29:23
**front (3)**
  13:19;24:7
**Exhibit (5)**
  8:1,3,5;16:18,21
**experience (1)**
  7:10
**expert (2)**
  30:5,7
**Explain (1)**
  7:9

**G**

**given (2)**
  4:8;13:11
**GOSMAN (27)**
  4:4;11:10,13,23;
  13:15;14:14,24;17:13,
  23;18:5,12;19:8,14;20:1,
  11;21:4;24:24;25:10;
  29:12,22;30:2,6,11,23;
  31:11,16;32:5
**ground (1)**
  4:11
**group (7)**
  13:17,18;16:1,4,7;
  27:8;30:19
**groups (1)**
  13:10
**guess (5)**
  10:22;14:13;23:11;
  24:5,23
**guns (1)**
  21:9
**guys (3)**
  11:1;18:11;26:23

**H**

**halfway (1)**
  8:5
**handcuffs (1)**
  28:6
**happened (1)**
  20:20
**hard (1)**
  5:5
**head (1)**
  14:23
**hear (10)**
  4:7;20:22,25;21:5,8,
  15;25:14,18;28:12;
  31:12
**heard (3)**
  17:5;21:9;23:14
**help (1)**
  17:4
**Hermiston (2)**
  6:19,19
**high (6)**
  6:16,17,19;9:9;12:23;
  18:24
**home (2)**
  27:9;32:1
**Hopefully (1)**
  5:10
**full (1)**
  5:16
**full-time (2)**
  7:8,16
**further (2)**
  30:8;32:5

**house (8)**
  19:22;20:10;21:10;
  25:14,21,23,25;26:2
**huh-uh (1)**
  5:3
**husband (2)**
  28:20,24
**hypothetical (2)**
  24:21;25:7

**I**

**idea (3)**
  15:15;19:2,9
**identified (2)**
  8:1;16:18
**impair (1)**
  5:25
**important (1)**
  4:23
**impression (1)**
  22:3
**incident (1)**
  15:5
**include (1)**
  23:21
**including (1)**
  10:13
**Incomplete (2)**
  24:21;25:6
**individual (1)**
  9:25
**information (1)**
  21:19
**initially (1)**
  26:24
**instance (1)**
  14:19
**instructed (1)**
  4:15
**instructor (1)**
  14:5
**interested (1)**
  11:4
**interview (2)**
  28:8,18
**interviewed (1)**
  28:11
**interviews (1)**
  29:7
**into (5)**
  13:10;15:13;19:22;
  20:10;30:5
**Investigator (3)**
  22:23;26:16;28:10
**involve (1)**
  17:17
**involved (8)**
  12:9;16:2;18:13,15,
  16;24:6;30:12,17
**involving (1)**
  6:6

**J**

**Joe (1)**
  5:18
**Join (14)**
  11:19;13:13;14:12,21;
  17:11,21;19:5,12,24;
  20:7;24:22;25:8;31:8;
  32:3
**jumped (1)**
  23:1
**justice (2)**
  6:25;7:2

**K**

**kind (1)**
  29:20
**knew (3)**
  19:17;27:17,21
**knock-and-announce (1)**
  22:11
**knocking (1)**
  22:14

**L**

**Lara (4)**
  26:16;27:7,19,23
**large (1)**
  30:19
**last (3)**
  8:25;10:4,6
**late (1)**
  12:11
**later (1)**
  4:20
**law (2)**
  7:9,20
**lawsuit (1)**
  6:13
**learn (3)**
  16:8;17:7,14
**learned (1)**
  17:15
**least (1)**
  10:8
**leave (2)**
  7:15;22:21
**left (2)**
  9:1;22:23
**listed (1)**
  30:6
**little (3)**
  5:2;7:5;12:21
**live (2)**
  13:1,2
**lived (1)**
  21:10
**long (4)**
  5:11;7:3;22:9,18
**look (2)**

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 37 of 92
Tricia Wachsmuth v.
City of Powell, et al.

Cody Bradley
November 23, 2010

11:6;16:21
**looked (1)**
21:11
**looking (2)**
8:16;14:19
**looks (1)**
12:9
**lot (2)**
12:9;21:11
**loud (1)**
30:7

## M

**making (1)**
11:12
**man (1)**
24:25
**many (1)**
18:11
**Marissa (1)**
16:22
**materials (1)**
14:1
**Matt (1)**
9:24
**may (2)**
17:5;28:15
**McCaslin (4)**
9:24;12:22;13:7,16
**mean (9)**
10:22,24.24;18:3;
20:12;23:3,9,13,16
**meant (1)**
5:5
**medication (1)**
5:24
**meeting (2)**
21:6;31:24
**members (2)**
10:20;12:14
**mention (1)**
22:6
**might (1)**
29:17
**minute (3)**
12:4,7;16:21
**misstates (1)**
31:7
**most (5)**
10:24;11:1,15;12:13;
16:1
**Mountain (1)**
6:21
**much (3)**
5:2,10;32:6
**multi-agency (1)**
9:12
**multiple (2)**
18:17;21:9
**must (1)**
5:12

## N

**name (2)**
5:16;31:23
**nearly (1)**
18:15
**necessary (1)**
18:8
**need (6)**
5:10;11:6,11;14:16;
23:17;30:2
**needed (2)**
20:9,12
**next (1)**
22:14
**night (8)**
16:2,24;19:3 10;20:3;
21:13;22:7,1 ?
**nobody (1)**
19:20;23:5
**Nope (1)**
13:17
**normally (2)**
17:17,24
**North (1)**
5:20
**notes (2)**
17:1,4
**notice (1)**
8:17
**November (1)**
32:9
**number (1)**
8:4

## O

**oath (1)**
4:20
**Object (10)**
11:17;14:10;:8:1;
19:23;21:2;24:20;29:19;
30:21;31:6,1 :
**objection (13)**
11:8;13:12;1--:20;
17:10,20;18:4;19:4,11;
20:5;25:6;29:11,18;32:2
**Objections (2)**
18:5.7
**occasions (1)**
12:5
**occupants (4)**
20:13,15,18,22
**occurred (1)**
30:13
**October (6)**
8:17;9:3,4;12 2,8,10
**off (3)**
14:22;25:16;27:2
**office (2)**
15:13;28:10
**Officer (29)**

4:5;7:6;8:6,9;9:16;
12:22;13:7,16;16:4,7,10;
20:2;21:1,5,12;22:14;
24:17;25:1,26:16;27:7,
11,16,19.23;28:1,12,22;
29:6;31:12
**officers (10)**
10:13;11:16;12:9;
16:1;17:7,18;18:17;
25:20;31:4,25
**old (1)**
12:23
**one (4)**
4:24;5:12;13:3;22:17
**only (2)**
9:25;29:16
**opened (1)**
25:24
**open-ended (1)**
9:2
**order (1)**
6:8
**Oregon (3)**
6:19,22;7:12
**out (5)**
21:11;23:6;26:1,23;
30:7
**over (6)**
4:10;7:5;9:6;12:22;
23:1;28:2
**own (1)**
20:2

## P

**paranoid (1)**
21:11
**Park (1)**
18:22
**participate (2)**
13:19;27:7
**participated (2)**
8:18;10:14
**part-time (1)**
7:11
**party (1)**
6:13
**Patrol (2)**
8:18;26:7
**Pechtel (3)**
11:25;12:8;15:4
**pending (1)**
5:14
**people (1)**
21:10
**person (1)**
23:24
**phone (2)**
15:8,11
**photographs (1)**
22:4
**photos (2)**
21:15,24

**phrases (1)**
5:4
**pinpoint (1)**
10:4
**placed (1)**
6:8
**planning (2)**
19:3,10
**please (1)**
18:6
**pm (1)**
32:9
**point (1)**
23:22
**pointing (1)**
23:7
**Police (24)**
7:4,6;8:12,15;9:20,23;
10:12,15,18,20,25;11:5.
15;12:14;15:23;17:18.
25;18:15,18;22:18,21;
26:5,8;28:5
**portion (2)**
24:18;25:4
**position (10)**
23:9,13,14,21,22;
24:10,11,14,18;25:4
**positon (1)**
25:2
**possibility (1)**
19:17
**POST (3)**
9:7,14;12:1
**Powell (17)**
7:4.17;8:12,15;9:22;
10:12,15,18,20,25;11:5.
15;12:14;17:18,25;
18:15,18
**practice (1)**
9:10
**prepared (1)**
19:21
**present (2)**
21:14;29:4
**previous (1)**
7:9
**prior (3)**
8:11;15:5;18:14
**Probably (1)**
10:6
**proceedings (2)**
4:20;32:8
**providing (1)**
27:8
**Put (1)**
20:2

## R

**raking (1)**
9:10
**ram (3)**
9:11;22:13,16

**rammed (1)**
25:18
**rather (1)**
5:3
**read (2)**
19:25;32:7
**ready (2)**
9:9;23:17
**rebuild (1)**
9:10
**recall (1)**
14:22
**received (1)**
15:8
**recite (1)**
5:16
**recollect (1)**
10:9
**recollection (2)**
10:7;17:5
**record (2)**
5:5,17
**records (1)**
8:16
**refer (1)**
17:4
**referring (1)**
9:2
**refresh (1)**
17:4
**regard (1)**
15:1
**related (1)**
10:16
**remember (28)**
9:17;10:2;12:11;13:9,
25;14:1,5;15:5,19,20,24;
16:12,16,20,24;24:17:1;
21:21,22,23,23;28:18,
19,22;29:1;31:2,3,23;
32:4
**removed (1)**
28:6
**required (1)**
4:16
**reserve (1)**
7:11
**reservist (1)**
8:8
**residence (7)**
17:9,16;20:8,14,16,20,
23
**residents (1)**
21:11
**Response (2)**
8:18;15:11
**restraining (1)**
6:8
**results (1)**
4:11
**ridiculous (1)**
11:9
**rifle (10)**

22:1;23:5,22,23;24:2,
10,14,17;25:2,3
**rifles (3)**
21:25;22:10;23:19
**right (18)**
4:10;8:8;10:19;11:3,
10,14;12:7,21;13:22;
15:6;19:18;23:21;24:13;
25:11;29:23;30:8,18;
31:20
**rights (1)**
29:17
**risk (1)**
18:24
**role (1)**
27:16
**room (12)**
24:4,7,9,9,11,13,16,19,
25;25:1,3,5
**rounds (1)**
13:1
**rules (3)**
14:9,15,16

**S**

**safety (4)**
20:13,15;21:1,6
**Same (2)**
19:11;25:6
**sat (1)**
28:10
**saw (1)**
26:6
**saying (1)**
28:23
**scaled (3)**
25:11;26:18;27:24
**scene (2)**
22:22,25
**school (5)**
6:16,17,20;9:10;12:23
**search (3)**
17:15,18;20:9
**second (2)**
24:25;27:8
**seeing (1)**
16:24
**seeking (1)**
7:16
**seemed (1)**
30:18
**segments (1)**
13:11
**sense (1)**
27:1
**September (1)**
12:11
**Sergeant (3)**
17:6;21:13;31:3
**serve (3)**
17:18;19:19;20:9
**service (4)**

15:7;16:2;18:14;30:13
**services (2)**
18:16,24
**serving (1)**
18:21
**shared (1)**
21:19
**shift (2)**
15:18,20
**shooting (1)**
19:21
**short (1)**
28:19
**shown (1)**
13:24
**sign (1)**
32:7
**site (1)**
27:15
**situation (2)**
23:20;25:9
**six (1)**
7:5
**slamming (1)**
28:22
**somebody (3)**
16:16;19:21;25:24
**sorry (2)**
4:7;19:7
**sort (1)**
9:1
**specific (4)**
8:22;10:9;12:12;13:22
**specifically (7)**
9:2;11:16;14:2;15:24;
16:15;20:18;27:13
**specifics (1)**
21:23
**stairs (1)**
31:5
**standing (1)**
22:10
**start (2)**
4:11;8:8
**started (1)**
19:21
**starting (1)**
6:15
**stated (1)**
30:4
**station (2)**
15:23;26:9
**stay (1)**
11:3
**still (1)**
27:2
**Street (1)**
5:20
**Strike (1)**
10:14
**sued (1)**
6:11
**Sure (8)**

4:13;13:6;16:3;22:20;
23:5,11;26:19;30:16
**SWAT (2)**
8:9,13
**sweep (1)**
24:18
**sworn (1)**
4:2

**T**

**tab (1)**
8:6
**table (1)**
28:23
**Tactical (2)**
8:18;21:24
**tactics (1)**
8:22
**talk (4)**
12:7;16:6;21:15;28:20
**talked (1)**
28:20
**talking (2)**
20:19;21:24
**taught (1)**
24:3
**team (11)**
10:13,15,19,21,23,24;
11:5,14;17:7;20:4;22:9
**tear (1)**
9:9
**term (1)**
23:14
**testified (1)**
4:2
**testimony (3)**
4:19;5:22;31:7
**THOMPSON (19)**
8:2;11:19;13:12;
14:12,20;16:19;17:10,
20;18:4;19:4,11,24;
20:5;24:22;25:8;29:11,
18;31:8;32:2
**though (1)**
27:1
**three (1)**
10:6
**throwing (1)**
9:11
**timeframe (1)**
9:3
**Tired (2)**
4:6;5:21
**today (5)**
4:5,14;5:21,22;6:1
**told (3)**
12:18,19;14:5
**Tom (4)**
22:6;31:18,21,23
**tone (1)**
11:20
**took (1)**

28:7
**top (2)**
14:22;25:17
**topic (1)**
6:24
**Torczon (1)**
16:22
**trained (6)**
8:9;10:12,18,20;11:5,
14
**training (19)**
7:20.20;8:13,16,22;
9:6,7,14;10:9.15;11:1,
25;12:2,22;13:11,23;
14:1,25;23:10
**transported (2)**
26:5;28:4
**Tricia (4)**
26:2;28:4,12;31:4
**trouble (2)**
5:2;28:1
**truthful (2)**
5:21,25
**try (2)**
11:3;19:19
**trying (1)**
19:18
**turn (4)**
5:4;8:3,6;30:5
**two (1)**
13:5
**type (2)**
29:9,15

**U**

**under (1)**
4:19
**University (1)**
6:22
**unless (1)**
4:14
**unprofessional (1)**
29:16
**up (4)**
5:4;23:19;24:2;31:24
**use (3)**
18:11;23:3,18
**used (1)**
4:20
**using (1)**
9:11

**V**

**vest (1)**
21:24
**violate (1)**
29:17

**W**

**Wachsmuth (12)**

15:7;16:2;17:8;21:16;
22:6;26:2;28:4,13;31:4,
18,21;32:1
**Wachsmuth's (1)**
31:23
**walked (1)**
25:25
**warrant (12)**
15:7;16:2;17:16,18,
22;18:10,14,16,24;
19:19;20:9;30:13
**warrants (1)**
18:21
**way (4)**
5:10;9:1;24:4;26:8
**weren't (1)**
26:24
**WESTBY (27)**
11:8,11,17,20;13:13;
14:10,21;17:11,21;18:1,
7;19:5,12,23;20:7;21:2;
24:20;25:6;29:19.25;
30:5.21;31:6,9,14;32:3,7
**Western (1)**
6:22
**window (3)**
21:11;26:24;27:5
**windows (1)**
9:11
**within (1)**
10:4
**WITNESS (18)**
11:22;13:14;14:13,22;
17:12,22;18:10;19:6,13,
25;20:8;21:3;24:23;
25:9;29:24;31:10,15;
32:4
**witnesses (1)**
5:3
**word (2)**
23:3.9
**words (2)**
13:24;20:2
**worked (1)**
7:11
**Wyoming (2)**
7:22,23

**Y**

**years (4)**
7:5,13;10:5,6
**yelling (1)**
28:12

# Appendix Nineteen

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powel, et al.*

*Matthew Danzer*
*October 4, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 10-4-10 Matthew Danzer_scoped.txt
Min-U-Script® with Word Index

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 41 of 92

Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                  October 4, 2010

MATTHEW DANZER - October 4, 2010                    Page 1

```
1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF WYOMING
3   ---------------------------------------------------
4   TRICIA WACHSMUTH,                )
5              Plaintiff,            )
6      vs.                          )   NO. 10-CV-041J
7                                    )
    CITY OF POWELL, AND IN THEIR     )
8   INDIVIDUAL CAPACITY, TIM         )
    FEATHERS, CHAD MINER, MIKE       )
9   CHRETIEN, ROY ECKERDT, DAVE      )
    BROWN, MIKE HALL, BRETT LARA,    )
10  MATT MCCASLIN, ALAN KENT, MATT   )
    DANZER, OFFICER BRILAKIS, LEE    )
11  BLACKMORE, CODY BRADLEY, KIRK    )
    CHAPMAN, JOHN DOES #1-#4,        )
12            Defendants.            )
13  _____
14       DEPOSITION OF MATTHEW DANZER
         3:28 p.m., Monday, October 4, 2010
15
16
17
18      Pursuant to notice, the deposition of MATTHEW
19  DANZER was taken in behalf of Plaintiff in accordance
20  with the applicable Federal Rules of Civil Procedure at
21  the Park County Circuit Court Jury Room, 109 W. 14th
22  St., Powell, WY 82435, before Vonni R. Bray, Registered
23  Professional Reporter and Notary Public of the State of
24  Montana.
25
```

MATTHEW DANZER - October 4, 2010                    Page 2

```
1                   APPEARANCES
2   FOR PLAINTIFF:
3          Mr. Jeffrey C. Gosman
           Gosman Law Office
4          123 W 1st Street
           P.O. Box 51267
5          Casper, WY 82601-2481
           Telephone: (307)265-3082 - Fax: (307)265-6715
6          E-mail: jeff@gosmanlawoffices.com
7
8   FOR INDIVIDUAL DEFENDANTS:
9          Ms. Misha Westby
           Senior Assistant Attorney General
10         2424 Pioneer Avenue, 2nd Floor
           Cheyenne, WY 82002
11         Telephone: (307)777-5477 Fax: (307)777-8920
           E-mail: mwest@state.wy.us
12
13  FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
    CAPACITY:
14
15         Mr. Tom Thompson
           MacPherson, Kelly & Thompson
16         616 West Buffalo
           P.O. Box 999
17         Rawlins, WY 82301-0999
           Telephone: (307)324-2713 - Fax: (307)324-7348
18         E-mail: tthompson@wyomingattorneys.net
19
20  Also Present:   Tim Feathers
                    Mike Chretien
21
22
23
24
25
```

MATTHEW DANZER - October 4, 2010                    Page 3

```
1                  INDEX TO WITNESSES
2                                                    PAGE
3   MATTHEW DANZER
4      Direct Examination by Mr. Gosman ...............6
5      Signature Page .............................148
       Reporter's Certificate .....................149
6
7
8                     EXHIBITS
9   EXHIBIT            DESCRIPTION               PAGE
10    10    Notes of Wachsmuth Warrant .............103
11    16    PPD Supplement 7 by Mike Chretien ......107
12    22    PPD Supplement 5 by Matthew Danzer .....137
13    27    Countermeasures Tactical Institute ......65
14          Patrol Officer Specialized Tactics
            Course
15    28    Countermeasures Tactical Institute ......30
16          Immediate Action for Patrol
      31    Wyoming P.O.S.T. Training Records .......18
17
      35    PPD Patrol Friday Training ..............22
18
      37    Powell Police Crisis Response ...........55
19          Tactics
20
21
22
23
24
25
```

MATTHEW DANZER - October 4, 2010                    Page 4

1 MR. GOSMAN: Before we go on the record this
2 afternoon, there are a couple of things that I think we
3 need to set out in the record.
4 First, we are giving depositions this
5 afternoon based on a schedule that has apparently been
6 made necessary because counsel for the defendant, in
7 part at least, has not yet interviewed their clients
8 for their depositions. And so we are limited to those
9 that are available who have been interviewed by their
10 counsel.
11 And counsel for plaintiff has agreed to
12 accommodate this issue. And we have established a
13 schedule by which we will go forward today.
14 I have been asked to --
15 MS. WESTBY: In that regard, before we go on
16 to the next issue, I think it also needs to be clear on
17 the record that counsel stated in writing as of 9/13,
18 that he did not have a schedule for the defendants
19 that, in conversations, told both defense counsel that
20 he wanted to depose Chief Feathers first. Chief
21 Feathers is ready to be deposed, has gone through
22 everything, is ready to be deposed. Counsel changed
23 his mind when we got here to the depositions. And we
24 were following the schedule that we were told we could
25 use.

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 42 of 92
Tricia Wachsmuth v.                                                                    Matthew Danzer
City of Powel, et al.                                                                  October 4, 2010

MATTHEW DANZER - October 4, 2010                    Page 5

1      Go ahead.

2          MR. GOSMAN: Counsel did not change his mind.

3  I want to be on the record with that comment.

4          But the other thing is with regard to the

5  capacity of the officers in this lawsuit, Chief

6  Feathers, I believe it's Sergeant Chretien, Michael

7  Chretien, in any event, are being sued in their

8  individual and their official capacity, too. And the

9  other officers are being sued in their individual

10 capacity.

11         MR. THOMPSON: Thank you, counsel.

12         MR. GOSMAN: Yes.

13         MS. WESTBY: And that -- your pleadings do

14 not reflect that.

15         MR. GOSMAN: Okay

16         MS. WESTBY: So we're -- you know, we're

17 going to need to handle that in some way.

18         MR. THOMPSON: And I think for purposes of

19 making a clear record of that representation, what I'd

20 like to do with your stipulation is upon completion of

21 the depositions this week, enter into a stipulation to

22 that effect and file it with the Court.

23         MR. GOSMAN: That's fine.

24         All right.  Make sure there isn't anything

25 else that we need to address here before we start.


MATTHEW DANZER - October 4, 2010                    Page 6
Direct Examination by Mr. Gosman

1                  MATTHEW DANZER,

2  having been first duly sworn, testified as follows:

3               DIRECT EXAMINATION

4  BY MR. GOSMAN:

5      Q.  Mr. Danzer, what is your full name, please?

6      A.  Matthew Allen Danzer.

7      Q.  Okay.  And have you ever been given a

8  deposition before?

9      A.  No.

10     Q.  And do you understand how a deposition takes

11 place?

12     A.  I believe so.

13     Q.  You sat through the deposition of Tricia

14 Wachsmuth this morning?

15     A.  Yes.

16     Q.  Heard the format?

17     A.  Yes.

18     Q.  Okay.  I will ask you questions today, and

19 you will be required to answer them truthfully unless

20 you're instructed by your counsel not to answer the

21 questions, do you understand that?

22     A.  Yes.

23     Q.  The answers that you give today will be

24 recorded and can be used against you at trial, do you

25 understand that?


MATTHEW DANZER - October 4, 2010                    Page 7
Direct Examination by Mr. Gosman

1      A.  Yes.

2      Q.  It is important for you to ask for

3  clarification if you don't understand a question, okay?

4      A.  (Witness nods head.)

5      Q.  If you don't ask for clarification, I will

6  assume that you understood the question and that the

7  answer you gave was in response to the question that is

8  on the record.

9          So there is an opportunity there for

10 confusion unless you clear it up at the time, do you

11 understand that?

12     A.  Yes.

13     Q.  Please allow me to finish my question before

14 you begin your answer.  You probably saw earlier today

15 that that can create some problems?

16     A.  Yes.

17     Q.  If you wish to take a break at any time, we

18 will do so.  But not while a question is pending.

19         In other words, if there are any pending

20 questions, you'll be required to answer them before

21 going on a break, do you understand that?

22     A.  Yes.

23         MR. GOSMAN: Can we have the radio turned

24 off?

25         SERGEANT CHRETIEN: I'm on duty.


MATTHEW DANZER - October 4, 2010                    Page 8
Direct Examination by Mr. Gosman

1          MR. GOSMAN: Okay.

2          SERGEANT CHRETIEN: I got it as low as I --

3  actually, I can call her -- I'm Sergeant Chretien.

4          MR. GOSMAN: Sergeant Chretien.  Okay.  Very

5  good.

6          SERGEANT CHRETIEN: I can call her and tell

7  her to call me on my cell phone if she needs me, or I

8  can sit outside the door.

9          MR. GOSMAN: Okay.  Thank you very much.

10 Appreciate that.

11         MS. WESTBY: Not even outside the door, but

12 maybe just --

13 BY MR. GOSMAN:

14     Q.  Okay.  Officer Danzer, what is your current

15 address?

16     A.  615 South 16th Avenue, Bozeman, Montana.

17 That's where I work.

18     Q.  And with whom do you work currently?

19     A.  Bozeman Police Department.

20     Q.  When did you leave the Powell Police

21 Department?

22     A.  The beginning of September.

23     Q.  And just tell me briefly why you left and

24 what took you to Bozeman.

25     A.  I just recently got married.  And my wife and

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 43 of 92
Tricia Wachsmuth v.                                                                    Matthew Danzer
City of Powel, et al.                                                                  October 4, 2010

1   I -- she's from Bozeman. So we're moving to her place.
2   Q. And what is your rank with the Bozeman Police
3   Department?
4   A. A basic police officer. I'm on probationary
5   status right now because I just got hired on. So
6   probationary police officer.
7   Q. And what was your rank with the Powell Police
8   Department when you left?
9   A. I was a police officer, too.
10  Q. Who was in your chain of command?
11  A. Above me were sergeants. And then the chief.
12  Q. Okay. Sergeants who?
13  A. Sergeant Chretien, Sergeant Kent, and
14  Sergeant Eckerdt.
15  Q. Did you work in investigations?
16  A. Not specifically.
17  Q. You were a patrol officer?
18  A. Yes.
19  Q. And are you currently on any medication that
20  would impair your ability to give truthful answers here
21  today?
22  A. No.
23  Q. Do you have any medical problems or illnesses
24  that might interfere with your ability to give truthful
25  answers today?

1   Q. And that was where?
2   A. In Lewistown, Montana.
3   Q. Lewistown. Okay. All right. Go ahead.
4   A. And I graduated from that. And then I
5   attended the Pensacola Christian College.
6   Q. Okay.
7   A. And I graduated from there with a bachelor's
8   degree.
9   Q. In what field?
10  A. Criminal justice.
11  Q. And what year was that?
12  A. That was 2004.
13  Q. Describe your work history from -- well,
14  let's go back to high school, if you worked in high
15  school, and just tell me a little bit about your work
16  history.
17  A. In high school, I worked at a drive-up coffee
18  kiosk, served gourmet coffee.
19  Q. How long?
20  A. I'm not exactly sure. I believe it was
21  sometime -- I started sometime in my junior year and
22  worked there until I went off to college. But I'm not
23  sure.
24  Q. In college, where did you work?
25  A. I worked -- part of the time, I worked in --

1   A. No.
2   Q. Have you ever been arrested for a crime,
3   other than a traffic violation?
4   A. No.
5   Q. Ever been arrested for a crime involving
6   dishonesty?
7   A. No.
8   Q. You're married now?
9   A. Yes.
10  Q. Were you married in February of 2009?
11  A. No.
12  Q. Does your family live here?
13  A. No.
14  Q. Have you ever been divorced?
15  A. No.
16  Q. Have you ever had a restraining order placed
17  against you?
18  A. No.
19  Q. Have you ever been sued in civil court?
20  A. No.
21  Q. Let's start with your educational background,
22  Officer Danzer. Could you go ahead and start with high
23  school and tell me about your education?
24  A. I attended a home school program. I was
25  taught by my parents.

1   as a -- at the bookstore -- at the academy bookstore
2   for, I guess it would be -- they had an academy, which
3   is for high school, home high school. And I worked
4   there as part of the college program, though. And then
5   I worked as a floor leader. And then as an RA. And --
6   yeah.
7   Q. Okay. Have you done any -- did you do any
8   police work while you were in school? Work with police
9   officers in any kind of training programs or ride along
10  programs?
11  A. I rode with my dad. He was a police officer
12  a couple times.
13  Q. And that's in Lewistown?
14  A. Yes.
15  Q. Police officer in Lewistown?
16  A. Yes.
17  Q. All right. How long have you worked -- let's
18  see, you graduated from college in what year?
19  A. 2004.
20  Q. And your work history from there?
21  A. I -- I mean, I've had different jobs off and
22  on through college.
23  Q. Let's go ahead and move forward beyond
24  college.
25  A. Beyond college?

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 44 of 92
Tricia Wachsmuth v.                                                                    Matthew Danzer
City of Powel, et al.                                                                  October 4, 2010

MATTHEW DANZER - October 4, 2010                                            Page 13
Direct Examination by Mr. Gosman

1   Q.  Yes.
2   A.  Not long after I graduated from college, I
3   was hired on with Powell Police Department.
4   Q.  In other words, within a few months?
5   A.  I graduated in May, and I got hired at the
6   beginning of July.  So as long as it took me to apply.
7   Q.  And did you receive any increase in grade
8   during the period that you worked for the Powell Police
9   Department?
10  A.  Yes.
11  Q.  Okay.  Explain that.
12  A.  At different points, time, you were subject
13  to merit increases or step ra ses, depending on the
14  years you worked, the positions you've held, that kind
15  of thing.  So I've got raises based on those schedules.
16  Q.  Did you -- were you ever bypassed for a merit
17  raise for a scheduled promotion or raise?
18        In other words, if the city gave a merit
19  raise annually, were you ever bypassed for the merit
20  raise in a year?
21  A.  This July, the city did not have funding to
22  give anybody raises.  So I d d not get a raise.
23  Q.  No one at the Powell Police Department got a
24  raise this year?
25  A.  As far as I know, no.

MATTHEW DANZER - October 4, 2010                                            Page 14
Direct Examination by Mr. Gosman

1   Q.  As far as you know.
2        All right.  As a law enforcement officer, you
3   have certain training requirements, correct?
4   A.  Yes.
5   Q.  And you've been a law enforcement officer for
6   about five years; is that roughly the case?
7   A.  Just over six years.
8   Q.  Just over six years.  Okay.  And are there
9   annual education requiremer ts that are set by law in
10  Wyoming for peace officers?
11  A.  Yes.
12  Q.  How many hours are they?  How many hours per
13  year are you required to take?
14  A.  I'm not sure.  I'm not sure if it's per year
15  or if it's every couple or three years.
16  Q.  Okay.  Have you maintained those standards?
17  A.  Yes.
18  Q.  Have you ever had any claims filed against
19  you at the Powell Police Department, either with
20  internal affairs or any other means by which you would
21  have been made aware of them?
22  A.  What kind of claims?
23  Q.  Claims.  Claims for excessive force, claims
24  for mishandling of a official police matter.
25        MS. WESTBY: That's two different questions.

MATTHEW DANZER - October 4, 2010                                            Page 15
Direct Examination by Mr. Gosman

1        BY MR. GOSMAN:
2   Q.  Well, I'm talking about claims generally.
3   Under the general rubric of claims that would be filed
4   against you, whether it involves misconduct or
5   mishandling of, you know, official case or anything.
6        MR. THOMPSON: Objection.
7        MS. WESTBY: Yeah, it's too broad.  And we're
8   not -- I mean. you need to specify what it is that
9   you're asking for.
10       BY MR. GOSMAN:
11  Q.  Have you ever had any claims filed against
12  you with Internal Affairs?
13       MS. WESTBY: As to --
14       BY MR. GOSMAN:
15  Q.  While you were at Powell Police Department.
16       MS. WESTBY: -- something that relates to
17  this case?
18       MR. GOSMAN: No.
19       MS. WESTBY: You know, we're -- I'm not going
20  to let you get into general, you know, completely
21  unrelated issues.
22       If you want to ask if there's anything having
23  to do with excessive force, with, you know, execution
24  of a search warrant.  If you want to ask something
25  related to this case, go ahead and ask.  But I'm not --

MATTHEW DANZER - October 4, 2010                                            Page 16
Direct Examination by Mr. Gosman

1   I'm not just going to let this be a free-for-all about
2   what's in there.  If you want to ask about --
3        MR. GOSMAN: I heard you the first time.  I
4   believe that the protective order indicated that I was
5   entitled to the personnel file, including any claims
6   filed against the officers.  I don't have a single one.
7   I want to find out --
8        MS. WESTBY: No.  Actually, the protective
9   order talked about the -- talked about the internal
10  investigation issues, did not require us to produce
11  those.  Ordered us to produce the personnel file, the
12  discipline matters, disciplinary issues.
13       MR. THOMPSON: Promotion, demotion.
14       MS. WESTBY: And what else?  What was the
15  other?
16       MR. GOSMAN: Seems to me this is a
17  disciplinary.  When you get a complaint against you --
18       MS. WESTBY: Then you are more than welcome
19  to ask him about disciplinary matters in his personnel
20  file.
21       BY MR. GOSMAN:
22  Q.  Have you ever been under any kind of
23  investigation for a disciplinary matter?
24       MS. WESTBY: You're using investigation --
25  disciplinary matter, I'm assuming we're not talking

MATTHEW DANZER - October 4, 2010                    Page 17
Direct Examination by Mr. Gosman

1   about Internal Affairs investigations. You're talking
2   about disciplinary matters that are in his personnel
3   file, correct?
4          MR. GOSMAN: No, I'm not limiting it to his
5   personnel file. I want to know what's gone on in this
6   officer's career. What claims have been filed against
7   him, what disciplinary issues filed against him.
8   There's nothing in any of the personnel files.
9          MS. WESTBY: And we've sought a protective --
10  there's a protective order out there that specifically
11  allows you these three things out of their personnel
12  file. If you want to ask about his disciplinary issues
13  and his personnel file, then go ahead and do it. The
14  Court did not order us to turn over the Internal
15  Affairs investigations.
16         MR. GOSMAN: All right. We're going to have
17  to go off the record. I'm going to have to look at the
18  order.
19         THE COURT REPORTER: So are we off the
20  record?
21         MR. GOSMAN: Yes, we are.
22         (Discussion held off the
23         record.)
24         (Recess taken to call
25         Magistrate Beaman.)

