# Appendix Twenty

# In The Matter Of:

*Tricia Wachsmuth v.*
*City of Powell, et al.*

*Tricia Wachsmuth*
*October 04, 2010*

*Bray Reporting*
*P.O. Box 125*
*Laurel, MT 59044*
*(406) 670-9533*
*vonni.bray@yahoo.com*

Original File 10-4-10 Tricia Wacshmuth_scoped.txt
Min-U-Script® with Word Index

## Page 1

TRICIA WACHSMUTH - October 4, 2010                    Page 1

```
 1        IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF WYOMING
 3   ----------------------------------------------
 4   TRICIA WACHSMUTH,                    )
                                          )
 5             Plaintiff,                 )
                                          )
 6        vs.                             )  NO. 10-CV-041J
                                          )
 7                                        )
     CITY OF POWELL, AND IN THEIR         )
 8   INDIVIDUAL CAPACITY, TIM             )
     FEATHERS, CHAD MINER, MIKE           )
 9   CHRETIEN, ROY ECKERDT, DAVE          )
     BROWN, MIKE HALL, BRETT LARA,        )
10   MATT MCCASLIN, ALAN KENT, MATT       )
     DANZER, OFFICER BRILAKIS, LEE        )
11   BLACKMORE, CODY BRADLEY, KIRK        )
     CHAPMAN, JOHN DOES #1-#4,            )
12                                        )
             Defendants.                  )
13
14      VIDEOTAPED DEPOSITION OF TRICIA WACHSMUTH
15           8:41 a.m., Monday, October 4, 2010
16
17
18          Pursuant to notice, the videotaped deposition
19   of TRICIA WACHSMUTH was taken in behalf of Individual
20   Defendants in accordance with the applicable Federal
21   Rules of Civil Procedure at the Park County Circuit
22   Court Jury Room, 109 W. 14th St., Powell, WY 82435,
23   before Vonni R. Bray, Registered Professional Reporter
24   and Notary Public of the State of Montana.
25
```

## Page 2

TRICIA WACHSMUTH - October 4, 2010                    Page 2

```
 1                      APPEARANCES
 2   FOR PLAINTIFF:
 3           Mr. Jeffrey C. Gosman
             Gosman Law Office
 4           123 W 1st Street
             P.O. Box 51267
 5           Casper, WY 82601-2481
             Telephone: (307)265-3082 - Fax: (307)265-6715
 6           E-mail: jeff@gosmanlawoffices.com
 7
 8   FOR INDIVIDUAL DEFENDANTS:
 9           Ms. Misha Westby
             Senior Assistant Attorney General
10           2424 Pioneer Avenue, 2nd Floor
             Cheyenne, WY 82002
11           Telephone: (307)777-5477 Fax: (307)777-8920
             E-mail: mwest@state.wy.us
12
13   FOR CITY OF POWELL & OFFICERS IN THEIR OFFICIAL
     CAPACITY:
14
15           Mr. Tom Thompson
             MacPherson, Kelly & Thompson
16           616 West Buffalo
             P.O. Box 999
17           Rawlins, WY 82301-0999
             Telephone: (307)324-2713 - Fax: (307)324-7348
18           E-mail: tthompson@wyomingattorneys.net
19
20   Also Present:  Joel Hageman  Videographer
                    Matthew Danzer
21                  Michael Chretien
                    Michael Hall
22                  David Brown
                    Cody Bradley
23                  Matt McCaslin
                    Roy Eckerdt
24                  Lee Blackmore
                    Matt Brilakis
25                  Tim Feathers
```

## Page 3

TRICIA WACHSMUTH - October 4, 2010                    Page 3

```
 1                 INDEX TO WITNESSES
 2                                                  PAGE
 3   TRICIA WACHSMUTH
 4       Direct Examination by Ms. Westby ..............8
         Cross-Examination by Mr. Thompson ...........185
 5       Cross-Examination by Mr. Gosman .............213
         Signature Page ..............................218
 6       Reporter's Certificate ......................219
 7
 8                     EXHIBITS
 9   EXHIBIT          DESCRIPTION                    PAGE
10
11   1        Drawing .............................150
12   2        Drawing .............................211
13   3        LCSW Letter .........................213
14
15            REQUESTED ON THE RECORD
16   REQUEST                              PAGE  LINE
17   Portion to be redacted per Ms. Westby's .....39   21
18   request
19
20
21
22
23
24
25
```

## Page 4

TRICIA WACHSMUTH - October 4, 2010                    Page 4

1  THE VIDEOGRAPHER: Let the record show that
2  this is the videotaped deposition of Tricia Wachsmuth,
3  Plaintiff, versus City of Powell, et al., defendants,
4  in the United States District Court for the District of
5  Wyoming, Cause Number 10-CV-041-J.
6  The date today is October 4th, 2010. The
7  time on the video monitor is 8:41 a.m. My name is Joel
8  Hageman, I'm the videotape operator today. The court
9  reporter today is Vonni Bray.
10  Counsel, please voice identify yourselves,
11  and state whom you represent.
12  MR. GOSMAN: Jeff Gosman, counsel for
13  plaintiff.
14  MS. WESTBY: Misha Westby, counsel for the
15  individual defendants.
16  MR. THOMPSON: Tom Thompson, counsel for the
17  City of Powell, and those individual defendants that
18  are being sued in their official capacity.
19  THE VIDEOGRAPHER: Would the reporter please
20  swear the witness.
21  (Witness sworn.)
22  MR. GOSMAN: Before we begin -- this is Jeff
23  Gosman, counsel for the plaintiff -- I do have
24  something that I need to put on the record. And it is
25  in relation to a letter that we have received from

Case 1:10-cv-00041-ABJ Document 65-13 Filed 01/10/11 Page 4 of 78
Tricia Wachsmuth v.                                                                 Tricia Wachsmuth
City of Powell, et al.                                                                  October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                      Page 5

1 Michael Kobos, who is the counselor currently treating
2 Tricia Wachsmuth, and the letter will be introduced as
3 an exhibit. We can do that now or later. I would
4 prefer to get it on the record now. It would be
5 Plaintiff's Exhibit 1.
6           And this letter makes it clear that Tricia
7 does suffer from PTSD and that those symptoms will
8 likely be inflamed during the course of any stressful
9 period where she's confronted by the police officers
10 that were involved in the search of her home. So I
11 would caution everyone in this room to be circumspect
12 and -- and respectful of Tricia Wachsmuth in -- in
13 every respect.
14          MS. WESTBY: And the position of the
15 defendants is that -- we had this discussion earlier in
16 the week. We discussed whether or not you raised the
17 concern about officers being present in the room. We
18 told you that it was our posit on that they had the
19 right to be here, and that they have all been
20 individually named and individually sued. You withdrew
21 that objection. We gave you the option of taking this
22 to the magistrate and having the magistrate address
23 this issue.
24          It is the position of the defendants that
25 this is a last-minute kind of, you know, production

TRICIA WACHSMUTH - October 4, 2010                      Page 6

1 that we were not aware of, that puts us in the
2 situation where you were threatening, you know, that
3 she is going to have additional symptoms because these
4 officers are here -- here, when this was an issue that
5 could have -- that could have been addressed last week
6 with the magistrate judge. You chose not to do that.
7           We're -- we're concerned about this.
8           THE WITNESS: May I say something real quick?
9 They are not additional symptoms. It just it could
10 make the symptoms I go through worse.
11          MS. WESTBY: This -- this is something that
12 if you were going to raise this kind of issue, we
13 should have addressed this last week --
14          MR. GOSMAN: We did address this last week.
15          MS. WESTBY: -- with the magistrate. And you
16 withdrew --
17          MR. GOSMAN: Misha, you left out an important
18 part of that discussion.
19          MS. WESTBY: You withdrew --
20          MR. GOSMAN: I made my objection, it's on the
21 record. The defendants are entitled to be here, and
22 we'll just take it from there.
23          MR. THOMPSON: And -- and, Counsel, for
24 purposes of joining, and Misha's position, I -- I would
25 join -- I would note that there were discussions

TRICIA WACHSMUTH - October 4, 2010                      Page 7

1 telephonically last week with an opportunity to present
2 these concerns to the magistrate. That was not done by
3 yourself as counsel for the plaintiff.
4           I've got significant concerns that this
5 letter now states that her inability to focus on
6 specific subject matters in questioning may be present
7 during this deposition. And so I don't know if it's --
8 I -- I -- I just have significant concerns about this
9 last-minute introduction of this type of -- of
10 statement without any ability to address these concerns
11 with Mr. Kobos.
12          MR. GOSMAN: Well, as a matter of fact, you
13 knew when we discussed this last week that these were
14 the very concerns that I had and that those concerns
15 were discussed and that I mentioned that I would have a
16 letter here today from her counselor. And so if this
17 comes as a surprise to you, I -- honestly, Thomas, I
18 can't -- I can't understand why.
19          MR. THOMPSON: It's -- it's Tom. And -- and
20 it does come as a surprise, because I believe that the
21 issue was addressed last week, and you withdraw -- you
22 withdrew your objection.
23          If you wanted to make it an issue, we should
24 have taken it to the federal magistrate so we didn't
25 waste everybody's time this morning. That's my

TRICIA WACHSMUTH - October 4, 2010                      Page 8

1 concern.
2           MR. GOSMAN: All right.
3           MS. WESTBY: Okay. Are we ready to proceed?
4           MR. GOSMAN: Can we go ahead and mark this as
5 a --
6           MS. WESTBY: No.
7           MR. GOSMAN: Thank you.
8           MS. WESTBY: This is my portion of the
9 deposition.
10          TRICIA WACHSMUTH,
11 having been first duly sworn, testified as follows:
12          DIRECT EXAMINATION
13 BY MS. WESTBY:
14   Q. Are you ready to proceed with the deposition?
15   A. (Witness nods head.)
16   Q. Okay. Please state your name and address for
17 the record.
18   A. Full and last? Full name or just first?
19   Q. First and last.
20   A. Tricia Wachsmuth, and I now live at 524 Road
21 7.
22          THE COURT REPORTER: I'm sorry. I'm having a
23 hard time hearing you. You live at 5 what?
24          THE WITNESS: 524 Road 7.
25

TRICIA WACHSMUTH - October 4, 2010     Page 9
Direct Examination by Ms. Westby

BY MS. WESTBY:

1  Q.  My name is Misha Westby.  I'm with the
2  Wyoming Attorney General's office.  And I represent the
3  officers in their individual capacity.
4     If at any time during the deposition you
5  don't understand a question that I've asked you, you
6  need me to rephrase it, please ask me to do that, and
7  that's not a problem.  I don't have any problem
8  rephrasing it.
9     But if you answer my question, I will assume
10  that you understood the question, okay?
11  A.  Okay.
12  Q.  Okay.  We have a court reporter and a
13  videographer here.  So you need to make sure that you
14  answer each question audibly.  Say yes or no.  Don't
15  nod your head, as we all have a tendency to do, okay?
16  A.  (Witness nods head.)
17  Q.  Before we get started.  I'm wondering if you
18  are on any type of medications.
19  A.  Sorry.
20  Q.  And you're showing me a pill bottle, Clon?
21  A.  Clonazepam.  Clonazepam or whatever.  It's
22  generic for Klonopin.
23  Q.  Okay.  And what type of medication do you
24  understand this to be?

TRICIA WACHSMUTH - October 4, 2010     Page 10
Direct Examination by Ms. Westby

1  A.  For anxiety and anti-panic attack.
2  Q.  Okay.  Any other medications?
3  A.  On Lexapro, 20 milligrams.
4  Q.  What do you understand that to be for?
5  A.  It's an antidepressant plus -- plus a
6  slight -- a slight -- slight antianxiety.  So that way
7  I don't have to take as many of these.
8  Q.  Okay.  Anything else?
9  A.  (Witness shakes head.)
10  Q.  So your --
11  A.  Not prescriptive.  I mean, I've taken
12  ibuprofen.  I don't think that matters, though, does
13  it?
14  Q.  No, that's fine.  Any other nonprescribed
15  substances or --
16  A.  That's --
17  Q.  -- medications you've -- and -- and let me
18  finish my question before you answer, so that it's
19  clear on the record.
20  A.  Sorry.
21  Q.  No, it's -- it's one of those difficult
22  things to do.
23     Any other substance, legal or illegal, that
24  you have in your system right now that might limit your
25  ability to understand my questions or take this

TRICIA WACHSMUTH - October 4, 2010     Page 11
Direct Examination by Ms. Westby

1  deposition?
2  A.  No.
3  Q.  No.  Okay.  And do you feel like you are
4  able, with the medications you're on, to understand my
5  questions and answer my questions?
6  A.  I do.
7  Q.  Okay.  And this is not a marathon.  If you
8  need a break, just answer the -- the last question that
9  I've asked you, and then feel free to take a break,
10  okay?
11  A.  Okay.
12  Q.  Let's talk about your background, first of
13  all.  Tell me where you were born and raised.
14  A.  Mora, Minnesota.
15  Q.  Okay.  How do you spell that?
16  A.  M-o-r-a.  And then M-i-n-n-e-s-o-t-a.
17  Q.  Okay.  How long did you live there?
18  A.  Up until I was 19.
19  Q.  Okay.
20  A.  I was in Wisconsin for three months.  In
21  between when I was 18.  Seventeen, 18.  Just before I
22  turned 18.
23  Q.  Okay.  So you were born and went all the way
24  through school in Minnesota?
25  A.  No, I didn't graduate.

TRICIA WACHSMUTH - October 4, 2010     Page 12
Direct Examination by Ms. Westby

1  Q.  Okay.  What year did you go through in
2  school?
3  A.  Until I was 15, 9th, 10th grade.  And then I
4  dropped out and I went through the junior alternative
5  and finished up to my 10th, 11th year.  I did both
6  classes.
7  Q.  Okay.  Tell me about that -- that program.
8  Why did you go into that program?
9  A.  Because my dad died.
10  Q.  Okay.  And you were struggling with -- with
11  that?
12  A.  They gave me less hours so I could be home
13  more.
14  Q.  Okay.  So you went through 10th and 11th
15  grade in -- in that program, correct?
16  A.  (Witness nods head.)
17  Q.  And then at that point in time, did you drop
18  out of school?
19  A.  I did.
20  Q.  Okay.  Tell me --
21  A.  About four months after.
22  Q.  I'm sorry?
23  A.  Four months after, I dropped out.
24  Q.  Four months after?
25  A.  I went back.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 6 of 78
Tricia Wachsmuth v.                                                                    Tricia Wachsmuth
City of Powell, et al.                                                                 October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                    Page 13
Direct Examination by Ms. Westby

1  Q. Was this before or after your dad passed
2  away?
3  A. It was after, but then my brother passed
4  away.
5  Q. Okay. And I'm assuming those were -- were
6  hard experiences in your life?
7  A. Sad.
8  Q. Particularly at that age?
9  A. Yeah.
10 Q. Did you -- did you have trouble in school?
11 Did you get into trouble at school?
12 A. No.
13 Q. When did you meet Bret?
14 A. When I was 19.
15 Q. How did you meet him?
16 A. At a friend's. Mutual friends. We grew up
17 in the same town. We had known of each other. Small
18 town. And he was up from S.. Cloud. And he was at a
19 friend's house that I was. And I liked him. And then
20 just kind of went from there.
21 Q. Okay. So that was still when you were in
22 Minnesota?
23 A. Yes.
24 Q. Okay. When you went to Wisconsin for a
25 couple of months, what did you -- what were you doing

TRICIA WACHSMUTH - October 4, 2010                    Page 14
Direct Examination by Ms. Westby

1  in Wisconsin?
2  A. I was living with my sister.
3  Q. Okay. Did you have a job when you were
4  there?
5  A. No. I tried to go back to school when I was
6  there.
7  Q. And did that -- were -- were you successful
8  in going back to school?
9  A. I went back for the few months until I moved
10 back home to Minnesota.
11 Q. Okay. Have you ever finished high school?
12 A. No.
13 Q. Did you get your GED?
14 A. No.
15 Q. What about any kind of, you know, trade
16 schools -- trade programs, have you ever done any of
17 those?
18 A. No.
19 Q. So you met Bret in 2003; is that accurate?
20 A. '03, '04.
21 Q. Okay.
22 A. Because I was 19, and it was just before the
23 new year. So, you know, end of '03, beginning of '04.
24 Q. Okay. How old are you now?
25 A. Twenty-six.

TRICIA WACHSMUTH - October 4, 2010                    Page 15
Direct Examination by Ms. Westby

1  Q. When you met Bret, were you still living at
2  home?
3  A. Yes.
4  Q. Okay. And your -- your father and your
5  brother had passed away at that point; is that correct?
6  A. My father and my older brother.
7  Q. Okay. Do you have other siblings?
8  A. I have a half-brother, and then one more full
9  brother. Because I had two full brothers. One passed
10 and then I have a half-brother and a half-sister.
11 Q. Okay. And I'm not going to ask you a lot of
12 questions about it, but it's my understanding that your
13 brother committed suicide; is that correct?
14 A. Yeah.
15 Q. Okay. And your father died of cancer; is
16 that correct?
17 A. That is.
18 Q. Okay. Now, you met Bret at a party, correct?
19 A. No, not at a party. It was just at a
20 friend's house watching movies.
21 Q. Okay. And how long did you date before you
22 got married?
23 A. We were together for a year-and-a-half before
24 we got married.
25 Q. Okay. When did you get married?

TRICIA WACHSMUTH - October 4, 2010                    Page 16
Direct Examination by Ms. Westby

1  A. June 4th, 2005.
2  Q. How long after you met did you start living
3  together?
4  A. Just a couple weeks.
5  Q. So you --
6  A. My mom kicked me out of the house, and Bret
7  took me in.
8  Q. Okay. Did there come a time when you and
9  Bret moved back in with your mother?
10 A. When she got really ill.
11 Q. And what was your mom sick with?
12 A. Cancer. She was in -- going into remission,
13 but they had just removed all of her woman parts, I
14 guess I would call that. So she was really sick. And
15 then it went into her kidneys, and her kidneys are
16 failing.
17 Q. Okay. Why did your mom kick you out shortly
18 after you met Bret?
19 A. She got mad at me because my social security
20 stopped.
21 Q. The social security -- social security you
22 were --
23 A. From my dad when he died, because he was on
24 social security and passed on to me until I was 19 --
25 if I was in school until I was 19.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 7 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                October 04, 2010

TRICIA WACHSMUTH - October 4, 2010          Page 17
Direct Examination by Ms. Westby

1   Q. Okay. Anything -- any other disagreements,
2   arguments you had?
3   A. No. I mean, we got over it quick. She, you
4   know, apologized and everything. And wanted me back
5   home.
6   Q. Okay. So how long were you out of the house
7   before you moved back?
8   A. Bret and I moved out here -- we had our
9   wedding out here. So about a year-and-a-half, maybe
10  two years. 'Cause we moved out here -- I got to think
11  about it. Sorry.
12  Q. No, that's fine. Take your time.
13  A. Moved out here in '04-, got married in '05.
14     Okay. So we moved out here in '04, April --
15  around April-ish of '04. And then we moved back after
16  my wedding in June. We moved a couple weeks after we
17  got married.
18  Q. Okay. Tell me why you and Bret moved out
19  here.
20  A. Out here? Bret's parents lived out here, and
21  they were more than willing to help us out and get on
22  our feet, because I didn't have a driver's license or
23  anything at the time. So there really wasn't much I
24  could do. So when we moved out here, they helped me
25  get my ID so I could get a job and then they helped me

TRICIA WACHSMUTH - October 4, 2010          Page 18
Direct Examination by Ms. Westby

1   get my driver's license.
2   Q. Okay.
3   A. And it's beautiful out here.
4   Q. Did you live with Bret's parents while you
5   were out here then?
6   A. For a little while. We got our own place a
7   few times.
8   Q. Okay. And then at some point after the
9   wedding, you moved back with your mother, correct?
10  A. Yes.
11  Q. Why did you do that?
12  A. Because my brother moved out, and she was
13  left alone. And she was getting really bad at that
14  time. Doctors gave her a time limit to live. And I
15  wasn't there when my dad died, and I wanted to be there
16  when my mom died.
17  Q. Why weren't you there when your dad died?
18  A. Because he made me promise I'd go to my
19  sister's. And the night I went to my sister's was the
20  night he died.
21  Q. How old were you when he died?
22  A. I think 16.
23  Q. Okay.
24  A. Because it was December 30th.
25  Q. Okay. So at some point in --

TRICIA WACHSMUTH - October 4, 2010          Page 19
Direct Examination by Ms. Westby

1   A. In 2000.
2   Q. Okay. Some point after you and Bret get
3   married, you move back to Minnesota, correct?
4   A. Yeah.
5   Q. Okay. And how long did you live with your
6   mom?
7   A. About -- maybe two years, year-and-a-half
8   until she was able -- she started putting on weight and
9   the cancer went into remission.
10  Q. Okay. How was that? How were you doing
11  psychologically during that time frame?
12  A. It was a depressing time frame. It was
13  depressing being there. You know, working, watching
14  your mom die.
15  Q. And did you suffer from --
16  A. And stuff.
17  Q. -- depression during that time?
18  A. Yeah. I mean, I've had, you know, on and off
19  depression. I would call it on and off depression
20  since my dad died. Because it's never really anything
21  severe. It's not something that I can't get out of
22  bed, you know, it's just sad.
23  Q. What about anxiety and stress?
24  A. The doctor once diagnosed me with mild
25  anxiety. But he misdiagnosed me. He took my

TRICIA WACHSMUTH - October 4, 2010          Page 20
Direct Examination by Ms. Westby

1   depression symptoms and thought it could have been
2   anxiety, but never medicated me for it at all. And
3   after feeling what anxiety and panic attacks actually
4   feel like -- because I never had one before. And once
5   I actually had one, I thought I was going to die.
6      And then I found out that that's what it was
7   I was going through. It felt like I was going to die.
8   And that was the first time I ever had a panic attack.
9   Q. When was the first time you ever had a panic
10  attack?
11  A. December 26 -- I mean, not December. Sorry.
12  September -- February 26th, 27th. Too many dates. I'm
13  sorry.
14  Q. Okay. Any other psychological symptoms or
15  conditions you were diagnosed with while you were in
16  Minnesota?
17  A. No. Just depression.
18  Q. It's my understanding that you had a baby
19  fairly recently; is that correct?
20  A. Yeah.
21  Q. How old is the baby?
22  A. He will be ten months on the 14th.
23  Q. Okay. And healthy and good?
24  A. My little peanut.
25  Q. What's his name?

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 8 of 78
Tricia Wachsmuth v.
City of Powell, et al.
Tricia Wachsmuth
October 04, 2010

1  A. Thomas.
2  Q. Let's talk about -- okay. So -- so you lived
3  with your mother in Minnesota for, I think you said a
4  year-and-a-half, two years; is that correct?
5  A. Yeah. Yeah. Between a year-and-a-half and
6  two years.
7  Q. Until she started doing better?
8  A. Yeah. And our marriage was on the rocks, so
9  we figured it would be best just to save our marriage.
10  Q. Tell me why -- why you felt that way.
11  A. I was depressed all the time. You know, my
12  husband understood that. You know, with what I was
13  going through and watching her and stuff. He
14  understood I was depressed. And, you know, depression
15  in a marriage can -- you know, isn't always good for
16  it. And that would pretty much be it, you know. It's
17  just female emotions.
18  Q. Did you discuss divorce --
19  A. No, we never discussed it.
20  Q. -- at any time?
21  A. We just discussed ways to make it better.
22  Ways to help -- help us. You know, I mean -- no, we
23  never have discussed divorce.
24  Q. Okay.
25  A. I'd stick by him no matter what.

1  Q. Okay. When did you move back -- well, what
2  did you do after you left your mom's house?
3  A. We moved back here with Tom and Donna, got
4  back on our feet, got a job, and bought a house.
5  Q. You bought a house?
6  A. Uh-huh. We were doing pretty good when we
7  moved back.
8  Q. Okay.
9  MR. GOSMAN: I couldn't hear that.
10  BY MS. WESTBY:
11  Q. You need to speak up a little bit.
12  THE WITNESS: Sorry.
13  MR. GOSMAN: That's okay, Tricia, but we --
14  we do need to make sure that everything you say --
15  THE WITNESS: Is heard.
16  MR. GOSMAN: -- is heard.
17  THE WITNESS: Okay. I'm sorry.
18  BY MS. WESTBY:
19  Q. No, that's fine.
20  Moved back here, what -- what year do you
21  think you moved back here?
22  A. 2007.
23  Q. Okay. And how long did you live with -- with
24  Tom and his wife?
25  A. I'm not positive, but maybe a year, maybe

1  less. Because we moved out here in '07, and I don't
2  remember the year we bought our house.
3  Q. Okay. And when you say bought your house,
4  did -- did Tom cosign for that house?
5  A. No, we got it all on our own.
6  Q. Okay.
7  A. We went through WCDA.
8  Q. Okay. With that -- did you live in Tom's
9  house at some point in time?
10  A. Up until we moved into our own.
11  MR. GOSMAN: Tom being whom?
12  BY MS. WESTBY:
13  Q. Tom, your father-in-law.
14  So you lived with your father and
15  mother-in-law for, you thought maybe a year; is that
16  correct --
17  A. Yeah, maybe. Like I said, I'm not sure on
18  that time frame. I'd have to actually look at when we
19  got our loan for WCDE.
20  Q. Okay. Did there come a point in time when
21  you moved into a house that Tom owned?
22  A. Without him?
23  Q. Yes.
24  A. No. Without them living there with us?
25  Q. Yeah.

1  A. And him just owning a house?
2  Q. Yeah.
3  A. No.
4  Q. It was -- so did -- did Tom and his wife
5  cosign or do anything to help you get your house?
6  MR. GOSMAN: I think we've asked that
7  question.
8  THE WITNESS: No, they helped us get our car.
9  We got our house loan on our own. We went through WCDA
10  for our house loan --
11  BY MS. WESTBY:
12  Q. Okay. So the house where this incident
13  occurred belonged to you and Bret?
14  A. Me and Bret, yes. It was in our names only.
15  There wasn't -- we did it all on our own.
16  Q. Where do your in-laws -- do you need
17  something?
18  A. I wanted to throw these away.
19  MR. GOSMAN: Let's see if we can get a trash
20  can.
21  MS. WESTBY: Right back behind there.
22  Careful.
23  THE WITNESS: Oh, sorry.
24  MR. GOSMAN: That's okay, Hon. That -- that
25  happens all the time.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 9 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                  October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                                Page 25
Direct Examination by Ms. Westby

1    THE WITNESS: I guess I won't grab that.
2    MR. GOSMAN: I will go grab it.
3    BY MS. WESTBY:
4    Q.  Do your in-laws still live in the same house
5    that they lived in when you and Bret were living with
6    them?  Today?
7    A.  See, that's confusing.  'Cause when we first
8    moved out here and lived with them, they lived in a
9    different house.  And then when we came back from
10   Minnesota, we moved in the house that they live in now.
11   Q.  Okay.  Where -- what's the address of that?
12   A.  524 Road 7, the one we live in now.
13   Q.  The one that you live in now?
14   A.  Yeah.
15   Q.  Okay.  What about your in-laws?  What's their
16   address?
17   A.  524 road 7.  We just moved back in with them
18   this week.
19   Q.  Okay.  Okay.  So I just want to make sure
20   that I have the timeline straight.  When you moved back
21   from Minnesota, you moved in with your in-laws,
22   correct?
23   A.  Yeah, 524 Road 7.
24   Q.  Okay.  Then at some point in time, you
25   moved -- you bought your own home, correct?

TRICIA WACHSMUTH - October 4, 2010                                Page 26
Direct Examination by Ms. Westby

1    A.  Uh-huh.
2    Q.  And then recently moved back in with your
3    in-laws?
4    A.  Yeah.
5    Q.  Okay.  Is there any -- any residence that I'm
6    missing since you moved back from Minnesota?
7    A.  Since we -- no.  Well, we lived at 740 Road
8    9, and that's what we just moved from into with them.
9    Q.  And 740 Road 9 is the house that you and Bret
10   bought?
11   A.  No.
12   Q.  Okay.
13   A.  It's just a house that we were just recently
14   living in before we moved back in with them.
15   Q.  Okay.  After you moved out of your house, you
16   moved into a rental?
17   A.  To Tom and Donna's.  No.  After we moved out
18   of our house, we moved into Tom and Donna's house.  And
19   we stayed with them up until we could find a place in
20   the country.  And then we lived in that.  And now we
21   just recently moved back in with them.
22   Q.  Okay.  So whose -- whose house did you live
23   in --
24   A.  After it happened?
25   Q.  Yes.

TRICIA WACHSMUTH - October 4, 2010                                Page 27
Direct Examination by Ms. Westby

1    A.  Tom and Donna's, 524.
2    Q.  Okay.  And was that a rental house that they
3    had, or were you living with them there?
4    A.  We were living with them.  We lived upstairs.
5    Q.  Okay.  Okay.  When -- when did you move in
6    with Tom and Donna?
7    A.  Right after the day that we got released from
8    jail.  That was it.
9    Q.  What happened to your house?
10   A.  Sold it.
11   Q.  When did you sell it?
12   A.  Shortly after, it actually went pretty quick.
13   I don't remember the dates.
14   Q.  How long did you live with Tom and Donna?
15   A.  A while.  We just lived with them recently up
16   until May of '06 -- May.  And then we just moved back
17   in with them.
18   Q.  Moved back in with?
19   A.  Them.
20   Q.  Okay.  And, you know, maybe I'm not
21   understanding what you're saying.  But there -- did
22   they move and you moved with them?
23   A.  No.
24   Q.  Or explain the --
25   A.  They stayed in the 524 Road 7.

TRICIA WACHSMUTH - October 4, 2010                                Page 28
Direct Examination by Ms. Westby

1    Q.  Okay.
2    A.  When this all happened, we moved out, and we
3    moved in with them.
4    Q.  Okay.
5    A.  And then when I was pregnant, we wanted to
6    get a place of our own.
7    Q.  Okay.
8    A.  I had my son, and then we found a rental
9    trailer out of city limits.  And we moved in there.
10   Q.  Okay.
11   A.  And then we just moved back in with Tom and
12   Donna.
13   Q.  Okay.  What happened -- was the -- was the
14   place -- the trailer out in the country, was that a
15   rental?
16   A.  Yes, we were renting.
17   Q.  Okay.  Tell me about the -- the jobs that
18   you've had since you've been -- let's start from the
19   point in time when you came back from Minnesota.
20   A.  I worked at the hospital for a little over
21   two years.
22   Q.  What were you doing?
23   A.  Housekeeping.
24   Q.  Okay.
25   A.  And then I worked at McDonald's for maybe two

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 10 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                  October 04, 2010

1   weeks, maybe three. And then I got a job at the gas
2   station, Sinclair, and now Express Lane.
3       Q.   Okay. Why did you eave the job at the --
4   when did you leave the job at the hospital?
5       A.   In April.
6       Q.   April of?
7       A.   2000 and -- I got to think of January's -- 9.
8       Q.   Why did you leave that job?
9       A.   I couldn't handle the stress. The cops, I
10  would see them outside all the time. And I'd have to
11  walk by. Because where I worked, I'd have to walk by
12  to the laundry room and get stuff, and occasionally
13  clean the ER. And if I seen them there, my body would
14  start freaking out and I'd start panicking. And then
15  I -- I was medicated. And then there was lots of
16  noises. I hid in my closets a lot. I didn't get my
17  work done. I hid in my closet. And I quit that job.
18       And then I stayed at Tom -- we were staying
19  at Tom and Donna's, and then I found out that I was
20  pregnant. And I took any job I possibly could get for
21  my family. And McDonald's first came about. I
22  couldn't stay there 'cause there wasn't enough room.
23  And I was obviously getting bigger.
24       Q.   When did you start working at McDonald's?
25       A.   May maybe.

1       Q.   May of the same year, of '09?
2       A.   Yeah.
3       Q.   What were you making at the hospital when you
4   quit?
5       A.   9.94 an hour.
6       Q.   What will -- if we get your employment
7   records from the hospital, what will the hospital state
8   is the reason that you left?
9       A.   That -- they would state -- I wrote them a
10  letter. I should have made a copy of it for you guys.
11  Just basically, I just put in, you know, that I just
12  didn't want the work anymore. 'Cause I didn't want
13  anybody to find out what had happened. I mean, it was
14  my work atmosphere.
15       Q.   Why didn't you want them to find out what had
16  happened?
17       A.   It wasn't any of their business.
18       Q.   Any other reason?
19       A.   I was scared.
20       Q.   Scared about them finding out what had
21  happened?
22       A.   No. Because there are certain people that
23  work there that I know. And I didn't want them to make
24  up their own stories and judge me.
25       Q.   Judge you for what?

1       A.   Marijuana. And to make up their own stories,
2   because there are certain people that work there that I
3   know -- know certain people. And I just -- I couldn't
4   handle it anymore. I pretty much came down to I just
5   couldn't handle it anymore thinking about all that.
6   And hiding in my closet all the time out of fear. I
7   mean, who wants to work in a job like that?
8       Q.   So were they aware that you had been
9   arrested?
10       A.   No.
11       Q.   Okay. Will your employment records show that
12  you quit or that you were terminated?
13       A.   Quit. I gave them a resignation letter.
14       Q.   Okay. When you went to work at McDonald's in
15  May of '09, how much were you making?
16       A.   8.50.
17       Q.   Okay. And how long were you at McDonald's?
18       A.   Just a couple weeks.
19       Q.   Where did you go from there -- or why did you
20  leave McDonald's?
21       A.   Because I was pregnant, and they had me
22  working the grill. And like I said, you get bigger,
23  and you only have a little bit of space to work with,
24  and people would come by and push you, and I was
25  concerned that my reflex would be to go forward and

1   land with my hands and my stomach on the grill. And
2   the smells were making me so sick. And you can't
3   really handle a job if you're puking all the time.
4       Q.   So did you -- did you quit that job?
5       A.   I quit that job. And then I took the first
6   one that came along.
7       Q.   At --
8       A.   I needed full-time hours, and McDonald's
9   didn't offer full-time hours.
10       Q.   Okay. Were you full-time at the hospital?
11       A.   I was.
12       Q.   How many --
13       A.   Until recently. And then they had talked me
14  down because of all the stuff going on, I wasn't doing
15  my job, and I was coming up with any excuse not to go
16  to work, not to come into town.
17       Q.   When were you changed from full-time to less
18  hours at the hospital?
19       A.   About a week after this happened.
20       Q.   A week after this happened?
21       A.   About. I'd have to say about because ...
22       Q.   What were your hours decreased to?
23       A.   Just to PRN, which is pretty much full hours,
24  you just don't get benefits. It's a call in, more or
25  less. You know, they need someone to fill in, they

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 11 of 78
Tricia Wachsmuth v.                                                          Tricia Wachsmuth
City of Powell, et al.                                                       October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                Page 33
Direct Examination by Ms. Westby

1   call you. And you go around the hospital and do the
2   miscellaneous items.
3   Q.  Okay.  Then when did you go to work for
4   Sinclair?
5   A.  Right after I quit McDonald's.
6   Q.  What were you making at Sinclair?
7   A.  At Sinclair?  7.25.  And then I got
8   transferred to Express Lane.
9   Q.  Are they owned by the same company?
10  A.  Yeah.  I just got transferred because I was
11  pregnant, and they didn't want me putting 30 packs out
12  the drive-through window.
13  Q.  Okay.  When were you transferred to Express
14  Lane?
15  A.  May 5th, I think.
16  Q.  Of '09 or of this year?
17  A.  Okay.  I got to remember my Januaries.  Of
18  '09.
19  Q.  Okay.  So have you been working --
20  A.  Because I've worked there for a year now.
21  Q.  What were you making at Express Lane?
22  A.  7.25 to start.
23  Q.  And then were you bumped up?
24  A.  I make eight now.
25  Q.  Eight?

TRICIA WACHSMUTH - October 4, 2010                Page 34
Direct Examination by Ms. Westby

1   A.  (Witness nods head.)
2   Q.  How many -- what was your -- were you working
3   full-time?
4   A.  Full-time, yep.
5   Q.  Since you started?
6   A.  Yep.
7       MR. GOSMAN:  You okay?
8       THE WITNESS:  (Witness nods head.)
9   BY MS. WESTBY:
10  Q.  Okay.  Let's talk a little bit -- I want to
11  talk to you about your relationship with Tom and Donna.
12  Are you and Bret close to --
13  A.  Uh-huh.
14  Q.  -- them?
15      Is that a "yes"?
16  A.  Yes.  Sorry.
17  Q.  No, that's fine.  There in the -- when you
18  were -- when you and Bret were arrested, there was a
19  prescription bottle of Tom's in your house.  Can you
20  explain why that was there?
21  A.  Tom would come over, you know, and help Bret
22  out on his vehicles and sets things down, like every
23  person.  You set something down, you get in a hurry,
24  and you forget about it.
25  Q.  So did they spend quite a bit of time at your

TRICIA WACHSMUTH - October 4, 2010                Page 35
Direct Examination by Ms. Westby

1   house?
2   A.  Um, if Bret needed help on vehicles or if he
3   needed help with anything.  They are always there to
4   help us.
5   Q.  Okay.  Did they just stop by sometimes just
6   to say hi to you -- do you need to sneeze?
7   A.  I think so.  So if -- if I turn my head, I'm
8   sorry.
9   Q.  That's fine.
10  A.  Can you --
11  Q.  Would they just stop by for a visit every now
12  and then?
13  A.  Um, if Bret needed something.  That's, you
14  know, pretty much it.  Only if we needed help with
15  something, then they would stop by and help us or if we
16  invited them over.  But they never did any surprise
17  visits like hey, I'm here.
18  Q.  Was there a reason that they didn't do that?
19  A.  No.  Not that I know of.  You know, kids need
20  privacy.  It's our home, you know.
21  Q.  Were they aware of the --
22  A.  Their house is bigger, so it was easier just
23  to go to their house.
24  Q.  Okay.  Were they aware of the marijuana?
25  A.  No.

TRICIA WACHSMUTH - October 4, 2010                Page 36
Direct Examination by Ms. Westby

1   Q.  And, you know, I'm curious about that.
2   Because when I look at the things that the officers
3   found when they came into the house, it seemed -- it
4   looked to me like there were things lying around the
5   house that would have indicated that.  So I'm
6   wondering, how you handled that when -- when Tom and
7   Donna came over?
8   A.  We would go downstairs, and we would stack
9   things up in front of the plants.  And we pushed the
10  cords and unplug them.  That way if Tom had to go
11  downstairs, none the wiser.
12  Q.  What about the, you know, magazines and --
13  and potting soil and -- and all of the things that you
14  had --
15  A.  Potting soil was kept in the garage.  You
16  don't think anything of it when you have a backyard.
17  Q.  Okay.
18  A.  And the magazines were just kept on our
19  bookshelf, so they never felt the need to look at our
20  books.
21  Q.  Okay.  Did -- as far as you're aware, did Tom
22  ever talk to -- ever express to you and/or Bret that he
23  had a concern about your use of illegal substances?
24  A.  No.  He had no idea we were smoking pot.
25  Q.  Did you ever smoke pot when you were living

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 12 of 78

Tricia Wachsmuth v.                                              Tricia Wachsmuth
City of Powell, et al.                                          October 04, 2010

1    with them?

2    A.   No.

3    Q.   Never?

4    A.   Not in their house.

5    Q.   But did you smoke it and then come back to

6    their house?

7    A.   I'd go for a walk at night.

8    Q.   Okay.

9    A.   I mean, I respect Tom, and I respect Donna,

10   and I would never do any of that in their home.

11   Q.   Okay.  I guess I'm -- I'm just surprised that

12   Tom, with his background, wouldn't have had some

13   suspicion of --

14        MR. GOSMAN: Is that a question?  I mean,

15   you're surprised?  I -- I don't -- I don't know where

16   you're going with that, but I think you could be more

17   direct.

18        MS. WESTBY: Your -- your objection is --

19        MR. GOSMAN: I haven't raised an objection.

20        MS. WESTBY: -- as to form?

21        MR. GOSMAN: Vague.

22        MS. WESTBY: Is as to form?

23        MR. GOSMAN: Yes, it is.

24   BY MS. WESTBY:

25   Q.   Did Tom, with his background as a DCI agent,

1    ever indicate to you or Bret any suspicion about your

2    use of illegal substances?

3    A.   I don't think he even knew.  You know, I

4    mean, I wasn't stupid about it.  You know, we lived

5    upstairs.  You know, we had the whole upstairs to

6    ourselves.  I'd go for my walk, I'd do it, put some

7    Visine in, and go upstairs and watch TV.

8    Q.   Okay.  How long had you and Bret -- I mean,

9    it appears to me from the grow logs that ...

10   A.   Okay.

11   Q.   It appears to me that from the grow logs that

12   this was something that you and Bret had been doing

13   for -- for quite some time; is that correct?

14   A.   Off and on, yeah.

15   Q.   How -- how long had you been trying to grow

16   marijuana?

17   A.   We had some in Minnesota.  And then when we

18   moved out here, it wasn't until we got our house.  But

19   then we had to wait for seeds, because we didn't have

20   any seeds.

21   Q.   When did you move in to your house?  Can you

22   come up with a time for me?

23   A.   I think -- I think -- I'm not positive.  I

24   think it was -- it was just before summer, so I think

25   it was in May, I think.

1    Q.   In May of '09?

2    A.   No.

3    Q.   No.  The year before?

4    A.   '08, I think.  I think.  I'm not positive.

5    I'd have to look at our WCDA records.  Bret took care

6    of all the bills.  I just brought home the money.

7    Q.   Okay.  Okay.  So since you tried to grow

8    marijuana plants when you were in Minnesota, and then

9    you didn't while you were living with Tom and Donna --

10   A.   No.

11   Q.   -- correct?

12        And then started again whenever you moved

13   into your house?

14   A.   When we had our own place.

15   Q.   Okay.  And that could have potentially been

16   May of -- of '08, but I won't hold you to that.  I'm

17   just trying to get a general --

18   A.   When we moved in, yeah.

19   Q.   Okay.  Tell me about how you were getting

20   the -- the things that you needed to start this --

21   A.   The seeds?  We got them from Bessler, Josh

22   Bessler, because we had no connections to buying pot.

23   And he bought us a bag which had a bunch of seeds in

24   it.

25   Q.   And let's talk about -- let's do -- the court

1    order, I think -- we have a court order stating that

2    we're not going to identify the confidential --

3    A.   Or should I say CI?

4        MR. GOSMAN: You didn't --

5        THE WITNESS: I'm sorry.  I didn't know.

6        MR. GOSMAN: That's just not what's going on

7    here.  There is an order that -- that you were not

8    required to identify the confidential informant.  We

9    know who he is.  And we have his criminal record.  And

10   so we're certainly not going to avoid talking about the

11   confidential informant during the course of this case.

12        MS. WESTBY: And that's not what I'm

13   suggesting.  What I am trying to make more simple is

14   the use of this deposition, you know, instead of trying

15   to put portions of this -- sealed portions of this

16   whenever we use it in motions or whatever we do with

17   it.

18        MR. GOSMAN: Okay.

19        MS. WESTBY: I'm just thinking for

20   convenience and for making the system work better, it

21   would be easier if we referred to -- to this as CI, so

22   we don't have to do that.

23        MR. GOSMAN: And that's fine.  You can refer

24   to him any way you -- you wish to.  And you -- and I'll

25   be more than happy to ask my client to accommodate that

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 13 of 78
Tricia Wachsmuth v.                                                              Tricia Wachsmuth
City of Powell, et al.                                                           October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                                    Page 41
Direct Examination by Ms. Westby

1   and avoid using his name in her deposition.
2           MS. WESTBY: Okay. And wait -- and I should
3   have started with that. We should have talked about
4   that at the beginning, and I apologize.
5           If we can -- can we go back and change that
6   to CI at this point on the written --
7           MR. GOSMAN: No.
8           MS. WESTBY: -- transcript?
9           Probably not. Can we -- can you mark that
10  portion of the -- the deposit on?
11          MR. THOMPSON: Let's just go off the record
12  for a minute.
13          MS. WESTBY: Okay.
14          THE VIDEOGRAPHER: Let's go off the record.
15  The time is 9:26.
16               (Discussion held off the
17               record.)
18          MS. WESTBY: Let's go back on.
19          THE VIDEOGRAPHER: We're back on the record.
20  The time is 9:29.
21          MS. WESTBY: And I think we've agreed that we
22  will just mark that -- that portion of the -- the
23  record and go from there.
24          MR. THOMPSON: And seal it.
25          MS. WESTBY: And seal it.

TRICIA WACHSMUTH - October 4, 2010                                    Page 42
Direct Examination by Ms. Westby

1   BY MS. WESTBY:
2   Q.  And for -- for our purposes in this
3   deposition, we'll just refer to that person as CI, if
4   that's okay with you?
5   A.  Yeah.
6   Q.  Okay. So we were talking about how you
7   obtained the material to start growing the marijuana
8   plants. And it's -- and I think you told me that he
9   CI provided seeds to you; is that correct?
10  A.  A bag of marijuana --
11  Q.  Okay.
12  A.  -- with seeds in it.
13  Q.  Okay.
14  A.  And he knew there were seeds in it because he
15  knew what we wanted them for.
16          And then we got the light online.
17  Q.  And where did you set up this --
18  A.  Downstairs in the basement.
19  Q.  Okay. Describe the area for me.
20  A.  It's a little -- there's the basement stairs,
21  and underneath the basement stairs, just a little,
22  like, storage area, I guess, I would call it.
23  Q.  Okay. How big is it? If you can give me a
24  rough estimate?
25  A.  Not big. Can I stand up?

TRICIA WACHSMUTH - October 4, 2010                                    Page 43
Direct Examination by Ms. Westby

1   Q.  Just --
2   A.  Don't move?
3   Q.  Okay.
4   A.  Maybe about like that, because then it dips
5   under, and there's really no use under there. So
6   probably about like that. Maybe about that tall. And
7   this is just me guessing. You know, probably about
8   like that and then cement wall and it goes about this
9   far back in the cement wall.
10  Q.  Okay. And how long was it?
11  A.  Maybe about like that.
12  Q.  Okay. And I think I'm --
13  A.  That's guesstimating.
14  Q.  Okay.
15  A.  I never measured it.
16  Q.  How many plants at any given time did you
17  have in that area?
18  A.  Two.
19  Q.  Was that the most that you ever --
20  A.  That's the most that would ever even fit
21  under there. But that's the most that we would ever
22  want under there.
23  Q.  Okay. Did you have more plants than that
24  when you were growing marijuana in -- in Minnesota?
25  A.  Yeah. It's a touchy thing 'cause you have to

TRICIA WACHSMUTH - October 4, 2010                                    Page 44
Direct Examination by Ms. Westby

1   separate males from females, so you end up with a lot
2   until you get rid of the males. And then -- cause all
3   you want is females, because if you keep a male in
4   there, you have nothing. You just have seeds. So you
5   have to separate them. You plant so many, and then you
6   separate the males from the females so all you have are
7   the female growing.
8   Q.  At -- so at any given time when you were in
9   Minnesota, how many plants --
10  A.  I never counted. I really don't know. I
11  mean, it's been such a long time. I honestly could not
12  tell you an honest answer on that.
13  Q.  Okay. How many -- were there times when you
14  were at your house in Powell where you had more than
15  just the two but some were males, and you were trying
16  to do whatever you were doing with those?
17  A.  Yeah.
18  Q.  Okay.
19  A.  It wasn't much. I mean, the most there would
20  ever be was just a few at once. And then obviously if
21  you only end up with two females, you're not planting a
22  whole crop load. And they would only get probably
23  about that high and tossed.
24  Q.  And "tossed"?
25  A.  Burned.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 14 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                 October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                          Page 45
Direct Examination by Ms. Westby

1  Q. Okay. Okay. If you -- so it was more a
2  function of how many useful plants you were getting as
3  opposed to --
4  A. Yeah, we didn't want much. We only needed it
5  for personal use. We didn't need a whole, you know,
6  pound. Just needed personal use. Just a couple
7  ounces.
8  Q. And how much were you using for personal use?
9  A. I was only a night smoker, helped me relax
10 and get to bed, and hold down my dinner.
11 Q. Every night?
12 A. Not every night. If I had to work the next
13 day I wouldn't, you know.
14 Q. Was Bret -- was Bret doing about the -- the
15 same or using about the same amount?
16 A. No, Bret used way less. He didn't smoke
17 much, you know. And I didn't smoke a lot either. I
18 mean, you know, I wasn't a "blazer" or anything like
19 that, if you understand that term.
20 Q. I don't. What does that mean?
21 A. Constant. You know. have to have it all the
22 time.
23 Q. Okay. What about other -- other drugs,
24 narcotics?
25 A. Just prescribed.

TRICIA WACHSMUTH - October 4, 2010                          Page 46
Direct Examination by Ms. Westby

1  Q. Prescribed to you --
2  A. Bret. Every -- every now and then, when I
3  was having bad issues with my teeth; I'd get a couple
4  here and there, you know, until the pain would go away,
5  and they would be able to pull it, because I had a
6  nerve that was going up into my brain. So I had to do
7  a little slice and pull and slice up a little further.
8  Q. A nerve that was going up into your brain
9  from where?
10 A. From my teeth.
11 Q. Okay.
12 A. Yeah, the nerve was just working its way up
13 into my sinuses.
14 Q. Okay. When was that going on?
15 A. That was a while ago. That was just before I
16 got my teeth fixed. And I worked at the hospital at
17 the time. So maybe two years ago.
18 Q. Was it before or after this -- the incident
19 we're here --
20 A. It was before this even happened.
21 Q. Okay. Were they medications that were
22 prescribed to you --
23 A. Yes.
24 Q. -- or were you taking somebody else's?
25 A. No. No, they were prescribed to me from my

TRICIA WACHSMUTH - October 4, 2010                          Page 47
Direct Examination by Ms. Westby

1  dentist because of the pain, because of him having to
2  surgically remove that nerve.
3  Q. Okay. Why were you having problems with your
4  teeth?
5  A. I have bad teeth. I don't want to disown my
6  parents.
7  THE COURT REPORTER: I'm sorry?
8  THE WITNESS: I don't want to disown my
9  parents.
10 BY MS. WESTBY:
11 Q. Okay. Well, then I will just ask you -- my
12 question goes to use of illegal substance.
13 A. Oh, no. It was -- no. It was due to neglect
14 as a baby, and then no enamel came on to my teeth.
15 Q. Okay.
16 A. I mean, even my baby teeth were getting
17 pulled and capped and rotting.
18 Q. Okay. In the -- the documents, the -- the
19 journal of Bret's, that the police took from your
20 house, he talks about both of you being seriously
21 addicted to narcotics when you were in Minnesota.
22 What's he referring to?
23 A. You know, every now and then, if we'd get
24 depressed, Bret had his own meds and I had mine. You
25 know, sometimes we would take them, you know, to just

TRICIA WACHSMUTH - October 4, 2010                          Page 48
Direct Examination by Ms. Westby

1  kind of take the edge off.
2  Q. What kind of -- of medications are we talking
3  about?
4  A. I got prescribed Vicodin, and I think he got
5  the same, I'm not sure, because he had issues with his
6  neck.
7  Q. Did there come a time, either when you were
8  in Minnesota or when you moved back here, where you
9  were using the -- the prescription narcotics in a form
10 other than taking the -- the pills orally?
11 A. No.
12 Q. Never?
13 A. Nope.
14 Q. Okay. Were your -- did your mother ever
15 provide you with any of her narcotic medications?
16 A. No. When I was younger, after my dad died, I
17 had really, really bad cramps, you know, 'cause nerves
18 come out with all that. And I couldn't get out of bed.
19 And she had called the doctors, and was given
20 permission to give me one of her Tramadol; and I ended
21 up having an allergic reaction to it. And he came and
22 asked what I took, and she told him, "I gave him a
23 Tramadol" -- you know, "I gave her a Tramadol for her
24 cramps," because I couldn't get out of bed. And
25 they're like, oh, okay. Because it wasn't a narcotic

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 15 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                 October 04, 2010

1  at that point in time.
2    Q.  When did that happen?
3    A.  Oh, years ago.  I would have to say it was
4  January.
5    Q.  Of 2000?
6    A.  Of '01.  It was right after my dad died when
7  I got my period and ...
8    Q.  What did they do?
9    A.  What did what do?
10   Q.  What -- what did they do at the hospital,
11  when you were taken to the hospital?
12   A.  Oh, nothing.  They just released me.  You
13  know, they told me never to take Tramadol again because
14  they're not sure -- you know, they thought that had
15  caused an allergic reaction with my body.
16   Q.  What hospital was that?
17   A.  Mora, Minnesota.
18   Q.  Is there more than one?
19   A.  No, there should be just the one.  As far as
20  I know, there's just the one.  I don't know what they
21  have done since.
22   Q.  Okay.  Who -- just go through and tell me who
23  has provided medical care or psychiatric care for you
24  since --
25   A.  This happened?

1    Q.  No.  Since -- let's start with 2000, when you
2  were living in Mora, Minnesota.
3    A.  I don't remember half the doctor's names.  It
4  was more in Cambridge.  I can tell you the hospitals.
5  Doctor's names, there's no way I could tell you them.
6    Q.  Do you remember the name of the clinic that
7  you received care from?
8    A.  It was Mora Hospital and Cambridge Hospital.
9  I don't -- I think they are Allina, but I'm not sure.
10   Q.  You think they're what?
11   A.  Allina Medical Centers, but I'm not positive.
12   Q.  Okay.  Did you have a treating physician,
13  somebody you saw on a regular basis?
14   A.  No.  I used to, but he -- he retired.
15   Q.  What was his name?
16   A.  Grossbach (phonetic).  But he didn't see me.
17  He only saw me when I was a kid.
18   Q.  Okay.
19   A.  I don't even know if he's still alive.
20   Q.  Did you receive treatment at any kind of
21  urgent healthcare place, any clinic like that in Mora,
22  Minnesota?  Any other treater that you can think of
23  while you were there?
24   A.  Just the depression.
25   Q.  Who was -- who was providing medication for

1  that?
2    A.  I don't remember the doctor's names.  It was
3  either Mora or Cambridge.  I don't remember which
4  hospital.  It's been years.
5    Q.  Did you go to the hospital to get those
6  medications?
7    A.  You kind of have to because the clinics are
8  connected to the hospitals.
9    Q.  Okay.
10   A.  There, they're not separate like they are
11  here.  It's pretty much all in one.
12   Q.  Okay.  So if we obtained those records, they
13  would provide -- they would tell us who -- who
14  prescribed those medications for you?
15   A.  Should.  I think.
16   Q.  Okay.  Then what about whenever you came out
17  here?  Who have you seen -- who did you see before this
18  incident for healthcare?
19   A.  Reisner.
20   Q.  Reisner?
21   A.  Yeah.
22   Q.  What kind of doctor is Reisner?
23   A.  Family doctor.
24   Q.  Is he at a clinic --
25   A.  He's in Powell Clinic, I think is what it

1  would be called.
2    Q.  What's it called?
3    A.  In Powell.  I think they consider it a
4  clinic.
5    Q.  Have you provided those records?
6    A.  Yeah, I think so.
7       I got them to you.  But ...
8    Q.  The records that I have from Reisner only go
9  back to --
10   A.  Until I got pregnant and then I went to
11  Spomer, that could be why they don't ...
12   Q.  Well, they only go back as far as --
13   A.  Because I didn't see any doctors until I saw
14  him.
15   Q.  You didn't see any doctor in Wyoming until
16  you saw Reisner?
17   A.  Yeah.  As far as I can recollect.  He was the
18  first one with open patients.  I mean, I saw Wurzel.
19   Q.  I'm sorry.  What was that?
20   A.  Dr. Wurzel from Expresscare after this had
21  happened.  Because I didn't go to the doctor that
22  often, so I didn't have a primary.  And I had just made
23  Reisner my primary shortly before this had happened.
24   Q.  Why did they do that?
25   A.  Why do they do what?

Case 1:10-cv-00041-ABJ    Document 65-13    Filed 01/10/11    Page 16 of 78
Tricia Wachsmuth v.                                    Tricia Wachsmuth
City of Powell, et al.                                    October 04, 2010

TRICIA WACHSMUTH - October 4, 2010    Page 53
Direct Examination by Ms. Westby

1   Q. Make him your primary.
2   A. He was the only one who was available taking
3   patients.
4   Q. And why did you go see him before this
5   happened?
6   A. Before this happened, why was I seeing him?
7   Just to have a primary doctor. Woman issues.
8   Q. What kind of issues?
9   A. Period issues.
10  Q. Any other kind of issues you were having
11  prior to this incident?
12  A. No, just -- until I got my teeth fixed, it
13  was pretty much my teeth and my period.
14  Q. Who were you seeing for the mouth issues?
15  A. Dr. Hull in Billings. Sweetest guy. He's an
16  oromaxillofacial surgeon, if that makes any difference,
17  to help find his number.
18  Q. Let's talk about what medications you were on
19  prior to this incident.
20  A. Before this all happened?
21  Q. Yeah.
22  A. He wasn't -- unless I had teeth pulled or
23  teeth issues, I wasn't on anything. If I had to have
24  teeth pulled and stitched up, then I'd get some
25  Lortabs.

TRICIA WACHSMUTH - October 4, 2010    Page 54
Direct Examination by Ms. Westby

1   Q. What about any psychiatric medications,
2   medications for --
3   A. Not until after this happened.
4   Q. Nothing until after this happened?
5   A. I was on Zoloft. I don't know if that's
6   considered a psychiatric medication or not.
7   Q. It is.
8   A. Oh, okay. So, yeah, Zoloft then.
9   Q. How long were you taking Zoloft?
10  A. Not long, couple weeks. I had bad effects to
11  it, so I quit taking it.
12  Q. Why did you start taking it?
13  A. Depression.
14  Q. When did you start experiencing depression --
15  we talked about the depression that you were suffering
16  from when you were living in Minnesota with your
17  mother. Let's take it from the point in time when you
18  and Bret moved back to -- to Wyoming. Tell me about
19  what was going on with your psychiatric state?
20  A. I just started going through -- you know,
21  it's depression, it comes and it would go. When it
22  would get closer to deaths, anniversaries, or birthday
23  anniversaries is when I would start to get pretty down.
24  Nothing that I -- you know, felt like I couldn't
25  handle. But I also wasn't the one getting the whole

TRICIA WACHSMUTH - October 4, 2010    Page 55
Direct Examination by Ms. Westby

1   blunt end of it. Like my poor husband was getting the
2   blunt end of, you know, my depression. And I realized
3   that and that's when I went in and got put on some
4   Zoloft.
5   Q. When do you think you started taking Zoloft?
6   A. I don't remember. I know I still lived at
7   home. Probably January maybe.
8   Q. January of?
9   A. '09. Maybe. Like I said, I'm not positive
10  on these dates.
11  Q. Were you reporting any anxiety --
12  A. No.
13  Q. -- or upset at the time?
14  A. Just depression, just sad.
15  Q. No anxiety?
16  A. No.
17  Q. What about insomnia?
18  A. That's the issue I had with the Zoloft, is
19  when I was taking them, and they, you know, started to
20  kick in, I -- I was suffering from insomnia because of
21  them. And my appetite wasn't really that well at all.
22  Take a bite of something, it would taste horrible, and
23  I'd spit it out. And I had called my doctor after
24  being awake for a few days because I couldn't sleep.
25  And he's like, "That is the effect of the Zoloft, you

TRICIA WACHSMUTH - October 4, 2010    Page 56
Direct Examination by Ms. Westby

1   need to get off of them." And that's when they
2   switched me to Trazodone.
3   Q. Okay. So you were switched to Trazodone
4   before this happened?
5   A. No, I switched to it after, because the
6   Zoloft, you know, you have to wait a month for it to
7   hit your system. And then once it started to take
8   effect in my system is when I started to have those
9   adverse effects.
10  Q. Okay. Did you take anything between the time
11  that you moved from Minnesota and when you were
12  prescribed the Zoloft in --
13  A. No.
14  Q. -- January of '09?
15  A. No.
16  Q. Okay. Would it be accurate to say -- no, go
17  ahead.
18  A. I know I was on Paxil at one point in time.
19  But I don't remember if it was before or after.
20  Q. Okay.
21  A. But I think I was on Paxil when my dad died.
22  Q. Okay.
23  A. I think.
24  Q. Were you on it after you and Bret got married
25  when you were in Minnesota?

Case 1:10-cv-00041-ABJ Document 65-13 Filed 01/10/11 Page 17 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                  October 04, 2010

1    A. No, when I -- when I met my husband was the
2    happiest time in my life.
3    Q. How about when you said that the marriage was
4    struggling?
5    A. That was when we lived back in Minnesota, you
6    know, with my mom and all the stress. And, you know,
7    he handled it well. He did. I didn't. I took, you
8    know -- it was my mom, you know, watching her slowly
9    deteriorate, you know, kind of gets to any person. I
10   don't know anybody who, with their mother, wouldn't
11   have the same feelings.
12       And once she started getting better, Bret and
13   I talked about what would be the best for us. And we
14   figured moving out here. You know, we were happy and
15   secure, and we had his paren s to help if we needed it.
16       Sorry.
17   Q. Describe for me why that situation was
18   stressful to you. And -- and I'm asking you stressful,
19   that's the word that you used --
20   A. My -- yeah.
21   Q. -- as opposed to sad?
22   A. My dad and my brother died in that house. So
23   I'd have to go back to it with my mom wanting to die
24   there.
25       Sorry.

1    Q. Take your time.
2    A. So having to go back there with my mom
3    wanting to die there kind of just brought back those
4    memories and thoughts. And ...
5    Q. And I'm sure it was hard that she was sick
6    and you were having to -- were you taking care of her?
7    A. I was doing my best. I was also working.
8    She had health nurses and stuff like that that would
9    come out and check her meds and check on her and make
10   sure she was getting the right Coumadin levels.
11   Because at one point she had to give her a shot --
12   herself a shot in the stomach. The needle is about
13   that long and just shoot it in. I couldn't stand
14   watching it, so we had to get a nurse to come and
15   observe because I couldn't -- couldn't watch that. Oh,
16   no.
17   Q. Okay. What was -- you said at one point in
18   time they had given her a -- a short time to live --
19   A. Yeah.
20   Q. -- when -- when did that happen?
21   A. They had given her, like when she -- she's a
22   bigger woman. She was over 200 pounds. And then about
23   a month, month-and-a-half, she had dropped down to a
24   130 pounds. And that's when they told her, you'll
25   probably only going to have three to six months left.

1    And then Bret and I had moved back in, because I was
2    thinking if this is my only chance to say good-bye. I
3    don't want to miss it again.
4        And she started putting on weight when we
5    were living there, you know, making her good meals,
6    eating good meals, whatever she wanted, trying her best
7    to, you know, keep her comfortable. And she started
8    getting better. And the doctors were baffled.
9        And then when she started getting better,
10   Bret and I had talked about it, it was like, okay,
11   well, she's getting better, you know. We moved out,
12   and then my brother had moved back in with her, so she
13   wasn't alone. My full brother. I don't know if I have
14   to -- do I have to determine the difference between my
15   half and my full?
16   Q. No.
17   A. Okay.
18   Q. In Bret's diary, he talks about that time,
19   and, you know, says that it's very stressful and hard.
20   And he talks about the two of you using narcotics. And
21   he uses this reference to 980s. Do you know what that
22   refers to?
23   A. No, you'd have to ask him. I don't read his
24   journals. I don't ask him about his journals.
25   Q. What would it have been -- when he refers to

1    being very addicted to narcotics, what's -- is he -- is
2    he referring to the medications that you talked about
3    before? Why -- why is he using that term, "very
4    addicted"?
5    A. Honestly, like I said, you'd have to talk to
6    him about that. You know --
7    Q. And I will.
8    A. I never wrote his journals. I don't know.
9    Q. I will. But I'm wondering if that's -- was
10   he just crazy for thinking that the two of you had an
11   issue or problem at that point?
12   A. I wouldn't call my husband crazy, and
13   honestly, I hope I'm not stepping boundaries, but I
14   would appreciate it if you did not call my husband
15   crazy.
16   Q. I'm not. I'm -- I'm asking you if you would
17   disagree with his impression that the two of you were
18   very addicted to narcotics when you were in Minnesota?
19   A. We were -- like I said, you know, if we'd get
20   prescriptions we would -- you know, we wouldn't take
21   them all at once. You know, but there would be days
22   where it's like, okay, you know, take a couple more,
23   you know.
24   Q. Did you feel like you were addicted to
25   narcotics when you were in Minnesota?

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 18 of 78
Tricia Wachsmuth v.
City of Powell, et al.
Tricia Wachsmuth
October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                           Page 61
Direct Examination by Ms. Westby

1  A. I wouldn't say that, you know. Would I say
2  that I felt that they helped? Yeah. But I was also in
3  pain. So it's hard to say if they helped my -- you
4  know, helped me because my pain was going away. Or if
5  they -- you know.
6  Q. Okay. Okay. I'm going to move on to when
7  you met the CI after you came to live in Wyoming. Tell
8  me how you met -- got to know him?
9  A. A lady -- sorry -- a lady I worked with, a
10 girl, because she's around my age, she's also my
11 neighbor, had asked me and Bret, you know, you want to
12 stop by and play some cards. And we didn't know
13 anybody. We had no friends. And it was like, okay,
14 you know, maybe we can meet some friends.
15       And we go over there and your CI was there.
16 And you may have to catch me on that. He was there.
17 And she was saying how he was homeless and living in
18 his car. And his car window was broken. And it was
19 when we were having those below zero weathers, you
20 know, where it was getting cold out. And I was always
21 raised, if you have it to give. you give it. You know,
22 if you have it, you know, it's there to share. If you
23 have enough. And we had an extra bedroom, you know.
24 And instead of seeing some guy living on the streets in
25 his car with a broken window, we took him in, gave him

TRICIA WACHSMUTH - October 4, 2010                           Page 62
Direct Examination by Ms. Westby

1  a place to stay.
2  Q. What's the name of your friend from the
3  hospital?
4  A. I don't know her last name. I know her name
5  was Tabitha. Tabby is what we called her. She worked
6  in the kitchen.
7  Q. Okay. When did he come to live with you, the
8  CI come to live with you?
9  A. End of November, maybe beginning of December.
10 Q. Okay. A - a couple of months before this
11 incident happened, three --
12 A. Yeah.
13 Q. Three, four months before this happened?
14 A. Yeah, probably about two months. I wouldn't
15 even say three. Probably about two months.
16 Q. Okay. Did you become friends with him?
17 A. I wouldn't say friends. You know, he was a
18 guy we were helping out. You know, a guy we both felt
19 bad for. You know, I would never consider someone like
20 him, you know, a friend. Even before all this
21 happened, neither one of us would have considered him a
22 friend. He lied too much.
23 Q. What did he lie about?
24 A. Anything and everything. It was really
25 weird, you know, because we could care less what he was

TRICIA WACHSMUTH - October 4, 2010                           Page 63
Direct Examination by Ms. Westby

1  doing with his days, you know, when he was out of the
2  house. I don't care what you do as long as you don't
3  do it in my home.
4        And he would tell Bret one story, you know,
5  yeah, I was over here doing -- buying this or doing
6  that. And then later on he's telling me a different
7  story, like me and Bret didn't talk, you know. And
8  Bret would be like, "Yeah, he said he was doing this."
9  I was like, "Really? He told me he went over to this
10 person's house." You know, and he's like, "Oh, huh,"
11 you know.
12       And then after that, we just constantly kept
13 comparing notes, you know, and okay, what did he say to
14 you today? Okay. Well, he said this to me. I mean,
15 it was constant lies about little things we could have
16 cared less about. I don't care who you're hanging out
17 with or who you're sleeping with. That has nothing to
18 do with me. I don't care. You know, but it's just
19 those little lies like that, where it's like, okay, he
20 obviously just feels the need to have to lie. And then
21 those kept piling up.
22 Q. Did you ever smoke marijuana with him?
23 A. Yes.
24 Q. Okay. Did -- did he bring -- were you
25 smoking the marijuana that you were growing in the

TRICIA WACHSMUTH - October 4, 2010                           Page 64
Direct Examination by Ms. Westby

1  house? What marijuana were you smoking?
2  A. No, we were smoking -- 'cause the stuff that
3  was in the house wasn't -- there wasn't even any buds
4  on it yet. You couldn't smoke it. Anything we smoked
5  was bought through him.
6  Q. What about before you got to know him, were
7  you -- and I'm not going to ask you who you were
8  getting it from. But were you obtaining marijuana from
9  another source before you met the CI?
10 A. I tried. It didn't work out so well. And
11 then after that, it's easy to quit. We just quit, you
12 know. And then we met him. And he said that he could
13 get us pot. And it's, like, great. So he went and got
14 us a bag -- bag of pot. And we told him, Hey, if you
15 see any seeds in there, we -- you know, try to keep
16 them in the bag. Don't, you know, throw a fit about
17 them. And then he kept them in the bag. And then
18 that's where we got our seeds to grow with.
19 Q. What about other -- other types of drugs?
20 Were there other types of illegal drugs, not --
21 A. In my home?
22 Q. In your home.
23 A. No. The only thing we told him when he moved
24 in -- the only thing is you can smoke pot, that's it.
25 Q. And I mean -- and I'm not talking about his

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 19 of 78
Tricia Wachsmuth v.
City of Powell, et al.
Tricia Wachsmuth
October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                              Page 65
Direct Examination by Ms. Westby

1  drugs. I'm talking about your drugs.
2     A. Yeah.
3     Q. Did you have any other --
4     A. We had prescription pills. But they were all
5  prescribed, you know, which shows in when they came in.
6  And it was all prescription drugs to mainly Bret,
7  couple in my name. But mainly in Bret's name, because
8  I didn't -- I don't have to hold on to my bottles like
9  he does with his. 'Cause he has to hold on to his.
10    Q. Why does he have to hold on to his?
11    A. Because with his appointments with the psychs
12 and stuff, they like to know everything he's been on
13 and the milligrams of it. And it just makes it easier
14 if we keep them in a box to okay, you know, I pull
15 them out and read them off and you write them down.
16    Q. Okay. I may come back and ask you about --
17 about his condition. But I want to -- I want to get
18 through the CI stuff.
19       In Bret's journal, he talks about obtaining
20 credit cards to buy the marijuana grow equipment; is
21 that accurate? Did you guys take out credit cards?
22    A. We -- we got a credit card, and that's where
23 we bought that light that was downstairs over the
24 plants.
25    Q. Okay. There's also some reference to

TRICIA WACHSMUTH - October 4, 2010                              Page 66
Direct Examination by Ms. Westby

1  purchasing seeds --
2     A. No.
3     Q. -- and other equipment --
4     A. The only -- the only thing we got offline was
5  that one big light, which I don't know the name of it.
6  And all of our seeds were -- were -- what's that word?
7  That we got from. We got from -- I'll use that word
8  instead -- Bes -- CI. Sorry.
9     Q. Okay. Where were you getting the seeds when
10 you were growing marijuana when you were in Minnesota?
11    A. Easy. People.
12    Q. In the same manner, it would just be --
13    A. We lived -- you know, we grew up in
14 Minnesota.
15    Q. Let me finish -- let me finish -- wait. Let
16 me finish my question. Listen to the -- the whole
17 question, then answer.
18       Were you getting the seeds in bags of
19 marijuana that you were purchasing?
20    A. Yes.
21    Q. Okay. Okay. Was the -- was the room where
22 the marijuana plants were in your house under the
23 stairs, was it painted white?
24    A. Yes.
25    Q. Is the light that you're talking about a

TRICIA WACHSMUTH - October 4, 2010                              Page 67
Direct Examination by Ms. Westby

1  sodium light? Does that ring a bell?
2     A. Could be.
3     Q. Were there also fans and timers?
4     A. Yes.
5     Q. Where did you obtain the fans and the timers?
6     A. Just a local store. I think the Wal-Mart or
7  Pamida, but I think Wal-Mart.
8     Q. Okay. Would you agree with the general
9  premise that there are some people who grow marijuana
10 to have enough to sell it?
11       MR. GOSMAN: Object to the form of the
12 question.
13 BY MS. WESTBY:
14    Q. And you can go ahead and answer.
15    A. What?
16       MR. GOSMAN: Go ahead. Feel free to answer
17 that question.
18       THE WITNESS: Can you repeat it then. I'm
19 sorry. I was --
20 BY MS. WESTBY:
21    Q. That's fine.
22       Would you agree with the general premise that
23 some people grow marijuana to have enough to sell it?
24    A. Some people, yes.
25    Q. Would you agree that some people would

TRICIA WACHSMUTH - October 4, 2010                              Page 68
Direct Examination by Ms. Westby

1  consider trying to make money with a -- with a
2  marijuana grow operation?
3     A. Some people, yes.
4     Q. Were you and your husband, at the time of
5  this incident or around the time of this incident,
6  having any financial problems?
7     A. No. I made good money, and he had his social
8  security. Our house payments and bills were always
9  paid. And car payments were. And if we were ever
10 short, we'd borrow the money from his parents.
11    Q. How often did you do that?
12    A. Not very often when we lived in our own
13 house. I was very proud of ourselves for that, you
14 know, because I was making really good money. Our --
15 our house payment was only 650 a month, you know, which
16 Bret's check covered that. And then mine covered
17 utilities without a problem.
18       I wouldn't say we were rich or wealthy by any
19 means. We were living the line. But we're not -- we
20 never really -- we're not wanty people. So it was
21 pretty much groceries and miscellaneous items around
22 the house like knickknacks.
23    Q. And I'll just go through this now since you
24 have talked about it a couple times. But why is -- why
25 is Bret disabled?

TRICIA WACHSMUTH - October 4, 2010                    Page 69
Direct Examination by Ms. Westby

1    A.  He's bipolar.
2    Q.  When was that diagnosis made?
3    A.  I don't know. It was made before him and I
4    were together.
5    Q.  Okay. Did he go on disability before you --
6    A.  No, he went on to disability after we were
7    married.
8    Q.  Do you remember what year that would have
9    been?
10   A.  Probably, I think, '05, I think.
11   Q.  How -- how did it come about that he was
12   diagnosed with bipolar disorder?
13   A.  I don't know. I was -- like I said, it was
14   before him and I were together. I know he has it, and
15   I know the symptoms of it.
16   Q.  What are the symptoms?
17   A.  But I really don't try to pry too much into
18   that. I mean, honestly, in my opinion, even though I'm
19   his wife, that's something he has to deal with with the
20   rest of his life. So that, I think, is personal for
21   him. I mean, he'll tell me, I know he would. But I
22   don't want to be the prying person, you know. Some
23   things, even though you're married, are nice to be kept
24   to yourself.
25   Q.  What are the symptoms of his disorder that

TRICIA WACHSMUTH - October 4, 2010                    Page 70
Direct Examination by Ms. Westby

1    you see?
2    A.  Sometimes --
3        MR. GOSMAN: Can you --
4        MS. WESTBY: I'm sorry?
5        MR. GOSMAN: I -- I didn't catch the rest of
6    the question. Go ahead. I have no objection.
7        THE WITNESS: Do you want her to rephrase
8    it --
9        MR. GOSMAN: No.
10       THE WITNESS: -- repeat it?
11       Okay. Sometimes he'll get depressed. And
12   then other times he's just in a good mood. You know,
13   it's pretty much just moods. And I know he does suffer
14   from anxiety. I don't really know much of anything
15   else.
16       You know, like I said, that's stuff that you
17   would have to ask him. And I know he would be more
18   than willing to let you know what he all has been
19   diagnosed with.
20   BY MS. WESTBY:
21   Q.  During the time that -- since you've -- since
22   you've known him, has he always been on medications --
23   A.  Yeah.
24   Q.  -- for his condition?
25   A.  Yeah.

TRICIA WACHSMUTH - October 4, 2010                    Page 71
Direct Examination by Ms. Westby

1    Q.  Do you notice times when he struggles more
2    with it than other times?
3    A.  Being his wife, I can tell when he's starting
4    to have, like, anxiety, you know. But after being
5    around for, you know, someone for so many years, you
6    pick up on those. So I can kind of tell when he's
7    starting to go through anxiety.
8        The depression, it's one of those things
9    where, you know, he'll let me know just so I'm, you
10   know, aware, you know. Or he'll just want to sleep or,
11   you know, he's just not himself, you know, just down.
12   Q.  What -- how does the anxiety manifest itself?
13   What do -- what do you see when he's having anxiety?
14   A.  See, it's hard to say 'cause he doesn't talk
15   to me much about it, you know, 'cause I know he doesn't
16   want to freak me out, you know, being the paranoid
17   wife, you know. I know his pupils will sometimes get
18   really big, and his heart just starts just racing, you
19   know, if you lay his head -- your head on his chest,
20   it's just like (indicating). His legs, I've noticed
21   that, you know and -- little things like that I can
22   notice.
23       But other than that, he's usually pretty good
24   at telling me, you know, I'm going through anxiety
25   right now. I need, you know -- I need to be quiet or I

TRICIA WACHSMUTH - October 4, 2010                    Page 72
Direct Examination by Ms. Westby

1    need the radio on or, you know, on low or, you know,
2    he'll let me know things like that. And then it's like
3    okay, I know he's going through, you know, just by him
4    saying things like that to me.
5    Q.  Okay. What about -- you know, does he --
6    when he's in a manic phase, how does that -- how can
7    you tell when he's in a manic phase?
8    A.  Manic, that's where he's really depressed,
9    right, or is that the happy high?
10   Q.  No, the high.
11   A.  Okay. Sorry. I get those two confused.
12       He's just in a good mood. You know, he's
13   just Bret.
14   Q.  Okay. Paranoia, have you ever seen him act
15   paranoid?
16   A.  No.
17   Q.  Never?
18   A.  No, not -- I wouldn't call it paranoid, no.
19   Q.  What would you call it?
20   A.  Well, I mean, a dog barks, I look out the
21   window. I mean, I don't know anybody who owns a dog,
22   and their dog barks, and you're not going to look out
23   the window. And that's pretty much about it. I
24   wouldn't call him paranoid. And I've been with him
25   forever. And I wouldn't say he's paranoid.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 21 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                 October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                                    Page 73
Direct Examination by Ms. Westby

1   Q. Okay. Did the two of you ever discuss
2   getting caught growing marijuana?
3   A. Well, you know, we figured -- we figured that
4   there would have to be an investigation.
5   Q. No. And what I'm -- I'm talking about before
6   this incident happened --
7   A. Yeah.
8   Q. -- did the two of you ever discuss any
9   concern about getting caught growing marijuana?
10  A. No, just a misdemeanor. We weren't really
11  concerned about a misdemeanor.
12  Q. What about --
13  A. And it would have to be -- you know, they
14  would have to do an investigation, and they would have
15  to have legitimate reason, which we didn't do anything
16  wrong. You know -- I mean, besides growing marijuana,
17  but I mean, with it.
18  Q. Were you concerned when police would go by
19  your house, and you knew that you had illegal --
20  A. No.
21  Q. -- substances in your house?
22      That didn't concern you at all?
23  A. No. 'Cause as far as I knew, they had to do
24  an investigation. And they can go ahead and do an
25  investigation. They weren't going to find -- we didn't

TRICIA WACHSMUTH - October 4, 2010                                    Page 74
Direct Examination by Ms. Westby

1   talk to anybody, you know. We didn't know anybody.
2   And especially after all that had happened. It's like
3   okay, well, definitely ain't trusting anybody ever.
4   Q. All what had happened?
5   A. Getting busted and stuff, you know.
6   Q. Okay.
7   A. But after that, I never stepped foot in the
8   house either.
9   Q. But I'm talking about before this happened.
10  A. Oh, before this happened?
11  Q. Yes?
12  A. When he was living with us or before he was?
13  Q. Well, either time.
14  A. Okay.
15  Q. You know, you have -
16  A. Well, when he was living with us, 'cause
17  that's when we started grow ng the plants, because
18  obviously, I suppose, before plants are there, you have
19  no paranoia. But we didn't really think anything about
20  it because you have to do an investigation, you know.
21  And we figured we were nice enough to give this
22  homeless guy a place to live You know, that -- you
23  know most people, if someone is nice to them like that,
24  feed them, shelter them, you don't expect them to turn
25  around and do that.

TRICIA WACHSMUTH - October 4, 2010                                    Page 75
Direct Examination by Ms. Westby

1   Q. Were you ever concerned about, you know,
2   getting caught at work with somebody finding out that
3   you had been smoking marijuana, getting caught at work?
4   Did that ever bother -- ever concern you?
5   A. No, because I assumed that they would have
6   had to do an investigation.
7   Q. Yeah. And I'm not clear what you mean by
8   that.
9   A. To make sure that we were doing something
10  wrong.
11  Q. Okay. Was Bret ever -- indicated concern, or
12  did you ever have a concern that the two of you were
13  engaging in this illegal activity when Bret's father
14  was involved in --
15  A. That's why we --
16  Q. -- law enforcement.
17  A. -- went downstairs and would always cover
18  everything up. We both have nothing but the utmost
19  respect for Tom and his job. And that's why we did our
20  best to make it so, you know, there was no way in
21  heck -- can I say heck?
22  Q. So you wouldn't get caught?
23  A. Yeah.
24  Q. Correct?
25  A. Yeah. And that way he would never know,

TRICIA WACHSMUTH - October 4, 2010                                    Page 76
Direct Examination by Ms. Westby

1   because we didn't want to pull him into it.
2   Q. So that was a concern to you?
3   A. Tom, yeah. Just because, you know, we didn't
4   want to pull him into it. I respect him. I don't want
5   to lose his respect. He's family.
6   Q. Is there a -- was there, in the house that
7   you lived in when this incident occurred, was there a
8   padlock on the basement door?
9   A. A padlock?
10  Q. Uh-huh.
11  A. No.
12  Q. Was there some kind of lock on the basement
13  door?
14  A. All of our doors have those little handle
15  locks. All of them. Bedrooms, bathrooms, basement,
16  they all had the handle locks.
17  Q. Did you keep that basement door locked?
18  A. No. There was no need to keep it locked.
19  Except for -- I will say one time we did lock it 'cause
20  when they were doing those fiberoptic cables around
21  town, they spliced our septic, and it was running into
22  the basement, which made the house smell, so I locked
23  the door because it stunk really bad until they could
24  come and fix it.
25  Q. How did they fix it? Did they --

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 22 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                  October 04, 2010

1   A.  Well, it was behind our house.  So they just
2   had to just dig up a hole and find where they had
3   sliced through the pipe and then fix the pipe, which
4   lasted temporarily.
5       Q.  Did you do anything -- were you concerned
6   about people potentially going into the basement when
7   that was going on?
8   A.  No.
9       Q.  Did you cover up the plants or --
10  A.  Yeah.
11      Q.  -- or do anything?
12      Why did you cover up the plants?
13  A.  Well, because if they had to go downstairs, I
14  didn't want them to see it.
15      Q.  Right.
16  A.  I mean, we knew it was illegal.  But we also
17  knew it was a misdemeanor.
18      Q.  And you -- you didn't want to get caught,
19  correct?
20  A.  Correct.  I mean, that would -- you know, I
21  guess Bret and I neither one of us would do anything,
22  you know, would want to do anything that would dis --
23  get Tom to have less respect for us.
24      Q.  The police, when they were at your house,
25  found stuffed animals with the -- the seams ripped.

1   A.  Uh-huh.
2       Q.  Is that a method that people used for --
3   A.  Instead of --
4       Q.  -- hiding drugs?
5   A.  Well, it's also a method people used instead
6   of hurting themselves.
7       THE COURT REPORTER: I'm sorry.
8       MR. GOSMAN: You're -- you're going over each
9   other here, Tricia.  You'll have to wait until she
10  finishes the question.
11      THE WITNESS: Okay.  Sorry.
12      MR. GOSMAN: And then -- and then give me
13  just a minute -- well, not a minute, but a second, to
14  register an objection if I have one.
15      THE WITNESS: Okay.  Sorry.
16      MR. GOSMAN: Thank you, Tricia.
17      THE WITNESS: Sorry.  Just kind of in a hurry
18  to get it done.  I'm sorry.
19      MR. GOSMAN: Yeah.
20      MS. WESTBY: Sorry.  Did you get -- get my
21  question?
22      THE COURT REPORTER: I'm not sure.  Say it
23  again.
24  BY MS. WESTBY:
25      Q.  Okay.  Is that a method that people use to

1   hide drugs?
2       MR. GOSMAN: Object to the form.
3   BY MS. WESTBY:
4       Q.  Putting it in the -- in stuffed animals?
5   A.  I don't know what people do.
6       Q.  Have you ever heard of that being done?
7   A.  No.
8       Q.  Okay.  What's your explanation for the --
9   A.  I have a tendency to -- when I was younger
10  and depressed, I'd cut myself.  I'd burn myself to try
11  and make the pain go away.  And then one day I
12  discovered I can take it out on my stuffed animals
13  instead of having to take it out on myself.  And that's
14  where that came from.
15      I mean, you lose your dad and brother and
16  watch your half-brother almost die in front of you,
17  you're going to have issues for a little bit, too.
18      Q.  What happened to your half-brother?
19  A.  He got into an accident, rolled his truck.  I
20  was in the vehicle right behind him, because I went to
21  go get him.  But he decided that he wanted to drive.
22  Drove, crashed his truck, and lost his left eye, use of
23  his left arm.  He went back to the 14-year-old
24  mentality.
25      Q.  How --

1   A.  And he was pinned in his truck and he
2   couldn't get out.
3       Q.  And you were right there watching that?
4   A.  (Witness nods head.)
5       Q.  When did that happen?
6   A.  I was 16.  It happened four months after my
7   brother killed himself.  No.  So I was 17 at that time.
8       Q.  So then you began cutting and burning
9   yourself?
10  A.  (Witness nods head.)
11      It was an escape.  And it was before
12  medications, before antidepressants.  You know, because
13  I had stopped taking them because they didn't seem to
14  work.  They just kind of seemed to make things worse.
15  I was thinking about it more often than that, so I quit
16  taking them.  And then when I couldn't handle it, I
17  would burn or cut myself.
18      Q.  Do you have any scars?
19  A.  Yeah.
20      Q.  Are they visible?
21  A.  Yes.
22      Q.  Can I see them?
23  A.  (Witness complies.)
24      Q.  Do you -- can you point them out?
25  A.  (witness complies.)

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 23 of 78
Tricia Wachsmuth v.                                                                Tricia Wachsmuth
City of Powell, et al.                                                              October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                              Page 81
Direct Examination by Ms. Westby

1   Q.  Are those burns --
2   A.  Yeah, these are burns. These are
3   lacerations.
4   Q.  And I'm sorry.  I don t see what you're
5   referring to when you say "lacerations".
6   A.  There's another -- cuts.  They are kind of
7   light because they were from years ago.  There's one
8   there.  There's one here.  Stab mark there.  Stab mark
9   there.  Stab mark there.  Burn there.  Burn, burn,
10  burn, burn, burn.
11  Q.  When did you stop doing that?
12  A.  I had stopped when I was able to take
13  frustrations out on things like that.  But then other
14  stuff happened, and I couldn't handle it.
15  Q.  And so -- I'm sorry.  I don't understand your
16  answer.
17  A.  These ones are from about a month and a half
18  ago.  I took away every other thing I could do.  I had
19  no choice.
20  Q.  Who took away everything you could do?
21  A.  I couldn't stab any stuffed animals anymore.
22  I couldn't tear into things without fear.  So the only
23  thing I could do was commit harm to myself, so I did
24  it.
25  Q.  What -- why couldn't you take it out on

TRICIA WACHSMUTH - October 4, 2010                              Page 82
Direct Examination by Ms. Westby

1   stuffed -- stuffed animals?
2   A.  Because of what they are trying to accuse me
3   of with my stuffed animals.  And so I'm afraid that if
4   I even cut another stuffed animal, that they could
5   construe it in the wrong way.
6   Q.  But these aren't cut marks.
7   A.  These are burn marks.
8   Q.  These are burns, correct?
9   A.  Yep.
10  Q.  Do you have any recent cut marks?
11  A.  Nope, I don't cut because I have my son.  I
12  burn because it's easier to take care of and control
13  and bandage up, and I don't have to worry about
14  bleeding or being too sore to take care of him.
15  Q.  And you weren't burning the stuffed animals,
16  you were cutting open the back seam.
17  A.  I would cut open the stuffed animals, yeah.
18  Q.  Okay.
19  A.  And I would take it out on that.
20  Q.  Okay.
21      MR. GOSMAN:  You okay?  Do you need to take a
22  break.
23      THE WITNESS:  (Witness nods head.)
24      MR. GOSMAN:  It's break time.
25      MS. WESTBY:  Okay.  That sounds fine.

TRICIA WACHSMUTH - October 4, 2010                              Page 83
Direct Examination by Ms. Westby

1       THE VIDEOGRAPHER:  We'll go off -- we'll go
2   off the record.  The time is 10:22.
3           (Recess taken 10:22 to 10:39
4           a.m., October 4, 2010)
5       THE VIDEOGRAPHER:  We're back on the record.
6   The time is 10:39.
7   BY MS. WESTBY:
8   Q.  Okay.  I'm going to go back and -- and cover
9   a couple of -- of things, or get a little bit more
10  detail on a couple of things.
11      You -- when I was talking to you about being
12  worried about getting caught.  You kept telling me,
13  "Well, they would have to do an investigation."  What
14  kind of investigation are you talking about?  Where did
15  you get that information?
16  A.  Well, they would have to do an -- you know,
17  it's just -- I always thought it was common knowledge
18  that in order to do a bust, you have to have
19  information.  You have to have an investigation done.
20  You have to know for sure what you're going into.
21  Q.  Where -- where did you obtain that
22  information?
23  A.  Legal Ways in high school.  It's a class that
24  they make you take.
25  Q.  And what kind of class is it?

TRICIA WACHSMUTH - October 4, 2010                              Page 84
Direct Examination by Ms. Westby

1   A.  Teaches you, you know, your rights and, you
2   know, legal aspects on things.  Just pretty much how it
3   sounds, legal ways, you know.
4   Q.  Okay.  What about -- what about the fact that
5   you believe this would be a misdemeanor.  Where were
6   you getting your information from?
7   A.  Because as far as I was aware, is anything
8   under a certain amount is a misdemeanor.
9   Q.  What's that amount?
10  A.  I think -- I do believe it's 3 ounces, which
11  we had well under 3 ounces.
12  Q.  Were you making sure that you had under
13  3 ounces?
14  A.  Well, the two plants we had going didn't even
15  have any buds on them.  And we make them small enough
16  where you know that you're not going to get that huge
17  amount.  You know, it was only for personal.  We didn't
18  need anything massive.
19  Q.  Did you have other shoots started in addition
20  to -- or other starters, other than the two plants, as
21  well?
22  A.  I don't understand.
23  Q.  Did you have other plants started?  Other
24  starters?
25  A.  Oh, okay.  Um, we had tried, but they didn't

Case 1:10-cv-00041-ABJ  Document 65-13  Filed 01/10/11  Page 24 of 78
Tricia Wachsmuth v.
City of Powell, et al.

Tricia Wachsmuth
October 04, 2010

1  work out. They died. Male seeds. They just kind of
2  curled up and died.
3      Q. Okay. But you were at some point in time
4  trying to grow more than at least the two plants?
5      A. No, those would have been ready when the two
6  plants were done. You know, so we were not going over
7  the limit.
8      Q. And you were specifically trying -- you were
9  specifically conscious of the -- the limit?
10     A. Misdemeanor -- yeah.
11     Q. Okay. And I'm curious, you know, you talked
12  about -- several times you've talked about the fact
13  that you respect Tom, and you respect his job. But I'm
14  curious --
15     A. I respect his wife as well.
16     Q. Okay. And -- but I'm curious how that
17  relates to -- or -- or how you -- your concern about
18  doing illegal activities.
19     A. I don't understand.
20         MR. GOSMAN: Object to the question.
21  BY MS. WESTBY:
22     Q. Were you -- were you concerned about -- that
23  getting caught doing something illegal would look bad
24  for -- for --
25     A. Tom?

1      Q. -- Tom?
2      A. Yeah. That's why we were very careful and
3  very cautious.
4      Q. And why you really didn't --
5      A. I mean, the only reason why we let him into
6  our house, the CI, sorry, into our house is because we
7  felt bad. You know, I -- I can't see somebody living
8  in their car in below zero weather.
9      Q. Did Tom Wachsmuth -- Wachsmuth know the CI
10  who was living with you?
11     A. No, he did not know he was living with us.
12     Q. He didn't know he was living with you?
13     A. No.
14     Q. Did he know the CI? Had he had any --
15     A. I don't know.
16     Q. -- dealings with him?
17     A. I know that, you know, after the fact this
18  had all happened, we had told Tom he we had a guy staying
19  with us, you know. And he's the one who had turned us
20  in. And that's pretty much how far that went.
21         I think Tom was still a little upset with --
22  you know, what we had going on in our house. Can't
23  blame him. You know, I can never hold that against
24  him. I would be upset, too, if it was my kid.
25     Q. Did Tom tell you, after the fact, that he had

1  come into contact with the CI in his job?
2      A. No. No -- well, not me per se, no. I know
3  that talking to my lawyer here, that he had been. And
4  then my lawyer got some information, and that's when
5  some things --
6         MR. GOSMAN: All right. Tricia, you do not
7  have to, and I instruct you not to, discuss any
8  information that is exchanged between you and I.
9         THE WITNESS: Okay.
10         MR. GOSMAN: Okay?
11  BY MS. WESTBY:
12     Q. Other than from your attorney, have you ever
13  heard that Tom Wachsmuth had any contact with the CI?
14     A. The only thing Tom had told us when he found
15  out who was living in our house was, "Shit." Sorry.
16  And pardon my language, you know. Because we didn't
17  know, you know, anything about him. I just knew he was
18  homeless.
19     Q. And Tom didn't ever come over to your house
20  while the CI was living at your house?
21     A. When he did come over, it was to help Bret
22  and the truck in the garage. And, you know, the CI
23  would usually either be gone or if he was there, he
24  would leave, which we never would -- you know, didn't
25  think anything of it, you know. Cause people leave,

1  you know. Friends, things to do, you know.
2      Q. If -- if you were aware of the amount and
3  concerned about misdemeanor versus felony, was it your
4  understanding that the police could still get a search
5  warrant for a misdemeanor offense?
6      A. Yeah, and that's fine. I would have gladly
7  let them -- I would have let them into my home. I
8  would have shown them where the plant pots were. And I
9  would have shown them where my paraphernalia was.
10     Q. And you knew that there would be consequences
11  to your actions?
12     A. I knew I'd be getting a ticket.
13     Q. Could you also be arrested for that?
14     A. For a misdemeanor?
15     Q. Yes.
16     A. Usually as far as -- from what I know --
17  obviously I'm not in law enforcement. From what I
18  know, it's a ticketable offense. You get a ticket, you
19  go to court.
20     Q. Was this something that you ever talked to
21  Tom Wachsmuth about? Your questions --
22     A. Before?
23     Q. Before this happened.
24     A. Before this happened?
25     Q. Yes.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 25 of 78
Tricia Wachsmuth v.                                                        Tricia Wachsmuth
City of Powell, et al.                                                   October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                    Page 89
Direct Examination by Ms. Westby

1    A.  No, why would I talk to him about pot?
2    Q.  I'm just asking.
3    A.  Oh, no.
4    Q.  When the police were in your house, they
5    found on your shelves, on your bookshelves, a big book
6    called a Cannabible.
7    A.  Uh-huh.
8    Q.  Is that correct?
9        THE COURT REPORTER: Cannon?
10       MS. WESTBY: Cannabible.
11       THE WITNESS: Could be the name of it.
12   BY MS. WESTBY:
13   Q.  And that's the name of the book on the seam
14   of the -- you know, on the end of the book, the part
15   that's visible; is that correct?
16   A.  I think so.  I can't really answer that yes
17   or no.  Because I don't remember the title.  That's the
18   only reason why I can't answer yes or no.  I do know
19   what you're talking about, but I don't remember the
20   title.
21   Q.  Does the -- okay.  Does the title, to your
22   recollection, have something to do with mari --
23   marijuana?
24   A.  Yes.
25   Q.  Okay.  And was that book taken off of the

TRICIA WACHSMUTH - October 4, 2010                    Page 90
Direct Examination by Ms. Westby

1    shelves and hidden when Tom and Donna would come to
2    your house?
3    A.  They never looked at our bookshelves.  There
4    was never no need.
5    Q.  Okay.  But you didn't take it out of the
6    bookshelves when they came?
7    A.  No, there was no need.  They weren't nosy
8    people.
9    Q.  Okay.  Did you also have High Times --
10   A.  Magazines?
11   Q.  -- magazines around?
12   A.  Yeah, which are not illegal.
13   Q.  Did you leave those out when Tom and Donna
14   were at your house?
15   A.  They were in the bookshelf.  Like I said,
16   they never looked at the bookshelf.
17   Q.  Okay.  I'm wondering too --
18   A.  Sometimes I would turn them around, but they
19   never looked at the bookshelf.  We didn't have any
20   books they like to read.
21   Q.  Did you ever keep -- I think you told me that
22   you kept the potting soil out in the garage.  Did you
23   ever keep the potting soil in the house or in the
24   basement?
25   A.  Every now and then, it would be on the top of

TRICIA WACHSMUTH - October 4, 2010                    Page 91
Direct Examination by Ms. Westby

1    the stairs.  But after we'd use it, it would go
2    straight outside into the garage.  It wasn't something
3    I really cared to kick over when I'm going down to do
4    laundry.
5    Q.  Okay.  When the police executed the search
6    warrant, did they find potting soil at other places in
7    your house, other than the garage?
8        MR. GOSMAN: Well, go ahead and answer if you
9    know.
10       THE WITNESS: I don't know.
11       MR. GOSMAN: I mean, how would she know what
12   the police found.
13       THE WITNESS: I don't know.
14       MS. WESTBY: Well, I'm assuming that she was
15   aware of what was going on.
16   BY MS. WESTBY:
17   Q.  Was there potting soil at --
18   A.  I wasn't aware --
19   Q.  -- inside your house when the police came to
20   execute the search warrant?
21   A.  I don't know.
22   Q.  And I'm curious, when you were talking about
23   cutting the -- the stuffed animals, it's accurate to
24   say, isn't it, that the stuffed animals that were cut
25   that were at your house were just cut on the seam?

TRICIA WACHSMUTH - October 4, 2010                    Page 92
Direct Examination by Ms. Westby

1    A.  That's because I would grab them.  And it's
2    the easiest place to cut and it cuts quick -- quick.
3    Just kind of grab it, hold it there, stab, and rip.
4    Q.  And so the answer --
5    A.  And then --
6        MR. GOSMAN: That's okay, Hon, I'll do it.
7    BY MS. WESTBY:
8    Q.  The answer to my question would be yes, that
9    they were just cut on the -- on the seam?
10   A.  Some of them, yeah.
11   Q.  Were there any that were cut other places?
12   A.  Yeah, I had cut a bear in the foot one time.
13   And I don't know if they were in my house or if they
14   were still left at my mom's.  That's why she would fix
15   them and send them to me because they were sentimental.
16   The stuff my dad got me before he died.  Then after he
17   died, I kind of -- he had the wise.
18       And so -- you know, I started cutting myself
19   and I grabbed a stuffed animal one day and had it with
20   its face down like that right on the back and shoop
21   (indicating), and that's how it all started.  It made
22   me feel better.
23   Q.  And there were stuffed animals in a shipping
24   box in your house, correct?
25   A.  Yeah.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 26 of 78
Tricia Wachsmuth v.                                                                    Tricia Wachsmuth
City of Powell, et al.                                                                 October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                                      Page 93
Direct Examination by Ms. Westby

1   Q. With the seams cut?

2   A. Yeah, for her to sew them.

3   Q. So your testimony is that you were sending

4   those to her or that she was sending them back to you?

5   A. I was sending them to her so she could sew

6   them for me. I don't know how to sew. You could give

7   me a needle and thread right now, and I'd be asking you

8   how to do it. So I would send them to her to sew. And

9   she would sew them up because they were ones, like I

10  said, my dad had given me. And then she would send

11  them back to me looking like new.

12  Q. So your testimony is that the stuffed animals

13  that had the seams ripped, that were in the shipping

14  box in your house, were ones that you were going to

15  ship back to your mother to have her sew up to send

16  back to you?

17  A. Uh-huh.

18  Q. Okay. Is that a "yes"?

19  A. Yes. Sorry.

20  Q. Also, in your house, you had a book about --

21  basically, a drug ID book, correct?

22  A. Uh-huh.

23  Q. Is that a "yes"?

24  A. Yeah. Sorry. Yes.

25  Q. What -- what was that book for?

---

TRICIA WACHSMUTH - October 4, 2010                                      Page 94
Direct Examination by Ms. Westby

1   A. Just to have. You know, 'cause like Bret is

2   on certain medications, it's nice to be able to look

3   them up before he takes them. He's one of those types

4   where if he gets new meds, he has to know side effects

5   and what he's taking and if he can take it with certain

6   things. You know, with his condition it kind of helps

7   ease his mind just to know what he's taking.

8   Q. And didn't he get that information with the

9   medications when they were prescribed to him?

10  A. Not enough -- not all that is there. You get

11  different stuff from different things. He was just --

12  he's the type who -- after you meet him, he's the type

13  who has to do the most thorough look at stuff before he

14  takes it. 'Cause --

15  Q. Is -- okay. Is that the type of drug ID book

16  that has a picture of the drug so you can identify

17  the -- the pill from a picture of it?

18  A. Yes.

19  Q. Okay. Did you ever use that book to identify

20  a prescription pill that you weren't sure what it was?

21  A. No. Well, we knew what it was by the label,

22  you know. But we didn't know the effects of it. So

23  every now and then -- you know, or if we'd find a pill

24  on the floor, we'd pick it up and look and say, okay,

25  do I need to call for my dog? Because we have a little

---

TRICIA WACHSMUTH - October 4, 2010                                      Page 95
Direct Examination by Ms. Westby

1   Chihuahua, and if something happened to fall on the

2   floor, you'd think, oh my gosh, did he eat one? And

3   then you'd be looking it up: Okay, well, it's not

4   going to hurt him. Okay, just an ibuprofen, no big

5   deal.

6   Q. Did that happen often, that there would be a

7   pill on the floor?

8   A. Not too often, but occasionally. You know,

9   when you open them up, sometimes they fall.

10  Q. Is Tabitha's last name Armstrong?

11  A. Could be.

12  Q. Does that ring a bell?

13  A. Maybe. Like I said, she worked in kitchen.

14  I worked in housekeeping.

15  Q. Was she a -- somebody who you spent time

16  with?

17  A. She did piercings for me. And then like I

18  said, she became our neighbor. And it was a place

19  where we'd play cards, poker, and then we'd leave. You

20  know, usually if I was getting a piercing done, Bret

21  would be waiting for me.

22  Q. How did it happen that the CI moved out of

23  your house?

24  A. We kicked him out.

25  Q. Why?

---

TRICIA WACHSMUTH - October 4, 2010                                      Page 96
Direct Examination by Ms. Westby

1   A. Several reasons. You know, Bret and I were

2   first talking about it was with the lies. And then we

3   had found out that he brought methamphetamines into our

4   home, which we had told him when he moved in, we were

5   totally against and did not allow in our house. The

6   only thing we would ever allow him to do in our house

7   is smoke marijuana.

8       And then when we found that out, we kicked

9   him out, you know, between all of the lies and constant

10  lies. And then found that out, and it's like, okay,

11  you're done. You know, you need to find a new place to

12  live. You have a job now. And then he got mad and we

13  kicked him out. He told us we would regret it. We

14  have much more to lose than what he does.

15  Q. Okay. Anything else that I need to know

16  about why he left?

17  A. No, that's pretty much it. Bad roommate.

18  Bad decision. Learn not to help people.

19  Q. Were you concerned that it was more likely

20  that you were going to get caught with him in the

21  house?

22  A. No. You know, like I said, we knew it was a

23  misdemeanor. And honestly, helping somebody, I was

24  always raised that, you know, if you can help somebody,

25  you help them. And he was in his car below zero,

---

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 27 of 78
Tricia Wachsmuth v.                                                                    Tricia Wachsmuth
City of Powell, et al.                                                                  October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                                       Page 97
Direct Examination by Ms. Westby

1 window broken, freezing, no food. Bret and I talked
2 about it and neither one of us could just turn him
3 away.
4   Q. Where did he get a job?
5   A. It's one of the restaurants. It's downtown.
6 It's the one where you walk in and they have that glass
7 piece, and you watch them make it. I think it starts
8 with a T. Tios, I want to say.
9   I suppose you're not from here either, huh?
10   MR. GOSMAN: No.
11 BY MS. WESTBY:
12   Q. What --
13   A. I think it's Tapatio's.
14   Q. Okay. What weapons did you and Bret have in
15 the house at the time -- around the time that this
16 incident occurred?
17   A. We had a .22, .357, .45 Long Colt, and his
18 hunting rifles, which I have no idea what those would
19 be called besides hunting rifles.
20   Q. Where were they located in the house before
21 this -- before the police came and executed the search
22 warrant?
23   A. Bret -- after we had kicked the CI out, and
24 he had threatened us, Bret took the .22 and he placed
25 it on the bookshelf. Because in our living room was

TRICIA WACHSMUTH - October 4, 2010                                       Page 98
Direct Examination by Ms. Westby

1 our TV and then there's a bookshelf here with an
2 opening through the kitchen-type area. Our bookshelf
3 was under there.
4   And Bret told me, he's like, "I'm placing
5 this here," and he'd place it before he left. I'm
6 placing this here in case, you know, he does try
7 something when I'm not home, out of fear for my safety,
8 you know, after he did threaten us.
9   He put that there. And all the other ones
10 were in the bedroom.
11   Q. And let's talk about --
12   A. But -- sorry.
13   Q. Let's talk about the threat. Tell me
14 specifically what the threat was?
15   A. He was going to get us. He would get us
16 back. We had a lot more to lose than what he does.
17 And he said that to Bret, "You have a lot more to lose
18 than I do." And he had told us both that he was going
19 to get us back for this. "I will get you for this."
20 And then he had threatened that, and that's what made
21 Bret worry about me.
22   Q. Did he, in fact, threaten to get you by
23 turning you into the police for your illegal activity?
24   A. At that point, no. He called Bret the day
25 that this all had occurred. He had called Bret. Bret

TRICIA WACHSMUTH - October 4, 2010                                       Page 99
Direct Examination by Ms. Westby

1 didn't answer because it was restricted, you know. So
2 he's like, hum, I'm not going to answer that. And he
3 left him a message telling Bret, "Yeah, I just turned
4 you in. You need to get all your shit out of your
5 house." And just -- sorry. Pardon my language. You
6 have to get all of your stuff out of the house. And
7 just went often into that rant. You know, I just
8 turned you guys in. You know, good luck.
9   It's like well, thanks. But we still didn't
10 think anything of it, you know. It's like, okay, you
11 know, well, they have to do an investigation. They are
12 not going to find anything because we don't talk to
13 anybody.
14   Q. Describe this investigation that you think
15 needed to be done.
16   A. Well, when it comes to drugs especially, they
17 need to make sure that their informant is reliable and
18 they need to verify that, okay, this is a drug house,
19 look at all this traffic. And things like that, I
20 would think. You know, according -- you know, it's
21 been years since I've taken that class, but...
22   Q. According to that class you took in high
23 school or something else?
24   A. Uh-huh. My class.
25   Q. And only the class?

TRICIA WACHSMUTH - October 4, 2010                                      Page 100
Direct Examination by Ms. Westby

1   A. Yeah, I've taken a class. And in the class
2 they, you know, would teach you your rights and things
3 like that. And what you have the right to do and --
4 sorry. I just need to breathe. Okay.
5   Q. When did the CI move out of your house? How
6 many days before this incident happened?
7   A. January, I do believe, is when we kicked him
8 out. Maybe -- it was either the end of January or
9 beginning of February.
10   Q. What day did this happen on?
11   A. February 24th.
12   Q. So how -- do you have a -- a recollection of
13 how many days or weeks before this happened that you
14 kicked him out?
15   A. Like I said, maybe a month.
16   Q. Okay. Now, you were telling me about the --
17 the gun placement after he moved out. Was that the gun
18 placement the whole month in between or was there a
19 specific time that that happened?
20   A. After he moved out and after he had
21 threatened us, that's when Bret got concerned with me
22 being home alone. I'm not a big girl. So Bret would
23 be concerned about me being home. And that's why he
24 would put the .22 -- every time before he left, he'd
25 put the .22 on the bookshelf for me. That way, you

Case 1:10-cv-00041-ABJ Document 65-13 Filed 01/10/11 Page 28 of 78
Tricia Wachsmuth v.               Tricia Wachsmuth
City of Powell, et al.               October 04, 2010

TRICIA WACHSMUTH - October 4, 2010    Page 101
Direct Examination by Ms. Westby

1  know, it was someplace he never knew of, and it was
2  someplace where I could get to in case -- because he --
3  he showed Bret and I a gun that he had.
4  Q. The CI did?
5  A. The CI did.
6  Q. And did he know --
7  A. And with Bret knowing that he had this gun,
8  Bret got really concerned for me after he had
9  threatened.
10  Q. And did the CI know where Bret's guns were?
11  A. I know -- I don't know actually, because we
12  kept them in our bedroom. So unless he went into our
13  bedroom and dug through, you know, the dresser drawer,
14  no. 'Cause we kept the .357 and the .45 in the top
15  dresser drawer. And then over by the side, 'cause our
16  dresser was here, and there was just like an open
17  little side here. He kept his long rifle -- shotguns,
18  rifles, one of the two I think they are shotguns.
19  Hunting guns, I'll say. I'm not a gun person. He'd
20  keep those by the side of the dresser.
21    And then the ammo was kept in a chest at the
22  end of our bed.
23  Q. Did you keep weapons loaded in your house?
24  A. Yes.
25  Q. Which ones?

TRICIA WACHSMUTH - October 4, 2010    Page 103
Direct Examination by Ms. Westby

1  range and shoot them. And a couple of them -- a few of
2  them are Bret's, his hunting guns, and stuff like that
3  were his. I think were his.
4  Q. Which ones were Tom's?
5  A. The .22, the .357, and the .45 Long Colt.
6  And then I don't know about the long rifles. You'd
7  have to ask my husband that. I don't know whose are
8  whose. I could be completely wrong on that.
9  Q. How did Bret end up with Tom's guns?
10  A. Because we'd go out to the shooting range.
11  And after the shooting range, we'd go home.
12  Q. Did Bret ask Tom for those --
13  A. He borrowed them.
14  Q. -- guns?
15  A. Yes.
16    Tom would occasionally come out to the
17  shooting range with us, our vehicle was the one where
18  we'd just put them in because Bret's truck was a little
19  bit bigger.
20  Q. When did the CI make these -- make the -- the
21  threat --
22  A. After we kicked him out.
23  Q. -- to you?
24    At what point in time? Immediately? Couple
25  weeks later? What?

TRICIA WACHSMUTH - October 4, 2010    Page 102
Direct Examination by Ms. Westby

1  A. There was two -- I know it was the .22. The
2  other one, I'm not sure. I never loaded them. You'd
3  have to ask my husband that.
4    And I know the .22 was loaded because he had
5  set it there for me just in case. And he told me
6  safety is on and it's loaded.
7  Q. Did you keep loaded weapons in your house
8  before the CI moved in with you?
9  A. Not unless we went shooting. I think Bret
10  might have kept one loaded in he bedroom. But I'm not
11  a gun person. I don't pick them up to play with them.
12  So I never really paid attention to which ones he did
13  have loaded and which ones he didn't.
14  Q. Did you get any weapons, any guns, after you
15  moved to -- back to Wyoming from Minnesota? Or did
16  you -- had you had all of these?
17  A. I don't get the question.
18  Q. Um, did you have all of those guns that
19  were --
20  A. When he lived --
21  Q. -- that were in your house when you lived in
22  Minnesota or those -- or were those ones that you
23  bought after you moved back to Wyoming?
24  A. No. A lot of them were Tom's. We'd borrow
25  them, you know, because we'd go out to the shooting

TRICIA WACHSMUTH - October 4, 2010    Page 104
Direct Examination by Ms. Westby

1  A. The day we kicked him out, he made the threat
2  that we were going to regret it. And then maybe a day,
3  maybe two, later is when he had made the threat, you
4  guys have a lot more to lose than I do.
5  Q. And then the day that this incident occurred,
6  he called and said he'd turned you guys in?
7  A. Yeah.
8  Q. Okay.
9  A. And then he left it on Bret's voice mail, so
10  Bret would be more of a detailed accurate on what he
11  had left on that message.
12  Q. Okay. Tell me about the 24th, the date of
13  this incident, what you were doing before the police
14  came.
15  A. I was sitting on the couch watching Grease.
16  Q. Okay. Where was Bret?
17  A. At his parents' house.
18  Q. How long had he been there?
19  A. I'm not sure. Not too long. Maybe half an
20  hour, an hour. Maybe about an hour.
21  Q. Okay. Was there anybody else in the house?
22  A. No. Thank God.
23  Q. Is there a -- is there some kind of, you
24  know, metal thing that could be used as a padlock on
25  the basement door?

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 29 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                 October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                         Page 105
Direct Examination by Ms. Westby

1    A. It was just the handle.
2    Q. There was nothing that --
3    A. A dead bolt or anything like that?
4    Q. Or a piece of metal that went over?
5    A. One of these hooky slides?
6    Q. Uh-huh.
7    A. No, just the door handle.
8    Q. Okay. Or one of those things that you could
9    hang a padlock on, a metal piece that goes over that
10   you hang a padlock on?
11   A. No.
12   Q. Okay. So you're sitting on the couch
13   watching Grease, Tom -- or Bret is at Tom and Donna's
14   house. What happened?
15   A. I curled up on the couch with a blanket, and
16   I have the dog on me, Chihuahua. And all of a sudden,
17   he's just staring at the door. Which he has never
18   done. Just stared at it. You know, no growl, no bark
19   no nothing, just staring. So I was thinking, okay,
20   maybe Bret is pulling up.
21        And so I leaned back -- and -- can I lean
22   back? I leaned back and looked out my window, and I
23   saw something, but I wasn't sure what it was. I saw
24   some person. My heart star s racing. It's like, okay,
25   you know, is this CI trying o break into my home

TRICIA WACHSMUTH - October 4, 2010                         Page 106
Direct Examination by Ms. Westby

1    knowing that the Blazer is gone, knowing Bret is gone?
2        So I lean forward just to make sure, you
3    know, get a double-take and I squinted, because I
4    didn't have my glasses on. And as soon as I leaned
5    forward and squinted it was just bam. Throughout my
6    whole house.
7    Q. Okay. Let's talk first about -- was there a
8    knock at the door?
9    A. No.
10   Q. You never heard a knock at the door?
11   A. Never heard a knock at the door.
12   Q. How high was the TV up?
13   A. Not high. It was just me sitting on the
14   couch, not far from the TV. You know, it wasn't at a
15   high volume at all.
16   Q. Did you see one or more people come up the
17   stairs?
18   A. What do you mean? After they busted in or
19   when I looked out the window.
20   Q. No. When you looked out the window?
21   A. When I looked out the window I could only see
22   one. And that's why I squinted closer. And as soon as
23   I squinted closer, made eye contact with the one, it
24   was just boom throughout my whole house.
25        And then they came running in. Police search

TRICIA WACHSMUTH - October 4, 2010                         Page 107
Direct Examination by Ms. Westby

1    warrant, police search warrant. And then a guy came
2    running in and had a gun held at me.
3    Q. Okay. And when you say held at you --
4    A. It was -- I was sitting on the couch, hands
5    up, of course, you know -- because at first I grabbed
6    my cell phone to call 911 because I wasn't sure what
7    was going on. I was thinking I was getting robbed.
8        I grabbed my phone and then the officer was
9    told to take my phone. He took my phone. And I looked
10   up, and that's when I realized it was the cops. And
11   the officer had the gun pointed directly at my head the
12   entire time. I'm sitting there with my hands up.
13   Blanket still on me.
14   Q. What kind of weapon was it?
15   A. A big long one. I just call it a big -- big
16   one.
17   Q. Okay. And your testimony is that he had it
18   pointed at your head?
19   A. Yep.
20   Q. How far away from you was he?
21   A. About from me to you.
22   Q. Do you know which officer that was?
23   A. (Witness shakes head.)
24   Q. Okay. And then what happened?
25   A. Okay. And then I was sitting there on my

TRICIA WACHSMUTH - October 4, 2010                         Page 108
Direct Examination by Ms. Westby

1    couch with my hands up. And they are going around,
2    clear, clear, clear, clear. And then they get to the
3    basement door. And I hear, "Oh, it's unlocked. Get
4    her. She's going first."
5        I said, "Me?" And he said, "Yes, you. Get
6    her. She's going first." And then that's when I stood
7    up, hands up the entire time. And the officer got
8    behind me with his gun. And there's officers -- a few
9    officers lined up here along the -- there's the door to
10   the garage -- basement. And then there's a few
11   officers here. I'm walking by, guns pointed at me the
12   entire time.
13   Q. When you say guns pointed at you, where on
14   your body were they pointed?
15   A. As I was walking by them, the guy behind me
16   had it at my head the entire time. As I was walking by
17   them, I don't know. They were just pointed at me.
18   Q. So show me how the guy has his gun pointed at
19   your head, the one who is walking behind you.
20   A. (Witness complies.)
21        Like that.
22   Q. Okay. Where were the other officers' weapons
23   pointed?
24        THE COURT REPORTER: I'm sorry. I didn't
25   hear you.

Tricia Wachsmuth v.
City of Powell, et al.

Tricia Wachsmuth
October 04, 2010

1  BY MS. WESTBY:
2      Q.  Where were the other officers' weapons
3  pointed?
4      A.  Okay.  As I was walking by them, they were
5  just kind of following me with them.  And then I get to
6  the top of the stairs, kind of went to the side and was
7  told, "Yeah, you're going."  And so I started to go
8  down the stairs.  Officers are following.  And I got
9  really scared.  All these thoughts kept going through
10  my head.  You know, what if I trip?  What if my furnace
11  goes off?  What if I knock something down the stairs?
12  Am I going to get shot?  You know, they are all behind
13  me, you know.
14      And I had my hands up -- because I stopped
15  halfway and put my hands up against the wall.  When I
16  stopped and put my hands up against the wall, they kind
17  of took a step back.  Everybody lifted up their guns.
18  And then the guy -- and then the guy who was on my side
19  right about here, he had his gun, and he had to let go
20  and shift it into one hand and reached for me.  When I
21  had my hands up against the side of the wall, I was --
22  I was froze.  I was scared.  He grabbed me, pulled
23  me -- pushed me away from the wall.  As he pushed me
24  away from the wall, he said to keep going.  And I
25  looked back and saw the officers and guns.  And I just

1  kept going.
2      And then when I got down to the bottom of the
3  stairs, as soon as I had got down to the bottom and
4  stopped, that's when they all came rushing down.  And
5  an officer came and cuffed me.  As he put my cuffs on
6  he told me, he was like, you know, "I'm not going to
7  put these on tight.  Please don't get out of them.
8  You've been cooperative."  And he took me immediately
9  upstairs.  And I had asked to get my shoes on.
10      And he checked my shoes.  He said, "Yeah,
11  we'll do that for you."  He checked my shoes, let me
12  put on my shoes.  And I was shaking so bad that I had
13  to ask for a coat.  And he had an officer grab me one
14  of my coats that was hanging up, so I could get a
15  little warm and quit shaking.
16      And then I was sitting in the cop car.  And
17  as I was sitting in the cop car looking, I could see
18  some officers standing by my couch laughing and
19  talking.  And then another officer has a camera, get
20  ready to take a picture.  And an officer jumps in front
21  of the camera and goes just like that.
22      MS. WESTBY:  Do we need to take a break?
23      MR. GOSMAN:  I think we probably do.
24      THE VIDEOGRAPHER:  We'll go -- we'll go off
25  the record.  The time is 11:15.

1          (Recess taken 11:15 to 11:30
2          a.m., October 4, 2010)
3          (Matt Brilakis and Matt
4          McCaslin are no longer
5          present.)
6      THE VIDEOGRAPHER:  Okay.  We're back on the
7  record.  The time is 11:30.
8  BY MS. WESTBY:
9      Q.  I want to go back through and get some --
10  some more details so that I can make sure that I'm
11  clear about what you're talking about.
12      You testified that as you were walking to the
13  top of the basement stairs, that an officer had a gun
14  pointed at the back of your head, correct?
15      A.  Yep.
16      Q.  If you were in front of him, how do you know
17  that he had the gun pointed at your head?
18      A.  Because when I stood up from the couch, he
19  did that number.  And I stood there, and he was behind
20  me.  I could feel him behind me.  You know, and you
21  know when someone is behind you.
22      Q.  Did you look behind you?
23      A.  When he -- when he first went like that, and
24  I went like that, and he stood behind me with his gun.
25  Shoop, (indicating), however you hold a gun.

1      Q.  So do you know if at any point in time he put
2  it down while he was walking behind you?
3      A.  No.  Because when we were at the -- when I
4  stopped at the bottom of the stairs with my hands up, I
5  looked up --
6      Q.  And I'm talking about -- I'm talking about to
7  the top of the stairs.  From the point in time when you
8  were -- when you got up off the couch to the point in
9  time when you got to the top of the stairs, you said
10  that an officer had a gun pointed at the --
11      A.  Back of my head.
12      Q.  -- back of your head.
13      A.  Yes.
14      Q.  And I'm wondering how you know that if you
15  were walking in front him and he was behind you.
16      A.  Because when I first stood up, I saw him
17  behind me with the gun pointed to my head as I was
18  walking and you could hear his foot -- footsteps behind
19  me walking.
20      Q.  Could you see the gun?
21      A.  After that?  No.  But I know it was pointed
22  at my head.  Because when I was going down the stairs
23  and I stopped halfway down, I looked up, he still had
24  that gun pointed at me.
25      Q.  In fact, I think what you testified to is

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 31 of 78
Tricia Wachsmuth v.                                                          Tricia Wachsmuth
City of Powell, et al.                                                       October 04, 2010

1  that when you stopped halfway on the stairs, he brought
2  the gun back up?
3     A.  Yes.  They were -- they were in a relaxed
4  position.  And then as soon as I stopped, they went
5  like this.
6     Q.  So at some point in time, they put their guns
7  down?
8     A.  From my head.
9     Q.  From your head.  Do you know when that
10 happened?
11    A.  Honestly, I can't for surely say they put
12 them down from my head because they were behind me.
13    Q.  So it could have been from the -- the point
14 in time when you got up and walked in front of them?
15    A.  No.  He was having that gun behind me on my
16 way to the stairs.  I know that because I saw him
17 following me with that gun behind my head.
18    Q.  And then whenever you went down the stairs --
19    A.  For -- for that -- for that period when I was
20 walking down the stairs until I turned -- no, I did not
21 know if they were pointed at my head or not.  But as
22 soon as I stopped and put my hands up, they took a step
23 back and they went from this position up to this
24 position.
25    Q.  So while you were walking down the stairs --

1  or at least at some point --
2     A.  For about a 30-second period, I don't know.
3     Q.  -- they were down, and then they brought them
4  back up; is that correct?
5     A.  While I was down the stairs, yes.
6     Q.  Okay.
7     A.  And then they were held there until I made it
8  to the bottom of the stairs.  I was scared.
9     Q.  Let's talk about how many officers were going
10 down the stairs behind you.
11    A.  I didn't count.  I was too scared to count.
12 A lot.  The stairs were filled.
13    Q.  Are the stairs narrow?
14    A.  Yeah.  I would say narrow, normal basement
15 stairs.
16    Q.  One person can get through at a time?
17    A.  Depending.  Too smaller people can go through
18 down at once.  Like Bret and I can go down through at
19 once.
20    Q.  Did you walk side by side going down the
21 stairs?
22    A.  With an officer, no.  They were -- they
23 were -- one was about right here on my side.
24    Q.  That's not my --
25    A.  But he wasn't on my side.

1     Q.  Listen to my question.  Let me get to the end
2  of -- of my question and then answer -- please answer
3  what I ask you.
4         Did you and Bret walk side by side -- could
5  you --
6     A.  Me and Bret --
7     Q.  -- walk side by side --
8     A.  My husband Bret?
9     Q.  Yes, you and Bret, could you walk side by
10 side going down the basement stairs?
11    A.  We could, yeah.  I'm small.
12    Q.  So is that something that you did on a -- on
13 a regular basis?
14    A.  No.
15        MR. GOSMAN:  Object to the form of the
16 question.
17 BY MS. WESTBY:
18    Q.  Because --
19    A.  I don't understand it.
20 BY MS. WESTBY:
21    Q.  Because basically, it's a stairway that's big
22 enough for one person, correct, so you go single file
23 down the stairs generally?
24    A.  Generally.
25    Q.  Okay.

1     A.  Unless we were playing around.
2     Q.  The -- about at a certain level on the
3  stairs, it's open to the basement, correct, on the --
4     A.  Yeah.
5     Q.  -- left side?
6     A.  It goes like this.  And then you can see.
7     Q.  You can see into the basement?
8     A.  Yeah, after about a quarter of the way down
9  there's, like -- it kind of goes like that.
10    Q.  Okay.
11    A.  You know, and there's the stair like that.
12    Q.  And you knew that no one was downstairs,
13 correct?
14    A.  Honestly, after all this, I started to think
15 that, okay, when I went to the bathroom, maybe somebody
16 snuck in my house and ran down the basement because of
17 how many times they continuously asked me who all was
18 in this house.  And I kept telling them it was just me.
19    Q.  You were not aware of anybody else being in
20 the house?
21    A.  As far as I knew, no.
22    Q.  Okay.  And you said that your concern going
23 down the stairs was that you would fall, correct?
24    A.  I would either trip, hit something, my
25 furnace would go off, and I'd get shot.  And like I

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 32 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                 October 04, 2010

1  said, you never know. And even in my -- even in my
2  thing it states that I had no clue if somebody was down
3  there. You know, my doors were all unlocked. I went
4  to the bathroom. You know, you don't have anything.
5  You know, someone comes in quietly and goes straight to
6  the basement. It was unlocked.
7      Q.  Did you have any indication that anybody,
8  other than you, was in the house before the police
9  arrived?
10     A.  Before the police arrived, no, I thought it
11  was just me.
12     Q.  Okay.
13     A.  But then as they -- after they made me go
14  first, I started to think, you know, what if my furnace
15  goes off? Are they going to shoot me? What if I kick
16  something on the side of the stairs, am I going to get
17  shot? What if there is somebody down there, am I going
18  to get shot? You know, because I knew it wasn't Bret.
19     Q.  Okay. And let's talk about -- let's talk
20  about this stairway. Because the stairway -- at the
21  end of the basement stairs is a wall, correct?
22     A.  Yep. It goes there and then there's a wall,
23  and then a turn off.
24     Q.  Okay. So in between, as you're walking down
25  the -- the stairs, the basement -- the part of the

1  basement that you can see is off to the left; is that
2  accurate?
3      A.  Yes.
4      Q.  In front of you is a wall. There's --
5  there's nothing there. It -- the --
6      A.  A wall.
7      Q.  The stairs and the wall, correct? Is that
8  correct?
9      A.  Yes.
10     Q.  Okay. So the point that you got to before
11  the officers went around you was to that wall, correct?
12     A.  No. They made me walk down into the
13  basement. There's a little -- here's the wall. You
14  get down to the stairs. There's, like, a little
15  walkway entry thing you would call it, cement slab.
16  And then you turn.
17         And as soon as I turned and got right here,
18  that's when they came rushing down. And oh, we got two
19  pot plants. We got a crawl -- a crawl space. We got
20  another crawl space. And at this point, I'm getting
21  arrested. Cuffed, and the officer who cuffed me was
22  really nice. He told me, you know, he let me know, I'm
23  putting these on, you know, loose. So please don't try
24  to get out. You've been very cooperative.
25         And then he brought me immediately upstairs.

1  And I heard my fire alarm going off. My house is
2  filled with smoke. And when I was sitting on the couch
3  with the -- my hands up and the gun pointed at me, I
4  could smell the smoke coming through my house. And I
5  started asking about my dog.
6      Q.  Did you hear the flashbang device?
7      A.  Everything was just a boom throughout my
8  house. From them crashing into the door and the
9  flashbang. It was just a simultaneous, like, boom. I
10  had no idea because when I was sitting on the couch
11  with my hands up, noticed my dog was gone. The officer
12  who was holding me at gunpoint, and I had asked him,
13  "Where is my dog? Where is my dog?" And he -- that's
14  when he told me, "Oh, he jumped out the window." I
15  said, "How did he get out the window?" You know, we
16  have screens on our windows and they were closed. And
17  that's when he said, "Oh, we broke it in."
18     Q.  I want to go back to going down the stairs.
19         From the point in time when you got up off
20  the couch and went downstairs, did any officer grab
21  your arm, put your -- put their hand on your shoulder?
22     A.  Not until I was halfway down the stairs.
23     Q.  And then --
24     A.  Then I was pushed away from the wall. And
25  told to get going.

1      Q.  So that -- and -- and is it possible that the
2  officers wanted to get around you?
3      A.  No. There was no possibility because I was
4  up against that wall. If they wanted around me, they
5  could have went. I'm not a big girl. I was sucked up
6  against that wall like this. I was stuck. I was so
7  scared. I was stuck. And -- and I looked up, and
8  nobody was going down.
9      Q.  At the point in time where you stopped, were
10  your legs or any part of your body exposed --
11     A.  To the --
12     Q.  -- because of the opening to the basement?
13     A.  Yes.
14     Q.  How -- how far -- how far up your body was
15  exposed?
16     A.  I would say probably about from my kneecaps
17  down.
18     Q.  Okay. And did any of the --
19     A.  From my kneecaps down.
20     Q.  Did any of the officers say, you know, keep
21  going, we need to get around you?
22     A.  No.
23     Q.  Do you recall officers saying that?
24     A.  No. The only thing the officers said to me
25  was he shifted his gun over to this side, reached over

TRICIA WACHSMUTH - October 4, 2010                    Page 121
Direct Examination by Ms. Westby

1  and pushed me away from the wall and said, "Keep
2  going."
3      Q.  Did he keep your -- his hand on you or did
4  he --
5      A.  He did -- oh, I can't touch you, can I?  He
6  would keep going.
7      Q.  And then he took his hand off of you and you
8  continued down the stairs?
9      A.  Yeah, all these guns pointed at me, I wasn't
10  going to argue.
11      Q.  Nobody at any point in time had their hand on
12  your shoulder or your arm while you were walking,
13  correct?
14      A.  No.  Just all guns.  You don't argue with
15  guns.
16      Q.  And at least at some point, those guns were
17  pointed down and then were brought up when you stopped
18  on the stairs?
19      A.  They were pointed -- can I use this as a gun?
20         They were pointed in a relaxed position.  You
21  know, not down.  Just in a relaxed position.  And then
22  as soon as I stopped and put my hands up against the
23  wall, they stepped back and lifted up.  It's not a good
24  example because it's shorter.
25      Q.  When they were pointed -- when they were in

TRICIA WACHSMUTH - October 4, 2010                    Page 122
Direct Examination by Ms. Westby

1  the relaxed position, were they pointed to the side?
2      A.  No.  They were pointed at me in the relaxed
3  position.
4      Q.  So they were pointed to the front as opposed
5  to the side?
6      A.  Yes.
7      Q.  What about when you got to the part on the
8  stairs where the -- where it's open to the basement?
9  Were the guns directed --
10      A.  I was too afraid to look back.
11      Q.  -- at that opening.
12         So you don't know where the guns were aimed
13  at that point?
14      A.  After I got to the bottom of the stairs?
15      Q.  No, I'm asking about when you're on the
16  stairs.
17      A.  When I'm on the stairs?  Like I said, when I
18  had my hand up against the wall, I looked back and I
19  saw the guns --
20      Q.  Come up?
21      A.  -- pointing.
22         Yeah, come up and pointing at me.  And then
23  the officer reached over, pushed me away from the wall
24  and said, "Keep going," so I kept going.  And I kept
25  looking forward going.  Just scared.

TRICIA WACHSMUTH - October 4, 2010                    Page 123
Direct Examination by Ms. Westby

1      Q.  Okay.  So at that point for the rest of the
2  way down the stairs, you were facing forward?
3      A.  Yes.  After I came up from the wall.
4      Q.  Okay.
5      A.  I was facing forward.
6      Q.  Okay.
7      A.  And then they all came rushing down.  Once I
8  got down to the bottom, they all came rushing down.
9      Q.  Into the basement?
10      A.  Yeah.
11      Q.  Yeah.  Not directing it at you, going into
12  the basement, correct?
13      A.  Yeah, they ran down into the basement.  I got
14  plants.  I got a crawl space.  And I got another crawl
15  space.  And then an officer came immediately, and he
16  was cuffing me as soon as I was down on the bottom.  An
17  officer came immediately, put me in cuffs, and got me
18  out of that situation.
19      Q.  Okay.  And I want to go back to the
20  conversation that occurred.  Do you know which officer
21  you were having a conversation with about going
22  downstairs?
23      A.  What do you mean?
24      Q.  Do you know who that was?
25      A.  Well, you have to rephrase the question.

TRICIA WACHSMUTH - October 4, 2010                    Page 124
Direct Examination by Ms. Westby

1  What question?
2      Q.  When you were sitting up on the couch and
3  there was a discussion about you going downstairs --
4      A.  There wasn't a discussion.  It was a "Get
5  her; she's going first."  There was no discussion about
6  it.
7      Q.  Do you know which officer said that?
8      A.  I think it was Chretien.
9      Q.  Do you know what he looks like?
10      A.  Possibly, you know, he was all geared up.
11  Maybe if I saw him in all of his gear.
12      Q.  Have you seen him --
13      A.  I try to avoid them as much as possible.
14      Q.  You have to let me finish -- you have to let
15  me finish my question before you answer.
16         Have you seen that officer since this
17  incident took place that you're aware of?
18      A.  It's -- it's hard to tell without the men in
19  their riot gear.  They look different.  They look
20  bigger and bulkier.  He was clean cut.
21      Q.  So would you recognize him if -- if you saw
22  him right now?
23      A.  Maybe.
24      Q.  Do you --
25      A.  Do I have to?

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 34 of 78
Tricia Wachsmuth v.                                    Tricia Wachsmuth
City of Powell, et al.                                 October 04, 2010

1   Q.  Well, I'm just wondering if you --
2   A.  I don't want to look at them if I don't have
3   to look at them.
4   Q.  Okay.  That's fine.  I'm wondering if you've
5   seen him since this happened, that you know of?
6   A.  I don't know.  Like I said, they were all in
7   their riot gear.  I can't tell you what they look like
8   outside of work clothes.
9   Q.  Have you ever seen someone --
10  A.  Who looks like him?
11  Q.  -- since then and though, oh, that's --
12  that's that officer.  Has that ever happened to you?
13  A.  Yes, and I go in the back room.
14  Q.  When did that happen and where was he?
15  A.  It happened a while ago.  I was working at a
16  gas station.  I was working at Sinclair.  And then I
17  know there's an officer, and I do know his name, who
18  liked to come into my store occasionally.  And I would
19  avoid him.  I -- I tried to help him one day, and I
20  couldn't.  So I went into the back room.
21  Q.  But that's not my question.
22      My question is:  The officer, who you say
23  told you to go downstairs.  Have you seen him --
24  A.  I don't know.  You know, without seeing them
25  all in their riot gear again.  It's hard to tell.

1   Q.  Okay.
2   A.  It's over a year.  People change.  And unless
3   I get to see them in all of their riot gear and ready
4   to go.  You know, I can describe them to you.
5   Q.  But you don't -- do you -- can you tell me of
6   any time when you've seen him in the -- since this
7   happened?
8   A.  Honestly, I cannot tell you that because I do
9   not know.  So I can't answer that with a yes or a no.
10  Q.  And that's fine.
11      Tell me about -- as close to the exact
12  wording as you can get, I want to know the conversation
13  that took place, the words that were said about you
14  going downstairs and recall them.
15  A.  Get her.  She's going first.  And I said,
16  "Me?"  And he said, "Yes, you.  Get her."
17  Q.  I believe at some point in time you told me
18  that you were asked over and over again about if there
19  was anybody downstairs?
20  A.  Yes.  And that was when they first busted
21  into the house before they made it to the basement.
22  Q.  Okay.  I want to start from the very
23  beginning.  You tell me any -- anything that any of the
24  officers said to you, every -- every word --
25  A.  Police search warrant, police search warrant,

1   anybody else in the home?  Anybody else here?  And I
2   said, "No.  No."  Is anybody else here?  I said, "No,
3   it's just me and my dog."  And ...
4   Q.  And were you being truthful when you said
5   that?
6   A.  Yeah, it was just me and my Chihuahua.
7   Q.  And that was -- that was what you believed to
8   be the truth?
9   A.  That was the truth, yes.
10  Q.  Okay.  Okay.  Go ahead.  So tell me the
11  conversations that you recall.
12  A.  And then as I was sitting on the couch with
13  my hands up, I had asked where my dog was because I
14  didn't see him.  And the officer holding the gun on me
15  had told me he jumped out the window.  I said, "My
16  window?  How did he get out my window?"  Oh, we broke
17  it.  Why did you break my window?  And then he didn't
18  respond after that.
19  Q.  Okay.  And -- and continue.  Continue telling
20  me the conversation.
21  A.  That was the conversation with him.
22  Q.  Okay.  And --
23  A.  And then I was sitting on the couch and then
24  I was told to, you know, get her, she's -- you know,
25  get to the basement door.  Oh, it's unlocked.  Get her,

1   she's going first.  And I said, "Me?"  And he said,
2   "Yes, you.  Get her.  She's going first."  And I sit up
3   with my hands up.  An officer went like that for me to
4   get in front of him.  I got in front of him.  And he
5   had his gun up the entire time.  And I got in front of
6   him.  And he walked behind me until I got to the --
7   sorry -- until I got to the basement door.
8       And then once I got to the basement door, I
9   was told to get going.  And I started going down the
10  stairs.  And that's when I got scared halfway down, all
11  these thoughts just went through my mind, like, so many
12  and so at once.
13      And I had my hands still up against the wall
14  as far as I could go up against the wall.  And when I
15  did that, when I first stopped and put my hands up
16  against the wall, the officers jumped back.  I just
17  started getting other thoughts going into my mind, you
18  know, like who could be down there if they're jumping
19  back, you know.
20  Q.  Was it a -- was it a possibility that they
21  were concerned that you were stopping, that that
22  indicated to them that there might be something of
23  concern down in the basement?
24  A.  I don't know how they felt or what was going
25  through their mind.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 35 of 78
Tricia Wachsmuth v.                                                                    Tricia Wachsmuth
City of Powell, et al.                                                                   October 04, 2010

1   Q.  Would that -- would that be a reasonable fear
2   for them?
3   A.  Honestly, I don't want to answer that.
4         MR. GOSMAN: Object to the form.
5         THE WITNESS: Because I don't know.
6   BY MS. WESTBY:
7   Q.  Okay.
8   A.  I don't know how they feel.  I don't know how
9   certain people handle fear in situations.
10  Q.  And you can sit down.
11  A.  And I don't want to answer questions for
12  them.
13  Q.  Okay.
14  A.  Because I don't know.  Everybody has their
15  own feelings.  Everybody handles things in different
16  situations.
17  Q.  Is that -- have we discussed all of the
18  conversations with officers that you can recall?
19  A.  I had a -- a conversation with Officer Brown
20  when I was taken in.
21  Q.  And I should have been --
22  A.  I don't know if he's an officer.
23  Q.  I should have been more specific.  While the
24  police were in your house, any other conversations that
25  you can recall?

1   A.  Honestly, in all their gear, they looked
2   pretty similar.
3   Q.  No.  Was the officer --
4   A.  Oh, when he did that?  He was outside when he
5   did that.
6   Q.  -- who was supposedly making that --
7         THE COURT REPORTER: One at a time, please.
8         MS. WESTBY: Sorry.
9         THE COURT REPORTER: Honestly, in all their
10  gear they looked similar is the last one I have.
11  BY MS. WESTBY:
12  Q.  Okay.  Was the officer who was supposedly
13  making that -- that -- doing that?
14  A.  Gesture?  That was outside.
15  Q.  -- sign -- and then -- you have -- you have
16  to wait until I get all the way through my question
17  before you answer.
18        Was that officer making that sign inside or
19  outside of the house?
20  A.  Outside.
21  Q.  In front of --
22  A.  In front of the front door.
23  Q.  -- in front of the front of your house?
24  A.  Yes.
25  Q.  Okay.  Did you see a flashbulb go off?

1   A.  Um, when they were bringing me out of the
2   house in cuffs, a car had pulled up across the street,
3   a red car, maroon-ish colored car.  And the guy kept
4   asking me, "Who is that?"  said, "I don't know."
5   He's like, "Who is that?" I said, "I don't know."
6   He's like, "We need to know.  Who is that?"  I said, "I
7   don't know who it is."  And all of the sudden, "Oh,
8   nevermind.  I do."  And then they put me in the car.
9   Q.  Okay.  Let's talk about this picture that you
10  testified to before.  You're sitting in the car --
11  A.  Watching.
12  Q.  What are you watching?
13  A.  Well, I looked inside my house because the
14  door was busted open, so I could see straight in.  And
15  there was a couple of officers in my living room
16  laughing and smiling.  You know, I have no idea what
17  they're talking about.
18        And then an officer started taking pictures
19  of the house.  And another officer jumped in on the
20  first picture taken, jumps up and goes (indicating.)
21  Sorry.  Like this.  And then falls back.
22  Q.  Was the officer --
23  A.  Like a rock and roll sign.
24  Q.  -- who supposedly did that, was he inside the
25  house or outside the house?

1   A.  Everything happened quick.  When -- when they
2   busted in the door, I was scared.  I didn't know who it
3   was.  Everything happened so quick.  All I know is
4   there was smoke in my house as I was going to the
5   basement.  I was getting led to the basement.
6   Q.  And please again, listen to my question.  My
7   question is very specific.
8         You're telling me about a picture that's
9   being taken while you're sitting in the car?
10  A.  Yes.
11  Q.  I'm asking you, if when that event occurs, a
12  flashbulb -- you see a flashbulb?
13  A.  Oh, from the camera?
14  Q.  Yes.
15  A.  Yes.
16  Q.  You did see one?
17  A.  Yes.
18  Q.  Have you seen the pictures that were taken of
19  your house in this search?
20  A.  Yes.
21  Q.  Did you see a picture that represents what
22  you saw?
23  A.  No.  But there's also other things pertaining
24  to that.
25        MR. GOSMAN: We'll talk about that in -- in

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 36 of 78
Tricia Wachsmuth v.                                           Tricia Wachsmuth
City of Powell, et al.                                        October 04, 2010

1  due time.
2  BY MS. WESTBY:
3  Q. No, go ahead and tell me.
4  A. No.
5  Q. What other things are you?
6  A. My --
7  Q. And I'm asking you, what other things --
8  A. And I'm advising you by lawyer right now.
9  MR. GOSMAN: What she knows is based on
10 conversations she's had with me beyond what she's
11 testified.
12 BY MS. WESTBY:
13 Q. Is this something that you plan on testifying
14 about in this case?
15 MR. GOSMAN: You can answer that.
16 THE WITNESS: That was to me?
17 MR. GOSMAN: Yes.
18 THE WITNESS: Okay.
19 MR. GOSMAN: The question was to you. Do you
20 plan on testifying about the officers in the pictures,
21 I assume.
22 BY MS. WESTBY:
23 Q. What -- what -- whatever it is that this
24 discussion is about.
25 A. Yes.

1  Q. Okay. Then you need to tell me. This is my
2  opportunity to find out --
3  MR. GOSMAN: No, she doesn't need to tell you
4  anything that she learned from me in communications
5  with her attorney.
6  MS. WESTBY: If she's going to be testifying
7  about it in this trial.
8  MR. GOSMAN: Well, she is not. She's --
9  she's testified, Counsel. Come on.
10 MS. WESTBY: So this is the -- this is the
11 total -- sum total of her information and what she's
12 going to be testifying about in that regard?
13 MR. GOSMAN: Why don't you ask her that.
14 BY MS. WESTBY:
15 Q. Is this the sum total of your testimony, what
16 you're going to be claiming about what -- what -- what
17 happened when the officers were taking pictures or
18 whatever --
19 MR. GOSMAN: Answer that to the best of your
20 knowledge.
21 THE WITNESS: Yes
22 BY MS. WESTBY:
23 Q. Because if there's something that you've
24 learned about from your attorney, but that you were
25 going to be testifying about or claiming against these

1  officers, I have the right to learn that --
2  A. And that's something you can learn from my
3  attorney.
4  Q. Yeah. I can't.
5  MR. GOSMAN: All right. Let's move on.
6  We're not going to argue about attorney-client
7  privilege here.
8  BY MS. WESTBY:
9  Q. Then I -- then by your silence in this
10 regard, I am assuming that there's no other information
11 that you have that you will be testifying about or
12 claiming in this case?
13 MR. GOSMAN: Go ahead and answer the
14 question. That's fine.
15 THE WITNESS: I don't know. I don't
16 understand the question. And I don't want to not be
17 able to ...
18 MR. GOSMAN: Okay.
19 BY MS. WESTBY:
20 Q. Is there something that you've learned from
21 your attorney that you're planning on claiming against
22 these officers, testifying about against these officers
23 at trial?
24 MR. GOSMAN: You know what? This has gone on
25 just far enough. Now, you understand attorney-client

1  privilege, I assume.
2  MS. WESTBY: And I'm not asking --
3  MR. GOSMAN: Yes, you are.
4  MS. WESTBY: -- about attorney-client
5  privilege. My question was very specific.
6  MR. GOSMAN: Yes, it was indeed. You want to
7  know what -- what I spoke to my client about in terms
8  of -- of evidence in this case.
9  MS. WESTBY: It's a yes or no answer.
10 MR. GOSMAN: No, it wasn't a yes or no
11 answer.
12 MS. WESTBY: It's a yes or no answer.
13 MR. GOSMAN: You wanted to know what she --
14 what she was told.
15 THE WITNESS: That's something I cannot
16 answer without a yes or no. So I would decline to
17 answer that until further --
18 MS. WESTBY: We can have the -- the question
19 read back.
20 THE WITNESS: -- counsel with my attorney.
21 MR. GOSMAN: We can just end this discussion.
22 I'm instructing my client not to respond to any
23 questions that invade attorney-client privilege.
24 MS. WESTBY: Would you please read the
25 question back. It is a yes or no answer.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 37 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                 October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                          Page 137
Direct Examination by Ms. Westby

1   THE WITNESS: Okay. How's this? I cannot
2   answer that without a yes or a no, so I would like to
3   talk to my attorney before I co address that matter any
4   further.
5   MR. GOSMAN: I don't have a problem with
6   that. Let's read the question, though. I -- I want to
7   hear what it said.
8   (The record was read as
9   requested.)
10  MR. GOSMAN: Go ahead and answer that
11  question yes.
12  THE WITNESS: Yes.
13  MS. WESTBY: Then we have the right to
14  discover that.
15  MR. GOSMAN: Okay. Well, get after it.
16  BY MS. WESTBY:
17  Q.   What is that? What is it? What is it that
18  you plan to claim against these officers that you've
19  learned from your attorney?
20  MR. GOSMAN: She s -- listen, if she's
21  learned it from her attorney, she doesn't have to
22  testify about it. If she's learned it from someone
23  else, then she does. Now, you know that.
24  MS. WESTBY: If something that you're going
25  to use --

TRICIA WACHSMUTH - October 4, 2010                          Page 138
Direct Examination by Ms. Westby

1   MR. GOSMAN: I'm instructing her not to
2   answer any further questions on this subject, because
3   she's already made clear that what she knows, she knows
4   from her attorney.
5   MS. WESTBY: Then we will argue that you did
6   not allow us to discover it and you --
7   MR. GOSMAN: Just go right ahead and do that.
8   MS. WESTBY: -- won't be able to testify
9   about it at trial. And that's your --
10  MR. THOMPSON: And -- yeah -- and -- and I
11  would, for the record, Counsel, I believe if there's
12  evidence out there, whatever source it comes from. If
13  she's going to use it at trial, that's not invading the
14  attorney-client privilege. There's a right at a
15  discovery deposition to find out what that is. And we
16  can -- you know, we can address it with the magistrate
17  and leave the deposition open.
18  MS. WESTBY: Or, you know what? I guess my
19  take on it is that -- that we'l just keep you from
20  testifying about it at trial.
21  MR. GOSMAN: Well, go -- you can do whatever
22  you want to do.
23  MS. WESTBY: If you're not -- if you're not
24  allowing us to learn that information through the
25  discovery process, which is where we're supposed to

TRICIA WACHSMUTH - October 4, 2010                          Page 139
Direct Examination by Ms. Westby

1   learn this information, then you're not allowed to
2   bring it up at trial.
3   MR. GOSMAN: Yeah. Well ...
4   MR. THOMPSON: It has nothing to do with the
5   attorney-client privilege.
6   MR. GOSMAN: It has everything to do with it.
7   It has to do with my conversations with my client about
8   the evidence of the case.
9   MR. THOMPSON: But if -- but if there's --
10  Counsel, if there's evidence that is going to be used
11  at trial that has not been disclosed, we have a right
12  in a discovery deposition to determine what that
13  evidence is. And that's the simple question. It has
14  nothing to do with what did Mr. Gosman tell you. It's
15  what is the evidence that you're going to use against
16  these police officers at trial?
17  MS. WESTBY: That's the underlying
18  information.
19  MR. THOMPSON: That's the question. It has
20  nothing to do with the conversation that she had with
21  you. It's what is the evidence?
22  MR. GOSMAN: It's too fine a point for me.
23  To me, it's just -- it's just straightforward
24  attorney-client privilege. And I'm instructing my
25  client to not answer.

TRICIA WACHSMUTH - October 4, 2010                          Page 140
Direct Examination by Ms. Westby

1   MR. THOMPSON: Okay.
2   MR. GOSMAN: There may be other ways for you
3   to discover this information. And I'll leave it at
4   that.
5   MS. WESTBY: Well, this is -- this is a
6   direct request for it. So we'll have this on the
7   record. And -- and we'll do what we need to do at
8   trial.
9   MR. GOSMAN: That's fine.
10  MS. WESTBY: Or you can provide the
11  information, if that's the way that you feel is
12  appropriate. But either it has to be provided or it
13  can't be used.
14  MR. GOSMAN: You want to send me an
15  interrogatory?
16  MR. THOMPSON: Well, it's not an
17  interrogatory. It's to the extent that this question
18  has been directed by you not to be answered. One, I
19  think the option is to strike it at trial. Two, to
20  leave the deposition open.
21  MR. GOSMAN: Well, I'm not opposed to your
22  leaving the deposition open if you want to get
23  clarification on the issue. I am not going to have my
24  client talk -- talking about our conversations.
25  MR. THOMPSON: It's not your conversation --

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 38 of 78
Tricia Wachsmuth v.                                                                    Tricia Wachsmuth
City of Powell, et al.                                                                 October 04, 2010

1  MR. GOSMAN: Privacy of my attorney-client
2  privilege.
3  MR. THOMPSON: It's not your conversation.
4  MR. GOSMAN: It is my conversation.
5  MR. THOMPSON: No.
6  MR. GOSMAN: I didn't say anyone else's name.
7  She hasn't mentioned anyone else's name. There's no
8  other information here that -- that has a source
9  attached to it. Other than -- than my conversations
10  with her about the case.
11  MR. THOMPSON: The question isn't what
12  Mr. Gosman said. It's what is the evidence that you're
13  going to use against our clients at trial. Simple
14  question.
15  MR. GOSMAN: She doesn't know it. She
16  doesn't know the answer except through me.
17  MR. THOMPSON: Okay.
18  THE WITNESS: That's why I looked at him.
19  MR. THOMPSON: Let's -- let's just move on.
20  We'll address it with Magistrate Beaman.
21  MS. WESTBY: Yeah.
22  BY MS. WESTBY:
23  Q. So you're in the -- the vehicle. You see
24  this picture being taken. Does anything else happen
25  while you're still at the -- the house, while you're

1  out in the squad car?
2  A. I saw a guy with a flashlight down the street
3  looking probably for my dog because he was aiming it
4  low, but that's about it.
5  Q. Did you find the dog?
6  A. My brother-in-law took off work and found my
7  dog.
8  Q. Okay. You're not claiming that anybody
9  physically touched you and hurt you in this --
10  A. I was physically touched when I was pushed
11  towards the stairs.
12  Q. Okay. I will rephrase that.
13  You're not claiming that you were physically
14  injured in this --
15  A. Physically, no.
16  Q. Okay. Other than the fears that you have
17  talked about when you were going downstairs, any other
18  injury or damage that you claim occurred as a result of
19  this incident?
20  A. Mental.
21  THE COURT REPORTER: I'm sorry?
22  THE WITNESS: Mental anguish.
23  BY MS. WESTBY:
24  Q. And how -- why did you suffer mental anguish?
25  A. 'Cause I suffer panic attacks and mild

1  anxiety attacks. After this happened, I tried to go
2  into my house, and I couldn't. And I went back to Tom
3  and Donna's, and I thought I was going to die. And I
4  was getting ready to have my husband bring me into the
5  emergency room because I thought I was going to die.
6  Q. And I'm talking about at the house during
7  this incident, what happened? What were you concerned
8  about? What were you afraid of?
9  A. My husband. When I was in the squad car or
10  during the whole thing?
11  Q. Well, let's start with while you were in the
12  house.
13  A. While I was in the house. I was concerned
14  with being shot and killed.
15  Q. Were you concerned --
16  A. Nobody could hear me scream if I was in the
17  basement. There's no windows and only one exit.
18  Q. Were you concerned about getting caught doing
19  something illegal?
20  A. No.
21  Q. That wasn't -- that wasn't a concern for you?
22  A. Well, I mean, obviously I know it was
23  illegal. You know, and it was a misdemeanor. And I
24  know that. You know. But honestly, with all those
25  guns pointed at me and everything that was happening, I

1  was concerned for my life. I could not think of
2  anything else but my life.
3  Q. So it never -- is it your --
4  A. After the fact it came to me, but beforehand,
5  no. All I could think about was my life. And -- and
6  am I going to die tonight?
7  Q. Is it your testimony that when the -- when
8  the police came into the house, that you were not
9  upset -- not -- not concerned that you were getting
10  caught doing something illegal?
11  A. It's not that I wasn't upset. I mean, you
12  know, I got caught. I took my responsibility. I took
13  the responsibility for what I got caught with. I did
14  my time. I'm not saying what I did was right. It
15  wasn't right. It is illegal in this state. And I know
16  that. And I did my time for it.
17  Q. So you -- in addition to that, you were
18  concerned because the officers had weapons, correct?
19  A. Yes.
20  Q. Okay.
21  A. I was concerned for my life.
22  Q. Okay.
23  A. My safety. I mean, my house was on fire. I
24  had guns pointed at me. I didn't know who was waiting
25  for me downstairs. There's no windows downstairs.

TRICIA WACHSMUTH - October 4, 2010                    Page 145
Direct Examination by Ms. Westby

1   Nobody could hear me scream if they did -- if the
2   furnace popped off and one of the cops shot, and there
3   I am falling down the stairs dead because I have a
4   bullet in the back of my head because they weren't
5   paying attention, and they got scared. So they took it
6   out on me because I'm the only one in front of all
7   these officers.
8   Q. So did you get shot?
9   A. Thank God, no.
10       MR. GOSMAN: That question is argumentative
11  and foolish.
12  BY MS. WESTBY:
13  Q. Did you -- were you injured in any physical
14  way?
15       MR. GOSMAN: You've already asked her that
16  question a couple of times.
17  BY MS. WESTBY:
18  Q. Were you injured in any physical way?
19  A. No.
20  Q. Let's talk about what the officers found when
21  they were -- and -- and I guess the reason that I'm
22  cutting it off at going out to the car is it's my
23  understanding that your claims stem from the time that
24  the officers are in the house, what happens as a result
25  of the execution of the search warrant.

TRICIA WACHSMUTH - October 4, 2010                    Page 146
Direct Examination by Ms. Westby

1        Is there anything else, after you're taken
2   out of the house, that forms basis of your claim
3   against these officers?
4   A. After I was taken out of the house?
5   Q. Yes.
6   A. I was placed into the cop car. And the cop
7   who drove me there was very nice. And until you're
8   ready to get into what happened with Brown, that's it.
9   Q. Okay. What happened with Brown?
10  A. Going to Brown, he reads me my rights.
11  Q. And this is at the station?
12  A. At the station. He reads me my rights. And
13  he asked me if I understood them. I said, "Yes. I'm
14  choosing to remain silent, and I want to talk to my
15  attorney and my husband."
16       And then he got mad. And he started to ask
17  me questions on where my husband was. And I just sat
18  there silent. I was using my right to remain silent.
19  And then he kept asking me again, it's like I want to
20  talk to my attorney and my husband before I answer any
21  questions. I want to talk to my attorney and my
22  husband.
23       And then he stands up, and he does,
24  (indicating) "You have to tell me where your husband
25  is." And after he did that, I got very scared and

TRICIA WACHSMUTH - October 4, 2010                    Page 147
Direct Examination by Ms. Westby

1   started thinking about what they were going to do when
2   my husband came home. How they were going to treat
3   him, if they were going to beat the crap out of him,
4   let alone shoot him. I started worrying for my
5   husband.
6        And then he did it again. He's like, "You
7   have to tell me where your husband is and what his
8   phone number is. You have to tell me."
9        And as all these thoughts are going through
10  my mind on what they were going to do to my husband,
11  that's when I told him. He's at his father's house.
12  His phone number is 302-1321. But I thought -- he told
13  me I had no choice. I had to tell him where my husband
14  was. So I did in fear for my husband's life.
15  Q. Was it a concern to you that Bret was at his
16  father's house, that he was going to -- that the
17  police --
18  A. I would rather them arrest him at his
19  father's house than have him go home and end up in the
20  hospital.
21  Q. Was Bret injured as a result of being
22  arrested for -- in this incident?
23  A. Because he was at his parents's house, I feel
24  that because he was at his parents's house, no, he was
25  not.

TRICIA WACHSMUTH - October 4, 2010                    Page 148
Direct Examination by Ms. Westby

1   Q. Okay. So the answer -- answer is: No, he
2   was not injured, correct?
3   A. Correct.
4   Q. And the conversation with Officer Brown does
5   not form the basis of the claim in this case as your
6   complaint is written. Do you -- is this something that
7   you plan to amend to make a claim about?
8        MR. GOSMAN: You know, you don't need to --
9   first of all, you've -- you've started with an
10  assumption that the complaint says something. And she
11  hasn't even had a chance to --
12       MS. WESTBY: Is this an objection as to form?
13       MR. GOSMAN: Yes, it is.
14  BY MS. WESTBY:
15  Q. And go ahead -- go ahead and answer.
16       MR. GOSMAN: There's no way she can answer
17  that question.
18       MS. WESTBY: Again, is this an objection as
19  to form? Mr. Gosman, I would appreciate it if you
20  would limit yourself to the objections that you are
21  entitled to make.
22       MR. GOSMAN: Very well.
23  BY MS. WESTBY:
24  Q. And you can go ahead and answer the question.
25       MR. GOSMAN: Go ahead.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 40 of 78
Tricia Wachsmuth v.                                                                    Tricia Wachsmuth
City of Powell, et al.                                                                  October 04, 2010

1   THE WITNESS: What was the question?
2   BY MS. WESTBY:
3   Q.  That there is not a specific claim in this
4   case about Officer Brown trying to get you to tell him
5   where your husband is?
6   A.  I don't know.  A lot of my stuff has been
7   through my attorney.
8   Q.  Okay.  Let's talk about what the officers
9   found when they were at your house.  And I'm just going
10  straight out of the -- the search warrant and the
11  documents that go along with the search warrant.
12      There was a semiautomatic pistol in the
13  hallway, correct?
14  A.  Huh?  It was a .22.
15      MR. GOSMAN: Well, now, wait a minute.  There
16  was a .22 caliber pistol in the hallway.  I want you to
17  think about these questions
18      THE WITNESS: It wasn't in the hallway.  It
19  was in the living room on the bookshelf.  We didn't
20  really have a hallway.
21  BY MS. WESTBY:
22  Q.  Okay.
23  A.  It's a small house.
24  Q.  All right.  I'm going to have you draw a
25  quick diagram of the top floor of the house.

1   A.  (Witness complies.)
2       It's not going to be perfect.  I'm trying.
3   I'm not a good artist.
4   Q.  That's fine.
5       Okay.  Where are the bookshelves that you
6   were --
7   A.  The bookshelf.  Here's our TV stand.  Here is
8   our bookshelf.  And this is our living room.  And this
9   is our kitchen.  And there's, like, a little design
10  wood thing there.  And then here's our bedroom and our
11  bathroom.  And there is just a lit teeny space right
12  here, which is right before you went into the bedroom
13  door.  So like I said, we had no hallway.
14  Q.  Okay.
15  A.  It was pretty much a flat lay.
16      MS. WESTBY: And I guess we'll go ahead and
17  mark this as Exhibit 1.
18      THE WITNESS: If you want, I can redraw it a
19  little better.
20      (Exhibit 1 marked)
21  BY MS. WESTBY:
22  Q.  So the -- the gun, as you remember it, was
23  sitting on -- was sitting on the bookshelf?
24  A.  In the bookshelf, yeah, on top of some books.
25  Q.  Okay.  There were two loaded --

1   A.  There was only one on the bookshelf.
2   Q.  And again, this is why it's so important for
3   you to let me finish the -- the question before you
4   answer.
5       Were there two loaded revolvers in the
6   bedroom?  One lying on the bed, the other one on the --
7   A.  None of them laying on the bed, that I know
8   of.  Like I said, those questions you have to ask Bret.
9   The only gun -- because I wasn't in the bedroom.  You
10  know, the only gun I knew of that he had put there
11  before he left was for my safety in case the CI had
12  decided to try something, noticing Bret was gone.
13  Q.  There -- you were aware of other guns in the
14  bedroom, you just don't know if they were loaded; is
15  that fair?
16  A.  Yeah.
17  Q.  Okay.  There was also an unloaded 9mm
18  semiautomatic pistol in the nightstand; is that
19  accurate?
20  A.  Oh, okay.  Yeah, could be.
21  Q.  Okay.  Again, things that we may want to ask
22  Bret about?
23  A.  Yeah.
24  Q.  Okay.  There were two marijuana plants in the
25  basement, correct?

1   A.  Correct.
2   Q.  Okay.  The area where these were located was
3   painted white; I think we discussed that, correct?
4   A.  Yes.
5   Q.  Okay.  There were light -- there was light on
6   the plants, fans, and timers in the room, correct?
7   A.  Uh-huh.
8   Q.  Is that a "yes"?
9   A.  Sorry.  Yes.
10  Q.  Okay.  There was loose marijuana on the
11  coffee table in the living room, correct?
12  A.  Yeah.
13  Q.  Okay.  Why do you laugh about that?
14  A.  Huh?
15  Q.  Why do you laugh about that?
16  A.  Because I found it under the couch that day.
17  So it was just kind of funny that it ended up there
18  because I was -- yeah.  I found it under the couch and
19  just kind of threw it up there.
20  Q.  Okay.  There were pill bottles containing
21  pills and marijuana residue in the house, correct?
22  A.  I know about the pills.
23  Q.  Do you know if there were pill bottles with
24  marijuana residue in them?
25  A.  No.

TRICIA WACHSMUTH - October 4, 2010                    Page 153
Direct Examination by Ms. Westby

1   Q.  Did you keep marijuana in pill bottles?
2   A.  No.
3   Q.  Never?
4   A.  No. I had a little orange container.
5   Q.  A little orange container?
6   A.  Yeah.
7   Q.  Did it look like a pill bottle?
8   A.  I guess you could consider it. I mean, it
9   was a matchbook holder.
10  Q.  Okay.
11  A.  So it would -- you know, it's the shape of a
12  pill bottle. But it's just orange.
13  Q.  Okay. And is that what you kept your
14  marijuana in?
15  A.  Yep.
16  Q.  The loose marijuana?
17  A.  Yeah.
18  Q.  They found a teddy bear with the back seam
19  ripped open, correct?
20  A.  Yeah.
21  Q.  And they found shipping boxes with stuffed
22  animals with the seams ripped open, correct?
23  A.  Correct.
24  Q.  They found cocaine?
25  A.  No.

TRICIA WACHSMUTH - October 4, 2010                    Page 154
Direct Examination by Ms. Westby

1   Q.  It's your understanding that they didn't find
2   cocaine?
3   A.  No, there was no cocaine in my house.
4   Q.  And you're sure of that?
5   A.  I am absolutely positive.
6   Q.  Okay. They also seized your computer hard
7   drive?
8   A.  Yeah.
9   Q.  And that was eventually sent for forensic
10  evaluation for child pornography -- pornography,
11  correct?
12  A.  Correct.
13  Q.  Have you seen a picture of Bret or Bret and
14  his brother in gear -- in riot gear holding assault
15  weapons?
16  A.  Have I seen the picture?
17  Q.  Uh-huh.
18  A.  No. I haven't really seen many pictures of
19  him when he was younger.
20  Q.  And I'm not talking about when he was
21  younger. I'm talking about fairly recently?
22  A.  I haven't seen the pictures.
23  Q.  Do you have a MySpace page?
24  A.  I don't, no.
25  Q.  Does Bret?

TRICIA WACHSMUTH - October 4, 2010                    Page 155
Direct Examination by Ms. Westby

1   A.  Actually, he did just set up a MySpace page.
2   Q.  MySpace or Facebook?
3   A.  Face -- we both have Facebook.
4   Q.  Okay. And are you aware of any picture like
5   that that was placed on Bret's Facebook or -- or
6   MySpace page?
7   A.  Not that I know of. I don't go through his
8   stuff. I'm a respectful wife.
9   Q.  So it's your testimony that you've never seen
10  anything like that?
11  A.  No, I don't go through his Facebook.
12  Q.  Okay. What about his brother's page?
13  A.  I don't go through his either.
14  Q.  But are you there -- are you friends on
15  Facebook?
16  A.  Yeah. Yeah, I go on occasionally. But not
17  very often. When I do it's to play games. Not to look
18  at people.
19  Q.  So you've never looked at pictures on
20  anybody -- on any of your friends on Facebook?
21  A.  The only pictures I've ever looked at on
22  Facebook was my niece.
23  Q.  Okay.
24  A.  Everything else I just kind of skip over.
25  Oh, and a friend's wedding. I did look at their

TRICIA WACHSMUTH - October 4, 2010                    Page 156
Direct Examination by Ms. Westby

1   wedding photos.
2   Q.  Have you ever seen Bret put on any of Tom's
3   DCI gear?
4   A.  No.
5   Q.  Never?
6   A.  Not his DCI gear, no.
7   Q.  What about something that looks like riot
8   gear?
9   A.  No, he's got a bulletproof vest. I've never
10  seen him wear it, but he does have a bulletproof vest.
11  Q.  Bret does?
12  A.  Yeah.
13  Q.  Why does he have that?
14  A.  Why are you asking me questions? I have no
15  idea. I don't -- my husband's life is his life. You
16  would have to ask him these questions. I'm not a nosy
17  wife. He loves me, that's good for me.
18  Q.  How do you know that he has that?
19  A.  Has that? 'Cause it's hanging up in the
20  closet.
21  Q.  The first time that you saw it, did you say
22  to him, "Hey, why do you have a bulletproof vest?"
23  A.  No, he hunts, you know. He does all sorts of
24  things. I -- it's not a question I really ever thought
25  to ask.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 42 of 78
Tricia Wachsmuth v.                                                                              Tricia Wachsmuth
City of Powell, et al.                                                                           October 04, 2010

1   Q.  Do you know if it's --
2   A.  I'm not nosy.
3   Q.  Do you know if it's his or if it's Tom's?
4   A.  No, I don't know.
5   Q.  Do you know if Tom ever gave him a
6   bulletproof vest?
7   A.  I don't know.
8   Q.  Okay.  When you both were arrested, Bret
9   listed the medications that he was prescribed.  And two
10  of those were Hydrocodone and Oxy -- Oxycontin.
11  A.  The Razapan.
12  Q.  And I'm just asking you about Hydrocodone and
13  Oxycontin.  Do you -- and this is my question:  Do you
14  know why he was taking those prescriptions?
15  A.  Because he has chronic back pain.
16  Q.  Okay.  What is the back pain from?
17  A.  We are figuring that out.  The one physical
18  therapist that he had seen is saying that half of his
19  spine, his lower spine does not move.  So when he moves
20  and bends, it does not move with him.  And in 2008, he
21  had a bulged disk in his back.
22  Q.  How long has he been prescribed those
23  medications?
24  A.  You'd have to ask him.
25  Q.  But I'm asking you.

1   A.  And I'm telling you, you have to ask him.
2   He's -- I'm Tricia.  He is Bret.
3   Q.  And my question to you is:  As his wife, do
4   you know how long he's been aking those medications?
5       MR. GOSMAN:  And I want you to go ahead
6   and -- and try to cooperate with counsel.  Those are
7   fair questions, Tricia.
8       THE WITNESS:  They are, but I don't know.
9       MR. GOSMAN:  Well, then say I don't know.
10      THE WITNESS:  I don't know.  I'm not a nosy,
11  snoopy wife.  If he wants to tell me something, he
12  tells me.
13  BY MS. WESTBY:
14  Q.  We've talked about the -- what your fears
15  were while this was happening.  My question to you now
16  is:  I want to know what damages you're claiming as a
17  result of this incident.  And -- and specifically what
18  I'm looking for is what symptoms you are suffering from
19  that you claim were caused by this incident?
20  A.  I have to say it out loud, huh?  I have
21  nightmares, severe nightmares.  I suffer from panic
22  attacks, anxiety attacks.  And that's panic, anxiety,
23  and nightmares, bad nightmares.  That's why I'm trying
24  to get them all under control and make them go away.
25  Q.  Okay.  Is that -- that the --

1   A.  That's the therapist.
2   Q.  All of the symptoms?
3   A.  Yeah.  You know.
4   Q.  Okay.
5   A.  Just pretty much fear.  You know, it's what
6   my doctors brought it down to is it's fear.
7   Q.  And you're going to have to speak up a little
8   bit.
9   A.  It's fear.
10  Q.  Okay.  So this --
11  A.  I have several triggers to it.  Lots of
12  triggers to the anxiety and panic attacks.  I've had to
13  miss work due to them.  I've had to go to the ER due to
14  them.  I'm up all hours of the night because I have a
15  bad dream and I can't get back to sleep.  And the
16  nightmares are not just nightmares.  They are vivid
17  nightmares.  It's like I'm there reliving it.
18  Q.  Any other symptoms, other than nightmares,
19  panic attacks, anxiety attacks?  That's -- that's --
20  that's a complete list?
21  A.  (Witness nods head.)
22  Q.  Yes?
23  A.  Yes.
24  Q.  Okay.  And I think that -- well, I want to --
25  if you can tell me, who prescribed -- you were on

1   Lexapro prior to this incident, correct?  Or -- no,
2   Zoloft?
3   A.  Right.  Zoloft, yeah.
4   Q.  Who prescribed Zoloft to you?
5   A.  I can give you two doctor's names because I'm
6   not sure which one prescribed me the Zoloft.  I think
7   it was Dr. Wurzel who prescribed the Zoloft or it could
8   have been Dr. Reisner.  Too many doctors.
9       THE VIDEOGRAPHER:  Five minutes and I'll need
10  to switch tapes.
11      MS. WESTBY:  Okay.  Just let me ask one more
12  thing before we ...
13  BY MS. WESTBY:
14  Q.  Tricia, do you know what medical records
15  these are?
16  A.  Doctor's writing sucks.  This is pertaining
17  to my Zoloft because it was causing me the --
18  Q.  Right, but --
19  A.  It was causing me the --
20  Q.  Right.  Which doctor --
21  A.  -- insomnia.
22  Q.  Which doctor is this, do you know?
23  A.  Wurzel.
24  Q.  It is Dr. Wurzel.  And then do you -- is that
25  his -- the initials, MSW or something?

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 43 of 78
Tricia Wachsmuth v.                                    Tricia Wachsmuth
City of Powell, et al.                                 October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                     Page 161
Direct Examination by Ms. Westby

1   A.  I really don't know what his full name is. I
2   just know he's Dr. Wurzel.
3   Q.  Okay. And what about the name on these
4   records. Do you recognize that or know which doctor
5   that is?
6   A.  I think that's the nurse, but I'm not sure.
7   Q.  Okay. You can't read the -- the signature
8   should be over here?
9   A.  I can't.
10  Q.  Okay.
11  A.  Yeah. I was trying to read that thinking
12  maybe I could figure it out from that.
13  Q.  Okay.
14  A.  I'm thinking it's one of the nurses, but I'm
15  not sure.
16  Q.  One of the nurses with?
17  A.  Dr. Spomer.
18  THE COURT REPORTER: Doctor who?
19  THE WITNESS: Spomer, I think.
20  BY MS. WESTBY:
21  Q.  Okay.
22  MS. WESTBY: Okay. Let's take a short break
23  to switch out the tape.
24  THE VIDEOGRAPHER: Go off -- go off the
25  record. The time is 12:28.

TRICIA WACHSMUTH - October 4, 2010                     Page 162
Direct Examination by Ms. Westby

1   (Recess taken 12:28 to 12:31
2   p.m., October 4, 2010)
3   THE VIDEOGRAPHER: We're back on the record.
4   The time is 12:31.
5   BY MS. WESTBY:
6   Q.  You testified that you've missed some days of
7   work because of this. How many days of work have you
8   missed?
9   A.  Since working at the gas station, I missed --
10  I went home -- three to four.
11  Q.  Three to four days?
12  A.  (Witness nods head.)
13  Q.  Okay.
14  A.  My boss had to help me out to my husband's
15  truck. It got really bad. My boss had to help me out
16  to my husband's truck. It got really bad.
17  Q.  Now, before this incident happened, and let's
18  talk about when you were working at the -- at the
19  hospital, did you miss days of work at the hospital?
20  A.  Yeah, and I would come up with any excuse
21  possible to leave.
22  Q.  I'm talking about before the incident.
23  A.  Oh, before the incident, I missed some.
24  Yeah.
25  Q.  What did you miss for?

TRICIA WACHSMUTH - October 4, 2010                     Page 163
Direct Examination by Ms. Westby

1   A.  Sick. Sick days. And then PTO days.
2   Q.  I'm sorry?
3   A.  Sick days and paid time off days.
4   Q.  Okay. What were you sick with, if you can
5   remember?
6   A.  Cold, flu.
7   Q.  Shortly before this incident happened, did
8   you have a concern that you were going to get fired
9   from the hospital for missing time?
10  A.  Beforehand, no. I figured if anything, they
11  would dock my hours. I was a very good employee. I
12  did my job very well.
13  Q.  So did you ever tell -- did you ever request
14  one of your physicians to write a letter to work
15  explaining your absences in the hope that you wouldn't
16  get fired prior to this incident?
17  A.  No. She offered. But I don't think I had
18  her write one.
19  Q.  So it's your testimony that you didn't
20  request your physician to write you a note --
21  A.  I've had doctor's notes to get me out of
22  work.
23  Q.  And let me finish my -- finish my question
24  before you answer.
25  Is it your testimony that shortly before --

TRICIA WACHSMUTH - October 4, 2010                     Page 164
Direct Examination by Ms. Westby

1   and I'm talking about the day before this incident
2   happened, did you go into your physician and request
3   that your doctor write a note, fax it to your employer,
4   because you were afraid of losing your job for missing
5   time at the hospital?
6   A.  Um, I had gone in to the doctor, and I don't
7   know how long before it had happened, I had talked to
8   him about what was going on with work aspects, and he
9   had offered to write me a note. I don't recall -- I
10  don't remember if he had or not written me that note.
11  But I didn't miss any, you know. I wasn't allowed to
12  because I was a good employee.
13  And so after this incident happened, I just
14  kind of came up with any excuse I possibly could to
15  leave.
16  Q.  And I'm talking about before this incident.
17  Tell me what -- what you --
18  A.  I don't remember.
19  Q.  Tell me what you --
20  A.  I don't --
21  Q.  -- were talking --
22  A.  -- remember.
23  Q.  Well, you just said that you went in to talk
24  to the doctor --
25  A.  Yeah.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 44 of 78
Tricia Wachsmuth v.
City of Powell, et al.

Tricia Wachsmuth
October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                    Page 165
Direct Examination by Ms. Westby

1    Q. -- about --
2         MR. GOSMAN: Shh, shh, shh.
3    BY MS. WESTBY:
4    Q. Let me finish --
5         MR. GOSMAN: Let her go ahead and finish,
6    Tricia.
7    BY MS. WESTBY:
8    Q. -- about work aspects prior to this incident,
9    and you didn't remember whether you asked her to write
10   you a note?
11   A. Yes.
12   Q. My question is: What work aspects are you
13   talking about?
14   A. What do you mean?
15   Q. That's the term you used.
16   A. My work -- you know, I was having issues at
17   work.
18   Q. What kind of issues?
19   A. Boss-related issues.
20   Q. Okay. Well, tell me about that.
21   A. What does that have to do to pertain to this
22   case?
23        MR. GOSMAN: That's not for you to question,
24   Tricia. So go ahead and -- and answer the question.
25        THE WITNESS: I didn't get along with my

TRICIA WACHSMUTH - October 4, 2010                    Page 166
Direct Examination by Ms. Westby

1    boss.
2    BY MS. WESTBY:
3    Q. Why not?
4    A. Because, I just didn't get along with her.
5    She expected too much from me.
6    Q. And explain that. Expected too much in terms
7    of the assignments she was giving you?
8    A. No, in terms of I worked with an older lady,
9    so the older lady didn't have to do anything but sit on
10   her butt while I did everything.
11   Q. Was there also an element to this that you
12   were missing work and that she was upset with you about
13   that?
14   A. I had missed work, you know, but I just made
15   PTO on it, and I always gave her notice when I was
16   sick.
17   Q. Did -- did your boss express concerns to you
18   about the amount of time that you were missing from
19   work?
20   A. Yeah. But she didn't start to express it
21   fully or dock my hours until after this happened.
22   Q. But before this happened, you were having
23   problems with your boss because you were missing too
24   much work?
25        MR. GOSMAN: You just asked her that

TRICIA WACHSMUTH - October 4, 2010                    Page 167
Direct Examination by Ms. Westby

1    question.
2         THE WITNESS: Not to much -- yeah.
3         MR. GOSMAN: Tricia, I'm sorry.
4         THE WITNESS: So I don't have to reanswer?
5         MS. WESTBY: You have to.
6         MR. GOSMAN: Well, it's asked and answered
7    but go ahead.
8         THE WITNESS: Okay. What was the question
9    again?
10   BY MS. WESTBY:
11   Q. Before this incident happened, you were
12   having problems with your boss because of how much time
13   you were missing from work?
14   A. I was having problems with my boss due to
15   other situations, and I was missing work. You know, I
16   wasn't feeling well. I was sick.
17   Q. How were you sick?
18   A. I already told you. I had the cold and the
19   flu.
20   Q. Were you -- did you miss any days because of
21   psychological problems that you were having?
22   A. The only time I missed was when the Zoloft
23   was messing with me, and I wasn't sleeping. And I had
24   called her that morning and told her, and she
25   understood. She's like, okay. I understand that. You

TRICIA WACHSMUTH - October 4, 2010                    Page 168
Direct Examination by Ms. Westby

1    know. We got it covered.
2    Q. Who was your boss?
3    A. Christina DeLeon.
4    Q. Is she still there?
5    A. Not a clue. I know she was really mad when I
6    quit.
7    Q. Why was she mad?
8    A. Because I was a good worker.
9    Q. Is that what your employment records will
10   reflect?
11   A. Oh, yeah, my raises will reflect that.
12   Q. Okay. Before this incident, I've also seen
13   indications in your medical records that you were
14   provide -- provided Celexa?
15   A. Okay. Maybe that's another one I was on when
16   I was younger.
17   Q. Okay.
18   A. That's an antidepressant?
19   Q. It is. Do you know which doctor was
20   prescribing Celexa for you?
21   A. No.
22   Q. When were you on it?
23   A. Not a clue.
24   Q. Okay. What about Lexapro?
25   A. Recently with the Lexapro.

TRICIA WACHSMUTH - October 4, 2010                Page 169
Direct Examination by Ms. Westby

1  Q.  Who were you prescribed Lexapro by?
2  A.  Dr. Troy Stiles. And he's also the one who
3  prescribed me these.
4  Q.  We've talked about the treaters prior to --
5  well, when you were in Minnesota. And then, I think,
6  we tried to -- to figure out treaters after you moved
7  back from Minnesota.
8       But can you just give me a list of every
9  doctor or every clinic that you've been to since you've
10  moved back from Minnesota to Wyoming?
11  A.  So all the clinics in Wyoming that I've been
12  to?
13  Q.  Or Billings or -- you know, any place since
14  you've moved back to Wyoming?
15  A.  Do I have to bring up my pregnancy?
16  Q.  Just so I have a complete list of the
17  physicians that you've seen, yes?
18  A.  My child will not be brought into this
19  whatsoever, right?
20  Q.  I -- you know, we're entitled to get all of
21  your medical records.
22       MR. GOSMAN: You don't have to worry about
23  that, Tricia. Do not worry about that.
24       THE WITNESS: Okay.
25

TRICIA WACHSMUTH - October 4, 2010                Page 170
Direct Examination by Ms. Westby

1  BY MS. WESTBY:
2  Q.  There's --
3  A.  I seen a doctor in Billings when I was
4  pregnant. It was for an ultrasound. Which doctor? I
5  don't know.
6  Q.  Do you know --
7  A.  He was a specialist. It should probably be
8  on my records through Powell. But they had sent me
9  there because they got me the appointment with them.
10  Q.  Why did you have a special -- an appointment
11  with a specialist?
12  A.  Because with all the complications that were
13  going on, it was affecting him as a fetus.
14  Q.  What complications?
15  A.  I started to bleed.
16  Q.  What complications?
17  A.  Stress. You know, when I found out I was --
18  when I found out I was pregnant, I stopped all my meds.
19  Because they all said, if pregnant, stop. So I stopped
20  them all.
21       And then I started to have complications,
22  because I also tried to quit smoking cold turkey. And
23  then with the stress of everything that was going on,
24  it started to cause me to bleed. And I went into the
25  doctor. And she told me, she's like, "You know, you

TRICIA WACHSMUTH - October 4, 2010                Page 171
Direct Examination by Ms. Westby

1  need to pick up smoking again." She says, "Try to cut
2  down, but pick it up again." She goes, "Because the
3  stress levels you're on right now is going to cause you
4  to lose your baby."
5  Q.  The stress of what was going on?
6  A.  The stress of everything that was going on
7  after it had happened. The anxiety and the panics.
8  And seeing a cop and having an attack. I mean, it
9  was -- it was stressful. Just driving into town was
10  stressful.
11  Q.  Did you have financial issues? Were you
12  having financial issues at the -- the time this
13  happened, at the time of this incident in February of
14  '09?
15  A.  Nope.
16  Q.  Nothing?
17       MR. GOSMAN: Asked -- asked and answered.
18  BY MS. WESTBY:
19  Q.  Do you -- were you making all of your house
20  payments?
21  A.  Yes.
22  Q.  So no financial issues whatsoever? Is that
23  accurate?
24  A.  Yeah. Correct.
25  Q.  Okay. Okay. So the doctor -- which doctor

TRICIA WACHSMUTH - October 4, 2010                Page 172
Direct Examination by Ms. Westby

1  told you to take up smoking again?
2  A.  Dr. Spomer. It was either Dr. Spomer or her
3  aide, Lisa Hobby.
4  Q.  Were you still smoking marijuana while you
5  were pregnant?
6  A.  No. I'd never do anything to hurt my kid.
7  Q.  Okay. So continue with all of the
8  physician's, clinics, treaters that you've seen since
9  you've lived in Wyoming?
10  A.  I seen that one in Billings, like I said, for
11  the ultrasounds. Otherwise, it's been here in Powell.
12  Betsy Spomer. And Dr. Reisner. And then occasionally,
13  Dr. Wurzel, if it was -- I couldn't get in to see my
14  doctors.
15  Q.  Did you say Isner?
16  A.  Reisner.
17  Q.  Okay.
18  A.  Not a clue on the spelling.
19  Q.  What about psychological things? Anybody in
20  addition to this list?
21  A.  For counselor-wise?
22  Q.  Anything. Any treaters for anything?
23  A.  Well, I've only seen my counselor since this
24  happened.
25       THE COURT REPORTER: I'm sorry?

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 46 of 78
Tricia Wachsmuth v.                                                                    Tricia Wachsmuth
City of Powell, et al.                                                                 October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                    Page 173
Direct Examination by Ms. Westby

1        THE WITNESS: I've only seen counselors and
2    therapists since this has happened.
3    BY MS. WESTBY:
4        Q. And I'm asking you for a complete list,
5    before and after the incident since you've moved back
6    from Wyoming -- or since you moved back from Minnesota
7    to Wyoming, a complete list of all treaters of any
8    nature that you have seen.
9        A. Dr. Troy Stiles, Dr. Kobos. I don't know if
10   he's a doctor. I would just say Kobos. And then there
11   was my pastor, Bill Spencer. And then there was Zan
12   Liljegren through the hospital. When I still worked
13   there.
14       Q. I'm sorry. I can't understand you.
15       A. Zan Liljegren. I have no idea how to spell
16   that. And that was through the hospital. And you got
17   Dr. Reisner, right?
18       Q. Uh-huh. Yes.
19       A. Spomer, Hobby. Can't think of any more off
20   the top of my head. But if I think of any more, do you
21   want me to have him contact you with the names?
22       Q. Yes, that would be great.
23          You testified that Dr. Spomer -- when you
24   said that you have this stress, part of it was quitting
25   smoking, correct?

TRICIA WACHSMUTH - October 4, 2010                    Page 174
Direct Examination by Ms. Westby

1        A. She wasn't sure. But she told me to keep --
2    to cut down, to pick it up again and cut down from
3    there and see if I could quit. 'cause I was bleeding
4    heavily and about to lose my child.
5        Q. And did you ever --
6        A. And she did say it was stress-related.
7        Q. Did you ever --
8        THE COURT REPORTER: She did or didn't?
9        THE WITNESS: She did say to me verbally that
10   it was stress-related.
11   BY MS. WESTBY:
12       Q. Did -- did you ever quit smoking while you
13   were pregnant?
14       A. I had cut down, but that was about as far as
15   I was willing to take it. I didn't want to lose my
16   kid.
17       Q. So you never quit smoking while you were
18   pregnant?
19       A. (Witness shakes head.)
20       Q. In -- Dr. Wurzel wrote a letter to Zan
21   Liljegren, or however you say his name, talking about
22   that you had had this experience that you had described
23   as traumatic, the incident that we're talking about
24   today, and that this was on top of your already
25   deteriorating condition. What was he referring to?

TRICIA WACHSMUTH - October 4, 2010                    Page 175
Direct Examination by Ms. Westby

1        A. Depression.
2        Q. So just generally that you were suffering
3    from depression before this?
4        A. Yes.
5        Q. Anything else?
6        A. Not that I know of.
7        Q. It also -- your medical records -- records
8    also mention a charge of possession of marijuana in
9    2009, but then your report that that was expunged from
10   your record?
11       A. Uh-huh.
12       Q. Is that "yes"?
13       A. Yes.
14       Q. Tell me where -- how -- how -- tell me what
15   you're talking about, about it being expunged.
16       A. It was expunged because in order for me to
17   get off and get it expunged, they told Bret that he'd
18   have to take the cultivation and have it stay on his
19   record. And Bret didn't want it on mine, so Bret took
20   the plea so mine would get expunged.
21       Q. So that was your understanding of what
22   happened with your conviction?
23       A. Uh-huh.
24       Q. "Yes"?
25       A. Yep, because my husband didn't want me to

TRICIA WACHSMUTH - October 4, 2010                    Page 176
Direct Examination by Ms. Westby

1    suffer any more than what I had to.
2        Q. And you, in fact, pled guilty to this --
3        A. Yeah.
4        Q. -- charge, correct?
5        A. Correct.
6        Q. Okay. What is your understanding of Bill
7    Spencer's qualifications?
8        A. Who's Bill Spencer?
9        Q. Oh, pastor?
10       A. Oh, okay. As far as I know, he's got a Ph.D.
11       Q. Is it in psychology?
12       A. I think, I'm not positive. I know he is very
13   qualified to, you know, listen and treat and stuff like
14   that. You know.
15       Q. Has he told you that he's a psychologist?
16       A. No, it's just kind of something everybody
17   knew when he took over the church, you know.
18       Q. That -- that he was a psychologist?
19       A. That he's -- yeah, that he's a very smart
20   man. I don't know if he's a psychologist. I just know
21   he has a Ph.D. I don't really ask him much.
22       Q. Okay. In the -- when the police searched
23   your house, they found test kits?
24       A. Uh-huh.
25       Q. Tell me about those.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 47 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                October 04, 2010

1   A.  You'd have to ask my husband about those.
2   Q.  Those -- you don't know anything about those?
3   A.  I know that they were tester kits.
4   Q.  What were they test kits for?
5   A.  I don't remember. I know one was marijuana.
6   And I don't remember, to be honest.
7   Q.  What -- what did you use those test kits for?
8   A.  Nothing, just to kind of keep on hand. You
9   know, something cool and different.
10  Q.  But I mean, what did you -- what did you do
11  with them?
12  A.  They were in storage
13  Q.  Did you use them to test for --
14  A.  No.
15  Q.  -- levels of something in your marijuana?
16  A.  No.
17  Q.  You never used them?
18  A.  No. Just something different.
19  Q.  Was the other test kit, in addition to the
20  marijuana test kit, for methamphetamine?
21  A.  Could have been. I never read them.
22  Q.  Where did you get them?
23  A.  You'd have to ask my husband that. I don't
24  know. It just kind of appeared in boxes, you know.
25  When you move so many places, things get put in

1   different boxes. You go through your boxes, and you're
2   like, hey, that's cool and different.
3   Q.  Where were these test kits in your house?
4   A.  I think they were in the garage. I don't
5   know.
6   Q.  And it's your testimony that your husband
7   will know where they came from?
8   A.  Yeah.
9   Q.  That they were his?
10  A.  I'm not saying they were his. I'm saying he
11  would know where they were placed and where they were
12  at.
13  Q.  And where did they came from?
14  A.  Possibly. You know, honestly, if you want,
15  you know, questions for my husband, you should have had
16  him stay in.
17      MR. GOSMAN: That s not how it works, Tricia.
18      THE WITNESS: Well, I know, but I can't
19  answer for him.
20      MR. GOSMAN: Well, I don't -- please, don't
21  argue with --
22      THE WITNESS: I know, I'm trying not to.
23      MR. GOSMAN: And do not be sarcastic. Just
24  answer the questions.
25      THE WITNESS: I'm trying not to be sarcastic.

1   I'm trying to be nice. I'm sorry if I come off as
2   sarcastic.
3   BY MS. WESTBY:
4   Q.  How often -- your attorney has listed Bruce
5   Olsen and Gill Parnell; is that her name?
6   A.  I know a Jill Harr (phonetic).
7   Q.  As -- as character witnesses for --
8   A.  It could be Parnell -- I mean, Harr.
9   Q.  Parnell?
10  A.  I know a Joan Harr, but I don't know a
11  Parnell. But I don't know if she changed her last
12  name, either.
13  Q.  Okay. And it could be. Are those people who
14  work with Tom Wachsmuth?
15  A.  Joan is. And the other name was?
16  Q.  Bruce Olsen.
17  A.  He doesn't work with Tom. He is in law
18  enforcement.
19  Q.  Okay. Have -- have Bruce or Joan been to
20  your house? Were they to this house that's -- that you
21  lived in when this incident happened?
22  A.  Joan has been there. Bruce never was.
23  Q.  How many times was Joan there?
24  A.  I don't know. I really don't know.
25  Q.  Can you give me an estimate?

1   A.  No. If she was there, it was usually with
2   Tom, running, help out with the vehicle real quick. you
3   know.
4       We let her stay there for a little bit while
5   we paid rent because we had our monthly -- you know,
6   because when we moved out, we were still were paying
7   our house payments, and our house payments are paid up.
8   So we let her crash there for a little while after all
9   this had happened and ...
10  Q.  When did she live there?
11  A.  I don't know. I can't give you a month or a
12  time frame. I really don't know.
13  Q.  Was it in February after this happened?
14  A.  I think so, but I'm not positive. It could
15  have been. It could have been end of February,
16  beginning of March.
17  Q.  How long did she live there?
18  A.  Not long. Just until she found a place,
19  until our rent was paid up. Because like I said, we
20  had paid it. And it sucked that we weren't -- you
21  know, I couldn't go in there. So we weren't living
22  there because I couldn't even go in the house, and we
23  told her, it's like you know what? Our rent is paid,
24  our utilities are paid. Free living for you to get on
25  your feet and get your own place.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 48 of 78
Tricia Wachsmuth v.                                          Tricia Wachsmuth
City of Powell, et al.                                       October 04, 2010

1   Q.  Why did she need that?  Was she going through
2   a divorce or some problem?
3       THE WITNESS: Do I have to answer that?
4       MR. GOSMAN: Yes.
5       THE WITNESS: That's kind of personal
6   information on her part.
7       MR. GOSMAN: Well, if you know it you should
8   answer.
9       THE WITNESS: She was going through a
10  divorce.
11  BY MS. WESTBY:
12  Q.  Did she pay you rent?
13  A.  No.  We had it all paid up.
14  Q.  Was the house -- did you sell or did the
15  house go back to the bank?
16  A.  We sold.
17  Q.  Are --
18      MR. GOSMAN: I think we ought to take a break
19  for lunch.
20      MS. WESTBY: I have two -- I have two more
21  questions.
22      MR. GOSMAN: That's fine.  We'll take those
23  two.
24  BY MS. WESTBY:
25  Q.  Did -- it looks like Bret kept a journal.  In

1   Q.  How did you know that?
2   A.  I'm being used --
3       MR. GOSMAN: I thought that was your last
4   question.
5       THE WITNESS: Yeah, like I said. I took Legal
6   Ways. Being used as a human shield is not part of your
7   constitutional rights.  It is a violation of your
8   constitutional rights to be used as a human shield.
9   BY MS. WESTBY:
10  Q.  Did you talk to Tom Wach -- Wachsmuth about
11  whether or not you should hire an attorney?
12  A.  No, I already told him I was hiring an
13  attorney before I told him what was happening.
14  Q.  Did you talk to anybody else about hiring an
15  attorney before you did it?
16  A.  Just Tom.  You know, I told Tom I was going
17  to hire an attorney.  And he said, "Okay."
18      MS. WESTBY: Okay.  I don't think I have any
19  further, unless your attorney asks you questions and I
20  have follow-ups.
21      MR. THOMPSON: Well, I've got some, too,
22  so ...
23      MR. GOSMAN: We're going to take a lunch
24  break.
25      MR. THOMPSON: Yeah.

1   addition to the grow log, he also kept a journal or a
2   diary.  Did you keep a journal or a diary?
3   A.  No.
4   Q.  Have you -- do -- I mean, do you have
5   anything where any notes would be written about this
6   incident, Day-Timer --
7   A.  No.  I don't keep journals.  I write poems.
8   Q.  You write poems?
9   A.  Used to write poems, I should say.  I haven't
10  done it in years.
11  Q.  Do you have, like, notebooks of poems?
12  A.  No, I have a little book of them.
13  Q.  Okay.  When are those -- when were those
14  written?
15  A.  After my dad and brother died.
16  Q.  Okay.  Up to -- up to when?
17  A.  Not long after.  I think I wrote two after my
18  dad died and two after my brother, and he died in July.
19  So I stopped probably September of 2001.
20  Q.  Okay.  And the last question that I want to
21  ask you is when you hired an attorney and why you hired
22  an attorney?
23  A.  I hired an attorney immediately.  And I hired
24  an attorney because I knew what was done to me was
25  wrong.

1       THE VIDEOGRAPHER: We'll go off the record.
2   The time is 12:57.
3       (Recess taken 12:57 to 2:30
4       p.m., October 4, 2010)
5       MR. GOSMAN: Okay.  Do you want me to go
6   ahead?
7
8       MR. THOMPSON: Go ahead, Jeff.
9       MR. GOSMAN: Yeah, thanks.
10      For the record, we have set -- set out an
11  order for the depositions of the party defendants, and
12  the order that we will proceed in this week will be --
13  I'm -- I'm just going to list the last name of the
14  officers involved. Danzer, Chretien, McCaslin, Brown,
15  Miner. Hall, Lara, Eckerdt, Blackmore, Chapman, and
16  Chief Feathers.
17      MR. THOMPSON: Thank you, Counsel.
18  BY MR. THOMPSON:
19  Q.  Ma'am. before we go any further, I want to
20  remind you that you're still under oath.
21      THE VIDEOGRAPHER: We need to go on the video
22  though.
23      MR. THOMPSON: Okay.  Thought you were
24  quicker than me.
25      THE VIDEOGRAPHER: We're back on the record.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 49 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                  October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                    Page 185
Cross-Examination by Mr. Thompson

1   The time is 2:31.
2            CROSS EXAMINATION
3   BY MR. THOMPSON:
4   Q. Ma'am, before we go any further with any
5   additional questioning, I'll remind you that you're
6   still under oath; you understand?
7   A. (Witness nods head.)
8   Q. Is that a "yes"?
9   A. Yes. Sorry.
10  Q. At the beginning of the deposition, I
11  introduced myself. My name is Tom Thompson, I
12  represent the City of Powell and all those officers who
13  may be named in their official capacity. And I just
14  have some questions that I want to follow up on. So
15  that I'm clear about your testimony, okay?
16  A. (Witness nods head.)
17  Q. Is that --
18  A. Okay.
19  Q. And remember, you got to give an audible
20  response to the -- the questions that I ask. All
21  right?
22  A. (Witness nods head.)
23  Q. Is that a "yes"?
24  A. Yes. Sorry. Habit.
25  Q. You stated that since the time that your

TRICIA WACHSMUTH - October 4, 2010                    Page 186
Cross-Examination by Mr. Thompson

1   father passed away, that you were treated on and off
2   for depression, do you recall that testimony?
3   A. Yes.
4   Q. And how were you treated for depression?
5   A. Just depression pills.
6   Q. And I'll remind you also, you got to wait for
7   me to ask --
8   A. I thought you were done because you paused.
9   Q. -- the question because I'm -- I'm a little
10  slow.
11  A. Okay.
12  Q. I'm from the southern part of the state.
13      So how were you treated for depression during
14  that time after your -- your father passed?
15  A. I was given prescription medication.
16  Q. And that would have been back in Minnesota?
17  A. Yes.
18  Q. And you can't recall the -- other than the
19  testimony that you've already provided, you can't
20  recall the names of the treating providers?
21  A. No.
22  Q. Did you seek out any sort of counseling for
23  your depression or anxiety in those early years after
24  your father passed?
25  A. I didn't have anxiety after my dad died.

TRICIA WACHSMUTH - October 4, 2010                    Page 187
Cross-Examination by Mr. Thompson

1   They thought I did until after I seen a different
2   doctor, and he said, "No, this is depression. I'm
3   going to put you on Zoloft."
4   Q. Okay.
5   A. Because he knew as soon as I explained to him
6   my symptoms, he knew what it was. I was just sad.
7   Q. Okay. And I'm going to skip around a little
8   bit. There's not much of a -- a logical sequence to
9   these questions, other than it's the notes that I took
10  as you gave your testimony, okay?
11  A. (Witness nods head.)
12  Q. You talked about the house that you lived in
13  when this incident occurred. And my belief is that
14  your testimony has been that you and your husband owned
15  that house. Is that correct?
16  A. When this incident took place in Wyoming?
17  Q. Yes.
18  A. We owned the house in Wyoming, yes.
19  Q. And was the house mortgaged?
20  A. I don't --
21  Q. You don't know?
22  A. I don't really know. I know we went through
23  WCDA for our loan, and we paid them.
24  Q. And -- and so you had a loan on the house?
25  A. Yeah.

TRICIA WACHSMUTH - October 4, 2010                    Page 188
Cross-Examination by Mr. Thompson

1   Q. And you made payments on that house to WCDA?
2   A. Yep.
3   Q. And if you've answered this question already,
4   I apologize. My note doesn't indicate that you did.
5   But who prescribed Zoloft for you prior to this
6   incident?
7   A. I don't know the name of the -- well, like,
8   back in Minnesota or the most recent Zoloft?
9   Q. The most recent Zoloft.
10  A. I think, and I'm not positive on it, but I
11  think it was Dr. Wurzel. But I could be wrong.
12  Q. Would there have been another doctor that was
13  prescribing that sort of medication for you --
14  A. It could have been my primary doctor, which
15  would have been Lengfelder at the time.
16  Q. You talked about an investigation. And you
17  related that back to a class that you had in -- in high
18  school?
19  A. Uh-huh.
20  Q. Did anybody else, either Bret or anybody
21  locally, tell you that they would have to do an
22  investigation, other than your experience in high
23  school? Where did that come from?
24  A. High school. Books. You know, I was in
25  the -- it was in the junior high -- in the alternative

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 50 of 78
Tricia Wachsmuth v.                                                      Tricia Wachsmuth
City of Powell, et al.                                                   October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                    Page 189
Cross-Examination by Mr. Thompson

1  program. And you get to pick your courses. And I
2  picked Legal Ways, which is pretty much getting you
3  prepared for college if you want.
4      Q.  Did you ever talk to Tom Wachsmuth about that
5  issue, that they would have to do an investigation
6  prior to an arrest?
7      A.  No, I never talked to him about
8  investigations.
9      Q.  Did you ever talk to him at all about his
10 work in DCI?
11     A.  He keeps his work pretty to himself.
12     Q.  So the answer is yes or no?
13     A.  No. Well, wait. Rephrase the question.
14     Q.  Did you ever talk to him about his work in
15 DCI?
16     A.  No.
17     Q.  And what led you to believe that the amount
18 of marijuana that you were growing would result in just
19 a misdemeanor charge?
20     A.  Because my husband and I looked online to see
21 what the legal limits were, and it's under 3 ounces of
22 marijuana, as long as it is not in individual bags, is
23 considered misdemeanor.
24     Q.  And you looked online. Do you recall where
25 online you looked?

TRICIA WACHSMUTH - October 4, 2010                    Page 190
Cross-Examination by Mr. Thompson

1      A.  No.
2      Q.  Do you recall what you looked at online?
3      A.  I know it was Wyoming laws for something. I
4  know it was under the Wyoming laws. 'Cause we know
5  they differ state by state.
6      Q.  Were -- were you taught by someone to take
7  your frustrations out on animals, stuffed animals?
8      A.  It was something I did one day instead of
9  cutting my arm. I cut a stuffed animal, and it worked
10 just as well. And I thought, great, no more
11 mutilation.
12     Q.  So it was self-taught?
13     A.  Yeah.
14     Q.  Have you talked to any of your counselors,
15 either to the pastor that you're seeing or to the
16 counselor, about cutting and -- and burning,
17 self-mutilation?
18     A.  No.
19     Q.  You haven't mentioned it to either one of
20 them?
21     A.  No.
22     Q.  Have you ever talked to any healthcare
23 provider about either burning or cutting yourself?
24     A.  No.
25     Q.  Why not?

TRICIA WACHSMUTH - October 4, 2010                    Page 191
Cross-Examination by Mr. Thompson

1      A.  It's not something I'm proud of. And it's
2  not something I'm like, hey, look at what I do?
3      Q.  You're seeking counseling for your mental
4  health issues, are you not?
5      A.  Yes. And I just started seeing Kobos. But
6  you have to make sure that you trust the person you're
7  talking to before you go ahead and give them
8  information that is personal to you and that you feel
9  they could look down and judge you for that. And I've
10 been judged too many times.
11     Q.  Is there anything else, besides the -- the
12 cutting and the burning, that you've not told either
13 the pastor or the counselor about?
14     A.  Not if you've asked me -- I pretty much --
15 anything they have asked, I've been honest.
16     Q.  Do you trust your -- your counselor at this
17 point?
18     A.  Um, he's a really nice guy. Very easy to
19 talk to. I wouldn't say I don't trust him. I wouldn't
20 say I've built up to the point where, you know, I would
21 trust him with my life. But he's a very nice guy. And
22 there could be a possibility of me gaining that trust
23 with him.
24     Q.  How about the pastor that you're seeing?
25     A.  He's nice. I really like him. But there's

TRICIA WACHSMUTH - October 4, 2010                    Page 192
Cross-Examination by Mr. Thompson

1  certain things -- he's a pastor. There's certain
2  things that I don't want to be judged for.
3      Q.  You're -- you're not completely disclosing
4  everything to either of those providers?
5      A.  If they ask me, I tell them the truth. If
6  they don't ask me, I don't feel any need to tell them.
7      Q.  You -- you talked about the threat that you
8  believed you received from the confidential informant,
9  do you recall that testimony?
10     A.  Uh-huh.
11     Q.  Is that a "yes"?
12     A.  Oh, sorry. Yes.
13     Q.  Did you feel that your life was being
14 threatened?
15     A.  Yes.
16     Q.  Why didn't you go to law enforcement?
17     A.  No proof besides him calling saying it to
18 Bret and then hanging up. There's really no proof
19 there. And what are they going to do? Oh, no proof,
20 have a good day.
21     Q.  You didn't go to law enforcement?
22     A.  No.
23     Q.  And talk to them --
24     A.  No.
25     Q.  -- about that either?

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 51 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                  October 04, 2010

1  Let me finish the question.
2      Even though your father-in-law was a DCI
3  agent, correct?
4      A. Correct. My husband -- well, I thought
5  you -- I thought you were done. You paused.
6      MR. GOSMAN: Well, yeah. We got to let the
7  witness finish the answer as well as the person taking
8  the deposition --
9      MR. THOMPSON: I agree.
10     MR. GOSMAN: -- finish the question.
11     MR. THOMPSON: And I don't believe I had a
12 question that I was asking you. You said your husband
13 and -- and it trailed off.
14     THE WITNESS: I felt my husband could protect
15 me. And when he wasn't there to -- to protect me,
16 that's why he would put the gun on that shelf.
17 BY MR. THOMPSON:
18     Q. And when --
19     A. My husband -- the guy -- the confidential
20 informant was a little bit shorter -- shorter -- you
21 know, a little bit taller than me. About an inch
22 taller than me. And my husband is not short. You
23 know, and I feel very safe when it comes to being with
24 my husband or my father-in-law. I feel incredibly
25 safe. You know, like, I know neither one of them would

1  let any harm come to me if it came to it.
2      Q. You didn't go for the gun that was sitting
3  there that your husband had placed there for you when
4  you saw somebody on the porch, did you?
5      A. No, I went to call 91 .
6      Q. So you went to call the police at that point
7  in time?
8      A. Until I realized it was the police. Then --
9      Q. Why didn't you go for the gun?
10     A. I was frozen. I was scared. As soon as they
11 busted in my door, I was scared. I was frozen.
12     Q. Did you talk to Tom Wachsmuth about filing
13 this lawsuit prior to seeking out an attorney?
14     A. I told him I wanted to talk to an attorney
15 and I'd like to sue. And then I told him what had
16 happened. And he said, Yes you are correct, they did
17 do -- you know, what they did do was wrong. And I got
18 a lawyer. You know, it was my decision. It was my
19 choice. I'm the one who is choosing to do this. Not
20 Tom.
21     Q. He provided you an opinion in regards to what
22 the -- what the officers did?
23     A. What do you mean? I don't understand the
24 question.
25     Q. Well, you stated that you told him what had

1  happened, and he told you that it was wrong?
2      A. Well, I told him -- I told him I wanted to
3  talk to an attorney, first. And then, you know, he
4  just kind of looked at me, and I told him what had
5  happened. And he was like, "Well, you were wronged and
6  we will get you an attorney."
7      Q. Is it -- is it Tom who got you the attorney?
8      A. No, we got the attorney. It is all on me. I
9  got the attorney. I am the one paying for the
10 attorney.
11     Q. And the reason I ask you that, ma'am, is
12 because you said he said, "We will get you an
13 attorney"?
14     A. Well, he's a father. You know, everything
15 comes out like that. I mean, do you have kids? You
16 know, if you were to talk to your kids, you would say
17 it the same way. "We will." You know, just to more or
18 less give your kid that -- you know, that security of,
19 you know, you're not alone. Whether they are or not,
20 you never want your kid to think they are alone.
21     Q. Is -- and I'm -- I'm not going to ask you
22 about any conversations that you had with any attorney.
23 But did you see any attorneys before you saw
24 Mr. Gosman?
25     A. Bill Simpson.

1      Q. And did you see Mr. Gosman after Mr. Simpson?
2      A. Yep.
3      Q. Were -- were any of the pistols that were in
4  the house when the officers came in, were any of those
5  pistols that you or your husband owned?
6      A. I'd -- you'd -- that's a husband -- ask him
7  that -- that's a question you'd have to ask my husband.
8      Q. Let -- let me ask you --
9      A. I don't know.
10     Q. Wait for the question.
11     Let me ask you, did you own any of those
12 handguns?
13     A. No.
14     Q. Have you ever owned a handgun?
15     A. No.
16     Q. You've -- you've shot guns before?
17     A. Yeah.
18     Q. Pistols, rifles?
19     A. No, I can't hold the rifle. Just the handgun
20 ones, whatever those are called. The little ones.
21     Q. And you shot with whom?
22     A. My husband.
23     Q. Ever shoot --
24     A. He took me out.
25     Q. Ever shoot with your father-in-law?

Case 1:10-cv-00041-ABJ Document 65-13 Filed 01/10/11 Page 52 of 78
Tricia Wachsmuth v.
City of Powell, et al.
Tricia Wachsmuth
October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                                    Page 197
Cross-Examination by Mr. Thompson

1    A. No.
2    Q. So you knew how to use a handgun?
3    A. Yeah. My husband thought it was funny that I
4  had never shot one.
5    Q. When you -- when you looked out the window
6  and -- and saw somebody on your porch on the -- the
7  evening of this incident, was your porch light on?
8    A. Yes.
9    Q. And I believe your testimony was that you
10 heard at some point in time, "Get her, she's going
11 first"?
12   A. Uh-huh.
13   Q. Is that correct?
14   A. That is correct.
15   Q. Did you ever say why?
16   A. I said, "me," is all I said.
17   Q. Did you ever say, "I'm not going to go down
18 those stairs"?
19   A. You don't argue when there's several guns
20 pointed at you. You do what you're told.
21   Q. Did you ever say, "I'm not going to go down
22 those stairs"?
23   A. You never argue when there's guns pointed at
24 you're head. I cannot answer that with a yes or no.
25 Because you don't argue. It's one of those questions

TRICIA WACHSMUTH - October 4, 2010                                    Page 198
Cross-Examination by Mr. Thompson

1  that has to have an explanation with it.
2    Q. You didn't say, "I'm not going to go down
3  those stairs"?
4        MR. GOSMAN: Go ahead. Tell him.
5        THE WITNESS: Well, I would like to explain
6  if I answer that a yes or no because it's a yes or no
7  question that needs an explanation followed by it.
8  BY MR. THOMPSON:
9    Q. I think you've explained it twice.
10   A. Well, I would like to explain it again.
11       MR. GOSMAN: No, Tricia, I don't -- I don't
12 want you to do that. The record is full of that
13 information. We really don't even need to be here.
14       THE WITNESS: Okay. I just don't want him to
15 use it against me.
16       MR. GOSMAN: Well --
17       THE WITNESS: Because I --
18       MR. GOSMAN: I'll take care of you in that
19 regard.
20 BY MR. THOMPSON:
21   Q. Did you ever tell them, "I'm not going to go
22 down"? Did you ever refuse?
23   A. No. No.
24   Q. Your testimony also is that you believed that
25 you felt when the officer was walking behind you, that

TRICIA WACHSMUTH - October 4, 2010                                    Page 199
Cross-Examination by Mr. Thompson

1  the gun was pointed at you, but that was just a
2  feeling. You didn't --
3    A. That was a feeling --
4    Q. Ma'am, ma'am, wait for me to ask the
5  question, please. This will go a lot quicker if we do
6  it that way.
7        You never did observe the officer as you were
8  walking, looking forward, you never observed the
9  officer behind you, correct?
10   A. No.
11   Q. Is that correct?
12   A. That is correct.
13   Q. And you stated the only time that you saw,
14 when you were going down the stairs, that the officers
15 had their guns up is when you abruptly stopped and put
16 your hands to the side?
17   A. Up.
18   Q. Put your hands up, correct?
19   A. Up on the wall, yes.
20   Q. Up on the wall, correct?
21   A. Correct.
22   Q. Is it your testimony that when that happened,
23 all of the officers in line brought their guns up?
24   A. Yep.
25   Q. So they were pointing at each other?

TRICIA WACHSMUTH - October 4, 2010                                    Page 200
Cross-Examination by Mr. Thompson

1    A. No. They were all standing right here and
2  here. And they lifted them up and they aimed at me.
3  They aimed them at me, like ready to shoot me. I was
4  their target. They wanted -- in my opinion, they
5  wanted me dead.
6    Q. That's -- that's your opinion.
7    A. And that's what I said, in my opinion.
8    Q. What -- what do you base that on?
9    A. Twenty guns pointed at you? How would you
10 feel? Would you not get scared? Would you not do what
11 you're told.
12   Q. I'm just trying to find out, ma'am, what's
13 your opinion as to why they wanted you dead?
14   A. After what they did to my home and the way
15 they were treating me. They were bringing me down into
16 a basement forcefully. I had no choice. I was held at
17 gunpoint. You don't argue when you have -- when you're
18 held at gunpoint.
19       Not once did they ask me if I wanted a vest.
20 Not once did they ask me if I wanted to go upstairs.
21 Not once did they ask me if I was okay with any of it.
22 Not once did somebody say, "Hey, stop. Bring her back
23 up here." Not once did anybody try to stop this from
24 happening to me.
25   Q. Are you done?

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 53 of 78
Tricia Wachsmuth v.                                                    Tricia Wachsmuth
City of Powell, et al.                                                 October 04, 2010

1    A. Are you?
2    Q. No, ma'am, I still have some additional
3  questions. Are you okay, or do you need a break?
4    A. I'm okay.
5    Q. Now, you were in the house before the
6  officers ever came in, and you were concerned that
7  somebody could be in the basement, correct?
8    A. Not until after they did what they did
9  towards the basement. That's when I started thinking
10 if somebody is in my basement.
11        MR. GOSMAN: And by the way, I want to go on
12 the record. I have no problem with questions that are
13 true follow-up questions to the deposition that's been
14 given here today. But these -- this is territory that
15 has been covered foot by foot in the previous
16 questions, and you're asking the same questions over
17 again. And there's only so many times I'm going to
18 allow my client to, you know, testify.
19        MR. THOMPSON: So the -- so the objection is
20 objection as to form?
21        MR. GOSMAN: Asked and answered.
22        MR. THOMPSON: Okay.
23 BY MR. THOMPSON:
24    Q. Now, when you had concern that someone was in
25 the basement, did you ever believe that the officers

1    A. Yeah, my -- Kobos and Stiles. I'm supposed
2  to see Kobos sometime this week to work on the
3  nightmares because they are getting worse, and that's
4  why he gave me the medication that I'm on for now. And
5  I'm supposed to keep seeing him until we find the right
6  dosage and get the -- get the nightmares taken away so
7  I can actually sleep and wake up without fear.
8    Q. And -- and I think you misunderstood my
9  question. I said, "Other than the providers who you've
10 treated with, have you relayed these symptoms or
11 these" -- "this condition to anyone else?"
12    A. Huh-uh.
13    Q. Is that a "no"?
14    A. Other than my healthcare providers?
15    Q. Yes, ma'am.
16    A. No.
17    Q. Have you talked to your husband at all about
18 it?
19    A. Not really often. He sits in with some of my
20 meetings with me to try and keep me calm. But even
21 when we leave, he'll look at me and say, "How come
22 you've never told me this?" I don't -- I don't want to
23 hurt anybody.
24    Q. I don't understand.
25    A. I don't want to hurt him.

1  had a concern that somebody was in the basement?
2    A. With the way they were hiding behind me and
3  pointing their guns at me, yeah, I honestly thought, in
4  my opinion, if anybody was going to die that night, it
5  wasn't going to be them. It was going to be me. I
6  didn't feel they cared about my life.
7    Q. You -- you talked about the --
8    A. Sorry. I didn't mean to fly like that.
9    Q. You talked about the questioning by Officer
10 Brown. Was officer Brown by himself when he was
11 talking to you?
12    A. There was an officer sitting on a chair over
13 by a filing cabinet. Which officer, I do not know.
14    Q. How far away from where you and officer Brown
15 were at?
16        You're going to pull your microphone off.
17    A. Me to her, the end of her away. So he wasn't
18 too far. It's a small little office. I wouldn't
19 consider it anything nice.
20    Q. Seven, 8 feet away?
21    A. Oh, yeah. Give or take a foot.
22    Q. Other than the healthcare providers that your
23 attorneys provided us records on, have you relayed your
24 nightmares, anxiety attacks, panic attacks to anybody
25 else?

1    Q. Okay.
2    A. You know, I tell him my nightmares and he's
3  going to be worried and stay up all night with me. And
4  there's no sense in making everybody suffer because I
5  am.
6    Q. Have you talked to anyone else in your family
7  about these nightmares?
8    A. Pretty much my husband knows a little bit
9  about them. It's pretty much my healthcare
10 professionals that know a lot and how vivid they are.
11 And I go into detail with them. With my husband it's,
12 oh, I have a nightmare. My healthcare providers, it's
13 detail.
14    Q. And -- and -- and you said pretty much my
15 healthcare providers and my husband. And I just want
16 to make sure that I've exhausted all of the possible
17 people that you've talked to this about, other than the
18 healthcare providers and your husband.
19    A. Just personal. I just keep it between us.
20 You know.
21    Q. So there's nobody else that you talk to,
22 other than --
23    A. My father-in-law knows I have nightmares.
24    Q. What -- how --
25    A. But he doesn't know how bad they are or what

TRICIA WACHSMUTH - October 4, 2010            Page 205
Cross-Examination by Mr. Thompson

1   they pertain to.
2   Q.  And your father-in-law, Tom Wachsmuth?
3   A.  Uh-huh.
4   Q.  Is that a "yes"?
5   A.  Yes.
6   Q.  And how does he know that you have
7   nightmares?
8   A.  Because we lived with them and we lived with
9   them after, and he's heard me scream, he's seen me
10  downstairs watching TV at a l hours of the night trying
11  to get it out of my mind.
12  Q.  And is that an assumption on your part that
13  he knows about that, or have you talked to him about
14  that?
15  A.  I guess it's more of an assumption because
16  he's seen me down there. He's never asked because he
17  doesn't like to bring up bad things, because he knows
18  every time I go through this and every time I have to
19  say it over, I have very vivid, very vivid nightmares.
20  Q.  How about your mother-in-law, Donna
21  Wachsmuth?
22  A.  No, I keep her out of it.  And Pastor Bill,
23  he knows about my nightmares, too.
24      MR. THOMPSON: Let's talk about --
25      MS. WESTBY: Oh, yes.

TRICIA WACHSMUTH - October 4, 2010            Page 206
Cross-Examination by Mr. Thompson

1   BY MR. THOMPSON:
2   Q.  Ma'am, when -- when you were going down the
3   stairs, do you know who the officer was that was behind
4   you? Was it the officer who told you to go down the
5   stairs, or a different officer?
6   A.  The officer who was directly behind me, I do
7   believe, was the officer who was holding me at gunpoint
8   the whole time. And the officer who cuffed me at the
9   bottom was a different officer.
10  Q.  And was the officer who told you that you
11  were going to go down first was that the officer that
12  was holding you at gunpoint?
13  A.  No.  That was the officer who was first to
14  the basement doors.
15  Q.  So do you know where the officer was that
16  told you, you were going to go down first?  When you
17  went down the stairs?
18  A.  He was -- he was -- when the officer -- when
19  I first was told, you're going to go down first, the
20  officer, who I do believe was Chretien, who made the
21  order, I stood up, all that blah, blah, blah, walked to
22  the front of the thing, tells me I have to go first. I
23  go first, start to go down, and it was Chretien, as far
24  as I know, who made that order. And reached over,
25  pushed me away from the wall, and told me to keep

TRICIA WACHSMUTH - October 4, 2010            Page 207
Cross-Examination by Mr. Thompson

1   going.
2   Q.  I -- and -- and I confuse easily, but I --
3   you just confused me.  I thought you said that the
4   officer that held you at gunpoint was the one that was
5   directly behind you as you were going downstairs?
6   A.  Behind me, yes.  And the one who ordered me
7   to go down was on the side of me.  Like a little bit
8   back behind on the side of me.
9   Q.  So --
10  A.  Like if I'm standing here, he would have been
11  right there.  And the officer who was behind me was
12  behind me.  This is behind, this is my side.
13  Q.  I'm going to give you one more chance to
14  be --
15  A.  An artist?
16  Q.  -- an artist.
17      MR. GOSMAN: We use numbers.  We -- we -- or
18  letters.  I'm sorry.
19      We probably ought to renumber the first
20  exhibit as Exhibit A.
21      MS. WESTBY: Why?
22      MR. GOSMAN: Because defendants use letters.
23      MS. WESTBY: Not in deposition.  They are
24  just deposition exhibits.
25      THE WITNESS: What am I drawing?

TRICIA WACHSMUTH - October 4, 2010            Page 208
Cross-Examination by Mr. Thompson

1   BY MR. THOMPSON:
2   Q.  Let's -- let's go ahead and draw two parallel
3   lines for the stairs. And you can -- let's -- let's --
4   let's start over.
5   A.  I told you I'm not an artist.
6   Q.  I want you to use the -- the whole piece of
7   paper, okay?
8   A.  Like that?
9   Q.  That's good.  Why don't you extend it all the
10  way down to the bottom.
11  A.  (Witness Complies.)
12      Bottom.  This is where you can start to see.
13  This is my light switch.
14  Q.  Okay.  Let's -- let's slow down, ma'am, okay?
15  A.  This is the top.
16  Q.  All right.  Don't -- please?
17  A.  This is the door.
18  Q.  Okay.  Why don't you put -- why don't you put
19  "D" for door?
20  A.  I'm not an artist.  I told you.
21  Q.  And -- and -- and you've written out door.
22  Just put "T" for Top.  And that's the top of the
23  stairs?
24  A.  No, that's the top of the base.  Top, base.
25  Q.  Okay.  Now you've written in base next to the

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 55 of 78
Tricia Wachsmuth v.
City of Powell, et al.

Tricia Wachsmuth
October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                                    Page 209
Cross-Examination by Mr. Thompson

1  "T," correct?
2  A. Yes, it's top base, it's like the landing.
3  Q. Okay. And where are the bottom of the
4  stairs? Why don't you write bottom?
5  A. (Witness complies.)
6  Q. And I want you to put a "P" for where --
7  and -- and let's just talk about when you stopped and
8  put your hands up. Let's put a "P" for you.
9  A. (Witness complies.)
10     Okay.
11  Q. And as you go down the stairs, you've put
12  yourself against the right side of the stairs, correct?
13  A. I think -- it's hard not being in the house.
14  I put my side against the whole cement wall, the one
15  that didn't have the hole in it.
16  Q. And let's put a one for officer that was
17  directly behind you.
18  A. (Witness complies.)
19     That's a step.
20  Q. And because it -- the one looks like another
21  hash mark, just put a circle around the one. Okay.
22  And let's put a two for the officer that you claim was
23  beside you.
24  A. (Witness complies.)
25  Q. And you believe the number two represents the

TRICIA WACHSMUTH - October 4, 2010                                    Page 210
Cross-Examination by Mr. Thompson

1  officer that told you that you were going first?
2  A. Pushed me, yep.
3  Q. And the number one is the officer who had
4  you -- and -- and let's not put anymore lines on there
5  because it's going to clutter up the diagram.
6     Okay. I'm going to take your pen away.
7  Number one is the -- the officer that you
8  believe had you at --
9  A. Gunpoint.
10  Q. -- gunpoint, correct?
11  A. Uh-huh.
12  Q. When you stopped and put your hands up
13  against the -- the -- the wall, you went against the
14  wall, what did Officer 2 do?
15  A. All of the officers took a step back. And
16  then all these officers lifted up their guns. And that
17  officer even had his gun. And then once he realized I
18  was up against -- up against the wall, switched it and
19  reached over and pushed me away from the wall and said
20  to keep going.
21  Q. Okay.
22     MR. THOMPSON: Let's mark this Exhibit 2.
23
24
25

TRICIA WACHSMUTH - October 4, 2010                                    Page 211
Cross-Examination by Mr. Thompson

1     (Exhibit 2 marked)
2     THE WITNESS: Sorry. My art sucks.
3  BY MR. THOMPSON:
4  Q. And you told Ms. Westby that you could
5  describe the officer that said, "She's going first"?
6  A. I can describe him.
7  Q. And -- and you said he was clean-cut?
8  A. Clean-cut.
9  Q. And -- and do you have any more definitive
10  description than just clean-cut?
11  A. Skinny, average height, short hair, gel in
12  it, very clean-cut. Very preppy.
13  Q. Crew cut?
14  A. No, it was shaved. Like --
15  Q. Don't look at my head, I don't have any hair
16  to look at.
17  A. Like his hair, but a little bit shorter here
18  and gelled.
19     MR. GOSMAN: And "his" being whom?
20     THE WITNESS: Him, top one, you.
21  BY MR. THOMPSON:
22  Q. Ma'am, where did you first hear the
23  terminology --
24  A. Shorter.
25  Q. Where did you first hear the terminology

TRICIA WACHSMUTH - October 4, 2010                                    Page 212
Cross-Examination by Mr. Thompson

1  "human shield"?
2  A. When I was a little girl. Everybody has
3  heard the terminology "human shield."
4  Q. I never heard it when I was a little kid.
5     How -- how -- in what context?
6  A. I grew up in Minnesota.
7     MR. GOSMAN: We really appreciate knowing
8  that, too, Thomas.
9  BY MR. THOMPSON:
10  Q. Well, I -- I'm just curious. In what
11  context?
12  A. Honestly, I don't know. It's just one of
13  those things when you're young, you hear. You ask, and
14  you look up and you find out the definition. You know,
15  not to mention with all these wars going on, it's been
16  nothing but public access.
17  Q. And -- and enlighten me. I mean, was it on a
18  cartoon?
19  A. No.
20  Q. When you say "a little kid," was it on a
21  cartoon? Was it on --
22  A. What do you mean "little kid"?
23  Q. Well, you said -- I think you said --
24  A. When I was a little kid, I heard about it.
25  High school, I guess. I feel old now, so high school.

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 56 of 78
Tricia Wachsmuth v.
City of Powell, et al.

Tricia Wachsmuth
October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                    Page 213
Cross-Examination by Mr. Thompson

1    Q.   So do you know in what context --
2    A.   They teach you.
3    Q.   Let me finish my question, okay, so we have a
4    clean record.
5         Do you know in what context you heard it in
6    high school?
7    A.   They teach you in high school when we're in
8    classes that -- sorry -- when you're in classes, like
9    history classes and stuff, they teach you about things
10   like that.  And all the people in this country would do
11   this with bodies and use them as human shields and take
12   them down.  And it was just stuff we learned in school.
13   Q.   Okay.
14   A.   Different school systems, I guess.
15        MR. THOMPSON: I don't believe I have any
16   further questions.
17        THE WITNESS: Okay.
18        MR. THOMPSON: Thank you.
19        THE WITNESS: Thank you.
20             (Exhibit 3 identified)
21             CROSS EXAMINATION
22   BY MR. GOSMAN:
23   Q.   Tricia, I may have a couple of questions.
24   First of all, let's go ahead and -- and have you take a
25   look at something that we'll mark as Exhibit No. 3 to

TRICIA WACHSMUTH - October 4, 2010                    Page 214
Cross-Examination by Mr. Gosman

1    your deposition.
2         And I want you to te l me what that is and --
3    and where -- where you go. it.
4    A.   This is a letter from my LCSW from Powell --
5    Cody -- blah, Billings, Montana.  He's the -- I guess I
6    would call him a counselor.  I don't know what -- LCSW
7    stands for counselor, right?
8    Q.   Well, I honestly am not part of the
9    deposition.  So we're going to have to go with whatever
10   you know about this letter and this man.
11   A.   Okay.  He's my counselor.  I see him on a
12   weekly basis.  Sometimes more if I -- need be.  He's on
13   call for me, and he knows everything that's been going
14   on and how it's been affecting me lately.  And I was
15   talking to him about how I was deathly scared about the
16   officers being present.  And if I had forgotten my
17   medications, what I was supposed to do.  Or if I
18   started having an attack in front of them, what I was
19   supposed to do.
20        And he gave me a letter stating that he's
21   hoping that this would make it so if I did need to
22   leave the room, you guys would understand and let me
23   gain my composure and take my breath and do my
24   exercises and see if any of that would help me.
25        MS. WESTBY: And I would just reassert the

TRICIA WACHSMUTH - October 4, 2010                    Page 215
Cross-Examination by Mr. Gosman

1    objection and the discussion that we had at the
2    beginning of the deposition in regard to this letter.
3         MR. THOMPSON: I'd join.
4         MR. GOSMAN: All right.  I don't think I have
5    anything else.  Thank you very much.
6         THE WITNESS: Am I done?
7         MR. GOSMAN: Yes.
8         MS. WESTBY: And how -- do you have the
9    additional medical records that you were going to try
10   to bring to the deposition?
11        MR. GOSMAN: No, I don't.
12        MS. WESTBY: We're going to have to, then,
13   keep the deposition open in case we need to look into
14   those.
15        MR. GOSMAN: I don't really have a problem
16   with that.  Although I -- I will say that there's no
17   reason why you couldn't have had these medical records
18   in time to conclude the deposition.  I'm -- I'm just
19   not going to make an issue.
20        MS. WESTBY: Well, and I guess the problem
21   with that is you still haven't provided --
22        MR. GOSMAN: You want me to get them for you.
23   You were to get me releases months ago with the
24   protective order.  And I had never seen either.  I've
25   seen the releases, but no protective order until I got

TRICIA WACHSMUTH - October 4, 2010                    Page 216
Cross-Examination by Mr. Gosman

1    an e-mail from you.  An e-mail, which I did receive
2    from you.
3         MS. WESTBY: You have the releases and you
4    told me that you would provide them to me.  You haven't
5    provided the releases to me.
6         MR. GOSMAN: Oh, you know what?  We can get
7    you the releases -- I'll get you the releases --
8         THE COURT REPORTER: Excuse me, Counsel.
9         MR. GOSMAN: Yeah.  All right.  I'll get you
10   the releases, like, tomorrow.
11        MS. WESTBY: That would be appreciated.  And
12   we will get the records.
13        And so you're in agreement that the
14   deposition was held open -- open pending --
15        MR. GOSMAN: For that purpose only.  To -- to
16   review information in those medical records.
17        MS. WESTBY: And in addition to that, the
18   other -- the other area that you asserted
19   attorney-client privilege to.
20        MR. GOSMAN: I don't --
21        MS. WESTBY: That -- if that becomes an issue
22   and we need to ask her questions about that once that
23   is presented to us, then I believe that is also
24   appropriate.
25        MR. GOSMAN: Well, you may believe that, but

Tricia Wachsmuth v.
City of Powell, et al.

Tricia Wachsmuth
October 04, 2010

TRICIA WACHSMUTH - October 4, 2010                     Page 217
Cross-Examination by Mr. Gosman

1   you are certainly not going to get a stipulation from
2   me for that. So I think we're done here. Thank you
3   very much.
4           Tricia, you may leave.
5           THE VIDEOGRAPHER: This will conclude the
6   deposition. We'll go off the record. The time is
7   3:09.
8           (Proceedings concluded at 3:09
9           p.m., October 4, 2010.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

TRICIA WACHSMUTH - October 4, 2010                     Page 218
Cross-Examination by Mr. Gosman

1           DEPONENT'S CERTIFICATE
2           I, Tricia Wachsmuth, do hereby certify, under
3   penalty of perjury, that I have read the foregoing
4   transcript of my testimony consisting of 217 pages,
5   taken on October 4, 2010 and that the same is, with any
6   changes noted below, a full, true and correct record of
7   my deposition.
8   PAGE  LINE      CORRECTION      REASON FOR CORRECTION
9   ____  ____  _____  _____
10  ____  ____  _____  _____
11  ____  ____  _____  _____
12  ____  ____  _____  _____
13  ____  ____  _____  _____
14  ____  ____  _____  _____
15  ____  ____  _____  _____
16  ____  ____  _____  _____
17  ____  ____  _____  _____
18  ____  ____  _____  _____
19  ____  ____  _____  _____
20  ____  ____  _____  _____
21  ____  ____  _____  _____
22
23
24                        Tricia Wachsmuth   Date
25

TRICIA WACHSMUTH - October 4, 2010                     Page 219
Cross-Examination by Mr. Gosman

1                      CERTIFICATE
2           I, VONNI R. BRAY, Registered Professional
3   Reporter, and Notary Public for the State of Montana,
4   do hereby certify that TRICIA WACHSMUTH was by me first
5   duly sworn to testify to the truth, the whole truth,
6   and nothing but the truth;
7           That the foregoing transcript, consisting of
8   218 pages, is a true record of the testimony given by
9   said deponent, together with all other proceedings
10  herein contained.
11          IN WITNESS WHEREOF, I have hereunto set my
12  hand this 15th day of October, 2010.
13
14
15
16
17
18
19
20
21  _____
    Vonni R. Bray, RPR
22  P. O. Box 125
    Laurel, MT 59044
23  (406) 670-9533 Cell
    (888) 277-9372 Fax
24  vonni.bray@yahoo.com
25

Tricia Wachsmuth v.
City of Powell, et al.

Tricia Wachsmuth
October 04, 2010

**0**

**01 (1)**
49:6
**03 (2)**
14:20,23
**04 (5)**
14:20,23;17:13,14,15
**05 (2)**
17:13;69:10
**06 (1)**
27:16
**07 (1)**
23:1
**08 (2)**
39:4,16
**09 (8)**
30:1;31:15;33:16,18;
39:1;55:9;56:14;171:14

**1**

**1 (3)**
5:5;150:17,20
**10:22 (2)**
83:2,3
**10:39 (1)**
83:6
**10-CV-041-J (1)**
4:5
**10th (3)**
12:3,5,14
**11:15 (2)**
110:25;111:1
**11:30 (1)**
111:7
**11th (2)**
12:5,14
**12:28 (2)**
161:25;162:1
**12:31 (1)**
162:4
**12:57 (2)**
184:2,3
**130 (1)**
58:24
**14th (1)**
20:22
**14-year-old (1)**
79:23
**15 (1)**
12:3
**16 (2)**
18:22;80:6
**17 (1)**
80:7
**18 (3)**
11:21,21,22
**19 (5)**
11:18;13:14;14:22;
16:24,25

**2**

**2 (3)**
210:14,22;211:1
**2:30 (1)**
184:3
**2:31 (1)**
185:1
**20 (1)**
10:3
**200 (1)**
58:22
**2000 (4)**
19:1;29:7;49:5;50:1
**2001 (1)**
182:19
**2003 (1)**
14:19
**2005 (1)**
16:1
**2007 (1)**
22:22
**2008 (1)**
157:20
**2009 (1)**
175:9
**2010 (6)**
4:6;83:4;111:2;162:2;
184:4;217:9
**22 (9)**
97:17,24;100:24,25;
102:1,4;103:5;149:14,16
**24th (2)**
100:11;104:12
**26 (1)**
20:11
**26th (1)**
20:12
**27th (1)**
20:12

**3**

**3 (6)**
84:10,11,13;189:21;
213:20,25
**3:09 (2)**
217:7,8
**30 (1)**
33:11
**302-1321 (1)**
147:12
**30-second (1)**
114:2
**30th (1)**
18:24
**357 (3)**
97:17;101:14;103:5

**4**

**4 (5)**

**A**

**ability (2)**

83:4;111:2;162:2;
184:4;217:9
**45 (3)**
97:17;101:14;103:5
**4th (2)**
4:6;16:1

**5**

**5 (1)**
8:23
**524 (7)**
8:20,24;25:12,17,23;
27:1,25
**5th (1)**
33:15

**6**

**650 (1)**
68:15

**7**

**7 (6)**
8:21,24;25:12,17,23;
27:25
**7.25 (2)**
33:7,22
**740 (2)**
26:7,9

**8**

**8 (1)**
202:20
**8.50 (1)**
31:16
**8:41 (1)**
4:7

**9**

**9 (3)**
26:8,9;29:7
**9.94 (1)**
30:5
**9:26 (1)**
41:15
**9:29 (1)**
41:20
**911 (2)**
107:6;194:5
**980s (1)**
59:21
**9mm (1)**
151:17
**9th (1)**
12:3

7:10;10:25
**able (7)**
11:4;19:8;46:5;81:12;
94:2;135:17;138:8
**abruptly (1)**
199:15
**absences (1)**
163:15
**absolutely (1)**
154:5
**access (1)**
212:16
**accident (1)**
79:19
**accommodate (1)**
40:25
**according (2)**
99:20,22
**accurate (8)**
14:19;56:16;65:21;
91:23;104:10;118:2;
151:19;171:23
**accuse (1)**
82:2
**across (1)**
130:2
**act (1)**
72:14
**actions (1)**
88:11
**activities (1)**
85:18
**activity (2)**
75:13;98:23
**actually (7)**
20:3,5;23:18;27:12;
101:11;155:1;203:7
**addicted (5)**
47:21;60:1,4,18,24
**addition (6)**
84:19;144:17;172:20;
177:19;182:1;216:17
**additional (5)**
6:3,9;185:5;201:2;
215:9
**address (9)**
5:22;6:14;7:10;8:16;
25:11,16;137:3;138:16;
141:20
**addressed (3)**
6:5,13;7:21
**adverse (1)**
56:9
**advising (1)**
133:8
**affecting (2)**
170:13;214:14
**afraid (4)**
82:3;122:10;143:8;
164:4
**again (19)**
39:12;49:13;59:3;
78:23;125:25;126:18;

132:6;146:19;147:6;
148:18;151:2,21;167:9;
171:1,2;172:1;174:2;
198:10;201:17
**against (26)**
86:23;96:5;109:15,16,
21;120:4,6;121:22;
122:18;128:13,14,16;
134:25;135:21,22;
137:18;139:15;141:13;
146:3;198:15;209:12,
14;210:13,13,18,18
**age (2)**
13:8;61:10
**agent (1)**
37:25;193:3
**ago (7)**
46:15,17;49:3;81:7,
18;125:15;215:23
**agree (4)**
67:8,22,25;193:9
**agreed (1)**
41:21
**agreement (1)**
216:13
**ahead (27)**
8:4;56:17;67:14,16;
70:6;73:24;91:8;127:10;
133:3;135:13;137:10;
138:7;148:15,15,24,25;
150:16;158:5;165:5,24;
167:7;184:6,8;191:7;
198:4;208:2;213:24
**aide (1)**
172:3
**aimed (3)**
122:12;200:2,3
**aiming (1)**
142:3
**ain't (1)**
74:3
**al (1)**
4:3
**alarm (1)**
119:1
**alive (1)**
50:19
**allergic (2)**
48:21;49:15
**Allina (2)**
50:9,11
**allow (4)**
96:5,6;138:6;201:18
**allowed (2)**
139:1;164:11
**allowing (1)**
138:24
**almost (1)**
79:16
**alone (6)**
18:13;59:13;100:22;
147:4;195:19,20
**along (5)**

32:6;108:9;149:11;
165:25;166:4
**alternative (2)**
12:4;188:25
**Although (1)**
215:16
**always (9)**
21:15;35:3;61:20;
68:8;70:22;75:17;83:17;
96:24;166:15
**amend (1)**
148:7
**ammo (1)**
101:21
**amount (7)**
45:15;84:8,9,17;88:2;
166:18;189:17
**and/or (1)**
36:22
**anguish (2)**
142:22,24
**animal (3)**
82:4;92:19;190:9
**animals (15)**
77:25;79:4,12;81:21;
82:1,3,15,17;91:23,24;
92:23;93:12;153:22;
190:7,7
**anniversaries (2)**
54:22,23
**answered (5)**
140:18;167:6;171:17;
188:3;201:21
**antianxiety (1)**
10:6
**antidepressant (2)**
10:5;168:18
**antidepressants (1)**
80:12
**anti-panic (1)**
10:1
**anxiety (22)**
10:1;19:23,25;20:2,3;
55:11,15;70:14;71:4,7,
12,13,24;143:1;158:22,
22;159:12,19;171:7;
186:23,25;202:24
**anymore (5)**
30:12;31:4,5;81:21;
210:4
**apologize (2)**
41:4;188:4
**apologized (1)**
17:4
**appeared (1)**
177:24
**appears (2)**
38:9,11
**appetite (1)**
55:21
**appointment (2)**
170:9,10
**appointments (1)**

65:11
**appreciate (3)**
60:14;148:19;212:7
**appreciated (1)**
216:11
**appropriate (2)**
140:12;216:24
**April (3)**
17:14;29:5,6
**April-ish (1)**
17:15
**area (6)**
42:19,22;43:17;98:2;
152:2;216:18
**argue (9)**
121:10,14;135:6;
138:5;178:21;197:19,23,
25;200:17
**argumentative (1)**
145:10
**arguments (1)**
17:2
**arm (4)**
79:23;119:21;121:12;
190:9
**Armstrong (1)**
95:10
**around (20)**
17:15;33:1;36:4;
61:10;68:5,21;71:5;
74:25;76:20;90:11,18;
97:15;108:1;116:1;
118:11;120:2,4,21;
187:7;209:21
**arrest (2)**
147:18;189:5
**arrested (6)**
31:9;34:18;8:13;
118:21;147:22;157:8
**arrived (2)**
117:9,10
**art (1)**
211:2
**artist (5)**
150:3;207:15,16;
208:5,20
**aspects (4)**
84:2;164:8;165:8,12
**assault (1)**
154:14
**asserted (1)**
216:18
**assignments (1)**
166:7
**assume (3)**
9:10;133:21 136:1
**assumed (1)**
75:5
**assuming (3)**
13:5;91:14;135:10
**assumption (3)**
148:10;205:12,15
**atmosphere (1)**

30:14
**attached (1)**
141:9
**attack (5)**
10:1;20:8.10;171:8;
214:18
**attacks (10)**
20:3;142:25;143:1;
158:22,22;159:12,19,19;
202:24,24
**attention (2)**
102:12;145:5
**Attorney (35)**
9:3;87:12;134:5,24;
135:3,21;136:20;137:3,
19,21;138:4;146:15,20,
21;149:7;179:4;182:21,
22,23,24;183:11,13,15,
17,19;194:13,14;195:3,
6,7,8,9,10,13,22
**attorney-client (9)**
135:6,25;136:4,23;
138:14;139:5,24;141:1;
216:19
**attorneys (2)**
195:23;202:23
**audible (1)**
185:19
**audibly (1)**
9:15
**available (1)**
53:2
**average (1)**
211:11
**avoid (4)**
40:10;41:1;124:13;
125:19
**awake (1)**
55:24
**aware (14)**
6:1;31:8;35:21,24;
36:21;71:10;84:7;88:2;
91:15,18;116:19;
124:17;151:13;155:4
**away (25)**
13:2,4;15:5;24:18;
46:4;61:4;79:11;81:18,
20;97:3;107:20;109:23,
24;119:24;121:1;
122:23;158:24;186:1;
202:14,17,20;203:6;
206:25;210:6,19

---

**B**

**baby (5)**
20:18,21;47:14,16;
171:4
**back (104)**
12:25;14:5,8,9,10;
16:9;17:4,7,15;18:9;
19:3;22:1,3,4,7,20,21;
24:21;25:9,17,20;26:2,6,

14,21;27:16,18;28:11,
19;37:5;41:5,18,19;
43:9;48:8;52:9,12;
54:18;57:5,23;58:2,3;
59:1,12;65:16;79:23;
82:16;83:5,8;92:20;
93:4,11,15,16;98:16,19;
102:15,23;105:21,22,22;
109:17,25;111:6,9,14;
112:11,12;113:2,23;
114:4;119:18;121:23;
122:10,18;123:19;
125:13,20;128:16,19;
130:21;136:19,25;
143:2;145:4;153:18;
157:15,16,21;159:15;
162:3;169:7,10,14;
173:5,6;181:15;184:25;
186:16;188:8,17;
200:22;207:8;210:15
**background (3)**
11:12;37:12,25
**backyard (1)**
36:16
**bad (18)**
18:13;46:3;47:5;
48:17;54:10;62:19;
76:23;85:23;86:7;96:17,
18;110:12;158:23;
159:15;162:15,16;
204:25;205:17
**baffled (1)**
59:8
**bag (6)**
39:23;42:10;64:14,14,
16,17
**bags (2)**
66:18;189:22
**bam (1)**
106:5
**bandage (1)**
82:13
**bank (1)**
181:15
**bark (1)**
105:18
**barks (2)**
72:20,22
**base (5)**
200:8;208:24,24,25;
209:2
**based (1)**
133:9
**basement (45)**
42:18,20,21;76:8,12,
15,17,22;77:6;90:24;
104:25;108:3,10;
111:13.114:14;115:10;
116:3,7,16;117:6,21,25;
118:1,13;120:12;122:8;
123:9,12,13;126:21;
127:25;128:7,8,23;
132:5,5;143:17;151:25;

200:16;201:7,9,10,25;
202:1;206:14
**basically (3)**
30:11;93:21;115:21
**basis (5)**
50:13;115:13;146:2;
148:5;214:12
**hathroom (3)**
116:15;117:4;150:11
**bathrooms (1)**
76:15
**Beaman (1)**
141:20
**bear (2)**
92:12;153:18
**beat (1)**
147:3
**beautiful (1)**
18:3
**became (1)**
95:18
**become (1)**
62:16
**becomes (1)**
216:21
**bed (7)**
19:22;45:10;48:18,24;
101:22;151:6,7
**bedroom (10)**
61:23;98:10;101:12,
13;102:10;150:10,12;
151:6,9,14
**Bedrooms (1)**
76:15
**beforehand (2)**
144:4;163:10
**began (1)**
80:8
**begin (1)**
4:22
**beginning (8)**
14:23;41:4;62:9;
100:9;126:23;180:16;
185:10;215:2
**behind (33)**
24:21;71:1;79:20;
108:8,15,19;109:12;
111:19,20,21,22,24;
112:2,15,17,18;113:12,
15,17;114:10;128:6;
198:25;199:9;202:2;
206:3,6;207:5,6,8,11,12,
12;209:17
**belief (1)**
187:13
**bell (2)**
67:1;95:12
**belonged (1)**
24:13
**below (3)**
61:19;86:8;96:25
**bends (1)**
157:20

**benefits (1)**
32:24
**Bes (1)**
66:8
**beside (1)**
209:23
**besides (4)**
73:16;97:19;191:11;
192:17
**Bessler (2)**
39:21.22
**best (6)**
21:9;57:13;58:7;59:6;
75:20;134:19
**Betsy (1)**
172:12
**better (9)**
21:7,21;40:20;57:12;
59:8,9,11;92:22;150:19
**beyond (1)**
133:10
**big (12)**
42:23,25;66:5;71:18;
89:5;95:4;100:22;
107:15,15,15;115:21;
120:5
**bigger (6)**
29:23;31:22;35:22;
58:22;103:19;124:20
**Bill (5)**
173:11;176:6,8;
195:25;205:22
**Billings (5)**
53:15;169:13;170:3;
172:10;214:5
**bills (2)**
39:6;68:8
**bipolar (2)**
69:1,12
**birthday (1)**
54:22
**bit (15)**
22:11;31:23;34:10,25;
79:17;83:9;103:19;
159:8;180:4;187:8;
193:20,21;204:8;207:7;
211:17
**bite (1)**
55:22
**Blackmore (1)**
184:15
**blah (4)**
206:21,21,21;214:5
**blame (1)**
86:23
**blanket (1)**
105:15;107:13
**blazer (2)**
45:18;106:1
**bleed (2)**
170:15,24
**bleeding (2)**
82:14;174:3

4:9
**break (11)**
11:8,9;82:22,24;
105:25;110:22;127:17;
161:22;181:18;183:24;
201:3
**breath (1)**
214:23
**breathe (1)**
100:4
**Bret (95)**
13:13;14:19;15:1,18;
16:6,9,18;17:8,18;19:2;
24:13,14;25:5;26:9;
34:12,18,21;35:2,13;
36:22;38:1,8,12;39:5;
45:14,14,16,46:2,47:24;
54:18;56:24;57:12;59:1,
10;61:11;63:4,7,8;65:6;
68:25;72:13;75:11;
77:21;87:21;94:1;95:20;
96:1;97:1,14,23,24;98:4,
17,21,24,25,25;99:3;
100:21,22;101:3,7,8;
102:9;103:9,12;104:10,
16;105:13,20;106:1;
114:18;115:4,6,8,9;
117:18;147:15,21;151:8,
12,22;154:13,13,25;
156:2,11;157:8;158:2;
175:17,19,19;181:25;
188:20;192:18
**Bret's (13)**
17:20;18:4;47:19;
59:18;65:7,19;68:16;
75:13;101:10;103:2,18;
104:9;155:5
**Brilakis (1)**
111:3
**bring (7)**
63:24;139:2;143:4;
169:15;200:22;205:17;
215:10
**bringing (2)**
130:1;200:15
**broke (2)**
119:17;127:16
**broken (3)**
61:18,25;97:1
**brother (14)**
13:3;15:5,6,9,13;
18:12;57:22;59:12,13;
79:15;80:7;154:14;
182:15,18
**brother-in-law (1)**
142:6
**brothers (1)**
15:9
**brother's (1)**
155:12
**brought (10)**
39:6;58:3;96:3;113:1;
114:3;118:25;121:17;

159:6;169:18;199:23
**Brown (10)**
129:19;146:8,9,10;
148:4;149:4;184:14;
202:10,10,14
**Bruce (4)**
179:4,16,19,22
**buds (2)**
64:3;84:15
**built (1)**
191:20
**bulged (1)**
157:21
**bulkier (1)**
124:20
**bullet (1)**
145:4
**bulletproof (4)**
156:9,10,22;157:6
**bumped (1)**
33:23
**bunch (1)**
39:23
**burn (10)**
79:10;80:17;81:9,9,9,
10,10,10;82:7,12
**Burned (1)**
44:25
**burning (5)**
80:8;82:15;190:16,23;
191:12
**burns (3)**
81:1,2;82:8
**business (1)**
30:17
**bust (1)**
83:18
**busted (6)**
74:5;106:18;126:20;
130:14;132:2;194:11
**butt (1)**
166:10
**buy (1)**
65:20
**buying (2)**
39:22;63:5

**C**

**cabinet (1)**
202:13
**cables (1)**
76:20
**caliber (1)**
149:16
**call (18)**
16:14;19:19;32:24;
33:1;42:22;60:12,14;
72:18,19,24;94:25;
107:6,15;118:15;194:5,
6;214,6,13
**called (12)**
48:19;52:1,2;55:23;

62:5;89:6;97:19;98:24,
25;104:6;167:24;196:20
**calling (1)**
192:17
**calm (1)**
203:20
**Cambridge (3)**
50:4,8;51:3
**came (36)**
25:9;28:19;29:21;
31:4;32:6;36:3,7;47:14;
48:21;51:11;66:1;7:65:5;
79:14;90:6;91:19;97:21;
104:14;106:25;107:1;
110:4,5;118:18;123:3,7,
8,15,17;144:4,8;147:2:
164:14;178:7;13:194:1;
196:4;201:6
**camera (3)**
110:19,21;132:13
**can (73)**
5:3;8:4;21:15;24:19,
20;34:19;35:10;38:21;
40:23;41:5,5,9,9;42:23,
25;50:4,22;52:17;61:14;
64:24;67:14,18;70:3;
71:3,6,21;72:6;73:24;
75:21;79:12;80:22,24;
86:23;94:5,16;96:24;
105:21;111:10;114:16,
17,18;116:6,7;118:1;
121:5,19;126:4,5,12;
129:10,18,25;133:15;
135:2;136:18,21;138:16,
16,21;140:10;148:16,24;
150:18;159:25;160:5;
163:4;169:8;179:25;
203:7;208:3,12;211:6;
216:6
**cancer (3)**
15:15;16:12;19:9
**Cannabible (2)**
89:6,10
**Cannon (1)**
89:9
**capacity (3)**
4:18;9:4;185:13
**capped (1)**
47:17
**car (19)**
24:8;61:18,18,25;
68:9;86:8;96:25;110:16,
17;130:2,3,3,8,10;132:9;
142:1;143:9;145:22;
146:6
**card (1)**
65:22
**cards (4)**
61:12;65:20,21;95:19
**care (12)**
39:5;49:23,23;50:7;
58:6;62:25;63:2,16,18;
82:12,14;198:18

**blunt (2)**
55:1,2
**bodies (1)**
213:11
**body (5)**
29:13;49:15;108:14;
120:10,14
**bolt (1)**
105:3
**book (10)**
89:5,13,14,15;93:20,
21,25;94:15 19;182:12
**books (4)**
36:20;90:20;150:24;
188:24
**bookshelf (14)**
36:19;90:15 16,19;
97:25;98:1,2;100:25;
149:19;150:7,8,23,24;
151:1
**bookshelves (-l)**
89:5;90:3,6;150:5
**boom (3)**
106:24;119:7,9
**born (2)**
11:13,23
**borrow (2)**
68:10;102:24
**borrowed (1)**
103:13
**boss (8)**
162:14,15;166:1,17,
23;167:12,14;168:2
**Boss-related (1)**
165:19
**both (7)**
12:5;47:20;62:18;
75:18;98:18.155:3;
157:8
**bother (1)**
75:4
**bottle (4)**
9:21;34:19;153:7,12
**bottles (4)**
65:8;152:20,23;153:1
**bottom (12)**
110:2,3;112:4;114:8;
122:14;123:8,16;206:9;
208:10,12;209:3,4
**bought (10)**
22:4,5;23:2,3;25:25;
26:10;39:23;64:5;65:23;
102:23
**boundaries (1)**
60:13
**box (3)**
65:14;92:24:93:14
**boxes (4)**
153:21;177:24;178:1,
1
**brain (2)**
46:6.8
**Bray (1)**

cared (2)
    63:16;91:3;202:6
Careful (1)
    24:22;86:2
cartoon (1)
    212:18,21
case (14)
    40:11;98:6;101:2;
    102:5;133:14;135:12;
    136:8;139:8;141:10;
    148:5;149:4;151:11;
    165:22;215:13
catch (2)
    61:16;70:5
caught (13)
    73:2,9;75:2,3,22;
    77:18;83:12;85:23;
    96:20;143:18;144:10,12,
    13
Cause (26)
    4:5;17:10;25:7;29:22;
    30:12;43:25;44:2;48:17;
    64:2;65:9;71:14,15;
    73:23;74:16;76:19;
    87:25;94:1,14;101:14,
    15;142:25;156:19;
    170:24;171:3;174:3;
    190:4
caused (2)
    49:15;158:19
causing (2)
    160:17,19
caution (1)
    5:11
cautious (1)
    86:3
Celexa (2)
    168:14,20
cell (1)
    107:6
cement (4)
    43:8,9;118:15;209:14
Centers (1)
    50:11
certain (10)
    30:22;31:2,3;84:8;
    94:2,5;116:2;129:9;
    192:1,1
certainly (2)
    40:10;217:1
chair (1)
    202:12
chance (3)
    59:2;148:11;207:13
change (2)
    41:5;126:2
changed (2)
    32:17;179:11
Chapman (1)
    184:15
character (1)
    179:7
charge (3)

check (3)
    58:9,9;68:16
checked (2)
    110:10,11
chest (2)
    71:19;101:21
Chief (1)
    184:16
Chihuahua (3)
    95:1;105:16;127:6
child (3)
    154:10;169:18;174:4
choice (4)
    81:19;147:13;194:19;
    200:16
choosing (2)
    146:14;194:19
chose (1)
    6:6
Chretien (4)
    124:8;184:14;206:20,
    23
Christina (1)
    168:3
chronic (1)
    157:15
church (1)
    176:17
CI (28)
    40:3,21;41:6;42:3,9;
    61:7,15;62:8;64:9;
    65:18;66:8;86:6,9,14;
    87:1,13,20,22;95:22;
    97:23;100:5;101:4,5,10;
    102:8;103:20;105:25;
    151:11
circle (1)
    209:21
circumspect (1)
    5:11
City (4)
    4:3,17;28:9;185:12
claim (8)
    137:18;142:18;146:2;
    148:5,7;149:3;158:19;
    209:22
claiming (7)
    134:16,25;135:12,21;
    142:8,13;158:16
claims (1)
    145:23
clarification (1)
    140:23
class (9)
    83:23,25;99:21,22,24,
    25;100:1,1,;88:17
classes (4)
    12:6;213:8,8,9
clean (3)
    29:13;124:20;213:4
clean-cut (4)
    211:7,8,10,12

clear (10)
    5:6;10:19;75:7;108:2,
    2,2,2;111:11;138:3;
    185:15
client (7)
    40:25;136:7,22;139:7,
    25;140:24;201:18
clients (1)
    141:13
clinic (6)
    50:6,21;51:24,25;
    52:4;169:9
clinics (3)
    51:7;169:11;172:8
Clon (1)
    9:21
Clonazepam (2)
    9:22,22
close (2)
    34:12;126:11
closed (1)
    119:16
closer (3)
    54:22;106:22,23
closet (3)
    29:17;31:6;156:20
closets (1)
    29:16
clothes (1)
    125:8
Cloud (1)
    13:18
clue (4)
    117:2;168:5,23;
    172:18
clutter (1)
    210:5
coat (1)
    110:13
coats (1)
    110:14
cocaine (3)
    153:24;154:2,3
Cody (1)
    214:5
coffee (1)
    152:11
cold (4)
    61:20;163:6;167:18;
    170:22
college (1)
    189:3
colored (1)
    130:3
Colt (2)
    97:17;103:5
comfortable (1)
    59:7
coming (2)
    32:15;119:4
commit (1)
    81:23
committed (1)

15:13
common (1)
    83:17
communications (1)
    134:4
company (1)
    33:9
comparing (1)
    63:13
complaint (2)
    148:6,10
complete (4)
    159:20;169:16;173:4,
    7
completely (2)
    103:8;192:3
complications (4)
    170:12,14,16,21
complies (9)
    80:23,25;108:20;
    150:1;208:11;209:5,9,
    18,24
composure (1)
    214:23
computer (1)
    154:6
concern (17)
    5:17;8.1;36:23;73:9.
    22;75:4,11,12;76:2;
    85:17;116:22;128:23;
    143:21;147:15;163:8;
    201:24;202:1
concerned (22)
    6:7;31:25;73:11,18;
    75:1;77:5;85:22;88:3;
    96:19;100:21,23;101:8;
    128:21;143:7,13,15,18;
    144:1,9,18,21;201:6
concerns (7)
    7:2,4,8,10,14,14;
    166:17
conclude (2)
    215:18;217:5
concluded (1)
    217:8
condition (5)
    65:17;70:24;94:6;
    174:25;203:11
conditions (1)
    20:15
confidential (5)
    40:2,8,11;192:8;
    193:19
confronted (1)
    5:9
confuse (1)
    207:2
confused (2)
    72:11;207:3
confusing (1)
    25:7
connected (1)
    51:8

connections (1)
    39:22
conscious (1)
    85:9
consequences (1)
    88:10
consider (5)
    52:3;62:19;68:1;
    153:8;202:19
considered (3)
    54:6;62:21;189:23
Constant (3)
    45:21;63:15;96:9
constantly (1)
    63:12
constitutional (2)
    183:7,8
construe (1)
    82:5
contact (4)
    87:1,13;106:23;
    173:21
container (2)
    153:4,5
containing (1)
    152:20
context (3)
    212:5,11;213:1,5
Continue (3)
    127:19,19;172:7
continued (1)
    121:8
continuously (1)
    116:17
control (2)
    82:12;158:24
convenience (1)
    40:20
conversation (11)
    123:20,21;126:12;
    127:20,21;129:19;
    139:20;140:25;141:3,4;
    148:4
conversations (8)
    127:11;129:18,24;
    133:10;139:7;140:24;
    141:9;195:22
conviction (1)
    175:22
cool (2)
    177:9;178:2
cooperate (1)
    158:6
cooperative (2)
    110:8;118:24
cop (5)
    110:16,17;146:6,6,
    171:8
cops (3)
    29:9;107:10;145:2
copy (1)
    30:10
cords (1)

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 62 of 78
Tricia Wachsmuth v.
City of Powell, et al.                                                    Tricia Wachsmuth
                                                                          October 04, 2010

36:10

cosign (2)
23:4;24:5

couch (17)
104:15;105:12,15;
106:14;107:4;108:1;
110:18;111:18;112:8;
119:2,10,20;124:2;
127:12,23;152:16,18

Coumadin (1)
58:10

Counsel (14)
4:10,12,14,16,23;6:23;
7:3;134:9;136:20;
138:11;139:10;158:6;
184:17;216:8

counseling (2)
186:22;191:3

counselor (9)
5:1;7:16;172:23;
190:16;191:13,16;214:6,
7,11

counselors (2)
173:1;190:14

counselor-wise (1)
172:21

count (2)
114:11,11

counted (1)
44:10

country (3)
26:20;28:14;213:10

couple (18)
13:25;16:4;17:16;
31:18;45:6;46:3;54:10;
60:22;62:10;65:7;68:24;
83:9,10;103:1,24;
130:15;145:16;213:23

course (3)
5:8;40:11;107:5

courses (1)
189:1

Court (19)
4:4,8:8:22;9:13;39:25;
40:1;47:7;78:7,22;
88:19;89:9;108:24;
131:7,9;142:21;161:18;
172:25;174:8;216:8

cover (4)
75:17;77:9,12;83:8

covered (4)
68:16,16;168:1;
201:15

cramps (2)
48:17,24

crap (1)
147:3

crash (1)
180:8

crashed (1)
79:22

crashing (1)
119:8

crawl (5)
118:19,19,23;123:14,
14

crazy (3)
60:10,12,15

credit (3)
65:20,21,22

Crew (1)
211:13

criminal (1)
40:9

crop (1)
44:22

CROSS (2)
185:2;213:21

cuffed (4)
110:5;118:21,21;
206:8

cuffing (1)
123:16

cuffs (3)
110:5;123:17;130:2

cultivation (1)
175:18

curious (6)
36:1;85:11,14,16;
91:22;212:19

curled (2)
85:2;105:15

currently (1)
5:1

cut (21)
79:10;80:17 82:4,6,
10,11,17;91:'4,25;92:2,
9,11,12;93:1;124:20;
171:1;174:2,;,14;190:9;
211:13

cuts (2)
81:6;92:2

cutting (9)
80:8;82:16;91:23;
92:18;145:22;190:9,16,
23;191:12

**D**

dad (16)
12:9;13:1;16:23;
18:15,17;19:20;48:16;
49:6;56:21:5;;22;79:15;
92:16;93:10;.82:15,18;
186:25

damage (1)
142:18

damages (1)
158:16

Danzer (1)
184:14

date (3)
4:6;15:21;104:12

dates (3)
20:12;27:13;55:10

day (14)

27:7;45:13;79:11;
92:19;98:24;100:10;
104:1,2,5;125:19;
152:16;164:1;190:8;
192:20

days (14)
55:24;60:21;63:1;
100:6,13;162:6,7,11,19;
163:1,1,3,3;167:20

Day-Timer (1)
182:6

DCI (6)
37:25;156:3,6;189:10,
15;193:2

dead (4)
105:3;145:3;200:5,13

deal (3)
69:19;95:5

dealings (1)
86:16

deathly (1)
214:15

deaths (1)
54:22

December (4)
18:24;20:11,11;62:9

decided (2)
79:21;151:12

decision (2)
96:18;194:18

decline (1)
136:16

decreased (1)
32:22

defendants (8)
4:3,15,17;5:15,24;
6:21;184:11;207:22

definitely (1)
74:3

definition (1)
212:14

definitive (1)
211:9

DeLeon (1)
168:3

dentist (1)
47:1

Depending (1)
114:17

deposition (28)
4:2;7:7;8:9,14;9:5;
11:1;40:14;41:1,10;
42:3;138:15,17;139:12;
140:20,22;185:10;
193:8;201:13;207:23,
24;214:1,9;215:2,10,13,
18;216:14;217:6

depositions (1)
184:11

depressed (6)
21:11,14;47:24;70:11;
72:8;79:10

depressing (2)

19:12,13

depression (22)
19:17,19,19;20:1,17;
21:14;50:24;54:13,14,
15,21;55:2,14;71:8;
175:1,3;186:2,4,5,13,23;
187:2

Describe (6)
42:19;57:17;99:14;
126:4;211:5,6

described (1)
174:22

description (1)
211:10

design (1)
150:9

detail (3)
83:10;204:11,13

detailed (1)
104:10

details (1)
111:10

deteriorate (1)
57:9

deteriorating (1)
174:25

determine (2)
59:14;139:12

device (1)
119:6

diagnosed (3)
19:24;20:15;69:12;
70:19

diagnosis (1)
69:2

diagram (2)
149:25;210:5

diary (3)
59:18;182:2,2

die (10)
19:14;20:5,7;57:23;
58:3;79:16;143:3,5;
144:6;202:4

died (21)
12:9;15:15;16:23;
18:15,16,17,20,21;
19:20;48:16;49:6;56:21;
57:22;85:1,2;92:16,17;
182:15,18,18;186:25

differ (1)
190:5

difference (2)
53:16;59:14

different (14)
25:9;63:6;94:11,11;
124:19;129:15;177:9,
18;178:1,2;187:1;206:5,
9;213:14

difficult (1)
10:21

dig (1)
77:2

dinner (1)

45:10

dips (1)
43:4

DIRECT (3)
8:12;37:17;140:6

directed (2)
122:9;140:18

directing (1)
123:11

directly (4)
107:11;206:6;207:5;
209:17

dis (1)
77:22

disability (2)
69:5,6

disabled (1)
68:25

disagree (1)
60:17

disagreements (1)
17:1

disclosed (1)
139:11

disclosing (1)
192:3

discover (3)
137:14;138:6;140:3

discovered (1)
79:12

discovery (3)
138:15,25;139:12

discuss (4)
21:18;73:1,8;87:7

discussed (8)
5:16;7:13,15;21:19,
21,23;129:17;152:3

discussion (9)
5:15;6:18;41:16;
124:3,4,5;133:24;
136:21;215:1

discussions (1)
6:25

disk (1)
157:21

disorder (2)
69:12,25

disown (2)
47:5,8

District (2)
4:4,4

divorce (4)
21:18,23;181:2,10

dock (2)
163:11;166:21

doctor (25)
19:24;51:22,23;52:15,
21;53:7;55:23;160:20,
22;161:4,18;164:3,6,24;
168:19;169:9;170:3,4,
25;171:25,25;173:10;
187:2;188:12,14

Doctors (7)

18:14;48:19;52:13;
59:8;159:6;160:8;
172:14
**doctor's (6)**
50:3,5;51:2;160:5,16;
163:21
**documents (2)**
47:18;149:11
**dog (24)**
72:20,21,22;94:25;
105:16;119:5,11,13,13;
127:3,13;142:3,5,7
**done (19)**
7:2;14:16;29:17;
49:21;78:18;79:6;83:19;
85:6;95:20;96:11;99:15;
105:18;182:10,24;
186:8;193:5;200:25;
215:6;217:2
**Donna (11)**
22:3;27:6,14;28:12;
34:11;36:7;37:9;39:9;
90:1,13;205:20
**Donna's (6)**
26:17,18;27:1;29:19;
105:13;143:3
**door (24)**
76:8,13,17,23;104:25;
105:7,17;106:8,10,11;
108:3,9;119:8;127:25;
128:7,8;130:14;131:22;
132:2;150:13;194:11;
208:17,19,21
**doors (3)**
76:14;117:3;206:14
**dosage (1)**
203:6
**double-take (1)**
106:3
**down (87)**
31:4;32:14;34:22,23;
45:10;54:23;58:23;
65:15;71:11;91:3;92:20;
109:8,11;110:2,3,4;
112:2,22,23;113:7,12,
18,20,25;114:3,5,10,18,
16,23;117:2,17,24;
118:12,14,18;119:18,22;
120:8,17,19;121:8,17,
21;123:2,7,8,8,13,16;
128:9,10,18,23;129:10;
142:2;145:3;159:6;
171:2;174:2,2,14;191:9;
197:17,21;198:2,22;
199:14;200:15;205:16;
206:2,4,11,16,17,19,23;
207:7;208:10,14;
209:11;213:12
**downstairs (18)**
36:8,11;42:18;65:23;
75:17;77:13;116:12;
119:20;123:22;124:3;

125:23;126:14,19;
142:17;144:25,25;
205:10;207:5
**downtown (1)**
97:5
**Dr (18)**
52:20;53:15,160:7,8,
24;161:2,17,169:2;
172:2,2,12,13;173:9,9,
17,23;174:23;188:11
**draw (2)**
149:24;208:2
**drawer (2)**
101:13,15
**drawing (1)**
207:25
**dream (1)**
159:15
**dresser (2)**
101:13,15,16,20
**drive (2)**
79:21;154:7
**driver's (2)**
17:22;18:1
**drive-through (1)**
33:12
**driving (1)**
171:9
**drop (1)**
12:17
**dropped (3)**
12:4,23;58:23
**Drove (2)**
79:22;146:7
**drug (4)**
93:21;94:15.16;99:18
**drugs (9)**
45:23;64:19.20;65:1,
1,6;78:4;79:1;99:16
**due (5)**
47:13;133:1,159:13,
13;167:14
**dug (1)**
101:13
**duly (1)**
8:11
**during (10)**
5:8;7:7;9:5;  9:11,17;
40:11;70:21,143:6,10;
186:13

**E**

**earlier (1)**
5:15
**early (1)**
186:23
**ease (1)**
94:7
**easier (4)**
35:22;40:21,65:13;
82:12
**easiest (1)**

92:2
**easily (1)**
207:2
**easy (3)**
64:11;66:11;191:18
**eat (1)**
95:2
**eating (1)**
59:6
**Eckerdt (1)**
184:15
**edge (1)**
48:1
**effect (2)**
55:25;56:8
**effects (4)**
54:10;56:9;94:4,22
**eight (2)**
33:24,25
**either (21)**
45:17;48:7;51:3;74:8,
13;87:23;97:9;100:8;
116:24;140:12;155:13;
172:2;179:12;188:20;
190:15,19,23;191:12;
192:4,25;215:24
**element (1)**
166:11
**else (23)**
10:8;70:15;96:15;
99:23;104:21;116:19;
127:1,1,2;137:23;
141:24;144:2;146:1;
155:24;175:5;183:14;
188:20;191:11;202:25;
203:11;204:6,21;215:5
**else's (3)**
46:24;141:6,7
**e-mail (2)**
216:1,1
**emergency (1)**
143:5
**emotions (1)**
21:17
**employee (2)**
163:11;164:12
**employer (1)**
164:3
**employment (3)**
30:6;31:11;168:9
**enamel (1)**
47:14
**end (16)**
14:23;44:1.21;55:1,2;
62:9;89:14;100:8;
101:22;103:9;115:1;
117:21;136:21;147:19;
180:15;202:17
**ended (2)**
48:20;152:17
**enforcement (5)**
75:16;88:17;179:18;
192:16,21

**engaging (1)**
75:13
**enlighten (1)**
212:17
**enough (9)**
29:22;61:23;67:10,23;
74:21;84:15;94:10;
115:22;135:25
**entire (5)**
107:12;108:7,12,16;
128:5
**entitled (3)**
6:21;148:21;169:20
**entry (1)**
118:15
**equipment (2)**
52:20;66:3
**ER (2)**
29:13;159:13
**escape (1)**
80:11
**especially (2)**
74:2;99:16
**estimate (2)**
42:24;179:25
**et (2)**
4:3
**evaluation (1)**
154:10
**even (20)**
38:3;43:20;46:20;
47:16;50:19;62:15,20;
64:3;69:18,23;82:4;
84:14;117:1,1;148:11;
180:22;193:2;198:13;
203:20;210:17
**evening (1)**
197:7
**event (1)**
132:11
**eventually (1)**
154:9
**Everybody (6)**
109:17;129:14,15;
176:16;204:4;212:2
**everybody's (1)**
7:25
**everyone (1)**
5:11
**evidence (8)**
136:8;138:12;139:8,
10,13,15,21;141:12
**exact (1)**
126:11
**EXAMINATION (3)**
8:12;185:2;213:21
**example (1)**
121:24
**Except (2)**
76:19;141:16
**exchanged (1)**
87:8
**excuse (4)**

32:15;162:20;164:14;
216:8
**execute (1)**
91:20
**executed (2)**
91:5;97:21
**execution (1)**
145:25
**exercises (1)**
214:24
**exhausted (1)**
204:16
**exhibit (10)**
5:3,5;150:17,20;
207:20,20;210:22;
211:1;213:20,25
**exhibits (1)**
207:24
**exit (1)**
143:17
**expect (1)**
74:24
**expected (2)**
166:5,6
**experience (2)**
174:22;188:22
**experiences (1)**
13:6
**experiencing (1)**
54:14
**explain (5)**
27:24;34:20;166:6;
198:5,10
**explained (2)**
187:5;198:9
**explaining (1)**
163:15
**explanation (3)**
79:8;198:1,7
**exposed (2)**
120:10,15
**Express (7)**
29:2;33:8,13,21;
36:22;166:17,20
**Expresscare (1)**
52:20
**expunged (5)**
175:9,15,16,17,20
**extend (1)**
208:9
**extent (1)**
140:17
**extra (1)**
61:23
**eye (2)**
79:22;106:23

**F**

**face (2)**
92:20;155:3
**Facebook (7)**
155:2,3,5,11,15,20,22

facing (2)
123:2,5
fact (9)
7:12;84:4;85:12;
86:17,25;98:22;112:25;
144:4;176:2
failing (1)
16:16
fair (2)
151:15;158:7
fairly (2)
20:19;154:21
fall (3)
95:1,9;116:23
falling (1)
145:3
falls (1)
130:21
family (4)
29:21;51:23;76:5;
204:6
fans (3)
67:3,5;152:6
far (21)
36:21;43:9;49:19;
52:12,17;73:23;84:7;
86:20;88:16;106:14;
107:20;116:21;120:14,
14;128:14;135:25;
174:14;176:10;202:14,
18;206:23
father (9)
15:4,6,15;23:14;
75:13;186:1,14,24;
195:14
father-in-law (6)
23:13;193:2,24;
196:25;204:23;205:2
father's (3)
147:11,16,19
fax (1)
164:3
fear (10)
31:6;81:22;98:7;
129:1,9;147:14;159:5,6,
9;203:7
fears (2)
142:16;158:14
Feathers (1)
184:16
February (6)
20:12;100:9,11;
171:13;180:13,15
federal (1)
7:24
feed (1)
74:24
feel (18)
11:3,9;20:4;60:24;
67:16;92:22;111:20;
129:8;140:11;147:23;
191:8;192:6,13;193:23,
24;200:10;202:6;212:25

feeling (4)
20:3;167:16;199:2,3
feelings (2)
57:11;129:15
feels (1)
63:20
feet (4)
17:22;22:4;180:25;
202:20
felony (1)
88:3
felt (10)
20:7;21:10;36:19;
54:24;61:2;62:18;86:7;
128:24;193:14;198:25
female (2)
21:17;44:7
females (4)
44:1,3,6,21
fetus (1)
170:13
few (7)
14:9;18:7:4:20;
55:24;103:1,108:8,10
fiberoptic (1)
76:20
figure (2)
161:12;169:5
figured (6)
21:9;57:14;73:3,3;
74:21;163:10
figuring (1)
157:17
file (1)
115:22
filing (2)
194:12;202:13
fill (1)
32:25
filled (2)
114:12;119:2
financial (4)
68:6;171:11,12,22
find (17)
26:19;30:13,15;53:17;
73:25;77:2;91:6;94:23;
96:11;99:12.134:2;
138:15;142:5;154:1;
200:12;203:5;212:14
finding (2)
30:20;75:2
fine (16)
10:14;17:12:22:19;
34:17;35:9;40:23;67:21;
82:25;88:6;125:4;
126:10;135:14;139:22;
140:9;150:4;181:22
finish (15)
10:18;66:15,15,16;
124:14,15;151:3;163:23,
23;165:4,5;193:1,7,10;
213:3
finished (2)

12:5;14:11
finishes (1)
78:10
fire (2)
119:1;144:23
fired (2)
163:8,16
first (42)
8:11,18,19;11:12;
20:8,9;25:7;29:21;32:5;
52:18;96:2;106:7;107:5;
108:4,6;111:23;112:16;
117:14;124:5;126:15,
20;128:1,2,15;130:20;
148:9;156:21;195:3;
197:11;206:11,13,16,19,
19,22,23;207:19,210:1;
211:5,22,25;213:24
fit (2)
43:20;64:16
Five (1)
160:9
fix (4)
76:24,25;77:3;92:14
fixed (2)
46:16;53:12
flashbang (2)
119:6,9
flashbulb (3)
131:25;132:12,12
flashlight (1)
142:2
flat (1)
150:15
floor (4)
94:24;95:2,7;149:25
flu (2)
163:6;167:19
fly (1)
202:8
focus (1)
7:5
follow (1)
185:14
followed (1)
198:7
following (3)
109:5,8;113:17
follows (1)
8:11
follow-up (1)
201:13
follow-ups (1)
183:20
food (1)
97:1
foolish (1)
145:11
foot (6)
74:7;92:12;112:18;
201:15,15;202:21
footsteps (1)
112:18

forcefully (1)
200:16
forensic (1)
154:9
forever (1)
72:25
forget (1)
34:24
forgotten (1)
214:16
form (11)
37:20,22;48:9;67:11;
79:2;115:15;129:4;
148:5,12,19;201:20
forms (1)
146:2
forward (7)
31:25;106:2,5;122:25;
123:2,5;199:8
found (23)
20:6;28:8;29:19;36:3;
77:25;87:14;89:5;91:12;
96:3,8,10;142:6;145:20;
149:9;152:16,18;153:18,
21,24;170:17,18;176:23;
180:18
four (7)
12:21,23,24;62:13;
80:6;162:10,11
frame (4)
19:11,12;23:18;
180:12
freak (1)
71:16
freaking (1)
29:14
free (3)
11:9;67:16;180:24
freezing (1)
97:1
friend (3)
62:2,20,22
friends (8)
13:16;61:13,14;62:16,
17;88:1;155:14,20
friend's (4)
13:16,19;15:20;
155:25
front (19)
36:9;79:16;110:20;
111:16;112:15;113:14;
118:4;122:4;128:4,4,5;
131:21,22,22,23,23;
145:6;206:22;214:18
froze (1)
109:22
frozen (2)
194:10,11
frustrations (2)
81:13;190:7
Full (9)
8:18,18,15:8,9;32:23;
59:13,15;161:1;198:12

full-time (6)
32:8,9,10,17;34:3,4
fully (1)
166:21
function (1)
45:2
funny (2)
152:17;197:3
furnace (4)
109:10;116:25;
117:14;145:2
further (8)
46:7;136:17;137:4;
138:2;183:19;184:19;
185:4;213:16

# G

gain (1)
214:23
gaining (1)
191:22
games (1)
155:17
garage (7)
36:15;87:22;90:22;
91:2,7;108:10;178:4
gas (3)
29:1;125:16;162:9
gave (12)
5:21;12:12;18:14;
31:13;48:22,23;61:25;
157:5;166:15;187:10;
203:4;214:20
gear (12)
124:11,19;125:7,25;
126:3;131:1,10;154:14,
14;156:3,6,8
geared (1)
124:10
GED (1)
14:13
gel (1)
211:11
gelled (1)
211:18
general (3)
39:17;67:8,22
generally (3)
115:23,24;175:2
General's (1)
9:3
generic (1)
9:23
Gesture (1)
131:14
gets (2)
57:9;94:4
Gill (1)
179:5
girl (4)
61:10;100:22;120:5;
212:2

given (8)
43:16;44:8;48:19;
58:18,21;93:10;186:15;
201:14
giving (1)
166:7
gladly (1)
88:6
glass (1)
97:6
glasses (1)
106:4
God (2)
104:22;145:9
goes (12)
43:8;47:12;105:9;
109:11;110:21;116:6,9;
117:5,15,22;130:20;
171:2
good (19)
20:23;21:15;22:6;
59:5,6;68:7,14;70:12;
71:23;72:12;99:8;
121:23;150:3;156:17;
163:11;164:12;168:8;
192:20;208:9
good-bye (1)
59:2
gosh (1)
95:2
Gosman (144)
4:12,12,22,23;6:14,17,
20;7:12;8:2,4,7;22:9,13,
16:23:11;24:6,19,24;
25:2;34:7;37:14,19,21,
23;40:4,6,18,23;41:7;
67:11,16;70:3,5,9;78:8,
12,16,19;79:2;82:21,24;
85:20;87:6,10;110:23;
115:15;129:4;132:25;
133:9,15,17,19;134:3,8,
13,19;135:5,13,18,24;
136:3,6,10,13,21;137:5,
10,15,20;138:1,7,21;
139:3,6,14,22;140:2,9,
14,21;141:1,4,6,12,15;
145:10,15;148:8,13,16,
19,22,25;149:15;158:5,
9;165:2,5,23;166:25;
167:3,6;169:22;171:17;
178:17,20,23;181:4,7,
18,22;183:3,23;184:5,9;
193:6,10;195:24;196:1;
198:4,11,16,18;201:11,
21;207:17,22;211:19;
212:7;213:22;215:4,7,
11,15,22;216:6,9,15,20,
25
grab (6)
25:1,2;92:1,3;110:13;
119:20
grabbed (4)

grade (2)
12:3,15
graduate (1)
11:25
Grease (2)
104:15;105:13
great (3)
64:13;173:22;190:10
grew (3)
13:16;66:13;212:6
grill (2)
31:22;32:1
groceries (1)
68:21
Grossbach (1)
50:16
grow (11)
38:9,11,15;39:7;
64:18;65:20;67:9,23;
68:2;85:4;182:1
growing (10)
42:7;43:24;44:7;
63:25;66:10.73:2,9,16;
74:17;189:18
growl (1)
105:18
guess (14)
16:14;25:1;37:11;
42:22;77:21;138:18;
145:21;150:16;153:8;
205:15;212:25;213:14;
214:5;215:23
guessing (1)
43:7
guesstimating (1)
43:13
guilty (1)
176:2
gun (35)
100:17,17;101:3,7,19;
102:11;107:2,11;108:8,
18;109:19;111:13,17,24,
25;112:10,17,20,24;
113:2,15,17 119:3;
120:25;121:19;127:14;
128:5;150:22;151:9,10;
193:16;194:2,9;199:1;
210:17
gunpoint (8)
119:12;200:17,18;
206:7,12;207 4;210:9,10
guns (30)
101:10,19;102:14,18;
103:2,9,14;108:11,13;
109:17,25;113:6;121:9,
14,15,16;122:9,12,19;
143:25;144:24;151:13;
196:16;197:19,23;
199:15,23;200:9;202:3;
210:16
guy (16)
53:15;61:24 62:18,18;

92:19;107:5,8;109:22
grade (2)
12:3,15
graduate (1)
11:25
Grease (2)
104:15;105:13
great (3)
64:13;173:22;190:10
grew (3)
13:16;66:13;212:6
grill (2)
31:22;32:1
groceries (1)
68:21

guys (6)
30:10;65:21;99:8;
104:4,6;214:22

H

Habit (1)
185:24
Hageman (1)
4:8
hair (3)
211:11,15,17
half (5)
50:3;59:15;81:17;
104:19;157:18
half-brother (4)
15:8,10;79:16,18
half-sister (1)
15:10
halfway (5)
109:15;112:23;113:1;
119:22;128:10
Hall (1)
184:15
hallway (5)
149:13,16,18,20;
150:13
hand (7)
109:20;119:21;121:3,
7,11;122:18;177:8
handgun (3)
196:14,19;197:2
handguns (1)
196:12
handle (12)
29:9;31:4,5;32:3;
54:25;76:14,16;80:16;
81:14;105:1,7;129:9
handled (2)
36:6;57:7
handles (1)
129:15
hands (22)
32:1;107:4,12;108:1,
7;109:14,15,16,21;
112:4;113:22;119:3,11,
121:22;127:13;128:3,13,
15;199:16,18;209:8;
210:12
hang (2)
105:9,10
hanging (4)
63:16;110:14;156:19;
192:18
happen (8)
49:2;58:20;80:5;95:6,
22;100:10;125:14;
141:24
happened (71)

74:22;86:18;107:1;
108:15,18;109:18,18;
130:3;142:2;191:18,21;
193:19
guys (6)
30:10;65:21;99:8;
104:4,6;214:22

H

Habit (1)
185:24
Hageman (1)
4:8
hair (3)
211:11,15,17

26:24;27:9;28:2,13;
30:13,16,21;32:19,20;
46:20;49:25;52:21,23;
53:5,6,20;54:3,4;56:4;
62:11,13,21;73:6;74:2,4,
9,10;79:18;80:6;81:14;
86:18;88:23,24;95:1;
100:6,13,19;105:14;
107:24:113:10;125:5,12,
15;126:7;132:1,3;
134:17,143:1,7;146:8,9;
162:17;163:7;164:2,7,
13;166:21,22;167:11;
171:7,13;172:24;173:2;
175:22;179:21;180:9,
13;194:16;195:1,5;
199:22
happening (4)
143:25;158:15;
183:13;200:24
happens (2)
24:25;145:24
happiest (1)
57:2
happy (3)
40:25;57:14;72:9
hard (10)
8:23;13:6;58:5;59:19;
61:3;71:14;124:18;
125:25;154:6;209:13
harm (2)
81:23;194:1
Harr (3)
179:6,8,10
hash (1)
209:21
head (40)
8:15;9:16,17;10:9;
12:16;34:1,8;35:7;
71:19,19;80:4,10;82:23;
107:11,18,23;108:16,19;
109:10;111:14,17;
112:11,12,17,22;113:8,
12,17,21;145:4;159:21;
162:12;173:20;174:19;
185:7,16,22;187:11;
197:24;211:15
health (2)
58:8;191:4
healthcare (9)
50:21;51:18;190:22;
202:22;203:14;204:9,12,
15,18
healthy (1)
20:23
hear (12)
22:9;108:3,25;112:18;
117:4;119:6;137:7;
143:16;145:1;211:22,
25;212:13
heard (13)
22:15,16;79:6;87:13;
106:10,11;119:1;

197:10;205:9;212:3,4,
24;213:5
hearing (1)
8:23
heart (2)
71:18;105:24
heavily (1)
174:4
heck (2)
75:21,21
heed (1)
113:9
height (1)
211:11
held (8)
41:16;107:2,3;114:7;
200:16,18;207:4;216:14
help (21)
17:21;21:22,22;24:5;
34:21;35:2,3,4,14,15;
53:17;57:15;87:21;
96:18,24,25;125:19;
162:14,15;180:2;214:24
helped (7)
17:24,25;24:8;45:9;
61:2,3,4
helping (2)
62:18;96:23
helps (1)
94:6
here's (3)
118:13;150:7,10
herself (1)
58:12
hey (6)
35:17;64:14;156:22;
178:2;191:2;200:22
hi (1)
35:6
hid (2)
29:16,17
hidden (1)
90:1
hide (1)
79:1
hiding (3)
31:6;78:4;202:2
high (18)
14:11;44:23;72:9,10;
83:23;90:9;99:22;
106:12,13,15;188:17,22,
24,25;212:25,25;213:6,7
himself (4)
71:11;80:7;189:11;
202:10
hire (2)
183:11,17
hired (4)
182:21,21,23,23
hiring (2)
183:12,14
history (1)
213:9

**hit (2)**
    56:7;116:24
**Hobby (2)**
    172:3;173:19
**hold (9)**
    39:16;45:10;65:8,9,
    10;86:23;92:3;111:25;
    196:19
**holder (1)**
    153:9
**holding (5)**
    119:12;127:14;
    154:14;206:7,12
**hole (2)**
    77:2;209:15
**home (25)**
    5:10;12:12;14:10;
    15:2;17:5;25:25;35:20;
    37:10;39:6;55:7;63:3;
    64:21,22;88:7;96:4;
    98:7;100:22,23;103:11;
    105:25;127:1;147:2,19;
    162:10;200:14
**homeless (3)**
    61:17;74:22;87:18
**Hon (2)**
    24:24;92:6
**honest (3)**
    44:12;177:6;191:15
**honestly (17)**
    7:17;44:11;60:5,13;
    69:18;96:23;113:11;
    116:14;126:8;129:3;
    131:1,9;143:24;178:14;
    202:3;212:12:214:8
**hooky (1)**
    105:5
**hope (2)**
    60:13;163:15
**hoping (1)**
    214:21
**horrible (1)**
    55:22
**hospital (24)**
    28:20;29:4;30:3,7,7;
    32:10,18:33:1;46:16;
    49:10,11,16;50:8,8;51:4,
    5;62:3;147:20;162:19,
    19;163:9:164:5;173:12,
    16
**hospitals (2)**
    50:4;51:8
**hour (4)**
    30:5;104:20,20,20
**hours (10)**
    12:12;32:8,9,18,22,23;
    159:14;163:11;166:21;
    205:10
**house (150)**
    13:19;15:20;16:6;
    17:6;22:2,4,5;23:2,3,4,9,
    21;24:1,5,9,10,12;25:4,
    9,10;26:9,13,15,18,18,

    22;27:2,9;34 19;35:1,22,
    23;36:3,5;37:4,6;38:18,
    21;39:13;44:14;47:20;
    57:22;63:2,10;64:1,3;
    66:22;68:8,13,15,22;
    73:19,21;74:8;76:6,22;
    77:1,24;86:6 6,22;87:15,
    19,20;89:4;90:2,14,23;
    91:7,19,25;92:13,24;
    93:14,20;95:23;96:5,6,
    21;97:15,20;99:5,6,18;
    100:5;101:23;102:7,21;
    104:17,21;105:14;106:6,
    24;116:16,18,20;117:8;
    119:1,4,8;136:21;
    129:24;130:2,13,19,25,
    25;131:19,23;132:4,19;
    141:25;143:2,6,12,13;
    144:8,23;145:24;146:2,
    4;147:11,16,19,23,24;
    149:9,23,25;152:21;
    154:3;171:19;176:23;
    178:3;179:20,20;180:7,
    7,22;181:14,15;187:12,
    15,18,19,24 188:1;
    196:4;201:5;209:13
**Housekeeping (2)**
    28:23;95:14
**How's (1)**
    137:1
**huge (1)**
    84:16
**huh (5)**
    63:10;97:9;149:14;
    152:14;158:20
**Huh-uh (1)**
    203:12
**Hull (1)**
    53:15
**hum (1)**
    99:2
**human (5)**
    183:6,8;212:1,3;
    213:11
**hunting (4)**
    97:18,19;10 :19;
    103:2
**hunts (1)**
    156:23
**hurry (2)**
    34:23;78:17
**hurt (5)**
    95:4;142:9;172:6;
    203:23,25
**hurting (1)**
    78:6
**husband (46)**
    21:12;55:1;57:1;
    60:12,14;68:4;102:3;
    103:7;115:8;143:4,9;
    146:15,17,20,22,24;
    147:2,5,7,10,13;149:5;
    175:25;177:1 23;178:6,

    15;187:14;189:20;
    193:4,12,14,19,22,24;
    194:3;196:5,6,7,22;
    197:3;203:17;204:8,11,
    15,18
**husband's (4)**
    147:14;156:15;
    162:14,16
**Hydrocodone (2)**
    157:10,12

**I**

**ibuprofen (2)**
    10:12;95:4
**ID (3)**
    17:25;93:21;94:15
**idea (6)**
    36:24;97:18;119:10;
    130:16;156:15;173:15
**identified (1)**
    213:20
**identify (5)**
    4:10;40:2,8;94:16,19
**ill (1)**
    16:10
**illegal (16)**
    10:23;36:23;38:2;
    47:12;64:20;73:19;
    75:13;77:16;85:18,23;
    90:12;98:23;143:19,23;
    144:10,15
**Immediately (6)**
    103:24;110:8;118:25;
    123:15,17;182:23
**important (2)**
    6:17;151:2
**impression (1)**
    60:17
**inability (1)**
    7:5
**inch (1)**
    193:21
**incident (41)**
    24:12;46:18;51:18;
    53:11,19;62:11;68:5,5;
    73:6;76:7;97:16;100:6;
    104:5,13;124:17;
    142:19;143:7;147:22;
    158:17,19;160:1;162 17,
    22,23;163:7,16;164:1,
    13,16;165:8;167:11;
    168:12;171:13;173:5;
    174:23;179:21;182:6;
    187:13,16;188:6;197:7
**incredibly (1)**
    193:24
**indeed (1)**
    136:6
**indicate (2)**
    38:1;188:4
**indicated (3)**
    36:5;75:11;128:22

**indicating (5)**
    71:20;92:21;111:25;
    130:20;146:24
**indication (1)**
    117:7
**indications (1)**
    168:13
**individual (4)**
    4:15.17;9:4;189:22
**individually (2)**
    5:20,20
**inflamed (1)**
    5:8
**informant (5)**
    40:8,11;99:17;192:8;
    193:20
**information (19)**
    83:15,19,22;84:6;
    87:4,8:94:8;134:11;
    135:10;138:24;139:1,
    18;140:3,11;141:8;
    181:6;191:8;198:13;
    216:16
**initials (1)**
    160:25
**injured (5)**
    142:14;145:13,18;
    147:21;148:2
**injury (1)**
    142:18
**in-laws (5)**
    24:16;25:4,15,21;26:3
**inside (4)**
    91:19;130:13,24;
    131:18
**insomnia (3)**
    55:17,20;160:21
**instead (7)**
    40:14;61:24;66:8;
    78:3,5;79:13;190:8
**instruct (1)**
    87:7
**instructing (3)**
    136:22;138:1;139:24
**interrogatory (2)**
    140:15,17
**into (59)**
    12:8;13:11;16:12,15;
    19:9;23:10,21;26:8,16,
    18;32:16;36:3;38:21;
    39:13;46:6,8,13;69:17;
    76:1,4,21;77:6;79:19;
    81:22;83:20;86:5,6;
    87:1;88:7;91:2;96:3;
    98:23;99:7;101:12;
    105:25;109:20;116:7;
    118:12;119:8;123:9,11,
    13;125:18,20;126:21;
    128:17;143:2,4;144:8;
    146:6,8;150:12;164:2;
    169:18;170:24;171:9;
    200:15;204:11;215:13
**introduced (2)**

    5:2;185:11
**introduction (1)**
    7:9
**invade (1)**
    136:23
**invading (1)**
    138:13
**investigation (14)**
    73:4,14,24,25;74:20;
    75:6;83:13,14,19;99:11,
    14;188:16,22;189:5
**investigations (1)**
    189:8
**invited (1)**
    35:16
**involved (3)**
    5:10;75:14;184:14
**Isner (1)**
    172:15
**issue (11)**
    5:23;6:4,12;7:21,23;
    55:18;60:11;140:23;
    189:5;215:19;216:21
**issues (16)**
    46:3;48:5;53:7,8,9,10,
    14,23;79:17;165:16,18,
    19;171:11,12,22;191:4
**items (2)**
    33:2;68:21

**J**

**jail (1)**
    27:8
**Januaries (1)**
    33:17
**January (6)**
    49:4;55:7,8;56:14;
    100:7,8
**January's (1)**
    29:7
**Jeff (3)**
    4:12.22;184:8
**Jill (1)**
    179:6
**Joan (5)**
    179:10,15,19,22,23
**job (21)**
    14:3;17:25;22:4;29:1.
    3,4,8,17,20;31:7;32:3,4,
    5,15;75:19;85:13;87:1;
    96:12;97:4;163:12;
    164:4
**jobs (1)**
    28:17
**Joel (1)**
    4:7
**join (2)**
    6:25;215:3
**joining (1)**
    6:24
**Josh (1)**
    39:21

**journal (5)**
47:19;65:19;181:25;
182:1,2
**journals (4)**
59:24,24;60:8;182:7
**judge (4)**
6:6;30:24,25;191:9
**judged (2)**
191:10;192:2
**July (1)**
182:18
**jumped (4)**
119:14;127:15;
128:16;130:19
**jumping (1)**
128:18
**jumps (2)**
110:20;130:20
**June (2)**
16:1;17:16
**junior (2)**
12:4;188:25

**K**

**keep (30)**
44:3:59:7;64:15;
65:14;76:17,18;90:21,
23;101:20,23;102:7;
109:24;120:20;121:1,3,
6;122:24;138:19;153:1;
174:1;177:8;182:2,7;
203:5;20:204:19;
205:22;206:25;210:20;
215:13
**keeps (1)**
189:11
**kept (23)**
36:15,18:63:12:21;
64:17;69:23;83:12;
90:22;101:12,14,17,21;
102:10;109:9;110:1;
116:18;122:24,24;
130:3;146:19;153:13;
181:25;182:1
**kick (4)**
16:17;55:20;91:3;
117:15
**kicked (9)**
16:6;95:24;96:8,13;
97:23;100:7,14;103:22;
104:1
**kid (10)**
50:17;86:24;172:6;
174:16;195:18,20;212:4,
20,22,24
**kidneys (2)**
16:15,15
**kids (3)**
35:19;195:15,16
**killed (2)**
80:7;143:14
**kind (40)**

5:25;6:12:13:20;
14:15;48:1,2:50:20;
51:7,22;53:8,10;57:9;
58:3;71:6;76:12;78:17;
80:14;81:6;83:14,25;
85:1;92:3,17,94:6;
104:23;107: 4;109:5,6,
16;116:9;152:17,19;
155:24;164:14;165:18;
176:16;177:8,24;181:5;
195:4
**kit (2)**
177:19,20
**kitchen (3)**
62:6;95:13;:50:9
**kitchen-type (1)**
98:2
**kits (5)**
176:23;177:3,4,7;
178:3
**Klonopin (1)**
9:23
**kneecaps (2)**
120:16,19
**knew (23)**
7:13;38:3;42:14,15;
73:19,23;77 16,17;
87:17;88:10 12;94:21;
96:22;101:1:116:12,21;
117:18;151: 0;176:17;
182:24;187:5,6;197:2
**knickknacks (1)**
68:22
**knock (4)**
106:8,10,11;109:11
**knowing (4)**
101:7;106:1.1;212:7
**knowledge (2)**
83:17;134:20
**known (2)**
13:17;70:22
**knows (9)**
133:9;138:3,3;204:8,
23;205:13,17,23;214:13
**Kobos (7)**
5:1;7:11;173:9,10;
191:5;203:1,2

**L**

**label (1)**
94:21
**lacerations (2)**
81:3,5
**lady (4)**
61:9,9;166:8,9
**land (1)**
32:1
**landing (1)**
209:2
**Lane (4)**
29:2;33:8,14 21
**language (2)**

87:16;99:5
**Lara (1)**
184:15
**last (16)**
6:5,13,14;7:1,13,21;
8:18,19;11:8;62:4;
95:10;131:10;179:11;
182:20;183:3;184:13
**lasted (1)**
77:4
**last-minute (2)**
5:25;7:9
**lately (1)**
214:14
**later (4)**
5:3;63:6;103:25;104:3
**laugh (2)**
152:13,15
**laughing (2)**
110:18;130:16
**laundry (2)**
29:12;91:4
**law (5)**
75:16;88:17;179:17;
192:16,21
**laws (2)**
190:3,4
**lawsuit (1)**
194:13
**lawyer (4)**
87:3,4;133:8;194:18
**lay (2)**
71:19;150:15
**laying (1)**
151:7
**LCSW (2)**
214:4,6
**lean (2)**
105:21;106:2
**leaned (3)**
105:21,22;106:4
**Learn (5)**
96:18;135:1,2;138:24;
139:1
**learned (7)**
134:4,24;135:20;
137:19,21,22;213:12
**least (3)**
85:4;114:1;121:16
**leave (16)**
29:3,4,8;31:20;87:24,
25;90:13;95:19;138:17;
140:3,20;162:21;
164:15;203:21;214:22;
217:4
**leaving (1)**
140:22
**led (2)**
132:5;189:17
**left (17)**
6:17;18:13;22:2;30:8;
58:25;79:22,23;92:14;
96:16;98:5;99:3;100:24;

104:9,11;116:5;118:1;
151:11
**legal (7)**
10:23;83:23;84:2,3;
183:5;189:2,21
**legitimate (1)**
73:15
**legs (2)**
71:20;120:10
**Lengfelder (1)**
188:15
**less (9)**
12:12;23:1;32:17,25;
45:16;62:25;63:16;
77:23;195:18
**letter (13)**
4:25;5:2,6;7:5,16;
30:10;31:13;163:14;
174:20;214:4,10,20;
215:2
**letters (2)**
207:18,22
**level (1)**
116:2
**levels (3)**
58:10;171:3;177:15
**Lexapro (5)**
10:3;160:1;168:24,25;
169:1
**license (2)**
17:22;18:1
**lie (2)**
62:23;63:20
**lied (1)**
62:22
**lies (5)**
63:15,19;96:2,9,10
**life (13)**
13:6;57:2;69:20;
144:1,2,5,21;147:14;
156:15,15;191:21;
192:13;202:6
**lifted (4)**
109:17;121:23;200:2;
210:16
**light (10)**
42:16;65:23;66:5,25;
67:1;81:7;152:5,5;
197:7;208:13
**liked (2)**
13:19;125:18
**likely (2)**
5:8;96:19
**Liljegren (3)**
173:12,15;174:21
**limit (5)**
10:24;18:14;85:7,9;
148:20
**limits (2)**
28:9;189:21
**line (2)**
68:19;199:23
**lined (1)**

108:9
**lines (2)**
208:3;210:4
**Lisa (1)**
172:3
**list (7)**
159:20;169:8,16;
172:20;173:4,7;184:13
**listed (2)**
157:9;179:4
**Listen (5)**
66:16;115:1;132:6;
137:20;176:13
**lit (1)**
150:11
**little (45)**
18:6;20:24;22:11;
28:20;31:23;34:10;
42:20,21;46:7,7;63:15,
19;71:21;76:14;79:17;
83:9;86:21;94:25;
101:17;103:18;110:15;
118:13,14;150:9,19;
153:4,5;159:7;180:4,8;
182:12;186:9;187:7;
193:20,21;196:20;
202:18;204:8;207:7;
211:17;212:2,4,20,22,24
**live (22)**
8:20,23;11:17;18:4,
14;19:5;22:23;23:8;
25:4,10,12,13;26:22;
27:14;58:18;61:7;62:7,
8;74:22;96:12;180:10,
17
**lived (23)**
17:20;21:2;23:14;
25:5,8,8;26:7,20;27:4,
15;38:4;55:6;57:5;
66:13;68:12;76:7;
102:20,21;172:9;
179:21;187:12;205:8,8
**living (31)**
14:2;15:1;16:2;23:24;
25:5;26:14;27:3,4;
36:25;39:9;50:2;54:16;
59:5;61:17,24;68:19;
74:12,16;86:7,10,11,12;
87:15,20;97:25;130:15;
149:19;150:8;152:11;
180:21,24
**load (1)**
44:22
**loaded (10)**
101:23;102:2,4,6,7,10,
13;150:25;151:5,14
**loan (5)**
23:19;24:9,10;187:23,
24
**local (1)**
67:6
**locally (1)**
188:21

located (2)
97:20;152:2
lock (2)
76:12,19
locked (3)
76:17,18,22
locks (2)
76:15,16
log (1)
182:1
logical (1)
187:8
logs (2)
38:9,11
long (30)
11:17;15:21;16:2;
17:6;19:5;22:23;27:14;
31:17;38:8,15;43:10;
44:11;54:9,10;58:13;
63:2;97:17;101:17;
103:5,6;104:18,19;
107:15;157:22;158:4;
164:7;180:17,18;
182:17;189:22
longer (1)
111:4
look (29)
23:18;36:2,19;39:5;
24;99:19;111:22;
122:10;124:19,19;125:2,
3,7;153:7;155:17,25;
191:2,9;203:21;211:15,
16;212:14;213:25;
215:13
looked (26)
36:4;90:3,16,19;
105:22;106:19,20,21;
107:9;109:25;112:5,23;
120:7;122:18;130:13;
131:1,10;141:18;155:19,
21;189:20,24,25;190:2;
195:4;197:5
looking (7)
93:11;95:3;110:17;
122:25;142:3;158:18;
199:8
looks (5)
124:9;125:10;156:7;
181:25;209:20
loose (3)
118:23;152:10;153:16
Lortabs (1)
53:25
lose (9)
76:5;79:15;96:14;
98:16,17;104:4;171:4;
174:4,15
losing (1)
164:4
lost (1)
79:22
lot (12)

15:11;29:16;44:11;
45:17;98:16 17;102:24;
104:4;114:12;149:6;
199:5;204:10
lots (2)
29:15;159:11
loud (1)
158:20
loves (1)
156:17
low (2)
72:1;142:4
lower (1)
157:19
luck (1)
99:8
lunch (2)
181:19;183:23
lying (2)
36:4;151:6

# M

Ma'am (11)
184:19;185:4;195:11;
199:4,4;200 12;201:2;
203:15;206:2;208:14;
211:22
mad (5)
16:19;96:12 146:16;
168:5,7
magazines (1)
36:12,18;90:10,11
magistrate (8)
5:22,22;6:6,15;7:2,24;
138:16;141:20
mail (1)
104:9
mainly (2)
65:6,7
makes (3)
5:6;53:16;65:13
making (14)
30:3;31:15;32:2;33:6,
21;40:20;59:5;68:14;
84:12;131:6,13,18;
171:19;204:4-
male (2)
44:3;85:1
males (4)
44:1,2,6,15
man (2)
176:20;214:10
manic (3)
72:6,7,8
manifest (1)
71:12
manner (1)
66:12
many (22)
10:7;20:12;32:12;
34:2;43:16;44:5,9,13;
45:2;71:5;100:6,13;

114:9;116:17;128:11;
154:18;160:8;162:7;
177:25;179:23;191:10;
201:17
marathon (1)
11:7
March (1)
180:16
mari (1)
89:22
Marijuana (38)
31:1;35:24;38:16;
39:8;42:7,10;43:24;
63:22,25;64:1,8;65:20;
66:10,19,22;67:9,23;
68:2;73:2,9,16;75:3;
89:23;96:7;151:24;
152:10,21,24;153:1,14,
16;172:4;175:8;177:5,
15,20;189:18,22
mark (10)
8:4;41:9;22;81:8,8,9;
150:17;209:21;210:22;
213:25
marked (2)
150:20;211:1
marks (3)
82:6,7,10
maroon-ish (1)
130:3
marriage (4)
21:8,9,15;57:3
married (9)
15:22,24,25;17:13,17;
19:3;56:24;69:7,23
massive (1)
84:18
matchbook (1)
153:9
material (1)
42:7
Matt (2)
111:3,3
matter (3)
7:12;21:25;137:3
matters (2)
7:6;10:12
May (19)
6:8;7:6;27:16,16;
29:25;30:1;31:15;33:15;
38:25;39:1,16;61:16;
65:16;140:2;151:21;
185:13;213:23;216:25;
217:4
maybe (31)
17:9;19:7;22:25,25;
23:15,17;27:20;28:25;
29:1,25;43:4,6,11;46:17;
55:7,9;61:14;62:9;
95:13;100:8,15;104:2,3,
19,20;105:20;116:15;
124:11,23;161:12;
168:15

McCaslin (2)
111:4;184:14
McDonald's (8)
28:25;29:21,24;31:14,
17,20;32:8;33:5
meals (2)
59:5,6
mean (47)
10:11;17:3;19:18;
20:11;21:22;30:13;31:7;
37:9,14;38:4,8;44:11,19;
45:18,20;47:16;52:18;
63:14;64:25;69:18,21;
72:20,21;73:16,17;75:7;
77:16,20;79:15;86:5;
91:11;106:18;123:23;
143:22;144:11,23;
153:8;165:14;171:8;
177:10;179:8;182:4;
194:23;195:15;202:8;
212:17,22
means (1)
68:19
measured (1)
43:15
medical (9)
49:23;50:11;160:14;
168:13;169:21;175:7;
215:9,17;216:16
medicated (2)
20:2;29:15
medication (6)
9:24;50:25;54:6;
186:15;188:13;203:4
medications (21)
9:19;10:2,17;11:4;
46:21;48:2,15;51:6,14;
53:18;54:1,2;60:2;
70:22;80:12;94:2,9;
157:9,23;158:4;214:17
meds (4)
47:24;58:9;94:4;
170:18
meet (4)
13:13,15;61:14;94:12
meetings (1)
203:20
memories (1)
58:4
men (1)
124:18
Mental (4)
142:20,22,24;191:3
mentality (1)
79:24
mention (2)
175:8;212:15
mentioned (3)
7:15;141:7;190:19
message (2)
99:3;104:11
messing (1)
167:23

met (10)
14:19;15:1,18;16:2,
18;57:1;61:7,8;64:9,12
metal (3)
104:24;105:4,9
methamphetamine (1)
177:20
methamphetamiues (1)
96:3
method (3)
78:2,5,25
Michael (1)
5:1
microphone (1)
202:16
might (3)
10:24;102:10;128:22
mild (2)
19:24;142:25
milligrams (2)
10:3;65:13
mind (4)
94:7;128:11,17,25;
147:10;205:11
mine (2)
47:24;68:16;175:19,
20
Miner (1)
184:15
Minnesota (37)
11:14,24;13:22;14:10;
19:3;20:16;21:3;25:10,
21;26:6;28:19;38:17;
39:8;43:24,44:9;47:21;
48:8;49:17;50:2,22;
54:16;56:11,25;57:5;
60:18,25;66:10,14;
102:15,22;169:5,7,10;
173:6;186:16;188:8;
212:6
M-i-n-n-e-s-o-t-a (1)
11:16
minute (4)
41:12;78:13,13;
149:15
minutes (1)
160:9
miscellaneous (2)
33:2;68:21
misdemeanor (13)
73:10,11;77:17;84:5,
8,85:10;88:3,5,14;
96:23;143:23;189:19,23
misdiagnosed (1)
19:25
Misha (3)
4:14;6:17;9:2
Misha's (1)
6:24
miss (6)
59:3;159:13;162:19,
25;164:11;167:20
missed (6)

162:6.8.9,23;166:14;
167:22
missing (8)
26:6;163:9;164:4;
166:12,18,23;167:13,15
misunderstood (1)
203:8
mom (10)
16:6,11,17;18:16;
19:6,14;57:6,8,23;58:2
mom's (2)
22:2;92:14
money (5)
39:6;68:1,7,10,14
monitor (1)
4:7
Montana (1)
214:5
month (7)
56:6;58:23;68:15;
81:17;100:15,18;180:11
month-and-a-half (1)
58:23
monthly (1)
180:5
months (14)
11:20;12:21,23,24;
13:25;14:9;20:22;58:25;
62:10,13,14,15:80:6;
215:23
mood (2)
70:12;72:12
moods (1)
70:13
Mora (6)
11:14;49:17;50:2,8,
21;51:3
M-o-r-a (1)
11:16
more (38)
12:13;15:8;17:21;
32:24;37:16;40:13,25;
43:23;44:14;45:1;49:18;
50:4;60:22;70:17;71:1;
80:15;83:9;85:4;96:14,
19;98:16,17;104:4,10;
106:16;111:10;129:23;
160:11;173:19,20;
176:1;181:20;190:10;
195:17;205:15;207:13;
211:9;214:12
morning (2)
7:25;167:24
mortgaged (1)
187:19
most (8)
43:19,20,21;44:19;
74:23;94:13;188:8,9
mother (7)
16:9;18:9;21:3;48:14;
54:17;57:10;93:15
mother-in-law (2)
23:15;205:20

motions (1)
40:16
mouth (1)
53:14
move (13)
19:3;22:1:2'':5,22;
38:21;43:2;61:6;100:5;
135:5;141:19;157:19,
20;177:25
moved (65)
14:9;16:9;17:7,8,10,
13,14,15,16, .8,24;18:9,
12;22:3,7,20.21;23:1,10.
21;25:8,10,17,20,21,25;
26:2,6,8,14,15,16,17,18,
21;27:16,18,.2;28:2,3,9,
11;38:18;39: 2,18;48:8;
54:18;56:11;:9:1,11,12;
64:23;95:22 96:4;
100:17,20;102:8,15,23;
169:6,10,14.173:5,6;
180:6
moves (1)
157:19
movies (1)
15:20
moving (1)
57:14
MSW (1)
160:25
much (40)
17:23;21:16;31:4,15;
32:23;35:14;∶4:19;45:4,
8,17;51:11;53:13:62:22;
68:21;69:17;70:13,14;
71:15;72:23;8·4:2;86:20;
96:14,17;12-∶13;
150:15;159:∶;166:5,6,
24;167:2,12;176:21;
187:8;189:2;191:14;
204:8,9,14;2і5:5;217:3
mutilation (1)
190:11
Mutual (1)
13:16
myself (7)
79:10,10,13;30:17;
81:23;92:18:185:11
MySpace (4)
154:23;155:1,2,6

N

name (29)
4:7;8:16,18;5:2;20:25;
41:1;50:6,15 62:2,4,4;
65:7;7;66:5;89:11,13;
95:10;125:17;141:6,7;
161:1,3;174:21;179:5,
12,15;184:13;185:11;
188:7
named (2)
5:20;185:13

names (7)
24:14;50:3.5;51:2;
160:5;173:21;186:20
narcotic (2)
48:15,25
narcotics (7)
45:24;47:21;48:9;
59:20;60:1,18,25
narrow (2)
114:13,14
nature (1)
173:8
neck (1)
48:6
need (47)
4:24;9:7,14;11:8;
22:11,14;24:16;32:25;
35:6,19;36:19;45:5;
56:1;63:20;71:25,25;
72:1;76:18;82:21;84:18;
90:4,7;94:25;96:11,15;
99:4,17,18;100:4;
110:22;120:21;130:6;
134:1,3;140:7;148:8;
160:9;171:1;181:1;
184:21;192:6;198:13;
201:3;214:12,21;
215:13;216:22
needed (10)
32:8;35:2,3,13,14;
39:20;45:4,6;57:15;
99:15
needle (2)
58:12;93:7
needs (1)
198:7
neglect (1)
47:13
neighbor (2)
61:11;95:18
neither (4)
62:21;77:21;97:2;
193:25
nerve (4)
46:6,8,12;47:2
nerves (1)
48:17
nevermind (1)
130:8
new (4)
14:23;93:11;94:4;
96:11
next (2)
45:12;208:25
nice (11)
69:23;74:21,23;94:2;
118:22;146:7;179:1;
191:18,21,25;202:19
niece (1)
155:22
night (10)
18:19,20;37:7;45:9,
11,12;159:14;202:4;

204:3;205:10
nightmare (1)
204:12
nightmares (17)
158:21,21,23,23;
159:16,16,17,18;202:24;
203:3,6;204:2,7,23;
205:7,19,23
nightstand (1)
151:18
nobody (5)
120:8;121:11;143:16;
145:1;204:21
nod (1)
9:16
nods (14)
8:15;9:17;12:16;34:1,
8;80:4,10;82:23;159:21;
162:12;185:7,16,22;
187:11
noises (1)
29:16
none (2)
36:11;151:7
nonprescribed (1)
10:14
Nope (3)
48:13;82:11;171:15
normal (1)
114:14
nosy (4)
90:7;156:16;157:2;
158:10
note (7)
6:25;163:20;164:3,9,
10;165:10;188:4
notebooks (1)
182:11
notes (4)
63:13;163:21;182:5;
187:9
notice (3)
71:1,22;166:15
noticed (2)
71:20;119:11
noticing (1)
151:12
November (1)
62:9
Number (8)
4:5;53:17;111:19;
147:8,12;209:25;210:3,7
numbers (1)
207:17
nurse (2)
58:14;161:6
nurses (3)
58:8;161:14,16

O

oath (2)
184:20;185:6

Object (5)
67:11;79:2;85:20;
115:15;129:4
objection (12)
5:21;6:20;7:22;37:18,
19;70:6;78:14;148:12,
18;201:19,20;215:1
objections (1)
148:20
observe (2)
58:15;199:7
observed (1)
199:8
obtain (2)
67:5;83:21
obtained (2)
42:7;51:12
obtaining (2)
64:8;65:19
obviously (6)
29:23;44:20;63:20;
74:18;88:17;143:22
occasionally (6)
29:12;95:8;103:16;
125:18;155:16;172:12
occurred (8)
24:13;76:7;97:16;
98:25;104:5;123:20;
142:18;187:13
occurs (1)
132:11
October (6)
4:6;83:4;111:2;162:2;
184:4;217:9
off (37)
19:18,19;38:14;41:11,
14,16;48:1;56:1;65:15;
83:1,2;89:25;109:11;
110:24;112:8;116:25;
117:15,23;118:1;119:1,
19;121:7;131:25;142:6;
145:2,22;161:24,24;
163:3;173:19;175:17;
179:1;184:1;186:1;
193:13;202:16;217:6
offense (2)
88:5,18
offer (1)
32:9
offered (2)
163:17;164:9
office (2)
9:3;202:18
officer (66)
107:8,11,22;108:7;
110:5,13,19,20;111:13;
112:10;114:22;118:21;
119:11,20;122:23;
123:15,17,20;124:7,16;
125:12,17,22;127:14;
128:3;129:19,22;130:18,
19,22;131:3,12,18;
148:4;149:4;198:25;

199:7,9;202:9,10,12,13,
14;206:3,4,5,6,7,8,9,10,
11,13,15,18,20;207:4,
11;209:16,22;210:1,3,7,
14,17;211:5

**officers (45)**
5:9;17:6:4;9:4;36:2;
108:8,9,11;109:8,25;
110:18;114:9;118:11;
120:2,20,23,24;126:24;
128:16;129:18;130:15;
133:20;134:17;135:1,22,
22;137:18;139:16;
144:18;145:7,20,24;
146:3;149:8;184:14;
185:12;194:22;196:4;
199:14,23;201:6,25;
210:15,16;214:16

**officers' (2)**
108:22;109:2

**official (2)**
4:18;185:13

**offline (1)**
66:4

**often (10)**
52:22;68:11,12;80:15;
95:6,8;99:7;155:17;
179:4;203:19

**old (4)**
14:24;18:21;20:21;
212:25

**older (3)**
15:6;166:8,9

**Olsen (2)**
179:5,16

**once (18)**
19:24;20:4;44:20;
56:7;57:12;60:21;
114:18,19;123:7;128:8,
12;200:19,20,21,22,23;
210:17;216:22

**one (95)**
10:21;15:8,9;20:4,5;
25:12,13;32:6;48:20;
49:18,19,20;51:11;
52:18;53:2;54:25;56:18;
58:11,17;62:21;63:4;
66:5;71:8;76:19;77:21;
78:14;79:11;81:7,8;
86:19;92:12,19;94:3;
95:2;97:2,5,6;101:18;
102:2,10;103:17;105:5,
8;106:16,22,23;107:15,
16;108:19;109:20;
110:13;114:16,23;
115:22;116:12;125:19;
131:7,10;132:16;
140:18;143:17;145:2,6;
151:1,6,6;157:17;160:6,
11;161:14,16;163:14,18;
168:15;169:2;172:10;
177:5;190:8,19;193:25;
194:19;195:9;197:4,25;

207:4,6,13;209:14,16,
20,21;210:3,7;211:20;
212:12

**ones (11)**
81:17;93:9,14;98:9;
101:25;102.12,13,22;
103:4;196:20,20

**online (5)**
42:16;189:20,24,25;
190:2

**only (39)**
24:14;31:23;35:14;
44:21,22;45 4,9;50:17;
52:8,12;53:2;58:25;
59:2;64:23,:4;66:4.4:
68:15;81:22;84:17;86:5;
87:14;89:18;9:6,6;99:25;
106:21;120:24;143:17;
145:6;151:1,9,10;
155:21;167:22;172:23;
173:1;199:13;201:17;
216:15

**open (16)**
52:18;82:16 17;95:9;
101:16;116:3;122:8;
130:14;138:.7;140:20,
22;153:19,2?;215:13;
216:14,14

**opening (3)**
98:2;120:12 122:11

**operation (1)**
68:2

**operator (1)**
4:8

**opinion (7)**
69:18;194:2 .;200:4,6,
7,13;202:4

**opportunity (2)**
7:1;134:2

**opposed (4)**
45:3;57:21;122:4;
140:21

**option (2)**
5:21;140:19

**orally (1)**
48:10

**orange (3)**
153:4,5,12

**order (11)**
40:1,1,7;83:18;
175:16;184:11,12;
206:21,24;215:24,25

**ordered (1)**
207:6

**oromaxillofacial (1)**
53:16

**Otherwise (1)**
172:11

**ought (2)**
181:18;207:19

**ounces (5)**
45:7;84:10,1  ,13;
189:21

**ourselves (2)**
38:6;68:13

**out (135)**
6:17;12:4,18,23;16:6,
17;17:6,8,9,10,13,14,18,
20,20,21,24;18:3,5,12;
19:21;20:6;23:1;25:8;
26:15,17;28:2,9,14;
29:14,19;30:13,15,20;
31:6;33:11;34:22;38:18;
48:18,24;51:16;55:23;
57:14;58:9;59:11;61:20;
62:18;63:1,16;64:10;
65:15,21;71:16;72:20,
22;75:2;79:12,13;80:2,
24;81:13,25;82:19;85:1;
87:15;90:5,13,22;95:22,
24;96:3,8,9,10,13;97:23;
98:7;99:4,6;100:5,8,14,
17,20;102:25;103:10,16,
22;104:1;105:22;
106:19,20,21;110:7;
118:24;119:14,15;
123:18;127:15,16;
130:1;134:2;138:12,15;
142:1;145:6,22;146:2,4;
147:3;149:10;157:17;
158:20;161:12,23;
162:14,15;163:21;
169:6;170:17,18;180:2,
6;184:10;186:22;190:7;
194:13;195:15;196:24;
197:5;200:12;205:11,
22;208:21;212:14

**outside (8)**
29:10;91:2;125:8;
130:25;131:4,14,19,20

**over (33)**
17:3;28:20;34:21;
35:16;36:7;58:22;61:15;
63:5,9;65:23;78:8;85:6;
87:19,21;91:3;101:15;
105:4,9;120:25,25;
122:23;126:2,18,18;
155:24;161:8;176:17;
201:16;202:12;205:19;
206:24;208:4;210:19

**own (15)**
18:6;23:5,10;24:9,15;
25:25;28:6;30:24;31:1;
39:14;47:24;68:12;
129:15;180:25;196:11

**owned (6)**
23:21;33:9;187:14,18;
196:5,14

**owning (1)**
24:1

**owns (1)**
72:21

**Oxy (1)**
157:10

**Oxycontin (2)**
157:10,13

---

**P**

**packs (1)**
33:11

**padlock (5)**
76:8,9;104:24;105:9,
10

**page (4)**
154:23;155:1,6,12

**paid (11)**
68:9;102:12;163:3;
180:5,7,19,20,23,24;
181:13;187:23

**pain (7)**
46:4;47:1;61:3,4;
79:11;157:15,16

**painted (1)**
66:23;152:3

**Pamida (1)**
67:7

**panic (9)**
20:3,8,9;142:25;
158:21,22;159:12,19;
202:24

**panicking (1)**
29:14

**panics (1)**
171:7

**paper (7)**
208:7

**parallel (1)**
208:2

**Paranoia (2)**
72:14;74:19

**paranoid (5)**
71:16;72:15,18,24,25

**paraphernalia (1)**
88:9

**pardon (2)**
87:16;99:5

**parents (6)**
17:20;18:4;47:6,9;
57:15;68:10

**parents's (3)**
104:17;147:23,24

**Parnell (4)**
179:5,8,9,11

**part (11)**
6:18;89:14;117:25;
120:10;122:7;173:24;
181:6;183:6;186:12;
205:12;214:8

**Particularly (1)**
13:8

**parts (1)**
16:13

**party (3)**
15:18,19;184:11

**passed (8)**
13:1,3;15:5,9;16:24;
186:1,14,24

**pastor (7)**

173:11;176:9;190:15;
191:13,24;192:1;205:22

**patients (2)**
52:18;53:3

**paused (2)**
186:8;193:5

**Paxil (2)**
56:18,21

**pay (4)**
181:12

**paying (3)**
145:5;180:6;195:9

**payment (2)**
68:15

**payments (6)**
68:8,9;171:20;180:7,
7;188:1

**peanut (1)**
20:24

**pen (1)**
210:6

**pending (1)**
216:14

**people (28)**
30:22;31:2,3,24;
66:11;67:9,23,24,25;
68:3,20;74:23;77:6;
78:2,5,25;79:5;87:25;
90:8;96:18;106:16;
114:17;126:2;129:9;
155:18;179:13;204:17;
213:10

**per (1)**
87:2

**perfect (1)**
150:2

**period (6)**
5:9;49:7;53:9,13;
113:19;114:2

**permission (1)**
48:20

**person (11)**
34:23;42:3;57:9;
69:22;101:19;102:11;
105:24;114:16;115:22;
191:6;193:7

**personal (8)**
45:5,6,8;69:20;84:17;
181:5;191:8;204:19

**person's (1)**
63:10

**pertain (2)**
165:21;205:1

**pertaining (2)**
132:23;160:16

**phase (2)**
72:6,7

**PhD (2)**
176:10,21

**phone (6)**
107:6,8,9,9;147:8,12

**phonetic (2)**
50:16;179:6

**photos (1)**
156:1
**physical (3)**
145:13,18;157:17
**physically (4)**
142:9,10,13,15
**physician (3)**
50:12;163:20;164:2
**physicians (2)**
163:14;169:17
**physician's (1)**
172:8
**pick (7)**
71:6;94:24;102:11;
171:1,2;174:2;189:1
**picked (1)**
189:2
**picture (11)**
94:16,17;110:20;
130:9,20;132:8,21;
141:24;154:13,16;155:4
**pictures (8)**
130:18;132:18;
133:20;134:17;154:18,
22;155:19,21
**piece (4)**
97:7;105:4,9;208:6
**piercing (1)**
95:20
**piercings (1)**
95:17
**piling (1)**
63:21
**pill (10)**
9:21;94:17,20,23;
95:7;152:20,23;153:1,7,
12
**pills (5)**
48:10;65:4;152:21,22;
186:5
**pinned (1)**
80:1
**pipe (2)**
77:3,3
**pistol (3)**
149:12,16;151:18
**pistols (3)**
196:3,5,18
**place (18)**
18:6;26:19;28:6,14;
39:14;50:21;62:1;74:22;
92:2;95:18;96:11;98:5;
124:17;126:13;169:13;
180:18,25;187:16
**placed (5)**
97:24;146:6;155:5;
178:11;194:3
**placement (2)**
100:17,18
**places (3)**
91:6;92:11;177:25
**placing (2)**
98:4,6

**Plaintiff (4)**
4:3,13,23;7:3
**Plaintiff's (1)**
5:5
**plan (4)**
133:13,20;137:18;
148:7
**planning (1)**
135:21
**plant (2)**
44:5;88:8
**planting (1)**
44:21
**plants (22)**
36:9;39:8;4;:8;43:16,
23;44:9;45:2;65:24;
66:22;74:17,18;77:9,12;
84:14,20,23;85:4,6;
118:19;123: 4;151:24;
152:6
**play (4)**
61:12;95:19;102:11;
155:17
**playing (1)**
116:1
**plea (1)**
175:20
**please (13)**
4:10,19;8:16:9:7;
110:7;115:2;118:23;
131:7;132:6;136:24;
178:20;199:5;208:16
**pled (1)**
176:2
**plus (2)**
10:5,5
**pm (3)**
162:2;184:4;217:9
**poems (4)**
182:7,8,9,11
**point (40)**
12:17;15:5;18:8,25;
19:2;23:9,20;25:24;
28:19;41:6;4':1;54:17;
56:18;58:11, 7;60:11;
80:24;85:3;98:24;
103:24;112:1,7,8;113:6,
13;114:1;118:10,20;
119:19;120:9,121:11,
16;122:13;123:1;
126:17;139:27;191:17,
20;194:6;197 10
**pointed (31)**
107:11,18;108:11,13,
14,17,18,23;109:3;
111:14,17;112 10,17,21,
24;113:21;119:3;121:9,
17,19,20,25;122:1,2,4;
143:25;144:24;197:20,
23;199:1;200:9
**pointing (2)**
122:21;190:25;
202:3

**poker (1)**
95:19
**police (25)**
5:9;47:19;73:18;
77:24;88:4;89:4;91:5,
12,19;97:21;98:23;
104:13;106:25;107:1;
117:8,10;126:25,25;
129:24;139:16;144:8;
147:17;176:22;194:6,8
**poor (1)**
55:1
**popped (1)**
145:2
**porch (3)**
194:4;197:6,7
**pornography (2)**
154:10,10
**portion (3)**
8:8;41:10,22
**portions (2)**
40:15,15
**position (11)**
5:14,18,24;6:24;
113:4,23,24;121:20,21;
122:1,3
**positive (9)**
22:25;38:23;39:4;
50:11;55:9;154:5;
176:12;180:14;188:10
**possession (1)**
175:8
**possibility (3)**
120:3;128:20;191:22
**possible (4)**
120:1;124:13;162:21;
204:16
**possibly (4)**
29:20;124:10;164:14;
178:14
**pot (8)**
36:24,25;39:22;64:13,
14,24;89:1;118:19
**potentially (2)**
39:15;77:6
**pots (1)**
88:8
**potting (6)**
36:13,15;90:22,23;
91:6,17
**pound (1)**
45:6
**pounds (2)**
58:22,24
**Powell (9)**
4:3,17;44:14;51:25;
52:3;170:8;172:11;
185:12;214:4
**prefer (1)**
5:4
**pregnancy (1)**
169:15
**pregnant (11)**

28:5;29:20;31:21;
33:11;52:10;170:4,18,
19;172:5;174:13,18
**premise (2)**
67:9,22
**prepared (1)**
189:3
**preppy (1)**
211:12
**prescribed (18)**
45:25;46:1,22,25;
48:4;51:14;56:12;65:5;
94:9;157:9,22;159:25;
160:4,6,7;169:1,3;188:5
**prescribing (2)**
168:20;188:13
**prescription (6)**
34:19;48:9;65:4,6;
94:20;186:15
**prescriptions (2)**
60:20;157:14
**prescriptive (1)**
10:11
**present (5)**
5:17;7:1,6;111:5;
214:16
**presented (1)**
216:23
**pretty (25)**
21:16;22:6;27:12;
31:4;32:23;35:14;51:11;
53:13;54:23;68:21;
70:13;71:23;72:23;84:2;
86:20;96:17;131:2;
150:15;159:5;189:2,11;
191:14;204:8,9,14
**previous (1)**
201:15
**primary (5)**
52:22,23;53:1,7;
188:14
**prior (9)**
53:11,19;160:1;
163:16;165:8;169:4;
188:5;189:6;194:13
**privacy (2)**
35:20;141:1
**privilege (9)**
135:7;136:1,5,23;
138:14;139:5,24;141:2;
216:19
**PRN (1)**
32:23
**Probably (15)**
41:9;43:6,7;44:22;
55:7;58:25;62:14,15;
69:10;110:23;120:16;
142:3;170:7;182:19;
207:19
**problem (9)**
9:8,8;60:11;68:17;
137:5;181:2;201:12;
215:15,20

**problems (6)**
47:3;68:6;166:23;
167:12,14,21
**proceed (2)**
8:3,14;184:12
**Proceedings (1)**
217:8
**process (1)**
138:25
**production (2)**
5:25
**professionals (1)**
204:10
**program (4)**
12:7,8,15;189:1
**programs (1)**
14:16
**promise (1)**
18:18
**proof (3)**
192:17,18,19
**protect (2)**
193:14,15
**protective (2)**
215:24,25
**proud (2)**
68:13;191:1
**provide (5)**
48:15;51:13;140:10;
168:14;216:4
**provided (10)**
42:9;49:23;52:5;
140:12;168:14;186:19;
194:21;202:23;215:21;
216:5
**provider (1)**
190:23
**providers (8)**
186:20;192:4;202:22;
203:9,14;204:12,15,18
**providing (1)**
50:25
**pry (1)**
69:17
**prying (1)**
69:22
**psychiatric (4)**
49:23;54:1,6,19
**psychological (3)**
20:14;167:21;172:19
**psychologically (1)**
19:11
**psychologist (3)**
176:15,18,20
**psychology (1)**
176:11
**psychs (1)**
65:11
**PTO (2)**
163:1;166:15
**PTSD (1)**
5:7
**public (1)**

Tricia Wachsmuth v.
City of Powell, et al.

212:16

**puking (1)**
32:3

**pull (6)**
46:5,7;65:14;76:1,4;
202:16

**pulled (5)**
47:17;53:22,24;
109:22;130:2

**pulling (1)**
105:20

**pupils (1)**
71:17

**purchasing (2)**
66:1,19

**purpose (1)**
216:15

**purposes (2)**
6:24;42:2

**push (1)**
31:24

**pushed (10)**
36:9;109:23,23;
119:24;121:1;122:23;
142:10;206:25;210:2,19

**put (44)**
4:24;30:11;38:6;
40:15;55:3;98:9;100:24,
25;103:18;109:15,16;
110:5,7,12;112:1;113:6,
11,22;119:21,21;121:22;
123:17;128:15;130:8;
151:10;156:2;177:25;
187:3;193:16;199:15,
18;208:18,18,22;209:6,
8,8,11,14,16,21,22;
210:4,12

**puts (1)**
6:1

**putting (5)**
19:8;33:11;59:4;79:4;
118:23

**Q**

**qualifications (1)**
176:7

**qualified (1)**
176:13

**quarter (1)**
116:8

**quick (9)**
6:8;17:3;27:12;92:2,2;
132:1,3;149:25;180:2

**quicker (2)**
184:24;199:5

**quiet (1)**
71:25

**quietly (1)**
117:5

**quit (17)**
29:17;30:4;31:12,13;
32:4,5;33:5;54:11;

64:11,11;80:15;110:15;
168:6;170.2?;174:3,12,
17

**quite (2)**
34:25;38:13

**quitting (1)**
173:24

**R**

**racing (2)**
71:18;105:24

**radio (1)**
72:1

**raise (1)**
6:12

**raised (5)**
5:16;11:13;37:19;
61:21;96:24

**raises (1)**
168:11

**ran (2)**
116:16;123: 3

**range (4)**
103:1,10,11,17

**rant (1)**
99:7

**rather (1)**
147:18

**Razapan (1)**
157:11

**reached (5)**
109:20;120:25;
122:23;206:24;210:19

**reaction (2)**
48:21;49:15

**read (10)**
59:23;65:15;90:20;
136:19,24;137:6,8;
161:7,11;177:21

**reads (2)**
146:10,12

**ready (8)**
8:3,14;85:5;110:20;
126:3;143:4;  46:8;
200:3

**real (2)**
6:8;180:2

**realized (4)**
55:2;107:10;194:8;
210:17

**really (47)**
16:10,14;17:23;18:13;
19:20;32:3;43:5;44:10;
48:17,17;55:21;62:24;
63:9;68:14,20;69:17;
70:14;71:18;72:8;73:10;
74:19;76:23;86:4;89:16;
91:3;101:8;102:12;
109:9;118:22;149:20;
154:18;156:24;161:1;
162:15,16;168:5;
176:21;179:2 ;180:12;

187:22;191:18,25;
192:18;198:13;203:19;
212:7;215:15

**reanswer (1)**
167:4

**reason (9)**
30:8,18;35:18;73:15;
86:5;89:18;145:21;
195:11;215:17

**reasonable (1)**
129:1

**reasons (1)**
96:1

**reassert (1)**
214:25

**recall (12)**
120:23;126:14;
127:11;129:18,25;
164:9;186:2,18,20;
189:24;190:2;192:9

**receive (2)**
50:20;216:1

**received (3)**
4:25;50:7;192:8

**recent (3)**
82:10;188:8,9

**recently (8)**
20:19;26:2,13,21;
27:15;32:13;154:21;
168:25

**Recess (4)**
83:3;111:1;162:1;
184:3

**recognize (2)**
124:21;161:4

**recollect (1)**
52:17

**recollection (2)**
89:22;100:12

**record (30)**
4:1,24;5:4;6:21;8:17;
10:19;40:9;41:11,14,17,
19,23;83:2,5;110:25;
111:7;137:8;138:11;
140:7;161:25;162:3;
175:10,19;184:1,10,25;
198:12;201:12;213:4;
217:6

**records (19)**
30:7;31:11;39:5;
51:12;52:5,8;160:14;
161:4;168:9,13;169:21;
170:8;175:7,7;202:23;
215:9,17;216:12,16

**red (1)**
130:3

**redraw (1)**
150:18

**refer (2)**
40:23;42:3

**reference (2)**
59:21;65:25

**referred (1)**

40:21

**referring (4)**
47:22;60:2;81:5;
174:25

**refers (2)**
59:22,25

**reflect (2)**
168:10,11

**reflex (1)**
31:25

**refuse (1)**
198:22

**regard (4)**
134:12;135:10;
198:19;215:2

**regards (1)**
194:21

**register (1)**
78:14

**regret (2)**
96:13;104:2

**regular (2)**
50:13;115:13

**Reisner (10)**
51:19,20,22;52:8,16,
23;160:8;172:12,16;
173:17

**related (1)**
188:17

**relates (1)**
85:17

**relation (1)**
4:25

**relationship (1)**
34:11

**relax (1)**
45:9

**relaxed (5)**
113:3;121:20,21;
122:1,2

**relayed (2)**
202:23;203:10

**released (2)**
27:7;49:12

**releases (7)**
215:23,25;216:3,5,7,7,
10

**reliable (1)**
99:17

**reliving (1)**
159:17

**remain (2)**
146:14,18

**remember (21)**
23:2;27:13;33:17;
50:3,6;51:2,3;55:6;
56:19;69:8;89:17,19;
150:22;163:5;164:10,18,
22;165:9;177:5,6;
185:19

**remind (3)**
184:20;185:5;186:6

**remission (2)**

16:12;19:9

**remove (1)**
47:2

**removed (1)**
16:13

**rent (4)**
180:5,19,23;181:12

**rental (2)**
26:16;27:2;28:8,15

**renting (1)**
28:16

**renumber (1)**
207:19

**repeat (2)**
67:18;70:10

**rephrase (5)**
9:7;70:7;123:25;
142:12;189:13

**rephrasing (1)**
9:9

**report (1)**
175:9

**reporter (16)**
4:9,19;8:22;9:13;47:7;
78:7,22;89:9;108:24;
131:7,9;142:21;161:18;
172:25;174:8;216:8

**reporting (1)**
55:11

**represent (3)**
4:11;9:3;185:12

**represents (2)**
132:21;209:25

**request (4)**
140:6;163:13,20;
164:2

**requested (1)**
137:9

**required (1)**
40:8

**residence (1)**
26:5

**residue (2)**
152:21,24

**resignation (1)**
31:13

**respect (10)**
5:13;37:9,9;75:19;
76:4,5;77:23;85:13,13,
15

**respectful (2)**
5:12;155:8

**respond (2)**
127:18;136:22

**response (1)**
185:20

**responsibility (2)**
144:12,13

**rest (3)**
69:20;70:5;123:1

**restaurants (1)**
97:5

**restricted (1)**

99:1
result (5)
   142:18;145:24;
   147:21;158:17;189:18
retired (1)
   50:14
review (1)
   216:16
revolvers (1)
   151:5
rich (1)
   68:18
rid (1)
   44:2
rifle (2)
   101:17;196:19
rifles (5)
   97:18,19;101:18;
   103:6;196:18
right (49)
   5:19;8:2:10:24;24:21;
   27:7;33:5;49:6;58:10;
   71:25;72:9;77:15;79:20;
   80:3;87:6;92:20;93:7;
   100:3;109:19;114:23;
   118:17;124:22;133:8;
   135:1,5;137:13;138:7,
   14;139:11;144:14,15;
   146:18;149:24;150:11,
   12;160:3,18,20;169:19;
   171:3;173:17;185:21;
   200:1;203:5;207:11;
   208:16;209:12;214:7;
   215:4;216:9
rights (6)
   84:1;100:2;146:10,12;
   183:7,8
ring (2)
   67:1;95:12
riot (6)
   124:19;125:7,25;
   126:3;154:14;156:7
rip (1)
   92:3
ripped (4)
   77:25;93:13;153:19,
   22
Road (8)
   8:20,24;25:12,17,23;
   26:7,9;27:25
robbed (1)
   107:7
rock (1)
   130:23
rocks (1)
   21:8
roll (1)
   130:23
rolled (1)
   79:19
room (15)
   5:11,17;29:12,22;
   66:21;97:25;125:13,20;

130:15;143:5;149:19;
   150:8;152:6,11;214:22
roommate (1)
   96:17
rotting (1)
   47:17
rough (1)
   42:24
running (4)
   76:21;106:25;107:2;
   180:2
rushing (4)
   110:4;118:13;123:7,8

S

Sad (5)
   13:7;19:22;55:14;
   57:21;187:6
safe (2)
   193:23,25
safety (4)
   98:7;102:6;144:23;
   151:11
same (11)
   13:17;25:4;30:1;33:9;
   45:15,15;48:5;57:11;
   66:12;195:17;201:16
sarcastic (3)
   178:23,25;179:2
sat (1)
   146:17
save (1)
   21:9
saw (20)
   50:13,17;52:13,16,18;
   105:23,23;109:25;
   112:16;113:16;122:19;
   124:11,21;13:2:22;
   142:2;156:21 194:4;
   195:23;197:6 199:13
saying (9)
   27:21;61:17;72:4;
   120:23;144:1-,157:18;
   178:10,10;192:17
scared (16)
   30:19,20;109:9,22;
   114:8,11;120:7,122:25;
   128:10;132:2;145:5;
   146:25;194:10,11;
   200:10;214:15
scars (1)
   80:18
school (20)
   11:24;12:2,18:13:10,
   11;14:5,8,11;16:25;
   83:23;99:23;188:18,23,
   24;212:25,25;13:6,7,
   12,14
schools (1)
   14:16
scream (3)
   143:16;145:1;205:9

screens (1)
   119:16
se (1)
   87:2
seal (2)
   41:24,25
sealed (1)
   40:15
seam (5)
   82:16;89:13;91:25;
   92:9;153:18
seams (4)
   77:25;93:1,13;153:22
search (13)
   5:10;88:4;91:5,20;
   97:21;106:25;107:1;
   126:25,25;132:19;
   145:25;149:10.11
searched (1)
   176:22
second (1)
   78:13
secure (1)
   57:15
security (6)
   16:19,21,24;68:8;
   195:18
seeds (15)
   38:19,20;39:21,23;
   42:9,12,14;44:4;64:15,
   18;66:1,6,9,18;85:1
seeing (9)
   53:6,14;61:24;125:24;
   171:8;190:15;191:5,24;
   203:5
seek (1)
   186:22
seeking (2)
   191:3;194:13
seem (1)
   80:13
seemed (2)
   36:3;80:14
seized (1)
   154:6
self-mutilation (1)
   190:17
self-taught (1)
   190:12
sell (4)
   27:11;67:10,23;
   181:14
semiautomatic (2)
   149:12;151:18
send (5)
   92:15;93:8,10,15;
   140:14
sending (3)
   93:3,4,5
sense (1)
   204:4
sent (2)
   154:9;170:8

sentimental (1)
   92:15
separate (4)
   44:1,5,6;51:10
September (2)
   20:12;182:19
septic (1)
   76:21
sequence (1)
   187:8
seriously (1)
   47:20
set (6)
   34:23;42:17;102:5;
   155:1;184:10,10
sets (1)
   34:22
Seven (1)
   202:20
Seventeen (1)
   11:21
several (4)
   85:12;96:1;159:11;
   197:19
severe (2)
   19:21;158:21
sew (6)
   93:2,5,6,8,9,15
shakes (3)
   10:9;107:23;174:19
shaking (2)
   110:12,15
shape (1)
   153:11
share (1)
   61:22
shaved (1)
   211:14
shelf (1)
   193:16
shelter (1)
   74:24
shelves (2)
   89:5;90:1
shh (3)
   165:2,2,2
shield (4)
   183:6,8;212:1,3
shields (1)
   213:11
shift (1)
   109:20
shifted (1)
   120:25
ship (1)
   93:15
shipping (3)
   92:23;93:13;153:21
Shit (2)
   87:15;99:4
shoes (4)
   110:9,10,11,12
shoop (2)

92:20;111:25
shoot (7)
   58:13;103:1;117:15;
   147:4;196:23,25;200:3
shooting (5)
   102:9,25;103:10,11,17
shoots (1)
   84:19
short (5)
   58:18;68:10;161:22;
   193:22;211:11
shorter (5)
   121:24;193:20,20;
   211:17,24
shortly (5)
   16:17;27:12;52:23;
   163:7,25
shot (12)
   58:11,12;109:12:
   116:25;117:17,18;
   143:14;145:2,8;196:16,
   21;197:4
shotguns (2)
   101:17,18
shoulder (2)
   119:21;121:12
show (3)
   4:1;31:11;108:18
showed (1)
   101:3
showing (1)
   9:21
shown (2)
   88:8,9
shows (1)
   65:5
siblings (1)
   15:7
sick (11)
   16:11,14;32:2;58:5;
   163:1,1,3,4;166:16;
   167:16,17
side (28)
   94:4;101:15,17,20;
   109:6,18,21;114:20,20,
   23,25;115:4,4,7,7,9,10;
   116:5;117:16;120:25;
   122:1,5;199:16;207:7,8,
   12;209:12,14
sign (3)
   130:23;131:15,18
signature (1)
   161:7
significant (2)
   7:4,8
silence (1)
   135:9
silent (3)
   146:14,18,18
similar (2)
   131:2,10
simple (3)
   40:13;139:13;141:13

Case 1:10-cv-00041-ABJ   Document 65-13   Filed 01/10/11   Page 74 of 78
Tricia Wachsmuth v.
City of Powell, et al.

Tricia Wachsmuth
October 04, 2010

**Simpson (2)**
195:25;196:1
**simultaneous (1)**
119:9
**Sinclair (5)**
29:2;33:4,6,7;125:16
**single (1)**
115:22
**sinuses (1)**
46:13
**sister (1)**
14:2
**sister's (2)**
18:19,19
**sit (3)**
128:2;129:10;166:9
**sits (1)**
203:19
**sitting (19)**
104:15;105:12;
106:13;107:4,12,25;
110:16,17;119:2,10;
124:2;127:12,23;
130:10;132:9;150:23,
23;194:2;202:12
**situation (3)**
6:2;57:17;123:18
**situations (3)**
129:9,16;167:15
**six (1)**
58:25
**Skinny (1)**
211:11
**skip (2)**
155:24;187:7
**slab (1)**
118:15
**sleep (4)**
55:24;71:10;159:15;
203:7
**sleeping (2)**
63:17;167:23
**slice (2)**
46:7,7
**sliced (1)**
77:3
**slides (1)**
105:5
**slight (3)**
10:6,6,6
**slow (2)**
186:10;208:14
**slowly (1)**
57:8
**Small (5)**
13:17;84:15;115:11;
149:23;202:18
**smaller (1)**
114:17
**smart (1)**
176:19
**smell (2)**
76:22;119:4

**smells (1)**
32:2
**smiling (1)**
130:16
**smoke (11)**
36:25;37:5;45:16,17;
63:22;64:4,24;96:7;
119:2,4;132 4
**smoked (1)**
64:4
**smoker (1)**
45:9
**smoking (12)**
36:24;63:25:64:1,2;
75:3;170:22;171:1;
172:1,4;173:25;174:12,
17
**sneeze (1)**
35:6
**snoopy (1)**
158:11
**snuck (1)**
116:16
**social (5)**
16:19,21,21,24;68:7
**sodium (1)**
67:1
**soil (6)**
36:13,15;90:22,23;
91:6,17
**Sold (2)**
27:10;181:16
**somebody (16)**
46:24;50:13;75:2;
86:7;95:15;96:23,24;
116:15;117:2,17;194:4;
197:6;200:22;201:7,10;
202:1
**someone (10)**
32:25;62:19;71:5;
74:23;111:21;117:5;
125:9;137:22;190:6;
201:24
**someplace (1)**
101:1,2
**sometime (1)**
203:2
**sometimes (8)**
35:5;47:25;70:2,11;
71:17;90:18:95:9;
214:12
**son (2)**
28:8;82:11
**soon (10)**
106:4,22;110:3;113:4,
22;118:17;121 22;
123:16;187:5;194:10
**sore (1)**
82:14
**sorry (55)**
8:22;9:20;10:20;
12:22;17:11;20:11,13;
22:12,17;24:23;34:16;

35:8;40:5;47:7;52:19;
57:16,25;61:9;66:8;
67:19;70:4;72:11;78:7,
11,15,17,18,20;81:4,15;
86:6;87:15;93:19,24;
98:12;99:5;100:4;
108:24;128:7;130:21;
131:8;142:21;152:9;
163:2;167:3;172:25;
173:14;179:1;185:9,24;
192:12;202:8;207:18;
211:2;213:8
**sort (2)**
186:22;188:13
**sorts (1)**
156:23
**sounds (2)**
82:25;84:3
**source (3)**
64:9;138:12;141:8
**southern (1)**
186:12
**space (6)**
31:23;118:19,20;
123:14,15;150:11
**speak (2)**
22:11;159:7
**special (1)**
170:10
**specialist (2)**
170:7,11
**specific (6)**
7:6;100:19;129:23;
132:7;136:5;149:3
**specifically (4)**
85:8,9;98:14;158:17
**spell (2)**
11:15;173:15
**spelling (1)**
172:18
**Spencer (2)**
173:11;176:8
**Spencer's (1)**
176:7
**spend (1)**
34:25
**spent (1)**
95:15
**spine (2)**
157:19,19
**spit (1)**
55:23
**spliced (1)**
76:21
**spoke (1)**
136:7
**Spomer (8)**
52:11;161:17,19;
172:2,2,12;173:19,23
**squad (2)**
142:1;143:9
**squinted (4)**
106:3,5,22,23

**St (1)**
13:18
**Stab (5)**
81:8,8,9,21;92:3
**stack (1)**
36:8
**stair (1)**
116:11
**stairs (59)**
42:20,21;66:23;91:1;
106:17;109:6,8,11;
110:3;111:13;112:4,7,9,
22;113:1,16,18.20,25;
114:5,8,10,12,13,15,21;
115:10,23;116:3,23;
117:16,21,25;118:7,14;
119:18,22;121:8,18;
122:8,14,16,17;123:2;
128:10;142:11;145:3;
197:18,22;198:3;
199:14;206:3,5,17;
208:3,23;209:4,11,12
**stairway (3)**
115:21;117:20,20
**stand (3)**
42:25;58:13;150:7
**standing (3)**
110:18;200:1;207:10
**stands (2)**
146:23;214:7
**stared (1)**
105:18
**staring (2)**
105:17,19
**start (18)**
16:2;28:18;29:14,14,
24;33:22;39:20;42:7;
50:1;54:12,14,23;
126:22;143:11;166:20;
206:23;208:4,12
**started (37)**
9:18;19:8;21:7;34:5;
39:12;41:3;54:20;55:5,
19;56:7,8;57:12;59:4,7,
9;74:17;84:19,23;92:18,
21;109:7;116:14;
117:14;119:5;128:9,17;
130:18;146:16;147:1,4;
148:9;170:15,21,24;
191:5;201:9;214:18
**starters (2)**
84:20,24
**starting (2)**
71:3,7
**starts (3)**
71:18;97:7;105:24
**state (9)**
4:11;8:16;30:7,9;
54:19;144:15;186:12;
190:5,5
**stated (3)**
185:25;194:25;199:13
**statement (1)**

7:10
**States (3)**
4:4;7:5;117:2
**stating (2)**
40:1;214:20
**station (5)**
29:2;125:16;146:11,
12;162:9
**stay (6)**
29:22;62:1;175:18;
178:16;180:4;204:3
**stayed (3)**
26:19;27:25;29:18
**staying (2)**
29:18;86:18
**stem (1)**
145:23
**step (4)**
109:17;113:22;
209:19;210:15
**stepped (2)**
74:7;121:23
**stepping (1)**
60:13
**stick (1)**
21:25
**Stiles (3)**
169:2;173:9;203:1
**still (21)**
13:21;15:1;25:4;
50:19;55:6;86:21;88:4;
92:14;99:9;107:13;
112:23;128:13;141:25;
168:4;172:4;173:12;
180:6;184:20;185:6;
201:2;215:21
**stipulation (1)**
217:1
**stitched (1)**
53:24
**stomach (2)**
32:1;58:12
**stood (6)**
108:6;111:18,19,24;
112:16;206:21
**stop (8)**
35:5,11,15;61:12;
81:11;170:19;200:22,23
**stopped (21)**
16:20;80:13;81:12;
109:14,16;110:4;112:4.
23;113:1,4,22;120:9;
121:17,22;128:15;
170:18,19;182:19;
199:15;209:7;210:12
**stopping (1)**
128:21
**storage (2)**
42:22;177:12
**store (2)**
67:6;125:18
**stories (2)**
30:24;31:1

story (2)
63:4,7
straight (5)
25:20;91:2;117:5;
130:14;149:10
straightforward (1)
139:23
street (2)
130:2;142:2
streets (1)
61:24
stress (9)
19:23;29:9;57:6;
170:17,23;171:3,5,6;
173:24
stressful (6)
5:8;57:18,18;59:19;
171:9,10
stress-related (2)
174:6,10
strike (1)
140:19
struggles (1)
71:1
struggling (2)
12:10;57:4
stuck (2)
120:6,7
stuff (21)
19:16;21:13;29:12;
32:14;58:8;64:2;65:12,
18;70:16;74:5;81:14;
92:16;94:11,13;99:6;
103:2;149:6;155:8;
176:13;213:9,12
stuffed (18)
77:25;79:4,12;81:21;
82:1,1,3,4,15,17;91:23,
24;92:19,23;93:12;
153:21;190:7,9
stunk (1)
76:23
stupid (1)
38:4
subject (2)
7:6;138:2
substance (2)
10:23;47:12
substances (4)
10:15;36:23;38:2;
73:21
successful (1)
14:7
sucked (2)
120:5;180:20
sucks (2)
160:16;211:2
sudden (2)
105:16;130:7
sue (1)
194:15
sued (2)
4:18;5:20

suffer (8)
5:7;19:15;70:13;
142:24,25;158:21;
176:1;204:4
suffering (4)
54:15;55:20;158:18;
175:2
suggesting (1)
40:13
suicide (1)
15:13
sum (2)
134:11,15
summer (1)
38:24
suppose (2)
74:18;97:9
supposed (5)
138:25;203:1,5;
214:17,19
supposedly (3)
130:24;131:6,12
sure (28)
9:14;22:14;23:17;
25:19;48:5;49:14;50:9;
58:5,10;75:9;78:22;
83:20;84:12;94:20;
99:17;102:2;04:19;
105:23;106:2;107:6;
111:10;154:4,160:6;
161:6,15;174 1;191:6;
204:16
surely (1)
113:11
surgeon (1)
53:16
surgically (1)
47:2
surprise (3)
7:17,20;35:16
surprised (2)
37:11,15
suspicion (2)
37:13;38:1
swear (1)
4:20
Sweetest (1)
53:15
switch (3)
160:10;161:23;208:13
switched (4)
56:2,3,5;210:13
sworn (2)
4:21;8:11
symptoms (14)
5:7;6:3,9,10;20:1,14;
69:15,16,25;158:18;
159:2,18;187:6;203:10
system (4)
10:24;40:20;56:7,8
systems (1)
213:14

**T**

Tabby (1)
62:5
Tabitha (1)
62:5
Tabitha's (1)
95:10
table (1)
152:11
talk (44)
11:12;21:2;34:10,11;
36:22;39:25;53:18:60:5;
63:7;71:14;74:1;89:1;
98:11,13;99:12;106:7;
114:9;117:19,19;130:9;
132:25;137:3;140:24;
145:20;146:14,20,21;
149:8;162:18;164:23;
183:10,14;189:4,9,14;
191:19;192:23;194:12,
14;195:3,16;204:21;
205:24;209:7
talked (27)
32:13;41:3;54:15;
57:13;59:10;60:2;68:24;
85:11,12;88:20;97:1;
142:17;158:14;164:7;
169:4;187:12;188:16;
189:7;190:14,22;192:7;
202:7,9;203:17;204:6,
17;205:13
talking (34)
40:10;42:6;48:2;
64:25;65:1;66:25;73:5;
74:9;83:11,14;87:3;
89:19;91:22;96:2;
110:19;111:11;112:6,6;
130:17;140:24;143:6;
154:20,21;162:22;164:1,
16,21;165:13;174:21,23;
175:15;191:7;202:11;
214:15
talks (4)
47:20;59:18,20;65:19
tall (1)
43:6
taller (2)
193:21,22
Tapatio's (1)
97:13
tape (1)
161:23
tapes (1)
160:10
target (1)
200:4
taste (1)
55:22
taught (1)
190:6
teach (4)

100:2;213:2,7,9
Teaches (1)
84:1
tear (1)
81:22
teddy (1)
153:18
teeny (1)
150:11
teeth (12)
46:3,10,16;47:4,5,14,
16;53:12,13,22,23,24
telephonically (1)
7:1
telling (9)
63:6;71:24;83:12;
99:3;100:16;116:18;
127:19;132:8;158:1
tells (2)
158:12;206:22
temporarily (1)
77:4
ten (1)
20:22
tendency (2)
9:16;79 9
term (3)
45:19;60:3;165:15
terminated (1)
31:12
terminology (3)
211:23,25;212:3
terms (2)
136:7;166:6,8
territory (1)
201:14
test (7)
176:23;177:4,7,13,19,
20;178:3
tester (1)
177:3
testified (8)
8:11;111:12;112:25;
130:10;133:11;134:9;
162:6;173:23
testify (3)
137:22;138:8;201:18
testifying (8)
133:13,20;134:6,12,
25;135:11,22;138:20
testimony (18)
93:3,12;107:17;
134:15;144:7;155:9;
163:19,25;178:6;
185:15;186:2,19;187:10,
14;192:9;197:9;198:24;
199:22
thanks (2)
99:9;184:9
therapist (2)
157:18;159:1
therapists (1)
173:2

thinking (11)
31:5;40:19;59:2;
60:10;80:15;105:19;
107:7;147:1;161:11,14;
201:9
Thomas (3)
7:17;21:1;212:8
Thompson (44)
4:16,16;6:23;7:19;
41:11,24;138:10;139:4,
9,19;140:1,16,25;141:3,
5,11,17,19;183:21,25;
184:8,17,18,23;185:3,
11;193:9,11,17;198:8,
20;201:19,22,23;205:24;
206:1;208:1;210:22;
211:3,21;212:9;213:15,
18;215:3
thorough (1)
94:13
though (6)
10:12;69:18,23;137:6;
184:22;193:2
thought (21)
20:1,5;23:15;49:14;
83:17;117:10;125:11;
143:3,5;147:12;156:24;
183:3;184:23;186:8;
187:1;190:10;193:4,5;
197:3;202:3;207:3
thoughts (5)
58:4;109:9;128:11,17;
147:9
thread (1)
93:7
threat (6)
98:13,14;103:21;
104:1,3;192:7
threaten (2)
98:8,22
threatened (5)
97:24;98:20;100:21;
101:9;192:14
threatening (1)
6:2
three (8)
11:20;29:1;58:25;
62:11,13,15;162:10,11
threw (1)
152:19
Throughout (3)
106:5,24;119:7
throw (2)
24:18;64:16
ticket (2)
88:12,18
ticketable (1)
88:18
tight (1)
110:7
timeline (1)
25:20
timers (3)

67:3,5;152:6

**times (13)**
18:7;44:13;68:24;
70:12;71:1,2;85:12;
90:9;116:17;145:16;
179:23;191:10;201:17

**Tios (1)**
97:8

**title (3)**
89:17,20,21

**today (8)**
4:6,8,9;7:16;25:6;
63:14;174:24;201:14

**together (4)**
15:23;16:3;69:4,14

**told (62)**
5:18;42:8;48:22;
49:13;58:24;63:9;64:14,
23;86:18;87:14;90:21;
96:4,13;98:4,18;102:5;
107:9;109:7;110:6;
118:22;119:14,25;
125:23;126:17;127:15,
24;128:9;136:14;
147:11,12;167:18,24;
170:25;172:1;174:1;
175:17;176:15;180:23;
183:12,13,16;191:12;
194:14,15,25;195:1,2,2,
4;197:20;200:11;
203:22;206:4,10,16,19,
25;208:5,20;210:1;
211:4;216:4

**Tom (60)**
4:16;7:19;22:3,24;
23:4,11,13,21;24:4;
26:17,18;27:1,6,14;
28:11;29:18,19;34:11,
21;36:6,10,21;37:9,12,
25;39:9;75:19;76:3;
77:23;85:13,25;86:1,9,
18,21,25;87:13,14,19;
88:21;90:1,13;103:12,
16;105:13,13;143:2;
157:5;179:14,17;180:2;
183:10,16,16;185:11;
189:4;194:12,20;195:7;
205:2

**tomorrow (1)**
216:10

**Tom's (7)**
23:8;34:19;102:24;
103:4,9;156:2;157:3

**tonight (1)**
144:6

**took (31)**
16:7;19:25;29:20;
32:5;39:5;47:19;48:22;
57:7;61:25;81:18,20;
97:24;99:22;107:9;
109:17;110:8;113:22;
121:7;124:17;126:13;
142:6;144:12,12;145:5;

175:19;176:17;183:5;
187:9,16;190:24;210:15

**top (17)**
90:25;101:14;109:6;
111:13;112:7,9;149:25;
150:24;173:20;174:24;
208:15,22,22,24,24;
209:2;211:20

**tossed (2)**
44:23,24

**total (3)**
134:11,11,15

**totally (1)**
96:5

**touch (1)**
121:5

**touched (2)**
142:9,10

**touchy (1)**
43:25

**towards (2)**
142:11;201:9

**town (5)**
13:17,18;32:16;76:21;
171:9

**trade (2)**
14:15,16

**traffic (1)**
99:19

**trailed (1)**
193:13

**trailer (2)**
28:9,14

**Tramadol (4)**
48:20,23,23;49:13

**transcript (1)**
41:8

**transferred (3)**
33:8,10,13

**trash (1)**
24:19

**traumatic (1)**
174:23

**Trazodone (2)**
56:2,3

**treat (2)**
147:2;176:13

**treated (4)**
186:1,4,13;203:10

**treater (1)**
50:22

**treaters (5)**
169:4,6;172:8,22;
173:7

**treating (4)**
5:1;50:12;186:20;
200:15

**treatment (1)**
50:20

**trial (11)**
134:7;135:23;138:9,
13,20;139:2,11,16;
140:8,19;141:13

**Tricia (21)**
4:2;5:2,6,12,8;10,20;
22:13;78:9,16;87:6;
158:2,7;160:14;165:6,
24;167:3;169:23;
178:17;198:11;213:23;
217:4

**tried (8)**
14:5;39:7;64:10;
84:25;125:19;143:1;
169:6;170:22

**triggers (2)**
159:11,12

**trip (2)**
109:10;116:24

**trouble (2)**
13:10,11

**Troy (2)**
169:2;173:9

**truck (7)**
79:19,22;80:1;87:22;
103:18;162:15,16

**true (1)**
201:13

**trust (5)**
191:6,16,19,21,22

**trusting (1)**
74:3

**truth (3)**
127:8,9;192:5

**truthful (1)**
127:4

**try (12)**
64:15;69:17;79:10;
98:6;118:23;124:13;
151:12;158:6;171:1;
200:23;203:20;215:9

**trying (20)**
38:15;39:17;40:13,14;
44:15;59:6;68:1;82:2;
85:4,8;105:25;149:4;
150:2;158:23;161:11;
178:22,25;179:1;
200:12;205:10

**turkey (1)**
170:22

**turn (6)**
35:7;74:24;90:18;
97:2;117:23;118:16

**turned (7)**
11:22;86:19;99:3,8;
104:6;113:20;118:17

**turning (1)**
98:23

**TV (6)**
38:7;98:1;106:12,14;
150:7;205:10

**Twenty (1)**
200:9

**Twenty-six (1)**
14:25

**twice (1)**
198:9

**two (42)**
15:9;17:10;19:7;21:4,
6;28:21,25;43:18;44:15,
21;46:17;59:20;60:10,
17;62:14,15;72:11;73:1,
8;75:12;84:14,20;85:4,
5;101:18;102:1;104:3;
118:18;140:19;150:25;
151:5,24;157:9;160:5;
181:20,20,23;182:17,18;
208:2;209:22,25

**type (6)**
7:9;9:19,24;94:12,12,
15

**types (3)**
64:19,20;94:3

---

**U**

**ultrasound (1)**
170:4

**ultrasounds (1)**
172:11

**Um (7)**
35:2,13;84:25;102:18;
130:1;164:6;191:18

**under (6)**
43:5,5,21,22;66:22;
84:8,11,12;98:3;152:16,
18;158:24;184:20;
185:6;189:21;190:4

**underlying (1)**
139:17

**underneath (1)**
42:21

**understood (5)**
9:11;21:12,14;146:13;
167:25

**United (1)**
4:4

**unless (6)**
53:22;101:12;102:9;
116:1;126:2;183:19

**unloaded (1)**
151:17

**unlocked (4)**
108:3;117:3,6;127:25

**unplug (1)**
36:10

**Up (138)**
11:18;12:5;13:16,18;
22:11;23 10;26:19;
27:15;30:24;31:1;32:15;
33:23;36:9;38:22;42:17,
25;44:1,21;46:6,7,8,12;
48:21;53:24;63:21;
66:13;71:6;75:18;77:2,
9,12;82:13;85:2;93:9,
15;94:3,24;95:3,9;
102:11;103:9;105:15,
20;106:12,16;107:5,10,
12;108:1,7,7,9;109:14,
15,16,17,21;110:14;

111:18;112:4,5,8,16,23;
113:2,14,22,23;114:4;
119:3,11,19;120:4,5,7,
14;121:17,22,23;122:18,
20,22;123:3;124:2,10;
127:13;128:2,3,5,13,14,
15;130:2,20;139:2;
146:23;147:19;152:17,
19;155:1;156:19;159:7,
14;162:20;164:14;
169:15;171:1,2;172:1;
174:2;180:7,19;181:13;
182:16,16;185:14;
191:20;192:18;199:15,
17,18,19,20,23;200:2,
23;203:7;204:3;205:17;
206:21;209:8;210:5,12,
16,18,18;212:6,14

**upset (6)**
55:13;86:21,24;144:9,
11;166:12

**upstairs (7)**
27:4;38:5,5,7;110:9;
118:25;200:20

**urgent (1)**
50:21

**use (7)**
36:23;38:2;40:14,16;
43:5;45:5,6,8;47:12;
66:7;78:25;79:22;91:1;
94:19;121:19;137:25;
138:13;139:15;141:13;
177:7,13;197:2;198:15;
207:17,22;208:6;213:11

**used (14)**
45:16;50:14;57:19;
78:2,5;104:24;139:10;
140:13;165:15;177:17;
182:9;183:2,6,8

**useful (1)**
45:2

**uses (1)**
59:21

**using (7)**
41:1;45:8,15;48:9;
59:20;60:3;146:18

**usually (5)**
71:23;87:23;88:16;
95:20;180:1

**utilities (2)**
68:17;180:24

**utmost (1)**
75:18

---

**V**

**Vague (1)**
37:21

**vehicle (4)**
79:20;103:17;141:23;
180:2

**vehicles (2)**
34:22;35:2

**verbally (1)**
174:9
**verify (1)**
99:18
**versus (2)**
4:3;88:3
**vest (5)**
156:9,10,22;157:6;
200:19
**Vicodin (1)**
48:4
**video (2)**
4:7;184:21
**VIDEOGRAPHER (16)**
4:1,19;9:14;41:14,19;
83:1,5;110:24;111:6;
160:9;161:24;162:3;
184:1,21,25;217:5
**videotape (1)**
4:8
**videotaped (1)**
4:2
**violation (1)**
183:7
**visible (2)**
80:20;89:15
**Visine (1)**
38:7
**visit (1)**
35:11
**visits (1)**
35:17
**vivid (4)**
159:16;204:10;
205:19,19
**voice (2)**
4:10;104:9
**volume (1)**
106:15
**Vonni (1)**
4:9

**W**

**Wach (1)**
183:10
**Wachsmuth (15)**
4:2;5:2,12;8:10,20;
86:9,9;87:13;88:21;
179:14;183:10;189:4;
194:12;205:2,21
**wait (11)**
38:19;41:2;56:6;
66:15;78:9;131:16;
149:15;186:6;189:13;
196:10;199:4
**waiting (2)**
95:21;144:24
**wake (1)**
203:7
**walk (10)**
29:11,11;37:7;38:6;
97:6;114:20;115:4,7,9;

118:12
**walked (3)**
113:14;128:6;206:21
**walking (16)**
108:11,15,16,19;
109:4;111:12;112:2,15,
18,19;113:20,25;117:24;
121:12;198:25;199:8
**walkway (1)**
118:15
**wall (33)**
43:8,9;109:15,16,21,
23,24;117:21,22;118:4,
6,7,11,13;119:24;120:4,
6;121:1,23;122:18,23;
123:3;128:13,14,16;
199:19,20;206:25;
209:14;210:13,14,18,19
**Wal-Mart (2)**
67:6,7
**wants (2)**
31:7;158:11
**wanty (1)**
68:20
**warm (1)**
110:15
**warrant (11)**
88:5;91:6,20;97:22;
107:1,1;126:25,25;
145:25;149:10,11
**wars (1)**
212:15
**waste (1)**
7:25
**watch (4)**
38:7;58:15;79:16;97:7
**watching (11)**
15:20;19:13;21:13;
57:8;58:14;80:3;104:15;
105:13;130:11,12;
205:10
**way (26)**
10:6;11:23;21 10;
36:10;40:24;45:16;
46:12;50:5;75.20,25;
82:5;100:25;1 3:16;
116:8;123:2;1 1:16;
140:11;145:14,18;
148:16;195:17 199:6;
200:14;201:11 202:2;
208:10
**ways (7)**
21:21,22;83:23;84:3;
140:2;183:6;189:2
**WCDA (5)**
23:7;24:9;39:5;
187:23;188:1
**WCDE (1)**
23:19
**wealthy (1)**
68:18
**weapon (1)**
107:14

**weapons (8)**
97:14;101:23;102:7,
14;108:22;109:2;
144:18;154:15
**wear (1)**
156:10
**weather (1)**
86:8
**weathers (1)**
61:19
**wedding (5)**
17:9,16;18:9;155:25;
156:1
**week (12)**
5:16;6:5,13,14;7:1,13,
21;25:18;32:19,20;
184:12;203:2
**weekly (1)**
214:12
**weeks (7)**
16:4;17:16;29:1;
31:18;54:10;100:13;
103:25
**weight (2)**
19:8;59:4
**weird (1)**
62:25
**weren't (9)**
18:17;73:10,25;82:15;
90:7;94:20;145:4;
180:20,21
**Westby (129)**
4:14,14;5:14;6:11,15,
19;8:3,6,8,13;9:1,2;
22:10,18;23:12;24:11,
21;25:3;34:9;37:18,20,
22,24;40:12,19;41:2,8,
13,18,21,25;42:1;47:10;
67:13,20;70:4,20;78:20,
24;79:3;82:25;83:7;
85:21;87:11;89:10,12;
91:14,16;92:7;97:11;
109:1;110:22;111:8;
115:17,20;129:6;131:8,
11;133:2,12,22;134:6,
10,14,22;135:8,19;
136:2,4,9,12,18,24;
137:13,16,24;138:5,8,
18,23;139:17;140:5,10;
141:21,22;142:23;
145:12,17;148:12,14,18,
23;149:2,21;150:16,21;
158:13;160:11,13;
161:20,22;162:5;165:3,
7;166:2;167:5,10;170:1;
171:18;173:3;174:11;
179:3;181:11,20,24;
183:9,18;205:25;207:21,
23;211:4;214:25;215:8,
12,20;216:3,11,17,21
**What's (12)**
20:25;25:11,15;40:6;
47:22;52:2;60:1;62:2;

66:6;79:8;84:9;200:12
**whatsoever (2)**
169:19;171:22
**whenever (4)**
39:12;40:16;51:16;
113:18
**white (2)**
66:23;152:3
**whole (12)**
38:5;44:22;45:5;
54:25;66:16;100:18;
106:6,24;143:10;206:8;
208:6;209:14
**Who's (1)**
176:8
**whose (4)**
26:22,22;103:7,8
**wife (10)**
22:24;24:4;69:19;
71:3,17;85:15;155:8;
156:17;158:3,11
**willing (3)**
17:21;70:18;174:15
**window (17)**
33:12;61:18,25;72:21,
23;97:1;105:22;106:19,
20,21;119:14,15;127:15,
16,16,17;197:5
**windows (3)**
119:16;143:17;144:25
**Wisconsin (3)**
11:20;13:24;14:1
**wise (1)**
92:17
**wiser (1)**
36:11
**wish (1)**
40:24
**withdraw (1)**
7:21
**withdrew (4)**
5:20;6:16,19;7:22
**without (10)**
7:10;23:22,24;68:17;
81:22;124:18;125:24;
136:16;137:2;203:7
**witness (92)**
4:20,21;6:8;8:15,24;
9:17;10:9;12:16;22:12,
15,17;24:8,23;25:1;34:1,
8,8;40:5;47:8;67:18;
70:7,10;78:11,15,17;
80:4,10,23,25;82:23,23;
87:9;89:11;91:10,13;
107:23;108:20;129:5;
133:16,18;134:21;
135:15;136:15,20;137:1,
12;141:18;142:22;
149:1,18;150:1,18;
158:8,10;159:21;
161:19;162:12;165:25;
167:2,4,8;169:24;173:1;
174:9,19;178:18,22,25;

181:3,5,9;183:5;185:7,
16,22;187:11;193:7,14;
198:5,14,17;207:25;
208:11;209:5,9,18,24;
211:2,20;213:17,19;
215:6
**witnesses (1)**
179:7
**woman (3)**
16:13;53:7;58:22
**wondering (7)**
9:18;36:6;60:9;90:17;
112:14;125:1,4
**wood (1)**
150:10
**word (4)**
57:19;66:6,7;126:24
**wording (1)**
126:12
**words (1)**
126:13
**work (42)**
29:17;30:12,14,23;
31:2,7,14,23;32:16;33:3;
40:20;45:12;64:10;75:2,
3;80:14;85:1;125:8;
142:6;159:13;162:7,7,
19;163:14,22;164:8;
165:8,12,16,17;166:12,
14,19,24;167:13,15;
179:14,17;189:10,11,14;
203:2
**worked (12)**
28:20,25;29:11;33:20;
46:16;61:9;62:5;95:13,
14;166:8;173:12;190:9
**worker (1)**
168:8
**working (11)**
19:13;29:24;31:22;
33:19;34:2;46:12;58:7;
125:15,16;162:9,18
**works (1)**
178:17
**worried (2)**
83:12;204:3
**worry (4)**
82:13;98:21;169:22,
23
**worrying (1)**
147:4
**worse (3)**
6:10;80:14;203:3
**write (11)**
65:15;163:14,18,20;
164:3,9;165:9;182:7,8,9;
209:4
**writing (1)**
160:16
**written (7)**
41:6;148:6;164:10;
182:5,14;208:21,25
**wrong (8)**

73:16;75:10;82:5;
103:8;182:25;188:11;
194:17;195:1
**wronged (1)**
195:5
**wrote (4)**
30:9;60:8;174:20;
182:17
**Wurzel (9)**
52:18,20;160:7,23,24;
161:2;172:13;174:20;
188:11
**Wyoming (17)**
4:5;9:3;52:15;54:18;
61:7;102:15,23;169:10,
11,14;172:9;173:6,7;
187:16,18;190:3,4

## Y

**year (13)**
12:1,5;14:23;22:20,
25;23:2,15;30:1;33:16,
20;39:3;69:8;126:2
**year-and-a-half (5)**
15:23;17:9;19:7;21:4,
5
**years (13)**
17:10;19:7;21:4,6;
28:21;46:17;49:3;51:4;
71:5;81:7;99:21;182:10;
186:23
**yep (12)**
34:4,6;82:9;107:19;
111:15;117:22;153:15;
175:25;188:2;196:2;
199:24;210:2
**young (1)**
212:13
**younger (5)**
48:16;79:9;154:19,21;
168:16

## Z

**Zan (3)**
173:11,15;174:20
**zero (3)**
61:19;86:8;96:25
**Zoloft (20)**
54:5,8,9;55:4,5,18,25;
56:6,12;160:2,3,4,6,7,
17;167:22;187:3;188:5,
8,9