# Appendix Twenty One

**SUBMITTED BY:**
JEFFREY C. GOSMAN
**GOSMAN LAW OFFICE**
PO Box 51267
Casper, WY 82601-2481
(307) 265-6715 (fax.)
(307) 265-3082 (ph.)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TRICIA WACHSMUTH,<br><br>Plaintiff,<br><br>vs.<br><br>City of Powell, and in their individual capacity,<br>Tim Feathers, Chad Miner,<br>Mike Chretien,Roy Eckerdt, Dave Brown,<br>Mike Hall, Brett Lara, Matt McCaslin,<br>Alan Kent, Matt Danzer, Off cer Brilakis,<br>Lee Blackmore, Cody Bradley, Kirk Chapman<br>John Does #1 - #4<br><br>Defendants. | CASE NO. *10 cv 041J* |

**DECLARATION UNDER PENALTY OF PERJURY**

**COMES NOW,** D.P. Van Blaricom, and states and deposes as follows:

1.  I have personal knowledge of all matters herein.

2.  I have attached my Curriculum Vitae to this declaration, which is a true and accurate

    representation of my training and experience. Exhibit One.

3.  I was requested by Mr. Jeff Gosman in the fall of 2010 to conduct an evaluation of police

practices associated with the execution of a search warrant by the Powell Police Department on the 24th of February 2009.

4.     I conducted an evaluation of records and submitted a report.  A copy of that report is attached hereto as Exhibit Two.

5.     After depositions were completed, I was forwarded the depositions of the Powell Police Officers who performed the warrant service and I prepared an update of my report.

6.     The updated report is attached as Exhibit Three.

       Further Affiant Sayeth Not.

       **I declare and certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.**

**Executed on this 5th day of January 2011.**

D.P. Van Blaricom

Appendix 1

# EXHIBIT "A"

## D. P. VAN BLARICOM, INC.
### MPA, FBI-NA, CHIEF OF POLICE (RET.)
*POLICE & SECURITY PRACTICES EXPERT*
835 91ST LANE NORTHEAST
BELLEVUE, WASHINGTON 98004-4811
(425) 453-0082   FAX (425) 453-3263   E-Mail dvbinc@aol.com

## *SUMMARY of QUALIFICATIONS*

A. Retained as a police practices expert by both plaintiffs and defendants in over **1,500** lawsuits alleging police liability throughout the United States: AK, AL, AZ, CA, CO, DC, DE, FL, GA, HI, IA, ID, IL, IN, KS, KY, LA, MD, ME, MI, MN, MO, MS, MT, NC, ND, NE, NH, NJ, NM, NV, NY, OH, OK, OR, PA, RI, SC, SD, TX, UT, VA, WA, WI and WY.

B. Testified in several hundred depositions, federal court trials, state court trials and arbitrations.

C. Prevailing parties' police practices expert in appellate decisions for the United States 1st, 6th, 7th, 8th, 9th and 10th Circuits; State Supreme Courts of AZ, CO, ID, MT, MS, OR and WA; Appeals Courts of AZ, CA, CO, FL and WA.

D. Recognized as an expert on the issues of:

1. **POLICE USE of FORCE – Including 300+ Officer-Involved Shootings** (plaintiff's expert in 9th Cir. Davis v. City of Ellensburg 1989, plaintiff's expert in 9th Cir. Davis v. Mason County 1991, a consultant to federal prosecution task force in United States v. Koon, et al. 1993, a plaintiff's expert in Rodney King v. City of Los Angeles 1994, defendants' expert in 1st Cir. Roy v. City of Lewiston 1994, defendants' expert in WA App. Lee v. City of Spokane 2000, plaintiff's expert in 9th Cir. Haugen v. City of Puyallup 2003, plaintiff's expert in 9th Cir. Wilkins v. City of Oakland 2003, plaintiff's expert 9th Cir. Marsall v. City of Portland 2004, plaintiff's expert in 8th Cir. Craighead v. City of St. Paul 2005, plaintiff's expert in 9th Cir. Davis v. City of Las Vegas 2007, plaintiff's expert in 9th Cir. Kiles v. City of North Las Vegas 2008, plaintiff's expert in 9th Cir. Tubar v. City of Kent 2008, plaintiff's expert in AZ App. Celaya v. City of Phoenix 2008, plaintiff's expert in 10th Cir. Rhoads v. Big Horn County 2009, plaintiff's expert in Bryan v. City of Las Vegas 2009 and plaintiff's expert in 6th Circuit Jefferson v. City of Flint 2010).

2. **LESS-LETHAL ALTERNATIVES to DEADLY FORCE in BOTH EQUIPMENT and TACTICS** (plaintiff's expert in the 9th Cir. Reed v. Hoy 1989 and ID S.Ct. Kessler v. Payette County and State of ID 1997);

3. **POLICE K-9s as USE of FORCE** (quoted in Deadly Force: What We Know 1992 and plaintiff's expert in FL App. Pacot v. Wheeler 2000);

4. **CONTROL of POLICE VEHICULAR PURSUIT and EMERGENCY DRIVING – Including 200+ accidents** (my policy was recommended by the Public Risk and Insurance Management Association of Washington, D.C. as being among the 4 best in the United States 1984, quoted

by 2 CA App. <u>Payne v. City of Perris</u> 1993 and <u>Berman v. City of Daly City</u> 1993, OR S.Ct. <u>Lowrimore v. Marion County</u> 1990, MS S.Ct. <u>Mosby v. Jeffries</u> 1998, CO S.Ct. <u>Tidwell v. City & County of Denver</u> 2003, WA App. <u>Brooks v. City of Washougal</u> 2007 and CO App. <u>Meyer v. City of Evans</u> 2008);

5. **POLICE ADMINISTRATION and POLICY** (defendants' expert in 7th Cir. <u>Montano v. City of Chicago</u> 2008);

6. **POLICE PRACTICES, PROCEDURES and STANDARDS of CARE** (plaintiff's expert in 9th Cir. <u>Gulliford v. Pierce County</u> 1998, defendant's expert in 6th Cir. <u>Carter v. City of Detroit</u> 2005, defendant's expert in 9th Cir. <u>Hall v. Hughes</u> 2007, defendant's expert in 9th Cir. <u>Tensley v. City of Spokane</u> 2008, defendants' expert in 9th Cir. <u>Howell v. Yavapai County Attorney</u> 2008, plaintiff's expert in 9th Cir. <u>DeLew v. Adamson</u> 2008 and plaintiff's expert in 9th Cir. <u>Tennison v. City & County of San Francisco</u> 2009);

