Bruce Salzburg
Wyoming Attorney General

John Renneisen
Deputy Attorney General

Misha Westby – WY Bar No. 6-2826
Cathleen D. Parker –WY Bar No. 6-3236
Senior Assistant Attorney General
2424 Pioneer Ave., 2nd Floor
Cheyenne, WY 82002
T: (307) 777-5457
F: (307) 777-8920
E: mwestb@state.wy.us

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| Tricia Wachsmuth, | ) | |
| | ) | |
| Plaintiff, | ) | 10-CV-041-J |
| | ) | |
| vs. | ) | |
| | ) | |
| City of Powell, Tim Feathers, Chad Miner, | ) | |
| Mike Chretien, Roy Eckerdt, Dave Brown, | ) | |
| Mike Hall, Brett Lara, Matt McCaslin, | ) | |
| Alan Kent, Matthew Danzer, Officer Brilakis, | ) | |
| Lee Blackmore, Cody Bradley, Kirk Chapman, | ) | |
| | ) | |
| Defendants. | ) | |

## INDIVIDUAL DEFENDANTS PRETRIAL MEMORANDUM

The Individual Defendants, by and through the Wyoming Attorney General's Officer, hereby present their Final Pretrial Memorandum in accordance with the Rules and the Court's scheduling orders.

# I.  JURISDICTION AND PARTIES

This Court has jurisdiction over Plaintiffs civil rights claims pursuant to 28 U.S.C. § 1331 and 1343(a)(2)(3) and (4).   Plaintiffs have failed to plead any actionable state law claim and therefore this Court lacks subject matter jurisdiction over all state law claims.

# II.  GENERAL NATURE OF THE CLAIMS OF THE PARTIES

On February 24, 2009, Officer Miner of the Powell Police Department was contacted by an individual claiming to have information about a marijuana grow operation at the Wachsmuth residence.  The informant explained why he was coming forward and the information was verified by Officer Miner.  The informant was then interviewed by Officer Miner, Sheriff's Deputy Patterson and Assistant County Attorney Davis.  Patterson was brought in because of his experience with drug investigations and the initial report run by Officer Miner on the Wachsmuths' showed their address in the county.  The deputy prosecuting attorney assisted law enforcement in the interview preparing the affidavit for the search warrant.  The search warrant was signed by Judge Waters.

Officer Miner contacted his superiors and a team was gathered to execute the search warrant.  Sgt. Chretien was assigned to organize the team based on the high risk nature of the warrant and his experience with tactical operations. The information provided by the informant and relied on in analyzing the manner of executing the search warrant was as follows:

- the Wachsmuths had a marijuana grow operation with 10-20 plants;

- the Wachsmuths exhibited paranoid behavior;

- the Wachsmuths were always "peeping" out the windows looking for law enforcement;

- there were several loaded weapons left lying around the house and Bret Wachsmuth sometimes carried a loaded .22 caliber pistol on his person;

- there was armor piercing ammunition in the home;

- Tricia's mother sent prescription medications mostly oxycodone and valium and the Wachsmuths crushed up the pills and injected or smoked the powder;

- The CI had warned them that they had been turned into the police.

Some of the officers also provided additional corroboration during the planning meeting:

- Officer Lara described a conversation with Tom Wachsmuth where Tom discussed his son, Bret Wachsmuth's, psychiatric and emotional issues;

- Sgt. Eckerdt informed the officers that he had seen a photograph on a social networking site of Bret Wachsmuth brother and another individual thought to be Bret in riot gear posing with assault weapons.

Several options were considered by Chief Feathers and Sgt. Kent for executing the warrant including not preparing for a contingency and getting Tom Wachsmuth involved in serving the warrant. A contemporaneous recording of a conversation between Sgt. Kent and Chief Feathers captures some of these discussions. Based on the high risk nature of the search warrant, the first option was not considered viable. There were also concerns about getting Tom Wachsmuth involved including the appearance that they were giving law enforcement special treatment, the possibility that Tom could be accused of warning his son and daughter-in-law if nothing was discovered in the search and the

possibility of introducing an uncertain variable that can cause an already potentially violent situation to spin out of control.  Even with these concerns, Chief Feathers made the decision that he would contact Tom Wachsmuth's supervisor Steve Hermann to ask his opinion about involving Tom in the execution of the search warrant.  Chief Feathers asked whether or not Tom Wachsmuth could be counted on to handle the situation appropriately.  Hermann responded that he would like to think so but he just wasn't sure. Based on Hermann's hesitation, Chief Feathers determined that involving Tom Wachsmuth in the execution of the search warrant was not a viable option.