MATTHEW DANZER - October 4, 2010                    Page 18
Direct Examination by Mr. Gosman

1          THE COURT: What I ll allow you to ask is:
2   Mr. Deponent or Ms. Deponen, have you ever received
3   any kind of disciplinary action during the last five
4   years which is not reflected in your personnel records?
5          MR. GOSMAN: That includes verbal reprimands
6   and discipline as well?
7          THE COURT: Correc .
8          MR. GOSMAN: Okay. Very good. Thank you,
9   Your Honor.
10         (Brief recess taken to
11         reassemble in jury room.)
12         THE COURT REPORTER: You want me to read
13  this?
14         MR. GOSMAN: I do.
15         (The record was read as
16         requested.)
17         THE WITNESS: No.
18  BY MR. GOSMAN:
19  Q.  All that for nothing. Maybe tomorrow. You
20  know, who knows? All righ .
21         (Exhibit 31 identified)
22  BY MR. GOSMAN:
23  Q.  Okay. Let's go ahead and take a look at
24  Exhibit 31, if we could for a moment, officer Danzer.
25  And those are training records. It's actually quite a

MATTHEW DANZER - October 4, 2010                    Page 19
Direct Examination by Mr. Gosman

1   collection there. And let's see where Officer Danzer
2   is. Yes, you're at the very tail end. The very last
3   page of Exhibit 31.
4          MS. WESTBY: What are the numbers?
5          THE WITNESS: Oh, here we are.
6   BY MR. GOSMAN:
7   Q.  Got it?
8   A.  Yes.
9          MR. GOSMAN: And for the record, the Bates
10  Number is 612.
11  BY MR. GOSMAN:
12  Q.  First of all, why don't you take a second and
13  describe what these records reflect or what they are.
14  A.  It says Wyoming P.O.S.T. Training Records.
15  Q.  And is this all of the training that you have
16  received as a law enforcement officer?
17  A.  This is the P-O-S-T approved training that I
18  have received.
19  Q.  All right. So what other -- you have
20  in-service training, I assume, and you have other kinds
21  of training that don't -- aren't P.O.S.T. approved?
22  A.  Yes.
23  Q.  Tell me about -- let's go ahead and talk
24  about those different kinds of training, other than
25  what's reflected in your post records or record?

MATTHEW DANZER - October 4, 2010                    Page 20
Direct Examination by Mr. Gosman

1   A.  There's -- can be a lot of different things.
2   Example could be firearms training, qualifications.
3   Q.  All right. Now, let me stop you there, sir
4   and ask you this question: When you undertake firearms
5   training, for instance, is it done in an in-service
6   setting where there's a log kept of those who attended,
7   the name of the instructor and the time and date that
8   the training occurred, that kind of information?
9   A.  I am not the person in charge of that. So I
10  can only guess to that answer.
11  Q.  All right. That's fine. I want you to take
12  another minute, then, and review this document of
13  your -- that contains your P.O.S.T. training. And let
14  me know what other kinds of training that you have
15  received as a law enforcement officer not reflected in
16  that official record?
17  A.  To clarify the question, are you talking
18  about P.O.S.T. approved?
19  Q.  No, if it were P.O.S.T. approved, I assume it
20  would be in the document that you were looking at?
21  A.  Yes, that's all that is.
22  Q.  Yes. So what other kinds of training have
23  you received?
24  A.  Firearms training.
25  Q.  Firearms training, okay. That's a category,

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 46 of 92
Tricia Wachsmuth v.                                                                    Matthew Danzer
City of Powel, et al.                                                                  October 4, 2010

1  and it's fine to go ahead and sort of generalize the
2  categories of training you received outside of your
3  P.O.S.T. formal coursework. You've named one.
4  Firearms.
5      A.  Yes.
6      Q.  Go ahead.
7      A.  Field training initially when I got hired.
8      Q.  When you talk about field training, you're
9  talking about general patrol work?
10     A.  The -- initially, what I was trained as an
11 officer here, I went through a field training program.
12     Q.  All right. Anything else?
13     A.  We have done Friday Trainings, what we call
14 "Friday Training."
15     Q.  Do you know if that's in-service training?
16     A.  Within our department.
17     Q.  Is it called in-service training?
18     A.  I'm not sure if we ever labeled it, other
19 than Friday Training.
20     Q.  It took place on Fridays, correct?
21     A.  Most often. That was the common day we
22 conducted training.
23     Q.  And you don't remember whether there was a
24 log or a book where you signed in or where any evidence
25 of the attendance was taken"

1      A.  When I was in charge of it, I wrote down who
2  was in attendance.
3      Q.  Okay. What did you do with that information?
4      A.  I turned it over to another officer who was
5  in charge of the Friday Trainings.
6      Q.  Okay. And what Friday Trainings were you in
7  charge of?
8      A.  What I can remember, it's mainly when we were
9  covering policies.
10     Q.  Okay. So it would have been a review of
11 policies and procedures of the Powell Police
12 Department?
13     A.  Yes.
14          (Exhibit 35 identified)
15 BY MR. GOSMAN:
16     Q.  Why don't you go ahead and turn to
17 Exhibit 36. And 36 isn't marked because I ran out of
18 tabs. Okay. We're going to call it 35. I appear to
19 have misnumbered it.
20          Okay. That document is entitled -- it's
21 stamped Exhibit 36, is it not, and it's entitled
22 "Friday Trainings," or is it 35?
23     A.  Says 35 up in the corner.
24     Q.  Okay. We'll use that number, 35. Could you
25 identify that document for me?

1      A.  It says "Powell Police Department 4th Quarter
2  2005, Patrol Friday Training."
3      Q.  Okay. Is that the Friday Training that you
4  referred to? Does that document reflect the type of
5  training that took place on Fridays?
6      A.  It appears so.
7      Q.  And I just want you to check, go through the
8  document, see if your name is there and let me know if
9  that in-service record is complete based on whether or
10 not your name appears in any of the training. And the
11 exhibit is about six pages long.
12     A.  Oh, so you want me to look through it?
13     Q.  Yes.
14          MS. WESTBY: This is also labeled 35, these
15 e-mails. Do you want him -- are these e-mails part of
16 it as well?
17          MR. GOSMAN: That's a misnumber. I'll have
18 to take care of that.
19          Yeah, just the Friday night trainings.
20          MR. THOMPSON: Are there Bates numbers we can
21 refer to so the record is clean?
22          MR. GOSMAN: Well, the record is clean
23 because the Exhibit is 35. And I'll change the other
24 exhibit, which hadn't been offered yet.
25          THE WITNESS: I've reviewed it.

1  BY MR. GOSMAN:
2      Q.  Okay. And first, let's back up for just a
3  second. Do you remember actually participating in
4  these Friday night trainings as an instructor?
5      A.  In some of them.
6      Q.  Okay. And are any of those training sessions
7  reflected in the record I've shown you in Exhibit 36 --
8  35? I'm sorry.
9      A.  That I was an instructor, is that your
10 question?
11     Q.  Or that the training occurred. I don't care
12 if it lists you as an instructor, just whether or not
13 the training occurred?
14     A.  It looks like these are lists of training
15 that took place. That's what it appears to be records
16 of.
17     Q.  And as far as you know, were there any Friday
18 night trainings that took place that aren't reflected
19 in those records? And I realize this is covering a
20 fairly long period of time. So your answer doesn't
21 have to be 100 percent accurate. But is there anything
22 that should have been in there that has taken place in
23 an in-service setting that's not in those records?
24     A.  Not that I can think of.
25     Q.  Officer, do you have any training in the area

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 47 of 92
Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

1 of dynamic entry?
2    A.  Define dynamic entry.
3    Q.  Dynamic entry is an entry that is
4 accomplished with an element of surprise using a team
5 of law enforcement officers, a superior show of force,
6 and it involves quick entry into a premises, oftentimes
7 through barricaded premises.  And it's dynamic in the
8 sense it involves a tactical team of police officers.
9       MS. WESTBY: I'm going to have to object as
10 to form.
11     Go ahead and answer if you can.
12       THE WITNESS: Parts of those things, I'm not
13 sure that it necessarily would be all-inclusive every
14 time.  But, we trained in building and room entry.
15 Those kinds of things.
16 BY MR. GOSMAN:
17    Q.  Okay.  When you say we trained in those
18 settings, who is we?  Let's start there.
19    A.  The officers of the Powell Police Department.
20    Q.  And so what would you do?
21    A.  And also any other agency that might have
22 been participating with us, whether the sheriff's
23 department --
24    Q.  Were there times when the sheriff's
25 department participated with the Powell Police

1 Department in practices involving dynamic entry teams?
2    A.  Yes.
3    Q.  Okay.  And do you have any idea how many
4 times that has occurred in the last five years, or
5 since you've been a police officer with the Powell
6 Police Department?
7    A.  A couple times that I can think of.
8    Q.  Okay.  Twice?  All right.
9    A.  At least twice.
10    Q.  All right.  Who all was involved in those
11 training sessions?
12    A.  Members of the Powell Police Department and
13 some of the members of the Park County Sheriff's
14 Office, and possibly officers with the Cody Police
15 Department.
16    Q.  List the officers of the Powell Police
17 Department that were involved that you remember.
18    A.  Chief Feathers, Officer Matt Brilakis.
19      Now, this isn't necessarily attended both
20 trainings I can think of.  There's past training.  I'm
21 trying to think of people who have been in past
22 training in these kinds of things.  Not their number of
23 attendances they've made.
24    Q.  Okay.  Fine.
25    A.  Officer Cody Bradley, Investigator Brown,

1    Officer Brett Lara, Sergeant Chretien, officer Chad
2 Glick, Officer Lee Blackmore, Officer Chad Miner,
3 Sergeant Eckerdt, Officer Kevin Schmidt.  Officer Paul
4 Sapp, Sergeant Kent, Sergeant -- Officer Matt McCaslin,
5 Officer Mike Hall, Officer Kirk Chapman.
6    Q.  Is there anybody that didn't show up for
7 these things?
8    A.  I'm sure it was mandatory.
9    Q.  Okay.  Was it documented anywhere?
10      MR. THOMPSON: Objection as to form.
11     Go ahead.
12 BY MR. GOSMAN:
13    Q.  Was the training documented?
14    A.  I didn't document.  So if there was
15 documenting taking place, it wasn't me.
16    Q.  Would it have been in-service type training?
17    A.  Some of them -- a couple of instances I
18 believe were P.O.S.T. approved as well.
19    Q.  Okay.  Are they reflected on your P.O.S.T.
20 records?  That's the last page of Exhibit 35.
21    A.  Of 35?
22    Q.  Yes.  Whoops, we got two 35s unfortunately.
23    A.  I think it was 31.
24    Q.  I'm sorry.  You're right.  It is 31.  Excuse
25 me.

1    A.  Yes.
2    Q.  Okay.  Where?
3    A.  Patrol tactical response.
4    Q.  Okay.  Where was that held?
5    A.  In Powell.
6    Q.  And who was the instructor?
7    A.  Doug Pechtel.
8    Q.  And that was a 50-hour course?
9    A.  Yes.
10    Q.  And that involved joint exercises with the
11 Powell -- with Park County Sheriff's Department?
12    A.  Yes.
13    Q.  And was there anything else then on your
14 P.O.S.T. records?
15    A.  Looks like there's a couple other.
16    Q.  Okay.  Go ahead.
17    A.  Patrol response to active shooter.
18    Q.  And what does that have to do with dynamic
19 entry or did it?  I mean, did you actually study the
20 dynamic entry situation where multiple officers were
21 involved in the breach of a home in that course?
22    A.  Not specifically as you described.
23    Q.  Okay.  What did that course involve?
24    A.  An active shooter, someone who is in the
25 process of shooting people, responding to that threat.

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 48 of 92
Tricia Wachsmuth v.                                              **Matthew Danzer**
City of Powel, et al.                                            **October 4, 2010**

MATTHEW DANZER - October 4, 2010                    Page 29
Direct Examination by Mr. Gosman

1   Q. Okay.
2   A. And wherever they are located at.
3   Q. Okay. And one of the primary principles of
4   that type of tactical training for a patrol officer is
5   the understanding that this is a first responder's
6   situation, and it is not intended as a substitute for a
7   trained SWAT team, isn't that true?
8           MS. WESTBY: Object to the form of the
9   question.
10  BY MR. GOSMAN:
11  Q. Do you know that?
12  A. It's designed for whoever is available is
13  going to go over there if somebody is shooting people.
14  Q. Exactly.
15  A. Whether they are SWAT trained or other.
16  Q. All right. And the last of the courses
17  there?
18  A. Immediate action for patrol.
19  Q. Okay. And isn't it also true that in the
20  literature, the coursework that's -- the literature
21  that's supplied with that course, that it's also made
22  clear that immediate action for patrol is not intended
23  as a substitute for a trained SWAT team?
24          MS. WESTBY: Again, object to form.
25          Go ahead.

MATTHEW DANZER - October 4, 2010                    Page 30
Direct Examination by Mr. Gosman

1           THE WITNESS: I would have to look, I guess,
2   at the materials.
3   BY MR. GOSMAN:
4   Q. Okay.
5   A. I can't answer that question.
6           (Exhibit 28 identified)
7   BY MR. GOSMAN:
8   Q. Let's go ahead and take a look at -- let's
9   see -- Exhibit -- let's see. Let's look at Exhibit 28.
10  I believe those -- that is the Immediate Action for
11  Patrol handbook. It is issued by Countermeasures
12  Tactical Institute.
13          While you're looking, and I'll help you try
14  to find some of this stuff. But who was your
15  instructor for that class, do you remember?
16  A. Doug Pechtel.
17  Q. Okay. Let's take a look at IA for Patrol
18  Fundamentals. And this is -- it's Page 6 of the
19  manual, and you'll see here under these fundamentals,
20  a bulleted list. The primary objective is to save
21  human lives, and patrol officers are combining
22  immediate resources to interdict and resolve
23  in-progress calls where there are no other options
24  readily available; do you see that?
25  A. Yes.

MATTHEW DANZER - October 4, 2010                    Page 31
Direct Examination by Mr. Gosman

1   Q. And you understand that you're not trained as
2   a patrol officer to function in a SWAT setting?
3           MS. WESTBY: Object.
4   BY MR. GOSMAN:
5   Q. Special Weapons and Tactics team approach?
6           MS. WESTBY: Object to the form of the
7   question.
8           MR. THOMPSON: Join.
9   BY MR. GOSMAN:
10  Q. Isn't that true?
11  A. Not necessarily.
12  Q. So you feel you're fully capable to function
13  in a SWAT team?
14          MS. WESTBY: Object to the form of the
15  question.
16          THE WITNESS: No.
17  BY MR. GOSMAN:
18  Q. So what is the difference, then, officer?
19  Let's try to resolve this. Because I think what you've
20  told me is it's not necessarily the case that patrol
21  officers are not prepared to act in a SWAT setting as a
22  SWAT team.
23          And I want you to explain to me -- there are
24  circumstances, of course, where you may be forced to
25  function in such a setting. But you're not saying that

MATTHEW DANZER - October 4, 2010                    Page 32
Direct Examination by Mr. Gosman

1   you're trained as a Special Weapons and Tactical team
2   member in a SWAT setting, correct?
3           MS. WESTBY: Object to the form of the
4   question.
5           MR. THOMPSON: Join.
6           MS. WESTBY: Go ahead and answer if you can.
7           THE WITNESS: We don't have a title of that.
8   There's no team in the Powell Police Department that's
9   called Special Weapons and Tactics.
10  BY MR. GOSMAN:
11  Q. So the Powell Police Department does not have
12  a SWAT team, correct?
13  A. Correct.
14  Q. Okay. Does the Powell Police Department have
15  a special operations unit?
16          MS. WESTBY: Object to the form of the
17  question.
18  BY MR. GOSMAN:
19  Q. Or, did it while you were there?
20  A. Special operations unit, what do you mean by
21  a special operations unit?
22  Q. I mean a unit that is specifically designed
23  and trained to handle a dynamic entry, a tactical
24  response situations. When I say tactical response, I
25  mean situations involving police tactics as opposed to

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 49 of 92
Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                  October 4, 2010

1  patrol-type interdiction.
2       MS. WESTBY: Object to the form of the
3  question.
4       MR. THOMPSON: Join.
5       THE WITNESS: We are trained to handle a lot
6  of different situations.
7  BY MR. GOSMAN:
8  Q. Okay. All right. How many dynamic entries
9  have you done, Officer McCaslin?
10  A. I'm not officer McCaslin.
11  Q. I'm sorry. You are Officer Danzer.
12  A. Again, that's a title that ...
13  Q. Okay. How many times have you assembled with
14  a team and broken down the door of a home and entered
15  the house with weapons, automatic weapons, and deployed
16  a flashbang device before February 24th of 2009?
17  A. I have never done those things that you have
18  described in a single instance.
19  Q. Do you feel like you needed to have some
20  training to do those things or you could just jump into
21  a situation like that and be fully functional?
22       MR. THOMPSON: Objection as to form.
23       MS. WESTBY: Join. Go ahead.
24       THE WITNESS: We were trained in different
25  elements involving those things.

1  BY MR. GOSMAN:
2  Q. Okay. What were you specifically trained in?
3  A. I was trained in how to enter buildings.
4  Q. Were you trained to use a ram?
5  A. Yes.
6       MR. THOMPSON: Counsel, you're not letting
7  the witness answer the question.
8  BY MR. GOSMAN:
9  Q. Go ahead. I'm sorry. I do apologize for
10  that.
11       You were trained to enter buildings?
12  A. Yes.
13  Q. Okay. What else?
14  A. We were trained in how to clear rooms. We
15  were trained in flashbang deployment.
16  Q. Where did you receive that training?
17  A. With the two programs that Doug Pechtel put
18  on. He covered --
19  Q. He covered it in the materials?
20  A. Yes, he did.
21  Q. And did you deploy a flashbang in his course?
22  A. Yes, I did.
23  Q. And what did you do? Did you stand out in a
24  field and toss a flashbang? Was it in a house? What
25  was the setting?

1  A. We were -- there was a house involved. There
2  was -- it was a response to somebody exiting the house
3  was one instance I used. And it might have been
4  another instance where we were trained in deploying.
5       In fact, we trained in -- when we entered
6  rooms deploying flashbangs.
7  Q. Okay. And how many flashbangs have you
8  deployed then? And I assume this is in connection with
9  your training with Countermeasures Tactical Institute,
10  correct?
11  A. Yes.
12  Q. All right. How many?
13  A. Are you talking -- I can think of at least
14  one instance where there was a live flashbang. And we
15  practiced using flashbangs pretty much throughout the
16  training. A lot of times, you could not deploy one
17  inside a building somebody was letting us use. So we
18  would have to throw a blank body of a flashbang. But
19  we trained in those deployments.
20  Q. All right. And this was all part of this
21  50-hour course that you took?
22  A. Those two courses.
23  Q. And the other one being, I'm sorry?
24  A. I'm not sure of the exact title. I can look
25  back.

1  Q. Immediate Action for Patrol?
2  A. Yes.
3  Q. Okay. And you took that in 11 -- that would
4  have been November of 2009. So that was actually a few
5  months after the Wachsmuth warrant was served, correct?
6  A. The second one would have been after, that's
7  correct.
8  Q. Okay. So prior to February 24, 2009, your
9  entire experience with regard to flashbangs had been
10  limited to coursework you took in October of 2005 in a
11  course called "Patrol Tactical Response"; is that
12  correct?
13  A. Yes.
14       MS. WESTBY: Object to the form of the
15  question.
16  BY MR. GOSMAN:
17  Q. And did you have any occasion to use any of
18  that information and training that you acquired during
19  that training program in October of 2005 afterward,
20  prior to the 24th of February of 2009?
21  A. Yes.
22  Q. All right. Tell me about it, Officer. What
23  happened that resulted in you employing entry tactics
24  or room clearing tactics and so on.
25  A. Repeat the first question, then. I'm

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 50 of 92
Tricia Wachsmuth v.                                                    **Matthew Danzer**
City of Powel, et al.                                                  **October 4, 2010**

MATTHEW DANZER - October 4, 2010                                 Page 37
Direct Examination by Mr. Gosman

1  confused, I guess.
2    Q.  Okay.  Following your coursework in October
3  of 2005, did you ever have the opportunity to use that
4  expertise in any official police operation prior to the
5  24th of February 2009?
6    A.  Yes.
7    Q.  When?  And tell me about it, I want to know
8  about those circumstances.
9    A.  I can think of an instance when we responded
10  to someone who had fired a weapon in a trailer.
11    Q.  Okay.
12    A.  Who -- we had been told was suicidal.  I
13  don't remember all the details.  But we -- it was a
14  response that required a lot of officers and we
15  employed tactics that we learned at that course.
16    Q.  Okay.
17    A.  That was the main instance that sticks out in
18  my mind.  If there are others, it's not jumping to me
19  right now.
20    Q.  Okay.  Did they all involve cases where
21  someone was considered armed and dangerous?
22    MS. WESTBY: Object to the form of the
23  question.
24    THE WITNESS: Again, I cannot think of every
25  instance. We never leave that potential out there that

MATTHEW DANZER - October 4, 2010                                 Page 39
Direct Examination by Mr. Gosman

1    THE WITNESS: In the way you put that, I
2  cannot think of an instance in that case.
3    BY MR. GOSMAN:
4    Q.  All right.  You mentioned a situation a
5  moment ago where an individual was -- was he barricaded
6  in his trailer house, this individual that -- where the
7  Powell Police Department was called upon to enter the
8  home?
9    A.  He came outside.  So ...
10    Q.  So you didn't have to knock the door down?
11    A.  No.
12    Q.  You didn't have to enter the house and clear
13  the rooms?
14    A.  No.
15    Q.  All right.  So when have you done that prior
16  to February 24th, 2009?
17    And by the way, I don't care if you haven't
18  done it.  I just want you to be truthful with me and
19  we'll get on to the next question.
20    MS. WESTBY: Object to the form of the
21  question.
22    THE WITNESS: How you just posed it, I can't
23  think of a time where I have.
24    BY MR. GOSMAN:
25    Q.  Okay.  Have you ever been involved with the

MATTHEW DANZER - October 4, 2010                                 Page 38
Direct Examination by Mr. Gosman

1  somebody is armed.  So that --
2    BY MR. GOSMAN:
3    Q.  Well, you don't always use a SWAT-type entry
4  to go into a residence either.  So we understand that
5  people may be armed.  But I'm talking about a response
6  that actually involved a tactical unit where these
7  tactics were employed.
8    And I'm asking you if in fact, they were
9  limited to situations where persons were armed and
10  considered dangerous, in your experience with the
11  Powell Police Department.
12    MS. WESTBY: Object to the form of the
13  question.
14    MR. THOMPSON: Join.
15    THE WITNESS: Again, there's no way of -- I
16  could remember every possible situation.
17    BY MR. GOSMAN:
18    Q.  Well, I'm only asking you to remember those
19  that have to do with what I've called a dynamic entry,
20  where the door was broken down and officers stormed the
21  residence and flashbang devices were used and those
22  kinds of things.
23    MR. THOMPSON: Objection as to form.  Asked
24  and answered.
25    MS. WESTBY: Join.

MATTHEW DANZER - October 4, 2010                                 Page 40
Direct Examination by Mr. Gosman

1  Powell Police Department in the detonation of a
2  flashbang in an official police operation?
3    MS. WESTBY: Object to the form of the
4  question.
5    BY MR. GOSMAN:
6    Q.  Other than the one that occurred on the
7  24th of February 2009.
8    A.  What do you mean by official police action?
9    Q.  Well, I'm talking about serving a warrant,
10  taking care of a hostage situation, or some situation
11  that involved a dynamic entry that used a flashbang
12  device as a police officer?
13    A.  Outside of training?
14    Q.  Yes.
15    A.  No.
16    Q.  All right.  And outside of the -- and I think
17  you've answered this question, and this is going to
18  happen from time to time.
19    But you've never used a flashbang other than
20  what you did, if you will, at the Countermeasures
21  Tactical Institute training in October of 2005?
22    MS. WESTBY: Object to the form of the
23  question.
24    THE WITNESS: Now, when I was telling you
25  about a training, I lumped those two together because

MATTHEW DANZER - October 4, 2010                                    Page 41
Direct Examination by Mr. Gosman

1  they covered basically the same course, the material.
2  BY MR. GOSMAN:
3  Q.  Right.
4  A.  So my recollections of using the -- or of
5  deploying a flashbang, it happened in those two.
6  Q.  Okay.  That's the only time you've done it?
7  A.  Correct.
8  Q.  All right.  So I had a question a minute ago,
9  and that was: Does the Powell Police Department have a
10  special operations unit, a unit that's specially
11  trained to conduct dynamic entry, as far as you know?
12  And I realize you're a patrol officer here.  So ...
13  A.  There's nothing with a title.
14  Q.  All right.  And does the Powell Police --
15  since October of 2005, when you got together for the
16  course, has the Powell Police Department, to your
17  knowledge, engaged in practice exercises involving a
18  tactical unit and performing dynamic entry where the
19  officers rush into the residence, a ram may or may not
20  be used, flashbang devices may or may not be used,
21  automatic weapons are generally involved?
22       MS. WESTBY: Object to the form of the
23  question.
24  BY MR. GOSMAN:
25  Q.  Have you ever been involved in any kind of

MATTHEW DANZER - October 4, 2010                                    Page 42
Direct Examination by Mr. Gosman

1  training operation like that?
2  A.  At any time?
3       MS. WESTBY: Same objection.
4  BY MR. GOSMAN:
5  Q.  Well, prior to February 24th on 19 -- of
6  2009.
7       MR. THOMPSON: I'd join in the objection.
8       THE WITNESS: We have -- we conduct training
9  all the time in some or all of those things.
10  BY MR. GOSMAN:
11  Q.  Some or all of those things?
12  A.  The things that you mentioned.
13  Q.  And I did mention flashbangs.  Apparently --
14  I mean, you haven't deployed flashbangs except in the
15  context of your training, you coursework with the
16  Countermeasures Tactical Institute?
17       MS. WESTBY: Object to the form.
18  BY MR. GOSMAN:
19  Q.  Let me carry on.  What do you mean by "all of
20  those things"?
21  A.  All of the things that you mentioned in your
22  question.
23  Q.  Why don't you take just a minute, then,
24  Officer, and tell me what kinds of training exercises
25  you're talking about?  And what was conducted, who was

MATTHEW DANZER - October 4, 2010                                    Page 43
Direct Examination by Mr. Gosman

1  involved, whether it was -- whether there was a record
2  kept of the training, those kinds of thing.  Go ahead.
3       MS. WESTBY: Object to the form of the
4  question.
5       MR. GOSMAN: I'm asking for a narrative.
6       MS. WESTBY: Answer it if you can, if you
7  know what he's asking.
8       MR. THOMPSON: Join.
9       THE WITNESS: We conduct training in room
10  entry, in building entry and response to active
11  shooters, in response to barricade gunmen, in response
12  to hostage rescue, in response to warrant service, in
13  many different areas.
14  BY MR. GOSMAN:
15  Q.  When do you do this training?
16  A.  I believe some of them took place on Fridays.
17  Q.  So they would be part of that in-service
18  record that we've looked at as an exhibit --
19       MR. THOMPSON: Objection as to form.
20  BY MR. GOSMAN:
21  Q.  -- what is that -- 35?
22       And your answer, sir?  I didn't catch the
23  answer.
24  A.  What was the question?
25  Q.  You said Friday Trainings, you believe some

MATTHEW DANZER - October 4, 2010                                    Page 44
Direct Examination by Mr. Gosman

1  of these operations were conducted in your Friday
2  Trainings, correct?
3  A.  From what I can remember, they were done on
4  Fridays.  That was kind of our training time set aside.
5  They could have been done on different days.  I guess
6  my point is we do periodic training.  And in those
7  areas as well.
8  Q.  All right.  Have you ever conducted a
9  training involving room entry, building entry, and a
10  hostage situation, other than on a Friday night
11  training or in the context of your coursework that's
12  listed on your P.O.S.T. training records?
13       MS. WESTBY: Object to the form of the
14  question.
15       THE WITNESS: It's possible we covered
16  something in the field training and things that might
17  not have been necessarily documented.
18  BY MR. GOSMAN:
19  Q.  And I can appreciate that it's possible.  But
20  I assume by your saying that, that in fact, the
21  training that you're talking about generally occurred
22  either in the context of your P.O.S.T. training
23  coursework or in your Friday night in-service training
24  sessions or Friday in-service training sessions?  I
25  don't know whether it was Friday night or not.  Is that

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 52 of 92
Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                 October 4, 2010

1 right?

2 A. That's when we conducted a majority of it.

3 Q. All right. So when you would conduct this

4 training, Officer Danzer, what role would you play?

5 Did you play the same -- I'll let you answer that

6 question. I'm sorry.

7 MS. WESTBY: And I'm sorry. Are we talking

8 about -- are you talking about a specific training, or

9 are you generally talking about the Friday Trainings?

10 MR. GOSMAN: No, I'm talking about room

11 entry, building entry, overwhelming show of force,

12 automatic weapons, tactical gear, that kind of thing.

13 MS. WESTBY: Okay. And just because I think

14 I should tell you why I'm objecting, it's just so

15 compound. You are including so many different things

16 in there. That's my objection.

17 MR. GOSMAN: Okay.

18 MS. WESTBY: And I'm just letting you know.

19 MR. GOSMAN: Thank you.

20 BY MR. GOSMAN:

21 Q. And I'm going to let the witness know that

22 I'm talking about those kinds of entries that I called

23 dynamic entry or SWAT-type entry, which most of the

24 rest of the industry knows, and is aware of in terms of

25 how they are defined.

1 Since we don't have an agreement on that

2 here, I'm breaking it down into separate elements, such

3 as overwhelming show of force, element of surprise,

4 multiple officers, tactical weapons, and, you know,

5 battering rams, room clearing, flashbang devices, all

6 of those things are part of a dynamic situational

7 response. And I want you to know -- I want you to tell

8 me what role you played in the trainings when you

9 trained as a group to do this work?

10 MR. THOMPSON: Object as to form.

11 MS. WESTBY: Object.

12 THE WITNESS: Role as -- I went through the

13 different -- all different parts of entering a room or

14 whatever type of training you were talking about.

15 Say we're covering a room entry. My role was

16 to be trained and cover all different areas that

17 involved that.

18 BY MR. GOSMAN:

19 Q. The room entry?

20 A. Room entry is one example. Clearing a room,

21 team entry into a room. In that case, I would have

22 been a team member entering the room. So we just --

23 whatever the instructor or who was conducting the

24 training was trying to train, I was instructed in those

25 things.

1 Q. Okay. So in other words, you weren't

2 instructed as a team, and you didn't practice as a

3 team, you simply took course instruction and were --

4 and reviewed different practices, such as room entry?

5 MR. THOMPSON: Object as to form.

6 MS. WESTBY: Yeah, join.

7 THE WITNESS: No.

8 BY MR. GOSMAN:

9 Q. Well, go ahead and clear it up for me.

10 A. We would practice as a team.

11 Q. Okay.

12 A. I would define team as the officers there.

13 Q. Okay.

14 A. For instance, if we were practicing a room

15 entry, and we had a team of officers, the team would

16 enter. So we'd work together as a team.

17 Q. All right. So we've talked about room

18 entering, and I assume this took place on Friday nights or

19 Fridays, the Friday Training, correct?

20 A. Whenever -- if it was on a Friday, if we had

21 to reschedule it for a different day, yes.

22 Q. So was it either on a Friday or it had to be

23 rescheduled to a different day?

24 A. We called it Friday Training because that was

25 typically when we did it. I can't say if -- memory,

1 you know, if it happened a different day, specific day

2 or not.

3 Q. All right. All right. And so you mentioned

4 that there were different officers that were present

5 from time to time?

6 A. Yes.

7 Q. And so there really was no team that was

8 provided training on a regular basis to perform these

9 different functions?

10 MS. WESTBY: Object to the form of the

11 question.

12 MR. THOMPSON: Join.

13 THE WITNESS: What's your definition of a

14 team.

15 BY MR. GOSMAN:

16 Q. I mean, a group that trains regularly and

17 together where each individual member has specific

18 assignments in the performance of the team activity.

19 A. In that definition, I would say we were

20 acting as a team then.

21 Q. So you did this with the same officers over

22 and over again?

23 A. Yes, everyone in the department.

24 Q. Okay. And, of course, this is the kind of

25 training that would normally be documented?