7. **SPECIAL DUTIES to PROTECT and 911 RESPONSES** (plaintiffs' expert in WA S.Ct. <u>Bailey v. Town of Forks</u> 1987, <u>Roy v. City of Everett</u> 1992, AZ S.Ct. <u>Hutcherson v. City of Phoenix</u> 1998, MT S.Ct. <u>Nelson v. Driscoll</u> 1999, 9th Cir. <u>Wood v. Ostrander</u> 1988 and 9th Cir. <u>Kennedy v. City of Ridgefield</u> 2005);

8. **DOMESTIC VIOLENCE** (quoted by the National Law Enforcement Policy Center in their model policy 1991 and plaintiff's expert in 9th Cir. <u>Beier v. City of Lewiston</u> 2004);

9. **POLICE RESPONSE to the MENTALLY ILL** (listed in the FBI Academy's Subject Bibliography, plaintiff's expert 9th Cir. <u>Gibson v. Washoe County</u> 2002, US MD PA <u>Schorr v. Borough of Lemoyne</u> 2003 and 9th Cir. <u>Herrera v. City of Las Vegas 2004</u>);

10. **CIVIL RIGHTS VIOLATIONS** (under 42 U.S.C. § 1983);

11. **EXCITED DELIRIUM and RESTRAINT ASPHYXIA – Including 50+ Deaths** (plaintiff's expert in 10th Cir. <u>Cruz v. City of Laramie</u> 2001, AZ App. <u>Oscielowski v. City of Benson</u> 2003, 9th Cir. <u>Arce v. City of North Las Vegas</u> 2008 and 10th Cir. <u>Weigel v. State of WY</u> 2008);

12. **POLICE INTERNAL INVESTIGATION and DISCIPLINE**;

13. **DISCRIMINATORY ENFORCEMENT or EMPLOYMENT PRACTICES**;

14. **AMERICANS with DISABILITIES ACT** (plaintiff's expert in 10th Cir. <u>Davoll v. City of Denver</u> 1996, 9th Cir. <u>Cripe v. City of San Jose</u> 2001 and US MD PA <u>Schorr v. Borough of Lemoyne</u> 2003);

15. **POLICE COLLECTIVE BARGAINING**;

16. **FIREARMS** (USMC trained small arms repair MOS 2111 and police firearms instructor); and

17. **PRIVATE SECURITY PRACTICES** (plaintiff's expert in US WD WA <u>Groom v. Safeway</u>).

E. Served 29 years in municipal policing with the last 11 as Chief of Police (until retirement and election to the City Council) in Bellevue, Washington - the State's then fourth largest and fastest growing city.

F. Directed development of a progressive police department and created several model programs, including: control of vehicular pursuits, alternatives to deadly force, fully integrated emergency response team operations, domestic violence reduction, affirmative action employment of minorities and women, comprehensive crime prevention, lateral recruitment of experienced officers, police canine operations, multi-city narcotics unit and others.  Additionally, co-authored the Washington State Standards on Internal Discipline of Law Enforcement agencies.

G. Served on many professional commissions and committees, including:  Washington Criminal Justice Education & Training Center Steering Committee, Bellevue Community College Local Advisory Council and Chairman Law Enforcement Program Advisory Board, Washington Attorney General's Committee on Security and Privacy, consultant to U.S. Department of Justice Community Relations Service, consultant to the National Consultation on Safety and Force, intern with 94th Congress, Governor's appointee to Community Task Force for Corrections Development, Washington State Council on Crime & Delinquency's Adult Criminal Policy Committee and Ad Hoc Committee on Board of Prison Terms/Paroles, Youth Eastside Services Board of Trustees, Eastside Community Mental Health Center Advisory Board, King County Executive's appointee to E911 Task Force, U.S. Attorney's Law Enforcement Coordinating Committee, Governor's appointee to Select Committee for Police/Fire Pension Review, IACP's Education & Training Committee, IACP's Organized Crime Committee, Assessor Team Leader for 1 of 5 Pilot Projects of the Commission on Accreditation for Law Enforcement Agencies, Governor's appointee to the Emergency Commission on Prison Overcrowding, IACP book reviewer, Suburban Cities Association's Jail Advisory Committee, Governor's Advisory Group on Personal Harassment, Portland  Oregon Chief's Committee on Police Use of Force.  Assisted the appointing authorities at various times in selecting Chiefs of Police for Cities of Longview, Everett, Bellingham, Richland, Bremerton, Kirkland, Redmond, Clyde Hill, Kent (1991), Bellevue (1996) a Sheriff of King County and the Security Administrator of Seattle City Light (all in the State of Washington), King County Regional Justice Center Citizens Site Advisory Committee, Solutions To Tragedies of Police Pursuits Advisory Board, Superintendent of Public Instruction's Washington State Safe Schools Advisory Committee, King County Civil Rights Commission, Voices Insisting on Pursuit Safety.

H. Hold a security clearance from the U. S. Government.

I. Maintain an extensive and current library of standards, policies, procedures, references, depositions and information on other experts with subscription services to update professional and legal developments in my areas of expertise.

## EDUCATION and CERTIFICATION

University of Washington - Bachelor of Arts degree with magna cum laude honors l973
Seattle University - Master of Public Administration degree 1976
**University of Washington – Certificate in Forensics 2000**
**Americans for Effective Law Enforcement – Certified Police Litigation Specialist 2003, 2008**
Graduate of the FBI's National Academy and Law Enforcement Executive Development programs

## CONTINUING TRAINING

Police Civil Liability AELE 1987, Deadly Force and the Police Officer NWU 1987, Police Liability for Policies and Practices AELE 1988, PR-24 Side Handle Baton BPD 1988, Police Civil Liability AELE 1989, Sexual Harassment and the Consequences FS 1989, Wrongful Discharge RIMS 1989, Police Practices and Use of Expert Witnesses AELE 1989, Expert Witnesses, Litigation Consultants and Attorneys NFS 1989, Police Discipline and Labor Problems AELE 1990, Assessment Center Selection Process HRA 1991, Rodney King Incident and Policing SWLEI 1992, Role of Expert