Officer Chretien was assigned to plan the execution of the search warrant based on his experience with special operations.  The plan was to knock and announce, wait a reasonable amount of time for them to answer the door, and prepare for a dynamic entry if no one answered the door.  Officers were called and Sgt. Chretien organized a team to be stationed at the front door, a team to be stationed by the back door and a team to potentially deploy a flashbang device by the master bedroom window.

After the briefing, the officers went to the Wachsmuth residence and began getting into position.  As the front yard team assembled in front of the house, the dog in the Wachsmuth house began barking.  This caused a heightened level of awareness and concern for the officers since the element of surprise was lost.  As the front door team approached the porch, officers saw a woman sitting on the couch turn around, pull the curtain aside and peek out the window.  The officers were in clear view on the porch when the woman looked in their direction.  Officer Chapman knocked on the door,

announced "Police, search warrant."  Officer Hall observed the woman on the couch turn around and sit back down on the couch.  The Plaintiff testified that she was watching television and did not hear the knock but that she did look out the window and see someone on the porch.

After waiting a reasonable time, specifically long enough to allow the woman on the couch to open the door if she chose, Officer Miner used the ram to open the door and Officer Chapman entered the residence with the other officers behind him.  The officers at the side of the house, upon hearing that the door was rammed, raked the window, scanned the area immediately inside the window and deployed the flashbang device. Officer Chapman entered the front door with his weapon at the ready position, held to his shoulder with the barrel pointing forward and toward the ground.  Consistent with his training and standard police procedure, the gun was brought up and pointed when a potential threat was identified.  Immediately upon entering the living room, Officer Chapman identified the Plaintiff heading away from the front door and towards the kitchen.  He pointed his weapon at her briefly until he analyzed the threat, put his weapon down and told her to sit back on the couch.

The other officers on the entry team entered the house and fanned out to secure the residence.  Officer Eckerdt stayed with Tricia during this process and never pointed his weapon at Tricia.  In fact, none of the officers ever pointed their weapons at her after the initial entry and identification of possible threats.  Although Tricia testifies that the officers all had their weapons trained at her head for a majority of the time while they

were clearing the house and going downstairs, she also testifies that she had her back to them and could not see them and that they were "lined up" behind her on a narrow stairway necessitating each officer in line pointing his weapon at the officer in front of him as well as Tricia.

When the officers came to the basement door, they realized that the door was unlocked and informed Sgt. Cretien. Sgt. Cretien asked Tricia if anyone was downstairs and when she hesitated asked her again. In an effort to determine whether or not she was telling the truth, Sgt. Chretien called her bluff and said something to the effect of "good, you're going first." The Plaintiff then jumped up, surprising the officers, went to the basement door, opened it and flipped on the light stating, "see there is no one else here." She then proceeded downstairs, again surprising the officers by the door who began following her downstairs until they could get around her at the landing and clear the basement. The officers did not point their weapons at the Plaintiff but instead had them pointed down or into the opening to the basement off to the side of the staircase.

The Plaintiff was then "arrested" and "cuffed" on the landing and taken back upstairs. She was allowed to get her shoes and coat, taken out to one of the squad cars and eventually to the Powell Police Department.

During the search of the Wachsmuth home, officers found, in part, loaded weapons placed strategically around the house, including the book shelves in the hall and in the master bedroom, marijuana and drug paraphernalia on the living room table as well as in the bedroom and two mature two feet tall marijuana plants. Police also found a

grow log, which Bret Wachsmuth admits fairly represents the history of the grow operation, that supported the CI's statement that there were between ten and twenty plants shortly before the search warrant was executed.[1]   There were also references in the logs to pricing and potentially selling the marijuana.   Officers found a bullet proof vest in the closet, prescription bottles and a box with a stuffed animal with the seam ripped open and a letter to Tricia Wachsmuth's mother.   The officers also found a baggie containing cocaine residue that was confirmed by a DCI lab analysis report.   In short, all of the information provided as the basis for the search warrant was confirmed during the search of the residence.

The damage to the house was only that damage necessary to the execution of the warrant.   There was damage to the front door and a broken window in the bedroom. There is no claim of fire or smoke damage and the house did not catch on fire.   There were powder marks to the wall and scorch marks on a pillow and bedspread from the flashbang device and the bathroom door was dented when officers tried to get the door open during the clearing of the house.