Case 1:10-cv-00041-ABJ Document 65-12 Filed 01/10/11 Page 53 of 92
Tricia Wachsmuth v.
City of Powel, et al.
Matthew Danzer
October 4, 2010

MATTHEW DANZER - October 4, 2010      Page 49
Direct Examination by Mr. Gosman

1   A. I don't believe it -- I didn't document it,
2   but --
3   Q. Somebody did?
4   A. -- it's possible. I can't speak to that,
5   but ...
6   Q. All right. So you've cone room -- we've
7   talked about room entry, and apparently you did that
8   from time to time. What else did you do in these
9   Friday sessions, these training sessions?
10   A. Building entries.
11   Q. Okay. How many times did you practice that?
12   A. I have no way of putting a number to that.
13   Q. Well, was it more than once?
14   A. Yes.
15   Q. All right. Was it more than twice?
16   A. Yes.
17   Q. All right. Did you practice -- do you
18   have -- for instance, on the night of the 24th of
19   February 2009, what kind of gear were you wearing,
20   Officer Danzer? Did you have on a tactical uniform?
21       MS. WESTBY: Object to the form of the
22   question.
23       THE WITNESS: I was wearing my uniform, my
24   patrol uniform. I was also wearing a vest that carried
25   a ceramic plate, which offered additional protection to

MATTHEW DANZER - October 4, 2010      Page 50
Direct Examination by Mr. Gosman

1   me.
2   BY MR. GOSMAN:
3   Q. Uh-huh.
4   A. More than my personal vest would. On that
5   vest, we had additional equipment or pouches on it.
6   Q. What was the additional equipment?
7   A. We had extra ammunition, medical pouch. And
8   I had -- let's see, what did I have on? I think I had
9   a pouch that had, like, some snacks and water in it. I
10   believe that's ...
11   Q. What weapon were you carrying?
12   A. I was carrying H&K MP5.
13   Q. H&K MP5?
14   A. Yes.
15   Q. Okay. What is that?
16   A. It is a weapon that shoots a 9mm round.
17   Q. Is it a rifle?
18   A. A 9mm is a pistol round.
19   Q. Okay.
20   A. But it's a longer weapon.
21   Q. Okay. Is it fully automatic?
22   A. No.
23   Q. Semiautomatic?
24   A. Yes.
25   Q. Do you normally carry that weapon in your

MATTHEW DANZER - October 4, 2010      Page 51
Direct Examination by Mr. Gosman

1   patrol duties?
2   A. At that time, no.
3   Q. Did there come a time when you carried that
4   weapon normally in your patrol car?
5   A. Yes.
6   Q. All right. On that night, you were -- you
7   were dressed a certain way. Had you ever practiced --
8   did you ever put on that garb before and met with the
9   officers and conducted building entry and room
10   clearance?
11   A. Yes.
12   Q. Okay. More than once?
13   A. Yes.
14   Q. Who was the team leader? Did you have a team
15   leader?
16   A. I believe Sergeant Chretien was in charge of
17   the tactical considerations.
18   Q. Okay. And when you say "in charge of
19   tactical considerations," I understand that, at least
20   as far as you know, there hadn't been any tactical team
21   used prior to the 24th of February in the time that you
22   had been with the Powell Police Department, except for
23   the instance involving the trailer?
24       MR. THOMPSON: Objection as to form.
25       MS. WESTBY: Join.

MATTHEW DANZER - October 4, 2010      Page 52
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2   Q. Go ahead.
3   A. I was speaking to my instances when I'm on
4   duty or I am called in to work.
5   Q. Okay.
6   A. And in reference to your question of being --
7   us entering a building or a structure of some type.
8   Q. Yes. Okay. When did you first learn that
9   you would be doing a dynamic entry of the Wachsmuth
10   home on the 24th of February?
11   A. I'm not -- I'm not sure I learned that. I
12   guess I'm confused by your question.
13   Q. Okay. Well, it could have something to do
14   with what we talked about in terms of dynamic entry.
15   When did you learn that the Wachsmuth search warrant
16   was going to be served by a team of officers that would
17   involve a flashbang, automatic weapons, and --
18   actually, were there any automatic weapons used that
19   night?
20   A. Not that I knew about.
21   Q. Okay. So they were semiautomatic weapons?
22   A. I believe they all are.
23   Q. Okay. That it would involve a team of
24   officers, breaching of the door, use of a flashbang,
25   and entry by a team of -- a team using semiautomatic

MATTHEW DANZER - October 4, 2010                                    Page 53
Direct Examination by Mr. Gosman

1  weapons, rifles --
2        MR. THOMPSON: Objection as to form.
3  BY MR. GOSMAN:
4     Q.  -- as opposed to just service pistols?
5        MR. THOMPSON: Same objections.
6        THE WITNESS: When did I learn about that?
7  BY MR. GOSMAN:
8     Q.  Yes.
9     A.  Those are options discussed during planning
10 of the execution of the search warrant.
11    Q.  Okay. How did you first find out that -- how
12 were you contacted about this warrant?
13    A.  I was called in while I was off duty.
14    Q.  Okay. You were at home, correct?
15    A.  I have no idea where I was at.
16    Q.  Okay. What did they say? What were you
17 told?
18    A.  I don't know exact -- what was exactly told
19 me.
20    Q.  Okay. And what did you do? You got a call,
21 and you said -- and someone, I assume, told you to come
22 down to the police station, they would like to have you
23 help serve a warrant?
24    A.  Yes.
25    Q.  Is that what happened?

MATTHEW DANZER - October 4, 2010                                    Page 54
Direct Examination by Mr. Gosman

1     A.  Yes.
2     Q.  Okay. And about what time was that?
3     A.  Did I receive the call?
4     Q.  If you remember.
5     A.  I don't remember.
6     Q.  Okay. Was it after dark?
7     A.  I believe it was still light outside.
8     Q.  Okay. And so you went to the police
9  department?
10    A.  Yes.
11    Q.  Who was there? In the group that you were
12 talking to about this situation?
13    A.  Who was -- I'm asking for a clarification, I
14 guess. Who was present when I got there?
15    Q.  Yes.
16    A.  Or, who was present that night, whether they
17 came there or later.
18    Q.  No. Who was present when you got there?
19    A.  I don't remember who exactly was there.
20    Q.  Do you remember anybody being there when you
21 arrived?
22    A.  The officers on duty. I know they were
23 there. I guess I shouldn't say I know they were there.
24 I know who was there. I don't know what time they
25 arrived, and who was where at what time.

MATTHEW DANZER - October 4, 2010                                    Page 55
Direct Examination by Mr. Gosman

1     Q.  I'm going to back up for just a second and
2  ask you this: Did you ever have any SWAT training?
3        MS. WESTBY: Object to the form of the
4  question.
5  BY MR. GOSMAN:
6     Q.  Do you know what SWAT -- as a patrol officer,
7  are you familiar with what SWAT stands for, what it
8  means?
9     A.  Yes.
10    Q.  Okay. Have you ever had any SWAT training?
11       MS. WESTBY: Object to the form.
12       Go ahead.
13       THE WITNESS: Yes, but not with that title.
14 BY MR. GOSMAN:
15    Q.  Okay. What was the title?
16    A.  Parole Tactical Response was one.
17    Q.  Okay.
18    A.  And Patrol Active Response Shooter was
19 another.
20            (Exhibit 37 identified)
21    Q.  Have you ever seen the Powell Police Crisis
22 Response Tactics document?
23    A.  I don't know.
24    Q.  Okay. And I don't know that we've got it

MATTHEW DANZER - October 4, 2010                                    Page 56
Direct Examination by Mr. Gosman

1  listed as an exhibit at this time.
2        I'm going to read you something from this
3  document, and I'm going to ask you to comment on it.
4  This is a document that was produced by the City of
5  Powell. This is apparently their Tactical Response
6  Program. And it indicates on the document that it is
7  identified as Bates-stamp 116, Defendant's 116.
8        "It would take a fully trained SWAT or
9  hostage rescue team to deal with many of these types of
10 critical incidents. As an agency, we cannot justify a
11 SWAT team by these types of activity being commonly
12 present here, and a SWAT team requires a great deal of
13 training or time" -- "great deal of training and time."
14       Do you understand what that paragraph is
15 referring to?
16    A.  Possibly.
17    Q.  Okay. Go ahead and give me your best
18 estimate of what it means.
19       MS. WESTBY: Object to the form.
20       THE WITNESS: A SWAT team requires lots of
21 training and probably time and an investment.
22 BY MR. GOSMAN:
23    Q.  Okay. It probably requires a lot of training
24 or time? I mean, if you don't know, that's fine.
25       Does it require -- do you know whether it

MATTHEW DANZER - October 4, 2010                    Page 57
Direct Examination by Mr. Gosman

1    requires a lot of training and time? Do you know the
2    difference between a SWAT team and just getting a bunch
3    of guys together and breaking down a door?
4         MS. WESTBY: Object to form.
5         MR. THOMPSON: Object to form.
6    Argumentative. Asked and answered.
7         THE WITNESS: I mean, how you phrase it that
8    way -- I know what a SWAT team is.
9    BY MR. GOSMAN:
10   Q.   You know what a SWAT team is. Okay. Good.
11   Have you had any SWAT training? I'm going to
12   ask that question again.
13        MS. WESTBY: Object to the form of the
14   question.
15        MR. THOMPSON: Join.
16        MS. WESTBY: Asked and answered, at least a
17   couple of times.
18        THE WITNESS: Again, that training, but not
19   necessarily under that title.
20   BY MR. GOSMAN:
21   Q.   You had one 50-hour course in 2005, correct?
22   A.   Yes.
23   Q.   And was there anything in that course that
24   indicated that you were actually being trained as a
25   SWAT officer or to perform as -- in a SWAT team?

MATTHEW DANZER - October 4, 2010                    Page 58
Direct Examination by Mr. Gosman

1         MR. THOMPSON: Objection as to form.
2         THE WITNESS: The individual that puts on the
3    training, trains SWAT teams in the same tactics that he
4    was training us.
5    BY MR. GOSMAN:
6    Q.   You know, that wasn't what I asked, Officer.
7    I just asked if you had been trained as a SWAT team
8    member in that course?
9         MS. WESTBY: Object to the form of the
10   question. Asked and answered.
11        MR. THOMPSON: Join.
12        THE WITNESS: Again, that training, not under
13   that title.
14   BY MR. GOSMAN:
15   Q.   All right. So you were SWAT trained, but you
16   just didn't have that title attached to it?
17        MS. WESTBY: Object to the --
18   BY MR. GOSMAN:
19   Q.   Is that correct?
20        MS. WESTBY: Object to the form of the
21   question.
22        THE WITNESS: Training was -- we received the
23   same training that SWAT teams would.
24   BY MR. GOSMAN:
25   Q.   You did?

MATTHEW DANZER - October 4, 2010                    Page 59
Direct Examination by Mr. Gosman

1    A.   The training he conducted is what he puts the
2    SWAT teams through.
3    Q.   And how do you know that?
4    A.   He trains -- he said he trains SWAT teams in
5    tactics -- these types of tactics, that he was training
6    us in the same type of tactics.
7    Q.   Well, just because somebody goes to a
8    firearms class and takes a basic firearms class doesn't
9    make them a firearms expert, does it?
10        MS. WESTBY: Objection to form.
11        MR. THOMPSON: Objection to form.
12   Argumentative.
13   BY MR. GOSMAN:
14   Q.   I mean, you certainly see the difference
15   between going to a class and participating in some of
16   these basic concepts, and being a trained member of a
17   team that actually performs these functions in real
18   life?
19        MS. WESTBY: Mr. Gosman, you're to the point
20   where you're not behaving appropriately. Please limit
21   your questions to appropriate deposition questions.
22   BY MR. GOSMAN:
23   Q.   Do you understand that difference, Officer?
24        MS. WESTBY: Object to the form --
25

MATTHEW DANZER - October 4, 2010                    Page 60
Direct Examination by Mr. Gosman

1    BY MR. GOSMAN:
2    Q.   Between having -- being part of a 50-hour
3    course once, and being trained as a SWAT team member?
4         MR. THOMPSON: Objection as to form. Asked
5    and answered. Argumentative. Badgering.
6         MS. WESTBY: I join.
7    BY MR. GOSMAN:
8    Q.   Go ahead.
9    A.   I'm sorry. What was the question again?
10   BY MR. GOSMAN:
11   Q.   Do you understand the difference between
12   taking a course one time that is -- that deals with
13   tactical issues and being a qualified member of a SWAT
14   team or being qualified to function as a SWAT team
15   member?
16        MS. WESTBY: Object to the form of the
17   question. In addition to all of those other things,
18   misstates his testimony.
19        MR. THOMPSON: Join.
20        THE WITNESS: I can't answer that in a yes or
21   no question.
22   BY MR. GOSMAN:
23   Q.   Okay. Well, answer it any way you want to,
24   then, Officer.
25   A.   Well, we don't have the title of the SWAT

MATTHEW DANZER - October 4, 2010                                Page 61
Direct Examination by Mr. Gosman

1   team.
2   Q.  Okay.  That's because you're not trained as a
3   SWAT team.
4         MS. WESTBY: Object to the form of the
5   question.
6   BY MR. GOSMAN:
7   Q.  Correct?
8         MS. WESTBY: Object to the form of the
9   comment.  Please allow him to finish his --
10        MR. GOSMAN: He said he was not trained as a
11  SWAT team, he stopped, and I asked him, "It's because
12  you're not trained as a SWAT team?"
13        MR. THOMPSON: Counsel, you can't ask him one
14  question and interrupt his answer and pose another
15  question.
16        MR. GOSMAN: Okay.  All right.
17        MR. THOMPSON: We'll be here until midnight.
18  BY MR. GOSMAN:
19  Q.  Okay.  Go ahead, Officer.  I'm sorry.
20  A.  We don't have the title of a SWAT team.
21  Q.  Okay.
22  A.  We are a small department.
23  Q.  Yes.
24  A.  We don't have the luxury of being able to set
25  guys aside specifically to a team to handle just those

MATTHEW DANZER - October 4, 2010                                Page 62
Direct Examination by Mr. Gosman

1   things.
2   Q.  Okay.
3   A.  We're too small.  So when we have an
4   incident, it's the officers -- the patrol officers that
5   have to handle those things.  That's why we receive
6   that training, so we could handle that.  That's the
7   difference.
8   Q.  And -- all right.  Thank you.
9         And that training was your 50 hours of patrol
10  tactic -- Tactics Response Training in October of 2005?
11  A.  That was part of it.
12  Q.  And then the Friday night training -- or the
13  Friday Trainings that you say occurred since then?
14  A.  That was -- we continued that training.
15  Q.  All right.  Okay.  So let's get back to the
16  night in question here.
17        What was your role in the execution of the
18  search warrant on the Wachsmuth residence?
19  A.  At what part?
20  Q.  You had more than one role, Officer Danzer,
21  that night?
22  A.  I guess so.
23  Q.  Okay.  Well, tell me what they were.
24        MS. WESTBY: Object to the form of the
25  question.

MATTHEW DANZER - October 4, 2010                                Page 63
Direct Examination by Mr. Gosman

1         THE WITNESS: I was one of the individuals
2   that entered the residence initially.
3   BY MR. GOSMAN:
4   Q.  Okay.
5   A.  So I was in that role.
6   Q.  Did you have a ski mask on or anything like
7   that?
8   A.  No.
9   Q.  So the officer's faces were all uncovered?
10  A.  I don't know for sure.  But from what I can
11  remember, our faces were uncovered.
12  Q.  Okay.  So you were part of the entry team,
13  and you carried an automatic weapon -- or a
14  semiautomatic weapon, correct?
15  A.  Yes.
16  Q.  And you've had training in firearms?  You've
17  had training in, you know, entering a building,
18  correct?  You've had this training before?
19  A.  Yes.
20  Q.  Okay.  And in the course of this training,
21  did you -- were you -- how were you taught to carry
22  your weapon when you entered the premises?
23  A.  We were taught to keep our -- to carry
24  weapons against our bodies with a sling slung over our
25  body.

MATTHEW DANZER - October 4, 2010                                Page 64
Direct Examination by Mr. Gosman

1   Q.  So you're telling me that you were actually
2   taught in room clearing tactics to have your weapon
3   next to your body and down to the ground?
4         MR. THOMPSON: Objection as to form.
5   Misstates -- well, your question wasn't that.
6   BY MR. GOSMAN:
7   Q.  Well, he entered the residence with his
8   weapon down, correct?
9   A.  Yes.
10  Q.  All right.  And did you clear the rooms with
11  your weapon down?
12  A.  Yes.
13  Q.  Is that what you were trained to do as -- in
14  this situation involving clearing rooms?
15  A.  Yes.
16  Q.  All right.  Who trained you to do that?
17  A.  Doug Pechtel.
18  Q.  And was that in the Patrol Tactical Response
19  course you took in 2005?
20  A.  Yes.
21  Q.  So we've got his materials, and we can review
22  those materials, then.
23        MS. WESTBY: Is that a comment?
24        MR. GOSMAN: Yeah, it was.  You got me there.
25

1   (Exhibit 27 identified)
2   BY MR. GOSMAN:
3   Q.  Okay.  I'm going to have you go ahead and
4   turn to Exhibit 27 and we'll see what we can do with
5   this.
6       Does this look familiar to you?  Is this the
7   course materials that were associated with this class
8   you took in 2005?
9   A.  Yes.
10  Q.  Okay.
11  A.  This page does.
12  Q.  Okay.  All right.  Go ahead and take a look
13  at enough pages to satisfy yourself that that's the
14  manual.
15  A.  I believe we were given this during that
16  training.
17  Q.  Okay.  Okay.  And these are the principles
18  that you're taught in this course, and I'm referring to
19  page -- let's see, 15.  Go ahead -- that's
20  Bates-stamped 18.
21      Mindset:  The ability to function forward
22  under very uncommon conditions.  Judgment, attitude,
23  creativity, physical ability, team player."
24      Are those the elements that you were taught?
25  A.  I believe that was something that was

1   covered.
2   Q.  Covered?  Okay.
3       When you got out of that course, did you have
4   a certificate that you had completed the course, or did
5   you have a certificate that you were capable of
6   conducting dynamic operations?
7   A.  I received a certificate.  I'm not sure what
8   it said.
9   Q.  Okay.
10  A.  I don't know.  I don't have it in front of
11  me.
12  Q.  Okay.  And I note there's something here.
13  The options of the hostage taker.  This is on Page 18.
14  Let's go ahead and turn to that for just a second.
15  "Surrender, suicide, kill hostages, leave with
16  hostages."  So you were -- you dealt with a hostage
17  situation in this course, correct?
18  A.  Yes.
19  Q.  And then, by golly, there's -- let's see,
20  Page 20 is "Dynamic Entry."  Certainly you've heard
21  this phrase, "dynamic entry," haven't you, Officer?
22  A.  Yes.
23  Q.  You know what a dynamic entry is?
24  A.  It depends on who is using it and what they
25  are referring to.

1   Q.  Okay.  Well, go ahead and give me your
2   definition of dynamic entry, so we can get this behind
3   us at least.
4   A.  A dynamic entry would be something as opposed
5   to you're not sneaking in, I guess.  You're --
6   Q.  Element of surprise, would that be one of the
7   factors?
8   A.  It could be.
9   Q.  Could be?
10  A.  It could be.
11  Q.  Okay.  So there could be situations where you
12  don't have the surprise.  The hostage taker, for
13  instance, knows you're coming?
14      All right.  "Assaulter moves as fast as he
15  can shoot accurately."  That's on Page 21.  Do you see
16  that?
17  A.  Yes, I do.
18  Q.  All right.  Let's see here.  What is the
19  "P.I.E.R. Philosophy"?  Do you remember that?
20      I'll ask you to go ahead and turn to Page 27.
21      MS. WESTBY: Bates-stamped 27 or -- okay.
22  BY MR. GOSMAN:
23  Q.  Do you remember being taught about the
24  P.I.E.R. Philosophy?
25  A.  I believe parts of that were discussed.

1   Q.  P.I.E.R. is not intended to be used as a SWAT
2   team.  It's not intended to be used as a means of
3   resolving any type of critical incident, other than a
4   immediate life-threatening crisis.  You were taught
5   that, correct?
6   A.  I don't remember.  The course wasn't entitled
7   P.I.E.R.
8   Q.  It wasn't?
9   A.  The title wasn't called P.I.E.R.
10  Q.  What was the course trying to teach you,
11  Officer?
12  A.  How to deal with --
13  Q.  Emergency situations, correct?
14  A.  That would be a part of it.
15  Q.  What else?
16  A.  It taught us a wide variety of things, of
17  tactics.
18  Q.  Okay.  All right.  Is it your understanding
19  that this course was designed to teach you, the patrol
20  officer, how to respond in emergency situations when
21  there are no other resources available, such as a
22  qualified SWAT team to prevent loss of life or to make
23  sure that the law is being enforced?
24  A.  I don't know if I can fully agree with that
25  statement.

Case 1:10-cv-00041-ABJ    Document 65-12    Filed 01/10/11    Page 58 of 92
Tricia Wachsmuth v.                                                              Matthew Danzer
City of Powel, et al.                                                           October 4, 2010

1   Q.  All right.  Well, tell me why not.  I mean,
2   what do you, as a patrol officer, know about
3   functioning in a SWAT-type setting?  You're being
4   trained to respond to an emergency situation, correct?
5           MS. WESTBY: I'm objecting to the form of the
6   question.  You make these comments, and then you throw
7   in an unrelated question.
8           MR. GOSMAN: That's true.  I did that.
9           All right.  I'll withdraw that question.
10  BY MR. GOSMAN:
11  Q.  Officer, you're being trained to respond in
12  an emergency situation.  You're not being trained to
13  serve in a SWAT team unit, correct, when you go to this
14  course for 50 hours?
15          MS. WESTBY: Object to the form of the
16  question.
17          MR. THOMPSON: Join.
18          THE WITNESS: We learn SWAT tactics there.
19  BY MR. GOSMAN:
20  Q.  You learn how to respond in an emergency
21  situation when there was no SWAT team available,
22  correct?
23          MR. THOMPSON: Object as to form.
24          MS. WESTBY: Yeah.  Join.
25          THE WITNESS: We learned to respond to

1   in-progress calls, active situation calls.
2   BY MR. GOSMAN:
3   Q.  Okay.  And that's what that course was trying
4   to teach you, correct?
5   A.  Part of it.
6   Q.  First responder tactical situations?
7   A.  That was part of it.
8   Q.  All right.  And the rest of it was?
9   A.  We trained in other things as well.  That's
10  an all-encompassing statement.  There's a lot of things
11  underneath of that that require training.  And these
12  areas overlap.  It's not just in-progress.  It's --
13  they overlap to other things well.
14  Q.  Well, let's be a little more specific than
15  that.  What other things?
16  A.  For instance, if you have to respond to an
17  active shooter, that's inside a building, you have to
18  enter the building.  And because you have to enter the
19  building, you need to receive training in how to enter
20  the building.
21  Q.  All right.  And I don't really think we have
22  that much of a disagreement here.  There is a
23  difference between having to enter a building and take
24  care of an active shooter and having a situation where
25  you don't have to do anything right now.  You can call

1   on resources that are better trained to respond to the
2   situation.
3           MS. WESTBY: Object to the form of the
4   question.
5   BY MR. GOSMAN:
6   Q.  Would you agree with that?
7   A.  Just kind of repeat back to you so I
8   understand.
9   Q.  Yeah, go ahead.
10  A.  You're asking that there's times when you
11  need to respond right away, and there's times that you
12  don't have to respond right away?  Is that your
13  question?
14  Q.  Yeah, let's start with that.  Go ahead.
15  A.  Yes, there's certain calls that require
16  immediate response.
17  Q.  And there are certain calls that don't
18  require an immediate response?
19  A.  Yes.
20  Q.  And those calls can be handled -- if they
21  require a specialized team, they should be handled by a
22  specialized team, if there's no emergency that requires
23  people who are not trained in that field to take that
24  action, correct?
25          MS. WESTBY: Object to the form of the

1   question.
2           MR. THOMPSON: Join.
3           THE WITNESS: I guess I'm not sure what your
4   question is on that.  Can you repeat it or break it
5   down or something?
6   BY MR. GOSMAN:
7   Q.  Yes.  If there is no emergency situation, and
8   yet you are required a dynamic entry, all of this
9   coursework is designed to tell you that you should
10  allow a qualified team to enter and do their work when
11  you have the opportunity to bring them in?
12          MS. WESTBY: Object to the form of the
13  question.
14          MR. THOMPSON: Join.
15          THE WITNESS: He was training officers to
16  respond primarily to in-progress situations.
17  BY MR. GOSMAN:
18  Q.  All right.
19  A.  And who makes a call and who responds to what
20  in a thing that's not active, that's a decision that's
21  probably -- could be made by someone who, you know, not
22  a typical officer.  Maybe, maybe not.  So he didn't --
23  he doesn't really focus on that with us.  Gave us the
24  skills we needed.
25  Q.  He gave you the skills you needed to act when

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 59 of 92
Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                  October 4, 2010

1  there was no one else able to act in that situation?
2         MS. WESTBY: Object to the form of the
3  question.
4         MR. THOMPSON: Join.
5         THE WITNESS: Not necessarily.
6  BY MR. GOSMAN:
7     Q.  Well, in terms of available law enforcement
8  resources, correct?
9         MS. WESTBY: Object to the form of the
10 question.
11        THE WITNESS: In terms of -- I'm sorry. What
12 was the question?
13        MS. WESTBY: You know, we've gone over this
14 area over and over.
15        MR. GOSMAN: Yeah, we have.
16        MS. WESTBY: And you've received the answers
17 you've received. I think it's time to move on.
18 BY MR. GOSMAN:
19    Q.  Okay. Anyway, I guess the course that you
20 took sort of speaks for itself, and there are qualified
21 people who can tell us what they were trying to teach
22 you. Would it be fair to say that?
23        MS. WESTBY: Object to the form of the
24 question.
25        MR. THOMPSON: Join.

1         THE WITNESS: Are you talking about the
2  instructor of this course being able to speak to what
3  he was training?
4  BY MR. GOSMAN:
5     Q.  Yeah, what his course was designed to do and
6  what the course materials were designed to do?
7     A.  I would agree he would probably give an
8  explanation of that.
9     Q.  All right. Now, I think we did have a
10 question, though, of -- a minute ago -- about whether
11 or not you were supposed to -- what your weapon
12 position was. And you were telling me -- and -- you
13 were telling me that your weapon position was down, and
14 you'd clear the rooms with your weapon faced down to
15 the ground and with it actually slung over your
16 shoulder?
17        MS. WESTBY: Object to the form of the
18 question. Misstates his testimony.
19 BY MR. GOSMAN:
20    Q.  Well, let's clear that up. Go ahead.
21    A.  I'm not sure what you meant by "let's clear
22 that up."
23    Q.  Yes. What I need to know is how that weapon
24 was carried by you as you deployed in the house?
25    A.  Okay. There was a sling on it that I had

1  over my shoulder.
2     Q.  Right.
3     A.  Position the weapon in front of my body. And
4  then I had my hands on the weapon, and I had it pointed
5  towards the ground.
6     Q.  And that's -- that's how you were taught to
7  clear a room?
8     A.  Yes.
9     Q.  And what happens if you need to use your
10 weapon when you're entering a room, if there's somebody
11 that poses a threat, say a hostage taker, and you got
12 your weapon pointed to the ground?
13    A.  Then you bring the weapon up.
14    Q.  And if the shooter has his weapon up and
15 pointed at you, what do you think your chances of
16 survival are there?
17        MS. WESTBY: Object to the form of the
18 question.
19        MR. THOMPSON: Join.
20 BY MR. GOSMAN:
21    Q.  Do you really remember, Officer, how that
22 weapon is supposed to be deployed as you're clearing a
23 room, in a room-clearing situation?
24    A.  Yes.
25        MR. THOMPSON: Objection to form. Asked and

1  answered.
2  BY MR. GOSMAN:
3     Q.  Do you know about room-clearing tactics like
4  the Israeli Lean?
5     A.  Yes.
6     Q.  Is the gun supposed to be up in a ready
7  position as you undertake an Israeli Lean?
8     A.  I think that depends on how you're doing the
9  Israeli Lean.
10    Q.  In other words, it depends on whether the gun
11 is up or down?
12    A.  My understanding of the Israeli Lean is how
13 you lean out, not necessarily where you have your
14 weapon at.
15    Q.  All right. And where is your weapon when
16 you're doing an Israeli Lean? How is it to be
17 deployed?
18    A.  That depends on who is doing the instructing.
19 I don't know how every possible trainer trains how to
20 do the Israeli Lean.
21    Q.  So you went into the house with your weapon
22 pointed to the ground, correct, and you kept it pointed
23 to the ground as you cleared the rooms?
24    A.  Yes.
25    Q.  Did you have a specific assignment to clear

1  the rooms?
2  A.  No.
3  Q.  No?  What was your assignment?
4  A.  Assignment was to enter the house and to
5  clear it.
6  Q.  And to clear it?
7  A.  Yes.
8  Q.  How many men were involved -- given that
9  assignment?
10  A.  I believe there were five or six individuals.
11  Q.  Did you --
12  A.  I mean, officers.
13  Q.  When you met at the police station prior to
14  performing this warrant service, did you -- were you
15  shown an entry plan?
16  A.  Yes, we talked about plans.
17  Q.  Okay.  What did you talk about?  What were
18  the plans?
19  A.  Part of that was to have a team at the front
20  door, a -- are you talking about entry plans?
21  Q.  Yes, I am.
22  A.  Okay.  A team at the front of the house, and
23  one that came up to the back of the house.
24  Q.  Okay.  That was it?
25  A.  To enter?

1  Q.  Well, you just said there was a team that was
2  set up to enter the house, a team at the back of the
3  house, and a team at the side of the house?
4  A.  There was -- to enter, there was a team at
5  the front -- you're talking about our plans of entry?
6  Q.  Yes.
7  A.  There's a team at the front of the house, and
8  there's a team to come up to the back of the house.
9  Q.  All right.  And who was to perform what
10  functions?
11  A.  We had officers --
12  Q.  And by the way, you don't have to have this
13  memorized.  But generally speaking, who was to perform
14  what functions?
15  A.  Like individual officers?
16  Q.  Yes.  Well, I don't care about the names of
17  the individual officers, at least right now.  What was
18  the team in the back supposed to do?  Do you remember
19  that?  Was that made clear in the plan?
20  A.  At the time, I believe it was.
21  Q.  Okay.  You don't remember exactly what it
22  was, though?
23  A.  Not exactly.
24  Q.  That's fine.
25  All right.  So what were you supposed to do?

1  And I think you've said you were supposed to clear --
2  you were supposed to enter with a team and clear the
3  house.  Did you have any further instructions than
4  that?
5  A.  Oh, yes.
6  Q.  Okay.  What were they?
7  A.  We were to -- the team at the front, which I
8  was a part of, was going to stage at the front of the
9  house and enter the house.  Things we took into
10  consideration was whether or not entry would be given
11  to us or not.  And ...
12  Q.  Go ahead.
13  A.  So that was part of the considerations.
14  Q.  So part of the considerations was whether or
15  not the entry would be provided?  In other words,
16  whether the door would be opened?
17  A.  Somebody opened the door.
18  Q.  If somebody opened the door?
19  A.  (Witness nods head.)
20  Q.  All right.  And did you understand, then,
21  that this was what they call a knock and announce
22  warrant, which required the presence of the officers be
23  made known, and that the occupant of the house be given
24  an opportunity to answer the door?
25  A.  Yes.

1  Q.  Okay.
2  THE COURT REPORTER:  Counsel, can we take
3  just a 2-minute break?
4  MR. GOSMAN:  Yes, we sure can.
5  (Recess taken 6:05 to 6:15
6  p.m., October 4, 2010)
7  BY MR. GOSMAN:
8  Q.  Okay.  Let's go ahead and go back to the time
9  that you went down to the police station that night,
10  the 24th of February.  Who was there when you arrived?
11  A.  I don't remember.
12  Q.  And how long did it take to assemble the
13  group?
14  A.  I don't remember the time it took.
15  Q.  Was -- did you speak with anyone about what
16  you were there for, prior to the time that the group
17  was assembled and they were given the information about
18  the plan?
19  A.  What was the first part?  I'm sorry.
20  Q.  Yeah.  Did you speak with anybody while you
21  were waiting for this group to be assembled?
22  A.  I spoke to whoever called me on the phone.  I
23  came down.
24  Q.  You don't remember who that was?
25  A.  I don't, no.

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 61 of 92
Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                  October 4, 2010

MATTHEW DANZER - October 4, 2010                    Page 81
Direct Examination by Mr. Gosman

1   Q. All right. So you came down, and you were in
2   the middle of a little narrative there about who you
3   spoke to.
4      A. I don't remember who I spoke to down there.
5   Or at what point everyone -- there was people there
6   already. There was still people planning on showing
7   up. I just -- I don't remember the time frame, though.
8      Q. It took some time to get the group together,
9   though, correct?
10     A. A period of time passed, yes. I'm not sure
11  what it was, though.
12     Q. Was Chief Feathers there?
13     A. There as in the building, or the room we were
14  in?
15     Q. I'm really talking about, you know, this
16  evening and the plan of the execution of the search
17  warrant. I don't care if he was in the building and
18  not in the room. So yeah, I want to know if he was
19  there with you guys.
20     A. I don't remember if he was physically
21  present.
22     Q. Did you understand that Chief Feathers had
23  approved the operation?
24     A. That was my understanding, that he had
25  approved it in some way.

MATTHEW DANZER - October 4, 2010                    Page 83
Direct Examination by Mr. Gosman

1   entire -- or nearly the entire police force. Other
2   than the search warrant and the tactical service of
3   that warrant, what were you -- who else would have been
4   in charge? What other issues were there to be in
5   charge of?
6      A. There was tactical considerations on how
7   things were done. There was the actual search that
8   took place.
9      Q. Who was in charge of that?
10     A. I'm not sure.
11     Q. Okay. Let me ask this question: Do you have
12  any idea whether there were different people in charge
13  of different aspects of this operation, or was there
14  one person in charge of the whole thing?
15     A. Sergeant Chretien was in charge of the
16  tactical considerations.
17     Q. Okay. Was someone else in charge of the
18  search?
19     A. I'm not sure.
20     Q. All right. Did you have anything to do with
21  the search?
22     A. No.
23     Q. So the group assembled, and what happened
24  then?
25     A. Everyone went to their positions.