Witnesses in the 1990's SEAK 1992, Critical Liability Issues AELE 1992, Pursuit Driving and Managing Use of Force ILM 1992, AFIS Live ID HP 1993, Police/Medical Investigation of Death IACP 1993, Medical Records Review for the Legal Professional PES 1994, Developing Policies, Procedures and Rules NLEPC 1994, Civil Rights Trial Advocacy ATLA 1994, Family Violence and Police Policy SLEI 1995, Investigation of Excessive Force Incidents IACP 1995, Police Civil Liability and Defense of Misconduct Complaints AELE 1996, Use of Force and Pursuit Driving Policies SLEI 1996, Critical Incident Dispatching NWU 1996, Police Officer Survival Tactics NWU 1997, Police Civil Liability AELE 1998, Criminal Justice WSBA 1999, Critical Incident Trauma and Legal Survival CP 1999, Traffic Stops and Racial Profiling PI 2001, Racial Profiling NWU 2001, Police Liability LES 2002, Cap-Stun ZARC 2002, Masters in Trial ABOTA 2002, Discipline and Internal Investigations AELE 2003, Critical Incident Response Management and Liability AELE 2003, Police Civil Liability AELE 2003, Police-Involved Shooting Reconstruction NWU 2004, Police Liability AELE 2005, Shooting Reconstruction AAFS 2005, Police Misconduct Litigation SULS 2005, Use of Force TASER 2006, Lethal and Less-Lethal Force AELE 2006, TASER AAFS 2006, Excited Delirium SPD 2007, Winning Extreme Encounters from Street to Court FSRC 2007, Sudden Death, Excited Delirium & In-Custody Death IPICD 2007, Discipline & Internal Investigation AELE 2008, Police Liability LES 2009, Legal, Psychological and Biomechanical Aspects of Officer-Involved Lethal and Less-Lethal Force AELE 2009, Use of Force / Domestic Violence / Community Policing / Emotional Intelligence IACP-PCN 2009, Gunshot Residue / Gunshot Wounds AAFS 2010, Active Shooter / Bloodborne Pathogens / Applied Ethics / Ethnic and Sexual Harassment IACP-PCN 2010.

## *TEACHING and TRAINING EXPERIENCE*

Taught law enforcement courses at the Bellevue Police Academy, Washington Criminal Justice Education and Training Center, Bellevue Community College, Seattle University, Northwestern University's Traffic Institute and International City Management Association's Training Institute. Lectured on police-related issues before the University of Washington School of Law and Graduate School of Public Affairs, Simon Fraser University, American Civil Liberties Union, Washington State Bar, Seattle-King County Bar, Washington State Court Administrators, Washington Association of Legal Secretaries, American G. I. Forum, United States Justice Department Community Relations Service, National Institute of Law Enforcement and Criminal Justice, U. S. Attorney General's Task Force on Family Violence, Montana Department of Social and Rehabilitation Services, Washington Advisory Committee to the U.S. Commission on Civil Rights, American Society of Criminology, debated California Highway Patrol Commissioner on police pursuit before National Association of Police Planners and International Association of Police Planning and Research Officers in 1990, Labor Relations Information System, City of Bellevue's Management Certificate Training Program, lectured for Association of Trial Lawyers of America's Civil Rights Section and the National College of Advocacy on excessive force from the expert's perspective in 1994 and domestic violence litigation liability arising from failure of prevention and response in 1995, lectured on loss protection civil liability to Nordstrom Washington/Alaska Region in 1997, demonstrated expert witness testimony to the American Board of Trial Advocates in 2002. Additionally, served on the Law Enforcement Education Advisory Committee to the Washington State Board for Community College Education in developing their statewide curriculum, achieved the first college accreditation of a Basic Law Enforcement Academy in the State of Washington, testified before the California State Senate on police vehicular pursuit in 2005, testified before the City of Oakland Citizens' Police Review Board on police vehicular pursuit policy in 2007, serve on the Bellevue College Criminal Justice Program Advisory Board.

## PUBLICATIONS

"Recruitment and Retention of Minority Race Persons as Police Officers" in September 1976 issue of The Police Chief magazine, "An Overview of Police Service Today" in the April 18th and May 2nd, 1978 issues of Law Enforcement News, "Kids Meet Cops Through Basketball Trading Card Program" in the July 9th, 1979 issue of Law Enforcement News, "A Police Chief's View of Deadly Force" in the National Institute of Law Enforcement & Criminal Justice January 1979 booklet on Police Use of Deadly Force, "Career Development:  The Next Step to Police Professionalism" in the November 1979 issue of The Police Chief magazine, "Crime Prevention Cuts Insurance Cost" in the August 1980 issue of Center City Report, "A Sensible Alternative to Those High-Speed Chases" in the November 25, 1980 issue of The Seattle Times, "Chiefs Should Chase Sane Pursuit Driving Guidelines" in the December 22, 1980 issue of Law Enforcement News, "Commercial Crime Prevention Can Earn Discounts" in the February 1981 issue of the FBI Law Enforcement Bulletin, "Enforcing Malicious Harassment Laws" in the January 1983 edition of Washington Council on Crime and Delinquency News, "Reducing Crime, Traffic Accidents - Bellevue Shows It Can Be Done" in the May 10, 1983 issue of The Seattle Times and the June 27, 1983 issue of Law Enforcement News, "Carrying A Gun - It Depends On You" in the February 3, 1985 issue of the Journal-American, "When To Use Deadly Force" in the Winter 1985 issue of the Washington Law Enforcement Executive Journal, "Domestic Violence - A New Approach to an Old Problem" in the June 1985 issue of The Police Chief magazine, "It's Time for Police To Re-Examine Their Role In Society" in the October 1, 1989 issue of The Seattle Times, "Shaking The Pillars of Police Tradition" in the October 31, 1989 issue of Law Enforcement News, "Training-The First Hundred Years" in Law Enforcement In Washington State: The First Hundred Years 1889-1989, "K-9 Use of Force:  A Biting Example of Questionable Policy" in the July/August 1992 issue of Law Enforcement News, "Police Pursuit: Uncontrolled Deadly Force" in the February 28, 1993 issue of Law Enforcement News, Bulletin Alert on a "Hair-raising Comb" in the June 1994 issue of the FBI Law Enforcement Bulletin, "Excessive Force - The Expert's Perspective" in the Association of Trial Lawyers of America July 1994 Annual Convention Reference Materials Volume I, "Domestic Violence Litigation: Liability Arising from Failure of Prevention and Response" in the Association of Trial Lawyers of America July 1995 Annual Convention Reference Materials Volume I, "Shades of Blue: What White Police Officers Can - and Must - Learn from Minority Officers" in the January/February 1996 of the Police Executive Research Forum's Subject to Debate, "Doing Something About Excessive Force" in the January 15, 1998 issue of Law Enforcement News (republished by San Diego State University 2003), "The Consistent Law Enforcement Expert" in the November/December 1998 issue of The Forensic Examiner, "To Pursue or Not to Pursue: THAT is the Question" in the November 1998 issue of Police, "Handling the Mentally Ill" in the March 2000 issue of Police, "Building a Bridge" in the September 30, 2000 (25th Anniversary) issue of Law enforcement News, "The Media: Enemies or Allies?" in the April 2001 issue of The Police Chief, "Control of Police Vehicular Pursuit" in the 2004 (1) issue of Law Enforcement Executive Forum, "Preventing Officer-Involved Deaths of the Mentally Ill" in the Third Quarter 2004 issue of The Law Enforcement Trainer, "Suicide-by-Cop" in the September-October 2006 issue of American Cop, "Police Response to Excited Delirium" in the January 2008 issue of the IADLEST Newsletter (republished by Americans for Effective Law Enforcement 2008), "Policing in the 1950's" in the January-February 2009 issue of National Academy Associate.