The Plaintiff, as well as her husband, was arrested and charged as a result of evidence found pursuant to the search warrant.   She pled guilty and was given a 301 deferred sentence.

---

[1] One mature plant was discarded because it was a male and approximately 8 to 10 starter plants died.

**A.     Plaintiff's Claims**

1. Fourth Amendment, unreasonable search and seizure, overall executing of the search warrant.

2. Fourth Amendment, use of the flashbang device constituted excessive force.

3. Excessive force, "using Plaintiff as a human shield."

4. Excessive force, holding Plaintiff at gunpoint during the search of the premises.  The Court has granted summary judgment to the officers on this claim.

5. Allegation of use of excessive force, failing to knock and announce.

6. Failure to properly supervise and train his officers against Chief Feathers

7. Count seven and eight are only asserted against the entity

8. Counts nine and ten assert liability for intentional infliction of emotional distress.  The Court has granted summary judgment to all Defendants on this claim.

9. Finally, the Plaintiff attempts to state a cause of action under Article 1 § 4 of the Wyoming Constitution.  The Court has granted summary judgment to all Defendants on this claim.

**B.     Defendants Contentions**

1. The Defendants assert that all actions were objectively reason under the totality of the circumstances.

2. That all use of force was reasonable, appropriate and consistent with the relevant police practices and standards.

3. That the officers are entitled to qualified immunity on the basis of no constitutional violation as well as the fact that the law is not clearly established.

    4.   The State law claims are barred by the Wyoming Governmental Claims Act and the relevant Wyoming case law.

## III.  UNCONTROVERTED FACTS

1.    On February 24, 2009, Officer Miner of the Powell Police Department was contacted by an individual claiming to have information about a marijuana grow operation at the Wachsmuth residence.

2.    The informant explained why he was coming forward and the information was verified by Officer Miner.

3.    The informant was then interviewed by Officer Miner, Sheriff's Deputy Patterson and Assistant County Attorney Davis.

4.    Patterson was brought in because of his experience with drug investigations and the initial report run by Officer Miner on the Wachsmuths' showed their address in the county.

5.    The deputy prosecuting attorney assisted law enforcement in the interview and in preparing the affidavit for the search warrant.

6.    The deputy prosecuting attorney was also present for some of the planning of the search warrant and went to the house with the officers.

7.    The search warrant was signed by Judge Waters.

8.    Officer Miner contacted his superiors and a team was gathered to execute the search warrant.

9.    Sgt. Chretien was assigned to organize the team based on the high risk nature of the warrant and his experience with tactical operations.

10.    The information provided by the informant and relied on in analyzing the manner of executing the search warrant was as follows:

- the Wachsmuths had a marijuana grow operation with 10-20 plants;

- the Wachsmuths exhibited paranoid behavior;

- the Wachsmuths were always "peeping" out the windows looking for law enforcement;

- there were several loaded weapons left lying around the house and Bret Wachsmuth sometimes carried a loaded .22 caliber pistol on his person;

- there was armor piercing ammunition in the home;

- Tricia's mother sent prescription medications mostly oxycodone and valium and the Wachsmuths crushed up the pills and injected or smoked the powder;

- The CI had warned them that they had been turned into the police.

11.   Some of the officers also provided additional corroboration during the planning meeting:

- Officer Lara described a conversation with Tom Wachsmuth where Tom discussed his son, Bret Wachsmuth's, psychiatric and emotional issues;

- Sgt. Eckerdt informed the officers that he had seen a photograph on a social networking site of Bret Wachsmuth brother and another individual thought to be Bret in riot gear posing with assault weapons.

12.   Several options were considered by Chief Feathers and Sgt. Kent for executing the warrant including not preparing for a contingency and getting Tom Wachsmuth involved in serving the warrant.

13.   A contemporaneous recording of a conversation between Sgt. Kent and Chief Feathers captures some of these discussions.

14.   Based on the high risk nature of the search warrant, the first option was not considered viable.

15.   There were also concerns about getting Tom Wachsmuth involved including the appearance that they were giving law enforcement special treatment, the possibility that Tom could be accused of warning his son and daughter-in-law if nothing

was discovered in the search and the possibility of introducing an uncertain variable that can cause an already potentially violent situation to spin out of control.