MATTHEW DANZER - October 4, 2010                    Page 82
Direct Examination by Mr. Gosman

1      Q. Who told you that?
2      A. I'm not sure if somebody told me.
3      Q. You may have just assumed that Chief Feathers
4   approved the plan?
5      A. I believe it was discussed.
6      Q. It was discussed that Chief Feathers had
7   approved the plan?
8      A. Or had approved -- somebody talked to him
9   about what was going on.
10     Q. That's your understanding?
11     A. Yes.
12     Q. All right. And who was in charge of this
13  operation?
14     A. The whole thing, or certain parts of it?
15     Q. Well, the whole thing.
16     A. I don't know if -- I don't know.
17     Q. Did you meet as a group?
18     A. Yes.
19     Q. Did someone take charge?
20     A. Yes.
21     Q. Who?
22     A. Sergeant Chretien was in charge of the
23  tactical side of it.
24     Q. What else was there to be in charge of? You
25  were meaning to execute a search warrant with the

MATTHEW DANZER - October 4, 2010                    Page 84
Direct Examination by Mr. Gosman

1      Q. Well -- all right. When I say "the group
2   assembled," I mean, you all got together there at the
3   police department, and you were waiting to find out
4   what you were going to do.
5         And I want you to tell me what happened. How
6   did you learn about what it was that you were going to
7   do. Who was involved in providing you that
8   information. What information were you given, that
9   sort of thing?
10        MS. WESTBY: At the police department?
11        MR. GOSMAN: Yes, at the police department.
12        THE WITNESS: I'm sorry. I misunderstood
13  what you were inquiring about.
14        Are you wanting the officers that -- who was
15  doing the discussion?
16  BY MR. GOSMAN:
17     Q. Yes. I want the people that were in charge
18  and those that spoke and defined the plan and provided
19  you the information about what you were doing and why
20  you were doing it.
21        MR. THOMPSON: Objection as to form.
22        THE WITNESS: Officer Miner conducted some of
23  the briefing for... Sergeant Chretien, I remember him
24  talking about, you know, all the tactical
25  considerations. And other officers, probably who had

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 62 of 92
Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                  October 4, 2010

MATTHEW DANZER - October 4, 2010                    Page 85
Direct Examination by Mr. Gosman

1  knowledge -- firsthand knowledge of what was going on,
2  probably were also part of it. I can't think
3  specifically who all.
4  BY MR. GOSMAN:
5  Q. Okay. Well, were there any other officers
6  that had firsthand knowledge of what was going on,
7  other than Chretien and Miner?
8       MR. THOMPSON: Object as to form.
9       MS. WESTBY: Join.
10      THE WITNESS: I'm sure there were.
11 BY MR. GOSMAN:
12  Q. What kind of firsthand knowledge? Do you
13 know anything specific?
14  A. The officers that were on duty were the ones
15 who probably knew the most. I was called in, so I'm
16 not sure who knew what.
17  Q. Well, let's be realistic here. How were the
18 officers who were on duty, who have no idea what's
19 going on with this search warrant and weren't involved
20 with any of the discussions with the confidential
21 informant, have any firsthand knowledge of what's going
22 on?
23      MR. THOMPSON: Object as to form.
24      THE WITNESS: I don't understand the
25 question.

MATTHEW DANZER - October 4, 2010                    Page 87
Direct Examination by Mr. Gosman

1  Q. You don't know anyone, other than Officer
2  Miner, that had firsthand knowledge of what was going
3  on, with respect to the Wachsmuth's, which was the
4  reason that you were down there that night to serve a
5  warrant on their home?
6       MS. WESTBY: Objection. Asked and answered.
7       THE WITNESS: I'm not sure. I don't remember
8  at this point.
9  BY MR. GOSMAN:
10  Q. Okay. What did Officer Miner share with you?
11 You said he spoke.
12  A. Like information?
13  Q. Yes.
14  A. Okay. He gave details of what he had learned
15 from the confidential informant.
16  Q. Which were?
17  A. That there was a marijuana grow operation at
18 the house.
19  Q. Did he describe how big it was?
20  A. The confidential informant, I believe, had
21 given a number of plants or said something, or at least
22 Officer Miner had. I don't remember what the exact
23 number is, though.
24  Q. Twenty to 30?
25  A. I don't remember what the number is.

MATTHEW DANZER - October 4, 2010                    Page 86
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2  Q. You told me there were others -- and I need
3  to get this cleared up. Others who may have had
4  firsthand knowledge of what was going on. And maybe
5  that was just kind of a careless statement on your
6  part. But who had firsthand knowledge of what was
7  going on in the Wachsmuth residence that bore on the
8  question of this tactical response that was being
9  planned?
10      MS. WESTBY: Object to the form of the
11 question.
12      MR. THOMPSON: Join.
13      THE WITNESS: I don't know who all had
14 firsthand knowledge.
15 BY MR. GOSMAN:
16  Q. Do you know anybody who had firsthand
17 knowledge?
18  A. Officer Miner.
19  Q. Okay. Anybody else?
20  A. I don't remember who all. He was one, yes.
21  Q. He was one.
22      Do you remember that there were others who
23 had firsthand knowledge that was being considered there
24 that evening?
25  A. I don't know.

MATTHEW DANZER - October 4, 2010                    Page 88
Direct Examination by Mr. Gosman

1  Q. All right. So there were -- you do
2  specifically remember Officer Miner telling you there
3  were a number of plants at the Wachsmuth residence in
4  this marijuana grow operation?
5  A. Yes.
6  Q. And what else did he tell you?
7  A. Just what the, you know, confidential
8  informant had told him.
9  Q. We know that. You told me that already. But
10 I don't know what the confidential informant told him.
11 And I don't know what he told you. So that's what I'm
12 trying to get at here.
13      What did he tell you about what the
14 confidential informant had told him?
15  A. Beyond the grow operation, that gave the
16 names -- gave the name of an individual who was
17 conducting the grow operation. Some -- you know,
18 information about the individual.
19  Q. What information did he give you about the
20 individual?
21  A. That the male was Bret Wachsmuth.
22  Q. Okay.
23  A. That he was paranoid, that he carried guns on
24 his person, and that there were guns in the house, that
25 he liked to peek out windows. He was kind of always

MATTHEW DANZER - October 4, 2010      Page 89
Direct Examination by Mr. Gosman

1 worried who might be outside his house. That he was on
2 medications and possibly -- he may be unstable, or --
3 I'm not sure the exact wording. But that's kind of the
4 gist I got.
5      Q. Okay. All right. And this was information
6 that was important for you to know?
7      A. Yes.
8      Q. Okay. And it was important for you to know
9 why?
10      A. What we would be facing as we executed the
11 search warrant.
12      Q. Somebody who was on medication and who had
13 firearms and who was paranoid, okay; is that correct?
14 Is that a fair summary?
15      A. Those are some of the things.
16      Q. Okay. What else?
17      MS. WESTBY: Object to the form of the
18 question. He's already given you the list.
19 BY MR. GOSMAN:
20      Q. Go ahead, though.
21      A. There's weapons placed around the house.
22 Some of them are loaded. He carries weapons on his
23 person. He uses drugs. You know, it differentiated
24 between, you know, prescriptions or, you know, illegal
25 drugs.

MATTHEW DANZER - October 4, 2010      Page 90
Direct Examination by Mr. Gosman

1      Q. Uh-huh.
2      A. That he's paranoid, you know, kind of
3 unstable. We don't know how he might react to law
4 enforcement coming to serve a search warrant on his
5 house.
6      Q. I realize you're just a young officer, but
7 did it occur to you that maybe you want to knock on the
8 door and ask him to come to the door rather than try to
9 break into the house with a, you know, a team of armed
10 police officers and a flashbang device?
11      MS. WESTBY: I'm going to object to the form
12 of the question. Argumentative. Badgering. You're
13 tone is inappropriate.
14      Go ahead and answer the question if you can.
15      MR. THOMPSON: Join.
16      THE WITNESS: I think a lot of different
17 options were discussed that night or, you know, for the
18 execution of that search warrant. And I don't know
19 what all the options discussed were.
20 BY MR. GOSMAN:
21      Q. Were you involved in any of those discussions
22 about the options?
23      A. Yes.
24      Q. Okay. Well, what were they?
25      A. When I say "options," it's not necessarily

MATTHEW DANZER - October 4, 2010      Page 91
Direct Examination by Mr. Gosman

1 limited to that area. I mean, options of who does
2 what, goes where, uses what.
3      Q. I'm talking -- you know, we're going to be
4 here all night.
5      I'm talking about options to a dynamic entry
6 when you have somebody who is paranoid and who has guns
7 in his house, and he's got marijuana plants in the
8 basement. What other options were talked about?
9      A. I know an option that was talked about was
10 whether to, you know, contact his father.
11      Q. And?
12      A. That was an option we -- you know, that was
13 discussed. I know that was discussed. I'm not sure if
14 I --
15      Q. Why didn't you do that? What was the reason
16 why that wasn't done?
17      A. I'm not -- I don't remember what all the
18 reasoning was behind it.
19      Q. Did you have any input in this?
20      A. In some aspects of it.
21      Q. Were you concerned at all that you were using
22 a dynamic entry when other options were clearly
23 available, such as calling Tom Wachsmuth and asking him
24 to bring his son either out of the house or down to the
25 police station?

MATTHEW DANZER - October 4, 2010      Page 92
Direct Examination by Mr. Gosman

1      MS. WESTBY: Object to the form of the
2 question.
3 BY MR. GOSMAN:
4      Q. We're talking about someone who is paranoid
5 and has guns in the house, would have been a lot safer,
6 wouldn't it?
7      MS. WESTBY: Object to the form of the
8 question.
9      MR. THOMPSON: Join.
10      THE WITNESS: It was discussed.
11 BY MR. GOSMAN:
12      Q. And?
13      A. You know, options of would he have actually
14 come out? Could it make the situation worse?
15      Q. How could it make the situation worse,
16 Officer?
17      A. Well, if he wouldn't have come out.
18      Q. Okay.
19      A. Then, now he -- you know, knows there's a
20 search warrant. Has a chance to prepare weapons, other
21 things. A lot of different things.
22      Q. Okay. Anything can happen, right? But as a
23 police officer, you're trained to be objectively
24 reasonable about what may happen in a given situation,
25 right? That's your duty?

Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

MATTHEW DANZER - October 4, 2010                    Page 93
Direct Examination by Mr. Gosman

1    MS. WESTBY: Object to the form of the
2  question.
3  BY MR. GOSMAN:
4    Q.  Do you understand that?
5    A.  My duty as to?
6    Q.  Be objectively reasonable in the way you
7  apply force against citizens"
8    MS. WESTBY: Object to the form of the
9  question.
10    MR. THOMPSON: Join.
11    THE WITNESS: I want to be reasonable how I
12  conduct --
13  BY MR. GOSMAN:
14    Q.  All right. Well, let's talk about that,
15  then, for just a second.
16    What made you think or anyone else in that
17  room that Tom Wachsmuth could not get his son to come
18  out of the door?
19    MR. THOMPSON: Objection as to form.
20  BY MR. GOSMAN:
21    Q.  Is there any history?  I mean, we had Miner
22  talking to a confidential informant for a few minutes,
23  maybe an hour.  Was there any history that anyone was
24  aware of that would lead anyone to believe that Tom
25  Wachsmuth could not bring his son out of that house?

MATTHEW DANZER - October 4, 2010                    Page 94
Direct Examination by Mr. Gosman

1    SPEAKER 3: Objection as to form.
2  Speculation.
3    MS. WESTBY: Join.
4    THE WITNESS: For -- I can only answer for
5  myself, for one.
6  BY MR. GOSMAN:
7    Q.  No.  No.  Well, you were in with a group, and
8  you had input.  So I want you to answer -- I do want
9  you to answer for yourself.
10    You had an obligation as a police officer to
11  make sure that force was going to be objectively
12  reasonable.  Did you stop to think why it was that Tom
13  Wachsmuth couldn't have been consulted in this case and
14  a SWAT entry avoided altogether?
15    A.  I'm sure I thought about it.  I don't
16  remember, though.
17    Q.  Do you understand that you may have a legal
18  duty to consider these things and to prevent the -- to
19  prevent constitutional violations from taking place in
20  your presence?
21    MR. THOMPSON: Object to the form of the
22  question.
23    MS. WESTBY: Object to the form of the
24  question.
25

MATTHEW DANZER - October 4, 2010                    Page 95
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN:
2    Q.  Did you understand that?
3    MS. WESTBY: Object to the form of the
4  question.
5    THE WITNESS: Understand -- I'm sorry.
6  BY MR. GOSMAN:
7    Q.  Did you understand as a police officer that
8  you can be liable for allowing constitutional
9  violations to take place when you have -- are present
10  and have an opportunity to object and intervene in the
11  situation?
12    MS. WESTBY: Object to the form of the
13  question.
14    MR. THOMPSON: Join.
15    THE WITNESS: I'm not sure if that was
16  discussed that night.
17  BY MR. GOSMAN:
18    Q.  It probably wasn't. But I mean, did you know
19  that as a police officer, that you had that duty?
20    A.  We are trained in how to respond in
21  situations.
22    Q.  That didn't answer that question at all.
23    MR. THOMPSON: Counsel, you got to let him
24  answer the question.
25    MR. GOSMAN: I did.

MATTHEW DANZER - October 4, 2010                    Page 96
Direct Examination by Mr. Gosman

1    MS. WESTBY: No, you didn't.
2    MR. THOMPSON: No, you're not.  You're
3  arguing with him.
4    MR. GOSMAN: No.
5    MR. THOMPSON: Yes, you are.  You're asking
6  the question --
7    MR. GOSMAN: Let's answer that question.
8    MR. THOMPSON: For the record, you're asking
9  him a question and then you're halfway through his
10  answer interposing another question.  That's why we're
11  not getting any place.
12    MR. GOSMAN: All right. I'll concede that
13  that's happened tonight.
14  BY MR. GOSMAN:
15    Q.  Officer, were you aware that you had a duty
16  to prevent constitutional violations from taking place
17  in your presence --
18    MS. WESTBY: Object to the form --
19  BY MR. GOSMAN:
20    Q.  -- on the 24th of February 2009?
21    MS. WESTBY: Object to the form of the
22  question.  Misstates the law.
23    MR. THOMPSON: Join.
24    THE WITNESS: I'd agree.  I don't know if
25  that's a fair statement.

1   BY MR. GOSMAN:
2      Q.   What is a fair assessment of your duty to
3   prevent constitutional violations?
4           MR. THOMPSON: Object as to form.
5           MS. WESTBY: Yeah.
6           THE WITNESS: I have a lot of duties.  And
7   part of that is to uphold the Constitution, okay.  And
8   a lot of that is subject to the case law interpretation
9   by judges.  I can't possibly know all that.
10  BY MR. GOSMAN:
11     Q.   All right.  Well, you certainly knew that Tom
12  Wachsmuth was a reputable law enforcement officer in
13  the Powell area, didn't you?
14          MR. THOMPSON: Object as to form.
15          MS. WESTBY: Join.
16          THE WITNESS: I don't remember what my
17  thoughts were of him at that point.
18  BY MR. GOSMAN:
19     Q.   Did you know about Tom Wachsmuth at that
20  point?
21     A.   Yes.
22     Q.   Did you know at that point that he was a
23  reputable law enforcement officer?
24          MS. WESTBY: Object --
25          THE WITNESS: I don't remember --

1           MS. WESTBY: Object to the form of the
2   question.
3           THE WITNESS: -- what I thought of him at
4   that point.
5   BY MR. GOSMAN:
6      Q.   What do you think of him now?
7           MS. WESTBY: Object to the form of the
8   question.
9           Go ahead and answer.
10          THE WITNESS: I think he's a DCI agent that
11  works in the Powell area.
12  BY MR. GOSMAN:
13     Q.   Okay.  All right.  And he was a DCI agent
14  that worked in the Powell area on the night that the
15  Wachsmuth home was entered, correct?
16     A.   Yes.
17     Q.   Did you discuss the option of a knock and
18  talk warrant or execution of the warrant?
19     A.   I believe these options were discussed.  I'm
20  not sure I was a part of them.
21     Q.   Okay.
22     A.   But I believe we're discussed.
23     Q.   And do you know why those options were
24  rejected in favor of this dynamic entry?
25     A.   I don't remember --

1      Q.   You don't remember?
2      A.   -- why they were or if they were discussed in
3   front of me.
4      Q.   Did anyone in the group voice any concerns
5   about using such a show of force under the
6   circumstances?
7      A.   I don't remember.
8      Q.   Did you have any concerns about it?
9      A.   Concerns about?
10     Q.   The use of the dynamic entry with everyone
11  assembled there, the flashbang, the multiple teams, as
12  opposed to knocking on the door and asking to visit
13  with Tom -- or Bret Wachsmuth.
14     A.   Not necessarily.
15     Q.   Okay.  What do you mean by "not necessarily"?
16     A.   Well, my understanding of search warrants, a
17  lot of times -- well, specially one that, you know,
18  knock and announce, you go knock on the door, see if
19  they are willing to let you search.  If they are not,
20  then you can search regardless of, you know, whether
21  they come to the door and cooperate.
22          So the plan was to knock on the door.  If --
23  you know, entry was not given to us, to use other
24  options.  I didn't have a problem with that.
25     Q.   Okay.  We'll talk about that later.  And it

1   is important what information you were processing at
2   the time this occurred, this plan was being described.
3   Did anyone tell you that -- did anyone bother to check
4   Mr. Wachsmuth's criminal record, Bret Wachsmuth's
5   criminal record?
6      A.   I don't remember.
7      Q.   Wouldn't that have been something that was
8   kind of important to know if you were going to plan a
9   SWAT entry?
10          MS. WESTBY: Object to the form of the
11  question.
12          MR. THOMPSON: Join.
13          THE WITNESS: That could be important.
14  BY MR. GOSMAN:
15     Q.   No, that would be important, wouldn't it?  I
16  mean, let's be fair about it.
17          MS. WESTBY: Object.
18  BY MR. GOSMAN:
19     Q.   That's important information to know, isn't
20  it?
21          MS. WESTBY: Object to the form of the
22  question.  Please refrain from those types of comments
23  or questions.
24          MR. THOMPSON: Join.
25

MATTHEW DANZER - October 4, 2010                   Page 101
Direct Examination by Mr. Gosman

1   BY MR. GOSMAN:
2       Q.  That information would be important, wouldn't
3   it, Officer?
4           MS. WESTBY: Object to the form of the
5   question.
6           THE WITNESS: I said could be.
7   BY MR. GOSMAN:
8       Q.  All right.  Do you know whether there was any
9   information about whether Bret Wachsmuth had a history
10  of violence, any history of violence?
11      A.  I don't remember.
12      Q.  Would that have been important?
13          MS. WESTBY: Object to the form of the
14  question.
15          THE WITNESS: That would be something that
16  would be important to us.
17  BY MR. GOSMAN:
18      Q.  Would you agree with me that it is more
19  appropriate to base decisions about what type of entry
20  team to use and what type of force to present on the
21  basis of objective evidence?
22          MR. THOMPSON: Object as to form.
23          MS. WESTBY: Yeah.  Join.
24          THE WITNESS: Are you asking if you want to
25  be reasonable in how you conduct business or serve

MATTHEW DANZER - October 4, 2010                   Page 102
Direct Examination by Mr. Gosman

1   search warrants?
2   BY MR. GOSMAN:
3       Q.  No.  I'm talking about objective evidence as
4   opposed to subjective evidence, like the statement
5   "he's mentally unstable."  I mean, I call that a
6   subjective statement.  An objective statement is that
7   he's been in a mental institution and he waved a gun.
8           MS. WESTBY: Object to the form.  Wait.
9   Object to the form of the question.  Your definition is
10  not accurate, for one.
11          But go ahead and answer if you can.
12          THE WITNESS: I don't remember exactly what
13  was said and how it was said  That is my impression
14  that I remember at this point.
15  BY MR. GOSMAN:
16      Q.  That he was mentally unstable, correct?
17      A.  Of one of the things I said.  He was
18  paranoid.
19      Q.  Yeah, one of the things that was said was
20  that he was mentally unstable, apparently.  Was there
21  any objective evidence of that discussed?
22      A.  I don't remember.
23      Q.  Okay.  All right.  Once it was decided -- let
24  me ask this question:  Who decided to choose the option
25  that was chosen and to go forward with the dynamic

MATTHEW DANZER - October 4, 2010                   Page 103
Direct Examination by Mr. Gosman

1   entry team?
2           MS. WESTBY: Object to the form of the
3   question.  As a -- you know, you're talking about
4   dynamic entry.  That's your term.
5           MR. GOSMAN: Yes, it is.  I agree with that.
6   It's not my term.  It's a term that's used generally in
7   the law enforcement industry.  That's true.
8   BY MR. GOSMAN::
9       Q.  So who made the decision to do that?
10      A.  I don't remember exactly.  I mean, it's been
11  a year-and-a-half.  I know Sergeant Chretien was, you
12  know, had a part in the decision.
13      Q.  Okay.  Chief Feathers?
14      A.  I don't know for sure.  But I'm guessing he
15  was consulted.
16              (Exhibit 10 identified)
17  BY MR. GOSMAN:
18      Q.  I want you to go ahead and turn to
19  Exhibit 10.
20          Have you ever seen that document before?
21      A.  I'm not sure.
22      Q.  Were you given any diagrams of the house?
23      A.  I believe so.
24      Q.  How were they given to you?  Were they --
25  explain how.

MATTHEW DANZER - October 4, 2010                   Page 104
Direct Examination by Mr. Gosman

1       A.  I believe it was written up on a board.
2       Q.  Okay.
3       A.  But I don't remember for sure.
4       Q.  Does it look familiar to the diagram, what
5   you saw on the board, to the diagram you are seeing
6   there on Exhibit 10?
7       A.  At this point, I don't remember.
8       Q.  Okay.  Did you discuss any surveillance that
9   had been done on the home?
10      A.  Yes.
11      Q.  Okay.  What did you discuss about
12  surveillance?
13      A.  That an officer was conducting -- for one,
14  conducting surveillance on it.  Just basically some of
15  his observations.
16      Q.  Okay.  Was he out there at the house right
17  then?
18      A.  He was somewhere in the area.
19      Q.  Had there been any other surveillance on the
20  home, other than Officer -- and I believe it was
21  Blackmore being there just before the operation took
22  place?
23      A.  I know he was conducting surveillance on it.
24  Outside of what he was doing, I'm not sure if there was
25  anything else.

1   Q.  Did you learn that there was a small child in
2   the home?
3   A.  That was something that was mentioned as a
4   possibility.
5   Q.  Were you told that a small child had been
6   seen entering the home and not been seen exiting the
7   home prior to the service of that warrant?
8   A.  I'm not sure small child is accurate.
9   Q.  Okay.
10  A.  Child, yes; entering the home, yes; hadn't
11  seen it leave, yes.
12  Q.  Well, if you look on Exhibit 10, it actually
13  refers to the agent, child is a ten-year-old child,
14  boy, ten-year-old male perhaps.  Do you see that there?
15  A.  Yes.
16  Q.  Do you have any reason to doubt that that was
17  the age of that child that was actually discussed that
18  night?
19      MR. THOMPSON: Objection as to form.
20      MS. WESTBY: Join.
21      THE WITNESS: I'm not sure if it was
22  determined what the age was or if that was just a
23  guess.
24  BY MR. GOSMAN::
25  Q.  Okay.  Well, was it -- was there a guess made

1   that a ten-year-old child was in the residence?
2       MS. WESTBY: Object to form.
3       THE WITNESS: I don't remember if there was
4   an age put on it --
5   BY MR. GOSMAN:
6   Q.  Okay.
7   A.  -- for sure.
8   Q.  What did you learn about the interior of the
9   home, in terms of the rooms that you would be asked to
10  clear?
11  A.  I believe there was a diagram drawn to at
12  least the best information we had.
13  Q.  All right.  You see the diagram on
14  Exhibit 10.  Do you see any rooms drawn in to the
15  outline of the home?
16  A.  No.
17  Q.  You didn't know where the rooms were in the
18  home when you went into that home; isn't that true,
19  Officer?
20      MS. WESTBY: Object to the form of the
21  question.
22      MR. THOMPSON: Join.
23      THE WITNESS: I don't remember.
24  BY MR. GOSMAN:
25  Q.  Well, certainly you wouldn't have learned it

1   from the information contained on Exhibit 10, correct?
2       MR. THOMPSON: Objection as to form.
3       THE WITNESS: I don't see an interior
4   diagram, if that's what you're asking.
5   BY MR. GOSMAN::
6   Q.  Uh-huh.  Okay.  And you don't remember
7   whether there was an interior diagram provided to the
8   officers before you went into the home?
9   A.  I don't know for sure.
10      (Exhibit 16 identified)
11  BY MR. GOSMAN:
12  Q.  All right.  Let's go ahead and turn to
13  Exhibit 16 now -- before we do that, let's take a look
14  at the list of officers there.
15      Take me through that list.  And let's start
16  at the top.  And I want you to tell me what each person
17  was assigned to do based on your best understanding.
18  A.  You want me to start at the top of the list
19  and go down?
20  Q.  Yes.
21  A.  Brett, he was to go to the back door.
22  Q.  And that's Brett who?
23  A.  Lara.
24  Q.  Okay.
25  A.  Cody -- Cody Bradley, same.

1   Q.  Okay.
2   A.  Matt Brilakis, he would have been on the
3   perimeter somewhere according to this.  Curt Chapman
4   would go to the front of the house.  Myself, front of
5   the house.  Roy Eckerdt, front of the house.  Mike
6   Chretien, front of the house.  Mike Hall, front of the
7   house.  Dave Brown, go to the back, back door.  Lee
8   Blackmore, he was doing surveillance, perimeter.  Alan
9   Kent, says bedroom.  I'm not exactly sure what that's
10  referring to.  Chad Miner, entry.  And then it says
11  "ram door."  So he was going to go to the front of the
12  house.  And Matt McCaslin, evidence and bedroom.
13  Q.  Okay.  We have six -- we have six officers
14  that were involved in the entry.  That's just a simple
15  matter of counting them up on the list, but would you
16  confirm that for me?
17      MR. THOMPSON: According to the document?
18      MR. GOSMAN: Yes.
19      THE WITNESS: There would be six according to
20  this document.
21  BY MR. GOSMAN:
22  Q.  Okay.  And did all of those officers have
23  what we call the long guns, this 9mm pistol with the
24  extension on it?
25  A.  I'm not sure what everyone carried.

Case 1:10-cv-00041-ABJ    Document 65-12    Filed 01/10/11    Page 68 of 92
Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                 October 4, 2010

MATTHEW DANZER - October 4, 2010                          Page 109
Direct Examination by Mr. Gosman

1    Q.  You don't remember that?
2    A.  I don't remember what exact weapon everyone
3  was carrying.
4    Q.  Okay.  And who was in charge of the entry
5  team?
6    A.  Sergeant Chretien.
7    Q.  And were these assignments discussed before
8  you went to the house?
9    A.  Assignments as in this list?
10   Q.  Yes.
11   A.  Yes.
12   Q.  And was the other information that's
13  contained on Exhibit 10 discussed prior to your going
14  to the house?
15       MR. THOMPSON:  Object to the form.
16       THE WITNESS:  It contains topics we talked
17  about.
18  BY MR. GOSMAN:
19   Q.  Okay.  You notice there's a list on the
20  right-hand side of the page down towards the bottom.
21  It's a list that contains seven entries.  And it sort
22  of sets out the sequence of events for this action.  Do
23  you see that?
24   A.  Yes, there's a number list here.
25   Q.  Review that list for me for a second.  And I

MATTHEW DANZER - October 4, 2010                          Page 110
Direct Examination by Mr. Gosman

1  want you to tell me if that's what you were supposed to
2  do in that order.
3    A.  (Witness complies.)
4        It looks like shorthand, you know, someone's
5  notes to themselves.  But a lot of those ideas in that
6  list were talked about.
7    Q.  That isn't what I asked, Officer.  I asked if
8  that was the order in which you were to carry out the
9  plan that night?
10   A.  This is not a detailed plan, that list.
11   Q.  Well, I'll agree with you there.  But I'm
12  talking about the order of events that are listed, one
13  through seven, on the right-hand side of the page.  Is
14  that the sequence that you were instructed to carry out
15  that plan that night?
16       MR. THOMPSON:  Objection as to form.
17       THE WITNESS:  It wasn't -- it wasn't said --
18  exactly what was told to me.  And we talked about it
19  wasn't said exactly how that's written down.
20  BY MR. GOSMAN::
21   Q.  All right.  Well, why don't you go ahead and
22  tell me what you remember about that.
23   A.  Remember about what?
24   Q.  About the sequence of events that were to
25  take place as part of the plan of execution of the

MATTHEW DANZER - October 4, 2010                          Page 111
Direct Examination by Mr. Gosman

1  warrant?
2    A.  After we were, you know, went up to the front
3  of the house?
4    Q.  No.  While you were planning the operation.
5    A.  While we were -- I'm sorry.  What was the
6  question again?
7    Q.  Yeah.  Well --
8        MR. THOMPSON:  You want to know the sequence
9  of events?
10       MR. GOSMAN:  No, I don't.
11  BY MR. GOSMAN:
12   Q.  I want to know the sequence in which the
13  events were to be staged that night based on the plan
14  you had.
15   A.  Starting at what point?
16   Q.  Knock on door.  I mean, there's list of seven
17  items there, and that's what I'm referring to.
18   A.  Well, the first thing it says is "knock
19  door."
20   Q.  Right.
21   A.  I mean, that's not descriptive.
22   Q.  Yeah, it could mean knock it down, couldn't
23  it?  We'll assume that means knock on door.  Okay?
24   A.  If that's where you want me to start --
25   Q.  Yes.

MATTHEW DANZER - October 4, 2010                          Page 112
Direct Examination by Mr. Gosman

1    A.  Okay.  First thing we were going to do was
2  knock on door.
3    Q.  Yes.
4    A.  And announce our presence.
5    Q.  Yes.
6    A.  Inform there was a search warrant.  If no one
7  came to the door, then the other things that were
8  discussed were inserting a flashbang into the
9  bedroom -- a bedroom.  Using a ram on the front door,
10  breaking a back window into the back door.
11   Q.  Okay.  And then -- oh, well, number seven,
12  did you say something about that?
13   A.  Yes.  Using a ram on the front door if it was
14  not opened to us.
15   Q.  Okay.  All right.  What about this Tom
16  Wachsmuth stays in the lobby?  Do you know anything
17  about that, if father shows up?
18   A.  I didn't write this list, so I'm not sure
19  exactly what they were referring to on that.
20   Q.  Okay.  And I understand you didn't write the
21  list.  All I asked you was:  Do you know anything about
22  that?
23   A.  I could -- the best I could do is take
24  guesses at what the exact meaning of that is.
25   Q.  All right.  Okay.  Now, I want you to go

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 69 of 92
Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                  October 4, 2010

1  ahead and take a look at Exhibit 16. Have you ever
2  seen that document before?
3  A. Yes.
4  Q. Okay. What is it?
5  A. It's a police report.
6  Q. Did you prepare a police report like this?
7  A. I prepared a police report.
8  Q. Okay. I don't know the answer to this. Why
9  didn't you prepare a police report that described the
10 events of the entry and the service of the warrant?
11 A. It was covered in someone else's report.
12 Q. Okay. All right. So is that the report that
13 it was covered in, Exhibit 16?
14 A. Could you repeat the question?
15 Q. Is that the report of the events that night?
16 A. This is part of it.
17 Q. Okay. Do you know of any other reports that
18 cover that information?
19 A. Well, this is the supplement. So there's
20 more supplements in this report.
21 Q. All right. I want you to turn your attention
22 to those paragraphs that start with "the plan was."
23 About the middle of the page. I want you to read those
24 first three paragraphs. They're small. "The plan was
25 for three officers to approach the back door."

1  A. I don't remember for sure.
2  Q. Okay. Let's go on to the next one. "Six
3  officers would form the primary entry team." Go ahead.
4  A. "Six officers would form the primary entry
5  team. One officer would carry the ram, the rest were
6  equipped with long guns. Two other officers" -- excuse
7  me -- "two other officers would form a distraction team
8  and follow the entry team in to secure prisoners, and
9  would be armed with pistols. One of these two would
10 carry the window rake, and the other the NFDD."
11 Q. Okay. Is that an accurate description of
12 information that was shared with you and the other
13 members of the team before you went to this Wachsmuth
14 residence?
15 A. We had talked about that.
16 Q. Okay. All right. Go ahead and take the next
17 paragraph.
18 A. "The plan was to knock on the front door and
19 announce 'police'" -- in quotes -- "police, search
20 warrant" -- end of quotes. "If the door did not open
21 immediately, we would use the ram to force entry. The
22 primary entry team's responsibility was to secure the
23 residence and ensure the safety of everyone involved.
24 The follow-on officers would secure prisoners. Once
25 everyone was secure and the residence checked for

1  A. Okay. "The plan was for three officers to
2  approach the back door via wooden privacy fence in the
3  backyard. Their purpose was to secure the back door
4  and create a distraction by breaking a window in either
5  the south east bedroom, or the back door itself."
6  Q. Were you given that information as part of
7  the plan that night?
8  A. That was an option that we discussed.
9  Q. So was that information accurate?
10 A. I know we discussed it. I wasn't part of
11 that team, so ...
12 Q. So the language of that paragraph, accurately
13 represents what you discussed that night? That's all
14 I'm asking.
15 A. That was something that was discussed.
16 Q. Okay. Let's go on to the next paragraph.
17 A. Do you want me to read it?
18 Q. Yes, go ahead.
19 A. Okay. "Another officer, along with Officer
20 Blackmore, would secure the detached garage from
21 outside the fence. The fence connected the house to
22 the garage, and we would not know where a gate was
23 located."
24 Q. Was that discussed that night prior to your
25 going to the residence?