### NATIONAL TELEVISION and RADIO APPEARANCES

NBC Nightly News special report on the dangers of police vehicular pursuit.
NBC Today Show:
    1. Personal protection against criminal attack;
    2. Misuse of pepper spray to punish;
    3. Police use of force (opposite Rev. Al Sharpton).
NBC *"You Be The Judge"* on the dangers of police vehicular pursuit.
NPR *"Cops and the Mentally Ill"*.
CKNW World Today:
    1. TASER;
    2. Restraint asphyxia.

### QUOTED in MAJOR NEWSPAPERS

USA Today, Wall Street Journal, The New York Times, The Baltimore Sun, Los Angeles Times, San Francisco Chronicle, The Seattle Times, The Oregonian, Toronto Sun, The Virgin Island Daily News ("Deadly Force" won ABA's 2004 Silver Gavel Award), The Tennessean, Christian Science Monitor, Milwaukee Journal Sentinel, Vancouver (B.C.) Sun, Ottawa Citizen.

### PROFESSIONAL MEMBERSHIPS

**American Academy of Forensic Sciences (AAFS)**, International Association of Chiefs of Police (IACP) - Life Member, Americans for Effective Law Enforcement (AELE), FBI National Academy Associates, Washington Association of Sheriffs & Police Chiefs (WASPC) - Life Member, International Association of Directors of Law Enforcement Standards and Training (IADLEST), Association of Professional Law Enforcement Emergency Vehicle Response Trainers International (ALERT).

### AWARDS

USMC Expert Rifleman 1953-1956, FBI "Possible Club" 1970 (of the 19,130 police officers who attended the FBI National Academy during the 50 years from when it started to the year of my retirement in 1985, I was 1 of only 165/.0086% who fired a perfect score on the PPC or TRC), Appreciation from the Drug Enforcement Administration 1977, Outstanding Community Service from Bellevue Jaycees 1979, Human Rights (Implementing Law and Order with Justice) from Baha'i Communities of Bellevue and Eastside 1980, Youth Service from the Chief Seattle Council of the Boy Scouts of America 1983, Program Innovation from the King County Domestic Violence Coalition 1983, Support and Service from Bellevue Cadet Squadron Auxiliary USAF 1984, Law Enforcement Appreciation from the Puget Sound Chapter of the American Society for Industrial Security (presented by the Governor of the State of Washington) 1984, Outstanding Volunteer Service from the Salvation Army 1984, Outstanding Service as a Public Official Citizenship Award from the Bellevue Kiwanis Club 1985, Appreciation from the United States Secret Service 1986, **Award for Public Service from The U.S. Department of Justice 1986**, Recognition for 30 Years of Public Service from the City of Bellevue 1986, Recognition and Commendation Resolution by the Municipality of Metropolitan

Seattle 1988, Appreciation for Service from the Woodland Park Zoo Bond Oversight Committee 1990, Appreciation for Service from the King County Executive 1992, Appreciation for Personal Contribution to Developing Bellevue Convention Center from the City of Bellevue 1993, Outstanding Support of the Arts (jointly with wife) from the City of Bellevue Arts Commission 1993, Commendation for Outstanding Service from the City of Bellevue 1997.

# Appendix 2

### D.P. VAN BLARICOM, Inc.
MPA, FBI-NA, CHIEF of POLICE (Ret)
#### POLICE PRACTICES EXPERT
835 – 91ST lane N.E.
Bellevue, Washington 98004-4811
(425) 453-0082 FAX 453-3263 E-Mail dvbinc@aol.com

### Federal Rule 26 (a) (2) (B)
### PRELIMINARY REPORT OF PLAINTIFF'S POLICE PRACTICES EXPERT
### September 16, 2010

1. My name is D.P. Van Blaricom and I make this report on behalf of plaintiff in the U.S. District Court of Wyoming 10-CV-041-J filing of **Wachsmuth v. City of Powell, et al.** under my file 10-1601.

2. My law enforcement career has spanned over fifty-three years of active employment to date:

    a. Twenty-nine years of continuous police service, during which I was the Chief of Police of Bellevue, Washington for the last eleven of those years;

    b. Thereafter, I have been engaged as a police practices consultant for an additional twenty-four years.

3. A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A". Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively. My areas of expertise in the police arts and sciences include but are not limited to: police administration, policies, practices, procedures and standards of care; police use of force; internal investigation and discipline. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants throughout the United States.

4. Jeff Gosman retained my services on September 9, 2010 to review the facts and circumstances of a search warrant service on Tricia Wachsmuth's home by City of Powell Police Department (PPD) officers (defendants) on February 24, 2009 (Tuesday) at 2116 hours (9:16 PM). I have discussed the matter with plaintiff's counsel and this report was prepared in reliance upon my review of the following documents:

    a. Notice of Claim;

    b. Complaint;

    c. Defendants':

        1) Answers (2),

        2) Entry of Appearance (2),

        3) Notice of Non-Complexity (2);

    d. PPDS reports 09-223;

    e. Powell County Sheriff's Office (PCSO) reports 09-231;

    f. Computer Aided Dispatch (CAD) report 090224086.