16.     Even with these concerns, Chief Feathers made the decision that he would contact Tom Wachsmuth's supervisor Steve Hermann to ask his opinion about involving Tom in the execution of the search warrant.

17.     Chief Feathers asked whether or not Tom Wachsmuth could be counted on to handle the situation appropriately, Hermann responded that he would like to think so but he just wasn't sure.

18.     Based on Hermann's hesitation, Chief Feathers determined that involving Tom Wachsmuth in the execution of the search warrant was not a viable option.

19.     Officer Chretien was assigned to plan the execution of the search warrant based on his experience with special operations.

20.     The plan was to knock and announce, wait a reasonable amount of time for them to answer the door, and prepare for a dynamic entry if no one answered the door.

21.     Officers were called and Sgt. Chretien organized a team to be stationed at the front door, a team to be stationed by the back door and a team to potentially deploy a flashbang device by the master bedroom window.

22.     After the briefing, the officers went to the Wachsmuth residence and began getting into position.

23.     As the front yard team assembled in front of the house, the dog in the Wachsmuth house began barking.

24.     This caused a heightened level of awareness and concern for the officers since the element of surprise was lost.

25.     As the front door team approached the porch, officers saw a woman sitting on the couch turn around, pull the curtain aside and peek out the window.

26.     The officers were in clear view on the porch when the woman looked in their direction.

27.    Officer Miner used the ram to open the door and Officer Chapman entered the residence with the other officers behind him.

28.    The officers at the side of the house, upon hearing that the door was rammed, raked the window, scanned the area immediately inside the window and deployed the flashbang device.

29.    The officers on the entry team entered the house and fanned out to secure the residence.

30.    One of the officers stayed with Tricia during this process.

31.    When the officers came to the basement door, they realized that the door was unlocked and informed Sgt. Cretien.

32.    Tricia went at least part of the way down the basement stairs until officers went around her and began clearing the basement.

33.    The Plaintiff was then "arrested" and "cuffed" on the landing and taken back upstairs.

34.    She was allowed to get her shoes and coat, taken out to one of the squad cars and eventually to the Powell Police Department.

35.    During the search of the Wachsmuth home, officers found, in part, loaded weapons placed strategically around the house, including the book shelves in the hall and in the master bedroom, marijuana and drug paraphernalia on the living room table as well as in the bedroom and two mature two feet tall marijuana plants.

36.    Police also found a grow log, which Bret Wachsmuth admits fairly represents the history of the grow operation, that supported the CI's statement that there were between ten and twenty plants shortly before the search warrant was executed.

37.    Officers found a bullet proof vest in the closet, prescription bottles and a box with a stuffed animal with the seam ripped open and a letter to Tricia Wachsmuth's mother.

38.    In short, all of the information provided as the basis for the search warrant was confirmed during the search of the residence.

39.     The damage by the flashbang was scorch marks on the bedding and a powder mark on the wall.

40.     The Plaintiff, as well as her husband, was arrested and charged as a result of evidence found pursuant to the search warrant.

41.     She pled guilty and was given a 301 deferred sentence.

42.     The Plaintiff suffers from a long history of psychological issues, including serious depression, self mutilation and personality disorders predating this incident.

## IV.     CONTESTED ISSUES OF FACT

1.     Whether the officers knocked and announced when they arrived.

2.     When weapons were pointed at the Plaintiff during the clearing and search.

3.     The circumstances under which the Plaintiff went downstairs.

4.     The preexisting damage to the home and the damage caused by the officers.

5.     Whether the Plaintiff suffered any kind of damages as a result of the execution of the search warrant.

## V.  CONTESTED ISSUES OF LAW

1.     Defendants maintain that the actions of the Officers were objectively reasonable and that no violation of Tricia Wachsmuth's constitutional rights occurred. Reasonableness is to be judged from the perspective of a reasonable officer on the scene, not 20/20 vision of hindsight. *Graham v. Connor*, 489 U.S. 386 (1989), *Marquez v. City of Albuquerque*, 399 F.3d 1216 (10th Cir. 2005). The perceptions of the officers were reasonable and are supported by the undisputed evidence in this case. They are also supported by a police practices expert and the Officers supervisors.

2.     That the Officers decision to prepare for a tactical entry if necessary was reasonable under the totality of the circumstances. *Holland v. Harrington,* 268 F.3d 1179, 1189 (10th Cir. 2001).

3.     That the Officers waited a reasonable amount of time after the knock and announce before ramming the door under the totality of the circumstances.