1  threats, the evidence team would take over. We planned
2  to immediately remove any occupants to the police
3  station for interviews."
4  Q. Is that information contained in that
5  paragraph accurate as discussed with you before you
6  went into the home that night?
7  A. I don't remember.
8  Q. Well, you were part of the entry team. You
9  don't remember what you were told about going into the
10 home?
11 A. Not exactly.
12 Q. Is there anything there that you have any
13 disagreement with, and this is Officer Chretien's
14 report?
15      MR. THOMPSON: Object as to form.
16      MS. WESTBY: Join.
17      THE WITNESS: Other than that's just his
18 recollection of what was discussed. That's why he
19 prepared that report.
20 BY MR. GOSMAN:
21 Q. All right. My question was: Do you have any
22 disagreement with it? Do you disagree with his
23 recollection?
24      MR. THOMPSON: Object as to form.
25      THE WITNESS: I don't remember exactly for

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 70 of 92
Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                  October 4, 2010

MATTHEW DANZER - October 4, 2010                    Page 117
Direct Examination by Mr. Gosman

1  sure it was discussed, so ...
2  BY MR. GOSMAN:
3   Q.  You don't remember whether it was discussed
4  that you would knock on the front door and announce
5  "police, search warrant"?
6          MR. THOMPSON: Object as to form.
7          THE WITNESS: Yes  we discussed that.
8  BY MR. GOSMAN::
9   Q.  Okay. "If the door did not open immediately,
10  we would use the ram to force entry."
11   A.  I don't remember the exact wording on that.
12   Q.  You got a problem with that, huh, Officer?
13  Is that where you have your problem?
14          MS. WESTBY: Object to the form of the
15  question. Argumentative.
16          MR. THOMPSON: Join.
17  BY MR. GOSMAN::
18   Q.  Go ahead.
19   A.  Well, it's his wording, not mine.
20   Q.  Well, is it accurate?
21   A.  I don't remember.
22   Q.  I know it's his wording.
23   A.  I don't remember what was exactly said.
24   Q.  "One officer would carry the ram and the rest
25  were equipped with long guns," do you have any problem

MATTHEW DANZER - October 4, 2010                    Page 118
Direct Examination by Mr. Gosman

1  with that?
2   A.  It sounds like -- you know, we discussed
3  that.
4   Q.  You don't have any problem with that, then,
5  do you?
6          MS. WESTBY: Object to the form of the
7  question.
8  BY MR. GOSMAN::
9   Q.  Yes or no?
10   A.  Well, I previously answered a question saying
11  I don't remember exactly what every person entering the
12  front carried as a weapon. So that's one thing I can't
13  say for sure if they all had long guns. That's part of
14  that. And I don't remember.
15   Q.  Okay. All right. Okay. Well, let's go down
16  to the next paragraph. "The plan was to knock on the
17  front door." Go ahead. I'm sorry. That's the one we
18  just read. "As the officers arrived and approached the
19  house."
20   A.  "As the officers arrived and approached the
21  house, the dog started to bark out the front living
22  room window. Officer Chapman knocked on the front door
23  and announced, 'police, search warrant.'"
24   Q.  Let's stop there. Did that happen? As it's
25  written there in the report?

MATTHEW DANZER - October 4, 2010                    Page 119
Direct Examination by Mr. Gosman

1   A.  I don't remember.
2   Q.  Do you remember the dog barking?
3   A.  Yes.
4   Q.  Okay. Where was the dog when he started
5  barking, do you know?
6          MR. THOMPSON: Object as to form.
7          THE WITNESS: I don't know.
8  BY MR. GOSMAN::
9   Q.  You don't have any reason to disagree with
10  the statement there, though, that it was in the front
11  living room window, correct?
12   A.  I guess that would be true.
13   Q.  Do you know what kind of dog it was? Do you
14  remember that?
15   A.  I didn't see the dog, but other people's --
16  you know, had said what it was.
17   Q.  Other people later told you what the dog was?
18   A.  (Witness nods head.)
19   Q.  All right. So at that moment when the dog
20  started barking, where were you?
21   A.  I was approaching the house, the front of the
22  house.
23   Q.  So did the dog start barking before everybody
24  was ready?
25   A.  Yes.

MATTHEW DANZER - October 4, 2010                    Page 120
Direct Examination by Mr. Gosman

1   Q.  Did that cause things to be hurried up?
2   A.  Yes.
3   Q.  Officer Chapman knocked on the front door and
4  announced, "police, search warrant"; is that your
5  recollection of what happened?
6   A.  I believe it was him.
7   Q.  Okay. Somebody knocked on the door and said,
8  "police, search warrant"; is that your statement here,
9  Officer?
10   A.  Yes.
11   Q.  You heard someone say, "police, search
12  warrant," before or at the time the door was knocked?
13   A.  Yes.
14   Q.  And you heard someone -- and it looks like it
15  probably was officer Chapman, based on Chretien's
16  report, knock on the door? You heard that?
17   A.  Yes.
18   Q.  And it says that "When the door did not open,
19  Officer Miner forced it open with the ram"; is that
20  correct?
21   A.  Yes.
22   Q.  Okay. And the backyard team was not in
23  position when this occurred, correct?
24   A.  Yes.
25   Q.  All right. And that's how you remember it?

MATTHEW DANZER - October 4, 2010          Page 121
Direct Examination by Mr. Gosman

1  A.  Yes.
2  Q.  And then it says down below, "As the door was
3  being rammed, Sergeant Kent used the window rake to
4  break the window in the northeast bedroom"; is that how
5  you remember that happening?
6  A.  I don't know.  I wasn't -- I didn't have
7  firsthand ...
8  Q.  Okay.  Did you hear the flashbang device
9  being deployed?
10  A.  I heard it go off.
11  Q.  Okay.  Did it go off after the door was
12  rammed?
13  A.  Yes.
14  Q.  How long did it take between the ramming of
15  the door and the noise distraction device?
16  A.  I have no idea of a time, how much time
17  passed.
18  Q.  Okay.  Would that be true of the sequence of
19  events, really from the time you got up to the door
20  until the time you got back out of the house?
21  A.  What would be true?
22  Q.  That you really don't have any recognition of
23  the actual time it took for the events to occur?
24  MR. THOMPSON: Objection as to form.
25  THE WITNESS: I don't know how long it took.

MATTHEW DANZER - October 4, 2010          Page 122
Direct Examination by Mr. Gosman

1  BY MR. GOSMAN::
2  Q.  Okay.  All right.  So after the dog barked,
3  how long did it take before the battering ram was
4  employed?
5  A.  I don't remember how much time had passed.
6  Q.  And you weren't there, so you don't know what
7  McCaslin and Kent were doing on the side of the house
8  where the bedroom was, correct?
9  A.  Correct.
10  Q.  Did they join you in the house after they had
11  deployed the flashbang device?
12  A.  At some point I think they came inside.
13  Q.  Okay.  All right.  So who was the first
14  officer in the house?
15  A.  I don't remember for sure.
16  Q.  Who do you think?
17  A.  Officer Chapman.
18  Q.  Okay.  Do you know if he tried the door
19  before he knocked it down?
20  A.  I don't remember if he did.
21  Q.  When you got in the house -- where were you
22  in the procession of folks entering the home?
23  A.  I was one of the middle.
24  Q.  Third perhaps or fourth?
25  A.  I think I was the third person in.

MATTHEW DANZER - October 4, 2010          Page 123
Direct Examination by Mr. Gosman

1  Q.  Okay.  And did you notice where Tricia
2  Wachsmuth was when you entered the house?
3  A.  Yes.
4  Q.  Where was she?
5  A.  She was sitting on the couch.
6  Q.  How far from the door was she?
7  A.  I don't remember for sure.
8  Q.  Well, give me your best guess, Officer.
9  A.  She was sitting in the living room.  The
10  couch was in the living room.
11  Q.  Uh-huh.  And the couch was right up against
12  the picture window, correct?  And it was right next to
13  the door, correct?
14  A.  I don't remember for sure.
15  Q.  What don't you remember about that?
16  MS. WESTBY: Object to the form of the
17  question.
18  THE WITNESS: I can't tell you 100 percent
19  that's where the couch was at and that's where she was
20  at.
21  BY MR. GOSMAN::
22  Q.  You saw her sitting on the couch but you
23  don't know where the couch was at in the house?
24  A.  It was in the living room.
25  Q.  You don't know where it was in the living

MATTHEW DANZER - October 4, 2010          Page 124
Direct Examination by Mr. Gosman

1  room?
2  A.  Not for sure.
3  Q.  All right.  Did you ever see a diagram of the
4  house after you had entered it, completed your mission?
5  A.  I don't know.
6  Q.  Okay.  Did you see an officer take control of
7  Tricia Wachsmuth?
8  A.  No.
9  Q.  Was somebody assigned to that responsibility?
10  A.  No.
11  Q.  That hadn't been figured out in the plan
12  before you went in, as far as you know?
13  A.  Not that I remember.
14  Q.  Did you see an officer point a weapon at
15  Ms. Wachsmuth?
16  A.  No.
17  Q.  Not once in the entire time that you were in
18  the house with Ms. Wachsmuth did you see an officer
19  point a weapon at her?
20  A.  No.
21  Q.  You'd had plenty of opportunities to see that
22  if it had occurred, correct?
23  A.  Not necessarily.
24  Q.  Tell me why not.
25  A.  I entered the house.

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 72 of 92
Tricia Wachsmuth v.                                                                          Matthew Danzer
City of Powel, et al.                                                                        October 4, 2010

1   Q. Yes, I know that.

2   A. She was in the front of the house. I

3   proceeded past that area to continue to clear the rest

4   of the house.

5   Q. Had Ms. Wachsmuth been secured by the time

6   you went past that area into the rest of the house?

7   A. No.

8   Q. Go ahead.

9   A. Then we finished clearing the rest of the

10  house.

11  Q. Did you go down the stairs?

12  A. Yes.

13  Q. Okay. What were you doing with your weapon

14  when you went down the stairs?

15  A. I had my weapon down towards the ground. And

16  I believe I used the light on it to shine towards my

17  left to the open area, since it was dark down there.

18  Q. There was an opening in the stairway into the

19  basement --

20  A. The basement --

21  Q. -- walls?

22  A. The basement was to the left. The rest of

23  the basement was to the left

24  Q. Did you see what the other officers were

25  doing as they proceeded down the stairs?

1   A. No.

2   Q. Why did Tricia Wachsmuth lead the group?

3   A. I don't know.

4   Q. That's fine. Did you see that?

5   A. Lead the group?

6   Q. Yes. Did you see her forced down the stairs

7   in front of the officers?

8          MR. THOMPSON: Object as to form.

9          THE WITNESS: No.

10  BY MR. GOSMAN::

11  Q. What did you see?

12  A. I saw her walk down the stairs.

13  Q. She just voluntarily led the group down the

14  stairs; is that your testimony?

15         MS. WESTBY: Object to the form of the

16  question.

17         MR. THOMPSON: Join.

18         THE WITNESS: I don't know how it came about

19  that she went down first.

20  BY MR. GOSMAN::

21  Q. All right. Did you help clear the basement?

22  A. I went downstairs.

23  Q. Okay. And did you -- how long were you down

24  there?

25  A. I don't remember for sure.

1   Q. Okay. Was it more than a couple of minutes?

2   A. I don't remember for sure.

3   Q. Okay. From the time you entered the house

4   until the time you started back up those stairs, can

5   you tell me how much time elapsed?

6   A. I don't know.

7   Q. Okay. Could it have been ten minutes?

8          MS. WESTBY: Object to the form of the

9   question. Asked and answered.

10         THE WITNESS: I'd like to say no, but I don't

11  know.

12  BY MR. GOSMAN::

13  Q. Okay. Officer, you were aware that there was

14  a fire that started in the house, were you not?

15  A. No.

16  Q. Did you go into the bedroom where the

17  flashbang device had been deployed?

18  A. I don't remember. I don't think I did.

19  Q. Who were the officers that were -- well, let

20  me ask this question: As the group assembled to go

21  down to the basement, where were you in that

22  procession?

23         MR. THOMPSON: Objection as to form.

24         MS. WESTBY: Join.

25         THE WITNESS: Well, I was standing near the

1   back door.

2   BY MR. GOSMAN::

3   Q. So you were the last one to go down the

4   stairs?

5   A. No.

6   Q. All right. Well, there were at least six men

7   with long rifles that were part of the entry team. I

8   assume that the entry team was responsible for clearing

9   the entire house, including the basement; is that true?

10  A. Yes.

11  Q. And so you couldn't all go down the stairs

12  abreast. There had to be sort of a line. Where were

13  you in that line?

14  A. I was the first one.

15  Q. Well, I think we've established that Tricia

16  Wachsmuth was the first one. So you were the second

17  person in that line?

18         MS. WESTBY: Object to the form of the

19  question.

20         MR. THOMPSON: Join.

21         THE WITNESS: I answered that based on the

22  fact that you were talking about officers, entry team

23  going in.

24  BY MR. GOSMAN::

25  Q. That's fair enough. So you were the first

Case 1:10-cv-00041-ABJ Document 65-12 Filed 01/10/11 Page 73 of 92
Tricia Wachsmuth v.
City of Powel, et al.
Matthew Danzer
October 4, 2010

MATTHEW DANZER - October 4, 2010                    Page 129
Direct Examination by Mr. Gosman

1   officer headed down the stairs?
2   A. Yes.
3   Q. Do you know where Chretien was?
4   A. No.
5   Q. Did you hear Chretien say, "Get her over
6   here"?
7   A. No.
8   Q. "She's going first"?
9   A. Not necessarily that phrase.
10  Q. What did you hear?
11  A. What did I hear of what? In reference to
12  what? To what Officer Chretien said?
13  Q. Yeah, that's what we're talking about.
14  A. I don't know the exact phrasing. But
15  something to the effect of telling Tricia to go down.
16  Q. Did Tricia stop and put her back to the wall?
17  A. No.
18  Q. When you arrived at the house, did you notice
19  the vehicles that were in front of it?
20  A. I don't remember what was in front of it.
21  Q. Do you know what kind of a vehicle Bret
22  Wachsmuth drove?
23  A. Not for sure.
24  Q. Well, Bret Wachsmuth was the threat, such as
25  it was in that warrant; isn't that true?

MATTHEW DANZER - October 4, 2010                    Page 130
Direct Examination by Mr. Gosman

1       MS. WESTBY: Object to the form of the
2   question.
3       MR. THOMPSON: Join.
4       THE WITNESS: Not necessarily.
5   BY MR. GOSMAN::
6   Q. Okay. Well, who or what else posed a threat
7   to the safety of the officers that night?
8   A. We had no idea who was going to be there.
9   Q. Really? You had no idea who was going to be
10  at the house?
11  A. I didn't know who was inside the house at the
12  time.
13  Q. You had Officer Blackmore conducting
14  surveillance. The entry plan indicates that there were
15  three people in the house, maximum. And you didn't
16  know any of that?
17      MR. THOMPSON: Objection as to the form.
18  Asked and answered.
19      MS. WESTBY: Objection as to the form and
20  argumentative.
21      THE WITNESS: Intel is not always good intel.
22  You don't always know if that's what you're going to
23  encounter.
24  BY MR. GOSMAN::
25  Q. All right. So Bret Wachsmuth was the threat

MATTHEW DANZER - October 4, 2010                    Page 131
Direct Examination by Mr. Gosman

1   that had been identified in your planning session
2   before going into the house, correct? You described
3   him as unstable, paranoid, he had guns in his house,
4   all that?
5       MS. WESTBY: Object to the form.
6       MR. THOMPSON: Join.
7       THE WITNESS: I didn't describe him as that.
8   BY MR. GOSMAN::
9   Q. Yes, you did. And he was the threat,
10  correct? He was the reason why you decided to get
11  everybody together, put on armor, get your long guns
12  out, take a flashbang, and go break in his door, right?
13      MS. WESTBY: Object to the form of the
14  question.
15      MR. GOSMAN: That is a little argumentative.
16  I'll agree with that.
17      MS. WESTBY: And if you would just please.
18      MR. GOSMAN: All right. I apologize. We'll
19  back up on that.
20  BY MR. GOSMAN::
21  Q. That's -- the reason why you used the force
22  that was used that night was because you were concerned
23  of officer safety that was presented by the threat of
24  Bret Wachsmuth, correct?
25  A. He was a concern.

MATTHEW DANZER - October 4, 2010                    Page 132
Direct Examination by Mr. Gosman

1       MS. WESTBY: Object.
2   BY MR. GOSMAN::
3   Q. He was the concern, wasn't he?
4       MS. WESTBY: Object to the form.
5       MR. THOMPSON: Join.
6       THE WITNESS: He was a concern.
7   BY MR. GOSMAN:
8   Q. All right. And well, you've got to help me
9   out here. It just can't be the universe of other
10  conceivable possibilities that could arise in a
11  situation.
12      Your job is to figure out what the risk and
13  the threat is, correct?
14  A. Part of it.
15  Q. And what other threat was there if it wasn't
16  Bret Wachsmuth?
17  A. Any other person inside the house did --
18  Q. A ten-year-old child?
19      MS. WESTBY: Object to the form. Again, this
20  is exactly what we talked about. He is answering your
21  question. Please calm down, be polite, and let him
22  finish his answer.
23  BY MR. GOSMAN:
24  Q. What other persons, Officer? I mean --
25      MS. WESTBY: And again, he's in the middle of

1  an answer. He is in the middle of an answer.
2        MR. GOSMAN: He just said other persons.
3  BY MR. GOSMAN:
4    Q. Go ahead. Did I interrupt your answer?
5    A. Yes.
6    Q. All right. Go ahead and finish.
7    A. I don't remember what I was ...
8    Q. Well, we're talking about all the possible
9  threats that you were concerned about that night when
10 you entered the Wachsmuth's residence. We identified
11 Bret. He was the one you talked about. And we talked
12 about a child that was in the house.
13   A. That was mentioned.
14   Q. Yes. And we talked about the possibility of
15 who -- of Tricia being in the house. Who else, as a
16 realistic objective concern, would have been present in
17 that house that you had to be concerned about?
18       MS. WESTBY: Object to the form.
19       MR. THOMPSON: Join.
20       THE WITNESS: I'd be concerned about anyone
21 else who could have been there, including friends. Any
22 person they could have invited over. There's --
23 BY MR. GOSMAN:
24   Q. In other words, anyone that they --
25       MR. THOMPSON: Counsel --

1        MR. GOSMAN: Go ahead.
2        MR. THOMPSON: Let him answer.
3  BY MR. GOSMAN:
4    Q. All right. Are you done?
5    A. I understand —
6        MS. WESTBY: You keep interrupting him.
7        MR. THOMPSON: If faced with a summary
8  judgment motion, you're going to say, no, he didn't
9  answer this way. That's because he's never been given
10 the chance.
11       MR. GOSMAN: Yeah. Okay.
12 BY MR. GOSMAN:
13   Q. All right. Well, you know, you're a police
14 officer. This is not a, you know, a game here. You
15 have to identify objective dangers that were present
16 that night. And we talked about Bret Wachsmuth.
17       And I want to know what other objective
18 dangers were there at that house that you had to be
19 afraid of that caused a concern for officer safety?
20       MS. WESTBY: Object to the form of the
21 question. He has attempted to answer your question.
22 If you want him to run through the list again, then
23 don't interrupt him as he's going through the list.
24       MR. GOSMAN: Well I'm taking issue you with
25 the fact that he's saying that anyone who was at the

1  house could have been a threat to the safety of the
2  officers.
3        MS. WESTBY: You know what? Because you
4  don't like his answer to the question does not mean
5  it's not an answer.
6        MR. GOSMAN: That's true.
7  BY MR. GOSMAN:
8    Q. All right. Is that your answer? I'm talking
9  about objective dangers that were present at the
10 Wachsmuth home that night when the planning was done.
11 And are you telling me that anyone else who was in that
12 home represented an objective danger to the officers?
13       MS. WESTBY: Object to the form of the
14 question. Answer if you can.
15       THE WITNESS: Possibly.
16 BY MR. GOSMAN:
17   Q. All right.
18   A. In law enforcement, we function in worst-case
19 scenario situations. One thing we're trained in is the
20 plus one rule. If there's one threat, you know,
21 there's -- there could be another threat. And that's
22 how we're trained.
23       So if we're trained there's going to be one
24 threat, then that threat has a friend who could be a
25 threat. And that friend could have brought a friend

1  with him, could have been a threat, could have been a
2  house full of threats. We don't know.
3    Q. Okay. Was there any evidence that Bret
4  Wachsmuth had any other friends that posed a danger to
5  police officers?
6        MS. WESTBY: Object to the form of the
7  question.
8        MR. THOMPSON: Join.
9        THE WITNESS: At what point?
10 BY MR. GOSMAN:
11   Q. Any point. Well, before the raid.
12   A. We didn't know who all would be in that
13 house.
14   Q. No, that's not what I asked, Officer. And I
15 do need you to just answer this question. And that is:
16 Was there anybody mentioned who would have been a
17 friend of Bret Wachsmuth who would have posed a threat
18 to the safety of officers that might have been in that
19 house?
20       MS. WESTBY: Object to the form of the
21 question. Asked and answered over again.
22       MR. THOMPSON: Join.
23       THE WITNESS: I don't remember who all was
24 discussed that night. I can tell you what -- going
25 through my mind. But I don't know who all we talked

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 75 of 92
Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

MATTHEW DANZER - October 4, 2010                 Page 137
Direct Examination by Mr. Gosman

1    about. Another name was dropped, it's possible I
2    didn't remember.
3    BY MR. GOSMAN:
4        Q.  And you don't remember any other name?
5        A.  No.
6                (Exhibit 22 identified)
7    BY MR. GOSMAN:
8        Q.  All right. Let's go ahead and turn to
9    Exhibit 22 for a minute. And is this your report?
10       A.  Yes.
11       Q.  And you apparently were the officer that
12   searched Bret Wachsmuth's vehicle?
13       A.  I was one of them.
14       Q.  Okay. What kind of vehicle was it, do you
15   remember? Is it identified in the report? It probably
16   is.
17       A.  Yes.
18       Q.  What kind of vehicle was it?
19       A.  Chevy Blazer.
20       Q.  And had you been told that Bret Wachsmuth
21   drove a Chevy Blazer before you went to the house that
22   night?
23       A.  I don't remember for sure.
24       Q.  It's true that Bret Wachsmuth was not at the
25   house that night, correct?

MATTHEW DANZER - October 4, 2010                 Page 138
Direct Examination by Mr. Gosman

1            MR. THOMPSON: Objection as to form.
2    BY MR. GOSMAN:
3        Q.  At least when you arrived?
4        A.  The house we did the search warrant?
5        Q.  Yes.
6        A.  He was not there while I was there.
7        Q.  And were you with Bret when he was taken into
8    custody?
9        A.  Yes.
10       Q.  Okay. Was he armed?
11       A.  Armed as in?
12       Q.  A weapon of any kind.
13       A.  Any kind, I don't know. I don't remember.
14       Q.  Okay. That would have been pretty important
15   for a guy that you were so concerned about, wouldn't it
16   have been?
17           MS. WESTBY: Object to the form of the
18   question.
19   BY MR. GOSMAN:
20       Q.  You don't remember whether he was armed?
21       A.  If you said -- if you said, "any weapon," I
22   don't know if he had any weapons on him.
23       Q.  What are we talking about? When I say any
24   weapons.
25       A.  You used that. I don't know.

MATTHEW DANZER - October 4, 2010                 Page 139
Direct Examination by Mr. Gosman

1        Q.  Ballpoint pens?
2        A.  Yeah, they could all be weapons.
3        Q.  Okay. All right. Did he have a gun?
4        A.  No.
5        Q.  Did he have a knife.
6        A.  I don't remember.
7        Q.  Did he offer any resistance at all?
8        A.  No.
9        Q.  How about Tricia Wachsmuth, did she offer any
10   resistance at all?
11       A.  Resistance of what?
12       Q.  Resistance.
13       A.  Of what?
14       Q.  Of the authority of the officers in the
15   house?
16           MR. THOMPSON: Objection. Asked and
17   answered.
18           THE WITNESS: She didn't open the front door.
19   I guess that would be -- the answer is yes.
20   BY MR. GOSMAN::
21       Q.  How much time did you give her to open the
22   door, Officer?
23       A.  I don't know how much time passed between --
24   exact time passed between.
25       Q.  Couple seconds?

MATTHEW DANZER - October 4, 2010                 Page 140
Direct Examination by Mr. Gosman

1            MS. WESTBY: Object as to the form of the
2    question.
3            MR. THOMPSON: Join. Argumentative.
4            THE WITNESS: I don't remember the exact
5    time.
6    BY MR. GOSMAN:
7        Q.  Could have been a couple seconds, huh?
8            MS. WESTBY: Object to the form of the
9    question.
10   BY MR. GOSMAN:
11       Q.  Go ahead and answer.
12           MR. THOMPSON: Join.
13           THE WITNESS: I don't know if it was a couple
14   seconds or if it was longer. I don't remember the
15   exact time frame.
16   BY MR. GOSMAN:
17       Q.  Do you know whether she even had time to get
18   up and answer the door?
19           MR. THOMPSON: Objection as to form.
20   Speculation.
21           MS. WESTBY: Join.
22           THE WITNESS: I don't know. I couldn't see
23   her inside the house, so I guess there's no way of
24   knowing if she could have made it to the door. I
25   didn't know if she was in the bathroom. I don't know.

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 76 of 92
Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

1  Couldn't see inside the house.
2  BY MR. GOSMAN:
3      Q.  Well, let's assume she was sitting on the
4  couch and the couch was against the window, and the
5  window was next to the door. Did she have time to get
6  up and answer the door?
7          MR. THOMPSON: Object to form.
8          MS. WESTBY: Join.
9          THE WITNESS: You're asking for my opinion?
10 BY MR. GOSMAN:
11     Q.  No, I'm not asking for your opinion. I'm
12 asking you to tell me, if based on what you know, she
13 had time to get up and answer the door?
14         MS. WESTBY: Object to the form.
15 BY MR. GOSMAN::
16     Q.  And if you don't know --
17         MS. WESTBY: The question by its nature calls
18 for speculation. So when he answers it that way, he is
19 being honest and truthful. Do not badger him. Do not
20 be disrespectful.
21         THE WITNESS: And that is why I asked you,
22 "Do you want my opinion?" Because that's how you posed
23 the question to me.
24 BY MR. GOSMAN:
25     Q.  Okay. You don't have any idea how much time

1  elapsed between the moment that officer Chapman
2  announced, "police, search warrant," and the door was
3  rammed?
4      A.  I don't know exact time elapsed, no.
5      Q.  And you're unable to give any kind of
6  estimate?
7      A.  I wasn't looking at my watch. I wasn't
8  counting necessarily out loud in my head.
9      Q.  All right. Other than the fact that you
10 consider it to be resistance that Ms. Wachsmuth didn't
11 get up to answer the door, did she display any other
12 resistance to the commands or directions of the police
13 officers?
14         MR. THOMPSON: Objection as to form.
15         MS. WESTBY: Join.
16         THE WITNESS: I don't know. Because I wasn't
17 with her the whole time.
18 BY MR. GOSMAN:
19     Q.  Do you know when she was handcuffed?
20     A.  Not for sure.
21     Q.  Was she handcuffed when she went down the
22 stairs?
23     A.  She was not in handcuffs.
24     Q.  Do you know why not?
25     A.  I don't.

1      Q.  Should she have been in handcuffs?
2          MS. WESTBY: Object to the form.
3          THE WITNESS: She was directed -- I mean,
4  there was a conversation or the discussion, all that
5  took place. I wasn't even right there. So I don't --
6  I don't know what took place. I can't make a judgment
7  call on that.
8  BY MR. GOSMAN:
9      Q.  You started to say she was directed. What
10 did you mean by that?
11     A.  I'm not sure, because I didn't finish.
12     Q.  Because you didn't finish, you're not sure
13 what you meant?
14         MS. WESTBY: Object to the form of the
15 question.
16         THE WITNESS: I don't know. Because I used a
17 different word.
18 BY MR. GOSMAN:
19     Q.  She was directed to take you downstairs
20 wasn't she, and lead the group?
21         MS. WESTBY: Object to the form of the
22 question.
23         MR. THOMPSON: Join.
24         THE WITNESS: I wasn't there -- I wasn't in
25 that conversation, so I don't know.

1  BY MR. GOSMAN:
2      Q.  You said you heard Chretien say, "Come here."
3      A.  No.
4      Q.  What was it that you heard him say? I may be
5  wrong.
6      A.  He said something to the effect of, "go
7  downstairs." I don't remember what he exactly said.
8  That's my impression of what I got from that. From
9  what I heard at least.
10     Q.  Was she within the custody and control of the
11 police officer at that time?
12         MS. WESTBY: Object to the form of the
13 question.
14         MR. THOMPSON: Join.
15         THE WITNESS: What do you mean by "custody
16 and control"?
17 BY MR. GOSMAN:
18     Q.  I mean, was she in custody? Was she being
19 held?
20         MS. WESTBY: Same objection.
21 BY MR. GOSMAN:
22     Q.  Was she free to leave the house?
23         MS. WESTBY: Calls for a legal conclusion.
24 And you're changing your question. Every single one of
25 your questions is different.

Case 1:10-cv-00041-ABJ    Document 65-12    Filed 01/10/11    Page 77 of 92

Tricia Wachsmuth v.                                    Matthew Danzer
City of Powel, et al.                                  October 4, 2010

MATTHEW DANZER - October 4, 2010                          Page 145
Direct Examination by Mr. Gosman

1    MR. THOMPSON: Join.

2    MS. WESTBY: Which question are you asking

3    him to answer?

4    BY MR. GOSMAN:

5    Q.  Was Ms. Wachsmuth free to leave the house

6    when Officer Chretien said whatever he said to her

7    about going downstairs?

8    A.  I don't know what their conversation was.

9    So, I don't know.

10   Q.  Well -- okay.

11   A.  I can't say for sure.

12   Q.  Was she free to leave the house when that

13   conversation occurred?

14   A.  I wasn't in that conversation.

15   Q.  She was in custody, wasn't she?

16   MS. WESTBY: Object to the form of the

17   question. Calls for a legal conclusion. It's a

18   different question.

19   Go ahead and answer if you can.

20   THE WITNESS: I don't know if she was in

21   custody at that point.

22   BY MR. GOSMAN:

23   Q.  Officer, are you telling me that you don't

24   know whether Ms. Wachsmuth was free to leave the house

25   after you'd busted down the door and everybody entered

MATTHEW DANZER - October 4, 2010                          Page 146
Direct Examination by Mr. Gosman

1    the house and the flashbang had gone off in the

2    bedroom? You don't know whether she was free to leave

3    the house? You're trained as a police officer.

4    MS. WESTBY: Object to the form of the

5    question. I don't even know -- that's just rude

6    commentary. I don't even know if that's a question.

7    BY MR. GOSMAN:

8    Q.  You don't know whether she was free to leave

9    the house?

10   A.  I wasn't standing next to her. I don't know

11   what the conversation took place. I didn't know if

12   somebody could have told her, "Hey, you can leave." I

13   didn't know.

14   Q.  Okay.

15   A.  I would have to speculate to her interactions

16   with other officers. I can't, because I don't know.

17   Q.  Did Ms. Wachsmuth leave the house in

18   handcuffs?

19   A.  Yes.

20   MR. GOSMAN: I don't have any further

21   questions. Thank you very much. Have a safe trip back

22   to Bozeman.

23   THE WITNESS: Thank you.

24   MS. WESTBY: Okay. We'll read and sign,

25   okay?

MATTHEW DANZER - October 4, 2010                          Page 147
Direct Examination by Mr. Gosman

1    THE WITNESS: What's that?

2    MS. WESTBY: Read and sign. You'll have an

3    opportunity to look it over, check it for spelling or

4    those kind of errors.

5    THE WITNESS: Okay.

6    MS. WESTBY: And then sign it and send it

7    back.

8    THE WITNESS: Okay.

9    MS. WESTBY: Do you want it sent to your

10   office address or do you want it sent to a different

11   address?

12   THE WITNESS: Yeah, that's fine.

13   (Proceedings concluded at 7:46

14   p.m., October 4, 2010.)

15

16

17

18

19

20

21

22

23

24

25

MATTHEW DANZER - October 4, 2010                          Page 148
Direct Examination by Mr. Gosman

1    DEPONENT'S CERTIFICATE

2    I, MATTHEW DANZER, do hereby certify, under

3    penalty of perjury, that I have read the foregoing

4    transcript of my testimony consisting of 147 pages,

5    taken on October 4, 2010 and that the same is, with any

6    changes noted below, a full, true and correct record of

7    my deposition.

8    PAGE  LINE        CORRECTION        REASON FOR CORRECTION

9    ___  ___  _____  _____

10   ___  ___  _____  _____

11   ___  ___  _____  _____

12   ___  ___  _____  _____

13   ___  ___  _____  _____

14   ___  ___  _____  _____

15   ___  ___  _____  _____

16   ___  ___  _____  _____

17   ___  ___  _____  _____

18   ___  ___  _____  _____

19   ___  ___  _____  _____

20   ___  ___  _____  _____

21   ___  ___  _____  _____

22

23

24                          MATTHEW DANZER    Date

25

Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

1                       CERTIFICATE

2               I, VONNI R. BRAY, Registered Professional

3   Reporter, and Notary Public for the State of Montana,

4   do hereby certify that MATTHEW DANZER was by me first

5   duly sworn to testify to the truth, the whole truth,

6   and nothing but the truth;

7               That the foregoing transcript, consisting of

8   148 pages, is a true record of the testimony given by

9   said deponent, together with all other proceedings

10  herein contained.

11              IN WITNESS WHEREOF, I have hereunto set my

12  hand this 15th day of October, 2010.

13

14

15

16

17

18

19

20

21  _____

    Vonni R. Bray, RPR
22  P. O. Box 125
    Laurel, MT 59044
23  (406) 670-9533 Cell
    (888) 277-9372 Fax
24  vonni.bray@yahoo.com

25

Tricia Wachsmuth v.
City of Powel, et al.