5. This report is preliminary because there will be additional documents for my review but there is an expert disclosure date to be met.

6. It is my customary practice to evaluate the objective reasonableness of police conduct on a case-by-case basis from the perspective of a former Chief of Police, career law enforcement officer and nationally recognized police practices expert (see Exhibit "A"). In conducting that evaluation I apply:

- a. My training and experience as a police officer, who was required to serve search warrants in the performance of my law enforcement duties;
- b. My training and experience as a police supervisor, who was assigned to conduct internal investigations;
- c. My training and experience as a police supervisor and commander, who was assigned to train police officers on use of force and arrest, search and seizure;
- d. My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;
- e. My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, discipline and/or terminate police officers;
- f. My training and experience as a chief of police, who had to develop and administer policies and procedures for directing police officers under my command;
- g. My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;
- h. My service as an elected city council member, after my retirement as chief of police;
- i. My continuing training, as is supplemented by an ongoing review of professional publications, that addresses contemporary developments in my areas of expertise;
- j. Additionally, I have served as a police practices expert in 1,500+ matters of police-related litigation (see Exhibit "A"), wherein I have testified at deposition or trial in hundreds of cases (see Exhibit "C") on whether or not a particular fact pattern was objectively reasonable under the totality of circumstances.

7. My use of certain terms (i.e. – "negligent", "reasonable suspicion", "probable cause", "objectively reasonable", "deliberately indifferent", "ratified", "unconstitutional", etc.) merely reflects my training and experience, in applying reasonable standards of care to police officers' conduct, and does not presume or imply a statement of any legal opinion.

8. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the following facts appear to be undisputed in the record:

- a. The PPD is a small police department of 17 officers serving a population of 5 373 in Northern Wyoming:
    - 1) The administration consists of a Chief and 3 Sergeants,

    2) They are not large enough to have and do not have a SWAT team,

    3) As is obvious from the documentation in this matter, they do not have expertise in drug enforcement;

b. Nevertheless, PPD Officer Chad Miner engaged a confidential informant (CI) to learn of an alleged marijuana *"grow operation"* in plaintiff's home:

    1) The CI had previously lived in plaintiff's home but had been *"kicked out"*,

        a) The CI's information about marijuana in plaintiff's home was at least a month old,

        b) There is no information in the record or Officer Miner's affidavit that establishes the CI's reliability,

    2) Officer Miner enlisted the advice of PCSO Lieutenant Dave Patterson, who apparently has drug enforcement expertise, and, after interviewing the CI, he concluded:

        a) This *"sounded like a small one light growing operation and a small amount of starter plants"* (there would prove to be a total of only 2),

        b) That *"if a warrant was obtained"*, it could be served *"similar to a knock and talk"*,

        c) He declined to have PCSO personnel participate;

c. There was no allegation that plaintiff was engaged in the sale of marijuana;

d. There was no history of violence for plaintiff, her husband or their home and criminal history record information (CHRI) was not sought in advance;

e. A search warrant was obtained:

    1) Service was limited to the waking hours of *"between 6:00 AM and 10:00 PM"*,

    2) There was no exception to the *"knock and announce"* requirement;

f. It was believed that a *"male child"* was in the home;

g. Sergeant Michael Chretien assumed responsibility for *"organizing the initial entry"* into plaintiff's home and *"decided to take extra precautions"*:

    1) He literally cobbled together a makeshift SWAT team, using 16 of the PPD's 17 officers (apparently only the Chief was absent but had presumably been informed):

        a) They were apparently armed with automatic weapons,

        b) There is no evidence in the record available thus far of these officers having any SWAT training and/or experience to conduct such an operation,

    2) Entry was to be through the front door of plaintiff's home:

        a) The entry team was to knock and announce,

   b) If the door did not *"open immediately, we would use a ram to force entry"* (plaintiff was sitting on her couch next to the front door but never had time to answer before her *"front door was busted open"*),

  3) Diversionary tactics were also to be used:

   a) The back door was to be secured by officers, who were to also break a window,

   b) Additional officers were to break a bedroom window and throw a flash/bang into the home (these grenades ignite at 2700° centigrade and, not surprisingly, immediately started a fire);

 h. The *"grow operation"* amounted to *"two marijuana plants underneath a light with a fan blowing on them"*.

9. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the search warrant was obtained without adequate information and the service thereof was fundamentally flawed. In reaching that conclusion I was especially mindful of the following information from the record:

 a. All of the information previously described herein;

 b. There was absolutely no basis upon which to establish the CI's reliability:

  1) His information was not reasonably current,

  2) He had not been engaged in a controlled buy,

  3) Accordingly, there is no evidence or even an allegation in the search warrant affidavit that he had been previously proven to be reliable;

 c. Plaintiff was not given even the slightest but requisite opportunity to respond to the knock and announce, before her door was forcibly breached.

10. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that plaintiff was the victim of objectively unreasonable excessive force. In reaching that conclusion, I was specifically mindful of the following information from the record:

 a. All of the information previously described herein;

 b. According to plaintiff, who was home alone and wearing only pajamas, while watching television:

  1) She immediately raised her *"hands in the air"*, submitted to the officers' questions, informed them that no one else was home and was compliant/submissive but, nevertheless, she was continually held thereafter at gunpoint,

  2) She was forced ahead of the officers searching her home, while still held at gunpoint, as a literal human shield,

  3) When plaintiff briefly stopped on the stairs down to the basement, the officers raised their weapons to the ready position and pointed them at her head;