4.     That the Officers use of a flashbang device was reasonable and appropriate under the circumstances. *Kirk v. Watkins*, 182 F.3d 932 (10th Cir. 1999); *Whitewater v. Goss*, 192 Fed.Appx. 794 (10th Cir. 2006); *United States v. Myers,* 106 F.3d 936 (10th Cir. 1997).

5.     Whether the Officers actions were reasonable under the totality of the circumstances in light of the unexpected occurrence of the Plaintiff jumping up and going downstairs after Officers tried to call her bluff about who was in the basement.

6.     The Officers are entitled to qualified immunity given that the law is not clearly established and that the contours of the right must be sufficiently clear that the official would understand he is violating the right. *Anderson v. Creighton*, 483 U.S. 635 (1987).  There must be a U.S. Supreme Court or Tenth Circuit decision on point on the clearly established right. *Medina v. City and County of Denver*, 960 F.2d 1493 (10th Cir. 1992).

## VI.  WITNESSES

See Witness List attached hereto as Exhibit A.

All witnesses listed are may call witnesses since a determination about the necessity of calling them at trial depends on the Plaintiff's case.

The Defendants reserve the right to call any witness listed by the other parties in their final pretrial memorandum, self-executing discovery, and any subsequent witness list.  The Defendants further reserve the right to list additional witnesses upon discovery and within any time constraints set by the Court.

Defendants reserve the right to list or offer rebuttal, impeachment or foundation witnesses.  Defendants further reserve the right to object to, remove or add witnesses

based on the Court's rulings in the previously filed motions and/or any motions in limine filed in this case.

## VII.  EXHIBITS

See Exhibit List attached hereto as Exhibit B.

The Defendants reserve the right to use any exhibit listed by the other parties in their final pretrial memorandum, self-executing discovery, and any subsequent exhibit list.  The Defendants further reserve the right to list additional exhibits upon discovery and within any time constraints set by the Court.  The Defendants also reserve the right to enlarge, edit or modify any exhibit or to create demonstrative exhibits during the course of the trial.

Defendants reserve the right to list or offer rebuttal or impeachment exhibits. Defendants further reserve the right to object to, remove or add exhibits based on the Court's rulings in the previously filed motions and/or any motions in limine filed in this case.

## VIII.  DEPOSITIONS

The Defendants may call Dr. Miller by videotaped trial deposition at trial in lieu of live testimony since he will be out of the country during the trial.  The Defendants would also like to call Jonathan Davis by telephone or video conference since has moved to Oklahoma and is beyond the subpoena power of the Court.

## IX.   DISCOVERY

Discovery has been completed with the exception of the continuing duty to supplement and final updates will be provided to the Plaintiffs.

## X.   OTHER MATTERS

1.      The Plaintiff has listed a "rebuttal IME expert witness" who conducted an examination of the Plaintiff following the IME conducted by the Defendants in compliance with the Court's rules and scheduling order.  The Defendants object to the designation as simply a late filed expert witness.  There is no basis for allowing such "rebuttal expert" and the Plaintiff has already identified the Plaintiff's treating psychiatrist to testify as an expert in this case.  The Defendants will be filing a motion to strike the late designated expert.

2.      The Defendants have filed motions for summary judgment that have been heard by the Court.  The motions are currently pending before the Court.

3.      The parties have also filed Motions in Limine relevant to the admissibility of evidence and witnesses at trial.

## XI.   TRIAL TIME

The Court has allotted twelve (12) days for trial of this case.  Defendants anticipate it will take no longer than ten (12) days to try this case.

## XII.  SETTLEMENT

The parties are not discussing settlement at this time.  Defendants believe the possibility of settlement is poor.

DATED this 24th day of January, 2011.


/s/ Misha Westby
Misha Westby – WSB No. 6-2826
Senior Assistant Attorney General


/s/ Cathleen D. Parker
Cathleen D. Parker –WSB No. 6-3236
Senior Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of January, 2011, the foregoing was filed and served electronically using CM/ECF to the following individuals:

Jeffrey C. Gosman                         Tom Thompson
Gosman Law Office                         MacPherson, Kelly & Thompson
PO Box 51267                              PO Box 999
Casper, WY 82601-2481                     Rawlins, WY  82301-0999
E:  Jeffg@gosmanlawoffices.com            E:  tthompson@wyomingattorneys.net


/s/ Lee Ann Schutt
Office of the Wyoming Attorney General