**1**

**10 (7)**
103:16,19;104:6;
105:12;106:14;107:1;
109:13
**100 (2)**
24:21;123:18
**11 (1)**
36:3
**116 (2)**
56:7,7
**15 (1)**
65:19
**16 (4)**
107:10,13;113:1,13
**16th (1)**
8:16
**18 (2)**
65:20;66:13
**19 (1)**
42:5

**2**

**20 (1)**
66:20
**2004 (2)**
11:12;12:19
**2005 (10)**
23:2;36:10,19;37:3;
40:21;41:15;57:21;
62:10;64:19;65:8
**2009 (11)**
10:10;33:16;36:4,8,
20;37:5;39:16;40:7;
42:6;49:19;96:20
**2010 (2)**
80:6;147:14
**21 (1)**
67:15
**22 (2)**
137:6,9
**24 (1)**
36:8
**24th (11)**
33:16;36:20;37:5;
39:16;40:7;42:5;49:18;
51:21;52:10;80:10;
96:20
**27 (4)**
65:1,4;67:20,21
**28 (2)**
30:6,9
**2-minute (1)**
80:3

**3**

**3 (1)**
94:1
**30 (1)**

87:24
**31 (5)**
18:21,24;19:3;27:23,
24
**35 (11)**
22:14,18,22,23,24;
23:14,23;24:8,27:20,21;
43:21
**35s (1)**
27:22
**36 (4)**
22:17,17,21;24:7
**37 (1)**
55:20

**4**

**4 (2)**
80:6;147:14
**4th (1)**
23:1

**5**

**50 (2)**
62:9;69:14
**50-hour (4)**
28:8;35:21;57:21;60:2

**6**

**6 (1)**
30:18
**6:05 (1)**
80:5
**6:15 (1)**
80:5
**612 (1)**
19:10
**615 (1)**
8:16

**7**

**7:46 (1)**
147:13

**9**

**9/13 (1)**
4:17
**9mm (3)**
50:16,18;108:23

**A**

**ability (4)**
9:20,24;65:21,23
**able (3)**
61:24;73:1;74:2
**Above (1)**
9:11
**abreast (1)**

**128:12**
**academy (2)**
12:1.2
**accommodate (1)**
4:12
**accomplished (1)**
25:4
**according (3)**
108:3,17,19
**accurate (7)**
24:21;102:10;105:8;
114:9;115:11;116:5;
117:20
**accurately (2)**
67:15;114:12
**acquired (1)**
36:18
**act (3)**
31:21;72:25;73:1
**acting (1)**
48:20
**action (8)**
18:3;29:18,22;30:10;
36:1;40:8;71:24;109:22
**active (3)**
28:17,24;43:10;55:18;
70:1,17,24;72:20
**activity (2)**
48:18;56:11
**actual (2)**
83:7;121:23
**actually (15)**
8:3;16:8;18:25;24:3;
28:19;36:4;38:6;52:18;
57:24;59:17;64:1;74:15;
92:13;105:12,17
**addition (1)**
60:17
**additional (3)**
49:25;50:5,6
**address (4)**
5:25;8:15;147:10,11
**affairs (4)**
14:20;15:12;17:1,15
**afraid (1)**
134:19
**afternoon (2)**
4:2,5
**afterward (1)**
36:19
**Again (14)**
29:24;33:12;37:24;
38:15;48:22;57:12,18;
58:12;60:9;111:6;
132:19,25;134:22;
136:21
**against (13)**
6:24;10:17;14:18;
15:4,11;16:6,17;17:6,7;
63:24;93:7;123:11;
141:4
**age (3)**
105:17,22;106:4

**agency (2)**
25:21;56:10
**agent (3)**
98:10,13;105:13
**ago (3)**
39:5;41:8;74:10
**agree (8)**
68:24;71:6;74:7;
96:24;101:18;103:5;
110:11;131:16
**agreed (1)**
4:11
**agreement (1)**
46:1
**ahead (57)**
5:1;10:22;11:3;12:23;
15:25;17:13;18:23;
19:23;21:1,6;22:16;
25:11;27:11;28:16;
29:25;30:8;32:6;33:23;
34:9;43:2;47:9;52:2;
55:12;56:17;60:8;61:19;
65:3,12,19;66:14;67:1,
20;71:9,14;74:20;79:12;
80:8;89:20;90:14;98:9;
102:11;103:18;107:12;
110:21;113:1;114:18;
115:3,16;117:18;
118:17;125:8;133:4,6;
134:1;137:8;140:11;
145:19
**Alan (1)**
108:8
**Allen (1)**
6:6
**all-encompassing (1)**
70:10
**all-inclusive (1)**
25:13
**allow (4)**
7:13;18:1;61:9;72:10
**allowing (1)**
95:8
**allows (1)**
17:11
**along (2)**
12:9;114:19
**altogether (1)**
94:14
**always (4)**
38:3;88:25;130:21,22
**ammunition (1)**
50:7
**announce (5)**
79:21;99:18;112:4;
115:19;117:4
**announced (3)**
118:23;120:4;142:2
**annual (1)**
14:9
**annually (1)**
13:19
**answered (14)**

38:24;40:17;57:6,16;
58:10;60:5;76:1;87:6;
118:10;127:9;128:21;
130:18;136:21;139:17
**apologize (2)**
34:9;131:18
**apparently (6)**
4:5;42:13;49:7;56:5;
102:20;137:11
**appear (1)**
22:18
**appears (3)**
23:6,10;24:15
**apply (2)**
13:6;93:7
**Appreciate (2)**
8:10;44:19
**approach (3)**
31:5;113:25;114:2
**approached (2)**
118:18,20
**approaching (1)**
119:21
**appropriate (2)**
59:21;101:19
**appropriately (1)**
59:20
**approved (10)**
19:17,21;20:18,19;
27:18;81:23,25;82:4,7,8
**area (10)**
24:25;73:14;91:1;
97:13;98:11,14;104:18;
125:3,6,17
**areas (4)**
43:13;44:7;46:16;
70:12
**arguing (1)**
96:3
**Argumentative (8)**
57:6;59:12;60:5;
90:12;117:15;130:20;
131:15;140:3
**arise (1)**
132:10
**armed (9)**
37:21;38:1,5,9;90:9;
115:9;138:10,11,20
**armor (1)**
131:11
**around (1)**
89:21
**arrested (2)**
10:2,5
**arrived (7)**
54:21,25;80:10;
118:18,20;129:18;138:3
**aside (1)**
44:4;61:25
**aspects (2)**
83:13;91:20
**Assaulter (1)**
67:14

Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

**assemble (1)**
80:12
**assembled (7)**
33:13;80:17,21;83:23;
84:2;99:11;127:20
**assessment (1)**
97:2
**assigned (2)**
107:17;124:9
**assignment (4)**
76:25;77:3,4,9
**assignments (3)**
48:18;109:7,9
**associated (1)**
65:7
**assume (10)**
7:6;19:20;20:19;35:8;
44:20;47:18;53:21;
111:23;128:8;141:3
**assumed (1)**
82:3
**assuming (1)**
16:25
**attached (1)**
58:16
**attempted (1)**
134:21
**attendance (2)**
21:25;22:2
**attendances (1)**
26:23
**attended (4)**
10:24;11:5;20:6;26:19
**attention (1)**
113:21
**attitude (1)**
65:22
**authority (1)**
139:14
**automatic (7)**
33:15;41:21;45:12;
50:21;52:17,18;63:13
**available (7)**
4:9;29:12;30:24;
68:21;69:21;73:7;91:23
**Avenue (1)**
8:16
**avoided (1)**
94:14
**aware (5)**
14:21;45:24;93:24;
96:15;127:13
**away (2)**
71:11,12

**B**

**bachelor's (1)**
11:7
**back (27)**
11:14;24:2;35:25;
55:1;62:15;71:7;77:23;
78:2,8,18;80:8;107:21;

108:7,7;112:  0,10;
113:25;114:2,3,5;
121:20;127:4;128:1;
129:16;131:19;146:21;
147:7
**baekground (1)**
10:21
**backyard (2)**
114:3;120:22
**badger (1)**
141:19
**Badgering (2)**
60:5;90:12
**Ballpoint (1)**
139:1
**bark (1)**
118:21
**barked (1)**
122:2
**barking (4)**
119:2,5,20,2?
**barricade (1)**
43:11
**barricaded (2)**
25:7;39:5
**base (1)**
101:19
**based (8)**
4:5;13:15;23:?;
107:17;111:13;120:15;
128:21;141:12
**basement (8)**
91:8;125:19,20,22,23;
126:21;127:21;128:9
**basic (3)**
9:4;59:8,16
**basically (2)**
41:1;104:14
**basis (2)**
48:8;101:21
**Bates (2)**
19:9;23:20
**Bates-stamp (1)**
56:7
**Bates-stamped (2)**
65:20;67:21
**batbroom (1)**
140:25
**battering (2)**
46:5;122:3
**Beaman (1)**
17:25
**bedroom (1)**
108:9,12;112:9,9;
114:5;121:4;122:8;
127:16;146:2
**begin (1)**
7:14
**beginning (2)**
8:22;13:6
**behaving (1)**
59:20
**behind (2)**

67:2;91:18
**below (1)**
121:2
**best (5)**
56:17;106:12;107:17;
112:23;123:8
**better (1)**
71:1
**beyond (3)**
12:23,25;88:15
**big (1)**
87:19
**bit (1)**
11:15
**Blackmore (5)**
27:2;104:21;108:8;
114:20;130:13
**blank (1)**
35:18
**Blazer (2)**
137:19,21
**board (2)**
104:1,5
**bodies (1)**
63:24
**body (4)**
35:18;63:25;64:3;75:3
**book (1)**
21:24
**bookstore (2)**
12:1,1
**bore (1)**
86:7
**both (2)**
4:19;26:19
**bother (1)**
100:3
**bottom (1)**
109:20
**boy (1)**
105:14
**Bozeman (6)**
8:16,19,24;9:1,2;
146:22
**Bradley (2)**
26:25;107:25
**breach (1)**
28:21
**breaching (1)**
52:24
**break (7)**
7:17,21;72:4;80:3;
90:9;121:4;131:12
**breaking (4)**
46:2;57:3;112:10;
114:4
**Bret (17)**
88:21;99:13;100:4;
101:9;129:21,24;
130:25;131:24;132:16;
133:11;134:16;136:3,
17;137:12,20,24;138:7
**Brett (3)**

27:1;107:21,22
**Brief (1)**
18:10
**briefing (1)**
84:23
**briefly (1)**
8:23
**Brilakis (2)**
26:18;108:2
**bring (4)**
72:11;75:13;91:24;
93:25
**broad (1)**
15:7
**broken (2)**
33:14;38:20
**brought (1)**
135:25
**Brown (2)**
26:25;108:7
**building (16)**
25:14;35:17;43:10;
44:9;45:11;49:10;51:9;
52:7;63:17;70:17,18,19,
20,23;81:13,17
**buildings (2)**
34:3,11
**bulleted (1)**
30:20
**bunch (1)**
57:2
**business (1)**
101:25
**busted (1)**
145:25
**bypassed (2)**
13:16,19

**C**

**call (14)**
8:3,6,7;17:24;21:13;
22:18;53 20;54:3;70:25;
72:19;79:21;102:5;
108:23;143:7
**called (12)**
21:17;32:9;36:11;
38:19;39 7;45:22;47:24;
52:4;53:13;68:9;80:22;
85:15
**calling (1)**
91:23
**calls (9)**
30:23;70:1,1;71:15,
17,20;141:17;144:23;
145:17
**calm (1)**
132:21
**came (8)**
39:9;54:17;77:23;
80:23;81:1;112:7;
122:12;126:18
**can (44)**

6:24;7:15,23;8:3,6,8;
20:1,10;22:8;23:20;
24:24;25:11;26:7,20;
32:6;35:13,24;37:9;
43:6;44:3,19;63:10;
64:21;65:4;67:2,15;
68:24;70:25;71:20;72:4;
73:21;80:2,4;90:14;
92:22;94:4;95:8;99:20;
102:11;127:4;135:14;
136:24;145:19;146:12
**capable (2)**
31:12;66:5
**capacity (3)**
5:5,8,10
**car (1)**
51:4
**care (7)**
23:18;24:11;39:17;
40:10;70:24;78:16;
81:17
**career (1)**
17:6
**careless (1)**
86:5
**carried (7)**
49:24;51:3;63:13;
74:24;88:23;108:25;
118:12
**carries (1)**
89:22
**carry (9)**
42:19;50:25;63:21,23;
110:8,14;115:5,10;
117:24
**carrying (3)**
50:11,12;109:3
**case (9)**
14:6;15:5,17,25;
31:20;39:2;46:21;94:13;
97:8
**cases (1)**
37:20
**catch (1)**
43:22
**categories (1)**
21:2
**category (1)**
20:25
**cause (1)**
120:1
**caused (1)**
134:19
**cell (1)**
8:7
**ceramic (1)**
49:25
**certain (5)**
14:3;51:7;71:15,17,
82:14
**certainly (4)**
59:14;66:20;97:11;
106:25

Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

certificate (3)
66:4,5,7
Chad (3)
27:1,2;108:10
chain (1)
9:10
chance (2)
92:20;134:10
chances (1)
75:15
change (2)
5:2;23:23
changed (1)
4:22
changing (1)
144:24
Chapman (7)
27:5;108:3;118:22;
120:3,15;122:17;142:1
charge (19)
20:9;22:1,5,7;51:16,
18;82:12,19,22,24;83:4,
5,9,12,14,15,17;84:17;
109:4
check (3)
23:7;100:3;147:3
checked (1)
115:25
Chevy (2)
137:19,21
Chief (10)
4:20,20;5:5;9:11;
26:18;81:12,22;82:3,6;
103:13
child (10)
105:1,5,8,10,13,13,17;
106:1;132:18;133:12
choose (1)
102:24
chosen (1)
102:25
Chretien (22)
5:6,7;7:25;8:2,3,4,6;
9:13;27:1:51:16;82:22;
83:15;84:23;85:7;
103:11;108:6;109:6;
129:3,5,12;144:2;145:6
Chretien's (2)
116:13;120:15
Christian (1)
11:5
circumstances (3)
31:24;37:8;99:6
citizens (1)
93:7
city (3)
13:18,21;56:4
civil (1)
10:19
claims (10)
14:18,22,23,23,23;
15:2,3,11;16:5;17:6
clarification (3)

7:3,5;54:13
clarify (1)
20:17
class (5)
30:15;59:8.8 15;65:7
clean (2)
23:21,22
clear (21)
4:16;5:19;7:10;29:22;
34:14;39:12;47:9;64:10;
74:14,20,21;75:7;76:25;
77:5,6;78:19 79:1,2;
106:10;125:3;126:21
clearance (1)
51:10
cleared (3)
76:23;86:3
clearing (8)
36:24;46:5,20;64:2,
14;75:22;125:9;128:8
clearly (1)
91:22
clients (1)
4:7
Cody (4)
26:14,25;107:25,25
coffee (2)
11:17,18
collection (1)
19:1
College (9)
11:5,22,24:1::4,18,22,
24,25;13:2
combining (1)
30:21
coming (2)
67:13;90:4
command (1)
9:10
commands (1)
142:12
comment (4)
5:3;56:3;61:9;64:23
commentary (1)
146:6
comments (2)
69:6;100:22
common (1)
21:21
commonly (1)
56:11
complaint (1)
16:17
complete (1)
23:9
completed (2)
66:4;124:4
completely (1)
15:20
completion (1)
5:20
complies (1)
110:3

compound (1)
45:15
concede (1)
96:12
conceivable (1)
132:10
concepts (1)
59:16
concern (5)
131:25;132:3,6;
133:16;134:19
concerned (6)
91:21;131:22;133:9,
17,20;138:15
concerns (3)
99:4.8.9
concluded (1)
147:13
conclusion (2)
144:23;145:17
conditions (1)
65:22
conduct (6)
41:11;42:8;43:9;45:3;
93:12;101:25
conducted (8)
21:22;42:25;44:1,8;
45:2;51:9;59:1;84:22
conducting (7)
46:23;66:6;88:17;
104:13,14,23;130:13
confidential (7)
85:20;87:15,20;88:7,
10,14;93:22
confirm (1)
108:16
confused (2)
37:1;52:12
confusion (1)
7:10
connected (1)
114:21
connection (1)
35:8
consider (2)
94:18;142:10
consideration (1)
79:10
considerations (7)
51:17,19;79:13,14;
83:6,16;84:25
considered (3)
37:21;38:10;86:23
Constitution (1)
97:7
constitutional (4)
94:19;95:8;96:16;97:3
consulted (2)
94:13;103:15
contact (1)
91:10
contacted (1)
53:12

contained (3)
107:1;109:13;116:4
contains (3)
20:13;109:16,21
context (3)
42:15;44:11,22
continue (1)
125:3
continued (1)
62:14
control (3)
124:6;144:10,16
conversation (6)
143:4,25;145:8,13,14;
146:11
conversations (1)
4:19
cooperate (1)
99:21
corner (1)
22:23
couch (2)
123:5,10,11,19,22,23;
141:4,4
counsel (14)
4:6,10,11,17,19,22;
5:2,11;6:20;34:6;61:13;
80:2;95:23;133:25
Countermeasures (4)
30:11;35:9;40:20;
42:16
counting (2)
108:15;142:8
County (2)
26:13;28:11
couple (11)
4:2:12:12;14:15;26:7;
27:17;28:15;57:17;
127:1;139:25;140:7,13
course (34)
28:8,21,23;29:21;
31:24;34:21;35:21;
36:11;37:15;41:1,16;
47:3;48:24;57:21,23;
58:8;60:3,12;63:20;
64:19;65:7,18;66:3,4,17;
68:6,10,19;69:14;70:3;
73:19;74:2,5,6
courses (2)
29:16;35:22
coursework (8)
21:3;29:20;36:10;
37:2;42:15;44:11,23;
72:9
Court (8)
5:22;10:19;17:14,19;
18:1,7,12;80:2
cover (2)
46:16;113:18
covered (8)
34:18,19;41:1;44:15;
66:1,2;113:11,13
covering (3)

22:9;24:19;46:15
create (2)
7:15;114:4
creativity (1)
65:23
crime (2)
10:2,5
Criminal (3)
11:10;100:4.5
Crisis (2)
55:22;68:4
critical (2)
56:10;68:3
current (1)
8:14
currently (2)
8:18;9:19
Curt (1)
108:3
custody (6)
138:8;144:10,15,18;
145:15,21

D

dad (1)
12:11
danger (2)
135:12;136:4
dangerous (2)
37:21;38:10
dangers (3)
134:15,18;135:9
DANZER (11)
6:1,5,6;8:14;10:22;
18:24;19:1;33:11;45:4;
49:20;62:20
dark (2)
54:6;125:17
date (1)
20:7
Dave (1)
108:7
day (5)
21:21;47:21,23;48:1,1
days (1)
44:5
DCI (2)
98:10,13
deal (4)
56:9,12,13;68:12
deals (1)
60:12
dealt (1)
66:16
decided (3)
102:23,24;131:10
decision (3)
72:20;103:9,12
decisions (1)
101:19
defendant (1)
4:6

**defendants (1)**
4:18
**Defendant's (1)**
56:7
**defense (1)**
4:19
**Define (2)**
25:2;47:12
**defined (2)**
45:25;84:18
**definition (4)**
48:13,19;67:2;102:9
**degree (1)**
11:8
**demotion (1)**
16:13
**Department (36)**
8:19,21;9:3,8;13:3,9,
23;14:19;15:15;21:16;
22:12;23:1;25:19,23,25;
26:1,6,12,15,17;28:11;
32:8,11,14;38:11;39:7;
40:1;41:9,16;48:23;
51:22;54:9;61:22;84:3,
10,11
**depending (1)**
13:13
**depends (4)**
66:24;76:8,10,18
**deploy (2)**
34:21;35:16
**deployed (9)**
33:15;35:8;42:14;
74:24;75:22;76:17;
121:9;122:11;127:17
**deploying (3)**
35:4,6;41:5
**deployment (1)**
34:15
**deployments (1)**
35:19
**Deponent (2)**
18:2,2
**depose (1)**
4:20
**deposed (2)**
4:21,22
**deposition (4)**
6:8,10,13;59:21
**depositions (4)**
4:4,8,23;5:21
**Describe (4)**
11:13;19:13;87:19;
131:7
**described (5)**
28:22;33:18;100:2;
113:9;131:2
**description (1)**
115:11
**descriptive (1)**
111:21
**designed (6)**
29:12;32:22;68:19;

**dishonesty (1)**
10:6
**display (1)**
142:11
**disrespectful (1)**
141:20
**distraction (3)**
114:4;115:7;121:15
**divorced (1)**
10:14
**document (16)**
20:12,20;22:20,25;
23:4,8;27:14;49:1;
55:23;56:3,4,6;103:20;
108:17,20;113:2
**documented (4)**
27:9,13;44:17;48:25
**documenting (1)**
27:15
**dog (9)**
118:21;119:2,4,13,15,
17,19,23;122:2
**done (16)**
12:7;20:5;21:13;33:9,
17;39:15,18;41:6;44:3,
5;49:6;83:7;91:16;
104:9;134:4;135:10
**door (64)**
8:8,11;33:14;38:20;
39:10;52:24;57:3;77:20;
79:16,17,18,24;90:8,8;
93:18;99:12,18,21,22;
107:21;108:7,11;111:16,
19,23;112:2,7,9,10,13;
113:25;114:2,3,5;
115:18,20;117:4,9;
118:17,22;120:3,7,12,
16,18;121:2,11,15,19;
122:18;123:6,13;128:1;
131:12;139:18,22;
140:18,24;141:5,6,13;
142:2,11;145:25
**douht (1)**
105:16
**Doug (4)**
28:7;30:16;34:17;
64:17
**down (45)**
22:1;33:14;38:20;
39:10;46:2;53:22;57:3;
64:3,8,11;72:5;74:13,14;
76:11;80:9,23;81:1,4;
87:4;91:24;107:19;
109:20;110:19;111:22;
118:15;121:2;122:19;
125:11,14,15,17,25;
126:6,12,13,19,23;
127:21;128:3,11;129:1,
15;132:21;142:21;
145:25
**downstairs (4)**
126:22;143:19;144:7;
145:7

**drawn (2)**
106:11,14
**dressed (1)**
51:7
**drive-up (1)**
11:17
**dropped (1)**
137:1
**drove (2)**
129:22;137:21
**drugs (2)**
89:23,25
**duly (1)**
6:2
**during (5)**
13:8;18:3;36:18;53:9;
65:15
**duties (2)**
51:1;97:6
**duty (12)**
7:25;52:4;53:13;
54:22;85:14,18;92:25;
93:5;94:18;95:19;96:15;
97:2
**dynamic (30)**
25:1,2,3,7;26:1;28:18,
20;32:23;33:8;38:19;
40:11;41:11,18;45:23;
46:6;52:9,14;66:6,20,21,
23;67:2,4;72:8;91:5,22;
98:24;99:10;102:25;
103:4

**E**

**earlier (1)**
7:14
**east (1)**
114:5
**Eckerdt (3)**
9:14;27:3;108:5
**education (2)**
10:23;14:9
**educational (1)**
10:21
**effect (3)**
5:22;129:15;144:6
**either (6)**
14:19;38:4;44:22;
47:22;91:24;114:4
**elapsed (3)**
127:5;142:1,4
**element (3)**
25:4;46:3;67:6
**elements (3)**
33:25;46:2;65:24
**else (20)**
5:25;16:14;21:12;
28:13;34:13;49:8;68:15;
73:1;82:24;83:3,17;
86:19;88:6;89:16;93:16;
104:25;130:6;133:15,
21;135:11

**else's (1)**
113:11
**e-mails (2)**
23:15,15
**Emergency (7)**
68:13,20;69:4,12,20;
71:22;72:7
**employed (3)**
37:15;38:7;122:4
**employing (1)**
36:23
**encounter (1)**
130:23
**end (2)**
19:2;115:20
**enforced (1)**
68:23
**enforcement (11)**
14:2,5;19:16;20:15;
25:5;73:7;90:4;97:12,
23;103:7;135:18
**engaged (1)**
41:17
**enough (2)**
65:13;128:25
**ensure (1)**
115:23
**enter (17)**
5:21;34:3,11;39:7,12;
47:16;70:18,18,19,23;
72:10;77:4,25;78:2,4;
79:2,9
**entered (12)**
33:14;35:5;63:2,22;
64:7;98:15;123:2;124:4,
25;127:3;133:10;145:25
**entering (10)**
46:13,22;47:18;52:7;
63:17;75:10;105:6,10;
118:11;122:22
**entire (5)**
36:9;83:1,1;124:17;
128:9
**entitled (4)**
16:5;22:20,21;68:6
**entries (4)**
33:8;45:22;49:10;
109:21
**entry (72)**
25:1,2,3,3,6,14;26:1;
28:19,20;32:23;36:23;
38:3,19;40:11;41:11,18;
43:10,10;44:9,9;45:11,
11,23,23;46:15,19,20,
21;47:4,15;49:7;51:9;
52:9,14,25;63:6;69:1;
72:9;78:5;79:10,15;91:5,
22;94:14;98:24;99:10,
23;100:9;101:19;103:1,
4;108:10,14;109:4;
113:10;115:3,4,8,21,22;
116:8;117:10;128:7,8,

**detached (1)**
114:20
**detailed (1)**
110:10
**details (2)**
37:13;87:14
**determined (1)**
105:22
**detonation (1)**
40:1
**device (7)**
33:16;40:12;90:10;
121:8,15;122:11;127:17
**devices (3)**
38:21;41:20;46:5
**diagram (27)**
104:4,5;106:11,13;
107:4,7;124:3
**diagrams (1)**
103:22
**difference (7)**
31:18;57:2;59:14,23;
60:11;62:7;70:23
**different (27)**
12:21;13:12;14:25;
19:24;20:1;33:6,24;
43:13;44:5;45 15;46:13,
13,16;47:4,21,23;48:1,4,
9;83:12,13 90 16;92:21;
143:17;144:25;145:18;
147:10
**differentiated (1)**
89:23
**DIRECT (1)**
6:3
**directed (1)**
143:3,9,19
**directions (1)**
142:12
**disagree (2)**
116:22;119:9
**disagreement (3)**
70:22;116:13,22
**disciplinary (9** `
16:12,17,19, 3,25;
17:2,7,12;18:3
**discipline (2)**
16:12;18:6
**discuss (3)**
98:17;104:8, 1
**discussed (30)**
53:9;67:25:8 5,6;
90:17;91:9;91 3,13;
92:10;95:16;98:19,22;
99:2;102:21; 05:17;
109:7,13;112 8;114:8,
10,13,15,24;116:5,18;
117:1,3,7;118 2;136 24
**Discussion (3)**
17:22;84:15; 43:4
**discussions (2)**
85:20;90:21

22;130:14
**equipment (2)**
  50:5,6
**equipped (2)**
  115:6;117:25
**errors (1)**
  147:4
**established (2)**
  4:12;128:15
**estimate (2)**
  56:18;142:6
**even (5)**
  8:11;140:17;143:5;
  146:5,6
**evening (2)**
  81:16;86:24
**event (1)**
  5:7
**events (9)**
  109:22;110:12,24;
  111:9,13;113:10,15;
  121:19,23
**everybody (3)**
  119:23;131:11;145:25
**everyone (8)**
  48:23;81:5;83:25;
  99:10;108:25;109:2;
  115:23,25
**evidence (8)**
  21:24;101:21;102:3,4,
  21;108:12;116:1;136:3
**exact (12)**
  35:24;53:18;87:22;
  89:3;109:2;112:24;
  117:11;129:14;139:24;
  140:4,15;142:4
**exactly (18)**
  11:20;29:14;53:18;
  54:19;78:21,23;102:12;
  103:10;108:9;110:18,
  19;112:19;116:11,25;
  117:23;118:11;132:20;
  144:7
**EXAMINATION (1)**
  6:3
**Example (2)**
  20:2;46:20
**except (2)**
  42:14;51:22
**excessive (2)**
  14:23;15:23
**Excuse (2)**
  27:24;115:6
**execute (1)**
  82:25
**executed (1)**
  89:10
**execution (7)**
  15:23;53:10;62:17;
  81:16;90:18;98:18;
  110:25
**exercises (3)**
  28:10;41:17;42:24

**Exhibit (32)**
  18:21,24;19:3;22:14,
  17,21;23:11,23,24;24:7;
  27:20;30:6,9,9;43:18;
  55:20;56:1;65:1,4;
  103:16,19;104:6;
  105:12;106:14;107:1,10,
  13;109:13;113:1,13;
  137:6,9
**exiting (2)**
  35:2;105:6
**experience (2)**
  36:9;38:10
**expert (1)**
  59:9
**expertise (1)**
  37:4
**Explain (3)**
  13:11;31:23;103:25
**explanation (1)**
  74:8
**extension (1)**
  108:24
**extra (1)**
  50:7

**F**

**faced (2)**
  74:14;134:7
**faces (2)**
  63:9,11
**facing (1)**
  89:10
**fact (6)**
  35:5;38:8;44:20;
  128:22;134:25;142:9
**factors (1)**
  67:7
**fair (6)**
  73:22;89:14;96:25;
  97:2;100:16;128:25
**fairly (1)**
  24:20
**familiar (3)**
  55:7;65:6;104:4
**family (1)**
  10:12
**far (7)**
  13:25;14:1;24:17;
  41:11;51:20.123:6;
  124:12
**fast (1)**
  67:14
**father (2)**
  91:10;112:17
**favor (1)**
  98:24
**Feathers (9)**
  4:20,21;5:6;26:18;
  81:12,22;82:16,6;103:13
**February (13)**
  10:10;33:16:36:8,20;

37:5;39:16;40:7;42:5;
  49:19;51:21;52:10;
  80:10;96:20
**feel (2)**
  31:12;33:19
**fence (3)**
  114:2,21,21
**few (3)**
  13:4;36:4;93:22
**field (7)**
  11:9;21:7,8,11;34:24;
  44:16;71:23
**figure (1)**
  132:12
**figured (1)**
  124:11
**file (8)**
  5:22;16:5,11,20;17:3,
  5,12,13
**filed (6)**
  14:18;15:3,11;16:6;
  17:6,7
**files (1)**
  17:8
**find (4)**
  16:7;30:14;53:11;84:3
**fine (8)**
  5:23;20:11;21:1;
  26:24;56:24;78:24;
  126:4;147:12
**finish (6)**
  7:13;61:9;132:22;
  133:6;143:11,12
**finished (1)**
  125:9
**fire (1)**
  127:14
**firearms (10)**
  20:2,4,24,25;21:4;
  59:8,8,9;63:16;89:13
**fired (1)**
  37:10
**First (21)**
  4:4,20;6:2;16:3;19:12;
  24:2;29:5;36:25;52:8;
  53:11;70:6;80:19;
  111:18;112:1;113:24;
  122:13;126:19;128:14,
  16,25;129:8
**firsthand (11)**
  85:1,6,12,21;86:4,6,
  14,16,23;87:2;121:7
**five (4)**
  14:6;18:3;26:4;77:10
**flashbang (23)**
  33:16;34:15,21,24;
  35:14,18;38:21;40:2,11,
  19;41:5.20;46:5;52:17,
  24;90:10;99:11;112:8;
  121:8;122:11;127:17;
  131:12;146:1
**flashbangs (6)**
  35:6,7,15;36:9;42:13,

14
**floor (1)**
  12:5
**focus (1)**
  72:23
**folks (1)**
  122:22
**follow (1)**
  115:8
**following (2)**
  4:24;37:2
**follow-on (1)**
  115:24
**follows (1)**
  6:2
**force (13)**
  14:23;15:23;25:5;
  45:11;46:3;83:1;93:7;
  94:11;99:5;101:20;
  115:21;117:10;131:21
**forced (3)**
  31:24;120:19;126:6
**form (136)**
  25:10;27:10;29:8,24;
  31:6,14;32:3,16;33:2,22;
  36:14;37:22;38:12,23;
  39:20;40:3,22;41:22;
  42:17;43:3,19;44:13;
  46:10;47:5;48:10;49:21;
  51:24;53:2;55:3,11;
  56:19;57:4,5,13;58:1,9,
  20;59:10,11,24;60:4,16;
  61:4,8;62:24;64:4;69:5,
  15,23;71:3,25;72:12;
  73:2,9,23;74:17;75:17,
  25;84:21;85:8,23;86:10;
  89:17;90:11;92:1,7;
  93:1,8,19;94:1,21,23;
  95:3,12;96:18,21;97:4,
  14;98:1,7;100:10,21;
  101:4.13,22;102:8,9;
  103:2;105:19;106:2,20;
  107:2;109:15;110:16;
  115:3,4,7;116:15,24;
  117:6,14;118:6;119:6;
  121:24;123:16;126:8,
  15;127:8,23;128:18;
  130:1,17,19;131:5,13;
  132:4,19;133:18;
  134:20;135:13;136:6,
  20;138:1,17;140:1,8,19;
  141:7,14;142:14;143:2,
  14,21;144:12;145:16;
  146:4
**formal (1)**
  21:3
**format (1)**
  6:16
**forward (4)**
  4:13;12:23;65:21;
  102:25
**fourth (1)**
  122:24