   c. Nearly the entire complement of PPD officers was deployed in this SWAT configured operation, however:
      1) There was no evidence of prior drug trafficking from the home,
      2) There was no history of violence for the known occupants of the home or on those premises,
      3) There was no objective threat to the officers or general public;
   d. Plaintiff was not given even the slightest but requisite opportunity to answer the knock and announce before her door was forcibly breached;
   e. Such an outrageous and gratuitous application of police force, under the indisputable facts of this operation, was excessive per se:
      1) Such an operation would be perhaps understandable, if mounted against the fortified drug house of a major crack dealer in East Los Angeles,
      2) The totality of circumstances in this case, however, more probably than not indicates that some small town police officers wanted to seem engaged in big city police work and blew a relatively insignificant enforcement situation out of all reasonable proportion (otherwise, this fact pattern is essentially inexplicable),
      3) Plaintiff has also reported, *"One officer was posing for the camera by standing on one leg, holding his hands in the air with his fingers making the 'rock and roll' sign and sticking out his tongue in front of the house",* while other officers were *"laughing and joking"*;
   f. Setting plaintiff's bedroom on fire was recklessly unnecessary but certainly foreseeable:
      1) Use of a flash/bang was wholly out of proportion to the afore described circumstances,
      2) Additional but unnecessary property damage to plaintiff's home can best be described as officer-involved vandalism;
   g. Further and most specifically:
      1) Continually pointing guns at plaintiff, who was obviously and certainly believed to be unarmed, was clearly unreasonable and an impermissible use of excessive force:
         a) The severity of the crime was minimal at most,
         b) There was no immediate threat to the officers or others,
         c) Plaintiff made no attempt to resist or flee,
         d) Accordingly, the officers were not required to make split-second judgments under circumstances that were tense, uncertain and rapidly evolving
      2) Using plaintiff as a human shield was so outrageous and contrary to police practice as to be unconscionable:
         a) Police do not use hostages to protect themselves and have a fundamental duty to protect people who they have taken into custody,

      b) If, as the officers were apparently contemplating, some armed threat had appeared before them, plaintiff would have undoubtedly been caught in the resulting crossfire and killed or seriously injured;

h.  Although emotional trauma is beyond my expertise, police officers are well aware that unnecessarily pointing guns at people not only puts them at risk of death or serious injury but is also a terrifying personal experience.

    11.  I am prepared to testify to these opinions at deposition or trial, if called upon to do so.

    12.  When I am provided with further documentation for my review, I may have additional opinions.

*/s/ D.P. VAN BLARICOM*

Appendix 3

**D.P. VAN BLARICOM, Inc.**
MPA, FBI-NA, CHIEF of POLICE (Ret)
*POLICE PRACTICES EXPERT*
835 – 91ST lane N.E.
Bellevue, Washington 98004-4811
(425) 453-0082 FAX 453-3263 E-Mail dvbinc@aol.com

### Federal Rule 26 (a) (2) (B)
### REPORT OF PLAINTIFF'S POLICE PRACTICES EXPERT
### September 16, 2010 – Amended December 31, 2010

    1. My name is D.P. Van Blaricom and I make this report on behalf of plaintiff in the U.S. District Court of Wyoming 10-CV-041-J filing of *Wachsmuth v. City of Powell, et al.* under my file 10-1601.

    2. My law enforcement career has spanned over fifty-three years of active employment to date:
   a. Twenty-nine years of continuous police service, during which I was the Chief of Police of Bellevue, Washington for the last eleven of those years;
   b. Thereafter, I have been engaged as a police practices consultant for an additional twenty-four years.

    3. A detailed statement of my qualifications, experience, training and a list of all of my publications are attached hereto as Exhibit "A". Both my fee schedule for services and a list of my deposition and trial testimony for the preceding four years are attached hereto as Exhibits "B" and "C" respectively. My areas of expertise in the police arts and sciences include but are not limited to: police administration, policies, practices, procedures and standards of care; police use of force; internal investigation and discipline. As a police practices expert, I have testified in state and federal courts for both plaintiffs and defendants throughout the United States.

    4. Jeff Gosman retained my services on September 9, 2010 to review the facts and circumstances of a search warrant service on Tricia Wachsmuth's home by City of Powell Police Department (PPD) officers (defendants) on February 24, 2009 (Tuesday) at 2116 hours (9:16 PM). I have discussed the matter with plaintiff's counsel and this report was prepared in reliance upon my review of the following documents:
   a. Notice of Claim;
   b. Complaint;
   c. Defendants':
      1) Answers (2),
      2) Entry of Appearance (2),
      3) Notice of Non-Complexity (2);
   d. PPDS reports 09-223;
   e. Powell County Sheriff's Office (PCSO) reports 09-231;
   f. Computer Aided Dispatch (CAD) report 090224086;
   g. Depositions:
      1) Chief Timothy Feathers,
      2) Sergeant Mike Cretien,

2

     3) Officer Chad Miner,
     4) Officer Matt McCaslin:
       a) Exhibit #27 – Patrol Officer Specialized Tactics Course,

       b) Exhibit #35 – PPD in-service training,
     5) Park County Sheriff's Office (PCSO) Lieutenant David
      Patterson;
  h. Officers' training records.
  5. It is my customary practice to evaluate the objective reasonableness of police conduct on a case-by-case basis from the perspective of a former Chief of Police, career law enforcement officer and nationally recognized police practices expert (see Exhibit "A").  In conducting that evaluation I apply:
    a. My training and experience as a police officer, who was required to serve search warrants in the performance of my law enforcement duties;
    b. My training and experience as a police supervisor, who was assigned to conduct internal investigations;
    c. My training and experience as a police supervisor and commander, who was assigned to train police officers on use of force and arrest, search and seizure;
    d. My training and experience as a police supervisor and commander, who had to evaluate the performance of my subordinate police officers;

    e. My training and experience as a chief of police, who had to hire, train, assign, administer and, as may be necessary, discipline and/or terminate police officers;
    f. My training and experience as a chief of police, who had to develop and administe· policies and procedures for directing police officers under my command;
    g. My training and experience as a chief of police, who had to review internal investigations and make the final administrative decision on whether to sustain or not sustain allegations of misconduct;
    h. My service as an elected city council member, after my retirement as chief of police;
    i. My continuing training, as is supplemented by an ongoing review of professional publications, that addresses contemporary developments in my areas of expertise;
    j. Additionally, I have served as a police practices expert in 1,500+ matters of police-related litigation (see Exhibit "A"), wherein I have testified at deposition or trial in hundreds of cases (see Exhibit "C") on whether or not a particular fact pattern was objectively reasonable under the totality of circumstances.
  6. My use of certain terms (i.e. – *"negligent"*, *"reasonable suspicion"*, *"probable cause"*, *"objectively reasonable"*, *"deliberately indifferent"*, *"ratified"*, *"unconstitutional"*, etc.) merely reflects my training and experience, in applying

3

reasonable standards of care to police officers' conduct, and does not presume or imply a statement of any legal opinion.

7. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the following facts appear to be undisputed in the record:

   a. The PPD is a small police department of 17 officers serving a population of 5,373 in Northern Wyoming:
      1) The administration consists of a Chief and 3 Sergeants,
      2) They are not large enough to have and do not have a SWAT team,
      3) As is obvious from the documentation in this matter, they do not have expertise in drug enforcement;

   b. Nevertheless, PPD Officer Chad Miner engaged a confidential informant (CI) to learn of an alleged marijuana *"grow operation"* in plaintiff's home:
      1) The CI had previously lived in plaintiff's home but had been *"kicked out"*,
         a) The CI's information about marijuana in plaintiff's home was at least a month old,
         b) There is no information in the record or Officer Miner's affidavit that establishes the CI's reliability,
      2) Officer Miner enlisted the advice of PCSO Lieutenant Patterson, who apparently has drug enforcement expertise, and, after interviewing the CI, he concluded:
         a) This *"sounded like a small one light growing operation and a small amount of starter plants"* (there would prove to be a total of only 2),
         b) That *"if a warrant was obtained"*, it could be served *"similar to a knock and talk"*,
         c) He declined to have PCSO personnel participate;

   c. There was no allegation that plaintiff was engaged in the sale of marijuana;

   d. There was no history of violence for plaintiff, her husband or their home and criminal history record information (CHRI) was not sought in advance;

   e. A search warrant was obtained:
      1) Service was limited to the waking hours of *"between 6:00 AM and 10:00 PM"*,
      2) There was no exception to the *"knock and announce"* requirement;

   f. It was believed that a *"male child"* was in the home;

   g. Sergeant Michael Chretien assumed responsibility for *"organizing the initial entry"* into plaintiff's home and *"decided to take extra precautions"*:

4

    1) He literally cobbled together a makeshift SWAT team, using 16 of the FPD's 17 officers (apparently only the Chief was absent but had presumably been informed) and they were apparently armed with automatic weapons;

    2) Although, Officer McCaslin claims to have been trained in the use of flash bangs:

        a) There is no records of any such training (the supposed training was conducted in Powell but Chief Feathers says the training was provided in Cody),

        b) He was admittedly not certified to deploy the device,

    3) Entry was to be through the front door of plaintiff's home:

        a) The entry team was to knock and announce,

        b) If the door did not *"open immediately, we would use a ram to force entry"* (plaintiff was sitting on her couch next to the front door but never had time to answer before her *"front door was busted open"*),

    4) Diversionary tactics were also to be used:

        a) The back door was to be secured by officers, who were to also break a window,

        b) Additional officers were to break a bedroom window and throw a flash/bang grenade into the home (these devices ignite at 2700° centigrade and, not surprisingly, immediately started a fire);

h. The *"grow operation"* amounted to *"two marijuana plants underneath a light with a fan blowing on them"*.

    8. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that the search warrant was obtained without adequate information and the service thereof was fundamentally flawed. In reaching that conclusion I was especially mindful of the following information from the record:

    a. All of the information previously described herein;

    b. There was absolutely no basis upon which to establish the CI's reliability:

        1) His information was not reasonably current,

        2) He had not been engaged in a controlled buy,

        3) Accordingly, there is no evidence or even an allegation in the search warrant affidavit that he had been previously proven to be reliable;

    c. Plaintiff was not given even the slightest but requisite opportunity to respond to the knock and announce, before her door was forcibly breached;

    d. The flash bang grenade was deployed with reckless indifference:

        1) Thrown through a window onto a bed,

5

> 2) A "child" was believed to be in the home and Officer McCaslin, who threw the flash bang grenade, could not see inside but knew it was a bedroom.

9. Based upon my training, experience and a careful evaluation of the totality of circumstances in this matter, it is my considered professional opinion that plaintiff was the victim of objectively unreasonable excessive force. In reaching that conclusion I was specifically mindful of the following information from the record:

- a. All of the information previously described herein;
- b. According to plaintiff, who was home alone and wearing only pajamas, while watching television:
    1) She immediately raised her "hands in the air", submitted to the officers' questions, informed them that no one else was home and was compliant/submissive but, nevertheless, she was continually held thereafter at gunpoint,
    2) She was forced ahead of the officers searching her home, while still held at gunpoint, as a literal human shield,
    3) When plaintiff briefly stopped on the stairs down to the basement, the officers raised their weapons to the ready position and pointed them at her head;
- c. Nearly the entire complement of PPD officers was deployed in this SWAT configured operation, however:
    1) There was no evidence of prior drug trafficking from the home,
    2) There was no history of violence for the known occupants of the home or on those premises,
    3) There was no objective threat to the officers or general public;
- d. Even Chief Feathers, who approved of the "general plan" has testified in his deposition, "This was not what I would call and extremely high-risk critical incident", such as would justify the used of a "SWAT team", but the operation "share(d) some common ground in equipment, tactics" with a 'SWAT-type entry" (page 170 lines 8-23);
- e. Plaintiff was not given even the slightest but requisite opportunity to answer the knock and announce before her door was forcibly breached;
- f. Such an outrageous and gratuitous application of police force, under the indisputable facts of this operation, was excessive per se:
    1) Such an operation would be perhaps understandable, if mounted against the fortified drug house of a major crack dealer in East Los Angeles,
    2) The totality of circumstances in this case, however, more probably than not indicates that some small town police officers wanted to seem engaged in big city police work and blew a relatively insignificant enforcement situation out of all

6

reasonable proportion (otherwise, this fact pattern is essentially inexplicable),

3) Plaintiff has also reported, *"One officer was posing for the camera by standing on one leg, holding his hands in the air with his fingers making the 'rock and roll' sign and sticking out his tongue in front of the house"*, while other officers were *"laughing and joking"*;

g. Setting plaintiff's bedroom on fire was recklessly unnecessary but certainly foreseeable:

1) Use of a flash/bang was wholly out of proportion to the afore described circumstances,

2) Additional but unnecessary property damage to plaintiff's home can best be described as officer-involved vandalism;

h. Further and most specifically:

1) Continually pointing guns at plaintiff, who was obviously and certainly believed to be unarmed, was clearly unreasonable and an impermissible use of excessive force:

a) The severity of the crime was minimal at most,

b) There was no immediate threat to the officers or others,

c) Plaintiff made no attempt to resist or flee,

d) Accordingly, the officers were not required to make split-second judgments under circumstances that were tense, uncertain and rapidly evolving