**frame (2)**
  81:7;140:15
**free (6)**
  144:22;145:5,12,24;
  146:2,8
**free-for-all (1)**
  16:1
**Friday (26)**
  21:13,14,19;22:5,6,22;
  23:2,3,19;24:4,17;43:25;
  44:1,10,23,24,25;45:9;
  47:18,19,20,22,24;49:9;
  62:12,13
**Fridays (5)**
  21:20;23:5;43:16;
  44:4;47:19
**friend (4)**
  135:24,25,25;136:17
**friends (2)**
  133:21;136:4
**front (32)**
  66:10;75:3;77:19,22;
  78:5,7;79:7,8,99:3;
  108:4,4,5,6,6,11;111:2;
  112:9,13;115:18;117:4;
  118:12,17,21,22;119:10,
  21;120:3;125:2;126:7;
  129:19,20;139:18
**full (2)**
  6:5;136:2
**fully (5)**
  31:12;33:21;50:21;
  56:8;68:24
**function (6)**
  31:2,12,25;60:14;
  65:21;135:18
**functional (1)**
  33:21
**functioning (1)**
  69:3
**functions (4)**
  48:9;59:17;78:10,14
**Fundamentals (2)**
  30:18,19
**funding (1)**
  13:21
**further (2)**
  79:3;146:20

**G**

**game (1)**
  134:14
**garage (2)**
  114:20,22
**garb (1)**
  51:8
**gate (1)**
  114:22
**gave (7)**
  7:7;13:18;72:23,25;
  87:14;88:15,16
**gear (2)**

Case 1:10-cv-00041-ABJ  Document 65-12  Filed 01/10/11  Page 84 of 92

Tricia Wachsmuth v.                                                    Matthew Danzer
City of Powel, et al.                                                  October 4, 2010

45:12;49:19

**general (3)**
15:3;20;21:9
**generalize (1)**
21:1
**generally (6)**
15:2;41:21;44:21;
45:9;78:13;103:6
**gist (1)**
89:4
**given (15)**
6:7;65:15;77:8;79:10,
23;80:17;84:8;87:21;
89:18;92:24;99:23;
103:22,24;114:6;134:9
**giving (1)**
4:4
**Glick (1)**
27:2
**goes (2)**
59:7;91:2
**golly (1)**
66:19
**good (4)**
8:5;18:8;57:10;130:21
**GOSMAN (220)**
4:1;5:2,12,15,23;6:4;
7:23;8:1,4,9,13;15:1,10,
14,18;16:3,16,21;17:4,
16,21;18:5,8,14,18,22;
19:6,9,11;22:15;23:17,
22;24:1;25:16;27:12;
29:10;30:3,7;31:4,9,17;
32:10,18;33:7;34:1,8;
36:16;38:2,17;39:3,24;
40:5;41:2,24;42:4,10,18;
43:5,14,20;44:18;45:10,
17,19,20;46:18;47:8;
48:15;50:2;52:1;53:3,7;
55:5,14,21;56:22;57:9,
20;58:5,14,18,24;59:13,
19,22;60:1,7,10,22;61:6,
10,16,18;63:3;64:6,24;
65:2;67:22;69:8,10,19;
70:2;71:5;72:6,17;73:6,
15,18;74:4,19;75:20;
76:2;80:4,7;84:11,16;
85:4,11;86:1,15;87:9;
89:19;90:20;92:3,11;
93:3,13,20;94:6;95:1,6,
17,25;96:4,7,12,14,19;
97:1,10,18;98:5,12;
100:14,18;101:1,7,17;
102:2,15;103:5,8,17;
105:24;106:5,24;107:5,
11;108:18,21;109:18;
110:20;111:10,11;
116:20;117:2,8,17;
118:8;119:8;122:1;
123:21;126:10,20;
127:12;128:2,24;130:5,
24;131:8,15,18,20;
132:2,7,23;133:2,3,23;

134:1,3,11,12,24;135:6,
7,16;136:10;137:3,7;
138:2,19;139 20;140:6,
10,16;141:2,10,15,24;
142:18;143:8 18;144:1,
17,21;145:4,2.2;146:7,20
**gourmet (1)**
11:18
**grade (1)**
13:7
**graduated (5)**
11:4,7;12:18:13:2,5
**great (2)**
56:12,13
**ground (7)**
64:3;74:15;75:5,12;
76:22,23;125:15
**group (17)**
46:9;48:16;54:11;
80:13,16,21;81:8;82:17;
83:23;84:1;94:7;99:4;
126:2,5,13:1.7:20;
143:20
**grow (4)**
87:17;88:4,15,17
**guess (18)**
12:2;20:10;30:1;37:1;
44:5;52:12;5-1:14,23;
62:22;67:5;72:3;73:19;
105:23,25;11:12;
123:8;139:19;140:23
**guesses (1)**
112:24
**guessing (1)**
103:14
**gun (4)**
76:6,10;102:7;139:3
**gunmen (1)**
43:11
**guns (10)**
88:23,24;91:6;92:5;
108:23;115:6.117:25;
118:13;131:3 11
**guy (1)**
138:15
**guys (3)**
57:3;61:25;81:19

## H

**H&K (2)**
50:12,13
**halfway (1)**
96:9
**Hall (2)**
27:5;108:6
**handbook (1)**
30:11
**handcuffed (2)**
142:19,21
**handcuffs (3)**
142:23;143:1:146:18
**handle (6)**

5:17;32:23;33:5;
61:25;62:5,6
**handled (2)**
71:20,21
**hands (1)**
75:4
**happen (4)**
40:18;92:22,24;
118:24
**happened (8)**
36:23;41:5;48:1;
53:25;83:23;84:5;96:13;
120:5
**happening (1)**
121:5
**happens (1)**
75:9
**head (4)**
7:4;79:19;119:18;
142:8
**headed (1)**
129:1
**hear (4)**
121:8;129:5,10,11
**Heard (10)**
6:16;16:3;66:20;
120:11,14,16;121:10;
144:2,4,9
**held (4)**
13:14;17:22;28:4;
144:19
**help (4)**
30:13;53:23;126:21;
132:8
**Hey (1)**
146:12
**high (6)**
10:22;11:14,14,17;
12:3,3
**hired (4)**
9:5;13:3,5;21:7
**history (7)**
11:13,16;12:20;93:21,
23;101:9,10
**home (25)**
10:24;12:3;28:21;
33:14;39:8;52:10;53:14;
87:5;98:15;104:9,20;
105:2,6,7,10;106:9,15,
18,18;107:8;116:6,10;
122:22;135:10,12
**honest (1)**
141:19
**Honor (1)**
18:9
**hostage (8)**
40:10;43:12;44:10;
56:9;66:13,16;67:12;
75:11
**hostages (2)**
66:15,16
**hour (1)**
93:23

**hours (4)**
14:12,12;62:9;69:14
**house (92)**
33:15;34:24;35:1,2;
39:6,12;74:24;76:21;
77:4,22,23;78:2,3,3,7,8;
79:3,9,9,23;87:18;88:24;
89:1,21;90:5,9;91:7,24;
92:5;93:25;103:22;
104:16;108:4,5,5,6,7,12;
109:8,14;111:3;114:21;
118:19,21;119:21,22;
121:20;122:7,10,14,21;
123:2,23;124:4,18,25;
125:2,4,6,10;127:3,14;
128:9;129:18;130:10,11,
15;131:2,3;132:17;
133:12,15,17;134:18;
135:1;136:2,13,19;
137:21,25;138:4;
139:15;140:23;141:1;
144:22;145:5,12,24;
146:1,3,9,17
**huh (2)**
117:12;140:7
**human (1)**
30:21
**hurried (1)**
120:1

## I

**IA (1)**
30:17
**idea (8)**
26:3;53:15;83:12;
85:18;121:16;130:8,9;
141:25
**ideas (1)**
110:5
**identified (12)**
18:21;22:14;30:6;
55:20;56:7;65:1;103:16;
107:10;131:1;133:10;
137:6,15
**identify (2)**
22:25;134:15
**illegal (1)**
89:24
**illnesses (1)**
9:23
**Immediate (8)**
29:18,22;30:10,22;
36:1;68:4;71:16,18
**immediately (3)**
115:21;116:2;117:9
**impair (1)**
9:20
**important (12)**
7:2;89:6,8;100:1,8,13,
15,19;101:2,12,16;
138:14
**impression (2)**

102:13;144:8
**inappropriate (1)**
90:13
**incident (2)**
62:4;68:3
**incidents (1)**
56:10
**includes (1)**
18:5
**including (4)**
16:5;45:15;128:9;
133:21
**increase (1)**
13:7
**increases (1)**
13:13
**indicated (2)**
16:4;57:24
**indicates (2)**
56:6;130:14
**individual (11)**
5:8,9;39:5,6;48:17;
58:2;78:15,17;88:16,18,
20
**individuals (2)**
63:1;77:10
**industry (2)**
45:24;103:7
**Inform (1)**
112:6
**informant (7)**
85:21;87:15,20;88:8,
10,14;93:22
**information (23)**
20:8;22:3;36:18;
80:17;84:8,8,19;87:12;
88:18,19;89:5;100:1,19;
101:2,9;106:12;107:1;
109:12;113:18;114:6,9;
115:12;116:4
**initially (3)**
21:7,10;63:2
**in-progress (4)**
30:23;70:1,12;72:16
**input (2)**
91:19;94:8
**inquiring (1)**
84:13
**inserting (1)**
112:8
**in-service (10)**
19:20;20:5;21:15,17;
23:9;24:23;27:16;43:17;
44:23,24
**inside (7)**
35:17;70:17;122:12;
130:11;132:17;140:23;
141:1
**instance (14)**
20:5;33:18;35:3,4,14;
37:9,17,25;39:2;47:14;
49:18;51:23;67:13;
70:16

instances (2)
27:17;52:3
Institute (4)
30:12;35:9;40:21;
42:16
institution (1)
102:7
instructed (4)
6:20;46:24;47:2;
110:14
instructing (1)
76:18
instruction (1)
47:3
instructions (1)
79:3
instructor (8)
20:7;24:4,9,12;28:6;
30:15;46:23;74:2
intel (2)
130:21,21
intended (4)
29:6,22;68:1,2
interactions (1)
146:15
interdict (1)
30:22
interdiction (1)
33:1
interfere (1)
9:24
interior (3)
106:8;107:3,7
internal (5)
14:20;15:12;16:9;
17:1,14
interposing (1)
96:10
interpretation (1)
97:8
interrupt (3)
61:14;133:4;134:23
interrupting (1)
134:6
intervene (1)
95:10
interviewed (2)
4:7,9
interviews (1)
116:3
into (22)
5:21;15:20;25:6;
33:20;38:4;41:19;46:2,
21;76:21;79:9;90:9;
106:18;107:8;112:8,10;
116:6,9;125:6,18;
127:16;131:2;138:7
investigation (3)
16:10,23,24
investigations (3)
9:15;17:1,15
Investigator (1)
26:25

investment (1)
56:21
invited (1)
133:22
involve (4)
28:23;37:20;52:17,23
involved (18)
26:10,17;28:10,21;
35:1;38:6:39 25;40:11;
41:21,25;43:1;46:17;
77:8;84:7;85 19;90:21;
108:14;115:23
involves (3)
15:4;25:6,8
involving (8)
10:5;26:1;32 25;
33:25;41:17;44:9;51:23;
64:14
Israeli (6)
76:4,7,9,12,16,20
issue (3)
4:12,16;134:24
issued (1)
30:11
issues (7)
15:21;16:10,12;17:7,
12;60:13;83:4
items (1)
111:17

J

job (1)
132:12
jobs (1)
12:21
Join (56)
31:8;32:5;33:4,23;
38:14,25;42:7;43:8;
47:6;48:12;51:25;57:15;
58:11;60:6,19;59:17,24;
72:2,14;73:4,25;75:19;
85:9;86:12;90 15;92:9;
93:10;94:3;95:14;96:23;
97:15;100:12,24;
101:23;105:20,106:22;
116:16;117:16;122:10;
126:17;127:24;128:20;
130:3;131:6;132:5;
133:19;136:8,22;140:3,
12,21;141:8;142:15;
143:23;144:14;145:1
joint (1)
28:10
judges (1)
97:9
Judgment (3)
65:22;134:8;143:6
July (2)
13:6,21
jump (1)
33:20
jumping (1)

37:18
junior (1)
11:21
jury (1)
18:11
justice (1)
11:10
justify (1)
56:10

K

keep (2)
63:23;134:6
Kent (5)
9:13;27:4;108:9;
121:3;122:7
kept (3)
20:6;43:2;76:22
Kevin (1)
27:3
kill (1)
66:15
kind (26)
12:9;13:14;14:22;
16:22;18:3;20:8;41:25;
44:4;45:12;48:24;49:19;
71:7;85:12;86:5;88:25;
89:3;90:2;100:8;119:13;
129:21;137:14,18;
138:12,13;142:5;147:4
kinds (10)
19:20,24;20:14,22;
25:15;26:22;38:22;
42:24;43:2;45:22
kiosk (1)
11:18
Kirk (1)
27:5
knew (4)
52:20;85:15,16;97:11
knife (1)
139:5
knock (16)
39:10;79:21;90:7;
98:17;99:18,18,22;
111:16,18,22,23;112:2;
115:18;117:4;118:16;
120:16
knocked (5)
118:22;120:3,7,12;
122:19
knocking (1)
99:12
knowing (1)
140:24
knowledge (12)
41:17;85:1,1,6,12,21;
86:4,6,14,17,23;87:2
known (1)
79:23
knows (4)
18:20;45:24;67:13;

92:19

L

labeled (2)
21:18;23:14
language (1)
114:12
Lara (2)
27:1;107:23
last (6)
18:3;19:2;26:4;27:20;
29:16;128:3
later (3)
54:17;99:25;119:17
law (15)
14:2,5,9;19:16;20:15;
25:5;68:23;73:7;90:3;
96:22;97:8,12,23;103:7;
135:18
lawsuit (1)
5:5
lead (4)
93:24;126:2,5;143:20
leader (3)
12:5;51:14,15
Lean (7)
76:4,7,9,12,13,16,20
learn (8)
52:8,15;53:6;69:18,
20;84:6;105:1;106:8
learned (5)
37:15;52:11;69:25;
87:14;106:25
least (12)
4:7;26:9;35:13;51:19;
57:16;67:3;78:17;87:21;
106:12;128:6;138:3;
144:9
leave (12)
8:20;37:25;66:15;
105:11;144:22;145:5,12,
24;146:2,8,12,17
led (1)
126:13
Lee (2)
27:2;108:7
left (5)
8:23;9:8;125:17,22,23
legal (3)
94:17;144:23;145:17
letting (3)
34:6;35:17;45:18
Lewistown (4)
11:2,3;12:13,15
liable (1)
95:8
life (2)
59:18;68:22
life-threatening (1)
68:4
light (2)
54:7;125:16

liked (1)
88:25
limit (1)
59:20
limited (4)
4:8;36:10;38:9;91:1
limiting (1)
17:4
line (3)
128:12,13,17
List (19)
26:16;30:20;89:18;
107:14,15,18;108:15;
109:9,19,21,24,25;
110:6,10;111:16;112:18,
21;134:22,23
listed (3)
44:12;56:1;110:12
lists (2)
24:12,14
literature (2)
29:20,20
little (4)
11:15;70:14;81:2;
131:15
live (2)
10:12;35:14
lives (1)
30:21
living (6)
118:21;119:11;123:9,
10,24,25
loaded (1)
89:22
lobby (1)
112:16
located (2)
29:2;114:23
log (2)
20:6;21:24
long (17)
11:19;12:17;13:2,6;
23:11;24:20;80:12;
108:23;115:6;117:25;
118:13;121:14,25;
122:3;126:23;128:7;
131:11
longer (2)
50:20;140:14
look (15)
17:17;18:23;23:12;
30:1,8,9,17;35:24;65:6,
12;104:4;105:12;
107:13;113:1;147:3
looked (1)
43:18
looking (3)
20:20;30:13;142:7
looks (4)
24:14;28:15;110:4;
120:14
loss (1)
68:22

**lot (14)**
20:1;33:5;35:16;
37:14;56:23;57:1;70:10;
90:16;92:5,21;97:6,8;
99:17;110:5
**lots (1)**
56:20
**loud (1)**
142:8
**low (1)**
8:2
**lumped (1)**
40:25
**luxury (1)**
61:24

**M**

**Magistrate (1)**
17:25
**main (1)**
37:17
**mainly (1)**
22:8
**maintained (1)**
14:16
**majority (1)**
45:2
**makes (1)**
72:19
**making (1)**
5:19
**male (2)**
88:21;105:14
**mandatory (1)**
27:8
**manual (2)**
30:19;65:14
**many (12)**
14:12,12;26:3;33:8,
13;35:7,12;43:13;45:15;
49:11;56:9;77:8
**marijuana (3)**
87:17;88:4;91:7
**marked (1)**
22:17
**married (3)**
8:25;10:8.10
**mask (1)**
63:6
**material (1)**
41:1
**materials (6)**
30:2;34:19;64:21,22;
65:7;74:6
**Matt (4)**
26:18;27:4;108:2,12
**matter (4)**
14:24;16:23,25;
108:15
**matters (3)**
16:12,19;17:2
**MATTHEW (2)**

6:1,6
**maximum (1)**
130:15
**May (13)**
13:5;31:24;33:5;
41:19,19,20,20;82:3;
86:3;89:2;92 24;94:17;
144:4
**maybe (7)**
8:12;18:19;72:22,22;
86:4;90:7;93 23
**McCaslin (5)**
27:4;33:9,10 108:12;
122:7
**mean (32)**
12:21;15:8;23:19;
32:20,22,25;43:8:42:14,
19;48:16;56:24;57:7;
59:14;69:1;77:12;84:2;
91:1;93:21;95:18;99:15;
100:16;102:5;103:10;
111:16,21,22;132:24;
135:4;143:3,10;144:15,
18
**meaning (2)**
82:25;112:24
**means (5)**
14:20;55:8;56:18;
68:2;111:23
**meant (2)**
74:21;143:13
**medical (2)**
9:23;50:7
**medication (2)**
9:19;89:12
**medications (1)**
89:2
**meet (1)**
82:17
**member (8)**
32:2;46:22;43:17;
58:8;59:16;60:3,13,15
**Members (3)**
26:12,13;115:13
**memorized (1)**
78:13
**memory (1)**
47:25
**men (2)**
77:8;128:6
**mental (1)**
102:7
**mentally (3)**
102:5,16,20
**mention (1)**
42:13
**mentioned (7)**
39:4;42:12,2 ;48:3;
105:3;133:13;136:16
**merit (4)**
13:13,16,18,19
**met (2)**
51:8;77:13

**Michael (1)**
5:6
**middle (5)**
81:2;113:23;122:23;
132:25;133:1
**midnight (1)**
61:17
**might (7)**
9:24;25:21;35:3;
44:16;89:1;90:3;136:18
**Mike (3)**
27:5;108:5,6
**mind (4)**
4:23;5:2;37:18;136:25
**Mindset (1)**
65:21
**mine (1)**
117:19
**Miner (11)**
27:2;84:22;85:7;
86:18;87:2,10,22;88:2;
93:21;108:10;120:19
**minute (5)**
20:12;41:8;42:23;
74:10;137:9
**minutes (3)**
93:22;127:1,7
**misconduct (1)**
15:4
**mishandling (2)**
14:24;15:5
**misnumber (1)**
23:17
**misnumbered (1)**
22:19
**mission (1)**
124:4
**misstates (4)**
60:18;64:5;74:18;
96:22
**misunderstood (1)**
84:12
**moment (4)**
18:24;39:5;119:19;
142:1
**Montana (2)**
8:16;11:2
**months (2)**
13:4;36:5
**more (10)**
16:18;49:13,15;50:4;
51:12;62:20;70:14;
101:18;113:20;127:1
**morning (1)**
6:14
**Most (3)**
21:21;45:23;85:15
**motion (1)**
134:8
**move (2)**
12:23;73:17
**moves (1)**
67:14

**moving (1)**
9:1
**MP5 (2)**
50:12,13
**much (10)**
8:9;35:15;70:22;
121:16;122:5;127:5;
139:21,23;141:25;
146:21
**multiple (3)**
28:20;46:4;99:11
**myself (2)**
94:5;108:4

**N**

**name (7)**
6:5;20:7;23:8,10;
88:16;137:1,4
**named (1)**
21:3
**names (2)**
78:16;88:16
**narrative (2)**
43:5;81:2
**nature (1)**
141:17
**near (1)**
127:25
**nearly (1)**
83:1
**necessarily (15)**
25:13;26:19;31:11,20;
44:17;57:19;73:5;76:13;
90:25;99:14,15;124:23;
129:9;130:4;142:8
**necessary (1)**
4:6
**need (10)**
4:3;5:17,25;15:8;
70:19;71:11;74:23;75:9;
86:2;136:15
**needed (3)**
33:19;72:24,25
**needs (2)**
4:16;8:7
**next (10)**
4:16;39:19;64:3;
114:16;115:2,16;
118:16;123:12;141:5;
146:10
**NFDD (1)**
115:10
**night (36)**
23:19;24:4,18;44:10,
23,25;49:18;51:6;52:19;
54:16;62:12,16,21;80:9;
87:4;90:17;91:4;95:16;
98:14;105:18;110:9,15;
111:13;113:15;114:7,13,
24;116:6;130:7;131:22;
133:9;134:16;135:10;
136:24;137:22,25

**nights (1)**
47:18
**nods (3)**
7:4;79:19;119:18
**noise (1)**
121:15
**normally (3)**
48:25;50:25;51:4
**northeast (1)**
121:4
**note (1)**
66:12
**notes (1)**
110:5
**notice (3)**
109:19;123:1;129:18
**November (1)**
36:4
**Number (10)**
19:10;22:24;26:22;
49:12;87:21,23,25;88:3;
109:24;112:11
**numbers (2)**
19:4;23:20

**O**

**object (114)**
25:9;29:8,24;31:3,6,
14;32:3,16;33:2;36:14;
37:22;38:12;39:20;40:3,
22;41:22;42:17;43:3;
44:13;46:10,11;47:5;
48:10;49:21;55:3,11;
56:19;57:4,5,13;58:9,17,
20;59:24;60:16;61:4,8;
62:24;69:15,23;71:3,25;
72:12;73:2,9,23;74:17;
75:17;85:8,23;86:10;
89:17;90:11;92:1,7;
93:1,8;94:21,23;95:3,10,
12;96:18,21;97:4,14,24;
98:1,7;100:10,17,21;
101:4,13,22;102:8,9;
103:2;106:2,20;109:15;
116:15,24;117:6,14;
118:6;119:6;123:16;
126:8,15;127:8;128:18;
130:1;131:5,13;132:1,4,
19;133:18;134:20;
135:13;136:6,20;
138:17;140:1,8;141:7,
14;143:2,14,21;144:12;
145:16;146:4
**objecting (2)**
45:14;69:5
**Objection (32)**
15:6;27:10;33:22;
38:23;42:3,7;43:19;
45:16;51:24;53:2;58:1;
59:10,11;60:4;64:4;
75:25;84:21;87:6;93:19;
94:1;105:19;107:2;

Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

110:16;121:24;127:23;
130:17,19;138:1;
139:16;140:19;142:14;
144:20
**objections (1)**
53:5
**objective (10)**
30:20;101:21;102:3,6,
21;133:16;134:15,17;
135:9,12
**objectively (3)**
92:23;93:6;94:11
**obligation (1)**
94:10
**observations (1)**
104:15
**occasion (1)**
36:17
**occupant (1)**
79:23
**occupants (1)**
116:2
**occur (2)**
90:7;121:23
**occurred (11)**
20:8;24:11,13;26:4;
40:6;44:21;62:13;100:2;
120:23;124:22;145:13
**October (8)**
36:10,19;37:2;40:21;
41:15;62:10;80:6;
147:14
**off (10)**
7:24;11:22;12:21;
17:17,19,22;53:13;
121:10,11;146:1
**offer (2)**
139:7,9
**offered (2)**
23:24;49:25
**Office (2)**
26:14;147:10
**Officer (108)**
8:14;9:4,6,9,17;10:22;
12:11,15;14:2,5;18:24;
19:1,16;20:15;21:11;
22:4;24:25;26:5,18,25;
27:1,1,2,2,3,3,4,5,5;29:4;
31:2,18;33:9,10,11;
36:22;40:12;41:12;
42:24;45:4;49:20;55:6;
57:25;58:6;59:23;60:24;
61:19;62:20;66:21;
68:11,20;69:2,11;72:22;
75:21;84:22;86:18;87:1,
10,22;88:2;90:6;92:16,
23:94:10;95:7,19;96:15;
97:12,23;101:3;104:13,
20;106:19;110:7;
114:19,19;115:5;
116:13;117:12,24;
118:22;120:3,9,15,19;
122:14,17;123:8;124:6,

14,18;127:13;129:1,12;
130:13;131:23;132:24;
134:14,19;136:14;
137:11;139:22;142:1;
144:11;145:6,23;146:3
**officers (64)**
5:5,9;12:9;14:10;16:6;
25:5,8,19;26 14,16;
28:20;30:21:31:21;
37:14;38:20;41:19;46:4;
47:12,15;48:4,21;51:9;
52:16,24;54:22;62:4,4;
72:15;77:12;78:11,15,
17;79:22;84:14,25;85:5,
14,18;90:10;107:8,14;
108:13,22;113:25;
114:1;115:3,4,6,7,24;
118:18,20;125:24;
126:7;127:19;128:22;
130:7;135:2, .2;136:5,
18;139:14;142:13;
146:16
**officer's (2)**
17:6;63:9
**official (7)**
5:8;14:24;15:5;20:16;
37:4;40:2,8
**often (1)**
21:21
**oftentimes (1)**
25:6
**once (6)**
49:13;51:12;60:3;
102:23;115:24;124:17
**one (48)**
13:23;16:6;21:3;29:3;
35:3,14,16,23;36:6;40:6;
46:20;55:16;57:21;
60:12;61:13;62:20;63:1;
67:6;73:1;77:23;83:14;
86:20,21;94:5;99:17;
102:10,17,19;104:13;
110:12;112:6;115:2,5,9;
117:24;118:12,17;
122:23;128:3.14,16;
133:11;135:19,20,20,23;
137:13;144:24
**ones (1)**
85:14
**only (4)**
20:10;38:18;41:6;94:4
**open (7)**
115:20;117:9;120:18,
19;125:17;139:18,21
**opened (4)**
79:16,17,18;1  2:14
**opening (1)**
125:18
**operation (12)**
37:4;40:2;42:1;81:23;
82:13;83:13;87:17;88:4,
15,17;104:21;111:4
**operations (6)**

32:15,20,21;41:10;
44:1;66:6
**opinion (3)**
141:9,11,22
**opportunities (1)**
124:21
**opportunity (6)**
7:9;37:3;72:11;79:24;
95:10;147:3
**opposed (5)**
32:25;53:4;67:4;
99:12;102:4
**option (5)**
91:9,12;98:17;102:24;
114:8
**options (15)**
30:23;53:9;66:13;
90:17,19,22,25;91:1,5,8,
22;92:13;98:19,23;
99:24
**order (9)**
10:16;16:4,9;17:10,
14,18;110:2,8,12
**Ordered (1)**
16:11
**others (4)**
37:18;86:2,3,22
**out (29)**
4:3;16:7;17:10,11;
22:17;34:23;37:17,25;
53:11;66:3;76:13;84:3;
88:25;91:24;92:14,17;
93:18,25;104:16;
109:22;110:8,14;
118:21;121:20;124:11;
131:12;132:9,12;142:8
**outline (1)**
106:15
**outside (10)**
8:8,11;21:2;39:9;
40:13,16;54:7;89:1;
104:24;114:21
**over (18)**
14:7,8;17:14;22:4;
29:13;48:21,22;63:24;
73:13,14,14;74:15;75:1;
116:1;129:5;133:22;
136:21;147:3
**overlap (2)**
70:12,13
**overwhelming (2)**
45:11;46:3

**P**

**page (12)**
19:3;27:20;30:18;
65:11,19;66:13,20;
67:15,20;109:20;
110:13;113:23
**pages (2)**
23:11;65:13
**paragraph (6)**

56:14;114:12,16;
115:17;116:5;118:16
**paragraphs (2)**
113:22,24
**paranoid (7)**
88:23;89:13;90:2;
91:6;92:4;102:18;131:3
**parents (1)**
10:25
**Park (2)**
26:13;28:11
**Parole (1)**
55:16
**part (32)**
4:7;11:25;12:4;23:15;
35:20;43:17;46:6;60:2;
62:11,19;63:12;68:14;
70:5,7;77:19;79:8,13,14;
80:19;85:2;86:6;97:7;
98:20;103:12;110:25;
113:16;114:6,10;116:8;
118:13;128:7;132:14
**participated (1)**
25:25
**participating (3)**
24:3;25:22;59:15
**Parts (2)**
25:12;46:13;67:25;
82:14
**passed (5)**
81:10;121:17;122:5;
139:23,24
**past (4)**
26:20,21;125:3,6
**patrol (26)**
9:17;21:9;23:2;28:3,
17;29:4,18,22;30:11,17,
21;31:2,20;36:1,11;
41:12;49:24;51:1,4;
55:6,18;62:4,9;64:18;
68:19;69:2
**patrol-type (1)**
33:1
**Paul (1)**
27:3
**peace (1)**
14:10
**Pechtel (4)**
28:7;30:16;34:17;
64:17
**peek (1)**
88:25
**pending (2)**
7:18,19
**pens (1)**
139:1
**Pensacola (1)**
11:5
**people (12)**
26:21;28:25;29:13;
38:5;71:23;73:21;81:5,
6;83:12;84:17;119:17;
130:15

**people's (1)**
119:15
**per (2)**
14:12,14
**percent (2)**
24:21;123:18
**perform (4)**
48:8;57:25;78:9,13
**performance (1)**
48:18
**performing (2)**
41:18;77:14
**performs (1)**
59:17
**perhaps (2)**
105:14;122:24
**perimeter (2)**
108:3,8
**period (3)**
13:8;24:20;81:10
**periodic (1)**
44:6
**person (10)**
20:9;83:14;88:24;
89:23;107:16;118:11;
122:25;128:17;132:17;
133:22
**personal (1)**
50:4
**personnel (9)**
16:5,11,19;17:2,5,8,
11,13;18:4
**persons (3)**
38:9;132:24;133:2
**Philosophy (2)**
67:19,24
**phone (2)**
8:7;80:22
**phrase (3)**
57:7;66:21;129:9
**phrasing (1)**
129:14
**physical (1)**
65:23
**physically (1)**
81:20
**picture (1)**
123:12
**PIER (5)**
67:19,24;68:1,7,9
**pistol (2)**
50:18;108:23
**pistols (2)**
53:4;115:9
**place (20)**
6:11;9:1;21:20;23:5;
24:15,18,22;27:15;
43:16;47:18;83:8;94:19;
95:9;96:11,16;104:22;
110:25;143:5,6;146:11
**placed (2)**
10:16;89:21
**plaintiff (1)**

4:11
**plan (23)**
77:15;78:19;80:18;
81:16;82:4,7;84:18;
99:22;100:2,8;110:9,10,
15,25;111:13;113:22,24;
114:1,7;115:18;118:16;
124:11;130:14
**planned (2)**
86:9;116:1
**planning (5)**
53:9;81:6;111:4;
131:1;135:10
**plans (4)**
77:16,18,20;78:5
**plants (3)**
87:21;88:3;91:7
**plate (1)**
49:25
**play (2)**
45:4,5
**played (1)**
46:8
**player (1)**
65:23
**pleadings (1)**
5:13
**please (7)**
6:5;7:13;59:20;61:9;
100:22;131:17;132:21
**plenty (1)**
124:21
**plus (1)**
135:20
**pm (2)**
80:6;147:14
**point (17)**
44:6;59:19;81:5;87:8;
97:17,20,22;98:4;
102:14;104:7;111:15;
122:12;124:14,19;136:9,
11;145:21
**pointed (5)**
75:4,12,15;76:22,22
**points (1)**
13:12
**Police (75)**
8:19,20;9:2,4,6,7,9;
12:8,8,11,15;13:3,8,23;
14:19,24;15:15,22;11;
23:1;25:8,19,25;26:5,6,
12,14,16;32:8,11,14,25;
37:4;38:11;39:7;40:1,2,
8,12;41:9,14,16;51:22;
53:22;54:8;55:22;77:13;
80:9;83:1;84:3,10,11;
90:10;91:25;92:23;
94:10;95:7,19;113:5,6,7,
9;115:19,19;116:2;
117:5;118:23;120:4,8,
11;134:13;136:5;142:2,
12;144:11;146:3
**policies (2)**

22:9,11
**polite (1)**
132:21
**pose (1)**
61:14
**posed (5)**
39:22;130:6;136:4,17;
141:22
**poses (1)**
75:11
**position (5)**
74:12,13;75:3;76:7;
120:23
**positions (2)**
13:14;83:25
**possibilities (1)**
132:10
**possibility (2)**
105:4;133:14
**possible (7)**
38:16;44:15,19;49:4;
76:19;133:8;137:1
**possibly (5)**
26:14;56:16;89:2;
97:9;135:15
**POST (12)**
19:14,21,25;20:13,18,
19;21:3;27:18,19;28:14;
44:12,22
**P-O-S-T (1)**
19:17
**potential (1)**
37:25
**pouch (2)**
50:7,9
**pouches (1)**
50:5
**Powell (31)**
8:20;9:7;13:3,4,23;
14:19;15:15;22 11;23:1;
25:19,25;26:5,12,16;
28:5,11;32:8,11,14;
38:11;39:7;40:1;41:9,
14,16;51:22;55:22;56:5;
97:13;98:11,11··
**practice (5)**
41:17;47:2,10;49:11,
17
**practiced (2)**
35:15;51:7
**practices (2)**
26:1;47:4
**practicing (1)**
47:14
**premises (3)**
25:6,7;63:22
**prepare (3)**
92:20;113:6,9
**prepared (1)**
31:21;113:7;115:19
**prescriptions (1)**
89:24
**presence (4)**