2) Using plaintiff as a human shield was so outrageous and contrary to police practice as to be unconscionable:

a) Police do not use hostages to protect themselves and have a fundamental duty to protect people who they have taken into custody,

b) If, as the officers were apparently contemplating, some armed threat had appeared before them, plaintiff would have undoubtedly been caught in the resulting crossfire and killed or seriously injured;

i. Although emotional trauma is beyond my expertise, police officers are well aware that unnecessarily pointing guns at people not only puts them at risk of death or serious injury but is also a terrifying personal experience;

j. A refreshingly candid analysis of this incident, with which I agree, is contained in the deposition testimony PCSO Lieutenant Patterson, who is both knowledgeable and local:

1) The *"proper informant protocol"* had not been followed (page 36 line 24-25 and page 37 lines 1-7),

2) He had suggested *"getting a warrant in hand and doing it like a knock-and-talk"* but it was apparent *"that wasn't going to happen"* (page 39 lines 8-11),

7

   3) He told Officer Miner that there was no hurry to take down a
      *"grow"* but (page 39 lines 21-25 and page 40 lines 1-15:
         a) Officer Miner *"had indicated that he had a lot of heat
            from admin*(istration), *that they were on his ass, and he
            wanted to get this done"*,
         b) Officer Miner *"said something to the effect that he
            needed to boot a door"*,
   4) He told his sheriff, *"I didn't think that it was anything that we*
      (PCSO) *would want to deploy SRG* (special response Group –
      SWAT) *on"* (page 45 lines 23-25),
   5) Placing plaintiff at risk, after she was in-custody, was *"not
      acceptable"* (page 57 lines 9-17),
   6) In summary and after becoming aware of how the PPD intended
      to proceed, he *"decided to walk away"* (page 96 lines 2-6),

   7) The mere factors of *"guns in the house"* and an occupant of the
      target home supposedly being in *"some mental state"* do not
      alone justify a *"dynamic entry"* (page 133 line25 and page 134
      lines 1-25);
k. As previously described herein, this whole operation was
   fundamentally flawed from outset to completion!
      10. Based upon my training, experience and a careful evaluation of the
totality of circumstances in this matter, it is my considered professional opinion
that Chief Feathers has knowingly ratified the previously described misconduct of
his officers as being within the custom, policy and practice of the PPD. In
reaching that conclusion I was specifically mindful of the following information
from the record:
a. All of the information previously described herein;
b. Chief Feathers admittedly was briefed by Sergeant Cretein and
   approved his plan for service of the search warrant;
c. Thereafter, Chief Feathers:
   1) Determined or should have determined that his officers did more
      probably than not officially acted as described herein,
   2) Knew or should have known that his officers were acting within
      the scope of their employment,
   3) Knew or should have known that his officers' conduct was
      unconstitutional:
         a) They did not provide plaintiff with an opportunity to
            respond to their knock and announce before forcing
            entry to her home,
         b) They used objectively unreasonable excessive force
            against plaintiff,
   4) Nevertheless, Chief Feathers expressly, consciously and
      affirmatively approved of his officers' conduct toward plaintiff;

8

      d. Accordingly, Chief Feathers has ratified his officers' unconstitutional conduct toward plaintiff, as being within the custom, policy and practice of the PPD.

    11. I am prepared to testify to these opinions at deposition or trial, if called upon to do so.

    12. When I am provided with further documentation for my review, I may have additional opinions.

*/s/ D.P. VAN BLARICOM*

# Appendix Twenty Two

SUBMITTED BY:
JEFFREY C. GOSMAN
**GOSMAN LAW OFFICE**
PO Box 51267
Casper, WY 82601-2481
(307) 265-6715 (**fax.**)
(307) 265-3082 (ph.)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TRICIA WACHSMUTH,<br><br><div align="center">Plaintiff,</div><br>vs.<br><br>City of Powell, and in their individual capacity,<br>Tim Feathers, Chad Miner,<br>Mike Chretien,Roy Eckerdt, Dave Brown,<br>Mike Hall, Brett Lara, Matt McCaslin,<br>Alan Kent, Matt Danzer, Officer Brilakis,<br>Lee Blackmore, Cody Bradley, Kirk Chapman<br>John Does #1 - #4<br><br><div align="center">Defendants</div> | CASE NO. **10 CV 041J** |

## SWORN DECLARATION OF TRICIA WACHSMUTH

*Comes Now*, Tricia Wachsmuth, and makes this declaration under penalty of perjury:

1.  Your affiant is under no disability, is competent to testify, and has personal knowledge of all matters contained herein.

2.  Your affiant is the Plaintiff herein.

3.    The total distance from where I was sitting on the couch at the time the officers entered my home and the front door is about four feet.

4.    I did not have time to make any movement from my position on the couch before the officers had rammed the door and were entering the house.

5.    I had my hands in the air as soon as I gave up my cell phone, and I did everything the officers told me to do.

6.    Your affiant has reviewed the weapon positions outlined in exhibit 11 to the depositions, which is attached hereto.

7.    After clearing the upstairs portion of my house, which took approximately five minutes, all the officers assembled in the living room and kitchen and those with rifles pointed their weapons at me in the ready position, except for the officer that was standing next to me. That officer, held his weapon in the weapon position as exhibited in Exhibit 11 to the depositions and pointed it at my head.

8.    This exhibit 11 contains drawings which accurately depict the way in which the officers held their weapons in the last two of the pictures shown in the exhibit, the ready position and the weapon position.

9.    Other officers had come into the house by the time the group assembled in my living room and kitchen.

10.     All of the officers who were in the house were present in the living room or the kitchen when Chretien informed me that I would be leading them downstairs.

11.     All the officers heard Chretien order me down stairs first. I could tell this because his voice was loud, the rooms are small, and his voice was clear.

12.     As I was going down the stairs, when I turned and rested against the wall, I could see the line of officers behind me.

13.     As I stopped, all of them carrying the rifles raised their weapons to the weapon position and pointed them at my torso and head.

14.     There were six to eight persons who were behind me.

15.     Officer Miner, handcuffed me, at the bottom of the stairs. I was not handcuffed prior to that time.

16.     Officer Miner was right behind the other officers who went past me at the bottom of the stairs.

17.     I estimate the time that I was being held at gunpoint at ten minutes.

**I declare and certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on Friday, January 7, 2011**

_Tricia Wachsmuth_
Tricia Wachsmuth

Wachsmuth v. City of
Powell— CV 10-041J
Plaintiff's Exhibit
# _____11_____



Relaxed Carry



Ready Position

DEFENDANTS 000449



Weapon Presentation

DEFENDANTS 000450