79:22;94:20;96:17;
112:4
**present (11)**
48:4;54:14,16,18;
56:12;81:21;95:9;
101:20;133:16;134:15;
135:9
**presented (1)**
131:23
**pretty (2)**
35:15;138:14
**prevent (5)**
68:22;94:18,19;96:16;
97:3
**previously (1)**
118:10
**primarily (1)**
72:16
**primary (5)**
29:3;30:20;115:3,4,22
**principles (2)**
29:3;65:17
**prior (11)**
36:8,20;37:4;39:15;
42:5;51:21;77:13;80:16;
105:7;109:13;114:24
**prisoners (2)**
115:8,24
**privacy (1)**
114:2
**probably (11)**
7:14;56:21,23;72:21;
74:7;84:25;85:2,15;
95:18;120:15;137:15
**probationary (2)**
9:4,6
**problem (5)**
99:24;117:12,13,25;
118:4
**problems (2)**
7:15;9:23
**procedures (1)**
22:11
**proceeded (2)**
125:3,25
**Proceedings (1)**
147:13
**process (1)**
28:25
**processing (1)**
100:1
**procession (2)**
122:22;127:22
**produce (2)**
16:10,11
**produced (1)**
56:4
**program (5)**
10:24;12:4;21:11;
36:19;56:6
**programs (3)**
12:9,10;34:17
**promotion (2)**

13:17;16:13
**protection (1)**
49:25
**protective (4)**
16:4,8;17:9,10
**provided (4)**
48:8;79:15;84:18;
107:7
**providing (1)**
84:7
**purpose (1)**
114:3
**purposes (1)**
5:18
**put (6)**
34:17;39:1;51:8;
106:4;129:16;131:11
**puts (2)**
58:2;59:1
**putting (1)**
49:12

---

**Q**

**qualifications (1)**
20:2
**qualified (5)**
60:13,14;68:22;72:10;
73:20
**Quarter (1)**
23:1
**quick (1)**
25:6
**quite (1)**
18:25
**quotes (2)**
115:19,20

---

**R**

**RA (1)**
12:5
**radio (1)**
7:23
**raid (1)**
136:11
**raise (6)**
13:17,17,19,20,22,24
**raises (3)**
13:13,15,22
**rake (2)**
115:10;121:3
**ram (11)**
34:4;41:19;108:11;
112:9,13;115:5,21;
117:10,24;120:19;122:3
**rammed (3)**
121:3,12;142:3
**ramming (1)**
121:14
**rams (1)**
46:5
**ran (1)**

22:17
**rank (2)**
9:2,7
**rather (1)**
90:8
**react (1)**
90:3
**read (8)**
18:12,15;56:2;113:23;
114:17;118:18;146:24;
147:2
**readily (1)**
30:24
**ready (5)**
4:21,22;76:6;119:24
**real (1)**
59:17
**realistic (2)**
85:17;133:16
**realize (3)**
24:19;41:12;90:6
**really (8)**
48:7;70:21;72:23;
75:21;81:15;121:19,22;
130:9
**reason (6)**
87:4;91:15;105:16;
119:9;131:10,21
**reasonable (5)**
92:24;93:6,11;94:12;
101:25
**reasoning (1)**
91:18
**reassemble (1)**
18:11
**receive (5)**
13:7;34:16;54:3;62:5;
70:19
**received (10)**
18:2;19:16,18;20:15,
23;21:2;58:22;66:7;
73:16,17
**recently (1)**
8:25
**Recess (3)**
17:24;18:10;80:5
**recognition (1)**
121:22
**recollection (3)**
116:18,23;120:5
**recollections (1)**
41:4
**record (22)**
4:1,3,17;5:3,19;7:8;
17:17,20,23;18:15;19:9,
25;20:16;23:9,21,22;
24:7;43:1,18;96:8;
100:4,5
**recorded (1)**
6:24
**records (11)**
18:4,25;19:13,14,25;
24:15,19,23;27:20;

Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

28:14;44:12
**refer (1)**
  23:21
**reference (2)**
  52:6;129:11
**referred (1)**
  23:4
**referring (6)**
  56:15;65:18;66:25;
  108:10;111:17;112:19
**refers (1)**
  105:13
**reflect (3)**
  5:14;19:13;23:4
**reflected (6)**
  18:4;19:25;20:15;
  24:7,18;27:19
**refrain (1)**
  100:22
**regard (3)**
  4:15;5:4;36:9
**regardless (1)**
  99:20
**regular (1)**
  48:8
**regularly (1)**
  48:16
**rejected (1)**
  98:24
**related (1)**
  15:25
**relates (1)**
  15:16
**remember (93)**
  21:23;22:8;24:3;
  26:17;30:15;37:13;
  38:16,18;44:3;54:4,5,19,
  20;63:11;67:19,23;68:6;
  75:21;78:18,21;80:11,
  14,24;81:4,7,20;84:23;
  86:20,22;87:7,22,25;
  88:2;91:17;94:16;97:16,
  25;98:25;99:1,7;100:6;
  101:11;102:12,14,22;
  103:10;104:3,7;106:3,
  23;107:6;109:1,2;
  110:22,23;115:1;116:7,
  9,25;117:3,11,21,23;
  118:11,14;119:1,2,14;
  120:25;121:5;122:5,15,
  20;123:7,14,15;124:13;
  126:25;127:2,18;
  129:20;133:7;136:23;
  137:2,4,15,23;138:13,
  20;139:6;140:4,14;
  144:7
**remove (1)**
  116:2
**Repeat (4)**
  36:25;71:7;72:4;
  113:14
**report (14)**
  113:5,6,7,9,11,12,15,

20;116:14,19;118:25;
  120:16;137:9,15
**REPORTER (3)**
  17:19;18:12;30:2
**reports (1)**
  113:17
**representation (1)**
  5:19
**represented (1)**
  135:12
**represents (1)**
  114:13
**reprimands (1)**
  18:5
**reputable (2)**
  97:12,23
**requested (1)**
  18:16
**require (6)**
  16:10;56:25;70:11;
  71:15,18,21
**required (6)**
  6:19;7:20;14:13;
  37:14;72:8;75:22
**requirements (2)**
  14:3,9
**requires (5)**
  56:12,20,23;57:1;
  71:22
**reschedule (1)**
  47:21
**rescheduled (1)**
  47:23
**rescue (2)**
  43:12;56:9
**residence (14)**
  38:4,21;41:19.62:18;
  63:2;64:7;86:7;88:3;
  106:1;114:25;115:14,23,
  25;133:10
**resistance (6)**
  139:7,10,11,12;
  142:10,12
**resolve (2)**
  30:22;31:19
**resolving (1)**
  68:3
**resources (4)**
  30:22;68:21;7 1;73:8
**respect (1)**
  87:3
**respond (11)**
  68:20;69:4,11,20,25;
  70:16;71:1,11,12;72:16;
  95:20
**responded (1)**
  37:9
**responder (1)**
  70:6
**responder's (1)**
  29:5
**responding (1)**
  28:25

**responds (1)**
  72:19
**response (23)**
  7:7;28:3,17;32:24,24;
  35:2;36:11;37:14;38:5;
  43:10,11,11,12;46:7;
  55:16,18.23;56:5;62:10;
  64:18;71:16,18;86:8
**responsibility (2)**
  115:22;124:9
**responsible (1)**
  128:8
**rest (8)**
  45:24;70:8;115:5;
  117:24;125:3,6,9,22
**restraining (1)**
  10:16
**resulted (1)**
  36:23
**review (4)**
  20:12;22:10;64:21;
  109:25
**reviewed (2)**
  23:25;47:4
**ride (1)**
  12:9
**rifle (1)**
  50:17
**rifles (2)**
  53:1;128:7
**right (109)**
  5:24;9:5;11:3;12:17;
  14:2;17:16;18:20;19:19;
  20:3,11;21:12;26:8,10;
  27:24;29:16;33:8;35:12,
  20;36:22;37:19;39:4,15;
  40:16;41:3,8,14;44:8;
  45:1,3;47:17;48:3,3;
  49:6,15,17;51:6;58:15;
  61:16;62:8,15;64:10,16;
  65:12;67:14,18;68:18;
  69:1,9;70:8,21,25;71:11,
  12;72:18;74:9;75:2;
  76:15;78:9,17,25;79:20;
  81:1;82:12;83:20;84:1;
  88:1;89:5;92:22,25;
  93:14;96:12;97:11;
  98:13;101:8;102:23;
  104:16;106:13;107:12;
  110:21;111:20;112:15,
  25;113:12,21;115:16;
  116:21;118:15;119:19;
  120:25;122:2,13;123:1,
  12;124:3;126:21;128:6;
  130:25;131:12,18;
  132:8;133:6;134:4,13;
  135:8,17;137:8;139:3;
  142:9;143:5
**right-hand (2)**
  109:20;110:13
**risk (1)**
  132:12
**rode (1)**

12:11
**role (7)**
  45:4;46:8,12,15;
  62:17,20;63:5
**room (33)**
  18:11;25:14;36:24;
  43:9;44:9;45:10;46:5,
  13,15,19,20,20,21,22;
  47:4,14,17;49:6,7;51:9;
  64:2;75:7,10,23;81:13,
  18;93:17;118:22;
  119:11;123:9,10,24;
  124:1
**room-clearing (2)**
  75:23;76:3
**rooms (11)**
  34:14;35:6;39:13;
  64:10,14;74:14;76:23;
  77:1;106:9,14,17
**roughly (1)**
  14:6
**round (2)**
  50:16,18
**Roy (1)**
  108:5
**rubric (1)**
  15:3
**rude (1)**
  146:5
**rule (1)**
  135:20
**run (1)**
  134:22
**rush (1)**
  41:19

## S

**safe (1)**
  146:21
**safer (1)**
  92:5
**safety (6)**
  115:23;130:7;131:23;
  134:19;135:1;136:18
**same (10)**
  41:1;42:3;45:5;48:21;
  53:5;58:3,23;59:6;
  107:25;144:20
**Sapp (1)**
  27:4
**sat (1)**
  6:13
**satisfy (1)**
  65:13
**save (1)**
  30:20
**saw (4)**
  7:14;104:5;123:22;
  126:12
**saying (4)**
  31:25;44:20;118:10;
  134:25

**scenario (1)**
  135:19
**schedule (4)**
  4:5,13,18,24
**scheduled (1)**
  13:17
**schedules (1)**
  13:15
**Schmidt (1)**
  27:3
**school (8)**
  10:23,24;11:14,15,17;
  12:3,3,8
**search (28)**
  15:24;52:15;53:10;
  62:18;81:16;82:25;83:2,
  7,18,21;85:19;89:11;
  90:4,18;92:20;99:16,19,
  20;102:1;112:6;115:19;
  117:5;118:23;120:4,8,
  11;138:4;142:2
**searched (1)**
  137:12
**second (8)**
  19:12;24:3;36:6;55:1;
  66:14;93:15;109:25;
  128:16
**seconds (3)**
  139:25;140:7,14
**secure (6)**
  114:3,20;115:8,22,24,
  25
**secured (1)**
  125:5
**seeing (1)**
  104:5
**Seems (1)**
  16:16
**Semiautomatic (4)**
  50:23;52:21,25;63:14
**send (1)**
  147:6
**sense (1)**
  25:8
**sent (2)**
  147:9,10
**separate (1)**
  46:2
**September (1)**
  8:22
**sequence (6)**
  109:22;110:14,24;
  111:8,12;121:18
**Sergeant (20)**
  5:6;7:25;8:2,3,4,6;
  9:13,13,14;27:1,3,4,4;
  51:16;82:22;83:15;
  84:23;103:11;109:6;
  121:3
**sergeants (2)**
  9:11,12
**serve (5)**
  53:23;69:13;87:4;

Tricia Wachsmuth v.
City of Powel, et al.

Matthew Danzer
October 4, 2010

90:4:101:25
**served (3)**
11:18;36:5;52:16
**service (6)**
43:12;53:4;77:14;
83:2;105:7;113:10
**serving (1)**
40:9
**session (1)**
131:1
**sessions (6)**
24:6;26:11;44:24,24;
49:9,9
**set (3)**
4:3;14:9;44:4;61:24;
78:2
**sets (1)**
109:22
**setting (8)**
20:6;24:23;31:2,21,
25;32:2;34:25;69:3
**settings (1)**
25:18
**seven (4)**
109:21;110:13;
111:16;112:11
**share (1)**
87:10
**shared (1)**
115:12
**sheriff's (4)**
25:22,24;26:13;28:11
**shine (1)**
125:16
**shoot (1)**
67:15
**shooter (6)**
28:17,24;55:18;70:17,
24;75:14
**shooters (1)**
43:11
**shooting (2)**
28:25;29:13
**shoots (1)**
50:16
**shorthand (1)**
110:4
**shoulder (2)**
74:16;75:1
**show (5)**
25:5;27:6;45:11;46:3;
99:5
**showing (1)**
81:6
**shown (2)**
24:7;77:15
**shows (1)**
112:17
**side (5)**
78:3;82:23;109:20;
110:13;122:7
**sign (3)**
146:24;147:2,6

**signed (1)**
21:24
**simple (1)**
108:14
**simply (1)**
47:3
**single (3)**
16:6;33:18;144:24
**sit (1)**
8:8
**sitting (4)**
123:5,9,22;141:3
**situation (25)**
28:20;29:6;33:21;
38:16;39:4;40:10,10;
44:10;54:12;64:14;
66:17;69:4,12,21;70:1,
24;71:2;72:7;73:1;
75:23;92:14,15,24;
95:11;132:11
**situational (1)**
46:6
**situations (11)**
32:24,25;33:6.38:9;
67:11;68:13,20;70:6;
72:16;95:21;135:19
**six (10)**
14:7,8;23:11;77:10;
108:13,13,19;115:2,4;
128:6
**ski (1)**
63:6
**skills (2)**
72:24,25
**sling (2)**
63:24;74:25
**slung (2)**
63:24;74:15
**small (6)**
61:22;62:3;105:1,5,8;
113:24
**snacks (1)**
50:9
**sneaking (1)**
67:5
**somebody (16)**
29:13;35:2,17;38:1;
49:3;59:7;75:10;79:17,
18;82:2,8;89:13;91:6;
120:7;124:9;145:12
**someone (11)**
28:24;37:10,21 53:21;
72:21;82:19;83:17;92:4;
113:11;120:11,14
**someone's (1)**
110:4
**sometime (2)**
11:21,21
**somewhere (2)**
104:18;108:3
**son (3)**
91:24;93:17,25
**sorry (15)**

24:8;27:24;33:11;
34:9;35:23;45:6,7;60:9;
61:19;73:11;80:19;
84:12;95:5;111:5;
118:17
**sort (5)**
21:1;73:20;84:9;
109:21;128:12
**sought (1)**
17:9
**sounds (1)**
118:2
**South (2)**
8:16;114:5
**speak (4)**
49:4;74:2;80:15,20
**SPEAKER (1)**
94:1
**speaking (2)**
52:3;78:13
**speaks (1)**
73:20
**Special (7)**
31:5;32:1,9,15,20,21;
41:10
**specialized (2)**
71:21,22
**specially (2)**
41:10;99:17
**specific (6)**
45:8;48:1,17;70:14;
76:25;85:13
**specifically (8)**
9:16;17:10;28:22;
32:22;34:2;61:25;85:3;
88:2
**specify (1)**
15:8
**speculate (1)**
146:15
**Speculation (3)**
94:2;140:20;141:18
**spelling (1)**
147:3
**spoke (5)**
80:22;81:3,4;84:18;
87:11
**stage (1)**
79:8
**staged (1)**
111:13
**stairs (11)**
125:11,14,25;126:6,
12,14;127:4;128:4,11;
129:1;142:22
**stairway (1)**
125:18
**stamped (1)**
22:21
**stand (1)**
34:23
**standards (1)**
14:16

**standing (2)**
127:25;146:10
**stands (1)**
55:7
**start (10)**
5:25;10:21,22;25:18;
71:14;107:15,18;
111:24;113:22;119:23
**started (7)**
11:21;118:21;119:4,
20;127:4,14;143:9
**Starting (1)**
111:15
**stated (1)**
4:17
**statement (9)**
68:25;70:10;86:5;
96:25;102:4,6,6;119:10;
120:8
**station (5)**
53:22;77:13;80:9;
91:25;116:3
**status (1)**
9:5
**stays (1)**
112:16
**step (1)**
13:13
**sticks (1)**
37:17
**still (2)**
54:7;81:6
**stipulation (2)**
5:20,21
**stop (4)**
20:3;94:12;118:24;
129:16
**stopped (1)**
61:11
**stormed (1)**
38:20
**structure (1)**
52:7
**study (1)**
28:19
**stuff (1)**
30:14
**subject (2)**
13:12;97:8
**subjective (2)**
102:4,6
**substitute (2)**
29:6,23
**sued (3)**
5:7,9;10:19
**suicidal (1)**
37:12
**suicide (1)**
66:15
**summary (2)**
89:14;134:7
**superior (1)**
25:5

**supplement (1)**
113:19
**supplements (1)**
113:20
**supplied (1)**
29:21
**supposed (8)**
74:11;75:22;76:6;
78:18,25;79:1,2;110:1
**sure (55)**
5:24;11:20,23;14:14,
14;21:18;25:13;27:8;
35:24;52:11;63:10;66:7;
68:23;72:3;74:21;80:4;
81:10;82:2;83:10,19;
85:10,16;87:7;89:3;
91:13;94:11,15;95:15;
98:20;103:14,21;104:3,
24;105:8,21;106:7;
107:9;108:9,25;112:18;
115:1;117:1;118:13;
122:15;123:7,14;124:2;
126:25;127:2;129:23;
137:23;142:20;143:11,
12;145:11
**surprise (4)**
25:4;46:3;67:6,12
**Surrender (1)**
66:15
**surveillance (7)**
104:8,12,14,19,23;
108:8;130:14
**survival (1)**
75:16
**SWAT (44)**
29:7,15,23;31:2,13,21,
22;32:2,12;55:2,6,7,10;
56:8,11,12,20;57:2,8,10,
11,25,25;58:3,7,15,23;
59:2,4;60:3,13,14,25;
61:3,11,12,20;68:1,22;
69:13,18,21;94:14;100:9
**SWAT-type (3)**
38:3;45:23;69:3
**sworn (1)**
6:2

**T**

**tabs (1)**
22:18
**tactic (1)**
62:10
**tactical (30)**
25:8;28:3;29:4;30:12;
32:1,23,24;35:9;36:11;
38:6;40:21;41:18;42:16;
45:12;46:4;49:20;51:17,
19,20;55:16;56:5;60:13;
64:18;70:6;82:23;83:2,
6,16;84:24;86:8
**Tactics (17)**
31:5;32:9,25;36:23,

Case 1:10-cv-00041-ABJ   Document 65-12   Filed 01/10/11   Page 91 of 92
Tricia Wachsmuth v.
City of Powel, et al.                                                                                    Matthew Danzer
October 4, 2010

24;37:15;38:7;55:23;
58:3;59:5.5,6;62:10;
64:2;68:17;69:18;76:3
**tail (1)**
19:2
**taker (3)**
66:13;67:12;75:11
**talk (6)**
19:23;21:8;77:17;
93:14;98:18;99:25
**talked (19)**
16:9,9;47:17;49:7;
52:14;77:16;82:8;91:8,
9;109:16;110:6,18;
115:15;132:20;133:11,
11,14;134:16;136:25
**talking (34)**
15:2;16:25;17:1;
20:17;21:9;35:13;38:5;
40:9;42:25;44:21;45:7,
8,9,10,22;46:14;54:12;
74:1;77:20;78:5;81:15;
84:24;91:3,5;92:4;
93:22;102:3;103:3;
110:12;128:22;129:13;
133:8;135:8;138:23
**taught (10)**
10:25;63:21,23;64:2;
65:18,24;67:23;68:4,16;
75:6
**teach (4)**
68:10,19;70:4;73:21
**team (86)**
25:4,8;29:7,23;31:5,
13,22;32:1,8,12;33:14;
46:21,22;47:2,3,10,12,
15,15,16;48:7,14,18,20;
51:14,14,20;52:16,23,
25,25;56:9,11,12,20;
57:2,8,10,25;58:7;59:17;
60:3,14,14;61:1,3,11,12,
20,25;63:12;65:23;68:2,
22;69:13,21;71:21,22;
72:10;77:19,22;78:1,2,3,
4,7,8,18;79:2,7;90:9:
101:20;103:1;109:5;
114:11;115:3,5,7,8,13;
116:1,8;120:22;128:7,8,
22
**teams (6)**
26:1;58:3,23;59:2,4;
99:11
**team's (1)**
115:22
**telling (8)**
40:24;64:1;74:12,13;
88:2;129:15;135:11;
145:23
**ten (1)**
127:7
**ten-year-old (4)**
105:13,14;106:1;
132:18

**term (3)**
103:4,6,6
**terms (5)**
45:24;52:14;73:7,11;
106:9
**testified (1)**
6:2
**testimony (3)**
60:18;74:18;126:14
**Third (2)**
122:24,25
**THOMPSON (97)**
5:11,18;15:6;16:13;
23:20;27:10;31:8;32:5;
33:4,22;34:6;38:14,23;
42:7;43:8,19;46:10;
47:5;48:12;51:24;53:2,
5;57:5,15;58:_,11;
59:11;60:4,19;61:13,17;
64:4;69:17,23 72:2,14;
73:4,25;75:19,25;84:21;
85:8,23;86:12 90:15;
92:9;93:10,19 94:21;
95:14,23;96:2 5,8,23;
97:4,14;100:1,2,24;
101:22;105:19;106:22;
107:2;108:17;109:15;
110:16;111:8;116:15,
24;117:6,16;1 9:6;
121:24;126:8,.7;
127:23;128:20;130:3,
17;131:6;132:5;133:19,
25;134:2,7;136:8,22;
138:1;139:16;140:3,12,
19;141:7;142:14;
143:23;144:14 145:1
**though (10)**
12:4;74:10;78:22;
81:7,9,11;87:23;89:20;
94:16;119:10
**thought (2)**
94:15;98:3
**thoughts (1)**
97:17
**threat (17)**
28:25;75:11;129:24;
130:6,25;131:9 23;
132:13,15;135:1,20,21,
24,24,25;136:1.17
**threats (3)**
116:1;133:9;136:2
**three (6)**
14:15;17:11;113:24,
25;114:1;130:15
**throughout (1)**
35:15
**throw (2)**
35:18;69:6
**times (11)**
12:12;25:24;26:4,7;
33:13;35:16;49:11;
57:17;71:10,11;99:17
**title (12)**

32:7;33:12;35:24;
41:13;55:13,15;57:19;
58:13,16;60:25;61:20;
68:9
**today (6)**
4:13;6:18,23;7:14;
9:21,25
**together (8)**
40:25;41:15;47:16;
48:17;57:3;81:8;84:2;
131:11
**told (21)**
4:19,24;31:20;37:12;
53:17,18,21;82:1,2;86:2;
88:8,9,10,11,14;105:5;
110:18;116:9;119:17;
137:20;146:12
**Tom (8)**
91:23;93:17,24;94:12;
97:11,19;99:13;112:15
**tomorrow (1)**
18:19
**tone (1)**
90:13
**tonight (1)**
96:13
**took (25)**
8:24;13:6;21:20;23:5;
24:15,18;35:21;36:3,10;
43:16;47:3,18;64:19;
65:8;73:20;79:9;80:14;
81:8;83:8;104:21;
121:23,25;143:5,6;
146:11
**top (2)**
107:16,18
**topics (1)**
109:16
**toss (1)**
34:24
**towards (4)**
75:5;109:20;125:15,
16
**traffic (1)**
10:3
**trailer (3)**
37:10;39:6;51:23
**train (1)**
46:24
**trained (46)**
21:10;25:14,17;29:7,
15,23;31:1;32:1,23;33:5,
24;34:2,3,4,11,14,15;
35:4,5,19;41:11;46:9,16;
56:8;57:24;58:7,15;
59:16;60:3;61:2,10,12;
64:13,16;69:4,11,12;
70:9;71:1,23;92:23;
95:20;135:19,22,23;
146:3
**trainer (1)**
76:19
**training (106)**

12:9;14:3;18:25;
19:14,15,17,20,21,24;
20:2,5,8,13,14,22,24,25;
21:2,7,8,11,14,15,17,19,
22;23:2,3,5,10;24:6,11,
13,14,25;26:11,20,22;
27:13,16;29:4;33:20;
34:16;35:9,16;36:18,19;
40:13,21,25;42:1,8,15,
24;43:2,9,15;44:4,6,9,
11,12,16,21,22,23,24;
45:4,8;46:14,24;47:19,
24;48:8,25;49:9;55:2,
10;56:13,13,21,23;57:1,
11,18;58:3,4,12,22,23;
59:1,5;62:6,9,10,12,14;
63:16,17,18,20;65:16;
70:11,19;72:15;74:3
**Trainings (13)**
21:13;22:5,6,22;
23:19;24:4,18;26:20;
43:25;44:2;45:9;46:8;
62:13
**trains (5)**
48:16;58:3;59:4,4;
76:19
**trial (1)**
6:24
**Tricia (9)**
6:13;123:1;124:7;
126:2;128:15;129:15,
16;133:15;139:9
**tried (1)**
122:18
**trip (1)**
146:21
**true (13)**
29:7,19;31:10;69:8;
103:7;106:18;119:12;
121:18,21;128:9;
129:25;135:6;137:24
**truthful (4)**
9:20,24;39:18;141:19
**truthfully (1)**
6:19
**try (3)**
30:13;31:19;90:8
**trying (6)**
26:21;46:24;68:10;
70:3;73:21;88:12
**turn (9)**
17:14;22:16;65:4;
66:14;67:20;103:18;
107:12;113:21;137:8
**turned (2)**
7:23;22:4
**Twenty (1)**
87:24
**Twice (3)**
26:8,9;49:15
**two (9)**
14:25;27:22;34:17;
35:22;40:25;41:5;115:6,

7,9
**type (9)**
23:4;27:16;29:4;
46:14;52:7;59:6;68:3;
101:19,20
**types (4)**
56:9,11;59:5;100:22
**typical (1)**
72:22
**typically (1)**
47:25

**U**

**unable (1)**
142:5
**uncommon (1)**
65:22
**uncovered (2)**
63:9,11
**Under (7)**
15:3;16:22;30:19;
57:19;58:12;65:22;99:5
**underneath (1)**
70:11
**understood (1)**
7:6
**undertake (2)**
20:4;76:7
**unfortunately (1)**
27:22
**uniform (3)**
49:20,23,24
**unit (9)**
32:15,20,21,22;38:6;
41:10,10,18;69:13
**universe (1)**
132:9
**unless (2)**
6:19;7:10
**unrelated (2)**
15:21;69:7
**unstable (6)**
89:2;90:3;102:5,16,
20;131:3
**up (30)**
7:10;22:23;24:2;27:6;
47:9;55:1;74:20,22;
75:13,14;76:6,11;77:23;
78:2,8;81:7;86:3;104:1;
108:15;111:2;112:17;
120:1;121:19;123:11;
127:4;131:19;140:18;
141:6,13;142:11
**uphold (1)**
97:7
**upon (2)**
5:20;39:7
**use (14)**
4:25;22:24;34:4;
35:17;36:17;37:3;38:3;
52:24;75:9;99:10,23;
101:20;115:21;117:10

**used (18)**
6:24;35:3;38:21;
40:11,19;41:20,20;
51:21;52:18;68:1,2;
103:6;121:3;125:16;
131:21,22;138:25;
143:16

**uses (2)**
89:23;91:2

**using (10)**
16:24;25:4;35:15;
41:4;52:25;66:24;91:21;
99:5;112:9,13

**V**

**variety (1)**
68:16

**vehicle (4)**
129:21;137:12,14,18

**vehicles (1)**
129:19

**verbal (1)**
18:5

**vest (3)**
49:24;50:4,5

**via (1)**
114:2

**violation (1)**
10:3

**violations (4)**
94:19;95:9;96:16;97:3

**violence (2)**
101:10,10

**visit (1)**
99:12

**voice (1)**
99:4

**voluntarily (1)**
126:13

**W**

**Wachsmuth (42)**
6:14;36:5;52:9,15;
62:18;86:7;88:3,21;
91:23;93:17,25;94:13;
97:12,19;98:15;99:13;
101:9;112:16;115:13;
123:2;124:7,15,18;
125:5;126:2;128:16;
129:22,24;130:25;
131:24;132:16;134:16;
135:10;136:4,17;137:20,
24;139:9;142:10;145:5,
24;146:17

**Wachsmuth's (5)**
87:3;100:4,4;133:10;
137:12

**Wait (1)**
102:8

**waiting (2)**
80:21;84:3

**walk (1)**
126:12

**wall (1)**
129:16

**walls (1)**
125:21

**warrant (35)**
15:24;36:5;40:9;
43:12;52:15;53:10,12,
23;62:18;77:.:4;79:22;
81:17;82:25;83:2,3;
85:19;87:5;85:11;90:4,
18;92:20;98:18,18;
105:7;111:1;112:6;
113:10;115:20;117:5;
120:4,8,12;129:25;
138:4;142:2

**warrant' (1)**
118:23

**warrants (2)**
99:16;102:1

**watch (1)**
142:7

**water (1)**
50:9

**waved (1)**
102:7

**way (14)**
5:17;38:15;39.1,17;
49:12;51:7;57:8;60:23;
78:12;81:25;93 6;134:9;
140:23;141:18

**weapon (34)**
37:10;50:11,16,20,25;
51:4;63:13,14,22;64:2,8,
11;74:1,13,14,23;75:3,
4,10,12,13,14,22;76:14,
15,21;109:2;118:12;
124:14,19;125:13,15;
138:12,21

**Weapons (19)**
31:5;32:1,9;33:15,15;
41:21;45:12;46:4;52:17,
18,21;53:1;63:24;89:21,
22;92:20;138:22,24;
139:2

**wearing (3)**
49:19,23,24

**week (1)**
5:21

**welcome (1)**
16:18

**weren't (3)**
47:1;85:19;122:6

**WESTBY (158)**
4:15;5:13,16;8:.1;
14:25;15:7,13,15,19;
16:8,14,18,24;17:9;19:4;
23:14;25:9;29:8 24;
31:3,6,14;32:3,6,16;
33:2,23;36:14;37:22;
38:12,25;39:20;40:3,22;
41:22;42:3,17;43:3,6;

44:13;45:7,13,18;46:11;
47:6;48:10;49:21;51:25;
55:3,11;56:19;57:4,13,
16;58:9,17,20;59:10,19,
24;60:6,16;61:4,8;
62:24;64:23;67:21;69:5,
15,24;71:3,25;72:12;
73:2,9,13,16,23;74:17;
75:17;84:10;85:9;86:10;
87:6;89:17;90:11;92:1,
7;93:1,8;94:3,23;95:3,
12;96:1,18,21;97:5,15,
24;98:1.7;100:10,17,21;
101:4,13,23;102:8;
103:2;105:20;106:2,20;
116:16;117:14;118:6;
123:16;126:15;127:8,
24;128:18;130:1,19;
131:5,13,17;132:1,4,19,
25;133:18;134:6,20;
135:3,13;136:6,20;
138:17;140:1,8,21;
141:8,14,17;142:15;
143:2,14,21;144:12,20,
23;145:2,16;146:4,24;
147:2,6,9

**what's (7)**
16:2;17:5;19:25;
48:13;85:18,21;147:1

**Whenever (1)**
47:20

**wherever (1)**
29:2

**whole (4)**
82:14,15;83:14;
142:17

**Whoops (1)**
27:22

**wide (1)**
68:16

**wife (1)**
8:25

**willing (1)**
99:19

**window (10)**
112:10;114:4;115:10;
118:22;119:11;121:3,4;
123:12;141:4,5

**windows (1)**
88:25

**wish (1)**
7:17

**withdraw (1)**
69:9

**within (3)**
13:4;21:16;144:10

**Witness (110)**
7:4;18:17;19:5;23:25;
25:12;30:1;31:16;32:7;
33:5,24;34:7;37:24;
38:15;39:1,22;40:24;
42:8;43:9;44:15;45:21;
46:12;47:7;48:13;49:23;

53:6;55:13;56:20;57:7,
18;58:2,12,22;60:20;
63:1;69:18,25;72:3,15;
73:5,11;74:1;79:19;
84:12,22;85:10,24;
86:13;87:7;90:16;92:10;
93:11;94:4;95:5,15;
96:24;97:6,16,25;98:3,
10;100:13;101:6,15,24;
102:12;105:21;106:3,
23;107:3;108:19;
109:16;110:3,17;116:17,
25;117:7;119:7,18;
121:25;123:18;126:9,
18;127:10,25;128:21;
130:4,21;131:7;132:6;
133:20;135:15;136:9,
23;139:18;140:4,13,22;
141:9,21;142:16;143:3,
16,24;144:15;145:20;
146:23;147:1,5,8,12

**wooden (1)**
114:2

**word (1)**
143:17

**wording (4)**
89:3;117:11,19,22

**words (7)**
7:19;13:4,18;47:1;
76:10;79:15;133:24

**work (14)**
8:17,18;9:15;11:13,
15,24;12:8,8,20;21:9;
46:9;47:16;52:4;72:10

**worked (11)**
11:14,17,22,25,25;
12:3,5,17;13:8,14;98:14

**works (1)**
98:11

**worried (1)**
89:1

**worse (2)**
92:14,15

**worst-case (1)**
135:18

**write (2)**
112:18,20

**writing (1)**
4:17

**written (3)**
104:1;110:19;118:25

**wrong (1)**
144:5

**wrote (1)**
22:1

**Wyoming (2)**
14:10;19:14

**Y**

**year (7)**
11:11,21;12:18;13:20,
24;14:13,14

**year-and-a-half (1)**
103:11

**years (7)**
13:14;14:6,7,8,15;
18:4;26:4

**young (1)**
90:6